# EXHIBIT 2



ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

July 11, 2017

Gregg M. Galardi
T +1 212 596 9139
gregg.galardi@ropesgray.com

**BY E-MAIL**

Chad Husnick
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
chad.husnick@kirkland.com

Re:  In re Energy Future Holdings Corp. Case No. 14-10979 (CSS)

Dear Chad:

    I write on behalf of Elliott Management Corporation in its capacity as an adviser to certain funds (together with Elliott Management Corporation, "Elliott") that hold over 74% of Energy Future Intermediate Holding Company LLC's ("EFIH") unsecured bonds, regarding (1) your July 7, 2017 letter on behalf of Energy Future Holdings Corp. ("EFH") and EFIH (the "Debtors"), and (2) the July 7, 2017 merger agreement contemplating a comprehensive transaction by and among Berkshire Hathaway Energy Company ("Berkshire") and the Debtors (the "Berkshire Agreement").

    Your July 7 letter states that the Debtors' boards of directors (the "Boards") are "acutely aware" of their fiduciary duty to maximize value for the Debtors' estates. Despite that assertion, the recent conduct of the Boards suggests otherwise and reflects a fundamental failure to discharge the fiduciary duties owed to all creditors. Most notably, the terms of the Berkshire Agreement, which contemplates approximately $9 billion in cash for the EFH and EFIH Debtors and an implied total enterprise valuation of approximately $18.1 billion for Oncor, are far inferior to the terms of the equitization plan proposed by Elliott and will result in a significant decrease in value for EFIH's creditors, including Elliott. As you well know, the current Berkshire Agreement – providing for the acquisition of the EFH and EFIH Debtors for $9 billion in cash – reflects a valuation that is hundreds of millions of dollars below Berkshire's bid from one year ago, despite both Oncor profits and valuations for publicly-traded regulated utilities being higher today versus one year ago. It similarly reflects a valuation markedly below what Elliott proposed pursuant to the creditor-led equitization plan that we have been discussing with you. It also reflects a valuation below current prevailing sector valuations for similar, very high-quality, high-growth assets. Simply speaking, the Boards' pursuit of the Berkshire Agreement without creditor input and support cannot be justified.

    The Debtors terminated the NextEra transaction Thursday night, simultaneously with execution of the Berkshire Agreement. Thus, there has been no period at all during which the

ROPES & GRAY LLP

Chad Husnick — - 2 - — July 11, 2017

Debtors have pursued a value-maximizing proposal with creditor input or support. The only courtesy provided to creditors was to convene hastily a conference call late at night to advise Elliott that the Berkshire Agreement was all but done, prior to then issuing a press release a couple of hours later. The Boards' fiduciary obligations require them not only to consider fully but also to aggressively pursue – on a level playing field – all available alternatives in order to maximize the value of the estates. *See, e.g.*, *In re Netsmart Techs., Inc., Shareholders Litig.*, 924 A.2d 171, 199 (Del. Ch. 2007) (holding that plaintiff was likely to succeed on fiduciary duty claim based on board's failure to "examine the universe of possible strategic buyers"). This has not been done in the instant case. Here, the Debtors jumped immediately from one sale transaction to the next one when they terminated the NextEra transaction and executed the Berkshire Agreement on the same day. The Debtors evidently prize quasi-exclusivity over the exploration of greater value for these estates and the reflection and consideration of creditor input. Importantly, the Debtors consistently rebuffed repeated requests by Elliott to have some participation in any discussions with Berkshire in order to pursue and facilitate a consensual resolution of these cases.

As a result, under the Berkshire Agreement, the EFIH creditors who were to receive approximately eighty cents on the dollar with the NextEra transaction are now estimated to recover a mere twenty-four cents, **at best**. In fact, the creditors' projected recovery is at risk of being substantially further reduced by the alleged $275 million termination fee potentially payable under the NextEra Merger Agreement, to which the Debtors allegedly agreed and for which the Debtors have received absolutely no benefit. Moreover, the Debtors are now seeking court approval of a reorganization plan proposed to be consummated in October, feigning their concern for preserving creditor recoveries while championing a far inferior plan.

The Debtors have claimed that they expect the proposed Berkshire plan to be merely a starting point, and not an ending point, in the process of maximizing creditor recoveries and that there is an expectation Berkshire will have to increase meaningfully the valuation and consideration that is paid in order to obtain the needed creditor consensus for the plan. However, there is no assurance that Berkshire will be willing to increase its offer in the future to a level that will maximize the value of the estates and accordingly obtain the needed creditor consensus. Therefore, the estates and their creditors must pursue executable alternatives in the event that the increases which will be needed in order for Berkshire's proposal to become capable of being consummated are not forthcoming.

The Debtors know full well, however, that obtaining the financing for an alternative plan proposed by creditors that would obtain both PUCT approval and Bankruptcy Court approval will take the Debtors' and Oncor's full cooperation. While Elliott's substantial efforts with the PUCT staff and Oncor to date, coupled with Elliott's willingness to commit a substantial amount of its own funds toward the exit financing needed to consummate a plan that it believes can be confirmed and consummated by year-end if not sooner are certainly helpful, as you know they are unlikely to be sufficient. The estates' creditors will naturally need assistance from their fiduciaries – the Debtors' boards and management (and advisors).

