# EXHIBIT 9

| | |
|---|---|
| **From:** | Wofford, Keith H. <Keith.Wofford@ropesgray.com> |
| **Sent:** | Saturday, April 29, 2017 12:11 AM |
| **To:** | Kieselstein, Marc <mkieselstein@kirkland.com>; Husnick, Chad J. <chusnick@kirkland.com> |
| **Cc:** | Galardi, Gregg <Gregg.Galardi@ropesgray.com>; *ross.martin@ropesgray.com; Agudelo, Jonathan <Jonathan.Agudelo@ropesgray.com> |
| **Subject:** | EFIH -- Letter dated April 28, 2017 |
| **Attach:** | Letter dated April 28, 2017.pdf; ATT00001.txt |

Marc, Chad --

Please see attached.  We look forward to discussing the proposal you sent today, as well as the attached, during the coming week.

Regards,
Keith


Keith H. Wofford
ROPES & GRAY LLP
T +1 212 841 8816 | M +1 917 570 5071
1211 Avenue of the Americas
New York, NY 10036-8704
keith.wofford@ropesgray.com
www.ropesgray.com


This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.



ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

April 28, 2017

Marc Kieselstein
Chad Husnick
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654

Re:    In re Energy Future Holdings, Inc. (the "Chapter 11 Cases")
       Issues Raised by Plan Support Agreement dated January 2, 2017 (as amended on January
       19, 2017, the "PIK PSA")

Dear Marc and Chad,

As you know, this firm represents Elliott Management Corporation ("EMC") and various funds
advised by or affiliated with EMC  (collectively, "Elliott") in connection with the Chapter 11 Cases.
We appreciate our recent discussions and are happy to continue them with you.  However, this is an
appropriate time to address, in writing, a number of questions to which Elliott and other creditors
need the Debtors (and EFIH in particular) to respond, in order to move the case forward in the most
constructive and timely manner possible.

Elliott is now the beneficial owner of approximately: (i) $782 million face amount of First Lien
Notes (33.8% of the First Lien Notes class) and (ii) $746 million face amount of Second Lien Notes
(34.6% of Second Lien Notes class) of EFIH.  Additionally, Elliott has purchased from
"marketmakers" approximately $1,047 million of EFIH Unsecured Notes (66.8% of the EFIH
Unsecured Notes class).  Therefore, absent consummation of the Eighth Amended Plan of
reorganization, which the Debtors have advised the Court may well need to be modified and
resolicited, confirmation of any reorganization plan will require its support.  Elliott is interested in
working with the Debtors and facilitating a prompt and value-maximizing resolution of the Chapter
11 Cases.  As the Debtors also acknowledged, the reality is that the Chapter 11 Cases become more
difficult to resolve as time passes, due to continuing secured creditor interest accruals, professional
fee expenses, and other factors.

Thus, while Elliott agrees that steps should be taken to consummate the proposed transaction with
NextEra, that cannot be an exclusive path, or a path pursued for more than a reasonable, curtailed

ROPES & GRAY LLP

- 2 -

time regardless of the likelihood of the transaction closing on the current terms. The Debtors' exclusive right to file a plan has expired, and Elliott is prepared to move forward with extensive efforts to formulate and sponsor (and would consider co-sponsoring) an alternative or backup plan of reorganization that could be consummated by year end. To pursue that alternative and minimize the reduction in creditor recoveries arising from the mere passage of time, Elliott's efforts must commence immediately, for only then can an alternative plan be confirmed before year-end.

The PIK PSA, and the limitations it may or may not place on other purchasers of PIK PSA Notes (as defined below), however, impedes these efforts at the expense of the holders of the EFIH Unsecured Notes. They also impede the progress of these Chapter 11 Cases. In particular, as it now stands, the Debtors are aware that Supporting Creditors have sold some of their PIK PSA Notes, but you have also advised us that the Debtors have not yet received any joinders under the PIK PSA. As a result, there is an immediate issue as to which holders can direct the Indenture Trustee for the EFIH Unsecured Notes to take action. More importantly, there is a significant issue as to which holders of the EFIH Unsecured Notes may vote on an alternative plan or even modifications to the plan that has already been confirmed. *See* Bankr. R. 3017(e); *see also In re Southland Corp.*, 124 B.R. 211, 223-27 (Bankr. N.D.Tex 1991) (discussion of methods for soliciting beneficial holders). Thus, the transfer-restriction provisions of the PIK PSA must be addressed now for the benefit of the case as a whole.

Accordingly, we request that you provide a written response to the following questions by May 5, 2017 (following the discussions that we propose below), so that Elliott and the Debtors may determine what disputes they have with respect to the PIK PSA and Elliott's rights as a creditor. So that there is no misunderstanding, Elliott believes that there are a number of immediate, ripe issues and intends to proceed with appropriate court action regarding various aspects of the PIK PSA, should they not be resolved consensually. In that regard, we propose to have a series of meetings among professionals (and some with principals as well) for Elliott and the Debtors during next week, May 1-4, in order to see whether areas of dispute can be resolved or at least narrowed. At the very least, such meetings would focus the issues for any potential judicial resolution.

     1.     The central issue is whether the Debtors maintain that Elliott is not a beneficial owner of the PIK PSA Notes (as defined below) that it purchased through marketmakers. In that regard, please advise whether either of (a) or (b) below is the Debtors' position:

     (a)   Because Elliott has not executed and delivered a joinder to the PIK PSA, Elliott's purchases of securities entitlements are allegedly "void *ab initio*" to the extent that such securities entitlements were previously owned by signatories to the PIK PSA ("PIK PSA Notes") pursuant to section 4.04 of the PIK PSA and therefore Elliott is not a beneficial holder of any PIK PSA Notes; or

ROPES & GRAY LLP

- 3 -

> (b) Elliott's purchases of PIK PSA Notes are not "void *ab initio*", and notwithstanding section 4.04 of the PIK PSA and Elliott's failure to execute and deliver a joinder, Elliott is a beneficial holder of the PSA PIK Notes bound by the PIK PSA.

If the Debtors' position is 1(a), Elliott believes that it is not bound by the commitments set forth in the PIK PSA and may immediately file a proposed chapter 11 plan both (x) as a holder of EFIH Unsecured Notes that are not PIK PSA Notes and (y) as a holder of First Lien and Second Lien notes. If the Debtors disagree, please state the grounds for any such limitation on Elliott as a creditor in the Chapter 11 Cases.

If instead the Debtors' position is 1(b), do the Debtors agree that because the PIK PSA only governs the holders of PIK PSA Notes with respect to their claims as holders PIK PSA Notes, Elliott is nonetheless permitted to immediately file a proposed chapter 11 plan of reorganization as a holder of First Lien and Second Lien notes? If not, please explain the basis for the Debtors' position.

If the Debtors' position is neither 1(a) nor 1(b), please state and explain the Debtors' position.

2.    A second critical issue is whether the "void *ab initio*" provision of the PIK PSA (the "Voidness Provision") required Bankruptcy Court approval in order for such provision to be enforceable with respect to any transfers of PIK PSA Notes. In that regard, please set forth the basis for the Debtors' position.

Elliott maintains that at the very least, the Voidness Provision had to be approved by the Bankruptcy Court, and that the Bankruptcy Court's jurisdiction to void third party transfers of EFIH Unsecured Notes traded in the open market is lacking in this circumstance. As you know, however, the Debtors never filed a motion to approve the PIK PSA. Instead, the Debtors only filed a copy of the January 2, 2017 PIK PSA (the "Original PIK PSA"), which Original PIK PSA provided that it was immediately enforceable on the Supporting Creditors but would only be enforceable against the Debtors upon Bankruptcy Court approval. *See* Section 5.02(a). More importantly, when Elliott asked what agreement it was being asked to join, the Debtors provided Elliott with the Original PIK PSA as well as an executed amendment dated January 19, 2017 (the "Amendment", a copy of which is attached). To the best of our knowledge, the Amendment was never filed with the Court. Moreover, that Amendment removed (a) the requirement that the Original PIK PSA be approved by the Bankruptcy Court to be enforceable on the Debtors and (b) the right of the holders of PIK PSA Notes to terminate the Original PIK PSA if Bankruptcy Court approval of the PIK PSA was not obtained by February 5, 2017. So, to the extent that the Debtors maintain that the PIK PSA with the Voidness Provision is enforceable despite not being approved by the Bankruptcy Court, please state the basis for the Debtors' position. If instead, the Debtors maintain that the PIK PSA was approved by the Bankruptcy Court, please identify the order that approved the PIK PSA.

ROPES & GRAY LLP

- 4 -

Assuming, as the Debtors have advised, that the Debtors believe that the PIK PSA did not require Bankruptcy Court approval, you should be aware that Elliott maintains that absent Bankruptcy Court approval, and perhaps even with it, the provisions of the PIK PSA are not binding on purchasers of securities entitlements to the EFIH Unsecured Notes if UCC 8-502, as in force in New York, Delaware, Texas or other applicable jurisdiction, applies.  If the Debtors disagree, please explain the Debtors' position.

       3.     If at any point Elliott were to elect to sign the PIK PSA, please advise whether the Debtors maintain that Elliott cannot propose a plan of reorganization or take other actions as a holder of First Lien or Second Lien notes.

       4.     Finally, in our discussions, the Debtors have said that they are prepared to waive the restrictions in the PIK PSA that limit Elliott's ability to discuss restructuring alternatives and "Competing Transactions" with the Debtors and/or third parties.  If at any point Elliott were to elect to sign the PIK PSA, please state the basis on which the Debtors believe they can provide such a waiver without an amendment to the PIK PSA, which amendment would require the agreement of the Required Supporting PIK Creditors (as defined in the PIK PSA).

As we stated above, Elliott wants to move forward consensually with the Debtors, but needs immediate clarity on the above issues to do so.  The goal of this letter is to eliminate, reduce or at least clarify disputes.  Elliott's current view is that the transfer restriction in the PIK PSA was not approved by the Bankruptcy Court, and that as a purchaser of securities entitlements in EFIH Unsecured Notes, including those sold by the Supporting Creditors, it is not subject to any restrictions or covenants of the PIK PSA.  Elliott also believes that the indisputable facts are that any plan will have economics that are less favorable to the holders of EFIH Unsecured Notes, other than a very near-term consummation of the original NextEra deal.  That economic reality means that the Debtors should not (and certainly EFIH should not) use the PIK PSA to preclude Elliott from trying to move the case forward in a productive fashion.

