1   UNITED STATES BANKRUPTCY COURT

2   FOR THE DISTRICT OF DELAWARE

3   Case No. 14-10979-css

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   Energy Future Holdings, Corp. et al.

8

9           Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13

14                      United States Bankruptcy Court

15                      824 N. Market Street

16                      Wilmington, DE   19805

17                      July 26, 2017

18                      10:33 a.m.

19

20

21

22  B E F O R E:

23  HON. CHRISTOPHER S. SONTCHI

24  U.S. BANKRUPTCY JUDGE

25  ECRO:  LESLIE MURIN

1    HEARING RE DI 11425:  Motion of the EFH/EFIH Debtors for

2    Entry of an Order Scheduling Certain Hearing Dates and

3    Deadlines and Establishing Certain Protocols in Connection

4    with Confirmation of the Joint Plan of Reorganization of

5    Energy Future Holdings Crop, Energy Future Intermediate

6    Holding Company LLC, and the EFH/EFIH Debtors

7

8    HEARING RE DI 11506:  The Elliott Funds' Motion to Adjourn

9    Hearing on the Motion of the EFH/EFIH Debtors for Order

10   Authorizing Entry into Merger Agreement and Approving

11   Termination Fee

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Theresa Pullan & Sonya Ledanski Hyde

Page 3

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP/KIRKLAND & ELLIS INTERNATIONAL LLP

4         Attorneys for Debtors and Debtors in Possession

5         300 North LaSalle

6         Chicago, Illinois  60654

7    BY:   CHAD J. HUSNICK, ESQ.

8         MARC P. KIELSELSTEIN, ESQ.

9         BRIAN M. STEPHANY, ESQ. (DC Office)

10        MARK MCKANE, ESQ. (San Francisco Office)

11

12   SULLIVAN AND CROMWELL

13        Attorneys for Creditors Committee

14        125 Broad Street

15        New York, NY  10004

16   BY:   BRIAN D. GLUECKSTEIN

17

18   ROPES & GRAY

19        Attorneys for Elliott Funds

20        1211 Avenue of the Americas

21        New York, NY  10036

22   BY:   GREGG M. GALARDI, ESQ.

23

24

25

1                         P R O C E E D I N G S

2          (Call to order of the Court.)

3                THE COURT:  Please be seated.  Good morning.

4                ALL:  Good morning, Your Honor.

5                THE COURT:  We have Mr. Brody in the house, so we

6     can start.

7                UNIDENTIFIED:  Thank you, Your Honor.

8                THE COURT:  You're welcome.

9                MR. HUSNICK:  Your Honor, if I may approach.  It's

10    Chad Husnick from Kirkland & Ellis appearing on behalf of the

11    debtors.  I'm here with my colleagues Mr. McKane, Mr. Bryan

12    Stephany and Mr. Marc Kieselstein who will be participating

13    in the hearing today on behalf of the debtors.

14                THE COURT:  Okay.

15                MR. HUSNICK:  Your Honor, if I may approach with

16    the presentation.

17                THE COURT:  Yes.

18                UNIDENTIFIED:  [indiscernible]

19                THE COURT:  Yeah, she couldn't make it today.

20                MR. HUSNICK:  Your Honor, we're here today on the

21    debtors' motion to approve a scheduling order for

22    confirmation, consummation of the Berkshire transaction that

23    I discussed on the record at the last omnibus hearing.

24                Your Honor may remember that on July 7th, the

25    debtors filed a plan of reorganization, a disclosure

1    statement, a motion in support of or approval of a merger

2    agreement with Berkshire including the associated termination

3    fee as well as a motion to approve the disclosure statement.

4              On July 19th, Elliott filed an objection to the

5    debtors' scheduling motion and a motion to adjourn the August

6    10th hearing date that the debtors had set for the motion to

7    approve the merger agreement.  Their objection, Your Honor,

8    I'll talk about in a moment, asked for a delay to the

9    schedule.

10             The debtors are here today asking that the Court

11   overrule that objection and deny the motion for adjournment

12   of the merger agreement approval motion.

13             Your Honor, I'm not going to go through each of

14   these dates.  I'm sure Your Honor has read our proposed

15   schedule.  As you can imagine, we've been through this three

16   times with Your Honor, we have a pretty good idea of how long

17   things take, although we may underestimate given our youthful

18   optimism.  But we did our best to try and track the schedule

19   that we've used before with the goal of hitting an October

20   24th hearing.  Your Honor's chamber has indulged us with

21   scheduling that hearing to begin, the confirmation hearing to

22   begin on October 24th.

23             And we backed up from those dates and we set a host

24   of intermediate dates and we'll talk about these a little bit

25   later on on specific requests.  But suffice it to say the

1    first date to kick off this process is the subject of a

2    motion that was separately noticed up, that is the motion to

3    approve the Berkshire merger agreement and the related

4    termination fee.  That is scheduled to be heard on August

         th
5    10 , and then the disclosure statement motion which would

6    follow on the very next day on August 11th.  Your Honor,

7    those are very important dates to get this process moving.

8            Your Honor, how did we get to Berkshire Hathaway?

9    You know this story probably better than I do.  We've been

10   here for three years.  We've marketed this asset time and

11   time again.  In 2014, we had the informal marketing process

12   following on the termination of the initial RSA.  That led to

13   the 2015 exhaustive information marketing process in which

14   the debtors approached 50 potential strategic and financial

15   bidders and 28 of those bidders requested NDAs and 17 signed

16   NDAs.

17           In 2016, after the Hunt merger agreement

18   terminated, we revisited that process and we approached 18 of

19   the potential strategic and financial bidders who had

20   previously demonstrated an interest in acquiring the company,

21   and we once again signed eight of those to NDAs and we walked

22   through the process again.  And we ultimately came out on the

23   other end with, as Your Honor knows, two parties emerged --

24   one was Nextera, and one was Berkshire Energy as I reported

25   at the last hearing.

1            We ultimately selected Nextera as a higher or

2     otherwise better offer and we went to the PUCT.

3     Unfortunately, we didn't get regulatory approval of that

4     transaction either.

5            We are back here today, Your Honor, after having

6     gone back to the drawing board and reached an agreement with

7     Berkshire.

8            But one thing became very, very clear to the

9     debtors and I think to Your Honor based on the last hearing,

10    and that is we need to take a harder look at getting

11    regulatory approval.  We need to be more certain that we're

12    going to be able to obtain that approval before we walk down

13    yet another path.  And that's why, Your Honor, as we

14    discussed at the last hearing, that we've decided to flip the

15    process, to go to the PUCT first and ask for their approval.

16    And, Your Honor, then we will come to this Court and ask for

17    its approval on a confirmation.  And I think most of the

18    parties, bar for Elliott, agreed that that's probably the

19    appropriate approach.

20           So why did we select Berkshire against the backdrop

21    of knowing we need to have regulatory certainty?  Well,

22    Berkshire is a financially stable and very well regarded

23    energy or utility holding company.  We selected them as the

24    purchaser because their proposal was an all cash deal that

25    had no financing contingencies, yet, it still provided an

1    approximately $9 billion recovery to the debtors' estates,

2    that's in addition to the cash on hand.

3            Your Honor, that pays in full EFIH DIP.  That's the

4    6 point, it's over 6, I think it's $6.3 billion DIP facility,

5    pays in full the EFIH second liens.  As you know, we've

6    already repaid Mr. Anchor's (phonetic) clients, the EFIH

7    first lien, when we upsized the DIP facility.  It provides a

8    significant recovery to the EFIH unsecured creditors, albeit,

9    it is a lower amount than it was entitled that they were

10   going to be receiving under the next tara plan.  That's not

11   surprising. We're a year later out and that bid did not

12   succeed.  So that bid, the new bid, is lower.

13           It also permits a significant recovery to the EFH

14   creditors.  That is, it allows the EFH creditors to receive a

15   recovery on account of the cash that EFH had, which is a

16   separate pot of cash from the cash held by EFIH.  Of course,

17   that's subject to any potential dilution by the next tara

18   breakup fee if that next tara breakup fee becomes due and

19   payable and depending upon the allocation of that breakup fee

20   amongst EFIH and EFH on the other hand.

21           In addition to being an all cash deal from a

22   financially stable and well-regarded facility, we address

23   this regulatory issue, this issue that we've been dealing

24   with for the last three years.

25           What did Berkshire do that was different?  They

1    went down to Texas and they negotiated with the intervenors.

2    And what has come out of that is an agreement first with

3    eight, actually first it was with two, then it was with

4    eight, and now just of yesterday, they've added two

5    additional intervenors.  Berkshire is locking down these

6    intervenors as they move forward and building momentum

7    towards approval in the PUCT for this transaction.  This is a

8    previously unheard level of consensus in the PUCT process.

9            In addition to that, Your Honor, Berkshire was

10   willing to agree to the typical fiduciary duty structure and

11   it's similar to the one that we negotiated with Nextera.

12   Suffice to say and probably most important for today's

13   hearing, Your Honor, is this very first period.  From the

14   moment we signed the agreement with Berkshire on July 7th

15   until the approval, if it approves the Berkshire merger

16   transaction and the related termination fee, it's a free

17   option.  The debtors are able to explore all other higher or

18   otherwise better proposals as they come in and we are willing

19   to listen.  And if ultimately a higher or otherwise better

20   proposal comes forward that delivers the same or better

21   committed financing -- remember, no committed financing

22   required here -- it delivers the same or better regulatory

23   support, then the debtors are going to consider that offer

24   whether it comes from Elliott or any other stakeholder in the

25   world, quite frankly.

1        Once the merger agreement is approved, we fall into

2    a more standard fiduciary duty out if we exercise the

3    fiduciary duty out between August 10th and confirmation.  Of

4    course, we would have to pay the termination fee assuming

5    it's approved. After confirmation, there's no fiduciary, but

6    again, as I said at the last hearing, we actually think

7    that's not really a relevant time period anymore because we

8    will have obtained approval from the PUCT in advance of

9    confirmation, so it's going to proceed quite quickly to

10   closing.

11       So what are we hearing in objections?  Your Honor,

12   we hear form the Elliott Funds who we know is one of the

13   largest, perhaps, and I think it is the largest creditor on

14   the E side debtors.  But, its holdings are almost exclusively

15   focused in the EFIH box.  They're a large holder of the EFIH

16   PIC notes, they're a large holder of the EFIH second lien

17   notes.

18       We also heard from UMB Bank who filed a limited

19   joinder, or a joinder to the Elliott Funds' objection to the

20   scheduling motion, as well as a joinder to the motion to

21   adjourn the breakup fee hearing.  Notably, UMB Bank is a

22   fiduciary for the EFIH PIC notes which are controlled by

23   Elliott, so it's not surprising that UMB Bank would file a

24   joinder.

25       Lastly, with Sunrise Partners.  They filed a

1    joinder, again, just like UMB.  Sunrise is a purported owner

2    of EFIH PIC notes.  I would not have an opportunity to

3    independently verify that but I have no reason to doubt that

4    they are.  They're represented by Mr. Scott Talmadge.  We've

5    not heard of them before.

6             But one of the key factors across the three people

7    disputing the schedule here today is they're not parties who

8    owe duties generally to the estates.  They're not parties who

9    owe duties generally to the unsecured creditors of both EFIH

10   and EFH.  Instead, they're solely focusing on extracting

11   additional dollars for the EFIH pics at the potential expense

12   of others.  And that's a really, really critical point.  And

13   you're going to hear evidence on that fact that the higher or

14   otherwise better recoveries that Elliott is attempting to

15   obtain in the market are unlikely to yield any additional

16   recovery for other stakeholders other than the PICs.

17            Who is not objecting, Your Honor?  Well, the

18   debtors of course aren't objecting because it's their motion.

19   We're an estate fiduciary.  The EFH notes indentured trustee

20   who is the fiduciary for the EFH notes has filed a statement

21   in support of the debtors' motion and also noted their

22   objection to any effort to adjourn the motion on the breakup

23   fee.

24            We also understand that the EFH/EFIH committee,

25   that's the statutory fiduciary for the EFH and EFIH unsecured

1    creditors, is going to support the requested relief.  At

2    bottom, all of the estate fiduciaries support the relief.

3         The objecting parties demand a few things.  Most

4    importantly for the opening, Your Honor, is a 35 to 40 day

5    delay in the schedule.  That's a delay on the October 10th

6    hearing to authorize the Berkshire merger agreement and a

7    delay on the October 11th disclosure statement hearing.

8         THE COURT:  You mean August.

9         MR. HUSNICK:  I'm sorry, thank you.  August 11th.

10   Another Freudian slip.

11        The other extension that they asked, Your Honor,

12   and what we'll hear or what you'll see when you plot this out

13   on a schedule, is that these aren't simple delays to the

14   front end of the schedule.  They cause material ripple

15   effects through the schedule.  And we'll talk about that in a

16   little bit.  But it's not simple enough to just say, we're

17   going to move the date 30 to 45 days and we're going to hold

18   an October timeline.

19        The other two issues identified here, Your Honor,

20   we'll address in closing, but they relate to discovery

21   issues, and we can get to that later.  What I'm going to

22   focus on here is the schedule.

23        So let's talk about costs and benefits, or as Your

24   Honor has heard in prior hearings, the gives and the gets.

25   We think the only benefit to adjourning the hearing today and

1    granting the request of Elliott to deny the scheduling motion

2    or grant the original, or additional time, is to provide

3    Elliott with a marginal amount of additional time to obtain

4    committed financing and at least some level of regulatory

5    support similar to that continued in the Berkshire agreement.

6    But you're not going to hear any evidence today, Your Honor,

7    that such financing is guaranteed to come forward.  You're

8    going to hear quite the opposite.  You're going to hear that

9    they're in the nascent stages, as Mr. Kieselstein said to me

10   yesterday, it's in the embryonic stages.

11           You're going to also hear, Your Honor, that the

12   financing -- you're not going to hear, Your Honor, any

13   evidence the financing will provide an additional recovery

14   for other creditors at the EFIH box or at the EFH box.  It's

15   simply meant to benefit the one constituency that Elliott

16   controls.  I can't begrudge them that.  But it's important

17   when the Court is balancing the interest of the estates and

18   all of the creditors on one hand against the interest of a

19   stakeholder who is fighting to just increase and claw back

20   some of the recovery because it happened to buy in at a high

21   price.  That's what we're balancing here.

22           And we'll submit that at the end of the day when

23   Your Honor hears the evidence that I'm about to summarize,

24   it's going to be very clear that the risk of adjourning these

25   hearings and taking a flyer that Berkshire will not terminate

1   the merger agreement because of a material delay to the

2   schedule.  That's a huge risk that the estate should just not

3   have to bear under the circumstances.

4           So let's talk about the first cost and risk, and

5   that's what I just mentioned, termination of the agreement.

6   You're going to hear evidence, Your Honor, that the agreement

7   is crystal clear on its terms, the debtors have 45 days to

8   obtain entry of an approval order.  That date happens to be

9   August 21st of 2017.  We must have an order approving the

10  Berkshire agreement and the related termination fee in

11  advance of that date to avoid Berkshire having the right to

12  terminate the agreement and otherwise leave the debtors

13  empty-handed.

14          The evidence is going to show that there's a

15  material risk that Berkshire will terminate the agreement.

16  The evidence will show, for example, that Berkshire's threat

17  is not an idle threat.  It's going to show that Berkshire

18  negotiated for this specific timeline.  In fact, 34 days are

19  going to pass between July 7th and August 10th.  That's a 34

20  day period that's unheard of, virtually unheard of in the

21  non-bankruptcy setting.  We're bankruptcy.  But what's

22  required in bankruptcy?  21 days notice to get approval to

23  use property of the estate outside the ordinary course.  We

24  are giving 35 days' notice of that hearing, ample time for

25  parties to address the issue.  But that's not enough says

1   Elliott.

2          But you're also going to hear, actually you're not

3   going to hear it through testimony.  I can submit to you,

4   Your Honor, that there's at least one case, Burlington

5   Industries from Delaware where Berkshire actually followed

6   through on its word.  We have not identified a case in which

7   Berkshire has not followed through on its word.  But they're

8   to be taken seriously when they say they will walk.

9          And does that mean they're going to walk forever?

10  No.  You're going to hear in the testimony that they're going

11  to walk from this agreement, and maybe they'll walk down the

12  street and have a bowl of that delicious white bean chili

13  over at Chelsea Tavern.  And they'll come back over here and

14  their price won't be 9 billion anymore, it'll be 8.9 or 8.8

15  billion. Suffice to say, it's a big risk to take.  They may

16  not go away forever, but they definitely have told us, and we

17  have no reason to doubt them, that they will go away.

18          Your Honor, moving on to the other potential risks.

19  Even if Elliott develops a comprehensive proposal at 9.3

20  billion and we encourage them to do it, but do it fast, the

21  incremental $300 million of potential benefit is quickly

22  being reduced.  That's by at least $50 million a month in

23  interest rate burn and that's not to mention the cost of all

24  of my lovely colleagues and brethren from the bankruptcy bar

25  sitting behind me.  We have no shortage of lawyers in this

1   case, and the professional fee burn will continue as long as

2   delay is on the table.

3           Your Honor, they say it's on a marginal amount of

4   delay, we can hit that schedule.  But you're going to see

5   it's not possible.  We're at least one month of additional

6   delay out so that's probably $50 million based on what you'll

7   hear from Mr. Horton in terms of interest rate burn and the

8   corresponding amount of fees for that period.

9           Your Honor, you're not going to hear any evidence

10  either, this is another risk, that Elliott can obtain the

11  committed financing or the regulated support that we have

12  with the Berkshire transaction in the next 30 to 40 days.

13  The objecting parties assert that this additional time is

14  required, that's what the pleadings say.  You're going to

15  hear that Elliott's banker, Mr. Wolf, from Mullus (phonetic),

16  is running a process in which he's asking to have fully

17  committed financing by August 10th.  They're acting under

18  that timeline. They're just trying to extract additional time

19  at a huge risk to the company.

20          The evidence is going to show, however, that

21  Elliott could have started a long time ago on this financing

22  arranging process.  It's no secret that on March 30th, the

23  PUCT indicated its initial ruling on the Nextera transaction.

24  And on April 13th, the PUCT followed through on that initial

25  ruling and entered an order denying it.  And very soon

1    thereafter, Elliott was in conversations with the debtors

2    about potential alternative transactions.

3           Elliott could have hired a banker, could have

4    gotten started.  In fact, we'll talk about the PIC PSA in a

5    second. That's what they're going to fall back on, but that

6    doesn't work.  They could have taken steps.  And what you're

7    going to hear Mr. Wood testify is if that had they taken

8    steps, they'd be done with the process.  They would at least

9    have a much, much better indication of where they're at.  But

10   they didn't do that.  They created their own fire drill.

11   They sat on their hands until July 4th when they retained Mr.

12   Wood.  July 4th, Your Honor.  And now they come in, Your

13   Honor, and they ask for another 30 to 45 days at the expense

14   of others.

15          It's discussed above, even if we give them, the

16   30/45 days, there's no guarantee they're going to come up

17   with anything.  You're going to hear about where we're at in

18   the process.  You're going to hear about the indications of

19   interest, alleged indications of interest that came in.

20   We'll let the testimony bear out on that as it's still

21   developing real time.

22          But I think what you're going to hear, Your Honor,

23   is going to be unfortunately going to leave us all wanting.

24          Let's spend a little bit of time talking about what

25   we do have.  We have Elliott's word.  But Elliott has made

1    some severe misstatements and mischaracterizations both in

2    this Court and externally in written correspondence with the

3    debtors and the Oncor board.  And those are serious mistakes

4    when you're asking the Court, the debtors, the PUCT staff and

5    other parties who have billions of dollars at risk to take

6    you at your word.

7            Let's take a moment to understand before we get

8    there what the Elliott proposal was.  At a very high level,

9    Your Honor, the Elliott proposal that the debtors were

10   negotiating which is now blown out, and it'll be introduced

11   in the exhibits was a new one-and-a-half lien DIP facility in

12   the amount of up to $2 billion that would be slotted right

13   behind the first lien DIP facility, and it would be used to

14   reduce the first lien DIP facility.

15           It also contemplated a new second lien DIP

16   facility. Similar story, Your Honor, I think you're seeing

17   where this is headed from the beginning of the cases.  But

18   that second lien DIP facility would be used to take out the

19   second lien debt, pay down a modest amount of the first lien

20   debt ultimately leaving these estates stuck behind 7, 8, $8

21   billion of debt of secured DIP debt.

22           While Elliott's proposal contemplated that the one-

23   and-a-half lien DIP and the second lien DIP would be

24   convertible, you're going to hear that one of the issues,

25   you're going to hear from Mr. Horton, one of the issues we

1    continuously flag is that Elliott wasn't willing to convert

2    that debt in any other plan.  It was an Elliott only plan.

3    We identified that as an issue.  It's a significant risk of

4    administrative insolvency, attack the estates with that kind

5    of DIP financing.

6         Your Honor, we understand at the, well, at the end

7    of the day, what Elliott proposed is that new DIP financing

8    would convert into equity, there would be a new approximately

9    $4 billion, I think it was 4.3 under the last draft of the

10   debtor Elliott term sheet.  Now, I think Elliott, you may

11   hear from the testimony, is contemplating 3.7 billion under

12   the reorganized debtor.  We don't have privy to those

13   conversations that they're having with their investors.  But

14   suffice to say they're talking about somewhere in the

15   neighborhood of 4, 3 1/2 to $4 billion of debt on the

16   reorganized CFIH.

17        What they didn't have, Your Honor, was any

18   committed financing.  The evidence is going to show that

19   there was no committed financing when we were talking to

20   them, there is no committed financing today.  In fact, you'll

21   hear from Mr. Wood Elliott hasn't even circulated, at least

22   as of yesterday's deposition, draft commitment papers.  We

23   got one this morning, we're looking at it, but we haven't

24   seen draft commitment papers.  We asked them to produce them

25   yesterday in the deposition.  We haven't seen those.

1           You'll also hear that there are indications of

2    interest, and that it's oversubscribed.  You're going to hear

3    that most of these, I think they said almost exclusively or

4    exclusively with two exceptions, are oral or in person.  What

5    that means to me is that's someone else's word.  And having

6    been down the -- left at the alter a couple of times in this

7    case, somebody's else word is not meaningful.  We need to see

8    the documents.  These are not worth the paper that they're

9    not written on.

10          The regulatory support to date -- nothing.  You're

11   going to hear no evidence of that because there is no

12   evidence. And there's no evidence to support that there have

13   been any substantive discussions regarding support for review

14   from the key regulatory intervenors.

15          You're going to hear that there's no agreement on

16   the value available for EFH unsecured creditors, thus raising

17   significant questions about the ability of the estate to

18   continue to honor the obligations that the debtors agreed to

19   under the EFH committee settlement.

20          You're going to hear that there's no certainty of

21   Bankruptcy Court approval of the Elliott transaction.  Why is

22   that?  Because Elliott conditioned its proposal that it was

23   making to the debtors upon there being a 50 percent

24   allocation of the Nextera termination fee between EFH and

25   EFIH.  There's simply no basis to support that assertion or

Page 21

1    that conditionality.  It is what it is, what the

2    [indiscernible] directors negotiate or Your Honor finds,

3    that's a reality.  We should not be dictating it.

4           And you're going to find that there's no effort,

5    there's evidence to say that they tried to mitigate this

6    liquidation risk in their proposal.  That's what the debtors

7    faced when they made the decision to sign the Berkshire

8    agreement.  And as far as I know, and as far as everyone on

9    my team knows, there's been no change on that front, nothing

10   has changed.  Elliott is instead asking the Court to take it

11   at its word that it can move faster, that it can get the

12   financing if it only had 35 to 40 more days.

13          Your Honor, to borrow a phrase from Elliott's own

14   witness yesterday, this proposal has a "long way to go."

15   Elliott's word, Your Honor, is what we're relying on.

16   Elliott's word, Your Honor, is what the witness is relying on

17   for the most part because a large chunk of committed

18   financing is coming from Elliott.  It's not committed yet,

19   notwithstanding that Elliott is the alleged financier.

20          But why would we accept Elliott's word? I don't

21   have to spend too much time on this.  But there's a number of

22   really, really key misrepresentations and misstatements by

23   Elliott in the last month.

24          The first, Your Honor, is the assertion that the

25   debtors somehow did not assist Elliott in its financing.  And

1    I think this all goes to you may be wondering why are we

2    focused on the past.  I think you're going to hear from Mr.

3    Galardi. Judge, we're focused on the future.  We're going to

4    raise more money.  And I'm saying, amen, let's raise more

5    money.  But let's, before we do that and as we're walking

6    down this path and we're deciding which path to go down, we

7    got to weigh what the risks are.  And when somebody says,

8    yes, we will be there, you have to take into consideration

9    the representations that the party has previously made to

10   this Court, to the debtors, to the PUCT.

11           Falsehood number one was the debtors' involvement

12   and efforts to help Elliott raise the financing.  You're

13   going to hear in testimony that the debtors bent over

14   backwards to try and help Elliott raise their financing.  We

15   spent at least ten terms of the terms sheet.  Now the same

16   three to four gating issues that I highlighted on the

17   previous page, including the lack of committed financing and

18   the lack of regulatory support, continue to rear their ugly

19   heads.  Mr. Horton will talk about that in some level of

20   detail.

21           But you're also going to hear some bellyaching from

22   Elliott about the EFIH PIC PSA.  And what I'm going to say to

23   you is, very early on in that process as the Court is aware,

24   the debtors offered a waiver of the PIC PSA, a unilateral

25   waiver.  We tried to negotiate a termination, we tried to

1   negotiate an amendment.  We ultimately said, forget it, we'll

2   waive the restrictions on your ability to talk to third

3   parties, just sign an NDA so that you're getting the

4   confidential information, and then the other party signs an

5   NDA and you can go off and have your discussions.

6            You're going to see in the exhibits as well as what

7   I've put in the blown up here, what that waiver looked like.

8   You're going to hear, I was limited, Judge, we couldn't do

9   everything we needed to do.  But they can't articulate a

10  single thing that they needed to do in order to raise

11  financing that they weren't allowed to do under the waiver.

12           What were they prohibited from doing?  Filing a

13  competing plan.  Filing a plan on Your Honor's docket

14  immediately.  At that point, we decided either the debtors

15  would have to agree with them or they would have to come and

16  litigate the ability to file the plan that the debtors don't

17  agree to.  But that didn't stop them from retaining an

18  investment banker, that didn't stop them from going out and

19  talking to third parties.  It's just wrong.

20           The DIP amendment.  You're not going to hear, Your

21  Honor, I would imagine from counsel to Elliott about what the

22  debtors did to help facilitate the Elliott proposal by

23  modifying the DIP.  And we didn't really get into this in the

24  evidence in support of the DIP because it ended up being

25  uncontested because the debtors agreed to: a) adjourn the

1    hearing, take a month -- I think it was about a month, maybe

2    it was a couple of weeks, to sit down with Elliott, work

3    through Elliott's comments, their concept on what their

4    structure looked like, and craft.  You'll hear from Mr.

5    Horton that we crafted the DIP in order to facilitate these

6    junior DIPS coming in.  It wasn't an easy battle.  You're

7    going to hear from Mr. Horton that he spent a lot of time on

8    the phone with the DIP lenders getting them comfortable with

9    this structure in allowing Elliott to be positioned to do

10   their offer.

11         You're going to hear that the PIC PSA litigation,

12   you know, they commenced the litigation after we gave the

13   offer on the waiver.  It's beside the point that they

14   ultimately ended up accepting the waiver that we offered,

15   there may have been some small language tweaks, but in

16   general it was the same offer that we made several weeks

17   before.

18         What's key is, why did Elliott agree to adjourn the

19   PIC PSA litigation if Elliott actually thought that the PIC

20   PSA was impeding their financing efforts that they were

21   actively working on with the debtors?  Why?  Because they

22   didn't actually believe it.  Such a post-hoc attack on the

23   PIC PSA and their decision to adjourn the PIC PSA and their

24   decision to adjourn the PIC PSA litigation.  It just simply

25   lacks credibility.

1          Lastly, the investor presentation.  We've already

2     gone over this one.  At the hearing, I corrected the record.

3     Elliott asserted in its pleadings to the Court, I'm sorry, in

4     its statements to the court that "we never received comments

5     back" -- simply false.  It's unfortunate, Your Honor.

6          The second falsehood that you're going to hear

7     about, and this one Your Honor hasn't necessarily heard about

8     other than in the pleadings, was representations regarding

9     the status of negotiations with the PUCT staff.  Elliott

10    represented that the PUCT staff had accepted the terms of the

11    Elliott's proposed equitization plan.  First of all, I'd love

12    to know what that proposed equitization plan was because

13    there really never was a proposed equitization plan, and

14    there still isn't.  It was unfortunate they said that,

15    because the Attorney General's Office for the State of Texas

16    on behalf of the PUCT staff was forced to send them a letter

17    correcting the record, correcting those misstatements and

18    misrepresentations and assuring me, by cc on the letter that

19    there were no such assurances made in those meetings.  It's

20    important.  It's important when they misrepresent the status.

21          The staff also included, and this is helpful,

22    guidance as to what the staff would need in order to evaluate

23    a transaction.  They need a transaction.  They don't need a

24    proposal, they don't need thoughts about what a proposal may

25    look like.  They needed a transaction, and they asked for ten

1    separate data points, including how much debt is going to be

2    at EFIH, who are the equity investors, who are the debt

3    investors, what are the terms, what are the commitments

4    ancillary to the overall capital structure that formulate the

5    basis for your proposal, all of which are embodied in the

6    Berkshire deal, none of which were embodied in the Elliott

7    proposal at least as it was formulated when we were having

8    the discussions.

9         Your Honor, moving on to my last point before I

10   conclude, they emphasize at the outset the proposed

11   adjournments, they're not as simple as moving a couple of

12   dates here or there.  It's a very simple point.  Moving the

13   dates moves the confirmation hearing date out.  I could get

14   into the detail, but if you just look at the pleading, we

15   laid it out in a little bit more detail.  As I said, this is

16   not the first time we've gone through this process, we can't

17   cut corners on serving notice to parties, it does in fact

18   take ten business days to get notice out to the level of

19   public debtholders that we have here even though we may not

20   be soliciting a couple of those classes.  It still takes

21   time.

22        Your Honor, any date that we move is going to cost

23   us estate money.  And you may hear, it's our money, Judge,

24   we're the biggest creditor of EFIH, it's our money.  But it's

25   not just their money.  It's other EFIH creditors -- not every

1   EFIH creditor is sitting in here.  No EFH creditor is

2   actually supporting the relief that they're requesting.

3   Instead, you're hearing from the case fiduciaries that we

4   need to move this forward and that the Berkshire deal has the

5   most certainty.

6           So let me conclude.  The evidence is going to show,

7   Your Honor, that the Berkshire deal is the highest or

8   otherwise best offer that we have and is the best offer that

9   we have today.  In fact, it's the only transaction that we

10  have. Elliott's proposal is simply in the embryonic phase.

11  Their cash financing hasn't even gotten off the ground.

12  Elliott has had 69 days so far to formulate their financing

13  package, and not a single dollar -- I take that back, there

14  might be a commitment over there sitting on the desk, so

15  we'll address that in closing.  However, I suspect that that

16  commitment has quite a few out.

17          Your Honor, you're also going to hear that Elliott

18  doesn't have a single signature on a single document from a

19  single intervenor on regulatory support.  That's important.

20  In a process that's been stalled out twice by regulators, by

21  the regulators -- and I'm not blaming the regulators, it is

22  what it is -- but in a process that has been stalled out

23  twice in a regulatory process, for a competing bidder to

24  stand here and pound the table, maybe they won't pound the

25  table, but to assert that we should pump the brakes and wait

1    and allow them to catch up, it just doesn't, it just lacks

2    all credibility, Your Honor.  There's a material risk that

3    the bird in the hand that we have with Berkshire, if we don't

4    get the relief today, if the relief today is not granted or

5    the motion to adjourn is granted, that Berkshire will walk.

6             And it's not just, it's not just an idle threat.

7    Berkshire has done it before; we have no reason to doubt that

8    they'll do it again.  They may come back after their bowl of

9    chili, but it's certainly going to be a lower price.  At the

10   end of the day, if Elliott produces fully committed

11   financing, signed regulatory approvals just like Berkshire

12   has at a $9.3 billion valuation and on a workable timeline,

13   the debtors are going to be here to consider it.  Your Honor

14   is going to be here to consider it.  But time is ticking,

15   money is wasting, and it's time to move forward.  Thank you.

16             THE COURT:  Thank you, Mr. Husnick.

17             If I could hear from supporters, and then we'll

18   hear from the opposite side.

19             MR. KRAUSE:  Good morning, Your Honor, Jeffrey

20   Krause from Gibbons Dunn on behalf of Berkshire Hathaway

21   Energy.

22             THE COURT:  Good morning.

23             MR. KRAUSE:  I will endeavor not to repeat Mr.

24   Husnick's arguments, but just to address a couple of specific

25   issues.

1          I think it's important that the request for an

2     adjournment and the objection do not address the merits of

3     the time necessary to address the motion.  They don't say

4     that we can't have an evidentiary hearing presenting whether

5     the Berkshire Hathaway deal is reasonable or whether the

6     termination fee is a market fee.  They specifically say we

7     need more time to compare a competing proposal.  So that ties

8     in why it is there is a termination fee.

9          Outside of bankruptcy, the termination fee would be

10    enforceable immediately upon execution of the contract.

11    Bankruptcy creates an unusual dynamic.  There's a window of

12    time between when the parties sign the contract and when the

13    Court approves the termination fee and the merger agreement,

14    that the debtor actually has the ability to go find the

15    superior transaction, and Berkshire Hathaway Energy receives

16    no compensation for the time, commitment, effort it put into

17    the process.  That's not economic.  It wouldn't apply in any

18    other context other than in the context of the bankruptcy.

19          Your Honor, Berkshire Hathaway Energy agreed to

20    that for a fixed period of time for 45 days -- not a short

21    period of time, more than double the normal notice period.

