# EXHIBIT C

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF WILLIAM O. HILTZ
## IN SUPPORT OF THE MOTION OF THE EFH/EFIH
## DEBTORS FOR ORDER (A) AUTHORIZING ENTRY INTO MERGER
## AGREEMENT, (B) APPROVING TERMINATION FEE, AND (C) AUTHORIZING
## ENTRY INTO AND PERFORMANCE UNDER PLAN SUPPORT AGREEMENT

I, William O. Hiltz, declare as follows:

1.　　I am a Senior Managing Director of Evercore Group L.L.C. ("Evercore"), a financial advisory and investment banking firm with offices around the world and financial advisor and investment banker to the above-captioned debtors and debtors in possession (the "Debtors"). I submit this declaration (this "Declaration") in support of the *Motion of the EFH/EFIH Debtors for Orders (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* (the "Motion").[2]

2.　　Except where specifically noted, the statements in this Declaration are based on either my personal knowledge, information supplied or verified by the Evercore financial team that I supervise or the Debtors' personnel and third-party advisors, my review of relevant

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

Case 14-10979-CSS    Doc 9191-3    Filed 08/04/16    Page 2 of 10

documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

3. I offer this declaration in support of the Debtors' motion requesting authority to enter into the Merger Agreement, pay the Termination Fee, and enter into and perform under the PSA.

**I.     Qualifications.**

    **A.     Background in Mergers and Acquisitions.**

4. Evercore is one of the world's leading independent investment banking groups that serves a diverse set of clients around the world with over 20 offices in North America, Europe, South America and Asia, including an office located at 55 East 52nd Street, New York, NY 10055. Evercore has expertise in domestic and cross border restructurings, mergers and acquisitions, debt and equity capital markets transactions, and other financial advisory services. Evercore has served as an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes and secured creditors, shareholders, and boards of directors in a variety of industries. Evercore is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5. I am a Senior Managing Director of Evercore's corporate advisory business and head of the General Advisory Group. I am also Chairman of Evercore's Special Committee Execution Group, which oversees all of Evercore's Special Committee transactions. I joined Evercore in 2000 and have 39 years of experience in investment banking. Prior to joining Evercore, I was Head of the Global Energy Group at UBS Warburg and, prior to UBS' acquisition of Dillon Read & Co. Inc., Head of the Energy Group at Dillon Read since 1995. From 1982 to 1995, I was a Managing Director at Smith Barney where at various times I headed

2

the Energy Group, the High Yield and Merchant Banking Group, the Transportation Group and the General Industrial Group. I received an A.B. in History and Government from Dartmouth College and an M.B.A. from The Wharton School at the University of Pennsylvania.

6. I have worked on numerous mergers and acquisitions transactions, including the Chrysler and Fiat merger, the sale of Dell, the sale of McMoRan to Freeport-McMoRan, the sale of ACS to Xerox, the sale of EDS to Hewlett Packard, the CVS and Caremark merger, and the sale of Aquila to Great Plains, among others. In addition, I have worked on several restructurings, including General Motors, CIT, Northwest Airlines, Continental Airlines, and Eastern Airlines.

**B.  Role in the Chapter 11 Cases.**

7. I am the Evercore representative primarily responsible for administering the marketing process for the EFH/EFIH Debtors' economic interests in Oncor Electric Delivery Company LLC ("Oncor"). I began advising the Debtors in connection with this matter on or around August 18, 2014. Beginning at that time, I advised the Debtors in designing the marketing process and served as a declarant and witness in connection with the Debtors' request for Court approval of that process. Since then, I and members of my team have played a central role in the process, including communicating and negotiating with potential bidders, evaluating bids and contract terms, and managing the logistics of the process.

8. In virtually all aspects of the process, I advise the Debtors together with Evercore restructuring professionals, including David Ying, head of the firm's Restructuring and Debt Advisory Group. Throughout the process, Mr. Ying has been primarily responsible for communicating and negotiating with creditor groups, in particular with respect to creditor plan discussions. I am, however, familiar with these discussions, including discussions concerning

3

alternative transactions for the economic interests in Oncor. My opinions in this Declaration take into account these discussions and Mr. Ying's views with respect to these potential transactions, discussed in greater detail in the *Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement*, filed substantially contemporaneously herewith.

**I.    Formal Two-Stage Marketing of the EFH/EFIH Debtors' Interest in Oncor.**

9.   The Debtors' indirect economic interest in Oncor has undergone an extensive formal and informal marketing process in these chapter 11 cases over a period spanning more than two years.

10.   In January of 2015, the Court approved bidding procedures governing a formal, two-stage marketing process for the Oncor interest. For over six months after entry of that order, the Debtors aggressively marketed the Oncor interest to a wide range of potential bidders through the Court-approved process. Throughout the process, the Debtors consulted with the conflicts matters advisors and the advisors to the EFH and TCEH creditors' committees, including on twice-weekly standing update calls.

