# EXHIBIT E

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related Documents: 9190** |
| | ) | **Obj. Deadline: August 25, 2016 at 4:00 p.m.** |
| | ) | |

**OBJECTION OF CERTAIN FUNDS AND ACCOUNTS ADVISED OR SUB-ADVISED BY FIDELITY MANAGEMENT & RESEARCH COMPANY OR ITS AFFILIATES TO MOTION OF THE EFH/EFIH DEBTORS FOR ORDER (A) AUTHORIZING ENTRY INTO MERGER AGREEMENT, (B) APPROVING TERMINATION FEE, AND (C) AUTHORIZING ENTRY INTO AND PERFORMANCE UNDER PLAN SUPPORT AGREEMENT**

Certain funds and accounts advised or sub-advised by Fidelity Management & Research Company or its affiliates (collectively, "Fidelity") file this objection (the "Objection") to the *Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance under Plan Support Agreement* [D.I. 9190] (the "Motion"). In support of its Objection, Fidelity respectfully states as follows.

---

[1] The last four digits of Energy Future Holding Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## PRELIMINARY STATEMENT

1.  In connection with the Debtors' proposed sale of substantially all of the assets of the E-Side Debtors to NextEra Energy, Inc. ("NextEra"), the Debtors seek authority to pay NextEra a $275,000,000 break-up fee (the "Break-Up Fee") in the event the Agreement and Plan of Merger (the "Merger Agreement") with NextEra is terminated and any alternative transaction is consummated.  Third Circuit precedent dictates that the Break-Up Fee may only be approved if it is an actual and necessary cost to preserve the value of the Debtors' estates, and requires a showing that without the Break-Up Fee, NextEra would abandon its bid.  Given NextEra's relentless pursuit of the Debtors' assets for the past two-plus years, the Debtors have not and cannot make such a showing.

2.  As this Court is well aware, since as far back as June 2014, NextEra has been one of Oncor's most eager and determined suitors.  At the outset of these chapter 11 cases, in connection with the Debtors' efforts to obtain approval of the original restructuring support agreement (the "Restructuring Support Agreement") and the proposed convertible second lien DIP facility (the "RSA EFIH Second Lien DIP Facility"), NextEra submitted multiple unsolicited bids to fund a convertible lien DIP and acquire the equity of reorganized EFH.  As a direct result of NextEra's involvement, the Debtors terminated the Restructuring Support Agreement and commenced a two-stage marketing process in which NextEra was a key participant.  After the marketing process failed to yield a satisfactory proposal, the Debtors signed the plan support agreement (the "Original PSA") with, among others, the Hunt Consortium, and filed a chapter 11 plan (as amended, the "Original Plan")[2], pursuant to which reorganized EFH would be converted into a REIT.

---

[2] *Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 7187].

3.      Even as the Debtors moved forward with the Original Plan, NextEra persevered. During the confirmation hearing for the Original Plan, NextEra stated it was prepared to consummate an alternative transaction that would pay in full or otherwise leave all E-Side creditors unimpaired.  And finally, after confirmation of the Original Plan and prior to issuance of the Termination Notice (as defined below) related to the Original Plan, NextEra lobbied regulators to not approve the transactions contained in the Original Plan and continued to engage the Debtors on a renewed bid for Oncor.

4.      Time and time again over the past two-plus years, NextEra has openly pursued its very serious interest in acquiring Oncor.  NextEra's persistence – often unsolicited – since the commencement of these chapter 11 cases proves that the Debtors cannot meet their heavy burden to show that the Break-Up Fee was necessary to induce NextEra to bid or that its approval is necessary to prevent NextEra from abandoning its bid.  In fact, NextEra's conduct throughout these cases demonstrates the opposite – NextEra will continue to pursue Oncor with or without a break-up fee.  Accordingly, approval of the Break-Up Fee must be denied.

**BACKGROUND**

5.      On April 29, 2014, each of the Debtors filed a voluntary petition for bankruptcy relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court (the "Court") for the District of Delaware.  No trustee or examiner has been appointed.

6.      On December 1, 2015, the Debtors filed the Original Plan.  On December 7, 2015, the Court entered an order confirming the Original Plan [D.I. 7244] (the "Confirmation Order").

7.      The Original Plan required timely approval by the Public Utility Commission of Texas ("PUCT") for the transactions contemplated therein, including an order approving the change of control application submitted by Oncor and the Hunt Consortium.  The Original PSA

3

gave certain parties, including the ad hoc group of TCEH first lien creditors (the "TCEH First
Lien Group"), the right to terminate the support obligations related to the Original Plan should all
required PUCT approvals not be obtained by April 30, 2016 (the "Plan Support Outside Date").
Original PSA §11(g).

8.       On May 1, 2016, the TCEH First Lien Group sent a plan support termination
notice (the "Termination Notice") to the parties to the Original PSA.  Delivery of the
Termination Notice triggered a "Plan Support Termination Event" under Section 11 of the
Original PSA and as a result rendered the Original Plan and Confirmation Order "null and void"
under Article IX.D of the Original Plan and paragraph 147 of the Confirmation Order.

9.       On May 1, 2016, the Debtors filed the *Joint Plan of Reorganization of Energy
Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (as subsequently
amended, the "New Plan") [D.I. 8355].

10.       On August 3, 2016, the Debtors filed the Motion and accompanying Merger
Agreement.  As described in the Motion, the Merger Agreement contemplates a merger of EFH
Corp. into a wholly-owned subsidiary of NextEra by which NextEra would acquire the Debtors'
interest in Oncor.

11.       The Merger Agreement provides that, if it is terminated and any alternative
transaction is consummated, the Debtors are to pay NextEra a two hundred and seventy-five
million dollar ($275,000,000) Break-Up Fee.  Merger Agreement § 8.5(c).

