EXHIBIT I

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 9190, 9397, 9398, 9399, 9402** |

### EFH/EFIH DEBTORS OMNIBUS REPLY TO OBJECTIONS TO MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER (A) AUTHORIZING ENTRY INTO MERGER AGREEMENT, (B) APPROVING TERMINATION FEE, AND (C) AUTHORIZING ENTRY INTO AND PERFORMANCE UNDER PLAN SUPPORT AGREEMENT

Energy Future Holdings Corp., certain of its direct and indirect subsidiaries (together with EFH Corp., the "EFH Debtors"),[2] Energy Future Intermediate Holding Company LLC ("EFIH"), and EFIH Finance, Inc. (together with EFIH, the "EFIH Debtors," and, together with the EFH Debtors, the "EFH/EFIH Debtors") file this reply (this "Reply") to the objections of (1) certain funds and accounts advised or sub-advised by Fidelity Management & Research Company or its affiliates ("Fidelity"), (2) American Stock Transfer & Trust Company, LLC, as successor trustee to The Bank of New York Mellon Trust Company, N.A. (the "EFH Indenture Trustee"), (3) Shirley Fenicle, individually and as successor-in-interest to the Estate of George

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] The other EFH Debtors are EBASCO Services of Canada Limited, EEC Holdings, Inc., EECI, Inc., EFH Australia (No. 2) Holdings Company, EFH Finance (No. 2) Holdings Company, EFH FS Holdings Company, EFH Renewables Company LLC, Generation Development Company LLC, LSGT Gas Company LLC, LSGT SACROC, Inc., NCA Development Company LLC, and TXU Receivables Company.

Fenicle, David William Fahy, and John H. Jones (collectively, the "Asbestos Objectors"), and (4) Contrarian Capital Management, LLC ("Contrarian") (each of Fidelity, the EFH Indenture Trustee, the Asbestos Objectors, and Contrarian an "Objector," collectively, the "Objectors," and the objections filed by the Objectors, collectively, the "Objections") filed in connection with the *Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9190] (the "Merger and PSA Motion").[3]

In support of the relief requested in the Merger and PSA Motion the EFH/EFIH Debtors respectfully state as follows.[4]

## PRELIMINARY STATEMENT

1.      In a refrain that has become familiar in these chapter 11 cases, the Objectors seek to cherry-pick provisions of the Merger Agreement without regard for the hard-fought negotiations that yielded the value provided to the EFH/EFIH Debtors and their constituencies in the Merger Agreement, and with a blind eye towards the EFH/EFIH Debtors' limited alternatives under the cloud of expired statutory exclusivity and the on-going costs of the EFH/EFIH Debtors' chapter 11 cases.

---

[3] *See Objection of Certain Funds and Accounts Advised or Sub-Advised by Fidelity Management & Research Company or its Affiliates to Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9397] (the "Fidelity Objection"); *Objection of Shirley Fenicle, William Fahy, and John H. Jones to Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9398] (the "Asbestos Objection"); *EFH Indenture Trustee's Objection to Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9399] (the "EFH Indenture Trustee Objection"), and *Objection and Joinder of Contrarian Capital Management, LLC to Motion of EFH/EFIH Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9402] (the "Contrarian Objection").

[4] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Merger and PSA Motion.

2.      As the evidence will show at the hearing to consider the relief requested in the Merger and PSA Motion, a termination fee has always been part of the calculus with respect to a merger or sale transaction involving the EFH/EFIH Debtors.  The EFH/EFIH Debtors agreed to an increased Termination Fee as part of a larger, integrated transaction that ultimately included, for the benefit of the EFH/EFIH Debtors and their estates: (a) an eleventh hour purchase price increase of $110 million (which directly increases recoveries to the very same EFH Debtor stakeholders that filed Objections) and (b) NextEra's agreement to drop the demand for the ability to match any competing offer (a so-called "match right").  The purchase price increase constitutes additional consideration for the benefit of the EFH/EFIH Debtors' constituencies (consideration that was not available in any other actionable alternative option following a two-year effort to market EFH Corp.'s economic interest in Oncor).  Additionally, the elimination of the "match right" ensured that the execution of the Merger Agreement would not chill the EFH/EFIH Debtors' efforts to find a higher or otherwise better offer.  Indeed, the deletion of the match right coupled with the EFH/EFIH Debtors' extensively negotiated "fiduciary out" ensures that the EFH/EFIH Debtors can explore higher or otherwise better alternatives (subject to certain conditions) through entry of the order confirming the Plan as it relates to the EFH/EFIH Debtors.

3.      At the same time, recognizing that these very same provisions left NextEra exposed to the monetary and opportunity cost risk that the EFH/EFIH Debtors could ultimately close a transaction with another purchaser, the EFH/EFIH Debtors needed to be willing to compensate NextEra for terminating the Merger Agreement to pursue such a transaction.  This compensation came in the form of the Termination Fee, a provision NextEra has insisted be included in their proposed transaction in every term sheet and merger agreement draft exchanged

with the EFH/EFIH Debtors since the EFH/EFIH Debtors withdrew their pursuit of the EFIH Second Lien DIP Facility (as defined in the Objections) in July 2014.

4.      The size of the Termination Fee correlated with the parallel discussions that the EFH/EFIH Debtors were having with the only other potential alternative purchaser that had put forth an actionable proposal with committed financing.  This is not a surprising result.  Over the course of the EFH/EFIH Debtors' efforts in the last two years to market EFH Corp.'s interests in Oncor, it became clear that it would ultimately be difficult (if not impossible) to consummate a transaction that provided significant consideration to the EFH/EFIH Debtors' constituencies without requiring a commitment to pay a termination fee.  The Objectors ignore this fact. Indeed, assuming another purchaser would even be willing to transact with the EFH/EFIH Debtors in the absence of a termination fee, the consideration provided to the EFH/EFIH Debtors' constituencies under the Plan (including all of the Objectors) would likely have been significantly less in the absence of a termination fee, whether that consideration was provided by NextEra or another purchaser.  Perhaps the best evidence of this is the fact that no other purchaser has presented an actionable higher or otherwise better proposal in the approximately forty-seven days that have passed since the Merger Agreement was made public.  Importantly, the EFH/EFIH Debtors would not have been obligated to pay the Termination Fee if they determined to pursue such a higher or otherwise better proposal.

