EXHIBIT O

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                          :

                                    :    Chapter 11

6   ENERGY FUTURE HOLDINGS CORP., :

    et al.,                         :    Case No. 14-10979 (CSS)

7                                   :

            Debtors.                :    (Jointly Administered)

8   _____:

9

10

11                                  United States Bankruptcy Court

12                                  824 North Market Street

13                                  Wilmington, Delaware

14                                  September 26, 2016

15                                  10:06 a.m. – 11:05 a.m.

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER J. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:   LESLIE MURIN

1    HEARING re 9584 Filed Sep 19 2016Order (A) Authorizing Entry

2    into Merger Agreement, (B) Approving Termination Fee, and

3    (C) Authorizing Entry into and Performance Under Plan

4    Support Agreement (Related Doc # [9190]) Order Signed on

5    9/19/2016. (Attachments: # (1) Exhibit 1-Part 1 # (2)

6    Exhibit 1 part 2 # (3) Exhibit 1- part 3 # (4) Exhibit 2)

7    (TC)

8

9    HEARING re Status update on both E-Side and T-Side.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
1    A P P E A R A N C E S :

2    AKIN GUMP STRAUSS HAUER & FELD LLP

3         Attorney to Ad Hoc Committee of EFIH Unsecured

4         Noteholders and EFIH Second Lien DIP Commitment

5

6    BY:  SCOTT L. ALBERINO (TELEPHONICALLY)

7         ABID QURESHI (TELEPHONICALLY)

8

9    CADWALADER WICKERSHAM & TAFT LLP

10        Attorneys for Morgan Stanley Capital Grp, Inc.

11

12   MICHELE MAMAN (TELEPHONICALLY)

13

14   CHADBOURNE & PARKE, LLP

15        Attorneys for NextEra Energy

16

17   BY:  ERIC C. DAUCHER (TELEPHONICALLY)

18

19   CROSS, SIMON

20        Attorneys for American Stock Transfer

21

22   BY:  CHRISTOPHER P. SIMON

23

24

25
```

1   FOX ROTHSCHILD LLP

2       Attorney to Ad Hoc Committee of EFIH Unsecured

3       Noteholders and EFIH Second Lien DIP Commitment

4

5   BY:  JEFFREY M. SCHLERF

6

7   HOGAN MCDANIEL

8       Attorneys for Fenicle & Fahy

9

10  BY:  DANIEL K HOGAN

11

12  KLEHR HARRISON HARVEY BRANZBURG LLP

13      Counsel to UMB Bank N.A. Indenture Trustee

14

15  BY:  RAYMOND LEMISCH

16

17  KOBRE & KIM LLP

18      Attorney for Delaware Trust Co., et al.

19

20  BY:  JEREMY HOLLEMBEAK

21

22

23

24

25

Case 14-10979-CSS  Doc 9693  Filed 09/28/16  Page 5 of 55

Page 5

1   KIRKLAND & ELLIS

2       Attorneys for Debtor

3

4   BY:  MARC KIESELSTEIN

5       CHAD HUSNICK

6

7   MORRIS JAMES LLP

8       Attorney for Law Debenture of New York, Indenture

9       Trustee

10

11  BY:  STEPHEN MILLER

12

13  MUNGER, TOLLES & OLSON LLP

14      Co-Counsel to the TCEH Debtors

15

16  BY:  THOMAS WALPER (TELEPHONICALLY)

17

18  NIXON PEABODY LLP

19      Attorneys for AST as EFH Indenture Trustee

20

21  BY:  RICHARD PEDONE (TELEPHONICALLY)

22      CHRIS FOY

23

24

25

Page 6

1   O'KELLY, ERNST & BIELLI LLP

2       Co-Counsel to Energy Future Holdings Corp.

3

4   BY:  DAVID KLAUDER

5

6   PAUL WEISS RIFKIND WHARTON & GARRISON LLP

7       Counsel to Ad Hoc Committee Of TCEJ First Liens

8

9   BY:  ALAN KORNBERG

10

11  PAUL WEISS RIFKIND WHARTON & GARRISON LLP

12      Counsel to Ad Hoc Committee Of TCEJ First Liens

13

14  BY:  JACOB A. ADLERSTEIN (TELEPHONICALLY)

15

16  MOSS PERKINS COIE

17      Attorneys for Delaware Trust Co., et al

18

19  BY:  TINA MOSS

20

21  POTTER ANDERSON & CORROON LLP

22      Attorney for Deutsche Bank New York

23

24  BY:  R. STEPHEN MCNEILL

25

1   PROSKAUER ROSE LLP

2       Attorneys for EFH Corp. Disinterested Directors

3

4   BY:  PETER YOUNG

5       MICHAEL FIRESTEIN (TELEPHONICALLY)

6

7   RICHARDS, LAYTON & FINGER, P.A.

8       Co-Counsel to the Debtors

9

10  BY:  DANIEL DEFRANCHESCHI

11      JASON M. MADRON

12

13  SEWARD & KISSEL LLP

14      Counsel To Wilmington Trust Na-First Lien Agent

15

16  BY:  ARLENE R. ALVES

17      MARK D. KOTWICK

18

19  NED S. SCHODEK X    SCHODEK   SHEARMAN & STERLING LLP

20      Counsel To Deutsche Bank, Agent To Dip Financing

21

22  SULLIVAN & CROMWELL, LLP

23      Co-Counsel to the EFH Creditors' Committee

24

25  BY:  BRIAN GLUECKSTEIN (TELEPHONICALLY)

1   U.S. DEPARTMENT OF JUSTICE

2        U.S. Trustee

3

4   BY:  RICHARD SCHEPACARTER

5

6   WHITE & CASE LLP

7        Attorney to Ad Hoc Committee of EFIH Unsecured

8        Noteholders and EFIH Second Lien DIP Commitment

9

10  BY:  J. CHRISTOPHER SHORE

11

12  YOUNG CONAWAY

13        Counsel to Ad Hoc Group of TCEH Unsecured Noteholders

14

15  BY:  JOEL WAIT

16

17  PATTERSON BELKNAP WEBB & TYLER

18        Attorney for Law Debenture Trust Company

19

20  BY:  BRIAN GUINEY (TELEPHONICALLY)

21

22  KEN STUART - Interested Party

23

24

25

Page 9

1    ALSO PRESENT TELEPHONICALLY:

2

3    EPHRAIM DIAMOND

4    ALYSA AIN

5    ARLENE R. ALVES

6    NII=ARAM AMAMOO

7    ASHLEY F. BARTRAM

8    PHILIP E. BROWN

9    STEPHEN BURNAZIAN

10   THOMAS J. CURTIN

11   STACY DORÉ

12   JAMIE EDMONSON

13   BRADLEY FEINGERTS

14   MARK A. FINK

15   PATRICK FLEURY

16   JOSEPH A. FLORCZAK

17   CHRISTOPHER FONG

18   MEGHAN FORCE

19   SETH GOLDMAN

20   BEAU HARBOUR

21   PATRICK HOLOHAN

22   NATASHA HWANGPO

23   MATTHEW KIMBLE

24   TOM KLECKNER

25   HAL F. MORRIS

1    NAOMI MOSS

2    JOANNA S. NEWDECK

3    MEREDITH PFISTER

4    NOAH M. SCHOTTENSTEIN

5    JENNIFER SHARRET

6    ANGELO THALASSINOS

7    AMER TIWANA

8    MICHAEL TURKEL

9    MATTHEW UNDERWOOD

10   TAMARA VAN HEEL

11   THOMAS WALPER

12   MICHELE C. MIA

13   APARNA YENAMANDRA

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Please be seated.

 3              MR. KIESELSTEIN:  Good morning, Your Honor.  Marc

 4    Kieselstein, Chad Husnick Kirkland & Ellis, on behalf of the

 5    Debtors.

 6              THE COURT:  Before we turn to the agenda, I'd like

 7    to make some comments about the merger agreement if I could.

 8    So I'd like to take a moment to discuss the merger agreement

 9    and termination fee thereunder that was approved by the

10    Court on September 19, 2016 at Docket Number 9584.

11              It has come to the Court's attention that

12    Commissioner Anderson, Commissioner Marquez, and Chairman

13    Nelson of the Public Utility Commission of Texas commented

14    on the merger agreement and termination fee at an open

15    meeting on Thursday, September 22nd.  I have reviewed the

16    relevant portions of that transcript and would like to make

17    a few comments.

18              Broadly speaking, Commissioner Anderson expressed

19    a concern which Commissioner Marquez and Chairman Nelson

20    appear to have shared as to whether the merger agreement is

21    contrary to public policy because the termination fee of 275

22    million is payable to NextEra if the PUCT approves the

23    transaction but NextEra declines to close the transaction

24    because the PUCT has imposed a burdensome condition as

25    defined in the merger agreement.
```

Case 1-14-10979-CSS Doc 16308-16 Filed 07/29/17 Page 13 of 56
Case 1-14-10979-CSS Doc 16633 Filed 09/28/16 Page 12 of 95

Page 12

1           Commissioner Anderson noted that this provision,

2      quote, "appears to be an effort to really tie the

3      commission's hands in the proceeding," end quote -- and

4      that's at Page 88 of the transcript.  Put another way, he

5      stated that this provision, quote, "is an improper attempt

6      to, I think, constrain the commission form its statutory

7      duty when it evaluates any transaction," end quote.  And

8      that's at Page 89 of the transcript.

9           This may be particularly relevant here in that

10     Commissioner Anderson went on to identify certain aspects of

11     the proposed transaction that give him pause, the remedy of

12     which might constitute a burdensome condition under the

13     merger agreement and give rise to the payment of the

14     termination fee.  And that's at Page 90-92 of the

15     transcript.

16          Chairman Nelson noted that Commissioner Anderson,

17     quote, "raised a lot of good points," end quote, and

18     expressed additional concerns on Page 93-95 of the

19     transcript.

20          I am sympathetic to the Commissioner's concerns.

21     It is widely accepted that termination or breakup fees can

22     chill bidding for an asset by making it more expensive for

23     competing bidders to participate in an auction process.  And

24     the termination fee in this case undoubtedly has that

25     effect.

1         However, by making the termination fee payable if

2    the PUCT imposes burdensome conditions as defined in the

3    merger agreement and NextEra chooses not to close as a

4    result thereof, another issue is raised with which this

5    Court is familiar.  It puts pressure on the judge, or in

6    this case, the regulators to approve a provision that would

7    otherwise be unacceptable in order to avoid blowing up the

8    transaction.  This is unusual and troubling.

9         Late last evening, however, EFH and NextEra sent a

10   joint letter to the Court regarding the termination fee.  In

11   that letter the parties clarified their position with regard

12   to the termination fee.  More specifically, the parties

13   state that it is their view that NextEra is not entitled to

14   a termination fee under the merger agreement if NextEra

15   terminates the merger agreement because the PUCT either

16   approves the merger agreement transaction with burdensome

17   conditions or does not approve the merger agreement

18   transaction.

19        In addition, the parties clarified that in any

20   event, NextEra will not seek to collect any portion of the

21   termination fee contemplated by the merger agreement in the

22   event NextEra terminates the merger agreement and the

23   circumstances just described by the Court and more

24   specifically detailed in the letter.

25        I believe last night's joint letter addresses the

 1  concerns raised by Commissioner Anderson with regard to the

 2  termination fee on Thursday.  Nonetheless, I'd like to make

 3  an additional comment, and that is to suggest respectfully

 4  that the possible triggering and payment of the $275 million

 5  termination fee is an issue for the Bankruptcy Court and the

 6  creditors of EFH and EFIH, and not for the PUCT, Oncor, and

 7  the rate payers.

 8           Under Section 8.5 of the merger agreement, the

 9  termination fee is payable by the, quote, "company", end

10  quote, which is defined as EFH Holdings Corp or EFH, and its

11  direct subsidiary, E Energy Future Intermediate Holding

12  Company LLC or, as we all know it, EFIH.  It is not payable

13  by Oncor or its rate payers.

14           If the termination fee is payable, it will

15  constitute an administrative expense claim payable by EFH

16  and EFIH.  That administrative expense will be senior in

17  priority to the substantial unsecured claims at EFH and EFIH

18  and will directly and adversely affect the recoveries of

19  those unsecured creditors.

20           In deciding whether to approve the merger

21  agreement and termination fee, this Court considered this

22  very point and in so doing found it highly significant that

23  the creditors of EFH and EFIH which would be directly harmed

24  by the imposition of the termination fee supported the

25  transaction, notwithstanding the real possibility of the

1    imposition of a $275 billion administrative expense.

2         I strongly encourage the commissioners to review

3    the proposed merger transaction with NextEra with an

4    unblinking eye and in no way to be influenced by the

5    possible triggering of the termination fee.  If the PUCT in

6    the exercise of its independent regulatory authority imposes

7    a burdensome condition as defined in the merger agreement

8    and NextEra chooses not to close regardless of whether it

9    receives the termination fee, this Chapter 11 case will

10   continue.

11        I have every confidence these debtors will

12   reorganize rather than liquidate.  The creditors in the

13   court would adopt -- excuse me, would adapt to such a

14   circumstance and move forward as we have done numerous times

15   in this case.

16        Now, let me close my comments by stating

17   unequivocally that I have every confidence in the

18   commissioners' exercise of their authority and I completely

19   respect and honor their independent duty to consider the

20   proposed transaction under Texas law.  This Court does not

21   intend to interfere in any way with the PUCT jurisdiction; I

22   merely offer these comments to clarify on the record how

23   this Court views the merger agreement and the termination

24   fee.  And I request that the Debtors forward a copy of the

25   relevant portion of this transcript to the PUCT through

1   appropriate channels.  Thank you.  Let's turn to the agenda.

2            MR. KIESELSTEIN:  Thank you again, Your Honor.

3   Marc Kieselstein on behalf of the Debtors.  First, I think I

4   can speak for everyone in the courtroom.  We're grateful for

5   Your Honor's attention and comments.  I think it's quite

6   helpful and much appreciated, and we will certainly forward

7   that transcript.

8            Your Honor, I think the only item on the agenda

9   that's not being handled through certificates of counsel

10  that I think are on their way to be docketed is an update, a

11  general update on the status on both the E-side and the T-

12  side.  And then we'll have a chambers conference at the end

13  of the proceedings.

14           THE COURT:  Right.

15           MR. KIESELSTEIN:  Your Honor, I wanted to report

16  that there are numerous positive developments on both the T-

17  side and the E-side in terms of bringing these cases to a

18  conclusion.  Let me start with the E-side, Your Honor.

19           First, Your Honor, the Debtors continue to engage

20  in constructive discussions with the E seconds, the EFIA

21  seconds, as well as the PIKs on bringing them onboard so

22  that they would become plan support agreement signatories.

23  And we're hopeful we'll have more to say on that in the next

24  few days.  But with those constituencies on board we hope, I

25  think that reflects just an extreme level of consensus

1   around the E-side path, obviously subject to the regulatory

2   issues you discussed.

3            THE COURT:  Let me interrupt you for a second

4   because I just wanted a clarification.  So I understand

5   Fidelity is a party to the PSA and the EFH indenture trustee

6   is not, although Fidelity has certain obligations to

7   instruct the indenture trustee.

8            MR. KIESELSTEIN:  Correct.

9            THE COURT:  Is Contrarian a party to the PSA?

10           MR. KIESELSTEIN:  I don't believe they are a

11   signatory to the PSA.  Obviously we'd like to bring them on

12   board as well.  We think Fidelity with its holdings has the

13   ability to instruct the indenture trustee, and insofar as we

14   know, Contrarian having withdrawn its objection to the

15   motions that were up last week is supportive of the goal

16   that we're all seeking to achieve.

17           THE COURT:  Okay, thank you.

18           MR. KIESELSTEIN:  Again, Your Honor, we're going

19   to do our level best to achieve as much consensus on the E-

20   side as we can in advance of the confirmation hearing in

21   December.  And in light of these ongoing and constructive

22   discussions we've revised certain of the fact and expert

23   deadlines for the E-side confirmation schedule that Your

24   Honor had previously approved.  We did not accelerate any

25   deadlines, Your Honor.  In fact, we relaxed a few of them so

1    that people could focus on constructive dialogue and getting

2    to closure on open issues.

3              THE COURT:  Okay.

4              MR. KIESELSTEIN:  We have filed an amended

5    schedule on the docket -- that's Docket Number 9647.

6              THE COURT:  Does that require any action by the

7    Court?

8              MR. KIESELSTEIN:  I don't believe so, Your Honor.

9    Mr. McKane will correct me at some point if I'm mistaken

10   there.

11             So let me switch to the T-side, Your Honor.  And,

12   again, I'm pleased to report that the T-side Debtors believe

13   they are on track for a TCH effective date to occur next

14   week.  In fact, we have October 3rd circled on the calendar

15   as our target date.

16             As you might imagine, Your Honor, there's

17   elaborate choreography around the closing process for a

18   transaction of this complexity and there are many items on

19   our emergent to-do list, but we wanted to update the Court

20   on the most significant of those items that are conditions

21   precedent to a T-side effective date, and that's

22   specifically the T-side exit financing, the Luminant self-

23   bonding applications of the Railroad Commission, the

24   preferred stock sale, which is an integral part of the exit

25   process, and the contribution of EFH Properties and

1    Corporate Services, which Your Honor has heard much about in

2    past hearings.

3             With regard to the exit financing, Your Honor, on

4    August 4th the Debtors closed on the DIP roll facilities,

5    which collectively provided for four and a quarter billion

6    dollars in financing.  I think we think of those in our head

7    as sort of a bridge between the existing DIP and the exit

8    financing.

9             We used a portion of the funds from that DIP roll

10   facility, Your Honor, to repay the TCH DIP facility, and

11   Your Honor approved that way back in May of 2014.  That

12   facility has been terminated.

13            TCH is in the process of working with its lenders,

14   and it is the same group of lenders to convert the remaining

15   funds in the DIP roll facilities into the exit financing on

16   the effective date.

17            Your Honor, the DIP roll facilities also include a

18   first priority lien in favor of the Railroad Commission of

19   Texas until such time as Luminant's self-bonding application

20   is approved.  I'll speak to that in a moment.  But approval

21   of that application, it's also condition precedent to the

22   effective date.

23            So let me turn to the Railroad Commission

24   application.  And just to refresh Your Honor's memory, under

25   the Texas Administrative Code, a mine operator like Luminant

1    Mining must have a permit to conduct mine operations, not

2    surprisingly, and most -- and must bond its associated

3    regulatory and reclamation obligations.  This bond can take

4    several forms, including a surety bond, a collateral bond,

5    an escrow account bond, a self-bond or a combination.

6         Here we have opted for a self-bond -- I'm sorry,

7    not a self-bond, a collateralized bond, and in connection

8    with the TCH DIP facility we have carved out a $1.1 billion

9    bond out of the $4-1/2 billion overall facility for those

10   very reclamation obligations, and the RCT had previously

11   approved this replacement bond.

12        In anticipation of emergence, in July of 2016,

13   Luminant filed a new application with the RCT to substitute

14   and replace the existing mine reclamation performance

15   collateral bond associated with the DIP with a similar

16   collateral bond that would apply to reorganize Luminant's

17   mining operations.

18        The RCT is scheduled to confer tomorrow for the

19   purpose of ruling on Luminant's application.  We understand

20   that the Railroad Commission staff and the administrative

21   law judge who looked at this in the first instance have

22   recommended approval of the application.

23        And if that's attained, as we hope it will be,

24   this would be the last material regulatory approval

25   necessary for the appearance of the effective date.

1            THE COURT:  Is that a scheduled date that it'll be

2      approved, or are you simply awaiting this decision?

3            MR. KIESELSTEIN:  I think that's their regularly

4      scheduled meeting and this is on the agenda to be ruled

5      upon.

6            THE COURT:  Okay, and that date is when?

7            MR. KIESELSTEIN:  Tomorrow...

8            THE COURT:  Tomorrow.  Sorry.

9            MR. KIESELSTEIN:  Your Honor, let me turn to the

10     preferred stock sale, and this really gets into sort of the

11     plumbing of the transaction so I'll be brief.  But Your

12     Honor will recall that in connection with the spinoff, TCH

13     will contribute the assets and liabilities of Comanche Peak,

14     the nuclear plant, and TCH's retail electricity business to

15     a subsidiary of reorganized TCH.  That's referred to as the

16     preferred stock sale.  That subsidiary in turn will issue

17     common stock and preferred stock in exchange for those

18     assets, and reorganized TCH will then sell the preferred

19     stock to third parties.

20            As I said, there is elaborate choreography around

21     this.  I've seen the closing memo and it reminded me why I

22     could never, ever, ever be a transactional lawyer.  Your

23     Honor, it literally plots out minute by minute the dozens of

24     steps required and the sequence that has to be followed for

25     this to be done correctly.  And we're working very closely

 1    with the TCH first liens to conduct this operation

 2    successfully, and we are in the process of finalizing and

 3    executing the definitive documents necessary to consummate

 4    each and every step.

 5            Your Honor, with respect to the EFH Corporate

 6    Services and EFH Properties Contribution, you'll recall the

 7    confirmation order contemplates this will occur on the

 8    effective date.  The equity in both those entities will be

 9    contributed to reorganized TCEH from the E-side.  Each of

10    these entities, again, is finalizing the logistical steps

11    necessary to contribute the equity.

12            Let me just speak to a couple of other key T-side

13    work streams.  First, Your Honor, there is the asbestos

14    estimation.  As Your Honor's aware, pursuant to the bar

15    date, several thousand claims, a small subset of the overall

16    asbestos claims which were filed against the E-side --

17    several thousand were filed by the bar date and we filed

18    last week a motion for entry of an order to estimate the

19    asbestos claims.

20            That motion is to be heard on October 21st.  And

21    determining the maximum value for distribution purposes of

22    those claims is important, as we'll discuss later in

23    chambers, for the purposes of making distributions of the

24    TCH cash payment, i.e., the $550 million.

25            THE COURT:  When is the objection deadline for

1    that?  Is it the 14th?

2              MR. KIESELSTEIN:  I don't know.

3              MAN 1:  October 6th, Your Honor.

4              THE COURT:  October 6th?  Can we...  I'm just

5    thinking aloud.  That's an evidentiary hearing I suppose, so

6    we can't sign that under CNO I expect.

7              MR. KIESELSTEIN:  Your Honor, there is not a sort

8    of central organizing principle around the ET-side asbestos

9    claims.  We don't have Mr. Hogan, we don't have Mr. Kazen,

10   to my knowledge.  I think there are many different disparate

11   claimants.  So CNO with respect to some may not impact the

12   estimation.

13             THE COURT:  All right, so we'll just go for it.

14   That's fine.

15             MR. KIESELSTEIN:  Again, Your Honor, we are

16   obviously highly focused, as I know the stakeholders are on

17   getting distributions out the door as quickly as humanly

18   possible.  But...well, I won't get into what we'll discuss

19   in chambers.

20             THE COURT:  Right.

21             MR. KIESELSTEIN:  The other issue that I'm going

22   to ask Mr. Husnick to address when I'm done relates to the

23   TCH first lien inter-creditor issues.  He'll have something

24   to report on on that, Your Honor.

25             THE COURT:  Okay.

1          MR. KIESELSTEIN:  The last thing I wanted to speak

2     to is just the practical effect of the TCH effective date on

3     the remaining Debtors, EFH and EFIH.  Per the separation

4     agreement, Your Honor, you'll recall TCH is taking all the

5     employees, at least for a moment in time.  But as required

6     by Texas law, SEC rules, our bylaws, and, frankly, as a

7     debtor in possession, the EFH debtors and EFIH debtors need

8     a management team and need a board.

9          THE COURT:  Right.

10          MR. KIESELSTEIN:  So, I'm pleased to report that

11     the EFH and EFIH debtors have negotiated in the ordinary

12     course of business to retain the following people on a

13     consultant basis.  First, Your Honor, Chairman Donald Evans,

14     who will continue to serve as the chairman of the EFH board

15     -- EFH Corporation board; Mr. Keglevic, who you know well,

16     who will become CEO, CRO, and chief accounting officer, as

17     required by Texas law, of those debtors.

18          Mr. Anthony Horton, who you also know, Your Honor,

19     who will become the chief financial officer; and, Your

20     Honor, Mr. Andrew Wright, who's in the courtroom, who will

21     become the general counsel, and who we've worked with hand

22     in hand for all these many years.

23          THE COURT:  Will these people -- well, what about

24     -- will these persons also still have a role at TCEH?

25          MR. KIESELSTEIN:  No.

1          THE COURT:  They will not.

2          MR. KIESELSTEIN:  They will not.

3          THE COURT:  Okay.  And Ms. Doré.

4          MR. KIESELSTEIN:  Ms. Doré will not be staying.

5     She will not be on the T-side nor on the E-side.  She'll be

6     pursuing other opportunities, of which I'm sure there will

7     be many.

8          THE COURT:  That's our loss.

9          MR. KIESELSTEIN:  Yes, it is our loss.

10    Absolutely, Your Honor.

11         THE COURT:  What about Ms. Williamson?  Am I

12    getting the name wrong?

13         MR. KIESELSTEIN:  I think she'll remain on the

14    board as well.

15         THE COURT:  She's going to remain on the board?

16         MR. KIESELSTEIN:  Yes.

17         THE COURT:  And I assume that -- I can't remember

18    who the EFIH independent director is.

19         MR. KIESELSTEIN:  Mr. Cremens will also remain.

20         THE COURT:  Will also remain on the board, okay.

21         MR. KIESELSTEIN:  And, Your Honor, I guess I'd

22    summarize by saying that the end appears to be in sight for

23    the DCH debtors, thanks again in no small part to Your

24    Honor's and your staff's Herculean efforts.  At the same

25    time the EFH and EFIH debtors are pushing forward as quickly

1    as they can in a positive direction and we're very hopeful

2    that those levels of consensus will increase and will make

3    our path to emergence as efficient as possible.

4              THE COURT:  Can I back up again?  What are the

5    compensation agreements or arrangements for Mr. Keglevic,

6    Mr. Horton, and Mr...

7              MR. KIESELSTEIN:  Mr. Evans?

8              THE COURT:  Evans.  And there was -- I'm sorry,

9    the general counsel, I forget his --

10             MR. KIESELSTEIN:  Mr. Wright.

11             THE COURT:  Mr. Wright.

12             MR. KIESELSTEIN:  It'll be basically monthly

13   payments to...  We don't know exactly when the emergence

14   date of the E-side will be.  I don't have the information

15   tip of my tongue but there will be a substantial savings,

16   obviously, reflective of the pared down corporate structure.

17             THE COURT:  All right.  Will that be paid directly

18   to them from the E-side or is that going to follow through

19   the corporate services?  Just trying to figure out the

20   mechanics.

21             MR. KIESELSTEIN:  I'll find out the mechanics and

22   I'll get back to you before the end of this hearing.

23             THE COURT:  Okay.  Thank you.

24             MR. KIESELSTEIN:  And with that, Your Honor, I

25   think Mr. Husnick would like to address the T-first inter-

1   creditor issue.

2          THE COURT:  Okay, thank you.

3          MR. HUSNICK:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. HUSNICK:  Chad Husnick, Kirkland & Ellis, on

6   behalf of the Debtors.  Your Honor, I'll try and be as brief

7   as possible on this.  I'm happy to report that we at least

8   now have agreement on a process, which is further than we

9   were 20 minutes ago.

10         THE COURT:  Okay.

11         MR. HUSNICK:  Your Honor, there's one fairly

12  significant outstanding issue among the TCH first-lien

13  creditors.  Your Honor may remember that there's an inter-

14  creditor dispute among certain of the credit agreement

15  lenders, the swap counterparties, and the bondholders.

16         Your Honor, pursuant to that dispute, Your Honor

17  ruled in March of this year on the issue and that ruling has

18  been appealed and remains pending on appeal right now.  The

19  plan that was confirmed --

20         THE COURT:  There's also a motion for

21  reconsideration with regard to that, right?

22         MR. MALONEY: That's correct, Your Honor.  Not a

23  motion for reconsideration, Your Honor.  But there's a 60B

24  motion before Your Honor.

25         THE COURT:  Okay.

1          MR. HUSNICK:  Your Honor, what the plan provided

2     on this aspect, and it was a negotiated provision, is that

3     pending entry of a final order, and final order is defined

4     in the plan as a final non-appealable or an order where all

5     appeals have been dealt with -- pending entry of that final

6     order, the Debtors would establish a reserve with respect to

7     the amounts that are disputed.  But that reserve needed to

8     be consented to by each of the parties that are party to the

9     dispute.

10          We have been working with the parties, and the

11     parties mostly amongst themselves have been working to try

12     and come up with an agreed reserve.  And thus far, peace has

13     not broken out.  The Debtors do not have the ability to just

14     propose an amount and go effective.

15          What we did propose this weekend is a process for

16     resolving this in the near term but it would involve,

17     unfortunately, the Court's indulgence to resolve a dispute

18     on a relatively shortened timeframe.  But I think I've come

19     up with -- Mr. Kieselstein came up with something for me to

20     present to Your Honor as a proposed process that, one,

21     hopefully limits the burden on the Court, and two, is

22     something that has been agreed to by the parties.

23          THE COURT:  And this is a condition of going

24     effective?

25          MR. HUSNICK:  Correct.

```
 1              THE COURT:  So you're going to need me to do

 2      something by October 3rd?

 3              MR. HUSNICK:  Correct.  But what I'll put forward

 4      to Your Honor will not require a further hearing unless Your

 5      Honor requests one.  But I'll lay it out and you can tell me

 6      whether it works or not.

 7              But generally what I've put forth to the parties

 8      is each of the parties -- there's three principal

 9      constituencies -- would submit a 1-2 page letter brief to

10      Your Honor identifying their proposed allocation -- or

11      reserve calculation and an explanation for it.  They'd

12      submit those briefs by Wednesday, the 28th, at 5 o'clock

13      Eastern Time.

14              Your Honor, there would be three proposals.  One

15      for the first lien swap holders, one from the credit

16      agreement lenders, and then one from the noteholders.

17              Your Honor, we'd ask that the Court then, once it

18      has the three proposals, make a ruling on the proposals by

19      Friday, September 30th, if possible, so that we can adjust

20      whatever distributions are being made on Monday, October

21      3rd.  Of course we can be flexible with Your Honor in terms

22      of the ruling timing but that was what we were going to

23      propose.

24              This way we could avoid contested motion practice

25      but hopefully get Your Honor sufficient information to make
```

1    a ruling on the reserve.

2            THE COURT:  So you want me to pick one?

3            MR. HUSNICK:  Correct.

4            THE COURT:  Okay.  And everyone's agreed not to

5    appeal?

6            MR. HUSNICK:  So, let me...  There were three

7    qualifications.

8            THE COURT:  Because that won't help if I pick on

9    and someone appeals.

10            MR. HUSNICK:  Correct.  So, parties would have the

11    right to appeal the reserve decision, but they would all

12    agree and will represent today -- they each have counsel in

13    the room today -- that they will not seek a stay pending

14    appeal.  So, while they could appeal the reserve decision in

15    theory, they will not seek a stay pending appeal, so we can

16    go effective on October 3rds.

17            Number two, the second qualification is that the

18    Court's decision with respect to the reserve would be

19    without prejudice on the litigation.  So it wouldn't

20    prejudice any arguments in the appeal, which I think is

21    relatively straightforward.

22            And, lastly, each of the parties has asked for a

23    very brief opportunity -- I heard three minutes, but up to

24    five minutes this morning to address Your Honor.  Each of

25    the three parties.  Just to preview for you what the issues

1    are.  If Your Honor is willing to indulge in that process it

2    would be very helpful to the Debtors.

3              THE COURT:  My only statement with that would be

4    that it would be helpful to the Court that when the letter

5    briefs are submitted, they also submit forms of order.

6              MR. HUSNICK:  Okay.

7              THE COURT:  Otherwise I have to craft a form of

8    order, which I'll do.  That's fine.  I may not like the ones

9    that are submitted in any event, but that would be helpful.

10   It's a good rule -- if you want the Court to do something in

11   your favor, make it as easy as possible for the Court to do

12   that.

13             MR. HUSNICK:  Duly noted.

14             THE COURT:  All right.  Yes, go ahead.

15             MR. HUSNICK:  Your Honor, I'm not sure if you'd

16   like us to entertain an order memorializing this process or

17   if the transcript will be sufficient once they all confirm.

18             THE COURT:  Given people are reserving their right

19   to appeal, it would probably make sense to have an order

20   setting up the process.

21             MR. HUSNICK:  Okay.  We can work with the parties

22   and submit that order today, Your Honor.

23             THE COURT:  Okay.  Very good.  All right.

24             MR. HUSNICK:  Thank you.

25             THE COURT:  Who wishes to be heard?  And I have to

1    say, I'm a little cold on these issues and on these facts.

2    So, you might need a little more than three minutes to give

3    me context.

4         MR. MALONEY:  Right.  That's why I want to take a

5    few seconds, Your Honor.  For the record, Tom Maloney

6    representing J.  Aron, and I'm speaking on behalf of the

7    three major swap holders, which are Brookfield, J. Aron, and

8    Morgan Stanley.  And you'll recall that we had an argument

9    before you on the issue of whether there should be a

10   reallocation of the consideration to the first lien holders

11   based on the inter-credit agreement.  And Your Honor ruled

12   in favor of the swap's position, holding that there was no

13   triggering event that would cause the formula to kick in.

14        And you reserved issue with Steven where if the

15   formula did kick in, where it would require a different

16   result.  As Your Honor will recall, we argued that this

17   provision was never intended to provide this advantage that

18   was being sought by the noteholders.

19        That decision is now on appeal, and there's been a

20   60B motion filed by the bondholders before Your Honor, which

21   I think is holding up the resolution of that appeal, just

22   parenthetically.  Because they raised the issue that the

23   plan that that related to was not the plan that was now

24   going to be confirmed.

25        We now have a new plan confirming, Your Honor -- I

1  think for all practical purposes, it's the same as the old

2  plan.  But I don't know if you need anything more from us on

3  that issue.  If you do, we're happy to --

4           THE COURT:  No, just time.  Just time to deal with

5  it.

6           MR. MALONEY:  Okay.  But you don't need any more

7  briefing or argument from us?  If you do, you'll let us know

8  but...

9           THE COURT:  Yeah, I will let you know.  I don't

10  think so.

11           MR. MALONEY:  Okay.  So, I want to make just four

12  points.  One is I'm not faulting the Debtor because they

13  have a lot to do, but they approached us on this issue on

14  Friday, this past week.  We've been trying to push for a

15  resolution for quite a long period of time, and we were

16  pushed back to the end of the line.

17           What we proposed on behalf of the swap holders is

18  that the deal that we spent three months, four months

19  negotiating with the noteholders whereby we basically give

20  them indemnity to deal with the only possible reparable harm

21  they have, which is that J. Aron, or Morgan Stanley, or

22  Brookfield will sell a claim, will have to go chase after

23  somebody else.

24           So, we dealt with that in the stipulation Your

25  Honor approved dealing with the adequate protection issue.

1    And we said, look, we've spent three months solving this

2    problem.  It's the exact same problem, we'll do the exact

3    same solution again.  And they've rejected that.

4            And, Your Honor, there's no basis for them to

5    reject that proposal.  This deals with their irreparable

6    injury argument and it gives them complete protection

7    because their only risk is the credit risk of three of the

8    most outstanding companies in the United States.  So, it

9    doesn't make any sense.

10           And the path forward, alternatively, is legally

11   quite complex if we don't do this.  And I just wanted to

12   point out to Your Honor those complexities.

13           The first is we would -- if for some reason we're

14   required to escrow the stock -- because the consideration

15   all anyone's going to get is the stock, for potentially

16   years during an appellate process, there's a huge risk to

17   the swap holders because they're using the opportunity

18   clause of trading in that stock.  And so there should be a

19   significant bond.  So we think if you don't go with the

20   indemnity approach, we think part of any solution has to

21   require a significant bond.

22           The second problem is that -- I think they would

23   like to argue in the context of this one or two-page brief

24   on two days' notice what the appropriate interest rates

25   should be for all the various instruments in this case.  You

1   have nothing in the pleadings dealing with that issue, you

2   have nothing in the record dealing with that issue.  They

3   have not even sought that relief in their complaint.

4           Now, our interest rate is 5.5 percent for J.

5   Aron, which is a capped interest rate under a swap

6   agreement, which is basically standard cost of funds but

7   they capped it at prime plus two.  We would argue our

8   interest rate is much higher.  And in England there's been a

9   trial going on for a year on that question in the Lehman

10  bankruptcy as to what the appropriate cost of funds is for

11  swap counterparties.

12          We don't think that could be resolved between now

13  and Friday.  So we think 5.5 percent is the rate you have to

14  use for us.  And if you use that rate for us, actually, and

15  you use the bank rate in the SEC filings the Debtor has

16  made, which is prime plus 350 or prime plus -- no, LIBOR

17  plus 350 or LIBOR plus 450, J.  Aron actually has the

18  highest interest rate of anyone other than the bondholders.

19  Which means even though we filed this lawsuit opposing

20  relief, we would get the benefit of the escrow.  It seems

21  absurd.

22          You know, so the third point I'd like to make on

23  this is that if you use the plan mechanism rather than the

24  litigation mechanism to deal with the reserve, you have a

25  problem under 1123A4 about unequal treatment of people who

Page 36

1    were getting the same treatment in the plan.

2         The way the plan dealt with that is -- that's what

3    a plan says, everybody else consent to the treatment.

4    Because 1123A4 provides an exception for people who are

5    equal in the same class who accept disparate treatment.

6    Since we had no consensual agreement, the only reserve you

7    can order would be a pro-rated reserve on everyone,

8    including the banks, which they don't want to be part of.

9    And I'm not saying they should be part of this dispute, but

10   that's the only reserve we think legally is -- you're

11   entitled to enter under the plan.  And we're not waiving our

12   rights under 1123A4.  We never waived our rights under

13   1123A4, and we're not waiving them today.

14        So, we think we offered a very sensible solution,

15   which we worked out months to work out before, just repeated

16   again; it provides full protection to the swap holders and

17   avoids, frankly, a legal quagmire that I think is unfair to

18   impose on the Court and the Court has no real ability to

19   deal with.  Thank you, Your Honor.

20        THE COURT:  All right, thank you.

21        MR. ROMANELLO:  Your Honor, if I may -- Salvatore

22   Romanello from Weil Gotshal & Manges on behalf of Titan

23   Investments Holdings, a Brookfield affiliate.  I just wanted

24   to clarify the record.  We've been using the term the swap

25   parties to describe the three interveners.  Only two of the

1   interveners are actually swap parties; Titan is not, but we

2   will join with the swaps in our submission.

3           Secondly, Mr. Husnick referenced reserving rights,

4   issues on appeal.  It's really reserving rights and issues

5   with respect to the whole litigation if in the event Your

6   Honor's decision is reversed and then we have to get to the

7   issue of what the appropriate interest rate is.  So, the

8   parties -- I think the agreement is we would reserve your

9   decision if it comes to that with respect to a reserve would

10  not prejudice any parties with respect to the underlying

11  litigation.  Thank you, Your Honor.

12          THE COURT:  You're welcome.

13          MR. SLAUGHTER:  Good morning, Your Honor.  Joe

14  Slaughter from Kobre & Kim on behalf of the Trustee for the

15  notes.  So, the first point I want to make is that the

16  background of this is that the reserve came into being

17  because during the time when the plan was being negotiated,

18  the notes -- the Trustee had a concern about exactly this

19  scenario, that this litigation might not be finally

20  concluded by the time the plan went effective, and insisted

21  upon the reserve construct as sort of a hedge against that

22  eventuality.

23          At the time Your Honor hadn't issued his order, we

24  didn't know who was going to win, and it conceivably could

25  have gone either way.  We may have had to pay in if we had

1    won before Your Honor.

2              So, the first point is the reserve is in the plan.

3    It's contemplated by the plan, everybody knew about it, it

4    was a condition of our agreeing to the plan, and there

5    should be a reserve.

6              The idea that this is analogous to the adequate

7    protection situation is very different.  There was an open

8    question there as to whether the reserve construct even

9    applied to the adequate protection payments, and here I

10   don't think anybody questions that this is exactly what the

11   reserve applies to.  So we don't think it's accurate for the

12   swaps to say now that this is exactly the same situation.

13             So, that's the background of how this came into

14   being and why there has to be some reserve.  What the

15   reserves should look like, in our opinion, is basically --

16   there's two components.  First, the notes shouldn't have to

17   contribute in any form.  Regardless of any litigation

18   outcome, it can affect the distributions that we're entitled

19   to on the effective date.

20             We only stand to gain from this litigation because

21   right now the prepetition methodology is going to be used.

22   We'll get our distributions.  We won't get anything that

23   would be due to us if the litigation ends up in our favor.

24   And so there's no sense in us paying in to the reserve.  It

25   would just be moving money from one pocket to the other.

Case 1:11-09079-CSS Doc 1638-16 Filed 07/29/17 Page 40 of 56
Case 1:11-09079-CSS Doc 9693-16 Filed 09/28/16 Page 39 of 55

Page 39

1          The second point I want to make is that the size

2     of the reserve should be calibrated so that we are fully

3     covered in the event that we end up winning.  The reason we

4     had a concern about this was because, you know, if the

5     distributions are made in full under the prepetition

6     allocation method, there's basically no way for us to

7     recover those.  You know, all of the collection risk is on

8     us and there's so many swap parties, I don't think we'd ever

9     be able to realistically get them.  And that's why we

10    insisted on this construct, and that's why it exists.  And

11    so in calculating it, it should be designed to fully cover

12    us.

13          I understand, Your Honor, that you're not in a

14    position to delve into these complex contractual issues

15    about the rates that should apply on two days' notice or

16    anything like that.  And, frankly, we think that's something

17    that can be worked out after there's a resolution on the

18    litigation and may never have to be worked out if we don't

19    prevail.

20          But we do think that the calculation should use

21    numbers that are conservative enough to have us be covered.

22    And when we put forth our proposals, you know, that's what

23    we did.  We didn't give ourselves the best possible outcome;

24    we gave ourselves what we thought was fair based on our

25    readings of the documents, based on the history of the case,

1    and put that to the parties.

2           And, basically, we're pretty much agnostic as to

3    what rates apply because nobody argues in any scenario we're

4    the highest.  And if you do the math with the various things

5    that could be applied to the banks on the swaps, it's

6    basically them just trading money amongst one another.

7           So, we have our view based on what we think is a

8    fair reading of the documents but we don't -- if Your Honor

9    has a different view, it's not going to affect us

10   negatively.  But what we do think should be included in any

11   eventual resolution is, one, an understanding that we

12   shouldn't be required to contribute anything; and, two, an

13   understanding that what we think the proper amount that

14   should go in there is, which is eminently reasonable, should

15   be accounted for in Your Honor's decision.  Thank you.

16          MR. FRIEDMAN:  Good morning, Your Honor.  Peter

17   Friedman of O'Melveny & Myers on behalf of Wilmington Trust

18   as administrative agent for the bank debt.  The bank debt

19   has -- and the administrative agent has been relatively

20   silent so far in this litigation; has reserved rights in all

21   respects as to what an appropriate interest rate might be.

22          Because there are certain circumstances under

23   which the bank debt or at least certain portions of it might

24   be winners under this litigation if there's a ruling in

25   favor of the notes trustee, and certain circumstances where

1    there could be negative -- we think very small negative

2    implications for the bank debt, particularly if an

3    appropriate interest rate which reflects a default interest

4    rate, which the bank lenders are entitled to under their

5    credit agreements applies in this circumstance where it's

6    not a default rate applied versus the Debtor, but rather as

7    between the three parties that share the same collateral.

8    And if that were applied, the bank debt would, as I said,

9    wind up in a likely positive decision.

10           I think the bank debt has tried to be constructive

11   in trying to come with proposals that reflect the economic

12   realities of the situation.  And in any event, I think what

13   is the most important thing is I don't think there's a

14   situation where bank lenders could ever wind up owing swap

15   lenders money.  So, it's inappropriate for the swaps to try

16   to essentially force the bank lenders to subsidize them in

17   any fashion.

18           So, we'll try to continue to negotiate with the

19   parties and see if we can't come to a resolution prior to

20   Wednesday and submissions or potentially even after that to

21   try to reach a resolution that makes sense and does pave the

22   way for an expeditious exit for the company.

23           THE COURT:  I think it's ironic that you want the

24   party that actually won the fund your protection on appeal.

25           MR. FRIEDMAN:  We're not really asking for

1    protection.  The parties put a reserve in to the plan,

2    largely at the notes' insistence; not the bank debt's

3    insistence.

4              THE COURT:  Fair enough.

5              MR. FRIEDMAN:  Thank you, Your Honor.

6              THE COURT:  Well, I don't know if I can unwrap

7    this Gordian knot in five days, four days, but I guess I'll

8    try.  But if I can't, we need to have a mechanism to let you

9    know you can't close.

10             MR. HUSNICK:  Your Honor, I guess we could do one

11   or two things.  One, Your Honor could file a notice and say

12   we need to schedule it for a hearing, or just communicate it

13   through Mr. Madron and Mr. DeFrancheschi, and we can let the

14   parties know.

15             THE COURT:  All right.  Well, let's do this.  So,

16   when are you going to submit?  By Wednesday at five?

17             MR. HUSNICK:  Wednesday at 5 o'clock.  And we'll

18   submit an order hopefully under certification today to

19   memorialize the process.

20             THE COURT:  All right.  I'm not making any

21   promises that I can meet your deadline.  I have a full week

22   of trial starting tomorrow.  I haven't thought about these

23   issues in five months.  I'll have to reread everything that

24   I previously did.

25             The matter, the 60B is under advisement, but it's

1   frankly not worked its way to the worklist based on the

2   large weight of other matters under advisement that the

3   Court has.

4       I did rule promptly when actually presented with

5   the issue initially.  So I haven't been delaying it on

6   purpose, but there are other matters the Court has to give

7   its attention to.  And I was not aware until 20 minutes ago

8   that this might be an impediment to going effective.  So, I

9   can't turn around to a decision on the 60B motion -- not

10  that anyone's asking me to do that, but I can't pivot to

11  that in two days.  It's simply impossible.

12      So, send me what you want to send me and I'll

13  figure it out as best I can.  And if I can, I'll enter an

14  order that I deem is appropriate; and if not, I'll inform

15  Mr. Madron and he can pass on that I cannot enter an order

16  and we can circle around to figure out a mechanism for

17  deciding it.  Whether it's going to require a briefing and a

18  hearing on adequate notice or not, I don't know.  It'll

19  depend on how construe the problem.

20      Monday is Rosh Hashanah so that creates issues for

21  people being able to respond to anything the Court decides

22  on Friday, in any event.  And many people observe Tuesday as

23  well, so I don't know how quickly we'll be able to pivot

24  even if the Court needs further information or a hearing.

25  But I'll respond as best I can.

1          MR. HUSNICK:  Understood, Your Honor, and we

2     appreciate all your efforts.

3          THE COURT:  Okay.

4          MR. KIESELSTEIN:  Your Honor, Marc Kieselstein

5     again.  Two follow-up items from our colloquy before.

6     First, Your Honor, I've confirmed that there are no changes

7     that are required to the scheduling order.

8          THE COURT:  Okay.

9          MR. KIESELSTEIN:  For the E-side confirmation.

10    And then with respect to the mechanics of compensation for

11    the remaining E-side fiduciaries, in essence, there'll be

12    payments directly from EFH Corp to the E-side fiduciaries.

13    The EFIH portion will be allocated to it through the

14    intercompany accounting system and on a basis that's still

15    going to be negotiated between EFH and EFIH, between the

16    independent directors.

17         THE COURT:  Okay.  EFH is still required to make

18    public reporting under the SEC rules?

19         MR. KIESELSTEIN:  Yes, Your Honor.

20         THE COURT:  All right, so whatever appropriate SEC

21    required disclosures with regard to officer and director

22    compensation will be made?

23         MR. KIESELSTEIN:  Yes, Your Honor.

24         THE COURT:  Okay.  All right.  Well, I thought we

25    were going to have a good day and then you messed it up at

1    the end.

2            MR. KIESELSTEIN:  You can always count on us, Your

3    Honor.

4            THE COURT:  Absolutely.  All right, we are where

5    we are.  Okay, I'll await those orders.  We're going to have

6    -- anything further for today?  Mr. Stewart, yes.

7            MR. STEWART:  On August the 17th I was here and on

8    August 20th I put in an objection, and they were supposed to

9    answer -- or she said she would answer by the 23rd or the

10   24th of August.  And then you gave them to September the

11   20th to answer my objection.  They have not answered my

12   objection.  I haven't received any of the documents.

13           And I believe today was supposed to be the day

14   where we'd hear the issue of my objection.  That's why I'm

15   here.  I got it off of PACER, but I wasn't served.

16           THE COURT:  Your objection to what?

17           MR. STEWART:  Objection to...  I disagree with

18   everything that's going on.

19           THE COURT:  All right, well...

20           MR. STEWART:  That I'm a stockholder of the

21   company, a bondholder...

22           THE COURT:  There is no publically traded stock so

23   you're not a stockholder.

24           MR. STEWART:  Well, as of 2003, before they

25   started the fraud, I had interest in it, 51 percent through

Case 1-11-09079-CSS Doc 1-1-63316 Filed 07/29/17 Page 47 of 56
Case 1-11-09079-CSS Doc 9693 Filed 09/28/16 Page 46 of 95

Page 46

```
 1   Edison International.

 2              THE COURT:  All right, Mr. Husnick, can you help

 3   us out here?

 4              MR. STEWART:  So, I was wondering if you made a

 5   ruling on the objection that I did submit on August the

 6   20th, 2016.  Because you gave them until September the 20th

 7   to answer my objection and they did not answer.  So...

 8              THE COURT:  Well, I have to say, as I sit here

 9   today I don't remember, frankly, and I apologize.  So, maybe

10   Mr. Husnick can help me out.

11              MR. HUSNICK:  Your Honor, the only request for a

12   relief that we were aware of was a motion that was filed

13   that requested that the Debtor provide overnight delivery or

14   -- it was some type of motion along those lines, and Your

15   Honor overruled it at the hearing.

16              THE COURT:  Right.

17              MR. HUSNICK:  Then there was a submission made

18   ostensibly in connection with the scheduling motion.  It was

19   a late filed time and that's what it got wrapped up into,

20   and Your Honor granted the scheduling order.  I believe

21   that's all we're aware of.  We'll triple check on the docket

22   to make sure but...

23              MR. STEWART:  I can submit the document that I

24   have as proof of, you know, they were supposed to answer by

25   the 20th.
```

Case 1-14-10979-CSS Doc 16883-16 Filed 07/29/17 Page 48 of 56
Case 1-14-10979-CSS Doc 16893 Filed 09/28/16 Page 47 of 95

Page 47

1           THE COURT:  Well, what do you have?

2           MR. STEWART:  And under Bankruptcy...  I'm asking

3    for the Federal Bureau of Investigations to come in due to

4    the fraud.  The U.S. Attorney, United States Attorney.  Ken

5    Paxton is involved so I'm not going to get Texas to do

6    anything for me.  So, I'm asking you to bring in the Justice

7    Department.

8           THE COURT:  Oh, that's not my job.  Whether the

9    Justice Department decides to launch any investigation

10   public or private of any entity, a bankruptcy or not, has

11   nothing to do with this Court.  And I don't ask, nor do I

12   have the power to ask the Justice Department to perform any

13   investigation.  That's an issue for the Justice Department.

14          MR. STEWART:  I'm not a lawyer and I don't want to

15   flip through all these notes that I do have, but I thought

16   that...

17          THE COURT:  I can refer a matter to the Office of

18   the United States Trustee if I think it's appropriate for

19   investigation, but I haven't seen anything in this case that

20   would require me to do so.

21          MR. STEWART:  The fraudulent transfer.

22          THE COURT:  There was no...  Well, the issues with

23   regard to whether there was a fraudulent transfer were

24   settled back in December of 2015.  So, those claims are

25   settled and they're subject to a final order that no one has

1   appealed.  So, there's no ongoing ability for the Court to

2   launch an investigation or provide any relief in connection

3   with those claims because they've been settled.

4           MR. STEWART:  Okay.

5           THE COURT:  The intercompany claims based on the

6   fraudulent conveyance -- I assume you're talking about the

7   leveraged buyout being a fraudulent conveyance?

8           MR. STEWART:  Yes.  Which is another hot company,

9   KKR -- started by Nelson Bunker Hunt.

10          THE COURT:  Those claims were settled.

11          MR. STEWART:  All the companies is the same

12  entity.  Like, NextEra, that's a Hassie Hunt.  And I have a

13  document stating in 1987 that I hold the nuclear insurance

14  policy for Florida also.

15          THE COURT:  Well, the only issue I have with

16  NextEra is the fact that they --

17          MR. STEWART:  I'm just giving you a little

18  information.

19          THE COURT:  Yeah, that's fine.  But that they've

20  entered into a merger agreement to buy the E-side

21  transaction.

22          MR. STEWART:  It's taking money out of one pocket

23  and putting it another because they're really all the same

24  entity.

25          THE COURT:  You say the Debtors and NextEra are

1   the same entity?

2               MR. STEWART:  Pretty...yes.

3               THE COURT:  Okay, well...

4               MR. STEWART:  Because I have an insurance policy

5   on Florida Power and Light as of 1987 is when it was given

6   to me, or hit my insurance policy.

7               THE COURT:  All right.  Well, here's where I come

8   out, Mr. Stewart.

9               MR. STEWART:  Yes.  I just came here specifically

10  for the...  I thought we were going to be here on the

11  objection that I put in on the 20th.  They said they would

12  have the objections answered in three days.

13              THE COURT:  Let me pull up your objection and have

14  a look at it again.  The 20th of August, is that right?

15              MR. STEWART:  I believe so.

16              THE COURT:  All right, give me just a minute.  I

17  can pull it up here.  That was a Saturday.

18              MR. STEWART:  It was a Friday.  Like I said, my

19  notes might be a day off.

20              THE COURT:  All right.

21              MR. STEWART:  I think it was August the 17th is

22  when I was here.

23              THE COURT:  Okay, let me pull that up.  Just give

24  me a second here.  I'm a little slow at the computer.  Okay,

25  yeah, it was the 19th.  All right, let me look at this.

1   Okay, so this is a motion to object to approval of Debtor's

2   hearing dates and deadlines.

3            And it says, "Do you object to the Debtors and all

4   pertaining parties the right to schedule hearing dates,

5   deadlines, and establish certain protocols until all parties

6   settle and fall on my credit accounts due on my properties

7   to return specific control of business assets and stocks,

8   the ruling pushing control of my asset-backed securities and

9   bonds to me, cash accounts transferred, make restitution and

10   payments in full for using me to hold the $375 million

11   liability nuclear insurance policy in my name without my

12   consent or payment or reimbursed to my assigns  all the

13   legal and research expenses presented in court to date." So

14   that's the objection.

15            MR. STEWART:  And you gave them until September

16   20th to answer.

17            THE COURT:  I don't remember doing that, I have to

18   say.  Because...

19            MR. STEWART:  I have to...well, sorry...

20            THE COURT:  That's okay.  Because I did enter the

21   order scheduling those dates.  So when did I do that?  When

22   did I enter the scheduling order, Mr. Husnick, if you

23   remember?  If you don't, you don't.  What do you have that

24   indicates that I gave them until September 20th to respond?

25            MR. STEWART:  I have a PACER -- the PACER website.

1   I have a screenshot of it.  Unfortunately, I cannot access

2   that document again for some reason.  I'm not sure why.  But

3   I have a screenshot of it.

4           It actually said -- the screenshot that I have

5   said September the 26th, 10 p.m.  So, am I supposed to be

6   here at 10 p.m.  tonight?

7           THE COURT:  You're going to be lonely if you are.

8           MR. HUSNICK:  Your Honor, I may be able to clarify

9   what happened.  So the order was entered on the 17th, the

10  scheduling order.

11          THE COURT:  Right.

12          MR. HUSNICK:  Mr. Stewart's filing was originally

13  docketed as a motion...

14          THE COURT:  Right, that's what happened.

15          MR. HUSNICK:  ...which would've tricked an

16  immediate response, but it was later changed to an objection

17  by the Clerk's Office.

18          THE COURT:  Right, right.  So what happened is --

19  okay, and that's what it looks like here, too.  I'm looking

20  at the website.  What happened is that your objection was

21  docketed by the Court's Clerk's Office as a motion.  And

22  because it was a motion as it was docketed, it generated

23  automatically a hearing date for the next omnibus hearing

24  because it was docketed as a motion.

25          It should not have been docketed as a motion.

1    That was a clerical error by the Clerk's Office.  It was an

2    objection.  It was an objection to a motion that had already

3    been filed -- excuse me, it was an objection to a motion

4    that had already been approved.  So that's why the Clerk's

5    Office probably cited it as a motion as opposed to an

6    objection.  Because you were objecting to something that had

7    already occurred.

8              MR. STEWART:  Okay.

9              THE COURT:  So, I expect my Clerk's Office doing

10   the best they can to interpret your filings initially

11   thought, well, this must be a motion for reconsideration or

12   some sort of motion.  And I remember having a conversation

13   now.  And I'm looking at the docket.  The docket entry now

14   says "Modified text.  No hearing, per chambers on August 25,

15   2016." So I had a conversation with the Clerk's Office on

16   August 25th where I said, no, no, it's not a motion; it's an

17   objection.  Cancel the hearing.

18             So, I apologize.  The screenshot you have is old

19   and so no hearing was ultimately set because there was no

20   actual relief being requested.  It was an objection, not a

21   motion.

22             MR. STEWART:  Okay.

23             THE COURT:  So, the objection deadline that

24   would've been generated and the hearing date that would've

25   been generated as a matter of sort of automation when it was

1   initially docketed as a motion was canceled.  So there's no

2   hearing on it.

3           MR. STEWART:  Is there any way that you can

4   appoint a bankruptcy lawyer to help me?  Because I have --

5   you know...

6           THE COURT:  Nope.  I don't have that power.  You

7   have to fund your own case.  There may be an ability in

8   Texas, I don't know, for you to get pro bono help.

9           MR. STEWART:  I'm not going to get a lawyer to

10   help me in Texas.

11           THE COURT:  Well, I can't help you.  I don't have

12   that ability.

13           MR. STEWART:  Okay.

14           THE COURT:  All right.  Thank you, Mr. Stewart.

15           MR. STEWART:  All right, thanks.

16           THE COURT:  You're welcome.

17           MR. HUSNICK:  Your Honor, I just want to say the

18   order was actually entered on the 24th.  I misspoke.  It's

19   the 24th, not the 17th.

20           THE COURT:  All right.  In any case, the objection

21   was -- I do remember this now, it was docketed as a motion

22   and then corrected.  So that issue's taken care of, because

23   that objection was overruled.

24           We're adjourned.  I may need a little time before

25   we do the chambers conference.  We'll meet in the mediation

Page 54

1   room and that's in connection with the closing issue that's

2   been discussed.

3                          * * * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya Ledanski           Digitally signed by Sonya Ledanski Hyde
                              DN: cn=Sonya Ledanski Hyde, o=Veritext,
     Hyde                     ou, email=digital@veritext.com, c=US
7                             Date: 2016.09.27 16:16:45 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:   September 27, 2016