# EXHIBIT R

# Exhibit G



Control Number: 46238



Item Number: 543

Addendum StartPage: 0

## DOCKET NO. 46238

| | | |
|---|---|---|
| JOINT REPORT AND APPLICATION | § | |
| OF ONCOR ELECTRIC DELIVERY | § | PUBLIC UTILITY COMMISSION |
| COMPANY LLC AND NEXTERA | § | |
| ENERGY, INC. FOR REGULATORY | § | OF TEXAS |
| APPROVALS PURSUANT TO PURA | § | |
| §§ 14.101, 39.262 AND 39.915 | § | |

2017 MAY -8 PM 2:00
PUBLIC UTILITY COMMISSION
FILING CLERK
RECEIVED

## NEXTERA ENERGY, INC.'S MOTION FOR REHEARING

I.    INTRODUCTION ........................................................................................... 4

II.   POINTS OF ERROR ..................................................................................... 8

      A.    POINT OF ERROR NO. 1 – The Order erred in applying PURA § 14.101
            as a basis to deny approval of the EFH and TTHC transactions. (Ordering
            Paragraph No. 1; Order § I.F.; Findings of Fact Nos. 94-95) ....................... 8

      B.    POINT OF ERROR NO. 2 – The Order failed to address public interest
            factors mandated by PURA § 14.101. (Order §§ I.B.-F.; Findings of Fact
            Nos. 96, 104; Conclusions of Law Nos. 2-3; Ordering Paragraph No. 1) .............. 8

      C.    POINT OF ERROR NO. 3 – The Order erred by adopting and applying a
            newly minted, more stringent standard to evaluate the public interest.
            (Order §§ I.C., F.; Findings of Fact Nos. 68-77, 102-104; Conclusion of
            Law No. 2; Ordering Paragraph No. 1) ............................................ 10

      D.    POINT OF ERROR NO. 4 – The Order erred in its interpretation and
            application of PURA §§ 39.262 and 39.915 as a basis to deny approval of
            the transactions. (Order §§ I.C., F.; Findings of Fact Nos. 68-77, 91-93,
            96-104; Conclusions of Law Nos. 2-3; Ordering Paragraphs Nos. 1-2) ............... 14

            1.    The Order erred in its interpretation of PURA §§ 39.262 and 39.915 ........... 14

            2.    The Order erred in its application of the PURA §§ 39.262 and 39.915
                  factors ................................................................ 16

      E.    POINT OF ERROR NO. 5 – The Order erred by failing to address each of
            the issues identified in the Preliminary Order. (Order §§ I.B.-F.; Finding
            of Fact No. 11) ..................................................................... 20

      F.    POINT OF ERROR NO. 6 – The Order erred by failing to address the
            threshold jurisdictional question involving the TTHC transaction and by
            failing to disclaim jurisdiction over the transaction. (Order § I;
            Conclusions of Law Nos. 1-2; Ordering Paragraphs Nos. 1-3) ...................... 21

      G.    POINT OF ERROR NO. 7 – If the Commission determines that it has
            jurisdiction over the TTHC transaction, the TTHC transaction should be
            approved and the Order revised to include findings, conclusions, and
            ordering language specific to the TTHC transaction as required under
            PURA §§ 14.101, 39.262 and 39.915 and the Commission's Preliminary
            Order. (Order § I.A.; Findings of Fact Nos. 39-104; Conclusions of Law
            Nos. 1-3; Ordering Paragraphs Nos. 1-3) ....................................... 23

543
1

1. The Order erred by failing to address the separate TTHC transaction issues identified in the Preliminary Order. .................................................... 23

2. The Order violates § 2001.141 of the APA, which requires the Commission to independently address the TTHC transaction as it is a stand-alone transaction separate and apart from the EFH transaction. ........... 23

3. The Order erred in denying the TTHC Transaction (Order § I.A.; Findings of Fact Nos. 57-93; Conclusions of Law Nos. 2-3; Ordering Paragraphs Nos. 1-3). ..................................................................................... 24

H. POINT OF ERROR NO. 8 – The Order erred by failing to apply the Commission's established practice of evaluating and adopting regulatory conditions necessary to the public interest determination. (Order § I.F.; Findings of Fact Nos. 103-104; Conclusions of Law Nos. 2-3; and Ordering Paragraphs Nos. 1-3) ..................................................................... 25

I. POINT OF ERROR NO. 9 – The Order erred in finding that the sole tangible and quantifiable benefit of the proposed transactions meriting consideration is the sharing of interest rate savings for four years. (Order § I.C.; Findings of Fact Nos. 69-72) ....................................................... 27

J. POINT OF ERROR NO. 10 – The Order erroneously determined that the proposed transactions would subject Oncor and Oncor ratepayers to increased risks. (Order § I.B.; Findings of Fact Nos. 57-67, 88, 101-104) ......... 28

1. The Order erred by failing to consider the significant risks shown in the record of maintaining the "status quo" and, thereby, requiring Oncor to remain under a bankrupt parent. .................................................................. 28

2. The Order erred by finding that that the "expansive and diversified structure" of NextEra Energy and its affiliates would subject Oncor and Oncor ratepayers to increased risk. ......................................................... 29

3. The Order erred by basing its determination of increased risk to Oncor and Oncor ratepayers on isolated excerpts from two credit rating agency documents. ........................................................................................ 30

4. The Order erred by finding that Oncor's contribution to payment of NextEra Energy's consolidated debt following the close of the proposed transactions would result in increased risk to Oncor and Oncor ratepayers. ........................................................................................ 31

5. The Order erred by finding that NextEra Energy's competitive businesses would subject Oncor and Oncor ratepayers to increased risks. ..... 32

K. POINT OF ERROR NO. 11 – The Order erroneously found that the existing ring fence for EFH plus a majority of independent and disinterested board of directors at Oncor would be necessary for NextEra Energy's ownership of Oncor. (Order § I.D., E.; Findings of Fact Nos. 78-93) ..................................... 34

1. The Order's findings that Oncor's existing ring fence requires a majority of independent and disinterested board of directors and that NextEra Energy objected to a majority independent board are both factually erroneous. ................................................................................ 34

2.  The Order erred by finding that the EFH ring fence plus a majority independent and disinterested board of directors at Oncor are necessary to protect Oncor and Oncor ratepayers from the alleged risks of NextEra Energy's ownership. ........................................................................ 35

3.  The Order erred by finding that the majority independent and disinterested board appointment and veto restrictions were critical in protecting Oncor from the EFH bankruptcy and that such measures are necessary to protect Oncor from a NextEra Energy bankruptcy. ................. 38

4.  The Order's findings that removal of the Board appointment and veto restrictions could adversely affect Oncor's reliability, availability, and cost of service are erroneous. ........................................................ 39

L.   POINT OF ERROR NO. 12 – The Order erred by relying on facts not in evidence.  (Order § I.B.; Finding of Fact No. 60) ................................. 40

M.   POINT OF ERROR NO. 13 – Additional Procedural and Substantive Errors ..... 40

1.  The Order fails to address or even recognize evidence on the Stipulation and Agreement between NextEra Energy and certain intervenors. (Order § I.C.; Findings of Fact Nos. 68-77, 94-104) ..................................... 40

2.  The Order erred by including inconsistent statements regarding the composition of Oncor's Board of Directors.  (Order § I.D.; Findings of Fact Nos. 85, 88, and 89). ......................................................... 41

3.  Finding of Fact Nos. 54 and 100 contain errors. ............................................. 42

a.  Finding of Fact No. 54 contains factual and typographical errors. ........... 42

b.  Finding of Fact No. 100 has a typographical omission. ........................... 43

N.   POINT OF ERROR NO. 14 – The Order violates NextEra Energy's constitutional rights of due process and equal protection. .................................... 43

III.  CONCLUSION ................................................................................... 44

**DOCKET NO. 46238**

| | | |
|---|---|---|
| **JOINT REPORT AND APPLICATION** | § | |
| **OF ONCOR ELECTRIC DELIVERY** | § | **PUBLIC UTILITY COMMISSION** |
| **COMPANY LLC AND NEXTERA** | § | |
| **ENERGY, INC. FOR REGULATORY** | § | **OF TEXAS** |
| **APPROVALS PURSUANT TO PURA** | § | |
| **§§ 14.101, 39.262 AND 39.915** | § | |

## <u>NEXTERA ENERGY, INC.'S MOTION FOR REHEARING</u>

NextEra Energy, Inc. ("NextEra Energy" or the "Company") respectfully files this Motion for Rehearing pursuant to Texas Administrative Procedure Act[1] § 2001.146 and Public Utility Commission of Texas ("Commission") Procedural Rule 22.264 to request reconsideration of the Commission's Order signed on April 13, 2017, and to preserve the Company's rights to judicial review.

## I.  <u>INTRODUCTION</u>

The Commission's Order in this proceeding is unprecedented.  Unlike in past major sale-transfer-merger proceedings, the Commission, after minimal open-meeting discussion of the fully briefed issues and evidence, ruled that the proposed transactions at issue are not in the public interest, and summarily denied approval.  Rehearing should be granted because the Order contains a number of serious errors that require correction.  The Order represents an expansion of power that exceeds the limits set by the Legislature and the bounds of the Commission's own precedent.  In denying approval of the proposed transactions, the Order fails to consider mandated statutory factors and impermissibly conflates the standards and remedies set out in PURA § 14.101 and in PURA §§ 39.262 and 39.915 to re-define the public interest and deny a transaction on an unlawful *ad hoc* basis.  Specifically, the Commission's Order:

- Bases its denial of the transaction in part on PURA § 14.101 notwithstanding the fact that this provision does not authorize that remedy;

- Fails to address factors that PURA § 14.101(b) requires the Commission to consider in its public interest analysis;

- Sets forth a new, more stringent public interest standard under PURA § 14.101(b) that requires a showing of tangible benefits to ratepayers that are "unique" and "exclusive" to the transaction;

- Holds for the first time that the term "public interest" in PURA §§ 39.262 and 39.915 is "amorphous" and empowers the Commission to disapprove a transaction based on factors found nowhere in those sections; and

---

[1] Administrative Procedure Act, Tex. Gov't Code §§ 2001.001-.902 (West 2016) (APA).

- Fails to make adequate findings on the public interest factors in PURA §§ 39.262 and 39.915 that are required to be considered before a transaction may be disapproved.

The Order's *ad hoc* imposition of new requirements and the resulting findings and summary denial of the two separately negotiated transactions at issue stand in contrast to those in the order issued only last year in the *Ovation* case,[2] where the Commission found a proposed transaction to acquire Oncor Electric Delivery Company LLC ("Oncor") to be in the public interest subject to certain conditions. The contrast is especially striking because the *Ovation* order found the transaction proposed there to be in the public interest despite evidence establishing that billions of dollars in debt entirely dependent on Oncor cash flows for servicing would continue to reside directly above Oncor and that Oncor would, at least initially, be owned by a non-investment grade entity.[3] The transactions in this case would eliminate all of that debt through refinancing by a traditional utility holding company parent that is A- rated, widely diversified, and highly liquid with more than $7 billion of annual operating cash flows.[4] Despite this evidence, the Order summarily denies NextEra Energy's proposed acquisition of Oncor outright. In doing so, the Order misplaces emphasis on a partial sentence in a Moody's report that the proposed transactions will constrain NextEra Energy's debt capacity, while wholly ignoring the report's assessment that the constraint will be short-lived over the 2017–2018 period and that the Oncor acquisition is a "credit positive for NextEra" warranting "affirmation" of NextEra Energy's credit ratings and stable outlook—credit ratings that are better than Oncor's.[5]

The Order additionally ignores Moody's determination that NextEra Energy's acquisition of Oncor will unequivocally benefit Oncor:

> The acquisition by a traditional, strategic player will remove the contagion risks of EFH and provides a more transparent view of Oncor's credit profile. The approximately $10 billion of debt that exists above Oncor ... will be extinguished. As a result, Oncor's rating will no longer be constrained by the EFH and EFIH debt burden that was secured by the implied equity value of Oncor and looked to Oncor for its debt service expenses.[6]

The Order also failed to give any consideration to the benefits and protections offered by NextEra Energy's 73 regulatory commitments[7]—commitments that include and exceed many of

---

[2] *Joint Report and Application of Oncor Electric Delivery Co., LLC, Ovation Acquisition I, LLC, et al. for Regulatory Approvals Pursuant to PURA §§ 14.101, 37.154, 39.262(l)-(m), and 39.915*, Docket No. 45188 (Mar. 24, 2016).

[3] Docket No. 45188, Order at 1, 9, 15; Docket No. 45188, Direct Testimony of Michael P. Gorman, TIEC Ex. 2 at 8.

[4] Tr. at 182:22-23 (Shapard Redirect) (Feb. 21, 2017); Rebuttal Testimony of John Reed, NextEra Ex. 6 at 7:12-16.

[5] Direct Testimony of John Reed, NextEra Ex. 4, Exhibit JR-6 at 5-6.

[6] *Id.*, Exhibit JR-6 at 1.

[7] Attachment A to this Motion for Rehearing is a copy of NextEra Energy's proposed regulatory commitments. This attachment was additionally provided as an attachment to NextEra Energy's Initial Brief.

those adopted by the Commission in *Ovation* or in Docket No. 34077, which involved Energy Future Holdings Corp.'s ("EFH") acquisition of Oncor. The effect of the Order is to deny Oncor the opportunity to: (1) eliminate the approximately $11 billion in legacy debt at EFH/Energy Future Intermediate Holding Company LLC ("EFIH") that is entirely dependent on Oncor's cash flows;[8] (2) eliminate exposures to legacy federal tax and asbestos liabilities;[9] (3) eliminate current credit rating constraints Oncor has experienced under EFH's ownership and obtain as much as a three-notch upgrade to Oncor's credit rating;[10] (4) ensure Oncor's funding of its five-year capital plan;[11] (5) retain a majority independent Board of Directors with three Disinterested Directors—markedly more restrictive than 95 percent of the utilities in this country, and every other utility in Texas, which are governed by wholly dependent boards of directors;[12] and (6) receive the benefits of the robust suite of regulatory commitments that includes protections with respect to debt issuance, capital structure, and bankruptcy exposure.[13]

Notably, the Order denies these and other benefits of the proposed transactions because the Commission is unwilling to allow NextEra Energy to exercise governance control over Oncor, an entity in which NextEra Energy will invest $12.2 billion to acquire. This Commission-imposed public interest bar against allowing an acquiring entity to exercise governance control over an acquired utility is contrary to: (1) the Legislature's intent in adopting PURA §§ 39.262 and 39.915, as these sections expressly contemplate transactions in which "a controlling interest or operational control of the [utility] will be transferred"; (2) the statutory criteria governing approval of transactions under PURA §§ 39.262 and 39.915; and (3) the record evidence.

The Order further erred by denying approval of the separately negotiated transaction to acquire Texas Transmission Holdings Corporation's ("TTHC") minority ownership interest in Oncor on the basis of facts specific to the transaction to acquire EFH's majority ownership interest. Applicants as an initial matter sought review of both transactions in deference to the Commission's general regulatory oversight authority. Upon reviewing the application, the Commission in its Preliminary Order properly identified as a threshold issue the jurisdictional question of whether

---

[8] *See* NextEra Ex. 4 at 13:5-8; Rebuttal Testimony of Mark Hickson, NextEra Ex. 5 at 4:2-9.

[9] NextEra Ex. 5 at 5:6-10; NextEra Ex. 6 at 4:7-8, 10:12-14.

[10] Direct Testimony of Mark Hickson, NextEra Ex. 1 at 10:6-8; NextEra Ex. 6 at 24:18-25.

[11] Attachment A at 2 (Regulatory Commitment No. 10).

[12] Tr. at 407:17-19 (Hickson Redirect) (Feb. 22, 2017); Tr. at 185:2-4 (Shapard Redirect) (Feb. 21, 2017); *see* Attachment A at 2-3 (Regulatory Commitment Nos. 14-16). In addition, to provide additional autonomy, NextEra Energy has committed that Oncor Board member compensation and benefits shall not be linked to the performance of NextEra Energy or any of its other subsidiaries. *See id.* (Regulatory Commitment No. 14).

[13] *See generally* Attachment A.

"NextEra Energy's acquisition of Texas Transmission Investment's 19.75% interest in Oncor constitutes a change in control for purposes of PURA §§ 14.101, 39.262(l) or 39.915(a)."[14] The Commission's Order did not resolve this issue. On rehearing, the Commission should determine that Commission approval is not required to close the TTHC transaction—a conclusion supported not only by the plain language in PURA §§ 14.101, 39.262, and 39.915, but also the fact that the Commission did not exercise jurisdiction over the transaction in which TTHC acquired its indirect 20 percent interest in Oncor.[15]

Alternatively, if the Commission determines that it does have jurisdiction, the Commission should issue a favorable public interest determination as to the TTHC transaction because the Order's discussion of perceived risks, benefits, and ring-fencing provisions do not apply to the TTHC transaction, and the record evidence supports a favorable public interest determination as to this separate transaction.[16]

In sum, the Commission should grant rehearing and render an order on rehearing with revised findings and conclusions that corrects these and other errors identified in Section II of this Motion for Rehearing. The order on rehearing should hold that the proposed transaction with EFH is in the public interest and approved, and either disclaim jurisdiction over the proposed transaction with TTHC or find that the transaction also is in the public interest and approved. Failure to do so would result in reversible error that prejudices the substantial rights of NextEra Energy because the Order contains findings, inferences, conclusions, and decisions that violate statutory provisions and constitutional rights; are in excess of the Commission's authority; are affected by other error of law; are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion.[17] To ensure sufficient time to consider the merits of this motion and encourage possible settlement discussions, NextEra Energy respectfully requests that the Commission extend the period for acting on this motion for rehearing to the maximum extent allowed by law.

---

[14] Preliminary Order at 9 (Issue No. 39) (Dec. 1, 2016).

[15] There is no obligation in the Order on Rehearing in Docket No. 34077 involving EFH that requires Commission approval of the 20 percent minority interest in Oncor. In Docket No. 34077, the Order on Rehearing required only that, if a minority interest in Oncor was sold, it be sold to a party that was not affiliated with, and that was independent from, the purchasers of TXU. *See* Docket No. 34077, Order on Rehearing at Finding of Fact No. 75.

[16] NextEra Energy's proposed regulatory commitments are also not applicable to the TTHC transaction. The proposed regulatory commitments are specific to NextEra Energy's request for a favorable public interest determination on the separate transaction involving EFH.

[17] *See* APA § 2001.174.

## II. **POINTS OF ERROR**

**A.** **POINT OF ERROR NO. 1 – The Order erred in applying PURA § 14.101 as a basis to deny approval of the EFH and TTHC transactions. (Ordering Paragraph No. 1; Order § I.F.; Findings of Fact Nos. 94-95)**

The Commission committed clear error in Ordering Paragraph 1 of its Order by relying on PURA § 14.101 as authority for denying the proposed transactions. Section 14.101 does not authorize the Commission to deny a transaction. Instead, § 14.101 confers only the right to "take the effect of the transaction into consideration in ratemaking proceedings" and "disallow the effect of the transaction if the transaction will unreasonably affect rates or service."[18] The Commission has no authority under PURA § 14.101 to deny the transaction outright.[19] The Order acknowledges as much in Findings of Fact Nos. 94-95 and § I.F., which base the authority to deny the transactions solely on PURA §§ 39.262 and 39.915.[20] The internal inconsistency between Ordering Paragraph No. 1 and Findings of Fact Nos. 94-95, and the contradiction between the Order and the statute, should be corrected through an order on rehearing.

**B.** **POINT OF ERROR NO. 2 – The Order failed to address public interest factors mandated by PURA § 14.101. (Order §§ I.B.-F.; Findings of Fact Nos. 96, 104; Conclusions of Law Nos. 2-3; Ordering Paragraph No. 1)**

Rehearing should also be granted on the independent ground that the Order failed to consider public interest factors mandated by PURA § 14.101(b)(2). That section directs that the Commission, in determining whether a proposed transaction is in the public interest, "shall consider":

> (2) whether the transaction will:
>
> (A) adversely affect the health or safety of customers or employees;
>
> (B) result in the transfer of jobs of citizens of this state to workers domiciled outside this state; or
>
> (C) result in the decline of service.

The Order contains no discussion or even mention of the first two factors. The Order also does not directly mention or give meaningful consideration to the third factor. Whereas, this third factor requires the Commission to evaluate whether the proposed transactions "will result in the decline in service," the Order merely speculates, when addressing PURA §§ 39.262 and 39.915

---

[18] Tex. Util. Code § 14.101(c) (West 2007, 2016 & Supp. 2016) (PURA); *Nucor-Steel Tex. v. Pub. Util. Comm'n of Tex.*, 363 S.W.3d 871, 883 (Tex. App.—Austin 2012, no pet.).

[19] *Nucor-Steel Tex.*, 363 S.W.3d at 883 (recognizing that under the statute, the Commission "is only explicitly permitted to 'disallow the effect of the transaction if the transaction will unreasonably affect rates or service' and to 'take the effect of the transaction into consideration in ratemaking proceedings'").

[20] Order at Findings of Fact Nos. 94-95.

8

factors, that service "could be" adversely affected and only "if Oncor were to be subject to" a hypothetical future NextEra Energy bankruptcy.[21]

The failure of the Order to consider these § 14.101 factors violates the statute and is arbitrary and capricious decision-making and an abuse of the Commission's discretion. The Texas Supreme Court has held that it is arbitrary and capricious decision-making and an abuse of discretion under the Texas Administrative Procedure Act for an agency to disregard factors that the Legislature has directed it to consider.[22] Consistent with this precedent, the Third Court of Appeals in *Consumers Water, Inc. v. Public Utility Commission*[23] ruled that the Commission had engaged in arbitrary and capricious decision-making and had abused its discretion by failing to consider certain "rules" and "factors" that the Legislature had expressly prescribed in PURA that the Commission "shall" consider in determining a water utility's adjusted value of invested capital.

*Consumers Water* is applicable here. The Order failed to make underlying findings or otherwise address the three specific factors identified above that the Legislature directed in PURA § 14.101(b)(2) that the Commission "shall" consider in determining whether a proposed transaction is in the public interest. This failure is arbitrary and capricious and an abuse of discretion. The Commission accordingly should grant rehearing to correct this error, and on rehearing should find that these statutory criteria in § 14.101 are met.[24]

---

[21] These findings are also insufficient under PURA §§ 39.262 and 39.915, as discussed below in Point of Error 4.

[22] *See City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994) (citing *Gerst v. Nixon*, 411 S.W.2d 350, 360 n.8 (Tex. 1966)) (holding that an "agency's decision is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor that the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result."); *CenterPoint Energy Houston Elec., LLC v. Pub. Util. Comm'n*, 212 S.W.3d 389, 400 (Tex. App.—Austin 2006, pet. abated) ("An agency decision may be found arbitrary and capricious if it is based on legally irrelevant factors or if legally relevant factors were not considered.").

[23] 774 S.W.2d 719, 721-22 (Tex. App.—Austin 1989, no writ).

[24] With regard to the evidence establishing that neither the EFH or the TTHC transactions will adversely affect the health or safety of Oncor customers or employees, please refer to: Direct Testimony of Robert S. Shapard, Oncor Ex. 1 at 17:14-23; Direct Testimony of James A. Greer, Oncor Ex. 3 at 6:22-7:2, 10:18-21, 12:14-25; Direct Testimony of Michael Spoor, NextEra Ex. 3 at 10:4-11:7, 12:19-22. As to the evidence demonstrating the fact that the transactions will not result in the transfer of jobs of citizens of this state to workers domiciled outside this state, please refer to: Oncor Ex. 1 at 18:25-19:7; NextEra Ex. 1 at 8:19-9:7, 47:22-26; NextEra Ex. 4 at 66:7-67:9; Attachment A at 2, 4-5, 11 (Regulatory Commitment Nos. 8, 20-24, and 68). Finally, with regard to the fact that the transactions will not result in a decline in service, please refer to: Oncor Ex. 1 at 17:24-18:2; Oncor Ex. 3 at 9:18-12:13; NextEra Ex. 1 at 37:12-38:7; NextEra Ex. 3 at 12:3-18; NextEra Ex. 4 at 65:1-66:6; Direct Testimony of Constance McDaniel Wyman, Staff Ex. 2 at 7:12-8:2; Attachment A at 1-2 (Regulatory Commitment Nos. 5, 6, and 10).

C.    **POINT OF ERROR NO. 3 – The Order erred by adopting and applying a newly minted, more stringent standard to evaluate the public interest. (Order §§ I.C., F.; Findings of Fact Nos. 68-77, 102-104; Conclusion of Law No. 2; Ordering Paragraph No. 1)**

The Order further erred by imposing a new, more stringent standard for consideration of the benefits of a transaction. First, while the Commission in prior dockets has construed PURA § 14.101 to give the Commission discretion to consider whether a transaction provides tangible benefits to ratepayers, the Order in this case newly declared that the benefit also must be shown to be "unique" and "exclusive" to the transaction or else the benefit would not be considered.[25] While the Preliminary Order included as one sub-issue whether there are tangible and quantifiable benefits specific to the proposed transactions, neither the Preliminary Order nor any other order apprised NextEra Energy that no consideration would be given to any other tangible benefits absent proof that the benefit was "unique" and "exclusive" to the transactions. The Commission included the same sub-issue in its preliminary order in the *Ovation* case but imposed no such "unique" and "exclusive" requirement in its public interest evaluation in its final order. The Commission erred by imposing this new requirement in the Order in this proceeding.

Second, the Order further excluded from consideration all benefits of the proposed transactions unless the benefits were quantified.[26] Here again, the Commission both in this case and in the *Ovation* case stated as one issue in the preliminary order whether the transactions would result in tangible and quantifiable benefits to Texas customers. But neither preliminary order provided that all other benefits of a transaction would be disregarded if not quantified. To the contrary, the Commission in its final order in *Ovation* found the proposed transaction to be in the public interest based on findings of "benefits to ratepayers," *none of which was quantified.*[27]

A review of the *Ovation* order illustrates the fundamentally new and more stringent "unique and exclusive" and "quantified" tangible benefits standard applied by the Order in this case:

- The lead "benefit to ratepayers" found by the Commission in *Ovation* was that "the proposed transaction provides an opportunity to end the bankruptcy proceeding faced by Oncor's majority parent company, EFH, in a relatively expeditious manner."[28] The Order in this case, however, rejected this benefit, stating that "[t]he conclusion of the bankruptcy proceeding is not a benefit unique to the proposed transactions; removal of

---

[25] Order at §§ I.C., F. & Findings of Fact Nos. 68, 74, and 102.

[26] *Id.* at § I.C. & Findings of Fact Nos. 68-73.

[27] *See* Docket No. 45188, Order at 14-15 (Mar. 24, 2016).

[28] *Id.* at 14; *see also id.* at Finding of Fact No. 293.

[EFH] . . . from bankruptcy will be obtained by any transaction that the Commission approves."[29]

- The second benefit to ratepayers found by the Commission in *Ovation* was that "the transaction will allow a well-regarded Texas company to acquire operational control of Oncor."[30] The Order in this case made no comparable finding even though it determined that NextEra Energy also "is a well-regarded utility holding company," and further that the Company "has been a successful owner and operator of its regulated subsidiary, Florida Power & Light."[31] Moreover, NextEra Energy and Oncor witnesses uniformly testified that the proposed transactions would provide Oncor with a supportive parent company and opportunities for collaboration between experienced utilities.[32] The Order dismissed the benefit of collaboration between utilities as "not quantified."[33]

- The third benefit found in *Ovation* was that the proposed transaction would reduce, though not eliminate, the amount of debt held directly above Oncor at EFH and EFIH.[34] The proposed transactions in this case would eliminate that debt in its entirety by retiring a portion and refinancing a portion at a NextEra Energy subsidiary that is not within the direct chain of ownership above Oncor.[35] Moody's confirmed this benefit[36] and found that NextEra Energy's acquisition of Oncor would "remove the contagion risks of EFH" to Oncor.[37] These facts are undisputed. Moreover, NextEra Energy is far less dependent on Oncor revenues to service repayment of the refinanced debt as compared to Oncor's current situation under EFH or that approved by the Commission in the *Ovation* case. The Order nonetheless did not recognize these benefits, and erroneously found that the debt above Oncor would not be "truly" eliminated.[38]

- The fourth benefit found in *Ovation* was that "the transaction will not adversely affect the health or safety of Oncor's customers or employees."[39] This issue is a statutory factor that must be considered under PURA § 14.101, and NextEra Energy and Oncor presented testimony demonstrating that the proposed transactions in this case will not adversely affect the health or safety of Oncor's customers or employees.[40] The Order makes no finding of benefit, or any finding at all on this issue; an error discussed above in Point of Error No. 2.

- The fifth benefit found in *Ovation* was that "the transaction will not result in the transfer of jobs of citizens of this state to workers domiciled out of this state."[41] Like employee and customer health and safety, this issue also is a statutory factor that must be

---

[29] Order at § I.C. & Finding of Fact No. 74.
[30] Docket No. 45188, Order at 14.
[31] Order at §§ I.C., E.
[32] NextEra Ex. 3 at 5:4-11:17; Oncor Ex. 3 at 9:13-12:25; *see also* Oncor Ex. 1 at 20:14-20.
[33] Order at §§ I.C. & Findings of Fact Nos. 71-72.
[34] Docket No. 45188, Order at 14 & Findings of Fact Nos. 150-152.
[35] *See* NextEra Ex. 5 at 4:1-14; Tr. at 331:2-7 (Hickson Cross) (Feb. 22, 2017); Tr. at 405:11-7 (Hickson Redirect) (Feb. 22, 2017).
[36] NextEra Ex. 4, Exhibit JR-6 at 1. Moody's stated that "[t]he approximately $10 billion of debt that exists above Oncor . . . will be extinguished." *Id.*
[37] *Id.*
[38] Order at Finding of Fact No. 57.
[39] Docket No. 45188, Order at 14.
[40] NextEra Ex. 3 at 10:6-7; Oncor Ex. 3 at 6:27-7:2, 10:18-21.
[41] Docket No. 45188, Order at 14.

considered under PURA § 14.101. NextEra Energy and Oncor presented testimony on this issue, including regulatory commitments relating to Oncor's employees that are essentially identical to those approved as conditions in the *Ovation* order.[42] The Order, however, makes no comparable finding of such a benefit, and no finding on this statutory factor at all, which is an error discussed in Point of Error No. 2. To the contrary, the Order specifically rejected NextEra Energy's workforce commitment as a benefit because it was not quantified despite the fact that no such benefit quantification was required in *Ovation*.[43]

- The sixth benefit found in *Ovation* was that "the transaction will not result in a decline in service."[44] Here again, NextEra Energy and Oncor presented testimony on this issue, including regulatory commitments relating to reliability metrics, including a SAIDI metric that exceeded that found sufficient by the Commission in the *Ovation* order.[45] The Order, however, makes no finding on this statutory factor or the associated benefit, which is an error discussed in Point of Error No. 2.

- The seventh benefit found in *Ovation* was the "possible combination" of Oncor with Sharyland Utilities.[46] NextEra Energy in this case made the commitment that, if the proposed transactions are approved and close, NextEra Energy will seek approval to consolidate Lone Star Transmission into Oncor and any net savings will be reflected in Oncor's cost of service.[47] The Order rejected this as a benefit because it was not quantified.[48]

- The *Ovation* order included, as a condition necessary to finding that the transaction was in the public interest, that the applicants must fund the amount of capital expenditures in Oncor's current long range plan for five years following the date of closing, with permission to reduce capital spending due to conditions not under the company's control, including, without limitation, siting delays, cancellations of projects by third parties, or weaker than expected economic conditions. NextEra Energy made the same but stronger commitment, to fund Oncor's current long range plan for five years unconditionally with no exceptions that would allow reduced capital spending.[49] The Order nonetheless dismissed this benefit as "not exclusive" to the proposed transactions, stating that such a commitment "would likely" be required "for any transaction" to be found in the public interest.[50]

---

[42] *Compare* Docket No. 45188, Order at 51-52 & Findings of Fact Nos. 286–290 *with* Attachment A at 4-5 (Regulatory Commitment Nos. 20-24).

[43] Order at 5 & Findings of Fact Nos. 71-72.

[44] Docket No. 45188, Order at 14.

[45] *Compare* Docket No. 45188, Order at Finding of Fact No. 238 ("For a period of five years, OEDC's system average interruption duration Index (SAIDI) and system average interruption frequency index (SAIFI) benchmarks should be calculated based on the performance standards applicable to Oncor for years 2011, 2013, and 2014. OEDC's SAIDI benchmark should be 96.30667 and its SAIFI benchmark should be 0.94000."), *with* Attachment A at 1 (Regulatory Commitment No. 5) ("For purposes of Substantive Rule 25.52, system average interruption duration index ("SAIDI") and system average interruption frequency index ("SAIFI") standards should be calculated based on Oncor's forced interruption performance for years 2013, 2014, and 2015. Oncor's SAIDI standard should be 93.74667 and its SAIFI standard should be 0.95667. These standards should go into effect starting with the calendar year 2018.").

[46] Docket No. 45188, Order at 14.

[47] Attachment A at 10 (Regulatory Commitment No. 64).

[48] Order at 5 & Findings of Fact Nos. 71-72.

[49] Attachment A at 2 (Regulatory Commitment No. 10).

[50] Order at 5.

- The *Ovation* order also found as part of its public interest determination that "the possibility of" sharing the tax savings from the REIT structure with ratepayers is a "potential benefit" of the transaction.[51] The *Ovation* order contained no estimate or other quantification of the potential benefit. The Order in this case rejected any consideration of the possibility of synergy savings resulting from the proposed transactions as a potential public interest benefit despite the fact that numerous intervenors consistently proposed synergy savings estimates throughout this proceeding. The Order stated only that NextEra Energy had not yet estimated such savings.[52]

Because the "public interest" factor in PURA § 14.101(b)(4) is not defined in the statute or in the Commission's rules,[53] applicants must be able to know and rely on Commission precedent in presenting their case. While the Commission has issued orders in sale-transfer-merger cases in the past, many involved review and approval of parties' stipulations and do not carry precedential weight.[54] Indeed, most of the existing ring fence provisions for EFH resulted from the Commission's approval of a non-unanimous stipulation of the parties in Docket No. 34077. The Commission's order in Docket No. 34077 expressly provided that the order should not "be regarded as precedent as to the appropriateness of any principle or methodology underlying the stipulation."[55] The *Ovation* case, by contrast, is strong and direct precedent because it was fully litigated, it was heard by the same Commissioners who heard this case, it involved the same utility and many of the same issues, and the Commission issued its order only last year. None of the public interest benefits to ratepayers found by the Commission in *Ovation* was quantified, and none was shown to be "unique" and "exclusive" to the transaction at issue. The Order in this case starkly departs from that precedent without explanation and erroneously imposes new and different restrictive requirements for considering whether a transaction is in the public interest.[56]

For the foregoing reasons, the Commission should grant rehearing and render an order with revised findings, conclusions, and ordering paragraphs that does not restrict the Commission's public interest evaluation and instead considers and recognizes the full benefits of the proposed transactions. The order on rehearing should determine that the EFH transaction with the regulatory

---

[51] Docket No. 45188, Order at 15.
[52] Order at Finding of Fact No. 73. The *Ovation* order noted as a final benefit that Oncor would be separated from its competitive affiliates Luminant and TXU Energy Retail Company. Docket No. 45188, Order at 14-15. That separation recently occurred as a result of the spin-off of Texas Competitive Energy Holdings Company from EFH.
[53] *See generally* 16 Tex. Admin. Code § 22.2.
[54] *See, e.g.*, Docket No. 34077, Order on Rehearing at Ordering Paragraph No. 3.
[55] *Id.*
[56] *Oncor Elec. Delivery Co. LLC v. Pub. Util. Comm'n of Tex.*, 406 S.W.3d 253, 267 (Tex. App.—Austin 2013, no pet.) (noting that an agency must explain its reasoning "when it appears to have departed from its earlier administrative policy or to be inconsistent in its determinations").

13

commitments proposed by NextEra Energy and the TTHC transaction are in the public interest and should be approved.[57] To do otherwise prejudices the substantial rights of NextEra Energy because the Order contains findings, inferences, conclusions, and decisions on these issues that violate due process and applicable statutory provisions; are in excess of the Commission's authority; are affected by other error of law; are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion.[58]

**D.** **POINT OF ERROR NO. 4 – The Order erred in its interpretation and application of PURA §§ 39.262 and 39.915 as a basis to deny approval of the transactions. (Order §§ I.C., F.; Findings of Fact Nos. 68-77, 91-93, 96-104; Conclusions of Law Nos. 2-3; Ordering Paragraphs Nos. 1-2)**

**1.** **The Order erred in its interpretation of PURA §§ 39.262 and 39.915.**

The Commission's Order interpreted "public interest" in PURA §§ 39.262 and 39.915 as "an amorphous concept" that imposes no limits on the factors the Commission may consider or the public interest standard to be applied.[59] The Order relied on *Railroad Commission v. Texas Citizens for a Safe Future and Clean Water* for this interpretation.[60]

Rehearing should be granted because this interpretation is clearly erroneous. Unlike the Railroad Commission statute at issue in *Texas Citizens*, the term "public interest" in PURA §§ 39.262 and 39.915 is not "amorphous." The statute in *Texas Citizens* listed "the public interest" as one of four separate factors the Railroad Commission was required to consider in deciding whether to grant an injection well permit. As the Texas Supreme Court explained, the term "public interest" in that statute was "amorphous," and the Railroad Commission's interpretation of it entitled to deference, because the Legislature had left the term public interest completely "undefined."[61]

This is not the case with PURA §§ 39.262 and 39.915. Instead, the Legislature defined the "public interest" to entail three specific criteria, which, if satisfied, require the transaction to be approved:

> The commission shall approve a transaction [under this section] if the commission finds that the transaction is in the public interest. In making its determination, the

---

[57] As discussed in Point of Error Nos. 6 and 7, the Commission should approve the TTHC transaction if the Commission determines that it has jurisdiction over that transaction.

[58] *See* APA § 2001.174.

[59] *See* Order at § I.F. and Findings of Fact Nos. 96 and 98.

[60] *Id.* at § I.F. (citing *R.R. Comm'n of Tex. v. Texas Citizens for a Safe Future and Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011)).

[61] *Texas Citizens*, 336 S.W.3d at 627-32.

commission shall consider whether the transaction will adversely affect (1) the reliability of service, (2) availability of service, or (3) cost of service of the electric utility or transmission and distribution utility.[62]

In this regard, PURA §§ 39.262 and 39.915 are comparable to the Texas Commission on Environmental Quality ("TCEQ") statute that the Court in *Texas Citizens* contrasted with the Railroad Commission statute. The Court observed that the TCEQ statute "requires the TCEQ to consider specific criteria . . . in its public interest inquiry" whereas there is "no parallel provision enumerating the types of public interest considerations the [Railroad] Commission must evaluate."[63] The Legislature thus chose to define "public interest" both in the TCEQ statute and in PURA §§ 39.262 and 39.915, but not in the Railroad Commission statute. The Order erroneously equates §§ 39.262 and 39.915 with the Railroad Commission statute.

A review of *Texas Citizens* also makes clear that, contrary to the Order's interpretation,[64] PURA §§ 39.262 and 39.915 do not grant the Commission discretion to consider additional factors beyond the three factors specified by the Legislature. Unlike the TCEQ statute, which contains an express Legislative grant that the TCEQ "shall not be limited to consideration of"[65] the factors specified in the statute, PURA §§ 39.262 and 39.915 contain no such grant of authority. The Legislature's decision to limit the Commission's discretion to the factors specified in §§ 39.262 and 39.915 dovetails with the severe consequence of a finding that the factors have not been met— the transaction is not approved and may not close.[66] This pairing of limited discretion with strong remedy contrasts with § 14.101, which, as discussed, affords the Commission broader discretion in evaluating the public interest but limits remedial relief to the ratemaking process, not the actual approval of the transactions.

It is well established that the Commission has only those powers that are expressly granted or necessarily implied by the language of PURA.[67] The Order impermissibly expands the Commission's powers in contravention of the statutory language. The Order's interpretation that the term "public interest" in §§ 39.262 and 39.915 is amorphous, and that the Commission is not bound by the factors specified in the statute, is a fundamental error that requires rehearing.

---

[62] PURA §§ 39.262(m), 39.915(b) (numbering added).

[63] *Texas Citizens*, 336 S.W.3d at 626-27.

[64] Order at § I.F. and Finding of Fact No. 98.

[65] *See Texas Citizens*, 336 S.W.3d at 627 n.11 (citing Tex. Water Code § 27.051(d)).

[66] *See* PURA §§ 39.262(l)-(m), 39.915(a)-(b).

[67] *Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184, 192-93 (Tex. 2007).

2. **The Order erred in its application of the PURA §§ 39.262 and 39.915 factors.**

Rehearing should also be granted because the Order's findings on the three public interest factors in PURA §§ 39.262 and 39.915 are deficient as a matter of law to support the Order's denial of approval of the proposed transactions. As discussed above, any determination that a proposed transaction is not in the public interest and not approved must be based on the Commission's consideration of whether the transaction *will* adversely affect the (1) reliability of service; (2) availability of service; or (3) cost of service of the utility.[68] While Findings of Fact Nos. 91, 92, and 93 purport to address these three factors, none finds that the proposed transactions actually *will* adversely affect service in the specified respects. Instead, under the heading "*Potential* Impacts of Ring Fence Elimination," Findings 91, 92, and 93 each in a sentence merely opine that service "*could be* adversely affected" and only if "*Oncor were to be subject to a NextEra Energy bankruptcy, without the protection of the [EFH] ring fence.*"[69] These speculative findings on their face do not meet the statutory requirement for denying approval of a proposed transaction and thus, violate statutory provisions, are in excess of the Commission's authority; are affected by other error of law; and are arbitrary and capricious or an abuse of discretion.[70]

There is also no credible substantial evidence in the record that the hypothetical circumstance of a NextEra Energy bankruptcy will come to pass. To the contrary, the undisputed evidence established that NextEra Energy has held an A- or higher credit rating for years and that NextEra Energy is expected to retain its A- rating following the close of the Oncor transaction.[71] The Order cites no evidence to support any possibility of a NextEra Energy bankruptcy filing. Moreover, as discussed below in Point of Error No. 10, the Order failed to consider undisputed evidence that all three credit rating agencies, after considering the risks, determined that the outlook for NextEra Energy's credit ratings will remain stable and not result in any downgrade at all upon consummation of the proposed transactions.[72]

There is also no credible substantial evidence in the record to support the further hypotheticals in Findings 91, 92, and 93 that Oncor might be exposed to a NextEra Energy bankruptcy without the existing Oncor ring fence, and that Oncor's provision of service, as a result of limited governance changes, could be adversely affected by a bankruptcy filing by NextEra

---

[68] *See* PURA §§ 39.262(m), 39.915(b).

[69] Order at Findings of Fact Nos. 91-93 (emphasis added).

[70] *See* APA § 2001.174.

[71] Tr. at 328:12-330:18 (Hickson Cross) (Feb. 22, 2017); NextEra Ex. 1 at 14:19-20; NextEra Ex. 4 at 31:6-11.

[72] NextEra Ex. 4 at 31:6-11; NextEra Ex. 6 at 24:6-25:8; *see also id.*, Exhibit JR-R-2.

Energy. Notably, the Order does not mention and fails to analyze the protections that the ring fence proposed by NextEra Energy would provide, including its commitment that "[a]n affirmative vote by a majority of the Disinterested Directors shall be required to file Oncor into bankruptcy for the benefit of NextEra Energy."[73] The Order makes no attempt to evaluate whether those protections would be equally effective (or provide even stronger protection) than those under Oncor's existing ring fence.

Indeed, the Order contains no analysis or mention whatsoever of the two key requirements for avoiding substantive consolidation of a utility's assets and liabilities into a parent company's bankruptcy, namely, that separate books and records are maintained and that creditors are not confused into expecting they can seek the utility's assets.[74] NextEra Energy's regulatory commitments specifically address these two requirements. The commitments include numerous provisions to ensure separation and arm's length interaction between Oncor and NextEra Energy and its affiliates.[75] NextEra Energy has further committed that, in the event NextEra Energy's credit ratings, which are several notches above those of Oncor, were to be downgraded to below investment grade by any one of the three major credit rating agencies, NextEra Energy and its subsidiaries will provide advance notice of their corporate separateness from Oncor to lenders on

---

[73] Attachment A at 3 (Regulatory Commitment No. 14).

[74] Tr. at 98:18-99:10 (Shapard Cross) (Feb. 21, 2017); Tr. at 183:16-184:4 (Shapard Redirect) (Feb. 21, 2017); *see also* Tr. at 282:9-15 (Hickson Cross) (Feb. 21, 2017).

[75] These measures include: (1) Oncor will maintain its separate existence as a separate entity with separate assets, franchises, obligations, and privileges (Regulatory Commitment No. 9); (2) Oncor will maintain detailed books, financial records and accounts, that are separate and distinct from those of NextEra Energy and its other affiliates (Regulatory Commitment No. 42); (3) transactions between Oncor and its competitive affiliates will be at arm's length in accordance with Commission Substantive Rule 25.272(e)(2) (Regulatory Commitment No. 25); (4) Oncor will maintain a separate board of directors (Regulatory Commitment No. 14); (5) Oncor's board of directors must approve Oncor's capital budgets, O&M expense budgets, and changes to Oncor's dividend policy (Regulatory Commitment Nos. 15 and 16); (6) Oncor will maintain a separate name and logo from its affiliates (Regulatory Commitment No. 51); (7) Oncor will maintain separate headquarters and management in Dallas County, Texas (Regulatory Commitment No. 8); (8) Oncor will maintain its debt separate and apart from NextEra Energy and its affiliates and subsidiaries and will maintain its own corporate and debt rating for its publicly traded securities (Regulatory Commitment No. 33); (9) Oncor's assets will not be pledged for any entity other than Oncor (Regulatory Commitment No. 31); (10) Oncor will not enter into inter-company debt transactions with affiliates of NextEra Energy and Oncor will not lend money to or borrow money from NextEra Energy and its affiliates (Regulatory Commitment No. 41); (11) Oncor will not share credit facilities with NextEra Energy or its affiliates (Regulatory Commitment No. 44); (12) Oncor will not incur or assume any debt related to the Proposed Transactions or future non-Oncor acquisitions by NextEra Energy (Regulatory Commitment No. 32); (13) Oncor will not incur or assume liability for the debts of NextEra Energy or its affiliates or subsidiaries or guarantee the debt or credit instruments of NextEra Energy or its affiliates (Regulatory Commitment No. 35); (14) NextEra Energy and its subsidiaries other than Oncor will not incur, guarantee, or pledge assets for any new debt that is disproportionately dependent on Oncor revenues or stock without first seeking Commission approval (Regulatory Commitment No. 2); (15) Oncor will not include in any of its debt or credit agreements cross-default provisions between Oncor's named securities and securities of NextEra Energy or any of its affiliates or subsidiaries and will not include in its debt or credit agreements any financial covenants or rating agency triggers related to NextEra Energy or other NextEra Energy affiliates (Regulatory Commitment No. 36). *See* Attachment A.

all new debt, and will use commercially reasonable efforts to seek an acknowledgement of that separateness and non-petition covenants in all new debt instruments.[76] NextEra Energy has made the additional commitment to provide the same advance notice of corporate separateness to all potential lenders of any new debt approved by the Commission that is disproportionally dependent on Oncor revenues or stock.[77] NextEra Energy also committed to implement measures necessary to obtain a non-consolidation legal opinion in the event NextEra Energy's credit ratings were to be downgraded to below investment grade by any one of the three major rating agencies.[78] This latter provision offers more protection than that which was approved by the Commission for EFH's acquisition of TXU Corp.[79]

The Order evaluates none of this. Instead, the Order focuses solely on the existing EFH ring fence and summarily states that two of the restrictions in that ring fence, the board member appointment restriction and the minority interest owner veto restriction, "are among the most important," and that the existing ring fence was "critical in protecting Oncor from the [EFH] bankruptcy."[80] As discussed below in Point of Error No. 11, these statements are not supported by the credible substantial evidence in the record, and they are at odds with established bankruptcy case law, also not addressed in the Order, which holds that substantive consolidation is a highly fact-specific inquiry and no one factor is dispositive.[81]

Finally, leaving aside the bankruptcy hypotheticals in the Order's findings, the Order failed to acknowledge the evidence establishing that the three factors in §§ 39.262 and 39.915 were satisfied because the proposed transactions will support and enhance, not adversely affect, Oncor's continued provision of reliable service to its customers. Specifically:

- Mr. Shapard, Mr. Greer, and Ms. Constance McDaniel Wyman testified that Oncor's customers at a minimum should not notice any change from the safe and reliable service that they currently enjoy.[82] Oncor, Staff, and NextEra Energy witnesses specifically

---

[76] *Id.* at 11 (Regulatory Commitment No. 71).

[77] *Id.* at 1 (Regulatory Commitment No. 2).

[78] *Id.* at 8 (Regulatory Commitment No. 50). A legal non-consolidation opinion would opine that a bankruptcy court would not consolidate Oncor's assets and liabilities with those of NextEra Energy in the highly unlikely event of a NextEra Energy bankruptcy.

[79] *See* NextEra Ex. 6 at 52:1-11. In addition, NextEra Energy's proposed ring fence addresses any concern about a possible voluntary bankruptcy filing by Oncor in favor of NextEra Energy or its affiliates. As noted, Regulatory Commitment No. 14 would require an affirmative vote by a majority of the disinterested directors before such a filing could be made. *See* Attachment A at 2-3.

[80] Order at § I.D. & Finding of Fact No. 84; *see also id.* at Findings of Fact Nos. 83, 85, and 88.

[81] *See* NextEra Energy's Initial Brief at 33; *see also In re Eagle-Picher Industries, Inc.*, 192 B.R. 903, 905 (Bankr. S.D. Ohio 1996) ("A review of the case law dealing with substantive consolidation makes it clear that the decisions on the subject are fact intensive, and decisions are made on a case-by-case basis"); *In re Donut Queen*, Ltd., 41 B.R. 706, 709 (Bankr. E.D.N.Y. 1984).

[82] Oncor Ex. 1 at 11:27-30; Oncor Ex. 3 at 10:18-21; Staff Ex. 2 at 7:12-8:2.

18

established that availability of that service will not be adversely affected[83] and that there would be no decline in service.[84]

- NextEra Energy has committed to full, unconditional funding of the capital expenditures in Oncor's current long-range plan for five years from the date of closing.[85] Mr. Shapard observed that this commitment to Oncor's robust capital expenditure program has the potential to improve service.[86]

- NextEra Energy has made specific SAIDI and SAIFI commitments to ensure Oncor's continued system reliability.[87]

- NextEra Energy intends to rely on Oncor local management and employees to continue to operate and manage the Oncor system in the same safe and reliable manner as today.[88]

- Mr. Ragland testified that the proposed transactions will not adversely affect Oncor's cost of service.[89] His conclusion is supported by proposed regulatory commitments that assure continued compliance with Oncor's previous rate settlements, as well as assure that Oncor's customers will not bear any fees and expenses associated with the proposed transactions or any expenses or liabilities related to EFH's bankruptcy.[90]

Further, the record conclusively establishes that NextEra Energy is a strong, capable and experienced partner and that its operational strengths complement those of Oncor.[91]

For the foregoing reasons, the Commission should grant rehearing and render an order with revised findings, conclusions, and ordering paragraphs that determine that the proposed transactions are in the public interest and should be approved under PURA §§ 39.262 and 39.915.[92] To do otherwise prejudices the substantial rights of NextEra Energy because the Order contains findings, inferences, conclusions, and decisions on these issues that violate statutory provisions, are in excess of the Commission's authority; are affected by other error of law; are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion.[93]

---

[83] Oncor Ex. 3 at 11:13-23; NextEra Ex. 4 at 65:2-17; Staff Ex. 2 at 7:12-8:2.
[84] Oncor Ex. 1 at 19:26-29; NextEra Ex. 1 at 37:12-38:7; NextEra Ex. 3 at 12:3-18; Staff Ex. 2 at 7:12-8:2.
[85] Attachment A at 2 (Regulatory Commitment No. 10).
[86] Oncor Ex. 1 at 17:24-18:2.
[87] Attachment A at 1-2 (Regulatory Commitment Nos. 5 & 6).
[88] NextEra Ex. 1 at 38:23-39:2.
[89] Oncor Ex. 4 at 7:10-25.
[90] Attachment A at 4, 5-6, 8 (Regulatory Commitment Nos. 18, 29, 30, and 53).
[91] NextEra Ex. 3 at 3:11-11:17.
[92] As discussed in Point of Error Nos. 6 and 7, the Commission should approve the TTHC transaction if the Commission determines that it has jurisdiction over that transaction.
[93] See APA § 2001.174.

E.    **POINT OF ERROR NO. 5 – The Order erred by failing to address each of the issues identified in the Preliminary Order. (Order §§ I.B.-F.; Finding of Fact No. 11)**

The Order erred by failing to address the list of issues set forth in the Preliminary Order in this proceeding. In its Preliminary Order, the Commission identified an extensive list of issues that *"must* be addressed in this docket."[94] This list included questions that the Commission determined must be answered under the applicable statutes, PURA §§ 14.101(b), 39.262(m), and 39.915(b),[95] and under Commission precedent related to sale-transfer-merger proceedings. The Commission specified the effect of the Preliminary Order, stating that the "Commission, *upon its own motion or upon the motion of any party*, may deviate from this Order when circumstances dictate that it is reasonable to do so. The Commission *will not* address whether this Order should be modified *except upon its own motion*."[96]

The Order erred by failing to address many, if not most, of the issues identified in the Preliminary Order. As discussed in Point of Error No. 2, the Order failed to address the statutory factors under PURA § 14.101(b)(2), which were set forth as Issue Nos. 5(b) through 5(d) and 40(b) through 40(d) in the Preliminary Order. The Order also failed to address, or even mention, in part or in full at least 30 other Preliminary Order issues, such as "[w]ill the transaction result in the evasion of regulation, or will it facilitate regulatory oversight?"[97]

The Order's failure to address the issues in the Preliminary Order is contrary to the Commission's own direction that modifications to the list of issues identified in the Preliminary Order be made only upon the Commission's or a party's motion. Neither the Commission nor any other party moved that the Preliminary Order be modified to remove the issues. The Order in this case itself notes the Commission's obligation to address issues identified in the Preliminary Order.[98] The courts have held that an agency is required to explain its reasoning when it departs from prior administrative policy or agency determinations.[99] As courts have explained, "the major factor that runs through arbitrary-capricious review cases is that the parties must be able to know what is expected of them in the administrative process."[100] The Order's failure to address the

---

[94] Preliminary Order at 4 (emphasis added).
[95] *Id.* at 4-5, 9 (Issue Nos. 5, 6, 40 and 41).
[96] *Id.* at 11 (emphasis added).
[97] *Id.* at 6, 10 (Issue Nos. 14 and 44).
[98] *See* Order at 4 and n.15 (noting that the Commission pursuant to Preliminary Order Issue Nos. 8(a)-(g) and 43(a)-(g) "must" evaluate whether a transaction would provide tangible and quantifiable benefits to Texas ratepayers).
[99] *Flores v. Employees Ret. Sys.*, 74 S.W.3d 532, 544-45 (Tex. App.—Austin 2002, pet. denied) (citing *City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896, 900 (Tex. App.—Austin 1993, writ denied)).
[100] *Starr County v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 355-56 (Tex. App.—Austin 1979, writ ref'd n.r.e.).

issues that the Commission found in its Preliminary Order must be addressed is clear error and must be corrected on rehearing.[101]

**F.    POINT OF ERROR NO. 6 – The Order erred by failing to address the threshold jurisdictional question involving the TTHC transaction and by failing to disclaim jurisdiction over the transaction. (Order § I; Conclusions of Law Nos. 1-2; Ordering Paragraphs Nos. 1-3)**

The application filed in this proceeding requested Commission review and approval of two separately negotiated transactions: the proposed transaction with EFH to acquire an approximately 80 percent majority ownership interest in Oncor, and the transaction with TTHC to acquire a 19.75 percent minority ownership interest in Oncor. This composite filing, which reflected NextEra Energy's goal to acquire a 100 percent ownership interest in Oncor, included the TTHC transaction under PURA §§ 14.101, 39.262, and 39.915 out of deference to the Commission even though their plain reading provides for more limited jurisdictional authority.

The Commission noted the threshold jurisdictional issue related to the TTHC transaction at its first open meeting to consider the application.[102] In accordance with its discussion, the Commission included the issue in its Preliminary Order Issue No. 39, which asks whether "NextEra Energy's acquisition of Texas Transmission Investment's 19.75% interest in Oncor constitutes a change in control for purposes of PURA §§ 14.101, 39.262(l) or 39.915(a)."[103]

The Order failed to address this jurisdictional question. As discussed in Point of Error No. 5, the Commission was obligated to address the issues identified in the Preliminary Order, including this one, and it was error not to do so. Specifically, it was error for the Order to assert jurisdiction over the TTHC transaction without an express finding that that transaction constitutes a change of control or otherwise falls within the purview of PURA §§ 14.101, 39.262(l) or 39.915(a). Moreover, because these provisions do not grant authority to review the proposed purchase of TTHC's minority ownership interest, the Order also erred by not disclaiming jurisdiction over the transaction.[104]

Looking first to PURA §14.101(a), if a utility does not report a transaction within a "reasonable time," it "may not sell, acquire, or lease plant as an operating unit or system" in Texas for more than $10 million, nor can it "merge or consolidate with another public utility operating

---

[101] *See* APA § 2001.174.
[102] Open Meeting Tr. at 17:6-18:25 (Dec. 1, 2016).
[103] Preliminary Order at 9 (Issue No. 39).
[104] The application's inclusion of the TTHC transaction did not serve to waive jurisdiction. The Commission may exercise only the authority conferred on it by statute. *See Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 315-16 (Tex. 2001).

in this state."[105]  Under § 14.101(b), a utility also must report each transaction that involves the sale of at least 50 percent of the utility's stock.  The sale of TTHC's minority ownership interest in Oncor does not implicate any of these provisions.  The TTHC transaction does not involve the sale of plant as an operating unit or system, the merger or consolidation with another public utility operating in Texas, or the sale of at least 50 percent of a utility's stock.  Therefore, the TTHC transaction is not subject to PURA § 14.101.

The TTHC transaction also does not implicate PURA §§ 39.262(l) or 39.915(a).  These provisions require Commission approval of a transaction that will (1) merge or consolidate a utility with another utility, or (2) sell or transfer at least 50 percent of a utility's stock, or (3) transfer a "controlling interest or operational control" of the utility.[106]  As stated, there is no merger or consolidation with another utility as part of the TTHC transaction here, and the minority interest is not the sale or transfer of 50 percent of Oncor's stock.  There is also no evidence in the record, nor could there be, that TTHC has a "controlling interest or operational control" of Oncor because TTHC is exactly that, a minority interest owner.  Therefore, §§ 39.262(l) and 39.915(a) do not apply.

The conclusion that Commission review of the TTHC transaction is not required under PURA §§ 14.101, 39.262, and 39.915 is further supported by the fact that the Commission has not previously exercised jurisdiction over the acquisition of the 20 percent minority interest in Oncor.  Specifically, in 2008, the transaction in which TTHC acquired its indirect 20 percent interest in Oncor closed without obtaining Commission approval.[107]

In sum, the Commission should grant rehearing because the Order's failure to address this jurisdictional issue and the Order's findings, inferences, conclusions, and decisions on the TTHC transaction violate statutory provisions; are in excess of the Commission's authority; are affected by other errors of law; are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion.[108]  The Commission should issue an order on rehearing that includes specific findings, conclusions, and ordering paragraphs disclaiming jurisdiction over the TTHC transaction.

---

[105] PURA § 14.101(a).
[106] *Id.* §§ 39.262(l), 39.915(a).
[107] *See supra* footnote 15.
[108] *See* APA § 2001.174.

22

**G.** **POINT OF ERROR NO. 7 – If the Commission determines that it has jurisdiction over the TTHC transaction, the TTHC transaction should be approved and the Order revised to include findings, conclusions, and ordering language specific to the TTHC transaction as required under PURA §§ 14.101, 39.262 and 39.915 and the Commission's Preliminary Order. (Order § I.A.; Findings of Fact Nos. 39-104; Conclusions of Law Nos. 1-3; Ordering Paragraphs Nos. 1-3)**

As stated in Finding of Fact No. 40 of the Order, "the application requested Commission approval of two, separately negotiated private transactions." Rather than adjudicating each of the transactions on its own merits, however, the Commission erroneously evaluated whether the proposed transactions "as a whole" are in the public interest.[109] If the Commission determines that it does have jurisdiction over the TTHC transaction, rehearing should be granted to approve the TTHC transaction and correct the following errors:

**1.** **The Order erred by failing to address the separate TTHC transaction issues identified in the Preliminary Order.**

In its Preliminary Order, the Commission identified Issues 39 through 48 to be addressed related to the "Acquisition of Texas Transmission Investment's Interest in Oncor."[110] Together with their subparts, the Preliminary Order lists twenty-five issues to be addressed specifically dealing with the TTHC transaction. However, these issues are not addressed in the Order. Rehearing should be granted to correct this error as discussed in Point of Error No. 5.

**2.** **The Order violates § 2001.141 of the APA, which requires the Commission to independently address the TTHC transaction as it is a stand-alone transaction separate and apart from the EFH transaction.**

The "two separate, privately negotiated transactions"[111] for which approval was sought were evidenced by the EFH Merger Agreement and the separate TTHC Merger Agreement.[112] The Order's Findings of Fact Nos. 40-42 confirm this fact.

Section 2001.141 of the APA requires that a final order "must include findings of fact and conclusions of law, separately stated."[113] The Order here, however, contains no separate statutory or underlying findings as to why the TTHC transaction is or is not in the public interest under PURA §§14.101, 39.262, or 39.915.

---

[109] Order at 3.
[110] Preliminary Order at 9-10 (Issue Nos. 39-48).
[111] Application at 1, 6 (Oct. 31, 2016); *see also id.* at 8-9.
[112] *Id.* at 8-9; NextEra Ex. 1 at 3:4-4:11, Exhibit MH-1 (EFH Merger Agreement) & Exhibit MH-2 (TTHC Merger Agreement).
[113] APA § 2001.141(b).

The lack of statutory and underlying findings on the TTHC transaction deprive the Order of any support for denying approval of that transaction. Rehearing should be granted to correct this error.

**3.     The Order erred in denying the TTHC Transaction (Order § I.A.; Findings of Fact Nos. 57-93; Conclusions of Law Nos. 2-3; Ordering Paragraphs Nos. 1-3).**

The Order's Findings of Fact Nos. 57-93 have no bearing on the TTHC transaction. Instead, the findings all relate to the EFH transaction, which would give NextEra Energy an indirect majority ownership interest in, and a degree of operational control over, Oncor. Findings 91-93 in particular, which purport to address the statutory factors in PURA §§ 39.262 and 39.915 regarding the reliability, availability, and cost of Oncor's service could be adversely affected, do not and cannot apply to the stand-alone TTHC transaction. All three of these findings presume the possibility of a NextEra Energy bankruptcy for which there is no evidence in general, and no evidence specifically, showing that closing the TTHC transaction would result in any financial risk to NextEra Energy or Oncor. Nor is there other evidence to support findings that closing the TTHC transaction will adversely affect Oncor's reliability, service, or rates. To the contrary, the TTHC transaction represents only a 20 percent ownership interest in Oncor, the existing Oncor ring fence will remain in place, and TTHC does not and post-closing NextEra Energy would not have control over these aspects of Oncor's operations. Accordingly, there is no basis under PURA §§ 39.262 and 39.915 to deny approval of the TTHC transaction.

Thus, if the Commission finds it has jurisdiction over the TTHC transaction, it should grant rehearing and approve the transaction.[114] To do otherwise prejudices the substantial rights of NextEra Energy as the Order contains or lacks findings, inferences, conclusions, and decisions that violate statutory provisions or are in excess of the Commission's authority; are affected by other error of law; are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion.[115]

---

[114] NextEra Energy's proposed regulatory commitments are specific to NextEra Energy's request for a favorable public interest determination on the separate transaction involving EFH. The regulatory commitments are not offered in connection with the transaction involving TTHC.

[115] *See* APA § 2001.174.

24

**H.    POINT OF ERROR NO. 8 – The Order erred by failing to apply the Commission's established practice of evaluating and adopting regulatory conditions necessary to the public interest determination.    (Order § I.F.; Findings of Fact Nos. 103-104; Conclusions of Law Nos. 2-3; and Ordering Paragraphs Nos. 1-3)**

As mentioned at the outset of this motion, the Commission's decision to summarily deny the proposed transactions is unprecedented. It is contrary to the Commission's established practice of evaluating regulatory commitments and adopting regulatory conditions necessary to the public interest determination. It is also contrary to the Preliminary Order in this case, which required the Commission to consider "[w]hat other regulatory commitments should the Commission require to ensure that the proposed transaction is in the public interest."[116]

NextEra Energy carefully considered the concerns expressed by Staff and intervenors and introduced into evidence 73 regulatory commitments designed to address any perceived risks associated with the transaction involving EFH and to provide financial, ring fencing, governance, and other protections to Oncor and its customers.[117] The Order, however, fails to evaluate the extent to which any of the proposed commitments support the public interest or address the concerns expressed in the Order. The Commission's failure to conduct this analysis, which is expressly provided for under PURA §§ 39.262(o), 39.915(d) and § 14.101, violates these statutory provisions; violates due process; is affected by other error of law; is not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and is arbitrary and capricious or an abuse of discretion.[118]

Sections 39.262(o) and 39.915(d) authorize an applicant to file regulatory commitments in advance of or as part of a filing under that section or under § 14.101. Upon the filing of these commitments, the Commission is vested with authority to enforce the commitments to the extent that they are consistent with the public interest standards under those statutes.[119] The Commission in past sale-transfer-merger cases has consistently fulfilled its statutory responsibility by considering the applicant's regulatory commitments and accepting them or imposing additional conditions necessary to support the public interest. In this case, however, the Commission abandoned its past practice and did not evaluate the extent to which the 73 regulatory commitments

---

[116] Preliminary Order at 8 (Issue No. 36). As discussed above in Point of Error No. 5, the Commission had an obligation to address the issues set forth in the Preliminary Order.
[117] *See* Attachment A.
[118] *See* APA § 2001.174.
[119] PURA §§ 39.915(d), 39.262(o).

were consistent with the standards for determining the public interest as provided by §§ 39.262(o) and 39.915(d).

In past sale-transfer-merger proceedings, the Commission has performed a careful and detailed analysis of the extent to which regulatory commitments including ring-fencing protections serve the public interest. The Commission has specifically recognized that ring-fencing protections should be applied not indiscriminately but in proportion to the risks of a specific transaction, which vary according to the facts and circumstances. In the *Ovation* case, the Commission selected ring-fencing measures designed to address the unique risks presented by the purchaser's proposal to break Oncor into two companies within a novel corporate structure. As part of this analysis, the Commission imposed conditions on the transaction that would compensate ratepayers for the remaining risks, including the possibility of sharing in tax savings.[120] The Commission described the required commitments as "a balanced approach" that tailored the selected conditions to the risks presented.[121]

In this case, the Order erred by not conducting the regulatory commitment analysis provided for in the statute, the Commission's precedent, and the Preliminary Order. The Commission should grant rehearing and render an order giving consideration to NextEra Energy's proposed regulatory commitments, and include revised findings and conclusions that the protections afforded by the regulatory commitments more than offset any perceived risks associated with NextEra Energy's acquisition of EFH's ownership interest in Oncor.[122] The Commission should further render an order with revised findings, conclusions, and ordering paragraphs to conclude that each of the proposed transactions are in the public interest and should be approved.[123] To do otherwise prejudices the substantial rights of NextEra Energy because the Order contains findings, inferences, conclusions, and decisions on these issues that violate due process and applicable statutory provisions; are in excess of the Commission's authority; are affected by other error of law; are not reasonably supported by substantial evidence considering

---

[120] TIEC's Initial Brief at 35 (citing Docket No. 45188, Final Order at 15 (Mar. 24, 2016) ("While the legacy buyout debt and the REIT structure impose some unique risks, the conditions set forth in this Order provide a balanced approach to mitigate these and other risks and compensate ratepayers for the remaining risks.")); *see also* Docket No. 45188, Open Meeting Tr. at 73:21-74:10 (Feb. 11, 2016) (Commissioner Anderson: "I mean, that's an example of a risk that they don't have now that they would have if it's not—if it doesn't continue as investment grade. . . . But that is something that I personally would require in this transaction unless shareholders are getting paid very well—or not shareholders—ratepayers are getting compensated very well for that loss of investment grade.").

[121] Docket No. 45188, Order at 15.

[122] Points of Error Nos. 10 and 11 address the issues of perceived risk and the protections afforded by NextEra Energy's regulatory commitments.

[123] As discussed in Point of Error Nos. 6 and 7, the Commission should approve the TTHC transaction if the Commission determines that it has jurisdiction over that transaction.

the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion.[124]

**I.    POINT OF ERROR NO. 9 – The Order erred in finding that the sole tangible and quantifiable benefit of the proposed transactions meriting consideration is the sharing of interest rate savings for four years. (Order § I.C.; Findings of Fact Nos. 69-72)**

The Order acknowledged only one "tangible and quantifiable" benefit of the proposed transactions—NextEra Energy's commitment to share 90 percent of the interest rate savings on Oncor's cost of debt achieved until final rates are set in the Oncor rate case after the rate case now pending in Docket No. 46957. The Order estimated that ratepayers would receive approximately $3.2 million per year over the first four years after closing of the transactions.[125] The Order considered these savings to be minimal and insufficient to support a public interest finding. This confinement of the benefits analysis to the short term stands in direct conflict with the Commission's Preliminary Order, which stated that the analysis should focus on a medium- and long-term horizon.[126] Oncor witness Mr. Davis calculated Oncor's expected debt cost savings over the longer term and estimated them to be in the range of $360 - $600 million by 2045.[127] The evidence further established that these interest rate savings will be reflected in future rate cases, and the savings over time will benefit both current and future ratepayers in Oncor's service area.[128] As recognized in the Preliminary Order, the public interest determination is not limited to short term savings for current customers, and the Order erred in disregarding the full amount of expected interest rate savings.

Moreover, in response to Commissioner concerns expressed at the hearing on the merits that additional affiliate costs due to NextEra Energy ownership could "overwhelm" or offset any interest rate savings for Oncor customers, NextEra Energy added Regulatory Commitment 72, which provides that Oncor would not seek to recover any shared or common service costs that are not equal to or less than the costs incurred by Oncor in 2016, adjusted for inflation.[129] The Order failed to consider this commitment.

The Order further erred by not recognizing as an additional tangible and quantifiable benefit NextEra Energy's commitment to fund Oncor's current long range capital investment plan

---

[124] *See* APA § 2001.174.
[125] Order at § I.C. & Finding of Fact No. 70.
[126] Preliminary Order at 6 (Issue Nos. 8(g) and 43(g)).
[127] Direct Testimony of David M. Davis, Oncor Ex. 2 at 6:11-15; Rebuttal Testimony of David M. Davis, Oncor Ex. 6 at 5:19-22.
[128] *See* Oncor Ex. 2 at 6:16-21.
[129] Attachment A at 12 (Regulatory Commitment No. 72).

for five years. NextEra Energy has guaranteed *without qualification* full funding for Oncor's plan, which entails quantified capital expenditures of over $1.5 billion this year and each year thereafter for a total of more than $7.5 billion. The Order erred in failing to recognize this quantified benefit.

For these reasons and those presented in Point of Error No. 3, the Commission should grant rehearing and render an order with revised findings, conclusions, and ordering paragraphs that fully recognize the benefits of the proposed transactions and determine that the EFH transaction and the TTHC transaction, if the Commission determines that it has jurisdiction over the latter transaction, are in the public interest and should be approved. To do otherwise prejudices the substantial rights of NextEra Energy because the Order contains findings, inferences, conclusions, and decisions on these issues that violate due process and applicable statutory provisions; are in excess of the Commission's authority; are affected by other error of law; are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion[130]

**J.    POINT OF ERROR NO. 10 – The Order erroneously determined that the proposed transactions would subject Oncor and Oncor ratepayers to increased risks. (Order § I.B.; Findings of Fact Nos. 57-67, 88, 101-104)**

The Order contains erroneous findings that the proposed transactions would expose Oncor and Oncor ratepayers to increased risks.

**1.    The Order erred by failing to consider the significant risks shown in the record of maintaining the "status quo" and, thereby, requiring Oncor to remain under a bankrupt parent.**

The Order erred by disregarding the evidence in the record showing the risks to Oncor if the proposed transactions do not close and Oncor is compelled to remain under a bankrupt parent. EFH has been in bankruptcy for nearly three years, and faced insurmountable financial challenges for years before that. The evidence made clear that no magic wand can be waived to make billions of dollars of debt disappear at EFH, EFIH, and at their subsidiaries, nor make disappear other legacy claims and potential liabilities. The Order is also silent on the alternatives for Oncor if the EFH transaction does not close, finding only that Oncor has been able to provide safe and reliable service during the course of the EFH bankruptcy.[131] In short, the Order erred by failing to consider the risks and other consequences of disapproving the transactions and leaving Oncor to face the continued bankruptcy of its parent company.

---

[130] *See* APA § 2001.174.
[131] Order at § I.C. & Findings of Fact Nos. 74-77.

The Commission should correct this error on rehearing by considering the record evidence, which demonstrates that allowing Oncor to remain under a bankrupt parent for an indeterminate period with the prospect of a stand-alone equitization or a hypothetical alternative transaction would be riskier and less beneficial than NextEra Energy ownership. Specifically, the record shows that rejection of the proposed transactions would leave Oncor subject to continuing risk and credit rating contagion of EFH's ownership, including exposure to the EFH legacy liabilities and the burden of servicing the approximately $11 billion in debt that currently resides directly above Oncor.[132] Approximately $5.5 billion of that total is post-filing Debtor in Possession financing that must be repaid in cash or refinanced.[133] The record also shows that a stand-alone equitization scenario posited by some parties would leave much of this debt and these legacy liabilities in place above Oncor.[134] There is no credible evidence in the record to show that a hypothetical alternative purchaser would address these debt and legacy liability issues or provide the other benefits and protections offered by the proposed transactions.

    **2.    The Order erred by finding that that the "expansive and diversified structure" of NextEra Energy and its affiliates would subject Oncor and Oncor ratepayers to increased risk.**

The Order erroneously found that NextEra Energy's "expansive and diversified structure" would subject Oncor to increased risks.[135] The record evidence established, to the contrary, that the risk to Oncor would be reduced precisely because NextEra Energy's business is widely diversified. When a business is widely diversified, the risk exposure to any single company within the enterprise is decreased, not increased.[136] NextEra Energy itself consequently has less overall risk than Oncor, as shown by the fact that NextEra Energy's credit ratings are several notches higher than Oncor's.[137] By linking the credit profiles of the two companies, the proposed transactions will reduce Oncor's risk and thereby improve its credit ratings.[138]

The record evidence on this issue is unequivocal and reflected in the credit rating reports of all three credit rating agencies: Moody's upgraded Oncor's credit rating immediately when the EFH transaction was announced, and indicated that Oncor would be eligible for an additional two-notch upgrade if the proposed transactions closed; Fitch placed Oncor on positive watch for a

---

[132] NextEra Ex. 6 at 19:4-12.

[133] *Id.* at 20:2-5; *see also* Rebuttal Testimony of Robert S. Shapard, Oncor Ex. 5 at 4:17-21.

[134] NextEra Ex. 6 at 20:1-13; Oncor Ex. 5 at 4:20-21.

[135] Order at § I.B.

[136] *See* NextEra Energy Ex. 6 at 17:22-18:3; 15:10-16.

[137] *Id.* at 23:6-25:8; *see generally* NextEra Ex. 4, Exhibit JR-6.

[138] NextEra Ex. 6 at 25:3-5, 66:22-67:5.

probable one-notch upgrade of Oncor's issuer default rating and a likely two-notch upgrade of Oncor's senior secured debt; and Standard & Poor's likewise revised Oncor's credit outlook to positive to reflect the potential for higher ratings as a result of the proposed transactions.[139] All three rating agencies further indicated that NextEra Energy will retain its own stable and strong credit ratings following the close of the proposed transactions.[140]

These determinations were the result of expert analysis by credit rating agencies whose assessments are routinely relied upon by the capital markets in evaluating credit risk.[141] The Order erred by failing to mention—much less consider—this evidence, which goes to the heart of the risk issue in this case.

### 3. The Order erred by basing its determination of increased risk to Oncor and Oncor ratepayers on isolated excerpts from two credit rating agency documents.

Instead of considering the credit rating agencies' actual determinations that the proposed transactions would reduce the overall risk to Oncor and improve Oncor's credit rating, the Order erroneously relied on isolated excerpts from one Moody's report and one Fitch assessment.

The Order recited a statement from Moody's that the funding of the Proposed Transactions would "exhaust NEE's debt capacity at its current rating and make the company more vulnerable to unforeseen events."[142] The Order ignored, however, that Moody's expected these circumstances to be only temporary given NextEra Energy's "solid record of project execution."[143] The Moody's report further determined, contrary to the Order's finding, that the acquisition of Oncor "further *stabilizes* [NextEra Energy] and allows the flexibility for slightly lower financial thresholds."[144]

The Order also erred in relying on a Fitch assessment, which itself is not in the record. The Order references this document by citing the testimony of TIEC witness Mr. Griffey. Mr. Griffey extracted a portion of the document, taken from a section that is standard in Fitch assessments that listed possible future developments. While Mr. Griffey represented that Fitch indicated that this

---

[139] *Id.* at 24:14-25:2.

[140] *Id.* 6 at 24:6-25:8; *see also id.*, Exhibit JR-R-2.

[141] Tr. at 182:6-8 (Shapard Redirect) (Feb. 21, 2017).

[142] *See* Order at 3-4 & Finding of Fact No. 61 (citing NextEra Ex. 4, Exhibit JR-6 at 5).

[143] NextEra Ex. 4, Exhibit JR-6 at 5 (stating that NextEra Energy's "solid record of project execution . . . supports the likelihood of a steady recovery in its credit metrics over the 2017-2018 period"). This expectation was confirmed by NextEra Energy witness Mr. Hickson. *See* Tr. 362:19-363:1 (Hickson Cross), 406:16-23 (Hickson Redirect) (Feb. 22, 2017). NextEra Energy witness Mr. Reed further observed that it is "common that the acquirer stretches in the first year to meet those targets and then it looks to improve its credit metrics after that." Tr. at 504:5-12 (Commissioner Questions) (Feb. 22, 2017).

[144] NextEra Ex. 4, Exhibit JR-6 at 5 (emphasis added). The Moody's report thus concluded that the outlook for NextEra Energy remains "stable." *Id.* at 6.

"could lead to a downgrade" of NextEra Energy,[145] the record is devoid of any independent confirmation of his representation and this slice of testimony on its face does not establish that the transactions would subject Oncor to increased risk. To the contrary, Moody's and Fitch's complete evaluations of the transactions indicated that NextEra Energy would maintain its excellent credit rating and that Oncor's credit rating would improve as a reflection of reduced risk.[146] The Order erred by ignoring these determinations.

4.    The Order erred by finding that Oncor's contribution to payment of NextEra Energy's consolidated debt following the close of the proposed transactions would result in increased risk to Oncor and Oncor ratepayers.

The Order erroneously concluded that the proposed transactions will result in increased risk to Oncor based on a finding that Oncor revenues will support about 15 percent, or approximately $6.75 billion, of the approximately $45 billion of consolidated debt at NextEra Energy.[147] As noted in Point of Error No. 12, there is no evidentiary support for the percentage referenced. Further, the Order failed to consider that Oncor revenues now support 100 percent of the $11 billion in EFH/EFIH legacy debt that resides above Oncor,[148] which represents a very high level of risk to Oncor—a risk that would be eliminated under NextEra Energy's ownership.

Moody's has been clear that the existing debt above Oncor is a significant risk, and has been equally specific that the proposed transactions will eliminate this risk.

> The acquisition by a traditional, strategic player will remove the contagion risks of EFH and provides a more transparent view of Oncor's credit profile. The approximately $10 billion of debt that exists above Oncor … will be extinguished. As a result, Oncor's rating will no longer be constrained by the EFH and EFIH debt burden that was secured by the implied equity value of Oncor and looked to Oncor for its debt service expenses.[149]

The record is further undisputed that the proposed transactions will eliminate that Oncor-dependent debt, now $11 billion, in its entirety by expunging a portion and refinancing approximately $7.5 billion of debt as a part of NextEra Energy's consolidated debt.[150] Moreover, NextEra Energy, in Regulatory Commitment No. 2, ensures that under NextEra Energy ownership the risk of over-reliance on Oncor cash flows will not reoccur in that no new debt will be

---

[145] Direct Testimony of Charles Griffey, TIEC Ex. 1 at 49:2-18.
[146] *See* NextEra Ex. 4, Exhibit JR-6 at 1-4 (Moody's Rating Action for Oncor, dated July 29, 2016), 5-10 (Moody's Rating Action for NextEra Energy, dated July 29, 2016), 11-13 (Moody's Issuer Comment for Oncor and NextEra Energy, dated August 1, 2016), and 30-34 (Fitch Ratings Outlook for NextEra Energy, dated August 1, 2016).
[147] Order at § I.B. and Findings of Fact Nos. 57-62.
[148] *See* NextEra Ex. 4 at 13:4-8; NextEra Ex. 5 at 4:1-14.
[149] NextEra Ex. 4, Exhibit JR-6 at 1.
[150] *See* NextEra Ex. 4 at 34:19-35:2; NextEra Ex. 6 at 7:12-16.

disproportionately dependent on Oncor revenue or stock unless approved by the Commission.[151] The Order, however, ignored these facts and implicitly assumed that no debt currently resides above Oncor. The Order erroneously relied on this false premise to conclude that Oncor's contribution to the payment of NextEra Energy's consolidated debt following the close of the proposed transactions would result in increased financial risk to Oncor and Oncor ratepayers.

5. **The Order erred by finding that NextEra Energy's competitive businesses would subject Oncor and Oncor ratepayers to increased risks.**

The Order erred by finding that NextEra Energy's competitive businesses (described in the Order as "unregulated" businesses) would result in increased risk to Oncor and Oncor ratepayers. In support of this finding, the Order relied on the portion of testimony of Intervenor witness Mr. Smith that recited verbatim the potential "Risk Factors" presented in NextEra Energy's SEC Form 10-K.[152] The mere recitation of risk factors does not support the Order's finding of increased risk because it fails to consider that the breadth and scale of NextEra Energy's operations, which results in reduced exposure to risk in the aggregate.[153] As discussed above, the rating agencies unanimously concluded that NextEra Energy is less risky than Oncor.[154] The Order erred by relying on a Form 10-K list of risk factors while completely disregarding the rating agencies' analysis and conclusions regarding those risks.[155]

The Order similarly erred in relying on the testimony of Staff witness Mr. Vickroy, who briefly described the wholesale generation and other non-utility businesses owned by NextEra Energy subsidiaries, and then made the conclusory statement that the wholesale generation business is riskier than Oncor's business.[156] But, like the Order itself, this testimony failed to consider how small the proportion of NextEra Energy's actual merchant generation is relative to the Company's overall portfolio. It is undisputed that 92 percent of NextEra Energy's portfolio as a whole is either rate-regulated or long-term contracted under 16-year weighted average life contracts with creditworthy counterparties. Stated differently, 86 percent of NextEra Energy's adjusted earnings in 2016 came from lower-risk rate-regulated and long-term contracted generation.[157] The Order's finding of increased risk to Oncor and Oncor ratepayers failed to take

---

[151] Attachment A at 1 (Regulatory Commitment No. 2).
[152] Order at 4 n.14 (citing Direct Testimony of Ralph Smith, Joint TIEC, Cities, and OPUC Ex. 1 at 39-40).
[153] NextEra Ex. 6 at 14:14-18:3.
[154] *See id.* at 23:6-24:5; *see generally* NextEra Ex. 4, Exhibit JR-6.
[155] *See* NextEra Ex. 6 at 24:2-5.
[156] Direct Testimony of Randall Vickroy, Staff Ex. 3A at 22:24-25.
[157] NextEra Ex. 38.

into consideration these critical undisputed facts regarding the overall makeup of the Company's competitive business portfolio.[158]

The Order further erred in finding that the proposed transactions would result in increased risk because, as "a result of the spin-off of Texas Competitive Energy Holdings, Oncor is not currently subject to risks related to unregulated generation development."[159] Oncor has operated without competitive affiliates for a mere matter of months, whereas Oncor operated with very large Texas competitive affiliates under the ownership of TXU Corporation for approximately six years and under the ownership of EFH for about nine years.[160] There is no basis for the Order's implicit assumption that Oncor will have no competitive affiliates under any alternative transaction that might be approved by the bankruptcy court and presented to the Commission if the proposed EFH transaction is not permitted to close. Nor does the Order take into consideration how the breadth and diversified composition of NextEra Energy's total portfolio, or its de-risked strategy of entering into long term power purchase agreements for the output of those projects from creditworthy counterparties, mitigates risk, as discussed above.

In sum, the Commission erred in its findings determining that the Proposed Transactions would subject Oncor and Oncor ratepayers to increased financial risk, including a failure to consider the consequences of allowing Oncor to remain subject to EFH ownership. The Commission should grant rehearing and render an order with revised findings, conclusions, and ordering paragraphs regarding risk and determine that each of the proposed transactions are in the public interest and should be approved. To do otherwise prejudices the substantial rights of NextEra Energy because the Order contains findings, inferences, conclusions, and decisions on these issues that violate due process and applicable statutory provisions; are in excess of the Commission's authority; are affected by other error of law; are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion.[161]

---

[158] The Order also erred in basing its finding on the testimony of TIEC witness Mr. Griffey, as discussed above in this Point of Error.

[159] Order at § I.B. and Finding of Fact No. 64.

[160] Rebuttal Testimony of Jess Totten, NextEra Ex. 7 at 28:8-10.

[161] See APA § 2001.174.

**K.**   **POINT OF ERROR NO. 11 – The Order erroneously found that the existing ring fence for EFH plus a majority of independent and disinterested board of directors at Oncor would be necessary for NextEra Energy's ownership of Oncor. (Order § I.D., E.; Findings of Fact Nos. 78-93)**

   **1.**   **The Order's findings that Oncor's existing ring fence requires a majority of independent and disinterested board of directors and that NextEra Energy objected to a majority independent board are both factually erroneous.**

In Docket No. 34077, the Commission approved a settlement establishing most (but not all) elements of Oncor's existing ring fence. This ring fence was designed to protect Oncor from the specific risks of EFH's 2007 leveraged buyout of TXU Corp. The Order in this case erred by finding that:

> To protect Oncor if NextEra Energy or one of its subsidiaries files for bankruptcy, Oncor would *still* need a ring fence that includes a *majority of independent and disinterested board of directors* at Oncor and that retains both all of the authority that Oncor's board currently possesses and the ability of a majority of independent and disinterested directors to veto dividends."[162]

This finding, in the first instance, contains a factual error. The order for EFH in Docket No. 34077 did not impose a requirement that Oncor have a majority independent and disinterested board of directors at Oncor. The Commission only required that Oncor's Board be composed of a majority of directors who qualified as independent under New York Stock Exchange rules and regulation—not both independent *and* disinterested—with provisos that the board could not include members from the boards of Oncor's EFH competitive subsidiaries Luminant Generation Company or TXU Energy Retail Company and that EFH could not overrule the Oncor Board on most financial and governance issues.[163]

Also factually erroneous is the Order's finding that ". . . NextEra Energy has stated that conditions requiring Oncor to have a *majority independent board* and the ability of a majority of independent and disinterested directors to veto dividends are unacceptable."[164]  Contrary to this finding, NextEra Energy proposed a ring fence for Oncor that would have a majority independent board, including three disinterested directors and four independent directors for a total of seven out of eleven directors overall.[165]  NextEra Energy further proposed that the Oncor Board of Directors would have the authority to approve any changes to Oncor's dividend policy.[166]

---

[162] Order at Finding of Fact No. 85 (emphasis added).
[163] *See* NextEra Ex. 6, Exhibit JR-R-7 at 1, 5, 13, and 15 (Docket No. 34077 Condition Nos. 44, 54, 74 and 76).
[164] Order at Finding of Fact No. 89 (emphasis added).
[165] Attachment A at 2-3 (Regulatory Commitment No. 14).
[166] *See id.* at 3 (Regulatory Commitment No. 16) (providing that any "[c]hanges to Oncor's dividend policy must be approved by Oncor's Board of Directors").

Rehearing should be granted to correct these two factual errors.

**2.    The Order erred by finding that the EFH ring fence plus a majority independent and disinterested board of directors at Oncor are necessary to protect Oncor and Oncor ratepayers from the alleged risks of NextEra Energy's ownership.**

More fundamentally, the Order erred in finding that NextEra Energy's ownership of Oncor would require the same set of ring fence protections approved for EFH's ownership plus a majority disinterested board with the ability to veto dividends.  There is simply no rational basis to apply anything approaching the ring fence for EFH, a highly risky, sub-investment grade entity with no utility management or operational experience, to NextEra Energy, an A- utility holding company with a credit profile that is "among the best in the industry."[167]   As the following diagram illustrates, NextEra Energy's credit rating stands *nine* notches above where EFH's credit rating stood at the time of the final order in Docket No. 34077.

**NextEra Energy's Credit Rating at the Time of the Final Order in this Docket**
**vs.**
**EFH's Credit Rating at the Time of the Final Order in Docket No. 34077**



---

[167] Oncor Ex. 5 at 5:6-7.

As Staff witness Mr. Vickroy testified, the "especially extreme debt leverage of the EFH acquisition was one-of-a-kind," and it was this "extremely leveraged financial structure [that] caused correspondingly strong ring-fencing protections to protect Oncor."[168]

For this reason, it was error to find that Oncor "will not be adequately insulated" under NextEra Energy's ownership without the EFH ring fence plus a majority disinterested board at Oncor with dividend veto authority.[169] EFH at the time of Docket No. 34077 was a far riskier parent company, and NextEra Energy's ownership would make Oncor less risky, as discussed above in Point of Error No. 10.

It was similarly error for the Order to find that an EFH ring fence "plus" is necessary under NextEra Energy ownership to ensure that Oncor "retains sufficient earnings" for its operations and "overall financial integrity."[170] The Order contains no analysis to show that this is necessary. There is no credible evidence in the record to support the Order's blanket declaration that a majority disinterested board with dividend veto power is necessary to prevent "undue interference from a parent company,"[171] much less that NextEra Energy—a long-time supportive and successful owner of Florida Power & Light—would seek to deprive Oncor of the retained earnings necessary to its continued successful operations. There is also no evidence to show that an EFH ring fence "plus" is necessary to ensure Oncor's financial integrity. To the contrary, the evidence demonstrates conclusively that the proposed transactions will improve Oncor's financial strength and credit ratings.[172]

The infirmity of the foregoing findings is underscored by the Order's omission of any consideration of the extensive ring-fencing measures NextEra Energy proposed to protect Oncor and its customers. NextEra Energy's proposed ring-fencing provisions are detailed, extensive, and robust, and many provisions were adopted during the course of this proceeding in response to matters raised by Commission Staff, intervenors, and the Commissioners themselves.[173] Among the protective measures offered by NextEra Energy's ring fence are:

- a bar against the issuance of any dividends without prior Commission approval in the event that one of the rating agencies were to determine that Oncor is not investment grade;[174]

---

[168] Staff Ex. 3A at 15:24-16:3.
[169] Order at § I.D. & Finding of Fact No. 88.
[170] *Id.* at § I.D. & Finding of Fact No. 86.
[171] *Id.* at § I.D. & Finding of Fact No. 87.
[172] NextEra Ex. 6 at 24:6-25:5.
[173] *See* Attachment A; NextEra Ex. 6 at 40:4-15.
[174] Attachment A at 7-8 (Regulatory Commitment No. 48).

36

- a requirement for Oncor to file a remedial plan with the Commission within 60 days explaining the actions that are planned to address and rectify a situation in which one or more of the major credit rating agencies determine that Oncor's issuer/corporate credit rating is not investment grade.[175]

- a prohibition against any changes to Oncor's dividend policy unless approved by Oncor's Board of Directors;[176] and

- a requirement that the majority of the Disinterested Directors on Oncor's Board of Directors must affirmatively vote to file Oncor into bankruptcy for the benefit of NextEra Energy.[177]

Importantly, NextEra Energy's dividend-restriction commitment in Regulatory Commitment No. 48 is more restrictive than a similar dividend restriction imposed by the Commission in the *Ovation* order that was found to be in the public interest even though the parent entity in that case would have been below investment grade at closing.[178]

NextEra Energy additionally made commitments to ensure that Oncor will retain sufficient capital at all times. NextEra Energy committed: to maintain Oncor's regulatory debt-to-equity ratio on an annual basis at or below its Commission-approved debt-to-equity ratio;[179] not to incur new debt that is disproportionately dependent on the revenues or stock of Oncor without prior Commission approval;[180] and not to pledge Oncor's assets for any entity other than Oncor.[181] NextEra Energy also committed that Oncor will fund its five-year long-range capital expenditures plan[182] and to increase, measure, and maintain Oncor's system reliability,[183] all of which serve as mechanisms to ensure adequate investment and ongoing maintenance to the benefit of customers. Additionally, the Commission has ongoing jurisdiction and oversight to ensure that Oncor continues to provide safe, reliable, and affordable electric delivery service.[184] NextEra Energy's regulatory commitments would enhance and preserve that authority.[185]

The Company's proposed regulatory commitments ensure that Oncor will maintain sufficient retained earnings for its operations and maintain its financial integrity. The Order erroneously addresses none of these commitments.

---

[175] *Id.* at 8 (Regulatory Commitment No. 49).
[176] *Id.* at 3 (Regulatory Commitment No. 16).
[177] *Id.* (Regulatory Commitment No. 14).
[178] *See* Docket No. 45188, Order at Finding of Fact No. 226.
[179] Attachment A at 3-4 (Regulatory Commitment No. 17).
[180] *Id.* at 1 (Regulatory Commitment No. 2).
[181] *Id.* at 6 (Regulatory Commitment No. 31).
[182] *Id.* at 2 (Regulatory Commitment No. 10).
[183] *Id.* at 1-2 (Regulatory Commitment Nos. 5 and 6).
[184] NextEra Ex. 1 at 44:1-45:12; NextEra Ex. 4 at 72:12-76:12.
[185] *See* Attachment A at 2, 7, 8-9 (Regulatory Commitment Nos. 11, 45-47, 54).

3.    The Order erred by finding that the majority independent and disinterested board appointment and veto restrictions were critical in protecting Oncor from the EFH bankruptcy and that such measures are necessary to protect Oncor from a NextEra Energy bankruptcy.

To justify the continuation of the EFH ring fence and, specifically, the majority independent and disinterested board appointment and veto restrictions, the Order places especially heavy reliance on the need to protect Oncor from being consolidated into a hypothetical NextEra Energy bankruptcy. The Order finds that Oncor was not made a party to the EFH bankruptcy "as a result of" the ring fence, of which the two ring-fencing restrictions "are among the most important," and that the existing EFH ring-fencing restrictions were "critical in protecting Oncor from the bankruptcy."[186]

These findings are unsupported. The Order's sole citations to the evidence are to unsupported sentences in the testimony of Staff witness Mr. Vickroy, including his assertion that the board appointment and veto restrictions were "instrumental in avoiding the consolidation of Oncor into EFH's bankruptcy"[187] The unsupported, conclusory statements of an expert witness do not constitute substantial evidence sufficient to uphold an order on appeal.[188]

The Order's findings also conflict with established bankruptcy case law, which holds that a substantive consolidation inquiry is highly fact-specific and no one factor is dispositive.[189] As discussed above in Point of Error No. 4, the two key requirements for avoiding substantive consolidation are ensuring that separate books and records are maintained and that creditors are not confused into expecting that they can seek the utility's assets.[190] The Order failed to address these requirements or consider the numerous provisions of NextEra Energy's regulatory commitments that do address them. Oncor witness Mr. Shapard testified that, because regulated utilities typically have basic safeguards in place that address both of these issues, "no operating

---

[186] Order at § I.D.; *see also id.* at Findings of Fact Nos. 83-85, 88.

[187] *See id.* at § I.D. nn.30-31 & 33 (citing Staff Ex. 3A at 16:2-4, 28:2-4, 42:13-16).

[188] *See Pub. Util. Comm'n of Tex. v. Gulf States Utils. Co.*, 809 S.W.2d 201, 211 (Tex. 1991). The testimony of intervenor witness Mr. Smith asserted that Oncor was not consolidated into the EFH bankruptcy "due to" the EFH ring fence in general. *See* Cities, OPUC, and TIEC Joint Ex. 1 at 51:28-52:2, 59:18-23. Unlike Mr. Vickroy, neither Mr. Smith nor the EFH SEC Form 10-Ks that he referenced claim that the board appointment and veto restrictions were instrumental or critical to keeping Oncor out of the bankruptcy.

[189] *See* NextEra Energy's Initial Brief at 33; *see also In re Eagle-Picher Industries, Inc.*, 192 B.R. 903, 905 (Bankr. S.D. Ohio 1996) ("A review of the case law dealing with substantive consolidation makes it clear that the decisions on the subject are fact intensive, and decisions are made on a case-by-case basis"); *In re Donut Queen*, Ltd., 41 B.R. 706, 709 (Bankr. E.D.N.Y. 1984).

[190] Tr. at 98:18-99:10 (Shapard Cross) (Feb. 21, 2017).

utility has ever been consolidated into a holding company's bankruptcy."[191]  The Order provides no analysis or explanation why, in the extremely unlikely event of a NextEra Energy bankruptcy, Oncor might become the first such case, especially given the extensive ring-fencing and Code of Conduct safeguards agreed to by NextEra Energy.

In sum, the Order erred by making findings regarding the need for ring fence provisions that have no credible support in the record and by failing to consider the law and the supporting evidence in the record on the issues.  The Commission should grant rehearing because the Order contains findings, inferences, conclusions, and decisions on these issues that are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion.[192]  The Commission should issue an order on rehearing with specific findings, conclusions, and ordering paragraphs to correct this error.  The new order should include a finding that an eleven-member Oncor Board of Directors comprised of a majority of NYSE independent directors with three disinterested directors, together with NextEra Energy's numerous other commitments, is reasonable under NextEra Energy ownership and in the public interest.

### 4.    The Order's findings that removal of the Board appointment and veto restrictions could adversely affect Oncor's reliability, availability, and cost of service are erroneous.

As a final matter, the Commission's determination that removal of the existing Board appointment and veto restrictions could adversely affect Oncor's reliability, availability, and cost of service are legally insufficient under PURA §§ 39.262 and 39.915 to justify a finding that the transactions are not in the public interest and are further not reasonably supported by substantial evidence in the record.[193]  To the contrary, as discussed in Point of Error No. 4, the record shows unequivocally that the proposed transactions will support and enhance, not adversely affect, Oncor's continued provision of reliable service to its customers.

In conclusion, the Order erred in finding that the existing ring fence for EFH plus a majority of independent and disinterested board directors at Oncor would be necessary for NextEra Energy's ownership of Oncor.  The Commission should grant rehearing and render an order with revised findings, conclusions, and ordering paragraphs to correct this error and conclude that each of the proposed transactions are in the public interest and should be approved.  To do otherwise

---

[191] Tr. at 184:1-4 (Shapard Redirect) (Feb. 21, 2017); Tr. at 98:22-99:10 (Shapard Cross) (Feb. 21, 2017); *see also* Tr. at 282:9-15 (Hickson Cross) (Feb. 21, 2017).
[192] *See* APA § 2001.174.
[193] *See* Order at § I.E and Findings of Fact Nos. 91-93.

prejudices the substantial rights of NextEra Energy because the Order contains findings, inferences, conclusions, and decisions on this issue that violate due process and applicable statutory provisions; are in excess of the Commission's authority; are affected by other error of law; are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion.[194]

**L.      POINT OF ERROR NO. 12 – The Order erred by relying on facts not in evidence. (Order § I.B.; Finding of Fact No. 60)**

The Order at Finding of Fact No. 60 states that "[t]he revenues of Oncor would be required to support about 15% of that $45 billion in debt."[195]  The record contains no evidence regarding the percentage of Oncor's revenues that will be relied on to support the total amount of consolidated debt at NextEra Energy.  The Order's reference on page 3 to TIEC Ex. 1 at 22:3-6 supports only the amount of consolidated debt at NextEra Energy, not the percentage.  The only statement regarding the percentage appears in the transcript of the Open Meeting on February 23, 2017, which is not part of the evidentiary record.[196]  The Commission specifically ruled that statements made during the Open Meeting were not to be considered evidence.[197]  Thus, Finding of Fact No. 60 is not supported by substantial evidence in the record, and the Order's inclusion of the finding is arbitrary and capricious, an abuse of discretion, and error as a matter of law. Rehearing should be granted to correct this error.

**M.      POINT OF ERROR NO. 13 – Additional Procedural and Substantive Errors**

**1.      The Order fails to address or even recognize evidence on the Stipulation and Agreement between NextEra Energy and certain intervenors.  (Order § I.C.; Findings of Fact Nos. 68-77, 94-104).**

On the first day of the hearing in this docket, February 21, 2017, NextEra Energy offered into evidence, without objection, a Stipulation and Agreement it had reached between itself, TXU Energy Retail Company LLC, Texas Energy Association for Marketers, and NRG Companies, as well as an another Stipulation and Agreement it had reached between itself and NRG Companies, each resolving the issues these signatories have raised in this case.[198]  The Stipulations contained revised regulatory commitments regarding the treatment of NextEra Energy's competitive

---

[194] *See* APA § 2001.174
[195] *See also* Order at § I.B. ("Including the debt from the proposed transactions, the total amount of consolidated debt at NextEra Energy would be about $45 billion, and Oncor would be required to support about 15% of that debt.").
[196] Open Meeting Tr. at 13:11-14:18 (Feb. 23, 2017).
[197] Tr. at 556:17-557:13 (Comm'r Discussion) (Feb. 23, 2017); *see also id.* at 557:16-562:13, 567:10-19 (parties stating agreement on the record).
[198] NextEra Ex. 36; NextEra Ex. 37; *see* Tr. at 50:18-21 (Feb. 21, 2017).

affiliates, and each stated that "[t]he Signatories agree that the terms of this Stipulation are in the public interest and that the Commission should enter an order materially consistent with this Stipulation and providing for its implementation."[199]

Despite the uncontroverted status of the Stipulations and the fact that they support the public interest on issues regarding NextEra Energy's competitive affiliates, the Stipulations were neither discussed substantively in the Order nor were they listed in the Order's Procedural History. The total disregard of the uncontroverted Stipulations violates statutory provisions; is in excess of the Commission's authority; is affected by other error of law; is not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and is arbitrary and capricious or an abuse of discretion.[200] The Commission should grant rehearing to correct these errors.

   2.   **The Order erred by including inconsistent statements regarding the composition of Oncor's Board of Directors. (Order § I.D.; Findings of Fact Nos. 85, 88, and 89).**

The Order contains additional substantive errors in that it makes contradictory statements regarding the composition of Oncor's Board of Directors. At times, the Order states that, under NextEra Energy ownership, the Oncor Board of Directors must include a majority of directors that are both independent *and* disinterested. In some places the Order states:

- "The Commission finds that if the proposed transactions were to close, *a majority of Oncor's board would need to be independent and disinterested* and retain all of the authority the Oncor board currently possesses .... Without these protections, the Commission finds that Oncor will not be adequately insulated from the additional risks resulting from NextEra Energy ownership."[201]

- "To protect Oncor if NextEra Energy or one of its subsidiaries files for bankruptcy, Oncor would still need a ring fence that includes *a majority of independent and disinterested board of directors at Oncor* and that retains both all of the authority that Oncor's board currently possesses and the ability of a majority of independent and disinterested directors to veto dividends."[202]

In other instances, however, the Order indicates or implies that the Oncor Board of Directors under NextEra Energy ownership must only include a majority of independent directors. Specifically, the Order states:

- "Without a *majority independent board* and the ability of a majority of independent and disinterested directors to veto dividends, Oncor will not be adequately insulated

---

[199] NextEra Ex. 36 at 3; NextEra Ex. 37 at 3.
[200] *See* APA § 2001.174.
[201] Order at § I.D.
[202] *Id.* at Finding of Fact No. 85.

from the additional risks resulting from NextEra Energy ownership."[203]

- "Because NextEra Energy has stated that conditions requiring Oncor to have a *majority independent board* and the ability of a majority of independent and disinterested directors to veto dividends are unacceptable, the Commission finds that the proposed transactions are not in the public interest."[204]

- "A truly *independent board of directors* at Oncor, with control over Oncor's decisions on capital expenditures and operating expenses is a critical part of the ring fence protecting Oncor."[205]

- "Oncor's existing ring fence requires that both Oncor and Oncor Holdings each have a *majority independent board* and that the Oncor board has the sole right to determine dividends. The ring fence was critical in protecting Oncor from the bankruptcy of its indirect parent company. Under the proposed transactions, a robust ring fence is *still* necessary to protect Oncor if NextEra Energy or one of its subsidiaries were to file for bankruptcy."[206]

In sum, the inconsistent nature of these findings presents error and requires the Commission to offer further clarity with respect to these issues on rehearing.

### 3. Finding of Fact Nos. 54 and 100 contain errors.

#### a. Finding of Fact No. 54 contains factual and typographical errors.

The $7.8 billion referenced in Finding of Fact No. 54 should be $7.5 billion as reflected on page 3 of the Order and in the relevant evidentiary citation in footnote 6 of the Order. Additionally, Finding of Fact No. 54 erroneously states that this debt funding is specific to the EFH transaction. This is not correct. The $7.5 billion in debt funding financed at NextEra Energy Capital Holdings is for both the transaction involving EFH and the transaction involving TTHC.[207] Finding of Fact No. 54 should be corrected in an order on rehearing to address these errors, as shown below:

> NextEra Energy's proposed financing of the ~~$9.8~~ $12.2 billion acquisition of Energy Future Holdings and Texas Transmission Holdings Corporation was to include approximately ~~$7.8~~ $7.5 billion of debt funding financed at NextEra Energy Capital Holdings.

The corresponding sentence on page 3 of the Order should similarly be corrected to reflect the financing for both transactions.[208]

---

[203] *Id.* at Finding of Fact No. 88.

[204] *Id.* at Finding of Fact No. 89.

[205] *Id.* at § I.D.

[206] *Id.* at § I.D. As indicated in Point of Error No. 11, the Order additionally contains a factual error relating to the requirements in Oncor's current ring-fence. *See id.* at Finding of Fact No. 85.

[207] *See* Tr. At 330:10-331:7 (Hickson Cross) (Feb. 22, 2017).

[208] Order at 3 ("The financing of the *$9.8 billion* was to include approximately $7.5 billion in debt funding financed at NextEra Energy Capital Holdings." (emphasis added)).

b.  Finding of Fact No. 100 has a typographical omission.

The underscored language below, included on page 8 of the Final Order, was omitted from Finding of Fact No. 100:

> The determination of whether a transaction that would change the ownership of the largest transmission and distribution utility in Texas is in the public interest is squarely within the scope of the Commission's area of technical expertise.

## N.  POINT OF ERROR NO. 14 – The Order violates NextEra Energy's constitutional rights of due process and equal protection.

In addition to the statutory errors described above, the Order suffers from constitutional defects that require rehearing.

As noted throughout the points of error raised in NextEra Energy's Motion for Rehearing, the Order violates due process because it imposes new standards that had not been raised at any other stage of these proceedings to deny both the EFH and TTHC transactions. An agency order is arbitrary and capricious if a denial of due process has prejudiced the litigant's rights or if the agency has improperly based its decision on non-statutory criteria.[209] An agency must respect the due process rights of parties that appear before it in contested cases.[210] Courts have held that parties are deprived of procedural due process when an agency adopts new policy in the course of a contested case hearing without giving the parties pre-hearing notice.[211] A party is entitled to notice, before the hearing, of the legal norms or standard that will be applied to the facts upon which an agency contemplates taking action.[212] Introduction of a new policy or requirement at the end of a proceeding is improper because it impedes a party's due process rights, as the party would likely have presented its case differently to the agency had it been aware of the new policy.[213] For an administrative hearing to be meaningful, a party must be able to present evidence on the issues to be decided.[214]

The Commission's Order violates the right to due process guaranteed by the Texas and U.S. Constitutions because it disregards prior Commission precedent and applies new standards for determining the public interest under PURA §§ 14.101, 39.262, and 39.915.[215] Neither the

---

[209] *Texas Dept. of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 245 (Tex. App.—Austin 2008, no pet.).

[210] *See State v. Mid-South Pavers*, 246 S.W.3d 711, 722 (Tex. App.—Austin 2007, pet. denied).

[211] *See, e.g., Flores*, 74 S.W.3d at 545; *see also Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 658 (Tex. 2004) ("Due process at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner.").

[212] *See Texas State Bd. of Pharmacy v. Seely*, 764 S.W.2d 806, 814 (Tex. App.—Austin 1988, writ denied).

[213] *Id.*

[214] *See Flores*, 74 S.W.3d at 545; *Seely*, 764 S.W.2d at 815; *Madden*, 663 S.W.2d at 626–27.

[215] U.S. Const. Amend. XIV; Texas Const. art. I, § 19.

Commission's precedent nor the Preliminary Order in this proceeding provided notice to NextEra Energy of this precipitous change in the proceedings. In fact, the Preliminary Order sets forth public interest standards that differ from those ultimately applied in the Commission's Order.[216] As a result, NextEra Energy was denied the opportunity to present evidence on issues that the Commission later decided would be decisive in the proceeding. As discussed elsewhere in this motion, the public interest standards under § 14.101 have never before required a showing that a transaction's benefits will not be considered unless they are unique and exclusive to the proposed transactions and are quantified. Similarly, the public interest standard in §§ 39.262 and 39.915 has never previously been classified as "amorphous" and subject to expansion by the Commission. The sudden and unannounced changes in Commission practice has thus prejudiced NextEra Energy's rights and violated constitutional due process requirements. The Order also violates constitutional equal protection requirements because the summary disapproval of the proposed transactions based on the errors in the Order treats NextEra Energy differently than similarly situated applicants whose transactions were approved with conditions.[217]

Accordingly, the Commission should grant rehearing because the Order violates constitutional as well as statutory provisions, and as such exceeds the Commission's authority, is affected by other error of law, and is arbitrary and capricious or an abuse of discretion.[218] If uncorrected, these errors will result in prejudice to the substantial rights of NextEra Energy.[219]

## III.  CONCLUSION

The Order's summary disposition that the EFH and TTHC transactions are not in the public interest and are disapproved does not give full and fair consideration to the application, the law, or the record evidence as a whole. As discussed in this motion, the Order contains errors that range from the exercise of authority not granted by the Legislature to reliance on facts not in evidence. NextEra Energy respectfully requests that the Commission grant rehearing and issue an order on rehearing to correct these errors. The order on rehearing should hold that the proposed transaction with EFH is in the public interest and approved, and either disclaim jurisdiction over the proposed transaction with TTHC or find that the transaction also is in the public interest and approved. To do otherwise and allow the Order to stand would prejudice the substantial rights of NextEra Energy

---

[216] *See* Preliminary Order at 4-10 (Issue Nos. 5-48).
[217] *Mauldin v. Tex. State Bd. of Plumbing Examiners*, 94 S.W.3d 867, 871, 873 (Tex. App.—Austin 2002, no pet.); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).
[218] APA § 2001.174.
[219] *Id.*

because, as discussed in this motion, the Order contains findings, inferences, conclusions, and decisions that violate applicable statutory and constitutional provisions; are in excess of the Commission's authority; are affected by other error of law; are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion.

To ensure sufficient time to consider the merits of this motion and encourage possible settlement discussions, NextEra Energy respectfully requests that the Commission extend the period for acting on this motion for rehearing to the maximum extent allowed by law.

Respectfully submitted,

By: _____

Ann M. Coffin
State Bar No. 00787941
Julie Caruthers Parsley
State Bar No. 15544920
Mark Santos
State Bar No. 24037433
Parsley Coffin Renner LLP
P.O. Box 13366
Austin, Texas 78711
512.879.0900
512.879.0912 (fax)
ann.coffin@pcrllp.com
julie.parsley@pcrllp.com
mark.santos@pcrllp.com

Steven Baron
State Bar No. 01797200
Steven Baron Consulting and Legal Services
P.O. Box 5573
Austin, Texas 78763
512.535.3104
512.479.8070 (fax)
sbaron@baroncounsel.com

Charles E. Sieving
Executive Vice President and General Counsel
NextEra Energy, Inc.
700 Universe Boulevard
Juno Beach, Florida 33408

**COUNSEL FOR NEXTERA ENERGY, INC.**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on all parties of record in this proceeding by fax, hand delivery, overnight delivery, or U.S. first class mail on this the 8th day of May 2017.

Ann M. Coffin

**Revised Regulatory Commitments – Redlined Based on February 24, 2017, Hearing on the Merits against NextEra Exhibit 5a (Exhibit MH-R-2 (Errata 2))**

In support of the Application for Sale, Transfer, or Merger with the Public Utility Commission of Texas ("Commission") for approval of the transfer of control of Oncor Electric Delivery Company LLC ("Oncor") from Energy Future Holdings Corp. ("EFH") and Energy Future Intermediate Holding Company LLC ("EFIH") to EFH Merger Co., LLC ("Merger Sub"), a wholly owned subsidiary of NextEra Energy, Inc. ("NextEra Energy"), and the acquisition by NextEra Energy of Texas Transmission Holding Corporation's ("TTHC's") indirect ownership interest in Oncor (collectively, "Proposed Transactions"), NextEra Energy, on behalf of itself, Merger Sub, and WSS Acquisition Company, makes the following commitments:

1. **Existing Legacy Debt and Liabilities** – NextEra Energy will extinguish and refinance at its subsidiary NextEra Energy Capital Holdings, Inc. all debt that resides above Oncor at EFIH and EFH, reducing it to zero, immediately following the closing.[1] Please refer to Regulatory Commitment 53 with respect to legacy liabilities.

2. **New Debt ~~Solely~~Not Disproportionately Dependent on Oncor** – NextEra Energy and its subsidiaries, other than Oncor, will not incur, guarantee, or pledge assets in respect of any new debt that is ~~solely or almost entirely~~disproportionately dependent on the revenues or stock of Oncor without first seeking Commission approval. NextEra Energy and its Affiliates (other than Oncor) will provide advance notice to potential lenders of new debt issued pursuant to the Commission approval received under this commitment of its corporate separateness from Oncor and will obtain an acknowledgement of the separateness and non-petition covenants in all such new debt instruments.

3. **Credit Rating** – The credit issuer/corporate ratings of Oncor will be maintained or improved at the time of Closing as compared to the ratings on July 28, 2016. If, at any time from the date of closing through December 31, 2021, Oncor's issuer/corporate ratings are not maintained, as compared to the ratings on July 28, 2016, by Standard & Poor's, Moody's, or Fitch credit ratings agencies, Oncor shall not use the lower credit rating as a justification for a higher regulatory rate of return.

4. **Credit Rating Reporting** – Oncor shall notify the Commission if either NextEra Energy's or Oncor's credit issuer/corporate rating as rated by Standard & Poor's, Moody's, or Fitch credit ratings agencies falls below its then current level.

5. **Reliability** – For purposes of Substantive Rule 25.52, system average interruption duration index ("SAIDI") and system average interruption frequency index ("SAIFI") standards should be calculated based on Oncor's forced interruption performance for years 2013, 2014, and 2015. Oncor's SAIDI standard should be 93.74667 and its SAIFI standard should be 0.95667. These standards should go into effect starting with the calendar year 2018.

---

[1] NextEra Energy also commits that no debt will reside at TTHC or Texas Transmission Investment LLC upon the close of the merger with TTHC.

6. **Report of SAIDI and SAIFI to Commission** – Oncor will report its actual system-level SAIDI and SAIFI statistics to the Commission in its Quarterly Performance Reports and yearly Service Quality Reports filed pursuant to 16 Tex. Admin. Code ("TAC") § 25.81.

7. **Interconnection Process** – Oncor will continue to participate in discussions with Commission staff and customers to address implementing improvements to its interconnection process.

8. **Headquarters/Management** – Oncor will maintain its separate headquarters and management in Dallas County, Texas. Local management of Oncor will remain the primary point of contact on all regulatory and operational matters.

9. **Separate Entity** – Oncor will maintain its separate existence as a separate entity with separate assets and separate franchises, obligations and privileges. Oncor's corporate form will not be changed without prior Commission approval.

10. **Capital Expenditures** – Oncor will fund capital expenditures in the total amount set forth in Oncor's current long-range plan for five (5) years following the date of the closing.

11. **Commission Jurisdiction** – Oncor and Oncor Holdings will not own, operate, or construct capital assets outside of ERCOT without prior approval from the Commission or take any other action that would impair the Commission's regulatory jurisdiction. Neither Oncor, Oncor Holdings, NextEra Energy nor their respective affiliates will take any action that would subject ERCOT assets to the jurisdiction of the Federal Energy Regulatory Commission ("FERC"); provided, however, that it is the opinion of NextEra Energy that FERC continues to have jurisdiction under sections 210, 211, and 212 of the Federal Power Act ("FPA") and may direct transmission and interconnection services over certain existing facilities outside of ERCOT; provided further that the existing reliability and critical infrastructure standards administered by the North American Electric Reliability Corporation ("NERC"), through delegation of authority from FERC, may affect the operations of assets that are deemed part of the bulk electric system.

12. **Texas Utility** – Oncor will continue to operate solely within the state of Texas as a public utility subject to the continuing jurisdiction of the Commission pursuant to the state of Texas' applicable statutes regulating public utilities, and without any reduction in the Commission's oversight or authority over Oncor.

13. **Advisory Board** – NextEra Energy will establish an advisory board of Texas residents that will meet quarterly with the Chief Executive Officer of Oncor to discuss service and other operational issues.

14. **Oncor Board of Directors** – NextEra Energy will maintain a separate Board of Directors at Oncor composed of 11 persons, three of whom will be "Disinterested Directors" and four of whom will qualify as "independent" from NextEra Energy and its subsidiaries and affiliated entities in accordance in all material respects with the rules and regulations of the New York Stock Exchange, Inc. ("NYSE"), for a total of

7 of 11 members of the Oncor Board of Directors that qualify as either "independent" or "Disinterested Directors." A majority of the members of the Oncor Board of Directors shall be residents of Texas. Successor "independent" directors and "Disinterested Directors" must satisfy the criteria to qualify as "independent" directors or "Disinterested Directors," respectively. Any increase in the size of the Oncor Board of Directors will be accompanied by a proportionate increase in the number of "independent" directors and in the number of "Disinterested Directors" sufficient to maintain the required pre-increase percentage of "independent" directors and "Disinterested Directors."

"Disinterested Directors" must be: (a) independent from NextEra Energy and its subsidiaries and affiliated entities in accordance in all material respects with the rules and regulations of the NYSE; (b) have no material relationships with NextEra Energy or its subsidiaries or affiliates currently or within the previous ten years; (c) must be residents of Texas; and (d) must satisfy the 72-year-old age limit for members of the Board of Directors of a NextEra Energy company. Initially, the three Disinterested Directors will be chosen from the current Oncor Board of Directors and will satisfy the definition of "Disinterested Director." At all times, a "Disinterested Director" may only be removed by a majority of the remaining directors, which affirmative vote must include a majority of the remaining Disinterested Directors. When a vacancy of a "Disinterested Director" occurs, successors will be appointed solely by affirmative vote of a majority of the remaining Disinterested Directors.[2]

An affirmative vote by a majority of the Disinterested Directors shall be required to file Oncor into bankruptcy for the benefit of NextEra Energy.

The Disinterested Directors will develop, regularly maintain, and apply as part of each decision by them to elect successor Disinterested Directors, a skills and experience matrix that identifies a range of skills, experience, and background appropriate to maintaining a robust, diversified group of Disinterested Directors.

Oncor Board member compensation and benefits must be approved by Oncor's Board of Directors and shall not be linked to the performance of NextEra Energy or any of its other subsidiaries.

15. **Oncor Budgets** – Oncor's capital and operating and maintenance expense budgets must be approved by Oncor's Board of Directors.

16. **Dividend Policy** – Changes to Oncor's dividend policy must be approved by Oncor's Board of Directors.

17. **Debt-to-Equity Ratio** – Oncor's debt will be limited so that its regulatory debt-to-equity ratio (as determined by the Commission), calculated as of December 31 of each year, is at or below the assumed debt-to-equity ratio established from time to time by the Commission for ratemaking purposes, which is currently set at 60% debt

---

[2] This commitment assumes NextEra Energy acquires the 19.75 percent interest in Oncor held indirectly by TTHC.

to 40% equity. The calculations of the debt-to-equity ratio for purposes of this commitment will not include goodwill resulting from the Proposed Transactions.

18. **Rate Settlements** – Oncor will comply with all terms and conditions imposed by Oncor's previous rate settlements.

19. **Rate Case** – Oncor will file a general base rate case by July 1, 2017, unless before that date a general base rate case has been initiated by Commission Staff or some other party.

20. **Workforce** – For two years after closing, each current Oncor employee who is employed on the Closing Date, other than those identified in Regulatory Commitment 23 below, will be provided: (a) a base salary or wage rate that is no less favorable than the base salary or wage rate provided to such employee immediately prior to the Effective Time; (b) aggregate incentive compensation opportunities that are substantially comparable in the aggregate to those provided to such employee immediately prior to the Effective Time; and (c) employee benefits that are substantially comparable in the aggregate to those provided to such employee immediately prior to the Effective Time, and Oncor will not implement any material involuntary workforce reductions (with respect to either field or corporate personnel) of Oncor employees.

21. **Collective Bargaining Agreement** – With respect to any Oncor employee whose terms and conditions of employment are covered by a collective bargaining agreement, the terms and conditions of such employment will continue to be governed by the terms of the applicable collective bargaining agreement, as may be modified from time to time.

22. **Employment Agreements** – Oncor will honor any employment, severance, retention, termination, and change in control arrangements of Oncor in accordance with their terms, provided that no payments under any such arrangements that are covered under Regulatory Commitments 29 and 30 shall be recovered from Oncor's customers.

23. **Change in Control** – Each party hereto hereby acknowledges that, with respect to any employee listed on Exhibit F hereto, a "change in control" or "change of control" within the meaning of each Assumed Plan in which such employee is a participant or to which such employee is a party will occur as a result of the consummation of the Purchase Transactions. For each employee listed on Exhibit F who chooses to retire from or terminate his or her service with the Oncor Entities in connection with the closing of the Purchase Transactions, Parent and Merger Sub agree to pay any and all benefits (including change in control benefits) to which such individual would be entitled in connection with such retirement or termination, treating such retirement or termination as a resignation with "good reason," a termination "without cause," or a retirement under the relevant Assumed Plans. Such payments shall not be recovered from Oncor's customers consistent with Regulatory Commitments 29 and 30.

24. **Benefits** – For Oncor employees who become participants in any employee benefit plan of NextEra Energy or its Affiliates in connection with the Proposed

Transactions, the prior service of those employees to an Oncor entity will generally be taken into account, for purposes of eligibility and vesting thereunder.

25. **Code of Conduct** – Oncor will conduct its activities in compliance with a proposed updated Code of Conduct that will govern interactions between Oncor and its NextEra Energy affiliates. The provisions of the updated Code of Conduct that address competitive affiliates will apply to Gexa Energy, L.P. ("Gexa") and NextEra Energy Resources, LLC generation subsidiaries, and any other NextEra Energy affiliate to the extent they provide services or sell products in a competitive energy-related market in Texas. The updated Code of Conduct will incorporate the supplemental obligations set forth in Regulatory Commitments 26, 27, 32, 33, 35, 36, 41, 44, 55, 56, 57, 58, 59, 60, and 62.

26. **Oncor Compliance Officer and Affiliate Standards Compliance Program** – Oncor's compliance officer will have the responsibility to develop, implement, enforce, and maintain Oncor's Corporate Compliance Program of which the Affiliate Standards Compliance Program is a part. The Compliance Officer is accountable to the Oncor Board of Directors and will provide the Oncor Board of Directors with an annual report regarding the effectiveness of the Corporate Compliance Program and any proposed changes to the Corporate Compliance Program. Oncor will also maintain an Affiliate Standards Compliance Program of the same substantive scope, structure, and content that exists now at Oncor.

27. **Tax Indemnification** – NextEra Energy will indemnify Oncor for any liability for federal, state or local income taxes (including interest and penalties related thereto, if any) in excess of Oncor's standalone liability for federal, state or local income taxes (including interest and penalties related thereto, if any) for any period in which Oncor is included in a consolidated income tax return with NextEra Energy.

28. **Accumulated Deferred Income Taxes ("ADIT")** – No Internal Revenue Code ("IRC") Sections 338(h)(10), 336(e), or 754 elections will be made in regards to the Proposed Transactions. Unless expressly authorized by the Commission, after hearing and notice, the Proposed Transactions shall have no impact on Oncor's pre-acquisition recorded ADIT balances. After the close of the Proposed Transactions, Oncor's recorded ADIT balances will reflect applicable accounting and tax rules and regulations as they currently exist or may be amended from time to time.

29. **Transaction Costs** – None of the transaction costs will be borne by Oncor's customers, nor will Oncor seek to include transaction costs in rates. For purposes of this commitment, "Transaction Costs" are those incremental costs paid to advance or consummate the Proposed Transactions. Examples of Transaction Costs include, but are not limited to: NextEra Energy employee time and expenses; change of control payments; certain executive severance costs; and third party costs, including bank advisors, external legal advisors, rating agencies, and expert witnesses and consultants in each case paid to advance or consummate the Proposed Transactions. Transaction Costs do not include Oncor employee time and expenses.

30. **Transition Costs** – No NextEra Energy employee time and expenses, third party costs, fees, expenses or costs of the transition ("Transition Costs") will be borne by

Oncor's customers, nor will Oncor seek to include Transition Costs in rates. Transition Costs are those costs necessary to integrate the two companies for Day 1 Readiness, including the one-time transition costs being incurred either directly or indirectly through affiliate charges to transition Oncor to ownership by NextEra Energy and to integrate Oncor's operations and systems with those of NextEra Energy. Provided, however, that Transition Costs do not include Oncor employee time and expenses, costs to achieve savings or synergies or costs that reflect reasonable and necessary costs in providing service to the public. "Costs to achieve" reflect amounts incurred to realize operating enhancements, efficiency gains, or cost reduction initiatives.

31. **Pledging of Assets** – Oncor will not incur, guarantee, or pledge assets in respect of any incremental new debt related to the Proposed Transactions at the closing or thereafter. Oncor's assets shall not be pledged for any entity other than Oncor.

32. **New Debt Related to Acquisitions** – Oncor will not incur or assume any debt, including the provision of guarantees or collateral support, related to the Proposed Transactions or any future non-Oncor acquisition by NextEra Energy.

33. **Separate Debt** – Oncor will maintain its debt separate and apart from NextEra Energy and NextEra Energy's affiliates and subsidiaries. Oncor will maintain its own corporate and debt credit ratings for its publicly traded securities.

34. **Credit Rating Registration** – NextEra Energy and Oncor will be registered with major nationally and internationally recognized bond rating agencies, such as Standard & Poor's, Moody's Investor Service, or Fitch Ratings.

35. **Debt Liability** – Oncor will not incur or assume liability for the debts of NextEra Energy or its affiliates or subsidiaries, other than an Oncor subsidiary. Oncor will not guarantee the debt or credit instruments of NextEra Energy or any of its affiliates or subsidiaries, other than an Oncor subsidiary.

36. **Cross-Default Provisions, Financial Covenants or Rating Agency Triggers** – Oncor will not include in any of its debt or credit agreements cross-default provisions between Oncor's securities and the securities of NextEra Energy or any of its affiliates or subsidiaries. Oncor will not include in its debt or credit agreements any financial covenants or rating agency triggers related to NextEra Energy or any other NextEra Energy affiliate.

37. **Goodwill** – Any costs of goodwill of NextEra Energy or its Affiliates (including the pre-existing goodwill recognized by Oncor) will not be included in rate base, cost of capital, or operating expenses in future Oncor ratemaking proceedings. Write-downs or write-offs of goodwill will not be included in the calculation of net income for dividend payment purposes.

38. **Pushdown Accounting** – NextEra Energy will not elect to apply pushdown accounting for the merger, i.e., the merger will have no impact on Oncor's assets being acquired; and any incremental goodwill will not be allocated to, or recognized within, Oncor's balance sheet.

39. **Goodwill Impairments** – Within 10 days after a report to the Securities and Exchange Commission by NextEra Energy that indicates that the amount of goodwill on NextEra Energy's or Oncor's books has been impaired, NextEra Energy shall notify the Commission of such developments.

40. **Neutral Acquisition Accounting** – The acquisition accounting associated with the Proposed Transactions shall be rate neutral for Oncor's customers.

41. **Inter-company Debt** – Oncor will not enter into any inter-company debt transactions with Affiliates of NextEra Energy following consummation of the Proposed Transactions and Oncor will not lend money to or borrow money from NextEra Energy or its Affiliates.

42. **Separate Books and Records** – Oncor will maintain accurate, appropriate, and detailed books, financial records and accounts, including checking and other bank accounts, and custodial and other securities safekeeping accounts that are separate and distinct from those of NextEra Energy and its other Affiliates.

43. **Final Accounting Entries** – To the extent the Proposed Transactions result in any adjustment to the books of Oncor or a NextEra Energy subsidiary that is required to keep its books in accordance with the Federal Energy Regulatory Commission's Uniform System of Accounts, Oncor and such subsidiary shall submit to the Commission its final accounting entries within six months of the date that the Proposed Transactions are consummated. The accounting submission shall provide all accounting entries made to the books and records of the applicable subsidiary, along with the appropriate narrative explanations describing the basis for the entries.

44. **Shared Credit Facilities** – Oncor will not share any credit facility with NextEra Energy or its Affiliates.

45. **Organizational Documents** – The organizational documents of Oncor and any modifications to those documents will not be inconsistent with any order approving the Proposed Transactions.

46. **Regulatory Modifications** – Until the Proposed Transactions close, NextEra Energy and Oncor agree to request approval from the Commission of any modifications or additions to the approved commitments in this case by other regulatory bodies.

47. **Compliance Reports** – For five (5) years post-closing, Oncor will file annual reports with the Commission regarding compliance with these commitments. Such reports will be filed at the same time as the annual earnings monitoring report under 16 Texas Administrative Code § 25.73 is filed for Oncor. All unexpired commitments will remain in effect after the end of the five-year reporting period and will expire according to their own terms.

48. **Dividends** – Oncor shall not make any distributions, dividends, or other payments to NextEra Energy or its Affiliates without the prior approval of the Commission at any

time that one or more of Standard & Poor's, Moody's, or Fitch credit rating agencies determine that Oncor's issuer/corporate credit rating is not investment grade.[3]

49. **Remedial Plan** – If a ratings event described in Regulatory Commitment 48 occurs, Oncor will file a plan with the Commission within 60 days explaining the actions that are planned to address and rectify the situation. The dividend payment provision of Regulatory Commitment 48 ends when the relevant investment grade credit rating is restored.

50. **Non-Consolidation Legal Opinion** – In the event the credit ratings of NextEra Energy are downgraded to below investment grade by one of the three major credit rating agencies (Standard & Poor's, Moody's Investors Service, or Fitch Ratings), NextEra Energy commits to implement measures necessary to obtain a non-consolidation legal opinion in customary form and substance based on laws in effect as of the date of the final order in Docket No. 46238 opining that a bankruptcy court would not consolidate the assets and liabilities of Oncor with NextEra Energy in the event of a bankruptcy.

51. **Separate Name** – Oncor shall maintain a name, trademark, brand, logo, and identifying brand features separate and distinct from NextEra Energy and its current and any future Texas competitive affiliates. For the sake of clarity, Gexa, NextEra Energy Marketing, LLC, NextEra Retail of Texas, L.P., and any other current or future Texas competitive affiliates will not use the Oncor name, trademark, brand, logo, or any other brand identifying features; nor will Oncor engage in joint marketing, advertising, or promotional efforts with Gexa, NextEra Energy Marketing, LLC, NextEra Retail of Texas, L.P., or any other current or future Texas competitive affiliate, in a manner that is inconsistent with the Public Utility Regulatory Act and the Commission's affiliate rules.

52. **No Recovery of Gexa Bad Debt** – So long as Oncor is affiliated with Gexa, Oncor will not seek to recover from its customers any costs incurred as a result of a bankruptcy of Gexa.[4]

53. **Bankruptcy Expenses and Liabilities** – Oncor will not seek recovery in rates of any expenses or liabilities related to EFH's bankruptcy. This commitment includes the agreement that Oncor will not seek recovery in rates of amounts resulting from any: (1) tax liabilities resulting from the spin-off of Texas Competitive Electric Holdings Company LLC; (2) asbestos claims relating to non-Oncor operations of or under EFH; or (3) make-whole claims by creditors of EFH or EFIH set forth in the EFH and EFIH Plan of Reorganization. For the avoidance of doubt, Oncor's customers will not be required to pay for these items.

54. **Texas Reliability Entity** – Oncor will not seek to have another NERC Regional Entity other than the Texas Reliability Entity serve as the lead regional entity responsible for

---

[3] Distributions for payment of reasonable and necessary expenses recovered through Oncor's Commission-approved rates are not subject to this commitment.
[4] This commitment also applies to NextEra Retail Texas, LP.

Exhibit MH-R-2 (Errata 2)
Page 9 of 12

·monitoring Oncor's activities and ensuring compliance with NERC Reliability Standards.

55. **Competitive Affiliate Generation** – No generation facilities owned by NextEra Energy or its subsidiaries or affiliates are currently interconnected with Oncor's electric 'delivery system. NextEra Energy commits· that no electric generation facilities owned by it or its subsidiaries or affiliates will be interconnected with Oncor's electric delivery system without the prior approval of the Commission. NextEra Energy commits that it will not seek any other 'approvals required to interconnect generation facilities owned by NextEra Energy or its subsidiaries with Oncor without first obtaining 'Commission approval for such interconnection. NextEra Energy believes that any such application for approval would constitute a contested case pursuant to the Texas Administrative Procedure Act, including, but not limited to ~~determine~~, the determination of whether the interconnection is in the public interest consistent with the purpose and standards of PURA sec. 35.004 and Commission Substantive Rules, Subchapter I, Division 1, which require electric utilities to provide non-discriminatory access to wholesale transmission service and consistent with the standards in the Commission's rules governing affiliate transactions and interactions and compliant with Oncor's Code of Conduct.

56. **Code of Conduct Audit** – For the five (5)-year period following the close of the transaction with EFH, Oncor will have an audit prepared by independent auditors on an annual basis that verifies Oncor's compliance with its Code of Conduct rather than once every three years as required by Commission Substantive Rule 25.272. The independent auditors will be selected by the Disinterested Directors. The Commission will be designated as the intended beneficiary of such audit and will be consulted in connection with the scope of the audit. The independent auditor will have access to the books and records of any affiliate doing business with Oncor and any NextEra Energy Texas retail or generation affiliate to the extent necessary to address code compliance.

57. **Code of Conduct ·Certificate of Compliance** – For the five (5)-year period following the close of the transaction with EFH, the NextEra Energy CEO will file a certificate on a calendar year basis to the effect that Oncor's competitive affiliates (as defined in Oncor's Code of Conduct) have not engaged in any activity during the prior calendar year that would have resulted in an event of non-compliance by Oncor with its Code of Conduct.

58. **Report of Affiliate Activities** – Oncor will submit a report of affiliate activities required by Commission Substantive Rule 25.84 every six months for the five (5)-year period following the close of the transaction with EFH rather than on an annual basis as required by the rule.

59. **Code of Conduct Training** – All members of the NextEra Energy Board of Directors, the Oncor Board of Directors, and all employees and executives of Oncor and any affiliate entity with whom Oncor transacts or that engages in activities required, prohibited, or limited by the Oncor Code of Conduct will complete training on Oncor's Code of Conduct on an annual basis.

60. **Employee Transfers** – Oncor will file a public notification with the Commission before an employee of Oncor transfers to become an employee of a competitive affiliate or before an employee of a competitive affiliate transfers to become an employee of Oncor.

61. **Notification of New Affiliates** – Oncor will post a conspicuous notice on its Internet site within one week of the creation or acquisition of a new competitive affiliate of Oncor, or a new affiliate that provides services to or receives services from Oncor.

62. **ERCOT Voting Rights** – NextEra Energy subsidiaries that are competitive affiliates of Oncor shall not exercise voting rights on a matter before the ERCOT Board of Directors or ERCOT Technical Advisory Committee.

63. **Non-Utility Subsidiaries** – NextEra Energy commits that Oncor, Oncor Holdings, reorganized EFIH, and Merger Sub (Reorganized EFH) will not, and will not permit any of its subsidiaries to, form or otherwise acquire control of any new non-utility subsidiaries without the prior approval of the Commission.[5]

64. **Consolidation of Lone Star Transmission, LLC ("Lone Star") into Oncor** – Subject to Commission approval of and closing of the Proposed Transactions, NextEra Energy commits that it will seek approval to consolidate Lone Star into Oncor and any net savings will be reflected in Oncor's cost of service.

65. **Implementation of Ring-Fencing Measures** – NextEra Energy will implement the ring-fencing and corporate governance measures set out above in Regulatory Commitments 1, 2, 3, 4, 9, 11, 14, 15, 16, 17, 31, 33, 34, 35, 36, 41, 42, 44, 48, 49, 50, and 63 within 120 days of acquisition closing for the purpose of providing protections to customers.

66. **Certificates of Compliance** – Oncor will file with the Commission an annual compliance report with respect to the ring-fencing and corporate governance requirements (referenced in Regulatory Commitment 65) certified by an executive with appropriate authority under penalty of perjury and certified by two disinterested directors of Oncor. For the first five years following the closing of the transactions, Oncor will also file with the Commission on an annual basis a certificate of two disinterested directors of Oncor in which such directors certify that, to the best of their knowledge, all of the commitments set forth in these Revised Regulatory Commitments have been complied with. To the extent that either of the two certifying disinterested director believes that he or she needs to add an exception to such certification for it to be, to the best knowledge of such director, true and correct in all material respects, such exception shall be reported to the Commission together with such certification and the Disinterested Directors shall be available to discuss their exceptions with the Commission.

67. **Sharing of Interest Rate Savings** – Oncor will provide monthly bill credits to electric delivery rates for ultimate credits to customers in an amount equal to 90% of

---

[5] This commitment also applies to the formation or acquisition of any new non-utility subsidiaries by TTHC upon the close of the transaction with TTHC.

the interest rate savings achieved until final rates are set in the next Oncor base rate case after the Oncor base rate case that is referenced in Regulatory Commitment 19. Until final rates are set in the next Oncor base rate case after the Oncor base rate case that is referenced in Regulatory Commitment 19, Oncor will file a report with the Commission every 6 months detailing the interest rate savings determined by multiplying the amount of debt issued by Oncor by at least 0.15% (amounts above 0.15% being based on actual interest rate savings by Oncor) and demonstrating a calculation of the credit. NextEra Energy and Oncor agree to work in good faith with TXU Energy Retail Company LLC, Texas Energy Association for Marketers, NRG Companies, and other interested parties to determine an acceptable method for implementation of the bill credits to effectuate this commitment, as approved by the Commission. At a minimum, Oncor shall provide retail electric providers 45-day notice of the amount of the customer credits (*e.g.*, for each customer class, the amount per kWh or per-customer credit that would apply) prior to the effective date of the credits and shall implement updated bill credits simultaneously with other changes in Oncor's rates.

68. **Reporting Relationships** – The Oncor CEO will report directly to the NextEra Energy CEO or President. Oncor employees will report through their management chain to the Oncor CEO. Unless otherwise required by the applicable law or permitted by order of the Commission, each existing position (or its functional equivalent(s)) that is a direct reporting position to the Oncor CEO will for a period of at least five years following such closing continue to be direct reporting positions to the Oncor CEO and the positions set forth in NextEra Energy Exhibit 39 in this docket, or their substantive equivalents if such positions change, may also have "dotted line" reporting relationships as specified on such exhibit.

69. **Competitive Shopping Platforms** – NextEra Energy agrees that neither Oncor nor Oncor's subsidiaries will host or allow the Oncor name, trademark, brand, logo, or other identifying brand features to be used to promote a competitive retail electric shopping website.

70. **Oncor LLC Agreement** - The Oncor LLC Agreement in effect immediately upon closing of the Proposed Transactions shall comply with the Final Order of the Commission approving the Proposed Transactions. Any changes to such agreement shall be approved by the Commission.

71. **Notice of Corporate Separateness** ~~Commitment~~ – In the event the credit ratings of NextEra Energy are downgraded to below investment grade by any one of the three major credit rating agencies (Standard & Poor's, Moody's Investors Service, or Fitch Ratings), NextEra Energy commits that it and its subsidiaries will provide advance notice of their corporate separateness to lenders on all new debt and will use commercially reasonable efforts to seek an acknowledgment representation of that separateness and non-petition covenants in all new debt instruments, including the debt instruments used in connection with financing the merger. This commitment will terminate at such time that the relevant investment grade credit rating of NextEra Energy is restored.

**72.** ~~Operating Expenses~~Shared and Common Services Costs – Oncor may not seek to recover shared and common services costs due to charges from NextEra Energy or its affiliates that in the aggregate are not equal to or lower than such costs ~~presently~~ incurred by Oncor directly or from other providers indirectly~~.~~ during 2016, adjusted for inflation.

**73.** FERC Preemption - Neither Oncor, NextEra Energy nor its affiliates will assert before the Commission or a Texas court of competent jurisdiction that the Commission is preempted pursuant to the Federal Power Act (e.g., under a FERC tariff) from making a determination regarding the prudence of affiliate costs sought to be allocated to Oncor.