IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X
                                                           :
In re:                                                     :    Chapter 11
                                                           :
Energy Future Holdings, Inc., *et al.*,[1]                 :    Case No. 14-10979 (CSS)
                                                           :
                                    Debtors.               :    (Jointly Administered)
                                                           :
                                                           :    **Re: D.I. 9584**
                                                           :
                                                           :    **Hearing Date: September 19, 2017 at 10:00 a.m. (ET)**
                                                           :    **Objection Deadline: August 25, 2017 at 4:00 p.m. (ET)**
---------------------------------------------------------- X

## APPLICATION OF NEXTERA ENERGY, INC.
## FOR PAYMENT OF ADMINISTRATIVE CLAIM

NextEra Energy, Inc. ("NextEra"), pursuant to this Court's *Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9584] (the "Termination Fee Approval Order"), hereby submits this application (the "Application") for payment of the Termination Fee (as defined below). The Application is supported by the *Declaration of Howard Seife in Support of Application of NextEra Energy, Inc. for Payment of Administrative Claim* (the "Seife Declaration"), filed contemporaneously herewith. In support of the Application, NextEra respectfully states as follows:

## PRELIMINARY STATEMENT[2]

The Debtors seek to escape their contractual obligation to pay a Termination Fee that was litigated before, and approved by, this Court—a contractual provision that the Debtors

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]    Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to them in the Background section.

themselves insisted was critical to the contemplated merger and entirely proper. NextEra seeks confirmation that the Debtors' contractual commitments—and this Court's previous order—will be enforced, notwithstanding the Debtors' expedient desire to refuse payment to NextEra under pressure from creditors seeking to enhance their own recoveries.

This Application should not have been necessary. When this Court approved the Merger Agreement between the Debtors and NextEra, it also approved the Termination Fee. The Court recognized that, as the Debtors themselves argued, NextEra assumed substantial risks and provided "massive value" to the estates by entering into the Merger Agreement. To avoid precisely the type of cynical re-trading that the Debtors now attempt, the parties agreed, and the Court expressly ordered, that EFH and EFIH would pay NextEra the Termination Fee "without any further proceedings before, or order of, the Court" should the circumstances requiring payment of the Termination Fee arise. *See Termination Fee Approval Order* at ¶ 4.

There can be no doubt that those circumstances will arise when an alternative transaction is consummated. NextEra and the Debtors provided the Court a joint letter clarifying the circumstances under which the Termination Fee would be payable. In terms that presciently describe the present situation, the parties jointly informed the Court that "the $275 million termination fee is triggered if EFH and/or EFIH terminate the merger agreement as a consequence of the Commission either not approving the merger agreement transaction or approving the merger transaction with the imposition of a burdensome condition." *See Termination Fee Clarification Letter* [D.I. 9655].

This bargain had a specific purpose: if NextEra continued to diligently pursue the transaction after the June 24, 2017 "drop dead" date, the Debtors could nevertheless walk away—but only at a price. The Debtors have now done just that—terminating the deal with NextEra so it can pursue an alternative transaction with Berkshire. Yet, in a mockery of the deal

2

they freely struck and their representations to the Court, the Debtors now seek to wriggle out of paying the Termination Fee by falsely claiming that NextEra breached its obligations under the Merger Agreement.  The Debtors have now alleged, for the first time, that NextEra did not use its reasonable best efforts to consummate the transaction.  The Debtors' position is nonsense, wholly unsupported by the record, or by the evidence presented to the Public Utility Commission of Texas (the "PUCT").  Putting aside that there can be no rational explanation for *why* NextEra would have sabotaged its own deal, the fact is that NextEra worked tirelessly to attempt to consummate the transaction.  For months the Debtors actively supported NextEra in that process, and repeatedly praised NextEra's "many efforts" towards achievement of their shared goal.  Indeed, the Debtors lauded NextEra's willingness to accept certain PUCT restrictions that the Debtors described as "far from commonplace in a parent-subsidiary relationship," *see First EFH PUCT Amicus Brief* at p. 6; similarly praised "the many efforts NextEra made to address concerns about debt issuance, capital structure, and bankruptcy exposure in its 73 regulatory commitments," *see Second EFH PUCT Amicus Brief*; and acknowledged to this Court that "NextEra and the debtors are committed to reviving the NextEra deal if at all possible." Tr. Hr'g Apr. 17, 2017 at 18:2–4.  Only now, when the PUCT has determined not to let the transaction go forward and the Debtors have a new deal, do the Debtors cry breach.

It is patently obvious why the Debtors object to payment of the Termination Fee.  An extra $275 million to distribute to unsecured creditors may make it easier to garner creditor support for the Berkshire Plan.  The intense pressure brought to bear on the Debtors by the Elliott funds, which are collectively perhaps the largest of the Debtors' unsecured creditors, is also manifest.[3]  Payment of the Termination Fee is no doubt a particularly bitter pill because the

---

[3]    On July 29, 2017, Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott") filed a motion asking the Court to reconsider that portion of the Merger Approval Order that approved the Termination Fee.  In that ill-considered motion, Elliott takes the outrageous positions that the

3

Berkshire Plan would provide hundreds of millions of dollars less to the estates than NextEra's transaction would have. But neither deal-making convenience for the Debtors nor the creditors' understandable disappointment at the recovery decline wrought by the PUCT's decision justifies the Debtors' effort to deprive NextEra of the Termination Fee in derogation of this Court's Termination Fee Approval Order.

Nor can the Debtors, Elliott, or anyone else claim to be surprised by the effect of the Termination Fee. As this Court noted in advance of approving the Termination Fee, "[i]f the termination fee is payable . . . [t]hat administrative expense will be senior in priority to the substantial unsecured claims at EFH and EFIH and will directly and adversely affect the recoveries to those unsecured creditors." Hr'g Tr. Sept. 26, 2016 at 14:14-19.

The true causes of the transaction's failure are simple. The PUCT insisted that the Oncor ring-fence be maintained and enhanced. Nobody can show that the PUCT could be persuaded to budge from that position—it is telling that the Berkshire Plan is premised on Berkshire committing to accept the very Burdensome Conditions that NextEra reasonably could not. And nobody can reasonably dispute that the ring-fence constitutes a "Burdensome Condition" under the Merger Agreement that would have prevented the transaction from closing. Everything else is noise and irrelevant. The public statements and the record in the PUCT proceeding—from the Commissioners, to the PUCT Staff, to the other intervenors—were a continuous drumbeat of insistence on the imposition of Burdensome Conditions. It is absurd to allege, in blatant contradiction of the PUCT's own public statements, that it was NextEra's behavior rather than a

---

Debtors and their counsel repeatedly misled the Court regarding the terms of the Termination Fee and that the Court fundamentally misunderstood the circumstances under which the Termination Fee would be payable. Needless to say, neither position is remotely credible, especially coming from a creditor that acquired its position so late in these cases and is desperately attempting to make good on its financial roll of the dice. Moreover, Elliott has waived any right to challenge the Termination Fee because certain of Elliott's predecessors-in-interest initially objected to and ultimately consented to approval of the Termination Fee. For these and many other reasons, Elliott's motion is wholly without merit and NextEra will respond appropriately in due course. NextEra expressly reserves all rights with respect thereto.

4

fundamental disagreement over the propriety of the Burdensome Conditions that caused the PUCT to deny the transaction.

Simply put, NextEra negotiated for the protection of the Termination Fee, received the Court's approval, acted in reliance on that approval, and more than complied with its obligations under the Merger Agreement. The Debtors' attempt to revise history to dodge payment is not based on fact or the governing agreements. NextEra did not breach its obligations and did not cause the transaction to fail. The transaction failed because the PUCT insisted on maintaining and enhancing the Oncor ring-fence, and because the Debtors changed course while NextEra diligently pursued its appeal of that decision and worked to sway the intervenors from their insistence on the unacceptable Oncor ring-fence Burdensome Condition. It is the Debtors' unwillingness to now live by the deal they struck—pressured by Elliott's aggressive behavior and implicit threat of endless litigation—that has necessitated NextEra's request for relief from the Court. The Court should enforce the Termination Fee Approval Order and direct that the Termination Fee be paid upon consummation of an alternative transaction.

## JURISDICTION AND VENUE

1.      This court has jurisdiction over the Application pursuant to 28 U.S.C. §§ 157 and 1334, the Amended Standing Order of Reference dated February 29, 2012, and Paragraph 10 of the Termination Fee Approval Order.

2.      This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

3.      Pursuant to Local Rule 9013-1(f), NextEra consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

CPAM: 12682756.27

5.     The bases for the relief requested in the Application include, without limitation, 11 U.S.C. §§ 105, 363, and 503, and the Termination Fee Approval Order.

## BACKGROUND

A.     Negotiation and Bankruptcy Court Approval of the NextEra Deal

6.     On April 29, 2014 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (the "Debtors") commenced these Chapter 11 cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

7.     In 2014, the Debtors began marketing their economic interest in Oncor Electric Delivery Company LLC ("Oncor"). That marketing process included a multistage Court-approved bidding process. *See Approval Motion* (as defined below) at ¶ 2. During the early stages of this process, NextEra and the Debtors engaged in discussions concerning the terms of a potential transaction pursuant to which NextEra would indirectly acquire the Debtors' interest in Oncor.

8.     In April 2016, the Debtors engaged in additional discussions with NextEra that followed an extensive and strategic marketing process by the Debtors for the sale of their economic interest in Oncor. The Debtors contacted eighteen potential bidders for the E-side assets, eight of whom went so far as to sign nondisclosure agreements and begin diligence. *See Approval Motion* ¶ 22. Apart from NextEra, two other bidders "engaged in extensive negotiations" to purchase the E-side assets, and "[w]ith one of those other bidders, negotiations progressed to definitive documentation." *Id.* at ¶ 24. This multi-bidder dynamic allowed the Debtors to "to obtain the highest and otherwise best terms and conditions," and it was only "after three months of intensive multiparty negotiations" that the Debtors committed to move forward with and seek approval of the NextEra transaction. *Id.*

CPAM: 12682756.27

9.    On July 29, 2016, certain of the Debtors, NextEra, and EFH Merger Co., LLC ("Merger Sub")—a newly formed subsidiary of NextEra—executed definitive documentation to govern this transaction, including an Agreement and Plan of Merger among Energy Future Holdings Corp. ("EFH"), Energy Future Intermediate Holding Company LLC ("EFIH"), NextEra, and Merger Sub, dated as of July 29, 2016 (the "Merger Agreement").

10.    The Merger Agreement, as amended, contemplated a merger of EFH with and into Merger Sub, whereby EFH would have become a wholly-owned subsidiary of NextEra with an approximately $18.7 billion implied Oncor total enterprise value. The proposed transaction included the repayment of the EFIH first lien debtor-in-possession financing facility as part of NextEra's contribution of approximately $9.5 billion—primarily consisting of cash, plus a relatively small amount of NextEra common stock.

11.    A critical element of the Merger Agreement was the inclusion of a "Termination Fee" in the amount of $275 million in favor of NextEra (the "Termination Fee"), which would be payable following (i) termination of the Merger Agreement by either party, except under certain limited circumstances and (ii) the Debtors' consummation of an alternative transaction involving Oncor.  As the Debtors have acknowledged, the Termination Fee was a key deal term that NextEra insisted be included in every term sheet and merger agreement draft they had exchanged since July 2014. *See Debtors' Reply in Support of Approval Motion* (as defined below) at ¶ 3.

12.    Also on July 29, 2016, EFH, EFIH, EFIH Finance Inc., certain direct and indirect subsidiaries of EFH, and NextEra entered into the *Plan Support Agreement* (the "Original Plan Support Agreement") in support of the *Amended Joint Plan of Reorganization of Energy Future Holdings Corp. et al., pursuant to Chapter 11 of the Bankruptcy Code*, as modified and filed with the Bankruptcy Court on August 5, 2016 [D.I. 9199] (as modified, amended or supplemented from time to time, the "E-Side Plan").

CPAM: 12682756.27

13.     After the Merger Agreement was finalized, the Debtors, working closely with NextEra, prepared numerous bankruptcy pleadings and took other actions in support of the NextEra transaction.  In particular, the Debtors, with NextEra's support, filed the E-Side Plan, as well as the Disclosure Statement and other solicitation materials in respect of the E-Side Plan (collectively, and as modified, amended or supplemented from time to time, the "E-Side Disclosure Statement"), all of which were premised on consummation of the transactions set forth in the Merger Agreement.

14.     On August 5, 2016, the Debtors sought approval of the E-Side Disclosure Statement.  *See Motion of the EFH/EFIH Debtors for Entry of an Order (A) Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols in Connection with Confirmation of the Debtors Joint Plan of Reorganization as it Relates to the EFH/EFIH Debtors, (B) Approving the EFH/EFIH Disclosure Statement, (C) Establishing the EFH/EFIH Voting Record Date, EFH/EFIH Voting Deadline and Other Dates, (D) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan, and (E) Approving the Manner and Forms of Notice and Other Related Documents* [D.I. 9201].  By motion dated August 3, 2016 (the "Approval Motion"), the Debtors also sought approval of their entry into the Plan Support Agreement and Merger Agreement.  *See Motion Of The EFH/EFIH Debtors For Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, And (C) Authorizing Entry Into And Performance Under Plan Support Agreement* [D.I. 9190].

15.     In its Approval Motion, the Debtors sought approval not only of the Merger Agreement, but also explicitly of the Termination Fee.  In seeking approval of the Termination Fee, the Debtors acknowledged and highlighted both the enormous value that NextEra was providing to the Debtors' estates and the risks that NextEra was assuming by entering into the Merger Agreement.  The Debtors further posited, among other things, that "[e]ach of [the]

8

outcome-determinative factors" for approving a termination fee under *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 536 (3d Cir. 1999) "is present here." *See EFH/EFIH Debtors Omnibus Reply to Objections to Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement, dated September 14, 2016* [D.I. 9536] (the "Debtors' Reply in Support of Approval Motion") ¶ 7. The Debtors supported the Approval Motion with declarations by key members of the Debtors' advisory team, including William Hiltz and David Ying. *See Declaration of William O. Hiltz in Support of the Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9191]; *Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9192].

16.     Various parties objected to approval of the Merger Agreement, and specifically challenged approval of the Termination Fee. In particular, certain parties argued that the Debtors had not demonstrated that NextEra had provided sufficient value to the Debtors' estates to warrant approval of the Termination Fee as an administrative expense of EFH and EFIH.

17.     The Debtors opposed these objections, and again highlighted the significant value that NextEra was providing to the Debtors' estates by entering into the Merger Agreement. *See Debtors' Reply in Support of Approval Motion.* The Debtors pointed out that the Termination Fee satisfied the Third Circuit's *O'Brien* factors in that it (i) promoted a competitive process, (ii) kept NextEra committed to the merger, and (iii) was not used by the Debtors to favor NextEra over others. *See Debtors' Reply in Support of Approval Motion* ¶¶ 6-14. The Debtors urged that,

9

consistent with the *O'Brien* standard, the Termination Fee should be viewed as "one part of a larger transaction," *id.* at ¶ 16, a transaction that the Debtors insisted "provide[d] massive value to the EFH/EFIH Debtors' estates . . . ." *Id.* at ¶ 21. The Debtors made clear that the Termination Fee was necessary to realize that value, "as the EFH/EFIH Debtors' and NextEra's negotiation history proves, [the Termination Fee] is one protection that has *always* been required by NextEra." *Id.* at ¶ 22; *see also id.* at ¶ 3 ("NextEra has insisted [the Termination Fee] be included in their proposed transaction in every term sheet and merger agreement draft exchanged . . . since . . . July 2014"); *see also Ganter Declaration* ¶¶ 1-20 (attaching email correspondence between NextEra and the Debtors to demonstrate that the Termination Fee was necessary to the Merger Agreement and directly related to the proposed transaction's risk profile).

18.     The Debtors also explained that not only was the Termination Fee an indispensable deal term, but that its size was directly related to NextEra's reciprocal commitment to (i) increase its purchase price at the "eleventh hour" by $110 million and (ii) drop its demand for the ability to match any competing offers. *See Debtors' Reply in Support of Approval Motion* ¶¶ 3, 19. Consequently, as the Debtors argued, the Termination Fee was a vigorously negotiated term that was "ultimately necessary to induce NextEra" to do the deal that would provide massive value to the Debtors' estates. *See Approval Motion* ¶¶ 40-43.

19.     On September 19, 2016, this Court entered the Termination Fee Approval Order, overruling each of the objections on the merits and approving the Termination Fee. Specifically, the court ruled that "the EFH/EFIH Debtors are authorized ***and directed*** to pay the Termination Fee as an allowed administrative expense to the extent it becomes due and payable pursuant to the terms and conditions of the Merger Agreement, at the time and in the manner provided for therein, ***without any further proceedings before, or order of, the Court . . . .***" Termination Fee Approval Order ¶ 4 (emphasis added).

20.    The Debtors and NextEra also worked together to garner creditor support for the E-Side Plan and Merger Agreement transactions. Those efforts resulted in the parties' entry into the *Amended and Restated Plan Support Agreement*, made and entered into as of September 19, 2016, among certain funds and accounts advised or sub-advised by Fidelity Management & Research Company or its affiliates (collectively, the "Fidelity Funds") and the parties to the Original Plan Support Agreement (as modified, amended or supplemented from time to time, the "Amended Plan Support Agreement"), which amended and superseded the Original Plan Support Agreement. At the time the Amended Plan Support Agreement was entered into, the Fidelity Funds held significant positions across the EFH and EFIH capital structure. As requested by the Debtors and to induce the Fidelity Funds to enter into the Amended Plan Support Agreement, NextEra agreed to increase its purchase price for Oncor by an additional $300 million.

21.    On September 25, 2016, NextEra and the Debtors jointly submitted a letter to the Court (the "Termination Fee Clarification Letter") that clarified the circumstances in which the Termination Fee would be payable to NextEra. In that letter, the parties explained that "the $275 million termination fee is triggered if EFH and/or EFIH terminate the merger agreement as a consequence of the [PUCT] either not approving the merger agreement transaction or approving the merger transaction with the imposition of a burdensome condition. In order for EFH and/or EFIH to pursue an alternative transaction, EFH and EFIH believe that they would only terminate in such a situation if they had an alternative proposal to pursue." *Termination Fee Clarification Letter* [D.I. 9655]. The parties went on to clarify that "[t]he termination fee is not triggered if, under the same circumstances, NextEra Energy terminates the merger agreement instead of EFH and/or EFIH." *Id.*

22.    On February 17, 2017, the Court confirmed the E-Side Plan, as amended, entering its *Order Confirming the Eighth Amended Joint Plan of Reorganization of Energy Future*

CPAM: 1268275627

*Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Relates to the EFH*

*Debtors and EFIH Debtors* [D.I. 10859] (the "Confirmation Order").

B.    NextEra's Extraordinary Efforts to Seek PUCT Approval

23.    The Plan's effectiveness remained subject to a number of conditions precedent, including approval of the transactions by the PUCT.  The Merger Agreement itself addressed the parties' respective obligations with respect to seeking approval from various governmental authorities, including the PUCT.

24.    Under the Merger Agreement, NextEra agreed to include 32 "Key Regulatory Terms" in its PUCT application.  These terms would have imposed certain obligations and restrictions governing NextEra's ownership of Oncor.  The terms set forth in the Merger Agreement reflected the full list of restrictions and obligations that the Debtors were requiring NextEra to include in its PUCT application.  The Merger Agreement required NextEra to accept additional conditions imposed by a PUCT approval order, provided that they were not "Burdensome Conditions" (as defined in the Merger Agreement).  *See Merger Agreement* §§ 6.3(d) and (e); *Merger Agreement* Exh. E.  NextEra was expressly *not* obligated to accept Burdensome Conditions, including conditions that individually or in the aggregate: (i) limited or restricted NextEra's ability to appoint, remove or replace Oncor or Oncor Holdings directors; (ii) imposed requirements or restrictions on director qualifications (other than requiring that no more than a majority of the directors of an entity qualify as "independent"); or (iii) limited or restricted the Oncor entities' ability to make dividends or other payments to its Parent or affiliates (subject to certain permitted limitations specified in the Merger Agreement).  NextEra was not willing to accept these Burdensome Conditions because, among other things, such conditions would have resulted in a downgrade to NextEra's own credit ratings.  *See Amicus Curiae Brief of Energy Future Holdings Corp. and Energy Future Intermediate Holdings*

*Company LLC in Support of Rehearing*, PUCT Docket No. 46238, Item No. 545, at p. 8-9 (the

"First EFH PUCT Amicus Brief," Seife Decl. Exh. D).

25.    The Burdensome Conditions and related governance restrictions that NextEra was

unwilling to accept as part of a sale were critical aspects of the transaction for both NextEra and

the Debtors.    Before engaging with NextEra, the Debtors insisted that the terms of the

Burdensome Conditions be agreed.  As a result of this position, the Burdensome Conditions and

Key Regulatory Terms were developed and negotiated by and between the Debtors and NextEra

in May 2016, before the development and negotiation of other deal documents and rest of the

Merger Agreement.  Notably, the Key Regulatory Terms were adapted from the prior two PUCT

approvals of a change of control of Oncor—EFH's acquisition of Oncor and affiliates (PUCT

Docket No. 34077) and the PUCT's conditional approval of the Hunt acquisition of Oncor

(PUCT Docket No. 45188).  Given their direct involvement, the Debtors *were fully aware*, at all

relevant times, of the importance of the Burdensome Condition provisions to NextEra and the

possibility that NextEra would not close the transaction if the PUCT conditioned its approval on

the imposition of any of the Burdensome Conditions.

26.    Reflecting its strong desire to consummate the merger, NextEra agreed to many

additional undertakings to obtain PUCT approval, albeit without accepting Burdensome

Conditions, which NextEra could not reasonably accept and was not obligated to accept under

the Merger Agreement.    Ultimately NextEra agreed to more than double the number of

regulatory commitments it would make, from 32 to 73.

27.    NextEra expended massive resources and efforts in seeking the PUCT's approval

of the proposed transactions.  For three months in advance of filing its application with the

PUCT in October 2016, NextEra assigned employees full-time and hired numerous outside

consultants to prepare its filing and conduct necessary legislative and regulatory outreach to

define and quantify issues that could impede approval of the transaction.  These efforts included reaching out to stakeholders and potential intervening parties to ascertain potential points of contention in an effort to preemptively resolve those issues and enhance the opportunity for regulatory approval.  NextEra hired experienced government relations specialists and lobbyists in Texas to advocate for and support its application. NextEra likewise hired experienced, well-established outside regulatory counsel in Texas to litigate the proceeding before the PUCT and worked on a daily basis to evaluate and respond to issues raised in the PUCT proceeding.

28.    In addition, NextEra retained highly experienced expert witnesses to support the application, including John Reed, a leading consultant in the energy field and the Chairman and Chief Executive Officer of Concentric Energy Advisors, Inc. and CE Capital, Inc., to discuss benefits and impacts of the transaction.  NextEra also retained Jess Totten, a Principal with Osprey Energy Group, LLC, who was employed by the PUCT for 23 years and served as the PUCT's Director of the Competitive Markets Division and Director of the Electric Industry Oversight Division, to discuss the various Regulatory Commitments made by NextEra to support a favorable PUCT decision.

29.    Moreover, NextEra executive employees, with the help of their respective support staffs, provided direct and rebuttal testimony in support of the transaction and responded to discovery and other issues.  During the proceeding before the PUCT, NextEra responded to more than 1,100 distinct discovery requests, and provided almost 40,000 pages of supporting documentation.  For three months in advance of the hearing on the merits, NextEra's outside consultants and employees devoted thousands of man-hours to prepare for the hearing. NextEra's Chief Executive Officer, James Robo, appeared before the PUCT at an open meeting held during the middle of the proceeding on the merits to answer any questions that the commissioners had and to address the PUCT in person to support the transaction.  This was done

14

with the encouragement of both Oncor's CEO and its General Counsel, as well as with the support of EFH and EFIH.

30.    NextEra also actively pursued opportunities to reach settlement with key constituencies both prior to filing its application with the PUCT and during the PUCT proceeding. Those efforts began in May 2016 and were continuous throughout the entirety of the PUCT proceeding. Among other things, NextEra arranged and attended meetings with various stakeholders, discussed potential settlement terms with stakeholders and prepared settlement documents for consideration. By way of example, between May 2016 and April 2017, NextEra participated in no less than 35 meetings with intervenors, including PUCT Staff, Texas Industrial Electric Consumers ("TIEC"), Office of Public Counsel, and the Oncor Coalition of Cities (the "Cities"). Additionally, NextEra senior executives participated in meetings with members of TIEC and the Cities in an effort to enhance goodwill with these parties and lay the groundwork for settlement opportunities regarding the PUCT proceeding. NextEra's efforts resulted in a successful settlement with several intervenors on important issues relating to wholesale and retail electric market competition.

31.    The Debtors raised not a single objection to NextEra's efforts to consummate the transaction. To the contrary, the Debtors and their advisors regularly praised NextEra's work in advancing the parties' common interest in obtaining PUCT approval.

32.    The PUCT and its staff, however, continuously took the position that any approval should be conditioned upon maintenance and enhancement of existing "ring-fencing" provisions that imposed restrictions concerning Oncor's board of directors and the payment of dividends. Both sets of restrictions plainly constituted Burdensome Conditions under the Merger Agreement. Rather than approve NextEra's application subject to the Burdensome Conditions, which NextEra could not reasonably accept and was not obligated to accept, the PUCT held a

brief open meeting discussion that touched on only a few of the issues presented and thereafter issued a final order that denied approval of the proposed transactions. *See Order*, dated April 13, 2017, PUCT Docket No. 46238, Item No. 538 (Seife Decl. Exh. C).

33.    In response to the order denying approval of the transaction, NextEra filed a motion for rehearing, explaining that the PUCT's summary disposition of the case and its determination that the transactions were not in the public interest and would not be permitted to close failed to give full and fair consideration to the application, the law, or the evidence as a whole.    While the PUCT did grant a rehearing, it did so only to bolster its findings and conclusions through the issuance of an Order on Rehearing. *See Order on Rehearing*, dated June 7, 2017, PUCT Docket No. 46238, Item No. 551 (Seife Decl. Exh. F).    NextEra timely filed a Second Motion for Rehearing, again explaining that the PUCT's determination was contrary to the law and the evidence.    The PUCT summarily denied NextEra's Second Motion for Rehearing two days later. *See Order Denying Second Motion for Rehearing*, dated June 29, 2017, PUCT Docket No. 46238, Item No. 557 (Seife Decl. Exh. H).

34.    Determined to obtain judicial review of the PUCT's denial of its application, on July 13, 2017, NextEra Energy filed an appeal with the Travis County District Court.    The appeal asserts errors of both law and fact resulting from the PUCT determination that the transactions were not in the public interest and would not be permitted to close.

35.    Over the course of the proceedings before the PUCT, NextEra worked diligently to consult with the Debtors and their counsel, and kept them fully apprised of developments, including presentations and testimony to the PUCT.    Throughout the rehearing process in particular, the Debtors expressed support for and satisfaction with NextEra's efforts to obtain PUCT approval of the proposed transactions.    In conjunction with NextEra's filings, EFH and EFIH twice submitted *amicus curiae* briefs, joining NextEra in urging the PUCT to reconsider

and approve the proposed transaction. Additionally, the Debtors were afforded the opportunity to review and comment on NextEra's motions for rehearing prior to filing. All comments, including those provided by the Debtors' outside counsel, were considered and addressed prior to filing. Further, the Debtors consistently provided positive and complimentary feedback regarding NextEra's efforts and never indicated over the course of the PUCT proceedings that anything NextEra had done (or had not done), or any position NextEra had taken, was improper or in any way in breach of its obligations under the Merger Agreement.

36.    At no point in time during this extended process did the Debtors so much as suggest—to say nothing of actually providing notice of—any purported breach of the Merger Agreement by NextEra. To the contrary, the Debtors praised NextEra's performance and supported NextEra's efforts to close the transactions before the PUCT. Notably, in one of their *amicus* filings with the PUCT, the Debtors specifically touted NextEra's agreement to "maintain many key elements of the ring-fence," commitments that the Debtors described as "far from commonplace in a parent-subsidiary relationship." *See First EFH PUCT Amicus Brief*, at p. 6 (Seife. Decl. Exh. D). The Debtors also characterized the various ring-fencing restrictions that NextEra could not reasonably accept as "anomalous conditions" and expressed their agreement with NextEra's unwillingness to accept such Burdensome Conditions. *Id.* at 8. In particular, the Debtors noted that "the credit ratings agencies have informed NextEra that if it retains [the ring-fence] restrictions, then its (and some of its affiliates) own credit rating may be downgraded, *which understandably is not a tolerable outcome for NextEra.*" *Id.* at 9 (emphasis added).

37.    In yet another of their *amicus* filings with the PUCT, the Debtors acknowledged and praised "the ***many efforts*** NextEra made to address concerns about debt issuance, capital structure, and bankruptcy exposure in its 73 regulatory commitments." *See Amicus Curiae Brief of Energy Future Holdings Corp. and Energy Future Intermediate Holdings Company LLC in*

*Support of Second Motion for Rehearing*, PUCT Docket No. 46238, Item No. 555, at p. 2 (Seife

Decl. Exh. G) (the "Second EFH PUCT Amicus Brief") (emphasis added).

38.     The Debtors also lauded NextEra's efforts in periodic status reports made to this

Court.  For example, on April 17, 2017, during a status conference following entry of the

PUCT's initial order, the Debtors informed this Court that "NextEra and the debtors are

committed to reviving the NextEra deal if at all possible." Tr. Hr'g Apr. 17, 2017 at 18:2–4.  At

that time, the Debtors also recognized NextEra's strong efforts, in collaboration with the Debtors,

to reach a settlement with the PUCT staff that could still permit the deal to go forward. *See id.* at

13:14–19 ("at the same time NextEra is still working on a potential settlement.  We understand

that NextEra is engaged with the PUCT interveners, including the PUCT staff in an effort to try

and reach a settlement.  And the debtors will continue to work with NextEra on that front as

well.").

C.     Debtors' Termination of the Merger
       Agreement and Pursuit of Alternative Transaction

39.     On July 6, 2017, only thirteen days after occurrence of the Merger Agreement's

"drop dead" date, but with NextEra continuing in earnest to pursue PUCT approval, EFH and

EFIH, without any prior notice to NextEra, delivered a letter to NextEra terminating the Merger

Agreement, invoking Section 8.2(a) and Section 8.3 thereof, and alleging that termination of the

Merger Agreement resulted in the automatic termination of the Amended Plan Support

Agreement.  In the letter, the Debtors did not specify any particular subsection of Section 8.3 as

the basis for their action. Each subsection of Section 8.3 notably provides a distinct basis for

termination of the Merger Agreement (most of which would afford no basis for avoiding the

Termination Fee).  The Debtors also suggested that they may have had additional unidentified

bases on which they could have terminated the Merger Agreement. *See Notice of Filing of*

*Letters Terminating (A) the NEE Plan Support Agreement and (B) the NEE Merger Agreement*, at Exh. B [D.I. 11424].

40.    The following day, July 7, 2017, having already terminated the Merger Agreement, the Debtors delivered a letter terminating the Amended Plan Support Agreement, citing, *inter alia,* Section 8.02(c) thereof (permitting termination of the Amended Plan Support Agreement based on termination of the Merger Agreement). *See id.* at Exh. A.

41.    Also on July 7, 2017, the Debtors filed with the Court a number of documents related to an alternative transaction pursuant to which Berkshire Hathaway Energy Company and related entities (collectively, "Berkshire") would acquire Oncor. These documents included:

- The *Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11426] (the "Berkshire Plan");

- The *Disclosure Statement for the Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11427] (the "Berkshire Disclosure Statement");

- The *Motion of the EFH/EFIH Debtors for Entry of an Order (A) Approving the EFH Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates, (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan, and (D) Approving the Manner and Forms of Notice and Other Related Documents* [D.I. 11428];

- The *Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11430];

- The *Declaration of Paul Keglevic in Support of the Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11431];

- *Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11432]; and

- The *Motion of the EFH/EFIH Debtors for Entry of an Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols in Connection with Confirmation of the Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11425].

CPAM: 12682756.27

42.     In short, the Debtors voluntarily terminated the Merger Agreement and immediately pivoted to a *signed* transaction pursuant to which Berkshire would acquire Oncor.

43.     Notably, the Berkshire Disclosure Statement, despite the Termination Fee Approval Order, describes the proposed transaction with Berkshire and calculates creditor recovery percentages on the "assum[ption] that the NEE Termination Fee does not become due and payable by any of the EFH/EFIH Debtors." *See* Berkshire Disclosure Statement at 17 n.13.

44.     Shortly after the Debtors completed their filings with respect to the proposed Berkshire Plan, NextEra replied to the Debtors' July 6 letter, acknowledging termination of the Merger Agreement, but solely pursuant to Section 8.2(a) thereof (a termination pursuant to Section 8.2(a) entitles NextEra to the Termination Fee).   NextEra also acknowledged, as a consequence of the termination of the Merger Agreement, termination of the Amended Plan Support Agreement, the Oncor Letter Agreement, the Tax Matters Agreement (with respect to NextEra and Merger Sub), and that certain letter, dated October 31, 2016, from EFH to NextEra regarding the Investor Rights Agreement, and the voiding of the Transition Services Agreement. However, NextEra disputed the Debtors' claimed termination of the Merger Agreement pursuant to Section 8.3.   NextEra likewise disputed that the Debtors had any other basis on which they could have terminated the Merger Agreement.  *See Notice of Filing a Letter in Reply to Debtors' Notice of Termination of the Agreement and Plan of Merger*, at Exh. A [D.I. 11441].

45.     On July 10, 2017, the Debtors terminated the Plan Support Agreement entered into as of January 2, 2017 (the "PIK PSA"), among EFH, EFIH, EFIH Finance, Inc., certain direct and indirect subsidiaries of EFH, UMB Bank, N.A., as indenture trustee under the EFIH Unsecured Notes (as defined in the PIK PSA) and certain holders of the EFIH Unsecured Notes. *See Notice of Filing of (A) Letter Terminating the PIK Plan Support Agreement and*

*(B) Additional "Cleansing" Materials Under that Certain Confidentiality Agreement with Elliott*

*Capital Management* [Docket No. 11435].

46.     On July 12, 2017, the Court held a status conference, during which both the Debtors and NextEra acknowledged termination of the Merger Agreement.  The Debtors also reaffirmed their decision to press forward with an alternative transaction in the form of the Berkshire Plan.  During that same status conference, Elliott stated their intention to propose an alternative transaction whereby Elliott would become the owner of Oncor Holdings (the "Elliott Plan").

47.     On July 14, 2017, in response to the assertion in the Berkshire Disclosure Statement that the Termination Fee might not become due and payable upon the consummation of the Berkshire Plan, NextEra sent a further letter to the Debtors seeking, among other things, confirmation from the Debtors "that the Termination Fee will be paid following consummation of the proposed transaction with Berkshire Hathaway Energy Company . . . (or the consummation of any other alternative transaction as described in Section 8.5(b))."  NextEra also requested that the Debtors, if unable or unwilling to confirm that the Termination Fee would be payable, explain in detail the basis for their position.  A true and correct copy of this letter is attached as Exhibit I to the Seife Declaration.

48.     In response to NextEra's request, on July 18, 2017, EFH and EFIH delivered a letter to NextEra asserting that the Termination Fee is not and will not be owed under the Merger Agreement.  In support, the Debtors contended that they terminated the Merger Agreement under Section 8.3(a) (for breach resulting from the failure of a condition to the Merger Agreement) and under Section 8.3(g) (based on termination of the Amended Plan Support Agreement (which, in fact, they did not terminate until a day *after* the termination of the Merger Agreement)).  In the July 18 letter, the Debtors for the first time alleged breaches by NextEra of the Merger

CPAM: 12682756.27

Agreement (purportedly Sections 6.3(a)(i), 6.3(a)(vii), 6.3(a)(viii) and 6.3(d)(ii)). They also asserted, again for the first time, that NextEra had breached the Amended Plan Support Agreement (purportedly Sections 4.03(a)(iii), 4.03(a)(iv) and 4.03(a)(v)).  Generally speaking, the purported bases of the alleged breaches relate to the PUCT's refusal to approve the sale of EFH's interest in Oncor to NextEra.  Notwithstanding their contemporaneous acknowledgment of and praise for NextEra's efforts to obtain regulatory approval, the Debtors' letter alleged that NextEra and its executives failed to use their "reasonable best efforts" (as required by the Merger Agreement) or "commercially reasonable efforts" (as required by the Plan Support Agreement) to obtain regulatory approval from the PUCT and that these alleged failures were material breaches.  The Debtors' letter further stated that, notwithstanding this Court's Termination Fee Approval Order, some of the Debtors' largest creditors may seek to attack the Merger Approval Order on the basis that the Termination Fee does not satisfy the Third Circuit's *O'Brien*[4] standard.  A true and correct copy of this letter is attached as Exhibit J to the Seife Declaration.

49.    On July 23, 2017, NextEra sent a reply letter rejecting the Debtors' assertion that NextEra committed any breach of the Merger Agreement or Amended Plan Support Agreement, noting that the Debtors never raised any issues during the nearly one-year period that NextEra and the Debtors worked closely together to accomplish the merger.  NextEra also reiterated to the Debtors that the reasons cited by the PUCT for rejecting the transaction are specifically identified as "Burdensome Conditions" in the Merger Agreement, thus depriving the Debtors of a valid basis to deny NextEra the Termination Fee.  A true and correct copy of this letter is attached as Exhibit K to the Seife Declaration.

50.    The parties have since attempted but have been unable to resolve these issues, thus necessitating the filing of this Application.

---

[4]    *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).

CPAM: 12682756.27

## **RELIEF REQUESTED**

51.     NextEra requests that the Court enter an order, substantially in the form attached

hereto:

- allowing NextEra, upon the consummation of the Berkshire Plan, the Elliott Plan, or any alternative transaction (as described in Section 8.5 of the Merger Agreement), an administrative claim against EFH and EFIH in the amount of $275,000,000;

- directing EFH and EFIH to comply with the Court's previous Termination Fee Approval Order and pay the Termination Fee to NextEra within five days of the consummation of the Berkshire Plan, the Elliott Plan, or any other alternative transaction; and

- granting NextEra such other and further relief as is just and proper.

52.     NextEra has been compelled to file this Application based on the Debtors' ill-

founded, but now clear and unequivocal, position that NextEra is not entitled to payment of the

Termination Fee.  Although payment of the Termination Fee is not due until five days following

the consummation of an alternative transaction, resolution of this issue at this time is appropriate

and is in the best interest of the Debtors' estates, especially as the Debtors pursue an alternative

transaction with Berkshire and Elliott advances its own alternative plan.  The Debtors do not

disagree that this issue is ripe for adjudication as they state in their July 18 letter that "time is of

the essence" regarding determining NextEra's entitlement to the Termination Fee.

53.     It is indisputable that NextEra's entitlement to the Termination Fee could have a

material impact on creditor recoveries.  As described above, the Berkshire Disclosure Statement

calculates recoveries to creditors based on the assumption that the NextEra Termination Fee will

not be owing.  This assumption is wrong and creditors, as well as the Court, would benefit from

having clarity and certainty on this issue in advance of plan confirmation of the proposed

Berkshire deal.  Resolution of this issue will also avoid any potential delay in the occurrence of

the effective date of any alternative plan or in the making of distributions to creditors.

**BASIS FOR THE RELIEF REQUESTED**

54.     NextEra is entitled to payment from EFH and EFIH of the Termination Fee pursuant to the terms of the Termination Fee Approval Order and the Merger Agreement itself.

A.     <u>The Termination Fee has Already Been Approved as an Administrative Expense</u>

55.     As described above, this Court has already determined that the Termination Fee meets all of the requirements for payment as an administrative expense without any further action of the Court.  *See* Termination Fee Approval Order ¶ 4 ("the EFH/EFIH Debtors are authorized and directed to pay the Termination Fee as an allowed administrative expense to the extent it becomes due and payable pursuant to the terms and conditions of the Merger Agreement, at the time and in the manner provided for therein, without any further proceedings before, or order of, the Court. . . .").  Notably, at the hearing to consider approval of the Merger Agreement, the Court found that the Termination Fee was not only necessary to induce NextEra to make its bid, but that the amount of the Termination Fee was appropriate, stating "I believe the amount [of the Termination Fee] is supported by the market, I think the evidence overwhelmingly indicates that a breakup fee was necessary to induce NextEra to make a bid, and to move forward with a merger agreement."  Hr'g Tr. Sept. 19, 2016 at 121:16–19.  Moreover, the Court, in a subsequent status conference addressing certain concerns raised by the PUCT about the Termination Fee, made clear that, in approving the Termination Fee, the Court considered the potential adverse effect payment of the Termination Fee could have on creditor recoveries, finding that "[i]f the [T]ermination [F]ee is payable . . . [t]hat administrative expense will be senior in priority to the substantial unsecured claims at EFH and EFIH and will directly and adversely affect the recoveries to those unsecured creditors."  Hr'g Tr. Sept. 26, 2016 at 14:14-19.  Nevertheless, the Court, in approving the Termination Fee, "found it highly significant that the creditors of EFH and EFIH which would be directly harmed by the imposition of the

CPAM: 12682756.27

[T]ermination [F]ee supported the transaction, notwithstanding the real possibility of the imposition of a $275 [m]illion administrative expense." *Id*. at 14:22–15:1.

B.  Enforcement of the Termination Fee Approval Order
is Essential as a Matter of Policy

56.  NextEra relied on the Termination Fee Approval Order in taking the extraordinary measures that it did in attempting to obtain PUCT approval.  It is essential that parties like NextEra—would-be buyers of assets who potentially are infusing significant amounts of money into a debtor's estate and expending significant resources—be able to fully rely on a bankruptcy court's order.  This is particularly true where, as here, by the Debtors' own assertion, the Court-approved "Termination Fee [was] one component in a larger, complex, and heavily negotiated transaction" that was "needed to compensate NextEra for the risks it was undertaking in the Merger Agreement." *See Debtors' Reply in Support of Approval Motion* ¶¶ 3, 15; *see also* Hr'g Tr. Sept. 19, 2016 at 96:18–19 ("the termination fee ultimately was part of the holistic transaction that was negotiated with NextEra.").

57.  Denying the Termination Fee will affect the ability of stalking horse bidders to rely on court orders approving bidding procedures and providing for break-up fees.  If potential asset buyers cannot rely on the enforcement of bankruptcy court orders, there will be a chilling effect on the market and a reduction in prices that buyers are willing to pay for assets.  It will also affect the willingness of potential buyers, like NextEra in this case, to make important concessions to reach agreement on sale terms.  Indeed, here, NextEra made a significant "eleventh hour" increase in consideration and made other concessions, all premised on the inclusion and approval of the Termination Fee.  Depriving NextEra of the Termination Fee at this juncture will send a strong message that potential buyers should be wary of making similar concessions in the future in reliance on negotiated-for protections blessed by the court.

CPAM: 12682756.27

C.    The Termination Fee Must be Paid under the Plain Terms
of the Merger Agreement and Termination Fee Approval Order

58.    Based on this Court's prior approval of the Termination Fee, the sole issue for the

Court to consider is whether the Merger Agreement's requirements for payment of the

Termination Fee will be satisfied.

59.    Section 8.5 of the Merger Agreement, which is the operative provision setting

forth the conditions to payment of the Termination Fee, provides that:

> *If this Agreement is terminated pursuant to this Article VIII and any alternative transaction is consummated* (including any transaction or proceeding that permits the E-Side Debtors that are the direct or indirect owners of Oncor Holdings to emerge from the Chapter 11 Cases) pursuant to which neither Parent nor any of its Affiliates will obtain direct or indirect ownership of 100% of Oncor Holdings and Oncor Holdings' approximately 80% equity interest in Oncor, then, subject to the approval of the Bankruptcy Court, *no later than five (5) days following the consummation of such alternative transaction, the Company and EFIH shall pay to Parent the Termination Fee* (as defined below), by wire transfer, as directed by Parent, in immediately available funds; *provided, however, that the Termination Fee (as defined below) will not be payable if this Agreement is terminated* (i) pursuant to Section 8.1, (ii) by Parent pursuant to Section 8.2(a) and the receipt of the PUCT Approval (without the imposition of a Burdensome Condition) is the only condition set forth in Article VII not satisfied or waived in accordance with this Agreement (other than those conditions that by their nature or pursuant to the terms of this Agreement are to be satisfied at the Closing) or 8.2(b), or 8.4(g) (unless the Chapter 11 Cases are dismissed or converted to Chapter 7 of the Bankruptcy Code with respect to the Company or EFIH in which case the Termination Fee is payable) or Section 8.4(i) if the Plan Support Agreement is terminated pursuant to a breach thereof by Parent or Merger Sub, or (iii) *by the Company pursuant to Section 8.3(a), 8.3(b), or 8.3(g) to the extent that the Plan Support Agreement is terminated pursuant to a breach thereof by Parent or Merger Sub.* (Emphasis added.)

60.    Thus, based on Section 8.5 of the Merger Agreement, only three questions need to

be considered by the Court:

- Did the Debtors Terminate the Merger Agreement pursuant to Article VIII of the Merger Agreement?

- Do the Berkshire Plan and the Elliott Plan qualify as alternative transactions?

26

- Does an exception to payment of the Termination Fee apply because the Debtors properly terminated the Merger Agreement under Section 8.3(a) or under Section 8.3(g) (based on termination of the Amended Plan Support Agreement for breach)?

61.     If the first two questions are answered in the affirmative, and the third is answered in the negative, EFH and EFIH will be required to pay the Termination Fee upon consummation of either of those plans.

62.     First, there is no dispute that the Merger Agreement was terminated by EFH and EFIH pursuant to Article VIII.  As described above, the Debtors' July 6, 2017 letter to NextEra expressly terminated the Merger Agreement, invoking various provisions of Article VIII.  By letter dated July 7, 2017, NextEra expressly acknowledged that the Debtors terminated the Merger Agreement pursuant to Article VIII.  Moreover, on July 12, 2017, both the Debtors and NextEra acknowledged the Debtors' termination of the Merger Agreement pursuant to Article VIII at a status conference held before the Court.

63.     Second, both the Berkshire Plan and the Elliott Plan plainly qualify as "alternative transactions."  An alternative transaction includes any transaction "pursuant to which neither [NextEra] nor any of its Affiliates will obtain direct or indirect ownership of 100% of Oncor Holdings and Oncor Holdings' approximately 80% equity interest in Oncor," or any other "transaction or proceeding that permits the E-Side Debtors that are the direct or indirect owners of Oncor Holdings to emerge from the Chapter 11 Cases."  Merger Agreement § 8.5.  Needless to say, neither the Berkshire Plan nor the Elliott Plan contemplates that NextEra will acquire "direct or indirect ownership of 100% of Oncor Holdings and Oncor Holdings' approximately 80% equity interest in Oncor."

64.     Under the circumstances, it is indisputable that NextEra will be entitled to the Termination Fee upon consummation of an alternative transaction (that is, unless NextEra breached the Merger Agreement and wrongfully caused the failure of the transactions).  Indeed,

27

in the Termination Fee Clarification Letter the Debtors acknowledged that NextEra would be entitled to payment of the Termination Fee in the event the Debtors terminate the Merger Agreement and the Debtors pursue (and ultimately consummate) an alternative transaction. In the Termination Fee Clarification Letter the Debtors expressly acknowledged that "the $275 million termination fee is triggered if EFH and/or EFIH terminate the merger agreement as a consequence of the [PUCT] either not approving the merger agreement transaction or approving the merger transaction with the imposition of a burdensome condition." *See Termination Fee Clarification Letter* [D.I. 9655]. This is precisely what has occurred: the PUCT did not approve the transaction and the Debtors terminated the Merger Agreement. The Debtors should be held to their agreement with NextEra and abide by this Court's Termination Fee Approval Order.

65.    Despite the Debtors' baseless allegations to the contrary, none of the exceptions to payment apply. As described above, by their letter dated July 18, 2017, the Debtors have alleged that NextEra is not entitled to the Termination Fee based on purported breaches of the Merger Agreement and Amended Plan Support Agreement. Specifically, the Debtors have alleged that NextEra breached Sections 6.3(a)(i), 6.3(a)(vii), 6.3(a)(viii) and 6.3(d)(ii) of the Merger Agreement, thus giving rise to termination pursuant to Section 8.3(a) of the Merger Agreement. The Debtors also allege that NextEra breached Sections 4.03(a)(iii), 4.03(a)(iv) and 4.03(a)(v) of the Amended Plan Support Agreement, and claim that this supports termination pursuant to Section 8(g) of the Merger Agreement. The general premise for the Debtors' position is that NextEra failed to use its "reasonable best efforts," as required under the Merger Agreement, and "commercially reasonable efforts," as required under the Amended Plan Support Agreement, to obtain regulatory approval from the PUCT. Despite NextEra's request for a detailed explanation, the Debtors have offered little factual support to substantiate these allegations beyond general accusations that NextEra refused to accept "Burdensome Conditions" and took positions both

publicly and privately (what the Debtors describe as "off-the-record messaging") that undermined the PUCT application and supposedly were inconsistent with its obligations to try to consummate the transaction. The Debtors also reference NextEra's involvement in a potential transaction involving "Sharyland," which the Debtors allege somehow negatively affected the prospects for the PUCT's approval of the Oncor transaction.  The Debtors' attempts to invoke an exception to their Termination Fee obligation fail for any number of reasons, including those set forth below.

66.     There is no basis for the Debtors' assertions that NextEra breached the Merger Agreement and/or Plan Support Agreement—***assertions that, prior to their July 18 letter, the Debtors and their representatives never made***.  Contrary to the Debtors' allegations, NextEra fulfilled and, indeed, went above and beyond its obligations to the Debtors in seeking approval from the PUCT.  The efforts of NextEra detailed above evidence an unyielding and good faith effort by NextEra to obtain regulatory approval for the transaction.

67.     Indeed, the three PUCT commissioners specifically praised NextEra's forthright and capable efforts to consummate the transaction. First, in a memorandum following close of submissions regarding the PUCT application, Commissioner Anderson stated that "it is worth mentioning here that I believe that [NextEra] has been forthright and candid in their dealings with the Commission, or at least this Commissioner." *Memorandum*, dated March 30, 2017, from Commissioner Kenneth W. Anderson, Jr., PUCT Docket No. 46238, Item No. 535 at p. 2 (Seife Decl. Exh. A).  Later that day, during an open meeting of the PUCT, Chairman Nelson echoed those sentiments, stating:

> I thought all the Applicants and the stakeholders and everybody who participated from OPUC to Staff to other intervenors did an excellent job, and ***I do appreciate NextEra, their forthrightness***, and, you know, about what they consider to be deal killers in this case, because we know where they stand.

CPAM: 12682756.27

Tr. Mar. 30, 2017 Open Meeting before PUCT at 18:18-23 (Seife Decl. Exh. B). Finally, Commissioner Marquez declared her agreement with her fellow commissioners regarding the quality of NextEra's conduct, stating "I agree with both of you. I think – I do compliment NextEra's team. They have been a pleasure to work with from the beginning of this process. Working with an institution that is so incredibly capable is a pleasure." *Id*. at 27:1-5.

68.    The Debtors themselves recognized NextEra's unwavering commitment to get the transaction done, even after the PUCT rejected NextEra's application. Indeed, the Debtors: (i) touted NextEra's willingness to accept certain PUCT restrictions that the Debtors described as "far from commonplace in a parent-subsidiary relationship," s*ee First EFH PUCT Amicus Brief* at p. 6 (Seife Decl. Exh. D); (ii) praised "the ***many efforts*** NextEra made to address concerns about debt issuance, capital structure, and bankruptcy exposure in its 73 regulatory commitments," s*ee Second EFH PUCT Amicus Brief* at p. 2 (Seife Decl. Exh. G) (emphasis added); and (iii) informed this Court that "NextEra and the debtors are committed to reviving the NextEra deal if at all possible." Tr. Hr'g Apr. 17, 2017 at 18:2–4. Notably, in recent testimony given to the Court, Anthony Horton, the Chief Financial Officer and Executive Vice President/Treasurer of EFH and EFIH, stated that the Debtors were "disappointed and surprised actually" by the PUCT's decision to not approve the NextEra deal. Tr. Hr'g July 26, 2017 at 54:22–23. If the Debtors truly believed that NextEra's actions somehow undermined the PUCT approval process, then their reaction to the PUCT's decision would clearly not have been one of "surprise." Their praise, rather than criticism, of NextEra and its efforts during the entire PUCT process, and their "surprise" by the PUCT's decision, are inconsistent with their newfound "belief" that NextEra's effort was lacking in any way. Simply put, neither Section 6.3(i) of the Merger Agreement, or Sections 4.03(a)(iii) and 4.03(a)(v) of the Amended Plan Support Agreement, provide a valid basis for termination of the pertinent agreement. There is a good

CPAM: 12682756.27

reason that the Debtors never alleged a breach—there was none. The Debtors' newly created theory is little more than a transparent attempt by the Debtors to absolve themselves of their obligations to NextEra because of pressure being exerted on them by creditors.

69.    At no time did EFH and EFIH ever provide written notice to NextEra of any purported breach of the Merger Agreement or Amended Plan Support Agreement. The Debtors simply declared the Merger Agreement terminated by letter dated July 6, 2017, and then declared the Amended Plan Support Agreement terminated by letter dated July 7, 2017. Written notice of a breach, however, is a predicate for termination by the Debtors for breach under Section 8.3(a) of the Merger Agreement, as well as under Section 8.02 of the Amended Plan Support Agreement. Indeed, the termination provisions in both the Merger Agreement and Amended Plan Support Agreement contain cure periods with respect to any breaches capable of being cured. The Debtors' failure to provide timely written notice of the purported breaches makes ineffective any purported termination for breach. Of course, had they actually thought any of NextEra's conduct during the course of the PUCT proceedings amounted to a breach, one would have thought the Debtors would have raised the issue at the time so that the resulting impediment to PUCT approval could be addressed, rather than waiting until now. Moreover, upon becoming aware of an event that could cause a condition to closing not to be satisfied, EFH and EFIH were required under the Merger Agreement to provide notice to NextEra. *See Merger Agreement* at § 6.17. No such notice was ever provided.

70.    None of the other purported bases relied on by the Debtors support a valid breach claim. Although Section 6.3(d)(ii) of the Merger Agreement required NextEra to accept certain conditions imposed by the PUCT, it expressly exempted NextEra from any duty to accept "Burdensome Conditions" defined by the Merger Agreement. Here, PUCT approval was denied because the PUCT made it clear that approval of NextEra's application would be conditioned on

31

the imposition of "Burdensome Conditions," which NextEra could not reasonably accept and which NextEra was not obligated to accept under the terms of the Merger Agreement. Needless to say, a good-faith effort to consummate a transaction does not require a party to give up negotiated-for closing conditions. Notably, the Debtors were extremely critical of the PUCT for imposing those conditions, describing them as "onerous" and "a counterproductive obstacle to bringing Oncor the full benefits of association with a stronger and more stable parent." *See Second EFH PUCT Amicus Brief* at p. 3 (Seife Decl. Exh. G). Moreover, NextEra could not have possibly violated Section 6.3(d)(ii) because the PUCT never issued a conditional approval order—the PUCT simply denied NextEra's application.

71.    Nor is there any merit to the Debtors' suggestion that NextEra's efforts in connection with a requested territory swap between Oncor and Sharyland undermined the transaction. As a threshold matter, the Debtors' supposed "belief" that the Sharyland transaction somehow "negatively affected the prospects for the PUCT's approval of the NextEra merger" is unsubstantiated speculation belied by the PUCT's orders themselves, which make no mention whatsoever of Sharyland or any connected dealings. Moreover, notwithstanding any unsupported newly discovered "beliefs" of the Debtors, NextEra hoped that a transaction involving the Sharyland assets would enhance, rather than hinder, the prospects for PUCT approval of NextEra's acquisition of Oncor. Even ignoring that nothing in the Merger Agreement prevents NextEra from "protecting NextEra's own prospects," the Debtors cannot plausibly claim given the facts in this case (including the PUCT's own orders and other record statements) that NextEra would have allowed a sideshow-of-a-sideshow transaction such as the proposed Sharyland territory swap to imperil an $18.7 billion merger.

72.    Even if NextEra breached the Merger Agreement in exactly the manner the Debtors have alleged, which NextEra most certainly did not, the Termination Fee would still be

owed.   Not every breach of the Merger Agreement supports termination or, consequently, excuses payment of the Termination Fee.   Rather, under Section 8.3(a), the Debtors are only excused if the breach itself is the cause for failure of satisfaction of the underlying condition (*i.e.*, obtaining regulatory approval).   Indeed, even without such an express contractual requirement, Delaware courts recognize that even when a party breaches under a "reasonable best efforts clause," a defense exists if that breach "did not materially contribute to the failure of the closing condition." *Williams Companies, Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017).

73.    Here, there was one reason, and one reason only, for failure to obtain regulatory approval—the PUCT's dogged insistence on the inclusion of Burdensome Conditions.   Indeed, Commissioner Anderson said as much, in writing, following the close of submissions regarding the application:

> From the earliest contacts, well before the sale merger transfer application was filed, NextEra's representatives have been very clear and consistent about the conditions that they could not accept and the reasons why those conditions were unacceptable.   As the Chairman noted perceptively toward the end of the Hearing on the Merits, among the core issues in this case is whether ***our deal killers are [NextEra] deal-killers.***   At least for this Commissioner, I fear that they do indeed correlate negatively.

*Memorandum*, dated March 30, 2017, from Commissioner Kenneth W. Anderson, Jr., PUCT Docket No. 46238, Item No. 535 at p. 2 (Seife Decl. Exh. A) (emphasis added).   Then, erasing any doubt that Oncor ring-fence Burdensome Conditions were immovable obstacles, Commissioner Anderson went on to explain what he identified as the "*three key issues*" (emphasis in original) impeding regulatory approval of the transaction:

> Namely: (1) the nature, composition and independent authority of Oncor's Board of Directors, including, but not limited to that board's independent authority over distributions; (2) additional restrictions on upstream distributions; and (3) the related linking of Oncor's credit rating with [NextEra].   In each case I believe that [NextEra] deal killers are also mine. I believe that a majority of Oncor's board must be truly independent,

> disinterested and have all of the authority they currently possess as well as those requested by Staff, TIEC and other intervening parties. Without limiting that, I also have concluded that we must impose more restrictive parameters around upstream distributions in order to ensure that Oncor retains sufficient retained earnings to fund the equity portion of capital expenditures approved by its board as well as to maintain the company's liquidity to provide for operations and its overall financial integrity. Indeed Oncor since 2007 has been able to fund the equity portion of its capital- investment program by retaining internally generated earnings as noted by Bob Shapard in response to a question from this commissioner. Finally and without belaboring at this time all of the reasons . . . I see as much downside as upside to linking Oncor's credit rating to [NextEra]. Therefore I would require Staff's version of the condition de-linking the respective credit ratings. These are not the only requirements that l would impose, but given that they are all also [NextEra] deal-killers it seems to me that we would be wasting time and resources to proceed further down the road of appearing to approve the transactions with such conditions

*Id.* Nobody can legitimately argue that the "key issues" identified by Commissioner Anderson are anything other than Burdensome Conditions. During the March 30, 2017 PUCT open meeting, Chairman Nelson expressed the same concerns, stating "[t]he·lack of a truly independent disinterested Board and the lack of independent Board control over the dividends are what worry me the most, and unfortunately those are the issues on which it seems NextEra is not willing to budge." Tr. March 30, 2017 Open Meeting before PUCT at 20:15-20 (Seife Decl. Exh. B). The Debtors can search the PUCT Orders and Commissioners' unequivocal explanation of the *real* challenges the transaction faced for any reference to Sharyland or insufficient outreach and diligence by NextEra, but they will find none.

74.    There is no suggestion that the PUCT would have backed away from the "ring-fencing" requirements and governance restrictions it was imposing even if NextEra had taken additional actions or pitched its presentation to the PUCT differently. To the contrary, the PUCT has never wavered from its insistence on these Burdensome Conditions, which the PUCT deemed necessary to protect Oncor from purportedly "new and potentially substantial risks," including credit and bankruptcy risks, associated with NextEra. *Order*, dated April 13, 2017,

CPAM: 12682756.27

PUCT Docket No. 46238, Item No. 538 at pp-3-8 (Seife Decl. Exh. C).  Indeed, in preparing to rule on NextEra's first motion for a rehearing, Commissioner Marquez specifically requested that the proposed order include language highlighting the parties' irresolvable disagreement over the ring-fencing Burdensome Condition as the "fatal flaw" that resulted in regulatory disapproval:

> I would recommend adding the following language to end of the partial paragraph at the top of page 7 to clarify that while the Commission did evaluate the proposed benefits cited by NextEra Energy in its application, *the fatal flaw in the application was NextEra Energy's refusal to accept appropriate ring-fencing conditions*, and any benefits offered could not overcome that failure.
>
> . . . without appropriate ring-fencing protections, discussed below, the commission finds that any purported benefits could not support a decision that the proposed transactions are in the public interest or overcome NextEra Energy's refusal to agree to the ring-fencing protections.

*Memorandum*, dated June 6, 2017 from Commissioner Brandy Marty Marquez to Commission [sic] Kenneth W. Anderson, Jr., PUCT Docket No. 46238, Item No. 550 at p. 1 (Seife Decl. Exh. E at 5).  The PUCT's order on rehearing reflects that language, *see Order on Rehearing*, dated June 7, 2017, PUCT Docket No. 46238, Item No. 551 at p. 7 (Seife Decl. Exh. F), and further explains that "[u]nder the proposed transactions, a *robust* ring fence is still necessary to protect Oncor . . . ." *Id.* at p. 9 (emphasis added).  The Debtors ignore the uncontroverted record— which includes the PUCT's own unambiguous statements on why it disapproved the transaction—in suggesting that something other than the ring-fencing Burdensome Condition caused the transaction to fail.

75.    Notably, in the Berkshire Disclosure Statement the Debtors proclaim that maintaining "the current Oncor ring-fence"—a structure that all parties agree constituted a Burdensome Condition under the Merger Agreement—"should facilitate a more consensual PUCT approval process." Berkshire Disclosure Statement at p. 12.  The Debtors would be disingenuous if they were to tell the Court that something other than NextEra's understandable

unwillingness to accept Burdensome Conditions caused the PUCT's disapproval of the NextEra transaction while, out of the other side of their mouth, they are telling the Court (and creditors) that eliminating these Burdensome Conditions will lead to consummation of the Berkshire deal.

76.     Consequently, under Merger Agreement Section 8.3(a)(i), which requires that, to support termination, the breach must cause the failure of a closing condition, the supposed breaches of the Merger Agreement alleged by the Debtors could not justify termination or excuse payment of the Termination Fee even had they occurred, which they did not.

77.     The Debtors' reliance on Section 8.3(g) of the Merger Agreement makes no sense and does not provide a valid basis for termination of the Merger Agreement.  That section permits termination of the Merger Agreement upon termination of the Amended Plan Support Agreement.  However, as per the Debtors' July 6, 2017 letter, termination of the Amended Plan Support Agreement occurred *after* (and because of) the termination of the Merger Agreement. So there is no basis to contend that the termination of the Amended Plan Support Agreement was a basis to terminate the Merger Agreement.  Accordingly, Section 8.3(g) of the Merger Agreement is not applicable.

78.     In short, neither the PUCT's rejection of NextEra's application, nor any actions or omissions on the part of NextEra gave rise to a breach of the Merger Agreement or the Amended Plan Support Agreement.  Because all of the requirements for payment of the Termination Fee are present, and no exceptions to payment apply, EFH and EFIH should be required to pay the Termination Fee within five days after consummation of the Berkshire Plan, the Elliott Plan, or any other "alternative transaction."

CPAM: 12682756.27

## CONCLUSION

79.    Wherefore, NextEra requests that the Court enter an order, substantially in the

form attached hereto:

- allowing NextEra, upon the consummation of the Berkshire Plan, the Elliott Plan, or any alternative transaction (as described in Section 8.5 of the Merger Agreement), an administrative claim against EFH and EFIH in the amount of $275,000,000;

- directing EFH and EFIH to comply with the Court's previous Termination Fee Approval Order and pay the Termination Fee to NextEra within five days of the consummation of the Berkshire Plan, the Elliott Plan, or any other alternative transaction; and

- granting NextEra such other and further relief as is just and proper.


Dated: July 31, 2017
      Wilmington, Delaware      LANDIS RATH & COBB LLP

                                      */s/ Joseph Wright*
                                Adam G. Landis (No. 3407)
                                Matthew B. McGuire (No. 4366)
                                Joseph D. Wright (No. 5669)
                                919 Market Street, Suite 1800
                                Wilmington, Delaware 19801
                                Telephone:  (302) 467-4400
                                Facsimile:  (302) 467-4450
                                Email:    landis@lrclaw.com
                                          mcguire@lrclaw.com
                                          wright@lrclaw.com

                                – and –

                                NORTON ROSE FULBRIGHT US LLP
                                Howard Seife (admitted *pro hac vice*)
                                Robin Ball (admitted *pro hac vice*)
                                Andrew Rosenblatt (admitted *pro hac vice*)
                                Eric Daucher (admitted *pro hac vice*)
                                1301 Avenue of the Americas
                                New York, New York 10019-6022
                                Telephone:  (212) 408-5100
                                Facsimile:  (212) 541-5369
                                Email:    howard.seife@nortonrosefulbright.com
                                          robin.ball@nortonrosefulbright.com
                                          andrew.rosenblatt@nortonrosefulbright.com
                                          eric.daucher@nortonrosefulbright.com

CPAM: 12682756.27

– and –

WINSTON & STRAWN LLP
Dan K. Webb (*pro hac vice* motion pending)
35 W. Wacker Drive
Chicago, Illinois 60601-9703
Telephone:  (312) 558-5600
Facsimile:  (312) 294-5700
Email:   dwebb@winston.com

Thomas M. Buchanan (*pro hac vice* motion pending)
1700 K Street, NW
Washington, D.C. 20006
Telephone: (312) 282-5000
Facsimile: (202) 282-5100
Email: tbuchana@winston.com

David Neier (*pro hac vice* motion pending)
200 Park Avenue
New York, New York 10166-4193
Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700
Email:   dneier@winston.com

*Counsel to NextEra Energy, Inc.*

CPAM: 12682756.27