# Exhibit B

TRANSCRIPT OF PROCEEDINGS

BEFORE THE

PUBLIC UTILITY COMMISSION OF TEXAS

AUSTIN, TEXAS

OPEN MEETING

THURSDAY, MARCH 30, 2017

BE IT REMEMBERED THAT AT approximately 9:34 a.m., on Thursday, the 30th day of March 2017, the above-entitled matter came on for hearing at the Public Utility Commission of Texas, 1701 North Congress Avenue, William B. Travis Building, Austin, Texas, Commissioners' Hearing Room, before DONNA L. NELSON, Chairman, KENNETH W. ANDERSON, JR. and BRANDY MARQUEZ, Commissioners; and the following proceedings were reported by William C. Beardmore, Certified Shorthand Reporter.

TABLE OF CONTENTS

PAGE

AGENDA ITEM NO. 11

DOCKET NO. 46909 - AGREED NOTICE OF
VIOLATION AND SETTLEMENT AGREEMENT
RELATED TO TPC GROUP, LLC'S
VIOLATIONS OF PURA § 39.151, RELATED
TO ESSENTIAL ORGANIZATIONS, AND 16 TAC
§ 25.503, RELATED TO OVERSIGHT OF
WHOLESALE MARKET PARTICIPANTS ................. CONSENTED

AGENDA ITEM NO. 12

PROJECT NO. 46369 - RULEMAKING RELATING
TO RELIABILITY MUST-RUN SERVICE .............. CONSENTED

AGENDA ITEM NO. 13

PROJECT NO. 46393 - RULEMAKING PROCEEDING
TO AMEND 16 TAC § 25.192, RELATING TO
TRANSMISSION SERVICE RATES ................... NOT HEARD

AGENDA ITEM NO. 14

PROJECT NO. 45927 - RULEMAKING REGARDING
ERCOT EMERGENCY RESPONSE SERVICE ............. CONSENTED

AGENDA ITEM NO. 15

DOCKET NO. 45633 - PROJECT TO IDENTIFY
ISSUES PERTAINING TO LUBBOCK POWER AND
LIGHT'S PROPOSAL TO BECOME PART OF THE
ELECTRIC RELIABILITY COUNCIL OF TEXAS .............. 16

AGENDA ITEM NO. 16

DOCKET NO. 46238 - JOINT REPORT AND
APPLICATION OF ONCOR ELECTRIC DELIVERY
COMPANY, LLC AND NEXTERA ENERGY, INC.
FOR REGULATORY APPROVALS PURSUANT TO
PURA §§ 14.101, 39.262 AND 39.915 ................. 18

```
 1                    AGENDA ITEM NO. 16
 2   DOCKET NO. 46238 - JOINT REPORT AND
     APPLICATION OF ONCOR ELECTRIC DELIVERY
 3   COMPANY, LLC AND NEXTERA ENERGY, INC.
     FOR REGULATORY APPROVALS PURSUANT TO
 4   PURA §§ 14.101, 39.262 AND 39.915
 5                    CHAIRMAN NELSON:  So that brings up
 6   docket -- Item 16, Docket No. 46238, and this is the
 7   Oncor Joint Application.
 8                    Let me start -- I'll start this discussion
 9   up if you-all are okay with that.
10                    COMM. ANDERSON:  So you want to take it in
11   order?
12                    CHAIRMAN NELSON:  Yeah.
13                    COMM. ANDERSON:  Okay.
14                    CHAIRMAN NELSON:  I thought that -- I'm
15   not going to pull out my notebooks yet unless I need
16   them, but I thought the discussions we had -- I thought
17   the hearing that we had was really good.
18                    I thought all the Applicants and the
19   stakeholders and everybody who participated from OPUC to
20   Staff to other intervenors did an excellent job, and I
21   do appreciate NextEra, their forthrightness, and, you
22   know, about what they consider to be deal killers in
23   this case, because we know where they stand.
24                    I would like us to have a discussion today
25   to really signal to the stakeholders kind of where we
```

```
 1  stand.
 2              NextEra's commitment to a strong credit
 3  profile is both a blessing and a curse; a blessing
 4  because it could potentially save ratepayers a lot of
 5  money -- or some money; a curse because in order to
 6  maintain the credit status and take advantage of the
 7  credit profile NextEra and Oncor must be linked in that
 8  way that removes many of the strong ring-fencing
 9  provisions currently in effect.
10              My thoughts on this case are very
11  factually driven.  I do not think a ring fence similar
12  to the one that currently exists is necessary in all
13  cases; indeed, I think it's probably regulatory overkill
14  in many cases.
15              Having said that, I worry about removing
16  the ring fence protections in this situation or the debt
17  above Oncor isn't being extinguished but is, instead,
18  being refinanced with new debt and NextEra Energy
19  Capital Holdings, (pen malfunction) the parent company,
20  will remain substantially leveraged in order to make the
21  purchase happen.
22              COMM. MARQUEZ:  I'm so sorry.
23              CHAIRMAN NELSON:  That's okay.  We needed
24  a little levity on this one.
25              You couple that with the fact that Moody's
```

has noted that -- and I quote -- the acquisition related debt without a material amount of de-leveraging would exhaust NextEra Energy's debt capacity at its current rating" and "makes the company more vulnerable to unforeseen events or margin shortfalls."

And you further couple that with the risk associated with the large amount of renewable generation that NextEra owns, the demand for which is subject to changes and tax and climate policy.

The Intervenors point out at length that this transaction places the potential risk on the ratepayers while the potential reward will flow through to NextEra Energy shareholders.

I believe the evidence supports this assertion and I find the argument a compelling one. The lack of a truly independent disinterested Board and the lack of independent Board control over the dividends are what worry me the most, and unfortunately those are the issues on which it seems NextEra is not willing to budge.

The tangible benefits to this transaction, I think, are few. So in order to find this in the public interest I would need to keep those ring-fencing provisions in place.

I can go over some of the benefits that

1   NextEra talked about and say why I don't find them
2   compelling, but with that I'm going to stop and I'd love
3   to hear what the two of you think.
4               COMM. ANDERSON:  The short answer is I
5   think that I generally agree with you.
6               I will just note that this case
7   presents -- I think presents us with a difficult
8   decision because the Applicant in this case, NextEra, is
9   an extremely well regarded utility holding company but
10  that generally is considered to be among the best
11  operators in the business, and among its virtues is a
12  strong and stable investment grade credit rating.
13              It is also generally agreed that at its
14  reputation at least in part is based on focused and
15  disciplined management out of its corporate headquarters
16  in Florida.
17              Furthermore, it is something of a known
18  quantity to us because it does own -- it owns renewable
19  merchant generation, a transmission service provider and
20  a retail electric provider in Texas.
21              However, in a paradoxical sense that is
22  also one of the problems that we face, because its Texas
23  competitive affiliates will also create -- will create
24  certain both real and potential conflicts of interest.
25              After reviewing the transcripts and my

1  notes of the Hearing on the Merits and the evidence
2  submitted into the record and all the argument that is
3  set out in post-hearing briefs I was going to file a
4  detailed memorandum laying out all the many conditions
5  that I would need imposed in order to find the proposed
6  transaction to be in the public interest.
7              However, the more I reflected upon the
8  history and the record in this case, the more I came to
9  believe that such a memorandum really was premature.
10 Instead, I decided to wait to file a memorandum until
11 after we had today's discussions.
12             I so concluded because laying out all of
13 those conditions really presupposes that I can find the
14 transaction before us in the public interest.  The
15 problem is that on balance I do not believe that the
16 transaction as proposed, including the conditions that
17 are currently offered by NextEra, are in the public
18 interest.
19             I'm not going to go into all the details
20 why, although the Chairman touched on some of them.  If
21 necessary, after our discussion, I can always file a
22 more detailed memoranda but it's based on the record
23 that I reviewed.
24             Bottom line is, I did not file -- I do not
25 find that the tangible and quantifiable benefits to

1  Oncor's ratepayers are such a significant improvement
2  over the status quo as to justify approval.
3            I can and will, if necessary, point out
4  the credible evidence that rebuts almost all the
5  arguments in favor of approving the transaction.  For
6  now just let me limit my discussion to the problems
7  associated with the conditions that are offered by
8  NextEra, and really to be honest it has to do with their
9  deal killers, what they won't accept as conditions.
10           By the way, as the Chairman did, I think
11 it's worth mentioning that I believe -- I believe that
12 NextEra has been forthright and candid in their dealings
13 with the Commission.  Really from the earliest contacts
14 well before even the application was filed, the
15 Company's representatives have been very clear and
16 consistent about the conditions that they would not
17 accept and the reasons -- and the reasons why those
18 conditions weren't acceptable.
19           As the Chairman I think noted preceptively
20 toward -- or at the last day of the Hearing on the
21 Merits among those core issues are whether in this case
22 whether they're our deal killers or their deal killers.
23           At least for this Commissioner I fear that
24 they do -- they do correlate and they correlate
25 negatively.

1     I'll not go over all the conditions that
2  have been proffered but I'll focus on three key issues
3  that are among the main obstacles; namely, the nature --
4  the nature composition and independent authority of
5  Oncor's Board of Directors, including but not limited to
6  the Board's independent authority over distributions,
7  additional restrictions on upstream -- on upstream
8  distributions and the related linking of Oncor's credit
9  rating with NextEra.
10     In each case I believe that NextEra's deal
11 killers are also mine.  I believe that a majority of
12 Oncor's Board must remain at this time to be truly
13 independent and disinterested and have all the authority
14 that they currently possess, you know, as well as the
15 authority that has been requested by Staff, by TIEC and
16 the other intervening parties.
17     Without limiting that I've also concluded
18 that we must impose more restrictive -- more restrictive
19 parameters around upstream distributions in order to
20 ensure that Oncor retains sufficient retained earnings
21 in order to fund the equity portion of its Cap-X as well
22 as provide for operations and its overall financial
23 integrity.
24     I would just note that Oncor, since the
25 beginning of 2007, has been able to fund the equity

1  portion of its capital investment program by retaining
2  those internally-generated earnings, you know, as noted
3  by Bob Shapard in response to a question that I posed to
4  him in the Hearing on the Merits.
5                And then, finally, without belaboring at
6  this time all the reasons which I can set out in a
7  detailed memo if it becomes necessary, you know, I see
8  much -- I see much downside risk or as much downside
9  risk as upside risk in the linking of Oncor's -- linking
10 of Oncor's credit rating with NextEra's.
11               Therefore, I would require Staff's version
12 of the condition that would de-link the respective
13 credit ratings.  These are not only requirements that I
14 would impose, but given that they're also NextEra's deal
15 killers it seems to me that we'd be wasting our time and
16 resources to proceed further down the road of appearing
17 to approve the transactions with these conditions.
18               For those reasons, therefore, at least
19 preliminarily it seems to me that we should take -- we
20 should take NextEra at its word that it cannot and will
21 not consummate the transactions with the foregoing
22 conditions in place, and we should go ahead and find
23 that NextEra's proposed transaction are not in the
24 public interest.
25               I would just note if, however, my

colleagues want to proceed in that direction, the direction of tentatively approving it with conditions, then I will file a more detailed memorandum in advance of the Open Meeting and I appreciate your indulgence.

I make also two brief -- really brief procedural points.  I would just note that the record is closed in this proceeding and that given the time constraints that really we can't entertain any new commitments really from any of the parties that are in the absence of the unanimous consent of all the parties to reopen the record.

The other point is that, you know, neither do we have the time to, I think, consider a nonunanimous settlement that is opposed because of the lack of time that remains in order to conduct the City of El Paso analysis and process.

So I just want to get that on the record because I know there's always an instinct to throw a last-minute deal or sweetener.  The law in Texas is pretty clear that unless all parties have due process to evaluate and contest those kind of proposals we can't -- we can't entertain it as evidence in the record, and with that, again, I thank you and your indulgence.

CHAIRMAN NELSON:  Okay.  Commissioner Marquez.

1     COMM. MARQUEZ:  I agree with both of you.
2  I think -- I do compliment NextEra's team.  They have
3  been a pleasure to work with from the beginning of this
4  process.  Working with an institution that is so
5  incredibly capable is a pleasure.
6     However, it was made clear that some of
7  the deal killers that NextEra has are not in line with,
8  it sounds like unanimously, some of the deal killers
9  that the Commission has.
10     I agree with your comments, Madam Chair,
11  and I tried to write them down precisely; however, my
12  pen exploded.
13     (Laughter)
14     CHAIRMAN NELSON:  That was the moment of
15  levity.
16     (Laughter)
17     COMM. MARQUEZ:  But I agree that a ring
18  fence may not be necessary in every case, but there are
19  distinguishing factors in this particular case that make
20  that the most prudent course of action in my opinion as
21  well.
22     And along with you, Commissioner Anderson,
23  I do take NextEra at their word.  They have been no
24  nonsense this entire proceeding, which I appreciate
25  greatly, but I don't believe that they were posturing.

1   I think that they were telling us quite clearly what
2   they could and could not live with, and I am not happy
3   to say that those are unfortunately things that I feel
4   like we need to also not bend on.
5                   CHAIRMAN NELSON:  So from a procedural
6   standpoint at this point, I guess I'm okay with
7   proceeding the way you described because I think just
8   from a judicial efficiency standpoint it would make the
9   most sense to, as you both noted, take them at their
10  word and find that the transaction at this point is not
11  in the public interest, and -- but from that standpoint,
12  Stephen, I guess we could vote on that at this meeting
13  and then you-all would issue the order?
14                  MR. JOURNEAY:  We would bring one around
15  for your signature, yes, ma'am.
16                  CHAIRMAN NELSON:  Do you have enough
17  discussion from us?
18                  MR. JOURNEAY:  I think if we could come by
19  and get copies of your prepared remarks, then -- we
20  won't get the transcript until tomorrow.
21                  CHAIRMAN NELSON:  Right.
22                  MR. JOURNEAY:  We could --
23                  COMM. ANDERSON:  Stephen, I'm filing my
24  remarks as we speak.
25                  MR. JOURNEAY:  Let us look at those.  I

1  mean, I think you have laid out the requirements that
2  you think are necessary for this transaction to be in
3  the public interest and that those will not be
4  forthcoming, and I don't know what else we really need
5  to put in there.
6              Lisa and I talked briefly yesterday about
7  writing this order and how we would go forward if this
8  is what happened.
9              We're -- we know the direction we need to
10 go.  I don't know.  Until we start writing it, I'm not
11 sure I can give you a firm answer --
12             COMM. ANDERSON:  Can I suggest that we let
13 CADM do a little work, because we've got till the 28th
14 of next month, not that I want to take that long, but I
15 think we could formally vote and adopt an order --
16             CHAIRMAN NELSON:  At the next Open
17 Meeting?
18             COMM. ANDERSON:  -- at the next Open
19 Meeting.
20             MR. JOURNEAY:  Yeah, sure.  Direct us to
21 go draft an order and --
22             CHAIRMAN NELSON:  Actually, the next Open
23 Meeting is April --
24             MR. JOURNEAY:  April 14th.
25             CHAIRMAN NELSON:  13th.

1   MR. JOURNEAY:  13th.  It didn't move.
2 That's right.
3   CHAIRMAN NELSON:  Yeah.  So we could --
4 they could bring it back to us for the April 13th Open
5 Meeting and so, therefore, we would be way ahead of the
6 deadline.
7   Is that okay with you, and then we don't
8 take a vote, but --
9   COMM. MARQUEZ:  Yes.
10   MR. JOURNEAY:  I doubt we would get one
11 down to you-all for signature much before that anyway.
12   CHAIRMAN NELSON:  Okay.  So, with that,
13 let's just move on to the next item on the agenda.
14   Let's take a break of a minute or two in
15 case there are people who want to leave.
16   (Brief pause off the record)
17   CHAIRMAN NELSON:  We're ready to go back
18 on the record.  Let's just go back for a moment, and I
19 would note that we were informed late last night that
20 two children were killed from downed power lines in the
21 Oncor area.
22   Oncor has made a commitment to -- because
23 of the storm -- the -- I'm assuming it's because of the
24 storm, Oncor has made a commitment to investigate what
25 the facts were related to it and get back to us, and

```
 1  obviously that needs to be a thorough investigation, but
 2  our thoughts and prayers are with the families of the
 3  two children, and I just wanted to note that.
 4              Okay.  So which brings us around to the
 5  fact that none of this stuff is life-affecting.  That's
 6  what's life-affecting and operating the TDU is what's
 7  important.
 8                      AGENDA ITEM NO. 17
 9  PROJECT NO. 46397 - PROJECT TO EVALUATE
    THE COSTS AND BENEFITS OF ENTERGY
10  TEXAS, INC.'S PARTICIPATION IN MISO AND
    PROJECT NO. 40979 - PROCEEDING TO TRACK
11  COMPLIANCE WITH THE TERMS AND CONDITIONS
    SET FORTH IN THE COMMISSION'S ORDER
12  ISSUED IN DOCKET NO. 40346 AND THE NUS,
    AND ASSOCIATED STUDIES ARISING FROM THE
13  ORDER AND/OR NUS
14              CHAIRMAN NELSON:  Let's go to Item 17,
15  Project No. 46397.
16              This is a memo from Staff to let us know
17  what Entergy's -- that Entergy's completed much of the
18  task assigned in their transition to MISO.
19              So we need to decide how we want to move
20  forward.  And, Commissioner Anderson, since you have
21  been carrying all the heavy weight on that, I guess I
22  would like to hear where you are on it.
23              COMM. ANDERSON:  Where I think we are
24  right now is that the remaining step, unless Margaret
25  wants to make any remarks first...
```

```
 1                C E R T I F I C A T E
 2  STATE OF TEXAS     )
 3  COUNTY OF TRAVIS   )
 4            I, William C. Beardmore, Certified Shorthand
 5  Reporter in and for the State of Texas, do hereby
 6  certify that the above-mentioned matter occurred as
 7  hereinbefore set out.
 8            I FURTHER CERTIFY THAT the proceedings of such
 9  were reported by me or under my supervision, later
10  reduced to typewritten form under my supervision and
11  control and that the foregoing pages are a full, true,
12  and correct transcription of the original notes.
13            IN WITNESS WHEREOF, I have hereunto set my hand
14  and seal this 30th day of March 2017.
15
16            _____
17            WILLIAM C. BEARDMORE
              Certified Shorthand Reporter
18            CSR No. 918 - Expires 12/31/18
              Firm Registration No. 276
19
              Kennedy Reporting Service, Inc.
20            555 Round Rock West Drive
              Building E, Suite 202
21            Round Rock, TX 78681
              512.474.2233
22
23
24
25
```