# Exhibit D



Control Number: 46238



Item Number: 545

Addendum StartPage: 0

PUC DOCKET NO. 46238

| | | |
|---|---|---|
| JOINT REPORT AND APPLICATION OF ONCOR ELECTRIC DELIVERY COMPANY LLC AND NEXTERA ENERGY, INC. FOR REGULATORY APPROVALS PURSUANT TO PURA §§14.101, 39.262, AND 39.915 | § § § § § § § | PUBLIC UTILITY COMMISSION OF TEXAS |

RECEIVED
2017 MAY 11  PM 4: 35
PUBLIC UTILITY COMMISSION
FILING CLERK

*AMICUS CURIAE* BRIEF OF
ENERGY FUTURE HOLDINGS CORP. AND ENERGY FUTURE INTERMEDIATE
HOLDINGS COMPANY LLC IN SUPPORT OF REHEARING

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
 INTERNATIONAL LLP
James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C.
Chad J. Husnick, P.C.
300 North LaSalle
Chicago, Illinois 60654

Edward O. Sassower, P.C.
601 Lexington Avenue
New York, New York 10022-4611

Mark McKane, P.C.
555 California Street
San Francisco, California 94104

KIRKLAND & ELLIS LLP
Paul D. Clement
Erin E. Murphy
Galen B. Bascom
655 Fifteenth Street, NW
Washington, DC 2005
Telephone:   (202) 879-5000
Facsimile:   (202) 879-5200
Email:       paul.clement@kirkland.com
             erin.murphy@kirkland.com
             galen.bascom@kirkland.com

ENERGY FUTURE HOLDINGS CORP.
Andrew M. Wright
EVP, General Counsel and Secretary
Texas Bar #00797702
1601 Bryan, 41st Floor
Dallas, Texas 75201

COUNSEL FOR *AMICUS CURIAE*

May 11, 2017

545

1

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

I. The Order Underestimates The Proposed Transaction's Many Significant Benefits. ............................................................................................ 3

II. The Order Overstates The Proposed Transaction's Potential Risks. ............... 5

III. The Order Does Not Acknowledge The Reality That A Better Alternative Is Exceedingly Unlikely To Materialize. .................................... 10

CERTIFICATE OF SERVICE

PUC DOCKET NO. 46238

| | |
|---|---|
| JOINT REPORT AND APPLICATION OF ONCOR ELECTRIC DELIVERY COMPANY LLC AND NEXTERA ENERGY, INC. FOR REGULATORY APPROVALS PURSUANT TO PURA §§14.101, 39.262 AND 39.915 § § § § § § § § | PUBLIC UTILITY COMMISSION OF TEXAS |

**AMICUS CURIAE BRIEF OF
ENERGY FUTURE HOLDINGS CORP. AND ENERGY FUTURE INTERMEDIATE
HOLDINGS COMPANY LLC IN SUPPORT OF REHEARING**

Energy Future Holdings Corp. ("EFH") and Energy Future Intermediate Holdings Company LLC ("EFIH," and collectively with EFH, the "Debtors") respectfully file this *Amicus* Brief in Support of the Motion for Rehearing filed by NextEra Energy, Inc., ("NextEra") seeking reconsideration of the Commission's April 13, 2017 Order regarding the proposed transaction between Oncor Electric Delivery Company LLC ("Oncor") and NextEra.

## INTRODUCTION

The Debtors are not parties to this proceeding; however, its outcome is of the utmost importance to them, as the Debtors are indirect owners of approximately 80% of Oncor and have supported the NextEra transaction through the bankruptcy process. The Debtors' top priority in the bankruptcy process has been to provide the best outcome for Oncor and its customers, because optimizing the value of Oncor, both now and into the future, would provide the best outcome for their creditors. The Debtors selected NextEra's proposal to purchase Oncor because, of all the available options, NextEra's proposal would best optimize the value of Oncor. Among other things, the transaction would allow Oncor to be owned by one of the largest, most widely respected, and most financially stable electric utility holding companies in the industry; would remove the overhang of the Debtors' existing debt; and would eliminate the need for

1

Oncor's management to focus on the Debtors' bankruptcy. The Debtors accordingly concluded that, of all the available alternatives, the NextEra transaction would provide the best outcome for Oncor and its customers.

The Debtors appreciate the commitment of the Commission to its statutory responsibility in these transactions to protect the public interest. But for the reasons outlined in NextEra's Motion for Rehearing, the Debtors respectfully urge the Commission to reconsider its conclusion that this transaction is inconsistent with the public interest and respectfully ask the Commission to reassess the balance of both the benefits and the risks associated with the proposed transaction. In evaluating the proposed transaction, the Debtors concluded that NextEra's proposal to purchase Oncor through a financially balanced transaction that would extinguish the Debtors' existing $11 billion debt overhang and result in an upgrade of as many as three notches to Oncor's current credit rating (and a correspondingly lower cost of capital) would be in the best interests of Oncor, its ratepayers, the continued economic development of the State of Texas, and all other interested parties. The strong support of Oncor's management during the hearing affirms that conclusion.

In concluding otherwise, the Commission's Order undervalues the extent of the significant benefits that the transaction would generate, overestimates the extent of the potential risks associated with the transaction, and does not fully account for the reality that a better alternative is unlikely to materialize. Before consigning Oncor to the risks and uncertainties of a third alternative such as equitization (which will be much more likely in the Debtors' Chapter 11 cases if the proposed transaction is not approved by the Commission), the Debtors respectfully ask the Commission to reconsider its Order.

## I. The Order Underestimates The Proposed Transaction's Many Significant Benefits.

The Commission's Order overlooks many of the significant benefits that the proposed transaction would bring to Oncor. Oncor would benefit significantly by having a strong and stable parent company. NextEra's A- credit rating is four notches above investment grade. Precisely because of NextEra's proven financial strength and stability, "the rating agencies have universally concluded that the [transaction] will reduce Oncor's risks, thereby increasing its bond rating and reducing its cost of debt."[1] Indeed, Oncor's credit rating was upgraded as soon as the proposed transaction was announced, and it is projected to improve if the transaction is consummated.[2] That not only translates into a concrete and immediate benefit for Oncor and its ratepayers; it also confirms what the expert credit agencies tasked with assessing financial and default risk have uniformly concluded: Oncor would be a stronger and more stable entity with NextEra as its parent. That uncontested record evidence cannot be squared with the conclusion that the transaction's benefits are "minimal in comparison to the status quo."[3]

Oncor also would benefit from the resolution of the Debtors' debt overhanging Oncor. At the moment, Oncor has approximately $11 billion in legacy EFH/EFIH debt above it—debt that is supported solely by Oncor and its cash flows. Under the proposed transaction, all $11 billion of that debt would be extinguished, and EFH's bankruptcy proceeding would come to an end. The Commission appropriately recognized the magnitude of that very benefit in its conditional approval of a previous proposed transaction.[4] The Debtors' creditors' claims would be

---

[1] NextEra Ex. 6, at 25:3-5.

[2] NextEra Ex. 1, at 10:6-8; NextEra Ex. 6, at 24.

[3] Order 4.

[4] Dkt. 45188 Order 14 (identifying as benefits that "the proposed transaction provides an opportunity to end the bankruptcy proceeding faced by Oncor's majority parent company, EFH,

3

5

extinguished under the EFH/EFIH plan of reorganization, and approximately $3.5 billion of the debt would be expunged, with the remaining $7.5 billion to be refinanced and consolidated into debt serviced by NextEra itself, using its many revenue sources.[5] To be sure, as a NextEra subsidiary, Oncor would serve as one of those sources. But being one of several substantial, stable, and diversified sources servicing NextEra's debt would put Oncor in a considerably better financial position, and pose less risk to its customers, than if Oncor's cash flows remained solely liable for all of reorganized EFH/EFIH's debt in an equitization. By any measure, NextEra's commitment to extinguish the current debt over Oncor and consolidate the substantially reduced new debt is a significant benefit to Oncor and its customers, as evidenced by the fact that the credit ratings agencies specifically identified the extinguishment of the existing Debtors' debt when explaining why they concluded that the transaction would make Oncor financially stronger.[6]

Oncor would also receive several other benefits from the transaction, including but not limited to the elimination of exposure to legacy federal tax and asbestos liabilities; the elimination of the need for Oncor's management to focus on its parent holding company's bankruptcy; NextEra's commitment to preserve Oncor's existing management and fully fund Oncor's five-year capital expenditures plan; the synergies of having a traditional and experienced

---

in a relatively expeditious manner"; "will reduce the amount of debt held above Oncor from the approximately $9.6 billion that exists today to between $4.3 billion to $5 billion at closing; and subsequent to the restructuring, … to $3.5 billion in 12 months")

[5] By contrast, in an equitization, Oncor's cash flows would be the sole source of funds to service the debt that would remain at a reorganized EFH/EFIH following the Debtors' emergence from bankruptcy. Oncor's credit rating (and cost of capital) likely would be negatively affected by this overhang, and the reorganized EFH/EFIH likely would be a non-investment grade parent company.

[6] NextEra Initial Br. 16.

4

utility holding company as a parent; and the many other efforts NextEra made to address concerns about debt issuance, capital structure, and bankruptcy exposure in its 73 robust regulatory commitments. Instead of giving those benefits the appropriate weight, the Order minimizes them as either insufficiently "quantified" or "not exclusive to this proposal."[7] The Order is mistaken on both counts. First, a benefit does not cease to be a benefit just because it is difficult to quantify; indeed, the Order treats certain perceived *risks* as tangible even though they were no more quantified or quantifiable than certain benefits. Second, even assuming there are other potential purchasers waiting in the wings (a matter of considerable uncertainty), a benefit does not cease to be a benefit just because other transactions might provide comparable benefits.

In sum, the proposed transaction would generate benefits far beyond those acknowledged in the Order. By failing to take considerable, even if unquantified, benefits into account while at the same time according weight to potential but unquantified risks, the Order fundamentally skews the statutorily required analysis of whether the transaction is in the public interest.

## II. The Order Overstates The Proposed Transaction's Potential Risks.

The Order also overstates the potential risks of the transaction. First, the Order erroneously classifies as a *risk* the benefit that Oncor would receive from the extinguishment of the Debtors' debt.[8] As already explained, Oncor would be in a better position as but one of many stable sources supporting NextEra's consolidated $45 billion debt than as the sole source supporting the Debtors' $11 billion debt or as the sole source supporting some portion of that debt if equitization is the ultimate result. The findings of three separate credit rating agencies support this conclusion.

---

[7] Order 5.

[8] Order 3.

5

7

The Order also expresses considerable concern about the elimination of two features of Oncor's current ring-fence: "(1) restrictions on NextEra Energy's ability to appoint, remove, and replace members of the Oncor and Oncor Holdings boards of directors, with the exception of three disinterested directors on the Oncor board of directors, and (2) the ability of the Texas Transmission Investment shareholders to veto dividends declared by the Oncor board of directors and, in certain circumstances, capital and operating budgets."[9] The Debtors certainly recognize the appropriateness of the Commission's focus on governance considerations, particularly in light of the current Chapter 11 proceeding. The Debtors respectfully suggest, however, that requiring those two features of the current ring-fence to be maintained in the NextEra transaction would lead to the unintended consequence of putting Oncor and its customers at greater rather than lesser risk.

At the outset, it bears emphasizing that NextEra agreed to maintain many key elements of the ring-fence, including such restrictions as a commitment to maintain separate books and records, separate credit facilities, and to act on arms' length basis; and commitments not to incur new debt that is disproportionately dependent on the revenues or stock of Oncor without Commission approval, or to pledge Oncor's assets for any entity other than Oncor.[10] Those commitments—commitments that are far from commonplace in a parent-subsidiary relationship—considerably decrease any risks that Oncor's new ownership structure might generate, yet they are not discussed in the Order.

But even setting that aside, concerns regarding the board-composition constraints and dividend-veto provisions are misplaced and can give rise to unintended negative consequences.

---

[9] Order 6.

[10] *See* NextEra Ex. 5A, Exhibit MH-R-2, at 12, 17-19.

6

As NextEra and Oncor explained during the hearing, those restrictions were crafted to address dramatically different circumstances. Oncor's present ring-fence was a direct result of the 2007 transaction in which a group of three private equity funds indirectly purchased Oncor through a highly leveraged buyout financed by more than $36 billion in debt. As one of the Staff's witnesses explained, the "especially extreme debt leverage of the EFH acquisition was one-of-a-kind."[11] And in part because that transaction was so extraordinarily leveraged, there was also an extraordinary disparity in credit rating between parent and subsidiary following the transaction: EFH's credit rating was four to six notches lower than Oncor's.[12] In fact, EFH's credit rating was five to six notches below the minimum standard for investment grade (*i.e.*, nine notches below NextEra's expected credit rating following the currently proposed transaction). Thus, not only did the highly leveraged nature of the transaction threaten to put both the Debtors and Oncor at significant long-term risk, but having the Debtors as a parent holding company also put Oncor at immediate risk of losing its investment grade credit rating.[13] It was the unique dynamic of that "extremely leveraged financial structure [that] caused [the need for] correspondingly strong ring-fencing protections to protect Oncor," as those protections were the only way to ensure that Oncor could preserve its investment grade credit rating (although not without some downgrade as a result of the debt that its new parent brought with it).[14]

The proposed transaction does not present those same concerns. First, the NextEra transaction is not nearly as leveraged as the almost unprecedentedly leveraged EFH

---

[11] Staff Ex. 3A, at 15:24-16:3.

[12] *See* Energy Future Holdings Corp, Form 10-K for the Fiscal Year 2007, at 88, *available at* http://bit.ly/2q5RgNz. EFH's credit ratings were B-, B2, and B, whereas Oncor's ratings were BBB-, Ba1, and BBB- (Standard & Poor, Moody's, and Fitch respectively).

[13] Tr. at 90 (Feb. 21, 2017).

[14] Staff Ex. 3A, at 15:24-16:3.

7

transaction.[15] Second, far from posing a serious credit risk to Oncor, having NextEra as its parent would *improve* Oncor's credit rating, financial stability, and cost of capital, and having Oncor as a wholly owned subsidiary would *improve* NextEra's credit rating and financial stability. Not only is NextEra's credit rating nine notches above EFH's at the time of the 2007 transaction, but it is several notches above Oncor's even now—and would remain so after the transaction.[16] Third, precisely because NextEra is a strong, diversified, and financially stable company, it does not present anywhere near the same bankruptcy risk as the Debtors did at the time of the 2007 leveraged buyout transaction. Accordingly, the unique circumstances that supported the Commission's adoption of the uniquely robust ring-fence between Oncor and the Debtors would no longer exist with NextEra as Oncor's parent holding company.

Instead, preservation of the board-composition constraints and the dividend-veto provisions would actually be detrimental to Oncor and its ratepayers. As NextEra explained throughout the proceedings, it has not insisted on eliminating those provisions out of a bare desire to exercise more control over Oncor. It has done so because all three credit ratings have indicated that they will not link NextEra's and Oncor's credit profiles (and gain the benefits of such linkage) unless those anomalous restrictions are eliminated.[17] In other words, not only do the credit ratings agencies no longer view those restrictions as necessary to preserve the credit rating or stability of Oncor; the agencies actually view those restrictions as a counterproductive obstacle to bringing Oncor the full benefits of association with a stronger and more stable parent.

---

[15] The 2007 transaction was and remains the largest leveraged buy-out transaction in United States history. Peter Lattman, *A Record Buyout Turns Sour for Investors*, N.Y. Times (Feb. 28, 2012), http://nyti.ms/2qvWdAl.

[16] NextEra Ex. 6, at 22-25.

[17] Tr. at 49 (Feb. 21, 2017).

Conversely, the credit ratings agencies have informed NextEra that if it retains those restrictions, then its (and some of its affiliates') own credit rating may be downgraded, which understandably is not a tolerable outcome for NextEra.[18]

Notably, as NextEra also explained, the credit agencies have not insisted on eliminating those provisions because of anything unique to NextEra or this particular transaction; they have insisted on it because they view eliminating those restrictions as essential to establishing the kind of parent-subsidiary relationship that would allow for financial stability.[19] Declining to approve the proposed transaction absent preservation of those restrictions thus frustrates Oncor's ability to bring its ratepayers and the State of Texas the benefits of association with *any* stronger and more stable parent. The Debtors do not believe that is the Commission's intent.

Moreover, the potential risks the Order identifies with respect to linking Oncor's credit to NextEra would matter (if at all) only if NextEra one day finds itself in bankruptcy. Yet there is no reason to think that NextEra poses any significant risk of imminent or future bankruptcy, or at least any risk more significant than the risk *any* company that might purchase Oncor would pose. As the Order acknowledges, NextEra is a well-regarded $70 billion energy company with a "strong and stable investment grade credit rating," as well as years of experience owning and successfully operating a major utility.[20] While the Order sets forth perceived risks associated with NextEra's wholesale generation portfolio, it fails to account for the fact that this portfolio makes up less than 10% of NextEra's portfolio; fully 92% comes from rate-regulated entities or long-term contracts with credit-worthy counterparties that present none of the risks to which the

---

[18] *See* Tr. at 286-87, 291-92 (Feb. 21, 2017); Tr. at 355-56, 381-82, 400 (Feb. 22, 2017).

[19] Tr. at 49 (Feb. 21, 2017).

[20] Tr. at 21 (March 30, 2017).

Order alludes.[21] Any risks associated with the possibility of a NextEra bankruptcy are remote, at best. Moreover, even assuming that unlikely scenario were to occur, the Order fails to explain why the many other provisions of the ring-fence that NextEra has agreed to keep intact would not suffice to protect Oncor.

Again, it is undisputed that all three credit rating agencies have concluded that the proposed transaction would benefit Oncor (and, indirectly, its ratepayers and the State of Texas) by improving and stabilizing Oncor's financial outlook and likely upgrading its credit rating. Credit ratings are the product of careful consideration of exactly the kinds of benefits and risks that the Commission is tasked with taking into consideration when assessing the public benefit. And after carefully considering those factors, three credit rating agencies concluded that this transaction would have exactly the *opposite* effect on Oncor, its financial outlook, and its credit rating as the risky 2007 massively leveraged buyout transaction. While the Debtors acknowledge that the Commission must independently review the benefits and risks associated with the proposed transaction, and certainly is not bound by the views of those credit rating agencies, the Debtors respectfully urge that those views warrant further consideration before the Commission declares not in the public interest a transaction that those objective agencies have concluded would benefit both Oncor and its ratepayers.

### III. The Order Does Not Acknowledge The Reality That A Better Alternative Is Exceedingly Unlikely To Materialize.

The Debtors also respectfully urge the Commission to give further consideration to the reality that the proposed transaction is, in all likelihood, the best possible option. If all of the other options to a particular transaction are worse, then the public interest is disserved by rejecting the best outcome available. Here, there were and are currently no better alternative

purchasers of reorganized EFH/EFIH, and a stand-alone equitization would be a risky, uncertain, and devaluing undertaking for Oncor. The Debtors' priority has been to provide the best outcome for Oncor and its customers because optimizing the value of Oncor, both now and into the future, would produce the best outcome for their creditors. The Debtors respectfully submit that the NextEra transaction is the best outcome for Oncor, its ratepayers, and the continued economic development of the State of Texas.

As NextEra explained, the reason it will not purchase Oncor unless the board-composition restrictions are relaxed and the dividend-veto provisions are eliminated is because the credit rating agencies conditioned linkage of the credit profiles of NextEra and Oncor on those alterations to the present ring-fence. And as NextEra further explained, the credit rating agencies imposed those conditions not because of anything specific to NextEra or the manner in which it proposed to finance the transaction, but because those anomalous conditions interfere with an ordinary parent-subsidiary relationship. Accordingly, there is little reason to think that the credit rating agencies would not impose the same conditions before linking Oncor's credit with any other proposed parent holding company. Likewise, there is little reason to think that any company would be willing to directly or indirectly purchase Oncor while keeping those novel and onerous restrictions in place—or at least that they would be willing to do so at anything close to Oncor's fair market value.

Yet the reasons the Order identifies for insisting on maintaining those restrictions would apply with equal force to nearly any company that might be willing to purchase Oncor. After all, it is the rare parent holding company that does not operate with *some* degree of debt and engage in other operations, and NextEra's debt level and other operations are certainly not out of the

11

mainstream for utility holding companies.[22] It is also the rare parent holding company that does not operate with at least *some* degree of risk in its portfolio, yet the Commission treated NextEra as too risky despite the fact 92% of NextEra's cash flows come from rate-regulated entities or long-term contracts with credit-worthy counterparties. Accordingly, if the Order stands, it likely will dissuade other prospective purchasers from pursuing a transaction at all.

That might be a tolerable situation if Oncor were a stand-alone entity that could continue in perpetuity without shareholders. But Oncor is not a stand-alone entity. It is majority-owned by the Debtors, who have declared bankruptcy and have $11 billion in unresolved debt. The Debtors' boards of directors have a fiduciary duty to find some way to monetize the valuable asset that Oncor represents for their creditors. Perpetual bankruptcy is not an option.[23] And an equitization of Oncor comes with its own inherent risks and uncertainties.[24] As Mr. Shapard noted, the NextEra plan is superior to equitization.[25] Simply put, the proposed transaction is the best available outcome.

For all these reasons, the Debtors respectfully ask the Commission to grant NextEra's Motion for Rehearing and reconsider the petition of Oncor and NextEra in this matter.

---

[22] The parent of every other investor-owned utility in the Electric Reliability Council of Texas ("ERCOT") has debt and engages in other operations. The Debtors are unaware of any other utility in ERCOT that is subject to any ring-fence, let alone a ring-fence as robust as the one that NextEra agreed to maintain.

[23] *See* NextEra Ex. 6, at 19:3-15.

[24] *See* NextEra Motion for Reh'g 29.

[25] *See* Tr. at 187-89 (Feb. 21, 2017).

Respectfully submitted,

_____
Paul D. Clement

| | |
|---|---|
| **KIRKLAND & ELLIS LLP** **KIRKLAND & ELLIS INTERNATIONAL LLP** James H.M. Sprayregen, P.C. Marc Kieselstein, P.C. Chad J. Husnick, P.C. 300 North LaSalle Chicago, Illinois 60654 <br><br>Edward O. Sassower, P.C. 601 Lexington Avenue New York, New York 10022-4611 <br><br>Mark McKane, P.C. 555 California Street San Francisco, California 94104 <br><br>May 11, 2017 | **KIRKLAND & ELLIS LLP** Paul D. Clement Erin E. Murphy Galen B. Bascom 655 Fifteenth Street, NW Washington, DC 2005 Telephone:   (202) 879-5000 Facsimile:   (202) 879-5200 Email:   paul.clement@kirkland.com        erin.murphy@kirkland.com        galen.bascom@kirkland.com <br><br>-and- <br><br>**ENERGY FUTURE HOLDINGS CORP.** Andrew M. Wright EVP, General Counsel and Secretary Texas Bar #00797702 1601 Bryan, 41st Floor Dallas, Texas  75201 <br><br>*Counsel for Amicus Curiae* |

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was served on all parties of record in this proceeding via electronic mail and this document was filed with the Commission on this 11th day of May, 2017.

_____
Paul D. Clement

13

15