## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) ) ) | Chapter 11<br>Case No. 14-10979 (CSS)<br>(Jointly Administered) |
| *Debtors.* | ) ) | |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP. | ) ) | Adversary Proceeding<br>No. 17-[XXXXX] (CSS) |
| and | ) ) | |
| ENERGY FUTURE INTERMEDIATE HOLDING COMPANY, LLC | ) ) ) | |
| *Plaintiffs.* | ) ) | |
| v. | ) ) | |
| NEXTERA ENERGY, INC. | ) ) ) | |
| *Defendant.* | ) ) | |

## ADVERSARY COMPLAINT

Plaintiffs Energy Future Holdings Corp. ("EFH") and Energy Future Intermediate Holding Company, LLC ("EFIH" and collectively with EFH, the "Debtors" or "Plaintiffs") bring this Adversary Complaint for declaratory judgment against Defendant NextEra Energy, Inc. ("NextEra").

## NATURE OF THE ACTION

In exchange for a $275 million Termination Fee (among other things), NextEra agreed to use "reasonable best efforts," and to lead the efforts, to secure regulatory approval from the Public Utility Commission of Texas ("PUCT") for the purchase of the Debtors' indirect interest in the regulated electric utility Oncor—a transaction that would have enabled the Debtors finally

1

to emerge from these years-long Chapter 11 proceedings. But NextEra failed to live up to its end of that bargain. Not only did NextEra fail to obtain regulatory approval from the PUCT, which was harmful enough, but NextEra failed in the first instance to conduct itself in a manner reasonably calibrated to ever obtain that regulatory approval.

The utility industry is highly regulated, and securing regulatory approval in the context of a change of control application requires gaining the trust of the regulators and other stakeholders. This critical goal was placed in stark relief when a prior attempt to purchase Oncor, led by the Hunt consortium, failed to garner sufficient support from regulators and stakeholders. NextEra failed to learn from that example, however, and instead employed aggressive tactics that were destined to fall short of that crucial goal. NextEra failed to engage with and failed to win the support of intervenors in the process. Despite these significant obstacles, NextEra loudly announced to the PUCT that NextEra had drawn lines in the sand that it was not willing to discuss or modify in any way. And NextEra signaled that its interests in Texas were to maximize its own gain, and frustrate the PUCT's goals, when NextEra used its rights under a side letter with Oncor to scuttle a deal in which the PUCT had significant interest. When faced with this course of conduct, the PUCT declined to approve the transaction.

NextEra, in contrast, views its unreasonable efforts as nothing more than harmless error. According to NextEra, it agreed to purchase Oncor under strict conditions, including the complete demolition of the existing "ring fence"—the financial, management, and operational structures erected to insulate Oncor from external financial stressors. The PUCT's April 13, 2017 order cited certain ring fence protections as essential in these circumstances and declined to approve the transaction. This fact, in NextEra's view, means that *any* of NextEra's efforts are irrelevant—no matter how unreasonable. NextEra agreed that its purchase of Oncor would not

be subject to some of the ring fence conditions cited by the PUCT. NextEra therefore takes the position that, not only may it decline to close the transaction, but it also must be paid the $275 million Termination Fee, when, inevitably, the Debtors pursue an alternative transaction in an effort to emerge from Chapter 11.

NextEra's simplistic view ignores how, upon information and belief, its aggressive conduct *contributed* to the PUCT's conclusion that certain ring fence conditions are necessary in these circumstances. NextEra also incorrectly treats the "ring fence" as one monolithic construct that, in its view, was a foreordained result that NextEra was powerless to effect. Upon information and belief, even after hearing the PUCT's concerns, NextEra failed meaningfully and reasonably to engage with the PUCT and its staff regarding potential adjustments to the various components of the ring fence. NextEra should not be permitted to use the ring fence conditions in the PUCT's April 13 Order as a firewall to conceal from appropriate scrutiny the missteps that led to the PUCT's choice to impose those conditions.

In the end, NextEra appears to believe that all it was required to do was provide the regulatory commitments set forth in the Merger Agreement (along with the defined Burdensome Conditions) to the PUCT and demand an answer. That is not reasonable best efforts. NextEra had an affirmative requirement under the Merger Agreement and governing Delaware law to take all steps "reasonably necessary, proper, and advisable" to solve problems and consummate the transaction. NextEra was also required by the Plan Support Agreement to use "commercially reasonable efforts" to secure regulatory approval. It did neither, and, under these circumstances, and other circumstances to be further explored through discovery, NextEra is not owed a $275 million Termination Fee.

The Debtors respectfully request that the Court enter a declaratory judgment that the Termination Fee is not owed.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012, because this adversary proceeding arises in and relates to the Chapter 11 Cases.

2. This is a core proceeding under 28 U.S.C. § 157(b) because it relates to the administration and property of the bankruptcy estates in the Chapter 11 Cases, including in connection with the NextEra Plan.

3. Pursuant to Local Rule of Bankruptcy Practice and Procedure 7008-1, Plaintiffs consent to this Court's entry of final orders with regard to any claim in this action if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. Plaintiffs seek relief under 28 U.S.C. §§ 2201 and 2202 ("The Declaratory Judgment Act") and section 105(a) of the United States Bankruptcy Code, as the parties to this action have adverse legal interests, and a substantial controversy of sufficient immediacy and reality exists to warrant the issuance of a declaratory judgment.

## PARTIES

6. Plaintiff EFH is a Texas corporation with its principal place of business in Dallas, Texas.

7.      Plaintiff EFIH is a Delaware limited liability company with its principal place of business in Dallas, Texas.  Plaintiffs indirectly own an 80.03% interest in Oncor.  Plaintiffs are debtors in the Chapter 11 Cases.

8.      Defendant NextEra is a Florida corporation with its principal place of business in Juno Beach, Florida.

## FACTUAL ALLEGATIONS

**I.     Plaintiffs Seek To Rely On The Sale Of Their Economic Interest In Oncor To Emerge From Bankruptcy.**

9.      On April 29, 2014, Plaintiffs, together with the other above-captioned debtors and debtors in possession, filed voluntary petitions for protection under chapter 11 of the United States Bankruptcy Code (the "Chapter 11 Cases").

10.     EFH owns an indirect 80.03% interest in Oncor Electric Delivery Company LLC ("Oncor")—a regulated electric utility that operates the largest transmission and distribution system in Texas—by means of EFH's wholly owned subsidiary EFIH, which in turn wholly owns Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), which owns 80.03% of Oncor.  Neither Oncor nor Oncor Holdings filed for bankruptcy protection in the Chapter 11 Cases, and neither of them is a debtor.

11.     Oncor is the only remaining operating entity in the Debtors' enterprise.  In the course of the Chapter 11 Cases, the Debtors have marketed their indirect interests in Oncor to third party buyers as a means to restructure their debt and emerge from bankruptcy.

12.     Oncor is regulated by, among others, the PUCT, which oversees Oncor's operations and approves the rates Oncor charges its ratepayers.  The PUCT must approve any change in control of Oncor, including a sale of Plaintiffs' interests in Oncor to a third party buyer.

5

**II.    The Parties Enter Into The Merger Agreement And The PSA.**

13.    In May 2016, after a prior transaction with another third party buyer—the Hunt consortium—faltered at the PUCT approval stage, NextEra and Plaintiffs began negotiating the terms of a merger by which NextEra would purchase Plaintiffs' indirect interests in Oncor.

14.    On July 29, 2016, EFH, EFIH, NextEra, and an entity wholly owned by NextEra called EFH Merger Co. ("Merger Sub"), entered into an Agreement and Plan of Merger (as amended on September 18, 2016, the "Merger Agreement," attached hereto as **Exhibit A**) by which, among other things, EFH and EFIH agreed to effectively sell their 80.03% indirect interest in Oncor to NextEra in exchange for cash and NextEra common stock (the "NextEra Merger").

15.    The Merger Agreement contained various conditions precedent to consummating the transactions contemplated therein, including, among other things, obtaining regulatory approval by the PUCT.

16.    In the Merger Agreement, NextEra agreed, among other things:

    a.    to "cooperate" with Plaintiffs and to use its "*reasonable best efforts to take or cause to be taken all actions, and do or cause to be done*, and assist and cooperate with the other parties and the Oncor Entities in doing, *all things reasonably necessary, proper or advisable* on its part under this Agreement and applicable Laws to consummate and make effective the transactions contemplated by this Agreement and the Plan of Reorganization . . . ," Ex. A (Merger Agreement § 6.3(a)(i) (emphasis added));

    b.    to use its "*reasonable best efforts to provide [Plaintiffs] a reasonable opportunity to review in advance and, to the extent practicable, . . . consult with [Plaintiffs]* on and consider in good faith the views of [Plaintiffs] in connection with, all material information that appears in any filing made with, or written materials submitted to, or oral presentations or testimony made to any Governmental Entity . . . in connection with the transactions contemplated by this Agreement," Ex. A (Merger Agreement § 6.3(a)(vii) (emphasis added));

    c.    to use its "*reasonable best efforts to obtain the PUCT Approval* . . . as expeditiously as possible," Ex. A (Merger Agreement § 6.3(a)(viii) (emphasis added)); and

    d.    to use its "*reasonable best efforts* to take or cause to be taken the following actions: . . . *with respect to . . . the PUCT Approval . . . , obtaining all such necessary approvals and avoiding the entry or enactment of any* permanent, preliminary or temporary injunction or other *order, decree, decision*, determination, judgment or Law that, individually or in the aggregate would be *reasonably likely to prevent*, enjoin or otherwise prohibit, or materially impair, restrain or restrict, the transactions contemplated by this Agreement or the Plan of Reorganization," Ex. A (Merger Agreement § 6.3(d)(ii) (emphasis added)).

    17.    These express contractual provisions were in addition to the implied covenant of good faith and fair dealing imposed on NextEra pursuant to Delaware law.

7

18. Obtaining regulatory approval is NextEra's obligation under the Merger Agreement and a condition to the obligations of Plaintiffs to close the transactions contemplated by the Merger Agreement. *See* Ex. A (Merger Agreement §§ 7.3(b), (e)).

19. Similarly, a condition precedent to all parties' obligations to close is that no "Governmental Entity" (like the PUCT) will have entered an "order (whether temporary, preliminary or permanent) that is in effect and restrains . . . or otherwise prohibits consummation of the Closing Date transactions." Ex. A (Merger Agreement § 7.1(b)).

20. In exchange for NextEra's promise to use "reasonable best efforts," Plaintiffs provided NextEra with, among other things, the protection of a $275 million Termination Fee. Ex. A (Merger Agreement § 8.5(b)).

21. Subject to crucial exceptions, this Termination Fee would be triggered by termination of the Merger Agreement pursuant to Article VIII thereof, if an alternative transaction was consummated pursuant to which neither NextEra nor any of its affiliates obtained direct or indirect ownership of 100% of Oncor Holdings and Oncor Holdings' 80.03% interest in Oncor. *Id.*

22. The fee would not be payable if the Merger Agreement was terminated (i) mutually by Plaintiffs, NextEra, and Merger Sub; (ii) by NextEra, under certain circumstances, including if PUCT approval had not been obtained by the June 24, 2017 "Termination Date"; or (iii) by EFH, pursuant to Merger Agreement sections 8.3(a), 8.3(b), or 8.3(g) to the extent that the PSA (defined below) was terminated pursuant to a breach by NextEra or Merger Sub. *Id.*

23. The Merger Agreement could be terminated by Plaintiffs under section 8.3(a) if NextEra breached any representation, warranty, covenant, or agreement in the Merger

Agreement, which breach or failure to be true or performed (i) would result in failure of a condition set forth in section 7.1 or section 7.3 and (ii) cannot be or has not been cured within thirty business days' notice to NextEra. *Id.* (Merger Agreement § 8.3(a)).

24. The Merger Agreement could be terminated by Plaintiffs under section 8.3(g) "upon any termination of the [PSA] in accordance with its terms as to [Plaintiffs, NextEra, and Merger Sub]." *Id.* (Merger Agreement § 8.3(g)).

25. At or around the same time the Merger Agreement was executed, Plaintiffs and the other EFH debtors, on the one hand, and NextEra and Merger Sub, on the other, entered into a Plan Support Agreement, dated as of July 29, 2016 and amended on September 19, 2016 (as amended, the "PSA," attached hereto as **Exhibit B**).

26. In the PSA, NextEra agreed, among other things, that:

   a. "it shall use good faith efforts to assist in obtaining . . . consummation of the [NextEra Plan] and all other transactions contemplated by this Agreement," Ex. B (PSA § 4.03(a)(iii));

   b. "it shall not directly or indirectly, or encourage any other entity to directly or indirectly: (A) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, consummation, or amendment" of the NextEra Plan, Ex. B (PSA § 4.03(a)(iv)); and

   c. "it shall (A) use commercially reasonable efforts to obtain required regulatory and/or third-party approvals (including from the PUC[T] . . . )," Ex. B (PSA § 4.03(a)(v)).

27. This Court approved Plaintiffs' entry into the PSA and Merger Agreement on September 19, 2016.

9

28. On February 17, 2017, the Court approved a plan of reorganization ("NextEra Plan") that, if consummated, would have largely resolved the approximately three-year Chapter 11 proceedings for EFIH and its parent EFH. That NextEra Plan was never, and will never be, consummated.

### III. NextEra Fails To Use Its Reasonable Best Efforts To Close.

29. On October 31, 2016, NextEra and Oncor jointly filed an application with the PUCT for approval of the proposed change in control of Oncor in connection with the NextEra Merger (the "PUCT Application").

30. NextEra led the effort to seek PUCT approval. Ex. A (Merger Agreement § 6.3(a)(vi)).

31. Building a coalition of support with the PUCT Staff and intervenors in PUCT proceedings (the "Intervenors") is a critical step towards obtaining PUCT approval. On information and belief, rather than learning from the Hunt consortium's experiences before the PUCT a year earlier and working to garner the support of the various constituencies in the PUCT proceedings—and contrary to statements made to Plaintiffs during the negotiations of the Merger Agreement and PSA about its ability to obtain approval of the PUCT Application and its good relationships with the PUCT Staff and Intervenors—NextEra proceeded on its own without garnering any consensus prior to, or following, the filing of the PUCT Application.

32. Indeed, Commissioner Anderson made a special note in his June 29, 2017 memorandum regarding NextEra's motion for rehearing that "[almost] every intervenor in this case urged the Commission to deny [NextEra's] application . . . ." Anderson Memorandum, dated June 29, 2017 [PUCT Control No. 46238, Item No. 556] (attached hereto as **Exhibit C**).

33. On information and belief, NextEra took positions, both in testimony before the PUCT and through off-the-record messaging to and interactions with the PUCT Staff and the various key Intervenors, that were not "reasonably necessary, proper, or advisable" to obtain PUCT approval and to consummate the NextEra Merger, and that ultimately undermined the PUCT Application.

34. NextEra proclaimed to the PUCT, the PUCT Staff, and the Intervenors that certain conditions were non-negotiable "deal-killers" and, on information and belief, refused to attempt to negotiate or accommodate any of the concerns expressed about those conditions. NextEra therefore went into the PUCT proceedings making requests of the PUCT that it knew were unlikely to be granted as-is and threatened to walk away from the transaction if the PUCT did not yield to NextEra's demands. As one PUCT Commissioner noted, "From the earliest contacts [with the PUCT], well before the [PUCT Application] was filed, NextEra's representatives have been very clear and consistent about the conditions that they could not accept and the reasons why those conditions were unacceptable." Anderson Memorandum, dated March 30, 2017 [PUCT Control No. 46238, Item No. 535] (attached hereto as **Exhibit D**).

35. Additionally, NextEra failed to use reasonable best efforts to provide Plaintiffs with "a reasonable opportunity to review in advance" and failed to "consult with [Plaintiffs] on and consider in good faith the views of [Plaintiffs]," Ex. A (Merger Agreement § 6.3(a)(vii)), in connection with, at minimum, the substance of the February 23, 2017 testimony of NextEra's CEO Jim Robo.

36. NextEra also employed a public relations tactic that pressured the PUCT to demonstrate its independence by denying approval. NextEra hired former Texas Governor, and current United States Secretary of Energy, Rick Perry to advocate on behalf of the transaction.

Secretary Perry appointed the PUCT Commissioners. On information and belief, far from assisting in winning approval for the transaction, that strategy only pressured the Commissioners to demonstrate their independence by further scrutinizing and ultimately rejecting NextEra's application.

37. In addition, on information and belief, NextEra abused its rights under a side letter with Oncor, executed in connection with the Merger Agreement, in an effort to advance NextEra's overall interests in the Texas utility sphere. This conduct—which occurred just days before the PUCT issued its ruling with respect to the PUCT Application—signaled to the PUCT that NextEra was not operating in Oncor's interest or the public interest and, on information and belief, had a damaging effect on NextEra's ability to receive PUCT approval for its purchase of Oncor.

38. NextEra neither provided Plaintiffs with advance disclosure of its involvement in discussions with Oncor regarding these matters nor provided Plaintiffs with any opportunity to review or give input regarding the substance of the communications, which NextEra, on information and belief, knew and intended would be conveyed by Oncor to the PUCT.

39. NextEra's positions with the PUCT constituted neither "commercially reasonable efforts" nor "reasonable best efforts" to obtain PUCT approval and effectuate the NextEra Merger. To the contrary, NextEra's conduct and statements irretrievably and materially harmed the parties' efforts to close the deal.

40. NextEra's actions, and inactions, constituted a breach of its contractual obligations under both the Merger Agreement and the PSA.

41. NextEra's breaches had an immediate and irreparable effect on the PUCT Application. For example, one PUCT Commissioner stated, "we should take [NextEra] at its

word that *it cannot and will not* consummate the transactions with foregoing conditions in place, and find that NextEra's proposed transactions are not in the *Public Interest*." Ex. D (March 30 Anderson Memo at 2) (first emphasis added)); *see also* Order dated June 7, 2017 [PUCT Control No. 46238, Item No. 551] (attached hereto as **Exhibit E**) ("The [February 23, 2017] conversation between Mr. Robo [NextEra's CEO] and the Commission underscored the Commission's understanding that NextEra Energy would not close the proposed transactions if the Commission imposed certain conditions on the proposed transactions.").

42. NextEra even recognized that the damage was irreparable. On April 5, 2017, on information and belief, NextEra sought financial concessions from the Debtors' large debt holders under the threat of the break fee—in exchange for an amendment to the Merger Agreement.

43. On April 13, 2017, the PUCT entered an order finding that the transactions contemplated by the NextEra Plan and the NextEra Merger Agreement were not in the public interest. Order dated April 13, 2017 [PUCT Control No. 46238, Item No. 538] (the "April 13, Order") attached hereto as **Exhibit F**).

44. Although NextEra subsequently filed a motion for rehearing on the PUCT Application on May 8, 2017, NextEra's true position with respect to the NextEra Merger remained unchanged—they were not genuinely interested in closing the NextEra Merger with reasonable conditions. As Mr. Robo admitted publicly in a NextEra earnings call on April 21, 2017, "we don't have to do anything on the M&A front because we really do love our standalone organic growth prospects."

45. Notwithstanding NextEra's actions that ultimately thwarted the deal, Plaintiffs honored their obligations under the Merger Agreement and PSA. Consistent with Plaintiffs'

obligations to support the NextEra Merger, they filed amicus briefs, at NextEra's request, in support of NextEra's motions for rehearing. But, the damage was done and irretrievable. Accordingly, after March 30, 2017—when NextEra's breaches and their effect on the PUCT Application became clear—a notice of breach to NextEra would have been futile.

46. On June 7, 2017, the PUCT issued its Order on Rehearing that reaffirmed its denial of NextEra's application. *See* Ex. E (Order dated June 7, 2017).

47. On June 29, 2017, the PUCT denied NextEra's second motion for rehearing. *See* Ex. C (June 29 Anderson Memorandum ("I remain unpersuaded by their regurgitation of essentially the same arguments.")).

**IV.    Plaintiffs Execute Merger Agreement With Berkshire Hathaway Energy Company.**

48. Following the PUCT's April 13 Order, Plaintiffs engaged in discussions with a variety of parties regarding a potential "backup" plan, including in response to an unsolicited, inbound proposal from Berkshire Hathaway Energy Company ("Berkshire"). These discussions culminated in an agreement by the Debtors to pursue a new path forward with Berkshire as a plan sponsor, following the Debtors' termination of the Merger Agreement and PSA.

49. On July 7, 2017, Berkshire and the Plaintiffs entered into a merger agreement contemplating Berkshire's purchase of Plaintiffs' 80% indirect ownership interest in Oncor.

50. Also on July 7, 2017, Plaintiffs filed a motion seeking approval of a disclosure statement reflecting a proposed plan that seeks to reorganize EFH and EFIH through the consummation of the Berkshire transaction.

51. Tellingly, and unlike NextEra, Berkshire *did* learn from prior PUCT proceedings and not only engaged with PUCT Staff and the Intervenors, but has already reached an accord with the key constituencies.

**V.     Plaintiffs Terminate The Merger Agreement And The PSA.**

52.     On July 6, 2017, Plaintiffs delivered a notice terminating the Merger Agreement with NextEra pursuant to Sections 8.2(a) and 8.3. *See* Ex. A (Merger Agreement §§ 8.2(a), 8.3).

53.     Shortly thereafter, on July 7, 2017, Plaintiffs delivered a notice terminating the PSA pursuant to Section 8.02 of that agreement. *See* Ex. B (PSA § 8.02). The termination notices caused the NextEra Plan to be null and void.

54.     On July 7, 2017, NextEra and Merger Sub acknowledged termination of the Merger Agreement by Plaintiffs pursuant to Section 8.2(a), as well as termination of the PSA; however, NextEra and Merger Sub disputed termination of the Merger Agreement pursuant to section 8.3 thereof and likewise disputed termination of the Merger Agreement on any other bases. NextEra's counsel reiterated this position to this Court at an omnibus hearing for the Chapter 11 Cases on July 12, 2017.

55.     Under the terms of the Merger Agreement, consummation of an "alternative transaction," can trigger the Termination Fee. The transaction contemplated by the July 7, 2017 merger agreement with Berkshire, if consummated, would qualify as an "alternative transaction" under the Merger Agreement. Ex. A (Merger Agreement § 8.5(b)).

56.     Because of NextEra's breaches, however, a Termination Fee is not, and will not be, payable to NextEra. *Id.*

**CAUSES OF ACTION**

*Count 1: Declaratory Judgment — Breach of Contract (Merger Agreement)*

57.     Plaintiffs re-allege and incorporate each of the above allegations as if set forth in this cause of action.

58. An actual, justiciable controversy exists between Plaintiffs and Defendant regarding whether NextEra's conduct violated the Merger Agreement and therefore whether the Termination Fee is owed.

59. Plaintiffs and NextEra executed and are parties to the Merger Agreement, which until its termination was a valid, binding, and enforceable contract.

60. Plaintiffs have performed their obligations under the Merger Agreement, except those excused by NextEra's prior breaches of the Merger Agreement.

61. NextEra has breached the Merger Agreement, including without limitation by:

   a. failing to use its reasonable best efforts to consummate the transactions contemplated in the Merger Agreement, PSA, and NextEra Plan, Ex. A (Merger Agreement § 6.3(a)(i));

   b. failing to use its reasonable best efforts to obtain PUCT approval in connection with the NextEra Merger and to avoid an order that would prevent the NextEra Merger, Ex. A (Merger Agreement §§ 6.3(a)(viii), 6.3(d)(ii)); and

   c. failing to use its reasonable best efforts to consult with and to provide Plaintiffs a reasonable opportunity to review in advance the content of all its written submissions, oral presentations, and testimony before the PUCT Ex. A (Merger Agreement § 6.3(a)(vii)).

62. These failures to use "reasonable best efforts" resulted in a failure of certain conditions to closing in the Merger Agreement, including sections 7.1(b), 7.3(b), and 7.3(e).

63. None of these breaches could be cured, and therefore Plaintiffs were not required to provide NextEra with notice and a thirty-day cure period under section 8.3(a).

64. Because of those breaches resulting in failures in conditions to closing, Plaintiffs were permitted to terminate the Merger Agreement under section 8.3(a).

65. Because the Merger Agreement was validly terminated under section 8.3(a), no Termination Fee is owed under section 8.5(b) of the Merger Agreement.

66. Plaintiffs were harmed as a result of NextEra's breaches of the Merger Agreement, and must now pursue a new path toward reorganization and emergence from Chapter 11.

67. Accordingly, EFH is entitled to a declaratory judgment that a Termination Fee is not payable to NextEra under the Merger Agreement because of NextEra's breaches of the Merger Agreement.

### *Count 2: Declaratory Judgment — Breach of Contract (PSA)*

68. EFH re-alleges and incorporates each of the above allegations as if set forth in this cause of action.

69. An actual, justiciable controversy exists between Plaintiffs and Defendant regarding whether NextEra's conduct violated the PSA and therefore whether the Termination Fee is owed.

70. Plaintiffs and NextEra executed and are parties to the PSA, which until its termination was a valid, binding, and enforceable contract.

71. NextEra has breached the PSA, including without limitation by:

   a. failing to use good faith efforts to consummate the transactions contemplated in the Merger Agreement, PSA, and NextEra Plan, Ex. B (PSA § 4.03(a)(iii));

      b.      directly or indirectly impeding and taking actions to interfere with the consummation of the NextEra Plan, Ex. B (PSA § 4.03(a)(vi)); and

      c.      failing to use commercially reasonable efforts to obtain PUCT approval in connection with the NextEra Merger, Ex. B (PSA § 4.03(a)(v)).

72.    Because of NextEra's breaches of the PSA, Plaintiffs were permitted to terminate the Merger Agreement under section 8.3(g).

73.    Because the Merger Agreement was validly terminated under section 8.3(g) due to NextEra's breaches of the PSA, no Termination Fee is owed under section 8.5(b) of the Merger Agreement.

74.    Plaintiffs were harmed as a result of NextEra's breaches of the PSA, and in turn the Merger Agreement, and must now pursue a new path toward reorganization and emergence from Chapter 11.

75.    Accordingly, EFH is entitled to a declaratory judgment that a Termination Fee is not payable to NextEra under the Merger Agreement because of NextEra's breaches of the PSA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs EFH and EFIH respectfully request that the Court enter judgment in their favor and award the following relief:

    A.    An order declaring that a Termination Fee is not payable to NextEra under the Merger Agreement;

    B.    An order declaring that a Termination Fee is not payable to NextEra because NextEra breached the PSA;

    C.    An order awarding the Plaintiffs costs, expenses, and reasonable attorneys' fees, both at trial and appeal, in addition to all other sums allowed by law; and

D.  An order awarding such other relief that this Court deems just and equitable.

Dated: August 3, 2017
Wilmington, Delaware

Respectfully Submitted,

*/s/ Joseph H. Huston, Jr.*
**STEVENS & LEE, P.C.**
Joseph H. Huston, Jr. (No. 4035)
Jason Daniel Angelo (No. 6009)
919 N. Market Street, Suite 1300
Wilmington, Delaware 19801
Telephone: (302) 425-3310/11
Facsimile: (610) 371-7972/11
Email: jhh@stevenslee.com
    jda@stevenslee.com

*Co-Counsel to Plaintiff EFIH*

-and-

**BIELLI & KLAUDER, LLC**
David M. Klauder (No. 5769)
1204 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 803-4600
Facsimile: (302) 397-2557
Email: dklauder@bk-legal.com

*Co-Counsel to Plaintiff EFH*

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:    edward.sassower@kirkland.com
     stephen.hessler@kirkland.com
     brian.schartz@kirkland.com

-and-

Mark McKane, P.C.
555 California Street
San Francisco, CA 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email:        mark.mckane@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Andrew R. McGaan, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              marc.kieselstein@kirkland.com
              chad.husnick@kirkland.com
              steven.serajeddini@kirkland.com

*Co-Counsel to Plaintiffs*