

ROPES & GRAY LLP
PRUDENTIAL TOWER
800 BOYLSTON STREET
BOSTON, MA 02199-3600
WWW.ROPESGRAY.COM

August 7, 2017

Matthew L. McGinnis
T: 617.951.7567
matthew.mcginnis@ropesgray.com

**BY ECF AND HAND DELIVERY**

The Honorable Christopher S. Sontchi
United States Bankruptcy Court
824 North Market Street, 5th Floor
Wilmington, Delaware 19801

Re:   *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del.)

Dear Judge Sontchi:

We write on behalf of Elliott Associates, L.P., Elliott International, L.P. and The Liverpool Limited Partnership (collectively, "Elliott") regarding discovery disputes that have recently arisen between the parties. We look forward to discussing these issues with the Court today at 12:00 pm.

The parties' disputes center around discovery in connection with the *Motion of the EFH/EFIH Debtors for Order Authorizing Entry Into Merger Agreement and Approving Termination Fee* [D.I. 11430] (the "Motion"), which is scheduled for hearing on August 21, 2017. In advance of that hearing, Elliott seeks discovery concerning whether the proposed merger agreement between Berkshire Hathaway Energy ("Berkshire") and the Debtors (the "Berkshire Transaction") is, as the Debtors have claimed, "the highest and most actionable transaction . . . at this time," *see* Motion ¶¶ 43-44, including whether the Debtors have made **any** efforts to secure a higher and better offer during the critical "go shop" period from July 7 to August 21. The Debtors have refused to provide this discovery while simultaneously seeking discovery that is not relevant to their prosecution of the Motion.

The Debtors' requests are a transparent effort to interfere with the limited time this Court gave Elliott to pursue regulatory support and committed financing for a proposal that is superior to the Berkshire Transaction (the "Creditor Proposal"). Discovery concerning the Creditor Proposal will only become relevant when Elliott finalizes and makes a proposal, and at such time, the Debtors will be able to assess the *bona fides* of the Creditor Proposal. In fact, the Debtors' insistence on such discovery at this time makes clear that the Debtors are far more interested in defeating the Creditor Proposal than taking the "go shop" window seriously and doing what they can to maximize the value of their estates for the benefit of creditors by supporting Elliott's efforts.

To be sure, if Elliott succeeds in putting together a proposal that is superior to the Berkshire Transaction, the Debtors and their advisors will have ample opportunity to review the regulatory

ROPES & GRAY LLP

- 2 -

commitments made and details about financial commitments for the Creditor Proposal. But that review can and should await definitive documentation. Discovery into Elliott's ongoing efforts serves no purposes other than to harass Elliott and potential investors in its consortium and to undermine the potential Creditor Proposal.

Over the last week, the parties have held multiple conferences and resolved many of their discovery disputes, but were unable to resolve the issues described below. In particular, three discovery disputes remain unresolved. With this letter, Elliott seeks:

1. The production of the Debtors' non-privileged communications with Oncor Electric Delivery Company LLC ("Oncor") or Berkshire and each of their respective advisers concerning either the Berkshire Transaction or the Elliott-led Creditor Proposal for the three-week period from July 8 through July 29, 2017;

2. An order that Elliott need not produce confidential settlement communications with the Public Utility Commission of Texas (the "PUCT") or its staff; and

3. Relief from the disclosure of the identities of hundreds of potential investors in the Creditor Proposal.

**I.   The Debtors Should Be Ordered To Produce Non-Privileged Communications with Berkshire and Oncor from July 8, 2017 to July 29, 2017.**

The Debtors should be required to produce all responsive, non-privileged emails between the Debtors and both Berkshire and/or Oncor concerning either the Berkshire Transaction or the Creditor Proposal for the limited three-week period following the signing of the Berkshire Merger Agreement on July 7. The Debtors' Responses and Objections state that they refuse to produce any documents after this date on the grounds of relevance and proportionality. *See* Exhibit A, Debtors' Amended Responses and Objections. The Debtors have further contended that some of these documents may be subject to the common interest privilege. Although they have now agreed to produce Board materials from after July 7, the Debtors have refused to produce *any* email communications.

The Debtors' non-privileged communications with Berkshire or Oncor during the critical "go shop" period after the Berkshire Merger Agreement was signed are plainly relevant. The Debtors have a fiduciary duty to maximize the value of their estates for the benefit of creditors. In recognition of this duty, the Berkshire Merger Agreement expressly permits them to actively solicit higher value alternatives from July 8 to August 21. *See* Berkshire Merger Agreement § 6.2(a) [D.I. 11430-2]. As a result, discovery concerning whether the Debtors and their advisors have, in fact, pursued such alternatives, including the Creditor Proposal, during this time period or have instead treated the "go shop" period as a non-event is relevant to whether Debtors' claim that the Berkshire Transaction is "the highest and most actionable transaction" is accurate. *See* Motion, ¶¶ 43-44.

ROPES & GRAY LLP

- 3 -

Further, the burden of producing these materials is more than reasonable.  Elliott only seeks emails from a three-week period.  Despite repeated requests by Elliott, the Debtors have refused to identify any particular search terms that result in an unduly burdensome number of documents for review.

The Debtors have offered two reasons for their refusal to search for and produce emails from after July 7.  Both are meritless.  First, they contend that an unknown number of these documents are likely subject to a common-interest privilege with either Oncor or Berkshire.  But Elliott does not seek production of privileged communications, and surely many of the communications between the Debtors and either Oncor or Berkshire about a proposed $9 billion transaction concern business matters, not legal advice.  Furthermore, even if the Debtors and Oncor share a unity of interest with respect to many legal matters, the same cannot be said of the Debtors and Berkshire.  Indeed, any claimed unity of interest between the Debtors and Berkshire (if one exists at all, since there is no presently enforceable agreement) cannot shield Elliott's discovery in connection with the Motion.  For example, the Debtors are obliged to act as an honest broker on behalf of the estates, and they have an obligation to encourage higher and better alternative transactions, including the Creditor Proposal.  These efforts should have extended beyond July 7, 2017 and into the Debtors' 45-day "go shop" period.  Thus, any communications with Berkshire regarding the Creditor Proposal or other possible transactions, regardless of date, are highly relevant to this Court's review of the sale process and the Debtors' and Berkshire's "good faith" pursuit of the Berkshire Transaction.

Second, the Debtors have also suggested that Elliot's request for documents after July 7 came at the "eleventh hour."  This is not true.  Elliott's initial document requests sought documents from June 1, 2017 to the present.  *See* Exhibit B, Elliott's Requests, General Instruction R.  And during the parties' negotiations over search terms, Elliott repeatedly struck the Debtors' proposed July 7 end date and replaced it with "[p]resent."  *See* Exhibit C, July 31, 2017 Email from K. Jobson to M. Thompson; Exhibit D, Aug. 1, 2017 Email from M. Thompson to K. Jobson; *see also* Exhibit E, Aug. 2, 2017 Email from K. Jobson to M. Thompson ("While Elliott reserves all rights to request discovery responsive to its document requests, including but not limited to the right to seek discovery following July 7, 2017, we accept the Debtors' search terms . . . .").

The Debtors should accordingly be ordered to produce all non-privileged post-July 7 communications with Berkshire or Oncor concerning the Berkshire Transaction or the Creditor Proposal.

**II.    Elliott's Communications with PUCT are Confidential and Irrelevant.**

Elliott seeks relief from this Court preventing the disclosure of confidential settlement communications between Elliott and the PUCT or its staff that are irrelevant.  The Debtors seek broad disclosure of all documents and communications regarding Elliott's efforts to secure regulatory support from the PUCT, including its direct communications with the PUCT or its staff.

ROPES & GRAY LLP

- 4 -

*See* Exhibit F, Debtors' Amended Requests Nos. 13, 18.  These Requests are a blatant attempt to interfere with and defeat the Creditor Proposal.

The PUCT staff has expressly advised Elliott that any PUCT-related discussions concerning the Creditor Proposal must remain confidential.  *See* Exhibit G, July 17, 2017 Ltr. From B. Lloyd to G. Galardi, at p. 2 ("I will require express written acknowledgement by Elliott and its representatives that any discussions concerning a possible equitization transaction will remain confidential between the parties to those discussions and not be misrepresented to others.").  Given the ongoing settlement discussions and absent any compelling reason to the contrary, Elliott is accordingly obliged to abide by the confidentiality request of a government entity.

Furthermore, the documents sought by the Debtors are irrelevant to the Motion.  The Debtors will no doubt contend that the Creditor Proposal should only be deemed "superior" to the Berkshire Transaction if it has the same regulatory support as Berkshire from the staff of the PUCT and other parties.  But that can be evaluated based on whether or not Elliott finalizes regulatory commitments with the staff of the PUCT and others.  These issues may be assessed once the discussions are concluded with the PUCT staff or Elliott's time to provide its proposal to the Debtors' and this Court has run.  Interim communications with regulatory staff are, by contrast, settlement discussions and of no relevance to the Motion.  Given the PUCT staff's clear position that disclosure of these documents risks compromising the integrity of that ongoing settlement discussions regarding regulatory support, the Debtors' request for these documents should be denied.

### III. The Court Should Confirm that Elliott May Continue to Redact the Names of Potential Investors in the Creditor Proposal.

Finally, Elliott also seeks a protective order preventing the wholesale disclosure of the identities of hundreds of potential financing sources for the Creditor Proposal.  Elliott has informed the Debtors that it intends to redact the identities of *potential* investors from its forthcoming production to ensure confidentiality, just as it did with documents used at the July 26, 2017 scheduling hearing.  Elliott has, however, also told the Debtors that it will identify all *actual* investors in Elliott's proposed consortium of investors once finalized, along with unredacted, signed equity commitment letters for all investors supporting the Creditor Proposal.[1]

The names of all potential third-party investors that may—or may not—participate in Elliott's capital raise are irrelevant to the Motion.  Furthermore, disclosure of this information risks compromising Elliott's ongoing capital raise.  Elliott has confidentiality obligations to its potential

---

[1]   Elliott also offered to move its Rule 30(b)(6) deposition from August 17 to August 19 – two days before the August 21 hearing – so that the Debtors would have an opportunity to examine Elliott regarding all details of the proposed Creditor Plan and with signed, unredacted equity commitment letters in hand.  The Debtors refused, claiming that this would somehow result in unfair "surprise."

ROPES & GRAY LLP

- 5 -

investors pursuant to a series of nondisclosure agreements. Elliott has further made clear to potential investors that it will not disclose their identities unless and until they commit capital.

The Debtors' sole justification for seeking the identities of these 200+ potential investors is a professed need to diligence the "creditworthiness" of Elliott's proposed consortium of investors. But that rationale simply does not apply to all of the *potential* investors that Elliott and its advisor have contacted. Moreover, the Debtors will be able to review the names and equity commitments of all actual investors, once finalized. That opportunity is more than sufficient to accomplish the Debtors' stated objective and does not risk interfering with Elliott's efforts to pull together a higher value alternative transaction for the Debtors' estates.[2] The Debtors' request should be rejected.

\*   \*   \*

Elliott looks forward to discussing these issues further with the Court on Monday, August 7, 2017 at 12:00 p.m.


Respectfully,



/s/ Matthew L. McGinnis
Matthew L. McGinnis

---

[2] Any suggestion that the Protective Order's Highly Confidential designation affords sufficient protection to permit production of this highly sensitive confidential information is without merit. The Protective Order permits disclosure of Highly Confidential documents to a number of persons, including witnesses, experts, deponents, and even outside photocopying services. *See* Protective Order ¶ 13 [D.I. 1833]. Such sweeping disclosure is insufficient to protect the confidentiality concerns at issue here. And though renegotiation of the Protective Order may be a plausible solution in certain circumstances, it is simply not feasible here given the number of parties to this litigation and the imminence of the August 21 hearing. Elliott will not, and should not, be obliged to produce this confidential information for the reasons stated above.