# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

Mark McKane, P.C.
To Call Writer Directly:
(415) 439-1473
mark.mckane@kirkland.com

555 California Street
San Francisco, California 94104

(415) 439-1400

www.kirkland.com

Facsimile:
(415) 439-1500

August 7, 2017

**By eFiling and Hand Delivery**

The Honorable Christopher S. Sontchi
United States Bankruptcy Judge
United States Bankruptcy Court
824 North Market Street, 5th Floor
Wilmington, Delaware 19801

        Re:    *In re Energy Future Holdings, Corp., et. al.* (Case No. 14-10979)

Dear Judge Sontchi:

      I write to address discovery disputes between the Debtors and Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott") in connection with the hearing on the *Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11430] (the "Merger Agreement Motion").

      The Court rejected Elliott's request to set a hearing after the merger approval milestone expired. Now, Elliott's discovery strategy seems designed to upset the schedule and delay the August 21 hearing. Despite obtaining important concessions from the Debtors to help Elliott stick to that schedule, Elliott's "rolling" production to date is a useless mass of publicly disseminated news updates—in short, Elliott has not yet begun meaningful production of substantive documents. Further, Elliott refuses to produce documents regarding its efforts, if any, to clear regulatory scrutiny, an issue central to Debtors' decision-making and the Court's consideration of Elliott's as-yet undisclosed alternative deal. Nor will Elliott produce the identity of its claimed financing sources, rejecting even Debtors' compromise offer that Elliott produce equity commitment letters within 24 hours of execution. And, after negotiating a schedule and document search terms, it is now demanding an absurdly and unjustifiably expanded production from the Debtors.

      For the reasons set forth below, Elliott's positions should be rejected on the merits, but also to prevent discovery games from upending the Court's order setting an August 21 hearing date.

\*      \*      \*

Beijing   Chicago   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   Shanghai   Washington, D.C.

RLF1 17941367v.1

**KIRKLAND & ELLIS LLP**

The Honorable Christopher S. Sontchi
August 7, 2017
Page 2

### A. Elliott Should Not Be Permitted to Jeopardize the Merger Agreement Discovery Schedule.

Since the Court's scheduling ruling on July 26, the Debtors and Elliott engaged in extensive negotiations to streamline discovery proceedings for the Merger Agreement hearing. The result was a comprehensive schedule that organizes the three weeks before the August 21, 2017 hearing, as reflected in the calendar attached as **Exhibit A**. While the schedule allows for robust discovery, it is demanding, with little room for delay or gamesmanship.

To ensure that the August 21 milestone would not be inappropriately jeopardized by lagging discovery efforts, the Debtors engaged with Elliott on all of the minutia of discovery, including the exchange of proposed search terms, meet and confer efforts, responses and objection to the merger agreement discovery requests, rolling document production deadlines, merger agreement objection and reply deadlines, pre-hearing evidentiary exchanges, and a carefully planned deposition schedule for 10 witnesses over six days. To ensure the schedule worked, the Debtors made a number of concessions, including providing Elliott additional time to serve responses and objections, an additional week to complete their document productions, additional time for Elliott's forthcoming Objection to the Merger Agreement Motion, and agreeing to a deposition schedule in which the Elliott and Moelis depositions take place after the Debtors' and BHE's witnesses (on the day of and the day after the Debtors' own reply deadline). The Debtors have been more than accommodating.

The Debtors also engaged in good-faith to resolve discovery disputes without the need for Court intervention. Despite these efforts, the Debtors and Elliott are unable to resolve three issues that could threaten the current schedule. ***First***, Elliott is preventing the Debtors from obtaining crucial discovery related to Elliott's efforts to obtain regulatory support under the auspices of vague, unwritten confidentiality "obligations." ***Second***, Elliott is depriving the Debtors of any meaningful opportunity to assess Elliott's financing efforts by delaying the production of equity commitment letters and improperly redacting the identity of potential bidders and/or financing sources. ***Third***, Elliott's conduct during discovery and unreasonable attempts to expand the scope of discovery for the Debtors threatens to jeopardize the agreed-to schedule and should not be permitted.

### B. Elliott's Initial Document Production Exemplifies Its Gamesmanship and Dilatory Conduct.

Elliott's document production efforts to date undermine the integrity of the discovery process. In the scheduling negotiations, Elliott sought a rolling production of documents allegedly to avoid any last-minute dump of documents before depositions. In the agreed-to

**KIRKLAND & ELLIS LLP**

The Honorable Christopher S. Sontchi
August 7, 2017
Page 3

schedule, Elliott was required to make a rolling production of 25-50% of their responsive documents on Friday, August 4, 2017.[1]  There is no colorable argument that Elliott made a good faith effort to comply with that obligation.

Of the 1,287 documents in Elliott's initial production, at least 1,123, or roughly 87%, are news alerts, mostly from Factiva and Bloomberg.  A list reflecting the domains for those emails is attached as **Exhibit B**.  The dearth of substance is underscored by the fact that the 1,287 documents total just 3,349 pages.  In contrast, the Debtors' production contains 3,146 documents totaling 38,674 pages.  By making an initial production comprised almost entirely of news alert fluff, Elliott tried to create a superficial impression that it met its initial discovery obligations.  Instead, the "junk mail dump" is a fairly obvious attempt to jam the Debtors with substantive documents before the depositions of Elliott's own witnesses.  This morning, Elliott agreed to make a supplemental production tomorrow—only after the Debtors stated their intention to seek a Court order on this issue.

> **C.     The Debtors Require the Court's Guidance to Ensure that Discovery Disputes Do Not Derail the Merger Agreement Hearing.**

The Debtors spent considerable time and effort over the last week, including multiple telephonic meet and confers and numerous email exchanges, attempting to resolve all disputes. While the parties made some progress, they were unable to resolve three issues outlined below.

> 1.     Documents and Communications Regarding Elliott's Efforts to Obtain PUCT Support Are Key to Evaluating Whether Elliott Has a Viable Proposal.

The importance of regulatory support weighs heavily on these cases and Elliott's progress (or lack thereof) with the PUCT staff and interveners is unquestionably a core issue for the Merger Agreement hearing.  BHE made substantial efforts to obtain strong indications of support from PUCT staff and interveners, and this support was an important consideration in the Boards' decisions to pursue the BHE transaction.

In contrast, Elliott seeks to propose an alternative transaction but refuses to produce documents related to Elliott's own efforts to obtain regulatory support from the PUCT staff or interveners, citing an unwritten "confidentiality obligation to the PUCT and the PUCT Staff." *See* **Exhibit C**, Elliott's Responses and Objections to Requests for Production Nos. 13 and 18. During an August 4, 2017 meet and confer, counsel for Elliott represented that the "obligation" stems from the confidential nature of their discussions with the PUCT and the letter from PUCT

---

[1]  In contrast, the Debtors made their initial production on Wednesday, August 2, 2017 and a final production on Friday, August 4, in accordance with the agreed-upon schedule.

## KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
August 7, 2017
Page 4

Director Brian Lloyd to Mr. Galardi, dated July 17, 2017.  *See* **Exhibit D**, Letter from Brian H. Lloyd to Gregg Galardi (July 17, 2017).  Neither is a meritorious reason to withhold such critical discovery.

  First, confidential settlement communications are discoverable.  Federal Rule of Evidence 408 is an evidentiary rule regarding the *admissibility* of certain settlement discussions to prove the value of claims; but it does not bar the *discoverability* of interactions with regulators or other parties to regulatory proceedings.[2]  Second, the Lloyd letter does not require that Elliott withhold documents in this context.  The PUCT Director requested that conversations remain confidential in order to prevent Elliott from *making more misstatements* about its interactions with the PUCT, not to side-step its discovery obligations in the bankruptcy court.[3]

  To the extent Elliott is concerned about the confidentiality of its efforts, the "Highly Confidential" designation in this Court's Protective Order are sufficient, as they have been throughout these cases.[4]  The Order applies to all documents exchanged in discovery and is specifically designed to protect sensitive information of this kind.  Given the importance and relevance of these documents, the existence of this Court's multi-tiered Protective Order, and the absence of any written confidentiality agreement with the PUCT staff or interveners, the Court should compel the production of documents and communications responsive to Requests Nos. 13 and 18.

---

[2] *See Sippel Dev. Co. v. W. Sur. Co.*, No. CIVA 05-46, 2007 WL 1115207, at *2 (W.D. Pa. Apr. 13, 2007) ("Federal Rule of Evidence 408 does not create a discovery privilege but, rather, addresses whether evidence relating to settlement discussions is admissible at trial."); *see also Tribune Co. v. Purcigliotti*, No. 93 CIV.7222, 1996 WL 337277, at *1 (S.D.N.Y. June 19, 1996) ("Rule 408 neither governs nor precludes the discovery of settlement-related materials . . . . [T]he mere fact that the settling parties agreed to maintain the confidentiality of their agreement cannot serve to shield it from discovery.").

[3] **Ex. D.**, Letter from Brian Lloyd to Gregg Galardi, dated July 17, 2017, at 2 ("In light of the misstatements in your July 11 letter . . . I will require express written acknowledgement by Elliott and its representatives that any discussions concerning a possible equitization transaction will remain confidential between the parties to those discussions and not be misrepresented to others.").

[4] *Stipulated Confidentiality Agreement and Protective Order* [D.I. 1833], August 13, 2014 at ¶ 8 (generally prohibiting materials designated as "Highly Confidential" from being shared with clients or principals, with limited exceptions inapplicable here).

# KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
August 7, 2017
Page 5

      2.      The Court Should Compel Timely Production of Unredacted Equity Commitment Letters and Direct Elliott Not to Redact the Names of Potential Bidders and/or Financing Sources.

To respond to an argument that Elliott proposes an otherwise higher and better transaction, the Debtors are entitled to discovery concerning Elliott's efforts to obtain financing, including a meaningful opportunity to evaluate any proposed financing. The fact that Elliott's efforts to obtain committed financing are happening in real time does not diminish or alter Elliott's discovery obligations but rather underscores the importance of Elliott's ongoing obligation to timely supplement its productions. Despite the undeniable importance of this financing discovery, Elliott has (1) refused to commit to a rolling production of any equity commitment letters within 24 hours of receipt; and (2) indicated that it will redact the identity of any potential bidder and/or financing source who have not yet executed an equity commitment letter despite having no basis to do so.

Instead of producing unredacted equity commitment letters within 24 hours of execution, Elliot proposed further delaying the Elliott and Moelis depositions and offered to produce any equity commitment letters in advance. Specifically, after previously agreeing to a Rule 30(b)(6) deposition on Thursday, August 17, Elliott suggested Saturday, August 19 for its deposition—just two days before the August 21 hearing. Elliott's proposal is untenable. The Debtors cannot allow Elliott to wait until the last minute to produce highly relevant documents or to delay Elliott's deposition until the Saturday before a Monday hearing. The Debtors should receive this discovery in a timely fashion, and requiring Elliott to produce its unredacted equity commitment letters on a rolling basis, within 24 hours of receipt is reasonable under the circumstances. Elliott's insistence on redacting the names of potential bidders and/or financing sources that have not yet executed an equity commitment letter is equally meritless, and again ignores the provisions of this Court's Protective Order, and the Highly Confidential designation specifically designed to protect sensitive information of this nature.

      3.      The Scope of the Debtors' Searches is Appropriately Broad Prior to July 7, 2017, and Appropriately More Limited After July 7, 2017.

Elliott's challenge to the Debtors' document production should be denied. The Debtors intentionally proposed broad search parameters designed to capture potentially relevant communication since the signing of the Elliott NDA on May 17, 2017 until the execution of the BHE merger agreement on July 7, 2017. In fact, the Debtors searched 13 custodians from EFH and Kirkland & Ellis for ***all*** communications with any potentially relevant party: BHE and its advisors, Elliott and its advisors, Oncor and its advisors, and several third-parties who also executed NDAs. See **Exhibit E**, Debtors' Final Search Parameters. The Debtors also agreed to several additional searches proposed by Elliott for additional, targeted issues. *Id*. In short, the Debtors' searches for the key time period of May 17 to July 7 are broad and appropriately robust.

## KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
August 7, 2017
Page 6

For the post-July 7 time period—after the execution of the BHE merger agreement—the Debtors appropriately tailored the scope of the searches, replacing the "all communications" searches with a targeted collection of documents reflecting the Debtors' ongoing analysis and evaluation of the restructuring efforts, and specifically, the consideration of any alternative proposals. The Debtors also agreed to supplement the targeted collection and production efforts as necessary, to the extent that the Debtors consider any alternative proposals between now and the August 21 hearing.[5]

Nonetheless, Elliott is pursuing additional searches for documents after July 7, 2017. Indeed, Elliott intends to ask the Court to require the Debtors to expand the date range from July 7, 2017 to "present" for *all* the Debtors' searches in connection with *all requests* for production. In light of all of the Debtors' document production efforts to date—and the limited relevance of the Debtors' other restructuring efforts after entry into the BHE Merger Agreement—Elliott's additional demands are unreasonable, overly burdensome, and should be denied for at least three reasons.

*First*, Elliott *agreed* to the Debtors' proposed search parameters, including a May 17-July 7 date range for the Debtors' broad email searches. *See* **Exhibit F**, K. Jobson E-Mail (Aug. 2, 2017). Elliott then waited two days—on the eve of the Debtors' document production deadline—to demand that the Debtors expand the date range for *all* searches. Elliott's attempted eleventh-hour retrade is a transparent bid to delay the merger agreement hearing.

*Second*, the Debtors have *already* produced responsive documents after July 7 from a targeted collection of Board materials, including responsive, non-privileged communications with the Boards, presentations or other materials provided to the Boards, assessments prepared for the board, and minutes of Board meetings. In addition to what has already been produced, the Debtors have *already agreed* to supplement the targeted collection and production efforts as appropriate, and produce the same categories of Board materials mentioned above for any future analysis or consideration of alternative proposals between now and the August 21 hearing.

*Third*, beyond the post-July 7 materials that the Debtors have already produced or agreed to produce, the burden of additional, broad based email searches post-July 7 significantly outweighs any probative value of the potentially responsive material because all or nearly all will be privileged. The burden of reviewing such materials is simply not justifiable in the circumstances. For example, to the extent the Debtors are communicating with BHE or its advisors, the Debtors' work product and attorney-client communications are subject to the

---

[5] To avoid burdening the Court, the Debtors also offered to consider targeted email searches after July 7, but Elliott refused to provide a search proposal, instead demanding global expansion of the date range for all searches.

# KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
August 7, 2017
Page 7

common interest privilege. Specifically, approval of the merger agreement with BHE is a common, legal interest between the Debtors, BHE, and Oncor, as is securing the regulatory approvals necessary for the Debtors to emerge from chapter 11.[6] Consistent with well-established precedent, the burden and cost for the Debtors' advisors to collect and review—and then log and withhold on privilege grounds—communications with BHE and Oncor regarding approval of the merger agreement and/or efforts to obtain regulatory support for the PUCT approval process far outweighs any probative value from such communications.

\* \* \*

For the reasons set forth above, the Debtors seek an order compelling Elliott to produce: (1) documents regarding Elliott's efforts to secure regulatory support from the PUCT staff and interveners (Debtors' Requests for Production Nos. 13 and 18), (2) unredacted documents reflecting the identity of potential bidders and/or financing sources, and (3) unredacted equity commitment letters on a rolling basis, within 24 hours of execution. Additionally, the Debtors respectfully request that the Court hold Elliott to its prior agreement and deny Elliott's untimely request to universally expand the date range of the Debtors searches beyond July 7, 2017.

Sincerely,

*/s/ Mark McKane, P.C.*

Mark McKane, P.C.

---

[6] *See In re Teleglobe Comm. Corp.*, 493 F.3d 345, 364, 365-66 (3d Cir. 2007) (holding common interest privilege exists when parties have "substantially similar legal interest"); *In re Leslie Controls, Inc.*, 437 B.R. 493, 497 (Bankr. D. Del. 2010) (stating that common interest privilege does not require the parties' interests be identical, and may even apply where the parties' interests are adverse in certain respects); *In re Tribune Co.*, 2011 WL 386827, at \*4-5 (Bankr. D. Del. 2011) (same).