Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4   In re:                          :

5                                   :   Chapter 11

6   ENERGY FUTURE HOLDINGS CORP., :   Case No. 14-10979 (CSS)

7   et al.,                         :

8          Debtors.                 :   (Jointly Administered)

9   _____:

10

11                              United States Bankruptcy Court

12                              824 North Market Street

13                              Wilmington, Delaware

14                              August 7, 2017

15                              12:04 p.m. - 12:37 p.m.

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:   LESLIE MURIN

1   HEARING re Motion of the EFH/EFIH Debtors for Order

2   Authorizing Entry into Merger Agreement and Approving

3   Termination Fee.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   KIRKLAND & ELLIS LLP

4        Attorneys for the Debtors

5        601 Lexington Avenue

6        New York, NY 10022

7

8   BY:  MARK MCKANE (TELEPHONICALLY)

9

10   ROPES & GRAY LLP

11        Attorneys for the Plaintiffs, Elliott Funds L.P., et al

12        1211 Avenue of the Americas

13        New York, NY 10036

14

15   BY:  MATTHEW L. MCGINNIS (TELEPHONICALLY)

16

17   ALSO PRESENT TELEPHONICALLY:

18

19   ARLENE R. ALVES

20   SAM N. ASHURAEY

21   ROBING D. BALL

22   NEGISA BALLUKU

23   JOSHUA BRODY

24   MATTHEW C. BROWN

25   CHRISTOPHER L. CARTER

1    ALLISTER CHAN

2    WILLIAM E. CHIPMAN

3    MARIA CHUTCHIAN

4    MARK A. CODY

5    ERIC C. DAUCHER

6    DANIEL DEFRACESCHI

7    JAMIE EDMONSON

8    MARK A. FINK

9    JOSEPH A. FLORCZAK

10   DAVID M. FOURNIER

11   JULIA FROST0DAVIS

12   BRIAN GLUCKSTEIN

13   DANIEL K. HOGAN

14   CHAD J. HUSNICK

15   LAURA D. JONES

16   EMILY L. KATZ

17   MARC KISELSTEIN

18   VINCENT LAZAR

19   RAYMOND LEMISCH

20   JASON M. MADRON

21   MATTHEW B. MCGUIRE

22   R. STEPHEN MCNEILL

23   HAL F. MORRIS

24   RICHARD PEDONE

25   NATALIE D. RAMSEY

1   MATTHEW M. ROOSE

2   JEFFREY S. SABIN

3   RICHARD SCHEPACARTER

4   NED S. SCHODEK

5   HOWARD SEIFE

6   CHARLES E. SIEVING

7   BRYAN STEPHANY

8   SCOTT TALMADGE

9   FOTEINI TELONI

10   ANGELO THALASSINOS

11   AMER TIWANA

12   CARL TULSON

13   ABBEY WALSH

14   MEGAN WASSON

15   BRADY C. WILLIAMSON

16   ANDY WRIGHT

17   JOSEPH WRIGHT

18   APAMA YENAMANDRA

19   SCOTT D. COUSINS

20   ERIN FAY

21   GREGG M. GALARDI

22   KRISTY JABSON

23

24

25

1                 P R O C E E D I N G S

2          THE COURT:  Good afternoon, everyone.  Good early

3    afternoon, everyone.  This is Judge Sontchi.  We're here in

4    the Energy Future Holdings Case 14-10979 on dueling

5    discovery requests-slash-dispute between the Debtors and

6    Elliott.

7          I was out of the office when a lot of this action

8    happened last week so I'm not sure who initiated the

9    requests -- the sort of cross requests for relief among the

10   parties.  So, I don't know who to turn to -- turn to first,

11   excuse me, but I guess as always we'll defer to the Debtor

12   to decide whether they'd like to go first or not since

13   that's the privilege of being a debtor.

14          I did receive, literally minutes ago, a copy of a

15   correspondence from Hal Morris in the Attorney General's

16   Office of Texas.  So I do have that and have reviewed that.

17   So I guess it'll be Mr. McKane.  I'll turn it over to the

18   Debtors.

19          MR. MCKANE:  Thank you, Your Honor.  And for the

20   record, it's Mark McKane of Kirkland & Ellis.  The context

21   in which this came up was really a coordinated effort and so

22   we appreciate the opportunity to go first.  We also very

23   much appreciate your willingness to hear us on an expedited

24   basis to address these discovery disputes as we proceed

25   forward in our efforts to prepare for the merger agreement

1    hearing on August 21st.

2           Your Honor, I would like to start by emphasizing

3    how hard the Debtors have worked to avoid these disputes and

4    to narrow the issues before the Court today -- literally,

5    hours and hours of effort meeting and conferring with

6    Elliott moving back and forth, we do believe we've narrowed

7    the issues and crystallized and that's why vis-à-vis I think

8    there's a general consensus as to what is appropriate to be

9    raising before you today.  But we want you to know that we

10   appreciate making yourself available to us and we don't take

11   it lightly.

12          Your Honor, the issues of the day really kind of

13   start with everything we've been doing to move forward, be

14   in preparation for the merger agreement hearing.  And if

15   there's anything that's kind of indicative of some of the

16   concerns we're having it was Elliott's existing document

17   production.  So parties had document productions obligations

18   last week, the Elliott didn't issue production because we

19   gave them more time; it was due Friday night.  And when we

20   received what we received, which was, in all candor, the

21   fluff of public news reports amounting to 97 percent of

22   their production, we had issues.

23          Now, we took those issues to Elliott and this

24   morning they agreed to commit and committed to a

25   supplemental production after we called out the lack of

1   (indiscernible) of those reports and threatened to raise it

2   with Your Honor.  But it shouldn't have to be that way.

3   That's not how we think civil discovery should proceed.

4           Now, we don't know exactly what the parameters of

5   their supplemental production will be on Tuesday or whether

6   it'll be more than what we thought we should've been

7   receiving, which is 25-50 percent of their productions back

8   on Friday night.  But we'll evaluate what we receive and

9   we'll take whatever additional steps we believe are

10  necessary, again, attempting to resolve issues with Elliott

11  first.

12          But we call it to Your Honor's attention simply

13  because of how fast we're moving and there is a possibility

14  that we may need to raise these type of issues in front of

15  you again.  But we'll try to avoid it.

16          I'm turning to the other three issues that I still

17  think are ripe and crystallized for today.  The first is

18  really the ability of Elliott to shield discovery into any

19  regulatory efforts they have, either meeting with the PCUT

20  staff or intervenors to gain some regulatory support for any

21  proposal they put forward.

22          Your Honor, I'll give you the direct quote from

23  the Elliott letter when they suggested our discovery efforts

24  are, "a transparent effort to interfere with the limited

25  time the Court gave Elliott to pursue regulatory support."

1    That is absolutely not true and that is not our intention.

2              Your Honor, if the Debtors have learned anything

3    through the course of these proceedings over three years,

4    after two failed regulatory efforts, it's that regulatory

5    support will be an important factor as the Court evaluates

6    whether to approve the merger agreement that we're going to

7    put forward on the 21st.  We have to be able to do it.  The

8    Debtors need to evaluate where the parties' perspective --

9    where Berkshire is, versus where Elliott is with regards to

10   having some type of regulatory support by the staff or the

11   intervenors, and the Court needs that information as well.

12   In fact, it's the Court that is more important than the

13   Debtors.

14             It cannot be that their efforts to interact with

15   the staff or intervenors are irrelevant, or that somehow we

16   should wait to, "when they're concluded" to be able to

17   evaluate it.

18             Your Honor, the Elliott argument on that front

19   that we should be waiting until their arguments are

20   concluded, really ignored their own argument and position to

21   date.  To date they've been in front of Your Honor,

22   including back on July 26th and said, look at how much

23   progress we're making; look at how far we're going.  You

24   need to enable us to move forward so that you can evaluate

25   where we are and where we may be on August 21st and to say

1    whether it's (indiscernible).

2          Your Honor, the Debtors can't be forced to sit

3    back and wait until the 11th hour for a potential

4    alternative transaction to be placed before it and the Court

5    on the eve of the merger agreement hearing and that's why we

6    seek the discovery that we seek.  And, Your Honor, we do

7    believe that it is important to take notice of the letters

8    sent by Hal Morris, who's one of the assistant attorney

9    generals in Texas, that's Docket Number 11-686, because Mr.

10   Morris specifically addresses Elliott Gardner.  And in their

11   letter, Elliott says that any PVG related discussions must

12   remain confidential.

13         But Assistant Attorney General Morris rejects that

14   notion, saying there is no shield that should protect those

15   discussions form discovery.  She doesn't recognize it as a

16   shield, there is no shield under Federal Rule of Evidence

17   403.  That is an evidentiary rule; that's not a discovery

18   rule.

19         And, Your Honor, the parties have a well-

20   established protective order with attorneys' eyes only law

21   of protection to address confidentiality concerns.  That

22   protective order has served us well throughout a variety of

23   disputes over the last three years, and we have a hard time

24   seeing why it's deficient now.  And for all those reasons,

25   Your Honor, we believe we should have access and discovery

1    into the status of Elliott's efforts with the PUSG staff or

2    intervenors up through the date of the hearing.

3            Now, the second issue, Your Honor, again, is a

4    confidentiality issue, and it relates to Elliott's efforts

5    to raise financing.  And here again, Your Honor, Elliott

6    contends that our discovery interference -- efforts, excuse

7    me, are interfering with Elliott's overall financing

8    efforts.  But, Your Honor, we have to proceed forward, just

9    as we always have done in these cases, with a restructuring

10   process, or the M&A process, and the litigation process.

11   They have to go down parallel paths at the same time.

12           And, again, the Court should have the ability to

13   assess where Elliott is with its financing in advance of the

14   litigation.  That's why we keep asking for it to be on a

15   rolling basis.

16           Aanother aspect of their discovery, Elliott says,

17   yeah, we believe in a rolling basis.  But here what they

18   want to do is not provide any information as it relates to

19   the status of their financing efforts until they have what

20   they view as a complete and total package, and then they'll

21   provide it to the Court and to the Debtors.

22           Your Honor, that is absolutely not how the

23   discovery process should work in a case like this.  All

24   Elliott and (indiscernible) need to do is to hit forward on

25   an equity commitment letter that they receive.  All we're

1    asking for is to get information in real time so we can

2    evaluate it.  And it's not as black and white as Elliott

3    wants us to believe -- that they're either going to have a

4    transaction or they're not.

5           We fully expect that there may be a scenario on

6    August 21 where Elliott comes forward and says, "Your Honor,

7    if I had until the middle of September I might be able to

8    have everything." But here's where we are.  We've got our

9    debt financing, we've got most of our equity financing,

10   we're still working on some regulatory issues because

11   members of the PCUT staff believe that should lag or follow

12   after we get a committed deal.  But we believe we're higher

13   and better.

14          How could the Debtors and the Court be in a

15   situation where we evaluate that type of scenario when it's

16   all being dumped -- we're not receiving anything until

17   either the 18th or the 19th, days before the hearing begins?

18   That is not how this discovery process should proceed.

19          And, again, as it relates to the confidentiality

20   issue, the core concern that Elliott has, we have the

21   attorneys' eyes only level of protection to -- excuse me --

22   attorneys' eyes only level provision to the protective

23   order.  They have the ability to protect that if there is

24   concern and all the parties that have signed on to the

25   protective order have an obligation to honor it.

1          So it's for those reasons that we are raising our

2     concerns and seeking an affirmative order moving forward on

3     those aspects of the discovery.

4          As it relates to the issue that's been raised by

5     Elliott vis-à-vis the Debtors that specifically ties into

6     the Debtors' post July 7th document production effort.  And,

7     Your Honor, in response there, we believe Elliott, frankly,

8     in their letter mischaracterizes our efforts after July 7th.

9     We're not trying -- we're not drawing some hard line in the

10    sand where we say no documents in discovery.

11         We think it's important for the Court to evaluate

12    why the discovery is needed and what it's for, and to the

13    extent that Elliott is assessing the Debtor's exercise of

14    their business judgment, but both of that discovery and the

15    bulk of those materials are before July 7th, because that's

16    the period of time in which the Debtors evaluated the

17    Berkshire proposal, the Berkshire agreement and the Elliott

18    proposal.

19         Now, we are continuing to honor our fiduciary

20    obligations, as you would expect us to, and Elliott is

21    perfectly entitled to challenge the Debtors' exercise of

22    their fiduciary duty.  They've gone so far as to suggest

23    we're more interested in winning the litigation than

24    maximizing value, and that's demonstrably not true.

25         But our discovery efforts have shown that we are

1    moving forward with providing materials that will enable

2    Elliott to have the Debtors exercise their fiduciary duty

3    after July 7th.  Specifically, the Debtors have already

4    produced additional board materials regarding the Berkshire

5    merger agreement and Elliott's efforts since July 7th.

6            In the production that we made on Friday, there

7    are board materials and minutes from July 14th, July 20th,

8    July 28th.  And the Debtors will continue to supplement

9    those efforts in real time as the board receives updates as

10   to where Elliott is with their efforts.

11           Your Honor, there's a material disconnect between

12   the Elliott allegations of what they're trying to evaluate

13   and the additional discoveries that they seek.  What they

14   stated they're seeking in their letters are communications

15   between the Debtors and Berkshire.  Your Honor, we're not

16   discussing an Elliott proposal with Berkshire in terms of

17   evaluating whether it's a higher or better proposal.  That

18   makes no sense.

19           What we discuss with Berkshire these days is

20   moving forward with the motion, and moving forward with the

21   hearing preparation, and moving forward with potential

22   implementation of the Berkshire transaction.  And, Your

23   Honor, the reason why we believe there's a significant

24   burden for searching and reviewing these materials isn't

25   because it's going to generate some wealth of responsive

1   (indiscernible) materials; it's the exact opposite.  It's

2   that we're going to be going through a burdensome effort as

3   we're on an expedited time table to produce what we believe

4   is almost certainly going to be a null set.  And that's the

5   concern we have of the undue burden associated with

6   additional email searches post July 7th.  It's not because

7   of the volume; it's because the overwhelming set of

8   materials will be privileged -- either attorney-client

9   communications between EFH and its advisors, or materials

10  that are covered under the common interest doctrine's

11  extension of the attorney work product and attorney-client

12  privilege between either Berkshire and/or Encore.  That's

13  what these materials cover.

14          Essentially, to use a phrase our construction team

15  likes to use, the juice isn't worth the squeeze.  We're

16  going to be doing a lot of work to produce very little.

17  And, Your Honor, if this argument sounds familiar, it's

18  because we almost had the exact same argument with Elliott

19  on May 6th -- excuse me, May 26th in response to Elliott's

20  discovery for its preliminary injunction motion.

21          In that argument, like it does here, Elliott

22  sought discovery of the Debtor's communications with its

23  proposed buyer after the merger agreement was entered into.

24  In that case, it was NextEra.  And what Elliott wanted to

25  prove was essentially that the deal was dead and they wanted

1    our communications with Elliott in that time period.

2           Here, they want our communications with Berkshire

3    after we've entered into a meeting of the minds of a merger

4    agreement going forward regarding what we believe an

5    implementation of that agreement and work product in

6    preparation for a hearing.  It's the exact same issue.  And

7    in that case, Your Honor, you denied the discovery

8    recognizing that the common interest privilege was formed

9    and extended, and that it was hard to see how the search of

10   these materials would lead to non-privileged responsive

11   materials.

12          And, Your Honor, there really is no material

13   difference in the argument from May 26th and now.  It

14   doesn't matter that the Court has not already approved the

15   merger agreement for the issue of whether there is a common

16   interest.  A common interest is formed when there is a

17   meeting of the minds between the buyers and the debtor.

18   That is essentially your holding in Leslie Controls.  It's

19   do you have a meeting of the minds that you're moving

20   forward with the advancement of that agreement?  And that is

21   exactly what we're doing here.

22          A common interest was formed between the Debtors

23   and Berkshire, you know, as of June 7th, and the Debtors

24   have had a common interest with Encore regarding a deal for

25   far before that time.  Therefore, the material that they're

Page 17

1    going to be seeking does not ever get to the point where

2    it's going to be responsive non-privileged materials.  What

3    we've already agreed to provide, which is the evaluation by

4    the Debtors of their boards of directors as to whether there

5    remains a higher and better offer to the Berkshire deal,

6    that is what we've agreed to produce, that is what we have

7    produced, and that is what's responsive to the issue that

8    Elliott is investigating.

9            And for all those reasons, Your Honor, we ask that

10   you deny their additional discovery demand beyond July 7th.

11   We will continue to supplement, and that you order us to

12   provide any materials they have regarding their interactions

13   with the PCUT staff and/or intervenors, and to provide their

14   financing sources without redaction.  Thank you, Your Honor.

15           THE COURT:  Thank you, Mr. McKane.  Mr. McGinnis.

16           MR. MCGINNIS:  Good afternoon, Your Honor.  Matt

17   McGinnis of Ropes & Gray on behalf of Elliott.  Thank you

18   again for your time today, Your Honor.

19           Let me just start briefly by touching on the

20   subject of PUCT Communications, which Mr. McKane also

21   touched on.  You know, as outlined in our letter from this

22   morning, Elliott's position -- and explain that we

23   understood these to be in the nature of two things: One,

24   both confidential communications with PUCT, and, two,

25   settlement communications with PUCT under 408.

1           We have also reviewed the letter that the Texas

2   Attorney General's Office provided this morning.  We

3   understand that they do not agree with our position with

4   respect to whether these are settlement communications or

5   not -- in part, because as we understand it, that could

6   imply for purposes of the Texas Regulatory procedure that

7   there is conversation with PUCT staff where some level of

8   influence might be undertaken.

9           We understand their position and we accept it,

10  given this, although we continue to believe that these are

11  confidential and we believe that PUCT has directed us to

12  keep these confidential communications confidential -- we

13  are prepared to produce them if the Court so orders and

14  believes them to be relevant.  And we will designate them as

15  Highly Confidential if that's the case.

16          I'm not sure if they are relevant or responsive at

17  this point, but we are aware of the Texas communication and

18  don't want to burden the Court unnecessarily with this

19  issue.

20          Let me now turn to the other issues that Mr.

21  McKane addressed, and I think there are essentially two

22  issues here:  One is the scope of Debtor's production of

23  documents after the July 7th merger agreement with Berkshire

24  was entered into; and then the scope of Elliott's production

25  after that same time period.

1          And I think it's important to keep in mind, Your

2   Honor, that the discovery that we are discussing today

3   concerns the Debtor's motion to approve the Berkshire merger

4   agreement.  Now, this is not a motion to approve any

5   proposed Elliott equitization plan but really to approve the

6   Debtor -- excuse me, the Berkshire merger agreement.

7          And in connection with that I think there's a few

8   questions.  There's a 25-day go-shop period specified in the

9   agreement.  Because of that and because of Debtor's

10   representation that the Berkshire merger agreement is the

11   highest and most actionable proposal on the table, we

12   believe it is appropriate to test that proposition.  What,

13   if anything, have Debtors done since July 7th to actively

14   solicit better and higher alternatives for their estates?

15          Did Debtor take any steps to solicit higher value

16   transactions?  Did they ever seek to extend the go-shop

17   window in connection with Berkshire?  And these are

18   subjects, Your Honor, that I think go directly to the

19   questions that Your Honor will be asked to decide on August

20   21st.

21          Now, as I understand it, I think that there are a

22   couple of things that Mr. McKane is saying as to why the

23   communications should not be produced.  First, he says -- or

24   the Debtors say that they have to do some of them.  That is

25   true.  They have produced board materials after July 7th.

1    They have not, so far as I understand, agreed to produce nor

2    have they produced all responsive emails after July 7th.

3    And they have not explained why doing so would be voluminous

4    or unduly burdensome.

5              In fact, I understand from Debtor's counsel that

6    perhaps they are not voluminous.  Instead, their argument

7    seems to be that these communications with Berkshire or with

8    Encore are in the nature of -- they're either privileged or

9    common interest privileged.

10             Well, to be clear, we have no interest in the

11   production of common interest privileged documents to the

12   extent those exist.  But it simply cannot be that every

13   communication between the Debtors and Berkshire or between

14   Debtors and Encore are privileged.  And yet that is the

15   basis that they are offering for refusing to review and

16   produce documents from a subset that they acknowledge is

17   not, in fact, voluminous to begin with.

18             And, Your Honor, Debtors have acknowledged that

19   they are willing to produce some materials after July 7th

20   but it goes without saying that you can't simply pick and

21   choose the discovery that you provide.  Elliott is entitled

22   to the emails from after July 7th for a limited three-week

23   period to understand what, if any, steps Debtors have taken

24   to actually conform with their fiduciary duties and their

25   go-shop window that's actually specified in the merger

1    agreement.

2            Now, let me turn to the additional post-July 7th

3    discovery that they are seeking from Elliott.  Your Honor,

4    as you're familiar from the July 26th hearing, Elliott has

5    to date redacted the identities of potential investors in

6    the proposed equitization plan on the grounds that this is

7    highly sensitive information and that these are simply

8    potential investors, not actual committed investors, who are

9    in the middle of communications regarding an ongoing capital

10   raise and an effort to actually put together a higher value

11   transaction for the estates.

12           Now, we have told Debtors, and I believe they

13   understand this, that we will provide signed effective

14   equity commitment letters once those are active and

15   finalized.  Those will be un-redacted, they will be free to

16   see the names of all actual investors included in the

17   proposed consortium for the equitization plan.  I don't have

18   those today.  Those are not signed yet today.  But when

19   those are signed and when those are effective, we will

20   produce them.

21           But what Debtors are asking for here, Your Honor,

22   is for us to actually produce to them and disclose to them

23   more than 200 names of potential investors.  Candidly, Your

24   Honor, I have difficulty understanding any plausible reason

25   why they need that information in connection with the motion

1    to approve the Berkshire merger agreement.

2            The only reason that they've offered today is to

3    diligent the creditworthiness of the investors included in

4    the proposed equitization plan.  They will have ample

5    opportunity to do that if and when the equity commitment

6    letters are signed and produced, and I cannot see any reason

7    why they need the names of potential investors -- especially

8    given that doing so risks compromising the ongoing capital

9    raise and actually undermining the ability of Elliott to put

10   together an equitization plan that could deliver higher

11   value to the estate.

12           So, for these reasons, Your Honor, we would ask

13   you to confirm that Elliott may continue to redact the names

14   of potential investors on the understanding that we'll

15   provide the names of actual investors once the equity

16   commitment letters are signed; and then also order the

17   Debtors to produce all responsive email communications from

18   July 7th to July 29th with Berkshire or Encore that are not

19   privileged and that concern the Elliott or the Berkshire

20   transactions.

21           THE COURT:  Thank you, Mr. McGinnis.  Mr. McKane,

22   response?

23           MR. MCKANE:  Yes, Your Honor, thank you.  And I

24   will be brief.

25           Your Honor, I want to make absolutely clear and if

1    we need to do this at the start of every hearing, we will --

2    we absolutely would love to get a higher and better -- not

3    proposal; transaction.  We want to do better for this

4    estate, okay?  But we have to be able to compare and

5    contrast where we are in real time, and in a clear-eyed

6    fashion, and that's what we're trying to do here.

7            Your Honor, we're not trying to put the Elliott

8    proposal on trial; we're trying to evaluate what we have,

9    the bird in the hand, as compared to what they're trying to

10   offer to us.  And, Your Honor, with regard to -- and they

11   know this already because they've already gave these

12   depositions -- did we ask to extend the go-shop window?

13   They know that.  They know the goal and we've had testimony

14   on those issues.

15           And there will be testimony as well when they ask

16   our witnesses in depositions later this week, did you go and

17   re-shop the most shopped asset in Chapter 11 history?  No,

18   we didn't do another marketing effort you're asking, but

19   obviously we're open to receiving other efforts, especially

20   Elliott's since they're making the most concerted effort to

21   do so.

22           Your Honor, with regard to the equity commitment

23   letters, please appreciate what Mr. McGinnis is saying.  He

24   says, if I get together one complete comprehensive package,

25   even if it's on the eve of trial, I am going to give that to

1    you.  But until that moment in time, we get nothing.  Zero.

2    And all we're saying is if this is going to proceed in real

3    time we need to move together in real time because think of

4    where we might be on Monday, August 21st.

5            We could be in the scenario that we're concerned

6    about where we get a proposal that comes in at the eve of

7    trial that our board and Your Honor has to evaluate; or we

8    could be in a scenario where Elliott comes in and says, "Oh,

9    we're so close.  And look at all that we've done.  And it's

10   remarkable everything we've done -- all the financing

11   efforts, the debt commitment efforts, and the equity

12   commitment efforts, and look at all the progress we're

13   making with the intervenors, and we just need a little more

14   time."

15           But under either one of those scenarios -- and to

16   be absolutely clear, Mr. McGinnis is not foreclosing that

17   latter scenario -- under either of those scenarios we need

18   to be able to take discovery in real time to evaluate where

19   we are.  And, Your Honor, for all those reasons we ask for

20   the relief that we sought.  And the last thing I would say

21   is what's apparent here and what Mr. McGinnis can't refute

22   is we have a protective order to address against some of

23   these confidentiality issues, and we should be able to

24   implement it for the purposes in this case.  Thank you.

25           THE COURT:  Thank you, Mr. McKane.  Mr. McGinnis,

1   last words?

2            MR. MCGINNIS:  Your Honor, I'll simply point out

3   that the 40-day go-shop window means 45 days.  We will, if

4   Elliott is in a position to put forth an equitization plan,

5   it intends so, and in all events hopefully before August

6   21st.  But efforts to provide interim piecemeal discovery

7   about an ongoing capital raise do not actually go to the

8   issue of whether or not there is a superior alternative

9   transaction on the table, and actually with undermining any

10  efforts to do so.

11           THE COURT:  Thank you, Mr. McGinnis.  Thank you

12  very much for your oral presentations, thank you for your

13  written presentations as well.  With one exception, which

14  I'll talk about in a minute, I agree completely with the

15  Debtor's position on the discovery disputes before the

16  Court.

17           With regard to the communications, etc., with the

18  staff of the Public Utility Commission of Texas or any

19  intervenors, I believe that this dispute is basically

20  resolved but just so we're clear, I agree with the Debtor's

21  position that while they may be confidential, they're not

22  sufficiently confidential to prevent the Debtors from having

23  discovery and production of those documents and information,

24  and they can be subject to our protective order and

25  attorney's eyes only or highly confidential designation.

1    But I think it's even made clear by the position of the

2    Attorney General of the State of Texas that they don't view

3    them as particularly confidential.

4              I think the previous letter was meant to -- well,

5    I think the previous letter of a few days ago or maybe a

6    week ago now, was meant to limit commentary about

7    communications but not limit access to what the

8    communications, in fact, were.  So, I'll order the

9    production of those documents subject, of course, to

10   whatever privileges apply, subject to objections as to

11   responsiveness, although I don't see how they couldn't be

12   responsive, and of course, subject to the protective order

13   if they want to be designated as Highly Confidential.

14             With regard to the discovery sought by Elliott

15   against the Debtors, I agree with the Debtor's position.

16   Just to be clear, it's not that the Debtors aren't producing

17   discovery; it's that they're narrowing the scope of the

18   discovery they are producing.

19             I agree that it is appropriate to more narrowly do

20   so in the context of the transaction it has already been

21   entered into, although of course not approved yet, and that

22   the inquiry with regard to those kind of communications

23   shall frankly be lower because -- it must be Mr.

24   Kieselstein's turn of phrase because he's famous for his

25   turns of phrase, but I think it's right that the juice isn't

1   worth the squeeze.  There's no point in making the Debtors

2   go through an elaborate production and privilege process to

3   produce half a dozen documents and have 10,000 not

4   producible because of privilege.  So, I agree with the

5   Debtor's position with regard to that.

6           With regard to the potential investors and the

7   equity letter commitments, this is a much closer call.

8   However, I think it's overly reaching -- and this is the

9   exception to agreeing with the Debtors -- I think it's

10  overly reaching for the Debtors to seek the names of --

11  identity of potential investors.  I think it would serve as

12  counterproductive for purposes of the equity raise that

13  Elliott's trying to put together, the competitive offer.

14  And at the same time, I don't think it'll actually provide

15  the Debtors with any leg up because until they actually have

16  investors, what the potential investor pool looks like is

17  really sort of neither here nor there.

18          However, I do agree that any actual deal

19  documentation signed or executed -- deal documentation such

20  as equity letter commitments, etc., must be produced on a

21  rolling basis within 25 -- 24, excuse me, hours after they

22  are executed.  And this fear that I think Mr. McKane

23  expressed that there'd be a wait until there's a completely

24  done transaction and then a dump of all the equity letters I

25  think is a valid fear and should be protected against by

1    allowing serial production of those documents.  Unless, of

2    course, they're executed and committed, there's certainly no

3    reason not to make them available for discovery.

4           I will offer one comment on this latter scenario

5    that's been posited, which is that Elliott comes in on

6    August 21st without a completed transaction and argues that

7    "Judge, we're very, very close.  Just give us a few more

8    days, weeks, months in order to complete this transaction.

9    See the progress we have made." I will, of course, hear any

10   and all arguments on the 21st but I want to be crystal clear

11   that if Elliott expects to oppose the Berkshire deal on the

12   21st based on a potential as opposed to documented

13   transaction, I think that they are going to have a

14   tremendous difficulty in being successful.  The Court is

15   very much cognizant of the burden at hand and will not

16   (indiscernible) risk of losing that based on a potential

17   transaction.

18          So I know this timeline is challenging.  The

19   testimony at the last hearing was very clear that it's

20   challenging, but we are where we are, it is what it is, and

21   if any party wants to dispute that the Berkshire transaction

22   shouldn't be approved on the 21st based on the fact that

23   there's a better deal out there, we need that deal to be

24   done and ready to go.  And a potential deal will have a lot

25   of -- someone pushing in a potential deal is facing serious

1   challenges in opposing the merger based on that -- on that

2   basis.

3           So, having offered that editorial commentary,

4   which probably no one wanted, I will ask the Debtors to

5   consult with Elliott and submit an order consistent with the

6   Court's rulings under certification of counsel.  I think an

7   order is appropriate here.  Usually I don't ask for them in

8   discovery disputes but I think it's appropriate here.

9           MR. MCKANE:  We will do so, Your Honor.  Thank you

10  very much for your time.

11          THE COURT:  You're welcome.  Any questions?  Any

12  further comments?  Okay, thank you very much.  Everyone have

13  a pleasant day.  We're adjourned.

14          MR. MCGINNESS:  Thank you.

15                      * * * * *

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya                    Digitally signed by Sonya
                              Ledanski Hyde
     Ledanski Hyde           DN: cn=Sonya Ledanski Hyde, o,
                             ou, email=digital1@veritext.com,
7                            c=US
                             Date: 2017.08.08 14:27:24 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 8, 2017