**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| *Debtors*. | (Jointly Administered) |
| | **Re: D.I. 11430** |

**THE ELLIOTT FUNDS' OBJECTION TO MOTION
OF THE EFH/EFIH DEBTORS FOR ORDER AUTHORIZING ENTRY
INTO MERGER AGREEMENT AND APPROVING TERMINATION FEE**

Elliott Associates, L.P., Elliott International, L.P., and the Liverpool Limited Partnership (collectively, "Elliott" or the "Elliott Funds"), as creditors in the chapter 11 cases (the "Chapter 11 Cases") of certain of the E-Side Debtors[1] (or, the "Debtors"), hereby object (the "Objection") to the *Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. No. 11430] (the "Sale Motion").[2]  In support of their Objection, the Elliott Funds respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.     After two failed attempts, the E-Side Debtors are yet again seeking to sell their approximately 80% economic interest (the "Oncor Interest") in Oncor Electric Delivery Company LLC ("Oncor").  This time, the E-Side Debtors are seeking to do so despite having been in the midst of advanced discussions with Elliott regarding a creditor-led equitization plan of reorganization (the "Creditor Plan") that would have provided *far greater* value to creditors, especially EFIH creditors.  As demonstrated below, the E-Side Debtors' purported "bird in the

---

[1] Capitalized terms used but not defined in this Objection shall have the meanings ascribed to them in the Sale Motion.
[2] *See* Exh. A to the *Declaration of Erin R. Fay Filed in Connection With The Elliott Funds' Objection to the Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* (hereinafter, the "Fay Decl.").

hand" is far from caged, and the cost of not closing that cage is tremendous – $270 million and likely administrative insolvency of EFIH.   Moreover, the ongoing sale process that has been purported to induce competitive bidding is fatally flawed – *it doesn't merely chill bidding, it stops any value maximizing effort dead in its tracks and violates fundamental statutory protections provided to creditors.*   For these and other reasons set forth below, the Debtors' request to approve the merger agreement with Berkshire Hathaway Energy Corporation ("BHE Merger Agreement"), *see* Exh. B to Fay Decl., and a $270 million termination fee (the "BHE Termination Fee") should be denied.

## BACKGROUND

2.    Each of the E-Side Debtors commenced its Chapter 11 Case on April 29, 2014.

3.    Elliott is EFIH's largest unsecured creditor, holding approximately 74% of the senior unsecured notes due December 1, 2018 and approximately 71% of the unsecured claims filed against EFIH.

*The Failed Hunt Transaction and Hunt Plan*

4.    On September 18, 2015, the Court approved the E-Side Debtors' merger with Hunt Consolidated, Inc. and certain co-investors (the "Hunt Group").   On December 9, 2015, the Court entered an order confirming the *Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 7235] (the "Hunt Plan").   *See* Exh. C to Fay Decl.   Despite the E-Side Debtors' financial advisors and management assurances to this Court that there was a high probability that the transaction with the Hunt Group (the "Hunt Transaction") would be approved by the Public Utility Commission of Texas (the "PUCT"), *see* Exh. D to Fay Decl., Hr'g Tr. at 43:5-8, *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del. Nov. 3, 2015), D.I. 6878, the PUCT order

approving the Hunt Transaction contained conditions that the Hunt Group would not accept. Consequently, the Hunt Transaction was not consummated and the Hunt Plan was deemed null and void.

**The Failed NextEra Transaction and NEE Plan**

5.        After failing to obtain the necessary regulatory approval for the Hunt Transaction, the E-Side Debtors continued to pursue a transaction that would result in a monetization of their Oncor Interest. These efforts culminated in the E-Side Debtors entering into the merger agreement dated July 29, 2016 (the "NEE Merger Agreement") with NextEra Energy, Inc. ("NextEra"). *See* Exh. E to Fay Decl. The transactions contemplated by the NEE Merger Agreement (the "NextEra Transaction") formed the basis for the Debtors' *Eighth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10853] (the "NEE Plan"). *See* Exh. F to Fay Decl. **For a second time,** the E-Side Debtors and their advisors testified that a proposed change of control would be approved by the PUCT. *See* Exh. W to Fay Decl., Hr'g Tr. at 28: 9-11, *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del. Sept. 19, 2016), D.I. 9606. This time, however, the Debtors asked the Court to allow them to wager a $275 million termination fee (the "NEE Termination Fee") based on their word that NextEra would satisfy that condition subsequent. This was a very bad bet. The PUCT rejected not only the joint application filed by NextEra and Oncor, but also NextEra's two subsequent requests for rehearing.

6.        On July 7, 2017, the Debtors terminated the plan support agreement for the NEE Plan and the NEE Merger Agreement and subsequently filed the *Notice That the NextEra Plan and NextEra Plan Confirmation Order Have Been Rendered Null and Void* [D.I. 11446]. *See*

Exh. G to Fay Decl.    As a result, NextEra is now seeking to recover the $275 million NEE

Termination Fee from the Debtors' estates.[3]

**The TTI Minority Interest Agreement and Drag-Along Rights Dispute**

7.    As noted above, the E-Side Debtors hold an approximately 80% economic interest

in Oncor.  Nearly all of the remaining interest in Oncor, 19.75% (the "TTI Minority Interest"), is

presently owned by Texas Transmission Investment LLC ("TTI"), a subsidiary of Texas

Transmission Holdings ("TTH").

8.    The E-Side Debtors' approximately 80% economic interest in Oncor is subject to

an Investor Rights Agreement, dated as of November 5, 2008, among Oncor and certain of its

direct and indirect equity holders, including EFH and TTI (the "Investor Rights Agreement").

*See* Exh. K to the Fay Decl.  Pursuant to the Investor Rights Agreement, if an offer is made

pursuant to which the Oncor Interest is acquired by a third party, then in certain situations EFH

may "drag-along" the TTI Minority Interest and thereby require TTI to sell the TTI Minority

Interest to the same buyer if the total payments TTI receives satisfy the "IRR Hurdle" (the

"Drag-Along Rights").  Investor Rights Agreement § 3.3(d).

9.    In connection with the proposed NEE Transaction, NextEra entered into an

agreement, dated October 30, 2016, to acquire the TTI Minority Interest (the "TTI Minority

---

[3] On July 29, 2017, Elliott filed the *Motion to Reconsider in Part the September 16 Order Approving the NextEra Termination Fee* [D.I. 11636] (the "Reconsideration Motion"), *see* Exh. H to Fay Decl., seeking to have this Court reconsider its order authorizing the payment of the NEE Termination Fee to disallow any claim by NextEra for payment of the NEE Termination Fee when the PUCT rejected the NextEra Transaction and the Debtors were forced to terminate the NEE Merger Agreement.  On July 31, 2017, NextEra filed *the Application of NextEra Energy, Inc. for Payment of Administrative Claim* [D.I. 11649] (the "Administrative Claim Motion"), *see* Exh. I to Fay Decl., to which Elliott filed a preliminary objection on August 2, 2017.  *See The Elliott Fund's Prelim. Obj. to the Appl. of NextEra Energy, Inc. for Payment of Administrative Claim* [D.I. 11666].  The hearings on the Reconsideration Motion and the Administrative Claim Motion are presently scheduled for September 19, 2017.  On August 3, 2017, the E-Side Debtors commenced an adversary proceeding against NextEra seeking disallowance of the NEE Termination Fee.  *See Energy Future Holdings Corp. and Energy Future Intermediate Holding Co., LLC v. NextEra Energy, Inc.*, Adv. Pro. 17-50942 (Bankr. D. Del.). The E-Side Debtors have sought to consolidate proceedings on the Reconsideration Motion, the Administrative Claim Motion and the adversary proceeding.  *See* Exh. J to Fay Decl., *Pls' Energy Future Holdings Corp. and Energy Future Intermediate Holding Co. LLC's Mot. to Consolidate and Set a Rule 7016 Scheduling Conference*, dated August 3, 2017 [D.I. 11669].

Interest Agreement"). *See* Exh. L to Fay Decl. Pursuant to the TTI Minority Interest Agreement, TTH will receive an approximately $72.3 million termination fee from NextEra (the "TTH Termination Fee") in the event that the sale of the TTI Minority Interest to NextEra does not receive PUCT approval by August 1, 2017. *Id.* § 9.2(b). The August 1 deadline is subject to a 90-day extension, which has been triggered by the events described in paragraph 10 below. *Id.* § 9.1(b). Critically, until that 90-day extension lapses, TTH, TTI, the Primary Holders (as defined in the TTI Minority Interest Agreement), and their respective Affiliates (as defined in the TTI Minority Interest Agreement) are ***prohibited*** from engaging in any discussions or negotiations regarding the consensual sale of the TTI Minority Interest. *See id.* § 6.2(b).

10.    Notwithstanding the termination of the NEE Merger Agreement, NextEra continues to pursue PUCT approval for its acquisition of Oncor and the TTI Minority Interest. On July 13, 2017, NextEra filed an appeal of the PUCT order rejecting NextEra's request to approve its acquisition of Oncor, including the Minority Interest (the "NextEra Appeal"). *NextEra Energy Inc. v. Public Utility Comm'n of Texas*, No. D-1-GN-17-003234 (District Ct. of Travis Cty, Texas). Most recently, on July 28, 2017, NextEra and TTH filed a new application (the "Minority Interest Application") seeking PUCT approval of NextEra's acquisition of the TTI Minority Interest. *See* Exh. M to Fay Decl., *Joint Report and Appl. of Texas Transmission Holdings Corp. and NextEra Energy, Inc. for Regulatory Approvals*, PUCT Docket No. 47453.

***The BHE Merger Agreement***

11.    Hoping the third time is a charm, the Debtors now seek Bankruptcy Court approval of the BHE Merger Agreement among the Debtors and Berkshire Hathaway Energy Corporation (collectively, "BHE"). Pursuant to the BHE Merger Agreement, BHE would pay

the Debtors $9 billion in cash for the Oncor Interest.[4]  Closing of the transactions contemplated

by the BHE Merger Agreement (the "BHE Transaction") is subject to a number of conditions

that are presently unsatisfied.  *See* Exh. B to Fay Decl., BHE Merger Agreement, Article VII.

12.    BHE's and the E-Side Debtors' rights to terminate the BHE Merger Agreement

are set forth in Article VIII of the BHE Merger Agreement.  Section 8.5 of the BHE Merger

Agreement governs the terms and conditions under which the $270 million BHE Termination

Fee is payable.  As with the NEE Termination Fee, the Debtors have left for another day how the

BHE Termination Fee would be allocated in the event it becomes due and payable.  *See* Exh. N

to Fay Decl., *Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future*

*Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the*

*Bankruptcy Code* (the "BHE Plan") [D.I. 11426] Article IV(D) (noting that "[t]he allocations

between the EFH Debtors on the one hand and the EFIH Debtors on the other hand of any

liabilities of any of the EFH Debtors or the EFIH Debtors (or both) for any Administrative Claim"

will be settled by either a settlement between the Debtors or in such amounts as the Bankruptcy

Court determines by Final Order); Exh. A to Fay Decl., Sale Motion ¶ 35 ("Recoveries will

depend on, among other things … allocations or agreements between EFH and EFIH").

### *The Elliott Adversary Proceeding and Creditor Plan Negotiations*

13.    Anticipating the failure of the NEE Transaction, in May 2017, Elliott filed an

adversary complaint seeking a declaration that it was not bound by the "PIK PSA" and was free

to commence discussions with other creditors and potential financing sources regarding an

alternative restructuring.  *Elliott Assocs., L.P. v. Energy Future Intermediate Holding Co.*, Adv.

Pro. 17-50479 (Bankr. D. Del.).  In an effort to render that litigation moot, Elliott and the E-Side

---

[4] As discussed below, the BHE Merger Agreement also requires that BHE either (i) consensually acquire the TTI
Minority Interest or (ii) obtain an order from this Court finding that the Drag-Along Rights are valid and enforceable
and that EFH is entitled to enforce the Drag-Along Rights.

Debtors began discussions regarding the Creditor Plan.  The Creditor Plan reflected a total enterprise value of approximately $18.5 billion or a $9.3 billion value for the Debtors' approximately 80% economic interest in Oncor.  But before finalizing their preparations with respect to the Creditor Plan, the E-Side Debtors suddenly pivoted and entered into the BHE Merger Agreement on July 7.  On the same date, the E-Side Debtors filed the Sale Motion.

14.    The Debtors now request that this Court approve the BHE Merger Agreement (and ultimately, the BHE Plan) even though it would provide EFIH unsecured creditors with a *maximum* estimated recovery of 18 cents on the dollar.  *See* Exh. O to Fay Decl., *Disclosure Statement for the Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company, LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11427] at 28 (the "Disclosure Statement").    Only two months ago, the Debtors' counsel opposed Elliott's adversary complaint and request for declaratory relief based upon an 80-cent recovery that the Debtors were allegedly pursuing.  *See* Exh. P to Fay Decl., Hr'g Tr. at 8:14-23; 29:10-12, *In re Energy Future Holdings Corp.*, Adv. Pro. 17-50479 (Bankr. D. Del. May 19, 2017) D.I. 40 (noting, for purposes of evaluating irreparable harm, that "I think the parties would be willing to stipulate that it remains possible that there is an 80-cent plan that can be available to big creditors").  The estimated recovery under the BHE transaction is less than one-fourth of the recovery that the Debtors estimated for the NEE Transaction only seven months ago and materially less than the recovery the Creditor Plan would provide.  Moreover, the 18 cent recovery estimate completely ignores the dilutive impact that any payment of the NEE Termination Fee would have on EFIH creditor recoveries. The EFIH creditor recovery is now put at further risk by the proposed $270 million BHE Termination Fee.

**ARGUMENT**

15.     The E-Side Debtors seek approval of the BHE Merger Agreement and the $270 million BHE Termination Fee. The E-Side Debtors' request should be denied for at least two fundamental reasons, regardless of whether Elliott provides a fully-financed competing proposal by the August 21 hearing.[5]   ***First,*** the E-Side Debtors cannot carry their "heavy" burden under *O'Brien* to show that the $270 million BHE Termination Fee is an ***actual and necessary*** expense of preserving the value of their assets.   ***Second,*** the E-Side Debtors cannot carry their burden to demonstrate that the BHE Transaction has a sound business purpose for EFIH and is being proposed in "good faith."   The Sale Motion should therefore be denied.

**I.     THE $270 MILLION BHE TERMINATION FEE MAY NOT BE APPROVED AS AN ACTUAL EXPENSE UNDER *O'BRIEN***

16.     The Third Circuit has held that "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were ***actually necessary to preserve the value of the estate***." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999) (emphasis added).   Under *O'Brien,* this Court's approval of the BHE Termination Fee rests on the E-Side Debtors showing that the ***prospective payment of the BHE Termination Fee*** satisfies the requirements of section 503(b).   To do so, this Court must find that in the circumstances in which the $270 million Termination Fee becomes payable, the BHE Merger Agreement was "both ***supplied to*** and ***beneficial to*** the debtor-in-possession." *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir. 1976) (addressing the precursor to section 503(b)) (emphasis added); *In re Mid-American Waste Sys., Inc.*, 228 B.R. 816, 821 (Bankr. D. Del. 1999) (noting "heavy" burden to demonstrate that a postpetition transaction "directly and substantially benefit[ed] the estate").

---

[5] Elliott remains confident that it will be able to provide such proposal before the hearing and reserves the right to supplement this Objection.

Critically, the benefit must be ***actual and demonstrated, not potential or speculative***. *In re Bernard Techs., Inc.*, 342 B.R. 174, 180 (Bankr. D. Del. 2006) (emphasis added).

17.      The E-Side Debtors emphasize that the $270 million BHE Termination Fee may be approved if "**some**" benefit exists and that such benefit need not be substantial. *See* Sale Motion ¶ 50 (citing *O'Brien* and stating that "[a] termination fee must provide **some** benefit to the debtor's estate") (emphasis in original); *id* ("[t]here is no suggestion that the . . . benefit to the estate [has] to be substantial") (quoting *In re Women First Healthcare, Inc.,* 332 B.R. 115, 121 (Bankr. D. Del. 2005)). Here, the stakes demand more.

18.      The ***potential*** value that the BHE Transaction provides creditors, only minimally exceeds creditor recoveries under the Debtors' own liquidation analysis (which Elliott believes is flawed), and for such minimal potential value, the E-Side Debtors are risking the administrative solvency of EFIH and all the remaining EFIH creditor distributions on their bet that the BHE Transaction will close. The Debtors have been wrong twice before, and the BHE Merger Agreement is presently ***far too conditional*** for this Court to approve it, thereby countenancing the $270 million BHE Termination Fee and foreclosing alternative transactions. *In re President Casinos, Inc.*, 314 B.R. 786 (Bankr. E.D. Mo. 2004) (relying on *O'Brien* and denying application for break-up fee, finding no benefit to the estate based on multiple contingencies to closing controlled by events outside of the bankruptcy case); *In re Am. Appliance*, 272 B.R. 587, 601 (Bankr. D.N.J. 2002) (denying approval of a break-up fee, opting instead to await the conduct of a sale to see what amount would be realized by the estate).

**A.     The Debtors Will Receive No Actual And Demonstrated Benefit If The Minority Interest Acquisition Condition Is Not Satisfied**

19.      Pursuant to section 7.2(f) of the BHE Merger Agreement, closing of the BHE Transaction is expressly conditioned on BHE either (i) consensually acquiring the TTI Minority

Interest or (ii) this Court entering "an order to the effect that the Drag-Along Rights are valid and enforceable with respect to TTI in connection with the [BHE Transaction] . . . and that the Company [*i.e.,* EFH] is entitled to enforce the Drag-Along Right if the total payments TTI receives in connection with the [BHE Transaction] satisfy the IRR Hurdle . . . .". *See* Exh B to Fay Decl, BHE Merger Agreement § 7.2(f) (the "Minority Interest Acquisition Condition"). *Neither event has occurred.*

20.    Critically, if the Minority Interest Acquisition Condition is not satisfied, the Debtors do not have the right to terminate the BHE Merger Agreement. *See* Exh. B to Fay Decl., BHE Merger Agreement §§ 8.1–8.3.  Unless BHE waives the Minority Interest Acquisition Condition, the E-Side Debtors will have only two untenable options: (i) wait until at least the Initial Termination Date (*i.e.,* March 4, 2018)[6] – *accruing a minimum of $50 million per month of interest expenses in the interim* – and terminate the BHE Merger Agreement without paying the BHE Termination Fee;[7] or (ii) breach the BHE Merger Agreement by pursuing an alternative transaction or plan of reorganization and thereby trigger the $270 million BHE Termination Fee. *See id.* §§ 7.1, 7.2, 8.4(a), 8.4(d), 8.5(b).  As to the second option, BHE will still have the option to seek specific performance to force the Debtors to incur the $50 million monthly burn. *See* Exh. B to Fay Decl., BHE Merger Agreement § 9.10 (providing that "prior to the termination of this Agreement pursuant to Article VIII, each party shall be entitled to specific performance to prevent breaches of this Agreement and of the terms hereof (including the obligation to consummate the Closing Date Transactions …").   In any event, in neither case do the Debtors

---

[6] The "Initial Termination Date" is defined in section 8.2(a) of the BHE Merger Agreement as 240 days after entry into the BHE Merger Agreement.  *See* Exh. B to Fay Decl., BHE Merger Agreement § 8.2(a).
[7] An Initial Termination Date of March 4, 2018 assumes all other conditions are satisfied.  If certain other conditions are not satisfied, as is likely given the interrelationship with PUCT approval, *see supra,* then the Debtors will need to wait an additional 90 days, until June 2, 2018, before the Debtors could terminate, and in such event the BHE Termination Fee will remain payable.  *See id.*

receive an **actual and demonstrated benefit** from entering into the BHE Merger Agreement—**they have received no merger consideration and will have been left with yet another failed transaction**.  Instead, in both situations the Debtors pay dearly: they either accrue $50 million per month through at least March 31, 2018, or pay a $270 million BHE Termination Fee and, pending allocation of the BHE Termination Fee, risk administrative insolvency.  As with the NEE Termination Fee, the prospective payment of the $270 million BHE Termination Fee in such a circumstance cannot be approved under *O'Brien*.

21.    The Debtors cannot dismiss this risk as insignificant or irrelevant.  There are at least four reasons why the Minority Interest Acquisition Condition is a material risk to the BHE Transaction closing and very likely to delay any closing, substantially eroding the value of the BHE Transaction.

22.    *First*, BHE is presently prohibited from purchasing the TTI Minority Interest by the TTI Minority Interest Agreement.  TTH, TTI, the Primary Holders, and their respective Affiliates are contractually prohibited from discussing a consensual acquisition of the TTI Minority Interest under the TTI Minority Interest Agreement until October 30, 2017 unless the parties otherwise agree in writing.  *See* Exh. L to Fay Decl., TTI Minority Interest Agreement §§ 6.2(b), 9.1(a).

23.    *Second*, based on NextEra's appeal of the PUCT order denying its request to acquire the TTI Minority interest, *see NextEra Energy Inc. v. Public Utility Comm'n of Texas*, No. D-1-GN-17-003234 (Dist. Ct. of Travis Cty, Tex.), and NextEra and TTH's July 28, 2017 filing of the Minority Interest Application, it is unlikely that BHE will be able to engage in discussions with TTH or TTI regarding a sale of the TTI Minority Interest any time soon.  Thus,

even if TTI were interested in selling the TTI Minority Interest, any consensual sale is likely, at the very least, months away, at the least.

24.      *Third*, the Debtors and BHE are not likely to receive an order declaring that the Drag-Along Rights are valid and enforceable any time soon.  As this Court knows, TTI contested the Drag-Along Rights in connection with the Hunt Transaction.  *See Energy Future Holdings Corp. v. Texas Transmission Inv. LLC*, Adv. Pro. No. 15-51386 (Bankr. D. Del.).  It was not resolved, but the dispute still spanned seven months.  Moreover, as long as the TTI Minority Interest Agreement is in effect, TTH and TTI are seemingly obligated to oppose any such declaratory relief.  Additionally, given that the value being offered by BHE for the Oncor Interest is far less than that offered by the Hunts, TTI is likely financially motivated to again contest the Debtors' exercise of the Drag-Along Rights.

25.      *Fourth*, it is not clear that BHE and Oncor may properly file an application with the PUCT seeking approval of BHE owning 100% of Oncor ***before*** BHE has actually satisfied the Minority Interest Acquisition Condition.  If an application were filed prior to the Minority Interest Acquisition Condition being satisfied, Oncor and BHE would be asking for an advisory opinion from the PUCT because the application would seek approval of BHE's acquisition of 100% of Oncor ***before*** BHE owns or even has a contractual right to own TTI's 19.75% interest in Oncor.  Texas courts and the PUCT have repeatedly declined to issue advisory opinions based on hypothetical, speculative, or contingent facts.  *See Pub. Util. Comm'n v. Houston Lighting and Power Co.*, 748 S.W.2d 439, 442 (Tex. 1987) (PUCT's allocation of costs from pending litigation was premature and advisory); Exh. Q to Fay Decl., Order of Dismissal on Rehearing, *Appl. of Central Power & Light Co. for Declaratory Order and Approval of Plan of Divestiture*, PUCT Docket No. 27120 (May 22, 2003) (dismissing application asserted to be premature and

contingent on future events).[8]  Even if BHE were prepared to waive the Minority Interest

Acquisition Condition, a new revised application would need to be submitted, restarting the

PUCT approval process and imposing additional costs and delay on the Debtors' estates.  *See*

Tex. Util. Code §§ 39.915(b), 39.262(m) (providing for automatic approval if the PUCT does not

act within the 180-day deadline on PUCT review of acquisitions, which restricts ability to

materially amend a pending application).

26.     Thus, failure to satisfy the Minority Interest Acquisition Condition is likely to

force the E-Side Debtors to choose between (i) pursuing an alternative transaction in breach of

the BHE Merger Agreement and pay the $270 million BHE Termination Fee,[9] or (ii) continuing

to accrue $50 million per month of interest through at least March 2018 while waiting for BHE

to get an order regarding the Drag-Along Rights, obtain a consensual agreement with TTI, or

waive the Minority Interest Acquisition Condition.[10]  This Court should not approve the E-Side

Debtors placing their estates in such a position ***yet again***.  The Minority Interest Acquisition

Condition renders the value of the BHE Merger Agreement not actual and demonstrated.

Consequently, the $270 million BHE Termination Fee fails the *O'Brien* standard.

**B.     The Debtors' Estates Will Receive No Actual And Demonstrated Benefit If The BHE Plan Confirmation Condition Is Not Satisfied**

27.     The Debtors also seek to have this Court approve the payment of the $270 BHE

Termination Fee in the event that this Court does not enter the EFH Confirmation Order by

---

[8] Available at:  http://interchange.puc.state.tx.us/WebApp/Interchange/Documents/27120_51_394394.PDF.  *See also* Exh. R to Fay Decl., Order on Certified Issue at 3-4, *Joint Pet. of Sw. Pub. Serv. Co. and Golden Spread Elec. Coop., Inc. for a Declaratory Order*, PUCT Docket No. 35820 (Jun. 26, 2009) (stating that "[t]he Commission does not have the authority to issue advisory opinions").

[9] As noted above, *supra* ¶ 19, the Debtors may not have the option to breach the BHE Merger Agreement
[10] Choices (i) and (ii), however, are not mutually exclusive.  The Debtors could continue to pursue the BHE Transaction—and accrue $50 million per month in the process thereof—and still not consummate the BHE Transaction, requiring payment of the BHE Termination Fee in addition to the accrued interest.

December 15, 2017. *See* Exh. B to Fay Decl., BHE Merger Agreement §§ 8.4(h)(iv),8.5 (the "BHE Plan Confirmation Condition"). The payment of the BHE Termination Fee in this circumstance also fails the *O'Brien* standard.

28.    The BHE Plan Confirmation Condition does not require the closing of an alternative higher or otherwise better transaction. The BHE Plan Confirmation Condition provides that the Debtors are obligated to pay the $270 million BHE Termination Fee if BHE exercises its termination right because the Court did not enter the EFH Confirmation Order by December 15, 2017 *for any reason whatsoever.* Thus, regardless of whether the BHE Plan fails to receive the requisite creditor votes or this Court concludes that one of the conditions set forth in Bankruptcy Code section 1129 is not satisfied, the $270 million BHE Termination Fee becomes payable. In those circumstances, no actual benefit was provided by the BHE Merger Agreement. For this reason as well, the $270 million BHE Termination Fee fails the *O'Brien* standard.

29.    The BHE Merger Agreement conditions closing on not only the entry of the EFH Confirmation Order by December 15, 2017, but also on the EFH Confirmation Order including:

> (i) a finding that the Plan of Reorganization ***and this Agreement*** satisfy, among other things section 1129(a)(4) and section 1129(a)(5) of the Bankruptcy Code; (ii) a finding that Parent is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protections afforded good faith purchasers to the fullest extent permitted under the Bankruptcy Code; and (iii) a finding that the purchase price to be provided by Parent pursuant to this Agreement was not controlled by any agreement between the Parent and any potential bidders and was not reduced or suppressed in any manner by any agreement or arrangement involving Parent and any creditor.

Exh. B to Fay Decl., BHE Merger Agreement § 7.2(g) (emphasis added). It is unclear whether the absence of any one of those findings in the EFH Confirmation Order provides BHE with an

immediate right to terminate the BHE Merger Agreement or simply not close.  *See id.* § 7.1(a)

(defining EFH Confirmation Order to mean an order in a form "reasonably satisfactory" to BHE).

But even if BHE does not have an immediate right to terminate, BHE would be able to hold the

Debtors hostage to paying $50 million a month while BHE decides whether to waive and close

or wait and terminate.

### C.    The Debtors' Estates Will Receive No Actual And Demonstrated Benefit If The PUCT Imposes Burdensome Conditions

30.    The BHE Merger Agreement also provides that if the PUCT approves the

transaction but imposes a "Burdensome Condition" (as defined in the BHE Merger Agreement)

BHE has no obligation to close.  *See id.* § 7.2(c).[11]  If BHE refuses to close as a result of a

Burdensome Condition and does not agree to a mutual termination, the Debtors have no right to

terminate the BHE Merger Agreement.  Instead, the Debtors will be faced (once more) with the

same Hobson's choice: (i) wait until at least March 4, 2018 – accruing $50 million per month in

interest – and terminate the BHE Merger Agreement without paying the BHE Termination Fee or

(ii) pursue an alternative transaction or plan of reorganization in breach of the BHE Merger

Agreement and incur the $270 million BHE Termination Fee to avoid the $50 million per month

interest burn.[12]   Regardless of the choice made, EFIH will potentially be administratively

insolvent and EFIH unsecured creditor recoveries eliminated entirely.

---

[11] Although an important condition given past history, the Debtors merely noted this condition in footnote 8 of the
Sale Motion, stating: "[I]f the PUCT approval approves the contemplated transaction with a Burdensome Condition
(as defined in the Merger Agreement), then BHE would not be obligated to close on the proposed
transaction.  Under those circumstances, the Termination Fee would be payable in some, but not all,
circumstances.  Additional details regarding the circumstances in which the Termination Fee could become due and
payable in connection with a Burdensome Condition are set forth in Section 8.2 and Section 8.5 of the Merger
Agreement."  Exh. A to Fay Decl., Sale Motion ¶ 39 n.8.  Importantly, as the language of section 7.2 of the BHE
Merger Agreement makes clear, it is all of the regulatory consents, not just the PUCT Approval that cannot
"individually or in the aggregate" impose a Burdensome Condition. Exh. B to Fay Decl., BHE Merger Agreement
§ 7.2(c).
[12] Again, *supra* ¶¶ 19, 25 the Debtors may not have the option to breach the BHE Merger Agreement.

**D.     The Debtors Will Likely Trigger The $270 Million Termination Fee If The PUCT Rejects The BHE Transaction**

31.     The Debtors may terminate the BHE Merger Agreement without triggering the BHE Termination Fee if the PUCT enters a ***final, non-appealable order prohibiting the BHE Transaction.*** *See* Exh. B to Fay Decl., BHE Merger Agreement § 8.5(b)(ii) (providing no termination fee if Debtors terminate pursuant to section 8.2(b)). But this right provides the E-Side Debtors' estates with little comfort.

32.     If the PUCT denies approval of the BHE Transaction, BHE may pursue the appellate process, as NextEra has done.  In that situation, the Debtors arguably would not have a right to terminate the BHE Merger Agreement for nearly a year, until the end of June 2018, without triggering the BHE Termination Fee.  Section 8.2(b) of the BHE Merger Agreement requires the E-Side Debtors to use "reasonable best efforts . . . to contest such order" and would permit them to terminate the BHE Merger Agreement only if the PUCT order becomes "final and non-appealable." *See Id.* § 8.2(b).  As long as BHE is pursuing its appellate rights, the E-Side Debtors would have to do the same, if they want to avoid the BHE Termination Fee. Consequently, although the E-Side Debtors have yet again expressed their confidence in obtaining PUCT approval, absent that approval, the Debtors face a similar dilemma to the one that NextEra's pursuit of its appellate rights placed them: either (i) wait until June 2018 to terminate the BHE Merger Agreement pursuant to section 8.2(a) to avoid the BHE Termination Fee but incur $50 million per month in interest or (ii) pursue an alternative transaction or plan of reorganization in breach of the BHE Merger Agreement and pay the $270 million BHE

Termination Fee.  The E-Side Debtors' estates plainly receive no actual and demonstrated benefit from either choice.[13]

## II.    THE $270 MILLION BHE TERMINATION FEE MAY NOT BE APPROVED AS A NECESSARY EXPENSE UNDER *O'BRIEN*

33.    For this Court to approve the BHE Termination Fee, the Court must also find that the BHE Termination Fee was a **_necessary_** expense.  *O'Brien,* 181 F.3d at 533; 11 U.S.C. § 503(b)(1)(A) ("there shall be allowed administrative expenses, including … the actual, **_necessary_** costs and expenses of preserving the estate") (emphasis added).  The Debtors contend that the BHE Termination Fee was necessary to attract BHE's bid, stating that "it was ultimately necessary to induce BHE to enter into the Merger Agreement."  *See* Exh. A to Fay Decl., Sale Motion ¶ 52.  They also suggest that the BHE Termination Fee was "necessary to achieve a value-maximizing outcome." *Id.* ¶ 47.  The Debtors cannot, however, carry their heavy burden to show that the $270 million BHE Termination Fee was a necessary expense to induce BHE to enter into the BHE Merger Agreement as opposed to a device to chill bidding and undermine Elliott's efforts to propose and prosecute the Creditor Plan or another alternative.

### A.    The BHE Termination Fee Was Not Necessary To Induce BHE To Bid Or To Promote Competitive Bidding For The Oncor Interest

34.    While a termination fee may be necessary to attract or retain a bidder as a potentially successful bidder, *see In re Tama Beef Packing, Inc.*, 290 B.R. 90, 98 (8th Cir. 2003), the *O'Brien* court stressed that a termination fee is not necessary when "a potential purchaser

---

[13] The E-Side Debtors also downplay the risk associated with the requirement that they seek supplemental ruling(s) from the IRS, touting that the BHE Termination Fee will not be payable if the BHE Merger Agreement is terminated because "BHE does not agree to issue the required amount or type of stock in order to obtain such rulings . . . ." *See* Sale Motion ¶ 39.  But again, payment of the BHE Termination Fee is only avoided if the E-Side Debtors terminate under section 8.2(a) of the BHE Merger Agreement, which requires the Debtors to accrue $50 million a month until at least March 31, 2018.  *See id.*

will bid whether or not break-up fees are offered." *O'Brien*, 181 F.3d at 535. The Debtors offer no proof that a ***$270 million*** termination fee was necessary to attract BHE's bid.

35. The Debtors will undoubtedly provide drafts of the BHE Merger Agreement showing BHE always requested a fee, but that is merely evidence of BHE having experienced bankruptcy counsel and their having used the NEE Merger Agreement as a template. The declarations filed in support of the Sale Motion make clear three critical facts: (i) BHE had bid once before; (ii) BHE had already done all or nearly all of its due diligence; and (iii) the current BHE Merger Agreement was an ***unsolicited offer***. *See* Exh. S to Fay Decl., *Declaration of Paul Keglevic in Support of the Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11431] at ¶ 7 (the "Keglevic Declaration"); *see also* Exh. T to Fay Decl., *Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11432] (the "Ying Declaration").

36. The evidence will also show that the promise of a termination fee was not necessary to induce a transaction for the E-Side Debtors' approximately 80% economic interest in Oncor. Elliott was already pursuing the Creditor Plan that would have transferred the Oncor Interest to the creditors, which plan ***did not*** include any termination fee. Elliott continues to pursue an alternative transaction that will not require the payment of a termination fee, and expects to present imminently a vastly superior alternative to the BHE Transaction.

37. A termination fee may also be warranted when it promotes competition for the debtor's assets. *See O'Brien*, 181 F.3d at 537. Here, the Debtors don't even feign such an intention. They have advised this Court that no auction or formal sale process was necessary because the Oncor Interest was one of the most shopped assets in the history of bankruptcy. *See*

Exh. U to Fay Decl., Hr'g Tr. at 40:24-25, *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del. Jul. 12, 2017) [D.I. 11473] ("This is the most marketed asset in Chapter 11 history."). Yet, despite such conviction, the Debtors seek to impose a $270 million termination fee to protect BHE. This was not to promote competition, but to abruptly stop it.

38. Although the BHE Termination Fee is $5 million less than NEE Termination Fee, it will also "undoubtedly" chill bidding. *See* Exh. V to Fay Decl., Hr'g Tr. at 12:21-25, *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del. Sep. 26, 2016), D.I. 9693] (stating that the $275 NEE Termination Fee would "undoubtedly" chill bidding). Worse, the BHE Termination Fee is specifically intended to do so. Regardless of whether BHE knew about Elliott's pursuit of the Creditor Plan, the Debtors plainly did.

39. In abandoning discussions over the Creditor Plan and seeking to obligate themselves to the BHE Termination Fee, the Debtors proposed to burden the estates with an obligation that *would consume 90%* of the higher incremental value that the Creditor Plan would provide for the Oncor Interest and the creditors of the EFIH estate. The Debtors apparently chose this path *based on an overriding concern to preserve recoveries at EFH at EFIH's expense,* going so far as to make the BHE Termination Fee payable in the event that the BHE Plan is not confirmed for any reason whatsoever. The BHE Termination Fee thus serves an impermissible purpose; it is intended to advantage the Debtors' preferred purchaser, BHE, over others and cannot be approved under *O'Brien. See* 181 F.3d. at 535 (stating that "[a]lthough the assurance of a break-up fee may serve to induce an initial bid (a permissible purpose), it may also serve to advantage a favored purchaser over other bidders by increasing the cost of the acquisition to the other bidders (an impermissible purpose)").

**B.    The BHE Termination Fee Is Not Reasonably Related To The Risk, Time And Expenses Of BHE**

40.    The Debtors also attempt to justify their agreement to pay a $270 million termination fee by citing *In re Reliant Energy Channelview LP*, 594 F.3d 200, 207 (3d Cir. 2010) for the proposition that "the first bidder in a bankruptcy sale necessarily takes a risk at least to the extent of investing the time, money and energy needed to produce its bid." *See* Exh. A to Fay Decl., Sale Motion ¶ 51.   Again, Elliott does not dispute that a termination fee is proper when it compensates a bidder for researching the value of the debtor's assets, creates a "floor" and increases the likelihood that the price at which the debtor's assets are sold will reflect their actual value.  *See O'Brien*, 181 F.3d at 537; *In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) (noting that break-up fees may assuage an initial offeror's fear that it will be "topped" by an entity relying on the initial offeror's due diligence).   But this proffered justification does not withstand closer scrutiny.

41.    "A break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, ***and should be reasonably related to the risk, effort, and expenses of the prospective purchaser***." *See In re Integrated Res., Inc.*, 147 B.R. 650, 662 (Bankr. S.D.N.Y. 1992) (emphasis added); *see also In re WorldSpace, Inc.*, No. 08-12412 (PJW), 2010 WL 4739929, at *4 (Bankr. D. Del. Jun. 2, 2010) (approving break-up fee that was "an essential inducement and condition of Buyer's entry into, and continuing obligations under," an all-asset sales agreement and is "reasonable and appropriate in light of the size and nature of the proposed sale and comparable transactions, the commitments that have been made and the efforts that have been and will be expanded by the Buyer"); *In re Magic Brands, LLC*, No. 10-11310 (BLS), 2010 WL 3493041, at *2 (Bankr. D. Del. May 18, 2010) (approving break-up fee based on size and nature of proposed sale, efforts expanded by the bidder, and benefits provided by the bidder to

the Debtors' estates, creditors and all parties-in-interest); *In re Verasun Energy Corp.*, No. 08-12606 (BLS), 2009 WL 7215671, at *2 (Bankr. D. Del. Feb. 19, 2009) (granting bid-protections in the form of a break-up fee and expense reimbursement when it "effectively compensates" the stalking horse bidder "for granting of unsecured credit to the Debtors . . . in the form of uncompensated efforts and expenditure of human and monetary capital necessary to drive the entire auction process, capital which would not have been and will not be expended absent [] the granting of a superpriority, administrative claim, and [is] fair, reasonable and appropriate in light of" the size of the sale, efforts expended and the benefits provided).

42.     The E-Side Debtors readily acknowledge that in the spring of 2016, BHE made a bid for the Oncor Interest and negotiated the terms of a transaction with a substantially higher price.  As the Ying Declaration makes clear, "[n]egotiations progressed to documentation with NextEra and one other party—Berkshire Hathaway Energy Company."  *See* Exh. T to Fay Decl., Ying Declaration ¶ 18.  BHE necessarily invested most, if not nearly all, of its "time, money and energy needed to produce its bid" at that time.  *See id. at* ¶ 9 (describing access to the "extensive electronic data room maintained by the Debtors" and potential bidders' diligence calls and meetings with the Debtors' advisors and Oncor management).  The Court cannot therefore find that the $270 million BHE Termination Fee is reasonably related to the risk, effort, and time spent by BHE on the current deal.[14]  Nor can the $270 million BHE Termination Fee be justified on the grounds that it is "a fair and reasonable percentage" of the purchase price and proper compensation for the "floor" set by BHE.

43.     As shown above, any "floor" established by BHE is conditional and unstable.  In the present circumstances, $270 million is also not a fair and reasonable percentage of the

---

[14] The Debtors also cannot justify the BHE Termination Fee based on its efforts in the spring of 2016 either, as that would be equivalent to paying two termination fees in the aggregate amount of $545 million in connection with the failed NextEra Transaction.

purchase price. *First*, the BHE Termination Fee would be the second termination fee approved in connection with a transaction for the Oncor Interests, and together with the NEE Termination Fee, would obligate the E-Side Debtors estates for as much as $545 million. *Second*, the Court acknowledged that the $275 million NEE Termination Fee would "undoubtedly" chill bidding, *see* Exh. V to Fay Decl., Hr'g Tr. at 12:20-25, *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del. Sept. 26, 2016), D.I. 9693, but nonetheless approved the termination fee finding "it highly significant that the creditors of EFH and EFIH . . . supported the transaction . . . ." *Id.* at 14:20-15:1. This time, creditor support ***does not exist from the creditors with the greatest economic interest in a transaction***. Creditors holding the overwhelming majority of EFIH's impaired debt have already announced their opposition to the BHE Merger Agreement and the BHE Termination Fee related obligations with which it would burden the Debtors' estates. BHE's offer is also for a significantly lower price for the Oncor Interest, but only a *de minimis* $5 million reduction in the termination fee.

44. Nor is the proposed $270 million BHE Termination Fee reasonably related to BHE's risk, effort and expenses. As set forth above, nearly all of BHE's efforts and expenses were expended last year. BHE approached the Debtors and negotiated the entire deal in only two weeks, basing the transaction structure and documentation on that negotiated and used by NextEra. *See* Exh. S to Fay Decl., Keglevic Declaration ¶ 7 (the BHE proposal "largely preserved the structure of the NextEra deal"). There is no credible argument that the $270 million BHE Termination Fee is needed to compensate BHE for, or reasonably related to, the time and effort expended.

45. In sum, the $270 million BHE Termination Fee will have no positive impact, and in fact will have a profoundly negative impact, on competition and did not induce BHE's offer.

Instead, the BHE Termination Fee only serves the wholly improper purpose "to advantage a favored purchaser over other bidders by increasing the cost of the acquisition to the other bidders," *see O'Brien*, 181 F.3d at 535, and to prolong the Debtors' hold on the Chapter 11 Cases.

## III.    THE COURT MAY NOT APPROVE THE MERGER AGREEMENT

46.    The E-Side Debtors request this Court approve the BHE Merger Agreement pursuant to Bankruptcy Code section 363.  To do so, the E-Side Debtors, and EFIH in particular, must show that the Berkshire Transaction has a "sound business purpose" and is being proposed in "good faith."  *In re Martin,* 91 F.3d 389, 395 (3d Cir. 1996).  The E-Side Debtors, especially EFIH, cannot carry this burden.

### A.    The BHE Transaction Has No Sound Business Purpose For EFIH

47.     The E-Side Debtors contend that "entering into the [BHE] Merger Agreement is a sound exercise of their business judgment and is justified."  Exh. A to Fay Decl., Sale Motion ¶ 43.  In support, the E-Side Debtors contend that a sound business justification exists because the Oncor Interest "has been heavily-marketed for years" and the BHE "Merger Agreement represents the highest and most actionable transaction for the E-Side Debtors to pursue at this time."  *Id.* at ¶¶ 43-44.  To determine whether entry into the BHE Merger Agreement has a sound business purpose for the EFIH estate, as opposed to EFH estate, the Court must weigh the potential costs and benefits of the BHE Transaction ***to EFIH*** against its available alternatives.[15] The Court does not have sufficient facts to assess the sound business purpose from the EFIH perspective.

---

[15]  As the Sale Motion makes clear, none of the potential BHE merger consideration is distributed to EFH creditors. *See* Exh. A to Fay Decl., Sale Motion ¶ 45.  EFH creditors simply benefit by the Chapter 11 Cases concluding with confirmed plans for EFH and EFIH.

48.     There is no declaration in support for the BHE Merger Agreement from the independent director for EFIH, Mr. Cremens.[16]  While E-Side Debtors may maintain that there are no conflict issues requiring Mr. Cremens to attest in favor of the BHE Transaction, that is simply not the case.

49.     For example, the Sale Motion and supporting papers include no statement as to what EFIH, as opposed to all the E-Side Debtors, did to investigate its various restructuring alternatives.  There is no discussion as to Mr. Cremens' participation in negotiations with BHE. In that respect, there is no explanation as to why EFIH did not seek more time to pursue the Creditor Plan that could have provided ***significantly more value*** to the EFIH unsecured creditors than the BHE Merger Agreement.  There is also no explanation as to why EFIH is proceeding on the BHE Transaction in the face of opposition not only by Elliott, the largest EFIH unsecured creditor, but also by EFIH creditors holding in the aggregate the substantial majority of EFIH's impaired claims, and in the face of expected opposition by other holders of EFIH unsecured claims.  There is no explanation as to why the EFIH independent director would support the BHE Transaction when the BHE Termination Fee provisions penalize EFIH creditors from successfully opposing the BHE Plan or prosecuting a competing plan.

50.     Importantly, the Sale Motion provides that the allocation of any liability for the BHE Termination Fee will await another day.  Exh. A to Fay Decl., Sale Motion ¶ 35; Disclosure Statement § F(10) (reserving allocation of Administrative Claims between the EFH Debtors and EFIH Debtors for either settlement among the parties or bankruptcy court determination by final order).  The actual allocation is ***absolutely critical*** for this Court to assess the sound business judgment of EFIH.  ***One simply cannot reasonably assess the value of the BHE Merger Agreement to the EFIH estate in the first place without understanding the intended allocation***

---

[16] Elliott expressly reserves, and does not waive, the right to challenge Mr. Cremens' independence.

*of this enormous proposed potential liability.*  Specifically, if, as Elliott believes, the "Debtors" would seek to allocate all or nearly all of the BHE Termination Fee to EFIH, then approval of the BHE Merger Agreement places EFIH at significant risk of administrative insolvency.  There is nothing in the Sale Motion that demonstrates that the advantages of entering into the BHE Transaction outweigh that risk.  Without this information, the Court simply cannot find that EFIH's entry into the BHE Merger Agreement was an exercise of sound business judgment.

### B.    The BHE Merger Agreement And Sale Process Have Not Been Proposed In Good Faith

51.    Section 1121 of the Bankruptcy Code provides that a debtor has, subject to court approval, the exclusive right to file and solicit acceptances with respect to a plan of reorganization for up to 18 months from the petition date.  The Debtors' exclusive periods expired over 21 months ago, and to date the Debtors have prosecuted well over 10 plans of reorganization, confirming two of them, *but failing to fully consummate any plan of reorganization for the E-Side Debtors*.  The Debtors' past failures should not, and cannot, be rewarded by this Court granting them a *de facto* extension of exclusivity.  That is exactly the consequence of approving the BHE Merger Agreement and the BHE Termination Fee.

52.    *First*, as set forth above, the BHE Plan Confirmation Condition expressly provides that if the EFH Confirmation Order is not entered by this Court, the Debtors' estates will be liable for the $270 million BHE Termination Fee.  That effectively eliminates any competing plan process by punishing creditors from exercising their fundamental statutory right to file a competing plan.  *See In re Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993) ("The ability to file a competing plan, thereby allowing creditors to cast ballots for multiple plans, also encourage a chapter 11 policy of 'creditor democracy.'  The creditor body

benefits because a competing plan allows each individual creditor to decide which plan best comports with its respective interests").

53.    Indeed, had any plan of reorganization included such a provision, the plan would violate Bankruptcy Code section 1129(a)(3).  *See In re PWS Holding Corp.*, 228, F.3d 224, 242 (3d Cir. 2000) (citing *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 140 n.5 (3d Cir. 1986)) (for purposes of determining good faith under section 1129(a)(3), "the important point of inquiry is the plan itself and *whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code*") (emphasis added).  The elimination of the competing plan process is squarely at odds with the Bankruptcy Code objective of allowing creditor plans once exclusivity lapses, and consequently, inclusion in the BHE Merger Agreement of a requirement to pay the BHE Termination Fee if the EFH Confirmation Order is not entered warrants denying BHE's request for a "good faith" purchaser finding.

54.    Moreover, it should also be clear to the Court why the Debtors and BHE have sought approval of the BHE Merger Agreement so swiftly.  If this Court approves the BHE Merger Agreement, BHE and Oncor will move forward with filing an application with the PUCT (the "PUCT Application") to approve the BHE Transaction.  Under Texas law, an application with the PUCT seeking approval of a change in control must be filed by the affected utility.  Tex. Util. Code §§ 14.101(b), 39.915(a), 39.262(l).  ***When Oncor files its application for approval of the BHE transaction, the Commission will not consider whether there are alternative or superior transactions to the BHE proposal, such as a creditor-sponsored transaction.***  *See, e.g.*, Exh. X to Fay Decl., Preliminary Order at 4,  *Joint Report and Appl. of Oncor Electric Delivery Co. and Texas Energy Future Holdings Pursuant to PURA §14.101*, PUCT Docket No. 34077 (identifying "alternative business combinations to the one proposed" as an "issue not to be

addressed"), *id.* at 5 (order's conclusions about issues not to be addressed should be considered dispositive).[17]

55.     Further, while the PUCT Application is pending, Oncor itself could not support or file for authority with the PUCT to enter into a separate and competing creditor-led transaction. ***As a result, creditors are effectively foreclosed from pursuing an alternative plan of reorganization that may be consummated***. Thus, while Elliott believes that obtaining regulatory support is prudent, obtaining formal regulatory approval in the present situation is at odds with a creditor's right to pursue a competing plan. ***Consequently, in the unique circumstances of these cases, and given the conditionality of the BHE Merger Agreement, approval of the BHE Merger Agreement is inconsistent with the statutory rights of Elliott and other creditors to pursue a competing plan.***

56.     Moreover, even leaving aside the improper burden that the BHE Plan Confirmation Condition imposes on the Court to enter the EFH Confirmation Order, the threat that the $270 million BHE Termination Fee will be due and payable if the EFH Confirmation Order is not entered is akin to an impermissible "death trap" used to obtain creditor acceptances. *See In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992), *aff'd*, 140 B.R. 346 (S.D.N.Y. 1992) (concluding that a "death trap" was impermissible because it penalized a class rejecting a plan by reducing that class' recovery to less than what it would have otherwise be entitled to receive under a plan); *In re Adelphia Communs. Corp.*, 368 B.R. 140, 276 (Bankr. S.D.N.Y. 2007) (same). Here, the Debtors and BHE fully understand that the BHE Plan will be opposed by EFIH creditors, especially the EFIH Class 6B creditors that include Elliott, Sunrise Partners Limited Partnership, and others. The BHE Merger Agreement puts Elliott and other EFIH creditors in no different position than an impermissible death trap: if

---

[17] Available at:  http://interchange.puc.state.tx.us/WebApp/Interchange/Documents/34077_412_560386.PDF.

Elliott is successful in opposing the BHE Plan, creditor recoveries will be eroded by payment of the BHE Termination Fee and Elliott will no longer receive the recovery to which it would have been entitled had Elliott voted to accept the BHE Plan.  For this and the other reasons set forth above, approval of the BHE Termination Fee is inappropriate in these circumstances.

[Remainder of Page Intentionally Left Blank]

WHEREFORE, Elliott respectfully requests that this Court (i) deny the E-Side Debtors' request to approve the BHE Merger Agreement and the BHE Termination Fee, and (ii) grant such other relief as is appropriate under the circumstances.

Wilmington, Delaware
Date: August 9, 2017

BAYARD, P.A.

/s/ *Erin R. Fay*
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Evan T. Miller (No. 5364)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail:  scousins@bayardlaw.com
         efay@bayardlaw.com
         emiller@bayardlaw.com

   --AND--

ROPES & GRAY LLP
Keith H. Wofford                    Andrew G. Devore
Gregg M. Galardi                    Meredith S. Parkinson
1211 Avenue of the Americas         Prudential Tower
New York, NY 10036-8704             800 Boylston Street
Telephone: 212-596-9000             Boston, MA  02199-3600
Facsimile:  212-596-9090            Telephone: 617-951-7000
Keith.Wofford@ropesgray.com         Facsimile: 617-951-7050
Gregg.Galardi@ropesgray.com         Andrew.Devore@ropesgray.com
                                    Meredith.Parkinson@ropesgray.com

*Counsel to the Elliott Funds*