# Exhibit D

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                    :

                              :     Chapter 11

6   ENERGY FUTURE HOLDINGS    :

    CORP., et al.,            :     Case No. 14-10979(CSS)

7                             :

            Debtors.          :     (Jointly Administered)

8   _____ :

9

10

11                           United States Bankruptcy Court

12                           824 North Market Street

13                           Wilmington, Delaware

14                           November 3, 2015

15                           10:22 a.m. - 5:19 p.m.

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  LESLIE MURIN

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    to Approve a Settlement of Litigation Claims and Authorize

3    the Debtors to Enter Into and Perform Under the Settlement

4    Agreement [D.I. 5249; filed August 10, 2015]

5

6    HEARING re Fifth Amended Joint Plan of Reorganization of

7    Energy Future Holdings Corp., et al., Pursuant to Chapter 11

8    of the Bankruptcy Code [D.I. 6122; filed September 21, 2015]

9

10   HEARING re Debtors' Motion in Limine to Limit the Expert

11   Report and Testimony of Mark Rule [D.I. 6737; filed October

12   28, 2015]

13

14   HEARING re EFH Committee's Motion and Memorandum of Law in

15   Support of its Motion in Limine to Exclude Evidence of the

16   Purchasers' Subjective Intent to Close the Transaction

17   Contemplated in the Plan (Redacted) [D.I. 6739; filed

18   October 28, 2015]

19

20   HEARING re EFH Committee's Motion and Memorandum of Law in

21   Support of its Motion in Limine to Exclude Evidence

22   Concerning the Value of Oncor [D.I. 6740; filed

23   October 28, 2015]

24

25   HEARING re EFH Committee's Motion and Memorandum of Law in

Page 3

1    Support of its Motion in Limine to Exclude Evidence of

2    Consultation with Counsel Offered to Support Reasonableness

3    of Settlement (Redacted) [D.I. 6741; filed October 28, 2015]

4

5    HEARING re Debtors' Motion in Limine to Limit the Expert

6    Report and Testimony of Michael Henkin (Redacted) [D.I.

7    6742; filed October 29, 2015]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
                                              Page 4

 1    A P P E A R A N C E S :

 2

 3    ASHBY & GEDDES PA

 4        Attorney for WSFS Second Lien Indenture Trustee

 5

 6    BY:  WILLIAM BOWDEN

 7

 8    BROWN RUDNICK LLP

 9        Attorneys for WSFS Second Lien Trustee

10

11    BY:  JEFFREY L. JONAS

12         JONATHAN D. MARSHALL

13

14    FOX ROTHSCHILD LLP

15        Attorney to Ad Hoc Committee of EFIH Unsecured

16        Noteholders and EFIH Second Lien DIP Commitment

17

18    BY:  L. JOHN BIRD

19         JEFFREY M. SCHLERF

20

21    HOGAN MCDANIEL

22        Attorneys for Fenicle & Fahy

23

24    BY:  DANIEL K HOGAN

25
```

```
 1   KIRKLAND & ELLIS LLP

 2        Co-Counsel to the Debtors

 3

 4   BY:  ANDY MCGAAN

 5        MARK E. MCKANE

 6        CHAD J. HUSNICK

 7        MARC KIESELSTEIN

 8

 9   KRAMER LEVIN NAFTALIS & FRANKEL LLP

10        Attorneys for Second Lien Indenture Trustee

11

12   BY:  JOSHUA BRODY

13        GREGORY HOROWITZ

14

15   MCELROY, DEUTSCH, MUVANEY, & CARPENTER, LLP

16        Co-Counsel to the TCEH Debtors

17

18   BY:  DAVID PRIMACK

19

20   MORRIS JAMES LLP

21        Attorney for Law Debenture of New York,

22        Indenture Trustee

23

24   BY:  STEPHEN MILLER

25
```

1   MORRIS NICHOLS ARSHT & TUNNELL LLP

2        Attorneys for Equity Sponsors

3

4   BY:  DEREK C. ABBOTT

5

6   MORRISON & FOERSTER

7        Attorneys to TCEH Official Committee

8

9   BY:  CHARLES KERR

10

11  NIXON PEABODY LLP

12        Attorneys for AST as EFH Indenture Trustee

13

14  BY:  RICHARD PEDONE

15        MORGAN NIGHAN

16        GEORGE SHELLY

17

18  O'KELLY, ERNST & BIELLI LLP

19        Co-Counsel to Energy Future Holdings Corp.

20

21  BY:  DAVID KLAUDER

22

23

24

25

```
 1   PACHULSKI STANG ZIEL & JONES

 2        Attorney for Second Lien Indenture Trustee

 3

 4   BY:  LAURA DAVIS JONES

 5

 6   PATTERSON BELKNAP

 7        Attorney for Law Debenture of New York,

 8        Indenture Trustee

 9

10   BY:  DANIEL A. LOWENTHAL

11

12   PAUL WEISS RIFKIND WHARTON & GARRISON LLP

13        Counsel to Ad Hoc Committee Of TCEH First Liens

14

15   BY:  JACOB A. ADLERSTEIN

16        ANDREW EHRLICH

17        BRIAN HERMANN

18        ALAN KORNBERG

19

20   POTTER ANDERSON & CORROON LLP

21        Attorney for Deutsche Bank New York

22

23   BY:  R. STEPHEN MCNEILL

24        JEREMY RYAN

25
```

Page 8

```
 1   PROSKAUER ROSE LLP

 2        Attorneys for EFH Corp DDs

 3

 4   BY:  MICHAEL FIRESTEIN

 5        MARK K. THOMAS

 6

 7   RICHARDS, LAYTON & FINGER, P.A.

 8        Co-Counsel to the Debtors

 9

10   BY:  DANIEL DEFRANCHESCHI

11        JASON M. MADRON

12

13   THERESE SCHER

14        Attorney for DTC Company as Indenture Trustee

15

16   BY:  THERESE SCHER

17

18   U.S. TRUSTEE'S OFFICE

19        U.S. Trustee

20

21   BY:  RICHARD SCHEPACARTER

22        ANDREA B. SCHWARTZ

23

24

25
```

```
 1   VENABLE LLP

 2        Attorney for PIMCO

 3

 4   BY:  JAMIE EDMONSON

 5        JEFFREY S. SABIN

 6

 7   WACHTELL

 8        Attorneys for Equity Sponsors

 9

10   BY:  EMIL KLEINHAUS

11

12   WHITE & CASE LLP

13        Attorney to Ad Hoc Committee of EFIH Unsecured

14        Noteholders and EFIH Second Lien DIP Commitment

15

16   BY:  THOMAS LAURIA

17        J. CHRISTOPHER SHORE

18

19   WILMER CUTLER PICKERING HALE & DORR LLP

20        Attorney for EFIH First Lien Indenture Trustee

21

22   BY:  PHIL ANKER

23        ISLEY M. GOSTIN

24

25
```

```
 1   YOUNG CONAWAY

 2        Counsel to Ad Hoc Group of TCEH Unsecured Noteholders

 3

 4   BY:  PAULINE K. MORGAN

 5

 6   APPEARING TELEPHONICALLY:

 7   DESIREE M. AMADOR

 8   NII-AMAR AMAMOO

 9   LAUREN BITZIN

10   PEG A. BRICKLEY

11   EMILY A BUSSIGEL

12   MARIA CHUTCHIAN

13   KEVIN COCO

14   MARK A. CODY

15   LOUIS A. CURCIO

16   ADAM M. DENHOFF

17   EPHRAIM DIAMOND

18   ARNISH R. DOSHI

19   DAVID M. DUNN

20   BENJHAMIN D. FEDER

21   MARK A. FINK

22   MARK FLANNAGAN

23   SCOTT FRIEDMAN

24   JULIA FROST-DAVIES

25   THOMAS A. GAA
```

1    MEGGIE GILSTRAP

2    JOHN GIONIS

3    RICHARD GITLIN

4    ANDREW GLENN

5    DAVID GRINGER

6    XIAOYU GU

7    BRIAN GUINEY

8    CHRISTOPHER HAHM

9    MARK F. HEBBEIN

10   SANDRA HORWITZ

11   NATASHA HWANGPO

12   ANNA KALENCHITS

13   HAROLD KAPLAN

14   MATTHEW W. KINSKEY

15   CHARLES KOSTER

16   STUART KOVENSKY

17   MICHELLE F. KYROUZ

18   PHILIP G. LAROCHE

19   ALEXANDER LEES

20   KEVIN LIPPMAN

21   ROBERT K. MALONE

22   RICHARD G. MASON

23   BRIAN MORGAN

24   HAL F. MORRIS

25   TINA MOSS

```
 1   JAMES OSBORNE
 2   MEREDITH S. PARKINSON
 3   LARS A PETERSON
 4   BRIAN PFEFFER
 5   MEREDITH PFISTER
 6   ABID QURESHI
 7   ELIZABETH RASSKAZOVA
 8   ERICA RICHARDS
 9   RACHAEL RINGER
10   MARC B. ROITMAN
11   MATTHEW ROOSE
12   CHARLES SIEVING
13   FREDRIC SOSNICK
14   PATRICIA SMOOTS
15   RICHARD A. STIEGLITZ
16   ANDREW M. THAU
17   AMER TIWANA
18   BRIAN TONG
19   CARL TULLSON
20   MICHAEL TURKEL
21   MATTHEW UNDERWOOD
22   KEVIN M. VAN DAM
23   BRADY C. WILLIAMSON
24   APARNA YENAMANDRA
25   DANIELE ZAZOVE
```

1   DAVID ZYLBERBERG

2   CHETAN BANSAL

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              CLERK:  All rise.

 3              THE COURT:  Please be seated.  Excuse me.  Good

 4    morning.

 5              MR. KIESELSTEIN:  Good morning, Your Honor.  Marc

 6    Kieselstein, Andrew McGaan, and Mark McKane on behalf of the

 7    Debtors.  Your Honor, before I start my opening, I do have a

 8    handful of slides that I'm going to intermittently refer to.

 9    May I approach?

10              THE COURT:  Yes.  Thank you.  Before we start, I

11    just want to -- if you're going to be speaking, try to -- we

12    have a lot of people, and this room eats noise.  We're

13    actually getting more speakers; they were supposed to be in

14    before the trial started, but they're not.  Welcome to the

15    government.  So, please try to keep -- make sure you're

16    speaking into the microphones, and try to keep your voices

17    up as much as possible in order -- it won't be a problem for

18    Mr. Kieselstein, but others, please keep your voices up so

19    everybody can hear.

20              MR. KIESELSTEIN:  No microphone necessary, Your

21    Honor, yeah.

22              THE COURT:  All right.  Let's get started.

23              MR. KIESELSTEIN:  Your Honor, this is an

24    enormously important day for these Debtors, their employees,

25    their customers, and their stakeholders, for, after several
```

1    years of painful, expensive, and nonstop struggle, these

2    companies are on the verge of accomplishing something that

3    looked nearly impossible a year ago today, an almost

4    entirely consensual restructuring, one that has the

5    overwhelming support of impaired creditors and leaves the

6    rest unimpaired, one that now has the support of a majority

7    of the largest E-side unsecured group.

8              And, as I was stepping up to the podium, I was

9    informed that there's a deal, in principle, with the PCRBs

10   to resolve their objection.  So, we are running out of

11   chairs on this side of the room.

12             Your Honor, if one had said a year ago that these

13   Debtors could exit Chapter 11 consensually, without having a

14   cram-down fight or two, one might have had one's sanity

15   questioned, and with good reason.

16             Your Honor, the evidence you will hear will speak

17   much more eloquently than I ever could, so I am going to be

18   relatively brief and relatively high-level.  But I want to

19   start with where we were exactly one year ago today.

20             Your Honor said, at the end of one of our many

21   contested hearings, you strenuously urged the parties to

22   begin plan negotiations, noting that, quote, "opening that

23   dialogue sooner rather than later, even over a dinner, can

24   only be beneficial for all parties."  Now, I don't think

25   it's a shining moment for a group of adult professionals to

1    have to be told that by a judge, but that's where we were a

2    year ago, in the land of Mr. Shore's lobster and potato

3    chips.

4             And how did we get from that place to this place?

5    And I want to talk briefly about that, not for the purpose

6    of imparting a history lesson, but because the many steps

7    that led to the settlement agreement and the plan are the

8    epitome of good faith, and they undermine the objectors'

9    major theme that some sort of secret and corrupt process is

10   what gathers us here all together today.

11            I want to start with the CRO term sheet.  Your

12   Honor, the CRO term sheet was circulated in March of 2015,

13   but the knowledge at the end of 2014 that a CRO term sheet

14   might be circulated is what started the ball rolling,

15   however slowly.  All of our stakeholders said it would

16   impede dialogue, but frankly there was no dialogue to

17   impede.  We convened awkward global meetings at the end of

18   2014 that were marked by stony silence, punctuated by the

19   occasional unduly personal remark.

20            Now, Your Honor, when the CRO term sheet was

21   circulated, the reaction was predictable.  Everyone hated

22   it.  Yet the conversations became more substantive from that

23   point on.  And some of the concepts in that term sheet

24   survive to this day and are in the plan.

25            Second, Your Honor, there was the retention of the

1    conflict matter advisors.  This helped quiet the ceaseless

2    din around conflicts, and of course led to the disinterested

3    directed deal that is a key component of the proposed

4    settlement agreement.

5         Third, Your Honor, bid procedures with definitive

6    deadlines:  toward the end of 2014, the Debtors sought the

7    Court's approval of bid procedures, in light of indications

8    that the Oncor value was more than originally anticipated.

9    That in part led to the termination of the original RSA.

10   And after installing governance required by the Court in

11   January, Your Honor approved bid procedures for the

12   disposition of the Oncor stake.  That order had firm,

13   aggressive, but achievable deadlines.

14        And what did that do to galvanize the process?

15   Well, it quickened the pulses of those stakeholders who saw

16   Oncor upside leaving the estate.  And quickened pulses in

17   restructuring often lead to open checkbooks.  And here,

18   after many months of hard-fought negotiation, we had the $12

19   billion of debt and equity commitments that undergird our

20   proposed plan.

21        Fourth, Your Honor, the filing of the initial plan

22   in April of 2015:  again, this was a Debtor in good faith

23   doing its job of pushing the pile up the hill, with or

24   without creditor support.  That plan contemplated either a

25   fail or an in-money deal or a standalone equitization.

1         And I'm sure Your Honor recalls the conga line of

2    stakeholders shimmying their way to the podium to profess

3    their undying enmity for that plan.  And, as Mr. Weisfelner

4    colorfully put it on that day in April, quote, "There does

5    appear to be a consensus.  The consensus that we've reached

6    is that we all hate the plan they've filed."

7         And fifth, the scheduling order:  despite the

8    enmity for our original plan, we asked for, and Your Honor

9    entered, over many objections, a scheduling order with firm

10   deadlines, on a plan and disclosure statement that had no

11   support.  And that was critical, because it told the

12   stakeholders that, while the Debtors didn't know exactly

13   which path they were going to choose, and we didn't

14   precisely know how we were going to get there, this case was

15   not going to stand still.

16        But, at the same time, Your Honor told us that, if

17   we showed up at a confirmation hearing with no support, it

18   would be the world's shortest confirmation hearing.  And we

19   heard you loud and clear.  The pressure all around the table

20   that was necessary and appropriate was created.

21        Sixth, Your Honor, the legacy litigation protocol:

22   Your Honor, that ongoing project was critical, though hugely

23   expensive and torturous, to be sure.  Completion of that

24   massive project allowed stakeholders brave enough to enter

25   our cavernous data room all the information they needed to

1   assess and compare the risks and opportunities of a

2   restructuring versus a descent, as some of the objectors

3   still crave, into a multiyear litigation quagmire.

4          Without that work having been done, without the

5   production of a million documents and five million pages of

6   discovery, without the thousands of hours spent, including

7   by our worthy adversaries, reviewing and producing those

8   documents, we would not be here today.

9          Seventh, Your Honor, 18 months of exclusivity:

10  Your Honor, this Court's decision to grant the full measure

11  of exclusivity was vital.  It provided the centripetal force

12  that kept this case from breaking apart into an asteroid

13  belt of competing plans, with stakeholders stuck in orbit

14  around their parochial concerns.  Crucially, that allowed

15  the Debtor to create a competitive marketplace between

16  bidders in the Oncor sale process on the one hand and

17  potential plan sponsors, including the T-unsecureds,

18  Fidelity, and others, on the other -- on the other hand.

19         Now, you'll hear from the objectors that we

20  somehow sabotaged our own auction process.  But the facts

21  will tell you otherwise.

22         Finally, Your Honor, the mediation:  the Court-

23  authorized mediation process on the T-side helped parties

24  who had trouble communicating directly to speak to one

25  another through an intermediary so they could settle their

1   own massive corner of these cases, a $25 billion lien

2   avoidance and subordination dispute.  That resolution, built

3   into the settlement agreement, is an essential piece of the

4   puzzle, without which we would not be here today.  And we

5   again thank Mr. Borowitz for striding into the lion's den

6   and coming out with a deal.

7           Now, looking back, Your Honor, the contentious

8   start to these cases was probably unavoidable, given the

9   enormous sums at stake, the presence of so many smart

10  distressed players, a sleepy restructuring market in

11  general, and the theatrical rambunctiousness of parties not

12  yet in a compromising frame of mind.

13          Now, no one, including the Debtors, is blameless.

14  But this is a textbook case of a Debtor, with the assistance

15  of a Court, where we earned it, pulling a case out of the

16  doldrums and putting it firmly on a path toward a value-

17  maximizing emergence.  What has happened in the last year is

18  what Chapter 11 is all about.  It radiates good faith, good

19  faith that permeates the settlement agreement and the plan.

20          That said, we know that all the hard work and

21  progress is for naught if we fail to meet our burden and

22  persuade Your Honor that the settlement agreements should be

23  approved and the plan confirmed.  And we know full well Your

24  Honor will cut us no slack, whatever the consequences of

25  failure.  And we ask for no quarter.

1          Fortunately, Your Honor, the evidence that we

2     will, with apologize, inundate the Court with over the next

3     few weeks will leave no room for doubt that we have

4     resoundingly met that burden.  So, let me start to turn to

5     that now.

6          Your Honor, at a high level, the settlement

7     agreement resolves the intercompany claims, the

8     intercreditor claims at TCEH, and the claims by and against

9     the sponsors and the directors and officers.  As you will

10    hear repeatedly throughout the trial, the settlement

11    agreement facilitates the plan, indeed makes the plan

12    possible, by ensuring a critical degree of certainty in the

13    unlikely but not unthinkable event that the plan is

14    confirmed but does not consummate.

15         Think of the settlement agreement as an insurance

16    policy to make certain that under no circumstances do we

17    find ourselves back where we were on November 3rd, 2014, on

18    the precipice of all-out litigation, only this time beyond

19    the outer bounds of exclusivity.  As you will hear, Your

20    Honor, the settlement agreement and all of its integral

21    components preclude that nightmare scenario.

22         As to the plan, at a high level, everyone knows

23    what the plan contemplates:  full payment through cash at

24    emergence, or through reinstatement, for certain series of

25    EFH bonds.  And that's on the E-side.  On the T-side, a

1    change of control with the TCEH first-lien lenders emerging

2    as the new owners, with specified recoveries to unsecured

3    creditors.

4          So, what are the major issues that the objectors

5    raise?  Well, when you think about where we were a year ago,

6    they are remarkably few in number.  But given the substance

7    and the structure of the settlement agreement and the plan,

8    it's not surprising that the overarching disputes are so

9    few, few enough, in fact, that you could count them on one

10   hand with a couple of digits to spare.

11         As to the settlement agreement, there really only

12   is one issue:  does it satisfy the well developed standards

13   under Rule 9019 for approval of compromises?  As to the

14   plan, was it proposed in good faith?  And is it feasible as

15   to EFH?  Your Honor's recent rulings have, we believe,

16   largely vitiated complaints about impairment from the E-

17   side.

18         And in the interests of time, we will deal with

19   all the other plan objections at closing.  But rest assured,

20   to the extent they turn on the factual record, we will lay

21   down that evidence in the next few weeks.

22         So, let's start with the settlement agreement, and

23   in particular the controlling law.  And we start with first

24   principles; compromises are favored in bankruptcy.  So said

25   the Third Circuit 20 years ago in Martin, and that's not a

1    proposition that's open to serious dispute.  Every

2    administrative dollar spent in litigation is one less dollar

3    for recovery to creditors, one less dollar that can be

4    invested in the business.  And even operationally healthy

5    and profitable companies, such as these, don't have infinite

6    assets, as Your Honor recently noted on October 15th.

7            So, as the evidence will demonstrate, and I don't

8    think the objectors will seriously dispute, the transactions

9    and claims being settled here number in the tens of

10    thousands.  Some of those are in the billions of dollars.

11    And they cover a decade of frenetic activity.

12            As Judge Walrath said in WaMu, this is, quote,

13    "the precise type of multifaceted litigation that cries out

14    for settlement," close quote.  And WaMu was a liquidation

15    case.  And what was true there is even more true here for an

16    operating business:  years of continued litigation and

17    appeals would be an enormous drag on these going concerns.

18            And a couple of observations on the objections as

19    they relate to this point:  first, Your Honor, in a show of

20    admirable restraint, the committee does not allude to the

21    concept of a litigation trust all the way until page two of

22    their brief.  Well, according to the committee, it's no

23    problem for the Debtors to emerge from Chapter 11 towing an

24    18-wheeled litigation trust behind it as it goes.  But

25    history and logic tells us otherwise.

1       First, Your Honor, litigation among these Debtors

2    would likely preclude an exit until such time as the

3    litigation concluded.  But even if the Debtors could emerge

4    wearing concrete galoshes, the cost and drag on the business

5    would be enormous.  And we don't believe that there can be

6    serious dispute about that.

7       The largest fee cases ever in bankruptcy, as all

8    the professionals in this room know, are the large

9    liquidations with litigation trusts:  the Mortells, the

10   Adelphias, the WorldComs, the Rescaps, the Lehmans, et

11   cetera.  They are an all-you-can-eat buffet for

12   professionals, and they are inimical to the fresh start that

13   bankruptcy Debtors so badly need.

14      And one clash of visions you will hear throughout

15   this case is whether the fresh start of bankruptcy and the

16   closure it provides, including standard releases, is a good

17   thing.  And (indiscernible) a cardinal principle of

18   bankruptcy enshrined in the Code, as we assert, or an

19   insider protection scam that drives self-interested

20   behavior, as the objectors suggest.

21      Second, the committee asserts that the

22   intercompany claims are simple and straightforward, all of

23   them, of course, without exception, simple and

24   straightforward in favor of the E-side.  But there's a rule

25   of logic.  I think it goes back to the early Greek

1   philosophers.  It goes like this:  if it takes almost 200

2   pages or scrolls to explain how simple and straightforward

3   something is, it is neither simple nor straightforward.

4           And the evidence here, we are confident, will

5   persuade you of the complexity, unfortunately the often

6   mind-numbing complexity, of many of the disputes the

7   settlement agreement mercifully resolves.

8           Just one example:  the committee suggests that the

9   $700 million intercompany settlement has a large component

10  attributable to compensating the T-firsts for agreeing to a

11  tax-free spin.  That tax-free spin spares the E-side from

12  what could be a very considerable tax liability, but only

13  permits a partial rather than a full step-up in basis at

14  reorganized TCEH.  At certain values, agreeing to forego the

15  full step-up would cost reorganized TCEH, and derivatively

16  its new owners, a lot of money, something they, not

17  surprisingly, would want to be compensated for.

18          Now, as the value of TCEH has diminished of late,

19  due to degrading power prices, there is no doubt that the

20  difference between the partial and the full step-up has

21  diminished, and maybe even disappeared, and that drop of

22  values also means, as we stand here today, that a taxable

23  deal might not create the same magnitude of liability for

24  reorganized EFH as previously thought.  And so, the

25  committee says, "Aha, the settlement therefore can't be

1    approved."

2              But the reality is not nearly so simple, nor so

3    straightforward.  First of all, the step-up issue is one of

4    a dozen or more material issues.  Second, what goes down may

5    very well go up.  This plan, if approved, will likely not

6    consummate for six to nine months.  If any of us could

7    predict with certainty what the power price curve was going

8    to look like, say, six to nine months from now, we wouldn't

9    be here.  We'd be on our private beach somewhere, enjoying

10   an adult beverage.

11             The measurement that will determine whether the

12   partial as opposed to the full step-up will create a

13   liability for reorganized TCEH will not happen until after

14   the effective date, based on post-emergence trading values.

15   And even the committee's expert conceded he had no earthly

16   idea what the value of TCEH would be come mid-2016.  He

17   further conceded that value could swing billions of dollars

18   in that timeframe, as it has of late.  And those were two

19   wise concessions.

20             But there's more to this alleged simple and

21   straightforward story.  Even if it turns out there is no

22   financial impact on reorganized TCEH from a tax-free deal,

23   and even if a taxable deal would not create liability at

24   reorganized EFH, and we don't concede that point, there is

25   yet another reason why this transaction needs to be based on

1    a tax-free spin of TCEH and we need to get the consent of

2    the T-firsts for that to happen.  That reason relates to the

3    ability to successfully pursue a REIT conversion.

4            For reasons that we set out in our confirmation

5    brief, and the committee has ignored, a taxable spinoff at

6    TCEH would result in an allocation of earnings and profits

7    to EFH that would, in the context of a REIT, require a cash

8    dividend of something around $5 billion.  Suffice it to say

9    that required dividend would all but destroy the economic

10   viability of the REIT option, which everyone agrees, even on

11   the E-side, is the structure that maximizes value.

12           So, when the committee says these claims are all

13   so simple and so straightforward, grab your wallet.  There

14   are many claims even far more complicated than this issue.

15   So, we don't think simple and straightforward and these --

16   this universe of claims are terms that should be used in the

17   same paragraph.

18           And, Your Honor, this example demonstrates why the

19   law is clear that the Court need not try the claims in full

20   or in miniature to gauge the appropriateness of the

21   settlement, but rather need only canvass the issues with

22   sufficient specificity to be able to assess the

23   reasonableness of the compromise.  Obviously, Your Honor,

24   sparing the expense of trying the claims in full, or even in

25   truncated fashion, is what captures the financial and

1    temporal savings that settlements are designed to provide.

2            And even with all that, Your Honor, I submit this

3    will be one of the longest and most detailed 9019 hearings

4    any of us have been involved in.  At the end of many days,

5    Your Honor, the evidence will demonstrate that the

6    settlement agreement is fair and equitable, meeting the

7    standards this Court articulated in Capmark.

8            Your Honor, the objectors, particularly the

9    committee, no doubt recognize that the well settled legal

10   test under Rule 9019 is lethal to their objections.  So, in

11   their zeal, what does the EFH committee do?  Unfortunately,

12   it takes a low road to try to escape the vast body of

13   liberal Rule 9019 jurisprudence.

14           And, to their shame, I must say, they accuse the

15   disinterested directors in turns of being stupid, lazy, in

16   the pockets of the sponsors, and fixated on their own

17   releases.  Their brief contains a pastiche of wildly out-of-

18   context deposition fragments to try and make that case.  And

19   some of that same regrettable rhetoric seeps into their

20   arguments on the good faith elements of the plan.

21           I don't want to spend a lot of time dignifying

22   what was alleged, other than to say Your Honor will hear

23   from a number of the disinterested directors, and you can

24   determine yourself their level of intelligence, integrity,

25   work ethic, and the purity of their motives.

```
 1              I'll just say that attempts to escape Rule 9019

 2       jurisprudence in favor of entire fairness, based on alleged

 3       derelictions of the duty of care and loyalty, or attempts to

 4       apply heightened scrutiny by contorting the settlement

 5       agreement into a change of control transaction, and other,

 6       more outlandish theories will shrivel up in the cold light

 7       of the facts.

 8              But let me briefly turn to what the evidence will

 9       show about the process leading to the intercompany

10       settlement.  First, Your Honor, the evidence will show that

11       the disinterested directors, along with the entire board,

12       had a thorough grounding in potential intercompany claims

13       and sponsor claims well before the disinterested director

14       advisors were retained.

15              Second, the evidence will show that the focus on

16       intercompany claims intensified when the disinterested

17       director advisors came on board.  They immediately went to

18       work reviewing the trove of documents, which all objectors

19       have had full access to, provided interviews and

20       (indiscernible) sessions, and they heard a variety of views,

21       including, on multiple occasions, those of the allegedly

22       disenfranchised EFH committee.

23              Third, Your Honor, each of the disinterested

24       directors and their advisors engaged in dialogue with their

25       counterparts, exchanged presentations, advocated the
```

1   strengths of their respective positions, pointed out the

2   weaknesses of the other estate's claims, and, after the

3   groundwork had been laid, exchanged a series of proposals

4   and counterproposals.

5            And ultimately, an agreement was reached, one that

6   the objectors take strong issue with on the merits.  Fair

7   enough. But the evidence will show that the assertion that

8   this process was rushed or cursory or some rubber-stamping

9   exercise is simply not true.

10           Now, Your Honor, on the next two slides, I've

11   listed the categories of claims by and among EFH, EFIH, and

12   TCEH.  And I'm not going to repeat them here.  It's merely

13   to give the Court a sense of the 31 flavors or so of claims

14   resolved in the settlement.  And you will hear a great deal

15   of detail, more than you want, from a number of witnesses,

16   about the complicated facts surrounding these claims.

17           Your Honor, there's also a slide to remind the

18   Court of the magnitude of the T-side intercreditor

19   settlement, which, of course, would likely need to be tried

20   in a far more comprehensive fashion than Rule 9019 requires

21   if we were engaged in a hotly contested cram-down fight.

22           So, putting aside what standard a review should

23   apply, what are the objectors substantive complaints, again,

24   primarily asserted by the E-committee?  Now, this is

25   actually something that is simple and straightforward:  too

 1   much, too soon, too broad.

 2           As to the first, that the 700 million is an

 3   unreasonably high number, we will let the evidence speak for

 4   itself.  While reasonable minds can always disagree, well

 5   informed minds here disagree over whether 700 million is too

 6   high, too low, or just right.  We think that alone means

 7   that we have met our burden.

 8           But I do want to spend a few minutes on "too soon"

 9   and "too broad."  By "too soon," the objectors mean that the

10   settlement agreement should not be approved by separate

11   order in this hearing, but should only be approved

12   conditionally and tied to the consummation of the plan

13   itself.  In their view, only if the plan consummates should

14   the settlement become final.  If the plan fails to

15   consummate, the settlement agreement fails, too, and we are

16   back to square one, litigation central.

17           A few observations:  first, Your Honor, the claims

18   being settled are historical in nature.  The facts

19   surrounding those claims are immutable.  There is no theory

20   of relativity that changes the nature of the claims

21   depending on the frame of reference of the observer or the

22   date of the observation.  There is no spooky action that

23   will mysteriously transform these claims into something

24   better or worse six months from now.

25           And that is why settlements untethered to plans

1   happen all the time.  They rise or fall on their own merits,

2   or lack thereof.  And Your Honor will recall, in the context

3   of the scheduling order, the EFH committee was chomping at

4   the bit to have an immediate adjudication on the merits of

5   the intercompany claims.

6           We thought it made sense for it to be heard as it

7   is being heard, in conjunction with but independent of the

8   plan.  So, even the EFH committee has acknowledged that the

9   facts that form the basis of the settlement agreement are

10  fixed, not variable.

11          Second, while it's magnanimous of the objectors to

12  agree to the settlement in the context of a consummated

13  plan, it's a meaningless concession.  If the plan

14  consummates, all the E-side creditors get paid in full, and

15  unimpairment means, by definition, they have no residual

16  claims against the T-side, the sponsors, or the fiduciaries.

17          But third, and most importantly, the evidence will

18  show that the freestanding existence and permanence of the

19  settlement agreement actually lays down the track by which

20  the E-side creditors will be paid in full in cash or

21  reinstated.  And what do I mean by that?  Well, let me give

22  a couple of examples.

23          Under the settlement agreement, the sponsors give

24  up any and all upside at EFH to which they would otherwise

25  be entitled, most notably the added value potentially

1    generated by the conversion of Oncor to a REIT as the plan

2    contemplates.  Giving up that upside obviously benefits the

3    TCEH junior creditors.  And that is a permanent concession,

4    true under this plan or any alternative plan.

5              Now, keep in mind that, while only time will tell

6    what reorganized EFH would be worth with a REIT structure,

7    Mr. Seager at his deposition suggested that it might -- and

8    I emphasize "might" -- be worth well north of $20 billion.

9    Given the hurdle to recovery by the sponsors, even taking

10   into account the $700 million intercompany claim, is

11   approximately $19.5 billion, the sponsors are potentially

12   leaving an enormous payday on the table.

13             And the sponsors, of course, are structurally

14   senior to the TCEH creditors when it comes to surplus value

15   at EFH.  If that surplus value was simply going to be

16   waylaid by the sponsors, the TCEH unsecured creditors would

17   of course not be writing a $7 billion equity check.  And it

18   is that check that is making full payment or reinstatement

19   available for the E-side creditors.  And, not surprisingly,

20   the sponsors would not be agreeing to that permanent

21   concession if their releases were only temporary or

22   conditional.

23             Another example:  the plan sponsors have agreed to

24   disarmament and drag, to give up all of their litigation

25   rights if, for any reason, the plan confirms but does not

1   consummate, let's say for regulatory reasons.  And they only

2   agreed to give up those litigation rights and that option if

3   they knew that they would get the $550 million carve-out

4   from the collateral of the first-lien lenders in any

5   alternative plan scenario.

6           Without that floor under their potential recovery,

7   the plan sponsors, again, would not have agreed to give up

8   their litigation rights, inject $7 billion of equity, and

9   pursue the merger transaction that makes full E-side

10  recoveries under this plan possible.

11          A third example: the TCEH first-lien lenders

12  agreed to let the plan go forward and wait for the process

13  to play out because they knew that the settlement agreement

14  permanently shelved intercompany and intercreditor and

15  sponsor litigation that could tie up the TCEH estate for

16  years.  Without that assurance, they would not have agreed

17  to the plan, the tax-free spinoff, or the carve-out from

18  their collateral.  And, again, without that floor recovery,

19  there is no $7 billion equity check to be had.

20          One last example, Your Honor:  the TCEH first-lien

21  lenders also would not have agreed to pay $550 million under

22  any circumstances under an alternative plan scenario if they

23  did not know that there would be an allowed $700 million

24  claim of TCEH against EFH to defray, in part or in full, the

25  cost of that carve-out from their collateral.  No one, of

1    course, knows what that claim will yield in the context of

2    an alternative plan scenario.  But one suspects it would

3    yield a material amount to at least partially defray the

4    insurance policy the T-firsts are writing.

5              I could give more examples, but hopefully the

6    point is, to coin a phrase, simple and straightforward.  The

7    evidence will show that moving the settlement agreement into

8    the plan or making it contingent on consummation of the plan

9    would basically strangle the plan in the cradle.  That same

10   evidence will also show that the settlement agreement is a

11   carefully constructed set of give-and-takes.  Pull out the

12   pieces; the objectors don't like, as they urge the Court to

13   do, and the whole settlement agreement comes crashing down,

14   and with it the plan itself.

15             As to "too broad," Your Honor, that goes to the

16   proposed release of potential claims against the sponsors,

17   an issue that also comes up in the good faith element of the

18   plan as well.  And what I say about the state of the

19   evidence here will apply in that context, too.

20             First, as I said a moment ago, a permanent release

21   of the sponsors in the settlement agreement is of critical

22   importance to the structure and integrity of that agreement.

23   And again, they are given in exchange for important and

24   permanent economic concessions from the sponsors that are --

25   include but are by no means limited to conceding the upside

1    at EFH.

2              Second, Your Honor, the evidence will show that

3    the claims against the sponsors have been thoroughly vetted

4    over a period of years by the Debtors, with the input of any

5    number of advisors.

6              Third, the evidence will show that proper

7    governance was punctiliously followed.  The sponsor releases

8    were reviewed and approved by special board committees of

9    the Debtors, without sponsor participation or

10   representation.

11             Fourth, the evidence will show that the proposed

12   claims against the sponsors from the E-side are thin to the

13   point of invisibility.  Even the E-committee's own experts

14   confess that the biggest single payment to the sponsors at

15   the closing of the LBO cannot be challenged on a colorable

16   basis.

17             And the bulk of other payments received by the

18   sponsors in exchange for what the evidence will show were

19   good and valuable services was paid for from the cash flows

20   of TCEH.  In fact, that over-allocation of expense to the T-

21   side was set to be corrected so the E-side could start to

22   pay its fair share, but, before implementation, the

23   sponsors, of their own accord, suspended the receipt of any

24   additional management fee payments.  And they did so while

25   continuing to provide those services which they are doing up

 1   until today.

 2          Your Honor, the timing of the assertion of these

 3   allegedly valuable claims is telling and highly suspect.

 4   The potential claims alleged against the sponsors were first

 5   identified with any degree of particularity only within the

 6   last two weeks, not when the intercompany settlement, which

 7   contemplated sponsor releases, was made known in the spring

 8   of 2015; not when the CRO term sheet contemplating global

 9   releases was circulated early in 2015; not when the first

10   plan was actually filed containing global releases in April;

11   not when the amended plans were filed all the way through

12   August, all with global releases.

13          The EFH committee, as it railed against the

14   intercompany settlement, never had anything the least

15   specific to say about the sponsors.  And despite full access

16   to the litigation database, for many months, neither this

17   Court nor the Debtor heard anything in particular about the

18   sponsors, until, we suspect, it occurred to the E-committee

19   that these newly articulated claims against the sponsors

20   might provide a way around Rule 9019.  You will hear a lot

21   of talk, but not much evidence, on these claims.

22          Your Honor, when King William III urged his

23   soldiers in England to defend and die in the last ditch, he

24   wasn't thinking about these claims, but he might have been,

25   because that -- it fits.  That's where these claims belong,

1   in the last ditch.  So, in sum, Your Honor, the cries of

2   "too much, too soon, and too broad" will all yield to the

3   weight of the evidence.

4        Now let me turn, with my remaining time, to the

5   plan.  And I'm only, again, going to touch on good faith and

6   feasibility.  The rest we will cover in the closing, no

7   disrespect to the U.S. Trustee or the PCRB Trustees or any

8   of the other objectors.  I'm just trying to save time.

9        Your Honor, as to good faith, it is somewhat

10  astonishing to us that the objectors have focused on this.

11  But then again, when a plan leaves your entire constituency

12  unimpaired, one must search high and low to find something

13  to complain about.  But the law is clear from PWS and W.R.

14  Grace in the Third Circuit, and it's similar in other

15  circuits:  good faith turns on whether a proposed plan is

16  consistent with the policy goals of Chapter 11, preserving

17  going concerns and maximizing recoveries.

18        And it's really hard to argue with a straight face

19  that this plan fails to preserve value or fails to maximize

20  recoveries when it sheds $30 billion of debt with the

21  consent of every single voting class; when it has the

22  support of a majority of the pick holders, the largest E-

23  side unsecured constituency; when it pays all E-side

24  creditors in full, in cash or reinstates; when it allows

25  TCEH to emerge with a sustainable capital structure in the

```
 1    hands of an -- of new owners, and when it allows EFH to

 2    emerge expeditiously under a value enhancing REIT structure,

 3    all without the albatross of endless litigation.

 4           This plan cannot maximize E-side creditor

 5    recoveries any more than it already does.  Also, as I

 6    detailed earlier, Your Honor, the arduous process of getting

 7    to where we are today with multiple proposed plans, due

 8    diligence, endless negotiations on both the E-side and the

 9    T-side, they all paint a vivid picture of good faith.

10           And, Your Honor, while I'm on the topic, I wanted

11    to touch on some of the more, shall we say, esoteric

12    theories set forth by the committee in their objection.

13    They aren't tethered to any particular provision of Section

14    1129 as far as I can tell, but they feel like a veiled

15    attack on the good faith of the plan.

16           And these are purported Chapter 11 concepts with

17    which I think many of us are not familiar.  And I'm talking

18    about the notion that every plan proposed with director and

19    officer releases is a per se breach of fiduciary duty, and

20    that every plan containing such provisions, which means 99

21    percent of plans, must be judged by a more onerous legal

22    standard.

23           Clearly why every plan that proposes D&O releases

24    is not followed by an immediate motion for appointment of

25    the Chapter 11 Trustee, for that per se breach of duty.  And
```

Page 40

1    that would certainly make the Chapter 11 Trustee business

2    one worth getting into.

3           Your Honor, then there is the complaint that an

4    official committee not deeply involved in the negotiation of

5    a plan that leaves its stakeholders unimpaired, if they're

6    not involved from the start at every meeting, that the plan

7    needs to be rejected.

8           I'm also referring to alien notions of artificial

9    unimpairment and synthetic exclusivity.  Your Honor, these

10   ideas, these theories, have no textual or case support.  But

11   they do demonstrate the extraordinary challenge of filling

12   almost 200 pages objecting to a plan that pays your

13   constituents in full, and the extraordinary creativity

14   needed to meet that challenge.  In sum, Your Honor, the

15   evidence will establish that this plan and the process that

16   led to it are the very picture of good faith.

17          And let me spend my last few minutes on

18   feasibility, Your Honor.  When you take a step back, this is

19   a really odd objection.  If the objection is successful, the

20   E-side creditors will never know if they would have received

21   a full cash recovery.  And until this case, I thought a full

22   cash recovery was a phenomenal outcome in any Chapter 11.

23          Now, are the objectors so convinced that the plan

24   won't be consummated that they are not willing to wait and

25   see the outcome, particularly when the evidence will show

1   there is no other alternative plan that could produce that

2   result or could get done in the meantime?  It does make one

3   wonder what the committee is thinking, and perhaps explains

4   why no actual principals on the E-side filed independent

5   feasibility objections asserting that the merger would not

6   close.

7          That aside, what are the feasibility issues?

8   First, Your Honor, will the regulators approve?  And second,

9   will the plan sponsors close, or will they walk?  At the

10  outset, Your Honor, there is no real dispute that the law on

11  feasibility requires a Debtor to show only a reasonable

12  likelihood of success, not a guarantee.  To make this

13  showing, a Debtor must clear only a, quote, "relatively low

14  threshold of proof," close quote.  That's the Brice Road

15  Development case, quoted also by -- with approval by Judge

16  Walrath in WaMu.

17         Your Honor, as to the regulatory question, there

18  are complaints about the absence of regulatory certainty.

19  But that is something that is available to no one, ever, and

20  cannot in and of itself be a bar to a finding of

21  feasibility.  Regulators, like judges, don't broadcast their

22  conclusions in advance.  And, as Your Honor noted, no one

23  can or should be able to compel a PUC commissioner or an IRS

24  official to take the stand and testify as to future

25  regulatory outcomes.  A baseline level of uncertainty just

1    comes with the territory.

2        So, what evidence will we adduce to give the Court

3    the relatively relaxed level of comfort necessary to show

4    that approvals are reasonably likely to be obtained?  First,

5    Your Honor, you will hear about the involvement of the Hunt

6    entities.  The Hunts are well experienced in this area, as

7    experienced as anyone on the planet, having shepherded the

8    only utility REIT through the PUC process.

9        Again, that's no guarantee of success.  This is a

10   larger transaction with different dimensions and different

11   issues.  But it is a highly relevant data point.  The Hunts

12   are experienced players in Texas in general and in the

13   utility space in particular.  They have evinced a strong

14   interest in these assets, very unique assets, for some 10

15   years.  They are heavily invested in a successful outcome,

16   and they have devoted enormous time and resources to this

17   project.  And the $550 million in the alternative plan

18   scenario does nothing for them.

19       Similarly, the plan sponsors here are large, well

20   respected, and sophisticated institutions.  They have also

21   devoted enormous time to this endeavor and put their

22   reputations on the line.  This would be a flagship

23   transaction for these institutions.

24       Your Honor, the evidence will also show that the

25   PUC process is well underway.  Applications have been

1    submitted.  Numerous meetings have been held with staff.

2    Feedback has been received, assimilated, and responded to.

3    Dates have been set for a January hearing on the merits, and

4    for a late March 2016 decision.

5           All that can be done is being done.  And Debtor

6    representatives will testify to their reasonable and well-

7    informed belief that the necessary approvals will ultimately

8    be obtained.  And evidence will support a similar conclusion

9    with respect to the IRS, FERC, and the Nuclear Regulatory

10   Commission.

11          And the case law, Your Honor, and standard big

12   case practice demonstrate that regulatory processes are no

13   burden to a finding of feasibility.  And we cited many of

14   those cases in our briefing.  And that makes sense.

15   Regulated businesses are not immune from the pressures that

16   force companies into Chapter 11.  And they need a way out of

17   Chapter 11, same as any other business.

18          Now, Your Honor, as to the question of the

19   mythical free option, the evidence will show that the Debtor

20   considered an array of remedies over a number of months as

21   the negotiations took their course, and concluded that

22   disarmament and drag rights were far more valuable than

23   traditional M&A remedies like a reverse breakup fee or

24   specific performance.

25          The E-committee complains that standard M&A deals

Case 14-10979-CSS   Doc 5073   Filed 07/09/15   Page 44 of 160

Page 44

1      contain standard M&A remedies, but this one doesn't.  This

2      is not a standard M&A deal, Your Honor.  Disarming and

3      dragging do not exist in the rarefied air outside of Chapter

4      11.  Disarm from what?  Drag to what?  The evidence will

5      show why the decision to pursue disarmament and drag was the

6      right decision.  For purposes of time, I will just say that

7      the amount of any breakup fee offset by the time, money, and

8      continued opportunity costs from the unending stresses of

9      additional litigation and restructuring would pale in

10     comparison the benefits conferred here by disarmament and

11     drag and their deterrent effects against walking away from

12     closing.

13             Your Honor, would I love have a breakup fee and

14     specific performance and disarmament and drag?  Sure.  I'd

15     like to have Mr. Lauria's firstborn if his clients don't

16     close the transaction.

17             MR. LAURIA:  Okay.

18             MR. KIESELSTEIN:  Maybe, maybe not.  But if I can

19     only have one of those remedies, Your Honor, the evidence

20     will clearly demonstrate that we would take disarmament and

21     drag all day long.  Your Honor, as he -- as Your Honor has

22     noted, and the evidence will be enforced, the notion that

23     the plan sponsors have constructed this elaborate

24     diversionary tactic so they can lock in the $450 million

25     consolation prize, that beggars belief, Your Honor.  But if,

1    against all the evidence, that is the plan sponsor's secret

2    agenda, disarmament and drag will lay the groundwork for

3    what comes after:  a streamlined expedited process to pursue

4    an alternative plan, and will do so in a way that a couple

5    of 100 million dollars more for consumption by hordes of

6    professionals.

7            And as for the other feasibility items, Your

8    Honor, we believe the evidence will show that reorganized

9    EFH can handle the cost of any make-whole claim that some

10   appellate court may award long after emergence.  Even so,

11   the law is clear that for feasibility purposes, The Court

12   must discount the face amount of those disallowed claims at

13   EFIH by the likelihood of any court reversing.

14           And based on the record, on the merits established

15   in this court, we believe the likelihood of success of those

16   appeals is extremely low.  And as for the end result, EFIH

17   legacy bond make-whole claims, the Debtors are seeking in

18   phase two of this trial to establish the right to pursue the

19   reinstatement option in lieu of paying cash, should this

20   court letter allow the claim.

21           Now, Your Honor, I will leave for closing what's

22   left of the impairment objections after your make whole and

23   PPI rulings, and again, the same goes for the PCRB trustee's

24   objection on a release and professional fee issues.  We're

25   not forgetting them.  We're just trying to save time, and I

```
 1    see my time is about up.  And I know, no matter what they

 2    say, it was Mr. McGaan and Mr. McKane who lobbied my time

 3    limit into the order and not the objectors.  But that was

 4    probably a wise choice on their part.

 5              Your Honor, I would just leave you with this.

 6    After you hear all the evidence and suffer the tedium of the

 7    next few weeks, we very respectfully believe that these will

 8    not be close calls and that Your Honor will agree with us

 9    that the settlement agreement should be approved and the

10    plan confirmed.  Thank you.

11              THE COURT:  Thank you.

12              MR. KIESELSTEIN:  Your Honor, I am told that

13    there's a couple of housekeeping items before we get to the

14    next opening statement by Mr. Husnick.

15              THE COURT:  Alright.

16              MR. KIESELSTEIN:  Thank you, Your Honor.

17              THE COURT:  Thank you.

18              MR. HUSNICK:  Morning, Your Honor.  Chad Husnick

19    with Kirkland & Ellis on behalf of the Debtors.  Very

20    quickly, two quick statements that I think will clean up two

21    of the pending objections.

22              First, with respect to the United States trustee,

23    the plan of reorganization talks about a reorganized

24    management incentive plan.  As Your Honor may recall or

25    know, one of the documents filed in the plan supplement was
```

1   a term sheet regarding a reorganized Debtor management

2   incentive plan.  We are not seeking approval of the

3   management incentive plan today or as part of confirmation.

4   And to be clear nothing in the plan or the confirmation

5   order will establish the terms of the reorganized Debtor

6   management incentive plan.

7           The plan will be established by the new board of

8   reorganized TCEH.  This new board and any compensation

9   committee appointed by the new board will establish the

10  plan, determine the rights to compensation of individual

11  managers under the reorganized deter management incentive

12  plan, and award those rights.  This is what is reflected in

13  the filed plain supplement, and we will make that clear in

14  the plan as well.

15          Your honor, the second statement that I'd like to

16  make is with respect to the objection of Tex-La and RUS.

17  Your Honor, the Debtors engaged in discussions with Tex-La

18  and RUS, and I'm happy to report that we've been able to

19  negotiate language that I won't summarize here, but we've

20  negotiated language that'll be included in the plan and

21  confirmation order that resolves that objection, and I

22  believe Mr. Fine is secluded in the overflow room, but he

23  wanted me to make that statement so he can depart from

24  Wilmington.

25          THE COURT:  All right, thank you.

 1          MR. HUSNICK:  Your Honor, with that, I will,

 2     unless you have any questions, turn it over to Mr. Thomas.

 3          THE COURT:  Okay, thank you.

 4          MR. THOMAS:  Good morning, Your Honor.

 5          THE COURT:  Good morning.

 6          MR. THOMAS:  Mark Thomas from Proskauer, counsel

 7     to Energy Future Holdings Corp, acting on behalf of and at

 8     the direction of the disinterested directors, Mr. Donald

 9     Evans and Ms. Billie Williamson.

10          THE COURT:  Go ahead.

11          MR. THOMAS:  Thank you, Your Honor.  I'll do -- I

12     will be brief.  Your Honor, the disinterested directors of

13     EFH Corp. have been acting since 2013, well in advance of

14     the filing of these cases, and the evidence will show that

15     commencing in 2013, the EFH it disinterested directors had

16     numerous meetings of board meetings that excluded sponsor

17     directors or affiliates to review issues relating to the

18     sponsors.

19          Your Honor, the objections that have been filed

20     are replete with the statements, fall citations, and

21     revisionist history.  And we filed a response, docket number

22     6797, to the objections, Your Honor, on behalf of the EFH

23     Corp. disinterested directors.  We also reviewed, revised,

24     enjoined, and signed the replies filed by the Debtors at

25     docket number 6817 and 6820, but one telling example of how

1   these objections are replete with revisionist history is the

2   statement at paragraph 199, page 84 of the committee's

3   objection that says, quote, the evidence at trial will show

4   that EFH gave TCEH an effective consent right over matters

5   such as the disposition of Oncor, close quote.

6          That statement is utterly false, Your Honor.  Your

7   Honor's November 3rd ruling at pages 18 and 19 ruled that in

8   connection with any Oncor sale process, that the TCEH board

9   and the disinterested manager of TCEH, Mr. Hugh Sawyer, had

10  to first approve bidding procedures; second, approve the

11  choice of a stalking horse bidder; and third, approve the

12  choice of the winning bidder.  And the committee knows that.

13         Your Honor, what did the disinterested directors

14  do?  In this case, the evidence will show the professionals

15  were retained by EFH disinterested directors in November and

16  December of 2014, and those professionals dove into

17  extensive document review and investigation.  We interviewed

18  numerous personnel.  We had meetings with numerous creditor

19  representatives, including representatives of picks, EFIH

20  picks, EFIH second liens, and Fidelity, and the EFH

21  committee, and a partial listing of those meetings of those

22  meetings is set forth in docket 4147.

23         Your Honor, the evidence will show that there were

24  numerous formal meetings of the disinterested directors.

25  Minutes have been produced.  There were not less than 12

1    such meetings between December and April.  In addition,

2    there were numerous informal meetings with telephone calls,

3    electronic communications.  The disinterested directors also

4    were fully informed, through board of directors meetings

5    that were held almost weekly throughout this process, and

6    during those board of directors meetings, the status of the

7    cases was discussed.

8              Your Honor, contrary to the allegations of the

9    objections, the evidence will show that litigation was

10   always an option for the EFH Corp. disinterested directors,

11   and that if a settlement was not reached, there was a

12   litigation option, and it was a bad option for EFH Corp.

13   The expense, the time, and the risk of the litigation will

14   be proven.  And the fact that there was no upside to EFH

15   Corp. in litigating against TCEH will also be proven.

16             Your Honor can take judicial notice that the make-

17   whole litigation with the EFIH first liens, which was a

18   dispute over an unambiguous contract commenced in May of

19   2014, and now 17 months later, the first brief and the U.S.

20   District Court has finally been filed.  What was the result

21   of the disinterested directors work for -- on behalf of EFH

22   Corporation?

23             On April 3, 2014 -- I'm sorry, 2015 -- the

24   disinterested directors settlement was published and made

25   known.  It had a few primary items.  One is EFIH, another

1   Debtor with its own disinterested manager, released EFH

2   Corp. from legacy note holdings in excess of $1.2 billion.

3   TCEH released litigation claims that, exclusive of an LBO

4   claim, ranged in excess of $1.8 billion, and one $700

5   million claim was allowed in lieu of all these billions of

6   dollars of claims.  And disinterested directors settlement,

7   Your Honor, had a fiduciary out.

8         Now the committee claims that the disinterested

9   directors settlement was concocted in stealth and presented

10  as a fait accompli, and the record will show that everyone

11  that was paying attention and that was a stakeholder in this

12  case knew what the disinterested directors were

13  investigating and what the disinterested director advisers

14  were investigating.  And, Your Honor, a fiduciary out is the

15  antithesis of a fait accompli.

16        Your Honor, since the announcement of the

17  disinterested directors settlement on April 3rd, the EFH

18  Corp. disinterested directors have continued their

19  diligence, and have continued with meetings, continued

20  receiving input from creditor representatives, and continued

21  to consider the appropriateness of exercising their

22  fiduciary out from the settlement.  They were, at all times,

23  involved in the Oncor sale process, pursuant to the bidding

24  procedures that stretched from January through June.  And,

25  Your Honor, the evidence will show that the result of that

1     Oncor sale process was an unacceptable bid that would not

2     have paid the EFIH undisputed creditor claims and full.  And

3     that meant for the EFH Corp. disinterested directors that

4     the settlement was much better now than it was in April of

5     2015.

6             So what are the current alternatives for EFH

7     Corp.?  One alternative is to prosecute this plan and the

8     settlement agreement with an opportunity to pay all our

9     creditors in full, yet, at the same time, we have a

10    fiduciary out under the plan support agreement Your Honor

11    approved as well as the merger agreement.  We have a shop

12    right to shop for alternative transactions.  We have the

13    right to negotiate inbound transactions, so we are available

14    if there is a better alternative.

15            There is no alternative plan, Your Honor.  There

16    is no alternative plan that has been proposed by the

17    objectors.  There was no alternative plan with any E-side

18    creditor support whatsoever.  Given EFH Corp.'s few current

19    alternatives, what are the future options available to EFH

20    Corp.?  Again, we have the fiduciary right.  The committee

21    in its objections states that the Oncor value is volatile.

22    Where might EFH Corp. be if this transaction does not close?

23            Your Honor, we don't know, but we think it's a

24    fair bet that if this transaction does not close, it's

25    because the Oncor value has materially decreased as opposed

1    to stayed the same or increased, and again, in that

2    situation, the alternative restructuring terms in the plan

3    support agreement, the drag rights, the disarmament, and the

4    approval of the settlement agreement that resolves inter

5    creditor litigation, inter Debtor litigation, and potential

6    sponsor director and officer litigation is of great benefit

7    to EFH Corp.

8              Your Honor, we believe that the settlement

9    agreement and plan have met all of the required standards,

10   and should be approved under any level of scrutiny you wish

11   to provide.  We think the business judgement has just the

12   right test, but these transactions merit approval under even

13   more stringent scrutiny.  If required, we would request Your

14   Honor to overrule all objections, grant the motion approving

15   the settlement agreement, and confirm the plan.  Thank you.

16             THE COURT:  Thank you.

17             MR. WALPER:  I've got to catch my breath, Your

18   Honor.  It's a long walk.  Good morning, Your Honor.

19             THE COURT:  Good morning.

20             MR. WALPER:  Thomas Walper, Munger, Tolles &

21   Olson, counsel for TCEH and EFCH as directed by

22   disinterested manager, Mr. Hugh Sawyer.  I will be more

23   short than Mr. Thomas figuratively.  It has really been a

24   remarkable year, what's transpired in these cases.  There's

25   been a fundamental transformation.  The T-side was meshed in

1    litigation, and the cases seemed handcuffed to years and

2    years of the same thing.  Now we have a plan that's

3    sponsored by the T-side with, as of, I guess, today,

4    complete agreement now that the PCRBs have a settlement and

5    we'll, I guess, hear more about that, and the E-side is

6    being paid off in full.

7              Coupled with a settlement agreement, which we

8    think is particularly important, we create a path not only

9    for the confirmation of this highly valuable plan, but also

10   a path for an alternative plan free from the morass of

11   litigation that prevented the reorganization of these

12   companies and progress going forward a year ago.

13             Harkening back, as Mr. Thomas did, to the November

14   hearing about the bid procedures, and Mr. Sawyer takes the

15   admonition of The Court with respect to the independent

16   duties very, very seriously.  And you will hear an evidence

17   in great detail the tireless efforts of Mr. Sawyer on behalf

18   of the T-side to advocate for the constituents.

19             As This Court may know, certainly in the record --

20   certainly in the record and he has testified already in this

21   case -- he is a seasoned professional, Mr. Sawyer, with over

22   35 years of reorganization and business experience.  He has

23   been a CEO of several companies, he has been a CRO of

24   companies, and also has been a director on many boards.  He,

25   along with the adviser's that he retained, Greenhill and

1    Munger, Tolles & Olson, over a four-month period,

2    investigated assiduously the claims.  Exhibit DX-10, it's a

3    very long exhibit, but it does outline many of the actions

4    that were undertaken by Mr. Sawyer in connection with that

5    diligence.

6              He and his professionals also during that time

7    engaged in a virtual walkabout to all of the T-side

8    constituents -- unsecured, secured creditors, second lien

9    creditors -- to get input with respect to those claims and

10   to fully understand the interests of the T-side

11   constituents.

12             We'll hear testimony about the claims analysis

13   that was undertaken, the size of the claims.  There were a

14   number, in particular, a tax-sharing claim, which has been

15   accused of being contrived.  And the amount of that claim is

16   approximately $754 million, and it was so contrived, of

17   course, that it appears on the Debtor's schedules.

18             We'll hear about the intercompany notes claim

19   valued at $400 to $800 billion was undercharging of interest

20   between the estates.  You'll hear about a tax preference

21   claim of about $100 million, and of course you'll hear in

22   detail about the possibility of a leveraged buyout of

23   (indiscernible) claim in excess of $21 billion.

24             No also, through the testimony of Mr. Sawyer, be

25   taken to the negotiating room and hear about the highly

1   adversarial and contentious negotiations that were

2   undertaken after the analysis of the claims between the

3   disinterest the ed directors in order to try to reach a

4   settlement.  In this respect, Mr. Sawyer is particularly

5   credible because nobody can accuse him of breaching his

6   duties, or nobody has accused him of breaching his duties in

7   connection with the settlement, and he has simply no

8   relationship whatsoever with the other directors or the

9   sponsors.

10          Also, you'll hear that he was fully prepared to

11  proceed with litigation at any time in the event that this

12  settlement, or a settlement, could not be reached.  The

13  evidence will show that Mr. Sawyer continued his role as

14  disinterested director even after the settlement was

15  reached, overseeing the evolution of the plans and

16  protecting the interests of the T-side Debtors as a whole.

17          Your Honor, the settlement is monumental.  There's

18  really a panacea for these cases because it would survive in

19  case the plan did not go effective, and the plan itself is

20  simply the only actionable approach to reorganization.  And

21  it provides a seemingly unattainable result in its consensus

22  of the T-side and its full payment of the E-side.  One can

23  wonder why it is there are even objections to this plan.

24  Thank you, Your Honor.

25          THE COURT:  Thank you.  Mr. Kornberg.

1          MR. KORNBERG:  Good morning, Your Honor.  Alan

2     Kornberg from Paul, Weiss, Rifkind, Wharton & Garrison, on

3     behalf of the ad hoc committee of TCEH first lien creditors.

4          THE COURT:  Go ahead.  I'm sorry.

5          MR. KORNBERG:  Today we join the Debtors and the

6     majority of their key stakeholders in supporting a value

7     maximizing plan that enjoys a near unanimous, or maybe even

8     unanimous, T-side support and renders all E-side claims

9     unimpaired.  None of the objections raised, no matter how

10    voluminous, should stand in the way of what has been a

11    heroic effort after several failed attempts to restructure a

12    massive enterprise with a very complex capital structure.

13         The Debtors have fully and effectively responded

14    to the various objections, so there are just a very few

15    points that we wish to make with respect to the settlement

16    agreement in particular.  First, no party has objected to

17    the $550 million inter-creditor settlement among TCEH's

18    first lien creditors, our clients, and junior creditors in

19    that silo.  This settlement was the product of intense arm's

20    length negotiations conducted as part of the court ordered

21    mediation process.

22         The T-side inter-creditor settlement resolves

23    litigation that threatened to bog these cases down for

24    years, an outcome that would be a disaster for TCEH and

25    their stakeholders.  Second, the resolution of intercompany

1   claims was also critically important to our committee.  One

2   of the fundamental objectives, or what was referred to

3   throughout the mediation as a pillar of that process, was

4   that and a settlement that we negotiated be durable.

5           In other words, if the re-plan failed, we did not

6   want to start over again by facing the prospect of years of

7   litigation over T-side inter-creditor issues or claims

8   between the T side and the E side of silence.  As to this

9   latter category, all stakeholders were fortunate to have the

10  benefit of the hard work of the disinterested directors and

11  their independent advisers in handing out what was a very

12  complex intercompany settlement resolving many difficult

13  issues.  It would be wasteful in the extreme, Your Honor,

14  not to take advantage of their efforts in settling these

15  complex matters.

16          So even if there are substantial terms that remain

17  to be hammered out in an alternative restructuring scenario,

18  a scenario that we sincerely hope that none of us and that

19  This Court will ever have to face, including potentially

20  complex tax and other matters, we won't be starting from

21  scratch.  The T-side inter-creditor disputes into the T-

22  side/E-side intercompany claims will have been put to bed

23  permanently.  This is a principle and important objective of

24  the settlement agreement and a huge benefit to these cases

25  and these estates.

 1            The objectives would like to pick and choose among

 2       the various terms of the settlement agreement.  That is

 3       simply not possible here.  If it is often said about

 4       settlements presented to The Court for approval that they're

 5       integrated transactions.  That is certainly true about this

 6       settlement.  Each and every part of it is a necessary

 7       component of a global compromise.  When you unravel one

 8       piece, the others fall away.

 9            For example, as Mr. Kieselstein mentioned, the E-

10       side committee suggests that because the T-side has lost so

11       much value, a taxable transaction could be accomplished

12       without significant tax liability to the E-side.  Without

13       debating the technical aspects of that argument, that

14       suggestion borders on the irresponsible when one considers

15       that values can and will shift in the protracted period

16       between the effective date, or through the effective date,

17       and such an approach today as Mr. Kieselstein mentioned

18       would effectively kill the possibility of using a REIT to

19       maximize value on the E-side.

20            So this is an appropriate moment to consider where

21       we are and where we are not.  The objectors complain about a

22       plan, that although not a certainty, will pay them in full

23       under any reasonable interpretation of that term.  While the

24       E-side creditors have been good at complaining and grasping

25       for more value, they have repeatedly failed to coalesce

1    around a valuable -- a viable alternative.

2           As we have reminded parties at virtually every

3    hearing before This Court, the T-side has lost a staggering

4    amount of value since these cases began.  Added to such loss

5    in value is the extraordinary course of running these cases.

6    The Debtors have spent the last 18 months trying to solve

7    the E-side capital structure, whether through an Oncor sale

8    or an all-equity plan, both of which approaches failed.

9           Meanwhile, the TCEH creditors have had to stand by

10   as the parties attempt to achieve a tax-free restructuring

11   to the benefit of the E-side.  Enough is enough.  The plan

12   and the settlement agreement together represent the only

13   viable option available today, and the plan and the

14   confirmation -- the plan and the settlement agreement meet

15   all relevant standards for confirmation and approval.

16          The TCEH creditors should not be held hostage in

17   any longer to the E-side's inability to restructure their

18   estates.  The Court should approve the settlement agreement

19   and confirm the plan, and all parties should move

20   expeditiously to consummate the transactions they provide

21   for.  Thank you, Your Honor.

22          THE COURT:  Thank you, Mr. Kornberg.  Mr. Jonas.

23          MR. JONAS:  Good afternoon, Your Honor, Jeff Jonas

24   from Brown Rudnick for the ad hoc consortium of TCEH second

25   lien noteholders.  Some 18 months ago, Your Honor, on about

1     the first day of this case, I stood here the arguing for the

2     change of venue of these chapter 11 cases to Texas.  We're

3     not renewing that motion today, Your Honor.

4              Today, Your Honor, my clients fully support the

5     Debtor's plan --

6              THE COURT:  You might -- you might get it granted

7     today.

8              MR. JONAS:  Unless you'd like us to, Your Honor.

9              THE COURT:  No, no.

10             MR. JONAS:  Today, Your Honor, my clients fully

11    support the Debtor's plan and settlement agreement, and

12    they're obviously not alone.  Of course, we wait to hear

13    details of additional settlements, but we'll promptly

14    responds to those when appropriate.  As you've heard from

15    the Debtors, the plan enjoys nearly universal support from

16    the secured and unsecured lenders at TCEH, all of whom are

17    not impaired -- all of whom are impaired under the plan, and

18    each and every impaired class of claims and interests that

19    are entitled to vote under the plan hasn't voted to accept

20    it.

21             Given where we were 18 months ago, that fact is

22    truly remarkable.  Of course, this broad consensus among the

23    Debtor's constituents wasn't always the case.  At the

24    outset, my clients were at odds with a number of parties,

25    including the Debtor's sponsors, TCEH first liens, and we

1    took issue over, among other things, what we perceived to be

2    missed or ignored opportunities to unlock value for all of

3    the Debtor's constituents and what to do with the value of

4    the legacy litigation.

5           Few if any of us thought we'd be standing here

6    before you today all supporting the settlement agreement,

7    which embodies a global resolution of all of those

8    litigation claims in a plan that pays all E-side creditors

9    in full, in cash -- likely in cash -- and provides a

10   valuable investment opportunity for many.

11          This is truly a success story borne out of many

12   different parties deciding it was in everyone's economic

13   interest to lay down arms and use the tools provided by the

14   Bankruptcy Code to build a confirmable Chapter 11 plan.  And

15   we believe, Your Honor, that the plan is confirmable.  I

16   won't belabor the points that the Debtors and others have

17   and will make as to why this plan satisfies all the

18   requirements under the Code, but we have independently

19   assessed those merits and believe the record will show that

20   the plan satisfies those requirements.

21          Finally, Your Honor, we owe a debt of gratitude

22   for the patience and guidance you've given us throughout the

23   process. Now that we've progressed beyond the in-fighting

24   and arrived at the point of confirmation, we respectfully

25   request that you overrule all objections to the settlement

1   agreement and the plan.

2         Your Honor, the extent you don't see me or Mr.

3   Weisfelner in the Courtroom, our colleague, Jonathan

4   Marshall, who I think you met this morning and our local

5   counsel, Bill Bowden, will be present and available if the

6   Court has any questions for us. Thank you, Your Honor.

7         THE COURT:  You're welcome.  Mr. Miller?

8         MR. MILLER:  Good afternoon, Your Honor.  Brett

9   Miller of Morrison and Foerster for the TCEH Committee.  We

10  have come a long way from the plan kickoff dinners of a year

11  ago.  The path to get here was at times painful, but it got

12  us to the right result.  I'm proud to be standing here on

13  behalf of the TCEH Committee in full support of both the

14  plan and the settlement agreement.  As an outspoken advocate

15  for a global settlement and an early party to the plan

16  support agreement, the TCEH Committee has been involved in

17  the negotiation of the plan and settlement agreement.

18        As a fiduciary for unsecured Creditors, on the T

19  side, we believe that this is the best opportunity to

20  maximize value for our constituents, and in light of the

21  likely resolution of the PCRB Trustee's objection, it looks

22  like the entire T side is now in agreement in support of the

23  plan and settlement agreement.

24        Notably though, our counterpart, the EFH

25  Committee, is one of the most vociferous opponents to the

1    plan and settlement agreement.  This is despite that fact

2    that its constituents will be paid in full under then plan.

3    To return to Mr. Shore's early airplane analogy, which was

4    adopted by Mr. Weisfelner, the E side Committee is sitting

5    in first class, getting ready for its champagne, its lobster

6    and its filet mignon, but suddenly decides it doesn't like

7    the menu, doesn't like the destination, doesn't really like

8    the departure schedule, so it'd rather start the whole trip

9    from scratch.  Why?  It makes no sense.

10         The biggest issue that the E side Committee is

11   complaining about is that it wants more money. This plan is

12   the only plan, though. We were shocked by the revisionist

13   history, as others have stated before us, in the trial brief

14   and omnibus objection to the settlement and plan

15   confirmation filed by the E side Committee.  It completely

16   erases the painstakingly deliberate process undertaken by

17   the disinterested directors, and their advisors, to reach

18   the settlement, and in place, fabricates a tale based on

19   failed fiduciary duties and prejudice to E side Creditors.

20         The evidence to be presented over the next few

21   weeks will set the record straight and demonstrate that the

22   E side Creditors are getting everything under the plan they

23   are entitled to as a matter of law, and the objections lack

24   merit.

25         The case management protocol was put in place last

1   year to remedy exactly what the E side Committee is

2   complaining about.  The disinterested directors and their

3   advisors should be lauded, not skewered, for correcting the

4   flaw that was exposed last year in the Debtor's corporate

5   governance.

6          With regard to the Oncor sales process, the TCEH

7   Committee professionals, like the EFH Committee

8   professionals, were both under the sales tent, the code of

9   silence.  Sullivan & Cromwell, and Guggenheim, on behalf of

10  the E side Committee was involved, together with Morrison &

11  Foerster and Lazard, in participating in twice-weekly update

12  calls for months with the Debtor's advisors regarding the

13  sales process.  None of the advisors on either side was shy

14  in stating their concerns along the way.  But no one

15  disputes that the sales process failed to produce a viable

16  bid.  It just didn't work.

17         What we agree on is it did propel us towards the

18  plan that we are seeking to confirm today.  The only

19  proposal that presented sufficient value to pay the E side

20  Creditors in full was in fact, this plan, the re plan.

21  David Kurtz of Lazard foretold this at the hearing on the

22  sale procedures approval, and I'll quote him:  "The matter

23  of Oncor, and whether or not it should be sold at all, is

24  something that should be done in the context of the plan of

25  reorganization discussions.  And perhaps we could use the

1   potential of the Oncor sale as an inflection point to drive

2   those negotiations.  The plan should determine whether or

3   not there is a sale.  The sale shouldn't drive the terms of

4   the plan."  And I may need to remind you of that when I'm

5   defending Lazard's final fee application.

6               THE COURT:  Mm hmm.

7               MR. MILLER:  For the E side to suddenly attack the

8   process in which it was an active participant, and the

9   parties who came up with the construct that pays all the E

10  side Creditors in full while providing a satisfactory

11  resolution for the T, side, because it's not entirely liking

12  all of the bits and pieces of the plan, is quite audacious.

13  Its own adviser agreed in yesterday's deposition that the E

14  side has failed to come up with a viable plan alternative.

15  Again, why do they want to get off the airplane when there

16  is no alternative flight available?

17              The EFH Committee has gone rogue in its approach

18  to the settlement agreement.  With all due respect, it is an

19  extremely distorted view of the value of the claims it sets

20  forth in its brief.  As explained in our reply, the TCEH

21  Committee conducted and exhaustive investigation of claims

22  and causes of action against individual Debtors, their

23  directors, officers and the sponsors.  In arriving at the

24  conclusion that the proposed settlement agreement is

25  reasonable, the TCEH Committee looked at not only the claims

1   in favor of the T side, but also the likely counterclaims,

2   defenses, potential delay and the massive expense related to

3   litigating those claims to fruition.

4          Absent this settlement and the plan, the TCEH

5   Committee would absolutely be seeking more value from the E

6   side, but given the tremendous complexity and high stakes of

7   those claims, the proposed settlement of those claims is

8   manifestly reasonable and will maximize value to all

9   Creditors.

10          The EFH Committee appears to focus solely on the

11   value and strength it attributes to the E side claims.  As a

12   result, the EFH Committee's position is based on a funhouse

13   view mirror of the world, and it is not that -- and it is

14   not a view that is supported by a significant portion of its

15   own constituents, as we have seen, and it is not a view that

16   should be adopted by the Court.

17          Instead, Your Honor, we respectfully request that

18   the Court take note of the overwhelming support of Creditors

19   who are impaired under the plan, who have nonetheless

20   committed to putting billions of dollars new capital, and

21   who have agreed to stand aside and remain bound by the

22   settlement if the plan should not go effective.

23          We believe that these concrete facts, and not the

24   E side Committee's wild speculations, are entitled to

25   significant weight and should provide the Court with all the

```
 1   comfort it needs that the settlement is reasonably fair and
 2   the plan is proposed in good faith and reasonable.  Excuse
 3   me the pop culture reference, but doesn't the E side
 4   Committee look a lot like Sheriff Bart from Blazing Saddles
 5   with the gun to its own head?
 6                 THE COURT:  Hm.
 7                 MR. MILLER:  It's time for disarmament, not more
 8   fighting, and accordingly, we request that the Court approve
 9   the settlement agreement and confirm the plan.  Thank you.
10                 THE COURT:  Thank you.  Mr. Shore?
11                 MR. SHORE:  Good afternoon, Your Honor.  Chris
12   Shore from White & Case on behalf of the ad hoc group of
13   TCEH Unsecured Notes.  In deference to the tree apocalypse
14   that's gone on here, I've got just a one-pager, if I may
15   approach?
16                 THE COURT:  Yes.  Thank you.  Hm.
17                 MR. SHORE:  Your Honor, I put down three thoughts
18   that I think are going to be useful to focus on, as you hear
19   the evidence come in and assess the objections that are
20   being put forward, because really, this confirmation
21   hearing, 20 days of -- in phase one is all about the
22   objections.
23                 $11,537,279 dollars.  That was the amount that the
24   EFH Committee billed the Debtors for professional fees
25   through August 31, which was the time the plan was set and
```

1   the confirmation scheduling order was put in.  That does not

2   include any of the fees that have been incurred by the E

3   side indentured Trustees, EFH, EFIH picks, first liens and

4   second liens.  Throughout this trial, you're going to hear

5   questions and arguments to the effect that the negotiations

6   of the plan up through August were corrupted, that the EFH

7   objectors were frozen out of the negotiation, that EFH

8   Creditors were powerless against the Debtor that was dead

9   set on consensus and an end to litigation, that the TCEH

10  Unsecured creditors were granted an upper hand in the

11  negotiations, that there were other, better ways to

12  structure the negotiation.

13          While all that was playing out, the EFH Committee

14  ran up $11,537,279 dollars in fees that they have sought

15  compensation for, and others, obviously, millions in

16  pursuing what they're doing.  It is somewhat insulting to

17  the parties that are ultimately going to be paying those

18  fees to respond to objections such as, "deeply subordinated

19  Creditors, who funded themselves and other estates outfoxed

20  us," especially when coming from an estate-funded fiduciary

21  who must have been 20,000 hours into the case by that time.

22          It's also somewhat insulting for the Court to have

23  to hear protests of powerlessness when time and again,

24  throughout this case, this Court has made itself available

25  on almost no notice to assist all parties who felt wronged

1    or disenfranchised in the process.  The evidence will show

2    that the negotiation process worked and everybody, every

3    Creditor in these cases, was given a fair shot at the prize.

4            The next thought, WTFA.  What's the feasible

5    alternative?  The next category --

6            (Laughter)

7            MR. SHORE:  Got that right.  The next category --

8            (Laughter)

9            MR. SHORE:  The next category of evidence and

10   arguments you're going to hear from the objecting parties

11   are all blithely premised on some other hypothetical deal

12   out there.  So, for example, the EFH Committee in its brief

13   contented EFH could be out of Chapter 11 tomorrow.  There

14   should have been a taxable transaction.  Why can't the E

15   side just litigate?

16           I think the Court can fairly conclude from the

17   record that these cases, starting on the first day of these

18   cases, that a deal led by the TCEH unsecured creditors was

19   probably the last place that these Debtors wanted to end up.

20   In fact, you're going to hear from Mr. Keglevich about how

21   many rocks the Debtors overturned to find any deal that

22   promised a path out.  Even then, how many times did this

23   Court have to hear, even after a fully baked TCEH plan was

24   presented, that the Debtors were still marching on to

25   preserve alternative plans and alternative structures?

1          While that was playing out, the EFH Committee has

2     had access to Sullivan & Cromwell and Montgomery McCracken,

3     they've had access to Guggenheim Securities, they've had

4     access to management of the Debtors and professionals,

5     they've had access to the Court, and they've had no apparent

6     budgetary constraints on what they were doing.  It's now the

7     day of the confirmation.  WTFA?  And the F here, as always,

8     is important.

9          (Laughter)

10          MR. SHORE:  If it was going to be a litigation

11    plan that they wanted, is that plan feasible?  What's the

12    budget?  How's it getting funded.  What's the timeline?

13    What Creditors even want that?  Is there a single Creditor

14    who's expressed the view that they want more litigation and

15    to defer recoveries further?  We're doing now what's going

16    to be a $10 million dollar trial on a 9019 of the

17    settlement.  How is a trial on the merits ever going to be

18    resolved in our lifetimes?  If it's a tax deconsolidation

19    plan with this list of massive tax, that the Committee says,

20    "Don't worry about it," where, today, are E side Creditors

21    or T side Creditors, the ones who would have to vote for

22    that plan in requisite number and amount, to say, you know

23    what?  We want to take the risk of a taxable

24    deconsolidation.

25          If the EFH Committee is going to insist on

Page 72

1    funding, backed by a specific performance right, where is

2    the hypothetical funding party today who is willing to do

3    that deal?  It's time, today, to stop hearing about

4    hypothetical, higher, better alternatives and for the Court

5    to asses the plan that is on the docket, which is the only

6    plan.

7           Finally, Ned Ludd and the industrial revolution.

8    It's not a band name, it should be.  I'm talking to my son

9    about that.

10          (LAUGHTER IN THE COURTROOM)

11          MR. SHORE:  Ned Ludd was an 18th Century British

12   kid who smashed stocking frames to protest the anticipated

13   loss of work by -- of people who still wove by hand, and now

14   we've got the phrase a Luddite to express someone with an

15   irrational fear of innovation.  There's a whole lot of

16   Luddite sentiment running through the objections here.

17          Synthetic exclusivity, how could that be?  It must

18   be stopped.  Disarmament in drag, oh, no, un-impairing

19   entire estates, but what work will we do then?  Utility

20   reconversions?  It's never been done.  But really, what's

21   the problem with any of that?  The fact that a difficult

22   case has produced new solutions is not, in and of itself, a

23   bad thing.  It's innovation, and if innovation works right,

24   it ultimately reduces the cost of the process and benefits

25   everyone.

1          So when the Court hears questions like, don't most

2     major M&A contracts have at least a liquidated break fee?

3     To us, that seems like just a continuation of an 18th

4     century protest that stocking frames will put people out of

5     work.  At the end of the day, what's in front of the Court,

6     and what the Court needs to assess is, does this plan work?

7     Is this plan feasible?  We think the evidence is going to

8     show that this plan, with its innovations, is a feasible

9     mechanism for getting everybody and all of these boxes out

10    of your court.

11          THE COURT:  Thank you, Mr. Shore.

12          MR. KLEINHAUS:  Good afternoon, Your Honor.  Emil

13    Kleinhaus from Wachtell, Lipton, Rosen & Katz.  I represent

14    Kohlberg Kravis Roberts & Co., LLP, TPG Capital LLP. and

15    Goldman Sachs & Co., along with affiliated funds that own

16    indirect equity interest in EFH as well as Texas Energy

17    Future Holdings Limited Partnership, which is the direct

18    equity owner of EFH.

19          As Your Honor is going to hear throughout the

20    course of this trial, senior members of KKR, TPG and Goldman

21    Sachs, as board members of the Debtor companies, as advisors

22    to the Debtors, and as equity owners, have devoted an

23    enormous amount of time for almost three years to helping

24    the Debtors find a viable restructuring path.  They've held

25    weekly board meetings, sometimes more, and they've worked

1   tirelessly with management and with other Creditors to try

2   to find a consensual solution.  The comprehensive settlement

3   and plan that's before the Court, which would resolve all

4   disputes on the T side and pave the way for a 100 cent

5   recovery on the E side, represents a milestone for them as

6   it does for the Debtors and the sponsors fully support the

7   relief the Debtors are seeking.

8         I'm going to refer to my client generally as the

9   sponsors or the EFH Equity owners, but they're more.

10  They're also Creditors.  KKR, TPG and Goldman Sachs have all

11  filed proofs of claim in this case for indemnities, and also

12  for unpaid fees of approximately $80 million dollars under

13  the management agreement.  No one has objected to those

14  claims, and so my clients are here not only as equity owners

15  but also as Creditors of these estates.

16        There's really just one disputed issue before the

17  Court that relates to the sponsors and the EFH Equity

18  owners, and that's the EFH Committee's objection to releases

19  in the settlement agreement.  We filed an extensive brief at

20  Docket No. 6810 in response to the supplemental brief and

21  the main brief filed by the Committee so I'm just going to

22  limit myself today to a few additional comments about those

23  releases.

24        First, process.  These releases come after two

25  major investigations, two independent investigations.

1    First, in 2013, what the evidence will show is that the

2    Debtors, the non-sponsor directors at EFH retained Sidley &

3    Austin to conduct an exhaustive, independent investigation

4    of potential claims against the sponsors.  Before the RSA

5    was signed and entered into, Sidley & Austin reported to the

6    non-sponsor directors of the board after full cooperation

7    with the sponsors in that investigation, and releases were

8    approved in that context.

9            After the bankruptcy, we've had a second

10   investigation, and that's what's been called Legacy

11   Discovery, or Rule 2004.  That process, as it relates to the

12   EFH Equity owners, has occurred completely behind the

13   scenes.  Nobody has come to the Court in all of the

14   discovery disputes that have happened over the last year and

15   a half and said the sponsors aren't cooperating, the

16   sponsors are resisting, or anything along those lines, and

17   that's because it's not true.  We were asked for essentially

18   every piece of paper that exists relating to this company

19   going back to 2006, and that's what we gave to the Creditors

20   in response.

21           And the reason I focus on this up front is that

22   these releases are the result of an exhaustive process, and

23   they're based on an exhaustive record, and the releases that

24   the sponsor -- the non-sponsor directors have approved and

25   the Creditors Committee claims as well, have to be

1    considered against that backdrop.

2            With that background of process, just a few words

3    today on the substance of the settlement.  What is it that

4    the E side estates are releasing and what is it that the

5    sponsors are releasing in exchange?  And to illustrate this

6    point, with Your Honor's permission, I just want to hand up

7    a -- an excerpt from the declaration of Michael Carter, and

8    put it on the screen as well.

9            THE COURT:  All right.

10           MR. KLEINHAUS:  May I approach?

11           THE COURT:  Yes.

12           MR. KLEINHAUS:  Thank you.

13           THE COURT:  Thank you.

14           MR. KLEINHAUS:  So this page, Your Honor, is taken

15   from the declaration of Michael Carter.  It is a summary of

16   all fees paid to the sponsor starting in 2007 under the

17   management agreement, and the reason I'm putting this in

18   front of the Court is because I'm going to make a few

19   adjustments to this summary which show what the fraudulent

20   transfer claims here really boil down to, as asserted by the

21   E side estate.

22           And the first adjustment is, as Your Honor heard

23   before, the E side Creditors Committee has conceded in the

24   context of their objection that there is no viable challenge

25   to the 2007 LBO.  Instead, their position is that the E

1    side, EFH in particular, actually only, was insolvent on a

2    balance sheet basis as of 2009.  So the first adjustment,

3    and this brings me to the second page, if you could go to

4    the next screen please, is to take away everything before

5    2009.

6              The next adjustment I'm going to make to the

7    schedule is to take away all the payments that are made by

8    Debtors whose Creditors are not represented by the EFH

9    Committee, and that's TCEH and EFH Corporate Services.  It's

10   axiomatic that a Debtor could only seek to recover transfers

11   that it made, and if the TCEH and EFH Corporate Services

12   transfers are taken off this list, we get to the third page,

13   or the next slide, which is fees paid by the E side Debtors.

14             We're down to the fees paid by EFIH and EFH Corp.

15   Now the next adjustment I'm going to make is to take off the

16   EFIH transfers, and that's because nobody has claimed, and

17   in fact, the EFH Committee's expert has refuted the claim,

18   that EFIH as an estate was ever insolvent.

19             So you take off EFIH, you get to the next slide,

20   or the next page, and this is just EFH.  We're down to two

21   transfers.  We have a -- an advisory fee paid in 2009, we

22   have a financing fee paid in 2010.  Now, what those two fees

23   have in common is they are both outside of the statute of

24   limitations that the EFH Committee has stated in its brief

25   would apply to avoidance claims here.

1          The EFH Committee says in its brief that Texas

2     law, or Delaware law would apply.  Those are both UFTA

3     states, that's a four year statute of repose.

4          So, if you take out transfers outside the four

5     years, we get to the last page, fees within the four-year

6     period.  It's a null set.

7          Now, if any of those assumptions are wrong, so for

8     example, if somebody were to claim the statute of

9     limitations could be extended, we could have a whole

10    litigation about value and a whole litigation about solvency

11    and Your Honor's going to hear some evidence as to solvency,

12    you're going to hear evidence including an expert, you're

13    going to hear a lot of contemporaneous evidence that goes

14    against what that expert says.

15         As to value, I think Your Honor is going to hear

16    overwhelming evidence of value provided by the sponsors, but

17    that whole litigation only occurs once they identify claims

18    that were actually made by the relevant estates -- excuse

19    me, transfers made by the relevant estates that are

20    recoverable.

21         So that's the fraudulent transfer piece of this.

22    The only other claim that is identified in the EFH

23    Committee's briefing, and the EFH Committee's briefing from

24    about two weeks ago was the first time that we've heard of

25    claims on the E side against the sponsors, is a fiduciary

1  duty claim, and the crux of that fiduciary duty claim is

2  that the sponsor directors were required, back in 2009 or

3  2010, to file the company EFH for bankruptcy.  And the

4  predicate for that claim is that, according to the

5  Committee's expert, EFH Core was insolvent on a balance

6  sheet basis back in 2009 or 2010.

7        Now, our clients strongly dispute that point about

8  insolvency, but it doesn't matter.  As we showed in our

9  reply brief, as a matter of fiduciary law, and Texas law in

10  this case, there is no duty to file for bankruptcy.

11  Delaware case law, venerable Delaware authority from Judge

12  Gross, from Judge Walsh, from Judge Strine, all of which

13  we've cited in our brief, thoroughly rejects the notion

14  that, if a company is insolvent on a balance sheet basis,

15  there is some obligation on the part of fiduciaries to put

16  it into bankruptcy.

17        So we don't believe this claim gets to square one

18  legally, but what the facts are going to show at this trial

19  is that the narrative of what's happened with EFH over the

20  last four years is totally inconsistent with the notion that

21  the company should have been put into bankruptcy in 2009.

22  The value of the Oncor business, and EFH's stake in Oncor,

23  has increased substantially.  EFIH and EFH have paid

24  billions of dollars to their Creditors that are owed.  We're

25  now in a position where the E side estates are proposing a

1    plan to pay their Creditors in full.  So the arc of what's

2    happened on the E side, putting aside all the legal

3    protections that the directors had, are completely

4    inconsistent with this last minute claim that the company

5    was -- that the directors were obligated to put the company

6    into bankruptcy back in 2009 or 2010.

7              So these are the two categories of claims that are

8    being given up against the sponsors.  The flipside is what

9    the sponsors are giving up.  I won't take a lot of time on

10   that.  Mr. Kieselstein already mentioned the give up of the

11   equity upside in the settlement agreement, which means that

12   after the settlement agreement is approved, if it's

13   approved, the T side unsecured will have access to that

14   upside.

15             The sponsors are also giving up the claims that I

16   mentioned earlier, that's an $80 million dollar claim, and I

17   note that that's not just a claim against EFH, which itself

18   would be a 100 percent claim under the plan, it's also a

19   claim against EFIH under the management agreement.

20             So indemnities are being given up, there's an $80

21   million dollar give up of advisory fees, and then finally,

22   the sponsors have agreed that Texas Holdings, which is a

23   direct equity holder of EFH, would not take a worthless

24   stock deduction during this case if it would effectuate a

25   change of control for tax purposes.

1          So with all that, Your Honor, I respectfully

2     submit that this settlement agreement is completely fair to

3     the Debtors as it regards the sponsors.  The sponsors fully

4     support the settlement agreement and the plan, and we

5     respectfully ask the Court to overrule objections.  Thank

6     you.

7          THE COURT:  Thank you.

8          MR. LOWENTHAL:  Good afternoon, Your Honor.  Dan

9     Lowenthal of Patterson Bellknap Webb & Tyler, and I'm here

10    with Steve Miller of the Morris James firm, our Delaware

11    counsel.  And as you know, Your Honor, we represent Law

12    Debenture Trust Company of New York, Law Debenture, the

13    indentured Trustee on the more than $5 billion dollars'

14    worth of TCEH unsecured notes, and as a reminder, Your

15    Honor, Law Debenture is the co-chair of the T side

16    Creditor's Committee, and the TCEH unsecured ad hocs

17    represented by White & Case and Fox Rothschild holder of the

18    majority of the debt.

19         And Your Honor, throughout this case we've worked

20    both closely with the professionals for the TCEH ad hocs and

21    the Committee professionals as well.  And from the outset of

22    the case, Your Honor, we heard repeatedly that the TCEH, the

23    T side unsecured creditors were out of the money.  But

24    fortunately, over the course of these cases, through the

25    hard work effort of a lot of parties, that has changed.  And

1    on behalf of Law Debenture, we submitted a statement in

2    support of the plan and the settlement agreement.  We submit

3    that the evidence will show, as others have already

4    indicated, that the requirements of the Bankruptcy Code and

5    the rules would be satisfied, and accordingly, we join with

6    the other proponents in urging the Court, and we will later,

7    in closing and post-trial briefing, as necessary to confirm

8    the plan and approve the settlement agreement.

9           In our statement, Your Honor, also responds

10   specifically to the objections of the United States Trustee

11   with respect the fees under the plan and the settlement

12   agreement.  That objection addresses a legal issue, whether

13   those fees should be paid in accordance with the Bankruptcy

14   Code, certain sections in Bankruptcy Rule 9019.

15          Our statement, the one we submitted as well as

16   some others, indicates why and explains why what the Debtors

17   propose is  appropriate, and I won't repeat those arguments

18   here, but again, to the extent necessary, in closing and in

19   post-trial briefing, we will do so.  Thank you.

20          THE COURT:  Thank you.

21          MR. KIESELSTEIN:  I think that's it from this side

22   of the room.

23          MAN:  One more.

24          MR. KIESELSTEIN:  Sorry, apologies, Your Honor.

25          MR. KANOWSKY:  Arie Kanowsky on behalf of the

1    United States, Your Honor.  Now, overall, the United States

2    as a unitary Creditor has objected to the plan but I'm here

3    today to talk about the taxes.  The Debtors have proposed a

4    plan that they contend is going to lead to a tax-free

5    reorganization.  They've asked for a private letter ruling,

6    or PLR, from the IRS.  The IRS is diligently working on that

7    PLR process, working with the Debtors.  We have not reached

8    a resolution yet.  We have not raised an objection to

9    confirmation at this time, because the plan currently as

10   filed, purports to have a tax-free reorganization.

11           To the extent the Debtors revise their plan, amend

12   their plan, to have a large taxable sale where there's an

13   unfunded liability, we've reached a resolution, and

14   reservation of rights, where we would be allowed to later

15   object to the plan -- to that subsequently amended plan, in

16   addition to the extent that the PLR process or for whatever

17   reason, the Debtors wind up with a large taxable liability,

18   we've reached language to resolve which Debtor specifically

19   would be -- Debtors specifically would be liable.

20           With that being said, we have no objection as to

21   the tax claims on behalf of the United States at this time.

22           THE COURT:  Thank you.

23           MR. KANOWSKY:  Thank you, Your Honor.

24           THE COURT:  Thank you very much.  Anyone else wish

25   to be heard in favor of the plan?  Okay, I hear and see no

```
 1    one. We'll take a recess for lunch and we will try very hard

 2    to stick to an hour for our lunch recesses, so we will

 3    reconvene at 1:55.  Thank you very much.

 4         (Recess)

 5              CLERK:  All rise.

 6              THE COURT:  Please be seated.  Thank you for

 7    returning so timely.  I appreciate it.  It'll help keep us

 8    on schedule.  Mr. Dietderich?

 9              MR. DIETDERICH:  Good afternoon, Your Honor.  Andy

10    Dietrich for the official committee, with my colleagues

11    Brian Glueckstein and John Hardiman.  I do have some slides

12    for the Court, if I can pass those up.

13              THE COURT:  Yes, of course.

14              MR. DIETDERICH:  Thanks.

15              THE COURT:  (Indiscernible) busy misspelling your

16    name.  Okay.

17              MR. DIETDERICH:  May it please the Court.  For the

18    EFH unsecured creditors committee, these proceedings are not

19    about being paid in full.  They're about risk.  And there's

20    an opportunity to be paid in full.  But it's not the

21    estate's opportunity.  It's not the opportunity of anybody

22    in this courtroom.  It's the opportunity of a handful of

23    institutional investors.  They will decide whether this plan

24    becomes effective.  No one in this courtroom will.  Not even

25    the Hunts will.  It will be these investors.
```

1       They have no fiduciary duties to the estate.  In

2   fact, they have contrary fiduciary duties to the investors

3   that gave them money.  They are economically rational

4   actors.  They will look at a spreadsheet months from now,

5   based on market prices, and make their decision.  And no one

6   in this courtroom will have any rights to do anything about

7   it if their answer is no, which is why there's a settlement.

8   The settlement is binding.

9       The settlement is permanent.  The settlement is

10  meaningful.  The settlement is final.  The plan?  Not so

11  much.  This will be a rare confirmation hearing where two-

12  thirds of the time is spent discussing what happens if the

13  plan does not become effective.

14      What does the committee want?  We have no

15  objection to selling Oncor to the Hunts.  We have no

16  objection to selling Oncor to the Hunts and the T-side

17  creditors.  We have no objection to selling Oncor to

18  Nextera.  We've asked only for three things.

19      First, if Oncor is to be sold, there should be an

20  enforceable contract against the buyer so the estate can

21  have appropriate assurances the deal will close.  Second,

22  the estate should not permanently compromise all claims by

23  it or against it now, outside of a plan of reorganization,

24  but only effective upon the future plan of reorganization,

25  on this record, on these terms.  We have no problem with the

1    settlement being moved later, closer to the plan.  But not

2    now, and not on these terms.  Third, insiders should not be

3    released until the effectiveness of a plan of

4    reorganization.

5              That's it.  Those are not unreasonable requests.

6    There's no ulterior motive.  It isn't particularly

7    difficult.  These are right down the middle of the fairway.

8              But we have no line-item veto.  And we have no

9    practical ability to require the Debtors and the plan

10   proponents to make these changes.  They've taken the

11   position that the consent of my client and its constituency

12   is unnecessary, because that consent can be manufactured as

13   a matter of law.

14             So, they bring to the Court a package deal,

15   designed by everybody but the EFH creditors, in the best

16   interests of everybody but the EFH creditors.  And we

17   object.

18             Now, they try to buy creditors off individually to

19   resolve those objections, outside of a plan.  That's a kind

20   of progress.  It's consensus.  But the payments are made to

21   large investors, particularly the investors who an direct a

22   trustee, but also the investors with the money and the

23   resources to have played an active part in the case.  And

24   the treatment is disparate.  And it's happening outside of a

25   plan.

```
 1              The committee is the fiduciary for all creditors,
 2      large and small.  And it may be consensus, but it's not
 3      consensus achieved in the rules set down by Congress.
 4              What's coming to trial?  Putting aside all the
 5      rhetoric in the brief, the most important facts for Your
 6      Honor to find are not even in dispute.  There's no deals to
 7      work through.  There's no details to work through.  The
 8      parties characterize the main facts very, very differently.
 9      But most of the facts themselves are pretty clear.
10              What will be left for you to decide, after
11      evidence, is a disagreement about how bankruptcy is supposed
12      to work.  The EFH unsecured creditors, chiefly bondholders
13      and retirees, are the fulcrum creditors at EFH.  All one has
14      to do is listen to the threats of doom and destruction
15      visited on the EFH unsecured creditor if the REIT deal is
16      not confirmed to know who's at risk if the decision to
17      pursue the REIT deal doesn't play out, and of course who
18      bears the cost of the settlement when it doesn't.
19              So, this case will raise important questions for
20      you to decide about how much can be taken from the EFH
21      creditors by the package of a preplanned settlement they
22      object to and a plan they haven't been given the opportunity
23      to approve.  You will have to decide three primary
24      questions.
25              First:  what is the standard of review?  And
```

Page 88

1    what's the relevance of creditor objections and insider

2    participation to that standard of review?  Second:  should

3    the settlement be approved now for the alternative plan?

4    And is it fair and equitable, and not prejudicial, to do so?

5    Third:  are the confirmation standards satisfied?  The

6    parties have briefed these matters, and they are the heart

7    of the dispute, the law.

8              From the committee's perspective, all we will say

9    now is that you have been asked to sail into uncharted

10   waters.  The unimpaired fulcrum creditor is a pretty rare

11   occurrence.  And we will argue, after evidence, that the

12   Court should keep it that way if the Bankruptcy Code is to

13   work as Congress intended it to.  We have no problem with

14   consensus.  It's a question of how consensus is achieved.

15             As to the factual record, we thought it would

16   assist Your Honor to divide the facts now into three related

17   groups.  The first group relates to the standard of review,

18   the second to the objective merits of the settlement, and

19   the third to the test for confirmation.

20             With respect to the standard of review, here's

21   what we know.  First, the decision-makers -- do we have a

22   slide? -- the decision-makers for the Debtors were

23   conflicted.  This is a legal conclusion, Your Honor.  It is

24   not a personal attack.  What we allege is that they were put

25   in a position where they were conflicted on the decisions

1    they were making.  That's the fact.

2              As indicated on the slide, 10 of the 13 EFH

3    directors had a conflict, because they were directors of

4    TCEH.  Or they were affiliated with the directors of TCEH,

5    in the case of the controlling owners' designees.  And six

6    of the seven TCEH directors were directors of EFH.

7              Board overlap is not unusual in multi-Debtor

8    cases.  However, unlike most multi-Debtor cases, these were

9    two distinct credit silos, with creditors at war.  And the

10   central issue in the case was and is the allocation of value

11   among the silos.  Witness the fact of two separate statutory

12   committees.  In addition, the two co-CROS, with primary

13   responsibility for restructuring decisions, also served both

14   EFH and TCEH.

15             So, what is the standard of review?  The answer

16   under applicable law is heightened in one form or another.

17   Now, (indiscernible) mitigate the heightened standard of

18   review under corporate law, although, as we'll argue after

19   evidence, it may not be as effective in bankruptcy, is the

20   effective delegation of decision-making to disinterested

21   directors.

22             Here, the facts will show that the disinterested

23   directors at EFH were delegated only limited authority.

24   Their job was to approve the sale of Oncor under the bidding

25   procedures, which never happened, and to fill in the blank

```
 1    on a global settlement proposed by the CROs.

 2            This slide shows the actual delegated authority of

 3    the disinterested directors with respect to the intercompany

 4    claim settlement, and I'll read it:  "All prepetition

 5    interDebtor claims, causes of action, and disputes,

 6    including avoidance actions, including, without limitation,

 7    the intercompany claims and the step-up matters or conflict

 8    matters."

 9            Now, for these delegated matters, Your Honor, the

10    EFH disinterested directors had external advisors only.

11    They had no management team.  There was no attempt to have

12    an E-side CRO.  All management input for the delegated

13    decisions came from conflicted officers with fiduciary

14    duties to TCEH.

15            With respect to all other meaningful decisions,

16    where the interest of EFH and TCEH diverged, the

17    disinterested directors have no delegated authority.

18    Instead, they approve the package, negotiated by others, at

19    the end of the process.

20            The next slide shows these non-conflict matters.

21    And I'll read them:  "Determining for EFH the architecture

22    of the settlement with TCEH, determining for EFH to include

23    insider releases in the intercompany settlement, negotiating

24    for EFH a joint plan with TCEH, negotiating for -- with --

25    for EFH tax matters with TCEH and the IRS, negotiating for
```

1   EFH the sale of Oncor by EFH to TCEH creditors, and

2   negotiating for EFH a PSA between EFH and TCEH and

3   insiders."

4           For these corporate actions by EFH, EFH was

5   represented by officers with a duty to TCEH.  The officers

6   were advised by advisors with duties to TCEH.  And they

7   reported to a board, the majority of whom had duties to

8   TCEH.  We call these insiders conflicted insiders because

9   that is what they are as a factual matter.  Again, it isn't

10  a personal attack.  It's the position they were put in.

11          They may have tried their best to consider EFH

12  interests as well as other interest.  But as dual

13  fiduciaries, the best they could possibly do was balance the

14  interests of EFH with the interests of TCEH.  They had a

15  clear and obvious conflict.  And that requires heightened

16  scrutiny by the Court.

17          The second set of facts relevant to the standard

18  of review is the lack of approval by EFH creditors.  Now,

19  the absence of creditor approval, Your Honor, is a factor

20  relevant to many legal and equitable issues to be decided by

21  you after trial, as the Debtors concede.

22          As you consider the evidence, we ask Your Honor to

23  note in particular the statements in the record from the

24  Debtors and others that EFH has no other way to pay its

25  creditors in full, that EFH creditors are at risk now and in

1    the future, and that the business decision being made on

2    behalf of creditors is meaningful and important.

3            Without evidence of creditor approval, other than

4    E-side creditors with crossover claims that are actually

5    participating in the T-side transaction, the Court will hear

6    evidence from the Debtors about how the E-side creditors are

7    to blame because they could not come up with a better

8    approach themselves.  This is of course irrelevant to your

9    standard of review.

10           The reason why there has been no plan from the E-

11   side creditors is because the E-side creditors did not want

12   to make a giant payment to the T-side for no reason.  It is

13   a commercial point.  It is an intercreditor point.  It's not

14   complicated.  And all the finger pointing by the EFH Debtors

15   at their own creditors, whose interest they say they are

16   protecting, as a legal matter, underscores the magnitude of

17   the disagreement and the need for heightened scrutiny.

18           The third set of facts relevant to the standard of

19   review relate to the nature of the entire transaction,

20   settlement and plan, as a sale in which controlling owners

21   participated, to some extent.  And Your Honor can decide the

22   extent of the participation and whether it's cognizable.

23   But the evidence will be clear that this transaction was

24   negotiated between the buyer and the controlling owners, and

25   that the controlling owners have some economic interest in

1    its success.

2         The Debtors pretend this is somehow not unusual.

3    But a change-of-control transaction, outside of the context

4    of a Court-approved option, arranged with controlling

5    owners, implemented through an unimpaired plan, over the

6    objection of the fulcrum class, doesn't happen every day.

7         And the evidence will show, Your Honor, that this

8    global settlement must be looked at as part and parcel of

9    the M&A transaction, as a way to divide up the value of that

10   transaction among parties other than the actual sellers of

11   Oncor, EFH and EFIH.  Oncor was treated as an asset of

12   everybody's.  The clearest example of this is the trade of

13   contractual damages, which would be payable only to the

14   seller, for disarmament, which is paid to everybody.

15        The second group of facts you will hear relate to

16   the settlement.  In a nutshell, the core settlement the

17   committee is challenging is simple.  EFH and TCEH give up

18   all of their litigation claims against each other, now and

19   forever, in the event the proposed plan does not close.  EFH

20   allows a $700 million general unsecured claim.

21        I would note, further on -- and this is critically

22   important from the committee's perspective -- that the $700

23   million allowed claim is only paid by EFH.  But TCEH gives

24   up all of its own claims against directors, officers,

25   controlling owners, and even TCEH's creditors.  TCEH

1   releases many claims, not only against EFH.  But only EFH

2   pays.

3           The Debtors, however, Your Honor, are less

4   complicated.  They're asking the Court to justify the

5   settlement on its own terms as a litigation settlement.  It

6   can't be justified by the opportunity to be paid in full

7   under the plan, because the Debtors removed it from the plan

8   and are seeking approval only on the narrow basis of 9019.

9           Nor can the Debtors justify the settlement with

10  the T-side mediation settlement.  Your Honor will not hear

11  evidence that EFH's agreement to the settlement is

12  necessary, or that TCEH's mediation settlement will somehow

13  be lost.  Of course not.  It would defy belief that the T-

14  side mediator would resolve a lien challenge at TCEH by

15  awarding to the junior creditors the right to buy Oncor from

16  EFH and the senior creditors a $700 million claim against

17  EFH if they do not.  That would be the easy way to resolve

18  the TCEH lien challenge.

19          Instead, the settlement must live or die on its

20  merits as a litigation settlement, now, pre-plan, as between

21  EFH on the one hand and TCEH and all the insiders on the

22  other hand.  Does it?

23          Well, putting aside the standard of review and

24  legal arguments, the important facts for assessing the

25  merits of the settlement are those probative to how a

1   reasonable person at arms' length would settle the claims.

2   Your Honor will operate under the mandate of TMT Trailer,

3   which requires an independent judgment by the Court based

4   on, quote, "facts, not allegations," close quote.

5          The Debtors' listing of claims and repetition of

6   words like "complex" and "uncertain" is not probative

7   evidence.  And the choice of the Debtors to proceed with a

8   multipart settlement all at once does not relieve them of

9   their burden of proof.  The Debtors will need to show

10  admissible facts that support a $700 million allowed claim.

11  And Your Honor will then need to consider the applicable

12  principles of law on which they rely.  It is the admissible

13  facts and the applicable law that the Court must canvass

14  under TMT Trailer, not the list of allegations.

15         The facts for you to canvass are narrowed after

16  briefing.  And there's now clarity into the main claims

17  being settled.  The starting point is the claims TCEH

18  submitted to EFH on March 16th.

19         This is taken directly from the minutes of the

20  meetings of the EFH disinterested directors describing the

21  ask from TCEH, and it is a discrete list of claims:  an

22  intercompany tax claim, $754 million; an insider preference,

23  84 million; claims for an interest rate delta on the

24  intercompany notes, 620 million; an amend and extend claim,

25  80 million; over-allocation of shared services, 125; sponsor

Page 96

1    fees, 140; LBO claims, zero; and a basis step-up for 700.

2              And, Your Honor, all of these are listed at face,

3    as the document says, without regard to the law or the

4    facts.  There are not five million pages of legacy documents

5    to worry about.  There are only these eight claims.

6              As to the legal claims to which material value is

7    attributed, Your Honor, they fall into two types.  And we've

8    organized them very simply.  There are contract claims, and

9    there's avoidance claims.

10             The contract claims arise under the tax allocation

11   agreement, consisting of an AMT credit claim and an NOL

12   claim.  Both can be dismissed under the four corners of the

13   contract. As the AMT credit claim, the largest, the Debtors

14   can barely find evidence for it, and already admit in their

15   pleading that the contract does not cover AMT credits.

16             As to the NOL claim, the question is whether a

17   Court will or will not follow the very specific principles

18   for tax group allocation set forth in the tax allocation

19   agreement, which happened to mirror those in the Internal

20   Revenue Code.  The Court can see, on its face, that the

21   contract is not ambiguous.

22             The Debtor, in response, digs through years of

23   papers to find pieces of parole evidence trying to turn this

24   into a "he said/she said."  But the parole evidence is

25   consistent with the four corners, which is also irrelevant.

1    It is a Texas law contract.  Under Texas law, the words of

2    the contract govern.

3              Everything else is an avoidance action.  And with

4    respect to the avoidance actions by TCEH against EFH, Your

5    Honor, we ask the Court, in listening to the evidence on

6    these claims, to consider the question of reasonably

7    equivalent value, from the perspective of TCEH.

8              For example, as to the underpayment of interest on

9    the intercompany note, which appears to be one of the

10   pillars of the settlement, (indiscernible) in their case

11   where underperformance of interest on a performing loan is a

12   fraudulent transfer in the first place, and have no evidence

13   that TCEH did not receive reasonably equivalent value for

14   its demand deposit at EFH, running LIBOR plus 550 basis

15   points.

16             Similarly, the alleged overpayment of corporate

17   services and sponsor fees by TCEH are accompanied by no

18   evidence that TCEH did not have -- receive reasonably

19   equivalent value for what it paid, or could have obtained

20   similar services more cheaply somewhere else.  This is a

21   fatal lack of evidence under applicable law.

22             The LBO, Your Honor, requires special attention.

23   TCEH listed at zero for good reason.  We would like Your

24   Honor to understand one fact about the EFH unsecured

25   creditors, a trait shared by the legacy (indiscernible),

 1   most of the retirees, and even the asbestos victims:  they

 2   all have claims that predated the LBO.  This stands in

 3   contrast to the TCEH creditors, who hold the debt that

 4   financed it.

 5           If the statute of limitations or solvency issues

 6   are overcome to permit an LBO challenge, EFH and its pre-LBO

 7   unsecured creditors would never agree to a settlement where

 8   they paid TCEH creditors for LBO exposure and everyone

 9   involved in are benefiting from the LBOs released.  The LBO

10   is properly zero as a claim against EFH in any settlement

11   where LBO claims are not also actively pursued in every

12   direction.

13           The Court should also briefly consider EFH's

14   claims against TCEH.  All that is important for the Court to

15   note now is that there will be no evidence that these claims

16   are worthless.  The undisputed claims have a market value

17   today.  The demand note is the only intercompany note, Your

18   Honor, that was never repaid.  At a minimum, these claims

19   must be taken into account in the settlement math as

20   defenses.

21           Your Honor also will have no evidence about EFH's

22   DNO insurance.  Your Honor should consider whether -- well,

23   we'll have evidence about EFH's DNO insurance.  Your Honor

24   should consider whether some of TCEH's allegations were

25   properly sound as breach of duty of loyalty claims, which

1    claims would be covered by insurance.  That's it.  That's

2    the merits.

3            The Court also will hear testimony from the

4    Debtors trying to justify this settlement with litigation

5    expense.  However, these again will be allegations and not

6    the facts required by TMT Trailer.  There will be no

7    probative evidence of the cost of actual litigation of any

8    of these limited, discrete claims.  There's been no

9    litigation budget, no litigation plan.

10           In the past, the Debtors have confused litigation

11   expenses with case burn, which is chiefly interest expense.

12   Debt service cost is not litigation expense.  There will be

13   no evidence that the settlement of these claims, as between

14   EFH and TCEH, is necessary to emerge from bankruptcy.

15           Every one of the alleged claims is a general

16   unsecured claim.  There's no allegation of an administrative

17   priority.  There's no allegation of a right through

18   property.  They're general unsecured claims, subject to an

19   orderly claims resolution process.

20           More fundamentally, the Court will hear no

21   evidence that the alternative to settlement is litigation of

22   these claims until the end of time.  The question before the

23   Court is whether the settlement should be entered now,

24   globally, outside of a plan, applicable only to a future

25   plan, for all claims simultaneously, as a package.

```
 1            There's no evidence that this is a particularly
 2    good way or time to settle any of these claims.  To the
 3    contrary, the evidence will suggest that EFH creditors are
 4    prejudiced by settlement as a package, especially before
 5    important information about the future effect of the
 6    settlement is known, including the relative value of the E
 7    and T estates.  In short, the Court will not hear evidence
 8    to justify the settlement as a normal litigation settlement.
 9            Now, the Court also will hear no evidence that EFH
10    must pay TCEH because the Debtors need a tax-free deal and
11    TCEH is losing 700 million in present value of a loss of
12    business (indiscernible).  And no matter how much the
13    Debtors run from this, this is a very big change.
14            $700 million was initially attributed by TCEH to
15    this alone.  And it's now clear that the T-side today
16    suffers no loss from a tax-free transaction that requires
17    them to be compensated.  Debtor cannot justify today's
18    settlement on yesterday's facts, and it can't really justify
19    today's settlement on speculation about future facts.  The
20    different tax landscape today, right now, alone destroys the
21    basis for the equal disinterested director settlement.
22            Instead, the Debtors now try to justify the same
23    700 million with a new tax theory, that the T-side could
24    threaten the taxable foreclosure and create issues for a
25    subsequent REIT conversion.  Allowance of the claim becomes
```

1    a sort of consent fee to the T-side for permitting a REIT.

2           Now, whether Your Honor chooses to analyze it

3    under Rule 9019 or 363(b), Your Honor will not hear evidence

4    that this fee is reasonable on today's facts.  There's no

5    agreement by the TCEH first-lien creditors to a REIT or to a

6    tax-free reorganization in the future.  The only tax-free

7    reorganization they are facilitating is the current plan.

8    And the current plan cannot be a justification for the

9    settlement, because it was removed from the current plan,

10   presented on its own merits, and applies only if the current

11   plan fails.

12          I would like to talk for just a minute, though,

13   about Mr. Kieselstein's tax accounting advice.  The evidence

14   will show there's been no tax planning advice for a future

15   alternative plan.  And Mr. Kieselstein's comments indicate

16   the problem with this.  The premise of his remarks is that

17   it is impossible to do a REIT deal and a taxable deal.  This

18   is not correct.

19          Of course, if you were to sell TCEH in a taxable

20   disposition, and then convert to a REIT, there may be a

21   necessary E&P purge.  But if you were to convert to a REIT

22   first, and then do a taxable disposition, the problem

23   disappears.  Any tax lawyer actually asked to structure a

24   transaction as opposed to come up with yet another way to

25   justify a settlement would think of this.

1          It certainly is not necessary or appropriate for

2     the Court to (indiscernible) tax structure now.  Again, I

3     don't know how it justifies a litigation claim settlement.

4     But the Court should certainly be skeptical about tax

5     planning in the future and hesitate before considering it

6     probative evidence for the fairness of the litigation claim

7     settlement.

8          I'd also like to take a moment, Your Honor, to

9     address a comment from Mr. Thomas.  Mr. Thomas stated to the

10    Court that Your Honor extended to TCEH an approval right

11    over the disposition of Oncor at the bidding procedures

12    hearing.  Your Honor will remember that this ruling was

13    issued orally from the bench at a hearing, at which the

14    newly formed committee was not yet represented by counsel.

15         We did not and certainly do not interpret the

16    Court's statements from the bench as granting TCEH a veto

17    over the sale of Oncor.  Indeed, it's hard to figure out how

18    that would be possible as a matter of law.

19         The Court's ruling was in the context of the

20    bidding procedures.  And it has always been the position of

21    the committee that EFH and EFIH could sell Oncor on their

22    own motion at any time.  Again, there's been no allegation

23    of a property interest in Oncor by the T-side.  They are a

24    general unsecured creditor.

25         The entire bidding procedures discussion arose

1    because the Debtors moved for relief to sell Oncor

2    collectively, including TCEH in a motion for permission to

3    sell Oncor.  Your Honor correctly ruled that, to the extent

4    TCEH is involved in the disposition, it's a conflict matter

5    and requires Mr. Sawyer's approval.  Your Honor, in our

6    view, did not extend to TCEH as a corporate matter the right

7    to approve any sale of Oncor for the duration of the case.

8           Mr. Thomas's comments underscore a fact that will

9    be established at trial:  the EFH disinterested directors

10   thought there was a veto.  So, the EFH disinterested

11   directors thought they needed to pay TCEH whatever it took

12   for consensus.

13          And last:  the plan.  The third set of facts

14   relates to the plan.  I'll focus on feasibility, although

15   the other defects are also important.  And there will be

16   some evidence going to those as well, in particular

17   impairment, discrimination, and the good faith elements of

18   1129(a)(3).

19          Let me speak about good and bad faith for just a

20   second, Your Honor, because that was confusing this morning

21   as well.  We've not accused any individual of bad faith.  We

22   mentioned bad faith once in our complaint, and it's a point

23   about bankruptcy policy under (indiscernible), and whether

24   or not it's consistent with bankruptcy policy for a clearly

25   fulcrum class to be stripped of its vote.  It's a bankruptcy

Page 104

1   policy argument.  It's not an accusation.

2          But with respect to feasibility, the single most

3   important piece of evidence is not disputed, that the

4   purchasers bargained for and obtained, in their contract, a

5   clear right to walk away from the M&A transaction with no

6   remedy by the seller to stop them.  And here's the contract.

7          The first highlighted provision, Your Honor, says

8   that the seller has no right to specific performance.  The

9   second says that the seller has no other remedies.  The

10  third says that the seller has no damages remedy.

11         In addition, Your Honor, there's also no ability

12  to enforce the buyer's equity commitments through a

13  guarantee or otherwise, which is what makes specific

14  performance against a shell vehicle meaningful in every

15  other financial sponsor acquisition.  This is unprecedented.

16  And it is bargained for.

17         Now, rather than a contractual commitment, we

18  expect the Debtors to offer the personal speculation of

19  their witnesses that the buyers will want to close.

20  Testimony about the assumed intent is contradicted by the

21  express terms of the bargained-for agreement.  The contract

22  is the manifestation of intent.  There's no deal outside of

23  its four corners.  People mean what they write in contracts.

24  And the more sophisticated they are, Your Honor, the more

25  they mean what they write in contracts.

Case 14-10979-CSS   Doc 11702-4   Filed 00/09/17   Page 106 of 207
Case 14-10979-CSS   Doc 5676-4   Filed 11/05/15   Page 106 of 200

Page 105

1          The problem for the buyers is they do not know

2     what the REIT is going to look like after it makes it

3     through the regulatory process.  They don't know what

4     they're buying.  The assets to be included in the Oncor REIT

5     will be a subset of the assets occur in Oncor.  Oncor must

6     be divided into an operating company and an asset company,

7     and only the asset company is the REIT.

8          Since there's neither a business nor a business

9     plan, there's yet no evidence of the feasibility of

10    splitting Oncor into an operating company and a REIT.  And

11    there's no evidence that the value of Oncor as a REIT.  And

12    there's no evidence of how much of that value, if it exists,

13    regulators will demand to be returned to ratepayers as a

14    condition of the REIT approval.  It's all total speculation.

15    And so, there's no remedy in the bargained-for terms of the

16    contract to buy whatever exists in the future.

17         Now, we expect you will hear testimony, Your

18    Honor, that the settlement works like a remedy in the merger

19    agreement.  So, the merger agreement doesn't actually need

20    one.  In effect, this testimony will say that the buyers

21    will close because they would be disappointed to only

22    receive 550 million in cash.  You will not hear this

23    testimony from the buyers, who are not in the courtroom.  It

24    also is speculation, not evidence.

25         You will hear no probative evidence, Your Honor,

1    that the $550 million cash payment is a disappointing

2    outcome at all, especially in a downside case.  The 550

3    million is a floor price on the bonds, Your Honor.  And that

4    floor price is more than double what was provided in the

5    initial RSA.

6             The only objective evidence of the likelihood of

7    closing is the bargained-for terms of the contract and the

8    laws of economics.  And with respect, Your Honor, I submit

9    that the closing decision is a simple equation.  Will the

10   value of the REIT in the future exceed the price, which, by

11   the way, is set at the amount of claims, plus $550 million?

12   This, and this alone, will determine whether the plan

13   becomes effective.

14            Assuming total overlap, which this does, between

15   buyers and creditors, the first thing that will happen as

16   closing approaches is that the buyers will decide whether to

17   part with $550 million in cash, plus the purchase price, on

18   their equity (indiscernible).  And there's no evidence they

19   will.  The laws of economics are what they are.  The

20   contract is what it is.  And the decision is entirely

21   theirs.

22            For EFH, Your Honor, this is a disaster.  If Oncor

23   is valuable in the future, EFH should be able to sell it

24   without the buyer paying a $550 million penalty.  The

25   Court's ruling on Friday added another gloss, because the

1    P/E would now be significantly inflated and create another

2    disincentive for closing this particular plan.  The

3    economics are incontrovertible.  And expert testimony will

4    explain it more fully to the Court.

5             And I want to pause here, Your Honor, because I

6    don't want to miss a particular point.  This is not a

7    question of this equation versus another equation for

8    liquidated damages.  The strange thing about the M&A

9    contract is the absence of an ability to enforce the equity

10   commitments themselves.

11            And, as testimony will show, the equity commitment

12   letters are almost invariably specifically enforced.  There

13   can be regulatory conditions.  There can be financing

14   conditions.  But this is the one deal with which we're

15   familiar where the equity investors themselves do not have

16   to fund, and the estate -- even if the conditions are

17   satisfied, and the estate has no recourse.

18            So, on this record, there's no evidence a rational

19   future commitment party will close.  The Debtors' insistence

20   that the TCEH junior creditors believe their claims are

21   worth more than 550 million today is speculation.  And it's

22   irrelevant to the laws of economics.

23            If the Court approves the settlement and the plan,

24   the TCEH junior creditors have converted their claim into an

25   election to receive either REIT value minus price, and call

1   that the in-the-money-ness of the option, or 550 million.

2   They will never get their claim back.  And they will never,

3   simply because they thought that claim was worth a lot of

4   money, throw good money after bad.

5           The economics illustrate, more than anything, that

6   the plan sale is a poorly conceived afterthought for the

7   settlement.  The Debtors were happy to trade contractual

8   remedies, benefiting only EFH's seller, for a settlement

9   benefiting everybody.  In so doing, they come now to this

10  Court with the objective, meaningful evidence -- without

11  objective, meaningful evidence of feasibility.  The plan is

12  all about a settlement.  The settlement is permanent,

13  meaningful; the plan is speculative.  That's what all of the

14  documents say.

15          So, what do we have at the end of the day, from

16  the standpoint of EFH?  Here's how the committee sees the

17  situation for creditors as a commercial matter.  We believe

18  that, in considering the total package from EFH's

19  perspective, this is a useful illustration for the Court, to

20  show you how we think.

21          In the upper left-hand quadrant, if Oncor has a

22  high value in the future and the plan is confirmed, E-side

23  creditors are paid in full.  If the plan is not confirmed

24  and Oncor has a high value, E-side creditors are paid in

25  full.  Confirmation of the plan doesn't change the

1    underlying economics.  All it does is take away the ability

2    of the EFH estate to control the disposition process for the

3    asset.

4             And at a low Oncor value, E-side creditors allow,

5    if the plan is confirmed, a $700 million claim.  And they

6    give up all their affirmative claims.  If the plan is not

7    confirmed, EFH and TCEH both reserve their rights on all

8    affirmative claims, and a plan can be negotiated without

9    artificial constraints of a settlement that contemplates

10   that plan.

11            In both circumstances, the EFH estate is not

12   better off.  What we've done is we've lost rights, rights in

13   the high-value case to control the disposition of the

14   assets, and rights in the low-value case to have an

15   influence in the formation of the future plan.  And we've

16   lost those rights, Your Honor, without a vote.  Thank you.

17            THE COURT:  You're welcome.

18            MS. RAMSEY:  For the record, Natalie Ramsey,

19   Montgomery McCracken Walker & Rhoads, conflicts counsel to

20   the committee.  Let me begin, Your Honor, where Mr.

21   Dietderich began, because it's important.

22            The EFH committee has no objection to EFH's

23   release of the controlling owners and their designated

24   directors at the effective date of a current plan or another

25   plan.  Releases upon the effectiveness of a plan would

Page 110

1    require that all EFH creditors are unimpaired, or that, if

2    impaired, they vote to accept a plan that contains the

3    releases, or that the plan would be subject to a voting

4    impaired class, not including insiders, that was otherwise

5    fair and equitable.

6           The committee's objection is to the Debtors'

7    request to release the controlling owners and their

8    designated directors now and forevermore, regardless and

9    separate from whatever the treatment is that the E-side

10   creditors might expect.  We will argue, after trial, why

11   this is unprecedented and wholly inappropriate.  But for

12   today, I want to highlight briefly the evidence that the

13   Court will hear and what it won't hear with respect to the

14   insider releases.

15          First, Your Honor, we'll hear no evidence of why a

16   release now, as opposed to in a plan, is good for EFH.  You

17   will hear that the Debtors want peace.  You'll hear

18   arguments about the necessity of a global deal.  But the

19   desire for peace and global resolution cannot justify giving

20   up a potentially valuable estate asset in the form of an

21   outgoing claim for grossly inadequate consideration.

22          Second, we will hear evidence that the controlling

23   owners have wanted to be, and at times have insisted on

24   being, released from the time that the Debtors first began

25   contemplating bankruptcy.  They wanted it so much that they

1    inserted themselves into the current deal as the principals

2    in the negotiations with the buyers, and made the release a

3    central term of the sales transaction.

4              The releases are set forth in the contract, which

5    is the settlement agreement, signed by the controlling

6    owners on one side, the Debtors on the other, as adverse

7    parties.  And the controlling owners have agreed to one

8    thing, which is:  support the transaction.  They get one

9    thing, which is the releases.  The evidence will show that

10   the releases are being granted to the sponsors on a quid pro

11   quo basis, on account of their interest within the meaning

12   of PWS Holdings.

13             Third, you will not hear evidence that the bargain

14   reflected is a fair process or a fair price.  In respect of

15   process, Your Honor will hear evidence that a special

16   committee was convened in April of this year to evaluate the

17   sponsor claims.  We won't hear what happened at that

18   meeting.  We will not hear that there was an exhaustive

19   review of claims, because we won't know what those claims

20   are.

21             But you will hear evidence that the special

22   committee agreed to release the sponsors and the directors

23   as part of a plan that at that time contemplated that the E-

24   side creditors would either be paid in full or would consent

25   to the treatment in a plan.  You will hear no evidence that

1    the special committee agreed to the releases outside a plan,

2    and you'll hear no evidence, importantly, that they agreed

3    to the releases when they migrated from a plan over into a

4    standalone settlement.

5           The special committee never met again.  Instead,

6    you'll hear evidence that the releases became bargained-for

7    terms in an overall plan transaction first negotiated with

8    the sponsors, and that, when the Debtors considered the new

9    structure of the transaction in connection with a PSA, that

10   they didn't consider that the new structure changed

11   materially the treatment to the E-side creditors.

12          They didn't ask for the special committee to be

13   reconvened at that time.  They didn't recognize the

14   importance.  But the TCEH ad hoc committee did.  They

15   indicated in correspondence to the sponsors' counsel that

16   they were getting everything they could have ever dreamed

17   of.

18          In respect of price, you'll hear from the

19   settlement parties that the controlling owners are

20   contributing value in the form of equity upside, taking --

21   not taking a worthless stock deduction, foregoing their

22   claims for unpaid management fees, and foregoing a claim for

23   indemnification.

24          Taking those one at a time, you will not hear

25   compelling evidence that there is any upside in the REIT

1   plan to give away.  But if there were, it wouldn't be coming

2   to EFH, because it would only exist if EFH creditors had

3   been paid in full.  You will not hear that there's a

4   realistic likelihood of a worthless stock deduction that

5   would harm EFH's NOLs.  You will not hear that the small

6   portion of the management fees that would be allocable to

7   EFH, even if they were enforceable as priority claims, have

8   any value of significance.

9           And finally, with respect to the indemnification

10  claim, to the extent that it is enforceable, it would be a

11  prepetition claim treated as an unsecured claim along with

12  all others in the bankruptcy.  And there are certainly

13  circumstances in which pursuing a claim that would be

14  payable to the estate in 100-cent dollars and payable by the

15  estate in less than 100-cent dollars would be a claim worth

16  pursuing.

17          As regards the sponsor-designated directors, the

18  Debtors will argue that their service during the

19  reorganization justifies the release that they're receiving.

20  You will not hear, however, that they have provided value

21  outside of the scope of their regular responsibilities and

22  existing fiduciary duties.

23          Fourth, you will certainly not hear evidence that

24  the Debtors valued the release claims.  And you will not

25  hear evidence that the Debtors valued the cost of pursuing

1    any claims against the sponsors or their designated

2    directors.

3            Fifth, and importantly, the EFH committee believes

4    that the facts will support colorable claims as that

5    terminology is used in Cybergenics, or, to use the

6    terminology of TMT Trailer and Martin, that there are claims

7    with a likelihood of success on the merit as to which there

8    are no collection concerns.

9            These claims include claims against the conflicted

10   directors for breach of their fiduciary duties of loyalty in

11   connection with various of the amend and extend transactions

12   that took place prepetition, as well as aiding and abetting

13   claims against the sponsors related to those same

14   transactions.

15           The corporate governance deficiencies that were

16   recognized by this Court a year ago existed throughout the

17   prepetition period.  Your Honor will hear evidence,

18   including the expert testimony of Mr. Rule from

19   AlixPartners, supporting a finding that EFH has been

20   continuously insolvent on both a consolidated and a

21   standalone basis since the end of 2008.  The evidence will

22   show that the damages associated with a successful claim for

23   waste, or, as termed in Texas, negligent mismanagement,

24   could measure in the billions of dollars.

25           However, the claims are not on trial.  The

1    releases are.  And they must be evaluated separately and

2    under a standard of entire fairness.

3            You heard -- you will near no one say that the

4    releases are worthless.  Notably, you did not hear anyone

5    say today that the releases are worthless.  We believe this

6    fact alone should end the inquiry.  The circumstantial

7    evidence of the constancy of the releases throughout the

8    period and the structure that's before this Court certainly

9    suggest value.

10            But to the extent that the Court requires more, we

11   believe the evidence will show that EFH has claims against

12   the controlling owners and designated directors that have

13   both merit and value.  Thank you.

14            THE COURT:  Thank you.  Ms. Schwartz?

15            MS. SCHWARTZ:  May it please the Court.  Before

16   the Court is a settlement agreement and plan by which the

17   Debtors and the plan supporters seek to resolve extremely

18   complicated legal and factual disputes, and stake out a path

19   for restructuring the approximately $40 billion in debt that

20   the Energy Future Debtors owed to their creditors when they

21   sought Chapter 11 protection from this Court and our federal

22   bankruptcy system.

23            Throughout these cases, the Debtors, their

24   creditors, and other parties have asked the Court, through

25   motions and filings, and conferred with the U.S. Trustee on

Page 116

1    a multitude of issues that are way too many to count, to

2    assist them in allowing the bankruptcy process to work.  And

3    that has been a consistent theme from the parties.

4          And although there are currently calls for reform

5    of our system, the fact that the Debtors and their creditors

6    have been able to ready a plan for confirmation in these

7    highly litigious and factional Chapter 11 cases demonstrates

8    the merits of our bankruptcy process that is predicated

9    upon, in large part, the ability of the parties to reach

10   consensus.

11         And, as a front-line observer, Your Honor, I can

12   attest to and also wish to commend the many, many hard work

13   and efforts of the parties here, despite the differing

14   opinions and issues, including, Your Honor, the willingness

15   of the Debtors to work with the U.S. Trustee on issues that

16   are regular issues that come before the Court, as well as

17   the Debtors' management, who has acted in a very

18   professional and responsive manner throughout these cases.

19         Notwithstanding the Bankruptcy Code's flexibility,

20   it is meant to be a comprehensive scheme to govern the

21   bankruptcy process.  And it cannot remain comprehensive if

22   interested parties in each case are free to tweak or stretch

23   the law to fit their preferences, no matter how big the

24   case, no matter how much money is at stake, no matter how

25   many boxes are in the courtroom, no matter how many lawyers

1    are in the courtroom.

2           The public has the right to be able to have faith

3    in our system that there is a fair and consistent process in

4    place, with appropriate parameters and boundaries that are

5    upheld and protected through judicial oversight and

6    transparency.  And that same level of oversight that -- and

7    scrutiny applies in all cases, whether they be small deli

8    cases or huge enterprises with the restructuring and

9    complicated transactions that you have before the Court.

10          In addition, Your Honor, I think the other part

11   that's important is that, given the size and magnitude of

12   this case, it is difficult to bring it all down, to relate

13   to what's going on, particularly in light of the magnitude

14   of dollars.

15          For example, Your Honor, at the deposition of Don

16   Evans, chairman of the board of Energy Futures, he was asked

17   questions regarding the sponsor releases.  And in his view,

18   he said, in his honest view, the sponsors were really

19   getting, quote, "zippo."  Well, they may be getting zippo in

20   terms of what their investment was, but, as Your Honor is

21   aware, this settlement agreement provides that the sponsors

22   get a payment of $15 million if that settlement agreement is

23   approved.

24          Now, $15 million might seem like a very small

25   amount of money when compared to the $40 billion of debt

1    that the Debtors have walked in and sought to get the

2    assistance of our laws.  But it's still $15 million, Your

3    Honor.  And it's important for us and the Court to be

4    cognizant of that.

5         In thinking about addressing the Court this

6    morning, I was thinking very carefully about what was the

7    most important thing to highlight for the Court on behalf of

8    the U.S. Trustee program as part of the U.S. Department of

9    Justice.  And one of the things that has been asked of us

10   many, many times is:  why is what you say so important, when

11   you don't have any money on the line in the case, when you

12   don't have a financial stake in the outcome?  And --

13         THE COURT:  You've heard that before.

14         MS. SCHWARTZ:  Yes.  Yes.  And that's why it was

15   plaguing me this morning when we were coming.  But therein

16   lies the answer, Your Honor.  It is that very fact that the

17   U.S. Trustee and the Court, for that matter, are not

18   hindered by financial considerations in the bankruptcy case

19   and are, therefore, free.  Whereas the Debtors may not be or

20   other parties may not be.  To point out provisions in a

21   global settlement that they may not like but they go along

22   with because they have bigger fish to fry.  And, in fact,

23   Your Honor, it's those types of provisions that cross the

24   line, that extend past the boundary, that extend past the

25   parameters and statutory limitations set by our Congress,

1   that the U.S. Trustee can raise to the Court so that we can

2   protect and have a consistent system.

3            And I will say, Your Honor, that you will hear

4   testimony from Stacey Dore, general counsel and co-

5   restructuring officer, who was questioned at her deposition

6   and asked in particular, as Your Honor knows, one of the

7   issues that we have objected to are the fees that are

8   proposed to be paid as part of the settlement agreement.

9   And we asked the question and she said pretty much "The

10  global settlement is a give and take process" and so the

11  issues that were of greater paramount, commercial issues to

12  the corporation, outweighed certain provisions that, as we

13  will argue at our closing, do not comport with the

14  Bankruptcy Code.  But the point there, Your Honor, is that

15  the beauty of the system is that there is an independent arm

16  of the Justice Department that can present it to Your Honor,

17  that can assist the Court in making sure that our system is

18  intact, that our system is something that the public can

19  have faith in, that works and is applied consistently across

20  the board.

21           The U.S. Trustee's objection to confirmation and

22  approval of the settlement is based on three provisions, and

23  those provisions include the fee provisions under the

24  settlement agreement, the releases, and the exculpation

25  provision.  As Your Honor noted at the hearing on the PSA

1    motion, the majority of the U.S. Trustee's objections are

2    legal and, therefore, the greatest part of our participation

3    in the trial will be today to set the table and during

4    closing when we make our arguments.  But I just want to

5    highlight some of the facts that are in evidence and will

6    weigh and factor into that, as well as the legal issues that

7    the Court has already considered in other cases.

8              But specifically, in 2.7 of the settlement

9    agreement and Article 4R of the plan provide for the payment

10   of certain third party fees that either are not disclosed,

11   are only available under Bankruptcy Code Provision Section

12   503B3D and 4 -- and in this case, what the Debtors are

13   asking and the other parties supporting the plan is that

14   they have unfettered discretion to pay these fees, removing

15   that from the Bankruptcy Court's oversight, removing that

16   form the public's knowledge as to who's getting paid what,

17   and actually doing what is fair to say a workaround around

18   the Bankruptcy Code.

19             The people, the attorneys in these cases are

20   experienced practitioners.  Many of them have addressed this

21   issue with respect to the 503B claims and attempting through

22   the creative processes of the bankruptcy system to devise a

23   mechanism by which they wouldn't have come before the Court

24   to demonstrate that those claims fit within the parameters

25   of the Bankruptcy Code.

1          Here you've got somewhat of a new variation that

2     will put a bulk of those fees in the settlement agreement.

3     And we'll say, "Your Honor, that's a 9019 motion." We don't

4     have to pay attention to the actual sections of the code

5     that are the sole source for the payment of administrative

6     claims -- but, rather, we'll put it in a settlement

7     agreement and ask Your Honor to, in advance of approving

8     confirmation, find that it falls above the lowest point in

9     the range of reasonableness under 9019.  I don't think that

10    avails them the ability to circumvent the code, and I don't

11    think the Court should allow them to do that.  And one of

12    the things that none of parties has mentioned today is that

13    9019 is a rule and the rules implement the statute.  And the

14    statutory section under which they seek approval of the plan

15    is Section 105A.  And the law is very clear, Your Honor,

16    that when there's a specific section of the Bankruptcy Code

17    that deals with administrative claims, priority of claims,

18    the Court should not and cannot use the more general 105A as

19    the basis for that decision.

20         So, I think that you're going to hear testimony

21    that the reason why the Debtors agreed to allow the

22    provision in the settlement agreement is because they had

23    bigger fish to fry and they wanted a global settlement, and

24    as far as they were concerned, in their own business

25    judgment and in their own business sense, they would review

Page 122

1    the fees, which made sense to them because they're a huge

2    corporation and they have a process for reviewing fees.  But

3    the difference here is they're in Bankruptcy Court and the

4    fees that they agreed to pay are subject to the provisions

5    of the Bankruptcy Code, and that's the job of the Court to

6    make sure that the parameters of the system remain intact.

7            The U.S. Trustee has also objected to the

8    releases.  Our objection is somewhat different.  We've taken

9    a different spin on it.  Our objection is pretty much the

10   standard objection with respect to releases, that the

11   Debtors are going to have to establish and put in evidence

12   that the consensual releases meet the statutory and the

13   jurisprudence of the Third Circuit -- but that there are

14   also nonconsensual releases and the Court should not approve

15   those nonconsensual releases.  And we submit and believe

16   that the evidence will not establish that they can make a

17   case to be able to get the Court to approve the

18   nonconsensual releases.

19           And, finally, with respect to the exculpation,

20   after Your Honor issued the Court's decision in Allied

21   Systems, the Debtors modified the exculpation.  The problem

22   is it hasn't been fixed in its entirety.  The exculpation as

23   it stands today still seeks to provide exculpation for non-

24   estate fiduciaries, including shareholders and non-Debtor

25   affiliates.  And, Your Honor, as we will emphasize in

1    closing at the appropriate time, it's our view that simply

2    because a party brings an action against a shareholder or a

3    non-Debtor affiliate and one of the claims in that action is

4    fiduciary duty related does not make that party a fiduciary

5    entitled to exculpation.  Thank you very much for your time,

6    Your Honor.

7            THE COURT:  You're welcome.  Mr. Anker?

8            MR. ANKER:  Thank you, Your Honor.  For the

9    record, Philip Anker, Wilmer Cutler Pickering Hale & Dorr

10   for Delaware Trust Company as EFIH first lien and trustee.

11   From the moment we heard about this plan, the mantra we have

12   heard from that side of the room has been that it will

13   unimpair the E side.  I think I heard that this morning

14   eight times but I might be wrong on my count.  The

15   transcript will answer.  Were it so, as much as I enjoy

16   being in this courtroom, I'd be out enjoying the beautiful

17   weather today or working on other matters.  We do not -- I

18   heard so much today in eloquence about the plan, about the

19   settlement, about getting these companies out of bankruptcy.

20   Those are lofty goals, they're goals we share, they're goals

21   we applaud.  We do not want this Court to deny confirmation.

22   We want this Court to direct the Debtors and direct the plan

23   proponent supporters to do what they have promised, to

24   unimpair us.

25            We included with our plan objections specific

1    language -- language as to which, despite all these

2    suggestions about all these negotiations, we have not

3    received one phone call, one conversation, one email "Let's

4    talk through them and work through the language".  Not one.

5    Never.  We want a plan that unimpairs us and then I will

6    gladly go and join this side of the room, notwithstanding

7    how crowded it is.  We want our rights to be preserved.

8    That's all we want.  Those rights include the right where a

9    claim is disputed to litigate it.  To litigate it to

10   judgment before Your Honor and, yes, to invoke our appellate

11   rights.

12          If we lose -- if there ultimately is a final non-

13   appealable order that says we're not entitled to that claim,

14   we're big boys, we know we won't get paid.  But if there's a

15   final non-appealable order that says we're entitled to the

16   claim, whether entered by Your Honor or an Appellate Court,

17   then the law entitles us to that claim and entitles us to be

18   paid.  And for us to be unimpaired we need to be paid.

19          I will also try not to mess up the words but I'll

20   use Mr. Shore's shorthand acronym, WTFA.  What is the

21   feasible alternative?  The feasible alternative is to be

22   good to your word and unimpair us.  What is unimpairment?

23   You answered that last week.  It's not a hard, complicated

24   thought.  It comes right out of the statute and you said it

25   in your opinion.  Unimpairment means, to quote the statute,

1    "that all the legal, equitable, and contractual rights of

2    the holder of a claim are preserved or unaltered".  The

3    Third Circuit has said the statute means what it says.  In

4    PPI it said, and I quote, "If the plan does not leave

5    creditor rights entirely unaltered, the creditor's claim is

6    impaired".

7          Put simply, impairment requires you to take two

8    snapshots in time -- pictures: What are our rights one

9    minute before the plan is confirmed and consummated?  What

10   are our rights one minute after?  And if there is any

11   difference -- if the plan changes it at all, then we are

12   impaired.  That's what the statute says, that's what the

13   Third Circuit said, that's what you said last week.  And

14   most assuredly this will happen.

15         We went through many, many points in our plan

16   objection but let's just go through a few here.  Let's focus

17   first on the biggest dollar issue, the make-whole.  Your

18   Honor has denied that claim.  Let's take the before shot.

19   And, therefore, we do not have a right today to be paid.  I

20   acknowledge that.  But we have a right to appeal and we have

21   a right, if an Appellate Court holds that Your Honor erred,

22   to then be paid, assuming that order becomes itself final

23   and non-appealable.  That just happened in a leading case in

24   the Second Circuit Chesapeake, and their own plan

25   acknowledges it.  Because their plan says that if we prevail

1    on appeal prior to the effective date -- not that the plan

2    will go forward and they won't pay us because they know that

3    would be unlawful but, rather, a condition that confirmation

4    fails.

5              So, our right is to appeal and if we win, to get

6    paid.  That's the before snapshot.  What's the after

7    snapshot?  The plan actually enjoins our appeal.  It

8    explicitly provides in the injunction provisions that in

9    satisfaction of all the claims no one can prosecute any

10   other claim.  Now, they're not serious about it, and that's

11   why I expected a phone call that said, "This is a glitch.

12   We'll fix it".  We didn't get that call.  I hope I get it

13   tonight.  What does it say about the more significant issue?

14   If we do get the prosecutor appeal and we win, will we get

15   paid?  The plan says unequivocally the answer to that is no.

16   The plan says no make-whole claims are allowed and we'll be

17   paid, no ifs, no ands, no buts.  And Ms. Dore, as the 30B6

18   witness for the Debtors -- and I commend her for her candor

19   and honesty, confirmed that in deposition over and over

20   again.  And I will grant I and Mr. Horowitz were perhaps

21   repetitive in our questioning, but we wanted no doubt about

22   our understanding.

23             What is the Debtor's response?  The Debtor's

24   response is to say, "Well, look, as we said on the record,

25   we reserve our right to argue that the plan entirely

1   disallows your claim and when an Appellate Court to rule

2   your way it would be violating the plan".  But if an

3   Appellate Court disagrees and says it reorganized EFH's

4   libel and that becomes a final order and the Court has

5   jurisdiction, then I guess, you know what?  We're going to

6   see if EFH will be liable.  That's a tautology.  That's

7   nothing.  That's meaningless.  They're not telling you and

8   they're not putting it in the plan that if we win on appeal

9   we will be paid.  That's what the plan has to say.

10          They say, second, that we're not entitled to an

11  Appellate remedy, we're not entitled to a reserve.  I agree,

12  we're not entitled to a reserve.  We don't have a right to a

13  reserve today -- that's the before picture, so we don't have

14  a right to it as the after picture.  Of course, if they want

15  to take away our liens, they're going to have to do

16  something and a reserve is a possibility.  But if they

17  maintain our liens, we're not entitled to a reserve.  But

18  what we are entitled to is to be paid if we prevail, and

19  that's all we're asking for.  Their whole point about a

20  reserve is setting up a strawman and knocking it down.  It

21  also is supported entirely by cases, not one of which deals

22  with unimpairment.  Indeed, not one case they cite in

23  response to our arguments, not one is an 1124 non-impairment

24  case.

25          This is, Your Honor, plan impairment.  It's not

1    statutory impairment.  There's nothing in the Bankruptcy

2    Code that says claims that are disallowed by a trial court

3    but as to which an Appellate Court revives the claim or

4    nevertheless disallowed -- there's no 502B6 equivalent or

5    502B2 equivalent for claims that prevail on appeal anywhere

6    in the Bankruptcy Code.  Indeed, if anything, it is exactly

7    the contrary.  Because 502J says that even after a claim

8    (indiscernible) but it was final and non-appealable, it can

9    be reconsidered for cause.

10           Let's go to a second set of issues, fees.  Now,

11   this is a much smaller dollar issue.  But the plan says

12   we're entitled under our indenture to be paid our fees and

13   we're over-secured so we're entitled under 506B.  The plan

14   says that's right.  All your reasonable fees incurred up

15   until the effective date will be paid.  But what about fees

16   we incur after the effective date?  And let me pause here.

17   Mr. Thomas is right.  It's 17 months and we are still in the

18   District Court on our first brief.  Why?  Because we asked

19   the Debtors to agree to certification directly to the Third

20   Circuit of the make-whole appeal.  They said no.  We asked

21   for (indiscernible) briefing.  They said no.  They've done

22   everything they can to delay resolution, final resolution of

23   our make-whole appeal.

24           So that's where we are today.  And the consequence

25   of having to go through all this process and this briefing

Case 1:14-09079-CSS Doc 5078-4 Filed 00/09/17 Page 130 of 207
Case 1:14-09079-CSS Doc 5078 Filed 11/05/15 Page 129 of 200

Page 129

1    schedule is we're likely to still be litigating after this

2    plan goes effective, assuming it goes effective.  There's

3    nothing in our indenture today...  Let's do the before and

4    after snapshot again.  The before snapshot is we're entitled

5    to get paid the fees.  It doesn't say, "Upon confirmation of

6    a plan we're not entitled to get paid fees".  It doesn't say

7    that.  But the plan says we're no longer entitled to our

8    fees.  So, the before snapshot and the after snapshot are

9    different.  That is plan impairment caused by the plan.

10         Think of the simple date.  Let's imagine this plan

11   goes effective on June 1, 2016.  On June 2, 2016 I happen to

12   be writing my opening brief in the Third Circuit.  If the

13   plan hasn't been confirmed, I'm entitled to get the fees.

14   If the plan has been confirmed and gone effective the day

15   before, according to the plan, I'm not.  It's entirely the

16   plan that draws the distinction.  It's entirely the plan

17   that alters my rights.  That's plan impairment.

18         Interest.  I'll be brief.  We're entitled to,

19   under the terms of our indenture, not only interest on

20   principal but interest on the premium.  If we prevail on our

21   make-whole argument, then we will be entitled to interest.

22   At 10 percent, approximately, per year, that's $43 million a

23   year.  The plan has no provision.  Even if we win the make-

24   whole, it's the same analysis.  So the plan again is

25   disallowing a claim as to which we have the legal right

1 today.

2         Interesting accruing after the effective date --

3 again, if they would move the appeal forward, maybe we

4 wouldn't have any litigation after the effective date.  But

5 they've declined to do that.  And so, interest will continue

6 to accrue but the plan explicitly says, "No, you're not

7 entitled to get paid that," even though we have that right

8 today -- assuming, again, we win on appeal.

9         Additional interest.  The Debtors acknowledge in

10 their own disclosure statement that they failed to register

11 our notes, and as a result of failing to register our notes,

12 the interest rate bumped up on one of the tranches from 10

13 percent to 10.25 percent originally and then 10.50, 50 basis

14 points.  They say that to the extent of that additional

15 interest accruing after the petition date -- so, between the

16 petition date and the effective date, you're entitled to be

17 paid an interest on it.  But when we look at the language --

18 and I was absolutely convinced it was a drafting glitch --

19 there's no provision for its payment with respect to the

20 additional interest that accrued prepetition.  But they've

21 not fixed the glitch.  We gave them language to fix the

22 glitch.  I'm not standing up here if they fixed these

23 glitches, but they declined.

24         And, finally, interest on fees.  They say we're

25 not entitled to interest on the unpaid fees.  If they're

1   right, then we're not entitled to get paid it.  We say we

2   are entitled.  They've said, "We're not going to litigate

3   every claim in plan confirmation." That's fine.  But in that

4   case, all we're asking is that the plan not alter our legal

5   right if we're right to get paid.

6           Just a couple more points.  The plan provides for

7   the release of our liens.  How is that not plan impairment?

8   We're secure today.  Having a lien is a legal right, it's a

9   contractual right.  After confirmation we're not.  So if we

10  prevail on the appeal we go from being a secured creditor to

11  an unsecured creditor purely because the plan releases it.

12  The plan terminates our indenture and indenture is what

13  gives us the right to the fees and everything else.  That's

14  a contract.  If I'm a party to a contract and someone says,

15  "No, you're not, I'm ripping up the contract and I'm ripping

16  it up pursuant to a plan," how is that not plan impairment?

17          Finally, nonconsensual releases.  The definition

18  of releasing parties includes the EFIH first lien trustee

19  and the EFIH first lien noteholders.  The definition of

20  release parties includes the EFIH second lien trustee and

21  the second liens where we have an inter-creditor action.  It

22  includes Mr. Shore and his clients, who most assuredly we

23  will argue on appeal.  If any court is unwilling to require

24  the reorganized Debtors to pay, every one of his clients

25  should have to disgorge everything they've received under

1   the plan if we prevail on appeal to make us whole.  We have

2   not consented to, we've not been asked to consent the grant

3   of releases.  Yet they're imposing nonconsensual releases on

4   us.

5          I can't imagine -- I can't come up with a

6   hypothetical of a more obvious impairment of a legal right

7   than forcing a party against its will to give a release.

8   How is that not altering the legal rights of a party?  Your

9   Honor, this isn't a close call.  These aren't difficult

10   issues.  The law comes directly out of the statute and the

11   Third Circuit's controlling decision in PPI.  The fact are

12   undisputed.  They come right out of the plan and the

13   admissions by the Debtors, their own 30B6 witnesses, in

14   deposition.  I will be silent for much of this hearing.  For

15   good or bad you won't hear a lot of me.  I will cross-

16   examine Mr. Keglevic, Ms. Dore, and Mr. Ying, but it'll be

17   brief.  Maybe Mr. Hordan, but it'll be brief.  But please do

18   not confuse my silence during the evidentiary part of this

19   presentation, or relative silence, with either a lack of

20   concern or a lack of importance of these issues to my

21   client.  They are vitally important.

22          I'm silent because, frankly, as far as our issues

23   are concerned, we shouldn't have to stand up here today

24   because the Debtor should simply correct the plan.  And if

25   the Debtor won't, frankly, our issues could be resolved with

1    an evidentiary record with the depositions supplemented by

2    an hour of testimony, and we could be in final argument

3    tomorrow.  These are black and white issues and the bottom

4    line is this: If the Debtors want their plan confirmed, they

5    hold the key, at least as to us.  They just have to truly

6    unimpair us.  They have to do what they've promised to do,

7    and if they do, they will not hear from us further.  We've

8    provided language, I'm available to talk about that

9    language, I know Mr. Horowitz and Mr. Brody, who share many

10   of our interests, are available to talk.  We want to resolve

11   those issues and I'm serious in saying we want to be on my

12   right hand side of this courtroom, Your Honor's left -- not

13   on the left side.  But as the plan stands today, when it

14   fundamentally takes away all of our rights, we cannot be.

15   Thank you, Your Honor.

16             THE COURT:  Thank you.  Mr. Brody?

17             MR. BRODY:  Your Honor, good afternoon.  For the

18   record, Josh Brody from Kramer Levin Naftalis & Frankel on

19   behalf of Computer Share as EFIH second lien indenture

20   trustee.  So, Your Honor, just to start, a lot of what Mr.

21   Anker addressed are issues that I completely agree with him

22   and I'm going to really do my best to avoid repeating the

23   things that Mr. Anker has already argued in front of your

24   court.

25             Now, to be clear, we are here to blow up the plan.

1    We think that the plan that the parties have negotiated and

2    this grand bargain and disarmament and all the wonderful

3    things that they've been telling the Court about for so many

4    months -- great.  That would be fantastic.  I'm happy to sit

5    on somebody's lap if I have to, and that's not important.

6    But the reality is that that's not what's happened.  What

7    happens is the Debtors are using their plan to actually

8    impair our rights.  Now, the issues that we have in some

9    respects compared to the objections that Your Honor has

10   already heard, for example, from the EFH committee, are much

11   smaller in scope and you're not going to hear a lot from us

12   over the course of the trial, as Mr. Anker pointed out.

13   But, unfortunately, as small as these issues may be in terms

14   of the complexity, it's pretty significant for the Debtors.

15   Because as Your Honor pointed out at the hearing a number of

16   months ago, they chose to not solicit my clients, they chose

17   to render us unimpaired.  If they actually impair us,

18   however, the plan necessarily fails, as Your Honor pointed

19   out.

20        It's really unfortunate that all the hard work

21   that we've heard about that's gone into this plan would

22   actually flop because of the fact that they just decided to

23   be a little bit cute with how they actually tried to

24   unimpair us.  And also, I think it's important, a little bit

25   of history and context here.  The first time that, Your

1   Honor, I think frankly most of us heard about the REIT plan

2   was, I believe, some point in June.  And when Mr. Schiff

3   stood up here and told Your Honor about that plan that they

4   were working on, there was a point in time when they were

5   trying -- they were competing to be the plan sponsor along

6   with a number of other parties, including some of the second

7   lien holders who were trying to jockey for position to be

8   the plan sponsor, as Your Honor may recall.  Mr. Schiff

9   stood up here and said, "Well, we have a plan that's going

10  to render the E-side unimpaired and irrelevant" and that

11  essentially gave them a leg up in helping them win that

12  race.  And more power to them.  That's fantastic.  Except

13  that now at the point of the bait and switch -- and while

14  they've been telling Your Honor all this time that they're

15  going to render E-side creditors unimpaired, that's just not

16  what they're doing.

17          Now, the Debtor's response, or I should say lack

18  thereof, to our objections is pretty telling -- both in

19  terms of what you did not hear this morning from Mr.

20  Kieselstein and really their actual rely brief.  They really

21  don't do much.  They kind of just shoved us to the side a

22  little bit and focused all of their energy on the plan

23  itself and how the REIT plan is just a fantastic thing and

24  it's going to cure all the world's ill.  In fact, Mr. Anker

25  mentioned that they mentioned this morning -- I think you

1    said he said it eight times.  We actually counted up more

2    than 20 times somebody from the Debtors or the

3    (indiscernible) of unsecured creditors stood at this podium

4    and said, "Your Honor, our plan is fantastic.  We're going

5    to render the E-side creditors unimpaired and irrelevant."

6    It seems like their basic approach is "We're just going to

7    say it so many times, ultimately people will believe that

8    it's true."

9              And in an example of what I can only call "the

10   gentleman doth protest too much" they kind of say "No, no,

11   no, they're unimpaired, Your Honor, they're really

12   unimpaired" but they give no explanation as to how we're

13   actually unimpaired.  And, frankly, it's not even close and

14   they know it.  If you look at their reply brief, in

15   Paragraph 6, they summarize a portion of our argument as

16   follows: "The trustee effectively argues that indentures are

17   instruments that survive post-bankruptcy until every avenue

18   of appeals has been exhausted." Well, yeah, that's exactly

19   right.  If you're unimpairing us, all the rights I have

20   under my indenture are going to survive.  If the only thing

21   that's changed, as Mr. Anker pointed out, between before and

22   after is the plan, then it's the plan that's impairing me

23   and clearly I'm impaired, and they can't satisfy 1124.

24             What I worry about a little bit -- it seems like

25   the Debtor's approach here is really to sort of just, again,

1    ignore us and sort of distract Your Honor with all the

2    wonderful things about the REIT plan and why the objections

3    that are being plan by the EFH Committee among others

4    shouldn't -- Your Honor, should be overruled.  It's kind of

5    sad.  With apologies to Mr. Keiselstein, I kind of imagine

6    him standing here this morning talking about our objection,

7    how he'll get to it later as like an old vaudeville

8    magician.  "Look, we'll do this wonderful thing later and

9    we'll get to this stuff at the end." And they're not going

10   to.  They're going to try to ignore us through the rest of

11   this trial.  And you're really not going to hear from us

12   much, as Mr. Anker pointed out.  The evidentiary issues that

13   are going to be raised throughout the course of the trial

14   are not things that impact us.  Our issues are simple and

15   straightforward and there's just no question that they

16   actually do impair us.

17            Now, just to spend a couple of minutes on that

18   issue, again, Mr. Anker did a very good job of laying out

19   the issues and I'm really not going to retread over those

20   specific items that he did.  But I have a couple of

21   additional points I want to raise.  So, first, I think

22   there's two general categories as to how you can look at how

23   the plan impairs the second lien noteholders.  One is they

24   all have to pay certain amounts that are clearly due under

25   the indenture, such as fees and the like.  And in addition,

Page 138

1    it strips our legal and equitable rights in a number of

2    different manners.  A couple of examples.

3            So, to start with on the make-whole litigation,

4    the Debtors, again, I'm not going to retread what Mr. Anker

5    raised -- but the Debtors seem to make this argument that

6    "Well, the plan can't be held up because of the make-whole

7    appeals.  The Debtors are entitled to go forward with their

8    plan and get finality that a plan (indiscernible) to

9    provide." With all due respect to the Debtors, that is a

10   complete red herring.  They are entitled to all the finality

11   the plan gives them.  But the plan gives them unimpaired

12   second lien creditors -- that means they're prepared to live

13   with the fresh start of taking all rights with them post-

14   reorganization.  Anything else necessarily means the plan is

15   impairing us.

16           Secondly, I have to be honest -- I have a hard

17   time really following 100 percent what specifically the

18   Debtors are arguing when it comes to our appeal rights.

19   Now, on the one hand -- and, again, looking at their reply

20   brief, they point out that "The Bankruptcy Code could not be

21   clearer that the discharge upon confirmation as well as any

22   order of the Bankruptcy Court unless (indiscernible) is

23   immediately enforceable and, therefore, any ability or right

24   to preserve our rights on appeal are our burden." Okay, but

25   then they later say that "Our rights to appeal any order are

1   fully preserved." But the plan itself, as Mr. Anker pointed

2   out, provides that after -- given Your Honor's ruling, after

3   the effective date, our claim for a make-whole is disallowed

4   regardless of what happens on appeal.  And that means that -

5   -it's the plan itself and nothing else that's impacting our

6   rights.

7            Your Honor, of course, again, this is not a

8   surprise to the Debtor.  One of the evidentiary issues Your

9   Honor will see -- we put it in our brief and it'll come out

10  during the course of the evidence -- is the Debtors advise

11  their own boards that the second noteholders will be

12  impaired unless the appeal of a make-whole is fully and

13  finally decided, and in addition, that they could not

14  release our liens and render us unimpaired unless they

15  actually provided some sort of reserve.  And as Mr. Anker

16  pointed out, the release of the line points, again, this

17  goes to the overall.  We have a right under our indenture to

18  all of our claims being secured until they've been finally

19  resolved.  Releasing those leans by the plan is necessarily

20  impairment.

21           Litigation issues, Your Honor, I think also are

22  important for other reasons as well aside from the make-

23  whole.  As Your Honor will recall, we were in front of Your

24  Honor now on inter-creditor litigation with the first lien

25  (indiscernible) that's currently in front of Your Honor.  I

1     don't know what's going to happen in that litigation.  How

2     Your Honor's going to (indiscernible).  I assume we're going

3     to win but I don't know.  And the reality is that depending

4     on how that litigation turns out, there may be rights and

5     issues that various parties have against the Debtors --

6     under our inter-creditor agreement, under our indenture.

7     They can't just say, "Well, the plan's going to cut those

8     off and too bad." And is there creditor litigation?  You

9     know, that's between creditors and is not a Debtor's

10    problem.  But that's, again, just incorrect.  The documents

11    themselves provide certain rights to the second lien

12    indenture trustee and the second lien noteholders and they

13    can't use the plan to cut that off.

14          To sum up, Your Honor, the Debtors and plan

15    supporters made a conscious decision that they were going to

16    render our claims unimpaired in order to give themselves a

17    clear path towards confirmation of the plan.  They want

18    their benefits, they've got to live with the burdens too,

19    and that means living with all of our legal, contractual and

20    equitable rights.  And, frankly, it would really be a shame,

21    given all the hard work, if the plan fails because they

22    couldn't get that right.  Thank you.

23          THE COURT:  Thank you, Mr. Brody.  Mr. Pedone.

24          MR. PEDONE:  Your Honor, Richard Pedone on behalf

25    of the AFH indenture trustee.  May approach with the chalk?

1          THE COURT:  Yes.

2          MR. PEDONE:  Your Honor, the last page of our

3    brief slide deck contains a summary of necessary amendments

4    to the plan and it serves as a guide on how the issues that

5    I will briefly touch upon could be resolved.  Of course, the

6    committee has articulated a variety of other issues.  Your

7    Honor, consummation of this plan remains contingent on the

8    disallowance of the EFH make-wholes or their reinstatement.

9    Notably, even if Condition Precedent Number 9, "the

10   effectiveness of a plan is waived," which we would welcome,

11   "the plan on file does not contain a provision for the

12   payment of the EFH make-wholes if they are, in fact, allowed

13   or if they're not disallowed prior to the effective date."

14         Unlike other disputed claim amounts, there is no

15   reserve for the payment of the EFH make-wholes.  This is

16   quite a simple amendment that needs to be made to the plan

17   unless, in fact, they succeed on reinstatement, and if they

18   want to preserve both options, the change needs to be made.

19   But the last articulated position with the plan proponents

20   on this issue was quite clear.  As Mr. Lauria noted at the

21   September 28th conference, we have always required from an

22   investment standpoint that the make-wholes have to be

23   disallowed or not paid, and we recognize that there's risk

24   around that issue from an appellate perspective.  There's no

25   provision to pay the make-wholes because they are unwilling

1   to pay the make-wholes.  We hope that that changes and that

2   they can proceed with the option that they have, but it

3   hasn't changed and the plan needs to be revised.

4           Further, Your Honor, every witness questioned in

5   discovery on this topic has indicated that the subject --

6   mere subject of possibly waiving the make-wholes has not

7   come up.  In their reply brief the Debtors indicate that

8   they will, in fact, now be presenting evidence of possibly

9   waiving that condition and, again, we welcome the waiver of

10  Condition Precedent Number 9 as long as it is accompanied by

11  a provision to pay the make-wholes.

12          Your Honor, even if the Debtors offer new evidence

13  regarding the possibility of the waivers, as they indicated

14  they would, there needs to be a provision for payment.

15  Accordingly, until that provision is made, the plan itself

16  is not feasible.  Of course, Your Honor, the real driving

17  issue here and the reason that we believe the Debtors have

18  not engaged in the merits of the EFH make-whole is they

19  merit -- the EFH make-whole claims are different than others

20  that have been considered by this Court to date.  There's no

21  acceleration provision.  We summarize the law and the issue

22  in our summary judgment motion and we believe that it should

23  be heard.

24          In their reply papers in connection with Phase 1,

25  the Debtors took pains to note that they believe that they

1  will establish a right to reinstatement that will be their

2  cure-all on this issue.  Your Honor, the EFH indenture

3  trustee does not believe that reinstatement in form as

4  contemplated in the plan is permitted under the indentures

5  or under applicable law.  For example, on the most basic

6  level, the proposed movement of the debt at EFH Corp.  to

7  reorganize TCEH is not reinstatement as that term is used in

8  1124.  The debt does not end up where it was before the

9  petition date.

10          In addition, we do not even believe that the

11  supplement on which the Debtors purport to rely was approved

12  in compliance with the Trust Indenture Act.  Your Honor,

13  discovery on these Phase 2 issues is ongoing in all events.

14  The Debtors conclusory statements in their Phase 1 brief

15  that they believe they will succeed should not be credited.

16  those issues are reserved.

17          Your Honor, turning briefly to the settlement --

18  this settlement should've been put into and it should live

19  or die with a plan of reorganization.  It should not be

20  allowed to restrict future plan structures in the event that

21  this innovative plan fails.  While the laboratory experiment

22  or the technology of creating the REIT structure may, in

23  fact, generate tremendous value for all creditors, the

24  suffering that could be inflicted on the EFH bondholders by

25  the settlement does not need to stand alone.  Most labs

1    carry insurance and we shouldn't suffer the loss if the plan

2    fails.

3           I'm sure that all will agree and the evidence will

4    certainly show that if approved, this will be the largest,

5    most comprehensive, most multifaceted 9019 settlement in the

6    history of Chapter 11.  We are well outside the bounds of

7    what anyone has ever tried to do with Rule 9019 outside of a

8    plan.  We do not believe that the rule again provides this

9    Court with authority to approve such a large bucket, or more

10   aptly, perhaps dump truck full of settlements.  I was trying

11   to add up the number of independent compromises that take

12   place in the plan and I was getting to dozens.  Mr.

13   Kieselstein this morning actually said that his number

14   brings it to tens of thousands of claims in one settlement

15   motion.  As we noted in our objection, this can't be done

16   under the authority granted in a mere rule.  The rule's

17   enabling statute did not delegate substantive lawmaking to

18   the Supreme Court.  The complexity of what is being

19   attempted in this settlement will permanently deprive

20   holders of rights and recovery on a massive scale in

21   connection with any future plan.

22          If this is permissible, what deal permanently

23   revolving multiple issues in a Chapter 11 could not be

24   pushed through in settlement as opposed to needing to be

25   taken care of in a plan?  Well, the code encourages

1  settlements.  Such settlements are encouraged in connection

2  with and ultimately tied to the plan process where all

3  impacted parties have a say, a vote in the enumerated rights

4  in Section 1129.  This is why the plan process is discussed

5  as a brilliant mechanism for compelling resolution of

6  disputes.  It's the plan process that forces the compromise,

7  not the three-line Rule 9019.  The evidence will show that

8  this multi-billion dollar dump truck load full of

9  settlements involving tens of thousands of claims insiders -

10  - and these are insider claims; one estate against another

11  by definition is insider, and that addresses issues with

12  regard to the standard that apply -- sponsors, equity

13  holders, competing Debtors' estates that never filed proofs

14  of claim against each other.  This crosses the line of

15  settlements that can be implemented under the authority of a

16  mere rule.  The permanent restructuring of massive

17  obligations that they are attempting to do with the

18  settlement agreement in a settlement needs to be done with

19  a plan.  That's what the architects of the code and that's

20  what Congress dictated.

21          Accordingly, Your Honor -- and this is our final

22  suggestion in the outline that we provide at the end --

23  unless this settlement is made condition on the plan, which

24  truly leaves all non-consenting creditors unimpaired and it

25  dies and has no afterlife if this plan fails, approval of

1    the settlement must be denied.  Thank you, Your Honor.

2            THE COURT:  Thank you, Mr. Pedone.

3            MR. HOGAN:  Good afternoon, Your Honor.  Daniel

4    Hogan of Hogan McDaniel on behalf of Fennacle and Fahey.

5    Thank you for the time.  Mr. Kazin sends his regards, Your

6    Honor, he couldn't make it.  He asked me to appear in his

7    presence.  We appear in opposition to the proposed plan of

8    reorganization settlement agreement with respect to four of

9    the 70-odd Debtors whose individual bankruptcy cases have

10   been ordered to be jointly administered under Local Rule

11   1015-1 for procedural purposes only.  The four companies in

12   question, LSGT Gas Company and its wholly-owned

13   subsidiaries, LSGT SACROC, Inc., and EEC Holdings, Inc., the

14   latter of which owns EECI, Inc.  EECI is only one of four

15   Debtors whose interest have in theory been protected by the

16   committee -- exercising fiduciary obligations, the E-side

17   (indiscernible) committee, which has already advised the

18   Court at least with respect to the un-manifested future

19   claimants that it has an irreconcilable conflict of interest

20   which prevents that representation.

21           The evidence to be presented here will demonstrate

22   that the companies are, in fact, not really Debtors but

23   rather creditors holding in excess of $1 billion and inter-

24   company receivables that are intra-E-silo claims. If the

25   plan of reorganization intends to proceed on the theory that

1    the E-side creditors are unimpaired and will be paid in

2    full, then the gas group, as I'm referring to should be

3    called, should be paid in full as well.  The Debtor's intent

4    -- to reinstate these receivable claims and then to secure

5    the credit support for all present and future asbestos

6    claims and then cancel them for the benefit of the EFH

7    parent with the consent of the plan sponsors.

8              These four companies share common traits.  They

9    own no real property, they have no cash on hand -- checking

10   account, savings account, or other financial accounts.  They

11   don't really have any assets other than the fact that they

12   have receivables between themselves to and from the parent.

13   None of them have been operating companies since the early

14   1990s and none have any real employees since that time.  All

15   funds they receive from selling off assets and operations

16   were upstreamed, ultimately going to the parent, which

17   created these receivables.  The evidence will show that the

18   funds were and always have been treated as contributions to

19   the cash management money pools with respect to which

20   interest was supposed to be credited on a multi basis at the

21   rate of 10.875 percent annually at least since the leverage

22   buyout in 2008.  At a minimum, the assets of the gas group

23   consist of a $560 million receivable, which has been in the

24   books since 2009, with a current value of $1 billion due in

25   payable.

1      The evidence will show that the gas group is

2   perhaps the largest single E-side creditor in this case and

3   its interest is (indiscernible) along with the other

4   creditors.  The evidence will show that EECI and EEC

5   Holdings held at least $296 million in receivables in 1998.

6   With interest that receivable should be worth in excess of

7   $1.5 billion today.  Yet EECI has zero assets until last

8   year when EFH bookkeepers transferred $84 million from EEC

9   Holdings to EECI balance sheet.  All of this evidence exists

10  in the SOVAs and related documents.  We join with and adopt

11  the objections and arguments of the E-side Creditors

12  Committee (indiscernible) articulated and detailed the

13  grounds of our various concerns and objections and pleadings

14  filed heretofore, including objections to the disclosure

15  statement and our trial brief and omnibus objection filed

16  herein on October 23rd.

17      The main grounds for our objection to confirmation

18  are as follows: One, the Debtor's plan is unconfirmable with

19  respect to the four asbestos Debtors or the gas companies,

20  as I've referred to them, in that the plan fails to comply

21  with 11524G, which governs the treatment of future asbestos

22  claims under a Chapter 11 plan of reorganization.  Number 2.

23  The settlement agreement releases claims by over 70 Debtors

24  without evidence that the (indiscernible) settlement is fair

25  and equitable with respect to the individual estates of the

1   four gas companies -- or gas Debtors, as I refer to them.

2   Number 3.  The plan fails to comply with 11USC-1123A4.  The

3   plan provides for unimpaired status of claims against the

4   EHF Debtors arising from liabilities based on asbestos

5   exposure, such as Fennacle, as the state representative, and

6   Fahey, while denying such treatment for Mrs.  Fennacle, her

7   children and other unmanifested asbestos claimants whose

8   claims will arise from asbestos exposure.

9             Finally, 4.  It is our position that the plan is

10  not feasible.  The plain text at 1129A11 requires a

11  determination that, quote, "Confirmation of the plan is not

12  likely to be followed by the liquidation or the need for

13  further financial reorganization of the Debtor or any

14  successor to the Debtor under the plan unless such a

15  liquidation or reorganization is proposed in the plan," end

16  quote.  It is entirely unclear how the Debtors can possibly

17  address the feasibility requirement of their plan as it

18  relates to manifested asbestos claimants and unmanifested

19  asbestos claimants.  Among other things, the deadline to

20  file claims for those holders affected by the Court's prior

21  orders will not pass for another six weeks until after the

22  start of today.

23            These claims are not liquidated and can result in

24  a significant liability for the Debtor that will not be

25  determined over a fixed period of time, making forecasting

1   impossible.  We will revisit these arguments during our

2   closing argument.  Thank you, Your Honor.

3              THE COURT:  Thank you.

4              MR. GWYNNE:  Good afternoon, Your Honor.  Kurt

5   Gwynne from Reed Smith.  I address the Court on behalf of

6   Bank of New York Mellon Trust Company and A, as indenture

7   trustee for 9 million in EFCH 2037 notes.  Of the 40 billion

8   in debt, Your Honor, obviously, the $9 million is a

9   relatively small amount.  It is classified in Class C6 under

10  the plan.  The disclosure statement provides that because

11  TCEH's creditors are not being paid in full, the creditors

12  of EFCH, the parent of TCEH, will receive no distribution.

13             We filed the objection just to make sure, Your

14  Honor, that as the Court knows, the Debtor has the burden of

15  proving all the elements necessary to confirm a plan,

16  including that the treatment of that class is appropriate.

17  Thank you.

18             THE COURT:  Thank you.

19             MS. GRACE:  Good afternoon, Your Honor.

20             THE COURT:  Good afternoon.

21             MS. GRACE:  Anna Grace from the Department of

22  Justice for the United States on behalf of the Environmental

23  Protection Agency.  Your Honor, the United States objects to

24  the settlement agreement and the plan that is premised on

25  the settlement agreement because creditors of EFCH receive

1    zero payment.  And a settlement that waives all causes of

2    action that belong to EFCH in exchange for zero

3    consideration is fundamentally unfair.

4           EPA's claim against EFCH as alleged in Proof of

5    Claim Number 10059, concerns four abandoned uranium mines in

6    Mexico that a former subsidiary of EFCH owned and/or

7    operated in the 1970s and 1980s.  These mines are located in

8    a rural area; land at the sites and livestock wells near the

9    sites are contaminated with uranium.  People live within a

10   mile radius of the sites and one mine site is next door to

11   Navajo reservation land.

12          The radioactive material at these sites presents a

13   real danger to the public health and to the environment.

14   The radioactive soil, the contaminated soil needs to be

15   consolidated and contained, and the groundwater needs to be

16   monitored.  EPA estimates that this will cost $23 million or

17   more.  The subsidiary that owned and operated the mine sites

18   retained its liabilities relating to those sites until in

19   2007, on the very same day of the LBO, that subsidiary

20   assigned its liabilities to EFCH and then it dissolved.

21          Under the LBO and related transactions, EFCH

22   assumed its subsidiary liabilities but the many parties that

23   profited from the LBO transaction provided EFCH with no

24   assets to satisfy those assumed liabilities.  That is to

25   say, no assets other than the stock in the subsidiaries that

1    were themselves insolvent because of the enormous debt and

2    fees that the LBO parties had burdened them with.

3         Focusing now on the United States' objection to

4    the settlement agreement and that the settlement agreement

5    is unfair, we understand that EFCH has substantial causes of

6    action for fraudulent conveyance, including assigning the

7    liability for the contaminated mine sites but failing to

8    provide for those liabilities, as well as for breach of

9    fiduciary duty, just to name two examples.  And these causes

10   of action arose from the way that the LBO was structured.

11   These causes of action belong to the estate of EFCH.  But

12   the settlement agreement that resolves all claims of EFCH

13   from the beginning of the world provides zero dollars to

14   EFCH and its unsecured creditors, including EPA.  Of the

15   many questions before the Court, a critical question

16   concerning the settlement agreement is, does the unfair

17   treatment of creditors of EFCH under the settlement

18   agreement, an agreement that wipes out all of these

19   substantial causes of action without any consideration

20   whatsoever -- is that settlement unfair and inequitable?

21        We believe that the answer to this question is

22   obviously yes.  The settlement agreement must not be

23   approved unless the unfairness to creditors of EFCH is

24   remedied.  The burden, as others have pointed out, rests

25   squarely on the Debtors to demonstrate that the settlement

1    agreement is fair and equitable, and the Debtors have not

2    yet come anywhere close to meeting that burden.  Indeed, the

3    Debtors did not even respond in substance to the United

4    States' objection to the settlement agreement.

5    Specifically, the Debtors did not respond to the United

6    States' objection raised on the grounds that the settlement

7    agreement is unfair because it bargains away valid causes of

8    action in exchange for zero consideration to EFCH.

9             In considering a settlement agreement on similar

10   facts, Judge Walsh in the Bankruptcy Court here in Delaware

11   recognized that the Bankruptcy Court has a duty to ensure

12   that non-settling parties are not injured to the benefit of

13   other creditors -- especially when the non-settling party

14   was excluded from the settlement negotiations.  And that's

15   exactly like this case here.  First, the record demonstrates

16   that creditors of EFCH were inadequately represented in

17   settlement negotiations.  As discussed in the United States

18   brief, the committee was comprised of seven members, three

19   of which were purported to represent the interests of EFCH

20   but these three all had claims against TCEH and in some

21   cases, at least two cases, very, very valuable claims,

22   placing them in a far different position under the plan than

23   creditors like EPA.  And, second, creditors of EFCH received

24   zero value from the settlement agreement, a result that

25   certainly benefits the creditors of TCEH.

Page 154

1          To justify this, the Debtors would have to

2     establish that all of the many causes of action being

3     resolved, or in EFCH's case really just waived, by the

4     settlement agreement -- that none of them belong to the

5     estate of ECH and none would provide any value at all to

6     EFCH if successfully litigated.  This is precisely the kind

7     of unfairness that has been recognized as something that the

8     Bankruptcy Court should ensure against.  And, in fact, we

9     know that there are substantial claims that belong to the

10    estate of EFCH.  For example, part of what's being resolved

11    by the settlement agreement is the assignment of a

12    subsidiary's environment liabilities to EFCH on the day of

13    the LBO without providing adequate assets to meet those

14    liabilities.  This is a quintessential fraudulent conveyance

15    claim and it belongs to the estate of EFCH.

16          For another example, EFCH was similarly situated

17    to the subsidiaries of TCEH with respect to the pledges and

18    liens provided under the credit agreement.  The lien should

19    not be avoided in the same manner for each, so that EFCH's

20    causes of action have value, just as the TCEH subsidiaries

21    do.  There's also insurance coverage for breaches of

22    fiduciary duty by EFCH's directors and officers, and EFCH

23    should not be required to waive those claims in exchange for

24    zero consideration.

25          And for a final example, there is the $5.4 million

1    cause of action against EFCH arising from tax payables and

2    receivables.  EFCH should not have to give up valuable

3    causes of action in exchange for no consideration.  A

4    settlement agreement that requires EFCH to do so is unfair,

5    unless the Debtors establish that all of these claims either

6    don't belong to EFCH or are worth nothing.  And the Debtors

7    have failed, at least thus far, to do that.  The Debtors,

8    the committee, the disinterested directors assert that they

9    have fulfilled their fiduciary duties to EFCH but their

10   briefs and declarations provide no valid explanation as to

11   why these causes of action were waived in exchange for zero

12   consideration.  The results for unsecured creditors of EFCH

13   is unfair and inequitable and should not be approved.

14           Finally, the creditors of EFCH who are shut out of

15   the settlement agreement in the plan include the

16   Environmental Protection Agency.  If creditors of EFCH

17   receive zero distribution and zero value from the plan and

18   settlement agreement, then EFCH will walk away without ever

19   paying its fair share of the costs of cleaning up pollution

20   hazards at the New Mexico uranium mine sites and it will pay

21   nothing to make these sites safe again.  Meanwhile, the

22   various parties to the LBO and the TCEH creditors will

23   profit from the way in which the LBO and settlement

24   agreement were structured, a structure that excludes and

25   does not provide for EPA and other EFCH creditors.  Instead,

1    EFCH's share of cleaning up the mine sites will fall on the

2    public.  This result would not take the public interest into

3    account when applying bankruptcy law, as the case law

4    requires, and it would be in direct contravention of the

5    strict liability principles of CERCLA, requiring companies

6    to pay the cost of cleaning up the pollution hazards that

7    they create.  Such a result is unfair and inequitable and

8    should not be approved.  Thank you, Your Honor.

9             THE COURT:  Thank you.  Is there anyone else that

10   wishes to be heard?  Okay, that'll close openings.  Let's

11   take a short recess and then we'll put Mr. Keglevic on the

12   stand for direct.  Five or ten minutes.  Certainly no later

13   than four.

14        (Recess)

15             CLERK:  All rise.

16             THE COURT:  Hello?  Please be seated.  Mr.

17   Keglevic, yes?  I'm sorry.  Go ahead.  Please remain

18   standing, Mr. Keglevic, I apologize.

19             MR. KEGLEVIC:  Your Honor--

20             CLERK:  Raise your right hand.  Do you affirm that

21   you are telling the truth, the whole truth and nothing but

22   the truth to the best of your knowledge and ability?

23             MR. KEGLEVIC:  I do.

24             CLERK:  Please state and spell your name for the

25   record.

Page 157

1              MR. KEGLEVIC:  It's Paul Keglevic.  K-e-g-l-e-v-i-

2     c.

3              CLERK:  Thank you.

4              THE COURT:  All right, thank you.  You may be

5     seated.  Mr. McGann?

6              MR. MCGANN:  Your Honor, before I begin my

7     examination, there is a somewhat -- I believe the

8     (indiscernible) would like to announce.  I apologize for--

9              THE COURT:  That's okay.

10             MR. MCGANN:  --placing the witness, but Mr. Laurie

11    has something--

12             THE COURT:  I'm sure Mr. Keglevic is more than

13    happy to sit and listen to a settlement.

14             MR. LAURIE:  Good afternoon, Your Honor.

15             THE COURT:  Good afternoon.

16             MR. LAURIE:  Tom Laurie with White & Case.  We

17    have negotiated a resolution of the PCRB trustee's objection

18    to confirmation, and I think that counsel's here to describe

19    the terms on the record.

20             THE COURT:  Very good.  Thank you.  Mr. Gwynne?

21             MR. GWYNNE:  Good afternoon, Your Honor, Kurt

22    Gwynne from Reed Smith on behalf of Bank of New York Mellon

23    as indentured trustee for the PCRBs.  Your Honor, we've

24    reached a resolution of the PCRB trustee's objection to both

25    the plan and the settlement agreement.  And that effect to

1    the resolution is that the -- it will reduce the discount on

2    distributions on account of the PCRB claims from the range

3    of 50 to 55 percent in the plan to 30 percent.  In other

4    words, the discount on account of -- the distribution

5    discount to the PCRB claims is reduced to 30 percent so that

6    the holders of the PCRB claims will receive a distribution

7    that's 70 percent of what the PCRB claimants would receive

8    if they shared pari passu with the TCEH unsecured debt and

9    the TCEH second lien debt, the other class C4 claimants.

10            The PCRBs will receive that distribution of 70

11    percent of pari passu treatment from both the stock that's

12    being distributed to class C4 and the rights that are being

13    distributed to class C4, but also, with respect to the

14    distributions on account of the waiver of the TCEH first

15    lien deficiency claim.  The TCEH unsecured ad hoc group will

16    cause the debtors to modify the fifth amended plan and the

17    settlement agreement to provide, in language mutually

18    acceptable to the PCRB trustee in the ad hoc group for that

19    70 percent pari passu treatment.  And in addition, for the

20    payment of up to one million dollars in Bank of New York

21    Mellon's fees and expenses, which will be paid in addition

22    to the distribution, to the PCRB claimants.

23            Any fees in excess of a million dollars would then

24    be paid via a charging lien and priority of payment rights

25    under the indenture.  In exchange for the foregoing, the

1   PCRB trustee, combined with (indiscernible) objections to

2   the plan and the settlement agreement, and will use good

3   faith efforts to convince the eight holders of the PCR

4   claims with who the PCRB trustee is in contact.

5          To change any of their votes against the fifth

6   amended plan to votes in favor of the fifth amended plan, as

7   modified by this settlement agreement. As Your Honor may

8   know that of the 881 million in PCRBs that are not company

9   owned, about 600 million voted on the plan, 70 percent in

10  amount, 417 million voted against the plan, 30 percent an

11  amount, about 183 million voted in favor of the plan.

12         The group of eight PCRB claimants that with whom

13  the PCRB trustee is in contact comprise about 385 million.

14  There was a ninth member, but that member of the group

15  didn't want to be restricted by learning information that

16  was not confidential.  But the $383 million worth of that

17  group is in favor of this settlement, so we think that there

18  is significant support, you know, well into a heavy majority

19  of PCRB claimants that are now in favor of the plan, as

20  modified by the settlement agreement.

21         With respect to the efforts to change the votes,

22  the debtors are also going to seek authority from Your

23  Honor, and maybe we can just do it now via an oral motion,

24  ask the Court for authority to let the PCRB claimants change

25  their votes in favor of the plan without filing a written

Page 160

```
 1    motion with the Court.

 2           THE COURT:  Isn't there something in the

 3    procedures that allows for that?  I don't think we -- I'll

 4    only take that under advisement.  I don't want to -- I think

 5    they can do it already, but--

 6           MR. HUSNICK:  I believe that's correct, Your

 7    Honor, but I'll take another look.

 8           THE COURT:  Yeah, yeah, we'll figure it out, one

 9    way or the other.  So they're not going to stand in the way

10    of them changing their votes, but I think they probably

11    already have the authority to do that, and if not, we'll

12    figure out a mechanism--

13           MR. GWYNNE:  And if they--

14           THE COURT:  --so they have the Court approve that.

15           MR. GWYNNE:  Thank you, Your Honor.  And those are

16    the terms of the settlement agreement.  And I would just ask

17    Mr. Laurie or Mr. Shore to confirm that I accurately

18    described it.

19           THE COURT:  Very good.  Mr. Laurie?

20           MR. LAURIE:  Yes, the description on the record is

21    accurate and reflects the deal of the parties and we'll work

22    with counsel to get an appropriate amendment and a plan made

23    in due course to implement the agreement.  And I guess we'll

24    have to sort out what parts of the confirmation hearing have

25    now been eliminated.
```

1          THE COURT:  Okay.  Very good.  Thank you.

2          MR. LAURIE:  Great, thank you.

3          MR. GWYNNE:  Thank you, Your Honor.

4          THE COURT:  You're welcome.

5          MR. HUSNICK:  Your Honor, Chad Husnick on behalf

6     of the debtors, just to confirm that that's our

7     understanding of the deal as well, and that the debtors are

8     supportive of that resolution.

9          THE COURT:  Very good.  Thank you.  All right.

10         MR. MCKANE:  Your Honor, Mark McKane of Kirkland &

11    Ellis for the debtors.  Before I begin my examination of Mr.

12    Keglevic, may I approach with two sets of binders?  One is a

13    binder containing demonstratives and potential exhibits that

14    I'll be using with Mr. Keglevic.  I've already provided one

15    to the witness table.  I have one for you and both of your

16    law clerks.  I believe I provided copies to opposing counsel

17    as well.  In addition to that, I have an index of all of the

18    debtors' exhibits.  We can also provide that electronically,

19    to the extent that we use exhibits during the examination,

20    we will do so, and electronically as well.  But as you note,

21    there are also hard copies available here in the courtroom.

22         THE COURT:  Okay.

23         MR. MCKANE:  Thank you.

24         THE COURT:  Thank you.

25         MR. MCKANE:  Good afternoon, Mr. Keglevic.  Can

1    you introduce yourself to the court again, please?

2              MR. KEGLEVIC:  Good afternoon, yes.  I'm Paul

3    Keglevic.  I am the Executive Vice President, Chief

4    Financial Officer of the debtors and Co-Chief Restructuring

5    Officer.

6              MR. MCKANE:  And sir, the binder in front of you

7    contains a set of demonstrative aids, your written direct

8    examination and a series of exhibits.  If I could ask that

9    you turn to the tab that is labeled your written direct?

10             MR. KEGLEVIC:  Yes.

11             MR. MCKANE:  Sir, do you recognize what has been

12   labeled "Debtor's Direct Keglevic," or "DDIR Keglevic" up on

13   the upper right hand side?

14             MR. KEGLEVIC:  I do.

15             MR. MCKANE:  And sir, is this your written direct

16   testimony that you prepared and submitted to the court?

17             MR. KEGLEVIC:  Yes, it is.

18             MR. MCKANE:  And sir, is this in support of both

19   the motion, summon motion as well as for (indiscernible)

20   confirmation?

21             MR. KEGLEVIC:  Yes, it is.

22             MR. MCKANE:  Your Honor, I -- we move the debtor's

23   written direct testimony from Mr. Paul Keglevic into

24   evidence.

25             THE COURT:  Any objection?  Okay, it's admitted

Page 163

1    without objection.

2              MR. MCKANE:  Thank you, Your Honor.  Mr. Keglevic,

3    I'd like to cover a few topics with you today, and if

4    possible, I'd like to complete your examination today by

5    five o'clock.  If not, it may roll over, Your Honor.  I

6    apologize.

7              THE COURT:  That's fine.

8              MR. MCKANE:  There are five topics I'd like to

9    cover with you.  First, I'd like to do an overview of how we

10   got here.  Then, I'd like to cover disarmament and drag.

11   Then, feasibility of the plan, focusing on the E side.

12   Fourth, I'd like to cover uncertain aspects of the

13   settlement agreement.  And then, finally, the sponsor

14   releases, okay?

15             MR. KEGLEVIC:  Yes.

16             MR. MCKANE:  All right.  And to do that, let's

17   start with how we got here.  And to do that, did you prepare

18   or have us prepare a series of demonstrative aids that is

19   labeled under "Keglevic Demonstratives?"

20             MR. KEGLEVIC:  I did.

21             MR. MCKANE:  And is the first of those

22   Demonstrative A, Demonstrative Keglevic One, a timeline?

23             MR. KEGLEVIC:  It is.

24             MR. MCKANE:  And so, would using that

25   demonstrative aid assist you in your testimony today?

1           MR. KEGLEVIC:  I certainly hope so.

2           MR. MCKANE:  All right.  So using that timeline,

3    sir, why don't we just start at the beginning of the year?

4    Can you tell the Court, what were the drivers that the court

5    was -- that you were -- that the debtors were focusing on in

6    January of 2015, as you were trying to advance its

7    restructuring efforts?

8           MR. KEGLEVIC:  Certainly.  I think Mr. Kieselstein

9    started in November, but this starts with actually the big

10   procedures being approved and the receipt of the order on

11   January 15th.  Obviously, we thought that was a critical

12   part of the case, because ultimately, the construct that we

13   had been exploring was a construct where the -- EFH's

14   interest in Encore would be sold, and we would use the

15   proceeds of that sale to, as best possible, pay all the E

16   side creditors at par.

17          So effectively, the bidding procedures are the

18   vehicle through which we attempted to determine how much

19   value we would have to distribute to the E side creditors

20   and any T creditors that might have claims against E.  So

21   that was the beginning of the procedures, and as I think

22   we've testified to before Mr. Ying reached out to over 50

23   possible candidates for bid.  I think we had 14 or so that

24   signed non-disclosure agreements, and as we'll talk about in

25   a bit, we ultimately ended up with three initial bids, but

1    that's the beginning of the bid process.

2              Shortly after we got the bid procedure order, and

3    because we knew the bids and the amount we were going to

4    receive for the sale of Encore was only one piece of a plan.

5    We knew we needed to get, and we certainly attempted to get

6    creditor consensus around how to distribute those proceeds,

7    and some agreement of what claims between estates may be.

8              MR. MCKANE:  And sir, what approach did you all

9    take in the December/January time period to try to develop

10   some creditor consensus on how to allocate whatever proceeds

11   you received from the Encore sale?

12             MR. KEGLEVIC:  We certainly, at the end of the

13   day, we knew it was going to be the disinterested directors'

14   determination of the settlement, but before we got to a

15   disinterested director result, we were hopeful that we would

16   have consensus among the estates and agreement and

17   settlement of claims between the estates. So what we tried

18   to do, and I think the Court, as Mr. Kieselstein pointed out

19   earlier today, had encouraged us whether over at dinner or

20   whatever, to continue that dialogue and look for consensus.

21   We are using the time, even before and after the bid

22   procedures were finalized, to talk to the various groups of

23   creditors and get their points of view and beliefs on what

24   claims were, how they would value them, their willingness to

25   settle, etc., because we knew that was going to be a key

 1    element of any plan that we would enter.

 2          MR. MCKANE:  And sir, how constructive were those

 3    conversations in December and January?  Were you making

 4    progress?

 5          MR. KEGLEVIC:  We certainly had a lot of meetings

 6    and were having a dialogue, but the parties were

 7    substantially apart.  The bid-ask spreads were wide and they

 8    -- I would characterize it as nobody was in the mood to

 9    settle at that point in time.

10          MR. MCKANE:  Okay.  Were you looking at any point

11    for a catalyst or a means by which to advance that part of

12    the (indiscernible)?

13          MR. KEGLEVIC:  Yes, absolutely, because as I said,

14    you know, we knew it was a critical point or a part of any

15    plan we were to file, and we knew the clock was ticking on

16    exclusivity.  So you know, with a fundamental belief, the

17    consensus was the best way for the estates to get out of

18    bankruptcy, we tried to get that.  We thought the bid

19    procedures may -- might spur that consensus, but we soon

20    realized that the bid procedures in and of themselves would

21    not drive settlement discussions that we had to undertake

22    different procedures or try something new.  And that is what

23    led us to, I think the next point here on this chart, is the

24    January 30th so-called COR term sheet, that was--

25          MR. MCKANE:  What is that team sheet?

1          MR. KEGLEVIC:  That was a term sheet that Ms. Doré

2     and I constructed, that basically would -- was without

3     numbers, but that effectively talked -- looked at the

4     estates and effectively had a schematic, if you will, about

5     how settlements may flow between the estates.  And we put

6     that out and effectively, I would say at least initially, it

7     was not very effective, because there were no numbers in

8     there.  We got a lot of complaints that this isn't that

9     helpful.  It's maybe directional in terms of, you know,

10    which estate owns which estate, but until you guys start

11    taking a position, you know, we don't know if we agree or

12    disagree.  And we were nowhere in terms of ENT settlements,

13    big, big ask spreads.

14          The T side media (indiscernible) hadn't begun and

15    they had big, big ask spreads of, you know, intra T.  So

16    this was our attempt with our board's approval, you know, to

17    put something out there that would attempt to stimulate that

18    exact conversation.

19          MR. MCKANE:  Yeah, and let's touch on that board's

20    approval for a minute.  Can you just clarify for the Court

21    that process?  What did you ask the boards to approve before

22    you put off the COR term sheet?

23          MR. KEGLEVIC:  We basically explained exactly what

24    I just explained, that the reason we wanted to do it, the

25    benefit we saw of doing it, a drive toward consensus and

1    acceleration of the case.  But the board and the

2    specifically disinterested directors, we did not

3    specifically ask them to vote on this issue, since they

4    effectively just did not object to us going forward.  So we

5    informed them of our decision to make sure nobody was

6    opposed to it, but we did it, and I think with a disclaimer

7    that it was purely Ms. Doré and my attempt to drive

8    consensus.

9               MR. MCKANE:  All right.  And once the COR term

10   sheet's out there, you're still running the bidding process

11   for -- the sales process for Encore.  When did you receive

12   first round bids?

13              MR. KEGLEVIC:  We received first round bids on, I

14   think as this indicates, I apologize, March 2nd.  And as I

15   mentioned before, we received three bids, and we've listed

16   here, we've had one bid from a creditor, the EFIH PIK group,

17   one bid from the HUC group, which we've talked about earlier

18   today and I'm sure will again, and the third one, which is

19   also talked about in the court, before we even issued bid

20   procedures because they had put in an unsolicited bid

21   earlier in the case was the NextEra group, a strategic.

22              MR. MCKANE:  And sir, how would you just

23   characterize the overall value of those bids versus what you

24   were hoping for?

25              MR. KEGLEVIC:  Slightly disappointed.  NextEra, I

Case 14-10979-CSS   Doc 11702-4   Filed 00/09/17   Page 170 of 207
Case 14-10979-CSS   Doc 5078-4   Filed 11/05/15   Page 169 of 206

Page 169

1    think it was public in the proceedings leading up to the bid

2    procedure order that NextEra had thrown in an unsolicited

3    bid that had topped $18 billion.  When we received these

4    bids, we did not get to that same level with NextEra.  While

5    the other two bids were slightly above that amount, they had

6    other conditions and/or deductions that gave us less

7    distributable value than I had hoped for.  And of course,

8    remember at this point in time, as it was throughout the

9    entire case, we're trying to get as much distributable value

10   as possible to pay the E side group at par, and to have them

11   be unimpaired.  So all of my thoughts with respect and my

12   feelings with respect to the bids were with that objective

13   in mind.

14           MR. MCKANE:  And sir, if you could turn to page

15   three of your demonstratives?  And I ask that you not put

16   this on the screen, thank you.  Sir, page three of your

17   demonstratives is a page out of a board presentation or a

18   restructuring update from March 6th that's Debtor's Exhibit

19   85.  Do you recognize it?

20           MR. KEGLEVIC:  Yes.

21           MR. MCKANE:  Sir, is this the recovered waterfall

22   in comparison of bids that you presented to the Boards of

23   Directors as you evaluated that first round bids?

24           MR. KEGLEVIC:  Yes, it is.  It -- and in fact, it

25   took the same format as the format that we had provided on

1    the COR term sheet, because obviously, we took a position

2    that it was important to show distributions to each party

3    that were undisputed.  Obviously, we have the make whole and

4    the post-petition interest disputes.  And then, there was --

5    I believe the next page would've then gone through this same

6    exercise with respect to the EFH group, but the

7    distributable value to EFH was based on undisputed claims

8    and an estimated settlement amount that was what we were

9    willing to settle those claims for, which would show how

10   much would then be available to the EFH box to resolve the

11   claims they had for all of their creditors, including inter

12   creditor claims, if any, at this point.

13              MR. MCKANE:  And sir, based on the management and

14   the advisors' assessment of the bids, did the CORs make a

15   recommendation to the boards as to whether the bidder should

16   advance to a second round?

17              MR. KEGLEVIC:  Yeah, at this point, especially

18   since we only had three bidders, and that all of them were

19   providing some distributable value to EFH, and also, with

20   the background and belief that rarely do bidders give you

21   their full, you know, their best and final in round one,

22   that most of them are just trying to get to round two.  We

23   thought there was enough here for each of them, that we

24   could explore and potentially optimize and maximize.

25              MR. MCKANE:  All right.  And as you move forward

1    into round two of the bid process, did you also move forward

2    on the plan front with any tools to advance that process?

3            MR. KEGLEVIC:  Yes.  And if I go back to my

4    timeline, I apologize if I'm making it hard to follow, but

5    we -- upon receipt of this distributable value, and now,

6    first round bids that drove that distributable value, and

7    given the input we had gotten from the creditors, that a COR

8    term sheet without numbers wasn't very helpful.  We decided

9    to put out a COR term sheet that actually, we didn't put in

10   the actual bid numbers that we had received.  We did not

11   disclose that to the parties, but we put a hypothetical

12   amount that we hoped to get, which showed the distribution

13   through the waterfalls.  And at that point, it was the first

14   time I believe that we also put in some hypothetical

15   settlement amounts between the estates, which then

16   ultimately, you know, showed that the EFH estate would pay

17   the TCEH estate based on the claims that they had, you know,

18   brought at that point in time, or at least raised through

19   the process at that point in time.

20           MR. MCKANE:  And sir, what did you base the

21   amounts that you allocated for intra to your recoveries and

22   (indiscernible) your recoveries as you populated that COR

23   term sheet?

24           MR. KEGLEVIC:  Since we knew it was the -- we

25   weren't trying to overstep our bounds with respect to the

1  disinterested directors.  And obviously, we wanted to drive

2  toward consensus.  At that point, I would say it was more a

3  financial exercise.  I'll not kick this one to Ms. Doré,

4  like I usually do, that I was really looking at bid-ask

5  spreads that we had between what the T side was

6  communicating to the E side, what the E side was

7  communicating to the T side.

8          Frankly, at this point, EFIH and E were hopeful

9  that the EFIH was going to get paid in par, so that claims

10  of EFIH against E, you know, were kind of put to the side

11  because they assume that they would get paid par on those

12  claims, effectively would accrue to the benefit of EFH, and

13  therefore, we didn't need to pursue them.

14          But as you indicated, we also then put the TCEH

15  intra silo settlements, and probably not unlike the

16  responses we've received throughout this case, everybody

17  told us they hated the numbers.  But they were simply, we

18  took the bid-ask spread and I picked a number in between.

19          MR. MCKANE:  And when you say--

20          MR. KEGLEVIC:  And not exactly in between.

21          MR. MCKANE:  And when you say the bid-ask spread,

22  you're talking specific indicators of proposals that you

23  received (indiscernible) underwriting from creditors?

24          MR. KEGLEVIC:  Yes, we had received, at that

25  point, from both EFIH and EFH creditors, their large

Case 14-10979-CSS   Doc 5676   Filed 10/05/17   Page 173 of 307

Page 173

1   creditor in that box, that they were willing to pay

2   something to the T side and settlement of the claims, and in

3   recognition of the tax issues associated with the

4   transaction that we had contemplated, the tax free spin.

5   The T side had substantial amounts that they thought were

6   due from the E side.  So you know, we picked numbers that

7   we, you know, thought were reasonable, somewhere in between,

8   but frankly, were closer to the E side offer than they were

9   to the T side at that point in time.

10           MR. MCKANE:  And sir, you mentioned the

11  disinterested directors and the work that they were doing in

12  terms of evaluating claims.  Did they, around this time,

13  reach a resolution?

14           MR. KEGLEVIC:  They reached a resolution

15  approximately a couple of weeks after we did that.  We knew

16  they were engaged in that process.  We certainly, you know,

17  went through the same process we did with the prior term

18  sheet.  We brought it to our board.  We didn't ask them to

19  approve it or agree with it, but we notified them we were

20  going to do it in the hopes of driving consensus.  I think

21  the disinterested directors' point of view is that if that

22  drove more consensus and got people to -- and answer, then

23  they wouldn't -- we'd have to rely on their own judgment.

24  But ultimately, we did not get much movement in the bid-ask

25  spread as a result of that.  So the next step was the

Case 14-10979-CSS   Doc 5078   Filed 10/05/17   Page 174 of 200

Page 174

1    disinterested directors spent the, I guess the next couple

2    of weeks going through their negotiation process, which I'm

3    sure will be part of the testimony that disinterested

4    directors provide or have provided and came out with the

5    settlement agreement on April 1st.

6              MR. MCKANE:  Yeah, great.  And sir, also in April,

7    did you receive second round bids, as it relates to the

8    Encore equity sale?

9              MR. KEGLEVIC:  Yes.  A couple of weeks after this

10   -- disinterested director settlement, we received round two

11   bids that the most notable thing of the round two bids is

12   they didn't substantially enhance the value from round one.

13   A lot of the issues we had with the round one bids remained,

14   and notably the EFIH PIKs ceased to be a standalone bidder

15   and teamed with the hunts.  So we went from three bids down

16   to two at that point in time, and we had a consolidated hunt

17   PIK bid.

18             MR. MCKANE:  And sir, did you do an assessment for

19   the Board of Directors once you received those second round

20   bids?

21             MR. KEGLEVIC:  Yes, we did the same review with

22   the board that we did, focused on enterprise value and

23   distributable value to the creditors.  And of course, this -

24   - now, when the boards see these numbers, they have the

25   disinterested director settlement numbers in their minds, so

1    they had another piece of the puzzle in terms of whether the

2    -- what those bids would do to the creditors up at EFH,

3    because I think at that point, we were, at least still at

4    the point that ignoring the make wholes and the post-

5    petition interests, that the recoveries through EFIH would

6    be at par.

7                MR. MCKANE:  Okay.  And sir, does de -- taking a

8    look at demonstrative four, sir, is that an extraction of

9    one page out of the board presentation, which is Debtor's

10   Exhibit 91, that provided at least a part of the assessment

11   of the bids that you discussed with the joint boards?

12               MR. KEGLEVIC:  Yes, and it had the, you know, the

13   key financial numbers are the enterprise value, the

14   distributable value, and then we talk a little bit about

15   (indiscernible) fees, break fees, which were some of the key

16   terms, but this is only one page, as you described.  We went

17   through the bid in good and complete detail.

18               MR. MCKANE:  All right, yeah.  Yeah, and around

19   the same time that you received second round bids, did the

20   debtors also file their first plan of reorganization?

21               MR. KEGLEVIC:  Yes, we did, because at that point,

22   we were getting, you know, close to where we thought we knew

23   what the distributable value were.  We had a basis upon

24   which to allocate it, which was the disinterested director.

25   So we want -- and we wanted to get a plan on file,

1   recognizing that we'd probably have to do some iterations of

2   the plan, and you know, once again, this is to drive

3   consensus and to push the creditors forward toward that

4   consensus, so we filed a plan.

5           Notably, that plan gave us three options.  And we

6   kept -- I think throughout this process, we did our absolute

7   best to be inclusive and transparent, so we -- the three

8   options were that we had a self equitization opportunity,

9   which could mean the E side creditors could come to a deal

10  and effectively convert their claims into equity.

11          Secondly, we had a -- effectively, the provision

12  for a NextEra type bid, a merger bid with a strategic.  And

13  then, third, we effectively had a sale to a, you know, like

14  for example, to the Hunts, where it would've been a new

15  money equity deal coming in.  So our -- the plan we filed at

16  that point left all three options open, and you know, was

17  general, and you know, in that respect, in terms of what

18  recoveries the creditors would get.

19          MR. MCKANE:  Yeah, yeah.  By the time you'd filed

20  a plan, had there been discussions with creditors about the

21  ability to convert Encore into a REIT?

22          MR. KEGLEVIC:  Yes.  I think I don't recall

23  exactly when REIT came up, but certainly, it was as early as

24  January, February timeframe.  And the TCEH unsecured holders

25  effectively brought up the idea.  I would say that

1    underlying the EFIH bid and the Hunt bid, there clearly was

2    evidence that they were contemplating a REIT.  We hadn't

3    worked out yet the conditionality around the REIT, but at

4    that point, every bid and every creditor discussion other

5    than NextEra was premised either explicitly or implicitly on

6    a REIT based on the public information that had come out

7    through "Debt Wire" and other publications, and just the

8    market was very hot for REITs, yield co's.  And there was a

9    belief that if we were going to sell the company, that that

10   could be the best way to advantage the estates and then

11   ultimately, the distribution to the creditors is to go to a

12   REIT.

13          So I think in -- we certainly were -- started a

14   process of allowing people to do due diligence on the REIT.

15   We had preliminary discussions with the IRS around the REIT.

16   We did our internal homework about the Texas Public Utility

17   Commission.  Obviously, they -- there was an example in

18   Texas, there is an example in Texas, Infrareit, where they

19   did convert a distribution utility into a REIT.  So REIT was

20   clearly in the game and was front of mind for everybody

21   except NextEra.

22          MR. MCKANE:  Okay.  When you filed the plan of

23   reorganization, was -- there was also a request for a

24   scheduling order to be entered at that time?

25          MR. KEGLEVIC:  Yes, and obviously, filing a plan,

1    having a disinterested director settlement, and then, you

2    know, ultimately getting a schedule REIT that were very

3    important to get the scheduling in order, we didn't want to

4    go to the court without having filed a plan and asked for a

5    schedule.  So those were all steps contemplating that once

6    we got a scheduling order, that would also put a timeframe

7    in front of the creditors, and hopefully, drive consensus

8    and agreement as well.  So we looked at this as a kind of a

9    three pronged approach -- the plan, which encompassed, you

10   know, expected bids and the disinterested directors and a

11   schedule with the court.

12         MR. MCKANE:  The T uns' interest in a REIT, was

13   that part of the bid process or was that distinct from it?

14         MR. KEGLEVIC:  It is distinct from it, and in

15   fact, when the, the TCEH unsecured came up with this idea,

16   you know, it took us a little by surprise.  We did not

17   anticipate that they would be a likely bidder for Encore.

18   But they -- their owners had done their own homework and

19   thought that the REIT might be worth pursuing.  And I -- our

20   position at that point in time was anything that would

21   maximize the value for the estate, get us to a consensual

22   plan and get us out of bankruptcy, was in the best interest

23   of the estate.  So we provided them with the due diligence

24   information that they needed, and they started to begin

25   their own homework.

1        Prior to that time, I would say the EFIH PIKs had

2    talked to the TPUC, had done their own IRS research, et

3    cetera, but this was the first time that the TCEH unsecureds

4    kind of entered into the competition.

5        MR. MCKANE:  Yeah.  And you mentioned that the

6    PIKs were evaluating potential, you know, plan options, the

7    T uns were mentioning evaluating plan options.  Were there

8    other E side creditors that were evaluating a plan option at

9    this time?

10        MR. KEGLEVIC:  Yeah, well, shortly in, I think it

11    shows up sometime after we got the second round bids,

12    Fidelity, you know, which is the largest creditor of the

13    EFIH estate, also suggested that they may have an interest

14    in effectively putting together a E side solution, which

15    would be valued on an assumption that they get to a REIT,

16    but potentially not be conditioned on a REIT.  So at that

17    point, we had two bidders, the Hunts and the PIKs.  We had

18    NextEra and then we had two creditors effectively TCEH Uns

19    and Fidelity, that were very, very clear that they wanted to

20    be plan sponsors and not bidders, and because they believed

21    they could bring other consensus and settlement and value to

22    the estates outside of the bid process and they didn't want

23    to be characterized as a bidder.  So at that point, we

24    continued on both fronts, with the two bidders and with the

25    two potential new plan sponsors, so as not to exclude

1    anything that could bring value to the creditors and to the

2    estates.

3                  MR. MCKANE:  And did the debtors' management team,

4    the CROs and the advisors, evaluate all four of these

5    options, the two within the plan proposal and the two that

6    are more in the bidding process for the board?

7                  MR. KEGLEVIC:  Yes, we continually updated the

8    board.  And you know, while we recognize a distinction

9    between a plan sponsor and a bidder, we continued to have

10   dialogue with both the TCEH unsecured and the EFH Fidelity

11   Group, that you know, we would, you know, apply the same

12   kind of discipline to their proposed plan, as we would to

13   the bidders, and there was not a, you know, we're not -- we

14   weren't necessarily going to agree that there was an

15   advantage to being a planned sponsor versus a bidder, that

16   ultimately, we stick with the objectives of the process and

17   that was to, you know, maximize the value to the estates and

18   the distribution of the creditors.

19                 MR. MCKANE:  Yeah, and in that May, June time

20   period, did you receive plan proposals separately from the T

21   uns and from the Fidelity Group?

22                 MR. KEGLEVIC:  Yes, and I apologize.  I should

23   refer to my demonstrative that the Fidelity Group, Fidelity

24   owns a, I think, well, I should just say, a relatively

25   significant position in the EFIH second lien notes.  So when

1   I say Fidelity, it was Fidelity and EFIH second lien group

2   that joined together in that proposal.  It wasn't Fidelity

3   on its own.

4            MR. MCKANE:  All right, thank you, sir.  Now the

5   second round bids, those are moving towards a stalking horse

6   selection date.  Do you recall that, sir?

7            MR. KEGLEVIC:  Yes, we were under the court

8   procedures and we were hoping to get a stalking horse filed

9   with the court in June.  And we were on pace to do that with

10  the two bid proposals because we had been working with them

11  longer.  We consistently got feedback from the two potential

12  plan sponsors, the EFH, EFIH second lien group, which I

13  referred to as a Fidelity Group, previously, and the TCEH

14  unsecured, that they needed more time.  And so, effectively,

15  what you see is we were pushing the stalking horse filing

16  out and to give them as much chance as we possibly could,

17  recognizing that we were getting to the point where we had a

18  court hearing on June 25th and we did not want to go into

19  that court hearing without an understanding of which

20  direction we were taking it.

21           MR. MCKANE:  And sir, did you give the creditors,

22  the bidders, or/and the creditors (indiscernible) plan

23  essentially a deadline of mid-July -- mid-June, excuse me?

24           MR. KEGLEVIC:  You know, unfortunately, I failed

25  because I gave them multiple deadlines that I kept

Case 14-10979-CSS   Doc 5078   Filed 11/05/15   Page 182 of 200

1   extending, because at the end of the day, they were somewhat

2   artificial.  But June 25th was the one date we didn't

3   believe was artificial.  We did not want to come back to the

4   court and say, "You know, even though you approved these bid

5   procedures, we still don't know who we want to do as a

6   stalking horse."  You know, and we wanted to have something

7   more definitive, and recognizing that the court had just

8   given us the schedule that required us to start getting

9   specific about the plan, if we were going to use exclusivity

10  wisely.

11          So ultimately, I think, you know, to their credit,

12  both creditor groups recognize June 25th was not artificial.

13  But as you see, we still weren't done on that date.  And

14  just to show you how the world changes, I think on that

15  date, we said that, you know, we -- at that point, if we had

16  to rank them, we thought the E side deal, with Fidelity in

17  the seconds, would have been closer to our choice and was

18  the TCEH unsecured deal.  And obviously, we came to a

19  different point of view on that.  But I missed an important

20  point that's, you know, you want me to go back?  Okay.

21          MR. MCKANE:  Well, actually, (indiscernible) --

22  yeah, let me do that.  And first of all, do you need water?

23  Would you like some?  I recognize I didn't give you--

24          MR. KEGLEVIC:  So far so good.

25          MR. MCKANE:  Okay, let me know.  I apologize.  So-

```
 1      -
 2                THE COURT:  We have some of Wilmington's finest
 3      right there.
 4                MR. MCKANE:  Outstanding.  Sorry about that.
 5                MR. KEGLEVIC:  We don't need those expensive
 6      bottles.
 7                MR. MCKANE:  All right.  Before the June 25th
 8      hearing, in mid-June, as you were approaching creditors to
 9      give their best before you selected a stalking horse, did
10      you have an event with one of the bidders, regarding the
11      value of their bid?
12                MR. KEGLEVIC:  Yes, well, we got second round
13      bids.  Once again, we still were not satisfied.  We didn't
14      think we could get an amount.  Well, we knew we did not have
15      an amount, a high enough bid that would clear -- that would
16      pay everybody in par, including the claim that the
17      disinterested directors had assessed that EFH owned TCEH.
18      So we were pushing behind the scenes to get a higher value
19      from all of the bidders.
20                And we thought there was still some money that
21      NextEra had that they could put on the table.  Frankly, they
22      had the -- you know, a clean bid with less conditionality.
23      And if we could get the value up from them, they probably
24      would've been our choice.  And you know, they had proven
25      currency.  It was a strategic.  We had no REIT
```

1    conditionality, you know?  It was probably the easiest deal

2    to execute from a tax standpoint.  It was clean because it

3    was a merger with existing stock.

4         But then, on -- and I'm sure the date is here --

5    on June 11th, not only did we not get the extra money that

6    we wanted from NextEra, they substantially dropped their

7    bid, which effect -- so deeply impaired EFH.

8         MR. MCKANE:  Yeah, and to illustrate that--

9         MR. KEGLEVIC:  And in fact, depending on what the

10   outcomes may have been associated with make wholes and post-

11   petition, that low bid could've even impaired EFIH, so it

12   was a substantial decrease over where they were, and you

13   know, that also explains why I was more willing to give

14   extra time to the other two creditor groups, was I didn't

15   have anything in my pocket that I could execute.

16        MR. MCKANE:  All right.  And sir, the drop in

17   value of the NextEra bid, did you illustrate that for the

18   Court, its impact on distributable value?

19        MR. KEGLEVIC:  Basically, and I'm remembering

20   these numbers because--

21        MR. MCKANE:  Well, let me help you.  Did you

22   prepare a demonstrative aid on page five, which is an extra

23   active, your presentation on June 17th to the board?

24        MR. KEGLEVIC:  I--

25        MR. MCKANE:  To help you with that?

1       MR. KEGLEVIC:  I did, and this one, I remember.

2   And as can be shown on the current bid on June 11, '15,

3   after undisputed claims, there was only $130 million of

4   distributable value to pay all the disputed claims that EFIH

5   and to pay any of the claims that EFH--

6       MR. MCKANE:  And that's focusing on the lefthand

7   column, the -- where the current bid from 6/11?

8       MR. KEGLEVIC:  It is.  It's basically taking you

9   from where we were from the unsolicited bid, that is the far

10  right hand column, original.  Interestingly enough, round

11  one, NextEra went below that, but then in round two, came

12  back to where they were in July of '14 at 18, 190.  And

13  then, basically dropped $900 million or roughly at that

14  point.

15      So we had -- I had spent, personally, enough time

16  with all the creditor groups to know that absolutely every

17  creditor on the E side, and I would say TCEH, would have us

18  rather file -- would not want us to file a stalking horse

19  with a bid that locked in impairment on the E side.  They

20  would rather own the company and pursue the REIT.  And you

21  know, so that was -- this was a major shift in priority and

22  strategy and focus for the company, and really eliminated an

23  option that we thought we were going to be able to execute.

24      MR. MCKANE:  Yeah.  In this same time period, in

25  advance of the June 25th hearing, was there also a movement

1   from the Hunts, previously in the round two, the Hunts had

2   been with the PIKs.  At some point, the Hunts team up with

3   the T uns.  When does that happen?

4           MR. KEGLEVIC:  Yeah, so let me explain that.

5   Round two, we did a bid from the Hunts with the PIKs, and

6   there wasn't substantially more distributable value.  And in

7   fact, the Hunts had agreed as part of their bid or a

8   provision or an element of their bid, was that some of the

9   value would go to pay the PIKs, their post-petition interest

10  claim, which meant that the headline value, the enterprise

11  value was much higher than the distributable value would

12  indicate.

13          And we did not think the post-petition interest

14  claim was worth settling at 100 cents on the dollar.  And as

15  was our process throughout the bids, every time we received

16  a round, we went to each bidder and we told them what we

17  liked about their bid and we told them what we didn't like

18  about their bid.  And at that point, we went to the Hunts

19  and said, "You know, why did you team up with the PIKs?  You

20  know, you're paying an expensive price in terms of post-

21  petition interests."  But they were struggling raising

22  enough equity to make their deal go.  And paying the PIKs

23  the post-petition interest allowed them to get the PIKs to

24  convert their debt into equity and effectively filled the

25  shortfall that the Hunts had in equity at that point in

1    time.

2              Knowing that in -- and in fact, in forming the

3    Hunts that they had a, you know, that we were worried about

4    whether they had enough equity to make their deal go, even

5    with the PIKs, and with the infirmity associated with the

6    post-petition interest settlement, we -- I met with them and

7    I informed them that we had the TCEH unsecured group, was

8    kind of an almost a polar opposite situation, that they had

9    sophisticated financial buyers who have a lot of access to

10   the capital markets, who believed they had the equity

11   circled up.

12             And they were looking for a partner that had the

13   operating expertise, the Texas presence, the Texas PUC

14   experience, et cetera.  So they had informed me at that

15   point, I suggested that maybe there was an opportunity to

16   team.  They said they had already had discussions with the

17   TCEH unsecureds.  I told them we were fine with them

18   exploring that team, but I also encouraged them not to drop

19   their standalone bid, because I wanted all the options I

20   could get at that point in time.

21             MR. MCKANE:  You mentioned that when you read --

22   you were discussing with the Hunts and the uns about

23   potentially teaming, that they had already had that

24   discussion.  Was there, during this process, cross talk

25   between the creditor groups about what each of them were

1    pursuing?

2            MR. KEGLEVIC:  I believe everybody was speaking to

3    everybody frequently.  You know, Fidelity and the PIKs,

4    Fidelity and the TCEH unsecured, the Hunts and the PIKs, the

5    Hunts and the TCEH unsecureds.  NextEra had several

6    discussions with the creditor groups.  I'm probably missing

7    everybody, but it's only because I'm just not looking at a

8    matrix because I -- everybody was trying to find the right

9    combination.  And I'll give them, you know, credit.  I think

10   everybody was trying to become the winning bidder and

11   provide the most value to the estate, so we were encouraging

12   that dialogue to take place.

13           MR. MCKANE:  Okay.  And sir, at that June 25

14   hearing, was that essentially the end of the stalking horse

15   process?

16           MR. KEGLEVIC:  Yes, we effectively indicated, you

17   know, as I said, at that point in time, we effectively had

18   no bidders.  The Hunts had transformed of their bid into an

19   agreement to partner with the TCEH unsecureds, which moved

20   us to a plan sponsor approach.  The NextEra had lowered the

21   bid in an amount that we knew the E side would've objected

22   to executing it.  And importantly, the E side deal, it was

23   still alive, but it was starting to show some stress.  You

24   know, we were intrigued with an E side deal at that point in

25   time, because we knew that if all the E side creditors

 1   agreed to convert into equity, you know, that would not only

 2   give us creditor consensus, but it could give us a full E

 3   side solution.  And in fact, had been led to believe that

 4   that agreement or consortium was further along and in fact,

 5   that it was a, you know, a -- that anybody who wouldn't

 6   agree to the deal, they would raise enough money to take

 7   them out in cash.  So it had the elements we were looking

 8   for, full payment of the E side at par, full consensus of

 9   the E, and that would've still left us with a cram down case

10   on the T side, but at least it was a lot of consensus at

11   that point in time.  And notably, while the un, TCEH

12   unsecured had teamed with the Hunts and had potentially

13   created a better entity, one with operating experience and

14   Texas presence and REIT know-how, with an entity that had

15   access to a substantial amount of equity capital and great

16   financial expertise, we still did not have T side consensus

17   in doing that deal.

18         And as stated earlier, and I'm sure we're going to

19   get into this, that the tax free spin under a REIT is a very

20   important element of getting the value to the E side.  So I

21   think in June 25th, we were probably, and I almost kind of

22   remember Mr. Kieselstein's comments.  I don't remember which

23   king he quoted or universe, but it was something that

24   indicated that we had a long way to go with the TCEH

25   unsecured group to get to a deal, where we would support

 1    that approach.

 2              MR. MCKANE:  All right--

 3              THE COURT:  And I remember that Mr. Laurie kept

 4    shaking his head at why are you saying that.

 5              MR. KEGLEVIC:  I think they were on this side of

 6    the table, too.

 7              THE COURT:  Oh yeah, you're right.

 8              MR. LAURIE:  How quickly we forget.

 9              MR. MCKANE:  Well, at that time, without T first

10    support, did you do that as a major hindrance to the T un,

11    Hunt proposal?

12              MR. KEGLEVIC:  Yes, because you know, the -- as we

13    did the due diligence and started working through all the

14    tax consequences associated with a deal that had a REIT at

15    the centerpiece of it, all of a sudden, the issue of a tax

16    free spin, there was another hook as to why a tax free spin

17    was critical to getting that extra value to the E side.  And

18    the tax free spin, as we've said all along, has been, you

19    know, something that was really controlled by the TCEH first

20    liens.

21              MR. MCKANE:  All right.  We'll get to the details,

22    on how the spin impacts the REIT in a little while, but you

23    didn't hide that information from the uns, did you? You

24    communicated, "You need to get the firsts on board?"

25              MR. KEGLEVIC:  Oh absolutely.  We, you know, our

1    not so friendly discussions, we had many of them, with the

2    Mr. Laurie, you know, was the -- how critical that was, that

3    if we were going to take them to the plan, that we needed,

4    you know, or we certainly wanted T side consensus so we

5    didn't have that tax issue.  Also, we knew T side consensus

6    could deliver what they were suggesting, and that is, you

7    know, a faster case.  We needed the TCEH first liens to sign

8    up to this deal (indiscernible) speed.  And I think one of

9    the things, and I blame myself a little bit, that we've not

10   gone on the record and really talked about, is the lack of

11   speed in this case, the party that has been really the most

12   disadvantaged has been the TCEH first liens.

13           You know, that is a company that is going through

14   a tremendous number of challenges in terms of reduced power

15   prices, increasing EPA regulations.  And everybody in that

16   space is transforming their company.  Our company, the TCEH

17   company, once its spun out, I have no understanding or

18   belief that I'll be a part of that company, by the way.  But

19   that company needs to transform itself.  It needs to get

20   geographic diversity.  It needs to get fuel diversity.  It

21   probably needs to retire its old co-assets.  I think the

22   Court is aware that we're looking at buying some gas assets,

23   but that transformation can't be done in bankruptcy.  It

24   needs to be unfettered.  And while we can do a few things,

25   you know, time is of the essence to the T estate.  And

Case 14-10979-CSS   Doc 6078   Filed 11/05/15   Page 192 of 200

1    anything that delays the case really has a substantial

2    impact on their estate well beyond, you know, the cost of

3    litigation.

4              MR. MCKANE:  Well sir, within a few weeks after

5    the -- that hearing, were the T uns able to strike a deal

6    with the two firsts?

7              MR. KEGLEVIC:  Yes.  And we don't have this on

8    here.  I know the mediator was involved and, you know,

9    success has many fathers, so I'm happy to give credit to

10   whoever did whatever they did.  But we were, you know, when

11   that piece came together, that all of a sudden became -- it

12   was twofold.  One, that plan brought us some very intriguing

13   developments to us, but T side consensus, the teaming of the

14   Hunts and the T uns, the opportunity for disarmament and

15   drag, you know, those things were very, very important and,

16   you know, the other plans, as has been pointed out, have

17   effectively fallen away.

18             MR. MCKANE:  Well, let's, and let's touch on that.

19             MR. KEGLEVIC:  So it was twofold, if I can just

20   continue.

21             MR. MCKANE:  Sorry.

22             MR. KEGLEVIC:  I just think it is very important,

23   one is, the plan that we picked, we believe, has the right

24   elements that are very good for all of the estates, and I'll

25   be cross examined on that tomorrow.  But, we also did not

1    have the alternative because the Fidelity's second lien and

2    the E side plan, they could not agree to a plan that we

3    could file and was executable.  The NextEra bid had fallen

4    to a level that impaired substantially, potentially all the

5    E side classes.  So we were stuck with the TCEH unsecured

6    plan.  But happy to be stuck with it because we believe it

7    had all the elements, and that our business judgment were

8    the appropriate way out of bankruptcy.

9              MR. MCKANE:  Let's talk about the E side efforts

10   to put together their own plan.  By June 25th, we're -- the

11   debtors are vocal in their support for an E side

12   equitization.  And that requires two things, am I correct,

13   both the raising of equity, if necessary, and an allocation

14   of the (indiscernible), or of the assets?

15             MR. KEGLEVIC:  Right.  We -- interestingly enough,

16   the E side plan that they proposed to us that they would

17   raise enough equity to at that point, the PIKs were not on

18   board to pay out the PIKs, to pay out the TCEH claims, and

19   you know, effectively have consensus of among everybody

20   else, so that the only classes that we wouldn't need the

21   vote of anybody other than we'd have to go get TCEH first on

22   board and do a cram down case on the T side.  But

23   effectively, the thought was, if they could pay the TCEH

24   claim, which they agreed to do at the $700 million

25   settlement value, in cash, and could pay the PIKs off in

1    cash, we thought that plan had a chance of going.  And you

2    know, unfortunately, they did not -- they could not come to

3    a consensus about who would fund the equity raised we needed

4    to take the PIKs out with cash.  And when we went to a self

5    equitization discussion among the three groups, all three

6    groups had demands that none of the other two would agree

7    to.  And effectively, it fell under its own weight.

8            MR. MCKANE:  Well, sir, even as it's falling under

9    its own weight, did you leave the door open by filing a duel

10   path plan in late July?

11           MR. KEGLEVIC:  Yes, just like we did after the

12   second round bids, where we had a three path plan.  We did

13   not -- you know, we wanted to encourage the T -- or the E

14   side plan to get resurrected because you never know when

15   consensus is going to come.  You never know if somebody's

16   going to change their point of view with respect to raising

17   the money.  So when we filed our plan at that point, it was

18   a duel path plan in July.  And then, only until we, I think

19   got to -- well I'm sure you're going to ask me about the

20   next steps, so I'll be quiet.

21           MR. MCKANE:  Well, just to be clear, the duel

22   paths were an E side equitization or the T un REIT approach,

23   is that correct?

24           MR. KEGLEVIC:  That's right.  At this point, as I

25   said, the bidders were gone, and all that were left were the

```
1    two potential plan sponsors, the TCEH uns, who had teamed
2    with the Hunts, and the E side plan, which was still led by
3    Fidelity and the second liens.
4              MR. MCKANE:  And sir, when you filed that first
5    amended plan with the duel path, there was a blank in there
6    that you left.  Why is there a blank, that blank in that
7    plan?
8              MR. KEGLEVIC:  You know, once again, we were
9    encouraged by the creditors to keep the option open, which
10   we were happy to do, but don't put in any specifics that
11   might hinder the negotiations among the E side, when at --
12   but ultimately, they -- even in the next couple of weeks,
13   could not come to closure, even with the blanks, which led
14   us to, in the August plan, which is the second amended, to
15   actually put equity splits that we thought the parties, you
16   know, were in the middle of the bid-ask spreads, and they
17   might be able to come to a consensus, even putting in the
18   equity splits, they could not agree with what we put forth
19   as a kind of a mediated solution on the E side.
20             MR. MCKANE:  And sir, that mediated solution on
21   the E side, was that handled by the disinterested directors
22   on the E side?
23             MR. KEGLEVIC:  They absolutely were involved and
24   gave us their input into what those amounts should be.  And
25   you know, I should mention, and had a substantial number of
```

```
 1    independent conversations among their constituencies at that

 2    point in time.  So Mr. Cremens as well as Ms. Williamson and

 3    Mr. Evans met with their individual E side constituencies.

 4    And obviously, Ms. Doré and I were keeping him informed

 5    about what we were seeing and what we heard the bid-ask

 6    spreads were, et cetera.

 7              MR. MCKANE:  Okay.  And then, sir, can you just

 8    bring us up to when we actually filed this plan in August

 9    9th and the final negotiations.

10              MR. KEGLEVIC:  So the final negotiations, as I

11    said, I think we had, at that point, we had the teaming of

12    the Hunts with the TCEH unsecured.  We had the first liens

13    on board, all critical elements.  Really, the rest of the

14    time was spent on two primary topics, disarmament and drag.

15    And then, obviously, we, you know, also negotiated a merger

16    agreement and the settlement agreement as part of that plan.

17              MR. MCKANE:  Okay.  Thank you, sir.  Throughout

18    all of this, your -- there's a whole governance process

19    that's running along.  Sir, can you just give the Court some

20    sense of how you as -- or the CRO on how the advisors kept

21    the boards apprised of this entire process in 2015?

22              MR. KEGLEVIC:  You know, as you can see on the

23    bottom of this demonstrative, those are the board meetings

24    that we have.  I can't recall any meeting where we didn't

25    bring usually both Ms. Doré and I, as well as our advisors
```

1   and the disinterested directors themselves in individual

2   meetings they had, bringing to all the boards exactly what

3   was transpiring and what they were hearing, what the bid-ask

4   spreads were, what the conditions of the deals were, how we

5   evaluated the proposals against each other.  It was

6   expensive and exhaustive to go through everything, so I

7   think our -- yeah, I feel very, very comfortable that our

8   board was fully informed and that led them to the conclusion

9   to file the plan.

10          MR. MCKANE:  Yeah.  And sir, was there a scheduled

11  weekly joint board meeting every Friday morning?

12          MR. KEGLEVIC:  Nine a.m. Central time every Friday

13  morning.

14          MR. MCKANE:  And are -- were the -- not just the

15  disinterested directors, but all of their advisors invited

16  and participated in on those calls?

17          MR. KEGLEVIC:  Yes, I think it was probably 50 to

18  70 people on -- in every phone call, and Chairman Evans on

19  every phone call after we made presentations of the debtor

20  CROs, the debtor advisors, the debtor financial experts.

21  Went around to each of the disinterested directors, all of

22  their lawyers and all of their financial advisors, and asked

23  them to, you know, agree, disagree, chime in, bring

24  additional information to the, you know, to the core.  So I

25  think we had taken great note of what the Court said in

 1   2014, and stepped up our governance process substantially.

 2              MR. MCKANE:  And sir, are Keglevic Demonstratives

 3   Six, Seven and Eight a summary of the restructuring update

 4   presentations that were made to the joint boards throughout

 5   2015?

 6              MR. KEGLEVIC:  Yes, they appear to be.

 7              MR. MCKANE:  Okay.  And sir, Keglevic Nine,

 8   Demonstrative Nine, in addition to that general

 9   restructuring update at the board meeting, were there

10   separate updates, specifically focused on the plan

11   negotiations that led up to this plan that was filed, with

12   all the plan with the REIT plan, if you will, on August 9th?

13              MR. KEGLEVIC:  Yes, as indicated here.

14              MR. MCKANE:  Your Honor, I'm cognizant of the

15   time, and this is actually an excellent point to break.

16              THE COURT:  Okay, good.

17              MR. MCKANE:  Can -- but I estimate probably --I've

18   gone about 40 minutes, I probably have another 30 to 40

19   more.  And then, if that's all right, in the morning.

20              THE COURT:  Yeah, let's -- we'll break for the

21   evening and take it up again tomorrow, starting promptly at

22   10 o'clock and we'll have our pre-informal, you know, plan

23   of the day meeting at 9:30 in the conference room like we

24   did this morning.  And that'll do it for this.  We were

25   going to have a status conference on the PIKs.  Mr. Pedone's

1    issues that with regard to arising from the opinion last

2    Friday, and I think we were going to talk about Alcoa very

3    briefly.

4              MR. MCKANE:  Yeah, I can give you an update on

5    that as well.

6              THE COURT:  Okay.

7              MR. MCKANE:  Your Honor, can I -- Mr. Keglevic

8    being excused from the witness box?

9              THE COURT:  Yes, of course.  Yeah, I was going to

10   suggest actually we take a recess.  Some people may not want

11   to stay, some people won't, I don't know, but we'll

12   reconvene in 10 minutes and have that status conference and

13   hopefully be done by 5:30.

14             MR. MCKANE:  Very good.  Thank you, Your Honor.

15             THE COURT:  You're welcome.

16             CLERK:  Counsel, if you would be seated, please.

17   All rise.

18             THE COURT:  Please be seated.

19             MR. HUSNICK:  Good evening, Your Honor, Chad

20   Husnick, Kirkland & Ellis on behalf of the debtors.  The

21   first I think of two issues you wanted to address this

22   evening was a carryover from yesterday, regarding the EFIH

23   PIK settlement discussions.  We continue to make our

24   progress, but we are not yet there with the form of the

25   direction letter, but things are progressing in the right

Case 1:14-cv-09779-CSS   Doc 1:1702-4   Filed 06/05/17   Page 201 of 207
Case 1:14-cv-09779-CSS   Doc 5074   Filed 11/05/15   Page 200 of 207

Page 200

1    direction.

2              So rather than waste Your Honor's time, tomorrow,

3    we were going to ask if we could put it over to Thursday,

4    perhaps either at the very beginning -- I know we're

5    starting I think at 12:30 on Thursday -- or we could do it

6    at the end.  But if we wanted to start at the beginning, we

7    may have something good to report.

8              THE COURT:  Okay, that's -- does anyone wish to be

9    heard?  All right, let's -- that's fine.  Let's do it at the

10   end of the day.  I -- I'm doing a -- I'm presiding over a

11   naturalization ceremony that morning, which is why we're

12   starting at 12:30, and across the street, and I don't know,

13   you know, 12:30 might be optimistic, but I'm going to push

14   it as best I can, so I don't want to waste any time at the

15   beginning.  So we'll probably take it at the end of the day.

16             MR. HUSNICK:  Okay.

17             THE COURT:  And we won't have one of our sort of

18   planning meetings that day.  We just won't have time.

19             MR. HUSNICK:  Okay.  Thank you, Your Honor.  And I

20   think the second item that you wanted to address was Mr.

21   Pedone's letter.  I think we talked briefly about it

22   yesterday, but I don't know if there's something further to

23   discuss.  I'm not sure if Mr. Pedone was able to join

24   yesterday, so I'll turn it over to--

25             THE COURT:  No, well, we just -- we certainly

1   weren't trying to pressure this to anybody.  I just raised

2   the issue and I wasn't sure if you were on the phone and

3   when no one responded.  I assumed you weren't, which is

4   fine, absolutely fine.  So why don't you -- I did read your

5   letter, so I know what your issues are.

6           MR. HUSNICK:  So Your Honor, in short, having read

7   the letter, which I think laid out the issue pretty well--

8           THE COURT:  Right.

9           MR. HUSNICK:  --we're looking some -- for some

10  clarity on the timing of the introduction of the evidence on

11  the equitable issues.

12          THE COURT:  Well, what I -- I was thinking about

13  it, and you know, there are a couple of things.  First of

14  all, of course you know, Friday's decision, as a technical

15  matter, did involve your client and was the PIK note

16  holders.  And the finding was that in order to un-impair the

17  PIK note holders, the plan had to provide for the ability of

18  the Court to award post-petition interests based on

19  equitable considerations because that was a solvent debtor

20  case, i.e. equity was receiving a distribution.

21          So a couple of differences.  First of all, you're

22  not a PIK note holder, you're a holder at the EFH.  Not

23  sure.  I know there's a fight over whether that's a solvent

24  debtor case or not a solvent debtor case.  And it depends

25  on, you know, the fact that, you know, whether equity there

```
 1    is receiving a distribution or not, so I'm not even sure

 2    that my holding on Friday would be applicable in your case.

 3    But having said all that, I think the issue really wasn't a

 4    evidence issue, it's a, what does the plan say issue?  And

 5    I'm wondering if it seems to me that, you know, the fight --

 6    not fight -- but the dispute or evidence about what the

 7    interests should be can be put with the other issues

 8    resolving your claim, which, you know, the entitlement to

 9    the make whole, et cetera, that we've sort of set for the

10    different trap.

11               And the issue about whether or not you're impaired

12    or not won't be, you know, whether -- what the amount of

13    that interest will be.  The issue about whether you're

14    impaired or not will be whether you will get paid that

15    interest, if I decide to award it.  So I'm not sure we have

16    to have evidence in this proceeding, with all these people,

17    about what your post-petition -- you know, what the

18    equitable award of your post-petition interests should or

19    shouldn't be.

20               MR. PEDONE:  Your Honor, I'm in complete agreement

21    with not bogging down these proceedings with claimant

22    specific or claim treatment specific type issues.  So to the

23    extent that we can be sure that we continue to press any

24    objection that we have, that the plan does not provide for

25    the payment and we don't think the reserve that exists for
```

1    post-petition interest is perfect.  I actually think it

2    could be worked with easily and hope that it is.  But so

3    long as we can press any impairment issues on that, that the

4    funds are made available to pay it, and that the term

5    allowed, actually means allowed by the court, not a tricky

6    term that happens to be written into the plan, describing

7    allowed in a different way, which I also think we can solve,

8    then I am in complete agreement, if everyone else is, that

9    any equitable evidence regarding solvency, regarding whether

10   anything actually flows up or not, regardless of solvency,

11   regarding value, could all be dealt with another day, and

12   that would be our preference.

13            THE COURT:  Okay.

14            MR. PEDONE:  But I just don't want -- wrote the

15   letter because we did not want to find that we were stuck

16   with evidence coming in from the debtors, taking us by

17   surprise unprepared.

18            THE COURT:  All right.

19            MR. PEDONE:  So if we could get to a stipulation

20   or agreement on the record to that effect, I'd be very

21   happy.

22            MR. HUSNICK:  Chad Husnick for the debtors.  Your

23   Honor, I think we'll work with Mr. Pedone on the precise

24   plan language and how it deals with this particular issue,

25   but we agree that it -- with both the Court and Mr. Pedone,

1    that it should be addressed as a separate issue.

2            THE COURT:  Okay.

3            MR. HUSNICK:  After confirmation.

4            THE COURT:  Okay.  Good.

5            MR. PEDONE:  Thank you, Your Honor.

6            THE COURT:  You're welcome.  What's going on with

7    Alcoa?

8            MR. MCKANE:  Your Honor, Mark McKane, Kirkland &

9    Ellis on behalf of the debtors.  With regard to Alcoa, I did

10   check in with my partners who are handling that matter and

11   that is a live discovery dispute.  I believe the -- that the

12   debtors' position was, there was no need for argument on

13   that -- we thought it could be ruled on on the papers.  I

14   think in response, my understanding is that Alcoa didn't

15   take up that issue one way or another.  So that litigation

16   is ongoing.  And so, there is an ask that the -- that you

17   rule on the discovery dispute.  And if you want oral

18   argument, we could schedule it, but when the letter was sent

19   in, they were -- our -- obviously, we are very aware of our

20   asks of your time is spent in November and December, and

21   that's why we thought we did not need oral argument for you

22   to rule.

23           THE COURT:  Okay, I'll read the letters again and

24   I will decide whether or not I want to have a conference

25   call on it.  And if I decide I won't, if I don't decide if I

1    don't need a conference on it, I'll probably rule during one

2    of our meetings in the next day or two on the issue, unless

3    you tell me that the dispute has gone away, at which point,

4    I won't decide it.

5              MR. MCKANE:  Very good, Your Honor.  We are doing

6    what we can to resolve the dispute.  I think it's one of

7    those situations where I think you've referenced a couple of

8    times, does ruling help drive the settlement or does not

9    ruling help drive the settlement?  As of now, our ask is

10   that we think ruling would help drive the negotiations.

11             THE COURT:  Okay.

12             MR. MCKANE:  Thank you, Your Honor.

13             THE COURT:  I'll look at the letters again, then.

14             MR. MCKANE:  Very good.  Thank you, Your Honor.

15             THE COURT:  Okay, very good.  All right, anything

16   else anyone wants to discuss?  All right, very good.  We'll

17   see you tomorrow morning.  Have a good evening.

18

19                        * * * * *

20

21

22

23

24

25

Page 206

1                    C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6      Sonya Ledanski Hyde

7

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  November 4, 2015