# Exhibit W

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                          :

                                     :    Chapter 11

6    ENERGY FUTURE HOLDINGS CORP., :

     et al.,                         :    Case No. 14-10979 (CSS)

7                                     :

            Debtors.                 :    (Jointly Administered)

8    _____:

9

10

11                              United States Bankruptcy Court

12                              824 North Market Street

13                              Wilmington, Delaware

14                              September 19, 2016

15                              10:11 a.m. – 1:09 p.m.

16

17

18

19

20

21    B E F O R E :

22    HON CHRISTOPHER J. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR:  LESLIE MURIN

1    HEARING re Motion of the EFH/EFIH Debtors for Order (A)

2    Authorizing Entry into Merger Agreement, (B) Approving

3    Termination Fee, and (C) Authorizing Entry into and

4    Performance Under Plan Support Agreement [D.I. 9190; filed

5    August 3, 2016]

6

7    HEARING re Disclosure Statement for the Third Amended Joint

8    Plan of Reorganization of Energy Future Holdings Corp., et

9    al., Pursuant to Chapter 11 of the Bankruptcy Code as it

10   Applies to the EFH Debtors and EFIH Debtors [D.I. 9493;

11   filed September 7, 2016]

12

13   HEARING re Motion of the EFH/EFIH Debtors for Entry of an

14   Order (A) Scheduling Certain Hearing Dates and Deadlines and

15   Establishing Certain Protocols in Connection with

16   Confirmation of the Debtors' Joint Plan of Reorganization as

17   it Relates to the EFH/EFIH Debtors, (B) Approving the

18   EFH/EFIH Disclosure Statement, (C) Establishing the EFH/EFIH

19   Voting Record Date, EFH/EFIH Voting Deadline, and Other

20   Dates, (D) Approving Procedures for Soliciting, Receiving,

21   and Tabulating Votes on the Plan, and (E) Approving the

22   Manner and Forms of Notice and Other Related Documents [D.I.

23   9201; filed August 5, 2016]

24

25

1    HEARING re Letter to the Honorable Christopher S. Sontchi

2    Regarding Discovery Disputes (SEALED) [D.I. 9483; filed

3    September 6, 2016]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 4

1   A P P E A R A N C E S :

2

3   PACHULSKI STANG ZIEHL & JONES

4        Attorney for the Second Lien Indenture Trustee

5

6   BY:  LAURA DAVIS JONES

7

8   KRAMER LEVIN NAFTALIS & FRANKLIN LLP

9        Attorneys for the Second Lien Indenture Trustee

10

11  BY:  JOSHUA BRODY

12       JENNIFER R. SHARRET

13

14  VENABLE, LLP

15       Attorney for PIMCO

16

17  BY:  JEFFREY S. SABIN

18       JAMIE EDMONSON

19

20  LANDIS ROTH & COBB

21       Attorney for NextEra

22

23  BY:  MATTHEW MCGUIRE

24

25

Case 14-10979-CSS   Doc 9606   Filed 09/21/16   Page 6 of 142

```
 1   CHADBORNE & PARKE

 2        Attorneys for NextEra

 3

 4   BY:  HOWARD SEIFE

 5        ANDREW ROSENBLATT

 6        MARC ASHLEY

 7

 8   SULLIVAN & CROMWELL

 9        Attorney for the E-Side Committee

10

11   BY:  BRIAN D. GLUECKSTEIN

12

13   MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP

14        Attorney for the E-Side Committee

15

16   BY   MARK A. FINK

17

18   FOX ROTHSCHILD

19        Attorney for the Ad Hoc Group of TCEH Unsecured

20        Noteholders

21

22   BY:  JEFFREY SCHLERF

23

24

25
```

Page 6

```
 1   WHITE & CASE

 2        Attorney for the Ad Hoc Group of TCEH Unsecured

 3        Noteholders

 4

 5   BY:  J. CHRISTOPHER SHORE

 6

 7   RICHARDS, LAYTON & FINGER, P.A.

 8        Attorney for the Debtor

 9

10   BY:  JASON MADRON

11

12   SHEARMAN & STERLING

13        Attorney for Deutsche Bank New York

14

15   BY:  NED A. SCHODEK

16

17   POTTER ANDERSON & CORROON LLP

18        Attorney for Deutsche Bank New York

19

20   BY:  R. STEPHEN MCNEILL

21

22   UNITED STATES DEPARTMENT OF JUSTICE

23        Attorney for the U.S. Trustee

24

25   BY:  RICHARD L. SCHERPACARTER
```

```
 1   KIRKLAND & ELLIS LLP

 2        Attorneys for the Debtor

 3

 4   BY:  CHAD HUSNICK

 5        JUSTIN SOWA

 6

 7   HOGAN MCDANIEL

 8        Attorney for Contraian

 9

10   BY:  GARVAN MCDANIEL

11        MARK MCKANE

12        MARC KIESELSTEIN

13        APARNA YENAMANDRA

14        JONATHAN F. GANTER

15        BARACK S. ECHOLS

16

17   JENNER & BLOCK

18        Attorneys for the EFIH Independent Members

19

20   BY:  RICHARD LEVIN

21        VINCENT LAZAR

22

23

24

25
```

Page 8

1   STEVENS & LEE

2       Attorney for the EFIH Independent Members

3

4   BY:  JOSEPH H. HUSTON, JR.

5

6   WILMER CUTLER PICKERING HALE & DORR

7       Attorney for Delaware Trust Company, EFIH Indenture &

8       Ad hoc Group Trustee

9

10  BY:  PHILIP D. ANKER

11

12  CROSS & SIMON

13      Attorney for EFH Indenture Trustee, American Stock

14      Transfer

15

16  BY:  CHRISTOPHER SIMON

17

18  NIXON PEABODY

19      Attorney for EFH Indenture Trustee, American Stock

20      Transfer

21

22  BY:  RICHARD PEDONE

23

24

25

```
                                                  Page 9

 1   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

 2        Attorney for Ad hoc Committee of TCEH First Lien

 3        Lenders

 4

 5   BY:  BRIAN S.HERMANN

 6        JACOB A. ADLERSTEIN

 7        ADAM J. BERNSTEIN

 8        KELLIE A. CARINS

 9

10   YOUNG CONAWAY STARGATT & TAYLOR, LLP

11        Attorney for Ad hoc Committee of TCEH First Lien

12        Lenders

13

14   BY:  PAULINE MORGAN

15

16   BIELLI & KLAUDER, LLC

17        Attorney for EFH Corp.

18

19   BY:  DAVID KLAUDER

20

21   FOLEY & LARDNER LP

22        Attorney for Unsecured Note Holders

23

24   BY:  HAROLD L. KAPLAN

25
```

```
 1   HOGAN MCDANIEL

 2        Attorney for Fenicle & Fahy

 3

 4   DANIEL K. HOGAN

 5

 6   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

 7        Attorney for TCEH Debtors

 8

 9   BY:  DAVID PRIMOSK

10

11   ALSO PRESENT TELEPHONICALLY:

12

13   JACOB A. ADLERSTEIN

14   SCOTT L. ALBERINO

15   ARLENE R. ALVES

16   ASHLEY F. BARTRAM

17   PEG A. BRICKLEY

18   PHILIP E. BROWN

19   STEPHEN BURNAZIAN

20   CHRISTOPHER L. CARTER

21   MICHAEL CARTER

22   MARK A. CODY

23   ANDREW COHEN

24   ALEXANDER DEFELICE

25   DANIEL B. DENNY
```

Case 14-10979-CSS  Doc 9606  Filed 09/10/16  Page 12 of 141

Page 11

1    CHERYL DIETRICH

2    STACY DORÉ

3    DAVID DUNN

4    CATHERINE EISENHUT

5    BRADLEY FEINGERTS

6    BARRY FELDER

7    MIHCAEL FIRESTEIN

8    MARK FLANNAGAN

9    PATRICK FLEURY

10   MEGHAN FORCE

11   PHILIP A. GELSTON

12   MARTY GILLECE

13   SETH GOLDMAN

14   TODD M. GOREN

15   BEAU HARBOUR

16   MARK F. HEBBEIN

17   MARK HICKSON

18   PATRICK HOLOHAN

19   AMBER HUANG

20   NATASHA HWANGPO

21   MATTHEW KIMBLE

22   JEFFREY C. KRAUSE

23   ERIC L. LANE

24   CHRIS MCBAY

25   HAL F. MORRIS

1    JAINIK PATEL

2    ABID QURESHI

3    CLAUDIA RICCIARDI

4    NICOLE SAAVEDRA

5    ERIK SCHNEIDER

6    NOAH M. SCHOTTENSTEIN

7    DAVID SMITH

8    FREDRIC SOSNICK

9    MARSHA SUKACH

10   ANGELO THALASSINOS

11   ANDREW M. THAU

12   AMER TIWANA

13   CARL TULLSON

14   MICHAEL TURKEL

15   MATTHEW UNDERWOOD

16   THOMAS WALPER

17   JULIA M. WINTERS

18   APARNA YENAMANDRA

19

20

21

22

23

24

25

1                  P R O C E E D I N G S

2    CLERK:   All rise.

3              THE COURT:  Please be seated.  Give me just a

4    minute.  Good morning.

5              MR. HUSNICK:  Good morning, Your Honor, Chad

6    Husnick with Kirkland & Ellis.  I'm here with my colleagues,

7    Mark Kieselstein and Mark McKane, appearing on behalf of the

8    Debtors.

9              Your Honor, we're here this morning on a -- what

10   was a relatively busy agenda, but hopefully we can

11   streamline things a little bit for Your Honor.

12             THE COURT:  Okay.

13             MR. HUSNICK:  We have agreed, with the objecting

14   parties, as you may have heard through our clerk, to waive

15   openings.  But in light of the developments over the last 48

16   hours, I've talked with Mr. Hogan, and I'm going to just put

17   a quick update, and I won't do any kind of opening statement

18   here.

19             THE COURT:  Okay.

20             MR. HUSNICK:  But I want to update the Court of

21   kind of what the state of play is at the moment.

22             THE COURT:  That'd be fine.

23             MR. HUSNICK:  Your Honor, as I said, there was

24   significant activity late last week, and over the weekend,

25   and the update is as follows:

 1           As a result of those discussions, NextEra, the

 2   proposed purchaser for the indirect ownership into in Oncor,

 3   has agreed to two very important changes and revisions to

 4   the merger agreement.  First, NextEra has agreed to increase

 5   its purchase price by an additional $300 million.  That

 6   results in a cash consideration of approximately $4.4

 7   billion, up from the $4.1 billion number that was originally

 8   disclosed in the motion.

 9           Second, NextEra has agreed to release

10   approximately $150 million from the holdback that would have

11   been established under the merger agreement, to pay asbestos

12   claims after the effective date.  That doesn't change the

13   reinstatement of asbestos claims; they're still being

14   reinstated at the reorganized Debtors, but NextEra, on its

15   own balance sheet, had set aside $250 million of what they

16   were purchase price into this escrow, they're going to drop

17   that down to 100 million, releasing an additional 150 of the

18   purchase price.  Net/net the result is an additional $450

19   million of distributable value, a significant increase in

20   recoveries for the EFH Legacy notes and the TCH intercompany

21   claim, the $750 million intercompany claim.

22           And when I say significant, I mean it virtually

23   quadrupled the recoveries of the EFH unsecured creditors.

24   As a result, FIDO, or Fidelity, Contrarian and the EFH

25   indenture trustee for the Legacy notes have agreed to

 1   withdraw their objections today, to the merger agreement and

 2   the plan support agreement.  In addition, Fidelity has

 3   agreed to join the plan support agreement.

 4          We just exchanged signature pages on that revised

 5   plan support agreement, and drafts are on their way over.

 6   And I will, after the hearing, assume if Your Honor grants

 7   the motion, I will present that for Your Honor's review.

 8          Your Honor, that's the update.  We think it's a

 9   lot of good news and I think there are going to be a lot of

10   creditors in the courtroom who will be very happy with this.

11   But we do have one objection remaining, and we are prepared

12   to proceed.  And I think the first step would be to offer

13   our witness and evidence in support of the plan support

14   agreement and the merger agreement.

15          THE COURT:  Okay.  Thank you.

16          MR. HUSNICK:  Thank you.

17          THE COURT:  Who's doing that?

18          MR. GANTER:  Your Honor, Jon Ganter of Kirkland &

19   Ellis on behalf of the Debtors.

20          Your Honor, pursuant to agreement among the

21   parties, we would like to offer the testimony of Anthony

22   Horton, by proffer, if that's okay with Your Honor.

23          THE COURT:  Any objection?

24          MR. HOGAN:  No objection, Your Honor.

25          THE COURT:  That's fine.  Thank you.

```
 1              MR. GANTER:  And a little housekeeping before we

 2    get to Mr. Horton's proffer.  We've already provided your

 3    clerk, and then yourself with a set of binders with our --

 4    with the Debtors' exhibits.

 5              THE COURT:  Yes.

 6              MR. GANTER:  We apologize for the size of the

 7    binders, but it's simply due to the length of the merger

 8    agreements that are attached -- that are included, the

 9    drafts of the merger agreements that are in the exhibits.

10              THE COURT:  Yeah.

11              MR. GANTER:  In addition to the exhibits, Mr.

12    Horton has prepared demonstratives to assist with his

13    proffered testimony, which have been distributed to the

14    parties.  May I approach with one for Your Honor?

15              THE COURT:  Yes.  Thank you.

16              MR. GANTER:  If called to testify, Mr. Horton

17    would declare as follows:

18              Mr. Horton makes this proffer in support of the

19    Debtors' -- in support of the motion of the EFH -- EFIH

20    Debtors for an order authorizing entry into a merger

21    agreement -- into merger agreement, approving the

22    termination fee, and authorizing entry into and performance

23    under a plan support agreement, which is docketed at 9190,

24    filed by the Debtors and Debtors in Possession, on August

25    3rd, 2016.
```

```
1            Since 2004 Mr. Horton has been the senior vice
2    president, treasurer and assistant secretary of Energy
3    Future Holdings Corp, the senior vice president and
4    treasurer of Energy Future Intermediate Holding Company, LLC
5    and the treasurer of Texas Competitive Electric Holdings
6    Company, LLC, each located at 1601 Bryan Street, Dallas,
7    Texas, ZIP code 75201.
8            He has been employed by the Debtors and their
9    predecessors for 30 years.  He served as the senior vice
10   president, treasurer and assistant secretary of EFH Corp.
11   Since 2004.  In such capacities Mr. Horton has worked on
12   numerous financial transactions on behalf of the Debtors,
13   including the transaction with NextEra proposing the motion,
14   and he is generally familiar with the Debtors' business's
15   day to day operations, financial matters, results of
16   operations, cash flows and underlying books and records.
17           Mr. Horton is generally familiar with the Debtors'
18   efforts to market the Debtors' economic interest in Oncor
19   and was involved in that process.  As treasurer, he was
20   frequently involved in direct discussions with bidders,
21   creditors and potential plan sponsors about the terms of
22   various proposals as they were offered, reviewed and
23   revised.
24           During his role in the Oncor marketing process,
25   Mr. Horton interacted directly with NextEra, one of the
```

1  bidders for Oncor.  He was the primary business person at

2  the company responsible for negotiating with NextEra.  Mark

3  Hickson, NextEra's senior vice president for corporate

4  development, was his primary contact at NextEra.  Mr. Horton

5  was in constant contact with Mr. Hickson during the

6  marketing process.

7          In addition, Ms. Stacy Dore, the Debtors' co-CRO

8  and general counsel, and the Debtors' counsel at Kirkland &

9  Ellis negotiated with NextEra's counsel, both in-house and

10  at Chadbourne.

11          Kirkland and the Debtors' financial advisors at

12  Evercore acted as Mr. Horton's -- acted at Mr. Horton's

13  direction and under the direction of Ms. Dore, throughout

14  the Oncor marketing process and negotiation with bidders,

15  including NextEra.  Of course, Mr. Horton, Ms. Dore,

16  Evercore and Kirkland were all acting under the authority of

17  the Debtors' boards of directors and managers.

18          Over the course of the negotiations with NextEra,

19  Mr. Horton reviewed the various drafts of the merger

20  agreement and other definitive deal documentation exchanged

21  between the parties.  In addition, his negotiating team

22  discussed with him the changes from draft to draft, as

23  proposals were exchanged with NextEra.  Therefore, even if

24  Mr. Horton did not review every draft in full, he was still

25  aware of incremental changes on key issues.

1          To assist with Mr. Horton's proffered testimony

2     regarding the Oncor marketing process, he helped prepared a

3     demonstrative labeled D-Dem-1, which summarizes the

4     negotiations with NextEra from 2014 through 2016.

5          NextEra has been involved in the Oncor marketing

6     process since early in this case, as they made an

7     unsolicited bid for Oncor in 2014.  At the time, in June

8     2014, the Debtors were pursuing a restructuring support

9     agreement, a feature of which was an EFIH second lien DIP.

10    Second creditors made proposals for DIP financing, including

11    the EFIH second liens, in conjunction with NextEra.

12         The NextEra EFIH second lien proposal, which never

13    developed beyond a short term sheet, included a mandatory

14    equity conversion with a $17.4 billion total equity value,

15    and no expressed termination fee, though it did include a

16    right for NextEra to match or top any subsequent higher and

17    better offer, which is referred to as a "match right."

18         In mid-July of 2014, NextEra sent the Debtors a

19    merger proposal with an implied Oncor total equity value, or

20    TEV, of $18 billion, a termination fee of 3 percent of case

21    and stock consideration, roughly $125 million and a match

22    right.

23         After receiving NextEra's bid, the Debtors

24    terminated the RSA on July 24th, 2014.  The Debtors

25    continued negotiating with NextEra in the hope that they

1    could be a stalking horse bidder.  On August 26th, 2014 the

2    Debtors filed a notice with the Bankruptcy Court stating

3    their intent to perform a formal marketing process for their

4    economic interest in Oncor.

5            As part of a robust marketing process between

6    February and June 2015, the Debtors contacted over 50

7    parties, including NextEra.  In parallel with the marketing

8    process, the Debtors negotiated with creditor groups on

9    their own competing proposals.

10           Three first round bids were received, including

11   one from NextEra.  The Debtors narrowed the bidders to two

12   finalists, NextEra and the Hunt's in partnership with

13   certain creditors.  NextEra's bid, which included a $110

14   million break fee, and a match right, valued Oncor at $18.2

15   billion at its highest.  The Hunt proposal included an

16   initial $225 million termination fee, which was subsequently

17   reduced to $175 million.

18           When the terms were nearly final, NextEra suddenly

19   reduced its price by nearly a billion dollars, to $17.3

20   billion.  At that time, the Debtors focused on pursuing a

21   plan proposal by the Hunt's in partnership with cert TCEH

22   unsecured creditors.  The Hunt proposal included $175

23   million termination fee, the plan was confirmed in December

24   2015 and then terminated on May 1st, 2016.

25           Mr. Horton also helped prepared demonstrative

1    labeled D-Dem-2, which provides additional detail regarding

2    the key steps in the 2016 merger negotiations with NextEra

3    leading up to the merger agreement that is before the Court

4    today.

5           The Debtors first heard from NextEra in 2016, the

6    day after the Hunt plan was terminated.  On May 2nd, Jim

7    Robo, the CEO of NextEra, emailed and EFH acquisition term

8    sheet to john Young the CEO of EFH.  Mr. Horton received and

9    reviewed the May 2nd proposal, which is at Debtors' Exhibit

10   28, Bates Number EFH-06362905.

11          The case component of the purchase price in the

12   May 2nd proposal, listed in Section A, under bid value, was

13   $3.5 billion.  The $3.5 billion cash component was based on

14   what had become outdated cash projections that had been

15   available to NextEra during the 2015 stalking horse bidding

16   process.  The cash component of NextEra's bid was heavily

17   negotiated over the course of 2016 and changed multiple

18   times.  Therefore, in Mr. Horton's demonstrative, he has

19   listed the cash component amounts at key steps in the

20   negotiation process.

21          In addition to the $3.5 billion cash component,

22   NextEra's May 2nd bid also contemplated a pay down and

23   assumption of E-side debt.  The May 2nd term sheet also

24   included a termination fee, the same number we had left --

25   the parties had left off on during the 2015 stalking horse

1    process, of $110 million, and that's in DX-28, at Bates EFH-

2    06362920 to 21.

3              As stated earlier, the negotiations with NextEra

4    involved a concept called a match right.  NextEra wanted a

5    right to a last look or match right in the event that the

6    Debtors received a higher and better offer from another

7    bidder, after the merger agreement with NextEra was signed.

8    Accordingly, NextEra wanted to include a provision in the

9    merger agreement that required the Debtors to negotiate with

10   NextEra for a certain period of time after receiving a

11   superior bid, in order to allow NextEra, the opportunity to

12   match the superior bid, and avoid the Debtors' exercising

13   their fiduciary out to take that superior bid.

14             NextEra had always sought a match right, ever

15   since making its first unsolicited bid for Oncor in 2014.

16   Although the May 2nd term sheet did not contain language

17   regarding a match right, because after all it was only a

18   term sheet and not a draft of the merger agreement, the

19   Debtors understood that NextEra wanted a match right as part

20   of the proposed transaction.

21             The next key step in the negotiations with NextEra

22   was on May 18th when Mr. Robo sent a revised bid and term

23   sheet to Mr. Young, and that's at Debtor's Exhibit 29, Bates

24   EFH-06337329.  The cash component of the May 18th revised

25   bid had increased to $3.781 billion in light of the updated

1   cash forecast the Debtors had provided to NextEra after

2   their May 2nd bid.  Note, the increase in the cash component

3   did not amount to an equivalent increase in distributable

4   value, because some of the E-side cash had been depleted by

5   the payment of fees.

6          The May 18th term sheet, like the May 2nd term

7   sheet included a $110 million termination fee.  Debtor's

8   Exhibit 29, at Bates EFH-06337349.  Again, although the May

9   18th term sheet was merely a term sheet and did not contain

10  match right language, the Debtors understood that NextEra

11  wanted the match right as part of their May 18th proposal.

12         On May 23rd, Bill Greason from Chadbourne sent the

13  Debtors draft instruction papers, draft transaction papers,

14  including a draft agreement and plan of merger, which is at

15  DX-39.  Mr. Horton also received and reviewed these drafts,

16  see Debtor's Exhibit 33 at EFH-06337914.  The May 23rd draft

17  merger agreement included the same $110 million termination

18  fee, as well as match right language requiring a five

19  business day match period, and that's Debtor's Exhibit 33 at

20  EFH-06337974 to 75.

21         Between May 23rd and July 21st, nine more drafts

22  were exchanged between EFH and NextEra.  The Debtors and

23  NextEra negotiated many points and Mr. Horton followed the

24  negotiations closely.  As an overview, the key issues being

25  negotiated were, the purchase price, including distributable

1   value; a termination fee; the match right, including go-shop

2   provisions; assumption of the asbestos liabilities; closing

3   conditions; the Oncor letter agreement; representations and

4   warranties; the ancillary agreements and the EFIH first lien

5   DIP refinancing.

6          Those first four issues in particular, price,

7   termination fee, match right and asbestos liabilities were

8   still being negotiated, as of July 21st when NextEra agreed

9   to increase the price by $50 million and submitted a draft

10   merger agreement reflecting this increased price of $3.786

11   billion, which appears at DX-35 EFH-06411142.

12          In the last week of July the Debtors had scheduled

13   several board meetings in anticipation of a few milestones

14   in the restructuring process, including the July 27th

15   deadline for filing the ancillary agreements, anticipation

16   of the T-side confirmation hearing and the July 28th

17   deadline for obtaining a private letter ruling from the IRS

18   in connection with the TCEH spinoff.  Board meetings were

19   scheduled on July 22nd in order to brief the board on key

20   issues; on July 27th, to approve the ancillary agreements

21   and July 28th, to review the PLR.

22          NextEra was aware of those board meetings and in

23   particular knew that the Debtors were going to the boards on

24   July 28th, which accelerated negotiations on the key

25   outstanding points in the merger negotiations.  The Debtors

1   had explained that if they did not reach an agreement with

2   NextEra by the time of the board meeting, they are not going

3   to advise the boards to enter into the merger agreement with

4   NextEra.

5           In the course of the negotiations on July 26th and

6   27th, NextEra finally agreed to drop the match right.  This

7   was important to the Debtors because they viewed the match

8   right as a value inhibiting term, particularly in a

9   bankruptcy context.  Debtors believed that potential bidders

10  likely would depress their bids, or not bid to account for

11  the burdens imposed by the match right.  At the same time,

12  the Debtors agreed to increase the termination fee to a

13  market amount, $275 million.

14          Mr. Horton learned about these developments when

15  Andy Wright, vice president and deputy general counsel for

16  EFH, asked for an EFH and Kirkland call to inform the team

17  that Charles Sieving of NextEra had sent an email agreeing

18  to drop the match right and increase the termination fee to

19  $275 million.

20          On July 27th, NextEra also agreed to assume the

21  asbestos liabilities that were being reinstated under the

22  Debtors' plan of reorganization.  This was an important

23  aspect of the plan for the Debtors.  This assumption of

24  asbestos liability resulted in $200 million increase in the

25  cash purchase price, which rose to $3.986 billion, to

1    account for the $250 million that would be placed in an

2    escrow account to pay for any asbestos liabilities that

3    became due at firm mergence.  The $50 million increase on

4    July 21st and the $200 million increase on July 27th of the

5    purchase price, resulted in more favorable treatment to the

6    E-side creditors, specifically recoveries were now

7    sufficient to pay the EFIH PIK noteholders roughly at par.

8         But NextEra was aware that the Debtors were not

9    done negotiating.  NextEra was aware that the Debtors would

10   go to the boards on July 28th and come back with a request

11   for more money and a reverse break fee, which the Debtors

12   did.  The reserve break fee was a nonstarter, as it always

13   had been, but NextEra agreed to add another $110 million to

14   the purchase price, which increased to $4.096 billion,

15   that's Debtors' Exhibit 45.

16        Based on Mr. Horton's experience as a lead

17   negotiator with NextEra, he understood that NextEra was

18   insistent on dual-back end deal protections, both a match

19   right and a termination fee, throughout the course of its

20   negotiations for EFH's economic interest in Oncor.  NextEra

21   first took that position in 2014, when it made its

22   unsolicited bid for Oncor.  In fact, only once did NextEra

23   ever indicate it would accept a deal without a break fee,

24   that was in July of 2014, before the Debtors' terminated the

25   RSA when NextEra submitted a term sheet with a group of EFIH

1    second lien creditors, for a EFIH second lien DIP facility.

2    Although this term sheet did not include a termination fee,

3    it did include a match right.  This was the only time

4    NextEra ever indicated it might accept a deal without a

5    termination fee.

6            The match right was critically important to

7    NextEra, they viewed it as a primary source of comfort that

8    the Debtors would consummate the merger.  NextEra never

9    indicated it would take a deal that included no back-end

10   protections, whatsoever.  NextEra always insisted on a match

11   right, a termination fee, or usually both.

12           The Debtors were also negotiating seriously with

13   one other bidder as of July 27th.  Mr. Horton was also

14   involved in these negotiations.  The other bidder was

15   requesting a $350 termination fee, as a result -- as of July

16   22nd -- 27th, as well as a full match right.

17           The Debtors ultimately agreed to increase the

18   termination fee for the NextEra merger agreement and to

19   eliminate the match right, on July 27th, because the Debtors

20   viewed the higher rate fee as a reasonable cost to pay to

21   eliminate the match right, particularly in the light of the

22   increase in the purchase price.  In addition, the Debtors

23   believed that the $275 million termination fee was a market

24   termination fee which was further supported by the fact that

25   the other bidder, at that point, was asking for an even

1    higher termination fee.

2            Based on his experience as a lead negotiator with

3    NextEra, Mr. Horton does not believe that NextEra would have

4    agreed to the merger without a termination fee.  This is a

5    market termination fee and it has been important to NextEra

6    from the beginning, but especially in light of the various

7    gives the Debtors got at the very end in exchange for

8    agreeing to this fee.

9            Mr. Horton is confident that the proposed

10   transaction with NextEra will close and believes there's a

11   low possibility that the termination fee will be triggered.

12   The Debtors have marketed Oncor for years now, to all

13   interested parties.  The Debtors do not expect anyone will

14   come in above the current purchase price.

15           A bidder would have to come in with a higher and

16   better offer that was viable and did not involve a higher

17   execution risk than the NextEra merger.  Additionally, even

18   though they do not have a match right, NextEra could still

19   decide to make an even higher, better offer.  And then the

20   Debtors would have to exercise their fiduciary out in order

21   to pursue that superior proposal, thereby terminating the

22   NextEra merger agreement at which point the termination fee

23   would be triggered.

24           The NextEra merger has been public for a month and

25   a half now, and no other party has come in with a viable and

1   higher, better offer.  Waiting is only detrimental to the

2   Debtors' estates.  Nevertheless, in the last two days the

3   Debtors have continued to negotiate with NextEra and have

4   reached agreement on another $300 million increase in the

5   purchase price, bringing the cash purchase price to $4.4

6   billion.  With this increase, and certain accounting

7   adjustments made with respect to the cash purchase price,

8   Debtors have brokered the support of the EFH indentured

9   trustee, Fidelity and Contrarian.

10          Your Honor, before we pass the witness, Mr. Horton

11   would also lay foundation for the admissibility of the

12   Debtor's documentary evidence.  Mr. Horton, through his role

13   in these negotiations, is familiar with the documents that

14   the Debtors seek to offer into evidence.  If called to

15   testify, he would make the following representation with

16   respect to those documents:

17          Mr. Horton has reviewed and is familiar with the

18   documents the Debtors intend to offer into evidence today.

19   They're all true and correct copies of the Debtors' business

20   records.  They were made at or near the time of the acts,

21   events, conditions or opinions they describe, by a person

22   with knowledge of that information and were kept in the

23   course of the regularly conducted activity of the company,

24   as was the regular practice of that activity.

25          They fall in one of three categories.  The

1  following documents are pleadings and attachments filed with

2  the Court, including the final copies of the July 29th

3  merger agreement and plan support agreement with NextEra,

4  Debtors' Exhibit 1 and Debtors' Exhibit 15.

5        The following documents are correspondence and

6  draft transaction documentation exchanged between the

7  Debtors and NextEra with respect to the Oncor marketing

8  process and related negotiations, those exhibits are DX-3,

9  DX-5, DX-6, DX-7, DX-9, DX-11, DX-12, DX-13, DX-14, DX-16,

10  DX-17, DX-19, DX-21, DX-22, DX-23, DX-24, DX-25, DX-28, DX-

11  29, DX-32, DX-33, DX-35, DX-36, DX-37, DX-38, DX-39, DX-40,

12  DX-41, DX-44 and DX-46.

13        The following documents are presentations to and

14  minutes of the meetings of the Debtors' joint boards, DX-2,

15  DX-4, DX-8, DX-10, DX-18, DX-20, DX-26, DX-27, DX-30, DX-31,

16  DX-34, DX-42, DX-43 and DX-44.

17        And with that, Your Honor, the Debtors move all

18  exhibits, DX-1 through DX-46 into evidence.

19        MR. HOGAN:  No objection, Your Honor.

20        THE COURT:  They're admitted.

21      (DEBTOR'S EXHIBITS DX-1 THROUGH DX 46 ADMITTED INTO

22  EVIDENCE )

23        MR. GANTER:  In addition, Your Honor, we ask that

24  the demonstrative aides be accepted as part of the record,

25  though we're not moving them into evidence.

1          MR. HOGAN:  No objection.

2          THE COURT:  They're admitted -- well, they're not

3    admitted, excuse me.  The Court will take notice of them,

4    but they're not admitted into evidence.

5          MR. GANTER:  And with that, Your Honor, we pass

6    the witness.

7          THE COURT:  All right.

8          You wish to cross examine?

9          MR. HOGAN:  Please, Your Honor.

10          THE COURT:  All right.  Where is Mr. Horton?

11          Good morning, sir.  I haven't seen you in a while.

12    I hope you're well.  Please remain standing.

13          CLERK:  Please raise your right hand.  Do you

14    affirm you will to tell the truth, the whole truth and

15    nothing but the truth, to the best of your knowledge and

16    ability?

17          MR. HORTON:  I do.

18          CLERK:  Please state and spell your name for the

19    record.

20          MR. HORTON:  Anthony Horton, H-O-R-T-O-N.

21          CLERK:  Thank you.

22          MR. HORTON:  Thank you.

23                    CROSS EXAMINATION

24    BY MR. HOGAN:

25    Q    Good morning.

1    A      Good morning.

2    Q      How you doing today?

3    A      Could be worse.  Could be raining.

4    Q      We need the rain.  If I could, I'd like to start, you

5    were here this morning at the start of the hearing, and you

6    heard the announcement that counsel for the Debtors made

7    regarding this latest deal?

8    A      Yes.

9    Q      If I could, I just want to unpack that as it relates to

10   the asbestos claimants.

11   A      Okay.

12   Q      There was a component of that that changed, and if you

13   could, please explain that.

14   A      Well, effective what is -- occurred, there was $250

15   million set aside as part of the purchase price, in an

16   escrow account, for the benefits -- sole benefit of the

17   asbestos liabilities.  Over the last -- I -- I would say

18   since Friday that number has come down from 250 million to

19   100 million.

20   Q      And so the characterization, I think, that counsel made

21   was that 150 of the 250 was released, or I guess taken away

22   from that pool, effectively?

23   A      Yeah, effectively it was -- it's not in the -- it's not

24   in the escrow account, so I wouldn't suggest it's released

25   but -- but the agreement is now such that there will be 100

1    million of the purchase price that will be set aside in --

2    in an escrow account.

3    Q    Okay.  And if you can tell us, what gave rise to that

4    change, from the 250 to the 100?

5    A    I think it was a process that NextEra went through,

6    from the due diligence perspective and working, I think,

7    with a couple of consultants reviewing the consultants'

8    reports.  I think they got comfortable with a level of 100

9    million, for the purposes they had, which I don't fully

10   understand of wanting to put it in an escrow account, rather

11   than just fully accepting -- they -- they have fully

12   accepted the liabilities, but rather than just do that on

13   their balance sheet, they put $100 million as a set aside.

14   Q    And so just so we're clear, the 100 million is a set

15   aside, but those claims are supposed to pass through the

16   plan unimpaired, and to the extent that there's claims that

17   exceed 100 million, or 250, whatever the number ends up

18   being, NextEra will be responsible for those?  Is that --

19   A    They are liable for those.  Yes.

20   Q    Just so I'm clear.  Okay.

21           THE COURT:  When you say "NextEra is liable for

22   those," do you mean NextEra the operating company worth

23   billions of dollars, or do you mean some holding company

24   that's being set up, through the merger agreement, that

25   wouldn't have sufficient funding to pay those liabilities?

1           MR. HORTON:  I don't know exactly.  My -- my -- my

2     anticipation, Your Honor, is that it is fully backed by

3     NextEra, the holding company.  They're -- you know, they

4     have a 8 -- they're, you know, spending roughly, you know,

5     18-point-you know-7 billion dollars for this -- for this --

6     for this entity, and my expectation is that whatever it

7     takes to hold on to this entity, they're going -- they're

8     going to do that.  So, my view is, it is, again, with the

9     holding company.

10          THE COURT:  So is it safe to -- because I'm very

11    interested in this, as well as Mr. Hogan --

12          MR. HORTON:  Sure enough.

13          THE COURT:  -- is it safe to say that the $250

14    million original set aside that's now been reduced to $100

15    million, wasn't for the benefit of the asbestos claimants,

16    as much as it was for the benefit of NextEra to make sure

17    they had set aside enough money for the liabilities?

18          MR. HORTON:  I would say that it was for the

19    benefit of the -- for the beneficiaries, and it was part of

20    their approach to managing the liabilities and setting aside

21    -- you know, and I'm assuming that they're doing that for

22    the purposes of their investors understanding that, look,

23    there's 250 million set aside.  And I -- I -- I think that

24    was, at the -- at that point in time, their very

25    conservative view of what they should do from a -- from the

1    asbestos liabilities.

2              THE COURT:  Okay.  Thank you.

3    Q    So you testified that they consulted with some experts

4    in order to make a determination, and they did their due

5    diligence in order to determine that the 250 should be

6    reduced to 100, and that's what was announced today,

7    correct?

8    A    That's correct.

9    Q    And in that process, did the Debtors share, with

10   NextEra, it's information regarding the number of claims

11   that had been filed against the Debtor in the context of the

12   bar date that was set in this case?

13   A    Yes, sir.

14   Q    And to that end, did the Debtor prepare or share any

15   calculation that it did with regard to a determination as to

16   the amount of claims that had been asserted against the

17   Debtor, vis-a-vis the bar date?

18   A    I think we -- the way I would characterize it is we had

19   previously had a reserve for the amounts -- the amount of

20   the asbestos claims.  Clearly the 27,000 is -- claims

21   through the bar date.

22   Q    I'm sorry, 27,000 you said?

23   A    Yeah.

24   Q    Just want to clarify.

25   A    Came through -- through the bar date, as I -- you know,

1    as I recall the number.

2    Q    Um hmm.

3    A    We didn't revise our estimate of what those liabilities

4    may be.  We had -- NextEra came in, worked with our internal

5    team and did their due diligence.  I think they had some

6    experts on the phone and they came to their own conclusion,

7    up to that point.

8    Q    And so at one point they came to a conclusion that it

9    was 250, and then subsequent to that, through further due

10   diligence, it's now at 100 million; is that correct?

11   A    I don't know what the exact amount that they came to,

12   in terms of a conclusion.

13   Q    But you heard the characterization that the 250 has now

14   been reduced to 100 million set aside for these purposes; is

15   that correct?

16   A    That's correct.

17   Q    Okay.  And as part of the merger agreement, there's a

18   provision in there about the acquisition of an insurance

19   policy that could be used to cover asbestos claims going

20   forward.  Are you familiar with that term?

21   A    Yes.

22   Q    Okay.  And is that still a viable option or has that

23   also gone to the wayside?

24   A    I think that's still a viable option.  I think there's

25   two options.  One, leave the $100 million in the escrow

1   account and then NextEra, again, assume -- has assumed all

2   of those liabilities and the asbestos liabilities; or they

3   could go out and purchase a -- they could go out and

4   purchase an insurance policy.  How they -- where they are

5   today on that decision?  I don't know.

6   Q    Okay.  And to the extent that they were to purchase an

7   insurance company (sic) I believe there's a provision that

8   allows them to use whatever that set aside is to acquire the

9   insurance policy and then whatever funds are remaining would

10  go out of that fund; is that a fair characterization?

11  A    I think so, yes.

12  Q    Now, the -- you had testified that the Debtor has these

13  claims, they were asserted by the bar date and the Debtor

14  shared those with NextEra for the purposes of determining --

15  in preparing a due diligence assessment of what the

16  liability is, correct?

17  A    I would -- I would -- I wouldn't say that I have

18  knowledge that they showed -- that they shared those exact -

19  - whatever those claims were.  My -- I -- I believe they

20  shared whatever the claims that came through the bar date,

21  and then they do -- did their due diligence on, you know,

22  generally the history and so forth of claims that had come

23  through.

24  Q    Okay.  Thank you.  So --

25  A    And had been paid.  Sorry.

Case 14-10979-CSS   Doc 1702-23   Filed 08/03/17   Page 38 of 141

Page 38

1   Q    So a couple things there, just so I have complete

2   clarity on this.  So as you understand the structure of this

3   case and how it's been set up.  There was a bar date that's

4   been set in this case, there's been, obviously, certain

5   contested matters by the asbestos objectors regarding the

6   prior confirmed plan that's since been set aside. And you're

7   familiar with this Grossman Protocol, and if not, tell me

8   you're not, but the ability of an individual who manifests

9   today or sometime in the future, and who has, then, the

10  ability to come to the Court and to make a showing that they

11  were somehow prejudiced or are somehow able to assert a

12  claim, after the bar date, because they didn't receive

13  adequate due process protections.  Are you familiar with

14  that process?

15  A    No, I'm not, actually.  That's --

16          MR. GANTER:  Objection, Your Honor.

17          MR. HORTON:  -- you're getting a little deep.

18          THE COURT:  Mr. Horton, I'm sorry, you're over --

19  you're talking over your lawyer.

20          MR. GANTER:  Counsel's question was vague.

21          THE COURT:  No it wasn't.  Overruled.

22          Go ahead.

23          THE WITNESS:  Sure. I'm not fully aware of that

24  entire process, in terms of from a legal perspective.

25          MR. HOGAN:  And I would --

```
 1            THE WITNESS:  And who --

 2            MR. HOGAN:  Excuse me.  I'm sorry.

 3            THE WITNESS:  -- and who would -- that's okay.

 4     And who and how they would actually go through the court

 5     process and -- and, you know, how that would actually, you

 6     know, result in some -- some kind of proceeding.  No, I'm

 7     not familiar that.

 8     Q    Okay.  And that's fair.  I didn't mean to characterize

 9     that you had an understanding of the process that would have

10     to be undertaken.  But more importantly, you understand that

11     someone who manifests today, or five years in the road --

12     down the road, could in fact assert a claim.  And assuming

13     that they satisfy all the requirements of the Grossman

14     Protocol, as I'm characterizing it, they could then assert a

15     claim and have that claim be approved by the Court and then

16     they'd have a claim that they could assert against you --

17     this insurance company or -- or this -- the NextEra entity;

18     is that a fair characterization?

19     A    Yes.

20     Q    Okay.  And do you know if those outliers, however small

21     or large they might be, whether they were considered, by

22     either the Debtor or NextEra when they went to do their due

23     diligence and characterize what this liability might be?

24     A    Yeah, I guess the way I would characterize it is they

25     were aware of the bar day, they were aware of the claims,
```

1   and they evaluated those claims in terms of potential payout

2   as well as legal costs associated with, you know, defending

3   against those liabilities.

4   Q    But again, those are the claims that have already been

5   asserted.  And I'm asking you about these -- I understand

6   it's a bit of a hypothetical, because it might not ever

7   happen, but it could happen that unmanifested,

8   (indiscernible) manifest, they're after the bar date, they

9   assert a claim, they pass the protocol and now they have a

10  valid claim against NextEra.  I'm just asking if that notion

11  was factored into a consideration about how big the pot

12  should be?

13  A    I don't know.

14  Q    Thank you.  I mentioned before the old confirmation

15  hearing, or the confirmation hearing that happened last

16  October/November, and ultimately with an order entered in

17  December of last year; are you familiar with that?

18  A    Yes, sir, I am.

19  Q    We'll call it the original plan, I guess, for lack of a

20  better characterization.

21  A    That's fine.

22  Q    Are you aware that certain asbestos debtors have

23  appealed that decision?

24  A    I am aware.

25  Q    And is NextEra aware of that fact as well?

```
 1   A     You'd have to ask them, but I'm sure they are.

 2   Q     The merger agreement and plan support against have, as

 3   a condition, or a term, that the Debtors support the plan,

 4   isn't that correct, as it's currently filed?

 5   A     That's correct.

 6   Q     And in fact the plan and the disclosure statement, as

 7   they're currently on file are an exhibit to the merger

 8   agreement; are they not?

 9   A     That's correct.

10   Q     Okay.  And so has any consideration been given to the

11   fact that we could be successful on those appeals?

12   A     You would need to talk to the -- my legal counsel.

13   Q     Okay.  And so -- and I understand that, and I'm not

14   asking you to divulge anything that they may have told you

15   about that, all I'm asking is whether, in the course of

16   conversations between the Debtor and NextEra, if in fact a

17   conversation or any mention was made of the fact that these

18   appeals were outstanding, and to the extent that those

19   appeals are successful, that would result in a change in the

20   plan that might give rise to the termination fee.  Does that

21   make sense?

22   A     I -- I appreciate your question.  Let me kind of back

23   up a step.

24   Q     Sure.

25   A     I mean, I was involved in the negotiations of the Oncor
```

1   sale.  And clearly I was relying upon Evercore, K&E, other

2   members of my team as it relates to the technical questions

3   such as that, which is, to me, as a deal guy, as the guy

4   who's running this process, that was a -- that would be a

5   question I'd bring to my legal counsel and seek their advice

6   to how to answer that question.  So I don't have an answer

7   for you.

8   Q    And so just the last final follow up on that, then.

9   And so I take it, from your statement, that that never

10  happened?  That you didn't say, oh wow, I better ask -- you

11  know, there's these appeals out there, and if they're

12  successful, it could have an impact on our deal, in terms of

13  how those asbestos claims are treated.

14  A    My view is there were experts involved in the process,

15  experts from the company perspective who dealt with the due

16  -- deal with the asbestos for years and years and years.

17  They sat down and had multiple conversations, in fact I

18  would suggest that these conversations and this due

19  diligence actually slowed down the actual signing of this

20  agreement.  And that with their experts, with my experts

21  they came to a conclusion of what those liabilities were and

22  what risk they were willing to take, from a balance sheet

23  perspective, versus putting cash into an escrow account.

24  That is the way I would characterize it.  They came to me

25  and -- and came with a summary of, this is where we are.  I

Page 43

1    did not get into that level of detail.

2    Q    Thank you.  You mentioned your experts that you turned

3    to on these issues.  Could you tell me who they are?

4    A    I -- from my -- again, I could not tell you who the --

5    I was not -- I was not on the due diligence calls --

6    Q    Okay.  Thank you.

7    A    -- as you would expect.  But internally, we have a --

8    we have an internal person that evaluates and has been

9    working with these asbestos claims for quite some time, Mike

10   Hunter's his name.  And then there were --

11   Q    Mike Conners?

12   A    Hunter.

13   Q    Hunter.  Thank you.

14   A    My apology.  My Texas accent and speaking too fast.

15   Mike Hunter.  And then again there were some experts that --

16   that we hired.  I don't know, under -- I'd have to look back

17   to the NDA whether or not I can -- you know actually

18   disclose who they are.  They were part of this -- part of

19   this process, very reputable, well known firm that -- that

20   we use that were -- was involved and actually evaluated the

21   -- the asbestos claims.  And then I know that NextEra also

22   had some experts.  I was at least on one call where their

23   experts were, you know, discussing some of the results of

24   the analysis.  But again, you're talking about a insurance

25   slash risk management type situation and they went into

1   greater detail and beyond my understanding.

2   Q    The consultant's name -- you said internally Mike

3   Hunter?

4   A    He's not a consultant, he's an internal --

5   Q    Right.  But then you said you had a consultant, too.

6   A    Yes, sir.

7   Q    And who is that?

8   A    Again, what I was saying to you, I'm not sure I'm able

9   to disclose that.

10  Q    Well they'll object, if I -- you know, if I'm stepping

11  out of bounds.  But I'm asking the question, until they do.

12  A     I hear your point.

13          MR. GANTER:  Objection, Your Honor.  As Mr. Horton

14  testified, it's an undisclosed consultant expert.

15          THE COURT:  Well, you're going to need to say more

16  than that.  Why -- under -- I understand you don't want to

17  disclose it.  The question is, legally, why aren't you --

18  why shouldn't I make him answer that question, because Mr.

19  Hogan is -- asked a relevant question. He wants to know who

20  your consultant is.

21      (Counsel confer)

22          MR. GANTER:  Your Honor, after consulting with Mr.

23  McKane, Mr. Horton can disclose the name, but it's a -- the

24  name of the consultant, but it's a work product concern

25  because it's an expert.

```
 1              THE COURT:  Okay.  So you're going to object to

 2    any questions about what the consultant said?

 3              MR. GANTER:  Yes, Your Honor.

 4              THE COURT:  All right. Well, we'll take that up

 5    when that comes up.  But --

 6              MR. HOGAN:  I think that's fair, Your Honor.

 7              THE COURT:  -- I assume that's the follow up

 8    question.

 9              MR. HOGAN:  I would of.  Well, first things first.

10              THE COURT:  Right.

11              So who's your consultant?

12              MR. HORTON:  Yes, sir.  Aon Risk.  I'm sure you're

13    familiar with them.

14              THE COURT:  A-O-N?

15              MR. HORTON:  Yes, sir.

16    Q    And so, you know, I spent a large part of my weekend

17    going through a binder of confidential documents which

18    essentially are your four binders of exhibits, and I'll

19    never get that time back.

20    A    Bless your heart.

21    Q    And that's for another day.

22    A    I've been down that path with you, so.

23    Q    But there is reference to that entity potentially

24    procuring an insurance policy.

25    A    Okay.
```

 1   Q    And so I understand that.  If I could, do you have your
 2   -- do you have the demonstrative up there?
 3   A    I do.
 4   Q    Could you turn to that, please?
 5   A    I will.
 6   Q    The first page, I have it as -- look at Debtors'
 7   Demonstrative Number 1, I guess they're three separate
 8   demonstratives.  Let's start with Demonstrative Number 1.
 9        Characterize this for me, generally.  What is this
10   page?  Is this supposed to be a timeline?  Is this -- are
11   these one offs, or what are they?
12   A    I think it's just a -- a comprehensive -- not
13   comprehensive, but a -- an overview or a high level summary
14   of the negotiations of the sale of Oncor with a focus of
15   NextEra from June of 2014 through the end of July of 2016.
16   Q    And this is offered, or utilized to demonstrate the
17   engagement by NextEra over the last two years, with EFH, in
18   terms of their negotiations?
19   A    Yeah, I think that's predominately the focus.  Yes,
20   sir.
21   Q    Okay.  And so if I focus in on the first tab there,
22   June, July -- mid-July 2014, mid-July to August 2014 and I
23   draw a line there, I can cut that off, right?  That deal
24   never happened; isn't that a fair characterization?
25   A    I would -- you would -- through -- my apologies, I was

1   trying to follow you.  So you're June to mid-July, I don't

2   mean to talk over you, go ahead.

3   Q    You're fine.

4   A    Go ahead.

5   Q    It's complicated.  2014.

6   A    Um hmm.  Yes, sir.

7   Q    There's a DIP lien negotiation and there was some

8   transaction that NextEra was involved in; is that a fair

9   characterization?

10  A    Yeah, there was the DIP as its described in the column

11  titled June to mid-July of 2014 where NextEra was involved,

12  you know, teaming up with the EFIH second liens with the DIP

13  term sheet and it was a term sheet and it, again, describes

14  the value of $17.4 billion.

15  Q    And that deal never happened.

16  A    That deal never happened.  No, sir.

17  Q    And then there's mid-July August 2014 NEE Strategic

18  Merger Proposal, $18 billion offer.

19  A    That's correct.

20  Q    Termination fee of three percent, approximately $125

21  million with a match, right?  Correct?

22  A    That is correct, sir.

23  Q    Did that deal ever happen?

24  A    No, sir.  As we continued to work through that process

25  we were getting feedback from our creditors and advisors

Case 14-10979-CSS  Doc 9666  Filed 09/21/16  Page 48 of 141

1    that we should open the process up to a, you know, broader

2    universe of potential buyers so that at that point in time

3    we dropped the NextEra stalking horse process, moved to a

4    more formal process and on August 26th we filed a motion for

5    a formal marketing process, which was later approved in

6    November.

7    Q    And the result of that was ultimately what?  Did that

8    give rise to the Hunt offer and the Hunt deal effectively?

9    A    Again, that's a very -- that's ultimately where we

10   ended.  There's a lot of steps in between.

11   Q    I understand that.

12   A    Absolutely that's where we ended up.

13   Q    Right, I was just cutting to the chase there.

14   A    Right.  I appreciate that.

15   Q    Let's go to the third column, February to June 2015,

16   formal bid process.  That's the one that ultimately ended up

17   with the Hunt transaction, correct?

18   A    That's correct.  We reached out to, you know, 50

19   Evercore -- I say "we" -- Evercore reached out along with

20   the company to approximately 50 potential buyers, 15 of them

21   signed an NDA and we worked through the process.  I think we

22   ended up, as I think was described earlier, ended up with

23   three initial round one bids with the Hunt, NextEra and then

24   I characterize them as the PIKs.  Continued to work with

25   NextEra and then ultimately they dropped their price almost

1    $1 billion as was described and we continued to pursue other

2    options with other creditors, like the E-Side creditors, but

3    ultimately where that headed was the consortium of the Hunts

4    with the T-uns and we moved down that process as you can see

5    in the next column.

6    Q    Right and so the fourth column is in fact really all

7    about the Hunts, isn't it really?

8    A    Yes, I would characterize that as is.

9    Q    So in terms of, that you referred demonstrative, in

10   terms of the proposed breakup fee that the Debtor's seeking

11   to have approved pursuant to the merger agreement, is it

12   really just this last column that is a fair characterization

13   of what gives rise to the $275 million termination fee?

14   A    I'm not sure I understood the question.

15   Q    We have a merger agreement that we're here today --

16   that the Debtors are here today seeking to have approved and

17   that merger agreement has a provision in it for a $275

18   million termination fee that would be payable to NextEra if

19   the merger isn't consummated.  Correct?

20   A    If the merger is not consummated and we actually close

21   an alternative transaction, yes.

22   Q    And all I'm asking is, is everything before that last

23   column relates to other deals.  Isn't that a fair

24   characterization?

25   A    I -- again, we were outlining the process and how you

Case 1:14-cv-07079-GSS Doc. 57a3-23 Filed 09/21/16 Page 50 of 142
Case 1:14-cv-07079-GSS Doc. 57a3-23 Filed 08/09/17 Page 51 of 142

Page 50

1    get from here to -- get to July of 2016.  All of those other

2    steps, while they aren't in that column, it was all part of

3    the process of getting there.

4    Q    Okay.  So if I were to characterize the last column as

5    the engagement before the wedding, wouldn't it be fair to

6    characterize everything else prior to that as just dating?

7    A    No, I would not characterize it that way.

8    Q    Okay.

9    A    I would characterize it as we were in serious

10   negotiations trying to get the highest and best value for

11   the estate and trying to find a transaction that we felt

12   like was closable, executable through that entire process

13   and there was a lot of learning and so forth in that process

14   that, you know, again, ultimately we ended up with the Hunts

15   transaction stalling out and we started again.

16   Q    Started again.

17   A    Yeah.  We continued the process and started again to

18   sell (indiscernible).

19   Q    Okay.  If you would, please turn to Demonstrative

20   Number 2?

21   A    Sure.  I'm reading off this paper and you guys have

22   this fancy screen here, so...

23   Q    Is it on your screen as well?

24   A    Yeah, it's fine, but the paper's fine.

25   Q    So this looks to be more of a timeline, really starting

1  in May of this year and up through the end of August.  Is

2  that a fair characterization?

3  A    I would -- I would -- it says August 3rd here on the

4  Demonstrative, but ultimately, you know, we are where we

5  are.

6  Q    But just in terms of characterizing, this is really

7  just from May to August of this year?  That's all I was

8  trying to characterize.

9  A    Oh, you said -- I thought you said end of August.  My

10  apologies.  Yes.

11  Q    Well the only reason I said that is because that dark

12  green bar appears to go through August and I don't see a

13  September on there.  That's the only reason I characterized

14  it as such.

15  A    Okay.

16  Q    And so this seems to show critical steps, at least from

17  the Debtors' perspective, along the way from the beginning

18  of May through -- to August, including August?

19  A    Yes.

20  Q    And I guess the question is why does it start, first of

21  all, in May?  Is that because of the termination of the Hunt

22  deal?

23  A    Yes, sir.

24  Q    And --

25  A    So the focus is now of -- in that fourth column,

1    effectively, of the previous page.

2    Q    Okay.  So can you show me on this Demonstrative where

3    the increase occurs in the termination phase?  It would seem

4    to me that that would be a critical part of the negotiation,

5    right?  And as I understand it, at some point prior to it

6    being a $275 million termination fee, it was a $110 million

7    termination fee, isn't that correct?

8    A    That is correct, sir.

9    Q    Okay.  And is it sometime during this frame reference

10   that it changed from $110 million to $275 million?

11   A    Yes, sir.  July 27th, as you can see, increased to

12   market rate fee of $275 million.

13   Q    Right.  And so that's the increase from the $110

14   million to the $275 million?

15   A    That's correct.

16   Q    And what's special about that July 27th date in terms

17   of that increase, if anything?

18   A    I think, you know, with any negotiations you try to get

19   to a deadline and try to resolve all issues as, you know,

20   effectively as possible, and not one particular item is

21   necessarily the most important item.  You've got a mixing

22   bowl of issues that you continue to negotiate along the way.

23           I would say that we were at a point where we

24   expected to get the PLR.  The counterparty knew of that.

25   They were very anxious about signing the transaction.  We

 1   clearly wanted to lock up a transaction as well and take the

 2   market risk off the table.  And so, I think the timing of

 3   really the PLR put in -- there was some competitive pressure

 4   and trying to get this transaction signed as, you know,

 5   quickly as possible.  No -- anything brilliant or specific

 6   about that date and, you know, the break fee going to

 7   market, I would just say it's all part of the negotiations

 8   of all of those items simultaneously.

 9   Q    Underneath the timeline, the Demonstrative lists key

10   issues, including price, termination fee, (indiscernible),

11   and asbestos liabilities.  Those are highlighted.  And then

12   underneath that, I guess, are non-bolded other -- additional

13   conditions.  Is there any -- take any import to the

14   difference in there between, I guess, the green, are those -

15   - is that supposed to be sort of like a map key in that the

16   dark green recites the August issues, and the light green

17   recites, or references, the earlier time period?  I'm just

18   trying to understand --

19   A    I don't think so.  I think what we were trying to

20   demonstrate were that those top items were the key issues

21   that actually, as you got to that August timeframe, right,

22   that we were really trying to resolve.

23   Q    Mm hmm.

24   A    Now, maybe that was your question and I answered it

25   slightly differently, but yes, those were the items that

1    were, you know, really --

2    Q    Hot button issues at that time, effectively?

3    A    I would say hot button issues, yeah, sure.

4    Q    Okay.  In going through -- like I said, I spent the

5    weekend going through the exhibits.  And the one thing that

6    I noticed in the various incantations of this merger

7    agreement as it changed and morphed and developed during

8    this process that you talked about, was the characterization

9    initially -- well, initially, there was no mention of

10   asbestos specifically in that agreement.  Do you recall

11   that?

12   A    No, I don't.  I don't recall that.

13   Q    Okay.  So if I asked you to look at a specific section

14   of an earlier draft of this agreement, there wouldn't be a

15   Section 1.7 that talked about this accessible account, and

16   there would -- there would be only a Section 1.3 that talked

17   about an escrow?  And initially, that escrow was in the

18   amount of $50 million?  Initially it wasn't there at all,

19   and then it morphed into $50 million, and then at some point

20   it changed from $50 to $250, and now we're hearing that it's

21   back down to $100.

22   A    Generally, I'm familiar with that, yes.

23   Q    Okay.  And can you tell me was it NextEra that -- it

24   seemed in my review of it and looking at the drafts, and

25   seeing drafts that came from NextEra's attorneys versus

1    drafts that came from Kirkland's attorneys, it seemed that

2    it was NextEra that was pushing for the creation of this

3    escrow to address these asbestos liabilities?

4    A    Yeah.  Again, I would -- as I recall, NextEra, even

5    further back before, you know, we had this bar date, Nextera

6    was taking those liabilities.  But there was a holdback for,

7    you know, the reserve amount that we had on -- you know, on

8    our books, in terms of the way we were -- we were looking at

9    the liability.  I was told by NextEra sometime between that

10   May 23rd date and maybe a few weeks after that -- I can't

11   recall exactly --

12   Q    Of this year?

13   A    Of this year, yes, sir.

14   Q    Just so I'm clear.

15   A    And I'm looking at this timeline in 2016 --

16   Q    Okay.  Thank you.

17   A    -- for clarification.  "We're not taking asbestos.

18   We're not taking asbestos liability." And I said, "Okay."

19   And you know -- look, you've done enough negotiations, a guy

20   says something like that to you and you just make a little

21   note or write it down and we see where this goes.  And so --

22   so ultimately we continued to negotiate around this issue.

23   They did a lot of due diligence, as I described before.

24   They had a holdback, I think, of 50.  I'd have to look back

25   in the agreement.  I don't recall it specifically.

1           But ultimately, in -- on July 21st, what I recall

2      and what was, you know, probably the most important to me,

3      was they held back -- showed a hold-back of $200 million.

4      And they increased their bid by $50 million.  So, that was

5      kind of their -- the way they were going to handle that.

6           Of course, we're saying that's not acceptable from

7      a -- from a value perspective.  We're clearly trying to get

8      as much distributable value to the -- to the estate, to the

9      creditors throughout the entire state, including the EFH

10     blocks.  And so, you know, they backed out $200 million,

11     even though they increased their bid by $50 million.

12     Q    And that -- then that subsequently changed again?  Were

13     there subsequent conversations on that issue?

14     A    Oh, again -- the conversation, again, centered around

15     these key topics, price, which again, if you're looking at

16     the parenthetical, including distributable value, and all of

17     these items, we were trying to get to a closing point.  And

18     if you -- if you go to that July 27th date, NextEra assumes

19     these -- we'll take the asbestos liabilities, but we're

20     going to put $250 million in an escrow account and we're

21     going to increase our price by another $200 million, and

22     effectively have an offset of the escrow account and the

23     purchase price, which at that point in time allowed us to

24     clear the PIKs.

25           THE COURT:  Mr. Hogan, could I take a very short

```
 1    recess, if that's all right?

 2              MR. HOGAN:  Certainly.

 3              THE COURT:  Thank you.

 4              MR. HOGAN:  Yes, Your Honor.  Thank you.

 5    (Recess)

 6              CLERK:  All rise.

 7              THE COURT:  Please be seated.  Settle down, you

 8    all, we've got a program.  Let's go.  Mr. Hogan, you may --

 9              MR. HOGAN:  Just a few more questions, Your Honor.

10              THE COURT:  That's okay, that's fine.  Sorry for

11    the interruption.

12              MR. HOGAN:  No problem.

13    Q    Are you -- are you familiar with the standard in this

14    court regarding inducement and the need to demonstrate that

15    NextEra was induced to make an offer?  Are you familiar with

16    that characterization at all?

17    A    I don't know that I understand it from a legal

18    perspective.  My job is to induce them to make an offer as a

19    negotiator, but I don't know.

20    Q    Okay.  And so your testimony in that you have been

21    involved in the negotiations of the various offers that have

22    been made by NextEra over the pendency of this bankruptcy?

23    Isn't that a fair statement?  You've been involved in those

24    negotiations?

25    A    Yes, sir.  Yes, sir.
```

1    Q    And when NextEra first came to you -- is that a fair

2    characterization?  Did they first -- I mean, how is it that

3    you first engaged with NextEra?

4    A    Again, if you go back to the timeline, the first time

5    that we actually had access to the NextEra employee, Mr.

6    Hickson.  And let me just be specific.  It was in the

7    original Court hearing, day-1 hearing and -- I believe it

8    was the day-1 hearing.  And so from that -- from that

9    perspective, yeah, that was the first time that I had

10   interaction with NextEra.

11   Q    And they've been engaged entirely since that time?  Is

12   that a fair statement?

13   A    I wouldn't say entirely.  Clearly, there was a break

14   when we had approved -- the Hunt transaction consortium was

15   approved, and a period of time where we were supporting --

16   certainly supporting their transaction and, you know, trying

17   to get that closed.  There was a, you know, long period of

18   time when there was no communication or interaction.

19   Q    And then all of a sudden you guys were dating again at

20   some point, using my characterization?

21   A    I like Mark Hickson a lot, but I don't -- I wouldn't

22   characterize that I was dating him, so...

23        (Laughter)

24   Q    Fair enough.

25   A    No, if we were using your -- and I know what you're

1    saying.  I didn't mean to poke fun at you.  Yeah, okay, so

2    we went back, you know, first part of, you know, May and

3    reengaged.  We were in negotiations with NextEra.

4    Q    Amongst other parties as well, presumably?

5    A    Yes, amongst other parties.  Clearly we reached -- we

6    went -- we had Evercore reach out again to a number -- I

7    can't tell you precisely but, you know, in the

8    (indiscernible) -- other potential buyers.

9           Surprisingly, we had a lot of NDAs signed and a

10    tremendous amount of due diligence early on.  And ultimately

11    the buyer started falling to the wayside and we were once

12    again engaged, as you would term, we were engaged in

13    negotiations with NextEra, as well as, you know, one or two

14    other counterparties.

15    Q    Berkshire Hathaway being one of the other?

16           MR. MCKANE:  Objection, Your Honor.

17           THE COURT:  Mr. Hogan, there's a confidentiality

18    agreement in place here.

19           MR. HOGAN:  Excuse me, Your Honor.

20           MR. MCKANE:  There's a confidentiality in place

21    that -- and Mr. -- all creditors are on notice of this that

22    they cannot disclose the names of the other bidders.

23           THE COURT:  Don't disclose the names of the other

24    bidders.

25           MR. HOGAN:  I didn't mean to, Your Honor.  It was

Page 60

1    clearly a mistake on my part.

2           THE COURT:  All right.  Let's be more careful.

3           MR. HOGAN:  Thank you.

4    Q    Could I turn you to the Demonstrative Number 3, please?

5    A    We'll just characterize them Debtor B and I won't --

6    Q    That's fine.

7    A    -- confirm that or not.

8    Q    That's fine.  Thank you.  If you would, turn to

9    Demonstrative Number 3, please?

10   A    Sure.

11   Q    Could you just speak to the purpose of this

12   Demonstrative?

13   A    Sure.  Clearly, when -- anytime you're doing a

14   transaction, you like to know where you are relative to

15   what, you know, what is the norm, what's the standard.  And

16   you deal with the market enough, the market speaks; the

17   counterparty with whom you are negotiating, they know what

18   market is.  And I think what we're trying to outline here --

19   and this was prepared by Evercore, and I clearly had

20   conversations with Evercore over, you know, the period of

21   time of the negotiations and what is an appropriate, or a

22   market-based, break fee.

23           And so what we effectively have done here is

24   characterized -- or what Evercore has done here is given us

25   an indication of what is, you know, effectively the average,

```
 1    the mean, the range of potential termination fees.

 2    Q    Okay.  And is the -- is the Hunt deal on here?

 3    A    I don't see it, no.

 4    Q    And the Hunt deal had a termination fee as well, did it

 5    not?

 6    A    It did.

 7    Q    Thank you, Mr. Horton.

 8         MR. HOGAN:  I have no more questions, Your Honor -

 9    -

10         THE COURT:  Thank you.

11         MR. HOGAN:  -- for this witness.

12         THE COURT:  Anyone else wish to cross-examine the

13    witness?  All right.  Redirect?

14         MR. GANTER:  No, Your Honor.

15         THE COURT:  All right.  Thank you, Mr. Horton.

16         MR. HORTON:  Thank you.

17         THE COURT:  Yes.

18         MR. ECHOLS:  Good morning, Your Honor.

19         THE COURT:  Good morning.

20         MR. ECHOLS:  Barack Echols, Kirkland & Ellis, on

21    behalf of the Debtors.  At this point in time, Your Honor,

22    the Debtors would like to proffer the testimony of William

23    Hiltz, the Senior Managing Director in Evercore's Corporate

24    Advisory Business and head of the General Advisory Group.

25         THE COURT:  Any objection to the use of a proffer?
```

1          MR. HOGAN:  None, Your Honor.

2          THE COURT:  Thank you.

3          MR. ECHOLS:  And Your Honor, Mr. Hiltz is here in

4    the courtroom and available to testify today.  If called to

5    testify, Mr. Hiltz would explain that he has been with

6    Evercore since 2000, but he's been working in investment

7    banking for 40 years now.  He was previously head of a

8    global energy group at UBS Warburg, and also with Dillon

9    Read, head of the Energy Group at Dillon Read.

10          He's worked on numerous M&A transactions,

11    including FMC Corporation's pending merger with Technip,

12    CVS's acquisition of Omnicare, Broadcom's sale to Avago, as

13    well as many others over the course of time.

14          Similarly, he has worked on a number of

15    restructuring matters, including General Motors, CIT,

16    Northwest Airlines, Continental Airlines, and Eastern

17    Airlines, among others.

18          Mr. Hiltz would tell you that he received his A.B.

19    in History and Government from Dartmouth and an M.B.A. from

20    the Wharton School at the University of Pennsylvania.

21          Specifically, with respect to this retention,

22    Evercore was retained in 2012 to evaluate EFH's future cash

23    flows and the value of its subsidiary entities, and to

24    advise its management team and board with respect to

25    restructuring alternatives.  And Mr. Hiltz's primary role

1   with respect to those negotiations was for marketing the E-

2   side Debtors' economic interest in Encore.  And of course,

3   of those negotiations, he dealt closely with the Debtors'

4   advisors and the board and attended most of the board

5   meetings and provided advice in the context of those

6   meetings.

7           His principal activity in the case began in late

8   August 2014.  Once the RSA terminated, he and his team

9   stepped in to leave the Oncor marketing process.  As he

10  would explain, his team ran the bidding and stalking horse

11  process and handled all of the logistics, communicated and

12  negotiated with potential bidders.

13          They reached out to more than 50 potential

14  bidders, including both strategic and financial interests,

15  17 of which signed NDAs, and gained access to the electronic

16  data room.  They coordinated regular diligence calls and

17  meetings and the most interested bidders met with Oncor

18  management.  And this process continued into the spring of

19  2015.

20          NextEra, during the course of these negotiations,

21  emerged as the lead bidder, but the Debtors' position and

22  Evercore's advice was that its round 1 price was too low and

23  they pushed NextEra to increase its bid.  They believed its

24  bid in round 2 was still too low and continued to push

25  NextEra to increase its price.

1           However, because of a change in interest rates

2    shortly before NextEra was to be selected as a stalking

3    horse, they dropped their bid by $900 million.  And that led

4    to the Debtors' changing their focus to the negotiations

5    that led to the Hunt plan.

6           Mr. Hiltz then became reengaged in the process

7    once the Hunt plan failed to come to fruition, and he and

8    his team immediately refreshed the Oncor marketing process

9    and contacted interested parties.  They contacted 18

10   potential strategic and financial bidders, most of which had

11   previously shown an interest -- shown interest, but one

12   additional one also indicated interest.  Sent out 15 process

13   letters, had eight NDAs signed up, and NextEra and three

14   other bidders expressed serious interest.  As these

15   proceeded, it ended up that NextEra and one other bidder,

16   bidder number 2, progressed to definitive documentation.

17          Throughout the process, Mr. Hiltz and Evercore,

18   the Debtors and counsel, used the multi-bidder process to

19   play these offers one against another, and this was with

20   respect to all provisions, including the purchase price, the

21   size of the break fee, and all other terms.

22          Specifically, with respect to these most recent

23   negotiations, Mr. Hiltz would testify that he was the

24   primary point of contact with bidder number 2.  And his

25   contact at the bidder was the CEO there.  There were also

1    additional contacts on behalf of the Debtors with the CFO

2    and the GC, but throughout the course of his dealings with

3    bidder number 2's CEO, the thrust was to drive as much in

4    price and distributable value that he could.

5           As between NextEra and bidder number 2, each of

6    the entities had different focuses of non-price issues.

7    NextEra was focused on asbestos issues, which Mr. Hiltz was

8    aware of; bidder number 2 had some concerns with the tax

9    indemnification issues.  But all of these were played off

10   one against another.  Bidder number 2 did have a break fee

11   in its proposal, and although there were numerous attempts

12   to have that break fee be negotiated at a lower level of

13   $100 million, $110 million at first, $220 million, bidder

14   number 2's break fee was at $350 million, and they refused

15   to budge from that amount until just the very end of July,

16   when they, in this ongoing competition, agreed to drop to

17   $275 million to meet the NextEra break fee level.

18          The size of the break fee relative to the size of

19   the transaction here is also something that Mr. Hiltz

20   consulted with the Debtors about.  Prior to the transaction

21   being signed up, he and Mr. Keglevic discussed whether the

22   $275 million break fee was considered reasonable, based on

23   market comparables, whether viewed as a percent of TEV or

24   equity, and Mr. Hiltz's initial conclusion was, yes, that it

25   was.  And in connection with preparing a declaration he

1    submitted to Your Honor for purposes of this motion, Mr.

2    Hiltz did a more detailed analysis, which we had up a moment

3    ago.  And if we could put up again, he has prepared a

4    Demonstrative here, D-Dem-3.

5            And what Mr. Hiltz would explain here is that he

6    has taken each and every transaction and (indiscernible)

7    publicly-traded utility companies since 2012.  And compared

8    the amount of the break fee as a percent of the total

9    enterprise value.  And as you can see from the

10   Demonstrative, out of all the 16 transactions, the proposed

11   transaction here with NextEra is tied as the second lowest.

12   There's only one that's lower out of all of these since

13   2012.

14           And Mr. Hiltz would also direct Your Honor to

15   approximately six bars in from the right.  You will note

16   there is another NextEra transaction which took place there,

17   which was the attempted acquisition of Hawaiian Electric

18   Industries, and the break fee for the target there was 2.1

19   percent, 40 percent higher than the break fee that NextEra

20   is agreeing to in this transaction.

21           Although this analysis relates strictly to

22   publicly-traded utility companies, Mr. Hiltz also looked at

23   this across all industries, and the mean and median of break

24   fee as a percentage of TEV across all industries, was 2.7

25   percent.  Again, much higher than the 1.5 percent here, and

1   if viewed as a percentage of equity, it would be 2.8

2   percent, whereas looking at it as a percentage equity for

3   publicly-traded targets, the mean break fee is 2.9 percent

4   and the median is 3 percent.  So, in any respect that this

5   is viewed, its within or better than the market comparables

6   for break fees in recent transactions.

7           Based on this analysis and his involvement in all

8   the negotiations during the course of this case, Mr. Hiltz

9   would testify that he has advised the Debtors that this

10  break fee is reasonable, particularly given the interest

11  rate risk, you know, which already he had experience with in

12  the past, based on a deal of this size and complexity,

13  regulatory uncertainty, and the fact that the bidder number

14  2 had also demanded a break fee as well.

15          At this point, I pass the witness.

16          THE COURT:  Yes.  I'm sorry.  I'm thinking

17  something.  Let's -- Mr. Hiltz, take the stand.

18          CLERK:  Please raise your right hand.  Do you

19  affirm (indiscernible) you will tell the truth, the whole

20  truth, and nothing but the truth, to the best of your

21  knowledge and belief?

22          MR. HILTZ:  I do.

23          CLERK:  Please state and spell your name for the

24  record.

25          MR. HILTZ:  William, last name Hiltz, H-I-L-T-Z.

1          CLERK:  Thank you.

2             CROSS-EXAMINATION OF WILLIAM HILTZ

3    BY MR. HOGAN:

4    Q    Good morning.

5    A    Good morning.

6    Q    You heard your proffer?

7    A    Yes.

8    Q    You were retained in 2012.  You valued --

9    A    No.  Evercore was retained in 2012.

10   Q    My apologies.  Evercore was retained and you work for

11   Evercore?

12   A    Right.

13   Q    You represent Evercore?  One of the things you were

14   required to do there was to value the various E-side

15   subsidiaries.  That was part of the proffer.  Do you

16   remember that characterization?

17   A    Yes.

18   Q    And one of the issues that the asbestos creditors have

19   been focused on from the get-go in this case relates to --

20   would have been characterized as the asbestos debtors.  Do

21   you know which entities I mean by that?

22   A    I'm not sure.

23   Q    EECI, Inc.; EEC Holdings; LSGT Gasrock -- or SACROC,

24   excuse me -- and then LSGT Gas Company, LLC.  Those are --

25   A    I'm not familiar with those.

1    Q    You're not familiar with those entities?  And so in

2    terms of the characterization that you conducted an

3    evaluation of the subsidiaries of the E-side Debtors, it

4    would be fair to say that did not include a valuation of

5    those entities?

6    A    No, I can't speak to that.  Evercore conducted

7    valuation, but my involvement in the case, as was stated in

8    my proffer, is primarily in the marketing of the Oncor

9    entities.

10   Q    Okay.

11   A    I know Evercore has done valuation work that I'm not

12   familiar with.

13   Q    Okay.  And just because I heard that and wrote that

14   down as part of your proffer that you were involved the

15   valuation of those E-side subsidiaries, I just wanted to --

16   A    No, I don't think that's what my proffer actually said.

17   Q    Okay.  That's fine, because you understand that if --

18   that's -- and you could understand why I might be interested

19   in that.  So you marketed -- you marketed the E-side

20   Debtors.  And you've seen the Demonstrative.  If you could -

21   -

22   A    Yes.

23   Q    -- I'd like you to look at the other Demonstrative up

24   there.

25   A    Oh, that's not up there.

1  Q    Look at Debtors' Demonstrative Number 1, if you would

2  please?

3  A    Yes.

4  Q    And as you probably heard me cross examine the last

5  witness, Mr. Horton, I attempted to elicit from him a

6  characterization of these various columns as different

7  deals.  Would you agree with that characterization?

8  A    I would not agree that the February, June 2015 and May,

9  July of 2016 are different transactions, no.

10  Q    So, the June to June to mid-July 2014, that clearly is

11  a different transaction?

12  A    Yes, the 2014 columns are a different transaction.

13  Q    Okay.  And then, obviously, the fourth column, the Hunt

14  deal, is entirely different also.

15  A    Correct.

16  Q    And so your testimony is that the February to June 15

17  and the May to July 16 are essentially a continuum?

18  A    Not a continuum.  There was obviously a break, but I

19  certainly feel they are related I wouldn't describe them as

20  "separate transactions."

21  Q    You heard Mr. Horton testify that he was essentially

22  one of the negotiators as it relates to EFH vis-à-vis

23  NextEra and trying to get this deal together.  Is that a

24  fair statement?

25  A    That's correct.

1    Q    And what was your role relative to that?

2    A    Well, when we began negotiations with NextEra,

3    certainly in the first box, the 2015 timeframe, and then

4    again early in the 2016 timeframe, we tended to have a very

5    large group involved in every negotiation.  There were some

6    20 people in the room every time we sat down, lots of

7    lawyers, lots of company people, and some investment

8    bankers.  And I think the conclusion that we reached was

9    that that process was not effective.  We were not making

10   progress on the issues.

11          And so we evolved into a much tighter negotiating

12   team, and the primary line of communication with NextEra was

13   twofold.  Tony with Mark Hickson and Andy Calder from

14   Kirkland & Ellis with the general counsel of NextEra.  So,

15   for the book of June, July and August, I had no real direct

16   interaction with NextEra in terms of negotiation.  I didn't

17   sit in the room as I had earlier in the process.  We

18   certainly discussed where we were on major issues with

19   NextEra.  And again, my focus was primarily on managing the

20   negotiation with bidder number 2, because that was the most

21   effective line of communication with bidder number 2.

22   Q    Okay.  Back to the characterization about valuing the

23   E-side Debtors and what have you, you didn't have any

24   involvement in that specifically, but Evercore did, I think

25   your testimony was.  Is that correct?

1    A    Yes.

2    Q    What about the determination of the asbestos

3    liabilities?  Did you have any involvement in that

4    determination whatsoever?

5    A    No.

6    Q    Did you have any discussions with anybody about the

7    changes that were made to the asbestos provisions of the

8    merger agreement during the pendency of this period that --

9    A    Certainly.

10   Q    And if you can, characterize those for me.

11   A    Well, again, I think that, you know, different bidders

12   looked at the asbestos liability differently.  For example,

13   bidder number 2 wasn't troubled by the asbestos liability.

14   They were prepared to assume that liability.

15          NextEra, on the other hand, was quite troubled by

16   the asbestos liability.  And my impression is that NextEra

17   was concerned in the manner that many public companies are

18   concerned, that assuming an asbestos liability, particularly

19   with a large nominal number of cases, would be viewed

20   negatively by their investors.  And certainly, the company's

21   carrying value of that liability was below what NextEra

22   thought the potential exposure was.

23          So, at first, NextEra was refusing to assume the

24   asbestos liability at all.  And, you know, that would have

25   been problematic in terms of getting a transaction done with

1    NextEra because there was no real way of handling it.

2            So, then we got to the point where NextEra said,

3    okay, you know, we'll have a reserve of some sort.  And I

4    believe the initial $50 million was suggested by us as a

5    number.  I'm not -- I'm not sure.  But obviously, they then

6    came back with this $250 million reserve.

7        Now, again, let's be clear.  With that reserve, NextEra

8    was assuming the liability, so the reserve had little impact

9    on your clients.  You have an investment break rate and a

10   $60 billion company assuming the liability, and so the

11   reserve was really there for NextEra to be able -- not a

12   seque, but my understanding is that that would allow them to

13   keep the asbestos liability off their books by having that

14   reserve.

15   Q    And so, just from a mechanical --

16   A    Right.

17   Q    How is it going to work?  How is that reserve going to

18   work?  We've heard today that it's now $100 million and --

19   A    Correct.

20   Q    -- not $250 million.

21   A    Correct.

22   Q    But explain to me, post-confirmation, post-effective

23   date, how is that reserve supposed to work, if you know?

24   A    My understanding is that that reserve sits there.  I

25   can't recall the period of time.  That money can be used by

 1    NextEra to pay claims, and at the end -- and again, I can't

 2    recall the time period -- the balance is either returned to

 3    the estate, or I believe it could actually be given to

 4    charity.

 5    Q    And if I said it was -- at the end of 50 years, would

 6    that refresh your recollection about what that period is?

 7    A    No, it wouldn't.

 8    Q    Okay.  The -- that asbestos pool, that money that's set

 9    aside --

10    A    Mm hmm.

11    Q    -- was any -- did you -- were you involved in any

12    conversations or any dialogue with anybody about whether

13    that pool of money would be made available for individuals

14    who later manifested a claim, and who had filed a claim?

15    A    I was not involved in any discussions on that.

16    Q    If I could, I want to direct your attention to D-Dem-3.

17    Are you there?

18    A    Yes.

19    Q    And you had some involvement in the creation of this

20    Demonstrative?

21    A    I mean, it was created at my direction, but I did not

22    create it myself, so (indiscernible).

23    Q    Fair enough.  You -- these deals that are listed are

24    deal that went through or blew up?

25    A    I believe that they were deals that -- well, obviously,

```
1    Hawaiian Electric didn't go through, so no, I guess they

2    didn't all go through.

3    Q    That's the NextEra Energy 2014 deal, correct?

4    A    Yes, correct.

5    Q    But most of these, or some of these deals actually went

6    through and didn't blow up?

7    A    I believe they all went through.

8    Q    With the -- with that --

9    A    With the exception of --

10   Q    With that one --

11   A    That's the only --

12   Q    -- one exception?

13   A    That's the only one that I know --

14   Q    Right.

15   A    -- that did not go through.

16   Q    And so wouldn't a better -- wouldn't a better

17   Demonstrative -- and tell me if I'm wrong; you can disagree

18   with me -- but wouldn't a better Demonstrative, if you are

19   trying to justify these break-up fees, be a listing of deals

20   that did blow up and what was actually paid out?

21   A    No, I don't think that's true at all.

22   Q    And why is that?

23   A    Why is that?

24   Q    Yeah.

25   A    Because we're talking about what is the market for a
```

1  negotiated break fee.  And again, you would look at all

2  transactions when you're looking at what's the market for

3  negotiating a break fee.

4          And again, in addition to this, which is just

5  utility transactions, as was stated in my proffer, we also

6  looked at all transactions for the last five years of a size

7  ranging from $5 billion to $15 billion of equity value, and

8  the midpoint of those is 3 percent.  And I believe the fee

9  is a percentage of equity value.  As we sit here today for

10 this transaction it's 2.8 percent.  And that's 50 some odd

11 transactions.

12 Q    And so the purpose of negotiating this break-up fee --

13 one of the purposes is in the unlikely event that the deal

14 isn't consummated and EFH enters into another transaction,

15 that the termination fee will be paid to, in this case

16 NextEra --

17 A    Correct.

18 Q    -- because of all their efforts up to that point in

19 trying to make the deal work?  Is that a fair

20 characterization?

21 A    I'm not sure I would characterize it as in compensation

22 for "all of their efforts."  It's for a variety of things;

23 the commitment of capital, opportunity costs as they sit

24 there pursuing this as opposed to other things.  There are a

25 variety of factors that I think would enter into why you

1    would pay a break fee.

2    Q    And included in those factors likely would be an

3    assessment of the liability and the assessment about whether

4    the plan would actually be confirmed that the merger

5    agreement is predicated upon.  Isn't that a --

6    A    State that again?

7    Q    So you agree with me that the plan of -- the plan that

8    is being proffered in this case is an exhibit to the merger

9    agreement.

10   A    Yes.

11   Q    And a condition of the merger agreement is that that

12   plan has to be consummated?

13   A    Correct.

14   Q    And that if that plan isn't consummated and another

15   plan is drawn up or otherwise proffered by the Debtors, or

16   they do a deal with someone else, that the termination fee

17   will have to be paid?

18   A    Correct.

19   Q    And so, included in that is a calculus or a

20   determination about the likelihood of the confirmation of

21   that current plan?  Wouldn't you agree?

22   A    I would.

23            MR. HOGAN:  I have no more questions.  Thank you,

24   Your Honor.

25            THE COURT:  I have a couple.  Given -- there was

1    in your proffer about execution risk going into negotiating

2    the break-up fee, so I just want to make sure I understand.

3    Or that there are -- if the Court confirms the plan, and by

4    that I mean the one on the table here, or the NextEra deal,

5    and that plan does not consummate because of a failure to

6    achieve regulatory approval, is the break-up fee payable?

7            MR. HILTZ:  If the Debtor enters into another

8    transaction, the answer is yes.

9            THE COURT:  But if this transaction simply falls

10   apart because you don't get regulatory approval from the

11   Public Utility Commission?

12           MR. HILTZ:  Well, again, I think if the Debtor

13   enters into another transaction including a reorganization

14   involving its own creditors --

15           THE COURT:  All right, so --

16           MR. HILTZ:  -- it would be payable.

17           THE COURT:  So I -- because if this plan gets

18   confirmed for Debtors -- not anything the Debtors do wrong,

19   they don't get the regulatory approval they need -- this

20   falls apart and a year and a half from now they confirm a

21   different plan that's not even a sale plan, say it's a

22   standalone plan, that break-up fee would be payable?

23           MR. HILTZ:  I believe so.

24           THE COURT:  Okay.  I had another question.  I had

25   a little bit of a colloquy with Mr. Horton about who's

```
 1   actually assuming the asbestos liabilities, and I think the
 2   point of that question's pretty clear.  The Court's
 3   concerned that there's an assumption of liabilities, but
 4   it's being siloed in some sort of entity that doesn't have
 5   sufficient assets to pay those liabilities.  So can you give
 6   me some clarification --
 7             MR. HILTZ:  My under- --
 8             THE COURT:  Your understanding of --
 9             MR. HILTZ:  My understanding --
10             THE COURT:  -- the assumption of those
11   liabilities.
12             MR. HILTZ:  -- is that NextEra parent is assuming
13   those liabilities.
14             THE COURT:  And the parent is the --
15             MR. HILTZ:  The $60 --
16             THE COURT:  -- entity that's --
17             MR. HILTZ:  The $60 billion --
18             THE COURT:  -- wroth $60 billion.
19             MR. HILTZ:  -- public company.  Correct.
20             THE COURT:  Okay.  Thank you.
21             Mr. Horton -- excuse me -- Mr. Hogan, anything I
22   said, you can follow up with if you wish.
23             MR. HOGAN:  I'm fine.  Thank you, Your Honor.
24             THE COURT:  You're welcome.  Very good.  Redirect?
25             MR. ECHOLS:  No redirect, Your Honor.  Excuse me
```

Case 14-10979-CSS   Doc 9663   Filed 09/21/16   Page 80 of 141

Page 80

```
 1    one second?

 2              THE COURT:  Yes.  Would you like a recess, Mr.

 3    Echols?

 4              MR. ECHOLS:  Yes, if we can take a short break,

 5    Your Honor.

 6    (Recess)

 7              CLERK:  All rise.

 8              THE COURT:  Please be seated.  You may proceed.

 9              MR. ECHOLS:  Yes, Your Honor.

10                REDIRECT EXAMINATION OF WILLIAM HILTZ

11    BY MR. ECHOLS:

12    Q    Just to clarify something that seemed like it may have

13    been a little bit muddled in the record.  If I could ask

14    you, Mr. Hiltz, please to look to Binder 1 of the exhibits

15    that you have there, Tab 1, which is Debtor's Exhibits,

16    Volume 1 of 4, Tab 1 --

17    A    Yes.

18    Q    -- which is the motion of the Debtors.  And if you'd

19    flip back to the page that's at the top left-hand side, it's

20    Page 174 of 429?

21    A    174 of 429?

22    Q    It says on the very -- on the top part from the Court

23    filing number.

24    A    Okay.

25    Q    Okay.
```

```
 1              MR. ECHOLS:  And Your Honor, are you at the

 2    same...?

 3              THE COURT:  I think so.

 4              MR. ECHOLS:  Okay.

 5    Q    The section here of the plan that has Arabic number 3,

 6    Class A-3 legacy, general unsecured claims against the EFH

 7    Debtors?  Are you there?

 8    A    Yes.

 9    Q    Okay.  Now, for the -- you understand that the legacy

10    general unsecured claims against the Debtors here includes

11    the asbestos claimants that Mr. Hogan was questioning you

12    about?

13    A    Yes.

14    Q    Okay.  And is it correct, does this refresh your

15    recollection, that the claims by the asbestos claimants are

16    being reinstated at the level of the reorganized Debtors?

17    Is that your understanding?

18    A    Yes.

19    Q    And this -- the Court had asked a couple of times

20    whether this was going to be backed by just a holding

21    company or a shell or something of that sort, but isn't it

22    the case that this is the reorganized Debtor entity that

23    will have an equity value of $12 billion and $4.4 billion of

24    cash, correct?

25    A    Correct.
```

1  Q    And is it in fact your understanding that the asbestos

2  claimants' claims are to be paid in full?

3  A    Yes, it is.

4  Q    Okay.  Thank you.

5           MR. ECHOLS:  No further questions.

6           THE COURT:  I actually have a question.  I want to

7  follow up because I pulled the (indiscernible) -- well, I

8  didn't pull, Ms. (indiscernible) has pulled the merger

9  agreement to help me out here.  And this goes to when the

10 break-up fee is payable in the event there is a regulatory

11 problem.

12          So, I'm looking at 8.5, I believe?  Do we have a -

13 - does he have an exhibit that has the merger agreement in

14 it?

15          MR. ECHOLS:  It's in Exhibit 1, Your Honor.

16          THE COURT:  Okay.  If you could look at Page...

17 Okay.  Page 111 of 429?  You got that?

18          MR. HILTZ:  I'm incorrect in my statement earlier.

19          THE COURT:  Okay.  I'm going to get that on the

20 record.  Okay, so looking at Subsection B there, it says

21 that -- I believe it says that the termination fee will not

22 be payable if this agreement is terminated (indiscernible)

23 by parent --

24          MR. HILTZ:  Yes.

25          THE COURT:  Pursuant to Section 8.2(a) and the

1   receipt of the PUCT approval is the only condition set forth

2   in Article 7 not satisfied or waived in accordance with this

3   agreement.  So, I read that to be is -- and maybe -- is this

4   your understanding that plan gets confirmed, they go to the

5   PUCT, the PUCT shuts it down, and NextEra -- or it sets

6   terms on it that NextEra doesn't like, and NextEra

7   terminates, that the break-up fee is not payable?

8           MR. HILTZ:  That's the way I would read it.

9           THE COURT:  Okay.  And that's your understanding?

10          MR. HILTZ:  Yes.

11          THE COURT:  Okay.  All right, Mr. Hogan.  Mr.

12   Husnick?

13          MR. HUSNICK:  Your Honor, I would --

14          THE COURT:  I got that wrong, didn't I?

15          MR. HUSNICK:  There is one clarification, Your

16   Honor.  The parenthetical in the section -- you're in the

17   right section; you're 100 percent right about if the PUCT

18   denies approval.  But one thing you said is if the PUC

19   imposes certain conditions, there's a very detailed

20   definition of what constitutes a burdensome condition.

21   That's a very hotly negotiated probation in the regulatory

22   world.

23          IF the PUC were to impose a burdensome condition

24   on the deal, even though they approved it, that would still

25   trigger the break-up fee.  That's what was the parenthetical

```
1    --
2             THE COURT:  That would trigger the break-up fee?
3             MR. HUSNICK:  Yes, sir.
4             THE COURT:  All right.  So if they simply
5    disapprove and the parent -- and NextEra walks, no break-up
6    fee?
7             MR. HUSNICK:  Correct.
8             THE COURT:  If they impose a burdensome condition
9    and NextEra walks, there is a break-up fee?
10            MR. HUSNICK:  Correct.
11            THE COURT:  Hmm.  Okay.  I just wondered if
12   it's...  All right.  Mr. Hogan.
13            MR. HOGAN:  Just briefly, Your Honor.
14            THE COURT:  Yes, of course.
15                 RECROSS-EXAMINATION OF WILLIAM HILTZ
16   BY MR. HOGAN:
17   Q    Sir, if you could, I'd ask you to turn back to Page 174
18   of 429, which is part of that Exhibit 1 that we've just been
19   rifling through?  And this relates to the Class A-3
20   treatment.
21   A    Yes.
22   Q    You recall, earlier during some questioning that the
23   Court raise regarding the treatment of the asbestos claims,
24   you had testified that who's assuming the liability
25   ultimately, it's (indiscernible) the parent.  And do you
```

1   still stand by that characterization?

2   A    No.  Evidently that was incorrect.

3   Q    Okay.  And so who is it that ultimately these claimants

4   will look to?

5   A    The reorganized entity?

6   Q    The reorganized entity?  And who will control that

7   reorganized entity?

8   A    NextEra.

9   Q    But for purposes of looking to -- looking for recovery

10  as an asbestos claimant, those individuals are only going to

11  be able to look to the reorganized entity for satisfaction

12  of those claims.  Isn't that correct?

13  A    Yes.

14  Q    And not NextEra?

15  A    That's the way I read it here.

16  Q    All right.  Thank you.

17           MR. HOGAN:  No more questions.  Thank you, Your

18  Honor.

19           THE COURT:  You're welcome.

20           MR. ECHOLS:  No further questions, Your Honor.

21           THE COURT:  All right.  Thank you, sir.

22           MR. ECHOLS:  Thank you.

23           MR. HUSNICK:  I think we're ready to close the

24  evidentiary case then, Your Honor.

25           THE COURT:  All right.  Mr. Hogan, do you have any

1    witnesses?

2              MR. HOGAN:  I do not, Your Honor.

3              THE COURT:  I'm just checking.

4              MR. HOGAN:  Thank you, Your Honor.

5              THE COURT:  All right.  Very good.  Evidentiary

6    record's closed.

7              MR. HUSNICK:  Would you like to move right into

8    closing?

9              THE COURT:  Yep, let's get it done.

10             MR. HUSNICK:  Okay.  May I publish my

11   presentation?

12             THE COURT:  Yep.

13             MR. HUSNICK:  Thank you, Your Honor.  Chad Husnick

14   from Kirkland & Ellis again, on behalf of the Debtors.  Your

15   Honor, I'll try and be as brief as I possibly can.

16             There's a little bit of repetition to what I said

17   at the very opening, but let me say what we're not seeking

18   today.  We're not seeking confirmation of the plan and were

19   not asking that they not -- Your Honor rule on certain of

20   the issues that I believe have been raised through the cross

21   as well as will be raised in argument related to the

22   treatment of asbestos claims.

23             What we are seeking is authority to enter into the

24   plan support agreement and the merger agreement that sets us

25   on the path to emergence and that allows us to continue to

1    move this case forward.

2              As part of that, Your Honor, we are, of course,

3    seeking approval of the $275 million termination fee.

4    That's inclusive of professional fees and expense

5    reimbursement.

6              The Debtors are not, however, seeking to allocate

7    that $275 million amongst the two estates, and this is very

8    important to certain of the resolutions that I announced

9    earlier today.  Any allocation of the $275 million by and

10   among EFIH on one hand and EFH on the other is an issue

11   reserved for a day if it ever becomes relevant or it ever

12   becomes a real issue.

13             Your Honor, I summarized this morning the recent

14   updates.  I think it's worth mentioning once again that as a

15   result of the negotiations over the weekend, we have an

16   increase of $450 million in distributable value, quadrupling

17   the potential recoveries for the EFH creditors.  That comes

18   as a result of a $300 million bid increase, purchase price

19   increase, and a release of $150 million from the asbestos

20   escrow account.  And I'm going to come back to that in a

21   second, based on the testimony.

22             Fidelity, as a result, is going to sign the plan

23   support agreement, and we have in the court now the finalize

24   plan support agreement involving adding Fidelity to the

25   document.

Case 14-10979-CSS    Doc 9663    Filed 09/21/16    Page 88 of 141

Page 88

```
 1              THE COURT:  Does this -- do I understand -- I
 2    understand they're not signing it, but do I understand that
 3    this change compromises or settles issues, any issues the
 4    indentured trustee or Contrarian might have with the plan?
 5              MR. HUSNICK:  What it -- no.  What it does is it
 6    resulted in a withdrawal of the objection to the motion
 7    before Your Honor today.  The plan support agreement
 8    contains an obligation for Fidelity to direct the indentured
 9    trustee to take action consistent with the direction.
10    Although it does not require Fidelity to provide an
11    indemnity, it does require the direction.  So that -- it
12    does not resolve plan objections per se.
13              THE COURT:  All right.
14              MR. HUSNICK:  It does -- as I said, Fidelity, EFH
15    indentured trustee and Contrarian will be withdrawing their
16    -- or have withdrawn their objections for today.
17              Let me spend a minute -- because I think there was
18    some confusion on -- and I think we got it clarified here at
19    the end, but just talking about the treatment of the
20    asbestos claims under the document.  That hasn't changed,
21    Your Honor, from the moment we signed the plan support
22    agreement and the merger agreement to today.
23              The treatment of the asbestos claims is they are
24    being reinstated at the Debtor at which they sit.  If it's a
25    claim against EFH, it's reinstated at reorganized EFH.  If
```

1   it's a claim against the asbestos subsidiaries or the

2   subsidiaries with asbestos liabilities, their claim is at

3   those entities.  That's where they're being reinstated.

4          What's also being reinstated under the plan that's

5   attached to the plan support agreement are the intercompany

6   claims.  And just with -- just as we did with Your Honor

7   when we spoke at the Hunt confirmation trial, those claims

8   are being reinstated.  And that provides the source of the

9   recovery up to the EFH.

10         We will have an opportunity to go through in a

11  great level of detail at confirmation about how that works

12  and how that's feasible, and we'll the record exactly how we

13  did in the first confirmation hearing.

14         But suffice to say, NextEra is putting in, as you

15  heard from Mr. Hiltz, $4.4 billion of cash.  That's going to

16  sit in; that's an equity investment that's going to sit

17  behind these liabilities that's it at EFH and at certain of

18  the asbestos-owning subsidiaries.

19         The fact that NextEra is taking on the balance

20  sheet of EFH and setting aside some cash to be used to pay

21  asbestos liabilities is really an accounting mechanism, as

22  you heard from Mr. Hiltz, on the NextEra side and the post-

23  reorganized balance sheet.  It does not alter the obligation

24  of the reorganized Debtors to pay the asbestos claims when

25  and if they come due.  That is always going to be an

 1  obligation of those entities and that's an obligation that's

 2  going to have to be satisfied with those entities if the

 3  equity investment that NextEra has made into the reorganized

 4  Debtors is to be worth anything going forward.

 5              That, Your Honor, I think is a very, very

 6  important point and one that makes clear that the asbestos

 7  liabilities here are going to be paid going forward and they

 8  truly are going to be unimpaired.  But we will be prepared

 9  to demonstrate that at confirmation.

10              Your Honor, the second thing I wanted to clarify

11  was just the break fee.  I think we are on the same page now

12  about when that gets paid, but just to cover it one more

13  time, it's an incredibly detailed provision.  Suffice to say

14  there's no break-up fee if the PUC just denies -- outright

15  denies approval.  But if the PUC imposes the burdensome

16  condition, which is a significant hurdle, there is a -- a

17  break-up fee is triggered.  But that's a highly negotiated

18  provision and it's very typical in the utility industry for

19  that type of a provision to exist.

20              Your Honor, that takes me to the objections and

21  kind of how we -- how we're going to deal with this.  What

22  we had was for objections originally filed.  We have one

23  left from Ms. Fenicle and Mr. Fahy and Mr. Jones.  That

24  objection, again, covers the same broad swath of issues,

25  which is an objection to the size of the break-up fee, as

1  well as an objection to the plan support agreement on due

2  process and (indiscernible) the plan basis.

3          Before I address each of those, I want to talk

4  about what the alternatives are facing and what you've heard

5  from the evidence.  The way I see it, Your Honor, if the

6  Court approves the termination fee, the plan support

7  agreement and the merger agreement, the Debtors are lacking

8  in a $4.4 billion purchase price.  That's $4.4 billion

9  dollars of cash consideration in addition to the $5.4 that's

10  payable for the EFIH first lien DIP.

11          It provides 100 percent recoveries for all of the

12  EFIH creditor constituencies.  That's 100 percent to the

13  first liens, 100 percent to the second liens, 100 percent to

14  the EFIH PIKS, 100 percent to the -- to the EFH settlement

15  beneficiary claims.  That's an important one because those

16  are the claims that benefit from the turnover provision.

17          That leaves two classes, Your Honor, the EFH

18  legacy notes at EFH and the TCEH intercompany settlement

19  claim at EFH.  Those two impaired classes, Your Honor, they

20  either don't object to this motion -- that's Contrarian,

21  indentured trustee -- or they affirmatively consent now that

22  Fidelity has entered into the plan support agreement.  Or

23  last, they just didn't file an objection and have been

24  silent.  Maybe they'll stand up later today.  But that's the

25  TCEH first liens who control the boating of that

1  intercompany claim now that the TCEH plan has been

2  confirmed.

3          The absence of objection, Your Honor, to what's

4  been proposed here is a recognition of the value of locking

5  in the NextEra bid.  Consummation with NextEra, an

6  experienced and financially strong partner with a market cap

7  of $59 billion and a credit rating among the strongest in

8  the utility industry, is something that the Debtors, their

9  boards and management determined is the right thing to do.

10         It was the right thing to do to agree, in the

11 event they were unable and do not consummate or find a

12 higher or better offer, to pursue another transaction to

13 agree to the $275 million break-up fee.

14         Your Honor, lastly, if Your Honor approves the

15 termination fee today, we will be able to keep the December

16 1st confirmation date, maybe even accelerate the

17 confirmation date, given that we've -- Your Honor is not as

18 optimistic as I am. (Laughter)  But we will at least be able

19 to keep us on track.

20         If the sole objector here, an objector who once

21 again is being rendered unimpaired under this plan, is

22 successful in blocking the termination fee, it would send

23 the Debtors back to the drawing board.  We would go back,

24 negotiating with NextEra.  We're going to take the risk that

25 NextEra doesn't agree to proceed without a break-up fee or

```
 1   with some lower break-up fee, and it risks the path to

 2   emergence.

 3            The framework, Your Honor -- the legal analysis

 4   framework is really not in dispute.  The O'Brien standard

 5   from the Third Circuit is what governed.  Under O'Brien,

 6   Your Honor, there needs to be some benefit to the estate.

 7   It's short of a substantial contribution under Section

 8   503(b) of the Bankruptcy Code, and it's more in line with

 9   one would typically think of a business judgment standard

10   engaged or used in other 363-like transactions.

11            When analyzing whether or not you satisfy the

12   O'Brien standard, courts in this circuit have considered

13   three primary factors.  Whether the break-up fee promotes a

14   competitive bidding process and induces the bid; whether the

15   bidder -- whether the termination fee induce the bidder to

16   remain committed to the purchase; and whether that

17   termination fee ends up favoring one bidder over another.

18   The evidence here shows that that's absolutely not the case

19   and that we satisfy each of the three factors.  Let me walk

20   through what that evidence is.

21            We heard evidence from Mr. Horton, the treasurer

22   and lead negotiator for the merger agreement, and we heard

23   from Mr. Hiltz, the Senior Managing Director at Evercore,

24   who is the Debtors' financial advisors and assisted in the

25   sale process and the negotiations.
```

1          Your Honor, we presented evidence that fits into

2      the five buckets that are on the slide before you.  We

3      talked -- we talked at length about the scope and depth of

4      the two-year formal marketing process and informal marketing

5      process.  We talked about how the negotiating landscape

6      shifted between 2014 and 2016.  And we talked about the

7      history of the negotiations and the key deal points.  You

8      heard at length from Mr. Horton about those deal points,

9      dating back to 2014 with NextEra.

10          The reasonableness of the termination fee.  On

11     that point you heard from Mr. Hiltz and Mr. Horton about why

12     they believe the termination fee is reasonable.  And

13     finally, Your Honor, I think it's self-evident that no one

14     is here objecting, arguing that there is another higher or

15     better actionable proposal that that does not exist.

16          So let me flip through each of these.  Beginning

17     with the efforts to market the interests in Oncor.  Your

18     Honor, we summarized on the slide, and I know opposing

19     counsel, Mr. Hogan, spent a great deal of time trying to

20     disregard the first half of the chart, arguing those deals

21     didn't consummate.  And later on, in connection with

22     reviewing the break-up fee chart, he said you should only

23     focus on deals that didn't consummate.

24          Suffice to say, Your Honor, and in building on the

25     dating/slash engagement thing, I didn't date the whole lot

1    growing up, not surprisingly.  (Laughter)  But what I did

2    learn in the dating process clearly informed my later

3    relationships.  (Laughter)  So, Your Honor, as we built up

4    through 2014, 2015 and into 2016, to simply throw away all

5    of that history, that's a mistake.

6         Your Honor, these negotiations were intense; they

7    went in fits and stops.  As Your Honor may remember, at the

8    formal process back in 2014, which ultimately rendered a --

9    or landed in a six-month formal process where we engage with

10   more than 50 potential bidders, and we reengaged in 2015

11   into 2016 with 18 potential bidders.  They were a subset of

12   the 50.  To say that this thing has been marketed is an

13   understatement.  It is perhaps the most marketed asset in

14   Chapter 11 history.

15        So the changing dynamic -- or in the landscape.

16   You heard from Mr. Horton that when we reengaged in 2016,

17   Your Honor, exclusivity had terminated December 29, 2015.

18   That reality and the inability of the EFIH and EFH creditor

19   constituencies to generate consensus around a deal that has

20   now been resolved, at least of this morning I hope, but that

21   reality was that the Debtors need to move this forward and

22   do something to push these cases.  With rising interest

23   rates, created a potential market risk -- you heard about

24   that from Mr. Horton and Mr. Hiltz -- that a transaction

25   involving Oncor could ultimately be at a lower purchase

1     price.  So there was that risk as well.

2          So what does that mean?  We needed to bring

3     (indiscernible) these cases.  We needed to sign a deal that

4     we could lock in a purchase price that yielded significant

5     recoveries for the EFIH and EFH creditors.  We needed to be

6     render as many of these EFH and EFIH creditor classes

7     unimpaired as possible.  The only other time we've reached

8     peace was when we unimpaired everybody, and even then we

9     didn't really have peace.  We have a couple of week trial to

10    show for it.  But that makes life easier.  So that was

11    another goal.

12          And the last thing is, is that the 2014 and 2015

13    marketed efforts, as I said, they generated significant

14    institutional knowledge about what points were important to

15    NextEra and what points we were going to need to address in

16    the 2016 negotiations.

17          What you heard from Mr. Horton, Your Honor, is

18    that the termination fee ultimately was part of the holistic

19    transaction that was negotiated with NextEra.  That

20    transaction, as I said, resulted in 100 percent recovery for

21    EFIH constituencies, and the majority of the EFH

22    constituencies.  It resulted in reinstatement of the

23    asbestos claims.  And as you heard from Mr. Horton, that

24    wasn't an easy negotiation.  That was a negotiation that

25    went on for quite some time and there was a lot of back and

1    forth and determinations were made that that was the right

2    thing to do, to reinstate and give a 100 percent recovery to

3    asbestos claims, rather than trying to impair asbestos

4    claims through a 524(g) process or some other process

5    through bankruptcy.

6           You heard about -- from Mr. Horton that as part of

7    increasing the breakup fee to 275, there was a withdrawal of

8    the match right, and I fought pretty hard about this match

9    right because in bankruptcy, you don't often see the ability

10   to bring whatever the higher and better offer is and then

11   give the last higher and better offer any opportunity to

12   match and then an obligation to take the matched bid.  You

13   can't go to the person who actually generated the value.

14   That was an important negotiating point that the Debtors

15   fought hard to rid the agreement of, and we were successful,

16   but that came, again, once again, with an increase in the

17   breakup fee.

18          And finally, we fiduciary out.  Your Honor, the

19   Debtors were very careful throughout the plan support

20   agreement and the merger agreement to maintain an

21   unadulterated fiduciary out provision through the

22   confirmation date.

23          You heard testimony from Mr. Horton and Mr. Hiltz

24   about the reasonableness of the termination fee.  NextEra,

25   from the very beginning, has insisted on a termination fee.

 1    There was a three-week period, Your Honor, in early 2014

 2    where they filed a term sheet on the docket when they had an

 3    exclusive relationship with the EFIH Second Liens that they

 4    did not list a termination fee in the document.  That was

 5    cited in the pleadings.  But what Your Honor saw from the

 6    testimony is that the minute definitive documentation

 7    started coming around, the minute after the EFIH Second Lien

 8    DIP process was terminated, there was a termination fee

 9    added to the document.  And Your Honor heard that all the

10    other potential bidders, any bidder that we ever talked to

11    for these assets, demanded a termination fee.  Put simply,

12    there was no transaction that didn't have a termination fee.

13              And that's not surprising.  You heard from Mr.

14    Hiltz that the termination fee here is supported by the

15    market comparisons both on a percentage of TED and on a

16    percentage of equity value, and you saw this demonstrative.

17    This demonstrative, as of this morning, is a little bit

18    dated, as you know, because it says 1.5 is the percentage of

19    total enterprise value, but as you heard in the testimony,

20    it's actually 1.47 because the purchase price went up, so

21    it's a little bit lower now, and it's actually below that

22    black dotted line.  But suffice to say, it's on the very

23    left hand side of this chart for a reason.  We fought very

24    hard to keep the breakup fee as low as we possibly could.

25              Your Honor, between the time that we signed the

Case 14-10979-CSS    Doc 9606    Filed 09/21/16    Page 99 of 141

1    document, again, no other actionable proposals, no proposals

2    without a breakup fee at that time, but between the time we

3    signed that document in the end of July and today, no other

4    party has come forward with an actionable proposal that

5    doesn't have a breakup fee.  No party in 47 days.  That's a

6    longer period of marketing with absolutely no bid

7    protections than I'm familiar with in most Chapter 11 cases.

8           So, how do you boil down the evidence?  We believe

9    it overwhelmingly supports three critical conclusions:

10   first, that the merger agreement and the plan support

11   agreement before Your Honor today are the best and most

12   actionable proposals, and that's following all of the

13   Debtors' hard efforts, the dating process, the engagement

14   process, all of those hard efforts.  NextEra has demanded

15   the termination fee in every term sheet or merger agreement

16   draft since the termination of the EFIH second lien DIP

17   facility.  It's been a very consistent term.

18          And you heard from Mr. Horton that he believes, in

19   his opinion as key negotiator in these deals, that the

20   transaction could not have been done without a transaction

21   fee, and that's because rising interest rates in this

22   environment, the costs of implementation of the transaction

23   that NextEra is already incurring, market comparisons, it

24   was hard to have a negotiation around no breakup fee when

25   every other transaction you point to in the precedent book

 1   says there's a breakup fee.  And the complex and inherently

 2   risky nature of this business.

 3             Your Honor, that brings me to one of these lovely

 4   charts I think you saw in the -- it's very hard to read, but

 5   you saw one of these in the last confirmation trial and I

 6   fell in love with the Gives and Gets chart, so I'm going to

 7   steal it from Mr. McKane.  But I think it's pretty clear

 8   here, Your Honor, that the Gets for the Debtors

 9   significantly outweigh the Gives.  While we are agreeing to

10   pay a $275-million-dollar market termination fee, we are

11   agreeing to forego a reverse breakup fee, there's no reverse

12   breakup fee, we are lacking in a $4.4-billion-dollar cash

13   investment, a cash investment that allows the Debtors to un-

14   impair all of the EFIH creditors and most of the EFH

15   creditors, leaving aside the two that are now accepting.

16             As a result of this change, we now have, today,

17   standing before you, agreement and support from Fidelity, we

18   have no objection from the EFH indenture trustee in

19   contrarian, and we have no objection from the TCEH firsts.

20   Unless you're paying everyone in full, Your Honor, that type

21   of consensus in this case is unprecedented.

22             Elimination of the match right and the go shop

23   through the entry of the EFH confirmation order, so we -- we

24   have -- we have the go shop through the confirmation order

25   for those that are under the tent.  We also have the

1   agreement to reinstate asbestos, and we have an experienced

2   $59-billion-dollar market cap partner with no financing

3   contingencies.  Ultimately, Your Honor, that last bullet

4   point, it keeps us on the confirmation path for this year,

5   and hopefully, Your Honor, we can bring these cases to a

6   close.

7            The sole remaining objection, again, is from

8   Fenicle and Fahy, the asbestos Plaintiffs.  The objections

9   really fit into two buckets: the first is the plan and the

10  merger agreement together constitute a sub rosa plan, the

11  second is that the plan and merger agreement violate due

12  process because it locks the Debtors into an unconfirmable

13  plan.  Let me start with the sub rosa plan.

14           The cases in the Third Circuit are very clear: if

15  the plan dictates the treatment of creditors and the plan --

16  or the PSA and the merger agreement dictated the treatment

17  of creditors and the plan -- or the PSA and merger agreement

18  dispose of all the Debtors' assets and strip the voting

19  rights, that is a sub rosa plan.  What we have here is

20  nothing of the sort.  We have a merger agreement that

21  commits the Debtors to go forward with a sale transaction

22  that's contingent upon the Court confirming the plan of

23  reorganization, that's contingent upon the Debtors

24  prosecuting a consent solicitation, that's what we're --

25  we're going to discuss at the end of this hearing, is the

Case 1:14-10979-CSS    Doc 11703-23    Filed 02/09/17    Page 103 of 142
Case 14-10979-CSS    Doc 5006    Filed 09/21/16    Page 102 of 141

Page 102

1    disclosure statement, so the votes aren't locked up, and not

2    all of the assets are being disposed of today.  Today, all

3    Your Honor is approving is the fact that we're going to

4    proceed with this transaction on the timeline set forth in

5    the merger agreement and the termination fee.  Undoubtedly,

6    Your Honor, approving a termination fee.

7              That, for all the reasons discussed in the case

8    law about sub rosa plans, shows that this is not a sub rosa

9    plan.  But the objectors also argue that the PSA itself

10   constitutes an improper solicitation and on this one, Your

11   Honor, you've ruled on this issue, I believe, once before on

12   this case, and I think Your Honor adopted the rationale and

13   the reasoning in the Indianapolis Downs case.  I would

14   submit that that's exactly what one should do here.  Your

15   Honor, the Third Circuit in Century Glove adopted a narrow

16   interpretation of solicitation.  Indy Downs built on that

17   for exactly the type of PSA that we're seeking approval of

18   here today, with Fidelity joining the plan support

19   agreement.  The voting obligation for Fidelity is contingent

20   upon receipt of a Court-approved disclosure statement, which

21   we hope Your Honor, will happen this afternoon.

22             So, suffice to say, we believe we satisfied the

23   standard for approval of these two documents and that the

24   objections should be overruled.

25             That takes me to due process.  I've been fighting

1   this one for a long time in these cases, and we'll live to

2   tell another day on that one, but suffice to say, Your

3   Honor, my position, the Debtors' position, has been

4   consistent throughout.  The Debtors are able to satisfy the

5   due process rights of unmanifested claims by giving

6   constructive notice, and we litigated that issue in 2014, we

7   litigated that issue in the beginning of 2015, in the middle

8   of 2015 and the end of 2015.  We litigated that issue six

9   times and we're back again today, Your Honor, hearing about

10  the Grossman standard that has absolutely no basis in the

11  law, I don't even know what a Grossman standard is, but what

12  Grossman's does is allow unmanifested claims to be

13  discharged based on the totality of the circumstances.  We

14  will carry that burden at confirmation just like we did the

15  last time.  This is just another crack by these objecting

16  creditors, at the bar date, the bar date that they didn't

17  appeal in 2015.

18          Your Honor, we believe the Court should reject the

19  due process argument and overrule the objections, authorize

20  the Debtors to enter into the merger agreement, enter into

21  the plan support agreement, and begin their walk towards

22  emergence from Chapter 11.  Thank you.

23          THE COURT:  You're welcome.  Hang on, Mr. Hogan.

24  There may be others that want to support the plan.  Mr.

25  Kaplan?

Page 104

1         MR. HUSNICK:  Oh, Your Honor, may I reserve five

2    minutes for a rebuttal?

3         THE COURT:  I'll give you four and a half.

4         MR. HUSNICK:  Thank you.

5         MR. KAPLAN:  Thank you, Your Honor.  Good

6    afternoon.  Gary Kaplan from Fried Frank on behalf of

7    Fidelity.  Your Honor, as has been mentioned multiple times,

8    Fidelity this morning signed up to the PSA and is now

9    supportive of this transaction.  The reason we're

10   supportive, and Your Honor, the PSA will be put in front of

11   you, and it goes to your question about whether others are

12   going to continue litigating through confirmation, you'll

13   see the only change in the PSA, the only negotiation, is

14   just increasing the consideration for distribution to all

15   EFH creditors.  There's no other payments, no other deals,

16   this is the deal that -- this is an improvement that's a

17   significant improvement, that benefits all creditors at EFH,

18   and that is why Fidelity signed on.

19         As Mr. Husnick said, the recoveries in the

20   disclosure statement for EFH creditors under -- as of

21   Friday, was 16 cents because of the changes that were

22   negotiated throughout the weekend and culminating this

23   morning, it's up to 50 cents recovered, that's five-zero.

24   So, we're now at a point -- well, of course we wish we were

25   back at par like we had at the Hunt deal, there's a

1    recognition of where we stand today and, based on the

2    changes, we now think that the deal is a fair deal and a

3    good deal for EFH -- for EFH creditors.

4             One of the components is that the 50 cents is an

5    estimate based on the Debtors' estimate of cash at the

6    conclusion of this case.  To the extent that litigation is

7    streamlined, the case is streamlined, which we anticipate

8    once people start to really assess the outcome and the

9    recovery, we do think that will ultimately happen and we

10   will have a very limited confirmation hearing with very few

11   objectors.  That saves cash, which ultimately means that the

12   recovery to EFH will increase.  We obviously filed an

13   objection because we did originally have real concerns about

14   whether the breakup fee or the termination fee did satisfy

15   the O'Brien standard.  We think, given how this has changed,

16   and the very significant increase in the bid by NextEra, we

17   think that they -- the Debtors have carried the burden now

18   and are buying -- and have showed that -- that the breakup

19   fee is reasonable and necessary to preserve the value of the

20   estate.

21            Where we were last week or two weeks ago when we

22   filed the objection, we knew that, as the Debtors testified,

23   there were other alternatives, other parties that they were

24   negotiating with, this was the highest at the time, and so

25   their view was, given their recoveries, you could always go

1   back to alternative B and try to negotiate.  Given the

2   significant increase in the NextEra bid and where we are

3   right now, we now think that denying approval of the

4   termination fee would potentially risk hundreds of millions

5   of dollars and potentially significant recovery to EFH

6   creditors.  So for that reason, we would urge the Court to

7   approve the motion.  Thank you, Your Honor.

8          THE COURT:  You're welcome.  Mr. Brody?

9          MR. BRODY:  One second, Your Honor.

10         THE COURT:  Okay.

11         MR. BRODY:  Thank you, Your Honor.  Josh Brody

12  from Kramer Levin on behalf of -- computer shows the EFIH

13  second lien indenture trustee.

14         It's funny, I actually have one little quibble

15  with something that Mr. Husnick said, which is, technically,

16  the way the plan is currently constructed, my clients are

17  actually impaired.  But that said, actually, the reason I

18  stood up is, we did not take a position on the PSA, but I

19  thought now would be as good a time as any to let Your Honor

20  know, and it's something we mentioned in our disclosure

21  statement objection, that we have been working pretty hard

22  with NextEra and the Debtors to try to bring the second lien

23  noteholders under the tent, and I'm very hopeful that

24  although we weren't able to sort of make it work in time for

25  the PSA as currently put in front of Your Honor, that we

1  should be in a position in the very near future where we're

2  going to be signing on, and I guess joining everyone on this

3  side of the room as well.

4            THE COURT:  Thank you.

5            MR. BRODY:  Thank you.

6            MR. ADLERSTEIN:  Good afternoon, Your Honor.

7  Jacob Adlerstein, Paul Weiss Rifkind Wharton & Garrison on

8  behalf of the ad hoc Committee of TCEH first lien creditors.

9            THE COURT:  Mm hmm.

10           MR. ADLERSTEIN:  As Your Honor may remember, the

11  TCEH first lien creditors are the economic beneficiaries of

12  the $700 million dollar TCEH intercompany claim, and so we

13  have been and will remain interested in how the E-side cases

14  are resolved.  We were very pleased with this morning's

15  announcement in terms of the revised deal terms and the

16  economic impact that's going to have for EFH unsecured

17  creditors and we are supportive of the relief before the

18  Court today.

19           THE COURT:  Thank you.

20           MR. ALBERINO:  Good afternoon, Your Honor.  Scott

21  Alberino from Akin Gump on behalf of UMB, the PIK Trustee.

22           Your Honor, I just rise to offer our support for

23  approval of the PSA and merger -- merger approval motion.  A

24  lot of work has occurred over the last couple of months

25  between NextEra and the company and a number of other

1    constituencies and I do want to recognize, at least from the

2    creditor perspective, that you know, this agreement has been

3    thoroughly reviewed and vetted by the principal

4    beneficiaries of this agreement.  We would like to see it

5    approved as quickly as possible.

6            We would also kind of like to applaud NextEra and

7    the company for working with the various creditor groups,

8    including Fidelity, over the last 48 hours to continue to

9    knock through issues to move this process forward very

10   quickly.

11           We are also in the process of trying to finalize,

12   you know, some -- a foreign PSA with the company with the

13   company and NextEra, and although we are in full agreement

14   on the merger, as to the means of implementation, we have a

15   number of limited issues that we're continuing to work

16   through with the company and NextEra on allowance and

17   distribution issues.

18           The way this plan is set up, it's essentially

19   creating a pot of value for distribution.  We've been

20   working with the company and we expect to, as we proceed

21   towards confirmation, you know, arrive at a point where, you

22   know, we are working with everybody on how the reserves are

23   going to be set up so we can facilitate, you know, material

24   distributions to creditors as soon as we can.  So, we hope

25   to be back in front of you with a PSA amount -- a PSA

1   amendment at some point in the not-too-distant future, but

2   as I said earlier, UMB supports approval of the motions.

3          THE COURT:  Thank you.  Mr. Pedone?

4          MR. PEDONE:  Your Honor, Richard Pedone on behalf

5   of American Stock Transfer, the EFH indenture trustee, and

6   we withdraw our objection to the entry of the order

7   approving the merger agreement and PSA, and we look forward

8   to working through the issues that we may have with the plan

9   as we see the final documents, so our rights with regard to

10  that are reserved, but we're optimistic.  Thank you.

11         THE COURT:  Thank you.  Mr. Shore?

12         MR. SHORE:  Thank you, Your Honor.  Chris Shore

13  from White and Case.  I rise only to memorialize a prior

14  agreement with the Debtors with respect to the merger

15  agreement and the PSA.  The PSA requires that the Debtors

16  seek a 363(m) finding if NextEra ends up purchasing the

17  company, but it also requires that the Debtors seek a

18  finding that NextEra otherwise has proceeded in good faith

19  in all respects in connection with the Chapter 11 cases.

20  That would not only include the stuff you heard testimony

21  today, but also what may or may not have happened in

22  connection with regulatory proceedings or why the other plan

23  failed.

24         We asked the Debtors to take that out of the PSA.

25  They would not take it out.  Rather than object, though, we

1    agreed that, by failing to object to the entry of the PSA

2    today, no one's prejudiced from objecting a confirmation to

3    a finding that would either exceed what 363(m) permits, or

4    isn't factually supported.

5              THE COURT:  Thank you, Mr. Shore.  Mr. Anker?

6              MR. ANKER:  Good afternoon, Judge Sontchi.  I

7    don't know if this is the right occasion to rise.  This is

8    Philip Anker for Delaware Trust as first lien indenture

9    trustee and EFIH and the ad hoc group.  We have taken no

10   position on the merger, to the extent we had objections to

11   the disclosure statement, I believe they have been fully

12   resolved.  We do reserve our rights with respect to

13   confirmation, although the plan does provide that all of our

14   claims, to the extent allowed by final order, will be paid.

15   It does provide that our liens will terminate at the

16   effective date, and thereby impairs us quite different from

17   the prior plan, and I suspect that will raise issues for

18   confirmation, but those are not issues for today, and I

19   simply wanted to give the Court a heads up on that, and also

20   inform the Court that our disclosure statement objections

21   have been resolved, subject to our reservation of rights as

22   to confirmation.

23             THE COURT:  Okay, thank you.

24             MR. ANKER:  Thank you.

25             THE COURT:  All right, Mr. Hogan?  You're the last

1    man standing.

2              (Laughter in the courtroom.)

3              MR. HOGAN:  I think it's a preview, Your Honor.

4    Thank you.  Your Honor, the asbestos Debtors object to the

5    provisions of the merger agreement and the plan support

6    agreement that would bind the Debtors to support a plan that

7    we believe is unconfirmable.  And as the asbestos objectors

8    will demonstrate at the appropriate time, the proposed E-

9    side plan is not confirmable and that is because we believe

10   that the plan violates the due process rights of holders of

11   unmanifested asbestos claims who have not asserted a claim

12   by the bar date.  By discharging those claims without notice

13   and without any safeguards of their rights.  We also believe

14   that the plan would cause EFH Debtors to effect a fraudulent

15   transfer of valuable assets of the EFH Debtor estates.  But

16   of the Debtors were to propose a plan, a revised plan, say

17   at some point they saw the light of day, that didn't suffer

18   from those alleged infirmities, they would be in breach of

19   the merger agreement and the plan support agreement and the

20   termination fee would be triggered.

21             The asbestos objectors also object to the

22   allowance of the termination fee provided for in the merger

23   agreement, as the Debtors have not demonstrated that the

24   termination fee was necessary to induce NextEra to bid.  I

25   elicited some of the testimony today, Your Honor.

1              Ignoring the controlling Third Circuit law and

2      citing no precedent from any Court in this Circuit until

3      their reply brief, the Debtors assert that the agreement to

4      pay the termination fee should be approved as the soundest

5      exercise of the Debtors' business judgment, but that is not

6      the legal standard, as the Court is well aware.  The law is

7      clear in the Third Circuit that, when considering a breakup

8      fee, the business judgment rule should not be applied in the

9      bankruptcy context, and that's in re O'Brien Environmental

10     Energy.  Rather, the Third Circuit has instructed that, in

11     considering request for breakup fees, the Court should apply

12     the general standard used for administrative expenses under

13     503.  Outside of bankruptcy, merger agreements include

14     breakup fee provisions which typically are intended to

15     compensate a prospective acquirer for the time and expense

16     putting together its offer, and if the transaction is not

17     completed for some reason, usually because another buyer

18     appears with a higher offer.

19              In the bankruptcy context, however, the focus must

20     be on the value to the estate and not on all of the purposes

21     of the breakup fee served in a corporate transaction as is

22     permissible in bankruptcy.  It is permissible in bankruptcy

23     to use a breakup fee to induce an initial bid, to promote

24     competitive bidding, and to insure that the bidder adheres

25     to the bid in an auction process, and that's under Reliant.

1    It is not permissible, however, to advantage a favored

2    purchaser over other bidders by increasing the cost of the

3    acquisition fee to other bidders.  Here, the Debtors have

4    made no effort, that I can tell, to demonstrate, until their

5    reply brief, that NextEra would not have bid even without

6    the termination fee.  There's no evidence of inducement.

7    The Debtors only offered that NextEra was the most engaged

8    of the bidders, Debtors sought to use multiple bidder

9    dynamic to obtain the highest and otherwise best terms and

10   conditions and the termination fee was ultimately necessary

11   to induce, this is their characterization, NextEra to enter

12   into the merger agreement.  By Debtors' own account, it

13   appears the termination fee was not required to induce

14   NextEra to bid, but rather was agreed to at the end of the

15   bidding process and in fact, even pumped up at the very end.

16          Thus, under the Third Circuit controlling

17   precedent, the termination fee was not necessary to preserve

18   the assets of the estate or value of the estate.  For this

19   reason alone, the termination fee cannot be approved.

20   There's no evidence that NextEra would not have bid without

21   the termination fee.  By the Debtors' own account, it

22   appears the termination fee was not required to induce

23   NextEra to bid, but was, as I said, agreed to at the end of

24   the bidding process.  A breakup fee in those circumstances -

25   - and so, what we have, Your Honor, is either of the Debtors

1   can show that the breakup fee was necessary to preserve the

2   value of the estate because, for example, it was necessary

3   to induce NextEra to bid.

4           The Court cannot approve a breakup fee that would

5   be triggered of the third amended plan is not confirmed

6   because it violates due process, as we allege, as it relates

7   to asbestos claimants, and the Debtors then support a plan

8   that does comport with the due process requirements.  A

9   breakup fee in those circumstances would penalize the

10  asbestos objectors from pursuing their objections by

11  diminishing the value of the estates available for the

12  security of their claims.  This is a breakup fee that would

13  chill the bidding by increasing the cost of acquisition to

14  other bidders.  It is not permissible.  A breakup fee that

15  would increase the cost to plan objections in this manner

16  cannot be approved.

17          NextEra and EFH developed the third amended plan

18  together, and they made a deliberate decision to include

19  provisions discharging unmanifested asbestos claimants who

20  have not asserted a claim by the bar date, even though both

21  parties are fully aware that the constitutionality of those

22  provisions were subject to an appeal in the District Court.

23  If the termination fee is approved now and the plan is

24  subsequently found to be unconfirmable because of those

25  constitutional objections, NextEra will receive a $275-

1    million-dollar windfall for having supported a plan that it

2    knew, or had reason to know, could not be confirmed.  Such a

3    result cannot be countenanced by this Court.

4              Approval now will preclude a challenge to the

5    merits on plan objections, Your Honor.  If the Court

6    approves the merger agreement now, it will resolve the issue

7    for purposes of this Bankruptcy Court and preclude any

8    challenge to the merit of the termination payment during the

9    confirmation hearing on the plan.  In AMR Corp, the

10   Bankruptcy Court approved the merger but did not approve a

11   provision of the merger agreement proposing a severance

12   payment for an insider because the payment was not permitted

13   under 503(b) of the Code.

14             In encompassing the sole asset of the Debtors, the

15   proposed -- in that instance, Your Honor, it was a lease and

16   similarly, until the plan was confirmed, the Court cannot

17   approve the payment of a termination fee that would be

18   triggered by a finding that the plan was not confirmable.

19   The payment of a termination fee under those circumstances

20   cannot be shown to be necessary to preserve the value of the

21   estate.  If, as the asbestos objectors contend, the current

22   plan cannot be confirmed, the Debtors will be constrained in

23   proposing a revised plan that would not violate the due

24   process rights of unmanifested asbestos claimants.  Under

25   the merger agreement and the plan support agreement,

1   Fundamental Index the Debtors were to do so, NextEra, fully

2   aware of the due process challenges to this discharge

3   provisions, could asset the right to walk away from the deal

4   and obtain the $275-million-dollar termination fee.

5           The Debtors have not demonstrated that the

6   termination fee, under any circumstances, can be approved

7   under the controlling Third Circuit precedent, and in any

8   event, such a fee not be approved to the extent that it

9   would be triggered by a ruling that the plan cannot be

10  confirmed.  The third amended plan as developed by EFH and

11  NextEra, and now -- and like the now defunct previous plan,

12  would in fact, discharge unmanifested claims for which a

13  timely proof of claim was not filed.

14          Now, let me just talk for a minute about the prior

15  plan treatment.  In its order to confirm the now defunct

16  previous plan, the Court rejected the due process objections

17  for the discharge of unmanifested claims, and that issue, as

18  I said, is now on appeal before the District Court.  If that

19  appeal is successful, the Debtors will be obligated to

20  revise their reorganization plan to provide either that

21  unmanifested asbestos claims that haven't been asserted by

22  the bar date will -- they'll have to pass those through the

23  plan or comply with 524(g) as we heard earlier.  The

24  asbestos objectors do not object, and this is important,

25  Your Honor, we don't object necessarily to the merger

1    transaction itself.  However, the merger agreement and the

2    plan support agreement go much further than requiring the

3    parties to support a plan that would implement the merger.

4    Rather, the agreements incorporate the third amended plan in

5    its entirety, including the provisions that discharge those

6    unmanifested claims, and do not permit the Debtors to

7    propose or support a plan that does not contain those

8    provisions without breaching those agreements.  Thus, the

9    merger agreement and the plan support agreement dictate the

10   terms of the plan and effectively preclude the possibility

11   of alternate methods or reorganization.  That's all I have,

12   Your Honor.

13           THE COURT:  Thank you, Mr. Hogan.

14           MR. HUSNICK:  I have a feeling I can do this in

15   less than four and a half minutes, so let me give it a shot.

16   Your Honor, Chad Husnick for the Debtors.  Very briefly, in

17   reply, counsel asserted that the focus under the Third

18   Circuit standard is on the value to the estate.  I agree.

19   There does need to be benefit to the estate, that's a clear

20   503(b) -- or 503 standard.  But, it doesn't have to be a

21   substantial contribution under 503.  It's interesting, Your

22   Honor, that there's a lot of reliance on, 'the Debtor didn't

23   put any evidence in, in its -- until its reply, it didn't do

24   this until its reply,' but we just did a trial that lasted

25   all morning long where we put on witnesses to testify.

1   That's the record, that's the evidence.  the objectors are

2   oblivious to that evidence.  they're just reading from the

3   objection that they filed before we put on the evidence, so

4   it just boggles my mind as to what we're doing here.  But

5   the evidence is clear, the evidence is unrebutted in support

6   of the transaction fee.

7           The theory that I've heard articulated today is

8   that, while the first confirmation order is on appeal in the

9   District Court, the Debtors can't move forward on certain

10  transactions down here until the District Court rules.

11  There's no stay pending appeal, and this Court is not

12  paralyzed while the District Court considers an appeal of an

13  order that's been rendered null and void by its own terms.

14  The Court will deal with that when it can, the Appellate --

15  when the District Court can deal with that.

16          But in Mr. Hogan's own words, the objectors' own

17  words that the plan is now defunct is yet another reason why

18  the District Court should get there, and it highlights the

19  absurdity of the fact that appealing an order that is null

20  and void.  If that were the case, Your Honor, that every

21  appeal would -- the risk of an appellate risk, the Debtor

22  would never be able to enter into an equity commitment

23  agreement for exit financing -- for exit financing or for

24  equity financing, at exit, because there would be a risk and

25  you wouldn't be able to pay a termination fee.  So breakup

1   fees would never get approved.  Somebody just appeals and

2   you can't agree to the breakup fee because there's appellate

3   risk and I may object to confirmation in the future so you

4   can't agree to pay that fee if I'm objecting to

5   confirmation.  No other party in this case, and you heard

6   several of them stand up at the podium and say they have

7   potential confirmation objections, the EFIH first, the EFIH

8   second, none of those parties are standing up here saying

9   you can't approve the merger -- or the termination fee

10  because we have objections to confirmation.  That's

11  nonsense.  With that, I'm done.

12          THE COURT:  Thank you.

13          MR. HUSNICK:  Thank you.

14          THE COURT:  All right.  I'm going to -- based on

15  the evidence that was submitted to the Court today, I'm

16  going to overrule the objection and approve the merger

17  agreement and the PSA.  We feel, again, with the due process

18  argument, the Court has ruled on this numerous times and I'm

19  not going to go through my previous lengthy rulings again.

20  Suffice it to say that I reject the due process argument

21  that the bar date that applied to unmanifested asbestos

22  claims and the seeking of discharge of those unmanifested

23  asbestos claims violates due process.  The rights, the post

24  hoc -- ex post, excuse me, rights, of those types of

25  claimants to come in and object to that discharge at a later

Case 1:14-10979-CSS Doc 1706-23 Filed 02/09/17 Page 121 of 142
Case 14-10979-CSS Doc 9006 Filed 07/21/16 Page 120 of 141

Page 120

1   date are fully preserved.  I was very careful when I made

2   that ruling initially, and I've been careful throughout to

3   make it clear that those rights are reserved.  I believe

4   that the Court's previous rulings are in compliance with the

5   law and consistent with the law.

6           I find -- well, there is no stay pending appeal of

7   the previous confirmation order.  I personally think that

8   appeal is moot because that order is null and void.  It has

9   not yet been dismissed by the District Court, but I believe

10  that the District Court will ultimately either dismiss that

11  or affirm this Court's previous ruling, and there's no

12  likelihood of success on the merits of that appeal.  As a

13  result, the idea that there is execution risk based on being

14  reversed on a now defunct, void order, that is, in my mind,

15  nonetheless, was proper, is not sufficient to, sort of, lock

16  in a result here.  In other words, if it were certain or

17  certainly probably that the Court would be reversed and that

18  that would either require either an amendment that NextEra

19  would have to agree to or the ability for NextEra to walk

20  away and trigger the breakup fee, that might be one thing to

21  have the Court have pause about approving the breakup fee in

22  this instance.  But there is no such risk, or the risk is so

23  de minimis as to not be worth noting.  As a result, there's

24  no impediment based on the pending appeal or the argument

25  that this plan being put before the Court is not consistent

1    with due process so as to give the Court any concern that

2    it's locking in a breakup fee based on that argument either

3    being successful on appeal or a confirmation of the plan.

4           The breakup fee amount is large but, like

5    everything in this case including the state of Texas, this

6    is a big case and everything in here big numbers, and you

7    have to look at it appropriately from a percentage basis,

8    that's at, I believe, approximately 1.47 percent of TEV as

9    we sit here today based on the most recent changes to the

10   deal.  That's an appropriate number for a case of this size.

11   Generally, those fee percentages drop as cases get bigger,

12   they go up as cases get smaller.  The evidence is clear that

13   this is on the low end of utility-type transactions.  It's

14   also on the low end of this Court's experience with regard

15   to breakup fees that I have approved numerous times, so I

16   believe the amount is supported by the market, I think the

17   evidence overwhelmingly indicates that a breakup fee was

18   necessary to induce NextEra to make a bid, and to move

19   forward with a merger agreement.

20          Now, it cannot be denied that NextEra has been

21   anxious, willing to buy this asset for quite some time.

22   They participated through, I guess it's now three rounds of

23   negotiation -- the negotiations in late 2014, the approved

24   negotiations in 2015 and now the 2016 negotiation.  They

25   also attempted to insert themselves into the last

1    confirmation trial, much to my displeasure, and I don't

2    think, frankly, appropriately, but that is what it is.  So,

3    there's no question that they are anxious to buy this asset,

4    but it's also clear from the evidence that they're not

5    anxious to buy this asset at any price, and in fact, they

6    walked away in 2015 when they lowered their purchase price

7    which led, of course, to the Hunt deal that was ultimately

8    confirmed but not consummated.  And it's clear that all

9    provisions of the APA have been subject to vigorous

10   negotiation and on some points they have given and on other

11   points they haven't given, and the termination fee has been

12   a piece of this deal from day one.

13          It's clear that the termination fee went up at the

14   end of the process but it went up primarily, I believe,

15   because they walked away from the match right, and the

16   combination of match right, lower breakup fee was replaced

17   with no match right and a higher breakup fee.  So, I don't

18   think there was any lack of negotiation or give without

19   consideration in the negotiation for the breakup fee in late

20   July when it increased in value.

21          I think importantly, with regard to the breakup

22   fee, it's really not an asbestos claimant issue because the

23   value that arises -- excuse me, the value that is

24   potentially taken away from creditors, if the breakup fee is

25   triggered, that value is not taken away from the asbestos

1    creditors.  That value is taken away from the EFH creditors

2    or EFH equity.  That never -- that money never works its way

3    to the asbestos claimants.  So, were there to be no breakup

4    fee and were there to be someone else coming in and bidding

5    another, say, $300 million, that full $300 million would

6    work its way through the waterfall up, but it wouldn't in

7    any way inure to the benefit of the asbestos claimants.

8              The asbestos claimants, perhaps, are more

9    interested in, and perhaps with reason, at least at first

10   blush, with regard to the change in the reduction of the

11   reserve from $250 million to $100 million, but that is, I

12   believe, the evidence indicates and supports a -- that $250-

13   million-dollar reserve that's now been reduced to $100-

14   million-dollar reserve doesn't exist for the benefit of the

15   asbestos plaintiffs, it exists for the benefit of the

16   purchaser, NextEra.  Whether it's an accounting incident or

17   a mechanism or simply a hold back mechanism to make sure

18   there are funds available, in any event, it doesn't affect

19   the ultimate liability under the proposed plan, that

20   liability flowing to the pre-organized entity that is going

21   to be a functioning business which has always been

22   profitable, by the way, and a full -- a business that's been

23   funded by over $4 billion dollars of equity infusion.  So,

24   there's no negative effect on the asbestos claimants by the

25   change in reduction from the reserve price.  The effect, if

1  any, would be on NextEra, but NextEra is in a much better

2  position than the Court to make its own judgment about what

3  it needs or doesn't need in connection with a reserve for

4  those liabilities.

5          So, I think that the argument based on due

6  process, I think the argument based on the amount of the

7  breakup fee, I think the argument based on the PSA, et

8  cetera, they're all refuted by the law and the facts in the

9  case, and I will overrule the objection.

10          MR. HUSNICK:  Thank you, Your Honor.  Chad Husnick

11  for the Debtors.  I have with me the order -- the order did

12  not change but what did change, of course, is the plan

13  support agreement to add in Fidelity as I mentioned, and I

14  also have the amendment to the merger agreement that we've

15  been discussing today, which facilitates the increase in the

16  purchase price and the reduction in the asbestos hold back.

17          If I may approach, I can hand these documents to

18  you.

19          THE COURT:  Yes.

20          MR. HUSNICK:  Your Honor, what I've handed the

21  Court is two documents: the first document is a red line of

22  the plan support agreement.  This is called the Amended and

23  Restated Plan Support Agreement, not surprisingly, but all

24  of the changes to this document relate to the addition of

25  Fidelity and its affiliated funds as plan support party and

1    I can flip through it with Your Honor but it may be -- the

2    Court may want to take a moment to read it on its own during

3    a break.

4              THE COURT:  Okay, I'll do that.

5              MR. HUSNICK:  The other document I handed to you

6    called Amendment Number 1 to the Agreement and Plan of

7    Merger.  As I said, Your Honor, this is what facilitates the

8    bump in the distributable value from three -- or by $450

9    million dollars.  That's pretty -- unlike the burdensome

10   condition provision, this one's pretty straightforward, so.

11   Perhaps Your Honor would like to read that as well.  We --

12   as I said, we did not change anything to the order itself

13   other than the attachments to the order.

14             THE COURT:  Okay.  Does anyone wish to be heard in

15   connection with the order?  All right.  We are going to need

16   to take a break anyway, so during that break, I will review

17   the red lines and as long as I have no problems, I'll simply

18   sign the order.  If I have any questions or issues, I'll

19   identify them when we reconvene.

20             MR. HUSNICK:  Thank you, Your Honor.  That'll be

21   helpful, the break, to give us an opportunity to make sure

22   we have the disclosure statement and plan ready to go.

23             THE COURT:  All right.  Yeah, I -- unfortunately,

24   I have a couple of meetings that I have to take care of some

25   internal core business, so we're going to recess now for

Page 126

1    lunch and we will reconvene 2:30, at 2:30.

2           MR. HUSNICK:  Thank you, Your Honor.

3           (Recess)

4           CLERK:  All rise.

5           THE COURT:  Please be seated.  Sorry about that,

6    my various court activities took longer than I thought they

7    would.  I apologize to keep you waiting.  Where are we?  Mr.

8    McKane?

9           MR. MCKANE:  Good afternoon, Your Honor.  Mark

10   McKane, Kirkland & Ellis, and I believe the next item on the

11   agenda is a discovery dispute that has been raised by the

12   asbestos plaintiffs, so I'll cede the podium to Mr. Hogan.

13          THE COURT:  Okay.

14          MR. HOGAN:  Thank you, Your Honor.  Daniel Hogan,

15   Hogan McDaniel on behalf of the asbestos claimants, Fenicle

16   and Fahy.  Your Honor, this is a very discrete discovery

17   dispute.  It relates to two sets of discovery issues, or

18   discovery topics that we pursued since starting back in May.

19   We were put off, understandably, by the bifurcation of the

20   T-side and E-side confirmation processes and bided our time,

21   all the while, conducting a meet and confer process with

22   opposing counsel to try to resolve the issues and obviously,

23   obviate the need for you to have to hear about it.

24   Unfortunately, we weren't able to do that, and so here we

25   are today on another asbestos matter.

1          The two areas that we are concerned with, Your

2    Honor, are very discrete.  One is the value of intercompany

3    claims and the other is available insurance that might be

4    available to cover claims of asbestos such that we wouldn't

5    even need to get to this reserve that we heard about this

6    morning.  It's our position that both of these are relevant,

7    and they're relevant particularly as they relate to the

8    issue about what's going to be available to pay these

9    asbestos claims.  You heard they're unimpaired.  We

10   understand that that's the characterization.  You know,

11   we're just trying to vet the issues to make sure that we

12   understand that they're unimpaired.  We also understand that

13   it's the Debtors' burden to demonstrate that there is no

14   impairment, and so, in doing so, we were just attempting to

15   drill down on those issues.

16          With regard to the intercompany claims, we found

17   certain discrepancies with regard to their SOFAs and how

18   they characterized what the starting point was for the

19   intercompany claims.  We're aware this intercompany loan

20   pool agreement that was in place, which attributed interest

21   relative to intercompany loans that may have occurred, and

22   we are just merely trying to vet those issues and make sure

23   that what they say the ultimate intercompany claims that the

24   four asbestos companies have are in fact the numbers that

25   they should be.

 1            The insurance, I think, is pretty self-

 2    explanatory.  We want to see if there's available insurance

 3    coverage.  There's -- that's really an interest or an issue

 4    that nobody else has an interest in.  I mean, either there

 5    is insurance coverage that would cover these claims or

 6    there's not. And so we just ask the Debtors to produce those

 7    documents and they've told us that they're not relevant,

 8    that they're either confidential or have some basis for why

 9    we're not entitled to see them.  And so, here we are.

10            THE COURT:  Okay.

11            MR. HOGAN:  Thank you.

12            THE COURT:  Okay, thank you, Mr. Hogan.

13            MR. SOWA:  Good afternoon, Your Honor.  Justin

14    Sowa of Kirkland & Ellis on behalf of the Debtors.  First of

15    all, I'd like to address the insurance point because the

16    insurance policies have been produced, and in fact were

17    produced in 2015 and have been available to Fenicle and Fahy

18    for some time now.  We informed Mr. Kazen of that.  To the

19    extent that Fenicle and Fahy are looking for insurance

20    information beyond the insurance policies, which were

21    produced, they've yet to communicate that to us, so I can't

22    really address what more can be produced on that front.

23    Happy to follow-up with counsel to Fenicle and Fahy to

24    address that point, but the insurance policies were

25    produced.

1          As for the intercompany claims information, we

2    spent a lot of time this morning discussing treatment of the

3    asbestos claimants.  I think we've all come together on the

4    fact that the claims under the plan are reinstated.  The

5    intercompany claims are also reinstated, and the state of

6    play is effectively unchanged by the plan.  Fenicle and

7    Fahy's legal rights are not impacted by the plan.  They 'are

8    fully reinstated, as are the intercompany claims, and

9    they're unimpaired.

10          Because the plan does not impact Ms. Fenicle or

11   Mr. Fahy's legal rights, we think there's really no basis

12   for them to take discovery.  There's no objection that they

13   can bring that we see the intercompany claim amounts being

14   relevant to -- the claims are what they are, they are what

15   they were before filing, they're unchanged by the plan, and

16   it's just simply not a confirmation issue.

17          Balanced against that, the burden to the Debtors,

18   their advisors and the business people of gathering,

19   reviewing and producing the information that Fenicle and

20   Fahy seek is particularly onerous.

21          Fenicle and Fahy are seeking records going all the

22   way back to 1990, and many of these records are no longer in

23   the Debtors' possession.  The asbestos liabilities largely

24   arise through the Debtors' ownership of an entity called

25   Ensearch.  Ensearch was the parent company of the various

1    asbestos Debtors.  Ensearch was sold by the Debtors in 2004,

2    and pursuant to the sale agreement, most of Ensearch's

3    operating records were transferred to the purchaser and are

4    no longer in the Debtors' possession.

5           To the extent that there are records dating back

6    to that time period in the Debtors' possession, anything

7    prior to 1998, we do not have electronic records of.  There

8    are some records that we have in obsolete electronic

9    formats, in old tape backups that we no longer have

10   equipment to recover.  Many other records would just be in

11   boxes in a warehouse somewhere in Texas, likely unlabeled,

12   and the burden to the Debtors of needing to go on this

13   expedition to dig through these boxes in warehouses, find

14   information that we view as irrelevant on behalf of an

15   unimpaired creditor, we think is really just not justified

16   under these circumstances.

17          That said, the Debtors are continuing their

18   discovery efforts.  We received a second round of discovery

19   requests from various creditors, including Ms. Fenicle and

20   Mr. Fahy, regarding the specific plan on file and material

21   changes to it since earlier this summer.  We will be

22   producing all of the negotiations with the bidders,

23   including on these asbestos issues.  We'll be -- many of the

24   materials related to the treatment of asbestos under the

25   merger agreement in the new plan are contained in data

Page 131

1    rooms, which will also be produced, and we have not yet had

2    an opportunity to meet and confer with Ms. Fenicle and Mr.

3    Fahy on their supplemental requests, but we hope to do so

4    and we're willing to run any other additional -- we're

5    willing to discuss additional search terms with them, as

6    with the other creditors.  So, thank you.

7              THE COURT:  Thank you.

8              MR. HOGAN:  Your Honor, let me speak to just a

9    couple points that were made.

10              With regard to the insurance coverages and the

11    insurance issue that we're looking for, certain asbestos

12    products liability insurance and general liability insurance

13    policies were produced to the E-side Committee with a

14    professional-eyes-only designation, and so we keep hearing

15    this characterization that we've already gotten insurance

16    information.  We haven't.  The Committee got it, and it was

17    restricted, and so we hadn't seen it.  And so, the

18    characterization that we got that information is

19    categorically incorrect.

20              THE COURT:  All right, let me interrupt.  Fix

21    that.

22              MR. MCKANE:  It's fixed.

23              MR. SOWA:  Your Honor, that was the original

24    production.  That was true.  It was produced to the

25    Committee under professional-eyes-only.  That was during the

Case 14-10979-CSS   Doc 9906-23   Filed 09/21/16   Page 133 of 142
Case 14-10979-CSS   Doc 11702-23   Filed 08/09/17   Page 133 of 142

Page 132

1   bar date litigation.  Since then, we've produced it into the

2   production repository that everyone, including, I believe,

3   Mr. Hogan has a login to that database.

4           THE COURT:  Can we just --

5           MR. SOWA:  I sent a letter to Mr. Kazen pointing

6   out the base numbers for those documents, so --

7           THE COURT:  Can you just send them a hard copy?

8           MR. SOWA:  Yes, we can do that.

9           THE COURT:  Let's try that.

10          MR. HOGAN:  Thank you, Your Honor.  I appreciate

11  that.

12          And then, with regard to intercompany receivables,

13  as I said earlier, this morning we heard about how the

14  asbestos claims were unimpaired and that the value of the

15  intercompany claims of those four asbestos Debtors were what

16  they were going to be looking to for their recoveries.  And

17  so, from a relevance standpoint, it's germane.  We found

18  discrepancies in their SOFAs, in their sworn statements, as

19  to the starting point of the value of those entities'

20  intercompany receivables, and then when you take that,

21  combined with this loan rate, we're just trying to strive to

22  understand the actual intercompany receivables of the four

23  asbestos Debtors are what has been represented by the

24  Debtors, and in order to do that, we need this information.

25  Nothing more, nothing less.  It's relevant, and it will help

1    -- it'll help, you know, hopefully --

2              THE COURT:  Do we need to go back to 1980, 1990?

3              MR. HOGAN:  Well, Your Honor, we -- we asked for

4    1990 because there was the leveraged buyout.  We wanted to

5    make sure that we had an understanding about when it

6    started.  We can limit it to some more recent date, but it's

7    got to be at least, you know, probably '97, '98, somewhere

8    in there.  If they say they only have from '99 forward, I

9    mean, we can't make them give us something that they can't -

10   - they can't get access to, we understand that.  But to the

11   extent that they can -- they can get it, they should - they

12   should produce it, and that's our position.

13             THE COURT:  All right.  Thank you.

14             MR. HOGAN:  Thank you.

15             MR. SOWA:  Your Honor, there's nothing new here.

16   This was the same in the last plan.  We produced countless

17   pages of information regarding, you know, every facet of the

18   company's financial operations in connection with the last

19   round of discovery in 2015 and earlier this year in the

20   lead-up to the T-side confirmation, and we've been producing

21   E-side information as well.  But I mean, there's -- the --

22   it's old information, we either don't have it or it's been

23   produced or it's just not --

24             THE COURT:  You've -- all right, you've produced -

25   -

```
 1              MR. SOWA:  -- not relevant.

 2              THE COURT:  -- you've produced discovery that is

 3       available to Mr. Fenicle and Ms. Fahy that relates to

 4       intercompany claims with regard to the asbestos Debtors?

 5              MR. SOWA:  Yes, sir, I believe so.

 6              THE COURT:  Okay, and when and where is that

 7       information?

 8              MR. SOWA:  So, all of our discovery is saved in a

 9       repository that Fenicle -- Ms. Fenicle and Mr. Fahy's

10       attorneys have access to.  It's fully searchable.  It's a

11       Relativity database.  This information has been produced on

12       a rolling basis going back to 2014 on the legacy process

13       when we produced the, you know, 6 million pages of documents

14       that we hear about a lot in this Courtroom.

15              MR. HOGAN:  Your Honor, if I may?  In order to not

16       take up any more of the Court's time in this regard, I would

17       just ask that we -- we reserve our rights with regard to

18       this issue.  Let me circle back to my co-counsel and see if,

19       in fact, what they're telling us is, in fact, the case, and

20       if it is, we're done and if it's not, I'll tee it up one

21       more time and we'll go from there.

22              THE COURT:  All right.  Okay.  We'll do that,

23       then, and just, if you can't work it -- if it's -- you still

24       have an issue, call the Court and we'll do it by telephone

25       if we have to.
```

Page 135

1              MR. HOGAN:  Thank you.  Appreciate it.

2              THE COURT:  Okay.

3              MR. SOWA:  Thank you, Your Honor.

4              THE COURT:  All right, no problem.

5              MS. YENAMANDRA:  Good afternoon, Your Honor.

6              THE COURT:  That noise is terrible.

7              MS. YENAMANDRA:  Aparna Yenamandra from Kirkland &

8     Ellis on behalf of the Debtors.  The next and last item up

9     on the agenda is the disclosure statement.  It turns out

10    third time is a charm and we have no objections to the

11    disclosure statement today.

12              Four parties filed objections, the first liens,

13    the second liens, the PIKs and Ms. Fenicle and Mr. Fahy.  We

14    worked with the parties, we resolved these objections.  We

15    filed an amended disclosure statement on Thursday.  We did

16    not file a reply because, at that time, we were resolved.

17              We also worked with the parties on a handful of

18    changes to the disclosure statement order itself,

19    specifically with requests to the -- with respect to the

20    releases sections and the ballots, the opt-in, opt-out, and

21    we added some language around the voting record date as

22    well, and connected it to the disclosure statement hearing

23    date so that the voting record date is today.

24              Subsequent to that filing on Thursday, as Your

25    Honor has heard throughout the day, we -- we had this

```
 1    resolution with Fidelity and with NextEra, and as those

 2    events unfolded, we developed a revised disclosure statement

 3    with very minor edits reflecting this development.  The most

 4    significant of those changes, of course, is the increased

 5    recoveries as a result of the increased purchase price,

 6    specifically that the legacy note claims and the EFH swap

 7    claims, instead of getting a recovery of 16 percent, now get

 8    a recovery of 47 percent, I believe, and the TCEH settlement

 9    claim goes from 12 percent to 50 percent.

10               A handful of other minor changes.  I do have a red

11    line of just the changed pages if Your Honor would like to

12    see them.

13               THE COURT:  Yes, please.

14               MS. YENAMANDRA:  May I approach?

15               THE COURT:  Yes.  Thanks.  Okay.

16               MS. YENAMANDRA:  Okay.  If Your Honor has -- does

17    -- doesn't have any questions, we have a copy of the

18    disclosure statement order itself with the negotiated

19    resolutions reflecting, you know, resolution on the

20    objections as well as a clean version of the disclosure

21    statement.

22               THE COURT:  Please approach.

23               MS. YENAMANDRA:  So, if it works for Your Honor,

24    what we propose, after you sign it, is we will file a

25    solicitation version on the docket that's got the docket
```

1  numbers filled in and any typos fixed before Mr. Kieselstein

2  makes heads roll, and then we will commence solicitation as

3  soon as possible.

4           THE COURT:  Are you that -- is he that mean?

5           (Laughter in the courtroom)

6           MS. YENAMANDRA:  It's actually Mr. Husnick more

7  than Mr. Kieselstein.

8           THE COURT:  That I believe.  That I believe.  It's

9  because you didn't date.

10          (Laughter in the courtroom)

11          THE COURT:  It's just bitter.  Okay.

12          MS. YENAMANDRA:  Well, heads are going to roll

13 because we're in the middle of review season, so --

14          THE COURT:  All right, I've signed the order.

15          MS. YENAMANDRA:  Okay, thank you very much.  I

16 don't think we have anything else, other than Your Honor's

17 ruling on the PSA and merger motion.

18          THE COURT:  I've got Mr. Shore here.

19          MR. SHORE:  I'd like to say I'm here on behalf of

20 BEFH Equity, but not yet.

21          On the T-side, we have a brewing dispute with some

22 of the mean guys.  Some people have hardened their position

23 on saying that, just start the litigation.  We'd rather not.

24 We'd like to work it out, but if Your Honor had some time,

25 maybe Wednesday or Thursday for a chambers conference call,

Page 138

1   because I think this can be worked out and we should work it

2   out, but if we can't, it affects the effective date and so

3   we've got to get started on resolving our dispute.

4          THE COURT:  Can we do next Monday?  I know that's

5   later than you want, but --

6          MR. SHORE:  That's later than we wanted, but if

7   that's the time you have, that's the time you have.

8          THE COURT:  Well, we're in Court at 10:00 in this

9   case on Monday, so let's -- I'm --

10         MR. SHORE:  Okay.

11         THE COURT:  -- I'm going to be in Miami, so.

12         MR. SHORE:  Okay, let's --

13         THE COURT:  We could do it in Mr. Lauria's office.

14         (Laughter)

15         MR. SHORE:  -- we could see you for a little -- a

16   little bit of time before Monday and we'll use the interim

17   time, hopefully, constructively.

18         THE COURT:  All right, so we'll -- so to the

19   extent you need me, Monday at 10:00.

20         MR. SHORE:  Very good, thank you, Your Honor.

21         MR. KIELSELTEIN:  And Your Honor -- Mark

22   Kieselstein for the Debtors.  Just -- I think it is

23   something we can work out, and frankly, it's something that

24   we're economically, as the Debtor, agnostic on.  We just

25   want to make sure we're getting it done the right way, and

Case 14-10979-CSS   Doc 9006   Filed 09/21/16   Page 139 of 141

Page 139

 1    we'll -- happy to discuss it with you next Monday.

 2              THE COURT:  All right.  Okay.

 3              MR. SHORE:  Very good, thank you, Your Honor.

 4              THE COURT:  You're welcome.  You said except for -

 5    - you said we were done except for something to do with the

 6    PSA.  Did I --

 7              MS. YENAMANDRA:  Just Your Honor's ruling on the -

 8    -

 9              MR. HUSNICK:  Your Honor has entered the order, so

10    we're good to go --

11              THE COURT:  Okay, all right.

12              MR. HUSNICK:  Thank you.

13              THE COURT:  That's what I thought, all right.

14    Confused me, which is easy to do.  All right, thank you very

15    much, we're adjourned.

16              MR. HUSNICK:  Thank you, Your Honor.

17              THE COURT:  See you Monday.

18

19                         * * * * *

20

21

22

23

24

25

1                    **I N D E X**

2

3                      **RULINGS**

4    **DESCRIPTION**                         **PAGE**      **LINE**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya                  Digitally signed by Sonya Ledanski
                            Hyde
     Ledanski Hyde          DN: cn=Sonya Ledanski Hyde, o, ou,
7                           email=digital1@veritext.com, c=US
                            Date: 2016.09.20 17:14:39 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 20, 2016