**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 ) |
| | ) Case No. 14-10979 (CSS) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) ) (Jointly Administered) |
| Debtors. | ) ) **Re: D.I. 11430** ) **Hearing Date:** August 21, 2017 ) **Objection Deadline:** August 9, 2017 at 4:00 p.m. ET |

**LIMITED OBJECTION OF UMB BANK, N.A.
TO THE MOTION OF THE EFH/EFIH DEBTORS FOR ORDER AUTHORIZING
ENTRY INTO MERGER AGREEMENT AND APPROVING TERMINATION FEE**

UMB Bank, N.A., as Indenture Trustee (the "Trustee") for the unsecured 11.25%/12.25% Senior Toggle Notes Due 2018 (the "PIK Notes"), by and through its undersigned counsel, files this limited objection (the "Limited Objection") to the *Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11430] (the "Approval Motion).[1] In support of this Limited Objection, the Trustee respectfully submits as follows:

**PRELIMINARY STATEMENT**

1. The E-Side Debtors, having previously sought and secured a $275 million termination fee in the NextEra transaction now the subject of dispute before this Court, seek approval of a $270 million Termination Fee for a transaction that may never be consummated and in an amount which will, at best, dwarf the recoveries of the EFIH unsecured creditors and, at worst, lead to the administrative insolvency of the EFIH estate. This places a substantial burden of proof – not yet met – on the Debtors to present credible evidence that approval of a

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Approval Motion or in the *Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11426] (the "Plan"), as applicable.

$270 million Termination Fee is a sound exercise of business judgment and is necessary to preserve value for EFIH unsecured creditors. Having proclaimed that the BHE Transaction is the "highest and best proposal" (*see* Approval Motion, ¶ 4), the Debtors must present evidence demonstrating that approval of the Termination Fee is in the best interests of the *EFIH* Debtor's estate, including that it is necessary to induce BHE to enter into, stay committed to, and consummate the Transaction. BHE has been an interested party and potential purchaser since as far back as early 2016 (if not earlier) and this is not the first time that it has submitted a bid for the Debtors' assets. BHE's past interest in the Debtors' assets suggests that the Debtors cannot meet their burden of demonstrating that the Termination Fee was necessary to induce BHE to enter into the Transaction or that BHE will terminate the Merger Agreement if the Termination Fee is not approved.

2. Further, as the prior two failed plans of reorganization have demonstrated, there are risks associated with the consummation of the BHE Transaction that are outside of the control of the Debtors and BHE. In light of the $275 million termination fee claimed by NEE in connection with its failed transaction, this Court should view approval of any additional termination fees with great caution with respect to (i) the necessity of *any* Termination Fee, (ii) the *amount* of any such fee, and (iii) the *circumstances* under which such fee is payable. In the present circumstances, if any termination fee is appropriate, it is one of a significantly lower amount that is payable only in limited circumstances in which the Debtors exercise their "fiduciary out" to pursue a superior transaction that ultimately is consummated.

## LIMITED OBJECTION

3. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d

Cir. 2004). To that end, under applicable Third Circuit law, much like a "bid protection" in a section 363 sale, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *In re Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535-37 (3d Cir. 1999). The Debtors must meet this burden if any Termination Fee is to be approved.

I. **APPROVAL OF THE TERMINATION FEE DOES NOT PRESERVE THE VALUE OF THE ESTATES**

4. The Debtors, who seek authority to enter into the Merger Agreement, including the Termination Fee, tout the BHE Transaction as the "highest and best" transaction for the E-Side Debtors to pursue at this time. *See* Approval Motion at ¶¶ 4, 44. While the Trustee does not object to approval of the Merger Agreement itself in the absence of an actionable better alternative transaction, approval of the Termination Fee must be shown to maximize the proceeds received by the estates and to preserve the value of the estates.

5. Just like bid protections granted to a stalking horse bidder, a termination fee should only be granted to a bidder who benefits the estate by creating a floor and sparking a vibrant bidding process. *See Reliant Energy*, 594 F.3d at 210 (finding that "[t]he Bankruptcy Court did not abuse its discretion when it concluded that an award of a break-up fee was not necessary to preserve the value of the estate …"). Evidence is necessary that approval of the Termination Fee will yield such a result. The Termination Fee should not act as a *de facto* hurdle to potential investors contemplating an alternative superior transaction. Although the Debtors argue that they will be permitted to continue to negotiate higher and otherwise better offers ***after*** the Termination Fee is approved, any decision to pivot to another transaction comes at a $270

million price tag that will dramatically reduce the likelihood that a superior transaction will be proposed. Rather than "sparking a vibrant bidding process", approval of the Termination Fee effectively locks the Debtors into pursuing one deal, and one deal only – the BHE Transaction – and likely forecloses the possibility that a higher and better bid will be presented. This is not the intended purpose of a Termination Fee. *See O'Brien*, 181 F.3d at 535 (stating that a break-up fee that "serves to advantage a favored purchaser over other bidders by increasing the cost of the acquisition to the other bidders" is an "impermissible purpose"). As such, the Termination Fee should not be approved until other potential investors have a sufficient opportunity to propose an alternative, value maximizing, transaction for the benefit of the Debtors' creditors before locking the Debtors and their creditors into the BHE Transaction.

6. The Debtors also fail to address the impact on the estates if the Termination Fee is approved and ultimately must be paid. Depending on the allocation of the Termination Fee between the EFH and EFIH estates and whether the NEE Termination Fee is payable (in whole or in part), the EFIH estate could find itself administratively insolvent or with significantly reduced recoveries for the EFIH unsecured creditors. This unquestionably is not in the best interests of the EFIH estate and its creditors.

7. Moreover, the Debtors must demonstrate that approval of the Termination Fee (in whole or in part) was necessary to induce BHE to bid and to close on the Transaction. According to the Third Circuit, there are two ways that a break-up fee can preserve the value of an estate: (i) by inducing the stalking-horse bidder to make the initial bid; and (ii) by inducing the bidder to adhere to its bid after the court orders an auction. *See id.* at 535 ("the assurance of a break-up fee may serve to induce an initial bid (a permissible purpose)"). At the same time, courts have rejected break-up fees when they are not necessary to induce the stalking horse bid. *See Reliant*

*Energy*, 594 B.R. at 207 (rejecting proposed break-up fee, in part, because the court found that payment of the break-up fee was not necessary to induce the stalking horse bid). Here, no evidence has been presented that the Debtors needed to agree to *any* Termination Fee, let alone a $270 million Termination Fee, to induce BHE to enter into and close the Transaction. BHE has a long and demonstrated interest in Oncor. For example, in the Spring of 2016, BHE was one of two investors negotiating the terms of a transaction with the Debtors that progressed to the documentation stage. *See* Approval Motion at ¶ 26. Given BHE's demonstrated interest in the Debtors' assets, the Debtors have not met their burden of demonstrating that the Termination Fee was necessary to induce BHE to enter into the Transaction or that BHE will terminate the Merger Agreement if the Termination Fee is not approved.

8. Further, insofar as the Third Circuit has recognized that the first bidder in a bankruptcy sale takes a risk at least "to the extent of investing the time, money and energy needed to produce its bid" (*id. at* 206), and, thus, provides support for approval of a termination fee, this is not the case here. BHE is ***not*** the first bidder for the Debtors' assets. Rather, this is the Debtors' third attempt to close a transaction to sell their assets and much of the necessary work has already been performed. In fact, the BHE Merger Agreement is largely based on the NextEra Merger Agreement that had already been heavily negotiated and analyzed. These facts further undercut any basis to approve the Termination Fee, and suggest that, if ***any*** termination fee is approved, it should be reduced to be reflective of BHE's reasonable transaction costs and expenses.

9. In any case, the Debtors have not met their burden of demonstrating that the ***amount*** of the Termination Fee is appropriate. While the Debtors provide various data points

demonstrating that the Termination Fee is within the range typically approved by courts,[2] the Debtors must explain why a $270 million Termination Fee is appropriate under the circumstances here, where BHE had previously demonstrated an interest in acquiring the Debtors' assets and at least one other potential bidder has appeared.

**II.      THE TERMINATION FEE, IF APPROVED, SHOULD ONLY BE TRIGGERED IF THE DEBTORS EXERCISE THEIR FIDUCIARY OUT AND CONSUMMATE SUCH HIGHER AND BETTER TRANSACTION**

10.     This is the Debtors' third attempt to confirm and consummate a plan of reorganization. History proves that there are numerous variables outside of the Debtors' control that could prevent confirmation and/or consummation of the Plan and the Merger Agreement. For example, these variables include the obtaining necessary regulatory approvals from the PUCT and other agencies, obtaining private letter rulings from the IRS, satisfying the "TTI/Minority Interest Acquisition Condition", meeting certain milestones set forth in the Merger Agreement, and confirming the "Plan of Reorganization" in the form attached as <u>Exhibit A</u> to the Merger Agreement. *See* Merger Agreement at Article VII. If BHE and/or the Debtors terminate the Merger Agreement under any of these scenarios, subject to certain exceptions, the Debtors' obligation to pay the Termination Fee would be triggered. *See* Merger Agreement at Article VIII. This construct, however, does not benefit the Debtors' estates and should not be approved. Thus, if the Court is inclined to approve a Termination Fee, it should only be triggered in the limited scenario in which the Debtors exercise their "fiduciary out" to terminate the Merger Agreement and consummate a higher and better transaction that provides a superior

---

[2] Although the Debtors provide various data points to support approval of the Termination Fee, they do not note which of these "similar transaction" fees were approved in connection with bankruptcy transactions versus out-of-court acquisitions. This distinction is relevant to any analysis in determining whether the amount of the Termination Fee is appropriate.

recovery to the EFIH unsecured creditors.[3]  The current form of the Merger Agreement places too much risk on the Debtors and may result in a situation where the Debtors are required to pay a Termination Fee without having received any tangible benefits from the Merger Agreement.

## RESERVATION OF RIGHTS

11.    The Trustee continues to evaluate the Approval Motion, Merger Agreement, and related documents.  In addition, the Trustee notes that discovery is ongoing with respect to the Approval Motion.  As such, this Limited Objection is submitted without prejudice to, and with a full reservation of, the Trustee's rights to supplement this Limited Objection in advance of, or in connection with, the hearing on the Approval Motion.  Furthermore, nothing herein shall be deemed to waive the Trustee's right to assert any arguments in connection with approval of the Disclosure Statement or confirmation of the Plan.

[*Remainder of page intentionally left blank.*]

---

[3] Further, to the extent that an order or ruling is issued that would permit BHE to not close on the Transaction (such as satisfaction of the TTI/Minority Interest Acquisition Condition set forth in Section 7.2(f) of the Merger Agreement), unless BHE agrees to waive such condition in writing, the Debtors should be able to immediately terminate the Merger Agreement, without paying the Termination Fee, rather than being required to wait to terminate the Merger Agreement until the outside date under the Merger Agreement has occurred.  *See* Merger Agreement at §§ 8.2, 8.5.

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth in this Limited Objection, the Trustee respectfully requests that the Court deny approval of the Termination Fee and grant such other relief as this Court deems just and proper.

Dated:  August 9, 2017
Wilmington, Delaware

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone:     (212) 872-1000
Facsimile:       (212) 872-1002
Email:             idizengoff@akingump.com
                      aqureshi@akingump.com

Scott L. Alberino (admitted *pro hac vice*)
Joanna F. Newdeck (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone:     (202) 887-4000
Facsimile:       (202) 887-4288
Email:             salberino@akingump.com
                      jnewdeck@akingump.com

By:   */s/ Raymond H. Lemisch*
**KLEHR HARRISON HARVEY BRANZBURG LLP**
Raymond H. Lemisch (No. 4204)
919 Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193
E-mail: rlemisch@klehr.com

*-and-*

**FOLEY & LARDNER LLP**
Harold L. Kaplan (admitted *pro hac vice*)
Mark F. Hebbeln (admitted *pro hac vice*)
Lars A. Peterson (admitted *pro hac vice*)
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
Email: hkaplan@foley.com
         mhebbeln@foley.com
         lapeterson@foley.com

Barry G. Felder (admitted *pro hac vice*)
Jonathan H. Friedman (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-2329
E-mail: bgfelder@foley.com
           jfriedman@foley.com

*Co-Counsel for UMB BANK, N.A., as Trustee*