## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. 11430, 11699, 11700, 11701, 11703,** |
| | ) **11704** |
| | ) |
| | ) **Hearing Date: August 21, 2017 at 9:00 a.m.** |
| | ) |

## EFH/EFIH DEBTORS' REPLY TO OBJECTIONS TO
## MOTION FOR ORDER AUTHORIZING ENTRY INTO
## MERGER AGREEMENT AND APPROVING TERMINATION FEE

Energy Future Holdings Corp. ("EFH Corp."), certain of its direct and indirect subsidiaries (together with EFH Corp., the "EFH Debtors"),[2] Energy Future Intermediate Holding Company LLC ("EFIH"), and EFIH Finance, Inc. (together with EFIH, the "EFIH Debtors," and together with the EFH Debtors, the "Debtors")[3] file this reply (this "Reply") in support of the *Motion of the EFH/EFIH Debtors for Order Authorizing Entry Into Merger Agreement and Approving Termination Fee* [D.I. 11430] (the "Motion") and in response to the Elliott Funds' objection to the Motion [D.I. 11700] (the "Elliott Objection"), the Official

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the Debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]   The other EFH Debtors are Ebasco Services of Canada Limited, EEC Holdings, Inc., EECI, Inc., EFH Australia (No. 2) Holdings Company, EFH Finance (No. 2) Holdings Company, EFH FS Holdings Company, EFH Renewables Company LLC, Generation Development Company LLC, LSGT Gas Company LLC, LSGT SACROC, Inc., NCA Development Company LLC, and TXU Receivables Company.

Capitalized terms used but not defined herein shall have the meanings ascribed in the Motion and the Plan (as defined herein).

[3]   As used herein, "Debtors" shall mean the EFH Debtors and the EFIH Debtors and, prior to the TCEH Effective Date only, the TCEH Debtors and EFH Shared Services Debtors.

Committee of Unsecured Creditors' limited objection [D.I. 11699] (the "UCC Objection"), the

EFH Indenture Trustee's limited objection [D.I. 11701] (the "EFH Indenture Trustee

Objection"), UMB Bank, N.A.'s objection [D.I. 11703] (the "UMB Objection"), and Sunrise

Partners' objection [D.I. 11704] (the "Sunrise Objection" and the Sunrise Objection, the Elliott

Objection, the UCC Objection, the EFH Indenture Trustee Objection and the UMB Objection,

collectively, the "Objections").

In support of this Reply, the Debtors respectfully state as follows.

## PRELIMINARY STATEMENT

1.      The Objections should be overruled and the relief requested in the Motion should

be granted.  There is a long history in these chapter 11 cases of objecting parties seeking to

cherry-pick provisions of comprehensive, complex, and delicately negotiated transaction

documents to extract value without regard to how such efforts are likely to jeopardize the

Debtors' overall efforts to maximize value for all their stakeholders.  The same is true today with

respect to the Objections.

2.      The stakes, however, have never been higher.  The EFIH Debtors burn

approximately $50 million per month in interest rate obligations alone (without factoring in

professional fee obligations at the EFIH Debtors or EFIH Debtors).  The Public Utility

Commission of Texas (the "PUCT") has now made clear that (a) they will not approve a

transaction that does not preserve the 2007 Oncor ring fence on at least an "as is, where is" basis;

and (b) there is some risk associated with any transaction that contemplates a diversified

Reorganized EFH equity ownership structure and/or the imposition of post-emergence debt at

Reorganized EFH and/or Reorganized EFIH.  The Debtors' exclusivity periods have expired.

The history of these Debtors' efforts to sell EFH's indirect economic interest in Oncor are

overshadowed by two failed emergence efforts, and recognition that Oncor's status as the

2

Debtors' "crown jewel" asset is no longer enough to incentivize strategic purchasers to wade into the litigation and regulatory labyrinth of these chapter 11 cases in the hopes of emerging as the owners of Reorganized EFH. Finally, while the Debtors are not approaching administrative insolvency, languishing in chapter 11 for an indeterminable length of time makes insolvency a real possibility for the first time in three years.

3.      Against this backdrop, the Debtors have negotiated and executed a comprehensive merger transaction with Berkshire Hathaway Energy Company ("BHE")—a prominent, well-regarded utility holding company, which reported more than $4.2 billion in operating income in 2016 (nearly 90% of which was from its investment-grade, rate-regulated businesses). Learning from past successes and obstacles, and as the evidence will show, the Debtors fought for a number of significant concessions from BHE, including, among others: (a) BHE's agreement to take the ring fence "as is, where is"; (b) BHE's agreement to develop general regulatory support for its transaction from key interveners prior to execution of the Merger Agreement (importantly, twelve interveners have now pledged their support of the proposed BHE transaction); (c) BHE's agreement to preserve the EFH Committee Settlement (limiting the scope of Plan confirmation objections from EFH creditors); and (d) BHE's agreement to share the risk that PUCT approval will not be obtained.

4.      In exchange for these concessions, among others, the evidence will show that BHE required the Termination Fee. Importantly, the evidence will show that the Debtors attempted to obtain additional concessions from BHE regarding the terms of the Termination Fee, the size of the Termination Fee, and the circumstances in which the Termination Fee would be payable (or not). As is the case in any intensive negotiation, certain of these efforts were successful (*i.e.*, the Debtors were able to extract concessions on the Termination Fee triggers

particularly with respect to avoiding the Termination Fee if PUCT approval was not obtained under certain circumstances).  Other efforts were not successful (*i.e.*, efforts to reduce the size of the Termination Fee, efforts to obtain a reverse Termination Fee, and efforts to avoid the Termination Fee in the face of a higher or otherwise better offer in the form of a creditor-led equitization plan).  After three years of restructuring efforts, three formal and informal marketing processes, two unconsummated merger agreements, two confirmed but voided plans of reorganization, a series of very public denials from a key regulatory agency, substantial interest obligations, significant professional fee obligations, and a well-known set of activist creditor constituencies, the evidence will show that the Debtors simply did not have the leverage to obtain additional concessions from BHE.  **Importantly, and indicative of BHE's commitment to close on its transaction, the Debtors and BHE are in the midst of negotiations regarding an amendment to Termination Fee provisions in an effort to resolve certain of the Objections.  The parties believe they will be in a position to file an amendment to the Merger Agreement reflecting these changes in the short-term.**[4]

5.      Of course, the one non-negotiable concession the Debtors *did* obtain prior to execution of the Merger Agreement was the ability to (a) "go shop" the Merger Agreement without incurring any Termination Fee risk during the period between execution of the Merger Agreement and Bankruptcy Court approval of the Merger Agreement and (b) validly terminate the Merger Agreement during the period between Bankruptcy Court approval and entry of a confirmation order authorizing the transactions contemplated by the Merger Agreement to pursue a higher or otherwise better offer.  Forty days have elapsed since the Merger Agreement was executed.  One hundred and twenty-five days have elapsed since the PUCT rejected the

---

[4]    This Reply does not incorporate the terms of the proposed settlement.

transaction with NextEra Energy, Inc. ("NEE") and the world became aware that the Debtors would likely need to explore a backup plan to the NEE transaction.  No party emerged with an actionable proposal before execution of the Merger Agreement and, following execution of the Merger Agreement, it is difficult to imagine how an actionable proposal could be higher or otherwise better than the Merger Agreement in the absence of some level of regulatory support.

6.      As all parties are acutely aware, Elliott was the most prominent party to emerge with an interest in purchasing EFH's indirect economic interest in Oncor.  The Debtors engaged with Elliott in mid-May 2017—91 days ago—on the terms of a possible restructuring proposal. Despite the Debtors' best efforts, no actionable proposal has coalesced.  To date, and to the best of the Debtors' knowledge, Elliott has managed to obtain the majority of its committed financing from only one party: itself.

7.      Moreover, Elliott has obtained no regulatory support and, indeed, has been the recipient of several letters from the PUCT, disavowing any alleged regulatory consensus.  It has littered the public and Bankruptcy Court record with a series of disproved statements regarding the Debtors' efforts to support its unsuccessful capital raise efforts.  Ninety days later, and contrary to the confidence expressed by Elliott's advisors at the July scheduling hearing, Elliott is largely in the same position it was in May with respect to its capital raise and regulatory efforts.

8.      At best, Elliott may try to create the last minute impression that it is close to parity with BHE from an execution basis.  But all indications are that the execution gap is a chasm.  And even if Elliott were only trailing closely behind—which is putting the most optimistic gloss on reality possible—the Court has spoken clearly on the implications of being "this close" at this stage.  If Elliott's proposal, or any other party's proposal, morphed into an

actionable transaction, the Debtors would be free to (and, indeed, would actively pursue) such alternative consistent with their fiduciary duties and as permitted by the Merger Agreement.  The fact that such pursuit may come at the cost of the Termination Fee is an unfortunate consequence of the bleak circumstances facing the Debtors.

9.       The Objectors demand the Debtors either extract additional consideration from BHE and/or amend the Merger Agreement to extend the Debtors' "go shop" period to allow additional parties to emerge.  In a case infamous for its complexity, the Debtors' response to these demands is simple.  How long must the Debtors and their stakeholders wait to emerge? If not BHE, then who? If not now, then when? As the evidence will show, BHE has consistently threatened to terminate the Merger Agreement if the milestone to obtain Bankruptcy Court approval is not satisfied.  The Debtors and their stakeholders are facing two roads, diverged in a yellow wood: one road leads to emergence, a successful deleveraging restructuring, and stakeholder recoveries, the other gives additional parties more time to develop their restructuring proposals into restructuring transactions without incurring Termination Fee risk, but may lead to severely reduced stakeholder recoveries or administrative insolvency.  The Debtors are sorry they could not travel both, but the time has come to exit chapter 11.   BHE represents the Debtors' best chance for achieving this long-awaited goal.

## BACKGROUND

### I.       The Debtors' Road to the Merger Agreement.

10.       When the Debtors filed for chapter 11, there was little doubt that the Debtors' chapter 11 cases reflected a level of complexity and challenges rarely encountered in recent chapter 11 history.  In the last three years, the Debtors' quest towards emergence from these chapter 11 cases has been fraught with many challenges and unexpected developments.  Most

notably, on two occasions, the Debtors have confirmed a plan of reorganization, only to meet regulatory resistance at the PUCT.

11.     After two prior merger agreements and two prior confirmation trials failed to result in a consummated plan, three facts have become clear: (a) early and widespread regulatory support is key to mitigating the risk of a third order from the PUCT rejecting the Debtors' proposed path to exit; (b) it is unlikely that additional financing can be used to cure what the PUCT perceives as deficiencies in the Debtors' proposed transactions (*i.e.*, the amount of distributable value the Debtors raise for the benefit of creditors is largely irrelevant in the PUCT's analysis); and (c) unsecured creditor recoveries are steadily eroded by even incremental additional delays in the Debtors' path to emergence.

12.     ***First***, in August 2015, the Debtors entered into a plan support agreement with Hunt Consolidated, Inc. and certain co-investors (such agreement, the "Hunt PSA", and such group, collectively, the "Hunt Group") contemplating a merger (the "Hunt Merger") that would have converted EFH Corp. into a real estate investment trust.  On September 18, 2015, the Court approved the Debtor's entry into the Hunt PSA, and on December 9, 2016, confirmed the plan of reorganization authorizing the Hunt Merger (the "Hunt Plan").  The PUCT indicated that it would require certain post-reorganization commitments for Oncor, which the Hunt Group deemed to be unacceptable.  Consequently, in May 2016, the Debtors terminated the Hunt Merger.  The termination of the Hunt Plan represented the Debtors' first post-confirmation regulatory roadblock in these chapter 11 cases.  And so the Debtors went back to the drawing board.

13.     ***Second***, following the termination of the Hunt Plan, the Debtors embarked on a new path to create a value-maximizing plan, that is, one which would maximize return to

creditor stakeholders while accommodating what the Debtors perceived to be the PUCT's desired regulatory framework. The TCEH Debtors emerged from bankruptcy on October 3, 2016, under a core framework that was established and agreed upon through alternative restructuring provisions of the Hunt PSA. With respect to the Debtors, in the spring of 2016, the Debtors contacted 18 strategic and financial bidders, and signed nondisclosure agreements with 8 of these parties, including NEE and BHE. Following three months of multiparty negotiations, on July 28, 2016, the Debtors executed a merger agreement with NEE (the "NEE Merger Agreement"), and filed an amended plan of reorganization contemplating the NEE deal (the "NEE Plan"). At the time the Debtors entered into the NEE Merger Agreement, the Debtors, BHE, and NEE did not contemplate preserving the ring-fence "as is where is," and the Debtors and BHE had not reached agreement on a number of key factors, including: (a) the treatment of asbestos claims at EFH; (b) the inclusion of a "match right" for the benefit of BHE; (c) the size of any proposed termination fee; and (d) the terms and length of any "go shop" and "no shop" periods.

14.    Unlike the Hunt Plan, the NEE Plan was not predicated on the "high risk, high reward" strategy of implementing a real estate investment trust. Consequently, and learning from the failures of the Hunt Plan, the Debtors and their stakeholders believed the NEE Merger Agreement eliminated many of the regulatory concerns that plagued the Hunt Plan. In early 2017, the PUCT indicated that it would deny support for the joint application of Oncor and NEE regarding the NEE Merger Agreement. On April 13, 2017, the PUCT issued an order denying the joint application (the "PUCT Order").

15.    With the entry of the PUCT Order, it became blindingly clear that the Debtors' third attempt at a comprehensive restructuring must take a different look: an effort to build as

much regulatory consensus with as many key interveners as early as possible, with the ultimate goal—if possible—of obtaining PUCT approval prior to, or contemporaneously with, plan confirmation. And so the Debtors went back to the drawing board, acutely aware of the hurdles that faced them and the need to limit regulatory risk wherever possible (*i.e.*, obtain regulatory consensus as early as possible (to the extent possible) and minimize known regulatory complexities (*e.g.*, imposition of post-emergence debt on Reorganized EFH or Reorganized EFIH and diversified or indeterminate ownership of Reorganized EFH equity)).

16.     In early April 2017, when it became clear that the PUCT would be unlikely to approve the transactions contemplated by the NEE Plan, the Debtors began engaging with various parties in discussions regarding a potential backup proposal to the NEE Plan (a process authorized by the NEE Merger Agreement). To this end, on May 17, 2017, the Debtors and Elliott Capital Management (the largest holder of EFIH unsecured note claims and a large holder of EFIH second lien note claims) ("Elliott") executed a confidentiality agreement.

17.     The Debtors and Elliott have remained in active discussions since May 17, 2017—the last 91 days. During the last 91 days, Elliott's contemplated proposal has taken two different forms (initially, an equitization plan that contemplated two new DIP facilities and, most recently, a proposed merger transaction). Despite the many forms of the Elliott contemplated proposal (all of which the Debtors have actively worked to develop, consistent with their fiduciary duties), committed financing (from non-Elliott sources) and regulatory support have eluded Elliott to date. Despite the Debtors' efforts, an agreement has not materialized.

18.     On June 23, 2017, the Debtors received a proposal from BHE, which in large part preserved the construct of the NEE Merger Agreement and NEE Plan. As described in the Motion, the Plan (as defined below) contemplates a transaction in which reorganized EFH Corp.

would survive as a wholly-owned subsidiary of BHE, and the successor by merger to reorganized EFIH would survive as an indirect subsidiary of BHE. For these rights, BHE has committed to provide approximately $9 billion (in addition to leaving behind the cash on hand as of the effective date), with no financing contingencies. The Debtors informed BHE that if BHE were able to generate general regulatory consensus for its proposed transaction, such consensus would materially influence the Debtors' decision to move forward with the BHE transaction. Rising to the challenge, BHE delivered signed regulatory commitments, reflecting general regulatory consensus with eight key interveners. Since signing the Merger Agreement, BHE has obtained support from four additional key interveners.

19.     Following two weeks of negotiations and consultation with their advisors, the boards of directors of EFH Corp. and EFIH Finance, and board of managers of EFIH determined that it was in the best interests of their stakeholders to (a) terminate the NEE Merger Agreement and (b) execute a merger agreement with BHE (the "Merger Agreement"). With these approvals in hand, on July 7, 2017, the Debtors filed the *Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11426] (as may be amended, supplemented, or revised from time to time, the "Plan") that reflects the transactions contemplated by the Merger Agreement and the Motion. One week later, on July 14, 2017, the Debtors filed a supplemental submission with the IRS (the "IRS Submission") seeking certain rulings in pursuit of the approval of the transactions contemplated by the Merger Agreement.

20.     The evidence will show that the Debtors determined to execute the Merger Agreement in light of, among other considerations, the absence of any financing contingencies, the previously unforeseen level of general regulatory consensus, BHE's reputation as a well-

regarded utility holding company, the absence of any alternative actionable proposals on the horizon, BHE's willingness to largely preserve the structure of the NEE Plan (which simplified the negotiation and documentation process), and interest accrual at the EFIH Debtors which causes a chronic shrinkage of EFIH unsecured creditor recoveries for each month the EFIH Debtors languish in chapter 11.

## II.    Alternatives to the BHE Transaction and Costs of Delay.

21.    **There are no alternatives that reflect any level of regulatory consensus and, as a result, there are no actionable proposals that are higher or otherwise better than the proposed BHE transaction**.  Unlike in many chapter 11 cases, where bidders can generate competition by increasing their purchase price, an increased purchase price by itself carries little weight in the face of intense regulatory scrutiny. The statutory period for PUCT approval provides for a review period of up to 180 days from the filing of an application.  It is the Debtors' fervent hope that in light of the general regulatory consensus supporting the BHE transaction, it may be possible to request the PUCT to accelerate their review.  Although such decision ultimately lies in the sole discretion of the PUCT, the evidence will show that BHE's discussions with the interveners leads BHE and the Debtors to believe approval may be achieved in a 60 to 90 day timeframe.  In the absence of such consensus, there is very little chance the PUCT Staff will accommodate an accelerated review process.  During the same 180 day period, the EFIH Debtors would burn $300 million in interest rate obligations alone.  Thus, increased distributable value to EFIH creditors in the form of a higher initial purchase price vaporizes when counterbalanced with the lengthy—and uncertain—PUCT process associated with a transaction that lacks key intervener support.  As described below, the Elliott proposal suffers from regulatory, financing, confirmation, and consummation deficiencies. Putting aside the

deficiencies of the Elliott proposal, there simply exists no other purchaser that has managed to obtain even a modicum of regulatory support.

22.    As the Debtors approach the hearing to consider approval of the Merger Agreement, it bears repeating that the PUCT Order was entered 125 days ago.  The Merger Agreement was signed 40 days ago.  During this entire period, no other actionable proposal has come forward.  BHE as stalking horse has been completely exposed to the market for this entire period of time, particularly after having agreed to forego any "match right" to top a higher or otherwise better.  If there were a purchaser capable of achieving the same level of regulatory consensus as BHE, and provide a better level of distributable value as BHE, such a purchaser has had at least 125 days, if not three years, to come forward.

### III.    Unpacking the Proposed Termination Fee.

23.    Given the lack of a viable, live alternative to extol, the proposed Termination Fee is at the heart of the Objections.  The arguments raised in the Objections will be addressed in detail below, but the following principles guide any analysis of the Termination Fee.  *First*, the Merger Agreement makes clear that the condition precedent to consummation that has historically proven to be the Debtors' biggest hurdle to exit—PUCT approval—will not in and of itself trigger the Termination Fee.  *Second*, the Debtors have further mitigated the risk created by the need for IRS approval and certain conditions related to TTI's minority interest in Oncor Holdings by shifting some of the risk to BHE.  *Third*, the Debtors have favorably resolved the ambiguity related to the scenario in which the PUCT does not conditionally approve the Merger Agreement (subject to a Burdensome Condition) but rather outright rejects the Merger Agreement by treating the payment of the Termination Fee as equivalent in both scenarios. *Fourth*, the Debtors have adjourned the issue of allocating the Termination Fee, if triggered, between the EFH Debtors, on the one hand, and the EFIH Debtors, on the other hand, to a

separate settlement and hearing, if and when such issue becomes ripe.  *Fifth*, as will be detailed below, the Termination Fee is one component of a comprehensive BHE Merger Agreement that was informed by, among other key factors, the PUCT rulings that resulted in the termination of the Hunt Plan and the NEE Plan.  In other words, evaluating the Termination Fee only through the lens of the Debtors' negotiations with BHE in 2016 is misleading, short-sighted, and ultimately irrelevant in light of how circumstances changed between 2016 and 2017.  Additional information regarding the payment (or non-payment) of the Termination Fee is set forth below:[5]



---

[5]    The chart set forth below sets forth the scenarios in which the Termination Fee is not payable by EFH and EFIH to BHE under the Merger Agreement.  The chart is being provided for illustrative purposes only.  In the event of inconsistency between the terms in the chart and the terms set forth in the Merger Agreement, the terms of the Merger Agreement shall govern.

## ARGUMENT

I.    **The BHE Merger Agreement Satisfies the *O'Brien* Standard.**

A.    **Elliott Turns *O'Brien* On Its Head**.

24.    Elliott's primary argument is that the Debtors' estates will receive no actual and demonstrated benefit from the Termination Fee if the Merger Agreement does not consummate due to the failure of one or more of its conditions.  *See* Elliott Objection, ¶¶ 16-32.   If Elliott were correct that the Court should take such a backwards-looking approach, termination fees could only be approved once sales have been completed—a time at which any termination fee would be worthless.   This tautology simply cannot be the law, and Elliott has not provided support that it is.[6]   No rational purchaser would transact in a chapter 11 sale if it were the case.

25.    On the contrary, the Third Circuit only "requires that [a termination fee] provide some benefit to the debtor's estate." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 536 (3d Cir. 1999); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) (noting court had approved termination fee of 2.8% of assets and stating that "[t]here is no suggestion that the . . . benefit to the estate have to be substantial, as required by section 503(b)(3)(D).").  Such a benefit may arise where the termination fee induces the bidder to "remain committed to a purchase[.]"  *O'Brien*, 181 F.3d. at 537; *In re Dura Auto. Sys., Inc.,* No. 06-11202 (KJC), 2007 WL 7728109, at *91 (Bankr. D. Del. Aug. 15, 2007) (approving termination fee where, *inter alia*, "bidding protections played a material role in inducing the Purchaser to enter into the binding APA, thereby, in addition to setting a minimum price for the Sale Assets, providing a baseline asset purchase agreement upon which other bidders can rely").   And, indeed, the

---

[6]    Elliott cites two non-precedential decisions in which the courts decided to wait for the completion of a sale before authorizing a breakup fee.  *In re President Casinos, Inc.*, 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004); *In re Am. Appliance*, 272 B.R. 587, 601 (Bankr. D.N.J. 2002).  However, such an approach would forestall the approval of any break-up fee and significantly reduce the ability of debtors to attract interested purchasers.

evidence will show that the Termination Fee has done precisely that.  Furthermore, the Third Circuit analyzes whether a benefit has been provided *at the time of approval*.  *In re Reliant Energy Channelview LP*, 594 F.3d 200, 208 (3d Cir. 2010) (discussing how the bankruptcy court had properly used its discretion to determine if the estate benefited from the termination fee at the time of the approval hearing).  In this situation, BHE is locked into a transaction that delivers $9 billion of value to the estate and has worked with the Debtors to minimize closing risk if circumstances change.

26.    Here, there are no actionable alternatives that are higher or otherwise better than the BHE transaction, and every delay in consummating a sale of Oncor will result in a considerable loss to the Debtors' estates to the detriment of the Debtors' unsecured creditors.  BHE is the best, and currently only, option for providing a path forward to finally concluding these chapter 11 cases.  The evidence will show that BHE consistently threatened to exercise its rights to terminate the Merger Agreement if the Termination Fee is not approved.  Accordingly, the Termination Fee was a necessary inducement to BHE to enter into the Merger Agreement, and, as such, the Termination Fee has provided considerable benefit to the Debtors' estates.  Indeed, harkening back to the Debtors' efforts to confirm a plan of reorganization for the TCEH Debtors, the Objectors are yet again asking the Debtors to throw down the gauntlet and jeopardize their only viable path to exit.  BHE is acutely aware of the limited possibility that another purchaser will generate the same level of regulatory consensus (and is also aware of the increased regulatory risk associated with (a) any other proposal that contemplates material equity splits between a strategic purchaser and any other constituencies and/or (b) imposing debt at Reorganized EFIH or Reorganized EFH).  Three years into these chapter 11 cases, one formal

marketing process, two informal marketing processes, and two unconsummated merger transactions later, the Debtors simply do not have the leverage they once had.

27.     Additionally, Elliott appears to argue that if a debtor has previously attempted to sell an asset and that sale fails, all future purchasers are foreclosed from termination fees entirely.  *See* Elliott Objection, ¶ 43.  Elliott's cited precedent is inapplicable to the Debtors' unique circumstances.   In *Integrated Resources*, the court did note that "bidders are often reluctant to make the first bid for fear that it will be shopped around[.]"  *In re Integrated Resources, Inc.*, 135 B.R. 746, 750.  However, that court also noted "a break-up fee may include compensation for a bidder's lost opportunity cost."  *Id*.  At no point did that court, or any court cited, state or imply that purchasers may not obtain termination fees on subsequent, new transactions should the initially pursued transaction fail.  In this instance, BHE would suffer an enormous cost of having $9 billion in committed financing and absorbing regulatory and consummation risk.  Understandably, BHE does not want to commit such a substantial amount of capital without any protection.  BHE's commitment, which provides considerable benefit to the Debtors' estate, will evaporate should the Termination Fee not be approved.  Since there are no other actionable proposals on the table, the Debtors would be forced to return to the drawing board and wait, while the Debtors' estates would continue to diminish.

      **B.**      **The BHE Merger Agreement Represents the Best Available Offer.**

            **1.**      **The Termination Fee is Part of a Larger, Holistic Transaction in Which BHE Provided Material Concessions**.

28.     Proper application of the *O'Brien* standard directs courts to examine the "record [of] evidence" to determine whether the record, *examined holistically*, supports awarding the Termination Fee.  *O'Brien*, 181 F.3d 527 at 536.  The size (and need) for the Termination Fee is a product of, among other factors, (a) the Debtors' negotiating posture vis-à-vis other alternative

purchasers with a viable bid before the execution of the Merger Agreement; (b) BHE's reasonable demand that they receive some measure of comfort that the Debtors would pursue the Merger, even in the absence of documented creditor constituency support (an exercise that has often eluded the Debtors at the outset of a negotiation (because creditors want to keep their options open as long as possible), but which the Debtors have driven to a successful result time and time again); and (c) public knowledge that an ongoing chapter 11 process—with a larger interest run—would be severely detrimental to the Debtors' unsecured creditors. Furthermore, the Termination Fee is one component in a large, complex, and negotiated transaction, and evaluating the size of the Termination Fee requires an examination of the entirety of the transactions contemplated by the Merger Agreement (*i.e.*, the "gives and gets" realized by each of the Debtors on the one hand and BHE on the other hand).

29.     *First*, and perhaps most significantly, BHE agreed to not only take the Oncor ring fence "as is where is," but, in fact, agreed to certain enhancements. Based on the earlier attempts to obtain PUCT approval, the Debtors felt (and continue to feel) strongly that preservation of the existing ring fence is critical to obtaining PUCT approval. In agreeing to an enhancement of the ring fence, BHE agreed to, among other things, (a) maintain the current independent authority of the Oncor board (including the board's independent authority over dividend distributions); (b) additional restrictions on dividend distributions; and (c) refrain from any "credit linking" between BHE and Oncor. In other words, BHE agreed to infuse $9 billion in capital and agree to an enhanced ring fencing structure in order to own Oncor—this is a significant concession.

30.     *Second*, before considering any allocation of the termination fee that may become due and payable under the NEE Merger Agreement, BHE agreed to largely preserve the EFH Committee Settlement (*i.e.*, reinstatement of asbestos claims, preservation of EFH cash on hand

for the benefit of EFH creditors, and preservation of the "turnover" distributions that provide certain Classes of EFH Claims with additional recovery that would have otherwise gone to TCEH first lien creditors).  The Debtors believe that maintaining the EFH Committee Settlement under the Plan with essentially the same legal and economic structure as the NEE Plan mitigates Plan confirmation risk with respect to the EFH Debtors.  Importantly, the Debtors and BHE had not reached agreement on the treatment of EFH creditors in 2016.

31.     *Third*, despite a general agreement to preserve the structure of the NEE Merger Agreement and NEE Plan as far as possible (to reduce the time spent negotiating definitive documentation and narrow the scope of issues to be litigated), BHE agreed to at least one important change in the Termination Fee structure.  As the Court is aware, under the NEE Merger Agreement, payment of the termination fee in some cases depends on which party terminated the NEE Merger Agreement.  Under the Merger Agreement, the parties now equally share the risk of failure to obtain PUCT approval.  Under Section 8.5(b)(iii), if the Merger Agreement is terminated by either BHE or EFH/EFIH, and failure to obtain the PUCT approval is the only condition to consummation not waived or satisfied (other than (a) those conditions to be satisfied at closing and (b) the condition requiring IRS approval, if the absence of IRS approval relates to BHE's refusal to accommodate the IRS's stock rulings), then the Termination Fee is not payable, regardless of who terminates the Merger Agreement.  Given that PUCT approval has been the single largest hurdle to chapter 11 for over two years, this is a significant concession from BHE.

**2.     The Debtors Sought Additional Termination Fee Concessions**.

32.     As the evidence will show, the Debtors sought additional concessions with respect to the Termination Fee.  Early in the negotiations, the Debtors sought a carveout from the Termination Fee that would allow the Debtors to avoid the Termination Fee if they terminated

the Merger Agreement to pursue and consummate a higher or otherwise better offer that contemplated a creditor-led equitization. At that time, the Debtors also pushed for a lower termination fee ($75 million versus $275 million, after considering the likelihood of a 2017 emergence) and raised the possibility of a reverse breakup fee. These efforts were not successful, as BHE remained unwilling to absorb 100% of the consummation risk related to the Debtors' ultimate pursuit of a creditor-led equitization plan (an unsurprising result given that the Debtors' negotiations with Elliott were a matter of public record and the Elliott proposal was the Debtors' only professed potential alternative to the Plan). Instead, as the evidence will show, BHE agreed to share the PUCT approval risk with the Debtors (as described above and as set forth in Section 8.5(b)(iii)) and agreed that if IRS approval was the only condition pending (as a result of BHE's refusal to accommodate the IRS's stock rulings) other than those conditions to be satisfied at closing, then the Termination Fee would not be payable even if PUCT approval was also still pending at the time (Section 8.5(b)(v)).

### 3.    There Are No Actionable Alternatives That Represent Higher or Otherwise Better Offers As Compared to the BHE Transaction.

33.    Blatantly mischaracterizing the deliberation process that culminated in the execution of the Merger Agreement, Elliott alleges the Debtors "suddenly pivoted" to the BHE deal as the Elliott-led proposal was being "finalized." Elliott Objection, ¶ 13. This is simply false. As has been stated *ad nauseum*, the Elliott-led proposal did not represent (and does not currently represent) an actionable alternative. *First*, the Elliott-led proposal is devoid of any regulatory support. On July 11, 2017, Elliott noted that "the PUCT staff advised Elliott that it would accept the proposed equitization plan, subject to setting the terms out in a formal agreement." This letter was published on July 11, 2017. *See* http://elliottdocs.com/energy-future.php. Immediately before the August 7, 2017 telephone discovery dispute hearing, the

RLF1 17988120v.1

Assistant Attorney General of the State of Texas sent an electronic e-mail to the Debtors, disputing Elliott's recollections of its meeting with the PUCT, stating "to date, there have been no settlement communications between the PUCT and Elliott." *Letter From Mark McKane, P.C. to The Honorable Christopher S. Sontchi Regarding Correspondence From the Assistant Attorney General of the State of Texas Relating to August 7, 2017 Telephonic Discovery Dispute Hearing* [D.I. 11686] (the "AG Letter").  The evidence will show that: (a) Elliott still has made absolutely no material progress on the regulatory front; and (b) Elliott's strategic shortcomings in the form of PUCT-related blunders and missteps, including those identified in the AG Letter, have forestalled any potential for achieving regulatory consensus on par with that of BHE.

34.    ***Second***, Elliott has not presented sufficient committed financing to support its proposal.  This was the case when the Debtors filed the Motion and it remains true at the time of this filing.[7]  Aside from being tied to a merger agreement that has not even been negotiated to execution, Elliott's currently "committed" financing remains billions of dollars short from satisfying the Debtors' secured debt obligations.  The financing source should be a familiar party to the Court: Elliott.  In a desperate effort to present any indicia of committed financing, Elliott has essentially pledged their own support for their own deal.  At the hearing to consider approval of the Debtors' Scheduling Motion, Elliott's representatives repeated what has now become their refrain: with more time, the committed financing would coalesce.  As of the date hereof, the Debtors are not aware of any progress on this front (and certainly have not seen any progress

---

[7]    Elliott has yet to produce a single draft commitment letter from other potential financiers (redacted or otherwise) let alone signed commitment letters.  It may well be that Elliott is tactically stockpiling unexecuted equity commitment letters to drop on the Debtors at the last possible moment.  Such a strategy would not only flout this Court's admonition to avoid gamesmanship but would also be a sign—not of confidence—of insecurity that bespeaks an effort to avoid scrutiny.

RLF1 17988120v.1

disclosed in the Elliott discovery productions made to date, which require Elliott to produce any executed equity commitment letters within 24 hours of execution).

35.    It is worth noting that it was not until nine days after the July 26, 2017 Scheduling Hearing, on August 3, 2017, that Elliott's representatives shared a draft merger agreement and equity commitment letter with the Debtors' advisors.  Within 48 hours, the Debtors' advisors scheduled and attended several requested diligence calls, provided the requested diligence materials (all of which the Debtors would have provided during the preceding 79 days if requested), and circulated a preliminary issues list.  Within another 48 hours, the Debtors circulated revised drafts of both the merger agreement and the draft equity commitment letter. No other drafts of the definitive documents were circulated back to the Debtors or their advisors. Thus, Elliott has materially modified its transaction structure, received all requested diligence from the Debtors' advisors and, to date, has yet to provide the Debtors with an actionable proposal yet to mention a plan of reorganization.

36.    Putting aside the deficiencies in the Elliott proposal, following entry of the PUCT Order, any proposal that can be considered a higher or otherwise *better* offer when compared to the BHE transaction must have some level of regulatory support.  A proposal that increases the distributable value available for creditors by a few hundred million, while certainly important to evaluate, does not fundamentally change this calculus in light of how quickly a few hundred million is absorbed by debt service and professional fee accruals.  Moreover, no amount of committed funding will cure the Debtors' inability to consummate a transaction in the absence of PUCT approval.  The regulatory obstacles to consummation are significant, well-known, and not subject to dispute.  And if an Elliott proposal ultimately fails to get PUCT approval, there is no way to measure how much lower the next proposal—if there is a next proposal—will be.  Simply

21

put, the Debtors do not have a proposal from any other party reflecting the same level—indeed any discernible level—of general regulatory consensus supporting the Merger Agreement.

37.     Nevertheless, in the unlikely event that Elliott or any other party is able to develop a higher or otherwise better offer, the Debtors would be able to exercise a fiduciary out under the Merger Agreement.  It is true that a pivot away from an approved Merger Agreement could potentially trigger the Termination Fee, but that is the cost that any purchaser will have to bear from emerging from the chapter 11 shadows more than 45 days after the Merger Agreement was signed (during which period the Debtors could pivot to an alternative transaction without incurring the Termination Fee).

**C.    The Time Is Not Ripe to Decide the Potential Allocation of the Termination Fee.**

38.     If this Court approves the Termination Fee, and it later becomes payable to BHE, then parties in interest would have full notice and opportunity to dispute how the fee should be allocated between the EFH and EFIH estates.   The Debtors are confident that the Merger Agreement provides the best, and only, path forward, and given the fact that BHE has already garnered considerable regulatory support, it is unlikely that the Merger Agreement will not close as a result of regulatory conditions remaining unsatisfied.

39.     If the Merger Agreement were terminated, and thus the issue regarding the allocation of the Termination Fee were to ripen, the EFIH and EFH disinterested directors will either settle the Termination Fee (subject to court approval) or ask the Court to adjudicate the allocation.   Elliott's belief that the Debtors "would seek to allocate all or nearly all of the Termination Fee to EFIH" is completely unfounded.   *See* Elliott Objection, ¶ 50.   As the evidence will show, the negotiations between the EFIH and EFH disinterested directors on the allocation of a fee that has not been triggered have not taken place.   The disinterested directors

22

have rigorously protected the interests of their respective estates through the course of these chapter 11 cases, and there is no reason to suggest they would forego their duties in this instance. Indeed, forcing the allocation to be adjudicated in a vacuum at the hearing to consider approval of the Merger Agreement does not maximize value for any stakeholder.  Each stakeholder will no doubt advocate for its parochial position (*i.e.*, that it should bear none of the Termination Fee obligation) and without the negotiations of the disinterested directors to provide some record and basis for considering opposing views, there will be an acute lack of support for any proposed allocation.

        **D.**       **The Termination Fee is Reasonable Based on Market Comparisons.**

       40.      As the evidence will show, the Termination Fee (equal to approximately 1.5% of the total enterprise value for the 80% of Oncor owned by EFIH and 3.0% of consideration made available to EFIH (*i.e.*, equity value)) is supported by market comparisons across both the energy industry and other large industries with similarly sized transactions.  ***First***, the Termination Fee is (a) 0.5% less than the average termination fee as a percentage of <u>total enterprise value</u> and (b) 0.1% less than average termination fee as a percentage of <u>equity value</u>, in each case payable by target companies in transactions of publicly traded utility companies in the last five years (with an equity value of $1.0 billion or more). Additionally, the Termination Fee is (a) 1.3% less than the average termination fee as a percentage of <u>total enterprise value</u> and (b) 0.3% less than average termination fee as a percentage of <u>equity value</u>, in each case payable by target companies in recent, similarly sized transactions across different industries.  It is worth repeating that the asset being sold is not itself in bankruptcy, making the industry comparisons even more appropriate.

### E.     The Termination Fee Did Not "Chill Bidding" To Date.

41.     Furthermore, contrary to Elliott's assertions, the Termination Fee was not designed to "chill bidding," nor has it had that effect.  Elliott Objection, ¶¶ 33, 38, 43. Forty days have passed since the execution of the Merger Agreement and 125 days have passed since entry of the PUCT Order.  During that time, no actionable proposals have materialized.  Elliott is the best example for this proposition: since the execution of the non-disclosure agreement, Elliott has had over three months to develop an actionable proposal and has failed.  Between May 17, 2017 and July 7, 2017, Elliott was able to negotiate with financing sources and regulatory interveners without the overhang of the Merger Agreement and from all appearances accomplished absolutely nothing.  Between July 7, 2017 and the date hereof (another 40 day interval), Elliott has—along with its belatedly retained financial advisor—been able to engage with financing sources and regulatory interveners without incurring the risk of the Termination Fee.  Other than the Plan, the Debtors have not received an actionable proposal—either from Elliott or any other party—during this three-month timeframe.  There is no reason to believe that a higher or otherwise better offer to the Plan is materializing and to the extent such a proposal exists, the parties have had ample time to develop and present them to the Debtors and the Court.

## II.     The BHE Transaction Was Proposed in Good Faith and Has a Sound Business Purpose.

42.     For all the reasons stated above, the BHE transaction was proposed in good faith and has a sound business purpose.  There are simply no other actionable alternatives that embrace the Debtors' first principles: maximum distributable value, regulatory consensus, minimum consummation risk, and fully committed financing.  Continuing to languish in chapter 11 is not an option and the facts dictating the Debtors' restructuring efforts are both bleak and unique.  As the Debtors approach their third attempt at chapter 11 exit, their leverage has

dropped precipitously.  Regulatory support has proven to be challenging and unpredictable.  The Debtors' exclusivity periods have long since expired.  Interest burn erodes unsecured creditor recoveries by $50 million every month.  Over $8.8 billion in secured debt obligations require the Debtors to raise a significant amount of capital purely to avoid a liquidation crisis.  Under these circumstances, the Debtors do not have significant leverage to demand additional consideration and additional Termination Fee concessions from the only credit-worthy purchaser willing to take the ring fence "as is where is" with no financing contingencies and the general support of twelve key interveners.

43.    Moreover, all potentially interested parties have had a significant period of time in which to develop an alternative proposal.  None have emerged.  Allowing such parties additional time in the hopes that a heretofore-unforeseen white knight purchaser will enter the regulatory and litigation morass that are the Debtors' chapter 11 cases is a reckless proposition.  Indeed, should those efforts prove to be unsuccessful (as they are very likely to be), the very creditors that are objecting to the Merger Agreement will be the first to suffer the consequences.  But the pain does not stop there—such a reckless set of circumstances puts at risk the recoveries of the EFIH and EFH creditors who have not objected to the Motion.

**III.    The Court Should Reject Attempts to Cherry-Pick the Termination Fee Carveouts**.

44.    Certain of the Objections challenge individual provisions of the Termination Fee. As discussed above, the Termination Fee is one component part of a larger, integrated, and negotiated transaction. Cherry-picking favorable provisions threatens to dismantle the entire Merger Agreement.  As discussed below, the arguments raised with respect to certain of the Termination Fee provisions are based on false premises.

45.    Elliott argues that the Termination Fee provisions create a so-called "Hobson's Choice" in which the Debtors are faced with a failure to obtain PUCT approval, IRS approval, or

satisfaction of the TTI conditions but must either (a) wait until the closing date has occurred, and then terminate the Merger Agreement, to avoid the Termination Fee or (b) terminate the Merger Agreement early and incur Termination Fee risk.  First, IRS approval and PUCT approval will be required no matter what restructuring path the Debtors opt to pursue.  Pursuit of these approvals takes time, so whether the Debtors are pursuing the BHE transaction, the Elliott proposal, or another transaction, the Debtors and their stakeholders will need to remain in chapter 11 while these regulatory approvals are obtained. Second, the parties have worked to mitigate the risk of not obtaining PUCT approval by generating widespread general regulatory consensus and eliminating the Termination Fee in the event PUCT approval is the last outstanding condition to be satisfied.  Finally, the Elliott proposal has no PUCT support, and the PUCT process (by statute) takes up to 180 days in the absence of an agreement for accelerated review.  Even if an Elliott proposal were to rapidly coalesce and Oncor were to file a PUCT application on September 1, 2017 (a date that is exceptionally difficult if not impossible to meet, given the current debilitating deficiencies in the Elliott proposal) with respect to such proposal, the PUCT process would take at least until February 28, 2018: a mere six days before the initial closing date in the Merger Agreement.  In short, it is an unfortunate reality that the Debtors' regulatory process lengthens the time between execution of definitive documentation and chapter 11 exit. That reality exists in virtually every realistic restructuring scenario.[8]

---

[8]     Elliott also argues that approval of the Merger Agreement constitutes a de facto extension of exclusivity and a de facto imposition of a "death trap."  Neither of these arguments has any merit.  Elliott could file a competing plan at any time.  The only hurdle to its ability to file a plan is the absence of an actionable transaction. The fact that the Debtors exclusively have the only actionable path to exit does not mean the Debtors have improperly extended their statutory exclusivity. Additionally, even assuming that a "death trap" means any scenario where a creditor is economically harmed by its rejection of a plan, which it does not, Elliott's argument fails.  Elliott cites *Adelphia* in support that death traps are impermissible.  *Id.*  Interestingly, that court held the opposite.  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 275 (Bankr. S.D.N.Y. 2007) ("Because the CVV Interests at issue will have only speculative value on the Effective Date, ***and because a "carrot and stick" provision such as the one set forth in the Plan is wholly permissible***, the Equity Committee's argument fails.").   More importantly,

46.    In addition, as noted above, the Debtors are in the middle of settlement discussions regarding the specific triggers to the Termination Fee.  To the extent the Debtors are unable to reach a resolution on such issues, the Debtors will address such arguments on the record at the hearing to consider approval of the Merger Agreement.

## Conclusion

47.    The transactions contemplated by the Merger Agreement represent the Debtors' only available and actionable proposal to emerge from chapter 11.  All interested parties have had at least 40 days from the signing of the Merger Agreement, arguably at least 125 days (from entry of the PUCT Order), and in some sense three years to develop an actionable proposal (without incurring any Termination Fee risk).    At best, providing additional time for an additional transaction to develop may result in an increased purchase price (which means little when faced with regulatory uncertainty for a third time).  At worst, it may result in the complete obliteration of any viable path to exit.  This is the stark reality that set the stage for the Debtors' negotiations with BHE and resulted in the comprehensive, integrated, and negotiated Merger Agreement in front of the Court on August 21, 2017.  For the foregoing reasons, the Debtors respectfully submit that the Court should overrule the Objections and grant the relief requested in the Motion and such other and further relief as is appropriate under the circumstances.

*[Remainder of page intentionally left blank.]*

---

courts in this district have held that death traps ***are permissible***.  *In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999)

RLF1 17988120v.1

Dated:  August 16, 2017
   Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email:  collins@rlf.com
     defranceschi@rlf.com
     madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email:  edward.sassower@kirkland.com
     stephen.hessler@kirkland.com
     brian.schartz@kirkland.com
     aparna.yenamandra@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email:  james.sprayregen@kirkland.com
     marc.kieselstein@kirkland.com
     chad.husnick@kirkland.com
     steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession