## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Related Docket Nos.: 11430, 11699, 11700, 11701, 11703, 11704, and 11761** |

## BERKSHIRE HATHAWAY ENERGY COMPANY'S JOINDER IN EFH/EFIH DEBTORS' MOTION FOR ORDER AUTHORIZING ENTRY INTO MERGER AGREEMENT AND APPROVING TERMINATION FEE AND OMNIBUS REPLY IN SUPPORT

Berkshire Hathaway Energy Company ("**BHE**") files this joinder to the E-Side Debtors'[2] Approval Motion [Docket No. 11430][3] and the *EFH/EFIH Debtors' Reply to Objections to Motion for Order Authorizing Entry Into Merger Agreement and Approving Termination Fee* [Docket No. 11761] (the "**Debtors' Reply**"), and in response to the objections to the Approval Motion filed by the Elliott Funds [Docket No. 11700] (the "**Elliott Objection**"), the EFH/EFIH Committee [Docket No. 11699] (the "**Committee Objection**"), the EFH Indenture Trustee [Docket No. 11701] (the "**EFH Indenture Trustee Objection**"), the PIK Note Trustee [Docket No. 11703] (the "**PIK Note Trustee Objection**"), and Sunrise Partners Limited Partnership [Docket No. 11704] (together with the Elliott Objection, Committee Objection, EFH Indenture Trustee

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]    For convenience, the E-Side Debtors are referred to herein as the "Debtors."

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [Docket No. 11430] (the "**Approval Motion**") and the Debtors' Reply (as defined below).

Objection, and PIK Note Trustee Objection, the "**Objections**").  In support of this joinder, BHE respectfully states as follows:

## JOINDER

1.      BHE, by and through its undersigned counsel, hereby joins and incorporates the arguments in the Approval Motion and the Debtors' Reply.

### I.

## BACKGROUND INFORMATION

**A.      The Merger Agreement Has Been Structured to Facilitate the Debtors' Prompt Exit From Chapter 11, and Elliott Has Had a Reasonable Opportunity to Produce a Superior Proposal.**

2.      On March 30, 2017, the Public Utility Commission of Texas (the "**PUCT**") stated that it was likely to deny the change in control application filed by Oncor Electric Delivery Company LLC ("**Oncor**") implementing the NextEra transaction that this Court had previously approved.  This signaled to the market that, unless the PUCT reversed its decision or NextEra yielded to the conditions being imposed on NextEra by the PUCT, the Debtors would need to promptly find an alternative transaction that would facilitate their exit from Chapter 11.  BHE acknowledged these circumstances, and began analyzing whether it could formulate a viable alternative proposal for the Debtors' 80% interest in Oncor.  After the PUCT denied NextEra's requests for rehearing, BHE circulated a full draft Merger Agreement to the Debtors and immediately began negotiating the terms of the deal that is currently before this Court.

3.      On July 7, 2017, BHE executed the Merger Agreement, which provides for BHE's acquisition of EFH Corp.'s indirect interest in Oncor for $9 billion in cash, plus the assumption by the reorganized Debtors of the "Legacy General Unsecured Claim Against the EFH Debtors" (as defined in the BHE Plan), including asbestos claims and certain legacy employee obligations (the

"**BHE Transaction**").  The aggregate value of Oncor based on the terms of the Merger Agreement equates to a total enterprise value ("**TEV**") of more than $18 billion.

4.      The Approval Motion was filed on July 7, 2017 and originally set on normal notice for hearing on August 11, 2017.  Elliott filed *The Elliott Funds' Motion to Adjourn Hearing on the Motion of the EFH/EFIH Debtors for Order Authorizing Entry Into Merger Agreement and Approving Termination Fee* [Docket No. 11506] (the "**Adjournment Motion**"), seeking a postponement of the hearing on the Approval Motion to as late as September 20.  Elliott asserted that it needed additional time to obtain financing commitments for its competing proposal, even though Elliott had been free to start seeking investors for such a plan not later than May 17, 2017, and knew that the PUCT was not likely to approve the NextEra transaction not later than March 30, 2017.  The Court postponed the hearing to August 21, 2017, to provide Elliott with additional time to arrange committed financing for an alternative proposal and to obtain indications of regulatory support for any such proposal.

5.      If the Approval Order is not entered by August 21, 2017, BHE has the right to terminate the Merger Agreement.  As BHE informed the parties and the Court in connection with the Adjournment Motion, absent unforeseen circumstances, BHE will terminate the Merger Agreement if it and the Termination Fee are not approved by August 21.  This was confirmed by BHE's President, Chairman, and Chief Executive Officer, Greg Abel, in his deposition on August 15, 2017.  Depo. Tr. 8/15/17 (Abel), p. 129:20–130:5 (BHE will terminate the Merger Agreement if the Merger Agreement and the Termination Fee is not approved at the hearing on August 21).

6.      To date, Elliott has not provided any evidence of sufficient financing commitments for a potential Elliott proposal or of regulatory support for such a potential proposal.[4]  As a result,

---

[4]      Elliott has failed to produce documents in response to the Debtors' requests for production with respect to sufficient financing commitments.

the Court, BHE, the Debtors, and the Debtors' creditors are in exactly the same place they were in on July 26, 2017:  (a) BHE has executed a Merger Agreement which provides for a $9 billion immediate cash payment and assumption of legacy claims by the reorganized Debtors, has no financing contingencies, and has signed support from the PUCT staff and key intervenors who have taken positions in connection with the prior applications to approve a change of control of Oncor (collectively, the "**PUCT Staff and Intervenors**"), and (b) Elliott has made no showing that it has (i) commitments for the more than $9 billion in debt and equity financing necessary for its elusive proposal, and/or (ii) support from the PUCT Staff and Intervenors for any proposed transfer of control of Oncor contemplated by a potential Elliott proposal.  Even if Elliott could demonstrate at the hearing that it has obtained financing commitments not yet delivered, it will not be able to provide any evidence of regulatory support, which would mean that proceeding with such a plan would create a tremendous risk of yet another confirmed reorganization plan that cannot be implemented because it is unacceptable to the PUCT.

7.    The simple fact is that the Termination Fee that is part of the Merger Agreement was an absolutely necessary inducement and that BHE would not have entered into the Merger Agreement without the Termination Fee, which includes BHE's commitment of $9 billion in cash for up to 240 days, unless the BHE Transaction successfully closes before that date.  Mr. Abel was crystal clear on this point in his deposition.  When asked by counsel whether the BHE deal would be better for the estate if there was no termination fee included, Mr. Abel said: "You wouldn't have us.  We wouldn't be here."  Depo. Tr. 8/15/17 (Abel), p. 123:10–11.  When counsel pressed the point again suggesting a scenario where BHE signs a merger agreement without the termination fee, he added: "I'm saying we would never enter into the deal."  *Id.* at p. 124:2–3.  Of course, if the BHE Transaction closes earlier than March 4, 2018 (the "**Outside Date**"), the Termination Fee

is not payable.  By inducing BHE to enter into the Merger Agreement and to remain bound while the Debtors have a fiduciary out until confirmation of a plan, the Termination Fee has provided a substantial benefit to the Debtors' estate.

8.    The "milestone" dates provided by the Merger Agreement were reasonable and appropriate.  They permit third parties a fair opportunity to put forth an executable alternative transaction.  The Debtors had a 45-day period during which they could have accepted a Superior Proposal (as defined in the Merger Agreement) without having to pay a Termination Fee.  Even after approval of the Merger Agreement the Debtors can accept a Superior Proposal; they simply have to pay the Termination Fee, which is less than 1.5% of TEV.  No such Superior Proposal has materialized to date.

9.    BHE remains optimistic that it will close the BHE Transaction and pay off EFIH's DIP facility and secured second lien notes much faster than any other buyer could close, even if another concrete offer were to surface.  In light of the ongoing accrual of interest at the rate of approximately $50 million per month and the ongoing accrual of professional fees, time is money. Even in the unlikely event that Elliott were to secure financing commitments and eventually obtain PUCT regulatory approval, because it is starting from scratch[5] and its structure includes approximately $4 billion of debt that is serviced solely by the revenues from Oncor, any closing (if it could be achieved) would almost certainly be months later than the BHE Transaction could close.  Even if Elliott could complete a transaction, an additional six-month delay by Elliott in obtaining more than $9 billion of cash and PUCT approval would deplete the funds available to

---

[5]    The fact that Elliott would be starting from scratch could not be more clear.  On August 7, 2017, Hal Morris, Assistant Attorney General for the State of Texas, confirmed in writing that "there have been no settlement communications between the PUCT and Elliott . . . as Elliot [sic] does not have a completed alternate transaction such that could be negotiated to obtain the support of PUCT staff."  Mr. Morris's letter was filed with this Court on August 7, 2017 [Docket No. 11686-1].

unsecured creditors at a rate of $50 million per month (or approximately $300 million total), largely obviating any alleged benefit by Elliott's effort to formulate a proposal, even if that proposal were $300 million higher than BHE's price.

> **B.    BHE Is Finalizing an Agreement to Amend the Merger Agreement to Address Certain Objections Regarding the Termination Fee**.

10.    The EFH/EFIH Committee's objection contends that the Merger Agreement is unclear as to whether the failure to close because *more than one* of the following conditions to closing under the Merger Agreement would trigger the Termination Fee:[6] (i) PUCT approval, (ii) BHE's acquisition of Texas Transmission Investment LLC's ("**TTI**") minority interest in Oncor through a consensual agreement or entry of an order by this Court enforcing the Debtors' drag-along rights with respect to such interest (the "**Minority Interest Condition**"), and (iii) obtaining the supplement to the Private Letter Ruling without a requirement that BHE issue different types of stock or greater quantities of stock than BHE is required to issue under the Merger Agreement and BHE declines to do so (the "**PLR Condition**").  *See* Committee Objection, ¶¶ 13–14.  The EFH/EFIH Committee also objected that the Termination Fee should not be payable if failure of one or more of the following three conditions causes confirmation to be delayed beyond December 15, 2017: (a) PUCT approval; (b) the Minority Interest Condition; or (c) the PLR Condition.

11.    BHE is confident that all of these conditions will be timely satisfied.  Further, the Debtors and BHE have neared completion of an amendment to the Merger Agreement to address many of the concerns raised by the EFH/EFIH Committee (the "**Amendment**").  BHE anticipates that this Amendment will be finalized and filed with the Court prior to the hearing on August 21,

---

[6]    Elliott objects that these same conditions purportedly make BHE's commitment "far too conditional" to justify a Termination Fee even though the Termination Fee is not payable if these conditions prevent the Closing (as defined in the Merger Agreement).  Elliott Objection, ¶ 18.  This contention is unfounded.  *See infra*, ¶¶ 34–45.

but the key provisions are generally described herein as they address many of the arguments raised in the Objections.

12.    The Amendment will provide that the Termination Fee will not be payable in the event that all other conditions are satisfied or waived,[7] the Debtors do not breach the Merger Agreement, but the BHE Transaction does not close because of *any or all* of failure to (i) obtain PUCT approval, (ii) satisfy the Modified Minority Interest Condition (as defined below), and/or (iii) satisfy the PLR Condition.  In addition, if BHE terminates the Merger Agreement because entry of an order confirming the BHE Plan is delayed beyond December 15, 2017, and at the time of that termination Oncor has not obtained PUCT approval or the Modified Minority Interest Condition and/or the PLR Condition have not been satisfied, BHE will not be entitled to a Termination Fee under the Amendment.

13.    The Amendment will provide for a Closing even if the Debtors' litigation against TTI to enforce their drag-along rights (the "**Enforcement Action**") is still pending before this Court when the BHE Plan is confirmed, if all other closing conditions have been met or waived (the "**Modified Minority Interest Condition**").  To the extent the objectors argue that the Closing could be delayed or blocked by the original Minority Interest Condition, the Modified Minority Interest Condition eliminates both the risk of delay and the risk that the BHE Transaction will not close if the Debtors are forced to litigate with TTI.[8]

14.    These changes address each of the EFH/EFIH Committee's objections to the Approval Motion, as well as several of the concerns raised by the other objectors.

## II.

---

[7]    This excludes those conditions that are to be satisfied at Closing if such conditions are capable of being satisfied at the Closing.

[8]    BHE will seek to acquire TTI's minority interest in Oncor through a consensual transaction, but if litigation becomes necessary the Amendment will place the risk of delay and of the outcome of any such litigation that is not completed prior to the Closing solely on BHE.

## SUMMARY OF ARGUMENT

15.     The primary objection submitted by objectors concerns the Termination Fee provided for in the Merger Agreement.  The objectors advocate an unduly narrow and inherently flawed interpretation of the standard for approving termination fees under the Third Circuit's decision in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).   Under *O'Brien*, the Debtors must prove only that the requested Termination Fee provides an actual *benefit* to the estate and that incurring the Termination Fee was necessary to preserve the value of the estate.  This standard is satisfied here.  The Termination Fee is a critical provision of the Merger Agreement that induced BHE to agree to commit $9 billion in cash to support the BHE Transaction.  *See* Depo. Tr. 8/15/17 (Abel), p. 122:25–123:19.  The amount of the Termination Fee and the triggering events that would make it payable are components of a comprehensive transaction that provides the Debtors the best opportunity they have had to date to obtain necessary regulatory approvals and creditor distributions through a confirmed Chapter 11 plan.  Further, even after approval of the Merger Agreement, the Debtors are free to pursue a Superior Proposal.

16.     Notwithstanding the benefits of the Merger Agreement, the objectors request that the Court deny the Approval Motion based on the unfounded allegation that the $270 million Termination Fee—which is 3% of the $9 billion cash portion of the purchase price and less than 1.5% of TEV—is "just too large" and will purportedly chill bidding, because a competing bidder would have to pay 1.5% more in TEV than BHE is offering to pay if the Termination Fee is approved.  They also argue that the Merger Agreement has too many open closing conditions to justify any termination fee.  Elliott also argues, without a shred of legal or factual support, that granting the Approval Motion would make it impossible for it to file a competing plan if it could

actually obtain the required financial commitments to fund such a plan or garner any regulatory support for it.  As explained below, these arguments either (a) are based on flawed interpretations of relevant case law, (b) do not reflect the terms of the Merger Agreement, as it will be modified by the Amendment, or (c) are inconsistent with the record in this case.

17.    Finally, Elliott contends that even if the Termination Fee is not payable due to the inability to satisfy a closing condition, BHE could seek to stall termination until the Outside Date—March 4, 2018—resulting in the additional accrual of interest on the EFIH DIP loan and EFIH second lien notes.   While this may have been a logical concern under the structure of the NEE Merger Agreement, because NextEra was entitled to its termination fee if PUCT approval was not obtained by the outside date under the NEE Merger Agreement and the Debtors then terminated, BHE is not entitled to the Termination Fee if it is unable to obtain PUCT approval by the Outside Date, regardless of who terminates the Merger Agreement.  This is just one of several ways in which the BHE Termination Fee provisions are more favorable to the Debtors' estate than the NextEra provisions that this Court previously approved.  BHE has no incentive to string along the PUCT approval process, because if the clock runs out BHE receives no fee.  Indeed, the Amendment will provide, among other things, that, if the PUCT denies the application to approve the BHE Transaction, the Debtors will be allowed to terminate the Merger Agreement before the Outside Date without triggering the Termination Fee, and that entry of an order enforcing the Debtors' drag-along rights is no longer a condition to Closing.[9]

---

[9]    The supplement to the Private Letter Ruling required under the Merger Agreement will likely be obtained well before the confirmation hearing (the request for the ruling was filed by EFH with the IRS on July 14, 2017), and, therefore, the PLR Condition will likely be satisfied or determined not to be capable of being satisfied before October 24, 2017.  The Amendment permits the Debtors to terminate the Merger Agreement before the Outside Date without triggering a Termination Fee, if the IRS indicates that BHE will be required to issue stock it is not obligated to issue under the Merger Agreement and BHE declines to issue that stock.

18.    For the above reasons and as explained in detail below, the Court should approve the Merger Agreement, as amended, and Termination Fee over the Objections in order to preserve and maximize value for the Debtor's estate.

## III.

## ARGUMENT

A.    **Burden of Proof.**#    #

19.    Elliott erroneously seizes on a reference in *O'Brien* to a "heavy burden" for administrative expense claimants to prove their right to priority payment from the estate.  *See Elliott Objection*, ¶¶ 15, 16, 33.[10]  "'[H]'eavy burden" is not the correct burden of proof for the Court to apply in assessing the Debtor's requested relief.  To the contrary, the Debtors must demonstrate only that the requested Termination Fee "'provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate'" by a "preponderance of the evidence." *In re Bernard Techs., Inc.*, 342 B.R. 174, 177 (Bankr. D. Del. 2006) (quoting *In re O'Brien*, 181 F.3d at 533).

20.    The Third Circuit has set forth the standard for approval of break-up and termination fees in *O'Brien* and *In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010)—"[T]he allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re Reliant Energy*, 594 F.3d at 206 (quoting *In re O'Brien*, 181 F.3d at

---

[10]    Elliott cites to *In re Mid-American Waste Systems, Inc.*, 228 B.R. 816 (Bankr. D. Del. 1999) as "noting 'heavy' burden to demonstrate that a post-petition transaction 'directly and substantially benefit[ed] the estate." Elliott Objection, ¶ 16.  This is not an accurate description of this case.  The court in *Mid-American* did not "note" any "heavy" burden requirement.  In fact, *Mid-American* has nothing to do with the approval of the Merger Agreement or the Termination Fee.  That case involved a request by a chapter 11 debtor's officers and directors for an administrative expense priority claim based on indemnification obligations under the debtor's certificate of incorporation for prepetition acts and omissions.  The case has nothing to do with the standard for approving a break-up or termination fee under a post-petition sale agreement.

535).  Such showing must be demonstrated by a preponderance of the evidence.  There is no

heightened scrutiny.

>   **B.    The Termination Fee Should Be Approved Under *O'Brien*.**
>
>>   1.    The Termination Fee Was Necessary to Induce BHE to Enter into the
>>   Merger Agreement and to Commit $9 Billion of Cash.

21.    Under *O'Brien*, to be allowed as a priority administrative expense claim, a break-

up or termination fee must be "actually necessary to preserve the value of the estate."  *In re

O'Brien*, 181 F.3d at 535.  A termination fee may be necessary to preserve the value of the estate

in one of two ways.  *First*, "the opportunity to obtain a break-up fee could have induced [the

purchaser] to make its bid . . . ."  *In re Reliant Energy*, 594 F.3d at 206.  *Second*, "the provision

for a break-up fee may have been necessary to induce [the purchaser] to adhere to its bid" in

connection with an "auction."  *Id.*  **Both** elements are satisfied here.

22.    Several of the objectors assert that the Termination Fee under the Merger

Agreement was not "necessary to preserve the value of the estate," because BHE submitted a bid

for the Debtors' interest in Oncor in 2016, and voluntarily reached out to the Debtors in 2017 to

pursue a transaction after the PUCT had determined that it would not approve the NextEra

transaction.  *See* Elliott Objection, ¶¶ 34–35; Committee Objection, ¶ 8; PIK Note Trustee

Objection, ¶ 7.  These contentions ignore the negotiations between BHE and the Debtors, which

evidence that the Termination Fee was a material term and necessary inducement for BHE to enter

into the Merger Agreement.  *See* Depo. Tr. 8/15/17 (Abel), pp. 122:25–123:19, 129:20–130:5.

23.    *First*, while BHE did submit a bid for the Debtors' interest in Oncor in 2016, and

exchanged several versions of a draft merger agreement reflecting BHE's proposal, in each of

these versions, BHE insisted on a termination fee, and the amount and terms of such termination

fee were heavily negotiated deal points, along with multiple other business points.

24.     *Second*, since BHE re-commenced negotiations with the Debtors after the PUCT denied rehearing for the NEE Merger Agreement, in every turn of the Merger Agreement and in every discussion between the principals and advisors of the Debtors and BHE, BHE has been adamant that it would not commit $9 billion in cash for a purchase with a TEV of more than $18 billion, unless the Debtors agreed to a Termination Fee of not less than $270 million.  Moreover, BHE has spent millions of dollars in fees and expenses and very significant management time and resources to pursue the BHE Transaction.

25.     BHE's management has testified unequivocally that BHE would not have made a $9 billion cash commitment to this transaction absent the Debtors' agreement to the amount and terms of the Termination Fee (as well as the other terms of the Merger Agreement).  In short, the Termination Fee was necessary to "induce" BHE to enter into the Merger Agreement and commit to a $9 billion cash payment to the Debtors' estate.  It was part of the fully negotiated contract and the objectors may not cherry pick, accepting all of the terms of the deal they like and rejecting the Termination Fee or materially changing the circumstances under which it would be payable[11] or the amount of the Termination Fee.  For these reasons, the Termination Fee is "necessary" to preserve the value of the Debtors' estate, as required under *O'Brien* and *Reliant*.

26.     Further, although the Approval Motion does not contemplate a court-supervised auction process, the structure of the Merger Agreement expressly permits submission of Superior Proposals for the Debtors' interest in Oncor.  *First*, the Termination Fee is not payable until after entry of the Approval Order.  Merger Agreement, § 8.5(b).  Therefore, by the time this Court concludes the hearing on the Debtors' Approval Motion on August 21, the Debtors will have already had a 45-day free option period to find alternative proposals without triggering the

---

[11]    BHE is finalizing an Amendment, which will address several of the specific concerns regarding triggers for the Termination Fee and related timing issues.

Termination Fee.  *Second*, the Debtors have the right up until the day of confirmation of the BHE

Plan to terminate the Merger Agreement and pursue an alternative transaction if necessary to

comply with the fiduciary duties of the Debtors' directors or managers.  *Id.* at §§ 8.3(e)–(f).  After

approval of the Merger Agreement, such termination would trigger payment of the Termination

Fee, but this "fiduciary out" has the effect of enabling the Debtors to continue discussions with

pre-existing bidders even after entry of the Approval Order.  This is similar to an auction, and no

rational buyer in BHE's position would commit $9 billion to an acquisition that the Debtors can

terminate to pursue a Superior Proposal without the protection of the Termination Fee.  As a result,

the Termination Fee is necessary to induce BHE to "adhere to its bid" under *Reliant*.  BHE will

not proceed absent entry of the Approval Order.

          2.     <u>The Termination Fee is a Market Rate and Does Not Improperly Chill Bidding</u>.

27.     Certain objectors also take issue with the amount of the Termination Fee and claim

that the fee may have a negative impact on potential alternative transactions.  The $270 million

Termination Fee is 3% of the $9 billion cash portion of the purchase price under the Merger

Agreement, and is less than 1.5% of TEV.  This fee is consistent with rates in the market for

comparable transactions, and is within the bounds of what courts routinely approve in bankruptcy

cases.  Indeed, it is consistent with the amount of the termination fee approved by this Court in

connection with the NEE Merger Agreement, but is payable in far fewer scenarios providing more

protections and benefit to the Debtors' estates, which benefits creditors.  Further, as explained

below, the proposed Termination Fee does not impermissibly chill bidding.

          a)     <u>The Termination Fee is Reasonable in Light of its Purpose</u>.

28.     Elliott contends that BHE should not be entitled to the Termination Fee, because

BHE "necessarily invested most, if not nearly all, of its 'time, money and energy needed to produce

its bid'" when BHE was initially bidding on the Debtors' interests in 2016. Elliott Objection, ¶ 42.

Elliott cites no case to support the argument that the Court should second-guess the fee here

because BHE spent part of the time, money and effort required to formulate the Merger Agreement

in 2016. BHE could not have completed due diligence or negotiated the Merger Agreement in two

weeks in 2017 absent the foundation BHE laid by spending millions of dollars and extensive

management resources in 2016. Elliott's argument to restrict protection for expenses incurred

based on timing is completely meritless.

29.     More importantly, Elliott is improperly linking termination or break-up fees with

expense reimbursements. "Break-up fees may take the form of paying the out-of-pocket expenses

incurred in arranging the deal, including due diligence expenses, *or break-up fees may be wholly*

*independent of the transaction costs. For example, a break-up fee may include compensation*

*for a bidder's lost opportunity costs*." *In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr.

S.D.N.Y. 1992) (emphasis added) (citing *In re 995 Fifth Avenue Assocs., L.P.*, 96 B.R. 24, 29, n.6

(Bankr. S.D.N.Y. 1989)), *aff'd* 147 B.R. 650 (S.D.N.Y. 1992). In *In re JW Resources, Inc.*, 536

B.R. 193 (Bankr. E.D. Ky. 2015), a bankruptcy court recently approved a break-up fee based on

testimony that "the break-up fees are *primarily based on the lost opportunity costs* of the stalking

horse bidder . . . ." *Id.* at 196 (emphasis added). The court recognized that the stalking horse

bidder "could switch to . . . potentially more lucrative options *if it is not adequately protected*

*through the break-up fees*." *Id.* at 197 (emphasis added).[12]

---

[12]   The EFH Indenture Trustee's argument that the Termination Fee is too large given the ***potentially*** short time period before BHE may be able to close fails for the same reason. *See* EFH Indenture Trustee Objection, ¶ 7. If the Debtors and BHE are successful in a prompt closing, as they hope to be, then this benefits the estates by cutting off the accrual of $50 million in debt interest per month. However, it does not meaningfully reduce BHE's compensable costs. Moreover, if the transaction closes (quickly or otherwise) the Termination Fee will not be paid. BHE is obligated to keep the $9 billion committed for the full 240 days if the BHE Transaction does not close: the same time period in the NEE Merger Agreement.

30.     Indeed, many of the cases cited by Elliott approved break-up fees ranging from 1.2% to 15.5% of the transaction's purchase price, with none of these fees being limited to expense reimbursements.  *In re Verasun Energy Corp.*, No. 08-12606, Docket Nos. 622, 699 (Bankr. D. Del.) (approving a 3% break-up fee and $1 million expense reimbursement); *In re WorldSpace, Inc.*, No. 08-12412 (PJW) Docket No. 1042-1) (Bankr. D. Del.) (approving a break-up fee that was 15.5% of the cash purchase price); *In re Magic Brands, LLC*, No. 10-11310 (BLS), Docket Nos. 21, 267 (Bankr. D. Del.) (approving a 1.2% combined break-up fee and expense reimbursement).[13] The BHE Termination Fee is 3% of the cash purchase price under the Merger Agreement, and is less than 1.5% of TEV.  Elliott's cited cases actually support the reasonableness of the Termination Fee.

b)     <u>The Termination Fee Does Not Impermissibly Chill Bidding</u>.

31.     The Termination Fee is not so large relative to the size of BHE's commitment as to chill bidding.  Elliott seems to argue that the fact that it is only willing to pay TEV that is not even 2% more than the TEV of BHE's proposal somehow demonstrates that a termination fee of less than 1.5% of TEV will chill bidding.  This just proves that BHE has committed to pay full value for the Debtors' assets.  Over the forty (40) days since the BHE Merger Agreement was signed, no buyer has offered to pay even 2% more in TEV for the assets and Elliott has been unable to raise financing or to obtain the regulatory approvals for its alternative.  Elliott is not being chilled by the Termination Fee: it would face the same daunting challenges to raise capital and obtain regulatory support whether it was seeking to bid at an $18.1 billion TEV or an $18.3 billion TEV.

---

[13]   Docket cites are attached as Exhibits A through E of the Chipman Declaration filed herewith.  These decisions were all unpublished orders entered by Delaware bankruptcy courts, not published opinions.  As a result, the language quoted by Elliott with respect to the findings in these orders has limited precedential weight.

32.    Elliott's objection to the Termination Fee is not based on a real concern that it will chill the market for the Debtors' interest in Oncor.  Rather, Elliott appears to be concerned that the Termination Fee will nearly eliminate the benefit of the $9.3 billion value that is associated with the proposal that Elliott is attempting to implement.  *See* Elliott Objection, ¶ 13.[14]  However, the fact that BHE's proposed Termination Fee (which is either 3% of cash purchase price or 1.5% of TEV), if paid, will eliminate most of the incremental value under Elliott's proposal does not reflect on the unreasonableness of the Termination Fee.  Rather, it is a product of the fact that Elliott is attempting to undermine the Debtors' interest in consummating a $9 billion all cash offer with no financing contingency and agreed-upon regulatory commitments supported by the PUCT Staff and Intervenors to advocate for an uncertain proposal that, if it could be implemented in an expeditious manner, would result in less than 2% of additional value that would inure to a select few creditors (and principally Elliott itself).  Much of this value, if it could ever be generated, would be consumed by the additional interest that would accrue because it would take Elliott far longer to close.  Elliott is willing to jeopardize the distributions to the second lien notes and the EFH creditors for comparatively small potential upside that is nothing more than theoretical at this point.

33.    The amount of the Termination Fee is reasonable, and does not impermissibly chill bidding.  As this Court previously recognized in the NextEra transaction, "you have to look at [a termination fee] appropriately from a percentage basis . . . ."  9/19/16 Hr'g Tr., p. 121:6–7.[15]  In analyzing the NextEra termination fee, this Court focused on the percentage based on TEV, which is less than 1.5% with respect to the BHE Termination Fee.  *See id.* at p. 121:8–10.  The Termination Fee should be approved in the amount of $270 million.

---

[14]    In reality, Elliott's sole goal may be to try to leverage additional consideration from BHE through endless litigation, and it may not have any intention or ability to submit a real, binding proposal that has any chance of obtaining regulatory approval.

[15]    *See* Chipman Declaration, Ex. H.

    3.    <u>The Merger Agreement's Closing Conditions Do Not Justify Denial of the Termination Fee</u>.

34.    Elliott contends that the Termination Fee must be denied because "the BHE Merger Agreement is presently far too conditional . . . ."  Elliott Objection, ¶ 18 (emphasis omitted).  However, the fact that there are appropriate conditions to the closing of the Merger Agreement does not interfere with the Court's ability to consider and approve the Termination Fee.  To hold otherwise would contradict applicable precedent, including precedent cited in the Elliott Objection.  Further, through the Amendment, BHE has evidenced a willingness to work with the Debtors' estates and is finalizing an agreement to provide clarifications that will moot many of the objectors' concerns, and eliminate most of the risks complained of in the Objections.  The Debtors and BHE are confident that all closing conditions can and will be satisfied in a manner that will minimize the monthly accrual of interest.

35.    Every purchase agreement includes closing conditions.  For any commitment to sponsor a plan of reorganization, one of those conditions is confirmation of the plan.  No rational party would agree to commit $9 billion in cash to a transaction for the months required to confirm the plan without a termination fee if the Debtors elect to pursue an alternative transaction, which they have the right to do until confirmation.  As BHE's Chief Financial Officer, Patrick Goodman, testified:

> We are exposed during this period of time with no compensation whatsoever to the extent that a superior offer is made or to the extent there is a downturn in the market.  We made a $9 billion offer.  So, to the extent catastrophes happen, market movements happen, we're exposed for that.

Hr'g Tr. 7/26/17, p. 131:10–15.

36.    Closing conditions to a merger agreement simply are not a bar to approval of break-up or termination fee.  Such a rule would be contrary to Third Circuit precedent providing that a break-up or termination fee can be approved if it "provide[s] ***some benefit*** to the debtor's estate."

*In re O'Brien*, 181 F.3d at 536 (emphasis added); *accord In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) ("There is no suggestion that the . . . benefit to the estate [has] to be substantial . . . ."). Such a rule would also contradict precedent cited in Elliott's own brief. *See generally In re Integrated Res., Inc.*, 147 B.R. 650 (S.D.N.Y. 1992).[16]  In *Integrated*, the court approved a break-up fee to a plan sponsor that had not yet even entered into final binding agreements with the debtors to provide plan funding.  *Id.* at 655, 663.  The fee would increase when documents were signed.  Over an objection, the court found that case law does not ban approval of "break-up fees in the absence of a binding agreement."  *Id.* at 663.  Thus, break-up fees may be approved not only when there are outstanding closing conditions to an executed agreement, but also when the party seeking the break-up fee is not yet contractually bound.

37.    In the *Adelphia* bankruptcy cases, in April 2005 the debtors entered into purchase agreements with Time Warner and Comcast to acquire the debtors' businesses and assets for "aggregate consideration of nearly $17.6 billion."  *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 630–31 (Bankr. S.D.N.Y. 2006).  The purchase agreements had an outside closing date of July 31, 2006 (after 15 months), *id.* at 631, and closing of the sale was conditioned on, among other things, confirmation of a chapter 11 plan and on regulatory approvals (including by "certain local franchising authorities to the change in ownership of the cable systems operated by Adelphia" and the Federal Communications Commission).[17]  Notwithstanding such contingencies, Time

---

[16]    *See* Elliott Objection, ¶ 41.

[17]    *See Debtors' Motion Pursuant to Sections 105, 363, 365 and 1146(c) of the Bankruptcy Code and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure Seeking Approval of: (I) A Form of Notice Regarding Certain Hearing Dates and Objection Deadlines; (II) New Provisions for Termination and for the Payment or Crediting of the Breakup Fee; (III) The Sale of Substantially All Assets of Adelphia Communications Corporation and its Affiliated Debtors to Time Warner NY Cable LLC and Certain Other Assets to Comcast Corporation Free and Clear of Liens, Claims, Encumbrances, and Interest and Exempt From Applicable Transfer Taxes; (IV) the Retention, Assumption and/or Assignment of Certain Agreements, Contracts and Leases; and (V) the Granting of Related Relief* [Docket No. 11022] (the "**Adelphia Sale Motion**"), at ¶ 2, *In re Adelphia Commc'ns Corp.* (Bankr. S.D.N.Y. Case No. 02-41729) (Chipman Decl. Ex. F); *see also* Form 8-K for Comcast Corporation dated Apr. 20, 2005, pp. 2–3 (Chipman Decl. Ex. G).

Warner/Comcast were granted a "breakup fee of approximately $443 million in the aggregate that must be paid to Time Warner and/or Comcast under certain termination scenarios." *Id.* at 639.

38.    The fact that the Merger Agreement has presently unfulfilled closing conditions does not preclude approval of the Merger Agreement along with the Termination Fee.  The existence of such closing conditions and the likelihood such conditions will be satisfied or waived may be relevant in determining whether the Debtors' decision to pursue approval of the Merger Agreement over Elliott's proposal—which is subject to tremendous financing and regulatory uncertainty—is supported by sound business judgment.  *See, e.g.*, *Slobodian v. Nissley (In re Nissley)*, 2015 WL 6556983, at *3 (Bankr. M.D. Pa. Oct. 29, 2015) ("[T]he Trustee can hardly be faulted for accepting a 'bird in the hand' rather than an offer subject to uncertain contingencies."). However, the fact that there are closing conditions to the Merger Agreement does not preclude approval of the Termination Fee.

39.    Elliott complains of three (3) principal closing conditions that have not yet been satisfied, which Elliott contends make the Merger Agreement "far too conditional" for the Court to approve.  Elliott Objection, ¶ 18.  Elliott notes that the "Debtors have been wrong twice before" with respect to the failed Hunt and NextEra transactions. *Id.*  As explained below, BHE and the Debtors have learned from these previous failures and have taken all reasonable steps to get the support from the PUCT Staff and Intervenors ***before*** seeking approval of the Merger Agreement. Further, BHE has agreed to exclude the failure to obtain PUCT approval or to satisfy the PLR Condition or the Modified Minority Interest Condition complained of by Elliott from those termination events that trigger the Termination Fee under that scenario.

40.    Both of the Debtors' prior reorganization efforts have failed due to an inability after plan confirmation to obtain PUCT approval.  In an effort to obtain greater certainty in the PUCT

approval process, BHE has agreed to forty-seven (47) regulatory commitments with respect to ring-fencing and other matters, thereby obtaining support from the PUCT staff and eleven (11) key intervenors.  While certainty of final approval by the PUCT cannot be guaranteed, BHE's regulatory commitments have put the Debtors' estate in the strongest position to date to get the necessary regulatory approval for a transaction that will allow the Debtors to exit chapter 11.  This alone substantially distinguishes the Merger Agreement from Elliott's attempt at formulating a competing proposal.

41.    In the event the PUCT does not approve the BHE Transaction and that is the only unsatisfied closing condition, then BHE is not owed the Termination Fee.  Merger Agreement, § 8.5(b).  The Amendment will also allow the Debtors to terminate the Merger Agreement before the Outside Date, if it becomes impossible to obtain PUCT approval or to satisfy the Modified Minority Interest Condition or the PLR Condition, without triggering the Termination Fee.  As a result, the Amendment directly addresses Elliott's assertion that BHE could hold the estate hostage by delaying for the sake of delay.

42.    The Amendment will remove any risks associated with satisfaction of the Modified Minority Interest Condition.  As initially filed, the Merger Agreement was contingent on either completion of a consensual Minority Interest Acquisition, or entry by the Court of an order enforcing the Debtor's drag-along rights with respect to TTI's minority interest in Oncor.  Merger Agreement, § 7.2(f).  This term was consistent with both the Hunt and NextEra transactions previously approved by this Court.  Elliott argued that this closing condition exposed the Debtors' estate to substantial risk because it was not clear that BHE would be able to promptly close the Minority Interest Acquisition or to proceed an Enforcement Action to judgment.  Under the Amendment, the BHE Transaction can close even if the Minority Interest Acquisition has not

closed or if the Court has not yet entered a ruling enforcing the Debtors' drag-along rights, so long as an Enforcement Action has been filed and is then "not stayed, suspended, transferred or dismissed" and the Court has not entered an adverse ruling determining that the Debtors' drag-along rights are not valid or enforceable.

43.     Finally, Elliott also contends that the Termination Fee should be denied because the Termination Fee will be payable if BHE terminates the Merger Agreement due to an inability to obtain an order confirming the BHE Plan by December 15, 2017.  Elliott Objection, ¶ 27.  Elliott further claims that "[t]he BHE Plan Confirmation Condition does not require the closing of an alternative higher or otherwise better transaction."  *Id.* at ¶ 28.  This is simply not true.  BHE's right to a Termination Fee is in ***all*** circumstances contingent on the consummation of an "alternative transaction" resulting in the Debtors' direct or indirect interests in Oncor being obtained by another entity.  Merger Agreement, § 8.5(b).

44.     If Elliott effectively blocks confirmation of the BHE Plan to enable it to pursue a competing purchase proposal, the Termination Fee is due to BHE.  Such a result should not be surprising.  In that situation, BHE will have spent substantial time and expense in attempting to confirm a chapter 11 plan that the Debtors have determined is in the estate's best interest, and will have committed $9 billion in cash putting it at risk during the entire process.  In effect, BHE will have backstopped the estates from losing any potential exit from this case while Elliott attempts to obtain financial commitments and PUCT approval for a competing bid.  This is certainly a substantial benefit to the Debtors' estates.  Elliott's alternative proposal is primarily based on a new cash investment (assuming it ever obtains commitments) and is simply a competing transaction.  BHE cannot be expected to, and will not, waste its time and capital solely to grant Elliott a free option to develop an alternative transaction.

45.     For the reasons stated above, the existing closing conditions under the Merger Agreement do not prevent the Court from approving the Merger Agreement and the corresponding Termination Fee.  This conclusion is consistent with the case law, and is also supported by the record in this case and the relief the Debtors are seeking.

**C.     The Timing of the Approval Motion Supports, Rather Than Undermines, Approval of the Merger Agreement and Termination Fee**.

46.     Both Elliott and the PIK Note Trustee take issue with the timing of the Approval Motion on more than double the standard notice for such a motion.  Elliott states, "it should also be clear to the Court why the Debtors and BHE have sought approval of the BHE Merger Agreement so swiftly.  If this Court approves the BHE Merger Agreement, BHE and Oncor will move forward with filing an application with the PUCT . . . to approve the BHE Transaction." Elliott Objection, ¶ 54.  The PIK Note Trustee asserts that the "Termination Fee should not be approved until other potential investors have a sufficient opportunity to propose an alternative, value maximizing, transaction for the benefit of the Debtors' creditors before locking the Debtors and their creditors in the BHE Transaction."  PIK Note Trustee Objection, ¶ 5.  Both of these contentions are simply not supportable.

47.     From the date of the filing of the Approval Motion through the hearing on August 21, 2017, potential bidders will have had 45 days during which they could have developed and proposed an alternative transaction that could have replaced the Merger Agreement without triggering the Termination Fee.  Elliott has had substantially longer to develop an alternative transaction—the Debtors executed an NDA with Elliott on May 17, 2017 to permit Elliott to solicit investors for its competing plan.  Elliott has known since March 30, 2017 that the PUCT had publicly announced that it did not believe that the transfer of Oncor to NextEra was in the public interest.  As of the date of this filing, Elliott has not obtained funding or regulatory support for an

alternative transaction.  To suggest that 45 days is too short a time period is just wrong, both because Elliott has had far longer than 45 days and because 45 days of free option period with no Termination Fee simply would not be unduly short even if Elliott had no advance opportunity to formulate its bid.  Not only has the Debtors' interest in Oncor been extensively marketed for years, but the PUCT's position on the NextEra transaction has been public for almost five months and 45 days' notice of the Approval Motion is more than double the normal notice period required for approval of a break-up fee.  *See* Fed. R. Bankr. P. 2002(a)(2), 6004(a); Local Bankr. R. 9006-1(c)(i).

48.    Moreover, approval of the Termination Fee does not "lock[] the Debtors into pursuing one deal . . . ."  PIK Note Trustee Objection, ¶ 5.  Until confirmation of the BHE Plan, the Debtors can accept a Superior Proposal.  Approval of the Termination Fee does not preclude this unless it is assumed that no rational buyer would pay a higher price that exceeds BHE's offer by more than 1.5% of TEV.

49.    Elliott and the PIK Note Trustee appear to be advocating that no application be submitted to the PUCT until this Court confirms a chapter 11 plan because this would somehow create "exclusivity."  When this Court approved the NEE Merger Agreement, Oncor immediately sought PUCT approval, while this Court was simultaneously proceeding with plan confirmation. The Debtors have informed this Court that their goal is to obtain PUCT approval before confirmation, so that this Court can be certain the next plan will not fail for lack of PUCT approval. It is, of course, impossible to do so if the process with the PUCT is not even commenced until after a plan has been confirmed, which seems to be what Elliott and the PIK Note Trustee are advocating.  The best case scenario for such a seriatim approach would be to guarantee at least two months of delay and more than $100 million in added costs, because delaying the start of the PUCT

process will delay Closing and implementation of any plan.  This proposed process would also mean that at confirmation hearing this Court will not have a ruling from the PUCT.

50.    The bottom line is that delaying the process with the PUCT cannot help anyone.  It will only guarantee additional expense and delay, eroding value that could accrue to the Debtors' estate, and is entirely unnecessary.  If Oncor starts the application process with respect to the BHE Transaction and the Debtors later seek to consummate an alternative Superior Proposal, Oncor can simply withdraw its PUCT application for the BHE Transaction and submit a new application to approve the Superior Proposal.

## **CONCLUSION**

51.    Accordingly, for the reasons set forth herein and in the Debtors' Reply, BHE respectfully requests that the Court overrule the Objections and approve the Merger Agreement, as amended, including the Termination Fee.

Dated:  August 16, 2017         **CHIPMAN BROWN CICERO & COLE, LLP**
      Wilmington, Delaware

                                    */s/ William E. Chipman, Jr.*
                        William E. Chipman, Jr. (No. 3818)
                        Mark D. Olivere (No. 4291)
                        Hercules Plaza
                        1313 North Market Street, Suite 5400
                        Wilmington, Delaware 19801
                        Telephone:    (302) 295-0191
                        Facsimile:    (302) 295-0199
                        Email:       chipman@chipmanbrown.com
                                        olivere@chipmanbrown.com

                                —and—

Jeffrey C. Krause (admitted *pro hac vice*)
Daniel B. Denny (admitted *pro hac vice*)
Michael S. Neumeister (admitted *pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone:       (213) 229-7000
Facsimile:       (213) 229-7520
Email:       JKrause@gibsondunn.com
             Ddenny@gibsondunn.com
             MNeumeister@gibsondunn.com

*Counsel for Berkshire Hathaway Energy Company*