Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ————————————————— x | : | **Chapter 11** |
| **In re:** | : |  |
|  | : | **Case No. 10-11310 (BLS)** |
| **MAGIC BRANDS, LLC, *et al.*,**[1] | : |  |
|  | : | **(Joint Administration Requested)** |
| **Debtors.** | : | **Bid Procedures Objection Deadline:  T/B/D** |
|  | : | **Bid Procedures Hearing Date:  T/B/D** |
|  | : | **Sale Objection Deadline:  T/B/D** |
| ————————————————— x | : | **Sale Hearing:  T/B/D** |

## DEBTORS' MOTION FOR ORDERS (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (II) APPROVING CERTAIN BIDDING PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV) SCHEDULING AN AUCTION AND SALE HEARING AND (V) APPROVING SUCH SALE

Magic Brands, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby move, pursuant to sections 105, 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of: (i) an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"), (a) approving the proposed bidding procedures (the "Bidding Procedures") in the form attached as Exhibit 1 to the Bidding Procedures Order, as well as certain proposed bid protections, in connection with the sale (the "Sale") of substantially all of the Debtors' assets (the "Assets") as more fully described in the

---

[1]       The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Magic Brands, LLC ("Magic") (8989); Fuddruckers, Inc. ("Fuddruckers") (8267), Atlantic Restaurant Ventures, Inc. ("Atlantic") (9769), King Cannon, Inc. ("King Cannon") (8671), and KCI, LLC ("KCI") (9281). The address for all of the Debtors is 5700 Mopac Expressway, Suite C300, Austin, Texas 78749.

Asset Purchase Agreement (the "Asset Purchase Agreement")[2] by and between the Debtors and Tavistock Ventures, Inc. (the "Stalking Horse Bidder"), (b) scheduling an auction (the "Auction") and a hearing to consider approval of the Sale (the "Sale Hearing"); and (c) approving the form and manner of notice of the Sale, including the form and manner of service of the notice (the "Sale Notice") attached as Exhibit 2 to the Bidding Procedures Order and the notice of the proposed assumption and assignment of executory contracts and unexpired leases in the form attached as Exhibit 3 to the Bidding Procedures Order (the "Assumption and Assignment Notice"); and (ii) an order approving the sale of the Assets free and clear of all liens, claims, interests and encumbrances (the "Sale Order").[3]  In support of this Motion, the Debtors rely on and incorporate by reference the *Declaration of Gregor Grant in Support of Chapter 11 Petitions and First Day Pleadings* (the "Grant Declaration"), filed with the Court contemporaneously herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

### General Background

2.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.    The Debtors continue to operate their businesses and manage their properties

---

[2]    Capitalized terms used but not otherwise defined herein shall have the definitions ascribed to them in the Asset Purchase Agreement, a copy of which is attached hereto as Exhibit B

[3]    A copy of the proposed Sale Order is attached hereto as Exhibit C

RLF1 3563212v 1

pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.       No trustee, examiner or statutory committee has been appointed in the Debtors' cases.

5.       The Debtors own, operate and franchise fast casual dining establishments under the concepts of Fuddruckers™ and Koo Koo Roo™.  As of the Petition Date, the Debtors operate approximately 98 corporate owned locations and have 135 franchised locations located in 33 states and the District of Columbia, with additional franchised locations in Canada and Puerto Rico.  Fuddruckers, a leader in the fast casual restaurant segment, has a long established reputation for high quality, upscale hamburgers that are grilled fresh-to-order.  Koo Koo Roo restaurants offer a variety of healthy chicken dishes.

6.       Prior to the Petition Date and continuing post-petition, the Debtors have been closing unprofitable corporate-owned locations in an effort to return the company to positive cash flow and stronger earnings.  The Debtors commenced these chapter 11 cases to complete their restructuring and position the business for a sale that should maximize value for creditors and other constituents.  The contemplated sale of substantially all of the Debtors' assets should allow the Debtors to emerge quickly from bankruptcy as a stronger and healthier enterprise, saving 1500 jobs in the process and generating a meaningful recovery for creditors.  Additional information regarding the Debtors' business, capital structure and the circumstances leading up to these chapter 11 filings is contained in the Grant Declaration filed contemporaneously herewith.

## The Debtors' Sales and Marketing Efforts

7.       After the Debtors learned, in January of this year, that existing equity would not be in a position to fund amounts necessary to accomplish a restructuring of the Debtors'

3

business, the Debtors' senior management, in consultation with its counsel and financial consultant, explored a range of alternative options, including closure of the business, orderly liquidation, chapter 11 reorganization and a sale in or outside of a chapter 11 process. By the end of January, senior management concluded that it could implement a short-term operational plan and, in chapter 11, accomplish a successful restructuring without the need for cash infusions from existing equity.

8.      In February 2010, the Debtors retained FocalPoint Securities, LLC ("FocalPoint"), as their investment bankers to assist the Debtors in their efforts to locate a new investor and/or market and sell substantially all of the Debtors' assets as a going concern. FocalPoint worked closely with the Debtors' senior management and counsel to, among other things, (i) model the Debtors' restaurant rationalization and strategic turnaround plan, (ii) prepare historical and projected financials that would reflect the impact of management's strategic plan, (iii) prepare a confidential information memorandum (the "CIM") that would describe the strategic plan, historical operations and pro forma projections in more detail, and (iv) identify a list of financial investors who FocalPoint, management and counsel reasonably believed would have the interest and ability to acquire the Debtors' business within the necessary time constraints.

9.      After discussing options with their secured lender, Wells Fargo Capital Finance, Inc. (the "Prepetition Agent"), the Debtors considered their short-term cash flow constraints, the Prepetition Agent's willingness to enter into a forbearance arrangement and provide debtor in possession financing to facilitate an orderly sale process, input from FocalPoint and counsel based on their experience restructuring and selling restaurants facing financial difficulties, and the anticipated obstacles that would need to be overcome in any chapter 11. The Debtors

4

concluded that the only cost-effective and viable alternative was to complete the restructuring through a sale in chapter 11.

10. FocalPoint commenced contacting potential investors. Approximately 41 potential investors expressed interest in learning more about the potential opportunity by executing confidentiality agreements, which entitled them to receive a copy of the CIM. In addition, FocalPoint established an electronic data room (the "Data Room") containing due diligence materials for prospective purchasers/investors.

11. By late March, FocalPoint had received nine serious indications of interest to be the stalking horse in a chapter 11 sale process. FocalPoint scheduled management interviews with all nine of these parties and reached out to other prospective purchasers to assess their continued interest. Eight management presentations (in person and on the phone) were ultimately given to potential purchasers between March 24 and April 6, 2010. During this time, FocalPoint circulated a form of asset purchase agreement to parties that had submitted indications of interest to use as a starting point for making definitive stalking horse offers.

12. After continued negotiations with several potential purchasers and consideration of their indications of interest, as well as more definitive offers in the form of marked up asset purchase agreements, the Debtors determined, with the advice of FocalPoint and their counsel, and in consultation with the Prepetition Agent, that the highest and best offer to date was the one submitted by the Stalking Horse Bidder, subject to higher or better offers and this Court's approval. Shortly before the commencement of their cases, the Debtors executed the Asset Purchase Agreement.

13. As more fully described below, in consideration for agreeing to act as the stalking horse bidder, the Stalking Horse Bidder insisted that the Asset Purchase Agreement include

5

certain bidding protections. In particular, subject to Court approval as part of the Bidding Procedures Order, in the event that the Court approves a Competing Transaction (as defined in the Asset Purchase Agreement), the Stalking Horse Bidder, if it is then not in default under the Asset Purchase Agreement, will be entitled to receive a payment equal to 3.5% of the cash portion of the purchase price set forth in Section 3.1(a) of the Asset Purchase Agreement as a combined break-up fee and expense reimbursement (the "Break-Up Fee and Expense Reimbursement").

14.    In order to increase the opportunity for the Debtors to receive competitive bids, and to ensure that the Debtors receive the maximum value for their assets, the Debtors will continue to engage in a full and robust marketing process with their financial advisor, FocalPoint.

## Summary of the Asset Purchase Agreement[4]

15.    The pertinent terms of the Asset Purchase Agreement are as follows:

- Purchase Price. Cash consideration for the Purchased Assets consists of (a) the Asset Price, plus (b) the amount of the Register Cash, and plus (c) the amount of all security deposits held by the landlords. As defined in the Asset Purchase Agreement, the "Asset Price" means (a) Thirty One Million Dollars ($31,000,000) in the event that the Bankruptcy Court does not approve the assumption and assignment to Purchaser of the seven (7) Locations referenced in the Sixth Amendment to that certain Master Lease with Spirit Master Funding, LLC in accordance with the provisions set forth in such Sixth Amendment (and with no other material conditions or additional material provisions), and such Master Lease as amended by such Sixth Amendment is not assumed and assigned to the Purchaser; and (b) Forty Million Dollars ($40,000,000.00) in all other cases. The Stalking Horse Bidder has already delivered to the Escrow Agent cash equal to $4,000,000 as a real money deposit in connection with the Sale.

- Purchased Assets. All of the Debtors' right, title and interest in all of the Debtors' properties, assets and rights (other than the Excluded Assets) existing

---

[4]    This summary of the Asset Purchase Agreement is for descriptive purposes only. To the extent there are any discrepancies between this summary and the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

as of the Closing, real or personal, tangible or intangible, including, but not limited to:

(a)     Assumed Leases;

(b)     Owned Real Property;

(c)     Inventory;

(d)     accounts receivable, notes receivable and other receivables related to the Purchased Assets;

(e)     goodwill;

(f)     Assumed Contracts;

(g)     prepaid charges and expenses paid in connection with or relating to any Purchase Asset;

(h)     Furniture and Equipment at any Acquired Location;

(i)     Purchased Intellectual Property;

(j)     computers, software, websites and related systems, master disks of source codes and other proprietary information owned or licensed;

(k)     Documents that are used in, held for use in or intended to be used in, or that arise out of, the Business and operations of the Debtors; **provided, however, that, following the Closing, the Purchaser shall provide the Debtors copies, upon the Debtors' reasonable cost request and at the Debtors' sole cost and expense, of any Documents that are Purchased Assets** (See Local Rule 6004-1(b)(iv)(J));

(l)     Permits;

(m)     rights under insurance policies relating to claims arising prior to the Closing for losses related to any Purchase Assets;

(n)     rights, claims or causes of action of the Debtors against third parties relating to the Purchased Assets or Assumed Liabilities, arising out of events occurring prior to the Closing (whether prepetition or postpetition), but excluding Estate Claims and any claims raised in *Flannery et al v Magic Brands LLC*;

(o)     rights under or pursuant to any and all warranties, representations and guarantees; and

(p)     the Register Cash.

7

- <u>Excluded Assets</u>. The Debtors shall retain all right, title and interest to, in and under, and all obligations with respect to all assets other than the Purchased Assets, including, but not limited to:

  (a) accounts receivable, notes receivable and other receivables related primarily to the Excluded Assets;

  (b) Excluded Locations and the Inventory, Furniture and Equipment located as any Excluded Location;

  (c) Excluded Executory Agreements;

  (d) Debtors' prepaid charges and expenses paid in connection with or relating solely to any Excluded Asset;

  (e) deposits and holdbacks related solely to any Excluded Executory Agreement or any other Excluded Asset;

  (f) personnel records of any Retained Employees and all Employee Benefit Plans;

  (g) Permits that are not assignable, and all Permits used solely in respect of the Excluded Locations and not also used or held for use in respect of the Acquired Locations;

  (h) documents relating to proposals to acquire the Business by Persons other than the Purchaser;

  (i) claims, rights, interests and proceeds with respect to Tax refunds, rebates, abatement or other recovery (i) relating to Debtors' assets or the conduct of the Business for the period prior to the Closing or (ii) not relating to the Purchased Assets;

  (j) rights, claims or causes of action of the Debtors (i) against third parties relating to an Excluded Asset or Excluded Liability, (ii) under Chapter 5 of the Bankruptcy Code, or (iii) against any current or former directors or officers and all rights under insurance policies providing insurance to the Debtors' directors and officers, and the proceeds thereof;

  (k) Documents related primarily to any Excluded Asset;

  (l) rights under insurance policies relating to claims for losses related to any Excluded Asset;

  (m) all shares of capital stock or other equity interest of any Debtor, and of ARVI of Pikesville, Inc., A.R.I.V. – Rockville, Inc and 8725 Metcalf II, Inc., or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of the above entities;

8

(n)     minute books, stock ledgers, corporate seals and stock certificates of the Debtors, and other books and records that the Debtors are required by Law to retain or that the Debtors determine are reasonably necessary to retain, including Tax Returns, financial statements and corporate or other entity filings, but excluding Documents that are Purchased Assets;

(o)     credit card accounts receivable, deposits and other holdbacks being held by credit card companies, in each case as of the Closing Date, in connection with credit cards accepted by the Debtors;

(p)     cash, cash equivalents, bank deposits or similar cash items of the Debtors other than the Register Cash;

(q)     deposits, retainers or on account cash paid to the Debtors' professionals and advisers (whether retained in the Bankruptcy Case or not); and

(r)     all rights of the Debtors under this Agreement.

• Assumed Liabilities.  The Purchaser shall assume, effective as of the Closing, and shall pay, perform and discharge in accordance with their respect terms:

(a)     all Liabilities of the Debtors arising, and to be performed, after the Closing Date under the Assumed Executory Contracts;

(b)     all Liabilities arising, and to be performed, after the Closing Date with regard to the Purchased Assets;

(c)     all Liabilities arising and to be performed after the Closing Date with regard to the employment by the Purchaser of any of the Transferred Employees;

(d)     all Liabilities set forth in Section 2.5(h) of the Asset Purchase Agreement); and

(e)     all Liabilities of the Debtors with respect to Customer Programs.

• Excluded Liabilities.  The Purchaser shall not assume and shall be deemed not to have assumed any Liabilities of the Debtors or the Business of whatever nature, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise, other than the Assumed Liabilities.

• Assumed Contracts and Leases ("Assumed Executory Contracts").  On the Closing Date, the Debtors shall, pursuant to the Sale Order, assume and assign to the Purchaser the Assumed Executory Contracts.  From the Effective Date through and including the Closing Date, the Debtors shall not reject any Assumed Contract or Assumed Lease unless otherwise agreed to, in writing, by

9

the Purchaser. The Debtors shall pay the Cure Costs to the counterparties to each such Assumed Executory Contract.

- Closing. Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 of the Asset Purchase Agreement (or the waiver thereof by the party entitled to waive the applicable condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "Closing") shall take place at the offices of Goulston & Storrs, P.C. in Boston, Massachusetts (or at such other place as the parties may designate in writing) at 10:00 a.m. (Boston time) on the date the conditions set forth in Article X of the Asset Purchase Agreement are satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties.

- Termination Rights. The Asset Purchase Agreement may be terminated prior to the Closing:

    (a)     by the Purchaser or the Debtors, if the Closing shall not have occurred by the close of business on July 15, 2010 (the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by the Purchaser or the Debtors, then the breaching party may not terminate this Agreement pursuant to this Section 4.4(a);

    (b)     by mutual written consent of the Debtors and the Purchaser;

    (c)     by the Purchaser, if any condition to the obligations of the Purchaser set forth in Section 10.1 or 10.3 shall have become incapable of fulfillment other than as a result of a breach by the Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by the Purchaser;

    (d)     by the Debtors, if any condition to the obligations of the Debtors set forth in Section 10.2 or 10.3 shall have become incapable of fulfillment other than as a result of a breach by the Debtors of any covenant or agreement contained in this Agreement, and such condition is not waived by the Debtors;

    (e)     by the Purchaser, if there shall be a breach by the Debtors of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 10.1 or 10.3 and which breach has not been cured by the earlier of (i) seven (7) days after the giving of written notice by the Purchaser to the Debtors of such breach and (ii) the Termination Date;

    (f)     by the Debtors, if there shall be a breach by the Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Sections 10.2 or 10.3 and which breach has not been cured by the earlier

10

of (i) seven (7) days after the giving of written notice by the Debtors to the Purchaser of such breach and (ii) the Termination Date;

(g)     by the Debtors or the Purchaser if there shall be in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence); and

(h)     automatically, upon the earlier to occur of (i) the consummation of a Competing Transaction, and (ii) sixty (60) days after the entry of a Sale Order with respect to a Competing Transaction.

- <u>Break-Up Fee and Expense Reimbursement</u>.  Provided that the Stalking Horse Bidder is not then in default under the Asset Purchase Agreement, the Stalking Horse Bidder shall be entitled to be paid an amount equal to three and a half percent (3.5%) of the amount set forth in Section 3.1(a) of the Asset Purchase Agreement as a combined break-up fee and expense reimbursement if (a) the Court approves a Competing Transaction and (b) the Debtors consummate such Competing Transaction.   Payment of the break-up fee and expense reimbursement shall be paid upon the occurrence of the consummation of the Competing Transaction.

- <u>Conditions to Closing</u>.  Among other conditions to Closing set forth in Article X of the Asset Purchase Agreement, one of the condition precedents to the obligation of the Purchaser to consummate the transaction with the Debtors is that the Bidding Procedures Order, which shall, among other things, approve the Break-Up Fee and Expense Reimbursement and the Bidding Procedures, shall have been entered and shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented in any material respect without the Purchaser's prior written consent.

16.     The Asset Purchase Agreement is explicitly subject to approval by this Court.

## **Relief Requested**

17.     By this Motion, the Debtors seek entry of (i) the Bidding Procedures Order, approving the Debtors' proposed Bidding Procedures for marketing the Assets, approving the form and manner of notice of the Sale and assumption and assignment of executory contracts and unexpired leases and approving the Break-Up Fee and Expense Reimbursement; and (ii) the Sale Order, approving, at the Sale Hearing, the sale of the Assets to the Stalking Horse Bidder, or

such other buyer who the Debtors determine has made the highest and best offer for the Assets (either the "Purchaser"), free and clear of all liens, claims, Encumbrances and interests, authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith and the attachment of the liens, claims, Encumbrances and interests of any kind or nature whatsoever to the net proceeds of the sale of the Assets in the order of their priority, with the same validity, force and effect which they now have as against the Assets in accordance with the DIP Order.[5]

## I.     **The Proposed Bidding Procedures**

18.     The following is a summary, pursuant to Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), of the proposed Bidding Procedures. The Debtors believe that the proposed Bidding Procedures are fair and reasonable, designed to provide an appropriate framework for selling the Assets and enable the Debtors to review, analyze, and compare all bids received to determine which bid is in the best interests of the Debtors' estates and creditors, and are not likely to dissuade any serious potential bidder from bidding for the Assets.

### A.     **Participation Requirements**

19.     To participate in the bidding process, each person or entity will be required to deliver (unless previously delivered) to the Debtors, on or before the Bid Deadline, a signed confidentiality agreement in form and substance satisfactory to the Debtors (the "Confidentiality Agreement"). Each person or entity that delivers the Confidentiality Agreement to the Debtors

---

[5]     "DIP Order" shall mean *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, and (V) Scheduling a Final Hearing on the Debtors' Motion to Incur Such Financing on a Permanent Basis.*

on or before the Bid Deadline is hereinafter referred to as a "Prospective Bidder." **After a Prospective Bidder delivers the Confidentiality Agreement, the Debtors will deliver or make available (unless previously delivered or made available) to each Prospective Bidder certain designated information and financial data with respect to the Assets. Neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who is not a "Prospective Bidder."** See Local Rule 6004-1(c)(i)(A).

**B.     Bid Deadline**

20.     **The Debtors request that the Court establish a date that is no later than twenty-eight (28) days after entry of the Bidding Procedures Order as the deadline for the submission of bids (the "Bid Deadline"). On or before the Bid Deadline, a Prospective Bidder that desires to make a bid (a "Competing Offer") is required to deliver written copies of its Competing Offer by facsimile and email to the representatives of the Debtors, any Official Committee of Unsecured Creditors formed in these cases (the "Committee") and the Prepetition Agent.** See Local Rule 6004-1(c)(i)(B).

**C.     Bid Requirements**

21.     **To be considered, all Competing Offers must:**

a)     **at a minimum, exceed the sum of (i) the cash portion of the Purchase Price set forth in Section 3.1(a) of the Asset Purchase Agreement, plus (ii) the Break-Up Fee and Expense Reimbursement, plus (iii) $250,000, for a total minimum bid of $41,650,000 (with the Spirit Locations) or $32,335,000 (without the Spirit Locations) (the "Minimum Overbid Amount");**

b)     **be accompanied by a signed asset purchase agreement in the form of the Asset Purchase Agreement, together with a marked copy showing all changes to the Asset Purchase Agreement, which changes shall not be less favorable to the Debtors and their estates;**

c)     **not be subject to, or conditioned on, any contingency or condition, including**

without limitation, the outcome of unperformed due diligence by the bidder or upon any financing contingency;

d)      be irrevocable until the earlier to occur of (i) the Closing Date, or (ii) for sixty (60) days following entry of the Sale Order;

e)      be submitted with a cash deposit equal to 10% of the purchase price offered in the Competing Offer (the "Deposit") in the form of a wire transfer or a certified check made payable to the Debtors and sent to the Debtors' counsel, which Deposit shall be non-refundable if the Court approves the sale of the Debtors' assets to such Prospective Bidder;

f)      be substantially on the same or better terms and conditions as set forth in the Asset Purchase Agreement; and

g)      be submitted with evidence substantially equivalent to that provided by the Purchaser establishing to the satisfaction of the Debtors, in consultation with the Prepetition Agent, that such Prospective Bidder or an entity that has executed a written guarantee of such Prospective Bidder's Bid has readily available funds sufficient to enable it to timely consummate its Competing Offer and provide all non-debtor parties to those executory contracts and unexpired leases to be assumed and assigned with adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code.

See Local Rule 6004-1(c)(i)(B) and (C).

22.      Competing Offers that the Debtors, in consultation with the Prepetition Agent, determine satisfy the provisions set forth in paragraph 21 above shall be deemed "Qualified Bids" and any party submitting such Qualified Bid shall be designated as a "Qualified Bidder." A Qualified Bid will be valued by the Debtors based upon any and all factors that the Debtors deem pertinent, including, among others, (a) the amount of the Qualified Bid, (b) the risks and timing associated with consummating a transaction with the Qualified Bidder, (c) any excluded assets or executory contracts or unexpired leases, and (d) any other factors that the Debtors may deem relevant to the Sale in consultation with the Prepetition Agent.

23.      If no Qualified Bids other than the bid by the Stalking Horse Bidder are received, the Debtors will report the same to the Court, and the Debtors shall proceed to seek court

approval of the Asset Purchase Agreement with the Stalking Horse Bidder; **provided, however, the Prepetition Agent shall retain its right to credit bid in accordance with section 363(k) of the Bankruptcy Code.** See Local Rule 6004-1(b)(iv)(N).

### D. Auction

24.      In the event that one or more Qualified Bid has been received, the Debtors will conduct the Auction for the sale of the Assets. The Debtors propose that the Auction take place no later than five (5) business days after the Bid Deadline at Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801. **Only representatives of the Stalking Horse Bidder, Qualified Bidders, the Debtors, the Committee and the Prepetition Agent will be entitled to attend the Auction. Only the Stalking Horse Bidder, Qualified Bidders and the Prepetition Agent are eligible to participate and make any subsequent bids at the Auction. At the Auction, bidding will commence at the amount of the aggregate consideration for the Assets and on the terms proposed in the Qualified Bid that the Debtors select as the highest and best offer prior to the Auction, and each subsequent bid shall be in increments of no less than $250,000.** See Local Rule 6004-1(c)(i)(C). Bidding will continue until such time as the highest and best offer is determined by the Debtors in consultation with the Prepetition Agent (the "Successful Bid," and the party submitting such Successful Bid being designated the "Successful Bidder").

25.      **The Debtors, after consultation with the Prepetition Agent and the Committee, may announce at the Auction additional rules or procedures for conducting the Auction so long as such rules are not inconsistent with the Bidding Procedures. The Debtors reserve the right, after consultation with the Prepetition Agent, to (i) determine, at their discretion, which bid, if any, is the highest and best offer, taking into consideration,**

15

inter alia, that the Break-Up Fee and Expense Reimbursement would be payable if a party other than the Stalking Horse Bidder is the Purchaser, (ii) reject any bid that the Debtors deem to be inadequate, insufficient or otherwise unsatisfactory, (iii) change the location of the Auction, and/or (iv) adjourn the Auction by announcing such adjournment at the Auction. The Debtors' presentation to this Court for approval of the selected bid as the Successful Bid does not constitute the Debtors' acceptance of such bid. The Debtors will have accepted a Successful Bid only when such Successful Bid has been approved by the Court at the Sale Hearing. See Local Rule 6004-1(c)(i)(D).

26.     All bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waived any right to jury trial in connection with any disputes relating to the Auction, the sale of the Assets and the construction and enforcement of the Asset Purchase Agreement.

### E.     Closing with Successful Bidder or Alternate Bidder

27.     **If, for any reason, the Successful Bidder fails to close on the purchase of the Assets (and assuming the conditions to closing have been satisfied), then: (i) the Successful Bidder shall forfeit the Deposit and be subject to such other rights and remedies as the Debtors may have for such failure; (ii) the Qualified Bidder who, as of the conclusion of the Auction, has made the next highest and best bid (as determined by the Debtors in consultation with the Prepetition Agent) automatically will be deemed to have submitted the Successful Bid without further order of the Court (such bidder, the "Alternate Bidder"); and (iii) the Alternate Bidder will be required to proceed as the purchaser at closing.** See Local Rule 6004-1(c)(i)(E).

## II.     Proposed Stalking Horse Bidding Protections

28.     **As part of the Bidding Procedures Order, the Debtors are requesting**

16

**approval of the provisions of the Asset Purchase Agreement regarding the Break-Up Fee**

**and Expense Reimbursement, on the terms and conditions set forth in the Asset Purchase**

**Agreement.** See Local Rule 6004-1(c)(i)(C). The Stalking Horse Bidder insisted on the

approval of the Break-Up Fee and Expense Reimbursement (3.5% of the cash portion of the

purchase price for the Assets) as a condition to its obligation to close on the transaction with the

Debtors. The Debtors submit that the proposed Break-Up Fee and Expense Reimbursement is a

necessary inducement for the Stalking Horse Bidder to submit its bid subject to higher and better

offers and is a necessary condition to closing the Sale.

29. Approval of the Break-Up Fee and Expense Reimbursement is governed by the

standards for determining the appropriateness of bidding incentives in the bankruptcy context

established by the Third Circuit in Calpine Corporation v. O'Brien Environmental Energy, Inc.,

181 F.3d 527 (3d Cir. 1999). In O'Brien, the Third Circuit concluded that "the determination

whether break-up fees or expenses are allowable under § 503(b) must be made in reference to

general administrative expense jurisprudence. In other words, [the inquiry] … depends upon the

requesting party's ability to show that the fees were actually necessary to preserve the value of

the estate." O'Brien, 181 F.3d at 535. That same standard was recently reiterated in the Third

Circuit's decision in In re Reliant Energy Channelview LP, 594 F.3d 200 (3d Cir. 2010) ("Under

O'Brien, we must decide whether an award of a break-up fee was necessary to preserve the value

of the Debtors' estate.").

30. In O'Brien, the Third Circuit referred to nine factors that the bankruptcy court

viewed as relevant in deciding whether to award bidding protections: (1) the presence of self-

dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than

encourages, bidding; (3) the reasonableness of the fee relative to the purchase price; (4) whether

the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction;" (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;" (6) the correlation of the fee to the maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committee of the break-up fee and expense reimbursement; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee and expense reimbursement] on unsecured creditors, where such creditors are in opposition to the break-up fee. The Debtors submit that under O'Brien the Break-Up Fee and Expense Reimbursement should be approved.

31.     First, all negotiations between the Debtors and the Stalking Horse Bidder have been conducted in good faith and at arm's length. Second, the Debtors have determined that the Break-Up Fee and Expense Reimbursement is necessary to attract and retain the Stalking Horse Bidder. The Debtors' ability to continue to seek a higher or better offer without the risk of losing the Debtors' current highest and best offer (following a robust marketing effort) will be eliminated if the Debtors cannot secure approval of the Break-Up Fee and Expense Reimbursement. Further, payment of the Break-Up Fee will not diminish the Debtors' estates. The Debtors will incur the Break-Up Fee and Expense Reimbursement only if an alternative transaction is consummated.

32.     The Debtors submit that authorization of the Break-Up Fee and Expense Reimbursement will not chill any bidding for the Assets. By ensuring the existence of a "floor" purchase price under the Asset Purchase Agreement, the Break-Up Fee and Expense Reimbursement will induce bids that potentially may have never been made and without which bidding may be limited. The Debtors' ability to provide the Break-Up Fee and Expense

Reimbursement enables them to ensure a sale to a bidder at a price they believe to be fair, while providing the Debtors with the potential of even greater benefit to the estates.

33.     Courts in this District have approved a range of break-up fees and expense reimbursements as being appropriate.  See, e.g., In re Spheris, Inc., Case No. 10-10352 (Bankr. D. Del. Feb. 23, 2010) (Gross, J.); In re Anchor Blue Retail Group, Inc., Case No. 09-11770 (Bankr. D. Del. June 12, 2009) (Walsh, J.); In re Radnor Holdings, Case No. 06-10894 (Bankr. D. Del. Sep. 22, 2006) (Walsh, J.); In re Riverstone Networks, Case No. 06-10110 (Bankr. D. Del. Feb. 24, 2006) (Sontchi, J.).

## III.    Proposed Sale Objection Deadline and Sale Hearing

34.     The Debtors propose that the Court establish the same date as the Bid Deadline as the deadline to file and serve objections to the Sale (the "Objection Deadline") and two (2) days after the Auction (or as soon thereafter as the Court's schedule permits) for the Sale Hearing, at which the Court will consider whether to approve the Asset Purchase Agreement or such other agreement between the Debtors and the Successful Bidder, authorize the Sale of the Assets free and clear of all liens, claims, interests and encumbrances, and authorize the assumption and assignment of executory contracts and unexpired leases in connection with the Sale.

35.     The Debtors propose that any objections to the Sale must be in writing, set forth with particularity the grounds for such objection, be filed with the Court, and be served upon (a) proposed counsel to the Debtors, (i) Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts  02110 (Attn: Douglas B. Rosner, Esq. and Christine D. Lynch, Esq.) and (ii) Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq.; (b) counsel to the Committee; (c) counsel to the Prepetition Agent, Paul Hastings, Janofsky & Walker LLP, 600 Peachtree Street, N.E., Twenty-Fourth Floor,

19

Atlanta, GA 30308 (Attn: Jesse H. Austin, III, Esq.) and Duane Morris LLP, 1100 North Market Street, Suite 1200, Wilmington, Delaware 19801 (Attn: Richard W. Riley, Esq.; (d) counsel to the Stalking Horse Bidder, Michelson Law Group, 150 Spear Street, Suite 1600, San Francisco, CA 941058 (Attn: Randy Michelson, Esq.) and DLA Piper LLC (US), 204 North LaSalle Street, Suite 1900, Chicago, IL 60601 (Attn: Richard J. Morey, Esq.); and (e) the Office of the United States Trustee for the District of Delaware (the "Interested Parties") so as to be actually received on or before the Objection Deadline.

## IV.  Notice of the Bidding Procedures, the Auction, and the Sale Hearing

36.    As part of the Bidding Procedures Order, the Debtors seek approval of the Sale Notice. The Sale Notice, the proposed form of which is attached to the Bidding Procedures Order as Exhibit 2, will include, among other things, the date, time, and place of the Auction and the Sale Hearing, as well as the deadline for filing any objections to the relief requested in the Motion once they are set by the Court. The Debtors propose to serve the Sale Notice on all parties provided with the notice of this Motion, all parties identified by the Debtors and FocalPoint having provided indications of interest for the purchase of the Assets and all parties on the Debtors' consolidated list of creditors. The Sale Notice will also include instructions on how to obtain a copy of the Motion and the Asset Purchase Agreement. The Debtors also propose to publish the Sale Notice in THE WALL STREET JOURNAL, National Edition as soon as practicable following entry of the Bidding Procedures Order.

37.    The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed Bidding Procedures and the sale of the Assets. Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

V.    **Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases**

38.    Additionally, the Debtors, seek approval of the Assumption and Assignment Notice, in substantially the form attached to the Bidding Procedures Order as Exhibit 3. In connection with the Sale, the Debtors will be required to assume and assign certain executory contracts and unexpired leases described in the Asset Purchase Agreement (the "Assumed Executory Contracts). To provide counterparties to the potential Assumed Executory Contracts appropriate notice of the requested relief, the Debtors propose to do the following:

39.    Upon entry of the Bidding Procedures Order, the Debtors will file a schedule of cure obligations (the "Cure Schedule") for all potential Assumed Executory Contracts to the Purchaser. The Cure Schedule will include a description of each Assumed Executory Contract and the amount, if any, the Debtors believe is necessary to cure any defaults under such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs"). A copy of the Cure Schedule, together with the Assumption and Assignment Notice, will be served on each of the non-debtor parties listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Court.

40.    The Assumption and Assignment Notice will provide, among other things, that information concerning the Purchaser's ability to perform under the Assumed Executory Contracts as contemplated by section 365(f)(2)(B) of the Bankruptcy Code (the "Adequate Assurance Information") will be provided as soon as practicable upon reasonable request in writing to the undersigned proposed counsel to the Debtors and upon the execution of a mutually acceptable confidentiality agreement. In the event that the Debtors propose to sell the Assets to a Purchaser who is not the Stalking Horse Bidder, the Adequate Assurance Information will be made available as soon as practicable after the conclusion of the Auction.

41.     The Debtors propose that any objections to the assumption and assignment of any executory contract or unexpired lease identified on the Cure Schedule, including, but not limited to, objections relating to adequate assurance of future performance or to the Cure Costs set forth on the Cure Schedule, must be in writing, filed with the Court, and served upon the Interested Parties so as to be actually received on or before the Objection Deadline; provided, however, in the event the Debtors propose to sell the Assets to a Purchaser other than the Stalking Horse Bidder, objections to the assignment of the Assumed Executory Contracts to such Purchaser on the basis of adequate assurance of future performance only may be raised at the Sale Hearing.

42.     Any objections shall set forth with particularity the grounds for such objection or other statements of position, including, if applicable, the specific monetary amount the objector asserts to be due, and the specific types and dates of alleged defaults, pecuniary losses, the specific adequate assurance of future performance that the Purchaser or Debtors have not provided and other conditions to assignment and support therefor.

43.     If no objections are timely received, then the Cure Costs set forth in the Cure Schedule will be binding upon the counterparties to the Assumed Executory Contracts for all purposes in these Chapter 11 Cases and will constitute a final determination of the total Cure Costs required to be paid by the Debtors in connection with the assumption and assignment of the Assumed Executory Contracts.  In addition, all counterparties to the Assumed Executory Contracts will (a) be forever barred from asserting any additional cure or other amounts with respect to the Assumed Executory Contracts, and the Debtors and the Purchaser will be entitled to rely solely upon the Cure Costs set forth in the Cure Schedule; (b) be deemed to have consented to the assumption and assignment; and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Purchaser that any additional amounts are due or

22

other defaults exist, that conditions to assignment must be satisfied under such Assumed Executory Contracts, or that there is any objection or defense to the assumption and assignment of such Assumed Executory Contracts.

44.     Where a counterparty to an Assumed Executory Contract files an objection to the proposed assumption and assignment including asserting a cure cost higher than the proposed Cure Costs, then to the extent that the parties are unable to consensually resolve the objection, such objection will be heard at the Sale Hearing. The Debtors intend to cooperate with counterparties to Assumed Executory Contracts to attempt to reconcile any differences in a particular cure cost.

45.     The Debtors request that any party failing to object to the proposed assumption and assignment be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code. See In re Decora Indus., 2002 WL 32332377, at *4 (Bankr. D. Del. May 17, 2002) (parties in interest who did not object to sale were deemed to accept the sale pursuant to sections 362(f) and 365 of the Bankruptcy Code); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

## VI.    The Sale of the Assets Pursuant to the Asset Purchase Agreement Is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment

46.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

23

estate." 11 U.S.C. § 363(b). Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he Court may issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a).

47.     A sale of the debtor's assets outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code should be authorized if a sound business reason exists for doing so. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 289, 295 (3d Cir. 1996), citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983). The Delaware and Hudson Railway court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable. In that regard, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

48.     The business judgment rule shields a debtor's management from judicial second-guessing. Johns-Manville Corp., 60 B.R. at 615-16 ("a presumption of reasonableness attaches to a debtor's management decisions"). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" The Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992)

(quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(l). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. See <u>Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.</u>), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

49.     The Debtors have concluded that an immediate sale of the Assets is the best way to preserve and maintain the value of the Assets for creditors and avoid a diminution of that value. Moreover, in the Debtors' business judgment, the consideration to be paid by the Purchaser pursuant to the Asset Purchase Agreement is fair and reasonable under the circumstances. The fairness and reasonableness of the consideration to be paid by the Purchaser will be demonstrated by adequate "market exposure" and an open and fair auction process—the best means for establishing whether a fair and reasonable price is being paid. In order to ensure a fair auction process, the Debtors will solicit interest from numerous potential purchasers and engage in the marketing process described above.

## VII.     The Sale of the Assets Free and Clear of Liens and Other Interests Is Authorized By Section 363(f)

50.     The Debtors further submit that it is appropriate to sell the Assets free and clear of liens, claims, interests and encumbrances (collectively, the "<u>Liens</u>") pursuant to section 363(f) of the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of the Assets to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of Liens if:

(1)     applicable nonbankruptcy law permits sale of such property free

RLF1 3563212v.1

and clear of such interests;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

51.     This provision is supplemented by section 105(a) of the Bankruptcy Code.  11 U.S.C. § 105(a).

52.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of Liens.  In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[S]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive, and holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

53.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Assets pursuant to the Asset Purchase Agreement.   In particular, the Debtors believe that at least section 363(f)(2) will be met in connection with the

26

transactions proposed under the Asset Purchase Agreement because each of the parties holding Liens on the Assets will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale. Any lienholder also will be adequately protected by having their Liens, if any, in each instance against the Debtors or their estates, attach to the cash proceeds of the Sale ultimately attributable to the Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force, and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. Accordingly, section 363(f) authorizes the transfer and conveyance of the Assets free and clear of any such Liens.

54.     Under the terms of the Asset Purchase Agreement, the Purchaser will assume and agree to pay, to perform, and to discharge as and when they become due and payable, or are required to be performed, all liabilities which are to be performed on and after consummation of the Asset Purchase Agreement. **The Purchaser is not liable for any of the Debtors' liabilities in connection with the sale of the Assets as a successor to the Debtors' business or otherwise.** See Local Rule 6004-1(b)(iv)(L). Extensive case law exists providing that claims against the winning bidder are directed to the proceeds of a free and clear sale of property and may not be asserted against a buyer subsequently.

55.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined in the Bankruptcy Code. Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000). In the case of In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in

27

property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" Id. at 289 (citing 3 Collier on Bankruptcy 363.06[l]). As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited extensively and with approval by the Third Circuit in Folger, supra, the scope of section 363(f) is not limited to in rem interests. Thus, the Third Circuit in Folger stated that Leckie held that debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." Folger, 209 F.3d at 258.

56. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); WBO Partnership v. Virginia Dept. of Medical Assistance Services (In re WBQ Partnership), 189 B.R. 97, 104-05 (Bankr. 22

28

E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[6] The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the Purchaser arising from the Debtors' pre-sale conduct. Under section 363(f) of the Bankruptcy Code, the Purchaser is entitled to know that the Assets are not subject to latent claims that will be asserted against the Purchaser after the proposed transaction is completed. Accordingly, consistent with the above-cited case law, the order approving the sale of the Assets should state that the Purchaser is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Assets.

## VIII. The Purchaser is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the Transfer of the Assets Does Not Violate Section 363(n)

57. The Debtors request that the Court find that the Purchaser is entitled to the full protections of section 363(m) of the Bankruptcy Code. Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor in the event that the sale conducted under section 363(b) is reversed or modified on appeal. Section 363(m) of the Bankruptcy Code "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." In re Chateaugay Corp., 1993 U.S. Dist. LEXIS 6130, *9 (S.D.N.Y. 1993).

58. The Debtors have presented the proposed Sale in good faith. The Stalking Horse Bidder's identity has been, and the identity of any Successful Bidder will be, fully disclosed to

---

[6]    Some courts, concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims, have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority. See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

the Court and parties in interest. Furthermore, the Debtors will be prepared to introduce evidence at the Sale Hearing regarding the arm's-length, good faith nature of the marketing and bidding process, the Auction and the negotiation of the asset purchase agreement with the Purchaser.

## IX. The Assumption and Assignment of the Assumed Contracts and Leases Should be Authorized

59.     In connection with the Sale, the Debtors seek authority to assume and assign the Assumed Executory Contracts. Under section 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The decision whether an executory contract or unexpired lease should be assumed and assigned or rejected is based on the debtor's exercise of its "business judgment." NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional"); In re III Enterprises Inc. V, 163 B.R. 453, 469 (Bankr. E. D. Pa 1994) (citations omitted) ("Generally, a court will give great deference to a debtor's decision to assume or reject the contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment – a standard which we have concluded many times is not difficult to meet."). As discussed above, the Debtors have made the business decision to sell substantially all of the Debtors' assets pursuant to the Asset Purchase Agreement. The Debtors are party to various executory contracts and unexpired leases that are necessary to the operation of their businesses. The assumption and assignment of the Assumed Executory Contracts is, therefore, an integral term of the Asset Purchase Agreement. If the Debtors are not able to assume and assign the Assumed Executory Contracts, the sale of the Assets will likely be impaired- resulting in reduced proceeds for the benefit of the estate.

60.     Section 365(f)(2) of the Bankruptcy Code provides in pertinent part:

The trustee may assign an executory contract or unexpired lease of the debtor only if –

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

61. Section 365(b)(1) of the Bankruptcy Code then codifies the requirements for assuming an unexpired lease or executory contract of a debtor. This subsection provides:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default … ;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease. 11 U.S.C. § 365(b)(1).

62. The Debtors submit that there are no incurable defaults under any of the Assumed Executory Contracts. The Debtors do believe, however, that there may be certain Cure Costs due under some of the Assumed Executory Contracts, and consistent with the Asset Purchase Agreement, any such Cure Costs will be paid by the Debtors as part of any assumption and assignment. As discussed above, the Debtors intend to provide counterparties to the potential Assumed Executory Contracts with adequate notice of the Cure Costs as well as the proposed assumption and assignment.

63. Moreover, the Debtors propose to provide all parties to the Assumed Executory

Contracts with adequate assurance of future performance. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988). Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

64. Upon written request and execution of a mutually acceptable confidentiality agreement, the Debtors will provide counterparties to the Assumed Executory Contracts the Adequate Assurance Information relating to (a) the Stalking Horse Bidder, as soon as practicable after the Court enters the Bidding Procedures Order, and (b) the Successful Bidder and Alternate Bidder, as soon as practicable after the Successful Bid and Alternate Bid is determined and the Auction concludes. The Adequate Assurance Information that the Debtors anticipate providing may include: (a) the name of the Purchaser, (b) information about Purchaser's financial condition, such as federal tax returns, a current financial statement, or bank account statements, (c) a description of the intended use of the premises (if applicable), and (d) such additional information regarding the potential purchaser as the Debtors may elect to include. This will

provide the Court and other interested parties with the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser to provide adequate assurance of future performance under such agreements, as required under section 365(b)(1)(C) of the Bankruptcy Code. The Court should therefore authorize the Debtors to assume and assign the Assumed Executory Contracts as set forth herein.

## X.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

65.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that any order approving the Asset Purchase Agreement be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

66.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, Collier suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be

33

reduced to the amount of time actually necessary to file such appeal. Id.

67. The Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

68. The Debtors have provided notice of this Motion by (i) facsimile and/or overnight mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' creditors holding the thirty (30) largest unsecured claims on a consolidated basis; (c) counsel to the Prepetition Agent; (d) the Internal Revenue Service; and (e) the United States Department of Justice; and (ii) first class mail to (a) counterparties to any potential Assumed Executory Contract and (b) the relevant taxing authorities. The Debtors respectfully submit that no further notice of this Motion is required.

34

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order substantially in the form attached hereto as <u>Exhibit A</u>, (ii) enter the Sale Order after the Sale Hearing, and (iii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: April 22, 2010
       Wilmington, Delaware

Respectfully submitted,

Daniel J. DeFranceschi (DE No. 2732)
Julie A. Finocchiaro (DE No. 5303)
Drew G. Sloan (DE No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Douglas B. Rosner. (MA BBO# 559963)
Christine D. Lynch. (MA BBO#640361)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
Tel:    (617) 482-1776
Fax:    (617) 574-4112

*Proposed Counsel for Debtors and Debtors in Possession*

RLF1 3563212v.1