# Exhibit C

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 08-12606 (BLS) |
| VERASUN ENERGY CORPORATION, et al., | *Chapter 11* |
| Debtors. [1] | Jointly Administered |
| | **Hrg. Date: 02/19/09 at 10:00 a.m.** |
| | **Obj. Due: 2/13/09 at 4:00 p.m.** |

**MOTION PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365 AND FED. R. BANKR. P. 2002, 6004, 6006 FOR (I) ENTRY OF AN ORDER (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES RELATED TO THE SALE OF SOME OR ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS FOR SALE OF VSE ASSETS; (C) ESTABLISHING PROCEDURES FOR THE DEBTORS TO ENTER INTO ADDITIONAL STALKING HORSE AGREEMENTS WITH BID PROTECTIONS IN CONNECTION WITH SALE OF ASSETS; (D) SCHEDULING AN AUCTION AND SALE HEARING FOR THE SALE OF THE DEBTORS' ASSETS; (E) PERMITTING CREDIT BIDDING PURSUANT TO BANKRUPTCY CODE SECTION 363(K); (F) ESTABLISHING CERTAIN NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS; (G) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES AND AGREEMENTS; AND (H) GRANTING CERTAIN RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors" or the "Company") hereby move (the "Motion") this Court for entry of an order (the

"Bidding Procedures Order") (A) establishing bidding and auction procedures (the "Bidding

---

[1]    The Debtors consist of: VeraSun Energy Corporation (EIN: 20-3430241); ASA OpCo Holdings, LLC (EIN: 68-0609122); US BioEnergy Corporation (EIN: 20-1811472); VeraSun Albert City, LLC (EIN: (20-2264707); VeraSun Albion, LLC (EIN: 55-0907221); VeraSun Aurora Corporation (EIN: 40-0462174); VeraSun BioDiesel, LLC (EIN: 20-3790860); VeraSun Bloomingburg, LLC (EIN: 55-0907224); VeraSun Central City, LLC (EIN: (55-0816855); VeraSun Charles City, LLC (EIN: 20-3735184); VeraSun Dyersville, LLC (20-5765890); VeraSun Fort Dodge, LLC (EIN: 42-1630527); VeraSun Granite City, LLC (EIN: 20-5909621); VeraSun Hankinson, LLC (90-0287129); VeraSun Hartley, LLC (EIN: 20-5381200); VeraSun Janesville, LLC (EIN: 20-4420290); VeraSun Linden, LLC (EIN: 55-0907228); VeraSun Litchfield, LLC (EIN: 20-8621370); VeraSun Marion, LLC (EIN: 20-34377343); VeraSun Marketing, LLC (EIN: 20-3693800); VeraSun Ord, LLC (75-3204878); VeraSun Reynolds, LLC (EIN: 20-5914827); VeraSun Tilton, LLC (EIN: 26-1539139); VeraSun Welcome, LLC (EIN: 20-4115888); and VeraSun Woodbury, LLC (20-0647425).

Procedures") in connection with the potential sale of substantially all of the Debtors' assets (the "Assets"), free and clear of all claims (as defined in section 101(5) of the Bankruptcy Code) and any other interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the "Interests"), except to the extent identified in a Successful Bidder's (defined below) asset purchase agreement; (B) approving the proposed bid protections to Valero Renewable Fuels Company, LLC ("Valero" or the "VSE Stalking Horse Bidder") in accordance with that certain Asset Purchase Agreement dated February 6, 2009, (the "VSE Asset Purchase Agreement") for the purchase of the VSE Assets (defined below); (C) establishing procedures for the Debtors to enter into stalking horse agreements (each, an "Additional Stalking Horse Agreement") containing bid protections with respect to any additional stalking horse bidders (the "Additional Stalking Horse Bidders") for the sale of all or a portion of the Assets; (D) scheduling an auction (the "Auction") and setting a date and time for a sale hearing (the "Sale Hearing") for the Sale of the Assets; (E) permitting credit bidding pursuant to Bankruptcy Code 363(k); (F) establishing procedures for noticing and determining cure amounts (the "Assumption and Assignment Procedures"); (G) approving the form and manner of notice of all procedures, protections, schedules and agreements; and (H) granting certain related relief.  The Debtors further request that at the Sale Hearing, subject to the results of the Auction and the Bidding Procedures set forth herein, this Court enter one or more orders (each a "Sale Order") (A) approving and authorizing the sale of Assets (the "Sale"), free and clear of all Interests, except to the extent set forth in a Successful Bidder's (defined below) asset purchase agreement; and (B) authorizing the assumption and assignment of certain executory contracts and unexpired leases.  In support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and sections 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A. The Chapter 11 Filing

3. On October 31, 2008 (the "Petition Date"), VeraSun Energy Corporation ("VeraSun") and 24 of its subsidiaries and affiliates each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., as amended.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court has ordered joint administration of these chapter 11 cases (the "Chapter 11 Cases").

4. On November 14, 2008, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in any of the Debtors' Chapter 11 Cases.

### B. Background and Current Business Operations

5. Founded in 2001, VeraSun is headquartered in Sioux Falls, South Dakota and, together with the other Debtors, is a leading producer and marketer of ethanol.  Ethanol is a type of alcohol produced principally from corn that is used as a blend component in the U.S. gasoline fuel market to increase octane and reduce tailpipe emissions.  The federal government has mandated ethanol's use in the fuel stream through the Renewable Fuel Standard (the "RFS"),

which requires that escalating volumes of ethanol be purchased and blended into gasoline. Specifically, by 2015 the RFS standards will require 15 billion gallons of ethanol a year. The Company also markets E85, a branded fuel blend consisting of 85 percent ethanol and 15 percent gasoline for use in "Flexible Fuel Vehicles."

6.      The Company has 14 operational facilities in eight states with a current combined ethanol production capacity of more than 1.4 billion gallons per year. According to the Renewable Fuels Association, this constitutes approximately 14% of the total U.S. ethanol production capacity. The Company also has a production facility in Welcome, Minnesota that is substantially complete but is not in operation, and a production facility in Janesville, Minnesota that is still under construction. In addition, the Company owns a partially constructed facility located in Reynolds, Indiana.

7.      The Company's facilities are designed to operate on a continuous basis and use current dry-milling technology, a production process that results in increased ethanol yield and reduced capital costs compared to wet-milling facilities. In addition to producing ethanol, the Company also produces and sells wet and dry distillers grains as ethanol co-products, which serve to partially offset the Company's corn costs.

8.      The Company's liquidity is materially affected by uncertain commodity prices for corn, natural gas and ethanol. Corn and ethanol prices were highly volatile during the past twelve months and are impacted by a number of factors beyond the Company's control. In addition, the Company expanded production capacity substantially during 2007 and 2008 through the acquisitions of ASA Opco Holdings (the "ASA Acquisition") and US BioEnergy Corporation (the "US BioEnergy Acquisition", together with the ASA Acquisition, the "Acquisitions"). As a result of the Acquisitions, the Debtors' operating Assets can generally be

4

divided into four (4) distinct segments as follows: (a) the VSE Segment;[2] (b) the ASA Segment;[3] (c) the US BioEnergy Segment;[4] and (d) the Marion Segment[5] (each a "Segment" and collectively, the "Segments").

9.      Ultimately, sizeable fluctuations in the price of corn, natural gas and ethanol, coupled with obligations to service the Company's debt in the face of continued lack of liquidity in the credit markets and the Company's inability to raise additional investment capital from depressed equity markets, precipitated these Chapter 11 Cases.

**C.      Debtors' Capital Structure**

10.     While run centrally at the parent level, the Debtors' operations consist of the four Segments noted above, each with its own prepetition secured credit facility or facilities (each a "Prepetition Secured Credit Faciliy"), which are not cross collateralized.  In the case of the US BioEnergy Segment, as discussed below, the capital structure consists of seven distinct credit facilities each secured by substantially all of the assets of a distinct production facility, without cross collateralization within the U.S. BioEnergy Segment.  As of the Petition Date, the Debtors total consolidated funded debt obligations were approximately $1.5 billion and consisted of, among other things, revolving credit, institutional term loans, secured and unsecured payable

---

[2]     The "VSE Segment" consists of VeraSun Aurora Corporation; LLC; VeraSun Charles City, LLC; VeraSun Fort Dodge, LLC; VeraSun Hartley, LLC; VeraSun Reynolds, LLC; VeraSun Welcome, LLC; VeraSun Marketing, LLC.  The assets of VeraSun BioDiesel, LLC, VeraSun Litchfield, LLC, VeraSun Granite City, LLC, VeraSun Tilton, LLC, which consist exclusively of undeveloped property (the "Development Sites"), are not part of this Auction process and will be sold separately.

[3]     The "ASA Segment" consists of substantially all of the assets of:  ASA Albion, LLC; ASA Bloomingburg, LLC; ASA Linden, LLC; and ASA OpCo Holdings.

[4]     The "US BioEnergy Segment" consists of substantially all of the assets of:  US BioEnergy Corporation; VeraSun Albert City, LLC; VeraSun Central City, LLC; VeraSun Dyersville, LLC; VeraSun Hankinson, LLC; VeraSun Janesville, LLC; VeraSun Ord, LLC; and VeraSun Woodbury, LLC.

[5]     The "Marion Segment" consists of substantially all of the assets of US Bio Marion, LLC.

notes and secured construction/project financing. As discussed below, the Debtors' funded debt obligations have increased since the Petition Date.

### The VeraSun Segment

11.     UBS Credit Facility.  On May 30, 2008, VeraSun entered into that certain Credit Agreement (the "UBS Credit Facility") with UBS Securities LLC, UBS AG, Stamford Branch and UBS Loan Finance LLC (collectively "UBS"), providing for a revolving credit facility of up to $125 million, subject to a borrowing base.  VeraSun and certain of its subsidiaries (collectively, the "VeraSun UBS Subsidiaries")[6] are co-borrowers and guarantors under this facility.  The UBS Credit Facility is secured by substantially all of the inventory and accounts receivable of VeraSun and the VeraSun UBS Subsidiaries.  As of the Petition Date, outstanding principal obligations under the UBS Credit Facility were approximately $95.0 million.

12.     On December 4, 2008, this Court authorized on a final basis the Debtors' use of UBS's cash collateral and the proceeds thereof (the "UBS Cash Collateral").  The UBS Cash Collateral is secured by first priority postpetition liens on substantially all of the inventory and accounts receivable of VeraSun and the VeraSun UBS Subsidiaries.

13.     Senior Secured Notes.  In December 2005, VeraSun issued 9.875% senior secured notes in the aggregate principal amount of $210 million, maturing in 2012 (the "Senior Secured Notes").  The Senior Secured Notes are guaranteed by certain subsidiaries, excluding ASA Holdings and its subsidiaries and US BioEnergy and its subsidiaries (collectively, the

---

[6]     The VeraSun UBS Subsidiaries include: VeraSun Aurora Corporation; VeraSun Charles City, LLC; VeraSun Marketing, LLC; VeraSun Welcome, LLC; VeraSun Fort Dodge, LLC; and VeraSun Hartley, LLC.

"VeraSun Subsidiaries").[7]  The Senior Secured Notes are secured on a first priority basis by liens on substantially all of the assets of VeraSun and the VeraSun Subsidiaries other than accounts receivable, inventory, commodities accounts, and the cash proceeds therefrom.

14.    On December 4, 2008, this Court authorized on a final basis a postpetition debtor-in-possession facility provided by certain of the holders of the Senior Secured Notes (the "VSE DIP Facility") in the amount of approximately $196.6 million.  The VSE DIP Facility consists of approximately $93.6 million of incremental liquidity and $103.0 million of "rolled" prepetition Senior Secured Notes.  The VSE DIP Facility is secured by perfected first priority senior priming liens on and security interest in all assets of the VSE Segment other than the UBS Cash Collateral.  After giving effect to the roll-up, approximately $107.0 million of prepetition Senior Secured Notes remain outstanding.

## The ASA Segment

15.    ASA Senior Credit Facility.  The entities that constitute the ASA Segment are co-borrowers and guarantors under the ASA Holdings prepetition senior credit facility, which provided for aggregate borrowings of up to $275 million in two tranches:  (a) Tranche A ($175 million) and (b) Tranche B ($100 million) (the "ASA Senior Credit Facility").  VeraSun is a guarantor of the ASA Senior Credit Facility.  Borrowings under the ASA Senior Credit Facility were used for the development, engineering, construction and operation of the Linden, Albion and Bloomingburg plants.  The obligations under the ASA Senior Credit Facility are secured by the assets of ASA Holdings and its subsidiaries and a pledge made by VeraSun of all of the

---

[7]    The VeraSun Subsidiaries include:  VeraSun Aurora Corporation; VeraSun Biodiesel, LLC; VeraSun Charles City, LLC; VeraSun Granite City, LLC; VeraSun Fort Dodge, LLC; VeraSun Hartley, LLC; VeraSun Litchfield, LLC; VeraSun Marketing, LLC; VeraSun Tilton, LLC; VeraSun Reynolds; and VeraSun Welcome, LLC.

equity interest in ASA Holdings. As of the Petition Date, approximately $266.7 million was outstanding under the ASA Senior Credit Facility.

16. On February 5, 2009, this Court authorized on a final basis a $20 million postpetition debtor-in-possession facility to be provided by certain of the lenders under the ASA Senior Credit Facility (the "ASA DIP Facility"). The ASA DIP Facility is secured by perfected first priority senior priming liens on and security interest in all assets of the ASA Segment.

**US BioEnergy Segment**

17. US BioEnergy Credit Facilities. Each direct operating subsidiary of US BioEnergy Corporation has its own individual credit facility with a combination of both revolving and term loans, secured by mortgages on real property and liens on all personal property at each operating entity. With the exception of US Bio Marion, LLC (discussed in further detail below), each entity acquired in the US BioEnergy Acquisition is party to a standalone credit facility with AgStar Financial Services, PCA ("AgStar"), as administrative agent and lender, and the other lenders party thereto (collectively, the "AgStar Credit Facilities"). As of the Petition Date, aggregate outstanding debt obligations under the AgStar Credit Facilities were approximately $464.9 million in the aggregate.

18. On December 4, 2008, this Court authorized on a final basis six separate postpetition debtor-in-possession credit facilities that provided $24.5 million in incremental financing to each Debtor in the US BioEnergy Segment other than VeraSun Janesville, LLC[8] (including the Janesville facility described in the footnote below, the "Initial AgStar DIP Facility"). The Initial AgStar DIP Facility matured on January 15, 2009.

---

[8] On January 8, 2009, this Court authorized on a final basis a $500,000 postpetition debtor-in-possession facility for VeraSun Janesville, LLC provided by AgStar.

19.    On January 15, 2009, this Court authorized on an interim basis a postpetition debtor-in-possession facility with AgStar (the "AgStar DIP Facility") of up to $81.7 million in the aggregate with an additional $28.9 million to be approved pursuant to a final order scheduled to be entered on or about February 10, 2009 (such facilities, together with the Initial AgStar DIP Facility, the "AgStar DIP Facility").

20.    The purpose of the supplemental debtor-in-possession financing provided by AgStar and the participating prepetition lenders was to refinance the Initial AgStar DIP Facility while providing $30.3 million of incremental liquidity.  In addition, the AgStar DIP Facility has, under this Court's January 15, 2009 interim order, a "roll-up" component, pursuant to which $55.3 million of prepetition indebtedness under the AgStar Credit Facilities was converted into postpetition indebtedness.  The AgStar DIP Facility is secured by perfected first priority senior priming liens on and security interests in substantially all of the assets of each operating entity in the US BioEnergy Segment.  However, as discussed herein, the AgStar DIP Facility is actually seven standalone credit facilities, without cross collateralization. Accordingly, the approximate funded secured indebtedness at each of the US BioEnergy Segment facilities, including prepetition and postpetition secured obligations, equals up to:

- VeraSun Albert City, LLC: $88.6 million

- VeraSun Central City, LLC: $83.8 million

- VeraSun Dyersville, LLC: $107.5 million

- VeraSun Hankinson, LLC: $108.8 million

- VeraSun Janesville, LLC: $66.3 million

- VeraSun Ord, LLC: $39.8 million

- VeraSun Woodbury, LLC: $43.5 million

21.     <u>Marion Credit Facilities</u>.  US Bio Marion, LLC, which became a subsidiary of VeraSun as a result of the US BioEnergy Acquisition, has outstanding construction loans from Dougherty Funding LLC ("<u>Dougherty</u>") relating to the Marion, South Dakota facility ("<u>Marion</u>"), as well as a $7 million revolving credit facility with First Bank & Trust ("<u>FB&T</u>") secured by a first priority lien on substantially all of the working capital of the Marion facility (the "<u>FB&T Collateral</u>").  On June 1, 2008, the outstanding Marion construction loans were converted into a $90 million term note maturing on March 31, 2013 (the "<u>Marion Loan</u>").  The Marion Loan is secured by substantially all of the assets of US Bio Marion, LLC other than the FB&T Collateral.  On December 3, 2008, this Court authorized the Debtors' use of Dougherty's and FB&T's cash collateral.

**D.     The Debtors' Marketing and Sales Efforts**

22.     The Debtors, with the assistance of their advisors, have been actively marketing the sale of substantially all of their Assets for the last five months.  Even before the Petition Date, the Debtors engaged in discussions with a variety of financial and strategic planners in an effort to maximize the value of the Assets.

23.     Prior to the commencement of these Chapter 11 Cases, on September 18, 2008, the Company retained Morgan Stanley & Co. Incorporated ("<u>Morgan Stanley</u>") to act in an advisory capacity to evaluate strategic alternatives.  As part of this evaluation, the Company and Morgan Stanley aggressively pursued a potential sale of the Assets.  The Company and Morgan Stanley undertook exhaustive efforts to solicit interest in the Company from third parties with the potential to acquire all or a portion of the Assets or to engage in other strategic transactions with the Company.

24.     Between September 19, 2008 and mid-October 2008, the Company and Morgan Stanley identified and contacted approximately 57 potential financial and strategic counterparties.  Approximately 14 of these parties entered into confidentiality agreements with the Company and were provided extensive due diligence materials on an electronic data site (the "Data Site"), as well as the opportunity to speak with the Company and its advisors and to conduct site visits with respect to the Assets.  Four of these parties (two private equity firms, a strategic investor and an individual investor) submitted preliminary offers and/or term sheets for various types of proposed transactions.  Two of these parties ultimately elected not to pursue their preliminary proposals.  The other two preliminary proposals were the basis for extensive discussions and negotiations with the Company, but ultimately did not lead to a definitive agreement.

25.     In July of 2008, the Debtors engaged Rothschild, Inc. ("Rothschild") to help further evaluate their strategic alternatives.  As described below, in late November, 2008, the Debtors received an unsolicited non-binding letter of intent from Valero.  On or about November 24, 2008, the Debtors issued a press release publicly disclosing their receipt of a letter of intent from a potential acquirer.  Since that time, Rothschild and the Debtors have responded to voluminous "in-bound" inquiries regarding the availability of the Debtors' Assets, as well as making numerous "out-bound" calls to potentially interested parties.  Approximately 64 parties (the "Interested Parties") have been in contact with the Debtors and expressed interest in purchasing some or all of the Debtors' Assets.  To date, of the Interested Parties, 15 have executed confidentiality agreements postpetition and, of those, 13 have been granted access to comprehensive due diligence materials, including the Data Site.

26.     Separately, many of the parties which were contacted pre-petition, are actively involved in diligence currently.  In addition to the 15 Interested Parties referenced above, prior to the Petition Date, 13 parties who were willing to become restricted received confidentiality agreements, nine (9) have executed confidentiality agreements, and seven (7) were granted access to comprehensive due diligence materials, including an electronic Data Site. Any party that has not received access to the Data Site either has not been responsive, is currently reviewing a confidentiality agreement, or is in the process of providing a preliminary indication of interest in order to be granted the appropriate access.  The Company and its advisors continue to have discussions with several of these Interested Parties regarding their interest in purchasing certain of the Debtors' Assets.  As a result of these efforts, the Debtors have received letters of interest (each a "LOI") from six different Interested Parties.

27.     As indicated above, in late November 2008, the Debtors received an unsolicited non-binding LOI from Valero.  Valero later submitted a revised LOI in January 2009. Since receiving the first LOI, Rothschild and the Debtors have been in active negotiations with Valero regarding the terms and conditions of the VSE Asset Purchase Agreement and have facilitated various diligence requests with Valero's representatives and advisors.  On February 6, 2009, the Debtors executed the VSE Asset Purchase Agreement with Valero for the purchase of the VSE Assets[9] for $280 million plus the fair market value at closing of inventory, attached hereto as Exhibit A.

28.     While negotiating the VSE Asset Purchase Agreement, Valero indicated to the Debtors that a relatively expedited sale process with respect to the VSE Assets was critical to

---

[9]     The "VSE Assets" consist of substantially all of the assets of (i) VeraSun Aurora, LLC; (ii) VeraSun Charles City, LLC; (iii) VeraSun Fort Dodge, LLC; (iv) VeraSun Hartley, LLC; (v) VeraSun Welcome, LLC; (vi) VeraSun Reynolds, LLC; and (vii) VeraSun Marketing, LLC.

their decision to provide a stalking horse bid.  In addition, both the AgStar DIP Facility and the

ASA DIP Facility are likewise conditioned on the Debtors' pursuit of a sale process within a

specified time frame.  Specifically, it is an "Event of Default" under the AgStar DIP Facility if

the Debtors do not hold an auction with respect to the Assets of the US BioEnergy Segment on

or before March 16, 2009, and close any such sale on or before March 31, 2009.  Similarly, the

ASA DIP Facility also is conditioned on a sale process that requires the Debtors to hold an

auction with respect to the Assets of the ASA Segment on or before March 31, 2009, and close

any such sale on or before April 15, 2009.  While the postpetition financing at the VSE Segment

is not expressly conditioned on a sale process, the Debtors liquidity at the VSE Segment is not

projected to last through 2009, and the Debtors believe that a sale process that includes a sale of

substantially all of the Assets will maximize value.  Consequently, the Debtors have determined

that it is in the best interest of their estates, creditors, and other parties in interest to move

forward with the Sale process set forth herein.

        29.      Accordingly, the Debtors have proposed the following timeline for the

Sale of the Assets: [10]

- February 19, 2009 – Bid Procedures Hearing

- March 13, 2009 – Submission Deadline for Qualified Bids (defined below)

- March 16, 2009 – Auction

- March 18, 2009 – Proposed Sale Hearing

        30.      As of the filing of this Motion, however, with the exception of the VSE

Assets, while significant interest has been expressed by other parties with respect to other Assets,

---

[10]    The Debtors, in the exercise of their business judgment, reserve their right to change these sale-related dates in order to achieve the maximum value for the Assets.

the Debtors have not yet negotiated a definite agreement(s) regarding the terms of a Sale(s) of

any of the Assets of the other Segments, individually or as part of a package.

**E.     The Asset Purchase Agreement**

31.     A summary of the principal terms of the VSE Asset Purchase Agreement,

set forth in full in the VSE Asset Purchase Agreement, is as follows:[11]

### Purchase Price; Closing Payments

- Cash consideration.  Cash in the amount of $280 million plus value of inventory and certain pre-paid expenses (for natural gas, utilities, rail, chemicals and denaturants) minus adjustments for allocation of certain taxes and certain other items.

- Payment of certain Administrative Expenses.  Amounts required to pay cure costs (to the extent Buyer is not responsible therefor), transaction-related professional fees and certain other allowed administrative expense claims will be paid directly from the cash consideration at the closing of the asset sale and, after the closing, from an additional portion of the cash consideration to be held in escrow for such purpose.

### Deposit

- Buyer will be required to make a deposit of $10 million, which would be applied toward the purchase price at closing.

### Acquired Assets

- The Aurora, Charles City, Fort Dodge, Hartley, Reynolds and Welcome production facilities and related equipment and inventory (including inventory held by VeraSun Marketing), as well as substantially all of the other assets associated exclusively with those facilities;

- intellectual property consisting of the trademarks and service marks "VERASUN," the VeraSun logo, and the slogan "AMERICA'S SOURCE FOR RENEWABLE FUELS";

- certain other intellectual property, including the VE85 trademarks and patents relating to corn oil extraction; and

- specified other assets as set forth in the APA, including the Company's former headquarters building in Brookings.

---

[11]     The following summary is qualified in its entirety by reference to the provisions of the VSE Asset Purchase Agreement.  In the event of any inconsistencies between the provisions of the VSE Asset Purchase Agreement and the terms herein, the terms of the VSE Asset Purchase Agreement  shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the VSE Asset Purchase Agreement.

**Employees**

- Buyer will offer employment, effective upon the closing, to all of the active employees at the production facilities on substantially similar terms as those under which they are employed by Sellers immediately prior to the closing.

**Representations and Warranties; Operations Pending Closing**

- Representations and warranties do not survive the closing; and there is no post-closing indemnity for breaches.

- Until the closing, Sellers are subject to covenants limiting their operating flexibility in certain respects and are generally required to carry on their business in the ordinary course, taking into account their status as debtors-in-possession.

**Termination to Pursue Higher or Better Offer**

- Sellers may, upon paying Buyer a $10 million break-up fee and reimbursing Buyer's transaction expenses up to $1 million, terminate the APA to consummate a competing sale transaction or undertake a stand alone restructuring.

**Remedies**

- Sellers' only remedy upon termination due to Buyer's breach is to retain the $10 million deposit.

- Buyer's only remedy upon termination due to Sellers' breach is to collect the $10 million break up fee and expense reimbursement of up to $1 million (and Sellers will have to return the $10 million deposit to Buyer).

## RELIEF REQUESTED

32.     The Debtors have determined that given their liquidity, current market conditions, and the condition of the ethanol market, a prompt Sale of their Assets is the best way to maximize the value of the Assets for their respective estates and creditors.

33.     Accordingly, by this Motion, the Debtors seek entry of the Bidding Procedures Order (A) approving procedures for (i) submitting bids for any or all of the Debtors' Assets, (ii) conducting an Auction with respect to any Assets on which the Debtors receive more than one Bid ("Competing Bids"); (B) approving the proposed bid protections to the VSE Stalking Horse Bidder; (C) establishing procedures for the Debtors to enter into Additional Stalking Horse Agreements including certain bid protections (the "Break-Up Fee and Expense

Reimbursement", together with the VSE Break-Up Fee and Expense Reimbursement (defined below), the "Bid Protections") with any Additional Stalking Horse Bidders for the purpose of establishing a minimum acceptable bid at which to begin the Auction with respect to all or any portion of the Debtors' Assets; (D) scheduling the Auction and a Sale Hearing with respect to any Bid accepted by the Debtors; (E) establishing Notice and Assumption and Assignment Procedures; and (F) approving form and manner of notice of all procedures, protections, schedules and agreements.

34.     The Debtors also request the Court to set a Sale Hearing on or about March 18, 2009, but reserve the right, in consultation with the Creditors' Committee, to extend the Sale process, including, but not limited to, the applicable bid deadline and Auction date, and request a continuance of the Sale Hearing to March 30, 2009.  At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bidding Procedures, the Debtors intend to seek entry of one or more orders (each a "Sale Order"), approving the Sale of all or certain of the Debtors' Assets free and clear of all interests and/or additional post-petition financing for the business and authorizing the assumption and assignment of certain executory contracts and unexpired leases.  A form of Sale Order will be filed by the Debtors no later than ten (10) calendar days before the Sale Hearing.

## BASIS FOR RELIEF

35.     The events leading to these Chapter 11 Cases are well known to this Court and to the Debtors' suppliers, creditors, and other parties in interest.  In furtherance of the Debtors' duty to maximize the value of their estates and in accordance with their obligations under the AgStar DIP Facility and the ASA DIP Facility, the Debtors have filed this Motion seeking approval of a Sale process, including the Bidding Procedures.

A.    **Necessity for Sale**

36.    The Debtors face severe liquidity constraints and have exhausted their options for addressing this issue, including an attempt to raise cash through an equity offering and other strategic transactions.  To date, none of these options has been successful.  Given current economic market conditions, including unfavorable conditions in the ethanol market, the Debtors' liquidity situation has not improved.  Consequently, the Debtors have had to work tirelessly in order to obtain debtor-in-possession financing given the capital structure of the Debtors and the fragmented nature of the Prepetition Secured Credit Facility, the Debtors needed to obtain separate financing from each of the Secured Lenders for each Segment.

37.    As set forth above, the Debtors presently face the possibility of continued financial deterioration.  However, the Debtors have managed to obtain necessary financing to conduct the Sale process proposed herein.  Under the terms of the AgStar DIP Facility, the Debtors are required to complete the Sale process with respect to the US BioEnergy Segment by March 31, 2009.  Likewise, under the terms of the ASA DIP Facility, the Debtors are required to complete the Sale process with respect to the ASA Segment by April 15, 2009.  Additionally, the Debtors may not have sufficient liquidity to operate much beyond March 31, 2009 with respect to any of the other Segments.  Thus, the Debtors have decided to pursue a Sale of all or a portion of the Assets and believe that they must be permitted to conduct the process in the manner and on the timetable set forth herein and in the Bidding Procedures.

38.    As indicated above, the Debtors have marketed and solicited offers for the Sale of all or any portion of the Assets for the last five months.  Although the Debtors have not yet received a binding offer for any of the non-VSE Segment Assets, the Debtors are optimistic that the Sale process will maximize the value of the Assets.

B.      **The Bidding Procedures**[12]

        39.     In order to maximize the value of the Assets for the benefit of the Debtors'

estates and their respective creditors, the Debtors seek to implement a competitive bidding

process that is designed to generate maximum recovery.  As described more fully in the Bidding

Procedures, attached hereto as <u>Exhibit B</u>, the Debtors may sell all or a portion of the Assets to

any bidder that makes the highest or otherwise best offer for the Assets.

        40.     As described more fully in the Bidding Procedures, the Debtors propose

that competing bids for Assets be governed by the following:[13]

> **Participation Requirements:**  Any person that wishes to participate in
> the Bidding Process (a "<u>Potential Bidder</u>") must become a "Qualified
> Bidder."  As a prerequisite to becoming a Qualified Bidder, a Potential
> Bidder must deliver (unless previously delivered) to the Debtors, not later
> than March 2, 2009:
>
>      i.         An executed confidentiality agreement in form and
> substance acceptable to the Debtors;
>
>      ii.        A letter of indication stating on which of the Assets the
> Potential Bidder is interested in bidding and the estimated purchase price
> and consideration for such Assets (including any assets to be excluded
> from such bid, if any); and
>
>      iii.       Sufficient information, as may be requested by the Debtors,
> to allow the Debtors to determine that the bidder has the financial
> wherewithal to close a sale of the Assets on which the bidder intends to
> bid, including, but not limited to, a signed commitment for any debt or
> equity financing, a bank account statement showing the ability of a
> Potential Bidder to pay cash for the designated Assets, and current audited
> financial statements (or such other form of financial disclosure and credit-
> quality support or enhancement acceptable to the Debtors) of the Potential

---

[12]   Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in
       the Bidding Procedures attached hereto.

[13]   The following description of the Bidding Procedures is a summary of the terms set forth in <u>Exhibit B</u> attached
       hereto.  To the extent that this summary differs in any way from terms set forth in the Bidding Procedures, the
       terms of the Bidding Procedures shall control.

Bidder or those entities that will guarantee the obligations of the Potential Bidder.

A "Qualified Bidder" is a Potential Bidder that delivers the documents described in subparagraphs (i) – (iii) above, and that the Debtors determine is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other consideration deemed relevant by the Debtors), to submit a bona fide offer and be able to consummate a sale if selected as the Successful Bidder (defined below). Notwithstanding the foregoing, the VSE Stalking Horse Bidder and the Secured Lenders shall be deemed Qualified Bidders. Not later than three (3) business days after a Potential Bidder delivers all of the materials required by subparagraph (i) – (iii) above, the Debtors shall determine, in consultation with the Committee and the Secured Lenders, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.

**Designation of Additional Stalking Horse Bidders:** The Debtors, in consultation with the Committee and the Secured Lenders, may select Additional Stalking Horse Bidders for all or a portion of the Assets, other than the VSE Assets, for the purpose of establishing a minimum acceptable bid with which to begin the Auction (defined below) for all or some portion of the Assets other than the VSE Assets (each, an "Additional Stalking Horse Bid"). The Debtors shall have until March 2, 2009 (the "Additional Stalking Horse Date") to select a Qualified Bid (defined below) of a Qualified Bidder to be an Additional Stalking Horse Bid. The Debtors, in consultation with the Committee and the Secured Lenders, shall finalize any purchase agreement with an Additional Stalking Horse Bidder (each, an "Additional Stalking Horse Agreement") by no later than the Additional Stalking Horse Date. The Debtors shall request a hearing (the "Additional Stalking Horse Hearing") to approve any Additional Stalking Horse Agreement on an expedited basis and, within one (1) day of the Additional Stalking Horse Date, file with the Bankruptcy Court a notice (the "Additional Stalking Horse Notice") containing the date and time of such Additional Stalking Horse Hearing and a copy of any Additional Stalking Horse Agreement. The Debtors shall serve such Additional Stalking Horse Notice on (i) counsel for the Committee, (ii) counsel to the Secured Lenders, (iii) all entities known to have expressed an interest in a transaction with respect to any of the Assets, individually or as part of a package, during the past six (6) months; and (iv) any known lienholder and any other person or entity asserting an interest in the Assets that either has filed notice of such interest as a matter of public record, or has provided notice of such interest in writing to the Debtors ("Additional Stalking Horse Notice Parties").

**Bid Deadline:** A Qualified Bidder that desires to make a bid shall deliver written copies of its bid to (i) the Debtors, c/o VeraSun Energy, 110 N Minnesota Ave., Suite 300, Sioux Falls, SD 57104 (Attn: Mark Dickey); (ii) counsel to the Debtors, (A) Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636 (Attn: Mark S. Chehi, Esq.) and (B) Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606 (Attn: Felicia Gerber Perlman, Esq. and Patrick J. Nash Jr., Esq.), (iii) financial advisors to the Debtors, Rothschild, Inc., 1251 Avenue of the Americas, 51st Floor, New York, NY 10020 (Attn: Neil A. Augustine and Homer D. Parkhill); and (iv) counsel to the Creditors' Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attn: David H. Botter, Esq.) not later than 5:00 p.m. (prevailing eastern time) on March 13, 2009 (the "Bid Deadline").  In the event that a bid is determined to be a Qualified Bid for the VSE Assets, the Debtors shall deliver a written copy of any such Qualified Bid to counsel to Valero, Fullbright & Jaworski LLP, 300 Convent Street, Suite 2200, San Antonio, TX 78205 (Attn: Michael Parker, Esq.)

**Bid Requirements:** All bids, other than the VSE Stalking Horse Bid, must include (unless such requirement is waived by the Debtors, provided that such waiver will not to be granted with respect to any bids covering the VSE Assets without the prior written consent of Valero) the following information and documents (the "Required Bid Materials"):

i.      For bids that cover the VSE Assets, a purchase price equal to or greater than  $291,000,000 plus the fair market value at closing of Inventory (as defined in the VSE Asset Purchase Agreement) (the "Minimum VSE Asset Bid Amount").

ii.      In the event that the Debtors enter into an Additional Stalking Horse Agreement for certain of the Assets, the purchase price submitted by any Qualified Bidder for such Assets must be equal to or greater than the sum of (a) the purchase price set forth in any Additional Stalking Horse Agreement, (b) any Break-Up Fee (defined below), if any, (c) the Expense Reimbursement (defined below), if any, and (d) the Overbid Amount, [14] as applicable (the sum of which shall be, the "Minimum Bid Amount").

iii.      In the event that no Additional Stalking Horse Bidder is designated for all or a portion of the Assets, the purchase price proposed by the Qualified Bidder for the Assets for which they are submitting a bid.

---

[14]   The "Overbid Amount" shall mean the amount by which any initial Qualified Bid shall exceed the purchase price submitted by an Additional Stalking Horse Bidder, as applicable, as stated in any Additional Stalking Horse Agreement.

iv.     A letter stating that the bidder's offer is irrevocable until two (2) business days after the Assets on which the Qualified Bidder is submitting a bid have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court.

v.     In the event an Additional Stalking Horse Bidder is designated for a given package of Assets, an executed copy of a purchase agreement and a redline of a Qualified Bidder's proposed purchase agreement over that of the VSE Stalking Horse Bidder or the applicable Additional Stalking Horse Bidder designated for such Assets.  In the event no Additional Stalking Horse Bidder is designated for a package of Assets, a copy of the proposed form of asset purchase agreement for the applicable package of Assets.  All Qualified Bids must provide (a) a commitment to close as soon as reasonably practicable following the entry of the Sale Order and (b) a representation that the Qualified Bidder will make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR") and pay the fees associated with such filings.

vi.     A deposit in the amount of 5% of the proposed purchase price, unless otherwise specified in the VSE Asset Purchase Agreement or any Additional Stalking Horse Agreement, as applicable; provided that with respect to bids that cover the VSE Assets, $11,000,000 out of such deposit (such portion, "VSE Bid Deposit") shall be placed in a segregated account  (the "BUFER Account").  The BUFER Account shall not be subject to the claims, liens, security interests, or encumbrances of Debtors' creditors, including those creditors serving as debtor-in-possession or cash collateral lenders to the Debtors, and funds shall be disbursed from the BUFER Account only as follows:  (i) if the Qualified Bidder becomes the Successful Bidder for the VSE Assets, its VSE Bid Deposit will be used to satisfy any Break-Up Fee and/or Expense Reimbursement to which the VSE Stalking Horse Bidder is entitled under the VSE Asset Purchase Agreement by reason of its not being the Successful Bidder for the VSE Assets, with the balance, if any, to be released to the Debtors or applied as provided under any asset purchase agreement between the Debtors and such Successful Bidder, and (ii) if such Qualified VSE Bidder is not the Successful Bidder for the VSE Assets at the Auction, then its VSE Bid Deposit shall be returned to it (subject to the other provisions of these Bid Procedures and the terms of its asset purchase agreement with the Debtors).

vii.     Written evidence of a commitment for financing or other evidence of proposed purchaser's ability to consummate the proposed transaction and which the Debtors believe to be sufficient to satisfy the standards to provide adequate assurance of future performance under Bankruptcy Code section 365.

     viii.    A list of the Debtors' executory contracts and unexpired leases with respect to which the bidder seeks assignment from the Debtors.

A bid received from a Qualified Bidder that includes all of the Required Bid Materials is a "<u>Qualified Bid</u>."  The Debtors, in consultation with the Committee and the Secured Lenders, reserve the right to determine the value of any Qualified Bid (either by itself or in connection with one or more other Qualified Bid or the Debtors' other restructuring alternatives), and which Qualified Bid constitutes the highest or best offer.  Upon the request of the Debtors, a Qualified Bidder who has submitted a bid for the Assets of more than one Segment and/or for the Assets of all or a portion of the US Bio Segment shall, not later than the second business day after the Bid Deadline, allocate its purchase price among the Segments sought to be acquired and, with respect to the US Bio Segment, among the Assets of the US Bio Segment sought to be acquired.  No bid for the VSE Assets shall constitute a Qualified Bid unless it provides for the payment of a least $291,000,000 for the VSE Assets, plus the market value of the Inventory and must otherwise meet the requirements of these Bidding Procedures related to the VSE Assets.    Notwithstanding the bid requirements detailed above, the VSE Stalking Horse Bid shall be deemed a Qualified Bid.

**<u>The Auction and Auction Procedures</u>:** If a Qualified Bid, other than that submitted by the VSE Stalking Horse Bidder or any Additional Stalking Horse Bidder, has been received by the Debtors, the Debtors may conduct an auction (the "<u>Auction</u>") with respect to all or some of the Assets.  The Auction shall be conducted at One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899 (the "<u>Auction Site</u>") at 11:00 a.m. (prevailing Eastern time) on March 16, 2009 (the "<u>Auction Date</u>"), or such other place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above.

Except as otherwise provided herein, or as restricted by the VSE Asset Purchase Agreement, based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors determine is relevant, the Debtors, in consultation with the Committee and the Secured Lenders, may conduct the Auction in any manner that they determine will achieve the maximum value for the Assets.  For example, the Debtors may commence the Auction by entertaining bids for individual Segments, for certain Assets within individual Segments or for Assets from multiple Segments as determined by the Debtors, <u>provided</u>, <u>however</u> that any bid to purchase the VSE Assets must be for all of the VSE Assets as a whole and not any portion of the VSE Assets.  Except as provided in the VSE Stalking Horse Agreement or any Additional Stalking Horse Agreement, the Debtors thereafter, in consultation with the Committee and the Secured Lenders,

may offer the Assets in such lots in such successive rounds as the Debtors determine to be appropriate so as to obtain the highest or otherwise best bid or combination of bids for the Assets. Except as otherwise provided herein or as restricted by the VSE Asset Purchase Agreement, the Debtors also may set opening bid amounts in each round of bidding as the Debtors determine to be appropriate.

If Qualified Bidders submit Qualified Bids, then as soon as practicable after the conclusion of the Auction or, if the Debtors, in consultation with the Committee and the Secured Lenders, determine not to hold an Auction, then promptly following the Bid Deadline, the Debtors shall (i) review each Qualified Bid on the basis of the financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale and (ii) identify the highest or otherwise best offers for the Assets (to the extent any such bid is acceptable to Debtors, in consultation with the Committee and the Secured Lenders, each a "Successful Bid" and each bidder making such bid, a "Successful Bidder"). At the Sale Hearing, the Debtors, after consultation with the Committee and the Secured Lenders, may present any Successful Bids to the Bankruptcy Court for approval. The Debtors reserve all rights not to submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court. The Debtors acknowledge that the VSE Stalking Horse Bid is a qualified and acceptable bid. Except as otherwise provided herein or as restricted by the VSE Asset Purchase Agreement, the Debtors, in the exercise of their fiduciary duties, may adopt rules for bidding at the Auction that, in its business judgment, will better promote the goals of the bidding process, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

## C.   Valero Stalking Horse Agreement And Bid Protection

41.      In order to provide an incentive and to compensate the VSE Stalking Horse Bidder for entering into the VSE Asset Purchase Agreement, the Debtors have agreed to a break-up fee in the amount of $10 million and to reimburse Valero for up to a maximum of $1,000,000 for all reasonable expenses incurred in connection with the VSE Stalking Horse Bidder's attempted purchase of the VSE Assets.

42.      By this Motion, the Debtors are seeking approval to provide certain bid protections to the VSE Stalking Horse Bidder in accordance with the VSE Asset Purchase Agreement. The Debtors believe that offering a break-up fee and expense reimbursement to the

VSE Stalking Horse Bidder (the "VSE Stalking Horse Break-Up Fee and Expense Reimbursement") will benefit the Debtors' estates by establishing a floor and promoting more competitive bidding. Without such a fee, bidding on the Debtors' VSE Assets would likely be reduced. The availability of the VSE Stalking Horse Break-Up Fee and Expense Reimbursement is necessary in order to provide Valero with some assurance that it will be compensated for the time and expense it has spent in putting together its offer for the VSE Assets and the risk that arises from participating in the Sale and subsequent bidding process.

### D. Procedures for the Designation of Additional Stalking Horse Bidders and Bid Protections

43.     By this Motion, the Debtors seek to establish procedures to enter into one or more Additional Stalking Horse Agreements containing certain bid protections (the "Additional Stalking Horse Procedures"). The Debtors believe that in order to entice potential bidders to establish a floor price for any of the Assets, other than the VSE Assets, they will need to offer bidders a break-up fee (a "Break-Up Fee") and to reimburse any such Additional Stalking Horse Bidder for all reasonable expenses incurred in connection with such Additional Stalking Horse Bidder's attempted purchase of all or a portion of the Assets (the "Expense Reimbursement"). The Debtors, in consultation with the Committee and the Secured Lenders, may select Additional Stalking Horse Bidders for all or a portion of the Assets, other than the VSE Assets, for the purpose of establishing a minimum acceptable bid with which to begin the Auction for all or some portion of the Assets other than the VSE Assets (each, an "Additional Stalking Horse Bid"). The Debtors shall have until March 2, 2009 (the "Additional Stalking Horse Date") to select a Qualified Bid (defined below) of a Qualified Bidder (defined below) to be an Additional Stalking Horse Bid. The Debtors, in consultation with the Committee and the Secured Lenders, shall finalize any purchase agreement with an Additional Stalking Horse

Bidder (each, an "Additional Stalking Horse Agreement") by no later than the Additional

Stalking Horse Date.  Within one (1) day of the Additional Stalking Horse Date the Debtors shall

request a hearing (the "Additional Stalking Horse Hearing") to approve any Additional Stalking

Horse Agreement on an expedited basis and file with the Bankruptcy Court a notice (the

"Additional Stalking Horse Notice") containing the date and time of such Additional Stalking

Horse Hearing and a copy of any Additional Stalking Horse Agreement.  The Debtors shall serve

such Additional Stalking Horse Notice on (i) counsel for the Committee; (ii) counsel to the

Secured Lenders; (iii) all entities known to have expressed an interest in a transaction with

respect to any of the Assets, individually or as part of a package, during the past six (6) months;

and (iv) any known lienholder and any other person or entity asserting an interest in the Assets

that either has filed notice of such interest as a matter of public record, or has provided notice of

such interest in writing to the Debtors ("Additional Stalking Horse Notice Parties").

      44.    At the Additional Stalking Horse Hearing, the Debtors shall present

evidence necessary to demonstrate that payment of a Break-Up Fee and/or Expense

Reimbursement is necessary to preserve and maximize the value of the Assets.

**E.**    **Credit Bidding**

      45.    In connection with the Sale of all or any of the Assets, the Debtors'

Secured Lenders may seek to credit bid some or all of their claims for their respective collateral

(a "Credit Bid").  In order to be considered a "Qualified Credit Bid" any Credit Bid submitted

must provide for the assumption and/or payment of administrative expense claims of the Debtor

estate holding their respective collateral, and satisfy any Bid Protections provided for in the

Bidding Procedures.

46.     Accordingly, the Debtors seek the Court's allowance of credit bidding in connection with any Sale to the full extent of Bankruptcy Code section 363(k).

**F.     Notice of Bid Procedures and Sale**

47.     <u>Notice of Sale Hearing</u>.  Within three (3) days after the entry of the Bidding Procedures Order (the "<u>Mailing Date</u>") or as soon thereafter as practicable, the Debtors (or their agents) shall serve the Motion, the VSE Asset Purchase Agreement, the Bidding Procedures and a copy of the Bidding Procedures Order by first-class mail, postage prepaid, upon (i) all entities known to have expressed an interest in a transaction with respect to any of the Assets, individually or as part of a package, during the past six (6) months; (ii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Assets; (iii) all parties to executory contracts and unexpired leases; (iv) the DIP Lenders; (v) the Prepetition Secured Lenders; (vi) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (vii) the United States Attorney's office; (viii) the Securities and Exchange Commission; (ix) the Internal Revenue Service; (x) all entities on the 2002 Service List and (xi) counsel to any official committee established in these Chapter 11 Cases (the "<u>Sale Notice Parties</u>").

48.     <u>Sale Notice</u>.  On the Mailing Date or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first class mail, postage prepaid, a sale notice (the "<u>Sale Notice</u>"), substantially in the form attached hereto as <u>Exhibit C</u>, upon all other known creditors of the Debtors.

49.     <u>Publication Notice</u>. The Debtors also propose, pursuant to Bankruptcy Rule 2002(l) and 2002(d), that the publication of the Sale Notice, attached hereto as <u>Exhibit D</u>, in *The Wall Street Journal* and the *Sioux Falls Argus Leader*, on the Mailing Date or as soon as

practicable thereafter, be deemed proper notice to any other interested parties whose identities
are unknown to the Debtors.

      50.    <u>Post Auction Notice</u>.  As soon as possible after the conclusion of the
auction the Debtors shall file, but not serve, a notice identifying any Successful Bidder (the "<u>Post
Auction Notice</u>"), substantially in the form attached hereto as <u>Exhibit E</u>.

## G.     **<u>Assumption and Assignment Procedures</u>**

      51.    The Debtors propose the following procedures for notifying counterparties
to executory contracts and unexpired leases of potential cure amounts in the event the Debtors
decide to assume such contracts or leases.

      52.    Within five (5) business days after entry of an order approving the Bidding
Procedures or as soon thereafter as practicable, the Debtors will file a notice of cure amount (the
"<u>Cure Notice</u>"), substantially in the form attached hereto as <u>Exhibit F</u>, with the Court and serve
the Cure Notice on all non-debtor parties to any executory contracts and unexpired leases for any
or all Segments (the "<u>Contract Notice Parties</u>") that the Debtors' determine, in the exercise of
their business judgment, are necessary to maximize value of any proposed transaction.

      53.    The Cure Notice shall state the cure amounts that the Debtors believe are
necessary to assume such executory contracts and unexpired leases pursuant to section 365 of the
Bankruptcy Code (the "<u>Cure Amount</u>") and notify the non-debtor party that such party's contract
or lease may be assumed and assigned to a purchaser of the Assets to be identified at the
conclusion of the Auction.  The Cure Notice shall set a deadline by which the non-debtor party
shall file an objection to the Cure Amount.  The Debtors request that the Court set the deadline to
object to any Cure Amount ten (10) days after service of the Cure Notice.  The Cure Notice shall

also provide that objections to any Cure Amount will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.

54. As soon as possible after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court a Post Auction Notice that identifies any Successful Bidder and provides notice that the Debtors will seek to assume and assign the Assumed Contracts at the Sale Hearing.

55. At the Sale Hearing, the Debtors shall (i) present evidence necessary to demonstrate adequate assurance of future performance by any Successful Bidder and (ii) request entry of an order requesting approval of the assumption and assignment of any Assigned Contracts to any Successful Bidder.

56. In addition, in the event the Court approves Valero as the purchaser of the VSE Assets, pursuant section 2.5 of the VSE Asset Purchase Agreement, Valero may elect to take assignment of certain contracts and leases listed on Schedule 1.1(a)-1 and 1.1(b)-1 of the VSE Asset Purchase Agreement for up to thirty (30) days after the closing of the Sale (the "Valero Assumed Contracts").  Upon designation of such Valero Assumed Contracts by Valero, the Debtors will file with the Bankruptcy Court and serve a notice, substantially in the form attached hereto as Exhibit G (the "Valero Assumption Notice"), on applicable Contract Notice Parties that identifies Valero as the purchaser of the VSE Assets and provides notice that the Debtors are assuming and assigning the Valero Assumed Contracts to Valero.[15]

---

[15]   Such Contract Notice parties would have previously received a Cure Notice, pursuant to the Assumption and Assignment Procedures described above, and would have been provided with an opportunity to object to the proposed Cure Amount and the ability of Valero to provide adequate protection of future performance.

## APPLICABLE AUTHORITY

57.     "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb, 385 F.Supp.2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F.Supp.2d 538, 555 n.111 (D. Del. 2008).  Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore.  See In re Delaware Hudson Ry. Co., 124 B.R. 169 , 179 (D. Del. 1991).

58.     The Debtors have sound business justifications for selling the Assets at this time.  Success in the ethanol business requires significant liquidity.  While the Debtors currently have limited access to capital, they are endowed with a strong customer base.  Accordingly, the Debtors have determined that the best option for maximizing the value of their estates for the benefit of their creditors is through a Sale of all or a portion of the Assets.

**A.     The Bidding Procedures are Fair and Are Designed to Maximize the Value Received for the Assets**

59.     Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The Debtors believe that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors.  The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to

participate and submit competing bids.  The Bidding Procedures provide potential bidders with

sufficient notice and an opportunity to acquire information necessary to submit a timely and

informed bid.  At the same time, the Bidding Procedures provide the Debtors with the

opportunity to consider all competing offers and to select the highest and best offer for certain

Assets within individual Segments or Assets from multiple Segments as determined by the

Debtors, in consultation with the Committee and the Secured Lenders.

60.     The Debtors request this Court's approval of the Bidding Procedures,

including the dates established thereby for an Auction and a Sale Hearing.  Accordingly, the

Debtors and all parties in interest can be assured that the consideration for the Assets will be fair

and reasonable, and there are sound business reasons to approve the Bidding Procedures.

**B.     The Break-up Fee and Expense Reimbursement Are Necessary To Preserve the
        Value of the Debtors' Estates**

61.     Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the

ordinary course of business may be by private sale or by public auction.  The Debtors believe

that having the ability to offer the Bid Protections to Additional Stalking Horse Bidders will

likely maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors

and other parties-in-interest.

62.     The Third Circuit identified at least two instances in which bidding

incentives may benefit the estate.  First, a break-up fee or expense reimbursement may be

necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive

bidding, such as by inducing a bid that otherwise would not have been made and without which

bidding would have been limited."  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien

Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien").  Second, if the

availability of break-up fees and expenses were to induce a bidder to research the value of the

debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may

have provided a benefit to the estate by increasing the likelihood that the price at which the

debtor is sold will reflect its true worth. Id.

      63.    In O'Brien, the Third Circuit reviewed the nine factors set forth by the

lower court as relevant in deciding whether to award a break-up fee.  Such factors are as follows:

> (A)    the presence of self-dealing or manipulation in negotiating the breakup fee;
>
> (B)    whether the fee harms, rather than encourages, bidding;
>
> (C)    the reasonableness of the break-up fee relative to the purchase price;
>
> (D)    whether the unsuccessful bidder placed the estate property in a "sales configuration, mode" to attract other bidders to the auction;
>
> (E)    the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;
>
> (F)    the correlation of the fee to a maximization of value of the debtor's estate;
>
> (G)    the support of the principal secured creditors and creditors committees of break-up fee;
>
> (H)    the benefits of the safeguards to the debtor's estate; and
>
> (I)    the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

      64.    VSE Stalking Horse Bidder Bid Protection.  The VSE Stalking Horse

Break-Up Fee and Expense Reimbursement set forth in the Bidding Procedures will enable the

Debtors to secure an adequate floor for the VSE Assets and, thus, insist that competing bids be

materially higher or otherwise better than the VSE Asset Purchase Agreement, a clear benefit to

the Debtors' estates.  Moreover, the VSE Stalking Horse Bidder would not agree to act as a

stalking horse bidder without the VSE Stalking Horse Break-Up Fee and Expense

Reimbursement.  Without the benefit of the VSE Stalking Horse Bidder, the bids received at

Auction for the VSE Assets could be substantially lower than that offered by the VSE Stalking

Horse Bidder.

       65.    Moreover, payment of the VSE Stalking Horse Break-Up Fee and

Expense Reimbursement will not diminish the Debtors' estate.  The Debtors do not intend to

terminate the VSE Stalking Horse Agreement, if to do so would incur an obligation to pay the

VSE Stalking Horse Break-Up Fee and Expense Reimbursement, unless to accept an alternative

bid.

**C.**      **Credit Bidding Should be Authorized**

       66.    A secured creditor is allowed to "credit bid" the amount of its claim in a

sale.  Section 363(k) of the Bankruptcy Code provides, in relevant part, that in a sale under

section 363 of the Bankruptcy Code, unless the court for cause orders otherwise, the holder of a

claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder

of such claim purchases such property, such holder may offset such claim against the purchase

price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is undersecured, as

determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows

such secured creditor to bid the total face value of its claim and does not limit the credit bid to

the claim's economic value. See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys.

Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district

and bankruptcy courts that creditors can bid the full face value of the their secured claims under

§ 3.63(k)").

67.     Pursuant to the Bidding Procedures, Debtors' Secured Lenders are entitled to credit bid some or all of their claims for their respective collateral pursuant to section 363(k) of the Bankruptcy Code.  Because the Secured Lenders hold claims that are secured by certain of the Assets, such Secured Lenders should be allowed to credit bid the face value of their secured claims in order to purchase the Assets.

**D.      Approval of the Sale is Warranted Under Bankruptcy Code 363(b)**

68.     Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. §363(b)(1).  A debtor's sale or use of assets outside the ordinary course of business should be approved by the Bankruptcy Court if the debtor can demonstrate a sound business justification for the proposed transaction.  See, e.g., In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbott's Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991).  Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

69.     The Debtors have a sound business justification for selling the Assets at this time.  Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a Sale of

all or some of their Assets in accordance with the procedures set forth in the Bidding Procedures

may be the best method to maximize recoveries to the estates.  Maximization of the Assets' value

is a sound business purpose warranting authorization of any proposed Sale.

> 70.     The Sale of any of the Debtors' Assets will be subject to competing bids,

enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.

Consequently, the fairness and reasonableness of the consideration to be received by the Debtors

will ultimately be demonstrated by a "market check" through the auction process, which is the

best means for establishing whether a fair and reasonable price is being paid.[16]

> 71.     In addition, all creditors and parties in interest will receive adequate notice

of the Bidding Procedures and Sale Hearing as set forth above.  Such notice is reasonably

calculated to provide timely and adequate notice to the Debtors' major creditor constituencies,

those parties most interested in these Chapter 11 Cases, those parties potentially interested in

bidding on the Assets and others whose interests are potentially implicated by a proposed Sale.

Accordingly, consummating the Sale(s) as soon as possible is in the best interests of the Debtors

and its creditors and parties in interest.

**E.     The Proposed Sale(s) Satisfy the Requirements of Section 363(f) for a Sale Free and Clear of Interests**

> 72.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets

free and clear of all liens, claims, interests, charges and encumbrances (with any such liens,

claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the

same rights and priorities therein as in the sold assets).  As Bankruptcy Code section 363(f) is

stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet

---

[16]   The Debtors reserve all rights not to submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court.

one of the five conditions of section 363(f).  The Debtors believe that they will be able to demonstrate that at the Sale Hearing that they have satisfied one or more of these conditions.

73.    The Debtors believe that at least certain of the Secured Lenders will consent to the sale free and clear under section 363(f)(2).  Where that may not be the case, a sale free and clear can proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the Secured Lenders' liens will attach to the proceeds of the sale and the Debtors will establish at the Sale Hearing that the Secured Lenders can be compelled to accept a monetary satisfaction of their claims.  Additionally, the Secured Lenders will have the right to credit bid pursuant to section 363(k) of the Bankruptcy Code.

74.    The Debtors propose that any bona fide and allowed Interests shall attach to the sale proceeds with the same force, validity, effect, priority and enforceability as such Interests had in the Assets prior to such Sale.

## F.    A Successful Bidder Should be Entitled to the Protections of Section 363(m)

75.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F,2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., Case No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); Abbotts Dairies of Penn., 788 F.2d at 147.

76.    The VSE Stalking Horse Agreement was negotiated at arm's-length, with both parties represented by their own counsel.  Although the Debtors engaged in discussions with other parties interested in acquiring certain of their Assets, the Debtors submit that Valero's proposal as contained in the VSE Asset Purchase Agreement represent Valero's highest and best offer for the VSE Assets.  The Debtors also submit that any Additional Stalking Horse

Agreements will only be executed if the Debtors' believe, in an exercise of their business

judgment, that such proposal represents the Additional Stalking Horse Bidder's highest and best

offer of the Assets and upon this Court's approval. Additionally, the Debtors will adduce facts at

the Sale Hearing on any objection demonstrating that any bidder who is deemed a Successful

Bidder for all or any portion of the Assets has negotiated at arm's-length, with all parties

represented by their own counsel.

77. Accordingly, the Sale Order will include a provision that the Successful

Bidder for the Assets, is a "good faith" purchaser within the meaning of section 363(m) of the

Bankruptcy Code. The Debtors believe that providing any Successful Bidder with such

protection will ensure that the maximum price will be received by the Debtors for the Assets and

closing of the same will occur promptly.

**G.     The Assumption and Assignment of Executory Contracts and Unexpired Leases**

78. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession "subject to the court's approval, may assume or reject any executory

contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing

bankruptcy court approval of a debtor's decision to assume or reject an executory contract or

unexpired lease is whether the debtor's reasonable business judgment supports assumption or

rejection. See, e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If

the debtor's business judgment has been reasonably exercised, a court should approve the

assumption or rejection of an unexpired lease or executory contract. See Group of Institutional

Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l

Fuel Gas Distrib. Corp., 872 F. 2d 36, 39-40 (3d Cir. 1989). The business judgment test

"requires only that the trustee [or debtor in possession] demonstrate that [assumption or]

rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn

Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)

(quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)).  Any more

exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere

with the Bankruptcy Code's provision for private control of administration of the estate, and

threaten the court's ability to control a case impartially.  See Richmond Leasing Co. v. Capital

Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the

Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide

adequate assurance that the debtor will promptly cure," any default, including compensation for

any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

   79. Once an executory contract is assumed, the trustee or debtor in possession

may elect to assign such contract.  See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d

Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of

the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994)

(noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's

assets).

   80. Section 365(f) of the Bankruptcy Code provides that the "trustee may

assign an executory contract…only if the trustee assumes such contract…and adequate assurance

of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance

of future performance" depends on the facts and circumstances of each case, but should be given

"practical, pragmatic construction."  See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes,

Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440

(Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute

assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. <u>Accord</u> <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

81.    Valero is a Fortune 500 company based in San Antonio, Texas with approximately $38 billion in assets. Valero is the largest refiner in North America and is considered a market leader with approximately 5,800 retail and wholesale stores in the United States, Canada and the Caribbean. Upon closing, Valero will have financial resources that are more than sufficient to perform under any executory contracts or unexpired leases it seeks to have assumed by the Debtors (the "<u>Assumed Contracts</u>"). Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of Valero or any Successful Bidder, and their willingness and ability to perform under the contracts to be assumed and assigned to them. The Sale Hearing therefore will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts.

82.    The Debtors respectfully submit that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Notice of Assumption or Cure Notice, as applicable, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Such Contract Notice Parties will then be given an

opportunity to object to such notice.  If an objection is filed, such objection will be heard at the

Sale Hearing or at a later hearing, as determined by the Debtors.

83.     Furthermore, to the extent that any defaults exist under any executory

contract or unexpired lease that is to be assumed and assigned in connection with the Sale of any

of the Assets, the Debtors will cure any such default prior to such assumption and assignment.

Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial

wherewithal of the Successful Bidder(s), its experience in the industry, and its willingness and

ability to perform under the contracts to be assumed and assigned to it.

84.     Accordingly, the Debtors submit that implementation of the proposed

Assumption and Assignment Procedures is appropriate in these cases.  The Court therefore

should have a sufficient basis to authorize the Debtors to reject or assume and assign contracts as

will be set forth in a Successful Bidder's asset purchase agreement.

**H.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

85.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property…is stayed until the expiration of 10 days after entry of the order, unless the

court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order

authorizing the trustee to assign an executory contract or unexpired lease…is stayed until the

expiration of 10 days after the entry of the order, unless the court orders otherwise."  The

Debtors request that any Sale Order be effective immediately by providing that the 10-day stays

under Bankruptcy Rules 6004(h) and 6006(d) are waived.

**I.     Payment of Secured Creditors at Closing**

86.     At the Sale Hearing, the Debtors expect that they will seek approval to pay

certain or all of the allowed secured claims out of the proceeds of such creditors collateral.

## NOTICE

87.     Notice of this Motion will be given to: (a) the Office of the United States
Trustee for the District of Delaware; (b) the Securities and Exchange Commission; (c) the
Internal Revenue Service; (d) the United States Attorney Office for District of Delaware; (e)
counsel to the Prepetition Lenders; (f) counsel to any proposed provider of debtor-in-possession
financing, (g) counsel to the Indenture Trustee; (h) counsel to the Creditors' Committee; (i)
Office of the United States Trustee; (j) those parties who expressed interest in purchasing some
or all of the Debtors' Assets; and (k) those persons filing notices of appearance or requests for
notice under Bankruptcy Rule 2002 in these Chapter 11 Cases.  The Debtors submit that, under
the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

88.     No previous request for the relief sought herein has been made to this or
any other court.

WHEREFORE, the Debtors respectfully request that this Court enter the Bid Procedures Order substantially in the form attached hereto (i) approving the Bidding Procedures; (ii) approving the VSE Stalking Horse Break-Up Fee and Bid Protections; (iii) establish procedures for the Debtors to enter into Additional Stalking Horse Agreements with Bid Protections; (iv) scheduling a Auction and a Sale Hearing to approve such sale or sales, and approving the form and manner of notice thereof; (v) permitting credit bidding; and (vi) granting such other and further resolved as is just.  Additionally, the Debtors requested that at the Sale Hearing that the Court enter one or more Sale Orders subject to the result of the Auction and to the Bidding Procedures (i) approving and authorizing the Sale; and (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases.


Dated:          Wilmington, Delaware
                February 6, 2009

                                        */s/ Davis Lee Wright*
                                        Mark S. Chehi (I.D. No. 2855)
                                        Megan E. Cleghorn (I.D. No. 4080)
                                        Davis Lee Wright (I.D. No. 4324)
                                        Skadden, Arps, Slate, Meagher & Flom LLP
                                        One Rodney Square
                                        P.O. Box 636
                                        Wilmington, DE 19899
                                        (302) 651-3000

                                        - and -

                                        Felicia Gerber Perlman
                                        John K. Lyons
                                        Patrick J. Nash, Jr.
                                        Skadden, Arps, Slate, Meagher & Flom LLP
                                        333 West Wacker Drive
                                        Chicago, Illinois 60606
                                        (312) 407-0700

                                        Counsel for Debtors and
                                        Debtors in Possession