**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Case No. 14-10979 (CSS) |
| | ) | |
| *Debtors*. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 11428** |

**THE ELLIOTT FUNDS' OBJECTION TO MOTION OF THE EFH/EFIH DEBTORS FOR ENTRY OF AN ORDER (A) APPROVING THE EFH DISCLOSURE STATEMENT, (B) ESTABLISHING THE VOTING RECORD DATE, VOTING DEADLINE, AND OTHER DATES, (C) APPROVING PROCEDURES FOR SOLICITING, RECEIVING, AND TABULATING VOTES ON THE PLAN, AND (D) APPROVING THE MANNER AND FORMS OF NOTICE AND OTHER RELATED DOCUMENTS**

Elliott Associates, L.P., Elliott International, L.P. and The Liverpool Limited Partnership (collectively, "Elliott" or the "Elliott Funds"), as creditors in the chapter 11 cases (the "Chapter 11 Cases") of certain of the EFH Debtors[1] and the EFIH Debtors (or, the "E-Side Debtors"), hereby object (the "Objection") to the *Motion of the EFH/EFIH Debtors for Entry of an Order (A) Approving the EFH Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates, (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan, and (D) Approving the Manner and Forms of Notice and other Related Documents*, dated July 7, 2017 [D.I. 11428] (the "BHE Disclosure Statement Motion"). In support of their Objection, the Elliott Funds respectfully represent as follows:

[1] Capitalized terms used and not defined herein shall have the meanings ascribed them in the BHE Disclosure Statement Motion or the *Disclosure Statement for the Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code*, dated July 7, 2017 [D.I. 11427] (the "BHE Disclosure Statement").

## PRELIMINARY STATEMENT

1. Continued prosecution of the BHE Plan is a futile exercise and would result in a monumentally wasteful expenditure of judicial time and estate resources, needlessly diminishing creditor recoveries. Despite the E-Side Debtors' assurances to this Court that the BHE Plan can and should be confirmed in the face of overwhelming creditor opposition, under these circumstances, it cannot be. There are only two impaired classes, Classes B5 and B6, in the EFIH plan of reorganization (the "EFIH Plan") described in the E-Side Debtors' proposed BHE Disclosure Statement. Because the overwhelming majority of claims in ***both*** of these classes have ***already*** rejected the EFIH Plan, it cannot be confirmed.

## BACKGROUND

2. Each of the E-Side Debtors commenced its Chapter 11 Case on April 29, 2014.

3. As of August 11, 2017, the original voting record date proposed in the BHE Disclosure Statement Motion (the "Voting Record Date"),[2] Elliott is one of the largest unsecured creditors of EFH and the largest unsecured creditor of EFIH. Elliott is also the largest holder of secured EFIH Second Lien Note Claims. *See Notice of Disapproval of the BHE Merger Agreement and Rejection of the BHE Plan* [D. I. 11764] (the "Notice of Disapproval").

### *The Failed Hunt Transaction and Hunt Plan*

4. On September 18, 2015, the Court approved the E-Side Debtors' merger with Hunt Consolidated, Inc. and certain co-investors (the "Hunt Group"). On December 9, 2015, the Court entered an order confirming the *Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 7235] (the

[2] *See* Disclosure Statement Motion at ¶ 4 (requesting August 11, 2017 to be set as the voting record date). On August 15, 2017, the Debtors filed a revised proposed form of order approving the BHE Disclosure Statement that proposes an extended record date of August 29, 2017.

"Hunt Plan"). *See* Sixth Am. Joint Plan of Reorganization of Energy Future Holding Corp., [Dkt. No. 11702]. Despite the E-Side Debtors' financial advisors and management assurances to this Court that there was a high probability that the transaction with the Hunt Group (the "Hunt Transaction") would be approved by the Public Utility Commission of Texas (the "PUCT"), *see*, Hr'g Tr. of November 3, 2015 at 43:5-8 [Dkt. No. 6878], the PUCT order approving the Hunt Transaction contained conditions that the Hunt Group would not accept. Consequently, the Hunt Transaction was not consummated and the Hunt Plan was deemed null and void.

***The Failed NextEra Transaction and NEE Plan***

5. The E-Side Debtors' next effort to monetize their 80% interest (the "Oncor Interest") in Oncor Electric Delivery LLC (the "Oncor") culminated in their entry into the merger agreement dated July 29, 2016 (the "NEE Merger Agreement") with NextEra Energy, Inc. ("NextEra"). *See* Agr. and Plan of Merger dated July 29, 2016 [Dkt No. 9190 at Ex. 1]. The transactions contemplated by the NEE Merger Agreement (the "NextEra Transaction") formed the basis for the Debtors' *Eighth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10853] (the "NEE Plan"). The E-Side Debtors and their advisors once again testified that a proposed change of control would be approved by the PUCT. *See* Hr'g Tr. of Sept. 19, 2016 [Dkt. No. 9606]. The PUCT rejected the joint application filed by NextEra and Oncor as well as NextEra's two subsequent requests for rehearing.

6. On July 7, 2017, the Debtors terminated the plan support agreement for the NEE Plan and the NEE Merger Agreement and subsequently filed the *Notice That the NextEra Plan and NextEra Plan Confirmation Order Have Been Rendered Null and Void* [D.I. 11446]. *See Notice That the NextEra Plan and NextEra Plan Confirmation Order Have Been Rendered Null*

*and Void* [D.I. 11446]. As a result, NextEra is now seeking to recover a $275 million termination fee from the Debtors' estates (the "NextEra Termination Fee").

***Elliott's Pursuit Of The Creditor Plan And An Alternative Restructuring Transaction***

7. Beginning in May 2017, Elliott and the E-Side Debtors began discussions regarding a standalone creditor plan of reorganization (the "Creditor Plan"). The Creditor Plan reflected a total enterprise value of approximately $18.5 billion for Oncor or a $9.3 billion value for the E-Side Debtors' Oncor Interest. The Creditor Plan contemplated the refinancing of the EFIH DIP, followed by equitization of the claims of EFIH unsecured creditors and the E-Side Debtors' emergence from Chapter 11 before year's end.

8. Before properly exploring the bona fides and viability of the Creditor Plan, the E-Side Debtors entered into a merger agreement dated July 7, 2017 (the "BHE Merger Agreement") with Berkshire Hathaway Energy Corporation ("BHE"). The BHE Merger Agreement contemplates the acquisition of the Oncor Interest for $9 billion (the "BHE Transaction") and seeks to impose a $270 million termination fee (the "BHE Termination Fee") on the E-Side Debtors' estates. The BHE Termination Fee, if approved, will consume *90% of the additional value* that is provided by the Creditor Plan. The E-Side Debtors chose this path: (i) without consulting—much less obtaining support from—*any* creditor constituency; (ii) knowing that Elliott, EFIH's largest unsecured creditor, opposed the BHE Transaction and BHE Plan; (iii) knowing that, following any public announcement, BHE would not likely further negotiate its price, the amount of the BHE Termination Fee, or the timetable set forth in the BHE Merger Agreement; and (iv) despite the BHE Transaction being highly conditional by its very terms.

9. Specifically, the BHE Merger Agreement includes a closing condition that, by December 15, 2017, the E-Side Debtors must obtain confirmation of the BHE Plan (the "BHE

Plan Confirmation Condition"), in effect betting the success of the BHE Transaction and the $270 million BHE Termination Fee on the success of a futile litigation strategy that requires the BHE Plan to be "crammed down," not only on the Class B6 Unsecured Note Claims controlled by Elliott, but also on the Class B5 EFH LBO Note Guaranty Claims, the Class A4 EFH Legacy Note Claims, and the Class A6 EFH LBO Note Primary Claims.

10. A second speculative closing condition of the BHE Merger Agreement requires that BHE either (i) consensually acquire a 19.75% interest in Oncor not owned by the Debtors (the "TTI Minority Interest") from Texas Transmission Investment LLC ("TTI") or (ii) have this Court enter an order ruling that certain disputed drag-along rights (the "Minority Drag-Along Rights") are valid and enforceable to require TTI to transfer the TTI Minority Interest to BHE in connection with the BHE Merger Agreement. *See* Agr. and Plan of Merger dated July 7, 2017 § 7.2(f) [Dkt. No. 11430 at Ex. A to Ex. 1] (the "Minority Interest Acquisition Condition"). As set forth in detail in the Sale Motion Objection (defined below), and as this Court is well aware, the enforceability of those Minority Drag-Along rights is already the subject of substantial, complex litigation arising from the failed NextEra Transaction so there is a material possibility that the Minority Interest Acquisition cannot be satisfied.

11. On July 7, 2017, the E-Side Debtors filed the *Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11430] (the "BHE Sale Motion") seeking approval of the BHE Merger Agreement and its contemplated $270 million termination fee.

12. On July 19, 2017, Elliott filed a motion to adjourn the hearing on the Sale Motion, seeking an adjournment of the hearing on the Sale Motion until the week of September 11, 2017. *See The Elliott Funds' Motion to Adjourn Hearing on the Motion of the EFH/EFIH Debtors for*

*Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11506] (the "Motion to Adjourn"). The Debtors opposed the Motion to Adjourn, *see* [D.I. 11598], and a hearing on the Motion to Adjourn was held on July 26, 2017. At that hearing, and despite the E-Side Debtors' fiduciary duty to maximize value for their respective estates, counsel to the Debtors opposed Elliott even obtaining an extension of time through August 21, 2017. *See In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del. Jul. 26, 2017), [D.I. 11630]. Counsel for the Debtors took this ***completely inexplicable position*** in closing argument, despite knowing full well that there was no harm or prejudice to the estates in granting Elliott such an extension. Hr'g Tr. of July 26, 2017 at 218:24-219:10, 231:23-232:3 (attached hereto as Exhibit A) ("I understand sometimes, Your Honor, that it takes longer to get break fees approved, but I've done several where you have a break fee hearing within 21 days of the petition date. . . . We had the hearing on August 10th and it should stick. . . . I'm just disappointed that we wasted an entire day for counsel to stand up and say, 'If I'm going to lose, Your Honor, at least ***give me the last 11 days***.' With all due respect to Mr. Galardi, ***their motion should just be denied and we should move forward***.").

13. On August 9, 2017, Elliott filed its objection to the BHE Sale Motion [D.I. 11700] (the "Sale Motion Objection"). In its Sale Motion Objection, Elliott opposed approval of the BHE Merger Agreement, expressly stating that the Court should not approve the BHE Merger Agreement because of, among other things, the BHE Plan Confirmation Condition and the Minority Interest Acquisition Condition. *See* Sale Motion Objection ¶¶ 27, 28, 52. Notwithstanding the Sale Motion Objection, the inevitable confirmation fight, and risks and costs attendant thereto, the E-Side Debtors continue to prosecute the BHE Sale Motion and the BHE Plan.

***Elliott's Request That The E-Side Debtors Withdraw The BHE Sale Motion and BHE Plan***

14. On August 16, 2017, Elliott advised the E-Side Debtors that Elliott had acquired the following positions in EFH and EFIH, which positions it would vote to reject the BHE Plan:

- $423.7 million of the EFH Legacy Notes or approximately 73% of the Class A4 EFH Legacy Notes Claims entitled to vote to accept or reject the plan of reorganization for EFH Corp. (the "EFH Plan");
- $56.4 million of the EFH LBO Notes or approximately 94% of the Class A6 EFH LBO Note Primary Claims entitled to vote to accept or reject the EFH Plan;
- $9.5 million of the Claims against EFH Corp. derived from or based upon the EFH Swaps or approximately 70% of the Class A7 EFH Swap Claims entitled to vote to accept or reject the EFH Plan; and
- $56.4 million of the EFH LBO Notes or approximately 94% of the Class B5 EFH LBO Note Guaranty Claims entitled to vote to accept or reject the EFIH Plan.[3]

15. As the Debtors had already been aware for some time, Elliott had long held $1.16 billion of the EFIH Unsecured Note Claims (approximately 74% of such claims) that Elliott would vote to reject the EFIH Plan.

16. On August 16, 2017, Elliott, together with Sunrise Partners Limited Partnership ('Sunrise"), filed the Notice of Disapproval, which publicly disclosed the amounts of claims held by Elliott and Sunrise against the E-Side Debtors, and stated Elliott and Sunrise's intent to vote all of those claims to reject the BHE Plan. Also on August 16, 2017, Elliott sent letters to the boards of directors of the E-Side Debtors and to Mr. Charles Cremens, as the independent manager for EFIH, demanding that they exercise the fiduciary out under the BHE Merger Agreement and immediately withdraw the BHE Sale Motion and BHE Plan because, plainly, the BHE Plan cannot be confirmed. *See* Letter to Board of Directors of EFH and Board of Directors of EFIH dated Aug. 16, 2017 (attached hereto as Exhibit B); Letter to Charles Cremens dated Aug. 16, 2017 (attached hereto as Exhibit C).

[3] Elliott also holds $921.4 million of the EFIH Second Lien Notes or approximately 43% of the Class B4 EFIH Second Lien Note Claims, deemed to accept the EFIH Plan.

17. Notwithstanding the Notice of Disapproval, Elliott's request, and the opposition, not only of Elliott, but of creditors that together with Elliott hold the overwhelming majority of claims in the Classes whose support is required for confirmation of the BHE Plan, the E-Side Debtors continue to pursue the BHE Sale Motion and approval to incur the $270 million BHE Termination Fee—an act beyond comprehension.[4] The apparent explanation is that the Debtors are pursuing a litigation strategy merely to maintain control in the E-Side Debtors' Chapter 11 Cases that they have twice steered to failure and to protect the parochial future interests of various estate representatives. Notwithstanding all of the hollow fiduciary talk from the Debtors, this Court must ask, exactly who are they protecting in seeking to defy virtually the entire creditor constituency of these estates?

## OBJECTION

18. The BHE Disclosure Statement should not be approved for—among others—at least two fundamental reasons. *First,* the BHE Plan cannot be confirmed, and consequently, approving the BHE Disclosure Statement and commencing solicitation of the BHE is a monumental waste of judicial time, estate resources and creditor value. *Second*, the BHE Disclosure Statement fails to provide "adequate information" as required by Bankruptcy Code section 1125(a).

### I. THE COURT SHOULD NOT APPROVE THE BHE DISCLOSURE STATEMENT BECAUSE THE BHE PLAN IS FUNDAMENTALLY FLAWED AND NOT CONFIRMABLE

[4] As a practical matter, this freezes out any other potential buyers from simultaneously pursuing an acquisition of the Oncor Interest at a higher price because, once Oncor files its application for approval of the BHE Transaction, the PUCT will not consider whether there are alternative or superior transactions to the BHE proposal, such as a creditor-sponsored transaction. *See, e.g.*, Preliminary Order at 4, Joint Report and Appl. of Oncor Electric Delivery Co. and Texas Energy Future Holdings Pursuant to PURA §14.101, PUCT Docket No. 34077 (identifying "alternative business combinations to the one proposed" as an "issue not to be addressed"), *id*. at 5 (order's conclusions about issues not to be addressed should be considered dispositive) (2007) http://interchange.puc.state.tx.us/WebApp/Interchange/Documents/34077_412_560386.PDF.

19. A disclosure statement that describes a plan that cannot be confirmed should not be approved even if the disclosure is adequate. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (holding that "a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable"); *John Hancock Mut.l Life Ins. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 (3d Cir. 1993) (reversing district court's order affirming denial of relief from the automatic stay when the plan as then proposed and described in the disclosure statement had "no reasonable prospect of confirmation."). Moreover, "the Court has an affirmative duty to determine whether each provision of § 1129 is satisfied," whether or not creditors have raised valid objections. *See, e.g., In re Flintkote Co.,* 486 B.R. 99, 122 (Bankr. D. Del. 2012) (internal citation omitted).

20. Elliott would not vote in favor of the EFIH Plan as proposed. Thus, pursuit of the EFIH Plan is futile, and this Court should not authorize a time-consuming and expensive solicitation process that would serve no purpose. *See In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the court will not subject the estate to the expense of soliciting votes and seeking confirmation."); *In re K Lunde, LLC*, 513 B.R. 587, 590 (Bankr. D. Colo. 2014) ("The rationale given for this short-circuited process is that the estate and parties should not bear the expense and effort required by the full confirmation process if there is a fatal flaw that makes the plan unconfirmable as a matter of law.") (*citing In re Am. Capital LLC*, 688 F.3d 145, 154 (3rd Cir. 2012)); *see also* Transcript of Hearing, *In re Optim Energy, LLC*, 14-10262 (Bankr. D. Del. Apr. 22, 2015) at 66:20-67:6 67:14-67:17, 70:24-71:18 (attached hereto as Exhibit D) (Judge Shannon expressing doubt that the court could disregard section 1129(a)(10) to confirm a plan that lacked an impaired accepting

class and his reluctance "to hand down a path that would necessarily create what I think we already anticipate might be moving target that the plan would change at confirmation and some Debtors would confirm, some Debtors wouldn't;" adjourning the debtors' disclosure statement hearing to a later date to provide time for other potential buyers to emerge).

### A. The BHE Plan Will Not And Cannot Satisfy Section 1129(a)(10) Of The Bankruptcy Code Because No Impaired Class Of EFIH Creditors Will Vote To Accept The EFIH Plan

21. Bankruptcy Code section 1129(a)(10) requires that "at least one class of claims that is impaired under the plan has accepted the plan." The BHE Plan does not seek substantive consolidation and instead consists of two plans of reorganization, including the EFIH Plan. *See* BHE Plan § I.A.54 ("As used herein, the term 'Debtor' shall refer to the EFH Debtors when referencing the plan of reorganization of the EFH Debtors and shall refer to the EFIH Debtors when referencing the plan of reorganization of the EFIH Debtors"). Both the EFH Plan and the EFIH Plan impair at least one class of claims. *See* BHE Plan Article III.A.1, III.A.2. The EFIH Plan may be confirmed by this Court only if an impaired class of claims against EFIH votes to accept the Plan. *See In re Tribune Co.*, 464 B.R. 126, 180 (Bankr. D. Del. 2011), on reconsideration, 464 B.R. 208 (Bankr. D. Del. 2011) (holding that, absent substantive consolidation or consent, section 1129(a)(10)'s requirement for an impaired accepting class of creditors must be satisfied by ***each*** debtor in a joint plan), on reconsideration, 464 B.R. 208 (Bankr. D. Del. 2011) (emphasis added); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293 (Bankr. D. Del. 2011) (same); Findings of Fact, Conclusions of Law, and Order Confirming First Amended Joint Chapter 11 Plan of Nortel Networks, Inc. and Certain of Its Affiliated Debtors, *In re Nortel Networks, Inc.*, No. 09-10138 (KG) (Bankr. D. Del. 2009), at ¶ 38 (confirming plan upon finding "at least one Class of Claims that is impaired under the Plan that

has accepted the Plan ***as to each Debtor*** . . .) (emphasis added); *see Collier on Bankruptcy* ¶ 1129.02[10][b] (16th ed.). The E-Side Debtors will not be able to satisfy this requirement for two reasons.

22. The EFIH Plan will not be accepted by either of the only two impaired classes: Class B5 EFH LBO Guaranty Note Claims and Class B6 EFIH Unsecured Note Claims. A class of claims "accepts" a plan only if creditors holding at least two-thirds in amount and more than one-half in number of the allowed claims voting in such class have voted to accept the plan. 11 U.S.C. 1126(c). The creditors that filed the Notice of Disapproval (the "Disapproving Creditors") hold far more than two-thirds of the face amount of the claims in both Class B5 and Class B6. The Disapproving Creditors will vote to reject the EFIH Plan in both classes. Therefore, the EFIH Plan cannot be confirmed because there will be no impaired accepting class for the purposes of satisfying the requirements of Bankruptcy Code section 1129(a)(10).[5]

**B. The BHE Plan Cannot Be Confirmed Because The BHE Termination Fee Is An Improper Penalty On Creditors Opposing The BHE Plan**

23. As set forth more fully in Elliott's objection to the BHE Sale Motion, the BHE Plan Confirmation Condition and the potential payment of the BHE Termination Fee renders the BHE Plan unconfirmable under Bankruptcy Code section 1129(a)(3). *See* Sale Motion Objection at ¶ 52. Furthermore, the BHE Termination Fee is analogous to an impermissible "death trap," making the BHE Plan unconfirmable. *See id*. at ¶ 55.

[5] The EFIH Plan is also flawed because the separate classification of the Class B5 EFH LBO Note Guaranty Claims from the Class B6 EFIH Unsecured Notes Claims does not have a "reasonable purpose, legitimate basis, or necessary business objective" *In re FF Holdings Corp.*, No. 98-37, 38 JJF, 1998 U.S. Dist. LEXIS 10741, at *16-17 (D. Del. Feb. 17, 1998). Instead, Debtors have crafted the EFIH Plan classes to "engineer[ ] literal compliance with the Code while [seeking to] avoid[] opposition to reorganization by truly impaired creditors." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 (3d Cir. 2004); *see also John Hancock Mut. Life Ins. Co.*, 987 F.2d at 158 (a "classification scheme must provide a reasonable method for counting votes" so "in a 'cram down' case, . . . each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice"). The E-Side Debtors appear to have been counting on the economic interest of certain creditors at EFH to motivate those creditors to cast a vote in Class B5 to accept the EFIH Plan, perhaps based upon their conflicting interest as EFH creditors.

## II. THE PROPOSED BHE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE INFORMATION FOR CREDITORS TO DETERMINE WHETHER TO ACCEPT OR REJECT THE PLAN

24. While it would not change Elliott's mind regarding the BHE Plan in the event the Debtors were to provide more detail about a deal that dramatically undervalues the estates and purports to give creditors only a *de minimis* recovery above the Debtors' projected liquidation value (which estimate Elliott believes is itself suspect), the BHE Disclosure Statement also fails to provide the requisite "adequate information" regarding the BHE Plan. 11 U.S.C. 1125(b).

25. Courts have consistently held that a disclosure statement must provide creditors sufficient information to make informed judgments to both negotiate the terms of, and vote on, a plan of reorganization. *Century Glove, Inc. v. First Am. Bank of New York,* 860 F.2d 94, 100 (3d Cir. 1988); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 322 (3d Cir. 2003) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure by the creditors and the court") (internal quotations omitted); *In re Phoenix Petroleum, Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan."). Specifically, the disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

26. The BHE Disclosure Statement fails to disclose many critical and important facts and legal positions, making the BHE Disclosure Statement not only inadequate, but also in some instances entirely misleading. These failures include the following:

a. The Best Interest Test and Hypothetical Chapter 7 Liquidation. Under section 1129(a)(7), every impaired creditor and interest holder must either: (1) accept the plan; or (2) receive at least as much value as the creditor or interest holder would receive in a Chapter 7 liquidation of the debtor. The liquidation analysis included as Exhibit E to the BHE Disclosure Statement [D.I. 11521] (the "Liquidation Analysis") assumes, without material analysis, that a hypothetical chapter 7 liquidation of the Oncor Interest would occur in a non-taxable transaction. Liquidation Analysis, Article III.G. The E-Side Debtors state that they have made this assumption because Reorganized TCEH has the ability to seek injunctive relief to prevent a taxable disposition of the Oncor Interest within two years of the spin-off of TCEH (*i.e.*, October 3, 2018). *Id*.

The Liquidation Analysis includes no meaningful disclosure as to (i) whether such an agreement would be specifically enforceable on a chapter 7 trustee, (ii) the availability of several exceptions, including obtaining a private letter ruling or a will-level tax opinion to the effect that a taxable disposition would not cause the spin-off of Reorganized TCEH to be taxable, or (iii) even assuming that a taxable transaction were not available until October 2018, the increased price that a chapter 7 trustee would obtain in a taxable deconsolidation and whether the chapter 7 trustee would pursue the economically rational course of waiting until October 2018 to liquidate the Oncor Interest to obtain billions of dollars in additional value for unsecured creditors. The absence of this information is particularly important in light of the Debtors' prior liquidation analysis, which they based on a taxable deconsolidation and which estimated EFIH unsecured creditor recoveries at up to 98.2% in a liquidation, as compared to the 7.6% to 13% in the current Liquidation Analysis. *See* Amended Disclosure Statement for the NEE Plan, Exh. E [D.I. 10564-5].

b. The E-Side Debtors' Intent To Pursue A "Cram Down" at EFIH. Although the BHE Disclosure Statement states that the E-Side Debtors will seek to cram down the BHE Plan over the objection of rejecting classes of creditors pursuant to Bankruptcy Code section 1129(a)(10), *see* BHE Disclosure Statement, Article III.B.5, the E-Side Debtors' use of the defined term for their joint "Plan" appears deliberately intended to leave open the possibility that they will seek to confirm the EFIH Plan even if the only two impaired EFIH Plan classes vote to reject the EFIH Plan. This is material information to the EFIH voting creditors and this Court because it is directly contrary to the well-established precedent of decisions of two judges of this Court as set forth in paragraph [19], *supra*, and thus precludes confirmation of the BHE Plan.

c. Effects of the NEE Termination Fee on Creditor Recoveries. The BHE Disclosure Statement lacks any description of (i) the Debtors' incurrence of an $275 million termination fee allegedly due in connection with entry into the NEE Merger Agreement (the "NEE Termination Fee"), (ii) the proposed allocation of the NEE Termination Fee between the EFH and the EFIH estates, (iii) the effect on the estimated recoveries to the EFH and EFIH estates if the NEE Termination Fee becomes due and payable, (iv) the potential administrative insolvency of EFIH in the event that the NEE Termination Fee is determined to be wholly allocated to EFIH, and (iv) the risk to creditor recoveries in the event that BHE is not able to

consummate the BHE Transactions or consummation of the BHE Transaction is significantly delayed.

d. Amount and Allocation of Pre-Effective Date Professional Fee Claims. The E-Side Debtors have paid hundreds of millions of dollars in Professional Fee Claims in the Chapter 11 Cases and have substantial additional accrued, unpaid Professional Fee Claims, but the BHE Disclosure Statement does not: (i) identify the aggregate amount of such Professional Fee Claims incurred, (ii) disclose whether the E-Side Debtors or the appointed Fee Committee have objected to, or intend to object to, any of these Professional Fee Claims; (iii) describe procedures for the allocation of those substantial Professional Fee Claims among the various E-Side Debtor estates, including with respect to (x) the Makewhole Litigation and Settlements described in Section IV.K of the BHE Disclosure Statement or (y) the anticipated litigation of the alleged NEE Termination Fee, or (iv) describe the potential impact of those allocations on creditor recoveries.

e. Insufficient Information Regarding Proposed Parent Preferred Stock. The BHE Plan provides that creditors may receive an unspecified portion of their consideration in the form of "Parent Preferred Stock," but defers to the Plan Supplement (i) whether that will occur, (ii) how creditors can be assured that this unlisted, minority preferred stock will have the same value as the cash it replaces, (iii) how much BHE Plan consideration will be provided in the form of this stock, (iv) whether this stock will be distributed to only creditors of EFH, EFIH, or both, and (v) how distribution of this Parent Preferred Stock will affect each Debtor's separate creditor recovery pool. This information will materially affect the plan treatment that impaired unsecured creditors of EFH and EFIH will receive so it must be fully disclosed with sufficient detail and time for review before creditors are required to vote.

f. Amount and Allocation of Post-Effectiveness Reserves. The BHE Plan contemplates establishment and funding of EFH Professional Fee Escrow Account and an EFIH Professional Fee Escrow Account out of funds from the Cash that would otherwise be available for distribution to each estate's respective creditors on the Effective Date to be administered by an EFH Plan Administrator Board, but the BHE Disclosure Statement does not: (i) disclose the size of either of those reserve accounts; or (ii) explain or identify any safeguard to ensure that the EFH Plan Administrator Board appropriately balances fiduciary duties to each different Debtor's different creditor constituencies.

g. Amount of Expected Effective Date Cash at Each Debtor. The amounts of Cash anticipated to be held by each of EFH and EFIH upon the Effective Date will be the baseline for calculating recovery pools for creditors of the EFH Debtors and EFIH Debtors, respectively, but the BHE Disclosure Statement includes no (i) estimate of the aggregate amount of Cash that the E-Side Debtors expect to have collectively as the Effective Date or (ii) the process for allocating that Cash among E-Side Debtors on or after the Effective Date.

h. Amount and Settlement Terms for Intercompany Claims. The BHE Plan contemplates the cancellation and release of all Intercompany Claims (as defined therein) through a settlement and the BHE Disclosure Statement explains that Intercompany Claims through December 7, 2015 have already been settled by a Disinterested Director Settlement, but the BHE Disclosure Statement does not: (i) quantify or even estimate the amount of Intercompany Claims that have accrued since December 7, 2015 and are expected to accrue through the Effective Date; (ii) describe the terms or methodologies implemented by the Disinterested Director Settlement or (iii) set forth procedures for any proposed settlement, waiver, or other treatment of current outstanding Intercompany Claims.

i. Unspecified Amounts of Legacy Unsecured Claims. Class A3 Legacy General Unsecured Claims Against the EFH Debtors include claims derived from or based upon liabilities based on asbestos claims or certain qualified post-employment benefits. The Debtors have provided this information to Elliott under protection of a non-disclosure agreement in response to Elliott's request, but this information should be disclosed publicly to all creditors in the BHE Disclosure Statement as well.

j. No Explanation of Likelihood of BHE Transaction Obtaining PUCT Approval. The Disclosure Statement describes that the BHE Merger Agreement includes various conditions precedent to consummation, including "various regulatory rulings from the PUCT," Disclosure Statement Section I.C.(i)(i), and expresses the Debtors' unsubstantiated belief "that Oncor will submit a change in control application to the PUCT seeking approval of the transactions contemplated by the Merger Agreement that satisfies the applicable legal standards under Texas Law." *Id.* Section VIII.B.7. The Debtors have already entered into two failed transactions based on similarly unfounded beliefs about what the PUCT would approve, which have already cost the estates years of professional fees and potentially $275 million of the NextEra Termination Fee. The Disclosure Statement should include detailed analysis of why the Debtors think their belief about this third transaction is any more credible than their mistaken views about regulatory approvals of the failed Hunt Transaction and NextEra Transaction.

## RESERVATION OF RIGHTS

27. Elliott Funds reserves the right to amend or supplement this Objection based upon any facts or arguments that come to light prior to the hearing on these issues, and to raise any additional objections to confirmation of the BHE Plan at the confirmation stage.

WHEREFORE, for all of the foregoing reasons, the Elliott Funds respectfully request that this Court deny approval of the BHE Disclosure Statement, which provides inadequate disclosure about a plan of reorganization that cannot be confirmed.

Dated: August 18, 2017
Wilmington, Delaware

Respectfully Submitted,

BAYARD, P.A.

*/s/ Erin R. Fay*
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Evan T. Miller (No. 5364)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail: scousins@bayardlaw.com
efay@bayardlaw.com
emiller@bayardlaw.com

--AND--

ROPES & GRAY LLP
Keith H. Wofford
Gregg M. Galardi
Joshua Y. Sturm
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile: 212-596-9090
Keith.Wofford@ropesgray.com
Gregg.Galardi@ropesgray.com
Joshua.Sturm@ropesgray.com

Andrew G. Devore
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Andrew.Devore@ropesgray.com

*Counsel to the Elliott Funds*