# Exhibit D

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          )  Case No. 14-10262 (BLS)
                                )  Chapter 11
OPTIM ENERGY, LLC               )
                                )
            Debtors.            )  Courtroom No. 1
                                )  824 Market Street
                                )  Wilmington, Delaware 19801
                                )
                                )  April 22, 2015
                                )  11:00 P.M.

TRANSCRIPT OF HEARING
BEFORE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:        Bracewell & Giuliani, LLP
                        By:  ROBERT BURNS, ESQUIRE
                             RACHEL GOLDMAN, ESQUIRE
                        1251 Avenue of the Americas
                        49th Floor
                        New York, New York 10020-1100

                        Morris Nichols
                        By:  ROBERT DEHNEY, ESQUIRE
                        1201 North Market Street
                        Wilmington, Delaware 19899

For Lyondell Chemical:  Stevens & Lee
                        By:  JOSEPH HUSTON, ESQUIRE
                        1105 North Market Street
                        Wilmington, Delaware 19801

ECRO:                   DANA MOORE

Transcription Service:  Reliable
                        1007 N. Orange Street
                        Wilmington, Delaware 19801
                        Telephone:  (302) 654-8080
                        E-Mail:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording:
transcript produced by transcription service.

```
 1   For Walnut Creek:         Kirkland & Ellis, LLP
                               By:  JUDSON BROWN, ESQUIRE
 2                                  JOSHUA SUSSBERG, ESQUIRE
                               655 Fifteenth Street, N.W.
 3                             Washington, D.C. 20005-5793

 4   For U.S. Trustee:         Office of the United States Trustee
                               By:  JANE LEAMY, ESQUIRE
 5                             844 King Street
                               Wilmington, Delaware 19801
 6
     For Cascade:              Cleary Gottlieb
 7                             By:  LINDSEE GRANFIELD, ESQUIRE
                               One Liberty Plaza
 8                             New York, New York 10006

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                               INDEX

2                                                        Page

3  NOTICE OF AGENDA MATTERS:
   For the Debtors, by Mr. Burns                      4,34
4  For the Debtors, by Mr. Rahn                          5
   For Lyondell, by Mr. Huston                          20
5  For Walnut Creek, by Mr. Sussberg                    21
   For the U.S. Trustee, by Ms. Leamy                   25
6  For Cascade, by Ms. Granfield                        40
   For the Debtors, by Ms. Goldman                      88
7  For Walnut Creek, by Mr. Brown                       94

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE CLERK:  All rise.

2    THE COURT:  Please be seated.  Good morning.  Ready

3  to proceed?

4    MR. BURNS:  Good morning, Your Honor, Robert Burns

5  from Bracewell & Giuliani on behalf of the Debtors.  Your

6  Honor, we have a few items on the agenda today.  Since we

7  haven't been in front of you for several months, I thought

8  first I'd give you a little status of the case.

9    THE COURT:  That sounds great.

10    MR. BURNS:  Second, we have the bidding procedures;

11  third, we have the disclosure statement motion to approve the

12  disclosure statement.  And I think the last thing I think

13  it's styled on the agenda as a status conference on some of

14  the other issues.

15    THE COURT:  And some discovery issues were raised as

16  well.

17    MR. BURNS:  Correct.  So, Your Honor, I'll give kind

18  of going in chronological order, if you will.  We did

19  accomplish the sale of the twin oaks plant.  It was stalking

20  horse of $60 million dollars was filed originally.  We got an

21  auction breakout at the bid procedures hearing which drove

22  that up to $82 million. We had an auction where we had 68

23  rounds of bidding and eventually sold the plant for a $126

24  million.  And the sale closed some time I think it was in

25  September after all the regulatory approvals were

1 | accomplished.  That was in August.

2 |      In the time also since we've been in front of the

3 | Court, we've been running the business.  And Mr. Rahn gave me

4 | an overview of what the Debtors accomplishments have been in

5 | that regard, but I would probably goof it up if I tried to

6 | repeat it.  So he is here today, Your Honor, if you'd like to

7 | hear from him a little bit more on the market.

8 |      THE COURT:  That would be great.  Mr. Rahn, welcome;

9 | welcome back.

10 |      MR. RAHN:  It's good to be back.  I've got a few

11 | updates that I can give you that I've prepared, but I

12 | remember from the past you ask questions so I'll try to do

13 | all I can to answer as they come up.

14 |      THE COURT:  Well I'll take your updates right now.

15 |      MR. RAHN:  Generally in my industry well we start at

16 | safety.  And so since we filed until now we've worked 225,000

17 | hours on Optim assets and there's been two recordable

18 | injuries, zero lost time.  There's a lot of distractions

19 | during a bankruptcy and so to be able to stay focused at that

20 | level and have everybody go home safe has been of utmost

21 | importance to us.

22 |      THE COURT:  Sure.

23 |      MR. RAHN:  And we succeeded.  Generally, your safe

24 | plants have a reasonably good performance and I was pleased

25 | to be able to achieve that.  We had a budget of 93%

1  availability in 2014 and hit 96%.  And I'm sure you're aware

2  that is really important.  Units have to be available in

3  order to generate and capture revenue opportunities.

4         THE COURT:  Did you do an annual down period?

5         MR. RAHN:  We do.  Yeah with especially with the gas

6  fired assets it's not very subjective.  Yeah you've got

7  standardized maintenance schedule that you do --

8         THE COURT:  Cycles.

9         MR. RAHN:  Yeah every so many thousand hours of

10  operation.  And that really the next thing we continue with

11  normal maintenance throughout the past year and a half.  One

12  of the neat things for us, I mean you're in a bankruptcy.

13  You've got a lot of service providers you work with and some,

14  you know, continue to support you and others don't.  But

15  we're located geographically where there's a lot of

16  competition.  And so we've been able to find alternatives.

17         I don't say relatively easy from my perspective.  I

18  think my plant managers might disagree, but anyway that went

19  well.  Also in that time we were able to continue to supply

20  Lyondell with on average about 1150 million pounds per hour

21  of high pressure steam and 65 megawatts of power 365 days a

22  year around the clock without interruption which for us is

23  very important for overall financial stability, because we

24  have penalties in the event that we don't succeed in doing

25  that.

1       Environmentally, we've had zero notices of

2 violations and, you know, all the various regulatory agencies

3 that we work with have been understanding in support of the

4 situation and, you know, continue to work with us as they

5 normally would.  You know, finally from a financial

6 standpoint yeah this is a challenging time in my industry.

7       THE COURT:  Oh yeah.

8       MR. RAHN:  You know largely driven by very low gas

9 prices and I'm pleased, you know in 2014 we did better than

10 plan.  We're about $5 million dollars better than plan in

11 EBITDA and almost more importantly at this point in time from

12 a free cash flow perspective, we were over $20 million

13 dollars better than we had planned at the beginning of the

14 year.

15       So to be at cash flow positive in this challenging

16 time is good.  Yeah 2015 is [indiscernible].  Never rest on

17 your laurels.  This is going to be a challenging year as

18 well, but you know ultimately the business is healthy;

19 healthier than it had been.

20       THE COURT:  When we talk about energy as one of

21 those classic we can call it cyclical or you can call boom

22 and bust, especially Texas.

23       MR. RAHN:  Right.

24       THE COURT:  I guess has that tradition.  You know if

25 I knew where petroleum prices were going I wouldn't be

1  sitting here talking to you.  But it seems to me again we're

2  seeing in this Court the effects of the substantial changes

3  to input prices for the energy sector.  And there is nothing

4  I'm hearing that would indicate that that situation is

5  expected to change.

6       MR. RAHN:  Not see changes.  You know some most of

7  the forecast for gas prices which to me are more important

8  than you know the crude price.  They're going up.  I mean

9  Houston [indiscernible] yesterday I think was $2.54 which is

10  across my career I've only seen numbers like that just a few

11  times.

12       THE COURT:  Right.

13       MR. RAHN:  You know it can be over 10.  Plants like

14  mine that are reasonably efficient certainly benefit from the

15  higher prices.  I don't have any illusions that we're going

16  to see $8.00 gas, but there's plenty forward curves that are

17  showing stuff moving in the $5.00 range.  And you can have a

18  healthy business in industry at that type of pricing.

19       THE COURT:  It's remarkable again to go off topic,

20  but it is remarkable to see at least for the United States

21  the degree of tumult right now in the Middle East.  Like now

22  another aircraft carrier parked off Yemen; a lot going on.

23  Without corresponding oil shock even an anticipated one or

24  one that runs on rumor.

25       MR. RAHN:  Yeah it's puzzling.

1      THE COURT:  Well it's not very puzzling if you've

2 been up to North Central Pennsylvania.  We are seeing, as I

3 said, you know, the consequences of this in a number of the

4 cases that are filing here and around the country, but I

5 certainly appreciate the report, and I thank you for coming

6 on up.

7      MR. RAHN:  Thanks a lot.

8      THE COURT:  Thanks very much.

9      MR. BURNS:  Your Honor, moving to some other

10 initiates that are directly relevant to today's motion.

11      THE COURT:  Sure.

12      MR. BURNS:  The most significant I think the Debtors

13 undertook is the sale process which brings us for the bidding

14 procedures today.  Your Honor, I think it will be helpful as

15 we go through some of the motions today just to remind the

16 Court of the organizational structure.  If I may approach and

17 give you a copy?

18      THE COURT:  Sure that would be great.  Thank you.

19      MR. BURNS:  So, Your Honor, first the sale of Twin

20 Oaks which the structure is more or less on the right hand

21 side of the chart.  We're left with the two plants that

22 comprise the gas plant portfolio Altura Cogen is the plant

23 that supplies amongst Lyondell.  And then we have the Optim

24 Energy CB4 and that is, what I'll call I believe is accurate,

25 a joint venture with NRG.

1    In the third quarter, Your Honor, the Debtors

2    commenced with the assistance of their investment banker

3    Barclays a sale process.  In the course of the third and

4    fourth quarters there were several bidders who signed copies,

5    conducted bidder diligence which consisted both of electronic

6    data room for documents and site visits, also management

7    presentations. That led to written bids which were evaluated,

8    but then there were some further discussions, as always, you

9    know to understand issues and bids and determine other points

10   needed to be put to rest.

11   After this process went on, Your Honor, the decision

12   was ultimately made to proceed to the sale that's in front of

13   the Court today.  Your Honor, to be clear we did receive

14   several bids that the Debtors found of interest.  But for I

15   think mostly economic reasons, we just didn't have one single

16   bid that was so substantially similar or, excuse me, superior

17   that it justified stalking horse status and the cost of bid

18   protections.

19   The result of that, Your Honor, is we put together

20   what we believe is the package that will allow these Debtors

21   to emerge from Chapter 11.  The first is, of course, the

22   bidding procedures; the second is the plan and with that,

23   obviously, we filed a disclosure statement.  From the very

24   highest level the bidding procedures set a reserved price of

25   $355 million dollars.  It proposes an auction of I believe

1   May 8th.  And if bids, a bid or bids are received we will have

2   an auction; excuse me, if just one bid is received that would

3   be the bidder or, excuse, the purchaser.  If more than one

4   bid is received we would have an auction.

5          Moving from the sale if there is an auction, Your

6   Honor, we would then go into the plan process.  We have kind

7   of two, we have sub-plans for each of the Debtors and they're

8   broken further really into two groups.  First again on the

9   left hand side of the page of what we've called the

10  reorganizing Debtors and those are the entities that would be

11  sold either to a third party or the existing equity owners

12  would own them as a result of the credit bid.

13         THE COURT:  Okay.

14         MR. BURNS:  What we think is very important to

15  highlight is that the unsecured creditors at these entities

16  would be paid the full amount of their unsecured claim.  On

17  the Liquidating Debtor side there's really, there are no

18  unencumbered assets over there.  The main asset was the Twin

19  Oaks plant and, of course, that's been sold.  There's some

20  cash there that operates the business I believe.  I don't

21  have the full details handy, but there is some cash really

22  more function of banking.

23         On that side under the plan the Liquidating Debtors

24  would wind down.  There are some levels of recovery that are

25  being left behind.  Again, the plan would implement the sale

1    or the credit bid; whichever were put forward.  The

2    confirmation hearing, rather, is set for June 4th.

3         From a process perspective, we did receive an

4    objection and a statement relating to bid procedures.  The

5    objecting party was Lyondell, as I'll get to in a minute.  We

6    resolved our objection with them.  And we received a

7    statement from the Walnut Creek entity.  We received through

8    the disclosure statement objections from Lyondell. And,

9    again, we resolved that issue so that's no longer relevant.

10   I'll explain that on the record.  And, of course, we received

11   an objection from the Walnut Creek entity.  We also received,

12   Your Honor, informal comments to the disclosure statement

13   from the U.S. Trustee.  We were able to address them either

14   with the addition of language or an agreement to reserve our

15   confirmation.

16        But I think the other activity that has played out

17   and taking time is the Walnut Creek claim objection and

18   ambulated litigation.  Again, this relates to issues that

19   were raised at the status conference I think a few weeks ago.

20   It emanates out of the claim that Walnut Creek filed after

21   the rejection of the FSA following the sale.  The focus of

22   the status conference later, I don't want to get too deep

23   into the details, but it does come up a little bit so at the

24   highest look.

25        If you look at the chart the Walnut Creek entity has

1  claims that the, I guess they're kind of orange shaded boxes,

2  which are Optim Energy Twin Oaks and Optim Energy LLC.  Twin

3  Oaks was the, I think, main counterparty to the FSA whereas

4  Optim Energy was, I believe, the financial guarantor of the

5  FSA.

6          THE COURT:  Okay.

7          MR. BURNS:  If those entities the Walnut Creek

8  entity, excuse me those Debtors, the Walnut Creek entities

9  currently hold approximately $3.9 million dollar unsecured

10 claim that relates to prepetition coal deliveries that fell

11 outside of the 20 day.

12         THE COURT:  Okay 20 day period, okay.

13         MR. BURNS:  They also hold or they've asserted,

14 rather, a $191 million dollar rejection damages.

15         THE COURT:  Rejection damages.

16         MR. BURNS:  And in addition, Your Honor, those

17 entities or, excuse me, the Walnut Creek entities hold a

18 $3.2, I believe give or take, million dollar claim that

19 relates to prepetition coal delivery within 20 days.

20         THE COURT:  503(b)(9) claims.

21         MR. BURNS:  Yes; yes, sir.  So that I wanted to put

22 that out because it will come up.  I'm not taking positions

23 on any of these right now other than to say that's kind of

24 the universe.  On the left side of the page none of the

25 litigation Walnut Creek has no claims on the reorganizing

1  Debtors side.  They have on ability to access any recoveries

2  that are generated over there, and I think that issue was

3  brought to finality, Your Honor, when the District Court

4  affirmed your decision and Walnut Creek elected not to pursue

5  an appeal there, so those orders are final.  There's no legal

6  basis to reach out to those assets and try to bring them over

7  to the liquidating side.

8        I think when you get into the issue relating to the

9  rejection damages claim if I can boil it down, I sincerely

10  believe that a lot of the issues and maybe all of them could

11  be saved for another day post-confirmation when we get to

12  this later.  There's a decision where we can walk you

13  through.  I think we'll probably find some common ground or

14  agreement as to the ability, you know, what implications have

15  for the case or doesn't have for the case, put it off.  But

16  the size of the claim a $190 million dollars is being

17  asserted.  It's not something that we can just simply agree

18  to.

19        We don't see why it makes a difference.  Mr.

20  Sussberg does.  I kind of understand his view.  Maybe there's

21  some common ground there we could find.  But we want to move

22  these cases towards confirmation, so when we get to that

23  aspect of the hearing we'll talk to you a little bit more,

24  but again it permeates, Your Honor.  It's not something

25  that's totally outside of the plan related issues.

1          THE COURT:  I understand.

2          MR. BURNS:  So I wanted to surface it.  So that

3 said, Your Honor, I want to move to the bid procedures

4 motion. Again, this motion, Your Honor, is unopposed having

5 resolved the Lyondell objection.

6          I represented to the Court the sale process.  Again,

7 we --

8          THE COURT:  Can you walk me through the timeline if

9 you would on the bid procedures.

10          MR. BURNS:  The timeline and sale process?

11          THE COURT:  Yes.

12          MR. BURNS:  Yes, sir.  So the sale process was

13 commenced in the third quarter of 2014.  The Debtors went out

14 to, excuse me the Debtors' financial advisor went out to

15 approximately --

16          THE COURT:  No I'm sorry I meant --

17          MR. BURNS:  Oh of the sale to come.

18          THE COURT:  Yeah on a going forward basis.  I mean

19 to the extent that we have issues with respect to the lead up

20 and how we got to this point that may be part of the

21 predicate for bid procedures, but I want to make sure I don't

22 know if there have been any changes to at least what was laid

23 out in terms of --

24          MR. BURNS:  I'm not aware of any, Your Honor.  I'm

25 happy to lay them out.

1        THE COURT:  Let just make sure we get that.

2        MR. BURNS:  If I may.

3        THE COURT:  Yeah sure.

4        MR. BURNS:  Your Honor, the qualifying bidding

5    materials are --

6        THE COURT:  Energy cases do it to me too.

7        MR. BURNS:  Very passionate about them.  Your Honor,

8    the qualifying bidder materials are due on April 24th.  And

9    what those would be, Your Honor, is a party who wishes to

10   bid.  It would be there, amongst other things, evidence of

11   their financial wherewithal, certain corporate and internal

12   approvals, the financial ability to close.  So really just

13   kind of the I think very standard qualifying bid materials.

14       Qualified bids themselves would be due May 1st, Your

15   Honor.  If there is no qualifying bid Cascade would be credit

16   bidding essentially.  It would receive the reorganized equity

17   and that would be accomplished through the plan.  And, again,

18   the plan confirmation is scheduled for June 4th.

19       Your Honor, if there's one qualified bidder that

20   party would be the purchaser.  There would be no need to have

21   an auction -- I'm sorry I want to clarify, Your Honor, the

22   plan is not a credit bid.  It's really the reorganized equity

23   would be distributed to the prepetition secured lenders.  So

24   if I say that it's shorthand.  I'm not intending it to have

25   legal significance.

1        If there's only one qualified bidder, Your Honor,

2   that meets the $355 million dollar reserved price that party

3   would be the purchaser.  My understanding and it could

4   certainly be confirmed that Cascade has no intention of

5   credit bidding or, excuse me, upping, overbidding above the

6   $355.  If we have more than one qualified bid that would be

7   above the $355 million then an auction is scheduled for May

8   8th and that would take place, post that auction we would file

9   the results with the Court and seek to have the, excuse me,

10  the sale confirmed or effectuated as part of the plan.

11        THE COURT:  Okay.

12        MR. BURNS:  Your Honor, moving to the objection that

13  was asserted by Lyondell.  And, again, this relates to on the

14  chart the Altura Cogen entity.  Mr. Rahn touched briefly on

15  the importance of the Lyondell agreement there.

16        I think the three broad basis for the objection;

17  first one relates to a claim for a steam event.  There was a

18  slight outage whether it was a few seconds or a few minutes

19  where the plant failed to deliver the required steam to

20  Lyondell.  Under the terms of the contract that does give

21  rise to some damages.  There was a dispute as to the quantum

22  of damages.  I believe it was originally asserted in the

23  range of just over $500,000.  Lyondell and the Debtors have

24  engaged in dialogue over that and we've agreed that it would

25  be settled for $250,000.00.  I think that can be effectuated

1  through the plan, Your Honor.  It has a 9019 feature built

2  into it and there's no claim.  I don't believe anybody

3  disbelieves the amount.

4         THE COURT:  Okay.

5         MR. BURNS:  The second element of the Lyondell

6  objection, Your Honor, was Lyondell has, the Debtors and

7  Lyondell have a series of agreements in place.  There's the

8  SEPSA which is the steam agreement.  There are other

9  agreements that, I don't have the names right in front of me.

10  But there are, I believe, five of them.  Lyondell has taken

11  the position throughout the case, these are integrated

12  agreements.  It must be assumed in their entirety.  It can't

13  be assumed or rejected in [indiscernible] in part separately.

14         We've looked at that, Your Honor.  I don't know so

15  we agree with that rationale, but it's never been a live

16  issue so there's been no reason to debate it.  For purposes

17  of resolving this objection and the disclosure statement

18  objection I think the way we've left it is that issue is not

19  ripe today.  It may never be ripe so the parties are just

20  reserving on it.  We acknowledge Lyondell's legal position.

21  They believe, I believe they would acknowledge ours.

22         And then the third, again, broad brush, Your Honor,

23  is the SEPSA which contains provisions that address a change

24  of operators, certain changes of control or even assignment.

25  And, again, we don't have a live transaction in front of us

1 so it would not be possible to assess how those provisions

2 might be relevant.  Unless or until that becomes live, again,

3 what we've agreed to with Lyondell is --

4          THE COURT:  Keep your powder dry.

5          MR. BURNS:  Exactly.  No reason to deal with those.

6          I want to make two further points, Your Honor,

7 because I think they're important.  In our pleadings, the

8 Debtors wanted to make very clear that we, and this is really

9 Mr. Rahn.  His credit wants to be commercially reasonable

10 with Lyondell.  So we have offered, the Debtors have offered

11 the opportunity for meetings.  I recited that in my pleadings

12 and I think I just left it along the lines of that Lyondell

13 has declined.

14          In conversations with Lyondell and their counsel

15 they have explained to us a little bit more their rationale.

16 They do have some reservations or concerns about engaging at

17 this point.  If I've left the impression with the Court or

18 anyone else that they are not also being commercially

19 reasonable I apologize for that.  That was not our intention.

20 I think the parties will continue to work.  We may need to

21 come up with the right way to get them some information they

22 may ultimately need, but I don't have any doubt that that can

23 be accomplished.

24          THE COURT:  All right I understand.

25          MR. BURNS:  So that, Your Honor, the objection to

1  the bid procedures has been resolved.  And you know spoiler

2  alert that is actually the same thing we've done to resolve

3  the Lyondell objection to the disclosure statement.  We've

4  actually added some language to the disclosure statement.

5          THE COURT:  Reciting it.

6          MR. BURNS:  Yes, sir, and we've previewed it and

7  we've actually shared it with Lyondell's counsel.  They've

8  indicated to us that it addresses the issues they've raised.

9  So I believe I'm accurate to say their objection there has

10 been resolved.  And part of the reason I'm saying this now is

11 that if they confirm those objections or resolve they may or

12 may not want to stay for the rest of the day.  I'd like to

13 see, Your Honor, Lyondell's counsels both on the line and if

14 they have anything to say.

15         THE COURT:  Mr. Huston, welcome.

16         MR. HUSTON:  Good morning, Your Honor, Joseph Huston

17 of Stevens & Lee on behalf of Lyondell. I'm actually, I've

18 gotten my training wheels and I'm here by myself today

19 without counsel on the line.

20         THE COURT:  All right; better get it right.

21         MR. HUSTON:  What Mr. Burns has recited is correct.

22 Our overriding concern in this has been our position that

23 this facility, there are a lot of bells and whistles to it.

24 And that we didn't want to be in a position where they got to

25 a sale and the successful bidder than it stays with our

1  saying oh by the way you got to take it all.  So I think

2  that's really been our mission.  I think that mission has

3  been accomplished and we have worked with them.  We've been

4  fighting nicely.  And I think we've gotten to a point where

5  we're comfortable with that.

6            THE COURT:  Okay I understand.

7            MR. HUSTON:  And I confirm that.

8            THE COURT:  All right.

9            MR. HUSTON:  Thank you, Your Honor.

10           MR. BURNS:  Your Honor, may I?

11           THE COURT:  Sure.

12           MR. BURNS:  Against my better judgment I'm going to

13  yield to Mr. Sussberg, Your Honor.

14           THE COURT:  Mr. Sussberg.

15           MR. SUSSBERG:  Good to see you, Your Honor.

16           THE COURT:  Good to see you.

17           MR. SUSSBERG:  Joshua Sussberg on behalf of Walnut

18  Creek.  I hope Mr. Burns stands up and apologizes for calling

19  me commercially unreasonable.  We're still friends and

20  colleagues but we'll save that for the end.

21           THE COURT:  Where is the badge of honor.

22           MR. SUSSBERG:  Exactly, Your Honor.  Very briefly

23  and I'll save Mr. Burns the breath and I'd like to be able to

24  speak in connection with the disclosure statement.  We

25  purposely filed a statement as opposed to an objection.  And

1  the reason for that and Mr. Burns said it and I'll quote him,

2  he said it's a package, right.  The bid procedures are tied

3  to the disclosure statement and they're tied to the plan.

4         And we asked a whole bunch of questions in our

5  statement that have gone unanswered that would typically be

6  asked and answered by a creditors committee for the benefit

7  of all unsecured creditors.  And for whatever reason those

8  questions they remain out there.  The process will proceed.

9  We're not standing here objecting.  But I do, would like the

10 opportunity, Your Honor, to be heard in connection with the

11 disclosure statement to explain how everything is, in fact,

12 interwoven inextricably.

13         THE COURT:  I understand.

14         MR. SUSSBERG:  Thank you.

15         THE COURT:  All right.

16         MR. BURNS:  Your Honor, for the reasons set forth

17 previously including the Debtors' business judgment in

18 putting forth the bid procedures the reasonable process and I

19 think has been described, the statement of Mr. Mack

20 [*phonetic*] that was submitted with the pleadings and the fact

21 that we've resolved the objections we would move that the bid

22 procedures be approved.

23         THE COURT:  Okay does anyone else wish to be heard

24 with respect to the Debtors' request for approval of bidding

25 procedures relating to the Altura Cogen and Bayou 4

1  properties?  Okay based upon the record before me I will

2  approve and authorize the relief requested.  I note as a

3  threshold matter that the limited objection of Lyondell has

4  been resolved on the terms have been I think carefully placed

5  upon the record.  And I believe the record reflects that the

6  informal comments identified on the agenda from the Texas

7  Commission on Environmental Quality have likewise been

8  resolved.

9        I have reviewed the statement of Walnut Creek and I

10 understand the context in which it was submitted and I

11 further note that Walnut Creek, again, as appeared today and

12 has advised that they are not intending to stand in the way

13 of the bidding procedures request and, therefore, I am

14 dealing with a motion that is effectively unopposed. Based

15 upon the record before me I will approve and authorize the

16 relief requested.

17       I'm satisfied that the proposal represents the

18 exercise of the Debtors' reasonable business judgment and is

19 appropriate for moving forward with the sale in a process

20 that I will allow to play out and I will deal with it at the

21 sale hearing.  There's an interesting colloquy in the party's

22 submissions and I think in your reply about the interplay of

23 reasonable business judgment and approval of bidding

24 procedures and a transcript reference from Judge Walrath.

25 Well I'll allow it, but she wouldn't allow you to give her a

1  transcript reference back.

2       It's an interesting question about how the business

3  judgment rule applies and I've observed in different context

4  that I think it has a functional difference in this Court

5  than it would four blocks down the street in the Chancery

6  Court.  And it's just a different nature of the this Court

7  versus Chancery Court, but regardless for purposes of today

8  I'm satisfied that the Debtors have carried their burden and

9  an order will issue.

10       MR. BURNS:  Your Honor, may I approach with the

11  paper?

12       THE COURT:  Thank you.  Your Honor, I'll now move to

13  the disclosure statement.  I've touched on Lyondell.  We've

14  addressed their issues and, again, I've represented the

15  language that's been made so I'll move past that.  I've also

16  or I believe represented, Your Honor, we did receive informal

17  comments from the U.S. Trustee.  We've added some language to

18  the disclosure statements.  It's my understanding with regard

19  to some of the issues it's my understanding that language was

20  acceptable.  And then there are other matters that we've

21  agreed with the U.S. Trustee that will be reserved until

22  confirmation, so I do not believe the U.S. Trustee has an

23  objection at this time.

24       THE COURT:  Ms. Leamy, good morning.

25       MS. LEAMY:  Good morning, Your Honor, Jane Leamy for

1   the U.S. Trustee.  That representation is correct. We do have

2   some outstanding issues but we agree those are confirmation

3   issues so we'll leave those for another day.

4           THE COURT:  Okay.

5           MR. BURNS:  Your Honor, in order to, I think,

6   describe why the disclosure statement is we believe in its

7   current form sufficient to be approved to be sent to

8   creditors for voting it's important to understand at least at

9   some level of the plan that it supports.  Let's start with

10  the reorganizing Debtors side; again the left side of the

11  paper.

12          As the Debtors work towards proposing a plan,

13  putting a plan forward and as the sale process evolved and as

14  the concept evolved the we would accomplish the disposition

15  of the gas plan assets in some shape of form through a plan,

16  there are kind of two overriding objectives.  First one was

17  that it was important to pay creditors at the reorganizing

18  Debtors the full amount of their allowed claim and this for a

19  few reasons, Your Honor.

20          Number one, most of the creditors there are very

21  important vendors.  Their claims didn't rise to the level of

22  critical vendor, but there are people who will be important

23  to the ongoing business regardless of who the owner is.

24          And a second reason in this, this was very important

25  to us, is as we looked at the structure of these entities we

1   came to a conclusion for a variety of reasons that this would

2   be best implemented as a portfolio sale such that in reality

3   it's the reorganized equity of Optim Energy Generation that

4   would be distributed either to a new purchaser or to the

5   prepetition secured lender in satisfaction of its claim.

6          The idea of potentially distributing reorganized

7   equity to "old equity" we didn't want to get into a thicket

8   of issues with regard to new value or absolute priority or

9   anything else.  We came to the determination that again a

10  plan that pays a 100% of the allowed claim would be

11  sufficient because most of these creditors, obviously, they

12  want to receive their money.

13         So with those in mind, we set forward to design a

14  plan to implement that.  Again, we've covered what general

15  unsecured creditors that the reorganizing Debtors will

16  receive.  They are not, and this has been pointed out, Your

17  Honor, receiving post-petition interest nor will they have

18  the ability to assert it.  For that reason, we believe them

19  to be properly and legally impaired.  And we look to the

20  general proposition in the case law that the slightest

21  alteration of legal rights constitute impairment.

22         There are certainly other ways that impairment could

23  be achieved while also achieving the goal of really taking

24  proper care of these creditors.  The point I want to make

25  because it can't be avoided nor I'm sure will it be is the

1 | concept of is this artificial impairment.  You know such as
2 | are we artificially impairing creditors here in order to
3 | confirm a plan.  I don't view it that way.  I do believe that
4 | we've altered legal rights and that is sufficient impairment.
5 | And, therefore, if it's legal impairment, it's impairment.

6 | To the extent we eventually at this hearing get into
7 | the issue of artificial impairment I think the reason that
8 | that concept has always been of such scrutiny or has been
9 | scrutinized by Court is because it's typically done in
10 | connection with a plan that's somehow coercive or somehow is
11 | detrimental to the rights of creditors.  Maybe you have an
12 | insider or a secured lender who's really seeking to assert,
13 | you know, something onerous or egregious on another class of
14 | creditors or I don't know what the normal paradigm is, Your
15 | Honor, but I think unfairness would resonate through an
16 | attempt to artificially impair a class in order to, you know,
17 | confirm a plan.  I don't think you can say that's the case
18 | here.  I don't think anybody can stand up and argue that any
19 | element of the impairment here is entirely detrimental.
20 | Again, we have done this because we look at the Bankruptcy
21 | Code.

22 | THE COURT:  I think of artificial impairment I don't
23 | necessarily disagree, but I see artificial impairment as more
24 | of a process question, not necessarily whether or not it
25 | unfairly harms someone.  I think as a practical matter the

1  case law would teach that it usually is associated with that

2  because it's not worth doing if you're not going to jam

3  somebody, right?

4         MR. BURNS:  Correct, Your Honor.

5         THE COURT:  But the issue is a process one about the

6  integrity of the process and whether or not parties are

7  afforded.  Creditors suffrage is just bedrock principle and

8  whether or not parties have an opportunity to vote and vote

9  in a meaningful way.  The Code is structured in a way that

10 does not require unanimity, right.  And Congress, you know,

11 recognized that non-consenting creditors can have

12 consequences occur that are, you know, clearly harmful to

13 their interest.  But if the Debtor can develop a plan that

14 gets sufficient creditor support compliant with the code then

15 so be it.

16        So the issue is really whether or not that process

17 Congress lays out that opportunity out there if you want to

18 compare it to non-bankruptcy reorganization opportunities.

19 And you said well there is sort of a brass ring.  You can

20 reorganize and survive in the absence of unanimity but that

21 it needs to be accomplished in a particular way.  And

22 artificial impairment is a way of saying but you haven't

23 really gone through the exercise to allow us to know that the

24 process was compliant.

25        You know fairness I don't think has much of a place

Case 1:14-cv-10979-CSS Doc 1378-4 Filed 04/28/17 Page 30 of 115
Case 1:14-cv-10979-BLS Doc 309-4 Filed 04/28/15 Page 29 of 115

29

1  in this because if I'm on the receiving end of a cram down it

2  does not seem fair.  It does not feel fair, right?  If I'm a

3  preference defendant you can go through the code.  A lot of

4  seems unfair, so that's not really necessarily that the

5  gestalt perspective of is this fair.  It's a question of

6  whether or not it's compliant with the spirit in the letter

7  of the statute.

8       But I also would observe that, and I assume you're

9  headed here at some point, questions of artificial impairment

10  are typically reserved for confirmation.  And there is case

11  law that talks about saying you stop it at the disclosure

12  statement and the briefing clearly reflects a series of

13  issues that Walnut Creek observes that, you know, we should

14  stop the process now.  I understand.  I've reviewed that and

15  we'll hear that.  But a question of artificial impairment is

16  usually a classic question for confirmation because in many

17  ways it's theoretically at least in advisory opinion.  I

18  don't know how you vote it.  I don't know what the

19  consequences of the voting are at the disclosure statement

20  stage.

21       Now there may not be much uncertainty about how it

22  plays out, but as a practical matter you know that seems to

23  me to be an issue that is either typically a confirmation

24  issue or a matter that's addressed in advance of

25  confirmation; sort of as a gating question.  If it fails then

Case 1:14-09079-CSS Doc 1378-4 Filed 08/18/17 Page 31 of 115
Case 1:14-09262-BLS Doc 1369-4 Filed 04/28/16 Page 30 of 115

30

1  we need to go back to the starting gate.  Now whether that

2  starting gate is at the disclosure statement hearing or at or

3  prior to a confirmation hearing seems to me to be the

4  concept.

5       MR. BURNS:  Thank you, Your Honor, and I will I

6  think move forward because you've observed what our point

7  will be ultimately here which is this is a confirmation

8  issue.  And I think the way that this will play out at

9  confirmation goes to how we did try to remain true to the

10  code as part of the which was to navigate ourselves through

11  1129(a)(8)and (a)(10), and some potentially incongruous

12  results that could come to play given the fact that we have

13  the only creditor not receiving a 100% of their claim is also

14  an insider.

15       So for 1129(a)(10) purposes would not be able to

16  count their vote; whereas, if you look at 1129(a)(8) we would

17  need the provisions of that.  And then looking to the very,

18  very narrow cases we found that discuss whether or not we

19  need to meet both of those tests as the introduction to

20  1129(a) might indicate or whether when you look more deeply

21  into it there is a very narrow set of circumstances where

22  meeting 1129(a)(8) which doesn't deal with the vote of an

23  insider is sufficient.

24       And so we would submit, Your Honor, as it relates to

25  the confirmability of the plans at the reorganized and

1  Debtors' side that issues have been raised.  The Debtors have

2  spent a significant amount of time looking at these issues.

3  We believe we will be able to address them to your

4  satisfaction at a confirmation hearing.  And, therefore, we

5  believe they're properly reserved until that time.

6          Your Honor, that moves, I think to the sub-plans for

7  what we call the Liquidating Debtors which is the right side

8  of the page.  As we stated earlier, the Walnut Creek entity

9  has its claims at the two orange colored boxes: Optim Energy

10  and Optim Energy Twin Oaks.

11          THE COURT:  right.

12          MR. BURNS:  If I can engage in a generalization.

13  The white boxes were really structural boxes.  I don't know

14  if you want to call them holding companies, but they would

15  not be operational entities when the Debtors owned Twin Oaks.

16  So I'd like to just kind of I'm not going to avoid them,

17  obviously, but leave them to the side.

18          But when we look at the liquidating plant for the

19  Debtors there are no assets, Your Honor.  There are no

20  unencumbered assets available for distribution to any

21  creditors.  The hard assets, if you will, have all been sold.

22  Nothing is remaining.  And the only remaining asset is some

23  amount of cash that is the unequivocal collateral of the

24  prepetition secured lenders.  It's not subject to any further

25  challenge or of any nature, so there's no question as to the

Case 4:14-cv-09076-SBA Document 309-4 Filed 04/28/17 Page 33 of 115
Case 14-10979-CSS Doc 13779 Filed 08/18/17 Page 32 of 114

32

1 | validity and scope of their security interest.

2 |     I firmly believe, Your Honor, that the issues with

3 | regard to classification and gerrymandering in this

4 | particular set of sub-plans is the kind of quintessential

5 | example of why voting should be allowed to occur before we

6 | try to pass judgment on the classification and gerrymandering

7 | issues. I know we've read in the Walnut Creek Company's

8 | papers that they'll vote against the plan. And they believe

9 | they're the largest unsecured creditor. And we'll certainly

10 | come to that.

11 |     But in considering whether it's sufficient to knock

12 | the props from underneath the plan just by coming in and

13 | saying I'll vote against it. I think you did need to weigh

14 | that statement in the context of what the facts of this case,

15 | at least. As I've stated earlier Walnut Creek has a $3.9

16 | million dollar general unsecured; a $190 million dollar

17 | rejection damages claim that they've asserted. They also

18 | have a $3.2 million dollar 503(b)(9).

19 |     And, Your Honor, as we kind of try to sink through,

20 | and I'm not smart enough to know what Mr. Sussberg has in

21 | mind here, but as we kind of try to think through here well

22 | what's the outcome if they're successful in undermining the

23 | plan or in blocking the confirmation of the plan, what's the

24 | outcome. You know, we come back and propose a new plan;

25 | certainly. And we have to rejigger things in order to try to

1   accomplish a Chapter 11 plan process through a liquidating

2   plan.

3        The next alternative which I'm not proposing by any

4   stretch and I'm not saying it doesn't have its issues, but

5   there's certainly the prospect of a Chapter 7 liquidation or

6   even further some sort of a structured dismissal.  When you

7   get to those last two options, Your Honor, my and I've not

8   done much work in the Chapter 7 arena, but my reading of

9   Section 724 I believe it is, is that 502(b)(9) claim is not

10   entitled to priority such that it would be paid out at all

11   given that there are on unencumbered assets.

12        So I think it's easy to come in and say we'll vote

13   against the plan and, therefore, you should listen to us.  I

14   think it's very difficult to take that at face value given

15   the $3.2 million dollars of true economic loss if they vote

16   against.  And why would they vote against it when they have

17   unsecured claims under any plan would receive nothing, zero

18   if the prepetition secured lender does not leave assets

19   behind.  I get balance the economic realities of those two

20   arguments, so I think that right there should be more than

21   sufficient to say this plan should go forward for voting

22   purposes, because a vote really will determine whether or not

23   this plan is confirmable.

24        Going more, I guess, into the classification issues

25   that have been raised, Your Honor, we have set it up so that

1 at the Twin Oaks level which is really was the operating

2 company there are some general unsecured claims that weren't

3 paid as a part of the process. They as a convenience class

4 that consists of 40 to 50 creditors that have claims in the,

5 I'll call it the range of $100,000.00. And then there are

6 the Walnut Creek general unsecured claims, so those are the

7 three impaired classes which would be solicited for voting.

8 The point, the objection has been made that, you

9 know, the general unsecured class and the Walnut Creek

10 general unsecured class should be combined or they shouldn't

11 be separately classified because they have essentially the

12 same legal basis. We have taken the view, and of course this

13 may never be an issue, but we would certainly be arguing that

14 the Walnut Creek claims are highly litigated in many senses.

15 There are issues surrounding them that make them very much

16 different from the general unsecured claims of trade vendors

17 who were just caught when the company filed Chapter 11

18 without a means of recovery.

19 I think the same is true the convenience class, Your

20 Honor. While the numbers of 40 to 50 creditors and the

21 dollar amounts certainly don't look the same as you might see

22 in a mega-case. You know this is a company with some limited

23 resources and this is one way to generate a return. So I

24 think the convenience class is proper. And, you know, we're

25 more than willing to argue that at the time.

1    On the Optim side there were on real operations

2   here, so I believe I'm correct in saying there are no general

3   unsecured claims.  The convenience class is much smaller, but

4   that would certainly, I think, as we view our own universe of

5   creditors the impaired accepted class we would look to.  And

6   then again we have Walnut Creek's claims at the Optim level.

7    Again, we referred to a line of cases why we think

8   separate classification is appropriate here.  We'll certainly

9   be in a position to brief those fully.  But, again, if it's

10   ever an issue.  And I really I brought forward I think as

11   clear as I can, I think the notion of a creditor, big very

12   large creditor, who clearly can come in, invoke their claim

13   and block a plan, I'm not disputing that.  But the notion of

14   just very easily coming in and claiming that which we see all

15   the time in this case has really has to be tested.  And I

16   think it really pushes very strongly in favor of let's leave

17   these plans go forward to voting, because I think voting is

18   going to be very important here.

19    THE COURT:  Can I ask a question just about

20   timeline?  If the disclosure statement were to be approved

21   and to go out what's the Debtors' proposal for timeframe for

22   confirmation?

23    MR. BURNS:  Your Honor, confirmation hearing has

24   been set for June 4th.  And so our I believe our solicitation

25   procedures require that the packages go out very early next

1   week.  I don't have the precise date, but I'm sure I can get

2   it.  They would be more than sufficient time to solicit,

3   tally the votes, and then see where we stand.  The voting

4   record date I believe is May 26th; 28th I'm sorry.

5           THE COURT:  The voting record date is --

6           MR. BURNS:  I'm sorry, the voting record date is I

7   believe today.  The voting deadline is May.  My apologies.

8           THE COURT:  Okay.

9           MR. BURNS:  So again I've moved forward the case why

10  voting could cure this.  I think one I neglected in addition

11  to the potential that there will be a yes vote from Walnut

12  Creek because there have been indications in their pleadings

13  that they may be a bidder.  I would assume; maybe I'm wrong.

14  But I think it's at least a discussion point.  If they are a

15  bidder and if they are the successful bidder I would assume

16  that their opposition to these plans would likely go away or

17  be subsumed.  I'm not forecasting or foreboding what might

18  happen, but I think that's certainly within the realm of

19  possibility.  So those are very two compelling reasons in my

20  view why a vote here could be interesting.

21          With that, Your Honor, I want to state just one

22  more.  I've taken time and I know Mr. Sussberg wants to be

23  heard.  The last element of the disclosure statement

24  objection that is still outstanding is we have the normal

25  commentary that came in or comments, rather, that Walnut

Case 14-10979-CSS  Doc 1309  Filed 04/28/15  Page 38 of 115

1 Creek entity has put in.  We looked at the comments.  I

2 believe some we took in verbatim.  I think some of them we

3 took, tried to capture the intent, but maybe not the same

4 words.  Some of them, again as I stated in the or as we

5 stated in the pleadings, were just turning the disclosure

6 statement into a brief for advocacy, so we didn't accept

7 them.

8         I think, again, in this case, Your Honor, when you

9 look at the realities of who the voting classes are in the

10 votes a lot of the issues that were raised in their

11 disclosure statement comments are really issues that are so

12 parochial and unique to Walnut Creek.  And they either do

13 know the answers to them or they know how they're going to

14 vote as a strategic matter as it is.  So I really think we

15 can cut through a lot of those line by line item.

16         We have, again, tried to accommodate them.  We're

17 more than willing to continue that dialogue to some extent.

18 But we are very much ready, Your Honor, to move forward.  We

19 see every reason in the world this plan can be confirmed in

20 just a little more than a month.  So those are my points.  My

21 friend Mr. Sussberg, I believe, wants to be heard unless you

22 have more.

23         THE COURT:  Hang on just a second; Mr. Dehney.

24         MR. DEHNEY:  Your Honor was asking about dates.

25 They're actually broken out here if you want to see them.

1       THE COURT:  Sure.  Let me ask before I hear from Mr.

2  Sussberg for Walnut Creek, I'd hear from anyone else that

3  wishes to be heard with respect to the disclosure statement

4  and particularly anybody who wishes to be heard in support of

5  the disclosure statement and Mr. Sussberg could respond to

6  any and all.  All right, Mr. Sussberg.

7       MR. SUSSBERG:  Thank you, Your Honor, for the record

8  Joshua Sussberg from Kirland Ellis on behalf of Walnut Creek.

9  I don't want to burst Mr. Burns' bubble but this is not a

10  voting issue.  We're not here today to talk about artificial

11  impairment, gerrymandering, improper use of convenience

12  classes, the Debtor has satisfied 1129(a)(3), any of those

13  confirmation issues.  Those, Your Honor, to the extent that

14  moves forward will be addressed at confirmation.

15       The Debtors would have you believe that Walnut Creek

16  standing here has a creditor is public enemy number one.

17  And, Your Honor, I just don't understand why.  And I want to

18  walk through a presentation exactly why that's the case

19  today.  Because what was proposed was a plan that provides

20  for a 2% recovery on an un-objected two claim of $3.9 million

21  dollars and no recovery on account of a rejection damage

22  claim that we believe provides a windfall to the estate.  And

23  this has nothing to do with valuation and whether people

24  ultimately are in or out of the money.

25       And it's a plan, Your Honor, that has been in the

1  works for months; yet not once as we as Walnut Creek, the

2  largest non-insider creditor of this case, had a conversation

3  about what that plan was going to provide or what it

4  provides.  And we get, Your Honor, that the Debtors want to

5  confirm a plan.  We appreciate that. But that plan is

6  designed to silence and isolate Walnut Creek and I want to

7  explain today for Your Honor very clearly why that mission

8  was not accomplished.  And we very much want to clear up this

9  continued confusion and conflation of identities between

10  Walnut Creek as the holder of claims and Blackstone Energy

11  Partners and its affiliates whoever they may be.

12       We're not motivated as a bidder. We're not here as a

13  bidder.  I'm here as a creditor.  I represent Walnut Creek.

14  And Walnut Creek has claims against these Debtor entities

15  that Mr. Burns has talked about, that Mr. Burns is aware of,

16  that these Debtors were always well aware of.  And we're not

17  simply willing to go away.  We're going to stand here and

18  vigorously fight for our claims and that will happen today,

19  tomorrow, whenever we need to be standing here to fight for

20  those claims.

21       And this case we keep hearing that it's unique and

22  there's strange circumstances that allow us to potentially

23  look away from Bankruptcy Code provisions that are required

24  to apply in every case.  This really isn't that unique, Your

25  Honor.  Every single day we have cases where secured lenders

1  are impaired.  And those secured lenders make determinations

2  as to whether or not they can proceed and move forward with a

3  Chapter 11 plan and meet all the requirements required under

4  the applicable Bankruptcy Code provisions; or whether there's

5  a creditors committee that's objecting as we've all seen

6  many, many times.  You figure out a way to resolve that.

7          Whether you want to call it a tip or a gift,

8  whatever it may be that's how people resolve plans or they

9  don't.  And if you can't resolve a plan with a creditor

10 that's objecting or a creditors committee that's raising

11 issues you move forward.

12         THE COURT:  Right.

13         MR. SUSSBERG:  And you plow ahead.  And Mr. Burns is

14 standing here today and he's telling you I want to plot

15 forward.  I want to go out and vote.  I can cure all these

16 issues with voting.  Let this plan go forward.  And, Your

17 Honor, that's not the case.  It is absolutely by the Debtors

18 own papers not the case.  And these Debtors they are free to

19 speak with whatever creditor and whoever they want to speak.

20 We don't live in a socialist society.  Your Honor mentioned

21 the Bankruptcy Code, it's not fair all the time.  We get it.

22 But the Debtors have to satisfy the Bankruptcy Code.

23         THE COURT:  Sure.

24         MR. SUSSBERG:  And I want to answer for Your Honor

25 five questions and I'm going to pass up a demonstrative to do

1 | this.

2 |     THE COURT: Okay.

3 |     MR. SUSSBERG: Before I get to those five questions

4 | I want to mention one thing because it's almost a year ago

5 | that we were here in Coldwater Creek. And Your Honor made a

6 | comment in the context of a disclosure statement where a

7 | creditors committee stood up and said we have enough votes to

8 | block confirmation of the plan. Let's not have this go

9 | forward. And Mr. Burns said as the Debtor would say in this

10 | case let this go forward, right. Let this go forward because

11 | the voting could cure it. And, Your Honor, if I may read

12 | from the transcript. You said,

13 |         "I think case law teaches us that there are

14 |         circumstances where a Court should identify a plan

15 |         that is so patently unconfirmable as to not warrant

16 |         moving forward to solicit creditors. I view that as

17 |         a very high standard. And I note that the committee

18 |         has expressed its understanding or expectation that

19 |         there are sufficient votes that the committee is

20 |         aware of to block confirmation of the plan.

21 |         My practice, I think, has been consistent to allow

22 |         the voting process to play out understanding that it

23 |         is a dynamic exercise. So in anticipation or

24 |         expectation or prediction about what will happen

25 |         with the voting is to my likes not sufficient to

1            determine whether or not a plan can be approved for

2            purposes of disclosure."

3    Agree with all of that, Your Honor, of course.

4            THE COURT:  I am good.

5            MR. SUSSBERG:  That was quick.

6            THE COURT:  I'm underpaid.

7            MR. SUSSBERG:  But I got to tell you this is not a

8    case where voting can change the outcome.  This has nothing,

9    nothing to do with voting.

10           THE COURT:  Okay.

11           MR. SUSSBERG:  There are six of eight sub-plans and

12   I'm going to get to why it is I can be heard on all of them;

13   six of eight sub-plans that have one party and one party only

14   voting that is an insider and it's a lender, and it happens

15   to be the facts of this case.  Whether or not it's unique is

16   not a question for the Bankruptcy Code.  It's a fact.  And if

17   I may, Your Honor, I want to pass up a demonstrative and

18   answer five questions.

19           THE COURT:  Sure.

20           MR. SUSSBERG:  First: who is Walnut Creek?  I think

21   it's important to clarify; two: why are we objecting as

22   Walnut Creek; three: does Walnut Creek have standing?

23   There's been illusions to note standing to stand here and

24   object to this plan or any of the sub-plans.  I want to

25   answer that for Your Honor.  Number four: why is any of this

1  relevant at the disclosure statement?  I want to answer that

2  specifically.  And number five: is the plan patently

3  unconfirmable?  So if I may approach?

4          THE COURT:  Sure.  Thank you.  Do you have another

5  one?

6          MR. SUSSBERG:   Absolutely.  And while this may feel

7  a bit heavy, Your Honor, I'll be able to go through very

8  quickly.

9          THE COURT:  Okay.

10         MR. SUSSBERG:  Your Honor, on slide one Mr. Burns

11  referred to this earlier, but I think it bears repeating just

12  to make sure it's crystal clear.  Black Walnut Mining, LLC,

13  an affiliate of Blackstone Energy Partners entered into a

14  membership interest purchase agreement with Kuwait Mining.

15  And if Your Honor remembers the corporate structure from way

16  back when the Kuwait owns a mine.  There was a whole big

17  discussion at the bidding procedures hearing in connection

18  with Twin Oaks as to whether potential bidders could have

19  conversations with Kuwait about purchasing the mine.

20         THE COURT:  I recall.

21         MR. SUSSBERG:  Okay.  And the Debtors ultimately

22  agreed in the context of those bid procedures and in an

23  effort to maximize value, and the transcripts crystal clear

24  on these points, to allow bidders to have those

25  conversations.  And the affiliate of Blackstone had those

1   conversations.  And as Mr. Burns announced on the record at

2   the August 6th auction there was a non-exclusive agreement

3   reached between the Blackstone affiliate and Kuwait to

4   purchase the mine contingent upon the purchase from these

5   Debtors of the Twin Oaks facility.

6         It was out there.  It was in the open.  And the

7   Debtors, in fact, said at the bottom of the slide and I

8   quoted, "there was nothing collusive going on.  There was no

9   misconduct.  Everyone knew what was happening."  And the 100%

10  purchase of the equity interest at the Kuwait entity resulted

11  in an acquisition of the claims of Walnut Creek.  And that's

12  why we're standing here today.  It's the claims of Walnut

13  Creek.

14        The Debtors, of course, as I mention on Slide two,

15  Your Honor, benefitted from this transaction as Mr. Burns

16  said the price that was paid for the Twin Oaks assets went

17  from $60 million dollars to a $126 million dollars; absolute

18  benefit for the estate.  It's interesting that the two

19  highest bidders at the auction, Your Honor, both the

20  Blackstone affiliate and ArcLight all had a condition; both

21  had a condition, excuse me, that they would reject the out of

22  the money FSA agreement.  And Mr. Burns was on record many

23  times in this case saying that agreement has been uneconomic.

24  Mr. Rahn's declaration makes that clear.

25        The sale closed on October 14th.  Your Honor, I can't

1  make this anymore clear Walnut Creek is not Blackstone.

2  There's comments in the papers about Blackstone being Walnut

3  Creek.

4        THE COURT:  Let me ask you a question.  I want to

5  take a step back.  Independent of the plan and all of this

6  separately we are looking at the Debtors' preliminary

7  objection to your plan or to your claim which is interesting.

8  I mean just as a matter of -- it circles back to this

9  question of who is Walnut Creek and is it Blackstone and is

10  Blackstone on the same side, are there actual damages or do

11  we attribute that to the parent entity on both sides; very

12  interesting question not in front of me today, not my

13  problem.

14        But I don't know that there's a strong dispute

15  between the parties.  The contract was rejected.  There are

16  consequences to rejection.  It's not a termination.  It's not

17  a recession.  It's a breach; a Court approved breach 365.

18  Everybody knows that.  Yields damages in one form or another

19  determined usually by state law, sometimes modified slightly

20  by the code, but basically contract damages; first year law.

21        So leave aside the issue for a moment that's in

22  that preliminary objection which I confess I have not looked

23  at again in anticipation of today.  I mean I'm generally

24  aware of it.  It's not --

25        MR. SUSSBERG:  And I don't think you'll need to get

1  into it.

2      THE COURT:  Not a today issue.  But I would ask

3  myself and I do this often when people are planning to gear

4  up and fight I ask myself whether or not the game is worth

5  the candle.  And so now it may affect voting or what sort of

6  claim is out there and we do have a 3018 motion that again is

7  not on today, but there's a part of me that's looking at this

8  going who cares.

9      MR. SUSSBERG:  If I may, Your Honor, we would

10  address in the 3018 context, but I'll tell you exactly.  We

11  don't disagree.  And what we propose to the Debtors and this

12  is truly because of an information gap.  And I'm going to

13  cover this in the classes of claims.  But we would propose to

14  the Debtors is forget the 3018, push this off.  Maybe it

15  never has to be heard, but let us, solely for purposes of

16  voting, vote our claim.

17      You put us in a separate class, let us vote our

18  claim.  You don't care if it's $3 million or a $194 million.

19  Let us vote our claim, reserve all rights on allowance,

20  whatever else you want for another day, and the Debtor said

21  no.  And the Debtor said we don't know why you're asking for

22  that.  We're very confused.  We're worried that it's giving

23  you leverage.  We don't want to do that.

24      And our response is it's your plan, you classified

25  us, I don't know what I don't know.  And I don't know if the

1  Debtors are correct when they list out estimates of claims,

2  whether or not those estimates are accurate.  I don't know

3  standing here today, Your Honor, whether or not these Debtors

4  intend to reject contracts. And I don't know sitting here

5  today whether or not their classification system is going to

6  hold up such that all the unsecured claims at every one of

7  the eight totally different sub-plans may get looped

8  together.

9        And so for that purpose and that purpose only we

10 made a proposal that said just allow it voting and voting

11 only.  And, unfortunately, I think we will have a status

12 conference if we get there about what has to move forward and

13 why.  But I'm hopeful as Mr. Burns alluded to that there may

14 be a way to resolve this if we have a little bit of time,

15 depending on what happens today and not have to deal with

16 that because we agree.

17        Your Honor, I just want to quickly hit page four.

18        THE COURT:  Yeah I'm there.

19        MR. SUSSBERG:  And I mentioned this why are we

20 objecting.  We're objecting because the plan provides us with

21 a 2% recovery on account of one account.  It disallows

22 another claim.  It tells us that if you don't like this

23 treatment then we're going to move to potentially subordinate

24 you and you're not going to get any recoveries what so ever.

25 And that just simply doesn't work.  It was not the product

1   for discussion.  It was served upon us.  Maybe there's a

2   negotiation down the road.  I don't know.  I think that's

3   what the outcome should be, but that's why we're objecting.

4        Your Honor, this is an important question, because

5   it's been alluded to in the papers.  It's on slide five.  And

6   it goes to whether or not we have standing to be here.  And

7   Mr. Burns passed upon a demonstrative and went to great

8   lengths to isolate the three reorganizing Debtors.

9        THE COURT:  I'll be honest my disclosure statement

10   decision today is not going to be determined as a function of

11   standing.  I will hear complaints and comments with respect

12   to standing at a later point.  There are certainly

13   confirmation issues, but I will hear you as to your

14   objections to all of these plans.

15        I don't really regard a disclosure statement hearing

16   as an appropriate time for the Court to be making

17   determinations about standing, etcetera.  It's not an

18   evidentiary hearing typically, so --

19        MR. SUSSBERG:  Understood.

20        THE COURT:  We need to move forward from here.

21        MR. SUSSBERG:  The only point I'd make, Your Honor,

22   is that just as the bid procedures and the disclosure

23   statement are inextricably linked if you look at the bottom

24   of slide five these plans are inextricably linked.  There was

25   a modified version of the disclosure statement that provided

1  that the Liquidating Debtors would be transferring potential

2  contracts and assets to reorganizing Debtors.

3        There's a condition in the back of the plan that

4  says the Liquidating Debtors cannot go effective if the plans

5  are confirmed unless the reorganizing Debtor plans go

6  effective.  So these are all interrelated.  And

7  notwithstanding all of that, these Debtors they have the

8  burden of coming to Your Honor and demonstrating that all of

9  the conditions of 1129 are satisfied.  And, of course, the

10  Court has to make a determination whether or not their

11  objections as to whether or not that's the case.

12        So we all dance around this question why this is

13  relevant at the disclosure statement hearing, and I'm on

14  slide seven, Your Honor.

15        THE COURT:  I'm there.

16        MR. SUSSBERG:  And it's because and it's very

17  relevant these defects in this plan which I'm going to walk

18  through and I'm not going to highlight confirmation issues,

19  but these defects are incapable, absolutely incapable of

20  being modified and addressed through a voting process.  And

21  the Debtors I believe it's footnote eight of their reply said

22  a whole bunch of different cases that say the only time our

23  disclosure should not be approved is what's patently

24  unconfirmable and where voting cannot cure or correct the

25  defects.

1    So I think it's important, Your Honor, to move to

2 the classification that Mr. Burns was talking about.  And we

3 introduce it on slide eight and then we walk through each of

4 the plans that these Debtors have proposed.  And to give the

5 highlights before I move to each plan; four sub-plans, Your

6 Honor, including the reorganized entity where the equity will

7 be transferred by admission one creditor, one creditor only,

8 one creditor voting Cascade.

9    Two sub-plans Mr. Burns talked about artificial

10 impairment and the lack of payment of interest in what

11 they've alleged to be an insolvent case.  Their pleading

12 suggested that they reserved the right to pay the interest to

13 unimpaired creditors.  I'm not quite sure what it is that

14 could be addressed at confirmation if necessary.  But it goes

15 to the point that if those two sub-plans the Debtors

16 acknowledge they're paying a 100%.  The only creditor voting

17 on those plans Cascade.

18    And then there's two other plans and Mr. Burns

19 talked about them where Walnut Creek has claims.  And

20 suddenly there's a whole bunch of different classes that are

21 impaired including new classes of convenience claims that

22 conveniently aren't being paid in full.

23    So if you turn and we go through each of these pages

24 on page nine is reorganizing sub-plan OG.  That's Optim

25 Energy Generation where the reorganized equity is

 1  transferring. One class that's voting, that's class number

 2  one. That's Cascade's claims. Interestingly, the Debtors

 3  state in their papers that 1129(a)(8) which I'm going to

 4  cover doesn't apply because everyone consented yet the equity

 5  interest are deemed to reject.

 6       Next page liquidating sub-plan OM; same exact

 7  circumstances. One class voting, class of equity interest

 8  deemed to reject. Liquidating sub-plan OEM, slide 11, one

 9  class voting Cascade, equity interest deemed to reject.

10  Liquidating sub-plan TOGP Optim Energy Twin Oaks GP, one

11  class voting Cascade, equity interest deemed to object.

12       Reorganizing sub-plan Cedar Bayou, one class voting

13  that's impaired, Cascade. General unsecured claims, this is

14  all the Debtors work, 100%. The Debtors note in their brief

15  that they reserve the right to pay the interest; unclear what

16  will ultimately be argued, but it's one class voting that's

17  impaired. Same to be said for sub-plan AC.

18       At liquidating sub-plan Optim Energy Cascade class

19  one is voting; class four unsecured claims estimated to be

20  zero, estimated recovery not applicable; a convenience class

21  of five to 10 holders with less than 20,000 claims will be

22  receiving 75 to 90% recovery. They're impaired and there's

23  Walnut Creek in class six. And that's the same circumstance

24  in the next liquidating plan with Cascade and then the three

25  classes of unsecured claims; although here there's a class of

1  unsecured claims estimated to be a 120 to 150 and then a

2  convenience class of 90 to a 120 where the convenience is not

3  being paid in full.

4         So, Your Honor, the question is the plan that I just

5  described that the Debtors filed that they would like to go

6  vote and have all creditors spend time reviewing patently

7  unconfirmable. And is this the case or the instance where

8  that high standard is satisfied. And I think Your Honor

9  you'll look no further than the Bankruptcy Code to answer

10  that question in the affirmative. Section 1129(a) governs

11  confirmation. It is unequivocal that 16 conditions set forth

12  in 1129(a) all must be satisfied. That includes (a)(8) with

13  an exception that we'll talk about. It includes (a)(10).

14         There's no case and I don't know what cases Mr.

15  Burns is referring to that say (a)(10) only applies in

16  certain circumstances. (a)(10) applies in every single

17  circumstances in every single case. It is a mandatory

18  requirement of 1129(a). If non-consensual confirmation is

19  sought as everyone is well aware under (b) you can move

20  forward by satisfying all the elements of 1129(a) with the

21  exception of one. That's 1129(a)(8).

22         And we note at the bottom, Your Honor, and the next

23  slide is going to cover some cases. I wanted to make sure

24  everyone was aware of these. Whether confirmation is sought

25  pursuant to (a) or (b) of 1129 all 1129(a) requirements other

1    than (a)(8) must be established.  Slide 18, Your Honor, walks

2    through a whole bunch of cases that we found that are very

3    clear that 1129(a) must be satisfied in all circumstances.

4    And I'll draw the Court to the first two.

5         In re Edgefield Inn at 521 B.R. 116: for a Court to

6    confirm a plan --

7         THE COURT:  I've read it.

8         MR. SUSSBERG:  And Traville [*phonetic*], Your Honor,

9    I think it's an important one.  Judge Carey's decision

10   heavily fought negotiated.  Judge Carey is very clear.  He

11   said before you get to 1129(b) you got to be able to satisfy

12   at each Debtor entity 1129(a)(10).

13        So in response, Your Honor, on slide 19 the Debtors

14   suggest that 1129(a) does not apply because 1129(a)(8) is

15   satisfied by its expressed terms.  First and foremost, there

16   are classes of equity that are being cancelled so 1129(a)(8)

17   cannot be satisfied by its own terms.  But this proposition

18   is truly unbelievable.  And these are quotes from their brief

19   and there's nothing left out.  There's no citations.  There's

20   no statutory authority.  There's no case law.  These are

21   simply untrue statements.  1129(a)(10) has to be satisfied.

22   And the cases that you saw in the prior page speak to that

23   specifically.

24        So what do the Debtors say.  Well they say on slide

25   20 alternatively if Your Honor finds that Walnut Creek is

1  right and 1129(a)(10) applies well the facts of our case

2  they're unique and we get a free pass.  We don't have to

3  satisfy the Bankruptcy Code.  We have a lender.  It happens

4  to be our sole lender on a pre and post-petition basis.  It

5  happens to be our 100% equity owner.  We're going to pay

6  these people a 100%.  We may argue they're artificially

7  impaired or not impaired because we're not paying $3,000

8  interest.  We don't have to satisfy 1129(a)(10) of the

9  Bankruptcy Code.  And they talk about precedent that's wholly

10  inapplicable and I do want to talk about that precedent.

11        Because the precedent that they cite to is non-

12  existent and what they say is untrue.  Because we don't

13  really cite precedent; we cite the Bankruptcy Code. And the

14  Bankruptcy Code says what it says and the precedent just

15  confirms from a statutory interpretation that the plain

16  literal meaning of the statue says what it says.  And that is

17  under 1129(a)(10) if there is an impaired class of claims

18  under a plan and there is an impaired class of claims under

19  every one of the eight sub-plans.  If there is an impaired

20  class of claims you must have an impaired accepting class

21  without reference and regard to the votes of insiders.

22        And Mr. Burns confirmed and Your Honor has a ruling

23  that Cascade, the only creditor in those classes, is an

24  insider.  There are no exceptions.  There's no

25  qualifications.  There's nothing ambiguous.  1129(a)(8) is

1  not even relevant to this conversation.  So when you apply

2  these facts to the law, Your Honor, and we go back to the

3  cases that talk about when it is that a disclosure statement

4  is patently -- the disclosure cannot be approved because the

5  plan is patently unconfirmable the Courts asked the question

6  as to whether all material facts are before us.  All the

7  material facts, Your Honor, are before you.

8         I'm not here arguing about any of the issues that we

9  understand Your Honor always deals with at confirmation.  If

10 we get to confirmation on a plan in this case and we believe

11 we certainly could, but if we get to confirmation we'll deal

12 with those issues whether or not it's consensual or not.  But

13 it's six of eight of these sub-plans and we'll save the

14 requirements of the other two Liquidating Debtors.  Six of

15 these eight sub-plans fail on their face.  And there is no

16 reason to waste the resources of these entities or the

17 Court's time in pursuing a plan that voting cannot cure.

18        And as far as the liquidating cases are concerned,

19 Your Honor, if these liquidating cases where maybe the votes

20 could change maybe we vote yes.  I don't know sitting here

21 today.  Your Honor said that before.  If those cases are so

22 inextricably tied to the reorganized Debtors cases and they

23 cannot go effective if the reorganized Debtor cases do not

24 get approved, confirmed, and effective, and those cannot be

25 confirmed as a matter of law, I'm not sure what we're doing.

1    So, Your Honor, I do want to just spend a minute on

2 the case that the Debtors cite and they say is wholly

3 inapplicable.  And that's the <u>South Beach Security's</u> case.

4    THE COURT:  The Seven Circuit?

5    MR. SUSSBERG:  Seven Circuit, Judge Posner; went up

6 there.  And I'm not here to talk about the facts of that case

7 as to whether the facts actually work with our facts.  The

8 facts in that case and there was all sorts of alleged

9 criminal activities in that.  No one is alleging that.  There

10 was one creditor in that case and it was an insider.  There

11 were on other creditors, period.  And Judge Posner concluded

12 and I'll walk you through the quote, when he concluded that

13 they could not satisfy 1129(a) of the Bankruptcy Code.  He

14 said because there's no circumstance where you could ever

15 satisfy 1129(a) of the Bankruptcy Code with one creditor

16 that's an insider, I need to dismiss that case.

17    That's not this case, right.  But what Judge Posner

18 said is important.  Because what he said and I'd like to

19 quote it, "while there's no risk of collusion," because he

20 was getting into the policy behind (a)(10).

21    THE COURT:  Sure.

22    MR. SUSSBERG:  "no risk of collusion between an

23 insider creditor and the Debtor at the expense of other

24 creditors."  And that takes the case out of the intended

25 scope of (a)(10).  It doesn't take it out of the approval

1 requirement.  And that's the point that we cited that case

2 for and why we cited all these other cases because there's no

3 argument around and the Debtors don't have one.

4 We submit they don't have one.  Mr. Burns cannot

5 stand up here and make a credible argument that (a)(10)

6 doesn't apply.  The statute is crystal clear and every single

7 Court that's weighed in on this issue has found unequivocally

8 that 1129(a) and all of its conditions need to be satisfied

9 with the exception of one and it's not even satisfied here in

10 a consensual case.

11 So, Your Honor, what we think should happen and what

12 really, you know, should happen in Chapter 11 cases generally

13 this plan was filed without any input from us.  There was no

14 negotiation.  This plan doesn't work.  These parties should

15 go and have conversations and there should be a discussion

16 just like there is in every single case where there's a

17 creditors committee that's arguing all of these issues on

18 behalf of all the unsecured creditors.

19 And we may or may not be able to get to a resolution

20 and we may or may not be before Your Honor on a contested

21 basis, but there's no reason as we said in our objection to

22 this disclosure statement to launch a certain fools' errand

23 where voting cannot, cannot, cannot cure any of the defects

24 we talked about today.  So, Your Honor, I'm happy to answer

25 any questions you have.

1        THE COURT:  No I don't have any questions right now.

2   Response?

3        MR. BURNS:  Your Honor, I think the supplemental

4   brief was in some respects illuminating.  But by the same

5   token I think it really drives home the point that these are

6   issues and I'll speak to really --

7        THE COURT:  Well let me ask you a question.

8        MR. BURNS:  Yes, sir.

9        THE COURT:  If I find that 1129(a)(10) is an

10  affirmative obligation that you need to meet in order to

11  confirm can these plans be confirmed?

12       MR. BURNS:  If (a)(8) and (a)(10) they both need to

13  be confirmed as I'm understanding your question.

14       THE COURT:  You don't have a plan that has everybody

15  voting to satisfy (a)(8), right?

16       MR. BURNS:  We would need (a)(8) so we have either

17  creditors voting in favor -- (a)(8) as I recall, I don't have

18  the code.  I can get it.  (a)(8) says that either you're

19  unimpaired or you vote you're impaired and voted in favor.

20  It doesn't have a carve out for insiders, so under --

21       THE COURT:  With respect to each class of claims or

22  interest such class has accepted the plan or such class is

23  not impaired under the plan.  And, again, when we look at

24  these we've got equity interest at a minimum that are deemed

25  to reject at OG, OM, OEM, TOGP.  We've got deemed to -- well

1 in the TOGP we've got, we do have unsecured claims that are

2 entitled to vote at OEM as well.  Are we in, I guess I'm

3 asking are we in -- does (a)(10) apply to these cases?

4      MR. BURNS:  We have looked at the issue and, again,

5 we think this is one of the very rare set of circumstances.

6 And we have seen in the cases and we've not briefed it

7 extensively.  We would do so at confirmation where if you --

8 it would be I think to use what I believe was in the code or,

9 excuse me, in the case an absurd result where you have the

10 affirmative vote I believe of impaired creditors or

11 unimpaired general unsecured creditors.  And the only reason

12 that you couldn't confirm a plan is because the only impaired

13 creditor at the entity is an insider, so you just can't meet

14 (a)(10).

15      And I think the question then becomes can you never

16 confirm that plan such that it meets to either convert to

17 Chapter 7 or be dismissed.  And we think that is not at all,

18 you know we talk about the plain language and we certainly

19 have that we've looked back also at legislative history which

20 is we want to take the vote of the insider, the significance

21 out because we don't want insiders to perpetuate plans that

22 are disadvantageous or otherwise to the detriment of

23 unsecured creditors.

24      So I think when we come back and we brief the issue

25 we will be able to take you in much more detail through why

1    this is that set of circumstances where if you meet (a)(8)

2    and as some classes have implied and some [indiscernible]

3    that we've seen (a)(10) is not applicable.

4         THE COURT:  Well I want to be clear I have zero

5    interest in any order and I'm not just parroting Judge

6    Walrath.

7         MR. BURNS:  No in other words I'm insinuating that

8    would be our basis, Your Honor.

9         THE COURT:  But the point is the fact that I -- look

10    for all I know you may bring me a case where I've confirmed

11    it with a single voting entity.  And I'll be candid in the

12    absence of material opposition, in the absence of a U.S.

13    Trustee objection or somebody else one of two things may

14    happen.  I may either, frankly, not catch it or,

15    alternatively, I could come to the conclusion that it's the

16    stakeholder's money.  It's not my problem.  But you know I am

17    struggling at least with the proposition that (a)(10) can be

18    simply written out of the code where circumstances would

19    suggest -- I don't necessarily disagree with your point that

20    perhaps it's an absurd result.  But as a general proposition

21    there's Supreme Court case law that talks about absurd

22    results.  Usually the answer from a trial Court is you can

23    call your Congressman.

24         So that, I guess that's the question I have is if

25    the analysis at the end of the day requires that (a)(10) be

1  satisfied these claims can't be confirmed.

2      MR. BURNS:  If your, again I want to make sure I'm

3  answering the right question.

4      THE COURT:  I need a non-insider voting accepting

5  class.

6      MR. BURNS:  Right so if you're saying that all of --

7      THE COURT:  Certain of these plans, right.

8      MR. BURNS:  All of the elements of 1129(a) must be

9  required then 1129(a)(10) I think on its face because the

10 only impaired class -- and, again this would assume that you

11 come back and say that the general unsecureds are not, in

12 fact impaired.  In other words, that the treatment we've

13 given them is not impairment from a legal perspective.  So

14 that would have to be assumed.

15      If they vote -- if we come back and convince you

16 that they are impaired --

17      THE COURT:  Right.

18      MR. BURNS:  Then we will have met all of the

19 components of 1129(a).  So I think that's a threshold issue

20 that we're not -- I don't believe we're arguing for a

21 decision today, so that's a threshold issue.

22      THE COURT:  So if I find that the impairment is

23 sufficient for general unsecured creditors because they're

24 not getting their interest, even though you reserved the

25 right to pay them perhaps the interest, then you could have a

1   class four acceptance class and you'd satisfy (a)(10)?

2          MR. BURNS:  That's correct, Your Honor.

3          THE COURT:  Mr. Sussberg, I'd like your focus on

4   that particular question.  Does this rise and fall on the

5   impairment issue?

6          MR. SUSSBERG:  That does actually make much sense

7   because if you look at the plan that's actually the key

8   driving plan.  That's the top entity on the left side of the

9   page that Mr. Burns handed out.  Impairment classification,

10  it doesn't matter.  There's only one class voting, so they

11  could never, ever, ever confirm a plan.

12         THE COURT:  Reorganizing sub-plan -- hang on.

13         MR. SUSSBERG:  That's Optim Energy Generation.  I'll

14  argue, Your Honor, about a 100% payment being impairment at

15  confirmation which I said I would and that's for a different

16  plan.  But for the plan that is the driving plan that

17  transfers the equity is one party and one party voting only.

18  They don't satisfy (a)(8).  I don't think it's relevant at

19  all to whether (a)(10) applies.

20         THE COURT:  But I think I've got, at least on my

21  notes, an Optim Energy General LLC that's your top end

22  reorganizing Debtor, right?

23         MR. SUSSBERG:  Yes.

24         THE COURT:  And I've got Cascade is entitled to

25  vote.  They're an insider so we got an (a)(10) issue.  But

1  the Debtor is proposing to pay general unsecured claims --

2      MR. SUSSBERG:  For zero.  And they have a provision

3  in their plan, Your Honor, that says vacant classes are

4  deemed to accept.  So this inquiry and, Your Honor, if Mr.

5  Burns wants to brief which is this is a threshold issue,

6  right.  The question that you asked is a threshold issue:

7  does 1129(a)(10) apply.  If Mr. Burns wants to brief that it

8  makes a whole lot more sense to do that then go onto this

9  errand of moving forward with plans and bid procedures that

10 are tied to plan.  The Debtors can proceed with their bid

11 procedures.  They can see if there's third parties that are

12 interested.  If there are, there are and they'll negotiate

13 provisions to our conversations.  And if not, this threshold

14 issue we should set a briefing schedule today to be resolved.

15 And the Debtors should stand up and argue whether or not

16 (a)(10) applies.

17     THE COURT:  Ms. Granfield.  Welcome, good to see

18 you.

19     MS. GRANFIELD:  Thank you, Your Honor, Lindsee

20 Granfield of Cleary Gottlieb Steen & Hamilton LLP on behalf

21 of Cascade Investment and ECJV holding prepetition secured

22 creditors and Cascade being the DIP lender.  A couple of

23 things.

24     The reason why I agree with the Debtor that the

25 disclosure statement should be approved and voting should go

1  forward is that number one the remaining assets are only in

2  Optim Altura and Optim CB4.  Optim Generation was just being

3  used as kind of a convenient holding company.  And with

4  respect to this Court said decision in <u>Tribune</u> and some other

5  cases, they said briefing happens for confirmation.  There

6  was basically a ruling that where essentially there was

7  enough acceptance and where there was no voting in a class

8  that acceptance could be deemed to have been satisfied for

9  (a)(10) purposes.

10       But the fact of the matter is it doesn't change

11  what's happening with the creditors who had received

12  treatment under the plan.  If, for instance, at confirmation

13  Your Honor were to hold where there's an (a)(10) problem with

14  Generation and we just have an implementation of the plan

15  where the equity of Altura and CB4 is given in terms of the

16  reorganized equity that's given out, because that's where the

17  value is.

18       So, you know, if there's an implementation problem

19  it's not going to change what the plan is in its sub-plans

20  suggesting the treatment of creditors is.  So being able to

21  have a disclosure statement approved, send it out for voting,

22  get the results from the voting creditors, and then Your

23  Honor would have all the facts and everyone can brief

24  standing because I don't believe they're going to have

25  standing with respect to the reorganizing Debtors and (a)(10)

1   and everything else in the kitchen sink that they want to

2   bring up.

3           THE COURT:  Mr. Sussberg, briefly.

4           MR. SUSSBERG:  I know Your Honor knows this, but you

5   have standing, Your Honor.  And 1129(a)(10) has to be

6   satisfied under the plan.  I'm actually surprised at what I

7   just heard because there's been 14 or maybe 15 consensual

8   extensions at the DIP facility.  And suddenly now there's

9   this hurry-up and move forward as quickly as we can to get a

10  disclosure statement approved because it's some type of

11  leverage play over a creditor that they've isolated under a

12  plan.

13          And if it was appropriate and if it worked under the

14  code, I would understand and I'd come to confirmation and I'd

15  argue all the things I'm going to argue.  But we were very

16  particular to argue the threshold issues that are not

17  satisfied.  And if the notion as Ms. Granfield says is to

18  sell the assets at the two entities where there are assets,

19  Your Honor approved bid procedures.  Those bid procedures

20  have very, very short duration deadlines and timelines.

21  People have to submit information I think it's in two days.

22  Bid deadline of May 1st.  I have no understanding as to why

23  anyone could stand up here and say we have to approve a

24  disclosure statement that doesn't work for a plan that can't

25  be confirmed today.  And there is no circumstance we could

1  submit supplemental briefing, Your Honor, there's no

2  circumstance where 1129(a)(10) of the Bankruptcy Code does

3  not apply to a Chapter 11 plan.

4         THE COURT:  Okay.

5         MR. SUSSBERG:  Thank you.

6         THE COURT:  Let me ask you a question, Mr. Burns,

7  what's the scheduled hearing date for the sale for the bid

8  procedures?  I know we've got a deadline.  I have written it

9  down, but do you have the sale hearing date?

10         MR. BURNS:  It's the confirmation date, Your Honor,

11  June 12th.

12         THE COURT:  Okay look I'm going to adjourned the

13  disclosure statement for two weeks.  I don't want to,

14  frankly, allow this process to linger.  I have a number of

15  observations.  First, at least looking at it I would need to

16  be convinced that I could as a practical matter disregard

17  based upon the circumstances of the case in front of me the

18  requirements of 1129(a)(8) or (a)(10); those specifically

19  (a)(10).

20         I am generally familiar with the Tribune case.  I

21  will also observe as I said a moment ago that there may be

22  cases that have been confirmed that present this context in

23  the absence of opposition, and I will tell you that, at

24  least, temperamentally I would be unlikely to throw myself in

25  the way of that in a different case.  The issue has been at

Case 1-14-10979-CSS   Doc 1378-4   Filed 04/28/17   Page 67 of 114
Case 1:14-10262-BLS   Doc 1369-4   Filed 04/28/15   Page 68 of 115

67

1 least raised.

2       I'll share with you I guess my doubts about the

3 point that where the creditor community is structured in a

4 particular way that we have one insider creditor in this

5 family in this corporate family that I can disregard

6 1129(a)(10). First, I don't necessarily accept the

7 proposition that it is unique. We've seen lots of different

8 multi-corporate structures before. So I need at least some

9 guidance on that from the parties. And if you wish to brief

10 it, you're welcome to do so, but I've at least shared with

11 you my observations.

12       The other concern is I understand Ms. Granfield's

13 comments and I think that's probably likely how it would play

14 out. But I'm reluctant to hand down a path that would

15 necessarily create what I think we already anticipate might

16 be a moving target that the plan would change at confirmation

17 and some Debtors would confirm, some Debtors wouldn't. And

18 we'd have really a rapidly evolving circumstance.

19       I don't have anything in front of me that reflects

20 that this is an absolute emergency. I believe as I do with

21 all of my cases that the sooner that they move forward to

22 confirmation and proceed the better. I've already approved a

23 sale process in this case that I think is frankly expedited,

24 but was presented on an unopposed basis. So I do believe

25 that over the course of the next few weeks we can address a

1   number of these issues.

2       I also frankly think it's incumbent upon the Debtor

3   and the senior lender to have that conversation with Walnut

4   Creek.  The conversation may be you're out of the money.

5   You're out luck, quit whining and go home.  You can tell them

6   that, but I think you're obliged as I see the process to have

7   that discussion.  And if they've got, if the Debtor is able

8   to formulate a plan that can be confirmed over the opposition

9   of Walnut Creek God bless you.  The code says it and I'll

10  confirm it.  And if the plan is not confirmable I won't

11  confirm it.

12      Let me make a couple other observations because I

13  don't want to waste the party's time with respect to other

14  issues relating to the disclosure statement.  I have no

15  significant other issues with the disclosure statement.

16  Issues relating to sufficiency of classification structure of

17  impairment and the many issues that have been raised by

18  Walnut Creek I think Mr. Sussberg was probably pretty candid

19  in saying our powder will and should remain dry.  I think he

20  prefer that I rule favorably to him on those issues today,

21  but I think the quote parroted back to me from Coldwater

22  Creek is pretty consistent with how I look at these.  My

23  intention is to let that process play out.

24      And I'm not making my ruling based upon a promise

25  that Walnut Creek is going to vote against the plan or will

1   actively oppose this, but it is more on this, kind of this

2   gating issue and the structure that we have.  I have no

3   concerns with respect to the sufficiency of disclosure as

4   well relating to the issues and dispute with Walnut Creek.  I

5   have said before many times the disclosure statement is not

6   an advocacy piece.  It's not a brief.  And often we have

7   sophisticated players that have vigorous opposition on the

8   terms of their claims and their specific interest and

9   position.  And my belief is that that's a proper subject for

10   litigation.  And I'll give you the opportunity to litigate

11   those issues.  But we don't need to litigate them in the

12   disclosure statement and in this case I don't think that the

13   hypothetical creditors needing a full exposition of this.

14        There is a live dispute between the Debtor and

15   Walnut Creek.  The latest version of the blackline of the

16   disclosure statement makes it abundantly clear that that's

17   out there.  The merits and the specific positions that the

18   parties have, I think, are the subject of litigation or even

19   perhaps negotiation.  So I'm not talking about a lot with

20   respect to the disclosure statement.  But I have concerns

21   with respect to this structure and whether or not it's

22   proceeding on a theory that might complicate matters and,

23   again, perhaps yield an unfortunate delay.

24        I intend that there will be a plan in here.  And I

25   will approve a disclosure statement at some point in the very

1    near future.  If we need to revise these plans or deal with

2    them in a way that addresses this concern or if you can

3    convince me that my assessment of (a)(10) is mistaken and

4    that you can get past that issue then, again, I welcome that.

5    I'm just sharing with you I think my initial reaction that

6    that is a consideration.

7          Again issues relating to those plans where you've

8    got a general unsecured class that has members that's voting

9    whether they're impaired or not that's a confirmation issue.

10   I have some heartburn about a class that is truly vacant and

11   whether that can satisfy an 1129(a)(10) issue.  I don't need

12   to rule on that today but that does seem to me to be not

13   necessarily consistent with the code, perhaps even contrived.

14         So I believe the best thing that we can do right now

15   would be, again, I'm not looking for a major turns on the

16   disclosure statement unless the Debtor feels that they need

17   to restructure the plan format.  And, Mr. Burns, I'm not

18   necessarily arguing with you.  It may be that the Debtor can

19   proceed in a way that will yield, that the economics of this

20   case mean that there is no meaningful distribution for Walnut

21   Creek and so be it.  I'm not making any ruling or observation

22   with respect to the merits of anybody's particular claim

23   right now.

24         But I am not comfortable with this process moving

25   forward at this stage and if we allow, frankly, a couple of

1  weeks to go by and figure out, frankly, whether there's a

2  buyer because that's, it's not necessarily a plan issue

3  today, but it's important.  And if there is a buyer that

4  comes out of the woodwork that could change the landscape as

5  well.  Again, I make no comment about whether it's any entity

6  related to Walnut Creek or Blackstone or anybody else.

7        But I believe that we would benefit from a couple of

8  week adjournment, so here's what I want to do.  I will ask

9  that the parties confer right now with respect to timing and

10  determine whether or not it's necessary and appropriate to

11  brief that issue relating to 1129(a)(10) and moving forward

12  or whether or not we might need to tinker with the process.

13  But I'm not sending anybody back to square one.  I am

14  adjourning the disclosure statement hearing.  And if the

15  Debtor needs to revise the plan and disclosure statement

16  hearing to get it teed up, then so be it.  But I'm not

17  prepared to move forward today.

18        And as I said I'd be prepared to see you in a couple

19  of weeks.  If you want to wait until out hearing which is

20  scheduled for confirmation which is the 27th of May; right is

21  that the 27th?

22        MR. BURNS:  I believe so, Your Honor.  That's an

23  omnibus hearing, Your Honor.

24        THE COURT:  Right.  That seems to me to be a long

25  time but and I'll be happy to hear you before then.  So why

1  don't you confer with respect to where we go from here in

2  terms of timing and mechanics.  We also have a discovery

3  issue that's been raised as well.  And I guess what I would

4  say is we can do one of two things.  We can have that

5  discussion right now or you can use some of the time that I'm

6  affording you to play this process out to deal with the

7  discovery issues or if you want to think about how all these

8  implicate each other and get on the phone with me no the

9  discovery issues that were raised I'd be happy to make myself

10 available later this week or early next week at the party's

11 convenience.

12       But I think with the landscape changing slightly,

13 it's not a significant delay from my point of view.  I'm not

14 pushing this out.  I intend to move this case forward.  But I

15 believe that we benefit from that.  So I would ask that the

16 parties confer with respect to scheduling and next steps.

17 And if I need to come back out, I'll come back out.  If you

18 want to have that discovery discussion we can have that today

19 or we can push it out to a point that's convenient.

20       MR. SUSSBERG:   I don't think we need to have a

21 discovery discussion.  I think I can talk to Mr. Burns and we

22 can see if we can cut through some of this, more hand to hand

23 litigation combat.

24       MR. BURNS:  Your Honor, I'm actually going to take

25 meaning no disrespect but I'm going to take the opposite view

1  on that.  I don't believe it needs to be a lengthy because

2  there are really two elements to it.  It's what should go --

3              THE COURT:  You mean on the discovery?

4              MR. BURNS:  On the discovery.

5              THE COURT:  That's fine I'll come back out.

6              MR. BURNS:  We fully appreciate your comments on the

7  disclosure statement aspects.  We clearly understand what's

8  expected of us and we will absolutely move forward.  We will

9  confer.  I do think Your Honor May 27th is too long.

10             THE COURT:  Okay.

11             MR. BURNS:  And I believe with what's been put in

12 front of us by the Court with regard to what is incumbent on

13 the Debtors we can come back much earlier.

14             THE COURT:  I'd be happy to hear you in between and

15 since the Debtor wants to move forward on the discovery

16 discussion I'm happy to have that.  But we'll take a break

17 now for about 10 minutes.  And we'll talk scheduling and

18 we'll talk discovery.  Stand in recess.

19             [Recess 12:58:05 - 1:26:50]

20             THE COURT:  Please be seated.  Mr. Burns.

21             MR. BURN:  Thank you, Your Honor, again for the

22 record Robert Burns of Bracewell & Giuliani for the Debtors.

23 During the break, Your Honor, the Debtors did confer with Mr.

24 Sussberg and his colleagues.  I believe based on the date we

25 were given from your chambers, May 13th.

1           THE COURT:  Great.

2           MR. BURN:  Is available at 10:00 a.m. and we agree

3   that that works for the parties.  Obviously, the Debtors, you

4   know, to go back we have taken the Court's guidance.  We are

5   going to have to go back and determine our next steps with

6   regard to the plan and how we proceed.

7           To the extent briefing is required, we are going to

8   see if the Court would allow those to be filed on a

9   simultaneous basis on Monday, May 11th at 10:00 a.m.

10          THE COURT:  That sounds fine.

11          MR. BURN:  We can agree with Mr. Sussberg on a

12  reasonable page limit because I don't think it's a very wide

13  breath.

14          THE COURT:  Sure.

15          MR. BURN:  And we will certainly give them, as we

16  said, we will meet and confer with them, so to the extent we

17  are making changes to a plan, you know, surgically address

18  whatever issues there are.  We will have plenty of time

19  sending out the facts.

20          THE COURT:  Okay.

21          MR. BURN:  We think with the sale process, you know,

22  coming up to will help guide as we move forward.  So that is

23  the proposal with regard to schedule on the disclosure

24  statement.

25          THE COURT:  All right, that sounds fine.  Mr.

1 | Sussberg.

2 |    MR. SUSSBERG:  Your Honor, very briefly.  I just

3 | wanted to make sure that if there are changes to the plan,

4 | changes to the disclosure statement that describe a new plan,

5 | we don't need tons of time to be able to review, but we have

6 | to have some sufficient time to review.  I would, obviously,

7 | suggest that you leave it to us and if something new comes

8 | out and we need to call chambers and be flexible, you have

9 | always been flexible and we appreciate that.

10 |    THE COURT:  Yeah, I do think, you know, we may be

11 | dealing with briefing on a particular issue, which is fine

12 | with me, but you're right, if the plan does evolve, they are

13 | going to need an opportunity to understand it in advance of

14 | the hearing.  So, I would expect there would be a dialog.  If

15 | you need me, you can get me on the phone, but I will be

16 | prepared to accommodate.

17 |    MR. BURN:  Absolutely, Your Honor.  We appreciate

18 | that.  So the next issue that's out there is a status

19 | conference because we do have the issue of the Walnut Creek

20 | rejection damages claim.  From our side, I would like to move

21 | through it, obviously, quickly, but there are two pieces.

22 | Number one, I kind of want to just set the table and put o ut

23 | some propositions as to a path forward, if you will, but to

24 | the extent that we are going to move forward, you know, we

25 | have been engaged in an objection, in a process now for

1  several months.

2      I hate discovery disputes, but when I can candidly

3  stand up here and say that despite numerous conferences and

4  everything else, we have received one piece of paper.  I just

5  can't not have the conversation now while we are before the

6  Court.  So my colleague Ms. Goldman will, to the extent we

7  are going to get into more granular issues, that's going to

8  be handled by her.

9      Your Honor, with regard to the Walnut Creek claims

10  rejection damages claim, they have, obviously, filed the

11  claim.  They believe they are entitled to $190 million.  The

12  Debtors have said we object.  We think we have a right, a

13  basis for objection.  They have filed a 3018 motion to seek

14  to have it estimated for purposes of voting only.  Mr.

15  Sussberg and I have had some dialog around that and I think

16  we will continue to do so.  Candidly, we have spoken about

17  that during the break.

18      THE COURT:  Sure.

19      MR. BURN:  But to us, I think it's boiled down.  I

20  think both of these issues with regard to the amount of the

21  claim for voting purposes were ultimately, you know, honor

22  the claim for allowance and distribution.  They are not,

23  necessarily, pivotal to confirmation with one potential

24  caveat.  As we described earlier when we referred to the

25  structure chart, the claims exist at two entities which have

1 no assets that are unencumbered.  There is nothing to

2 distribute, but for a distribution that might be left behind

3 by the prepetition secured lender.  I think Mr. Sussberg

4 referred to it as potentially a tip, but there is nothing

5 there otherwise.

6       Given the disclosure that we have had with regard to

7 the universe of claims in both amounts, excuse me, the amount

8 of claims in the number, $3.9 million dollar claim relating

9 to prepetition coal deliveries outside 20 days is more than

10 enough to vote in favor of, obviously, if it's the only claim

11 in the claim in the class, it can carry that class.  If for

12 some reason the Court were to, at confirmation, say that some

13 or all classes need to be combined for voting purposes, it

14 would still outweigh the other claims in the aggregate.  So

15 $3.9 million dollars gives them, I think, everything that

16 they are looking for with regard to voting their claim if we

17 decide, you know, might we seek to subordinate or designate.

18 I am not here to talk about that now.

19       THE COURT:  Yeah, I guess I'm not clear on what we

20 are doing.  Are you asking me to deal with the 3018 motion?

21       MR. BURN:  Sure, Your Honor.  I'm trying to lay out

22 why I think this can all wait.  I think we might be looking

23 for, candidly, some guidance on this.  I will run through our

24 decision tree.

25       THE COURT:  Sure.

1       MR. BURN:  First element, the $3.9 million dollar

2   claim.  We believe, based our analysis of the claims pool, is

3   more than sufficient to give Walnut Creek the voting rights

4   that they seek.  It wouldn't be disenfranchised in any way.

5   Mr. Sussberg and I have had some dialog around this, we can

6   continue.

7       If you move down from there, again, you know, we go

8   back to what we argued earlier, if they vote in favor of the

9   plan, it's not an issue.  If they vote against the plan with

10  the $3.9 million dollar claim, but the plan, as structured,

11  remains in place; in other words, we have other general

12  unsecured's in convenience.

13      THE COURT:  Convenience class.

14      MR. BURN:  They still get whatever the pot gives

15  them, if it's confirmed over their objection.  Really, the

16  only time it becomes relevant, I believe, is if they vote

17  against the plan, the Court says some or all of these classes

18  need to be collapsed.

19      THE COURT:  Classification structures don't work.

20      MR. BURN:  Then it's relevant, but only as it

21  relates to whether they get 93 percent of the $270,000.00

22  that's in there or 99.8, which is really what the numbers

23  would work out to if they have a $4 million dollar claim

24  versus $194.  Dollar wise, its $18,000.00.  I don't think

25  anybody is every going to really want to litigate that

1   either.  So I am really here to say I don't think that the

2   amount of the claim is that relevant.

3          Now, Mr. Sussberg has said to me it's not

4   irrelevant, just let me vote for the entire claim.  My

5   hesitation, reluctance and, candidly, refusal to do that is

6   the unknown, Your Honor.  As I laid the numbers out here,

7   they make sense to me, so in a theoretical sense it probably

8   doesn't matter whether its $4 million or $194 million in a

9   theoretical sense.  I don't know whether he thinks if there

10  is an appeal, $194 million is more compelling to an Appellate

11  Judge.  I heard, you know, a few notions floated today that

12  made me wonder if sub-con is something they are going to seek

13  to do, in which case maybe $4 million isn't enough, but $194

14  million is.  I just don't know what is around the next

15  corner.

16         My obligation is to move this case towards

17  confirmation and not create any issues, not shoot myself in

18  the foot by just merely saying sure because it doesn't

19  matter, I give it to you.  I just can't do that.  I need to

20  defend this claim.  It's a very significant claim.  It's a

21  big dollar amount and I don't know how it might be used

22  against me in the future.  So that's kind of why I think the

23  rejection damages claim can wait.

24         I think they have the leverage that they need, but

25  if they are trying to put together some alternative where

1  they put Debtors together, where they try to assert this

2  claim somewhere else where we think it has no legal merit, to

3  take, really, any other, make any other legal arguments that

4  that 190 is now really important, then I think they need to

5  come up and prove to the Court that is has relevance.  So

6  that's where I am on why it can wait and why we won't consent

7  to it for voting purposes.  Now we do have some issues with

8  discovery.  I can let Mr. Sussberg respond on that first.

9          THE COURT:  I think I want a response.

10         MR. SUSSBERG:  Joshua Sussberg, Kirkland & Ellis on

11  behalf of Walnut Creek.  I am totally confused, Your Honor.

12         THE COURT:  I'm confused.  I don't know where we

13  are. I'm not certain, actually I need Mr. Burns back.  I'm

14  not sure what you just asked me.  It sounded like you were

15  asking me to deal with the 3018 motion today and just allow

16  it at $3.9 and we move forward. I'm not sure what you just

17  asked me.

18         MR. BURN:  I apologize.  I think I was trying to lay

19  out, you know, a theme that I have heard was in the papers

20  and I thought I would be hearing now is that the Debtors

21  should just stipulate to the $190 million dollar claim.  I

22  was relatively confident that's what I was going to hear.

23         THE COURT:  For purposes of voting?

24         MR. BURN:  For purposes of voting.  I was laying out

25  why, just purely a consensual stipulation is not something I

1  can do.  I am not asking you to rule on anything.  I am

2  trying to set the table, if you will, for whether or not they

3  really need to go forward so that if we get to discovery we

4  can then deal with what's important.

5          THE COURT:  Okay.  I understand.  Thank you.

6          MR. BURN:  I apologize, Your Honor.

7          THE COURT:  No, I think I was a little dense.

8          MR. SUSSBERG:  Well, I didn't understand.  So, Your

9  Honor, this is their plan, right, that they have classified

10 us separately and they said that your claim is zero, and your

11 claim is big enough and you should be happy, that's fine.  We

12 came back to them and we said, I don't think it's a good use

13 of resources for anybody here, including Your Honor, to start

14 getting to the merits and specifics of the claim.  So let us

15 vote the claim, voting purposes only on this plan that they

16 proposed.

17         I don't need this for all time.  I don't need it on

18 the next plan.  I may need it on an amended version, which I

19 don't even know exists, which is why this may be an

20 irrelevant discussion to begin with, but it's just for voting

21 purposes only.  Again, Your Honor, Mr. Burns used this

22 demonstrative and I will tell you why this is relevant.  He

23 is worried about what he doesn't know and, again, I said this

24 earlier, there is a huge information gap because the

25 estimates are estimates.

1     We asked the Debtors to tell us in a world where

2   Cascade is converting its debt to equity, credit bidding,

3   however you want to define it, what happens with contracts?

4   It's important because there are contracts where Optim

5   Energy, LLC is a guarantor.  If, in a hypothetical land, we

6   get to confirmation on this plan --

7         THE COURT:  And you have rejected contracts.

8         MR. SUSSBERG:  And they rejected contracts, and

9   suddenly you, Your Honor, says there is only one class of

10  unsecured claims, you can't cram it down, put them in the

11  class; my claim for voting purposes matters.  That is what it

12  is for.  There is nothing nefarious here.  I am not trying to

13  come up with some scheme to handle these guys on a different

14  plan in a different world, it's for this plan that they

15  proposed.  So we made the proposal, very simply, that we will

16  use it for voting purposes and voting purposes only.  I will

17  stand here, I will put it on the record, I will put it in a

18  stipulation, whatever they want to propose in this plan,

19  whether they want to change it or not, this plan how amended,

20  $191 million for voting purposes.

21        If Mr. Burns wants to have a conversation about a

22  different number to allow our claim for voting purposes, I

23  guess we can have that conversation and we can have the right

24  people discuss it, but to get into the specifics now of the

25  discovery that they are asking for because they want to move

1  forward, because they think it's a zero sum game and it's all

2  or nothing, I don't think makes sense.  That's why I said it

3  before, my colleague Judson Brown in Washing is on the phone.

4  He tore his Achilles, so he was unable to attend in person,

5  but if he needs to, he can address the specifics on

6  discovery.  I think it's a total waste of time and resources,

7  and all we want is to vote our claim on this plan that they

8  proposed.

9       MR. BURN:  I've known Mr. Sussberg for well over 10

10  years and I have been looking for his Achilles heel and I

11  finally found it.  Your Honor, I'll move to the discovery.  I

12  think we have both the 3018 and the claims objection set up

13  for May 27th, I believe.  Again, the discovery has been

14  propounded to both sides for many, many months.  I don't know

15  who has produced what per say.  I know we have received

16  whatever we have received, which I don't think is much.  At

17  the end of the day its --

18       THE COURT:  I just want to make sure that I

19  understand.  If your classification structure holds up, as

20  currently postured under this plan, whether his claim is $3.9

21  million, $190 million or $3.9 billion, he's, I think said,

22  Mr. Sussberg has said, pretty convincingly, that he's likely

23  to vote against the plan and that your plan would be

24  confirmable because you are confident in the classification

25  structure, etc.

1    I am not necessarily saying that he, I have no idea

2 whether this number of $190 million makes any sense. I have

3 seen the Debtors' preliminary objection.  Again, I make no

4 comment on the substance of this, but at the end of the day,

5 I don't think there is anybody that's telling me that they

6 are expecting to see a material distribution on this claim.

7 I could be wrong, but whether its $3.9 million or, you know,

8 $190 million, well, definitely if its $190 million.  There is

9 nobody that's talking about a meaningful distribution.

10   That motion is not in front of me, but I'm not clear

11 why, I guess I want to understand the Debtors' concern and I

12 think Mr. Sussberg said it as well, but I want to make sure

13 that I can capture it from both of you.  The point is that if

14 your classification structure does not hold up, and I treat

15 it as one class of general unsecured creditors, your

16 concerned that allowance if you did it today, if you said

17 sure, $190 million, that the landscape would change under you

18 and that would prove to be an unwise decision, okay.  I get

19 it.

20   His point would be the landscape might change under

21 me by virtue of a claims process and contracts.  While today,

22 I think everyone would agree, that if I collapsed that he's

23 dominant, the Walnut Creek decision would be dominant, that

24 in the event that it were collapsed and he's at $3.9 million

25 and we have a bunch of guarantee claims.

1      MR. BURN:  Correct.

2      THE COURT:  Then he may not carry the class or have

3  that economic impact.  I understand.  It seems to me that, I

4  mean I can't really answer that question for you.

5      MR. BURN:  Correct.

6      THE COURT:  There is an argument that maybe the

7  Debtor ought to have the courage of its conviction to say I

8  like my plan, and I am going to succeed and if my plan

9  doesn't succeed then I go back to square one.  I would not

10 look you in the eye and say you know something, take whatever

11 number Mr. Sussberg writes onto a post-it note.  It's

12 incumbent upon the Debtor, I think, to know or anticipate

13 fairly what the creditor body is going to be and the creditor

14 constituencies and classifications its setting up, but in the

15 absence of being able to reach closure on that issue, then I

16 think we need to dispose of the matter.  So if we need to go

17 to discovery, we need to go to discovery.  It seems to me --

18     MR. BURN:  Can I confer with my colleague for just

19 one minute?

20     THE COURT:  Sure.

21     MR. BURN:  We have a lot of moving pieces, Your

22 Honor.

23     THE COURT:  Sure do.

24     MR. BURN:  In the first instance here, I think Mr.

25 Sussberg and I, as part of the meet and confer that we're

1   going to have or confer we are going to have on the plan, I

2   do understand his issue.  I think he understands mine and I

3   think there are ways that we can diligence.  Number one, I

4   think.  Number two, you know, just like the sale process

5   calendar may inform what we do on a plan, it may inform some

6   of this dialog as well.  So we will work on those issues to

7   see if the claim amount is truly relevant.

8          THE COURT:  Hang on.  There is a part of me that

9   wonders whether or not, part of this exercise and, frankly, I

10  think both of your positions are well founded, you know, I

11  don't know what's going to happen and so there is a crystal

12  ball element to this exercise.  So one of the questions that

13  I have is whether or not there is a way to square this circle

14  for purposes of the plan that the Debtor is pursuing.

15         I want to be clear, it seems to me that the Debtor

16  is looking to confirm a plan as to which the actual amount of

17  the Walnut Creek claim is immaterial.  You are anticipating

18  their opposition and you have structured it in a way that the

19  Debtor believes is compliant with the code and we confirm,

20  leaving aside the other 10 issues that are here, we just got

21  a straight up classic confirmation issues of, you know, does

22  the classification work, is the impairment there, is it

23  compliant with the code, we've got case law that teaches us

24  all of that.  So the question would be, you know, is a

25  number, is it possible to come up with a path forward that is

1  predicated upon the Debtors, frankly, you know, presentation

2  of a confirmable plan.

3       One of the things is I can't anticipate what might

4  happen at a confirmation hearing or on rare occasions, but

5  you guys may have seen them more than I have, on rare

6  occasions you see plans amended in between the voting

7  deadline and confirmation and you start dropping Debtors out.

8  You didn't get the votes, and they are liquidating entities

9  and we are just converting them.  I have seen that and,

10 again, that's complicated, but I don't know whether that's an

11 opportunity and whether or not that would make sense to allow

12 a structure that stipulates for purposes of this plan, as

13 presented, because the issue is not really what is the effect

14 of his vote, and his I mean Walnut Creek, the issue is what

15 if the Court doesn't buy the plan and then we are dealing

16 with a very different situation.

17       MR. BURN:  Yeah.

18       THE COURT:  I think it is difficult for me and I

19 think difficult for you folks to fairly anticipate that and I

20 think both of you are, I think, properly protecting your

21 clients flank and that's what lawyers do, but we are about to

22 spend a lot of money and a lot of effort on what seems to be,

23 at least, a hypothetical concern.  It may come to pass.

24       The issue would be, as I described it, it would

25 certainly limit the Debtors field of action or range of

1  opportunity at a confirmation hearing on the fly.  If you

2  don't want to run that risk, I respect that and I'm not going

3  to arm wrestle with you over it, but I guess that's the

4  point.  Again, you folks have thought about this a lot more

5  than I do, but to me this is boiling down to the consequences

6  of what happens if the Court does not accept the structure of

7  the plan as identified by the Debtor.  I make no comment,

8  obviously, at this point about that, but that, obviously, is

9  several moves into the chess game.

10          MR. BURN:  Right.  Okay.  I'm sorry, Your Honor.

11          THE COURT:  Let's talk discovery.

12          MR. BURN:  Sure.  So in terms of discovery, I might

13  ask my colleague to step up.  I think, you know, while

14  discovery can certainly be expensive, I think this is an

15  occasion where if we are moving forward with 3018, which

16  isn't a full trial on the merits, and if we really look at

17  what's at issue here, I am talking big picture.  To me there

18  are three elements, effectively, that broadly speaking and

19  our discovery will speak to that.

20          Number one is we each have an expert, I think, who's

21  going to establish goal posts on just pure quantitative

22  analysis.  Number two, you know, the next element, I think,

23  of proving up a material element or proving up a rejection

24  damages claim is mitigation.  And under both State Law and

25  equitable principals of the Bankruptcy Code, a party whose

1  contract has been rejected needs to do some level of

2  mitigation.  We can determine that's a mixed issue of fact

3  and law as it relates to this case.

4       What is the legal standard mitigation required and

5  what was done?  I think the discovery that relates to that is

6  something that will be found solely in Walnut Creek's books

7  and records, proposals on counter proposals, contracts, etc.,

8  communications on the renegotiation of the FSA.  So that is

9  one area of discovery. I don't think there is any reason to

10  hold-up and we can get that out.  It's very narrow.

11       I think the third one, and this really shouldn't be,

12  you know, I don't think too complex either, is, kind of what

13  I will call unity of interests.  You know, I have heard Mr.

14  Sussberg lay out for me and its laid out in their papers, the

15  corporate separateness, if you will, of, I think it's Walnut

16  Creek Mining something and Major Oaks, so, you know, the

17  private equity vehicles that were used to acquire their

18  corporate separateness and what not, but I think again when

19  you look at general equitable or equitable principals of

20  Bankruptcy Law, you do have to look, at some point, at

21  injuring the fact.

22       I think we would be able to show that at the end of

23  the day, and I am not asking you, as you said earlier, I am

24  not asking the Chancery Court, per say, to rule on veil

25  piercing, but I am saying from a general equitable

1  perspective when you've got, effectively, the same limited

2  partner investors who have these investments in their

3  portfolio and they get the benefits of the detriments, it's

4  very difficult to say where have they suffered an injury.  I

5  think that's more of an issue of, you know, how are these

6  structured.  You basically have the same people.  Did they

7  suffer an injury or it would be giving them the benefits of

8  cheaper coal contract, the benefit of a higher margin on fuel

9  prices and then a windfall on $190 million dollar claim, does

10  that really constitute injury and fact.  So there is probably

11  a mixed issue with fact and law there.

12        To me, Your Honor, you know, we have had a lot of

13  back and forth and I have heard a lot of the things that have

14  been requested from the Debtors.  I don't think that we have

15  a problem producing things that would go to, you know, the

16  merits at a certain point, but when I really sit here and put

17  my thought process and how, you know, for voting purposes,

18  those are really essential items that there really should not

19  be a lot of difficulty in turning over.  I know Ms. Goldman

20  has some other, maybe more narrow, but I don't think it's at

21  all unreasonable to say that discovery on those points really

22  can go forward.  In the meantime, Mr. Sussberg and I will

23  certainly about are there other ways to just put this to a

24  different resolution.

25        THE COURT:  Okay.

1      MS. GOLDMAN:  Good afternoon, Your Honor, Rachel

2 Goldman from Bracewell & Giuliani on behalf of the Debtors.

3 Your Honor may recall we had a March 16th discovery

4 conference.  There were a number of issues discussed and the

5 Court asked that we defer and that the Debtor and Walnut

6 Creek discuss some of the issues and get back to Your Honor.

7 Well, we are back, Your Honor, and unfortunately as you have

8 heard very few, if any, of those disputes have been resolved

9 as of today.

10      We had sent Your Honor, re-sent the list of issues

11 that were discussed at the last conference or that we had

12 started to discuss along with a couple additional issues that

13 have come up since we last spoke; although, I shouldn't

14 actually, the main issue actually hasn't come up since we

15 last spoke, but we had not raised it with the Court because

16 we are hopeful that we can resolve the issue.

17      The first, Your Honor, is the issue of the Debtors'

18 documents.  We prefaced that in an e-mail that was sent to

19 your clerk yesterday.  The issue is that Optim had an asset

20 manager in CPV, which is where Mr. Nick Rahn actually is

21 employed.  The asset manager has a number, CPV has a number

22 of other individuals who worked for Optim prior to the

23 closing of the sale of the Twin Oaks Plant.  CPV also manages

24 assets for Blackstone, Your Honor, a number of assets.  In

25 fact, Blackstone might be CPV's largest client; although, I

1   don't know if that is 100 percent accurate.

2       In an effort to respond to the document request that

3   Walnut Creek propounded, we identified a number of custodians

4   at CPV who worked on or for Optim in running the Twin Oaks

5   Plant.  CPV has asked for a hold harmless from Blackstone

6   before providing the documents of those custodians to the

7   Debtors for review and production because those same

8   individuals worked on a number of unrelated Blackstone

9   matters.  CPV has a similar asset management contract with

10  Blackstone, where there are confidentiality provisions just

11  as they have with Optim, and they do not want to be subject

12  to a lawsuit by Blackstone for inadvertently providing some

13  documents to the Debtors that have nothing to do with this

14  case, but belong to Blackstone.

15      We have tried to come up with a number of ways to

16  resolve this.  In this era of electronic discovery, we came

17  up with a protocol, whereby search terms that the parties

18  have already agreed to, would be run on those custodians

19  files.  The results of those search terms would be

20  downloaded, directly sent to a vendor, third party vendor and

21  then only Bracewell attorneys would be able to review those

22  documents to make sure that they were responsive.  This isn't

23  a privilege issue by the way, Your Honor, this is a

24  confidentiality issue.

25          THE COURT:  I understand.

1    MS. GOLDMAN:  But we would treat it like it was a

2 privilege issue so that if the attorneys at Bracewell found

3 Blackstone related documents that had nothing to do with this

4 matter, that really weren't properly responsive to the hit

5 terms, there would be a callback.  We would remove those from

6 the set that would be reviewed, we would never share those

7 with our client, they would never be disclosed to anyone.  We

8 would even keep Blackstone informed of that as our progress

9 continued so they would know what documents we had or hadn't

10 seen.  If we had missed one and a document came to light

11 during depositions or discovery, just like in a privileged

12 situation, Blackstone would have the opportunity to assert a

13 callback.

14    We can't really think of a better solution then

15 that.  Blackstone is taking the position that they will not

16 sign a hold harmless.  They will not release their asset

17 manager from possible liability for inadvertently giving us

18 documents that have nothing to do with this matter.  They

19 have suggested, instead, that CPV collect, run search terms

20 and review all the documents themselves or hire a third party

21 to do so because CPV does not have the internal IT capability

22 or staffing to run these search terms, to review the

23 documents and then give them to the Debtors for review to

24 make sure that all of Blackstone's documents aren't properly

25 segregated, not to mention the delay that would cause and the

1    cost.

2          We are sort of at a loss, Your Honor.  We are in a

3    catch 22.  We cannot get our own documents because Blackstone

4    refuses to allow them to be released.  So that is the first

5    issue.

6          THE COURT:  Okay.  Why don't I hear a response on

7    that?  I think I need a response from Blackstone on that,

8    right?  Your counsel for Walnut Creek.

9          MR. SUSSBERG:  I'm not sure I understand the

10   document request.  The only thing I would say is my colleague

11   is on the phone, we are here on behalf of Walnut Creek.  Your

12   Honor, I really want to say again that Judson Brown can

13   answer these questions.  We have been in communication with

14   the folks that are custodians.  It's a plan that they

15   proposed and that we are asking to have our claim allowed for

16   voting purposes only.

17         THE COURT:  Right.

18         MR. SUSSBERG:  None of this is relevant.  It's

19   really not.  We are going to deal with this.  We will address

20   it.  We will provide the documents.  We are not worried about

21   the documents.

22         THE COURT:  A couple things.  It is relevant to the

23   3018.  I don't think it's the best use of everybody's time

24   and resources, but sitting here, I can't figure out an answer

25   to the problem that you and Mr. Burns have, I think, fairly

1  articulated.  I am kind of busting your chops with the

2  Blackstone thing.  I'd be happy to hear from Mr. Brown or

3  anybody else, but, I mean to me, in the absence of a

4  resolution, the 3018 issue is pending.  I understand you want

5  your claim allowed as filed. I understand that they want to

6  allow your claim as they would like it.

7       3018 doesn't actually, you know, have a coin toss

8  provision or anything else.  I need to determine what it is

9  for purposes of voting and you know this as well as I do, the

10  code contemplates that this is for voting purposes, so there

11  are generally fewer bells and whistles associated with that

12  process, but I still need to determine what the claim is.

13       MR. SUSSBERG:  I understand.  Your Honor, my only

14  point, and maybe I didn't articulate it well, but Mr. Burns

15  stood up at the beginning of all this, and again we will get

16  into the discovery here, there is something more than meets

17  the eye.  Mr. Burns got up at the beginning and he started

18  talking about these claims and the fact that number one, they

19  don't even know if they are briefing the issues that we

20  talked about today or two, whether they are modifying this

21  plan.  I stood up to say that we would need an ability to

22  review whatever the modified plan is.

23       I don't know what they intend to do siting here

24  today, but all they want to do is move forward with discovery

25  no issues and concerns that Mr. Burns outlined that seem to

1  go more to confirmation related issues than 3018 questions

2  because the 3018 question was a narrow one on the plan they

3  proposed that they should believe is confirmable, just let me

4  vote in that class.  Your Honor made the point, it could be

5  $300 billion, it doesn't matter under their formulation.  So

6  I only want to make the point that there is something else

7  that's going on here.

8         We are not worried about the discovery.  It's almost

9  as if they are asking us for confirmation related discovery

10 on a plan that they have proposed.  We are happy to provide

11 it.  We will deal with these questions.  It just seems to be

12 out of order with a bid deadline that's 10 days away, that's

13 going to be well before we are back in front of Your Honor

14 deciding as to whether or not we are going to deal with

15 issues that we talked about today and that are threshold

16 issues or whether there is a whole new plan.

17        So just again, we will address them, but I just

18 don't understand.  Maybe Mr. Brown, who's on the phone, can

19 speak to the specifics.

20        THE COURT:  Mr. Brown.

21        MR. BROWN:  Your Honor, Judson Brown from Kirkland &

22 Ellis on behalf of Walnut Creek.  Your Honor, I sincerely

23 apologize for not being there in person.  Believe me, I wish

24 I could be.  To address Ms. Goldman's first point on the

25 Debtors' documents, I think she rightly laid out the

1    background, Your Honor.  We have worked, I think,

2    constructively with the Debtors on a path forward here, but

3    the bottom line is, as Ms. Goldman summarized, CPV has

4    documents concerning Blackstone assets that are entirely

5    unrelated to Twin Oaks, Walnut Creek or any other Optim

6    asset.

7           Pursuant to its own asset management agreement with

8    CPV, those documents concerning the other Blackstone related

9    assets are subject to certain confidentiality provisions that

10   effectively prevent CPV from sharing them with third parties.

11   So our only point, Your Honor, is that CPV can review the

12   documents that hit on the agreed upon search terms and

13   custodians.  There are custodians that the Debtors have

14   identified who actively work on the Blackstone assets that

15   are not related to Walnut Creek, or Twin Oaks or any other

16   asset at issue here.

17          The only response we have received, having CPV

18   actually internally review the documents, screen out what is

19   and what is not related to the assets at issue here, is that

20   CPV is not equipped to do that and they don't have the

21   resources, but that, effectively, Your Honor, is a burden

22   argent.  We have no idea what the scope is.  We don't know if

23   we are talking about, you know, 100 documents, 1,000

24   documents, we really have no idea what the burden is so it's

25   difficult for us to agree that our documents concerning

1   assets that aren't at issue here can be handed over to a

2   third party.

3          THE COURT:  Okay.  Well, a couple things.  First, my

4   typical expectation in this kind of an arrangement would be

5   that actually an outfit like CPV would not necessarily be

6   going through its own eDiscovery review in anticipation of or

7   in connection with litigation that it is not actually a party

8   to.  So this would typically be farmed out to a consulting

9   party.

10         I am going to do one of two things.  The first is,

11  if CPV can demonstrate to the satisfaction of the Court and

12  the Debtors that they have the resources to promptly move

13  forward with the discovery, then I will allow that to occur,

14  but it seems to me much more likely, unless they want to

15  devote substantial resources to this exercise, that the

16  structure that's been identified by the Debtor provides

17  sufficient protection to Blackstone and also, more

18  importantly, provides sufficient protection to CPV that it

19  would be making production pursuant to a Court order and I

20  would be prepared to so provide.

21         I think CPV's concerns about violating any

22  obligation it owes to Blackstone may be well founded, but I

23  believe that I have the ability to insulate them from

24  exposure for that and I think that the structure,

25  particularly, within attorneys eyes only and a callback

1  structure provides sufficient confidence to Blackstone and to

2  CPV, and I would be prepared to so provide.  My instinct

3  tells me that CPV has neither the resources nor the interest

4  in getting up to its elbows in this exercise, but I would

5  allow that process to play out.  If there is a dispute, I

6  will hear from the Debtor, Blackstone and CPV on a

7  teleconference promptly.  What is the next issue?

8          MS. GOLDMAN:  Your Honor, as Mr. Rahn is actually in

9  the Courtroom, we may come back to this issue.  He might be

10 able to answer your question.

11         THE COURT:  Okay.

12         MS. GOLDMAN:  So the next issue, Your Honor, which

13 is number 1 on the original list that we had sent, are the

14 bid documents.  Walnut Creek has requested the bid documents

15 themselves, the bid related documents, communications with

16 bidders from the prior sale process, the Twin Oaks sale

17 process.  As we discussed during our March 16th conference,

18 Your Honor, all of those documents are subject to

19 confidentiality agreements as is the standard practice.

20         THE COURT:  I think at our last hearing I indicated

21 that I felt that I was unlikely to approve or authorize that.

22 I am not clear how this, this might be theoretically relevant

23 to ultimately litigating the claim; although, I am not really

24 sure I see it, but I thought that I had previously ruled on

25 this.

Case 1:14-10979-CSS   Doc 11738-4   Filed 08/18/17   Page 101 of 115
Case 14-10262-BLS   Doc 809-4   Filed 04/28/15   Page 100 of 114

100

1    MS. GOLDMAN:  Actually, Your Honor, you had reserved

2    judgment.  You had heard both sides and saw both sides of the

3    argument where Mr. Brown had articulated what he saw as the

4    relevance and what we had articulated what we saw was not

5    relevant.  Your Honor had suggested that the parties try to

6    work through the issues with a stipulation.

7         THE COURT:  That does sound like me.

8         MS. GOLDMAN:  We tried.  We had originally proposed

9    a stipulation before our conference.  We went back and

10   revised that stipulation to include the information that we

11   think if there is any relevance would be relevant, which is

12   who the final bidders were in the last rounds, how many of

13   them rejected or contemplated rejection, how many

14   contemplated assumption and then, of course, identify those

15   who had appeared at the auction and whether or not they were

16   planning to reject or assume.  Additionally, we identified

17   the fact that only Blackstone had also had a deal in place to

18   buy the mine that none of the other bidders did.  We included

19   that in our stipulation, Your Honor.

20        THE COURT:  If my memory is correct, and I haven't

21   gone back and looked at the transcript, but I expect you

22   have.

23        MS. GOLDMAN:  I have.

24        THE COURT:  I figured.  I would assume that the

25   Walnut Creek argument or the Blackstone argument, whatever

1 you want, is a point that would be with respect to the claim,

2 this is a claim the Debtor would have faced under any

3 circumstance because every buyer was directing the rejection

4 of the FSA, right?

5       MS. GOLDMAN:  That is correct, Your Honor.

6       THE COURT:  Hang on, I put words in Mr. Brown's

7 mouth.  I will let him answer.

8       MR. BROWN:  Thank you, Your Honor.  That is part of

9 it.  Part of it is that there are some bidders who made a bid

10 that was contingent on rejecting the FSA.  The Debtors didn't

11 choose those bids, they chose a bid by Blackstone, a bid that

12 they knew was contingent upon Blackstone also buying Walnut

13 Creek and acquiring these claims.

14       The second point, Your Honor, is the Debtors also

15 had, at least, one bid that was based on assuming the FSA.

16 The Debtors didn't choose that bid, instead they chose this

17 course.  In other words, they chose the course of obtaining

18 from Blackstone the highest bid value in exchange for facing

19 a rejection damages claim from a Blackstone held Walnut

20 Creek.  So it's both of those, kind of, two issues, Your

21 Honor.

22       So the bid related documents, the bid related

23 communications and the Debtors evaluation of those are

24 directly relevant to what the Debtors are now seeking to do

25 here, effectively, to equitably disallow the claim because,

1   as the Debtors want to argue, Blackstone, to use their words,

2   is seeking a windfall, when that is actually not the case.

3   We are actually proceeding as everyone knew we would proceed,

4   back at the time that the Debtors chose Blackstone's bid as

5   the winning bidder for the Twin Oaks Plant.

6          THE COURT:  All right, here's what I would suggest.

7   I think that inquiry into the bids in the last phases, be it,

8   you can choose, you had 70 rounds.

9          MS. GOLDMAN:  Your Honor, I hate to interrupt you,

10  but if I could just embellish the arguments a little bit.  As

11  you said, you have not gone back to the transcripts.

12         THE COURT:  Yeah.

13         MS. GOLDMAN:  So if you would indulge me for a

14  moment to refresh your recollection, Your Honor.  We had

15  argued that it was relevant, but also that because of the

16  current sale process we were very concerned with the impact

17  on chilling the bids.  Your Honor had asked us to go back and

18  look into what the overlap of that was.  We have.

19  Additionally, Your Honor, Mr. Brown's point, we believe, we

20  fully addressed in the stipulation because they don't need

21  the details of the bids, they don't need the details and

22  negotiations.  They can make the exact argument that they

23  have made, knowing the information we provided, which is who

24  the bidders were, whether or not they were going to assume or

25  reject, or at least who the public bidders were.  There were

1  some that remained confidential and want to be confidential.

2  We don't think their names actually make a difference.

3         Just to briefly address the point that Mr. Brown has

4  made repeatedly and Mr. Sussberg made, and  he made in his

5  lovely demonstrative, which really looked more like a report,

6  but that the Debtors knew this was coming, Your Honor.  That

7  is exactly the opposite.  The reason to pick a bidder who is

8  going to buy the mine and the plant is because it's the least

9  likely that they would be the ones to bring a rejection

10 damages claim.  There is no reason they would expect that.

11        THE COURT:  Stop.  I got to tell you that there is

12 nothing in the record that reflects that there was an

13 absolute waiver.  I think I could probably find one way or

14 the other, because if you had a waiver I would have seen it.

15 I think I can imagine a factual scenario where the Debtor

16 expressed confidence that there wouldn't be a claim and I can

17 imagine a factual scenario where Walnut Creek could

18 demonstrate everybody was talking about this, everybody knew

19 about this and the Debtor went with Walnut Creek, well went

20 with the Blackstone bid because it was the highest bid and

21 also because have we talked about the value of this claim?

22        This claim is a $190 million dollar claim at

23 entities that aren't paying.  So I can imagine people sitting

24 in a room at Morris Nichols or Bracewell or wherever at 3:00

25 in the morning and saying who cares.  Who cares what the

1  rejection claim is, either because everybody is going to do

2  it or otherwise.  I think that this issue is complicated. I

3  think that it may have significant resonance in a fight over

4  the determination of the ultimate allowance for distribution

5  of this claim, but other than for generally informing the

6  inquiry about whether or not other players were making or

7  were anticipating doing this, the claim is what it is.

8          If the 3018 analysis is going to require me to take

9  a step and it may be that the Debtors expected me to make

10 this step, but to make this step that there was an

11 understanding, you know, I think that's more than a 3018

12 hearing is going to provide.  Again, I recall and I

13 appreciate being reminded, frankly, of the concern I had

14 about overlap. I don't necessarily want to be further

15 informed about overlap.  That issue may be not really

16 significant two or three days from now once you know who your

17 bidders are, but I got to tell you, I see this as one of the

18 most fraught areas of inquiry.  I know Walnut Creek wants it

19 and I know why.

20         I, frankly, think it could be relevant, but I think

21 it would be relevant in a hearing that I may be having a long

22 time from now.  This back and forth about what might be, what

23 the other bids might have been, sure, I might like to know

24 generally whether or not every bid or some bids were

25 contemplating this rejection; that would weigh in on it one

Case 14-10979-CSS   Doc 11778-4   Filed 08/18/17   Page 106 of 115
Case 14-10979-CSS   Doc 8869-4   Filed 04/28/17   Page 105 of 114

105

1  way or the other, but this issue goes to the ultimate

2  allowance of the claim.  So the issue is going to be you can

3  raise that argument, but I don't think we need an enormous

4  amount of discovery on it.

5      So I would direct that the Debtor can provide

6  information with respect to final stages of the bidding and

7  the positions of the parties with respect to assumption or

8  rejection.  If you got a piece of paper that says, you know,

9  at 2:30 in the morning at Morris Nichols somebody said and we

10  are waiving the claim or there won't be a claim because we're

11  all in the family, you can add that, but we are not going

12  into that discovery here.  You are not going to have time to

13  do that and I don't think that that's a worthwhile inquiry.

14      MS. GOLDMAN:  Thank you, Your Honor.

15      MR. BROWN:  Your Honor, if I may just ask a

16  clarification.  My understanding is that the Debtors are

17  seeking to not only litigate the 3018 motion, but also

18  litigate their objection as well.  In other words, they are

19  seeking to have all of the issues, allowance, amount,

20  validity of the claim, everything tried all at once.  It's

21  not clear to me how we can segregate out the discovery in the

22  way that you are proposing.

23      THE COURT:  You know something, Mr. Brown, I may

24  have erred.  Is this the discovery relating to the full

25  because I have a preliminary objection from you and I

1  probably on the 16th presumed that we were teeing up the whole

2  dog and pony show because we hadn't talked about 3018.  The

3  thing I see coming up, the Debtor wants to confirm a plan

4  that they are going to tinker with over the next couple of

5  weeks and my focus, I confess my focus in the absence of

6  lunch is perhaps a bit fuzzy, but was really on the issues

7  about 3018.

8          MS. GOLDMAN:  Yes, Your Honor, we are willing to

9  move the full merits hearing until post-confirmation.  So

10  this is the 3018 now.

11          THE COURT:  We will limit this then to the 3018.

12          MR. BROWN:  With the clarification that Walnut Creek

13  was unaware of.  So if we are delaying full merits discovery

14  until after confirmation and focusing on 3018, we understand

15  Your Honor's ruling.

16          THE COURT:  Okay.  To me that makes sense.  I

17  understand.  I'm sorry if I've sort of taken a step without

18  you, but I'm making this for two reasons.  One is because the

19  3018 issue is a today issue or a prompt issue.  The second

20  thing is, again, somebody is going to need to explain to me

21  why it is going to be worthwhile having a whole bunch of

22  people go hammer and tongues on discovery, I admit, on a

23  really interesting issue for a claim that, I think, is of

24  exceedingly limited value, at least, on the landscape as

25  currently postured.

1    The Debtor is convinced this claim is not getting

2   anything or next to nothing if that plan moves forward.  I

3   get it.  So I would ask myself, you know, does everybody want

4   to do this.  Again, it's an interesting academic exercise,

5   but I'm not certain that we are going to head that way.  You

6   have explained to me, satisfactory, why we need to answer

7   some of these issues for 3018.  There is a bid and ask.  I

8   now understand why and I think I said pretty clearly that I

9   think both sides have raised a pretty good argument.  I mean,

10  Mr. Sussberg stood up and said where are the arms to

11  stipulate.  I get it.  All right, there is an issue there.  I

12  think it ought to be susceptible to some sort of disposition,

13  but in the absence of that, I need the minimum record to

14  allow for a 3018 ruling, which is a vote.  Next issue.

15    MS. GOLDMAN:  Thank you, Your Honor.  Number 2 on

16  the list, which is the Debtors' request for documents from

17  the Blackstone affiliates concerning the assessment or

18  analysis of the value of the Twin Oaks Plant and the plant

19  and the mine together under common ownership, including

20  projections, valuation, financing and financial information.

21  Your Honor, this issue and since we are talking only about

22  3018, actually does go to the actual and projected damages,

23  the lost profits as well as their efforts to mitigate those

24  damages.

25    Your Honor, a significant aspect of our claim

1  objection, but it would also be of our 3018 objection, would

2  be that there is no actual damages here.  As Mr. Burns has

3  discussed, that all the profit of the mine, which was very

4  profitable for decades, was transferred over to the plant

5  with the benefit of that residing at the ultimate equity

6  owner, which is Blackstone.  I know Mr. Sussberg has repeated

7  himself a number of times and in his power point has insisted

8  that Walnut Creek is not Blackstone, but we disagree and for

9  the purposes of the 3018 and the discovery, we think it's

10  actually very relevant.

11          Blackstone conditioned its purchase of the mine, of

12  Walnut Creek, on the purchase of the plan, as Mr. Sussberg

13  said.  Blackstone would not have bought the mine if it had

14  not been the successful bidder at the auction and there's a

15  reason for that, Your Honor, an economic reason.  Blackstone

16  is not in the habit of --

17          THE COURT:  I understand the argument.

18          MS. GOLDMAN:  Okay.

19          THE COURT:  Response.

20          MS. GOLDMAN:  Your Honor, if I could just add to the

21  fact, the separateness, Your Honor.  The only explanation why

22  the owner of the mine would agree to a, what we understand to

23  be, basically, a cost plus contract for the supply agreement

24  after decades of a significant profit margin is because of

25  the common control; otherwise, it's not reasonable, Your

1  Honor.

2          THE COURT:  I understand.  Mr. Brown.

3          MR. BROWN:  Thank you, Your Honor. Your Honor, early

4  on in today's hearing you noted that a rejection is a breach,

5  all be it, a Court authorized breach, but a breach resulting

6  in contract damages.  Those contract damages are largely

7  governed by State Law.  Here we have got a contract that's

8  governed by Texas Law.  Texas Law, Your Honor, is clear that

9  in assessing the damages to Walnut Creek, the contract party,

10 under this FSA, it is not appropriate to look to Walnut

11 Creek's affiliates, parent entities or otherwise in assessing

12 the harm or damage to Walnut Creek, absent some sort of

13 collapsing or piercing of the veil.  The Debtors don't seek

14 to do that.  Their preliminary objection doesn't do it and

15 they haven't argued it yet today.  So there is no basis to

16 seek these documents beyond Walnut Creek and look at other

17 entities, particularly, in the context of this 3018 motion,

18 Your Honor.

19         THE COURT:  Okay.  I am going to direct production.

20 I am reserving, and I want to be clear on the merits, the

21 issue of the common ownership, the piercing of the veil,

22 etc., but I understand the Debtors' argument and for purposes

23 of the 3018 motion, I would consider it. If we get to

24 litigation on the merits, and the substance and allowance of

25 the claim, to me this would be an appropriate issue for a

1  motion *in limine* or a litigation about the common control

2  issue.  But for purposes of the 3018, I will hear, I will

3  permit the discovery and I will deal with arguments from each

4  side, but I will permit and direct the discovery.  Next item.

5       MS. GOLDMAN:  Your Honor, the next item is item

6  number 3, which are Walnut Creek's request for documents from

7  the Debtors concerning the value of the Twin Oaks Plant,

8  including projections and business plans.  So this would all

9  be pre-closing documents of the Debtors.  Your Honor, this is

10  really completely different from what we were just asking for

11  the Debtors' projections from two years ago.

12       THE COURT:  Yeah, I'll hear from Mr. Brown on what

13  his request is here.  Mr. Brown.

14       MR. BROWN:  Thank you, Your Honor.  We are

15  requesting documents concerning the value of the Twin Oaks

16  Plant, the projections, the business plans, the financial

17  information and the value that the Debtors anticipating

18  receiving from an auction.  The Debtors, in their preliminary

19  objection, Your Honor, make a number of arguments that

20  Blackstone is seeking to harm the estate and Blackstone is

21  seeking a windfall.  That is not it at all, Your Honor.

22       To the contrary, Blackstone provided substantial

23  value to the estate and the estate chose Blackstone as the

24  bidder to receive that value.  These documents that we are

25  requesting here are documents that go right to the value that

Case 1:14-09762-SS Doc 1778-4 Filed 04/28/15 Page 112 of 115
Case 1:14-09762-SS Doc 1869-4 Filed 04/28/17 Page 112 of 115

111

1  the estate received as a result of Blackstone's participation

2  in and ultimately winning of the auction.

3  　　　　THE COURT:  I'm not going to require production of

4  these documents.  Again, it may be that as we get to the

5  merits of this, it's relevant, but the value of the Twin Oaks

6  Plant was determined in the context of an auction that I

7  directed and approved.  The fact of the matter is that I

8  think I approved a sale that I said was in the Debtors' best

9  interest, represented a good faith exercise and delivered a

10 lot of value to the estate.  I think that there was a good

11 deal of cheering on the left hand side of the Courtroom when

12 that hearing started.

13 　　　　So I don't think that, while I understand the

14 argument that the Debtor is saying that Blackstone or Walnut

15 Creek is looking to realize a windfall, I don't think that

16 that, while I understand that argument, I don't think that

17 that requires a discovery and a meaningful response from the

18 Debtor in terms of discovery with respect to its asset.  Its

19 asset was sold, real value was provided and the question is

20 whether or not there is a surviving rejection damages claim.

21 　　　　If the Debtors' projections were that they got much

22 more than they expected, I mean, I don't think that that

23 really drives the analysis one way or the other.  The Debtor

24 was clearly delighted with the results of the auction. I

25 approved it, but I don't think that it really advances the

1  ball for Walnut Creek to demonstrate, for example, that the

2  Debtors projected, perhaps, over the next several years that

3  they were going to lose a fortune or that the business was

4  worth a fraction of what the auction ultimately brought.  I

5  don't think that that drives the analysis one way or the

6  other.

7          I want to be clear that my rulings today are with

8  respect to the context of a 3018 issue.  Again, if this issue

9  comes to fruition on the merits, I would be more than happy

10  to hear it, but I view this as a matter where I need a

11  relatively limited and discreet record before me. So I will

12  not direct that the Debtor produce the items identified in

13  number 3.

14          MS. GOLDMAN:  Your Honor, item number 4.  The

15  Debtors have requested documents concerning the treatment of

16  rejection damages claim in the Debtors' bankruptcy, including

17  priority potential recovery.  This is relevant, Your Honor,

18  to the value of the rejection damages claim.  For instance,

19  Your Honor, we had a conversation with counsel that if there

20  was an e-mail among business people that said the claim

21  really has no value, but it might get us a seat at the table,

22  would they produce that.  We were told no.  We think that

23  that does go to an analysis of the value of their rejection

24  damages claim, Your Honor.  In addition, as has been

25  discussed today --

1    THE COURT:  I'm not going to direct production of

2   that for purposes of the 3018 motion.  It may be relevant,

3   but, frankly, you know, I am not certain that that kind of

4   colloquia even if somebody said, you know, I don't know

5   whether we will get anything on it, but, you know, I still

6   like the price that we're paying for the, and again, maybe I

7   can just taking one example and I don't want to be unfair,

8   but that sort of thing, you know, would be structured in a

9   waiver argument or intent of the parties argument.  I will

10  deal with those on the merits in a substantive hearing, but I

11  don't think that that inquiry requires inquiry in the context

12  of 3018.  Agenda item 5 or item 5?

13       MS. GOLDMAN:  Actually, Your Honor, this is Walnut

14  Creek's request.  We have been working with Kiewit.  We don't

15  have a specific answer yet, but I know that they have been

16  collecting documents and we are supposed to be negotiating a

17  confidentiality agreement.  But I will let Mr. Brown speak to

18  it if he wants to further pursue it at this moment.

19       THE COURT:  Okay.  Mr. Brown, anything to add?

20       MR. BROWN:  No, nothing to add.  I think number 5 is

21  an item where there was a potential for dispute, but I think

22  both parties, frankly, Your Honor, have been working with

23  Kiewit to try and cut through this. I think we have

24  identified a path forward.  If we run into road blocks, we

25  certainly know how to reach you and we will reach out, Your

1  Honor, but I think we've got a path forward on item 5.

2          THE COURT:  Okay.  Ms. Goldman, any other issues and

3  an excellent answer would be no.

4          MS. GOLDMAN:  Then no it is, Your Honor.

5          THE COURT:  All right, anything further today?  Mr.

6  Burns, where are we?

7          MR. BURN:  Your Honor, the Debtors have nothing

8  further.  We have several follow-ups for, obviously, post-

9  hearing, but we have nothing further for today.  Thanks for

10  your time, Your Honor.

11          THE COURT:  Sure.  So we have got you on the

12  calendar for the 13th at 10:00 a.m. and I do appreciate

13  everyone's time today.  I'm sorry for dragging you through

14  lunch, I just didn't have my calendar today.  Stand in

15  recess.

16     (Court Adjourned)

17

18                          CERTIFICATE

19

20  I certify that the foregoing is a correct transcript from the

21  electronic sound recording of the proceedings in the above-

22  entitled matter.

23  /s/Mary Zajaczkowski                    April 23, 2015

24  Mary Zajaczkowski, CET**D-531                Date

25