Page 1

1  UNITED STATES BANKRUPTCY COURT

2  DISTRICT OF DELAWARE

3

4  In re:                         :

5                                 :   Chapter 11

6  ENERGY FUTURE HOLDINGS CORP.  :   Case No. 14-10979-css

7           Debtors.             :   (Jointly Administered)

8  _____:

9

10                              United States Bankruptcy Court

11                              824 North Market Street

12                              Wilmington, Delaware

13                              August 18, 2017

14                              1:09 p.m. - 1:45 p.m.

15

16

17

18

19

20

21  B E F O R E :

22  HON CHRISTOPHER S. SONTCHI

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO OPERATOR:  AL LUGANO

1    HEARING re Discovery Dispute

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4         Attorneys for the Debtor

5

6    BY:  MARK E. MCKANE

7

8    ROPES & GRAY LLP

9         Attorneys for the Plaintiff, Elliott Associates L.P.,

10        et al.

11

12   BY:  PETER L. WELSH

13        KEITH WOFFORD

14

15   ALSO APPEARING TELEPHONICALLY:

16

17   SAM N. ASHURAEY

18   ROBIN D. BALL

19   MATTHEW C. BROWN

20   CHRIS CARTY

21   WILLIAM E. CHIPMAN

22   SCOTT D. COUSINS

23   ERIN FAY

24   MARK A. FINK

25   MICHAEL FIRESTEIN

1  DAVID M. FOURNIER

2  SIMON E. FRASER

3  CHAD J. HUSNICK

4  KRISTY JABSON

5  LAURA D. JONES

6  MARC KIESELSTEIN

7  DAVID M. KLAUDER

8  VINCENT LAZAR

9  RAYMOND LEMISCH

10  ANDY MCGAAN

11  RICHARD PEDONE

12  NATALIE D. RAMSEY

13  JEFFREY S. SABIN

14  RICHARD SCHEPACARTER

15  CHRISTOPHER P. SIMON

16  FOTEINI TELONI

17  ANGELO THALASSINOS

18  MICHAEL J. WELSH

19  MEGAN WASSON

20  APARNA YENAMANDRA

21  GREG GALARDI

22  NOAH M. SCHOTTENSTEIN

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Good afternoon, counsel.  This is

3    Judge Sontchi.  Thank you for making yourself available to

4    hear this discovery dispute.  I don't -- I've received the

5    submissions by the Debtors and by Elliott.  I've read them.

6    I don't know really who should go first, or what the status

7    is, so I'll kind of open it up to the parties, and they can

8    proceed as they'd like.

9            MR. MCKANE:  Thank you, Your Honor.  It's Mark

10   McKane from Kirkland & Ellis on behalf of the Debtors.  Your

11   Honor, if I could just briefly present it, we're effectively

12   seeking a protective order to quash three deposition notices

13   that were issued by Elliott.  So I'm happy to open if you

14   think that's appropriate.

15           THE COURT:  That's fine.

16           MR. MCKANE:  Thank you, Your Honor.  And first, we

17   are very grateful of your willing to hear us on another

18   discovery dispute on an expedited notice this afternoon.

19           Your Honor, let me just set the stage by where we

20   are.  As you know, we have a hearing on Monday for the

21   Berkshire merger agreement.  We have been in extensive

22   discovery over the past two weeks.  And in parallel, as

23   things always go with restructuring, our restructuring team

24   and our corporate team have been working along the way to

25   evaluate the Berkshire merger agreement, and all possible

1     alternatives.

2           And consistent with the go-shop rights under the

3     Berkshire merger agreement, and consistent with the Debtor's

4     duties to maximize value, they have been evaluating that

5     agreement, seeking potential revisions to it, and evaluating

6     alternatives, including the Elliott proposal, and evaluating

7     where it stands, as well as any alternative proposals,

8     including a potential proposal from another strategic

9     purchaser or purchaser group.

10          Now, the Debtor's boards met this morning.  They

11    are scheduled again to meet over the weekend, on Sunday.  We

12    don't have a time yet on Sunday, but we are pushing forward

13    to continue to assess on an ongoing basis, the status of

14    these cases, the status of this proposal, and the Berkshire

15    merger agreement itself, including any potential amendments

16    thereto.

17          Your Honor, the discovery dispute relates

18    specifically to the Debtor's efforts in this area.  Late

19    Wednesday night, Elliott served additional deposition

20    notices on the EFIH disinterested director Chuck Cremens,

21    the EFH and EFIH CFO, Mr. Tony Horton, and the EFH and EFIH

22    CEO and Chief Restructuring Officer, Paul Keglevic.  Your

23    Honor, these individuals have already been deposed with

24    regard to this motion.  Mr. Keglevic was deposed on

25    Thursday, the 10th.  Mr. Horton was deposed on Friday, the

1    11th.  And Mr. Cremens was deposed the day before, on

2    Tuesday, August 15th.

3            Elliott noticed these depositions for later today,

4    Friday, and Saturday, citing the evaluation of alternative

5    proposals.  They seek six additional hours of deposition

6    time.  As a practical matter, that's an entire day of

7    additional time.  And Your Honor, we're seeking an order

8    quashing these deposition notices really for three

9    independent reasons.

10           First, Your Honor, the Elliott and the Debtors

11   worked and negotiated extensively to put together a schedule

12   to enable the discovery to go forward in these cases.  And

13   it was at the end of that negotiation process that we agreed

14   that the Debtor's witnesses would be deposed on the 10th,

15   the 11th, and the 15th.  That agreement was made eyes wide

16   open to the fact that the facts would be continuing to

17   evolve.

18           And there's no better evidence for that, Your

19   Honor, than the fact that Elliott knew, and they were

20   working very hard to put together a proposal that they

21   thought would potentially be higher or better, and that

22   those potential proposals, and any commitment letters there

23   coming out for the proposals, would be due later this week.

24   They knew that the facts would change after our witnesses

25   were deposed, and nonetheless, we all agreed to go forward.

1    We all knew the facts might change after we deposed their

2    witnesses.

3            So Your Honor, the fact that -- the fact that the

4    facts are continuing to evolve in these cases does not give

5    anyone ground to take a second deposition.  The potential

6    that there may be an alternative transaction that the

7    Debtors need to evaluate had always been known.  We've

8    always anticipated that.  We are still evaluating the

9    situation, but no decisions have been made.

10           Your Honor, the second reason that we seek an

11   order quashing these depositions is their reported basis

12   really speaks and proves too much.  In motions like this,

13   the facts continue to evolve.  And the fact that they -- the

14   facts are changing, and we're assessing the situation, and

15   Your Honor, there have been evaluations of potential

16   amendments and revisions, potential alternative proposals

17   that happened in the last 48 hours, that evaluations are

18   continuing in the last 24 hours, and that will continue for

19   the next 48 hours.

20           If a party had a basis to get a second deposition

21   simply because the Debtors continued to exercise their

22   fiduciary obligation to evaluate alternatives, then there

23   would be no stop to the depositions.  There could be a new

24   deposition every day in this case.  Mr. Rosenbaum, who's

25   running the deal team for Elliott was deposed yesterday.

1   Based on how things are changing, he could sit again

2   Thursday, he could sit again on Sunday.  There would be no

3   stop to the process. We all recognize when we do

4   restructuring litigation that there are going to be parallel

5   paths between restructuring and litigation.  And the fact

6   that we are continuing to evaluate proposals does not alter

7   that scenario.

8            Third, Your Honor, none of this is new to Elliott.

9   When they deposed Mr. Keglevic, he noted that we had

10  received an unsolicited, inbound inquiry from another

11  strategic.  We had been continuing to develop that.  We will

12  be continuing to develop that.  That is in addition to

13  Elliott, that is in addition to working with Berkshire.

14  That is our fiduciary duty, and that is what we're

15  continuing to do.  There's nothing new there.

16           And then finally, Your Honor, there is some sense

17  here that this is retaliatory.  And I bring that up -- and I

18  don't want this -- I don't want -- I'm not trying, throwing

19  mud here, I just want the Court to appreciate the dynamic in

20  which it was raised Wednesday night.  On Wednesday, night,

21  we informed Elliott that we were continuing to develop this

22  alternative proposal.  They knew about it in many ways

23  already, this was not news to them.

24           But the push was, and it came directly from Mr.

25  Rosenbaum and Mr. Horton, was, "Well, let's postpone my

1    deposition.  Given where we are, let's continue evaluating.

2    Don't take my deposition."  Your Honor, we have

3    (indiscernible) we're facing the same motions and the same

4    issues that we've been facing since we've filed the motion.

5    We needed to move forward, Mr. Rosenbaum, we declined. And

6    it was in response to (indiscernible), "If you decline to my

7    request that you adjourn my deposition, or you postpone my

8    deposition, we will seek to take your depositions again."

9    And it was that stark of a quid pro quo.

10           Now Your Honor, I bring that up only because even

11    if it's not retaliatory, it speaks to what is the value of

12    this.  They were willing to forgo this additional discovery

13    if Mr. Rosenbaum wasn't deposed.  Ultimately, we know that

14    we'll have to evaluate and defend -- let me say it again, we

15    will have to defend the Berkshire merger agreement as it

16    stands at that time on Monday.  Right?  There may be

17    additional amendments or revisions to the Berkshire

18    agreement at that time, and we will defend it at that time.

19    The facts are continuing to evolve and change, but the

20    evaluation, the ongoing obligation of the Debtors to

21    continue to evaluate additional proposals should not and

22    cannot give rise to a perpetual do-loop of depositions that

23    would essentially prevent the Debtors from continuing to

24    evaluate the landscape as it changes.

25           And for those reasons, Your Honor, that we ask

1    that you quash the depositions, or granting the protective

2    order, as needed, so that we can continue our efforts to

3    evaluate the proposals, and prepare for Monday.

4              THE COURT:  Thank you, Mr. McKane.

5              MR. WOFFORD:  Your Honor, if I may, this is Keith

6    Wofford from Ropes & Gray on behalf of the Elliott Fund.

7    I'm here with my partner Peter Welsh, who will handle some

8    of the more straightforward litigation back and forth.

9              But I want to elevate this a bit from that, Your

10   Honor.  Because I think the context of our request for

11   depositions, and importantly, documents, with respect to

12   this process, in anticipation of Monday's incredibly

13   important hearing, needs to be put in an appropriate

14   context.  Because I think there's a larger picture and

15   chronology here that is being, I think, given short shrift

16   by the presentation that you've received, and we're happy to

17   call to your attention.

18              Your Honor, on July 26th, when we were together,

19   Debtor's counsel told us that no time should be given for

20   bids to emerge to beat Berkshire, whether from strategics,

21   Elliott, (indiscernible) or elsewhere.  The Debtor's counsel

22   said, in effect, "Let's end it."  Okay?  That was the

23   rationale.  Don't even get us (indiscernible), nothing else

24   is coming, this is the way out of the building.

25              Then, just Wednesday, the Debtor's counsel filed a

1   response to our objection to the Berkshire motion.  Again,

2   they said that Oncor was a crown jewel asset "is no longer

3   enough to incentivize strategic purchasers to wade into

4   these Chapter 11 cases, in the hopes of emerging as the

5   owners of reorganized EFH."  So again, they said, "Hey, no

6   one's here, nothing to see."

7            Both of those statements, Your Honor, with all due

8   respect, were blatantly false.  In fact, after that filing

9   on Wednesday, Elliott was contacted by the Debtor's CFO that

10  afternoon to inform us of a (indiscernible) bid for $9.3

11  billion that has emerged, and asked whether our client would

12  be amenable to a path where the Debtors abandoned the motion

13  to impose a break fee on Monday, and in fact, engaged in a

14  dialogue with that bidder following that disengagement with

15  Berkshire.  They approached us and said, "Look, will you

16  tell us that Elliott will not react adversely to that

17  approach?"

18           Now, this bid, and I will not name the bidder, is

19  from a large, investment-grade utility.  So at the same

20  time, as they said on Wednesday, there was nothing from

21  strategics.  They're simultaneously negotiating an entire

22  deal with another strategic.  Now, all of this, by the way,

23  is after both the emergence of this bid, and the approach to

24  us -- all this, for what it's worth, is after the

25  depositions of Horton, and Keglevic, and Cremens, to which

1    Mr. McKane refers.

2            So look, our view, Your Honor, is that staying on

3    this Berkshire track hurts the creditors for two reasons.

4    The break fee is going to be imposed, obviously, and as

5    importantly, this Berkshire deal, with the pendency of the

6    motion, and the pendency of that motion is being used to

7    ward off higher alternatives at this point.  It's not as if

8    it's attractive, if that's a word.

9            Look, we simply cannot imagine why the fiduciaries

10   of this estate would prefer to go against the wishes of the

11   entire E-side creditor body, and fight us tooth and nail,

12   when there's an alternative that's hundreds of millions of

13   dollars higher, that Elliott has not even had a chance to

14   discuss with a counterparty.

15           THE COURT:  You do not represent the -- counsel,

16   you do not represent the entire E-side structure.

17           MR. WOFFORD:  That's fair.  That is fair, we do

18   not represent the entire E-side structure, but we do

19   represent a substantial amount of interest, that we would

20   hope that our views would be considered.  You're one hundred

21   percent correct, Your Honor.

22           So look, we cannot -- if the prospect of our

23   fiduciaries, Your Honor, trying to effectively force this

24   deal down our throats when there's a higher prospect, raise

25   the possibility to us of whether the record is going to

1    reflect that this Debtor has gone rogue.  There's a risk of

2    delay, there's a risk of regulatory approval.  But those,

3    you know, in great economic part on Elliott's risk.

4    Previously, the Debtors had intimated that only in EFIH, and

5    that the intent was to protect broader creditor interest in

6    EFH, and not just having a limited view toward EFIH.

7            Well, as the Court is aware, Elliot is now the

8    largest unsecured creditor at EFH as well.  So if the

9    Debtor's going to move forward Monday with this effort,

10   which we believe at a minimum leaves money on the table, and

11   in fact may destroy value, we simply want the opportunity to

12   create a complete record on what our fiduciaries are

13   purporting to do, and the rationale behind it.  So the

14   reason for the depositions, which has developed a record

15   around the events that are happening imminently, as Mr.

16   McKane said, is an integral part of that.

17           I'd like to turn this over to my litigation

18   partner, Peter Welsh, at this point, to discuss the

19   particularities of the document deposition request.  We

20   certainly don't want to impede the Debtor's efforts to

21   generate value.  But at the end of the day, if the die is

22   cast, and their decision is made on the path, regardless of

23   the potentially great value, that's something that we

24   believe we have an opportunity to develop a full and fair

25   record of.  Mr. Welsh?

1          MR. WELSH:  Your Honor, thank you, Your Honor.

2     I'd like to begin by reiterating where Mr. McKane began,

3     which is to thank Your Honor for taking time on very, very

4     short notice to hear us this morning.  Your Honor, just to

5     be clear on what is that Elliott is seeking here, we're

6     seeking two things:  documents relating to the recent board

7     deliberations around the potential alternative, higher

8     proposal or higher bid, and other documents -- and

9     communications related to that bid.  And we're also seeking

10    deposition testimony from the principal management

11    representatives, negotiating on behalf of the Debtors, as

12    well as the disinterested manager at EFIH.

13          With respect to the documents, briefly, Your

14    Honor, the Debtors have agreed to provide us with board

15    materials relating to the potential higher bid, and we'd

16    like some clear, near-term deadline for the Debtors to

17    produce that information to us, ideally by 5:00 p.m. today,

18    Your Honor.

19          And then with respect to the testimony, Your

20    Honor, the Debtors advance three arguments, as Mr. McKane

21    outlined, in support of their position.  And Your Honor,

22    each is wrong, and each is at this point in the process,

23    respectfully, frankly, disingenuous, Your Honor.

24          First, the Debtor has advanced the argument that

25    Elliott agreed to depose the Debtor's witnesses with full

1    appreciation that events could change.  Mr. McKane, I

2    believe, said that we worked extensively to put together a

3    discovery schedule, and that we agreed to that schedule

4    "with our eyes wide open."  Your Honor, that is missing the

5    point, to put it charitably.  They appear to be suggesting,

6    thereby that it's Elliott's fault, that we're not in a

7    position to be able to take dep testimony with respect to

8    these late-breaking, very material developments.  And that's

9    just wrong.

10           Most importantly, Your Honor, we originally were

11   seeking the deposition testimony of Mr. Keglevic and Horton

12   during this week, and when we were scheduling the discovery

13   schedule that Mr. McKane referenced, we were told that Mr.

14   Keglevic and Mr. Horton were not available this week for

15   testimony, which is the reason that their deposition took

16   place last week.

17           The second implied argument that we somehow should

18   therefore have been able to schedule their depositions for

19   Saturday and Sunday of this weekend, in advance of the

20   hearing on Monday, weeks ago, before these developments

21   occurred is just, frankly, Your Honor, absurd, at this

22   point.  So the idea that we did this will full appreciation

23   that events could change, and our eyes wide open is just

24   wrong.

25           The second argument, Your Honor, that the Debtors

1    advanced, is that litigation and restructuring efforts must

2    proceed on parallel paths, and therefore this is an entirely

3    ordinary course, and we don't need to deviate from the

4    ordinary course way in which, according to the Debtors,

5    these matters are handled in contested restructuring

6    proceedings.

7            Your Honor, the fact of parallel paths does not

8    mean that material developments like the higher and better

9    offer here are very, very material development that has

10   crystallized only in the last three days, that material

11   developments necessarily do not merit additional discovery.

12   Indeed, at the close of Mr. Rosenbaum's deposition

13   yesterday, counsel for the Debtors specifically reserved the

14   right on the record to recall Mr. Rosenbaum over the weekend

15   if it became necessary and appropriate to do so.  So the

16   idea that late-breaking material developments do not merit

17   additional discovery is wrong, and also, Your Honor,

18   disingenuous.

19           The idea that also where we are now, Your Honor,

20   is just a normal bend in the parallel restructuring and

21   litigation roads is also, Your Honor, disingenuous.  What's

22   happening now is the most important event, Your Honor, for

23   the creditors of these estates in this restructuring effort.

24   And it is an event, Your Honor, that the Debtors have

25   repeatedly represented to this Court would not, and could

1    not happen.  Indeed, as Mr. Wofford indicated, the Debtors

2    represented that to the Court as recently as only two days

3    ago.

4            So the idea, Your Honor, that where we find

5    ourselves at this point in the process is just part of the

6    normal twists and turns in the parallel restructuring

7    litigation road is disingenuous, and frankly, to our

8    clients, Your Honor, offensive at this point.

9            Third, the Debtor's claim that the request for

10   additional depositions here is retaliatory, that is also

11   wrong, Your Honor, and misstates the record.  Mr. McKane's

12   characterization of the conversation that occurred between

13   us on Wednesday evening is wrong, and misrepresents that

14   conversation.  We sent a letter to Kirkland & Ellis as

15   Debtor's counsel yesterday correcting the record.  They

16   didn't respond to that letter, and Your Honor, we're frankly

17   surprised that they didn't attach that correspondence to

18   their submission to the Court, if they were going to

19   reiterate that allegation.

20           But since the Debtors had put that conversation at

21   issue, let me provide a little more color beyond what Mr.

22   McKane represented to the Court.  As Mr. McKane and Mr.

23   Wofford had indicated, on Wednesday evening at about 4:50

24   p.m., Mr. Rosenbaum received an inbound call from Mr.

25   Horton, reporting that the Debtors were in the very advanced

1    stages of negotiations with a potential strategic bidder,

2    and that the negotiations were down to one or two very

3    narrow open issues.  They sought Elliott's input on that

4    process.  At that time, Mr. Rosenbaum said to Mr. Horton

5    that it would appear to make sense to postpone the

6    deposition, to allow folks on all sides to focus on that

7    potential higher and better bid, and also to avoid having it

8    potentially leak out prematurely during deposition

9    testimony.

10           Mr. Horton said to Mr. Rosenbaum that he agreed,

11   he went back to his side to discuss it.  He then came back

12   and said he had discussed it with his side, but he could not

13   get Kirkland & Ellis to agree to our proposal, and that

14   there was therefore nothing more than Mr. Horton could do.

15   Mr. Horton then suggested that we call Kirkland & Ellis to

16   discuss the issue of possibly postponing Mr. Rosenbaum's

17   deposition to allow parties to focus on this very material,

18   potentially value-generating opportunity.

19           I then spoke with Mr. McKane on Wednesday evening,

20   I raised the issue with Mr. McKane.  Mr. McKane responded

21   that he wanted to go forward with the deposition

22   nonetheless, because they need some very specific

23   information regarding Elliott's trades, namely price and

24   certain circumstances of Elliott's trades.  He said he

25   needed that information for the board meeting that was to

1    occur on Friday morning concerning the potential higher and

2    better bid.

3         I responded that if they needed specific

4    information relating to Elliott's trades for the board

5    deliberations, I would go back and discuss with our client,

6    and we may well be willing to provide it on a consensual

7    basis, prior to the board's meeting.  Mr. McKane responded

8    that no, they still wanted to take Mr. Rosenbaum's

9    depositions on those topics, and that a consensual exchange

10   of information would not work.  I said, "It sounds to me

11   like Kirkland is trying to open a new front on issues around

12   designation and other issues a mere four days before the

13   hearing on the approval motion for the Berkshire Hathaway

14   transaction."  He said, he responded, "no, they need it for

15   board deliberations, and they want it for a deposition."

16        At that point it seemed clear to me that the

17   Debtors were potentially preparing to take on an adversarial

18   discovery of Mr. Rosenbaum to litigate over the higher and

19   better bid, relative to the Berkshire Hathaway bid on

20   Monday.  And I said to Mr. McKane, if the Debtors intend to

21   go down that path, then -- and if the board is potentially

22   to going to litigate over turning down a higher and better

23   bid, that we're going to take reciprocal discovery with

24   respect to those issues, so that we can be fully armed on

25   Monday to address those issues.

1           That, Your Honor, is the factual context in which

2      the discussion came up, or the topic came up.  It was not

3      retaliatory, Your Honor, it was the idea of sauce for the

4      goose is sauce for the gander.  If they're going to litigate

5      those issues through Mr. Rosenbaum's deposition and plan to

6      present to the Court on Monday on those issues, we believe

7      we're entitled to reciprocal discovery of the Debtors with

8      respect to those issues, and we want that through document

9      discovery, and deposition testimony.  It was not

10     retaliatory, Your Honor, it was part of our efforts to

11     responsibly develop the record in advance of Monday's

12     hearing, with respect to highly material, late-breaking

13     developments with respect to this process.

14           With that, Your Honor, I'll pause.  I have nothing

15     more to say about the request for discovery, but I'm happy

16     to answer questions if Your Honor has any questions.

17           THE COURT:  Thank you. I do not, thank you.  Mr.

18     McKane?

19           Mr. MCKANE:  Your Honor, may I have a few minutes

20     to respond?

21           THE COURT:  Yes, of course.

22           MR. MCKANE:  Thank you, Your Honor, and I won't

23     use terms like false and disingenuous.  Your Honor, with

24     regard to Mr. Wofford's presentation, I think you've seen

25     enough of the Debtor's presentation to know when Mr. Wofford

1    characterizes a motion filing as, "Let's end this," that

2    that does not match up with the factual content of the

3    motion filed or the Debtor's statement.  If there is a 45-

4    day go-shop period, where there would be no topping fee, and

5    the Debtors have continued forward and evaluated proposals

6    during that go-shop period, there's nothing about that that

7    is consistent with, "Let's end this."

8              Second, with regards to the existence of the

9    strategic, the Elliott team knew about the potential for

10   this no later than Thursday, the 10th, when Mr. Keglevic

11   testified about it in his first deposition on this motion.

12   There shouldn't be a second.

13             Before we go further, as it relates to board

14   materials, and the Debtor's evaluation of these, I'm not

15   seeking to quash that, because I've already agreed to

16   provide it.  And to the extent that they want greater

17   clarification, we will produce the board materials,

18   including minutes, through last Friday, tonight.  I can't

19   commit to 5:00 Eastern, but it will be tonight.  Today's

20   board presentation, we will produce tomorrow, and we will

21   continue to move forward.  But there's no need for an order,

22   or engagement on something that we've already agreed to.

23   The Debtors have always produced the broad presentations and

24   their evaluations thereof.  We will continue to do so here.

25   There's no issue there.

1              Now, with regard to Mr. Wolford's presentation,

2    and the suggestion that the Debtors have quote, "gone

3    rogue", or somehow, Elliott is solely at risk, the Debtors

4    must evaluate all proposals, whether higher or better, to

5    evaluate not only the top-line number, but also the costs

6    associated with it, including time and regulatory approval

7    risk, we all know that.  And there is no basis to suggest

8    that Elliot is the only creditor at risk.  We have concerns

9    about if we were to have another failed process, would we be

10   in a situation where the second lien would be impaired?

11   That is a factor that the board has to consider, and has

12   considered.

13             As it relates to Mr. Welsh's presentation, we all

14   have worked together on a set schedule.  That schedule was

15   locked down, knowing that there would be other presentations

16   going forward.  That is not new or different information.

17   With regards to why they think they need this revision, no

18   decision has been made by the board.  They're continuing to

19   evaluate the proposals.  Elliott had -- based on where we

20   are right now -- I think had fallen away.  But if there is

21   another proposal, we will continue to evaluate.  That's why

22   we have another board meeting scheduled for Sunday.

23             But with regards to the suggestion, and the play-

24   by-play that Mr. Welsh tried to ascribe to that

25   communication, there's two, there's one between Mr. Horton

1    and Mr. Rosenbaum, and one between Mr. Welsh and myself, is

2    not accurate.  There isn't a quid pro quo of, if you're

3    going to take Rosenbaum, we're going to take these other

4    three witnesses, therefore it's sauce for the goose, sauce

5    for the gander.  Mr. Rosenbaum's deposition was already

6    scheduled for the same motion that we've already had

7    presented, and been pending for weeks.  They don't get to

8    re-take depositions or take new depositions simply because

9    we have an already-scheduled and noted motion--sorry, noted

10   deposition that we're trying to move forward with.  We don't

11   have to forgo our right to take that deposition and

12   understand where Elliott is in their efforts, or face the

13   specter of a second round of depositions.  That's not an

14   appropriate "sauce for the goose, sauce for the gander," not

15   at all.

16           And the issues that we needed to depose Mr.

17   Rosenbaum on were where are on your financing, where are you

18   on regulatory, and with your new acquisition, when did they

19   occur, and at what price?  Now, we took that information,

20   and that discovery, some of which was provided consensually

21   an hour before the deposition, so that we could better

22   assess the pending Berkshire motion, and what the

23   alternatives are, including the Elliott position.  Now,

24   Elliott will not tell you that they support the current

25   proposal right now, because they don't.  They're not on the

1    same page with the potential proposer's sponsor.  They're

2    not square there.

3            But we are evaluating where we are with the

4    Berkshire merger agreement.  If there are proposals, where

5    are we with them, and what dep may need to be taken with

6    them, and we'll continue to do that over the weekend, in

7    preparation for Monday.  We'll produce the board materials

8    on a rolling basis, on the timeline I have committed to, but

9    additional depositions, let alone six hours of additional

10   depositions, is inappropriate at this point in time.  We

11   need to prepare for the hearing on Monday.  Thank you, Your

12   Honor.

13           THE COURT:  Thank you, Mr. McKane.

14           MR. PEDONE:  Your Honor, Richard Pedone, may I be

15   heard for a moment?

16           THE COURT:  Yes.

17           MR. PEDONE:  Your Honor, Richard Pedone for

18   American Stock Transfer.  We believe that some additional

19   limited discovery on these issues would assist my client

20   with determining how to proceed on Monday, given light of

21   how fast moving this is.  And that's all that I want to add.

22           THE COURT:  Thank you, Mr. Pedone.  Anyone else,

23   or any other comments to the Court?

24           MR. WELSH:  Your Honor, this is Peter Welsh on

25   behalf of Elliott.  I just would like it if Your Honor would

1    permit us to respond to one point Mr. McKane mentioned, and

2    I believe Mr. Wofford has something to add as well.

3            THE COURT:  All right, please be brief.

4            MR. WELSH:  Thank you, Your Honor.  I will be

5    brief.  With respect to Mr. Rosenbaum's deposition, Your

6    Honor, I want to be very clear that the issue that got

7    raised was postponing Mr. Rosenbaum's deposition until after

8    the Friday board meeting, because if there was action on a

9    higher and better bid on Friday, then there would be no need

10   to take Mr. Rosenbaum's deposition, number one.

11           Number two, it would permit the parties to focus

12   on the higher and better bid between now and Friday, and

13   also not run the risk that it leaks out during deposition

14   testimony, that the issue around reciprocal sauce for the

15   goose, sauce for the gander discovery came up because of the

16   Mr. McKane's articulation of the reasons for why they needed

17   to take Mr. Rosenbaum's deposition imminently, and what that

18   suggested about the approach that the Debtors would be

19   taking potentially for that higher and better bid, and what

20   that suggested about the need of additional discovery prior

21   to Monday.

22           That's all I have to add on that, Your Honor.

23   I'll turn it over to Mr. Wofford, unless Your Honor has any

24   questions of me.

25           THE COURT:  I do not.

1              MR. WOFFORD:  I'll be even more brief, Your Honor.

2     To be clear, my reference to the Debtor's prior statements

3     on "just end it" was in reference to the July 26th closing

4     argument statement of Mr. Husnick, where even to the -- I

5     won't call it the bitter end, there was an opposition even

6     to extending the consideration time of the merger agreement

7     from July 10th to July 26th.

8              And secondly, Elliott's preoccupation here is

9     maximizing value.  And of the thrust of this, really, Your

10    Honor, is if the decision of these boards is going to be to

11    take what they say for lower and better, rather than higher

12    and better, that that has to stand up to scrutiny,

13    particularly if it's in opposition to the largest creditor

14    at both E-side levels.  So that's where I think we would

15    end, Your Honor.  Thank you for your time.

16             THE COURT:  You're welcome.  All right, thank you

17    for your presentations.  And here's what I'm going to do.

18    First of all, it sounds as if the issue with documents is

19    resolved, but I'll touch base in a second here on the

20    Saturday production.

21             I do think that the continued negotiations, or

22    emergence of a potential third party, maybe strategic or

23    not, who's interested in buying the asset is a development,

24    a material development, and a development that I think

25    Elliott is entitled to explore in conception with its

1    objection to the Berkshire transaction and break fee.  The

2    question is whether they should be granted discovery, or

3    they can -- or not, and how much.

4              The problem is, you know, I'd be tempted to let

5    them explore it on Monday cold, but we simply don't have the

6    time built into the schedule, given the incredibly truncated

7    period that I had available to hear this.  So I can't -- I

8    don't think it's fair to do that.  The other thing is that

9    it would be very inefficient, in any event.  However, I

10   think three depositions of two hours each is excessive, and

11   not necessary.

12             So what I'm going to do is authorize one

13   deposition of one person, of Elliott's choice for two hours

14   on Saturday, and I'm going to require that at a mutually-

15   agreeable place and time.  And I'm going to require that the

16   documents about today's board activity be produced at or

17   prior to that deposition, so that the documents are in hand,

18   and so Elliott can take an efficient deposition.  I am

19   completely out of pocket Saturday, so if any disputes arise,

20   you're on your own.  But you can contact me Sunday if there

21   are any problems that occur with the depositions that you

22   need me to chime in about.

23             But that's -- that's my ruling.  So Elliott get to

24   pick the deponent, Mr. Keglevic, Mr. Cremens, Mr. Horton,

25   whichever you want to spend time with.  Deposition will be

1    two hours, it'll be on Saturday, and the documents from

2    today need to be produced at or prior to that deposition.

3             MR. WELSH:  Your Honor, Peter Welsh from Ropes &

4    Gray on behalf of Elliott, can I just ask, make one request

5    of Your Honor?  And that is that the board materials get

6    produced prior to the deposition, a reasonable time prior to

7    the deposition, say two hours prior, so we have an

8    opportunity at least to review them, to prepare questions?

9             THE COURT:  That's fair.

10             MR. WELSH:  Rather than having to review them

11    during the two-hour time that we have for the deposition?

12             THE COURT:  I think that's fair, yes.  Two hours.

13    So they need to be produced two hours prior to the beginning

14    of the deposition.  And again, at a mutually-agreeable time

15    and place.  I don't know where any of these people are at

16    this point, (indiscernible) --

17             Mr. MCKANE:  Your Honor, if that mutually-

18    agreeable time and place ends up being a Sunday morning,

19    would that be acceptable?  Because I do not -- I am not in

20    the same place as any of these witnesses.

21             THE COURT:  Is Sunday morning acceptable?

22             MR. MCKANE:  I'm not committing -- if folks say

23    it's better for Saturday, I will prepare for Saturday

24    afternoon.  I will do my best to get to wherever they are,

25    wherever's mutually-agreeable, but (indiscernible) Sunday, I

1    just didn't want to be (indiscernible).

2            MR. WELSH:  Your Honor, this is Peter Welsh.

3    Again, Your Honor, we would very much prefer this to be

4    Saturday.  We will be flexible with Mr. McKane on timing,

5    and could do it late in the day on Saturday, if he -- if

6    that travel schedule requires that.  But we would very much

7    like this to be done on Saturday.

8            THE COURT:  Can you commit to give him your choice

9    of deponent -- what time is it now?  I don't even know, it's

10   2:00 Eastern, can you commit to give him a choice of

11   deponent by 3:00?

12           MR. WELSH:  Can we say 4:00, Your Honor?

13           THE COURT:  Yep, you can say 4:00.

14           MR. WELSH:  Thank you, Your Honor.

15           THE COURT:  All right, so we'll do it Saturday.

16   If it has to be late in the day, or even early evening, so

17   be it.  Mr. McKane, do your best to get where you have to

18   go.  At least you'll know by 4:00 today where that is.

19           Mr. MCKANE:  Understood, thank you, Your Honor.

20           THE COURT:  You're welcome.  I don't think an

21   order is necessary, I'm not going to enter an order.

22   However, I will so order the record, and if people are

23   violating that, then they're violating a court order.  Okay,

24   thank you very much.  Anything further?  It's always good to

25   talk to you every day of the week.

1          Mr. MCKANE:  Thanks for your time.

2          MR. WOFFORD:  Nothing further from Elliott and

3   thank you again for your time, Your Honor.

4          THE COURT:  You're welcome.  We're adjourned.

5                    *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 32

1                          I N D E X

2

3                            RULINGS

4    DESCRIPTION                              PAGE        LINE

5

6    Discovery Motion Partially Granted        28          12

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 33

1          C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya Ledanski Hyde

     Digitally signed by Sonya Ledanski Hyde
     DN: cn=Sonya Ledanski Hyde, o=Veritext,
     ou, email=digital@veritext.com, c=US
     Date: 2017.08.21 12:58:18 -04'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 21, 2017