**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Hearing Date: |
| | ) | September 6, 2017 at 2:00 p.m. (EDT) |
| | ) | Objection Deadline: |
| | ) | August 31, 2017 at 4:00 p.m. (EDT) |

**AMENDED AND SUPERSEDING MOTION OF THE E-SIDE DEBTORS FOR AN ORDER (A) AUTHORIZING ENTRY INTO THE MERGER AGREEMENT AND APPROVING THE TERMINATION FEE AND (B) AUTHORIZING ENTRY INTO AND PERFORMANCE UNDER THE PLAN SUPPORT AGREEMENT**

Energy Future Holdings Corp. ("EFH Corp."), certain of its direct and indirect subsidiaries (together with EFH Corp., the "EFH Debtors"),[2] Energy Future Intermediate Holding Company LLC ("EFIH"), and EFIH Finance, Inc. (together with EFIH, the "EFIH Debtors," and together with the EFH Debtors, the "E-Side Debtors") file this amended motion (this "Amended Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Approval Order"): (a) authorizing the E-Side Debtors to enter into the Agreement and Plan of Merger, attached as **Exhibit 1** to **Exhibit A** (the "Merger Agreement"), with Sempra Energy ("Sempra") and Power Play Merger Sub I, Inc. ("Merger Sub"),

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] The other EFH Debtors are Ebasco Services of Canada Limited, EEC Holdings, Inc., EECI, Inc., EFH Australia (No. 2) Holdings Company, EFH Finance (No. 2) Holdings Company, EFH FS Holdings Company, EFH Renewables Company LLC, Generation Development Company LLC, LSGT Gas Company LLC, LSGT SACROC, Inc., NCA Development Company LLC, and TXU Receivables Company.

(b) approving the payment of a termination fee to Sempra (the "Termination Fee") as an allowed administrative expense claim payable if and when due without further order of the Court, and (c) approving and authorizing the E-Side Debtors to enter into and perform under the plan support agreement, attached hereto as **Exhibit 2** to **Exhibit A** (the "PSA"), with the parties thereto (the "PSA Parties").³  In support of this Amended Motion, the E-Side Debtors file the *Declaration of Anthony R. Horton in Support of the Amended and Superseding Motion of the E-Side Debtors for an Order (A) Authorizing Entry into the Merger Agreement and Approving Termination Fee and (B) Authorizing Entry Into and Performance Under the Plan Support Agreement*, filed contemporaneously herewith.  In further support of this Amended Motion, the E-Side Debtors respectfully state as follows:

**Background**

1. On July 7, 2017, the E-Side Debtors filed the *Motion of the Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11430] (the "Motion"), requesting authorization to enter into the Agreement and Plan of Merger (the "BHE Merger Agreement") with Berkshire Hathaway Energy Company ("BHE") and approval of the payment of a termination fee to BHE as an allowed administrative expense claim.

2. After preliminary negotiations, on August 15, 2017, the E-Side Debtors received an alternative proposal from Sempra that largely preserved the structure of the transaction contemplated by the BHE Merger Agreement, but which contemplated a purchase price of $9.3 billion.  Following several days of discussions and negotiations, Sempra, among other things, (a)

---

³ Capitalized terms used but not otherwise defined in this Amended Motion shall have the meaning ascribed to them in the Merger Agreement, the PSA, or the *First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, modified, or supplemented, from time to time, the "Plan"), filed contemporaneously herewith, as applicable.

2

RLF1 18035872v.1

increased the purchase price by another $150 million, to $9.45 billion (representing an overall $450 million increase in purchase price as compared to the BHE Merger Agreement); (b) agreed to certain Oncor dividend relief that increases the distributable value to EFIH unsecured creditors, regardless of whether the Effective Date occurs before or after payment of such dividend; (c) improved other terms, including terms related to the size and "when payable" terms of the Termination Fee; and (d) perhaps most significantly, obtained a commitment from Elliott Capital Management ("Elliott") to support and not object to the Merger Agreement, as memorialized in the PSA executed between Sempra, the E-Side Debtors, and Elliott, thereby eliminating costly and uncertain litigation. In addition, the E-Side Debtors believe that the transaction contemplated by the Merger Agreement can achieve the requisite PUCT Approval, and plan to work closely with Sempra and Oncor toward that goal.  On August 20, 2017, the E-Side Debtors determined that the Sempra proposal represented a Superior Proposal (as defined in the BHE Merger Agreement).  Early on August 21, 2017, the E-Side Debtors (a) terminated the BHE Merger Agreement in accordance with its terms;[4] (b) entered into the Merger Agreement with Sempra; and (c) entered into the PSA.

**Summary of the Merger Agreement**

3. The Merger Agreement is substantially similar to the BHE Merger Agreement, for which the E-Side Debtors previously were requesting approval, as is evident in the redline of the

---

[4] The E-Side Debtors take the position that the BHE Merger Agreement was not binding on the E-Side Debtors because the E-Side Debtors did not obtain Bankruptcy Court approval of the BHE Merger Agreement or the termination fee provided under the BHE Merger Agreement.  Accordingly, the E-Side Debtors have no obligation under the BHE Merger Agreement, and, for the avoidance of doubt, have not incurred the termination fee provided for under the BHE Merger Agreement.

two merger agreements (the "Redline"), attached hereto as **Exhibit B**. The following is a summary of the material differences between the transactions sponsored by Sempra and BHE:[5]

- **Corporate Structure**. Reorganized EFH will survive as a subsidiary of the Plan Sponsor; *however*, the Merger Agreement no longer calls for Reorganized EFIH or Oncor Holdings to be merged into subsidiaries of Reorganized EFH. *See* Redline §§ 1.2, 1.6.

- **Purchase Price Consideration**. The consideration to be paid by the Plan Sponsor is *increased to $9.45 billion* (from $9.0 billion), *plus* 75% of the dividend that EFIH is expected to receive from Oncor with respect to amounts earned by Oncor during the fourth financial quarter of 2017, regardless of when the transactions contemplated by the Merger Agreement close. *See* Redline § 1.7. This Dividend is expected to be paid in February 2018, in the amount of approximately $52 million (although such amount may change).

- **The Termination Fee**. The Termination Fee is *reduced to $190 million* (from $270 million in the BHE Merger Agreement) and will be payable only upon consummation of an alternative transaction if the Merger Agreement is terminated due to EFH Corp. or EFIH (a) breaching the Merger Agreement; (b) exercising each of their respective fiduciary out rights; or (c) supporting an inconsistent plan or inconsistent other restructuring transaction (prior to termination of the Merger Agreement). *See* Redline §§ 8.2, 8.5.

  Importantly, the Termination Fee is *not payable* if the Merger Agreement is terminated following the occurrence of the Termination Date (*i.e.*, 240 days following the execution of the Merger Agreement, with the opportunity to extend for 90 days if certain outstanding regulatory approvals are capable of being obtained). *See* Redline § 8.3.

  Additionally, the Parties to the Merger Agreement can terminate the Merger Agreement if the PUCT issues an order either denying the approval sought in the PUCT Filing or approving the PUCT Filing but imposing a Burdensome Condition (that has not been accepted by Sempra) and such order has not been vacated or materially modified (in a way that grants PUCT Approval or eliminates the Burdensome Conditions) within 30 days. Under such circumstances, the Termination Fee would not be payable. *See* Redline § 8.5

- **All-Cash, Subject to IRS Ruling**. Consistent with the BHE Merger Agreement, the consideration will be entirely in cash unless otherwise required by the Internal Revenue Service ("IRS"). *See* Redline § 1.8. Sempra has guaranteed the full amount, which, pursuant to the Plan, will be sourced

---

[5] The summary below is being provided for illustrative purposes only and is qualified in its entirety by the Merger Agreement.

from an equity investment by Sempra and, potentially, third parties and Holders of EFIH Second Lien Notes Claims who elect to participate (excluding Elliott, except as otherwise required by the IRS), and the proceeds of an exit financing facility. *See* Plan, Art. IV.C.

- **Reorganized EFH Equity Ownership**. The interests in Reorganized EFH will be held indirectly by Sempra and a maximum of two trusts (the Rollover Trust and/or the Non-Rollover Trust). Sempra will own approximately 60% of the interests in Reorganized EFH. Shares in the Rollover Trust will be held by Holders of existing EFIH Second Lien Note Claims who elect to convert some or all of their Allowed EFIH Second Lien Note Claims into Rollover Trust Certificates. Shares in the Non-Rollover Trust will be held by third-party investors who determine to participate in the equity commitment for Reorganized EFH in exchange for Non-Rollover Trust Certificates. If the trusts are fully funded, the Rollover Trust and the Non-Rollover Trust will collectively hold the remaining 40% of interests in Reorganized EFH. Elliott will not hold certificates in the Rollover Trust or the Non-Rollover Trust (unless required by the IRS). In the event the trusts are not fully funded, Sempra has agreed to increase its ownership percentage in Reorganized EFH in an amount necessary to cover any shortfall in the required equity to consummate the transactions. *See* Redline § 5.2(b).

- **Regulatory Commitments**. Sempra has agreed to substantially the same regulatory commitments to the PUCT as BHE, other than (a) an increase in the size of the board of directors of Oncor through the addition of one more Oncor officer (though the board will remain majority independent) and (b) the incurrence of post-emergence funded debt at Reorganized EFH or Reorganized EFIH. However, with respect to the debt to be incurred upon the closing of the Merger Agreement, Sempra has agreed to pay off such debt in less than seven years and to not incur any other debt at Reorganized EFH or Reorganized EFIH. *See* Redline, Exhibit D.

    Further, Sempra agreed to an additional commitment not contained in the BHE Merger Agreement: working in good faith with Oncor's other owners to cause an equity contribution into Oncor within 180 days of closing in an amount sufficient to achieve the debt/equity ratio prescribed by the PUCT in Oncor's rate case settlement. *See* Redline, Exhibit D.

- **Post-Emergence Debt**. The Merger Agreement and Plan contemplate an exit facility of up to $3 billion at Reorganized EFH, which Sempra has stated it believes is conservative financing for this asset and would therefore be expected to improve Oncor's credit ratings profile.

- **No TTI Conditionality**. The Merger Agreement does not impose any conditions on the E-Side Debtors regarding TTI's minority interest in Oncor.

5

4. Otherwise, the representations and warranties, covenants, conditions to closing, termination rights, remedies, fiduciary out, and go-shop provisions contained in the Merger Agreement are substantially identical to those provisions contained in the BHE Merger Agreement and that were detailed in paragraphs 36 to 40 of the Motion.

5. Importantly, unlike the BHE Merger Agreement, the Merger Agreement with Sempra has garnered the support of Elliott, one of the largest Holders of Claims against the E-Side Debtors.

## Summary of the PSA

6. The PSA Parties—namely, the E-Side Debtors, Sempra, and Elliott—executed the PSA immediately after execution of the Merger Agreement. The PSA requires the PSA Parties to support the Plan. The following is a summary of certain material terms of the PSA.[6]

    A. **Support for Section 503(b) Finding**.

7. Until the PSA has been terminated in accordance with its terms, the E-Side Debtors will request a finding in the Confirmation Order under section 503(b) of the Bankruptcy Code, supporting the payment of the fees and expenses of the Supporting Creditors as an Allowed Administrative Claim against EFIH, in an aggregate amount not to exceed $35 million. If the E-Side Debtors do not successfully obtain this relief on terms acceptable to the Supporting Creditors, the Supporting Creditors are nevertheless bound by the PSA. For the avoidance of doubt, all other parties' rights to this relief are preserved and can be raised at the hearing to consider confirmation of the Plan.

---

[6] The summary below is being provided for illustrative purposes only and is qualified in its entirety by the PSA.

### B. Cooperation on Tax Issues.

8. The E-Side Debtors also agreed to notify and update tax counsel to the Supporting Creditors of any substantive communications with the IRS and agreed to consult in good faith with such counsel regarding the Supplemental IRS Submissions. The E-Side Debtors also agreed to use their reasonable best efforts to minimize the amount of stock consideration (if any) to be received by the Supporting Creditors.

### C. Milestones.

9. Most importantly, the PSA does not establish a defined Confirmation Order milestone. Instead, the PSA states that the E-Side Debtors are not obligated to commence a Plan confirmation hearing unless and until PUCT Approval is obtained. The E-Side Debtors also agreed to a milestone whereby the Confirmation Order must be obtained within 30 days of PUCT Approval. Moreover, the PSA sets forth certain additional, incremental deadlines intended to facilitate the expeditious implementation of the Plan and Merger Agreement. These milestones provide that certain of the PSA Parties may terminate the PSA, subject to certain notice requirements or other conditions, in the event that:

- the Approval Order has not been entered or approved by the Court by September 30, 2017;

- the Disclosure Statement is not approved by the Court by September 30, 2017; or

- the Plan has not become effective as to the E-Side Debtors by the date that is 240 days from the date of execution of the Merger Agreement (subject to a 90 day extension to obtain certain tax and regulatory approvals, consistent with the formulation in the Merger Agreement).

**D.     Other Termination Events.**

10.     In addition to the termination events associated with the milestones described above, the PSA provides that, upon written notice and subject to certain terms and conditions, the following events will trigger termination of the PSA:

- amendment or modification of the Plan as to the E-Side Debtors in a manner inconsistent with the PSA and materially adverse to the terminating party;

- material breach of the PSA or the Merger Agreement in a manner that would have a material adverse effect on the Plan as to the E-Side Debtors and the transactions contemplated by the PSA;

- the issuance by a governmental authority or the Court of a final and non-appealable order or similar restraint prohibiting the transactions contemplated by the PSA;

- the appointment of a trustee or examiner with expanded powers in the chapter 11 cases of the E-Side Debtors;

- the filing of certain motions or pleadings by PSA Parties inconsistent with the PSA in a manner that is material and adverse to the terminating party and not timely withdrawn;

- the conversion or dismissal of one or more of the chapter 11 cases (other than LSGT Gas Company LLC, EECI, Inc., EEC Holdings, Inc., and LSGT SACROC, Inc.);

- a condition to the effectiveness of the Plan as to the E-Side Debtors or the closing of the transactions contemplated by the Merger Agreement becoming incapable of being satisfied;

- the termination of the Merger Agreement; and

- until entry of the order confirming the Plan, if the EFH Debtors or the EFIH Debtors determine that failure to terminate the PSA is inconsistent with their fiduciary duties, so long as a material breach by EFH Corp. and EFIH of the Merger Agreement's provisions governing solicitation and negotiation of competing proposals has not provided a basis for such determination.

**Basis for Relief**

11. The Court should grant the relief requested for all the reasons described in the Motion: entry into the Merger Agreement and PSA is a sound exercise of the E-Side Debtors' business judgment and is justified under the circumstances, and the Termination Fee meets the applicable standard.

> **A. The Merger Agreement Represents $450 Million More in Purchase Price Consideration and Regulatory Commitments Commensurate With the BHE Transaction.**

12. The Merger Agreement represents a higher and better transaction to that contemplated by the BHE Merger Agreement in light of, among other factors, the increased purchase price, the reduced Termination Fee, elimination of certain Termination Fee triggers, elimination of any TTI-related contingencies, and, perhaps most significantly, the documented support of Elliott. As before, under the Plan, the cash contribution will be used to pay Administrative Claims, Priority Claims, and Secured Claims against the E-Side Debtors, which are projected to be paid in full based on the anticipated emergence date. Furthermore, assuming an Effective Date of March 31, 2018, recoveries to EFIH unsecured creditors are expected to increase by approximately 20 percent. *See* EFH Disclosure Statement § I.G. The funding that underlies those creditor recoveries is supported by the commitment of a highly credit-worthy acquirer with a strategic interest in acquiring the E-Side Debtors' interest in Oncor. The commitment is backed by a specific performance right of EFH Corp. and EFIH against Sempra and is subject to customary terms and conditions. It also largely preserves several of the key agreements reached in connection with the BHE Plan, including a complete preservation of the EFH/EFIH Committee Settlement (including the reinstatement of asbestos claims and preserving the turnover of a portion of proceeds from the TCEH Settlement Claim to certain other classes of claims against the EFH Debtors) and the EFIH Settlement Agreement.

13. The E-Side Debtors believe that the transaction contemplated by the Merger Agreement can achieve the requisite PUCT Approval and plan to work closely with Sempra and Oncor toward that goal.

14. As before, the Termination Fee is part of a large, complex, and heavily negotiated transaction in which Sempra has provided material concessions, including significantly increasing the purchase price, reducing the Termination Fee by $80 million, and eliminating certain scenarios in which the Termination Fee becomes due and payable, in each case as compared to the BHE Merger Agreement. In light of these concessions and benefits afforded by the Merger Agreement, including the improved consideration and firm financial commitment from a highly credit-worthy acquirer, the Termination Fee is reasonable under the circumstances and in the best interest of the estates.

15. The Termination Fee is equal to approximately 1% of the Transaction's total enterprise value ("TEV") for the 80% of Oncor owned by EFIH and approximately 2% of consideration made available to EFIH ("EV"), which is significantly less than previous fees negotiated and/or approved in these chapter 11 cases.[7]

16. Additionally, as noted above, Sempra has agreed to substantially the same regulatory commitments to the PUCT as BHE, with two exceptions. One exception relates to the incurrence of post-emergence debt at Reorganized EFH or Reorganized EFIH. Sempra has agreed to repay any such debt incurred in less than seven years and, most importantly, not incur any additional post-emergence funded debt at Reorganized EFH/EFIH. Additionally, Sempra agreed to preserve the hard-fought Oncor rate case settlement by agreeing to work in good faith

---

[7] The Termination Fee under the BHE Merger Agreement was equal to approximately 1.5% of TEV for the 80% of Oncor owned by EFIH and 3.0% of the EV, while the Termination Fee in connection with the NEE Merger Agreement was 1.5% of TEV for the 80% of Oncor owned by EFIH and 2.8% of the EV. *See* Motion ¶ 56 and accompanying tables.

with Oncor's other equity owners to cause an equity contribution into Oncor within 180 days of closing in an amount sufficient to achieve the debt/equity ratio prescribed by the PUCT in Oncor's rate case settlement.  Finally, Sempra has agreed to leave the TTI minority interest behind, which preserves an important element of the ring-fence and eliminates closing conditionality that existed in certain of the E-Side Debtors' previous restructuring efforts.  Through these efforts, Sempra has worked to mitigate the risk that the PUCT will not approve the transactions under the Merger Agreement.

> B. **The PSA Binds the E-Side Debtors' Largest Unsecured Creditor, Substantially Mitigating Plan Confirmation Risk**.

17.    Entry into postpetition plan support agreements is governed by the same business judgment standard that governs other postpetition transactions.  *See In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013).

18.    Here, approval of the PSA is extremely narrow relief.  The PSA embodies the commitments of the E-Side Debtors, Sempra, **and, most importantly, the E-Side Debtors' largest unsecured creditor, whose support is critical to a smooth confirmation process**, to support the Plan as to the E-Side Debtors.  Additionally, the PSA commits the PSA Parties' to pursuing Plan confirmation *after* obtaining PUCT Approval, thereby substantially mitigating any feasibility concerns that may have been raised at such hearing.  Importantly, the E-Side Debtors' commitment is subject to a fiduciary out.  Thus, approval of entry into the PSA does little more than commit the PSA Parties to support the Plan and a revised sequencing of approvals that will preserve time and judicial resources, in each case subject to the E-Side Debtors' fiduciary out. In addition, although the E-Side Debtors have committed to support a substantial contribution finding in the Confirmation Order, the E-Side Debtors are not seeking that finding in connection with approval of the PSA.

11

19. Courts in this and other districts have approved entry into postpetition plan support agreements. *See, e.g.*, *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Sept. 19, 2016); *In re Aspect Software Parent, Inc.*, Case No. 16-10597 (MFW) (Bankr. D. Del. May 2, 2016); *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Sept. 15, 2015); *In re Exide Techs,* Case No. 13-11482 (KJC) (Bankr. D. Del Feb. 4, 2015); *In re Nebraska Book Co.*, Inc., Case No. 11-12005 (PJW) (Bankr. D. Del Mar. 26, 2012); *In re Overseas Shipholding Grp., Inc.*, Case No. 12-20000 (PJW) (Bankr. D. Del. Apr. 7, 2014); *In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. June 17, 2010); *In re Intermet Corp.*, Case No. 08-11859 (KG) (Bankr. D. Del. June 5, 2009); *see also In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Dec. 23, 2009); *In re Bally Total Fitness of Greater New York*, Case No. 08-14818 (Bankr. S.D.N.Y. July 9, 2009); *In re Movie Gallery, Inc.*, Case No. 07-33849 (Bankr. E.D. Va. Feb. 6, 2008).[8]

### C. The PSA Complies With Section 1125 of the Bankruptcy Code.

20. Entering into the PSA does not constitute a "solicitation" of the PSA Parties' votes in favor of the Plan. Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title . . . unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). Courts considering both prepetition and postpetition plan support agreements have held that such agreements are not "solicitations" if they permit a party to the agreement to later vote to reject a plan if there are any material deviations from the representations made at the time of signing the plan support agreement. *See, e.g.*, *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr.

---

[8] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the E-Side Debtors' counsel.

D. Del. Sept. 18, 2015) (approving postpetition plan support agreement pursuant to which creditor agreed to vote in favor of plan provided there were no material modifications to the agreed upon plan); *In re Indianapolis Down, LLC*, No. 11-11046 (Bankr. D. Del. June 21, 2012) (same); *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. Sep. 7, 2011) (same); *Internet Corp.*, Case No. 08-11859 (KG) (Bankr. D. Del. June 5, 2009) (same); *In re Owens Corning*, Case No. 00-03837 (KG) (Bankr. D. Del. June 29, 2006) (same); *In re Heritage Org., L.L.C.*, 376 B.R. 783, 789-95 (Bankr. N.D. Tex. 2007) (finding that agreement to vote for plan in term sheet does not constitute a solicitation of official vote); *In re Kellogg Square P'ship*, 160 B.R. 336 (Bankr. D. Minn. 1993) (holding that secured creditors' agreement to vote for plan prior to approval of disclosure statement did not violate statutory restrictions on solicitation); *Transworld Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*, 81 B.R. 813 (Bankr. S.D.N.Y. 1988) (holding that parties' agreement to use best efforts to obtain confirmation of chapter 11 plan did not violate statutory restrictions on solicitation of votes for the plan).

21.   Bankruptcy courts have roundly rejected a broad reading of "solicitation." *See Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 101 (3d Cir. 1988) ("'[S]olicitation' must be read narrowly."); *see also In re Energy Future Holdings Corp.*, 9/17/2015 Hr. Tr. at 78 ("[S]olicitation means the formal sending out of ballots to parties in support of a plan asking them to vote on those ballots, mark yes or no and send them back for counting in connection with approval of the plan."); *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013) ("[A] narrow construction of 'solicitation' affords [the] parties the opportunity to memorialize their agreements in a way that allows a Chapter 11 case to move forward.").

22. Accordingly, the E-Side Debtors' and the other PSA Parties' negotiation and execution of the PSA do not constitute improper solicitation under section 1125(b) of the Bankruptcy Code, and the E-Side Debtors submit that they should be permitted to enter into the PSA.

23. In short, the E-Side Debtors respectfully submit that in light of, among other factors, (a) the significantly increased purchase price under the Merger Agreement as compared to the BHE Merger Agreement; (b) the significantly reduced Termination Fee and limited Termination Fee triggers; (c) the documented support from Elliott to support the Merger Agreement, as reflected in the PSA; (d) Sempra's regulatory commitments and efforts to mitigate the risk that the PUCT will not approve the transaction; and (e) Sempra's reputation as a creditworthy and well-regarded utility company, the Bankruptcy Court should approve the Merger Agreement (including the Termination Fee) and the E-Side Debtors' entry into the PSA.

**Notice**

24. The E-Side Debtors shall provide notice of this Motion on the date hereof via U.S. first class mail to: (a) the U.S. Trustee; (b) counsel to the EFH Creditors' Committee; (c) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (d) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (e) UMB Bank, N.A. in its capacity as indenture

14

RLF1 18035872v.1

trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (f) Delaware Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020; (g) counsel to certain holders of claims against the E-Side Debtors regarding each of the foregoing described in clauses (c) through (f); (h) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (i) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (j) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (k) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (l) Oncor Electric Delivery Company LLC and counsel thereto; (m) the Securities and Exchange Commission; (n) the Internal Revenue Service; (o) the Office of the United States Attorney for the District of Delaware; (p) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (q) counsel to the Electric Reliability Council of Texas; (r) Sempra; and (s) those parties that have requested notice pursuant to Bankruptcy Rule 2002. The E-Side Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

      WHEREFORE, the E-Side Debtors respectfully request that the Court enter the Approval Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in the Amended Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: August 23, 2017
Wilmington, Delaware

/s/ Jason M. Madron

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 651-7700
Facsimile:   (302) 651-7701
Email:   collins@rlf.com
      defranceschi@rlf.com
      madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:   edward.sassower@kirkland.com
      stephen.hessler@kirkland.com
      brian.schartz@kirkland.com
      aparna.yenamandra@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:   james.sprayregen@kirkland.com
      marc.kieselstein@kirkland.com
      chad.husnick@kirkland.com
      steven.serajeddini@kirkland.com

*Co-Counsel to the E-Side Debtors and Debtors in Possession*