**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 11801** |

**DECLARATION OF DAVID YING IN SUPPORT
OF THE AMENDED AND SUPERSEDING MOTION OF THE E-SIDE DEBTORS FOR
AN ORDER (A) AUTHORIZING ENTRY INTO THE MERGER AGREEMENT AND
APPROVING THE TERMINATION FEE AND (B) AUTHORIZING ENTRY INTO AND
PERFORMANCE UNDER THE PLAN SUPPORT AGREEMENT**

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the Debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## TABLE OF CONTENTS

**Page**

**I.    Marketing of the Debtors' Interest in Oncor. ................................................................. 3**

    A.    Formal Two-Stage Marketing of the Debtors' Interest in Oncor. ......................... 3

    B.    The Hunt Plan. ................................................................................................. 4

    C.    The NextEra Plan. ........................................................................................... 5

    D.    The BHE Merger Agreement and the Debtors' Pivot to the Sempra Merger
        Agreement. ...................................................................................................... 6

**II.   The Termination Fee in the Sempra Merger Agreement is Reasonable
Compared to Comparable Transactions. .................................................................... 77**

    A.    Fee As a Percentage of EV for Publicly Traded Utility Transactions. .................. 8

    B.    Fee As a Percentage of EV for Transactions Where the Target is a U.S.
        Public Company With $9 billion to $13 billion of equity value. .......................... 8

    C.    Fee As a Percentage of TEV for Public Utility Transactions. ............................... 9

    D.    Fee As a Percentage of TEV for Transactions Where the Target is a U.S.
        Public Company With $9 billion to $13 billion of equity value. ........................ 10

1.      I am a Senior Managing Director of Evercore Group L.L.C. ("Evercore"), a financial advisory and investment banking firm with offices around the world and financial advisor and investment banker to the above-captioned debtors and debtors in possession, including Energy Future Holdings Corp. ("EFH Corp.") and Energy Future Intermediate Holding Company LLC ("EFIH" and together with EFH Corp. and their respective direct and indirect subsidiaries, the "Debtors").   I submit this declaration (this "Declaration") in support of the *Amended and Superseding Motion of the E-Side Debtors for an Order (A) Authorizing Entry into the Merger Agreement and Approving the Termination Fee and (B) Authorizing Entry into and Performance Under the Plan Support Agreement* [D.I. 11801] (the "Motion").[2]

2.      Except where specifically noted, the statements in this Declaration are based on either my personal knowledge, information supplied or verified by the Evercore financial team that I supervise or the Debtors' personnel and third-party advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

3.      Evercore is one of the world's leading independent investment banking groups, with more than 20 offices in more than eight countries, including an office located at 55 East 52nd Street, New York, NY 10055.   Evercore has expertise in domestic and cross border restructurings, mergers and acquisitions, raising debt and equity capital, and other financial advisory services.  Evercore has served as an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes, and secured creditors in a

---

[2]     Capitalized terms used but not defined herein have the meanings assigned to them in the Motion.

1

variety of industries.  Evercore is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

4.      I specialize in advising both debtors and creditors in financial restructurings and distressed mergers and acquisitions; raising capital for troubled businesses; and representing debtors and creditor constituencies in bankruptcy proceedings.  I joined Evercore in 2005 and founded the firm's Restructuring and Debt Advisory Group.  I have over 30 years of experience in restructuring advisory and leveraged finance.   Prior to joining Evercore, I held similar positions at Miller Buckfire Ying & Co., Donaldson, Lufkin & Jenrette, Smith Barney, Drexel Burnham Lambert, and in private equity investing, at JLL Partners.  I have a B.S. from the Massachusetts Institute of Technology and an M.B.A. from the Wharton School at the University of Pennsylvania.

5.      I, together with my colleagues, have advised the Debtors in virtually all financial aspects of their restructuring process since before the Petition Date.  Evercore was retained, among other things, to evaluate the financial terms and the value of bids the Debtors received for the sale of their indirect economic interest in Oncor Electric Delivery Company LLC ("Oncor"), evaluate the feasibility of any plan of reorganization for purposes of 11 U.S.C. § 1129(a)(11), and advise the Debtors' management and boards of directors as to these and other financial matters. I have given expert opinion testimony throughout these bankruptcy proceedings, including nine written declarations, and have prepared three expert reports dated July 11, 2016; October 21, 2016; and January 20, 2017.

6.      In this declaration, I describe (1) the extensive marketing of the Debtors' interest in Oncor and (2) my view of the reasonableness of the $190 million termination fee (the "Sempra

Termination Fee") under the Agreement and Plan of Merger (the "<u>Sempra Merger Agreement</u>")

with Sempra Energy ("<u>Sempra</u>") and Power Play Merger Sub I, Inc. ("<u>Merger Sub</u>").

I.      **Marketing of the Debtors' Interest in Oncor.**

7.      The Debtors' indirect economic interest in Oncor has undergone an extensive

formal and informal marketing process for more than three years.

      A.      **Formal Two-Stage Marketing of the Debtors' Interest in Oncor.**

8.      In January 2015, the Court approved bidding procedures governing a formal, two-

stage marketing process for Oncor.  Over the next six months, the Debtors aggressively marketed

that interest to a wide range of potential bidders through the Court-approved process.

Throughout, the Debtors consulted with the conflicts matters advisors and the advisors to the E-

Side and T-Side creditors' committees, including on twice-weekly standing update calls.

9.      After entry of the bidding procedures order, the Debtors and their advisors

circulated a process letter to 50-plus potential strategic and financial bidders.  The process letter

explained the opportunity to bid and invited potential bidders to participate.  Twenty-eight

potential bidders requested and received nondisclosure agreements, and 17 signed them, gaining

access to an extensive electronic data room maintained by the Debtors.  Over the following

weeks, potential bidders held diligence calls and meetings with the Debtors' advisors, and a

number of the most interested bidders met with Oncor management.

10.     The Debtors received two first round bids and two second round bids from third-

party bidders (*i.e.*, non-creditors).  The Debtors negotiated value and key terms with these

bidders over several months.  After receiving second round bids, the Debtors simultaneously

negotiated definitive documentation for two third-party bids while continuing to advance plan

discussions with creditor constituencies.  Ultimately, both remaining third-party acquisition

proposals dissipated.  Toward the end of June 2015, the Debtors determined that the Oncor

3

bidding process had not yielded a sufficiently high offer to justify selecting a stalking horse. Accordingly, the Debtors declined to do so and instead shifted their focus to the ongoing plan negotiations.

**B.    The Hunt Plan.**

11.    One of the third-party bids received through the Court-approved marketing process was submitted by Hunt Consolidated, Inc. and certain co-investors (collectively, the "Hunt Group"). After the formal Oncor marketing process terminated, ad hoc groups of TCEH creditors submitted a compromise proposal for a Hunt Group-sponsored merger with reorganized EFH Corp. (the "Hunt Merger"), in which EFH Corp. would convert to a real estate investment trust. The proposal from the TCEH creditors also contemplated a global settlement of ongoing disputes, lien challenges, and legacy litigation.

12.    In August 2015, the Debtors, the Hunt Group, and various TCEH creditor parties entered into a plan support agreement contemplating the Hunt Merger (the "Hunt PSA"). The Hunt PSA includes provisions governing an alternative restructuring that remain in effect even after the primary plan support obligations terminate (the "Alternative Restructuring"). The Court approved the Debtors' entry into the Hunt PSA on September 18, 2015, and confirmed the plan of reorganization authorizing the Hunt Merger (the "Original Confirmed Plan") on December 9, 2015.

13.    Under the Hunt PSA, the parties' obligations to support the Original Confirmed Plan could terminate under certain circumstances on April 30, 2016 unless regulatory approvals from the Public Utility Commission of Texas ("PUCT") were obtained. On March 24, 2016, the PUCT entered an order that contained certain commitments for Oncor that the Hunt Group deemed unacceptable. Accordingly, on April 30, 2016, certain members of the Hunt Group as parties to the Hunt PSA indicated that they would not elect to extend the date for regulatory

4

approvals.  As a result, on May 1, 2016, the ad hoc group of TCEH first lien creditors delivered a plan support termination notice to the parties to the Hunt PSA, which caused the Original Confirmed Plan to be null and void.  Shortly thereafter, the Debtors terminated the merger agreement related to the Hunt Merger.

14.     Importantly, while this termination event terminated the parties' obligations to support the Original Confirmed Plan, it did not terminate the Hunt PSA.  The Alternative Restructuring provisions of the Hunt PSA, which generally restrict certain TCEH junior creditors from objecting to an alternative plan that meets certain requirements, remain in effect.

15.     After termination of the Original Confirmed Plan, the Debtors immediately implemented their contingency plans.  On the T-Side, the core framework for a restructuring had been established and largely agreed upon by key stakeholders via the Alternative Restructuring provisions of the Hunt PSA.  Accordingly, last summer, the confirmation processes for the T-Side Debtors and E-Side Debtors diverged.  On August 29, 2016, the Court confirmed a plan in which the T-Side Debtors were spun-off in a largely tax-free manner to the TCEH first lien creditors with a $550 million cash recovery to TCEH junior creditors, as contemplated by the Alternative Restructuring provisions under the Hunt PSA.  On October 3, 2016, the Plan went effective as to the T-Side Debtors.

C.     **The NextEra Plan.**

16.     Last spring, the E-Side Debtors restarted negotiations with creditors regarding a potential standalone plan in which reorganized EFH Corp. equity would be allocated among existing creditors.  To that end, the E-Side Debtors submitted a standalone plan proposal to the advisors of various creditors at the end of April 2016.  After years of such negotiations, however, the E-Side Debtors were aware of the distinct challenges associated with causing EFH Corp. and EFIH creditors to agree to allocations of reorganized EFH Corp. equity.  Among other

5

challenges, it may not be possible to compel the E-Side Debtors' prepetition secured lenders to accept equity on account of their secured claims.

17.     Informed by that experience, the E-Side Debtors also refreshed the Oncor marketing process.  The E-Side Debtors contacted 18 potential strategic and financial bidders, most of whom were parties that previously showed interest in the asset, and sent process letters to 15 of them.  Of those parties, eight parties signed nondisclosure agreements and obtained access to an updated electronic data room.

18.     At the time, NextEra, which had a longstanding interest in acquiring the Debtors' economic interest in Oncor, was the most engaged.  NextEra and two other bidders engaged in negotiations with the E-Side Debtors.  Negotiations progressed to documentation with NextEra and one other party, Berkshire Hathaway Energy ("BHE").  Throughout the negotiations, the E-Side Debtors sought to use the multiple-bidder dynamic to obtain the highest and otherwise best terms and conditions, particularly on the overall value of the bids.

19.     The Debtors ultimately determined to enter into a deal with NextEra.  After adverse rulings from the PUCT regarding the NextEra deal, the E-Side Debtors again considered alternative restructuring options.

**D.     The Berkshire Merger Agreement and the Debtors' Pivot to the Sempra Merge Agreement.**

20.     It is my understanding that in June 2017, a representative of BHE reached out to the Debtors regarding a potential acquisition of the estate.   On July 7, 2017, the Debtors filed a motion (the "BHE Merger Agreement Motion")  requesting authorization to enter into a merger agreement with BHE and approval of the payment of a termination fee to BHE as an allowed administrative expense claim (the "BHE Termination Fee").

6

21.    The BHE Merger Agreement contemplated a transaction whereby BHE contributed $9 billion in cash consideration or equity value ("EV"), resulting in an approximate $18.1 billion implied total enterprise value ("TEV") for the 80% of Oncor owned by EFIH.  The BHE Termination Fee was $270 million, or 3.0% of EV and 1.5% of TEV.

22.    In mid-August 2017, the Debtors received an alternative proposal from Sempra that largely preserved the structure of the transaction contemplated by the BHE Merger Agreement but with a higher purchase price of $9.3 billion.  On August 20, 2017, Sempra increased the purchase price by another $150 million to $9.45 billion, agreed to a $190 million termination fee, agreed to certain other terms, and obtained a commitment from Elliott Capital Management ("Elliott") to support and not object to the Merger Agreement.

23.    The Debtors ultimately determined it was in the best interests of their estates to enter into a transaction with Sempra.   Further information regarding the decision to pivot to the Sempra Merger Agreement is set forth in the *Declaration of Anthony Horton in Support of the Amended and Superseding Motion of the E-Side Debtors for an Order (A) Authorizing Entry into the Merger Agreement and Approving the Termination Fee and (B) Authorizing Entry into and Performance Under the Plan Support Agreement* [D.I. 11802].

## II.    The Termination Fee in the Sempra Merger Agreement is Reasonable Compared to Comparable Transactions.

24.    The Sempra Merger Agreement contemplates a transaction whereby Sempra contributes approximately $9.45 billion in EV resulting in an approximate $18.7 billion implied TEV for the 80% of Oncor owned by EFIH.  TEV and EV are commonly used as reference points for measuring the comparability of bids and other deal metrics, like termination fees.  In M&A transactions, EV represents offer price per share multiplied by the fully diluted shares

outstanding.  TEV represents EV plus debt, the minority interest, and preferred equity, less cash and cash equivalents.

25.    On July 7, 2017, I filed a declaration in support of the BHE Merger Agreement Motion stating that the BHE Termination Fee was reasonable under the circumstances and was comparable to fees payable by target companies in comparable transactions.  *See Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11432].    Because the Sempra Merger Agreement has a lower termination fee and contemplates a higher equity value and implied Oncor TEV, it is my opinion that the Sempra Termination Fee is reasonable and on average lower than comparable fees.

26.    The Sempra Termination Fee is lower than average termination fees payable by target companies in transactions of publicly traded utility companies since 2012 with equity values of $1 billion or greater.  The Sempra Termination Fee is also lower as a percentage of TEV and EV than fees payable by target companies, similarly sized transactions across industries dating back to 2012.

|  | Sempra Transaction | Public Utility Transactions | Similarly Sized Transactions |
|---|---|---|---|
| Fee as a % of EV | 2.0% | 3.0% - 3.1% | 3.3% |
| Fee as a % of TEV | 1.0% | 2.0% | 2.7% - 2.8% |

**A.    Fee As a Percentage of EV for Publicly Traded Utility Transactions.**

27.    Looking at the Sempra Termination Fee as a percentage of equity value, the Sempra Termination Fee is lower than average termination fee as a percentage of equity value in other Public Utility transactions since 2012 with equity values of $1 billion or greater:



*Figure 1: Public Utility Precedent Transactions, Target Break Fee as % of EV*[3]

**B.      Fee As a Percentage of EV for Transactions Where the Target is a U.S. Public Company With $9 billion to $13 billion of equity value.**

28.      The Sempra Termination Fee is also lower than average termination fee as a percentage of equity value in transactions across industries since 2012 where the target is a U.S. public company with $9 billion to $13 billion of equity value:



*Figure 2: Public Company Precedent Transactions, Target Break Fee as % of EV*[4]

---

3    The data supporting Figure 1, Figure 2, Figure 3, and Figure 4 is also contained in the tables attached hereto in the Appendix.  This data was gathered from the following sources:  Merger agreements for the actual break fee, FactSet and company filings for the calculation of equity value and TEV, and Securities Data Corporation ("SDC") to run a screen of large public M&A transactions using the program SDC Platinum.  The TEV used for the EFH/NextEra Energy input was calculated based on the $9.8 billion purchase price for 80 percent of Oncor, and Oncor net debt as of December 31, 2015.

4    The Lam Research/KLA-Tencor transaction has not been completed.

**C.    Fee As a Percentage of TEV for Public Utility Transactions.**

29.    Looking at the Sempra Termination Fee as a percentage of total enterprise value, the Sempra Termination Fee is lower than average termination fee as a percentage of total enterprise value in other Public Utility transactions since 2012 with equity values of $1 billion or greater:



*Figure 3: Public Utility Precedent Transactions, Target Break Fee as % of TEV[5]*

**D.    Fee As a Percentage of TEV for Transactions Where the Target is a U.S. Public Company With $9 billion to $13 billion of equity value.**

30.    The Sempra Termination Fee is also lower than average termination fee as a percentage of total enterprise value in transactions across industries since 2012 where the target is a U.S. public company with $9 to $13 billion of equity value:

---

5    The TEV used for the EFH/NextEra Energy input was calculated based on the $9.8 billion purchase price for 80 percent of Oncor, and Oncor net debt as of December 31, 2015.



*Figure 4: Public Company Precedent Transactions, Target Break Fee as % of TEV[6]*

31.    For the foregoing reasons, I believe that from a financial perspective the Sempra

Termination Fee is reasonable when compared to comparable transaction break fees.

---

6    The Lam Research/KLA-Tencor transaction has not been completed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Dated: September 1, 2017
      New York, New York

*/s/ David Ying*
_____
David Ying
Senior Managing Director
Evercore Group L.L.C.

12

**Appendix**

**Table 1**
**Termination Fee of Target as % of TEV for Publicly Traded Utility Transactions**

| Date Announced | Acquirer | Target | TEV $ (in millions) | Break Fee of Target | |
|---|---|---|---|---|---|
| | | | | $ (in millions) | % of TEV |
| 01/25/17 | AtlasGas | WGL Holdings | 6,299 | 136 | 2.2% |
| 07/29/16 | NextEra Energy | EFH Corp.[7] | 18,706 | 275 | 1.5% |
| 05/31/16 | Great Plains | Westar | 12,157 | 280 | 2.3% |
| 02/09/16 | Algonquin | Empire District | 2,364 | 53 | 2.2% |
| 02/09/16 | Fortis | ITC Holdings | 11,435 | 245 | 2.1% |
| 02/01/16 | Dominion | Questar | 5,979 | 99 | 1.7% |
| 10/26/15 | Duke Energy | Piedmont Natural Gas | 6,579 | 125 | 1.9% |
| 09/04/15 | Emera Inc. | TECO Energy | 10,389 | 213 | 2.0% |
| 08/24/15 | Southern Company | AGL Resources | 11,996 | 201 | 1.7%. |
| 02/25/15 | Iberdrola USA | UIL Holdings | 4,483 | 75 | 1.7%. |
| 12/03/14 | NextEra Energy | Hawaiian Electric Industries | 4,336 | 90 | 2.1% |
| 10/20/14 | Macquarie Group | Cleco Corporation | 4,720 | 120 | 2.5% |
| 06/23/14 | Wisconsin Energy Corp. | Integrys Energy Group | 9,137 | 175 | 1.9% |
| 04/30/14 | Exelon Corp. | Pepco Holdings | 11,928 | 293 | 2.5% |
| 12/11/13 | Fortis Inc. | UNS Energy | 4,276 | 64 | 1.5% |
| 05/29/13 | MidAm. Energy Holdings Company | NV Energy | 10,400 | 170 | 1.6% |
| | | | | **Mean** | **2.0%** |
| | | | | **Median** | **2.0%** |

---

[7]   EFH Corp. is not a publicly-traded utility.

**Table 2**
**Termination Fee of Target as % of EV for Publicly Traded Utility Transactions**

| Date Announced | Acquirer | Target | EV $ (in millions) | Break Fee of Target | |
|---|---|---|---|---|---|
| | | | | $ (in millions) | % of EV |
| 01/25/17 | AtlasGas | WGL Holdings | 4,519 | 136 | 3.0% |
| 07/29/16 | NextEra Energy | EFH Corp.[8] | 9,796 | 275 | 2.8% |
| 05/31/16 | Great Plains | Westar | 8,537 | 280 | 3.3% |
| 02/09/16 | Algonquin | Empire District | 1,491 | 53 | 3.6% |
| 02/09/16 | Fortis | ITC Holdings | 7,055 | 245 | 3.5% |
| 02/01/16 | Dominion | Questar | 4,390 | 99 | 2.3% |
| 10/26/15 | Duke Energy | Piedmont Natural Gas | 4,795 | 125 | 2.6% |
| 09/04/15 | Emera Inc. | TECO Energy | 6,508 | 213 | 3.3% |
| 08/24/15 | Southern Company | AGL Resources | 7,944 | 201 | 2.5% |
| 02/25/15 | Iberdrola USA | UIL Holdings | 2,999 | 75 | 2.5% |
| 12/03/14 | NextEra Energy | Hawaiian Electric Industries | 2,636 | 90 | 3.4% |
| 10/20/14 | Macquarie Group | Cleco Corporation | 3,357 | 120 | 3.6% |
| 06/23/14 | Wisconsin Energy Corp. | Integrys Energy Group | 5,804 | 175 | 3.0% |
| 04/30/14 | Exelon Corp. | Pepco Holdings | 6,872 | 293 | 4.3% |
| 12/11/13 | Fortis Inc. | UNS Energy | 2,508 | 64 | 2.5% |
| 05/29/13 | MidAm. Energy Holdings Company | NV Energy | 5,629 | 170 | 3.0% |
| | | | | Mean | 3.1% |
| | | | | Median | 3.0% |

---

8    EFH Corp. is not a publicly-traded utility.

**Table 3**
**Termination Fee of Target as % of TEV Across Industries**

| Date Announced | Acquirer | Target | TEV $ (in millions) | Break Fee of Target | |
|---|---|---|---|---|---|
| | | | | $ (in millions) | % of TEV |
| 07/07/16 | Danone SA | The WhiteWave Foods Co. | 12,494 | 310 | 2.5% |
| 03/20/16 | Sherwin-Williams Co. | Valspar Corp. | 11,292 | 300 | 2.7% |
| 11/17/15 | Air Liquide SA | Airgas Inc. | 13,346 | 400 | 3.0% |
| 10/21/15 | Lam Research Corp. | KLA-Tencor Corp. | 11,333 | 290 | 2.6% |
| 05/21/15 | CVS Health Corp. | Omnicare Inc. | 12,596 | 350 | 2.8% |
| 03/30/15 | UnitedHealth Group Inc. | Catamaran Corp. | 13,333 | 450 | 3.4% |
| 01/26/15 | Energy Transfer Partners LP | Regency Energy Partners LP | 18,024 | 450 | 2.5% |
| 10/05/14 | Becton Dickinson & Co. | CareFusion Corp. | 12,309 | 367 | 3.0% |
| | | | | **Mean** | **2.8%** |
| | | | | **Median** | **2.7%** |

15

**Table 4**
**Termination Fee of Target as % of EV Across Industries**

| Date Announced | Acquirer | Target | EV $ (in millions) | Break Fee of Target | |
|---|---|---|---|---|---|
| | | | | $ (in millions) | % of EV |
| 07/07/16 | Danone SA | The WhiteWave Foods Co. | 10,345 | 310 | 3.0% |
| 03/20/16 | Sherwin-Williams Co. | Valspar Corp. | 9,350 | 300 | 3.2% |
| 11/17/15 | Air Liquide SA | Airgas Inc. | 10,641 | 400 | 3.8% |
| 10/21/15 | Lam Research Corp. | KLA-Tencor Corp. | 10,451 | 290 | 2.8% |
| 05/21/15 | CVS Health Corp. | Omnicare Inc. | 10,604 | 350 | 3.3% |
| 03/30/15 | UnitedHealth Group Inc. | Catamaran Corp. | 12,911 | 450 | 3.5% |
| 01/26/15 | Energy Transfer Partners LP | Regency Energy Partners LP | 11,287 | 450 | 4.0% |
| 10/05/14 | Becton Dickinson & Co. | CareFusion Corp. | 12,168 | 367 | 3.0% |
| | | | | **Mean** | **3.3%** |
| | | | | **Median** | **3.3%** |