## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- X
                        :

In re:                           :    Chapter 11

                            :

Energy Future Holdings, Inc., *et al.*,[1]   :    Case No. 14-10979 (CSS)

                            :

              Debtors.       :    (Jointly Administered)

                            :

                            :    **Re: D.I. 11636**

                            :

------------------------------------------------------- X

## OBJECTION OF NEXTERA ENERGY, INC. TO THE ELLIOTT FUNDS' MOTION TO RECONSIDER IN PART THE SEPTEMBER 19, 2016 ORDER [DKT. NO. 9584] APPROVING THE NEXTERA TERMINATION FEE

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

NextEra Energy, Inc. ("NextEra") hereby submits this objection (the "Objection") to *The Elliott Funds' Motion to Reconsider in Part the September 19, 2016 Order [DKT. No. 9584] Approving the NextEra Termination Fee* [D.I. 11636] (the "Reconsideration Motion"). The Objection is supported by the *Declaration of Howard Seife in Support of Objection of NextEra Energy, Inc. to the Elliott Funds' Motion to Reconsider in Part the September 19, 2016 Order [Dkt. No. 9584] Approving the NextEra Termination Fee* (the "Seife Declaration") submitted contemporaneously herewith. In support of the Objection, NextEra respectfully states as follows:

## PRELIMINARY STATEMENT[1]

Elliott's Reconsideration Motion comes fully ten months after entry of the order it asks the Court to overturn. Elliott identifies no new evidence, asserts no change in controlling law, and alleges nothing about the operation of the Termination Fee that was not spelled out in detail in September 2016. In short, Elliott fails to offer any justification whatsoever for its enormous delay in seeking what is indisputably an extraordinary remedy: retroactive disapproval of a termination fee that Elliott and its predecessors in interest had every opportunity to oppose in the first instance, but did not.

Elliott's failure to timely act is no mere oversight: its much-belated Reconsideration Motion is an unjustifiable and cynical litigation ploy. Apparently content not to oppose the Termination Fee when the issue was timely, Elliott waited until NextEra, in reliance on the Termination Fee Approval Order, expended an enormous amount of time and money undertaking every effort to complete its acquisition of the Debtors' interests in Oncor. Only when that effort was terminated by the Debtors did Elliott suddenly assert that NextEra should be

---

[1] Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to them in the Background section.

retroactively deprived of the compensation for those efforts provided by the Court's Termination Fee Approval Order.

Elliott's motion should be denied for its tardiness alone, but is also deficient on the merits. Elliott has not begun to meet its high burden of showing that the Court's Termination Fee Approval Order was rooted in "manifest error." To the contrary, Elliott's claim that the Court committed a manifest "mistake of fact" justifying reconsideration relies on two baseless allegations. First, Elliott accuses the Debtors and their professionals of misleading the Court and of concealing the provisions of the Termination Fee. Second, Elliott accuses the Court of not understanding on two occasions the effect of the Termination Fee Approval Order, both when it entered that order and when it received further confirmation of the order's terms less than a week later.

Neither allegation has any merit. To the contrary, both allegations demean the integrity of the process before the Court by besmirching the reputations of all of the professionals that appeared before the Court in connection with approval of the Termination Fee. Elliott also ignores the key creditor constituencies that thoroughly vetted and then either supported or did not challenge approval of the Termination Fee.

Elliott's first accusation—that the Debtors somehow concealed the provisions of the Termination Fee—is belied by the record. The full terms of the Termination Fee were submitted to the Court on notice to all interested parties. The Debtors' motion seeking approval of the Termination Fee specifically noted that the Termination Fee would be payable if the *Debtors* terminated the Merger Agreement to pursue and consummate an alternative transaction. The motion also made clear that the Termination Fee would not be payable if *NextEra* terminated the Merger Agreement following denial of regulatory approval. These highly negotiated provisions

were carefully considered by the Estates' creditors, many of whom initially objected to approval of the Termination Fee but ultimately withdrew their objections.

The Debtors also presented extensive testimony regarding the Termination Fee during the Approval Hearing.  This testimony made clear that the Termination Fee would generally be payable if the Debtors consummated an alternative transaction following a denial of regulatory approval, but would not be payable if NextEra were the one to terminate.  Indeed, the Court directly asked the debtor's primary witness, William Hiltz, "if the Court confirms the plan . . . and that plan does not consummate because of a failure to achieve regulatory approval, is the break-up fee payable?"  Hiltz squarely answered in the affirmative: "If the Debtor enters into another transaction, the answer is yes."  Hr'g Tr. Sept. 19, 2016 at 78:3-23.[2]  Elliott conspicuously omits that testimony from its account.  The record on this point is extensive and uncontroverted—Elliott's refusal to acknowledge that record is deliberate blindness.

Moreover, to the extent the testimony initially left any room for confusion regarding the Termination Fee, it was because Mr. Hiltz **overstated**, rather than concealed, the circumstances in which the Termination Fee would be payable to NextEra.  Thus, any purported confusion would have worked against approval of the Termination Fee.  That the Court approved the Termination Fee anyway demonstrates the irrelevance of that purported misunderstanding.

The record of the Approval Hearing also dooms Elliott's second key argument: that the Court fundamentally misunderstood the provisions of the Termination Fee.  The record paints precisely the opposite picture.  Faced with testimony that appeared to overstate the circumstances in which NextEra would be entitled to the Termination Fee, the Court directed the witness— citing page and section—to the relevant provisions of the Merger Agreement.  The Court then clarified its view that the Termination Fee would not be payable if the Public Utility Commission

---

[2]    A true and correct copy of the transcript of the hearing held before the Bankruptcy Court on September 19, 2016 is attached as **Exhibit A** to the Seife Declaration.

of Texas (the "PUCT") denied approval of the transaction "and *NextEra* walks," and asked if the witness agreed with that understanding.  The witness agreed with the Court, acknowledging that he had mistakenly previously overstated the circumstances in which the Termination Fee would be payable.   This exchange, which is excised from Elliott's quoted testimony in the Reconsideration Motion, is utterly inconsistent with Elliott's claim that the Court overlooked the key provisions of the Termination Fee.  To the contrary, during the hearing the Court was laser-focused on those provisions, studied them, and instructed the witness to do the same.

Elliott's assertion that the Court committed one or more manifest legal errors is also unfounded.  Elliott's suggestion that the Court should evaluate the value provided by NextEra in entering into the Merger Agreement with the benefit of ten months of hindsight—*i.e.*, with the knowledge that the transaction would not be approved by the PUCT—is unsupportable.  The right question was whether NextEra, at the time the Debtors entered into the Merger Agreement, was providing value to the Debtors' estates.  The record unequivocally demonstrated that the NextEra transaction was providing *massive value* to the Debtors' estates.  Nor is there any support for Elliott's assertion that the Court committed clear error by approving a termination fee that could be payable even in the absence of a higher and better bid.  Far from being able to establish "clear error," Elliott fails to cite even a single case asserting that termination fees must be conditioned upon a higher and better bid emerging.

In any event, the Debtors' respective boards of directors and management subsequently concluded that the (now superseded) Berkshire proposal was superior to continuing to try to consummate the NextEra transaction.  Were they not of that view, they would have chosen to continue to try to work with NextEra to consummate its transaction rather than terminating the Merger Agreement and immediately entering into a new merger agreement with Berkshire.

Notably, Elliott did not object to the Debtors' termination of the Merger Agreement with NextEra.

In addition, pursuant to the *Stipulation and Order Regarding Elliott's Motion to Reconsider* [D.I. 11716], the Rosenbaum Declaration in support of the Reconsideration Motion is not part of the record, and all purported facts alleged therein (including all purported facts related to the April 2017 meeting), must be disregarded and Elliott's related arguments stricken. Even if those arguments were not foreclosed by the *Stipulation and Order*, Elliott's arguments fail because they mischaracterize the facts and are ultimately irrelevant. Elliott's allegation that NextEra attempted to "extort" creditors during a meeting in April 2017 is completely false. As Elliott well knows, the PUCT stated in March 2017 that it was unlikely to approve the NextEra transaction absent a universal settlement with all intervenors in that proceeding. Such a settlement would have required concessions, financial or otherwise, from key stakeholders. As part of its unwavering commitment to closing the transaction contemplated by the Court-approved plan, NextEra approached creditors, including Elliott, who had much to lose if the NextEra deal failed, to see if they would be willing to make concessions for the benefit of all parties. Elliott spurned that overture because NextEra refused Elliott's own demand (among others) that, for Elliott to agree to *any* concession that would shift value from creditors to Texas stakeholders, NextEra must agree to reduce its Termination Fee in the event NextEra could not win PUCT approval without Burdensome Conditions. As a result, it was Elliott's own unreasonable demand that precluded the possibility of a unanimous settlement.

Nor is there anything improper about NextEra seeking review of the PUCT's decisions in parallel with its efforts to reach a unanimous settlement. NextEra believed and continues to believe that the PUCT's decisions were incorrect. As demonstrated by their *amicus* filings with the PUCT, the Debtors whole-heartedly shared NextEra's view that the PUCT's decisions were

5

incorrect.  However, with the Debtors' decision to abandon the NextEra deal, Elliott stands to lose massively, and so seeks to cast aspersions on NextEra and its good-faith effort to reach a unanimous settlement or otherwise achieve approval of its transaction.    Such a baseless accusation must be rejected.[3]    In any event, the propriety of the Termination Fee was appropriately determined as of September 2016—Elliott's (inaccurate) complaints about an event that occurred more than six months later are simply irrelevant.

Ultimately, the Court's characterization of Elliott as a party that bought tickets for the Titanic after it hit the iceberg is just too kind to Elliott.  Elliott is a sophisticated party and its principal handling its investment in the Debtors (Mr. Rosenbaum) has been intimately immersed in the Debtors' restructuring efforts since before these Chapter 11 cases were even filed.  Elliott purchased its claims with eyes wide-open to the Termination Fee provisions.  Then Elliott watched, with a front row seat, as these cases collided with the PUCT-generated iceberg. Elliott's response was still not to challenge the Termination Fee.  Only now, when it appears that Elliott may be left with little to show for its financial misadventure, does Elliott attack the Termination Fee Approval Order and seek to recoup a portion of its outlays at NextEra's expense.  Elliott should not be rewarded for alleging that the Debtors deceived the Court and that the Court did not understand what it was approving.  The Reconsideration Motion should be denied.

## **BACKGROUND**

1.    On April 29, 2014 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (the "Debtors") commenced these Chapter 11 cases by filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

---

[3]    Moreover, the earliest that NextEra could have terminated the Merger Agreement as a result of the PUCT's denial of approval for the transaction would have been on June 25, 2017, less than two weeks before the Debtors terminated.

2.    In April 2016, after an extensive and strategic marketing process and various other efforts, the Debtors engaged in discussions with NextEra for the sale of their economic interest in Oncor Electric Delivery Company LLC ("Oncor").  Only "after three months of intensive multiparty negotiations" did the Debtors commit to move forward with and seek approval of a transaction with NextEra.[4]

3.    On July 29, 2016, certain of the Debtors, NextEra, and EFH Merger Co., LLC ("Merger Sub")—a newly formed subsidiary of NextEra—executed definitive documentation to govern this transaction, including an Agreement and Plan of Merger among Energy Future Holdings Corp. ("EFH"), Energy Future Intermediate Holding Company LLC ("EFIH"), NextEra, and Merger Sub, dated July 29, 2016 (the "Merger Agreement").

4.    The Merger Agreement, as amended, contemplated a merger of EFH with and into Merger Sub, whereby EFH would have become a wholly-owned subsidiary of NextEra with an approximately $18.7 billion implied Oncor total enterprise value.

5.    A critical element of the Merger Agreement was the inclusion of a "Termination Fee" in the amount of $275 million in favor of NextEra (the "Termination Fee"), which would be payable, with certain limited exceptions, following (i) termination of the Merger Agreement by the Debtors and (ii) the Debtors' consummation of an alternative transaction involving Oncor. The Termination Fee was a key deal term that NextEra insisted be included in every term sheet and merger agreement draft that was exchanged.  *See, e.g.,* Merger Agreement § 8.5(c) ("The parties hereto acknowledge that the agreements contained in this [Termination Fee] Section 8.5 are an integral part of the transactions contemplated by this Agreement, ***and that, without these agreements, the parties hereto would not enter into this Agreement.***") (emphasis added).[5]

---

[4]    *See* Approval Motion (as defined below) ¶ 24.

[5]    *See also Debtors' Reply in Support of Approval Motion* (as defined below) ¶ 3.

6.      Also on July 29, 2016, EFH, EFIH, EFIH Finance Inc., certain direct and indirect subsidiaries of EFH, and NextEra entered into a *Plan Support Agreement* (as modified, amended or supplemented from time to time, the "Plan Support Agreement") in support of the *Amended Joint Plan of Reorganization of Energy Future Holdings Corp. et al., pursuant to Chapter 11 of the Bankruptcy Code*, as modified and filed with the Bankruptcy Court on August 5, 2016 [D.I. 9199] (as modified, amended or supplemented from time to time, the "E-Side Plan").

7.      By motion dated August 3, 2016 (the "Approval Motion"), the Debtors sought approval of their entry into the Plan Support Agreement and the Merger Agreement.[6]

8.      In the Approval Motion, the Debtors not only sought approval of the Merger Agreement generally, but also explicitly sought a ruling approving the Termination Fee.  In seeking approval of the Termination Fee, the Debtors emphasized both the enormous value that NextEra was providing to the Debtors' estates as well as the risks that NextEra was assuming by entering into the Merger Agreement.  The Debtors supported the Approval Motion with declarations by key members of the Debtors' advisory team, including William Hiltz and David Ying.[7]

9.      The Approval Motion and the supporting declarations disclosed the circumstances under which the Termination Fee would be payable and also demonstrate that the Termination Fee was the product of extensive negotiations to avoid any ambiguity.  The Approval Motion made clear that "*[i]f the Debtors terminate the Merger Agreement following entry of the Approval Order to accept another proposal, and the transaction contemplated by such other*

---

[6]     *See Motion Of The EFH/EFIH Debtors For Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, And (C) Authorizing Entry Into And Performance Under Plan Support Agreement* [D.I. 9190].

[7]     *See Declaration of William O. Hiltz in Support of the Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9191]; *Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9192].

*proposal is consummated, the Debtors would owe the $275 million Termination Fee.*"[8] The

Hiltz and Ying Declarations both similarly disclosed that the Termination Fee would be paid "in

the event of a termination of the Merger Agreement."[9]

10.     The Approval Motion also explained that there were circumstances in which

NextEra would not be entitled to the Termination Fee.  First, NextEra would not be entitled to

the Termination Fee if the Debtors terminated the Merger Agreement as a result of a breach by

NextEra that caused one of the deal's closing conditions to fail.[10]  Second, NextEra would not be

entitled to the Termination Fee "following a termination *by NextEra* at the Termination Date . . .

where PUCT approval is the only closing condition not satisfied."[11]

11.     Four parties formally objected to approval of the Merger Agreement: (a) the

successor trustee for notes issued by EFH (the "EFH Indenture Trustee"); (b) certain funds and

accounts advised or sub-advised by Fidelity Management & Research Company or its affiliates

(collectively,  "Fidelity");  (c) Contrarian  Capital  Management,  LLC  ("Contrarian");  and

(d) certain individuals asserting asbestos-related injuries (collectively, the "Asbestos Objectors").

The objecting parties challenged approval of the Termination Fee on various grounds, but each

objector argued that the Debtors had failed to meet their evidentiary burden under *Calpine Corp.

v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536 (3d Cir.

1999) ("*O'Brien*") to show that the Termination Fee was necessary to secure commitment by

NextEra and that NextEra had provided sufficient value to the Debtors' estates to warrant

approval of the Termination Fee.

12.     Fidelity's objection, in particular, alleged that the Termination Fee would chill

---

[8]     Approval Motion ¶ 30.

[9]     Hiltz Decl. ¶ 19; Ying Decl. ¶ 10.

[10]    *See* Approval Motion ¶ 29.

[11]    *Id.* (emphasis added).

bidding and could unduly burden EFH creditors to the benefit of EFIH creditors.[12]  Fidelity's objection highlighted the risks associated with the Termination Fee, noting that "if [the Merger Agreement] is terminated and any alternative transaction is consummated, the Debtors are to pay NextEra a two hundred and seventy-five million dollar ($275,000,000) Break-Up Fee."[13]

13.    The Debtors responded to these objections, and emphasized the significant value that NextEra was providing to the Debtors' estates by entering into the Merger Agreement.[14] The Debtors argued, among other things, that "[e]ach of [the] outcome-determinative factors" for approving a termination fee under *O'Brien* "is present here," including that the Termination Fee (i) promoted a competitive process; (ii) kept NextEra committed to the merger; and (iii) was not used by the Debtors to favor NextEra over others.[15]  The Debtors urged that, consistent with the *O'Brien* standard, the Termination Fee should be viewed as "one part of a larger transaction,"[16] a transaction that the Debtors insisted "provide[d] massive value to the EFH/EFIH Debtors' estates . . . ."[17]  The Debtors made clear that the Termination Fee was necessary to realize that value: "as the EFH/EFIH Debtors' and NextEra's negotiation history proves, [the Termination Fee] is one protection that has *always* been required by NextEra."[18]

14.    The Debtors also explained that not only was the Termination Fee an

---

[12]    *See Objection of Certain Funds and Accounts Advised or Sub-Advised by Fidelity Management & Research Company or its Affiliates to Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9397].

[13]    *Id.* ¶ 11.

[14]    *See EFH/EFIH Debtors' Omnibus Reply to Objections to Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9536] (the "Debtors' Reply in Support of Approval Motion").

[15]    *See Debtors' Reply in Support of Approval Motion* ¶¶ 6-14.

[16]    *Id.* ¶ 16.

[17]    *Id.* ¶ 21.

[18]    *Id.* ¶ 22; *see also id.* ¶ 3 ("NextEra has insisted [the Termination Fee] be included in their proposed transaction in every term sheet and merger agreement draft exchanged . . . since . . . July 2014").

indispensable deal term, but its size was directly related to NextEra's reciprocal commitment to (i) increase its purchase price at the "eleventh hour" by $110 million and (ii) drop its demand for the ability to match any competing offers.[19]    Consequently, as the Debtors argued, the Termination Fee was a vigorously negotiated term that was "ultimately necessary to induce NextEra" to do the deal that would provide massive value to the Debtors' estates.[20]

15.    Before the hearing on the Approval Motion, the Debtors, NextEra, and certain of the objectors engaged in extensive discussions to resolve the objections.[21]    As a result of those discussions, NextEra agreed to several concessions and, most notably, agreed to increase its purchase price by an additional $300 million (on top of the prior $110 million purchase price increase).[22]    In recognition of the increased value provided by NextEra, every objecting party other than the Asbestos Objectors withdrew their objections, and several agreed to affirmatively support approval of the Termination Fee.[23]

16.    On September 19, 2016, the Court held a full evidentiary hearing concerning approval of the Merger Agreement and Plan Support Agreement (the "Approval Hearing").    The Approval Hearing lasted three hours and featured live testimony from two witnesses.    The Approval Hearing was attended by all of the key stakeholders.    Contrary to Elliott's allegation that the parties concealed the terms of the Termination Fee from the Court, a substantial portion of the Approval Hearing was devoted specifically to the Termination Fee.    Witnesses testified as to when and under what circumstances the Termination Fee would be payable.[24]    Indeed, that testimony specifically addressed when the Termination Fee would be payable if the PUCT

---

[19]    *See Debtors' Reply in Support of Approval Motion* ¶¶ 3, 19.

[20]    *See Approval Motion* ¶¶ 40-43.

[21]    *See* Hr'g Tr. Sept. 19, 2016 at 13:23–15:3.

[22]    *See id.*

[23]    *See, e.g.,* Hr'g Tr. Sept. 19, 2016 at 105:12–20.

[24]    *See, e.g.,* Hr'g Tr. Sept. 19, 2016 at 76:12–77:18 (cross examination of William Hiltz by Asbestos Objectors); *id.* at 77:2578:23 (examination of William Hiltz by the Court); *id.* at 82:6–83:10 (same).

denied approval of the transaction or imposed burdensome conditions.  For example, William Hiltz was explicitly asked whether the Termination Fee would be payable if the Debtors "don't get the regulatory approval they need[,] this falls apart and a year and a half from now they confirm a plan that's not even a sale plan"—a question he answered in the affirmative.[25]  Under questioning by the Court—which specifically referred Mr. Hiltz to the language of Section 8.5(b) of the Merger Agreement—Mr. Hiltz confirmed that the Termination Fee would not be payable if NextEra, rather than the Debtors, was the terminating party.[26]

17.    Following the close of argument at the Approval Hearing, the Court entered its *Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9584] (the "Termination Fee Approval Order"), overruling any remaining objections on the merits and approving the Termination Fee.  The Court ruled that "the EFH/EFIH Debtors are authorized and directed to pay the Termination Fee as an allowed administrative expense to the extent it becomes due and payable pursuant to the terms and conditions of the Merger Agreement, at the time and in the manner provided for therein, without any further proceedings before, or order of, the Court . . . ."[27]

18.    Three days later, on September 22, 2016, Commissioner Anderson of the PUCT expressed concerns that the Merger Agreement, and in particular the Termination Fee, were contrary to public policy because they would "tie the [PUCT]'s hands" by forcing it to choose between approving the transaction without burdensome conditions or risking a burden to

---

[25]    *See* Hr'g Tr. Sept. 19, 2016 at 78:17–23.

[26]    *See* Hr'g Tr. Sept. 19, 2016 at 82:9–83:10.

[27]    Termination Fee Approval Order ¶ 4.

ratepayers from the Termination Fee.[28]  The two other members of the PUCT, Commissioner

Marquez and Chairman Nelson, appeared to join in Commissioner Anderson's concerns.  *See id.*

19.    NextEra, wishing to correct any potential misunderstanding, drafted a letter to the

Court confirming the circumstances in which the Termination Fee would be payable to NextEra.

NextEra shared a draft of that letter with the Debtors, who then requested to join the letter as

signatories.  NextEra agreed and the parties jointly submitted the final letter to the Court on

September 25, 2016 (the "September 25 Letter").  In that letter, the parties explained that:

> the $275 million termination fee is triggered if EFH and/or EFIH
> terminate the merger agreement as a consequence of the [PUCT]
> either not approving the merger agreement transaction or
> approving the merger transaction with the imposition of a
> burdensome condition.  In order for EFH and/or EFIH to pursue an
> alternative transaction, EFH and EFIH believe that they would
> only terminate in such a situation if they had an alternative
> proposal to pursue.[29]

The parties went on to confirm that "[t]he termination fee is not triggered if, under the same

circumstances, NextEra Energy terminates the merger agreement instead of EFH and/or EFIH."[30]

20.    Following receipt of the September 25 Letter, which confirmed precisely the

information that Elliott alleges the Court was not aware of and that purportedly warrants denial

of the Termination Fee, the Court did not modify or alter the Termination Fee Approval Order.

Instead, at a hearing held on September 26, 2016 the Court acknowledged that it understood the

provisions of the Termination Fee and the "real possibility" that "the creditors of EFH and EFIH

. . . would be directly harmed by the imposition of the termination fee."[31]  Nor did Elliott (or any

other party) seek or suggest any basis for reconsideration of the Termination Fee Approval Order

---

[28]    Tr. Sept. 22, 2016 Open Meeting before PUCT at 88–89, a true and correct copy of which is attached as **Exhibit B** to the Seife Declaration.

[29]    September 25 Letter [D.I. 9655].

[30]    *Id.*

[31]    Hr'g Tr. Sept. 26, 2016 at 14:23–25.  A true and correct copy of the hearing held before the Bankruptcy Court on September 26, 2016 is attached as **Exhibit C** to the Seife Declaration.

at that time.

21.     On February 17, 2017, the Court confirmed the E-Side Plan, entering its *Order Confirming the Eighth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Relates to the EFH Debtors and EFIH Debtors* [D.I. 10859].

22.     Following confirmation of the E-Side Plan, NextEra expended massive resources and efforts in seeking to obtain PUCT approval and to close the transaction. Nevertheless, on March 30, 2016, PUCT Commissioner Anderson released a memorandum stating that he was inclined to deny approval of the transaction because he viewed strict ring-fencing of Oncor as essential, and was aware that NextEra was not obligated to, and would not, accept such burdensome conditions.[32] Later that day, during an open meeting of the PUCT, the other PUCT Commissioners indicated that they shared Commissioner Anderson's concerns.[33] Accordingly, the PUCT Commissioners instructed the PUCT staff to prepare an order denying approval of the transaction, which order would be considered on April 13, 2017 during the PUCT's next open meeting. The Commissioners did, however, leave open the possibility that they would reach a different decision if NextEra were able to present a unanimous settlement among the intervenors in that proceeding.[34]

23.     Between March 30, 2017 and April 13, 2017, NextEra worked with interested stakeholders in an effort to reach a unanimous settlement with the intervenors in the PUCT proceeding, but was ultimately unable to achieve that objective.[35]

---

[32]   *See Memorandum*, dated March 30, 2017, from Commissioner Kenneth W. Anderson, Jr., PUCT Docket No. 46238, Item No. 535 at 4, a true and correct copy of which is attached as **Exhibit D** to the Seife Declaration.

[33]   *See* Tr. March 30, 2017 Open Meeting before PUCT at 18:18–19:9, 27:17–28:4, a true and correct copy of which is attached as **Exhibit E** to the Seife Declaration.

[34]   *See id.* at 26:5-23.

[35]   These efforts included attending an April 5, 2017 meeting with certain unsecured creditors of EFIH, including Elliott. As addressed above, Elliott's account of the April 5 meeting is highly distorted and fundamentally

24.    On April 13, 2017, the PUCT held a brief open meeting and, as they had previously indicated would be the case if a unanimous settlement was not delivered, thereafter issued a final order that denied approval of the proposed transactions.[36]

25.    Following the PUCT's order, NextEra began pursuing its remedies by filing motions for rehearing.[37] These motions were fully supported by the Debtors, who submitted *amicus* briefs urging the PUCT to reverse its decision and approve the transaction.[38] When those efforts proved unsuccessful, NextEra continued its efforts to obtain regulatory approval by filing an appeal of the PUCT's decision with the Travis County District Court.[39] All of this was done with the singular goal of obtaining approval of the transaction so that NextEra could close the Merger, consummate the Plan, and thereby deliver "massive value" to the Debtors' estates. At no point during this process did Elliott or any other creditor request that NextEra abandon its efforts to consummate the transaction.[40]

26.    On July 6, 2017, only thirteen days after the occurrence of the Merger

---

mischaracterizes what took place. However, pursuant to the *Stipulation and Order Regarding Elliott's Motion to Reconsider* [D.I. 11716], the Rosenbaum Declaration in support of the Reconsideration Motion is not part of the record, and all purported facts alleged therein, including all purported facts related to the April 2017 meeting, must be disregarded and Elliott's related arguments stricken. Consequently, NextEra will refrain from further addressing Elliott's inaccurate characterization of the April 5 meeting unless Elliott seeks to introduce evidence or argument related to the April 5 meeting in violation of the stipulation and order.

[36]    *See Order*, dated April 13, 2017, PUCT Docket No. 46238, Item No. 538, a true and correct copy of which is attached as **Exhibit F** to the Seife Declaration.

[37]    *See Motion for Rehearing*, PUCT Docket No. 46238, Item No. 543, a true and correct copy of which is attached as **Exhibit G** to the Seife Declaration; *Second Motion for Rehearing*, PUCT Docket No. 46238, Item No. 554, a true and correct copy of which is attached as **Exhibit I** to the Seife Declaration.

[38]    *See Amicus Curiae Brief of Energy Future Holdings Corp. and Energy Future Intermediate Holdings LLC in Support of Rehearing*, PUCT Docket No. 46238, Item No. 545, a true and correct copy of which is attached as **Exhibit H** to the Seife Declaration; *Amicus Curiae Brief*, PUCT Docket No. 46238, Item No. 555, a true and correct copy of which is attached as **Exhibit J** to the Seife Declaration.

[39]    *See* Hr'g Tr. Jul. 26, 2017 at 119:1–23. A true and correct copy of the hearing held before the Bankruptcy Court on July 26, 2017 is attached as **Exhibit K** to the Seife Declaration.

[40]    For further details regarding the a numerous actions taken by NextEra in seeking PUCT approval of and otherwise supporting the transaction, the Court is respectfully referred paragraphs 23 through 38 of the *Application of NextEra Energy, Inc. for Payment of Administrative Claim* [D.I. 11649].

Agreement's "drop dead" date,[41] but with NextEra continuing in earnest to pursue regulatory approval, the Debtors terminated the Merger Agreement without any prior notice to NextEra.[42] The following day, the Debtors terminated the Plan Support Agreement.[43]    Immediately thereafter, the Debtors pivoted to a fully signed transaction in which Berkshire Hathaway Energy Company and related entities (collectively, "Berkshire") would instead acquire Oncor.[44]

27.    On July 29, 2017—more than *ten months* after the Court approved the Termination Fee (and the parties' subsequent submission of the September 25 Letter)—Elliott asserted, for the very first time, that the Termination Fee Approval Order was unsound.  Simply put, Elliott strategically and cynically waited until NextEra expended an enormous amount of money and many thousands of man-hours undertaking every effort to complete the transaction before asserting that NextEra should be retroactively deprived of the compensation for those efforts provided by the Termination Fee Approval Order.

## RELIEF REQUESTED

28.    NextEra requests that the Court enter an order denying the Motion in its entirety and granting such other and further relief as is just and proper.

## ARGUMENT

I.    **The 10 Month-Delayed Reconsideration Motion is Patently Untimely**

A.    The Termination Fee Approval Order is a Final Order,
       and the Reconsideration Motion is Untimely under Rule 60(b)

i.    *The Termination Fee Approval Order is a Final Order*

29.    The portion of the Termination Fee Approval Order approving the allowance and

---

[41]  Following the drop dead date, either NextEra or the Debtors were permitted to terminate the Merger Agreement, subject to certain conditions and limitations.

[42]  *See Notice of Filing of Letters Terminating (A) the NEE Plan Support Agreement and (B) the NEE Merger Agreement*, at Exh. B [D.I. 11424].

[43]  *See id.* at Exh. A.

[44]  *See, e.g., Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11426].

directing the payment of the Termination Fee is a final order.[45]  An order is final where "there [is] nothing further for the bankruptcy court to do." *In re West Elecs., Inc.*, 852 F.2d 79, 82 (3d Cir. 1988).  Here, the Termination Fee Approval Order expressly approved allowance and payment of the Termination Fee "*without any further proceedings before, or order of, the Court.*"[46]  The unambiguous language of the Termination Fee Approval Order leaves no doubt that there was "nothing further for the bankruptcy court to do" with respect to allowance and payment of the Termination Fee.  This necessarily included any further proceedings with respect to the discrete issue of whether the Third Circuit *O'Brien* standards were satisfied.  Despite the fact that ancillary issues regarding the Termination Fee may exist (*i.e.*, how the Termination Fee is to be allocated between EFH and EFIH), the issue of whether the fee satisfies the *O'Brien* standard and should be allowed has been "finally disposed of" by the Court.  *See West Elecs.*, 852 F.2d at 82.  And it is this specific issue—allowance of the Termination Fee under *O'Brien*— that is at the heart of Elliott's Reconsideration Motion.

30.      In addition to being mandated by the unambiguous language of the Termination Fee Approval Order itself, a finding of finality is also supported by the Third Circuit's consistent view that finality must be considered "in a more pragmatic and less technical way in bankruptcy cases than in other situations."  *In re Amatex Corp.*, 755 F.2d 1034, 1039 (3d Cir. 1985) (citations omitted); *see also Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 97 (3d Cir. 1988) (the Third Circuit "takes a pragmatic view of the finality of bankruptcy appeals."); *Walsh Trucking v. Insurance Co. of North America*, 838 F.2d 698, 701 (3d Cir. 1988) (finding that the flexible standards of finality in reviewing orders in bankruptcy cases also

---

[45]    The Court's approval of the Termination Fee was one aspect of the Termination Fee Approval Order, which also addressed the Debtors authorization to enter into the Merger Agreement and Plan Support Agreement.  An order can be bifurcated for purposes of considering finality.  *See Colon v. Hart (In re Colon)*, 941 F.2d 242, 245-46 (3d Cir. 1991).  Therefore, it is not necessary to address whether the Termination Fee Order as a whole is final or interlocutory.

[46]    Termination Approval Order ¶ 4 (emphasis added).

govern appeals of bankruptcy court orders to the district court).  At least one court in this district has squarely held that an order approving a termination fee was "final under the pragmatic test used by the … Third Circuit to determine the finality of orders entered in bankruptcy proceedings." *In re Fruit of the Loom, Inc.*, 274 B.R. 631, 632 (D. Del. 2002).

31.    Moreover, closely analogous orders have been held to be final by Circuit Courts that share the Third Circuit's pragmatic approach to finality of orders in bankruptcy.  In a case that should be very familiar to Elliott, the United States Court of Appeals for the Fifth Circuit, applying a "flexible" and "practical" approach to determining finality, held that an order approving expense reimbursement to potential sale bidders constituted a final order because it disposed of a discrete dispute within the larger cases, namely whether the debtor's reimbursement of potential bidders passed muster under the business judgment standard. *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 600 (5th Cir. 2011).

32.    What is particularly notable about *ASARCO* is that it was ***Elliott*** that argued that the order approving an expense reimbursement to potential bidders (which included Elliott) was a final order.[47]  In its brief, Elliott urged that the "pragmatic approach to finality" required "the examination of the facts and circumstances in their full context" and that an order approving a potential bidder's fees was final because it finally disposed of a discrete dispute within the larger case; there "the propriety of approving the fees under a business judgment standard ***despite the possibility of future disputes over the exact amount of the fees***."[48]  Elliott's on-point argument to the Fifth Circuit can be applied directly to the facts at hand—the Termination Fee Approval Order need not resolve ***all issues*** related to the Termination Fee to be a final order.  What is relevant is that the Termination Fee Approval Order finally disposed of the discrete dispute that

---

[47]    *See* Response Brief of Appellees/Intervenors Elliott Management and The Baupost Group, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593 (5th Cir. 2011) (No. 10-40930), 2011 WL 379833.

[48]    *Id.* at 14 (emphasis added).

Elliott now seeks to relitigate—whether the Termination Fee satisfies the *O'Brien* standards.[49] And with respect to that issue, "there [is] nothing further for the bankruptcy court to do." *West Elecs.*, 852 F.2d at 82.

33.    Concluding that the Termination Fee Approval Order is a final order also has strong policy support.  Holding that the Termination Fee Approval Order is non-final would negatively affect the ability of stalking horse bidders to rely on similar court orders approving bidding procedures and providing for break-up fees.  If potential asset buyers cannot rely on the enforcement of bankruptcy court orders, there will be a chilling effect on the market and a reduction in prices that buyers would be willing to pay for assets.  It will also affect the willingness of potential buyers, like NextEra in this case, to make important concessions to reach agreement on sale terms.  Indeed, here, NextEra made a significant "eleventh hour" increase in consideration and made other concessions, all premised on the approval of the Termination Fee.  Holding that the Termination Fee Approval Order is non-final at this juncture will send a strong message that potential buyers should be wary of making similar concessions in the future in reliance on negotiated-for protections blessed by the court.

34.    In short, because the Court fully resolved the issue of whether the Termination Fee is allowable under *O'Brien*, the Termination Fee Approval Order is a final order.[50]

ii.    *The Reconsideration Motion is Patently Untimely Under Rule 60*

35.    Because the Termination Fee Approval Order was a final order, the Reconsideration Motion must be evaluated under the standards set forth in Rule 60(b) of the

---

[49]  *In re Reliant Energy Channelview, LP*, 397 B.R. 697 (D. Del. 2008), which Elliott cites in the Reconsideration Motion, does not mandate a different result.  In *Reliant*, the court *denied* a debtor's motion to pay a potential buyer a break-up fee.  Notably, the procedures order denying the break-fee required the bankruptcy court to conclude that another bid was higher and better than the bid provided by the stalking horse bidder.  *See id.* at 700.  Unlike the order in *Reliant*, the Termination Fee Approval Order finally resolved the issue of allowance of the Termination Fee "without any further proceedings before, or order of, the Court."

[50]  Unless otherwise noted, all references to the Termination Fee Approval Order in this Objection refer only to the portion of that order addressing allowance of the Termination Fee.

Federal Rule of Civil Procedure, made applicable to bankruptcy cases by Rule 9024 of the Federal Rules of Bankruptcy Procedure. *See Chaney v. Grigg (In re Grigg)*, No 12-7008, 2013 WL 5310207, at *1 (Bankr. W.D. Pa. Sept. 20, 2013).

36.    Under Rule 60(c), a motion for reconsideration brought under Rule 60(b) "must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c). However, a "motion filed under Civil Procedure Rule 60(b) is not considered timely just because it is filed within the one-year time limit." *Taylor v. Taylor (In re Taylor)*, 357 B.R. 360, 364 (Bankr. W.D. Pa. 2006) (citing *Peltz v. Com Servs., Inc. (In re USN Commc'ns, Inc.)*, 288 B.R. 391, 396 (Bankr. D. Del. 2003)). Instead, "[t]he one year period, applicable to subsections (1)–(3) [of Rule 60(b)], is an outer limit and any Rule 60(b) motion is subject to denial if it is not also made within a reasonable time after the basis for relief is known." *Defeo v. Allstate Insurance Company*, No. 95-244, 1998 WL 328195 at *5 (E.D. Pa. 1998). Significantly, "a Rule 60(b) movant as a threshold matter must provide 'a good reason for any delay in filing.'" *Taylor*, 357 B.R. at 363 (citing *Defeo*, 1998 WL 328195, at *5).

37.    Here, the Reconsideration Motion was filed more than ten months after the Termination Fee Approval Order was entered and the September 25 Letter was filed and made public. NextEra relied on the Termination Fee Approval Order in expending the extraordinary effort and significant resources that it did in attempting to obtain PUCT approval. There is no plausible, much less "good," reason for Elliott's undue delay in bringing its motion—and Elliott has not even attempted to provide one. The infirmities alleged by Elliott—the purported failure of the Debtors to fully and accurately represent the conditions under which the Termination Fee would be paid and the Court's supposed failure to understand those conditions before approving the Termination Fee Order—are things that occurred (or failed to occur) in September 2016,

during or around the time of the Approval Hearing.

38.     The risk that the Termination Fee would be payable, and its potential impact on creditors, was expressly considered and addressed by the Court at the September 26, 2016 hearing.  The Court explained that, in deciding to enter the Termination Fee Approval Order, it "found it highly significant that the creditors of EFH and EFIH which would be directly harmed by the imposition of the termination fee supported the transaction, *notwithstanding the real possibility of the imposition of a $275 [m]illion administrative expense.*"[51]  If Elliott truly believed there was a manifest error of fact or law, it was incumbent on Elliott to raise the issue as soon as possible.

39.     Moreover, a "reasonable time" under Rule 60(c) means a time before "irrevocable acts have occurred" and before "other persons can be injured by the [movant's] inaction." *See In re Johnson*, 13 B.R. 342, 348 (Bankr. D. Minn. 1981).  Again, the alleged manifest errors supporting Elliott's Reconsideration Motion purportedly occurred in September 2016, and NextEra has spent an enormous amount of money and many thousands of man-hours in reliance on the Termination Fee Order since then.  It would be patently unfair and unreasonable to allow Elliott to sit silently to see if its financial gamble would pay off, all while NextEra was going full bore to get PUCT approval, and then, only after termination of the NextEra deal, raise an issue that could have been addressed ten months and tens of millions of dollars ago.  The purpose of a reconsideration motion, which should only be granted under exceptional circumstances, is to correct manifest error.  Reconsideration is not intended to serve as a litigation tactic or leverage play for disaffected creditors to retroactively extract incremental value from other case parties.

B.     Even if the Termination Fee Approval Order
is Interlocutory, the Reconsideration Motion is Untimely

40.     Even if the Termination Fee Approval Order is interlocutory, thus making the

---

[51]    Hr'g Tr. Sept. 26, 2016 at 14:22–15:1 (emphasis added).

time limitation set forth in Rule 60(c) of the Federal Rules of Civil Procedure inapplicable, the

Motion for Reconsideration is still untimely.   As this Court noted in *Conex*, a motion for

reconsideration of an interlocutory order may be untimely under the doctrine of laches "if there

was an inordinate delay in filing such a motion."   *Stanziale v. Southern Steel & Supply, L.L.C.*

*(In re Conex Holdings, LLC)*, 524 B.R. 55, 59 n.4 (Bankr. D. Del. 2015).   Laches is an equitable

doctrine premised on the theory that a party that has "slept" on its rights for an unreasonably

long time should not be permitted to bring an action where the delay has prejudiced another

party.   *See In re U.S. Metalsource Corp.*, 163 B.R. 260 (1993) (citing *Burke v. Gateway Clipper,*

*Inc.*, 441 F.2d 946 (3d Cir. 1971)).   According to the Third Circuit, laches should bar an action if

there exists "inexcusable delay in light of the equities of the case and prejudice to the defendant."

*Burke*, 441 F.2d at 946.

41.      Here, for the reasons described above, Elliott's delay in bringing the

Reconsideration Motion is inexcusable.   There is no good reason for Elliott's ten-month delay in

bringing the Reconsideration Motion that can counterbalance the severe prejudice that would be

imposed on NextEra by revisiting allowance of the Termination Fee and belatedly rejecting it.   It

is well-documented that NextEra would not have gone forward with the proposed transaction in

the absence of the Termination Fee, and certainly would not have undertaken the massive

amount of work it did to seek PUCT approval if the Court rejected the fee.[52]   Elliott, undoubtedly

aware of these facts and presumably not wishing to risk NextEra walking away while there was

still a possibility of the deal closing, tactically delayed its Reconsideration Motion until after the

Merger Agreement was terminated.   Such cynical game-playing should not be rewarded.   In

short, regardless of whether the Court deems the Termination Fee Approval Order to be a final

order or an interlocutory order, Elliott's delay in bringing the Reconsideration Motion and

---

[52]      *See, e.g.,* Tr. Hr'g Sept. 19, 2016 at 121:17-19 ("the evidence overwhelmingly indicates that a breakup fee was
necessary to induce NextEra to make a bid, and to move forward with a merger agreement.").

NextEra's reliance on the order require denial of the Reconsideration Motion.

## II.    The Reconsideration Motion Fails on its Merits Because the Court Did Not Commit a Manifest Error of Law or Fact in Entering the Termination Fee Approval Order

### A.    Governing Standard

42.    Even should the Court consider the Reconsideration Motion despite its untimeliness, the motion fails on its merits. Elliott does not begin to demonstrate the need for the extraordinary relief of reconsidering the Termination Fee Approval order, regardless of whether the order is treated as final or interlocutory.

43.    "A motion for reconsideration is not expressly recognized in the Federal Rules of Civil Procedure." *In re Grigg*, 2013 WL 5310207, at *1 (citing *In re Drumm*, 329 B.R. 23, 30 (Bankr. W.D Pa. 2005); *In re Hogan*, 79 Fed. App'x 846 (6th Cir. 2003)). Nevertheless, a motion to reconsider will generally be treated as a motion to alter or amend a judgment under Rule 59 (made applicable by Bankruptcy Rule 9023) if the order is interlocutory or the motion is filed within 14 days of entry of judgment or Rule 60 (made applicable by Bankruptcy Rule 9024) if the order is final and the motion is not made within 14 days of entry of judgment. *See id.* In either case, "[t]he purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985); *see also Max's Seafood Café by Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (same); *In re Maxus Energy Corp.*, 2017 WL 3278830, No. 16–51025 (CSS), at *2 (Bankr. D. Del. Aug. 2, 2017) (same).

44.    Under Rule 60(b)(1), the Court may grant relief from a judgment or order as a result of "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). "The movant under Rule 60(b) 'bears a heavy burden' . . . ." *Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991) (quoting *Plisco v. Union R. Co.*, 379 F.2d 15, 17 (3d Cir. 1967), *cert. denied*, 389 U.S. 1014 (1967)). Relief under Rule 60(b) is "extraordinary relief which should be granted only

where extraordinary justifying circumstances are present." *Plisco*, 379 F.2d at 17. Moreover, "the Third Circuit has maintained that a legal error, without more cannot justify granting a Rule 60(b) motion." *Cunningham v. Riley*, No. Civ. A. 99–460–SLR, 2003 WL 21383723, at *3 (D. Del. June 12, 2003) (citing *Smith v. Evans*, 853 F.2d 155, 158 (3d Cir. 1988)) (internal quotation marks and citations omitted).

45.     Absent a change in controlling law or newly discovered evidence, relief under Rule 59 should only be granted where there is a "need to prevent manifest injustice or correct a clear error of law or fact." *In re Maxus Energy Corp*, 2017 WL 3278830, at *2; *see also In re W.R. Grace & Co.*, 398 B.R. 368, 371-72 (D. Del. 2008) (citing *Max's Seafood Café*, 176 F.3d at 677) (same). While there is no "entirely settled" meaning of the terms used in Rule 59, "clearly a moving party has a very high hurdle to leap over before it can meet the required standard to alter or amend a judgment." *In re Titus*, 479 B.R. 362, 367 (Bankr. W.D. Pa. 2012). Generally, a "'clear error of law or fact' requires a finding that the error is 'plain and indisputable[,] amount[ing] to a *complete disregard of the controlling law or the credible evidence in the record.*'" *In re Maxus Energy Corp*, 2017 WL 3278830, at *3 (quoting *In re Titus*, 479 B.R. at 367-68) (emphasis added) (internal alterations omitted).[53]

46.     Regardless of which standard is applied here, Elliott faces an insurmountable burden.

B.     The Court Did Not Commit a Manifest Error of Fact Because the Terms of the Termination Fee Were Fully Disclosed, Were Expressly Reviewed and Considered by the Court, and Have Never Changed

47.     Elliott argues that the Court committed a manifest error of fact because the parties supposedly concealed the true terms of the Termination Fee from the Court, or misrepresented

---

[53]    Notably, "the term manifest injustice is an overlap of the term manifest error of law or fact, and it means that the court overlooked some dispositive factual or legal matter that was presented to it, or alternatively that there was an error in the trial court that was direct, obvious, and observable." *Id.* at 368 (citing *In re Telfair*, 745 F. Supp.2d 536, 561 (D.N.J. 2010)).

those terms, and the Court lacked the wherewithal to understand the terms on its own. Nothing could be further from the truth.

48.     The core of Elliott's argument is that "[h]ad the Court known the terms of the Termination Fee as now alleged, Elliott believes this Court would not have approved it on the circumstances of this case . . . ."[54]    In other words, Elliott believes that the Court failed to understand its own Termination Fee Approval Order.  Perhaps seeking to ameliorate the sting of that accusation, Elliott lays blame for the Court's supposed ignorance at the Debtors' feet, accusing them of "failing to *candidly* explain the material terms of the [Termination] Fee."[55]  In other words, Elliott believes that the Debtors—through their counsel—deceived the Court to obtain approval of the Termination Fee.

49.     Both of Elliott's key assertions are demonstrably false.  The facts do not support Elliott's revisionist history.

i.      *The Provisions of the Termination Fee Were*
        *Fully Disclosed in Advance of the Approval Hearing*

50.     Contrary to Elliott's accusation, the full terms of the Termination Fee were put before the Court—nothing was hidden.  When the Debtors filed the Approval Motion with the Court on August 3, 2016 they included, attached as Exhibit 1 to the proposed order approving the Debtors' entry into the Merger Agreement, a complete copy of the proposed Merger Agreement.[56]  Section 8.5(b) of the Merger Agreement provides the complete terms of the Termination Fee.[57]

51.     Nor was the Debtors' pre-hearing disclosure limited to providing the Court with just the Merger Agreement; the Approval Motion provided additional disclosure regarding the

---

[54]    Reconsideration Motion ¶ 41.

[55]    Reconsideration Motion ¶ 42 (emphasis added).

[56]    *See* D.I. No. 9190-2 Exh. 1.

[57]    *See* Merger Agreement § 8.5(b) [D.I. No. 9190-2 Exh. 1 at 105–06.].

Termination Fee. Significantly, the Approval Motion plainly stated that "[i]f the Debtors terminate the Merger Agreement following entry of the Termination Fee Approval Order to accept another proposal, and the transaction contemplated by such other proposal is consummated, the Debtors would owe the $275 million Termination Fee."[58] The Approval Motion also plainly disclosed the Termination Fee would *not* be paid if NextEra terminated the Merger Agreement at the drop dead date without having obtained PUCT approval:

> Upon Court approval of the Merger Agreement, EFH Corp. and EFIH are liable for the Termination Fee, in the amount of $275 million, as an allowed administrative expense claim, in the event of certain termination events in accordance with the Merger Agreement. Merger Agreement § 8.5(b). ***The Termination Fee is not payable*** in the event of, among other things, certain terminations resulting from breaches by NextEra or Merger Subsidiary or ***following a termination by NextEra at the Termination Date (as defined in the Merger Agreement) where PUCT approval is the only closing condition not satisfied***. The Termination Fee is inclusive of all professional fees and expense reimbursements of NextEra and Merger Subsidiary.[59]

52. The Approval Motion's disclosure concerning the terms of the Termination Fee could not have been more complete. The Approval Motion disclosed that, as a general rule, the Termination Fee would be payable to NextEra following termination of the Merger Agreement by the Debtors.[60] As an exception to that general rule, the Approval Motion expressly disclosed that if the Merger Agreement were terminated by the Debtors as a result of certain breaches by NextEra, the Termination Fee would not be payable.[61] The Termination Fee would also not be payable if the Merger Agreement was terminated "***by NextEra*** at the Termination Date . . .

---

[58] Approval Motion ¶ 30.

[59] *Id.* ¶ 29 (emphasis added).

[60] *See id.* ¶ 30 ("If the Debtors terminate[d] the Merger Agreement" and consummated an alternative transaction, the Termination Fee was payable.).

[61] *Id.* ¶ 29.

where PUCT approval" remained lacking.[62]  The Debtors made full and complete disclosure of

the terms of the Termination Fee.

      ii.    *The Provisions of the Termination Fee Were Thoroughly Vetted in*
               *Advance of the Approval Hearing--and Elliott Did Not Object*

53.      Prior to the Approval Hearing, the Termination Fee was thoroughly vetted by

creditors and other interested parties.  Indeed, demonstrating the seriousness with which the

Termination Fee was taken, no less than four separate stakeholders—including many of the most

sophisticated parties in these Chapter 11 cases—initially filed objections to the Termination

Fee.[63]  As described above, all but one of these objections was voluntarily withdrawn prior to the

Approval Hearing, and creditors broadly rallied behind the proposed NextEra transaction,

including the Termination Fee.

54.      Fidelity, in explaining its decision to abandon its objection and sign on to the Plan

Support Agreement, stated that:

> We obviously filed an objection because we did originally have
> real concerns about whether the breakup fee or the termination fee
> did satisfy the O'Brien standard.  We think, given how this has
> changed, and the very significant increase in the bid by NextEra,
> we think that they -- the Debtors have carried the burden [of
> showing] that the breakup fee is reasonable and necessary to
> preserve the value of the estate.[64]

Counsel for UMB Bank, N.A., in its capacity as trustee for the PIK Notes, and the *Ad Hoc* Group

of PIK Noteholders also spoke to "offer [their] support for approval of the PSA and merger --

merger approval motion"[65] and asked the Court "to recognize, at least from the creditor

perspective, that you know, *this agreement has been thoroughly reviewed and vetted by the*

---

[62]   *Id.* ¶ 30 (emphasis added).

[63]   The objecting parties included: (a) Fidelity [D.I. 9397]; (b) the EFH Notes Trustee [D.I. 9399]; (c) Contrarian [D.I. 9402]; and (d) the Asbestos Objectors [D.I. 9398].

[64]   Hr'g Tr. Sept. 19, 2016 at 105:12–20.

[65]   Hr'g Tr. Sept. 19, 2016 at 107:22–23

***principal beneficiaries of this agreement***[, who] would like to see it approved as quickly as possible."[66]  Despite this thorough disclosure and vetting of the provisions of the Termination Fee, Elliott (or any of its predecessors in interest) did not object.[67]

       iii.    *The Court Heard Testimony and Asked Detailed Questions Regarding the Key Provisions of the Termination Fee*

55.     In part because the Asbestos Claimants continued to press their objections to the Merger Agreement, including the Termination Fee, the Court held a lengthy evidentiary hearing regarding the Approval Motion, during which the Court heard testimony from two witnesses. Elliott has largely ignored this witness testimony and instead seized on a few cherry-picked statements of counsel made during the Approval Hearing to paint an inaccurate picture of the evidence put forward supporting the Termination Fee.  Particularly egregious is Elliott's false assertion that "[n]o one stated that NextEra would receive the Termination Fee should the PUCT not approve the NextEra Transaction unless NextEra terminated the Merger Agreement on its own accord."[68]  In fact, far from concealing that the Termination Fee could be payable to NextEra if the PUCT denied regulatory approval of the transaction, the Debtors' witness initially testified over-broadly as to the circumstances in which the fee would be payable:

> [THE COURT:] . . . if the Court confirms the plan, and by that I mean the one on the table here, or the NextEra deal, and that plan does not consummate because of a failure to achieve regulatory approval, is the break-up fee payable?
>
> MR. HILTZ: If the Debtor enters into another transaction, the answer is yes.

---

[66]  Hr'g Tr. Sept. 19, 2016 at 108:1–5 (emphasis added).  Notably, Jeff Rosenbaum, who is presently employed by Elliott and submitted a declaration in support of the Elliott Objection, was employed by York Capital Advisors, LLC—a member of the Approval Motion-supporting *Ad Hoc* Group of PIK Noteholders—and was responsible for managing York's investment in the Debtors prior to being hired by Elliott in October 2016.

[67]  It is irrelevant whether Elliott was a creditor at the time that interested parties were entitled to object to the Approval Motion.  Either Elliott was a creditor and did not object or Elliott bought its claims, with full knowledge of the approval of the Termination Fee, from parties that either did not object to the Approval Motion or objected but subsequently withdrew such objections.

[68]  Reconsideration Motion ¶ 43.

THE COURT: But if this transaction simply falls apart because you don't get regulatory approval from the Public Utility Commission?

MR. HILTZ: Well, again, I think if the Debtor enters into another transaction including a reorganization involving its own creditors--

THE COURT: All right, so--

MR. HILTZ: --it would be payable.

THE COURT: So I -- because if this plan gets confirmed for Debtors -- not anything the Debtors do wrong, they don't get the regulatory approval they need -- this falls apart and a year and a half from now they confirm a different plan that's not even a sale plan, say it's a standalone plan, that break-up fee would be payable?

MR. HILTZ: I believe so.[69]

That evidence—testimony, not summation by counsel—cannot be squared with Elliott's assertion that the Debtors "presented the impression that if the PUCT denied the Joint Application, there simply would be no fee paid."[70]  Mr. Hiltz testified to *exactly the opposite* proposition.[71]

56.    To be sure, this testimony was not perfectly accurate—the Termination Fee would not be payable if the PUCT denied approval of the transaction or imposed burdensome conditions and *NextEra* terminated the Merger Agreement.  But the errors in the testimony overstated, rather than hid, the circumstances in which the Termination Fee would be payable. Elliott thus has it exactly backwards—to the extent there was any room for misunderstanding (which there was not by the close of evidence), that misunderstanding would have worked against approval of the Termination Fee.  That the Court approved the Termination Fee even in

---

[69]    Hr'g Tr. Sept. 19, 2016 at 78:3-23.

[70]    Reconsideration Motion ¶ 43.

[71]    In the Reconsideration Motion, Elliott utterly fails to acknowledge Mr. Hiltz's testimony on the Termination Fee, burying the only reference to it in an unintelligible footnote that does not disclose that Mr. Hiltz testified that the Termination Fee would be payable if the PUCT denied approval of the transaction.  *See* Reconsideration Motion at p. 6 n.1 ("Although the Court was apparently concerned with the situation that has actually occurred, upon inquiry, the Court's concern may not have been fully addressed.").

the face of initially overbroad testimony regarding the terms under which it would be payable shows the irrelevance of the purported misunderstanding.

57.    Moreover, demonstrating that there was no misunderstanding and that the Court had reviewed in detail and keenly understood the Termination Fee provisions of the Merger Agreement, the Court conducted follow-up questioning of Mr. Hiltz and specifically clarified that the Termination Fee would not be payable if the Merger Agreement was terminated *by NextEra* following a denial of PUCT approval:

> THE COURT: I actually have a question. I want to follow up because I pulled the (indiscernible) -- well, I didn't pull, Ms. (indiscernible) has pulled the merger agreement to help me out here. And this goes to when the break-up fee is payable in the event there is a regulatory problem. So, I'm looking at 8.5, I believe? Do we have a -- does he have an exhibit that has the merger agreement in it?
>
> MR. ECHOLS: It's in Exhibit 1, Your Honor.
>
> THE COURT: Okay. If you could look at Page... Okay. Page 111 of 429? You got that?
>
> MR. HILTZ: I'm incorrect in my statement earlier.
>
> THE COURT: Okay. I'm going to get that on the record. Okay, so looking at Subsection B there, it says that -- I believe it says that the termination fee will not be payable if this agreement is terminated (indiscernible) by parent --
>
> MR. HILTZ: Yes.
>
> THE COURT: Pursuant to Section 8.2(a) and the receipt of the PUCT approval is the only condition set forth in Article 7 not satisfied or waived in accordance with this agreement. So, I read that to be is -- and maybe -- is this your understanding that plan gets confirmed, they go to the PUCT, the PUCT shuts it down, and NextEra -- or it sets terms on it that NextEra doesn't like, *and NextEra terminates*, that the break-up fee is not payable?
>
> MR. HILTZ: That's the way I would read it.
>
> THE COURT: Okay. And that's your understanding?

MR. HILTZ: Yes.[72]

The Court got the analysis exactly right.  Initially, Mr. Hiltz incorrectly testified that the Termination Fee would be payable to NextEra following PUCT denial of the transaction or imposition of a burdensome condition, regardless of which party terminated.[73]  Minutes later, under the Court's questioning and with the Court directing him to the definitive Merger Agreement language regarding the Termination Fee, Mr. Hiltz corrected his testimony to reflect that the fee would not be payable under those circumstances if "NextEra terminates."[74]

58.    The Court's demonstrated familiarity with, and analysis of, the provisions of the Termination Fee is fatal to the Reconsideration Motion because it shows that no facts were overlooked by the Court with respect to the Termination Fee.  *See Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.)*, 437 B.R. 488, 493 (Bankr. D. Del. 2010) ("The defendants have not identified any evidence presented but overlooked by the Court that might reasonably have altered the result.  Thus, the motion for reconsideration must be denied.").  To the contrary, the Court proved that it had specifically examined the key provisions of the Termination Fee and understood them fully.

iv.    *Debtors' Counsel Did Not Mislead
the Court Regarding the Termination Fee*

59.    Ignoring all of the above disclosure and testimony concerning the Termination Fee, Elliott quotes a handful of statements by Debtors' counsel—divorced from context—in an effort to show that the Debtors misled the Court.  The Debtors did no such thing.  If anybody is seeking to mislead the Court, it is Elliott.

60.    Amazingly, Elliott quotes portions of the record that appear to show Mr. Husnick

---

[72]  Hr'g Tr. Sept. 19, 2016 at 82:6-83:10 (emphasis added).

[73]  *See id.* at 78:3-23.

[74]  *Id.* at 82:6-83:10.

misstating the terms of the Termination Fee.  *See* Reconsideration Motion at 6–7.  But the ellipses included in Elliott's version of the exchange are doing more than their share of the work—Elliott has excerpted away ***the entire exchange between Mr. Hiltz and the Court quoted above***, and has instead made it appear that the Court and Mr. Husnick were engaged in colloquy. In fact, Mr. Husnick was merely attempting to provide clarification following Mr. Hiltz's testimony.  In offering that clarification, Mr. Husnick was responding to the Court's questioning regarding whether the Termination Fee would be payable if "NextEra walks" away from the deal following PUCT disapproval of the transaction or imposition of a Burdensome Condition.[75]  Mr. Husnick's statement regarding the Termination Fee during summation must also be read in reference to that hypothetical, not as a general statement that the Termination Fee would not be payable following PUCT denial of approval regardless of which party terminated.  At no point did the Debtors conceal from the Court that the Termination Fee would be payable if the PUCT denied approval or imposed burdensome conditions and the Debtors terminated the Merger Agreement.

> v.    *The September 25 Letter Was Not a Post Hoc Justification for the Termination Fee: It Clarified Potential Confusion Created by PUCT Remarks*

61.    Elliott is again off the mark in seeking to attack the September 25 Letter as impermissible *post hoc* support for the Court's approval of the Termination Fee.  It was nothing of the sort—the Debtors and NextEra already had Court approval of the Termination Fee and had no need to provide further support.  Instead, the September 25 Letter was designed to avoid any confusion created post-approval when PUCT Commissioner Anderson incorrectly characterized the terms on which the Termination Fee would be payable:

> [COMMISSIONER ANDERSON:] . . . if I read [the Merger Agreement] correctly, if the Commission rejects the transaction in

---

[75]    Hr'g Tr. Sept. 19, 2016 at 83:15-84:10.

> its entirety, [and finds that it] is not in the public interest subject to
> some caveats, there's no termination fee.
>
> If, on the other hand, the Commission purports to approve it but
> with what they call "burdens of condition" [sic] . . . they can walk
> and get paid $275 million. Now that's an extraordinary
> requirement.[76]

62.    Wishing to correct any potential confusion created by the Commissioner's statement that the Termination Fee would be payable if NextEra terminated the Merger Agreement following imposition of a burdensome condition, NextEra took the initiative in preparing, and then with the Debtors jointly submitting, the September 25 Letter explaining in the clearest possible terms the circumstances under which the Termination Fee would be payable:

> In particular, the merger agreement provides that, if the agreement
> is terminated by NextEra Energy, and not EFH or EFIH, because
> the transaction has not closed by a specified date and the closing
> condition that requires NextEra Energy to have received the
> Commission's approval of the transaction, without the imposition
> of a burdensome condition, is the only closing condition set forth
> in the merger agreement that is not as of that specified date
> satisfied, then NextEra Energy is not entitled to any portion of the
> $275 million termination fee.
>
> In other words, the $275 million termination fee is triggered if
> EFH and/or EFIH terminate the merger agreement as a
> consequence of the Commission either not approving the merger
> agreement transaction or approving the merger transaction with the
> imposition of a burdensome condition. . . . . The termination fee is
> not triggered if, under the same circumstances, NextEra Energy
> terminates the merger agreement instead of EFH and/or EFIH.[77]

63.    Needless to say, the September 25 Letter did not alter the already-approved, unequivocal language of Section 8.5 of the Merger Agreement that the Court reviewed in approving the Termination Fee. Moreover, in commenting on the September 25 Letter, the Court confirmed that, when it approved the Termination Fee, it understood the potential negative

---

[76]    Tr. Sept. 22, 2016 Open Meeting before PUCT at 88–89.

[77]    September 25 Letter at 1.

consequences of the Termination Fee for unsecured creditors:

> In deciding whether to approve the merger agreement and termination fee, this Court considered this very point and in so doing found it highly significant that the creditors of EFH and EFIH which would be directly harmed by the imposition of the termination fee supported the transaction, notwithstanding the real possibility of the imposition of a $275 [m]illion administrative expense.[78]

64.    If the Court was troubled or in any way confused by the terms of the Termination Fee, the Court could have and presumably would have revisited the Termination Fee Approval Order *sua sponte* immediately upon receiving the September 25 Letter. That the Court chose not to do so speaks volumes.

65.    In sum, there is no evidence whatsoever that the Court committed a manifest error of fact that would justify reconsideration of the Termination Fee Approval Order. The provisions of the Termination Fee were fully disclosed in writing. They were carefully examined and ultimately overwhelmingly supported by creditors. They were thoroughly probed by the Court prior to entry of the Termination Fee Approval Order. And when reconfirmed in the September 25 Letter, they were not revisited by the Court. As a result, the Reconsideration Motion must be denied.

C.    The Court Did Not Commit a Manifest Error of Law: Elliott's Hindsight Approach to Challenging the Termination Fee is Unsupportable

66.    Even setting aside the Reconsideration Motion's patent untimeliness, there is no basis for revisiting the Court's correct decision that the Merger Agreement satisfied the *O'Brien* legal standards for approval of an administrative expense. As addressed above, the Termination Fee Approval Order is a final order and, as a result, the Reconsideration Motion must be evaluated under the strict standards of Rule 60. Yet, "the Third Circuit has maintained that a legal error, without more cannot justify granting a Rule 60(b) motion." *Cunningham*, 2003 WL

---

[78]    Hr'g Tr. Sept. 26, 2016 at 14:20-15:1.

21383723, at *3 (*citing Smith*, 853 F.2d at 158) (internal quotation marks and citations omitted).

Accordingly, Elliott's assertion that the Court has misapplied *O'Brien* cannot be a basis for reconsideration. The Court can and should decline to reconsider the Approval Motion without further briefing or a hearing. *See In re Homelife Corp.*, No 01-2412 (EIK), 2002 U.S. Dist. LEXIS 17915, at * 7 (D. Del. Sept. 20, 2002) (noting that the Court was not required to reconsider a prior order concerning approval of a termination fee and declining to do so where the court had considered *O'Brien* before approving the fee). However, even if the Court were inclined to revisit *O'Brien*, the Reconsideration Motion for multiple reasons fails to demonstrate a manifest error of law.

67.    Elliott's first argument is that the Court committed a clear error of law is that "the Court may not have fully appreciated the situation we have here" because those terms were "complex."[79] This is simply a rehash of Elliott's allegation that the Court committed an error of fact for the same reason.[80] It must likewise be rejected because the Court was fully aware of the provisions of the Termination Fee.

68.    Elliott's second argument is that any benefit provided by NextEra entering in the Merger Agreement must have been "speculative, not actual" because the transaction ultimately did not close.[81] Elliott ignores that termination fees, by definition, are paid only where the transaction in question does not close. *See, e.g., In re Am. Appliance*, 272 B.R. 587, 601 (Bankr. D.N.J. 2002) ("the term 'break-up fee' refers to a fee paid by a seller to a prospective purchaser in the event that a contemplated transaction is not consummated."). Needless to say, the Court did not commit a clear error of law by failing to rely on purported facts that developed months

---

[79]    Reconsideration Motion ¶ 55.

[80]    *See* Section II.B, *supra*.

[81]    Reconsideration Motion ¶ 55.

Case 14-10979-CSS    Doc 11876    Filed 09/07/17    Page 37 of 41

after the Court entered the Termination Fee Approval Order.[82]  *See In re Am. Shipyard Corp.*,

229 B.R. 551, 552 (Bankr. D.R.I. 1998) (noting that the court's "task today is not to consider the

breakup fee *ab initio*, as it has already been approved," notwithstanding that "with hindsight, we

would probably not be approving" the breakup fee).

69.      The Court necessarily and properly made the *O'Brien* determination based on the

record before it—which was voluminous and clearly established the benefit to the Debtors'

estates provided by approval of the Merger Agreement in its totality, including the Termination

Fee.  As the Debtors argued, the Termination Fee was "one part of a larger transaction."[83]

Indeed, attempting to evaluate the supposed benefits of a termination fee in isolation from the

rest of the transaction fundamentally makes no sense—a termination fee is *always* a burden.  In

this respect, Elliott does not argue against NextEra's Termination Fee, it argues against *all*

termination fees.    That is not the approach courts adopt when considering approval of

termination fees.    Instead, they look to whether the termination fee was necessary to induce a

bidder to participate in a proposed transaction and then whether the proposed transaction, in its

entirety, stands to provide value to the debtor's estate.

70.      In this case, the Debtors made clear that the Termination Fee was "ultimately

necessary to induce NextEra" to submit its bid.[84]  Based on the evidentiary record after trial, the

Court ultimately agreed that "the evidence overwhelmingly indicates that a breakup fee was

---

[82]   Elliott's misleading citation to *In re RS Legacy Corp.*, No. 15-10197 (BLS), 2016 WL 1084400, at *3 (Bankr.
D. Del. Mar. 17, 2017) is not to the contrary.  The "hindsight" to which *RS Legacy* refers is nothing more than
the heightened standard to which attorneys' fees are held when incurred on behalf of a non-estate fiduciary.
Unlike an attorney for an estate fiduciary, who may claim compensation for whatever "services a reasonable
lawyer or legal firm would have performed in the same circumstances," an attorney seeking compensation
under section 503(b)(4) is subject to the "substantial contribution test[, which] is applied in hindsight and
scrutinizes the actual benefit to the case."  *In re Granite Partners*, 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997).
NextEra is not and does not purport to be a professional compensated under section 503(b)(4).

[83]   Debtors' Reply in Support of Approval Motion ¶ 16.

[84]   *Id.* ¶ 40.

necessary to induce NextEra to make a bid, and to move forward with a merger agreement."[85]

Moreover, the evidence was uncontroverted that the Merger Agreement, taken as a whole, "provide[d] massive value to the EFH/EFIH Debtors' estates . . . ."[86]    Creditors almost unanimously agreed with that assessment and either supported the Approval Motion outright or withdrew their objections prior to the commencement of the Approval Hearing.   Indeed, certain creditors specifically cited the additional value being provided to the estates by NextEra under the Merger Agreement as the reason for withdrawing their objections to approval of the Termination Fee.[87]    Moreover, as the Debtors have previously argued, "a break-up fee may include compensation for a bidder's lost opportunity costs," which in this case were indisputably enormous. *In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992) (citing *In re 995 Fifth Avenue Associates, L.P.*, 96 B.R. 24, 29 n.6 (Bankr. S.D.N.Y. 1989)).   Accordingly, even if the Court were to revisit its prior *O'Brien* determination—which it should not—the Termination Fee Approval Order would necessarily be upheld.

### III.    The Court Did Not Err in Approving the Termination Fee that Would be Payable Even in the Absence of a Higher and Better Offer

71.    Elliott's repeated complaint that the Termination Fee should not have been approved because it is payable even in the absence of a higher and better offer is likewise meritless.

72.    First, Elliott is again wildly off-base in claiming that the parties failed to disclose that the Termination Fee would be payable even in the absence of a higher and better offer. Obviously, the parties would not have engaged in an extended discussion regarding higher and

---

[85]    Tr. Hr'g Sept. 19, 2016 at 121:17-19.

[86]    Approval Motion ¶ 21.

[87]    Hr'g Tr. Sept. 19, 2016 at 105:12–20.

better offers because higher and better offers simply were not a factor in determining when the Termination Fee would be payable, as any party reading the Termination Fee provisions could readily discern. The Merger Agreement's description of potential Termination Fee-triggering "alternative transactions" is intentionally broad, and contains no reference to higher and better offers.[88] Indeed, as Elliott notes in the Reconsideration Motion, the Merger Agreement provides that "the Termination Fee was also payable in a Chapter 7 liquidation or a liquidating Chapter 11 plan for EFIH."[89] Even had it not noticed the absolute lack of any reference to "higher and better" offers in Section 8.5, Elliott is more than sophisticated enough to have known that a Chapter 7 liquidation would not have generated "higher and better" value for the Estates than NextEra's bid. Yet neither Elliott nor any other creditor opted to challenge the Termination Fee on those grounds.

73.     Second, Elliott is simply wrong on the substance—the Third Circuit has never imposed a requirement that Termination Fees be payable only if a higher and better offer is consummated. The best Elliott can muster, without citation or proof, is its assertion that it is the "regular situation" for termination fees to be paid as a result of a higher and better offer. But a court order departing from the "regular situation" does not justify revoking that order ten months after the fact and after a party has expended tens of millions of dollars in reliance on that order. It is Elliott's burden to show that the Court committed a "clear error" of law. It has not done so, and cannot do so, here.

## CONCLUSION

Wherefore, NextEra requests that the Court enter an order denying the Motion in its entirety and granting such other and further relief as is just and proper.

---

[88]     *See* Merger Agreement § 8.5(b).

[89]     Reconsideration Motion ¶ 23 (citing Merger Agreement §§ 8.3(d), 8.4(g), 8.5(b)).

Dated: September 7, 2017  
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*Matthew B. McGuire*  
Adam G. Landis (No. 3407)  
Matthew B. McGuire (No. 4366)  
Joseph D. Wright (No. 5669)  
919 Market Street, Suite 1800  
Wilmington, Delaware 19801  
Telephone: (302) 467-4400  
Facsimile: (302) 467-4450  
Email:    landis@lrclaw.com  
             mcguire@lrclaw.com  
             wright@lrclaw.com

– and –

WINSTON & STRAWN LLP  
Dan K. Webb (admitted *pro hac vice*)  
35 W. Wacker Drive  
Chicago, Illinois 60601-9703  
Telephone: (312) 558-5600  
Facsimile: (312) 294-5700  
Email:    dwebb@winston.com

Thomas M. Buchanan (admitted *pro hac vice*)  
1700 K Street, NW  
Washington, D.C. 20006  
Telephone: (312) 282-5000  
Facsimile: (202) 282-5100  
Email:    tbuchana@winston.com

– and –

NORTON ROSE FULBRIGHT US LLP
Howard Seife (admitted *pro hac vice*)
1301 Avenue of the Americas
New York, New York 10019-6022
Telephone:  (212) 408-5100
Facsimile:   (212) 541-5369
Email:        howard.seife@nortonrosefulbright.com

Robin Ball (admitted *pro hac vice*)
555 South Flower Street, 41st Floor
Los Angeles, California 90071
Telephone:  (213) 892-9200
Facsimile:   (213) 892-9494
Email:        robin.ball@nortonrosefulbright.com

*Counsel to NextEra Energy, Inc.*