# Exhibit B

# ORIGINAL

TRANSCRIPT OF PROCEEDINGS

BEFORE THE

PUBLIC UTILITY COMMISSION OF TEXAS

AUSTIN, TEXAS

OPEN MEETING

THURSDAY, SEPTEMBER 22, 2016

BE IT REMEMBERED THAT AT approximately
9:35 a.m., on Thursday, the 22nd day of September 2016,
the above-entitled matter came on for hearing at the
Public Utility Commission of Texas, 1701 North Congress
Avenue, William B. Travis Building, Austin, Texas,
Commissioners' Hearing Room, before DONNA L. NELSON,
Chairman, KENNETH W. ANDERSON, JR. and BRANDY MARQUEZ,
Commissioners; and the following proceedings were
reported by William C. Beardmore, Certified Shorthand
Reporter.

KENNEDY REPORTING SERVICE, INC.
512.474.2233   order@kennedyreporting.com

1223

1                        TABLE OF CONTENTS

2                                                          PAGE

3    PROCEEDINGS, THURSDAY, SEPTEMBER 22, 2016 .........   10

4                              WATER

5                        AGENDA ITEM NO. 1

6    DOCKET NO. 46120; SOAH DOCKET NO.
     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.WS - CITY OF MIDLOTHIAN'S
7    NOTICE OF INTENT TO SERVE AREA
     DECERTIFIED FROM MOUNTAIN PEAK SPECIAL
8    UTILITY DISTRICT IN ELLIS COUNTY ............. CONSENTED

9                        AGENDA ITEM NO. 2

10   DOCKET NO. 46140; SOAH DOCKET NO.
     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.WS - CITY OF LAMPASAS
11   NOTICE OF INTENT TO PROVIDE WATER
     SERVICE TO AREA DECERTIFIED FROM
12   KEMPNER WATER SUPPLY CORPORATION IN
     LAMPASAS COUNTY ............................. CONSENTED
13
                         AGENDA ITEM NO. 3
14
     DOCKET NO. 46247; SOAH DOCKET NO.
15   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.WS - APPLICATION OF DOUBLE
     DIAMOND PROPERTY CONSTRUCTION CO DBA
16   ROCK CREEK FOR A WATER RATE/TARIFF
     CHANGE .................................... CONSENTED
17
                         AGENDA ITEM NO. 4
18
     DOCKET NO. 42860; SOAH DOCKET NO.
19   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.WS - APPLICATION OF DOUGLAS
     UTILITY COMPANY TO CHANGE WATER AND
20   SEWER RATE/TARIFF IN HARRIS COUNTY,
     TEXAS .......................................   11
21
                         AGENDA ITEM NO. 5
22
     DOCKET NO. 44911; SOAH DOCKET NO.
23   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.WS - APPLICATION OF
     BOLIVAR UTILITY SERVICES, LLC FOR A
24   RATE/TARIFF CHANGE ..........................   12

25

3

1                        TABLE OF CONTENTS

2                                                    PAGE

3                      AGENDA ITEM NO. 6

4   DOCKET NO. 45645 - COMPLAINT OF MONICA
    BRIEGER AGAINST SWWC UTILITIES, INC.
5   D/B/A HORNSBY BEND UTILITY .................. CONSENTED

6                      AGENDA ITEM NO. 7

7   DOCKET NO. 45902 - PETITION OF CARMA
    EASTON, LLC TO AMEND CREEDMOOR-MAHA
8   WATER SUPPLY CORPORATION'S CERTIFICATE
    OF CONVENIENCE AND NECESSITY IN TRAVIS
9   COUNTY BY EXPEDITED RELEASE ......................   13

10                     AGENDA ITEM NO. 8

11  DOCKET NO. 46148 - PETITION OF LAS
    COLINAS SAN MARCOS PHASE I, LLC TO
12  AMEND CRYSTAL CLEAR SPECIAL UTILITY
    DISTRICT'S CERTIFICATE OF CONVENIENCE
13  AND NECESSITY IN HAYS COUNTY BY EXPEDITED
    RELEASE .........................................   13

14

15                     AGENDA ITEM NO. 9

    DOCKET NO. 46262 - PETITION FOR AN
16  ORDER APPOINTING A TEMPORARY MANAGER TO
    PEACH CREEK DAM AND LAKE CLUB, INC. IN
17  MONTGOMERY COUNTY ........................... CONSENTED

18                     AGENDA ITEM NO. 10

19  DOCKET NO. 46309 - PETITION FOR AN
    ORDER APPOINTING A TEMPORARY MANAGER TO
20  AERO VALLEY WATER SERVICE IN DENTON
    COUNTY ...................................... CONSENTED

21                     AGENDA ITEM NO. 11

22
    PROJECT NO. 46151 - PROJECT TO AMEND 16
23  TEX. ADMIN. CODE § 24.113, RELATING TO
    REVOCATION OR AMENDMENT OF A WATER OR
24  SEWER CERTIFICATE AND § 24.120 RELATING
    TO SINGLE CERTIFICATION IN INCORPORATED
25  OR ANNEXED AREAS ............................ NOT HEARD

1                           TABLE OF CONTENTS

2                                                                   PAGE

3                           AGENDA ITEM NO. 12

4    DISCUSSION AND POSSIBLE ACTION
     REGARDING IMPLEMENTATION OF STATE
5    LEGISLATION AFFECTING WATER AND SEWER
     COMPANIES, CURRENT AND PROJECTED
6    RULEMAKING PROJECTS, AND COMMISSION
     PRIORITIES ................................. NOT HEARD
7
                            COMMUNICATIONS
8
                            AGENDA ITEM NO. 13
9
     DOCKET NO. 42660; SOAH DOCKET NO.
10   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 - APPLICATION OF GS TEXAS
     VENTURES, LLC FOR DESIGNATION AS AN
11   ELIGIBLE TELECOMMUNICATIONS CARRIER (ETC)
     AND AS AN ELIGIBLE TELECOMMUNICATIONS
12   PROVIDER (ETP) ................................. 14

13                          AGENDA ITEM NO. 14

14   DOCKET NO. 46091; SOAH DOCKET NO.
     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 - NOTICE OF VIOLATION BY
15   GPSPS, INC. OF PURA § 55.303, RELATED
     TO VERIFICATION OF CHANGE, AND
16   § 17.151(a) (2), RELATED REQUIREMENTS
     FOR SUBMITTING CHARGES; AND 16 TAC
17   § 26.130(c) (1), RELATED TO CHANGES BY
     A TELECOMMUNICATIONS UTILITY AND
18   § 26.32(d), RELATED TO PROTECTION
     AGAINST UNAUTHORIZED BILLING CHARGES ......... CONSENTED
19
                            AGENDA ITEM NO. 15
20
     DOCKET NO. 45971 - APPLICATION OF DELL
21   TELEPHONE COOPERATIVE, INC. TO RECOVER
     FUNDS FROM THE TEXAS UNIVERSAL SERVICE
22   FUND PURSUANT TO PURA § 56.025 AND 16
     TAC § 26.406 ................................. 14
23

24

25

5

1                          TABLE OF CONTENTS

2                                                      PAGE

3                        AGENDA ITEM NO. 16

4   PROJECT NO. 45634 - 2017 REPORT ON THE
    SCOPE OF COMPETITION IN
5   TELECOMMUNICATIONS MARKETS IN TEXAS ..............   25

6                        AGENDA ITEM NO. 17

7   DISCUSSION AND POSSIBLE ACTION
    REGARDING IMPLEMENTATION OF STATE AND
8   FEDERAL LEGISLATION AFFECTING
    TELECOMMUNICATIONS MARKETS, CURRENT
9   AND PROJECTED RULEMAKING PROJECTS, AND
    COMMISSION PRIORITIES ........................ NOT HEARD
10
                             ELECTRIC
11
                        AGENDA ITEM NO. 18
12
    DOCKET NO. 45084; SOAH DOCKET NO.
13  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 - APPLICATION OF ENTERGY
    TEXAS, INC. FOR APPROVAL OF A
14  TRANSMISSION COST RECOVERY FACTOR ............... 27/30

15                       AGENDA ITEM NO. 19

16  DOCKET NO. 45414; SOAH DOCKET NO.
    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 - REVIEW OF THE RATES OF
17  SHARYLAND UTILITY COMPANY ....................... 30/31

18                       AGENDA ITEM NO. 20

19  DOCKET NO. 45885; SOAH DOCKET NO.
    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 - APPLICATION OF EL PASO
20  ELECTRIC COMPANY FOR APPROVAL TO
    ADJUST ITS ENERGY EFFICIENCY COST
21  RECOVERY FACTOR AND REQUEST FOR
    REVISED COST CAP ............................ NOT HEARD
22

23

24

25

6

TABLE OF CONTENTS

PAGE

AGENDA ITEM NO. 21

DOCKET NO. 45915; SOAH DOCKET NO.
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 - APPLICATION OF ENTERGY
TEXAS, INC. FOR AUTHORITY TO ADJUST
ITS ENERGY EFFICIENCY COST RECOVERY
FACTOR ........................................    70

AGENDA ITEM NO. 22

DOCKET NO. 46106 - APPLICATION OF
INVENERGY WIND GLOBAL, LLC FOR
APPROVAL PURSUANT TO SECTION 39.158
OF THE PUBLIC UTILITY REGULATORY ACT ........ CONSENTED

AGENDA ITEM NO. 23

DOCKET NO. 46291 - AGREED NOTICE OF
VIOLATION AND SETTLEMENT AGREEMENT
RELATING TO CITY OF AUSTIN D/B/A
AUSTIN ENERGY'S NONCOMPLIANCE WITH
PURA § 39.151, 16 TAC §§ 25.503(f) AND
25.507(f)(2) AND ERCOT PROTOCOLS
§ 8.1.3.3.1, RELATED TO SUSPENSION OF
QUALIFICATION OF NON-WEATHER-SENSITIVE
EMERGENCY RESPONSE SERVICE RESOURCES
AND/OR THEIR QUALIFIED SCHEDULING
ENTITIES ..................................... CONSENTED

AGENDA ITEM NO. 24

DOCKET NO. 46307 - AGREED NOTICE OF
VIOLATION AND SETTLEMENT AGREEMENT
RELATING TO SOUTHWESTERN PUBLIC SERVICE
COMPANY'S VIOLATION OF PURA § 38.005
AND 16 TAC § 25.52, CONCERNING
RELIABILITY AND CONTINUITY OF SERVICE ........ CONSENTED

AGENDA ITEM NO. 25

PROJECT NO. 45633 - PROJECT TO IDENTIFY
ISSUES PERTAINING TO LUBBOCK POWER AND
LIGHT PROPOSAL TO BECOME PART OF THE
ELECTRIC RELIABILITY COUNCIL OF TEXAS ............    71

7

1                          TABLE OF CONTENTS

2                                                        PAGE

3                        AGENDA ITEM NO. 26

4   PROJECT NO. 45635 - SCOPE OF COMPETITION
    IN ELECTRIC MARKETS REPORT ........................   78

5                        AGENDA ITEM NO. 27

6
    PROJECT NO. 40979 - PROCEEDING TO TRACK
7   COMPLIANCE WITH THE TERMS AND CONDITIONS
    SET FORTH IN THE COMMISSION'S ORDER
8   ISSUED IN DOCKET NO. 40346 AND THE NUS,
    AND ASSOCIATED STUDIES ARISING FROM THE
9   ORDER AND/OR NUS ............................. NOT HEARD

10                       AGENDA ITEM NO. 28

11  PROJECT NO. 42302 - REVIEW OF THE
    RELIABILITY STANDARD IN THE ERCOT
12  REGION .........................................   82

13                       AGENDA ITEM NO. 29

14  PROJECT NO. 42750 - MATTERS PERTAINING
    TO OR ARISING OUT OF THE CHAPTER 11
15  BANKRUPTCY OF ENERGY FUTURE HOLDINGS ..............   86

16                       AGENDA ITEM NO. 30

17  PROJECT NO. 37344 - INFORMATION RELATED
    TO THE ENTERGY REGIONAL STATE COMMITTEE ...... NOT HEARD
18
                         AGENDA ITEM NO. 31
19
    PROJECT NO. 41210 - INFORMATION RELATED
20  TO THE SOUTHWEST POWER POOL REGIONAL
    STATE COMMITTEE ............................. NOT HEARD
21
                         AGENDA ITEM NO. 32
22
    PROJECT NO. 41211 - INFORMATION RELATED
23  TO THE ORGANIZATION OF MISO STATES ........... NOT HEARD

24

25

8

TABLE OF CONTENTS

PAGE

AGENDA ITEM NO. 33

DISCUSSION AND POSSIBLE ACTION ON
ELECTRIC RELIABILITY; ELECTRIC MARKET
DEVELOPMENT; ERCOT OVERSIGHT;
TRANSMISSION PLANNING, CONSTRUCTION,
AND COST RECOVERY IN AREAS OUTSIDE OF
ERCOT; SPP REGIONAL STATE COMMITTEE
AND ELECTRIC RELIABILITY STANDARDS
AND ORGANIZATIONS ARISING UNDER FEDERAL
LAW ........................................ NOT HEARD

AGENDA ITEM NO. 34

DISCUSSION AND POSSIBLE ACTION
REGARDING IMPLEMENTATION OF STATE AND
FEDERAL LEGISLATION, AFFECTING
ELECTRICITY MARKETS, CURRENT AND
PROJECTED RULEMAKING PROJECTS, AND
COMMISSION PRIORITIES ....................... NOT HEARD

GENERAL

AGENDA ITEM NO. 35

PROJECT NO. 38639 - PROJECT RELATING
TO LIVE INTERNET BROADCAST OF PUBLIC
HEARINGS AND MEETINGS PURSUANT TO
PURA § 12.204 ................................ CONSENTED

AGENDA ITEM NO. 36

PROJECT NO. 46244 - REQUEST FOR
PROPOSAL FOR ASSISTANCE IN REVIEWING
THE CHANGE IN CONTROL FILING OF ENERGY
FUTURE HOLDINGS CORPORATION ................. CONSENTED

AGENDA ITEM NO. 37

PROJECT NO. 45746 - REQUEST FOR
QUALIFICATIONS FOR OUTSIDE COUNSEL TO
REPRESENT THE PUBLIC UTILITY COMMISSION
OF TEXAS WITH REGARD TO FEDERAL
PROCEEDINGS ................................. CONSENTED

9

TABLE OF CONTENTS

PAGE

AGENDA ITEM NO. 38

PROJECT NO. 45872 - REQUEST FOR
PROPOSALS TO PROVIDE RELAY ACCESS
SERVICES ..................................... CONSENTED

AGENDA ITEM NO. 39

DISCUSSION AND POSSIBLE ACTION
REGARDING AGENCY REVIEW BY SUNSET
ADVISORY COMMISSION, OPERATING BUDGET,
STRATEGIC PLAN, APPROPRIATIONS
REQUEST, PROJECT ASSIGNMENTS,
CORRESPONDENCE, STAFF REPORTS, AGENCY
ADMINISTRATIVE ISSUES, FISCAL MATTERS
AND PERSONNEL POLICY ........................ NOT HEARD

AGENDA ITEM NO. 40

DISCUSSION AND POSSIBLE ACTION
REGARDING CUSTOMER SERVICE ISSUES,
INCLUDING BUT NOT LIMITED TO
CORRESPONDENCE AND COMPLAINT ISSUES ......... NOT HEARD

AGENDA ITEM NO. 41

DISCUSSION AND POSSIBLE ACTION ON
INFRASTRUCTURE RELIABILITY, EMERGENCY
MANAGEMENT, AND HOMELAND SECURITY ........... NOT HEARD

PROJECT NO. 45448 - OPEN MEETING AGENDA
ITEMS WITHOUT AN ASSOCIATED CONTROL NUMBER ........    96

AGENDA ITEM NO. 42

ADJOURNMENT FOR CLOSED SESSION ...................    97

RECONVENING OF OPEN MEETING .....................    98

PROCEEDINGS CONCLUDED ...........................    98

REPORTER'S CERTIFICATE ..........................    99

10

```
1                  P R O C E E D I N G S
2              THURSDAY, SEPTEMBER 22, 2016
3                       (9:35 a.m.)
4          CHAIRMAN NELSON:  Good morning.  This
5    meeting of the Public Utility Commission of Texas will
6    come to order to consider matters that have been duly
7    posted with the Texas Secretary of State for today,
8    September 22, 2016.
9              Stephen, would you please walk us through
10   the concern agenda?
11         MR. JOURNEAY:  Good morning,
12   Commissioners.  By individual ballot the following items
13   were place on your consent agenda:  1, 2, 3, 6, 9, 10,
14   14, 22 through 24, 35 through 38.
15         CHAIRMAN NELSON:  The Chair will entertain
16   a motion to approve the consent agenda.
17         COMM. ANDERSON:  You have the motion.
18         COMM. MARQUEZ:  And I second.
19         CHAIRMAN NELSON:  Okay.  And we're not
20   taking up Items 11 and 20 today.  So 1 through 3 were
21   consented.
22
23
24
25
```

11

```
 1                        WATER
 2                  AGENDA ITEM NO. 4
 3   DOCKET NO. 42860; SOAH DOCKET NO.
     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.WS - APPLICATION OF DOUGLAS
 4   UTILITY COMPANY TO CHANGE WATER AND
     SEWER RATE/TARIFF IN HARRIS COUNTY,
 5   TEXAS
 6             CHAIRMAN NELSON:  Let me pull up Item 4,
 7   Docket No. 4286 --
 8             COMM. ANDERSON:  What was the other one?
 9   I'm sorry.  Oh, 20.
10             CHAIRMAN NELSON:  11 and 20.
11             COMM. ANDERSON:  20.  I see it.  I'm
12   sorry.
13             CHAIRMAN NELSON:  Let me call up Item 4,
14   Docket No. 42860.  Commissioner Marquez filed a memo,
15   and I agree and I would adopt the PFD with the changes
16   that you have set out in your memo.
17             COMM. ANDERSON:  I agree --
18             COMM. MARQUEZ:  Okay.
19             COMM. ANDERSON:  -- and would so move.
20             CHAIRMAN NELSON:  Do we need to discuss
21   the time frame?  Do you agree with the time frame for
22   the ALJ?
23             COMM. MARQUEZ:  You know, I think that
24   they made a well-reasoned argument.  So I'm fine.
25             CHAIRMAN NELSON:  I do, too.
```

12

1          COMM. ANDERSON:  I agree.  It's close

2  enough for government work, so to speak.

3          COMM. MARQUEZ:  So you made the motion?

4          CHAIRMAN NELSON:  So you move?

5          COMM. ANDERSON:  I would move, yes.

6          COMM. MARQUEZ:  And I second.

7          CHAIRMAN NELSON:  Okay.  Thank you.  Okay.

8              AGENDA ITEM NO. 5

9  DOCKET NO. 44911; SOAH DOCKET NO.
   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.WS - APPLICATION OF
10 BOLIVAR UTILITY SERVICES, LLC FOR A
   RATE/TARIFF CHANGE
11

12         CHAIRMAN NELSON:  That brings us to item

13 5 -- I actually consented this one -- Docket No. 44911.

14         COMM. MARQUEZ:  I think I may have not

15 consented this one because I think that Staff wanted to

16 make a few stylistic changes to the language.

17         CHAIRMAN NELSON:  Okay.  Maybe we

18 shouldn't have consented it.  Okay.

19         COMM. ANDERSON:  I would move that we

20 approve -- we approve the proposed order but delegate to

21 Staff the ability to make nonsubstantive changes.

22         COMM. MARQUEZ:  I second.

23         CHAIRMAN NELSON:  Okay.  That takes us to

24 Item 6 which was consented.

25

13

```
 1                      AGENDA ITEM NO. 7
 2   DOCKET NO. 45902 - PETITION OF CARMA
     EASTON, LLC TO AMEND CREEDMOOR-MAHA
 3   WATER SUPPLY CORPORATION'S CERTIFICATE
     OF CONVENIENCE AND NECESSITY IN TRAVIS
 4   COUNTY BY EXPEDITED RELEASE
 5                 CHAIRMAN NELSON:   Item 7.   Commissioner
 6   Marquez filed a memo, and I would adopt the proposed
 7   order of the changes set out in your memo.
 8                 COMM. ANDERSON:   I agree and would so
 9   move.
10                 COMM. MARQUEZ:   And I second.
11                 CHAIRMAN NELSON:   Okay.
12                      AGENDA ITEM NO. 8
13   DOCKET NO. 46148 - PETITION OF LAS
     COLINAS SAN MARCOS PHASE I, LLC TO
14   AMEND CRYSTAL CLEAR SPECIAL UTILITY
     DISTRICT'S CERTIFICATE OF CONVENIENCE
15   AND NECESSITY IN HAYS COUNTY BY EXPEDITED
     RELEASE
16
17                 CHAIRMAN NELSON:   Item 8, Docket No.
18   46148.   This is groundhog day.
19                 (Laughter)
20                 CHAIRMAN NELSON:   You filed a memo,
21   Commissioner Marquez, and I would adopt the proposed
22   order with the changes set out in the memo and would so
23   entertain a motion.
24                 COMM. ANDERSON:   You have that motion.
25                 COMM. MARQUEZ:   And I second.
```

```
 1                  CHAIRMAN NELSON:  9 is consented.  10 is
 2   consented.  11 and 12 are not taken up.  So if you came
 3   here for water you can leave.
 4                       COMMUNICATIONS
 5                  AGENDA ITEM NOS. 13 AND 15
 6   DOCKET NO. 42660; SOAH DOCKET NO.
     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 - APPLICATION OF GS TEXAS
 7   VENTURES, LLC FOR DESIGNATION AS AN
     ELIGIBLE TELECOMMUNICATIONS CARRIER (ETC)
 8   AND AS AN ELIGIBLE TELECOMMUNICATIONS
     PROVIDER (ETP)
 9
     DOCKET NO. 45971 - APPLICATION OF DELL
10   TELEPHONE COOPERATIVE, INC. TO RECOVER
     FUNDS FROM THE TEXAS UNIVERSAL SERVICE
11   FUND PURSUANT TO PURA § 56.025 AND 16
     TAC § 26.406
12
13                  CHAIRMAN NELSON:  Okay.  That takes us to
14   Item 13.
15                  I'm going to call up 13 and 15 together
16   just momentarily and that is -- Item 13 is Docket No.
17   42660, and this is the Application of GS Texas Ventures
18   that we talked about last time, and then Item 15 is an
19   Application of Dell Telephone Cooperative to recover
20   funds from the TUSF fund.
21                  The reason I pulled this up is just to
22   elaborate on what we have enforced as public policy
23   here, and that is to continue to shrink the size of the
24   USF.
25                  In this case -- and I don't know.  Maybe
```

1   we need to get Staff to open a project or something, but
2   in Docket No. 45971 it's an application of a company to
3   recover funds from USF, and Texas is now covering almost
4   $900,000 of replacement funds from the Federal USF as
5   the Federal USF has cut funding.

6          So I think we need to look at what we need
7   to do to continue to make the fund solvent.  Now let me
8   go back to Item 13, and I want to start just by saying,
9   you know, this is an application for a company to be
10  designated as an ETC and ETP which would allow them to
11  get funding under the USF fund for both Texas and the
12  federal government.

13         And when I go back to 1995, which was a
14  long time ago, but that's when Texas opened the telecom
15  market, and in the late '90s we put in place the USF
16  fund, and that was really to make those subsidies that
17  previously had been, you know, just flowing from
18  customer to customer or service to service more explicit
19  so that the market could be restructured.

20         And then in 2000 when we made -- when the
21  Commission made the decision about what the standard
22  should be on USF funding, you know, they set out a
23  standard that, "Okay, you don't have to be out there
24  providing service but you need to be offering service."
25         And now we're faced with this case today

1  where it's a company that will only provide service as I
2  understand it from the application in AT&T and Verizon
3  territory.
4          Well, those -- AT&T and Verizon --
5  territories have been deregulated.  So starting in 2005
6  and continuing on the Legislature set a policy that if
7  areas were deregulated, that because we had to find
8  there was competition in those areas that those
9  companies would not receive USF funding.
10         So, in other words, if you want to be free
11 from the reigns of regulation then you don't get USF
12 funding.  So last session some of the CLECs came in and
13 said, "We want to" -- to the Legislature -- "We want to
14 continue receiving funding even though these areas have
15 been deregulated," and the Legislature agreed to do it
16 for a two-year period.
17         One concern is I think they are going to
18 go in and ask for a continuation again and it will end
19 up like the PTC, and, you know, maybe that's not the
20 case, but -- so when I look at the policies that -- you
21 know, because so many of our decisions are driven by
22 public policy considerations and not black-letter law --
23 so when I look at the policy I just want to make sure
24 that we are not lessening the standards for getting
25 these designations from what they were in 2000.

```
 1              So, as I said, when we asked for briefing
 2   on the issue of 9-1-1, I still -- I think at this point
 3   we can go down one of two ways.  I think we can continue
 4   with the remand on the 9-1-1 issue.
 5              The applicant does not seem to think
 6   that's necessary and wants for us to make a decision.
 7   So I would -- as I said at the last Open Meeting, I
 8   would deny it on several grounds.
 9              I think Staff did a really good job, as I
10   said at the last meeting.  First, I don't believe
11   they've met their burden of proof for designation as an
12   ETC or ETP.  The burden is with them.  It has to be more
13   than mere promises to act.
14              I think the information in the record at
15   least as far as I'm concerned about how their company is
16   going to move forward from a technological standpoint is
17   very weak and confusing, and I think as the hearing went
18   on, you know, various aspects of the case changed over
19   time.
20              So because it is -- I don't think they've
21   met their burden of proof.  I would deny it, but I also
22   don't think GSTV has satisfied the own facilities
23   requirement.
24              I do agree with Staff that this is -- that
25   a company must provide all four functionalities.  Even
```

18

1  the ALJ recognized that that was an open question, and I
2  would also find that their ETP designation is not
3  consistent with the public interest.

4          You know, their service is not innovative
5  or new technology.  Keep mind in again that they are
6  applying in an area and they would be getting government
7  funds in an area that has been deregulated.  So this
8  Commission has found that there is competition in the
9  area.

10          So for all those reasons I would deny it.
11          COMM. MARQUEZ:  I think your points on the
12  public policy considerations here are very well taken,
13  and I am very open to having conversations regarding the
14  scope of competition report on how this Commission
15  should advise the Legislature in this next upcoming
16  session regarding those funds.

17          However, I do still think that this
18  application under the law as it's written today I think
19  that they meet the qualifications and I would still
20  adopt the PDF today.

21          CHAIRMAN NELSON:  Commissioner Anderson.
22          MR. JOURNEAY:  Before we go further I
23  might point out, we're only posted to consider a
24  preliminary order.  So we weren't foresightful enough
25  to --

1          CHAIRMAN NELSON:  Okay.  I was going by

2   the queues from -- by the applicant who asked for us to

3   make a decision today.  So --

4          MR. JOURNEAY:  I think you can discuss the

5   issues if you want to.

6          COMM. ANDERSON:  Yeah.  Let me deal with a

7   preliminary matter of the issue before us.

8          I would not grant -- not grant Staff leave

9   to file the response to the Applicant's response, and I

10  was then prepared to issue the preliminary order

11  thinking that that's what we had -- that we had more or

12  less decided to refer it to SOAH.

13          And I guess now we -- well, let me finish.

14          CHAIRMAN NELSON:  Okay.

15          COMM. ANDERSON:  Now that -- I mean -- and

16  so I don't think we can do anything but issue the

17  preliminary order, but if either of -- or -- either --

18  if both of you are ready to vote at the next Open

19  Meeting then I think we can delay the issue of the

20  preliminary order and I can -- and, frankly, I hadn't

21  mentally prepared to make a cut.

22          I'm inclined to go -- well, I was inclined

23  to go with the Chairman on this, but I'm willing

24  alternatively to refer it to SOAH on this fact question

25  because it does turn.

1              I mean, I can be persuaded, you know,
2  otherwise and I think Commissioner Marquez reaches a --
3  I mean, I understand where she's coming from given the
4  prior precedent.
5              So this is one of those really close
6  calls; although, again, I think the Chairman may have a
7  slightly better result based on the burden of proof, but
8  I'm really not ready to make that cut and we can't
9  anyway.
10              So depending on your preference we can
11  either vote the preliminary order out or --
12              (Simultaneous discussion)
13              CHAIRMAN NELSON:  Let's just -- my
14  preference would be to hold it.
15              COMM. ANDERSON:  -- or we can vote at the
16  next meeting.
17              CHAIRMAN NELSON:  Yeah.  My preference
18  would be to hold it and rule on the merits at the
19  next --
20              COMM. ANDERSON:  And then I can go back
21  and -- to be honest, I've got to refresh me recollection
22  on the record report.
23              CHAIRMAN NELSON:  Okay.  So let's --
24              COMM. ANDERSON:  And I apologize for sort
25  of not being prepared in that regard.

```
 1                COMM. MARQUEZ:  Well, it sounds like we're
 2   only, you know, posted for --
 3                (Simultaneous discussion)
 4                CHAIRMAN NELSON:  Posted, yeah.  You're
 5   prepared for what's posted.  Okay.  So let's just then
 6   move the final decision to the next Open Meeting.
 7                MR. JOURNEAY:  And that's fine, and we can
 8   push the good cause -- I mean, the leave request to that
 9   time if you want to also.
10                COMM. ANDERSON:  Well, I mean, I don't --
11   well --
12                MR. JOURNEAY:  I mean, because I wouldn't
13   want to issue -- my preference is we would not issue an
14   order separately on that.  We would incorporate your
15   ruling in the --
16                CHAIRMAN NELSON:  That's fine.
17                COMM. ANDERSON:  Oh, okay.  Then I
18   withdraw my motion at this time.
19                CHAIRMAN NELSON:  Okay.  And I also -- I
20   don't have a problem with striking Staff's pleading, but
21   I also think that the filing of GSTV doesn't meet the
22   order we issued either, because they put out an order
23   that said -- Staff put out -- Stephen's group put out an
24   order that asked for this issue to be responded to.
25                GSTV filed something, elected not to file
```

1  a response, and then when Staff filed their response

2  then GSTV responded on the merits of it, not really just

3  limiting their response to Staff's issue.

4          So I would strike their pleading as well,

5  but we can take this up next time.  Okay.  Let's move to

6  Item 14 which was consented.  15, I took -- we took the

7  two up together just to show you.  Let me go back to 13.

8  I just can't let 13 go.

9          COMM. MARQUEZ:  I'm kind of with you.  I

10  have some comments on 13, too.

11          CHAIRMAN NELSON:  Okay.  All I want to say

12  about 13 is this:  I understand what you're saying and

13  totally get it.

14          I'm not suggesting that we change the law

15  or even -- I'm suggesting that what we interpret is

16  consistent with the law as it exists.

17          All I'm saying is from a public policy

18  standpoint, if we grant this application I think we're

19  going back in time and I think we're loosening the

20  standard that we adopted in 2000, and that's my point.

21          I'm not saying that because I disagree

22  with the statute that was passed that we should deny

23  this.  I'm absolutely not saying that.  So I just wanted

24  to clarify that.

25          COMM. MARQUEZ:  No.  And I totally

23

1  understand that, and here's where I'm coming from:
2  These laws were written in a broad way to allow the
3  market to explode.  It has, and it may be time to
4  revisit all of that, and I'm so happy to have that
5  conversation and let's do a thorough breakdown of that
6  so we can advise the Legislature in a really meaningful
7  way of what they should be thinking about when they're
8  approached next session.
9              But at the same time we have another
10 policy interest and this Commission long before I ever
11 came to it has been renown for being efficient, and this
12 case has languished for two years.
13             And this is a company that -- and so I
14 appreciate the fact that you're ready to make a decision
15 today because -- you know, cut the pain.  If the answer
16 is going to be "No," let's let them go, but I think that
17 they are operating under the rules as written currently
18 today, and so I would say let's maintain the spirit of
19 this Commission.
20             Let's let them go do business.  If they
21 don't meet the requirements then they will not be able
22 to make it in this market, and -- but I just -- I feel
23 like this administratively has not been something that
24 is what I'm used to seeing from this Commission.
25             CHAIRMAN NELSON:  Well, I think these

1    cases are complex and they take a long time.

2              I agree that this could have been

3    processed more quickly, but I also think that they need

4    to be thorough because I think we're giving subsidies.

5              USF are subsidies, and I think it is --

6    and every ratepayer or every telephone customer has a

7    line item on their bill where they're paying for this.

8              And so -- and you can say, "Well, that

9    really goes to the issue of whether they should get

10   payment once they file, but the thing is they get

11   payment once they file.  Once they become -- once they

12   get this designation they get payment.

13             So we're giving government money in a

14   competitive market, and I just think we need to tread

15   carefully.  So we will take that up next time.  Let's go

16   to Item 15.

17             And, again, I think I would like Staff to

18   look at -- outside of this docket the concept of what

19   options we have, and maybe it's something that goes in

20   our legislative recommendation, but what options we have

21   with respect to payments and federal USF going down and

22   then Texas being required to make those payments, but,

23   otherwise, I'm okay with this order.

24             COMM. ANDERSON:  Then I would move

25   adoption of the order.

```
 1                COMM. MARQUEZ:  I second.
 2                     AGENDA ITEM NO. 16
 3   PROJECT NO. 45634 - 2017 REPORT ON THE
     SCOPE OF COMPETITION IN
 4   TELECOMMUNICATIONS MARKETS IN TEXAS
 5                CHAIRMAN NELSON:  Okay.  Then, that takes
 6   us to Item 16 --
 7                (Simultaneous discussion)
 8                COMM. ANDERSON:  Which actually is sort of
 9   relevant to what --
10                CHAIRMAN NELSON:  -- is the scope of
11   competition report.
12                COMM. ANDERSON:  -- that's relevant to
13   with what you've been talking about.
14                CHAIRMAN NELSON:  So are you guys ready
15   to -- you guys.  Sorry.  Are the two of you ready to
16   start looking at recommendations?
17                I think maybe at this -- at the next
18   meeting or maybe the one after that we should be
19   prepared to start giving Staff our legislative
20   recommendations.
21                I've always found in the past that --
22   because we have so many weighty issues in front of us,
23   sometimes this slips until about December, not because
24   of Staff.  The legislative recommendations come from us.
25                So I think the sooner the better.  And
```

1  I -- in terms of the draft I really -- I know some of it

2  needs to be updated -- right -- but I also just need

3  probably a little more time to look at it.

4             COMM. ANDERSON:  I have it read it and

5  really don't have a lot of comments.

6             I have a couple of grammatical things of

7  such, you know, earth-shaking importance such as

8  replacing the word "impacted" with "effect," but I do

9  think that your -- that the issue you raised in the

10  other dockets probably would make a good legislative

11  recommendation.

12             COMM. MARQUEZ:  Yeah.  And I'm glad we're

13  starting --

14             COMM. ANDERSON:  But I'm also more than

15  happy to engage in a substantive conversation at the

16  next Open Meeting or the meeting thereafter.

17             CHAIRMAN NELSON:  And I do really think

18  both of those issues need to be fleshed out as

19  recommendations, the one with respect to funding for

20  CLECs after the issue has been deregulated which -- and

21  the other, though, would as well be the issue of Texas

22  paying when the Federal USF fund stops paying.

23             COMM. ANDERSON:  Well, the real issue

24  is -- I mean, it seems to me the most important is that

25  latter, that as the federal support is curtailed we end

1  up picking up at least part of the gap, and that was

2  directed by the Legislature and the Legislature needs

3  to --

4          COMM. MARQUEZ:  At least get our input.

5          COMM. ANDERSON:  Yeah.  We need to tell

6  them that this -- remind them, "This is what's

7  happening.  Is this what you still want" --

8          CHAIRMAN NELSON:  Pam might quit.

9          COMM. ANDERSON:  -- "want to happen."

10          COMM. MARQUEZ:  And -- yeah.

11          CHAIRMAN NELSON:  Okay.  That sounds fine

12  with me.  So we'll be back in touch.

13          MS. KAYSER:  Thank you.

14          CHAIRMAN NELSON:  Okay.  So 17 is not

15  taken up.

16                    ELECTRIC

17               AGENDA ITEM NO. 18

18  DOCKET NO. 45084; SOAH DOCKET NO.
    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 - APPLICATION OF ENTERGY
19  TEXAS, INC. FOR APPROVAL OF A
    TRANSMISSION COST RECOVERY FACTOR

20

21          CHAIRMAN NELSON:  That takes us to

22  electric.  Let's move to Docket No. 45084.  This is the

23  Application of Entergy for approval of TCRF, and,

24  Commissioner Anderson, you filed a memo.  If you would

25  like to lay out your memo.

1          COMM. ANDERSON:  Yeah.  I would -- there

2   were both -- this before us is on motions for rehearing

3   that were filed by TIEC, the Texas Industrial Energy

4   Consumers, as well as the Company itself.

5          TIEC raised the issue of whether load

6   growth ought to be evaluated.  As much as I sympathize

7   with that approach we've consistently said, "No."  So I

8   would -- because they haven't raised any new argument, I

9   would deny their motion for rehearing.

10          The Company raised -- raised five issues

11  in their motion for rehearing, and I would grant the

12  motion for rehearing to modify and supplement our order,

13  but with respect to the particular issues I would deny

14  their -- I reject any changes to the order that -- how

15  do I say this?

16          I'm granting the motion for rehearing but

17  rejecting their substantive -- rejecting their arguments

18  on the merits --

19          CHAIRMAN NELSON:  Right.

20          COMM. ANDERSON:  -- and would affirm the

21  decision but with the modifications that are laid out in

22  my memo with respect to some of the particular issues.

23          CHAIRMAN NELSON:  And I was fine with your

24  memo.  I did think with respect to the issue of the MISO

25  Schedule 11 revenues that that was another area where

```
 1   that should be reconsidered in the next rate case.
 2               We didn't specifically state that, but I
 3   think that would be consistent with the concept of
 4   revisiting load growth, too, but --
 5               COMM. ANDERSON:  Yes.
 6               CHAIRMAN NELSON:  -- but I'm fine with the
 7   way your memo is written.
 8               COMM. MARQUEZ:  I am, too.
 9               COMM. ANDERSON:  And with that, I would
10   move adoption of the order as modified by our memo
11   and -- or, rather -- I'm sorry.
12               CHAIRMAN NELSON:  Reject motions for
13   rehearing.
14               COMM. ANDERSON:  -- reject the motions for
15   rehearing -- well, I would grant --
16               (Simultaneous discussion)
17               MR. JOURNEAY:  Grant rehearing.
18               CHAIRMAN NELSON:  Yes.
19               COMM. ANDERSON:  -- I would reject TIEC's
20   motion for rehearing, grant ETI's motion for rehearing
21   and modify the order consistent with my memo and our
22   discussion.
23               COMM. MARQUEZ:  And I second.
24               CHAIRMAN NELSON:  Okay.
25
```

30

```
 1                    AGENDA ITEM NO. 19

 2  DOCKET NO. 45414; SOAH DOCKET NO.
    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 - REVIEW OF THE RATES OF
 3  SHARYLAND UTILITY COMPANY

 4             CHAIRMAN NELSON:  And that brings us to

 5  Item 19.  This is the Sharyland rate case, and some of

 6  the parties have filed a joint proposal and a joint

 7  motion for approval of entry of a joint proposal in lieu

 8  of ruling on threshold issues.

 9             COMM. ANDERSON:  Oh, one thing I forgot.

10  Can we go back to the other item?

11             CHAIRMAN NELSON:  18?

12             COMM. ANDERSON:  Yes.  I had --

13                 AGENDA ITEM NO. 18 (CONT'D)

14  DOCKET NO. 45084; SOAH DOCKET NO.
    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 - APPLICATION OF ENTERGY
15  TEXAS, INC. FOR APPROVAL OF A
    TRANSMISSION COST RECOVERY FACTOR
16

17             CHAIRMAN NELSON:  Let me call back Item

18  18.

19             COMM. ANDERSON:  I had raised the issue of

20  reopening the TCRF rule with respect to non-ERCOT

21  utilities to deal with some of the issues that have been

22  raised in litigation in these -- in these proceedings,

23  and so with your -- if you agree that that ought to be

24  done, we would so direct Staff --

25             CHAIRMAN NELSON:  I'm fine with that.
```

31

```
 1                    COMM. ANDERSON:  -- as laid out in my
 2    memo.
 3                    COMM. MARQUEZ:  Yeah, I agree.
 4                    COMM. ANDERSON:  I apologize for skipping
 5    over that.
 6                    CHAIRMAN NELSON:  Okay.  So --
 7                    COMM. ANDERSON:  It's Rule 25.239.
 8                    CHAIRMAN NELSON:  I agree with that.
 9                    COMM. MARQUEZ:  Yeah.
10                    CHAIRMAN NELSON:  We're just piling the
11    work on Staff.
12                       AGENDA ITEM NO. 19 (CONT'D)
13    DOCKET NO. 45414; SOAH DOCKET NO.
      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 - REVIEW OF THE RATES OF
14    SHARYLAND UTILITY COMPANY
15                    CHAIRMAN NELSON:  Okay.  So let's call --
16    let me call back up docket -- Item 19, Docket No. 45414.
17                    I've got some questions.  I don't know if
18    you-all have questions after the filing.  So if all the
19    parties who wish to be heard could come up, that would
20    be great.
21                    And really I would like to start by just
22    getting -- I know Sharyland and several of the parties
23    filed that joint proposal, and in the documents they
24    filed they indicated that they were trying to be
25    responsive to the concerns that we have with respect to
```

1   how this case moves forward from a procedural
2   standpoint.
3           I would really like for specifically
4   anybody, but Sharyland and Staff, to lay out this
5   proposal and explain what the purpose of it is and what
6   it's meant to accomplish and what it's not meant to
7   accomplish, and then we'll give a chance for anyone else
8   to respond.
9           COMM. ANDERSON:  And in so doing could you
10  explain what it is you actually are asking the
11  Commission to do, because before us is a preliminary
12  order and the proposal which we'll get into the actual
13  merits of sort of the issues laid out, but -- so if we
14  agree with all or part of the proposal what -- you know,
15  what procedurally are we to do?
16          Are we going to just modify our
17  preliminary order and then issue it?  I mean, you asked
18  for us to grant the proposal except -- or to adopt it,
19  except I don't know what that means.  What's the --
20  there almost seems to be -- and Staff can address it a
21  little bit -- I won't say a difference of opinion but
22  the proposal is artfully drafted so as to smooth over
23  nuances of interpretation in order to live to fight
24  another day, if that's the way to phrase it.
25          So I'm sort of trying to understand the

33

1  supporters of the proposal what they -- okay.  Even if
2  we adopt it all or part of it, what does that really
3  mean?  I mean, what does that mean procedurally in this
4  case?

5          CHAIRMAN NELSON:  Go ahead.

6          MR. MENDIOLA:  Commissioners, Lino
7  Mendiola on behalf of Sharyland Utilities.  I'm happy to
8  start and we can certainly hear from Staff or others as
9  you direct.

10         Thank you for the opportunity to share
11 some thoughts about the joint proposal.  It was a strong
12 effort.  As you know, it's supported obviously by
13 Sharyland and by the Staff, also by the cities of
14 Midland and McAllen and Colorado City and the St.
15 Lawrence Cotton Growers; not opposed by several others
16 and then opposed by a couple of parties.

17         The purpose of the joint proposal was to
18 create some clarity around how to proceed on this case.
19 So the background I think is well established.  Everyone
20 knows it.  Had a restructuring order from 35287, and
21 that order really did two things.  It approved a
22 restructuring and approved a methodology for ratemaking
23 under that restructuring.

24         And then when the draft preliminary order
25 came out, as I understand it, the draft preliminary

```
 1   order was going to not change the approval of the
 2   restructuring -- made no effort to upset the
 3   restructuring -- but it was going to change how the
 4   rates were going to be set as they were determined in
 5   35287, the ratemaking treatment under the restructuring.
 6              So that created a bit of a disconnect
 7   between the restructuring is still approved, the way the
 8   Company has been operating for eight years is still
 9   approved, but how rates are going to be set is going to
10   be different.
11              So that led to a lot of discussion, as you
12   can imagine.  And, again, to just set the history, the
13   way that rates have been previously set, including in
14   the prior rate case, are that rates were established on
15   a combined books and records basis for both the Asset
16   Company, SDTS, annual the Operating Company, Sharyland
17   Utilities; combine everything, calculate a single rate
18   of return, have that approved and then collect that from
19   ratepayers.
20              But the preliminary order -- the draft
21   preliminary order said it's not going to change the
22   restructuring, but now there needs to be a separate
23   regulatory review of the rates of the AssetCo, SDTS, and
24   the rates of Sharyland Utilities, the Operating Company.
25   We understand that.
```

1            And the concern was that there was some
2    uncertainty around how that was going to be done, and
3    some of the uncertainty is very practical and some of it
4    is very policy oriented and important.

5            So the practical uncertainties are things
6    like what rate filing package does an asset company use
7    when there isn't really a rate filing package designed
8    for that because the RFPs all have class allocation
9    schedules and things like that, and then practically
10    when should those two filings be made?

11            SDTS hasn't been called in to submit a
12    Rate Filing Package before.  Sharyland Utilities, the
13    Operating Company, has done that in the past.  So, you
14    know, what does it mean for SDTS to be called in and how
15    much time do we need to prepare a rate filing package
16    for SDTS?  Again, those are the practical concerns.

17            The more policy and fundamental concerns
18    were, we think that what the Commission was trying to do
19    was, again, to not upset the structuring, to maintain
20    the consideration of the allowance for the Company to
21    proceed as a REIT and a fundamental part of that REIT
22    structure -- maybe the fundamental part -- is this true
23    lease concept that I think is fairly set out in the
24    Staff's motion in support of the joint proposal.

25            And the true lease concept means that

1  there has to be a lease between asset company and
2  operating company that's an actual lease, not just a --
3  nominally a lease but not really a lease.

4           And the key part of that is that there has
5  to be an opportunity for profit and loss, and that lease
6  has to be set at fair market value.

7           So the way that has been done in the past,
8  as the Commission is well aware, is that the lease
9  payment has essentially been set at 97 percent of the
10 amount that the asset company would otherwise be allowed
11 to earn if it owned and operated the assets itself.

12          So, what we were trying to do in the joint
13 proposal is to say, "Look, it's very clear what the
14 Commission wants to do in some respects."  What the
15 Commission wants to do is regulate that lease payment.
16 The Commission wants to review the rates and the cost of
17 service of SDTS, the Asset Company, also wants to review
18 the rates of Sharyland and it wants to do it all in one
19 case for efficiency reasons to not just ramp up the rate
20 case expenses unnecessarily.

21          So what we were trying to do in the joint
22 proposal is to say, "All right.  How can we take those
23 things that the Commission seems to want in the draft
24 preliminary order and actually operationalize that so
25 that we know what Rate Filing Package to use, when we're

1   going to use it, how will the true lease concept be

2   considered and whether anybody is waiving any rights to

3   raise any concern later?"

4            And on that point I think that

5   Commissioner Anderson is exactly right.  We're trying to

6   get to the point where we can prosecute the rate case

7   with knowing what the rules of the road are and we're

8   not trying to jump to the conclusion at the end on any

9   topic.

10            That's why we called it a "joint proposal"

11   which is somewhat vague, but the idea is, it is a

12   proposal and no one -- the signatories and the

13   nonsignatories are foreclosing a right to make any

14   argument under the joint proposal or under the rate

15   case, including the viability of the REIT itself.

16            But what we're trying to do is establish

17   the rules under which this new regulatory regime,

18   regulation of the lease and regulation of the AssetCo

19   can proceed.  That's it.  There's really nothing more

20   than that.

21            COMM. MARQUEZ:  So you're trying to set

22   the rules, but Rule 1A is you don't have to follow the

23   rules.

24            MR. MENDIOLA:  No.

25            COMM. MARQUEZ:  I mean, everyone gets to

 1  argue.  You're setting out this proposal of what the

 2  rules are, but you just said that nobody is foreclosed

 3  for arguing all of those same agreements that you came

 4  to?

 5              MR. MENDIOLA:  Well -- so -- good

 6  question.  Let me clarify.  It kind of goes back to what

 7  Commissioner Anderson was asking, "What are you asking

 8  us to do here?"

 9              COMM. MARQUEZ:  Yeah.  I mean, there is a

10  whole new piece of paper in front of us.

11              MR. MENDIOLA:  Sure.  So what we're asking

12  is for approval of the joint proposal in lieu of

13  answering the threshold questions but still issuing the

14  preliminary order on the issues that you typically see

15  in a preliminary order to be considered for each of the

16  two utilities.

17              So we're not trying to modify the issue

18  list in the preliminary order.  What we're trying to do

19  is present the Commission a way to answer the threshold

20  questions in a way that allows us to proceed and know

21  how to prosecute the case.

22              And so the questions that would be

23  foreclosed are, when do you need -- when does SDTS need

24  to file this rate case?  What Rate Filing Package would

25  you use?  But the questions that would not be foreclosed

1  are the -- is the return reasonable, are the expenses

2  reasonable, are the rates just and reasonable, all of

3  those issue.

4         So to be specific -- and Stephen can speak

5  to this further, obviously, but what we're asking is to

6  adopt the joint proposal in lieu of answering the

7  threshold questions, issue a preliminary order that

8  looks like a traditional preliminary order in the rate

9  case.

10         COMM. ANDERSON:  Can I ask this question

11  unless Commissioner Marquez continues to have questions.

12         COMM. MARQUEZ:  That's okay.

13         COMM. ANDERSON:  Okay.  When I sort of was

14  looking at this, it took me a bit to get my head

15  around -- I had to go back and look at the preliminary

16  order and sort of mesh.

17         It seems to me that the preliminary order,

18  there were seven threshold issues, and whether we

19  formally adopt the proposal or not or maybe -- again,

20  I'm going to lay that aside because I'm still a

21  little -- I'm trying to figure out exactly what it is we

22  do here, but -- of the -- I have, I guess, five out of

23  the seven are resolved or slashed in dispute as a result

24  of this joint proposal.

25         We could, for example -- or let me -- if,

1  for example -- and it appears there's really only one

2  big issue that separates you-all and the objectors.

3          I'll give Phillip his opportunity to

4  either agree or disagree in a minute, but it seemed to

5  me that the CCN for PropCo, the lease as a tariff and a

6  file package that separately includes -- or a file

7  package -- a separate file package for each, for the

8  PropCo and the AssetCo, that there's agreement there in

9  effect.

10          So, theoretically, rather than issues --

11  threshold issues, we could even move those to issues not

12  to be addressed laying out what we think the

13  understanding is, and then we could eliminate -- because

14  I'm not sure it's necessary anyway -- we could eliminate

15  Threshold Issue No. 7 which is the issue of -- it was on

16  Page 13.  Bear with me because I flip around.  That was

17  the threshold issue about the question --

18          CHAIRMAN NELSON:  Of whether the order is

19  void.

20          COMM. ANDERSON:  Yes, or whether -- well,

21  it's a -- "Does the Commission order adopting this

22  stipulation and is contrary to PURA continue to have any

23  force and effect?

24          I don't know that whatever we decide here

25  seems to me supersedes that anyway.  So I'm not even

1  sure we need to have a threshold issue other than a
2  statement that this order -- that ultimately the
3  decision here will supersede -- to the extent it
4  conflicts with the prior order it supersedes it.

5           So that solves four of the seven threshold
6  issues, leaving the one that I am still sort of
7  pondering the -- this issue of the PropCo only getting
8  97 percent of the revenue requirement and the 3 percent
9  going to the property -- I mean, the operating company
10 which flows out of the concern about a real lease.

11          And I'll get to those questions later in
12 the discussion with both you and Staff and any other
13 party that wants to help me understand it.

14          Now, as I've laid that out, is that a
15 clear -- I mean, is that one way to analyze this problem
16 where -- you know, these issues sort of have been
17 addressed.  We would modify the preliminary order and
18 move them from -- excuse me -- from threshold issues
19 to -- maybe threshold issues not to be addressed.

20          I don't know what you call them, but where
21 we say, "This is what's" -- and in doing so might
22 actually help clarify in my mind the gray area
23 between -- in the proposed order that sort of brushes
24 over what may be agreements to fight another day to kind
25 of get me to the point where I understand what we're

42

```
 1   doing here today with your proposal.
 2               MR. MENDIOLA:  Sure.  I think that
 3   generally --
 4               CHAIRMAN NELSON:  If I'm not being
 5   clear --
 6               MR. MENDIOLA:  No, no.  I think you're
 7   being clear, and I think that generally that's right,
 8   but the starting point is a little bit different in
 9   that, you know, when the Commission issued the request
10   for briefing on threshold issues and all the parties
11   filed very substantive briefs there was, you know, to
12   say the least, very wide disputes on how those issues
13   should be resolved.
14               And so at base what the joint proposal is
15   is an effort to eliminate those disputes and to say, "We
16   can agree on the vast majority of this," and that's
17   where I think, Commissioner Anderson, you're exactly
18   heading in the right direction.
19               And, for example, if we can agree that the
20   AssetCo needs to have a CCN, we agree with that.  We
21   agree that the Commission has regulatory oversight, full
22   regulatory review of the lease payments.  We agree with
23   that.
24               And then the question is, "All right.
25   Well, the 35287 order said that rates would be set on a
```

1    combined books and records basis."  We understood how to
2    do that.  We've done that a couple of times, and we
3    understand that the Commission wants us to do something
4    differently now on that.

5                So then the problem that we're solving for
6    is, "All right.  How can we do what the Commission wants
7    us to do and not -- you know, not put at risk the
8    business organization, the REIT structure," which we
9    don't believe the Commission wants to do.

10               In fact, there is a sentence in the draft
11   preliminary order that says that.  So that's the nut of
12   the real challenge, is how can we do that?

13               And through the effort of Staff and others
14   we've had several meetings and we thought that we had a
15   way to do exactly that; that is, proceed with the rate
16   case, two separate rate filing packages, one rate case,
17   file it in 90 days.

18               And our proposal for the true lease is the
19   way we've been historically doing it and others may have
20   other proposals for how to do the true lease, but that's
21   going to probably require some development in the record
22   and it will be presented back to the Commission for
23   ultimate approval.

24               COMM. ANDERSON:  So you would not --
25   because the joint proposal -- I want to take your line

44

 1   of thought because that -- I mean, I'm inclined to try
 2   to find a way forward here, and I am in no way
 3   dismissing the concerns of Commissioner Marquez which
 4   are real, particularly over this one open issue.
 5            The joint proposal implied -- what you
 6   said, you know, is a little different than what the
 7   joint proposal implied, and that is that the parties
 8   would somehow not be able to visit on the merits this
 9   issue of the revenue requirement, the 100 percent that's
10   attributable to invested capital owned by the PropCo
11   but, in fact, the rates under the tariff, a/k/a lease,
12   would only be about 97 percent.
13            If, in fact -- again, if, in fact, that
14   issue remains alive for purposes of the parties engaging
15   in the rate case, that's one thing.  Then, in fact, we
16   solve, I think, the problem.  We may have a solution
17   that allows us to move forward.  If, on the other hand,
18   as I read the joint proposal, and without addressing the
19   merits of the request, that issue was foreclosed from
20   being debated in the rate case.  So which -- just to get
21   on the record, which is it so that I understand,
22   because, again, I'm trying here to see if there's a
23   way -- it's one thing to say the issue is foreclosed.
24            It's another to say, "We're not going to
25   decide it as a threshold issue and leave it to the rate

1    case to be hashed out with the facts later," because

2    that actually would be a good solution in my mind

3    because I have questions about the true lease.

4              I have questions.  Staff made some

5    assertions that the true lease would be explained or

6    fleshed out later was the statement, and my note is,

7    "How, when" -- you know, "how and "when?"

8              CHAIRMAN NELSON:  Yeah.  And I would like

9    to hear from Staff.

10             COMM. ANDERSON:  But if, in fact, the

11   "how" and "when" is the rate case, well, then that's a

12   different matter.  If, in fact, the objectors have the

13   opportunity to say, "This is improper" or "This is" --

14   whatever -- "the amount is wrong, the allocation is

15   wrong," well, those are the kind of things that are

16   generally hashed out in a rate case.

17             MR. MACK:  This is Stephen Mack for

18   Commission Staff, and that is right.  The "how" and

19   "when" would be the rate case.

20             What this proposal is is basically how

21   should Sharyland file their case.  In the preliminary

22   stages of this case we were in discussions with

23   Sharyland about their rate filing package and how we

24   thought the Commission wanted it to look.

25             And even after the draft preliminary order

1 we didn't think that it was going to get filed the way
2 the Commission wanted.  So we entered into negotiations
3 with them in order to get a rate filing package -- or
4 two rate filing packages put together that seemed to be
5 what was intended by the Commission.
6           The one issue, of course, is this true
7 lease issue, and we wanted that laid out to be known
8 not -- we didn't necessarily want a ruling on it right
9 now, but we wanted it to be known so that if it is
10 something that can be done, but we believe the
11 Commission has the authority to do it, but if that's not
12 the case that would be nice to know now.
13           COMM. ANDERSON:  And I don't know now that
14 I'm -- because it's -- the way it's come up, I'm not
15 prepared even to rule on that, and I would actually
16 prefer facts fleshed out before I do make a decision on
17 that.
18           Let me you this because it's related:  The
19 joint proposal -- I think it's the invested capital for
20 distribution -- it generally punts it to -- that the
21 parties will work later to figure it out.
22           Is that to figure it out in the rate case
23 or is it --
24           MR. MACK:  In the rate case there would
25 have to be a baseline set for a DCRF.  That's one

1   necessary issue to be decided in a rate case.  The
2   reason behind there being sort of --
3             COMM. ANDERSON:  I don't mean to cut you
4   off, but -- so is that a "yes" or "no"?  I mean, again,
5   I'm trying to understand what we would be deciding under
6   the joint motion.
7             Is it the way that the distribution is
8   handled, going to be resolved in the rate case?  You
9   said parties agreed to work together to come up with a
10  solution.  Is that in the rate case or in a rulemaking
11  subsequently?  That's really what I'm trying to get at.
12            MR. MACK:  In the rate case.
13            MR. MENDIOLA:  I agree with that.  It's in
14  the rate case.
15            COMM. ANDERSON:  Okay.  So where you say
16  the parties are going to work together, possibly to come
17  up with other alternatives, you're talking about the
18  rate case?
19            MR. MENDIOLA:  Yes.
20            COMM. ANDERSON:  Didn't say that and I
21  was -- again, I have a "how" and "when" --
22            MR. GAY:  That's correct.
23            COMM. ANDERSON:  -- note in my -- okay.
24            COMM. MARQUEZ:  So I have a question for
25  Staff.  So when -- what sounds like what you were just

48

1  saying is that, you know, you-all just needed to get
2  together to figure out how to even get this thing going
3  and process.

4          MR. MACK:  Right.

5          COMM. MARQUEZ:  So since there has been
6  kind of an agreement between you two, why do we need to
7  approve anything up here?

8          I mean, I think that there may be
9  questions on what we include on the proposed order and
10 I'm certainly open.  Everybody --

11         CHAIRMAN NELSON:  Preliminary order.

12         COMM. MARQUEZ:  Yeah -- thank you -- the
13 preliminary order.  Everybody should have -- I mean, you
14 know where you're starting from.  You know the order
15 that the Commission has passed, but everybody should
16 have an opportunity to argue what they want to argue.
17 So there may be questions on what we include on that,
18 but why do we need to -- if you-all have agreed
19 procedurally how they should file, why do we have to
20 approve this or why are we being --

21         MR. MACK:  I think the point is to get an
22 understanding from the Commission.  If this is not what
23 you were intending we would certainly like to know that
24 now before a case is put together, because the case,
25 putting it together, may take 90 days.