```
 1              COMM. ANDERSON:  So if as I laid out -- I
 2   mean, trying to see if -- just making -- I need to
 3   understand what it is we're being asked, and I think I
 4   know now.
 5              If, for example, we went just went through
 6   the preliminary order, the threshold issues, and said,
 7   "Okay.  This essentially just needs to be rewritten to
 8   reflect what it is that the parties will do."  Just go
 9   through them.  In some cases, as I said, I would
10   probably drop No. 7.
11              CHAIRMAN NELSON:  I would.  I agree with
12   that.
13              COMM. ANDERSON:  And then sort of -- and
14   then tee up what remains an issue to be decided based on
15   language in the preliminary -- in the joint proposal.
16   Then we would be in a position to issue a revised
17   preliminary order that's consistent.
18              For example, it would -- in effect, we
19   would be abating -- we'd be issuing the order but then
20   abating the case for a supplemental -- a file package, I
21   guess, or amended application or supplemental
22   application.
23              So let me -- I sort of laid out where I
24   think we can go, and I don't know if it's acceptable --
25              CHAIRMAN NELSON:  Can I ask you a
```

1   question?

2           COMM. ANDERSON:   Sure.

3           CHAIRMAN NELSON:   So when you say -- I

4   think you said this before and I just want to be

5   clear -- on Issue 7 we're not saying that we think the

6   process that was originally set out in the STM is a

7   correct process.

8           What we're saying is we just don't need to

9   say this in the preliminary order --

10          COMM. ANDERSON:   We don't need to ask the

11  question.

12          CHAIRMAN NELSON:   Yeah, we don't.   And

13  obviously whatever we do here in this rate case will

14  take precedent over what we did in the past.

15          COMM. ANDERSON:   And there might be a

16  statement -- I would probably put a statement in saying

17  something like, "that whatever the decision -- the final

18  decisions in the case will supersede --

19          CHAIRMAN NELSON:   Will be controlling.

20          COMM. ANDERSON:   -- will supersede and not

21  get into the -- explicitly the -- whether the prior

22  order violated PURA and really answering almost a

23  hypothetical question about --

24          CHAIRMAN NELSON:   I agree.

25          COMM. ANDERSON:   -- what the effect is."

```
1   I think that's how I would deal with that.  But, again,
2   to be honest, I have not spent a great deal of time
3   going back through the preliminary order trying to mesh
4   the joint proposal into it because I didn't quite
5   understand what the joint proposal was -- what the
6   parties intended.
7                Let me ask -- I'm sorry -- Phillip:  What
8   I sort of laid out, if the order reflected it -- the
9   preliminary order reflected it, where do you stand -- I
10  understand where you are on the merits, but where do you
11  stand on the --
12               MR. OLDHAM:  Phillip Oldham for TIEC.  So
13  if you treat the proposal as basically supplemental
14  briefing on threshold issues, then I think what you're
15  laying out would be appropriate.
16               You would simply be treating that as
17  additional information.  Maybe it satisfies PURA in your
18  minds, maybe not, and you make some cuts and you issue a
19  preliminary order, we do need a supplemental preliminary
20  order.
21               I mean, I think procedurally we need SDTS
22  in the case.  As we said in our filings they're
23  shielding the tax -- we can't develop the record without
24  these affiliates being a part of the case.
25               COMM. ANDERSON:  Well, actually, we would
```

1   just issue a preliminary order.  I'm not sure we've done

2   that yet.  So we'd be issuing a preliminary order.

3            MR. OLDHAM:  Oh, I thought this was a

4   supplemental --

5            CHAIRMAN NELSON:  No.  We haven't issued

6   one.

7            MR. OLDHAM:  Oh, okay.  My mistake.

8            (Simultaneous discussion)

9            CHAIRMAN NELSON:  It was filed by CADM but

10  it wasn't adopted by us.

11           MR. OLDHAM:  And without getting into the

12  merits I do want to address one procedural issue, and

13  that is that the joint proposal did on paper attempt to

14  bind us in not being able to address the legality of

15  the -- it doesn't have to be 3 percent.  I get the

16  Company's position.  It could be 1.  It could be 5, but

17  there are clear statements in this proposal that we

18  cannot question the keeping of those dollars at the

19  OpCo.

20           In our mind there's no legality.

21           (Simultaneous discussion)

22           COMM. ANDERSON:  That's what I thought we

23  got clarity from the discussion here.

24           MR. OLDHAM:  And I think --

25           (Simultaneous discussion)

1           COMM. ANDERSON:  I really don't want to
2 decide that question.  I need more facts around --
3           MR. OLDHAM:  We support pushing that to be
4 a legal decision determined later.  I think that --
5           (Simultaneous discussion)
6           COMM. ANDERSON:  I would not rule against
7 it as a matter, but I'm not -- but I'm not sure I can --
8           COMM. MARQUEZ:  Approve.
9           COMM. ANDERSON:  -- approve it either.  I
10 understand -- well, I'm not sure I -- I understand it's
11 an issue that requires more factual development and
12 argument which in a rate case is exactly the proper
13 venue for it.
14           I think I know -- I'm assuming I know
15 where Staff is coming from, one the reasons they support
16 this process because they want to move the case forward
17 because there are bigger issues -- dollars issues at
18 stake that the parties basically have agreed that they
19 will be discussed.
20           It's not quite explicit but things like
21 the tax allowance and that sort of thing.  So I think
22 what we -- if we can come up with a mechanism to move
23 forward it benefits everybody.
24           MR. OLDHAM:  No question.  And TIEC does
25 not object.  If that issue is carried with the case so

```
 1   that we can address the legality of it, then we're okay.
 2                MR. MENDIOLA:  And I think we're on the
 3   same page or very close.  What the joint proposal
 4   does -- first of all, it's a proposal.  That's the whole
 5   idea.  It's something for the Commission to consider.
 6                COMM. MARQUEZ:  It's a proposal that
 7   you're asking us to vote on, though.  Right?
 8                MR. MENDIOLA:  Yes.  Yes, it is.  But the
 9   proposal really could not be more clear than to say,
10   what we need is a recognition that a true lease is
11   important for the REIT structure and no nobody, no party
12   is, whether you're a signatory or not, is foreclosed
13   from questioning the REIT structure in the case itself.
14   No one is; just not.
15                CHAIRMAN NELSON:  So you're not asking for
16   a recognition that it's a true lease -- I mean --
17                MR. OLDHAM:  There's no record evidence
18   about any of that yet.
19                CHAIRMAN NELSON:  No.  I -- yeah.  And I
20   agree.  I agree with what you said.
21                MR. MENDIOLA:  We're not asking for that
22   right now.  No.
23                CHAIRMAN NELSON:  Right.  I agree with
24   what you said, Commissioner Anderson.  I understand what
25   you're saying.  You're saying, "We want this to be an
```

1    issue in the rate case."

2              MR. MENDIOLA:  Correct.

3              CHAIRMAN NELSON:  Okay.  And so the way I

4    read everything when I first saw it was, this is a

5    process we need to follow.

6              If we don't change the process at this

7    point, then there will be a lot of wasted time and

8    wasted effort and wasted money, because let's remember,

9    ratepayers pay for these attorneys' fees.

10             So my question is, you have up to 90 days,

11   you would have.  When does that start?  You know, if we

12   don't order something today, which I don't know that we

13   need to approve the proposal.  I think when you hear our

14   thoughts, you understand how we want the case to move

15   forward.

16             We need to issue a preliminary order, but

17   when does the 90 days start and how soon within that 90

18   days could you file, because I do think Commissioner

19   Marquez and the other two of us have wanted this rate

20   case to move quickly?

21             Now, we understood because of the Oncor

22   case that there was a -- in the REIT structure there's a

23   level of complexity here that is difficult to avoid and

24   we want it to be addressed, but when could you file?

25             MR. MENDIOLA:  So we think that under --

1  so what we've been doing is filing on a combined books

2  and records basis, as you know, for several rate cases.

3          So we're doing something totally new

4  that's going to require some time.  We would propose

5  that the 90 days begin -- I think actually we say this

6  in here -- at the time that the preliminary order is

7  issued.

8          We need to understand what's written down

9  so that we can prepare the case, and we'll do that

10  there.  And what we gave up --

11          CHAIRMAN NELSON:  But you normally don't

12  have a preliminary order to file a case.  Now, we get

13  that you want to be efficient.  We appreciate that, but

14  why wouldn't -- you've heard what we have to say.  You

15  understand what we're looking for.  Why couldn't the 90

16  days start today?

17          COMM. ANDERSON:  And by the way, I didn't

18  list it on my sort of kind of checklist of "yes, no,

19  don't address."  The books and records I would be, the

20  way you're going to propose to skin the cat, more or

21  less, okay with.

22          You know, subject to the fact that in

23  discovery in this particular case we may need to be a

24  little more -- the ALJs may need to be a little more

25  flexible on what's relevant versus not because I'm not

1  sure -- for example, I know what -- I'm not even sure I
2  know what I don't know in this -- in this case.

3                    It's more like I don't know what I don't
4  know and so --

5                    MR. JOURNEAY:  Can I make a proposal?

6                    CHAIRMAN NELSON:  You sound like you're
7  singing a country song.

8                    (Laughter)

9                    CHAIRMAN NELSON:  Is your name Taylor
10 Swift?

11                    COMM. ANDERSON:  You would not want me
12 to -- that's one way to clear the room quickly.

13                    MR. JOURNEAY:  I would offer to you that
14 you issue a new order that orders both SDTS and
15 Sharyland to file a rate case by January 1st of 2017.
16 That's approximately 96, -7 days.

17                    I would suggest that you in that order
18 allow them to recognize the fact that they don't need
19 allocation factors to have a single customer and just
20 file what you need to file that reflects reality.

21                    I would suggest that for Sharyland that to
22 the extent they want to put the second column in there,
23 that's fine.  Do what you want, but make sure it's clear
24 whose books the numbers come from, and that then you
25 instruct us to go back and draft a new preliminary order

1    that removes all the threshold issues and adds some
2    additional issues to be addressed that it arrays the
3    issue on the true lease that arrays on the discount rate
4    that arrays on the other proposals that are items in the
5    proposal and we bring it to you at the next Open
6    Meeting.
7                   COMM. ANDERSON:  Well --
8                   MR. JOURNEAY:  That tells them when they
9    will file, what they --
10                   (Simultaneous discussion)
11                   COMM. ANDERSON:  One issue is we could go
12    through the threshold issues and sort of -- we could say
13    what's not going to be -- well --
14                   MR. JOURNEAY:  Well, it sounds like
15    you-all want facts to decide those issues.
16                   CHAIRMAN NELSON:  Yeah, we do.
17                   MR. JOURNEAY:  So the threshold issues
18    probably is not the appropriate way to move forward.
19                   COMM. ANDERSON:  Well, except that at
20    least three of them I'm -- we could probably adopt the
21    order.  I didn't see anybody objecting to it.
22                   (Simultaneous discussion)
23                   MR. JOURNEAY:  I heard the parties saying
24    they don't want to fight about those issues.
25                   CHAIRMAN NELSON:  Actually, what we could

1  do is just state in the introduction to the preliminary
2  order that the parties have agreed this, the parties
3  have agreed that, and then make it a nonissue.
4                (Simultaneous discussion)
5                COMM. ANDERSON:  You know, the CCN.  I
6  mean, there are three issues --
7                (Simultaneous discussion)
8                COMM. MARQUEZ:  But then what if we still
9  have parties that don't agree?  I mean, the parties
10 haven't agreed on those things.
11                COMM. ANDERSON:  There are three issues, I
12 mean, again, that I think there was no disagreement on:
13 The CCN for PropCo, the lease -- the leases constitute
14 tariffs or the tariffs -- the leases are tariffs or
15 however -- and that they file separate information.
16                So I think that can be laid out in the --
17 in the preamble or --
18                CHAIRMAN NELSON:  In an abundance of
19 caution, does anyone here disagree with --
20                (Simultaneous discussion)
21                COMM. ANDERSON:  And by the way --
22                CHAIRMAN NELSON:  -- concepts?
23                COMM. ANDERSON:  -- is -- OPUC is here
24 and --
25                CHAIRMAN NELSON:  Yes.

60

1              MR. OLDHAM:  Can I just say that what I --
2   the part of that I don't like is, it's not our
3   agreement.  This was not a stipulation that went through
4   the normal stipulation process.

5              So I think if you-all make a decision as
6   the Commission, "Here's what we're going to require," I
7   think that's fine --

8              CHAIRMAN NELSON:  I'm fine with that.

9              MR. OLDHAM:  -- but it would be better
10  than having it reflected as a result of the agreement of
11  the parties because I don't think that's --

12             COMM. ANDERSON:  So this goes to Stephen's
13  proposal which I'm fine with and then the Threshold
14  Issue 7 would just come out.

15             COMM. MARQUEZ:  I would like to hear from
16  OPUC.

17             MS. QUINN:  Yes.  Cassandra Quinn for the
18  Office of Public Utility Counsel.  I would first echo
19  the comments that Mr. Oldham made.

20             We do believe that there's substantive
21  things in the joint proposal that we have concerns with,
22  but as y'all have already talked about, the main issue
23  is really the whole discussion of the true lease
24  concept.

25             And it sounds like you-all are going down

1  the path of issuing a preliminary order that addresses
2  some of the issues but maybe not everything that's in
3  the joint proposal.
4           We certainly would not agree with
5  including anything related to the true lease
6  requirement.  That hasn't been litigated in this case.
7  It hasn't been briefed in this case.  There's not
8  evidence from anybody other than the Company.
9           CHAIRMAN NELSON:  And I don't think that's
10 intent.  So hearing the discussion, though, between us,
11 you would agree that -- well, I guess it doesn't -- this
12 is an issue to be addressed in the case -- in the rate
13 case.
14          COMM. ANDERSON:  It would be helpful -- I
15 think Stephen is -- I think CADM is listening to our
16 discussion and the answers to the questions.
17          I think coming back with a revised
18 preliminary order -- a new revised preliminary order for
19 us to consider would be a way to move this forward along
20 your lines.
21          CHAIRMAN NELSON:  With a deadline --
22          (Simultaneous discussion)
23          MR. JOURNEAY:  Well, I think you ought to
24 issue a new order requiring a rate case to the concerns
25 of who's supposed to file and when you're supposed to

1  file.

2        CHAIRMAN NELSON:  Yes.

3        MR. MENDIOLA:  That's important because

4  SDTS hasn't been prior to now required to file a rate

5  case.

6        I just wanted to say a couple of things.

7  One is that we -- while we don't dispute, Commissioner

8  Anderson, the way that you laid things out, the Devil

9  really is in the details and how it's framed.

10        So we agree that under the current

11  conditions; for example, if SDTS needs and will apply

12  for a CCN, but we also want to reflect that under the

13  35287 order that SDTS has been operating properly until

14  that order has been reconsidered.  So we don't want to

15  give the impression that it's been doing something

16  improper.

17        COMM. ANDERSON:  That's why I would

18  eliminate Threshold Issue 7.

19        MR. MENDIOLA:  Which I totally agree with.

20  And then --

21        COMM. ANDERSON:  But probably there does

22  need to be a statement about -- that not really

23  addressing the past but the effect of this rate case

24  prospectively once it's finalized.

25        CHAIRMAN NELSON:  Right.

63

1              MR. MENDIOLA:  And I did think that the
2  statement in the draft preliminary order that the
3  Commission is not revisiting that order and resending
4  approval for the transfer of the assets and operation of
5  control.
6              You know, that's really the crux of it
7  all.  We are trying to reduce any questions or concern
8  about -- you know, about the way the business is
9  currently operating while also creating an understanding
10  what we need to do.
11              And, for example, the regulatory oversight
12  of the tariff and the lease payments we're not
13  contesting that.  I think that -- but it's not quite as
14  simple as just saying lease is a tariff because --
15              COMM. ANDERSON:  Well, there's going to be
16  disputes I'm sure over the details --
17              MR. MENDIOLA:  Right.
18              COMM. ANDERSON:  -- and I had questions
19  about the wording, but if we can delay those --
20              (Simultaneous discussion)
21              MR. MENDIOLA:  Regulatory -- full
22  regulatory review and all of that, that's what we are
23  trying to get to.
24              CHAIRMAN NELSON:  Okay.  You-all need to
25  not talk over each other.

```
 1                  COMM. ANDERSON:  Yeah, I'm sorry.
 2                  CHAIRMAN NELSON:  That would mean he gets
 3    to talk first because he's a Commissioner.
 4                  MR. MENDIOLA:  Absolutely.
 5                  COMM. ANDERSON:  I mean, that -- that some
 6    of these details is exactly what the rate case is for.
 7    That's -- so, Stephen, do you --
 8                  (Simultaneous discussion)
 9                  MR. JOURNEAY:  One little pause and I'll
10    throw in one last thing, and that would be, I might also
11    suggest you issue an order to require STS and Sharyland
12    jointly to make a filing to deal with the CCN issue in a
13    separate docket outside of the rate case because
14    that's -- this is going to be a complicated-enough case.
15                  COMM. ANDERSON:  Well, I would rather just
16    move it forward.  I mean, the CCN --
17                  MR. JOURNEAY:  I think that would be a
18    fairly simple case to transfer certificate rights
19    relating to distribution/transmission facility ownership
20    to them.
21                  I've never heard anyone argue that point
22    really.
23                  CHAIRMAN NELSON:  I think that's all tied
24    up in the issue of structure --
25                  (Simultaneous discussion)
```

65

1              COMM. ANDERSON:  I think some of the
2     parties at the table are --
3              MR. JOURNEAY:  Are they nodding their head
4     or shaking their head?
5              COMM. ANDERSON:  They're shaking their
6     head.
7              MR. JOURNEAY:  Then I'll shut-up.
8              (Laughter)
9              COMM. ANDERSON:  But I think your -- I
10    think it would be helpful if we get a -- I'm not opposed
11    at all to doing a separate order to issue -- to have the
12    PropCo come in, but --
13              (Simultaneous discussion)
14              MR. JOURNEAY:  Well, then, we need to put
15    issues in the preliminary order I think about the
16    certificate if we're going to deal with it in this
17    proceeding.
18              That's, I think, one or the other.  It's
19    done here or it's not.  Our preliminary order doesn't
20    address --
21              (Simultaneous discussion)
22              COMM. ANDERSON:  Well, it would almost
23    have to be done here because we're setting rates -- we
24    would be setting rates for the PropCo in this case.
25              MR. JOURNEAY:  Fine.  We will add those

```
 1   in.
 2              COMM. MARQUEZ:  So what we're talking
 3   about doing today is setting aside the joint proposal
 4   and reworking the preliminary order and coming back next
 5   time and working --
 6              COMM. ANDERSON:  Well, yeah, to
 7   incorporate --
 8              COMM. MARQUEZ:  Some of the things we've
 9   discussed.
10              CHAIRMAN NELSON:  I wouldn't say we're
11   setting aside the proposal.  I think we're --
12              (Simultaneous discussion)
13              COMM. ANDERSON:  I would say we're
14   incorporating --
15              COMM. MARQUEZ:  Some of the --
16              COMM. ANDERSON:  -- the aspects of the
17   joint proposal into the preliminary order consistent
18   with our discussion today.
19              MR. JOURNEAY:  Today you would be, I
20   think, adopting an order that orders --
21              CHAIRMAN NELSON:  A filing by January 1st.
22              MR. JOURNEAY:  -- a new filing by both
23   utilities at whatever date you want.  I just threw out
24   January 1st out because it's a holiday.
25              (Laughter)
```

```
 1                    COMM. ANDERSON:  I would just say as soon
 2   as practicable.
 3                    MR. MACK:  May I request a clarification
 4   on that?  It's a filing with the same test year, same
 5   information.  It's the same case --
 6                    COMM. ANDERSON:  I would use the term
 7   "amended filing" that includes -- which is the PropCo --
 8                    MR. JOURNEAY:  Sure.
 9                    COMM. ANDERSON:  -- because they're not
10   withdrawing --
11                    (Simultaneous discussion)
12                    COMM. ANDERSON:  Well, because they're
13   not -- at least I didn't read the joint proposal as
14   they're withdrawing the present application.
15                    I think the -- what they were trying to
16   say is they're filing an amended, and then they are
17   delaying the clock that, you know, the deadline we have
18   to deal with rate cases by whatever time period it takes
19   to file the amended -- or the amended -- I guess it's
20   application.
21                    That's how I read the joint motion.
22                    MR. JOURNEAY:  Okay.  So then I would just
23   say that you vote on an order to tell them to do that so
24   that they have that certainty that if they're going to
25   be in the case, and then I would say that you tell them
```

1  in that order that they can make their filing consistent
2  with reality -- I mean, their concern with the one
3  package for SDTS because they have a single customer
4  they don't need an allocation --
5                    (Simultaneous discussion)
6                    COMM. ANDERSON:  Well, say -- I would say
7  make the filing --
8                    (Simultaneous discussion)
9                    CHAIRMAN NELSON:  Hey, Stephen, could you
10 talk into the mic?
11                    COMM. ANDERSON:  Consistent with --
12                    MR. JOURNEAY:  Sorry, Will.
13                    COMM. ANDERSON:  -- with the joint motion
14 as -- and the discussion in this -- at this meeting.
15                    MR. JOURNEAY:  And if you want we'll draft
16 an order and bring it back to Open Meeting to order
17 that, I guess, if you want to look at that.
18                    COMM. MARQUEZ:  I think I would like to
19 look at it.
20                    MR. JOURNEAY:  I mean, the parties know
21 they can start working on it.  I mean, they've got a --
22                    CHAIRMAN NELSON:  But you do want -- so,
23 just to be clear --
24                    (Simultaneous discussion)
25                    COMM. ANDERSON:  And I'd draft a

69

```
1   preliminary order, too.
2              MR. JOURNEAY:  No.  We will do that.  We
3   will do a new --
4              CHAIRMAN NELSON:  What is the time frame?
5   I don't think we have agreement on that, because you
6   said, "whenever practicable."  I think they've agreed to
7   90 days.
8              COMM. ANDERSON:  Well, how about whenever
9   practicable but no later than 90 days?
10             CHAIRMAN NELSON:  I'm fine with that.
11             COMM. MARQUEZ:  I'm fine with that.
12             MR. MENDIOLA:  That's fine with us, 90
13  days and no later, but I was also --
14             CHAIRMAN NELSON:  No later than January
15  1st.  Let's say -- because it will be less than 90 days
16  by the time we come to the next Open Meeting and signed
17  an order.  So let's say January 1st.
18             MR. JOURNEAY:  No later than January 1st
19  would mean December 30th, which is the Friday -- last
20  Friday of the --
21             CHAIRMAN NELSON:  Okay.  Merry Christmas.
22             COMM. MARQUEZ:  Over and over.  We're just
23  ruining the holidays.
24             (Laughter)
25             MR. MENDIOLA:  That's okay.  Thank you for
```

70

1   your consideration.

2              CHAIRMAN NELSON:   Okay.  So we're not

3   taking action at this meeting.  You're going to bring

4   something back to us.  So we can move on.  Thank

5   you-all.

6              MR. MENDIOLA:   Thank you very much.

7              CHAIRMAN NELSON:   Okay.  So that takes us

8   to 20 which is not taken up.

9                     AGENDA ITEM NO. 21

10  DOCKET NO. 45915; SOAH DOCKET NO.
    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 - APPLICATION OF ENTERGY
11  TEXAS, INC. FOR AUTHORITY TO ADJUST
    ITS ENERGY EFFICIENCY COST RECOVERY
12  FACTOR

13             CHAIRMAN NELSON:   21 is Entergy's EECRF,

14  and, Commissioner Anderson, you filed a memo and I was

15  fine with your memo.

16             COMM. MARQUEZ:   Agree.

17             CHAIRMAN NELSON:   And I would entertain a

18  motion to adopt the proposed order with the changes set

19  forth in your memo.

20             COMM. ANDERSON:   So moved.

21             COMM. MARQUEZ:   And I second.

22             CHAIRMAN NELSON:   Okay.  22 was consented.

23  23 and 24 were consented.

24

25

71

AGENDA ITEM NO. 25

PROJECT NO. 45633 - PROJECT TO IDENTIFY
ISSUES PERTAINING TO LUBBOCK POWER AND
LIGHT PROPOSAL TO BECOME PART OF THE
ELECTRIC RELIABILITY COUNCIL OF TEXAS

CHAIRMAN NELSON:  25 is Project No. 45633.
This is the Lubbock Power & Light proposal to become
part of ERCOT.

ERCOT and SPP filed a letter outlining
their plans for moving forward with the studies we've
asked them to do.

I was fine with their plans.  I think
either Lubbock Power & Light should fund the studies or
we need to leave that issue open depending on the
outcome of the studies, but I don't think it's fair to
require all the ratepayers in ERCOT to pay for that
study.

COMM. MARQUEZ:  I absolutely agree.

CHAIRMAN NELSON:  Okay.  And then ERCOT
and SPP stated in the letter the certain issues they
wouldn't be able to address.  I think we could get
Commission Staff to do some of the analysis once we do
get the analysis that they are going to provide.

COMM. MARQUEZ:  Do we need to provide
Staff any -- do you have any thoughts on the rulemaking?
Should we go ahead and open it or do you want to --

1          CHAIRMAN NELSON:  I think it might be
2  better -- because we're going to be looking at the cost
3  benefit, until we get the studies it's really hard to
4  get your arms around what to put in the rulemaking.
5          So I just fear that if we open the
6  rulemaking we'll just be waiting for the results of the
7  study.  I don't know.  I guess I could hear from Staff
8  on that issue.
9          MR. MEIER:  Good morning, Commissioners.
10  Kennedy Meier and Alicia Maloy for Commission Staff.
11  It's -- I think at this point we don't really have a
12  strong position one way or the other on the issue.
13          Given the time constraints involved with
14  the rulemaking, if you-all would like the rulemaking,
15  the sooner we can start the better, but if you-all
16  would -- if you-all decide that it's better to wait
17  until we have the study results, then --
18          COMM. MARQUEZ:  Madam Chair, if you feel
19  comfortable with that, I mean, you've said before,
20  "Let's get it right.  Let's not get" --
21          (Simultaneous discussion)
22          COMM. ANDERSON:  I thought -- I thought
23  my -- I mean, my recollection was -- and it may be
24  faulty -- that we were ultimately going to do a
25  rulemaking because there are other possibilities out

1  there, but that we would do it after or later in the
2  process with respect to Lubbock because the Lubbock
3  proceeding would inform us as to all the issues.
4          CHAIRMAN NELSON:  Yes.  That's what I was
5  saying.  So -- and I do agree with that.  So I think --
6  thank you for bringing that up, because I do think we
7  need to keep our eye on the ball, but I think it will be
8  more useful.
9          We've had so many cases since we've all
10 been here where we go -- we have an issued come up in a
11 contested case and we go, "Well, we need a rulemaking to
12 address that."  Then we open a rulemaking and we go,
13 "Well, we don't have any facts.  So how do we know what
14 to do?"
15         So I think to the extent we could wait for
16 some factual development, because this is really a
17 question of first impression and we do want to make sure
18 we get it right.
19         We have legislators concerned about costs
20 within the SPP system.  I'm concerned about that as
21 well.  We have people concerned about costs within the
22 ERCOT system.
23         I think we all need to be concerned about
24 that.  We clearly have questions about making sure that
25 we don't do anything to take away the PUC's jurisdiction

74

 1   over ERCOT.  I don't think it will be, but we just need
 2   to cross those Ts and dot the I's to make sure.
 3                  COMM. ANDERSON:  Again, this is not -- I'm
 4   not prejudging it, but that's -- also we need to be
 5   mindful.  I mean, there are certain -- there are other
 6   issues, too, like if we have -- if we have citizens or
 7   groups of Texans who want to be part of ERCOT, you know,
 8   should we -- we ought to be -- you know, is it -- do
 9   they -- I won't say a "right" -- "absolute right to join
10   the club," but do we want to facilitate that joining in
11   a way that's cost effective?
12                  CHAIRMAN NELSON:  I do think that's right,
13   but I do think the cost effective part --
14                  (Simultaneous discussion)
15                  COMM. ANDERSON:  And that's -- I mean,
16   that's obviously --
17                  CHAIRMAN NELSON:  -- and the cost benefit
18   is a really important one because --
19                  (Simultaneous discussion)
20                  COMM. ANDERSON:  -- that's obviously an
21   issue.  But as folks look at ERCOT there and it's -- you
22   know, increasingly it's -- there seems to be developing
23   a desire to get a piece of the action.
24                  COMM. MARQUEZ:  (inaudible) better and
25   better.

75

```
 1                    COMM. ANDERSON:  So, anyway.  All righty.
 2                    CHAIRMAN NELSON:  Thank you.  Okay.  So --
 3    I know you weren't talking about me there, but --
 4                    (Laughter)
 5                    CHAIRMAN NELSON:  Okay.
 6                    MR. BREWSTER:  Chairman, may I be heard on
 7    behalf of Lubbock briefly?
 8                    CHAIRMAN NELSON:  Yes.
 9                    MR. BREWSTER:  Just to get some further
10    clarification on the responsibility for the cost point
11    you raised at the outset, were you referencing both the
12    ERCOT study and the SPP study?
13                    CHAIRMAN NELSON:  I'm saying whatever
14    studies need to be done at some point we need to look at
15    the cost of those studies and who bears the cost.
16    That's all I'm saying.
17                    MR. BREWSTER:  Okay.  And that's a
18    conversation that I think Lubbock can take up with SPP
19    and ERCOT, certainly.  We knew that was at least part of
20    the memo and part of what the two entities filed.
21                    Just two additional points of
22    clarification.  I think they are relatively procedural
23    points.  One is that -- I know, you know, Lubbock has
24    hired a consultant, GDS, to do a similar kind of study
25    to what you have proposed.
```

1          As an important input for that work and
2    perhaps work done by other parties who are interested, I
3    think GDS and Lubbock would request that ERCOT and SPP
4    disclose the assumptions that they intend to make.
5          CHAIRMAN NELSON:  Absolutely.  And you-all
6    are disclosing your assumptions as well.
7          MR. BREWSTER:  Yes.  I mean, we're trying
8    to have kind of an open discussion about that, but to be
9    sure we're talking about the same things.
10         So to the extent we could get those
11   assumptions, you know, as early as this Autumn, October,
12   in ERCOT's case, roughly, as far as we've had
13   discussions with ERCOT.  We haven't heard that
14   specifically from SPP, but if we could get those
15   assumptions early I think that would help smooth the
16   process along.
17         CHAIRMAN NELSON:  I see Sam sitting in the
18   audience and Lannie (phonetic).  So I'm sure you-all are
19   willing to work with Lubbock to give them those
20   assumptions.  I see heads shaking.
21         FROM THE AUDIENCE:  Absolutely.
22         CHAIRMAN NELSON:  So we've got
23   confirmation from them.
24         MR. BREWSTER:  Very good.
25         CHAIRMAN NELSON:  So at this point you're

1   batting 100.

2           MR. BREWSTER:  Just the final point I

3   raise is that to the extent that --

4           CHAIRMAN NELSON:  The longer you talk the

5   less your chances of batting 100 are going to be.

6           MR. BREWSTER:  That is Lesson No. 1.  I

7   understand.  I understand that SPP has a scheduling

8   constraint as far as getting this work done.

9           If it were possible for ERCOT to release

10  its work when it was done, presumably sometime before

11  the end of the second quarter of next year, it might

12  assist Lubbock and other interested parties in digesting

13  what this kind of means for the ERCOT side while SPP

14  wraps up their work.

15          CHAIRMAN NELSON:  You know what?  All I

16  have in front of me is a letter.  I'm not going to

17  direct them at this meeting to do that.

18          We will go back and look at that and

19  revisit it.  Okay?

20          MR. BREWSTER:  I appreciate it.

21          CHAIRMAN NELSON:  Obviously, we've said

22  time is of the essence.  We understand the urgency.

23  We've also said we want it to be done right.  So the

24  sooner that people can release the better.  I would like

25  it if SPP -- I don't know what SPP's scheduling

1  constraints are.  I know they have a lot of employees.

2  I know they have a lot of really smart employees and two

3  of them are sitting here.

4        So I know that they have every intention

5  of working with this Commission and with ERCOT and with

6  Lubbock to make sure that we all have -- it's in SPS's

7  interest, too, to make sure that ratepayers and SPP

8  don't end up paying for part -- paying for -- being

9  unfairly advantaged when Lubbock leaves.  So...

10        MR. BREWSTER:  Understood.  Thank you.

11        CHAIRMAN NELSON:  Thank you.  Okay.

12        AGENDA ITEM NO. 26

13  PROJECT NO. 45635 - SCOPE OF COMPETITION
   IN ELECTRIC MARKETS REPORT

14

15        CHAIRMAN NELSON:  So that brings us to

16  Item 26, Project No. 45635 which is the scope of

17  competition in the electric report.

18        I've read the draft of the report and I

19  know there's a date in there that needs to be updated,

20  but there's one core concern I have with the report, and

21  I might have more as we move forward.

22        I will share this with Staff, but I know

23  it's something we need to talk about.  At some point in

24  the draft report Staff is looking at EIA data to show

25  what our rates are.  Ken, I'm sure you remember.  I

79

1   wrote that letter to --

2           COMM. ANDERSON:  It's woefully out of
3   date.

4           CHAIRMAN NELSON:  It's woefully out of
5   date.  It includes entities that aren't even in
6   competition, and it's not very well scrubbed.  So I
7   prefer looking at our Power to Choose data.

8           I'm giving this to you just for your
9   record.  We don't need to talk about it today, but maybe
10  at the next Open Meeting we could talk about it.

11          But I think even looking at the EIA data
12  you can see that our competitive market has resulted in
13  lower rates, but the truth is, if you look at like a
14  12th-month average or something like that -- I mean, an
15  average of the 12-month rates on Power to Choose you get
16  a better indication of what's out there instead of
17  looking at this backward data that nobody really scrubs.

18          So those were my only comments.  And,
19  obviously, again, I think from our perspective to the
20  extent we've got recommendations to make to the
21  Legislature it would be good to start having that
22  discussion sooner rather than later.

23          COMM. ANDERSON:  And I agree.  And I was
24  actually going to ask that we sort of defer discussion
25  because I have begun to go through it but that's about

```
1   as far as --
2              CHAIRMAN NELSON:  Well -- and me, too, and
3   that's all I wanted to bring up was just that one
4   small issue.
5              (Simultaneous discussion)
6              COMM. ANDERSON:  Okay.  No.  And I
7   completely agree with you.  It is -- EIA is just --
8   it's -- and that's not a criticism of the Energy
9   Information Agency.  It's just -- I'm not sure they
10  understand or know how to get their arms around -- how
11  to distinguish ERCOT from the rest of Texas, for example
12  and then within ERCOT that's (inaudible).
13              You've got co-ops and public power
14  entities and how do you -- I mean, those rates are
15  more -- perhaps more readily available.  Then there's
16  the question of how you actually decide what the rates
17  and the competitive space are because they --
18              (Simultaneous discussion)
19              CHAIRMAN NELSON:  But, actually -- yeah,
20  but those rates are not readily available because if you
21  look for --
22              (Simultaneous discussion)
23              COMM. ANDERSON:  I mean, all you have
24  available is the Power to Choose.
25              CHAIRMAN NELSON:  No.  I mean -- the Power
```

81

```
 1   to Choose rates are readily available.
 2                COMM. ANDERSON:  Oh, yeah.
 3                CHAIRMAN NELSON:  The rates that aren't
 4   readily available are the munis and co-ops because I
 5   spent a lot of time for a presentation I gave trying to
 6   figure out what some of the rates of munis and co-ops
 7   were and including the one I'm in.
 8                And so we went through and did this really
 9   robust analysis, because the truth is when they give us
10   cost information they are not comparing apples to
11   apples.
12                So we're not getting the same basis of
13   comparison from the cities and munis and co-ops as we
14   are on the Power to Choose website.
15                So, anyway, for those reasons I think we
16   need to look at Power to Choose and some indicia there.
17                COMM. ANDERSON:  And depending, for
18   example, on the public power entity, there may be
19   components of the bill that have nothing to do with
20   electricity.
21                I know my Austin electric bill depending
22   on the time of the year as much as 40 percent has
23   nothing to do with power.  It's clean streets and public
24   benefit or whatever that generic 5 or $10 is.
25                CHAIRMAN NELSON:  And we could talk all
```

```
 1   day about that.  So -- okay.  We will give you more
 2   feedback at the next Open Meeting.  But thank you for
 3   the great work you've done so far.
 4                So 27 is not taken up.
 5                    AGENDA ITEM NO. 28
 6   PROJECT NO. 42302 - REVIEW OF THE
     RELIABILITY STANDARD IN THE ERCOT
 7   REGION
 8                CHAIRMAN NELSON:  28 is the review of the
 9   reliability standards.  Well, let me ask.  This is one
10   of the last things we have, but I can imagine this might
11   be a long discussion.
12                Do you guys want to take a break or are
13   you okay moving forward?  I'm okay.
14                COMM. MARQUEZ:  I can take a break or --
15   either way.
16                COMM. ANDERSON:  Either way.
17                CHAIRMAN NELSON:  I'm good.  Let's just
18   keep going then.  So we have a memo in front of us in
19   this project from Staff.  I think they are looking for
20   direction of how we want to move forward.
21                COMM. ANDERSON:  I thought it was an
22   excellent memo.  What I would do is -- and it's really
23   following up on Commissioner Marquez's idea sometime
24   back, is, I would -- and I would probably do it with a
25   formal direction to ERCOT, but we could also open a
```

83

1   rulemaking to the extent it is to clear up anything
2   that's in our rules.

3           But, you know, I would sort of eliminate
4   the current target of LOLE and instead have ERCOT
5   every -- I was going to say two years, but there are
6   parties who said three.  I would like to get a sense --
7   and we can get that from ERCOT at the next Open Meeting
8   what the cost would be, but every two but not more than
9   three years, have an evaluation -- a new evaluations of
10  the -- or a new publication of the market equilibrium
11  reserve margin and the economically optimal reserve
12  margin and how those resulting margins then have them
13  converted into expected unserved energy to see how that
14  is reflected.

15          So you would end up with three -- well,
16  maybe four numbers, meaning that you would have the
17  economically optimal and the market equilibrium and then
18  the expected unserved energy conversion based on each.

19          So, again, that would give some indication
20  of magnitude and scope.  That's how I would begin to
21  proceed before making a final decision.  I would want to
22  know from ERCOT sort of what their preference is in
23  terms of frequency, what the estimated costs would be,
24  that sort of thing.

25          That's sort of where I would go, and then

 1   I would like Staff to tell us finally if -- are there
 2   any aspects of our rule that would need to be modified
 3   to accomplish that approach.
 4               CHAIRMAN NELSON:  I would like to hear
 5   from ERCOT because since this isn't a required reserve
 6   margin I do --
 7               MR. LASHER:  Today?
 8               CHAIRMAN NELSON:  No.
 9               MR. LASHER:  Oh.
10               (Laughter)
11               CHAIRMAN NELSON:  I continue to be
12   concerned about giving the impression that it's
13   required.
14               So I do want to see what the costs would
15   be when we put that information together and see what --
16   you know, do sort of a cost benefit analysis for lack of
17   another terminology.
18               So I'm fine with moving forward that way.
19               COMM. ANDERSON:  Because I think one of
20   the most salient points laid out in Staff's memo was
21   what the current -- the one in ten standard, you know,
22   what it implies, and we need to keep in mind that it is
23   hypothetical because it's what it implies the
24   interruption would be in any given year versus the
25   actual interruptions that occur in Oncor, and I would

85

```
 1   just make the point which I think they make --
 2               CHAIRMAN NELSON:  Or any utility.
 3               COMM. ANDERSON:  -- any utility, but they
 4   used Oncor's as an example.  We keep in mind that that
 5   does not include major storm interruptions.
 6               COMM. MARQUEZ:  Right.
 7               CHAIRMAN NELSON:  Right.
 8               COMM. ANDERSON:  So that actually is
 9   perhaps the most salient point about the one in ten
10   standard currently.  But, anyway, that's how I would
11   skin this, and, again, I want to give --
12               COMM. MARQUEZ:  Sounds great.
13               COMM. ANDERSON:  -- give credit to
14   Commissioner Marquez who sort of -- kind of coming up
15   with it way back.
16               COMM. MARQUEZ:  You're welcome.
17               (Laughter)
18               CHAIRMAN NELSON:  Okay.  So then if ERCOT
19   can work with our Staff to come up with some answer to
20   that.  If you can come up with it at the next Open
21   Meeting that would be great.  If you need a little more
22   time that's fine, too.  Just let us know.  Okay?  Thank
23   you.
24               Okay.  29 and 30 --
25               MR. JOURNEAY:  29 --
```

86

AGENDA ITEM NO. 29

PROJECT NO. 42750 - MATTERS PERTAINING
TO OR ARISING OUT OF THE CHAPTER 11
BANKRUPTCY OF ENERGY FUTURE HOLDINGS

CHAIRMAN NELSON:  I'm sorry.  29, Project No. 42750.

COMM. ANDERSON:  Yes.  I will actually -- I want to briefly go through some comments and I will be filing a memo of maybe the middle of next week that sort of lays it out in more detail unless you-all plan to file in this at the next Open Meeting.

But I wanted to -- the reason I'm taking time to sort of bring this up is -- let me switch -- it appears that we will shortly be considering the application from a very large and well-known utility that seeks our approval to acquire control of Oncor Electric Delivery Company.

One of the things that I had not looked at in great detail is the actual merger agreement, because until the judge approved it it was sort of not the best use of my time.

COMM. MARQUEZ:  Uh-huh.

COMM. ANDERSON:  When the judge approved it last Monday, I pulled it out and based on the trade press went and actually began to look at it more carefully.

1           There are some -- and I decided there are
2   some -- there are some -- there are some provisions in
3   there that raise deep concern and I wanted to get them
4   out there so that if the potential applicant was so
5   inclined they could address them.
6           Putting aside some other minor things that
7   I'll lay out, the biggest issue revolves around certain
8   conditions that they call "burdensome conditions" and as
9   well as the termination fee which is 275 million.
10          I want to be clear that the fact that they
11  have laid out a handful of conditions that they -- that
12  if imposed by the Commission would allow them to walk
13  the deal is not in and of itself, you know,
14  objectionable.
15          It's perfectly reasonable for an acquirer
16  to say, "Look, unless we get this, this and this or if
17  the Commission imposes this, that or A, B or C we want
18  to have the right to walk because that changes the
19  value."
20          However -- and neither is a termination
21  fee in and of itself unreasonable.  It's fairly standard
22  and it at least historically was designed to deal with
23  the problem that a bid was accepted in a regular
24  acquisition or merger and then a subsequent topping bid
25  came in and the board of the target decided they had a

88

```
1   fiduciary duty as they under a lease -- well, in most --
2   under Delaware case law to consider the higher bid.  The
3   termination fee is designed to compensate the original
4   date, if you will, to the transaction.  It amounts to
5   liquidated damages.
6              However, this merger agreement does
7   something much more, and that is it appears to be an
8   effort to really tie the Commission's hands in the
9   proceeding.
10             What they propose is that if the -- as it
11  stands now if I read the merger agreement correctly --
12  and I'm still digesting it -- but if I read it
13  correctly, if the Commission rejects the transaction in
14  its entirety, is not in the public interest subject to
15  some caveats, there's no termination fee.
16             If, on the other hand, the Commission
17  purports to approve it but with what they call "burdens
18  of conditions" which include, among other things, an
19  independent board at ERCOT -- I mean -- I'm sorry -- at
20  Oncor or restrictions on dividends or other conditions
21  that in the aggregate have a material -- could have a
22  material adverse effect on NextEra or its credit rating
23  and there they don't say it results in a downgrade but
24  it puts them on watch, and then they have a third which
25  talks about -- where is it -- a no for sale but it's
```

1    beyond that.  It says, "or holds separate."

2              If we were to require them to hold

3    separate other affiliate assets that that -- what it

4    says is "then such a requirement may contribute to be or

5    be a burdensome condition."  I'm not sure what that

6    means other than the result of it is that they can walk

7    the deal and get paid 275 million.  Now that's an

8    extraordinary requirement.

9              That is the equivalent of asking the DOJ

10   and their antitrust clearance to -- if they reject the

11   deal requiring them to pay or -- I'm not sure there is

12   an example, but basically saying, regulator, rather than

13   being a way to be compensated for a higher bid sort of

14   intervening is to say -- if the regulators under their

15   obligation under law to evaluate a transaction and

16   decide if it's in the public interest and if -- and to

17   impose conditions they may feel like are relevant,

18   "Okay.  We can walk and we get paid 275 million," and,

19   of course, part of the problem there is that there's

20   only one asset of EFIH.  That's Oncor.

21             I also -- I mean, that really is an

22   attempt to -- well, that does a couple of things.  One

23   is, I think it is an improper attempt to, I think,

24   constrain the Commission from its statutory duty when it

25   evaluates any transaction -- one.

1            Two, I think it would then force us -- and
2    I'm going to throw this out but we don't even have to
3    discuss or agree to it.  It's just something I would
4    probably ponder.

5            If there's an attempt -- I mean, if that
6    remains I think that -- and the application is filed, I
7    think before we even issue a preliminary order we would
8    need to do an abbreviated process to decide if the
9    merger agreement is even in the public interest with
10   those provisions, not whether the conditions themselves
11   ought to be imposed; it's simply given this merger
12   agreement would we would it -- this transaction -- I
13   mean, the requirement is in the public interest because
14   of the restriction it places -- the practical
15   restriction it places on the Commission's obligation
16   under PURA to evaluate the transactions, and we might
17   ask for briefing, have a hearing with oral argument but
18   then decide, because it seems to me if we come down six
19   months later after spending hundreds of thousands in
20   attorneys' fees, expert witness fees, not to mention
21   Staff time, where we decide, you know -- and this could
22   very well happen, but we decide, "Well, we've got to
23   impose certain conditions," and the effect of that is
24   that the acquirer can say, "You know what?  We don't
25   like it, but pay us 275 million."

1           I've got a problem with that.  I will say
2   that in this proposed -- one of the reasons that I'm
3   concerned about this is I think one of the -- the major
4   issues in this case that is likely to come up is issues
5   around the fact that this acquirer they have substantial
6   competitive assets in ERCOT both on the load side and on
7   the generation side.

8           They would be -- if the transaction was
9   consummated they would be -- there would be conflicts
10  between -- and this is the largest TDU in ERCOT.  It
11  plays a vital role.

12          The way we dealt with it in the EFH
13  transaction is a robust ring fence.  Just the code of
14  conduct itself is not enough and it wasn't enough in the
15  EFH case and their -- what they tout as robust -- you
16  know, robust regulatory commitments -- I'll just give an
17  example.  You know, the acquirer has made much about its
18  various regulatory commitments in press releases, you
19  know, such as -- and this is a quote that comes from a
20  very recent press release, (As read) Embrace a robust --
21  a robust set of regulatory and governance commitments
22  regarding, among other things, codes of conduct.

23          You know, yet, a careful examination of
24  their code of conduct commitment is little more than an
25  undertaking by this acquirer and its affiliates that

1   they will comply with applicable laws and rules
2   concerning affiliate activities and that they will
3   acknowledge for purposes of Oncor's code of conduct that
4   certain named affiliates will be considered Texas
5   competitive affiliates.

6          That came from Exhibit C of the key
7   regulatory terms of the Oncor letter agreement dated
8   August 4th of this year.  Of course, the reality is that
9   the law requires that as the minimum.  And with respect
10  to their other affiliated companies they're merely
11  acknowledging the obvious.

12         I mean, the truth, of course, is this is
13  no commitment at all but merely a restatement of what
14  Texas law and Commission rules would require of them.

15         So, again, this is an abbreviated kind of
16  statement.  I'll lay it out more with cites and
17  paginations so that you-all can look at it.  But, you
18  know, I just want to get that concern out there because
19  I do not want to go through a six-month process that
20  leaves us with the option of paying -- of technically
21  EFH and EFIH paying 275 million when the only asset may
22  be Oncor.

23         I don't -- they need to understand that
24  any attempt to foreclose on EFIH's asset, their sole
25  asset, which is the 80 percent of Oncor, that's a change

93

1   in control that's not likely to be successful.

2              You know, it's just -- this is -- and,

3   frankly, I think it's important for the judge in the

4   bankruptcy case to understand the problems we have with

5   that provision of the merger agreement and need -- and,

6   frankly, if it's not changed in some way that satisfies

7   us that he's also aware before the confirmation hearings

8   begin later this year.

9              CHAIRMAN NELSON:   I agree with you.

10   You've raised a lot of good points.   As this transaction

11   has progressed it does feel in many ways like a step

12   backwards in the Oncor area with respect to the

13   ownership of the utility.

14              One fundamental concept of competitive

15   markets is that you can't -- the reason the market was

16   restructured the way it was with the TDU being separate

17   and regulated is to grant the generators and the

18   retailers access to the customers and the way of serving

19   those customers.

20              So I, too, am concerned.   I've been

21   concerned for quite sometime about -- you can't call it

22   unbundling because they are separate companies right

23   now, but the impact that the ownership of generation and

24   retail customers will have on the ultimate TDU, and I

25   look forward to that.

1          I agree with you that I think it is really
2    important for us to give some insight into what we're
3    thinking early in the process, and I would totally
4    support the concept of doing some sort of an abbreviated
5    process that would have us make a decision on whether --
6    as it's stated whether that could in any sense be within
7    the public interest.
8          COMM. ANDERSON:  Yeah, because the TDUs
9    play in the ERCOT competitive market a vital role, the
10   open access regime, and it is, again, all the other
11   utilities when they unbundled actually separated with
12   the exception -- at least the two largest ones.
13         CHAIRMAN NELSON:  Yeah, CenterPoint.
14         COMM. ANDERSON:  CenterPoint completely
15   divested both generation and load.  Again, Oncor
16   initially was not.  They set up separate companies but
17   as a condition of the EFH transaction the Commission
18   required a ring fence which included an independent
19   board in order to protect and avoid the conflicts of
20   interest.
21         The other TDUs have -- the amount of
22   competitive affiliates they have are minute in relation
23   to the TDU.  So, I mean, this is -- to me this can be a
24   major issue and I think the merger agreement, it just
25   appears to me that it was designed to try to force -- I

1   mean, that they recognized this problem and they are
2   trying to force it down our throats and give us a
3   Hobbesian choice of -- and that's in the nasty, brutish
4   and short term -- not Hobson's as in the movie.

5                   I just am -- I've frankly been offended by
6   it, but it is what it is.  But 275 million, I don't know
7   where the money is coming from, but it's not going to be
8   from -- it can't be from Oncor's ratepayers.

9                   CHAIRMAN NELSON:  And I'm concerned about
10  the tax aspects, too, as they relate to the affiliate
11  issues, because if you read any of the press, the
12  Investment Community press, what they say as part of the
13  reason that NextEra wants to buy Oncor is so that they
14  continue investing in generation and get the benefit of
15  the production tax credit.

16                  So I really want to look at those kinds of
17  issues when we look at the case and what sort of -- I
18  don't want to say "subsidies" but -- or cross-subsidies
19  within the companies, but I do want to look at those as
20  well.  So...

21                  COMM. MARQUEZ:  Sounds good.

22                  CHAIRMAN NELSON:  Okay.  So stay tuned, I
23  guess, is what we're saying.

24                  COMM. MARQUEZ:  Because everybody was
25  about to change the channel on that one.

```
 1                    (Laughter)
 2              CHAIRMAN NELSON:  That's right.  So that
 3    takes us to -- 30 is not taken testimony.  31 is not
 4    taken up.  32 is not taken up.
 5      PROJECT NO. 45448 - OPEN MEETING AGENDA ITEMS WITHOUT
 6                 AN ASSOCIATED CONTROL NUMBER
 7              CHAIRMAN NELSON:  Commissioner Anderson,
 8    you filed a memo in Project No. 45448, the Open Meeting
 9    agenda items without an associated control on the issue
10    of CFTC.
11              COMM. ANDERSON:  Oh.
12              CHAIRMAN NELSON:  And I guess what
13    Commissioner Marquez and I would say is, "Good job --
14    great job."
15              COMM. MARQUEZ:  Yes.
16              COMM. ANDERSON:  Well, it was a -- I --
17    we -- the Commission and my staff played a comparatively
18    small role considering all the unanimous -- I mean, it
19    was the most unanimous opposition across the spectrum.
20              Even a group of consumer advocates that
21    filed an objection letter with the CFTC, and you had
22    what is, I think, almost unprecedented, at least in the
23    last few congresses, you had joint letters from the
24    Chairman that were signed out of both the House and the
25    Senate there, the relevant committee chairs and the
```

97

1    ranking members.

2              CHAIRMAN NELSON:  But --

3              COMM. ANDERSON:  I didn't think they could

4    agree on what day it is much less what time, but they

5    did on this.

6              CHAIRMAN NELSON:  But it's refreshing to

7    see a federal agency realize the error of their ways and

8    back off.  So, anyway...

9              COMM. ANDERSON:  And I would also note

10   that the Commissioner, Giancarlo, was a strong objector

11   to this throughout, and if you haven't read his dissent

12   you ought to go to the CFTC web page, to his web page,

13   to read it because it was -- it was strong.

14             CHAIRMAN NELSON:  Well, thank you for your

15   leadership on this.  So 34 is not taken up.  35, 36, 37,

16   38 were consented.  39, 40, 41 are not taken up.

17                          GENERAL

18                    AGENDA ITEM NO. 42

19   ADJOURNMENT FOR CLOSED SESSION

20             CHAIRMAN NELSON:  We do have closed

21   session today.  So, having convened in a duly-noticed

22   Open Meeting the Commission will now at 11:25 a.m. on

23   today, September 22, 2016 hold a closed session pursuant

24   to Chapter 551 of the Texas Government Code.

25             It will consult with its attorneys

1    pursuant to Section 551.071 of the code, deliberate

2    personnel matters pursuant to Section 551.074 of the

3    code and deliberate security matters pursuant to Section

4    551.076 of the code.

5                    (Recess:  11:26 a.m. to 11:36 a.m.)

6    RECONVENING OF OPEN MEETING

7                    CHAIRMAN NELSON:  The closed session is

8    hereby concluded at 11:36 a.m. on September 22, 2016 and

9    the Commission will resume its public meeting.

10                    The Chair will entertain a motion to

11   intervene in EL1 -- in FERC Docket EL16-112.

12                    COMM. ANDERSON:  You have the motion.

13                    COMM. MARQUEZ:  And I second.

14                    CHAIRMAN NELSON:  Okay.  This meeting is

15   adjourned.

16                    (Proceedings concluded at 11:37 a.m.)

17

18

19

20

21

22

23

24

25

99

```
 1              C E R T I F I C A T E

 2   STATE OF TEXAS    )

 3   COUNTY OF TRAVIS  )

 4          I, William C. Beardmore, Certified Shorthand

 5   Reporter in and for the State of Texas, do hereby

 6   certify that the above-mentioned matter occurred as

 7   hereinbefore set out.

 8          I FURTHER CERTIFY THAT the proceedings of such

 9   were reported by me or under my supervision, later

10   reduced to typewritten form under my supervision and

11   control and that the foregoing pages are a full, true,

12   and correct transcription of the original notes.

13          IN WITNESS WHEREOF, I have hereunto set my hand

14   and seal this 23rd day of September 2016.

15

16

17                    WILLIAM C. BEARDMORE
                      Certified Shorthand Reporter
18                    CSR No. 918 - Expires 12/31/16
                      Firm Registration No. 276
19
                      Kennedy Reporting Service, Inc.
20                    555 Round Rock West Drive
                      Building E, Suite 202
21                    Round Rock, TX 78681
                      512.474.2233
22

23

24

25
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233   order@kennedyreporting.com