## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE | ) | Case No. 14-10979 (CSS) |
| HOLDINGS CORP., *et al.*, | ) |  |
|  | ) | (Jointly Administered) |
| *Debtors*. | ) | **Re: Dkt. No. 11636** |
|  | ) |  |

## THE ELLIOTT FUNDS' REPLY SUPPORTING THEIR MOTION TO RECONSIDER IN PART THE SEPTEMBER 19, 2016 ORDER [DKT. NO 9584] APPROVING THE NEXTERA TERMINATION FEE

Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "<u>Elliott</u>") submit this reply in support of their *Motion to Reconsider in Part the September 19, 2016 Order [Dkt. No. 9584] Approving the NextEra Termination Fee* [Dkt. No. 11636] (the "<u>Motion</u>") and in response to the *Objection of NextEra Energy, Inc. to the Elliott Funds' Motion to Reconsider in Part the September 19, 2016 Order [Dkt. No. 9584] Approving the NextEra Termination Fee* [Dkt. No. 11876] (the "<u>NextEra Objection</u>" or "<u>NEE Obj.</u>") and *The Debtors' Objection to the Elliott Funds' Motion to Reconsider in Part the September 19, 2016 Order [Dkt. No. 9584] Approving the NextEra Termination Fee* [Dkt. No. 11879] (the "<u>Debtors' Objection</u>" or "<u>Debtors' Obj.</u>").[1]

## PRELIMINARY STATEMENT

1.    Reconsideration may be an extraordinary remedy, but this is an extraordinary case. NextEra seeks allowance of a $275 million Termination Fee as reimbursement for a deal that never came to fruition because the relevant regulators declined to approve the transaction on

---

[1] Capitalized words or phrases used but not defined in this reply have the meanings ascribed to them in the Motion.

terms that NextEra would accept.  As we now know, the Termination Fee provision purported to require the estates to pay a break fee even in the event that they closed a deal worth hundreds of millions of dollars *less* than the NextEra transaction.  Such a break fee cannot qualify as an administrative expense under prevailing Third Circuit law.

2.       Contrary to NextEra's and the Debtors' misapprehensions, Elliott does not argue that a termination fee can *never* qualify as an administrative expense.  As *O'Brien* makes clear, termination fees can (and usually do) provide an actual benefit if they are payable when the debtor terminates to pursue a higher and better offer.  But a termination fee payable when the buyer is unable and unwilling to close cannot be said to have conferred an "actual benefit" on the estate, nor can it ever be a necessary expense of preserving the estate.  The September 19, 2016 order approving the Termination Fee ("Termination Fee Order" or "Order") thus erred as a matter of law.

3.       No one—not NextEra, not the Debtors, nor their counsel—adequately described for the Court the Termination Fee provisions or the flawed incentive structure that the Termination Fee provisions purported to create.  Debtors' Obj. ¶ 5 ("[I]t is true that the Debtors inadvertently overstated the circumstances in which the Termination Fee would not be payable . . . .").  In discussing the scenario in which the PUCT rejects the deal and NextEra "walks," no one described for the Court that NextEra had no reason to "walk[ ]" following a PUCT denial or conversion to Chapter 7 and that it could then seek to impose the Fee upon the Debtors when they were forced—eventually—to terminate themselves.  In opposition, NextEra and the Debtors recount at length all that was disclosed at the September 19 hearing.  But they do not (and cannot) point to anything in the record that made clear to the Court that in the event of PUCT rejection, the Termination Fee gave NextEra a $275 million incentive to sit on its hands in

an effort to force the Debtors into terminating.  The fact that NextEra felt compelled to "clarify" the record on September 25 demonstrates that the record was unclear on September 19—and indeed even the supposed clarification failed to provide the critical facts.  The inaccurate and incomplete record on which the Court approved the Termination Fee alone compels reconsideration of the Termination Fee Order.

4.      NextEra's claims of reliance on the Order ring hollow.  No party can claim to have justifiably relied on an order premised on a substantially incomplete and inaccurate record. And Elliott's objection would, at most, narrow the grounds on which the Termination Fee would have been payable, not void the fee altogether.  Nor does any reliance interest justify the windfall of a $275 million Termination Fee, an amount utterly disproportionate to NextEra's damages— which it contends are at most in the "tens of millions of dollars," *see, e.g.*, NEE Obj. ¶ 39.

5.      In its attempt to deflect attention from the failure to notify the Court that it would claim the fee even if the PUCT denied approval, NextEra unfairly paints Elliott—which indisputably has brought substantial value to the estates—as "a party that bought tickets for the Titanic after it hit the iceberg."  NEE Obj. at 6.  But all creditors (including Elliott) benefit from curtailing a fee that never should or would have been approved in the first place under these circumstances.  For these reasons and those set forth below, Elliott respectfully requests that the Court reconsider the Termination Fee Order.

## ARGUMENT

## I.    THE TERMINATION FEE ORDER IS INTERLOCUTORY, NOT FINAL

6.      The Termination Fee Order is interlocutory, principally because it left considerable "additional work to be done" by the Court.  *See In re Reliant Energy Channelview, LP*, 397 B.R. 697, 699-700 & n.1 (D. Del. 2008) (concluding that an order denying a break-up fee was not a final order, and noting consistent cases involving orders approving break-up fees).

Both the Debtors and NextEra acknowledge that the Order left remaining work and yet maintain that there is nothing further for the Court to do. *Cf.* Debtors' Obj. ¶ 16 (listing "Bankruptcy Court approval of any allocation of the Termination Fee" as an outstanding item); NEE Obj. ¶ 29 (recognizing that "issues regarding the Termination Fee may exist," that is, "how the Termination Fee is to be allocated between EFH and EFIH"). In addition to the unresolved allocation issues, the Court must also decide whether the Termination Fee became payable, a dispute at the heart of the contested Termination Fee proceedings pending before the Court. *See Order Consolidating Certain Termination Fee Proceedings & Setting a Rule 7016 Scheduling Conference* [D.I. 11774] (consolidating the Adversary Proceeding and the NextEra Application as the "<u>Consolidated Proceedings</u>").

7.      Together, these outstanding issues demonstrate that the matter was not fully adjudicated and resolved on the merits on September 19. As NextEra's own cited authority provides, "[t]he critical issue . . . is whether the [Termination Fee] order was a final decision on the merits." *See In re Colon*, 941 F.2d 242, 245 (3d Cir. 1991). The present circumstances, then, are unlike those *In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011), and *In re Colon*, where courts fully disposed of their respective disputes. Here, the proceedings in connection with the Termination Fee are still ongoing and the Court has not yet entered a final judgment on all of the relevant issues of merit. *Cf. ASARCO*, 650 F.3d at 600 (finding that expense reimbursement order disposed of a "discrete dispute" within the larger case); *Colon*, 941 F.2d at 244-45 (finding that fines and lost wages order was a final disposition of plaintiffs' adversary proceedings). Moreover, unlike *ASARCO*, the outstanding issues presented in the Consolidated Proceedings do

not merely address the quantification of fees, but test whether a fee should be payable at all.  *Cf.*

*id.*[2]

8.     The Debtors' and NextEra's arguments are an exercise in misdirection.  This is

demonstrated by the Debtors' prior position in these cases that the Termination Fee Order was

interlocutory in nature and that the Termination Fee Order "is not a final order."  *See* Appellee's

Motion to Dismiss Appeal ¶¶ 13, 20–21, *In re Energy Future Holdings Corp.*, No. 16-cv-888-

RGA (D. Del. Dec. 22, 2016) (Dkt No. 18), Ex. V to the *Decl. of Erin R. Fay Filed in*

*Connection with the Elliott Finds' Mot. to Reconsider In Part the Sept. 19, 2016 Order* [Dkt. No.

9584] *Approving the NextEra Termination Fee*, dated July 29, 2017 (the "Fay Decl."); *see also*

Fay Decl. Ex. W, Appellees' Reply in Supp. of Mot. to Dismiss Appeal ¶ 10 (Feb. 3, 2017) (Dkt.

No. 21).  The Debtors now engage in contortions to argue that this position was limited to

specific issues not relevant here.  But the Debtors' prior briefing flatly declared that "many

courts have concluded that orders regarding termination fees are not final" and then cited a long

string of relevant cases before stating the following:

> This case illustrates why *Reliant*'s "wait-and-see" approach is sensible. The
> Termination Fee has not been triggered.   Even if it were triggered, the
> Authorization Order expressly defers, rather than allocates, any such fee between
> EFIH (of which Appellants are not creditors) and the EFH Debtors (of which
> Appellants purport to be creditors).   Accordingly, the parties' rights and
> obligations with respect to the Termination Fee remain unsettled and are subject
> to later determination.

---

[2] The other cases cited by Debtors and NextEra in support of their finality argument have no
force.  The *Reliant* court explained that it did not find *In re Fruit of the Loom, Inc.*, 274 B.R. 631
(D. Del. 2002), "to be dispositive or instructive, because it provides no analysis of the finality
issue and does not indicate whether the finality issues was even disputed by the parties." *Reliant*,
397 B.R. at 700.  Likewise, *In re Taylor*, 913 F.2d 102 (3d Cir. 1990), is neither dispositive nor
instructive for the same reasons.  *In re West Elecs., Inc.*, 852 F.2d 79 (3d Cir. 1988), involved an
automatic stay order under 11 U.S.C. § 362, a type of order not at issue here.

*See* Fay Decl. Ex. V, Appellee's Motion to Dismiss Appeal ¶ 21.  Notably, the Debtors there recognized the significance of the Supreme Court's most recent decision on the question of bankruptcy court orders' finality.  They cited *Bullard v. Blue Hills Bank*, 135 S. Ct. 1686 (2015), which held that an order remains interlocutory where "[t]he parties' rights and obligations remain unsettled" because "'[i]t ain't over till it's over,'" and which specifically rejected the argument that any resolution of a contested issue or proceeding is final.  *Id.* at 1693–94.  Now that the Debtors have inexplicably switched sides, they ignore the controlling precedent they previously embraced.  The Debtors previously declared the very same Termination Fee Order interlocutory in December 2016; they cannot claim that it is suddenly final now.[3]  And NextEra, which at the time would have been the beneficiary of the Debtors' motion to dismiss—since appeal of the Termination Fee Order could have jeopardized NextEra's claim to the Termination Fee—did not object to or contest the Debtors' insistence that the Termination Fee Order was interlocutory.

9.      NextEra's policy arguments in favor of finality overlook the countervailing policy issues that weigh strongly in favor of revisiting the Termination Fee Order.  *See* NEE Obj. ¶ 33.  NextEra cannot reasonably have relied on the Termination Fee Order when it knew the Order was premised on an incomplete and inaccurate record.  And it does not make for sound policy to award NextEra a windfall of $275 million simply because NextEra claims to have relied on the Termination Fee Order in spending tens of millions on legal fees.  Whatever interests NextEra may have in the Termination Fee must give way to the interest in ensuring that the Court's

---

[3] The Debtors have elsewhere adopted inconsistent positions.  For instance, at the hearing on this Motion, the Debtors will object to Elliott's request for derivative standing.  At the same time that the Debtors assure the Court that they are positioned to vigorously contest NextEra's Termination Fee claims, the Debtors are defending the Termination Fee against meritorious challenges.

decisions are based on an accurate and complete record, rather than obfuscation, omissions, or misunderstandings. Likewise, granting reconsideration does not impugn all termination fees. Parties that accurately and properly negotiate, structure, and disclose termination fees to a court—fees that provide real value to estates—can still rely on orders approving such fees. Correcting the Court's mistaken approval of an invalid administrative expense will indeed "send a strong message," but not the one NextEra augurs, *see id.* ¶ 33:  It will communicate that buyers will not be allowed to secure break-fee approval on inaccurate and incomplete records or be allowed to ignore prevailing Third Circuit law.

## II.    THE TERMINATION FEE ORDER SUFFERS FROM MANIFEST ERRORS OF LAW AND FACT

10.    This Court should reconsider the Termination Fee Order because the Order suffers from manifest errors of law and fact. *See Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)) ("'The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence.'").

### A.    The Termination Fee Order Was Premised on Mistakes of Fact

11.    NextEra misleadingly claims that "[t]he Debtors made full and complete disclosure of the terms of the Termination Fee," but never explains how or when the key facts identified in the Motion were clearly and fully disclosed to the Court before or during the September 19 hearing. NEE Obj. ¶ 52. At that hearing, Debtors' counsel affirmatively misstated that "there's no break-up fee if the PUC[T] just denies—outright denies approval." *See* Motion ¶¶ 16, 43. The Debtors (the actual movant) *admit* that this statement misrepresented the agreement's terms. Debtors' Obj. ¶ 5 ("[I]t is true that the Debtors inadvertently overstated the circumstances in which the Termination Fee would not be payable . . . ."). Whether the Debtors

7

made this statement in "good faith" is ***entirely*** besides the point.  The Debtors' misstatement goes to the heart of the issue at hand:  namely, the circumstances in which the Termination Fee would and would not be payable.

12.     Another failing of the record before the Court, beyond what specific witnesses said at the hearing, is what the parties left unsaid.  Absent from both the Debtors' and NextEra's objections is any recognition that neither the Debtors nor NextEra alerted the Court to the inappropriate loophole purportedly created by the Termination Fee—namely, the ability for NextEra to seek to force the Debtors to terminate and pay the fee should the deal die only because PUCT approval failed to materialize.  Because of the Termination Fee's size and structure, NextEra would never, if acting rationally, terminate after PUCT denial or a Chapter 7 conversion.  Instead, NextEra would hold the Debtors hostage and force a termination—facts neither NextEra, the Debtors, nor their counsel disclosed to the Court at the September 19 hearing.  This Court could not have intended to approve a fee with such a structure, which is flatly contrary to settled precedent.  NextEra's account of what was disclosed thus completely misses the point.

13.     This is equally true of the Debtor's argument that "[a]ny allegations that the Debtors masked any provisions of the Termination Fee from the Bankruptcy Court are baseless and appear to be a disturbing attempt to convert complexity into bad faith."  Debtors' Obj. ¶ 1.  The purpose of Elliott's Motion is not to blame—or otherwise cast aspersions on—the Debtors or NextEra, but this Court must reconsider its decision in light of the unclear and incomplete record on September 19.  This Court's decision to approve the termination fee has very serious consequences for all creditors of the estate, and it is only proper that this Court base its decision of this critical matter on a clear and correct understanding of the facts.

14.     NextEra points to the September 25 letter as support for its claim that the parties conveyed the Termination Fee's terms to the Court in the "clearest possible terms."  NEE Obj. ¶ 62.  The September 25 Letter cannot, *nunc pro tunc*, supplement this Court's decision on September 19, 2016.  The central question raised by this Motion is whether the Court properly approved the Termination Fee on September 19, 2016—the date on which the Court held a full evidentiary hearing and entered the Termination Fee Order—both as a matter of law and on the basis of a complete and accurate record.  The only record that matters to this question is the record before the Court at the September 19 hearing.  The Court approved the Termination Fee on the basis of that record, and so it is that record by which the Court's decision must be evaluated.

15.     Events after the hearing are relevant to this question only because they underscore how ***unclear*** and inaccurately disclosed the Termination Fee's structure was on September 19.  The fact that NextEra felt compelled to draft and send the September 25 Letter is proof that the record before the Court on September 19 was not clear.  Had NextEra believed that the Court adequately understood the terms of the fee when it made its decision based on the September 19 record, NextEra would have had no need to write the September 25 Letter.  Instead, NextEra was driven by a recognition that the parties had misstated—and that the Court may well have misunderstood—the scenarios in which the fee would be payable, which put any future payment to NextEra at risk.  Yet the letter ***still*** failed to cure the defects in the record, because it omitted two critical facts.  First, nothing in the Merger Agreement would ever require—or, indeed, create any reason whatsoever for—NextEra to terminate and forfeit the fee upon PUCT rejection.  Second, the Termination Fee would be payable even if the Debtors converted their cases to

Chapter 7. The September 25 Letter is thus no cure for the incorrect and misleading picture painted on September 19.

        **B.**     **The Termination Fee Order Was Based on Mistakes of Law**

                **1.**     **The Termination Fee Was Not an "Actual, Necessary" Expense to Preserve the Estate**

        16.     As spelled out in Elliott's opening brief, *see* Motion ¶ 52, 11 U.S.C. § 503(b) allows as "administrative expenses" the "actual, necessary costs and expenses of preserving the estate." For an expense to meet this standard, the party seeking it must show that the estate would not have received some meaningful benefit without the expense. *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 257, 535 (3d Cir. 1999) ("[T]he allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate"); *In re Mid-American Waste Sys., Inc.*, 228 B.R. 816, 821 (Bankr. D. Del. 1999) (noting heavy burden to demonstrate that a post-petition transaction "directly and substantially benefit[ed] the estate"). If the expense could become payable in circumstances where it would leave the estate worse off— for example, if payable when a debtor must pursue a lower-value alternative transaction because a closing condition failed—that expense cannot be said to be "necessary" to preserve the estate's value. At best, such an expense offers a possible, speculative benefit contingent on future events and even risks harming the estate—thus failing to satisfy Section 503(b). *See O'Brien*, 181 F.3d at 532–33 (requiring that "the consideration supporting the claimant's right to" an administrative claim "be beneficial to the debtor-in-possession") (modification omitted); *In re Bernard Techs., Inc.*, 342 B.R. 174, 180 (Bankr. D. Del. 2006) (quoting *In re Allen Care Centers, Inc.*, 163 B.R. 180, 188 (Bankr. D. Or. 1994)) (denying an administrative expense that provided only a

speculative benefit to the estate because "'[t]he benefit to the estate must be actual, not potential'").[4]

17.    Where a termination fee induces a "stalking horse" bid that establishes a floor for the value of the asset, and where the fee is payable because a significantly higher and better offer has emerged, the termination fee can fairly be said to have been actually necessary—by supporting the "stalking horse" bid—to preserve the value of the estate.   Indeed, in those circumstances, the fee has *increased* the value of the estate.   *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (recognizing "two ways a break-up fee could have preserved the value of the estate":  by inducing a stalking horse bidder to make its initial bid and to adhere to that bid during an ensuing auction); *see also In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) (noting that break-up fees may assuage an initial bidder's fear that it will be "topped" by an entity relying on the initial bidder's due diligence).

18.    But where a termination fee is payable because there is no deal at all, the termination fee has provided no benefit to the estate.  It has established no floor for the asset's value, it has generated no deal consideration for the estate, and it has prompted no higher and better offers.  It has only drained estate value, leaving the estate worse off.  Such an expense is not an actual, necessary cost of preserving the estate's value.  *See O'Brien*, 181 F.3d at 532–33; *see also In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976) (holding, under the predecessor to Section 503(b), that creditor's right to administrative claim turns on whether "the consideration supporting the claimant's right . . . was both *supplied to* and *beneficial to* the

---

[4] *See also In re President Casinos, Inc.*, 314 B.R. 786, 788-89 (Bankr. E.D. Mo. 2004) (relying on *O'Brien* and denying application for break-up fee, while finding no benefit to the estate based on multiple contingencies to closing controlled by events outside the bankruptcy case); *In re Am. Appliance*, 272 B.R. 587, 601 (Bankr. D.N.J. 2002) (denying approval of a break-up fee, opting instead to await the conduct of a sale to see what amount would be realized by the estate).

debtor-in-possession in the operation of the business") (emphasis added); *Mid-American Waste*, 228 B.R. at 821 (noting heavy burden to demonstrate that a post-petition transaction "directly and substantially benefit[ed] the estate").  That is precisely what happened here.  The NextEra transaction fell through because the PUCT rejected the Joint Application, causing a closing condition to fail.  The Debtors did not terminate to pursue a higher and better offer; indeed, the "backup" BHE transaction offered ***hundreds of millions of dollars less*** in consideration than the proposed NextEra transaction.  NextEra and the Debtors make unsupported allegations that the deal provided "***massive value***" to the estates, but they fail to cite a single benefit that would still have existed if the PUCT denied approval (as it in fact did).

19.    The Termination Fee thus conferred no benefit at all on the estates.  It only encouraged NEE to cling to the deal long after its demise was certain, heaping costs on the estates and preventing them from pursuing other, more viable, higher-value transactions.  To give NextEra a $275 million Termination Fee in those circumstances would provide NextEra a huge and unjustified windfall—rewarding NextEra, not for conferring an actual benefit on the estates, but for harming them by dragging out the transaction at a cost of $50 million per month.

20.    The Debtors and NextEra do not and cannot dispute these realities.  They do not dispute that the NextEra transaction did not result in a competitive bidding process.  They do not dispute that the BHE transaction did not provide a higher and better offer for the Debtors or that it in fact was worth far less.  They also do not explain how the NextEra transaction, let alone the Termination Fee, provided any actual benefit to the estate in the circumstances that materialized—where the PUCT denied approval of the deal and the deal simply died.

## 2.    The Debtors' and NextEra's Claims to the Contrary Miss the Mark

21.    Instead of addressing these key points head on—because they cannot do so—the Debtors and NextEra advance two arguments that thoroughly misstate Elliott's position.  First,

the Debtors and NextEra claim that under Elliott's interpretation of *O'Brien*, no termination fee would ever be allowed, or at least no termination fee would ever have value to bidders. *See* NEE Obj. ¶ 69 ("[A] termination fee is always a *burden*. In this respect, Elliott does not argue against NextEra's Termination Fee, it argues against all termination fees."); Debtors Obj. ¶ 22 ("Taken to its logical conclusion, termination fees could only ever be approved once sales have been completed—at which point every such termination fee would be worthless."). The Debtors and NextEra are wrong. Termination fees that are payable when a debtor terminates to pursue a higher and better offer provide a benefit to the estate by setting a floor for the value of the business. In those circumstances, a termination fee is properly characterized as an allowable expense because it was necessary to preserve the value of the estate—and, indeed, ***increased*** that value by prompting a higher and better bid. Thus, market participants have every incentive to negotiate for such fees to protect against the loss of the asset to another, better bidder.

22.    Elliott's position is not a broadside against all termination fees. NEE Obj. ¶ 69; Debtors Obj. ¶ 22. The structure of the NextEra termination fee, as drafted, is extraordinary. Elliott's position takes aim at fees drafted so as to force the estates to pay the fee without receiving any benefit in return. Indeed, more recently, the Debtors and their counsel have recognized this problem and fashioned the Sempra deal's far simpler termination fee provisions to address this issue. *See* Sept. 6, 2017 Hr'g Tr. at 18:8-11 ("Unlike prior termination fees . . . this [Sempra] termination fee is only triggered in limited circumstances.").

23.    Second, the Debtors and NextEra incorrectly contend that Elliott's interpretation of *O'Brien* always requires an *ex-post facto* analysis of developments following approval of the transaction and termination fee. Debtors' Obj. ¶¶ 22-23 ("Elliott appears to be arguing that the *O'Brien* standard allows Courts to reevaluate approved termination fees based on subsequent

developments that potentially give rise to the termination fee."); NEE Obj. ¶ 68 ("Needless to say, the Court did not commit a clear error of law by failing to rely on purported facts that developed months after the Court entered the Termination Fee Approval Order.").  Elliott has simply noted that events following the September 19 hearing elucidate and highlight what was true all along:  the Termination Fee provisions, when approved on September 19, allowed NextEra to collect $275 million in circumstances where the estates received no benefit and were only harmed.  *See O'Brien*, 181 F.3d at 536–37 (examining the parties' course of dealing to determine whether the termination fee was necessary to provide a benefit).  A court does not have to wait until after an approval hearing to determine whether an expense is properly allowable (although for the reasons set forth below, that may be entirely appropriate).  At the time of the approval hearing—provided the parties adequately describe and disclose the key features of the termination fee—a court is well positioned to determine whether the fee can only be triggered in which a higher and better offer has emerged, or whether, as in this case, the fee can be triggered when the transaction does not receive a key regulatory approval or another closing condition outside the debtor's control has not been satisfied.  In fact, the Sempra termination fee provisions, pursuant to which a fee is payable only in circumstances when a higher or better offer has emerged, illustrates that a court need not wait until closing to determine whether the termination fee properly  benefits the estate.  *See* Sept. 6, 2017 Hr'g Tr. at 18 (counsel for Debtors summarizing the circumstances in which a termination fee would be triggered under the Sempra transaction).

24.    Neither of the Debtors' and NextEra's counter-arguments detracts from Elliott's fundamental point that when a termination fee is payable under circumstances in which no higher and better deal has materialized, and therefore no incremental benefit has been conferred on the

estate, it cannot be properly allowed as an administrative expense under Section 503(b) and *O'Brien*.

### 3.    The Court May Now Assess Whether the Termination Fee Was an Actual, Necessary Expense

25.    The Court need not take a "hindsight approach" to determine that, had it been fully apprised at the September 19 hearing that NextEra could force the Debtors to pay a $275 million Termination Fee even where the PUCT rejected the transaction, the Court would not have approved the payment of the Termination Fee under those conditions as a proper administrative expense under *O'Brien*.  Nevertheless, courts do have the discretion to apply a hindsight approach in determining whether a termination fee was a necessary expense that provided an actual benefit to the estate.  In fact, this Court has analyzed Section 503(b) expenses in hindsight on other occasions.  *See, e.g.*, *In re Worldwide Direct, Inc.*, 334 B.R. 112, 120-21 (Bankr. D. Del. 2005) (granting in part administrative expense claim of indenture trustee for its fees and expenses and those of its attorneys); *In re RS Legacy Corp.*, No. 15-10197 (BLS), 2016 WL 1084400, at *3 (Bankr. D. Del. Mar. 17, 2016) (denying creditor's application for payment of attorney fees); *In re KiOR, Inc.*, 567 B.R. 451, 458 (D. Del. 2017) (affirming bankruptcy court's denial of creditor's application for payment of attorney fees).  Indeed, in *O'Brien* itself, the bankruptcy court evaluated the termination fee issue after the fact, and concluded it was not an appropriate administrative expense because it had not, ***as a factual matter***, benefited the estate.  *See O'Brien*, 181 F.3d at 536 (summarizing bankruptcy court's ruling).  The court of appeals likewise took into account those historical facts in affirming the conclusion that it was not an allowable expense.  *See id.* at 536–37.  Thus, if the Court does reconsider the Termination Fee issue, it may weigh subsequent facts in its analysis.

26.    NextEra attempts to frame the hindsight approach as only appropriate when evaluating attorneys' fees under Section 503(b)(4).  *See* NEE Obj. ¶ 68, n.82.  However, the "substantial contribution" test arises from the actual and necessary fees and expenses of any "creditor, indenture trustee, . . . equity security holder, . . . or committee . . . in a case under chapter 9 or 11," including those of their attorneys.  11 U.S.C. §§ 503(b)(3)(D), 503(b)(4); *see In re Granite Partners,* 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997).  Furthermore, the Third Circuit has applied a hindsight approach in order to limit Section 503(b) administrative expense claims in other circumstances.  *See*, *e.g.*, *Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 42 (3d Cir. 1989) (affirming bankruptcy court's decision to reduce the rate at which a fuel provider was compensated under an executory contract).

27.    Other sections of the Bankruptcy Code also allow a court to alter payment of expenses after evaluating those expenses in light of subsequent facts.  Section 328(a), for example, allows courts to modify the terms and conditions of professionals' compensation "if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."

28.    Taking a hindsight approach here, it is clear the Termination Fee did not result in higher competitive bidding—or any other benefit—for the estate.  Such an approach is appropriate under Section 503(b) and allows the Court to concretely examine the extent to which the Termination Fee provided, or failed to provide, a benefit to the estate.  The way events have unfolded may not have been anticipated at the time of the September 19 hearing, but it is now clear that the Termination Fee did not provide any benefit to the estate, let alone the $275 million NextEra now demands.  *See Mammoth*, 536 F.2d at 954 (A creditor "will not be entitled to [administrative expense] priority if the bankrupt estate was not benefitted ***in fact***" from the

creditor's contract performance during the reorganization period.) (emphasis added). In fact, it is now clear that entry into the NextEra Merger Agreement substantially *harmed* the estates, causing them to be drained of substantial value through the needless incurrence of hundreds of millions of dollars of interest and other professional expenses in the pursuit of a transaction with a counterparty whose behavior destroyed any serious hope or prospect of consummation.

## III.    ELLIOTT TIMELY FILED ITS MOTION

29.    NextEra and the Debtors make no serious effort to explain how a termination fee that is payable solely because a regulatory agency refused to approve the transaction provides the actual, necessary benefit that Section 503(b) requires.  Rather than reconcile those circumstances with prevailing law, NextEra and the Debtors defend the Termination Fee mainly by pointing to the deadlines for motions to reconsider and the lack of creditor objections at the September 19 hearing.  Neither defense holds water.

30.    NextEra's reliance on laches is misplaced.  Equitable doctrines cannot authorize a termination fee that otherwise fails to satisfy the statutory requirements of Section 503(b). "[C]ourts do not have the authority to create new ways to authorize the payment of fees from a bankruptcy estate, and the methods of recovering fees from an estate are limited to the procedures established by the Bankruptcy Code." *Reliant*, 594 F.3d at 206; *see also I.N.S. v. Pangilinan*, 486 U.S. 875, 883 (1988) (courts' equitable powers cannot confer naturalization in circumstances other than those permitted by statute, because "courts of equity . . . can no more disregard statutory and constitutional requirements . . . than can courts of law" (quotation omitted)); *O'Brien*, 181 F.3d at 532 (disapproving of "judicial expansion of the potential for recovery from the debtor's estate" beyond the Code's bounds).  A party thus cannot invoke equitable doctrines to enforce a claim to a fee that Section 503(b) does not permit.  *See Reliant*, 594 F.3d at 209 n.12, 210 (even if debtor were judicially estopped from raising its *O'Brien*

objection, court still would conclude fee was invalid, because court can evaluate validity of "judicial action," such as awarding termination fees, even absent any objection).[5]

31.    Even if laches could be used to enforce a claim to a statutorily defective termination fee, the doctrine would not apply here.  For one thing, Elliott's supposed delay in filing its motion was entirely justified.  *See In re Network Access Solutions, Corp.*, 330 B.R. 67, 79 (Bankr. D. Del. 2005) (listing among laches' elements that there must be "***inexcusable*** delay in bringing the action" (emphasis added)).  Elliott was not a substantial creditor at the time of the September 19 hearing and thus did not participate in those proceedings.  NextEra offers no justification—let alone supporting authority—for its implicit assumption that the silence of the creditors who did attend the hearing can be imputed to Elliott for laches purposes.  Elliott promptly began to raise its objection after it did become a substantial creditor and after that objection's basis became plain.

32.    In any event, there was at best general confusion during—and after—the September 19 hearing over the Termination Fee's precise terms.  The Merger Agreement's numerous, interlocking conditions left the fee's mechanics far from clear.  Even the parties misstated the Termination Fee's structure at the hearing, apparently failing to fully comprehend the terms themselves.  Only ***after*** the Court had issued the Termination Fee Order—and ***after*** creditors' initial opportunity to object and have those objections heard had passed—did the Debtors and NextEra purport to clarify the unilateral Termination Fee triggers.  And even then,

---

[5] *See also In re RFE Indus., Inc.*, 283 F.3d 159, 164–65 (3d Cir. 2002) (debtor could not be estopped from objecting to settlement, because estoppel could not restrain bankruptcy court from discharging statutory duty to approve or deny settlements in adversary proceedings after offering parties chance to object); *In re Cent. Fla. Metal Fabrication, Inc.*, 190 B.R. 119, 122-23 (Bankr. N.D. Fla. 1995) (debtor could not waive its right to reject executory contract because debtor could not waive statutory requirement that court approve rejection, and because debtor had limited right to assume or reject for estate's benefit and any waiver could not operate against estate).

NextEra and the Debtors omitted the critical fact that NextEra would always be able to claim the Termination Fee (assuming it honored its contractual obligations), because NextEra could simply wait out the Debtors in the standoff over who would terminate first.  No creditor was inexcusably neglecting its rights while the problem Elliott now raises remained obscured.  *See Network Access*, 330 B.R. at 79 (listing among laches' elements that the estopped party must have "knowledge of a claim"); *see also Cantor v. Perelman*, 414 F.3d 430, 439-40 (3d Cir. 2005) (same).

33.     Although NextEra contends that Elliott inexcusably delayed raising its *O'Brien* challenge, NEE Obj. ¶ 40, this argument is undermined by the facts.  The fact that NextEra would use the Termination Fee as leverage only became apparent in late March or early April 2017, when it became clear that the NextEra transaction likely would not close and no alternative transaction was available.  So, although Elliott raised the specific *O'Brien* concern with the Debtors, it was not only July 8, 2017, that the issue became ripe—the Debtors had terminated the NextEra Merger Agreement and had entered into an alternative transaction with BHE.  Within days, Elliott requested that the Debtors take action to oppose the Termination Fee on the *O'Brien* grounds set forth in the Motion, but the Debtors refused.  So, Elliott filed its Motion within three weeks of those critical events and a month after the PUCT denied NextEra's second rehearing request.  This is hardly the sort of inexcusable delay, if it is any delay at all, that justifies a finding of laches.[6]  *See Network Access*, 330 B.R. at 79 (defendants failed to demonstrate either inexcusable delay or prejudice sufficient to invoke laches, when plaintiffs filed the adversary

---

[6] Even if the Motion had been subject to Rule 60(b) as a motion to reconsider a final order, it still would have been filed within a reasonable time for the reasons laid out above.  *See* NEE Obj. ¶ 36 ("[A]ny Rule 60(b) motion is subject to denial if it is not also made within a reasonable time *after the basis for relief is known*.") (emphasis added), *quoting Defeo v. Allstate Ins. Co.*, No. 95-244, 1998 WL 328195, at *5 (E.D. Pa. 1998).

proceeding on the last day of the two-year statute of limitations period); *In re Narod*, 138 B.R. 478, 481 (E.D. Pa. 1992) (creditor's motion to reopen bankruptcy case was timely when filed after one-year delay); *In re Quackenbos*, 71 B.R. 693, 695-696 (E.D. Pa. 1987) (debtors' over one-year delay in moving to reopen was not prejudicial and thus not barred by laches).

34.     NextEra's claim that it would suffer prejudice from Elliott's objection also lacks credibility.  NextEra might have relied on the Termination Fee's approval when it decided to pursue the deal, but the idea that Elliott's objection, if raised at the September 19 hearing, would have changed NextEra's decision is absurd.  Elliott is ***not*** saying that the Termination Fee should never have been payable, in any circumstance.  To the contrary, the Termination Fee would and should have been payable if a third party had submitted a higher and better offer that the Debtors terminated to pursue.  Elliott's point is that the Termination Fee could not have been approved as an administrative expense ***to the extent*** the fee could be payable simply because the PUCT denied approval or another closing condition failed, killed the deal, and forced the Debtors to find another way out of bankruptcy.  It strains credulity to think that NextEra would have walked from a fully negotiated and execution-ready deal simply because the Court ***narrowed*** the circumstances in which the Termination Fee would have been payable.  *Reliant*, 594 F.3d at 208 ("[W]e see no reason to believe that bidders who already have made a full and complete bid necessarily will abandon their efforts to obtain an asset without an assurance of a break-up fee.").

35.     Moreover, the Termination Fee was far from certain even in the absence of Elliott's objection, so NextEra already had to temper its reliance on the fee.  The Asbestos Objectors appealed the Termination Fee Order less than two weeks after the hearing—an appeal that remained pending until late July 2017.  If successful, this pending appeal would have affected the Termination Fee far more significantly than Elliott's objection, since the Asbestos

Objectors broadly challenged whether Section 503(b) would *ever* allow payment of the Termination Fee.  *See Appellants' Statement of Issues on Appeal, Certificate Regarding Trs., and Designation of Items to be Included on the R. on Appeal* [D.I. 9821] at 2.  NextEra continued to pursue the deal despite this contingency.  The idea that Elliott's objection meaningfully changes the calculus for NextEra's now-complete decision to pursue the deal is hard to fathom.

36.    Finally, NextEra's repeated and heavy reliance on creditor actions is also irrelevant, because such actions are insufficient to satisfy Section 503(b).  Creditor approval alone does not make a break fee an actual, necessary cost of the estate:

> Clearly, section 503(b) does not give the Bankruptcy Court the authority to award fees solely because there is no objection to them from a party-in-interest.  That section requires that for fees to be awarded they must be part of 'the actual, necessary costs and expenses of preserving the estate,' and does not suggest that that standard is met merely because there is no objection to the application for the fees.

*Reliant*, 594 F.3d at 208–09.  Nor does the lack of creditor objections stop a court from correcting errors in a prior order.  "[Awarding termination fees] is a judicial action and, regardless of the parties' indifference to it, a court need not lend its imprimatur to an inappropriate order merely because there was no objection to its entry."  *Id.* at 209 n.12.  As *Reliant* shows, the Court must evaluate whether the Termination Fee satisfies Section 503(b), no matter what position creditors take on the question.  The Termination Fee here utterly fails to meet those statutory standards and thus cannot be allowed as an administrative expense— whether creditors have objected or not.  Elliott's motion was timely and NextEra's complaints of prejudice are vastly overblown.

## **CONCLUSION**

37.     For the foregoing reasons, Elliott respectfully requests that the Court enter an order in substantially the form attached to the Motion and grant such other relief as the Court deems just and proper.

Wilmington, Delaware
Date: September 14, 2017

**BAYARD, P.A.**

*/s/ Erin R. Fay*
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Evan T. Miller (No. 5364)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
scousins@bayardlaw.com
efay@bayardlaw.com
emiller@bayardlaw.com

–and–

**ROPES & GRAY LLP**

Keith H. Wofford
Gregg M. Galardi
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090
Keith.Wofford@ropesgray.com
Gregg.Galardi@ropesgray.com

Andrew G. Devore (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Andrew.Devore@ropesgray.com

*Counsel for Elliot Associates, L.P.,*
*Elliott International, L.P., and*
*the Liverpool Limited Partnership*