# EXHIBIT 1

## Sharyland Merger Agreement

*Execution Version*

**AGREEMENT AND PLAN OF MERGER**

among

**SHARYLAND DISTRIBUTION & TRANSMISSION SERVICES, L.L.C.,**

**SDTS ASSETCO, L.L.C.,**

**SHARYLAND UTILITIES, L.P.,**

**SU ASSETCO, L.L.C.,**

**ONCOR ELECTRIC DELIVERY COMPANY LLC**

and

**ONCOR ASSETCO LLC**

Dated as of July 21, 2017

**Table of Contents**

|  |  | Page(s |
|---|---|---|
| ARTICLE I SDTS/Oncor Transactions | | 3 |
| Section 1.01. | SDTS Pre-Closing Merger | 3 |
| Section 1.02. | Oncor Pre-Closing Contribution | 3 |
| Section 1.03. | SDTS Merger | 3 |
| Section 1.04. | Oncor Merger | 4 |
| Section 1.05. | Merger Consideration | 5 |
| Section 1.06. | Post-Closing Adjustments | 7 |
| ARTICLE II SU/Oncor Transactions | | 10 |
| Section 2.01. | SU Pre-Closing Merger | 10 |
| Section 2.02. | SU Merger | 10 |
| Section 2.03. | Merger Consideration | 11 |
| Section 2.04. | Post-Closing Adjustments | 12 |
| ARTICLE III Closing | | 14 |
| Section 3.01. | Closing | 14 |
| Section 3.02. | Closing Payments and Deliveries | 15 |
| ARTICLE IV Representations and Warranties of SDTS and SDTS AssetCo | | 19 |
| Section 4.01. | Organization and Qualification | 19 |
| Section 4.02. | Authority; Execution and Delivery; Enforceability | 19 |
| Section 4.03. | No Conflicts or Violations; No Consents or Approvals Required | 20 |
| Section 4.04. | Capitalization of SDTS AssetCo | 20 |
| Section 4.05. | Subsidiaries | 20 |
| Section 4.06. | Absence of Changes or Events | 21 |
| Section 4.07. | Material Contracts | 21 |
| Section 4.08. | Real Property | 21 |
| Section 4.09. | Ownership; Maintenance of Assets | 22 |
| Section 4.10. | Legal Proceedings | 23 |
| Section 4.11. | Environmental Matters | 23 |
| Section 4.12. | Tax Matters | 24 |
| Section 4.13. | Compliance with Applicable Law; Permits; Filings | 25 |
| Section 4.14. | Insurance | 25 |
| Section 4.15. | Employee Benefit Matters | 26 |
| Section 4.16. | Labor Matters | 26 |
| Section 4.17. | Sophisticated Industry Participant; Access to Information. | 26 |
| Section 4.18. | Brokers and Finders | 26 |
| Section 4.19. | Energy Regulatory Matters | 26 |
| Section 4.20. | Code Compliance | 27 |
| Section 4.21. | Intellectual Property | 27 |

ARTICLE V Representations and Warranties of SU and SU AssetCo ........................ 27

    Section 5.01.  Organization and Qualification ........................ 27
    Section 5.02.  Authority; Execution and Delivery; Enforceability ........................ 28
    Section 5.03.  No Conflicts or Violations; No Consents or Approvals Required ........................ 28
    Section 5.04.  Capitalization of SU AssetCo ........................ 29
    Section 5.05.  Subsidiaries ........................ 29
    Section 5.06.  Absence of Changes or Events ........................ 29
    Section 5.07.  Material Contracts ........................ 29
    Section 5.08.  Real Property ........................ 30
    Section 5.09.  Ownership; Maintenance of Assets ........................ 30
    Section 5.10.  Legal Proceedings ........................ 30
    Section 5.11.  Environmental Matters ........................ 30
    Section 5.12.  Tax Matters ........................ 31
    Section 5.13.  Compliance with Applicable Law; Permits; Filings ........................ 32
    Section 5.14.  Insurance ........................ 32
    Section 5.15.  Employee Benefit Matters ........................ 32
    Section 5.16.  Labor Matters ........................ 33
    Section 5.17.  Sophisticated Industry Participant; Access to Information ........................ 34
    Section 5.18.  Brokers and Finders ........................ 34
    Section 5.19.  Energy Regulatory Matters ........................ 34
    Section 5.20.  Intellectual Property ........................ 35

ARTICLE VI Representations and Warranties of Oncor and Oncor AssetCo ........................ 35

    Section 6.01.  Organization and Qualification ........................ 35
    Section 6.02.  Authority; Execution and Delivery; Enforceability ........................ 35
    Section 6.03.  No Conflicts or Violations; No Consents or Approvals Required. ........................ 36
    Section 6.04.  Capitalization of Oncor AssetCo ........................ 36
    Section 6.05.  Subsidiaries ........................ 36
    Section 6.06.  Absence of Changes or Events ........................ 37
    Section 6.07.  Material Contracts ........................ 37
    Section 6.08.  Real Property ........................ 37
    Section 6.09.  Ownership; Maintenance of Assets ........................ 38
    Section 6.10.  Legal Proceedings ........................ 38
    Section 6.11.  Environmental Matters ........................ 39
    Section 6.12.  Tax Matters ........................ 40
    Section 6.13.  Compliance with Applicable Law; Permits; Filings ........................ 41
    Section 6.14.  Insurance ........................ 41
    Section 6.15.  Sophisticated Industry Participant; Access to Information ........................ 41
    Section 6.16.  Brokers and Finders ........................ 41
    Section 6.17.  Energy Regulatory Matters ........................ 42
    Section 6.18.  Code Compliance ........................ 42
    Section 6.19.  Intellectual Property ........................ 42

ARTICLE VII Pre-Closing Covenants ........................ 42

    Section 7.01.  SDTS Conduct of Business ........................ 42

Section 7.02.    SU Conduct of Business                                                    44
Section 7.03.    Oncor Conduct of Business                                                 46
Section 7.04.    Access to Information                                                      48
Section 7.05.    Confidentiality                                                           48
Section 7.06.    Efforts; Consents and Approvals; Regulatory Filings                       49
Section 7.07.    SU/SDTS Leases                                                            52
Section 7.08.    Supplemental Disclosure                                                   53

ARTICLE VIII Conditions to Closing                                                         53

Section 8.01.    Conditions to the Obligation of Each Party                                53
Section 8.02.    Conditions to the Obligation of the Oncor Entities                        53
Section 8.03.    Conditions to the Obligation of the SDTS Entities                         55
Section 8.04.    Conditions to the Obligation of the SU Entities                           56

ARTICLE IX Termination                                                                     57

Section 9.01.    Termination                                                               57
Section 9.02.    Effect of Termination                                                     58

ARTICLE X Indemnification                                                                  58

Section 10.01.   Indemnification by SDTS                                                   58
Section 10.02.   Indemnification by SU                                                     59
Section 10.03.   Indemnification by Oncor of SDTS Indemnitees                              59
Section 10.04.   Indemnification by Oncor of SU Indemnitees                                60
Section 10.05.   Indemnification Procedures                                                60
Section 10.06.   Limitations on Indemnification                                            62
Section 10.07.   Exclusive Remedy                                                          66
Section 10.08.   Insurance and Other Sources of Recovery; Mitigation                       67
Section 10.09.   Cooperation; Access to Documents and Information                          67
Section 10.10.   Tax Treatment of Indemnification                                          68

ARTICLE XI Tax Matters                                                                     68

Section 11.01.   Liability for Taxes                                                       68
Section 11.02.   Tax Returns                                                               70
Section 11.03.   Transfer Taxes                                                            71
Section 11.04.   Tax Contests; Refunds; Cooperation; Tax Treatment                         71
Section 11.05.   Termination of Tax Sharing Agreements                                     73
Section 11.06.   Private Letter Ruling.                                                    74
Section 11.07.   Other Provisions                                                          75
Section 11.08.   1031 Allocation                                                           75

ARTICLE XII Additional Agreements                                                          75

Section 12.01.   Publicity                                                                 75
Section 12.02.   Employees                                                                 76

-iii-

Section 12.03.  Limited Representations                                                               80
Section 12.04.  Post-Closing Information                                                              81
Section 12.05.  Personally Identifiable Information                                                   81
Section 12.06.  Nontransferable Rights                                                               81
Section 12.07.  Further Assurances                                                                   82

ARTICLE XIII Miscellaneous                                                                           82

Section 13.01.  Assignment; Parties in Interest                                                      82
Section 13.02.  No Third Party Beneficiaries                                                         83
Section 13.03.  Expenses                                                                             83
Section 13.04.  Notices                                                                              83
Section 13.05.  Headings; Disclosure Schedules; Definitions; Interpretation                          84
Section 13.06.  Integrated Contract; Exhibits and Schedules                                          85
Section 13.07.  Severability; Enforcement                                                            86
Section 13.08.  Governing Law                                                                        86
Section 13.09.  Choice of Forum                                                                      86
Section 13.10.  Transaction Privilege.                                                               87
Section 13.11.  Amendments; Waivers                                                                  89
Section 13.12.  Specific Enforcement                                                                 89
Section 13.13.  Counterparts                                                                         89

**SCHEDULES:**

Schedule 1 — Definitions
Schedule 1.05(c) — Applicable Asset Identification Information
Schedule 3.02(a)(iii) –– Material Terms of Fiber Sharing License
Schedule 7.06(d)(i) — Terms of SU/SDTS Rate Case Dismissal
Schedule 7.06(d)(ii) — Terms of Oncor Rate Case Settlement
Schedule 8.03(f) — Certain Holders of SDTS Senior Secured Notes
Schedule 12.02(a) — Offered Employees
Schedule 12.02(c) — Temporary Employees
Schedule 12.02(d) — Oncor Benefit Plans

**EXHIBITS:**

Exhibit A — SU Pre-Closing Merger Agreement
Exhibit B — Form of SDTS Pre-Closing Merger Agreement
Exhibit C — Applicable Transmission Systems
Exhibit D — Oncor Pre-Closing Contribution Agreement
Exhibit E — Form of Transmission Tower Design License Agreement
Exhibit F — Form of Transition Services Agreement
Exhibit G — Regulatory Conditions
Exhibit H — Form of Interconnection Agreement

## AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER (this "Agreement") is entered into as of July 21, 2017, by and among Sharyland Distribution & Transmission Services, L.L.C., a Texas limited liability company ("SDTS"), Sharyland Utilities, L.P., a Texas limited partnership ("SU"), SU AssetCo, L.L.C., a Texas limited liability company ("SU AssetCo"), Oncor Electric Delivery Company LLC, a Delaware limited liability company ("Oncor"), and Oncor AssetCo LLC, a Texas limited liability company ("Oncor AssetCo") and will be entered into, upon the formation of such entity in accordance with Section 1.01, by SDTS AssetCo, L.L.C., a Texas limited liability company that will be a wholly owned subsidiary of SDTS ("SDTS AssetCo").

## RECITALS

WHEREAS, SU is engaged in the electric distribution business in and around Stanton and McAllen, Texas (the "Stanton/McAllen Distribution Business") and the electric distribution and transmission business in and around Brady and Celeste, Texas (the "Brady/Celeste Business" and, together with the Stanton/McAllen Distribution Business, the "Subject SU Businesses") and owns certain assets that relate to the Subject SU Businesses, which are more particularly described in the SU Pre-Closing Merger Agreement (as defined below) and include the Regulatory Asset (as defined below) (the "SU Assets");

WHEREAS, SDTS owns certain real property and other assets that it leases to SU pursuant to the existing leases between the parties, as amended, supplemented or consolidated from time to time (each, an "SU/SDTS Lease") and that are used by SU in connection with the conduct of the Subject SU Businesses, which are more particularly described in the SDTS Pre-Closing Merger Agreement (as defined below) (the "SDTS Assets");

WHEREAS, as of July 21, 2017, SU and SU AssetCo entered into an Agreement and Plan of Merger (the "SU Pre-Closing Merger Agreement"), a copy of which is attached as Exhibit A hereto, upon the terms and conditions of which SU has agreed to allocate the SU Assets and certain related liabilities, as more particularly described in the SU Pre-Closing Merger Agreement (the "SU Liabilities" and, together with the SU Assets, the "SU Package"), to SU AssetCo;

WHEREAS, upon the date of formation of SDTS AssetCo in accordance with Section 1.01, SDTS and SDTS AssetCo will enter into an Agreement and Plan of Merger (the "SDTS Pre-Closing Merger Agreement"), in the form attached as Exhibit B hereto (with such changes, if any, as are agreed upon in writing by SDTS and Oncor), upon the terms and subject to the conditions of which SDTS will agree to allocate the SDTS Assets and certain related liabilities, as more particularly described in the SDTS Pre-Closing Merger Agreement (the "SDTS Liabilities" and, together with the SDTS Assets, the "SDTS Package"), to SDTS AssetCo;

WHEREAS, Oncor desires to acquire the SDTS Package and SDTS is willing, through the consummation of the transactions contemplated by the SDTS Pre-Closing Merger Agreement and the merger of SDTS AssetCo and Oncor provided for in this Agreement (the "SDTS Merger"), to allocate the SDTS Package to Oncor, in each case upon the terms and subject to the conditions set forth therein and herein;

-1-

WHEREAS, Oncor desires to acquire the SU Package and SU is willing, through the consummation of the transactions contemplated by the SU Pre-Closing Merger Agreement and the merger of SU AssetCo and Oncor provided for in this Agreement (the "SU Merger"), to allocate the SU Package to Oncor, in each case upon the terms and subject to the conditions set forth therein and herein;

WHEREAS, Oncor owns and operates the electric transmission systems described in Exhibit C hereto (the "Applicable Transmission Systems");

WHEREAS, as of July 21, 2017, Oncor and Oncor AssetCo entered into a Contribution Agreement (the "Oncor Pre-Closing Contribution Agreement"), a copy of which is attached as Exhibit D hereto, upon the terms and subject to the conditions of which Oncor has agreed to contribute and transfer to Oncor AssetCo all of the properties and assets owned by Oncor that relate to the Applicable Transmission Systems (the "Oncor T Assets") and Oncor AssetCo has agreed to assume certain related liabilities, as more particularly described in the Oncor Pre-Closing Contribution Agreement (the "Oncor T Liabilities" and, together with the Oncor T Assets, the "Oncor T Package");

WHEREAS, SDTS desires to acquire the Oncor T Package and Oncor is willing, through the consummation of the transactions contemplated by the Oncor Pre-Closing Contribution Agreement and the merger of Oncor AssetCo and SDTS provided for in this Agreement (the "Oncor Merger"), to transfer and allocate the Oncor T Package to SDTS, in each case upon the terms and subject to the conditions set forth therein and herein;

WHEREAS, SU, SDTS, Oncor and the other Persons named therein have entered into a Stipulation Regarding STM Application (as defined below) that has become effective prior to or concurrently with the execution and delivery of this Agreement;

WHEREAS, the members of SDTS have approved this Agreement and the Transactions;

WHEREAS, SDTS, as the sole member of SDTS AssetCo, will approve this Agreement and the Transactions prior to the execution of the Joinder Agreement by SDTS AssetCo;

WHEREAS, (i) each of the general partner and limited partner of SU and (ii) SU, as the sole member of SU AssetCo, have approved this Agreement and the Transactions;

WHEREAS, (i) the Board of Directors of Oncor, (ii) Oncor Holdings (as defined below), (iii) EFIH (as defined below) (subject, in the case of EFIH, to obtaining the Bankruptcy Court Approval (as defined below)) and (iv) Oncor, as the sole member of Oncor AssetCo have approved this Agreement and the Transactions; and

-2-

WHEREAS, certain capitalized and other terms used herein without definition have the respective meanings set forth in Schedule I hereto;

NOW, THEREFORE, in consideration of the premises, the representations, warranties, covenants and agreements contained herein, the mutual benefits to be gained by the performance thereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree, intending to be legally bound, as follows:

## ARTICLE I
## SDTS/Oncor Transactions

Section 1.01. *SDTS Pre-Closing Merger.* No later than five business days prior to the Closing Date, (i) SDTS shall cause SDTS AssetCo to be formed under the Laws of the State of Texas, (ii) SDTS shall cause SDTS AssetCo to execute the Joinder Agreement and deliver a copy of such agreement to Oncor and (iii) SDTS shall enter into, and cause SDTS AssetCo to enter into, the SDTS Pre-Closing Merger Agreement. Immediately prior to the Closing, SDTS and SDTS AssetCo shall consummate the merger of SDTS and SDTS AssetCo (the "SDTS Pre-Closing Merger"), and shall thereby cause the SDTS Package to be allocated to SDTS AssetCo. The SDTS Pre-Closing Merger shall be consummated pursuant to the terms of the SDTS Pre-Closing Merger Agreement, and neither SDTS nor SDTS AssetCo shall amend or modify the terms of such agreement without the prior written consent of Oncor and SU.

Section 1.02. *Oncor Pre-Closing Contribution.* Immediately prior to the Closing, Oncor and Oncor AssetCo shall consummate the transactions contemplated by the Oncor Pre-Closing Contribution Agreement (the "Oncor Pre-Closing Contribution"), and shall thereby cause the Oncor T Package to be contributed and transferred to Oncor AssetCo. The Oncor Pre-Closing Contribution shall be consummated pursuant to the terms of the Oncor Pre-Closing Contribution Agreement, and neither Oncor nor Oncor AssetCo shall amend or modify the terms of such agreement without the prior written consent of SDTS and SU.

Section 1.03. *SDTS Merger.*

(a) *Merger.* Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the applicable provisions of the TBOC and DLLCA, at the SDTS Merger Effective Time, SDTS AssetCo shall be merged with and into Oncor. As a result of the SDTS Merger, the separate existence of SDTS AssetCo shall cease and Oncor shall continue as the surviving entity in the SDTS Merger (the "SDTS Merger Surviving Entity").

(b) *Merger Certificates.* As soon as practicable on the Closing Date, SDTS, SDTS AssetCo and Oncor shall cause the SDTS Merger to be consummated by filing (i) a certificate of merger relating to the SDTS Merger (the "Texas SDTS Merger Certificate") with the Secretary of State of the State of Texas, in such form as required by, and executed in accordance with the relevant provisions of, the TBOC and (ii) a certificate of merger relating to the SDTS Merger (the "Delaware SDTS Merger Certificate" and, together with the Texas SDTS Merger Certificate, the "SDTS Merger Certificates") with the Secretary

of State of the State of Delaware, in such form as required by, and executed in accordance with the relevant provisions of, the DLLCA. The SDTS Merger shall become effective at such time as SDTS and Oncor shall agree and as shall be specified in the SDTS Merger Certificates; *provided* that the effective time of the SDTS Merger (the "<u>SDTS Merger Effective Time</u>") shall occur on the Closing Date, after the SDTS Pre-Closing Merger and Oncor Pre-Closing Contribution, and concurrently with the Oncor Merger Effective Time and the SU Merger Effective Time.

(c) *Effects of the Merger*. At the SDTS Merger Effective Time, the SDTS Merger shall have the effects provided for in this Agreement and in the applicable provisions of the TBOC, the DLLCA and other applicable Law. Without limiting the generality of the foregoing, at the SDTS Merger Effective Time, all the property, rights, privileges, powers and franchises of SDTS AssetCo and Oncor shall vest or continue to vest in the SDTS Merger Surviving Entity, and all debts, liabilities and duties of SDTS AssetCo and Oncor shall become or shall continue to be the debts, liabilities and duties of the SDTS Merger Surviving Entity.

(d) *Surviving Entity LLC Agreement*. At the SDTS Merger Effective Time, by virtue of the SDTS Merger, the limited liability company agreement of Oncor as in effect immediately prior to the SDTS Merger Effective Time (the "<u>Oncor LLC Agreement</u>") shall continue to be the limited liability company agreement of the SDTS Merger Surviving Entity, until thereafter amended in accordance with the applicable provisions of the Oncor LLC Agreement and the DLLCA.

(e) *Equity Interests*. At the SDTS Merger Effective Time, by virtue of the SDTS Merger and without any action on the part of the parties, (i) the Equity Interests in SDTS AssetCo outstanding immediately prior to the SDTS Merger Effective Time shall be converted into and shall represent the right to receive the consideration set forth in Section 1.05(a) and, as of such time, all such Equity Interests shall be cancelled and cease to be outstanding and (ii) all of the Equity Interests in Oncor outstanding immediately prior to the SDTS Merger Effective Time shall remain outstanding in accordance with the terms of the Oncor LLC Agreement and shall not be affected by the SDTS Merger.

Section 1.04. *Oncor Merger*.

(a) *Merger*. Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the applicable provisions of the TBOC, at the Oncor Merger Effective Time, Oncor AssetCo shall be merged with and into SDTS. As a result of the Oncor Merger, the separate existence of Oncor AssetCo shall cease and SDTS shall continue as the surviving entity in the Oncor Merger (the "<u>Oncor Merger Surviving Entity</u>").

(b) *Certificate of Merger*. As soon as practicable on the Closing Date, Oncor, Oncor AssetCo and SDTS shall cause the Oncor Merger to be consummated by filing a certificate of merger relating to the Oncor Merger (the "<u>Oncor Merger Certificate</u>") with the Secretary of State of the State of Texas, in such form as required by, and executed in accordance with the relevant provisions of, the TBOC. The Oncor Merger shall become effective at such time as SDTS and Oncor shall agree and as shall be specified in the Oncor Merger Certificate; *provided* that the effective time of the Oncor Merger (the "<u>Oncor Merger Effective Time</u>") shall occur on the Closing Date, after the SDTS Pre-Closing Merger and Oncor Pre-Closing Contribution, and concurrently with the SDTS Merger Effective Time and the SU Merger Effective Time.

-4-

(c) *Effects of the Merger.* At the Oncor Merger Effective Time, the Oncor Merger shall have the effects provided for in this Agreement and in the applicable provisions of the TBOC and other applicable Law. Without limiting the generality of the foregoing, at the Oncor Merger Effective Time, all the property, rights, privileges, powers and franchises of Oncor AssetCo and SDTS shall vest or continue to vest in the Oncor Merger Surviving Entity, and all debts, liabilities and duties of Oncor AssetCo and SDTS shall become or continue to be the debts, liabilities and duties of the Oncor Merger Surviving Entity.

(d) *Surviving Entity LLC Agreement.* At the Oncor Merger Effective Time, by virtue of the Oncor Merger, the limited liability company agreement of SDTS as in effect immediately prior to the Oncor Merger Effective Time (the "SDTS LLC Agreement") shall continue to be the limited liability company agreement of the Oncor Merger Surviving Entity, until thereafter amended in accordance with the applicable provisions of the SDTS LLC Agreement and the TBOC.

(e) *Equity Interests.* At the Oncor Merger Effective Time, by virtue of the Oncor Merger and without any action on the part of the parties, (i) the Equity Interests in Oncor AssetCo outstanding immediately prior to the Oncor Merger Effective Time shall be converted automatically into and shall represent the right to receive the consideration set forth in Section 1.05(b) and, as of such time, all such Equity Interests shall be cancelled and cease to be outstanding and (ii) all of the Equity Interests in SDTS outstanding immediately prior to the SDTS Merger Effective Time shall remain outstanding in accordance with the terms of the SDTS LLC Agreement and shall not be affected by the Oncor Merger.

Section 1.05. *Merger Consideration.*

(a) *SDTS Merger.* As a result of the SDTS Merger, Oncor shall be obligated to pay and SDTS shall be entitled to receive consideration in an amount equal to the SDTS Package Target Amount (substantially all of which amount SDTS has elected to cause to be reinvested in, and which obligation shall be deemed satisfied to the extent of the transfer to SDTS of, the Oncor T Package pursuant to the Oncor Merger), with the remainder of such amount and obligation being satisfied through the payment of the Cash Payment Amount), *plus* or *minus* (as the case may be) the amounts payable in respect of the SDTS Package as a result of the adjustments provided in Section 1.05(f) and Section 1.06(g) (as so adjusted, the "Final SDTS Package Amount"). For purposes of this Agreement, the value of the SDTS Package (the "SDTS Package Amount") will be determined pursuant to this Section 1.05 and Section 1.06 based on the Net Book Value as of the SDTS Merger Effective Time of the land, easements, rights of way, other real property interests, property, plant and equipment and other assets included in the SDTS Package. The parties agree that, as of the date of this Agreement, (i) their agreed estimate of the Net Book Value of the SDTS Package, excluding the SDTS Working Capital Package, as of the Closing Date is $400,718,954 (the "SDTS Net Book Value Target"), (ii) their agreed target for the Net Book Value of the SDTS Working Capital Package as of the Closing Date is $179,277 (the "SDTS Net Working Capital Target") and (iii) the target value for the SDTS Package as a whole as of the Closing Date is $400,898,231 (the "SDTS Package Target Amount"), which equals the sum of the SDTS Net Book Value Target and the SDTS Net Working Capital Target.

-5-

(b) *Oncor Merger*. As a result of the Oncor Merger, SDTS shall be obligated to pay and Oncor shall be entitled to receive consideration in an amount equal to the Oncor T Package Target Amount (which amount Oncor has elected to cause to be reinvested in, and which obligation shall be deemed satisfied in full by the transfer to Oncor of, the SDTS Package pursuant to the SDTS Merger), *plus* or *minus* (as the case may be) the amounts payable in respect of the Oncor T Package as a result of the adjustments provided in Section 1.05(f) and Section 1.06 (g). For purposes of this Agreement, the value of the Oncor T Package (the "Oncor T Package Amount") will be determined pursuant to this Section 1.05 and Section 1.06 based on the Net Book Value as of the Oncor Merger Effective Time of the land, easements, rights of way, other real property interests, property, plant and equipment included in the Oncor T Assets. The parties agree that, as of the date of this Agreement, (i) their agreed estimate of the Oncor T Package Amount, excluding the Oncor Working Capital Package, as of the Closing Date is $383,064,253 (the "Oncor Net Book Value Target"), (ii) their agreed target for the Net Book Value of the Oncor Working Capital Package as of the Closing Date is $(3,242,703) (the "Oncor Net Working Capital Target") and (iii) the target value for the Oncor T Package as a whole as of the Closing Date is $379,821,550 (the "Oncor T Package Target Amount"), which (A) equals the sum of the Oncor Net Book Value Target and the Oncor Net Working Capital Target and (B) is equal to the parties' agreed estimate of the SDTS Package Target Amount set forth in (a), less the Cash Payment Amount.

(c) *SDTS Estimated Closing Statement*. No later than 5 business days prior to the Closing Date, SDTS shall deliver to Oncor a statement (the "SDTS Estimated Closing Statement"), which statement will (i) attach an estimated schedule of assets and liabilities included in the SDTS Package as of the SDTS Merger Effective Time (the "SDTS Package Schedule"), which schedule shall include the applicable account and identifying information set forth in Schedule 1.05(c) hereto (the "Applicable Asset Identification Information") (ii) set forth an estimate of the Net Book Value of the SDTS Package, excluding the SDTS Working Capital Package, as of the SDTS Merger Effective Time (the "SDTS Net Book Value Estimate"), which will be prepared on the basis of the SDTS Package Schedule and in accordance with the historical accounting principles, practices, and methodologies of SDTS reflected in its most recent audited financial statements (the "SDTS Accounting Principles") and (iii) set forth an estimate of the Net Book Value of the SDTS Working Capital Package as of the SDTS Merger Effective Time (the "SDTS Net Working Capital Estimate"), which will be prepared on the basis of the SDTS Package Schedule and in accordance with the SDTS Accounting Principles.

(d) *Oncor Estimated Closing Statement*. No later than 5 business days prior to the Closing Date, Oncor shall deliver to SDTS a statement (the "Oncor Estimated Closing Statement" and, together with the SDTS Estimated Closing Statement, the "Estimated Closing Statements"), which statement will (i) attach an estimated schedule of assets and liabilities included in the Oncor T Package as of the Oncor Merger Effective Time (the "Oncor T Package Schedule"), which schedule shall include the Applicable Asset Identification Information, (ii) set forth an estimate of the Net Book Value of the Oncor T Package, excluding the Oncor Working Capital Package, as of the Oncor Merger Effective

-6-

Time (the "<u>Oncor Net Book Value Estimate</u>"), which will be prepared on the basis of the Oncor T Package Schedule and in accordance with the historical accounting principles, practices, and methodologies of Oncor reflected in its most recent audited financial statements (the "<u>Oncor Accounting Principles</u>") and (iii) set forth an estimate of the Net Book Value of the Oncor Working Capital Package as of the Oncor Merger Effective Time (the "<u>Oncor Net Working Capital Estimate</u>"), which will be prepared on the basis of the Oncor T Package Schedule and in accordance with the Oncor Accounting Principles.

(e) *Access*. At all times after the delivery by either SDTS or Oncor (for purposes of this Section 1.05, the "<u>Delivering Party</u>") of the applicable Estimated Closing Statement to the other party (for purposes of this Section 1.05, the "<u>Receiving Party</u>") and prior to the Closing, the Delivering Party shall give the Receiving Party such access, during normal business hours, to the books and records (including relevant contracts, regulatory documents and filings) and the accounting and other appropriate personnel of the Delivering Party, as the Receiving Party may reasonably request in order to enable the Receiving Party to evaluate and verify the amounts set forth in the applicable Estimated Closing Statement. If either Receiving Party disagrees with any amounts set forth in the applicable Estimated Closing Statement, SDTS and Oncor shall work together in good faith to resolve any such disputes, and any changes to the amounts set forth in such Estimated Closing Statement that are agreed upon in writing by SDTS and Oncor prior to or at the Closing shall be substituted for the amounts set forth in such Estimated Closing Statement. If any dispute with respect to amounts set forth in an Estimated Closing Statement is not resolved prior to the Closing, then the amounts set forth in such Estimated Closing Statement shall be binding on SDTS and Oncor solely for purposes of the Closing (but shall be subject to adjustment after the Closing in accordance with the provisions of Section 1.06).

(f) *Closing Adjustments*. At the Closing, SDTS or Oncor, as applicable, shall make the following adjusting payment in cash:

(i) if the sum of (A) the SDTS Net Book Value Estimate and (B) the SDTS Net Working Capital Estimate (the "<u>SDTS Closing Estimated Amount</u>") is greater than the sum of (A) the Oncor Net Book Value Estimate, the (B) the Oncor Net Working Capital Estimate and (C) the Cash Payment Amount (the "<u>Oncor Closing Estimated Amount</u>"), Oncor shall pay SDTS an amount equal to (x) the SDTS Closing Estimated Amount, *minus* (y) the Oncor Closing Estimated Amount; or

(ii) if the SDTS Closing Estimated Amount is less than the Oncor Closing Estimated Amount, SDTS shall pay Oncor an amount equal to (x) the Oncor Closing Estimated Amount, *minus* (y) the SDTS Closing Estimated Amount.

Section 1.06. *Post-Closing Adjustments.*

(a) *Final Oncor AssetCo Statement*. No later than 45 days after the Closing Date, Oncor shall deliver to SDTS a statement (the "<u>Final Oncor AssetCo Statement</u>"), which statement will (i) attach a schedule of assets and liabilities included in the Oncor T Package as of the Oncor Merger Effective Time (the "<u>Final Oncor AssetCo Schedule</u>"), which will include the Applicable Asset Identification Information, be prepared

in accordance with the Oncor Accounting Principles and give effect to the consummation of the Oncor Pre-Closing Contribution immediately prior to the Oncor Merger Effective Time, and (ii) set forth a proposed calculation of the Net Book Value of the Oncor T Package, excluding the Oncor Working Capital Package, as of the Oncor Merger Effective Time, which will be prepared on the basis of the Final Oncor AssetCo Schedule and in accordance with the Oncor Accounting Principles, and (iii) set forth a proposed calculation of the Net Book Value of the Oncor Working Capital Package as of the Oncor Merger Effective Time, which will be prepared on the basis of the Final Oncor AssetCo Schedule and in accordance with the Oncor Accounting Principles.

(b) *Final SDTS AssetCo Statement*. No later than 45 days after the Closing Date, SDTS shall deliver to Oncor a statement (the "<u>Final SDTS AssetCo Statement</u>" and, together with the Final Oncor AssetCo Statement, the "<u>Final Statements</u>"), which statement will (i) attach a schedule of assets and liabilities included in the SDTS Package as of the SDTS Merger Effective Time (the "<u>Final SDTS AssetCo Schedule</u>"), which will include the Applicable Asset Identification Information, be prepared on a basis consistent with the SDTS Accounting Principles and give effect to the consummation of the SDTS Pre-Closing Merger immediately prior to the SDTS Merger Effective Time, (ii) set forth a proposed calculation of the Net Book Value of the SDTS Package, excluding the SDTS Working Capital Package, as of the SDTS Merger Effective Time, which will be prepared on the basis of the Final SDTS AssetCo Schedule and in accordance with the SDTS Accounting Principles, and (iii) set forth a proposed calculation of the Net Book Value of the SDTS Working Capital Package as of the SDTS Merger Effective Time, which will be prepared on the basis of the Final SDTS AssetCo Schedule and in accordance with the SDTS Accounting Principles.

(c) *Access*. From the date of delivery of each Final Statement until the determination of the final adjustments provided for in this Section 1.06, the party delivering such Final Statement (for purposes of this Section 1.06, the "<u>Delivering Party</u>") shall give the party receiving such Final Statement (for purposes of this Section 1.06, the "<u>Receiving Party</u>") such access during normal business hours, to the books and records (including relevant contracts, regulatory documents and filings) and the accounting and other appropriate personnel of the Delivering Party as the Receiving Party may reasonably request in order to enable the Receiving Party to evaluate and verify the amounts set forth in the applicable Final Statement.

(d) *Disputes*. Each Receiving Party shall be entitled to dispute any amounts set forth in the Final Statement received by it if such Receiving Party delivers a written notice (an "<u>Objection Notice</u>") to the Delivering Party no later than the end of the period of 45 days (the "<u>Objection Period</u>") commencing on the date upon which the last of the Final Statements is delivered pursuant to Section 1.06(a) or (b) in which the Receiving Party objects to one or more such amounts. The Objection Notice shall identify the amounts to which the Receiving Party is objecting (each, a "<u>Disputed Amount</u>") and include a brief statement as to the basis for the objections of the Receiving Party thereto. If a Receiving Party does not deliver an Objection Notice to the Delivering Party during the Objection Period or if a Receiving Party provides written notice accepting the Final Statement delivered to it, such Final Statement shall become final and binding and the Receiving Party shall not be entitled to dispute any amounts set forth therein. In addition, the items in a Final Statement that are not the subject of a timely Objection Notice shall be deemed accepted and be final and binding after the end of the Objection Period.

-8-

(e) *Negotiation Period.* If a Receiving Party delivers an Objection Notice with respect to the Final Statement received by it to the Delivering Party in a timely manner in accordance with Section 1.06(d), SDTS and Oncor shall attempt in good faith to agree upon each Disputed Amount during the period ending 30 days after the end of the Objection Period (the "<u>Negotiation Period</u>"). If SDTS and Oncor agree in writing prior to the expiration of the Negotiation Period on any Disputed Amount, the payment provided for in Section 1.06(g) shall be based upon the agreed amount.

(f) *Dispute Resolution.* If SDTS and Oncor do not agree in writing prior to the end of the Negotiation Period on any Disputed Amounts, each of SDTS and Oncor shall submit to the other, by 5:00 p.m., Central time, on the fifth business day after the expiration of the Negotiation Period, a statement setting forth its calculation of each remaining Disputed Amount (each, an "<u>Arbiter Objection Statement</u>"), it being understood that if either such party fails to deliver an Arbiter Objection Statement by such time and date, such party shall be deemed to have accepted and agreed to the Arbiter Objection Statement submitted by the other party (with the same effect as if the amounts set forth in such statement had been agreed upon by the parties pursuant to paragraph (e) above). All Disputed Amounts set forth in any Arbiter Objection Statement shall be submitted to the Final Arbiter, which firm shall make a final and binding determination as to all Disputed Amounts as promptly as practicable after its appointment. In determining the proper calculation of any Disputed Amounts, the Final Arbiter shall be bound by the terms of this Section 1.06 and may not increase the amount of any item in dispute above the highest amount set forth in the Arbiter Objection Statements nor decrease such amount below the lowest amount set forth in the Arbiter Objection Statements. To the extent practicable, the Final Arbiter shall make its determination as to all Disputed Amounts at the same time as it makes its determination as to any amounts in dispute pursuant to Section 2.04(e), so that all disputes under this Section 1.06 and Section 2.04 are resolved concurrently. The Final Arbiter shall send its written determination of all Disputed Amounts to SDTS and Oncor, and such determination shall be final and binding on each such party, absent fraud or manifest error. The fees and expenses of the Final Arbiter under this Section 1.06(f) shall be borne equally, with one-half being paid by SDTS and one-half being paid by Oncor. The Final Arbiter may not award damages, interest or penalties to any party with respect to any matter.

(g) *Adjustment Payments.* No later than five days after (x) each Final Statement shall have become final and binding in accordance with Section 1.06(d) or (y) an agreement between SDTS and Oncor with respect to or a final and binding determination of all Disputed Amounts shall have been reached or made pursuant to Section 1.06(e) or (f), SDTS and Oncor shall make the following adjusting payments in cash:

-9-

(i)    With respect to the SDTS Package:

(A) if the sum of (1) the Net Book Value of the SDTS Package, excluding the SDTS Working Capital Package, as finally determined pursuant to this Section 1.06, and (2) the Net Book Value of the SDTS Working Capital Package, as finally determined pursuant to this Section 1.06 (the "Final SDTS Amount"), is greater than the SDTS Closing Estimated Amount, Oncor shall pay to SDTS an amount equal to (x) the Final SDTS Amount, *minus* (y) the SDTS Closing Estimated Amount; or

(B) if the Final SDTS Amount is less than the SDTS Closing Estimated Amount, SDTS shall pay to Oncor an amount equal to (x) the SDTS Closing Estimated Amount, *minus* (y) the Final SDTS Amount.

(ii)    With respect to the Oncor T Package:

(A) if the sum of (1) the Net Book Value of the Oncor T Package, excluding the Oncor Working Capital Package, as finally determined pursuant to this Section 1.06, (2) the Net Book Value of the Oncor Working Capital Package, as finally determined pursuant to this Section 1.06, and (3) the Cash Payment Amount (the "Final Oncor Amount") is greater than the Oncor Closing Estimated Amount, SDTS shall pay to Oncor an amount equal to (x) the Final Oncor Amount, *minus* (y) the Oncor Closing Estimated Amount; or

(B) if the Final Oncor Amount is less than the Oncor Closing Estimated Amount, Oncor shall pay to SDTS an amount equal to (x) the Oncor Closing Estimated Amount, *minus* (y) the Final Oncor Amount.

The parties agree that the foregoing payments described in subparagraphs (g)(i) and (g)(ii) above shall be aggregated and, if applicable, shall be netted against each other so that only one payment is made by either SDTS or Oncor, as applicable, pursuant to this Section 1.06(g).

## ARTICLE II
## SU/Oncor Transactions

Section 2.01. *SU Pre-Closing Merger*. Immediately prior to the Closing, SU and SU AssetCo shall consummate the merger of SU and SU AssetCo (the "SU Pre-Closing Merger"), and shall thereby cause the SU Package to be allocated to SU AssetCo. The SU Pre-Closing Merger shall be consummated pursuant to the terms of the SU Pre-Closing Merger Agreement, and neither SU nor SU AssetCo shall amend or modify the terms of such agreement without the prior written consent of Oncor and SDTS.

Section 2.02. *SU Merger*.

(a) *Merger*. Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the applicable provisions of the TBOC and DLLCA, at the SU Merger Effective Time, SU AssetCo shall be merged with and into Oncor. As a result of the SU Merger, the separate existence of SU AssetCo shall cease and Oncor shall continue as the surviving entity in the SU Merger (the "SU Merger Surviving Entity").

-10-

(b) *Merger Certificates.* As soon as practicable on the Closing Date, SU, SU AssetCo and Oncor shall cause the SU Merger to be consummated by filing (i) a certificate of merger relating to the SU Merger (the "Texas SU Merger Certificate") with the Secretary of State of the State of Texas, in such form as required by, and executed in accordance with the relevant provisions of, the TBOC and (ii) a certificate of merger relating to the SU Merger (the "Delaware SU Merger Certificate" and, together with the Texas SU Merger Certificate, the "SU Merger Certificates") with the Secretary of State of the State of Delaware, in such form as required by, and executed in accordance with the relevant provisions of, the DLLCA. The SU Merger shall become effective at such time as SU and Oncor shall agree and as shall be specified in the SU Merger Certificates; *provided* that the effective time of the SU Merger (the "SU Merger Effective Time") shall occur on the Closing Date, after the SU Pre-Closing Merger, and concurrently with the SDTS Merger Effective Time and the Oncor Merger Effective Time.

(c) *Effects of the Merger.* At the SU Merger Effective Time, the SU Merger shall have the effects provided for in this Agreement and in the applicable provisions of the TBOC, the DLLCA and other applicable Law. Without limiting the generality of the foregoing, at the SU Merger Effective Time, all the property, rights, privileges, powers and franchises of SU AssetCo and Oncor shall vest or continue to vest in the SU Merger Surviving Entity, and all debts, liabilities and duties of SU AssetCo and Oncor shall become or shall continue to be the debts, liabilities and duties of the SU Merger Surviving Entity.

(d) *Surviving Entity LLC Agreement.* At the SU Merger Effective Time, by virtue of the SU Merger, the Oncor LLC Agreement shall continue to be the limited liability company agreement of the SU Merger Surviving Entity, until thereafter amended in accordance with the applicable provisions of the Oncor LLC Agreement and the DLLCA.

(e) *Equity Interests.* At the SU Merger Effective Time, by virtue of the SU Merger and without any action on the part of the parties, (i) the Equity Interests in SU AssetCo outstanding immediately prior to the SU Merger Effective Time shall be converted into and shall represent the right to receive the consideration set forth in Section 2.03(a) and, as of such time, all such Equity Interests shall be cancelled and cease to be outstanding and (ii) all of the Equity Interests in Oncor outstanding immediately prior to the SU Merger Effective Time shall remain outstanding in accordance with the terms of the Oncor LLC Agreement and shall not be affected by the SU Merger.

Section 2.03. *Merger Consideration.*

(a) *SU Merger.* As a result of the SU Merger, Oncor shall be obligated to pay and SU shall be entitled to receive cash consideration in an amount determined pursuant to this Section 2.03 and Section 2.04. For purposes of estimation only, the parties agree that, as of the date of this Agreement, (i) their agreed estimate of the Net Book Value of the SU Package, excluding the SU Working Capital Package and the Regulatory Asset, as of the Closing Date is $8,667,403, (ii) their agreed target for the Net Book Value of the SU Working Capital Package as of the Closing Date is $(4,810,127) and (iii) their agreed target value for the SU Package, excluding the Regulatory Asset, as a whole as of the Closing Date is $3,857,276, which equals the sum of the target amounts set forth in clauses (i) and (ii).

-11-

(b) *SU Estimated Closing Statement*. No later than 5 business days prior to the Closing Date, SU shall deliver to Oncor a statement (the "SU Estimated Closing Statement"), which statement will (i) attach an estimated schedule of assets and liabilities included in the SU Package as of the SU Merger Effective Time (the "SU Package Schedule"), which schedule shall include the Applicable Asset Identification Information, (ii) set forth an estimate of the Net Book Value of the SU Package, excluding the SU Working Capital Package and the Regulatory Asset, as of the SU Merger Effective Time (the "SU Net Book Value Estimate"), which will be prepared on the basis of the SU Package Schedule and in accordance with the historical accounting principles, practices and methodologies of SU reflected in its most recent audited financial statements (the "SU Accounting Principles"), (iii) set forth an estimate of the Net Book Value of the SU Working Capital Package as of the SU Merger Effective Time (the "SU Net Working Capital Estimate"), which will be prepared on the basis of the SU Package Schedule and in accordance with the SU Accounting Principles and (iv) set forth an estimate of the Regulatory Asset Payment Amount as of the SU Merger Effective Time.

(c) *Access*. At all times after the delivery by SU of the SU Estimated Closing Statement to Oncor and prior to the Closing, SU shall give Oncor such access, during normal business hours, to the books and records (including relevant contracts, regulatory documents and filings) and the accounting and other appropriate personnel of SU as Oncor may reasonably request in order to enable Oncor to evaluate and verify the amounts set forth in the SU Estimated Closing Statement. If Oncor disagrees with any amounts set forth in the SU Estimated Closing Statement, the parties shall work together in good faith to resolve any such disputes, and any changes to the amounts set forth in such SU Estimated Closing Statement that are agreed upon in writing by SU and Oncor prior to or at the Closing shall be substituted for the amounts set forth in such SU Estimated Closing Statement. If any dispute with respect to amounts set forth in the SU Estimated Closing Statement is not resolved prior to the Closing, then the amounts set forth in such SU Estimated Closing Statement shall be binding on SU and Oncor solely for purposes of the Closing (but shall be subject to adjustment after the Closing in accordance with the provisions of Section 2.04).

(d) *SU Closing Payment*. At the Closing, Oncor shall pay to SU an amount in cash equal to the sum of the SU Net Book Value Estimate, the SU Net Working Capital Estimate and the Regulatory Asset Payment Amount (the "SU Closing Payment").

Section 2.04. Post-Closing Adjustments.

(a) *Final SU AssetCo Statement*. No later than 45 days after the Closing Date, SU shall deliver to Oncor a statement (the "Final SU AssetCo Statement"), which statement will (i) attach a schedule of assets and liabilities included in the SU Package as of the SU Merger Effective Time (the "Final SU AssetCo Schedule"), which will include the Applicable Asset Identification Information, be prepared on a basis consistent with the SU Accounting Principles and give effect to the consummation of the SU Pre-Closing Merger immediately prior to the SU Merger Effective Time, (ii) set forth a proposed calculation of the Net Book Value of the SU Package, excluding the SU Working Capital Package and the Regulatory Asset, as of the SU Merger Effective Time, which will be prepared on the basis of the Final SU AssetCo Schedule and in accordance with the SU Accounting Principles, (iii) set forth a proposed calculation of the Net Book Value of the SU Working Capital

-12-

Package as of the SU Merger Effective Time, which will be prepared on the basis of the Final SU AssetCo Schedule and in accordance with the SU Accounting Principles, and (iv) set forth a proposed calculation of the Regulatory Asset Payment Amount as of the SU Merger Effective Time, which will be prepared on the basis of the Final SU AssetCo Schedule and in accordance with the SU Accounting Principles.

(b) *Access*. From the date of delivery of the Final SU AssetCo Statement until the determination of the final adjustments provided for in this Section 2.04, SU shall give Oncor such access during normal business hours, to the books and records (including relevant contracts, regulatory documents and filings) and the accounting and other appropriate personnel of SU as Oncor may reasonably request in order to enable Oncor to evaluate and verify the amounts set forth in the Final SU AssetCo Statement.

(c) *Disputes*. Oncor shall be entitled to dispute any amounts set forth in the Final SU AssetCo Statement if Oncor delivers a written notice (an "SU Objection Notice") to SU no later than the end of the period of 45 days (the "SU Objection Period") commencing on the date upon which the Final SU AssetCo Statement is delivered pursuant to Section 2.04(a) in which Oncor objects to one or more such amounts. The SU Objection Notice shall identify the amounts to which Oncor is objecting (each, an "SU Disputed Amount") and include a brief statement as to the basis for the objections of Oncor thereto. If Oncor does not deliver an SU Objection Notice to SU during the SU Objection Period or if Oncor provides written notice accepting the Final SU AssetCo Statement, such Final SU AssetCo Statement shall become final and binding and Oncor shall not be entitled to dispute any amounts set forth therein. In addition, the items in the Final SU AssetCo Statement that are not the subject of a timely SU Objection Notice shall be deemed accepted and be final and binding after the end of the SU Objection Period.

(d) *Negotiation Period*. If Oncor delivers an SU Objection Notice with respect to the Final SU AssetCo Statement to SU in a timely manner in accordance with Section 2.04(c), SU and Oncor shall attempt in good faith to agree upon each SU Disputed Amount during the period ending 30 days after the end of the SU Objection Period (the "SU Negotiation Period"). If SU and Oncor agree in writing prior to the expiration of the SU Negotiation Period on any SU Disputed Amount, the payment provided for in Section 2.04(f) shall be based upon the agreed amount.

(e) *Dispute Resolution*. If SU and Oncor do not agree in writing prior to the end of the SU Negotiation Period on any SU Disputed Amounts, each of SU and Oncor shall submit to the other, by 5:00 p.m., Central time, on the fifth business day after the expiration of the SU Negotiation Period, a statement setting forth its calculation of each remaining SU Disputed Amount (each, an "SU Arbiter Objection Statement"), it being understood that if either SU or Oncor fails to deliver an SU Arbiter Objection Statement by such time and date, such party shall be deemed to have accepted and agreed to the SU Arbiter Objection Statement submitted by the other party (with the same effect as if the amounts set forth in such statement had been agreed upon by the parties pursuant to paragraph (d) above). All SU Disputed Amounts set forth in any SU Arbiter Objection Statement shall be submitted to the Final Arbiter, which firm shall make a final and binding determination as to all SU Disputed Amounts as promptly as practicable after its appointment. In determining the proper calculation of any Disputed Amounts, the Final

-13-

Arbiter shall be bound by the terms of this Section 2.04 and may not increase the amount of any item in dispute above the highest amount set forth in the SU Arbiter Objection Statements nor decrease such amount below the lowest amount set forth in the SU Arbiter Objection Statements. To the extent practicable, the Final Arbiter shall make its determination as to all SU Disputed Amounts at the same time as it makes its determination as to any amounts in dispute pursuant to Section 1.06(f), so that all disputes under Section 1.06 and this Section 2.04 are resolved concurrently. The Final Arbiter shall send its written determination of all SU Disputed Amounts to SU and Oncor, and such determination shall be final and binding on each such party, absent fraud or manifest error. The fees and expenses of the Final Arbiter under this Section 2.04(e) shall be borne equally, with one-half being paid by SU and one-half being paid by Oncor. The Final Arbiter may not award damages, interest or penalties to any party with respect to any matter.

(f) *Adjustment Payments*. No later than five days after (x) the Final SU Statement shall have become final and binding in accordance with Section 2.04(c) or (y) an agreement between SU and Oncor with respect to or a final and binding determination of all SU Disputed Amounts shall have been reached or made pursuant to Section 2.04(d) or (e), SU or Oncor, as applicable, shall make the following adjusting payment in cash:

(i) if the sum of (1) the Net Book Value of the SU Package, excluding the SU Working Capital Package and the Regulatory Asset, as finally determined pursuant to this Section 2.04, (2) the Net Book Value of the SU Working Capital Package, and (3) the Regulatory Asset Payment Amount, as finally determined pursuant to this Section 2.04 (the "Final SU Amount"), is greater than the SU Closing Payment, Oncor shall pay to SU an amount equal to (x) the Final SU Amount, *minus* (y) the SU Closing Payment; or

(ii) if the Final SU Amount is less than SU Closing Payment, SU shall pay to Oncor an amount equal to (x) the SU Closing Payment, *minus* (y) the Final SU Amount.

**ARTICLE III**
**Closing**

Section 3.01. *Closing*. The closing of the SDTS Merger, the Oncor Merger and the SU Merger (the "Closing") shall take place at the offices of Baker Botts L.L.P., 2001 Ross Avenue, Dallas, Texas 75201. The Closing shall occur at 9:00 a.m., Central time, on the second business day following the day on which the last of the conditions of the parties with respect to the Closing set forth in Article VIII is satisfied or waived in accordance with this Agreement (other than any conditions to be satisfied through the making of payments or the delivery of documents at the Closing, which conditions must nonetheless be satisfied or waived in order for the applicable parties to be obligated to consummate the Transactions), or at such other time and date as the parties may agree. The date upon which the Closing takes place in accordance with the provisions of this Section 3.01 is referred to herein as the "Closing Date".

Section 3.02. *Closing Payments and Deliveries.*

(a) At the Closing, SDTS shall deliver, or cause to be delivered, to Oncor each of the following:

(i) any payment to which Oncor is entitled pursuant to Section 1.05(f) (to the extent not satisfied by subtracting such amount from the Cash Payment Amount as provided in Section 3.02(c)(i)), by wire transfer of immediately available funds to such account as Oncor shall have specified to SDTS at least 24 hours prior to Closing;

(ii) release letters or other evidence satisfactory to Oncor evidencing the release of Liens (other than Permitted Encumbrances) on the SDTS Assets;

(iii) a counterpart of the Fiber License Agreement, as to which the parties will use commercially reasonable efforts to negotiate in a reasonable and customary form following the date of this Agreement, but prior to Closing (the "Fiber Sharing License"), dated as of the Closing Date, duly executed by SDTS; *provided* that such Fiber Sharing License shall be consistent in all material respects with terms set forth on Schedule 3.02(a)(iii) attached hereto;

(iv) a counterpart of the 345 kV Transmission Tower Design License Agreement, in the form attached as Exhibit E hereto (the "Transmission Tower Design License Agreement"), dated as of the Closing Date, duly executed by SDTS;

(v) a counterpart of a license agreement, as to which the parties will use commercially reasonable efforts to negotiate in a reasonable and customary form following the date of this Agreement, but prior to Closing, which will evidence the right of SDTS to use, at no cost and for a perpetual term, the property used as of the date hereof for storage of a mobile station (the "Mobile Substation License Agreement"), dated as of the Closing Date, duly executed by SDTS;

(vi) a counterpart of a joint use agreement, as to which the parties will use commercially reasonable efforts to negotiate in a reasonable and customary form following the date of this Agreement, but prior to Closing, which sets forth the rights and obligations of SDTS and Oncor with respect to properties and assets upon which assets of both of the parties are located, including addressing each party's access to applicable substations (to the extent not addressed by the Interconnection Agreement) and which party will be responsible for maintenance of applicable Easements (the "Joint Use Agreement"), dated as of the Closing Date, duly executed by SDTS;

(vii) a duly executed FIRPTA certification which complies with Section 1445 of the Code and Treasury Regulations Section 1.1445-2(b)(2)(iv)(B) certifying as to SDTS's (or SDTS's regarded owner for U.S. federal income Tax purposes, if SDTS is a disregarded entity for U.S. federal income Tax purposes) non-foreign status;

(viii) a certificate of appropriate officers of SDTS, dated as of the Closing Date, to the effect that the conditions in Section 8.02(b)(i) and Section 8.02(c)(i) have been satisfied;

-15-

(ix) a certificate of appropriate officers of SDTS, dated as of the Closing Date, to the effect that (A) the consent adopted by the members of SDTS authorizing this Agreement and the Transactions was duly adopted and is in full force and effect on the Closing Date and (B) the authorized representatives of SDTS executing this Agreement and the applicable Ancillary Agreements are duly authorized to execute the same on behalf of SDTS;

(x) a certificate of appropriate officers of SDTS AssetCo, dated as of the Closing Date, to the effect that (A) the consent adopted by the sole member of SDTS AssetCo authorizing this Agreement and the Transactions was duly adopted and is in full force and effect on the Closing Date and (B) the authorized representatives of SDTS AssetCo executing this Agreement and the applicable Ancillary Agreements are duly authorized to execute the same on behalf of SDTS AssetCo; and

(xi) a certificate from the Secretary of State of the State of Texas, dated within two business days prior to the Closing Date, with respect to the existence of SDTS and SDTS AssetCo.

(b) At the Closing, SU shall deliver, or cause to be delivered, to Oncor each of the following:

(i) release letters or other evidence satisfactory to Oncor evidencing the release of Liens (other than Permitted Encumbrances) on the SU Assets;

(ii) a counterpart of the Interconnection Agreement, dated as of the Closing Date, duly executed by SU;

(iii) a counterpart of the Fiber License Agreement, dated as of the Closing Date, duly executed by SU;

(iv) a counterpart of the Transmission Tower Design License Agreement, dated as of the Closing Date, duly executed by SU;

(v) a counterpart of the Transition Services Agreement, in the form attached as Exhibit F hereto (the "Transition Services Agreement"), dated as of the Closing Date, duly executed by SU;

(vi) a duly executed FIRPTA certification which complies with Section 1445 of the Code and Treasury Regulations Section 1.1445-2(b)(2)(iv)(B) certifying as to SU's (or SU's regarded owner for U.S. federal income Tax purposes, if SU is a disregarded entity for U.S. federal income Tax purposes) non-foreign status;

(vii) a certificate of appropriate officers of SU, dated as of the Closing Date, to the effect that the conditions in Section 8.02(b)(ii) and Section 8.02(c)(ii) have been satisfied;

(viii) a certificate of appropriate officers of SU, dated as of the Closing Date, to the effect that (A) the consent adopted by the general partner and limited partner of SU authorizing this Agreement and the Transactions was duly adopted and is in full force and effect on the Closing Date and (B) the authorized representatives of SU executing this Agreement and the applicable Ancillary Agreements are duly authorized to execute the same on behalf of SU;

-16-

(ix) a certificate of appropriate officers of SU AssetCo, dated as of the Closing Date, to the effect that (A) the consent adopted by the sole member of SU AssetCo authorizing this Agreement and the Transactions was duly adopted and is in full force and effect on the Closing Date and (B) the authorized representatives of SU AssetCo executing this Agreement and the applicable Ancillary Agreements are duly authorized to execute the same on behalf of SU AssetCo; and

(x) a certificate from the Secretary of State of the State of Texas, dated within two business days prior to the Closing Date, with respect to the existence of SU and SU AssetCo.

(c) At the Closing, Oncor shall deliver, or cause to be delivered, to SDTS each of the following:

(i) the Cash Payment Amount, *plus* any payment to which SDTS is entitled pursuant to Section 1.05(f) or *minus* any payment to which Oncor is entitled pursuant to Section 1.05(f), by wire transfer of immediately available funds to such accounts as SDTS shall have specified to Oncor at least 24 hours prior to Closing;

(ii) release letters or other evidence satisfactory to SDTS evidencing the release of Liens (other than Permitted Encumbrances) on the Oncor T Assets;

(iii) a counterpart of the Fiber Sharing License, dated as of the Closing Date, duly executed by Oncor;

(iv) a counterpart of the Transmission Tower Design License Agreement, dated as of the Closing Date, duly executed by Oncor;

(v) a counterpart of the Mobile Substation License Agreement, dated as of the Closing Date, duly executed by Oncor;

(vi) a counterpart of the Joint Use Agreement, dated as of the Closing Date, duly executed by Oncor;

(vii) a duly executed FIRPTA certification which complies with Section 1445 of the Code and Treasury Regulations Section 1.1445-2(b)(2)(iv)(B) certifying as to Oncor's (or Oncor's regarded owner for U.S. federal income Tax purposes, if Oncor is a disregarded entity for U.S. federal income Tax purposes) non-foreign status;

(viii) a certificate of appropriate officers of Oncor, dated as of the Closing Date, to the effect that the conditions in Section 8.03(b) and Section 8.03(c) have been satisfied;

-17-

(ix) a certificate of appropriate officers of Oncor, dated as of the Closing Date, to the effect that (A) the consents adopted by the Board of Directors of Oncor and by Oncor Holdings authorizing this Agreement and the Transactions were duly adopted and are in full force and effect on the Closing Date and (B) the authorized representatives of Oncor executing this Agreement and the applicable Ancillary Agreements are duly authorized to execute the same on behalf of Oncor;

(x) a certificate of appropriate officers of Oncor AssetCo, dated as of the Closing Date, to the effect that (A) the consent adopted by the sole member of Oncor AssetCo authorizing this Agreement and the Transactions was duly adopted and is in full force and effect on the Closing Date and (B) the authorized representatives of Oncor AssetCo executing this Agreement and the applicable Ancillary Agreements are duly authorized to execute the same on behalf of Oncor AssetCo;

(xi) a certificate from the Secretary of State of the State of Delaware, dated within two business days prior to the Closing Date, with respect to the existence and good standing of Oncor; and

(xii) a certificate from the Secretary of State of the State of Texas, dated within two business days prior to the Closing Date, with respect to the existence of Oncor AssetCo.

(d) At the Closing, Oncor shall deliver, or cause to be delivered, to SU each of the following:

(i) the SU Closing Payment, by wire transfer of immediately available funds to such accounts as SU shall have specified to Oncor at least 24 hours prior to Closing;

(ii) a counterpart of the Interconnection Agreement, dated as of the Closing Date, duly executed by Oncor;

(iii) a counterpart of the Fiber Sharing License, dated as of the Closing Date, duly executed by Oncor;

(iv) a counterpart of the Transmission Tower Design License Agreement, dated as of the Closing Date, duly executed by Oncor;

(v) a counterpart of the Transition Services Agreement, dated as of the Closing Date, duly executed by Oncor;

(vi) a certificate of appropriate officers of Oncor, dated as of the Closing Date, to the effect that the conditions in Section 8.04(b) and Section 8.04(c) have been satisfied; and

(vii) the same certificates that are described in subparagraphs (c)(ix) through (xi) above.

-18-

(e) Upon the delivery of the agreements, certificates and other documents referred to in paragraphs (a), (b), (c) and (d) above, the applicable parties shall cause (i) the SDTS Merger Certificates and the SU Merger Certificates to be filed with the Secretary of State of Texas or the Secretary of State of Delaware, as applicable, and (ii) the Oncor Merger Certificate to be filed with the Secretary of State of the State of Delaware.

## ARTICLE IV
### Representations and Warranties of SDTS and SDTS AssetCo

Except as set forth in the disclosure schedules related to this Article IV (collectively, the "SDTS Disclosure Schedule") delivered by SDTS to Oncor prior to or on the date hereof and the documents attached to or incorporated by reference therein, SDTS and (upon its execution of the Joinder Agreement) SDTS AssetCo (collectively, the "SDTS Entities"), jointly and severally, represent and warrant to Oncor as set forth in this Article IV. For clarity, SDTS shall be deemed not to make any representation with respect to SDTS AssetCo, and SDTS AssetCo shall not be deemed to make any representation, until such time as SDTS AssetCo delivers the Joinder Agreement to Oncor pursuant to Section 1.01.

Section 4.01. *Organization and Qualification*. Each SDTS Entity is a limited liability company that is duly organized, validly existing and in good standing under the Laws of the State of Texas. Each SDTS Entity has all requisite limited liability company power and authority to enable it to own, lease or otherwise hold the SDTS Assets and to conduct the Subject SDTS Operations. Each SDTS Entity is duly qualified or registered as a foreign limited liability company in each jurisdiction (other than the State of Texas) in which the character or location of the SDTS Assets or the nature of the Subject SDTS Operations makes such qualification or registration necessary, except where the failure to be so qualified or registered would not have an SDTS Material Adverse Effect.

Section 4.02. *Authority; Execution and Delivery; Enforceability.*

(a) Each SDTS Entity has all requisite limited liability company power and authority to execute, deliver and perform this Agreement and the applicable Ancillary Agreements and to consummate the Transactions. Each SDTS Entity has taken all requisite limited liability company action required by its organizational documents or the TBOC or other applicable Law to authorize the execution, delivery and performance of this Agreement and the applicable Ancillary Agreements and to authorize the consummation of the Transactions. Except for any action on the part of a member of an SDTS Entity that has been taken prior to the date hereof and remains in full force and effect, no action is required to be taken by any member of an SDTS Entity to authorize the execution, delivery and performance of this Agreement or the applicable Ancillary Agreements or to authorize the consummation of the Transactions.

(b) Each SDTS Entity has duly executed and delivered this Agreement and, at the Closing (subject to the satisfaction or waiver of the applicable conditions to the obligations of such SDTS Entity), will have duly executed and delivered each applicable Ancillary Agreement, and this Agreement constitutes, and each applicable Ancillary Agreement, from and after the Closing, will constitute, a legal, valid and binding obligation of such SDTS Entity, enforceable against it in accordance with its terms, subject to the Enforceability Exceptions.

-19-

Section 4.03. *No Conflicts or Violations; No Consents or Approvals Required.*

(a) The execution and delivery by each SDTS Entity of this Agreement and the applicable Ancillary Agreements does not and will not, and the consummation of the Transactions will not, result in any breach or violation of or constitute a default under (or, in the case of clause (ii) below, give any party to any Contract referred to in such clause, other than an SDTS Entity, the right to cancel or terminate or modify in any material respect the rights or obligations of the parties under) (i) the organizational documents of such SDTS Entity, (ii) any Contract to which such SDTS Entity is a party or is bound or (iii) any Order to which such SDTS Entity is subject or any Law applicable to such SDTS Entity, except for, in the case of clauses (ii) and (iii) above, any such breach, violation or default that would not reasonably be expected to have an SDTS Material Adverse Effect.

(b) Other than the filings, reports and notices and the consents, registrations, approvals, permits and authorizations required to be made or obtained (i) to or from the Secretary of State of the State of Texas or the Secretary of State of the State of Delaware in connection with the filing of the SDTS Merger Certificates and the Oncor Merger Certificate, (ii) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), including the expiration or earlier termination of applicable waiting periods thereunder, or any other Competition Law, (iii) to or from the Public Utility Commission of Texas (the "PUCT") pursuant to authority asserted by the PUCT pursuant to the Public Utility Regulatory Act, as amended ("PURA"), or the PUCT's regulations thereunder, and the approval of the PUCT with respect to the matters identified in the PUCT Filings (the "PUCT Approval"), (iv) under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act") or (v) to or from any Governmental Entity under applicable Environmental Laws, no filings, reports or notices are required to be made by an SDTS Entity with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by an SDTS Entity from, any Governmental Entity in connection with the execution, delivery and performance by such SDTS Entity of this Agreement or any of the applicable Ancillary Agreements or the consummation of the Transactions, except for any of the foregoing which, if not made or obtained, would not have an SDTS Material Adverse Effect.

Section 4.04. *Capitalization of SDTS AssetCo.* SDTS owns all of the outstanding limited liability company interests in SDTS AssetCo, which constitute all of the authorized or outstanding Equity Interests in such entity. There are no outstanding options, warrants, calls, rights, convertible securities or other agreements or commitments of any character pursuant to which SDTS or SDTS AssetCo is or will be obligated to issue or sell any issued or unissued Equity Interests in SDTS AssetCo, and there are no Equity Interests in SDTS AssetCo reserved for issuance for any purpose.

Section 4.05. *Subsidiaries.* SDTS does not have any Subsidiaries that hold any SDTS Assets or participate in the Subject SDTS Operations (other than SDTS AssetCo).

-20-

Section 4.06. *Absence of Changes or Events*. During the period from January 1, 2017 through the date hereof, except as set forth on Section 4.06 of the SDTS Disclosure Schedule, there has not been:

(a) an SDTS Material Adverse Effect;

(b) any amendment or modification of the organizational documents of any SDTS Entity;

(c) any damage, destruction, loss or casualty to any properties or assets included in the SDTS Assets, which (after taking into account any available insurance coverage or other sources of recovery) is material to the SDTS Package, taken as a whole;

(d) the creation of any Lien on any material properties or assets included in the SDTS Assets, other than a Permitted Encumbrance;

(e) the sale, transfer, lease or other disposition of any material properties or assets included in the SDTS Assets, except in the ordinary course of business;

(f) any material capital expenditures by SDTS with respect to the SDTS Assets or in connection with the Subject SDTS Operations other than those contemplated by the capex forecast with respect to the SDTS Package and the SU Package provided by SDTS and SU to Oncor, a copy of which is attached as Section 4.06(f) of the SDTS Disclosure Schedule (the "SDTS/SU CapEx Forecast"); or

(g) any commitment or agreement to do any of the foregoing.

Section 4.07. *Material Contracts*.

(a) Other than the SDTS Real Property Agreements (which are addressed in Section 4.08), there are no Contracts included in the SDTS Assets that are material to the SDTS Package or the Subject SDTS Operations.

(b) Other than (i) Contracts related to ordinary course employment, employee or director compensation, or employee or director incentive arrangements and (ii) services agreements between SDTS and SU, there are no Contracts between any of the SDTS Entities, on the one hand, and (x) SU, (y) Hunt Utility Services, LLC or any of its Affiliates or (z) any employee, officer, director or other Affiliate of SDTS, SU or Hunt Utility Services, LLC, on the other hand, that are material to the Subject SDTS Operations.

Section 4.08. *Real Property*.

(a) Section 4.08(a) of the SDTS Disclosure Schedule sets forth a list as of the date hereof of (i) all real property included in the SDTS Assets ("SDTS Owned Property"), (ii) all real property currently leased or subleased to an SDTS Entity included in the SDTS Assets ("SDTS Leasehold Property" and, together with the SDTS Owned Property, the "SDTS Property"), including the lease and any amendments thereto (each, an "SDTS Lease") under which such SDTS Leasehold Property is held and (iii) all easements, license agreements (including railroad, pipeline and similar crossing rights), rights of way and lease for rights of way, or other rights in or to the use of real property (collectively, "SDTS Easements" and, together with the SDTS Leases, the "SDTS Real Property Agreements") included in the SDTS Assets.

(b) As of the date hereof, SDTS has, and at the Closing SDTS AssetCo will have, good and indefeasible fee title to all SDTS Owned Property, free and clear of all Liens other than Permitted Encumbrances. No SDTS Entity has granted to any third party the right to use or access the SDTS Owned Property in any manner that interferes in any material respect with the SDTS Owned Property or the Subject SDTS Operations or otherwise granted to any third party any ownership in any material SDTS Owned Property.

(c) As of the date hereof, SDTS has, and at the Closing SDTS AssetCo will have, valid and enforceable leasehold interests with respect to the SDTS Leasehold Property, free and clear of all Liens other than Permitted Encumbrances, except that the validity and enforceability of the SDTS Leases under which such SDTS Leasehold Property is held are subject to the Enforceability Exceptions.

(d) No consent from any counterparty to any SDTS Real Property Agreement is required in connection with the consummation of the SDTS Merger. To the Knowledge of SDTS, no SDTS Entity is in breach in any material respect or in material default under any SDTS Real Property Agreement to which it is a party. To the Knowledge of SDTS, no counterparty to any of the SDTS Real Property Agreements is in material default of any of its obligations under the applicable SDTS Real Property Agreement.

(e) To the Knowledge of SDTS, there are no developments affecting the SDTS Owned Property or any of the SDTS Real Property Agreements which are pending or threatened, which might materially detract from the value, materially interfere with any present or intended use or materially and adversely affect the fee title of the SDTS Owned Property or any of the SDTS Real Property Agreements.

(f) SDTS has not received written notice from any Person within three years prior to the date of this Agreement asserting that SDTS does not have the right, as a result of title defects or title failures, to use or occupy any portion of the SDTS Property, other than those notices that would not individually, or in the aggregate, reasonably be expected to have an SDTS Material Adverse Effect.

Section 4.09. *Ownership; Maintenance of Assets.*

(a) As of the date hereof, SDTS has, and at the Closing SDTS AssetCo will have, good and marketable title to, or, in the case of property held under a lease, Contract or other arrangement, a valid leasehold interest in or right to use, all of the personal property, assets and rights included in the SDTS Assets (excluding any SDTS Property, which is addressed exclusively in Section 4.08), whether tangible or intangible, in each case free and clear of all Liens, other than Permitted Encumbrances.

(b) Since July 13, 2010, the SDTS Assets have been maintained consistent with Good Utility Practice in all material respects.

-22-

Section 4.10. *Legal Proceedings*. Section 4.10 of the SDTS Disclosure Schedule sets forth a list of (x) each Legal Proceeding that is pending against any SDTS Entity as of the date hereof (as to which a complaint has been served on an SDTS Entity or of which an SDTS Entity has received written notice) which relates to the SDTS Assets or the Subject SDTS Operations or (y) to the Knowledge of SDTS, each material Legal Proceeding that has been threatened against any SDTS Entity since June 1, 2013 which relates to the SDTS Assets or the Subject SDTS Operations. As of the date hereof, there are no Legal Proceedings pending or, to the Knowledge of SDTS, threatened against any SDTS Entity since June 1, 2013 that (i) question the validity of this Agreement or any action taken or to be taken by an SDTS Entity in connection with this Agreement, any Ancillary Agreement or the Transactions or (ii) would reasonably be expected to adversely affect in any material respect the ability of an SDTS Entity to perform its obligations under this Agreement or any Ancillary Agreement or consummate the Transactions. No SDTS Entity is subject to any outstanding Order (other than Orders of general applicability to participants in the relevant industry or sector) that would reasonably be expected to have, individually or in the aggregate, an SDTS Material Adverse Effect.

Section 4.11. *Environmental Matters*.

(a) The Subject SDTS Operations have been conducted, since June 1, 2013, in compliance with all applicable Environmental Laws, except where the failure to so conduct the Subject SDTS Operations would not reasonably be expected to have an SDTS Material Adverse Effect.

(b) As of the date hereof, SDTS holds itself or SU holds on its behalf, and as of the Closing SDTS AssetCo will hold, all Environmental Permits necessary to conduct the Subject SDTS Operations as they are currently conducted, except where the failure to hold such Permits would not reasonably be expected to have an SDTS Material Adverse Effect.

(c) Except as do not affect the SDTS Assets or the Subject SDTS Operations in any material respect and for which Oncor would not be subject to any material liability from acquiring the SDTS Package as a result of the SDTS Merger, since June 1, 2013, no written notification, demand, request for information, citation, complaint, Legal Proceeding or Order has been issued to or filed against any SDTS Entity relating to any alleged material failure to comply with any Environmental Law or the suspension, revocation or non-renewal of any Environmental Permit, except for such notifications, demands, requests, citations, complaints, Legal Proceedings or Orders that have been fully and finally resolved without further material liability on the part of any SDTS Entity.

(d) Since June 1, 2013, no SDTS Entity has generated, treated, stored or disposed of (or arranged for the generation, treatment, storage, or disposal of), and no SDTS Entity has Released, Hazardous Materials in a manner that would reasonably be expected to result in material environmental liability on the part of Oncor following the Closing.

-23-

(e) To the Knowledge of SDTS, the SDTS Entities have made available, or caused to be made available, to Oncor copies of all environmental reports or assessments prepared (x) since June 1, 2013 or (y) in connection with the acquisition of assets from Cap Rock Holding Corporation completed in 2010 that are in the possession or control of any SDTS Entity with respect to compliance by any SDTS Entity with Environmental Laws, the environmental condition of any SDTS Assets, or any environmental liability of any SDTS Entity related to the SDTS Assets or the Subject SDTS Operations (including all Phase I and Phase II Environmental Site Assessment reports, investigations and studies).

(f) Since July 13, 2010, the SDTS Entities have not assumed any material environmental liabilities of another Person that are included in the SDTS Liabilities.

(g) Except as do not affect the SDTS Assets or the Subject SDTS Operations in any material respect and for which Oncor would not be subject to any material liability from acquiring the SDTS Package as a result of the SDTS Merger, to the Knowledge of SDTS, there currently are not and never have been any power generation facilities (other than back-up generation equipment) on any of the SDTS Real Property.

(h) The representations and warranties set forth in this Section 4.11 are the sole and exclusive representations and warranties of the SDTS Entities with respect to matters relating to Environmental Laws or Hazardous Materials.

Section 4.12. *Tax Matters.*

(a) For the avoidance of doubt, the representations and warranties made in this Section 4.12 (the "SDTS Tax Representations") are the sole and exclusive representations and warranties made by the SDTS Entities with respect to matters related to Taxes.

(b) All Tax Returns required to have been filed by or with respect to SDTS AssetCo, if any, and all material Tax Returns required to have been filed with respect to the Subject SDTS Operations and the SDTS Assets, have been timely filed (taking into account any extension of time within which to file); all such Tax Returns are complete and accurate in all material respects; and all Taxes required to be paid by SDTS AssetCo, and all material Taxes required to be paid with respect to the Subject SDTS Operations and SDTS Assets, in each case whether or not shown as due on such Tax Returns, have been paid.

(c) All material Taxes required to be withheld or collected and paid in connection with amounts paid or owing to or from any employee, independent contractor or any other third party by SDTS AssetCo or in connection with the Subject SDTS Operations have been withheld or collected and duly paid to the proper Governmental Authority or properly set aside in accounts for such purpose.

(d) There are no pending or, to the Knowledge of SDTS, threatened audits, examinations, investigations or other proceedings in respect of (i) Taxes relating to SDTS AssetCo or (ii) Taxes in respect of the Subject SDTS Operations or SDTS Assets.

(e) All deficiencies asserted or assessments made by any Governmental Entity in respect of (i) Taxes relating to SDTS AssetCo and (ii) Taxes in respect of the Subject SDTS Operations or SDTS Assets, in each case, have been fully paid.

(f) There are no Liens for Taxes on any of the SDTS Assets, other than Permitted Encumbrances.

(g) No written agreement or other document extending or waiving, or having the effect of extending or waiving, the period of assessment or collection of any Taxes of SDTS AssetCo or Taxes relating to the Subject SDTS Operations or SDTS Assets is in effect.

(h) SDTS AssetCo (i) is not subject to any private letter ruling of the IRS or any comparable rulings of any Governmental Authority, except with respect to the Private Letter Ruling, (ii) has not executed or entered into a closing agreement pursuant to Section 7121 of the Code or any similar provision of applicable state or local tax Law, (iii) has not participated in a "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4(b), (iv) has not granted any Person any power of attorney that is currently in force with respect to any material Tax matter or (v) has no liability for the unpaid Taxes of any other Person as a transferee or successor.

(i) At all times since its formation, SDTS AssetCo has been properly classified as an entity that is disregarded as an entity separate from its owner for U.S. Federal income Tax purposes.

Section 4.13. *Compliance with Applicable Law; Permits; Filings*. In connection with the ownership of the SDTS Assets and the conduct of the Subject SDTS Operations, the SDTS Entities are not in violation of, or default under, any applicable Law or any Permit, except for any such violation or default that would not result in an SDTS Material Adverse Effect. All material Permits required for SDTS to own the SDTS Assets and conduct the Subject SDTS Operations have been obtained and are valid and in full force and effect.

Section 4.14. *Insurance*. Section 4.14 of the SDTS Disclosure Schedule sets forth a list of the policies of insurance in force covering the SDTS Assets or the Subject SDTS Operations. The insurance policies so listed are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid, and no written notice of cancellation or termination has been received by any SDTS Entity with respect to any such policy.

-25-

Section 4.15. *Employee Benefit Matters*. None of the SDTS Entities sponsors, maintains, contributes to or has any obligation to contribute to any Employee Benefit Plans. None of the SDTS Entities has any material liabilities or other material obligations under or in respect of any Employee Benefit Plan. None of the SDTS Entities nor any of their respective ERISA Affiliates contribute to or have any obligation to contribute to, or have at any time within six years prior to the Closing Date contributed to or had an obligation to contribute to (i) any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA or (ii) any pension plan subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code. The representations and warranties set forth in this Section 4.15 are the sole and exclusive representations and warranties of the SDTS Entities with respect to matters relating to employee benefits.

Section 4.16. *Labor Matters*. None of the SDTS Entities has, or has ever had, any employees or been subject to the terms of any collective bargaining agreement or other Contract with a labor union. The representations and warranties set forth in this Section 4.16 are the sole and exclusive representations and warranties of the SDTS Entities with respect to matters relating to labor and employment.

Section 4.17. *Sophisticated Industry Participant; Access to Information*. (a) SDTS is an informed and sophisticated entity engaged in the electric transmission and distribution business with sufficient knowledge and experience in investment and financial matters and in such business to be capable of evaluating the risks and merits of the disposition of the SDTS Package and the acquisition of the Oncor T Package. SDTS has been furnished with such documents, materials and other information relating to the Oncor T Package, and has been afforded the opportunity to obtain such additional information and to ask such questions, as it deemed necessary in connection with the acquisition of the Oncor T Package.

(b) SDTS acknowledges that the tax consequences of its disposition of the SDTS Package and acquisition of the Oncor T Package will depend on SDTS's particular circumstances, and none of Oncor or any of its Affiliates, direct or indirect owners, officers or agents, or any other Person, will be responsible or liable for the tax consequences to SDTS arising from its disposition of the SDTS Package or acquisition of the Oncor T Package (except to the extent that there occurs a breach by the Oncor Entities of the Oncor Tax Representations or their covenants contained in Article XI).

Section 4.18. *Brokers and Finders*. Neither SDTS Entity has engaged any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with this Agreement or any Ancillary Agreement or the Transactions for which any Oncor Entity could have any liability or responsibility whatsoever.

Section 4.19. *Energy Regulatory Matters*.

(a) SDTS is not a "holding company" under the Public Utility Holding Company Act of 2005 (including the regulations of the FERC thereunder). SDTS is subject to regulation under Texas Law as a "public utility," an "electric utility" and a "transmission and distribution utility" (as such terms are defined under PURA).

-26-

(b) Since January 1, 2015, the SDTS Entities have filed or caused to be filed with each of the PUCT and any other Governmental Entity exercising jurisdiction over any SDTS Entity all material forms, statements, reports, agreements, and documents (including all exhibits, amendments and supplements thereto) required by applicable Law or Order to be filed by such SDTS Entity in connection with the conduct or operation of the Subject SDTS Operations.

Section 4.20. *Code Compliance*. To the Knowledge of SDTS, (i) none of the SDTS Assets constructed since July 13, 2010 were in material violation of the standards of the then-applicable version of the National Electrical Safety Code (the "NESC") when constructed, and (ii) none of the SDTS Assets are in a condition or circumstance that would require action to bring such SDTS Assets into compliance with the NESC (after taking into account any "grandfathered" status applicable to the SDTS Assets exempting such assets from compliance with certain provisions of the NESC).

Section 4.21. *Intellectual Property*. The use and operation of the SDTS Assets as presently used in the Subject SDTS Operations does not infringe, misappropriate, or otherwise violate the Intellectual Property Rights of a third party, except for any infringement, misappropriation or violation that would not have an SDTS Material Adverse Effect.

**ARTICLE V**
**Representations and Warranties of SU and SU AssetCo**

Except as set forth in the disclosure schedules related to this Article V (collectively, the "SU Disclosure Schedule") delivered by SU and SU AssetCo to Oncor prior to or on the date hereof and the documents attached to or incorporated by reference therein, SU and SU AssetCo (collectively, the "SU Entities"), jointly and severally, represent and warrant to Oncor as follows:

Section 5.01. *Organization and Qualification*.

(a) Each SU Entity is a limited partnership or limited liability company, as applicable, that is duly organized, validly existing and in good standing under the Laws of the State of Texas.

(b) Each SU Entity has all requisite limited partnership or limited liability company power and authority, as applicable, to enable it to own, lease or otherwise hold the SU Assets and to conduct the Subject SU Operations. Each SU Entity is duly qualified or registered as a foreign limited partnership or limited liability company, as applicable, in each jurisdiction (other than the State of Texas) in which the character or location of the SU Assets or the nature of the Subject SU Operations makes such qualification or registration necessary, except where the failure to be so qualified or registered would not have an SU Material Adverse Effect.

Section 5.02. *Authority; Execution and Delivery; Enforceability.*

(a) Each SU Entity has all requisite limited partnership or limited liability company power and authority, as applicable, to execute, deliver and perform this Agreement and the applicable Ancillary Agreements and to consummate the Transactions. Each SU Entity has taken all requisite limited partnership or limited liability company action, as applicable, required by its organizational documents or the TBOC or other applicable Law to authorize the execution, delivery and performance of this Agreement and the applicable Ancillary Agreements and to authorize the consummation of the Transactions. Except for any action on the part of a partner or member, as applicable, of an SU Entity that has been taken prior to the date hereof and remains in full force and effect, no action is required to be taken by any partner or member, as applicable, of an SU Entity to authorize the execution, delivery and performance of this Agreement or the applicable Ancillary Agreements or to authorize the consummation of the Transactions.

(b) Each SU Entity has duly executed and delivered this Agreement and, at the Closing (subject to the satisfaction or waiver of the applicable conditions to the obligations of such SU Entity), will have duly executed and delivered each applicable Ancillary Agreement, and this Agreement constitutes, and each applicable Ancillary Agreement, from and after the Closing, will constitute, a legal, valid and binding obligation of such SU Entity, enforceable against it in accordance with its terms, subject to the Enforceability Exceptions.

Section 5.03. *No Conflicts or Violations; No Consents or Approvals Required.*

(a) The execution and delivery by each SU Entity of this Agreement and the applicable Ancillary Agreements does not and will not, and the consummation of the Transactions will not, result in any breach or violation of or constitute a default under (or, in the case of clause (ii) below, give any party to any Contract referred to in such clause, other than an SU Entity, the right to cancel or terminate or modify in any material respect the rights or obligations of the parties under) (i) the organizational documents of such SU Entity, (ii) any Contract to which such SU Entity is a party or is bound or (iii) any Order to which such SU Entity is subject or any Law applicable to such SU Entity, except for, in the case of clauses (ii) and (iii) above, any such breach, violation or default that would not reasonably be expected to have an SU Material Adverse Effect.

(b) Other than the filings, reports and notices and the consents, registrations, approvals, permits and authorizations required to be made or obtained (i) to or from the Secretary of State of the State of Texas or the Secretary of State of the State of Delaware in connection with the filing of the SU Merger Certificates, (ii) under the HSR Act, including the expiration or earlier termination of applicable waiting periods thereunder, or any other Competition Law, (iii) to or from the PUCT pursuant to authority asserted by the PUCT pursuant to PURA, or the PUCT's regulations thereunder, and the PUCT Approval, (iv) under the Exchange Act, or (v) to or from any Governmental Entity under applicable Environmental Laws, no filings, reports or notices are required to be made by an SU Entity with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by an SU Entity from, any Governmental Entity in connection with the execution, delivery and performance by such SU Entity of this Agreement or any of the applicable Ancillary Agreements or the consummation of the Transactions, except for any of the foregoing which, if not made or obtained, would not have an SU Material Adverse Effect.

-28-

Section 5.04. *Capitalization of SU AssetCo.*

(a) SU owns all of the outstanding limited liability company interests in SU AssetCo, which constitute all of the authorized or outstanding Equity Interests in such entity.

(b) There are no outstanding options, warrants, calls, rights, convertible securities or other agreements or commitments of any character pursuant to which SU or SU AssetCo is or will be obligated to issue or sell any issued or unissued Equity Interests in SU AssetCo, and there are no Equity Interests in SU AssetCo reserved for issuance for any purpose.

Section 5.05. *Subsidiaries.* SU does not have any Subsidiaries that hold any SU Assets or participate in the Subject SU Operations (other than SU AssetCo).

Section 5.06. *Absence of Changes or Events* . During the period from January 1, 2017 through the date hereof, except as set forth on Section 5.06 of the SU Disclosure Schedule, there has not been:

(a) an SU Material Adverse Effect;

(b) any amendment or modification of the organizational documents of any SU Entity;

(c) any damage, destruction, loss or casualty to any properties or assets included in the SU Assets, which (after taking into account any available insurance coverage or other sources of recovery) is material to the SU Package, taken as a whole;

(d) the creation of any Lien on any material properties or assets included in the SU Assets, other than a Permitted Encumbrance;

(e) the sale, transfer, lease or other disposition of any material properties or assets included in the SU Assets, except in the ordinary course of business;

(f) any material capital expenditures by SU with respect to the SU Assets or in connection with the Subject SU Operations other than those contemplated by the SDTS/SU CapEx Forecast; or

(g) any commitment or agreement to do any of the foregoing.

Section 5.07. *Material Contracts.*

(a) Except as set forth on Section 5.07 of the SU Disclosure Schedule, there are no Contracts included in the SU Assets that are material to the SU Package or the Subject SU Operations.

-29-

(b) Other than (i) Contracts related to ordinary course employment, employee or director compensation, or employee or director incentive arrangements and (ii) services agreements between SDTS and SU, there are no Contracts between any of the SU Entities, on the one hand, and (x) SDTS, (y) Hunt Utility Services, LLC or any of its Affiliates or (z) any employee, officer, director or other Affiliate of SDTS, SU or Hunt Utility Services, LLC, on the other hand, that are material to the Subject SU Operations.

Section 5.08. *Real Property.* SU does not own or lease any real property included in the SU Assets.

Section 5.09. *Ownership; Maintenance of Assets.*

(a) As of the date hereof, SU has, and at the Closing SU AssetCo will have, good and marketable title to, or, in the case of property held under a lease, Contract or other arrangement, a valid leasehold interest in or right to use, all of the personal property, assets and rights included in the SU Assets, whether tangible or intangible, in each case free and clear of all Liens, other than Permitted Encumbrances.

(b) Since July 13, 2010, the SU Assets have been maintained consistent with Good Utility Practice in all material respects.

Section 5.10. *Legal Proceedings.* Section 5.10 of the SU Disclosure Schedule sets forth a list of (x) each Legal Proceeding that is pending against any SU Entity as of the date hereof (as to which a complaint has been served on an SU Entity or of which an SU Entity has received written notice) which relates to the SU Assets or the Subject SU Operations or (y) to the Knowledge of SU, each material Legal Proceeding that has been threatened against any SU Entity since June 1, 2013 which relates to the SU Assets or the Subject SU Operations. As of the date hereof, there are no Legal Proceedings pending or, to the Knowledge of SU, threatened against any SU Entity since June 1, 2013 that (i) question the validity of this Agreement or any action taken or to be taken by an SU Entity in connection with this Agreement, any Ancillary Agreement or the Transactions or (ii) would reasonably be expected to adversely affect in any material respect the ability of an SU Entity to perform its obligations under this Agreement or any Ancillary Agreement or consummate the Transactions. No SU Entity is subject to any outstanding Order (other than Orders of general applicability to participants in the relevant industry or sector) that would reasonably be expected to have, individually or in the aggregate, an SU Material Adverse Effect.

Section 5.11. *Environmental Matters.*

(a) The Subject SU Operations have been conducted, since June 1, 2013, in compliance with all applicable Environmental Laws, except where the failure to so conduct the Subject SU Operations would not reasonably be expected to have an SU Material Adverse Effect.

(b) As of the date hereof, SU holds, and as of the Closing SU AssetCo will hold, all Environmental Permits necessary to conduct the Subject SU Operations as they are currently conducted, except where the failure to hold such Permits would not reasonably be expected to have an SU Material Adverse Effect.

(c) Except as do not affect the SU Assets or the Subject SU Operations in any material respect and for which Oncor would not be subject to any material liability from acquiring the SU Package as a result of the SU Merger, since June 1, 2013, no written notification, demand, request for information, citation, complaint, Legal Proceeding or Order has been issued to or filed against any SU Entity relating to any alleged material failure to comply with any Environmental Law or the suspension, revocation or non-renewal of any Environmental Permit, except for such notifications, demands, requests, citations, complaints, Legal Proceedings or Orders that have been fully and finally resolved without further material liability on the part of any SU Entity.

(d) Since June 1, 2013, no SU Entity has generated, treated, stored or disposed of (or arranged for the generation, treatment, storage, or disposal of), and no SU Entity has Released, Hazardous Materials in a manner that would reasonably be expected to result in material environmental liability on the part of Oncor following the Closing.

(e) To the Knowledge of SU, the SU Entities have made available, or caused to be made available, to Oncor copies of all environmental reports or assessments prepared since June 1, 2013 that are in the possession or control of any SU Entity with respect to compliance by any SU Entity with Environmental Laws, the environmental condition of any SU Assets, or any environmental liability of any SU Entity related to the SU Assets or the Subject SU Operations.

(f) Since July 13, 2010, the SU Entities have not assumed any material environmental liabilities of another Person that are included in the SU Liabilities.

(g) The representations and warranties set forth in this Section 5.11 are the sole and exclusive representations and warranties of the SU Entities with respect to matters relating to Environmental Laws or Hazardous Materials.

Section 5.12. *Tax Matters.*

(a) For the avoidance of doubt, the representations and warranties made in this Section 5.12 (the "<u>SU Tax Representations</u>") are the sole and exclusive representations and warranties made by the SU Entities with respect to matters related to Taxes.

(b) All Tax Returns required to have been filed by or with respect to SU AssetCo, if any, and all material Tax Returns required to have been filed with respect to the Subject SU Operations and the SU Assets, have been timely filed (taking into account any extension of time within which to file); all such Tax Returns are complete and accurate in all material respects; and all Taxes required to be paid by SU AssetCo, and all material Taxes required to be paid with respect to the Subject SU Operations and SU Assets, in each case whether or not shown as due on such Tax Returns, have been paid.

(c) All material Taxes required to be withheld or collected and paid in connection with amounts paid or owing to or from any employee, independent contractor or any other third party by SU AssetCo or in connection with the Subject SU Operations have been withheld or collected and duly paid to the proper Governmental Authority or properly set aside in accounts for such purpose.

(d) There are no pending or, to the Knowledge of SU, threatened audits, examinations, investigations or other proceedings in respect of (i) Taxes relating to SU AssetCo or (ii) Taxes in respect of the Subject SU Operations or SU Assets.

(e) All deficiencies asserted or assessments made by any Governmental Entity in respect of (i) Taxes relating to SU AssetCo and (ii) Taxes in respect of the Subject SU Operations or SU Assets, in each case, have been fully paid.

(f) There are no Liens for Taxes on any of the SU Assets, other than Permitted Encumbrances.

(g) No written agreement or other document extending or waiving, or having the effect of extending or waiving, the period of assessment or collection of any Taxes of SU AssetCo or Taxes relating to the Subject SU Operations or SU Assets is in effect.

(h) SU AssetCo (i) is not subject to any private letter ruling of the IRS or any comparable rulings of any Governmental Authority, (ii) has not executed or entered into a closing agreement pursuant to Section 7121 of the Code or any similar provision of applicable state or local tax Law, (iii) has not participated in a "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4(b), (iv) has not granted any Person any power of attorney that is currently in force with respect to any material Tax matter or (v) has no liability for the unpaid Taxes of any other Person as a transferee or successor.

(i) At all times since its formation, SU AssetCo has been properly classified as an entity that is disregarded as an entity separate from its owner for U.S. Federal income Tax purposes.

Section 5.13. *Compliance with Applicable Law; Permits; Filings.* In connection with the ownership of the SU Assets and the conduct of the Subject SU Operations, the SU Entities are not in violation of, or default under, any applicable Law or any Permit, except for any such violation or default that would not result in an SU Material Adverse Effect. All material Permits required for SU to own the SU Assets and conduct the Subject SU Operations have been obtained and are valid and in full force and effect.

Section 5.14. *Insurance.* Section 5.14 of the SU Disclosure Schedule sets forth a list of the policies of insurance in force covering the SU Assets or the Subject SU Operations. The insurance policies so listed are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid, and no written notice of cancellation or termination has been received by any SU Entity with respect to any such policy.

Section 5.15. *Employee Benefit Matters.*

(a) SU AssetCo does not sponsor, maintain, contribute to or have any obligation to contribute to any Employee Benefit Plans. SU AssetCo does not have any material liabilities or other material obligations under or in respect of any Employee Benefit Plan.

(b) Schedule 5.15(b) of the SU Disclosure Schedule includes a true and complete list of each material Employee Benefit Plan of SU or its Subsidiaries and in which any Offered Employee participates as of the Closing Date (collectively, the "SU Benefit Plans" and each referred to as a "SU Benefit Plan").

(c) Each SU Benefit Plan intended to be qualified under Section 401(a) of the Code is subject to a determination letter, opinion letter or advisory letter issued by the IRS that is currently in effect.

(d) Neither SU nor any of its ERISA Affiliates contribute to or have any obligation to contribute to, or have at any time within the previous six years contributed to or had an obligation to contribute to, any pension plan subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code.

(e) Neither SU nor any of its ERISA Affiliates contribute to or have any obligation to contribute to, or have at any time within the previous six years contributed to or had an obligation to contribute to, any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA.

(f) Neither SU nor any ERISA Affiliate thereof is subject to any liability under Sections 4069, 4204, 4062(e), 4063 or 4064 of ERISA.

(g) The representations and warranties set forth in this Section 5.15 are the sole and exclusive representations and warranties of the SU Entities with respect to matters relating to employee benefits.

Section 5.16. *Labor Matters*.

(a) Section 5.16(a) of the SU Disclosure Schedule sets forth the name of each Offered Employee, as of the date hereof, and, with respect to each such individual, his or her: (i) employing entity; (ii) job title and principal location of employment; (iii) base salary or hourly rate of pay; (iv) status as exempt or non-exempt under the FLSA; (v) leave status (including nature and expected duration of any leave); (vi) status as being employed in a positon subject to Federal Motor Carrier Safety Act or Department of Transportation requirements; (vii) relevant dates for any SU Benefit Plans or programs related to workplace safety; (viii) hire date; and (ix) adjusted hire date used by SU to calculate years of service in accordance with, and for purposes of, the SU Benefit Plans ("Years of Service").

(b) No Business Employee is represented by a labor union or other representative of employees and no SU Entity is a party to, subject to, or bound by, a collective bargaining agreement or any other Contract with a labor union or representative of employees. Since June 1, 2013, there have not been any, strikes, lockouts or work stoppages existing or, to the Knowledge of SU, threatened, with respect to any Business Employees or an SU Entity. To the Knowledge of SU, no union organizing campaign or similar effort is pending or threatened with respect to any Business Employee or an SU Entity.

-33-

(c) There is no legal, administrative or other claim, charge, labor dispute, grievance or arbitration proceeding relating to the employment of an Offered Employee with respect to which SU has been served or otherwise received notice and, to the Knowledge of SU, no such legal, administrative or other claim, charge, labor dispute, grievance or arbitration proceeding has been threatened against an SU Entity. Since June 1, 2013, each SU Entity has complied in all material respects with all Laws with respect to its employment of each Offered Employee (including the FLSA and all such Laws regarding wages and hours, classification of employees and contractors, anti-discrimination, anti-retaliation, recordkeeping, employee leave, Tax withholding and reporting, affirmative action, equal employment opportunity, immigration and safety).

(d) The representations and warranties set forth in this Section 5.16 are the sole and exclusive representations and warranties of the SU Entities with respect to matters relating to labor and employment.

Section 5.17. *Sophisticated Industry Participant; Access to Information.*

(a) SU is an informed and sophisticated entity engaged in the electric transmission and distribution business with sufficient knowledge and experience in investment and financial matters and in such business to be capable of evaluating the risks and merits of the disposition of the SU Package.

(b) SU acknowledges that the tax consequences of its disposition of the SU Package will depend on SU's particular circumstances, and none of Oncor or any of its Affiliates, direct or indirect owners, officers or agents, or any other Person, will be responsible or liable for the tax consequences to SU arising from its disposition of the SU Package (except to the extent that there occurs a breach by the Oncor Entities of the Oncor Tax Representations or their covenants contained in Article XI).

Section 5.18. *Brokers and Finders.*

(a) Neither SU Entity has engaged any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with this Agreement or any Ancillary Agreement or the Transactions for which any Oncor Entity could have any liability or responsibility whatsoever.

Section 5.19. *Energy Regulatory Matters.*

(a) SU is an "associate company" in a "holding company system" as those terms are defined in the Public Utility Holding Company Act of 2005 and FERC's regulations thereunder which has a currently effective waiver of the accounting, record-retention and reporting requirements thereunder pursuant to 18 C.F.R. § 366.3(c). SU is subject to regulation (i) under Texas Law as a "public utility," an "electric utility" and a "transmission and distribution utility" (as such terms are defined under PURA and under the ERCOT Protocols as a "Transmission and/or Distribution Service Provider" (as such term is defined in the ERCOT Protocols), and (ii) by FERC, NERC and the TRE as a "user, owner and operator of the bulk-power system" under Section 215 of the Federal Power Act.

-34-

(b) Since January 1, 2015, the SU Entities have filed or caused to be filed with each of the PUCT, ERCOT, FERC, NERC, TRE and any other Governmental Entity exercising jurisdiction over any SU Entity all material forms, statements, reports, agreements, and documents (including all exhibits, amendments and supplements thereto) required by applicable Law or Order to be filed by such SU Entity in connection with the conduct or operation of the Subject SU Operations.

Section 5.20. *Intellectual Property*. The use and operation of the SU Assets as presently used in the Subject SU Operations does not infringe, misappropriate, or otherwise violate the Intellectual Property Rights of a third party, except for any infringement, misappropriation or violation that would not have an SU Material Adverse Effect.

## ARTICLE VI
## Representations and Warranties of Oncor and Oncor AssetCo

Except as set forth in the disclosure schedules related to this Article VI (collectively, the "Oncor Disclosure Schedule") delivered by Oncor and Oncor AssetCo to SDTS and SU prior to or on the date hereof and the documents attached to or incorporated by reference therein, Oncor and Oncor AssetCo (collectively, the "Oncor Entities"), jointly and severally, represent and warrant to SDTS and SU as follows:

Section 6.01. *Organization and Qualification*. Oncor is a limited liability company that is duly organized, validly existing and in good standing under the Laws of the State of Delaware. Oncor AssetCo is a limited liability company that is duly organized, validly existing and in good standing under the Laws of the State of Texas. Each Oncor Entity has all requisite limited liability company power and authority to enable it to own, lease or otherwise hold the Oncor T Assets and to conduct the Subject Oncor Operations. Each Oncor Entity is duly qualified or registered as a foreign limited liability company in each jurisdiction (other than the jurisdiction under the Laws of which it was formed) in which the character or location of the Oncor T Assets or the nature of the Subject Oncor Operations makes such qualification or registration necessary, except where the failure to be so qualified or registered would not have an Oncor Material Adverse Effect.

Section 6.02. *Authority; Execution and Delivery; Enforceability*.

(a) Subject to obtaining the Bankruptcy Court Approval, each Oncor Entity has all requisite limited liability company power and authority to execute, deliver and perform this Agreement and each applicable Ancillary Agreement and to consummate the Transactions. Subject to obtaining the Bankruptcy Court Approval, each Oncor Entity has taken all requisite limited liability company action required by its organizational documents or the DLLCA or the TBOC (as applicable) or other applicable Law to authorize the execution, delivery and performance of this Agreement and the applicable Ancillary Agreements and to authorize the consummation of the Transactions. Except for any action on the part of (x) a member of an Oncor Entity or (y) EFIH, including authorization by EFH of action by EFIH (and in the case of action by both EFH and EFIH, subject to obtaining the Bankruptcy Court Approval), that has been taken prior to the date hereof and remains in full force and effect, no action is required to be taken by any member of an Oncor Entity, Oncor Holdings, EFIH, EFH or other respective owners to authorize the execution, delivery and performance of this Agreement or the applicable Ancillary Agreements or to authorize the consummation of the Transactions.

-35-

(b) Each Oncor Entity has duly executed and delivered this Agreement and, at the Closing (subject to the satisfaction or waiver of the applicable conditions to the obligations of such Oncor Entity) will have duly executed and delivered each applicable Ancillary Agreement, and this Agreement constitutes, and each applicable Ancillary Agreement, from and after the Closing, will constitute, a legal, valid and binding obligation of such Oncor Entity, enforceable against it in accordance with its terms, subject to the Enforceability Exceptions.

Section 6.03. *No Conflicts or Violations; No Consents or Approvals Required.* The execution and delivery by each Oncor Entity of this Agreement and the applicable Ancillary Agreements does not and will not, and the consummation of the Transactions will not, result in any breach or violation of or constitute a default under (or, in the case of clause (ii) below, give any party to any Contract referred to in such clause, other than an Oncor Entity, the right to cancel or terminate or modify in any material respect the rights or obligations of the parties under) (i) the organizational documents of such Oncor Entity, (ii) any Contract to which such Oncor Entity is a party or is bound or (iii) any Order to which such Oncor Entity is subject or any Law applicable to such Oncor Entity, in each case subject to obtaining the Bankruptcy Court Approval, and except for, in the case of clauses (ii) and (iii) above, any such breach, violation or default that would not reasonably be expected to have an Oncor Material Adverse Effect.]

(b) Other than the filings, reports and notices and the consents, registrations, approvals, permits and authorizations required to be made or obtained (i) to or from the Secretary of State of the State of Texas or the Secretary of State of the State of Delaware in connection with the filing of the SDTS Merger Certificates, the SU Merger Certificates or the Oncor Merger Certificate, (ii) under the HSR Act, including the expiration or earlier termination of applicable waiting periods thereunder, or any other Competition Law, (iii) to or from the PUCT pursuant to authority asserted by the PUCT pursuant to PURA, or the PUCT's regulations thereunder, and the PUCT Approval, (iv) under the Exchange Act or (v) to or from any Governmental Entity under applicable Environmental Laws, no filings, reports or notices are required to be made by an Oncor Entity with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by an Oncor Entity from, any Governmental Entity in connection with the execution, delivery and performance by such Oncor Entity of this Agreement or any of the applicable Ancillary Agreements or the consummation of the Transactions, in each case subject to obtaining the Bankruptcy Court Approval, and except for any of the foregoing which, if not made or obtained, would not have an Oncor Material Adverse Effect.

Section 6.04. *Capitalization of Oncor AssetCo.* Oncor owns all of the outstanding limited liability company interests in Oncor AssetCo, which constitute all of the authorized or outstanding Equity Interests in such entity. There are no outstanding options, warrants, calls, rights, convertible securities or other agreements or commitments of any character pursuant to which Oncor or Oncor AssetCo is or will be obligated to issue or sell any issued or unissued Equity Interests in Oncor AssetCo, and there are no Equity Interests in Oncor AssetCo reserved for issuance for any purpose.

Section 6.05. *Subsidiaries.* Oncor does not have any Subsidiaries that hold any Oncor T Assets or participate in the Subject Oncor Operations (other than Oncor AssetCo).

-36-

Section 6.06. *Absence of Changes or Events*. During the period from January 1, 2017 through the date hereof, except as set forth on Section 6.06 of the Oncor Disclosure Schedule, there has not been:

(a) an Oncor Material Adverse Effect;

(b) any amendment or modification of the organizational documents of any Oncor Entity;

(c) any damage, destruction, loss or casualty to any properties or assets included in the Oncor T Assets, which (after taking into account any available insurance coverage or other sources of recovery) is material to the Oncor T Package, taken as a whole;

(d) the creation of any Lien on any material properties or assets included in the Oncor T Assets, other than a Permitted Encumbrance;

(e) the sale, transfer, lease or other disposition of any material properties or assets included in the Oncor T Assets, except in the ordinary course of business; or

(f) any commitment or agreement to do any of the foregoing.

Section 6.07. *Material Contracts*. Other than the Oncor Real Property Agreements (which are addressed in Section 6.08) and as set forth on Section 6.07 of the Oncor Disclosure Schedule, there are no Contracts included in the Oncor T Assets that are material to the Oncor T Package or the Subject Oncor Operations.

Section 6.08. *Real Property*.

(a) Section 6.08(a) of the Oncor Disclosure Schedule sets forth a list as of the date hereof of (i) all real property included in the Oncor T Assets ("Oncor Owned Property"), (ii) all real property currently leased or subleased to an Oncor Entity included in the Oncor T Assets ("Oncor Leasehold Property" and, together with the Oncor Owned Property, the "Oncor Property"), including the lease and any amendments thereto (each, an "Oncor Lease") under which such Oncor Leasehold Property is held and (iii) all easements, license agreements (including railroad, pipeline and similar crossing rights), rights of way and lease for rights of way, or other rights in or to the use of real property (collectively, "Oncor Easements" and, together with the Oncor Leases, the "Oncor Real Property Agreements") included in the Oncor T Assets.

(b) As of the date hereof, Oncor has, and at the Closing Oncor AssetCo will have, good and indefeasible fee title to all Oncor Owned Property, free and clear of all Liens other than Permitted Encumbrances. No Oncor Entity has granted to any third party the right to use or access the Oncor Owned Property in any manner that interferes in any material respect with the Oncor Owned Property or the Subject Oncor Operations or otherwise granted to any third party any ownership in any material Oncor Owned Property.

-37-

(c) As of the date hereof, Oncor has, and at the Closing Oncor AssetCo will have, valid and enforceable leasehold interests with respect to the Oncor Leasehold Property, free and clear of all Liens other than Permitted Encumbrances, except that the validity and enforceability of the Oncor Leases under which such Oncor Leasehold Property is held are subject to the Enforceability Exceptions.

(d) No consent from any counterparty to any Oncor Real Property Agreement is required in connection with the consummation of the Oncor Merger. To the Knowledge of Oncor, no Oncor Entity is in breach in any material respect or in material default under any Oncor Real Property Agreement to which it is a party. To the Knowledge of Oncor, no counterparty to any of the Oncor Real Property Agreements is in material default of any of its obligations under the applicable Oncor Real Property Agreement.

(e) To the Knowledge of Oncor, there are no developments affecting the Oncor Owned Property or any of the Oncor Real Property Agreements which are pending or threatened, which might materially detract from the value, materially interfere with any present or intended use or materially and adversely affect the fee title of the Oncor Owned Property or any of the Oncor Real Property Agreements.

(f) Oncor has not received written notice from any Person within three years prior to the date of this Agreement asserting that Oncor does not have the right, as a result of title defects or title failures, to use or occupy any portion of the Oncor Property, other than those notices that would not individually, or in the aggregate, reasonably be expected to have an Oncor Material Adverse Effect.

Section 6.09. *Ownership; Maintenance of Assets.*

(a) As of the date hereof, Oncor has, and at the Closing Oncor AssetCo will have, good and marketable title to, or, in the case of property held under a lease, Contract or other arrangement, a valid leasehold interest in or right to use, all of the personal property, assets and rights included in the Oncor T Assets (excluding any Oncor Property, which is addressed exclusively in Section 6.08), whether tangible or intangible, in each case free and clear of all Liens, other than Permitted Encumbrances.

(b) Since July 13, 2010, the Oncor T Assets have been maintained consistent with Good Utility Practice in all material respects.

Section 6.10. *Legal Proceedings.* Section 6.10 of the Oncor Disclosure Schedule sets forth a list of (x) each Legal Proceeding that is pending against any Oncor Entity as of the date hereof (as to which a complaint has been served on an Oncor Entity or of which an Oncor Entity has received written notice) which relates to the Oncor T Assets or the Subject Oncor Operations or (y) to the Knowledge of Oncor, each material Legal Proceeding that has been threatened against any Oncor Entity since June 1, 2013, which relates to the Oncor T Assets or the Subject Oncor Operations. As of the date hereof, there are no Legal Proceedings pending or, to the Knowledge of Oncor, threatened against any Oncor Entity since June 1, 2013 that (i) question the validity of this Agreement or any action taken or to be taken by an Oncor Entity in connection with this Agreement, any Ancillary Agreement or the Transactions or (ii) would reasonably be expected to adversely affect in any material respect the ability of an Oncor Entity to perform its obligations under this Agreement or any Ancillary Agreement or consummate the Transactions. No Oncor Entity is subject to any outstanding Order (other than Orders of general applicability to participants in the relevant industry or sector) that would reasonably be expected to have, individually or in the aggregate, an Oncor Material Adverse Effect.

-38-

Section 6.11. *Environmental Matters*.

(a) The Subject Oncor Operations have been conducted, since June 1, 2013, in compliance with all applicable Environmental Laws, except where the failure to so conduct the Subject Oncor Operations would not reasonably be expected to have an Oncor Material Adverse Effect.

(b) As of the date hereof, Oncor holds, and as of the Closing Oncor AssetCo will hold, all Environmental Permits necessary to conduct the Subject Oncor Operations as they are currently conducted, except where the failure to hold such Permits would not reasonably be expected to have an Oncor Material Adverse Effect.

(c) Except as do not affect the Oncor T Assets or the Subject Oncor Operations in any material respect and for which SDTS would not be subject to any material liability from acquiring the Oncor T Package as a result of the SDTS Merger, since June 1, 2013, no written notification, demand, request for information, citation, complaint, Legal Proceeding or Order has been issued to or filed against any Oncor Entity relating to any alleged material failure to comply with any Environmental Law or the suspension, revocation or non-renewal of any Environmental Permit, except for such notifications, demands, requests, citations, complaints, Legal Proceedings or Orders that have been fully and finally resolved without further material liability on the part of any Oncor Entity.

(d) Since June 1, 2013, no Oncor Entity has generated, treated, stored or disposed of (or arranged for the generation, treatment, storage, or disposal of), and no Oncor Entity has Released, Hazardous Materials in a manner that would reasonably be expected to result in material environmental liability on the part of SDTS following the Closing.

(e) To the Knowledge of Oncor, the Oncor Entities have made available, or caused to be made available, to SDTS copies of all environmental reports or assessments prepared since June 1, 2013 that are in the possession or control of any Oncor Entity with respect to compliance by any Oncor Entity with Environmental Laws, the environmental condition of any Oncor T Assets, or any environmental liability of any Oncor Entity related to the Oncor T Assets or the Subject Oncor Operations (including all Phase I and Phase II Environmental Site Assessment reports, investigations and studies).

(f) Since July 13, 2010, the Oncor Entities have not assumed any material environmental liabilities of another Person that are included in the Oncor T Liabilities.

(g) Except as do not affect the Oncor T Assets or the Subject Oncor Operations in any material respect and for which SDTS would not be subject to any material liability from acquiring the Oncor T Package as a result of the Oncor Merger, to the Knowledge of Oncor, there currently are not and never have been any power generation facilities (other than back-up generation equipment) on any of the Oncor Property.

-39-

(h) The representations and warranties set forth in this Section 6.11 are the sole and exclusive representations and warranties of the Oncor Entities with respect to matters relating to Environmental Laws or Hazardous Materials.

Section 6.12. *Tax Matters*. For the avoidance of doubt, the representations and warranties made in this Section 6.12 (the "Oncor Tax Representations") are the sole and exclusive representations and warranties made by the Oncor Entities with respect to matters related to Taxes.

(a) All Tax Returns required to have been filed by or with respect to Oncor AssetCo, if any, and all material Tax Returns required to have been filed with respect to the Subject Oncor Operations and the Oncor T Assets, have been timely filed (taking into account any extension of time within which to file); all such Tax Returns are complete and accurate in all material respects; and all Taxes required to be paid by Oncor AssetCo, and all material Taxes required to be paid with respect to the Subject Oncor Operations and Oncor T Assets, in each case whether or not shown as due on such Tax Returns, have been paid.

(b) All material Taxes required to be withheld or collected and paid in connection with amounts paid or owing to or from any employee, independent contractor or any other third party by Oncor AssetCo or in connection with the Subject Oncor Operations have been withheld or collected and duly paid to the proper Governmental Authority or properly set aside in accounts for such purpose.

(c) There are no pending or, to the Knowledge of Oncor, threatened audits, examinations, investigations or other proceedings in respect of (i) Taxes relating to Oncor AssetCo or (ii) Taxes in respect of the Subject Oncor Operations or Oncor T Assets.

(d) All deficiencies asserted or assessments made by any Governmental Entity in respect of (i) Taxes relating to Oncor AssetCo and (ii) Taxes in respect of the Subject Oncor Operations and Oncor T Assets, in each case, have been fully paid.

(e) There are no Liens for Taxes on any of the Oncor T Assets, other than Permitted Encumbrances.

(f) No written agreement or other document extending or waiving, or having the effect of extending or waiving, the period of assessment or collection of any Taxes of Oncor AssetCo or Taxes relating to the Subject Oncor Operations or Oncor T Assets is in effect.

(g) Oncor AssetCo (i) is not subject to any private letter ruling of the IRS or any comparable rulings of any Governmental Authority, except with respect to the Private Letter Ruling, (ii) has not executed or entered into a closing agreement pursuant to Section 7121 of the Code or any similar provision of applicable state or local tax Law, (iii) has not participated in a "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4(b), (iv) has not granted any Person any power of attorney that is currently in force with respect to any material Tax matter or (v) has no liability for the unpaid Taxes of any other Person as a transferee or successor.

-40-

(h) At all times since its formation, Oncor AssetCo has been properly classified as an entity that is disregarded as an entity separate from its owner for U.S. Federal income Tax purposes.

Section 6.13. *Compliance with Applicable Law; Permits; Filings.* In connection with the ownership of the Oncor T Assets and the conduct of the Subject Oncor Operations, the Oncor Entities are not in violation of, or default under, any applicable Law or any Permit, except for any such violation or default that would not result in an Oncor Material Adverse Effect. All material Permits required for Oncor to own the Oncor T Assets and conduct the Subject Oncor Operations have been obtained and are valid and in full force and effect.

Section 6.14. *Insurance.* Section 6.14 of the Oncor Disclosure Schedule sets forth a list of the policies of insurance in force covering the Oncor T Assets and the Subject Oncor Operations. The insurance policies so listed are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid, and no written notice of cancellation or termination has been received by any Oncor Entity with respect to any such policy.

Section 6.15. *Sophisticated Industry Participant; Access to Information.*

(a) Oncor is an informed and sophisticated entity engaged in the electric transmission and distribution business with sufficient knowledge and experience in investment and financial matters and in such business to be capable of evaluating the risks and merits of the disposition of the Oncor T Package and the acquisition of the SDTS Package and SU Package. Oncor has been furnished with such documents, materials and other information relating to the SDTS Package and SU Package, and has been afforded the opportunity to obtain such additional information and to ask such questions, as it deemed necessary in connection with the acquisition of the SDTS Package and SU Package.

(b) Oncor acknowledges that the tax consequences of its disposition of the Oncor T Package and the acquisition of the SDTS Package and SU Package will depend on Oncor's particular circumstances, and none of SDTS, SU or any of their respective Affiliates, direct or indirect owners, officers or agents, or any other Person, will be responsible or liable for the tax consequences to Oncor arising from its disposition of the Oncor T Package or acquisition of the SDTS Package or SU Package (except to the extent that there occurs a breach by the SDTS Entities or SU Entities of the SDTS Tax Representations or the SU Tax Representations, respectively, or their respective covenants contained in Article XI).

Section 6.16. *Brokers and Finders.* Neither Oncor Entity has engaged any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with this Agreement or any Ancillary Agreement or the Transactions for which any SDTS Entity or SU Entity could have any liability or responsibility whatsoever.

-41-

Section 6.17. *Energy Regulatory Matters.*

(a) Oncor is not a "holding company" under the Public Utility Holding Company Act of 2005 (including the regulations of the FERC thereunder). Oncor is subject to regulation (i) under Texas Law as a "public utility," an "electric utility" and a "transmission and distribution utility" (as such terms are defined under PURA and under the ERCOT Protocols as a "Transmission and/or Distribution Service Provider" (as such term is defined in the ERCOT Protocols), and (ii) by FERC, NERC and the TRE as a "user, owner and operator of the bulk-power system" under Section 215 of the Federal Power Act.

(b) Since January 1, 2015, the Oncor Entities have filed or caused to be filed with each of the PUCT, ERCOT, FERC, NERC, TRE and any other Governmental Entity exercising jurisdiction over any Oncor Entity all material forms, statements, reports, agreements, and documents (including all exhibits, amendments and supplements thereto) required by applicable Law or Order to be filed by such Oncor Entity in connection with the conduct or operation of the Subject Oncor Operations.

Section 6.18. *Code Compliance.* To the Knowledge of Oncor, (i) none of the Oncor T Assets constructed since July 13, 2010 were in material violation of the standards of the then-applicable version of the NESC when constructed, and (ii) none of the Oncor T Assets are in a condition or circumstance that would require action to bring such Oncor T Assets into compliance with the NESC (after taking into account any "grandfathered" status applicable to the Oncor T Assets exempting such assets from compliance with certain provisions of the NESC).

Section 6.19. *Intellectual Property.* The use and operation of the Oncor T Assets as presently used in the Subject Oncor Operations does not infringe, misappropriate, or otherwise violate the Intellectual Property Rights of a third party, except for any infringement, misappropriation or violation that would not have an Oncor Material Adverse Effect.

## ARTICLE VII
## Pre-Closing Covenants

Section 7.01. *SDTS Conduct of Business.*

(a) Except for matters (i) set forth in Section 7.01 of the SDTS Disclosure Schedule, (ii) approved or consented to by Oncor, (iii) required to comply with applicable Law, (iv) contemplated by the SDTS Pre-Closing Merger Agreement or this Agreement or (v) contemplated by or required to implement the SDTS/SU Capex Forecast, during the period (the "Pre-Closing Period") commencing on the date of this Agreement and ending on the earlier of the Closing Date and the termination of this Agreement in accordance with Article IX, each SDTS Entity shall conduct the Subject SDTS Operations in all material respects in the ordinary course of business and use commercially reasonable efforts to maintain and preserve its relationships with third parties that are material to such operations.

(b) In addition, except for matters (v) set forth in Section 7.01 of the SDTS Disclosure Schedule, (w) approved or consented to by Oncor, (x) required to comply with applicable Law, (y) contemplated by the SDTS Pre-Closing Merger Agreement or this Agreement or (z) contemplated by or required to implement the SDTS/SU Capex Forecast, during the Pre-Closing Period, neither SDTS Entity shall take any action to:

-42-

(i) amend or modify the organizational documents of SDTS AssetCo following its formation pursuant to Section 1.01;

(ii) issue any Equity Interests in (following its formation pursuant to Section 1.01), or incur any indebtedness of, SDTS AssetCo;

(iii) adopt a plan or agreement of liquidation, dissolution or other reorganization of SDTS AssetCo;

(iv) consummate any merger or consolidation of SDTS AssetCo with any other Person (other than the SDTS Pre-Closing Merger);

(v) sell, convey, assign, transfer or pledge any material properties or assets included in the SDTS Assets, other than in the ordinary course of business;

(vi) create or impose any Liens on any material properties or assets included in the SDTS Assets, other than Permitted Encumbrances;

(vii) enter into or assume any Contract that would be included in the SDTS Assets or amend, modify, supplement, terminate or waive any rights under any Contract that would be included in the SDTS Assets, other than in the ordinary course of business;

(viii) make any capital expenditure with respect to the SDTS Assets or the Subject SDTS Operations that is not contemplated by the SDTS/SU CapEx Forecast, except to the extent that any such capital expenditure inconsistent with the SDTS/SU CapEx Forecast is (A) reasonably necessary or advisable in response to natural disasters, acts of God, fires, terrorist attacks or changes in regulatory requirements, (B) to satisfy regulatory obligations to serve customers or maintain the safety or reliability of the SDTS Assets or (C) required to maintain compliance with Good Utility Practice; *provided*, that SDTS shall provide Oncor with prior notice if reasonably practicable (or to the extent prior notice is not reasonably practicable, prompt subsequent notice) of any such capital expenditures inconsistent with the SDTS/SU CapEx Forecast;

(ix) settle or compromise any material Tax claim or liability for Taxes, surrender any right to claim a refund of Taxes, change any Tax election or Tax method of accounting or make any new Tax election that is inconsistent with past practices or adopt any new Tax method of accounting, waive or extend any statute of limitations in respect of Taxes or file any amended Tax Return, in each case relating to the Subject SDTS Operations or SDTS Assets;

(x) enter into, amend, modify, supplement, terminate or waive any rights under any SDTS Real Property Agreement, other than in the ordinary course of business or associated with any capital expenditures permitted pursuant to clause (viii) above or in connection with Allocation Agreements;

-43-

(xi) fail to pay or satisfy when due any liability that would be an SDTS Liability if not paid or discharged prior to the SDTS Merger Effective Time, other than in the ordinary course of business;

(xii) settle or compromise any Legal Proceeding which relates to the SDTS Assets or the Subject SDTS Operations, other than as would not result in any liability to be borne by Oncor after the SDTS Merger Effective Time;

(xiii) amend in any material respect, breach in any material respect, terminate or allow to lapse or become subject to default in any material respect any Permit relating to the SDTS Assets or the Subject SDTS Operations, other than as required by applicable Law;

(xiv) make any change to the SDTS Accounting Principles, other than such principles that would not impact the calculation of the Net Book Value of the SDTS Package or the SDTS Working Capital Package hereunder, except as required by GAAP or applicable Law;

(xv) fail to maintain any insurance policy set forth on Section 4.14 of the SDTS Disclosure Schedule or policies comparable thereto with respect to the SDTS Assets;

(xvi) cause SDTS AssetCo to engage in any operations or activities or enter into any Contract, other than as contemplated by this Agreement or an Ancillary Agreement; or

(xvii) commit or agree to do any of the foregoing.

(c) Any approval or consent granted by Oncor as contemplated by paragraphs (a) or (b) above shall also extend and apply to any actions on the part of any SU Entity necessary or appropriate in order to permit or facilitate the action on the part of any SDTS Entity contemplated by such approval or consent.

Section 7.02. *SU Conduct of Business.*

(a) Except for matters (i) set forth in Section 7.02 of the SU Disclosure Schedule, (ii) approved or consented to by Oncor, (iii) required to comply with applicable Law, (iv) contemplated by the SU Pre-Closing Merger Agreement or this Agreement or (v) contemplated by or required to implement the SDTS/SU Capex Forecast, during the Pre-Closing Period, each SU Entity shall conduct the Subject SU Operations in all material respects in the ordinary course of business and use commercially reasonable efforts to maintain and preserve its relationships with third parties that are material to such operations.

(b) In addition, except for matters (v) set forth in Section 7.02 of the SU Disclosure Schedule, (w) approved or consented to by Oncor, (x) required to comply with applicable Law, (y) contemplated by the SU Pre-Closing Merger Agreement or this Agreement or (z) contemplated by or required to implement the SDTS/SU Capex Forecast, during the Pre-Closing Period, neither SU Entity shall take any action to:

-44-

(i) amend or modify the organizational documents of SU AssetCo;

(ii) issue any Equity Interests in, or incur any indebtedness of, SU AssetCo;

(iii) adopt a plan or agreement of liquidation, dissolution or other reorganization of SU AssetCo;

(iv) consummate any merger or consolidation of SU AssetCo with any other Person (other than the SU Pre-Closing Merger);

(v) sell, convey, assign, transfer or pledge any material properties or assets included in the SU Assets, other than in the ordinary course of business;

(vi) create or impose any Liens on any material properties or assets included in the SU Assets, other than Permitted Encumbrances;

(vii) enter into or assume any Contract which would be included in the SU Assets or amend, modify, supplement, terminate or waive any rights under any Contract that would be included in the SU Assets, other than in the ordinary course of business;

(viii) make any capital expenditure with respect to the SU Assets or the Subject SU Operations that is not contemplated by the SDTS/SU CapEx Forecast except to the extent that any such capital expenditure inconsistent with the SDTS/SU CapEx Forecast is (A) reasonably necessary or advisable in response to natural disasters, acts of God, fires, terrorist attacks or changes in regulatory requirements, (B) to satisfy regulatory obligations to serve customers or maintain the safety or reliability of the SDTS Assets or (C) required to maintain compliance with Good Utility Practice; *provided*, that SU shall provide Oncor with prior notice if reasonably practicable (or to the extent prior notice is not reasonably practicable, prompt subsequent notice) of any such capital expenditures inconsistent with the SDTS/SU CapEx Forecast;

(ix) settle or compromise any material Tax claim or liability for Taxes, surrender any right to claim a refund of Taxes, change any Tax election or Tax method of accounting or make any new Tax election that is inconsistent with past practices or adopt any new Tax method of accounting, waive or extend any statute of limitations in respect of Taxes or file any amended Tax Return, in each case relating to the Subject SU Operations or SU Assets;

(x) fail to pay or satisfy when due any liability that would be an SU Liability if not paid or discharged prior to the SU Merger Effective Time, other than in the ordinary course of business;

(xi) settle or compromise any Legal Proceeding which relates to the SU Assets or the Subject SU Operations, other than as would not result in any liability to be borne by Oncor after the SU Merger Effective Time;

-45-

(xii) terminate without "cause" any Transferred Employee;

(xiii) amend in any material respect, breach in any material respect, terminate or allow to lapse or become subject to default in any material respect any Permit relating to the SU Assets or the Subject SU Operations, other than as required by applicable Law;

(xiv) make any change to the SU Accounting Principles, other than such principles that would not impact the calculation of the Net Book Value of the SU Package or the SU Working Capital Package or the Regulatory Payment Amount hereunder, except as required by GAAP or applicable Law;

(xv) fail to maintain any insurance policy set forth on Section 5.14 of the SU Disclosure Schedule or policies comparable thereto with respect to the SU Assets;

(xvi) cause SU AssetCo to engage in any operations or activities or enter into any Contract, other than as contemplated by this Agreement or an Ancillary Agreement; or

(xvii) commit or agree to do any of the foregoing.

(c) Any approval or consent granted by Oncor as contemplated by paragraphs (a) or (b) above shall also extend and apply to any actions on the part of any SDTS Entity necessary or appropriate in order to permit or facilitate the action on the part of any SU Entity contemplated by such approval or consent.

Section 7.03. *Oncor Conduct of Business.*

(a) Except for matters (i) set forth in Section 7.03 of the Oncor Disclosure Schedule, (ii) approved or consented to by SDTS and SU, (iii) required to comply with applicable Law or (iv) contemplated by the Oncor Pre-Closing Contribution Agreement or this Agreement, during the Pre-Closing Period, each Oncor Entity shall conduct the Subject Oncor Operations in all material respects in the ordinary course of business and use commercially reasonable efforts to maintain and preserve its relationships with third parties that are material to such operations.

(b) In addition, except for matters (w) set forth in Section 7.03 of the Oncor Disclosure Schedule, (x) approved or consented to by SDTS and SU, (y) required to comply with applicable Law or (z) contemplated by the Oncor Pre-Closing Contribution Agreement or this Agreement, during the Pre-Closing Period, neither Oncor Entity shall take any action to:

(i) amend or modify the organizational documents of Oncor AssetCo;

(ii) issue any Equity Interests in, or incur any indebtedness of, Oncor AssetCo;

(iii) adopt a plan or agreement of liquidation, dissolution or other reorganization of Oncor AssetCo;

-46-

(iv) consummate any merger or consolidation of Oncor AssetCo with any other Person;

(v) sell, convey, assign, transfer or pledge any material properties or assets included in the Oncor T Assets, other than in the ordinary course of business or as contemplated by the Oncor Pre-Closing Contribution Agreement;

(vi) create or impose any Liens on any material properties or assets included in the Oncor T Assets, other than Permitted Encumbrances;

(vii) enter into or assume any Contract which would be included in the Oncor T Assets or amend, modify, supplement, terminate or waive any rights under any Contract that would be included in the Oncor T Assets, other than in the ordinary course of business;

(viii) settle or compromise any material Tax claim or liability for Taxes, surrender any right to claim a refund of Taxes, change any Tax election or Tax method of accounting or make any new Tax election that is inconsistent with past practices or adopt any new Tax method of accounting, waive or extend any statute of limitations in respect of Taxes or file any amended Tax Return, in each case relating to the Subject Oncor Operations or Oncor T Assets;

(ix) enter into, amend, modify, supplement, terminate or waive any rights under any Oncor Real Property Agreement, other than in the ordinary course of business or in connection with the Easement Assignments;

(x) fail to pay or satisfy when due any liability that would be an Oncor T Liability if not paid or discharged prior to the SDTS Merger Effective Time, other than in the ordinary course of business;

(xi) settle or compromise any Legal Proceeding which relates to the Oncor T Assets or the Subject Oncor Operations, other than as would not result in any liability to be borne by SDTS after the SDTS Merger Effective Time;

(xii) amend in any material respect, breach in any material respect, terminate or allow to lapse or become subject to default in any material respect any Permit relating to the Oncor T Assets or the Subject Oncor Operations, other than as required by applicable Law;

(xiii) make any change to the Oncor Accounting Principles, other than such principles that would not impact the calculation of the Net Book Value of the Oncor T Package or the Oncor Working Capital Package hereunder, except as required by GAAP or applicable Law;

(xiv) fail to maintain any insurance policy set forth on Section 6.14 of the Oncor Disclosure Schedule or policies comparable thereto with respect to the Oncor T Assets;

-47-

(xv) cause Oncor AssetCo to engage in any operations or activities or enter into any Contract, other than as contemplated by this Agreement or an Ancillary Agreement; or

(xvi) commit or agree to do any of the foregoing.

(c) Oncor agrees to provide prompt notice to SDTS if, to the Knowledge of Oncor, the Oncor T Package Amount is expected to materially exceed, at the Closing, the Oncor T Package Amount Target.

Section 7.04. *Access to Information.* During the Pre-Closing Period, (a) the SDTS Entities shall afford the Oncor Entities and their representatives, (b) the SU Entities shall afford the Oncor Entities and their representatives and (c) the Oncor Entities shall afford the SDTS Entities and their representatives reasonable access, upon reasonable prior notice and during normal business hours, to (i) the SDTS Assets, SU Assets or the Oncor T Assets, as applicable, (ii) the senior management personnel engaged in the Subject SDTS Operations, Subject SU Operations or the Subject Oncor Operations, as applicable (in accordance with such reasonable procedures as shall be determined by the party providing such access) and (iii) properties, books, Contracts, commitments and records relating to the Subject SDTS Operations, Subject SU Operations or the Subject Oncor Operations, as applicable; *provided, however,* that in each case such access shall not unreasonably disrupt the normal operations of the party providing such access and shall not include any sampling, testing or other intrusive environmental investigation (unless such the party who owns the relevant property and is providing such access shall consent in writing to such sampling, testing or investigation). Nothing contained in this Section 7.04 shall obligate any parties or their respective Affiliates or representatives to breach any duty of confidentiality owed to any Person, whether such duty arises contractually, statutorily or otherwise. In addition, notwithstanding anything to the contrary contained in this Section 7.04, no party or any of its Affiliates shall be obligated to provide to any other party (x) any work papers or similar materials prepared by the independent public accountants of such party or its Affiliates, except to the extent that such accountants agree to provide access to such work papers or similar materials upon such terms and conditions as shall be determined by such accountants in their sole discretion, or (y) any documents or information that are protected by the attorney-client privilege or work product doctrines if the applicable party determines in its reasonable discretion that providing copies or access to such documents or information could give rise to a possible waiver of such privilege or doctrine.

Section 7.05. *Confidentiality.* Each party acknowledges that the documents and information that have been or will be provided to it pursuant to Section 7.04 or otherwise in connection with the preparation, structuring or negotiation of this Agreement or the Ancillary Agreements or planning for, implementation or consummation of the Transactions are subject to the terms of the Confidentiality Agreement, dated April 27, 2017 (the "Confidentiality Agreement"), between InfraREIT, Inc. and Oncor. Effective upon the Closing, the Confidentiality Agreement shall terminate with respect to documents and information relating solely to (i) in the case of documents and information provided to the Oncor Entities, the SDTS Assets, Subject SDTS Operations, SU Assets and Subject SU Operations and (ii) in the case of documents and information provided to the SDTS Entities or SU Entities, the Oncor T Assets and the Subject Oncor Operations; *provided, however,* that each party

acknowledges that any and all other documents and information provided to it by the other party or its Affiliates or representatives that are covered by the Confidentiality Agreement shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing until the expiration or termination thereof in accordance with its terms.

Section 7.06. *Efforts; Consents and Approvals; Regulatory Filings.*

(a) *General.* At all times during the Pre-Closing Period, upon the terms and subject to the conditions set forth in this Agreement, each of the parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable (subject to any applicable Laws) to consummate the Transactions as promptly as practicable, including the preparation and filing of all forms, registrations and notices required to be filed to consummate the Transactions by the Initial Outside Date or, if extended, the Outside Date, and the taking of such actions as are necessary to make or obtain any requisite filings, consents, Orders, Permits, qualifications, registrations, exemptions or waivers from any third party or Governmental Entity. In addition, no party shall take any action during the Pre-Closing Period (other than any action required to be taken under this Agreement) that could reasonably be expected to materially delay the making or obtaining of, or result in not making or obtaining, any filing, consent, Order, Permit, qualification, registration, exemption or waiver from any Governmental Entity or other Person required to be obtained prior to the Closing.

(b) *Consultation; Communication.* Unless prohibited by applicable Law and subject to any limitations on access to documents and information provided for in Section 7.04, each party shall consult with the other parties with respect to, and provide any information reasonably requested by the other parties in connection with, all filings made or to be made with any Governmental Entity in connection with this Agreement and the Transactions (other than routine filings under the Exchange Act). If any party or any of its Affiliates receives a request for information (including additional information or documentary material) from any Governmental Entity with respect to this Agreement or any of the Transactions, then such party shall take commercially reasonable efforts to make, or cause to be made, as soon as reasonably practicable and, unless prohibited by applicable Law, after consultation with the other parties, an appropriate response in compliance with such request. Without limiting the generality of the foregoing, unless prohibited by applicable Law and subject to any limitations on access to documents and information contained in Section 7.04, each party shall provide to the other parties (or their respective representatives) upon request copies of all correspondence between such party and any Governmental Entity relating to the Transactions; *provided, however*, that no party shall be required to provide to the other parties (i) a complete copy of the filing made by such party or its "ultimate parent entity" under the HSR Act (but only such portions of such filing as are customarily exchanged by parties for the purposes of preparing similar filings) or (ii) copies of correspondence or other documents exchanged with the staff of the PUCT or other parties in connection with any contested proceedings before the PUCT other than proceedings with respect to the STM Application. A party may, as it deems advisable and necessary for the purpose of complying with applicable Law, designate any competitively sensitive materials provided to the other under this Section 7.06(b) as "outside counsel only." Such materials and the information contained therein shall be given only to outside counsel of the recipient and each Party shall direct and cause its outside counsel not to disclose such information to

-49-

employees, officers, or directors of the recipient without the advance written consent of the party providing such materials. Each party hereto agrees not to schedule, to the extent reasonably practicable, any substantive meetings or substantive communications with the PUCT regarding the Transactions without giving the other parties hereto or their respective Representatives a reasonable opportunity to participate in such meeting or communication to the extent permitted by the PUCT, and in any event the parties shall keep each other reasonably apprised of all material substantive communications with the PUCT regarding the Transactions; *provided, however*, that nothing in this Section 7.06(b) shall prevent, limit or restrict any party or its Affiliates from (i) interacting, communicating or making filings or applications with, or resolving any investigation or other inquiry of, any PUCT staff or other parties in connection with contested proceedings before the PUCT, other than proceedings with respect to the STM Application (including, for the avoidance of doubt, rate case settlement discussions to the extent the STM Application will include such term or provision being discussed in the context of a rate case settlement discussion) and (ii) responding to unsolicited inquiries related to the Transactions from any agency or other Governmental Entity in response to unsolicited communications related to the Transactions initiated by any such Person.

(c) *HSR Filing*. In addition to and without limiting the other covenants of the parties contained in this Section 7.06, SDTS, SU and Oncor shall (i) make or cause to be made all the filings required of them or their "ultimate parent entities" under the HSR Act in connection with the Transactions as promptly as practicable after the date of this Agreement (and in no event later than ten business days after the date hereof), (ii) comply, at the earliest practicable date, with any request for information, including any request for additional information and documentary material received by them or any of their respective Affiliates from the United States Federal Trade Commission (the "FTC") or the United States Department of Justice (the "DOJ") pursuant to the HSR Act or from any state attorney general or other Governmental Entity or representative thereof in connection with any Competition Law review or investigation of the Transactions, (iii) cooperate with each other and in good faith take into account the views of the other party in connection with any filings, analyses, presentations, memoranda, briefs, arguments, opinions and proposals under the HSR Act and in connection with resolving any investigation or other inquiry concerning the Transactions commenced by the FTC, DOJ, any state attorney general or any other Governmental Entity under any Competition Law, (iv) use commercially reasonable efforts to resolve such objections, if any, as may be asserted with respect to the Transactions under the HSR Act or any other Competition Law; *provided* that nothing in this Section 7.06(c) shall obligate any party to enter into any agreement that would limit its freedom of action, ownership or control with respect to its businesses, assets, product lines, properties or services or its ability to retain or hold, any its businesses, assets, product lines, properties or services or any of the businesses, assets, product lines, properties or services of any other party; and (v) advise the parties promptly of any material communication received by such party from the FTC, DOJ, any state attorney general or any other Governmental Entity related to a Competition Law review, investigation or inquiry in connection with the Transactions, and of any understandings, undertakings or agreements (oral or written) such party proposes to make or enter into with the FTC, DOJ, any state attorney general or any other Governmental Entity in connection with the Transactions. Concurrently with the filing of notifications under the HSR Act, SDTS and Oncor shall each request early termination of each applicable "waiting period" under the HSR Act. The Parties shall jointly determine all strategies and tactics regarding the foregoing.

-50-

(d) *PUCT Filing*. As promptly as practicable, but no later than fourteen days after the execution and delivery of this Agreement, one or more of SDTS, SU or Oncor, as applicable, shall submit the following filings or approval requests to the PUCT (collectively, the "PUCT Filings"):

(i) a proposed conditional dismissal of SU and SDTS's pending rate proceeding in Docket No. 45414 (the "SU/SDTS Rate Case") on the terms set forth in Schedule 7.06(d)(i) hereto or on other terms that are acceptable to SU and SDTS, in their sole discretion, including a date certain for SU and SDTS to file their next rate case (the "SU/SDTS Rate Case Dismissal");

(ii) a proposed conditional settlement or resolution of Oncor's pending rate proceeding in Docket No. 46957 (the "Oncor Rate Case") on the terms set forth in Schedule 7.06(d)(ii) hereto or on other terms that are acceptable to Oncor, in its sole discretion (the "Oncor Rate Case Settlement");

(iii) a single integrated Joint Application for Sale, Transfer or Merger (the "STM Application") and other necessary approvals required to effect the Transactions, which application will contain the terms and undertakings described below in this Section 7.06(d);

(iv) an application for the Interim Rate Order; and

(v) other filings or approval requests which SDTS, SU and Oncor mutually agree are necessary to satisfy the Regulatory Conditions.

The parties agree that the STM Application and any amendments or supplements thereto shall include (i) appropriate provisions designed to obtain satisfaction of the Regulatory Conditions prior to the Closing and (ii) such additional agreements or commitments on the part of the parties as SDTS, SU and Oncor mutually agree are advisable to obtain the PUCT Approval. In addition to and without limiting the other covenants of the parties contained in this Section 7.06, SDTS, SU and Oncor shall accept all requirements, conditions and limitations that are imposed by the PUCT as a condition to the PUCT Approval, other than such conditions or requirements that would, with respect to SDTS or SU, result in the failure of an SDTS/SU Regulatory Condition or, with respect to Oncor, result in the failure of an Oncor Regulatory Condition.

(e) *Interim Rate Proposal*.

(i) At the time the other applicable filings specified in paragraph (d) above are made, SU will propose and seek approval of agreed interim rates ("Interim Rates") for the Residential class served under SU's tariff applicable to the Stanton, Brady and Celeste divisions in Docket No. 45414 consistent with 16 Tex. Admin. Code § 22.125. The Interim Rates will reflect a Residential class retail revenue requirement decrease of $3 million on an annual basis for the Stanton, Brady and Celeste divisions. SU will propose that the Interim Rates take effect beginning 45 days after entry of an order by the PUCT approving the Interim Rates (the "Interim Rate Order").

-51-

(ii) SU shall propose that the Interim Rate Order include provisions to the following effect:

(A) the Interim Rates shall continue in effect until the earlier of (i) the date upon which SU's distribution customers are transferred to Oncor or (ii) in the event this Agreement is terminated pursuant to Section 9.01 herein, the effective date of SU's new residential rates finally ordered in Docket No. 45414; and

(B) beginning on the date such Interim Rates take effect, SU shall record on its books as a regulatory asset the difference between the money collected under Interim Rates and the amount of money that would have been collected under SU's currently-approved residential rates (the "Interim Rate Regulatory Asset").

(f) *SEC Filings.* Each of SDTS and Oncor agrees to provide such reasonable assistance to Oncor or Affiliates of SDTS, respectively, with respect to the preparation of any applicable pro forma financial information required to be filed by Oncor or Affiliates of SDTS, respectively, with the Securities and Exchange Commission and furnish or cause to be furnished reasonable access to personnel of SDTS or Oncor, as applicable, and its outside accountants and such other assistance and cooperation, in each case as Oncor or SDTS reasonably requests in connection with the reporting obligations of Oncor or Affiliates of SDTS, respectively, under the Exchange Act in connection with the Transactions and for any other reasonable purpose, including accounting and financial reporting matters.

(g) *Motion for Bankruptcy Court Approval.* Oncor agrees to use commercially reasonable efforts to cause EFH and EFIH (i) to file a motion with the Bankruptcy Court, requesting Bankruptcy Court Approval and (ii) to take all other actions reasonably required to obtain Bankruptcy Court Approval, in each case as promptly as practicable after the date hereof.

Section 7.07. *SU/SDTS Leases.* From and after the Closing, each of SU and SDTS hereby irrevocably releases the SDTS Assets from the limitations, restrictions and other terms and provisions of the SU/SDTS Leases and agrees that the SDTS Assets shall not be subject to any Claim, Lien, encumbrance or other right in favor of SU or SDTS arising under or by virtue of the SU/SDTS Leases. Notwithstanding the foregoing, the provisions of this Section 7.07 shall not be construed to alter or affect in any manner the rights and obligations of SDTS and SU against each other arising under or by virtue of the SU/SDTS Leases (as the same may be modified or amended from time to time).

-52-

Section 7.08. *Supplemental Disclosure*. Each of SDTS, SU and Oncor shall have the right from time to time during the Pre-Closing Period to supplement or amend the information contained in the SDTS Disclosure Schedule, SU Disclosure Schedule or the Oncor Disclosure Schedule, as applicable, with respect to any matter, whether or not in existence or known to such party at the date of this Agreement. Any supplement to or amendment of (i) the (A) listing of properties or assets included in the SDTS Assets, the SU Assets or the Oncor T Assets (including any schedule of assets to be delivered pursuant to Article I or Article II) or (B) the list of Easements set forth in an Easement Schedule, in each case to reflect changes in such properties, assets or Easements after the date of this Agreement that result from capital expenditures or acquisitions or sales or other dispositions of properties and assets that are permitted pursuant to the covenants of the parties set forth in Section 7.01, Section 7.02 and Section 7.03, as applicable, (ii) the list of Easements set forth in an Easement Schedule to (A) include additional Easements primarily related to the Subject SDTS Operations or Subject Oncor Operations, as applicable, or (B) remove Easements that are not primarily related to the Subject SDTS Operations or Subject Oncor Operations, as applicable, (iii) the list of Subject SDTS Transmission Easements, Subject Stanton/McAllen Distribution Easements or Oncor Retained Easements or (iv) the list of SDTS Property set forth in Section 4.08(a) of the SDTS Disclosure Schedule to the extent revisions to such list are expressly contemplated thereby shall, in the case of clauses (i) through (iv), be permitted without the consent of any other party and shall be given effect for all purposes of this Agreement as if such supplement or amendment had been reflected in the applicable disclosure schedule as of the date of this Agreement. Except as provided in the immediately preceding sentence, for purposes of determining whether the conditions to the obligations of Oncor, SDTS or SU in Section 8.02, Section 8.03 or Section 8.04, respectively, have been fulfilled, and for purposes of determining whether there has been a breach of a representation or warranty that is the subject of indemnification under Section 10.01, Section 10.02, Section 10.03 or Section 10.04, as applicable, the applicable disclosure schedule shall be deemed to include only that information contained therein on the date of this Agreement and shall be deemed to exclude any information contained in any supplement thereof.

## ARTICLE VIII
### Conditions to Closing

Section 8.01. *Conditions to the Obligation of Each Party*. The obligation of each of the parties to consummate the Transactions is subject to the satisfaction (or waiver in writing by each party) of the following condition:

(a) *No Legal Injunctions or Restraints*. There shall not be in effect any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity or any other legal restraint that restrains, enjoins, renders illegal or otherwise prohibits the consummation of the Transactions.

(b) *Bankruptcy Court Approval*. The Bankruptcy Court shall have entered an Order (the "Bankruptcy Court Approval") approving the grant by EFIH of its approval of this Agreement and the Transactions.

Section 8.02. *Conditions to the Obligation of the Oncor Entities*. The obligation of the Oncor Entities to consummate the Transactions is subject to the satisfaction (or waiver by the Oncor Entities) of the following conditions:

(a) *Regulatory Conditions*. The Oncor Regulatory Conditions shall have been satisfied.

(b) *Representations and Warranties*.

(i) The SDTS Fundamental Representations in this Agreement shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly state that they relate to or are made as of a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date) and all other representations and warranties of the SDTS Entities in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "SDTS Material Adverse Effect" set forth therein) as of the date hereof and as of the Closing Date, as though made on the Closing Date (except to the extent such representations and warranties expressly state that they relate to or are made as of a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date), with such exceptions in the aggregate (for all such representations and warranties) as would not be reasonably be expected to have a SDTS Material Adverse Effect.

(ii) The SU Fundamental Representations in this Agreement shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly state that they relate to or are made as of a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date) and all other representations and warranties of SU in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "SU Material Adverse Effect" set forth therein) as of the date hereof and as of the Closing Date, as though made on the Closing Date (except to the extent such representations and warranties expressly state that they relate to or are made as of a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date), with such exceptions in the aggregate (for all representations and warranties) as would not be reasonably be expected to have an SU Material Adverse Effect.

(c) *Performance of Obligations*.

(i) Each SDTS Entity shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by it prior to or at the Closing.

(ii) Each SU Entity shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by it prior to or at the Closing.

(d) *Closing Payments and Deliveries*. SDTS and SU shall have made, or caused to be made, each of the payments and delivered, or caused to be delivered, to Oncor each of the agreements, certificates and other documents required to be made or delivered by it at the Closing pursuant to Section 3.02(a) or (b), as applicable.

-54-

(e) *No Material Adverse Effect*. Since the date of this Agreement, there shall not have been an SDTS Material Adverse Effect or an SU Material Adverse Effect.

Notwithstanding the foregoing, no Oncor Entity may rely on the failure of any condition set forth in this Section 8.02 to be satisfied if such failure (i) resulted from an action or inaction on the part of SDTS, SU or their respective Affiliates requested or consented to in writing by Oncor or (ii) was caused by the failure of any Oncor Entity to comply in any material respect with its obligations under this Agreement.

Section 8.03. *Conditions to the Obligation of the SDTS Entities*. The obligation of the SDTS Entities to consummate the Transactions is subject to the satisfaction (or waiver by the SDTS Entities) of the following conditions:

(a) *Regulatory Conditions*. The SDTS/SU Regulatory Conditions shall have been satisfied.

(b) *Representations and Warranties*. The Oncor Fundamental Representations in this Agreement shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly state that they relate to or are made as of a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date) and all other representations and warranties of the Oncor Entities in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Oncor Material Adverse Effect" set forth therein) as of the date hereof and as of the Closing Date, as though made on the Closing Date (except to the extent such representations and warranties expressly state that they relate to or are made as of a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date), with such exceptions in the aggregate (for all representations and warranties) as would not be reasonably be expected to have an Oncor Material Adverse Effect.

(c) *Performance of Obligations*. Each Oncor Entity shall have performed and complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by it prior to or at the Closing that relate to or affect the SDTS Merger, the Oncor Merger or any of the other Transactions involving the SDTS Entities.

(d) *Closing Payments and Deliveries*. Oncor shall have made, or caused to be made, each of the payments and delivered, or caused to be delivered, to SDTS each of the agreements, certificates and other documents required to be made or delivered by it to SDTS at the Closing pursuant to Section 3.02(c).

(e) *SU Merger*. The SU Merger shall be consummated concurrently with the SDTS Merger and the Oncor Merger.

-55-

(f) *Lender Consent*. The SDTS Entities shall have obtained the consent of the holders of SDTS Senior Secured Notes identified on Schedule 8.03(f) to the consummation of the Transactions to be carried out by the SDTS Entities hereunder.

(g) *No Material Adverse Effect*. Since the date of this Agreement, there shall not have been an Oncor Material Adverse Effect.

Notwithstanding the foregoing, no SDTS Entity may rely on the failure of any condition set forth in this Section 8.03 to be satisfied if such failure (i) resulted from an action or inaction on the part of Oncor or its Affiliates requested or consented to in writing by SDTS or (ii) was caused by the failure of any SDTS Entity to comply in any material respect with its obligations under this Agreement.

Section 8.04. *Conditions to the Obligation of the SU Entities*. The obligation of the SU Entities to consummate the Transactions is subject to the satisfaction (or waiver by the SU Entities) of the following conditions:

(a) *Regulatory Conditions*. The SDTS/SU Regulatory Conditions shall have been satisfied.

(b) *Representations and Warranties*. The Oncor Fundamental Representations in this Agreement shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly state that they relate to or are made as of a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date) and all other Oncor Subject SU Representations in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Oncor Material Adverse Effect" set forth therein) as of the date hereof and as of the Closing Date, as though made on the Closing Date (except to the extent such representations and warranties expressly state that they relate to or are made as of a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date), with such exceptions in the aggregate (for all representations and warranties) as would not be reasonably be expected to have an Oncor Material Adverse Effect.

(c) *Performance of Obligations*. Each Oncor Entity shall have performed and complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by it prior to or at the Closing that relate to or affect the SU Merger or any of the other Transactions involving the SU Entities.

(d) *Closing Payments and Deliveries*. Oncor shall have made, or caused to be made, each of the payments and delivered, or caused to be delivered, to SU each of the agreements, certificates and other documents required to be made or delivered by it to SU at the Closing pursuant to Section 3.02(d).

(e) *SDTS Merger and Oncor Merger*. The SDTS Merger and the Oncor Merger shall be consummated concurrently with the SU Merger.

-56-

Notwithstanding the foregoing, no SU Entity may rely on the failure of any condition set forth in this Section 8.04 to be satisfied if such failure (i) resulted from an action or inaction on the part of Oncor or its Affiliates requested or consented to by SU or (ii) was caused by the failure of any SU Entity to comply in any material respect with its obligations under this Agreement.

**ARTICLE IX**
**Termination**

Section 9.01. *Termination.*

(a) Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing:

(i) by mutual written consent of SDTS, SU and Oncor;

(ii) by SDTS, if any of the conditions set forth in Section 8.01 or Section 8.03 shall have become incapable of fulfillment by the Outside Date (as defined below) and shall not have been waived by SDTS;

(iii) by Oncor, if any of the conditions set forth in Section 8.01 or Section 8.02 shall have become incapable of fulfillment by the Outside Date and shall not have been waived by Oncor;

(iv) by SU, if any of the conditions set forth in Section 8.01 or Section 8.04 shall have become incapable of fulfillment by the Outside Date and shall not have been waived by SU;

(v) by SDTS and SU jointly, if there has been a breach by any Oncor Entity of any representation, warranty, covenant or agreement contained in this Agreement and such breach (A) if it occurred or was continuing as of the Closing Date, would give rise to the failure of a condition to the obligations of SDTS or SU under Section 8.03 or Section 8.04 and (B) is not cured within 30 days after receipt of written notice thereof from SDTS and SU (which notice shall specify in reasonable detail the nature of such breach);

(vi) by Oncor, if there has been a breach by any SDTS Entity or SU Entity of any representation, warranty, covenant or agreement contained in this Agreement and such breach (A) if it occurred or was continuing as of the Closing Date, would give rise to the failure of a condition to the obligations of Oncor under Section 8.02 and (B) is not cured within 30 days after receipt of written notice thereof from Oncor (which notice shall specify in reasonable detail the nature of such breach);

(vii) by SDTS, SU or Oncor upon the issuance of an Order by the PUCT that finds or determines that the PUCT Approval will not be granted or that results in the failure of a Regulatory Condition applicable to such party; or

-57-

(viii) by SDTS, SU or Oncor, if the Closing does not occur prior to or on the date that is 240 days after the date of this Agreement (the "Initial Outside Date"); *provided, however*, that if any approval, authorization or Order required to satisfy the Regulatory Conditions has not been granted by the Initial Outside Date, SDTS, SU or Oncor may, by written notice to the other parties, extend the Initial Outside Date to a date that is no more than 90 days after the Initial Outside Date, but not more than 45 days following the receipt of the PUCT Approval (the Initial Outside Date or the date to which it is extended from time to time is referred to herein as the "Outside Date");

*provided, however*, that a party shall not have the right to terminate this Agreement pursuant to subparagraph (ii) through (viii) above if such party is in breach in any material respect of its representations, warranties, covenants or agreements contained in this Agreement.

(b) In the event of a termination of this Agreement pursuant to this Section 9.01, written notice thereof shall forthwith be given to each other party and the Transactions shall thereupon be abandoned, without further action by any party.

Section 9.02. *Effect of Termination*. If this Agreement is terminated and the Transactions are abandoned as provided in Section 9.01, this Agreement shall be of no further force and effect, except for the provisions of Section 7.05, Section 9.01 and this Section 9.02, Section 12.01 and Article XIII (which shall remain in full force and effect in accordance with their terms). Nothing in this Section 9.02 shall be deemed to release any party from any liability for any breach by such party of any term, condition, covenant or other provision of this Agreement that occurs when such term, condition, covenant or other provision remains in effect.

## ARTICLE X
### Indemnification

Section 10.01. *Indemnification by SDTS*. Subject to the limitations set forth in this Article X, from and after the Closing, SDTS shall indemnify and hold harmless Oncor and its Affiliates and their respective representatives (the "Oncor Indemnitees") from and against any and all Claims, losses, damages, liabilities, obligations and expenses, including reasonable third party legal fees and expenses, interest, penalties and reasonable expenses of investigation, response action, removal action or remedial action conducted in accordance with industry standards and in a reasonably cost-effective manner (collectively, "Losses"), suffered or incurred by any Oncor Indemnitee (without duplication in the case of any Loss for which indemnification may be provided under more than one provision of this Section 10.01) to the extent arising or resulting from any of the following:

(a) the breach of any representation or warranty of an SDTS Entity contained in this Agreement (excluding the SDTS Tax Representations, the remedy for which is intended to be addressed solely by Section 11.01);

(b) a breach of any covenant or agreement of an SDTS Entity contained in this Agreement to be performed prior to or at the Closing (excluding those set forth in Article XI, the remedy for which is intended to be addressed solely by Section 11.01);

(c) a breach of any covenant or agreement of an SDTS Entity contained in this Agreement to be performed after the Closing (excluding those set forth in Article XI, the remedy for which is intended to be addressed solely by Section 11.01); and

(d) the assertion against, imposition upon or incurrence by any Oncor Indemnitee of any SDTS Retained Liability or Oncor T Liability.

Section 10.02. *Indemnification by SU*. Subject to the limitations set forth in this Article X, from and after the Closing, SU shall indemnify and hold harmless the Oncor Indemnitees from and against any and all Losses suffered or incurred by any Oncor Indemnitee (without duplication in the case of any Loss for which indemnification may be provided under more than one provision of this Section 10.02) to the extent arising or resulting from any of the following:

(a) the breach of any representation or warranty of an SU Entity contained in this Agreement (excluding the SU Tax Representations, the remedy for which is intended to be addressed solely by Section 11.01);

(b) a breach of any covenant or agreement of an SU Entity contained in this Agreement to be performed prior to or at the Closing (excluding those set forth in Article XI, the remedy for which is intended to be addressed solely by Section 11.01);

(c) a breach of any covenant or agreement of an SU Entity contained in this Agreement to be performed after the Closing (excluding those set forth in Article XI, the remedy for which is intended to be addressed solely by Section 11.01); and

(d) the assertion against, imposition upon or incurrence by any Oncor Indemnitee of any SU Retained Liability.

Section 10.03. *Indemnification by Oncor of SDTS Indemnitees*. Subject to the limitations set forth in this Article X, from and after the Closing, Oncor shall indemnify and hold harmless SDTS and its Affiliates and their respective representatives (the "SDTS Indemnitees") from and against any and all Losses suffered or incurred by any SDTS Indemnitee (without duplication for any Loss for which indemnification may be provided under more than one provision of this Section 10.03) to the extent arising or resulting from any of the following:

(a) the breach of any representation or warranty of an Oncor Entity contained in this Agreement (excluding the Oncor Tax Representations, the remedy for which is intended to be addressed solely by Section 11.01);

(b) the breach of any covenant or agreement of an Oncor Entity contained in this Agreement to be performed prior to or at the Closing (excluding those set forth in Article XI, the remedy for which is intended to be addressed solely by Section 11.01);

(c) a breach of any covenant or agreement of an Oncor Entity contained in this Agreement to be performed after the Closing (excluding those set forth in Article XI, the remedy for which is intended to be addressed solely by Section 11.01); and

(d) the assertion against, imposition upon or incurrence by any SDTS Indemnitee of any Oncor T Retained Liability or SDTS Liability.

Section 10.04. *Indemnification by Oncor of SU Indemnitees* . Subject to the limitations set forth in this Article X, from and after the Closing, Oncor shall indemnify and hold harmless SU and its Affiliates and their respective representatives (the "SU Indemnitees") from and against any and all Losses suffered or incurred by any SU Indemnitee (without duplication in the case of any Loss for which indemnification may be provided under more than one provision of this Section 10.04) to the extent arising or resulting from any of the following:

(a) the breach of any Oncor Subject SU Representation;

(b) the breach of any covenant or agreement of an Oncor Entity contained in this Agreement to be performed prior to or at the Closing;

(c) a breach of any covenant or agreement of an Oncor Entity contained in this Agreement to be performed after the Closing (excluding those set forth in Article XI, the remedy for which is intended to be addressed solely by Section 11.01); and

(d) the assertion against, imposition upon or incurrence by any SU Indemnitee of any SU Liability.

Section 10.05. *Indemnification Procedures.*

(a) *Procedures Relating to Third Party Claims*. If any party or other Person entitled to indemnification under this Article X (an "Indemnified Party") receives written notice of the commencement of any Legal Proceeding or the assertion of any Claim by a third party or the imposition of any penalty or assessment by a Governmental Authority or other Person for which indemnity may be sought under Section 10.01, Section 10.02, Section 10.03 or Section 10.04 (a "Third Party Claim"), the Indemnified Party shall promptly provide the party who is obligated to indemnify it (the "Indemnifying Party") with written notice of such Third Party Claim, stating in reasonable detail the nature, basis and the amount thereof, to the extent known, which notice shall be accompanied by copies of the relevant notices and documents (including court papers) received by the Indemnified Party that evidence or relate to such Third Party Claim; *provided, however*, that the failure of the Indemnified Party to give prompt notice to the Indemnifying Party shall not affect the right of the Indemnified Party to be indemnified in respect of such Third Party Claim or related Losses, except to the extent that the Indemnifying Party is actually and materially prejudiced as a result of the failure to give prompt notice. The Indemnifying Party shall have the right to assume the defense of any Third Party Claim with counsel reasonably acceptable to the Indemnified Party by written notice of assumption delivered to the Indemnified Party within 30 days following the receipt of the written notice of the Third Party Claim referred to above; *provided, however*, that if, in the reasonable judgment of the Indemnified Party, there exists a material conflict of interest between the Indemnified Party and the Indemnifying Party with respect to such Third Party Claim that would make the assumption of such Third Party Claim inappropriate or inadvisable, (i) the Indemnifying Party shall not be entitled to assume the defense of a Third Party Claim, (ii) the defense thereof shall be conducted by the Indemnified

-60-

Party with counsel reasonably acceptable to the Indemnifying Party and (iii) the Indemnifying Party shall be liable to the Indemnified Party for the reasonable and actual legal expenses incurred by the Indemnified Party in the conduct of the defense thereof (subject to the limitations set forth in Section 10.06). If the Indemnifying Party has assumed the defense of a Third Party Claim, (i) the Indemnifying Party shall not be liable to the Indemnified Party for any legal expenses incurred by the Indemnified Party in connection therewith, (ii) the Indemnified Party may retain separate counsel reasonably acceptable to the Indemnifying Party at its sole cost and expense and participate in the defense of the Third Party Claim (but the Indemnifying Party shall control such defense), (iii) the Indemnifying Party will not (A) admit to any wrongdoing or (B) consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim on the part of the Indemnified Party, in each case, without the prior written consent of the Indemnified Party (such written consent not to be unreasonably withheld, conditioned or delayed) and (iv) the Indemnified Party shall cooperate in the defense or prosecution of the Third Party Claim, including through the retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of records and information that are reasonably relevant to the Third Party Claim, and making employees reasonably available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. If the Indemnifying Party assumes the defense of a Third Party Claim, the Indemnified Party shall consent to any settlement, compromise or discharge of a Third Party Claim that the Indemnifying Party may propose and that (i) includes as an unconditional term thereof a complete release of the Indemnified Party and its Affiliates from the Third Party Claim, (ii) does not require the Indemnified Party or its Affiliates to admit to any wrongdoing and (iii) does not impose any equitable relief on the Indemnified Party or its Affiliates that could reasonably be expected to affect the conduct of their business activities in any material respect. Whether or not the Indemnifying Party assumes the defense of a Third Party Claim, the Indemnified Party will not admit any liability with respect to, or consent to the entry of any judgment or enter into any settlement with respect to or otherwise compromise or discharge, the Third Party Claim without the prior written consent of the Indemnifying Party. For the avoidance of doubt, whether or not the Indemnifying Party assumes the defense of a Third Party Claim, the Indemnifying Party will not be obligated to indemnify the Indemnified Party hereunder for any settlement entered into or any judgment that was consented to without the prior written consent of the Indemnifying Party.

(b) *Procedures for Non-Third Party Claims*. The Indemnified Party will promptly provide the Indemnifying Party with written notice of its discovery of any matter that does not involve a Third Party Claim against the Indemnified Party, but that the Indemnified Party has determined gives rise to a Claim of indemnity hereunder, which written notice shall state in reasonable detail the nature, basis and the amount thereof, to the extent known, and be accompanied by copies of the relevant notices and documents received by the Indemnified Party that evidence or relate to such matter; *provided, however,* that the failure of the Indemnified Party to give prompt notice to the Indemnifying Party shall not affect the Indemnified Party's right to indemnification hereunder except to the extent that the Indemnifying Party is actually and materially prejudiced as a result of the failure to give prompt notice. The Indemnifying Party shall, within 30 days from receipt of any such notice, provide a responsive notice to the Indemnified Party acknowledging, disputing or otherwise responding to the Claim.

-61-

Section 10.06. *Limitations on Indemnification.* Notwithstanding anything to the contrary contained in this Article X, the rights of the parties to indemnification under this Article X and Article XI (solely to the extent provided in Section 10.06(a)) shall be subject to the following limitations:

(a) No Indemnified Party shall be entitled to be indemnified against any Losses of the type described in Section 10.01, Section 10.02, Section 10.03, Section 10.04 or Section 11.01, as applicable, unless a Claim therefor is asserted in writing by such Indemnified Party within the applicable survival period specified in subparagraph (i), (ii) or (iii), as applicable, of this paragraph (a), failing which, such Claim shall be deemed to have been irrevocably waived and extinguished for all purposes. Notwithstanding the foregoing, any Claims for which notice is provided by the Indemnified Party under this Agreement (including under Section 10.05(a) or (b)) prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such Claims shall survive until finally resolved.

(i) The representations, warranties, covenants and agreements of the SDTS Entities contained in this Agreement shall survive the Closing solely for purposes of this Article X and Article XI as follows: (A) the representations and warranties of the SDTS Entities in this Agreement (other than the SDTS Fundamental Representations and SDTS Tax Representations) shall survive until the date that is eighteen months after the Closing Date; (B) the SDTS Tax Representations shall survive until the 60th day following the expiration of the statute of limitations applicable to the subject matter thereof; (C) the representations and warranties of the SDTS Entities in Section 4.11 (the "SDTS Environmental Representations") shall survive until the date that is twenty four months after the Closing Date; (D) the representations and warranties of the SDTS Entities in Section 4.01 ("Organization and Qualification"), Section 4.02 ("Authority; Execution and Delivery; Enforceability"), Section 4.04 ("Capitalization of SDTS AssetCo"), Section 4.17 ("Sophisticated Industry Participant; Access to Information") and Section 4.18 ("Brokers and Finders") (the "SDTS Fundamental Representations") shall survive indefinitely and without limitation (subject to any non-waivable limitations imposed under applicable Law); (E) the covenants and agreements of the SDTS Entities in this Agreement to be performed prior to or at the Closing shall survive until the date that is eighteen months after the Closing Date; and (F) the other covenants and agreements of the SDTS Entities contained in this Agreement shall survive until they are fully performed in accordance with the terms thereof.

(ii) The representations, warranties, covenants and agreements of the SU Entities contained in this Agreement shall survive the Closing solely for purposes of this Article X and Article XI as follows: (A) the representations and warranties of the SU Entities in this Agreement (other than the SU Fundamental Representations and SU Tax Representations) shall survive until the date that is eighteen months after the Closing Date; (B) the SU Tax Representations shall survive until the 60th day following the expiration of the statute of limitations applicable to the subject matter thereof; (C) the representations and warranties of the SU Entities in Section 5.11 (the "SU Environmental Representations") shall survive until the date that is twenty four months after the Closing Date; (D) the representations and warranties of the SU

-62-

Entities in Section 5.01 ("Organization and Qualification"), Section 5.02 ("Authority; Execution and Delivery; Enforceability"), Section 5.04 ("Capitalization of SU AssetCo"), Section 5.17 ("Sophisticated Industry Participant; Access to Information") and Section 5.18 ("Brokers and Finders") (the "SU Fundamental Representations") shall survive indefinitely and without limitation (subject to any non-waivable limitations imposed under applicable Law); (E) the covenants and agreements of the SU Entities in this Agreement to be performed prior to or at the Closing shall survive until the date that is eighteen months after the Closing Date; and (F) the other covenants and agreements of the SU Entities contained in this Agreement shall survive until they are fully performed in accordance with the terms thereof.

(iii) The representations, warranties, covenants and agreements of the Oncor Entities contained in this Agreement shall survive the Closing solely for purposes of this Article X and Article XI as follows: (A) the representations and warranties of the Oncor Entities in this Agreement (other than the Oncor Fundamental Representations and the Oncor Tax Representations) shall survive until the date that is eighteen months after the Closing Date; (B) the Oncor Tax Representations shall survive until the 60th day following the expiration of the statute of limitations applicable to the subject matter thereof; (C) the representations and warranties of the Oncor Entities in Section 6.11 (the "Oncor Environmental Representations") shall survive until the date that is twenty four months after the Closing Date; (D) the representations and warranties of the Oncor Entities in Section 6.01 ("Organization and Qualification"), Section 6.02 ("Authority; Execution and Delivery; Enforceability"), Section 6.04 ("Capitalization of Oncor AssetCo"), Section 6.15 ("Sophisticated Industry Participant; Access to Information") and Section 6.16 ("Brokers and Finders") (the "Oncor Fundamental Representations") shall survive indefinitely and without limitation (subject to any non-waivable limitations imposed under applicable Law); (E) the covenants and agreements of the Oncor Entities in this Agreement to be performed prior to or at the Closing shall survive until the date that is eighteen months after the Closing Date; and (F) the other covenants and agreements of the Oncor Entities contained in this Agreement shall survive until they are fully performed in accordance with the terms thereof.

Except as expressly provided in this paragraph (a), the representations and warranties of the parties made in this Agreement or in any certificate or other document executed in connection herewith shall not survive the Closing for any purpose.

(b) The Oncor Indemnitees shall not be entitled to indemnification from or by SDTS for any of the following Losses (except to the extent provided in clause (i) or (ii) below):

(i) Losses of the type described in Section 10.01(a) or (b), other than Losses arising from a breach by the SDTS Entities of any SDTS Fundamental Representation or SDTS Environmental Representation or based on actual and intentional fraud on the part of any SDTS Entity ("Oncor Subject SDTS Losses"), unless the amount of all Oncor Subject SDTS Losses incurred or suffered by the Oncor Indemnitees exceeds, on a cumulative basis, 2% of the Final SDTS Package Amount, and then only to the extent of any such excess;

-63-

(ii) Losses of the type described in Section 10.01(a) arising from a breach by the SDTS Entities of any SDTS Environmental Representation ("Oncor SDTS Environmental Losses"), unless the amount of all Oncor SDTS Environmental Losses incurred or suffered by the Oncor Indemnitees exceeds, on a cumulative basis, 1% of the Final SDTS Package Amount, and then only to the extent of any such excess; or

(iii) Losses attributable to any individual items or series of items arising from substantially related facts, events or circumstances in an amount less than $200,000.

(c) The Oncor Indemnitees shall not be entitled to indemnification from or by SU for any of the following Losses (except to the extent provided in clause (i) or (ii) below):

(i) Losses of the type described in Section 10.02(a) or (b), other than Losses arising from a breach by the SU Entities of any SU Fundamental Representation or SU Environmental Representation or based on actual and intentional fraud on the part of any SU Entity ("Oncor Subject SU Losses"), unless the amount of all Oncor Subject SU Losses incurred or suffered by the Oncor Indemnitees exceeds, on a cumulative basis, 2% of the Final SU Amount, and then only to the extent of any such excess;

(ii) Losses of the type described in Section 10.01(a) arising from a breach by the SU Entities of any SU Environmental Representation ("Oncor SU Environmental Losses"), unless the amount of all Oncor SU Environmental Losses incurred or suffered by the Oncor Indemnitees exceeds, on a cumulative basis, 1% of the Final SU Amount, and then only to the extent of any such excess; or

(iii) Losses attributable to any individual items or series of items arising from substantially related facts, events or circumstances in an amount less than $200,000.

(d) The SDTS Indemnitees shall not be entitled to indemnification from or by Oncor for any of the following Losses (except to the extent provided in clause (i) or (ii) below):

(i) Losses of the type described in Section 10.03(a) or (b), other than Losses arising from a breach by the Oncor Entities of any Oncor Fundamental Representation or Oncor Environmental Representation or based on actual and intentional fraud on the part of any Oncor Entity ("SDTS Subject Losses"), unless the amount of all SDTS Subject Losses incurred or suffered by the SDTS Indemnitees exceeds, on a cumulative basis, 2% of the Final Oncor Amount, and then only to the extent of any such excess;

-64-

(ii) Losses of the type described in Section 10.01(a) arising from a breach by the Oncor Entities of any Oncor Environmental Representation ("SDTS Oncor Environmental Losses"), unless the amount of all SDTS Oncor Environmental Losses incurred or suffered by the SDTS Indemnitees exceeds, on a cumulative basis, 1% of the Final Oncor Amount, and then only to the extent of any such excess; or

(iii) Losses attributable to any individual items or series of items arising from substantially related facts, events or circumstances in an amount less than $200,000.

(e) The SU Indemnitees shall not be entitled to indemnification from or by Oncor for any of the following Losses (except to the extent provided in clause (i) below):

(i) Losses of the type described in Section 10.04(a) or (b), other than Losses arising from a breach by the Oncor Entities of any Oncor Fundamental Representation or based on actual and intentional fraud on the part of any Oncor Entity ("SU Subject Losses"), unless the amount of all SU Subject Losses incurred or suffered by the SU Indemnitees exceeds, on a cumulative basis, 2% of the Final SU Amount, and then only to the extent of any such excess;

(ii) Losses attributable to any individual items or series of items arising from substantially related facts, events or circumstances in an amount less than $200,000.

(f) The Oncor Indemnitees shall not be entitled to indemnification from or by SDTS (i) for Oncor Subject SDTS Losses or Oncor SDTS Environmental Losses in an amount that exceeds, on a cumulative basis, 10% of the Final SDTS Package Amount and (ii) for Oncor SDTS Environmental Losses in an amount that exceeds, on a cumulative basis for Oncor SDTS Environmental Losses only, 4.5% of the Final SDTS Package Amount.

(g) The Oncor Indemnitees shall not be entitled to indemnification from or by SU (i) for Oncor Subject SU Losses or Oncor SU Environmental Losses in an amount that exceeds, on a cumulative basis, 10% of the Final SU Amount and (ii) for Oncor SU Environmental Losses in an amount that exceeds, on a cumulative basis for Oncor SU Environmental Losses only, 4.5% of the Final SU Amount.

(h) The SDTS Indemnitees shall not be entitled to indemnification from or by Oncor (i) for SDTS Subject Losses or SDTS Oncor Environmental Losses in an amount that exceeds, on a cumulative basis, 10% of the Final Oncor Amount and (ii) for SDTS Oncor Environmental Losses in an amount that exceeds, on a cumulative basis for SDTS Oncor Environmental Losses only, 4.5% of the Final Oncor Amount.

(i) The SU Indemnitees shall not be entitled to indemnification for SU Subject Losses in an amount that exceeds, on a cumulative basis, 10% of the Final SU Amount.

(j) No party hereto shall be liable under or in connection with this Agreement (including under this Article X) for indirect, special, incidental, consequential or punitive damages claimed by any other party resulting from or relating to this Agreement or the Transactions; *provided*, *however*, that this Section 10.06(i) shall not apply to damages of the type described above that are payable in respect of Third Party Claims asserted against or imposed on an Indemnified Party.

(k) In no event shall the Oncor Indemnitees be entitled to indemnification with respect to any liability or obligation to the extent such liability or obligation was taken into account in the calculation of the Final SDTS Package Amount or the Final SU Amount in accordance with Article I of this Agreement.

(l) In no event shall the SDTS Indemnitees be entitled to indemnification with respect to any liability or obligation to the extent such liability or obligation was taken into account in the calculation of the Final Oncor Amount in accordance with Article I of this Agreement.

(m) For purposes of this Article X, if there occurs a breach of any representation or warranty for which an Indemnifying Party has agreed to provide indemnification (other than a breach of an SDTS Environmental Representation, SU Environmental Representation or Oncor Environmental Representation), the amount of Losses incurred as a result of such breach shall be determined without regard to any materiality, material adverse effect or other similar qualification contained in or otherwise applicable to such representation or warranty. In addition, for purposes of this Article X, solely in the case of any SDTS Environmental Representation, SU Environmental Representation or Oncor Environmental Representation, whether or not a breach of any such representation or warranty has occurred and the amount of Losses incurred as a result of any such breach shall be determined without regard to any materiality, material adverse effect or other similar qualification contained in or otherwise applicable to such representation or warranty.

Section 10.07. *Exclusive Remedy.* The parties hereby agree that, from and after the Closing, the remedies of the parties specifically provided for in this Article X and in Article XI shall be the sole and exclusive remedies available to any of the parties for all matters covered or contemplated by this Agreement; *provided, however*, that nothing herein shall limit the right of (i) SDTS and Oncor to receive the payments provided for in Section 1.05 or Section 1.06, (ii) SU to receive the payments specified in Section 2.03 or Section 2.04 or (iii) any party to seek specific performance or injunctive relief in connection with a breach by another party of its covenants that inure to the benefit of the first party to the extent that such covenants are required to be performed after the Closing Date. Without limiting the generality of the foregoing, the parties hereby expressly agree that, (a) outside of the remedies specifically provided for in this Article X and Article XI, (i) SDTS shall not have any liability to the Oncor Indemnitees arising out of or related to any breach by any SDTS Entity of any of the representations and warranties set forth in this Agreement, (ii) SU shall not have any liability to the Oncor Indemnitees arising out of or related to any breach by any SU Entity of any of the representations and warranties set forth in this Agreement, (iii) Oncor shall not have any liability to the SDTS Indemnitees or SU Indemnitees arising out of or related to any breach by any Oncor Entity of any of the representations and warranties set forth in this Agreement and (b) each party, on behalf of itself and its indemnitees, hereby irrevocably waives and relinquishes any right to, and agrees not to seek to enforce, any

-66-

indemnification, contribution, repayment or other remedy or recourse directly or indirectly (through any director or officer of the other party or otherwise) from any other party with respect to any matter relating to the subject matter of this Agreement, including the Transactions (whether on the basis of a claim sounding in tort, contract, statute or otherwise) outside of the provisions of Section 1.06, Section 2.04, this Article X or Article XI or the express provisions of any Ancillary Agreement. Notwithstanding the foregoing, the provisions of this Section 10.07 shall not be construed to alter or affect in any manner the rights and obligations of SDTS and SU against each other arising from any agreements, arrangements or transactions that have been or are in effect between such parties, including the SU/SDTS Leases (as the same may be modified or amended from time to time).

Section 10.08. *Insurance and Other Sources of Recovery; Mitigation.*

(a) In the case of any Claims for which it is reasonably likely that a party may have a direct or indirect right of recovery against or from one or more third parties or other sources (including rights of recovery under insurance policies or indemnification arrangements with third parties), such party shall seek recovery with respect to such Claims from such sources for so long as pursuit of such recovery is commercially reasonable. To the extent that a party obtains recovery in respect of any such Claims from any such sources, such party shall use the funds provided by such recovery (in lieu of funds provided by any other party pursuant to the indemnification provisions of this Article X) to pay or otherwise satisfy such Claims, and any related Losses for which indemnification is available under this Article X shall be reduced by the amount of such funds realized or paid to the Indemnified Party. If, after an Indemnified Party receives any indemnification payment in respect of Losses under this Article X, the amount of the Losses to which such payment relates is reduced by recovery, settlement or other payment by or from any other Person or source, the amount of such reduction will promptly be repaid by the Indemnified Party to the Indemnifying Party.

(b) Each party hereto shall take reasonable steps to mitigate its Losses upon and after becoming aware of any event which could reasonably be expected to give rise to any Losses for which it is or may be entitled to indemnification hereunder.

Section 10.09. *Cooperation; Access to Documents and Information.* The parties shall cooperate with each other in connection with resolving any Claims (including Third Party Claims) as to which indemnification is or may be required to be provided in accordance with the terms of this Agreement. Without limiting the generality of the foregoing, any Indemnified Party who elects to seek indemnification pursuant to this Agreement shall (i) provide to the Indemnifying Party, as promptly as practicable, all documents and information relating to any such Claim which are in the possession of the Indemnified Party or its Affiliates or can be obtained by the Indemnified Party without undue cost or expense and (ii) give the Indemnifying Party reasonable access to the accounting and other appropriate personnel and the independent accountants of the Indemnified Party and its Affiliates in order to permit the Indemnifying Party to obtain information reasonably required to evaluate any such Claim. In no event shall an Indemnifying Party be liable to an Indemnified Party pursuant to this Article X for any Losses arising from a Claim to the extent that such Losses could reasonably be expected to have been avoided or reduced if the Indemnified Party had complied in a timely manner with its obligations under this Section 10.09. In addition,

-67-

notwithstanding anything to the contrary contained in this Section 10.09, no party or any of its Affiliates shall be obligated to provide to any other party (x) any work papers or similar materials prepared by the independent public accountants of such party or its Affiliates, except to the extent that such accountants agree to provide access to such work papers or similar materials upon such terms and conditions as shall be determined by such accountants in their sole discretion, or (y) any documents or information that are protected by the attorney-client privilege or work product doctrines if the applicable party determines in its reasonable discretion that providing copies or access to such documents or information could give rise to a possible waiver of such privilege or doctrine.

Section 10.10. *Tax Treatment of Indemnification.* For all Tax purposes, (a) Oncor and SDTS agree to treat (and shall cause each of their respective Affiliates to treat) any indemnity payment made pursuant to Section 10.01, Section 10.03 or Section 11.01 as an adjustment to the Final SDTS Package Amount or the Final Oncor Amount, as applicable, and (ii) Oncor and SU agree to treat (and shall cause each of their respective Affiliates to treat) any indemnity payment made pursuant to Section 10.02, Section 10.04 or Section 11.01 as an adjustment to the Final SU Amount, in each case unless a final determination by the U.S. Internal Revenue Service (the "IRS") (which determination shall include the execution of an IRS Form 870-AD or successor form) or the applicable Taxing Authority provides otherwise.

**ARTICLE XI**
**Tax Matters**

Section 11.01. *Liability for Taxes.*

(a) Oncor shall be responsible for, and shall indemnify and hold SDTS harmless from and against, (i) Taxes relating to Oncor AssetCo, the Subject Oncor Operations or the Oncor T Assets which are attributable to any Pre-Closing Tax Period and the portion of any Straddle Period ending on and including the Closing Date, (ii) Taxes resulting from the Oncor Pre-Closing Contribution, (iii) Taxes relating to SDTS AssetCo, the Subject SDTS Operations or the SDTS Assets which are attributable to any Post-Closing Tax Period and the portion of any Straddle Period beginning on the day immediately after the Closing Date, (iv) those Transfer Taxes borne by Oncor pursuant to Section 11.03(b) and (c) and (v) (without duplication) any Taxes attributable to a Pre-Closing Tax Period or the portion of a Straddle Period ending on and including the Closing Date and resulting from a breach by the Oncor Entities of any Oncor Tax Representation or any of their covenants contained in this Article XI. Notwithstanding anything in this Section 11.01 or otherwise in this Agreement to the contrary, Oncor shall have no liability to SDTS for (x) Taxes to the extent such Taxes were included as a liability in calculating the Oncor Working Capital Package, (y) Taxes arising from actions taken by or at the direction of SDTS on the Closing Date after the Closing outside the ordinary course of business and (z) Taxes resulting from a breach by SDTS of the covenants in Section 11.02(e).

-68-

(b) Oncor shall be responsible for, and shall indemnify and hold SU harmless from and against, (i) Taxes relating to SU AssetCo, the Subject SU Operations or the SU Assets which are attributable to any Post-Closing Tax Period and the portion of any Straddle Period beginning on the day immediately after the Closing Date and (ii) those Transfer Taxes borne by Oncor pursuant to Section 11.03(e).

(c) SDTS shall be responsible for, and shall indemnify and hold Oncor harmless from and against, (i) Taxes relating to SDTS AssetCo, the Subject SDTS Operations or the SDTS Assets which are attributable to any Pre-Closing Tax Period and the portion of any Straddle Period ending on and including the Closing Date, (ii) Taxes resulting from the SDTS Pre-Closing Merger, (iii) Taxes relating to Oncor AssetCo, the Subject Oncor Operations and the Oncor T Assets which are attributable to any Post-Closing Tax Period and the portion of any Straddle Period beginning on the day immediately after the Closing Date, (iv) those Transfer Taxes borne by SDTS pursuant to Section 11.03(a) and (c) or (v) (without duplication) any Taxes attributable to a Pre-Closing Tax Period or the portion of a Straddle Period ending on and including the Closing Date and resulting from a breach by the SDTS Entities of any SDTS Tax Representation or any of their covenants contained in this Article XI. Notwithstanding anything in this Section 11.01 or otherwise in this Agreement to the contrary, SDTS shall have no liability to Oncor for (x) Taxes to the extent that such Taxes were included as a liability in calculating the SDTS Working Capital Package, as finally determined pursuant to Section 1.06, (y) Taxes arising from actions taken by or at the direction of Oncor on the Closing Date after the Closing outside the ordinary course of business and (z) Taxes resulting from a breach by Oncor of the covenants in Section 11.02(e).

(d) SU shall be responsible for, and shall indemnify and hold Oncor harmless from and against, (i) Taxes relating to SU AssetCo, the Subject SU Operations or the SU Assets which are attributable to any Pre-Closing Tax Period and the portion of any Straddle Period ending on and including the Closing Date, (ii) Taxes resulting from the SU Pre-Closing Merger, (iii) those Transfer Taxes borne by SU pursuant to Section 11.03(d) and (e) or (iv) (without duplication) any Taxes attributable to a Pre-Closing Tax Period or the portion of a Straddle Period ending on and including the Closing Date and resulting from a breach by the SU Entities of any SU Tax Representation or any of their covenants contained in this Article XI. Notwithstanding anything in this Section 11.01 or otherwise in this Agreement to the contrary, SU shall have no liability to Oncor for (x) Taxes to the extent that such Taxes were included as a liability in calculating the SU Working Capital Package, as finally determined pursuant to Section 2.04, (y) Taxes arising from actions taken by or at the direction of Oncor on the Closing Date after the Closing outside the ordinary course of business, and (z) Taxes resulting from a breach by Oncor of the covenants in Section 11.02(e).

(e) Taxes attributable to the portion of a Straddle Period ending on or prior to the Closing Date, and to the portion of the Straddle Period beginning after the Closing Date, shall be determined as follows: (i) in the case of property and other ad valorem Taxes, such Tax shall be prorated based on the number of days in the Straddle Period up to and including the Closing Date, and the number of days in the Straddle Period occurring after the Closing Date, and (ii) to the extent such Tax is measured by income or receipts or otherwise not described in clause (i) above, such Tax shall be allocated based on a closing of the books as of the end of the Closing Date; *provided* that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the period ending on and including the Closing Date and the period beginning after the Closing Date in proportion to the number of days in each period.

-69-

Section 11.02. *Tax Returns.*

(a) Oncor shall prepare or cause to be prepared all Tax Returns which are required to be filed under applicable Law (i) on or prior to the Closing Date and relate to Oncor AssetCo, the Subject Oncor Operations or the Oncor T Assets, (ii) after the Closing Date and relate to Oncor AssetCo, the Subject Oncor Operations or Oncor T Assets for any Pre-Closing Tax Period, (iii) after the Closing Date and relate to SDTS AssetCo, the Subject SDTS Operations or SDTS Assets for any Straddle Period and (iv) after the Closing Date and relate to SU AssetCo, the Subject SU Operations or SU Assets for any Straddle Period. In the case of any Tax Return described clause (ii), Oncor shall pay to the applicable Taxing Authority (or reimburse SDTS if SDTS made such payment) an amount equal to any Taxes shown as due on such Tax Return for which Oncor is responsible under Section 11.01(a), which reimbursement to SDTS shall be made within 10 days after the filing of such Tax Return. In the case of any Tax Return described in clause (iii) or clause (iv), (x) such Tax Return shall be prepared in a manner that is consistent with past practices employed by SDTS (in the case of Tax Returns described in clause (iii)) or SU (in the case of Tax Returns described in clause (iv)) except to the extent a change is required by Law, (y) Oncor shall provide a copy of such Tax Return to SDTS (in the case of Tax Returns described in clause (iii)) or SU (in the case of Tax Returns described in clause (iv)) for review and comment not less than 15 days prior to the due date for such Tax Return (taking into account any applicable extensions) and shall reflect on such Tax Return any reasonable comments provided by SDTS (in the case of Tax Returns described in clause (iii)) or SU (in the case of Tax Returns described in clause (iv)) within 5 days following SDTS' or SU's, as the case may be, receipt of such Tax Return from Oncor, and (z) Oncor shall pay to the applicable Taxing Authority the amount of Taxes reflected on such Tax Return and SDTS (in the case of Tax Returns described in clause (iii)) or SU (in the case of Tax Returns described in clause (iv)) shall reimburse Oncor for an amount equal to any Taxes shown as due on such Tax Return for which SDTS or SU, as the case may be, is responsible under Section 11.01(c) or Section 11.01(d), as the case may be, which reimbursement to Oncor shall be made within 10 days after the filing of such Tax Return.

(b) SDTS shall prepare or cause to be prepared all Tax Returns which are required to be filed under applicable Law (i) on or prior to the Closing Date and relate to SDTS AssetCo, the Subject SDTS Operations or the SDTS Assets, (ii) after the Closing Date and relate to SDTS AssetCo, the Subject SDTS Operations or the SDTS Assets for any Pre-Closing Tax Period and (iii) after the Closing Date and relate to Oncor AssetCo, the Subject Oncor Operations or the Oncor T Assets for any Straddle Period. In the case of any Tax Return described in clause (ii), SDTS shall pay to the applicable Taxing Authority (or reimburse Oncor if Oncor made such payment) an amount equal to any Taxes shown as due on such Tax Return for which SDTS is responsible under Section 11.01(c), which reimbursement to Oncor shall be made within 10 days after the filing of such Tax Return. In the case of any Tax Return described in clause (iii), (x) such Tax Return shall be prepared in a manner that is consistent with past practices employed by Oncor except to the extent a change is required by Law, (y) SDTS shall provide a copy of such Tax Return to Oncor for review and comment not less than 15 days prior to the due date for such Tax Return (taking

-70-

into account any applicable extensions) and shall reflect on such Tax Return any reasonable comments provided by Oncor within 5 days following Oncor's receipt of such Tax Return from SDTS, and (z) SDTS shall pay to the applicable Taxing Authority the amount of Taxes reflected on such Tax Return and Oncor shall reimburse SDTS for an amount equal to any Taxes shown as due on such Tax Return for which Oncor is responsible under Section 11.01(a), which reimbursement to SDTS shall be made within 10 days after the filing of such Tax Return.

(c) SU shall prepare or cause to be prepared all Tax Returns which are required to be filed under applicable Law and relate to SU AssetCo, the Subject SU Operations or the SU Assets for any Pre-Closing Tax Period and SU shall pay to the applicable Taxing Authority (or reimburse Oncor if Oncor made such payment) an amount equal to any Taxes shown as due on such Tax Return for which SU is responsible under Section 11.01(d), which reimbursement to Oncor shall be made within 10 days after the filing of such Tax Return.

(d) The Party required by Law will file all Tax Returns prepared pursuant to this Section 11.02 and each other Party will cooperate with such filing Party to the extent reasonably requested in connection with such filing.

(e) Except as otherwise required by applicable Tax Law, neither Oncor nor SDTS shall amend, modify or otherwise change any Tax Returns which are attributable to a Pre-Closing Tax Period or a Straddle Period and relate to the Subject Oncor Operations, the Oncor T Assets, the Subject SDTS Operations or the SDTS Assets without the other party's prior written consent. Except as otherwise required by applicable Tax Law, Oncor shall not amend, modify or otherwise change any Tax Returns which are attributable to a Pre-Closing Tax Period or a Straddle Period and relate to the Subject SU Operations or the SU Assets without SU's prior written consent.

Section 11.03. *Transfer Taxes*. All Transfer Taxes resulting from the transactions described in (a) Section 1.01 shall be borne solely by SDTS, (b) Section 1.02 shall be borne solely by Oncor, (c) Section 1.03 and Section 1.04 shall be borne one-half by SDTS and one-half by Oncor, (d) Section 2.01 shall be borne solely by SU and (e) Section 2.02 shall be borne one-half by SU and one-half by Oncor. Each of the parties shall use, and the parties shall cause each of their Affiliates to use, reasonable efforts to avail itself of any available exemptions from or refunds of any such Transfer Taxes, and to cooperate with the other parties in providing any information and documentation that may be necessary to obtain such exemption or refund.

Section 11.04. *Tax Contests; Refunds; Cooperation; Tax Treatment.*

(a) Within a reasonable time (but not more than ten days) after a party or any of their respective Affiliates receives written notice of any Tax contest, audit or other proceeding relating to Taxes which are attributable to a Pre-Closing Tax Period and relate to Oncor AssetCo, the Subject Oncor Operations, the Oncor T Assets, SDTS AssetCo, the Subject SDTS Operations, the SDTS Assets, SU AssetCo, the Subject SU Operations or the SU Assets (each, a "Pre-Closing Tax Contest"), the party receiving such written notice shall notify the other party or parties (Oncor, or SU or SDTS, as the case may be) in writing of such Pre-Closing Tax Contest.

-71-

(b) The party that is responsible or liable under Section 11.01 for any Taxes resulting from such Pre-Closing Tax Contest (the "Responsible Party") shall have the sole right, at such party's expense, to control the defense of any such Pre-Closing Tax Contest. The other party (which shall be Oncor in cases where SU or SDTS is the Responsible Party, SDTS in cases where Oncor is the Responsible Party in respect of Pre-Closing Tax Contests involving Taxes described in Section 11.01(a) or SU in cases where Oncor is the Responsible Party in respect of Pre-Closing Tax Contests involving Taxes described in Section 11.01(b) (the "Other Party")), shall have the right to participate, at its own expense, in any such Pre-Closing Tax Contest which is reasonably anticipated to have the effect of directly increasing the Tax liability of the Other Party or its Affiliates for any Post-Closing Tax Period. The Responsible Party shall not settle or compromise any Pre-Closing Tax Contest in which the Other Party has a right to participate without the Other Party's prior written consent if such settlement or compromise would directly and materially increase the Tax liability of the other party or its Affiliates for any Post-Closing Tax Period. Such consent will not be unreasonably withheld or delayed; *provided, however,* that the Other Party shall consent to any settlement or compromise if the Responsible Party agrees to fully indemnify the Other Party for any increase in the Tax liability of the Other Party and its Affiliates which both is attributable to any Post-Closing Tax Period and directly results from such settlement or compromise.

(c) SDTS or SU, as the case may be, and Oncor shall jointly control the defense of any Tax contest, audit or other proceeding relating to Taxes which are attributable to a Straddle Period and relate to Oncor AssetCo, the Subject Oncor Operations, the Oncor T Assets, SDTS AssetCo, the Subject SDTS Operations, the SDTS Assets, SU AssetCo, the Subject SU Operations or the SU Assets (each, a "Straddle Tax Contest"). Within a reasonable time (but not more than ten days) after a party or any of their respective Affiliates receives written notice of any Straddle Tax Contest, the party receiving such written notice shall notify the other party (Oncor, or SU or SDTS, as the case may be) in writing of such Straddle Tax Contest. Neither party shall settle or compromise any such Straddle Tax Contest without the other party's prior written consent (such consent not to be unreasonably withheld or delayed).

(d) The Responsible Party shall be entitled to any refund or overpayment of Taxes relating to Oncor AssetCo, the Subject Oncor Operations, the Oncor T Assets, SDTS AssetCo, the Subject SDTS Operations, the SDTS Assets, SU AssetCo, the Subject SU Operations or the SU Assets which are attributable to any Pre-Closing Tax Period. The amount of any refund of Taxes for any Straddle Period shall be equitably apportioned between the applicable parties in accordance with the principles set forth in Section 11.01(e). Any such refunds received by the Other Party or any of its Affiliates shall promptly be paid (together with any interest received thereon, but net of reasonable out-of-pocket expenses incurred in seeking such refund or overpayment) over to the Responsible Party. The Other Party agrees to notify the Responsible Party promptly of both the discovery of a right to claim any such refund or overpayment and the receipt of any such refund or utilization of any such overpayment.

-72-

(e) Each party shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to Section 11.02, any Pre-Closing Tax Contest, Straddle Tax Contest or tax refund or overpayment claim pursuant to this Section 11.04. Such cooperation shall include the retention and (upon the other party's reasonable request) the provision of records and information (including making such records and information available for copying) which are reasonably relevant to any such audit, litigation or other proceeding, the timely provision to the other party of powers of attorney or similar authorizations necessary to carry out the purposes of this Article XI, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The parties agree to retain all books and records with respect to Tax matters pertinent to the Oncor AssetCo, Subject Oncor Operations, the Oncor T Assets, SDTS AssetCo, the Subject SDTS Operations, the SDTS Assets, SU AssetCo, the Subject SU Operations and the SU Assets relating to any Pre-Closing Tax Period until the expiration of the statute of limitations (and, to the extent notified by the other party or its Affiliates, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any Taxing Authority.

(f) Unless otherwise required pursuant to a determination by an applicable Tax Authority, for U.S. federal income Tax purposes (and state and local tax purposes where applicable), the parties intend for the SDTS Merger and the Oncor Merger to be treated as a simultaneous exchange between Oncor and SDTS of the Oncor T Assets for the SDTS Assets which exchange, (a) to the extent such properties constitute real property or are otherwise of like kind (within the meaning of Section 1031 of the Code), will qualify for tax deferred treatment under Section 1031 of the Code to Oncor and SDTS and (b) to the extent not of like kind, under the applicable multi-asset exchange rules, will be treated as boot received in connection with asset transfers that occur pursuant to the SDTS Merger and the Oncor Merger. The parties will cooperate to structure the SDTS Merger and the Oncor Merger in a manner consistent with such intended tax treatment, including if requested by SDTS or Oncor, utilizing an "exchange accommodation titleholder" or a "qualified intermediary" as appropriate for the portion of such asset transfers that qualify as a like-kind exchange. Each party hereto shall prepare and file all Tax Returns in a manner that is consistent with the intended treatment described above, and none of the parties hereto, nor any of their respective Affiliates, shall take any position (whether in Tax Returns, Tax audits or otherwise) that is inconsistent with the intended tax treatment described in the preceding sentence.

Section 11.05. *Termination of Tax Sharing Agreements.* Any and all Tax allocation or Tax sharing agreements between Oncor AssetCo and any other Person, between SDTS AssetCo and any other Person and between SU AssetCo and any other Person shall be terminated as of the Closing Date and, from and after the Closing Date, none of Oncor AssetCo, SDTS AssetCo, SU AssetCo or their respective successors shall be obligated to make any payment pursuant to any such agreement for any past or future period.

Section 11.06. *Private Letter Ruling.*

(a) SDTS and Oncor shall use commercially reasonable efforts to, as promptly as reasonably practicable after the date hereof, jointly file with the IRS written requests (collectively, the "Ruling Request," and together with all related materials and supplements thereto filed or to be filed with the IRS, the "IRS Submissions") that the IRS issue a private letter ruling or rulings (the "Private Letter Ruling") to the effect that:

(i) Oncor's proposed removal/elimination of the accumulated deferred federal income tax ("ADFIT") attributable to the Oncor T Assets disposed of by Oncor and proposed manner of booking a deferred tax liability (which deferred tax liability would result in an effective reduction of Oncor's rate base) under FAS 109 (or similar GAAP accounting principles) to account for the difference in initial GAAP and tax basis with respect to the SDTS Assets acquired by Oncor is consistent with, and does not violate, the normalization accounting rules of Section 168(i)(9) of the Code and Treasury Regulations Section 1.167(l)-1(h); and

(ii) SDTS's proposed removal/elimination of the ADFIT attributable to the SDTS Assets disposed of by SDTS and proposed manner of booking a deferred tax liability (which deferred tax liability would result in an effective reduction of SDTS's rate base) under FAS 109 (or similar GAAP accounting principles) to account for the difference in initial GAAP and tax basis with respect to the Oncor T Assets acquired by SDTS is consistent with, and does not violate, the normalization accounting rules of Section 168(i)(9) of the Code and Treasury Regulations Section 1.167(l)-1(h).

(b) Oncor and SDTS shall jointly prepare and file the IRS Submissions. Each party shall provide the other party and its tax counsel with copies of, and a reasonable opportunity to review and comment on drafts of all proposed IRS Submissions prepared by the first party and will incorporate any comments or suggested revisions as are reasonably requested by the other party or its tax counsel with respect thereto; *provided, however,* that the rights to review and comment granted hereunder shall not result in unreasonable delays in submitting the IRS Submissions to the IRS. To the extent that a party, in its good faith judgment, considers any information included in such IRS Submissions (or drafts thereof) to be confidential, such party may require that any such documents provided to the other party be redacted to exclude such information. Subject to the foregoing, a party filing an IRS Submission shall provide the other party with copies of such IRS Submission promptly following the filing thereof.

(c) A representative of each of SDTS and Oncor shall be given the opportunity to participate in all substantive scheduled communications with the IRS concerning the IRS Submissions, including all substantive scheduled conference calls and in-person meetings. In addition, each party (i) shall keep the other party reasonably informed and shall consult in good faith with the other party and its tax counsel with respect to any issue relating to the IRS Submissions and (ii) shall provide the other party with copies of all correspondence, notices, and other written materials received from the IRS and shall otherwise keep the other party and its tax counsel advised of significant developments, and of any substantive communications, in each case, regarding the IRS Submissions and the Transactions. Each party agrees to cooperate and use its commercially reasonable efforts to assist in obtaining the Private Letter Ruling requested in the Ruling Request. Each party agrees to use commercially reasonable efforts to provide any appropriate information and additional representations as requested by the IRS in order to issue the Private Letter Ruling. No additional rulings will be requested unless mutually agreed by the parties.

-74-

(d) To the extent that the procedures described in Section 11.06(b) and Section 11.06(c) differ from the procedures applicable to any other regulatory filings described in Section 7.06, the procedures described in Section 11.06(b) and Section 11.06(c) shall govern.

(e) Each of the parties hereby expressly acknowledges and agrees that the obligations of the parties to consummate the Transactions are not conditioned in any way on the issuance or receipt of the Private Letter Ruling or on obtaining any specific ruling from the IRS requested in the IRS Submission.

Section 11.07. *Other Provisions*. Notwithstanding anything in this Agreement to the contrary, the provisions of Article X (other than Section 10.06(a), to the extent relating to the survival of the SU Tax Representations, Oncor Tax Representations or SDTS Tax Representations or the covenants set forth in this Article XI) shall not apply to indemnification with respect to Taxes or Tax Liabilities, indemnification with respect to breaches of SU Tax Representations, Oncor Tax Representations or SDTS Tax Representations, Pre-Closing Tax Contests or any other Tax matter covered under this Article XI.

Section 11.08. 1031 *Allocation*. SDTS and Oncor shall use commercially reasonable efforts to agree, within 30 days after the date that the Final Statements are finally determined pursuant to Section 1.6, to the classification of each SDTS Asset and Oncor T Asset for purposes of determining which of the SDTS Assets are like-kind to the Oncor T Assets within the meaning of Section 1031 of the Code (the "1031 Allocation"). If SDTS and Oncor reach an agreement with respect to the 1031 Allocation, (i) SDTS and Oncor shall, and shall cause their Affiliates to, report consistently with the 1031 Allocation in all Tax Returns, and neither SDTS nor Oncor shall take any position in any Tax Return that is inconsistent with the 1031 Allocation, in each case, unless required to do so by a final determination as defined in Section 1313 of the Code, and (ii) each of SDTS and Oncor agree to promptly advise each other regarding the existence of any Tax audit, controversy or litigation related to the 1031 Allocation.

**ARTICLE XII**
**Additional Agreements**

Section 12.01. *Publicity*. No public release or announcement concerning the Transactions shall be issued by any party without the prior consent of the other parties (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by Law (including the Exchange Act) or the rules or regulations of any national securities exchange, in which case the party required to make the release or announcement shall allow the other parties reasonable time to comment on such release or announcement in advance of such issuance; *provided, however*, that each of the parties may make internal announcements to its employees that are consistent with the parties' prior public disclosures regarding the Transactions; *provided, further*, that each of the parties may make a release or announcement without providing such release or announcement to the other parties for comment so long as such release or announcement is substantially similar to a previous release or announcement which such other parties were allowed to comment on pursuant to this Section 12.01.

Section 12.02. *Employees.*

(a) No later than thirty days following the execution of this Agreement, Oncor shall make written offers of employment (each, an "Employment Offer") to the Business Employees set forth on Schedule 12.02(a) hereto, which schedule lists the Business Employees to whom Oncor has chosen to make offers and may be modified from time to time after the date of this Agreement by Oncor with the consent of SU (which consent may not be unreasonably withheld) (the "Offered Employees"). Each Offered Employee shall receive a request for consent (a "Consent") to be signed and returned by the Offered Employee to SU, allowing SU to release the following (collectively, "Personnel Information"): (i) relevant personnel information of the Offered Employee, including background check results, drug screening results, (ii) materials related to commercial drivers' licenses held, and certifications, testing and documentation required by the Department of Transportation ("DOT") or the Federal Motor Carrier Safety Administration (collectively, "Driver Certification Materials"), (iii) lineman/apprentice training, qualification and certification records, and (iv) Form I-9 certifications, and other personally identifiable information such as contact and address information and compensation information. Upon receipt of an Employment Offer, an Offered Employee shall have ten business days to accept or reject the Employment Offer. If an Employment Offer is accepted by an Offered Employee, and except as otherwise provided herein with respect to Offered Employees on leaves of absence as of the Closing Date, the Offered Employee's employment shall commence with Oncor effective as of the Closing Date and be conditioned upon the occurrence of the Closing. Notwithstanding the foregoing, while the commencement of an Offered Employee's employment with Oncor shall not be conditioned on the execution of a Consent, such commencement of employment shall be conditioned on the Offered Employee satisfying Oncor's pre-employment screening and other requirements that apply to similarly situated Oncor employees, including, but not limited to, any applicable drug testing, background checks and completion of any Oncor-required consents; *provided, however,* that Oncor shall use reasonable efforts to, as permitted by applicable Law, use the Personnel Information supplied by SU with respect to any Offered Employee who has executed and returned a Consent to satisfy such Offered Employee's applicable pre-employment screening requirements. With respect to any Offered Employee to whom Oncor has made an Employment Offer pursuant to this Section 12.02(a), but who is on any leave of absence on the Closing Date, such Offered Employee shall become employed by Oncor effective as of the date such Offered Employee commences active employment with Oncor (provided that such commencement of active employment occurs not later than ninety (90) days following the Closing Date or such later time as may be required by applicable Law). The date an Offered Employee commences employment with Oncor is referred to herein as his or her "Hire Date." SU and its Affiliates shall use commercially reasonable efforts to assist Oncor in obtaining access to the Offered Employees prior to their Hire Date in order to discuss their potential employment with Oncor; *provided, however,* that such access shall not unreasonably disrupt the normal business operations of SU. SU and its Affiliates shall not discourage any Offered Employee from accepting employment with Oncor or make any representations to a Business Employee about terms and conditions of employment with

-76-

Oncor; *provided, however*, that SU and its Affiliates may provide to Business Employees summaries of the terms of this Section 12.02(a), after giving Oncor an opportunity to review and comment on such summaries. At least ten business days prior to the Closing Date, Oncor shall deliver to SU a written notice (the "Confirmation Notice") specifying (x) each Offered Employee who has accepted an Employment Offer and whether each such Offered Employee has satisfied Oncor's pre-employment screening requirements referred to above and (y) each Offered Employee who has rejected an Employment Offer. As used in this Agreement, the term "Transferred Employee" means each Offered Employee who accepts an Employment Offer as provided in the preceding provisions of this Section 12.02 and who becomes employed by Oncor on or, if applicable, following the Closing Date in accordance with such Employment Offer.

(b) The employment of each Transferred Employee with SU and its Affiliates shall be deemed terminated effective as of his or her Hire Date at such time that is immediately prior to such Transferred Employee's commencement of employment with Oncor (the "Transfer Time"). Effective as of (and conditioned upon the occurrence of) each applicable Transfer Time, SU on its own behalf and on behalf of its Affiliates, hereby waives and releases each provision of any confidentiality, non-competition, non-disclosure or other agreement between SU or any of its Affiliates and any Transferred Employee that would restrict or encumber such Transferred Employee's ability to perform his or her duties as an employee of Oncor; *provided, however*, that the foregoing waiver and release shall not diminish or otherwise affect in any respect any obligations of a Transferred Employee who was employed by SU at or above the supervisor level with respect to confidential information primarily related to any business, operations, properties or assets to be retained by SDTS or SU after giving effect to the Transactions.

(c) Notwithstanding any other provision herein, each Transferred Employee who is hired into a position with Oncor that is subject to the terms of any then-existing collective bargaining agreement (each, a "Represented Transferred Employee") with Oncor shall be employed pursuant to the terms of any applicable collective bargaining agreements that govern such position. Each Transferred Employee who is not a Represented Transferred Employee shall receive from Oncor, in connection with their employment and pursuant to its plans and policies, as they may be amended from time to time, (i) base salary or regular hourly wage equal to the greater of (A) the base salary or regular hourly wage received by such Transferred Employee from SU or its Affiliates immediately prior to the Transferred Employee's Hire Date (the "SU Salary") and (B) the base salary or regular hourly wage received as of the Hire Date by similarly situated employees of Oncor; *provided, however*, that if a Transferred Employee's base salary or regular hourly wage as of the Transfer Time is equal to the SU Salary, such Transferred Employee's base salary or regular hourly wage will be frozen until the base salary or regular hourly wage falls within the range of base salaries or regular hourly wages that are paid to similarly situated employees of Oncor; and (ii) benefits and incentives, including bonus opportunities, that are substantially similar in the aggregate to the benefits and incentives, including bonus opportunities, offered to similarly situated employees of Oncor; *provided, further* that any Business Employee who is (x) identified as a temporary employee on Schedule 12.02(a), (y) accepts an Employment Offer pursuant to Section 12.02(a) and (z) becomes employed by Oncor on or, if applicable, following the Closing Date in accordance with such Employment Offer (such Business Employee, a "Transferred Temporary Employee") shall be eligible for severance and termination benefits in accordance with and as described on Schedule 12.02(c).

-77-

(d) Oncor shall provide each Transferred Employee with service credit for benefit eligibility and vesting purposes under the Employee Benefit Plans of Oncor listed on Schedule 12.02(d) (the "Oncor Benefit Plans") in which such Transferred Employee participates on or after such Transferred Employee's Hire Date (but not for benefit accrual purposes except as specifically provided on Schedule 12.02(d)) based on each such Transferred Employee's years of service at SU or any of its Affiliates; *provided, however*, that such service credit shall be given in accordance with the service crediting provisions of the applicable Oncor Benefit Plan, and consistent with Schedule 12.02(d) and applicable Law; and *provided, further*, that such service credit shall not be provided to the extent that providing such service credit would result in a duplication of benefits for the same period of service. In calculating such service credit, Oncor shall utilize the Years of Service information provided in Section 5.16(a) of the SU Disclosure Schedule, as adjusted to take into account the amount of time between the date of this Agreement and the Hire Date. With respect to any Oncor Benefit Plans in which any Transferred Employee may, at any time, be eligible to participate that provide medical benefits (including prescription drug, but not life insurance or disability benefits), Oncor shall (i) waive any eligibility, pre-certification and participation requirements or pre-existing condition limitations to the same extent previously met under comparable SU Benefit Plans, and (ii) provide or cause to be provided to each Transferred Employee and his or her eligible dependents credit for any deductibles and out of pocket expenses that were paid (A) during the plan year that includes the Transferred Employee's Hire Date and (B) prior to becoming eligible to participate in such Oncor Benefit Plans under the analogous SU Benefit Plan (to the same extent that such credit was given under such SU Benefit Plan) in satisfying any applicable deductible requirements and out of pocket maximums under the applicable Oncor Benefit Plan; *provided, however*, that waiver of any such pre-certification requirement or crediting of such payments towards deductibles and out of pocket maximums shall not occur unless and until information with respect to the pre-certification or amounts paid toward deductibles by Transferred Employees under the analogous SU Benefit Plan as of the Closing Date is provided to Oncor or the third-party administrator of the applicable Oncor Benefit Plan by SU or the third-party administrator of the applicable SU Benefit Plan, and provided, further, that Oncor shall have a reasonable period of time after receipt of such information to reflect in its system the pre-certifications received and crediting of such amounts paid towards deductibles and out of pocket maximums. Notwithstanding the foregoing, the provisions of this Section 12.02(d) shall only apply to a Represented Transferred Employee to the extent the applicable collective bargaining agreement or relationship applicable to such Represented Transferred Employee's post-Hire Date employment permits the recognition of service (and other) credit contemplated by this Section 12.02(d).

(e) SU shall, subject to applicable Law, use commercially reasonable efforts to provide or cause to be provided to Oncor all information reasonably requested by Oncor to enable Oncor to comply with the terms of Section 12.02(d), including instructing any applicable third-party administrators to supply Oncor with pre-certification decisions and amounts paid by Transferred Employees towards any medical deductibles under the applicable SU Benefit Plan.

(f) Pursuant to the terms of the Oncor Thrift Plan (as defined below), an individual Transferred Employee may elect to rollover cash balances from the SU Benefit Plan that is a tax qualified defined contribution plan intended to be qualified under Section 401(a) of the Code (the "SU 401(k) Plan") to the analogous Oncor Benefit Plan (the "Oncor Thrift Plan") with respect to such Transferred Employee (each a "Cash Rollover" and together the "Cash Rollovers"). SU or an Affiliate thereof shall permit any Cash Rollover and shall, prior to the effective time of the Cash Rollovers, take any and all steps necessary to cause that the amounts included in the Cash Rollovers are fully vested prior to rollover.

(g) As soon as practicable after the Closing Date, SU shall (i) pay or cause to be paid to all Transferred Employees any bonuses and incentive compensation payments that are earned during the calendar year the Closing occurs under SU's annual incentive compensation plans prorated from January 1 of such year through the Closing Date, based on actual results as of the Closing, and (ii) make or cause to be made to SU's defined contribution plan, any profit-sharing and/or other non-elective contributions with respect to Transferred Employees that, pursuant to such defined contribution plan or in accordance with SU's past practice and in the ordinary course, would normally be made with respect to compensation earned by such Transferred Employees during the calendar year in which the Closing occurs. For the avoidance of doubt, for periods after a Transferred Employee's Transfer Time, Oncor shall be responsible for all notices of termination, termination pay, severance pay, and other liabilities and obligations under any applicable Laws or otherwise relating to such Transferred Employee and shall be responsible for salary, wages, benefit coverage, incentive compensation or paid time off earned by such Transferred Employee that relates to such Transferred Employee's employment with Oncor.

(h) SU shall be responsible for, and shall indemnify and hold Oncor harmless for, all Losses arising from, or relating to, employees of SU and its Affiliates: (i) who do not become Transferred Employees; and (ii) who are Transferred Employees to the extent such Losses arise from or relate to acts or omissions of SU and its Affiliates occurring prior to such Transferred Employees' Transfer Time, including in each case, termination pay, severance pay, and other liabilities and obligations under applicable Laws, Contracts, and any SU Benefit Plan. Oncor shall be responsible for, and shall indemnify and hold SU and its Affiliates harmless for, all Losses arising from, or relating to Transferred Employees to the extent such Losses arise from or relate to acts or omissions of Oncor occurring on or after such Transferred Employees' Transfer Time, including in each case, termination pay, severance pay, and other liabilities and obligations under applicable Laws, Contracts, and any Oncor Benefit Plan. For purposes of this Section 12.02, the following claims shall be deemed to arise (and otherwise give rise to Losses) as follows: (A) life, accidental death and dismemberment on the event giving rise to such benefits; (B) short-term disability or similar benefits on the event giving rise to such benefits; (C) medical, vision, dental, and prescription drug benefits, upon delivery of the applicable services, materials or supplies; (D) long-term disability benefits, on the eligibility date determined by the long-term disability insurance carrier for the plan in which the applicable employee participates; and (E) a claim for workers' compensation benefits shall be deemed to be incurred when the event giving rise to the claim (the "Workers Compensation Event") occurs, and if the Workers Compensation Event occurs over a period both preceding and following a Transferred Employee's Transfer Time, the claim shall be the joint responsibility and liability of SU and Oncor and shall be equitably apportioned between SU and Oncor based upon the relative periods of time that the Workers Compensation Event transpired preceding and following the relevant Transfer Time.

-79-

(i) If the Closing occurs, SU shall be responsible for providing applicable notices and coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, to all individuals who are M&A qualified beneficiaries (within the meaning assigned to such term under Q&A-4 of Treasury Regulation section 54.4980B-9) with respect to the Transactions, in accordance with the terms of the applicable SU Benefit Plan.

(j) Nothing in this Agreement shall constitute an amendment to, or be construed as amending, any Oncor Benefit Plan, SU Benefit Plan or similar arrangement. The provisions of this Section 12.02 are solely for the benefit of Oncor and SU, and nothing in this Section 12.02, express or implied, shall confer upon any Business Employee or Transferred Employee, or legal representative or beneficiary thereof, any rights or remedies, including any right to employment or continued employment for any specified period, or compensation or benefits of any nature or kind whatsoever under this Agreement. Nothing in this Section 12.02, express or implied, shall be construed to prevent Oncor or SU from terminating or modifying to any extent or in any respect any Employee Benefit Plan that Oncor or SU may establish or maintain.

Section 12.03. *Limited Representations.* The parties expressly acknowledge and agree that (a) the SDTS Entities have not made and shall not be deemed to have made to Oncor any representations or warranties relating to the SDTS Assets, the Subject SDTS Operations or any other matter, except for the representations and warranties expressly made in Article IV of this Agreement, (b) the SU Entities have not made and shall not be deemed to have made to Oncor any representations or warranties relating to the SU Assets, the Subject SU Operations or any other matter, except for the representations and warranties expressly made in Article V of this Agreement and (c) the Oncor Entities have not made and shall not be deemed to have made any representations or warranties relating to the Oncor T Assets, the Subject Oncor Operations or any other matter, except for the representations and warranties expressly made in Article VI of this Agreement. Without limiting the generality of the foregoing, the parties further acknowledge and agree that none of the SDTS Entities, the SU Entities, the Oncor Entities or their respective Affiliates or representatives has made or is making any (i) express or implied warranties as to any financial projections or other forward-looking information with respect to the Subject SDTS Operations, the Subject SU Operations or the Subject Oncor Operations, as applicable, (ii) implied warranties of merchantability and fitness for a particular purpose with respect to the SDTS Assets, the SU Assets or the Oncor T Assets, as applicable, or (iii) express or implied warranties as to any other matter which, under applicable Law, would be deemed to give rise to any express or implied warranty unless such warranties were expressly disclaimed, and SDTS, SU and Oncor hereby disclaim any other representations or warranties that would otherwise be deemed to be made by the SDTS Entities, the SU Entities or the Oncor Entities or their respective Affiliates or representatives in connection with this Agreement or the Transactions. Each party further agrees not to assert any Claims or take any position in any Legal Proceeding that is inconsistent with the provisions of this Section 12.03.

-80-

Section 12.04. *Post-Closing Information*. For a period of seven years after the Closing Date, upon reasonable written notice, each of SDTS and SU on the one hand and Oncor on the other hand shall afford or cause to be afforded to the other party and its Affiliates and their respective representatives reasonable access to the personnel, properties, books, Contracts, commitments and records, in each case if and to the extent relating to the SDTS Package, the SU Package or the Oncor T Package, as applicable, for any reasonable business purpose, including in respect of the preparation of financial statements, disclosure documents and reports or filings (including Tax Returns) with any Governmental Entity, of such other party and its affiliates; *provided, however* that such access does not unreasonably disrupt the normal operations of such other party or any of its Affiliates. Nothing contained in this Section 12.04 shall oblige SDTS, SU or Oncor or any of their respective Affiliates to breach any duty of confidentiality owed to any person, whether such duty arises contractually, statutorily or otherwise. In addition, notwithstanding anything to the contrary contained in this Section 12.04, no party or any of its Affiliates shall be obligated to provide to any other party (x) any work papers or similar materials prepared by the independent public accountants of such party or its Affiliates, except to the extent that such accountants agree to provide access to such work papers or similar materials upon such terms and conditions as shall be determined by such accountants in their sole discretion, or (y) any documents or information that are protected by the attorney-client privilege or work product doctrines if the applicable party determines in its reasonable discretion that providing copies or access to such documents or information could give rise to a possible waiver of such privilege or doctrine.

Section 12.05. *Personally Identifiable Information*. Each of the parties shall (a) comply with its obligations under all applicable data protection Laws relating to personally identifiable information provided to such party by another party in connection with the Transactions ("PII") and shall hold all PII in confidence, comply with the providing party's reasonable instructions regarding the handling of PII and take security measures to safeguard PII against unauthorized, unlawful or accidental access, loss, destruction, damage, disclosure, transfer or other improper use and (b) treat Proprietary Customer Information provided by such party as highly sensitive trade secrets consistent with applicable PURA provisions, PUCT rules, guidelines, and practices and ERCOT Protocols and practices.

Section 12.06. *Nontransferable Rights*.

(a) Oncor shall use commercially reasonable efforts to obtain at the earliest reasonably practicable date prior to the Closing Date all Oncor Required Authorizations, including the Oncor Required Authorizations set forth on Section 12.06(a) of the Oncor Disclosure Schedule. In the event that (i) any Oncor Required Authorization shall not be obtained by Oncor prior to the Closing Date or (ii) any other right is identified by SDTS to Oncor as an Oncor Nontransferable Right after the Closing Date, Oncor acknowledges and agrees that it shall be bound by, and SDTS as a result of the Oncor Merger shall have a right to enforce, Oncor's obligations set forth in Section 1.04 of the Oncor Pre-Closing Contribution Agreement.

-81-

(b) SDTS shall use commercially reasonable efforts to obtain at the earliest reasonably practicable date prior to the Closing Date all SDTS Required Authorizations, including the SDTS Required Authorizations set forth on Section 12.06(b) of the SDTS Disclosure Schedule. In the event that (i) any SDTS Required Authorization shall not be obtained by SDTS prior to the Closing Date or (ii) any other right is identified by Oncor to SDTS as an SDTS Nontransferable Right after the Closing Date, SDTS acknowledges and agrees that it shall be bound by, and Oncor as a result of the SDTS merger shall have a right to enforce, SDTS's obligations set forth in Section 4.02 of the SDTS Pre-Closing Merger Agreement.

(c) SU shall use commercially reasonable efforts to obtain at the earliest reasonably practicable date prior to the Closing Date all SU Required Authorizations, including the SU Required Authorizations set forth on Section 12.06(c) of the SU Disclosure Schedule. In the event that (i) any SU Required Authorization shall not be obtained by SU prior to the Closing Date or (ii) any other right is identified by Oncor to SU as an SU Nontransferable Right after the Closing Date, SU acknowledges and agrees that it shall be bound by, and Oncor as a result of the SU merger shall have a right to enforce, SU's obligations set forth in Section 4.02 of the SU Pre-Closing Merger Agreement.

(d) For the avoidance of doubt and notwithstanding anything in this Section 12.06, the Oncor Pre-Closing Contribution Agreement or the SDTS Pre-Closing Merger Agreement to the contrary, with respect to consents required to the assignment or transfer of any Easements, the use of commercially reasonable efforts shall not require making any monetary payment to any Person entitled to consent to the assignment or transfer of an Easement (except in connection with condemnation proceedings), but shall require the party required to seek consent to pursue, whether prior to or following Closing, appropriate condemnation proceedings (and make payments required by such proceedings).

Section 12.07. *Further Assurances*. From time to time after the Closing, as and when requested by any party hereto, any other party shall, at the expense of the requesting party (but subject to Section 12.06), execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such further or other actions as such requesting party may reasonably deem necessary or desirable to evidence and effectuate the Transactions. In addition, SDTS and Oncor shall (i) provide prompt notice to the other party upon discovery that any Easement reasonably believed to be primarily related to the Subject SDTS Operations or Subject Oncor Operations, as applicable, was not allocated or conveyed to the proper party upon the consummation of the Transactions, (ii) discuss and, if applicable, negotiate in good faith the appropriate remedy considering the nature of the Easement and the applicable Subject SDTS Operations or Subject Oncor Operations (including whether the Easement is reasonably necessary for such operations) and (iii) assign or otherwise convey, at the expense of the assigning or conveying party, such Easement (or easement rights pursuant to an Allocation Agreement or Easement Assignment, if applicable) to the proper party.

**ARTICLE XIII**
**Miscellaneous**

Section 13.01. *Assignment; Parties in Interest*. Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned or transferred by any of the parties hereto (including by operation of law in connection with a merger or consolidation) without the prior written consent of each of the parties hereto.

Notwithstanding any assignment or transfer of this Agreement or the rights and obligations of the parties hereunder, each of the parties shall remain responsible for all of its liabilities and obligations under this Agreement. Subject to the first sentence of this Section 13.01, this Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and their respective successors and assigns, the Indemnified Parties (with respect to the provisions of Article X) and SDTS/SU Counsel and Oncor Counsel (with respect to the provisions of Section 13.10), and no other Person shall have any right, obligation or benefit hereunder. Any attempted assignment or transfer in violation of this Section 13.01 shall be void.

Section 13.02. *No Third Party Beneficiaries.* This Agreement is for the sole benefit of the parties hereto and the other Persons identified in Section 13.01, and nothing herein expressed or implied shall give or be construed to give to any other Person any legal or equitable rights, obligations or benefits hereunder.

Section 13.03. *Expenses.* Whether or not the Transactions are consummated, except as otherwise expressly provided herein, each of the parties hereto shall be responsible for the payment of its own costs and expenses incurred in connection with the preparation, negotiation, execution, delivery and performance of this Agreement and the Ancillary Agreements, the performance of its obligations hereunder and thereunder and the planning for, implementation and consummation of the Transactions, including the fees and disbursements of any attorneys, accountants, brokers or advisors employed or retained by or on behalf of such party. SDTS shall pay any filing fees required under the HSR Act and any other Competition Laws related to the acquisition of the Oncor T Assets. Oncor shall pay any filing fees required under the HSR Act and any other Competition Laws related to the acquisition of the SDTS Assets and SU Assets.

Section 13.04. *Notices.* All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) three business days after they have been sent by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile transmission, (c) when delivered, if delivered personally to the intended recipient, and (d) two business days after they have been sent by overnight delivery via recognized international courier service, in each case, addressed to a party at the following address for such party:

(i) if to SDTS:

Sharyland Distribution & Transmission Services, L.L.C.
c/o InfraREIT, Inc.
1900 North Akard Street
Dallas, Texas 75201
Attention: Stacey H. Doré
Facsimile: (214) 855-6701

-83-

with a copy, which shall not constitute effective notice, to:

Baker Botts L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Attention: Geoffrey L. Newton
Facsimile: (214) 661-4753

(ii) if to SU:

Sharyland Utilities, LP
1807 Ross Avenue
4th Floor
Dallas, Texas 75201
Attention: Kelly Frazier
Facsimile: (214) 978-8810

with a copy, which shall not constitute effective notice, to:

Baker Botts L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Attention: Geoffrey L. Newton
Facsimile: (214) 661-4753

(iii) if to Oncor:

Oncor Electric Delivery Company LLC
1616 Woodall Rogers Freeway
Dallas, Texas 75202
Attention: Allen Nye, Kevin Fease and Mike Davitt
Facsimile: (214) 486-2190

with a copy, which shall not constitute effective notice, to:

Vinson & Elkins L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Attention: Matthew C. Henry and Christopher R. Rowley
Facsimile: (214) 999-7726 and (214) 999-7972

or to such other addresses as shall be furnished in writing by any such party to the other party or parties hereto in accordance with the provisions of this Section 13.04.

Section 13.05. *Headings; Disclosure Schedules; Definitions; Interpretation.*

(a) The descriptive headings of the several Articles and Sections of this Agreement and the Exhibits, Schedules and Table of Contents to this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall have the meaning as defined in this Agreement.

-84-

(b) For purposes of the representations and warranties of each party contained in this Agreement, disclosure in any section of a Disclosure Schedule delivered by such party of any facts or circumstances shall be deemed to be adequate disclosure of such facts or circumstances with respect to all other representations or warranties made by such party, whether or not such disclosure specifically identifies or purports to respond to one or more of such other representations and warranties, if it is reasonably apparent on the face of such Disclosure Schedule that such disclosure pertains to the subject matter of such other representations and warranties. Any information provided in a Disclosure Schedule is solely for informational purposes, and the inclusion of such information shall not be deemed to enlarge or enhance any of the representations or warranties of the party providing such Disclosure Schedule pursuant to this Agreement, or otherwise alter in any way the terms of this Agreement. The inclusion of any information in any section of the Disclosure Schedule or other document delivered by the parties pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever. Descriptions of terms or documents summarized in the Disclosure Schedules shall be deemed qualified in their entirety by reference to the documents themselves.

(c) For all purposes hereof, the terms "include", "includes" and "including" shall be deemed followed by the words "without limitation". The words "hereof", "hereto", "hereby", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "or" is not exclusive. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends or applies, and such phrase does not mean simply "if". The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Any agreement, instrument or Law defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or Law as from time to time amended, modified or supplemented. References to a Person are also to its permitted successors and assigns.

(d) For all purposes of this Agreement, the defined terms used in this Agreement shall have the meanings ascribed to them in Schedule 1 hereto.

Section 13.06. *Integrated Contract; Exhibits and Schedules*. This Agreement, including the Schedules and Exhibits hereto, any written amendments to the foregoing satisfying the requirements of Section 13.11, the Confidentiality Agreement and the Ancillary Agreements, including the schedules, exhibits and annexes thereto, constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and cancel, merge and supersede all prior and contemporaneous oral or written agreements, representations and warranties, arrangements and understandings relating to the subject matter hereof. The parties expressly represent that in entering into this Agreement: (a) they are not relying upon any statements, understandings, representations, expectations, or

-85-

agreements other than those expressly set forth in this Agreement; (b) they have been represented and advised by counsel in connection with this Agreement, which they have entered into voluntarily and of their own choice, and not under coercion or duress; (c) they are relying upon their own knowledge and the advice of counsel; (d) they knowingly waive any claim that this Agreement was induced by any misrepresentation or nondisclosure which could have been or was discovered before signing this Agreement; and (e) they knowingly waive any right to rescind or avoid this Agreement based upon presently existing facts, known or unknown. All Exhibits and Schedules hereto are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement. In the event of any conflict between the provisions of this Agreement (including the Disclosure Schedules and Exhibits hereto), on the one hand, and the provisions of the Confidentiality Agreement or the Ancillary Agreements (including the schedules and exhibits thereto), on the other hand, the provisions of this Agreement shall control.

Section 13.07. *Severability; Enforcement*. The invalidity, illegality or unenforceability of any provision of this Agreement or portion hereof shall not affect the validity, force or effect of the remaining provisions or portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by Law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any Legal Proceeding brought to enforce such restriction.

Section 13.08. *Governing Law*. This Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the laws of the State of Texas, without reference to its conflicts of law principles (except to the extent that the SDTS Merger or SU Merger is governed by the DLLCA).

Section 13.09. *Choice of Forum*.

(a) Each of the parties hereto (i) submits to the exclusive jurisdiction of any state or federal court sitting in Dallas, Texas in any Legal Proceeding arising out of or relating to this Agreement or the Ancillary Agreements, (ii) agrees that all Claims in respect of any such Legal Proceeding may be heard and determined in any such court and (iii) agrees not to bring any Legal Proceeding arising out of or relating to this Agreement or any Ancillary Agreement (whether on the basis of a Claim sounding in contract, equity, tort or otherwise) in any other court. Each of the parties hereto agrees that a final judgment (subject to any appeals therefrom) in any such Legal Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b) Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue in any Legal Proceeding arising out of or relating to this Agreement or the Ancillary Agreements in any court specified in accordance with the provisions of Section 13.09(a). Each of the parties hereto hereby irrevocably

-86-

waives, to the fullest extent permitted by Law, the defense of an inconvenient forum or *forum nonconveniens* to the maintenance of such Legal Proceeding in any such court. Each of the parties hereto hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 13.04. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by Law.

Section 13.10. *Transaction Privilege.* With respect to Baker Botts L.L.P., Eversheds Sutherland (US) LLP and any other counsel that represents SDTS or SU in connection with the Transactions (collectively, "SDTS/SU Counsel"):

(i) Oncor hereby acknowledges and agrees that SDTS/SU Counsel have represented the SDTS Entities and SU Entities over a substantial period of time prior to the date hereof, including in connection with the negotiation, preparation, execution and delivery of this Agreement and the Transactions, and that SDTS, SU and their respective Affiliates and representatives (each, an "SU/SDTS Group Member") have a reasonable expectation that, after the Closing, SDTS/SU Counsel will represent them in connection with any Claim or Legal Proceeding involving any SU/SDTS Group Member, on the one hand, and any Oncor Entity and its Affiliates and representatives (each, an "Oncor Group Member"), on the other hand, arising under or relating to this Agreement or the Transactions.

(ii) Oncor, on its own behalf and on behalf of the other Oncor Group Members, hereby expressly waives and agrees not to assert any conflict of interest that may arise or be deemed to arise under any applicable Law or standard of professional responsibility if, after the Closing, SDTS/SU Counsel represent the SU/SDTS Group Members or any of them in connection with any Claim or Legal Proceeding arising under or relating to this Agreement or the Transactions.

(iii) In addition, each of the parties hereto irrevocably acknowledges and agrees that, from and after the Closing, any attorney-client privilege arising from communications prior to the Closing between any one or more representatives of SU/SDTS AssetCo, on the one hand, and SDTS/SU Counsel, on the other hand, whether related to this Agreement, the Transactions, or otherwise, shall be excluded from the property, rights, privileges, powers, franchises and other interests that are possessed by or vested in the SDTS Merger Surviving Entity or SU Merger Surviving Entity as of the SDTS Merger Effective Time or SU Merger Effective Time, respectively, pursuant to the DLLCA or the TBOC. All communications involving attorney-client confidences between SDTS AssetCo or SU AssetCo, on the one hand, and SDTS/SU Counsel, on the other hand, relating to the negotiation, documentation and consummation of the Transactions shall be deemed to be attorney-client confidences that belong solely to SDTS or SU, as applicable (and not Oncor).

(iv) Oncor agrees that it shall, and shall cause any other Oncor Group Member to, execute any document or instrument requested from time to time by SDTS, SU or SDTS/SU Counsel in order to evidence or effectuate the intentions of the parties reflected in this Section 13.10 (a).

-87-

(v) This Section 13.10(a) is for the benefit of the SDTS, SU and SDTS/SU Counsel and such Persons are intended third-party beneficiaries of this Section 13.10(a). This Section 13.10(a) shall be irrevocable, and no term of this Section 13.10(a) may be amended, waived or modified, without the prior written consent of SDTS, SU and SDTS/SU Counsel.

(b) With respect to Vinson & Elkins LLP and any other counsel that represents Oncor in connection with the Transactions ("Oncor Counsel"):

(i) SDTS and SU hereby acknowledge and agree that Oncor Counsel has represented the Oncor Entities over a substantial period of time prior to the date hereof, including in connection with the negotiation, preparation, execution and delivery of this Agreement and the Transactions, and that the Oncor Group Members have a reasonable expectation that, after the Closing, Oncor Counsel will represent them in connection with any Claim or Legal Proceeding involving any Oncor Group Member, on the one hand, and any SU/SDTS Group Member, on the other hand, arising under or relating to this Agreement or the Transactions.

(ii) SDTS and SU, on their own behalf and on behalf of their respective SU/SDTS Group Members, hereby expressly waive and agree not to assert any conflict of interest that may arise or be deemed to arise under any applicable Law or standard of professional responsibility if, after the Closing, Oncor Counsel represents the Oncor Group Members or any of them in connection with any Claim or Legal Proceeding arising under or relating to this Agreement or the Transactions.

(iii) In addition, each of the parties hereto irrevocably acknowledges and agrees that, from and after the Closing, any attorney-client privilege arising from communications prior to the Closing between any one or more representatives of Oncor AssetCo, on the one hand, and Oncor Counsel, on the other hand, whether related to this Agreement, the Transactions, or otherwise, shall be excluded from the property, rights, privileges, powers, franchises and other interests that are possessed by or vested in the Oncor Merger Surviving Entity as of the Oncor Merger Effective Time pursuant to the TBOC. All communications involving attorney-client confidences between Oncor AssetCo, on the one hand, and Oncor Counsel, on the other hand, relating to the negotiation, documentation and consummation of the Transactions shall be deemed to be attorney-client confidences that belong solely to Oncor (and not SDTS or SU).

(iv) SDTS and SU agree that they shall, and shall cause their respective SU/SDTS Group Members to, execute any document or instrument requested from time to time by Oncor or Oncor Counsel in order to evidence or effectuate the intentions of the parties reflected in this Section 13.10(b).

(v) This Section 13.10(b) is for the benefit of the Oncor and Oncor Counsel and such Persons are intended third-party beneficiaries of this Section 13.10(b). This Section 13.10(b) shall be irrevocable, and no term of this Section 13.10(b) may be amended, waived or modified, without the prior written consent of Oncor and Oncor Counsel.

-88-

Section 13.11. *Amendments; Waivers.* This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be altered only by an instrument in writing signed by each of the parties hereto. The observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) by the party entitled to the benefits of such term, but such waiver shall be effective only if it is in a writing signed by the party entitled to the benefits of such term and against which such waiver is to be asserted. Unless otherwise expressly provided in this Agreement, no delay or omission on the part of any party in exercising any right or privilege under this Agreement shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right or privilege under this Agreement operate as a waiver of any other right or privilege under this Agreement nor shall any single or partial exercise of any right or privilege preclude any other or further exercise thereof or the exercise of any other right or privilege under this Agreement.

Section 13.12. *Specific Enforcement.* The parties agree that irreparable damage would occur and that the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, in addition to any other remedy to which they are entitled at law or in equity.

Section 13.13. *Counterparts.* This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person or by facsimile, or by electronic image scan to the other party hereto.

*[Remainder of the page intentionally left blank]*

-89-

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

**SDTS:**

SHARYLAND DISTRIBUTION & TRANSMISSION
SERVICES, L.L.C.

By: _____  /s/ Brant Meleski
Name: Brant Meleski
Title: Senior Vice President and Chief Financial
Officer

[Signature Page to Agreement and Plan of Merger]

**SU:**

SHARYLAND UTILITIES, L.P.

By: _____     /s/ Greg Wilks
                                  Name: Greg Wilks
                                  Title: Chief Financial Officer

**SU ASSETCO:**

SU ASSETCO, L.L.C.

By: _____     /s/ Greg Wilks
                                  Name: Greg Wilks
                                  Title: Chief Financial Officer

[Signature Page to Agreement and Plan of Merger]

**ONCOR:**

ONCOR ELECTRIC DELIVERY COMPANY LLC

By: _____ /s/ David Davis
Name: David Davis
Title: Senior Vice President and Chief Financial Officer

**ONCOR ASSETCO:**

ONCOR ASSETCO LLC

By: ONCOR ELECTRIC DELIVERY COMPANY LLC, its sole member

By: _____ /s/ David Davis
Name: David Davis
Title: Senior Vice President and Chief Financial Officer

[Signature Page to Agreement and Plan of Merger]