IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS | ) | Case No.: 14-10979 (CSS) |
| CORP., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Docket Nos.: 9584, 11636 |
| | ) | |

## OPINION

**BAYARD, P.A.**
Erin R. Fay
Scott D. Cousins
Evan T. Miller
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
-and-
**ROPES & GRAY LLP**
Keith H. Wofford
Gregg M. Galardi (Argued)
1211 Avenue of the Americas
New York, NY 10036-8704

**Counsel for Elliot Associates, L.P.,
Elliott International, L.P., and the
Liverpool Limited Partnership**

**RICHARDS, LAYTON & FINGER P.A.**
Mark D. Collins
Daniel J. DeFranceschi
Jason M. Madron
920 North King Street
Wilmington, DE 19801
-and-
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
Edward O. Sassower
Stephen E. Hessler, P.C.

**LANDIS RATH & COBB LLP**
Adam G. Landis
Matthew B. McGuire
Joseph D. Wright
919 Market Street, Suite 1800
Wilmington, DE 19801
-and-
**WINSTON & STRAWN LLP**
Dan K. Webb (Argued)
35 W. Wacker Drive
Chicago, IL 60601-9701

Thomas M. Buchanan
1700 K Street, NW
Washington, DC 20006
-and-

**NORTON ROSE FULBRIGHT US LLP**
Howard Seife
1301 Avenue of the Americas
New York, NY 10019-6022

Rose Ball
555 South Flower Street, 41st Floor
Los Angeles, CA 90071

**Counsel to NextEra Energy, Inc.**

Brian E Schartz
Aparna Yenamandra
601 Lexington Avenue
New York, NY  10022-4611
        -and-
James H.M. Sprayregen
Marc Kieselstein (Argued)
Chad J. Husnick
Steven N. Serajeddini
300 North LaSalle
Chicago, IL  60654

**Co-Counsel to the Debtors
and Debtors in Possession**

Dated: October 3, 2017

Sontchi, J. _____

# INTRODUCTION

Before the Court is a motion for reconsideration of an order approving, among

other things, a Termination Fee[1] in the amount of $275 million.  The Court is taking the

extraordinary step of reconsidering its order entered over one year ago because its

approval of the Termination Fee was based upon a fundamental misapprehension of

critical facts.  The Court's misunderstanding was based upon imprecise and incorrect

testimony by the Debtors' witness, incomplete responses by Debtors' counsel to questions

by the Court and conspicuous and unhelpful silence by the beneficiary of the Termination

Fee, NextEra.  However, the ultimate responsibility for the Court's mistake lies with the

---

[1]  Undefined terms used in the Introduction have the meaning set forth below.

Court itself.  The Court simply missed the critical nuance between when the Termination Fee would be payable and when it would not be.

In any event, had the Court properly understood the facts it would not have approved the payment of the Termination Fee under the present circumstances nor could it. Viewed at the time the Termination Fee was approved, the fee did not satisfy the *O'Brien* standard for payment of such fees because there could not be any actual benefit to the Debtors' estate by payment of the fee.  That has been borne out by the actual circumstances at present.  Indeed, payment of the Termination Fee at this time would be extremely harmful to the Debtors' estates.

The Court's misapprehension of the facts led to an incorrect application of the legal standard.  In short, the Court made a manifest error of fact and law. As such, the Court must take the extraordinary step, which it does not do lightly, of reconsidering an order it entered over a year ago and upon which parties have relied.

## <u>JURISDICTION</u>

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue in the United States Bankruptcy Court for the District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A), (B), (N), and (O).  The Court has the judicial power to enter a final order.

## STATEMENT OF FACTS[2]

Even a concise history of this 3½ year old Chapter 11 case would take hundreds of pages.  Thankfully, the issue before the Court is quite narrow and the relevant facts can be set forth with some brevity.

In April 2016, after an extensive and strategic marketing process and various other efforts, the Debtors engaged in discussions with NextEra Energy, Inc. ("NextEra") for the sale of the Debtors' economic interest in Oncor Electric Delivery Company LLC ("Oncor").

On July 29, 2016, certain of the Debtors, NextEra, and EFH Merger Co., LLC ("Merger Sub")—a newly formed subsidiary of NextEra—executed definitive documentation to govern this transaction, including an Agreement and Plan of Merger among Energy Future Holdings Corp. ("EFH"), Energy Future Intermediate Holding Company LLC ("EFIH"), NextEra, and Merger Sub, dated July 29, 2016 (the "Merger Agreement").  The Merger Agreement, as amended, contemplated a merger of EFH with and into Merger Sub, whereby EFH would have become a wholly-owned subsidiary of NextEra with an approximately $18.7 billion implied Oncor total enterprise value. Included in the Merger Agreement was a "Termination Fee" in the amount of $275 million in favor of NextEra (the "Termination Fee").

---

[2]  Pursuant to the Stipulation and Order Regarding Elliott's Motion to Reconsider, the parties have stipulated to the record with regard to the Motion to Reconsider. [D.I. 11716, ¶7(a)-(z)].  All statements of fact contained herein are drawn from the stipulated record.

Also on July 29, 2016, EFH, EFIH, EFIH Finance Inc., certain direct and indirect subsidiaries of EFH, and NextEra entered into a Plan Support Agreement (as modified, amended or supplemented from time to time, the "Plan Support Agreement") in support of the Amended Joint Plan of Reorganization of Energy Future Holdings Corp. et al., pursuant to Chapter 11 of the Bankruptcy Code, as modified and filed with the Bankruptcy Court on August 5, 2016 [D.I. 9199] (as modified, amended or supplemented from time to time, the "E-Side Plan"). By motion dated August 3, 2016 (the "Approval Motion"), the Debtors sought approval of their entry into the Plan Support Agreement and the Merger Agreement (collectively, the "NextEra Transaction").[3]

Through the Approval Motion, the Debtors sought approval of the Merger Agreement, including the Termination Fee. The Debtors supported the Approval Motion with declarations by two members of the Debtors' advisory team, William Hiltz and David Ying.[4] The supporting declarations included one identical statement as to when Termination Fee would be payable – "Upon Court approval of the Merger Agreement, EFH Corp. and EFIH are liable for the Termination Fee, in the amount of $275 million, as an allowed administrative expense claim, in the event of termination of the Merger

---

[3]  *See Motion Of The EFH/EFIH Debtors For Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, And (C) Authorizing Entry Into And Performance Under Plan Support Agreement* [D.I. 9190].

[4]  *See Declaration of William O. Hiltz in Support of the Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9191] ("Hiltz Declaration"); *Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9192] ("Ying Declaration").

Agreement."[5]  The Approval Motion repeated the above statement contained in the declarations and included two additional sentences:

> The Termination Fee is not payable in the event of, among other things, certain terminations resulting from breaches by NextEra or Merger Subsidiary or following a termination by NextEra at the Termination Date (as defined in the Merger Agreement) where PUCT approval is the only closing condition not satisfied.
>
> ***
>
> If the Debtors terminate the Merger Agreement following entry of the Approval Order order to accept another proposal, and the transaction contemplated by such other proposal is consummated, the Debtors would owe the $275 million Termination Fee.[6]

Several creditors objected to the Approval Motion, including Fidelity Management & Research Company; the Estate of George Fenicle, David William Fahy, and John H. Jones (the "Asbestos Objectors"); American Stock Transfer & Trust Company, LLC, as successor trustee to The Bank of New York Mellon Trust Company, N.A. (in such capacity, the "EFH Indenture Trustee"); and Contrarian Capital Management, LLC, which joined in the briefs of the EFH Indenture Trustee.[7]  None of these objections nor the Debtors' reply[8] focused the Court on a critical fact:  the Merger Agreement did not set a date by which approval by the Public Utility Commission of Texas ("PUCT") had to be obtained.  Consequently, no party alerted the Court to what is now alleged by movants: that *if* the PUCT did not approve the NextEra Transaction, the

---

[5]  Hiltz Declaration at ¶19; Ying Declaration at ¶10.

[6]  Hiltz Decl. ¶ 19; Ying Decl. ¶ 10.

[7]  D.I. 9397-99 and 9402.

[8]  D.I. 9536-37.

Debtors could eventually be required to terminate the Merger Agreement and trigger the Termination Fee unless NextEra terminated first of its own volition.

By the time of the hearing on September 19, 2016, all of the objecting creditors, except the Asbestos Objectors, had withdrawn their objections. Although the Asbestos Objectors pressed their objection to the Termination Fee, they focused primarily on the argument that the Termination Fee violated due process.[9] The Asbestos Objectors also objected to the Termination Fee under the Third Circuit's holding in *O'Brien*[10] but did not argue that the fee was impermissible because it could be payable when the Debtors had received no actual benefit.[11]

The testimony at the September 19 hearing focused on the reasonableness of the Termination Fee, stating that the size of the fee was "market" in the witnesses' view. The witnesses described generally the circumstances in which the Termination Fee would be triggered, with the Debtors' investment banker emphasizing that any fee would be paid upon EFH entering into "another transaction."[12] No mention was made of any instance when the Termination Fee could be triggered in the absence of a higher or better alternative transaction.

---

[9] 9/19/16 Hr'g Tr. at 111:7–13, 114:4–116:4.

[10] *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).

[11] 9/19/16 Hr'g Tr. at 111:21–114:3.

[12] *See id.* at 76:12–17 (affirmation by Debtors' banker that the termination fee will be paid "in the unlikely event that the deal isn't consummated and EFH enters into another transaction"); *see also id.* at 28:9–11 (proffer of EFH Treasurer Anthony Horton expressing his "confiden[ce] that the proposed transaction with NextEra will close and belie[f that] there's a low possibility that the termination fee will be triggered").

Mr. Hiltz testified that if the PUCT were not to approve the transaction and the

Debtors subsequently confirmed a different plan, the Termination Fee would be payable.

> THE COURT:  [I]f the Court confirms the plan, and by that I
> mean the one on the table here, or the NextEra deal, and that
> plan does not consummate because of a failure to achieve
> regulatory approval, is the break-up fee payable?
>
> MR. HILTZ:  If the Debtor enters into another transaction, the
> answer is yes.
>
> The COURT:  But if this transaction simply falls apart because
> you don't get regulatory approval from the Public Utility
> Commission?
>
> MR. HILTZ:  Well, again, I think if the Debtor enters into
> another transaction including a reorganization involving its
> own creditors … it would be payable.
>
> THE COURT:  [B]ecause if this plan gets confirmed for
> Debtors -- [and] not [because of] anything the Debtors do
> wrong, they don't get the regulatory approval they need --
> this falls apart and a year and a half from now, they confirm
> a different plan that's not even a sale plan, say it's a
> standalone plan, that break-up fee would be payable?
>
> MR. HILTZ:  I believe so.[13]

However, when the Court inquired directly of Debtors' counsel, Debtors' counsel was

unclear on the issue.

> THE COURT:  I actually have a question. . . .  And this goes to
> when the break-up fee is payable in the event there is a
> regulatory problem.
>
> . . .
>
> THE COURT:  So, I read [Sections 8.5(b) and 8.2(a)] to be is –
> and maybe – is this your understanding that the plan gets

---

[13]  *Id.* at 78:3-23.

> confirmed, they go to the PUCT, the PUCT shuts it down, and NextEra – or it sets terms on it that NextEra doesn't like, and NextEra terminates, that the break-up fee is not payable?
>
> . . .
>
> MR. HUSNICK: . . . [Y]ou're 100 percent right about if the PUCT denies approval.
>
> . . .
>
> THE COURT:  So if they simply disapprove and the parent – and NextEra walks, no break-up fee?
>
> MR. HUSNICK:  Correct.[14]

The initial response stated there would be no break-up fee if "NextEra walks" — but did not specify that if NextEra did not walk after a PUCT denial, the Termination Fee could be payable when the Debtors were forced to terminate.  Shortly after that exchange, counsel for the Debtors then made the following statement to the Court to clarify the earlier statements:

> MR. HUSNICK:  Your Honor, the second thing I wanted to clarify was just the break fee.  I think we are on the same page now about when that gets paid, but just to cover it one more time, it's an incredibly detailed provision.  Suffice to say there's no break-up fee if the PUC [sic] just denies – outright denies approval.[15]

After hearing closing statements, the Court overruled the remaining objection and approved the Merger Agreement, including the Termination Fee.[16]  While noting that the Termination Fee was "large," the Court found it "an appropriate number for a case of

---

[14]  9/19/16 Hr'g Tr. at 82:6–84:10.

[15]  *Id.* at 90:10–15.

[16]  *Id.* at 119-24.

this size."[17]  It also found that the amount was "supported by the market" and that the evidence indicated that the fee was "necessary to induce NextEra to make a bid."[18]

Following the hearing, the Court entered the Order granting the Approval Motion, including approval of the Termination Fee (the "Termination Fee Order").[19]  The Termination Fee Order did not include a finding regarding the actual benefit to the Debtors' estates from the imposition of a $275 million Termination Fee.  The Court did not limit or preclude assertion of the Termination Fee by NextEra if the PUCT denied the change-in-control application submitted by NextEra.

On September 22, 2016, three days after the record on the Approval Motion was closed and the Termination Fee Order was entered, the PUCT held a hearing at which the Commissioners expressed concerns regarding the Debtors' potential liability for the Termination Fee and the position in which it placed the Commissioners:

> COMM:  [T]his merger agreement does something much more, and that is it appears to be an effort to really tie the Commission's hands in the proceeding.
>
> What they propose is that . . . if I read [the Merger Agreement] correctly, if the Commission rejects the transaction in its entirety, is not in the public interest subject to some caveats, there's no termination fee.
>
> If, on the other hand, the Commission purports to approve it but with what they call "burdens of condition" (sic) . . . they can walk and get paid $275 million.  Now that's an extraordinary requirement.[20]

---

[17]  *Id*. at 121:4–19.

[18]  *Id*.

[19]  D.I. 9584.

[20]  Sept. 22, 2016 PUCT Hr'g Tr. at 88–89 (comments of Commissioner Anderson).

To Commissioner Anderson, the Termination Fee would be paid if the PUCT imposed "burdensome conditions," not if the PUCT rejected the application. So, it really was an "improper attempt" to constrain the PUCT in the exercise of its statutory duties under Texas law,[21] a view seemingly shared by Commissioner Nelson.[22]

Following Commissioner Anderson's remarks, on September 25, counsel for the Debtors and NextEra submitted a joint letter to the Court seeking to clarify when the Termination Fee would be paid (the "September 25 Letter").[23] Since this letter was submitted after the Termination Fee Order, it was not part of the record supporting the Termination Fee Order's entry. The September 25 Letter starts by stating that NextEra would not receive the Termination Fee if NextEra terminated the Merger Agreement because "the Commission either approves the merger agreement with 'burdensome conditions' (as defined in the merger agreement) or does not approve the merger agreement transaction."[24]

After adding a paragraph to clarify that representation, the September 25 Letter then stated:

> In other words, the $275 million termination fee *is triggered* if EFH and/or EFIH terminate the merger agreement as a consequence of the Commission either not approving the merger agreement transaction or approving the merger transaction with the imposition of a burdensome condition.[25]

---

[21] *Id.* at 89:22–25.

[22] *Id.* at 94:23–95:4.

[23] D.I. 9655.

[24] *Id.*

[25] *Id.*

And the next two sentences seek to assure the Court that the payment of the Termination

Fee is unlikely because:

> In order for EFH and/or EFIH to pursue an alternative
> transaction, EFH and EFIH believe they would only terminate
> in such a situation if they had an alternative proposal to
> pursue. The termination fee is not triggered if, under the
> same circumstances, NextEra Energy terminates the merger
> agreement instead of EFH and/or EFIH.[26]

The September 25 Letter suggests that the Termination Fee would be triggered

only if the Debtors opted to "pursue" an "alternative proposal." There is, however, no

definition of "alternative proposal" in the Merger Agreement. Nor is there a fixed

definition for "alternative transaction," which the Merger Agreement simply describes as

any transaction "(including any transaction or proceeding that permits the E-Side

Debtors that are the direct or indirect owners of Oncor Holdings to emerge from the

Chapter 11 Cases) pursuant to which neither [NextEra] nor any of its Affiliates will obtain

direct or indirect ownership of 100% of Oncor Holdings and Oncor Holdings'

approximately 80% equity interest in Oncor."[27] But the payment of the Termination Fee

did not stop with transactions that the Debtors would "pursue" to emerge from their

Chapter 11 cases because the Termination Fee was also payable in a Chapter 7 liquidation

or a liquidating Chapter 11 plan for EFIH.[28]

---

[26] *Id.*

[27] *See* Merger Agreement, § 8.5(b).

[28] *See id.* §§ 8.3(d), 8.4(g), 8.5(b).

At a previously scheduled September 26, 2016 hearing, the Court departed from the agenda and made a statement relating to the comments of Commissioner Anderson. The Court recognized the "unusual and troubling" pressure that the Termination Fee placed on both the PUCT and the Court.[29]  But the Court noted the clarification provided by the September 25 Letter with regard to whether NextEra would seek payment of the Termination Fee in the event NextEra Terminated the Merger Agreement.

> Late last evening, however, EFH and NextEra sent a joint letter to the Court regarding the termination fee.  In that letter the parties clarified their position with regard to the termination fee.  More specifically, the parties state that it is their view that NextEra is not entitled to a termination fee under the merger agreement if NextEra terminates the merger agreement because the PUCT either approves the merger agreement transaction with burdensome conditions or does not approve the merger agreement transaction.
>
> In addition, the parties clarified that in any event, NextEra will not seek to collect any portion of the termination fee contemplated by the merger agreement in the event NextEra terminates the merger agreement and the circumstances just described by the Court and more specifically detailed in the letter.[30]

Again, however, no one brought to the Court's attention that NextEra would never be required to terminate and could simply wait for mounting financial pressures to force the Debtors to do so instead.[31]

---

[29]  9/26/16 Hr'g Tr. at 12:20-13:8.

[30]  *Id.* at 13:9–24.

[31]  It is important to note as well that the bulk of the Court's comments were focused on alleviating pressure on the PUCT by noting that the risk associated with payment of the Termination Fee was borne by the Debtors' creditors and not Oncor's rate payers.  *Id.* at 14:2-16:1.

On October 31, 2016, NextEra and Oncor submitted their joint change of control application for the PUCT's approval ("Joint Application").  The Joint Application asked that the PUCT drop two key features of a "ring-fence" the regulator had erected around Oncor in connection with the 2007 leveraged buyout:  first, the requirement that Oncor maintain an independent Board of Directors; and second, certain minority shareholders' ability to veto dividends.  NextEra was unwilling to concede the governance terms, going so far as to call them "deal killers."

On March 30, 2017, the PUCT held an open meeting on the NextEra Transaction. During the meeting, the Commissioners expressed significant concerns about the transaction's terms and its impact on the public interest.  As Commissioner Anderson explained in a memorandum he filed the same day,

> From the earliest contacts, well before the sale merger transfer application was filed, NextEra's representatives have been very clear and consistent about the conditions that they could not accept and the reasons why those conditions were unacceptable.  As the Chairman noted perceptively toward the end of the Hearing on the Merits, among the core issues in this case is whether "our deal[-]killers are [NextEra's] deal-killers."  At least for this Commissioner, I fear that they do indeed correlate negatively.[32]

On April 13, 2017, the PUCT denied the Joint Application, citing, among other things, the impasse between the PUCT and NextEra over the critical "deal-killer" terms, as well as a number of other fundamental defects in the Joint Application.[33]  On May 8,

---

[32] *See* Mem. from Commissioner Kenneth W. Anderson, Jr. on Open Meeting of Mar. 30, 2017 (PUCT D.I. 46238).

[33] Notice of Order Entered by the Pub. Util. Comm'n of Tex. Related to the Change of Control Appl. of Oncor [D.I. 11152].

2017, NextEra filed a rehearing request, without Oncor joining, simply rearguing the same contentions the PUCT had rejected after months of debate.[34]  The deadline for a decision was set at June 7, 2017, but NextEra sought to prolong the process, requesting an extension to "the maximum extent allowed by law"—effectively July 22, 2017.  The PUCT denied that request and again rejected the Joint Application on June 7, 2017 for the same reasons cited in its April 13 decision.[35]  NextEra promptly filed a second rehearing request, again refusing to budge on the "deal-killer" conditions.  The PUCT again rejected NextEra's rehearing request, issuing a terse, one-sentence order on June 29, 2017.[36]

With the deal now clearly dead, NextEra still took no action to terminate the Merger Agreement.  Indeed, it was clear that NextEra would appeal the PUCT's decision to all levels of review, leaving the Debtors no choice but to terminate the Merger Agreement and risk triggering the Termination Fee or else incur months or years of continued interest and fee obligations.

On July 7, 2017, the Debtors terminated the Merger Agreement and entered into a merger agreement with another party.  The Debtors terminated the NextEra Merger Agreement based on both NextEra's failure to obtain regulatory approval and breach of

---

[34]  NextEra Energy, Inc.'s Mot. for Reh'g Filed Before the Pub. Util. Comm'n of Tex., Adv. Pro. No. 17-50479-CSS [D.I.6-7].

[35]  Notice of Order Entered by the Pub. Util. Comm'n of Tex. in the Admin. Proceeding Related to the Change of Control Appl. of Oncor [D.I. 11325].

[36]  Notice of Order Entered by the Pub. Util. Comm'n of Tex. in the Admin. Proceeding Related to Change of Control Appl. of Oncor Elec. Delivery Co. [D.I. 11398].

the Merger Agreement, while reserving their rights to assert other grounds for terminating.[37]

On July 29, 2017, Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott") filed The Elliott Funds' Motion to Reconsider in Part the September 19, 2016 Order [D.I. 9584] Approving the NextEra Termination Fee (the "Motion to Reconsider").[38]  The Debtors and NextEra objected to the Motion to Reconsider.[39]  On September 19, 2017 (one year to the day from entry of the Termination Fee Order), the Court held a hearing on the Motion to Reconsider on a stipulated record.[40]  At the conclusion of the hearing, the Court provided a tentative ruling granting the Motion to Reconsider subject to issuance of a formal opinion and entry of an order.  This is the Court's Opinion in support of granting the Motion to Reconsider.

## LEGAL ANALYSIS

### 1.  The Standard of Review

The applicable standard of review depends upon whether the Termination Fee Order is an interlocutory or a final order.  As set forth below, if the order is interlocutory in nature the standard under Rule 9023 is applicable and if the order is final the standard under Rule 9024 applies.

---

[37] *See* Notice of Filing of Termination Ltrs. [D.I. 11424].

[38] D.I. 11636.

[39] D.I. 11879 and 11876, respectively.

[40] *See* D.I. 11716.

The Federal Rules of Civil and Bankruptcy Procedure do not recognize a motion for reconsideration.[41]   A party seeking reconsideration in bankruptcy court must file a motion to alter or amend judgment under Fed. R. Bankr. 9023 or a motion for relief from judgment under Fed.R. Bankr. P. 9024.[42]   On their face neither Rule 9023 nor Rule 9024 apply to interlocutory orders.   As such, some courts have held that the court is free to apply whatever standard it deems appropriate to a motion to reconsider an interlocutory order.[43]   Nonetheless, in *Calyon New York Branch v. American Home Mortg. Corp.,* this Court held that the standard under Rule 59(e) (made applicable by Fed. R. Bankr. P. 9023) should apply to motions to reconsider or to amend interlocutory orders.

> The policy underlying the standards governing a motion to alter or amend a final order under Rule 59(e) is equally applicable to a motion to alter or amend an interlocutory order under Rule 54(b) - "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." This is especially true in the bankruptcy context where the very nature of the practice involves the routine entry of interlocutory orders.[44]

---

[41]  12 *Moore's Federal Practice*, §59.30[7] (Matthew Bender 3d ed.).

[42]  *See Williams v. Akers*, 837 F.3d 1075, 1077 n. 1 (10th Cir. 2016).

[43]  *Anderson Living Trust v. WPX Energy Production, LLC*, 308 F.R.D. 410, 433 (D. N.M. 2015) ("In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order. It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish on of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.").

[44]  *Calyon New York Branch v. American Home Mortg. Corp.*, 383 B.R. 585, 589 (Bankr. D. Del. 2008) (citing *Official Comm. Of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)).

A motion for reconsideration under Rule 9023 may not be used as a vehicle to "relitigate issues the Court has already decided,"[45] nor should Rule 9023 "… be used to advance arguments that a party could have made before judgment, but neglected to do so."[46]  However, a prior decision should be reconsidered "where it appears [the Court] has overlooked or misapprehended some factual matter that might reasonably have altered the result reached by the Court."[47]  As this Court has previously stated, "[w]hile it is true that a motion for reconsideration should not be used to reargue the facts or applicable law, it is appropriate when the facts were presented but overlooked by the Court."[48]

A motion for reconsideration under Rule 9023 may be granted where (i) there has been an intervening change in controlling law; (ii) new evidence has become available; or (iii) there is a need to prevent manifest injustice or to correct a clear error of fact or law.[49]  The issue here is whether the Termination Fee Order should be amended to prevent manifest injustice and to correct a clear error of fact and law.

The exact meanings of the terms "manifest injustice" and "clear error of law or fact" remain unsettled, and there fails to be uniform application of an agreed upon

---

[45] *In re W.R. Grace & Co.*, 556 B.R. 113, 118 (Bankr. D. Del. 2016) *(citing Max's Seafood Cafe ex rel. Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)).

[46] *Skretvedt v. E.I. DuPont de Nemours & Co.*, No. CIV.A. 98-61-MPT, 2009 WL 1649495, at *2 (D. Del. June 12, 2009).

[47]  *Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.)*, 437 B.R. 488, 490 (Bankr. D. Del. 2010) (citing *Karr v. Castle,* 768 F.Supp. 1087, 1093 (D.Del. 1991), *aff'd* 22 F.3d 303 (3d Cir. 1994)).

[48]  *Id.* (citing *In re Chama, Inc.,* 2000 WL 33712473, at *1 (Bankr. D. Del. Sept. 21, 2000)).

[49]  *Stanziale v. Southern Steel & Supply, L.L.C. (In re Conex Holdings, LLC)*, 524 B.R. 55, 58 (Bankr. D. Del. 2015); *In re W.R. Grace & Co.*, 398 B.R. 368, 372 (D. Del. 2008) (citations omitted).

definition by courts.[50]  With respect to "manifest injustice," various courts have observed

the following:

> There is no judicial consensus … but several courts have applied the Black's Law Dictionary definition, which states that "manifest injustice" is an error in the trial court that is direct, obvious, and observable, such as a defendant's guilty plea that is involuntary or that is based on a plea agreement that the prosecution rescinds. A party may only be granted reconsideration based on manifest injustice if the error is apparent to the point of being indisputable.  In order for a court to reconsider a decision due to "manifest injustice," the record presented must be so patently unfair and tainted that the error is manifestly clear to all who view it.[51]

Similarly, courts have held that a "clear error of law or fact" requires a finding that the

error is "plain and indisputable … amount[ing] to a complete disregard of the controlling

law or the credible evidence in the record."[52]

If the order approving the Termination Fee is a final order, however, Fed.R.Civ.P.

60(b), incorporated by Fed. R. Bankr. P. 9024, allows a party to seek relief from a

judgment, order, or proceeding for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect;

---

[50] *New Jersey Dept. of Environ. Protection v. Occidental Chemical Corp. (In re Maxus Energy Corp.)*, No. 16-11501 (CSS), 2017 WL 3278830, at *3 (Bankr. D. Del. Aug. 2, 2017)

[51] *In re Titus*, 479 B.R. 362, 367-68 (Bankr. W.D. Pa. 2012) (quoting *In re Roemmele*, 466 B.R. 706, 712 (Bankr. E.D. Pa. 2012)); *accord Teri Woods Pub., L.L.C. v. Williams*, No. CIV.A. 12-04854, 2013 WL 6388560, at *2 (E.D. Pa. Dec. 6, 2013).

[52] *Titus*, 479 B.R. at 368 ("Other courts have expressed much the same view, though in somewhat different words.") (citations omitted)).  *See, e.g., In re Telfair*, 745 F.Supp.2d 536, 561 (D.N.J. 2010) (the term manifest injustice is an overlap of the term manifest error of law or fact, and it means that the court overlooked some dispositive factual or legal matter that was presented to it, or alternatively that there was an error in the trial court that was direct, obvious, and observable); *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601 (7th Cir. 2000), (manifest error is not demonstrated by disappointment of losing party, rather it is the wholesale disregard, misapplication, or failure to recognize controlling precedent) *reh'g denied, cert. denied* as *Beverley v. Oto*, 531 U.S. 1152, 121 S.Ct. 1097, 148 L.Ed.2d 970 (2001); *In re Parikh*, 397 B.R. 518 (Bankr. E.D.N.Y. 2008) (same)).

(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud ..., misrepresentation, or other misconduct of an adverse party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

(6) any other reason justifying relief from the operation of the judgment.[53]

The purpose of Rule 60(b) is "to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice must be done."[54]  As with motions made pursuant to Rules 52 and 59, the decision to grant or deny relief pursuant to Rule 60(b) is committed to the discretion of the trial court.[55]

A threshold issue to determining whether a Rule 60 motion can prevail is whether the motion is filed timely.  Motions filed pursuant to Rule 60(b) must be made within a "reasonable time."[56]  Additionally, claims made under Rule 60(b)(1)-(3) are untimely *per se* if made more than one year from the entry of judgment.[57]  Here the Motion for

---

[53] Fed.R.Civ.P. 60(b).

[54] *Moss v. Potter*, 2007 WL 1726519, at *1 (W.D.Pa.2007) (*quoting Boughner v. Secretary of Health, Education, and Welfare*, 572 F.2d 976, 977 (3d Cir.1978)).

[55] *Id. See also In re Reading Broad., Inc.*, 386 B.R. 562, 567 (Bankr. E.D. Pa. 2008).

[56] Fed.R.Civ.P. 60(c).

[57] *Id.; see also In re G-I Holdings, Inc.*, 472 B.R. 263, 279 (Bankr. D.N.J. 2012). *See, e.g., In re USN Communications, Inc.*, 288 B.R. 391, 396 (Bankr.D.Del.2003) ("A motion filed under Civil Procedure Rule 60(b) is not considered timely just because it is filed within the one-year time limit"); *Defeo v. Allstate Ins. Co.*, No. CIV. A. 95-244, 1998 WL 328195, at *5 (E.D. Pa. June 19, 1998) ("The one year period, applicable to

Reconsideration was filed less than a year after the Court's entry of the Termination Fee Order.[58]  Furthermore, the Motion for Reconsideration was not ripe until the Debtors terminated the Merger Agreement with NextEra (purportedly triggering payment of the Termination Fee), which was not done until July 7, 2017,[59] mere weeks before the Motion for Reconsideration was filed.  Based on the facts and circumstances in these cases, the Motion for Reconsideration was timely filed.

As the motion for reconsideration is timely, the Court must look to the burden placed on movant.  "'The framers of Rule 60(b) set a higher value on the social interest in the finality of litigation.'"[60]  A movant "bears a heavy burden" in showing that relief is appropriate under Rule 60.[61]

The Third Circuit has stated that "[t]he power of a court to invoke Rule 60(b) to vacate its own earlier judgment is unquestioned."[62]  However, when a court is considering its own judgment, "extraordinary circumstances" must be present to justify the use of Rule 60(b) to vacate the judgment.[63]  Furthermore, "Rule 60(b) seeks to strike a delicate balance between two countervailing impulses: the desire to preserve the finality

---

subsections (1)—(3) [of Rule 60(b) ], is an outer limit and any Rule 60(b) motion is subject to denial if it is not also made within a reasonable time after the basis for relief is known"); *In re J.B. Winchells, Inc.*, 106 B.R. 384, 389 (Bankr.E.D.Pa.1989) (same).

[58] *Compare* D.I. 9655 (entered Sept. 19, 2016) and D.I. 11636 (filed July 29, 2017).

[59] *See* D.I. 11424 (filed July 7, 2017).

[60] *In re Syntax-Brillian Corp.*, 551 B.R. 156, 160 (Bankr. D. Del. 2016) (*quoting Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 682 (7th Cir.1983)).

[61] *Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir.1991) (citation omitted).

[62] *Budget Blinds, Inc. v. White*, 536 F.3d 244, 251 (3d Cir.2008).

[63] *Id.* at 251, 255 ("We have explained that a showing of extraordinary circumstances involves a showing that without relief from the judgment, an 'extreme' and 'unexpected' hardship will result.") (citation omitted).

of judgments and the 'incessant command of the court's conscience that justice be done in light of all the facts."[64]

Regardless of whether the order approving the Termination Fee is interlocutory or final, the Court's analysis as to whether it misapprehended the facts and, thus, made a manifest error of fact and law will be the same.  If the Termination Fee is interlocutory then consideration of the importance of the finality of the Court's order is of no moment. If the order is final, however, the Court must weigh the importance of the finality of its order in determining whether to grant the motion to reconsider.  In other words, it is the absence of finality and reliance on a final order that differentiates motions under Rule 9023 from Rule 9024.[65]  As to the "substance" the review under both Rule 9023 and Rule 9024 boils down to this - "'[t]he purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence.'"[66]

### 2.  The Order Approving the Termination Fee Is Interlocutory

> The problem of applying the final judgment rule to bankruptcy litigation with its numerous parties in interest and its adversary proceedings and contested matters makes "[t]he question of finality in bankruptcy appeals a thorny one," although most courts agree that the concept of finality in bankruptcy is broader and more flexible than in ordinary civil litigation, and that determinations of finality in the context of bankruptcy are dealt with "in a more pragmatic and less technical sense than in other settings."  As the U.S.

---

[64]  *In re New Century TRS Holdings, Inc.*, No. 07-10416 KJC, 2012 WL 38974, at *2 (Bankr. D. Del. Jan. 9, 2012), *aff'd*, No. ADV 09-52251 KJC, 2013 WL 1196605 (D. Del. Mar. 25, 2013) (citations and internal quotation marks omitted).

[65]  *See, e.g.*, *In re Reading Broad., Inc.*, 386 B.R. at 570.

[66]  *Max's Seafood Cafe*, 176 F.3d at 677 (*quoting Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).

Supreme Court put it, succinctly, "[t]he rules are different in bankruptcy."[67]

For an order to be final it "need not resolve all the issues raised by the bankruptcy; but it must completely resolve all of the issues pertaining to a discrete claim, including issues as to proper relief."[68]  In making its determination, the court is required to take a flexible, pragmatic approach.[69]

Even though the order approving the Termination Fee was entered on September 19, 2016, over one year ago, it remains interlocutory.  The order approving the Termination Fee does not resolve all issues relating to the Termination Fee.  The order expressly requires this Court to (i) approve an agreed-upon allocation of the Termination Fee between the estates, (ii) determine how the Termination Fee will be allocated, and/or (iii) rule on the appropriate allocation of the Termination Fee should the parties request it.[70]  Additionally, the Termination Fee is only to be paid when it becomes "due and payable pursuant to the terms and conditions of the Merger Agreement."[71]  There is an issue being litigated between the Debtors, Elliott, NextEra and others as to whether NextEra breached the Merger Agreement and, thus, whether it is entitled to the

---

[67] COLLIER ON BANKRUPTCY ¶ 5.08[1][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

[68] *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 3 F.3d 49, 53 (2d Cir. 1993) (emphasis omitted).

[69] *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 97 (3d Cir. 1988); *In re Reliant Energy Channelview LP*, 397 B.R. 697, 699 (D. Del. 2008) (citing *In re Armstrong World Indus., Inc.*, 432 F.3d 507 (3d Cir. 2005).

[70] *See* Termination Fee Order ¶ 4.

[71] *Id.*

Termination Fee at all.[72]   The Court expressly retained jurisdiction for exactly this dispute.[73]

The Debtors argue that the Termination Fee Order is final, even though they argued in a previous appeal that the same order is interlocutory.   Their previous argument makes a succinct case in favor of deeming the order interlocutory.

> This case illustrates why *Reliant*'s "wait-and-see" approach is sensible. The Termination Fee has not been triggered.  Even if it were triggered, the Authorization Order expressly defers, rather than allocates, any such fee between EFIH (of which Appellants are not creditors) and the EFH Debtors (of which Appellants purport to be creditors).  Accordingly, the parties' rights and obligations with respect to the Termination Fee remain unsettled and are subject to later determination.[74]

Moreover, NextEra's policy arguments in favor of finding the order to be final overlook the countervailing policy issues that weigh strongly in favor of revisiting the Termination Fee Order.  NextEra cannot reasonably have relied on the Termination Fee Order when it knew the order was premised on an incomplete and confusing record. And it does not make for sound policy to award NextEra a windfall of $275 million due to the passage of time or because NextEra claims to have relied on the order in spending tens of millions on legal fees.  Whatever interests NextEra may have in the Termination Fee must give way to the interest in ensuring that the Court's decisions are based on a complete record and a proper application of controlling precedent.  Likewise, granting

---

[72]  *See generally* Adv. Pro. 17-50942.

[73]  Termination Fee Order ¶ 10.

[74]  Appellee's Motion to Dismiss Appeal, *Fenicle v. Energy Future Holdings Corp.*, Civ. Act. No. 16-cv-888-RGA, D. Del. [D.I. 18] ¶ 21.

reconsideration here does not impugn all termination fees.  Parties that accurately and properly negotiate, structure, and disclose termination fees to a court can still rely on orders approving such fees.

In short, as the Supreme Court held in *Bullard v. Blue Hills Bank*,[75] an order remains interlocutory where "[t]he parties' rights and obligations remain unsettled" because "'[i]t ain't over till it's over.'"[76]  Applying a flexible and pragmatic approach, the Court finds that the order approving the Termination Fee is an interlocutory order because it left considerable "additional work to be done" by the Court.[77]

### 3. The Court Misapprehended The Facts As To When The Termination Fee Would Be Payable

The Court had a fundamental misunderstanding of the critical facts when it approved the Termination Fee.  Despite the Court's direct question as to whether the Termination Fee would be payable if the PUCT declined to approve the NextEra Transaction, the record is incomplete and confusing on that fundamental point.  The

---

[75]  135 S. Ct. 1686 (2015).

[76]  *Id.* at 1693.

[77]  *See Reliant*, 397 B.R. at 699-700 & n.1.  There are at least two additional arguments as to why the order approving the Termination Fee is interlocutory.  First, while the Termination Fee clearly has a negative impact on the assets of the Debtors' estates, the Termination Fee—calculated by the Debtors at 1.47 percent of TEV—is not so large a proportion of the estate as to make the Termination Fee Order final under relevant precedent.  *See Reliant*, 397 B.R. at 700 (concluding that when the termination fee amounted to less than 3% of the debtors' estate, the order approving the fee was not final).  Second, judicial economy and the avoidance of piecemeal litigation favor finding that the order approving the Termination Fee Order is interlocutory.  *See, e.g., In re New Century TRS Holdings, Inc.*, 407 B.R. 558, 571 (Bankr. D. Del. 2009) (citing "the need to protect creditors and reorganizing debtors from piecemeal litigation" and supporting case law).  Significant litigation regarding allocation will follow if the Termination Fee is determined to be payable.  Allocation litigation would greatly impact plan confirmation proceedings by affecting the Debtors' ability to demonstrate that administrative expenses will be paid and that the "best interests test" is satisfied.

Court simply did not understand that if the PUCT declined to approve the NextEra Transaction and the Debtors (as opposed to NextEra) terminated the Merger Agreement the Termination Fee would be payable to NextEra.  Despite the obvious confusion on this point neither the Debtors nor NextEra sought to clarify the record and affirmatively state that NextEra would receive the Termination Fee if the Debtors terminated the Merger Agreement.   Instead they repeatedly stated that NextEra would not receive the Termination Fee if it terminated the Merger Agreement.  It bears noting that at the time the PUCT had already evaluated one transaction approved by this Court and the PUCT approval process and its potential adverse effect on the Debtors' estate was at the forefront of the Court's mind, and still is.

The confusing record was critical because in combination with another fact that was not mentioned, i.e., the Merger Agreement had no time limit, the reality was that *under no foreseeable circumstances would NextEra terminate the Merger Agreement if the PUCT declined to approve the NextEra Transaction*.  Why?  Because NextEra had the ability to hold out and to pursue numerous motions for reconsideration and a fruitless appeal until the Debtors were forced by economic circumstances to terminate the Merger Agreement, which is exactly what occurred.  If the Court had understood these critical facts it would not have approved this provision of the Termination Fee.[78]

The Debtors and NextEra point to the September 25 Letter and September 26 hearing as providing clarification on these points.  This is insufficient for a number of

---

[78] Importantly, the Court is only reconsidering a narrow but highly significant provision of the Termination Fee.  Nothing herein affects any other provision of the Termination Fee or the Termination Fee Order.

reasons.  Most importantly, the Court approved the Termination Fee by order dated September 19, 2016 following a hearing that same day.  The record on the Termination Fee was closed on September 19th.  Second, the point of the status conference on September 26th was for the Court to respond to certain comments by Commissioner Anderson with regard to the Termination Fee.  No relief was sought from the Court.  In addition, the Court understood Commissioner Anderson to be concerned that the Termination Fee was designed to put pressure upon the PUCT.  The Court sought to alleviate those concerns by stating that the Termination Fee, if payable, would be borne by the Debtors' creditors not by Oncor's rate payers.  At no time did the Court understand the parties' submissions to be an attempt to clarify to this Court that the Termination Fee would be payable if the PUCT declined to approve the NextEra Transaction and the Debtors terminated the Merger Agreement.  Third, the key nuance – that NextEra had no economic incentive to terminate the Merger Agreement if the PUCT declined to approve the NextEra Transaction and indeed its incentive was just the opposite – was not disclosed in the September 25 Letter and not discussed at the September 26 hearing.

The critical issue is whether the Court misapprehended the facts, not whether the record may have been complete.  In any event, the record was, at the very least, confusing.  In one instance a witness clearly stated that the Debtors would be liable for the Termination Fee if the PUCT declined to approve the NextEra Transaction and the Debtors terminated the Merger Agreement.  But that testimony is countered with a contrary statement by counsel on the issue.  Moreover, at no point did anyone bring forward the critical fact that NextEra had no economic incentive to terminate the Merger

Agreement.  Indeed, no facts were sufficiently drawn to the Court's attention such that the Court might have realized the point on its own accord.  More was required by the Debtors and NextEra in order for them to rely on the record to refute the Court's own misunderstanding - whether justified or not.[79]

### 4.  The Termination Fee Cannot Not Satisfy The *O'Brien* Standard

The Third Circuit permits the payment of termination fees out of an estate only in certain narrow circumstances prescribed by Bankruptcy Code Section 503(b).[80]  To be allowed as an administrative expense, the Termination Fee must be one of the "actual, necessary costs and expenses of preserving the estate."[81]  In general, administrative expenses are narrow in scope and allowed only to the extent that the expense "provided an actual benefit to the estate" and was "necessary to preserve the value of the estate assets."[82]

Under *O'Brien*, the standard is no different, but the timing and circumstances make the Court's approval far more challenging.  The Court is required to determine whether the movant has carried the "heavy burden" of demonstrating that a post-petition

---

[79] The Court does not believe the Debtors acted improperly or with malice.  The reality is that the NextEra Transaction was extraordinarily complicated and the Debtors focused their attention on whether the Termination Fee was market not on when the Termination Fee might be payable in what the Debtors viewed was the unlikely event the PUCT declined to approve the NextEra Transaction.  As for NextEra, the record indicates it was happy to remain silent.  Whether NextEra realized the Court misapprehended the facts to NextEra's benefit is unknown but, if it did, it certainly made no effort to clarify the record.

[80] *O'Brien*, 181 F.3d at 532.

[81] 11 U.S.C. § 503(b)(1)(A).

[82] *In re Bernard Techs., Inc.*, 342 B.R. 174, 177 (Bankr. D. Del. 2006); *see In re Reliant Energy Channelview, LP*, 403 B.R. 308, 311 (Bankr. D. Del. 2009) (emphasizing that it is not enough that a termination fee provide "some benefit" to the estate; it must be "actually necessary to preserve the value of the estate").

transaction "provided an actual benefit" to the debtor's estate, justifying the future payment of a termination fee as one of the necessary costs or expenses of the estate.[83]  For this reason, bankruptcy courts considering approval of termination fees focus not only on whether the expense is necessary to induce a transaction, but also on the conditions that must be met to consummate the transaction (*e.g.*, financing, due diligence, regulatory approvals, etc.).  The lack of conditions or the certainty of meeting them ensures that the termination fee, as distinct from mere expense reimbursement, provides a debtor's estate with an actual benefit.

The regular situation in which a termination fee provides an actual benefit consistent with *O'Brien* is when the fee induces a bid that results in higher competitive bidding for the debtor's asset.[84]  Moreover, even if an auction does not occur, a termination fee may be justified when it "increase[s] the likelihood that the price at which the debtor is sold will reflect its true worth."[85]

In this instance, the Debtors (with the support of NextEra) sought approval of a termination or break-up fee that was not designed to induce competitive bidding for Oncor.  Rather, they sought a fee designed to induce NextEra to pursue approval of the NextEra Transaction before this Court through confirmation and before the PUCT through its regulatory process and to protect NextEra if the Debtors decided to pursue a

---

[83]  *O'Brien*, 181 F.3d at 533 (quoting district court opinion).

[84]  *See O'Brien*, 181 F.3d at 537; *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (explaining that a termination fee is permissible where it "induce[s] an initial bid"); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) (similar).

[85]  *O'Brien*, 181 F.3d at 537.

superior, alternative transaction.  Approval of a termination or break-up fee under those circumstances might be appropriate.  However, there are critical elements of the Termination Fee in this case that would provide for payment of the fee even if there was no actual benefit to the Debtors' estate that were discernable at the time the Termination Fee was approved (had the Court properly understood the facts).

Here, the Termination Fee was payable to NextEra *even if* the PUCT declined to approve the NextEra Transaction and the Debtors (as opposed to NextEra) terminated the Merger Agreement.  As discussed above, this was a critical point.  Payment of a termination or break-up fee when a court (or regulatory body) declines to approve the related transaction cannot provide an actual benefit to a debtor's estate sufficient to satisfy the *O'Brien* standard.[86]  Consider the more common circumstance of a request for a break-up fee in favor of a stalking horse bidder in an asset sale.  Could a court approve payment of a break-up fee under *O'Brien* in the event that the court declines to approve the actual sale (regardless of whether the stalking horse is the winning bidder)?  How would serving as a stalking horse in a sale that fails to garner court approval possibly provide an actual benefit to the debtor's estate?  The Court posits that it could not.  Indeed, this was the point of the Court's inquiry at the hearing on the Termination Fee as to whether the fee would be payable if the PUCT did not approve the NextEra Transaction.

---

[86] *See, e.g., In re Hupp Industries, Inc.*, 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992) (Court declining to approve break-up fee where fee is payable even if court declines to approve sale).

This issue was exacerbated in this case by the fact that the Merger Agreement did not have a time limit for approval and the Termination Fee was payable if the Debtors terminated the Merger Agreement.   This incentivized NextEra to pursue multiple motions for reconsideration and a fruitless appeal strategy to force the Debtors to terminate the Merger Agreement to pursue an alternative transaction.   Allowance of a termination or break-up fee when a debtor chooses to pursue a higher and better offer is appropriate.   In this case, the Debtors were forced to terminate the Merger Agreement to pursue a lower offer because NextEra had the Debtors in a corner.   Payment of a termination fee under those circumstances, which would have been predictable had the Court properly understood the facts, could not provide an actual benefit to a debtor's estate sufficient to satisfy the *O'Brien* standard.[87]

In short, had the Court properly apprehended the facts at the time of its approval of the Termination Fee it could not have approved the Termination Fee under *O'Brien*. To do so constituted legal error.

### 5.  The Interests Of Justice Outweigh The Interests Of Finality In This Instance

As discussed earlier, the order approving the Termination Fee is an interlocutory order.   As such, the applicable legal standard is Federal Rule of Civil Procedure 59 (incorporated by Bankruptcy Rule 9023) and the Court need not balance "two

---

[87] It is important to note that the Court is not judging whether the Termination Fee is payable based on hindsight.  Rather, the point is that had the facts been properly understood at the time the Court approved the Termination Fee it would not have done so because the *O'Brien* standard was not satisfied.  However, even if the Court is acting on hindsight, it may do so.  *See In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976) (A creditor "will not be entitled to [administrative expense] priority if the bankrupt estate was not benefitted ***in fact***" from the creditor's contract performance during the reorganization period.) (emphasis added).

countervailing impulses: the desire to preserve the finality of judgments and the 'incessant command of the court's conscience that justice be done in light of all the facts.'"[88]   However, even if the order approving the Termination Fee is a final order and, thus, the motion for reconsideration is reviewable under Federal Rule of Civil Procedure Rule 60 (made applicable by Bankruptcy Rule 9024), the interest of justice outweigh the interest of finality in this instance.

As discussed at length above, the Court fundamentally misapprehended the facts as to whether the Termination Fee would be payable if the PUCT failed to approve the NextEra Transaction.  This misapprehension of the facts was due in part to the confusing record presented by the Debtors and NextEra.  Had the Court understood there was a scenario in which NextEra would receive the Termination Fee even if the PUCT declined to approve the NextEra Transaction, it would not have approved the payment of the Termination Fee in those circumstances.  Indeed, it could not have done so under the Third Circuit's ruling in *O'Brien*.  The interests of justice – ensuring that the approval of a payment of $275 million to NextEra is based on a complete record and the proper application of the law – clearly outweighs the interest of finality of the Termination Fee Order.  In making this determination the Court is cognizant that NextEra acted in reliance upon the Termination Fee Order and spent tens of millions of dollars in pursuing the NextEra Transaction.[89]  But NextEra was conspicuously silent in response to the Court's

---

[88] *In re New Century TRS Holdings, Inc.*, No. 07-10416 KJC, 2012 WL 38974 at *2 (citations and internal quotation marks omitted).

[89]   At oral argument counsel for NextEra stated that NextEra incurred expenses of $300 million in connection with the Oncor merger.  That figure is unsupported by the stipulated record before the Court.

questions regarding whether the Termination Fee would be payable if the PUCT declined to approve the merger and was content to allow the Court to rely on an incomplete and confusing record.

Notwithstanding the passage of time and the reliance of the parties on the Termination Fee Order, the interests of justice, which include, among other things, requiring parties seeking relief from the Court to be accurate in their representations, outweigh the interest of finality in this instance.

**6.    The Entry Of The Termination Fee Was A Manifest Error Of Fact And Law That Must Be Reversed**

At the end of the day, "'[t]he purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence.'"[90]  The Court entered the Termination Fee Order based on a misapprehension of the facts as to whether the Termination Fee would be payable if the PUCT declined to approve the NextEra Transaction and the Debtors terminated the Merger Agreement.   This misapprehension of the facts was based, in part, on the presentation of an incomplete and confusing record by the Debtors and NextEra.   It was also based, in part, on the misunderstanding of the Court as to the record presented.   The Court's misapprehension of the facts constituted a manifest error of fact justifying reconsideration.

Based upon the Court's misapprehension of the facts it approved the Termination Fee under the Third Circuit's ruling in *O'Brien*.   Payment of the Termination Fee in the

---

[90]  *Max's Seafood Cafe*, 176 F.3d at 677 (*quoting Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).

event that the PUCT were to decline to approve the NextEra Transaction, regardless of whether the Debtors or NextEra actually terminated the Merger Agreement, cannot constitute an actual necessary cost and expense of preserving the Debtors' estates. The Court's approval of the Termination Fee was a manifest error of law justifying reconsideration.

The Court's manifest errors of fact and law requires the Court to take the extraordinary step of reconsidering its order entered on September 19, 2016, approving the Termination Fee.

<u>CONCLUSION</u>

For the reasons set forth above, the Court will grant the Motion for Reconsideration.  The parties are directed to submit proposed forms of order under certification of counsel by no later than October 10, 2017.