IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Energy Future Holdings, Inc., *et al.*, | Case No. 14-10979 (CSS) |
| | (Jointly Administered) |
| Debtors. | |
| | **Hearing Date: December 11, 2017 at 10:00 a.m. (ET)** |
| | **Objection Deadline: November 30, 2017 at 4:00 p.m. (ET)** |

**NEXTERA'S MOTION TO STAY THE
RECONSIDERATION ORDER PENDING APPEAL**

NextEra Energy, Inc. ("NextEra") hereby submits this motion to stay (the "Motion") the Court's *Order Granting the Motion To Reconsider of Elliott Associates, L.P. and Denying the Application of NextEra Energy Inc. for Payment of Administrative Claim* [D.I. 12075] (the "Reconsideration Order") pending appeal.[1]  In support of the Motion, NextEra respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      As the Court itself has recognized, with the Reconsideration Opinion and Order, it took the "extraordinary step" of "reconsidering an order it entered over a year ago and upon which parties have relied upon."[2]  It is thus completely proper for the Court to stay its Order pending appeal to ensure that NextEra's appellate rights are protected while it seeks review of what is concededly a highly unusual order.

2.      A stay should be ordered because NextEra can show a strong likelihood of success as there are "substantial grounds for a difference of opinion" relating to the Court's decisions on finality, timeliness, and the merits.  Regarding finality, the Court's reliance on Second Circuit precedent is inconsistent with the Third Circuit's more pragmatic approach.  On

---

[1]      Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to them in the Background section.

[2]      Reconsideration Opinion at 2–3.

{932.002-W0049410.}

timeliness, the Court failed to address the fact that Elliott knew of the alleged issues with the Termination Fee at the time of its approval, but chose not to challenge the fee until after it became clear that the NextEra merger would not be consummated. This departs from Third Circuit authority. And, on the merits, the Court's reading of *O'Brien* failed to consider that the Termination Fee was a necessary inducement for NextEra to go forward with the transaction, and was the *quid pro quo* for certain concessions made by NextEra (i.e., dropped match right and higher purchase price) that unlocked Oncor's "true worth." Each of these arguments meet the requirement for a "strong showing," *i.e.*, that the chance of success be "better than negligible but not greater than 50%."

3.    Neither Debtors nor creditors would be substantially harmed by a stay in this instance as it would merely require Debtors to reserve the funds pending the decision of the appellate court. The funds would remain available to creditors if NextEra is unsuccessful on appeal. This is especially true, as both Debtors and Elliott have consented to a direct and expedited appeal to the Third Circuit.

4.    Finally, a stay, which would preserve NextEra's appellate rights and permit appellate challenge of the Reconsideration Order, is in the public interest, because the Reconsideration Order implicates public policy concerns that reach well beyond NextEra, and call into question the ability of would-be buyers of assets in bankruptcy sales to rely on court ordered protections in pursuing those sales.

## BACKGROUND

5.    The Court is familiar with the relevant facts, which are only briefly summarized here. On April 29, 2014 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (the "Debtors") commenced these Chapter 11 cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

6.    In April 2016, after an extensive and strategic marketing process and various other efforts, the Debtors engaged in discussion with NextEra for the sale of their economic interest in Oncor Electric Delivery Company LLC ("Oncor").[3]

7.    On July 25, 2016, in an effort to overcome an impasse in negotiations, NextEra made an "eleventh hour" concession whereby NextEra would drop its previous requirement to have a "match right" and increase the purchase price by $110 million if Debtors would increase the amount of the Termination Fee to $275 million, which was still less than the termination fee demanded by the other serious bidder.[4]

8.    On July 29, 2016, certain of the Debtors, NextEra, and EFH Merger Co., LLC ("Merger Sub")—a newly formed subsidiary of NextEra—executed definitive documentation to govern this transaction, including an Agreement and Plan of Merger among Energy Future Holdings Corp. ("EFH"), Energy Future Intermediate Holding Company LLC ("EFIH"), NextEra, and Merger Sub, dated July 29, 2016 (the "Merger Agreement"). The Merger Agreement, as amended, contemplated a merger of EFH with and into Merger Sub, whereby EFH would have become a wholly-owned subsidiary of NextEra with an approximately $18.7 billion implied Oncor total enterprise value. Included in the Merger Agreement was a "Termination Fee" in the amount of $275 million, payable to NextEra under certain conditions if the proposed transaction could not be consummated (the "Termination Fee").

9.    Also on July 29, 2016, EFH, EFIH, EFIH Finance Inc., certain direct and indirect subsidiaries of EFH, and NextEra entered into a *Plan Support Agreement* (as modified, amended

---

[3]    *See Motion Of The EFH/EFIH Debtors For Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, And (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9190] ("Approval Motion").

[4]    *EFH/EFIH Debtors Omnibus Reply to Objections To Motion of Energy Future Holdings Corp., et al., For Entry of An Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9536] ¶ 2, 15–22 (Debtors' Reply in Support of Approval Motion).

or supplemented from time to time, the "Plan Support Agreement") in support of the *Amended Joint Plan of Reorganization of Energy Future Holdings Corp. et al., pursuant to Chapter 11 of the Bankruptcy Code*, as modified and filed with the Bankruptcy Court on August 5, 2016 [D.I. 9199] (as modified, amended or supplemented from time to time, the "E-Side Plan").

10.     By motion dated August 3, 2016 (the "Approval Motion"), the Debtors sought approval of their entry into the Plan Support Agreement and the Merger Agreement.[5]   In the Approval Motion, the Debtors sought approval of the Merger Agreement and the Termination Fee.  The Debtors supported the Approval Motion with declarations by key members of the Debtors' advisory team, including William Hiltz and David Ying.[6]

11.     Several creditors objected to the Approval Motion, including Fidelity Management & Research Company; the Estate of George Fenicle, David William Fahy, and John H. Jones (the "Asbestos Objectors"); American Stock Transfer & Trust Company, LLC, as successor trustee to The Bank of New York Mellon Trust Company, N.A. (in such capacity, the "EFH Indenture Trustee"); and Contrarian Capital Management, LLC, which joined in the briefs of the EFH Indenture Trustee.[7]

12.     During negotiations with the objecting creditors, NextEra again agreed to increase its offer, this time by an additional $300 million.  By the time of the hearing on September 19, 2016, all of the objecting creditors except the Asbestos Objectors had withdrawn their objections.

---

[5]   *See generally* Approval Motion.

[6]   *See Declaration of William O. Hiltz in Support of the Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9191]; *Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9192].

[7]   D.I. 9397–99 and 9402.

13.    On September 19, 2016, the Court held a full evidentiary hearing concerning approval of the Merger Agreement and Plan Support Agreement (the "Approval Hearing").  At least 94 attorneys attended the hearing—38 in person and 56 by phone. [D.I. 9583.] In the hearing, the Debtors presented evidence and argument in support of the merger and the Termination Fee.  The Asbestos Creditors presented their objections.  NextEra, which attended the hearing only to observe in its capacity as the Debtors' potential merger partner, did not make a presentation at the hearing.

14.    Following the close of argument at the Approval Hearing, the Court entered its *Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9584] (the "Termination Fee Approval Order"), overruling any remaining objections on the merits and approving the Termination Fee as an allowable administrative expense.  The Court ruled that "the EFH/EFIH Debtors are authorized and directed to pay the Termination Fee as an allowed administrative expense to the extent it becomes due and payable pursuant to the terms and conditions of the Merger Agreement, at the time and in the manner provided for therein, without any further proceedings before, or order of, the Court . . . ."[8]

15.    Three days later, on September 22, 2016, PUCT Commissioner Anderson expressed concerns that the Merger Agreement, and in particular the Termination Fee, were contrary to public policy because they would "tie the [PUCT]'s hands" by forcing it to choose between approving the transaction without burdensome conditions and risking placing a burden

---

[8]    Termination Fee Approval Order ¶ 4.

to ratepayers from the Termination Fee.[9]    The two other PUCT members, Commissioner Marquez and Chairman Nelson, appeared to share Commissioner Anderson's concerns.  *See id.*

16.    In response, NextEra drafted a letter to the Court confirming the circumstances in which the Termination Fee would be payable to NextEra.  NextEra shared a draft of that letter with the Debtors, who then requested to join the letter as signatories.  NextEra agreed and the parties jointly submitted the final letter to the Court on September 25, 2016 (the "Clarification Letter").  In that letter, the parties explained that:

> the $275 million termination fee is triggered if EFH and/or EFIH terminate the merger agreement as a consequence of the [PUCT] either not approving the merger agreement transaction or approving the merger transaction with the imposition of a burdensome condition.  In order for EFH and/or EFIH to pursue an alternative transaction, EFH and EFIH believe that they would only terminate in such a situation if they had an alternative proposal to pursue.[10]

The parties went on to confirm that "[t]he termination fee is not triggered if, under the same circumstances, NextEra Energy terminates the merger agreement instead of EFH and/or EFIH."[11]

17.    No creditor or any other party objected to the Court's consideration of the Clarification Letter.

18.    At a previously scheduled September 26, 2016 hearing, the Court departed from the agenda and made a statement responding to Commissioner Anderson's concern "as to whether the merger agreement is contrary to public policy because the termination fee of 275 million is payable to NextEra if the PUCT approves the transaction but NextEra declines to close the transaction because the PUCT has imposed a burdensome condition as defined in the merger agreement."  The Court noted the parties' clarification in the Clarification Letter that "NextEra is

---

[9]    *Declaration of Howard Seife in Support of Objection of NextEra Energy, Inc. to The Elliott Funds' Motion to Reconsider in Part the September 19, 2016 Order [DKT. No. 9584] Approving the NextEra Termination Fee* (the "Seife Declaration"), Ex. B, Tr. Sept. 22, 2016 Open Meeting before PUCT at 88–89.

[10]    Clarification Letter [D.I. 9655].

[11]    *Id.*

not entitled to a termination fee under the merger agreement if NextEra terminates the merger agreement because the PUCT either approves the merger agreement transaction with burdensome conditions or does not approve the merger transaction" and their representation that "NextEra will not seek to collect any portion of the termination fee contemplated by the merger agreement in the event NextEra terminates the merger agreement" following regulatory disapproval.[12]   The Court then reviewed the Termination Fee provision and reiterated its approval of the Fee as an administrative expense, noting that it was "highly significant that the creditors of EFH and EFIH which would be directly harmed by the imposition of the termination fee supported the transaction, notwithstanding the *real possibility* of the imposition of a \$275 [m]illion administrative expense."[13]

19.     On February 17, 2017, the Court confirmed the E-Side Plan, entering its *Order Confirming the Eighth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Relates to the EFH Debtors and EFIH Debtors* [D.I. 10859].

20.     On October 31, 2016, NextEra and Oncor submitted their joint change of control application for the PUCT's approval ("Joint Application").

21.     On March 30, 2016, Commissioner Anderson released a memorandum stating that he was inclined to deny approval of the transaction because he viewed strict ring-fencing of Oncor as essential, and was aware that NextEra was not obligated to, and would not, accept such burdensome conditions.[14]   Later that day, during an open meeting of the PUCT, the other PUCT Commissioners indicated that they shared Commissioner Anderson's concerns.[15]   Accordingly,

---

[12]   *Seife Declaration* Ex. C, Hr'g Tr. Sept. 26, 2016 at 11:18-25, 13:9-24.

[13]   *Id.* at 14:8-15:1 (emphasis added).

[14]   *See Seife Declaration* Ex. D, *Memorandum*, dated March 30, 2017, from Commissioner Kenneth W. Anderson, Jr., PUCT Docket No. 46238, Item No. 535 at 4–5.

[15]   *See Seife Declaration* Ex. E, Tr. March 30, 2017 Open Meeting before PUCT at 18:18–19:9, 27:17–28:4.

the PUCT Commissioners instructed the PUCT staff to prepare an order denying approval of the transaction, which order would be considered on April 13, 2017, during the PUCT's next open meeting. The Commissioners did, however, leave open the possibility that they would reach a different decision if NextEra were able to present a unanimous settlement among the intervenors in that proceeding.[16]

22.    Between March 30, 2017 and April 13, 2017, NextEra worked with interested stakeholders in an effort to reach a unanimous settlement with the intervenors in the PUCT proceeding, but was ultimately unable to achieve that objective.

23.    On April 13, 2017, the PUCT held a brief open meeting, as it had previously indicated it would if a unanimous settlement were not presented, and thereafter issued a final order denying approval of the proposed transactions.[17]

24.    Following the PUCT's order, NextEra filed two motions for rehearing (which, under applicable Texas law, were required steps before the PUCT's order could be challenged in court).[18] These motions were fully supported by the Debtors, who submitted *amicus* briefs urging the PUCT to reverse its decision and approve the transaction. NextEra also contacted intervenors and other stakeholders frequently during this period in an effort to redefine a new path forward for approval of the transaction. When those efforts proved unsuccessful, NextEra continued its efforts to obtain regulatory approval by filing an appeal of the PUCT's decision with the Travis County District Court.[19]

25.    Meanwhile, Debtors shifted their focus to a competing transaction in which Berkshire Hathaway Energy Company and related entities (collectively, "Berkshire") would

---

[16]   *See id.* at 26:5–23.

[17]   *See Order*, dated April 13, 2017, PUCT Docket No. 46238, Item No. 538.

[18]   *See Seife Declaration* Ex. G, *Motion for Rehearing*, PUCT Docket No. 46238, Item No. 543; *Seife Declaration* Ex. I, *Second Motion for Rehearing*, PUCT Docket No. 46238, Item No. 554.

[19]   *See* Case No. D-1-GN-003234, Travis County Dist. Ct., 201st Judicial Dist.

instead acquire Oncor—terminating the NextEra Merger Agreement[20] and Plan Support Agreement[21] just days before signing a deal with Berkshire. [22]

26.    On July 29, 2017, Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott") filed *The Elliott Funds' Motion to Reconsider in Part the September 19, 2016 Order [D.I. 9584] Approving the NextEra Termination Fee* (the "Motion to Reconsider").[23]    The Debtors and NextEra objected to the Motion to Reconsider.[24]

27.    On July 31, 2017, NextEra filed its *Application of NextEra Energy, Inc. for Payment of Administrative Claim* [D.I. 11649], seeking payment of the Termination Fee upon the consummation of the Berkshire transaction or any other alternative transaction (the "Application").

28.    On August 2, 2017, Debtors commenced an adversary proceeding against NextEra (the "Adversary Proceeding"), seeking a declaration that the Termination Fee, although an allowable administrative expense, would not become due and payable because of alleged breaches by NextEra of its contractual obligations under the Merger Agreement.

29.    On the same day, Debtors moved to consolidate the Motion to Reconsider and the Adversary Proceeding.[25]

---

[20]  *See Notice of Filing of Letters Terminating (A) the NEE Plan Support Agreement and (B) the NEE Merger Agreement*, at Ex. B [D.I. 11424].

[21]  *See id.* at Ex. A.

[22]  *See, e.g., Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11426] (the "Berkshire Plan").

[23]  D.I. 11636.

[24]  D.I. 11879 and 11876, respectively.

[25]  *Plaintiffs Energy Future Holdings Corp. and Energy Future Intermediate Holding Company LLC's Motion to Consolidate and Set a Rule 7016 Scheduling Conference* [Adv. D.I. 2] (the "Consolidation Motion").

30.    On August 18, 2017, the Court consolidated proceedings on the Application and the Adversary Proceeding (the "Consolidated Proceedings") and set a schedule for the first stages of the Consolidated Proceedings.

31.    On August 23, 2017, Debtors abandoned the proposed transaction with Berkshire and pivoted to a reorganization plan in which Sempra Energy would acquire Oncor.[26]  This roughly $9.45 billion deal is ongoing and, because Sempra Energy and Oncor recently filed their application before the PUCT, confirmation is possible within the next six to eight months.

32.    As specified in the *Disclosure Statement For The First Amended Joint Plan Of Reorganization Of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, And The EFH/EFIH Debtors Pursuant To Chapter 11 Of The Bankruptcy Code* [D.I. 11856] ("Sempra Amended Disclosure Statement"), the Sempra Plan provides that "[u]nless an order is entered prior to the EFH Effective Date determining that the [NextEra] Termination Fee will not become due and payable and such order is not stayed, the Debtors will reserve no less than $275 million (in the aggregate) in Cash in accordance with the Bankruptcy Court-approved allocation . . . ," *id.* at 21.

33.    On September 19, 2017, the Court held a hearing on the Motion to Reconsider (the "Reconsideration Hearing").  At the conclusion of the hearing, the Court provided a tentative ruling granting the Motion to Reconsider, subject to issuance of a formal opinion and entry of an order.

34.    On October 3, 2017, the Court issued its opinion in support of the oral ruling [D.I. 11998] (the "Reconsideration Opinion"), and directed the parties to submit proposed forms of order under certification of counsel.

---

[26]    *See, e.g., First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11803] (the "Sempra Plan").

35.     On October 18, 2017, the Court issued the Reconsideration Order, granting the Motion to Reconsider, denying the Application, and staying the Adversary Proceeding pending further order of the Court.[27]   The Court found that the Reconsideration Order was a final order, immediately appealable under 28 U.S.C. § 158, and granted NextEra leave to appeal the Reconsideration Order in the event that the appellate court determined that it was interlocutory with respect to the Termination Fee and/or its Reconsideration decision.[28]   However, the Court found that the terms and conditions of the Reconsideration Order were effective and enforceable immediately upon entry, notwithstanding the possibility of appeal.[29]

36.     On October 30, 2017, NextEra filed the *Notice of Appeal* [D.I. 12141] of the Reconsideration Order.

37.     On November 10, 2017, NextEra filed *Appellant NextEra Energy, Inc.'s Statement of Issues and Designation of Record on Appeal from the October 18, 2017 Reconsideration Order* (the "Issues on Appeal") [D.I. 12213].

38.     Also on November 10, 2017, NextEra, Elliott, and the Debtors jointly certified to the Court that a direct appeal of the Reconsideration Order was appropriate [D.I. 12222].   On November 14, 2017, the Court certified the appeal for direct consideration by the Third Circuit and transmitted that certification to the Third Circuit.

**RELIEF REQUESTED**

39.     Pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedure, NextEra respectfully requests the entry of an order staying the effect of the Reconsideration Order until the final resolution of NextEra's appeal.

---

[27]   Reconsideration Order ¶¶ 1, 6, 7.

[28]   *Id.* ¶ 9.

[29]   *Id.* ¶ 10.

**ARGUMENT**

40.    The Court should grant this Motion because the familiar four-factor test for equitable relief heavily favors a stay of the Reconsideration Order.  "In considering whether to grant a stay pending appeal, courts consider the following four factors: (1) whether the appellant has made a strong showing of the likelihood of success on the merits; (2) will the appellant suffer irreparable injury absent a stay; (3) would a stay substantially harm other parties with an interest in the litigation; and (4) whether a stay is in the public interest."  *In re Revel AC, Inc.*, 802 F.3d 558, 565 (3d Cir. 2015).  "[T]he most critical factors . . . are the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success and (2) that it will suffer irreparable harm—the latter referring to harm that cannot be prevented or fully rectified by a successful appeal."  *Id.* at 568.  Once a movant satisfies the first two factors, courts "weigh the likely harm to the movant (absent a stay) (factor two) against the likely irreparable harm to the stay opponent(s) if the stay is granted (factor three) . . . tak[ing] into account where the public interest lies (factor four)."  *Id.*

**I.    NextEra is Likely to Succeed on the Merits**

41.    "A sufficient degree of success for a strong showing exists if there is a reasonable chance, or probability, of winning."  *Revel AC Inc.*, 802 F.3d at 568.  While the probability of success must be "better than negligible," it need not rise to the level of "more likely than not."[30] *Id.* at 568–69.  Thus, the question this Court must ask is: "Did the applicant make a sufficient showing that . . . it can win on the merits (significantly better than negligible but not greater than 50%)?"  *Id.* at 571.  Importantly, the likelihood of success inquiry does not focus on the Court's assessment of the merits of its own decision, but rather whether "substantial grounds for a

---

[30]    Where, as here, the gravity of the irreparable harm is severe, the threshold a movant must meet to establish a strong likelihood of success is diminished.  *See Revel AC Inc.*, 802 F.3d at 569–70 (citing *Constructors Ass'n of W. Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978)).

difference of opinion" exist as to the correct outcome. *See, e.g.*, *In re Genesis Health Ventures, Inc.*, 367 B.R. 516, 521 (Bankr. D. Del. 2007) ("For the purposes of this motion, it does not matter whether this Court believes that Defendants should succeed on appeal . . . [A] court may grant a motion for a stay pending appeal even when it has confidence in the rectitude of its decision."); *In re Tribune Co.*, 477 B.R. 465, 475 (Bankr. D. Del. 2012) ("Although I am satisfied that I have thoroughly—and correctly—examined and determined the disputed issues . . . , the Movants have made an adequate showing of likelihood of success on the merits with respect to the issues on appeal[.]"). All of the issues that NextEra will raise in its appeal satisfy this standard.

A.    NextEra Is Likely to Succeed on the Merits of its
      Argument that the Termination Fee Approval Order Is a Final Order

42.    NextEra is likely to succeed on the merits of its argument that the relevant portion of the Termination Fee Approval Order constituted a final order and was therefore subject to the rigorous standard of Fed. R. Civ. P. Rule 60(b) and Fed. R. Bankr. P. 9024.

43.    The Third Circuit "takes a pragmatic view of the finality of bankruptcy" court orders. *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 97 (3d Cir. 1988); *In re Amatex Corp.*, 755 F.2d 1034, 1039 (3d Cir. 1985) (finality is considered "in a more pragmatic and less technical way in bankruptcy cases than in other situations.") (citations omitted). Under this approach, bankruptcy orders are considered final when they "constitute[] a final disposition of a discrete dispute within the larger case." *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 600 (5th Cir. 2011). An order can be bifurcated for purposes of considering finality. *See In re Colon*, 941 F.2d 242, 245–46 (3d Cir. 1991).

44.    Here, the Third Circuit's pragmatic approach to finality requires the conclusion that the Termination Fee Approval Order was a final order. Indeed, even under a less flexible standard the same conclusion applies, because the Order is clearly final by its plain terms: the

Order expressly approves allowance and payment of the Termination Fee "to the extent it becomes due and payable pursuant to the terms and conditions of the Merger Agreement, at the time and in the manner provided for therein, *without any further proceedings before, or order of, the Court*." Termination Fee Approval Order ¶ 4 (emphasis added). With this language, the Order definitively resolved the bankruptcy-law question of whether the Termination Fee qualified as an allowable administrative expense under the *O'Brien* standard. While the Order explicitly left open the question of the allocation of the fee between estates and implicitly allowed for challenges to whether the fee was due and payable pursuant to the Merger Agreement in particular situations, the Order left "nothing further for the bankruptcy court to do" regarding the discrete issue of bankruptcy law that it actually resolved. *In re West Elecs., Inc.*, 852 F.2d 79, 82 (3d Cir. 1988). It was thus a final order. *Id.*

45.     As recognized by the one lower court to address the finality of an order ***approving*** a termination fee, a flexible, pragmatic approach would acknowledge that the Termination Fee's allowability under Section 503(b) and *O'Brien* is distinct from the allocation of any fee if payable and NextEra's performance under the Merger Agreement—neither of which is relevant to the determination of allowability under § 503(b). *In re Fruit of the Loom, Inc.*, 274 B.R. 631, 632 (D. Del. 2002).

46.     The Reconsideration Opinion relies on *In re Integrated Resources* for the principle that an order "must completely resolve all of the issues pertaining to a discrete claim, including issues as to proper relief" to be final. Reconsideration Opinion at 23 (citing *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 3 F.3d 49, 53 (2d Cir. 1993). But, as the Fifth Circuit has explained, *Integrated Resources* is of "limited persuasiveness" to a court that has "rejected the Second Circuit's rigid rule of finality in bankruptcy appeals." *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 599

(5th Cir. 2011). Because the Third Circuit has rejected the Second Circuit's rigid approach to finality, *Integrated Resources* is not applicable here—and the Court's reliance on it was inconsistent with the Third Circuit's flexible and pragmatic approach. *See* Reconsideration Opinion at 23.

47.    In *In re ASARCO, L.L.C.*, the Court of Appeals for the Fifth Circuit, applying a "flexible" and "practical" approach to determining finality, held that an order approving expense reimbursement to potential sale bidders constituted a final order because it disposed of a discrete dispute within the larger cases, namely whether the debtor's reimbursement of potential bidders passed muster under the business judgment standard. 650 F.3d at 599–600.

48.    What is particularly notable about *ASARCO* is that it was Elliott that argued that the order approving an expense reimbursement to potential bidders (which included Elliott) was a final order.[31]  In its brief, Elliott urged that the "pragmatic approach to finality" required "the examination of the facts and circumstances in their full context" and that an order approving a potential bidder's fees was final because it finally disposed of a discrete dispute within the larger case; there "the propriety of approving the fees under a business judgment standard *despite the possibility of future disputes over the exact amount of the fees.*"[32]  Elliott's on-point argument to the Fifth Circuit can be applied directly to the facts at hand—the Termination Fee Approval Order need not resolve *all issues* related to the Termination Fee to be a final order.  What is relevant is that the Termination Fee Approval Order finally disposed of the discrete dispute that Elliott asked the Court to reconsider—whether the Termination Fee satisfies the *O'Brien*

---

[31]    *See* Response Brief of Appellees/Intervenors Elliott Management and The Baupost Group, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593 (5th Cir. 2011) (No. 10-40930), 2011 WL 379833.

[32]    *Id.* at 14 (emphasis added).

standards.[33] And with respect to that issue, "there [is] nothing further for the bankruptcy court to do." *West Elecs.*, 852 F.2d at 82.

49.     The Reconsideration Order also points to the Debtors' prior argument—made in connection with their motion to dismiss the Asbestos Creditors' appeal of the Termination Fee Approval Order in 2016—that the Order was interlocutory because it did not resolve questions of the ultimately contractual duty to pay the fee or its allocation between EFH and EFIH. *Id.* at 24. But as already explained (*supra* ¶¶ 41–42), the Debtors' contractual obligation to pay the fee and its proper allocation are wholly distinct from the discrete bankruptcy question resolved by the Order.    Moreover, as Debtors explained in their objection to the Motion to Reconsider, the basis for their argument that the Asbestos Creditors' appeal was premature was that "the Asbestos Objectors were seeking an appeal of the Termination Fee Approval Order with respect to an issue"—the discharge of unmanifested asbestos claims upon confirmation of the restructuring plan—that by law "would not become ripe for adjudication until confirmation of the new plan."[34] That argument for nonfinality is not relevant here, because the narrow and discrete dispute regarding allowability of the Termination Fee as an expense under Section 503(b) could be resolved without the occurrence of any subsequent events.

50.     The Court's Reconsideration Order similarly rejects NextEra's policy arguments in favor of finding that the Termination Fee Approval Order should be final.    It states that "NextEra cannot reasonably have relied on the Termination Fee Approval Order when it knew the order was premised on an incomplete and confusing record." *Id.* at 24.    But there is

---

[33]     *In re Reliant Energy Channelview, LP*, 397 B.R. 697 (D. Del. 2008), which Elliott cites in the Motion to Reconsider, does not mandate a different result.    In *Reliant*, the court *denied* a debtor's motion to pay a potential buyer a break-up fee.    Notably, the procedures order denying the break-up fee required the bankruptcy court to conclude that another bid was higher and better than the bid provided by the stalking horse bidder. *See id.* at 700.    Unlike the order in *Reliant*, the Termination Fee Approval Order finally resolved the issue of allowance of the Termination Fee "without any further proceedings before, or order of, the Court." Termination Fee Approval Order ¶ 4.

[34]     *Debtors' Objection to the Elliott Funds' Motion to Reconsider In Part the September 19, 2016 Order [Docket No. 9584] Approving the NextEra Termination Fee* ¶ 15.

absolutely no evidence that NextEra "knew," or even had any reason to suspect, anything of the sort—because it did not. Even Elliott has never made that accusation. In fact, there were nearly 100 lawyers at the Approval Hearing, and not one of them—not even the Asbestos Creditors, the sole objecting creditor—ever suggested that the record was incomplete, confusing, or otherwise inadequate. To the contrary, at the Approval Hearing, one of the creditors emphasized to the Court that from "the creditor perspective . . . this agreement has been thoroughly reviewed and vetted by the principal beneficiaries of [the] agreement," and urged its rapid approval. Sept. 19, 2017 H'rg Tr. at 107:22–108:5. Put simply, NextEra had no basis to know—nor did it know— that the Court was confused about the conditions for payment of the Termination Fee.

51.     Moreover, the Court's ruling that the Termination Fee Approval Order was not final will chill bidding in future Chapter 11 cases by undermining bidders' ability to rely on orders approving bidding procedures and break-up fees. The Court attempts to deflect the significant practical consequences of rejecting the finality of the Termination Fee Approval Order by asserting that the interests in finality are outweighed by the Court's misapprehension of the facts and the interests of applying a complete record. Contrary to the Court's suggestion, the Reconsideration Opinion's approach would "impugn all termination fees," by allowing courts to revise otherwise final decisions simply because, with the benefit of hindsight, the record later came to seem incomplete or confusing in the court's wholly subjective view. That hindsight-driven approach is inappropriate. *See In re Am. Shipyard Corp.*, 229 B.R. 551, 552, n.1 (Bankr. D. R.I. 1998) (noting that the court's "task today is not to consider the breakup fee *ab initio*, as it has already been approved," notwithstanding that "with hindsight, we would probably not be approving" the breakup fee).

52.     Because NextEra will likely establish that the Termination Fee Approval Order was final, the Court's ruling will be scrutinized under the high bar set by Fed. R. Civ. P. Rule

60(b) and Fed. R. Bankr. P. 9024. Reconsideration Opinion at 19. As explained in detail below, the finality of the Termination Fee Approval Order has two consequences that make NextEra likely to succeed on appeal. *First*, Rule 60(b) requires that any motion to reconsider be filed within a "reasonable time" of the challenged order, taking into account both the importance of finality and the prevailing party's reliance—and Elliott's 10-months-late motion plainly was not. *Second*, relief under Rule 60(b) is "extraordinary relief which should be granted only where extraordinary justifying circumstances are present." *Plisco v. Union R. Co.*, 379 F.2d 15, 16 (3d Cir. 1967); *Budget Blinds, Inc. v. White*, 536 F.3d 244, 255 (3d Cir. 2008) ("We have explained that a showing of extraordinary circumstances involves a showing that without relief from the judgment, an 'extreme' and 'unexpected' hardship will result.") (citation omitted). Where, as here, the basis for relief is a "clear error of law or fact" or a "manifest injustice," the error must be "plain and indisputable . . . amounting to a complete disregard of the controlling law or the credible evidence in the record." *In re Maxus Energy Corp.*, 571 B.R. 650, 655 (Bankr. D. Del. 2017). Because Elliott has made no such showing here, NextEra has a high likelihood of succeeding on the merits.

      B.     NextEra Is Likely to Succeed on the Merits of its
              <u>Argument that the Motion to Reconsider Was Untimely</u>

      53.     While the Court found the Motion to Reconsider timely because Elliott filed it within a year of the Court's Entry of the Termination Fee Approval Order, and within several weeks of Debtors' termination of the Merger Agreement, the Court failed, in reaching this conclusion, to address many of NextEra's arguments regarding why the Motion to Reconsider was nonetheless untimely, regardless of whether it was classified as interlocutory or final. Reconsideration Opinion at 20–21.

         i.     *Because the Termination Fee Approval Order was Final, the Motion to
                  Reconsider Was Untimely Under Rule 60*

54.    Pursuant to Rule 60(c), a motion for reconsideration brought under Rule 60(b) "must be made within a reasonable time and for [mistake] no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c).  But as the Court recognized, such motions are "not considered timely just because [they are] filed within the one-year time limit" of Rule 60(c).  Reconsideration Opinion at 20 n.57 (quoting *In re USN Commc'ns, Inc.*, 288 B.R. 391, 396 (Bankr. D. Del. 2003)).  One year is merely "an outer limit and any Rule 60(b) motion is subject to denial if it is not also made within a reasonable time." *Id.* at 21 n.57 (quoting *Defeo v. Allstate Ins. Co.*, 1998 WL 328195, at *5 (E.D. Pa. June 19, 1998)).  Thus, even for motions filed within a year, "a Rule 60(b) movant as a threshold matter must provide 'a good reason for any delay in filing.'" *In re Taylor*, 357 B.R. 360, 363 (Bankr. W.D. Pa. 2006).  For this reason, numerous courts in the Third Circuit have dismissed Rule 60(b) motions as untimely notwithstanding the fact that they were filed within one year.  *See, e.g., Chase Bank USA, N.A. v. Cherry*, 2017 WL 3485877, at *3 (D. Del. Aug. 14, 2017) (motion untimely where movant delayed 11 months and offered no excuse for delay); *In re Olick*, 311 F. App'x 529, 532 (3d Cir. 2008) (motion untimely where movant delayed ten months, offered no excuse for delay, and could have raised his argument earlier); *Taylor*, 357 B.R. at 365 (motion to set aside default judgment untimely where movant delayed 5½ months and offered no excuse for delay).

55.    Here, the facts provide a strong argument on appeal that Elliott's delay was unreasonable under the circumstances.  Elliott's proffered basis for reconsideration related to terms of the Merger Agreement that were present at the time of the Approval Motion, knowable by anyone who read the Merger Agreement, and in most cases subject to extensive briefing and testimony at the initial approval proceedings.  Further, as Elliott was a creditor at the time of the Approval Motion, it received notice of the Termination Fee and an opportunity to challenge any

aspects of which Elliott deemed to be objectionable. *See The Elliott Funds' Reply Supporting Their Motion To Reconsider In Part The September 19, 2016 Order [DKT. No 9584] Approving The NextEra Termination Fee* [D.I. 11905] ¶ 31; Sept. 19, 2017 H'rg Tr. at 23:21–24:5. Rather than raising any concerns in a timely manner, Elliott chose to let ten months pass by while NextEra expended significant time and vast resources in reliance on the court's unequivocal prior approval of the Termination Fee. Neither the Reconsideration Opinion nor the Court's oral ruling at the Reconsideration Hearing addressed or applied these facts when deciding the timeliness issue.

56.      Elliott's knowing failure to raise its objections when given the opportunity also establishes that the Motion to Reconsider was barred on equitable grounds.  Whether characterized in terms of quasi-estoppel, waiver, or another doctrine, it is a basic principle of equity that a party cannot be permitted to knowingly sleep on its rights to gain an advantage and then assert those rights later.  The doctrine of quasi-estoppel "applies where it would be unconscionable to permit a person to maintain a position inconsistent with one in which he acquiesced or where he accepted a benefit." *In re G-I Holdings, Inc.*, 568 B.R. 731, 765 (Bankr. D.N.J. 2017).  Similarly, a movant waives a right through "conduct inconsistent with claiming the waived right or any action or failure to act evincing an intent not to claim the right." *Evcco Leasing Corp. v. Ace Trucking Co.*, 828 F.2d 188, 195 (3d Cir. 1987).  Here, Elliott sat on its hands while NextEra worked diligently to gain PUCT approval.  Only when that effort was terminated by the Debtors, did Elliott suddenly assert that NextEra should be retroactively deprived of the Termination Fee.  In other words, Elliott knowingly permitted NextEra to act in reliance on the Termination Fee and supported the Merger Agreement until it was actually terminated, which imposes an unconscionable result upon NextEra and is inconsistent with the rights Elliott now asserts.

57.    Had the Court considered those facts, it would likely have found the Motion to Reconsider untimely under applicable law.  The Court's conclusion departs from Third Circuit authority establishing that delayed Rule 60(b) motions are untimely when their basis for relief relates to facts which existed at the time of the original order.  *See Moolenaar v. Gov't of Virgin Islands*, 822 F.2d 1342, 1348 (3d Cir. 1987) (holding that a motion for reconsideration "was not made within a reasonable time . . . because the relevant evidence was available to the plaintiffs at the time of the original trial"); *Hutchinson v. United States*, 2014 WL 2450868, at *2 (M.D. Pa. June 2, 2014) (dismissing petition as untimely when the movant's "stated grounds for relief . . . should have been apparent at the time the order was filed"); *Eisen v. Horn*, 2009 WL 3045596, at *9–10 (W.D. Pa. Sept. 22, 2009) (holding movant "failed to carry his heavy burden" when he "knew all of the facts necessary to bring [his] claim" when the court entered its final judgment). While the Termination Fee may not have become due and payable until a later date, all of the facts necessary to challenge the allowability of the Termination Fee as an administrative expense under *O'Brien* were available to Elliott and all other creditors when the Court initially approved it. Elliott therefore was obligated to object at that time.

58.    Further, the Court's timeliness finding ignores the importance of NextEra's reliance on the original order—reliance that the Court expressly acknowledged in its opinion. *See* Reconsideration Opinion at 32 ("[T]he Court is cognizant that NextEra acted in reliance upon the Termination Fee Approval Order and spent tens of millions of dollars in pursuing the NextEra Transaction").   The requirement that a motion for reconsideration be filed "within a reasonable time" is designed to resolve the parties' rights before they detrimentally rely on a court's order. *See In re Burival*, 449 B.R. 371, 379 (B.A.P. 8th Cir. 2011) ("since the property has been sold in reliance on the surcharge Orders, the horse is out of the barn, so to speak, and neither the Trustee, nor the taxing authorities, should have to bear the consequences of

[Appellant's] failure to understand the ramifications of the surcharge"). Indeed, several courts have rejected Rule 60(b) motions as untimely when non-movants acted in reliance on the original order. *See Taylor*, 357 B.R. at 366 (creditors allowed timeframe for objecting to debtor's discharge lapse "in reliance upon . . . the Debtors' inaction in seeking Rule 60(b)(1) relief"); *In re Johnson*, 13 B.R. 342, 348 (Bankr. D. Minn. 1981) (had "changed their positions in good faith reliance on the finality" of an order and the debtor "for almost a year . . . allowed others to act by a set of rules that the debtor now wishes to alter."); *Christian v. All Persons Claiming any Right, Title, or Interest in all Properties Known & Described*, 962 F. Supp. 676, 680 (D.V.I. 1997) (finding movant's delay was inexcusable when parties relied "on the finality of the judgment in actions taken subsequent to its entry"). As the Court recognized, NextEra had a substantial reliance interest in the Termination Fee Approval Order because it spent millions of dollars in pursuit of PUCT approval—expenses that it would not have accrued in the absence of approval of the Termination Fee.[35] In other words, Elliott delayed raising an issue, the timely resolution of which would have obviated NextEra's expenditures in the first place. Allowing Rule 60(b) relief here subverts the Rule's underlying purpose of ensuring that parties file such motions within a "reasonable time," as the decision disregards NextEra's reliance on the finality of the Termination Fee Approval Order.[36]

59.    The Court avoided the weight of authority on timeliness by finding Elliott's delay excusable because the Motion to Reconsider did not become "ripe" until Debtors terminated the Merger Agreement, after which Elliott filed its motion within a matter of weeks. Reconsideration Opinion at 21.

---

[35]    Hr'g Tr. Sept. 19, 2017 at 35:13–20; Reconsideration Opinion at 32.

[36]    As noted previously, the Court's assertion that NextEra was not entitled to rely on the Order because NextEra purportedly "knew the order was premised on an incomplete and confusing record" is wholly unsupported by any evidence. *Supra* ¶ 45.

60.     But that cannot be so.    First, as Elliott filed a *motion to reconsider*, the controversy (*i.e.*, whether the Termination Fee was an allowable expense under *O'Brien*) was necessarily ripe prior to Debtors' termination of the Merger Agreement, because the Court had already considered the issue.    Unless the Court is suggesting that no motion to approve a termination fee as an allowable expense is ever ripe until termination occurs, there is simply no logic to this position.    Second, if Elliott's claim was truly unripe until the Debtors terminated the Merger Agreement, then the Reconsideration Opinion would be internally inconsistent, as the Court itself asserted that whether the Termination Fee met the *O'Brien* standard was based on the record as of September 19, 2016.    Reconsideration Opinion at 27.    If the facts relevant to the resolution of the Termination Fee issue were all known as of September 19, 2016, it cannot also be true that Elliott's challenge to the Fee was not even ripe until July of the following year. Third, if a challenge to a termination fee only became ripe when the fee became payable, then a party would never be able to seek pre-approval of a termination fee, turning bankruptcy law on its head.    Had the court actually performed a ripeness analysis[37] when first reviewing the Termination Fee, the controversy would have been found to be ripe because whether a termination fee meets the requirements of *O'Brien* is a "purely legal" question. *See Abbott Labs*, 387 U.S. at 149 (issue ripe for decision because, *inter alia*, it is a "purely legal one").

61.     Finally, the Court's ripeness conclusion is erroneous even under the Court's own flawed analysis.    Indeed, payment of the Termination Fee was not triggered upon termination of the Merger Agreement.    As noted in the Court's own Reconsideration Opinion, the Termination Fee would only become payable upon the conclusion of an "alternative transaction."    The

---

[37]    The Supreme Court in *Abbott Labs v. Gardner* laid out two fundamental considerations for determination of a ripeness question: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration."    387 U.S. 136, 149 (1967).    The Third Circuit has read this to be analyzed through a threefold rubric: "first, the adversity of the parties' interests; second, the probable conclusiveness of a judgment; third, the practical utility to the parties of rendering a judgment." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 342 (3d Cir. 2001).

Court's conclusion that the Motion to Reconsider would not have been ripe immediately upon entry of the Termination Fee Approval Order, but somehow became ripe when one, but not all, conditions for payment of the Termination Fee were satisfied, is arbitrary and unsupportable.

62.    In light of these errors in the Reconsideration Opinion, NextEra possesses a strong likelihood of establishing that the Court committed a reversible error by concluding that Elliott's motion was timely. *See AAA Nevada Ins. Co. v. Buenaventura*, 644 F. App'x 775, 776–77 (9th Cir. 2016) (holding "it was an abuse of discretion for the district court implicitly to find that the motion was filed within a reasonable time" because the movants "offer[ed] no reason" for the delay, the motion "did not rely on any previously unknown facts," and the other party would "undeniably be prejudiced if the summary judgment order is vacated"); *Nucor Corp. v. Nebraska Pub. Power Dist.*, 999 F.2d 372, 374–75 (8th Cir. 1993) (finding district court abused its discretion in entertaining a Rule 60(b) motion when delay was unjustifiable in light of the movant's several opportunities to raise the issue providing a basis for reconsideration during the proceedings).

ii.    *Even if the Termination Fee Approval Order was Interlocutory, the Motion to Reconsider was Untimely*

63.    A motion for reconsideration of an interlocutory order may be untimely under the doctrine of laches "if there were an inordinate delay in filing such a motion." *In re Conex Holdings, LLC*, 524 B.R. 55, 59 n.4 (Bankr. D. Del. 2015) (Sontchi, J.). According to the Third Circuit, laches should bar an action if there exists "inexcusable delay in light of the equities of the case and prejudice to the defendant." *Burke v. Gateway Clipper, Inc.*, 441 F.2d 946, 949 (3d Cir. 1971).

64.    For the reasons described above, a strong likelihood exists that the reviewing court will find the Motion to Reconsider untimely due to the absence of a coherent justification for Elliott's ten-month delay and the extreme prejudice imposed on NextEra by revisiting

allowance of the Termination Fee and belatedly rejecting it despite NextEra's detrimental reliance on the Termination Fee Approval Order. Indeed, many courts have applied laches to bar interlocutory motions for reconsideration brought after delays much shorter than Elliott's ten-month procrastination. *See, e.g., Rafael Refojos & Assocs., Inc. v. Ideal Auto. & Truck Accessories, Inc.*, 2006 WL 695806, at *1 (D.P.R. Mar. 15, 2006) (laches barred four-months-delayed interlocutory motion for reconsideration); *Standard Quimica De Venezuela v. Cent. Hispano Int'l, Inc.*, 189 F.R.D. 202, 205 (D.P.R. 1999) (seven months); *Corp. Commc'n Servs. of Dayton, LLC v. MCI Commc'ns Servs., Inc.*, 2010 WL 1133212, at *1 (S.D. Ohio Mar. 19, 2010) (107 days); *cf. also Taylor*, 357 B.R. at 365–66 (holding 5 ½ month delayed Rule 60(b) motion barred by laches). Here, the Court failed to address NextEra's laches argument entirely, instead summarily finding the Motion to Reconsider timely.

65.    The Court's order essentially allows debtors and creditors to entice bidders with a termination fee and, after millions of dollars are spent in reliance on the fee, renege on the promise if the merger is ultimately unsuccessful. Here, Elliott sat on its hands for nearly a year, waiting to see if it would reap the benefits of a successful NextEra merger, while NextEra spent millions of dollars in its attempt to consummate the deal. Only after it became clear that the merger would fail—depriving Elliott of the benefit it sought—did Elliott suddenly challenge the legality of the Termination Fee. Permitting Elliott to eat its cake and have it, too, was reversible error. *See Gruca v. United States SteelCorp.*, 495 F.2d 1252, 1259–60 (3d Cir. 1974) (district court committed an abuse of discretion by failing to apply laches where plaintiff "offered no proof of any deception or promise, or any other valid reason for . . . the period for delay.").

C.    NextEra Is Likely to Succeed in Establishing that there was No "Manifest Injustice" or "Clear Error of Law or Fact

66.    "A motion for reconsideration under Rule 9023 may be granted where (i) there has been an intervening change in controlling law; (ii) new evidence has become available; or

(iii) there is a need to prevent manifest injustice or to correct a clear error of fact or law." Reconsideration Opinion at 18 (citing *Stanziale v. S. Steel & Supply, L.L.C. (In re Conex Holdings, LLC)*, 524 B.R. 55, 58 (Bankr. D. Del. 2015)). And as the Court acknowledged, the only basis for its order granting reconsideration was "to prevent manifest injustice and to correct a clear error of fact and law." *Id.*

67.     By the Court's own admission, "[i]n order for a court to reconsider a decision due to 'manifest injustice,' the record presented must be so patently unfair and tainted that the error is manifestly clear to all who view it." *Id.* at 19. Similarly, a "clear error of law or fact" justifying relief under Rules 59 or 60 requires a finding that "the error is 'plain and indisputable . . . amounting to a complete disregard of the controlling law or the credible evidence of record.'" *Id.*

68.     Nothing in the Reconsideration Opinion or the record supports a conclusion that the Termination Fee approval proceedings were "so patently unfair and tainted that the error [was] manifestly clear to all who view[ed] it." To the contrary, ***not one*** of the nearly 100 attorneys present for the Approval Hearing—many of whom represented unsecured creditors with a vested interest in objecting to any provision of the Merger Agreement that could result in additional administrative expense claims against the estates—noticed any error at all, never mind one that was "patently unfair" and "manifestly clear."

69.     Nor is there any basis for concluding that the Termination Fee Approval Order demonstrated "a complete disregard of . . . the credible evidence of record." There was an enormous amount of record evidence regarding the Termination Fee and its structure, and the Termination Fee Approval Order properly took account of that evidence.

70.     The only two aspects of the Termination Fee as to which the Reconsideration Order asserts that the record was "incomplete" or "confusing" are (i) the fact that the

Termination Fee could be payable to NextEra even if the PUCT rejected the transaction, and (ii) the absence of a drop-dead date the occurrence of which would eliminate NextEra's right to the Fee. Reconsideration Opinion at 29–31.

      i.    *The Record Evidence Unmistakably Showed that the Termination Fee Would Be Payable If Regulatory Approval Was Denied*

71.     As to Court's "confusion" about the fact that "the Termination Fee was payable to NextEra *even if* the PUCT declined to approve the NextEra Transaction," the record evidence on that point was broadly consistent. Debtors and their witnesses repeatedly informed the Court that the Fee would be payable upon regulatory rejection. As the Court acknowledged in the Reconsideration Opinion, "a witness clearly stated that the Debtors would be liable for the Termination Fee if the PUCT declined to approve the NextEra transaction and the Debtors terminated the merger agreement." Reconsideration Opinion at 27. Specifically, William Hiltz was expressly asked whether the Fee would be payable if the Debtors did not "get the regulatory approval they need," such that the transaction "falls apart and a year and a half from now they confirm a plan that's not even a sale plan." Hiltz answered in the affirmative—an answer that actually *overstated* the circumstances in which the Fee would be payable, because it did not specify that the Fee would not be payable if NextEra terminated. *See Seife Declaration* Ex. A, Hr'g Tr. Sept. 19, 2016 at 78:17–23. Under questioning by the Court—which specifically referred Mr. Hiltz to the language of Section 8.5(b) of the Merger Agreement—Mr. Hiltz clarified that the Termination Fee would not be payable if NextEra, rather than the Debtors, was the terminating party. *See Seife Declaration* Ex. A, Hr'g Tr. Sept. 19, 2016 at 82:9–83:10.

72.     The repeated references to elimination of the Fee if *NextEra* terminated the transaction were neither incomplete nor confusing: the clear implication is that if the *Debtors* terminated, the fee would be payable. Nor were those answers somehow calculated to mislead the Court about how the fee functioned: the witnesses explained the fee in terms of the effect of

NextEra terminating because *that is what the Court wanted to know*. The Court's questions about the fee repeatedly focused on the outcome if "NextEra terminates" or "NextEra walks." *Seife Declaration* Ex. A, Hr'g Tr. September 19, 2016 at 83:3–10, 84:3–9. The Court never asked, or expressed any interest in, the outcome if the PUCT rejected the transaction and *Debtors* terminated. Nor was there any need to ask that question, because (as the Court acknowledged) the only witness to directly address that issue "clearly stated that the Debtors would be liable for the Termination Fee if the PUCT declined to approve the NextEra transaction and the Debtors terminated the merger agreement." Reconsideration Opinion at 27. Moreover, the obvious implication of repeated statements that the fee would *not* be payable if NextEra terminated was that it *would* be payable if the Debtors terminated.

73.    The only even possible source of "confusion" at the hearing was a statement by Debtors' counsel—inconsistent with all testimony and other evidence presented at the hearing—that "there's no break-up fee if the PUC just denies—outright denies approval." *Seife Declaration* Ex. A, H'rg. Tr. September 19, 2016 at 90:10–19. That non-testimonial statement was incorrect, but cannot be the basis for disregarding the totality of evidence on the issue—including the text of the termination fee provision itself, which was in the record and available to all parties, and specifically reviewed by the Court.

74.    Even if that solitary sentence were sufficient to render the record materially confusing, that confusion could not have lasted long, because within a week, NextEra drafted and the Debtors joined the Clarification Letter. This letter, submitted to the Court on September 25, 2016 without objection, unambiguously stated that "the $275 million termination fee *is triggered* if [Debtors] terminate the merger agreement as a consequence of the Commission either not approving the merger agreement transaction or approving the merger transaction with

the imposition of a burdensome condition."[38] Clarification Letter [D.I. 9655] (emphasis added). At that point—still 10 months before Elliott's motion to reconsider—there was no possibility of confusion about the fact that if the PUCT rejected the transaction and the Debtors terminated the merger agreement, NextEra would be entitled to the Termination Fee.

75.    Moreover, the Court's stated confusion regarding the lack of a date by which NextEra would have been compelled to terminate the Merger Agreement is irrelevant in light of the Court's mistaken conclusion that "payment of a termination or break-up fee when a court (or regulatory body) declines to approve the related transactions cannot provide an actual benefit to a debtor's estate sufficient to satisfy the O'Brien standard." Reconsideration Opinion at 30. The record was absolutely, unambiguously clear as of September 19, 2016, that the Termination Fee would be payable in circumstances that were incompatible with the Court's sweeping statement of the law. Most notably, the inaccurate statement by Debtors' counsel that "there's no break-up fee if the PUC just denies—outright denies approval" was followed immediately by the statement that if the merger agreement is terminated because "the PUC imposes [a] burdensome condition . . .a break-up fee is triggered."[39] There is no meaningful difference, under the Court's interpretation of O'Brien, between approving a termination fee that is payable upon a regulator's imposition of burdensome conditions followed by termination of the merger agreement (with which the Court has not taken issue) and approving a termination fee that is payable upon an outright regulatory rejection of a merger agreement followed by termination of the agreement (which the Court now condemns as incompatible with O'Brien). In both cases, under the Court's interpretation of O'Brien, the debtor receives no cognizable benefit. Similarly, the record

---

[38]    There is no dispute that the Clarification Letter fully advised the Court that the Debtors would be liable for the Termination Fee if they terminated the merger agreement after regulatory disapproval. Elliott admitted as much in its Motion for Reconsideration, acknowledging that the Clarification Letter "acknowledged that the Debtors might have to pay the fee if *they* terminated after PUCT denial." Motion to Reconsider at 20 (emphasis in original).

[39]    H'rg Tr. September 19, 2017 at 90:16–19.

evidence unambiguously showed that NextEra would receive the Termination Fee if, following regulatory disapproval, the Debtors failed to enter into a merger agreement at all and instead negotiated "a reorganization involving its own creditors" (*i.e.*, an equitization)—another circumstance in which, under the Court's theory, the Debtors would receive no benefit.[40] Thus, if the Court's interpretation of *O'Brien* is valid, the record unambiguously gave the Court all of the information that it needed to reject the transaction as of September 19, 2016, making the Court's stated confusion regarding the Merger Agreement's outside date irrelevant.

ii.    *There was No Possible Confusion about the*
       *Absence of a Time Limit on the Termination Fee*

76.    The second basis for the Court's finding of a "clear error of fact" was the parties' purported failure to "focus[] the court on a critical fact," that is, that "the Merger Agreement did not set a date by which approval by the Public Utility Commission of Texas ('PUCT') had to be obtained." Reconsideration Opinion at 6. The absence of such a drop-dead date, the Court held, "incentivized NextEra to pursue multiple motions for reconsideration and a fruitless appeal strategy to force the Debtors to terminate the Merger Agreement to pursue an alternative transaction." *Id.* at 31.[41] "Payment of a termination fee under those circumstances," the Court continued, "which would have been predictable had the Court properly understood the facts, could not provide an actual benefit to a debtor's estate sufficient to satisfy the *O'Brien* standard." *Id.*

77.    But the Court's failure to "properly understand the facts" regarding the absence of a drop-dead date is not the kind of "clear error of fact" that justifies reconsideration. The record was silent about the absence of a drop-dead date *because there was no drop-dead date*, and no reason for the Court to believe there was one. None appears on the face of the Merger

---

[40]    *See* H'rg Tr. September 19, 2016 at 77:25–78:14.

[41]    NextEra's filing of the motions for reconsideration and appeal were not fruitless. *See infra* ¶¶ 89–92. Additionally, NextEra was also pursuing alternative strategies to gain approval of the deal.

Agreement's Termination Fee provision, and because no one objected to its absence, no party had any reason to discuss it. The Court's 10-months-later conclusion that the absence of a time limit was the "key nuance" in determining the Termination Fee's allowability is purely a product of hindsight. Reconsideration Opinion at 27. Litigants are not required to be clairvoyant, and for the Court to retroactively identify a "clear error of fact" based on the litigants' "failure" to answer a question that *nobody ever asked* was wholly unreasonable.

iii.     *The Court's Insinuations that it was Misled by the Debtors And NextEra are Without Basis in Fact*

78.     The Court's opinion strongly suggests that the parties' failure to "focus" on this single aspect of the Termination Fee was a product of deceptive intent. *See, e.g., id.* at 2 (describing NextEra's "conspicuous and unhelpful silence" at the hearing); *id.* at 26 ("Despite the obvious confusion on this point neither the Debtors nor NextEra sought to clarify the record and affirmatively state that NextEra would receive the Termination Fee if the Debtors terminated the Merger Agreement"); *id.* at 28 ("More was required by the Debtors and NextEra in order for them to rely on the record to refute the Court's own misunderstanding"); *id.* at 28 n.79 ("As for NextEra, the record indicates it was happy to remain silent. Whether NextEra realized that the Court misapprehended the facts to NextEra's benefit is unknown, but if it did, it certainly made no effort to clarify the record."); *id.* at 32 (stating that the Court's "misapprehension of the facts was due in part to the confusing record presented be Debtors and NextEra"); *id.* at 32–33 ("NextEra was conspicuously silent in response to the Court's questions regarding whether the Termination Fee would be payable if the PUCT declined to approve the merger and was content to allow the Court to rely on an incomplete and confusing record"); *id.* at 33 ("Notwithstanding the passage of time and the reliance of the parties on the Termination Fee Approval Order, the interests of justice, which include . . . *requiring parties seeking relief from the Court to be*

*accurate in their representations*, outweigh the interest of finality in this instance.") (emphasis added).

79.    The Court's insinuations about NextEra's motivations are wholly, categorically false.  NextEra was "conspicuously silent" at the Termination Fee Approval Hearing because, as the proposed merger partner of the Debtors, NextEra had no role in that proceeding, the purpose of which was for the Debtors to establish that the transaction would benefit the bankruptcy estate.    NextEra was not an appropriate party to represent the interests of the estate. Accordingly, it did not present *any* record to the Court, never mind a "confusing" record.  The repeated allegation that NextEra and the Debtors failed to "clarify the record" (*see* Reconsideration Opinion at 26, 28 n.79) cannot be reconciled with the Clarification Letter, which was drafted by NextEra, joined by  Debtors, and jointly filed just days after the hearing.  The Clarification Letter stated unambiguously that if the PUCT declined to approve the merger and the Debtors terminated, the Termination Fee would have to be paid.  If the Clarification Letter is not an attempt to clarify the record, it is not clear what could be.[42]  The basis for the Court's stated confusion about the record was a single sentence uttered by Debtors' counsel, which was inconsistent with all the other evidence presented, and which the Debtors and NextEra immediately addressed in writing.  The suggestion that the Debtors and NextEra were somehow complicit in a scheme to mislead the Court is wholly without basis in fact.  To the extent the Court's ruling was predicated upon the purported misconduct of Debtors and NextEra, NextEra is likely to succeed on appeal.

---

[42]    The Court's suggestion (at 12) that the Clarification Letter was confusing because of its "failure" to define the term "alternative transaction" is puzzling.  The Clarification Letter unambiguously clarifies the issue on which the Court purports to have been confused—that if the PUCT rejected the deal and the Debtors terminated the merger agreement, NextEra would receive the Termination Fee.  How the meaning of "alternative transaction" is relevant to that clarification is unclear.

D.      NextEra is Likely to Succeed in Establishing
        that the Termination Fee Satisfies *O'Brien*

80.     A finding by the Third Circuit that Elliott's motion was untimely would be sufficient of itself to require reversal of the Reconsideration Order and reinstatement of the Termination Fee. Even if the appellate court were to find the motion timely, however, NextEra would still be likely to succeed on the merits of its appeal because the Court erred in retroactively concluding that the Termination Fee could not satisfy the *O'Brien* standard for approval of an administrative expense.

i.      *The Termination Fee Satisfied the O'Brien Standard Because
        it Induced NextEra's Bid, Which Increased the Likelihood
        that Oncor's True Value Would be Realized by the Estates*

81.     In *O'Brien*, the Third Circuit explicitly recognized that breakup fees may be awarded to "attract or retain a potentially successful bid." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 536 (3d Cir. 1999). The relevant question therefore is ***not*** whether the breakup fee induces ***other parties*** to submit higher bids, but rather whether the "fee requested correlate[s] with a maximization of value to the debtor's estate." *Id.* For example, a bidder may provide a "benefit to the estate by ***increasing the likelihood*** that the price at which the debtor is sold will reflect its true worth." *Id.* at 537 (emphasis added).

82.     As a result, contrary to Elliott's hindsight-dependent analysis, a breakup fee does not need to in fact result in a higher purchase at the ultimate time of sale to satisfy *O'Brien*, but rather must simply provide a benefit that is apparent at the time the fee is proposed. *Cf. Reliant Energy Channelview, LP*, 594 F.3d 200, 208 (3d Cir. 2010) (conducting *O'Brien* analysis "from the Court's perspective" at the time the break-up fee was proposed, and explicitly "not decid[ing] the case on the basis of [its] knowledge of what happened after the Court denied the fee"); *In re ASARCO LLC*, 441 B.R. 813, 832 (S.D. Tex. 2010) (recognizing that a benefit inured at the time of a bid "even if no sale was ultimately made."). In the Reconsideration Order, the Court itself

acknowledged that a termination fee may be justified when "it increases the likelihood that the price at which the debtor is sold will reflect its true worth." Reconsideration Opinion at 29 (internal quotation omitted).

83.    To conclude that the Termination Fee could have satisfied the *O'Brien* standard (thus requiring reversal of the Reconsideration Order), the appellate court will need to answer only two questions in the affirmative. First, was the Termination Fee material in inducing NextEra's bid?[43] Second, was NextEra's bid more likely to unlock Oncor's "true value" than the available alternatives?

84.    Here, the Termination Fee offered a number of demonstrable benefits to the estate by inducing NextEra to offer a deal materially superior to those offered by competitive bidders— a deal closer than any other to Oncor's "true worth."

85.    As a threshold matter, the record demonstrated that NextEra would not have proceeded with the transaction without being induced by the Court's approval of the Termination Fee. Indeed, the Court found that "the evidence overwhelmingly indicates that a breakup fee was necessary to induce NextEra to make a bid, and to move forward with a merger agreement." *Seife Declaration* Ex. A, H'rg Tr. September 19, 2016 at 121:16–19. Thus, without the Termination Fee, there would have been no NextEra bid.

86.    Moreover, NextEra's Termination Fee-induced bid was materially superior to proposals from other bidders in several respects and thus closer to unlocking Oncor's "true worth."

---

[43]    *See, e.g., In re Dura Auto. Sys., Inc.*, No. 06-11202 KJC, 2007 WL 7728109, at *91 (Bankr. D. Del. Aug. 15, 2007) (approving break-up fee which "played a material role in inducing the Purchaser to enter into the binding APA"); *In re Tama Beef Packing, Inc.*, 290 B.R. 90, 98–99 (B.A.P. 8th Cir. 2003) (approving termination fee where the bidder "would not have negotiated without the break-up fee provision."); *In re Redwine Res., Inc.*, No. 10-34041, 2010 WL 5209287, at *2 (Bankr. N.D. Tex. June 24, 2010) (approving breakup fee where the bidder would not have made a binding offer "[i]n the absence of the Debtors' agreement to the Bid Protections").

87.    *First*, the dollar value of NextEra's bid was substantially higher than any other bid. This increased value is directly traceable to the Termination Fee. NextEra first obtained the Debtors' support for the Termination Fee in exchange for an "eleventh hour" commitment to increase its purchase price by $110 million. *Debtors' Reply in Support of Approval Motion* ¶¶ 3, 19. NextEra then obtained creditor support for approval of the Termination Fee by increasing its bid by an additional $300 million.[44]    As a result, the Termination Fee correlated with a maximization of value to the Debtors' estate by securing a purchase price higher than those offered by other bidders. *See In re Sea Island Co.*, No. 10-21034, 2010 WL 4393269, at *3 (Bankr. S.D. Ga. Sept. 15, 2010) (approving break-up fee when "extensive testimony as to the bidding process demonstrated that when the break-up fee became an integral part of the final rounds of the process, the amounts offered increased substantially, thereby maximizing the value to the Debtors' estate").

88.    *Second*, in exchange for the Termination Fee, NextEra agreed to remove perceived barriers to competitive bidding by dropping its insistence on a "match right."[45]    In the absence of the Termination Fee, any transaction with NextEra would have entailed a match right which the Debtors worried "would have a chilling effect" that would have caused other potential bidders to either discount their bids or avoid participating in the process entirely. *Debtors' Reply in Support of Approval Motion*, ¶ 18. As the Court recognized, this "match right" was only avoided by providing NextEra with the Termination Fee.[46]    As the Third Circuit recognized in *O'Brien*, "a benefit could be found if assurance of a break-up fee promoted more competitive

---

[44]    *See Seife Declaration* Ex. A, Hr'g Tr. Sept. 19, 2016 at 13:23–15:3.

[45]    *See Seife Declaration* Ex. A, Hr'g Tr. Sept. 19, 2016 at 97:6–17.

[46]    *See Seife Declaration* Ex. A, Hr'g Tr. Sept. 19, 2016 at 122:13–15 ("It's clear that the termination fee went up at the end of the process but it went up primarily, I believe, because they walked away from the match right[.]").

bidding . . . ." 181 F.3d at 537. Thus, by *O'Brien*'s express terms, the exchange of the Termination Fee for the allegedly bidding-inhibiting match right provided a benefit to the estates.

89.    ***Third,*** all other serious alternative bids were similarly subject to termination fees. Indeed, at least one other serious bidder competing with NextEra demanded both a higher termination fee ***and*** a full match right.[47] Thus, to the extent the Termination Fee represented a potential burden on the Debtors' estates, it represented no greater a burden than was demanded by other competitive bidders and, with respect to the most competitive alternative bidder, a substantially lower burden.

90.    The Court did not address or assess these benefits when conducting its *O'Brien* analysis on reconsideration, focusing solely on whether the portions of the Termination Fee which the Court asserts it initially misapprehended benefited the estate. NextEra thus possesses a strong likelihood on appeal of establishing that the Court erred in its application of *O'Brien*, because any potential detriment to the estate associated with these provisions does not vitiate the overwhelming benefits provided by the Termination Fee at the time it was offered.

ii.    *The Court's O'Brien Analysis with Respect to the Apparently Misapprehended Aspects of the Termination Fee was Erroneous*

91.    The Court's analysis of the misapprehended portions of the Termination Fee is also erroneous. The Court found that the Termination Fee failed under *O'Brien*, because "[p]ayment of a termination or break-up fee when a court (or regulatory body) declines to approve the related transaction cannot provide an actual benefit to a debtor's estate sufficient to satisfy the *O'Brien* standard." Reconsideration Opinion at 30. The Court's novel holding that no amount of regulatory risk can be allocated to a debtor's estate in connection with payment of a breakup fee depends on out-of-Circuit authority finding that "[b]reak-up fees, where

---

[47]    *See Seife Declaration* Ex. A, Hr'g Tr. Sept. 19, 2016 at 27:14–16 ("The other bidder was requesting a $350 termination fee . . . as well as a full match right.").

appropriate, should only be authorized where the fee is to compensate an unsuccessful acquirer which served as the so-called 'stalking horse.'" *In re Hupp Indus., Inc.*, 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992).    But the Court's conclusion and the relied-upon holding are completely at odds with *O'Brien* itself, which permits break-up fees that "attract or retain a *potentially* successful bid." *O'Brien*, 181 F.3d 527 at 536 (emphasis added).    As was the case here, breakup fees may often be necessary to induce potential acquirers in highly regulated industries where obtaining regulatory approval may be uncertain or cumbersome.    By taking breakup fees off the table in such circumstances, the Court departed from *O'Brien* in a manner that could potentially chill the market for bankrupt assets in such industries.

92.    The Court also viewed the lack of an outside date upon which the Merger Agreement automatically terminated fatal to the Termination Fee, because it "incentivized NextEra to pursue multiple motions for reconsideration and a fruitless appeal strategy to force the Debtors to terminate the Merger Agreement to pursue an alternative transaction." Reconsideration Opinion at 31.    This conclusion is flawed in multiple respects.

93.    First, the Court's insinuation that NextEra pursued appeals of the PUCT's decision in order to force payment of the Termination Fee is belied by the evidence.    Under Texas law, NextEra was required to seek reconsideration of the PUCT's initial order before it could take an appeal.[48]    The Debtors *supported* that motion for reconsideration.    Because the PUCT amended its order but still denied approval of the transaction (rather than simply denying NextEra's motion for reconsideration), NextEra was required by Texas law to once more seek reconsideration before it could take a genuine appeal.[49]    The Debtors again *supported* that motion for reconsideration.    Only when the PUCT outright denied NextEra's second motion was NextEra able to take its appeal, which it did expeditiously.    The Court had no basis for

---

[48]    *See* Texas Administrative Procedure Act § 2001.145.

[49]    *See id.*

concluding that this approach—required by Texas law and endorsed by the Debtors—was a "fruitless" dilatory strategy.

94.     Second, until its termination, the Merger Agreement required NextEra to undertake good-faith and commercially reasonable efforts to close the transaction. These requirements have two implications that undermine the Court's analysis. First, NextEra was **required** to pursue the motions for reconsideration and appeals that the Court has maligned. Not only did NextEra file these motions, but also pursued other strategies to win approval of the deal. There is no way of knowing whether the appeal or the alternative strategies would have ultimately been successful as Debtors terminated the Merger Agreement to pursue an alternative transaction. Second, had NextEra engaged in non-good faith dilatory tactics as the Court has baselessly suggested, NextEra would have been in breach of the Merger Agreement and the Termination Fee simply would not have been payable, making such delay self-defeating. *See In re Integrated Resources, Inc.*, 147 B.R. 650, 661 (S.D.N.Y. 1992) (finding termination fee which would not be payable if the bidder "fail[ed] to proceed in good faith" "properly balance[d] [creditors] concern[s] that the fee is excessive against [debtor's] concern that [bidder] might withdraw from bidding").

95.     In sum, the Court misapplied the law in concluding that: (a) Elliott's ten-month delayed Motion to Reconsider was timely and (b) it manifestly erred when it initially found that the Termination Fee, which was indisputably necessary to induce NextEra's best bid, satisfied the *O'Brien* standard. NextEra thus has at a minimum a reasonable likelihood of succeeding on the merits of its appeal. *See In re Tama Beef Packing, Inc.*, 290 B.R. 90, 99 (B.A.P. 8th Cir.

2003) (reversing order denying breakup fee under 503(b) because "the bankruptcy court misapplied the *O'Brien* test to the facts of this case.").[50]

## II.    NextEra Will Be Irreparably Harmed Absent A Stay

96.    "To establish irreparable harm, a stay movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Revel AC, Inc.*, 802 F.3d at 571. Harm is irreparable if the movant will suffer it during the pendency of the litigation and it cannot be prevented or fully rectified by the tribunal's final decision. *Id.*

97.    Absent a stay, Debtors will likely refuse to maintain a reserve for payment of the $275 million Termination Fee. Instead, the Debtors will likely seek to distribute those funds to creditors upon the Effective Date, which may occur before NextEra's appeal of the Reconsideration Order is decided. Allowing the funds to be distributed to unsecured creditors would impermissibly shift the burden of collection to NextEra, which would be forced to pursue creditors or the Reorganized Debtors for payment of the Termination Fee.[51] *See In re Spansion, Inc.*, 426 B.R. 114, 146 (Bankr. D. Del. 2010) (requiring a reserve for a disputed administrative expense claim because "the Code grants a right to priority of payment to administrative claimants. This priority should not be subject to the risk that the newly reorganized debtor lacks the funds or the motivation to resolve the outstanding dispute."). In analogous cases, courts have granted stays pending appeal, recognizing that distributions of bankruptcy estate assets prior to the adjudication of an appeal concerning those assets could hinder the appellant's ability to

---

[50]    *See also In re Athens/Alpha Gas Corp.*, 332 B.R. 578, 581 (B.A.P. 8th Cir. 2005) (reversing denial of application for administrative expense when lower court's decision "result[ed] from an erroneous application of the law to the facts"); *In re Metro Fulfillment, Inc.*, 294 B.R. 306, 312 (B.A.P. 9th Cir. 2003) ("We reject the Trustee's contentions, and conclude that the Reading exception applies: the penalty wages are administrative expenses entitled to priority under § 503(b)(1)(A). The bankruptcy court's contrary ruling was predicated on an erroneous view of the law, and thus an abuse of discretion. We REVERSE.").

[51]    Although NextEra would possess the right to seek such disgorgement as a matter of common law, the Plan should also be amended to make clear that NextEra will be entitled to disgorgement from unsecured creditors, or to recover from the Reorganized Debtors, to the extent necessary to satisfy the Debtors' ultimate obligations in respect of the Termination Fee.

recover upon a successful appeal. *See In re Tribune Co.*, 477 B.R. 465, 476 (Bankr. D. Del. 2012) ("a distribution of funds to diverse parties may constitute irreparable harm because once a distribution is made, funds may be difficult or impossible to recover."); *In re Finova Grp., Inc.*, No. 01-698-PJW, 2007 WL 3238764, at *2 (D. Del. Oct. 31, 2007) (finding irreparable harm where debtors, absent a stay, intended to distribute disputed funds to creditors, leaving the appellant with "little or no recourse available to reclaim the funds.").[52]

## III.   Other Parties Will Not be Substantially Harmed by the Entry of a Stay

98.     When considering whether to grant a stay, Third Circuit courts "weigh the likely harm to the movant (absent a stay) (factor two) against the likely irreparable harm to the stay opponent(s) if the stay is granted (factor three)." *Revel AC, Inc.*, 802 F.3d at 569.  In contrast to the irreparable injury NextEra will incur in the absence of a stay, creditors will not be unduly burdened if a stay pending appeal is granted.  Given that NextEra is merely asking this Court to ensure the Reconsideration Order is stayed so that the sale of any of Debtors' assets includes a provision temporarily setting aside the disputed funds, any harm to other interested parties will be temporary and minor.  In the event that NextEra is ultimately unsuccessful in achieving allowance of the Termination Fee, reserved funds can be easily distributed to creditors in a supplemental distribution.  Moreover, NextEra is working to minimize any potential burden by seeking to ensure that the dispute is resolved as quickly as possible, including by seeking direct review of the Reconsideration Order by the Third Circuit.  This is especially true given that the Debtors and Elliott are supportive of a direct and expedited appeal.  Weighing the substantial harm that NextEra faces in the absence of a stay against the small inconvenience other parties

---

[52]   *See also In re Focus Media, Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004) (holding that bankruptcy court did not abuse its discretion by granting a preliminary injunction where the "specter" of irreparable harm existed if funds were dissipated), *In re Netia Holdings, S.A.*, 278 B.R. 344, 357 (Bankr. S.D.N.Y. 2002) (finding balance of hardships weighed in favor of granting a preliminary injunction and stating that "if the funds leave State Street, they will be distributed to diverse parties and be difficult or impossible to recover. This is of course a concrete example exemplifying the well-established principle that piecemeal distribution of the debtor's estate constitutes irreparable harm.").

would experience—a minor delay in Debtors satisfying a small portion of their remaining debts—the balance of harms clearly tilts in favor of NextEra. *See In re Finova Grp., Inc.*, No. 01-698-PJW, 2007 WL 3238764, at *1 (D. Del. Oct. 31, 2007) (holding that the potential harm from the inability to recover distributed funds absent a stay outweighed the harm to the distributee).

## IV.    Public Interest Considerations Weigh in Favor of a Stay

99.     The public interest also weighs in favor of a stay.  If potential asset buyers cannot rely on the enforcement of bankruptcy court orders, there will be a chilling effect on the market and a reduction in prices that buyers would be willing to pay for assets.  It will also affect the willingness of potential buyers, like NextEra in this case, to make important concessions to reach agreement on sale terms.  The Court was mistaken in disregarding this public policy concern in issuing the Reconsideration Opinion, stating that "[p]arties that accurately and properly negotiate, structure, and disclose termination fees to a court can still rely on orders approving such fees."[53]  The Court's reasoning is nakedly tautological, amounting to an assertion that if parties have done everything correctly, they can be assured that their termination fee approval order will not be overturned.  The Court ignores the fact that when sophisticated parties negotiate a termination fee at arm's-length, provide the terms of the fee to the Court in writing, vet the terms of the fee with creditors, present witness testimony on the terms of the fee, and ultimately win the Court's unequivocal endorsement for the fee before beginning to rely on it, they will have every reason to believe that they have done everything right.  Yet, as the Reconsideration Order demonstrates, that will not be sufficient to protect it from being opportunistically overturned a full year later.  It is simply incorrect that the Court's approach to reconsideration, which lacks certainty and specificity as to exactly what parties must do to avoid being

---

[53]     Reconsideration Opinion at 25.

retroactively deprived of a termination fee after relying on the Court's order, will not deter potential bidders.

## V.    NextEra Should Not Be Required to Post a Bond

100.    Bankruptcy Rule 8007 allows the Court to condition a stay pending appeal on the filing of a bond.  The purpose of such a bond "is to protect the adverse party from potential losses resulting from the stay." *In re United Merchs. & Mfrs., Inc.*, 138 B.R. 426, 430 (D. Del. 1992).  The Court has "wide discretion in the matter of requiring security and if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary." *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964).  Where, as here, the adverse party will not suffer any losses as a result of a stay pending appeal, a bond is not necessary. *See United Merchs.*, 138 B.R. at 430; *see also Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 191 (3d Cir. 2001) (noting that a stay may be sought "with or without posting a bond").  Generally, a bond is only necessary where the stay is "likely to cause harm by diminishing the value of an estate or endanger the non-moving parties' interest in the ultimate recovery . . . ." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 368 (Bankr. S.D.N.Y. 2007).

101.    There is no risk that the reserve necessary to ensure that NextEra's appellate rights are fully preserved will result in a diminution of the Debtors' estate.  As explained above, the risk of any harm to parties in interest as a result of the stay is *de minimis*, at best, and no bond should be required. *See United Merchs.*, 138 B.R. at 430 (stay of further distributions pursuant to confirmed Chapter 11 plan would not be conditioned upon a bond because the debtor would not suffer any loss as a result of the stay pending appeal).

## CONCLUSION

Wherefore, NextEra requests the entry of an Order staying the effect of the Reconsideration Order until the final resolution of NextEra's appeal and such further relief as is just and proper.

Dated: November 16, 2017
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Joseph D. Wright (No. 5669)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:   (302) 467-4450
Email: landis@lrclaw.com
   mcguire@lrclaw.com
   wright@lrclaw.com

- and -

**WINSTON & STRAWN LLP**
Dan K. Webb (admitted *pro hac vice*)
35 W. Wacker Drive
Chicago, Illinois 60601-9703
Telephone:  (312) 558-5600
Facsimile:   (312) 294-5700
Email: dwebb@winston.com

Thomas M. Buchanan (admitted *pro hac vice*)
1700 K Street, NW
Washington, D.C. 20006
Telephone: (312) 282-5000
Facsimile: (202) 282-5100
Email: tbuchana@winston.com

- and -

**NORTON ROSE FULBRIGHT US LLP**
Howard Seife (admitted *pro hac vice*)
1301 Avenue of the Americas
New York, New York 10019-6022
Telephone:  (212) 408-5100
Facsimile:  (212) 541-5369
Email: howard.seife@nortonrosefulbright.com

Robin Ball (admitted *pro hac vice*)
555 South Flower Street, 41st Floor
Los Angeles, California 90071
Telephone:  (213) 892-9200
Facsimile:  (213) 892-9494
Email: robin.ball@nortonrosefulbright.com

*Counsel to NextEra Energy, Inc.*