## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ENERGY FUTURE HOLDINGS CORP., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 14-10979 (CSS)<br><br>(Jointly Administered)<br><br>**Hearing Date:** January 8, 2018 at 10:00 a.m.<br>**Objection Deadline:** December 29, 2017<br>at 4:00 p.m. |

## MOTION TO APPOINT A REPRESENTATIVE OF
## THE MAJORITY CREDITORS TO THE FEE COMMITTEE

Majority Creditors Elliott Associates, L.P., Elliott International, L.P., The Liverpool Limited Partnership, and Gatwick Securities LLC (collectively "Elliott") and Paloma Partners Management Company and Sunrise Partners Limited Partnership (collectively "Paloma") hereby respectfully seek entry of the appended [Proposed] Order of Appointment pursuant to 11 U.S.C. §105(a) appointing their representative to the Fee Committee in place of the seat currently occupied by a representative of the Official Committee of Unsecured Creditors ("UCC"). This Motion is based on the facts and authorities set forth below and in the accompanying declarations of Jeff Rosenbaum and J. Noah Hagey, and has support of various creditor fiduciaries including, *inter alia*, the E-Side Official Committee of Unsecured Creditors (the "UCC"), the Indenture Trustee for the EFH Notes, and the Indenture Trustee for the EFIH PIK Notes. In consideration of the Motion, the Majority Creditors respectfully state as follows:

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification Numbers is not provided herein.

1

## PRELIMINARY STATEMENT

1.     The Majority Creditors seek the Court's approval of their substitution onto the Fee Committee for the existing seat held by the UCC, which endorses that appointment. The Majority Creditors hold approximately 75% of the remaining unsecured E-Side debt. Every dollar spent (or saved) by the estate at this juncture directly affects approximately 75 cents of their recovery. They are uniquely motivated to contribute to the Committee's work and to provide perspective as those most affected by its success (or failure).

2.     Obtaining information about the Committee's process, work product and results has proven difficult. The Committee has been reluctant to disclose any of its means or methods, and has refused to state whether specific types of work product exist or might be disclosed. The Majority Creditors have not been given access to raw data, such as the Committee's fee database, or to any analysis or compilation of budgets, anticipated advisor spend or involvement through case closure.

3.     What is known, is that since April 2017, over $487 million in professional fees have been approved and/or recommended for approval by the Committee. (Declaration of J. Noah Hagey (the "Hagey Decl."), **Ex. 1**). This does not include the hundreds of millions of dollars in additional accrued and accruing fees, "success" and transaction fees, and related advisor costs that may be sought in connection with final plan confirmation. Even at the Court's most recent hearing on a single issue, well over twenty attorneys attended in person with countless others by phone.

4.     To-date, the Committee has secured modest reductions from these professionals in the amount of approximately $13 million, while incurring approximately $7 million in fees and expenses paid to the Committee Chairman and his counsel. At the same time, the financial position of unsecured E-Side creditors during the bankruptcy has eroded by approximately $1 billion.

5.     In addition to their intrinsic financial interest in the Committee's success, membership will allow the Majority Creditors' representative to participate in the Committee's

2

ongoing negotiations with professionals to reduce future expenditures *writ large*. It will give advisors greater confidence that, when reaching compromises supported by the Committee, they will be less likely to face secondary inquiry or challenge from the estate's largest unsecured creditors – helping to reduce after-the-fact collateral negotiations and adversary litigation before this Court. This will further conserve professional and party resources in having to address multiple inquiries, and hopefully reduce the number of contested fee disputes during final plan confirmation.

6.    The Committee's charter envisions participation and voting rights of the estate's major constituencies: the debtor, its creditors, the UCC and an independent member to oversee the process. Ostensibly this was to ensure both transparency and implied governance over the expenditure of estate resources. This structure began to fall apart in late 2016 when the original T-Side unsecured creditors' committee effectively went dormant following confirmation of the TXU plan. The E-Side UCC nominally stepped into those shoes, perhaps informally as there was never any order of transition (which the Committee appears to have resisted for reasons unknown).

7.    At this juncture, the UCC has indicated its support of the Majority Creditors' appointment to replace the creditor's current titular representative Peter Kravitz: "[T]he UCC is supportive of Elliott's request to be appointed to the fee committee with one seat as a replacement for the current creditor representative. We are communicating the same message to the fee committee." (Hagey Decl."), **Ex. 2**).[2] The Majority Creditors also enjoy support from other creditor constituencies, including the Indenture Trustee for the EFH Notes and the Indenture Trustee for the EFIH PIK Notes. (*Id.* ¶ 15 and **Ex. 3**).

---

[2]    Following the UCC's designation, and pursuant to Sections A.2 and A.7 of the Committee Order, the Majority Creditors filed a Notice Accepting Appointment of Representative to the EFH Fee Committee. (D.I. 12323). In light of the Court's comments about the self-effectuating nature of the UCC's actions, the Majority Creditors have withdrawn the notice without prejudice in favor of this Motion. The Notice also indicated the support of the EFIH Second Lien Indenture Trustee, which was premature; the Trustee is reserving its position upon consideration of the within Motion. (Note, Elliott alone holds approximately 40% of the interest of the Second Lien bonds.)

8.     The Committee will have its next meeting on December 18, 2017, where it will again consider the Majority Creditors' request for appointment.  This Motion is filed in an abundance of caution in event the Committee does not approve such appointment.[3]  The Majority Creditors respectfully submit that, regardless of whether their representative replaces the current UCC representative or simply becomes an additional member, their application should promptly be granted by the Court.  The Committee Order's mandate supports such application, as does analogous precedent involving membership in similar estate committees, *i.e.*, where parties with rising "material" interests are accorded active, voting roles regardless of when that right arises.

**JURISDICTION AND VENUE**

9.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The Majority Creditors consent to the entry of a final order by the Court in connection with this Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

12.     The statutory predicate for the relief requested is 11 U.S.C. § 105(a).

---

[3] The Court's August 2014 Fee Committee Order (D.I. 1896) (the "Committee Order") governs the addition and/or replacement of members.  It expressly provides for circumstances such as this where an existing Committee member stipulates to resign in favor of another representative: "In the event that a Fee Committee Member resigns, (i) **the constituent group represented by that resigning member may designate a successor member**, or (ii) ... Each constituent group may at any time name an individual other than its initial appointee as its designee to the Fee Committee ...."  (Committee Order ¶ A.7) (emphasis added).  Should it be the Court's or other constituencies' preference, the Majority Creditors would be willing to appoint a non-attorney representative.

4

**BACKGROUND**

**A.    The Fee Committee Order**

13.    On August 21, 2014, the Court entered the Fee Committee Order (D.I. 1896). The Fee Committee Order provided for the creation of a four-person Committee consisting of one Independent Member, one member appointed by and representing the interests of the Official Committee of the Unsecured Creditors, one member appointed by and representing the interests of the Debtors, and one member appointed by and representative of the United States Trustee. (Committee Order ¶ A.2). The Order further provided that the Debtors, the Creditors' Committee, and the U.S. Trustee "may, in their discretion, replace or rotate their respective Fee Committee designees *without order of the Court*." (*Id.* (emphasis added)). The Order further provides that in the event a Fee Committee member resigns, "the constituent group represented by that resigning member may designate a successor member." (*Id.* ¶ A.7).

14.    The Fee Committee Order provides that each member is to have one vote on all Committee matters and that the Committee shall make decisions by majority vote. In the event of a tie, the vote of the Independent Member, Mr. Gitlin, controls. (*Id.* ¶ A.5).

15.    The Committee was charged with monitoring, reviewing, and assessing all fee applications submitted by Retained Professionals to ensure their compliance with, among other things, Sections 328, 330 and 331 of the Bankruptcy Code, as applicable; this Court's Interim Compensation Order; and the U.S. Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 for Attorneys in Larger Chapter 11 Cases. (*Id.* ¶ C.1).

16.    The Committee also was given the power to, among other things, (1) require that Retained Professionals provide budgets and other information to the Fee Committee; (2) serve, file and litigate objections to fee applications filed by Retained Professionals; (3) serve objections to monthly fee statements, in whole or in part, precluding the payment of the amount questioned; and (4) negotiate with Retained Professionals regarding objections to fee applications and consensually resolve such objections if possible. (*Id.* ¶ C.2).

5

17.    The Committee Order provides for the appointment of Richard Gitlin as the Independent Member. (*Id.* ¶ B). As of this filing, the other members of the Fee Committee are Peter Kravitz (representative of the Creditors' Committee), Richard Schepacarter (counsel and representative for the U.S. Trustee), and Paul Keglevic (representing the Debtors). Godfrey & Kahn S.C. was appointed as Fee Committee Counsel. (*Id.* ¶ D.1).

18.    The Court retained jurisdiction to hear and to determine all matters arising from or related to the implementation of the Fee Committee Order. (*Id.* ¶ I).

### B.    The Majority Creditors' Interest in Joining the Fee Committee

19.    The Majority Creditors are the largest remaining unsecured creditors of EFH/EFIH, collectively holding approximately 90% of the remaining unsecured debt of EFIH, with Elliott holding approximately 40% of the claims pool at EFH. (*See* Declaration of Jeff Rosenbaum (the "Rosenbaum Decl.") ¶ 4). They have a vested interest in reducing the burn of estate resources and, in particular, the payment and/or incursion of excessive or unnecessary professional fees.

20.    Since April 2014, over $487 million in professional fees have been approved and/or recommended for approval by the Fee Committee. (Hagey Decl., **Ex. 1**). Hundreds of millions of dollars of additional fees are still accruing, not to mention success fees and related advisor costs that are scheduled to be spent against the estate's limited assets. (*See* Hagey Decl. ¶ 16). These figures also do not account for the hundreds of millions of dollars expended by debtor professionals and their advisors pre-petition. The Committee's work in this area has involved negotiated discounts or write-offs to specified fee applications.

21.    To-date, the Committee's efforts have secured less than approximately $13 million in reduced fees, representing less than 4% of the total professional fees approved by the Committee through October 2017. (*See* Rosenbaum Decl. ¶ 7). During this period, the Committee members and its professionals have charged the estate nearly $6.4 million (over $1 million to Mr. Gitlin and the remainder to the Committee's counsel), reducing actual estate recoveries to only about 1% of total fees paid.

6

C.   **Majority Creditors' Efforts to Engage with the Fee Committee**

22.   Beginning in September 2017, representatives of Elliott began negotiations with the Committee seeking further information and action regarding the significant expenditure of estate resources towards professional fees.  Those discussions yielded uneven responses, and Elliott retained commercial counsel at BraunHagey & Borden LLP, including professionals experienced in investigating complex financial matters for government and private enterprises.

23.   On November 9, 2017, counsel for the Majority Creditors conferred with the Fee Committee's counsel, Brady Williamson, to request certain information and background, as well as to obtain Mr. Gitlin's views on the issue.  The Majority Creditors offered to cooperate with and assist in the Committee's efforts to review, negotiate and streamline fees through confirmation.  Counsel for the Majority Creditors also requested information about the Committee's work, including, among other things, a list of all professionals and the amount of fees to date, and discussed having the Committee make a recommendation to the Court on ways in which to reduce and streamline professional fees in the months leading to final confirmation.

24.   In connection with that discussion, the Majority Creditors requested the following basic information relating to the Committee's work, including basic information that presumably would have been necessary for its counsel to perform its work, *e.g.*, an "overview 'map' summarizing the various advisor groups (law firms and FAs) and constituencies, together with fees paid and fees accrued for each through October 2017 (or most recent summary easily available), the "Committee's current expectation / assessment of each active advisors' ongoing roles heading toward final confirmation, together with expected budget for each: i.e., including "active burn" and "accruing" burn," disclosure of agreements with financial advisors regarding their monthly payments, and "internal procedure or protocol governing the Committee's operation, i.e., in addition to the Court's April 2014 mandate." (*See* Hagey Decl., **Ex. 4**).

25.   The Majority Creditors also requested that the Committee promptly take a position on adding Elliott at or before the next Fee Committee meeting scheduled for November 20 so that Elliott could actively participate in that meeting and beyond.  Counsel for the Majority

7

Creditors also requested that the Committee prepare a recommendation to the Court for potentially streamlining professional fees across various estate classes through confirmation. (*Id.*).

26.     On November 13, 2017, counsel for the Majority Creditors sent an email to Committee Counsel Brady Williamson asking for a status on the requests made on November 9. (*Id.* **Ex. 5**).  Mr. Williamson responded by memorandum later that day.  (*Id.* **Ex. 6**).  Though Mr. Williamson provided certain information, including a recent memorandum to professional advisors and the dates of upcoming Committee meetings, most of the requests went unanswered, including the "map" of advisor groups, expectation of roles and budgets, and details concerning agreements between the Committee and financial advisors.  (*Id.*).  Instead, Mr. Williamson suggested that the list of professionals could be found amongst the hundreds of fee applications and other public filings in a docket with over 12,000 filings spanning three and a half years.

27.     With respect to financial advisors, Mr. Williamson noted that most had not been paid at the Committee's request for a year or more, but claimed that the Committee's negotiations with professionals are confidential, and suggested that counsel review the retention agreements, which are a matter of public record.  Mr. Williamson also offered Elliott 10 minutes to make a "presentation" at the next Fee Committee meeting on November 20.  (*Id.*).

28.     On November 15, 2017, counsel for the Majority Creditors sent a letter to the Fee Committee, setting forth in detail the justifications for adding Elliott as a voting member of the Committee, including the fact that Elliott holds a significant majority of EFH/EFIH's remaining unsecured debt; that the Committee's current composition no longer represents the key stakeholders; and its willingness to devote substantial resources to the Committee's work.  (*Id.* **Ex. 7**).  The letter noted that Elliott's support and information access would allow it to directly participate in the fee approval process, rather than having to challenge fees on the back-end as a secondary inquiry to the work of the Committee.  The letter again repeated the request that the Committee develop a recommendation to the Court regarding minimizing future professional fees to protect the remainder of the estate.

8

29.    On November 17, 2017, counsel for the Majority Creditors sent another email to the Fee Committee's Counsel seeking responses to several of its unanswered November 9 requests. (*Id.* **Ex. 8**). These follow-up requests also sought additional information which the Majority Creditors assumed would be readily within the Committee's (or its counsel's) possession, *e.g.*: (1) a listing of the various professional advisors and their representatives and fees accrued and paid to date; (2) a summary of the on-going roles of active professional advisors and their anticipated budgets; (3) information regarding the Committee's agreements with certain professionals to halt their monthly payments; and (4) the requested recommendation regarding minimizing future spend on professional fees. The letter also requested information regarding pre-petition fees paid to professional advisors through April 2016. (*Id.*).

30.    On November 20, the Fee Committee held a meeting where counsel for the Majority Creditors were given "10 minutes" to present grounds for adding a representative to the Committee. The Majority Creditors explained that they were most immediately focused on understanding the Committee's work to date and assisting to help streamline the burn of professional fees.

31.    During the call, the Committee declined to answer questions about its work. Later that day, counsel for the Majority Creditors delivered a list of additional questions to Committee counsel, Mr. Williamson. (*Id.* **Ex. 9**). The Majority Creditors requested functional information about the status of the Committee's work product and available materials:

- "Does the Committee have any **existing** document that details for each professional advisor retained by the various constituencies (both active and inactive): name of lead principal(s), advisor role in BK, fees paid, fees accrued, fees reduced, and current budget? (If so, will you share it with us?)"

- "Does the Committee have any **existing** projections concerning anticipated reductions in the fees accrued, but unpaid, to the various professional advisors? (If so, will you share it with us?)"

9

- "Does the Committee have any **existing** evaluation or analysis of the "success" of specific "success fee" advisors in the case?  (If so, will you share it with us?)"

- "Does the Committee have any **existing** plans to re-evaluate and further reduce fees addressed in the various interim fee applications?  (If so, will you share it with us?)"

- "What database or software (if any) has the Committee utilized to review the fee applications submitted by the professional advisors to-date?"

- "Does the Committee have any **existing** written protocol outlining in general terms the process by which it reviews fee applications and proposes fee reductions?  (If so, will you share it with us?)"

- "Does the Committee have any **existing** analysis of whether professional advisors for similarly situated constituencies were performing duplicative analysis and generating duplicative work product?  (If so, will you share it with us?)"

- "Does the Committee have any **existing** analysis of whether duplicative and/or redundant work product was generated by professional advisors over the course of the proceedings as the various plans evolved (assignments from year 1 or 2 vs. year 3)?  (If so, will you share it with us?)"

- "Has the Committee tracked the number of "new" fee earners that have billed to "get up to speed" on the case for each advisor over the course of the BK?  (If so, will you share it with us?)"

- "Is there any record of Committee meetings?  (If so, will you share it with us?)"

- "Have all of the Committee's decisions been unanimous; if not, is there a record of any disagreements and, if so, can you provide that to us?"

- "Has the Committee tracked the reduction in fees (in $ or %) for each professional over the course of the proceedings?  (If so, will you share it with us?)"

(*Id.* (emphasis in original).)

32.     On November 27, counsel for the Majority Creditors reiterated their request for a response from the Fee Committee, seeking a response by November 29.  (*Id.* **Ex. 10**).

10

33.     Counsel for the Fee Committee responded by email on November 29, but again did not take a substantive position with respect to Elliott's request. (*Id.* **Ex. 11**). Rather, counsel stated that Elliott's request had been discussed at the Committee's November 20 meeting and the Committee would continue to do so at the next Committee meeting on December 18, 2017.

34.     On December 4, 2017, the Majority Creditors sent a letter to the Fee Committee indicating that counsel for the UCC had informed them that the UCC was supportive of the Majority Creditors' application to replace the current creditors representative with one designated by the Majority Creditors. That letter noted that it had been almost a month since the Majority Creditors had raised the issue of membership with the Committee, and given the support from the UCC and the other E-Side fiduciaries, advised the Fee Committee that it planned to file a motion seeking admission to the Committee with the Court on December 6, and asked for the Committee's position before the motion was filed. (*Id.* **Ex. 12**).

**D.     Support for the Majority Creditors' Request**

35.     The Majority Creditors' request to be appointed to the Fee Committee is supported by UMB Bank, N.A., as Indenture Trustee for the EFIH PIK Notes and the EFH Unsecured Creditors Committee. (Hagey Decl. **Ex. 3**).

**E.     The Notice of Appointment**

36.     As noted *supra*, on December 4, 2017, the UCC confirmed its intent to have its current representative on the Fee Committee, Peter Kravitz, resign and to designate its seat in favor of a representative of the Majority Creditors. Upon this designation, the Majority Creditors filed a Notice Accepting Appointment of Representative to the EFH Fee Committee, pursuant to Sections A.2 and A.7 of the Committee Order. (D.I. 12323). The purpose in doing so was to avoid the expenditure of estate resources necessitated by motion practice and the concomitant fees incurred responding to such application.

37.     On December 11, 2017, the Court expressed interest in having responses from other constituents regarding the Notice, with reference that the UCC's designation may not be

11

self-effectuating.  To avoid burdening the parties with additional briefing, concurrent with this
Motion, the Majority Creditors have withdrawn the Notice without prejudice.

## RELIEF REQUESTED

38.     The Majority Creditors seek entry of an Order appointing a representative as full
member to the Fee Committee either by (a) adding a new seat to the Committee, increasing the
number of Committee members from four to five, or (b) substituting in favor of the existing
UCC representative, Peter Kravitz.

## BASIS FOR RELIEF REQUESTED

39.     General principles of equity, common sense and analogous precedent support
adding the estate's largest creditors to help play a meaningful role in evaluating and reducing the
massive expenditure of estate resources on professional fees.  Even at this stage in proceedings,
it is not uncommon for upwards of twenty attorneys to attend even a limited purpose hearing.
(Hagey Decl. ¶ 1.)  The Committee's role in policing and addressing such largesse has been
inconsistent.  Meanwhile, the Majority Creditors' inquiries and requests for information from the
Committee and its work have gone unanswered.  While all creditors retain the right to challenge
and investigate advisors' fees on their own, doing so will only duplicate much of the
Committee's work, multiply the amount of advisor time spent responding to questions about
their fees, and add unnecessary friction to the confirmation and fee approval process.

### A.     Applicable Precedent Supports the Majority Creditors' Request

40.     The Fee Committee Order provides the Court broad jurisdiction to "monitor,
review and assess all Applications filed by Retained Professionals."  (D.I. 1896.)  Here, the same
equitable principles that guided the Court's creation of the Committee also support modifying its
membership to include a representative from the Majority Creditors.

41.     Factors courts have evaluated in determining whether to revise committee
membership due to questions of "adequate representation" most frequently arise in connection
with the addition or subtraction of members to an unsecured creditors committee under
§ 1102(a).  Additional or substitute members shall be added "if the court determines that the

12

change is necessary to ensure adequate representation of creditors." 11 U.S.C. § 1102(a)(4).
Courts have adopted a multi-factor test in determining whether "adequate representation" issues
warrant changing committee membership:

> (1) the ability of the committee to function; (2) the nature of the case; (3)
> the standing and desires of the various constituencies; (4) the ability for
> creditors to participate in the case even without an official committee and
> the potential to recover expenses pursuant to § 503(b); (5) whether different
> classes may be treated differently under a plan and need representation; (6)
> the motivation of the movants; (7) the delay and additional cost of granting
> the motion; (8) the point in the proceeding when the motion is made; (9)
> the tasks the committee is to perform; and (10) any other relevant factors.

*In re Park West Circle Realty, LLC*, 2010 WL 3219531, at *2 (Bankr. S.D.N.Y. Aug. 11, 2010)
(finding that the largest unsecured creditor's interests were not adequately represented and
appointing it to the committee). The analysis is "on a case-by-case basis, with no one factor
being dispositive." *Id.* at *3.

Here, each of these factors support inclusion of the Majority Creditors' representative on
the Fee Committee.

42.     **Joinder Will Help Aid the Committee's Mandate**. The Committee's
membership is no longer as practically suited to its mandate as it may have been in 2014. *See In
re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002) ("a committee may function just
fine…and still not adequately represent" a particular constituency); *see also In re Park West*,
2010 WL 3219531, at *3 ("a functioning committee, alone, does not necessarily ensure that all
creditor groups are adequately represented"). The Fee Committee was formed at an early stage
in this action, and its current structure is based on assumptions about the nature of this case and
the interests of constituents that existed as of four years ago – but which are no longer salient.

43.     Though the Majority Creditors would be joining the Committee several years
after its formation, their addition at this point is necessary to ensure that the Committee
adequately represents the key constituents in this bankruptcy, namely the major creditors whose
recoveries are most directly at risk from approval of, or objection to, professional fees. Such

13

creditors' interests currently are not represented on the Committee, as the sole creditor representative, Peter Kravitz, remains a T-Side fiduciary, even though the T-Side operations were sold and a plan confirmed almost a year ago. Mr. Kravitz no longer represents an active constituency, and his presence on the Committee – rather than a representative of the Majority Creditors, who remain actively invested in the conservation of dwindling estate resources – calls in to question the legitimacy of the Committee.

44.     The Majority Creditors do not doubt that the Committee is committed to satisfying its mandate, and nothing in this application is intended to suggest otherwise. Nonetheless, the Majority Creditors have had difficulty securing basic information or work product from the Committee, regarding advisor budgets and the Committee's approach to identifying redundancies and inefficiencies in the existing advisor landscape. (*See* Hagey Decl. **Exs. 4, 5, 8, 9, 10**) (unanswered requests for information regarding Committee approach to advisor landscape).

45.     Similarly, the Committee's counsel has been unable to provide responses to more mundane questions about whether certain types of work product even exist. For example, the Committee has not responded to repeated requests for agreements with financial advisors to halt payments or whether it intended to re-evaluate and further reduce fees addressed in the interim applications.

46.     No doubt there are perhaps good reasons for delay in transmitting answers to such questions – including perhaps that the work product itself does not exist. Whatever the reason, the Majority Creditors' concerns are amplified by the absence of ready responses or the willingness to share work product that itself was created to conserve estate resources.

47.     **Representation is Warranted**. The nature of the case and need for representation also weigh in favor of adding the Majority Creditors' representative to the Fee Committee. Already within the last several months, Elliott has led efforts generating almost a billion dollars in additional estate recoveries or savings. These include Elliott's lead in facilitating the Sempra transaction ($450 million in additional estate proceeds), successful

14

challenge of the NextEra break fee ($275 million in savings), and opposition to Berkshire's requested termination fee ($270 million in savings).

48.     In contrast, the Fee Committee has negotiated only modest reductions in professionals' requested fees and has not actively overseen the work done by professionals in order to avoid paying fees for duplicative and unnecessary work.  For example, it is common for numerous attorneys to attend court hearings on matters with which they are not directly involved, billing for their time, travel and expenses – often for multiple attorneys – when their presence at the hearing is unwarranted.

49.     **The Majority Creditors Are Highly Vested in the Committee's Work.**  The proceedings have been complex and generated astronomical professional fees, the grounds for which are often opaque at best.  Numerous advisors often have performed overlapping and often wholly redundant functions – without any clear explanation as to the need or justification for those services.  Meanwhile, the path to confirmation is now relatively linear, and the number of potential conflicts and material issues affecting E-Side constituencies have now collapsed with the pending Sempra transaction, as well as the Majority Creditors' position as the undisputed fulcrum security.  Additionally, this work would not just benefit the Majority Creditors, but all similarly-situated creditors whose recoveries would be diminished by the remaining spend on professional advisors.

50.     The Committee works at privileged cross-roads for these professionals – with access to records and work product that will help identify further opportunities to reduce the massive professional expenditures in this case.  The Majority Creditors' involvement in that process will be critical, particularly in terms of securing appropriate reductions and discounts to fee applications.  Having already demonstrated their ability to conserve estate resources, and obvious interest in securing further recoveries, representation on the Committee is clearly warranted.

51.     **Key Constituencies Support Committee Appointment**.  As noted above, there is no apparent E-Side representative currently involved in the Committee's work.  The Majority

15

Creditors are the obvious representative at this juncture and enjoy support from the UCC, UMB Bank, N.A., as Indenture Trustee for the EFIH PIK Notes, and the E-Side Unsecured Creditors Committee. (Hagey Decl. ¶ 15 and **Exs. 2, 3**).

52.     **Lack of Ability to Participate Without Appointment**. The Majority Creditors cannot effectively participate in the fee review process without an appointment to the Fee Committee. While much of the Committee's work is transparent, the crux of that work – the negotiations with the various professionals concerning their fee applications – is not. As case in point, numerous (non-confidential) questions to the Committee's existing representatives have gone unanswered for weeks. (*See* Hagey Decl. **Exs. 4, 5, 8, 9, 10**). And, while all creditors can object to fee applications, only the Committee has authority under the Fee Committee Order to negotiate fee discounts and settlements with professionals. The Majority Creditors should have an active role in this process, along with real time access to the Committee's work product.

53.     **There Will Be No Delay or Additional Cost from Granting the Motion**. There will be no delay or additional cost associated with appointing the Majority Creditors to the Fee Committee. The Majority Creditors are prepared to participate in the Committee's work immediately, and are interested to begin aiding the Committee's mandate, *i.e.*, without the need to replicate the Committee's work, thus further squandering estate resources. Similarly, adding the Majority Creditors should reduce the number of secondary inquiries with professionals, not to mention adversary proceedings relating to specific fee applications.

**B.     Applicable Precedent Supports the Majority Creditors' Request**

54.     The Majority Creditors' application for appointment also finds support in the Committee Order itself.

55.     The Committee Order expressly provides for substitution of Committee members by a constituent body: "In the event that a Fee Committee Member resigns, (i) the constituent group represented by that resigning member may designate a successor member, or (ii) … Each constituent group may at any time name an individual other than its initial appointee as its designee to the Fee Committee …." (Committee Order ¶ A.7).

16

56.    On or about December 4, 2017, counsel for the only formal creditor constituent involved in Fee Committee at this time, the E-Side UCC confirmed its position that its titular representative Peter Kravitz should resign in favor of a representative appointed by the Majority Creditors: "[T]he UCC is supportive of Elliott's request to be appointed to the fee committee with one seat as a replacement for the current creditor representative. We are communicating the same message to the fee committee." (Hagey Decl. **Ex. 2**).

57.    The Majority Creditors are cognizant of the Court's stated concern as to the juridical status of the E-Side UCC to wield this provision. Of course, if the E-Side UCC is not empowered, question begs forth as to who would do so. The T-Side UCC has been effectively disbanded upon final confirmation of that plan, and the UCC has not been active for almost a year. In other words, the spirit of the Committee Order would strongly counsel in favor of the unsecured creditors' control over designation of a seat reserved for that constituency. The UCC's direction in favor of the Majority Creditors satisfies that mandate, which the parties and Court should honor.

## CONCLUSION

58.    The current composition of the Fee Committee, which may have made sense at the outset of the proceedings, no longer has input or involvement from the fulcrum creditors whose recoveries are most directly affected by the Committee's work. The Court should grant the motion and adopt the [Proposed] Order accompanying this Motion, together with other relief as is just and proper.

17

Wilmington, Delaware
Date: December 17, 2017

FRIEDLANDER & GORRIS, P.A.

*/s/ Jeffrey M. Gorris*
Jeffrey M. Gorris (Bar No. 5012)
1201 N. Market St., Suite 2200
Wilmington, Delaware 19801
Tel: (302) 573-3500
Fax: (302) 573-3501
Email: jgorris@friedlandergorris.com

-and-

BRAUNHAGEY & BORDEN LLP
J. Noah Hagey (*pro hac vice*)
Amy Brown (*pro hac vice*)
7 Times Square, 27th Floor
New York, NY 10036-6524
Tel. & Fax: (646) 829-9403
Email: hagey@braunhagey.com
        brown@braunhagey.com

*Counsel to the Majority Creditors Elliott
Associates, L.P., Elliott International, L.P.,
The Liverpool Limited Partnership, Gatwick
Securities, LLC, Paloma Partners
Management Company, and Sunrise
Partners Limited Partnership*

18