# Exhibit F

7/13/2017 3:49 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-17-003234**
**victoria benavides**

**D-1-GN-17-003234**

NO. _____

| | | |
|---|---|---|
| **NEXTERA ENERGY, INC.,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | **TRAVIS COUNTY, TEXAS** |
| **PUBLIC UTILITY COMMISSION** | § | |
| **OF TEXAS,** | § | |
| | § | |
| **Defendant.** | § | **201ST** |
| | § | _____ **JUDICIAL DISTRICT** |

## ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NextEra Energy, Inc. ("NextEra Energy" or "the Company") seeks judicial review of the final order ("Order on Rehearing" or "Order") of Defendant, Public Utility Commission of Texas ("Commission"), in Docket No. 46238, *Joint Report and Application of Oncor Electric Delivery Company LLC and NextEra Energy, Inc. for Regulatory Approvals Pursuant to PURA §§ 14.101, 39.262, and 39.915.*

### I.   DISCOVERY CONTROL PLAN

1.     As this is an appeal of a final order of an administrative agency, no discovery is anticipated.   Should discovery be required, it will be conducted under Level 2 as specified in Texas Rule of Civil Procedure 190.3.

### II.  PARTIES AND SERVICE

2.     NextEra Energy is a Florida corporation with a principal place of business in Juno Beach, Florida.   In the underlying administrative action, NextEra Energy sought,

through two separate but concurrent requests (the "proposed transactions"), Commission approval to acquire an approximate 100 percent ownership interest in Oncor Electric Delivery Company LLC ("Oncor"), an electric utility that provides transmission and distribution service in Texas pursuant to the Public Utility Regulatory Act ("PURA")[1] and the Commission's regulations.

3.      The Commission is an agency of the State of Texas charged with the responsibility of regulating electric utilities and approving certain transactions relating to electric utilities as provided by PURA.  The Commission may be served with process by personally serving its Executive Director, Brian Lloyd, at the Commission's offices located at 1701 N. Congress Avenue, Room 7-160, Austin, Texas 78701.  *See* TEX. R. CIV. P. 106(a)(1); 16 TEX. ADMIN. CODE § 22.22.  NextEra Energy requests that the Clerk of the Court issue and deliver a citation to the Commission pursuant to Texas Rules of Civil Procedure 99 and 106(a)(1).

4.      NextEra Energy will serve a copy of this petition on all parties of record in Docket No. 46238 through their counsel of record.  TEX. GOV'T CODE § 2001.176(b)(2). A complete list of the parties of record and their counsel can be found in the certificate of service attached to this petition.

### III. JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action, which seeks judicial review of the Commission's Order on Rehearing in Docket No. 46238, pursuant to PURA § 15.001 and Tex. Gov't Code §§ 2001.171, *et seq*.  NextEra Energy has fully exhausted its

---

[1] TEX. UTIL. CODE §§ 11.001, *et seq.*

administrative remedies and is aggrieved by the Order on Rehearing.  *See* Tex. Gov't Code § 2001.171.

6.      The Commission issued a Final Order denying NextEra Energy's application for approval of the proposed transactions on April 13, 2017.  NextEra Energy timely filed a motion for rehearing on May 8, 2017, which the Commission granted.  The Commission signed an Order on Rehearing on June 7, 2017.  (*See* Appendix A).  NextEra Energy timely filed its second motion for rehearing on June 27, 2017.  (*See* Appendix B).  On June 29, 2017, the Commission denied NextEra Energy's second motion for rehearing (*see* Appendix C), rendering the Order on Rehearing final and appealable.  TEX. GOV'T CODE §§ 2001.144(a)(2)(A), 2001.145(b), and 2001.146(h).  This petition for judicial review is timely filed within thirty days after the Order on Rehearing became final and appealable.  TEX. GOV'T CODE § 2001.176(a).

7.      Venue is mandatory in Travis County.  TEX. GOV'T CODE § 2001.176(b)(1).

## IV.  PROCEDURAL BACKGROUND

8.      On October 31, 2016, NextEra Energy and Oncor filed a Joint Report and Application with the Commission pursuant to PURA §§ 14.101, 39.262(l)-(m), and 39.915 requesting that the Commission determine that the proposed transactions were in the public interest and should be approved.  The application presented to the Commission included, and requested distinct approval of, two separate, privately negotiated transactions.  The first transaction upon closing would result in NextEra Energy acquiring the approximately 80 percent interest in Oncor indirectly held by Energy Future Holdings Corp. ("EFH").  The second transaction upon closing would result in NextEra Energy acquiring the 19.75

percent minority interest in Oncor indirectly held by Texas Transmission Holdings Corporation ("TTHC").[2]

9.      The Commission docketed the matter as a contested case under the Administrative Procedure Act, granted parties' motions to intervene, and conducted an evidentiary hearing before the three Commissioners from February 21, 2017 to February 24, 2017.  The parties filed post-hearing briefs and reply briefs on March 10, 2017, and March 17, 2017, respectively.

10.      The Commission considered the application at its open meeting on March 30, 2017, and on April 13, 2017, the Commission issued its Final Order denying the application.  On May 8, 2017, NextEra Energy timely filed its motion for rehearing of the Final Order, and on June 7, 2017, the Commission issued its Order on Rehearing again denying the application, which contained both substantive and non-substantive revisions to its Final Order.

11.      On June 27, 2017, NextEra Energy timely filed a second motion for rehearing that was overruled by Commission order on June 29, 2017.  NextEra Energy timely filed its original petition with this Court, seeking judicial review of the Order on Rehearing.

## V.  STANDARDS OF REVIEW

12.      This administrative appeal is governed by the substantial evidence rule as provided by PURA § 15.001 and set forth in TEX. GOV'T CODE § 2001.174:

---

[2] NextEra Energy also entered into a privately negotiated agreement to purchase the remaining 0.22 percent minority interest in Oncor held by Oncor Management Investment LLC ("OMI"), subject to closing the proposed transaction with EFH.  The OMI transaction was not a subject of the application.

4

REVIEW UNDER SUBSTANTIAL EVIDENCE RULE OR UNDEFINED SCOPE OF REVIEW. If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

> (1) may affirm the agency decision in whole or in part; and

> (2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

>> (A) in violation of a constitutional or statutory provision;

>> (B) in excess of the agency's statutory authority;

>> (C) made through unlawful procedure;

>> (D) affected by other error of law;

>> (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

>> (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

13.     Any issues relating to statutory construction are questions of law, which the Court must review de novo. *Texas Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007).

## VI. ERRORS OF THE COMMISSION

14.     As set forth below, the Commission's Order on Rehearing contains findings, inferences, conclusions, and decisions that: violate statutory and constitutional provisions; are in excess of the Commission's authority; are affected by other error of law; are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion. NextEra Energy requests judicial review of these errors, which are detailed in NextEra Energy's second motion for rehearing filed in Docket No. 46238. (*See* Appendix B). The

points of error and arguments in NextEra Energy's second motion for rehearing are incorporated into this petition by reference. As a result of the Order on Rehearing, NextEra Energy has suffered harm and prejudice to its substantial rights. The Order on Rehearing contains the following errors:

- The Order on Rehearing's withdrawal of PURA § 14.101 as a basis for its decision leaves the Order on Rehearing with no statutory underpinning for weighing the alleged risks, protections, and benefits of the proposed transactions necessary to support its decision.

- The Commission erred by failing to address the public interest factors mandated by PURA § 14.101(b)(2) in support of its public interest analysis.

- The Commission erred by adopting and applying a new, more stringent standard to evaluate the public interest determination that contradicts and departs from clear Commission precedent without explanation.

- The Commission erred by unlawfully expanding its review under PURA §§ 39.262 and 39.915 to consider factors not enumerated in these provisions.

- The Commission erred by departing from statutory requirements and by disregarding NextEra Energy's regulatory commitments, errors that cannot be justified by references to the Commissioners' non-evidentiary "conversation" with NextEra Energy's Chairman and Chief Executive Officer in an open meeting.

- The Commission erred by holding that it has jurisdiction to approve NextEra Energy's proposed transaction to acquire the minority interest in Oncor from TTHC.

- The Commission erred in holding that the TTHC transaction was not presented as a separate transaction and that there was no evidence to support this stand-alone transaction.

- The Commission erred by finding that the proposed transactions would subject Oncor and Oncor ratepayers to increased risks as set out in Findings of Fact Nos. 66-77, 99, and 113-115, in contravention of the record evidence and NextEra Energy's regulatory commitments.

- The Commission erred in adopting Finding of Fact No. 63 because it is factually erroneous and, together with Finding of Fact No. 64, reflects the Order on Rehearing's misunderstanding regarding the amount of debt funding that will be required to finance the proposed transactions.

- The Commission erred by finding that NextEra Energy's ownership of Oncor would require the same set of "ring-fence" protections currently in place plus a majority independent and disinterested board of directors for Oncor with dividend veto authority, as there is no rational basis to apply an even more restrictive ring fence to NextEra Energy than the one applied to Oncor's current parent, and such a finding ignores the extensive ring-fencing protections proposed by NextEra Energy in its regulatory commitments.

- The Commission erred by finding that the current ring fence plus a majority independent and disinterested board of directors with dividend veto authority at Oncor is critical to protect Oncor from a NextEra Energy bankruptcy.

- The Commission erred in finding that the sole tangible and quantifiable benefit of the proposed transactions is the sharing of interest rate savings for four years.

- The Commision erred by failing to address each of the issues identified in the Preliminary Order.

- The Commission failed to give consideration to the merits of the stipulations entered into between NextEra Energy and certain intervenors.

- The Order on Rehearing violates NextEra Energy's constitutional rights to due process and equal protection.

These errors are set out in more detail in NextEra Energy's second motion for rehearing.  (*See* Appendix B).

## VII.    PRAYER

For these reasons, NextEra Energy prays that the Commission be cited to appear and answer herein and that, upon final hearing, the Commission's Order on Rehearing in Docket No. 46238 be reversed in the matters set forth in Appendix B, that judgment be rendered that the Commission lacks jurisdiction over the TTHC transaction, and that this matter be remanded to the Commission for further proceedings to correct these and any other errors consistent with this petition and the Court's judgment.  NextEra Energy requests such other and further relief to which it may show itself entitled.

Respectfully submitted,


By:   */s/ Ann M. Coffin*
       Ann M. Coffin
       State Bar No. 00787941
       Julie Caruthers Parsley
       State Bar No. 15544920
       Mark Santos
       State Bar No. 24037433
       Parsley Coffin Renner LLP
       P.O. Box 13366
       Austin, Texas 78711
       512.879.0900
       512.879.0912 (fax)
       ann.coffin@pcrllp.com
       julie.parsley@pcrllp.com
       mark.santos@pcrllp.com


**COUNSEL FOR NEXTERA ENERGY, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all parties of record in Commission Docket No. 46238 on this 13th day of July, 2017, via certified U.S. mail, return receipt requested.

Stephen Mack
Public Utility Commission of Texas
1701 N. Congress Ave., Ste. 8-110
Austin, Texas  78701
512/936-7229
512/936-7268 (fax)
stephen.mack@puc.texas.gov
**ATTORNEY – PUC LEGAL DIVISION**

Matthew C. Henry
Vinson & Elkins LLP
2001 Ross Ave., Suite 3700
Dallas, Texas  75201
214/220-7700
214/486-3221 (fax)
regulatory@oncor.com
**ATTORNEY FOR ONCOR ELECTRIC DELIVERY COMPANY LLC**

Geoffrey M. Gay
Thomas L. Brocato
Lloyd Gosselink Rochelle & Townsend, P.C.
816 Congress Ave., Suite 1900
Austin, Texas  78701
512/322-5800
512/472-0532 (fax)
gmg@lglawfirm.com
tbrocato@lglawfirm.com
**ATTORNEYS FOR STEERING COMMITTEE OF CITIES SERVED BY ONCOR**

Geoffrey M. Gay
Jamie L. Mauldin
Lloyd Gosselink Rochelle & Townsend, P.C.
816 Congress Ave., Suite 1900
Austin, Texas  78701
512/322-5800
512/472-0532 (fax)
gmg@lglawfirm.com
jmauldin@lglawfirm.com
**ATTORNEYS FOR IBEW LOCAL 69**

Laurie Barker
Cassandra Quinn
Office of Public Utility Counsel
PO Box 12397
Austin, Texas  78711-2397
512/936-7500
512/936-7525 (fax)
    laurie.barker@opuc.texas.gov
    cassandra.quinn@opuc.texas.gov
        **ATTORNEYS FOR OFFICE OF PUBLIC UTILITY COUNSEL**

Katherine Coleman
Thompson & Knight LLP
98 San Jacinto Blvd., Suite 1900
Austin, Texas  78701
512/469-6100
512/469-6180 (fax)
    katie.coleman@tklaw.com
        **ATTORNEY FOR TEXAS INDUSTRIAL ENERGY CONSUMERS**

John L. Munn
TXU Energy Retail Company LLC
6555 Sierra Blvd., 3rd Floor
Irving, Texas  75039
972/868-2823
972/556-6119 (fax)
    john.munn@txu.com
        **ATTORNEY FOR TXU ENERGY RETAIL COMPANY LLC**

Kristina F. Rollins
Winstead PC
401 Congress Ave., Suite 2100
Austin, Texas  78701
512/370-2828
512/370-2850 (fax)
    krollins@winstead.com
        **ATTORNEY FOR TXU ENERGY RETAIL COMPANY LLC**

Mark A. Walker
NRG Energy, Inc.
1303 San Antonio St., Suite 700
Austin, Texas  78701
512/691-6261
512/691-6353 (fax)
  mark.walker@nrg.com
        **ATTORNEY FOR NRG COMPANIES**

C. Joe Freeland
Mathews & Freeland, LLP
8140 N. MoPac Expy., Ste. 2-260
Austin, Texas  78759
512/404-7800
512/703-2785 (fax)
  jfreeland@mandf.com
        **ATTORNEY FOR NRG COMPANIES**

Eric M. Devito
Stephen J. Karina
Stone Mattheis Xenopoulos & Brew, PC
1025 Thomas Jefferson Street, NW
8th Floor, West Tower
Washington, DC  20007-5201
202/342-0800
202/342-0807 (fax)
  eric.devito@smxblaw.com
  steve.karina@smxblaw.com
        **ATTORNEYS FOR NUCOR STEEL - TEXAS**

Mark W. Smith
Miguel A. Huerta
Smith Trostle & Huerta LLP
4401 Westgate Blvd., Suite 330
Austin, Texas  78745
512/494-9500
512/494-9505 (fax)
  msmith@smithtrostle.com
  mhuerta@smithtrostle.com
        **ATTORNEYS FOR CMC STEEL TEXAS**

Lori Cobos
Cobos Law Firm
P.O. Box 804
Austin, Texas  78767
512/587-3985
 lori@coboslawfirm.net
        **ATTORNEY FOR GOLDEN SPREAD ELECTRIC COOPERATIVE, INC.**

William C. ("Bill") Harrelson
Golden Spread Electric Cooperative, Inc.
P.O. Box 9898
Amarillo, TX  79105-5898
806/349-6565
806/374-2922 (fax)
 bharrelson@gsec.coop
        **ATTORNEY FOR GOLDEN SPREAD ELECTRIC COOPERATIVE, INC.**

Catherine J. Webking
Scott, Douglas & McConnico, LLP
303 Colorado St., Suite 2400
Austin, Texas  78701
512/495-6337
512/495-6399 (fax)
 cwebking@scottdoug.com
        **ATTORNEY FOR TEXAS ENERGY ASSOCIATION FOR MARKETERS**

Stephen W. Naeve
3200 Southwest Freeway, Ste. 2210
Houston, Texas  77027
713/963-8104
832/553-1874 (fax)
 stephen.naeve@apexcaes.com
        **ATTORNEY FOR APEX BETHEL CENTER, LLC**

                                */s/ Ann M. Coffin*
                                Ann M. Coffin

**PUC DOCKET NO. 46238**

RECEIVED

2017 JUN -7  AM 11: 12

PUBLIC UTILITY COMMISSION
CLERK

| | | |
|---|---|---|
| JOINT REPORT AND APPLICATION | § | |
| OF ONCOR ELECTRIC DELIVERY | § | **PUBLIC UTILITY COMMISSION** |
| COMPANY LLC AND NEXTERA | § | |
| ENERGY, INC. FOR REGULATORY | § | **OF TEXAS** |
| APPROVALS PURSUANT TO PURA | § | |
| §§ 14.101, 39.262, AND 39.915 | § | |

## ORDER ON REHEARING

This Order addresses the joint report and application of Oncor Electric Delivery Company LLC and NextEra Energy, Inc. (NextEra Energy) for Commission approval of transactions by which NextEra Energy would acquire all equity interests in Oncor. Based on the evidence and testimony presented during a hearing held by the Commission, the Commission finds that the transactions described in the application are not in the public interest under Public Utility Regulatory Act[1] (PURA) §§ 39.262(m), and 39.915(b). Accordingly, the application is denied for the reasons discussed in this Order.

### I.  Discussion

The joint report and application filed by NextEra Energy and Oncor proposed transactions by which NextEra Energy would acquire both the approximately 80% interest in Oncor indirectly held by Energy Future Holdings Corp. and the 19.75% interest indirectly held by Texas Transmission Holdings Corporation. In addition, the application also discussed NextEra Energy's agreement to purchase the 0.22% interest in Oncor held by Oncor Management Investment LLC, subject to closing the proposed transaction with Energy Future Holdings. As a result of these proposed transactions, NextEra Energy would own all of the equity securities of Oncor.

Commission Staff, the Office of Public Utility Counsel, the Steering Committee of Cities Served by Oncor, the Texas Industrial Energy Consumers, TXU Energy Retail Company, LLC, NRG Companies,[2] Nucor Steel – Texas, CMC Steel Texas, Golden Spread Electric Cooperative,

---

[1] Public Utility Regulatory Act, Tex. Util. Code §§ 11.001-58.303 (West 2016), §§ 59.001-66.017 (West 2007 & Supp. 2016) (PURA).

[2] The NRG Companies include: NRG Texas Power LLC, Cedro Hill Wind LLC, Elbow Creek Wind Project, LLC, Goat Wind, LP, Gregory Power Partners LLC, Langford Wind Power, LLC, NRG Cedar Bayou Development Company LLC, NRG South Texas LP, Petra Nova Power I LLC, Sherbino I Wind Farm LLC, South

Texas Energy Association for Marketers, and APEX Bethel Energy Center LLC were granted intervention in this docket. A hearing on the merits was held by the Commission from February 21 through 24, 2017. The Commission considered this docket at the March 30, 2017 open meeting. A final order was issued by the Commission on April 13, 2017. NextEra Energy filed a motion for rehearing on May 8, 2017. On May 23, 2017, Commission Staff, OPUC, TIEC, and Cities filed a joint reply to NextEra Energy's motion for rehearing.

### A.   The Proposed Transactions

NextEra Energy proposed to acquire the 80.03% share of Oncor held indirectly by Energy Future Holdings in a transaction governed by an agreement and plan of merger by and among Energy Future Holdings, Energy Future Intermediate Holdings, LLC, NextEra Energy Inc., and EFH Merger Co., LLC.   Under the agreement, Energy Future Holdings would be merged with and into EFH Merger Co., LLC, a wholly-owned subsidiary of NextEra Energy, with EFH Merger Co. existing as the surviving company, and the successor to Energy Future Holdings. As a result, NextEra Energy would own 100% of Energy Future Holdings and its subsidiaries, including Energy Future Intermediate Holdings, and Oncor Holdings, which holds an 80.03% ownership interest in Oncor. This transaction was part of the eighth amended plan of reorganization of Energy Future Holdings, which was confirmed by the bankruptcy court for the district of Delaware on February 17, 2017.[3]

The joint applicants also sought Commission approval of a transaction in which NextEra Energy would acquire Texas Transmission Holdings Corporation's indirect 19.75% ownership interest in Oncor in a transaction governed by an agreement and plan of merger by and among Texas Transmission Holdings Corporation, NextEra Energy, and NextEra Energy affiliate WSS Acquisition Company. Under this agreement, WSS Acquisition would merge with and into Texas Transmission Holdings, with Texas Transmission Holdings existing as the surviving company. As a result, NextEra Energy would own 100% of Texas Transmission Holdings Corporation and Texas Transmission Investment, LLC, including the latter's 19.75% interest in Oncor. This second

---

Trent Wind LLC, Reliant Energy Retail Services LLC, Green Mountain Energy Company, Everything Energy LLC, US Retailers LLC, NRG Curtailment Solutions LLC, and NRG Power Marketing LLC.

    [3] *In re Energy Future Holdings Corp., et al.*, Case No. 14-10979 (CSS), Order Confirming the Eighth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code at Exhibit A, Art. IV § B.9. (Bankr. D. Del. Feb. 17, 2017).

transaction, if viewed on its own, would constitute the transfer of a controlling interest or operational control in Oncor under PURA §§ 39.262(*l*)(3) and 39.915(a)(3) because of Texas Transmission Investment's right to veto dividends declared by the Oncor board, as well as its right, in certain circumstances, to veto Oncor's capital and operations and maintenance expense budgets. However, the application did not request that this transaction be approved on a standalone basis, it was presented as part of a comprehensive plan to acquire 100% of the ownership interests of Oncor.

The application also addressed NextEra Energy's privately negotiated agreement to purchase the remaining 0.22% minority interest in Oncor held by Oncor Management Investment LLC, subject to closing the proposed transaction with Energy Future Holdings.[4]

NextEra Energy intended to fund $12.2 billion in order to obtain 100% of Oncor.[5] Of this amount, $9.8 billion would be used to obtain the 80.03% stake in Oncor currently held indirectly by Energy Future Holdings. The financing of the $9.8 billion was to include approximately $7.5 billion in debt funding financed at NextEra Energy Capital Holdings.[6] In addition to the $9.8 billion, $2.4 billion would be used to obtain the 19.75% interest held by Texas Transmission Holdings, and NextEra Energy proposed to pay for this acquisition in cash.[7]

The joint applicants have sought the Commission's approval for all transactions as part of a single application. NextEra Energy's application highlighted the interconnected nature of the transactions in its application, and noted that the transaction with Energy Future Holdings would not close unless NextEra Energy received Commission approval to acquire all the equity securities of Oncor, including those held by Texas Transmission Investments.[8] Throughout the Commission's review of the proposed transactions, parties focused on the consequences and public interest evaluation of the proposed transactions as a comprehensive plan.

---

[4] Mark Hickson Direct Testimony, NextEra Ex. 1 at 4:11-14.
[5] NextEra Energy Reply Brief at 6.
[6] Tr. at 331:3-7 (Hickson Cross) (Feb. 22, 2017).
[7] NextEra Ex. 1 at 21:11-14.
[8] *Id.* at 26:12-15.

At no time during the proceeding did NextEra Energy amend its application to seek approval of the transaction to acquire the 19.75% interest in Oncor held by Texas Transmission Holdings. NextEra Energy offered no evidence to evaluate this single, standalone transaction. Based on the evidentiary record, the Commission is unable to evaluate NextEra Energy's proposed transaction with Texas Transmission Investment on a standalone basis. A public interest evaluation of the purchase of Texas Transmission Holdings would necessarily be different than the proposed transactions addressed in this application. On the current state of the record and the application, it would be inappropriate for the Commission to rule on any single piece of the original application. It is inappropriate for NextEra Energy to attempt to amend its application to request different relief in a motion for rehearing. To the extent, however, that NextEra Energy is deemed to have requested that the Commission approve the single transaction with Texas Transmission Investment, the Commission finds that NextEra Energy has failed to meet its burden of proof to show that any single transaction is in the public interest, and so that request is denied. The Commission considered whether the proposed transactions, as a whole, are in the public interest, and the Commission's denial of the application applies to each of the transactions described in the application.

### B.    Increased Risk to Oncor Ratepayers

While NextEra Energy is a well-regarded utility holding company, the expansive and diversified structure of NextEra Energy and its affiliates would subject Oncor to new and potentially substantial risks. NextEra Energy's method of financing the proposed transactions does not entirely eliminate the debt above Oncor, but merely refinances that debt with new debt at NextEra Energy Capital Holdings.[9] The revenues of Oncor would continue to support repayment of that debt, albeit to a lesser extent. Including the debt from the proposed transactions, the total amount of consolidated debt at NextEra Energy would be about $45 billion, and the revenues of Oncor would be required to support its pro rata share of that debt.[10] Some parties have asserted that this share would amount to 15% of NextEra Energy's consolidated debt.[11] In addition, Moody's Investors Service has noted that "[t]he acquisition-related debt, without a material amount of deleveraging, would exhaust [NextEra Energy's] debt capacity at its current rating" and

---

[9]  Direct Testimony of Charles Griffey, TIEC Ex. 1 at 22:3-6.
[10]  *See, e.g.*, OPUC Ex. 42 and 43; TIEC Ex. 1C (HSPM Griffey Second Errata) at 7.
[11]  Open Meeting Tr. at 13:24-25 and 59:1-9 (Feb. 23, 2017)

"make the company more vulnerable to unforeseen events or margin shortfalls."[12]  The substantial amounts of leverage at NextEra Energy increases the financial risk to Oncor, particularly if Oncor's existing ring fence is to be weakened substantially as requested by NextEra Energy (as discussed below in section D).

In addition to exposing Oncor to the substantial amount of debt at NextEra Energy, the proposed transactions would introduce Oncor to risks associated with NextEra Energy's unregulated businesses, including generation development.[13]  As a result of the spin-off of Texas Competitive Energy Holdings, Oncor is not currently subject to risks related to unregulated generation development.[14]  The evidence admitted in this docket shows that the ratings agencies have found that NextEra Energy has a limited tolerance for financial risk due to unforeseen circumstances, and have identified risks that could lead to a downgrade in the credit rating of NextEra Energy.[15]  The evidence in this case has shown that NextEra Energy, including its subsidiary NextEra Energy Resources, LLC, is subject to numerous risks, including, but not limited to, potential changes in renewable demand resulting from changes in climate or tax policy, commodity risks, retail electric provider risks, as well as power and nuclear generation risks.[16]  These new risks, in conjunction with the high amount of leverage at NextEra Energy, increase the likelihood that unforeseen events could jeopardize Oncor's financial stability, yet NextEra Energy suggests that the Commission weaken the ring fence protecting Oncor and its ratepayers from such financial troubles.

## C.   Lack of Tangible Benefits

In determining whether a transaction is in the public interest under PURA §§ 39.262, and 39.915, the Commission must evaluate whether the transaction would provide tangible and quantifiable benefits to Texas ratepayers that are specific to the transaction at issue.[17]  Under NextEra Energy's proposal, the tangible benefits of the proposed transactions to Texas ratepayers are minimal in comparison to the status quo.  The sole tangible and quantifiable benefit offered by

---

[12]  Direct Testimony of John Reed, NextEra Energy Exhibit 4, Exhibit JR-6 at 5.
[13]  Direct Testimony of Randall Vickroy, Commission Staff Ex. 3A at 22:24-25.
[14]  TIEC Ex. 1 at 35:20-36:4.
[15]  TIEC Ex. 1 (HSPM Griffey Dir.) at 48:28-49:2.
[16]  Direct Testimony of Ralph Smith, Joint TIEC, Cities, & OPUC Ex. 1 at 39-40; Commission Staff Ex. 3A at 21-22.
[17]  Preliminary Order Issues 8(a)-(g) and 43(a)-(g) (Dec. 1, 2016).

NextEra Energy in its rebuttal testimony is a commitment to share 90% of the interest-rate savings on Oncor's cost of debt between the closing of the transaction and Oncor's next rate case after the rate case filed on March 17, 2017.[18] At most, this quantifiable benefit to Texas ratepayers would amount to credits of approximately $3.2 million per year for the first four years after the closing of the transaction.[19]

Beyond the interest rate savings, NextEra Energy identified benefits of the transaction that include a commitment to fund expenditures in Oncor's five-year long-range capital plan (subject to certain limitations),[20] opportunities for collaboration between Oncor and Florida Power & Light,[21] no material involuntary workforce reductions at Oncor for two years,[22] the possible consolidation of NextEra Energy's subsidiary Lone Star Transmission into Oncor,[23] and the resolution of the Energy Future Holdings Corporation's bankruptcy proceeding.[24] While these may be benefits of the transaction, NextEra Energy has made no attempt to quantify these benefits, and most are not exclusive to this proposal. A commitment to Oncor's five-year long-range capital plan would likely be a minimum threshold for the Commission to find any transaction in the public interest. The alleged benefit of increased collaboration between Florida Power & Light and Oncor was not quantified in any way, and NextEra Energy stated that they had not investigated whether any synergy savings would result from the proposed transactions.[25]

In addition, the conclusion of the bankruptcy proceeding is not a benefit that is unique to NextEra Energy's proposal; removal of Energy Future Holdings and its un-ring-fenced subsidiaries from bankruptcy will be obtained by any transaction that the Commission approves. Further, throughout the pendency of the Energy Future Holdings' bankruptcy proceeding, Oncor has safely provided reliable service to Texas customers.[26] Oncor has made $6 to $7 billion in capital investments over the past five years, funding the equity portion of these investments using

---

[18] Rebuttal Testimony of Mark Hickson, NextEra Energy Exhibit 5 at Exhibit MH-R-2 (Errata 2), 6:32-38, Commitment 67.

[19] Tr. at 568:18-569:24 (Griffey Clarifying Exam.) (Feb. 23, 2017).

[20] NextEra Energy Ex. 5a at Exhibit MH-R-2 at 2 (Revised Regulatory Commitment 10).

[21] NextEra Energy Initial Brief at 20-21.

[22] NextEra Energy Ex. 5, Exhibit MH-R-2 at 4-5.

[23] NextEra Energy Initial Brief at 22-23.

[24] *Id*. at 23; Direct Testimony of Robert Shapard, Oncor Ex. 1 at 13:6-11.

[25] Tr. (Hickson Cr.) at 218:13-19 (Feb. 21, 2017).

[26] Tr. (Shapard Cr.) at 132:4-17 (Feb. 21, 2017).

Oncor's retained earnings, and there is no evidence even suggesting that Oncor would be unable to continue to do so in the future.[27] In light of the additional risks to Oncor's ratepayers that would materialize as a result of NextEra Energy's ownership, the record evidence in this case does not support a conclusion that the benefits would outweigh the risks. Based on the magnitude of these risks, without appropriate ring-fencing protections, discussed below, the Commission finds that any purported benefits could not support a decision that the proposed transactions are in the public interest or overcome NextEra Energy's refusal to agree to the ring-fencing protections.

### D.    Elimination of Existing Oncor Ring-Fencing Protections

NextEra Energy's proposal is premised on the ability to link Oncor's credit profile with that of NextEra Energy.[28] NextEra Energy sought to achieve sufficient financial control over the actions and resources of Oncor to enable the linkage of Oncor and NextEra Energy's credit profiles.[29] To accomplish this goal, NextEra Energy requested that the Commission grant NextEra Energy the ability to eliminate the following two protections from Oncor's existing ring fence: (1) restrictions on NextEra Energy's ability to appoint, remove, and replace members of the Oncor and Oncor Holdings boards of directors, with the exception of three disinterested directors on the Oncor board of directors, and (2) the ability of the Texas Transmission Investment shareholders to veto dividends declared by the Oncor board of directors and, in certain circumstances, capital and operating budgets.[30]    NextEra Energy noted that if the Commission required the preservation of either of these two ring-fencing protections, the credit profiles of Oncor and NextEra Energy could not be linked, and NextEra Energy would not be able to close the proposed transactions.[31]    As discussed below, based on the facts and circumstances presented in this docket, the Commission has concluded that, in order to find the proposed transactions in the public interest, a majority of Oncor's board of directors would need to be independent and disinterested and retain all of the authority the Oncor board currently possesses, and a majority of the independent and disinterested directors would need the authority to veto dividends.

---

[27] *Id.* at 175:9-12; 175:24-176:2.
[28] NextEra Energy Ex. 1 at 27:7-13.
[29] NextEra Energy Ex. 4 at 36:17-19.
[30] Joint Report and Application at 15-16.
[31] NextEra Energy Ex. 1 at 27:7-13.

While Mr. James L. Robo, chairman and chief executive officer of NextEra Energy, did not provide testimony on the application, Mr. Robo did attend an open meeting of the Commission in order to clarify NextEra Energy's position on certain conditions proposed by Commission Staff and other intervenors. This discussion confirmed the Commission's understanding from the application and testimony that NextEra Energy would not close the proposed transactions if the Commission imposed conditions that would require greater Oncor board independence than that proposed by NextEra Energy, or required that a majority of the independent and disinterested directors possess the ability to veto dividends. Specifically, Mr. Robo informed the Commission that Commission Staff's proposed conditions regarding independent directors were "both burdensome and a deal killer."[32]   In addition, Mr. Robo informed the Commission that Commission Staff's proposed condition that required a vote of the majority of the independent and disinterested directors to file Oncor into bankruptcy for the benefit of NextEra Energy was both burdensome and a deal killer.[33] Mr. Robo also informed the Commission that Commission Staff's proposed conditions regarding Oncor's budgets and dividend policy "are burdensome and also deal killers."[34] When asked by the Commission whether NextEra Energy's concerns regarding approval of Oncor's capital and operating and maintenance expense budgets were related to the ratings agencies, Mr. Robo informed the Commission that "[t]his is an issue for me. So, whether the rating agencies are comfortable with it, it's an issue for me, and it's a deal killer."[35] This conversation between Mr. Robo and the Commission underscored the Commission's understanding that NextEra Energy would not close the proposed transactions if the Commission imposed certain conditions on the proposed transactions.

As discussed above, NextEra Energy ownership of Oncor would subject Oncor ratepayers to new and potentially substantial risks. Since the 2007 leveraged buyout of TXU Corp. by Energy Future Holdings, a robust ring fence has protected Oncor and Oncor's ratepayers from financial difficulties.[36] Oncor has not been made a party to the bankruptcy of its indirect parent company, Energy Future Holdings, as a result of this robust ring fence. Among the most important

---

[32] Open Meeting Tr. at 29:14-15 (Feb. 23, 2017); Commission Staff Ex. 15 at 3, section 14A.
[33] Open Meeting Tr. at 30:11-12 (Feb. 23, 2017); Commission Staff Ex. 15 at 3-4, section 14C.
[34] Open Meeting Tr. at 32:11-12 (Feb. 23, 2017); Commission Staff Ex. 15 at 4, sections 15 and 16.
[35] Open Meeting Tr. at 34:17-19 (Feb. 23, 2017).
[36] Commission Staff Ex. 3A at 16:2-4.

provisions of Oncor's existing ring fence are the two provisions that NextEra Energy seeks to eliminate.[37] A truly independent board of directors at Oncor, with control over Oncor's decisions on capital expenditures and operating expenses is a critical part of the ring fence protecting Oncor. The ability for a majority of independent and disinterested directors to limit dividends or other upstream distributions from Oncor is another critical layer of ring-fencing.

Oncor's existing ring fence requires that both Oncor and Oncor Holdings each have a majority independent board and that the Oncor board has the sole right to determine dividends.[38] The ring fence was critical in protecting Oncor from the bankruptcy of its indirect parent company.[39] Under the proposed transactions, a robust ring fence is still necessary to protect Oncor if NextEra Energy or one of its subsidiaries were to file for bankruptcy. The ring fence contains restrictive parameters for upstream distributions to ensure that Oncor retains sufficient earnings to maintain the company's liquidity to provide for operations and its overall financial integrity. The ability of the Oncor board to make an independent decision about when it is appropriate to pay dividends and when it is necessary to retain funds for operations, without undue interference from a parent company, is an essential part of the ring fence. The Commission finds that if the proposed transactions were to close, based on the facts and circumstances presented in this docket, a majority of Oncor's board would need to be independent and disinterested and retain all of the authority the Oncor board currently possesses, and a majority of the independent and disinterested directors would need the authority to veto dividends. Without these protections, the Commission finds that Oncor will not be adequately insulated from the additional risks resulting from NextEra Energy ownership. Because NextEra Energy has stated in no uncertain terms that these conditions would be unacceptable, the Commission finds that the proposed transactions are not in the public interest. Because NextEra Energy has made it clear that the proposed transactions will not close with the ring fence the Commission finds necessary, the Commission finds it unnecessary to list theoretical conditions on the proposed transactions when the proposed transactions have been denied outright.

---

[37] Commission Staff Ex. 3A at 42:13-16.
[38] *Joint Report and Application of Oncor Electric Delivery Company and Texas Energy Future Holdings Limited Partnership Pursuant to PURA § 14.101*, Docket No. 34077, Order on Rehearing at finding of fact nos. 54 and 58 (Apr. 28, 2008); *see also*, Tr. at 176:12 – 179:5 (Shapard Cross) (Feb. 21, 2017).
[39] Commission Staff Ex. 3A at 28:2-3.

The Commission notes that all ring-fencing conditions placed on Oncor continue to have full force and effect.

### E.    Potential Effects of Ring Fence Elimination

As discussed above, the elimination of the ring fence would subject Oncor to additional risks from NextEra Energy ownership that could subject Oncor to financial harm. If Oncor were to be subject to a NextEra Energy bankruptcy or financial distress, without the protection of the ring fence, the reliability, availability, and cost of Oncor's service to Texas ratepayers could be adversely affected. While the Commission acknowledges that NextEra Energy has been a successful owner and operator of its regulated subsidiary, Florida Power & Light, the Commission cannot subject Oncor to the additional financial risks entailed by NextEra Energy ownership without the protection of a robust ring fence.

### F.    Public Interest Determination

After evaluating the evidence in the record, the Commission finds that the proposed transactions are not in the public interest under PURA §§ 39.262, and 39.915. Under PURA §§ 39.262(m) and 39.915(b), the Commission shall approve a transaction only if the Commission finds it is in the public interest. Without Commission approval, a transaction cannot close under PURA §§ 39.262(*l*) and 39.915(a). In order to find the proposed transactions in the public interest, the Commission finds that a majority of Oncor's board of directors would need to be independent and disinterested and retain all of the authority the Oncor board currently possesses, and a majority of the independent and disinterested directors would need the authority to veto dividends, but NextEra Energy has made clear that it will refuse to close the proposed transactions with these conditions. The public interest is an amorphous concept.[40] PURA §§ 39.262 and 39.915 sets forth certain items for the Commission to consider, such as whether the transaction will adversely affect the reliability, availability, or cost of service, but the Commission is not limited to consideration of those items when evaluating the public interest. PURA recognizes that electric-utility regulation in Texas is part of a complex regulatory scheme, and it grants the Commission the authority to protect customers of electric service.[41] The determination of whether any transaction that would

---

[40] *See Railroad Com'n of Texas v. Texas Citizens for a Safe Future and Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011).

[41] PURA § 11.002(c)

change the ownership of the largest utility in Texas is in the public interest is squarely within the scope of the Commission's area of technical expertise.

NextEra Energy ownership of Oncor would subject Oncor and its ratepayers to significant new risks. The tangible benefits to Texas ratepayers that are specific to the proposed transactions are minimal, and would do little to compensate ratepayers for any of the additional risks imposed. When the Commission weighs the additional risks and the lack of tangible benefits, combined with NextEra Energy's insistence on eliminating two critical ring-fencing protections, the Commission finds that the proposed transactions are not in the public interest, and the application is denied. Because NextEra Energy has made it clear that the proposed transactions will not close with the ring fence the Commission finds necessary, the Commission finds it unnecessary to list theoretical conditions on the proposed transactions when the proposed transactions have been denied outright. Further, because the Commission finds that the proposed transactions are not in the public interest under PURA §§ 39.262(m) and 39.915(b) and does not approve the proposed transactions, the proposed transactions may not close. Consequently, it is not necessary for the Commission to address the public interest under PURA § 14.101–no decision by the Commission under PURA § 14.101 could affect the Commission's actions under PURA §§ 39.262(m) and 39.915(b).

The Commission adopts the following findings of fact and conclusions of law.

## II.  Findings of Fact

### *Procedural History*

1.      On October 31, 2016, Oncor Electric Delivery Company LLC and NextEra Energy, Inc. (collectively, the applicants) jointly filed an application for Commission approval of transactions that would transfer control of Oncor under PURA §§ 14.101, 39.262(m), and 39.915(b).

2.      On November 1, 2016, the Commission issued an order requesting each interested party to file a list of issues to be addressed by the Commission in this docket.

3.      On November 9, 2016, Commission Staff filed a recommendation on notice.

4.      On November 14, 2016, matters relating to discovery in the docket were referred to the State Office of Administrative Hearings (SOAH) for handling.

5.    On November 15, 2016, the Commission issued Order No. 3, approving the amended form of notice and directing the applicants to provide notice.

6.    On November 18, 2016, the Commission issued Order No. 4, finding the application sufficient.

7.    On November 18, 2016, a prehearing conference was held. The following parties entered an appearance: the applicants, the Steering Committee of Cities Served by Oncor (Cities), the Texas Industrial Energy Consumers (TIEC), the Office of Public Utility Counsel (OPUC), IBEW Local 69, TXU Energy Retail Company, the NRG Companies,[42] and Commission Staff. Also at the prehearing conference, the following motions to intervene were granted: Cities, OPUC, TIEC, IBEW Local 69, TXU Energy Retail Company, and the NRG Companies.

8.    On November 21, 2016, the Commission ALJ issued Order No. 5, memorializing the prehearing conference and adopting a procedural schedule.

9.    On November 22, 2016, Oncor filed an affidavit attesting to the provision of notice.

10.   On November 30, 2016, Chairman Nelson and Commissioner Anderson filed respective memoranda regarding the issues to be addressed in this docket.

11.   On December 1, 2016, the Commission issued a preliminary order identifying issues to be addressed.

12.   On December 28, 2016, the Commission issued Order No. 6, which granted the motions to intervene of Nucor Steel—Texas, CMC Steel Texas, Texas Energy Association for Marketers, Apex Bethel Energy Center, and Golden Spread Electric Cooperative, Inc.

13.   On January 11, 2017, OPUC filed the direct testimonies of Karl Nalepa and Cynthia Zamora.

---

[42] The NRG Companies include: NRG Texas Power LLC, Cedro Hill Wind LLC, Elbow Creek Wind Project, LLC, Goat Wind, LP, Gregory Power Partners LLC, Langford Wind Power, LLC, NRG Cedar Bayou Development Company LLC, NRG South Texas LP, Petra Nova Power I LLC, Sherbino I Wind Farm LLC; South Trent Wind LLC, Reliant Energy Retail Services LLC, Green Mountain Energy Company, Everything Energy LLC, US Retailers LLC, NRG Curtailment Solutions LLC, and NRG Power Marketing LLC.

14.    On January 11, 2017, Cities filed the direct testimonies of Lane Kollen and Richard A. Baudino.

15.    On January 11, 2017, TIEC filed the direct testimony of Charles S. Griffey.

16.    On January 11, 2017, TIEC, OPUC, and Cities jointly filed the direct testimony of Ralph · Smith.

17.    On January 11, 2017, the NRG Companies and the Texas Energy Association of Marketers filed statements of position.

18.    On January 18, 2017, Commission Staff filed the direct testimonies of Randall Vickroy, John Antonuk, Darryl Tietjen, and Constance McDaniel Wyman.

19.    On February 1, 2017, the Commission ALJ issued Order No. 7, establishing procedures and guidelines for the prehearing conference and the hearing on the merits.

20.    On February 2, 2017, NextEra Energy filed the rebuttal testimony of John Reed, Mark Hickson, and Jess Totten.

21.    On February 2, 2017, Oncor filed the rebuttal testimony of James Greer, Stephen Ragland, David Davis, and Robert Shapard.

22.    On February 7, 2017, TIEC filed a notice of intention to take the oral deposition of Mark Hickson.

23.    On February 8, 2017, TIEC filed a notice of intention to take the oral deposition of Robert Shapard.

24.    On February 10, 2017, Nucor Steel filed a statement of position.

25.    On February 13, 2017, IBEW Local 69, OPUC, Golden Spread Electric Cooperative, TXU Energy Retail Company, and Commission Staff filed statements of position.

26.    On February 14, 2017, TIEC filed a notice of intention to take the oral deposition of John Reed.

27.    On February 14, 2017, the SOAH ALJ issued Discovery Order No. 2, ruling on objections to discovery.  The SOAH ALJ sustained NextEra Energy's objections to requests for information from the NRG Companies as being outside the scope of the rebuttal testimony.

The SOAH ALJ also sustained Oncor's objection to TIEC's request for production of documents contained in the notice of intention to take the oral deposition of Oncor witness Robert Shapard. The ALJ found that the requested documents related to alternate transactions and were therefore irrelevant to the application in this docket.

28.   On February 15, 2017, the Commission ALJ issued Order No. 8, denying TIEC's motion to strike portions of the rebuttal testimony of Mark Hickson and John Reed.

29.   On February 16, 2017, SOAH issued Discovery Order No. 3, sustaining Oncor's objection to TIEC RFI's 6-1, 6-2, and 6-17b, finding that the requested documents related to alternate transactions and were therefore irrelevant to the application in this docket. Discovery Order No. 3 also sustained in part and overruled in part NextEra Energy's objections to TIEC requests for information.

30.   On February 16, 2017, TIEC appealed SOAH Discovery Order Nos. 2 and 3.

31.   On February 16, 2017, the Commission voted to add TIEC's appeal of SOAH Discovery Order Nos. 2 and 3 to the agenda for the February 21, 2017 open meeting.

32.   The Commission granted TIEC's appeal of SOAH Discovery Order Nos. 2 and 3 at the February 21, 2017 open meeting, finding that the requested evidence was relevant and must be provided.

33.   On February 21, 2017, a stipulation and agreement between NextEra Energy, TXU Energy Retail Company LLC, Texas Energy Association for Marketers, and the NRG Companies was offered into evidence, resolving the issues raised by these parties in the case.

34.   On February 21, 2017, a stipulation and agreement between NextEra Energy and the NRG Companies was offered into evidence, resolving the issues raised by NRG Energy in the case.

35.   The Commission convened the hearing on the merits on February 21, 2017, and the hearing concluded on February 24, 2017.

36.   Mr. James L. Robo, the chairman and chief executive officer of NextEra Energy, addressed the Commission at an open meeting held on February 23, 2017, in which Mr. Robo stated

which conditions recommended by Commission Staff would prevent NextEra Energy from closing any of the proposed transactions.

37.  On March 10, 2017, initial post-hearing briefs were filed by Cities, Nucor Steel – Texas, the Texas Energy Association for Marketers, OPUC, Commission Staff, NextEra Energy, Oncor, Golden Spread Electric Cooperative, and TIEC.

38.  On March 17, 2017, reply briefs were filed by Cities, OPUC, the Texas Energy Association for Marketers, Oncor, the NRG Companies, Golden Spread Electric Cooperative, Commission Staff, NextEra Energy, and TIEC.

39.  The Commission considered this docket at the March 30, 2017 open meeting.

40.  On March 30, 2017, Commissioner Anderson filed a memorandum discussing his conclusion that the proposed transactions are not in the public interest.

41.  On April 13, 2017, the Commission issued a final order in this docket.

42.  On May 8, 2017, NextEra Energy filed a motion for rehearing on the Commission's order.

43.  On May 11, 2017, Energy Future Holdings Corp. and Energy Future Intermediate Holdings Company LLC filed an *amicus curiae* brief in support of NextEra Energy's motion for rehearing.

44.  On May 23, 2017, Commission Staff, OPUC, TIEC, and Cities filed a joint reply to NextEra Energy's motion for rehearing.

*Notice*

45.  Notice of the transactions at issue in this docket was provided by first-class mail to the following: (a) all municipalities in Oncor's service area; (b) all entities listed in the Commission's transmission matrix in Docket No. 45382, *Commission Staff's Application to Set 2016 Wholesale Transmission Service Charges for the Electric Reliability Council of Texas*; (c) all electric cooperatives and municipally-owned utilities that have dually certified areas with Oncor; (d) all retail electric providers currently certificated by the Commission; and (e) all authorized representatives for parties in Docket No. 38929, *Application of Oncor Electric Delivery Company for Authority to Change Rates*. Further notice of this docket was provided by publication of an approved notice in local newspapers

of general circulation in Oncor's service territory once a week for two consecutive weeks in accordance with 16 TAC § 22.55.

### *Description of the Transactions in the Application*

46.  As detailed in findings of fact 47 through 65, the joint report and application and the direct testimony of NextEra Energy witness Mark Hickson described the proposed transactions.

47.  The application requested Commission approval of two, separately negotiated private transactions.

48.  NextEra Energy did not amend its application to request Commission approval of either transaction on an individual basis.

49.  The first transaction involves NextEra Energy's proposed acquisition of the 80.03% interest in Oncor indirectly held by Energy Future Holdings Corporation.

50.  The second transaction involves NextEra Energy's proposed acquisition of Texas Transmission Holdings Corporation's indirect 19.75% ownership interest in Oncor, held by its wholly-owned subsidiary, Texas Transmission Investment LLC.

51.  This transaction, if viewed on its own, would constitute the transfer of a controlling interest or operational control in Oncor under PURA §§ 39.262($l$)(3) and 39.915(a)(3) because of Texas Transmission Investment's right to veto dividends declared by the Oncor board, as well as its right, in certain circumstances, to veto Oncor's capital and operations and maintenance expense budgets.

52.  A third transaction is NextEra Energy's agreement to purchase Oncor Management Investment LLC's 0.22% interest in Oncor, subject to the closing of the first transaction.

53.  The applicants estimate that the proposed transactions have a combined enterprise value of approximately $18.7 billion, assuming a 100% ownership interest in Oncor. This valuation has not been evaluated or approved by the Commission, and the Commission expresses no opinion as to the validity or appropriateness of this valuation.

54.  The proposed acquisition of Energy Future Holding's 80.03% indirect interest in Oncor was to occur under an agreement and plan of merger by and among Energy Future Holdings, Energy Future Intermediate Holdings, NextEra Energy, and EFH Merger Co.,

LLC. EFH Merger Co., LLC is a direct, wholly-owned subsidiary of NextEra Energy formed specifically to effectuate NextEra Energy's acquisition of Energy Future Holdings.

55. Under the merger agreement, Energy Future Holdings was to be merged with and into EFH Merger Co., LLC, and EFH Merger Co., LLC was to continue as the surviving company and successor to the reorganized Energy Future Holdings.

56. The agreement and plan of merger by and among Energy Future Holdings, Energy Future Intermediate Holdings, NextEra Energy, and EFH Merger Co., LLC was entered into on July 29, 2016, and amended on September 18, 2016.

57. In conjunction with the September 18, 2016 amendment to the agreement and plan of merger discussed in finding of fact 47, certain funds advised by Fidelity Management and Research Company, which funds are creditors of Energy Future Holdings and Energy Future Intermediate Holdings, entered into an amended and restated plan support agreement with Energy Future Holdings, Energy Future Intermediate Holdings, and NextEra Energy.

58. On September 19, 2016, Energy Future Holdings and Energy Future Intermediate Holdings received authorization from the bankruptcy court to enter into and perform under both the agreement and plan of merger, as amended, and the amended and restated plan support agreement.

59. This transaction was part of the eighth amended plan of reorganization of Energy Future Holdings, which was confirmed by the bankruptcy court for the district of Delaware on February 17, 2017.

60. The proposed acquisition of Texas Transmission Holding Corporation's indirect 19.75% interest in Oncor was to occur under an agreement and plan of merger by and among Texas Transmission Holding Corporation, NextEra Energy, and a NextEra Energy affiliate, WSS Acquisition Company.

61. Under the merger agreement, WSS Acquisition was to merge with and into Texas Transmission Holdings Corporation, with Texas Transmission Holdings Corporation continuing as the surviving company.

62.  Upon the closing of the proposed transactions with Energy Future Holdings, NextEra Energy intended to fund $9.8 billion, primarily for the repayment of Energy Future Intermediate Holdings' debt. The proposed transactions would also repay the debt of Energy Future Holdings.

63.  NextEra Energy's proposed financing of the $9.8 billion acquisition of Energy Future Holdings was to include approximately $7.5 billion of debt funding financed at NextEra Energy Capital Holdings.

64.  Upon the closing of the proposed transaction with Texas Transmission Holdings Corporation, NextEra Energy intended to fund approximately $2.4 billion in cash primarily for the purchase of shares in Texas Transmission Holdings Corporation, with the remainder to repay all existing debt residing at Texas Transmission Holdings Corporation.

65.  Oncor's net existing debt of approximately $6.5 billion was to be unaffected by the proposed transactions, except insofar as the credit rating of Oncor would become linked to NextEra Energy's credit rating.

### *Risks to Oncor Ratepayers*

66.  NextEra Energy's method of financing the proposed transactions would not truly eliminate the debt above Oncor but would refinance that debt with new debt at NextEra Energy Capital Holdings.

67.  Oncor's revenues would continue to support repayment of that debt, though to a lesser extent.

68.  Including the debt from the proposed transactions, the total amount of consolidated debt at NextEra Energy would be approximately $45 billion.

69.  The revenues of Oncor would be required to support Oncor's pro rata share of that $45 billion in debt.

70.  Some parties asserted that Oncor's share of NextEra Energy's consolidated debt would be about 15%.

71.  Moody's Investors Service noted that "[t]he acquisition-related debt, without a material amount of deleveraging, would exhaust [NextEra Energy's] debt capacity at its current

ratings" and "make the company more vulnerable to unforeseen events or margin shortfalls."[43]

72.    The substantial amounts of leverage at NextEra Energy increases the financial risk to Oncor.

73.    The proposed transactions would introduce to Oncor risks associated with NextEra Energy's unregulated businesses, including generation development.

74.    Oncor is not currently subject to risks related to unregulated generation development.

75.    The ratings agencies have found that NextEra Energy has a limited tolerance for financial risk due to unforeseen circumstances, and have identified risks that could lead to a downgrade in the credit rating of NextEra Energy.

76.    NextEra Energy, including NextEra Energy Resources, is subject to numerous risks, including potential changes in renewable-energy demand resulting from changes to climate or tax policy, commodity risks, retail-electric-provider risks, and power- and nuclear-generation risks.

77.    The additional risks, in conjunction with the high amount of leverage at NextEra Energy, increases the likelihood that unforeseen events could affect Oncor's financial stability.

### *Lack of Tangible Benefits*

78.    In determining whether a transaction is in the public interest under PURA §§ 39.262, and 39.915, the Commission has evaluated whether the transaction would provide tangible and quantifiable benefits to Oncor's ratepayers that are specific to the transaction at issue.

79.    The sole tangible and quantifiable benefit offered by NextEra Energy is a commitment to share 90% of the interest-rate savings on Oncor's cost of debt between the closing of the transactions and Oncor's next rate case after the rate case filed on March 17, 2017.

80.    At most, this quantifiable benefit would amount to credits of approximately $3.2 million per year for the first four years after the closing of the transactions.

---

[43]  Direct Testimony of John Reed, NextEra Energy Exhibit 4, Exhibit JR-6 at 5.

81.    NextEra Energy identified benefits of the transactions that include a commitment to fund expenditures in Oncor's five-year long-range capital plan (subject to certain limitations), opportunities for collaboration between Oncor and Florida Power & Light, no material involuntary workforce reductions at Oncor for two years, the possible consolidation of NextEra Energy's subsidiary Lone Star Transmission into Oncor, and the resolution of the Energy Future Holdings bankruptcy proceeding.

82.    NextEra Energy's regulatory commitment 72 not to seek to recover any shared or common service costs that are not equal to or less than the costs incurred by Oncor in 2016, adjusted for inflation, is not a benefit, but a no-harm commitment.

83.    NextEra Energy has made no attempt to quantify the listed benefits.

84.    NextEra Energy made no estimate of synergy savings resulting from the proposed transactions.

85.    The conclusion of the Energy Future Holdings bankruptcy proceeding is not a benefit unique to the proposed transactions.

86.    Throughout the pendency of Energy Future Holdings' bankruptcy proceeding, Oncor has safely provided reliable service to Texas customers.

87.    Oncor has made $6 to $7 billion in capital investments over the past five years.

88.    The equity portion of these investments have been funded using Oncor's retained earnings.

### *Elimination of Existing Oncor Ring-fencing Protections*

89.    NextEra Energy's proposal is premised on the ability to link Oncor's credit profile with that of NextEra Energy.

90.    NextEra Energy needed to achieve sufficient financial control over the actions and resources of Oncor to enable the linkage of Oncor's and NextEra Energy's credit profiles.

91.    NextEra Energy requested that the Commission grant NextEra Energy the ability to eliminate two protections from Oncor's existing ring fence: (1) restrictions on NextEra Energy's ability to appoint, remove, and replace members of the Oncor and Oncor Holdings boards of directors, with the exception of three disinterested directors on the Oncor board of directors, and (2) the ability of Texas Transmission Investments

shareholders to veto dividends declared by the Oncor board of directors and, in certain circumstances, veto capital and operating budgets.

92.    NextEra Energy noted that if the Commission required the preservation of either of these two ring-fencing protections, the credit profiles of Oncor and NextEra Energy could not be linked, and NextEra Energy would not close the proposed transactions.

93.    The ring fence protecting Oncor since the 2007 leveraged buyout of TXU Corp. by Energy Future Holdings has protected Oncor and Oncor's ratepayers from any financial difficulties.

94.    Oncor has not been made a party to the bankruptcy of its indirect parent company, Energy Future Holdings.

95.    The two ring-fencing provisions that NextEra Energy seeks to eliminate are among the most important provisions of Oncor's ring fence.

96.    To protect Oncor if NextEra Energy or one of its subsidiaries files for bankruptcy, Oncor would need a ring fence that includes a majority of independent and disinterested board of directors at Oncor and that retains both all of the authority that Oncor's board currently possesses and the ability of a majority of independent and disinterested directors to veto dividends.

97.    The ring fence contains restrictive parameters for upstream distributions to ensure that Oncor retains sufficient earnings to maintain the company's liquidity to provide for operations and its overall financial integrity.

98.    The ability of the Oncor board to make an independent decision about when it is appropriate to pay dividends and when it is necessary to retain funds for operations, without undue interference from a parent company, is an essential part of the ring fence.

99.    Without a majority independent and disinterested board and the ability of a majority of independent and disinterested directors to veto dividends, Oncor will not be adequately insulated from the additional risks resulting from NextEra Energy ownership.

100.    Because NextEra Energy has stated that conditions requiring Oncor to have a majority independent and disinterested board and the ability of a majority of independent and

disinterested directors to veto dividends are unacceptable, the Commission finds that the proposed transactions are not in the public interest.

101.    Because the application is denied, the Commission finds it unnecessary to list theoretical conditions on the proposed transactions.

102.    All ring fence conditions placed on Oncor continue to have full force and effect.

### _Potential Effects of Ring Fence Elimination_

103.    If Oncor were to be subject to a NextEra Energy bankruptcy, without the protection of the ring fence, the reliability of Oncor's service could be adversely affected.

104.    If Oncor were to be subject to a NextEra Energy bankruptcy, without the protection of the ring fence, the availability of Oncor's service could be adversely affected.

105.    If Oncor were to be subject to a NextEra Energy bankruptcy, without the protection of the ring fence, the cost of Oncor's service could be adversely affected.

### _Public Interest Determination_

106.    Under PURA §§ 39.262(m) and 39.915(b), the Commission shall approve a transaction only if the Commission finds it is in the public interest.

107.    Without the Commission's approval, a proposed transaction cannot close under PURA §§ 39.262(*l*) and 39.915(a).

108.    The public interest is an amorphous concept.

109.    PURA §§ 39.262 and 39.915 set forth certain items for the Commission to consider, such as whether the transaction will adversely affect the reliability, availability, or cost of service.

110.    The Commission is not limited to consideration of the items referenced in §§ 39.262 and 39.915.

111.    PURA recognizes that electric-utility regulation in Texas is part of a complex regulatory scheme, and it grants the Commission authority to protect customers of electric service.

112.    The determination of whether a transaction that would change the ownership of the largest transmission and distribution utility in Texas is in the public interest is squarely within the scope of the Commission's area of technical expertise.

113.    NextEra Energy's ownership of Oncor would subject Oncor and its ratepayers to significant new risks.

114.    The benefits to Texas ratepayers that are specific to this transaction are minimal and would do little to compensate ratepayers for the additional risks imposed.

115.    Because of the proposed transactions' additional risks and lack of benefits, combined with NextEra Energy's insistence on the elimination of two critical ring-fencing protections, the proposed transactions are not in the public interest.

116.    Based on the record evidence in this case, the proposed transactions are not in the public interest.

117.    The application did not propose or request Commission approval of a single transaction, the application presented a comprehensive plan that requested approval of two transactions as part of that plan.

118.    It is inappropriate to request different relief in a motion for rehearing.

119.    No evidence was offered by NextEra Energy that would allow the Commission to evaluate any single transaction for compliance with any statutory requirement.

## III.  Conclusions of Law

1.    The Commission has jurisdiction over the parties and the subject matter of this docket under PURA §§ 14.101, 39.262(o), and 39.915.

2.    The sale of Texas Transmission Investment, LLC constitutes the transfer of a controlling interest or operational control in Oncor under PURA §§ 39.262(*l*)(3) and 39.915(a)(3) because of Texas Transmission Investment's right to control the dividend policy of Oncor, as well as to veto Oncor's capital and operations and maintenance expense budgets.

3.   No statute or rule requires the Commission to address each issue listed in a preliminary order, as the preliminary order sets out the issues the Commission would like to be addressed by the parties, but parties are free to raise other issues.

4.   In evaluating a transaction under PURA §§ 39.262 and 39.915, the Commission is not limited to consideration of the factors listed in PURA §§ 39.262(m) and 39.915(b).

5.   Each of the proposed transactions discussed in the joint report and application are not in the public interest under PURA §§ 39.262(*l*)-(m), and 39.915.

6.   The Commission is not required to address in this proceeding the public interest or any factors under PURA § 14.101 because compliance with that provision is rendered moot by the Commission's decision to not approve the application under PURA §§ 39.262 and 39.915.

7.   Because the Commission is not approving the transactions discussed in the joint report and application, under PURA §§ 39.262(*l*) and 39.915(a), the proposed transactions may not close.

8.   No evidence exists in the record of this matter that could support a Commission decision limited to any single transaction proposed in the application.

9.   To the extent that NextEra Energy has requested that the Commission approve the single transaction with Texas Transmission Investment in its motion for rehearing, NextEra Energy has failed to meet its burden of proof to show that any single transaction is in the public interest, and so that request is denied.

### IV.   Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders:

1.   The Commission does not approve the purchase of Oncor Electric Delivery Company LLC, by NextEra Energy, Inc. because the proposed transactions addressed in the joint report and application are not in the public interest under PURA §§ 39.262(*l*)-(m), and 39.915.

2.   Because the Commission's approval was not obtained by Oncor Electric Delivery Company LLC and NextEra Energy, Inc., the proposed transactions shall not close.

PUC Docket No. 46238                    **Order on Rehearing**                    Page 25 of 25

3.      To the extent that NextEra Energy has requested Commission approval of the single
transaction with Texas Transmission Investment in its motion for rehearing, that single
transaction shall not close.

4.      All motions or requests for entry of specific findings of fact and conclusions of law, and
other requests for general or specific relief not expressly granted, are denied.


Signed at Austin, Texas the _____ day of June 2017.


**PUBLIC UTILITY COMMISSION OF TEXAS**



_____
KENNETH W. ANDERSON, JR., COMMISSIONER


_____
BRANDY MARTY MARQUEZ, COMMISSIONER


W2013
q:\cadm\orders\final\46000\46238 reh.docx

DOCKET NO. 46238

| | | |
|---|---|---|
| JOINT REPORT AND APPLICATION | § | |
| OF ONCOR ELECTRIC DELIVERY | § | PUBLIC UTILITY COMMISSION |
| COMPANY LLC AND NEXTERA | § | |
| ENERGY, INC. FOR REGULATORY | § | OF TEXAS |
| APPROVALS PURSUANT TO PURA | § | |
| §§ 14.101, 39.262 AND 39.915 | § | |

RECEIVED

2017 JUN 27 PM 2:46

PUBLIC UTILITY COMMISSION
FILING CLERK

## NEXTERA ENERGY, INC.'S
## SECOND MOTION FOR REHEARING

I.   INTRODUCTION ................................................................................................ 4

II.  POINTS OF ERROR ........................................................................................... 6

    A.   POINT OF ERROR NO. 1 – The Order on Rehearing's withdrawal of PURA § 14.101 as a basis for decision leaves the Order on Rehearing with no statutory underpinning for weighing the alleged risks, protections, and benefits of the proposed transactions to reach its decision. ................................... 6

    B.   POINT OF ERROR NO. 2 – The Order on Rehearing failed to address the public interest factors mandated by PURA § 14.101(b)(2). ................................. 7

    C.   POINT OF ERROR NO. 3 – The Order on Rehearing erred by adopting and applying a new, more stringent standard to evaluate the public interest. ................................................................................................................ 8

    D.   POINT OF ERROR NO. 4 – The Order on Rehearing denied approval of the proposed transactions based on an erroneous interpretation and application of PURA §§ 39.262 and 39.915. ....................................................... 14

        1.   The Order on Rehearing misinterpreted PURA §§ 39.262 and 39.915. ......... 14

        2.   The Order on Rehearing erred in its application of the PURA §§ 39.262 and 39.915 factors. ....................................................................................... 16

    E.   POINT OF ERROR NO. 5 – The Order on Rehearing's departure from statutory requirements and disregard of NextEra Energy's regulatory commitments are error that cannot be justified by references to the Commissioners' "conversation" with NextEra Energy Chairman and Chief Executive Officer James L. Robo in an open meeting. ......................................... 20

    F.   POINT OF ERROR NO. 6 – The Order on Rehearing erred by failing to disclaim jurisdiction over the proposed transaction with TTHC. ........................ 22

    G.   POINT OF ERROR NO. 7 – The Commission erred in holding that the TTHC transaction was not presented as a separate transaction and that there was no evidence to support the stand-alone transaction. ............................. 23

    H.   POINT OF ERROR NO. 8 – The Order on Rehearing erred by finding that the proposed transactions would subject Oncor and Oncor ratepayers to increased risks. ................................................................................................... 25

1.   The Order on Rehearing erred by finding that that the "expansive and diversified structure" of NextEra Energy and its affiliates would subject Oncor and Oncor ratepayers to increased risk. ............................................... 26

2.   The Order on Rehearing erred by basing its determination of increased risk to Oncor and Oncor ratepayers on isolated excerpts from two credit rating agency documents.............................................................................. 27

3.   The Order on Rehearing erred by finding that Oncor's contribution to payment of NextEra Energy's consolidated debt following the close of the proposed transactions would result in increased risk to Oncor and Oncor ratepayers. ........................................................................................ 28

4.   The Order on Rehearing erred by finding that NextEra Energy's competitive businesses would subject Oncor and Oncor ratepayers to increased risks. .............................................................................................. 29

5.   The Order on Rehearing erred by failing to consider the significant risks of maintaining the "status quo" and requiring Oncor to remain under a bankrupt parent. .......................................................................................... 31

6.   Finding of Fact No. 63 in the Order on Rehearing is factually erroneous and, together with Finding of Fact No. 64, reflects the Order on Rehearing's misunderstanding regarding the amount of debt funding that will be required to finance the proposed transactions...................................... 32

I.   POINT OF ERROR NO. 9 – The Order on Rehearing erred by finding that NextEra Energy's ownership of Oncor would require the same set of ring-fence protections approved for EFH's ownership plus a majority independent and disinterested board of directors for Oncor with dividend veto authority. ..................................................................................................... 33

1.   There is no rational basis to apply an even more restrictive ring fence to NextEra Energy than the one applied to EFH.................................................. 33

2.   The finding that NextEra Energy's ownership of Oncor would require an EFH ring fence "plus" gave no consideration to the extensive ring-fencing protections proposed by NextEra Energy. ....................................................... 35

3.   The Order on Rehearing specifically erred by finding that the EFH ring fence plus a majority independent and disinterested board of directors with dividend veto authority at Oncor is critical to protect Oncor from a NextEra Energy bankruptcy.......................................................................... 36

J.   POINT OF ERROR NO. 10 – The Order on Rehearing erred in finding that the sole tangible and quantifiable benefit of the proposed transactions is the sharing of interest rate savings for four years. ........................................... 38

K.   POINT OF ERROR NO. 11 – The Order on Rehearing erred by failing to address each of the issues identified in the Preliminary Order............................ 39

L.   POINT OF ERROR NO. 12 – The Order on Rehearing failed to give consideration to the merits of the stipulations entered into between NextEra Energy and certain intervenors. ........................................................... 40

M.      POINT OF ERROR NO. 13 – The Order on Rehearing violates NextEra
        Energy's constitutional rights to due process and equal protection...................... 41

N.      POINT OF ERROR NO. 14 – The Order on Rehearing erred by relying on
        facts not in evidence............................................................................................ 42

III.    CONCLUSION........................................................................................................... 43

**DOCKET NO. 46238**

| | | |
|---|---|---|
| **JOINT REPORT AND APPLICATION** | § | |
| **OF ONCOR ELECTRIC DELIVERY** | § | **PUBLIC UTILITY COMMISSION** |
| **COMPANY LLC AND NEXTERA** | § | |
| **ENERGY, INC. FOR REGULATORY** | § | **OF TEXAS** |
| **APPROVALS PURSUANT TO PURA** | § | |
| **§§ 14.101, 39.262 AND 39.915** | § | |

**NEXTERA ENERGY, INC.'S**
**SECOND MOTION FOR REHEARING**

NextEra Energy, Inc. ("NextEra Energy" or the "Company") files this Second Motion for Rehearing pursuant to Texas Administrative Procedure Act[1] § 2001.146 and Public Utility Commission of Texas ("Commission") Procedural Rule 22.264 to request reconsideration of the Commission's Order on Rehearing signed on June 7, 2017, and to preserve the Company's rights to judicial review.

## I.  INTRODUCTION

As the Commission recognized in both its original final order and its Order on Rehearing, the Commission has an important statutory responsibility to fulfill in this case.  The Commission must determine whether a proposal to "change the ownership of the largest utility in Texas is in the public interest"[2] or whether the public interest is better served by leaving the state's largest utility under the constraints of ownership by financial investors mired in bankruptcy.

While the Commission has issued an Order on Rehearing that clarifies and corrects some of the deficiencies in the original final order, the Order on Rehearing neglects other errors and further introduces new errors in attempting to rectify the shortcomings of the earlier order.

NextEra Energy urges the Commission to grant rehearing to correct these errors and afford further opportunity for the Commission to reconsider the legal and evidentiary issues and reverse its ultimate decision to deny approval of a change in ownership that would provide Oncor with a traditional utility holding company parent that is A- rated, widely diversified, and highly liquid instead of subjecting Oncor to the continuing financial risk and credit rating contagion of Energy Future Holdings Corp.'s ("EFH") ownership, including exposure to the EFH legacy liabilities and the burden of servicing the approximately $11 billion in debt that currently resides directly above Oncor.

---

[1] Administrative Procedure Act, Tex. Gov't Code §§ 2001.001-.902 (West 2016) (APA).
[2] Order on Rehearing at 11.

Notably, PURA § 14.101 cannot simply be redlined out of the Commission's order while retaining findings of fact and conclusions of law that depend on the catch-all "public interest" factor in § 14.101(b)(4) to justify denial of the proposed transactions under Chapter 39.  To comply with the statute, the Commission should eliminate the § 14.101(b)(4) costs/risks/protections/benefits catch-all "public interest" analysis as the foundation for its decision to deny the proposed transactions under §§ 39.262 and 39.915, as the public interest factors under PURA §§ 39.262 and 39.915 are specific and prescriptive.[3]

Further, as to the foundation of the Order on Rehearing's analysis, the Commission on rehearing should ask, upon careful review of all of the evidence, whether it is truly reasonable to conclude that NextEra Energy is a financially risky company, and whether there is a genuine likelihood under bankruptcy law that Oncor would be consolidated into a highly unlikely NextEra Energy bankruptcy.  At a minimum, the Commission should recognize that, because its Order on Rehearing does not and could not find that transferring Oncor's ownership from EFH to NextEra Energy will adversely affect Oncor's provision of service, the Commission has an obligation under the plain language of PURA §§ 39.262 and 39.915 to issue an Order on Rehearing approving the proposed transaction with EFH even if that approval is contingent upon conditions the Commission deems appropriate.

The Commission should also take time to look beyond the two ring-fencing provisions discussed in the Order on Rehearing, and not just consider them in isolation.  Importantly, the Order on Rehearing fails to evaluate the ring fencing and other financial protections presented in NextEra Energy's 73 regulatory commitments.  The Order on Rehearing does not assess, in light of those protections, whether or why the two restrictions discussed are critical to impose on Oncor's proposed new owner.  A complete public interest determination under PURA requires this assessment.

The Commission should also reconsider its assertion of jurisdiction over the proposed transaction with Texas Transmission Holdings Corporation ("TTHC").  The Order on Rehearing does not accurately describe the rights held by TTHC's subsidiary Texas Transmission Investment ("TTI"), which holds only a 19.75% minority ownership interest in Oncor.  TTI's veto rights do not give TTI or TTHC a controlling interest or operational control of Oncor and therefore do not provide a basis to assert jurisdiction over the TTHC transaction.  Further, even if the Commission

---

[3] *See* Order on Rehearing at Conclusion of Law No. 6, which states that "[t]he Commission is not required to address in this proceeding the public interest or any factors under PURA § 14.101 because compliance with that provision is rendered moot by the Commission's decision to not approve the application under PURA §§ 39.262 and 39.915."

were to continue to assert jurisdiction over the TTHC transaction, the record is clear that: (1) the EFH and TTHC transactions were presented as two, separately negotiated transactions and (2) NextEra Energy presented evidence that the acquisition of TTI's interest through the TTHC transaction satisfied the relevant statutory criteria for approval.  On this last point, both NextEra Energy and Oncor testified that the proposed transactions, which include the TTHC transaction, would not adversely affect the reliability, availability, or cost of Oncor's service.[4]  As to the TTHC transaction, this evidence was uncontroverted.  Moreover, the adverse impact findings in the Order on Rehearing are based exclusively on the elimination of certain of Oncor's ring-fence protections.[5]  These protections will remain in place if the TTHC transaction is approved on a stand-alone basis.[6]  Thus, the Order on Rehearing's findings on this issue provide no basis for denial of the TTHC transaction.

The Legislature has entrusted the Commission to evaluate the proposed transactions under the terms prescribed by PURA.  NextEra Energy respectfully requests that the Commission carefully consider the legal and evidentiary issues presented in each of the points of error below and issue a second Order on Rehearing consistent with this motion.  The second Order on Rehearing should hold that the proposed transaction with EFH is in the public interest and approved, and either disclaim jurisdiction over the proposed transaction with TTHC or find that the transaction also is in the public interest and approved.

## II.    POINTS OF ERROR

**A.    POINT OF ERROR NO. 1 – The Order on Rehearing's withdrawal of PURA § 14.101 as a basis for decision leaves the Order on Rehearing with no statutory underpinning for weighing the alleged risks, protections, and benefits of the proposed transactions to reach its decision.[7]**

In NextEra Energy's and Oncor's joint application, it requested that the Commission make a public interest finding and approve the transactions under PURA §§ 39.262 and 39.915 and also find that the transactions are in the public interest under PURA §§ 14.101.  In its first motion for rehearing, NextEra Energy pointed out that the Commission's original final order erred by relying

---

[4] Direct Testimony of Robert S. Shapard, Oncor Ex. 1 at 19:20-20:6; Direct Testimony of James A. Greer, Oncor Ex. 3 at 11:13-23; Direct Testimony of Stephen N. Ragland, Oncor Ex. 4 at 7:10-25; NextEra Ex. 1 at 7:20-8:3; Direct Testimony of Michael Spoor, NextEra Ex. 3 at 12:3-18; Direct Testimony of John Reed, NextEra Ex. 4 at 24:17-25:3; *see also* NextEra Ex. 1 at 37:12-38:7; NextEra Ex. 4 at 65:2-17.

[5] Order on Rehearing at § I.E. & Findings of Fact Nos. 103-105.

[6] If approved, NextEra Energy would simply step into the shoes of TTI and hold the same minority rights that TTI currently holds.

[7] *See* Order on Rehearing at §§ I.B.-F.; Findings of Fact Nos. 66-119; Conclusions of Law Nos. 4-7; Ordering Paragraph No. 1-2.

on PURA § 14.101 as a basis to deny approval of the proposed transactions because § 14.101 does not authorize the Commission to approve or disapprove a sale-transfer-merger transaction.  In response, the Order on Rehearing eliminates citation of § 14.101 as a basis for disapproval of the transaction.  NextEra Energy's first motion also pointed out that the original final order transgressed § 14.101 in a second way, by failing to address the specific public interest factors mandated by § 14.101(b)(2).  The Order on Rehearing attempts to sidestep this error by renouncing reliance upon § 14.101 altogether as a basis for the Commission's decision.  Purporting to confine itself to only PURA §§ 39.262 and 39.915, the Order on Rehearing concludes that "[t]he Commission is not required to address . . . the public interest or any factors under § 14.101."[8]

This revision, however, introduces reversible error of its own: despite its claim to have removed compliance with § 14.101 from consideration, the Order on Rehearing impermissibly imports the catch-all "public interest" evaluation authorized under § 14.101(b)(4) to justify denying approval of the proposed transactions under §§ 39.262 and 39.915.  This is evidenced in the findings of fact and conclusions of law, which address the costs/risks/protections/benefits of the proposed transactions.[9]  To comply with the statute, the Commission should eliminate the § 14.101(b)(4) costs/risks/protections/benefits catch-all "public interest" analysis and provide a §§ 39.262 and 39.915 foundation for its decision; if it instead (improperly) continues to utilize a § 14.101 approach to transaction approval, then it must at minimum fully conduct the § 14.101 analysis.  Without correction, the Order on Rehearing violates PURA, exceeds the Commission's authority, and constitutes arbitrary and capricious decision-making and an abuse of the Commission's discretion.[10]

**B.     POINT OF ERROR NO. 2 – The Order on Rehearing failed to address the public interest factors mandated by PURA § 14.101(b)(2).[11]**

In retaining the § 14.101(b)(4)-related findings and conclusions, the Order on Rehearing further errs by failing to fully comply with that statutory provision.  If the Commission conducts a § 14.101 analysis (as it should do, not for purposes of determining whether to approve the transaction, but solely for purposes of addressing NextEra Energy's separate request for a public

---

[8] Order on Rehearing at Conclusion of Law No. 6; *see also id.* at § I.F.

[9] *See* Order on Rehearing at §§ I.B.–I.F., Findings of Fact Nos. 66-119, Conclusions of Law Nos. 4-7.  Section 14.101(b)(4) is the only source of Commission authority to weigh the alleged risks against the protections and benefits of a proposed transaction (but, again, is inapplicable to the decision to approve or disapprove a sale-transfer-merger transaction).

[10] *See* APA § 2001.174.

[11] *See* Order on Rehearing at §§ I.B.-F.; Findings of Fact Nos. 108, 116; Conclusions of Law Nos. 5, 7; Ordering Paragraph No. 1.

interest determination under § 14.101), it must address not only the catch-all factors developed by the Commission under Subsection (b)(4),[12] but also the factors listed in Subsection (b)(2). Subsection (b)(2) directs that the Commission "shall" consider whether the transaction will:

(A)     adversely affect the health or safety of customers or employees;

(B)     result in the transfer of jobs of citizens of this state to workers domiciled outside this state; or

(C)     result in the decline of service.

The Order on Rehearing does not address these factors. To the contrary, as noted in Point of Error No. 1, the Order on Rehearing affirmatively disclaimed the need to address any of them.[13] The failure of the Order on Rehearing to consider these § 14.101 factors violates the statute and is arbitrary and capricious decision-making and an abuse of the Commission's discretion. The Commission accordingly should grant rehearing to correct this error. On rehearing, the Commission should find that the clear evidence establishes that the § 14.101 criteria will not be violated by the proposed transactions.[14]

## C.    POINT OF ERROR NO. 3 – The Order on Rehearing erred by adopting and applying a new, more stringent standard to evaluate the public interest.[15]

As explained in Point of Error No. 1, the Order on Rehearing impermissibly retains findings and conclusions based the catch-all public interest factor under PURA § 14.101(b)(4) to support the decision to deny the proposed transactions. This runs counter to the Order on Rehearing's finding that analysis of the public interest under § 14.101 is not required. The Order

---

[12] In Docket No. 14980, the seminal case involving the merger of Southwestern Public Service Company and Public Service Company of Colorado, the Commission interpreted the catch-all in Subsection (b)(4) to authorize the Commission to expand the list of public interest factors to include consideration of a merger's costs and benefits. The Commission did so, identifying additional factors the Commission found necessary to address the circumstances at the time when the industry was transitioning to competition. The phrasing of some of those factors has evolved in subsequent dockets to refer to "risks" and "tangible benefits" to ratepayers, while other factors continue to be stated in accordance with their original formulation. The Preliminary Order's inclusion of these Subsection (b)(4) factors and the Order on Rehearing's evaluation of those factors in this case rest on this precedent.

[13] Order on Rehearing at § I.F. and Conclusion of Law No. 6.

[14] For the evidence establishing that proposed transactions will not adversely affect the health or safety of Oncor customers or employees, please refer to: Oncor Ex. 1 at 17:14-23; Oncor Ex. 3 at 6:22-7:2, 10:18-21, 12:14-25; NextEra Ex. 3 at 10:4-11:7, 12:19-22. For the evidence demonstrating that the transactions will not result in the transfer of jobs of citizens of this state to workers domiciled outside this state, please refer to: Oncor Ex. 1 at 18:25-19:7; NextEra Ex. 1 at 8:19-9:7, 47:22-26; NextEra Ex. 4 at 66:7-67:9; Attachment A at 2, 4-5, 11 (Regulatory Commitment Nos. 8, 20-24, and 68). For the evidence establishing that the transactions will not result in a decline in service, please refer to: Oncor Ex. 1 at 17:24-18:2; Oncor Ex. 3 at 9:18-12:13; NextEra Ex. 1 at 37:12-38:7; NextEra Ex. 3 at 12:3-18; NextEra Ex. 4 at 65:1-66:6; Direct Testimony of Constance McDaniel Wyman, Staff Ex. 2 at 7:12-8:2; Attachment A at 1-2 (Regulatory Commitment Nos. 5, 6, and 10). Attachment A to this Second Motion for Rehearing is a copy of NextEra Energy's proposed regulatory commitments. This attachment was additionally provided as an attachment to NextEra Energy's Initial Brief and original Motion for Rehearing.

[15] *See* Order on Rehearing at §§ I.C., F.; Findings of Fact Nos. 78-88, 114-116; Conclusion of Law No. 5; Ordering Paragraph No. 1.

on Rehearing's error in this regard is compounded by the fact that the § 14.101(b)(4) analysis conducted applied a new, more stringent standard to evaluate the public interest.

The catch-all public interest factor in PURA § 14.101(b)(4) is not defined in the statute or the Commission's rules.[16]  Therefore, applicants must be able to know and rely on Commission precedent in presenting their case.  This can be challenging for an applicant because many of the Commission's Orders on Rehearing in sale-transfer-merger cases have involved approval of parties' stipulations and therefore do not carry precedential weight.[17]  Indeed, most of the existing ring-fence provisions adopted for the EFH transaction in 2007 resulted from the Commission's approval of a non-unanimous stipulation of the parties in Docket No. 34077.  The Commission's Order on Rehearing in Docket No. 34077 expressly provides that the Order on Rehearing should not "be regarded as precedent as to the appropriateness of any principle or methodology underlying the stipulation."[18]

The decision that stands apart from the others is the Commission's Order in *Joint Report and Application of Oncor Electric Delivery Company LLC, Ovation Acquisition I, LLC, and Shary Holding, LLC for Regulatory Approvals Pursuant to PURA §§ 14.101, 37.154, 39.262(i)-(m), and 39.915* ("*Ovation*") in Docket No. 45188.[19]  The *Ovation* Order is strong and direct precedent here because it was fully litigated, it was heard by the same Commissioners who heard this case, it involved the same utility and many of the same issues, and the Commission issued its Order only last year.  NextEra Energy accordingly relied on the Commission's Order in *Ovation* in working with Oncor to prepare the joint application and testimony supporting the application.  The joint filing included many of the same or stronger regulatory commitments as those approved in *Ovation*, and met and surpassed the "benefits to ratepayers" that the Commission in *Ovation* found to merit an Order of approval with appropriate conditions.

The Commission's Order on Rehearing upends the applicants' reasonable expectations by sharply departing from the Commission's *Ovation* Order without explanation.  The Order on Rehearing in this case flatly rejected benefits of the proposed transactions on the ground they were

---

[16] *See generally* 16 Tex. Admin. Code § 22.2.

[17] *See, e.g.*, *Joint Report and Application of Oncor Electric Delivery Company and Texas Energy Future Holdings Limited Partnership Pursuant to PURA § 14.101*, Docket No. 34077, Order on Rehearing at Ordering Paragraph 3 (April 24, 2008).

[18] *Id.*

[19] *Joint Report and Application of Oncor Electric Delivery Company LLC, Ovation Acquisition I, LLC, and Shary Holding, LLC for Regulatory Approvals Pursuant to PURA §§ 14.101, 37.154, 39.262(i)-(m), and 39.915*, Docket No. 45188, Order (March 24, 2016).

not shown to be "unique" and "exclusive" to the transactions.[20]  The *Ovation* Order contained no such requirement.  To the contrary, the benefits to ratepayers found by the Commission in *Ovation* were not unique or exclusive to the proposed transaction there.  Further, the Order on Rehearing rejected benefits of the proposed transactions if the benefits were not quantified.[21]  In its *Ovation* Order, by contrast, the Commission found the proposed transaction to be in the public interest based on findings of benefits to ratepayers, *none* of which was quantified.[22]  Thus, without explanation, the Commission starkly departed from its precedent by applying a new and more stringent "unique and exclusive" and "quantified" tangible benefits standard to the proposed transactions in this docket.[23]

NextEra Energy's first motion for rehearing set out a point-by-point comparison between the original final order in this case and the *Ovation* Order to show how the Commission in this case arbitrarily applied a new, more stringent standard for consideration of the benefits of a transaction.  The Order on Rehearing made no changes to correct this error.  NextEra Energy again urges the Commission to review this point-by-point comparison:

- The lead "benefit to ratepayers" found by the Commission in its *Ovation* Order was that "the proposed transaction provides an opportunity to end the bankruptcy proceeding faced by Oncor's majority parent company, EFH, in a relatively expeditious manner."[24]  The Order on Rehearing, however, rejected this benefit, stating that "[t]he conclusion of the bankruptcy proceeding is not a benefit that is unique to NextEra Energy's proposal; removal of [EFH] . . . from bankruptcy will be obtained by any transaction that the Commission approves."[25]

- The second benefit to ratepayers found by the Commission in *Ovation* was that "the transaction will allow a well-regarded Texas company to acquire operational control of Oncor."[26]  The Order on Rehearing in this case made no comparable finding even though the Order on Rehearing determined that NextEra Energy also "is a well-regarded utility holding company," and further that the Company "has been a successful owner and operator of its regulated subsidiary, Florida Power & Light."[27]  Moreover, NextEra Energy and Oncor witnesses uniformly testified that the proposed transactions would provide Oncor with a supportive parent company and opportunities

---

[20] Order on Rehearing at §§ I.C., F. and Findings of Fact Nos. 78, 85 and 114.

[21] *Id.* at § I.C. and Findings of Fact Nos. 78-84.

[22] *See* Docket No. 45188, Order at 14-15 (Mar. 24, 2016).

[23] This error is underscored in the Preliminary Order in the two cases.  While both Preliminary Orders stated as one issue whether the transactions would result in tangible and quantifiable benefits to Texas customers, neither Order informed the parties that all other benefits of a transaction would be disregarded if not quantified.

[24] Docket No. 45188, Order at 14; *see also id.* at Finding of Fact No. 293.

[25] Order on Rehearing at § I.C.; *see also id.* at Finding of Fact No. 85.

[26] Docket No. 45188, Order at 14.

[27] Order on Rehearing at §§ I.B., E.

for collaboration between experienced utilities.[28]  The Order on Rehearing dismissed the benefit of collaboration between utilities as "not quantified."[29]

- The third benefit found by the Commission in its *Ovation* Order was that the proposed transaction would reduce, though not eliminate, the amount of debt held directly above Oncor at EFH and EFIH.[30]  The proposed transactions in this case would eliminate that debt in its entirety by retiring a portion and refinancing a portion at a NextEra Energy subsidiary that is not within the direct chain of ownership above Oncor.[31]  Moody's confirmed this benefit[32] and found that NextEra Energy's acquisition of Oncor would "remove the contagion risks of EFH" to Oncor.[33]  These facts are undisputed. Moreover, NextEra Energy is far less dependent on Oncor revenues to service repayment of the refinanced debt as compared to Oncor's current situation under EFH or that approved by the Commission in the *Ovation* case.  The Order on Rehearing nonetheless did not recognize these benefits, and erroneously found that the debt above Oncor would not be "truly" eliminated.[34]

- The fourth benefit found in *Ovation* was that "the transaction will not adversely affect the health or safety of Oncor's customers or employees."[35]  This issue is a statutory factor that must be considered under PURA § 14.101, and NextEra Energy and Oncor presented testimony demonstrating that the proposed transactions in this case will not adversely affect the health or safety of Oncor's customers or employees.[36]  The Order on Rehearing makes no finding of benefit or any finding at all on this issue, an error discussed above in Point of Error No. 2.

- The fifth benefit found in *Ovation* was that "the transaction will not result in the transfer of jobs of citizens of this state to workers domiciled out of this state."[37]  Like employee and customer health and safety, this issue also is a statutory factor that must be considered under PURA § 14.101.  NextEra Energy and Oncor presented testimony on this issue, including regulatory commitments relating to Oncor's employees that are essentially identical to those approved as conditions in the *Ovation* Order.[38]  The Order on Rehearing, however, makes no comparable finding of such a benefit, and no finding on this statutory factor at all, which is an error discussed in Point of Error No. 2.  To the contrary, the Order on Rehearing specifically rejected NextEra Energy's workforce commitment as a benefit because it was not quantified despite the fact that no such benefit quantification was required in *Ovation*.[39]

---

[28] NextEra Ex. 3 at 5:4-11:17; Oncor Ex. 3 at 9:13-12:25; *see also* Oncor Ex. 1 at 20:14-20.

[29] Order on Rehearing at §§ I.C. and Findings of Fact Nos. 81, 83.

[30] Docket No. 45188, Order at 14 and Findings of Fact Nos. 150-152.

[31] *See* Rebuttal Testimony of Mark Hickson, NextEra Ex. 5 at 4:1-14; Tr. at 331:2-7 (Hickson Cross) (Feb. 22, 2017); Tr. at 405:11-7 (Hickson Redirect) (Feb. 22, 2017).

[32] NextEra Ex. 4, Exhibit JR-6 at 1.  Moody's stated that "[t]he approximately $10 billion of debt that exists above Oncor . . . will be extinguished."

[33] *Id.*

[34] Order on Rehearing at Findings of Fact Nos. 66; *see also id.* at § I.B.

[35] Docket No. 45188, Order at 14.

[36] NextEra Ex. 3 at 10:6-7; Oncor Ex. 3 at 6:27-7:2, 10:18-21.

[37] Docket No. 45188, Order at 14.

[38] *Compare* Docket No. 45188, Order at 51-52 and Findings of Fact Nos. 286-290 *with* Attachment A at 4-5 (Regulatory Commitment Nos. 20-24).

[39] Order on Rehearing at § I.C. and Findings of Fact Nos. 81, 83.

- The sixth benefit found in *Ovation* was that "the transaction will not result in a decline in service."[40]  Here again, NextEra Energy and Oncor presented testimony on this issue, including regulatory commitments relating to reliability metrics, including a SAIDI metric that exceeded the metric found sufficient by the Commission in the *Ovation* Order.[41]  The Order on Rehearing, however, makes no finding on this statutory factor or the associated benefit, which is an error discussed in Point of Error No. 2.

- The seventh benefit found in *Ovation* was the "possible combination" of Oncor with Sharyland Utilities.[42]  NextEra Energy in this case made the commitment that, if the proposed transactions are approved and close, NextEra Energy will seek approval to consolidate Lone Star Transmission into Oncor and any net savings will be reflected in Oncor's cost of service.[43]  The Order on Rehearing rejected this as a benefit because it was not quantified.[44]

- The *Ovation* Order included, as a condition necessary to finding that the transaction was in the public interest, that the applicants must fund the amount of capital expenditures in Oncor's current long-range plan for five years following the date of closing, with permission to reduce capital spending due to conditions not under the company's control, including, without limitations, siting delays, cancellations of projects by third parties, or weaker than expected economic conditions.[45]  NextEra Energy made the same but stronger commitment, to fund Oncor's current long-range plan for five years unconditionally with no exceptions that would allow reduced capital spending.[46]  The Order on Rehearing nonetheless dismissed this benefit as "not exclusive" to the proposed transactions, stating that such a commitment "would likely be a minimum threshold for any transaction" to be found in the public interest.[47]

- The *Ovation* Order also found as part of its public interest determination that "the possibility of" sharing the tax savings from Oncor's post-transaction business structure with ratepayers is a "potential benefit" of the transaction.[48]  The *Ovation* Order contained no estimate or other quantification of the potential benefit.  The Order in this case rejected any consideration of the possibility of synergy savings resulting from the proposed transactions as a potential public interest benefit despite the fact that numerous intervenors consistently proposed synergy savings estimates throughout this

---

[40] Docket No. 45188, Order at 14.

[41] *Compare* Docket No. 45188, Order at Finding of Fact No. 238 ("For a period of five years, OEDC's system average interruption duration Index (SAIDI) and system average interruption frequency index (SAIFI) benchmarks should be calculated based on the performance standards applicable to Oncor for years 2011, 2013, and 2014.  OEDC's SAIDI benchmark should be 96.30667 and its SAIFI benchmark should be 0.94000."), *with* Attachment A at 1 (Regulatory Commitment No. 5) ("For purposes of Substantive Rule 25.52, system average interruption duration index ("SAIDI") and system average interruption frequency index ("SAIFI") standards should be calculated based on Oncor's forced interruption performance for years 2013, 2014, and 2015.  Oncor's SAIDI standard should be 93.74667 and its SAIFI standard should be 0.95667.  These standards should go into effect starting with the calendar year 2018.").

[42] Docket No. 45188, Order at 14.

[43] Attachment A at 10 (Regulatory Commitment No. 64).

[44] Order on Rehearing at § I.C. and Findings of Fact Nos. 81, 83.

[45] Docket No. 45188, Order at Finding of Fact No. 291.

[46] Attachment A at 2 (Regulatory Commitment No. 10).

[47] Order on Rehearing at § I.C.; *see also id.* at Findings of Fact Nos. 81, 83.

[48] Docket No. 45188, Order at 15.

proceeding.  The Order on Rehearing stated only that NextEra Energy had not yet estimated such savings.[49]

The Order on Rehearing does not so much as mention the *Ovation* Order, let alone explain the Commission's departure from its precedent in all the foregoing respects.

This error is not cured by simply striking the word "tangible" before the word "benefits."[50] This edit, which was recommended by other parties to signify that the Commission "considered" all benefits,[51] is purely cosmetic.  It fails to address the core error — summary rejection of transaction benefits in this case on the unprecedented grounds that the benefits were not "unique and exclusive" or "quantified."

Ignoring and departing from precedent also cannot be justified by adding the phrase "based on the facts and circumstances of this case."[52]  Nor can the error be cured by dismissing in a sentence "any purported benefits" offered by NextEra Energy as insufficient "[b]ased on the magnitude of the[] risks, without appropriate ring-fencing protections."[53]  These generalities fail to explain why the Commission applied a much more lenient benefit standard in *Ovation* to find that the benefits outweighed the magnitude of the risks of Ovation's proposal to completely restructure Oncor post-transaction close.  As the courts have made clear, it is incumbent on the Commission to fully explain its reasoning "when it appears to have departed from its earlier administrative policy or to be inconsistent in its determinations."[54]  The Order on Rehearing fails to do so.

NextEra Energy accordingly requests that the Commission grant rehearing and issue a new Order on Rehearing that recognizes the Commission's *Ovation* precedent and applies the same standard so as to provide even-handed treatment in its evaluation of sale-transfer-merger applications.  Consistent with *Ovation*, the new Order on Rehearing should not reject all benefits unless they are "unique and exclusive" to the proposed transactions and specifically "quantified." The new Order on Rehearing instead should recognize the full set of benefits that the proposed

---

[49] Order on Rehearing at Finding of Fact No. 84; *see also id.* at § I.C.  The *Ovation* Order noted as a final benefit that Oncor would be separated from its competitive affiliates Luminant and TXU Energy Retail Company.  Docket No. 45188, Order at 14-15.  That separation recently occurred as a result of the spin-off of Texas Competitive Energy Holdings Company from EFH.

[50] *See* Draft Order on Rehearing at § I.C. and Findings of Fact No. 114 and 115 (June 6, 2017); the Order on Rehearing adopted this recommendation.

[51] *See* Joint Reply to NextEra Energy, Inc.'s Motion for Rehearing at 4 (May 23, 2017).

[52] *See* Order on Rehearing at § I.D.

[53] Order on Rehearing at § I.C.; *see* Memorandum of Commissioner Brandy Marty Marquez at 1 (June 6, 2017).

[54] *Oncor Elec. Delivery Co. LLC v. Pub. Util. Comm'n of Tex.*, 406 S.W.3d 253, 267 (Tex. App.—Austin 2013, no pet.).

transactions will provide, as well as the extensive protections afforded by NextEra Energy's 73 regulatory commitments.   Recognition of these benefits and protections should result, as in *Ovation*, an Order on Rehearing approving the proposed transactions.  Without this correction, the Order on Rehearing fails to comport with due process requirements, is arbitrary and capricious decision-making and an abuse of the Commission's discretion, and is not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole.[55]

### D.   POINT OF ERROR NO. 4 – The Order on Rehearing denied approval of the proposed transactions based on an erroneous interpretation and application of PURA §§ 39.262 and 39.915.[56]

#### 1.   The Order on Rehearing misinterpreted PURA §§ 39.262 and 39.915.

The Commission's Order on Rehearing, like its original final order, interpreted "public interest" in PURA §§ 39.262 and 39.915 as "an amorphous concept" that imposes no limits on the factors the Commission may consider or the public interest standard to be applied.[57]  The Order on Rehearing relies on *Railroad Commission of Texas v. Texas Citizens for a Safe Future and Clean Water* for this interpretation.[58]

This interpretation is clearly erroneous, as shown by comparing PURA with the statutes at issue in *Texas Citizens*.  The Railroad Commission statute in *Texas Citizens* listed "the public interest" as one of four separate factors the agency was required to consider in deciding whether to grant an injection well permit.  As the Texas Supreme Court explained, the term "public interest" in that statute was truly "amorphous," and the Railroad Commission's interpretation of it entitled to deference, because the Legislature had left the term public interest completely "undefined."[59] The Railroad Commission statute is similar in this respect to PURA § 14.101(b), which in Subsection (b)(4) likewise lists "public interest" as a separate factor from others without defining the term.

PURA §§ 39.262 and 39.915, on the other hand, are very different.  Unlike the Railroad Commission statute and PURA § 14.101, the term "public interest" in PURA §§ 39.262 and 39.915 is not undefined and "amorphous."  There is no catch-all public interest provision in the Chapter

---

[55] *See* APA § 2001.174.

[56] *See* Order on Rehearing at §§ I.C., F.; Findings of Fact Nos. 78-88, 103-105, 108-116; Conclusions of Law Nos. 5, 7; Order on Rehearing Paragraphs Nos. 1-2.

[57] *See* Order on Rehearing at § I.F. and Findings of Fact Nos. 108-110.

[58] *Id.* at § I.F. (citing *R.R. Comm'n of Tex. v. Texas Citizens for a Safe Future and Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011)).

[59] *Texas Citizens*, 336 S.W.3d at 627-32.

39 statutes. Instead, the Legislature defined the "public interest" to entail three specific criteria, which, if satisfied, require the transaction to be approved:

> The commission shall approve a transaction [under this section] if the commission finds that the transaction is in the public interest. In making its determination, the commission shall consider whether the transaction will adversely affect (1) the reliability of service, (2) availability of service, or (3) cost of service of the electric utility or transmission and distribution utility.[60]

PURA §§ 39.262 and 39.915 are comparable in this regard to the Texas Commission on Environmental Quality ("TCEQ") statute that the Court in *Texas Citizens* contrasted with the Railroad Commission statute. The Court observed that the TCEQ statute "requires the TCEQ to consider specific criteria . . . in its public interest inquiry" whereas there is "no parallel provision enumerating the types of public interest considerations the [Railroad] Commission must evaluate."[61] The Legislature thus chose to define "public interest" both in the TCEQ statute and in PURA §§ 39.262 and 39.915, unlike in the Railroad Commission statute and PURA § 14.101. The Order on Rehearing's reliance on *Texas Citizens* erroneously equates §§ 39.262 and 39.915 with the Railroad Commission statute and fails to account for § 14.101.

*Texas Citizens* makes equally clear that, contrary to the Order on Rehearing's interpretation,[62] PURA §§ 39.262 and 39.915 do *not* grant the Commission discretion to consider additional factors beyond the three factors specified by the Legislature. The TCEQ statute contained an express Legislative grant that the TCEQ "shall not be limited to the consideration of"[63] the factors specified in the statute. PURA §§ 39.262 and 39.915 contain no such grant of authority. This legislative decision to limit the Commission's discretion to the factors specified in §§ 39.262 and 39.915 dovetails with the severe consequence of a finding that the factors have not been met — the transaction is not approved and may not close.[64] The pairing of limited discretion with strong remedy in these sections of PURA contrasts with § 14.101, which affords the Commission broader discretion in evaluating the public interest but limits remedial relief to the ratemaking process, not the actual approval of the transactions.

It is well established that the Commission has only those powers that are expressly granted or necessarily implied by the language of PURA.[65] The Order on Rehearing impermissibly

---

[60] PURA §§ 39.262(m), 39.915(b) (numbering added).

[61] *Texas Citizens*, 336 S.W.3d at 626-27.

[62] Order on Rehearing at § I.F. and Finding of Fact No. 110.

[63] *See Texas Citizens*, 336 S.W.3d at 627 n.11 (citing Tex. Water Code § 27.051(d)).

[64] *See* PURA §§ 39.262(l)-(m), 39.915(a)-(b).

[65] *Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184, 192-93 (Tex. 2007).

expands the Commission's powers in contravention of the statutory language. The Order on Rehearing's interpretation that the term "public interest" in §§ 39.262 and 39.915 is amorphous, and that the Commission is not bound by the factors specified in the statute, is a fundamental error that requires rehearing.

### 2. The Order on Rehearing erred in its application of the PURA §§ 39.262 and 39.915 factors.

Rehearing should also be granted because the Order on Rehearing's findings on the three public interest factors in PURA §§ 39.262 and 39.915 are deficient as a matter of law to support the Order on Rehearing's denial of approval of the proposed transactions. As discussed above, any determination that a proposed transaction is not in the public interest and disapproved must be based on the Commission's consideration of whether the transaction *will* adversely affect the (1) reliability of service; (2) availability of service; or (3) cost of service of the utility.[66] While Findings of Fact Nos. 103, 104, and 105 in the Order on Rehearing purport to address these three factors, none finds that the proposed transactions actually *will* adversely affect service in the specified respects. Instead, under the heading "*Potential* Effects of Ring Fence Elimination," Findings 103, 104, and 105 each in a sentence merely opine that service hypothetically "*could be* adversely affected" and only if "*Oncor were to be subject to a NextEra Energy bankruptcy, without the protection of the [EFH] ring fence.*"[67] These speculative findings on their face do not meet the statutory requirement for denying approval of a proposed transaction.

Moreover, there is simply no credible substantial evidence in the record that the hypothetical circumstance of a NextEra Energy bankruptcy will come to pass. The Order on Rehearing itself cites no evidence to support any risk of a NextEra Energy bankruptcy filing. Nor could it. The undisputed evidence in the record showed that NextEra Energy has held an A- or higher credit rating for years and that NextEra Energy is expected to retain its A- rating following the close of the Oncor transaction.[68] In addition, as discussed below in Point of Error No. 8, the evidence is unequivocal that all three credit rating agencies, after considering the risks, determined that the outlook for NextEra Energy's credit ratings will remain stable and not result in any downgrade—much less present any risk of bankruptcy.[69] Further, all three credit rating agencies have concluded that NextEra Energy has a higher credit rating than Oncor itself.[70]

---

[66] *See* PURA §§ 39.262(m), 39.915(b).
[67] Order on Rehearing at Findings of Fact Nos. 103-105 (emphasis added).
[68] Tr. at 328:12-330:18 (Hickson Cross) (Feb. 22, 2017); NextEra Ex. 1 at 14:19-20; NextEra Ex. 4 at 31:6-11.
[69] NextEra Ex. 4 at 31:6-11; NextEra Ex. 6 at 24:6-25:8; *see also id.*, Exhibit JR-R-2.
[70] NextEra Ex. 6 at 23:15-19.

There is also no credible substantial evidence to support the further hypotheticals in Findings 103, 104, and 105 that Oncor might be exposed to a NextEra Energy bankruptcy without the existing Oncor ring fence, and that Oncor's provision of service, as a result of limited governance changes, could be adversely affected by a bankruptcy filing by NextEra Energy.  The Order on Rehearing does not analyze or even mention the protections afforded by the ring fence proposed by NextEra Energy, including the commitment that "[a]n affirmative vote by a majority of the Disinterested Directors shall be required to file Oncor into bankruptcy for the benefit of NextEra Energy."[71]  The Order on Rehearing makes no attempt to evaluate whether the ring-fencing protections proposed by NextEra Energy will be just as effective or provide even stronger protection from bankruptcy than Oncor's existing ring fence.

Indeed, the Order on Rehearing contains no analysis or mention whatsoever of the two key requirements for avoiding substantive consolidation of a utility's assets and liabilities into a parent company's bankruptcy, namely, that separate books and records are maintained and that creditors are not confused into expecting they can seek the utility's assets.[72]  NextEra Energy's regulatory commitments specifically address these two requirements.  The commitments include numerous provisions to ensure separation and arm's length interaction between Oncor and NextEra Energy and its affiliates.[73]  NextEra Energy has further committed that, in the event NextEra Energy's

---

[71] Attachment A at 3 (Regulatory Commitment No. 14).

[72] Tr. at 98:18-99:10 (Shapard Cross) (Feb. 21, 2017); Tr. at 183:16-184:4 (Shapard Redirect) (Feb. 21, 2017); *see also* Tr. at 282:9-15 (Hickson Cross) (Feb. 21, 2017).

[73] These measures include: (1) Oncor will maintain its separate existence as a separate entity with separate assets, franchises, obligations, and privileges (Regulatory Commitment No. 9); (2) Oncor will maintain detailed books, financial records and accounts, that are separate and distinct from those of NextEra Energy and its other affiliates (Regulatory Commitment No. 42); (3) transactions between Oncor and its competitive affiliates will be at arm's length in accordance with Commission Substantive Rule 25.272(e)(2) (Regulatory Commitment No. 25); (4) Oncor will maintain a separate board of directors (Regulatory Commitment No. 14); (5) Oncor's board of directors must approve Oncor's capital budgets, O&M expense budgets, and changes to Oncor's dividend policy (Regulatory Commitment Nos. 15 and 16); (6) Oncor will maintain a separate name and logo from its affiliates (Regulatory Commitment No. 51); (7) Oncor will maintain separate headquarters and management in Dallas County, Texas (Regulatory Commitment No. 8); (8) Oncor will maintain its debt separate and apart from NextEra Energy and its affiliates and subsidiaries and will maintain its own corporate and debt rating for its publicly traded securities (Regulatory Commitment No. 33); (9) Oncor's assets will not be pledged for any entity other than Oncor (Regulatory Commitment No. 31); (10) Oncor will not enter into inter-company debt transactions with affiliates of NextEra Energy and Oncor will not lend money to or borrow money from NextEra Energy and its affiliates (Regulatory Commitment No. 41); (11) Oncor will not share credit facilities with NextEra Energy or its affiliates (Regulatory Commitment No. 44); (12) Oncor will not incur or assume any debt related to the Proposed Transactions or future non-Oncor acquisitions by NextEra Energy (Regulatory Commitment No. 32); (13) Oncor will not incur or assume liability for the debts of NextEra Energy or its affiliates or subsidiaries or guarantee the debt or credit instruments of NextEra Energy or its affiliates (Regulatory Commitment No. 35); (14) NextEra Energy and its subsidiaries other than Oncor will not incur, guarantee, or pledge assets for any new debt that is disproportionately dependent on Oncor revenues or stock without first seeking Commission approval (Regulatory Commitment No. 2); (15) Oncor will not include in any of its debt or credit agreements cross-default provisions between Oncor's named securities and securities of NextEra Energy or any of its affiliates or subsidiaries and will not include in its debt or credit agreements any financial covenants or rating agency triggers related to NextEra Energy or other NextEra Energy affiliates (Regulatory Commitment No. 36). *See* Attachment A.

credit ratings, which are several notches above those of Oncor, were to be downgraded to below investment grade by any one of the three major credit rating agencies, NextEra Energy and its subsidiaries will provide advance notice of their corporate separateness from Oncor to lenders on all new debt, and will use commercially reasonable efforts to seek an acknowledgement of that separateness and non-petition covenants in all new debt instruments.[74]  NextEra Energy has made the additional commitment to provide the same advance notice of corporate separateness to all potential lenders of any new debt approved by the Commission that is disproportionally dependent on Oncor revenues or stock.[75]  NextEra Energy also committed to implement measures necessary to obtain a non-consolidation legal opinion in the event NextEra Energy's credit ratings were to be downgraded to below investment grade by any one of the three major rating agencies.[76]

The Order on Rehearing evaluates none of this.  Instead, the Order on Rehearing focuses solely on the existing EFH ring fence and summarily states that two of the restrictions in that ring fence, the board member appointment restriction and the minority interest owner veto restriction, "are among the most important," and that the existing ring fence was "critical in protecting Oncor from the [EFH] bankruptcy."[77]  As discussed below in Point of Error No. 9, these statements are not supported by the credible substantial evidence in the record, and they are at odds with established bankruptcy case law, also not addressed in the Order on Rehearing.[78]  These statements are also contradicted by the testimony of Oncor witness Mr. Shapard, who explained that the regulatory safeguards, such as the required maintenance of separate books and records, provide protections sufficient to insulate a utility from a parent bankruptcy and that "no operating utility has ever been consolidated into a holding company's bankruptcy."[79]

---

[74] *Id.* at 11 (Regulatory Commitment No. 71).

[75] *Id.* at 1 (Regulatory Commitment No. 2).

[76] *Id.* at 8 (Regulatory Commitment No. 50).  A legal non-consolidation opinion would opine that a bankruptcy court would not consolidate Oncor's assets and liabilities with those of NextEra Energy in the highly unlikely event of a NextEra Energy bankruptcy.

[77] Order on Rehearing at § I.D. & Finding of Fact No. 94; *see also id.* at Findings of Fact Nos. 95-96, 99.

[78] *See* NextEra Energy's Initial Brief at 33; *see also In re Eagle-Picher Industries, Inc.*, 192 B.R. 903, 905 (Bankr. S.D. Ohio 1996) ("A review of the case law dealing with substantive consolidation makes it clear that the decisions on the subject are fact intensive, and decisions are made on a case-by-case basis"); *In re Donut Queen*, Ltd., 41 B.R. 706, 709 (Bankr. E.D.N.Y. 1984).

[79] Tr. at 184:1-4 (Shapard Redirect) (Feb. 21, 2017); Tr. at 98:22-99:10 (Shapard Cross) (Feb. 21, 2017); *see also* Tr. at 282:9-15 (Hickson Cross) (Feb. 21, 2017).

Finally, leaving aside the bankruptcy hypotheticals in Findings 103, 104, and 105, the Order on Rehearing failed to acknowledge the evidence establishing that the three factors in §§ 39.262 and 39.915 were satisfied because the proposed transactions will support and enhance, not adversely affect, Oncor's continued provision of reliable service to its customers.[80]  The record conclusively established that NextEra Energy is a strong, capable, and experienced partner for Oncor, and that its operational strengths complement those of Oncor.[81]

For all of these reasons, the Commission should grant rehearing and issue a new Order on Rehearing to correct the Order on Rehearing's erroneous interpretation and application of PURA §§ 39.262 and 39.915.  The new Order on Rehearing should respect the Legislature's instruction that approval or disapproval of a transaction must be based only on the three criteria specified in those provisions.  The new Order on Rehearing should recognize that concerns about the "potential effects" of a hypothetical NextEra Energy bankruptcy are not a permissible basis for outright disapproval of the proposed transactions, and that such concerns can properly be addressed through appropriate conditions on approval.  Without these corrections, the Order on Rehearing violates the statute, is in excess of the Commission's authority, is arbitrary and capricious and an abuse of discretion, and is not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole.[82]

---

[80] Specifically:
- Mr. Shapard, Mr. Greer, and Ms. Constance McDaniel Wyman testified that Oncor's customers at a minimum should not notice any change from the safe and reliable service that they currently enjoy. Oncor Ex. 1 at 11:27-30; Oncor Ex. 3 at 10:18-21; Staff Ex. 2 at 7:12-8:2.  Oncor, Staff, and NextEra Energy witnesses specifically established that availability of that service will not be adversely affected[80] and that there would be no decline in service.  Oncor Ex. 1 at 19:26-29; NextEra Ex. 1 at 37:12-38:7; NextEra Ex. 3 at 12:3-18; Staff Ex. 2 at 7:12-8:2.
- NextEra Energy has committed to full, unconditional funding of the capital expenditures in Oncor's current long-range plan for five years from the date of closing.  Attachment A at 2 (Regulatory Commitment No. 10).  Mr. Shapard observed that this commitment to Oncor's robust capital expenditure program has the potential to improve service.  Oncor Ex. 1 at 17:24-18:2.
- NextEra Energy has made specific SAIDI and SAIFI commitments to ensure Oncor's continued system reliability.  Attachment A at 1-2 (Regulatory Commitment Nos. 5 & 6).
- NextEra Energy intends to rely on Oncor local management and employees to continue to operate and manage the Oncor system in the same safe and reliable manner as today.  NextEra Ex. 1 at 38:23-39:2.
- Mr. Ragland testified that the proposed transactions will not adversely affect Oncor's cost of service. Oncor Ex. 4 at 7:10-25.  His conclusion is supported by proposed regulatory commitments that assure continued compliance with Oncor's previous rate settlements, as well as assure that Oncor's customers will not bear any fees and expenses associated with the proposed transactions or any expenses or liabilities related to EFH's bankruptcy.  Attachment A at 4, 5-6, 8 (Regulatory Commitment Nos. 18, 29, 30, and 53).

[81] *See* NextEra Ex. 3 at 3:11-11:17.

[82] *See* APA § 2001.174.

E.     **POINT OF ERROR NO. 5 – The Order on Rehearing's departure from statutory requirements and disregard of NextEra Energy's regulatory commitments are error that cannot be justified by references to the Commissioners' "conversation" with NextEra Energy Chairman and Chief Executive Officer James L. Robo in an open meeting.[83]**

PURA §§ 39.262 and 39.915 expressly authorize an applicant to file regulatory commitments as part of a sale-transfer-merger application.[84]  Upon consideration of these commitments, the Commission has authority to include them as conditions on approval of a transaction to the extent that the commitments are consistent with the public interest standards in §§ 39.262, 39.915 and 14.101.[85]  By statute, the Commission may reasonably interpret and enforce any conditions adopted.[86]

These provisions serve two important purposes.  They provide for the Commission's careful review of commitments made as part of an application, and they ensure that the public interest will be protected with appropriate conditions when a transaction is entitled to be approved under the three criteria for approval in PURA §§ 39.262 and 39.915.

The Commission has consistently fulfilled this statutory responsibility in past sale-transfer-merger cases by considering the applicant's regulatory commitments and accepting them or imposing such additional conditions as necessary to support the public interest.  The *Ovation* case again is highly illustrative because it involved Oncor and was decided only last year.  The Commission's Order in *Ovation* considered all of the applicants' ring-fencing and other commitments, adopted many of them, and added other conditions of approval to address and compensate ratepayers for the unique risks presented by the applicants' proposal to break Oncor into two companies within a novel corporate structure.[87]  The Commission described its Order on Rehearing as "a balanced approach" that tailored the selected conditions to the risks presented.[88]

In this case, the Commission's Order on Rehearing abandoned past practice and did not conduct the balanced regulatory commitment analysis contemplated by the statute and Commission precedent.  NextEra Energy introduced into evidence an expansive set of 73 regulatory commitments,[89] yet the Order on Rehearing did not examine them.  Nor did the Order

---

[83] *See* Order on Rehearing at § I.D., F.; Findings of Fact Nos. 36, 106-116; Conclusions of Law Nos. 5, 7; and Ordering Paragraphs Nos. 1-2.
[84] PURA §§ 39.262(o) and 39.915(d).
[85] *See id.*
[86] *Id.*
[87] *See* Docket No. 45188, Order at 4-5.
[88] *Id.* at 15.
[89] *See* Attachment A.

on Rehearing consider "[w]hat other regulatory commitments should the Commission require to ensure that the proposed transaction is in the public interest," as provided for by the Preliminary Order.[90]  Instead, the Order on Rehearing summarily denied approval.

The Order on Rehearing seeks to justify its departure from statutory procedure and past Orders in large part on the basis of what the Order on Rehearing describes as a "conversation" between the Commission and Mr. James L. Robo, NextEra Energy's Chairman and Chief Executive Officer.[91]  This conversation took place at an open meeting and is not part of the evidentiary record.  The Order on Rehearing states that the conversation confirmed the Commission's understanding that the proposed transactions would not close if the Commission were to impose two conditions on approval: First, that a majority of the members of the Oncor Board of Directors must be both independent and disinterested, and second, that such members have the right to veto dividends.[92]  The Order on Rehearing declared that there was no need for the Commission to review and list any other "theoretical conditions," and that the proposed transactions should be "denied outright, because of the importance of these two conditions."[93]

This summary declaration and disposition impermissibly short-circuits the statutory procedure.  NextEra Energy worked painstakingly over the course of this proceeding to craft its 73 regulatory commitments, which are designed to serve the public interest consistent with the standards in PURA §§ 14.101, 39.262, and 39.915.  Many of these commitments were responsive to and adopted based on the recommendations and concerns of other parties.  PURA §§ 39.262(o) and 39.915(d) provide for Commission consideration of these commitments and whether they are consistent with the standards in PURA.  This statutory procedure itself serves the public interest by ensuring that each of the proposed protections and benefits are fully considered, both individually and collectively.  Upon consideration, the Commission may adopt those commitments if they meet the statutory standards and may impose additional conditions if found also necessary to the public interest.

That is the statutory procedure.  What the Commission may not do is jump ahead as a matter of expediency and deny an application outright on the basis of pre-selected conditions.  As discussed above, PURA authorizes outright disapproval of a transaction only when a transaction

---

[90] Preliminary Order at 8 (Issue No. 36).  As discussed below in Point of Error No. 11, the Commission had an obligation to address the issues set forth in the Preliminary Order.

[91] Order on Rehearing at § I.D. and Finding of Fact No. 36.

[92] Id. at § I.D.

[93] Id. at §§ I.D., I.F. and Finding of Fact No. 101.

will adversely affect the provision of utility service, which is not the case here.  The Order on Rehearing's failure to follow the statutory procedure is error that must be corrected.

**F.     POINT OF ERROR NO. 6 – The Order on Rehearing erred by failing to disclaim jurisdiction over the proposed transaction with TTHC.[94]**

At its very first open meeting to consider the application in this proceeding, the Commission recognized the need to address a threshold jurisdictional issue: Whether the Commission has jurisdiction under PURA to review the transaction with TTHC to acquire a 19.75 percent minority ownership interest in Oncor.[95]  The TTHC agreement was negotiated separately from the EFH merger agreement, which provides for the acquisition of EFH's 80 percent majority ownership interest in Oncor.[96]  In accordance with its open meeting discussion, Issue No. 39 in the Preliminary Order asks whether "NextEra Energy's acquisition of Texas Transmission Investment's 19.75% interest in Oncor constitutes a change in control for purposes of PURA §§ 14.101, 39.262(l) or 39.915(a)."[97]

Despite its recognition of the need to address this threshold jurisdictional issue, the Commission failed to do so in its original final order.  The Order on Rehearing corrects this omission, but erroneously rules that PURA §§ 39.262(*l*)(3) and 39.915(a)(3) confer jurisdiction over the TTHC transaction on the basis that TTHC's 19.75% minority ownership interest constitutes the transfer of a controlling interest or operational control in Oncor "because of [TTI's] right to control the dividend policy of Oncor, as well as to veto Oncor's capital and operations and maintenance expense budgets."[98]  This statement is erroneous.  First, TTI does not have the right to control Oncor's dividend policy; it is the Oncor Board of Directors that determines Oncor's dividend policy.[99]  Further, the right of TTI-appointed directors to veto dividends declared by the Board can be exercised only when it is determined that Oncor requires such amounts to meet expected future revenue requirements.[100]

Also erroneous is the Order on Rehearing's unqualified statement that TTI may veto Oncor's capital and operations and maintenance expense budgets.[101]  This veto right may only be

---

[94] Order on Rehearing at § I; Finding of Fact No. 51; Conclusions of Law Nos. 1-2; Ordering Paragraphs Nos. 1-3.
[95] Open Meeting Tr. at 17:6-18:25 (Dec. 1, 2016).
[96] *See* NextEra Ex. 1 at Exhibit MH-1, Exhibit MH-2.
[97] Preliminary Order at 9 (Issue No. 39).  Texas Transmission Investment, LLC ("TTI") is the subsidiary of TTHC that directly owns the 20 percent minority ownership interest in Oncor.  NextEra Ex. 1 at 3:22-4:9.
[98] Order on Rehearing at Conclusion of Law No. 2; *see also id.* at § I.A. and Finding of Fact No. 51.
[99] Tr. at 177:7-9 (Shapard Cross) (Feb. 21, 2017).
[100] Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company, LLC at § 17(d)(v) (Nov. 5, 2008).
[101] *See* Order on Rehearing at § I.D.

exercised if the Oncor Board approves a budget that is 10 percent lower than the previous year.[102] Further, as a practical matter, a "controlling interest" gives a shareholder or group of shareholders significant influence over the actions of a company.  Here, TTI holds only a 19.75 percent direct interest in Oncor with an approximate 80 percent ownership interest indirectly held by EFH.  TTI holds only two seats on Oncor's 12-member Board of Directors, and none of the veto rights held by the minority owner convey the independent authority to take any action that would impact Oncor's reliability, availability, or cost of service.  Rehearing is therefore required because the Commission's jurisdictional ruling is based on the factually erroneous premise that TTI exercises broader powers than is the case.

Finally, it is important to remember that the rating agencies, not the Commission, were the ones that required EFH to sell this non-controlling minority ownership interest in Oncor.  The rating agencies required this sale to avoid a downgrade in Oncor's credit rating under EFH ownership.[103]  The Commission properly did not claim jurisdiction under PURA over the sale of the 19.75 percent minority ownership interest in Oncor in 2008[104] and there is no basis to do so now.

For these reasons, the Commission should grant rehearing to correct the errors in the Order on Rehearing and disclaim jurisdiction over the TTHC transaction.[105]

**G.    POINT OF ERROR NO. 7 – The Commission erred in holding that the TTHC transaction was not presented as a separate transaction and that there was no evidence to support the stand-alone transaction.[106]**

In its initial motion for rehearing, NextEra Energy raised as error the fact that the Commission did not address approval of NextEra Energy's transaction with TTHC on a stand-

---

[102] *See* NextEra Ex. 4 at 52:13-15; Direct Testimony of Randall Vickroy, Staff Ex. 3A at 31:19-21.

[103] Notably, the credit rating agencies have taken the opposite view and regard the elimination of the minority ownership interest as a credit positive for Oncor if NextEra Energy is allowed to obtain EFH's majority ownership interest.  *See* NextEra Ex. 4 at 36:1-38:3.

[104] TTHC closed its transaction acquiring the 19.75% minority interest in Oncor in 2008 without obtaining Commission approval under PURA §§ 39.262 or 39.915.  *Cf.* Docket No. 34077, Order on Rehearing, Finding of Fact No. 75 (2008) (providing only that, if a minority interest in Oncor was sold, it be sold to a party that was not affiliated with and was independent from the purchasers of TXU).

[105] The Order on Rehearing correctly does not assert jurisdiction based on PURA §§ 39.262(*l*)(1) or (*l*)(2) or 39.915(a)(1) or (a)(2).  These subsections confer jurisdiction over a transaction that will (1) merge or consolidate a utility with another utility, or (2) sell or transfer at least 50 percent of a utility's stock.  The TTHC transaction involves neither a merger nor consolidation of Oncor with another utility nor the sale or transfer of 50 percent or more of Oncor's stock.  PURA § 14.101 likewise does not confer jurisdiction over the TTHC transaction.  PURA § 14.101 does not apply because the TTHC transaction does not involve the sale of plant as an operating unit or system, the merger or consolidation with another public utility operating in Texas, or the sale of at least 50 percent of a utility's stock.  *See* PURA §§ 14.101(a), (b).

[106] Order on Rehearing at § I.A.; Findings of Fact Nos. 117, 119; Conclusions of Law Nos. 8-9; Ordering Paragraph No. 3.

alone basis.[107]  In the Order on Rehearing, the Commission agreed that "the application requested Commission approval of two, separately negotiated private transactions,"[108] but went on to hold that NextEra Energy did not seek approval of the TTHC transaction on a stand-alone basis, and if it had, no evidence exists in the record that could to support a public interest decision limited to the stand-alone TTHC transaction.[109]

The determination that NextEra Energy did not present the TTHC transaction as a stand-alone transaction is incorrect.  Not only were the EFH and TTHC transactions presented as two, separately negotiated transactions, the evidence presented at the hearing establishes that it is a stand-alone transaction.[110]  NextEra Energy specifically requested authority to conduct an initial public offering ("IPO") in the event that the TTHC transaction did not close.[111]  A review of Exhibit MH-4 showing the transaction structure post-IPO illustrates that NextEra Energy could have successfully closed the EFH transaction without approval of the TTHC transaction by conducting an IPO in which TTI remained the minority interest owner of Oncor.  This evidence disproves the statement in the Order on Rehearing that the application "highlighted the interconnected nature of the transactions."[112]

Moreover, contrary to the Order on Rehearing, NextEra Energy presented evidence that the acquisition of TTI's interest through the TTHC transaction satisfied the statutory criteria for approval.  Both NextEra Energy and Oncor testified that the proposed transactions, which include the TTHC transaction would not adversely affect the reliability, availability, or cost of Oncor's service.[113]  No party presented evidence that the TTHC transaction was *not* in the public interest. Additionally, no party argued that approval of the TTHC transaction would adversely affect the reliability, availability, or cost of Oncor's service.  Rather, such arguments were limited to the removal of certain components of the ring-fence.  And, the Commission's Order on Rehearing bases its adverse impact findings exclusively on the elimination of certain of Oncor's ring-fence protections.[114]

---

[107] NextEra Energy's Motion for Rehearing at 23-24 (May 8, 2017).
[108] Order on Rehearing at Finding of Fact No. 47.
[109] Order on Rehearing at § I.A., Finding of Fact No. 119, Conclusions of Law Nos. 8-9; Ordering Paragraph No. 3.
[110] NextEra Ex. 4 at 5:20-6:6, 52:20-22; NextEra Ex. 1 at 3:22-4:9, 19:3-18, Exhibit MH-1 (EFH Merger Agreement), Exhibit MH-2 (TTHC Merger Agreement).
[111] Application at 8-9 (Oct. 31, 2016); NextEra Ex. 4 at 52:1-19; NextEra Ex. 1 at 19:3-19.
[112] Order on Rehearing at § I.A.
[113] Oncor Ex. 1 at 19:20-20:6; Oncor Ex. 3 at 11:13-23; Oncor Ex. 4 at 7:10-25; NextEra Ex. 3 at 12:3-18; NextEra Ex. 4 at 24:17-25:3; *see also* NextEra Ex. 1 at 37:12-38:7; NextEra Ex. 4 at 65:2-17.
[114] Order on Rehearing at Findings of Fact Nos. 103-105.

Importantly, the TTHC transaction on a stand-alone basis does not implicate these ring-fence protections. If approved, NextEra Energy would simply step into the shoes of TTI and hold the same minority rights as TTI currently holds. Thus, the Commission's findings on this issue provide no basis for denial of the TTHC transaction on a stand-alone basis. In short, public interest evidence supporting the TTHC transaction is present in the record and the Order on Rehearing erred in reaching a contrary conclusion.[115]

Finally, in its Preliminary Order, the Commission identified Issues 39 through 48 to be addressed related to the "Acquisition of Texas Transmission Investment's Interest in Oncor."[116] Together with their subparts, the Preliminary Order lists twenty-five issues to be addressed specifically dealing with the TTHC transaction. These issues are, however, not addressed in the Order on Rehearing. Rehearing should be granted to correct these errors and the error as discussed in Point of Error No. 12.

**H.    POINT OF ERROR NO. 8 – The Order on Rehearing erred by finding that the proposed transactions would subject Oncor and Oncor ratepayers to increased risks.[117]**

The Commission should grant rehearing to reconsider the Order on Rehearing's findings that the proposed transactions would expose Oncor and Oncor ratepayers to increased risks. It is a "well-established rule that the standard of proof for any administrative agency finding can never be less than a preponderance of the evidence."[118]  A reviewing court may then evaluate those findings under the APA to determine whether or not the findings are "reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole" and whether they are affected by an error of law in other respects.[119]  Rehearing is required because the Order on Rehearing's findings on increased risk do not comport with these APA standards.

NextEra Energy urges the Commission to reevaluate the two paragraphs in the Order on Rehearing that address the issue of risk, along with the 12 findings of fact culled from those paragraphs, and consider these questions:

---

[115] The Order on Rehearing also went on to erroneously hold that if NextEra Energy was asking for approval of the TTHC transaction in its motion for rehearing, that NextEra Energy had not carried its burden of proof on the public interest determination. *See id.* at Conclusion of Law No. 9. This too is erroneous. NextEra Energy expressly requested approval of the TTHC transaction in its Application and Mr. Reed in his Direct Testimony stated that approval of the TTHC transaction was in the public interest. *See* NextEra Ex. 4 at 52:20-22.

[116] Preliminary Order at 9-10 (Issue Nos. 39-48).

[117] Order on Rehearing at § I.B.; Findings of Fact Nos. 66-77, 99, 113-115.

[118] *Southwestern Public Serv. Co. v. Public Util. Comm'n,* 962 S.W.2d 207, 213 (Tex. App.—Austin 1998, pet. denied).

[119] *Id.*; APA § 2001.174.

1) In finding that Oncor's "diversified structure" would subject Oncor to increased risks, did the Order on Rehearing take into consideration the record evidence that diversification actually decreases risk, and that linking Oncor's credit profile to NextEra Energy's profile accordingly will reduce Oncor's risk and improve Oncor's credit ratings?

2) In finding that Oncor would be required to support its pro rata share of NextEra Energy's consolidated debt, did the Order on Rehearing take into consideration that Oncor would be relieved of the heavier burden of being 100 percent responsible to service the $11 billion in debt that resides directly above Oncor at EFH and EFIH?  Did the Order on Rehearing also consider that NextEra Energy has more than $7 billion of annual operating cash flows to service its consolidated debt, and that NextEra Energy through financial discipline has consistently maintained an A- or higher credit rating for years?

3) In focusing on a single sentence in a Moody's Investors Service report stating that the acquisition would "exhaust NextEra Energy's debt capacity at its current rating," did the Order on Rehearing take into consideration the report's further assessment that this constraint would be short-lived over the 2017-2018 period, and Moody's conclusion that the Oncor acquisition is a credit positive warranting affirmation of NextEra Energy's credit ratings and stable outlook?

4) In finding that NextEra Energy's competitive businesses would increase risk to Oncor, did the Order on Rehearing take into consideration that the vast majority of NextEra Energy's portfolio is not competitive merchant generation but instead lower risk rate-regulated and long-term contracted generation?

5) Before concluding that the proposed transactions would increase the risks to Oncor and its customers, did the Order on Rehearing evaluate the comparative risks of leaving Oncor subject to the credit rating contagion of EFH's ownership, with exposure to the EFH legacy asbestos and federal tax liabilities and a continuing burden to service the EFH/EFIH debt?

6) Did the Order on Rehearing as a factual matter misapprehend the amount of debt funding that will be required to finance the proposed transactions?

To assist the Commission in its consideration of the core issue of risk, NextEra Energy addresses each of these points below in detail, with references to the evidentiary record.

**1.     The Order on Rehearing erred by finding that that the "expansive and diversified structure" of NextEra Energy and its affiliates would subject Oncor and Oncor ratepayers to increased risk.**

The Order on Rehearing erroneously found that NextEra Energy's "expansive and diversified structure" would subject Oncor to increased risks.[120]  The record evidence established to the contrary that the risk to Oncor would be reduced precisely because NextEra Energy's business is widely diversified.  When a business is widely diversified, the risk exposure to any

---

[120] Order on Rehearing at § I.B.

single company within the enterprise is decreased, not increased.[121]   NextEra Energy itself consequently has less overall risk than Oncor, as shown by the fact that NextEra Energy's credit ratings are several notches higher than Oncor's.[122] By linking Oncor's credit profile with NextEra Energy, the proposed transactions will reduce Oncor's risk and thereby improve Oncor's credit ratings.[123]

The record evidence on this issue is unequivocal and reflected in the credit rating reports of all three credit rating agencies:  Moody's upgraded Oncor's credit rating immediately when the EFH transaction was announced, and indicated that Oncor would be eligible for an additional two-notch upgrade if the proposed transactions closed; Fitch placed Oncor on positive watch for a probable one-notch upgrade of Oncor's issuer default rating and a likely two-notch upgrade of Oncor's senior secured debt; and Standard & Poor's likewise revised Oncor's credit outlook to positive to reflect the potential for higher ratings as a result of the proposed transactions.[124]  All three rating agencies further indicated that NextEra Energy will retain its own stable and strong credit ratings following the close of the proposed transactions.[125]

These determinations were the result of expert analysis by credit rating agencies whose assessments are routinely relied upon by the capital markets in evaluating credit risk.[126]  The Order on Rehearing erred by failing to consider or even mention this evidence, which goes to the heart of the risk issue in this case.

**2.      The Order on Rehearing erred by basing its determination of increased risk to Oncor and Oncor ratepayers on isolated excerpts from two credit rating agency documents.**

Instead of considering the credit rating agencies' actual determinations that the proposed transactions would reduce the overall risk to Oncor and improve Oncor's credit rating, the Order on Rehearing erroneously relied on isolated excerpts from one Moody's report and one Fitch assessment.

The Order on Rehearing recited a sentence in a Moody's report that the funding of the Proposed Transactions would "exhaust NEE's debt capacity at its current rating and make the company more vulnerable to unforeseen events."[127]   The Order on Rehearing overlooked,

---

[121] *See* NextEra Energy Ex. 6 at 17:22-18:3; 15:10-16.
[122] *Id.* at 23:6-25:8; *see generally* NextEra Ex. 4, Exhibit JR-6.
[123] NextEra Ex. 6 at 25:3-5, 66:22-67:5.
[124] *Id.* at 24:14-25:2.
[125] *Id.* 6 at 24:6-25:8; *see also id.*, Exhibit JR-R-2.
[126] Tr. at 182:6-8 (Shapard Redirect) (Feb. 21, 2017).
[127] *See* Order on Rehearing at § I.B. & Finding of Fact No. 71 (citing NextEra Ex. 4, Exhibit JR-6 at 5).

however, that Moody's expected these circumstances to be only temporary given NextEra Energy's "solid record of project execution."[128]  Thus, the Moody's report does not support and actually refutes the Order on Rehearing's findings.

The Order on Rehearing also erred in relying on a Fitch assessment, which itself is not in the record.  The Order on Rehearing references this document by citing the testimony of TIEC witness Mr. Griffey.  Mr. Griffey extracted a portion of the document, taken from a section that is standard in Fitch assessments that listed possible future developments.   While Mr. Griffey represented that Fitch indicated that this "could lead to a downgrade" of NextEra Energy,[129] the record is devoid of any independent confirmation of his representation and this slice of testimony on its face does not establish that the transactions would subject Oncor to increased risk.  To the contrary, Moody's and Fitch's *complete* evaluations of the transactions indicated that NextEra Energy would maintain its strong credit rating and that Oncor's credit rating would improve as a reflection of reduced risk.[130]

**3.    The Order on Rehearing erred by finding that Oncor's contribution to payment of NextEra Energy's consolidated debt following the close of the proposed transactions would result in increased risk to Oncor and Oncor ratepayers.**

The Order on Rehearing erroneously concluded that the proposed transactions will result in increased risk to Oncor based on a finding that the revenues of Oncor would support its pro-rata share of the approximately $45 billion of consolidated debt at NextEra Energy.[131]  The Order on Rehearing noted that some parties asserted that Oncor's share would be 15 percent,[132] which would mean that Oncor revenues would support $6.75 billion out of the total consolidated debt of NextEra Energy.  Even if the 15 percent figure was supported by the record, which it is not,[133] the Order on

---

[128] NextEra Ex. 4, Exhibit JR-6 at 5 (stating that NextEra Energy's "solid record of project execution . . . supports the likelihood of a steady recovery in its credit metrics over the 2017-2018 period").  This expectation was confirmed by NextEra Energy witness Mr. Hickson.  *See* Tr. 362:19-363:1 (Hickson Cross), 406:16-23 (Hickson Redirect) (Feb. 22, 2017).  NextEra Energy witness Mr. Reed further observed that it is "common that the acquirer stretches in the first year to meet those targets and then it looks to improve its credit metrics after that." Tr. at 504:5-12 (Commissioner Questions) (Feb. 22, 2017).

[129] Direct Testimony of Charles Griffey, TIEC Ex. 1 at 49:2-18.

[130] *See* NextEra Ex. 4, Exhibit JR-6 at 1-4 (Moody's Rating Action for Oncor, dated July 29, 2016), 5-10 (Moody's Rating Action for NextEra Energy, dated July 29, 2016), 11-13 (Moody's Issuer Comment for Oncor and NextEra Energy, dated August 1, 2016), and 30-34 (Fitch Ratings Outlook for NextEra Energy, dated August 1, 2016).

[131] Order on Rehearing at § I.B. and Findings of Fact Nos. 66-72.

[132] *Id.*, § I.B. and Finding of Fact No. 70.

[133] The only statement regarding the percentage appears in the transcript of the Open Meeting on February 23, 2017, which is not part of the evidentiary record.  Open Meeting Tr. at 13:11-14:18 (Feb. 23, 2017).  The Commission specifically ruled that statements made during the Open Meeting were not to be considered evidence.  Tr. at 556:17-557:13 (Comm'r Discussion) (Feb. 23, 2017); *see also id.* at 557:16-562:13, 567:10-19 (parties stating agreement on the record).

Rehearing failed to consider, that Oncor revenues now support 100 percent of the $11 billion in EFH/EFIH legacy debt that resides above Oncor.[134]  These numbers establish that Oncor's debt burden would decrease, not increase, as result of the proposed transactions, and that the risk to Oncor would thereby decrease, not increase as stated in the Order on Rehearing.

Moody's has been clear that the existing EFH and EFIH debt above Oncor is a significant risk that the proposed transactions will eliminate:

> The acquisition by a traditional, strategic player will remove the contagion risks of EFH and provides a more transparent view of Oncor's credit profile.  The approximately $10 billion of debt that exists above Oncor … will be extinguished. As a result, Oncor's rating will no longer be constrained by the EFH and EFIH debt burden that was secured by the implied equity value of Oncor and looked to Oncor for its debt service expenses.[135]

The record is further undisputed that the proposed transactions will eliminate this Oncor-dependent debt, now $11 billion, in its entirety by expunging a portion and refinancing approximately $7.5 billion of debt as a part of NextEra Energy's consolidated debt.[136]  Moreover, NextEra Energy, in Regulatory Commitment No. 2, ensures that under NextEra Energy ownership the risk of over-reliance on Oncor cash flows will not re-occur in that no new debt will be disproportionately dependent on Oncor revenue or stock unless approved by the Commission.[137]

The Order on Rehearing ignored these facts and inexplicably assumed that no debt currently resides above Oncor.  Oncor's $11 billion EFH debt burden cannot be assumed away.  The debt burden is real, and the proposed transactions would eliminate that burden in favor of a substantially less onerous requirement to make a pro rata contribution to the payment of NextEra Energy's consolidated debt.  The Order on Rehearing's finding that Oncor's pro rata contribution to the payment NextEra Energy's debt would result in increased financial risk to Oncor is error that requires correction.

**4.    The Order on Rehearing erred by finding that NextEra Energy's competitive businesses would subject Oncor and Oncor ratepayers to increased risks.**

The Order on Rehearing erred by finding that NextEra Energy's competitive businesses (described in the Order on Rehearing as "unregulated" businesses) would result in increased risk to Oncor and Oncor ratepayers.  To support this finding, the Order on Rehearing relied on the portion of testimony of Intervenor witness Mr. Smith that recited verbatim the potential "Risk

---

[134] *See* NextEra Ex. 4 at 13:4-8; NextEra Ex. 5 at 4:1-14.
[135] NextEra Ex. 4, Exhibit JR-6 at 1.
[136] *See* NextEra Ex. 4 at 34:19-35:2; NextEra Ex. 6 at 7:12-16.
[137] Attachment A at 1 (Regulatory Commitment No. 2).

Factors" presented in NextEra Energy's SEC Form 10-K.[138]  The mere recitation of risk factors does not support the Order on Rehearing's finding of increased risk because it fails to consider that the breadth and scale of NextEra Energy's operations, which results in reduced exposure to risk in the aggregate.[139]  As discussed above, the rating agencies unanimously concluded that NextEra Energy is less risky than Oncor.[140]  The Order on Rehearing erred by relying on the mere recitation of Form 10-K list of risk factors and by not considering the rating agencies' analysis and conclusions regarding those risks.[141]

The Order on Rehearing similarly erred in relying on the testimony of Staff witness Mr. Vickroy, who briefly described the wholesale generation and other non-utility businesses owned by NextEra Energy subsidiaries, and then made the conclusory statement that the wholesale generation business is riskier than Oncor's business.[142]  Like the Order on Rehearing itself, this testimony failed to consider how small the proportion of NextEra Energy's actual merchant generation is relative to the Company's overall portfolio.  It is undisputed that 92 percent of NextEra Energy's portfolio as a whole is either rate-regulated or long-term contracted under 16-year weighted average life contracts with creditworthy counterparties.  Stated differently, 86 percent of NextEra Energy's adjusted earnings in 2016 came from lower-risk rate-regulated and long-term contracted generation.[143]  The Order on Rehearing's finding of increased risk to Oncor and Oncor ratepayers failed to take into consideration these critical undisputed facts regarding the overall makeup of the Company's competitive business portfolio.[144]

The Order on Rehearing further erred in finding that the proposed transactions would result in increased risk because, as "a result of the spin-off of Texas Competitive Energy Holdings, Oncor is not currently subject to risks related to unregulated generation development."[145]  Oncor has operated without competitive affiliates for a mere matter of months, whereas Oncor operated with very large Texas competitive affiliates under the ownership of TXU Corporation for approximately six years and under the ownership of EFH for about nine years.[146]  There is no record basis for the

---

[138] Order on Rehearing at 5 n.16 (citing Direct Testimony of Ralph Smith, Joint TIEC, Cities, and OPUC Ex. 1 at 39-40).

[139] NextEra Ex. 6 at 14:14-18:3.

[140] *See id.* at 23:6-24:5; *see generally* NextEra Ex. 4, Exhibit JR-6.

[141] *See* NextEra Ex. 6 at 24:2-5.

[142] Staff Ex. 3A at 22:24-25.

[143] NextEra Ex. 38.

[144] The Order on Rehearing also erred in basing its finding on the testimony of TIEC witness Mr. Griffey, as discussed above in this Point of Error.

[145] Order on Rehearing at § I.B.; *see also id.* at Finding of Fact No. 74.

[146] Rebuttal Testimony of Jess Totten, NextEra Ex. 7 at 28:8-10.

Order on Rehearing's implicit assumption that Oncor will have no competitive affiliates under any alternative transaction that might be approved by the bankruptcy court and presented to the Commission if the EFH transaction in this case is not permitted to close.  Nor does the Order on Rehearing take into consideration how the breadth and diversified composition of NextEra Energy's total portfolio, or its de-risked strategy of entering into long term power purchase agreements for the output of those projects from creditworthy counterparties, mitigates risk, as discussed above.

For these reasons, the Order on Rehearing erred by finding that NextEra Energy's competitive businesses would subject Oncor and its customers to increased risks.

**5.    The Order on Rehearing erred by failing to consider the significant risks of maintaining the "status quo" and requiring Oncor to remain under a bankrupt parent.**

The Order on Rehearing erred by failing to consider the significant risks if the proposed transactions do not close and Oncor is compelled to remain under a bankrupt parent.  EFH has been in bankruptcy for three years, and faced insurmountable financial challenges for years before that.  The Order on Rehearing is silent on the alternatives for Oncor if the EFH transaction does not close, finding only that Oncor has been able to provide safe and reliable service during the course of the EFH bankruptcy.[147]

The Commission should grant rehearing to consider the risks and other consequences of disapproving the transactions and leaving Oncor to face the continued bankruptcy of its parent company.  The record evidence demonstrates that allowing Oncor to remain under a bankrupt parent with the prospect of a stand-alone equitization or a hypothetical alternative transaction would be riskier and less beneficial than NextEra Energy ownership.

Specifically, the record demonstrates that rejection of the proposed transactions would leave Oncor subject to continuing risk and credit rating contagion of EFH's ownership, including exposure to the EFH legacy liabilities and the burden of servicing the approximately $11 billion in debt that currently resides directly above Oncor.[148]  Approximately $5.5 billion of that total is post-filing Debtor in Possession financing that must be repaid in cash or refinanced.[149]  The record shows that a stand-alone equitization scenario posited by some parties would leave much of this

---

[147] Order on Rehearing at § I.C. and Findings of Fact Nos. 85-88.
[148] NextEra Ex. 6 at 19:4-12.
[149] *Id.* at 20:2-5; *see also* Rebuttal Testimony of Robert S. Shapard, Oncor Ex. 5 at 4:17-21.  On June 26, 2017, the Bankruptcy Court authorized the Debtors to refinance the Debtor in Possession financing in an amount equal to $6.3 billion.

debt and these legacy liabilities in place above Oncor.[150]  The record further shows that Oncor and, ultimately, its customers will incur higher than necessary borrowing rates and debt costs under EFH's ownership.  Oncor's Senior Vice President and Chief Financial Officer Mr. David Davis estimated Oncor's debt cost savings under NextEra Energy's ownership to be in the range of $360-600 million by 2045.[151]  The Order on Rehearing gives no consideration to continued incurrence of this unnecessary expense by Oncor's customers.  In short, there is no credible evidence in the record to support a conclusion that a hypothetical alternative purchaser or a stand-alone equitization would address these debt and legacy liability issues or provide the other benefits and protections offered by the proposed transactions.

> **6.    Finding of Fact No. 63 in the Order on Rehearing is factually erroneous and, together with Finding of Fact No. 64, reflects the Order on Rehearing's misunderstanding regarding the amount of debt funding that will be required to finance the proposed transactions.**

Finding of Fact No. 63 in the Order on Rehearing states that NextEra Energy's proposed financing of the $9.8 billion to acquire EFH's 80 percent ownership interest in Oncor entails $7.5 billion of new debt financing.  This finding is factually erroneous.  The $7.5 billion in expected new debt financing reflects both the $9.8 billion acquisition of EFH's 80 percent interest and the $2.4 billion acquisition of TTHC's 19.75% interest.  NextEra Energy witness Mr. Hickson testified specifically to this point at the hearing.[152]  Because Finding of Fact No. 64 separately addresses the $2.4 billion funding for TTHC's interest, the Order on Rehearing reflects a misunderstanding of the amount of new debt financing required for both transactions.  Rehearing is required to correct this error and enable the Commission to reconsider its findings on risk based on the actual amount of new debt financing needed for the transactions.

In sum, for all of the reasons discussed in this point of error, the Commission erred in its findings that the proposed transactions would subject Oncor and its customers to increased financial risk.  The findings are arbitrary and capricious and an abuse of discretion, and they are not reasonably supported by a preponderance of the evidence or by substantial evidence in the record as a whole.  On rehearing, the Commission should issue a Second Order on Rehearing with revised findings to recognize that the transfer of Oncor's ownership from EFH to NextEra Energy will reduce, not increase, the risks to Oncor and its customers.

---

[150] NextEra Ex. 6 at 20:1-13; Oncor Ex. 5 at 4:20-21.
[151] Direct Testimony of David M. Davis, Oncor Ex. 2 at 6:11-15; Rebuttal Testimony of David M. Davis, Oncor Ex. 6 at 5:19-22.
[152] Tr. at 331:4-332:3 (Hickson Cross) (Feb. 22, 2017).

**I.    POINT OF ERROR NO. 9 – The Order on Rehearing erred by finding that NextEra Energy's ownership of Oncor would require the same set of ring-fence protections approved for EFH's ownership plus a majority independent and disinterested board of directors for Oncor with dividend veto authority.[153]**

Related to the evaluation of risks is the equally important issue of which ring-fencing provisions are necessary and appropriate to NextEra Energy's ownership of Oncor.  NextEra Energy respectfully requests that the Commission grant rehearing to reconsider its determination that NextEra Energy ownership would require imposition of the full set of ring-fence protections that apply to EFH ownership plus a majority independent and disinterested board of directors for Oncor that has dividend veto authority.  In reviewing its Order on Rehearing, the Commission should consider the following questions:

1)  Why should a set of ring-fencing provisions designed to protect Oncor from ownership by a sub-investment grade group of financial investors should be imposed, along with even greater restrictions, on an A- rated utility holding company that has extensive experience and an unblemished record of industry performance?

2)  Why are the protections provided by NextEra Energy's proposed ring-fencing provisions, which include and expand upon many of the existing EFH ring-fencing protections, insufficient given the benefits afforded under the proposed transaction and NextEra Energy's standing as an A- rated, well-diversified, and highly liquid utility holding company?

3)  What evidence supports the finding in the Order on Rehearing that the EFH ring fence plus a majority independent and disinterested board with dividend veto authority are critical to protect Oncor from a NextEra Energy bankruptcy?

These points are addressed below.

**1.    There is no rational basis to apply an even more restrictive ring fence to NextEra Energy than the one applied to EFH.**

The Commission's Order on Rehearing in Docket No. 34077 approved ring-fencing provisions for EFH's ownership of Oncor that included a requirement for a majority independent board of directors for Oncor.[154]  The Order on Rehearing in this case finds that NextEra Energy's ownership of Oncor would require an even more restrictive ring fence that includes a majority of independent and disinterested directors with the authority to veto dividends.[155]

This determination is clearly erroneous.  There is no rational basis in the record to condition approval of the proposed transactions on the ring fence that was imposed for EFH, let alone a more

---

[153] Order on Rehearing at § I.D., E., F.; Findings of Fact Nos. 89-105, 115.
[154] *See* NextEra Ex. 6, Exhibit JR-R-7 at 1, 5, 13, and 15 (Docket No. 34077 Condition Nos. 44, 54, 74 and 76).
[155] *See* Order on Rehearing at § I.D. and Finding of Fact No. 96.

restrictive one.  EFH at the time of its acquisition of TXU Energy Corp. was a highly risky, sub-investment grade entity with no utility management or operational experience.  NextEra Energy is an A- utility holding company with a credit profile that is "among the best in the industry."[156] NextEra Energy's A- credit rating stands four notches above non-investment grade and *nine* notches above where EFH's credit B- non-investment grade rating stood at the time of the final order in Docket No. 34077.  As Staff witness Mr. Vickroy testified, the "especially extreme debt leverage of the EFH acquisition was one-of-a-kind," and it was this "extremely leveraged financial structure [that] caused correspondingly strong ring-fencing protections to protect Oncor."[157]

For this reason, it was plain error for the Order on Rehearing to find that Oncor "will not be adequately insulated" under NextEra Energy's ownership without the EFH ring fence plus a majority independent and disinterested board of directors at Oncor with dividend veto authority.[158] EFH at the time of Docket No. 34077 was a far riskier parent company, and NextEra Energy's ownership would make Oncor less risky as discussed above in Point of Error No. 8.

It was similarly error for the Order on Rehearing to find that an EFH ring fence "plus" is necessary under NextEra Energy ownership to ensure that Oncor "retains sufficient earnings" for its operations and "overall financial integrity."[159]  The Order on Rehearing contains no analysis to show that this is necessary.  There is no credible evidence in the record to support the Order on Rehearing's blanket declaration that a majority independent and disinterested board of directors with dividend veto power is necessary to prevent "undue interference from a parent company."[160] On the record presented, it is speculative at best to suggest that NextEra Energy—a long-time supportive and successful owner of Florida Power & Light—would seek to deprive Oncor of the retained earnings necessary to its continued successful operations.  Nor is there any evidence to show that an EFH ring fence "plus" is necessary to ensure Oncor's financial integrity.  The evidence demonstrates to the contrary that the proposed transactions will improve Oncor's financial strength and credit ratings.[161]

---

[156] Oncor Ex. 5 at 5:6-7.
[157] Staff Ex. 3A at 15:24-16:3.
[158] Order on Rehearing at § I.D. and Finding of Fact No. 99.
[159] *Id.* at § I.D. & Finding of Fact No. 97.
[160] *Id.* at § I.D. & Finding of Fact No. 98.
[161] NextEra Ex. 6 at 24:6-25:5.

2.    **The finding that NextEra Energy's ownership of Oncor would require an EFH ring fence "plus" gave no consideration to the extensive ring-fencing protections proposed by NextEra Energy.**

The infirmity of the Order on Rehearing's findings on ring-fencing is underscored by the Order on Rehearing's omission of any consideration of the extensive ring-fencing measures that NextEra Energy proposed.  NextEra Energy's proposed ring-fencing provisions are detailed, extensive, and robust, and many provisions were adopted during the course of this proceeding in response to matters raised by Commission Staff, intervenors, and the Commissioners themselves.[162]  Among the protective measures offered by NextEra Energy's ring fence are:

- a bar against the issuance of any dividends without prior Commission approval in the event that one of the rating agencies were to determine that Oncor is not investment grade;[163]

- a requirement for Oncor to file a remedial plan with the Commission within 60 days explaining the actions that are planned to address and rectify a situation in which one or more of the major credit rating agencies determine that Oncor's issuer/corporate credit rating is not investment grade.[164]

- a prohibition against any changes to Oncor's dividend policy unless approved by the Oncor's Board of Directors;[165] and

- a requirement that the majority of the Disinterested Directors on Oncor's Board of Directors must affirmatively vote to file Oncor into bankruptcy for the benefit of NextEra Energy.[166]

Notably, NextEra Energy's dividend-restriction commitment is more restrictive than a similar dividend restriction imposed by the Commission in the *Ovation* Order that was found to be in the public interest even though the parent entity in that case would have been below investment grade at closing.[167]

NextEra Energy also made commitments to ensure that Oncor will retain sufficient capital at all times.  NextEra Energy committed: to maintain Oncor's regulatory debt-to-equity ratio on an annual basis at or below its Commission-approved debt-to-equity ratio;[168] not to incur new debt that is disproportionately dependent on the revenues or stock of Oncor without prior Commission approval;[169] and not to pledge Oncor's assets for any entity other than Oncor.[170]  NextEra Energy

---

[162] *See* Attachment A; NextEra Ex. 6 at 40:4-15.
[163] Attachment A at 7-8 (Regulatory Commitment No. 48).
[164] *Id.* at 8 (Regulatory Commitment No. 49).
[165] *Id.* at 3 (Regulatory Commitment No. 16).
[166] *Id.* (Regulatory Commitment No. 14).
[167] *See* Docket No. 45188, Order at Finding of Fact No. 226.
[168] Attachment A at 3-4 (Regulatory Commitment No. 17).
[169] *Id.* at 1 (Regulatory Commitment No. 2).
[170] *Id.* at 6 (Regulatory Commitment No. 31).

35

also committed that Oncor will fund its five-year long-range capital expenditures plan[171] and to increase, measure, and maintain Oncor's system reliability,[172] all of which serve as mechanisms to ensure adequate investment and ongoing maintenance to the benefit of customers. Additionally, the Commission has ongoing jurisdiction and oversight to ensure that Oncor continues to provide safe, reliable, and affordable electric delivery service.[173] NextEra Energy's regulatory commitments would preserve and enhance that authority.[174]

The Order on Rehearing erred by failing to evaluate the ring-fencing protections proposed by NextEra Energy.

**3.** **The Order on Rehearing specifically erred by finding that the EFH ring fence plus a majority independent and disinterested board of directors with dividend veto authority at Oncor is critical to protect Oncor from a NextEra Energy bankruptcy.**

To justify the EFH ring fence plus the requirement for a majority independent and disinterested board with dividend veto authority, the Order on Rehearing places heavy reliance on the need to protect Oncor from being consolidated into a NextEra Energy bankruptcy. The Order on Rehearing finds that Oncor was not made a party to the EFH bankruptcy "as a result of" the ring-fencing provisions, and that the restrictions on Oncor board member appointments, removal and replacement and dividend veto authority "are among the most important."[175] The Order on Rehearing finds that the existing EFH ring-fencing restrictions were "critical in protecting Oncor from the bankruptcy."[176]

These findings are unsupported by either a preponderance of the evidence or by substantial evidence in the record as a whole. The Order on Rehearing's sole citations to the evidence are two unsupported sentences in the testimony of Staff witness Mr. Vickroy, including his assertion that the board appointment and veto restrictions were "instrumental in avoiding the consolidation of

---

[171] *Id.* at 2 (Regulatory Commitment No. 10).
[172] *Id.* at 1-2 (Regulatory Commitment Nos. 5 and 6).
[173] NextEra Ex. 1 at 44:1-45:12.
[174] *See* Attachment A at 2, 7, 8-9 (Regulatory Commitment Nos. 11, 45-47, 54).
[175] Order on Rehearing at Finding of Fact No. 95; *see also id.* at § I.D.
[176] Order on Rehearing at § I.D.; *see also id.* at § I.F. and Findings of Fact Nos. 94-96, 99.

Oncor into EFH's bankruptcy."[177]  The unsupported, conclusory statements of an expert witness do not constitute substantial evidence sufficient to uphold an Order on Rehearing on appeal.[178]

The Order on Rehearing's findings also conflict with established bankruptcy case law, which holds that a substantive consolidation inquiry is highly fact-specific and no one factor is dispositive.[179]  As discussed above in Point of Error No. 4, the two key requirements for avoiding substantive consolidation are ensuring that separate books and records are maintained and that creditors are not confused into expecting that they can seek the utility's assets.[180]  The Order on Rehearing failed to address these requirements or consider the numerous provisions of NextEra Energy's regulatory commitments that do address them.  Oncor witness Mr. Shapard testified that, because regulated utilities typically have basic safeguards in place that address both of these issues, "no operating utility has ever been consolidated into a holding company's bankruptcy."[181]  The Order on Rehearing provides no analysis or explanation why, in the extremely unlikely event of a NextEra Energy bankruptcy, Oncor might become the first such case, especially given the extensive ring-fencing and Code of Conduct safeguards agreed to by NextEra Energy.

Reduced to its essence, the Order on Rehearing's declaration that Oncor must have a majority independent and disinterested board of directors with dividend veto authority constitutes an impermissible public-interest bar against allowing an acquiring entity to exercise governance control over an acquired utility.  Such a bar contravenes the Legislature's intent in adopting PURA §§ 39.262 and 39.915, as these sections expressly contemplate transactions in which "a controlling interest or operational control of the [utility] will be transferred," as well as the statutory criteria governing approval of transactions under those provisions.

In sum, the Order on Rehearing erred by making findings regarding the need for ring-fence provisions that have no credible support in the record and by failing to consider the law and the supporting evidence in the record on these issues.  The Order on Rehearing's findings are arbitrary

---

[177] *See id.* at § I.D. nn.36-37 & 39 (citing Staff Ex. 3A at 16:2-4, 28:2-4, 42:13-16).

[178] *See Pub. Util. Comm'n of Tex. v. Gulf States Utils. Co.*, 809 S.W.2d 201, 211 (Tex. 1991).  The testimony of intervenor witness Mr. Smith asserted that Oncor was not consolidated into the EFH bankruptcy "due to" the EFH ring fence in general.  *See* Cities, OPUC, and TIEC Joint Ex. 1 at 51:28-52:2, 59:18-23.  Unlike Mr. Vickroy, neither Mr. Smith nor the EFH SEC Form 10-Ks that he referenced claim that the board appointment and veto restrictions were instrumental or critical to keeping Oncor out of the bankruptcy.

[179] *See* NextEra Energy's Initial Brief at 33; *see also In re Eagle-Picher Industries, Inc.*, 192 B.R. 903, 905 (Bankr. S.D. Ohio 1996) ("A review of the case law dealing with substantive consolidation makes it clear that the decisions on the subject are fact intensive, and decisions are made on a case-by-case basis"); *In re Donut Queen*, Ltd., 41 B.R. 706, 709 (Bankr. E.D.N.Y. 1984).

[180] Tr. at 98:18-99:10 (Shapard Cross) (Feb. 21, 2017).

[181] Tr. at 184:1-4 (Shapard Redirect) (Feb. 21, 2017); Tr. at 98:22-99:10 (Shapard Cross) (Feb. 21, 2017); *see also* Tr. at 282:9-15 (Hickson Cross) (Feb. 21, 2017).

and capricious, and abuse of discretion, not supported by substantial evidence in the record as a whole and contrary to PURA's provisions for review and approval of sale-transfer-merger transactions. The Commission should therefore grant rehearing to correct this error. The new Order on Rehearing should address the extensive ring-fencing protections proposed by NextEra Energy and find that those protections, which include an eleven-member Oncor board of directors comprised of a majority of NYSE independent directors with three disinterested directors are reasonable under NextEra Energy ownership and in the public interest.[182]

**J.      POINT OF ERROR NO. 10 – The Order on Rehearing erred in finding that the sole tangible and quantifiable benefit of the proposed transactions is the sharing of interest rate savings for four years.[183]**

The Order on Rehearing acknowledged only one "tangible and quantifiable" benefit of the proposed transactions: NextEra Energy's commitment to share 90 percent of the interest rate savings on Oncor's cost of debt achieved until final rates are set in the Oncor rate case after the rate case now pending in Docket No. 46957. The Order on Rehearing estimated that ratepayers would receive approximately $3.2 million per year over the first four years after closing of the transactions.[184] The Order on Rehearing considered these savings to be minimal and insufficient to support a public interest finding.

This confinement of the benefits analysis to the short term is error. The public interest determination is not limited to short term savings for current customers. As the Commission recognized in its Preliminary Order, it is important to focus on a medium- and long-term horizon.[185] Oncor witness Mr. Davis complied with this directive, and calculated Oncor's expected debt cost savings over the longer term and estimated them to be in the range of $360 - $600 million by 2045.[186] The evidence established that these interest rate savings will be reflected in future rate cases, and the savings over time will benefit both current and future ratepayers in

---

[182] Also erroneous are the Order on Rehearing's findings that without an EFH ring fence "plus" Oncor's service could "potentially" be adversely affected "if Oncor were to be subject of a NextEra Energy bankruptcy." *See* Order on Rehearing at Findings of Fact No. 103-105. As discussed above in Point of Error No. 4, these findings are legally insufficent under PURA §§ 39.262 and 39.915 to justify a finding that the transactions are not in the public interest and are further not reasonably supported by substantial evidence in the record. As discussed above, the record demonstrates that the proposed transactions will support and enhance, not adversely affect, Oncor's continued provision of reliable service to its customers.
[183] Order on Rehearing at § I.C. and Findings of Fact Nos. 79-84.
[184] Order on Rehearing at § I.C. and Finding of Fact No. 80.
[185] Preliminary Order at 6 (Issue Nos. 8(g) and 43(g)).
[186] Oncor Ex. 2 at 6:11-15; Oncor Ex. 6 at 5:19-22.

Oncor's service area.[187]  The Order on Rehearing erred by disregarding the full amount of expected interest rate savings.

The Order on Rehearing further erred by failing to recognize as an additional tangible and quantifiable benefit NextEra Energy's commitment to fund Oncor's current long-range capital investment plan for five years.  NextEra Energy has unconditionally guaranteed full funding for Oncor's plan.  This benefit is quantified in the record.  Oncor's plan entails capital expenditures of over $1.5 billion this year and each year thereafter for a total of more than $7.5 billion.  The Order on Rehearing erred in failing to recognize this quantified benefit.

For these reasons and for the reasons presented in Point of Error No. 3, the Commission should grant rehearing and issue a new Order on Rehearing that recognizes the full public interest benefits of the proposed transactions.

**K.**     **POINT OF ERROR NO. 11 – The Order on Rehearing erred by failing to address each of the issues identified in the Preliminary Order.[188]**

The Preliminary Order in this proceeding set out a list of the relevant issues that the Commission determined "must be addressed in this docket."[189]  The Order on Rehearing erred by failing to address many of those issues.  The Order on Rehearing did not address or even mention, in part or in full, at least 30 such issues.

NextEra Energy noted this error in its motion for rehearing of the original final order.  The Order on Rehearing responded by adding Conclusion of Law No. 3.  This conclusion states that no statute or rule requires the Commission to address each issue in a Preliminary Order, and that the Preliminary Order imposes no obligation but only sets out the issues the Commission "would like to be addressed by the parties."[190]

Conclusion of Law No. 3 does not correct the error because this new interpretation contradicts the Commission's recognition elsewhere in the Order on Rehearing that the Commission has an obligation to address issues identified in the Preliminary Order.  The Order on Rehearing on page 4 determined that, pursuant to Preliminary Order Issue Nos. 8(a)-(g) and 43(a)-(g), the Commission "must" evaluate the listed issues related to whether the transaction would provide tangible and quantifiable benefits to Texas ratepayers.  The Commission likewise "must"

---

[187] *See* Oncor Ex. 2 at 6:16-21.
[188] Order on Rehearing at §§ I.B.-F.; Finding of Fact No. 11.
[189] Preliminary Order at 4.  The Preliminary Order specified that the "Commission, upon its own motion or upon the motion of any party, may deviate from this Order when circumstances dictate that it is reasonable to do so."  *Id.* at 11.  Neither the Commission nor any party made such a motion.
[190] Order on Rehearing at Conclusion of Law No. 3.

evaluate the other issues listed in the Preliminary Order.  The Preliminary Order does more than merely set out issues the Commission "would like to be addressed by the parties."

The Commission's compliance with its Preliminary Order serves to ensure that all issues are given due consideration before a final decision is rendered.  The Commission has respected the need to consider all issues in its Preliminary Order in other dockets,[191] and it should do the same here.  While the Commission ultimately may determine that some issues need not be fully resolved in light the disposition of other issues, the Order on Rehearing must reasonably explain the basis for its determinations.[192]

**L.    POINT OF ERROR NO. 12 – The Order on Rehearing failed to give consideration to the merits of the stipulations entered into between NextEra Energy and certain intervenors.[193]**

Consistent with PURA and settled case law, a non-unanimous stipulation of the parties in a contested case is entitled to consideration and may be adopted on its merits after giving all parties the opportunity to be heard on any disputed issues.[194]  NextEra Energy presented two such stipulations on the first day of the hearing in this docket.  NextEra Energy offered into evidence, without objection, a Stipulation and Agreement it had reached between itself, TXU Energy Retail Company LLC, Texas Energy Association for Marketers, and NRG Companies, and a second Stipulation and Agreement it had reached between itself and NRG Companies, each resolving the issues these signatories have raised in this case.[195]  The Stipulations contained revised regulatory commitments regarding the treatment of NextEra Energy's competitive affiliates, and each stated that "[t]he Signatories agree that the terms of this Stipulation are in the public interest and that the Commission should enter an Order materially consistent with this Stipulation and providing for its implementation."[196]  The terms of the Stipulations are reflected in amendments to the regulatory commitments made by NextEra Energy that support a public interest finding.[197]

---

[191] *See, e.g.*, *Joint Report and Application of Sharyland Utilities, LP, et al.*, Docket No. 37990, Order at 14 (July 8, 2010) (making "Findings in Accordance with Preliminary Order" to determine whether proposed transaction with conditions consistent with parties' stipulation is in the public interest); *Application of AEP Texas Central Co., et al. for Approval of Merger*, Docket No. 46050, Order (Dec. 12, 2016) (adopting Proposal for Decision, including all findings and conclusions, except as provided, and addressing each of the issues listed in the Preliminary Order).
[192] *See Flores v. Employees Ret. Sys.*, 74 S.W.3d 532, 544-45 (Tex. App.—Austin 2002, pet. denied) (holding that an agency is required to explain its reasoning when it departs from prior administrative policy or agency determinations).
[193] Order on Rehearing at § I.C.; Findings of Fact Nos. 78-88, 106-119.
[194] *See* PURA § 14.054; *City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 182-84 (Tex. 1994).
[195] NextEra Ex. 36; NextEra Ex. 37; *see* Tr. at 50:18-21 (Feb. 21, 2017).
[196] NextEra Ex. 36 at 3; NextEra Ex. 37 at 3.
[197] *See* Attachment A at 8-11 (Regulatory Commitment Nos. 51, 55, 67, 69).

The Commission's original final order gave these Stipulations no consideration, neglecting even to note their existence in the Procedural History section. In response to NextEra's motion for rehearing, the Order on Rehearing added two findings of fact to the Procedural History section but nowhere discussed the merits of the Stipulations. The failure to consider the merits of the Stipulations as reflected in NextEra's regulatory commitments contradicts the Commissioners' recognition at the onset of this proceeding that NextEra Energy's ownership of Texas competitive affiliates in ERCOT would be "among the central issues to be resolved" in this proceeding.[198] This error also is part of the Order on Rehearing's larger failure to consider the public interest merits of NextEra Energy's regulatory commitments as a whole. Rehearing should be granted to correct this error.

**M.    POINT OF ERROR NO. 13 – The Order on Rehearing violates NextEra Energy's constitutional rights to due process and equal protection.**

In addition to the statutory errors described above, the Order on Rehearing suffers from related constitutional defects that require rehearing.

The Order on Rehearing violates the right to due process guaranteed by the Texas and U.S. Constitutions[199] because the Order on Rehearing disregards prior Commission precedent and applies new standards for determining the public interest under PURA without providing notice to NextEra Energy of the precipitous change in the proceedings. As discussed in preceding points of error, the Order on Rehearing imposed new standards that had not been raised at any other stage of these proceedings as a basis to deny the proposed transactions. The public interest standard for review of a sale-transfer-merger transaction has never before required a showing that a transaction's benefits will rejected unless they are shown to be unique and exclusive to the proposed transactions and are quantified. The public interest standard in PURA §§ 39.262 and 39.915 has never previously been classified as "amorphous" and subject to expansion by the Commission.

These sudden and unannounced *post hoc* changes in Commission practice have prejudiced NextEra Energy's right to due process. A party is entitled to notice, before the hearing, of the legal norms or standard that will be applied to the facts upon which an agency contemplates taking action.[200] For an administrative hearing to be meaningful, a party must be able to present evidence

---

[198] *See* Memorandum re EFH/NextEra Merger Agreement at 2, Docket No. 42750 (Oct. 6, 2016).
[199] U.S. Const. Amend. XIV; Texas Const. art. I, § 19.
[200] *See Texas State Bd. of Pharmacy v. Seely*, 764 S.W.2d 806, 814 (Tex. App.—Austin 1988, writ denied).

on the issues to be decided.[201]   A party is therefore deprived of procedural due process when an agency adopts new policy in the course of a contested-case hearing without giving the parties pre-hearing notice.[202]   That is what occurred here.   NextEra Energy was denied the opportunity to present evidence on issues that the Commission later decided would be determinative in the proceeding.

The Order on Rehearing also violates constitutional equal protection requirements.   Equal protection requires that similarly situated parties be given the same or comparable treatment.[203] As discussed in preceding points of error, the Order on Rehearing's summary disapproval of the proposed transactions treats NextEra Energy differently than similarly situated applicants whose transactions were approved with conditions.

Accordingly, the Commission should grant rehearing because the Order on Rehearing violates constitutional as well as statutory provisions.

## N.    POINT OF ERROR NO. 14 – The Order on Rehearing erred by relying on facts not in evidence.

The Order on Rehearing at Finding of Fact No. 70 states that "[s]ome parties asserted that Oncor's share of NextEra Energy's consolidated debt would be about 15%."[204]   The record contains no evidence regarding the percentage of Oncor's revenues that will be relied on to support the total amount of consolidated debt at NextEra Energy.   The Order on Rehearing's reference in Section I.B. to TIEC Ex. 1C supports only the amount of consolidated debt at NextEra Energy, not the percentage.[205]   The only statements regarding the percentage appears in the transcript of the Open Meeting on February 23, 2017, which is not part of the evidentiary record.[206]   The Commission specifically ruled that statements made during the Open Meeting were not to be considered evidence.[207]   Thus, Finding of Fact No. 70 is not supported by substantial evidence in the record, and the Order on Rehearing's inclusion of the finding is arbitrary and capricious, an abuse of discretion, and error as a matter of law.

---

[201] *See Flores*, 74 S.W.3d at 545; *Seely*, 764 S.W.2d at 815; *Madden*, 663 S.W.2d at 626–27.
[202] *See, e.g.*, *Flores*, 74 S.W.3d at 545; *see also Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 658 (Tex. 2004) ("Due process at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner.").
[203] *Mauldin v. Tex. State Bd. of Plumbing Examiners*, 94 S.W.3d 867, 871, 873 (Tex. App.—Austin 2002, no pet.); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).
[204] *See also* Order on Rehearing at § I.B. ("Some parties have asserted that this share would amount to 15% of NextEra Energy's consolidated debt.").
[205] *See* Order on Rehearing at § I.B (citing TIEC Ex. 1C at 7).
[206] Open Meeting Tr. at 13:11-14:18, 58:21-59:1 (Feb. 23, 2017).
[207] Tr. at 556:17-557:13 (Comm'r Discussion) (Feb. 23, 2017); *see also id.* at 557:16-562:13, 567:10-19 (parties stating agreement on the record).

### III.  <u>CONCLUSION</u>

In view of the importance of this case and its consequences, NextEra Energy respectfully appeals to the Commission's appreciation of the need to ensure a full and considered determination of the legal and evidentiary issues before jurisdiction is relinquished.  As the Commission will recall, following the hearing and submission of briefs, the Commissioners engaged in a very brief open meeting discussion that touched on only a few of the issues presented and issued a final order that tersely denied approval of the proposed transactions.  The Commission's summary disposition of this case and its determination that the EFH and TTHC transactions are not in the public interest and are disapproved does not give full and fair consideration to the application, the law, or the record evidence as a whole.

Granting rehearing affords the Commission the opportunity to step back and review its revised decision, correct errors, and give full consideration to the benefits and protections offered by the proposed transactions.  NextEra Energy respectfully requests that the Commission grant rehearing and issue a new Order on Rehearing with revised findings, conclusions, and ordering paragraphs that correct the errors identified in this motion.  The new Order on Rehearing should hold that the proposed transaction with EFH is in the public interest and approved, and disclaim jurisdiction over the proposed transaction with TTHC, or, alternatively, find that the TTHC transaction also is in the public interest and approved.  To allow the Order on Rehearing to stand without correcting these errors would prejudice the substantial rights of NextEra Energy because, as discussed in each point of error, the Order on Rehearing contains findings, inferences, conclusions, and decisions that violate applicable statutory and constitutional provisions; are in excess of the Commission's authority; are affected by other error of law; are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; and are arbitrary and capricious or an abuse of discretion.[208]

---

[208] *See* APA § 2001.174.

Respectfully submitted,

By: _____

Ann M. Coffin
State Bar No. 00787941
Julie Caruthers Parsley
State Bar No. 15544920
Mark Santos
State Bar No. 24037433
Parsley Coffin Renner LLP
P.O. Box 13366
Austin, Texas 78711
512.879.0900
512.879.0912 (fax)
ann.coffin@pcrllp.com
julie.parsley@pcrllp.com
mark.santos@pcrllp.com

Steven Baron
State Bar No. 01797200
Steven Baron Consulting and Legal Services
P.O. Box 5573
Austin, Texas 78763
512.535.3104
512.479.8070 (fax)
sbaron@baroncounsel.com

**COUNSEL FOR NEXTERA ENERGY, INC.**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing was served on all parties of record in this proceeding by hand delivery, overnight delivery, fax, or U.S. first class mail on this the 27th day of June 2017.

_____
Ann M. Coffin

**Revised Regulatory Commitments – Redlined Based on February 24, 2017, Hearing on the Merits against NextEra Exhibit 5a (Exhibit MH-R-2 (Errata 2))**

In support of the Application for Sale, Transfer, or Merger with the Public Utility Commission of Texas ("Commission") for approval of the transfer of control of Oncor Electric Delivery Company LLC ("Oncor") from Energy Future Holdings Corp. ("EFH") and Energy Future Intermediate Holding Company LLC ("EFIH") to EFH Merger Co., LLC ("Merger Sub"), a wholly owned subsidiary of NextEra Energy, Inc. ("NextEra Energy"), and the acquisition by NextEra Energy of Texas Transmission Holding Corporation's ("TTHC's") indirect ownership interest in Oncor (collectively, "Proposed Transactions"), NextEra Energy, on behalf of itself, Merger Sub, and WSS Acquisition Company, makes the following commitments:

1.  **Existing Legacy Debt and Liabilities** – NextEra Energy will extinguish and refinance at its subsidiary NextEra Energy Capital Holdings, Inc. all debt that resides above Oncor at EFIH and EFH, reducing it to zero, immediately following the closing. [1] Please refer to Regulatory Commitment 53 with respect to legacy liabilities.

2.  **New Debt ~~Solely~~Not Disproportionately Dependent on Oncor** – NextEra Energy and its subsidiaries, other than Oncor, will not incur, guarantee, or pledge assets in respect of any new debt that is ~~solely or almost entirely~~disproportionately dependent on the revenues or stock of Oncor without first seeking Commission approval. NextEra Energy and its Affiliates (other than Oncor) will provide advance notice to potential lenders of new debt issued pursuant to the Commission approval received under this commitment of its corporate separateness from Oncor and will obtain an acknowledgement of the separateness and non-petition covenants in all such new debt instruments.

3.  **Credit Rating** – The credit issuer/corporate ratings of Oncor will be maintained or improved at the time of Closing as compared to the ratings on July 28, 2016.  If, at any time from the date of closing through December 31, 2021, Oncor's issuer/corporate ratings are not maintained, as compared to the ratings on July 28, 2016, by Standard & Poor's, Moody's, or Fitch credit ratings agencies, Oncor shall not use the lower credit rating as a justification for a higher regulatory rate of return.

4.  **Credit Rating Reporting** – Oncor shall notify the Commission if either NextEra Energy's or Oncor's credit issuer/corporate rating as rated by Standard & Poor's, Moody's, or Fitch credit ratings agencies falls below its then current level.

5.  **Reliability** – For purposes of Substantive Rule 25.52, system average interruption duration index ("SAIDI") and system average interruption frequency index ("SAIFI") standards should be calculated based on Oncor's forced interruption performance for years 2013, 2014, and 2015.  Oncor's SAIDI standard should be 93.74667 and its SAIFI standard should be 0.95667.  These standards should go into effect starting with the calendar year 2018.

---

[1] NextEra Energy also commits that no debt will reside at TTHC or Texas Transmission Investment LLC upon the close of the merger with TTHC.

6.    **Report of SAIDI and SAIFI to Commission** – Oncor will report its actual system-level SAIDI and SAIFI statistics to the Commission in its Quarterly Performance Reports and yearly Service Quality Reports filed pursuant to 16 Tex. Admin. Code ("TAC") § 25.81.

7.    **Interconnection Process** – Oncor will continue to participate in discussions with Commission staff and customers to address implementing improvements to its interconnection process.

8.    **Headquarters/Management** – Oncor will maintain its separate headquarters and management in Dallas County, Texas.  Local management of Oncor will remain the primary point of contact on all regulatory and operational matters.

9.    **Separate Entity** – Oncor will maintain its separate existence as a separate entity with separate assets and separate franchises, obligations and privileges.  Oncor's corporate form will not be changed without prior Commission approval.

10.   **Capital Expenditures** – Oncor will fund capital expenditures in the total amount set forth in Oncor's current long-range plan for five (5) years following the date of the closing.

11.   **Commission Jurisdiction** – Oncor and Oncor Holdings will not own, operate, or construct capital assets outside of ERCOT without prior approval from the Commission or take any other action that would impair the Commission's regulatory jurisdiction.  Neither Oncor, Oncor Holdings, NextEra Energy nor their respective affiliates will take any action that would subject ERCOT assets to the jurisdiction of the Federal Energy Regulatory Commission ("FERC"); provided, however, that it is the opinion of NextEra Energy that FERC continues to have jurisdiction under sections 210, 211, and 212 of the Federal Power Act ("FPA") and may direct transmission and interconnection services over certain existing facilities outside of ERCOT; provided further that the existing reliability and critical infrastructure standards administered by the North American Electric Reliability Corporation ("NERC"), through delegation of authority from FERC, may affect the operations of assets that are deemed part of the bulk electric system.

12.   **Texas Utility** – Oncor will continue to operate solely within the state of Texas as a public utility subject to the continuing jurisdiction of the Commission pursuant to the state of Texas' applicable statutes regulating public utilities, and without any reduction in the Commission's oversight or authority over Oncor.

13.   **Advisory Board** – NextEra Energy will establish an advisory board of Texas residents that will meet quarterly with the Chief Executive Officer of Oncor to discuss service and other operational issues.

14.   **Oncor Board of Directors** – NextEra Energy will maintain a separate Board of Directors at Oncor composed of 11 persons, three of whom will be "Disinterested Directors" and four of whom will qualify as "independent" from NextEra Energy and its subsidiaries and affiliated entities in accordance in all material respects with the rules and regulations of the New York Stock Exchange, Inc. ("NYSE"), for a total of

Exhibit MH-R-2 (Errata 2)
Page 3 of 12

7 of 11 members of the Oncor Board of Directors that qualify as either "independent" or "Disinterested Directors." A majority of the members of the Oncor Board of Directors shall be residents of Texas. Successor "independent" directors and "Disinterested Directors" must satisfy the criteria to qualify as "independent" directors or "Disinterested Directors," respectively. Any increase in the size of the Oncor Board of Directors will be accompanied by a proportionate increase in the number of "independent" directors and in the number of "Disinterested Directors" sufficient to maintain the required pre-increase percentage of "independent" directors and "Disinterested Directors."

"Disinterested Directors" must be: (a) independent from NextEra Energy and its subsidiaries and affiliated entities in accordance in all material respects with the rules and regulations of the NYSE; (b) have no material relationships with NextEra Energy or its subsidiaries or affiliates currently or within the previous ten years; (c) must be residents of Texas; and (d) must satisfy the 72-year-old age limit for members of the Board of Directors of a NextEra Energy company. Initially, the three Disinterested Directors will be chosen from the current Oncor Board of Directors and will satisfy the definition of "Disinterested Director." At all times, a "Disinterested Director" may only be removed by a majority of the remaining directors, which affirmative vote must include a majority of the remaining Disinterested Directors. When a vacancy of a "Disinterested Director" occurs, successors will be appointed solely by affirmative vote of a majority of the remaining Disinterested Directors.[2]

An affirmative vote by a majority of the Disinterested Directors shall be required to file Oncor into bankruptcy for the benefit of NextEra Energy.

The Disinterested Directors will develop, regularly maintain, and apply as part of each decision by them to elect successor Disinterested Directors, a skills and experience matrix that identifies a range of skills, experience, and background appropriate to maintaining a robust, diversified group of Disinterested Directors.

Oncor Board member compensation and benefits must be approved by Oncor's Board of Directors and shall not be linked to the performance of NextEra Energy or any of its other subsidiaries.

15. **Oncor Budgets** – Oncor's capital and operating and maintenance expense budgets must be approved by Oncor's Board of Directors.

16. **Dividend Policy** – Changes to Oncor's dividend policy must be approved by Oncor's Board of Directors.

17. **Debt-to-Equity Ratio** – Oncor's debt will be limited so that its regulatory debt-to-equity ratio (as determined by the Commission), calculated as of December 31 of each year, is at or below the assumed debt-to-equity ratio established from time to time by the Commission for ratemaking purposes, which is currently set at 60% debt

---

[2] This commitment assumes NextEra Energy acquires the 19.75 percent interest in Oncor held indirectly by TTHC.

to 40% equity.  The calculations of the debt-to-equity ratio for purposes of this commitment will not include goodwill resulting from the Proposed Transactions.

18.  **Rate Settlements** – Oncor will comply with all terms and conditions imposed by Oncor's previous rate settlements.

19.  **Rate Case** – Oncor will file a general base rate case by July 1, 2017, unless before that date a general base rate case has been initiated by Commission Staff or some other party.

20.  **Workforce** – For two years after closing, each current Oncor employee who is employed on the Closing Date, other than those identified in Regulatory Commitment 23 below, will be provided:  (a) a base salary or wage rate that is no less favorable than the base salary or wage rate provided to such employee immediately prior to the Effective Time;  (b) aggregate incentive compensation opportunities that are substantially comparable in the aggregate to those provided to such employee immediately prior to the Effective Time; and (c) employee benefits that are substantially comparable in the aggregate to those provided to such employee immediately prior to the Effective Time, and Oncor will not implement any material involuntary workforce reductions (with respect to either field or corporate personnel) of Oncor employees.

21.  **Collective Bargaining Agreement** – With respect to any Oncor employee whose terms and conditions of employment are covered by a collective bargaining agreement, the terms and conditions of such employment will continue to be governed by the terms of the applicable collective bargaining agreement, as may be modified from time to time.

22.  **Employment Agreements** – Oncor will honor any employment, severance, retention, termination, and change in control arrangements of Oncor in accordance with their terms, provided that no payments under any such arrangements that are covered under Regulatory Commitments 29 and 30 shall be recovered from Oncor's customers.

23.  **Change in Control** – Each party hereto hereby acknowledges that, with respect to any employee listed on Exhibit F hereto, a "change in control" or "change of control" within the meaning of each Assumed Plan in which such employee is a participant or to which such employee is a party will occur as a result of the consummation of the Purchase Transactions.  For each employee listed on Exhibit F who chooses to retire from or terminate his or her service with the Oncor Entities in connection with the closing of the Purchase Transactions, Parent and Merger Sub agree to pay any and all benefits (including change in control benefits) to which such individual would be entitled in connection with such retirement or termination, treating such retirement or termination as a resignation with "good reason," a termination "without cause," or a retirement under the relevant Assumed Plans.  Such payments shall not be recovered from Oncor's customers consistent with Regulatory Commitments 29 and 30.

24.  **Benefits** – For Oncor employees who become participants in any employee benefit plan of NextEra Energy or its Affiliates in connection with the Proposed

Transactions, the prior service of those employees to an Oncor entity will generally be taken into account, for purposes of eligibility and vesting thereunder.

25. **Code of Conduct** – Oncor will conduct its activities in compliance with a proposed updated Code of Conduct that will govern interactions between Oncor and its NextEra Energy affiliates. The provisions of the updated Code of Conduct that address competitive affiliates will apply to Gexa Energy, L.P. ("Gexa") and NextEra Energy Resources, LLC generation subsidiaries, and any other NextEra Energy affiliate to the extent they provide services or sell products in a competitive energy-related market in Texas. The updated Code of Conduct will incorporate the supplemental obligations set forth in Regulatory Commitments 26, 27, 32, 33, 35, 36, 41, 44, 55, 56, 57, 58, 59, 60, and 62.

26. **Oncor Compliance Officer and Affiliate Standards Compliance Program** – Oncor's compliance officer will have the responsibility to develop, implement, enforce, and maintain Oncor's Corporate Compliance Program of which the Affiliate Standards Compliance Program is a part. The Compliance Officer is accountable to the Oncor Board of Directors and will provide the Oncor Board of Directors with an annual report regarding the effectiveness of the Corporate Compliance Program and any proposed changes to the Corporate Compliance Program. Oncor will also maintain an Affiliate Standards Compliance Program of the same substantive scope, structure, and content that exists now at Oncor.

27. **Tax Indemnification** – NextEra Energy will indemnify Oncor for any liability for federal, state or local income taxes (including interest and penalties related thereto, if any) in excess of Oncor's standalone liability for federal, state or local income taxes (including interest and penalties related thereto, if any) for any period in which Oncor is included in a consolidated income tax return with NextEra Energy.

28. **Accumulated Deferred Income Taxes ("ADIT")** – No Internal Revenue Code ("IRC") Sections 338(h)(10), 336(e), or 754 elections will be made in regards to the Proposed Transactions. Unless expressly authorized by the Commission, after hearing and notice, the Proposed Transactions shall have no impact on Oncor's pre-acquisition recorded ADIT balances. After the close of the Proposed Transactions, Oncor's recorded ADIT balances will reflect applicable accounting and tax rules and regulations as they currently exist or may be amended from time to time.

29. **Transaction Costs** – None of the transaction costs will be borne by Oncor's customers, nor will Oncor seek to include transaction costs in rates. For purposes of this commitment, "Transaction Costs" are those incremental costs paid to advance or consummate the Proposed Transactions. Examples of Transaction Costs include, but are not limited to: NextEra Energy employee time and expenses; change of control payments; certain executive severance costs; and third party costs, including bank advisors, external legal advisors, rating agencies, and expert witnesses and consultants in each case paid to advance or consummate the Proposed Transactions. Transaction Costs do not include Oncor employee time and expenses.

30. **Transition Costs** – No NextEra Energy employee time and expenses, third party costs, fees, expenses or costs of the transition ("Transition Costs") will be borne by

Oncor's customers, nor will Oncor seek to include Transition Costs in rates. Transition Costs are those costs necessary to integrate the two companies for Day 1 Readiness, including the one-time transition costs being incurred either directly or indirectly through affiliate charges to transition Oncor to ownership by NextEra Energy and to integrate Oncor's operations and systems with those of NextEra Energy.  Provided, however, that Transition Costs do not include Oncor employee time and expenses, costs to achieve savings or synergies or costs that reflect reasonable and necessary costs in providing service to the public. "Costs to achieve" reflect amounts incurred to realize operating enhancements, efficiency gains, or cost reduction initiatives.

31.  **Pledging of Assets** – Oncor will not incur, guarantee, or pledge assets in respect of any incremental new debt related to the Proposed Transactions at the closing or thereafter.  Oncor's assets shall not be pledged for any entity other than Oncor.

32.  **New Debt Related to Acquisitions** – Oncor will not incur or assume any debt, including the provision of guarantees or collateral support, related to the Proposed Transactions or any future non-Oncor acquisition by NextEra Energy.

33.  **Separate Debt** – Oncor will maintain its debt separate and apart from NextEra Energy and NextEra Energy's affiliates and subsidiaries.  Oncor will maintain its own corporate and debt credit ratings for its publicly traded securities.

34.  **Credit Rating Registration** – NextEra Energy and Oncor will be registered with major nationally and internationally recognized bond rating agencies, such as Standard & Poor's, Moody's Investor Service, or Fitch Ratings.

35.  **Debt Liability** – Oncor will not incur or assume liability for the debts of NextEra Energy or its affiliates or subsidiaries, other than an Oncor subsidiary.  Oncor will not guarantee the debt or credit instruments of NextEra Energy or any of its affiliates or subsidiaries, other than an Oncor subsidiary.

36.  **Cross-Default Provisions, Financial Covenants or Rating Agency Triggers** – Oncor will not include in any of its debt or credit agreements cross-default provisions between Oncor's securities and the securities of NextEra Energy or any of its affiliates or subsidiaries.  Oncor will not include in its debt or credit agreements any financial covenants or rating agency triggers related to NextEra Energy or any other NextEra Energy affiliate.

37.  **Goodwill** – Any costs of goodwill of NextEra Energy or its Affiliates (including the pre-existing goodwill recognized by Oncor) will not be included in rate base, cost of capital, or operating expenses in future Oncor ratemaking proceedings.  Write-downs or write-offs of goodwill will not be included in the calculation of net income for dividend payment purposes.

38.  **Pushdown Accounting** – NextEra Energy will not elect to apply pushdown accounting for the merger, i.e., the merger will have no impact on Oncor's assets being acquired; and any incremental goodwill will not be allocated to, or recognized within, Oncor's balance sheet.

39.  **Goodwill Impairments** – Within 10 days after a report to the Securities and Exchange Commission by NextEra Energy that indicates that the amount of goodwill on NextEra Energy's or Oncor's books has been impaired, NextEra Energy shall notify the Commission of such developments.

40.  **Neutral Acquisition Accounting** – The acquisition accounting associated with the Proposed Transactions shall be rate neutral for Oncor's customers.

41.  **Inter-company Debt** – Oncor will not enter into any inter-company debt transactions with Affiliates of NextEra Energy following consummation of the Proposed Transactions and Oncor will not lend money to or borrow money from NextEra Energy or its Affiliates.

42.  **Separate Books and Records** – Oncor will maintain accurate, appropriate, and detailed books, financial records and accounts, including checking and other bank accounts, and custodial and other securities safekeeping accounts that are separate and distinct from those of NextEra Energy and its other Affiliates.

43.  **Final Accounting Entries** – To the extent the Proposed Transactions result in any adjustment to the books of Oncor or a NextEra Energy subsidiary that is required to keep its books in accordance with the Federal Energy Regulatory Commission's Uniform System of Accounts, Oncor and such subsidiary shall submit to the Commission its final accounting entries within six months of the date that the Proposed Transactions are consummated.  The accounting submission shall provide all accounting entries made to the books and records of the applicable subsidiary, along with the appropriate narrative explanations describing the basis for the entries.

44.  **Shared Credit Facilities** – Oncor will not share any credit facility with NextEra Energy or its Affiliates.

45.  **Organizational Documents** – The organizational documents of Oncor and any modifications to those documents will not be inconsistent with any order approving the Proposed Transactions.

46.  **Regulatory Modifications** – Until the Proposed Transactions close, NextEra Energy and Oncor agree to request approval from the Commission of any modifications or additions to the approved commitments in this case by other regulatory bodies.

47.  **Compliance Reports** – For five (5) years post-closing, Oncor will file annual reports with the Commission regarding compliance with these commitments.  Such reports will be filed at the same time as the annual earnings monitoring report under 16 Texas Administrative Code § 25.73 is filed for Oncor.  All unexpired commitments will remain in effect after the end of the five-year reporting period and will expire according to their own terms.

48.  **Dividends** – Oncor shall not make any distributions, dividends, or other payments to NextEra Energy or its Affiliates without the prior approval of the Commission at any

time that one or more of Standard & Poor's, Moody's, or Fitch credit rating agencies determine that Oncor's issuer/corporate credit rating is not investment grade.[3]

49.  **Remedial Plan** – If a ratings event described in Regulatory Commitment 48 occurs, Oncor will file a plan with the Commission within 60 days explaining the actions that are planned to address and rectify the situation.  The dividend payment provision of Regulatory Commitment 48 ends when the relevant investment grade credit rating is restored.

50.  **Non-Consolidation Legal Opinion** – In the event the credit ratings of NextEra Energy are downgraded to below investment grade by one of the three major credit rating agencies (Standard & Poor's, Moody's Investors Service, or Fitch Ratings), NextEra Energy commits to implement measures necessary to obtain a non-consolidation legal opinion in customary form and substance based on laws in effect as of the date of the final order in Docket No. 46238 opining that a bankruptcy court would not consolidate the assets and liabilities of Oncor with NextEra Energy in the event of a bankruptcy.

51.  **Separate Name** – Oncor shall maintain a name, trademark, brand,  logo, and identifying brand features separate and distinct from NextEra Energy and its current and any future Texas competitive affiliates.  For the sake of clarity, Gexa, NextEra Energy Marketing, LLC, NextEra Retail of Texas, L.P., and any other current or future Texas competitive affiliates will not use the Oncor name, trademark, brand, logo, or any other brand identifying features; nor will Oncor engage in joint marketing, advertising, or promotional efforts with Gexa, NextEra Energy Marketing, LLC, NextEra Retail of Texas, L.P., or any other current or future Texas competitive affiliate, in a manner that is inconsistent with the Public Utility Regulatory Act and the Commission's affiliate rules.

52.  **No Recovery of Gexa Bad Debt** – So long as Oncor is affiliated with Gexa, Oncor will not seek to recover from its customers any costs incurred as a result of a bankruptcy of Gexa.[4]

53.  **Bankruptcy Expenses and Liabilities** – Oncor will not seek recovery in rates of any expenses or liabilities related to EFH's bankruptcy.  This commitment includes the agreement that Oncor will not seek recovery in rates of amounts resulting from any: (1) tax liabilities resulting from the spin-off of Texas Competitive Electric Holdings Company LLC; (2) asbestos claims relating to non-Oncor operations of or under EFH; or (3) make-whole claims by creditors of EFH or EFIH set forth in the EFH and EFIH Plan of Reorganization.  For the avoidance of doubt, Oncor's customers will not be required to pay for these items.

54.  **Texas Reliability Entity –** Oncor will not seek to have another NERC Regional Entity other than the Texas Reliability Entity serve as the lead regional entity responsible for

---

[3] Distributions for payment of reasonable and necessary expenses recovered through Oncor's Commission-approved rates are not subject to this commitment.
[4] This commitment also applies to NextEra Retail Texas, LP.

monitoring Oncor's activities and ensuring compliance with NERC Reliability Standards.

55. **Competitive Affiliate Generation** – No generation facilities owned by NextEra Energy or its subsidiaries or affiliates are currently interconnected with Oncor's electric delivery system. NextEra Energy commits that no electric generation facilities owned by it or its subsidiaries or affiliates will be interconnected with Oncor's electric delivery system without the prior approval of the Commission. NextEra Energy commits that it will not seek any other approvals required to interconnect generation facilities owned by NextEra Energy or its subsidiaries with Oncor without first obtaining Commission approval for such interconnection. NextEra Energy believes that any such application for approval would constitute a contested case pursuant to the Texas Administrative Procedure Act, including, but not limited to determine, the determination of whether the interconnection is in the public interest consistent with the purpose and standards of PURA sec. 35.004 and Commission Substantive Rules, Subchapter I, Division 1, which require electric utilities to provide non-discriminatory access to wholesale transmission service and consistent with the standards in the Commission's rules governing affiliate transactions and interactions and compliant with Oncor's Code of Conduct.

56. **Code of Conduct Audit** – For the five (5)-year period following the close of the transaction with EFH, Oncor will have an audit prepared by independent auditors on an annual basis that verifies Oncor's compliance with its Code of Conduct rather than once every three years as required by Commission Substantive Rule 25.272. The independent auditors will be selected by the Disinterested Directors. The Commission will be designated as the intended beneficiary of such audit and will be consulted in connection with the scope of the audit. The independent auditor will have access to the books and records of any affiliate doing business with Oncor and any NextEra Energy Texas retail or generation affiliate to the extent necessary to address code compliance.

57. **Code of Conduct Certificate of Compliance** – For the five (5)-year period following the close of the transaction with EFH, the NextEra Energy CEO will file a certificate on a calendar year basis to the effect that Oncor's competitive affiliates (as defined in Oncor's Code of Conduct) have not engaged in any activity during the prior calendar year that would have resulted in an event of non-compliance by Oncor with its Code of Conduct.

58. **Report of Affiliate Activities** – Oncor will submit a report of affiliate activities required by Commission Substantive Rule 25.84 every six months for the five (5)-year period following the close of the transaction with EFH rather than on an annual basis as required by the rule.

59. **Code of Conduct Training** – All members of the NextEra Energy Board of Directors, the Oncor Board of Directors, and all employees and executives of Oncor and any affiliate entity with whom Oncor transacts or that engages in activities required, prohibited, or limited by the Oncor Code of Conduct will complete training on Oncor's Code of Conduct on an annual basis.

60. **Employee Transfers –** Oncor will file a public notification with the Commission before an employee of Oncor transfers to become an employee of a competitive affiliate or before an employee of a competitive affiliate transfers to become an employee of Oncor.

61. **Notification of New Affiliates –** Oncor will post a conspicuous notice on its Internet site within one week of the creation or acquisition of a new competitive affiliate of Oncor, or a new affiliate that provides services to or receives services from Oncor.

62. **ERCOT Voting Rights –** NextEra Energy subsidiaries that are competitive affiliates of Oncor shall not exercise voting rights on a matter before the ERCOT Board of Directors or ERCOT Technical Advisory Committee.

63. **Non-Utility Subsidiaries –** NextEra Energy commits that Oncor, Oncor Holdings, reorganized EFIH, and Merger Sub (Reorganized EFH) will not, and will not permit any of its subsidiaries to, form or otherwise acquire control of any new non-utility subsidiaries without the prior approval of the Commission.[5]

64. **Consolidation of Lone Star Transmission, LLC ("Lone Star") into Oncor –** Subject to Commission approval of and closing of the Proposed Transactions, NextEra Energy commits that it will seek approval to consolidate Lone Star into Oncor and any net savings will be reflected in Oncor's cost of service.

65. **Implementation of Ring-Fencing Measures –** NextEra Energy will implement the ring-fencing and corporate governance measures set out above in Regulatory Commitments 1, 2, 3, 4, 9, 11, 14, 15, 16, 17, 31, 33, 34, 35, 36, 41, 42, 44, 48, 49, 50, and 63 within 120 days of acquisition closing for the purpose of providing protections to customers.

66. **Certificates of Compliance –** Oncor will file with the Commission an annual compliance report with respect to the ring-fencing and corporate governance requirements (referenced in Regulatory Commitment 65) certified by an executive with appropriate authority under penalty of perjury and certified by two disinterested directors of Oncor.  For the first five years following the closing of the transactions, Oncor will also file with the Commission on an annual basis a certificate of two disinterested directors of Oncor in which such directors certify that, to the best of their knowledge, all of the commitments set forth in these Revised Regulatory Commitments have been complied with.  To the extent that either of the two certifying disinterested director believes that he or she needs to add an exception to such certification for it to be, to the best knowledge of such director, true and correct in all material respects, such exception shall be reported to the Commission together with such certification and the Disinterested Directors shall be available to discuss their exceptions with the Commission.

67. **Sharing of Interest Rate Savings –** Oncor will provide monthly bill credits to electric delivery rates for ultimate credits to customers in an amount equal to 90% of

---

[5] This commitment also applies to the formation or acquisition of any new non-utility subsidiaries by TTHC upon the close of the transaction with TTHC.

the interest rate savings achieved until final rates are set in the next Oncor base rate case after the Oncor base rate case that is referenced in Regulatory Commitment 19. Until final rates are set in the next Oncor base rate case after the Oncor base rate case that is referenced in Regulatory Commitment 19, Oncor will file a report with the Commission every 6 months detailing the interest rate savings determined by multiplying the amount of debt issued by Oncor by at least 0.15% (amounts above 0.15% being based on actual interest rate savings by Oncor) and demonstrating a calculation of the credit. NextEra Energy and Oncor agree to work in good faith with TXU Energy Retail Company LLC, Texas Energy Association for Marketers, NRG Companies, and other interested parties to determine an acceptable method for implementation of the bill credits to effectuate this commitment, as approved by the Commission. At a minimum, Oncor shall provide retail electric providers 45-day notice of the amount of the customer credits (*e.g.*, for each customer class, the amount per kWh or per-customer credit that would apply) prior to the effective date of the credits and shall implement updated bill credits simultaneously with other changes in Oncor's rates.

68. **Reporting Relationships** – The Oncor CEO will report directly to the NextEra Energy CEO or President. Oncor employees will report through their management chain to the Oncor CEO. Unless otherwise required by the applicable law or permitted by order of the Commission, each existing position (or its functional equivalent(s)) that is a direct reporting position to the Oncor CEO will for a period of at least five years following such closing continue to be direct reporting positions to the Oncor CEO and the positions set forth in NextEra Energy Exhibit 39 in this docket, or their substantive equivalents if such positions change, may also have "dotted line" reporting relationships as specified on such exhibit.

69. **Competitive Shopping Platforms** – NextEra Energy agrees that neither Oncor nor Oncor's subsidiaries will host or allow the Oncor name, trademark, brand, logo, or other identifying brand features to be used to promote a competitive retail electric shopping website.

70. **Oncor LLC Agreement** - The Oncor LLC Agreement in effect immediately upon closing of the Proposed Transactions shall comply with the Final Order of the Commission approving the Proposed Transactions. Any changes to such agreement shall be approved by the Commission.

71. **Notice of Corporate Separateness** ~~Commitment~~ – In the event the credit ratings of NextEra Energy are downgraded to below investment grade by any one of the three major credit rating agencies (Standard & Poor's, Moody's Investors Service, or Fitch Ratings), NextEra Energy commits that it and its subsidiaries will provide advance notice of their corporate separateness to lenders on all new debt and will use commercially reasonable efforts to seek an acknowledgment representation of that separateness and non-petition covenants in all new debt instruments, including the debt instruments used in connection with financing the merger. This commitment will terminate at such time that the relevant investment grade credit rating of NextEra Energy is restored.

**72.** ~~Operating Expenses~~**Shared and Common Services Costs** – Oncor may not seek to recover shared and common services costs due to charges from NextEra Energy or its affiliates that in the aggregate are not equal to or lower than such costs ~~presently~~ incurred by Oncor directly or from other providers indirectly~~.~~ during 2016, adjusted for inflation.

**73.** **FERC Preemption -** Neither Oncor, NextEra Energy nor its affiliates will assert before the Commission or a Texas court of competent jurisdiction that the Commission is preempted pursuant to the Federal Power Act (e.g., under a FERC tariff) from making a determination regarding the prudence of affiliate costs sought to be allocated to Oncor.

PUC DOCKET NO. 46238

| | | |
|---|---|---|
| JOINT REPORT AND APPLICATION | § | |
| OF ONCOR ELECTRIC DELIVERY | § | PUBLIC UTILITY COMMISSION |
| COMPANY LLC AND NEXTERA | § | |
| ENERGY, INC. FOR REGULATORY | § | OF TEXAS |
| APPROVALS PURSUANT TO PURA | § | |
| §§ 14.101, 39.262, AND 39.915 | § | |

RECEIVED
2017 JUN 29  AM 11: 15
PUBLIC UTILITY COMMISSION
FILING CLERK

## ORDER DENYING SECOND MOTION FOR REHEARING

The Commission denies the second motion for rehearing filed by NextEra Energy, Inc. on June 27, 2017.

Signed at Austin, Texas the ____29th____ day of June 2017.

PUBLIC UTILITY COMMISSION OF TEXAS

_____
KENNETH W. ANDERSON, JR., COMMISSIONER

_____
BRANDY MARTY MARQUEZ, COMMISSIONER

W2013
q:\cadm\orders\final\46000\46238 order denying rehearing.docx

557