IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ENERGY FUTURE HOLDINGS CORP., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 14-10979 (CSS)<br><br>(Jointly Administered)<br><br>**Hearing Date:** January 8, 2018 |

**REPLY IN SUPPORT OF MOTION TO APPOINT A REPRESENTATIVE OF
THE MAJORITY CREDITORS TO THE FEE COMMITTEE**

Majority Creditors Elliott Associates, L.P., Elliott International, L.P., The Liverpool Limited Partnership, and Gatwick Securities LLC (collectively "Elliott") and Paloma Partners Management Company and Sunrise Partners Limited Partnership (collectively "Paloma") hereby submit this Reply in further support of their *Motion to Appoint a Representative of the Majority Creditors to the Fee Committee* (D.I. 12358) (the "Motion").[2] In support of the Reply, the Majority Creditors respectfully state as follows:

**INTRODUCTION**

1. Since early November, the Fee Committee and Debtors have had opportunity to engage with the Majority Creditors, seek to resolve issues and to voice their concerns. They did none of these things. Instead, they waited until the instant Motion and the filing of responses to raise concerns that easily could have been addressed – or at least crystalized for the Court – long before. Those filings (D.I. 12414 and 12416, respectively) rely on unsupported and wholly inaccurate characterizations of the Motion and the underlying Fee Committee Order itself. They

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification Numbers is not provided herein.

[2] All capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

2

also fail to refute the core facts giving rise to the Motion, such as the Committee's modest efforts to address estate spend and the refusal to respond to even basic inquiries about the its work and procedures.

2.  The equitable relief requested in the Motion begs for a common sense approach to Committee process: that a legitimate body charged to "monitor, review and assess" all fees include a direct representative of the parties most directly affected by the Committee's work. Contrary to the doom and gloom cited in Debtors' Opposition, the Motion does not seek majority control of the Committee or to somehow supplant the current "Independent Member." Rather, the Majority Creditors merely seek a seat at a table already occupied by the remaining primary estate constituents: the Debtors' lead representative, Paul Keglevic, who has often testified against the creditors' role and interests (and with him, Debtors' counsel whose fees make up a significant portion of the estate burn cited in the papers) and the U.S. Trustee. Moreover, the Majority Creditors repeatedly have offered to consult with the Committee and other parties, including the UCC, Debtors and the U.S. Trustee, on the identity of such person. Those offers have mostly been ignored. Most recently, the Majority Creditors proposed to designate, jointly with the UCC or separately, James P. Carroll, CPA, a respected independent fiduciary and trustee with experience in this area.

3.  At bottom, the Debtors and Committee counsel ascribe ill-motive to the Majority Creditors' interest in helping to promote a legitimate Committee process. Their papers cite no factual evidence, instead relying on innuendo and mischaracterizations, *e.g.*, that the Majority Creditors intend to "arbitrarily" drive fees to "below market" rates. These are unfounded and false accusations. The Motion and its supporting papers make clear the Majority Creditors' legitimate motivations and interests: to satisfy the Committee's mandate and protect the estate's dwindling assets by scrutinizing fee applications and providing robust oversight of professional fee burn in the run-up to estate confirmation.

**ARGUMENT**

4. Debtors and the Committee counsel present three thematically-overlapping arguments in response to the Motion: *First*, they re-cast the Committee's role as merely "advising" the Court about the "reasonableness" of fees. This contradicts the Committee Order itself which mandates that it apply applicable Bankruptcy standards which require the Committee to determine whether fees were "necessary" and "beneficial" to the estate (section 330), and further provides that the Committee is empowered to engage in fifteen supervisory and, if necessary, litigious roles, including analyzing "budgets, staffing plans" and promulgating "guidelines" regarding advisor work. *Second*, the Debtors and Committee contend that the Committee is solely reserved for fully independent estate "fiduciaries," even though that material (and loaded) term is found nowhere in the Committee Order itself. Notably they ignore material facts regarding the current alleged creditor representative, Peter Kravitz, that would disqualify him from continuing in that role given that he was a creditor principal himself as well as litigation "general counsel" for his firm, Province, Inc. (Mr. Kravitz has other entanglements discussed below.) *Third*, they argue that any direct representative of a creditor group, even one such as the Majority Creditors, would create a parade of pragmatic concerns about the smooth functioning of the body and issues around confidentiality. However, the creditors' representative holds only one seat and doubtless will be voted down on issues with which the remaining Committee members disagree. And confidentiality concerns can be handled in the ordinary course through a protective order, although it is notable that no such confidentiality restriction has ever been memorialized.

**I.    THE OBJECTION AND RESPONSES DO NOT CHALLENGE MOST OF THE UNDERLYING FACTS GIVING RISE TO THE MOTION**

5. The Debtors and Fee Committee counsel do not address – and essentially ignore – the Majority Creditors' key facts giving rise to their concerns about the Committee's work and

interest in helping to play a constructive role.[3] Fee savings achieved by the Committee have been *de minimis*. (Motion ¶ 21; Rosenbaum Decl. ¶ 7). The Committee's refusal to share or provide basic information regarding its work, such as an overview of the various advisor groups, the amount of fees paid and fees accrued, the Committee's assessment of the active advisors' ongoing roles, formal agreements with financial advisors, and internal Committee procedures. Despite repeated requests from the Majority Creditors, the Committee has not presented a recommendation for reducing ongoing spend by professionals or requested budgets from such professionals for necessary work through confirmation. The Committee also has refused the Majority Creditors' request to issue guidelines to professionals regarding duplicative and unnecessary work for which professionals will not be compensated by the estate. The Fee Committee's response is that issuing such guidelines, aimed at protecting the estate by reducing unnecessary and duplicative spend, is not part of its job. (D.I. 12414 at ¶ 24).

6. The Fee Committee and Debtors do not dispute these shortcomings of the Fee Committee's work to date. Instead, they embrace it, repeatedly emphasizing the limited role of the Committee and constraining its supposed supervisory powers. The Committee's review of fee applications has focused on areas such as excessive numbers of attendees at hearings and at depositions, time billed for invoicing activities and other administrative tasks that are properly part of a professional's overhead, travel expenses, block billing, and lack of sufficient detail in time records. (*See, e.g.,* D.I. 8800 at 3, D.I. 11038 at 3). Though unnecessary fees should certainly be reduced in these areas, the Committee has failed to look more broadly and identify other areas in which duplicative and unnecessary work is being done. For example, the Committee has failed to consider whether substantially similar work is being conducted by multiple advisors representing related entities.

---

[3] Neither the Debtors nor the Fee Committee submitted declarations with their responses to the Motion. All factual assertions made in their Response and Objection are inadmissible.

7. The Committee's modest reductions in fees have all been achieved with the consent of the relevant professionals, and the Committee members have voted unanimously on all fee applications. The fact that professionals who are being paid nearly all of their requested fees are not objecting to the Fee Committee's recommendations does not indicate that the Committee's process has been a success; rather, it bespeaks a lack of effort on the part of the Committee to achieve meaningful reductions in excessive, unnecessary and duplicative fees.

## II.     THE FEE COMMITTEE'S ROLE IS NOT MERELY QUANTITATIVE

8. Both the Debtors and the Fee Committee short change the Committee's job and the relevant standards it is to apply in evaluating fee applications. The Debtors claim that the Committee's job is not to "materially reduce fees," while the Committee contends that its role is not to advise professionals regarding the type of work for which they will be compensated by the estate. Both contentions are wrong.

9. **The Committee Is Manded with Broad Authority to Oversee Fees**. As set forth in the Order, the Committee has the power to "monitor, review and assess" all fee applications for their compliance with Sections 328, 330 and 331 of the Bankruptcy Code, as applicable; Rule 2016 of the Federal Rules of Bankruptcy Procedure; this Court's Interim Compensation Order; the Local Rules for Delaware Bankruptcy Courts; and the U.S. Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 for Attorneys in Larger Chapter 11 Cases. (D.I. 1896, Order ¶ C.1). The Order also grants the Committee the authority to file comments on the docket regarding fee applications (*id*. ¶ C.2.a); discuss their concerns regarding a fee application with the relevant professional and request additional information (*id*. ¶ C.2.b); and to negotiate with professionals regarding objections to fee applications and to "consensually resolve such objections where appropriate." (*Id*. ¶ C.2.g).

10. But the Fee Committee's powers under the Order do not stop there. Pursuant to the Order, the Committee also has the broad authority to (1) "[r]equire that Retained Professionals provide budgets, staffing plans, or other information to the Fee Committee" (*id*. ¶

6

C.2.c); (2) promulgate "[w]ritten case-specific guidelines" that supplement the statutory and other authorities that govern the Committee's work (*id*. ¶ C.2.f); (3) "[s]erve, file and litigate objections to the allowance or payment of fees or reimbursement of expenses" in a fee application (*id*. ¶ C.2.k); and (4) "[c]onduct discovery, including filing and litigating discovery motions or objections concerning Fee Committee matters." (*Id*. ¶ C.2.n).

11.     Thus, the power to advise estate professionals regarding the types of work for which they will and will not be compensated – *i.e*., the types of work that the Committee believes are reasonable and necessary – falls squarely within the Committee's mandate. Likewise, the Committee is authorized by the Order to recommend policies and procedures to reduce ongoing spend by professionals through plan confirmation. Though the Committee has proved unwilling to issue such recommendations, despite repeated requests by the Majority Creditors, it is fully authorized to do so.

12.     **The Standard to Be Applied to Fee Applications**. The Debtors and the Committee also misapprehend the purpose of Committee's review of fee applications and the statutory standard it is to apply. The Fee Committee was granted the powers enumerated in the Order so that it could aid the Court in fulfilling its "duty to review fee applications," a duty that "derives from the court's inherent obligation to monitor the debtor's estate and to serve the public interest." *In re Busy Beaver Bldg. Centers, Inc*., 19 F.3d 833, 841 (3d Cir. 1994). In bankruptcy cases, "neither the debtor nor the attorneys for the creditors have an incentive in the 'club' atmosphere of the bankruptcy bar to raise objections to fee requests." *In re APW Enclosure Sys., Inc*., No. 06-11378 (MFW), 2007 WL 3112414, at *2 (Bankr. D. Del. Oct. 23, 2007). The Court must therefore step in and "protect the estate, lest overreaching attorneys or other professionals drain it of wealth which by right should inure to the benefit of unsecured creditors." *In re Busy Beaver*, 19 F.3d at 844.

13.     To accomplish this goal of protecting the estate, the Court may only award "reasonable compensation" for "actual, necessary services" provided by attorneys and other professionals. 11 U.S.C. § 330(a)(1)(A) (emphasis added). The reasonableness of a fee request

is "based on (i) the nature of the services, (ii) the extent of the services, (iii) the value of the services, (iv) the time spent on the services, and (v) the cost of comparable services in non-bankruptcy cases." *In re Busy Beaver*, 19 F.3d at 840 (citing 11 U.S.C.A. § 330(a)).  The court cannot allow compensation for "unnecessary duplication of services," 11 U.S.C. § 330(a)(4)(A)(i), or "for services that were not reasonably likely to benefit the estate or were not necessary to the administration of the estate." *In re Cal Dive Int'l, Inc.*, No. 15–10458 (CSS), 2015 WL 9487852, at *2 (Bankr. D. Del. Dec. 28, 2015) (Sontchi, J.); *see also* 11 U.S.C. § 330(a)(4)(A)(ii); *In re Busy Beaver*, 19 F.3d at 856 (court "should review a fee application to ensure the applicant exercises the same 'billing judgment' as do non-bankruptcy attorneys by, for example, writing off unproductive research time, duplicative services, [and] redundant costs precipitated by overstaffing").

14.  Applying these standards, courts often reduce fees where professionals have engaged in duplicative or otherwise inappropriate work that does not benefit the estate or the creditors.  *See, e.g., In re Channel Master Holdings, Inc.*, 309 BR 855, 863 (Bankr. D. Del. 2004) (reducing fees for UCC's counsel for duplicative work where senior attorneys were handling the case and thus "it was not necessary for more than one professional to attend the hearings or the auction"); *id.* at 864 (reducing fees for financial advisor where excessive time billed "does not appear to have rendered much of a benefit to the Debtors' estates or creditors"); *In re Armstrong World Industries, Inc.*, 366 BR 278, 282-83 (Bankr. D. Del. 2007) (reducing fees where five professionals attended hearing and deposition preparation session; court determined that the attendance of two professionals was unnecessary); *In re Fleming Cos., Inc.*, 304 BR 85, 90 (Bankr. D. Del. 2004) (reducing fees for debtor's counsel where court found their actions were improper and did not provide benefit to the estate).

15.  In its role assisting the Court in reviewing fee applications, the Committee must follow the same legal standards, protecting the estate by reviewing fee applications to ensure that approved fees are compliant with the relevant provisions of the Bankruptcy Code.  (Order ¶ C.1.a).  Though the Debtors asserts otherwise, the Fee Committee can (and must) materially

reduce fees when the requested fees are not reasonable and necessary. While the Committee must also ensure that professionals are treated fairly, fair treatment does not require that the Committee approve, as it has here, nearly 99% of all professionals' fees. Nor does fair treatment require that professionals be allowed to perform work and incur fees free from the Committee's oversight.

16. Moreover, in a case where so many constituents have retained professionals, all of whom are seeking payment from the estate (*see* Hagey Reply Decl.), it is particularly important to examine the reasonableness of fees of any given professional not in isolation but as part of the collective, *e.g.*, to do its work properly here, the Fee Committee must (but by admission has not) look to see whether multiple professionals are doing the same or duplicative work such that the work of one or more not "necessary to the administration of, or beneficial" to the estate. 11 U.S.C. § 330(a)(3)(c).

### III. THE MAJORITY CREDITORS' GOALS ARE ALIGNED WITH THE FEE COMMITTEE'S MANDATE

17. At the heart of the Debtors' Objection to the Majority Creditors' Motion is the false assumption that the Majority Creditors'[4,5] purpose in joining the Fee Committee is to disrupt the process, prevent professionals from receiving payment for reasonable and necessary fees and expenses, and "reduce fees to a non-market level." (D.I. 12416 at 2, 5-7). The Debtors' (or their counsel's) self-serving argument reveals a fundamental hostility to any substantive review of its professionals' fees. It also makes plain the need for the Fee Committee to welcome a member who will insist on scrutinizing fee applications for the benefit of the remaining unsecured creditors, of which the Majority Creditors are the largest stakeholder.

---

[4] The Debtors altogether ignore Paloma's role in and support for the Majority Creditors' Motion.

[5] The Majority Creditors' Motion indicated that the EFH Indenture Trustee supported the Majority Creditors' Request to join the Fee Committee. The EFH Indenture Trustee since has clarified that it supports the request only insofar as it was made by Elliott, which is one of its constituents.

18. To muddy the issue, the Debtors argue nonsensically that because the Majority Creditors (along with *all* unsecured creditors) would directly benefit from a reduction in fees, they are ill-suited to advocate for them. The Debtors turn logic on its head. The Majority Creditors are perfectly suited to represent the interests of all unsecured creditors on the Committee *because* they have a vested interest in preserving estate resources and guaranteeing that only professional fees which are "actual and necessary" are paid by the estate.

19. Notably, the Majority Creditors have never taken the position that the professionals in these cases should be paid at reduced, "non-market" rates. To the contrary, the Majority Creditors have no objection to professionals receiving market rates for their services, so long as the services for which they are paid are actual and necessary.

20. Finally, Debtors argument that the Majority Creditors should be shut out of the Committee because they are new to the case makes no sense. That certain creditors are relatively new to these cases is irrelevant for determining whether estate resources have or will be improperly wasted on professional fees.

### IV. THERE IS NO "FIDUCIARY" REQUIREMENT FOR PARTICIPATION ON THE FEE COMMITTEE.

21. The Debtors' Objection is based, in part, on another fundamentally flawed reading of the Order and misunderstanding of the purpose of the Fee Committee: namely that each Committee member must be able to act as a "fiduciary" to the constituents it represents. (D.I. 12416 at 6, 9-11).[6] The Debtors' position is belied by the plain language of the Order and undercut by Peter Kravitz's role as the current UCC representative.

22. On its face, the Order does not require that each of its four members act as fiduciaries to their constituents. The Order does not contain the word "fiduciary." And apart from the independent member (who must be "disinterested"), the Order provides for the selection of individuals "appointed by and representative of" the Debtors, the UCC, and the U.S. Trustee.

---

[6] The Fee Committee's suggestion that members are "fiduciaries" because they are "appointed officers of the Court" is similarly misplaced. (D.I. 12414 ¶ 10).

(*See* Order at ¶ A.2). Debtors cite no authority – because there is none – for the proposition that a person who is "representative of" a particular class of persons need also be a person who owes fiduciary duties to that class.

23.     The Majority Creditors are "representative of" the remaining class of unsecured creditors because they own approximately 40% of the remaining EFH debt and approximately 90% of the outstanding unsecured debt of EFIH. (Motion ¶ 19). Any savings achieved by virtue of the Majority Creditors' membership on the Committee would necessarily inure to the benefit of all unsecured debt holders in proportion to the size of their ownership interests.

24.     Perhaps more importantly, the suggestion that each of the existing Fee Committee members is acting as a neutral, conflict-free fiduciary is pure fiction. Peter Kravitz, the current UCC representative, cannot possibly be acting as a fiduciary to the Majority Creditors, or other unsecured E-side creditors, for a host of reasons: *First*, it is unclear that Kravitz holds or ever has held unsecured interests in the E-Side entities. In its objection, the Fee Committee describes Kravitz as "a UCC member representative of a major EFH Corporate Services vendor that held claims against both T-Side and E-Side entities." (D.I. 12414 at 11). The "major EFH Corporate Services vendor" in question appears to be Province, Inc., of which Kravitz is a Principal and General Counsel. *Second*, Kravitz's membership on the Fee Committee may violate the provision of the Order which prohibits any "Retained Professional" from serving on the Fee Committee in any capacity. (*See* Order ¶ 4). Kravitz's firm's website lists Province as the "liquidating trustee" of Energy Futures. *See* http://provincefirm.com/recent-engagements-1/ . If Province/Kravitz has been engaged and/or paid by the Debtors in any capacity, then Kravitz's service on the Fee Committee violates the Order and gives rise to a clear conflict that would prevent Kravitz from representing the interests of the unsecured creditors.

25.     *Third*, a search of public records reveals that Mr. Kravitz's firm routinely has been retained as an advisor in bankruptcies where Debtors' counsel also has played a lead role

11

for the estate.[7] This is not unlike the broader commercial relationship between Debtors' counsel and other estate representatives in this case, such as Paul Keglevic, who serves on multiple boards and advisory roles in other restructuring matters helmed by Debtors' same counsel. It is unclear at this point in time whether such relationships create any legally disqualifying conflict but, at minimum, they should have been disclosed, particularly if Debtors' "fiduciary" standard were to apply to the Committee's work. *Fourth*, as Province's General Counsel and a litigator, Kravitz presumably owes fiduciary duties to his company and its clients. Under the standard evoked by Debtors and the Fee Committee, such interests inherently would have been disqualifying. For example, Kravitz's fiduciary duties to Province would prevent him from acting in a fiduciary capacity to the E-Side unsecured creditors in the very same manner that Debtors claim prevents Ms. Berger from acting as a fiduciary to all unsecured creditors.[8]

26.  *Finally*, it is difficult to understand how Kravitz can be said to be acting as a fiduciary to the Majority Creditors, with whom he has never communicated. When recently asked, the Fee Committee's own lawyers were unable to identify a single person or entity to whom Kravitz currently reports on Fee Committee matters. (Hagey Reply Decl. ¶ 6). If Kravitz

---

[7] A few examples of cases where Kravitz has worked with Kirkland & Ellis LLP: *In re Avaya Inc.*, No. 17-10089 (Bankr. S.D.N.Y.) (Kirkland & Ellis, Counsel to Debtors; Kravitz/Province, Liquidating Trustee); *In re BPS U.S. Holdings*, No. 16-12373 (Bankr. D. Del.) (Kirkland & Ellis, U.S. Counsel to Purchaser; Kravitz/ Province, Financial Advisor to UCC); *In re Pacific Sunwear of Calif.*, No. 16-10882 (Bankr. D. Del.) (Kirkland & Ellis, Counsel to Term Loan Agent; Kravitz/ Province, Financial Advisor to UCC); *In re RS Legacy Corp.*, No. 15-10197 (Bankr. D. Del.) (Kirkland & Ellis, Counsel for Interested Parties; Kravitz/ Province, Liquidating Trustee); *In re Sansom Resources Corp.*, No. 14-11934 (Bankr. D. Del.) (Kirkland & Ellis, Counsel to Debtors; Kravitz/ Province, Settling Trustee).

[8] The Debtors' claim that Ms. Berger is "unqualified" to serve on the Fee Committee is based exclusively on the argument that she cannot simultaneously act as a fiduciary to the Majority Creditors and other unsecured creditors who are not also her clients. (D.I. 12416 at 16.) The Debtors raise no objections to Ms. Berger's experience examining financial records and transactions, nor could they. Ms. Berger has almost two decades of experience as a federal prosecutor, during which time she oversaw complex investigations of fraud and other financial crimes, including referrals from the U.S. Trustee in New York. She also has held senior investigative and compliance roles at several private organizations. In any event, to address the concerns raised by the Debtors and UCC, the Majority Creditors are willing to appoint an individual unaffiliated with them to serve in Ms. Berger's stead. (Hagey Reply Decl., Ex. 2).

is performing his Fee Committee duties in a vacuum – as he apparently is – he is hardly discharging them as a fiduciary to anyone, least of all the Majority Creditors.

27. In short, the Majority Creditors' interests are plainly representative of the interests of all unsecured creditors – *i.e.*, to preserve estate resources and maximize recovery. That is all the Order requires.

## V. OTHER CONCERNS REGARDING A MAJORITY CREDITOR REPRESENTATIVE ARE MISPLACED

### A. Confidentiality Concerns Can Be Easily Addressed Through a Protective Order

28. Debtors argue that a representative of the Majority Creditors cannot sit on the Fee Committee because the seat would give them access to confidential information that they could use improperly outside the Fee Committee process. (D.I. 12416 at 10). Confidentiality concerns, however, do not justify the withholding of relevant information that can be disclosed subject to a protective order. Though the Debtors state – without any basis – that they have "no reason to believe" that the Majority Creditors would not keep non-public information confidential, courts generally presume that parties will comply with the terms of a protective order, especially one that imposes heightened restrictions, such as "attorney's eyes only" access.

29. Here, the entry of a protective order, which the Majority Creditors are prepared to sign, would prevent the Majority Creditors from using non-public information outside the Fee Committee process. For example, the protective order could: (1) limit disclosure of non-public information to BraunHagey in its capacity as special counsel to the Majority Creditors, BraunHagey's experts (if any) and a single representative of the Majority Creditors; and/or (2) prohibit disclosure to the Majority Creditor's bankruptcy counsel, which would prevent any use of Fee Committee confidential information to gain a litigation advantage in these proceedings.

### B. Concerns About the Compensation of BraunHagey Are a Red Herring

30. BraunHagey was retained as special counsel by the Majority Creditors to work on issues that directly overlap with the Fee Committee's mandate. While the firm's

communications and work product with its clients are privileged, it has confirmed that work on or related to the Committee is on a "time and materials" basis, *i.e.*, not contingency. Regardless, the Majority Creditors repeatedly have offered to appoint a non-attorney representative, whether a principal of one of their firms or a third party, to serve. Most recently, the Majority Creditors proposed that James P. Carroll, a well-regarded restructuring professional, be nominated to take Mr. Kravitz's seat. (*See* Hagey Reply Decl., Ex. 2.)

31. The Majority Creditors do not disagree that, in connection with Mr. Carroll's (or some other independent trustee's) appointment, he or she would need to be compensated by means other than through the estate. The Debtors and Committee briefs appear to go further than that, however, arguing that *any* compensation would be inappropriate. This is a misreading of the Order, which states that "No Fee Committee Member, except the Independent Member, shall receive compensation for service on the Fee Committee or time expended on Fee Committee matters." (Order ¶ E.1). In context, however, the logical reading of this provision is that no member shall be compensated *by the estate* (the remainder of the paragraph and later sections refer to estate compensation as the crux). To hold otherwise would unnaturally penalize the creditors' seat on the Committee given that all other members effectively are being compensated for their work, most of them, in fact, by the estate.

C. **The Majority Creditors' Economic Incentives Will Positively Impact the Committee's Mandate**

32. The argument that the Majority Creditors cannot fairly represent the interests of all unsecured creditors because they hold "materially larger" interests in EFIH as compared to EFH is senseless. (D.I. 12416 at 10-11). Even if the Majority Creditors were incentivized to negotiate disproportionately large cuts to fees and expenses incurred by EFIH advisors, as opposed to EFH advisors (they are not), with only a single seat on a four-person committee, the Majority Creditors could not achieve that result even if it were their end goal.[9] Rather, to

---

[9] The Debtors argue that the T-Side creditors have an interest in maintaining the current composition of the Fee Committee because "a number of TCEH-retained professionals have not had their final fee applications approved by

14

achieve real results, the Majority Creditors' representative would need to (and will) work cooperatively with the other Committee members to ensure that advisors are paid only for actual and necessary services.

**D.**   **The Debtors' Bad Faith Discovery Tactics Support the Need for a Modification to the Current Fee Committee Structure**

33.   To the extent any party has questionable motives with respect to the Majority Creditors' application to join the Fee Committee, it is the Debtors themselves.  Hours after the Majority Creditors filed their motion, Debtors' counsel served voluminous discovery requests on the Majority Creditors and BraunHagey, seeking documents and noticing depositions. Several of the discovery requests had nothing to do with the pending motion, such as requests for communications with news organizations concerning the Debtors.  And virtually all of the requests directed to BraunHagey requested obviously privileged communications.

34.   The Majority Creditors remain perplexed as to why the Debtors are fighting so hard to prevent them from gaining transparency into the fee review process and to block their efforts to preserve estate assets.  The Majority Creditors' goal, which should be a shared one among all constituencies, is to improve the fee review process.

**E.**   **The Appointment of a Majority Creditor Representative Will Help Streamline the Fee Approvals**

35.   The Chapter 11 cases are nearly four years old and have been through many twist and turns.  The Debtors and the estate have benefited from the hard work of the multiple Retained Professionals.  The path to plan confirmation is now quite linear.  Now is the ideal time to revamp the Fee Committee process so that all stakeholders, including the largest – the Majority Creditors – can participate cooperatively in ensuring that professionals are compensated

---

final order." (D.I. 12416 at 11-12).  According to the UCC, however, "the TCEH debtors have emerged from bankruptcy and the final fee applications of the TCEH estate professionals have been approved and paid on a final basis." (D.I. 12415 at 4 & n.3) (citing Omnibus Order Awarding Final Request for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses [D.I. 11072], which includes fee applications of counsel and financial advisors to the T-Side Debtors and TCEH Committee).

for their reasonable, actual and necessary work in support of confirmation.  All parties will benefit from a robust and focused process now, on the front end, as opposed to second-guessing of the Fee Committee's work during the final approval process.  The Majority Creditors are uniquely situated and motivated to help in that process.

36.     The Debtors' Objections, if sustained, will effectively lock the Majority Creditors out from any real and substantive participation, leaving them no choice but to bring collateral proceedings and challenges to fee applications and interim approvals, which will only complicate matters, lead to uncertainty, and prolong the proceedings.

## **CONCLUSION**

The Majority Creditors have sought in good faith to join a Committee process whose goal is to monitor and review the substantial expenditure of estate resources on professional fees.  All common sense and equity dictates that such parties have an active role.  In the event the other constituents continue to oppose or reject the Majority Creditors' overtures, there doubtless will be a substantial increase in fee application litigation.  Toward that end, the Court should consider modifying the existing Committee Order to provide for:  (a) appointment of a true unsecured creditor representative (such as James Carroll) who is unencumbered with questions raised regarding Mr. Kravtiz's status, (b) disclosure of all Committee work product to the Majority Creditors (and any other estate constituency) under cover of a Protective Order, (c) process for ensuring more routine disclosure of information to key constituencies, and (d) notice to all estate professionals that existing applications are likely subject to scrutiny by the Majority Creditors and to encourage such entities to provide information and collaborate with those parties to reduce unnecessary estate burn.

| | |
|---|---|
| Wilmington, Delaware<br>Date: January 5, 2018 | FRIEDLANDER & GORRIS, P.A.<br><br>  /s/ Jeffrey M. Gorris<br>Jeffrey M. Gorris<br>1201 N. Market St., Suite 2200<br>Wilmington, Delaware 19801<br>Tel: (302) 573-3500<br>Fax: (302) 573-3501<br>Email: jgorris@friedlandergorris.com<br><br>-and-<br><br>BRAUNHAGEY & BORDEN LLP<br>J. Noah Hagey (*pro hac vice*)<br>Amy Brown (*pro hac vice*)<br>7 Times Square, 27th Floor<br>New York, NY 10036-6524<br>Tel. & Fax: (646) 829-9403<br>Email: hagey@braunhagey.com<br>          brown@braunhagey.com<br><br>*Counsel to the Majority Creditors Elliott Associates, L.P., Elliott International, L.P., The Liverpool Limited Partnership, Gatwick Securities, LLC, Paloma Partners Management Company, and Sunrise Partners Limited Partnership* |