Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4   In re:                          :

5                                   :    Chapter 11

6   ENERGY FUTURE HOLDINGS          :    Case No. 14-10979 (CSS)

7   CORP., et al.,                  :    (Jointly Administered)

8            Debtors.              :

9   _____:

10  ENERGY FUTURE HOLDINGS CORP., :

11           Plaintiff,            :

12      v.                          :    Adv. Proc. No.

13  VISTRA ENERGY CORP.,            :    17-51785 (CSS)

14           Defendant.            :

15  _____:

16                                  United States Bankruptcy Court

17                                  824 North Market Street

18                                  Wilmington, Delaware

19                                  January 8, 2018

20                                  11:07 AM - 1:41 PM

21  B E F O R E :

22  HON CHRISTOPHER S. SONTCHI

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO OPERATOR:   UNKNOWN

Page 2

1    HEARING re Adversary Complaint (Filed Under Seal) [Adv. D.I.

2    1; filed October 10, 2017]

3

4    HEARING re Motion to Appoint a Representative of the

5    Majority Creditors to the Fee Committee [D.I. 12358; filed

6    December 17, 2017]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    STEVENS & LEE

4         Attorneys for EFIH Committee

5

6    BY:  JOSEPH HUSTON, JR.

7

8    KIRKLAND & ELLIS LLP

9         Attorneys for the Debtors

10

11   BY:  CHAD HUSNICK

12        MARK MCKANE

13        APARNA YENAMANDRA

14

15   GODFREY & KAHN S.C.

16        Attorneys for the Fee Committee

17

18   BY:  BRADY C. WILLIAMSON

19        KATHERINE STADLER

20

21   BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

22        Attorneys for the Fee Committee

23

24   BY:  KEVIN CAPUZZI

25

1   POTTER ANDERSON & CORROON LLP

2        Attorneys for EFIH DIP Agent

3

4   BY:  R. STEPHEN MCNEILL

5

6   RICHARDS, LAYTON & FINGER, P.A.

7        Attorneys for the Debtors

8

9   BY:  DANIEL J. DEFRANCESCHI

10       JASON M. MADRON

11

12  UNITED STATES DEPARTMENT OF JUSTICE

13       Attorney for the U.S. Trustee

14

15  BY:  RICHARD L. SCHEPACARTER

16

17  GITLIN & CO., LLC

18       Fee Committee Chair, Independent Member

19

20  BY:  RICHARD GITLIN

21

22  MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP

23       Attorneys for the Official Committee

24

25  BY:  NATALIE RAMSEY

1   SULLIVAN & CROMWELL

2        Attorneys for the Official Committee

3

4   BY:  BRIAN GLUCKSTEIN

5

6   CROSS & SIMON

7        Attorneys for EFH Indenture Trustee

8

9   BY:  CHRISTOPHER P. SIMON

10

11   NIXON PEABODY

12        Attorneys for EFH Indenture Trustee

13

14   BY:  RICHARD PEDONE

15

16   HOGAN MCDANIEL

17        Attorneys for Fenicle, Fahy, Jones, et al.

18

19   BY:  DANIEL V. HOGAN

20

21   BIELLI & KLAUDER LLC

22        Attorneys for EFH Corp.

23

24   BY:  DAVID KLAUDER

25

1   FRIEDLANDER & GORRIS, P.A.

2        Attorneys for Majority Creditors

3

4   BY:  JEFF GORRIS

5

6   BRAUNHAGEY & BORDEN LLP

7        Attorneys for Majority Credtors

8

9   BY:  NOAH HAGEY

10       AMY BROWN

11

12  KLEHR HARRISON HARVEY BRANZBURG LLP

13       Attorneys for UMB Bank, N.A. Indenture Trustees

14

15  BY:  RAYMOND H. LEMISCH

16

17  ALSO PRESENT TELEPHONICALLY:

18

19  ARLENE R. ALVES

20  PEG A. BRICKLEY

21  JOSHUA BRODY

22  JAMES P. CARROLL

23  CHRISTOPHER L. CARTER

24  ALLISTER CHAN

25  W. ANDREW DALTON

 1    ERIC C. DAUCHER

 2    BRADLEY FEINGERTS

 3    MARK A. FINK

 4    TAYLOR B. HARRISON

 5    HAROLD KAPLAN

 6    PATRICK C. MAXCY

 7    HAL F. MORRIS

 8    JOANNA S. NEWDECK

 9    DAVID NGUYEN

10    JEFFREY ROSEMBAUM

11    ERIK SCHNEIDER

12    NED S. SCHODEK

13    NOAH M. SCHODEK

14    NOAH M. SCHOTTENSTEIN

15    NACIF TAOUSSE

16    MARK K. THOMAS

17    PETER YOUNG

18    MARK A. CODY

19    LAURA DAVIS JONES

20    MICHAEL FIRESTEIN

21    JOSEPH A. FLORCZAK

22    ANGELO THALASSINOS

23    STEPHANIE S. WICKOUSKI

24

25

1                    P R O C E E D I N G S

2               CLERK:  All rise.

3               THE COURT:  Please be seated.

4               MR. HUSNICK:  Good morning, Your Honor.  Chad

5    Husnick, Mark McKane and Aparna Yenamandra on behalf of the

6    Debtors.

7               THE COURT:  Good morning.  Happy New Year.

8               MR. HUSNICK:  Happy New Year, Your Honor.  I have

9    a little bit of good news and a little bit of bad news, I

10   guess depending on your perspective.

11              THE COURT:  All right.

12              MR. HUSNICK:  The good news is, I'm back after six

13   months.  The bad news is, it's till EFH.  So Your Honor, if

14   I may, I'd like to give you a little bit of a status update

15   on EFH since the last court hearing.

16              On the PUCT front, Your Honor, we positive news to

17   report regarding the efforts to achieve PUCT approval of the

18   Sempra Oncor change in control application.  Sempra and

19   Oncor have recently signed a stipulation with key regulatory

20   authorities that include the PUCT staff, the Office of the

21   Public Utility Counsel, the steering Committee of cities

22   served by Oncor, the Texas Industrial Energy Consumers, the

23   Texas Energy Association for Marketers and the Alliance for

24   Retail Markets.  This stipulation was filed with the PUCT on

25   Friday.

1           It is not a unanimous stipulation, as there are

2    certain nonconsenting intervenors who have not signed on to

3    the stipulation as of yet.  Nevertheless, this is a very

4    significant step forward, particularly because many of these

5    intervenors that have signed the stipulation were some of

6    the key objectors in prior change in control applications.

7           The next open meeting, Your Honor, is scheduled

8    for January 11th.  And as always, we will continue to keep

9    the Court appraised as developments warrant down in Texas.

10          THE COURT:  All right.  Thank you.

11          MR. HUSNICK:  On the -- thank -- you're welcome.

12          On the financing front, Your Honor, on October

13   6th, 2017 Sempra and the company amended the Sempra merger

14   agreement to eliminate third party financing.  Put another

15   way, any financing would be completed at the Sempra level.

16   On January 2nd, 2018 Sempra announced a concurrent offering

17   of 2.5 billion of common stock and 1.5 billion of mandatory

18   convertible preferred stock as equity financing.  So the

19   parties continue to move the deal forward in anticipation of

20   potential regulatory approval and ultimately confirmation.

21          Your Honor, finally on the earnings and profits

22   tax dispute, as Your Honor is aware, there's an ongoing

23   dispute over the tax matters agreement between EFH Corp and

24   Vistra Energy, that is the spun-off entity, the former TCEH,

25   regarding whether the earnings and profits from the 2016 tax

1    year, prior to the spin-off of Vistra from TCEH, would be

2    allocated to Vistra or to EFH Corp.  Your Honor, I believe,

3    has scheduled a February 15th, status update on that

4    discussion, so I will stay away from the detail here, but

5    just wanted to preview that it is coming before Your Honor.

6                    THE COURT:  Okay.

7                    MR. HUSNICK:  Your Honor --

8                    THE COURT:  It's not resolved, I take it?

9                    MR. HUSNICK:  Not as of yet, Your Honor.

10                   THE COURT:  Okay.

11                   MR. HUSNICK:  So, Your Honor, I think the one item

12   on today's agenda is the motion filed by the Elliott

13   creditors to appoint a member to the fee review Committee.

14   And Your Honor, that motion was filed by Elliott, so I'd

15   propose that they take the podium and lead the argument.

16   The Debtors would then be prepared to respond to that

17   opening argument.  And followed by the Debtors, I understand

18   that a couple of parties want to make statements, including

19   the Official EFH Committee, then the U.S. Trustee, counsel

20   for the Fee Review Committee and ultimately Mr. Gitlin would

21   like to address the Court directly at the conclusion.

22                   THE COURT:  Okay.

23                   MR. HUSNICK:  Thank you, Your Honor.  I'll --

24                   THE COURT:  Thank you, Mr. Husnick.

25                   MR. HUSNICK:  -- cede the podium to Mr. Hagey.

1          THE COURT:  Thank you.

2          MR. HAGEY:  Good morning Your Honor, and also good

3     new year.

4          THE COURT:  Good morning.

5          MR. HAGEY:  Elliott and Paloma which are the

6     Majority Creditors who bring the motion are, you know,

7     caught in an interesting whipsaw, I think.  There's a

8     genuine desire on my client's behalf to actually be a

9     constructive force within the existing process.  When we

10    were first engaged around the concept of looking at advisor

11    fees, several months ago, it was clear there were a couple

12    paths that one might take.  There might be unilateral

13    adversary action to gain information, begin discovery

14    proceedings, trying to sort of force the issue in terms of

15    attacking or at least getting a handle on the amount of

16    advisor burn.  And that issue, from my client's perspective,

17    certainly seems to have been one that's been driving a lot

18    of what's been happening in the estate, particularly over

19    the last nine, ten months.  I think we've all heard, over

20    and over again, the concept of $50 million a month in estate

21    burn, a big chunk of that is interest payments, for sure,

22    but a very substantial chunk of that is also advisor spend.

23         And throughout the entire process there was this

24    question of what about the Fee Committee process and is

25    there a way to play a constructive role within that to

1    understand what the Fee Committee is doing to sort of shed

2    some transparency and to open up what is a little bit of a

3    black box, even to sophisticated parties like the Majority

4    Creditors, in order to be meaningful within it.  And really

5    the -- you know, the initiation of this project was to reach

6    out to the Fee Committee counsel, to reach out to Debtors,

7    to reach out to other constituencies just to begin to gather

8    information and have an understanding as to what was going

9    on, what kind of work product existed, what was the time

10   table.  And it was incredibly difficult to get responsive

11   information.  Not at all casting aspersions on whatever the

12   perspective or view that may have caused that lack of

13   responsiveness, but it was just very, very difficult.

14           And as the negotiations continued and we began to

15   talk to other creditor constituencies, including the UCC,

16   including the PIK Trustee, including the trustee

17   representative for EFH, it seemed like there was general

18   support for the idea that there should be some

19   representative of the E-side who actually is playing a

20   relevant role on the committee, given, you know, the

21   equities that we've put forth before the Court.  I don't

22   think they're disputed, 75 cents on the dollar that's

23   getting spent by the estate is directing affecting the

24   Majority Creditors' bottom line and indeed, you know, all

25   the creditors on the E-side.

1          And when we began approaching and trying to make

2     entreaties to have a negotiation, to have a dialogue, even

3     about what that appointment might look like, we were sort of

4     met with this cone of silence.  There was a call that we

5     were enabled to have with the Fee Committee itself, but were

6     not allowed to ask any questions.  And we followed up with a

7     number of questions about what exactly the Committee's

8     process looks like, what policies and procedures, what --

9     are there protocols that are governing it, so we can

10    understand.  Are there confidentiality restriction concerns,

11    are there protective orders?  You know, some of these, you

12    know, communications have been, you know, lodged into the

13    record under my declaration in conjunction with the motion.

14          But as this process unfolded and, you know, my

15    clients are getting concerned that time is a little bit of

16    the essence, we understand that this -- our request to be

17    involved, or to have a real genuine understanding of the

18    committee process is coming quasi late in the day, but it's

19    not necessarily coming late in the day in terms of the

20    amount of fees that are going to be washed through the

21    committee process.  The number of applications and the

22    quantum of applications that are likely to proceed between,

23    you know, let's call it mid-November and plan confirmation,

24    are going to be substantial.  We're going to have success

25    and transaction fees that may end up getting washed through

1    that process.  And we're going to have lots of applications

2    coming through, even from sort of nontraditionally retained

3    professionals who haven't even disclosed anything yet, such

4    as the EFH Trustee, who I think has a motion pending before

5    the Court currently.

6              And so, you know, when we filed the notice last

7    year, you know, based on I think probably an overly

8    indulgent reading of the communications that we were getting

9    from our friends at the E-side Unsecured Creditors

10   Committee, that they were happy for Elliott to designate a

11   representative to replace the current seat held by Peter

12   Kravitz, who's the designated creditor representative

13   currently, the intent was to sort of accelerate the process

14   and the discussion because we were not getting anywhere

15   trying to have a direct dialogue.  We weren't able to get

16   that engagement.

17             I mean, the process just -- I mean, we are not

18   restructuring specialists.  And part of the humility that

19   I'm going to speak to the Court about today is we certainly

20   are bringing a different perspective.  And I can just tell

21   you from, you know, a normal commercial litigator's view,

22   this process seems totally upside down and broken.  We have

23   a major constituent who just wants information and to

24   understand and to be involved and to have a dialogue, and we

25   are consistently treated like we're toxic and like there's,

1    you know, no ability to have a negotiation, much less even

2    to be involved.

3              And it's sort of in that vein that the notice was

4    filed.  I wasn't preparing to, you know, come out of the

5    back row and address Your Honor at that hearing, but I think

6    we heard, loud and clear, you know, the Court isn't

7    interested in some sort of, you know, weird hijacking of the

8    committee process, and that was never, ever, ever Elliott

9    and Paloma's intent.  We're talking about one-fourth of the

10   committee, we're talking about the creditor representative,

11   we're talking about the -- not the independent member.  If -

12   - you know, if there were ever suggestions that things that,

13   you know, Elliott and Paloma were interested to do were

14   contrary to the interest of the Committee, against its

15   mandate or whatever, easily voted down, right?

16             But that was the gravamen that was driving there.

17   And we heard Your Honor.  I mean, it's clear, the Court has

18   prudential concerns about something like that happening,

19   destabilizing a process that, at least from the Court's

20   perspective, has been functioning smoothly, you're getting

21   quarterly reports, et cetera.

22             All that's fine, and we took that to heart when we

23   filed the motion.  And I have to tell Your Honor, in filing

24   the motion, we were also, at the same time, reaching out

25   trying to understand who we should appoint because we heard,

1    you know, in the hallways and the rumor mill, that even

2    appointing a, you know, former Assistant U.S. Attorney who

3    has been involved in looking at U.S. trustee issues and

4    stuff like that, who's, you know, dealt with financial

5    stuff, who's been an investigator on the private side,

6    who's, you know, worked in very difficult, diplomatic

7    situations and very high pressure complex cases like, you

8    know, my colleague Kim Berger, it -- there's an issue having

9    an attorney or having attorney representative, that's fine.

10   Let's figure out who the right person is.

11          But we need somebody who has genuine agency,

12   right?  Who actually is bringing a little bit of a fresh

13   perspective that can translate into some transparency on

14   what's happening at the committee level, and who also is

15   interested to understand the Creditor concerns about how

16   much money is getting spent.  And trying to get their hands

17   around -- and I apologize for the PDF that was lodged into

18   the Court, but it took us a long time to prepare the chart

19   that I think was attached as Exhibit 3 to my reply.  I don't

20   think anybody ever put a chart like this together.

21          We certainly asked the Fee Committee if they ever

22   had a structural understanding of the -- of how the estate

23   was functioning, from an advisor perspective, and what the

24   advisor overlap and duplication might look like, for

25   purposes of analyzing something under 330 or analyzing

1  something under Appendix B of the U.S. Trustee's guidelines.

2  And it was -- anyway, it was -- we were trying to figure out

3  who the right type of person to appoint.  Tell us.  If you

4  want a principal of Elliott, do you want some sort of

5  independent person?  You know, let's have a dialogue.

6          And even after we filed the motion, and we were

7  engaged in meet and confer conversations with Debtor and we

8  finally got the Fee Committee's counsel to show up to a

9  hearing -- show up to a telephonic conference, there -- it

10  was just like there was no engagement or interest to

11  actually try to solve a problem.  Right?  There was no

12  attempt to sort of take this out of making Your Honor have

13  to, you know, be an adjudicator of these issues.

14          MR. MCKANE:  Objection, Your Honor.  I apologize

15  for --

16          MR. HAGEY:  Well --

17          MR. MCKANE:  -- objecting in the middle of an

18  argument, but 408 discussions are 408.  He referred to --

19  and it's in his reply declaration, which he hadn't moved

20  into evidence, and I thought we'd be engaging on this issue

21  when he did.  But in a meet and confer conference to address

22  the merits of a motion, right, and not just discovery, the

23  merits, and then just to use what is stated, or an exchange

24  in that meet and confer is classic 408.  It cannot be used.

25          And in his reply declaration, and just now,

1    counsel is trying to affirmatively assert positions taken

2    not just by the Debtors but by the Fee Committee counsel as

3    well in those discussions.  That's sacrosanct.

4              MR. HAGEY:  A couple things.  One, those

5    conversations were not styled as 408 settlement

6    conversations, in that manner.

7              THE COURT:  Really, that's your first argument?

8              MR. HAGEY:  This is the first time I've ever heard

9    counsel suggest that they were -- but the --

10             THE COURT:  If you want to shut down the dialogue,

11   that's the first way to accomplish it.

12             MR. HAGEY:  Well, I'm trying to give the Court

13   some perspective as to how difficult it's been to obtain

14   information and to actually have the dialogue.  And suffice

15   it to say, without going into further detail, we've been

16   unable to have any engagement around who the identity -- who

17   might be the correct person.  And so as a -- literally as a

18   preliminary matter for today's conference, we -- it would be

19   useful to us to understand whether there is actually an

20   active objection to somebody serving in the Creditors

21   Committee membership slot like a James Carroll, who has done

22   a lot of fiduciary, of trustee type work.

23             THE COURT:  But I think the issue isn't Mr.

24   Carroll's credentials.  I think the issue is Ms. Berger's

25   credentials.  I think the issue is who is the master of the

1    person who is participating on the Fee Committee and are

2    they truly independent, are they sharing confidential

3    information with a creditor, are they there to, as an

4    officer of the court, to provide the Court with assistance

5    in its duty to review the fees and expenses of retained

6    professionals, or are they answering to a creditor that's

7    trying to leverage its position on the committee to increase

8    its recovery.

9            So I don't think the issue was ever with Ms.

10   Berger, I think it's the fact that she was a member of your

11   firm and she's -- so she's both an advocate and she's

12   getting paid by a specific creditor.  The issue of Mr.

13   Carroll, assuming there are no inappropriate contacts, and I

14   don't know if there are or there are not, and you did raise

15   some issues in your pleadings about Mr. Kravitz that were

16   news to the Court and somewhat alarming, the issue then with

17   whoever is appointed, assuming its -- I grant your motion in

18   part or what have you and allow you to be a constituency,

19   basically, that nominates a member or appoints a member to

20   the committee, is whether someone like Mr. Carroll would be

21   paid.  And if so by whom, because the order clearly provides

22   not by the estate.  So then you, again, who's the master of

23   the person who is participating as a member of the

24   committee.

25           So I think those are the issues, not Mr. Carroll

1    versus Ms. Berger with regard to competence or credentials,

2    which are clearly impressive.  It's a question of, you know,

3    whether that person, if not a true fiduciary, is acting as

4    an officer of the court and in an independent manner, or

5    can.  That's how I read it.

6              MR. HAGEY:  That --

7              THE COURT:  And I think that continues to be an

8    open issue with regard to whoever you designate, whether

9    it's Mr. Carroll -- it's not so much Mr. Carroll, it's what

10   are his connections and what are the details of how he would

11   be compensated and to whom he would be responsible in

12   reporting, if he were appointed to the committee.

13             MR. HAGEY:  Yeah.  Look, Your Honor is raising,

14   you know, the committee role issue that was flagged upfront

15   in the Debtors' and the Fee Committee's papers.  And I get

16   it.  There is a -- what is the Fee Committee, what is its,

17   you know, four part structure, its charter, if you will.

18   And from our perspective, the compensation piece, at least

19   the way the order is written and read and the way it harkens

20   back to Appendix B, which is where it seems like most of the

21   principals of the -- that committee structure were founded,

22   we note that the committee order was sort of suggested by

23   the U.S. Trustee, there's no restriction on compensation of

24   the members, it's just that they shouldn't be compensated by

25   the estate.  In other words --

1          THE COURT:  I think it's -- I mean, clearly that's

2    true, i.e. they shouldn't be compensated --

3          MR. HAGEY:  Right.

4          THE COURT:  -- by the estate.  I think it's less

5    than clear, frankly, the way the language is written, as to

6    whether they are barred from compensation at all.

7          MR. HAGEY:  Well --

8          THE COURT:  I think it's vague.

9          MR. HAGEY:  -- it -- I grant you, under the order

10   it is vague.  I'm just referring back to sort of, you know,

11   the enabling stuff that goes on in Appendix B where it talks

12   about, you know, there's a -- you know, goes through

13   different types of committee structures, and one with an

14   independent member.  And it just says, you know, don't pay

15   folks through the estate except for the independent member.

16         THE COURT:  Well, it's like a member of an

17   Official Committee of Unsecured Creditors, right?  We don't

18   compensate members of the Official Committee of Unsecured

19   Creditors by -- through the estate.  However, I have served,

20   in my private practice, I have served as an agent of a

21   member of an official committee, and attended official

22   committee meetings as an agent of that member and got paid

23   for it.  So -- and wouldn't have done it if I wasn't getting

24   paid for it.

25         So I understand the idea, certainly, that even a

1   person who's acting on an Official Committee of Unsecured

2   Creditors, as an agent of a member, might get compensated

3   and you could make -- and that's not to, in any way, say

4   that that's somewhat disabling.  An agent always has to

5   represent its principal and it's the principal who has the

6   fiduciary duty that the agent then has to exercise.  So I'm

7   open to the idea, I'm just -- my only comment to you is I

8   think it's vague.  It's -- but I don't think it's at all

9   vague that that person not be paid by the estate.

10          MR. HAGEY:  By the estate or, you know, seek

11  substantial contribution later on or anything like that.  I

12  think the -- there's a, you know, a little bit of an analogy

13  that might be made to, you know, what happens when you have

14  different, you know, representatives serving on a corporate

15  board, different directors for different types of -- you

16  know, they're acting as a representative, sometimes they're,

17  you know, an investor, sometimes it's, you know, the CEO of

18  the company is also on the board, which is sort of the

19  construct that we have here, with Mr. Keglevic, you know,

20  serving both as the lead debtor representative and the

21  estate's general, as well as, you know, on the committee

22  itself.  Clearly he's getting compensated for, you know, his

23  time hanging out on the committee and he's able to liaise

24  with Debtors' counsel, who's getting compensated for their

25  work.

1          I don't think the Creditors are overreaching.  I

2     don't think we're -- and I don't think the Majority

3     Creditors are overreaching saying, look, here's a guy who

4     clearly knows how to do this job, he knows how to work

5     within a group setting and can be a team player.

6          It seems to me that normal conversations and

7     colloquy between counsel would solve the compensation

8     problem, right?  Half-jokingly, we could crowdsource it.

9     But -- you know, and his rates are not -- 435 an hour are a

10    marginal fraction of what, you know, a lot of the folks in

11    this room are privileged to be able to charge.

12         I guess the thing that I would speak to, though,

13    in terms of Your Honor's comments, is if the Court believes

14    that in order for this -- a committee like this to really

15    work, the folks on it have to be tried and true fiduciaries,

16    they have to be independent of anything else, they shouldn't

17    be voicing any concerns except for the collective on the

18    committee.  It seems to us that that's not quite the spirit

19    of what a committee function would look like where you have

20    different constituencies involved.  It strikes us that a

21    committee is robust, you have a meritocracy of ideas, you

22    have an exchange of ideas.  Some of them may be crappy.

23    Some of them may be really good.  Some of them may be fresh.

24    Some of them may be old.  But you would allow a Creditor

25    representative, just as you have a Debtor representative to

Page 24

1    voice the interests of that constituency --

2              THE COURT:  But, here's --

3              MR. HAGEY:  -- without fear that they're going to

4    be smacked.

5              THE COURT:  -- but here's the problem.

6              MR. HAGEY:  Yeah?

7              THE COURT:  The Debtors are a fiduciary, Mr.

8    Keglevic is an agent and principal, I guess, of that

9    fiduciary.  The Official Committee of E-side Unsecured

10   Creditors is a fiduciary to all creditors.  The Office of

11   the U.S. Trustee, not a fiduciary, but certainly has its own

12   governmental responsibilities to protect the integrity of

13   the system and creditors.  Elliott and Paloma have only one

14   responsibility and that's to their own clients and to their

15   own recovery.  So there is a difference.

16              You know, if Mr. Keglevic is acting in a way that

17   breaches his fiduciary duty, he does so at his own peril.

18   If La Paloma and Elliott act in a way that's good for them,

19   but may be contrary to the interest of creditors as a whole,

20   that's fine, that's their prerogative, their -- to act in

21   their self-interest.  So there's a difference between the

22   members we have now.

23              And the Official Committee of T-side Creditors

24   that initially appointed Mr. Kravitz were, again,

25   fiduciaries to T-side creditors.  And of course this --

1    unfortunately there was never an official transition or hand

2    off of that fiduciary responsibility to the E-side

3    Committee.  So we're in a vague situation here with regard

4    to why Mr. Kravitz is still the creditor representative and

5    who actually should appoint the creditor representative.  So

6    I think that is an open issue.

7            But there is a difference between having a

8    nonfiduciary appoint someone who's going to serve on a

9    committee as an officer of the court and an independent

10   party that's -- that owes no allegiance except to itself.

11   And that's not a bad thing, it just is what it is, it's the

12   difference between being an official committee, for example,

13   and being an ad hoc committee of independent parties with no

14   fiduciary duty to anyone else.

15           MR. HAGEY:  The Court's point is -- I mean look,

16   it's well taken, but the issue is, when you have an unusual

17   circumstance like this where you have a super majority of

18   creditors --

19           THE COURT:  We've had --

20           MR. HAGEY:  Okay.

21           THE COURT:  -- since day one, okay?  I listened to

22   $25 billion worth of T-side debt tell me every hearing that

23   they were the largest unsecured -- or the largest creditor

24   in the case, and actually ultimately ended up being the

25   largest unsecured creditor, who they were about $13 billion

1    under water at the time of confirmation.  So while I respect

2    your client's position and how much they've bought into this

3    estate, they actually aren't even the largest creditor I've

4    had to deal with the -- since the case started, still not

5    there, even with 70 percent of the EFIH debt and 40 percent

6    of the EFH debt.

7              So it's not that I'm not going to listen, because

8    I am going to listen to every creditor, and certainly a

9    creditor that has as much of the debt as yours -- as your

10   client does, and has a lot of power, for example, to block a

11   plan, welcome aboard.  You're not the first.

12             MR. HAGEY:  No, we get --

13             THE COURT:  And they didn't have a member on the

14   Fee Committee.  Now they were a secured creditor, but they

15   didn't have a designated member on the Fee Committee and

16   they ultimately took a $13 billion loss.  So a lot of people

17   have lost a lot of money in this case and that's extremely

18   unfortunately, but --

19             MR. HAGEY:  It is.  And I think the gravamen, or

20   at least the equity that our clients come to the Court with

21   is at an unusual and unique time in the case, in that we're

22   finally, you know, welcome to hear some of the good news,

23   not just that Mr. Husnick is back, but that, you know, it

24   sounds like there's some positive movement down in Texas, is

25   that we have a relatively linear process at this point.  The

1   -- a lot of the questionable chess pieces are finally more

2   or less in place.

3            And, you know, part of the -- I think part of the

4   thing that the -- that at least in terms of my client are

5   interested in hearing from the Court are how do we address

6   the common sense, practical concern that the Majority

7   Creditors are raising which is, like, look, if we can avoid

8   having, you know, filings contesting every single

9   application that comes through, you know, trying to take

10   discovery of the committee process to understand what the

11   heck is going on there so that -- and, you know, and

12   burdening the Court with adversary proceedings, where we

13   believe that there was, you know, some kind of duplication

14   or some kind of nondisclosure, or some kind of, you know,

15   embellishment in the fees, we would love to figure out a way

16   to do that.  And that was the whole purpose of getting

17   sidetracked into this process of wanting to play a team

18   sport, as opposed to just doing it ourselves.

19            And I -- it strikes me that the -- some of the

20   practical concerns that Your Honor is flagging, yes, we get

21   it, those are there, but at the same time it seems that

22   there are a myriad of ways to address that.  You have

23   protective orders, you have -- you know, if there's a

24   position that's being taken by the creditor representative

25   on the committee that is jaundiced towards, you know, one

1    creditor group or another, there would be a reporting and

2    involvement of the UCC.  There are lots of creative,

3    constructive ways to address that.

4          Our difficulty has been we just can't get people

5    to engage with us around that.  It seems like they want to

6    put all this before the Court, which I'm sure is annoying.

7    I mean, I can't imagine that the Court wants to be spending

8    its time and energy focusing on, you know, how a committee

9    process is going to work.  I mean, there's many things that

10   are better for the Court, and the parties, and the estate's

11   time to be focused on.  But for us, with the hundreds of

12   millions of dollars that are likely coming through, that

13   some of which may be questionable, and a process that has no

14   transparency to us right now, it's a problem.  And we want

15   to be active players in helping to try to fix it, or at

16   least try to be constructive.

17         And if we can't, I will tell you, Your Honor, if

18   the sensibility from the Court is, you've got to be an

19   absolute ironclad fiduciary on the committee, you know,

20   there should be no conversations or discourse of information

21   on the committee up to the constituent level and, you know,

22   we don't want Elliott or Paloma -- you know, we don't want

23   this person to be paid by anybody, because that would

24   somehow be untoward, then we're out.  Right?  We withdraw

25   the motion, you know, right now and avoid -- you know, and

1    everybody can go back to what they're doing and we'll just

2    start filing paper with the court.  That's not a threat, I

3    mean, that's the only practical alternative that we have.

4            The suggestion that I was sort of leading up into

5    in my long-winded preamble was that it may be useful for the

6    Court to instruct the parties that are here to actually have

7    a conference now as to whether Jim -- as a way to have Jim

8    Carroll appointed to replace Mr. Kravitz, who from our

9    perspective has all the same traits that mark the

10   characteristics of the type of person that these guys,

11   meaning the Debtor that objected, you know, are -- would

12   somehow disqualify you from being able to serve.

13           THE COURT:  All right.  So the question, again, to

14   back up, I'm happy to have a conversation that centers on

15   whether Mr. Carroll's an appropriate member of the

16   committee, but that -- you mentioned the details, and

17   they're critical details.  One, does he get paid and if so,

18   by whom.  And then two, what can he and cannot -- what can

19   he and what he cannot share with his -- whoever appoints

20   him, whether that be the E-side Committee or the -- or you,

21   your client.  And I don't know the answer to that question.

22           And I do want to hear from the various

23   constituencies about how it's been working, about how much

24   Mr. Keglevic passes on to his board and his lawyers.  I

25   don't know.  How much Mr. Kravitz has been passing on to the

1    Official Committee members and their lawyers.  I don't know.

2    I assume Mr. Schepacarter shares information with Mr.

3    (indiscernible) but I don't know actually know.  So I'm

4    ignorant of what's been going on with regard to the sharing

5    of information.

6            But I think the critical information -- the

7    critical question isn't whether Mr. Carroll is qualified.  I

8    looked at his resume online, he's clearly qualified.  All

9    right?  He's not a member of your firm, so that helps.

10            MR. HAGEY:  He has no relationship with my

11    clients.

12            THE COURT:  Okay.  Excuse me.  So the question I

13    would have is, again, you know, it's a technicality really

14    to appoint him, whether the E-side Committee appoints him,

15    in consultation with its largest creditor that it

16    represents, or whether you, your client, appoints him.

17    Today that's a technicality because the ultimate question is

18    going to be what can he share with his appointing person,

19    creditors, officers, agent or principal, et cetera.

20            There are ways to get information from the

21    Official Committee, for example, under its protocol, so if -

22    - that's why I think it's a technicality as to who appoints,

23    which entity appoints a representative.  But I think the key

24    issues are does he get paid, by whom and what can he report.

25            And you just -- I won't -- you were nice to say it

1    wasn't a threat.  It sounded a little bit like a threat.

2              MR. HAGEY:  Well, it's just the reality.

3              THE COURT:  But it was nice of you to say it

4    wasn't a threat.  But, I mean, what I heard from you a few

5    minutes ago was if he can't get paid, and if he can't tell

6    your client what's going on, it's a nonstarter.  So you may

7    -- you know, I think we have to have -- I think we can have

8    a conversation amongst ourselves in court about what's been

9    going on and what the norm is.  And I understand your

10   comments that you feel like you haven't had any transparency

11   as to what the norm has been.  I have not had transparency,

12   I have not asked because for all intents and purposes this

13   has been working.

14              I mean, to say this case was contentious in 2014

15   when this committee was formed is the understatement of the

16   year and it solved a lot of problems.  And people were

17   looking under every rock to try to find different ways to

18   provide pressure to each other, to save money, et cetera.

19   So -- and this organization and this order was drafted, not

20   by the Court, but by the parties.  So I've taken a laissez

21   faire attitude, frankly, to the process in that, you know,

22   the internal workings of how the Committee has been

23   processing because the results have been acceptable to the

24   parties and they seem appropriate to the Court.

25              Now, have I read every fee application filed in

1    this case?  No.

2            MR. HAGEY:  Yeah.

3            THE COURT:  I am relying on the Fee Committee.  My

4    staff -- talk about delay, it would be -- you know, it would

5    be years before you got -- so unless there's -- there -- if

6    there wasn't going to be a committee, there would be an

7    examiner.  I often appoint examiners.  So somebody would --

8    and examiners get paid.  So somebody was going to look at

9    these things, and I think the committee process and the idea

10   of getting Creditors and Debtors and the U.S. Trustee under

11   -- with an independent person working together made a lot of

12   sense.  It seemed to be working.

13           I think that the representative today should

14   represent the remaining creditors today and shouldn't be

15   necessarily a legacy of $25 billion worth of debt that's

16   already been reorganized and is no longer, you know, in

17   bankruptcy.  So I think it makes a lot of sense that the

18   creditor representative reflect, you know, Elliott's

19   concerns, at the very least be appointed by the E-Side

20   Official Committee, if not Elliott, one or the other.

21           To me it's the details of whether that person gets

22   paid, who pays the price and what they can share.  And maybe

23   you can reach an agreement on that, maybe I need to hear

24   more.  I'm happy to hear more because everybody's here, but

25   to me that's where we are, if that makes sense, hopefully.

1    I'm talking more than I should, but --

2            MR. HAGEY:  It makes sense to -- you know, it

3    makes sense to my ear as the Majority Creditors', you know,

4    spokesperson here.  I guess the only reaction I would have

5    to the information share is the Fee Committee is tasked with

6    creating a lot of work product that is designed to

7    understand and help resolve and address issues that may be

8    going on in terms of advisor spend, right?  And they spent

9    over $7 million, or approximately $7 million to date doing

10   that and they're -- you know, they're going to spend more as

11   this process goes through, and that's great and that's fine.

12           It strikes us that that is an asset of the estate

13   that everybody should have the ability to use.  There's a

14   database of all --

15           THE COURT:  Okay.  Right there, that's a problem.

16   You just said that it -- that lowering administrative fees

17   is an asset of the estate.  I couldn't disagree with you

18   more.  And I know that's how your client's looking at it.

19   No, I don't know.

20           MR. HAGEY:  I may have misspoken, Your Honor.

21           THE COURT:  I surmise --

22           MR. HAGEY:  I --

23           THE COURT:  -- that's how your client's looking at

24   it and they're going to increase their recovery by a hundred

25   million by stripping it out of the backs of the

1    professionals?  That's a problem.  And that's why they're

2    alarmed to have your client on their committee -- not their

3    committee, the Fee Committee.

4            MR. HAGEY:  Either I misspoke, Your Honor misheard

5    or -- and we'll have to go back to the transcript to see.

6    What I was saying is an asset is the work product that its

7    developing to review.  And I mean the actual work product.

8            THE COURT:  Okay.  All right.

9            MR. HAGEY:  Okay.

10           THE COURT:  I misunderstood what you were saying.

11           MR. HAGEY:  Yeah, I know that there's a -- look,

12   Your Honor, we've read their papers, there's a jaundiced

13   view of what Elliott and Paloma are directed to do.  We

14   heard completely unfounded, counter-factual

15   misrepresentations about our clients want below market

16   rates, we saw that punch line repeated in the press, I

17   wonder how it got there.  We saw, you know, a articulation

18   that we want arbitrary reductions in fees, completely

19   counter-factual, nowhere in the record; that is false.

20           What we want is a holistic understanding of what

21   the fee process has been.  And if -- you know, part of this

22   is, and I go -- and I just go to the Appendix B and this

23   maybe addresses a little bit of the Court's, you know,

24   quizzing of the parties and my clients, it talks about what

25   a committee process is supposed to be, what a fee review

1     entity is supposed to engage in.  And it says, "An entity

2     can assist the Court and the parties in reviewing fee

3     applications and can bring consistency, predictability and

4     transparency to the process."  And right now it seems like

5     we have a lot of constituency, right?  Nobody's objecting,

6     no -- you know, it's just happening, there's no

7     disagreement, there hasn't been a single dissent in four

8     years, which is somewhat of a red flag to me on a basic

9     human nature level.  There's been predictability, right,

10    because it's just kind of happening pro forma.  But there's

11    no transparency.

12             And if you actually look at some of the sort of

13    enabling guidelines that went into this that the U.S.

14    Trustee uses to try to -- you know, if it's going to

15    recommend a committee for the Court and for the Court to be

16    buying into that process, is that there's going to be this

17    public confidence in the integrity and soundness of the

18    bankruptcy compensation process.  And this is a much -- you

19    know, the 20,000 foot issue, but we have a process here

20    that, even the largest creditors in the estate can't get any

21    information about.

22             And you have a question being raised, well, you

23    know, what information should be shared with that Majority

24    Creditor constituency, or all the creditors.  I mean, we

25    don't -- we're agnostic.  We're happy to share all the work

1    product up with everybody.  I don't think the issue is one

2    of holding tight to certain information, it's the fact that

3    nobody has the information.

4            It seems to me that if we want a legitimate

5    process that we should be allowing for, you know, upwind and

6    downwind sharing of information.  It should not be this

7    syphoned activity.

8            And the last thing I'm going to say, I'm happy to

9    cede the podium, because I hear a lot of ruffling of papers

10   and conversation, but the Court asked, like, you know, well

11   maybe we can get some information about the committee's

12   procedures and what's been going on and stuff like that.  We

13   asked that question for two months.  Okay?  We were told

14   there were no protocols, right?  Aside from some guidelines

15   that were put into a binder, that basically were given to

16   some retained professionals, there's -- the internal

17   workings of the committee were basically being done, I

18   assume, on voiceovers.  I mean, there was no -- there's no

19   protective order regarding, like, restricted status.  I --

20   maybe there is, maybe we were, you know, misunderstanding

21   what we were being told.

22           But it strikes me that -- it's a little bit odd

23   for everybody to be complaining about confidentiality and

24   concerns about the sensitivity of the information.  We

25   acknowledge those are issues and those are addressed in

1   every case.  We have a trade secret case, we have all kinds

2   of cases come before the federal courts where those issues

3   are addressed, including in fee dispute issues.  You have

4   redaction of invoices, you have all this kind of stuff and

5   you have attorney's eyes only provisions as well that allow

6   parties at least to have an understanding, through their

7   representative, of what's going on.

8               And I will just say that there may be a very

9   eloquent discussion here from the Debtors' representative,

10  from the Fee Committee, as to how fabulous this process is

11  and how articulate and how sensitive the information is.

12  The fundamental problem is it's not in writing, right, and

13  they wouldn't tell us before today.  And that concerns me as

14  a -- you know, as a practitioner before the Court and it

15  also concerns my clients very deeply that we're meant to

16  have trust and faith in a process that is going to, you

17  know, charge our clients 75 cents out of every dollar when

18  we don't understand how it's supposed to be working.

19              So I have other comments we could direct towards

20  the responses and the objections, but I think that it may be

21  constructive to hear from the Debtors.

22              And our invitation, literally we're here -- I

23  could be here for the whole day, we're happy to go into a

24  separate chamber or separate room and see if there is some

25  compromise or if there's some way to work through some of

1    these detail issues to see if we can, you know, hopefully

2    address what is, I think, a legitimate interest on behalf of

3    the Majority Creditors to pay a constructive role, a real

4    role, to play a constructive role in the fee process from

5    here to plan conclusion and final application process.

6              THE COURT:  Thank you.

7              MR. HAGEY:  Anyway, thanks, Your Honor.

8              MR. HUSNICK:  Thank you, Your Honor.  Chad Husnick

9    on behalf of the Debtors.  I'll be very brief and I want to

10   focus in.  I think Your Honor cut straight through to the

11   nub of the issue.  And whether it's a Freudian Slip, but it

12   was at least two or three times I heard the word genuine

13   agency control reporting to me and then the continued

14   banging away at the podium of 75 cents on every dollar.  You

15   don't have to read between the lines in their pleading to

16   know exactly what they're trying to do here, which is hijack

17   this process, to borrow a phrase from Mr. Hagey.

18             Your Honor, on the sharing on info, that's exactly

19   why the information cannot be shared.  It's privileged and

20   confidential information in many instances where the Fee

21   Review Committee is asking the Debtors' advisors, the

22   Committee's advisors for the positions they're taking, where

23   they see the case going, what's the merits of this

24   litigation, what was that all about.  And Mr. Gitlin can --

25   he'll stand up for himself, I don't have to stand up for

1   him, I think he's pretty well established in the industry,

2   but Mr. Gitlin consults with everybody.  He picks up the

3   phone.

4          The frank issue here is that the questions that

5   were coming from the Elliott creditors were not, how does

6   the process work and what -- it was, how do we get our

7   member on there and what can we do to hijack the process,

8   how can we take control of a member on the committee.

9   That's what it was all about from the very beginning.

10          And the Debtors were steadfast in their position,

11  and I know the Fee Review Committee was steadfast in its

12  position, that it cannot be a representative on the

13  committee that is controlled by or reporting directly to one

14  of the larger stakeholders, it just doesn't work.

15          In terms of --

16          THE COURT:  Well, how does that -- how do you

17  reconcile that with the fact that Mr. Keglevic is on the

18  committee, Mr. Keglevic reports to his board.  But even

19  regardless of that he has broad authority, I'm sure, to

20  direct Kirkland and the other advisors how to act in

21  connection with the case.  He's still CRO --

22          MR. HUSNICK:  Yep.

23          THE COURT:  -- of the Debtors so -- or the E-side

24  Debtors, so how do you reconcile that?  How is that any

25  different from having someone like Elliott appoint Mr.

1     Carroll and then have Mr. Carroll report back to Elliott?

2          MR. HUSNICK:  Your Honor, he's a fiduciary and

3     that's exact -- you hit it, the nail on the head, when you

4     said you were talking to Mr. Hagey in your colloquy.  He's a

5     fiduciary for these estates.

6          On the litigation issues in particular, I don't

7     know of the inner workings of the Fee Review Committee, I'm

8     not privy to that either.  But I suspect what Mr. Gitlin

9     will tell you is if there's an issue that the Creditors

10    Committee was discussed with Mr. Gitlin, on a privileged and

11    confidential basis, about the litigation strategy from the

12    committee, that that information was not relayed to Mr.

13    Keglevic.  I'd be shocked if that was not the result,

14    because I remember having several conversations with Mr.

15    Gitlin in which I said, this is extraordinary sensitive, I'd

16    ask that the other members of the committee not be told

17    about this issue unless we have a subsequent dialogue.  And

18    Mr. Gitlin and Mr. Williamson have honored those requests

19    over time in an effort to drive the process.

20          But they do convey some information to all the

21    members, but they are sensitive to that particular issue,

22    and that's the importance that Mr. Gitlin plays as the truly

23    independent member in the chair of the Fee Review Committee.

24    I think he threads that needle appropriately.

25          There was a mention of a protective order and how

1    that could solve the issue, but it really, again, gets at

2    the nub.  There's zero chance -- I've dealt with Elliott in

3    these -- I don't know if you've represented Elliott before,

4    but I have dealt with Elliott in these cases from the very

5    beginning.  The Elliott representative used to be at another

6    hedge fund.  They're not going to get restricted to hear

7    some of this information, they're not going to stop trading.

8    So there's a huge issue with sharing information, even

9    subject to a protective order, if they're going to take

10   direction from the principals at Elliott.  It just doesn't

11   work.  The Fee Review Committee functions as an independent

12   officer of the court as was articulated by the Fee Review

13   Committee's counsel in their pleadings.  And it doesn't

14   work.

15          In terms of getting paid, I respectfully disagree

16   with Your Honor on whether the paragraph is vague.  I think

17   the very first sentence could not be clearer.  It says, "No

18   Fee Committee member, except the independent member, shall

19   receive compensation for service on the Fee Committee or

20   time expended on Fee Committee matters."  It doesn't say

21   anything about by the estate.

22          This document perhaps ate up a week of my life,

23   when I negotiated it with Mr. Schepacarter and Ms. Schwartz

24   from the Office of the United States Trustee and Mr. Miller

25   and Mr. Lorenzo -- Mr. Marinuzzi, from MOFO.  We spent hours

1    and hours on the phone negotiating this stipulation.  And I

2    can tell you it was crystal clear, these folks shall not be

3    compensated for what they're doing on the Fee Review

4    Committee, not just from the estate, but it was very

5    important that they not be paid any incremental

6    compensation.

7            Which takes me to Mr. Kravitz.  There was a couple

8    of drive-bys in the reply, and I think counsel should have

9    highlighted for Your Honor that subsequent to the filing of

10   their reply they were advised that there were inaccuracies

11   in their reply about Mr. Kravitz.  I just want to highlight

12   a couple of them because I think they're relevant to what's

13   going on.  Mr. Kravitz is not paid for his service on the

14   Fee Review Committee.  He's never been paid for his service

15   on the Fee Review Committee.

16           Second, Mr. Kravitz is not a liquidating trustee.

17   You don't have to be in this case for very long to realize

18   there's no such thing a liquidating trustee in the EFH or

19   TCEH bankruptcy cases.  Had they done a little bit of

20   diligence, they would have realized that the -- there was an

21   error on the Providence website saying that he was the

22   liquidating trustee.  It was actually of the Eddie Bauer

23   estate, I believe.

24           Third, any insinuation or innuendo about collusion

25   between Mr. Kravitz, the Debtors' advisors, the Debtors, Mr.

1    Keglevic is reckless and inappropriate.  They simply have

2    zero basis for saying that because one party shows up in

3    other cases that it's a record or any indication that

4    there's collusion.  Let me just tell you, if we did a Venn

5    diagram in this case of parties who are involved in this

6    case and other cases, I don't think there'd be a person on

7    the planet, at least in the restructuring space, that

8    wouldn't be conflicted and unable to participate in the

9    process.  Indeed Elliott itself shows up in almost every

10   case and therefore they would be disqualified under their

11   own test.

12           The bottom line is that Mr. Kravitz, they can't

13   find anything bad about him.  So where do we come out on Mr.

14   Kravitz?  What is this all about?

15           Then they come and they say, well, Mr. Kravitz has

16   a duty to unsecured creditors only on the T-side.  Well this

17   is exactly an issue that the Fee Review Committee and the

18   Official E-Committee, when it was appointed, recognized when

19   they came into begin.  They read the order, there was a me-

20   too order, by the way, that followed on when the EFH

21   Committee was appointed, and that me-too order gave the EFH

22   Committee some view into various things that had been

23   approved in the two months prior to the formation --

24           THE COURT:  Yeah.  It didn't specify the Fee

25   Committee, though.

1          MR. HUSNICK:  Pardon me?

2          THE COURT:  I don't believe it specified the Fee

3    Committee role.

4          MR. HUSNICK:  It didn't.  But it said including

5    without limitation.  It said all orders of these types, and

6    I believe it says including.  It's not limiting, though.

7          And Your Honor, on that specific point, the E-

8    Committee and you'll hear -- you've seen their pleading, and

9    I'll -- I want to quote from what they said because I think

10   it's really, really important, but the E-Committee discussed

11   with the Fee Review Committee whether there should be an

12   additional member, whether they should supplement and

13   ultimately what was decided, and you can hear this from Mr.

14   Gitlin and Mr. Gluckstein directly, was that Mr. Kravitz

15   could fill that role and that he could be the creditor

16   representative on the committee.  And that was what was told

17   to Mr. Hagey's firm.

18          But what Mr. Hagey didn't like is he said, well,

19   who is he reporting to.  And the answer from the Debtors and

20   from the Fee Review Committee is he doesn't report to

21   anyone, as it relates to this role on the Fee Review

22   Committee.  And this comes back to my original point, that

23   it doesn't work if you're reporting to a particular

24   stakeholder, especially someone interested in the process.

25          Ultimately, what the Unsecured Committee said in

1    their filing is, about Mr. Kravitz in particular, is, I

2    believe they said -- I'm trying to find the exact quote, but

3    something along the lines of they believe that the Fee

4    Review Committee and Mr. Kravitz are appropriately

5    discharging their duties on the Fee Review Committee.  That

6    doesn't need to change.  There doesn't need to be

7    supplementation on the Fee Review Committee.  All the drive-

8    bys about Mr. Kravitz turn out to be incorrect and untrue.

9    All this is is an attempt by Elliott to try and leverage

10   their way into this discussion.

11            Mr. Gitlin has made very clear to them, as he made

12   to me, that they're willing to consult, and they will

13   continue to consult.  The record is completely void of any

14   effort of Mr. Hagey's firm, or Elliott generally, to consult

15   with Mr. Kravitz on anything other than his replacement.

16   It's just simply not there.

17            As for Mr. Carroll, Your Honor, Mr. Carroll does

18   suffer from a number of faults that come out after you

19   understand with Kravitz not being compensated.  He is

20   compensated by Elliott.  And Elliott is going to be hard

21   pressed to find an individual who's not compensated or

22   doesn't have other direct ties.  As Your Honor said,

23   professionals don't work for free, and I think that's right.

24   And that's exactly why the U.S. Trustee put into the

25   document that it needed to be for no compensation and it

1     needs to be a fiduciary.

2             While Elliott points to the order and says nowhere

3     in the order does it say anything about having to be a

4     fiduciary, that order was very, very heavily negotiated.

5     There were only four members on the committee, the

6     independent member, the Debtor member, the U.S. Trustee and

7     the committee member from the TCEH Committee, that's the

8     only committee that existed at that time.

9             You could read Section 1103 and you're not going

10    to see the word fiduciary duty anywhere in Section 1103 or

11    1102, which gives rise to the Creditors Committee's role.

12    Unfortunately for Elliott, the case law is pretty clear that

13    folks who serve on the committee assume a fiduciary role.

14    And in assuming that fiduciary role, that's why it said it

15    had to be a representative of the Creditors Committee, it

16    had to be somebody with a fiduciary interest in this, and it

17    had to be somebody that was willing to step into that

18    position.  Mr. Kravitz filled exactly that role and the E-

19    Committee has absolutely no issue with that.

20            I think if Your Honor were to ask them, and I'll

21    let them answer the question, whether they object to Mr.

22    Kravitz continuing to serve, I think the answer will be no.

23            Your Honor, unless you have any other questions, I

24    think I've addressed the issues that you raised in your

25    questioning.

1                THE COURT:  Thank you, Mr. Husnick.

2                MR. HUSNICK:  Thank you.

3                THE COURT:  Mr. Gluckstein?

4                MR. GLUCKSTEIN:  Good afternoon, Your Honor.

5                THE COURT:  Good afternoon.

6                MR. GLUCKSTEIN:  Brian Gluckstein, Sullivan &

7     Cromwell on behalf of E-side Creditors Committee.

8                I think Your Honor has appropriately focused on

9     the right issues here.  I just want to give the Court a

10    little bit of perspective from our committee.  And as

11    everything in this case, how we got to this point is a bit

12    complicated.

13               As Mr. Husnick just went through, the Fee

14    Committee order predates the, as Your Honor knows, the

15    existence of our committee.  And so I think there are

16    questions as to authority under that order, and we certainly

17    weren't involved in negotiation of that order at the time.

18               It is true that when our committee was formed we

19    had extensive discussions and meeting with the Fee Committee

20    about whether or not an additional seat needed to be

21    created, or come to Your Honor to do that, to represent the

22    E-side separately from the existing creditor representative.

23    And at the time our committee was comfortable that Mr.

24    Kravitz could discharge the duties on behalf of unsecured

25    creditors generally.  And that's the way the Fee Committee

1    has proceeded.  And as we set forth in our statement that we

2    filed with the Court, our committee really has not had

3    concerns with how the Fee Committee has operated.

4            Mr. Kravitz does not report to our committee, as

5    far as I know never has had any sort of kind of formal

6    reporting role or dialogue.  And I think in our view that's

7    consistent with the somewhat independent nature or the Fee

8    Committee and the officer of the court nature of what the

9    Fee Committee did.  Certainly the professionals for the

10   committee have visibility into the work of the Fee Committee

11   and the Fee Committee's process, having been subject to the

12   Fee Committee's evaluation during the course of these cases.

13           But I do think, and we heard when Elliott came to

14   us, the concerns that they've raised, and I think our

15   committee certainly has sympathy and frankly has some

16   concern, when we looked back and revisited the question of

17   Mr. Kravitz serving in a role where the T-side estate has

18   been fully administered, from our perspective.  And we agree

19   with Elliott and the Majority Creditors, that from our

20   perspective it is the E-side with the remaining economic

21   interest in professional fees, case burn and the work of the

22   Fee Committee.  And for that reason we have voiced support

23   for the desire of the Elliott creditors to make a change on

24   that seat, if the Court found that to be appropriate.

25           And I think, as we've put forth in our statement,

Page 49

1    we did not ever purport to take unilateral action.  We're

2    not seeking to appoint somebody today on our own.  We do

3    think that should the Court be so inclined at this juncture

4    to make a change, that it should be the E-side committee who

5    makes that appointment, in consultation, certainly, with the

6    majority creditors and others.

7            But I do think, Your Honor, the questions that you

8    highlighted raise important concerns.  And I think as this

9    dialogue has continued over the past six weeks or so, our

10   committee has some concerns around the questions of

11   information sharing, the role that perhaps majority

12   creditors view the Fee Committee as playing, and

13   importantly, you know, potentially the desire to revisit

14   issues and fee applications that have been approved by this

15   Court.

16           And so, we do think that the parties do need some

17   guidance from the Court on the role going forward of the Fee

18   Committee.  And I know you're going to hear from the Fee

19   Committee directly.  But just so the Court is clear, from

20   our perspective, we don't have an issue with the Fee

21   Committee's work.  We didn't raise this issue.  We haven't

22   joined in the motion.  We certainly understand the concern

23   and are sympathetic to the concern that we don't have at

24   this juncture a representative in that creditor's seat who

25   was appointed by our committee with potentially, you know,

1    more of a tie to the E-side of the house.

2            But that being said, if we're going to make a

3    change -- and we don't have a view at this point with

4    respect to Mr. Carroll -- we have the same observations as

5    the Court does as far as his credentials.  Certainly, he'd

6    need to be vetted as far as any other conflicts or issues.

7    But I think whomever would come forward, or we would put on

8    the Committee is a bit of the cart before the horse, because

9    I think we do just need to understand and have everybody be

10   in agreement that the role of the Committee is to report to

11   the Court.  And I think if the majority creditors under the

12   existing construct, with consultation with the Fee

13   Committee, with our committee, we do believe there should be

14   reasonable information sharing, but there needs to be limits

15   on that.

16           And to the extent that that can be worked out and

17   the Court is so inclined to make a change at this juncture,

18   we would be supportive of that, under the rubric of the

19   existing architecture.  And we do not believe, though, that

20   anybody should be compensated by an individual creditor or

21   report to an individual creditor.  We think that that does

22   go beyond the scope of the order as we understand it, and as

23   we understand the Fee Committee been operating to date.

24           THE COURT:  Thank you, Mr. Gluckstein.  Mr.

25   Pedone, if you don't mind waiting.  We're going to take a

1    short recess and then I'll hear from Mr. Perdone and then,

2    of course, whoever else wants to be heard.

3          (Recess)

4                CLERK:  All rise.  Please be seated.

5                THE COURT:  Thank you for your patience.  Mr.

6    Pedone?

7                MR. PEDONE:  Good afternoon, Your Honor.  Richard

8    Pedone for American Stock Transfer, the bond trustee at EFH.

9                THE COURT:  We have you to blame for all of this,

10   because you got us the E-side committee.

11               MR. PEDONE:  Yes, sort of.

12               (Laughter)

13               Your Honor, Elliott is our largest creditor and

14   they are very close to the largest remaining creditor, and

15   their views and their input are exceedingly important.  I

16   want to clarify and sort of state our position ourselves

17   because it was noted a couple of times in papers that were

18   filed that we don't exactly agree with the way it was

19   stated.

20               We support a representative of Elliott playing a

21   role in the process and appointment to the Committee.  We

22   have a different view of the role of the Committee, who the

23   Committee reports to, and the processes by which it should

24   appropriately operate.  So, we don't agree with everything

25   that's in the request, but we do support them in having a

1    role, and perhaps even a business person from Elliott, or

2    someone acceptable to them having a seat.  And that would be

3    our position.  Thank you.

4              THE COURT:  All right.  Thank you, Mr. Pedone.

5    Mr. Schepacarter?

6              MR. SCHEPACARTER:  Good afternoon, Richard

7    Shepacarter for the United States Trustee.  If I might, Your

8    Honor -- and I'll try to, hopefully, elaborate on some of

9    the questions that Your Honor has raised.  I think that the

10   two questions that you raised, I think, are the key

11   questions that need answers at this point.  And hopefully,

12   I'll be able to put a little flesh on that for Your Honor.

13             The purpose of a special fee review entity such as

14   a fee review committee is to assist the Court and parties in

15   reviewing fee applications and to bring consistency,

16   predictability and transparency to the fee review process.

17   As such, a fee review committee should ensure that

18   professional fees and expenses paid by the estate are

19   reasonable, actual and necessary, as required by Section 330

20   of the bankruptcy code.  And in that regard, the Fee

21   Committee or the fee review entity should monitor, review,

22   and where appropriate object to interim final fee

23   applications filed by professionals seeking compensation

24   from the estate.

25             Given that -- and I think I can't highlight this

1    enough -- given that a Fee Committee functions as an arm of

2    the court and the Fee Committee members act as appointment

3    officers of the court, the Fee Committee members balance all

4    of the interests of the constituencies in the cases, and

5    this mix ensures that not one interest will be overly

6    representative, and the representatives will provide insight

7    to the fee review process that oversees the compensation of

8    retained professionals.

9         The Fee Committee members have a duty that they

10   discharge on behalf of constituency they represent that

11   transcends individual interests.  Fee committee members

12   should not be parties who have a vested interest in the

13   outcome of the cases, nor should they be professionals whose

14   fees would be reviewable by the Committee.

15        The Fee Committee and each committee member should

16   be able to fulfill this role and abide by their duties vis-

17   à-vis the fee review process.  Here, the proposed

18   representative presumed to act in their own self-interest

19   and to maximize their recovery does not appear to be

20   institutionally or constitutionally enabled to fulfill a

21   duty to the other unsecured creditors and to represent and

22   consider the best interests of all creditors, rather than

23   just the interests of the individual creditor.

24        The Fee Committee was established by Court order

25   upon agreed stipulation.  The Fee Committee order provides

1     for four members:  the debtor designee, a committee

2     designee, the United States Trustee designee, and an

3     independent member recommended by the parties.

4           Fee committee membership is a calibrated balance

5     between debtor and creditor interests, with two independent

6     voices, all enshrined in a court order.  It would otherwise

7     tip the balance to where independent voices are equaled by

8     the creditor voices, and the creditor voice will outweigh

9     the debtor voice.  This is fundamentally unfair and

10    undermines the consensual nature of what the parties agreed

11    to.

12          As we know, bankruptcy courts have an independent

13    duty to review fee applications, regardless of whether any

14    party in interest, including the United States Trustee,

15    objects.  And that's cited in the Busy Beaver case.  That's

16    also cited in the case that Judge Walrath issued an opinion

17    -- actually two opinions -- a case that I litigated, which

18    was the APW Enclosure System case.

19          In larger Chapter 11 cases where a significant

20    number of professionals will be retained, and a normal fee

21    application and review process would be especially

22    burdensome, a special fee review entity such as the fee

23    review committee can assist the court in reviewing fee

24    applications, and again, to bring the consistency

25    predictability and transparency to the fee review process.

1    That was even cited to a certain extent in Your Honor's

2    opinion in Molycorp, where Your Honor indicated that it was

3    an owner's burden to review fee applications and appointed a

4    fee review entity, which was a fee review examiner in that

5    case.

6              Despite inferences that the Fee Committee's

7    purpose might be to cut professional fees to the quick and

8    embark on a mission to reduce professional fees in order to

9    ensure the greatest and highest return to creditors, the

10   true purpose and proper purpose of a fee review entity is to

11   review fees and expenses for reasonableness under Section

12   330 in such large Chapter 11 cases with a significant number

13   of retained professionals and to assist the court

14   professionals to ensure compliance with the bankruptcy code

15   and rules.

16             The utility and benefit of a Fee Committee or any

17   fee review entity is not measured by the amount of fees

18   reduced or by hitting some arbitrary amount or percentage

19   fee reduction, but by the installation of a sense of

20   predictability, consistency with respect to the fee

21   applications, as well as the Committee's impartation of

22   transparency to the process.  Fee reduction is not the goal,

23   but the byproduct of a thorough, efficient, diligent and

24   responsible fee review process and procedure.

25             In these cases, the fee review committee is

1    comprised of parties that balance all the interests of the

2    constituencies in the cases, such as the Debtors, the

3    creditors, the U.S. Trustee, and the independent member.  In

4    addition, the Fee Committee members have duties and

5    obligations that they discharge on behalf of the

6    constituency they represent, and those duties include a duty

7    of care, good faith and loyalty.

8             Juxtaposed to that are the interests of an

9    individual creditor or group of creditors whose purpose is

10   to maximize its recovery and return to its members or

11   principals.

12            Individual or institutional creditors are presumed

13   to act in their own self-interest and to maximize their

14   recovery.  Parties whose actions are designed to benefit

15   only a limited class of creditors are not appropriate for

16   Fee Committee membership.  For example, unsecured creditors'

17   committee members who otherwise act in their self-interests

18   owe a fiduciary duty to other unsecured creditors, and to

19   both represent and consider the best interests of all

20   creditors, rather than just the interests of individual

21   creditors or committee members.

22            Of course, we know that members of a creditors'

23   committee may not use their positions as committee members

24   to advance their own individual interests.  And I'm citing

25   the Woods v. City National Bank case and Nationwide Sports

1    Distributors case, which was a Judge Fox case, where Judge

2    Fox held that both the Official Creditors' Committee and

3    their members owe a fiduciary duty to their constituencies,

4    and such creditor committee members have a fiduciary

5    obligation to act in the interests of members whom they

6    represent which prohibits such members from using their

7    position to advance their own individual interests.  In

8    other words, to use information for one's own purposes, even

9    on a fee review committee would exhibit a lack of good

10   faith.

11          Analogous to the present situation is a situation

12   under application that would be made under 503(b)(3)(D) or

13   (b)(4), that kind of analysis, where creditors are presumed

14   to act in their own interests until they satisfy the court

15   that their efforts have transcended self-protection.  And

16   again, that's the Lebron standard for the Third Circuit.

17   Any creditor's self-interest that appears to dominate a

18   creditor's actions results in a disallowance of any

19   substantial contribution claims under Section 503(b).

20          Accordingly, it would not be appropriate for a

21   party to be appointed to or selected for Fee Committee

22   membership where that party's goals are based upon

23   protecting their own collective economic interests.  Here, a

24   creditor's representative is imbued with a similar duty that

25   the Creditors' Committee and its members enjoy.  But placing

1    a member on a committee, either in place of the current

2    creditor's representative or in addition to that member,

3    upsets the balance of the constituent interest on the Fee

4    Committee since it appears that the proposed representative

5    -- and given the questions that Your Honor has raised --

6    would lack the essential crucial and integral duties and

7    obligations that the Committee members would otherwise

8    enjoy.

9              In this case, it's my understanding that the

10   majority creditors hold both a secured and unsecured credit

11   position in these cases.  Although no Rule 2019 statement

12   has been filed, the majority creditors have represented in

13   pleadings that they hold or represent $939 million of the

14   EFIH second lien notes, or approximately 46 percent of the

15   Class B EFIH second lien note claims.

16             In addition, these parties may seek applications

17   to be paid under 503(b), which would be subject to Fee

18   Committee review.  For example, they may file substantial

19   contribution applications, or some of them may seek a

20   provision in the confirmation order that they have made a

21   substantial contribution and have otherwise qualified for

22   payment under 503(b)(3)(D) and (b)(4).

23             Although it is the Court's responsibility to

24   determine if such creditor's efforts provide an actual and

25   demonstrable benefit to the Debtors' estate, and that such

1     benefit was not incidental to the creditor protecting its

2     own interests, and have otherwise satisfied the Court that

3     they have transcended self-protection, it's the Fee

4     Committee's charge to ascertain if the requested fees and

5     expenses are reasonable.  Not only does this create a direct

6     conflict, but as a potential Fee Committee member, that

7     representative may be reviewing, discussing and opining on

8     503(b) applications, while their own application may be

9     pending.

10              The creditor representative in any -- I think this

11    answers Your Honor's questions -- should not be beholden to

12    anyone creditor or group of creditors, but mindful and

13    representative of the interests of all the unsecured

14    creditors while discharging its duties and obligations as a

15    Fee Committee member.

16              Fee committee members must be able to exhibit and

17    impart an independent, disinterested and impartial review,

18    like any other fee review entity, and such individual

19    member's actions cannot be motivated by self-interest, but

20    rather by a sense of duty to provide insight to the fee

21    review process and to ensure compliance with the bankruptcy

22    code and underwrite the transparency, consistency and

23    predictability of the bankruptcy court's professional

24    compensation process.

25              And I'm available for questions, Your Honor.

1          THE COURT:  I have no questions.

2          MR. SCHEPACARTER:  Okay.  Thank you, Your Honor.

3          THE COURT:  Any other party -- yes?  Good

4     afternoon.

5          MS. STADLER:  Good afternoon, Your Honor.  ,I

6     would be remiss if I didn't chime in and wish Your Honor a

7     Happy New Year, so Happy New Year.

8          THE COURT:  Thank you.  Same to you.

9          MS. STADLER:  I don't want to repeat the points

10    that were made in our written submissions.  I'm Katherine

11    Stadler, on behalf of the Fee Committee, by the way.

12          THE COURT:  Mm hmm.

13          MS. STADLER:  I don't want to repeat the points

14    made in our written submissions, nor do I want to go over

15    material that Mr. Husnick and Mr. Schepacarter and Mr.

16    Gluckstein have covered.  I am here, however, to correct

17    certain factual misstatements about Mr. Kravitz that

18    appeared in the movant's reply papers filed late on Friday.

19    They have been addressed in part, but not fully.

20          We want to be clear that Mr. Kravitz does not

21    represent any liquidating trust related to these

22    proceedings.  Mr. Kravitz was hired, much as Your Honor

23    described your former role on behalf of creditors as an

24    agent of an unsecured creditor of EFH Corporate Services.

25    That creditor is HCL America, Inc., and that creditor was,

1    as I understand it, an IT service vendor for Corp. Services.

2          As all the Corporate Services creditors did, or

3    many of them did, HCL had claims against both E-side and T-

4    side entities because of the agreement between those

5    entities to share administrative or Corporate Services

6    expenses.  It is for that reason that when representatives

7    of the E-side UCC met with the Fee Committee shortly after

8    the E-side UCC was appointed, it was precisely for that

9    reason that the E-Committee concluded that Mr. Kravitz could

10   be an adequate representative of all unsecured creditors.

11         Mr. Kravitz was not paid by HCL or anyone else for

12   his services on the Fee Committee.  He did submit Fee

13   Committee related expenses, which were reviewed and reported

14   on by the Fee Committee, using the same standards that were

15   applied to all of the other retained professionals in these

16   cases and were awarded by Court order.

17         The current UCC, as we've heard, endorses the work

18   of the Fee Committee, as stated today and in the responsive

19   papers, and it appears that the indenture trustee has taken

20   no issue with it as well.

21         One final factual clarification, the movant's

22   papers suggest that the T-side fees have all been approved

23   on a final basis, which is inaccurate.  The applications

24   that were submitted and approved on a final basis after the

25   T-side emergence were, as Your Honor knows, professionals

1    providing services only to T-side debtors.  Many, many

2    professionals, including some of the ones sitting in this

3    room, have and will request fees to be paid from both T-side

4    and E-side entities.  And the award of those fees is far

5    from final.

6             That ends the factual clarifications that I would

7    like to make.  Mr. Gitlin does want to make a few comments

8    on his own behalf, but if you have questions, I'm happy to

9    address them.

10            THE COURT:  I do not.  Thank you.

11            MS. STADLER:  Thank you.

12            THE COURT:  Mr. Gitlin, good afternoon.

13            MR. GITLIN:  Good afternoon, Your Honor.  Richard

14   Gitlin, Chairman of the Fee Committee.  I had prepared

15   remarks, Your Honor, but I'm going to change them a bit,

16   based on the conversation today.

17            It should be noted that this whole process was not

18   initiated by the Official Committee of Unsecured Creditors.

19   In fact, the Official Committee of Unsecured Creditors has

20   consistently, and in his papers, indicated they've been very

21   pleased with the performance of the Fee Committee, and Peter

22   Kravitz as a representative.

23            This was initiated by a creditor group led by

24   Elliott, who has acquired maybe 75 percent of the debt, and

25   clearly would get 75 percent of the benefit of any fee

1    reduction.  This is initiated by the group that has

2    expressed severe disappointment with the work of the Fee

3    Committee, expressly saying they feel the Fee Committee has

4    not achieved adequate reductions of professional fees in its

5    work to date.

6              So, I'd like to address that request, quickly

7    mentioning three things.  But I'll mention them quicker

8    because they've been said by others.

9              We appoint Fee Committees and the U.S. Trustee

10   does in these cases because the Court and the U.S. Trustee,

11   which in normal cases do this function together, would be

12   unbelievably overwhelmed in mega cases.  So, a creditor

13   representative, a debtor representative, a U.S. Trustee, and

14   an independent party is appointed.

15             Our role is very clear, Your Honor.  There's no

16   misunderstanding about our role.  We are officers of a

17   Court; we owe the Court our duty.  We do not report to

18   anyone else.  We report to the Court and we make our

19   recommendations to the Court.  But why is there a creditor

20   representative, then?  Why is there a Debtor representative

21   on the Committee?

22             Let me comment on how the Committee works.  And I

23   happen to be independent Chair of the Lehman Committee as

24   well.  Fee committees are relatively new, so we have to

25   fashion how we work in a way that makes sense, and we do our

1   best to do that.  And as you know, Your Honor, we examine

2   fee examinations in great detail.  We deliberate seriously,

3   and everybody on our committee offers their views in our

4   deliberations.  But we will get to points where we say, for

5   example, why did Sullivan and Cromwell spend so much time in

6   this litigation when they weren't really the key party in

7   interest?  We don't know that.  So, we say to Peter Kravitz,

8   would you please interact with the Committee and Sullivan

9   and find out for us why they spent that time and give us

10  your view?

11          I would contact Sullivan on occasion and say, how

12  are you really using the investment bankers?  Their fees

13  seem to be too large on a monthly basis.  But we're not in a

14  position to make that judgment.  We would like feedback from

15  you.

16          We proactively, when we get to points where we

17  don't have enough information, seek out that information

18  with the appropriate party.  I will do it on occasion where

19  the feedback is confidential and shouldn't be shared, even

20  with other  members of the Fee Committee.  But we just try

21  and fashion a way, albeit informal, albeit -- I'm not sure

22  we write this in protocols; I know we don't -- we try and

23  fashion a way to be as best informed as we can in order to

24  deliver the best product to the Court.

25          So, what has happened over the three and a half

1    years?  Over the three and a half years, we've reviewed

2    hundreds of millions of fees.  We have filed 11 interim

3    reports with the Court.  There has not been one objection

4    filed by any party to the work of the Committee and the

5    recommendations of the Committee.  And the Court has seen

6    fit to approve our recommendations.  Not one by a creditor,

7    not one by a Creditors' Committee, not one by an ad hoc

8    committee.

9            So, I ask, Your Honor, is there a compelling

10   reason to change the Committee representation where the case

11   is coming to the end of the case, after we have worked three

12   and a half years together forming interactions that work out

13   quite well to do what is a very difficult task and to and do

14   it our best?

15           Peter Kravitz, in my view, has done an excellent

16   job, and I find it remarkable he's willing to continue to

17   serve without fee, Your Honor.  I thought for sure he would,

18   when the controversy started, say thank you, I'm gone.  But

19   he feels an obligation to continue, unless replaced.  If

20   Your Honor would choose to replace him, Peter will, of

21   course, immediately leave the Fee Committee.

22           So, question number 1, Your Honor, are we at a

23   point where there is a reason to change the composition of

24   the Fee Committee?  If Your Honor chooses to change the

25   composition of the Fee Committee, we would welcome whatever

1    representative.  We would give him the background, work with

2    him, do whatever we have to do to bring him up to date, and

3    we would integrate the party into our work.

4           But I would just suggest two guidelines, maybe

5    three.  One, the integrity of this process, in my view,

6    requires that a representative to the Committee be appointed

7    by the Official Committee of Unsecured Creditors as

8    fiduciaries and people who have fiduciary obligation.  And

9    if he goes back to them with information requests, he's

10   dealing with people who have a fiduciary obligation.

11          Two, this role is not easy to understand, as you

12   can tell by the dialect today by very competent people here.

13   It's very important this person be vetted by the U.S.

14   Trustee's office and, of course, the Court, to make sure

15   they understand what an officer of a court means.

16          We have a duty to the Court.  This doesn't run to

17   the creditors.  Our duty is to the entire estate and to the

18   Court to make sure we do the best job possible.  Yes, we

19   individually may offer more information in the dialogue and

20   have access to more information because of the nature of our

21   position, creditor or debtor.  But our duty is to the Court,

22   Your Honor.

23          Lastly, in Lehman, the creditor representative was

24   not paid throughout the whole case.  In this case, Peter

25   Kravitz has not been paid.  I think if we start paying a

1    member of the Fee Committee, unless there's no alternative

2    Your Honor -- and I guess Your Honor would have to chew on

3    that -- but I think it interferes with the integrity of what

4    we're doing.  And there is an integrity to this process that

5    must be maintained.

6            So, to summarize, Your Honor, I'm not sure there's

7    a compelling reason to change.  We would certainly respect a

8    decision to change and work with the person.  But those are

9    my comments, Your Honor.

10           THE COURT:  Thank you, Mr. Gitlin.  Reply?

11           MR. HAGEY:  Sure.  I think this motion has evolved

12   into sort of an existential exercise in what is the Fee

13   Committee, what is its role, what is its integrity, what

14   does it do.  It strikes us that the plain language of the

15   order, which is what the majority creditors were faced with

16   when we first undertook trying to figure out this process

17   and whether we would be involved, it frankly just kind of

18   describes a different level of interaction and robustness

19   than we read in the papers, in the responses and the

20   Debtors' objection, and frankly, that we've heard here

21   today.

22           We have a lot of respect for the concept of folks

23   being officers of the Court, and that the counsel here

24   certainly are officers of the court.  But we also think as

25   long as we're talking about the existential nature of what a

1    committee like this is meant to do, we think it's important

2    to understand the unique position for in some ways the

3    prejudice that it sounds like the group is trying to place

4    against having a creditor representative who would actually

5    vigorously represent creditor interests.  That's maybe an

6    academic and philosophical discussion that's larger than, I

7    think, today's hearing.  But it does harken to, I think, the

8    -- you know, the standard bearer for this whole discussion,

9    in our view at least, is the Third Circuit's Busy Beaver

10   case.  Judge Becker -- may he rest in peace -- was pretty

11   straightforward in calling out the problem that is faced by

12   a bar that is very familiar, that has to work together, and

13   where but for the U.S. Trustee, even in very large, complex

14   cases, there is an incredible inertia and incentive against

15   having views and objections about each other's

16   professionals' fees.

17          Judge Becker says in remarks, "Objections to fee

18   applications by parties other than the UST Trustee are often

19   relatively uncommon."  He goes on to say, "The debtor will

20   often not object to its attorney's fee application because

21   the fees will frequently be derived from the creditors'

22   award rather than its own assets.  And even attorneys for

23   the creditors, including committees and whatnot, may also be

24   reluctant to oppose fee requests, whether because of

25   perceived professional courtesy" -- cites a case --

1   "observing that continuing associations in the relatively

2   closed Bankruptcy Bar foster a club atmosphere which

3   militates against effective client representation in matters

4   relating to compensation and fear of retaliation."

5           I hadn't planned on necessarily harkening back to

6   Judge Becker, but the conversation has gotten philosophical

7   and existential, and it seems to me that if you ask anybody

8   on the street, whether you're composing a constitutional

9   body, a charter committee to evaluate and assess the

10  necessity of certain fees, the reasonableness, duplication

11  of effort, et cetera, you'd want to have a member who was

12  actively involved and really charged with looking after the

13  interests of the people who were going to feel the pain most

14  directly.  And that commonsense observation, I think is the

15  one that my clients share.  I think it's one that the

16  broader public would probably share about this process.

17          When I opened my remarks today, I indicated that

18  we -- you know, we have a lot of humility.  We don't know a

19  lot about what's happened.  You know, certainly my firm is

20  here, you know, very interested to understand the Fee

21  Committee process.  There is a lot that's occurred in this

22  case in the estate and, you know, we also know that this is

23  an extraordinarily unpopular position that the majority

24  creditors are taking.  It's very easy to line up on the

25  other side and to cast foot faults as misrepresentations or

```
 1    as earthquakes.

 2           But the bottom line is that when I was hearing Mr.

 3    Husnick in particular talk about the jaundiced motive

 4    somehow, that Elliott and Paloma had when they were coming,

 5    suggesting that we were just asking for information that was

 6    solely directed so that we could manipulate and highjack the

 7    Fee Committee process.  He actually isn't dealing with the

 8    evidence in the record of what transpired.

 9           And all Your Honor has to do is look at Exhibit 9

10    to my declaration that was filed with the original motion.

11    And these were just preliminary questions for Fee Committee.

12    We were just sort of quizzically trying to understand what

13    was going on.  And these questions:  does the Fee Committee

14    have projections regarding anticipated reductions?  Does it

15    have any existing evaluation or analysis of the success or a

16    specific success fee of advisors in the estate?  What

17    database or software has the Committee utilized?  Would it

18    allow anyone access to that?  Are there any written

19    protocols outlining the process?  Are there any existing

20    analysis of what a professional advisor's or similarly

21    situated constituencies who were performing duplicative

22    analysis and generating duplicative work product?  And the

23    list goes on.

24           These questions weren't, you know, engineered to

25    get us on the Committee.  These were questions where, what
```

1    has been happening?  And it strikes me that even the

2    commentary around Mr. Kravitz, which I think was lead into

3    around a conversation about, well, there shouldn't be any

4    compensation for this seat is also prejudicial.  Right?

5            There's four members of the Committee.  The other

6    three are getting compensated to do whatever they want to

7    do.  Mr. Gitlin is funded by the estate. His counsel is

8    funded by the estate.  The Debtors' representative is there

9    and funded by the estate.  The U.S. Trustee and his or her

10   counsel is funded by the government separately and could not

11   be funded by any other source.

12           So, the one person that you isolate, the one box

13   that you isolate, is this creditor.  And you basically give

14   them a seat with the thankless job of being on a committee

15   that you will not be compensated for.  And it strikes us

16   that that is antithetical, and we were actually shocked to

17   hear that that was the position.  It seems antithetical to

18   how you would have a committee process that would be

19   legitimate.

20           THE COURT:  Well, then you're saying that the

21   entire Official Committee of Unsecured Creditors process in

22   Chapter 11 is a sham.

23           MR. HAGEY:  We're not.  And the difference there

24   is --

25           THE COURT:  But that's -- what's the difference?

1           MR. HAGEY:  The difference there is that you have

2     principals from the creditors, right, who are participating

3     in the process.  So, for example, if an Elliott

4     representative, if one of the principals of Elliott or one

5     of the principals of Paloma, were to sit on the Committee --

6           THE COURT:  Mm hmm.

7           MR. HAGEY:  -- right, they wouldn't need to be

8     compensated.  But we've heard over and over again how that -

9     - and why that would be inappropriate.  So, they've got us

10    in -- I use the word whipsaw.  We're in a whipsaw.  On the

11    one hand, you can't appoint somebody independent, or an

12    attorney who might be developing work product that would be

13    useful for the Committee and vice-versa, to sit in that

14    seat.  And on the other hand, you can't appoint a direct

15    creditor principal because that creditor principal would

16    have conflicting obligations, right?

17          So, you're left with -- I don't want to cast

18    dispersions against Mr. Kravitz.  I have no -- it seems

19    remarkable and strange that an individual who represented a

20    telecom creditor of the estate in 2014 -- it appears he was

21    actually a representative of theirs.  He was being paid by

22    them at that point.  Maybe not for his Fee Committee time,

23    but he was otherwise -- you know, he was an attorney acting

24    on their behalf -- that he would be interested in continuing

25    to be appointed.  We didn't suggest there was collusion.  We

1    raised the question.  This is an individual who's being

2    appointed in estates where the Debtors' counsel is actively

3    involved.

4           And the ratchet about conflicts of interest and

5    about pecuniary and financial motivations goes both ways.

6    It can't just be that because Elliott might pay the

7    compensation of a member, that all of a sudden, that member

8    is tainted.  It can't just be that, right?  If that's true,

9    then it has to be that everybody else who is receiving

10   compensation and who might receive compensation through

11   those types of relationships would also be tainted.  And so,

12   then you end up with nobody.

13          We think the better observation is that there

14   needs to be a creditor representative on these types of

15   committees who is actually functioning, who is paid, who has

16   resources to be able to ensure that creditor interests are

17   being respected.

18          THE COURT:  So, if I were to say -- you make a

19   point there, maybe a point that differentiates whether it's

20   appropriate for the creditor representative to be

21   independently compensated, as opposed to the other

22   representatives on the committee.  The next question is,

23   generally speaking, if I pay somebody to do a job, I expect

24   them to report to me on how they're doing the job.  But what

25   I'm hearing from the Committee -- from Mr. Gitlin and from

1    the other constituents is that it's important that the

2    person appointed not report to anyone about how they're

3    doing, what they're doing.

4         So, you put Elliott and Paloma in a weird

5    situation, whereas I say, all right, going to grant your

6    motion, I'm going to let you appoint a representative, I'm

7    going to let you pay that representative.  But once that

8    representative is appointed, they can't tell you anything

9    about what they're doing.  So, you just have to trust that

10   you picked the right person.  That seems odd.

11        But, what I'm hearing for the entirety of the

12   process, the Fee Committee process, is that's exactly what's

13   going on and how people are participating and have been

14   participating, and that it raises concerns about how that

15   process would work, the integrity of that process, if you

16   were then able -- that representative was then able to go

17   back to its principal and say, yeah, I mean, you know, we

18   were talking to -- should we pick on Sullivan and Cromwell

19   again?  They're talking to Sullivan and Cromwell, you know,

20   trying to get them to try not to send six partners to every

21   hearing, and they were steadfast, and we just couldn't get

22   anywhere.  But Your Honor, maybe you should think about

23   fighting that independent.  That creates a problem for how

24   to make the process work.

25        And just to be clear, I don't think Sullivan and

1    Cromwell has sent six partners to any hearing, including

2    some heavy-duty litigation we had involving them several

3    years ago.  So, just a hypothetical, but you see my point.

4              MR. HAGEY:  It's --

5              THE COURT:  So, I'm happy to let you pay.  That

6    could -- you know, this is the -- you know, this will be the

7    answer, right?  Sure, pick somebody, pay that person, and

8    hope they do a good job.  I'm not sure your client would be

9    onboard with that, though.

10             MR. HAGEY:  Even in the construct that we heard

11   sitting here today about there should be no information

12   sharing, again, we go back to what the Committee order says.

13   And it says any Fee Committee member shall be free to

14   consult in connection with his or her service on the Fee

15   Committee, with either attorneys for the constituent group

16   that he or she represents, or his or her own attorneys.

17             It strikes me that this idea that there is a

18   blackout on what that constituent representative is doing is

19   bad for the process.

20             THE COURT:  Mm hmm.

21             MR. HAGEY:  I think the Court wants the Committee

22   member who's sitting in that seat to be vigorously

23   representing that constituent group.  I think you get better

24   outcomes from having a process where you actually are giving

25   and taking information, rather than it being this closed

1  off, hermetically sealed type engagement, which is what it

2  feels like now.

3        And you know, I heard Mr. Husnick, you know,

4  suggest that it's just a non-starter, that there would be

5  any information, and you know, information would cause, you

6  know, somebody like Elliot to have to go restricted.  I

7  mean, excuse me.  I'm sorry, protective orders are in there

8  all the time, and directions and protocols are in there all

9  the time, that tell people like Mr. Kravitz or Mr. Carroll,

10  here's the type of information that you can discuss with

11  your client; here's the kind of information you can't.

12        So, if there's privileged settlement conversations

13  that are happening and those are Rule 408, and they

14  shouldn't be discussed, or there is, you know, conversation

15  about a particular strategy item, or something that a

16  particular advisor is demanding not be shared outside the

17  Fee Committee process, that would be verboten.  But --

18        THE COURT:  Well, then what exact information are

19  you talking about?  Because some information comes out of

20  the Committee.  They file quarterly reports where they

21  discuss the various --

22        MR. HAGEY:  Fair enough.

23        THE COURT:  -- creditors.  I mean, unless you're

24  talking about those kind of -- what are we talking about?

25  What information is it that you want that you could get that

1    wouldn't be privileged?

2            MR. HAGEY:  Okay.  So, here's a good example.

3    What is the anticipated budget for, you know, the 40-plus

4    advisors who are currently engaged in this case through plan

5    confirmation?  How are those budgets being assessed?  Is

6    anybody looking at actual results versus the budget?  How

7    wide is the variance?

8            THE COURT:  All right, so let's talk about that a

9    little bit.  So, one of the places you see budgets is in the

10   U.S. Trustee guidelines.  You have to prepare budgets that

11   you then make available to the U.S. Trustee.  Those are very

12   sensitive, and the U.S. Trustee doesn't -- correct me if I'm

13   wrong; could be wrong -- the U.S. Trustee doesn't share

14   those budgets.  And indeed, the integrity of those budgets

15   relies on the fact that they're not sharing them with the

16   other constituency.  Mr. Schepacarter, I may be totally

17   wrong on this, so I don't know --

18           MR. SCHEPACARTER:  Yeah, you might be.

19           THE COURT:  Yeah, but not the first time.

20       (Laughter)

21           MS. STADLER:  That's all right.

22           MR. SCHEPACARTER:  That's all right.  Again,

23   Richard Schepacarter for the U.S. Trustee.  Those budgets

24   are actually attached with the interim fee applications.

25           THE COURT:  Right.

1          MR. SCHEPACARTER:  And I know the parties, I've

2     been diligent about making sure that those budgets get

3     filed.  It's part of the large case fee guidelines --

4          THE COURT:  Yep.

5          MR. SCHEPACARTER:  -- so they have to do a

6     staffing report budgeting.  And they're all filed,

7     comparable rate disclosures.

8          THE COURT:  Right.

9          MR. SCHEPACARTER:  And I've, you know -- so --

10          THE COURT:  They all get filed.

11          MR. SCHEPACARTER:  -- I make sure that that all

12     gets filed.  So, that's all public information.  So, it's

13     out there.  But I understand Your Honor's question, and

14     that's fine.

15          THE COURT:  I've been wrong before.

16          MR. SCHEPACARTER:  That's okay.

17          THE COURT:  It's only the 12th time today, so

18     that's good.

19          MR. SCHEPACARTER:  Thank you, Your Honor.

20          THE COURT:  All right, so then my -- so, there you

21     go.  All you have to do is read the fee apps.  There are

22     budgets in them.

23          MR. HAGEY:  Well, so, the practical question that

24     we asked the Fee Committee was, what does the expected

25     advisor spend for these different constituent groups, and

1   has anybody looked at whether there's an opportunity or

2   method for streamlining the amount of spend that's

3   anticipated to bring down that $50 million a month number

4   to somewhere that could be more reasonable.  And we couldn't

5   get any response.  Okay?  That is the kind of information

6   that --

7           THE COURT:  That's assuming, by the way, that the

8   $50 million number is unreasonable, because you just said

9   you want to make it less, so it'll be reasonable.  So,

10  you've got a prejudice in your position.

11          MR. HAGEY:  Well, I -- they're just --

12          THE COURT:  Which is fine, but I mean --

13          MR. HAGEY:  It is a perspective, Your Honor.

14          THE COURT:  You're assuming that people are

15  charging too much.

16          MR. HAGEY:  It is also a function of not having

17  the ability --

18          THE COURT:  Transparency.

19          MR. HAGEY:  The transparency to understand why,

20  for example, you have -- just use one construct to give the

21  Court some sense of this -- you have, you know, multiple

22  legal advisors, you know, restructuring counsel, regulatory

23  counsel, and investment bankers, who are all directionally

24  aligned on a particular issue, all, you know, basically

25  doing the same work on a particular project, when that could

1    have been shared amongst each other.  And we asked the

2    question of the Fee Committee, hey, that'd be a good project

3    to try to work with those advisors to streamline and

4    harmonize so that, for example, if there's a particular

5    issue where, you know, let's say the independent director

6    for EFH is directionally aligned with the independent

7    director for EFIH, or the trustee for EFIH and the trustee

8    for EFH, they have to duplicate the work.  They had all

9    these law firms, you know, don't engage and burn at the same

10   time to generate the same memos and the same research and

11   the same analysis.

12             And it would be useful for the Court, for

13   creditors, you know, for others, to understand that that

14   kind of information and work product and analysis is

15   happening at the Fee Committee level.  That's not

16   privileged.  It shouldn't put anybody on restricted status.

17   It would strike us that that kind of analysis would be

18   useful to the commonsense desire to ensure that there is a

19   conservation of the estate.  And I think we all share that

20   goal.

21             So, when the prejudice of reduction gets thrown

22   around, it does seem to be that we're all here wanting to

23   ensure that there is as much left over at the end of the

24   possible.  Not just targeting professionals, but in a

25   general sense.

1            So, I guess the -- if the solution here were to

2     keep the black box, but let Elliott pay or let Paloma pay to

3     put somebody inside the black box, it strikes me that that's

4     better than the status quo.  That would certainly be a

5     compromise the would be willing to live with.  But it does

6     seem to me that it still suffers from the part of the

7     gravamen of the issues that draws us to want to be on the

8     Committee, which is to actually be able to help with the

9     process, to play a meaningful role.

10            And if my clients are told a meaningful role isn't

11     in the cards here.  You just need to stay away.  You can

12     concern or write letters, but you're not going to get

13     anything back out of it, you'll hear from us when you hear

14     from us, that's not terribly satisfactory.  And I don't -- I

15     just can't believe that that is a process that folks think

16     is really going to work, or that is really the most

17     legitimate way to go about this.

18            So, I guess as a last observation, It doesn't

19     sound like I've convinced my colleagues who have risen in

20     response to the motion.  We get it that we're not really

21     being invited to the party.  Folks aren't interested in

22     hanging around the table with us.  They think we have some

23     sort of malignant design.  And that's unfortunate.

24            If the Court were inclined to have some kind of

25     process for us to have an appointment, I think along with

1  that we would be interested to have the parties forced to

2  actually meet and confer substantively to see if there's a

3  way to hash out the information sharing regime that

4  addresses some of the concerns raised by the U.S. Trustee

5  and by Mr. Gitlin.  And respectfully, I think I'll close

6  with that.

7          THE COURT:  Okay.  Thank you.  Any final words

8  before...?  Mr. Husnick?

9          MR. HUSNICK:   Just very quickly, Your Honor.  He

10  spent quite a bit of time talking about the existential

11  nature of the discussion.  We think it's frankly incredibly

12  important, the existential nature of this discussion.  And

13  the reference to the Busy Beaver case, is frankly exactly

14  why there's an independent Fee Committee here.  He seems to

15  indicate there might be some sort of bankruptcy cabal.  And

16  you know, if that's the case, then that's exactly why

17  there's an independent member in putting compensated parties

18  onto that committee.  To serve another element of the cabal

19  really doesn't seem to fit the bill.

20          Counsel said that there's no malignant design.

21  Well, I heard him, you heard him, and I think we all heard

22  him say on several occasions, topics about reducing fees, 75

23  cents.  You know, I first said I gave it a Freudian slip.

24  But sometimes, Your Honor, a cigar is just a cigar.  I think

25  that's another quote from Freud.  And that's exactly what

1    they're after here.  They're after reductions in fees.  It's

2    inappropriate.  And their attempt to get there has been

3    reckless thus far.

4             The last thing I'll say is one of the concerns

5    that they voice, they try to give concrete examples of

6    problems with the Fee Review Committee, and they started

7    with, you know, duplication and too many people at hearings.

8    Well, I can tell you the cases that they cited, duplication

9    at hearings and duplication at depositions are two of the

10   more onerous requests that we get from the Fee Review

11   Committee, and which Ms. Yenamandra and I have to prepare

12   detailed responses of what each individual did at the

13   hearing and why the were there.  And sometimes we're

14   anticipating objections that ultimately don't come to

15   fruition, but there are people who attend to say, I agree.

16   I don't agree with the Fee Review Committee at all times,

17   and there's a lot of negotiation that happens.  We believe

18   the process --

19             THE COURT:  You're their primary target as far as

20   I can tell.

21             MR. HUSNICK:  As far as we can tell.  And I think

22   you're right, Your Honor, and we don't always agree.

23             THE COURT:  I would love to receive what you've

24   written off in this case.  I would retire immediately.

25             (Laughter)

1          MR. HUSNICK:  But Your Honor, you know, the last

2     thing they mentioned in the speech -- and I think it goes

3     without -- it needs to be mentioned, are there's an implied

4     reference to the disinterested director advisors.  Nobody

5     knows more than Your Honor why the disinterested director

6     advisors are here.  This was in direct response to comments

7     from Your Honor in connection with issues earlier in the

8     case.

9          THE COURT:  When it cost the estate about $70

10    million dollars.

11         MR. HUSNICK:  And you know, Your Honor, I think,

12    said there's going to be overlap.  You made that observation

13    right away.  Unfortunately, there is overlap.  We don't

14    believe there was duplication, but there was some overlap.

15    And you know, it's an unfortunate side effect of the

16    complicated intercompany issues we had in this case and that

17    are, frankly, showing up in other cases, as I've now moved

18    on to one other case.

19         So, Your Honor, unless you have any further

20    questions, we'd respectfully request that Your Honor deny

21    this 11th hour request to adjust a functioning fee process

22    with a non-fiduciary, with a compensated individual, which

23    is in direct contravention of the plain language of the Fee

24    Committee Order that was a highly, highly negotiated

25    document.

1            THE COURT:  Okay.

2            MR. HUSNICK:  Thank you.

3            THE COURT:  Thank you, Mr. Husnick.  Any further

4    comment?  No?  Okay.  I'm going to take a recess, and then

5    I'll come out and order.

6        (Recess)

7            CLERK:  All rise.

8            THE COURT:  Please be seated.  Thank you for your

9    presentations and your arguments.  I guess as a technical

10   matter, I'm going to deny the motion in part and grant the

11   motion in part.  And I think I've fashioned a remedy that

12   will address many of the legitimate concerns raised by the

13   movants and the objectors.

14            A couple of comments to begin.  First of all, as

15   with a fee examiner, which is much more common in this

16   jurisdiction and in my court in particular, the Fee

17   Committee here is an officer of the Court.  The Fee

18   Committee here is an officer of the Court.  The members that

19   the Fee Committee serve is officers of the Court.  And the

20   primary goal of the Fee Committee is to assist the Court in

21   its duty to review fee applications under the applicable

22   legal standard, and to make sure that they meet that

23   standard, but at the same time, to help alleviate the burden

24   on a -- this is it, this is the staff -- and their ability

25   to have the time and resources to review the voluminous fee

1    applications that are to be expected in a case of this size

2    and complexity.

3              At the same time, in order to streamline the

4    process and, hopefully, to avoid fee litigation if possible,

5    this process was developed to provide important constituents

6    with a voice and skin in the game to review these fees.  So,

7    we have the office of the U.S. Trustee, of course; we have a

8    Debtor representative and a creditor representative, and

9    then an independent member.  That is designed, I think, in

10   large part to provide buy-in to the legitimacy of the Fee

11   Committee's actions.

12             At the same time, you need to make it clear that

13   these representatives that are appointed by different

14   constituencies are acting in an independent, if not truly

15   fiduciary way, but an independent way in exercising their

16   duties on the Committee.

17             So, that is, I think, what is behind, among other

18   things, the fact that Fee Committee members aren't to be

19   paid for their work on the Committee, other than the

20   independent member, who obviously, Mr. Gitlin has paid and

21   his counsel has paid out of the estate.

22             That creates a bit of a whipsaw, I think, as

23   pointed out by the movants, in that you get in a situation

24   where the only party not paid for his or her participation

25   ends up being the creditor representative.  And Mr. Keglevic

1   is obviously paid as CRO and, I think at this point CEO, if

2   I remember correctly, but certainly the more senior

3   executive of the E-side Debtors.  And he has many, many

4   duties, probably none of which are enumerated, you know, you

5   get five bucks for doing this and 10 bucks for doing that.

6   Included in his many, many duties is the pleasure of serving

7   on the Fee Committee.  I'm sure it's one of his more

8   enjoyable activities.

9           Of course, Mr. Schepacarter has many, many duties

10  and included in them is participating on this Fee Committee.

11  And as I said, Mr. Gitlin is paid.  But the creditor

12  representative works for free, isn't being paid either

13  through the E-side or specifically for the job of being on

14  the Fee Committee.  I think that is a problem.  I think that

15  creates an issue with regard to who you could get to do the

16  job and how hard that person is going to work at the job.

17          Now, I don't know Mr. Kravitz and I am in no way

18  commenting or casting dispersions on him, but if one were in

19  a situation like Mr. Kravitz is where he's been serving on

20  this Committee for three and a half years and hasn't been

21  paid for it, I wonder -- again, casting no dispersions --

22  how committed someone like that might be to the job.  And

23  there are a lot of reasons we do things for free and as a

24  professional.  And usually they involve hoping to turn that

25  into something you get paid to do, whether it be a different

1    client or subsequent business, or helping you expand your

2    resume, et cetera.

3            So, again, I'm just speculating.  But you know, I

4    see the point about being problematic that the creditor

5    representative isn't compensated.  And I think there's a

6    balancing there.  You want to make sure you're not putting a

7    hired gun on a Fee Committee with an agenda.  But at the

8    same time, people who work have to have the incentive of pay

9    in order to do a job.  So, I see the problem there.

10           Another issue that sort of percolates here is this

11   transparency issue.  And with regard to the job of helping

12   the Court, transparency really doesn't matter.  To the job

13   of creditor and Debtor and party buy-in to the legitimacy of

14   the process that is designed, among other things, to limit

15   or eliminate fee applications, transparency matters a lot.

16           The process as it's currently being run -- again,

17   I'm not casting any dispersions; just the way it's being run

18   -- is not overly transparent to the creditors.  That is

19   fine.  Again, where the primary purpose here being to aid

20   the Court, you know, it's worked wonderfully.  This

21   Committee has worked wonderfully.

22           In regard to creditor and party buy-in on the

23   legitimacy of the process, we haven't had an objection.

24   This might be the only think that hasn't been objection to.

25   We got nine objections to a 60-day extension of exclusivity

1   in 2015, which I remember well.  This case generates paper,

2   so there's obviously been some legitimacy, even if there

3   isn't a tremendous amount of transparency.

4           I think it's also important that while the members

5   of the Committee aren't fiduciaries in and of themselves and

6   acting necessarily in that manner, they have to -- the

7   Debtors and the Committee representatives so far have been

8   appointed by fiduciaries.  I think that's important, again,

9   for the legitimacy.  Also, you know for the long-term

10  stability of the Committee because people trade in and out

11  of positions.  Elliott is obviously, you know 00:16:18.

12  That's a different case.  What's your other client's name?

13  I apologize.

14          MR. HAGEY:  Paloma.

15          THE COURT:  Paloma?  All right.  Elliott and

16  Paloma bought in fairly recently to a large, to say the

17  least, position, and they trade off.  I mean, six months

18  from now, they may not exist as a creditor in this case.

19  So, you know, having the actually creditors as opposed to

20  the fiduciaries appoint representatives to the Fee

21  Committee, I think will result in an unstable situation.

22  So, here's what I am going to do.

23          I am going to officially designate, or formally

24  designate the Official Committee of E-side Creditors as the

25  appointing authority to join the Debtors and the U.S.

1    Trustee for membership in the Fee Committee.

2            I would like the E-side Committee to consult with

3    its constituency, including Elliott and Paloma, as well as -

4    - and again, consult, not divest authority, but consult with

5    the Debtors and Mr. Schepacarter and Mr. Gitlin on an

6    appropriate person to appoint to that position.

7            I'm going to change the order so that the person

8    appointed by the E-side Committee will be paid out of the

9    estate at a fixed monthly fee to be negotiated among the

10   parties.  Very similar, obviously, to how Mr. Gitlin is

11   compensated.

12           That appointed person will have the ability, as

13   all the other representatives have, to consult with the

14   attorneys for the appointing authority, i.e. Mr. Gluckstein,

15   on matters that come before the Fee Committee.

16           Mr. Gluckstein, I will allow you, in the complete

17   exercise of your discretion, to do it or not do it and to

18   determine how far to do it, if at all, to provide

19   information to the Brown Hagey firm on a lawyer's eyes only

20   basis, not to be shared, obviously, with your client or

21   outside the firm.  I suppose if you have a financial

22   professional involved, you can consult with Mr. Gluckstein

23   to the extent necessary to see if it's all right to provide

24   that information to a financial professional.

25           I think that solves some of the problems.  I think

1    it probably leaves no one happy, which means it was the

2    right decision.  It provides some transparency to the

3    process, provides for a fiduciary of the E-side Official

4    Committee to appoint a representative.  I think it solves

5    the problem that's inherent in how this situation was set

6    up, of compensation to make sure that the E-side can get an

7    engaged professional.  I think a flat fee makes a lot more

8    sense than some sort of hourly basis or contingency fee

9    basis.  And I think we're providing for some very limited

10   information to be provided to Elliott, more than they're

11   getting now, which is probably just enough to make them

12   unhappy.

13          So, I'd ask the parties to consult -- and by the

14   parties, pretty  much everybody that chimed in on this -- to

15   consult on a form of order that you can submit or

16   certification of counsel.  Whenever the E-side Committee

17   appoints someone, I'd like a notice of appointment on the

18   website, or on the docket.  And obviously, if there's an

19   objection to whoever is appointed, just like if there were

20   an objection to anybody else on the Fee Committee, parties

21   are free to seek relief from the Court, i.e, you know,

22   object, in effect, or file a motion, or something along

23   those lines.

24          Any questions?

25          MR. HUSNICK:  Can I have one moment?  Yeah, Mr. --

1    yeah.  And if you can -- I'm sorry.

2            MR. HUSNICK:  Your Honor, I just want to clarify

3    one aspect of the ruling.  When the information is shared

4    with the Brown Hagey firm, they can't turn around and file

5    said information with the bankruptcy court in an objection

6    because that would defeat the purpose of cutting off the

7    communication between the law firm and the client.  So, I

8    fear that opening --

9            THE COURT:  Well, they certainly couldn't file

10   anything except under seal.  I mean, anything containing

11   confidential information they receive would have to be filed

12   under seal with an appropriate motion.

13           MR. HUSNICK:  I'm not sure how they take direction

14   from the client if they're not communicating with their

15   client about what's in there, but --

16           THE COURT:  That's a problem for any attorney that

17   receives information on an attorney eyes only basis.  It's

18   very difficult.  Okay.  If you can't agree on the monthly

19   fee, I'll decide.  And I'm not overly generous, I can tell

20   you.

21           MR. HUSNICK:  Okay.

22           MR. HAGEY:  Okay.  The only comments that the

23   majority creditors would have is if there were to be some

24   time of time to limitation by when the parties should get

25   back to the Court, either with the UCC's appointment or a

1    joint endorsement of an appointment, we've been at this a

2    long time.  It'd be useful to have say five to seven days, a

3    week out, to hopefully put an end date on that.

4            THE COURT:  Well, I'm not going to set an

5    artificial deadline.  I think you're going to have to

6    negotiate the order.  That's going to take -- that may take

7    a couple days.  But, you know, if this thing lingers for

8    more than, you know, a week or so and you're not getting

9    anywhere, call chambers and we'll have a call, or we'll

10   figure out how to deal with it.

11           MR. HAGEY:  Okay.

12           THE COURT:  Okay.  Anything else for today?

13           MR. HUSNICK:  No, Your Honor.

14           MR. HAGEY:  Thank you.

15           THE COURT:  All right.  Thank you, we're

16   adjourned.

17           MAN 1: Thank you, Your Honor.

18                    * * * * *

19

20

21

22

23

24

25

Page 94

1                        I N D E X

2

3                        RULINGS

4    DESCRIPTION                            PAGE       LINE

5

6    Motion to Appoint a Representative      85       10-11

7    of the Majority Creditors to the Fee Committee

8    Denied in Part and Granted in Part

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 95

1                C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

**Sonya**                    Digitally signed by Sonya
6                               Ledanski Hyde
**Ledanski Hyde**            DN: cn=Sonya Ledanski Hyde, o,
                             ou, email=digital1@veritext.com,
7                            c=US
                             Date: 2018.01.09 16:40:14 -05'00'

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  January 9, 2018