## <u>EXHIBIT B</u>

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## DECLARATION OF ANDREW M. WRIGHT IN SUPPORT OF THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER APPROVING THE SETTLEMENT BETWEEN THE DEBTORS AND SEMPRA AND APPROVING THE AGREED AMENDMENT TO THE MERGER AGREEMENT

Pursuant to 28 U.S.C. § 1746, I, Andrew M. Wright, declare as follows:

1.      I am over the age of 18 and duly authorized to execute this declaration (the "Declaration") on behalf of the Debtors in support of the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Approving the Settlement Between the Debtors and Sempra and Approving the Agreed Amendment to the Merger Agreement* (the "Motion"),[2] filed contemporaneously herewith.

2.      I am the Executive Vice President, General Counsel, and Secretary of Energy Future Holdings Corp. ("EFH"), Energy Future Intermediate Holdings Company LLC ("EFIH"), and related entities (together, "Debtors"). I am a member in good standing with the State Bars of

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] All capitalized terms used herein have the meaning given to them in the Motion.

Texas and New York, and I am a Certified Public Accountant. I have been employed by the EFH Debtors and their predecessors for over 13 years.

3.      The facts in this Declaration are based on my personal knowledge and review of information and my experience with the Debtors' operations and transactions. If called to testify, I would testify to the facts set forth herein.

A.      **Background and Overview**

4.      On August 21, 2017, Sempra and the Debtors entered into the Agreement and Plan of Merger by and among Sempra Energy, Sempra Texas Merger Sub I, Inc. (formerly known as Power Play Merger Sub I, Inc.), Energy Future Intermediate Holding Company LLC, and Energy Future Holdings Corp. (the "Merger Agreement"). On September 7, 2017, the Court entered an Order approving the same [D.I. 11873].

5.      Following the Court's approval of the Merger Agreement, the parties have worked diligently towards consummating the merger, including efforts to advance the confirmation proceedings and obtain the regulatory approvals necessary for consummation.

6.      The cornerstone of the transaction is EFIH's ownership interest in Oncor, a ring-fenced subsidiary of the Debtors. Oncor is a regulated utility subject to the jurisdiction of the Public Utility Commission of Texas (the "PUCT") and accordingly, one of the necessary regulatory hurdles is seeking PUCT approval of a Change of Control application to transfer EFH's indirect ownership interest in Oncor to Sempra.

7.      The inability to obtain the requisite regulatory approval from the PUCT, or the conditions imposed by the PUCT, was, among others, a stumbling block for two prior transactions involving the sale of EFH's indirect interest in Oncor, each of which were ultimately unsuccessful. Based on my own personal experience with these prior efforts, I believe that the execution of the Stipulation between Sempra, Oncor, and all of the intervenors in the Change of

2

Control Application proceedings, have created positive momentum in the PUCT regulatory process.  With these positive developments, I believe the Settlement Agreement—which resolves a host of issues that I understand would otherwise have to be litigated in the Bankruptcy Court— is in the best interests of the Debtors, their estates, their stakeholders, and their efforts to emerge from chapter 11.

####    B.      The Dividend Issues

8.      On October 5, 2017, Oncor and Sempra submitted their joint regulatory approval application to the PUCT regarding the change of control of Oncor contemplated by the Merger Agreement.  On October 13, 2017, in an unrelated rate case before the PUCT involving Oncor, the PUCT issued an order that allowed for, among other things, a change to Oncor's existing debt to equity ratio to 42.5% equity and 57.5% long-term debt.

9.      On October 25, 2017, Oncor declared a dividend for the third quarter of 2017. Importantly, however, Oncor conditioned the payment of this dividend on additional equity contributions made to Oncor from its members in the total amount of approximately $250 million on or before the date of the closing of the Merger Agreement.  Based on knowledge and belief, this condition was added by the Board of Directors of Oncor in order to ensure that Oncor would meet its newly established Modified Debt/Equity Ratio at the time of Merger consummation.

10.     Under the Merger Agreement, the Debtors and Sempra agreed that any dividend paid for the fourth quarter of 2017 would be shared 75%/25% between the Debtors' estates and for the benefit of Sempra, respectively.  The Merger Agreement also provided in Exhibit D certain key regulatory terms, including that Sempra would commit to "work in good faith with … Oncor's other members so that, as promptly as practicable and in no event later than 180 days after closing of the transaction" an equity investment is made in Oncor sufficient to achieve the

3

modified debt to equity ratio.  The Merger Agreement did not expressly address the dividend for the third quarter of 2017.

11.     This set of facts and circumstances created certain unforeseen disputes between the Debtors and Sempra regarding interpretation of the Merger Agreement, the appended key regulatory terms, and the rights and obligations of the parties as set forth therein.  Absent resolution of such disputes, the Debtors would potentially have been in the unfortunate position of engaging in adversarial proceedings against their transaction partner, and the monetary and temporal costs of such proceedings would have potentially delayed the Debtors' emergence efforts as well as decreased creditor recoveries.

**C.     The Oncor TSA**

12.     EFH, Oncor, and Oncor's immediate parent, Oncor Electric Delivery Holdings Company LLC ("OEDH") have executed a tax sharing agreement known as the Oncor TSA. Under this agreement, each of Oncor and OEDH must calculate its taxable income and determine how much tax it would be required to pay if it were a standalone corporation.  Oncor and OEDH must also pay an amount equal to such hypothetical tax liability to the parties specified in the agreement.  EFH assumed the Oncor TSA on March 13, 2017 and made the Cure Payment.

13.     I understand that because OEDH and Oncor make payments to EFH based on estimated taxable income, the Oncor TSA contemplates a subsequent "true up" payment once tax calculations for a particular year are finalized.  I understand that such "true up" payments may require additional payments from OEDH and/or Oncor (if the original payments based on estimated taxable income were too low) or, conversely, refund payments from EFH (if the original payments based on estimated taxable income were too high).  I also understand that "true up" payments are generally made the year after any particular tax year (e.g., "true up" payments for the taxable year 2017 are made in 2018).

4

14.     I understand that these timing issues could affect Plan distributions with respect to EFH creditors because if EFH or its estate is obligated to make refund payments for a particular tax year, such refunds reduce distributable cash available for EFH creditors.  Based on my personal experience, I believe that absent an agreement between Sempra and the Debtors on the TSA Claims for tax years 2016, 2017, and 2018, the Debtors would once again be in the unfortunate position of having to engage in litigation with their transaction partner regarding the Oncor TSA.

**D.     The Settlement Agreement**

15.     The Settlement Agreement resolves both the Dividends' dispute and disputes related to the TSA Claims, eliminating the need for significant litigation between the Debtors, Sempra, and, potentially, certain of the Debtors' other stakeholders. Importantly, the resolution on the Dividends eliminates the harm EFIH creditors would otherwise suffer in the event Oncor did not declare and pay the Dividends prior to the Merger closing.  At the same time, the resolution on the TSA Claims eliminates the uncertainty and risk that EFH creditors would otherwise suffer as a result of (a) at best, reduced Plan distributions, as EFH would likely have to holdback certain distributions pending a future resolution on the TSA Claims and (b) at worst, protracted litigation between EFH and Sempra regarding the TSA Claims.  As a result, and given the positive developments on the PUCT regulatory front, I believe the Settlement Agreement is in the best interests of the Debtors and their estates in what I hope to be the final chapter of the Debtors' chapter 11 cases.

Dated:  February 2, 2018

                                             */s/ Andrew M. Wright*
                                             Andrew M. Wright
                                             Executive Vice President, General Counsel, and Secretary