**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>ENERGY FUTURE HOLDINGS CORP., *et al.*,[1]<br><br>*Debtors.* | ) Chapter 11<br>)<br>) Case No. 14-10979 (CSS)<br>)<br>) (Jointly Administered)<br>)<br>) **Re: D.I. 11887 and 12369**<br>) |

**ELLIOTT FUNDS' REPLY TO OBJECTION OF NEXTERA ENERGY, INC. TO FIRST AMENDED JOINT PLAN OF REORGANIZATION OF ENERGY FUTURE HOLDINGS CORP., ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, AND THE EFH/EFIH DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott" or the "Elliott Funds"), by and through their undersigned counsel, hereby submit this reply to the objection (the "Objection") of NextEra Energy, Inc. ("NextEra") to the *First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I 11887] (the "EFH/EFIH Plan").[2] In support of this reply, Elliott submits the Declaration of Michael Kramer of Ducera Partners LLC, attached hereto as **Exhibit A** (the "Kramer Declaration"). In further support hereof, Elliott respectfully states as follows:

**PRELIMINARY STATEMENT**

1. NextEra's confirmation objection and request for a plan reserve is little more than a de facto motion to stay the E-Side Debtors' long-awaited distributions to their creditors pending NextEra's appeal of this Court's reconsideration of the NextEra Termination Fee Order

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Objection.

-2-

("the <u>Reconsideration Order</u>"). Granting NextEra's request for a reserve will significantly delay creditor distributions and impose on them substantial opportunity costs. In such circumstances, courts regularly condition a stay on the movant providing security for the reinvestment opportunity costs imposed on affected parties. Here, the conclusion should be no different. Indeed, NextEra acknowledges that it could seek disgorgement of the funds distributed to creditors in the event the Third Circuit or the Supreme Court of the United States disagrees with the Court's conclusion that the $275 million fee (the "<u>Termination Fee</u>") should be disallowed. Consequently, to the extent the Court grants NextEra's request, NextEra should be required to compensate creditors for their reinvestment opportunity costs, especially when NextEra is receiving the additional benefit of avoiding the costs and risks associated with the practicalities of effecting a disgorgement remedy.

2. Importantly, NextEra is not entitled to a reserve under applicable law. The Bankruptcy Code contemplates a reserve for allocated and sometimes disputed claims—*but not disallowed claims*. And, NextEra fails to cite any legal authority for its proposition that a plan proponent must maintain a full reserve for a disallowed administrative expense. To the contrary, cases are clear that no reserve is necessary or appropriate for disallowed administrative expenses, even if the disallowance is pending on appeal.

3. Nonetheless, in the interest of expediting confirmation proceedings and consummation of the EFH/EFIH Plan, Elliott does not oppose the creation of a plan reserve on the condition that creditors are fairly compensated for their opportunity cost. But as is typical with a stay, affected parties—here, the creditors—require compensation for the opportunity costs associated with delayed receipt of funds. That compensation should reflect both (i) the significant benefit that NextEra will receive through creation of a reserve, including the

avoidance of the costs, expenses and risks of seeking disgorgement down the road, and (ii) adequate security for the loss of creditors' access to the full amount of the $275 million Termination Fee that would otherwise be distributed upon consummation of the EFH/EFIH Plan. Granting compensation for such opportunity costs also ensures that NextEra does not engage in undue delay during any phase of the appellate process.

4. As a result, in the event that NextEra's appeal is unsuccessful, the Court should ensure that creditors receive a commercial rate of return on the reserved $275 million to compensate for their inability to invest those funds immediately after the Effective Date of the EFH/EFIH Plan. The typical mechanism to ensure such compensation is, of course, to require the appellant to post a supersedeas bond in an amount equal to the expected commercial rate of return over the expected duration of the appeal. As an alternative, the Court may condition the reserve on NextEra's agreement to pay that rate of return to the estates if its appeal is unsuccessful. In all events, adequate security is necessary to ensure that creditors are not harmed while NextEra pursues what Elliott believes to be a baseless appeal.

**I.  NextEra's Request For A Reserve Is Not Required Or Justified Under Applicable Law.**

5. The Bankruptcy Code does not require a reserve for disputed, disallowed administrative expenses. NextEra's reliance on section 1129(a)(9)(A) is misplaced. That section refers only to payment of the "*allowed* amount" of an administrative expense "on the effective date of the plan." *See* 11 U.S.C. § 1129(a)(9)(A) (emphasis added). NextEra, however, does not have any allowed administrative expense, as the Termination Fee was disallowed by this Court and NextEra's application for payment of an administrative expense was denied. Accordingly, NextEra's disallowed Termination Fee does not fall within the purview of Section 1129(a)(9)(A) of the Bankruptcy Code. *See In re Mayco Plastics, Inc.*, 379 B.R. 691, 706 (Bankr. E.D. Mich.

-3-

2008) ("The requirements of § 1129(a)(9)(A) pertain only to claims of a kind specified in § 507(a)(2) or § 507(a)(3). . . . Because [claimant] does not hold a claim under § 507(a)(2) or (a)(3), it may not object to confirmation of the Debtor's plan based upon § 1129(a)(9)(A) of the Bankruptcy Code.").

6. Courts have, moreover, consistently held that a debtor is not required to reserve for a disallowed administrative expense or claim that is subject to a pending appeal. *See e.g.*, *Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10F.3d 944, 961 (2d Cir. 1993) (affirming bankruptcy court's rulings denying (a) administrative expense priority to certain claims and (b) requests by claimants to establish a plan reserve pending an appeal of the bankruptcy court's ruling denying administrative expense priority); *In re Kreisler Group, Inc.*, 648 F.2d 86 (2d Cir. 1981) (rejecting a purported creditor's contention that a plan reserve should be required for a disallowed claim that was pending on appeal); *In re MCorp Financial, Inc.*, 160 B.R. 941, 962–63 (S.D. Tex. 1993) (no reserve necessary "[o]nce an adjudication at the trial level has been made" disallowing the claim); *see also In re Johnson*, No. 14-57104, 2016 WL 8853601, at *11 (Bankr. S.D. Ohio Nov. 10, 2016) (no reserve required for a disputed secured claim that had been disallowed by the bankruptcy court, even where such disallowance had been appealed by the claimant).

7. Here, the EFH/EFIH Plan already provides for treatment of allowed administrative expenses required under Section 1129(a)(9)(A). *See* EFH/EFIH Plan, Art. II.A.1 (providing for payment of allowed administrative expenses on the effective date of the EFH/EFIH Plan or in the ordinary course of business pursuant to the terms and conditions of the applicable transaction or agreement). The EFH/EFIH Plan does not require the E-Side Debtors to establish any reserve for disallowed administrative expenses, nor is any reserve mandated

under applicable bankruptcy law. Indeed, any reserve for expenses or claims that have been disallowed by the Court would go well beyond the scope of Section 1129(a)(9)(A).

**II.    Any Reserve Should Be Conditioned Upon NextEra Providing Creditors Adequate Security For The Reinvestment Opportunity Cost Imposed By The Delayed Distribution Of $275 Million From The E-Side Debtors' Estates.**

8.     While styled as a confirmation objection, NextEra's request for a reserve is not, at bottom, a confirmation issue and should not be treated as one. Rather, NextEra's request for a reserve is, in essence, a request for a stay of the anticipated distribution under a confirmed EFH/EFIH Plan pending NextEra's appeal of the Reconsideration Order. Courts routinely reject such attempts to use a plan objection urging a reserve as a substitute for a stay pending appeal— especially where the court has already considered and denied a request for a stay, such as here. *See In re Tribune Co.,* 476 B.R. 843, 864 (Bankr. D. Del. 2012), *aff'd as modified,* No. 12-CV-1072 GMS, 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part sub nom. In re Tribune Media Co.*, 799 F.3d 272 (3d Cir. 2015) ("If EGI and WTC want to prevent plan distributions while their appeals are pending, they may seek a stay pending appeal pursuant to Fed. R. Bankr. P. 8005"); *see also In re Chateaugay Corp*, 10 F.3d 944, 961 (2d Cir. 1993) (citing the availability of the remedy of a stay pending appeal as an additional reason not to impose a reserve for disallowed claims pending appeal).

9.     Nonetheless, in the interest of expediting these proceedings and minimizing the burden on the E-Side Debtors' estates, subject to the critical condition that creditors are compensated for their opportunity costs, Elliott does not oppose the creation of a plan reserve, even though the reserve will significantly diminish the initial distributions to creditors of both the EFH Debtors and the EFIH Debtors who are projected ultimately to receive only about 16% and 39% recoveries on their allowed claim, respectively. [D.I. 11889, at pp. 30-40]. Such a reserve will provide NextEra with a significant benefit. In particular, in the event that NextEra prevails

in its appeal, NextEra will be able to recover the Termination Fee without any of the cost or risk associated with disgorgement.

10.   All Elliott requests in return is that it and other creditors receive security for the opportunity cost associated with the delay in the distribution of the $275 million reserve. If the Court allows a reserve, creditors will be unable to reinvest those funds immediately after the Effective Date. Creditors will thus be deprived of the ability to earn a more favorable rate of return than the funds would earn in the hands of the E-Side Debtors or Plan Administrator Board (as defined in the EFH/EFIH Plan). *See In re Motors Liquidation Co.*, 539 B.R. 676, 686 (Bankr. S.D.N.Y. 2015) ("There can be no serious dispute that [creditors] will be prejudiced by a delay in distributions when the underlying assets . . . would generate much higher yields after receipt by their recipients."); *In re Tribune Co.*, 477 B.R. 465, 480-81 (Bankr. D. Del. 2012) (lost opportunity cost to creditors from the delay in reinvesting distributable cash relevant to requiring claimant to post security); *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 352 n.70 (S.D.N.Y. 2007) ("There is also an inherent loss to the creditors in any delay because the interest on the proceeds from the Sale earned by the Debtors accrues at a very low rate. If the funds were distributed to the various creditors . . . they could likely achieve much higher rates of return.").[3]

11.   Here, that opportunity cost is creditors' expected commercial rate of return if they could invest the full amount of their distributions now. As set forth in the Kramer Declaration, that expected commercial rate of return under the circumstances is in the range of 8.64% to 9.11% per year. Kramer Decl. ¶¶ 20, 23. Mr. Kramer's conservative analysis is based on (i) fifteen

---

[3]   Based on the most recent operating reports filed by the E-Side Debtors, accounts maintained by the E-Side Debtors are earning interest at a rate of less than one percent per annum. *See* Monthly Operating Report for the Period from Oct. 1, 2017 to Oct. 31, 2017 [D.I. 12339] (reflecting monthly interest income for EFIH of $325,000 on account balances totaling $396,384,046); Monthly Operating Report for the Period from Nov. 1, 2017 to Nov. 30, 2017 [D.I. 12426] (reflecting monthly interest income for EFIH of $307,000 on account balances totaling $369,928,806).

years of annualized returns on well-known indices as proxies for investment returns by multi-strategy hedge funds and high yield investors, that are either known to or likely to have held EFH and EFIH unsecured obligations both prior to and during the bankruptcy cases, and (ii) the weighted average cost of capital for a large holder of secured claims against EFH (Vistra Energy Corporation) whose primary operations do not include making investments. *Id.* ¶¶ 17-19. Mr. Kramer then weighted the expected returns for both EFH and EFIH creditors in accordance with the allocation of the reserve amount. *Id.* ¶ 20. The 8.64% rate of return reflects an adjusted (or trimmed) mean of the fifteen-year annualized returns. *Id.* ¶ 23. The 9.11% rate of return reflects the median of the fifteen-year annualized returns. *Id.* ¶ 20.

12. Creditors' expected commercial rate of return is an especially appropriate benchmark here. NextEra is already receiving a significant benefit through the creation of a reserve. That reserve will alleviate any risk and cost NextEra may encounter with collection from creditors down the road, if and when NextEra's appeal is successful. Importantly, a commercial rate of return also deters strategic delay. Given the parties' rights to seek en banc and Supreme Court review, NextEra may be in a position in which seeking expedited relief is not in its economic interest, and, as it did with its appeal of the PUCT order, take advantage of the full appellate process to delay distributions to creditors.

13. This proposed commercial rate of return is, moreover, consistent with the rates of return in other bankruptcy cases involving similar concerns over creditors' opportunity costs because of a reserve. *See In re Motors Liquidation Co.*, 539 B.R. at 691 (concluding that a 9.23% rate of return "most fairly protects the [trust] in connection with the distribution that would be delayed by reason of the imposition of a stay"); *In re Tribune Co.*, 477 B.R. at 481-83 (using expert's "conservatively" calculated 6.986% rate of return to conclude same).

14. Accordingly, the Court should condition any reserve on NextEra compensating creditors for their lost opportunity cost in the event that NextEra's appeal is unsuccessful.

### III. The Court Should Either Require NextEra To Post A Supersedeas Bond Or Make Interest Payments into Escrow.

15. To ensure creditors have adequate security for their compensation, the Court should require NextEra to either (i) set aside payment by posting a supersedeas bond now or, (ii) agree that in the event that NextEra's appeal is unsuccessful, it will pay the estates interest at a rate in the range of 8.64% to 9.11% from the Effective Date until the date that NextEra's appeal is fully and finally resolved.

#### A. Supersedeas Bond.

16. The posting of a supersedeas bond by an appellant is the traditional mechanism for compensating creditors for lost opportunity cost. Bankruptcy Rule 8007 permits a party to move for approval of supersedeas bond following the filing of notice of appeal. *See* Fed R. Bankr. P. 8007(a)(1)(B). The purpose of a bond "is to preserve the status quo during the pendency of an appeal and protect the winning party from the possibility of loss resulting from the delay in execution." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 921 F. Supp. 2d 317, 335 (D. Del. 2013), *vacated in part on other grounds*, 763 F.3d 273 (3d Cir. 2014) (internal quotation marks omitted); *In re Adelphia Commc'ns Corp.*, 361 B.R. at 350, 368 (requiring appellants to "post a substantial bond that is commensurate with the threatened loss to the non-moving parties" and that protects the prevailing parties "against any loss that might be sustained as a result of an ineffectual appeal" (internal quotation marks omitted)).

17. Lost reinvestment opportunity cost to creditors is the precise type of harm that must be considered in calculating an appropriate bond amount where a party is seeking to stay or delay plan distributions. *See In re Motors Liquidation Co.*, 539 B.R. at 686 (calculating lost

opportunity costs to creditors resulting from delay in reinvesting distributable cash in calculating bond amount); *In re Tribune Co.*, 477 B.R. at 480-81 (same); *In re Adelphia Commc'ns Corp.*, 361 B.R. at 352 n.70 (same).

18. Here, any supersedeas bond should be based on the commercial rate of return outlined above over the expected duration of NextEra's appeal.

19. First, as explained above, the likely rate of return that could be achieved on the full amount of the Termination Fee (*i.e.*, $275 million) post-plan confirmation is in the range of 8.64% to 9.11%.

20. Second, a reasonable estimate of the time needed for NextEra's appeal—and thus the time over which creditors will likely lose access to the funds comprising the Termination Fee—is eighteen months. Although the Third Circuit has granted a direct appeal of the Reconsideration Order and has approved an expedited briefing schedule, it is uncertain how long it will take the Third Circuit to render a decision. Based on recent appeals, it is reasonable to assume that the Third Circuit may not issue a decision for approximately twelve months, until late 2018 or early 2019.[4] Once a judgment is entered by the Third Circuit, the non-prevailing party then has 90 days to file a petition for writ of certiorari with the Clerk of the United States

---

[4] For example, in a recent direct appeal to the Third Circuit from an order entered by a bankruptcy court in this District, notwithstanding an expedited briefing schedule, the time between (i) entry of the applicable bankruptcy court order and issuance of a merits decision by the Third Circuit was approximately 15 months, and (ii) completion of briefing in the Third Circuit and issuance of a merits decision was approximately 11 months. *See Unite Here Local 54 v. Trump Entm't Resorts (In re Trump Entm't Resorts)*, No. 14-4807, 2016 WL 191926 (3d Cir. Jan. 15, 2016). Similarly, in another recent bankruptcy appeal to the Third Circuit, the time between (i) docketing in the Third Circuit and issuance of a merits decision by the Third Circuit was approximately 15 months and (ii) completion of briefing in the Third Circuit and issuance of a merits decision was approximately 11 months. *See Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*, No. 16-2203, 2017 WL 3319963 (3d Cir. Aug. 4, 2017).

Additionally, according to statistics released by the Administrative Office of the United States Courts, during the 12-month period ending September 30, 2016, the median amount of time for the completion of a bankruptcy appeal in the Third Circuit from (i) filing a notice of appeal to the issuance of a merits decision is more than 12 months, and (ii) filing in lower court to the issuance of a merits decision is more than 21 months. *See* Administrative Office of the United States Courts, *2016 Annual Report of the Director: Judicial Business of the United States Courts*, Table B-4B, available at http://www.uscourts.gov/sites/default/files/data_tables/jb_b4b_ 0930.2016.pdf

Supreme Court, and the prevailing party then has 30 days after the case is docketed to file an opposition brief. *See* S. Ct. R. 13, 15. To the extent the writ of certiorari is granted, the appeal could continue for several years.

21. Other federal bankruptcy courts have imposed similar bonds. For example, in *Motors Liquidation*, the court enjoined a general unsecured creditor trust from distributing $135 million pending an appeal, but conditioned such relief on the movants posting a bond to protect creditors from harm resulting from lost reinvestment opportunity costs. 539 B.R. at 686. In calculating the bond amount, the court considered the composition of the creditor body (47% of which were hedge funds) and potential investment strategies creditors would likely utilize if the $135 million was distributed as initially contemplated by the trust. The court ultimately determined that 9.23% was an appropriate per annum rate to use in estimating returns that creditors could earn on reinvestments if distributions were made as contemplated without the injunction. Applying this rate, and assuming a ten-month duration for the appeal, the court set the bond at $10.6 million to protect creditors from the harm resulting from the delayed trust distributions. *Id.* at 688-92.[5]

### B. Court-Ordered Interest Payment.

22. Alternatively, the Court may ensure adequate security by simply conditioning any reserve on NextEra's written agreement to pay interest in the range of 8.64% to 9.11% to the estates if and when its appeal is unsuccessful. So long as NextEra remains creditworthy, and so

---

[5] Similarly, in *Tribune*, the court granted a stay pending appeal, but conditioned the stay on the movants posting a bond in the amount of $1.5 billion to, among other things, protect creditors from the harm resulting from lost reinvestment opportunity costs with respect to plan distributions. 477 B.R. at 483. Based on the evidence presented, the court used a "conservative[]" 6.896% potential rate of return that otherwise could be earned by creditors during an estimated two-year stay period. *Id.* at 481.

long as NextEra provides an undertaking, such a remedy would likewise provide adequate compensation to creditors but without the necessity of a bond today.[6]

## RESERVATION OF RIGHTS

23.  Elliott reserves the right to (i) supplement this reply and the arguments and facts set forth or incorporated herein and (ii) submit additional evidence in connection with any hearing with respect to NextEra's request for a plan reserve or any bond associated therewith. Elliott also reserves all rights in connection with the EFH/EFIH Plan in the event such plan is revised or modified by the E-Side Debtors to provide for a reserve on account of the Termination Fee.

[*Remainder of Page Intentionally Blank*]

---

[6] In the event that NextEra becomes a credit risk at any point during its appeal, Elliott reserves all rights to request payment of the interest on a periodic basis until the appeal is resolved.

WHEREFORE, Elliott respectfully requests that this Court (i) require NextEra to post a supersedeas bond pending resolution of its appeal, or alternatively (ii) require NextEra to pay interest at a rate within the range of 8.64% to 9.11% on resolution of the appeal, to protect creditors from potential loss resulting therefrom, and (iii) grant such other and further relief as is just and proper.

Wilmington, Delaware
Date: February 17, 2018

**BAYARD, P.A.**

*/s/ Erin R. Fay*
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Evan T. Miller (No. 5364)
600 N. King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
scousins@bayardlaw.com
efay@bayardlaw.com
emiller@bayardlaw.com

–and–

**ROPES & GRAY LLP**
Keith H. Wofford (admitted *pro hac vice*)
Gregg M. Galardi
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090
Keith.Wofford@ropesgray.com
Gregg.Galardi@ropesgray.com

*Counsel for Elliot Associates, L.P.,*
*Elliott International, L.P., and*
*the Liverpool Limited Partnership*