ROPES & GRAY LLP

Chad Husnick - 3 - July 11, 2017

To date, Elliott's efforts have proceeded while the Debtors have actually sought to hinder Elliott from pursuing alternative reorganization plans by insisting that Elliott is bound by the PIK PSA. However, as you well know, Elliott never signed the PIK PSA. Despite the obstacles thrown in its way by the Debtors, Elliott worked cooperatively with the Debtors to negotiate a term sheet for a fully consensual restructuring that values Reorganized EFH/EFIH at a total enterprise valuation of approximately $9.3 billion and Oncor at a total enterprise valuation of approximately $18.5 billion—meaningfully higher valuations than the transaction under the Berkshire Agreement. Elliott's proposed equitization transaction contemplates equal or significantly higher recoveries for all creditor constituencies than the Berkshire Agreement and corresponding reorganization plan contemplate.

The dramatically inferior unsecured creditor recovery under the Berkshire Agreement, the timing of its development and the long-predicted collapse of the NextEra deal show that the Debtors' prior claim that Elliott is bound by the PIK PSA was not only disingenuous but also apparently designed to impede Elliott's efforts to develop a competing plan. Over the past few weeks, the Debtors could easily have acknowledged (at least privately) to Elliott that the NextEra transaction was dead, given that the Debtors were simultaneously pursuing backup plans that were plainly inferior to the NextEra transaction by hundreds of millions of dollars. Or, the Boards could have provided a window following the termination of the NextEra transaction to allow Elliott to participate in negotiations with Berkshire and finalize its efforts to formulate the creditor plan it was developing. Instead, the Debtors and the Boards deliberately chose not do so, thereby destroying the opportunity for a creditor plan to develop as competition for the Berkshire Agreement.

Further, your characterization of the supposed "open issues" with Elliott's most recent proposal, upon which you rest your contention that the Debtors' Boards exercised their fiduciary duties, is incorrect in numerous respects:

- First, you cite "the current absence of any committed financing—or even the form of any commitment papers—and the projected additional difficulties in obtaining such financing in light of, among other factors, indications from the PUCT staff and the Debtors' requested mandatory conversion provisions regarding the proposed DIP facilities." Committed financing would in all likelihood be in place at this point if Debtors had not insisted on binding Elliott to the PIK PSA and had independently explored, as its fiduciary obligations required, financing for a standalone plan of reorganization. Moreover, as the Debtors well know, Elliott is already prepared to commit to provide substantial exit financing and has executed joinders with parties interested in providing financing, but has been waiting since June 21, 2017 – almost three weeks – for the Debtors' and Oncor's comments on a slide deck that was to be used to assist in discussions with potential financing sources. As for the Debtors' purported regulatory concerns, Elliott has already had face to face meetings with the PUCT staff and representatives of the Texas Attorney General's Office and Oncor, has assured them that Elliott's proposed alternative plan accepts the existing "ring fence" conditions. Indeed, the PUCT staff advised Elliott that it would accept the proposed

ROPES & GRAY LLP

Chad Husnick                                         - 4 -                                    July 11, 2017

equitization plan, subject to setting the terms out in a formal agreement. While Berkshire may be slightly further along in the regulatory process as a sole and direct consequence of the Debtors' inappropriate favoritism, Berkshire faces the very same regulatory hurdles that an Elliott-sponsored plan or any transaction might face. There is no challenge unique to the equitization plan that the PUCT staff has identified that stands in the way of that transaction being consummated before year-end.

- <u>Second</u>, you claim that there was a "fundamental disagreement on how to mitigate the Debtors' significant liquidation risk in the event the proposed DIP facilities are funded but the Elliott-sponsored transaction does not close." Elliott believes that the parties had worked in good faith to resolve this issue in the most recently circulated term sheet, dated July 1, 2017 (the "<u>Recent Term Sheet</u>"). In particular, as the Recent Term Sheet makes clear, Elliott was prepared to discuss the terms on which the "Last Out Tranche" of the New EFIH 2L DIP Facility could be converted into equity under alternative restructuring proposals should the equitization plan proposed by Elliott not be consummated. The Debtors never responded to the Recent Term Sheet.

- <u>Third</u>, you cite "Elliott's insistence on conditions for any settlement between the disinterested directors of an allocation, if payable, of the NextEra termination fee." Although your letter does not specify which conditions the Debtors find objectionable, it appears that the Debtors object to any provision that would prevent the Debtors from imposing upon the EFIH creditors (including Elliott) more than 50% of the NextEra termination fee. This is the case despite the fact that EFH creditors – not the EFIH creditors – were the intended beneficiaries of the transaction when the NextEra Merger Agreement was approved, and that the Debtors have imposed on the EFIH estate a disproportionate percentage of liability with respect to fees and expenses and – what's more – also sought to impose on the Reorganized EFH/EFIH the entirety of the legacy EFH asbestos liability. The Debtors' apparent continuing efforts to force creditors of the EFIH estate to bear more than their fair share (vis-a-vis the EFH estate) of the termination fee and other costs and claims is hardly a basis on which to reject a potential restructuring transaction.

- <u>Fourth</u>, you rely on "the comparatively limited certainty of closing associated with an Elliott-sponsored transaction compared to the BHE-sponsored transaction." However, it is not at all certain the Berkshire Agreement will close. In fact, it is quite likely that the Berkshire transaction will <u>not</u> close, given the lack of support from the Debtors' creditors and the requirement that Berkshire must also acquire the approximately 20% of outstanding Oncor equity not held by the Debtors. In any event, Elliott is prepared to provide a significant portion of the financing for an equitization transaction and has received substantial interest from other potential financing partners. Now that the PIK PSA has been terminated, Elliott will accelerate its efforts to put forth a specific plan. Once financing is in place, Elliott is committed to ensuring that the closing occurs.

ROPES & GRAY LLP

Chad Husnick — - 5 - — July 11, 2017

- <u>Fifth</u>, you also suggest as a basis for the Debtors' decision "the appropriate construct of the Debtors' fiduciary out, specifically regarding 'Superior Proposals.'" Elliott is surprised to see this characterized as an open issue that purportedly "imped[es] the Debtors from proceeding with an Elliott-sponsored transaction." Elliott has engaged in good faith to craft a definition of Superior Proposals satisfactory to all parties. The Recent Term Sheet reflects Elliott's desire to specify that a "more favorable" transaction merely means one that yields equal or better recoveries for creditors. Surely this is an unobjectionable point; to the extent Debtors' concern lies in wordsmithing, the parties could and should have handled this through continued discussions. To the extent that the Debtors' concern lies in more than wordsmithing, the same is true.

- <u>Sixth</u>, you cite "the unknown timeline associated with confirming and consummating an Elliott-sponsored transaction (given that the timeline hinges on Elliott obtaining committed financing, an effort that the Debtors assume Elliott began upon signing a confidentiality agreement with the Debtors on May 17, 2017—50 days ago)." As we have discussed, the equitization plan proposed by Elliott could obtain both PUCT approval and Bankruptcy Court approval by the end of the year or even earlier, if the Debtors only cooperated. Moreover, the timetable always required committed financing in August, until the Debtors themselves pushed the requirement to September. Until the Debtors both failed to respond to the Recent Term Sheet and to provide comments on the financing slide deck – deliberately leaving Elliott "hanging," waiting for a response and in the dark – Elliott believed that the parties were about to move to definitive documentation, proceed with financing discussions and consummate the required financings by the end of August or early September as discussed. It is simply disingenuous for the Debtors to rely on an "unknown timeline" as the basis for pursuing the Berkshire transaction that offers creditors far less value – the timeline for the transaction proposed by Elliott has been the subject of extensive discussions with the Debtors and is well understood by you.

While we agree that the Debtors and Elliott have had "productive discussions," the flawed process and unreasonable time constraints the Debtors have seemingly been intent on imposing only add to the infirmities of the proposed Berkshire transaction. The Debtors have requested that the Court consider approving the Berkshire Agreement on August 10, 2017, only 30 days from today. As you well know, this timeframe is plainly inadequate to propose, negotiate and also obtain committed financing for a deal of this magnitude. To compound matters, you claim that "[t]he Debtors have no obligation . . . to raise financing necessary for Elliott to implement its transaction." That is not, and never was, the point. The Debtors are obligated to explore <u>all</u> potential alternatives, on a level playing field and in good faith, to maximize the value of the estates. The Debtors must cooperate with all potential bidders and their potential financing sources to obtain the best possible deal for creditors.

Despite Elliott's significant and increasing concerns regarding the conduct of the Debtors and their advisers thus far, Elliott remains committed to engaging with the Debtors in good faith to

ROPES & GRAY LLP

Chad Husnick — - 6 - — July 11, 2017

maximize creditor recovery. To that end, Elliott requests that the Debtors provide Elliott with all information made available to Berkshire and any other potential acquirer, including any and all data rooms. To maximize the productivity of any continuing discussions between Elliott and the Debtors and to afford Elliott a fair opportunity to pursue financing sources, Elliott hereby requests that the Debtors reschedule (i) the August 10, 2017 hearing date on the Berkshire Agreement and (ii) the August 11, 2017 hearing with respect to the Debtors' proposed disclosure statement to a date not earlier than September 18, 2017, and also expressly commit to participating in management presentations associated with finalizing the financing commitments, other than Elliott's, with respect to the equitization plan.

For the avoidance of doubt, Elliott reserves all rights and remedies at law and in equity.

Very truly yours,

/s/ *Gregg M. Galardi*

Gregg M. Galardi

cc:  Dave Miller
     Jeff Rosenbaum
     Keith H. Wofford