All that said, it is our hope to continue our discussions, including if Elliott were to file a declaratory judgment action, which seems a likely course if there are unresolved disputes.  We understand that the Debtors have made no commitments at this point and reserve their rights regarding any such action.  Additionally, as we are sure you understand Elliott also reserves all of its rights as to remedies and other relief.

ROPES & GRAY LLP

- 5 -

Please let us know what times you could be available for a meeting regarding these issues on Monday, May 1.

Best Regards,

Keith Wofford

Gregg Galardi

Ross Martin

*Execution Version*
*Confidential*

## AMENDMENT TO THE PLAN SUPPORT AGREEMENT

**THIS AMENDMENT TO THE PLAN SUPPORT AGREEMENT** (this "**Amendment**") is made as of January 19, 2017 by and among all of the following: (a) the EFH/EFIH Debtors and (b) the Required Supporting PIK Creditors (each as defined in the Plan Support Agreement and listed on the signature pages attached hereto, collectively, the "**Required Amendment Parties**") and amends that certain Plan Support Agreement, dated as of January 2, 2017, by and among the Required Amendment Parties (the "**Plan Support Agreement**"). Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan Support Agreement.

WHEREAS, the Required Amendment Parties desire to amend the Plan Support Agreement as set forth in this Amendment;

WHEREAS, Section 9 of the Plan Support Agreement permits the Required Amendment Parties to modify, amend or supplement the Plan Support Agreement with the consent of the Required Amendment Parties as set forth above;

NOW, THEREFORE, in consideration of the mutual covenants and agreements and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Required Amendment Parties hereby agree to amend the Plan Support Agreement as set forth in **Exhibit 1**.

1.    Ratification.   Except as specifically provided for in this Amendment, no changes, amendments, or other modifications have been made on or prior to the date hereof or are being made to the terms of the Plan Support Agreement or the rights and obligations of the parties thereunder, all of which such terms are hereby ratified and confirmed and remain in full force and effect.

2.    Effect of Amendment.   This Amendment shall be effective on the date on which the EFH/EFIH Debtors have executed this Amendment and received all of the other Required Amendment Parties' signature pages (the "Amendment Effective Date"). Following the Amendment Effective Date, whenever the Plan Support Agreement is referred to in any agreements, documents, and instruments, such reference shall be deemed to be to the Plan Support Agreement as amended by this Amendment.

3.    Governing Law; Submission to Jurisdiction; Selection of Forum.   For the avoidance of doubt, this Amendment and interpretation of this Amendment shall be in accordance with Section 10.04 of the Plan Support Agreement.

*[Signature pages follow.]*

**YORK CAPITAL MANAGEMENT GLOBAL ADVISORS, LLC,**
on behalf of certain funds and/or accounts managed or advised by it or its affiliates

Name:
Title:      Richard P. Swanson
            General Counsel

Address:
767 Fifth Avenue
New York, NY 10153

E-mail address(es): rswanson @ yorkcapital.com
Telephone: 212 - 796. 1146
Facsimile:

Aggregate Principal Amount and Classes of Claims which the Supporting Creditor, or funds or accounts managed or advised by the Supporting Creditor or any of its affiliates, hold as legal or beneficial owner (including pursuant to any swap or derivative transactions):

**GSO CAPITAL PARTNERS LP**

Name:
Title:

Address: 345 Park Avenue, 31st Floor
New York, NY 10154


E-mail address(es): Bradley.Feingerts@gsocap.com, GSOLegal@gsocap.com
Telephone: (212) 503-2100
Facsimile: N/A


Aggregate Principal Amount and Classes of Claims which the Supporting Creditor, or funds or accounts managed or advised by the Supporting Creditor or any of its affiliates, hold as legal or beneficial owner (including pursuant to any swap or derivative transactions):

**AVENUE CAPITAL MANAGEMENT II, LP,**
on behalf of certain investment funds it advises

By: Avenue Capital Management II GenPar, LLC,
its general partner

Name: Sonia Gardner
Title: Member

Address: 399 Park Avenue
NY, NY 10022

E-mail address(es): sbulmzian@avenuecapital.com
Telephone: 212-878-3526
Facsimile:

Aggregate Principal Amount and Classes of Claims which the Supporting Creditor, or funds or accounts managed or advised by the Supporting Creditor or any of its affiliates, hold as legal or beneficial owner (including pursuant to any swap or derivative transactions):

*Confidential, Subject to FRE 408*

ANGELO GORDON & CO., L.P. AS INVESTMENT ADVISOR OF:

AG MM, L.P.
AG Capital Recovery Partners VIII, L.P.
AG Eleven Partners, L.P.
AG Cataloochee, L.P.
AG Centre Street Partnership, L.P.
AG Super Fund, L.P.

Name: D. Forest Wolfe
Title: General Counsel

Address: 245 Park Ave, 25th Floor, New York, NY 10167


E-mail address(es): gbaiera@angelogordon.com; jlenz@angelogordon.com; mbernstein@angelogordon.com; fwolfe@angelogordon.com
Telephone: 212-692-2000
Facsimile: 212-338-9611



Aggregate Principal Amount and Classes of Claims which the Supporting Creditor, or funds or accounts managed or advised by the Supporting Creditor or any of its affiliates, hold as legal or beneficial owner (including pursuant to any swap or derivative transactions):

**EFH/EFIH DEBTOR SIGNATURE PAGES**

Energy Future Holdings Corp.
Ebasco Services of Canada Limited
EEC Holdings, Inc.
EECI, Inc.
EFH Australia (No. 2) Holdings Company
EFH Finance (No. 2) Holdings Company
EFH FS Holdings Company
EFH Renewables Company LLC
EFIH Finance Inc.
Energy Future Intermediate Holding Company LLC
Generation Development Company LLC
LSGT Gas Company LLC
LSGT SACROC, Inc.
NCA Development Company LLC
TXU Receivables Company

Name: Andrew M. Wright
Title: Executive Vice President, General Counsel, and Corporate Secretary

**THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (including all exhibits attached hereto, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof, this "**Agreement**") is made and entered into as of January 2, 2017, by and among the following parties (each, a "**Party**" and, collectively, the "**Parties**"):

(a)     (i) Energy Future Holdings Corp., a Texas corporation ("**EFH Corp.**"); (ii) Energy Future Intermediate Holding Company LLC ("**EFIH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFH Corp.; (iii) EFIH Finance Inc. ("**EFIH Finance**," and together with EFIH, the "**EFIH Debtors**"), a Delaware corporation and a direct, wholly-owned subsidiary of EFIH; and (iv) each of EFH Corp.'s other direct and indirect subsidiaries listed on the signature pages hereto (each of the foregoing entities identified in subclauses (i) through (iv) an "**EFH/EFIH Debtor**" and, collectively, the "**EFH/EFIH Debtors**");

(b)     UMB Bank, N.A., as the indenture trustee under the EFIH Unsecured Notes (the "**PIK Notes Trustee**");

(c)     the undersigned holders or investment advisors or managers of discretionary accounts of such beneficial holders that hold, or direct the vote of, Claims against the EFIH Debtors under the EFIH Unsecured Notes (solely in such capacity, each, individually, a "**Supporting Creditor**" and, collectively, the "**Supporting Creditors**"), including Avenue Capital Management II, LP, GSO Capital Partners LP, York Capital Management Global Advisors, LLC, and Angelo Gordon & Co. (collectively, the "**Initial Supporting Creditors**"); and

(d)     each transferee who becomes a Permitted Transferee (as defined below) in accordance with Section 4.04 of this Agreement.

For the avoidance of doubt, each Supporting Creditor and the PIK Notes Trustee (collectively, the "**Supporting PIK Parties**") shall be bound by and subject to the provisions herein only as a holder or trustee of the EFIH Unsecured Note Claims, in respect of which it is signing this Agreement (as indicated on its signature page to this Agreement) and any reference to Claims with respect to an obligation of a Supporting Creditor only refers, respectively, to its EFIH Unsecured Note Claims whether or not it uses those terms.

Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Alternative E-Side Plan (as defined below).

## RECITALS

**WHEREAS**, on April 29, 2014, the Debtors commenced chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), which chapter 11 cases are being jointly administered and are captioned <u>In re Energy Future Holdings Corp., et al.</u>, Case No. 14-10979 (CSS) (the "**Chapter 11 Cases**");

**WHEREAS**, EFIH owns 100% of Oncor Electric Delivery Holdings Company LLC, which owns approximately 80.03% of the equity interests in Oncor Electric Delivery Company LLC ("**Oncor**");

**WHEREAS**, on May 11, 2016, the Debtors filed in the Chapter 11 Cases the Amended Joint Plan of Reorganization of Energy Future Holdings Corp., *et al.*, pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 8421] (as such plan has been amended, modified, and/or supplemented to the date of this Agreement, the "**New EFH Plan**") and related disclosure statement [Docket No. 8423];

**WHEREAS**, EFH Corp., EFIH, NextEra Energy, Inc., a Florida corporation (together with Merger Sub, as defined below, "**NEE**"), and EFH Merger Co., LLC ("**Merger Sub**") entered into that certain Merger Agreement, dated as of July 29, 2016, which was filed with the Bankruptcy Court on August 3, 2016 [Docket No. 9190] (such agreement, as amended from time to time in accordance with its terms, the "**Merger Agreement**"), pursuant to which Reorganized EFH Corp. will merge with and into Merger Sub, with Merger Sub as the surviving company (the "**Merger**");

**WHEREAS**, the EFH/EFIH Debtors and NEE entered into, and the Bankruptcy Court approved, an Amended and Restated Plan Support Agreement, dated September 19, 2016 [Docket No. 9584] (as further modified, amended, or supplemented from time to time, the "**NEE PSA**");

**WHEREAS**, EFH Corp., EFIH, NEE and Merger Sub agreed upon certain modifications to the New EFH Plan as it relates to EFH Corp., EFIH, EFIH Finance, and the other EFH/EFIH Debtors and such modified New EFH Plan, as further modified, was filed with the Bankruptcy Court on December 1, 2016 [Docket No. 10290] and modified on December 28, 2016 to reflect the EFIH PIK Settlement (as defined below) (the "**Filed Alternative E-Side Plan**");

**WHEREAS**, the Parties will negotiate in good faith certain further modifications to the Filed Alternative E-Side Plan as it relates to EFH Corp., EFIH, EFIH Finance, and the other

2

EFH/EFIH Debtors (as it may be further amended, modified, or supplemented from time to time in accordance with the terms of this Agreement, the "**Alternative E-Side Plan**");[1]

**WHEREAS**, the Alternative E-Side Plan would amend and replace the Filed Alternative E-Side Plan pursuant to the terms hereof;

**WHEREAS**, pursuant to the Alternative E-Side Plan and the Merger Agreement, upon the Merger Closing (as defined in the Merger Agreement), NEE would acquire 100% of the equity of Reorganized EFH and certain of its direct and indirect subsidiaries (EFH Corp. and its direct and indirect subsidiaries that are being acquired by NEE, collectively, the "**E-Side Acquired Debtors**");

**WHEREAS**, pursuant to the Alternative E-Side Plan and the Merger Agreement, NEE would not acquire, among others: (a) EFCH and its subsidiaries; (b) Reorganized TCEH and Reorganized TCEH's subsidiaries; (c) the EFH Shared Services Debtors (as defined in the Alternative E-Side Plan); and (d) EFH Properties Company and its subsidiaries;

**WHEREAS**, the Supporting Creditors and the EFH/EFIH Debtors have negotiated a settlement with respect to, among other things, (i) the litigation of, and/or objections to, Makewhole Claims asserted by Holders of EFIH First Lien Note Claims and Holders of EFIH Second Lien Note Claims (the "**EFIH First Lien Makewhole Claims**," the "**EFIH Second Lien Makewhole Claims**," and, collectively, the "**Secured Makewhole Claims**" and the "**Secured Makewhole Claims Litigation**"), (ii) the satisfaction of costs and expenses incurred by, among others, the EFH/EFIH Debtors, the EFH Plan Administrator Board, in connection with the Secured Makewhole Claims Litigation starting from the date this Agreement is effective and binding on the Threshold Supporting Creditors, and (iii) certain reserves to be established for the benefit of the Holders of EFIH First Lien Note Claims and EFIH Second Lien Note Claims, which reserves affect the timing and size of distributions under the Alternative E-Side Plan to Holders of Allowed Class B6 Claims, all as shall be set forth in the Alternative E-Side Plan, materially consistent with the term sheet set forth as **Schedule 1** hereto and Section 7 hereto (the "**EFIH PIK Settlement**");

**WHEREAS**, each EFH/EFIH Debtor and each Supporting Creditor, in exercising its respective business judgment, has determined that the Alternative E-Side Plan provides appropriate value to creditors (including in light of the Makewhole Litigation and any risks relating thereto) and increases certainty of execution;

**WHEREAS**, as of the date of this Agreement, Supporting Creditors collectively holding legal or beneficial interests in no less than 66 2/3% of the aggregate principal amount of EFIH Unsecured Note Claims have executed and delivered this Agreement (the "**Threshold Supporting Creditors**"); and

---

[1]    Unless otherwise indicated, any reference in this Agreement to the Alternative E-Side Plan is a reference to the Alternative E-Side Plan solely with respect to the EFH/EFIH Debtors.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

*AGREEMENT*

**Section 1.** *Exhibits Incorporated by Reference.*

Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits. Unless otherwise provided herein, in the event of any inconsistency between this Agreement and the Alternative E-Side Plan, the Alternative E-Side Plan shall govern, subject in all respects to the final paragraph of Section 3 in this Agreement.

**Section 2.** *Agreement Effective Date.*

This Agreement is effective and binding on the Threshold Supporting Creditors and the EFH/EFIH Debtors as of January 2, 2017 (the "**Agreement Effective Date**"). The "Agreement Effective Date" with respect to any Party shall mean the date on which this Agreement becomes effective and binding on such Party in accordance with the immediately preceding sentence.

For the avoidance of doubt, subject to the Parties' rights under Section 8, each Party shall be bound to this Agreement on the Agreement Effective Date applicable to such Party whether or not the Bankruptcy Court enters the Alternative E-Side Disclosure Statement Order (as defined below), or the Alternative E-Side Confirmation Order (as defined below).

**Section 3.** *Definitive Documentation*

The definitive documents and agreements governing the Alternative E-Side Plan and all transactions contemplated by this Agreement (collectively, the "**Alternative E-Side Restructuring Documents**") shall include:

(a) [Reserved];

(b) [Reserved];

(c) the Alternative E-Side Plan and each document or agreement contemplated in connection with consummation of the Alternative E-Side Plan; and

(d) the order of the Bankruptcy Court confirming the Alternative E-Side Plan and authorizing all of the transactions and agreements contemplated by the Alternative E-Side Plan with respect to the EFH/EFIH Debtors (the "**Alternative E-Side Confirmation Order**").

Each of the Parties acknowledges and agrees that certain of the Alternative E-Side Restructuring Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, the Merger Agreement, and the Alternative E-Side Plan, and shall otherwise be in form and substance acceptable to the EFH/EFIH Debtors in their sole discretion

4

and, to the extent inconsistent with the terms of this Agreement, the Merger Agreement, and the Alternative E-Side Plan in a manner that adversely affects (i) the Supporting Creditors in any material respect shall be reasonably acceptable to the Required Supporting PIK Creditors (ii) the PIK Notes Trustee in any material respect shall be reasonably acceptable to the PIK Notes Trustee; it being understood that any term inconsistent with Section 7 and/or Schedule 1 of this Agreement in a manner that adversely affects the Supporting Creditors or the PIK Notes Trustee shall be considered material as to such creditors and trustee. Each Party agrees that it shall act in good faith and use and undertake all commercially reasonable efforts to negotiate and finalize the terms of the Alternative E-Side Restructuring Documents to which it is to be a Party or by which it is to be bound that are not finalized as of the date hereof.

**Section 4.** *Commitments Regarding the Alternative E-Side Plan.*

4.01.   <u>Commitments of Each Supporting PIK Party</u>.

(a)     Each Supporting Creditor (in its capacity as a Holder of EFIH Unsecured Notes Claim) and the PIK Indenture Trustee, as applicable, agrees, for so long as this Agreement has not been terminated as to such Supporting PIK Party in accordance with Section 8, that:

(i)     following receipt of the E-Side Disclosure Statement for the revised Alternative E-Side Plan and the related solicitation materials (as approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code), it shall, to the extent it is permitted to vote to accept or reject the Alternative E-Side Plan:

(A)     vote each and every EFIH Unsecured Notes Claim now owned or hereafter acquired by such Supporting Creditor to accept the Alternative E-Side Plan by timely delivering its duly executed and completed ballot(s) accepting the Alternative E-Side Plan and (y) to the extent it is permitted to elect whether to opt out of the releases set forth in the Alternative E-Side Plan, elect not to opt out of the releases set forth in the Alternative E-Side Plan, by timely delivering its duly executed and completed ballot(s) indicating such election; and

(B)     not change or withdraw (or cause to be changed or withdrawn) any such vote to accept the Alternative E-Side Plan or election described in the foregoing (A);

(ii)     it shall use good faith efforts to negotiate and document the Alternative E-Side Restructuring Documents to which it is to be a Party or by which it is to be bound and to take such commercially reasonable actions as reasonably requested by the EFH/EFIH Debtors or as such Supporting PIK Party in good faith deems reasonable and appropriate to obtain Bankruptcy Court approval of the Alternative E-Side Restructuring Documents as soon as reasonably practicable;

(iii)     it shall use good faith and commercially reasonable efforts to assist in obtaining (A) entry of the Alternative E-Side Disclosure Statement Order, and the Alternative E-

5

Side Confirmation Order, and (B) to the extent capable, consummation of the Alternative E-Side Plan and all other transactions contemplated by this Agreement, as soon as reasonably practicable in accordance with the Bankruptcy Code and on terms consistent with this Agreement, including within the time frames contemplated in this Agreement;

(iv)    it shall execute and deliver any other agreements reasonably required to effectuate and consummate the Alternative E-Side Plan and all other transactions contemplated by this Agreement, provided that such agreements are consistent with the terms of this Agreement and the Alternative E-Side Plan and are reasonably acceptable to the Required Supporting PIK Creditors (as defined below);

(v)    on and following the Agreement Effective Date:

(A)    it and its Representatives (as defined in the Merger Agreement) shall immediately cease and cause to be terminated all existing discussions or negotiations with, or ongoing solicitation or encouragement of, any other entity with respect to any inquiry or proposal relating to a competing transaction to restructure or reorganize any EFH/EFIH Debtor, including any standalone plan of reorganization, any transaction by which a party other than NEE seeks to acquire any portion of Reorganized EFH's direct or indirect economic interest in Reorganized EFIH or Oncor, or any transaction that is conditioned or premised on the conversion or reorganization of EFH Corp., EFIH, or Oncor or its affiliates or any of their respective assets to an alternative entity or corporate form (a "**Competing Transaction**");

(B)    it shall not (1) directly or indirectly solicit, initiate, encourage, or knowingly induce or knowingly facilitate any Competing Transaction, or any inquiry or proposal that is reasonably expected to lead to a Competing Transaction, or (2) directly or indirectly participate in any discussions or negotiations with any other entity regarding, or furnish to any other entity, any information with respect to, or cooperate in any way with any other entity with respect to, any Competing Transaction, or any inquiry or proposal that is reasonably expected to lead to a Competing Transaction; *provided, however*, that from the Agreement Effective Date until entry of the Alternative E-Side Confirmation Order, the Supporting PIK Parties shall be entitled to consult with, discuss, and participate in meetings with respect to, Competing Transactions directly with the EFH/EFIH Debtors;

(C)    to the extent permitted by applicable law (including any confidentiality agreement to which a Supporting Creditor was a party prior to the Agreement Effective Date) and/or regulation, it shall promptly provide the EFH/EFIH Debtors with any written proposal or a written or oral description of any unwritten proposal

(and any supplement or modification of any such proposal) it receives, including the identity of the party making such proposal and the transaction structure, terms, and conditions proposed by such party, relating to a Competing Transaction;

(D)     it shall not directly or indirectly, or encourage any other entity to directly or indirectly: (1) propose, file, support, vote for, or take any other action in furtherance of any Competing Transaction, including, for the avoidance of doubt, by making or supporting any filings with the Bankruptcy Court or any regulatory agency, including the PUC, the IRS, the FCC, and the FERC, or by entering into any agreement or making or supporting any filing, press release, press report or comparable public statement, with respect to any Competing Transaction; or (2) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the EFH/EFIH Debtors (or any direct or indirect subsidiaries of EFH Corp. that are not party to this Agreement) other than as expressly permitted by this Agreement, the Alternative E-Side Plan and the Merger Agreement; *provided, however,* that notwithstanding the foregoing, each Supporting PIK Party may file with the Bankruptcy Court all documents necessary to obtain approval of this Agreement and entry of the Alternative E-Side Confirmation Order;

(vi)     except as may otherwise be expressly provided herein, without prejudice to any Person not a party hereto, the PIK Indenture Trustee agrees that it shall support the EFIH PIK Settlement set forth in the Alternative E-Side Plan including filing a statement in support of the EFIH PIK Settlement following the Amendment Effective Date;

(vii)     except as may otherwise be expressly provided herein and to the extent not expressly covered by Section 4.01(a)(ix) and/or Section 4.01(a)(x), and to the extent applicable, immediately prior to the occurrence of the Effective Time (as defined in the Merger Agreement), it shall (A)(1) file a motion or other pleading requesting that each presiding judge or other applicable adjudicator enter an order dismissing with prejudice any litigation to which it is a party seeking payment on any make-whole claim on account of the prepayment, repayment, or other redemption of any debt incurred by EFH Corp., EFIH, or their respective predecessors, or any other Claims inconsistent with the EFIH PIK Settlement (including, for the avoidance of doubt, any and all pending appeals related to such litigation) and (2) to the extent that it or any of its Affiliates has the right to do so, withdraw with prejudice, or join in a withdrawal with prejudice of, any litigation and Claims described in the foregoing clause (A)(1), and (B) direct the trustee(s) of any class of securities of which it is a beneficial owner to take the actions described in the foregoing clause (A), or deliver to any such trustee its consent with respect to such actions, as applicable; for the avoidance of doubt, any dismissal or withdrawal with prejudice shall be conditioned on the occurrence of the Effective Date of the Alternative E-Side Plan and shall be simultaneous with the Effective Time (as defined in the Merger Agreement);

7

(viii)    it shall not direct any administrative agent, collateral agent, or indenture trustee (as applicable) to take any action inconsistent with such Supporting Creditor's respective obligations under this Agreement, and if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with a Supporting Creditor's obligations under this Agreement, such Supporting Creditor shall promptly direct such administrative agent, collateral agent, or indenture trustee to cease and refrain from taking any such action; and

(ix)    the execution of this Agreement by the Threshold Supporting Creditors shall constitute a direction to the PIK Notes Trustee in its capacity as indenture trustee for the EFIH Unsecured Notes, to execute, deliver and perform its obligations under this Agreement for so long as this Agreement has not been terminated as to the Supporting Creditors in accordance with Section 8, including a direction to (A) not directly or indirectly, or encourage any other entity to directly or indirectly, object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, consummation, or amendment of the Alternative E-Side Plan and all other transactions contemplated by this Agreement, (B) refrain from supporting, and not pursue with respect to such notes, payment of postpetition interest (except as may be contemplated herein or the Alternative E-Side Plan) or any Makewhole Claims or any other Claims inconsistent with this Agreement, and (C) immediately prior to the occurrence of the Effective Time (as defined in the Merger Agreement), seek dismissal with prejudice or withdraw with prejudice, any litigation to which it is a party, seeking payment on any Makewhole Claims, the District Court appeal to which the PIK Notes Trustee is a party seeking payment of the PPI Claims for the PIK Notes (Case No. 15-1098) or any related Claim, or any other Claims inconsistent with this Agreement (including, for the avoidance of doubt, any and all pending appeals related to such litigation).  Notwithstanding anything to the contrary herein, for the avoidance of doubt, any such dismissal or withdrawal with prejudice shall be conditioned on the occurrence of the Effective Date of the Alternative E-Side Plan and shall be simultaneous with the Effective Time (as defined in the Merger Agreement).  In addition, at the reasonable request of the EFIH Debtors, each Supporting Creditor agrees that it will attempt to contact any Holder of EFIH Unsecured Notes not then a party hereto to request that such Holder execute this Agreement, not oppose confirmation of the Alternative E-Side Plan and not pursue payment of any Makewhole Claims or any other Claims inconsistent with this Agreement;

(x)    [Reserved]; and

(xi)    it shall not directly or indirectly, or encourage any other entity to directly or indirectly, object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, or consummation of the Alternative E-Side Plan (or any amendment thereof that is in accordance with the terms of this Agreement) and all other transactions contemplated by, and that are not inconsistent with, this Agreement.

(b)    The foregoing sub-clause (a) of this Section 4.01 will not limit any of the following rights of the Supporting PIK Parties:

(i)    to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, and to file any pleadings or documents in connection therewith, so long as such appearances or filings, and the positions advocated in connection

112514214 v2

therewith, do not violate the terms of this Agreement and are not inconsistent with and do not violate the terms of the Alternative E-Side Plan or the Merger Agreement;

(ii)    to exercise any right, remedy, power or defense under any applicable credit agreement, indenture, other loan document or applicable law that does not violate the terms of this Agreement and is not inconsistent with and does not violate the terms of the Alternative E-Side Plan or the Merger Agreement, including seeking reimbursement for reasonable and documented trustee fees and expenses as otherwise provided under any applicable indenture and under this Agreement; or

4.02.    <u>Commitments of the EFH/EFIH Debtors</u>.

(a)    Each EFH/EFIH Debtor agrees, for so long as this Agreement has not been terminated in accordance with Section 8.01, that:

(i)    [Reserved];

(ii)    it (A) shall not amend or modify the Alternative E-Side Plan in a manner that is inconsistent with this Agreement or adverse to the Supporting PIK Parties (for the avoidance of doubt, any decrease of the Merger Sub Cash Amount (as defined in the Merger Agreement) shall constitute a change that is material and adverse to the Supporting PIK Parties), unless the Required Supporting PIK Creditors consent to any such amendment or modification, *provided, that* the EFH/EFIH Debtors will need the consent of each Supporting Creditor if they amend or modify the EFIH PIK Settlement and *provided, further, that,* the EFH/EFIH Debtors will need the consent of the PIK Notes Trustee if they amend or modify the EFIH PIK Settlement or Alternative E-Side Plan in a way that is adverse to the PIK Notes Trustee and (B) shall use good faith efforts to negotiate and document the Alternative E-Side Restructuring Documents as soon as reasonably practicable;

(iii)    it shall support and take all steps reasonably necessary to obtain entry of the Alternative E-Side Confirmation Order, by February 22, 2017; *provided, however,* that for entry of such order shall be deemed to occur upon an oral indication by the Bankruptcy Court that it is approving or will approve the requested relief, so long as the order is promptly entered thereafter;

(iv)    [Reserved];

(v)    it shall support and take all steps reasonably necessary to consummate as soon as possible, and in any event by June 30, 2017 (the "**Initial Drop-Dead Date**"), or as soon thereafter as is reasonably practicable, the Alternative E-Side Plan solely as it relates to the EFH/EFIH Debtors and all other transactions contemplated by this Agreement in accordance with the Bankruptcy Code and on terms consistent with this Agreement;

(vi)    it shall execute and deliver any other agreements reasonably required to effectuate and consummate the Alternative E-Side Plan and all other transactions contemplated by this Agreement; and

(vii)    to the extent any of the EFH/EFIH Debtors has any right to vote or direct the vote of any Claim, such EFH/EFIH Debtor shall vote or direct such vote in favor of the Alternative E-Side Plan.

(b)    The foregoing sub-clause (a) of this Section 4.02 will not limit any of the following EFH/EFIH Debtors rights:

(i)    to appear and participate as parties-in-interest in any matter to be adjudicated in the Chapter 11 Cases, and to file any pleadings or documents in connection therewith, so long as such appearances or filings, and the positions advocated in connection therewith, do not violate and are not inconsistent with the terms of this Agreement and are not inconsistent with and do not violate the terms of the Alternative E-Side Plan or the Merger Agreement;

(ii)    to exercise any right, remedy, power, or defense under any applicable credit agreement, indenture, other loan document, or applicable law that does not violate and is not inconsistent with the other terms of this Agreement and is not inconsistent with and does not violate the terms of the Alternative E-Side Plan or the Merger Agreement; or

(iii)    the rights set forth in Section 6.2(a) of the Merger Agreement.

(c)    For the avoidance of doubt, the EFH/EFIH Debtors shall have no obligations under this Agreement to support, and reserve all of their rights to object to and otherwise litigate in connection with, any disclosure statement, plan of reorganization, or other restructuring document for the EFH/EFIH Debtors that is not filed by the EFH/EFIH Debtors, except where this Agreement otherwise imposes a contrary affirmative obligation.

(d)    Notwithstanding anything to the contrary in this Agreement, until entry of the Alternative E-Side Confirmation Order by the Bankruptcy Court, the board of directors, the board of managers, or any such similar governing body of any EFH/EFIH Debtor shall be permitted to take (or permitted to refrain from taking) any action with respect to the covenants and agreements set forth in this Agreement to the extent such board of directors, board of managers, or such similar governing body determines, in its sole discretion after consultation with its independent financial advisors and outside legal counsel, and based on the advice of such counsel, that taking such action, or refraining from taking such action, as applicable, is necessary to comply with its applicable fiduciary duties.

4.03.    [Reserved].

4.04.    <u>Transfer of Claims</u>.

(a)    For so long as this Agreement has not been terminated pursuant to Section 8.01 as to a Supporting Creditor (solely in its capacity as holder of an EFIH Unsecured Note Claim), that Supporting Creditor shall not sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of (each, a "**<u>Transfer</u>**") any ownership (including any beneficial ownership) in such Claims, unless:

(i)    such Transfer is to another Supporting Creditor; or

(ii)    if such Transfer is not to another Supporting Creditor, the intended transferee executes and delivers to the EFH/EFIH Debtors an executed transfer agreement in the form attached hereto as **Exhibit A** (a "**Transfer Agreement**") before such Transfer is effective (it being understood that any Transfer shall not be effective until notification of such Transfer and a copy of the executed Transfer Agreement is provided to counsel to the EFH/EFIH Debtors at the contact information on the Transfer Agreement, on the terms set forth herein).

A transferee that satisfies the requirements set forth in Section 4.04(a)(i) or 4.04(a)(ii) shall be a "**Permitted Transferee**," and such Transfer, a "**Permitted Transfer**".

(b)    Other than pursuant to Section 4.04(a)(ii) and Section 5.01(b), this Agreement shall in no way be construed to preclude the Supporting Creditors from acquiring additional Claims; *provided, however*, that if a Supporting Creditor acquires EFIH Unsecured Note Claims after the date hereof, (i) such Supporting Creditor, as applicable, shall promptly notify the EFH/EFIH Debtors, as applicable, at the contact information on the Transfer Agreement of such acquisition, including the amount of such acquisition, and (ii) such additional Claims shall automatically and immediately upon acquisition by such Supporting Creditor, as applicable, be deemed to be subject to the terms and conditions of this Agreement (regardless of when or whether notice of such acquisition is given to the EFH/EFIH Debtors).

(c)    Notwithstanding anything to the contrary herein, (i) a Qualified Marketmaker that acquires any of the Claims of a Supporting Creditor with the purpose and intent of acting as a Qualified Marketmaker for such Claims, shall not be required to execute and deliver a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker transfers such Claims (by purchase, sale, assignment, participation, or otherwise) as soon as reasonably practicable, and in no event later than the earlier of (A) one (1) Business Day prior to any voting deadline established by the Bankruptcy Court with respect to the Alternative E-Side Plan (solely if the Qualified Marketmaker acquires such Claims prior to such voting deadline) and (B) within ten (10) calendar days of its acquisition, to a Permitted Transferee and the Transfer otherwise is a Permitted Transfer (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement in accordance with Section 4.04(a)); (ii) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in Claims of any Supporting Creditor that it acquires from a holder of such Claims that is not, and was not required to be, a Party to a transferee that is not a Party at the time of such Transfer without the requirement that such transferee be or become a signatory to this Agreement or execute a Transfer Agreement; and (iii) a Supporting Creditor may Transfer any of its Claims pursuant to or in connection with any repurchase transaction, reverse repurchase transaction, or any swap or other derivative transaction without satisfying the requirements set forth in this Section 4 only if, in connection with such Transfer, such Supporting Creditor (or a wholly-owned subsidiary controlled by it) retains the contractual right to exercise any voting right or other direction that may be made on account of such Claims, and such Supporting Creditor exercises (or causes its wholly-owned subsidiary controlled by it to exercise) such rights so that the Transferred Claims are voted in accordance with this Agreement, the transferee thereof does not otherwise take any action inconsistent with the Supporting Creditors' obligations under this Agreement and such Supporting Creditor remains bound by, and continues to comply with, the terms and conditions of this Agreement. For purposes of subclause (iii), a Person shall be deemed to "control" another

11

person if such person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract, or otherwise. As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims (or enter with customers into long and short positions in Claims), in its capacity as a dealer or market maker in Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(d)    This Section 4.04 shall not impose any obligation on any EFH/EFIH Debtor to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling any Supporting Creditor to Transfer any of its Claims. Notwithstanding anything herein to the contrary, to the extent any of the EFH/EFIH Debtors and another Party have entered into separate confidentiality agreements (each such confidentiality agreement, a "**Confidentiality Agreement**"), the terms of such Confidentiality Agreements shall continue to apply and remain in full force and effect according to their respective terms.

(e)    Any Transfer made in violation of this Section 4.04 shall be void *ab initio*. Any Supporting Creditor that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

**Section 5.  *Representations, Warranties, and Covenants.***

5.01.    Supporting Creditor Representations, Warranties, and Covenants. Each Supporting Creditor, severally, and not jointly, represents, warrants, and covenants to each other Party that:

(a)    it is, as of the Agreement Effective Date, the beneficial owner (including pursuant to any swap, repurchase, or derivative transaction) of a Claim in the Class and face amount indicated on such Supporting Creditor's signature block to this Agreement, or is the nominee, investment manager, or advisor for beneficial holders of such Claim, and of no other Claim or Interest in such Class or Classes, which amount each Party understands and acknowledges shall not be publicly shared;

(b)    it has the requisite power and authority to act on behalf of, vote and consent to matters concerning its Claims and, with respect to any Claim beneficially held through any swap, repurchase or derivative transaction, it has the right (i) to demand the counterparty thereof to retransfer such Claim to the applicable Party and/or (ii) to instruct (directly or indirectly) the counterparty thereof with respect to the exercise of any voting right or other direction that may be made on account of such Claim; and

(c)    its Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Supporting Creditor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed.

5.02.    Mutual Representations, Warranties, and Covenants. Each Party, severally, and not jointly, represents, warrants, and covenants to each other Party that:

(a)    Enforceability.  It is validly existing and in good standing under the laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to bankruptcy, reorganization, or liquidation, or otherwise limiting creditors' rights generally, or by equitable principles relating to enforceability.

(b)    No Consent or Approval.  Except as expressly provided in this Agreement (including the exhibits hereto), any Alternative E-Side Plan Document, any Alternative E-Side Restructuring Document, or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the transactions contemplated by, and perform the respective obligations under, this Agreement.

(c)    Power and Authority.  Except as expressly provided in this Agreement (including the exhibits hereto) or the Bankruptcy Code, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the transactions contemplated by, and perform the respective obligations under, this Agreement.

(d)    Governmental Consents.  Subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the transactions contemplated by this Agreement, including any Bankruptcy Court approval and/or regulatory approval for any Alternative E-Side Plan Document, the execution, delivery, and performance by it of this Agreement does not, and shall not, require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

(e)    No Conflicts.  Subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the transactions contemplated by this Agreement, including any Bankruptcy Court approval and/or regulatory approval for any Alternative E-Side Plan Document, the execution, delivery, and performance of this Agreement, does not and shall not violate any provision of law, rules or regulations applicable to it in any material respect. Moreover, the execution, delivery, and performance of this Agreement does not and shall not: (i) violate its certificate of incorporation, bylaws, or other organizational documents; or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material adverse effect on the transactions contemplated by this Agreement.

(f)    No Bar. As of the date hereof, it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement.

**Section 6.** *ACKNOWLEDGEMENT*.    NOTWITHSTANDING ANY OTHER PROVISION HEREIN, THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF VOTES FOR THE ACCEPTANCE OF A PLAN OF REORGANIZATION FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE, AND ANY SUCH OFFER OR

SOLICITATION MAY BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. THE RELEVANT PARTIES WILL NOT SOLICIT ACCEPTANCES OF THE ALTERNATIVE E-SIDE PLAN, AS APPLICABLE, FROM THE RELEVANT PARTIES IN ANY MANNER INCONSISTENT WITH THE BANKRUPTCY CODE OR APPLICABLE NON-BANKRUPTCY LAW.

**Section 7.** *Additional Key Terms Regarding EFIH PIK Settlement*.

(a)    In addition to the terms set forth in **Schedule 1** (as shall be set forth in the Alternative E-Side Plan), the EFIH PIK Settlement shall contain the terms set forth below in this Section 7.

(b)    Prior to the EFH Effective Date, the Makewhole Litigation Oversight Committee shall be comprised of four representatives (all of whom shall be an Initial Supporting Creditor or a representative thereof and shall not hold, or have any interests in, the EFIH First Lien Notes or EFIH Second Lien Notes, each an "**Unconflicted Initial Supporting Creditor**"). Each Unconflicted Initial Supporting Creditor shall appoint one representative to the Makewhole Litigation Oversight Committee, which shall be established on the Confirmation Date (the "**Pre-Effective Date Makewhole Litigation Oversight Committee**"). The Plan Supplement shall include (i) the governance and mechanics of the Pre-Effective Date Makewhole Litigation Oversight Committee and (ii) the governance, mechanics and composition, of the Makewhole Litigation Oversight Committee after the EFH Effective Date, each of which shall be negotiated in good faith by and among the Supporting Creditors. Notwithstanding the foregoing, unless otherwise agreed to by each of the Unconflicted Initial Supporting Creditors, any decision of the Pre-Effective Date Makewhole Litigation Oversight Committee shall be by consent of those holding a majority of the total amount of EFIH Unsecured Notes held by the Unconflicted Initial Supporting Creditors. The benefit of any settlement of the Secured Makewhole Claims approved by the Makewhole Litigation Oversight Committee or, prior to the Confirmation Date, by the Initial Supporting Creditors, shall be distributed *ratably* among all Holders of Allowed Class B5 Claims and Allowed Class B6 Claims pursuant to the terms of the Alternative E-Side Plan until such time such Holders have received a 100% recovery on account of their respective Allowed Claims  For the avoidance of doubt, neither the Initial Supporting Creditors nor the members of the Makewhole Litigation Oversight Committee, as applicable, shall receive any consideration in excess of their *pro rata* share as holders of EFIH Unsecured Notes.

(c)    Notwithstanding the foregoing or anything to the contrary in **Schedule 1**, any consent rights or other rights granted to the Makewhole Litigation Oversight Committee concerning the settlement of the EFIH First Lien Makewhole Claims and/or EFIH Second Lien Makewhole Claims or otherwise shall be effective as of the date of the Agreement Effective Date. Until the appointment of the Pre-Effective Date Makewhole Litigation Oversight Committee on the Confirmation Date, any decision regarding the settlement of the EFIH First Lien Makewhole Claims and/or EFIH Second Lien Makewhole Claims or otherwise shall be by consent of those holding a majority of the total amount of EFIH Unsecured Notes held by the Unconflicted Initial Supporting Creditors.

(d)     Within three (3) Business Days after this Agreement becomes effective as to the Threshold Supporting Creditors, the Supporting Creditors and the PIK Notes Trustee shall withdraw, without prejudice, any outstanding discovery requests directed at the EFH/EFIH Debtors and NEE, its affiliates, or its Representatives in connection with the Chapter 11 Cases. For the avoidance of doubt, if this Agreement is terminated pursuant to Section 8, nothing herein shall preclude the Supporting Creditors or the PIK Notes Trustee from pursuing additional discovery against the EFH/EFIH Debtors and NEE, its affiliates, or its Representatives and all rights are reserved with respect thereto;

(e) The EFH/EFIH Debtors shall consult with the Supporting Creditors concerning any extensions of the deadlines under the NEE PSA and/or the Merger Agreement by which (i) the EFH/EFIH Debtors obtain entry of the Alternative E-Side Confirmation Order or (ii) the March 29, 2017 Initial Drop-Dead Date and Final Drop Dead Date (each as defined in the NEE PSA) must occur, in each case in advance of agreeing to such extensions.

(f) In addition to obligations set forth in Section 4.01(a) hereof, no later than three (3) Business Days after the Amendment Effective Date, the EFH/EFIH Debtors shall, and the Threshold Supporting Creditors shall direct the PIK Notes Trustee to, jointly file a motion or other pleading (individually and collectively, the "**PIK Makewhole Litigation Stay Motion**") requesting that the United States District Court for the District of Delaware (the "**District Court**") or other court with jurisdiction enter an order staying (the order issuing such stay, the "**PIK Makewhole Litigation Stay Order**") the appeal to which the PIK Notes Trustee is a party seeking payment on Makewhole Claims for the PIK Notes (Case No. 15-1099) (the "**PIK Makewhole Litigation**"), *provided, however,* that if the District Court grants the EFH/EFIH Debtors' motion for summary affirmance pending in the PIK Makewhole Litigation (Dkt. No. 27) or otherwise disposes of the PIK Makewhole Litigation prior to the entry of the PIK Makewhole Litigation Stay Order, the Threshold Supporting Creditors may direct the PIK Notes Trustee to further appeal the PIK Makewhole Litigation to the Court of Appeals for the Third Circuit prior to the EFH/EFIH Debtors and the PIK Notes Trustee, as directed by the Threshold Supporting Creditors, jointly filing the PIK Makewhole Litigation Stay Motion at the Court of Appeals for the Third Circuit.

(g)     Immediately prior to the Effective Time (as defined in the Merger Agreement), the EFH/EFIH Debtors shall, and the Threshold Supporting Creditors shall direct the PIK Notes Trustee to, enter into a Stipulation of Dismissal Pursuant to Rule 42(B) of the Federal Rules of Appellate Procedure (or other similar document), sufficient to, subject to the Bankruptcy Code and applicable law, irrevocably dismiss with prejudice (y) the PIK Makewhole Litigation and (z) the District Court appeal to which the PIK Notes Trustee is a party seeking payment of the PPI Claims for the PIK Notes (Case No. 15-1098) (the "**PIK PPI Litigation"**, and together with the PIK Makewhole Litigation, the "**PIK Notes Appeals**" and such stipulation or other document, individually and collectively, the "**PIK Notes Appeals Withdrawal Stipulation**").

(h)     Neither the EFH/EFIH Debtors nor the Supporting Creditors shall, and the Supporting Creditors shall not direct or permit the PIK Notes Trustee to, directly or indirectly, object to, take any other action or refrain from taking any action which could reasonably be expected to interfere with, delay or impede: (A) the filing or submission of the PIK Notes Appeals Withdrawal Stipulation to any court or tribunal before which the PIK Notes Appeals are

15

pending; or (B) the dismissal with prejudice of the PIK Notes Appeals in accordance with the terms and provisions of this Agreement or the PIK Notes Appeals Withdrawal Stipulation.

(i) The EFH/EFIH Debtors and the Supporting Creditors shall, and the Supporting Creditors shall direct the PIK Notes Trustee to, take any and all further acts, deeds, and assurances (including, without limitation, executing and delivering certificates, instruments, and documents reasonably requested by the EFH/EFIH Debtors) as such parties may deem reasonably necessary or desirable from time to time in order to: (A) carry out more effectively the purposes of this Section 7; and (B) cause the dismissal with prejudice of the PIK Notes Appeals in accordance with this Agreement or the PIK Notes Appeals Withdrawal Stipulation.

(j)    [Reserved]; and

(k)    <u>Duration of PIK Notes Appeals Stays</u>.    The Supporting Creditors and the EFH/EFIH Debtors each shall use commercially reasonable efforts to cause the PIK Makewhole Litigation Stay Order to be issued as promptly as practicable. Once issued, none of the Supporting Creditors or the EFH/EFIH Debtors shall take any action, and the Supporting Creditors shall use commercially reasonable efforts to cause the PIK Notes Trustee not to take any action, that would cause the PIK Makewhole Litigation Stay Order to cease to remain in effect until the earlier of (i) such time as this Agreement terminates as to the Supporting Creditors, and (ii) such time as the PIK Makewhole Litigation is irrevocably dismissed with prejudice.  Moreover, none of the Supporting Creditors or the EFH/EFIH Debtors shall take any action, and the Supporting Creditors shall use commercially reasonable efforts to cause the PIK Notes Trustee not to take any action, that would cause the currently-stayed PIK PPI Litigation to cease to remain stayed until the earlier of (i) such time as this Agreement terminates as to the Supporting Creditors, and (ii) such time as the PIK PPI Litigation is irrevocably dismissed without prejudice.

(l)    <u>Alternative E-Side Plan Provisions</u>.  The Alternative E-Side Plan shall:

(i)    allow the EFIH General Unsecured Claim which shall consist of the entirety of the Allowed Claim for Holders of Class B6 Claims, without prejudice to the rights of the PIK Indenture Trustee to further exercise its charging lien pursuant to the EFIH Unsecured Notes Indenture;

(ii)    provide for a release and injunction in favor of the PIK Notes Trustee from any claims brought by any party arising from or relating to any action or inaction it takes with respect to the PIK Makewhole Claim, the PIK PPI Claim, or with respect to any action or inaction it takes pursuant to the EFIH PIK Settlement and/or at the direction of the Threshold Supporting Creditors and all litigation related thereto;

(iii)    provide that, on the EFH Effective Date, the EFHH/EFIH Debtors shall (1) pay an amount of no less than the accrued and unpaid fees incurred as of the EFH Effective Date by the PIK Notes Trustee (including all reasonable professional fees and expenses) (the "**EFIH Base Payment Amount**") and (2) not dispute that such EFIH Base Payment Amount (including any fees owed to Centerview Partners LLC ("**Centerview**"), financial advisor to the PIK Notes Trustee, pursuant to the terms of Centerview's engagement agreement with the PIK

16

Notes Trustee, including any fees owed upon consummation of a "Transaction" (as defined in that certain original engagement letter, dated March 10, 2015)), are reasonable and allowed claims under the EFIH Unsecured Notes Indentures; *provided, however*, that if the Bankruptcy Court finds that the EFIH Base Payment Amount shall not be paid on the EFH Effective Date, such ruling shall not give rise to any rights or remedies under Section 8.01 of this Agreement. The payment of such amounts to the PIK Notes Trustee in accordance with the terms herein shall not be subject to disgorgement, setoff, recoupment, reduction or reallocation of any kind in the event this Agreement is subsequently terminated and is without prejudice to the PIK Notes Trustee's subsequent exercise of any charging lien. The payment of the EFIH Base Payment Amount shall be considered a "charging lien advance" pursuant to Sections 6.12, 6.13 and 7.07 of the EFIH PIK Notes Indenture; and

        (iv)    provide that if the Class of EFIH Unsecured Creditors votes in favor of the Alternative E-Side Plan, all Holders of EFIH Unsecured Notes Claims will be bound by the EFIH PIK Settlement and all Holders of EFIH Unsecured Notes Claims will be barred from seeking additional recovery on account of any Makewhole Claims or PPI Claims.

    (m)Alternative E-Side Confirmation Order. The Alternative E-Side Confirmation Order shall (i) approve an Alternative E-Side Plan containing the terms and provisions set forth in Section 7 and **Schedule 1**; and (ii) authorize and direct the PIK Notes Trustee to comply with the directives of the Threshold Supporting Creditors.

**Section 8.** *Termination Events.*

    8.01.   Supporting Creditors Termination Events. Except as expressly set forth herein, this Agreement shall automatically terminate as between the Supporting PIK Parties and the EFH/EFIH Debtors without further action by the Terminating Supporting Creditor (as defined below), following the delivery to the other Parties of a written notice in accordance with Section 10.11 hereof by, as applicable, the Supporting Creditors holding at least 50.1 % of the aggregate amount of EFIH Unsecured Note Claims held by all Supporting Creditors (the "**Required Supporting PIK Creditors**"), in each case, in the exercise of their discretion, upon the occurrence of or any time after any of the following events has occurred and is continuing:

    (a) the filing of any amendment or modification of the Alternative E-Side Plan in a manner inconsistent with this Agreement and materially adverse to the Supporting Creditors upon which a termination pursuant to this Section 8.01 would be effective (such creditors, the "**Terminating Supporting Creditors**") (it being understood that any amendment or modification of the EFIH PIK Settlement made without the consent of the Required Supporting PIK Creditors will be considered materially adverse to the applicable Terminating Supporting Creditors and that any decrease of the Merger Sub Cash Amount shall be considered materially adverse to the Supporting Creditors) and such filing has not been withdrawn within ten days after delivery of a written notice by the Terminating Supporting Creditor or Creditors to the other Parties in accordance with Section 10.11 hereof; *provided, further however*, that the termination right in this clause (a) shall not be available if any Terminating Supporting Creditor directly or indirectly supported, or encouraged any other entity to directly or indirectly support, any request for such an amendment or modification of the Alternative E-Side Plan;

(b) the material breach by the EFH/EFIH Debtors of any of the commitments, representations, warranties, covenants, or other obligations of the EFH/EFIH Debtors as set forth in this Agreement, that would have a material adverse effect on the Alternative E-Side Plan and the transactions contemplated by this Agreement; *provided, however*, if such breach is capable of being cured, the EFH/EFIH Debtors shall have fifteen (15) business days after receiving such notice to cure any such breach;

(c) the Alternative E-Side Confirmation Order is reversed, dismissed, vacated, or amended, after entry, in a manner that would adversely affect any provisions that relate to the EFIH PIK Settlement;

(d) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final and non-appealable injunction, judgment, decree, charge, ruling, or order permanently restraining, enjoining, rendering illegal, or otherwise prohibiting, directly or indirectly, the transactions contemplated by this Agreement in accordance with this Agreement; *provided, however*, that the termination right in this clause (d) shall not be available if any Terminating Supporting Creditor directly or indirectly supported, or encouraged any other entity to directly or indirectly support, any request for such a final and non-appealable injunction, judgment, decree, charge, ruling, or order; *provided, further, however*, that notwithstanding the foregoing, the Parties shall have thirty (30) Business Days after issuance of such a final and non-appealable injunction, judgment, decree, charge, ruling, or order in which to obtain relief that would allow consummation of the transactions contemplated by this Agreement in accordance with this Agreement before the termination right in this clause (d) becomes effective;

(e) an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee shall have been appointed in the Chapter 11 Cases; *provided, however*, that the termination right in this clause (e) shall not be available to any Terminating Supporting Creditor that directly or indirectly supported, or encouraged any other entity to directly or indirectly support, any request for the appointment of such an examiner or a trustee; *provided, further, however*, that the termination right in this clause (e) shall become effective five (5) Business Days after delivery of a written notice by the Terminating Supporting Creditors to the other Parties in accordance with Section 10.11 hereof;

(f) the EFH/EFIH Debtors file any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement in any respect that is material and adverse to the Terminating Supporting Creditors and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within five (5) Business Days of receipt of notice by the EFH/EFIH Debtors that such motion or pleading is inconsistent with this Agreement;

(g) the entry of a ruling or order by the Bankruptcy Court or any other court with appropriate jurisdiction that, in each case, would have the effect of preventing consummation of the transactions contemplated by this Agreement in a manner consistent with this Agreement; *provided, however*, that the termination right in this clause (g) shall not be available to any Terminating Supporting Creditor that directly or indirectly supported, or encouraged any other entity to directly or indirectly support, any request for such a ruling or order by the Bankruptcy Court or any other court; *provided, further, however*, that notwithstanding the foregoing, the

18

Parties shall have thirty (30) Business Days after issuance of such a ruling or order to obtain relief that would allow consummation of the transactions contemplated by this Agreement in accordance with this Agreement before the termination right in this clause (g) becomes effective;

(h) the conversion or dismissal of any of the Chapter 11 Cases unless such conversion or dismissal, as applicable, contemplates the consummation of the transactions contemplated by this Agreement in a manner consistent with this Agreement; *provided, however*, that the termination right in this clause (h) shall not be available to any Terminating Supporting Creditor that directly or indirectly supported, or encouraged any other entity to directly or indirectly support, any request for such a conversion or dismissal of the Chapter 11 Cases; *provided, further, however*, that the termination right in this clause (h) shall become effective five (5) Business Days after delivery of a written notice by the Terminating Supporting Creditors to the other Parties in accordance with Section 10.11 hereof;

(i) [Reserved];

(j) the Alternative E-Side Plan is not confirmed by February 22, 2017 or such later date, but in no event later than April 30, 2017, agreed to by NextEra in writing; *provided, however*, that entry of such order shall be deemed to occur upon an oral indication by the Bankruptcy Court that it is approving or will approve the requested relief;

(k) the Alternative E-Side Confirmation Order (as entered by the Bankruptcy Court), or the Alternative E-Side Plan, are inconsistent with this Agreement in a way that materially and adversely affects the EFIH PIK Settlement or the EFIH PIK Parties (it being understood that (i) any term inconsistent with Section 7 and/or Schedule 1 of this Agreement in a manner that adversely affects the EFIH Parties shall be considered material and (ii) any decrease of the Merger Sub Cash Amount shall be considered materially adverse);

(l) if the Merger Agreement is terminated; *provided, however*, notwithstanding anything to the contrary in this Section 8.01(l) or Sections 8.01(a)-(k), the Supporting Creditors shall not have a termination right under this Section 8.01 if the Merger Agreement is terminated in accordance with its terms and the EFH/EFIH Debtors pursue an alternative restructuring that preserves the EFIH PIK Settlement and is otherwise reasonably satisfactory to the Required Supporting PIK Creditors and with such other changes as may be agreed upon by the EFH/EFIH Debtors, the Required Supporting PIK Creditors, and any potential purchaser party to such alternative restructuring.

Notwithstanding anything to the contrary herein, this Agreement shall automatically terminate as between an individual Supporting Creditor (an "Individual Terminating Creditor") and the other Parties without further action by the Individual Terminating Creditor following delivery by the Individual Terminating Creditor to the other Parties of a written notice in accordance with Section 10.11 hereof by, in the exercise of its discretion, if the Alternative E-Side Plan is not confirmed by February 28, 2017 or a later date, but in no event later than May 31, 2017, agreed to by NextEra in writing; *provided, however*, that entry of such order shall be deemed to occur upon an oral indication by the Bankruptcy Court that it is approving or will approve the requested relief.

8.02.    [Reserved].

8.03.    <u>EFH/EFIH Debtor Termination Events as to the Supporting Creditors</u>.  Except as expressly set forth herein, this Agreement shall automatically terminate as between the Debtors and the Supporting Creditors without further action by the Terminating EFH/EFIH Debtor (as defined below), following the delivery to the other Parties of a written notice in accordance with Section 10.11 hereof by such Terminating EFH/EFIH Debtor (a "**Terminating EFH/EFIH Debtor**"), in the exercise of its discretion, upon the occurrence of or any time after any of the following events has occurred and is continuing:

(a)    the material breach by the Required Supporting PIK Creditors of the commitments, representations, warranties, or covenants of the Required Supporting PIK Creditors as set forth in this Agreement that would have an adverse effect on the Alternative E-Side Plan and the transactions contemplated by this Agreement; *provided, however*, if such breach is capable of being cured, the Supporting Creditors shall have fifteen (15) Business Days after receiving such notice to cure any such breach;

(b)    [Reserved];

(c)    the Required Supporting PIK Creditors file any motion or pleading with the Bankruptcy Court or any other court that is inconsistent with this Agreement in any respect that is adverse to the EFH/EFIH Debtors and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court or applicable court within ten (10) Business Days of receipt of notice by the Required Supporting PIK Creditors that such motion or pleading is inconsistent with this Agreement;

(d)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final and non-appealable injunction, judgment, decree, charge, ruling, or order permanently restraining, enjoining, rendering illegal, or otherwise prohibiting, directly or indirectly, the transactions contemplated by this Agreement in accordance with this Agreement; *provided, however*, that the termination right in this clause (d) shall not be available if the Terminating EFH/EFIH Debtor (i) did not use its commercially reasonable efforts to contest such injunction, judgment, decree, charge, ruling, or order prior to its becoming final and non-appealable, or (ii) directly or indirectly supported, or encouraged any other entity to directly or indirectly support, any request for such a final and non-appealable injunction, judgment, decree, charge, ruling, or order; *provided, further, however*, that notwithstanding the foregoing, the Parties shall have thirty (30) Business Days after issuance of such a final and non-appealable injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the transactions contemplated by this Agreement in accordance with this Agreement before the termination right in this clause (d) becomes effective;

(e)    an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee shall have been appointed in the Chapter 11 Cases; *provided, however*, that the termination right in this clause (e) shall not be available if the Terminating EFH/EFIH Debtor directly or indirectly supported, or encouraged any other entity to directly or indirectly support, any request for the appointment of such an examiner or a trustee; *provided, further, however*, that the termination right in this clause (e) shall become

20

effective five (5) Business Days after delivery of a written notice by the Terminating EFH/EFIH Debtor to the other Parties in accordance with Section 10.11 hereof;

(f)　　the entry of a ruling or order by the Bankruptcy Court or any other court with appropriate jurisdiction that, in each case, would have the effect of preventing consummation of the transactions contemplated by this Agreement in a manner consistent with this Agreement; *provided, however*, that the termination right in this clause (f) shall not be available if the Terminating EFH/EFIH Debtor directly or indirectly supported, or encouraged any other entity to directly or indirectly support, any request for such a ruling or order by the Bankruptcy Court or any other court; *provided, further, however*, that notwithstanding the foregoing, the Parties shall have thirty (30) Business Days after issuance of such a ruling or order to obtain relief that would allow consummation of the transactions contemplated by this Agreement in accordance with this Agreement before the termination right in this clause (f) becomes effective;

(g)　　the conversion or dismissal of any of the Chapter 11 Cases, unless such conversion or dismissal, as applicable, contemplates the consummation of the transactions contemplated by this Agreement in a manner consistent with this Agreement; *provided, however*, that the termination right in this clause (g) shall not be available if the Terminating EFH/EFIH Debtor directly or indirectly supported, or encouraged any other entity to directly or indirectly support, any request for such a conversion or dismissal of the Chapter 11 Cases; *provided, further, however*, that the termination right in this clause (g) shall become effective five (5) Business Days after delivery of a written notice by the Terminating EFH/EFIH Debtor to the other Parties in accordance with Section 10.11 hereof; and

(h)　　until entry of the Alternative E-Side Confirmation Order by the Bankruptcy Court, the board of directors, the board of managers, or any such similar governing body of any EFH/EFIH Debtor determines, in its sole discretion after consultation with its independent financial advisors and outside legal counsel, and based on the advice of such counsel, that proceeding with the transactions contemplated by this Agreement would be inconsistent with its applicable fiduciary duties.

8.04.　　[Reserved].

8.05.　　<u>Mutual Termination</u>.　This Agreement, and the obligations of all Parties hereunder, may be terminated, upon written notice to all other Parties in accordance with Section 10.11, by mutual agreement among all of the following: (a) the EFH/EFIH Debtors; and (b) the Required Supporting PIK Creditors.

8.06.　　<u>Termination Upon Completion of the Restructuring Transactions</u>.　Subject to 8.01(l), this Agreement shall terminate automatically upon the occurrence of the Effective Time (as defined in the Merger Agreement), without any further required action or notice.

8.07.　　<u>Limitation on Termination</u>.　The Parties acknowledge and agree that a Party's ability to terminate this Agreement shall only be available for so long as the event, condition, or circumstance giving rise to such termination right is continuing at the time of such termination.

8.08.　　<u>Effect of Termination</u>.　No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this

Agreement, and such failure to perform or comply caused, or resulted in, the occurrence of one or more termination events specified herein. The date on which termination of this Agreement as to a Party is effective in accordance with Section 8 shall be referred to as an "**Agreement Termination Date**." Upon the occurrence of an Agreement Termination Date as to a Party (but only as to such Party), except as expressly provided in this Agreement, (a) this Agreement shall be of no further force and effect with respect to such Party, (b) each Party entitled to such termination shall be released from its commitments, undertakings, and agreements under this Agreement and shall have the rights that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the transactions contemplated by this Agreement or otherwise, that it would have been entitled to take had it not entered into this Agreement, and (c) the remaining Parties to this Agreement, if any, shall be released from any commitments, undertaking, and agreements owed to such terminated Party under this Agreement; *provided, however*, that this Section 8.07, Section 10.04, Section 10.06, Section 10.08, Section 10.10, Section 10.11, Section 10.12 and Section 10.14 shall survive termination of this Agreement. Notwithstanding anything to the contrary in this Agreement, the foregoing shall not be construed to prohibit any of the Parties from contesting whether any such termination is in accordance with the terms of this Agreement. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party, or the ability of any Party to protect and preserve its rights, remedies, and interests, including its claims against any EFH/EFIH Debtor or any other Party. Nothing in this Section 8.08 shall restrict any EFH/EFIH Debtor's right to terminate this Agreement in accordance with Section 8.03(h).

In addition, and for the avoidance of doubt, the termination rights and effect of termination provided for under this Section 8 apply only to this Agreement (without reference to the exhibits). The applicable termination rights and effect of termination of other agreements between or among any of the Parties, including those attached to this Agreement as exhibits, are governed according to the respective terms and conditions of such agreements.

**Section 9.  *Amendments*.** This Agreement may not be modified, amended, or supplemented in any manner except in writing signed by (i) each of the EFH/EFIH Debtors; and (ii) the Required Supporting PIK Creditors; *provided, however*, that the terms of the EFIH PIK Settlement set forth in Section 7 and on Schedule 1 of this Agreement shall not be modified, amended, or supplemented without the prior written consent of each Supporting Creditor.  Any proposed modification, amendment, or supplement that is not approved by the requisite Parties as set forth above shall be ineffective and void *ab initio*.  For the avoidance of doubt, the limitations and requirements for amendment, modification, or supplementation provided for in this Section 9 apply only to this Agreement (without references to the exhibits).  Notwithstanding anything to the contrary in this Agreement, the applicable limitations and requirements to modify, amend, supplement, or waive any provision of other agreements between or among any of the Parties, including those attached to this Agreement as exhibits, are governed according to the respective terms and conditions of such agreements.

**Section 10.  *Miscellaneous*.**

10.01.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the

matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Alternative E-Side Plan and the transactions contemplated by this Agreement.

10.02. <u>Complete Agreement</u>. This Agreement (including any exhibits or schedules hereto including as actually executed) and the other agreements named herein constitute the entire agreement of the Parties with respect to the subject matter hereof, and cancel, merge, and supersede all other prior or contemporaneous oral or written agreements, understandings, representations, and warranties both written and oral, among the Parties, with respect to the subject matter hereof. Each Party hereto agrees that, except for the representations and warranties contained in this Agreement, none of the Parties make any other representations or warranties, and each Party hereby disclaims any other representations or warranties, express or implied, or as to the accuracy or completeness of any other information, made by, or made available by, itself or any of its representatives, with respect to, or in connection with, the negotiation, execution, or delivery of this Agreement or the transactions contemplated by this Agreement, notwithstanding the delivery or disclosure to the other or the other's representatives of any documentation or other information with respect to any one or more of the foregoing

10.03. <u>Headings</u>. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

10.04. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT SHALL BE CONSTRUED, PERFORMED, AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. EACH OF THE PARTIES HERETO (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, OR, IF THE BANKRUPTCY COURT DECLINES TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, THEN THE CHANCERY COURT OF THE STATE OF DELAWARE, AND IF THE CHANCERY COURT OF THE STATE OF DELAWARE DECLINES JURISDICTION, THEN ANY STATE OR FEDERAL COURT SITTING IN DELAWARE (THE "**CHOSEN COURTS**") IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, (II) AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE CHOSEN COURTS, AND (III) AGREES NOT TO BRING ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY OTHER COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT (SUBJECT TO ANY APPEALS THEREFROM) IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE LAW. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE

TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT IN THE CHOSEN COURTS IN ACCORDANCE WITH THE PROVISIONS OF THIS SECTION 10.04. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN THE CHOSEN COURTS. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.11. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

10.05. <u>Confidentiality; Disclosure</u>. Each Party shall keep strictly confidential and shall not, without the prior written consent of the applicable Supporting Creditor, disclose the holdings of any individual Supporting Creditor; *provided*, *however*, that the EFH/EFIH Debtors may disclose (i) such information to the extent that, after consultation with counsel and upon notice to the applicable Supporting Creditor, it determines in good faith that it is required to do so by any law, rule, regulation (including federal securities laws and regulations), or by any governmental, judicial, or regulatory authority, including the Bankruptcy Court, and (ii) the aggregate principal amount or aggregate percentage of each Class of Claims held by the Supporting Creditors. This Section 10.05 shall not apply with respect to any information that is or becomes available to the public other than as a result of a disclosure in violation of a Party's obligations under this Agreement.

10.06. <u>WAIVER OF TRIAL BY JURY</u>. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.06.

10.07. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts (including by electronic means), each such counterpart being deemed to be an original instrument, and all such counterparts taken together constituting one and the same agreement.

10.08. <u>Interpretation and Rules of Construction</u>. This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against

any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Parties were each represented by counsel during the negotiations, and drafting of this Agreement and continue to be represented by counsel. In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

10.09.  <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and, except as otherwise expressly permitted herein, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

10.10.  <u>Independent Due Diligence and Decision Making</u>.  Each EFH/EFIH Debtor, the PIK Notes Trustee, and each Supporting Creditor hereby confirms that it is (a) a sophisticated party with respect to the matters that are the subject of this Agreement, (b) has had the opportunity to be represented and advised by legal counsel in connection with this Agreement and acknowledges and agrees that it voluntarily and of its own choice and not under coercion or duress enters into this Agreement, (c) has adequate information concerning the matters that are the subject of this Agreement, and (d) has independently and without reliance upon any other Party hereto, or any of their affiliates, or any officer, employee, agent, or representative thereof, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon each other Party's express representations, warranties, and covenants in this Agreement.

10.11.  <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to the EFH/EFIH Debtors, to:

Energy Future Holdings Corp.
1601 Bryan Street,
Dallas, Texas 75201
Attention: Andrew Wright
E-mail addresses:
                    andrew.wright@energyfutureholdings.com


with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile: (212) 446-4900
Attention: Edward O. Sassower, P.C. and Aparna Yenamandra
E-mail addresses:  edward.sassower@kirkland.com
                    Aparna.yenamandra@kirkland.com

25

--and--

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Facsimile: (312) 862-2200
Attention: James H.M. Sprayregen, P.C., Marc Kieselstein, P.C., and Chad J. Husnick
E-mail addresses:  james.sprayregen@kirkland.com
                   marc.kieselstein@kirkland.com,
                   chad.husnick@kirkland.com

--and--

Proskauer Rose LLP
Three First National Plaza
70 W. Madison Street, Suite 3800
Chicago, Illinois 60602
Facsimile: (312) 962-3551
Attention: Jeff J. Marwil, Mark. K. Thomas, and Peter J. Young
E-mail addresses:  jmarwil@proskauer.com
                   mthomas@proskauer.com
                   pyoung@proskauer.com

--and--

Cravath Swaine and Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Facsimile: (212) 474-3700
Attention: Philip Gelston
E-mail address:  pgelston@cravath.com

--and--

Jenner & Block LLP
919 Third Avenue
New York, New York 10022
Facsimile: (212) 891-1699
Attention: Richard Levin
E-mail address:  rlevin@jenner.com

26

(b)    if to the PIK Notes Trustee, to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
Attention: Ira S. Dizengoff and Scott L. Alberino
E-mail addresses:  idizengoff@akingump.com
                           salberino@akingump.com

--and--

Foley & Lardner LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654
Attn: Harold L. Kaplan and Mark F. Hebbeln
Email addresses: hkaplan@foley.com
                        mhebbeln@foley.com

--and--

UMB Bank, N.A.
1010 Grand Avenue
4th Floor
Kansas City, Missouri  64108
Attention: Mark Flannagan
E-mail address:  Mark.Flannagan@umb.com

For such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above. Any notice given by delivery, mail, or courier shall be effective when received.

10.12.  Waiver.  If this Agreement is terminated for any reason in accordance with its terms, the Parties fully reserve any and all of their rights, except as otherwise expressly set forth in this Agreement.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or to pursue the consummation of the Alternative E-Side Plan.

10.13.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, that such breach would represent irreparable harm, and that each non-breaching Party shall be entitled to specific performance of the terms hereof and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages), including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, in addition to any other remedy at law or equity; *provided, however*, that no Party shall be liable for special, indirect, consequential, or punitive

27

damages arising out of, in connection with, or relating to this Agreement or any agreement or instrument contemplated hereby.

10.14.  <u>Several, Not Joint, Obligations</u>.  The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

10.15.  <u>Severability</u>.  If any term or other provision of this Agreement shall be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of this Agreement is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the essential terms and conditions of this Agreement are fulfilled to the extent possible.

10.16.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

10.17.  <u>NEE PSA</u>.  This Agreement is in addition to, and does not supersede, the NEE PSA.  As between the EFH/EFIH Debtors and NEE, to the extent of any conflict between the provisions of this Agreement and the NEE PSA, this Agreement shall control; *provided*, *however*, that notwithstanding anything to the contrary in this Agreement, the EFH/EFIH Debtors shall be permitted to take any action (or refrain from taking any action) to the extent necessary to comply with the NEE PSA or Merger Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

*[Remainder of page intentionally left blank.]*