22    The debtor has the absolute right to find a superior proposal

23    after the merger agreement is approved by the Court.  It can

24    find a superior proposal before.  The only thing that changes

25    is whether or not Berkshire Hathaway Energy is entitled to

1   compensation for the $9 billion all cash commitment it has

2   made to the process.  After the merger agreement is approved

3   by the Court, it is. Before the merger agreement is approved

4   by the court, it is not.  That is the free option Mr. Husnick

5   referred to.  And it has a limited window, and Berkshire

6   Hathaway is only willing to leave that limited window open

7   for that period of time that was necessary to get Court

8   approval.  We didn't negotiate a period of time just out of

9   the goodness of our heart.  It was based on, it's necessary

10  for Court approval, the Court needs time to review the merits

11  of it.  It was not, let's find a window of time during which

12  Elliott or anyone else can formulate a non-existent competing

13  proposal.

14          So, Your Honor, we did agree to the 45 day time

15  period, Berkshire Hathaway Energy did.  It was a negotiated

16  time period as the evidence will show.  Berkshire Hathaway

17  Energy is not prepared to extend that time.

18          Now, it's interesting, the adjournment motion is

19  saying, don't even have a hearing on the merits before the

20  milestone occurs.  Let's have a pocket veto of we'll never

21  get to the merits of the merger agreement because the debtor

22  won't achieve the milestone if the continuance is granted.

23  So Elliott says that's necessary because the termination fee

24  which is one-and-a-half percent of the total enterprise

25  value, 3 percent of the actual cash money being committed by

1    Berkshire Hathaway for the 80 percent interest.  That

2    termination fee equals or exceeds any additional value

3    Elliott might be able to generate through this not yet

4    existent financing and not yet approved PUCT process.  That's

5    really important, Your Honor, because they're not saying if

6    we had more time, somebody would come in with a 50 percent

7    higher offer.  They're saying maybe if we can pull everything

8    together, if we can find financing, if we can get regulatory

9    approval, if we can get the regulators to agree that a

10   company still having billions of dollars of debt at the

11   holding company level, we might be able to eek out 2 percent

12   more.

13           And to get that possible increase of 2 percent

14   more, the debtors and the fiduciaries of the estate should

15   gamble with $9 billion cash money and the regulatory

16   approvals Berkshire Hathaway has already obtained from the

17   intervenors. Not actual regulatory approval from PUCT, but

18   from the intervenors and the staff.  Your Honor, that's a big

19   risk for a really small potential upside.

20           Your Honor, I do want to address one other comment

21   because debtors' counsel focused on the potential delays of

22   the confirmation process, and that's important.  But as he

23   also said, the goal here is to get PUCT approval before the

24   confirmation hearing so we don't go down the path again of

25   having a confirmed plan not able to go effective because the

1   PUCT has not approved it.  Well the delay in the PUCT process

2   has already been created by Elliott's conduct to date.

3   Elliott has said to this Court they shouldn't be submitting

4   an application to the PUCT until the Court approves the

5   merger agreement.  So they're now seeking to continue the

6   hearing on the merger agreement.  They are also seeking to

7   delay the submission of an application to the PUCT, which by

8   definition will delay the PUCT's final determination.

9          So I'm not standing here saying they're right, the

10  submission to the PUCT has to wait until this Court rules on

11  the merger agreement, but they can't simultaneously say to

12  this Court that it would be improper for Oncor to submit the

13  application to the PUCT before the merger agreement is

14  approved, but a delay in the hearing on the merger agreement

15  approval won't cause delay at the PUCT.  The two positions

16  are entirely inconsistent.

17         And, Your Honor, I think most important for

18  purposes of the motion to adjourn today, what Elliott is

19  asking for, what the objecting parties are asking for is,

20  without actually addressing the merits of the merger

21  agreement or the amount of the termination fee or whether

22  it's in the best interest of the estate, the Court should

23  deny the debtor a day in court because they need more time to

24  put together a non-existent competing proposal.  The debtor

25  should be entitled to at least have the hearing on the merits

1      of the merger agreement on August 10th. Thank you.

2                  THE COURT:  Thank you.  Anyone else in support of

3      the debtor's position?

4                  Mr. Glueckstein.

5                  MR. GLUECKSTEIN:  Good morning, Your Honor.

6                  THE COURT:  Good morning.

7                  MR. GLUECKSTEIN:  Brian Glueckstein from Sullivan

8      and Cromwell on behalf of the official unsecured creditors

9      committee for the east side debtors including EFH and EFIH.

10                 Your Honor, the committee has carefully considered

11     the issues before the Court today, including the positions of

12     the objecting EFIH unsecured creditors.  Make no mistake, the

13     committee would certainly welcome an actionable alternative

14     proposal that provides more value to unsecured creditors with

15     regulatory certainty but that is also fair to all creditors

16     of the east side debtors, not only EFIH; and also importantly

17     preserves the east side committee settlement approved by this

18     court.  But, Your Honor, we're not starting from a clean

19     slate as we consider these issues today.  The pursuit of an

20     east side alternative creditor equitization plan is hardly a

21     new issue, is one that's been pursued throughout these cases

22     an alternative to the strategic process that's underway, but

23     is one that has financed an actionable thus far proved

24     elusive.

25                 The history of these cases has also shown that

1    delay has not led to increased or at this point any

2    recoveries to unsecured creditors.  The multitude of other

3    creditors separate from the objectors today should not be

4    forced to bear the risk of the delay that Elliott is seeking.

5    If the objectors or any other party has an actionable

6    alternative plan, they should bring it forward for

7    consideration by all stakeholders.

8              The east side committee believes these cases should

9    be put on track towards resolution, and therefore supports

10   the schedule put forth by the debtors so that the Berkshire

11   merger agreement can be considered by the Court prior to the

12   August 21st milestone.  Thank you, Your Honor.

13             THE COURT:  Thank you, Mr. Glueckstein.

14             Anyone else?  Yes.  Mr. Pedone.

15             MR. PEDONE:  Good morning, Your Honor.

16             THE COURT:  Good morning.

17             MR. PEDONE:  Richard Pedone representing American

18   Stock Transfer, the bond trustee at EFH Corp.

19             Your Honor, we support the schedule that's proposed

20   by the debtors for the reasons that have been stated.  And

21   based upon the evidence that you'll hear today, we believe it

22   represents the best actionable path forward at this time.  We

23   reserve all of our rights with regard to the actual merger

24   itself, and the breakup fee and discussions on that continue.

25   But we believe that this schedule should be kept and the

1    motion to adjourn should be denied.  Thank you.

2              THE COURT:  Very good.  Thank you.

3              Mr. Galardi, good morning.

4              MR. GALARDI:  Good morning, Your Honor.

5              For the record, Gregg Galardi on behalf of the

6    Elliott Funds, Your Honor.

7              We've heard a lot in the opening statements, but I

8    want to come back to a point that I raised with Your Honor

9    back Friday.  We're here on a scheduling motion and a motion

10   to adjourn.  As was put forth in their papers, they've been

11   in these cases three years, two months and now twenty-seven

12   days.  To put it in context, Your Honor, we are making a

13   fairly simple request to, and I will get to the milestones,

14   we made a simple request to target a date of September 14th

15   or 15th, I think they put 14th in their demonstrative, to

16   give us the opportunity to finance an equitization plan of

17   reorganization.

18             Your Honor, they're going to put in evidence

19   regarding all of the efforts, and you've seen it in their

20   papers, that since May 17th, Elliott has had the opportunity.

21   You've seen up there the evidence that they're going to put

22   in evidence that Elliott has had the limited waiver that they

23   offered, and that, Your Honor, we commence an adversary

24   proceeding.  The fact of the matter, Your Honor, as that

25   demonstrative said and as the evidence will show, that

1    limited waiver required Elliott to do only a plan supported

2    by the debtors, and only a financing supported by the

3    debtors.

4           So although Mr. Husnick can tell and the testimony

5    will come out about the financing, that was a financing that

6    they were willing to support, and now as of July 11th,

7    Elliott is free to pursue any form of financing.  So the

8    evidence will show that we are really starting from the July

9    11th date because of the PIC PSA, and we will have a dispute

10   about what the PIC PSA did and did not allow Elliott to do.

11          Your Honor, what you're not going to hear from

12   anybody today, and I want to take this in two bites, is there

13   is absolutely no obligation that the Court has to go forward

14   on August 10th, the Court has until August 11th -- August

15   21st. There are 11 days.  And what you will hear from Mollus

16   is that every day matters.  A fixed time period matters.  So,

17   Your Honor, when I made the presentation to make this into an

18   evidentiary matter, I noted people can come in to bid

19   procedures hearings all the time and they can make an

20   argument at that time -- if I only had another week, if I

21   only had another month.

22          Your Honor, this is a $9.3 billion financing.  As

23   the evidence will show, the financing is quite different than

24   the financing under the term sheets.  And so we are beginning

25   the process to finance that $9.3 billion.  Why is the

1   deadline of September 15th so important?  Why is the deadline

2   beyond August 10th to even August 21st so important?

3           What you will hear and what is not uncommon in any

4   process of raising financing, is some people will simply not

5   start because the period is too short.  Some people will

6   start, not start because they think they can't get it done.

7   But we are also getting, as the testimony will say, people

8   are unwilling to start because of the date of August 10th.

9   If we get more, they're willing to move heaven and earth to

10  try and get the financing commitments.

11          Your Honor has also heard that there's these

12  fiduciary duties and you'll hear it today.  But what Your

13  Honor did hear is EFH's recovery depends entirely on cash on

14  hand.  EFH creditors are not under this plan at all affected

15  other than the allocation of the termination fee by a higher

16  and better offer.  Now Mr. Krause may say and the evidence

17  will show that EFIH creditors are in fact significantly

18  affected by higher and better offers.  And it is not, and I

19  don't know where Mr. Husnick comes with the statements, that

20  it would be only the PIC creditors that would benefit from

21  that.

22          Your Honor, now let's go to the regulatory support

23  which they also tabbed.  Yes, there is a letter back, yes, it

24  is hearsay; but we are under a strict confidentiality

25  agreement to not discuss or to even give to the Court any of

1   our conversations with the PUCT staff or the intervenors.

2   And we are not going to be baited in today by Mr. Husnick or

3   the debtors to start to reveal those confidential

4   conversations.  We understand what we will have to do if Your

5   Honor extends the date, whether it's to August 21st or better

6   to September 15th, and we have in our meeting with all

7   interested parties to achieve those goals.

8         Now, Your Honor, with respect to Mr. Krause's

9   remark, we did raise, I did raise at the last hearing the

10  fact that they were jumping the gun on the application.  But

11  Your Honor should understand better than anyone, and the

12  evidence will show, there is a nuance to all of this.  Should

13  they file that application that is de facto exclusivity?  It

14  is not an issue today, it will be an issue at the approval

15  hearing.  That precludes Oncor from filing any other

16  application.  It is not [indiscernible] where you can court

17  two people.  So there is an aspect of that that we're asking

18  to be delayed.  We need the time so that we can get

19  regulatory commitments.

20        Your Honor, they've also mentioned the schedule and

21  that we would take Mr. Husnick at his word that it takes ten

22  business days to send out the disclosure statement.  Your

23  Honor has two ways to address that point and we have tried

24  and I've said to Your Honor; one, we all want to get done by

25  year end, and I think Your Honor wants to more than anyone;

1    two, they have scheduled a confirmation hearing for October

2    24th.  There are under the rules a way to shorten that.  But

3    what we're talking about here is if Your Honor approves the

4    extension, we're probably talking about a half a month or

5    less on the confirmation schedule, and there will be no

6    guarantee as the evidence shows that there will be regulatory

7    approval, that there will be a confirmation by October 24th.

8    And with the incremental amount which they slot at $50

9    million, there will be additional savings, that will only

10   occur at the end of this period so it is not $50 million

11   running each of the months that we're in this process, it's

12   about $25 million, and it comes out of for the most part the

13   unsecured creditors of EFIH.  So, Your Honor, we do think the

14   evidence will demonstrate that a September 15th date is

15   appropriate.

16          Now, Your Honor, you've heard once again from Mr.

17   Krause and the testimony will be, well if we don't get the

18   date, we will walk.  And if we walk, it doesn't mean we're

19   not coming back, but we'll lower our bid.  That will be what

20   the evidence will bear, will establish.  The fact of the

21   matter is as is clear and as we don't understand because

22   there is a different interest between the EFH and the EFIH,

23   and you'll see the people lining up against the transaction

24   or the timing, is that that delay falls on the EFIH

25   creditors, that risk falls on the EFIH creditors that they

1    walk away.  And those creditors are asking for the delay.

2    And they're asking for the delay because what they are being

3    given under this plan and what they suppose will happen after

4    the allocation of the next termination fee occurs, is that

5    they will receive little, if any, consideration under the

6    Berkshire deal.  Worse, Your Honor.  Your Honor has pending

7    before you a $275 million breakup fee from Nextera to be

8    allocated if to be paid.

9         Now had the debtors done what's often the case and

10   I understand it was not likely to be done here is, you can't

11   offer a backup bidder another breakup fee.  Well, they didn't

12   do that.  But now what are we getting?  $275 million and $270

13   million.  So, Your Honor, we don't think there's a rush to

14   get to the protection of the breakup fee, when as the

15   evidence will also show the deal is still contingent.  One,

16   they cannot say they have regulatory approval, only support;

17   two, as Your Honor pointed out, there is still the minority

18   interest condition that has to be satisfied or Your Honor has

19   to enter an order saying that they can drag the mandatory

20   interest; and three, there's a breakup fee even if this all

21   gets approved and a creditor has to object the plan and the

22   plan doesn't get confirmed.

23        Again, those are arguments that we will bring up at

24   the breakup fee but they're relevant today to the evidence

25   that we will propose that we will put on with respect to why

1    an extension at least to August 21st, but more importantly,

2    to September 15th is critical and we would ask Your Honor to

3    grant it.

4             THE COURT:  Thank you, Mr. Galardi.

5             Mr. Talmadge?

6             MR. TALMADGE:  Good morning, Your Honor.

7             THE COURT:  Good morning.

8             MR. TALMADGE:  Scott Talmadge from Freshfields on

9    behalf of Sunrise Partners Limited Partnership.

10            Your Honor, Sunrise holds in excess of $250 million

11   of EFIH PIC notes in this case.  Your Honor, we support the

12   efforts by Elliott to obtain a modest delay in the schedule

13   here to see if we can get a higher and better deal for all of

14   the creditors, and in particularly the creditors who are most

15   impacted by this, the EFIH unsecured creditors.  Thank you,

16   Your Honor.

17            THE COURT:  Thank you, Mr. Talmadge.

18            Anyone else wish to make an opening statement?  All

19   right.

20            We're doing Mr. Horton first?  If I remember

21   correctly.

22            MR. MCKANE:  That's correct, Your Honor.  We're

23   going to call, the debtors will call Mr. Horton.

24            THE COURT:  All right.  We're going to take a five

25   minute recess and then we'll turn to the evidence.

1          MR. MCKANE:  Very good.  Thank you, Your Honor.

2          THE COURT:  Thank you.

3      (Recess 11:30 to 11:38)

4      (Call to order of the Court.)

5          THE COURT:  Please be seated.

6          All right, Mr. Horton, if you know the way to the

7   witness stand.  Counsel, I guess you should call him before

8   we swear him in.

9          MR. STEPHANY:  Your Honor, Brian Stephany, Kirkland

10   & Ellis on behalf of the debtors.  At this time the debtors

11   will could Mr. Anthony Horton to the stand.

12              (Anthony Horton, Duly Affirmed)

13          THE CLERK:  Please state and spell your name for

14   the record.

15          THE WITNESS:  Anthony R. Horton, H-O-R-T-O-N.

16          THE CLERK:  Thank you.

17          THE COURT:  You may proceed.

18          MR. STEPHANY:  Thank you, Your Honor.

19          Your Honor, as has been the practice, the debtors

20   have prepared a witness binder for some exhibits and

21   demonstratives that may be used during Mr. Horton's

22   testimony, and we've provided a copy of that to you and also

23   to counsel.

24          THE COURT:  Yes.

25           DIRECT EXAMINATION OF ANTHONY R. HORTON

1    BY MR. STEPHANY:

2    Q.   Mr. Horton, can you remind the Court what positions you

3    currently hold with the debtors?

4    A.   I am the, excuse me voice, I am the CFO and the

5    executive vice president/treasurer at EFH and EFIH.

6    Q.   And how long have you held that position?

7    A.   Since 2016.

8    Q.   And how long have you been employed by the debtors?

9    A.   More than 30 years.

10   Q.   You're familiar with the debtors' efforts to market

11   EFIH's economic interest in Oncor during 2014, 2015, 2016.

12   Correct?

13   A.   Yes, sir.

14   Q.   What was your involvement in those efforts?

15   A.   Predominately discussions with creditors, with potential

16   bidders, buyers, reviewing documents, negotiations, so forth.

17   Q.   And sir, were you involved in the negotiation for both

18   the Hunt and Nextera merger agreements?

19   A.   I was.

20   Q.   And were you involved in the confirmation proceedings

21   for those transactions?

22   A.   I was.

23   Q.   And as a result of your involvement, are you familiar

24   with the efforts to close both those transactions including

25   seeking regulatory approval from the PUC?

1   A.   Yes, I am familiar, yes.

2   Q.   And did those experiences inform the debtors' efforts to

3   develop a backup proposal for the Nextera deal?

4   A.   Yes indeed.

5   Q.   And how so?

6   A.   Having, again, consummated the deals with the Hunts, the

7   Hunt consortium as well as Nextera, we clearly learned that,

8   you know, an important part of this process is approval of

9   the PUCT in support of the key constituents in the state of

10  Texas in these matters.  It's become our view and we've been

11  talking about this for several weeks, several months, that it

12  was in our best interest to ensure that the key constituents

13  had input into the process sin advance of signing the

14  transaction, bringing the transaction to Court.

15  Q.   Thank you.  I'd like to turn now to the current

16  transaction that the merger agreement the debtors have

17  entered into with Berkshire.  You understand, sir, that we

18  are here today on the debtors' motion for a scheduling order

19  in connection with that Berkshire related plan transaction?

20  A.   Yes.

21  Q.   Were you involved in negotiations for that merger

22  agreement with Berkshire?

23  A.   Yes, I was.

24  Q.   Okay. I want to focus on one component of that

25  negotiation process in particular, and that's the agreement,

1    the merger agreement approval for milestone.  Are you

2    familiar with that?

3    A.   I am.

4    Q.   And do you have an understanding as to what that

5    milestone requires?

6    A.   It requires that we seek approval from the signing date

7    within 45 days for the approval of the merger agreement and

8    the breakup fee.

9    Q.   And the merger agreement was executed --

10   A.   July 7.

11   Q.   Are you aware that Elliott has moved to adjourn the

12   merger agreement hearing beyond that 45-day milestone?

13   A.   Yes, I am.

14   Q.   And if the debtors are unable to obtain approval of the

15   merger agreement by that milestone, how could that affect the

16   Berkshire transaction?

17   A.   Berkshire has the right to terminate the agreement.

18   Q.   In terms of how the merger agreement approval milestone

19   came to be, was that milestone negotiated between the debtors

20   and Berkshire?

21   A.   Yes.

22   Q.   Did you have a demonstrative prepared to assist your

23   testimony today concerning the negotiations around that

24   particular milestone?

25   A.   Yes.

1   Q.   If you would turn in your witness binder to the tab

2   labeled, D Dem Horton 1, actually behind the tab

3   demonstratives, and --

4   A.   Curious as to whether it's going to come up on the

5   screen.

6           MR. STEPHANY:  Permission to publish that

7   demonstrative, Your Honor.

8           THE COURT:  It's easier.

9   BY MR. STEPHANY:

10  Q.   Is that the -- sorry.  Mr. Horton, is this the

11  demonstrative that you prepared in connection with the

12  negotiations around the merger agreement approval order

13  milestone?

14  A.   Yes, it is.

15  Q.   Okay.  Focusing on the first row of this chart, the June

16  23rd draft, whose draft of the merger agreement was shared on

17  June 23rd?

18  A.   This was a turn of the draft from Berkshire.

19  Q.   And was that the initial draft that the debtors received

20  the merger agreement?

21  A.   From Berkshire, yes it was.

22  Q.   And what did that June 23rd draft provide with respect

23  to the merger agreement approval milestone?

24  A.   We started with the, Berkshire started with the Nextera

25  agreement and the construct or the approach was they were

1    going to mark up that agreement and only mark up those areas

2    that were of great consideration and concern for them.  And

3    as you can see in A.4 and from the Berkshire redline, they

4    left in place the milestone of 45 days.

5    Q.   And do you have any understanding -- strike that.  Did

6    you personally discuss the 45-day milestone with Berkshire?

7    A.   I did.

8    Q.   And with whom did you discuss it?

9    A.   Mr. Pat Goodman.

10   Q.   And do you have a recollection as to approximately when

11   those conversations took place?

12   A.   My recollection is it was over a period of time that

13   multiple items were being negotiated, the 27th or 28th of

14   June is what I recall.

15   Q.   And what was the substance of those discussions?

16   A.   Specifically related to the milestone, or just in

17   general?

18   Q.   Specifically to the merger agreement approval milestone.

19   A.    Yes.  I had some conversations with Mr. Goodman about

20   the timeframe that we felt like there was going to be some

21   pushback from creditors and potentially others that the 45

22   day milestone was going to be too short.  We were concerned

23   about it being, you know, August coming up and a lot of

24   vacations and so forth. So just a scheduling issue itself.

25   And I said it probably makes sense that we push this out, you

1   know, past August and to the first part of September.  To

2   which Mr. Goodman replied, look, we typically, not typically,

3   when we execute an agreement, a merger agreement the break

4   fee takes affect immediately.  I understand that we are in

5   bankruptcy court situation but 45 days is a long time for our

6   bid to and our commitment to be outstanding, and that for us

7   to go beyond that to provide free backstop for other

8   potential buyers and investors beyond those 45 days,

9   basically a free option, is unacceptable to us.

10  Q.   Turning to the second of the demonstrative D Dem Horton

11  1, July 5th at 12:50 p.m., what happened on July 5th with

12  respect to the debtors' efforts to negotiate the merger

13  agreement approval milestone?

14  A.   So we continued to push on the point and so we turned a

15  draft on July 5th and we in section 8.4, we increased the 45

16  day milestone and the markup to 60 days.  As a concession in

17  section 6.3, we agreed that we would use our commercially

18  reasonable efforts to move the 45 day, to actually achieve

19  the 45 day milestone.

20  Q.   Thank you.  And just to provide some context here,

21  section 8.4, do you have an understanding as to what

22  provisions are contained in that section?

23  A.   Combination rights.

24  Q.   And section 6.3, do you have an understanding as to what

25  those provisions are?

1    A.   Our covenants as to what we'll do.

2    Q.   So the debtors sought to extend the milestone to 60 days

3    and then added a provision in section 6.3 committing to make

4    commercially reasonable efforts to obtain that approval in 45

5    days.

6    A.   That's correct.

7    Q.   Why did the debtors suggest that additional provision in

8    section 6.3?

9    A.   Again, I think it was to provide comfort, and again,

10   concessions for moving from 45 days to 60 days in 8.4 and

11   that we were committed to, again given our commercially

12   reasonable efforts, to obtain the approval within that 45-day

13   window.

14   Q.   Again, Mr. Horton, I'll have you turn in your binder to

15   the exhibit as marked as DX76.  If we could grab just the top

16   portion of that.  Do you recognize this?

17   A.   I do.

18   Q.   And is this the email that is summarized in the second

19   column of your demonstrative, July 5th email at 12:50?

20   A.   Yes, it is.

21   Q.   And it's from the debtors' legal advisors?

22   A.   Yes it is.

23   Q.   To Berkshire.

24   A.   That's correct.

25   Q.   And you're copied on this email?

1    A.   Yes, sir.

2    Q.   Okay.  If we could turn to page 90 of the redline that

3    was attached to this.  And this is within section 8.4, if we

4    could bring up that provision.  This reflects the debtors'

5    markup of the merger agreement.

6              THE COURT:  And this is, I'm sorry, this is DX 76?

7    Sorry.

8              MR. STEPHANY:  Correct, Your Honor, DX 76.  And I

9    should note, Your Honor, DX 76 has several attachments to it.

10   For purposes of the witness binder itself, we only included

11   the specific tabs that we're referring to, but we will

12   provide a complete attachment for purposes of the record.

13             THE COURT:  Okay.

14   BY MR. STEPHANY:

15   Q.   And Mr. Horton, is this the provision where the debtors

16   marked up the merger agreement proposal from Berkshire to

17   suggest 60 day milestone for the merger agreement approval

18   condition?

19   A.   Yes.

20   Q.   And then if we could turn to page 61 in that redline.

21   A.   Yes.

22             MR. STEPHANY:  And again, for the record, this is

23   DX76, the redline attachment and calling up subsection 3.

24   BY MR. STEPHANY:

25   Q.   Does this reflect the debtors' revision to introduce the

1    concept of commercially, exercising commercially reasonable

2    efforts to obtain the merger agreement approval within 45

3    days?

4    A.   Yes, it is.

5    Q.   If you could turn back to the demonstrative, D Dem

6    Horton 1.  If you would briefly just walk us through the rest

7    of the negotiations concerning this particular milestone.

8    A.   Sure.  No worries.  You can see at 10:39 p.m., much

9    later into the evening, Berkshire turned a revised version of

10   the merger agreement and actually accepted our section 6.3

11   change to use commercially reasonable efforts to get approval

12   within 45 days.  And then section 8.4, they reverted back to

13   45 days from our 60 day.  And then later that same day, there

14   was a call amongst our legal counsel and Berkshire's legal

15   counsel, Gibson Dunn, and look, we had worked this particular

16   issue for quite some time and continued to push on it, and at

17   that point in time conceded and agreed to the 45 day

18   milestone.

19   Q.   And is that the milestone that was ultimately included

20   in the file merger agreement that was executed?

21   A.   Yes, it is the milestone that is contained in the merger

22   agreement that was approved by our board.

23   Q.   Thank you.  I want to turn now, and we can bring that

24   demonstrative down.  Thanks.  I'd like to turn to the time

25   period shortly after the merger agreement was executed.

1    A.   Yes.

2    Q.   Did the debtors become aware after entering the merger

3    agreement with Berkshire of Elliott's desire to extend that

4    milestone?

5    A.   Yes, sir.

6    Q.   And did the debtors share that information and that

7    request with Berkshire?

8    A.   Yes, sir.

9    Q.   And how so?

10   A.   I had a couple of calls with Pat Goodman, the CFO, with

11   Berkshire on July 10th, and we were talking about various

12   topics.  I gave him a heads up that we were hearing rumblings

13   that creditors were asking for additional time beyond the 45

14   days.  His response to me was the same as before -- look, 45

15   days is a long time for our bid to hang out there, and you

16   know, it's not a topic we're willing to discuss.

17   Q.   And was the request for the extension communicated any

18   other ways as far as you're aware to Elliot?  I'm sorry, to

19   Berkshire.

20   A.   My understanding is there was a call and I think it was

21   leading up to the July 20th hearing between Mark McKane, Chad

22   Husnick and some members of the Gibson Dunn legal team for

23   Berkshire.  And in that conversation they communicated that

24   the creditors, and in particular --

25             MR. GALARDI:  Excuse me, Your Honor.  Objection,

1    hearsay.  He said he wasn't on that call.

2              THE COURT:  Sustained.

3    BY MR. STEPHANY:

4    Q.   Mr. Horton, are you aware that Berkshire filed a

5    pleading regarding the merger agreement approval milestone?

6    A.   I am.

7    Q.   And do you have any understanding as to what Berkshire's

8    position is with respect to extending or waiving that

9    condition, the merger agreement approval milestone?

10   A.   My understanding is if the milestone is not approve or

11   is not met, that they will terminate the merger agreement.

12   Q.   And do you have any reason to doubt that statement?

13   A.   I've worked with Berkshire multiple times over the

14   years, three or four transactions, had multiple conversations

15   with Pat Goodman and a couple with Greg Able, they've got a,

16   clearly they're well known on the street and I have no doubt

17   that they, if they said it, they're going to do it.

18   Q.   Thank you.  Turning now to the debtors' negotiations

19   with Elliott.  Were you directly involved in any discussions

20   or negotiations with Elliott concerning a potential

21   restructuring transaction?

22   A.   I was.

23   Q.   And did you again prepare a demonstrative to assist in

24   your testimony concerning those negotiations?

25   A.   I did.

1    Q.   And if you --

2              MR. STEPHANY:  Do I have permission to publish,

3    Your Honor?

4              THE COURT:  Yes.

5    BY MR. STEPHANY:

6    Q.   This demonstrative labeled D Dem Horton 2, is this the

7    demonstrative that you prepared to aid in your testimony

8    concerning the negotiations with Elliott?

9    A.   It is.

10   Q.   Let's start with the, on the far left the flag marked

11   March 30th.  Can you tell us what happened on March 30th?

12   A.   March 30th was the date of the PUCT open hearing for

13   discussions regarding approval of the Nextera transaction.

14   The commissioners said from the bench that they did not, they

15   were going to recommend that the Nextera transaction, not to

16   be approved.  And they cited several reasons including, you

17   know, specific deal killers, and therefore they were going to

18   recommend that it not be approved, ask for the staff to write

19   up the order for future consideration on that date.

20   Q.   And sir, how did the debtors respond or react to that

21   information?

22   A.   Well clearly we were disappointed and surprised actually

23   by that outcome.  We continued to try to work with Nextera on

24   various fronts to see if there's a way that we could push the

25   transaction forward.  We certainly began to think about our

1    fiduciary responsibilities to the estate and at least have

2    some preliminary discussions about what's next and a backup

3    plan.

4    Q.   And did any parties following the indication from the

5    PUCT that they were going to deny the Nextera application,

6    did any parties reach out to the debtors concerning an

7    alternative or a backup proposal?

8    A.   Jeff Elliott, excuse me, Jeff Rosenbaum with Elliott had

9    reached out to the company with some comments through email.

10   Q.   And were the debtors interested in working on a

11   transaction with Elliott?

12   A.   Absolutely.  As our largest creditor, we were certainly

13   focused on, you know, what their thoughts were and their

14   concerns, and it's an opportunity for us, you know, to begin

15   exploring, you know, what potential next steps we needed to

16   take in case the Nextera transaction was declined.

17   Q.   And Mr. Horton, does D Dem Horton 2 reflect the date

18   that the PUCT issued its formal order denying the Nextera

19   transaction?

20   A.   Yes.  On April 13, 2017, the PUCT issued the order that

21   they referred to back in March, on March 30th of 2017.

22   Q.   And focusing on the period from the issuance of that

23   order on April 13th, 2017 forward, what was the focus of the

24   initial wave of discussions with Elliott?

25   A.    I would say the focus was on the PIC PSA potentially

1    providing an amendment to the pic PSA, a lot of discussions

2    you know, back and forth on that point.  Eventually I think

3    Elliott made the assertion that they weren't bound by the PIC

4    PSA, and just a lot of back and forth around this topic.

5    Q.   And what happened on May 4th, 2017?

6    A.   Well, on April 28th of 2017 we sent an offer to Elliott

7    providing them a waiver from the or underneath the PIC PSA.

8    Then on May 4th, we sent a second offer again providing them

9    a waiver from underneath the PIC PSA to allow them to talk to

10   third parties such as potential equity investors, potential

11   debt investors, financing sources who had signed an NDA.

12   Q.   And so, I'm not asking for a legal opinion, but your

13   understanding the PIC PSA imposed certain restrictions on the

14   ability to speak with other creditors or third parties

15   concerning a potential back up proposals.  Is that correct?

16   A.   Yes.  You know, without the waiver, yes.

17   Q.   And this waiver eliminated those restrictions for

18   Elliott. Is that correct?

19   A.   That's correct.

20   Q.   Okay.  Did Elliott ultimately execute a nondisclosure

21   agreement?

22   A.   Yes, they did on May 17 of 2017.

23   Q.   And once Elliott executed that NDA, what happened?

24   A.   I would say even leading up a few days prior to signing

25   the NDA, we were working quite feverishly with Elliott on

1    multiple fronts, and including you know a potential plan.  We

2    eventually received a term sheet from Elliott on their

3    proposed plan.  We had a lot of activity back and forth on an

4    investor deck that Elliott intended on using to you know in

5    the capital raise, so we spent a lot of back and forth on

6    that deck working multiple, you know, calls and so forth on

7    reconciling numbers and issues and this overall story you

8    know facilitating discussions with Oncor on that deck.  We

9    also launched a new DIP.  I worked very closed with Elliott,

10   Jeff Rosenbaum on raising the new DIP.  We launched it

11   originally as a DIP roll to exit.  We eventually eliminated

12   the exit feature of that DIP.  We upsized it from 5.475 to

13   6.3 billion.  We had a delay draw feature in it.  We paid

14   down, once we closed on the DIP, we paid down the first lien

15   (indiscernible) claims, refinanced, again and extend the

16   existing DIP to June of 2018.  It was scheduled to mature on

17   June 30th of 2017 so we extended it a year.  And we again, we

18   have not drawn down the remaining 225 million at this point.

19   Q.   Unpacking just a little bit, you mentioned the exchange

20   of term sheets.  Do you have any recollection as to

21   approximately how many term sheets the debtors and Elliott

22   exchanged?

23   A.   It was eight to nine versions back and forth between the

24   two.  You can see on the demonstrative here actually Elliott

25   circulating its term sheet the day we executed the NDA.  And

1    then you can see that we were, we were circulating the term

2    sheet back to them and there was a bunch of back and forth,

3    again, all the way up through July 1st.

4    Q.    And so each of those red and blue flags on D Dem Horton

5    2 represent a turn of the term sheet, red representing

6    Elliott, revisions in blue representing the debtors.  Is that

7    correct?

8    A.    That's correct.

9              THE COURT:  And Ms. Diore is purple and yellow.

10             MR. STEPHANY:  I was precluded from using this.

11    By MR. STEPHANY:

12    Q.    You mentioned a number of discussions and meetings.

13    Were you personally involved in some of those discussions and

14    meetings during this period of negotiation with Elliott?

15    A.    Yes, I was, on multiple fronts whether it was regarding

16    the, their term sheet or the turn of the investor deck.

17    Q.    Let me stop you there.  On the investor deck, are the

18    debtors' efforts with respect to the investor deck reflected

19    in D Dem Horton 2?

20    A.    Yes.

21    Q.    And can you point us to the dates for the debtors --

22    A.    You can see on June 30th, again on the top right part of

23    the screen or page, you see the June 13th, 2017 Elliott sends

24    over its draft investor presentation and you can see the turn

25    of the investor deck.  There's about three turns and comments

1   we made to the investor deck on top of multiple conversations

2   via phone and in person specifically around the deck, and

3   most, I think most importantly, representation of financial

4   information contained within the deck.  We had conversations

5   with Oncor.  Clearly they were in the middle of a rate case.

6   They were in rate case settlement discussions.  There was a

7   test year, they had a test year out there for purposes of the

8   rate case and for the purposes of settlement discussions.  So

9   highly sensitive to, you know, what was contained within the

10  deck and what numbers were being represented to investors,

11  and clearly the discoverability of that as part of the rate

12  case.

13  Q.   Would it be fair in your estimation to characterize the

14  debtors' efforts on the term sheet changes, the investor

15  deck, the DIP findings that you mentioned as significant or

16  substantial?

17  A.   From my perspective and I'll give you my perspective.

18  From the point we signed the NDA and even a couple days

19  before, it was, you know, it was seven days a week, long

20  days, long nights.  I remember working over the Memorial Day

21  weekend, and so we were busy, everyone was working hard and

22  pushing hard and trying to get to a place where if the PUCT

23  ultimately denied the Nextera transaction, we were clearly

24  focused on the June 7th date and the June 29th date in terms

25  of PUCT hearings, motions for rehearing.  We were working

1    hard to make sure we were in a good spot in those dates.

2    Q.   Thank you.  I'd like to focus now briefly on the Elliott

3    proposal itself.  What were some of the issues that were the

4    focus of any negotiations between the debtors and Elliott

5    concerning the Elliott proposal?

6    A.   One of the issues was regarding the settlement that was

7    discussed earlier with EFH and the unsecured creditors

8    committee in maintaining that settlement, maintaining the

9    philosophy that the EFH cash was going to stay at the EFH

10   estate.  There were issues regarding the treatment of

11   asbestos, would be it reinstated.  There were discussions

12   regarding financial commitments, timing of having financial

13   commitments.  Within their structure they had a, they may

14   still have, I don't know, but they had a one and a half lien,

15   and they had a second lien construct in their structure and

16   their proposal.  We were very focused on the conversion

17   feature of the DIPs.

18   Q.   And why was that an issue of importance for you?

19   A.   Well, clearly if the Elliott plan for some reason didn't

20   close or go through, we didn't want to be hung with, you

21   know, one and a half, and second lien DIP that needed to be

22   paid fully in cash and not knowing the source of cash for

23   paying off those DIPS, and a liquidation scenario, you know,

24   what would we do with the DIPs.  We were very focused on the

25   conversation features of the DIPs, and you know, pushing, not

1    pushing, a strong requirement was that the DIPs had to be

2    able to convert to equity.

3    Q.   Were the issues that were the focus of the negotiations

4    between the debtors and Elliott, were they resolved through

5    the exchange of the various term sheets that we saw in D Dem

6    Horton 2?

7    A.   I think there were phone calls where it seemed like we

8    had reached, you know, commercial agreement and then through

9    the turns, it was like there wasn't a lot of change or there

10   was one step forward, two steps back in certain

11   circumstances.  I think everyone was trying to work in good

12   faith and try to come to conclusions, it was just different

13   views and perspectives and motives.  And so I think all the

14   way through July 1st, the issues were never resolved.  I saw

15   the July 1st turn and I considered it to be a step back.

16   Q.   And you mentioned July 1st.  Was that the last draft

17   term sheet that was exchanged between Elliott and the

18   debtors.

19   A.   Yes, it was a version that was sent to the debtors by

20   Elliott.

21   Q.   Briefly, you mentioned one of the issues was the

22   financing.  Are you aware of any, were you aware at the time

23   of the negotiations between the debtors and Elliott of any

24   committed financing?

25   A.   I was not aware of any committed financing.  I know that

1   somewhere in the mid-June timeframe I spoke to Mr. Rosenbaum

2   and asked him, are you actually out talking to investors, and

3   if so, could you give me a list of who you are talking to or

4   who you would like to talk to.  And he gave me a list that,

5   and I wrote the names down and ultimately we shared that with

6   our board.  We wanted to know that, you know, we were doing

7   all this work and I anticipated given Elliott's expertise and

8   connections, I assumed that they were out, and previous

9   experience with the E side that were out, you know, trying to

10  circle up, if you will, capital, lining up an opportunity to

11  raise capital for the purposes of the exercise we were going

12  through and to fund their plan.

13  Q.   And that was during the time period when the debtors and

14  Elliott were still exchanging term sheets and had not settled

15  on the terms of the proposal?

16  A.   That's correct.

17  Q.   And your understanding based on conversations with

18  Elliott was that they were attempting to obtain financing

19  commitments for the proposal.

20  A.   It's my understanding --

21          MR. GALARDI:  Objection, Your Honor.  Calls for

22  hearsay.

23          THE COURT:  Overruled.

24          THE WITNESS:  In my conversations with Mr.

25  Rosenbaum, they were in the process of identifying as well as

1   reaching out to potential investors in discussing the

2   opportunity for raising, investing into the business and

3   raising capital.

4   BY MR. STEPHANY:

5   Q.   Were there ever discussions between the debtors and

6   Elliott about efforts to obtain regulatory support?

7   A.   Yes.  We, as part of the term sheet and the term sheet

8   discussions, we clearly wanted them to understand that we

9   expected that they would take the existing ring fence at a

10  minimum as is where is and that it was important.  And we

11  communicated this, you know, amongst ourselves.  It's

12  important to go build support from the key constituents in

13  Austin for any particular transaction that was going to be a

14  key component to us bringing a plan and following the plan.

15  Q.   At the time that the debtors' board approved entry into

16  the merger agreement with Berkshire on July 6th, did you have

17  any understanding as to whether or not Elliott, the Elliott

18  proposal had any regulatory support?

19  A.   I know that they had had conversations with the PUCT

20  staff and other constituents in Austin.  I think you've seen

21  some of the letters back and forth between Elliott and the

22  PUCT staff.  In terms of, you know, had they circled up

23  anyone, I had not heard that they had circled up or gained

24  support or garnered support from any of the key constituents

25  at that point.

1    Q.   And what about the Berkshire transaction?  Were you

2    aware of any regulatory support for the Berkshire transaction

3    at that time?

4    A.   Yes.  I was aware of support from various key

5    constituents, including the PUCT staff, TIUC, the Texas, the

6    large industrial energy customers in Texas, OPUC, which is

7    the office of public utility council, various cities and the

8    counsel that represented the cities.  So they, based on my

9    experience, they garnered a tremendous amount of support from

10   those key constituents in Austin.

11   Q.   Turning back to the Elliott proposal, would the debtors

12   still consider an Elliott proposal today?

13   A.   Absolutely.

14   Q.   Is Elliott in any way foreclosed in your view from

15   presenting such a proposal?

16   A.   I'm sorry?

17   Q.   Is Elliott foreclosed in any way in your view from

18   presenting such a proposal to the debtors?

19   A.   No.  Again, they have until August 10 and 11 to continue

20   to circle up and raise their capital and get their

21   commitments. We are certainly available to help them in any

22   way that we can. As I said in my deposition yesterday, Mr.

23   Rosenbaum reached out to me and asked for a referral to a

24   leveraged finance individual at a specific bank, and I gladly

25   you know provided it to him immediately.  Again, if they need

1   additional assistance, if there's something we can do, if

2   they're clearly working with Oncor directly and Oncor in

3   terms of the capital raised at this point is I think the key

4   touch point with Elliott, but if there's something we can do,

5   we would certainly offer that up.

6   Q.   And that outreach that you just mentioned from Mr.

7   Rosenbaum and your cooperation with him, when did that take

8   place?

9   A.   Yesterday.

10  Q.   Turning to a new topic.  Are you aware that Elliott has

11  moved to adjourn the merger agreement approval hearing?

12  A.   Yes.

13  Q.   And did you have an opportunity to read Elliott's

14  motion?

15  A.   Yes, sir.

16  Q.   If you could turn to DX5 in your binder.  It's brought

17  up on the screen.  Do you recognize this?

18  A.   Yes, I do.

19  Q.   And is this the motion to adjourn filed by Elliott?

20  A.   Yes.

21  Q.   Are you aware that in the motion to adjourn, Elliott

22  takes the position that they have not had a full opportunity

23  to develop a competing proposal?

24  A.   Yes.

25  Q.   And do you agree with that assertion?

1   A.    No, I do not.

2   Q.    Why not?

3   A.    Again, we've been working through this process.  Clearly

4   there was a conversation as early as April, I think it was

5   sidetracked with this PIC PSA discussion.  We signed an NDA

6   on May of 2017, May 17th of 2017, and we worked, you know,

7   diligently with them trying to advance their plan, their

8   investor deck, their schedule.  They had full opportunity

9   through the waiver of the pic PSA to reach out to

10   counterparties.  They were reaching out to counterparties

11   based on what my conversations were with Mr. Rosenbaum, as

12   early as the second or third week in June, and they continue

13   to this day.  I don't know what their term sheet looks like

14   today.  I haven't seen it, I haven't seen the investor deck

15   that they're using.  But they're out in the process of

16   raising capital.  So I don't think it was hindered at all.

17   Q.    And so do you believe that they did have a full

18   opportunity to develop a proposal?

19   A.    Yes.

20   Q.    I'd like to direct your attention to a few specific

21   statements in the Elliott motion to adjourn.  First, on page

22   6 at paragraph 14.  Could you bring that up?  The final

23   sentence of paragraph 14 says the debtors flatly refuse to

24   permit Elliott to negotiate financing and restructuring

25   alternatives with third parties.  Mr. Horton, do you agree

1    with that statement?

2    A.    I do not.

3    Q.    Why not?

4    A.    Again, we provided under the PIC PSA a waiver that

5    allowed them explicitly to go negotiate financing and

6    restructuring alternatives with third parties to whomever

7    they chose.

8    Q.    And was this a waiver that you mentioned as we walked

9    through the timeline of your negotiations with them on April

10   28th and again on May 4th?

11   A.    That's correct.  And then ultimately that was contained

12   within the NDA, I believe in the NDA.  I'd have to look back.

13   Q.    And if I could turn your attention to tab DX21 in your

14   binder.  Do you recognize this?

15   A.    It would be easier if you took the -- I'm sorry, blowing

16   up the top of it.  Thank you.  Yes.

17   Q.    And DX 21 is an email from Mr. Kiklevick (phonetic) on

18   Thursday, May 4th to Mr. Rosenbaum.  And you're one of the

19   individuals that are copied on this email subject line

20   meeting?

21   A.    Right.

22   Q.    If I could direct your attention to the bottom half of

23   that email.  What do you understand the communication to be

24   conveying?

25   A.    It's again providing a waiver to Elliott to allow them

1    to talk with third parties regarding a backup proposal with

2    any parties regarding financing, including a DIP proposal.

3    The waiver does not, and it says here explicitly, does not

4    extend to the filing or prosecution of any financing or

5    restricting proposals that are not supported by EFH or EFIH.

6    Q.   And this is the waiver that the debtors provided to Mr.

7    Rosenbaum and Elliott.  Is that correct?

8    A.   That is correct.

9         MR. STEPHANY:  You can bring that down.

10   BY MR. STEPHANY:

11   Q.   Mr. Horton, how do you characterize -- strike that.

12   Let's turn back to DX5 on page 8.  And if we could call out

13   the carryover paragraph, paragraph 19 at the top of page 8

14   and the final sentence in there.  "Elliott represents that

15   after providing some minor comments by email on June 22nd,

16   the debtors ignored Elliott's interest apparently choosing

17   instead to proceed exclusively with Berkshire."  Do you have

18   an understanding as to what the minor comments refer to in

19   this sentence?

20   A.   I believe it's referring to the investor deck.

21   Q.   And do you agree with the representation or statement

22   that's highlighted there?

23   A.   I don't.  I think we had another turn of the term sheet

24   and continuing dialogue.  And again, the dialogue has

25   diminished quite heavily at this point and they're working

1    predominately with Oncor.  But again, as recent as yesterday,

2    we tried to provide assistance to them.

3    Q.   Mr. Horton, do you recall the date of the last term

4    sheet that the debtors revised and sent to Elliott during

5    your negotiations?

6    A.   I think it was the 23rd or 24th.  I can't recall.

7    Q.   And so do you believe it's an accurate statement that

8    the debtors ignored Elliott's interest after June 22nd?

9    A.   I think it's erroneous.

10   Q.   Okay.  Would you turn to page 17 of the motion to

11   adjourn?  Paragraph 40 at the every bottom of page 17.

12   "Thus, the suggestion that Elliott was to have raised 9.3

13   billion in financing in the middle of negotiations of a term

14   sheet upon which there was still no agreement, and before

15   Elliott had sufficient financial information for Oncor to use

16   in the capital raised defies all logic."  I want to break

17   this down in two pieces; I think there's two concepts in

18   that.  The notion of raising 9.3 billion in financing in the

19   middle of negotiations on a term sheet, do you have a view as

20   to whether or not ongoing negotiations concerning the term

21   sheet would prevent Elliott from attempting to obtain

22   financing?

23   A.   I disagree with that given the fact that I had already

24   spoken to Mr. Rosenbaum and they were in the process of

25   having conversations and circling up capital in the mid-June

1    timeframe.  I would hope that they were as we advance

2    forward, and they continue that dialogue, we could certainly

3    have had the investor deck and pivot it to them going out on

4    a road show with Oncor which we had already had conversations

5    almost immediately.  They're out in the market today without

6    the term sheet, I'm assuming, that we never reached agreement

7    on.  So they're out marketing today without the term sheet is

8    my point.

9    Q.   And then focusing on the second half of that sentence,

10   the suggestion that Elliott did not at that time have

11   sufficient financial information for Oncor to use in the

12   capital raised, do you agree with that suggestion?

13   Q.   I don't agree with that.  I think that there was very,

14   it's a regulated business, there was a disclosure statement

15   that was available to Elliott.  There have been multiple

16   conversations with Oncor and we provided a sensitivity table

17   to Elliott to help them have conversations with investors as

18   to what's in the disclosure statement and here's some

19   sensitivities on the, as to what could happen in a rate case,

20   so that there could be a conversation with the potential

21   investors.  Oncor's CEO and CFO are quite familiar with the

22   business, and could have talked any investor through that

23   type of analysis and discussion.  I'm very familiar with

24   their capabilities and they could have done that.

25   Q.   And the provision of that information, was that

1    something that you were personally involved in?

2    A.   I was involved in almost all of the discussions, if not

3    all.  I know there were some conversations directly with

4    Oncor, and you know, we supported, you know, direct

5    conversations between Elliott and Oncor.  I was intimately

6    involved in the conversations with the CFO of Oncor in terms

7    of trying to provide materials in a bridge to you know what

8    could potentially happen in the rate case.  And Oncor

9    actually provided that, it was posted on Elliott's website.

10   Q.   I'd like to shift to a final topic.

11         MR. STEPHANY:  Your Honor, I recognize the time.  I

12   do have one final topic to cover.

13         THE COURT:  That's fine.

14   BY MR. STEPHANY:

15   Q.   Mr. Horton, I'd like to --

16         THE COURT:  I think we're going to shoot for a 1:00

17   lunch break, so you have plenty of time.

18         Mr. Krause, are you going to have questions?

19         MR. KRAUSE:  No, Your Honor.

20         THE COURT:  You're not.  Okay.  Well we'll probably

21   break before cross.  I assume cross will take more than 20

22   minutes.

23         UNIDENTIFIED:  I think so, Your Honor.

24         THE COURT:  Okay.  So why don't you finish up

25   direct?

1          MR. STEPHANY:   Thank you.

2     BY MR. STEPHANY:

3     Q.   Mr. Horton, I want to focus as I said on one last topic,

4     specifically the benefits and risk of the Berkshire

5     transaction as compared to the Elliott proposal with respect

6     to the schedule that is currently before the Court today,

7     that scheduling motion from the debtors.  Did you, as part of

8     the debtors' management, did you make a recommendation to the

9     board concerning the Berkshire transaction vis-à-vis the

10    Elliott proposal?

11    A.   Management along with its advisors and counselors,

12    advisors made a recommendation to the board.  We had a board

13    meeting --

14    Q.   I'm sorry, do you recall what date that was?

15    A.   I think the first date was June 30th.  We had had a, we

16    had received an indication from Berkshire as to price

17    sometime on the evening of the 29th.  And on the 30th we had

18    a board meeting updating the board where we were with regards

19    to Berkshire.  In fact we backed up and we talked about where

20    are we with Nextera and where are we in that transaction,

21    where are we with regards to the Berkshire transaction,

22    looking at key elements such as clearly value, certainty of

23    closing, where are they with regards to regulatory matters

24    and regulatory support, where we were with the merger

25    agreement itself and key provisions in the merger agreement.

1   And we had a conversation as to where we were with regards to

2   the Elliott transaction. And I think the key, a couple of key

3   points of that discussion:  one was we still do not have

4   committed financing proposals or agreements from Elliott.

5   Elliott does not have near the level if any of the support of

6   Austin and the key constituents in Austin as Berkshire has or

7   had at that time.  And so we recommended that we move forward

8   and try to wrap up the final items regarding the merger

9   agreement and try to get to a place to where we could sign

10  the merger agreement and file a plan.

11  Q.   Signed merger agreement with Berkshire?

12  A.   Yes, sir.

13  Q.   And did the board following the consideration of the

14  various proposals or transactions ultimately approve the

15  debtors to enter into a merger agreement with Berkshire?

16  A.   Yes.  On July 6th, after we had resolved the remaining

17  outstanding items in the merger agreement with Berkshire, we

18  took the proposal to the board, the boards, EFH and EFIH and

19  we walked them through where we are in the, with the merger

20  agreement.  We again I think in that discussion we had a

21  comparison of where we were with Elliott and the board gave

22  us authority to go forward and execute the merger agreement

23  and terminate the Nextera agreement.

24  Q.   And as part of the board's consideration, did the board

25  evaluate the timing and the proposed schedule that was part

1    of the Berkshire transaction?

2    A.    Yeah, we went through the key terms and key

3    considerations for the board including the timing and the

4    overall construct of the merger agreement.  We talked, we

5    discussed with the board where Berkshire was in terms of

6    support in Austin with the key constituents, and clearly

7    where we were with the price.

8    Q.    And what was the -- focusing for a minute on the efforts

9    to obtain regulatory support for the various proposals.  As

10   of July 6th, the board's consideration when they ultimately

11   approved entry into the merger agreement with Berkshire, what

12   was the debtors' understanding as to the regulatory support

13   for the Elliott proposal?

14   A.    I think we would have considered it to be in its

15   infancy. It was in the beginnings and they were continuing

16   to, you know, try to garner support and had multiple

17   conversations.  Again, I think, again I was not part of those

18   conversations.  So I'm just doing this from in judgment in

19   what I've seen and clearly the exchange of the letters

20   between, clearly the exchange of letters between the PUCT and

21   Elliott gives some example.  My GC was in the room who had

22   had, had attended meetings with Elliott and Oncor in Austin

23   and he was able to provide feedback at this point.  At that

24   point there wasn't, you know, significant momentum and

25   support from the PUCT staff or other constituents.

1    Q.   Just to be clear, there wasn't significant support for

2    the --

3    A.   Elliott.

4    Q.   -- Elliott proposal.  And the, on July 6th, what if any,

5    understanding did the debtors have with respect to regulatory

6    support for the Berkshire transaction?

7    A.   Again, as I was saying earlier, they had very

8    significant support, strong support from the key constituents

9    from a regulatory perspective in Austin, and I think I

10   outlined those earlier -- the PUCT staff, the industrial

11   customers, the cities, the, I think it, the Office of Public

12   Utility Counsel  They had significant support and momentum in

13   Austin.

14   Q.   Mr. Horton, in your view, does significant regulatory

15   support necessarily guarantee regulatory approval of a

16   particular transaction?

17   A.   No.

18   Q.   Then why was the indications of regulatory support for

19   the Berkshire transaction so significant to the debtors?

20   A.   Well, there's no guarantee.  It is a very positive

21   indication that when you have those constituents onboard with

22   a transaction, that it certainly provides an opportunity, a

23   strong opportunity for it to be approved and for us to close.

24   Q.   And focusing specifically on the timing of any

25   transaction, what impact if any, does indications of

1    regulatory support have in your view?

2    A.    My view is when you have that type of support, and I

3    spent you know four years in public policy and many years

4    before that in regulatory matters, when you have that type of

5    support, it is much easier to reach settlements and get

6    approvals for certain, either rate cases or for certain

7    transactions.

8    Q.    And why is the timing of that regulatory approval an

9    important consideration for the debtors and their estates?

10   A.    We've clearly been in bankruptcy for a long time.  The

11   cost of the bankruptcy itself.  And again, our responsibility

12   is to the entire estate and to you know all creditors, not

13   one specific class.  We have an opportunity to pay off the

14   first lien DIP, to pay off the second lien noteholders we

15   have.  And there's other constituents -- I know Elliott is

16   the largest unsecured holders, but we have responsibilities

17   to the other unsecured holders.  And this continuous cost and

18   burden from cash burn, burn on, or an increase in the claim

19   amounts -- no offense to the professionals in the room,

20   incredible amount of professional fees.

21   Q.    And do you have any understanding as to the magnitude of

22   that burn as you called it?

23   A.    I'm sorry.  For the first and the second liens as it

24   currently sits today, it's roughly $50 million per month.

25   Q.    And does that include, the $50 million per month, does

1   that include the professional fees that you mentioned?

2   A.   I wish that it did, but it does not.

3   Q.   What does that cash burn, what impact, if any, does that

4   cash burn have on the debtors' considerations with respect to

5   the timing of seeking approval of any transaction?

6   A.   Again, we would like to eliminate, we would like to go

7   faster, we think that's the best thing for creditors in

8   general, the unsecured creditors in general.  Give Oncor an

9   opportunity to go out and continue to operate its business

10  without this overhanging.  And so it is a lot of benefit to,

11  economic benefit, as well as opportunity for management at

12  Oncor.  And I know that they do a great job, but this is a

13  bit of a distraction for all of us.

14          MR. STEPHANY:  Thank you, sir.

15          Your Honor, I don't have any other questions at

16  this time.  But as is the practice, I do have some exhibits

17  we would like to move into evidence.

18          THE COURT:  Okay.

19          MR. STEPHANY:  May I approach?

20          THE COURT:  Yes.

21          MR. STEPHANY:  Your Honor, the debtors and Elliott

22  had previously, and Berkshire, I apologize, have previously

23  conferred and exchanged the exhibit, list of the exhibits

24  that we intended to introduce into evidence, and neither

25  party identified any objections to the exhibits the debtors

1      would seek to admit now.

2              THE COURT:  Any objection, Mr. McGuiness?

3              MR. MCGUINESS:  Your Honor, on behalf of Elliott,

4      we do not object to the admission of these exhibits for

5      purposes of today's hearing.  We reserve all rights in the

6      future.  We do think some of them are hearsay but not for

7      purposes of the hearing today.

8              THE COURT:  Okay.  Rather than listening to them

9      all right now, let's hold that to the end.  But based on what

10     I've seen, I assume you want to move in live direct, other

11     exhibits, and then the judicial notice.  Is that correct?

12             MR. STEPHANY:  That is correct, Your Honor.  And we

13     would also just ask to have the demonstratives, D Dem Horton

14     1 and D Dem Horton 2 accepted into the record.

15             THE COURT:  Yes, of course.  They will all be

16     admitted without objection.  We'll go through the details

17     later.

18             Any further questions for Mr. Horton?  No.  Mr.

19     Krause, no questions?

20             MR. KRAUSE:  No questions.

21             THE COURT:  Okay.  We'll break for lunch then and

22     then we'll have cross-examination by Mr. Galardi or Mr.

23     McGuiness.  And we'll reconvene promptly at 2:00 as possible

24     if you could.  And Mr. Horton, during the break, you may not

25     discuss the substance of your testimony with any person.

1              THE WITNESS: Yes sir.

2              THE COURT:  And as I indicated to some people, I

3     would like to see the key parties in the mediation room for a

4     very brief meeting right before we break for lunch.  So I'll

5     meet you in the mediation room.  Okay?  Thank you.

6              ALL:  Thank you, Your Honor.

7          (Recess)

8              THE COURT:  Please be seated.  While everybody's

9     getting settled, I'll just read in the record the documents

10    that were just admitted.  So the motion was Horton 1 and 2,

11    DX-521, 76, 6 through 20?

12             MR. STEPHANY:  Correct.

13             THE COURT:  22 through 30 - excuse me, 22 through -

14    - I can't count this high.  43?

15             MR. STEPHANY:  Your Honor, if it's helpful, yes,

16    that's correct.

17             THE COURT:  And 65 through --

18             MR. STEPHANY:  75.

19             THE COURT:  75, 77, 78, and 79.  Judicial notice of

20    DX-1, 2, 3, and 4.  Very good?

21             MR. STEPHANY:  Thank you, Your Honor.

22             THE COURT:  You're welcome.  Mr. Galardi, cross?

23             MR. GALARDI:  Your Honor, may I take -- I was in

24    the middle of a conversation with my client about something

25    that we talked about at lunch.  Can I take five minutes?

Page 80

```
 1            THE COURT:  Yes, you may.

 2            MR. GALARDI:  Thank you, Your Honor.

 3            THE COURT:  All right.  Take a short recess.

 4       (Recess)

 5            THE COURT:  Please be seated.  All right, let's

 6    proceed.

 7              CROSS-EXAMINATION OF ANTHONY R. HORTON

 8    BY MR. GALARDI:

 9    Q.   Thank you again, for the time, Your Honor, and we'll

10    continue to explore.  Mr. Horton, as you know, my name is

11    Gregg Galardi, and I represent the LA Group.  Mr. Horton,

12    you've testified, I believe, that there are three reasons

13    that you -- that the Debtors oppose Elliot's motion for an

14    adjournment.  Financing is one of them, is that correct?

15    A.   Yeah.

16    Q.   Okay.  Regulatory support?

17    A.   That's correct.

18    Q.   And are there any others, that you recall, that you

19    testified to as to why you don't support the adjournment?

20    A.   It was the financing commitments and regulatory

21    commitment, so the primary reasons.

22    Q.   Okay.  Now, is -- I think you mentioned that one of the

23    other reasons you mentioned was your fiduciary duty to all

24    creditors, is that right?

25    A.   That's correct.
```

1  Q.    Okay.  And Mr. Horton, isn't it the case that under the

2  plan that's proposed by Berkshire, and the eighth plan that

3  was proposed by NextEra, the EFH creditors simply received

4  the cash held at EFH?

5  A.    Under the settlement agreement, that's my understanding,

6  yes.

7  Q.    Okay.  And does the Berkshire bid increase the

8  consideration to the EFH creditors?

9  A.    It does not.

10  Q.    And would a lower bid decrease the cash paid to the EFH

11  creditors?

12  A.    If you can continue under the current construct, it will

13  not.

14  Q.    Excuse me?

15  A.    Under the current construct, it will not.

16  Q.    Okay.  So the EFH creditors are not affected by either a

17  higher bid or a lower bid, is that correct?

18  A.    Again, that's a very narrow statement you're making.

19  This merger agreement encompasses the existing agreement with

20  the EFH creditors, as well as its current proposal and

21  valuation.

22  Q.    But again, just so I'm clear.  If there's $100 million

23  less of consideration, will that have any effect -- on the

24  same date of closing, will that have any effect on the

25  recoveries of the EFH creditors?

1    A.    No, it will not.  If crafted exactly like the --

2    Q.    Crafted --

3    A.    The merger agreement, is correct.

4    Q.    Okay, and crafted with the same time tables?

5    A.    Yes -- yeah.

6    Q.    And then with respect to a higher and better bid, who

7    would receive the proceeds of the higher and better bid?

8    A.    The EFIH creditors.  Unsecured creditors, potentially.

9    Q.    Potentially.

10   A.    Yeah.

11   Q.    So, and if the deal fell through right now, and

12   Berkshire walked, who stands to be harmed?

13   A.    Tell me what the price is.

14   Q.    Let's say 8.8 billion.

15   A.    That would probably come out of the PIKs.

16   Q.    Now, Mr. Horton, you also testified that Elliot is the

17   largest unsecured creditor at EFIH, correct?

18   A.    That's correct.

19   Q.    And it owns about 74 percent of the unsecured claims at

20   EFIH?

21   A.    That would be your statement, I don't -- that's my

22   understanding, but you would have to tell me --

23   Q.    But that's your understanding, correct?

24   A.    From what I've read, yes.  I don't know what they own,

25   specifically.

1    Q.   Okay, okay.  And do you have any understanding of what

2    Sunrise Partners owns?

3    A.   No, sir.

4    Q.   Okay.  And if I told you that they own $250 million of

5    the PIKs, would you be surprised by that?

6    A.   I just don't have knowledge of that.

7    Q.   Okay, but so you did admit that the PIK noteholders

8    would have the most to lost if the Berkshire transaction did

9    not close, is that correct?

10   A.   Monetarily, yes.

11   Q.   Excuse me?

12   A.   Monetarily, yes.

13   Q.   Now, Mr. Horton, in your testimony, you said before that

14   -- and I think I took this down, a quote.  After the PUCT --

15   A.   Can I go back to my previous question again?  If you're

16   saying $200 million lower, they certainly do.  If you're a

17   billion dollars lower, then it's the PIKs and the second

18   liens.

19   Q.   Correct.  But the second liens are also at EFIH,

20   correct?

21   A.   They're both at EFIH.  You just made the statement, I

22   just wanted to clarify that if the price was lower, the PIKs

23   would indeed potentially suffer the most.  Again, that is

24   dependent upon how low the price is.  And that was all I was

25   trying to clarify.  I wasn't trying to quibble with you.

1    Q.   Well, what you asked me for was the number, and I

2    intentionally chose 200 million for exactly that reason.

3    A.   I understand, but then you followed up, and I was

4    following up with you.

5    Q.   Sure.  Now, lets' go back to the question.  After

6    talking about the PUCT, I think I've got your quote right.

7    You said it was very important that "the key constituents

8    had" input before signing the agreement.  Did I get your

9    quote right?

10   A.   Basically.  I'm not sure if it's precise, but yes.

11   Q.   Okay.  Now, prior to entering into the Berkshire merger

12   agreement, did the Debtor solicit any support for the

13   transaction from the creditors of EFH?

14   A.   Not that I'm aware of.

15   Q.   And did the Debtor solicit any support for the

16   transactions from the creditors of EFIH?

17   A.   No, sir.  They're under confidentiality.

18   Q.   Okay.  Now, you are the CFO of one of those Debtors,

19   right?

20   A.   Both.

21   Q.   Okay.  And is EFH a regulated company?

22   A.   No.

23   Q.   And is EFIH a regulated company?

24   A.   No.

25   Q.   So the key constituents were not creditors to whom you

1    are a fiduciary, isn't that correct?

2    Q.   Were those creditors, Mr. Horton?  Did you solicit any

3    interest from any creditors?

4    A.   No, sir.

5    Q.   So the key constituents were who?

6    A.   The key constituents, for the purposes of regulatory

7    approval, of -- in a transaction where we are disposing of or

8    selling Oncor, and our interest in Oncor, the key

9    constituents, and to be very clear, in terms of an approval

10   process for the change of control, the key constituents in

11   order to maximize the value, our judgment was the regulators

12   and the key constituents in Austin that are part of the

13   regulatory process.  Having those key constituents onboard we

14   believed helped maximize the value for the -- for Oncor

15   itself, which cascaded up to the creditors.

16   Q.   Did you believe that the creditors would have a say in

17   which way you should maximize value?

18   A.   I believe that the company -- both the Debtors and Oncor

19   had a strong understating of how to maximize the value.  Of

20   Oncor, certainly we communicated directly with Oncor itself.

21   And I think we would all agree here in Court that one of the

22   key constraints that we continue to encounter have been the

23   regulatory process, and not having a -- having the key

24   constituents onboard, and understanding the transaction

25   itself.  In the course, we eroded a lot of time cover the

1    last couple of transactions.  And that's hurt the value to

2    the creditors.

3    Q.   Now, Mr. Horton, did Elliott ask to be consulted about

4    the Berkshire transaction before the Debtors executed the

5    merger agreement?

6    A.   I don't know that I would say that -- I wouldn't, I'm

7    not aware of them saying they wanted to be consulted.  I know

8    that on July 1st, myself, and Mr. Keglevic received a call

9    from Dave Miller and Geoff Rosenbaum, and they expressed a

10   desire to be part of the negotiations with Berkshire.  And

11   they warned us quite strongly that if they were not, then

12   there would be serious repercussions and litigation.  And we

13   said, "We can't control --" Our response was, we can't

14   control whether you can have conversations with Berkshire or

15   not.  Pick up the phone and call Berkshire if you'd like.

16   And I understand that they had, so --

17   Q.   And is it --

18   A.   I'm not sure that you're asking that we should have

19   forced Berkshire to allow Elliott to participate in the

20   discussions.

21   Q.   Did -- well, I'll ask you that question now.  Did the

22   Debtors suggest or recommend to Berkshire that Elliott be

23   part of the negotiations?

24   A.   I think the conversation happened.  I don't know, and I

25   probably would have to defer to Mr. Keglevic.  I wasn't

1   involved in any of those conversations.

2   Q.   So you personally never recommended to Berkshire that

3   litigation might be avoided if Elliott was invited to

4   participate in certain of the discussions regarding the

5   merger agreement.

6   A.   I did not give them that recommendation.

7   Q.   Now, if you would open the binder that the Debtors

8   provided to you, and it's the first tab, I guess it's DX --

9   it's actually, this is demos, so it's demos, the very first

10  page.  You testified about this first page --

11  A.   I apologize, I'm trying to follow you, you're referring

12  to DX, Exhibit --

13  Q.   I'm sorry, it's DM, and I think it's in the binder that

14  has to do -- I'm using the Debtor's one, not mine yet.

15  A.   Oh, you.

16  Q.   I thought it'd be easier.

17  A.   No, whatever works, I'm fine.  My apologies,

18  (indiscernible).

19  Q.   No, it's my fault.

20  A.   Okay.

21  Q.   Now, I'd ask you to open up to what's called D.  Dem

22  Horton 1?

23  A.   Yes, sir.

24  Q.   Now, you testified before that this was the chronology

25  regarding the negotiations regarding Section 6.3(g) and

1   8.4(h), correct?

2   A.   I would say 6.3, and 6.84.  The subsections moved around

3   a little bit, so I've tried to limit it to the 6.3 and 84,

4   but yes.

5   Q.   Okay.  And Mr. Horton, what is your understanding

6   between the differences between 6.3(g) and lets' call it 8.4,

7   instead of putting the H after it?

8   A.   Sure.  8.4 is a definitive milestone that states that

9   Berkshire has the right to terminate the agreement if the 45-

10  day milestone for approval of the merger agreement, and

11  approval of the break fee.  They have an absolute walk right

12  after 45 days.  The distinction, and I'm assuming you're

13  referring to the July 5th road with the 12:50 PM, where we've

14  added a clause, Debtors move the 45-day milestone to 6.3(g),

15  and agreed to have commercially -- use commercially

16  reasonable efforts to seek approval of the merger agreement,

17  and of the breakup fee.

18  Q.   Okay, and on June 29th, what was -- I mean, on June

19  23rd, what was the status of the negotiations with Elliott at

20  that point?

21  A.   June 23rd, we were continuing to negotiate with Elliott,

22  with regards to their -- in regards to their plan, their term

23  sheet.  It's my understanding and recollection that we sent a

24  revised term sheet, or turn of the term sheet on June 24th.

25  I might have that date off slightly.

1    Q.   If it helps you, I think demo, on your demo, the next

2    page may make it June 23rd, but right around then.

3    A.   Not sure you're looking at the right one.

4    Q.   Okay.

5    A.   Okay.

6    Q.   So June 23rd, June 24th, you were about to send back to

7    Elliott the term sheet, correct?

8    A.   We did, we did.

9    Q.   Okay, and in that term sheet, were you negotiating

10   timetables for Elliott to get funding commitments?

11   A.   I would have to look back specifically if it was funding

12   commitments, or funding itself and closing.  I'd have to look

13   back, I don't --

14   Q.   Do you recall if it was both of those things?

15   A.   I don't recall if it was both.

16   Q.   Mr. Horton, now I'm going to confuse you, and ask you to

17   turn to the binder that we handed to you with the white page

18   on the front, which is the Debtor's binder -- I mean, which

19   is Elliott's binder?

20   A.   Yes, sir.

21   Q.   Okay.  And if you would turn to Exhibit 3?

22   A.   Yes, sir.

23   Q.   Do you recognize that document?

24   A.   Yes, sir.

25   Q.   And does that refer to a K&E Draft of 6/23/17?

1    A.    Yes, sir.

2    Q.    And with respect to that draft, do you see the -- that

3    there was a negotiation, where there was at least the

4    requirements to fund by certain timetables?  And if you would

5    turn to Page 6 of that -- well, we can do a number of them.

6    But if you would turn to Page 6, would that your recollection

7    about the discussions regarding efforts to obtain financing,

8    and efforts to actually close the financing?  And I point

9    you, at least with respect to the funding for a backup plan

10   to close, to the very bottom of Page 6.

11   A.    Which, I'm sorry, can you give me the lead-in to the

12   sentence, or --

13   Q.    The very last bullet, it says the parties will use

14   commercially reasonable efforts to close and fund the new

15   EFIH 1.5L DIP facility, and the new EFIH 2L DIP facility as

16   it relates to the backup plan [by September 15th, 2017].

17   Does that refresh your recollection?

18   A.    Yeah, I did see that.

19   Q.    Okay, and that was the date to fund those commitments,

20   correct?

21   A.    That's correct.

22   Q.    And was there another date before that to try to get

23   commitments for those --

24   A.    That was a question you asked, and I said I don't recall

25   that in the term sheet.  I'd have to read back through the

1   term sheet.  I recall this, but I do not recall the date.

2   Q.   Okay.  But at the time -- but on June 23rd, you were

3   requesting that Elliott actually be prepared to fund on

4   September 15th, is that correct?

5   A.   I think it says we'll use commercially reasonable

6   efforts to close and fund the deal, yes.

7   Q.   And that date was acceptable to the Debtors, because

8   they sent this term sheet.  It was in brackets, but it was

9   the date.

10  A.   That's correct.

11  Q.   Okay.  Now on the same day, or during that week -- and

12  do you know whether the Debtors ever sent another mark-up of

13  this term sheet back to Elliott?

14  A.   This was the 6/23?

15  Q.   Correct.

16  A.   No, I'm not aware of one of those.

17  Q.   Okay.  Now, so you enter into -- let's go back to your

18  chronology.  So on the date that you've sent a term sheet to

19  Elliott saying that there was reasonable efforts to funds the

20  commitment on September 15th, during the week of June 23rd to

21  July 5th, the Debtors asked Elliott, I mean, asked Berkshire

22  for 15 days more, is that correct?

23  A.   Go back to --

24  Q.   Go back to your demo, Page 1?

25  A.   Okay.  And your question is, I'm sorry, sir?

1    Q.   Okay.  As I read Line 2, on July 5th, the Debtors gave

2    back a response, if this is correct, to Berkshire.  They

3    inserted a new section, 6.3(g), the commercially-reasonable

4    efforts provision.  And they asked for a deadline, a

5    termination date of 60 days as opposed to 45 days, is that

6    correct?

7    A.   That's correct.

8    Q.   Okay.  And do you know what date that is, is that before

9    or after September 15th?  I can help -- I know you're doing

10   the math.  45 is August 21st.

11   A.   Yes, I understand that.  So 15 more days, it would have

12   been before.

13   Q.   It would have been before, correct?

14   A.   That's correct.

15   Q.   And you didn't make any requests to see whether

16   Berkshire would go even beyond that date, to see if Elliott

17   could get the funded -- could fund its commitments by

18   September 15th, did you?

19   A.   It wasn't about getting funded commitments on September

20   15th.  It was about closing -- it was about closing.  You

21   don't go get commitments and close the very next day.  You go

22   get commitments, you go get approval from the Bankruptcy

23   Court, it's a first lien and second lien deal, and you don't

24   get that done in that short a period of time.  I had this

25   conversation yesterday with your colleague.

1   Q.   Well, Mr. Horton, again, goes back to Paragraph -- the

2   paragraph in the exhibit I gave you on the term sheet.  The

3   Debtors had sent back the term sheet that said the parties

4   will use commercially-reasonable efforts to close and fund

5   the two DIPs that we're talking about by September 15th.  So

6   you were insisting on a funding by September 15th, am I

7   correct?

8   A.   Use commercially-reasonable efforts.  Now, they could

9   have gotten -- they could have got commitments well in

10  advance of September 15th, which would have been encompassed

11  by these dates.

12  Q.   Exactly.

13  A.   And we were trying to get more time for the creditors,

14  yes.

15  Q.   But you only asked for --

16  A.   Give them more time to just pull together their two

17  payments, yes, sir.

18  Q.   But you only asked for 15 days, correct?

19  A.   We asked for 15 days.

20  Q.   And that 15 days is (indiscernible).

21  A.   Well, actually we asked for 60.

22  Q.   You asked for 60, but 15 more than what they had already

23  proposed.

24  A.   Additional two weeks, yes.

25  Q.   Was there any discussion of asking for 30 more than they

1    had proposed?

2    A.   We asked for 60 and, and we were -- it was declined.

3    Q.   And that 60th day falls, if I'm not mistaken, either a

4    day or two after Labor Day, isn't that correct?

5    A.   It was the math I was doing.

6    Q.   And after that, there were no further negotiations or

7    pushing, because on July 5th, you went to 45 days, and there

8    was no change after that, correct?

9    A.   That's correct.

10   Q.   And you knew throughout this period of time that that

11   date would probably be a problem for Elliott, didn't you?

12   A.   No, I didn't.

13   Q.   Now, Mr. Horton, did you ever tell Elliott that they had

14   to have their financing -- strike that.  Mr. Horton, were you

15   involved in a conversation on July 6th with Elliott, Kirkland

16   & Ellis, and Ropes & Gray?

17   A.   No, sir.

18   Q.   You were not on a call late at night to tell them about

19   the tra --

20   A.   No, sir.

21   Q.   Okay.  What do you know -- when was the first time that

22   Elliott was advised that there was a Berkshire transaction?

23   A.   By the Debtors, I couldn't tell you.  I don't know the

24   date.  I know that they had had a conversation with Oncor

25   some time -- at some point toward the end of June, maybe the

1    27th, 28th.  Having dinner, you could ask your clients, I

2    don't know, I wasn't there.

3    Q.   Okay.  Now, Mr. Horton, going back, did you participate

4    in the negotiate -- you did say you participated in the

5    negotiations on the equitization proposal, right, these term

6    sheets, correct?

7    A.   Yes, sir.

8    Q.   And there were about eight or nine of those that went

9    back and forth, correct?

10   A.   That's correct.

11   Q.   And those proposals included types of DIP financing,

12   correct?

13   A.   Yes, sir.

14   Q.   Okay.  Now, and so is DIP financing different than

15   financing for an acquisition or exit financing?

16   A.   You've asked me two questions that are similar, why

17   don't we do one at a time?

18   Q.   Okay, I'll ask you one.  Is DIP financing different than

19   exit financing?

20   A.   Is DIP financing -- can be different than exit

21   financing, yes.

22   Q.   Okay.  And is DIP financing different than acquisition

23   financing?

24   A.   Well, we -- if TCEH, as I recall, viewed some of its DIP

25   financing to that, acquire a generation asset in the middle

```
1    of the case.  So you can use DIP proceeds occasionally with

2    an accordion feature, in a basket, to acquire an asset.  So

3    I'm not sure the distinction you're trying to make.

4    Q.    Okay, let me ask you, could Elliott now do DIP financing

5    on its own, without the Debtor's support?

6    A.    I don't believe so.

7    Q.    Okay.  And the type of financing that was in the

8    restructuring proposal was a 1.5L DIP facility a two-second

9    lien DIP facility, correct?

10   A.    That's correct.

11   Q.    And that would have required the Debtor's support,

12   correct?

13   A.    Cooperation and support, yeah, I'm sure.

14   Q.    And the Debtors would have had to file the motion.

15   Elliott couldn't do that on its own, correct?

16   A.    I'd have to ask my lawyers that question.

17   Q.    Now, with respect to the discussions regarding the term

18   sheet, were there discussions about how to leave both EFH and

19   EFIH administratively solvent?

20   A.    Were there questions regarding?

21   Q.    Were there negotiations and discussions about

22   allegations of cash?

23   A.    Well, that's a switch in topics, I think.

24   Q.    Why don't I strike the question, I'll ask it more

25   cleanly.  Did Elliott and the Debtors negotiate the proper
```

1    allocation of cash as of the effective date of a plan?

2    A.   Allocation of -- I'm sorry, sir, and I don't mean to be

3    rude, what cash are we referring to?  Allocation of cash

4    between what?  I apologize, I'm really, I'm not following

5    you.

6    Q.   Were there discussions about how much cash EFH would

7    have on the effective date?

8    A.   How much EFH?  There was a projection of cash on

9    whatever the effective date you chose, you could look at the

10   forecast, and get an estimate as to what the cash forecast

11   would have been.

12   Q.   And did the Debtors provide Elliot with a forecast of

13   what the cash would be for EFH at a projected effective date?

14   A.   We gave them a cash forecast, and I can't recall, Mr.

15   Galardi, whether or not we said each one of these dates -- I

16   think we gave them a monthly cash forecast for EFH.  I think

17   that if -- I'm doing this from recollection, I think it went

18   out as far as June of 2018.  I think we gave them that cash

19   forecast for both EFH and EFIH.

20   Q.   Okay, and did Elliott raise any concerns about the way

21   the cash had been allocated, or the expenses that were being

22   paid out of that cash.

23   A.   My apologies, what expenses?

24   Q.   For example, was there a concern about the way

25   professional fees had been allocated, with respect to

1    payments made by the estates out of the cash?

2    A.   Okay, I see where you're going there.  There was

3    conversations around, and due diligence done by Elliott.

4    Seemed like they had -- I wasn't involved in all those

5    conversations.  I know that I was informed by members of K&E

6    and Evercor that the conversations -- that Geoff was spending

7    a lot of time -- Geoff, Mr. Rosenbaum, as he's referred --

8    reviewing the history of professional fees and so forth

9    between the two estates, I do recall that.

10   Q.   Okay, and do you recall there being a concern about how

11   much cash each of the estates would have on the year-end

12   effective date that was anticipated?

13   A.   The only time that I recall seeing that was in the last

14   turn of the term sheet that was sent over from Elliott on

15   July 1st, that said something to the effect -- and I'm doing

16   this from memory, maybe you have a copy of it, let me

17   paraphrase it.  To the extent EFIH has less than 225 -- I

18   don't remember the numbers, could have been 200 million of

19   cash, the first -- the 1.5 and the second liens would not

20   have to convert to equity.  I recall that, that particular

21   instance.  If there's something else you have in particular

22   you needed, let me know.

23   Q.   We'll come back to it.  Were there discussions about who

24   would properly be obligated to pay asbestos liabilities?

25   A.   There were definitely discussions from day one regarding

1    the reinstatement of the asbestos liabilities.

2    Q.    And was there a discussion as to if it was reinstated,

3    what estate should bear the financial burden of that

4    reinstatement?

5    A.    I think the way we described it initially was that it

6    would be reinstated as it was today.  And then I think in

7    your last draft, and again, doing this from memory, so in the

8    last draft, I think the way Elliott described it was that it

9    would be a claim to the EFH estate.  But again, I'm doing

10   this from memory.  So yeah, there was discussion around the

11   asbestos, and the treatment of it.

12   Q.    Okay, and was there also -- and was there also

13   discussions around the proper allocation of the potential

14   NextEra breakout date, or termination date?

15   A.    There was -- yeah, absolutely there was discussion, if

16   there was a break fee owed, what would be the allocation?

17   Q.    And what is the amount of the termination fee owed to

18   NextEra, if it is, in fact, owed?

19   A.    As owed in full, it's 275 million.

20   Q.    Okay, and does EFH have projected cash that it will be

21   able to pay that breakup fee in full, if it is determined

22   that EFH is fully liable for that termination fee?

23   A.    At what date?

24   Q.    October 24th.

25   A.    I'd have to look back.

1   Q.   Okay.  Now, Mr. Horton, you've done a number of

2   financings, correct?

3   A.   Yes, sir.

4   Q.   Do financing partners like to know what the cash is, on

5   the date that they will make their financial commitments?

6   A.   With all due respect, it depends on what financing

7   you're referring to.  Let me -- if you don't mind, if a A-

8   rated investment-grade entities, going out into the market

9   and raising capital -- debt, let's just do debt.  Unsecured

10  debt, I don't think there's any concern from the --

11  typically, there's no concern as how much cash is going to be

12  on your balance sheet that particular day.

13  Q.   But when you're raising -- so let me ask you this, when

14  you were negotiating the term sheets, you were also

15  negotiating a new DIP facility, isn't that correct?

16  A.   Yes, sir, we were.

17  Q.   Okay, and the original DIP facility had two features had

18  in it -- well, let's say one feature.  Did the original DIP

19  facility that was put before the Court have a conversation of

20  some of that debt -- the new DIP into an exit facility?

21  A.   Yes.

22  Q.   Okay.  And how much of that was going to -- would be

23  left to be converted to a DIP facility?

24  A.   So we were launching the transaction at $5.7 billion.

25  We had not yet upsized it to the 6.3.  We were at 5.7.  And

1    at exit, we anticipated we would have an ask for $4 billion

2    of exit facility.

3    Q.   And did there come a time when that transaction changed,

4    and that $4 billion no longer would be available as exit

5    financing?

6    A.   Yeah, we dropped the exit financing feature.

7    Q.   And do you remember what day that was?

8    A.   I don't remember the date.

9    Q.   And was there also a term loan facility in the original

10   proposal of the DIP facility?

11   A.   The DIP facility was -- the original was almost

12   predominately term loan.  So the 5.7 billion was term loan.

13   And we had actually also had commitments for $150 million

14   revolver.

15   Q.   Okay.  I misspoke.  There was an $825 million

16   incremental facility, wasn't there?  With the original

17   proposal?

18   A.   The original transaction, again, I'd have to look back,

19   to the original transaction was launched at $5.7 billion,

20   with potentially an accordion feature.  I don't think we

21   launched it with the -- that size.  I would have to look

22   back.  Spent a lot of iterations on that transaction.

23   Q.   Now, Mr. Horton, I'm going to hold up again the white

24   page binder, and ask you to turn to Tab 1 behind the white

25   page binder.

Page 102

1    A.   Yes, sir.  Tab 1?

2    Q.   Tab 1.

3    A.   Yes.

4    Q.   And that document, if you -- I'll identify it for the

5    record, it's been -- it is the Debtor's reply in support of -

6    - and it's a long title for financing.  It's Docket Number

7    11380, and it has a file stamp of 6/22/17 on the top.  Did I

8    get those facts correct?

9    A.   Yes, sir.

10   Q.   Okay.  Now, if you look on Page 3 of this document, the

11   first paragraph says, in particular the terms of the EFIH

12   first lien DIP credit agreement no longer contemplates

13   conversion of the EFI first lien DIP facility, in amount up

14   to $4 billion of the principal of the EFIH first lien DIP

15   facility, and to post-emergence exit term financing facility,

16   sorry, called the exit facility.  Did I read that correct?

17   A.   That's correct.

18   Q.   And that was a change that was made on or about June

19   22nd, correct?

20   A.   The change in the -- I'm sorry, are your referring to

21   the change where there's no longer a $4 billion --

22   Q.   Conversion feature.

23   A.   The conversion feature.  I don't recall if that was the

24   day we made that change.  I think that would happen in

25   advance of the --

1   Q.   In advance of the --

2   A.   We had filed, I think we filed a previous motion.

3   Q.   You filed a previous motion for the actual facility that

4   converted.  Did you ever advise anybody, other than through

5   NDAs, that this feature was now changing?

6   A.   Jeff Rosenbaum and I worked side by side on this

7   transaction.  When you said anybody, I --

8   Q.   That's fine.  And that was during the month of June,

9   correct?

10  A.   Yes.

11  Q.   And that was before the June hearing and this reply,

12  correct?

13  A.   Which June hearing?  My apologizes.

14  Q.   It was June.  Do you have a recollection of whether it

15  was June 15th, June 10th, June 22nd, June 21st?

16  A.   No, I don't.

17  Q.   Now, and that DIP facility was approved -- do you know

18  what date that DIP facility was approved?

19  A.   No, I don't know the exact date.  Did seem like it was -

20  - no, actually I don't know the date.

21  Q.   Okay, so if you would turn to Item Number 2 in your

22  binder, does this document look familiar to you?

23  A.   Yes, sir.

24  Q.   Okay.  And that is the DIP order that approved the new

25  DIP facility, correct?

1    A.    Yes, sir.

2    Q.    And that order is dated June 26th, correct?

3    A.    Sounds about right.

4    Q.    Okay, so you filed a reply the day before you gave

5    Elliott the markup of the term sheet.  You filed the reply

6    the day before you gave -- you got the Berkshire agreement.

7    And then you entered into, and got approved a post-petition

8    financing that no longer had $4 billion that could convert to

9    an equity, to an exit facility, is that correct?

10   A.    That's the sequence of events.  The sequence of the

11   timeline, that's -- I don't agree with your characterization

12   of the events.

13   Q.    But during the month of June, there was no longer $4

14   billion that would have been earmarked for the Elliott plan

15   to convert into an exit facility, isn't that correct?

16   A.    No, it's not correct.  I think you're mischaracterizing

17   the -- what happened.  And so we launched the transaction as

18   a DIP roll to exit.  The market was not going to absorb the

19   DIP roll to exit, would not accept the $4 billion.  We were

20   not going to get a $4 billion DIP roll to exit done, full

21   stop.

22   Q.    Okay, and --

23   A.    So we dropped that feature, and we launched the

24   transaction again.  I went and negotiation with a

25   counterparty to backstop the entire amount of the DIP.  And

1    we launched the transaction, we upsized it, I got them to

2    backstop the accordion feature, and Elliott was fully aware

3    of that.  And so I'm not sure where you're going with this.

4    Q.   Okay, and Elliott had to do a -- and in your mind, would

5    that change the sort of financing that Elliott was going to

6    have to look for?

7    A.   No.

8    Q.   Not at all?

9    A.   Not at all.

10   Q.   Okay, because you could still do another DIP facility,

11   correct?

12   A.   No, I could go back -- as soon as I got their

13   commitments for their equity, we could have gone -- in fact,

14   we could have gone the next day, and started working on

15   commitments for the $4 billion of exit financing.  We could

16   have done that four, five, six months prior to emergence, to

17   exit.  You would have had to pay for it, yes.  Could we have

18   waited until right before close, a month, or six months prior

19   to close, just like we did with TCEH, yes, we could have done

20   that.  So this doesn't change the structure of Elliott's

21   financing.  It's just a timing issue of when are we going to

22   raise the $4 billion?  Which, from my perspective, would have

23   been quite simple to do.

24   Q.   The 4 billion would be quite simple to do?

25   A.   Yeah, quite simple.

1   Q.   Okay.  And do you still believe the 4 billion would be

2   quite simple to raise, on an exit?

3   A.   Yes.  With appropriate capitalized business, of course.

4   I'm assuming that you've got a capitalized business.

5   Q.   Now, prior to July 7th, did you ever tell Elliott it had

6   to have financing commitments by July 7th?

7   A.   I think we went through this yesterday.  I don't recall

8   us ever saying to Elliott this is -- first off, that this is

9   Elliott's plan and proposal, this is their investor bank,

10  we're trying to assist them. Their timeline for completing

11  this, I mean, they were driving this process, and we were

12  trying to help them.  And I said that yesterday.

13  Q.   I understand, I have it here.

14  A.   Understand, I'm just trying to repeat --

15  Q.   And you said it was Elliott's plan proposal, correct?

16  A.   Yes.

17  Q.   But who -- you were party to discussions regarding whose

18  plan it was, weren't you?

19  A.   I don't understand the question.

20  Q.   Who was going to be the plan proponent, Mr. Horton?

21  A.   My understanding, my lawyers would have to correct me if

22  I'm wrong here, was that Elliot would file, be the plan

23  sponsor.

24  Q.   And who would be the plan proponent?  Who's name would

25  be, "It's our plan of reorganization."

1    A.    I'd have to ask the lawyers, specifically.

2    Q.    Do you remember negotiations in the term sheet,

3    regarding whether Elliott could be a plan proponent or not?

4    A.    No, I did not.

5    Q.    Did you read every version of the term sheet?

6    A.    No, I did not read every version.

7    Q.    And you do not recall any discussions regarding whether

8    Elliott could be a plan -- should be the plan proponent,

9    versus simply being a plan sponsor?

10   A.    I don't recall that conversation at all.

11   Q.    And there was discussions about this being a backup

12   plan, correct?

13   A.    Yes, sir.

14   Q.    And do you -- what was, why was it called a backup plan?

15   What's your understanding?

16   A.    My understanding in general, in layman terms, not legal

17   terms, is we had as part of the NextEra agreement, the right

18   to formulate a backup plan in the event that we felt, in our

19   -- the board, in management felt in its fiduciary capacity,

20   believed that it was prudent that we move forward with the

21   backup plan, given what we were observing with the NextEra

22   plan.

23   Q.    Okay, and to be a backup plan, did the Debtors have to

24   be a sponsor -- I mean, did the Debtors have to be a

25   proponent?

Page 108

1    A.   You would have to ask the lawyers.

2    Q.   Did the Debtors have to be supportive of that plan?

3    A.   The backup plan with Elliott, given that they were bound

4    by PIK PSA, we would need to be supportive of the plan.

5    Q.   And you do realize that Elliott contests whether to it

6    was bound to the PIK PSA?

7    A.   And they contested, and (indiscernible) a couple times,

8    yes, I realize that.

9    Q.   And you were shown an exhibit before -- if you turn back

10   to the binder that has the blue cover.  And I believe it's

11   behind DX-2021,

12   A.   Yes, sir.

13   Q.   And DX-2021 is the email form Mr. Keglevic to Mr.

14   Rosenbaum, and you are copied on that, correct?

15   A.   Yes, sir.

16   Q.   Okay.  And if you read the sentence you read before, it

17   says EFH and EFIH hereby waive any restrictions on Elliott

18   has under the PSA to refrain from --

19   A.   I'm sorry, my apologize.

20   Q.   I'm right in the middle, to the very bottom that you

21   read before they had a highlight, "I haven't been able to use

22   the --"

23   A.   Oh, I read -- I didn't, (indiscernible), I didn't read

24   that last.

25   Q.   Okay, I'm sorry?

1    A.    To facilitate the above -- you're in the very first

2    paragraph (indiscernible)?

3    Q.    Right, I'm in the paragraph that says "To facilitate the

4    above, this letter services as notice of the following."  And

5    it says that EFH and EFIH hereby waive any restrictions

6    Elliott has under the PIK PSA to refrain from discussions and

7    negotiations with third parties or creditors regarding a

8    backup plan proposal, provided that such parties are subject

9    to a current NDA with the Debtors, or, B, with any parties

10   regarding potential EFIH DIP proposals, again, subject to the

11   execution of any necessary NDAs.  Did I read that correctly?

12   A.    Yes, you did.

13   Q.    Okay, so with Elliott free to negotiate, we decide if it

14   didn't have any information from the Debtors, was it

15   permitted, under this waiver, to negotiate with third parties

16   that didn't have NDAs with the Debtors?

17   A.    To negotiate with those that did not?

18   Q.    Did not have it.

19   A.    No.

20   Q.    And if Elliott had no information, when this was

21   offered, no information, confidential information, they were

22   still precluded from negotiating with creditors at this

23   point, correct?

24   A.    I'm -- well, so long as they had an NDA, they could talk

25   to the creditors.  I don't know about your hypothetical.  I

1    can just tell you what this says.

2    Q.    So only people who had an NDA with the Debtor, so if

3    there was a creditor who didn't have an NDA with the Debtor,

4    Elliott could not speak to that creditor, correct?

5    A.    That's correct.

6    Q.    And if that -- and if a financing party did not have an

7    NDA with the Debtor, Elliott could not speak to that party,

8    is that correct?

9    A.    I think that's correct.  I think they could have again,

10   facilitated that, and we would have been happy to sign an

11   NDA.  We've done that over --

12   Q.    But you had to be a part of the process.  The Debtor

13   always had to be a part of the process, isn't that correct,

14   Mr. Horton?

15   A.    No, sir.  Signing the NDA is a significant milestone or

16   hurdle for your guys to talk to someone.  I guess you could

17   characterize that we had to be part of the process.  It was

18   at the very front end.  PIK could have had ad conversations

19   without us for months.  And we weren't part of that process.

20   So (indiscernible).

21   Q.    But you couldn't talk, and you threatened, actually,

22   Elliott, that if they talked about anything regarding other

23   than a backup plan, and other than EFIH Dip proposals, you'd

24   threaten to sue Elliott on the PIK PSA?

25   A.    You would need to talk to my lawyers about that.

1   Q.   I'm asking you, was that your understanding?

2   A.   I'm telling you, I don't know that.

3   Q.   You were not party to any of these emails that ever said

4   that?

5   A.   I have the emails, you asked me if we would sue, that's

6   my litigator's job.

7   Q.   Okay.  Now, what you offered here was a waiver of that

8   provision of the PIK PSA, is that correct?

9   A.   We did.

10  Q.   Okay.  But now let's read the second sentence.  The next

11  bullet says, "This limited waiver does not understand -- does

12  not extend to the filing or prosecution of any financing or

13  restructuring proposals that are not supported by EFH or

14  EFIH."  Did I read that correctly?

15  A.   Yes, you did.

16  Q.   And so Elliott was not free to go negotiate a creditor -

17  - a creditor-led plan that EFH or EFIH did not support, isn't

18  that correct?

19  A.   That's correct.

20  Q.   And that was --

21  A.   I mean, they could go negotiate it.  We wouldn't know if

22  they supported it or not; we would support it or not until

23  they brought it.

24  Q.   But this actually says we can't do the filing or

25  prosecution of any restructuring proposals that are not

1    supported.

2    A.    But you could go talk to third parties about a plan.

3    We've had negotiations with Elliott.  They understood what we

4    were looking for and what the key hot buttons were for us,

5    and they could have gone and negotiated with 100 different

6    parties.

7    Q.    And is it your understanding that the ultimate NDA that

8    Elliott signed with the Debtors included the waiver that's

9    set for in this email?

10   A.    That's my understanding.

11   Q.    And do you know the date on which the PIK PSA was

12   actually formally terminated?

13   A.    I want to say on the 8th or the 9th.  I don't remember

14   the exact date.

15   Q.    8th or 9th?

16   A.    8th or 9th of July.

17   Q.    July?

18   A.    Yeah.

19   Q.    So, until the 8th or 9th of July, based on this

20   language, Elliott was not free to go file or prosecute any

21   financing or restructuring proposals that were not supported

22   by the EFH or EFIH, is that correct?

23   A.    Based on the agreement that we signed, that is correct.

24   Again, you adjourned two different hearings on your objection

25   to being bound by the PIK PSA.  So if it was that great of a

1   restraint I'm not sure why you were doing that.

2   Q.   Now, were the Debtors also a party to a PSA with

3   Fidelity and NextEra?

4   A.   Yes.

5   Q.   And did that PSA preclude Fidelity from negotiating with

6   creditors?

7   A.   I don't know.  I'd have to look that up.

8   Q.   Were you ever asked to reach out to Fidelity or NextEra

9   to get a waiver so that Elliott could speak with Fidelity?

10   A.   By whom?

11   Q.   Did you ever -- I'll restate my question.  Were you ever

12   asked by representatives of Elliott to reach out to NextEra

13   and get a Waiver so that Elliott could speak to Fidelity

14   about restructuring proposals?

15   A.   I wouldn't -- I don't know.  I'd have to look back.  I'd

16   have to talk to my legal counsel if we ever got that request.

17   I don't recall getting that request but it's quite possible.

18   Q.   Now, and I think you may have already said this but is

19   it your testimony that you don't know whether Fidelity was

20   precluded from talking with Elliott under a Fidelity plan

21   support agreement?

22   A.   I think my broad -- and, again, you'd have to check me

23   on this, but that was not allowed.

24   Q.   It was not allowed, the communications?

25   A.   Yes.

1    Q.    Okay.  And is Fidelity a large creditor in these

2    bankruptcy cases?

3    A.    They are a large creditor at EFH.

4    Q.    Okay.  And when was the Fidelity plan support agreement

5    terminated?

6    A.    I don't know the date.

7    Q.    Was it after or before the company terminated the

8    NextEra merger agreement?

9    A.    I would suggest if it were, that it was after.  I'm not

10   even certain that it was.

11   Q.    But about the same time, correct?

12   A.    Correct.

13   Q.    Could you give a verbal answer?

14   A.    Yes, sir.  I apologize.

15   Q.    So, around July 7th?  We'll just use that date, correct?

16   A.    Or thereafter.

17   Q.    Or thereafter, thank you.  Now, Mr. Horton, did the

18   Debtors ever advise Elliott that there was a deadline before

19   July 7th to go obtain regulatory support from the staff, or

20   the PUCT, or the interveners?

21   A.    I don't know that we gave them deadlines on their plan

22   of -- in their proposal.  I think that was their plan in

23   their proposal.  They certainly had a significant amount of

24   risk.  I would think that they would be setting deadlines for

25   themselves and moving as rapidly as possible.  I know that

1    they were talking to potential investors prior to that date.

2    I know that they're talking to them now.  I would expect that

3    they had the ability to determine how fast they wanted to go

4    or how slow they wanted to go.

5    Q.   And as you sit here today, does Berkshire have the

6    approval of the PUCT?

7    A.    They have -- they have support.  And, again, the PUCT

8    staff -- they have staff.  They do not have approval of the

9    Public Utility of Texas for a change of control transaction.

10   Q.   And as you sit here today -- strike that.  Let me ask

11   you, before in your testimony I was a little confused.  You

12   said that your general counsel went to Austin and talked to

13   Oncor and Elliott.  And maybe I was just confused.  Did your

14   general counsel go to Austin and speak with PCUT staff and

15   Elliott at the same meeting?

16   A.   My apologies for confusing you.  My understanding is

17   that Elliott, Oncor, and my general counsel attended... Let

18   me say it differently.  Oncor and Elliott had meetings with

19   member -- key constituents in Austin.  My general counsel

20   attended those meetings with Oncor and Elliott.

21   Q.    Meetings with the PUCT staff?

22   A.    I don't know who all they had actually met with.

23   Q.    Okay.  And do you know when those meetings were that

24   they -- that your general counsel attended?

25   A.    It was...different points in time in the June -- month

1    of June.

2    Q.   And do you have any idea when in the month of June?

3    A.   No.

4    Q.   Okay.  And do you know whether your general counsel has

5    attended all of the meetings with Elliott and staff of the

6    PUCT?

7    A.   I do not know they attended all of them.

8    Q.   And do you have...  Strike that.  Is it your -- is it

9    the Debtor's position that Elliott will be simply unable to

10   obtain the same regulatory support as Berkshire?

11   A.   Are you referring to the Debtors?

12   Q.   I'm asking you, yes.  Is that your position -- that it's

13   simply impossible?

14   A.   No.

15   Q.   Now, Mr. Horton, Elliott -- Mr. Horton, sorry, EFH only

16   owns 80 percent of the economic interest in Oncor, correct?

17   A.   We have an 80 percent indirect ownership in Oncor.  100

18   percent of the EFIH.  You understand the structure?

19   Q.   I do.  And I think the judge has heard it for probably

20   three years, 20 months, and 27 days.  Now, who owns -- who

21   are the other owns of the equity interest in Oncor?

22   A.   There are three parties.  Borealis, GIC, and then a --

23   I'm not even sure what they call it these days.  They did

24   this all back in 2008.  It's part of the Hunt organization.

25   Q.   Okay.  And I'll call it TTH or TTI.  Is that what you're

1    referring to when you call it Borealis and GIC?

2    A.    Borealis, GIC, and -- yeah, Hunt --

3    Q.    They own that TTH?

4    A.    TTH or TTI, or whatever you call it.

5    Q.    Okay, right.  And that's about 19 percent, am I correct?

6    A.    Yeah.

7    Q.    And as a condition to the closing, Berkshire must

8    acquire that 20 percent or obtain an order from this court

9    authorizing Berkshire to exercise certain drag rights,

10   correct?

11   A.    Or Berkshire has a right to --

12   Q.    So there's three alternatives:  You get it consensually.

13   Berkshire buys it consensually...

14   A.    Mm hmm.  Yes.

15   Q.    This Court enters an order saying that they're

16   authorized to drag the -- I'll call it 20 percent because

17   it's easier for me.

18   A.    Yeah, fair enough.

19   Q.    Okay.  Or if neither of those happens, Berkshire could

20   walk, is that correct?

21   A.    Or waive.

22   Q.    Or waive.  Okay.  Now, do you have any indication, as

23   you sit here today, that Berkshire has any intention to waive

24   that condition?

25   A.    I have no idea.

1  Q.   So you have no knowledge today that it intends or will

2  waive that condition, correct?

3  A.   I have no knowledge as to what they will do.

4  Q.   Okay.  Now, is that 20 percent that is owned by TTA

5  presently subject to a contract with NextEra?

6  A.   They have an agreement.

7  Q.   Okay.  And does that agreement allow TTH or Borealis and

8  GIC to negotiate with third parties at this present time?

9  A.   It's my understanding that they do not at this present

10 time.

11 Q.   Okay.  And are Borealis and GIC familiar with the Oncor

12 asset?

13 A.   I think they are very much so.

14 Q.   And have Borealis and GIC expressed interest in the past

15 about increasing their economic interest in Oncor?

16 A.   I don't know to me directly.  Through hearsay I've heard

17 that, yes.

18 Q.   You've heard that they are interested in increasing the

19 interest, right?

20 A.   That's correct.

21 Q.   And as we sit here today, Elliott's not been able to

22 contact or talk to Borealis or GIC, correct?

23 A.   Okay.

24 Q.   Is that true?

25 A.   I'm assuming so.  Yes, sir.

1   Q.   Okay.  Now, do you know the time -- and are you familiar

2   with the NextEra appellate -- what NextEra's been doing with

3   respect to the appeals of the PUCT decision?

4   A.   I'm sorry.  I was reflecting back on your previous

5   question.

6   Q.   That's okay.  It's getting late.

7   A.   The one thing I would say is we did have conversations

8   with Elliott regarding whether TTI and TTH could actually

9   increase their ownership and a restructured EFH.  And we -- I

10  know there was some discussion about their being significant

11  tax issues with that.  So, I think that was put on hold for a

12  while.  My apologizes for interrupting -- I was just

13  reflecting.

14  Q.   No, that's quite all right.  My brain goes that way

15  sometimes too.  Mr. Horton, the PUCT denied NextEra's

16  application to acquire that 20 percent, correct?

17  A.   That's my understanding, that they -- yes.

18  Q.   And is it also your understanding that NextEra has

19  appealed that decision?

20  A.   That's my understanding.

21  Q.   And do you also have an understanding that NextEra has

22  sued the PUCT?

23  A.   I am aware of that.

24  Q.   Okay.  And did the board consider in determining the

25  timeline, the timeline for actually obtaining either that

1    drag right of a consensual purchase by Berkshire of that 20

2    percent interest?

3    A.   Yes, that was a consideration.

4    Q.   And does the board have any idea what the timeframe for

5    that purchase or order would be?

6    A.   I think what we are -- the way we had the conversation

7    along with our legal counsel is that the drag right

8    litigation had, through the Hunt transaction, had occurred.

9    Although we didn't get to a final summary judgment, there was

10   some initial opinions from the bench and from the Court.  And

11   that -- from that we got comfort that there was a probability

12   that that would be absolutely -- the drag right would be

13   enforceable.

14             I think where we ended up in the Hunt -- and I'm

15   doing this form memory, reflecting back, that one of the

16   holdups was that -- how to make the calculations of the IRR,

17   the entire return for the actual ability to drag out TTI from

18   the ownership.  I think prior to ever getting the final

19   summary judgment, the Hunt transaction was terminated due to

20   the burdensome conditions from the PUCT.

21             As you will note in the Berkshire transaction,

22   there's no requirement that we get a ruling on the IRR for

23   the 20 percent ownership interest.

24   Q.   Mr. Horton, as you sit here today, do you believe you

25   will have an order authorizing the drag by August 10th?

Page 121

```
 1    A.    Do I believe that?

 2    Q.    Yes.

 3    A.    No.

 4    Q.    No, you don't believe it or no, you don't think you will

 5    have an order by that date?

 6    A.    I'm not sure how to answer that question.  No, I don't

 7    (indiscernible)...

 8    Q.    Are you seeking -- that's a very good point, Mr. Horton,

 9    and I'll take my sentence back.  Are you seeking an order by

10    August 10th?

11    A.    No, sir.

12    Q.    Okay.

13          MR. GALARDI: Could I take one...?

14    BY MR. GALARDI:

15    Q.    Now, Mr. Horton, we talked about the timeframe and the

16    Debtor's request for an additional 15 days --

17    A.    Yes, sir.

18    Q.    -- earlier.  That is, to increase the period from 45

19    days to 60 days.  Do you remember we talked about that?

20    A.    Yes, sir, I do.

21    Q.    Okay.  And was the reason the Debtor sought that extra

22    15 days to give Elliott and creditors a longer time to make a

23    proposal?

24    A.    I think it was...  We had the conversation internally

25    that, you know, providing additional time would be helpful in
```

1   creditor support.  But there was a multitude of issues as

2   well.

3   Q.   Do you remember you were asked the question yesterday,

4   was there any reason other than the Court's schedule that you

5   and Mr. Keglovich tried to extend the approval order

6   deadline?  Do you remember that question being asked to you

7   yesterday?

8   A.   I don't remember precisely but...

9          MR. GALARDI:  May I approach, Your Honor.

10         THE COURT:  Yeah.

11  BY MR. GALARDI:

12  Q.   Mr. Horton, would you please turn to Page 81 of your

13  deposition transcript.  And I would ask you to look at Lines

14  19 to 24.  And you'll see the question was asked to you:

15  "Was there any other reason, other than the Court's schedule,

16  that you and Mr. Keglovich tried to extend the approval order

17  deadline?" And you answered, "That's my recollection of the

18  only reason." Did I read that correctly, sir?

19  A.   Yes, you did read it...

20  Q.   So there was never a time that you sought the additional

21  15 days to let creditors or Elliott form an alternative

22  proposal, isn't that correct?

23  A.   I don't know.  I think we're mincing words here.  So, we

24  were focused on it -- focused on creditors.  We asked for it.

25  And we wanted to give them more time -- the creditors more

1   time.  We knew the Court's schedule.  That's why we asked for

2   it.  We knew the -- go ahead.

3           MR. GALARDI:  No further questions, Your Honor.

4           THE COURT:  Thank you.  Redirect?

5           MR. STEPHENY:  No further questions, Your Honor.

6           THE COURT:  Thank you, Mr. Horton.  You may step

7   down.

8           THE WITNESS:  Thank you, sir.

9           THE COURT:  Next witness is from Berkshire,

10  correct?

11          MR. GALARDI:  Your Honor, can I leave this here?

12          THE COURT:  Yes, you may.

13          MR. STEPHENY:  Yes, Your Honor.  May we excuse Mr.

14  Horton?

15          THE COURT:  Yes.  Mr. Horton, you're excused.  You

16  may leave every -- all your trash behind.  I hope you have a

17  safe journey home.  We'll take a short recess, then we'll

18  hear the next witness.

19          MR. MCGUINESS: Thank you, Your Honor.

20      (Recess)

21          CLERK:  All rise.

22          THE COURT:  Please be seated.

23          MR. MCGUINESS:  Apologize, Your Honor.  We're

24  retrieving the Berkshire team.  Your Honor...

25          THE COURT:  Did they walk?  (Laughter) They really

1    meant it.

2              MR. MCGUINESS:  Apologize, Your Honor.

3              THE COURT:  No worries, that's fine.  Sir, please

4    take the stand and remain standing.

5              CLERK:  Please raise your right hand.  Do you

6    affirm you'll tell the truth, the whole truth, and nothing

7    but the truth to the best of your knowledge and ability?

8              MR. GOODMAN:  Yes.

9              CLERK:  Please state and spell your name for the

10   record.

11             MR. GOODMAN:  Patrick Jerome Goodman.  P-A-T-R-I-C-

12   K, J-E-R-O-M-E, G-O-O-D-M-A-N.

13             CLERK:  Thank you.

14             MR. SLETTEN:  Good afternoon, Your Honor.  Steven

15   Sletten, Gibson Dunn & Crutcher, for Berkshire Hathaway

16   Energy.

17             THE COURT:  Good afternoon.

18              DIRECT EXAMINATION OF PATRICK J. GOODMAN

19   BY MR. SLETTEN:

20   Q.   Good afternoon, Mr. Goodman.

21   A.   Good afternoon.

22   Q.   You stated your name for the record, sir.  Where are you

23   employed?

24   A.   With Berkshire Hathaway Energy.

25   Q.   And are you comfortable if I use the acronym BHE or as

1    others have used the term Berkshire during your testimony?

2    A.   Yes.

3    Q.   Okay.  Mr. Goodman, what is your title at BHE?

4    A.   I'm the executive vice president and chief financial

5    officer.

6    Q.   And how long have you served as the chief financial

7    officer, sir?

8    A.   Since 1999.

9    Q.   How long have you been employed at Berkshire?

10   A.   Since 1995.

11   Q.   Now, did you personally participate in the negotiation

12   of the merger agreement with EFH and EFIH?

13   A.   Yes.

14   Q.   How much will Berkshire Hathaway Energy pay to the

15   bankruptcy estates if the merger closes?

16   A.   $9 billion.

17   Q.   Is that 9 billion?

18   A.   Billion.

19   Q.   Thank you.  Is there any financing contingency tied to

20   Berkshire's $9 billion obligation?

21   A.   No.

22   Q.   Thank you.  Now, Mr. Goodman, you've been present here

23   in the courtroom all day today.  You've heard counsel and Mr.

24   Ordin discuss the dates set by the merger agreement; things

25   called milestones.  So, I'm going to start with a question

1    that I think is on everyone's mind, and that is what will

2    Berkshire Hathaway Energy do if an order approving the merger

3    agreement is not entered by August 21, 2017?

4    A.    We'll exercise our rights under the contract that we

5    negotiated for in good faith and will terminate the

6    agreement.

7    Q.    So we'll get into that in a little more detail, but I

8    just wanted to get that out now.  Let me show you what's

9    marked as Exhibit DX-004.  I'll get my copies up here, too.

10           MR. SLETTEN:  May I approach, Your Honor?

11           THE COURT:  Mm hmm.  Thank you.

12   BY MR. SLETTEN:

13   Q.    So let me ask you, Mr. Goodman, if you could turn -- if

14   you look at the page numbers at the top of the document for

15   now, and if you would please turn to Page 6 of 293 and tell

16   me if you recognize that document.

17   A.    Yes.

18   Q.    And what is this?

19   A.    This is the merger agreement.

20   Q.    Are you familiar, sir, with the milestone and

21   termination provisions in the merger agreement?

22   A.    Yes.

23   Q.    Let me direct your attention now -- if you'll look at

24   the bottom numbers on the agreement.  Page 88 of the

25   agreement itself, which is Page 100 of 293 at the top,

1   Section 8.4.  What is this section?

2   A.   This is the termination by parent section

3   (indiscernible) rights to terminate the agreement.

4   Q.   And if you turn the page to Section 8.4(h), are you

5   familiar with this section of the agreement?

6   A.   Yes.

7   Q.   And are these dates -- you've heard the term milestones

8   used -- are these milestone dates, 8.4H?

9   A.   Yes.

10   Q.   And Subsection 2 is the section that provides for the

11   45-day period during which -- or by which the approval order

12   is to be entered?

13   A.   Yes.

14   Q.   Now, we've heard some testimony about the negotiation of

15   this provision, so we won't get into too much detail but tell

16   me about how this term was negotiated.  I know you were

17   involved in that.

18   A.   Sure.  In the summer or fall of 2016, we were

19   negotiating for this transaction and we originally, for this

20   feature of it, proposed that that term be 30 days.  EFH and

21   their attorneys requested 60 days, and we ultimately settled

22   on 45 days.  That was for an agreement that was ultimately

23   never signed, never enforced, and out of play.  That was the

24   start of the discussions and the negotiations.

25   Q.   And was that the deal period at the conclusion of which

1    NextEra was selected as the merging partner for the Debtors?

2    A.    Yes.

3    Q.    Was the NextEra deal approved by regulators?

4    A.    No.

5    Q.    Did the NextEra merger agreement have the same 45-day

6    termination provision?

7    A.    Yes.

8    Q.    How do you know that?

9    A.    Because we reviewed it after it became public and we

10   compared our original thoughts and views to theirs.

11   Q.    Did the NextEra deal also have a termination fee?

12   A.    Yes.

13   Q.    And you know that also because you reviewed it?

14   A.    Yes.

15   Q.    How did you start the documentation for the new merger

16   agreement that ultimately was entered into and has been

17   marked as Exhibit DX-004?

18   A.    We started with the NextEra approved agreement, and we

19   modified it for relevant changes that were relevant to us and

20   different in terms of our bid versus theirs.  We also

21   identified other sections where we had a different view.

22   Q.    During the 2017 negotiations leading up to the July 7th

23   agreement, and in particular I'm thinking about the last

24   month, were there any discussions with the Debtors regarding

25   the 45-day period?

1    A.    Yes.

2    Q.    And can you tell me about that?

3    A.    So the last discussions were really consistent with Mr.

4    Horton's testimony where they put up that chart.  We proposed

5    45 days on, I think it was July 5th.  They countered with 60.

6    We told them no and that that was not an acceptable term for

7    us.  45 days is an incredibly long period of time, in my

8    view, for this type of provision.  Certainly in a non-

9    bankruptcy setting this term would be zero days, i.e., that

10   the legal rights signed for under the agreement would be

11   enforceable on all parties from the date assigned.  That

12   would be a typical commercial transaction.

13         We recognize that as part of the bankruptcy process

14   the Court needs to review the agreement and approve the

15   merger agreement.  So we're willing to accept some amount of

16   days but it's a difficult term for a buyer to accept.

17   Q.    You settled on 45 days after negotiating that term?

18   A.    Yes.

19   Q.    Until the approval order is entered by the Court, are

20   the Debtors able to accept a superior proposal?

21   A.    Yes.

22   Q.    And if they do that, where does that leave Berkshire

23   Hathaway Energy?

24   A.    We're out in the cold.

25   Q.    After the approval order is entered by the Court, if it

1   is, can Debtors still accept a superior proposal if they

2   receive on?

3   A.   Yes.

4   Q.   And if they do, what does that do for Berkshire Hathaway

5   Energy?

6   A.   If the merger agreement's approved, then we would be

7   owed upon consummation of that ultimate transaction the

8   termination fee in the most likely case.

9   Q.   Now, you understand, Mr. Goodman, that the L.A.  group

10  is asking for additional days beyond the 45-day period,

11  including adjourning the scheduled August 10 hearing,

12  correct?

13  A.   Yes.

14  Q.   And you said if the Court does not enter its approval

15  order by August 21, it is Berkshire Hathaway's -- Berkshire

16  Hathaway Energy's intention to terminate under the contract?

17  A.   Yes.

18  Q.   Who made the decision at Berkshire Hathaway Energy to

19  exercise the contract right to terminate under those terms?

20  A.   Our CEO, Gregory Abel, our general counsel, Natalie

21  Hawkin, and me discussed the issue and came to the view that

22  that was the right decision.

23  Q.   And that's -- does that group have authority independent

24  of the board to make that decision in this context?

25  A.   Yes.

1   Q.   Why did the senior executive team at Berkshire Hathaway

2   Energy make the decision to terminate if there is not an

3   order approving a merger agreement by August 21?

4   A.   Well, as I said, it's a very difficult term to live with

5   from the get-go. It's, in my world, completely not

6   commercial; something that we had to get our arms around

7   having in the bankruptcy process. We had -- I had certain

8   expectations for how the process would go. We think it's

9   very important to enforce our rights under the contract. We

10   negotiated hard for that right. We are exposed during this

11   period of time with no compensation whatsoever to the extent

12   that a superior offer is made or to the extent there is a

13   downturn in the market. We made a $9 billion offer. So, to

14   the extent catastrophes happen, market movements happen,

15   we're exposed for that.

16           And fundamentally EFH and the signatories to this

17   agreement, as I understand it, aren't obligated for their

18   commitments that they've made under the agreement until the

19   Court approves the agreement, including the termination fee.

20   And so as I said, it's a very difficult one to even live with

21   the 45 days, and if those 45 days pass, you know, things have

22   gone awry because they were supposed to be done ahead of that

23   time. We negotiated commercially reasonable efforts to have

24   the hearing and our expectation was that would occur by then.

25   Q.   If you terminate the merger agreement in the scenario

1    just described, have you made a decision on whether you'd

2    come back and negotiate a different transaction?

3    A.    No decision has been made on that.  You know, if -- and

4    I think it's -- if we would come back, it would definitely be

5    with different terms and conditions and most absolutely

6    likely at a lower price.

7    Q.    As of today, though, is Berkshire Hathaway Energy still

8    fully committed to this transaction?

9    A.    Yes.

10   Q.    And does Berkshire Hathaway Energy want the Court to

11   consider the merger agreement on August 10 as scheduled?

12   A.    Yes.

13   Q.    And going forward, is Berkshire Hathaway Energy

14   committed to dedicating the resources necessary to move the

15   transaction forward to a conclusion?

16   A.    Yes.  We've devoted substantial resources to date, a $9

17   billion commitment.  We've worked very hard to get to this

18   place over a couple summers, and we certainly would fully

19   intend to close.

20   Q.    Thank you.

21         MR. SLETTEN:  I have no further questions.  May I

22   approach?

23        THE COURT:  Yes.

24        MR. SLETTEN:  Thank you, Mr. Goodman.

25        THE COURT:  All right.  You're moving DX-4 into

1    evidence?

2              MR. SLETTEN:  Yes.  We would ask that Exhibit DX-4

3    be moved into evidence.  Thank you.

4         THE COURT:  Any objection?

5         MAN 1:  No objection.

6              THE COURT:  Submitted.

7         (Exhibit DX-4 Admitted into Evidence)

8              THE COURT:  Do the Debtors wish to examine the

9    witness?

10              MAN 1:  No, Your Honor.

11              THE COURT:  Okay.  Cross.  Mr. McGuiness.

12              MR. MCGUINESS:  May I approach?

13              THE COURT:  Yes.  Can I have one?

14              MR. MCGUINESS:  May I proceed, Your Honor?

15              THE COURT:  Yes.

16               CROSS-EXAMINATION OF PATRICK J. GOODMAN

17    BY MR. MCGUINESS:

18    Q.   Good afternoon, Mr. Goodman.

19    A.   Good afternoon.

20    Q.   My name is Matt McGuiness of Ropes & Gray and I

21    represent Elliott in this matter.  Just a few questions for

22    you today.  We've been talking a lot about the August 21

23    deadline that's specified in the agreement.  But you

24    understand that the current hearing proposed for the merger

25    agreement is August 10th, correct?

1   A.   Yes.

2   Q.   And -- but the agreement says August 21, correct?

3   A.   Technically, the agreement says 45 days from July 7th.

4   Q.   Fair enough, fair enough.  By the way, I know you

5   testified on your direct examination about why you think 45

6   days is a reasonable time period.  Do you think 45 days is a

7   reasonable time period for that provision in a bankruptcy

8   case?

9   A.   I think you mischaracterized my comment.  I don't know

10  that I said it was reasonable before.  But I don't have the

11  experience in Bankruptcy Court to know.  What I do know is

12  there's a minimum of 21 days.  I would've preferred shorter

13  than 45.  I think we offered 30 originally.  Again, it is not

14  a term that I would ever consider in any non-bankruptcy

15  setting when it's not legally required.  So it's hard for me

16  to say that it's reasonable.  I think if the law says 21

17  days, 21 days sounds pretty good to me.  It should be as

18  short as possible.

19  Q.   Fair enough.  So, you wanted shorter, you wanted 30,

20  perhaps even shorter.  You bargained for 45, correct?

21  A.   Yes.

22  Q.   You then bargained for 34 days, correct?

23  A.   That's correct.

24  Q.   And I take it as well that you're familiar that there's

25  a separate deadline for the approval of the disclosure

1   statement in this bankruptcy case, correct?

2   A.   Yes.

3   Q.   And that's September 5th, correct?

4   A.   Yes.

5   Q.   That's about -- so you've got August 21st and September

6   5th were the two deadlines that are specified in the merger

7   agreement, correct?

8   A.   And then there's the confirmation hearing on the 15th.

9   Yeah.

10  Q.   Fair enough, fair enough, fair enough.  And the hearings

11  that are currently proposed and sought by Berkshire and the

12  Debtors are August 10th and August 11th for deadlines that

13  are actually specified into the agreement for August 21st and

14  September 5th, correct?

15  A.   Yes.

16  Q.   Okay.  Now, you also testified on direct that as you sit

17  here today, Berkshire Hathaway Energy's intention is to

18  terminate the agreement if a merger agreement approval is not

19  received by August 21st, correct?

20  A.   Correct.

21  Q.   You were deposed a couple of days ago, I believe, is

22  that right?

23  A.   Yes.  I have to --

24  Q.   I realize that it may seem -- fair enough -- it may seem

25  like years ago at this point.  And at that deposition do you

1    recall agreeing that there are at least some circumstances

2    however unusual where you would at least need to pause and

3    think about whether you would terminate the agreement on

4    August 22nd?

5    A.   Yes.

6    Q.   All right.

7    A.   They were things such as Your Honor getting sick...

8    (Laughter) or there being a fire in the courtroom, I think is

9    an example.

10   Q.   However unusual they may be, correct?

11   A.   Yes.

12   Q.   Fair enough.  But you couldn't sit there and say with

13   100 percent or absolute certainty what Berkshire Hathaway

14   Energy would actually do on August 21st, correct?

15   A.   Well, what I would say is, under the most likely

16   scenario, is we will terminate if that order is not --

17   Q.   Fair enough.  The most likely -- I apologize.

18   A.   So, I'm not an unreasonable person, and if there are

19   extenuating circumstances that should be considered, God

20   forbid Your Honor gets sick or in a car accident or something

21   like that, we would have to consider that.

22           THE COURT:  Thank you.  (Laughter)

23   BY MR. MCGUINESS:

24   Q.   Fair enough.  So, the more likely scenario, as you say -

25   - most, I think -- more likely, is that the words you used?

1    Is that you would terminate on August 21st?

2    A.   Yes.

3    Q.   Fair enough.  Okay, I want to switch over to what

4    happens if you do not receive merger agreement approval on

5    August 21st.  You referred to, I think, being left out in the

6    cold.  Do you recall that?

7    A.   Yes, I did say that.

8    Q.   Right.  Or exposed.  Berkshire Hathaway would be

9    exposed.

10   A.   Well, I'm exposed today.  So I'm exposed today to those

11   issues that occur.  What happens when the merger agreement

12   gets approved is at least under certain situations, I might

13   have a right to a termination fee and the Debtor is obligated

14   legally to perform all the things that are in the agreement.

15   And today that isn't the case.  And I find that as a

16   completely unacceptable situation.

17   Q.   Fair enough.  So --

18   A.   But we're willing to do it for a period of time.

19   Q.   So, after merger agreement approval you have a right to

20   a $270 million termination fee, correct?

21   A.   Under certain conditions that would occur, yes.

22   Q.   And you, I believe, have suggested that there are

23   tremendous costs associated with the failure to receive that

24   merger agreement for approval by August 21st, correct?

25   A.   Yes.  I don't think I used the term tremendous costs,

1    but there are plenty of costs, exposures, risks with not

2    having that agreement approved and enforced.

3    Q.   Now, the $9 billion in cash that Berkshire Hathaway

4    Energy proposes to use to make this acquisition, that's

5    actually not sitting at Berkshire Hathaway Energy right now,

6    correct?

7    A.   That's correct.

8    Q.   That's at Berkshire Hathaway, Inc., the parent company?

9    A.   that's correct.

10   Q.   And Berkshire Hathaway, Inc. I take it is earning

11   interest on that money right now, is that right?

12   A.   Yes.  I testified that they are likely earning interest.

13   Warren's a pretty smart guy so it's probably earning a very

14   small amount, more than likely LIBOR.  But I'm not the CFO at

15   Berkshire Hathaway, Inc.  I don't know how they invest their

16   money.  I have a reasonable guess and expectation.

17   Q.   How much cash does Berkshire Hathaway, Inc. have right

18   now?

19   A.   So, cash, cash equivalents, and short-term Treasury

20   Bills, as of their March 31 10K, which is public -- anybody

21   can get it and add up the numbers -- it's $96-1/2 billion.

22   Q.   And the $9 billion in cash that we're talking about

23   here, for which Berkshire Hathaway Energy claims there are

24   tremendous costs associated with any delay, is less than 10

25   percent of that cash that Berkshire Hathaway, Inc. is sitting

1    on right now, is that right?

2    A.   Well, 9 billion is less than 10 percent of 96-1/2

3    billion.

4    Q.   And Berkshire Hathaway, Inc. or Berkshire Hathaway

5    Energy more particularly has no particular plans for that

6    cash over the next 30 days, correct?

7    A.   No.

8    Q.   Things don't happen that quickly in this space, correct?

9    A.   Correct.  We are focused on this transaction.  We're

10   trying to get this transaction completed.  Our time efforts

11   of our management team, of our legal staff, of our outside

12   counsel -- going to this transaction.  We're committed to $9

13   billion.  If circumstances change and the value of Oncor is

14   less, we're still obligated to pay 9 billion.  Nobody's

15   compensating us for that risk today.

16            And there are a lot of costs to us to enter into

17   that transaction, have an open-ended free option for 45 days,

18   and not have the rights and protections that we negotiated

19   for.  So I don't want there to be some misperception that

20   just because they're earning LIBOR, for example, on their 96

21   billion owed because we don't have a certain use of 9

22   billion, that somehow this is a small matter.

23   Q.   In terms of those other costs, though, you don't

24   actually have a sense of what those costs are, correct?

25   A.   We --

1    Q.    The costs of delay?

2    A.    We have not tried to put together a schedule or quantify

3    or make a projection of them.

4    Q.    And not even a ballpark number, exactly what those costs

5    would be?

6    A.    No, but you can look around this room and it gets pretty

7    expensive for every hour we're here.

8    Q.    We've had some time today to do that, I think.

9              MR. MCGUINESS:  Nothing further.  Thank you.

10             THE COURT:  Okay.  I'm sorry.  Redirect.

11             MR. SLETTEN:  No further questions, Your Honor.

12             THE COURT:  All right, thank you.

13             THE WITNESS:  Thank you.

14             THE COURT:  You may step down.

15             MR. MCKANE:  Your Honor, as we had discussed in

16   Chambers, it's a joint evidentiary hearing.  And we're -- we

17   would not close our case at this point in time, as it relates

18   in the schedule, because we would actually call Mr. Wood in

19   first.  But recognizing that we think it's probably more

20   efficient to have him do the direct first, you know, we'll --

21   we understand that the -- Elliott will call Mr. Wood from

22   Moelis, and then we'll conduct a cross-examination.

23             THE COURT:  Right.  Okay.  Again, let's get

24   started.

25             MR. MCGUINESS:  Elliott calls Roger Wood.

1          THE COURT:  Okay, Mr. Wood, if you would please

2     take the stand and remain standing?  And Rachel, I'm sorry.

3     Could you clear off some of those notebooks?

4          CLERK:  Please raise your right hand.  Do you

5     affirm your word that you'll tell the truth, the whole truth,

6     and nothing but the truth to the best of your knowledge and

7     ability?

8          THE WITNESS:  I do.

9          CLERK:  Please state and spell your name for the

10    record.

11         THE WITNESS:  Roger H. Wood.  R-O-G-E-R.  H.  W-O-

12    O-D.

13         CLERK:  Thank you.

14         THE COURT:  Please silence your phones.  Please be

15    seated, sir.  And if you could try to stay close to the

16    microphone, thank you.

17         THE WITNESS:  Yes, Your Honor.

18         THE COURT:  Thank you, Rachel.

19              DIRECT EXAMINATION OF ROGER WOOD

20    BY MR. MCGUINESS:

21    Q.   Good afternoon, Mr. Wood.

22    A.   Good afternoon, Mr. McGuiness.

23    Q.   By whom are you employed?

24    A.   Moelis and Company.

25    Q.   And what is your current title and position?

Page 142

1   A.   Managing Director.

2   Q.   And how long have you been at Moelis?

3   A.   Seven years.

4   Q.   And can you briefly describe your educational background

5   and work experience, please?

6   A.   Yes, I received a first class degree in modern history

7   from Oxford University, and I've been an investment banker

8   now for a little bit more than 30 years.

9   Q.   And you mentioned, I believe, that you've been at Moelis

10   for about seven years, is that right?

11   A.   Correct.

12   Q.   What sort of transactions do you work on at Moelis?

13   A.   Just a combination of mergers and acquisitions and

14   restructuring transactions.

15   Q.   And could you give some examples of recent deals that

16   you've worked on?

17   A.   Yes.  I've mentioned a few.  So for example, I

18   represented Edison International in the restructuring of

19   Edison Mission Energy.  They had a little bit over $5 million

20   of liabilities.  I also represented CenterPoint Energy,

21   another Texas-based transition and distribution company on

22   their investments in Enable Midstream, which they put in a

23   joint venture with OGE.  That was a transaction valued at

24   approximately $11 billion.

25          I represented Constellation Energy on a complex

1     transaction that they gave me with Electricite de France,

2     where they sold just under 50 percent of their operating

3     nuclear plants to Electricite de France.  And then, I had the

4     pleasure of some prior experience to this case, and I

5     represented Apollo Management in respect to their holdings on

6     the T-side for the first approximately two and a half years

7     of this case.  And I've enjoyed the six-month break that

8     we've had since then.

9     Q.   And you understand you are here today in connection with

10    a motion by the Debtors for a scheduling order, and a motion

11    by Elliott to adjourn an August 10th hearing, correct?

12    A.   Yes.

13    Q.   And has Moelis been retained by Elliott on connection

14    with the proposed transaction by Elliott and others?

15    A.   We have been retained.  We're still awaiting formal

16    execution of our engagement letter.  But we have agreement on

17    the commercial terms of that letter.

18    Q.   And when were you first contacted by Elliott about this

19    matter?

20    A.   It was late in the week of July 4th.

21    Q.   Shortly after the Berkshire transaction was announced?

22    A.   It was right around the time that the Berkshire

23    transaction was announced.  I believe it was strongly

24    rumored.  But the time that we were approached by Elliott, I

25    don't think the transaction had actually been formally

1    announced at that point.

2    Q.   And what was -- what did Elliott ask Moelis to do?

3    A.   Well, Moelis has been fairly simple, which is to assist

4    them in the raising of the required $9.3 billion of capital

5    that they need in order to support their transaction.

6    Q.   And what is the nature of your role, Mr. Wood's role in

7    particular?

8    A.   I'm the team leader at Moelis and Company, but we have a

9    core team of around 14 people, and we've also had

10   approximately 25 other bankers engaged in reaching out to

11   potential investors to support this transaction.

12   Q.   So with respect to the transaction that is proposed, can

13   you just briefly summarize the terms as you understand them?

14   A.   Yes, the current proposal is that out of the proposed

15   $9.3 billion, we would be looking for a term loan of $3.7

16   billion.  So that implies a net equity requirement of $5.6

17   billion.  And the -- and other holders of the PIKs have

18   indicated that they would be willing to put in approximately

19   $1.5 billion of new equity commitments, which leaves us with

20   $4.1 billion of equity to be raised from third parties.

21   Q.   In terms of third parties, do you have a sense of how

22   many third parties would make up that equity contribution?

23   A.   Our best case at the moment is it's probably somewhere

24   between five and 10, and within those individual investors,

25   there may be groups behind some of them, say for example,

1    Elliott has thought that it's more important to have some

2    Texas-based investors as part of their group.  It's possible

3    that those come together in a vehicle, so there may be

4    multiple investors behind any such type of Texas vehicle.

5    Q.   Mr. Wood, you've been in the courtroom for the testimony

6    today?

7    A.   Yes.

8    Q.   And you heard both some testimony and a presentation

9    regarding a proposal by Elliott that was made in June of this

10   year?

11   A.   Yes.

12   Q.   How, if at all, is the transaction that you just

13   described different from the transaction that was outlined

14   earlier in the day?

15   A.   So I'm not familiar with all of the details of the prior

16   transaction, but as described, that involved a one and a half

17   lien debt facility.  It involved additional second lien debt

18   facilities.  My understanding is that there was also

19   contemplating of international public offering of Oncor.  To

20   the transaction that we are currently contemplating, it's as

21   I described a couple of minutes ago.

22   Q.   So turning back to Moelis' responsibilities, can you

23   walk us through the process Moelis has undertaken to raise

24   capital for the proposed transaction?

25   A.   Yes.  So I mentioned that we were first approached by

1    Elliott later in that week of July 4th.  We negotiated

2    commercial terms for our engagement for several days.  And I

3    believe we had a kickoff meeting with Elliott late, late in

4    the week of July 10th.  But that meeting, we compared notes

5    on the investors that they had previously been in contact

6    with, those incoming expressions of interest that they'd

7    received and also some outgoing calls that they had made.

8            They had pulled together some summary marketing

9    materials that would be used to approach potential investors.

10   We finalized the terms of non-disclosure agreements that will

11   be in place between new investors, and on the one hand,

12   Elliott, and on the other hand, Oncor.

13           And then, starting just over a week ago, on July

14   17th, they actually began the process of reaching out to our

15   target investor group.

16   Q.   So in terms of the type of investors or investor groups

17   you're reaching out to, can you just briefly summarize,

18   without identifying any names, the categories of investors or

19   types of investors you're contacting?

20   A.   Let's see, so I mentioned already that Elliott believes

21   it's important to have a meaningful Texas component in the

22   investor group.  On top of that, we've been in discussions

23   with infrastructure funds, pension funds, sovereign wealth

24   funds, (indiscernible), alternative asset managers, and also

25   a number of strategic investors.

1    Q.    You mentioned a process with respect to non-disclosure

2    agreements, correct?

3    A.    Correct.

4    Q.    Outside of the NDA process, are there any other ways in

5    which interested investors are gaining information about the

6    proposed transaction hearing?

7    A.    Yes, I believe that Mr. Horton mentioned this morning

8    that this is a regulated public utility.  There is a fairly

9    significant amount of information available in the public

10   domain.  It falls with the SEC.  It falls with the Public

11   Utility Commissions of Texas.  And in addition to that, I

12   think they're aware that Elliott have put out some of their

13   own findings publicly.  So even in the absence of NDAs, we

14   believe that there is a significant body of information out

15   there that potential investors could use to evaluate a

16   potential investment in Oncor.

17   Q.    In terms of management presentations in particular, how

18   many have occurred, and to the extent you know, how many are

19   scheduled to occur in the next, in the coming future?

20   A.    Well, yes.  We held our first two management

21   presentations at the end of last week, and we've having a

22   further four scheduled for the remainder of this week.

23   Q.    Now Mr. Wood, have you set any deadlines internally or

24   in your communications with investors about, by which you

25   seek to secure a committed financing for the proposed

1    transaction?

2    A.   Yes.

3    Q.   And what is that deadline?

4    A.   So we set a deadline of yesterday for purposes of

5    receiving indications of interest in anticipation of this

6    court hearing today, Your Honor.

7    Q.   And did you also set -- have you communicated a deadline

8    by which you would like to receive not only indications of

9    interest, but actually committed financing as well?

10   A.   Yes, indeed.  The current schedule of the Court, as I

11   believe everyone knows, is August 10th.  So until or unless

12   the Court decides otherwise, that is the deadline that we are

13   directing people towards.

14   Q.   And approximately how many potential investors have you

15   contacted today?

16   A.   So as of late yesterday evening, the number that we have

17   in our tracker is 201 investors that we have contacted.

18   Q.   Now you also mentioned that some investors have been

19   signing NDAs, correct?

20   A.   Correct.

21   Q.   Approximately how many investors have signed NDAs as of

22   today, to the extent you know?

23   A.   Also, as of yesterday evening, again, that's the most

24   recent information that I have, I will have signed 23 NDAs

25   with investors.

1    Q.    Do you expect to sign any more?

2    A.    Yes.

3    Q.    Do you have a sense of how many more you expect to sign?

4    A.    I couldn't answer that with precision, but we do have an

5    additional 15 currently under negotiation, and we do have

6    continuing, all going outreach to investors.  So it's

7    possible that we will have others under negotiation on top of

8    that 15 over the coming days as well.

9    Q.    And Mr. Wood, you're aware, having been here today and

10   from your prior involvement, that this is not the first sales

11   process of some form for these assets, correct?

12   A.    Correct.

13   Q.    How, if at all, is the current transaction proposed by

14   Elliott different from those prior processes and

15   transactions?

16   A.    So as I said, the primary difference, at least compared

17   with the NextEra proposal is that we're looking to pull

18   together an investor group, comprising, as I mentioned,

19   perhaps between five and 10 different investors, maybe more,

20   maybe less, whereas the next day, it was an outright sale to

21   a strategic.  I'd also compare and contrast it with the Hunt

22   (indiscernible) proposal, which involved a novel and complex

23   structure, certainly for a utility of this size.

24   Q.    All right.  Having now contacted upwards of 200

25   potential investors, how, as a general matter, would you

1    characterize the investor interest to date?

2    A.   I'm very encouraged by the amount of interest that we've

3    seen so far.

4    Q.   And why is that?

5    A.   So I think there are three primary reasons I would

6    highlight.  The first is that Oncor is almost universally

7    regarded as a very good company, a very well regarded

8    management team, and importantly, within the sphere of

9    utilities, which is what I cover, they have a much higher

10   growth than just about every other regulated utility in the

11   United States.

12   Q.   Now the second reason that many people have cited is

13   valuation.  The proposed $9.3 billion from Elliott, and even

14   more compared with the proposed $9 billion from Berkshire

15   Hathaway, there's already meaningful discount to the price

16   that was agreed with NextEra in the summer of 2016.  And

17   during that time, utility valuations have, as a whole, have

18   gone up by approximately 10 percent.

19           So you've got a sector valuation that's gone up,

20   and you've got an apparent valuation for this asset that has

21   come down.  And you've seen other transactions involving

22   electric utilities, including one that was announced as

23   recently as last week, with meaningfully higher multiples,

24   multiples of EBITDA, multiples of rate-based and so on.

25           So a number of people view this as an opportunity

1   to invest in an attractive asset at an attractive price

2   point.  And the third reason I've highlighted it is that

3   particularly for the infrastructure fund, the pension fund,

4   sovereign wealth fund component, there is a lot of dry powder

5   sitting on the sidelines.

6           In the course of our business, we get frequent

7   calls from people saying, "Show us some products.  Show us

8   some great products."  So you've got an imbalance between on

9   the one-hand, you have a really attractive asset here.  And

10  on the other, a lot of money looking to be put to work, and

11  not much else of a similar quality that's available.

12  Q.   Now with respect to the investors that you have

13  contacted today, have some indicated that they are not

14  interested in pursuing a potential transaction here?

15  A.   Yes.

16  Q.   And in general, do you have an understanding as to the

17  reasons why those investors have not been interested?

18  A.   Yes.  There's a variety of reasons.  You know, for some,

19  that doesn't fit with their investment mandate.  It may be

20  too big.  (indiscernible) with full (indiscernible) some

21  people who do view it to be more fully valued, but the

22  stronger consensus is the one I mentioned earlier.

23          But one very consistent theme that we have heard

24  from people is timing.  And in particular, if we stick to the

25  August 10th deadline, this is a very significant amount of

1    work to do in a short period of time.  And importantly, given

2    (indiscernible) by most people to secure board approvals and

3    investment committee approvals and so on.

4            We have had a number of people who have flat out

5    declined to participate.  But interestingly, in a number of

6    cases, they've said, "Hey, if you're able to secure an

7    extension, then please get in touch with us again, because

8    this is the type of asset that we would love to invest in."

9    Q.   And what, if any role does the time of year play, with

10   respect to that timing factor that you were discussing?

11   A.   So there is clearly another component that is being

12   specifically referenced in a number of the conversations

13   we've had with investors, and in particular, for investors in

14   Europe and other parts of the world, trying to track people

15   down to put investment committees together and get approvals

16   in the space of the next two weeks, is something that a

17   number of participants have said is just not something that

18   they are physically able to do.

19   Q.   Now with respect to the investors that you're contacting

20   and your efforts to identify a proposed consortium for this

21   transaction, are there any criteria beyond capital that you

22   view as important for identifying the correct investors?

23   A.   Yes, I think a consistent theme that we've heard today,

24   and one that we were very, very familiar with before today is

25   the need to have a transaction that not only obtains approval

1    from the Court, Your Honor, but also, one that obtains

2    approval from the PUC in Texas.  So we're very focused on

3    putting together a group, which we believe is capable of

4    obtaining that approval as well.

5    Q.   And now, you had mentioned a minute ago that you had

6    requested that potential investors provide indications of

7    interest by yesterday, correct?

8    A.   Yes.

9    Q.   Did you request that these indications of ventures be

10   provided in any particular format?

11   A.   No.

12   Q.   Why not?

13   A.   Because given the extreme time pressure we're operating

14   under, we thought it was more important to understand where

15   investors were coming from, than to impose an additional

16   hurdle of a specific frame, which would almost inevitably, if

17   some of them require additional approvals.  So given that we

18   still have a firm target date of requiring firm commitments,

19   currently August 10th, but we hope Your Honor, that you will

20   consider an extension to that.

21          We thought that an additional burden of a formal

22   indication of interest, given everything else that we were

23   doing here, it was not a good use of time by us or by the

24   investors.

25   Q.   And did you receive indications of interest over the

1    last few days, including yesterday?

2    A.    Yes, we did.

3    Q.    And how did those indications of interest arrive at you,

4    by phone, by email, in person?

5    A.    So one of them was in person.  I believe two were in

6    email.  And the balances were verbal.

7    Q.    And every -- with respect to the method of the

8    indications of interest, the fact that most of these were

9    verbal or in person, any particular -- well, excuse me, is it

10   typical to request verbal indications of interest or in-

11   person indications of interest?

12   A.    I would say that every process has its own dynamic.

13   There is much about this process that we're running here that

14   is atypical, to raise $9.3 billion in a month.  So would many

15   other cases ask for written indications?  Absolutely, yes.

16   Did we believe that it was appropriate in this case, given

17   the totality of what we're trying to achieve and the time

18   currently available?  No, we did not.

19   Q.    All right.  So let's turn to the response you received.

20   Could you summarize for the Court the indications of interest

21   you received, in terms of the range of interest and the

22   number of potential investors?

23   A.    So there's a very broad range in terms of dollar

24   amounts.  I referenced some local Texas-based investors

25   earlier.  So some of them were committing in the single digit

1    millions of dollar range.  And at the other end of the

2    spectrum, we have people who were willing to indicate an

3    interest in a billion dollars or more each.

4              And I think you also asked for the number.  So we

5    had a total of, I believe, 11 specific investors or groups of

6    investors in addition to Elliott, who I believe as of this

7    morning, actually executed a commitment letter for that

8    proposed $1.1 billion or so commitment.

9    Q.   Did anyone else, to your knowledge, execute an equity

10   commitment letter this morning?

11   A.   I haven't seen it personally, but I understand that at

12   least one other holder of the PIKs may also have executed

13   such a commitment letter.

14   Q.   And do you have the rough range of the amount of their

15   commitment?

16   A.   I believe that's $400 million.  So with Elliott's $1.1,

17   that would account for a total of $1.5 billion of commitments

18   that we now have.

19   THE COURT:  Those are equity commitments.

20   THE WITNESS:  Correct, Your Honor.

21   BY MR. MCGUINESS:

22   Q.   So in the aggregate, when you actually totaled up all of

23   the indications of interest yesterday from -- what are the

24   total, the range of commitments that have been received?

25   A.   And so some commitments were made in ranges.  But if we

1    sum up all of those commitments in the aggregate, we have a

2    range of $9.7 billion at the low end of the range.  And

3    $11.85 billion at the high end of the range.

4    Q.   And this is for a proposed $9.3 billion transaction,

5    correct?

6    A.   That is correct.

7    Q.   Now Mr. Wood, an indication of interest is not a firm

8    commitment to invest, correct?

9    A.   That is correct.

10   Q.   Why not?

11   A.   Because particularly given the early stage of the

12   process that we're at, and I believe my words were on the

13   screen this morning as saying that we still had a long way to

14   go, there are still some very important work streams that

15   need to be continued, in particular, around due diligence,

16   around documentation of the proposed transaction, and around

17   obtaining of the necessary internal approvals, be that board

18   of directors, investment committee, et cetera.  So these are

19   indications that are some way away from being commitments.

20   But we do believe it's an important step on the road to

21   getting those eventual commitments.

22   Q.   And how would you characterize the progress that you've

23   made over the last couple of weeks?

24   A.   So I'm very encouraged.  I mentioned earlier the

25   timeline.  So we only started making investor calls last

1    Monday.  That's nine days ago.  We have, I mentioned earlier,

2    23 NDAs executed.  In the normal pace of these situations, in

3    my experience, that is a very quick start.  It needed to be a

4    very quick start, given what we're needing to do here.

5              But if someone had asked me nine days ago, you

6    know, would we have 23 people under NDA, an additional 15

7    people negotiating NDAs, and indications of interest, which

8    in the aggregate amount to more than the $9.3 billion, which

9    our client Elliott is looking for, I would've been pleasantly

10   surprised.

11   Q.   How does Moelis track its contact with potential

12   investors?

13   A.   So we have a master spreadsheet which we update on a

14   real time basis, and we send to our client Elliott, which

15   (indiscernible) at the end of the day, which normally ends up

16   being in the middle of the night.

17   Q.   Mr. Wood, I believe there should be a binder --

18   A.   I see no binder.

19   Q.   -- next to you, that will include Elliott's exhibits.

20   And once we locate that, I'll --

21   THE COURT:  Yeah, we took that away from you.  Okay, is that

22   your water?  All right.  Can we take a short recess, if that

23   would be all right, say five minutes?

24   MR. SLETTEN:  Absolutely, Your Honor.

25   THE COURT:  Okay, off the record now.

1    (Recess)

2    CLERK:  All rise.

3    THE COURT:  Please be seated.  Thank you for the recess.  You

4    may proceed.

5    BY MR. MCGUINESS:

6    Q.   Welcome back.  One last question before we turn to the

7    binder that, hopefully, we have found for you.

8    A.   Yes.

9    Q.   The commitments that you refer to in the Indications of

10   Interest, before we broke, that totaled an amount in excess

11   of the $9.3 billion, those were all premised, as I understand

12   it, on a $9.3 billion value transaction.  Is that correct?

13   A.   That is correct.

14   Q.   All right.  An equity valuation of $9.3 billion,

15   correct?

16   A.   For 80 percent held by EFH, correct.

17   Q.   All right.  Do you have the binder?

18   A.   Yes, I do.

19   Q.   If you could turn to ELX-11 in that binder, please.

20   A.   Yup.

21   Q.   Do you recognize this document, Mr. Wood?

22   A.   Yes, I do.

23   Q.   What is it?

24   A.   It is a summary of the Indications of Interest that we

25   had received as of yesterday evening.

1   Q.   All right, and focusing just on the first page of this

2   document for a moment, you'll see that there's some

3   redactions there on the first page.  Do you see that?

4   A.   Yes.

5   Q.   Are those, below the redactions are the names of

6   particular investors or groups of investors, is that right?

7   A.   The previous version of this that I saw had the real

8   names underneath, yes.

9   Q.   All right.  And can you describe for the Court, the rest

10   of the chart here, in terms of the numbers and how it sums up

11   to the bottom, please?

12   A.   So, the first block represents the Indications of

13   Interest that we received in respect of the equity.  So, I

14   mentioned previously, that if we had $9.3 billion total, $3.7

15   for the net, that meant $5.6 for the equity.  So, you will

16   see there's (indiscernible) between 4.5 billion and 6.5

17   billion of indications of interest for the equity from third

18   party investors.  In addition to that, there was the 1.5

19   billion indication.  I understand now a commitment from

20   Elliot and from other holders of the PIKs, which gives us

21   total equity indications and/or commitments between 6 billion

22   and 8.15 billion, that again, compared with the 5.6 billion

23   that Elliot would need.

24          We also have a turnaround of 3.7 billion.  And I

25   should note, briefly, on that, that we, Elliot have already

1    received income and indications from institutions which are

2    willing to do that single handedly.  We know the name very

3    well.  We've already had exposure to the name, which would be

4    repaid through this transaction.  So, we believe that that is

5    a very strong indication.  So, if we add the 3.7 to the 6 to

6    8.1 billion, that gets us to a range of the 9.7 to 11.85

7    billion that I referenced earlier.  And if you compare that

8    with the requirement of 9.3 billion, that would indicate that

9    if all of these indications of interest hold, we were over-

10   subscribed by between $400 million at the low end, and $2.55

11   billion at the high end.

12   Q.    Thank you.  Now, if I can turn your attention to page

13   two of this document.  Do you recognize this?

14   A.    Yes.

15   Q.    What is this?

16   A.    So, this would be the detailed tracking sheet which

17   tracks investor by investor.  I believe this would be the 201

18   that I referenced previously.  And this allows us to track

19   the date of the initial contact, whether they're negotiating

20   NDAs with Oncor and/or with Elliot.  And for people who've

21   told us they're not interested, we add those up and we've

22   tried to summarize in one word, occasionally two words if

23   they decline, what were the principal reasons for the

24   decline.

25   Q.    Thank you.  Now, if I can just turn to the second,

1    direct your attention to the second call under the chart that

2    is titled Initial Date of Formal Contact.  Do you see that?

3    A.    Yes, I do.

4    Q.    Now, what is this, the top section of this chart?  What

5    does this do?

6    A.    The top section breaks the investors down into the broad

7    categories that I mentioned earlier.

8    Q.    And it identifies at the top there are 162 total

9    contacts of investors.  Do you see that?

10   A.    I do.

11   Q.    Is that correct?

12   A.    I believe that's actually an error, that if we add those

13   up and go name by name, it's actually the 201 that I

14   referenced earlier.  I think it was just pulling the data

15   from an incorrect cell.

16   Q.    And the 201 number actually appears on the last page of

17   the chart, correct?

18   A.    That is correct.

19   Q.    All right.  Turning to the, I suppose, the third and

20   fourth columns of the chart, which are called Negotiating

21   Oncor NDA and Negotiating Elliot NDA.  Do you see those?

22   A.    Yes.

23   Q.    What do those refer to?

24   A.    Those refer to the number of NDAs currently under

25   negotiation with Oncor on the one hand, and for people who

1    would like access to non-public information on Oncor, and

2    with Elliot, on the other hand, and Elliot requires people to

3    enter into an NDA to be part of these discussions.  I would

4    observe that Elliot themselves had not received non-public

5    information on Oncor, and there are a number of other

6    investors that they're talking to who do not desire to obtain

7    non-public information on Oncor either.

8    Q.   Do these numbers here at the top of the chart include

9    those that have executed NDAs, or are they just those that

10   are negotiating NDAs?

11   A.   On this chart, this is only the ones that are still in

12   negotiation.

13   Q.   Fair enough.  So, I understand.  So, there are an

14   additional number that have executed NDAs that are not

15   reflected here.

16   A.   Correct.

17   Q.   All right.  And the next column is titled Not

18   Interested.  What does that refer to?

19   A.   That refers to investors that we've contacted who have

20   said, for whatever reason, they do not wish to continue in

21   our process.

22   Q.   Thank you.  And the next column is Reason for Decline.

23   What does that mean?

24   A.   So, where they gave specific reasons, we have stated

25   what those specific reasons or all principal reasons were.

1    Q.    And then, if you just look down the column, there's a

2    number of references to time.  Do you see those?

3    A.    Yes.

4    Q.    What does that refer to?

5    A.    So, this reflects the comment I made earlier, that given

6    the amount of work we're trying to do, the limited time

7    currently available, and although they don't talk about the

8    time of year, a number of investors simply said, "Hey, this

9    is really interesting, but another time of year with more

10   time available, we'd love to participate.  But if these are

11   the rules of the game, that's not something that we'd react

12   to now."

13   MR. MCKANE:  Objection, Your Honor, move to strike.  That's

14   double hearsay.  It's one thing for it to be communicated to

15   some unknown person at Mollusk, for them somehow to go

16   forward in some manner and then transcribe it into a

17   document.  You can't do the double chain.  So, I object and

18   move to strike.

19   MR. MCGUINESS:  Your Honor, I believe he was just testifying

20   as to his understanding based on the 8036 Business Record

21   here, of what they're essentially reflecting based on all of

22   their contacts.  I mean this is what they do.  They contact

23   investors.

24   MR. MCKANE:  And that solves one level of the problem and may

25   establish foundation for the document generally, but to be

1    sent the contents or actual communications by some other

2    people, and that's what they're asking you to rely on, that

3    somehow other investors are suggesting that there's time, I

4    think that's inappropriate, and that's why I'm moving to

5    strike the testimony.

6    THE COURT:  Overruled.

7    BY MR. MCGUINESS:

8    Q.   Do you anticipate contacting additional investors?

9    A.   Yes, I think it's likely that there will be additional

10   people that we end up talking to through our network.  We

11   understand Elliot is continuing its efforts in coordination

12   with us, but independently given their many relationships in

13   the investment community, I expect that this list will

14   continue to grow.

15   Q.   Now, Mr. Wood, I want to return to a subject we talked

16   about before the break, which was the indications interest

17   that you received.  I believe you testified that you'd

18   received two by email, is that right?

19   A.   That is correct.

20   Q.   And was one of those from the PIK holder that then

21   executed the equity commitment letter?

22   A.   Yes. I haven't seen personal evidence of the execution

23   of that letter, but I'm led to believe that it is the same

24   entity.

25   Q.   All right, Mr. Wood, I want to return to the August

1    10thdeadline that we've been discussing.  How, if at all,

2    does that deadline today impact your abilities to secure

3    committed financing for the proposed transaction?

4    A.   So, I'd already referenced the fact that we did have

5    numerous comments from potential investors and how I'll

6    respond to Mr. McKane, if I may, that I've personally been

7    involved in approximately 50, five-zero, of these

8    communications.  That is my direct personal knowledge, and I

9    have directly and personally heard many of those comments.

10   So, August 10this a real issue for many investors.  We ought

11   to be clear, we're doing everything we reasonably can to meet

12   the current August 10th deadline.  But there is no doubt in

13   my mind that if we had additional time, that this would be a

14   significantly easier task for Elliott to accomplish.

15   Q.   Why do you believe additional time would make a

16   difference?

17   A.   So, there are two reasons.  One is the substantive

18   reason of executing on due diligence, executing on revised

19   transaction documents that need to be agreed, and the other,

20   again, simply is time of year, having people pull together

21   investment committees, board of director meetings and so on,

22   to get the requisite approvals at this time of year.  I think

23   we all understand it's logistically just that much more

24   difficult than it would be if, for example, we had the

25   ability to do this in September or any other month.

1   Q.   Now, if you did have until the middle of September, is

2   there anything that you would be doing differently about how

3   you go about securing a committed financing for this?  Or

4   anything additional?

5   A.   Well, I think, firstly, we do is we go back to a number

6   of investors who said they really like the asset, they like,

7   at first blush, the valuation, the price point, and we will

8   strongly encourage them, if we did have the benefit of

9   additional time to participate in the process and join the

10  investor group that we've already had indications of interest

11  from.  So I think that would be the biggest single additional

12  thing, that we have the ability to do that we're not

13  currently doing.

14  Q.   Now, Mr. Wood, you had the good fortune of being deposed

15  yesterday, correct?

16  A.   Yes.

17  Q.   And I believe yesterday you were asked about your

18  assessment of obtaining committed financing by September.  Do

19  you remember that?

20  A.   Yes.

21  Q.   Has your assessment changed over the last 24 hours?

22  A.   Yes.

23  Q.   Why?

24  A.   Because between when I had the pleasure of being deposed

25  yesterday morning and now, we have received numerous

1    indications of interest, as I summarized a few minutes ago.

2    As of yesterday morning, I did not have the benefit of that

3    knowledge.

4    Q.   Now, Mr. Wood, some have suggested that the Court should

5    essentially defer a decision on the motion to adjourn until

6    August 10, at which point we could assess whether or not

7    Elliot needs additional time to obtain, to secure committed

8    financing.  Would that approach, from your perspective, make

9    securing committed financing feasible?

10   A.   In my view, that wouldn't make a material difference to

11   what we're currently looking at, because now people are

12   looking at approximately 14, 15 days until August 10.  If we

13   were then to say at the very last minute, "You've to an

14   additional X number of days," I don't think that's going to

15   change anything that they would have done in the meantime.

16   So, if we do, in fact, have a longer runway, I would

17   respectfully suggest to the Court that it would be

18   significantly more valuable for everyone to know that today,

19   than to know that halfway down the runway.

20   Q.   So, let me just try to put that a different way.  Is the

21   existence of the August 10th deadline today, affect, in any

22   respect, from your perspective, investor interest in

23   committing financing?

24   A.   Yes, as I've mentioned a couple of times, I think it

25   clearly has impacted where we are today.

Page 168

1    Q.   Pass the witness.

2            THE COURT:  Thank you.  Cross?

3            MR. MCKANE:  Absolutely, Your Honor.  And I'm very

4    conscious of the time of day and the Marshals.  Do you have a

5    sense of what our capacities are today?

6            THE COURT:  How long do you think your cross will

7    take, realistically?  An hour?

8            MR. MCKANE:  Until 6:00, 6:15, yeah.

9            THE COURT:  Yeah.

10           MR. MCKANE:  And I'm happy to go as far as we can

11   go.

12           THE COURT:  Yeah, let's ... do you know, can you

13   see if the, how late the (indiscernible).  Let's get started

14   and Ms. (indiscernible) is going to check on how late the

15   court security officers can stay.  They work for the

16   Marshal's office, and they have a budget so, overtime is a

17   problem, and I don't control that process at all, and don't

18   have the authority to ask them to stay late, although they're

19   usually very accommodating, so let's get started, and if we

20   have to end tonight and continue it sometime tomorrow, we'll

21   talk about when that will be.

22           MR. MCKANE:  Okay, very good, Your Honor.  Thank

23   you.

24           THE COURT:  You're welcome.

25               CROSS EXAMINATION OF ROGER WOOD

1    BY MR. MCKANE:

2    Q.    Good afternoon Mr. Wood.  For the record, Mark McKane of

3    Kirkland and Ellis.  It's nice to see you again.

4    A.    Good afternoon.  Nice to see you again too.

5    Q.    Sir, it's fair to say Elliot does not have a potential

6    transaction right now, does it?

7    A.    Could you repeat the question please?

8    Q.    Sure.  Is it fair to say Elliot does not have a

9    transaction now, it has a potential transaction now?

10   A.    They have proposed a transaction and we are engaged in

11   the process of trying to obtain financing for that

12   transaction.

13   Q.    There won't be more than a potential transaction until,

14   at a minimum, Elliot has obtained firm binding commitment

15   papers.  Do you agree with that?

16   A.    We're working on helping them obtain those binding

17   commitment papers, which would lead to a transaction.

18   Q.    And sir, I'm just trying to be precise, and if you ...

19   we're not being precise, is, I believe this is exactly what

20   you said yesterday.  I don't want to impeach you

21   unnecessarily.  I want to draw a distinction between having a

22   transaction and a potential transaction.  Do you understand

23   the difference?

24   A.    So, today, we're talking about a potential transaction.

25   Our effort is to help it become a real transaction.

1   Q.   Right.  And you would agree with me that you have a long

2   way to go before anyone would describe the Elliot proposal as

3   a firm and binding transaction?

4   A.   Correct.

5   Q.   And sir, as of yesterday at nine o'clock in the morning,

6   Eliot did not have any committed financing, correct?

7   A.   Correct.

8   Q.   And then this morning, as of nine o'clock today, there

9   was a commitment paper provided by Eliot, right?

10  A.   I believe so, I haven't seen it but I understand that

11  that was executed by Eliot and was served by other holders of

12  the PIKs this morning.

13  Q.   In fact, as of yesterday, Elliot had not even signed the

14  commitment paper for the own transaction that it was

15  pursuing, right?

16  A.   I believe so.

17  Q.   And that commitment paper, when you say, "Other members

18  of the PIK," to your knowledge, it's one holder of the PIK,

19  correct?

20  A.   I believe there's more than one holder, but I haven't

21  seen it myself, so I'm just stating that on (indiscernible)

22  belief.

23  Q.   The binder that your counsel gave you --

24  A.   Yes.

25  Q.   -- in white, if you could turn to Tab 12 in the back.

1    A.    Yes.

2    Q.    This is the document I believe that was ... sorry, Your

3    Honor.   This is the commitment paper that we received this

4    morning.   Have you seen any form of this prior to today?

5    A.    I have seen draft commitment papers in the past.  I have

6    not seen this until you showed it to me right now.

7    Q.    And when you see the top page, Texas Waters Company care

8    of Elliot Management Company, attention Dave Miller and Jeff

9    Rosenbaum, you see that, sir?

10   A.    Yes.

11   Q.    Texas wires I the transaction subsidiary of Elliot for

12   the purposes of this transaction, right?

13   A.    I don't know if it's a direct subsidiary of Elliot but

14   it would be the special purpose entity that would be formed

15   to follow through on the transaction.

16   Q.    And, sir, if you could turn to the back, final page of

17   these commitment papers, see Exhibit B?

18   A.    Yes.

19   Q.    Do you see the chart, Commitment Party Investment and

20   Percentage?

21   A.    Yes.

22   Q.    Do you recognize the first three entities as Elliot

23   affiliates?

24   A.    Yes.

25   Q.    For a contribution of approximately $1.1 billion, using

Page 172

1    lawyer math?

2    A.   Looks about right to me.

3    Q.   Okay.  And then there's one additional commitment from

4    Sunrise Partners Limited Partnership.  You see that, sir?

5    A.   Yes.

6    Q.   And that's for $270 million, right?

7    A.   Correct.

8    Q.   So, using my lawyer math, about $1.1 billion plus 270 is

9    about 1.378?

10   A.   Sounds good to me.

11   Q.   Okay, that's not 1.5, right?  That's not $1.5 billion,

12   right?

13   A.   That is correct.

14   Q.   Okay.  And so, if you could turn to the next page, the

15   next Exhibit, sorry, the one preceding it, the chart that was

16   provided this morning.

17   A.   Yes.

18   Q.   And you see the line that says Elliot slash the PIKs?

19   A.   Yes.

20   Q.   Would you agree that we should make an interlineations

21   and correct that to 1.37, where it says Elliot slash PIKS,

22   1.5 ... 1,500?

23   A.   If that is now the case Elliot represented to me

24   yesterday, which is why the 1.5 is in there, and the PIKs

25   were indicating interest for 1.5.  If there is new

1    information, obviously, I will be happy to update to reflect

2    any such new information.

3    Q.   Thank you, sir.  Now, I recognize things are moving in

4    real time, so, a lot of my questions are tethered to

5    yesterday.  So, if there's new information as of yesterday,

6    please let me know.

7    A.   Of course.

8    Q.   As of yesterday, Elliot had yet to identify the group of

9    investors that it would share direct commitment papers with,

10   correct?

11   A.   That is correct.

12   Q.   In fact, it had not even prepared direct commitment

13   papers to send out to this set of potential investors that

14   had just, from whom it had just received potential

15   indications of interest, right?

16   A.   I don't believe that's what I said.

17   Q.   My question is, is that true?

18   A.   I believe I said yesterday, and I will restate for the

19   Court today, that Elliot had begun preparation of draft

20   commitment papers to send out, they had not been physically

21   sent out.

22   Q.   Right.  And so did you guys -- they have not sent draft

23   commitment papers to any potential investors as of yesterday,

24   right?

25   A.   Correct.

1   Q.   And is that still the current state of your knowledge as

2   of this afternoon?

3   A.   Apart from the --

4   Q.   Apart from summaries.

5   A.   -- papers that you just referenced?

6   Q.   Yes.

7   A.   Correct.

8   Q.   Now, Elliot needs to raise $9.3 billion of new money for

9   its proposed transaction, right?

10  A.   Correct.

11  Q.   And Elliot's the only to contribute $1.1 billion of that

12  based on its commitment papers, right?

13  A.   Correct.

14  Q.   And that leaves you with an $8.2 billion raise, correct?

15  A.   Yes.

16  Q.   And about 1.37 of that is going to be a second lien term

17  loan, right?

18  A.   No.

19  Q.   I'm sorry, $3.7 billion of the raise isn't going to be a

20  second lien equity, a second lien term loan?

21  A.   You did not say 3.7.

22  THE COURT:  You didn't actually?

23  MR. MCKANE:  I didn't?  I apologize.  Let me try it again.

24  BY MR. MCKANE:

25  Q.   3.7 billion of the raise will be a second lien term

1   loan, right?

2   A.   It will be a term loan.

3   Q.   And, I'm sorry, as of yesterday, I believe you testified

4   that your best indication would be that it would be a second

5   lien term loan.  Has that changed?

6   A.   Again, we haven't formalized exactly what it looks like,

7   but 3.7 billion of term loan is what we are currently

8   assuming.

9   Q.   Okay.  And when you were retained, Elliot requested

10  Mollusk's help to raise 9.3 billion by any means necessary,

11  right?

12  A.   I don't think they used the words "by any means

13  necessary," but they asked us for assistance in raising 9.3

14  billion, and that's what we're currently engaged to do.

15  Q.   And that's the scope of your engagement, it's solely

16  focused on the capital raise and your focus on the 9.3.

17  You're not worried about the debt-to-equity conversion,

18  right?

19  A.   Right.

20  Q.   And the first time you heard from Elliot in any form or

21  fashion was after the July 4th weekend, right?

22  A.   We maintain a dialog with Elliot as we do with many

23  other clients in the sector about what's going on in the

24  electric utility industry and we did talk about Oncor from

25  time to time.  But the first specific discussions we had

1  around this specific matter that we're discussing today was

2  late in that week of July 4th.

3  Q.   Right, either Thursday the 6th or Friday the 7th, right?

4  A.   Correct.

5  Q.   And the Berkshire deal started to get leaked around the

6  6th, and the deal was announced on the 7th, right?

7  A.   Correct.

8  Q.   And you didn't contact your first investor until July

9  17th, right, Monday the 17th?

10  A.   That is correct.  Actually, let me -- I believe there

11  are one or two references in the chart where we had

12  (indiscernible) outreach but the substantial majority of the

13  invest (indiscernible) which began on July 17th.

14  Q.   And I'll get to the term in a minute.  I apologize.

15  A.   Okay.

16  Q.   So, you are specifically contacted as it relates to this

17  engagement, on the 6th or the 7th; you start to reach out on

18  the 17th.  You mentioned, I believe, in your testimony, that

19  you spent a few days trying to negotiate your retention

20  agreement, right?

21  A.   Correct.

22  Q.   And, in fact, it's been 21 days since your engagement

23  started, and you still won't have an engagement letter,

24  right?

25  A.   Well, the 21 days that you're referencing, I think,

1    would go back even before July 6th or 7th.  When they

2    approached us on July 6th or 7th, it was for a fee proposal.

3    We had discussions around a fee proposal.  I believe the

4    kickoff meeting that we had with Elliot was late in the week

5    of July 10th, so I think it was around July 13th.  So, July

6    13th to July 17th, I think you can do that math and you can

7    probably do the math from July 13th to now, in terms of an

8    engagement letter.

9    Q.    So, if Berkshire announces a deal on the 7th, it takes

10   Elliot and you a full week to actually have a kickoff meeting

11   on the 13th?

12   A.    Those were the facts.  I understand Elliot may have been

13   considering hiring other advisors and going through whatever

14   they needed to do but I have mentioned relevant dates to you.

15   Q.    There's a deal announced, you know, for an asset that

16   Elliot significantly prizes, you have until August 10th for -

17   - when motion is filed for a merger agreement hearing, and

18   you wait a week to even have a kickoff meeting, is that

19   right?

20   A.    I wasn't waiting a week.

21   Q.    But you didn't prepare to engage on the topic and had

22   the kickoff meeting until the 13th, for whatever reason?

23   A.    We, and Elliot, as I mentioned, were in the process of

24   agreeing terms so, after we had general agreement on a

25   commercial understanding, that was the first date that we

1    could substantively discuss how they're going to pursue this

2    effort.

3    Q.   And if you're successful, if you're successful in the

4    financial raise and this transaction closes, it's a pure

5    transaction that's led by Oncor based on your financing,

6    Mollusk receives a $15 fee, right?

7    A.   I think you said led by Oncor.  I think you --

8    Q.   Led, I'm sorry, led by Elliot, excuse me.

9    A.   If you mean led by Elliot, I was successfully raising

10   the financing.  There are other provisions which mean that it

11   may be a number different from $15 million, but the

12   (indiscernible) case is indeed $15 million success fee.

13   Q.   Okay.  Now, sir, you're aware of the fact that Elliot

14   signed an NDA with the Debtors on May 17th of this year,

15   right?

16   A.   I am now aware of that, yes.

17   Q.   Okay.  You learned that as part of your due diligences

18   in preparing to contact investors and learn more about what

19   Elliot has been doing, right?

20   A.   Yes.

21   Q.   And between May 17th and July 6th of 7th, did Mollusk do

22   any work with Elliot with regards to any financing or capital

23   raise?

24   A.   No.

25   Q.   And you were not personally involved in any of Elliot's

1    efforts to raise capital before July 6th or 7th, right?

2    A.   Correct.

3    Q.   And to your knowledge, Elliot did not work with any

4    investment banker to assist with its financing or capital

5    raise efforts between May 17th and July 6th or 7th, right?

6    A.   Not to my knowledge.

7    Q.   And when you had indirect -- sorry, when you're

8    interacting in an informal capacity with the Elliot team

9    before July 6th or 7th, do you have any understanding as to

10   whether Elliot was engaging with any other financial

11   institutions with regards to any insights for a potential

12   capital raise?

13   A.   I have no knowledge of any such dialog.

14   Q.   Okay.  So, you first reach out to investors on July

15   17th, right?

16   A.   I think there were a couple we might have reached out a

17   few days before, but the principal outreach began on July

18   17th.

19   Q.   Principal outreach happens on the 17th  And you have

20   filed, Elliot's filed a motion to adjourn which you've read,

21   right?

22   A.   Correct.

23   Q.   And you understand the ask is to move the hearing up 35

24   to 40 days, right?

25   A.   Yes.

1    Q.    And, in particular, the date that's been soft circled is

2    September 14th, right?

3    A.    September 14th, 15th, yeah.

4    Q.    All right.  I mean you have to have some degree of

5    confidence that you think you can get to committed financing

6    between July 17th and September 14th because Elliot's own ask

7    is for that two-month period, right?

8    A.    Correct.

9    Q.    Okay.  But you don't know what Elliot was doing between

10   May 17th, when it signs an NDA, and July 17th, when you kick

11   off the fundraiser here, right?  You don't know what efforts

12   they were doing for the two months prior to your contact from

13   Elliot.

14   A.    That's correct.

15   Q.    And if you think it takes two months to do this raise,

16   and Elliot had two months before it reached you, surely they

17   could have been doing this earlier, right?

18   A.    I have no knowledge of what else they were doing during

19   that two-month period.

20   Q.    Right.  Let's cover a couple of things that you may not

21   have had personal knowledge of.  Sir, am I correct, you have

22   no personal knowledge of anyone from the Debtors refusing to

23   permit Elliot to negotiate financing or restructuring

24   alternatives?

25   A.    That is correct.

1    Q.   And you have no knowledge of anyone from the Debtor's

2    advisors refusing to permit Elliot to negotiate financing or

3    restructuring alternatives?

4    A.   That is also correct.

5    Q.   And the Debtors are not instructed, prevented or

6    impaired Mollusk's ability to negotiate financing or

7    restructuring alternatives.

8    A.   Correct.

9    Q.   And the Debtors' advisors haven't done that either, have

10   they?

11   A.   No.

12   Q.   And you have no personal knowledge of the Debtors'

13   involvement with Elliot's investor presentations prior to

14   July 6th or 7th, right?

15   A.   Correct.

16   Q.   And you have no personal knowledge of whether the

17   Debtors or anyone of the Debtors' advisors prevented Elliot

18   from interacting with Berkshire, do you?

19   A.   I have no personal knowledge of that either.

20   Q.   And, in fact, you are aware that Elliot did have some

21   interaction with Berkshire prior to July 6th or 7th regarding

22   the Berkshire proposal, right?

23   A.   I don't have personal of that, but I understand from

24   proceedings, including today, that that may, in fact, have

25   happened.

1   Q.   Well, in fact, Mr. Rosenbaum told you that, right?

2   A.   I don't recollect him telling me that, no.

3   Q.   I want to be precise about that.  Mr. Rosenbaum told you

4   that he had interactions with Berkshire prior to July 5th

5   regarding their proposal, correct?

6   A.   I believe he may have told me that, indeed, yes.

7   Q.   And Mr. Wood, you view yourself as the person most

8   knowledgeable about Mollusk's efforts to assist Elliot in

9   raising the $9.3 billion, right?

10  A.   Yes.

11  Q.   And at Elliot, Mr. Rosenbaum was the point person for

12  the proposal and the related financing efforts, right?

13  A.   Correct.

14  Q.   And you believe you have sufficient information to go to

15  third party investors and raise the capital that Elliot

16  needs, right?

17  A.   Yes.

18  Q.   And you've received access and information from Oncor,

19  right?

20  A.   Yes, in fact, I commend the cooperation of Oncor

21  management in facilitating this process.

22  Q.   In fact, Oncor's management team has made themselves

23  available for two management meetings already, and you have

24  four more scheduled, correct?

25  A.   Correct.

1    Q.    And those aren't town hall sessions, those are

2    specialized presentations to individual investors, right?

3    A.    That is correct.

4    Q.    And, in fact, there is no information that you're aware

5    of, that either Elliot or Mollusk sought information from

6    Oncor, or the Debtors, that they refused to provide, right?

7    A.    Not at this point, no.

8    Q.    Now, in a timeline, the timeline of a capital raise of

9    this sort, there are some fairly established milestones,

10   right?

11   A.    In general there (indiscernible) observe, as I think

12   I've said previously, that this is an atypical process, but

13   please proceed.

14   Q.    Well, you understand that you had to initially reach

15   out, right?

16   A.    Correct.

17   Q.    And as of yesterday, you had contacted approximately 175

18   investors and now it's up to 200, right?

19   A.    Correct.

20   Q.    Okay.  And the next step would be the execution of NDAs,

21   right?

22   A.    We actually execute NDAs prior to that.

23   Q.    With some investors but with all, right?

24   A.    Correct.

25   Q.    And a minimum, you believe, that an NDA is a common and

1   necessary step in the process, right?

2   A.   Yes.

3   Q.   And as of Monday, 16 potential investors had executed

4   NDAs with Elliot, right?

5   A.   That's correct.

6   Q.   And 14 had contacted, sorry, and 14 potential investors

7   had executed NDAs with Oncor.

8   A.   So, let me correct what I said in my deposition

9   yesterday.  I don't believe I used the precise number 14.  I

10  said it was a couple less.  I have (indiscernible) I know it

11  is in fact 13 as of Monday, for Oncor.

12  Q.   And the reason why there's a differential between NDAs

13  with Elliot and NDAs with Oncor relates to the access to non-

14  public material information, right?

15  A.   That is correct.

16  Q.   Elliot requires anyone who's going to interact with them

17  to sign an NDA to discuss the transaction, but people who

18  might sign that NDA may not want to sign the NDA with Oncor

19  because they want to trade.

20  A.   That is correct.

21  Q.   And before Mollusk's engagement, to your knowledge,

22  there was only one to two NDAs between potential investors

23  and Elliot and regarding a potential Oncor proposal, correct?

24  A.   Yes.

25  Q.   And even as of last Wednesday, there have been only four

1    NDAs executed, right?

2    A.    Yes.

3    Q.    And then the next step, generally, in a capital raise

4    process, would be to seek non-firm indications of interest at

5    a set amount, right?

6    A.    Yes.

7    Q.    And that was what -- the milestone that you had set for

8    last night, correct?

9    A.    Correct.

10   Q.    And if I understood your testimony correctly, you didn't

11   care what form it came in, right?

12   A.    I'm not sure I'd use the words "I don't care," but it

13   wasn't important to us whether it was verbal, in person or

14   any other form.  We did --

15   Q.    Right.  You were taking preliminary --

16   A.    -- did not specify that

17   Q.    I apologize, so go ahead.

18   A.    We did not specify the form in which we requested the

19   indications of interest.

20   Q.    Right.  There's no standard form and, in fact, you take

21   it, you receive them in person and orally primarily, is that

22   right?

23   A.    And we received a couple via email as well.

24   Q.    And, in fact, you said if someone were to contact  you

25   and just communicate the interest, that would be okay because

1    they might not have time to go through their own internal

2    processes, right?

3    A.   That's possible, and I would add that we have at least

4    one part that already has board approval, but out of the

5    spectrum investors, there were some who said, "Look, this is

6    explicitly subject to subsequent board approval," and in my

7    experience there are some investors who do require some level

8    of committee approval before they submit anything in writing.

9    So, this was explicitly designed to streamline the process

10   that we're (indiscernible) what we all acknowledge is a very

11   tight timeframe.

12   Q.   So, this is a streamline process that is designed to get

13   an indication of interest, even if it were contingent to

14   additional internal approvals, correct?

15   A.   Absolutely.

16   Q.   ES-11, the Preliminary Indication of Interest chart that

17   you produced this morning --

18   A.   Yes.

19   Q.   There are three columns that were provided today, right?

20   A.   Which page are you on?

21   Q.   I'm just on that front page.

22   A.   Okay.

23   Q.   It says, "Preliminary Indications of Interest."  I just

24   want to talk about this chart on that first page.  You with

25   me, sir?

1    A.    Yes.

2    Q.    Okay.   There's the investor name and then there's a low

3    or high range, right?

4    A.    Yes.

5    Q.    Are there other columns to this document?   Is this an

6    Excel file with additional columns that are suppressed?

7    A.    I really don't know in what form it was provided.

8    Q.    You know, the reason I'm asking is you noted that like

9    some of the communications came with qualifications, like

10   this may be subject to additional approvals, like my

11   investment committee.   Is that something that you or anyone

12   else in Mollusk would note as a potential additional step

13   that that investor might need to go through?

14   A.    I don't have documentation of that, but I clearly have

15   recollection of that for a number of these names.

16   Q.    And so, a number of these names are preliminary, all

17   indications of interest that are subject to investor

18   committee approval, correct?

19   A.    Yes.   And I would also add -- you may be going there --

20   because they're subject to due diligence, they're subject to

21   documentation, they're subject to many other things.

22   Q.    And, in fact, this indication came in without even

23   having reviewed a sales or merger agreement, correct?

24   A.    That is correct.

25   Q.    And yet these non-binding, oral, qualified indications

1    of interest changed your perspective on your assessment of

2    the likelihood to successfully satisfy a capital raise?

3    A.   Yes.

4    Q.   Okay.  Now, you have a much higher degree of confidence

5    in successfully raising the term line than you do the equity,

6    right?

7    A.   I think that's fair.

8    Q.   And, in fact, you're much further along in that process.

9    It's easier to do too, right?

10   A.   Yeah.  And the reason I cited earlier is that we think

11   we could do that single handedly from one or more entities

12   who already knows the name very well, who's already invested

13   in the name, so, I think clearly dealing with one

14   counterparty is, by definition, a lot easier than dealing

15   with five or 10 or however many counterparties we end up

16   dealing with here.

17   Q.   Okay.  Now, with regards to the counterparties you're

18   dealing with, and the NDAs you're referring to, that's not

19   related to the debt.  That's all tied to your equity raise,

20   right?

21   A.   Correct.

22   Q.   And the tracker chart that you reference is the second -

23   - the pages after the first page of Exhibit 11, correct?

24   A.   Yes.

25   Q.   And this was a document that was also produced to us

1   today, right?  It's got today's date on it, in the upper

2   right hand corner?

3   A.   Yes.

4   Q.   And the internal project name for this, and Mollusk's

5   project, Alamo, right?

6   A.   That is correct.

7   Q.   You have, I think, six columns here, starting with the

8   Buyer Summary and running to the right, ending with Reasons

9   for Decline, right?

10  A.   That is correct.

11  Q.   This is an Excel file as well, right?

12  A.   I believe so.

13  Q.   Are there additional cells that go beyond Reasons for

14  Decline?

15  A.   Not to the best of my knowledge.  On this particular

16  chart we may track other things, like number of executed

17  NDAs, which I've referenced earlier.  But the total number of

18  columns you see here is what I believe is the total number of

19  columns and the underlying Excel for this particular

20  document.

21  Q.   You know, Mr. Wood, you actually anticipated one of my

22  questions.  See, the column after Initial Date of Contact, to

23  the right, it says "Negotiating Oncor NDA," and then,

24  "Negotiating Elliot NDA."  You see those, sir?

25  A.   Yes.

1    Q.    And the totals are 11 and 13, respectively, up in the

2    summary, in the top of the page.

3    A.    Yes.

4    Q.    This isn't a reflection as to who's actually signed

5    NDAs, this is a reflection as to who remains that may be

6    eligible to sign an NDA but hasn't done so yet.  Is that

7    right?

8    A.    Correct.

9    Q.    And so, to the best of my understanding, from your

10   testimony yesterday and again just now, people actually

11   signed NDAs.  You have 16 Elliot NDAs as of yesterday and 13

12   Oncor NDAs as of yesterday, is that right?

13   A.    That is correct.

14   Q.    And those numbers have increased through 23 as of today?

15   A.    Twenty-three and 15 are the numbers as of last night,

16   and I believe, for the record, that there are additional NDAs

17   that have been executed while we've been here today.

18   Q.    All right.  And only one is a strategic, correct?

19   A.    That is correct.

20   Q.    And as of yesterday, approximately four to five were

21   Texas entities?

22   A.    I think that's about right.

23   Q.    And the remainder would fall into a catchall category of

24   infrastructure funds, pension funds and sovereign law funds,

25   right?

1   A.   I think some of their family offices and alternative

2   asset managers would (indiscernible).

3   Q.   Okay.  Now, the investor names on the first page -- do

4   the investor profiles on that page also fall in the same

5   categories?  Some are pensions and sovereign wealth funds,

6   but some fall into the category of family offices and

7   alternative asset managers as well, right?  You have the

8   whole range in this group of 10.

9   A.   Correct.

10  Q.   And do you have any sense of the ability of any of these

11  entities to close on the commitment that they're making?

12  A.   I haven't yet done independent due diligence on that,

13  but I can tell the Court that these are, for the most part,

14  very serious, substantial investors who we believe have the

15  financial capacity to follow through on the indication of

16  interest that they have made to us.

17  Q.   Right.  And the challenge we have with that statement is

18  that we just have to take that on faith.  We have to just

19  believe you, because we don't have the ability to pressure

20  test this, because you redacted all the names.  Right?

21  A.   The names have been redacted, you're correct.

22  Q.   Right.  We have no ability to independently verify or

23  assess the capability or capacity of any of these investors

24  to close on their currently oral non-binding indications of

25  interest, right?

1   A.   It would be difficult for you to do that without knowing

2   their names.

3   Q.   Right now -- Your Honor, I apologize.  I'm doing okay

4   with time.  I think six o'clock is probably more accurate.

5   THE COURT:  Okay, that would be great.

6   MR. MCKANE:  I have a binder of a couple of documents I need

7   to walk through.  May I approach?

8   THE COURT:  Yes, of course.

9   BY MR. MCKANE:

10  Q.   Mr. Wood, I believe you said you've read the Motion to

11  Adjourn, correct?

12  A.   Correct.

13  Q.   And if you could -- in the blue binder I just provided

14  you, you should find a tap that says DX-5.  You see that?

15  A.   Yes.

16  Q.   And that's the Motion to Adjourn, right?

17  A.   Yes.

18  Q.   And if you could turn to page eight.

19  A.   Yes.

20  Q.   Do you see the sentence that's in bold, underlined and

21  italicized?

22  A.   I do.

23  Q.   All right.  And it says, "In fact, Elliot has also

24  received inbound expressions of interest from multiple

25  strategic bidders following the announcement of the Berkshire

1    transaction."  You see that, sir?

2    A.    Yes.

3    Q.    Now, that's Elliott's statement, not yours, right?

4    A.    Correct.

5    Q.    And with regards to those multiple strategic bidders and

6    their inbound expressions of interest, is it fair to say that

7    that stopped at the inbound expression of interest stage?

8    A.    I think it's fair to say that none of those strategic

9    bidders who made those expressions of interest at that point

10   have executed an NDA.  There are some with whom various

11   levels of discussions are continuing and, depending on the

12   Court's decision today, may continue in the future, but none

13   of those is in the exhibit that we were looking at earlier.

14   Q.    Right.  So, said another way, they remain, at that

15   preliminary stage, none of them have gone so far as to even

16   execute an NDA with either Elliot or Oncor, correct?

17   A.    Correct.

18   Q.    And, sir, you believe it may be reasonable to expect to

19   close on the financing based on the progress you've made, but

20   there's no guarantee on that, right?

21   A.    That's correct.

22   Q.    And you can't guarantee that you'll ever close, let

23   alone close by September 13th, correct?

24   A.    That is correct.

25   Q.    But you believe, based on the time, that the request

1    made by Elliot is reasonable, right?

2    A.    Yes, I do.

3    Q.    Because you wouldn't take an engagement where you didn't

4    think that you had a reasonable chance of actually completing

5    the engagement, correct?

6    A.    That is correct.  I believe you asked me yesterday if we

7    were doing this for engagement fee, and that answer to that

8    was no yesterday and it's still no today.

9    Q.    Exactly.

10   A.    And the period of time from when you started the

11   engagement, we were talking about it, that's two months from

12   July 17th to August ... sorry, July 17th to September 14th,

13   correct?

14   Q.    If the Court does indeed grant Elliot's motion, that is

15   correct.

16   A.    All right.  And you have no reason to, based on all that

17   you've learned from Elliot, based on what they were doing

18   before, you have no reason -- no reason, strike that -- based

19   on all you've learned from Elliot on what they were doing

20   from May 17th forward, you cannot explain why they did not

21   launch a financing sometime in May or early June, such that

22   it would be completed by now, and certainly by the August

23   10th hearing, right?

24   A.    Well, I think you heard some reasons for that from the

25   prior witnesses.  I have no personal knowledge of that.

1   Q.   And, in fact, you've communicated to all the investors

2   that you need firm commitments by them, by the August 10th

3   hearing, right?

4   A.   That is the deadline that we're currently operating

5   under.

6   Q.   And these preliminary indications of interest are from

7   folks who understand that they must get to final commitments

8   by August 10th, right?

9   A.   That is correct.

10  Q.   And so, based on this timeline, even what you're saying

11  is that you think that you might have over subscriptions by

12  those people who are willing to move forward on this

13  timeline, right?

14  A.   Based on the indications of interest, but I've already

15  said that there remains a lot to do, a long way to go, I

16  think were my exact words.  And we've achieved a lot in the

17  last nine days or so.  We've got a huge distance still to go,

18  but I'm pretty encouraged with what we've done in the last

19  nine days or so.

20  Q.   Now, you understand, even if the Court were to approve

21  the merger agreement on August 10th, you could continue to

22  move forward, right?

23  A.   Yes.  That would obviously be subject to an additional

24  breakup fee to come from the estate, but in theory, that

25  wouldn't impede our ability to market the transaction, where

1    at that point we may have certain investors who could

2    conclude that this was pretty much a done deal with Berkshire

3    and at that point, maybe significantly less worthy of their

4    efforts.

5    Q.    Well, you've done sufficient work in the bankruptcies

6    case to know that the Debtors have a fiduciary out, right?

7    A.    Correct.

8    Q.    And to the extent that a $270 million breakup fee were

9    approved by the Court, that wouldn't actually impact the

10    purchaser; it would impact, potentially, the creditor's

11    recoveries, right?

12    A.    That's correct.

13    Q.    So, if you were able to get to a deal that would

14    actually top Berkshire and be a superior deal, you present

15    that to the Debtors, they would evaluate it, and the chips

16    would fall where they may with the other creditors, right?

17    A.    May or may not, but certain other things we believe

18    would start happening over that same time period.  I think

19    one of the earlier witnesses was describing the regulatory

20    approval process.  So, our expectation is that if, indeed,

21    the Court did approve the Berkshire Hathaway deal on August

22    10th, that Oncor would likely file for approval, which at

23    that point would effectively preclude anyone else from filing

24    for approval.  So, I think certain other things do happen,

25    which would materially (indiscernible) the process, in

1   reality.

2   Q.   One of the things I'm struggling with is, on your

3   testimony live, you said that the valuation, based on what's

4   happened generally with utilities, that -- I'm not trying to

5   put words in your mouth, I think these are your words -- that

6   this an attractive price point for an attractive asset,

7   right?

8   A.   That's correct.

9   Q.   And so, if it's an attractive price point for an

10  attractive asset, and you think that Berkshire Hathaway is

11  getting it for a song at $9 billion, surely there would be

12  investor interest at 9.3 or 9.4, such that even if there was

13  a break fee, you could come in over the top.

14  A.   That's theoretically possible.  I think we heard from

15  the Debtor that they thought that $9 billion was adequate and

16  they turned over every stone.  So, I'm not sure you can have

17  that both ways.

18  Q.   Well, I think that's the issue with you.  You're either

19  making a lot of progress towards a deal where you're going to

20  have a potential transaction by August 10th, or August 10th

21  really doesn't matter because it will ultimately be, if this

22  is an attractive asset in this market, at this price,

23  somebody's going to pay for it, right?

24  A.   That's possible, subject to my earlier comment, but I

25  think that there may be a market perception that this is

1   pretty much a done deal and, to the extent -- and I cite

2   another reason that we've heard from some people as to why

3   they wouldn't participate, which is taking on Mr. Buffet and

4   Berkshire Hathaway.  So, I think there are clearly a large

5   number of people who are willing to do that during the period

6   that we're now in.  If we get to the point where a merger

7   agreement is, in fact, approved by the Court, and a filing is

8   made with the PUC too, I suspect there may be a long list of

9   people who would say that they weren't that interested in

10  trying to jump in the middle of the transaction, which at

11  that point is further down the road with Mr. Buffet.

12  Q.   So, ultimately, this is just a question of, you know,

13  how much will change at the date of the merger hearing,

14  right?  I mean -- let me explain.  Berkshire is not going

15  anywhere.  They're here right now, right.  And so, potential

16  investors have to evaluate, do I want to go against Buffet

17  and Berkshire on this, right?

18  A.   Correct.  But I think they may look at that differently

19  between now and August 10th.  And if indeed the Court

20  approves the Berkshire merger agreement on August 10th or

21  11th, I suspect maybe that risk to be somewhat different.

22  Q.   And any issues as it relates to creditors, that's

23  outside your purview.  Your sole mandate is to raise the 9.3

24  billion, so you're solely working with the outside investor

25  community, other than to the extent that existing investors

1    in EFH or EFIH want to make a new money investment, right?

2    A.    That's correct.

3    Q.    With regard to the commitment paper that was attached to

4    the LA commitment, I believe you said you'd reviewed an

5    earlier draft.  Do you know whether Elliot has made a

6    commitment to fill the hole to the extent that any of these

7    10 investor groups are unable to actually satisfy their

8    commitment when it comes time to close?

9    A.    (indiscernible) making any such commitment, no.

10   Q.    And even if you're able to get investors who are able to

11   raise the 9.3 billion, there's no guarantee that those

12   investors would be willing to agree to the regulatory

13   obligations that Elliot wants, correct?

14   A.    That's possible.  I think that is part of the process of

15   negotiation,  of transaction documents that I've indicated a

16   couple of times, is something that we need to move onto as

17   soon as we reasonably can.

18   Q.    And your interest right now is to craft as iron tight a

19   commitment as possible so as to ensure that investors stay in

20   and are locked in, with regards to where everything is with

21   Elliot, correct.

22   A.    That's correct, I think we clearly understand that we

23   want to come to the Court, if we're given the opportunity,

24   with a transaction, a real transaction, that is as

25   bulletproof as possible, because I'm sure there'll be plenty

1     of people trying to shoot holes in it.

2     Q.   Right.  And one problem could be to the extent that the

3     regulatory conditions are changed or different than what the

4     investors thought going in, right?

5     A.   That's possible.

6     Q.   And, sir, if you could turn -- I apologize, I hate to do

7     this, and I can hand out hard copy if we need to -- can we

8     back to the Elliot binder?

9     A.   Sure.

10    Q.   All right, you with me?  I actually just turned to EX-

11    12.

12    A.   Yes.

13    Q.   So, this is the Elliot merger commitment letter.  And

14    attached to the commitment letter is a model merger

15    agreement.  And if you need to verify that that's the case, I

16    would ask that you turn to Exhibit A, form of merger

17    agreement.  Unfortunately, these pages aren't paginated, but

18    it's about 10 pages in.

19    A.   Yes.

20    Q.   Okay.  And, sir, I believe you testified earlier, and I

21    apologize for being duplicative if I did, your goal is to

22    make this -- you want as airtight a merger agreement as

23    possible, right?

24    A.    I think our intent is to have a transaction that is

25    fully capable of being approved by the Court and fully

Page 201

1    capable of being approved by the PUC too.

2    Q.    Exactly.  And to have your commitments, your investors

3    stay in, right, so you need the financing, you need the

4    regulatory approval, you need the Court approval, you need

5    the investors to stay in, correct?

6    A.    That is our goal, obviously, subject to negotiation with

7    the investor group.

8    Q.    Can you turn to page 56 in the merger agreement?

9    A.    Yes.

10   Q.    Sir, do you see on page 56 and the preceding page, page

11   55 -- mine's double sided, so I can see both -- page 55,

12   under section D, these are the regulatory qualifications and

13   regulatory outs.  And do you see the definition of burdensome

14   conditions in page 56?

15   A.    Yes.

16   Q.    Am I correct that Elliot is proposing a transaction in

17   which, if the regulatory conditions are sufficiently

18   different from what they think it's going to be, and rise to

19   the level of a burdensome condition, Elliot and all the other

20   investors can walk?

21   A.    This is the first time I've seen this document, so I

22   would respectfully decline to answer the question until I've

23   had an opportunity to review it.

24   Q.    Okay.  So, you don't know?

25   A.    I don't know.

1    Q.   Now, the Public Utility Commission of Texas has 180

2    days, by statute, to review any change of control

3    transactions, right?  And for both the prior applications

4    made by Oncor, that process took pretty close to 180 days,

5    right?

6    A.   I believe so.

7    Q.   And the Berkshire transaction is, it's different in form

8    and structure than the earlier proposal, right?

9    A.   Yes.

10   Q.   And you agree that one of the factors that the Public

11   Utility Commission of Texas would evaluate in its approval

12   process would be the fact that the Berkshire transaction is

13   an all cash deal, right?

14   A.   I believe that's one of many factors that they would

15   consider, yes.

16   Q.   And another factor would be the fact that the Berkshire

17   transaction puts no debt directly beyond Oncor Holdings,

18   right?

19   A.   That is correct, although I would observe that Mid-

20   American Energy -- excuse me, Berkshire Hathaway Energy --

21   itself carries a reasonable amount of debt.

22   Q.   But the concern from the Public Utility of Texas would

23   be the fact that there would be debt solely obligated to be

24   satisfied by the cash flows of Oncor, right?

25   A.   That would likely be their primary concern, but I

1    suspect that they would look at this particular structure in

2    its entirety as well.

3    Q.   And you believe it would be premature to conclude what

4    Elliot will negotiate with the investor group as to whether

5    there would be a regulatory burdensome condition

6    (indiscernible) in the transaction, right?

7    A.   Correct.  That's something that we need to negotiate

8    among the group.  In the coming days, weeks, however much

9    time we have, with a goal, as I stated earlier, of having

10   commitments that are as watertight as can be reasonably

11   agreed between the parties.

12   Q.   And you just saw for the first time that, actually,

13   Elliot is proposing a language for a regulatory burdensome

14   condition, right?

15   A.   You showed me some language and in response to your

16   prior question I said I haven't had the time to review the

17   document.

18   Q.   And sir, you're generally aware of Elliot's goal with

19   respect to the Public Utility Commission, right?

20   A.   I'm generally aware that they wouldn't be embarking on

21   this endeavor unless they had a reasonable expectation that

22   they could get their transaction approved.

23   Q.   And you are aware that those discussions are ongoing,

24   right?

25   A.   I believe so.  I have not been a direct party to those

1    discussions, but I believe the Elliot team is in Texas as we

2    speak.  I was with them earlier this week.  I believe they're

3    working as hard as they possibly can to get themselves to a

4    position that is no worse than the one that Berkshire

5    Hathaway is in at the moment.

6    Q.   And to be precise, you had no personal involvement in

7    those efforts, regardless of whether you were in Texas

8    earlier this week, right?

9    A.   Correct.

10   Q.   And you've had no interactions with any of the Public

11   Utility Commission of Texas staff, right?

12   A.   Correct.

13   Q.   And you had no direct involvement with Elliot's efforts

14   to interact with anyone, like an intervener or a potentially

15   interested party in Texas, regarding that process, right?

16   A.   Correct.

17   Q.   And you're aware that Berkshire has secured written

18   agreements with the Public Utility of Texas staff and certain

19   interveners to support their application, right?

20   A.   (indiscernible) I guess.

21   Q.   And it's fair to say Elliott has not obtained any of

22   those equivalent agreements, right?

23   A.   I'm not aware of that at this point, no.

24   Q.   And the public utility approval -- Public Utility

25   Commission of Texas Approval Process is a concern for some of

1    Elliott's potential investors, right?

2    A.    That is correct.

3    Q.    In fact, under the current regulatory structure, only

4    the Oncor board can declare dividends for Oncor, right?

5    A.    Yes.

6    Q.    Even if they were wholly owned by a single parent, the

7    parent couldn't direct the subsidiary to declare the

8    dividends, right?

9    A.    That is correct.  And I believe that was one of the

10   issues that NextEra had with that proposed transaction.

11   Q.    And under the current regulatory structure, only the

12   Oncor board can decide the size of the dividends regardless

13   of the amount of cash on the Oncor balance sheet, right?

14   A.    That's correct.

15   Q.    And in fact, you're aware that the Public Utility

16   Commission of Texas has expressed concerns about any proposed

17   reduction in CapEx's forecasts at Oncor, right?

18   A.    I believe the concern was over an actual reduction in

19   CapEx that may be communicated through a forecast which was

20   less CapEx.  And I'm fully aware that is one of the many

21   factors they would consider in evaluating any transaction

22   that has been in front of them.

23   Q.    And in fact, in a letter by the director of Public

24   Utility Commission of Texas to Elliott, the director

25   expressed concern about statements made by Elliott's counsel

1    regarding a meeting they had with the PCT.

2              MR. MCGUINESS:  Objection, Your Honor.  Foundation?

3    He already testified he knows nothing about the PCT process

4    and Mr. McKane is simply talking about a letter that he has

5    not seen (indiscernible).

6              MR. MCKANE:  No.  And in fact, I can establish that

7    Mr. Wood is aware of the existence of the letter because part

8    of his job is to respond to the investor's expressed concerns

9    about his efforts because of the existence of the letter.

10             MR. MCGUINESS:  And Mr. Wood is aware of the letter

11   because it was shown to him in his deposition yesterday.

12             MR. MCKANE:  I apologize, Your Honor.

13   BY MR. MCKANE:

14   Q.   You knew about the existence of the letter prior to

15   yesterday, right?

16   A.   Correct.

17   Q.   Okay.  And you knew about that because investors had

18   contacted you asking about Elliott's efforts in Texas with

19   regulators, right?

20   A.   I actually knew about it before then.

21   Q.   And you know that you've had -- and in fact you've had

22   to discuss the letter with potential investors because

23   they've expressed concerns about what this may mean to

24   Elliott's efforts, right?

25   A.   Correct.

1   Q.   And it's fair to say that Elliott and their counsel are

2   working overtime to undo the potential damage of that letter

3   and any mis-statements or misunderstandings with the staff,

4   right?

5           MR. MCGUINNESS:   Objection, Your Honor.   He's again

6   -- foundation.   He said he doesn't know anything about this

7   process and I should also note that Mr. McKane is aware that

8   we are under a strict confidentiality agreement with

9   (indiscernible) regarding any interactions with them.

10          THE COURT:   Overruled.

11  BY MR. MCKANE:

12  Q.   Sir, and in fact, you and other members of the

13  (indiscernible) team have told potential investors that the

14  Elliott team and the (indiscernible) team have been, quote,

15  "working overtime" this week to correct whatever

16  miscommunications they had made and whatever poor position

17  they put themselves in, right?

18  A.   I think I used those words yesterday.   I don't believe I

19  used the words undue damage, which you had used earlier in

20  your question.

21  Q.   Now, sir, you're aware that Elliott's seeking a 35 to

22  40-day delay, right?

23  A.   Yes.

24  Q.   And as a consequence of the Elliott request, Berkshire

25  has the right in the contract to walk away, right?

1   A.   Yes.

2   Q.   And if Berkshire walked away because it exercises its

3   right under that milestone, you'll agree there's no guarantee

4   they would come back at the same price, right?

5   A.   Correct.

6   Q.   And you agree it would be reasonable for the Court to

7   evaluate the potential risks, benefits, and costs of allowing

8   Elliott to pursue its proposal past the milestone vis-à-vis

9   that risk, correct?

10  A.   And I assume that is exactly what the judge is doing,

11  yes.

12  Q.   And you agree that if you were advising Berkshire in

13  this scenario, you would have to assess whether to exercise

14  that right vis-à-vis the likelihood that Elliott would be

15  able to complete it financing, right?

16  A.   I think those are two slightly different tracts.  If I

17  was in Berkshire's shoes, I think I mentioned this yesterday,

18  I would clearly want people to think that I was going to

19  terminate, and we heard from Mr. Goodman earlier, but I think

20  the assessment of whether they will in fact execute on the

21  right that they have will depend on the facts and

22  circumstances at the time, and I think we had a fairly strong

23  statement from Mr. Goodman earlier.

24  Q.   Well, let's go further than that.  If you were the

25  advisor to Berkshire, you would be advising them that they

1    have to assess whether to use that walk right, because if

2    they did and Elliott were able to actually close on the

3    transaction, they might find themselves in a different

4    position as opposed to enabling maybe not exercising that

5    walk right, having the hearing and locking in the agreement,

6    correct?

7    A.    I'm sorry.  Could you repeat the question, please?

8    Q.    Yeah.  Let me rephrase it.  If you were advising

9    Berkshire, you would at least have them analyze whether to

10   walk away, let Elliott try and fail, and then potentially

11   come back with a lower purchase price later, right?

12   A.    That would be a component of the analysis.  I think

13   there are many, many other things which if I was them or

14   advising them I would consider, but that would clearly be one

15   of many factors, yes.

16           MR. MCKANE:  If I could have a minute, Your Honor?

17           THE COURT:  Mm hmm.

18           MR. MCKANE:  Just, I believe, one or two questions.

19   All right.

20   BY MR. MCKANE:

21   Q.    You mentioned, I believe in your testimony on direct,

22   that it's hard to raise money essentially in late July and

23   August, especially with certain international investors,

24   correct?

25   A.    That's correct.

1    Q.   Just as a practical matter, is it easier to raise money

2    in June and July before you get to those late summer months?

3    A.   (indiscernible), yes.

4    Q.   And based on what you've done to date and where you

5    think you can get, do you believe that you would have much --

6    you know, a high degree of confidence that if you had started

7    (indiscernible) started in mid-May that they would know

8    whether they'd have committed financing by August 21st?

9    A.   That's a speculative question, but I think it's a

10   statement of the obvious that if we had more time, we would

11   actually be further along.

12   Q.   Well, even beyond likely further along, you'd have a

13   higher -- much higher degree of confidence that if you had

14   started in mid-May, you would know the answer of whether at

15   that valuation and under those terms, Elliott's proposal

16   could actually be converted into committed financing,

17   correct?

18   A.   Yes, with an addition two months.  I think clearly we

19   would be further along and correspondingly (indiscernible)

20   we'd have high confidence, yes.

21          MR. MCKANE:  All right.  I have no further

22   questions.

23          THE COURT:  Okay.  Is there going to be redirect?

24          MR. MCGUINESS:  Two questions, Your Honor.

25          THE COURT:  All right.

1          MR. MCGUINESS:  And we're done.

2              REDIRECT EXAMINATION OF ROGER WOOD

3   BY MR. MCGUINESS:

4   Q.   Mr. McKane, as I think was clear in your cross-

5   examination, you have no personal knowledge of Elliott's

6   efforts before July 6th or 7th, correct?

7   A.   Correct.

8   Q.   And you're not also familiar with any of the

9   restrictions that may have been imposed upon them in terms of

10  what they could do, correct?

11  A.   You said not familiar with the restrictions?

12  Q.   Yes.  Not familiar.

13  A.   That is correct also.

14  Q.   Has -- as you sit here today, are there potential

15  strategic investors that are interested in participating in

16  the consortium?

17  A.   Yes.  I can say that one of the redacted names that we

18  have on our list represents a strategic investor.

19  Q.   Turning to a different subject, we spoke a little bit

20  about the $1.5 billion that was included on ELX-11.  Do you

21  remember that?

22  A.   Yes.

23  Q.   Are you familiar with the concept of a (indiscernible)

24  note holder rolling their notes?

25  A.   Yes.

1   Q.   Do you know whether the (indiscernible) holder who has

2   signed an equity commitment letter has agreed to roll their

3   (indiscernible) notes as part of that transaction?

4   A.   I understand that they have, yes.

5   Q.   In addition to providing additional new financing?

6   A.   Yes.

7         MR. MCGUINESS:  Thank you, Your Honor.  I have no

8   further questions.

9         THE COURT:  (indiscernible), just by the --

10         MR. MCGUINESS:  I was on a roll.  I apologize.

11         THE COURT:  That's all right.

12         MR. MCGUINESS:  I should not that I think I should

13   formally offer ELX-11 into the record.

14         THE COURT:  Any objection.

15         MR. MCKANE:  I have a slight recross on exact -- on

16   the one issue that he opened the door on with regards to the

17   1500 -- the $1.5 billion from the (indiscernible).

18         THE COURT:  Right.

19         MR. MCKANE:  I just have a few questions on that

20   exact issue.

21         THE COURT:  All right.

22         MR. MCKANE:  Okay.  I apologize.

23            RE-CROSS EXAMINATION OF ROGER WOOD

24   BY MR. MCKANE:

25   Q.   I believe you testified earlier that the sole focus of

1    your (indiscernible) was the new money raise of the $9.3

2    billion, correct?

3    A.    Correct.

4    Q.    And in fact, you weren't focusing on other monies in

5    terms of folks converting their debt to equity, correct?

6    A.    That is correct.

7    Q.    And so, based on the new money investment that has been

8    identified, it's not $1.5 million.  It's actually $1.378,

9    correct?

10   A.    You indicated that earlier.

11   Q.    And that's all you've seen based on the schedule that

12   has been provided by your own counsel -- by Elliott's

13   counsel, correct?

14   A.    That's correct.

15          MR. MCKANE:  Okay.  Thank you.

16          THE COURT:  All right.  Any further questions?  All

17   right.  Any objection to the admission of ELX-11?

18          MR. MCKANE:  No, Your Honor.

19          THE COURT:  It's admitted.

20      (Exhibit ELX-11 Admitted Into Evidence)

21          THE COURT:  Any further --

22          MR. MCKANE:  Your Honor, I apologize.  Just with

23   one clarification in the qualification.  For the purposes of

24   this hearing only --

25          THE COURT:  Yes.

1          MR. MCKANE:  -- the Debtors are agreeing to these

2     exhibits in these redacted forms.  I'm going to reserve all

3     rights going forward including at the (indiscernible)

4     hearing.

5          THE COURT:  Understood.

6          MR. MCKANE:  Thank you, Your Honor.

7          THE COURT:  Is there any other evidentiary matters

8     to take up?  Thank you, sir.  You may step down.

9          THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  What college were you in in Oxford?

11          THE WITNESS:  University College.

12          THE COURT:  University.  My son almost went to

13     (indiscernible).  All right, Mr. Husnick?

14          MR. HUSNICK:  Your Honor, if I may, I think we're

15     prepared to proceed straight to closing if you have

16     indulgence for us tonight.  Otherwise, it's kind of up to the

17     Court.

18          THE COURT:  How long do you think you're going to

19     be?

20          MR. HUSNICK:  I don't imagine my closing would be

21     more than 10 to 15 minutes.

22          THE COURT:  I hate to -- I mean, everyone's here.

23     All right.  Let's take a recess and then I'll hear closings.

24          MR. HUSNICK:  Okay.

25          (Recess)

1           CLERK:  All rise.

2           THE COURT:  Please be seated.

3           MR. HUSNICK:  Thank you, Your Honor.  Chad Husnick

4    from Kirkland & Ellis appearing on behalf of the Debtors.

5    Your Honor, if I may, I'll proceed with the Debtors' closing

6    argument in connection with the scheduling motion and the

7    Debtors' objection to the motion to adjourn.

8           THE COURT:  Okay.

9           MR. HUSNICK:  Thank you.  Your Honor, this morning

10   in my opening argument, I skipped a couple of things about

11   discovery.  And I'll just briefly offer on the record to make

12   the Debtors' record about our response to those.  I think we

13   addressed them in the papers, but on the rolling production

14   of documents, the Debtors are fine with a rolling production

15   of documents and we've been doing that for a lot of the

16   cases.  But we need it to be reciprocal.  So, we proposed

17   some language in a modified order that my partners will hand

18   up should Your Honor grant the motion, and we'll identify

19   that language, but hopefully that resolves that particular

20   objection.

21          The second two pieces of the discovery objections

22   relate to first the protocol, that is the discovery protocol

23   preventing the overlap of discovery from prior document

24   productions.  There are two points here.  One, the fact that

25   you buy into a large Chapter 11 case that's been going on for

1    three years does not entitle you to stick your head in the

2    sand and ignore the discovery and litigation that's been done

3    for the prior three years.  We facilitated, as the Debtors,

4    the search of this repository and we continue to be available

5    to assist in that effort.

6           But to simply require the Debtors to completely

7    reproduce all of the documents that have been produced

8    historically, it doesn't make sense.  It doesn't make sense

9    especially in this circumstance because Ropes & Gray is not

10   new to these Chapter 11 cases.  Mr. Galardi personally may

11   be, but every phone call I've had with Elliott has also had -

12   - or not every one but a lot of them -- have had Mr. Wofford

13   as well and Mr. Devore.  They've been in these cases since

14   April 2014, same amount of time as I have been unfortunately

15   for them.  So, I respectfully submit, Your Honor, we should

16   just keep going with that repository.

17          Lastly, on the interrogatories and the request for

18   admission, this is a tool, a discovery tool, that's available

19   but we haven't used it I believe at all in these Chapter 11

20   cases and we think it's a burdensome tool that simply doesn't

21   need to be used this time around.  We've made it so far.  We

22   don't need it now.

23          Let me turn, Your Honor, to the real show, the

24   scheduling motion.  Hard to believe that we've been here all

25   day long on a scheduling motion, but I think what we've

1    boiled the evidence down into after a full day of testimony

2    is three key points.

3            First, there's clear and convincing evidence that

4    there's a material and cognizable risk that Berkshire will

5    terminate the merger agreement.  What happens after that?  We

6    can talk about what the evidence shows, but we think there's

7    a clear and cognizable risk that they will terminate if we

8    don't hit the milestones.

9            Second, there was a significant amount of evidence

10   around the Elliott-sponsored transaction.  You heard from Mr.

11   Wood.  And we think that that evidence shows that the Elliott

12   proposal, in its current form, is not actionable, that

13   Elliott could have been substantially further along had

14   Elliott engaged a financial advisor earlier in the process,

15   and then it provides no guarantees -- a delay provides no

16   guarantees that Elliott will obtain fully-committed

17   financing, will obtain regulatory commitments similar to

18   those embodied in the Berkshire agreement.

19           And finally, we think the record bore out what I

20   emphasized this morning, and I'm not going to spend a ton of

21   time on it in closing, the record of misstatements and

22   mischaracterizations thus far in the last two months.  It's

23   unfortunate but it's true.  And when one is balancing the

24   risks, it needs to be taken into consideration what has been

25   said.

1          So, let me quickly scan through -- and I do think I

2     will keep it to 10 to 15 minutes, I promise -- what the

3     evidence actually showed regarding termination.  Very clear,

4     termination provision that kicks in 45 days after the signing

5     of the merger agreement on July 7th.  That is August 21,

6     2017.  It is unrebutted that that is the milestone that we

7     have to hit.

8          If the motion to adjourn is granted, we will not

9     hit that milestone.  If the objection to the scheduling

10    motion is sustained, we will not hit the disclosure statement

11    milestone.  Both of those are unacceptable results and

12    results that will bring with them a material risk that

13    Berkshire will terminate the merger agreement.

14          And we heard testimony from Mr. Goodman that

15    Berkshire is serious about terminating the -- or if the

16    approval motion is not met.  And we heard that Berkshire does

17    not usually hold open, and it's not surprising that Berkshire

18    does not usually hold open offers where there's no break-up

19    fee protection for an extended period of time.  And you and

20    I, Your Honor, can -- we do this all the time in bankruptcy,

21    and Berkshire is playing in our bankruptcy world, and they

22    have to live within the restrictions of the bankruptcy world.

23    But that's 21 days.  We provided 34 days.

24          I understand sometimes, Your Honor, that it takes

25    longer to get break fees approved, but I've done several

1    where you have a break fee hearing within 21 days of the

2    petition date.  Usually there's a melting ice cube.  But here

3    we have $50 million of interest accruing.  We have

4    professional fees ratcheting up.  It's not a destructing

5    business but it's an eroding level of value.  It warrants a

6    shorter a time period.  It warrants the normal notice.  But

7    we didn't just give the normal notice.  We realized in this

8    case there was going to be discovery.  So, we provided and I

9    had the negotiations.  We needed the 45 days.  That's what we

10   gave.  We had the hearing on August 10th and it should stick.

11            You heard from Mr. Horton also on this risk of

12   termination.  What happens if the risk is terminated?  You

13   heard from Mr. Horton.  And is his experience with Berkshire

14   over the last few years on a couple of deals that he's

15   negotiated, not the least of which is the one in which

16   Berkshire walked away when we were in the middle of

17   negotiations with NextEra and Berkshire, they do walk away.

18   They have a reputation for living up to their word.

19            Your Honor, that risk is significant.  What are we

20   balancing that against?  There's no committed financing.  I

21   just keep coming back to that.  The indication that the

22   interest that came in last night, they're not written on any

23   piece of paper.  There's a couple that came in with some

24   written indications just this morning.  We saw them in court.

25   The one e-mail offer says "soft indication" at the top.  The

1    signed agreement we have is conditioned upon receiving a

2    signed merger agreement that hasn't been litigation -- or

3    hasn't been negotiated.  There's simply nothing there.  It's

4    at the very, very nascent stages.

5         We also didn't hear any evidence of regulatory

6    support.  That's because there is no evidence of regulatory

7    support.  And we heard Mr. Galardi say this morning about,

8    "I'm not going to get baited into responding to what the

9    Debtor said."  Fair enough.  I'm not going to bait him into

10   responding to what I said.  But Your Honor can look at the

11   record and say there's no agreement, period, full stop.  No

12   agreement.  We have a written agreement with Berkshire.

13   That's irrefutable.  And that, Your Honor, shows that we have

14   support for the regulatory process that simply does not exist

15   in the Elliott deal.  The bottom line, Your Honor, is that

16   the Elliott-sponsored proposal has, in the words of Mr. Wood,

17   a long way to go.

18        Your Honor, we heard a lot of testimony about the

19   need for additional time, and our argument back is there is

20   no need for additional time.  Elliott's financial advisor

21   testified at the very end tonight that had it -- had Moelis

22   started the process in mid-May when the Debtors signed an NDA

23   with Moel -- or with Elliott, they would have been

24   substantially further along and would have significant

25   additional clarity and/or certainty about their ability to

1    deliver financing.  But they made the conscious decision not

2    to do that.  They didn't contact Moelis until, I believe,

3    July 4th.  And they didn't have a kick-off meeting, you heard

4    from Mr. Wood, until almost a week later.  That type of

5    dilatory behavior doesn't warrant an extension.

6            This is made even worse when one considers the

7    evidence that was -- that Elliott presented about why the PIK

8    PSA prevented them, even after the waiver and even after

9    signing on May 17th a NDA with the Debtor, why the PIK PSA

10   somehow prevented them from retaining Moelis and having

11   financing discussions a full two months -- not quite two

12   months but close to two months before they even began that

13   process.

14           Let me summarize the evidence that they put in in

15   favor -- in support of their position that the PIK PSA

16   prohibited them from doing this.  I'm done.  They didn't do

17   anything.  There's no evidence to support that.  Mr. Wood

18   wisely noted that he wasn't involved.  He didn't know why

19   they didn't commence.  We walked through what the language

20   says.  The language doesn't say that they can't have

21   discussions with third parties about financing transactions

22   generally, about plans generally.  It said back-up plans, but

23   if you read the definition of back-up plan, it's

24   extraordinarily broad.

25           But what was really key in that language is Mr.

1    Galardi tries to collapse it down with the next sentence that

2    says, "and thou shalt not file a plan and thou shalt not file

3    a financing motion."  Still scratching my head how Elliott is

4    ever going to file a financing motion under 364 of the

5    Bankruptcy Code.  That's the one piece of law I have in my

6    presentation.  They don't have any ability or standing to

7    file a financing motion, so they needed the Debtor to do

8    that.

9           But on the plan, there was nothing in that language

10   that prohibited them from having discussions that would lead

11   up to a discussion with the Debtor on whether or not that

12   financing package and that plan was acceptable.  And if it

13   wasn't, Your Honor, they could come back to Your Honor and

14   have that PIK PSA litigation decided.

15          There's just no evidence.  The only evidence they

16   presented was the colorful testimony from counsel in the

17   opening and whatever he's going to offer or make up in

18   closing.  There's just no evidence that they need additional

19   time.

20          The last point on addition time is Mr. Wood

21   testified that he set a date.  They set a date for getting

22   fully committed financing.  They're working within the

23   schedule that has been set forth.  They're asking for more

24   time, and that may be nice, but it's a reality that that time

25   is not available and it's certainly not necessary.  As I

1    said, I went over a lot of the misstatements in opening and

2    I'm not going to do so again here.

3            My parting words on that front are you can't just

4    stand here and say things.  You can't just write letters and

5    put stuff in letters and then not have consequences for

6    making misstatements and misrepresentations.  The

7    consequences of making a misrepresentation to the Court, to

8    parties, is you lose credibility.  I'm skeptical.  I'm

9    hopeful that they can pull together financing, but I'm highly

10   skeptical given where we are today.

11           So, in conclusion, Your Honor, there's a material

12   risk that we could lose the burden hand.  That's the

13   Berkshire transaction that delivers $9 billion of value to

14   these estates and allows these Debtors, Lord I hope so, to

15   finally get out of Chapter 11 before the end of 2017.

16           The Elliott proposal, as I said, once again, no

17   committed financing no regulatory consensus and no guarantee

18   of success even if you give them the additional time.  They

19   don't need that additional time.  It's simply an emergency of

20   their own creation.  So, we respectfully request, Your Honor,

21   that you grant the Debtors' scheduling motion, deny the

22   motion to adjourn, and allow the Debtors to continue towards

23   their path to exit.

24           THE COURT:  Thank you.

25           MR. HUSNICK:  Thank you.

1          THE COURT:  Mr. Krause?

2          MR. KRAUSE:  Thank you, Your Honor.  In light of

3   the hour I'll endeavor not to duplicate the Debtors'

4   counsel's arguments.  Your Honor, BHE has agreed to assume a

5   risk of $9 billion.  As counsel said, BHE's reputation is

6   important to it.  In that regard, it has tried to be straight

7   with the Court and it has said what will happen if, in fact,

8   the milestone isn't hit.

9          The milestone isn't unduly short.  It isn't new.

10  It's the same milestone that was in the NextEra deal.  It's

11  two times the -- more than two times the normal time period

12  for a motion to be filed.

13         The reason for bankruptcy timing, the reason to

14  need to get bankruptcy court approval and the reason that the

15  Debtor wasn't bound day one when the contract was signed is

16  not to give somebody else an opportunity to raise money and

17  submit a competing bid that can deprive Berkshire Hathaway of

18  compensation for the risk it has taken, the risk of $9

19  billion not matter what happens in the marketplace in the

20  interim.  It's to give the parties time to take discovery and

21  have a hearing before the Court.  Nobody has said there is

22  inadequate time to have those things happen.  And, Your

23  Honor, we think that that's because there is no argument

24  there is inadequate time to have those things happen.

25         Your Honor, during the opening statement, counsel

1   for Elliott indicate that there were other things that might

2   delay the actual closing of the Berkshire Hathaway

3   transaction, specifically focused on the fact PUCT approval

4   was not guaranteed and that our transaction involves the

5   drag-along rights with respect to the TTI, minority interest,

6   either a consensual deal with TTI or the drag-along

7   litigation.

8           Counsel is right.  Very few things in life are

9   guaranteed.  There is not a guarantee those things will in

10  fact come to fruition.  A couple of very important

11  observations.  One is with respect to the TTI.  We hope it

12  will be a consensual transaction.  But if it's not, as the

13  Court pointed out in the status conference a couple of weeks

14  ago, it's more important to start sooner rather than later,

15  and delay in starting that process of resolving that wouldn't

16  be a positive thing in terms of getting the transaction

17  closed more quickly.

18          With respect to the PUCT, counsel asked the

19  question of the witnesses, is PUCT approval guaranteed for

20  Berkshire because it has an agreement with so many of the

21  interveners and the staff.  The answer is no.  Of course,

22  it's not guaranteed.  The regulatory commission still needs

23  to rule.

24          But I think the Court could look at what Berkshire

25  Hathaway has in terms of that process and the support of

1    interveners and the support of the staff and what it's worked

2    so hard to do to facilitate that process so that we're not

3    back in front of the Court with a confirmable plan that can't

4    be approved by the commission.  With where Elliott stands,

5    which is the one thing the Court knows, is the letter that

6    the Commission wrote saying you're -- what you've said about

7    your interchange with us is inaccurate and misleading.  Don't

8    even talk to us unless there are attorneys present or it's in

9    writing.  That was a pretty strong letter.

10           Your Honor, with respect to the risk, the risk is

11   the estate will lose the $9 billion transaction.  That's a

12   risk not just to the PIK note holders that Mr. Galardi

13   focused on.  It's a risk to all of the creditors because if

14   in fact the value of the company diminishes and as the

15   interest continues to accrue on the second lien notes and on

16   the Debtor-in-possession financing, there are other people

17   who are going to be rendered out of the money if Berkshire

18   Hathaway is forced to walk away and the value of the company

19   drops and the process is delayed.

20           That's the risk.  What's the up side?  Maybe, if

21   everything falls right and if all of the nonexistent, not in

22   writing, oral indications of interest turn into real money

23   and they overcome the very rocky start they got with the

24   PUCT, maybe they can increase the value 2 percent.  And the

25   Debtor isn't being precluded from continuing to talk to them.

1    It's just going to be required to pay a market transaction

2    fee, and that's what would be heard at the hearing on

3    approval of the merger agreement.

4         We submit, Your Honor, the Debtor is entitled to a

5    hearing on that motion before the milestone expires.  And we

6    would request that the Court deny the motion to continue.

7         THE COURT:  Thank you.  Mr. Galardi?

8         MR. GALARDI:  Your Honor, I'm going to be extremely

9    brief.  First, Your Honor, I want to talk directly about the

10   evidence.  First, the evidence is uncontroverted that Elliott

11   was not advised of any financing commitment before July 7th

12   and in fact the evidence is uncontroverted that they were

13   negotiating to have committed financing and actually funded

14   by September 15th.

15        Second, it is uncontroverted that they were not

16   advised that regulatory support had to be before July 7th.

17   And though everyone knew that, Elliott was taking its steps

18   and in fact, you know, having the discussions.  Your Honor,

19   this is not the same as the process with NextEra despite the

20   fact that there was 45 days.  As Mr. Husnick admitted, while

21   this may have been the most shopped asset in bankruptcy

22   history, there was no shopping process from June 23rd to July

23   7th.

24        In fact, as the evidence is uncontroverted, there

25   was no Creditor involvement whatsoever in that process.  And

1    when they had someone who they spent negotiating with four

2    months who had made from the beginning of time -- the

3    negotiations to the end a higher offer, they weren't even

4    given the opportunity to come to the table about the timing

5    or say you need to do X or else we have to go here.  No.

6    They entered into an agreement with a party who would not

7    negotiate any value, we were told, and will not negotiate the

8    time table.  So, Your Honor, this is not like the NextEra

9    deal and this is far greater time.

10            So, Your Honor, we also now have to look, and I'm

11   going to go back and I'm going to date myself a little bit

12   with you and Judge Walsh, the testimony today is also

13   uncontroverted that the Creditors stand to win and lose are

14   the EFIH Creditors.  And I stood before Judge Walsh when I

15   was a Debtors' lawyer and he said, "I cannot approve it if it

16   does not have Creditor support."  That was the fact.  He

17   said, "They may be stupid.  They may be silly.  They may be

18   giving up value.  But when you don't have Creditor support

19   and they're the people that are going to lose the value, you

20   have to put significant weight on that."  What you have heard

21   and you see is the largest EFIH Creditors are not supportive

22   of the time table.

23            So, Your Honor, they can second-guess our judgment.

24   We understand that there is a risk.  I believe and I sat here

25   and heard the Berkshire representative say, "We will walk,"

1   and he will walk.  And then I've seen his deposition.  We'll

2   walk and we'll come back with a lower price.  But as

3   Creditors of the estate who are not getting the value and who

4   are willing to risk the value for a time table, then that is

5   a risk that we are prepared to take.  And as the testimony

6   said, the value will not affect, other than the fees and

7   we've tried to put it on our time table, the value will not

8   be affected, the EFH Creditors.

9          So, Your Honor, now we go to the timetable.  Your

10  Honor, we've asked for September 15th.  They have August

11  10th.  We all understand the month of August and the

12  commitments we have, but there is not one person who has

13  said, other than personal scheduling matters, that August 21s

14  is not a doable date.  And the very minimum, Your Honor, the

15  August 21st date should be used to give us those 11 days.  As

16  the testimony is uncontroverted, each day adds more to our

17  ability to get commitments.

18         Your Honor, we would strongly prefer and ask Your

19  Honor to enter an order that puts it over to September 15th,

20  and it's we the Creditors that will in fact be potentially

21  harmed should they walk away.  We the Creditors are prepared

22  to take the risk and ask Your Honor to approve our motion to

23  adjourn.

24         THE COURT:  Thank you.  Mr. Qureshi, good evening.

25         MR. QURESHI:  Thank you, Your Honor.  Very briefly,

1    Abid Qureshi, Akin, Gump, Strauss, Hauer & Feld on behalf of

2    UMB as Trustee for the EFIH PIK notes.

3           Your Honor, if I can briefly offer a word in

4    support of the alternative relief that Mr. Galardi has just

5    commented on, and that is a hearing on the 21st.  At a very

6    minimum, the evidence does establish the possibility of a

7    greater recovery for the EFIH unsecured creditors.  And we

8    absolutely think that everything ought to be done to allow

9    that possibility to come to fruition if at all possible.

10   Your Honor, it is perhaps unusual but not unprecedented that

11   if Your Honor's schedule does not permit a hearing on the

12   21st that perhaps one of your colleagues does.  I recognize

13   that the prospect of an EFIH hearing might not be that

14   appealing to everybody.

15          But, Your Honor, I do think that if Elliott can be

16   given the opportunity in a manner that does not jeopardize

17   the bird in the hand, then creditors deserve that

18   possibility.  Thank you, Your Honor.

19          THE COURT:  All right.  Thank you, Mr. Qureshi.

20          MR. HUSNICK:  Just three short points.

21          THE COURT:  Okay.

22          MR. HUSNICK:  I couldn't resist.

23          THE COURT:  Of course, not.

24          MR. HUSNICK:  It's not uncontroverted that we

25   didn't talk -- or that we never talked to Creditors.  We

1    didn't talk to Creditors about the Berkshire deal because we

2    were under a confidentiality agreement but we absolutely were

3    talking to Creditors from May 17th even before that including

4    Mr. Galardi's client.  So, it's simply -- I love to say it's

5    uncontroverted.  But it's not uncontroverted.  That's just

6    false.

7            The EFH Creditors are also not the only parties

8    that are -- or EFIH Creditors are not the only parties that

9    are harmed here.  What we're assuming when we say that is

10   that Berkshire doesn't walk altogether.  I don't know what

11   they will do.  They have walked altogether in other cases.

12   It may be a lower likelihood.  But I don't think as this

13   estate and as a fiduciary we can take that chance that they

14   walk altogether.  What happens if they walk altogether and

15   Elliott fails?  Fails like NextEra failed.

16           We all know that deep, deep down in the last double

17   or triple-D option is this tax Armageddon that we heard

18   about.  That absolutely affects EFH Creditors.  The Elliott

19   plan that was proposed the last time I saw it absolutely

20   affects EFH Creditors.  It conditioned their commitment to

21   fund any money on splitting the NextEra merger agreement fee.

22   So, it absolutely goes to -- directly to the EHF recoveries.

23           But let me finish on one last point.  I'm just

24   disappointed that we wasted an entire day for counsel to

25   stand up and say, "If I'm going to lose, Your Honor, at least

1    give me the last 11 days."  With all due respect to Mr.

2    Galardi, their motion should just be denied and we should

3    move forward.

4              THE COURT:  All right.

5              MR. HUSNICK:  Thank you.

6              THE COURT:  Thank you.  All right, thank you

7    everybody.  It's been a long day, but as usual in this case,

8    the presentations have been excellent.  So, what I'm going to

9    do is grant in part and deny in part both motions.  And I'm

10   going to schedule to make some serious changes to my

11   professional and personal schedule to accommodate what I

12   think is an appropriate extension of time upon the hearing on

13   the merger agreement.

14              So, we're going to have a hearing on the merger

15   agreement on August 21 at 10 a.m.  We're going to have a

16   hearing on the disclosure statement on August 28th at 10 a.m.

17   Obviously, the various dates keyed off on the schedule have

18   to adjust, so you'll have to submit an order under

19   certification.  The only production of documents -- I

20   understood you have language that everyone had agreed to?

21              MR. HUSNICK:  No.  I don't think it's been agreed

22   to.  The concept is reciprocal exchange -- or reciprocal

23   requirement.

24              THE COURT:  Well, I think that makes sense.

25              MR. MCGUINESS:  We don't object to the ruling.

1          THE COURT:  Okay.  All right.  So, we'll have the

2     reciprocal production.  Yeah.  We're not -- the Debtors are

3     not reproducing anything they've already produced.  And while

4     Elliott may be new to the case, you know, you bought tickets

5     to the Titanic after the iceberg hit, you know?  Too late.

6     But of course, the database should be made available, et

7     cetera, for their own review.  I agree also, the

8     interrogatories and request for admissions aren't necessary

9     here and I'm not going to include them.  Otherwise, the dates

10    were fine.  I don't know if that messes with the October

11    date.  If it does, just contact chambers tomorrow and we'll

12    get you -- I have not -- as the local lawyers know, I'm very

13    stingy about actually opening up months for scheduling.  So,

14    I just opened September.  But I haven't opened October or

15    November yet, so there are still lots of dates available.

16          MR. MCKANE:  Thank you, Your Honor.  I actually

17    think if -- after we meet and confer with Ropes we should be

18    able to make that kind of adjustment work.

19          THE COURT:  Okay.  Mr. Galardi?

20          MR. GALARDI:  And Your Honor, just to be clear, two

21    dates that I know are there, I think there's a September --

22    there is a July 27th date for discovery requests to start.

23    Was that something we can work on tomorrow?

24          MR. MCKANE:  Yeah.  Your Honor, if you're okay

25    getting the order tomorrow, there are a couple dates about

1   serving document requests that are keyed off of the entry of

2   the order.

3            THE COURT:  Okay.

4            MR. MCKANE:  And we'll work with Ropes to adjust

5   those a couple days here and there.

6            THE COURT:  Okay.  That's fine.  Yeah, I don't

7   expect the order until tomorrow.  That's fine.

8            MR. GALARDI:  Okay.  And I think just on the

9   disclosure statement, having been moved to -- and I'm sure

10  this should be fine -- to August 28th, 7 days before as it is

11  right now, 7 days before, or 8 days before, whatever it was.

12  We had an August 3rd disclosure statement objection deadline

13  for that.  So, I just want to make sure we're -- okay.

14           MR. MCKANE:  We'll do the sausage-making outside

15  your presence, Your Honor.

16           THE COURT:  Yeah.  Okay.  That's fine.  Mr. Pedone?

17           MR. PEDONE:  May I confer --

18           THE COURT:  Yes.

19           MR. MCKANE:  And, Your Honor, we'll reset the

20  objection deadline for the merger agreement as well.

21           THE COURT:  Okay.  Thank you.  Thank you, Mr.

22  Pedone, for thinking of that.  All right.  Thank you very

23  much.  We're adjourned.

24           MR.  MCKANE:  Thank you, Your Honor.

25           THE COURT:  We still have -- I'm sorry.  Hey, we

Page 235

1    still have an omnibus on the 9th, right?

2             MR. MCKANE:  Yes, Your Honor.

3             THE COURT:  All right.  We'll keep that but I'm

4    going to cancel the 10th and 11th.

5             MR. MCKANE:  Very good, Your Honor.

6         (Whereupon these proceedings were concluded at 6:41 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 236

```
 1                          I N D E X

 2    WITNESS          DIRECT     CROSS      REDIRECT   RECROSS

 3    Mr. Horton       42         80

 4    Mr. Goodman      124        132

 5    Mr. Wood         141        168        211        212

 6                               RULINGS

 7    DESCRIPTION                                       PAGE

 8    HEARING RE DI 11425:  Motion of the EFH/EFIH

 9    Debtors for Entry of an Order Scheduling Certain

10    Hearing Dates and Deadlines and Establishing

11    Certain Protocols in Connection with Confirmation

12    of the Joint Plan of Reorganization of Energy

13    Future Holdings Crop, Energy Future Intermediate

14    Holding Company LLC, and the EFH/EFIH Debtors

15

16    HEARING RE DI 11506:  The Elliott Funds' Motion

17    to Adjourn Hearing on the Motion of the EFH/EFIH

18    Debtors for Order Authorizing Entry into Merger

19    Agreement and Approving Termination Fee

20

21

22

23

24

25
```

Page 237

1                          CERTIFICATION

2              I, Theresa Pullan, certify that the foregoing is a

3    correct transcript from the official electronic sound

4    recording of the proceedings in the above-entitled matter.

5    Theresa Pullan

Digitally signed by Theresa Pullan
DN: cn=Theresa Pullan, o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2017.07.28 14:22:32 -04'00'

6    AAERT Certified Electronic Transcriber CET**00650

7    Theresa Pullan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    Veritext

23    330 Old Country Road

24    Suite 300

25    Mineola, NY  11501

Page 238

1                    C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya                    Digitally signed by Sonya Ledanski
                              Hyde
6    Ledanski Hyde            DN: cn=Sonya Ledanski Hyde,
                              o=Veritext, ou,
7                             email=digital@veritext.com, c=US
                              Date: 2017.07.28 14:23:04 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  July 28, 2017