11.   After entry of the bidding procedures order, the Debtors and their advisors circulated a process letter to over 50 potential strategic and financial bidders. The process letter explained the opportunity to bid for the Debtors' economic interests in Oncor and invited the potential bidders to participate in the process. Twenty-eight of these potential bidders requested and received nondisclosure agreements and 17 signed them, gaining access to an extensive electronic data room maintained by the Debtors. Over the following weeks, potential bidders

held diligence calls and meetings with the Debtors' advisors, and a number of the most interested bidders met with Oncor management.

12.     Excluding creditors, the Debtors received two first round bids and two second round bids. The Debtors negotiated both value and key terms with these bidders over a period of months. After receiving second round bids, the Debtors simultaneously negotiated definitive documentation of the two final third-party bids while continuing to advance plan discussions with creditor constituencies. Ultimately, both remaining third-party acquisition proposals dissipated. Toward the end of June of 2015, the Debtors determined that the Oncor bidding process had not yielded a sufficiently high offer to justify selecting a stalking horse. Accordingly, the Debtors declined to do so and instead shifted their focus to the ongoing plan negotiations.

## II.    The Hunt Merger Agreement and the Original Plan.

13.     One of the third-party bids received through the Court-approved marketing process was submitted by Hunt Consolidated, Inc. and certain co-investors (collectively, the "Hunt Consortium"). After the formal Oncor marketing process terminated, *ad hoc* groups of TCEH creditors submitted a compromise proposal to the Debtors that contemplated a Hunt Consortium-sponsored merger with reorganized EFH Corp. (the "Hunt Merger"). The Hunt Merger contemplated that Oncor would be restructured to permit reorganized EFH Corp. to convert to a real estate investment trust ("REIT") for federal income tax purposes. The proposal from the TCEH creditors also contemplated a global settlement of ongoing disputes, lien challenges, and legacy litigation.

14.     In August of 2015, the Debtors, the Hunt Consortium, and various TCEH creditor parties entered into a plan support agreement contemplating the Hunt Merger (the "Original

5

PSA") and corresponding plan of reorganization (the "Original Plan"). After confirmation of the Original Plan in December, the Debtors worked tirelessly to effectuate the transaction. Due to the lack of certain required regulatory approvals by a specified outside date, however, the ad hoc group of TCEH first lien creditors delivered a plan support termination notice to the parties to the Original PSA on May 1, 2016, which caused the Original Plan to be null and void. Shortly thereafter, the Debtors terminated the Hunt Merger agreement.

### III. The Amended Plan on the E-Side.

15. After the termination of the Original Plan, the Debtors immediately began implementing their contingency plans. The Debtors refreshed the Oncor marketing process promptly after the Original Plan terminated in April 2016. In particular, the Debtors contacted 18 potential strategic and financial bidders, most of which were parties that had previously shown at least some level of interest, and sent process letters to 15 of them. Of those parties, eight parties signed nondisclosure agreements and obtained access to an updated electronic data room.

16. Of the potential bidders, NextEra was the most engaged from the outset. NextEra is a leading clean energy company with consolidated revenues of approximately $17.5 billion and approximately 14,300 employees in 27 states and Canada as of year-end 2015, as well as approximately 45,000 megawatts of generating capacity. Headquartered in Juno Beach, Florida, NextEra's principal subsidiaries are Florida Power & Light Company, which serves more than 4.8 million customer accounts in Florida and is one of the largest rate-regulated electric utilities in the United States, and NextEra Energy Resources, LLC, which, together with its affiliated entities, is the world's largest generator of renewable energy from the wind and sun. Its common stock is listed on the New York Stock Exchange at a market capitalization of approximately $59

6

billion. Moreover, NextEra has among the strongest credit ratings in the industry. NextEra has had a longstanding interest in acquiring the EFH/EFIH Debtors' economic interest in Oncor, dating back to before the Court entered the bidding procedures order in January of 2015.

17.    Two other bidders, in addition to NextEra, engaged in extensive negotiations with the EFH/EFIH Debtors after termination of the Original Plan. With one of those other bidders, negotiations progressed to definitive documentation. Throughout the negotiations, the EFH/EFIH Debtors sought to use the multiple-bidder dynamic to obtain the highest and otherwise best terms and conditions, including, in particular, on the overall value of the bids. Ultimately, after three months of intensive multiparty negotiations, the boards of directors and managers of EFH Corp. and EFIH approved the execution of the Merger Agreement and the PSA with NextEra on July 28, 2016.

### IV.    Merger Transaction and Termination Fee.

18.    The Merger Agreement contemplates an E-side transaction with an approximately $18.3 billion implied Oncor total enterprise value. Specifically, NextEra will repay the EFIH first lien DIP facility as part of its contribution of approximately $9.5 billion—which is primarily cash but also includes stock (initially issued as stock of Reorganized EFH Corp., and later exchanged for stock of NextEra, a highly liquid, publicly-traded security listed on the New York Stock Exchange)—subject to post-closing adjustments. As a result, the EFH/EFIH Debtors project that, assuming among other things a first quarter 2017 emergence, EFIH secured debt will be repaid in full, EFIH unsecured claims will receive an estimated 100% recovery, and creditors of EFH Corp. will receive a recovery based, in part, on the adjusted estimated cash on hand at EFH Corp., plus anticipated additional cash. The mixture of cash and

7

NextEra common stock to be received is subject to allocation methodologies designed to ensure the satisfaction of certain tax requirements related to both the Merger and the spin-off of TCEH.

19. Upon Court approval of the Merger Agreement, EFH Corp. and EFIH are liable for the Termination Fee, in the amount of $275 million, as an allowed administrative expense claim, in the event of a termination of the Merger Agreement. Although the EFH/EFIH Debtors vigorously negotiated the Termination Fee, it was ultimately necessary to induce NextEra to enter into the Merger Agreement and commit to provide the billions of dollars in consideration that it contemplates. In light of the consideration provided by the Merger Agreement, and the firm commitment from a credit-worthy acquirer that supports it, I believe that the Termination Fee is reasonable under the circumstances.

20. The Termination Fee is $275 million in cash, equal to approximately 1.5% of the transaction's total enterprise value. The Termination Fee is comparable on a percentage basis to fees approved in transactions of publicly traded utility companies since 2012:

| Date Announced | Acquirer | Target | Enterprise Value ("TEV") (in millions) | Break Fee of Target | |
|---|---|---|---|---|---|
| | | | | $ (in millions) | % of TEV |
| 5/31/16 | Great Plains | Westar | $12,157 | $280 | 2.3% |
| 2/9/16 | Algonquin | Empire District | 2,364 | 53 | 2.2% |
| 2/9/16 | Fortis | ITC Holdings | 11,435 | 245 | 2.1% |
| 2/1/16 | Dominion | Questar | 5,979 | 99 | 1.7% |
| 10/26/15 | Duke Energy | Piedmont Natural Gas | 6,579 | 125 | 1.9% |
| 9/4/15 | Emera Inc. | TECO Energy | 10,389 | 213 | 2.0% |
| 8/24/15 | Southern Company | AGL Resources | 11,996 | 201 | 1.7%. |

8

RLF1 14947690v.1

| Date Announced | Acquirer | Target | Enterprise Value ("TEV") (in millions) | Break Fee of Target | |
|---|---|---|---|---|---|
| | | | | $ (in millions) | % of TEV |
| 2/25/15 | Iberdrola USA | UIL Holdings | 4,483 | 75 | 1.7%. |
| 12/3/14 | NextEra Energy | Hawaiian Electric Industries | 4,336 | 90 | 2.1% |
| 10/20/14 | Macquarie Group | Cleco Corporation | 4,720 | 120 | 2.5% |
| 6/23/14 | Wisconsin Energy Corp. | Integrys Energy Group | 9,137 | 175 | 1.9% |
| 4/30/14 | Exelon Corp. | Pepco Holdings | 11,928 | 293 | 2.5% |
| 12/11/13 | Fortis Inc. | UNS Energy | 4,276 | 64 | 1.5% |
| 5/29/13 | MidAm. Energy Holdings Company | NV Energy | 10,400 | 170 | 1.6% |
| 2/21/12 | Fortis Inc. | CH Energy | 1,470 | 20 | 1.3% |
| | | | | **Mean** | **1.9%** |
| | | | | **Median** | **1.9%** |

21. I believe that the Merger Agreement currently represents the highest and best available transaction to permit the EFH/EFIH Debtors to emerge from these chapter 11 cases. Critically, the funding for the Merger Agreement is supported by the commitment of a highly credit-worthy acquirer with a long-standing strategic interest in acquiring the EFH/EFIH Debtors' Oncor interest. Moreover, the Oncor interest has been heavily-marketed, formally and informally, for more than two years. Thus, I believe that entry into the Merger Agreement, including the agreement to pay the Termination Fee if it becomes due and payable, is in the best interests of the EFH/EFIH Debtors and their estates.

Pursuant to 28 U.S.C. § 1746, I hereby declare that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 3rd day of August, 2016.

_____
William O. Hiltz
Senior Managing Director
Evercore Group L.L.C.

RLF1 14947690v.1