## OBJECTION

**I.**       **For Bankruptcy Court Approval, a Break-up Fee Must Be Necessary to Preserve
the Value of the Estate**

12.       In the Third Circuit, approval of a break-up fee requested in connection with a
363(b) sale is governed by § 503(b) of the Bankruptcy Code, which provides that "[a]fter notice

4

and a hearing, there shall be allowed administrative expenses . . . including . . . the actual,
necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b)(1)(A). *See, e.g.,*
*In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 532 (3d. Cir. 1999).

13.    According to the Third Circuit, "'the allowability of break-up fees, like that of
other administrative expenses, depends upon the requesting party's ability to show that the fees
were actually necessary to preserve the value of the estate.'" *In re Reliant Energy Channelview
LP, et al.*, 594 F.3d 200, 206 (3d. Cir. 2010) (quoting *O'Brien*, 181 F.3d at 535). The party
seeking the award of a break-up fee bears a "heavy burden" to show this standard is met. *In re
Bernard Techs., Inc.*, 342 B.R. 174, 177 (Bankr. D. Del. 2006) (quoting *O'Brien*, 181 F.3d at
533). Necessity, and *not* the business judgment rule, is the appropriate standard in this context.
*See Reliant*, 594 F.3d at 209 ("'the business judgment rule does not apply as such in the
bankruptcy context'") (quoting *O'Brien*, 181 F.3d at 535).

14.    Where a break-up fee was not necessary to induce a stalking horse bidder to
submit its bid (in other words, when the party would have bid even without the break-up fee),
and where the award of a break-up fee would not be necessary to preserve the bid, such fee is <u>not</u>
necessary to preserve the value of the estate. *See Reliant*, 594 F.3d at 206 (stating there were
"two ways a break-up fee could have preserved the value of the estate. First, the opportunity to
obtain a break-up fee could have induced [the bidder] to make its bid . . . second, the provision
for the break-up fee may have been necessary to induce [the bidder] to adhere to its bid"). As
stated succinctly in *O'Brien,* "in some cases a potential purchaser will bid whether or not break-
up fees are offered . . . In such cases, the award of a break-up fee cannot be characterized as
necessary to preserve the value of the estate" and cannot be approved. 181 F.3d at 535.

15.     The related question of whether a break-up fee would cause harm to the bidding

process is also relevant to the "necessary to preserve the value of the estate" calculus.  Where

"the potential harm to the estate that a break-up fee would cause by deterring other bidders

outweigh[s] [any] benefit", the break-up fee should not be approved.  *See Reliant*, 594 F. 3d at

208; *see also O'Brien*, 181 F.3d at 536-38 (concluding the bankruptcy court was justified in

refusing to approve a break-up fee where the bankruptcy court found, among other

considerations, that allowing such fee would have "'chilled or at best certainly complicated the

competitive bidding process'").

**II.     The Break-Up Fee Was Not Necessary to Induce NextEra to Bid; Nor Is Its
Approval Necessary for NextEra to Adhere to Its Bid**

16.     Despite clear and binding Third Circuit precedent regarding the standard for

approval of a break-up fee, the Debtors simply ignore such precedent.  The Debtors fail to cite

*O'Brien* or any other Third Circuit decision addressing break-up fees and make no reference

whatsoever to § 503(b).  Rather, the Debtors rely only upon § 363(b) and argue that "[i]n light of

the consideration provided by the Merger Agreement, and the firm commitment from a credit-

worthy acquirer that supports it, the Break-Up Fee is reasonable under the circumstances."

Motion at ¶ 40.  They further submit that the agreement to pay the Break-Up Fee "is a sound

exercise of their business judgment." *Id.* at ¶ 43.  However, as the Third Circuit has made very

clear, reasonableness and business judgment are not the correct inquiry here, and not the standard

this Court is bound to apply.

17.     Moreover, the Debtors, who bear the heavy burden to show that the Break-Up Fee

is necessary to preserve the value of the estate, have offered no evidence whatsoever to support

approval of the Break-Up Fee.  Without citing any factual evidence, and while ignoring the

entire history of these chapter 11 cases, the Debtors baldly claim that the Break-Up Fee "was

ultimately necessary to induce NextEra to enter into the Merger Agreement." Motion at ¶ 40.

Any suggestion that the unavailability of the Break-Up Fee would actually have deterred

NextEra from bidding for Oncor or would cause it to abandon its bid for Oncor strains

credibility. NextEra has made it clear to the world for the past two-plus years that it is one of

Oncor's most eager suitors. As the Debtors themselves point out in the Motion, "NextEra has

had a longstanding interest in acquiring the Debtors' economic interest in Oncor, dating back to

before the Court entered the bidding procedures order in January of 2015." *Id.* at ¶ 23.

18.    At the outset of the chapter 11 cases, the Debtors executed the Restructuring

Support Agreement. Under the Restructuring Support Agreement, certain EFIH and EFH

creditors (the "RSA DIP Parties") proposed to backstop the RSA EFIH Second Lien DIP

Facility, which would have mandatorily converted into 60% of the reorganized EFH Corp.

equity. As a result of the conversion feature, the RSA DIP Parties would ultimately own the

Debtors' interest in Oncor. Almost immediately, competition to fund an EFIH second lien DIP

facility broke out.

19.    On June 18, 2014, NextEra, together with a group of holders of the EFIH second

lien claims (the "EFIH Second Lien Group"), submitted a letter to Paul Keglevic, the Debtors'

chief financial officer and co-chief restructuring officer, proposing an alternative EFIH second

lien DIP facility and plan structure pursuant to which NextEra would acquire, through the

convertible EFIH second lien DIP facility, the Debtors' interest in Oncor. *See Declaration of

Todd R. Snyder* [D.I. 1070] (the "Snyder Declaration"). This initial competing alternative

proposal contemplated a break-up fee. *See id.* at Exhibit 2 (providing that, in the event an

alternative transaction was entered into, "Debtors shall pay an amount in cash equal to [1.5%] of

$1.9 billion to the Backstop Parties").

20.     On June 21, 2014, the Debtors informed NextEra and the EFIH Second Lien
Group that the RSA DIP Parties had amended the RSA EFIH Second Lien DIP Facility to reduce
the fees payable thereunder.  Snyder Declaration at ¶ 23.  The next day, NextEra and the EFIH
Second Lien Group transmitted a term sheet containing improvements to their alternative
proposal to the Debtors' advisors.  *Id.* at ¶¶ 23, 24.  Notably, the cover letter and the term sheet
for NextEra's improved proposal expressly provided that the proposal did not contemplate a
break-up fee.  *See* Snyder Declaration at Exhibit 4 ("Specifically, we have . . . [e]liminated any
Alternative Transaction Fee.").

21.     On June 22, 2014, the Debtors informed NextEra and the EFIH Second Lien
Group that the Debtors would pursue approval of the revised RSA EFIH Second Lien DIP
Facility.  *Id.* at ¶ 25.  Just days later, on June 27, 2014, NextEra filed a *Notice of Enhanced
Terms Relating to Alternative Second Lien DIP Financing Proposed by NextEra Energy, Inc.
and EFIH Second Lien Group* [D.I. 1224] (the "Notice of Enhanced Terms") pursuant to which
NextEra yet again improved the terms of their proposed convertible EFIH second lien DIP
facility.  *See* Notice of Enhanced Terms at Exhibit A.  As before, NextEra's further revised
proposal did not contemplate a break-up fee.  *See id.*

22.     Following two days of hearings regarding the RSA EFIH Second Lien DIP
Facility, on July 1, 2014, the Debtors indefinitely adjourned the hearing regarding the RSA EFIH
Second LIP DIP Facility in order "to continue discussions among certain creditors and third
parties," among other considerations.  *See Notice of Adjourned/Rescheduled Hearing* [D.I.
1504].  Seizing the opportunity, on July 16, 2014, NextEra submitted a letter to Mr. Keglevic
outlining the terms of a strategic proposal pursuant to which NextEra would acquire the Debtors'
interest in Oncor (the "NextEra Strategic Proposal").  *See Notice of Strategic Proposal* [D.I.

1593].  According to the Debtors, the bidding to fund a convertible EFIH second lien DIP facility

"culminated in a proposal from strategic bidder NextEra Energy that provided superior value to

the [RSA] EFIH Second Lien DIP Facility" and, as a consequence, on July 24, 2014, the Debtors

terminated the Restructuring Support Agreement.  *See Motion for Sale of Property Free and

Clear of Liens under Section 363(f)* (the "Oncor Sale Motion") [D.I. 2087] at ¶ 1.

23.     Following receipt of the NextEra Strategic Proposal and termination of the

Restructuring Support Agreement, the Debtors worked with NextEra with the goal of signing a

definitive agreement, until an increasing number of potential bidders expressed interest in

participating in the bidding process.  *See* Oncor Sale Motion at ¶ 21.  On August 26, 2014, the

Debtors filed a *Notice Regarding Marketing Process* [D.I. 1919], announcing that "given the

interest in Reorganized EFH expressed by potential strategic and financial bidders" they would

seek approval of a Court-supervised marketing process.  *See Notice Regarding Marketing*

*Process* at 1-2.  That same day, NextEra withdrew the NextEra Strategic Proposal, stating that

NextEra and EFH had engaged in discussions regarding the terms on which NextEra would serve

as stalking horse bidder in an auction process for the equity of reorganized EFH, and that it was

withdrawing its proposal as a result of the fact that EFH had filed its plan to run an auction

process.  *See Notice of Withdrawal of Strategic Proposal* [D.I. 1294].  The Debtors filed the

Oncor Sale Motion on September 19, 2014.

24.     As explained in the Motion, after completing the bidding and sales process

provided for in the Oncor Sale Motion, the Debtors determined in June 2015 that the process had

not yielded a sufficiently high offer to justify selecting a stalking horse, and in August of 2015,

the Debtors entered into the Original PSA and filed the Original Plan, which sought to unimpair

E-Side creditors.  *See* Motion at ¶¶ 14, 16.  A confirmation hearing in connection with the

Original Plan commenced on November 3, 2015. On November 18, 2015, in the midst of that

confirmation hearing, NextEra filed a *Statement with Respect to Pending Confirmation Matters*

*and Feasible Alternative Restructuring* [D.I. 7028] (the "NextEra Statement"), stating that

NextEra was prepared to consummate an alternative transaction that would pay in full or

otherwise leave all E-Side creditors unimpaired, and that from June 2014 through June 2015,

NextEra had been prepared to "immediately negotiate and sign definitive agreements at a bid

value equal to its July 2014 proposal." NextEra Statement at ¶¶ 1, 3. The NextEra Statement

noted that NextEra had maintained its July 2014 proposal "for almost a year, notwithstanding the

significant market risk to NextEra . . . ." *Id.* at ¶ 3, FN1. NextEra stressed that it "continue[d] to

be interested in Oncor", "[stood] ready to reengage immediately" and was "prepared to execute

definitive documentation that would provide for specific performance remedies against

NextEra." *Id.* at ¶¶ 7, 8. Notably, NextEra endeavored to purchase Oncor – including keeping

its July 14 proposal open for almost a year and submitting competing proposals in the face of a

transaction that would unimpair E-side creditors – all while NextEra neither benefited from nor

was protected by a break-up fee.

25.     Ultimately, on December 7, 2015 this Court entered the Confirmation Order

confirming the Original Plan. Even after entry of the Confirmation Order, NextEra was heavily

involved lobbying behind the scenes during the Hunt Consortium's PUCT approval process,

working to ensure that the PUCT did not approve the Hunt Consortium's change of control

application for Oncor so that NextEra would have another chance to acquire Oncor.

26.     Then, in April 2016, even before the termination of the Original Plan, NextEra

again approached the Debtors with unsolicited proposals. As Stacey Doré, the Debtors' general

counsel and co-chief restructuring officer testified, "[w]e didn't approach NextEra. They

approached us . . . . I think they reached out to us in late April and said[,] we want to send you a
new proposal." Hrg. Tr. 163:20-24, Aug. 22, 2016. *See also*, DX096, Minutes of Joint Meeting
(Apr. 29, 2016) at 2 ("Discussion followed concerning the marketing process for the sale of EFH
Corp.'s economic interest in Oncor and the associated timing. Sassower noted that [NextEra]
has indicated continued interest in Oncor . . ."). Thereafter, "after termination of the Original
Plan, the Debtors immediately began implementing their contingency plan," and in connection
therewith, the Debtors "refreshed the Oncor marketing process." Motion at ¶¶ 20, 21. Of the
potential bidders, "NextEra was the most engaged from the outset." *Id.* at ¶ 23.

27.     It bears noting, as well, that NextEra is a creditor and party-in-interest in these
cases, owning approximately $45.3 million in principal amount of EFIH PIK notes as of May 16,
2016. See *Objection of NextEra to Motion of Energy Future Holdings Corp., et al., for Entry of
an Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols
in Connection with the Confirmation of Debtors' Joint Plan of Reorganization and Approval of
Debtors' Disclosure Statement* [D.I. 8452] at ¶ 2. Given that NextEra is a publicly traded utility
company and does not regularly acquire debt securities of other companies, its purchase of the
EFIH PIK Notes highlights the lengths to which NextEra will go to obtain leverage in its pursuit
of Oncor without the promise of any break-up fee. As an existing creditor, NextEra is already
invested in the Debtors' capital structure with a vested financial interest in the outcome of the
Oncor sales process. In addition to the many determined advances NextEra has made at Oncor,
this fact, as well, belies the notion that NextEra will abandon its bid absent approval of the
Break-Up Fee.

28.     In light of NextEra's track record, it simply strains credulity for the Debtors to
attempt to argue that NextEra would have walked away from these latest negotiations and

refused to bid without the promise of the Break-Up Fee. NextEra has repeatedly submitted

proposals without requiring a break-up fee and has not wavered from its two-plus year pursuit of

Oncor. The fact that NextEra's bid, on paper, is contingent on approval of the Break-Up Fee

does not change this fact and does not meet the standards of section 503(b). As the Third Circuit

found in *Reliant*,

> [it does not necessarily follow] that the bidder will withdraw its bid, pass up on
> the opportunity to acquire the asset to be sold, and nullify its work in preparing its
> bid if a court . . . declines to authorize a break up fee. *O'Brien* makes that clear
> because even though [the bidder] had made its bid contingent on the award of a
> break-up fee, it competed at the auction after the Bankruptcy Court rejected the
> request for a break-up fee.

594 F.3d at 207.

29.    Moreover, the Debtors and NextEra have offered <u>no</u> facts to the contrary, despite

their "heavy burden" to prove the "necessity" of the Break-Up Fee. *See In re Bernard Techs*,

342 B.R. at 177; *Reliant*, 594 F.3d at 206. The Debtors filed two declarations in support of the

Motion, but neither the Motion nor the Declarations offer any facts to justify the award of the

Break-Up Fee. *See Declaration of William O. Hiltz in Support of the Motion of the EFH/EFIH*

*Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination*

*Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement*

[D.I. 9191]; *Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for*

*Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C)*

*Authorizing Entry Into and Performance Under Plan Support Agreement* [9192]. The Debtors

are silent on this issue because no facts exist to support the conclusion that the Break-Up Fee

was necessary to induce NextEra's bid or that NextEra would not adhere to its bid without its

approval.

## IV.    **The Break-Up Fee Will Chill Bidding**

30.    In both *O'Brien* and *Reliant*, the requested break-up fees were denied because of
the negative effect the fees would have on bidding.  This is, of course, a salient consideration in
these chapter 11 cases as well.  Approval of the Break-Up Fee could have a serious chilling
effect on other potential bidders.  Mr. Keglevic has testified that once the Break-Up Fee is
approved, the opportunity to receive higher bids – and thus improve creditor recoveries –
evaporates.  Specifically, at the T-Side confirmation hearing for the New Plan, Mr. Keglevic
stated ". . . I'm pleased where we got to with NextEra.  I think there's some, you know,
opportunities maybe . . . until the Judge approves the break fee to even do better."  Hrg. Tr.
130:10-13, Aug. 17, 2016 (emphasis added).

31.    In addition to NextEra, other parties have expressed interest in EFH Corp.'s
assets.  For example, Hunt Consolidated, Inc. has publicly confirmed its renewed interest in
acquiring Oncor and recently announced that it had negotiated with PUCT staff and other parties
that intervened in the PUCT process to resolve some of the objections that derailed the Original
Plan.  *See* Peggy Brickley, *Hunt Consolidated in Bid to Revive Deal for Energy Future's Oncor*,
Wall Street Journal, Aug. 17, 2016, http://www.wsj.com/articles/hunt-consolidated-in-bid-to-
revive-deal-for-energy-futures-oncor-1471474949 (attached hereto as **Exhibit A**); *see also*
Memorandum of Understanding Regarding Potential STM and Letter from Brian H. Lloyd,
Executive Director, PUCT, to David Campbell, President, Hunt Utility Services (Aug. 16, 2016),
(attached hereto as **Exhibit B**).  In addition, press reports indicate that seven other entities,
including Berkshire Hathaway and Edison International, have expressed interest in Oncor.  *See,
e.g.*, Harry Weber and Matthew Monks, *NextEra Said to Bid on Oncor as Berkshire, Edison
Interested*, Bloomberg, June 28, 2016, http://www.bloomberg.com/news/articles/2016-06-

13

27/nextera-said-to-bid-on-oncor-as-berkshire-edison-eye-utility (attached hereto as **Exhibit C**). The opportunity to "do better" with any other interested party would be severely weakened by the approval of the Break-Up Fee. This Court should find that not only is the Break-Up Fee not necessary to preserve the value of the Debtors' estate, its net effect could well prove deleterious.

32.     Moreover, while the Debtors go to great lengths to highlight that the Break-Up Fee is within the range of percentages of other approved break-up fees, see Motion at ¶¶ 41-42, the Debtors ignore the fact that the proposed Break-Up Fee – $275,000,000 – is more than the aggregate recovery proposed to be distributed to all creditors of EFH. As Ms. Doré testified, the Debtors currently estimate that the total consideration available for distribution to EFH creditors is $250,000,000. Hrg. Tr. 101:18-19, Aug. 22, 2016. If the Break-Up Fee is approved, an overbid would have to more than double the recovery being paid to EFH creditors, yet none of that amount will inure to the benefit of the EFH creditors. A proposed break-up fee that exceeds the total amount of consideration payable to EFH creditors simply cannot be justified under any circumstances, least of all here, given NextEra's unrelenting pursuit of Oncor.

## CONCLUSION

For the reasons set forth in the Objection, Fidelity respectfully requests that this Court deny the Break-Up Fee and grant such other relief as is just and proper.

Dated:   Wilmington, Delaware          **CROSS & SIMON, LLC**
         August 25, 2016

         _____
         Michael J. Joyce (No. 4563)
         1105 North Market Street
         Suite 901
         Wilmington, Delaware 19801
         Telephone: (302) 777-4200
         Facsimile: (302) 777-4224
         Email: mjoyce@crosslaw.com

         – and –

         **FRIED, FRANK, HARRIS, SHRIVER &
         JACOBSON LLP**

         Brad Eric Scheler
         Gary L. Kaplan
         Matthew M. Roose
         Fried, Frank, Harris, Shriver & Jacobson LLP
         One New York Plaza
         New York, New York 10004
         Telephone: (212) 859-8000
         Facsimile: (212) 859-4000
         Email:  brad.eric.scheler@friedfrank.com
         gary.kaplan@friedfrank.com
         matthew.roose@friedfrank.com

         *Counsel to certain funds and accounts advised or sub-*
         *advised by Fidelity Management & Research Company*
         *or its affiliates*

# EXHIBIT A

# THE WALL STREET JOURNAL.

http://www.wsj.com/articles/hunt-consolidated-in-bid-to-revive-deal-for-energy-futures-oncor-1471474949

BANKRUPTCY

# Hunt Consolidated in Bid to Revive Deal for Energy Future's Oncor

Energy Future has agreed to sell Oncor to NextEra



Hunt Consolidated is trying to put its Oncor deal back together on terms that would ease regulatory approval if the NextEra deal doesn't prevail. *PHOTO: KAEL ALFORD FOR THE WALL STREET JOURNAL*

By PEG BRICKLEY

August 17, 2016

Hunt Consolidated Inc. is back in the chase after Oncor, Energy Future Holding Corp.'s regulated electricity transmissions business, which is slated to be sold to Florida's NextEra Energy Inc.

Last month, NextEra emerged as the winner of a competition for Oncor that was touched off when Texas regulators scuttled a takeover proposal led by Hunt.

Now, Hunt is trying to put its Oncor deal back together on terms that would ease regulatory approval if the NextEra deal doesn't prevail, according to a letter from a key Texas regulatory executive describing that potential deal, which The Wall Street Journal reviewed. Dead in May, the Hunt deal could be revived if investors back a new effort, one that would be based on an agreement to share tax advantages with ratepayers.

"It is clear that a lot of people want a Texas alternative," said Jeanne Phillips, Hunt spokeswoman, who confirmed the company's continued interest in Oncor.

NextEra declined to comment Wednesday afternoon.

Energy Future, of Dallas, also declined to comment on the renewed overture from Hunt. The company is selling Oncor to bail itself out of a bankruptcy that has lasted two years. Confirmation hearings began Wednesday on a chapter 11 plan that will take Energy Future's Luminant and TXU Energy businesses out of chapter 11 as a separate company. The sale of Oncor will be the centerpiece of a second chapter 11 plan that will take Energy Future out of bankruptcy.

The NextEra sale agreement allows Energy Future to consider alternative offers but adds a $275 million breakup fee in the event of a rival deal. NextEra is offering $9.5 billion in cash and stock in a deal, as well as the comfort of a big balance sheet to absorb debt that could pose a threat to an essential element of the Texas power grid.

Hunt hasn't spelled out all the financial details of its potential new deal, which needs to pick up investor backing to get off the ground. But it has been talking to regulators about what it would take to get a new deal over the hurdles, according to a letter signed by Brian Lloyd, executive director of the Public Utility Commission of Texas.

One of the largest electricity distribution systems in the country, Oncor carries power to some 10 million Texans. It avoided being drawn into Energy Future's bankruptcy thanks largely to oversight by the Public Utility Commission of Texas, or PUC, a body that will ultimately decide who gets Oncor.

NextEra and Hunt have been dueling over Oncor for years, in bankruptcy court and before regulators. Last year, Hunt was Energy Future's choice of a buyer in a deal that had financial backing from many creditors.

Creditors and other investors walked away from the Hunt deal after the state PUC imposed restrictions that changed the economics of the planned takeover.

Documents reviewed by The Wall Street Journal indicate Hunt, the family business of Ray L. Hunt, has an understanding with a key critic of the earlier deal, a group of cities where Oncor supplies power. If Hunt can put its Oncor deal back together, ratepayers will share tax savings, according to a document memorializing the understanding.

Trouble erupted over the original Hunt deal at the PUC because, as a real-estate investment trust, Oncor would pay no taxes but its rates would include an allowance for income taxes. That allowance would translate into an estimated $200 million annually in cash flow that would go straight into the pockets of investors, due to the REIT structure.

Hunt's new deal would involve a modified REIT structure and an estimated $24 million annually in shared savings for customers.

"This opportunity was lost when the first deal fell apart," Pat Wood, a former chairman of the Texas PUC and an adviser to Hunt in its pursuit of Oncor, said Wednesday.

Write to Peg Brickley at peg.brickley@wsj.com

# EXHIBIT B

### Memorandum of Understanding Regarding Potential STM

This document memorializes the undersigned's understanding of the general structure for a potential Sale, Transfer, or Merger ("STM") proceeding to be initiated by a subsidiary of Hunt Transmission Services, L.L.C. or its designee(s) ("Purchasers") to acquire Energy Future Holdings Corp.'s indirect majority interest in Oncor Electric Delivery Company LLC and certain other transactions (together, the "Transaction"). The parties to this document include the undersigned entities and are collectively referred to as the "Parties."

### Company Structure

- Purchasers intend that their transaction will separate Oncor into a Distribution Company and a Transmission Company. It is anticipated that there will be no significant ownership overlap between the two companies, but coordination will be necessary between the two companies.

- Purchasers will separate the Transmission Company into an asset company and an operating company, which will enable the asset company to elect REIT status (the "T-REIT") and that a Hunt affiliated entity will control the operating company ("T-Utility").

- The T-REIT board of directors will be comprised of a majority of disinterested directors. The Distribution Company shall have two seats on the T-REIT board and will be counted as disinterested directors. The board will have an appropriate conflicts committee. The T-REIT will also have and an advisory board comprised of company-appointed customers and market stakeholders.

- The Distribution Company will retain the current ring fence, including dividend restrictions, board composition, governance requirements and other applicable provisions currently in place. It is anticipated that current Oncor management will become the management of the Distribution Company. The Distribution Company will not be separated into an asset company and operating company, and it will not be placed into a REIT structure.

- Total debt at the holding companies of the Distribution and Transmission utilities will be no more than $3.5 billion, and the Transmission company holding company debt will not exceed $1.6 billion.

### Tangible Benefits

- Purchasers commit to sharing tangible benefits equal to 20% of the T-REIT income tax allowance (calculated at a 35% federal income tax ("FIT") rate -- estimated to be $24 million per year) that will arise from election of REIT status for the transmission company.

1

  o   Prior to the next rate case, it is intended that the sharing of the income
      tax allowance will be accomplished through a credit that will be
      allocated to ERCOT customers consistent with the method of recovering
      transmission costs through the postage stamp method.

  o   Purchasers commit that a transmission rate case will be filed by June 1,
      2017 and a second rate case no later than June 1, 2022.

  o   In the 2017 rate proceeding, Purchasers commit that equivalent income
      tax allowance benefits will be shared with retail customers in the Oncor
      service area through appropriate mechanisms that are consistent with
      PURA.

  o   The Parties agree they will support this construct for sharing the T-REIT
      income tax allowance with ratepayers and will not argue for a greater
      sharing or for a reduction in the income tax allowance. After the rates
      from the first rate case (to be filed no later than June 1, 2017) become
      effective, all parties are free to advocate for any level of income tax
      allowance to be included in transmission rates.

- Purchasers agree the Distribution Company will provide a credit of $50 million per
  year for two years (total of $100 million) for Oncor's retail customers, which will be
  allocated to retail customers without regard the voltage level at which the
  customers receive service. This credit is separate from the income tax allowance
  sharing described above.

## Commission Authority

- Purchasers agree that the PUC has regulatory authority over material terms of the T-
  REIT leases. Lease payments, formulae, or other structures of the lease will be
  reviewed and approved in rate proceedings. The T-REIT and T-Utility will jointly file
  rate cases, and the Commission has authority to set rates for the two entities as the
  Commission deems appropriate consistent with PURA.

- Purchasers expressly agree that the Commission has considerable discretion to
  determine the appropriate method to calculate an FIT expense, the amount of such
  expense, and the ratemaking treatment of any tax benefits resulting from a REIT in a
  utility's ownership structure. Purchasers and the undersigned retain the right to
  make any argument that the PUCT exercised its discretion in an arbitrary and
  capricious manner.

- Purchasers agree that it is proper for the Commission to review all transactions
  between the T-REIT and T-Utility and their respective affiliates under the standards
  of PURA 36.058.

Case 14-10979-CSS   Doc 9397-2   Filed 08/29/16   Page 4 of 31

## Agreement

The Parties do not intend this document to be enforceable by or against the Parties, but is intended to provide a broad outline of the mutual understanding of the Parties as to the major points that will be included in an STM filing seeking a determination by the PUCT that the Transaction is in the public interest under PURA §§ 14.101, 39.262(l)-(m) and 39.915, should such a filing be made.  The Parties' will support the treatment of income taxes consistent with the principles outlined herein.  Each of the Parties will endeavor to negotiate an agreement relating to the subject matter of this document as promptly as practicable in the event that Energy Future Holdings indicates it is willing to commence negotiations with Purchasers for the acquisition of Oncor with the goal of presenting a settlement for Commission approval, recognizing that significant details remain regarding the precise corporate structure, governance protections, mechanisms of implementing the income tax savings sharing, and other matters not discussed in this document. If no agreement is reached, and Purchasers proceed to file an STM application, the Parties are under no obligation to support the STM or to take the positions as set forth herein.

This document reflects an understanding reached as a compromise among the Parties with respect to the STM, and does not represent any Party's endorsement or approval of any principle, theory or methodology that is contemplated by or may underlie the document. The document shall not be regarded as binding any party, nor shall it be considered precedent as to the appropriateness or applicability of any principle, theory or methodology contemplated by or underlying the document. The document and any such principle, theory or methodology shall not be invoked or applied by any Party in any other proceeding involving any of the Parties or HUS or any of their respective affiliates, whether currently existing or that may be filed in the future, except the STM contemplated herein.

Date of Execution:  August 17, 2016.


**HUNT UTILITY SERVICES**

By: _____
    Lino Mendiola
    Attorney for Hunt Utility Services


**STEERING COMMITTEE OF CITIES SERVED BY ONCOR ("Cities")**

By: _____
    Geoffrey Gay
    Attorney for Cities



**Brian H. Lloyd**
Executive Director

# *Public Utility Commission of Texas*

August 16, 2016

Mr. David Campbell,
President, Hunt Utility Services
1807 Ross Avenue, 4th Floor
Dallas, Texas 75021

Dear Mr. Campbell,

Thank you for all the time that you and Mr. Lino Mendiola have spent with the PUCT Staff ("Staff") and other parties regarding a general structure of a new Sale, Transfer, Merger ("STM") proceeding that may be initiated by a subsidiary of Hunt Transmission Services, L.L.C. or its designee(s) ("Purchasers") to acquire Energy Future Holdings Corp.'s indirect majority interest in Oncor Electric Delivery Company LLC and certain other transactions (together, the "Transaction") should the other announced or proposed transactions not come to fruition.

My understanding of your intended transaction is as follows:

## **Company Structure**

Purchasers intend that their transaction will separate Oncor into a Distribution Company and a Transmission Company. It is anticipated that there will be no significant ownership overlap between the two companies, but coordination will be necessary between the two companies. Purchasers will separate the Transmission Company into an asset company and an operating company, which will enable the asset company to elect REIT status (the "T-REIT") and that a Hunt affiliated entity will control the operating company ("T-Utility"). The T-REIT board of directors will be comprised of a majority of disinterested directors. The Distribution Company shall have two seats on the T-REIT board. The board will have an appropriate conflicts committee. The T-REIT will also have an advisory board comprised of company-appointed customers and market stakeholders.

It is intended that the Distribution Company will retain the current ring fence, including dividend restrictions, board composition, governance requirements and other applicable provisions currently in place. It is anticipated that current Oncor management will become the management of the Distribution Company. The Distribution Company will not be separated into an asset company and operating company, and it will not be placed into a REIT structure. Purchasers further commit that total debt at the holding companies of the Distribution and Transmission utilities will be no more than $3.5 billion, and the Transmission company holding company debt will not exceed $1.6 billion.

## Tangible Benefits

The Purchasers are willing to commit to a sharing of 20% of a 35% T-REIT income tax allowance (estimated to be $24 million per year) that will arise from the election of REIT status. Prior to the next rate case, it is intended that there will be some mechanism created that will provide a credit to customers in a manner consistent with PURA. It is your intention that a transmission rate case will be filed no later than June 1, 2017 and you commit to continue this sharing of income tax savings in an appropriate mechanism. After that rate case, all parties, including Purchasers, would be free to advocate for the level of income tax allowance, if any, that should be included in transmission rates. Additionally, the Purchasers will commit to a credit of $50 million per year for two years for Oncor's distribution utility to be provided by the Distribution Company. All told, these tangible benefits are estimated to be approximately $220 million over the first five years post-transaction.

## Commission Authority

Finally, it is my understanding that Purchasers will agree that the PUC has regulatory authority over material terms of the T-REIT leases. Lease payments, formulae, or other structures of the lease will be reviewed and approved in rate proceedings. The T-REIT and T-Utility will jointly file rate cases, and the Commission has authority to set rates for the two entities as the Commission deems appropriate consistent with PURA. Purchasers also expressly agree that the Commission has considerable discretion to determine the appropriate method to calculate an FIT expense, the amount of such expense, and the ratemaking treatment of any tax benefits resulting from a REIT in a utility's ownership structure, while recognizing that the Commission must exercise that discretion in a manner that is not arbitrary and capricious. Additionally, Purchasers agree that it is proper for the Commission to review all transactions between the T-REIT and T-Utility and their respective affiliates under the standards of PURA 36.058.

David, it is my view that this proposal addresses many of the Staff and intervenor concerns voiced in Docket No. 45188 and I commend you for the flexibility you have shown in this effort. I am encouraged that such a structure increases the likelihood that the Purchasers, Oncor, Staff, and other intervenors would be able to reach a settlement that recommends the Commission approve such a transaction, recognizing that the Staff will need to perform its independent review of the significant details that remain regarding the precise corporate structure, governance protections, mechanisms of implementing the income tax savings sharing, and other items. As we have discussed, placing only the Transmission Company in a REIT structure, in my view, lowers the risks of the structure to ratepayers, as the Distribution Company will continue to operate as a traditional utility, minimizing the risks that it cannot meet its obligation to reliably serve customers at just and reasonable rates. Additionally, your intended transaction would provide tangible financial benefit to customers as compensation for the risks that remain. Furthermore, your intended transaction may continue to provide avenues to discuss business combinations between Oncor and Sharyland, which may provide an added benefit to ratepayers in the state. As such, you have my commitment that, should such a transaction come to fruition, that the Staff will engage productively in settlement discussions, recognizing that the Staff's recommendation and positions are not binding upon the Commissioners, who must each independently evaluate the evidence presented before them.

This letter is not intended to suggest that any other transaction that may be presented to the Commission would receive any different treatment or analysis by the Commission Staff, nor is it intended to in any way bind the Commission Staff position on related matters in Docket No. 45414. Indeed, I take great pride in our Staff's independent and thoughtful review of all proposed transactions that have come before the Commission during my tenure and transactions with other potential owners may ultimately receive favorable recommendations as well.   However, as I have noted above, this proposal addresses many of the concerns voiced by parties in the last transaction, and I thought it appropriate to convey these thoughts to you.

Sincerely,

Brian H. Lloyd
Executive Director

# EXHIBIT C

# NextEra Said to Bid on Oncor as Berkshire, Edison Eye Utility

Ⓑ Bloomberg News Enterprise
**Published: Jun 27 2016 17:01:28**

News Story

- At least seven parties have shown interest in Texas company
- Negotiations follow failed takeover by Hunt-led group

By      Harry R. Weber and      Matthew Monks

(Bloomberg) --
NextEra Energy Inc. has offered to buy Energy Future Holdings Corp.'s Oncor Electric Delivery Co. and is closest to reaching a deal among at least seven companies that have expressed interest in the Texas power utility, people familiar with the talks said.

NextEra has submitted its bid to Energy Future Holdings, which is working to emerge from bankruptcy after two years, according to people familiar with the talks, asking not to be identified because the information isn't public. Berkshire Hathaway Inc. and   Edison International are among the others that have expressed interest in buying Oncor. The company may be valued at $17 billion to $18 billion, one of the people said.

Energy Future is holding negotiations after a plan to sell the power utility to a group led by   Hunt Consolidated Inc. unraveled. Oncor's takeover is seen as key to Energy Future's emergence from bankruptcy after restructuring almost $50 billion in debt.

NextEra has proposed to buy Oncor with a combination of cash and debt, the people familiar with the negotiations said. The amount offered is more than what Hunt's group offered, one of the people said, without providing further details. Energy Future may reach a deal by early July, the people familiar with the talks said.

Investors would have had to raise more than $12 billion and cancel billions in debt under the Hunt offer, court filings show. Unlike the group led by Hunt, NextEra doesn't plan to form a real-estate investment trust to save on taxes, the people said.

## Hunt Application

Spokesmen for Oncor, NextEra and Dallas-based   Energy Future declined to comment. Warren Buffett, chairman and largest shareholder of Berkshire Hathaway, and a spokesman for Rosemead, California-based Edison International didn't immediately respond to requests for comment.

The Hunt group withdrew its application to buy Oncor last month, saying some of the buyers wouldn't sign off



© 2016 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

NextEra Said to Bid on Oncor as Berkshire, Edison Eye Utility

on terms set by the Public Utility Commission of Texas, including one that could have required the buyers to share potential tax savings with the utility's ratepayers. Hunt sued the commission last week, seeking reversal of its March 24 approval setting conditions on the deal. Hunt said at the time it wants to preserve its legal rights.

Hunt has said it remains interested in Oncor and may submit a new bid if it can muster the necessary support. "Our goal is to ensure that the largest utility in Texas continues to be owned and operated by Texans for Texans," company spokeswoman Jeanne Phillips said in an e-mailed statement Monday.

A new deal would have to be submitted to a Delaware bankruptcy court and to Texas regulators, among others, for approval.

--With assistance from      Noah Buhayar ,      Jim Polson and      Steven Church .

To contact the reporters on this story:
Harry R. Weber in Houston at  hweber14@bloomberg.net;
Matthew Monks in New York at  mmonks1@bloomberg.net
To contact the editors responsible for this story:
Lynn Doan at  ldoan6@bloomberg.net
Jim Efstathiou Jr.,      Stephen Cunningham

**Bloomberg Law** ®

© 2016 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

## CERTIFICATE OF SERVICE

I, Michael J. Joyce, hereby certify that on August 25, 2016, I caused a true and correct copy of the **Objection of certain funds and accounts advised or sub-advised by Fidelity Management & Research Company or its affiliates to Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement** to be served upon all interested parties via CM/ECF and upon the parties listed below via electronic mail and first class mail.

RICHARDS, LAYTON & FINGER, P.A.
 Mark D. Collins, Esq.
Daniel J. DeFranceschi, Esq.
Jason M. Madron, Esq.
920 North King Street
Wilmington, Delaware 19801
Email: collins@rlf.com
        defranceschi@rlf.com
        madron@rlf.com

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Edward O. Sassower, P.C.
Stephen E. Hessler, Esq.
Brian E. Schartz, Esq.
601 Lexington Avenue
New York, New York 10022-4611
Email: edward.sassower@kirkland.com
        stephen.hessler@kirkland.com
        brian.schartz@kirkland.com

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C.
Chad J. Husnick, Esq.
Steven N. Serajeddini, Esq.
300 North LaSalle
Chicago, Illinois 60654
Email: james.sprayregen@kirkland.com
        marc.kieselstein@kirkland.com
        chad.husnick@kirkland.com
        steven.serajeddini@kirkland.com

*/s/ Michael J. Joyce*
Michael J. Joyce (No. 4563)