5.      After two years of formal and informal efforts to market EFH Corp.'s economic interest in Oncor, the Merger Agreement emerged as the EFH/EFIH Debtors' best available option for bringing their chapter 11 cases to a close.  Compared to the available alternatives, the Merger Agreement reflects the highest and best value for the EFH/EFIH Debtors and provides the greatest likelihood of closing, while simultaneously preserving the EFH/EFIH Debtors'

ability to continue exploring higher and better alternatives for the benefit of all of their creditor constituencies. The Objectors' attack on the Termination Fee is an oversimplification of the negotiation process that yielded the Merger Agreement. The evidence will detail the hard-fought negotiation process that resulted in the value-maximizing transaction embodied in the Merger Agreement, and ultimately unmask the Objections for what they are— yet another attempt to throw down the gauntlet in a misguided effort to eke out additional consideration without regard for the potentially detrimental effect on recoveries for structurally senior creditor constituencies.

## ARGUMENT

### I.    THE TERMINATION FEE SATISFIES THE *O'BRIEN* STANDARD.

6.    The Third Circuit "requires that [a termination fee] provide some benefit to the debtor's estate." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 536 (3d Cir. 1999). There is no suggestion that the benefit to the estate should be evaluated under the more rigorous substantial contribution standard under section 503 of the Bankruptcy Code. *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) (noting court had approved termination fee of 2.8% of assets and stating that "[t]here is no suggestion that the . . . benefit to the estate have to be substantial, as required by section 503(b)(3)(D)."). Indeed, the *O'Brien* court specifically noted that while the Court's analysis "must be made in reference to general administrative expense jurisprudence . . . **the considerations that underlie the debtor's judgment may be relevant** to the Bankruptcy Court's determination on a request for termination fees and expenses." *O'Brien Envtl. Energy*, 181 F.3d at 535 (emphasis added).

7.    In evaluating the debtor's agreement to pay a termination fee, courts in the Third Circuit have evaluated whether the fee (a) promotes a competitive bidding process, including by inducing a bid that otherwise would not have been made, and without which bidding would have been limited; (b) induces the bidder to "remain committed to a purchase"; and (c) is not being

used by the Debtors to favor one bidder over another. **Each of these outcome-determinative factors is present here.** *Id.* at 537; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 207 (3d Cir. 2010) ("We recognize that the first bidder in a bankruptcy sale necessarily takes a risk at least to the extent of investing the time, money and energy needed to produce its bid."); *Reliant Energy*, 594 F.3d at 207-08 (adding "[a] break fee certainly provides a benefit to an estate if a bidder remains committed to a purchase"); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at \*91 (Bankr. D. Del. Aug. 15, 2007) (approving break fee where, *inter alia*, "bidding protections were not used by the Debtors to favor one bidder over another" and "bidding protections played a material role in inducing the Purchaser to enter into the binding APA, thereby, in addition to setting a minimum price for the Sale Assets, providing a baseline asset purchase agreement upon which other bidders can rely").

8.     As an initial matter, the Termination Fee is part of a larger, holistic transaction in which NextEra provided material concessions. Second, the history of negotiations with NextEra dating back to the Debtors' withdrawal of the Second Lien DIP makes clear that a Termination Fee and related provisions have been a critical negotiation point for two years. Finally, any potential alternative bids were either not actionable or similarly subject to termination fees.

9.     Moreover, in arguing that the Termination Fee did not induce NextEra to enter into the proposed Merger, all three Objectors mistakenly analogize this case to *Reliant*, a case in which the Third Circuit determined that a bankruptcy court did not abuse its discretion by declining to approve a termination fee.[5] *Reliant* is completely inapposite to the situation facing the EFH/EFIH Debtors for several reasons. **First,** unlike here, the potential purchaser in *Reliant* did not condition its bid on bankruptcy court approval of a termination fee. **Second,** in *Reliant*,

---

[5] *See* Fidelity Objection ¶¶28-30; Asbestos Objection at 11-12; EFH Indenture Trustee Objection.

another viable purchaser asserted its intent to continue bidding and, indeed, ultimately provided $32 million more in consideration than the potential purchaser. **Third**, the bankruptcy court's decision to deny the termination fee in the first instance was in large part driven by the concern that in the absence of an auction, the termination fee may chill bidding.

10.     In *Reliant*, a chapter 11 debtor sought to sell its most valuable asset and conducted a marketing process to solicit potential bidders. Twelve parties submitted bids, with the winning bidder being chosen in part because its bid was not limited by a financing contingency. *See Reliant*, 594 F.3d at 202. The debtor and the winning bidder thereafter entered into an asset purchase agreement, which required the debtors to "file a bidding procedures motion with the Bankruptcy Court . . . *seeking* the entry of an order approving the bid protections." *Id.* at 207 (alterations and emphasis in original). Those bid protections would have provided for a significant termination fee in favor of the purchaser. However, no portion of the proposed asset purchase agreement expressly conditioned the bid on bankruptcy court *approval* of the bid protections. *See id.* Based on that structure, the Third Circuit concluded "that it is clear beyond doubt that [the purchaser] did not condition its bid on the presence of a provision for a break fee, although it did condition the bid on the debtors' promise to seek authority to pay it such a fee." *Id.* The Third Circuit therefore found that the purchaser was not induced to bid by the break fee because it had in fact submitted its complete bid "without the assurance of a termination fee." *Id.*

11.     The Merger, in contrast to the bid in *Reliant*, is expressly conditioned on the Debtors not merely seeking, but actually obtaining, this Court's approval of the Termination Fee. The Merger Agreement provides, in relevant part, that:

> The obligations of each party to effect the Closing are subject to the satisfaction or mutual waiver . . . of the following conditions at or prior to the Closing:
>
> (a) Bankruptcy Orders. The Bankruptcy Court shall have entered . . . (i) the order of the Bankruptcy Court approving this Agreement, **including, among other things, approval of the Termination Fee** . . . .

Merger Agreement § 7.1. The Merger Agreement further provides that "[t]he parties hereto acknowledge that the agreements" relating to termination of the Merger Agreement and payment of the Termination Fee "are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, the parties hereto would not enter into this Agreement." Merger Agreement § 8.5(c). The crux of *Reliant*—that a buyer cannot have been induced to bid by a termination fee where the bid was not conditioned on approval of that fee—is inapplicable here, where the Court's approval of the Termination Fee is an explicit condition to NextEra's bid.

12.       The Objectors' bid-chilling argument is also premised on *Reliant*. In *Reliant*, the court was confronted with an actual interested bidder who asserted that "it was willing to enter a 'higher and better' bid at an auction, but the . . . termination fee along with the . . . reimbursement for expenses would be a deterrent to it doing so." *Reliant*, 594 F.3d at 203. And even with that concrete evidence of potential bid chilling, the Third Circuit noted that "the Bankruptcy Court was faced with a difficult choice" and concluded that the bankruptcy court "could have granted a termination fee to secure [the initial proposed buyer's] existing bid" without committing error. *Id.* at 208. Indeed, the Third Circuit expressly held that "the estate might have benefitted if . . . the Bankruptcy Court had provided for a termination fee to secure [the potential buyer's] adherence to its earlier bid . . . ." *Id.* Indeed, in *Reliant*, the alternative

purchaser ultimately provided significantly more consideration than the proposed purchaser. *Id.* at 204.

13.     This is not the situation that faces the Court today. No alternative purchaser has objected to the Termination Fee. No alternative purchaser has come forward in the forty-seven days the Merger Agreement has been public with an actionable proposal that provides a higher and better value (and the same or better certainty of close) for the EFH/EFIH Debtors than the Merger. The Objectors are parties that have had over four years to submit a proposal to purchase EFH Corp.'s economic interest in Oncor and have instead sat on the sidelines for the duration of this period, only to question the most actionable proposal that has emerged after years of marketing efforts.

14.     For this reason, the concerns of the bankruptcy court in *Reliant* regarding the chilling effect of the proposed termination fee in the absence of a formal auction do not apply here. The EFH/EFIH Debtors have left no stone unturned in their efforts to market EFH Corp.'s economic interest in Oncor over the course of several years. This is not a case where additional time and a third round of marketing will yield a bid that provides higher or otherwise better value, let alone a higher or otherwise better value without a termination fee. Ultimately, the concerns raised by the bankruptcy court in *Reliant* and reaffirmed by the Third Circuit are not applicable here: no party with an actionable proposal has come forward, and the Merger Agreement is the product of several years' worth of efforts to market EFH Corp's economic interest in Oncor.

### A.     The Termination Fee Is Part of a Larger, Holistic Transaction in Which NextEra Provided Material Concessions.

15.     Proper application of the *O'Brien* standard directs courts to examine "the record [of] evidence" to determine whether the record, *examined holistically*, supports awarding the

Termination Fee.[6]  As discussed in greater detail below, the size of the Termination Fee is a product of (1) the EFH/EFIH Debtors' negotiating posture vis-a-vis the only other alternative purchaser with a viable bid before the execution of the Merger Agreement, and (2) NextEra's reasonable demand that they receive some measure of comfort that the EFH/EFIH Debtors would pursue the Merger, even in the absence of documented creditor constituency support (at the time).  Furthermore, the Termination Fee is one component in a larger, complex, and heavily negotiated transaction and evaluating the size of the Termination Fee requires an examination of the entirety of the transactions contemplated by the Merger Agreement (i.e., the "gives and gets" realized by each of the EFH/EFIH Debtors on the one hand, and NextEra on the other hand).

16.     As the evidence will show at the hearing to consider the Motion (and as a review of the key documents exchanged in the days and weeks leading up to the execution of the Merger Agreement demonstrates), the Termination Fee is one part of a larger transaction.  There are two significant provisions that are particularly informative when evaluating the size of the Termination Fee in the context of the larger transaction.

17.     *First*, NextEra agreed to withdraw its demand for a "match right."  A match right would have allowed NextEra to have a right of last refusal in the event of any competing offer (and, by extension, would have obligated the EFH/EFIH Debtors to accept any offer NextEra "matched").[7]  For the duration of the negotiations on the Merger Agreement in 2016, and consistent with its negotiating posture **since 2014**, NextEra had indicated that it considered the match right its primary source of comfort that the EFH/EFIH Debtors would consummate the

---

[6] *O'Brien*, 181 F.3d 527 at 536.

[7] *See, e.g.*, Ex. 1, July 24, 2016 Email from W. Greason to EFH, K&E attach Redline to Draft Merger Agreement [EFH06409134, EFH06409269 at EFH06409339].

Merger.[8]  If the EFH/EFIH Debtors agreed to NextEra's demand for a match right, the EFH/EFIH Debtors would not be able to pursue a higher or otherwise better offer without offering NextEra a defined period of time to match such offer, and if NextEra matched the offer, the EFH/EFIH Debtors would be obligated to accept NextEra's match.

18.    Despite NextEra's continued insistence on the inclusion of a match right, the EFH/EFIH Debtors and their advisors were steadfast in their position that such a match right — while consistent with market comparisons in a "healthy" M&A transaction—would have a chilling effect in a restructuring-related transaction.[9]  The EFH/EFIH Debtors' management team and advisors believed that bidders would be unlikely to consider the sale process to be competitive if each bid was automatically subject to a match right.  In a "best case" scenario, a required match right would depress potential bids, as bidders discounted their bids to account for the match right burden.  In a "worst case" scenario, a required match right would disincentivize potential bidders from even participating in the process (thereby depriving the EFH/EFIH Debtors from accessing potential sources of value).

19.    Faced with NextEra's reasonable need to have comfort that the EFH/EFIH Debtors would pursue the Merger in good faith, the EFH/EFIH Debtors were faced with the

---

[8] *See, e.g.*, Ex. 2, July 31, 2014 Email from M. Hickson to EFH, K&E attach Redline to Exhibit A to Term Sheet for Acquisition [EFH06164088, EFH06164105 at EFH06164107]; Ex. 3, Aug. 6, 2014 Email from M. Roitman to EFH, K&E attach Redline to Exhibit A to Term Sheet for Acquisition [EFH05782709, EFH05782727 at EFH05782728]; Ex. 4, Apr. 14, 2015 Email from E. Lane to K&E, Evercore attach Redline to Agreement and Plan of Merger [EFH06166703, EFH06166800 at EFH06166848]; Ex. 5, May 23, 2016 Email from W. Greason to EFH, K&E attach Draft Merger Agreement [EFH06321566, EFH06321567 at EFH06321672]; Ex. 6, July 23, 2016 Email from V. Nunn to NextEra, Chadbourne attach Redline to Draft Merger Agreement [EFH06409410, EFH06409415 at EFH06409484] (K&E draft deleting match right language); Ex. 1, July 24, 2016 Email from W. Greason to EFH, K&E attach Redline to Draft Merger Agreement [EFH06409134, EFH06409269 at EFH06409339]] (Chadbourne draft re-inserting match right language that Debtors deleted in prior July 23, 2016 draft).

[9] *See, e.g.*, Ex. 6, July 23, 2016 Email from V. Nunn to NextEra, Chadbourne attach Redline to Draft Merger Agreement [EFH06409410, EFH06409415 at EFH06409484].

decision on how best to provide that comfort while preserving the sale process.  Ultimately, in the context of a larger, integrated transaction, the EFH/EFIH Debtors compared the potentially crippling effect of a match right (that would force the EFH/EFIH Debtors to accept a NextEra offer that "matches" the offer of an alternative purchaser) against the mere possibility that the Termination Fee would be triggered, and determined that a higher Termination Fee was a reasonable cost to pay to eliminate a match right.

20.    **Second**, as the evidence shows, NextEra also agreed to increase its purchase price **by $110 million** less than 48 hours before the parties signed the Merger Agreement.  This purchase price increase represents competitive bidding at its finest.  As the evidence will show, NextEra increased its purchase price in an effort to incentivize the EFH/EFIH Debtors to execute the Merger Agreement with NextEra as opposed to another, potentially viable purchaser.[10] Importantly, this additional consideration enabled the EFH/EFIH Debtors to provide the recoveries set forth in the Plan to the EFH Debtor constituencies.

21.    NextEra now stands ready to assume approximately $6.7 billion in liabilities and infuse approximately $9.5 billion, virtually all of which will be in cash, and all of which it in cash, that will be available to pay creditors.  None of the Objectors dispute that fact.  In short, the Merger provides massive value to the EFH/EFIH Debtors' estates and minimizes the level of conditionality necessary to permit the EFH/EFIH Debtors to emerge from chapter 11.

22.    Yet, as the EFH/EFIH Debtors' and NextEra's negotiation history proves, that is one protection that has **always** been required by NextEra as part of its proposal to acquire EFH's

---

[10] *See, e.g.,* Ex. 7, July 28, 2016 Email from V. Nunn to NextEra, Chadbourne attach Merger Agreement [EFH06421876, EFH06421885 at EFH06421899] (K&E draft redline reflecting revision of Merger Sub Cash Amount from $3.986 billion to $4.096 billion); Ex. 8, July 28, 2016 Email from W. Greason to EFH, K&E [EFH06421655] (signing off on K&E draft including Merger Sub Cash Amount of $4.096 billion).

economic interest in Oncor and to provide the corresponding value to the EFH/EFIH Debtors' estates. The Objectors are thus utterly mistaken in asserting that "the Termination Fee was not required to induce NextEra to bid."

**B.     The History of Negotiations With NextEra Makes Clear That a Termination Fee Has Been a Critical Discussion Point for Two Years**.

23.     A number of Objectors point to the EFH/EFIH Debtors' long history with NextEra in these chapter 11 cases as proof of NextEra's apparent willingness to enter into the Merger Agreement in the absence of the Termination Fee. In support of this proposition, the Objectors cite two comparisons. **First**, the Objectors compare the terms of the Merger with the terms set forth in the non-binding term sheets that were briefly the subject of negotiations between NextEra and the EFH/EFIH Debtors between June 18, 2014 and roughly July 25, 2014, when the Debtors filed a notice with the Court announcing the termination and withdrawal of the Debtors' motion for approval of the Second Lien DIP [D.I. 1697] (the "Second Lien DIP Term Sheets"). **Second**, the Objectors also compare the terms of the Merger to the terms set forth in the bid letter and term sheet that NextEra submitted to the EFH/EFIH Debtors in April 2015 (the "2015 Term Sheet")—which also featured a termination fee. Neither of these comparisons is compelling.

**1.     The 2014 Term Sheets Are an Inappropriate Comparison but Taken as a Whole, Show NextEra's Insistence on a Termination Fee and Match Right.**

24.     As an initial matter, the Objectors' comparisons between the Second Lien DIP Term Sheet and the Merger are both overstated and misplaced. First, the Objectors ignore the multiple term sheets exchanged in 2014 after the EFH/EFIH Debtors' termination of the EFIH Second Lien Facility—all of which featured a termination fee (the "Post-Second Lien DIP Term

Sheets" and, collectively with the Second Lien DIP Term Sheets, the "2014 Term Sheets").[11]

Putting aside that terms in non-binding term sheets (such as the Second Lien DIP Term Sheets) should fundamentally be viewed through a different lens than the terms set forth in binding definitive documentation, the 2014 Term Sheets do not provide an appropriate comparison to the terms of the Merger because the negotiating landscape materially shifted between June 2014 and 2016.

25. First, in connection with discussions on the Second Lien DIP Term Sheets, NextEra had already publicly partnered with the ad hoc group of EFIH second lien noteholders.[12] In other words, at the time the Second Lien DIP Term Sheets were exchanged, NextEra was already operating with the support of a significant EFIH constituency, which provided NextEra with some measure of comfort that if the EFH/EFIH Debtors partnered with NextEra, one of the significant obstacles in the path to confirmation and consummation of NextEra's alternative restructuring plan—acceptance of the plan by an impaired, accepting class of creditors—would be eliminated. As a result, it was only in connection with the Second Lien DIP Term Sheets—

---

[11] Ex. 2, July 31, 2014 Email from M. Hickson to EFH, K&E attach Redline of Term Sheet for Acquisition [EFH06164088, EFH06164105]; Ex. 9, Aug. 1, 2014 Email from T. Horton to NextEra, Chadbourne attach Redline of Term Sheet for Acquisition [EFH05835998, EFH05836014]; Ex. 3, Aug. 6, 2014 Email from M. Roitman to EFH, K&E attach Redline of Term Sheet for Acquisition [EFH05782709, EFH05782727]; Ex. 10, Aug. 10, 2014 Email from A. Meek to NextEra, Chadbourne attach Redline of Term Sheet for Acquisition [EFH05848366, EFH05848375].

[12] *See Preliminary Objection of Second Lien Indenture Trustee and EFIH Second Lien Group of Second lien Noteholders to Debtors' Motion to Approve Second Lien DIP* [D.I. 1060], ¶ 3(stating that "[o]n June 18th, the EFIH Second Lien Group submitted a joint proposal with a strategic investor, NextEra Energy, Inc.") and an accompanying new restructuring plan (the "Alternative Restructuring Plan") with a strategic investor, NextEra Energy, Inc. ("NextEra")); *Objection of EFIH Second Lien Notes Trustee and EFIH Second Lien Group to Debtors' Motion to Approve Second Lien DIP* [D.I. 1066], ¶ 21(stating that "the EFIH Second Lien Group negotiated the terms of an alternative (and superior) second lien DIP financing proposal (the "Strategic DIP") and an accompanying new restructuring plan (the "Alternative Restructuring Plan") with a strategic investor, NextEra Energy, Inc. ("NextEra").");
*Notice of Strategic Proposal by NextEra Energy, Inc. and EFIH Second Lien Group* [D.I. 1593] (attaching a letter and term sheet on behalf of NextEra and the EFIH Second Lien Group with respect to a comprehensive restructuring).

when NextEra was part of a consortium with EFIH second lien noteholders—that NextEra agreed to the elimination of any alternative-transaction or prepayment fee.[13] And, significantly, despite removing these fees, the related term sheets still contained a broad match right, which would obligate the Debtors to provide notice to NextEra of any superior proposal or alternative transaction for which the Debtors were prepared to terminate the transaction and to negotiate in good faith with NextEra for a given period thereafter to allow NextEra an opportunity to propose changes to its deal to match or beat any competing offer.[14]

26.    That is not the environment in which NextEra has operated since 2015.  No creditor constituency is currently party to the PSA, and the absence of exclusivity means that NextEra is forced to shadow box against potential existing and third-party constituencies. Additionally, the EFH/EFIH Debtors' staunch position that their fiduciary duty obligations require them to continue negotiations with other interested parties prior to entry of the order confirming the Plan as to the EFH/EFIH Debtors only increased the risk from NextEra's perspective that they would expend significant costs in furtherance of the Merger only to be deprived of the ability to close the Merger.

27.    Second, and most significantly, the EFH/EFIH Debtors undertook a formal Court-approved marketing process in 2015 (and informally re-engaged with interested purchasers in

---

[13] *See Preliminary Objection of Second Lien Indenture Trustee and EFIH Second Lien Group of Second lien Noteholders to Debtors' Motion to Approve Second Lien DIP* [D.I. 1060], ¶ 3(stating that "[o]n June 18th, the EFIH Second Lien Group submitted a joint proposal with a strategic investor, NextEra Energy, Inc.") and an accompanying new restructuring plan (the "Alternative Restructuring Plan") with a strategic investor, NextEra Energy, Inc. ("NextEra")); *Objection of EFIH Second Lien Notes Trustee and EFIH Second Lien Group to Debtors' Motion to Approve Second Lien DIP* [D.I. 1066], ¶ 21(stating that "the EFIH Second Lien Group negotiated the terms of an alternative (and superior) second lien DIP financing proposal (the "Strategic DIP") and an accompanying new restructuring plan (the "Alternative Restructuring Plan") with a strategic investor, NextEra Energy, Inc. ("NextEra").").

[14] *See Notice of Filing of Commitment Letter Relating to EFIH Second Lien Group's Proposed Competing Second Lien DIP* [D.I. 1179].

2016) after withdrawing pursuit of the EFIH Second Lien DIP Facility. These formal and informal marketing efforts provided key intelligence regarding not only the value of EFH Corp.'s indirect economic interest in Oncor, but also the appetite of strategic investors to bid for such interest in a competitive process. In addition, as of December 29, 2015, the EFH/EFIH Debtors no longer had the protection of exclusivity and, as a result, no longer had the luxury of indulging a "wait and see" approach to see if more time could drive higher bids. Nor was such time necessary given the extensive (and nearly two-year) marketing process the EFH/EFIH Debtors had already undertaken to evaluate the appetite of strategic bidders with respect to EFH Corp.'s economic interest in Oncor.

28.     But, even assuming a comparison between the 2014 Term Sheets and the Merger were appropriate, a comprehensive comparison of the 2014 Term Sheets as compared to the terms set forth in the Merger Agreement yields two key conclusions that contradict the Objectors' arguments. *First*, the EFH/EFIH Debtors exchanged five drafts of the 2014 Term Sheet following the EFH/EFIH Debtors' determination to terminate the prepetition restructuring support agreement. **Each of these drafts contemplated a termination fee**. Thus, while it is true, as the Objectors highlight, that the Second Lien DIP Term Sheets did not include a proposed termination fee, it is clear NextEra promptly re-ignited the negotiations on a potential termination fee as soon as the EFIH Second Lien DIP came off the table in late July 2014. The EFH/EFIH Debtors and NextEra engaged in subsequent negotiations on the potential termination fee for the duration of the 2014 negotiation period.[15]

---

[15] Ex. 9, Aug. 1, 2014 Email from T. Horton to NextEra, Chadbourne attach Redline of Term Sheet for Acquisition [EFH05835998, EFH05836014] (reducing termination fee to be inclusive of expense reimbursement and professional fees); Ex. 3, Aug. 6, 2014 Email from M. Roitman to EFH, K&E attach Redline of Term Sheet for Acquisition [EFH05782709, EFH05782727] (increasing termination fee to be exclusive of additional expense reimbursement and professional fees); Ex. 10, Aug. 10, 2014 Email from A. Meek to NextEra, Chadbourne attach Redline of Term Sheet for Acquisition

29.  *Second*, in the 2014 Term Sheet, NextEra demanded a match right **in addition to** a termination fee.[16]  As they were in 2016, the EFH/EFIH Debtors were steadfast in their rejection of an unqualified match right in 2014, but as of the time negotiations ceased, NextEra had not dropped its demand for a match right.[17]

### 2.  The 2015 Bid Contemplated a Termination Fee.

30.  In connection with the EFH/EFIH Debtors formal marketing process in 2015, NextEra submitted a preliminary indication of interest and term sheet that contemplated a termination fee.[18]  This ask was repeated for a **second time** three weeks later, in a draft merger agreement submitted by NextEra that included, among other things, a termination fee and a match right.[19]  Three weeks later, NextEra submitted a "Round 2" bid that contemplated a termination fee and a match right.[20]  Between April 2015 and June 2015, the EFH/EFIH Debtors

---

[EFH05848366, EFH05848375] (K&E draft reducing termination fee to be inclusive of expense reimbursement and professional fees).

[16] Ex. 2, July 31, 2014 Email from M. Hickson to EFH, K&E attach Redline of Term Sheet for Acquisition [EFH06164088, EFH06164105 at EFH06164107] (NextEra's advisors adding a requirement that "NEE has the opportunity to match any competing bid and be deemed the first qualified bid at the auction."); Ex. 3, Aug. 6, 2014 Email from M. Roitman to EFH, K&E attach Redline of Term Sheet for Acquisition [EFH05782709, EFH05782727 at EFH05782729] (reinstating the match right).

[17] Ex. 9, Aug. 1, 2014 Email from T. Horton to NextEra, Chadbourne attach Redline of Term Sheet for Acquisition [EFH05835998, EFH05836014 at EFH05863016] (deleting the match right); Ex. 10, Aug. 10, 2014 Email from A. Meek to NextEra, Chadbourne attach Redline of Term Sheet for Acquisition [EFH05848366, EFH05848375 at EFH05848377] (subjecting NextEra's right to be the first qualified bid at the auction to EFH's determination that "NEE's bid is equal to the competing bid in the aggregate on all metrics that it is required or otherwise permitted to take into account").

[18] Ex. 11, Mar. 2, 2015 Email from A. Masud to K&E, Evercore attach Bid Letter and Term Sheet [EFH05981511, EFH05981512].

[19] Ex. 12, Mar. 23, 2015 Email from T. Watson to K&E, Evercore attach Redline to Agreement and Plan of Merger [EFH05983282, EFH05983371 at EFH05983423-24, EFH05983452-53].

[20] Ex. 4, Apr. 14, 2015 Email from E. Lane to K&E, Evercore attach Final Bid [EFH06166703, EFH06166705, EFH06166711 EFH06166800 at EFH06166848-49, EFH06166873].

and NextEra exchanged drafts of definitive documentation with respect to a merger transaction.[21]
**These drafts (i) each contemplate a termination fee and (ii) demonstrate the parties'
opposing positions on the match right**. The termination fee ask was repeated for a **third time**
in the proposal NextEra sent in May 2016, one day after the Hunt Plan had been rendered null
and void.[22]

### 3. The Terms of the Merger Were Only Made Possible by the Termination Fee.

31.     The negotiations that ultimately produced the Merger Agreement began in April
2016. By mid-May 2016 those negotiations resulted in initial draft term sheets and a draft of the
Merger Agreement which were exchanged among NextEra and certain EFH and EFIH creditor
constituencies. Those initial documents contained three particularly noteworthy features. **First,**
they contained a $3.7 billion purchase price in excess of the approximately $5.4 billion needed to
repay the EFIH First Lien DIP Facility. **Second,** they conditioned the transaction on this Court's
approval of a termination fee in the amount of $110 million. **Third,** they contained a match
right.[23]

32.     From June 1, 2016 through July 24, 2016, the Debtors and NextEra extensively
negotiated the terms of the proposed Merger Agreement (and its accompanying plan of

---

[21] Ex. 13, May 6, 2015 Email from V. Nunn to Credit Suisse, NextEra, Chadbourne attach Redline to Agreement and Plan of Merger [EFH05841236, EFH05841324 at EFH05841406-07]; Ex. 14, May 29, 2015 Email from T. Watson to K&E, Evercore, DDAs attach Cover Letter, Redline to Agreement and Plan of Merger [EFH05837209, EFH05837210, EFH05837312 at EFH05837398]; Ex. 15, June 8, 2015 Email from V. Nunn to Chadbourne attach Redline to Agreement and Plan of Merger [EFH05855200, EFH05855290 at EFH05855368-69].

[22] Ex. 16, May 2, 2016 Email from S. Dore to K&E, EFH forwarding NEE Bid Letter and Term Sheet [EFH06362905, EFH06362906, EFH06362924 at EFH06362920].

[23] *Id.*; Ex. 17, May 18, 2016 Email from P. Keglevic to T. Horton forwarding NextEra Revised Bid Letter [EFH06337329, EFH06337330 at EFH06337331, EFH06337349]; see also Ex. 5, May 23, 2016 Email from W. Greason to K&E, EFH attach Draft Merger Agreement [EFH06321566, EFH06321567 at EFH06321579, EFH06321664].

reorganization). During these negotiations NextEra persistently refused to offer a bid that was not conditioned on both upfront approval of the Termination Fee and the match right, despite heavy pressure from the EFH/EFIH Debtors to do so.

33. On July 25, 2016, the parties were able to break the impasse. The EFH/EFIH Debtors contacted NextEra to discuss a potential resolution of the outstanding Merger Agreement items, including the Termination Fee and the match right, and again urged NextEra to make additional concessions to the estate. The following day, at the culmination of two months of hard-fought negotiations, NextEra's General Counsel, Charles Sieving, contacted the Debtors by email and made the following proposal:

> All:
>
> In the interests of putting everything totally to bed, attached is an excerpt of the fiduciary out provision, clean and marked to show changes to the last draft. This concession is coupled with an increase in the termination fee to $275 million. I know you are all aware of how important this provision is to us, so hopefully the proposal is acceptable.
>
> Thanks,
>
> Charlie[24]

As reflected in the excerpts of the Merger Agreement attached to that email, NextEra agreed to the EFH/EFIH Debtors' request to eliminate the match right, but only in exchange for an increase in the Termination Fee from $110 million to $275 million.

34. Throughout all of these negotiations, NextEra refused to concede ground on the Termination Fee. The facts thus bely the Objectors' unsupported supposition that NextEra would have been willing to submit a bid at the presently offered value that was not conditioned

---

[24] Ex. 18, July 27, 2016 Email from C. Sieving to EFH, K&E attach Redline to Draft Merger Agreement [EFH06408771, EFH06408774].

on approval of the Termination Fee.  Instead, the record establishes that NextEra refused to bid
without the protection of the Termination Fee.  On these facts, there can be no doubt that
NextEra was "induced," by the protections afforded by the Termination Fee, to make the final
concessions embodied in the Merger Agreement.

**C.    Other Bids Were (1) Not Actionable or (2) Subject to Termination Fee
        Requirements.**

35.    At the time the EFH/EFIH Debtors entered into the Merger Agreement, the
evidence will show that they were either in active discussions with, or otherwise made aware of
significant interest from, three other potential purchasers. In connection with these discussions,
the EFH/EFIH Debtors provided access to thousands of pages of financial and legal due
diligence through a dataroom and engaged in a host of diligence and process calls.  Two of these
potential purchasers had not submitted any proposals in writing or evidence of committed
financing sources.  Instead, they had indicated that they may be able to potentially offer more
consideration than the Merger Agreement.  In evaluating these hypothetically actionable offers,
the EFH/EFIH Debtors had no option but to hope for the best and prepare for the worst: that
neither of these proposals would come into fruition.  Without the protection of exclusivity, the
EFH/EFIH Debtors simply did not have the luxury to "wait and see" if these hypothetical offers
would coalesce into a real transaction.  The sole alternative written proposal the EFH/EFIH
Debtors received in connection with a sale of their economic interest in Oncor (1) was subject to
a match right, (2) contemplated, at the time, **a higher termination fee than the NextEra
proposal**, and (3) required support from at least one significant EFIH constituency prior to
execution.[25]

---

[25] *See* Ex. 19, July 28, 2016 M&A Update [EFH06375541 at EFH06375546].

36.     The EFH/EFIH Debtors determined to pursue the Merger because it balances many competing considerations, including (1) maximizing the recoveries to stakeholders, (2) minimizing execution risk, (3) setting the stage for the EFH/EFIH Debtors to emerge from chapter 11 as quickly as possible, and (4) accommodating the EFH/EFIH Debtors' fiduciary duty obligations to explore higher and better offers.  By comparison, at the time of execution of the Merger Agreement, other potential bids—including the sole alternative written proposal—were either insufficiently developed or did not appropriately balance such competing needs.

37.     There are no assurances that any other interested party would have agreed to transact with the EFH/EFIH Debtors in what would undoubtedly be an immensely complex and expensive endeavor without the comfort provided by a termination fee (or a more onerous alternative, such as a match right).  In fact, the evidence presented at the hearing to consider approval of the Motion will show just the opposite: the EFH/EFIH Debtors did not have the leverage to force a value-maximizing and actionable transaction in the absence of a termination fee.  The best evidence of this is the fact that the Merger Agreement has been public for forty-seven days and no party has come forward with an actionable offer that provides more value to the EFH/EFIH Debtors' estates than the Merger, despite the fact that the EFH/EFIH Debtors would have been able to pursue a genuinely higher or otherwise better actionable offer during that period without triggering the Termination Fee.

## II.     THE REMAINING OBJECTIONS SHOULD BE OVERRULED.

### A.     The PSA and Merger Agreement are Not a *Sub Rosa* Plan.

38.     The Asbestos Objectors contend that the PSA and Merger Agreement constitute a *sub rosa* plan because such agreements allegedly "lock" the Debtors into supporting a plan. [Objection of the Asbestos Objectors, at 8-10].

39.     To be found to dictate the terms of a plan, an agreement must "either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010). The Merger Agreement and PSA do neither. Neither agreement disposes of any claims against any Debtor estate. No creditor party is currently party to the PSA and, as a result, no party's voting rights are even addressed by the PSA, let alone restricted by the PSA. Moreover, even if a creditor constituency were to become party to the PSA, such agreement would not constitute an improper solicitation of votes. Contemporary case law rejects the notion that postpetition plan support agreements are improper solicitations. *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286, 295 (Bankr. D. Del. 2013); *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *20 (Bankr. S.D.N.Y. June 27, 2013); *In re Heritage Org., L.L.C.*, 376 B.R. 783, 791 (Bankr. N.D. Tex. 2007). The EFH/EFIH Debtors' creditor constituencies are sophisticated financial institutions, represented by experienced legal and financial professionals, all of whom have been extensively engaged in discussions and negotiations with the EFH/EFIH Debtors regarding the PSA and the Plan.[26]

40.     Finally, and perhaps most importantly, neither the Merger Agreement, nor any relief currently requested in connection with the Merger Agreement allocates the Termination Fee to any particular Debtor estate. The EFH/EFIH Debtors will file a revised proposed form of order in advance of the hearing to consider the Merger and PSA Motion reserving the rights of

---

[26] This Court has already overruled this objection in connection with the plan support agreement entered into between the Debtors, the TCEH Debtors' significant creditor constituencies, and Hunt Consolidated, Inc. *See Order Authorizing Debtors to Enter Into and Perform Under Plan Support Agreement* [D.I. 6097] (authorizing the Debtors to enter into a plan support agreement with Hunt Consolidated in advance of the approval of a disclosure statement).

each of the EFH/EFIH Debtors' respective estates with respect to the allocation of the Termination Fee, should it ever become payable.

41.    In short, the relief requested in the Merger Agreement does not impair any party's rights with respect to the effect of the Termination Fee on any particular constituency's recoveries, and the PSA does not currently impose any obligations on holder of claims and interests against any Debtor estate.

**B.    The Asbestos Objectors' "Due Process" Objections are Meritless and are No Basis for Delaying Consideration of the Termination Fee or PSA.**

42.    The Asbestos Objectors improperly use a hearing to consider approval of the Termination Fee as yet another opportunity to raise "due process" concerns that have been raised and addressed in other contexts, including (1) litigation related to establishing an asbestos bar date, (2) the unsuccessful motion to appoint a separate legal representative for unmanifested asbestos claimants, (3) the unsuccessful disclosure statement objection raised in connection with the Hunt Plan, (4) the unsuccessful objection raised in connection with the global settlement agreement, (5) the unsuccessful objection raised in connection with the hearing to consider approval of the Hunt plan, and (6) the unsuccessful motion to file a class proof of claim on behalf of all unmanifested claimants.  This Court has conducted the same analysis in overruling the "due process" objections at every turn, and should do so again here.

43.    In its 2015 published opinion (that no party appealed), this Court concluded that a discharge of unmanifested claims may be appropriate if an appropriate notice program is implemented.  *In re Energy Future Holdings Corp.*, 522 B.R. 520, 527 (Bankr. D. Del. 2015). The Court specifically noted that under the Third Circuit standard set forth in *In re Grossman's, Inc.*, 607 F.3d 114 (3d Cir. 2010), unmanifested claims "may be discharged on a case by case basis under the totality of the circumstances." *In re Energy Future Holdings Corp.*, 522 B.R. at

530.  In June 2015, after eight months of discussions with the EFH Committee, the Debtors developed and obtained Court approval of a notice plan, which was ultimately successfully executed. *See* 8/11/2015 Hr'g Tr. at 116:5-6 ("The E-side committee fought hard and long in connection with the details of the notice that went out."); *Order (A) Setting Bar Date for Filing Asbestos Proofs of Claim, (B) Approving the Form of and Manner for Filing Asbestos Proofs of Claim, and (C) Approving Notice Thereof* [D.I. 5171].

44.  The Asbestos Objectors renewed their same objections five more times, including in connection with the hearing to consider confirmation of the Hunt plan. *See Order Denying Motion of Charlotte Liberda and Curtis Liberda to Appoint Legal Representative* [D.I. 5265], (denying motion to appoint separate legal representation for unmanifested asbestos claimants); *see also Order (A) Approving the Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates, (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan, and (D) Approving the Manner and Forms of Notice and Other Related Documents* [D.I. 6131]; *see also* Hr.'g Tr. Sept. 21, 2015, at 55-56 (emphasis added) ("[I]f the debtors and I get to confirmation and I decide they are trying to do what they can only do under 524(g), . . . I think you'd have to start over with . . . a lot of additional information in the disclosure statement, et cetera. I don't read that as what they're doing, that's not how I read the plan. They're not in any way trying to channel future claimants, but I'll hear argument on that at confirmation."); 12/3/2015 Hr'g Tr. at 57:16-22; *See Order Denying the Amended Motion for Application of Fed. R. Bankr. P. 7023 to this Proceeding and to Certify a Class Pursuant to FRCP Rule 23* [D.I. 7383]; 12/16/2015 Hr'g Tr. at 83:11-21 (recognizing that to "certify[] a class solely for purposes of filing a proof of claim . . . would be in effect a collateral attack on what this Court has already done, which is set a bar

date . . . and establish[] and approv[e] an elaborate noticing procedure that cost several million dollars designed to provide a notice as adequately as possible to as many possible claimants as possible. None of those matters have been appealed, and they are final orders."); *see also id.* at 83:1-3 (concluding that "to allow a class proof of claim under the facts and circumstances of this case would be unprecedented").

45.     In overruling the objections, the Court reiterated that the approved notice plan was "reasonably calculated to provide notice to unmanifested claimants" and that nothing in the Hunt plan foreclosed the ability of a claimant to bring a claim after the asbestos bar date, arguing that the Debtors' notice plan was unconstitutional.

46.     The Debtors will vigorously defend against any further due process challenges raised by the Asbestos Objectors at the appropriate time and in the appropriate forum. Now is not the time or place for that dispute.

## CONCLUSION

47.     The PSA requires the EFH/EFIH Debtors to obtain oral indication of the Court's approval of the relief requested in the Motion by September 20, 2016. In the absence of such an oral indication, NextEra will have the ability to terminate the PSA. A termination of the PSA would, without a doubt, derail the EFH/EFIH Debtors' path to emergence at a time when the end at long last appears to be in sight. The EFH/EFIH Debtors' negotiating posture vis-à-vis other interested parties would be impaired, the EFH/EFIH Debtors' confirmation schedule approved less than three weeks ago would be very difficult to meet, and there would be no guarantee that the ultimate restructuring of the EFH/EFIH Debtors would provide the same, let alone better, value than the restructuring contemplated by the Merger Agreement.

48.     There is no doubt that the EFH/EFIH Debtors made every effort, both formally

and informally, over the course of two years and in response to evolving market conditions, to market EFH Corp.'s economic interest in Oncor in a value-maximizing way.  There is no doubt that the EFH/EFIH Debtors' negotiating landscape shifted after the expiration of statutory exclusivity and the looming threat of competing plans of reorganization threatened to materially delay their emergence from chapter 11.  There is no doubt that at the time the EFH/EFIH Debtors entered into the Merger Agreement, only one other purchaser had proposed an actionable proposal, and that proposal contained a termination fee **and** a match right, and there were no assurances that any other purchaser would come forward.   And finally, there is no doubt that the Termination Fee increase was necessary to elicit a significant, deal-changing concession from NextEra at a time when NextEra had virtually no other protections from the risk that the EFH/EFIH Debtors would ultimately pursue a transaction with another purchaser.

49.     For the foregoing reasons, the EFH/EFIH Debtors respectfully submit that the Court should overrule the Objections and grant the relief requested in the Merger and PSA Motion and such other and further relief as is appropriate under the circumstances.

*[Remainder of page intentionally left blank.]*

Dated: September 14, 2016
        Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:         collins@rlf.com
               defranceschi@rlf.com
               madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         edward.sassower@kirkland.com
               stephen.hessler@kirkland.com
               brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         james.sprayregen@kirkland.com
               marc.kieselstein@kirkland.com
               chad.husnick@kirkland.com
               steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession