# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: D.I. 11587, 11872, 12344, 12369, 12500, 12654 |

## DEBTORS' MEMORANDUM OF LAW
## IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED JOINT
## PLAN OF REORGANIZATION OF ENERGY FUTURE HOLDINGS CORP.,
## ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, AND THE
## EFH/EFIH DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

# TABLE OF CONTENTS

Preliminary Statement ............................................................................................... 1

Background ................................................................................................................ 4

I.    The Path to the Sempra Plan. ......................................................................... 4

    A.    The Hunt Plan. ...................................................................................... 4

    B.    Development of the NEE Plan. .............................................................. 7

    C.    Elliott's Involvement and the BHE Plan. ............................................. 10

    D.    The Reconsideration Order and Subsequent NEE Proceedings. ........... 11

    E.    Exit on the Horizon: The Sempra Plan and Merger Agreement. ........... 12

II.   Plan Confirmation Objections Are Either Not Section 1123 or Section 1129 Issues or Are Narrow in Scope. ........................................................................ 14

    A.    The NEE Objection: Notwithstanding Applicable Case Law, the EFH/EFIH Debtors are Prepared to Reserve $275 Million—Leaving Open No Section 1123 or Section 1129 Issues for Plan Confirmation. ........................ 14

    B.    The Asbestos Plaintiffs' Objection Has Already Been Adjudicated and Overruled. ........................................................................................... 16

    C.    The Miller Objection Contravenes Applicable Bankruptcy Law. ......... 17

III.  Confirmation Solicitation and Notification Process. ...................................... 18

    A.    Unimpaired and Deemed to Accept. .................................................... 18

    B.    Fully Impaired and Deemed to Reject. ................................................ 19

    C.    Intercompany Claims and Interests Subject to Reinstatement or Discharge and Deemed to Accept or Reject. ......................................................... 19

IV.   Voting Results. ............................................................................................. 20

Argument .............................................................................................................. 21

I.    The Plan Satisfies the Requirements to Confirm a Plan Under the Bankruptcy Code. ........................................................................................................... 21

    A.    The Plan Fully Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)). .............................................. 22

B.     The EFH/EFIH Debtors Have Complied Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2))...................................... 28

C.     The EFH/EFIH Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3))....................................................... 29

D.     The Plan Provides for Bankruptcy Court Approval of Certain Payments (Section 1129(a)(4))............................................................................................. 31

E.     The EFH/EFIH Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5))................................. 33

F.     The Plan Does Not Provide for Any Rate Changes Requiring Governmental Approval (Section 1129(a)(6))....................................................... 34

G.     The Plan Is In the Best Interests of Holders of Claims and Interests (Section 1129(a)(7))............................................................................................. 35

H.     The Plan Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8). ........................................................................................... 35

I.     The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Claims (Section 1129(a)(9)). ................................... 36

J.     At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10))................................................ 36

K.     The Plan Is Feasible (Section 1129(a)(11)). ....................................................... 37

L.     The Plan Provides For the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).......................................................................................... 41

M.     The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code. ............. 42

N.     Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ......................................................................................... 42

O.     The Waiver of the 14-Day Stay Period is Appropriate........................................ 43

P.     The Plan Complies with Section 1129(b) of the Bankruptcy Code..................... 43

Q.     The Plan Complies with Sections 1129(c)-(e) of the Bankruptcy Code............... 47

II.     The Discretionary Contents of the Plan Are Appropriate................................................. 47

A.     The Debtor Releases in the Plan Are Appropriate............................................... 48

B.     The Third-Party Releases in the Plan are Appropriate. ....................................... 50

C.      The Plan's Exculpation Provisions Are Appropriate...........................................51

D.      The Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained In the Plan....................................................53

III.    The Bankruptcy Court Should Overrule the Objections to the Plan................................54

A.      The NEE Objection: The NEE Plan Reserve Resolves NEE's Section 1123 and Section 1129 Plan Confirmation Objections But Raises Non-Confirmation Issues Ripe for Contemporaneous Adjudication...........................54

B.      Allowing NEE to Pursue Additional, Amorphous Claims Against the Reorganized Debtors Threatens the Merger Transaction On the Brink of Consummation...................................................65

C.      The Bankruptcy Court Should Overrule the Asbestos Objectors' Objection and Joinder...........................................66

D.      The Requested 503(B) Findings are Appropriate, Narrowly-Tailored, and Subject to Fee Committee Review and Bankruptcy Court Approval...................74

E.      The Bankruptcy Court Should Overrule the Objections of Mr. Robert Miller.................................................76

Conclusion ............................................................................77

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 203 N. LaSalle St. Ltd. P'ship*,
190 B.R. 567 (Bankr. N.D. Ill. 1995) .........................................................35, 44, 46

*In re 300 Washington St. LLC*,
528 B.R. 534 (Bankr. E.D.N.Y. 2015).................................................................47

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007).......................................................................59, 60

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007)..................................................................35

*In re Adelphia Commc'ns Corp.*,
Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) ...................................39

*In re Ahead Commc'ns Sys., Inc.*,
395 B.R. 512 (D. Conn. 2008)...........................................................................26

*In re Am. Int'l Airways, Inc.*,
77 B.R. 490 (Bankr. E.D. Pa. 1987) ..............................................................55, 56

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988)............................................................27, 33

*In re Ambanc La Mesa Ltd. P'ship*,
115 F.3d 650 (9th Cir. 1997) .......................................................................44, 45

*In re AMR Corp.*,
Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) ................................39

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006)..............................................................................22

*In re Armstrong World Indus., Inc.*,
432 F.3d 507 (3d Cir. 2005)...............................................................................46

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) .......................................................44, 45

*In re B.D. Int'l Disc. Corp.*,
701 F.2d 1071 (2d Cir. 1983).............................................................................30

*Bittner v. Borne Chem. Co.*,
691 F.2d 134 (3d Cir. 1982)..............................................................................54

**TABLE OF AUTHORITIES (CONT'D)**

*In re Blitz U.S.A., Inc.*,
  Nos. 2007, 2008, 2005 & 2014, 2014 WL 2582976 (Bankr. D. Del. Jan. 30,
  2014) ................................................................................................................49

*In re Bonded Mailings, Inc.*,
  20 B.R. 781 (Bankr. E.D.N.Y. 1982) .......................................................30

*In re Bowles*,
  48 B.R. 502 (Bankr. E.D. Va. 1985) .........................................................44

*In re Brice Rd. Devs., L.L.C.*,
  392 B.R. 274 (B.A.P. 6th Cir. 2008) ..........................................................37

*In re Cajun Elec. Power Coop., Inc.*,
  150 F.3d 503 (5th Cir. 1998) ......................................................................31

*In re Century Glove, Inc.*,
  Civ. A Nos. 90-400-SLR & 90-401-SLR, 1993 WL 239489 (D. Del. Feb. 10,
  1993) ................................................................................................................35

*In re Charter Commc'ns*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) ..........................................27, 33, 49

*Chemetron Corp. v. Jones*,
  72 F.3d 341 (3d Cir. 1995) ..........................................................................72

*In re Chemtura Corp.*,
  2010 WL 4638898 (Bankr. S.D.N.Y. 2010) ............................59, 60, 72

*In re Chemtura Corp.*,
  505 B.R. 427 (S.D.N.Y. 2015) .....................................................................72

*In re Citadel Broad. Corp.*,
  Case No. 09-17442 (BRL) (Bankr. S.D.N.Y. May 19, 2010) .................39

*In re Coastal Broad. Sys., Inc.*,
  570 F. App'x 188 (3d Cir. 2014) ................................................................23

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2014) ........................................................................71

*In re Congoleum Corp.*,
  No. 09-4371, 2010 WL 1850182 (D.N.J. May 7, 2010) .........................31

*Connecticut v. Doehr*,
  501 U.S. 1 (1991) ...............................................................................70, 73

*In re Cont'l Airlines*,
  203 F.3d 203 (3d Cir. 2000) ........................................................................50

**TABLE OF AUTHORITIES (CONT'D)**

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004) ........................................................................23

*Corestates Bank, N.A. v. United Chemical Technologies, Inc.*,
  202 B.R. 33 (E.D. Pa. 1996) ..................................................................................44

*In re DBSD N. Am.*,
  Case No. 09-13061 (REG) (Bankr. S.D.N.Y. July 5, 2011) ....................................39

*In re Drexel Burnham Lambert Grp., Inc.*,
  960 F.2d 285 (2d Cir. 1992) ...................................................................................52

*In re Edison Mission Energy*,
  Case No. 12-49219 (JPC) (Bankr. N.D. Ill. Mar. 11, 2014) ..................................39

*In re Energy Future Holdings Corp.*,
  522 B.R. 520 (Bankr. D. Del. 2015) ........................................................67, 69, 71

*In re Enron Corp.*,
  326 B.R. 497 (S.D.N.Y. 2005) ................................................................................52

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ...................................................................23, 49

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................44

*In re Gen. Motors Corp.*,
  409 B.R. 24 (Bankr. S.D.N.Y. 2009) ......................................................................61

*In re Genesis Health Ventures, Inc.*,
  266 B.R. 591 (Bankr. D. Del. 2001) ..................................................................22, 50

*In re Global Crossings, Ltd.*,
  Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Dec. 26, 2002) ................................39

*In re Greate Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D.N.J. 2000) ........................................................................44

*In re Grossman's, Inc.*,
  607 F.3d 114 (3d Cir. 2010) ......................................................................69, 71, 73

*In re Hawaiian Telecom Commcn's, Inc.*,
  Case No. 08-02005 (Bankr. D. Haw. Dec. 30, 2009) ............................................39

*Indianapolis Downs*,
  486 B.R. 286 (Bankr. D. Del. 2013) ....................................................38, 39, 40

*In re Innovasystems, Inc.*,
  2014 WL 7235527 (Bankr. D. N.J. 2014) ..............................................................54

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re ION Media Networks, Inc.*,
    419 B.R. 585 (Bankr. S.D.N.Y. 2009) ................................................................46

*In re Jersey Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987) ..............................................................................23

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993) ................................................................................23

*In re Johns-Manville Corp.*,
    68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.
    1987),
    *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ...................44, 45

*In re Journal Register Co.*,
    407 B.R. 520 (Bankr. S.D.N.Y. 2009) ................................................................31

*In re Kaiser Aluminum Corp.*,
    No. 02-10429(JKF), 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006), *aff'd*,
    343 B.R. 88 (D. Del. 2006) ................................................................................23

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) ..............................................................................45

*In re Key3Media Grp., Inc.*,
    336 B.R. 87 (Bankr. D. Del. 2005) ....................................................................49

*In re Landing Assoc., Ltd.*,
    157 B.R. 791 (Bankr. W.D. Tex. 1993) ..............................................................37

*In re Lapworth*,
    No. 97-34259DWS, 1998 WL 767456 (Bankr. E.D. Pa. Nov. 3, 1998) ...............28

*In re Lightsquared Inc.*,
    Case No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015) ..............................39

*In re Madison Hotel Assocs.*,
    749 F.2d 410 (7th Cir. 1984) ..............................................................................29

*In re Majestic Star Casino, LLC*,
    Case No. 09-14136 (KG) (Bankr. D. Del. Mar 10, 2011) [D.I. 1059] ...............39

*In re Martin*,
    91 F.3d 389 (3d Cir. 1996) ................................................................................30

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ...........................................................48, 49

# TABLE OF AUTHORITIES (CONT'D)

*In re Maxcom Telecommunicaciones, S.A.B. de C.V.*,
Case No. 13-11839 (PJW) (Bankr. D. Del. Sept. 10, 2013) ...................................................39

*In re Mirant Corp.*,
No. 03-46590DML11, 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007).......................23

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007)................................................................................................46

*In re Motors Liquidation Co.*,
539 B.R. 676 (Bankr. S.D.N.Y. 2015)........................................................................... *passim*

*In re Motors Liquidation Company*,
No. 09-50026 (Bankr. S.D.N.Y. Jun. 1, 2015), ECF No. 13177 ...........................................60

*Mullane v. Cent. Hanover Bank & Trust*,
339 U.S. 306 (1950)......................................................................................................70, 72

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984)............................................................................................................30

*In re Premier Int'l Holdings, Inc.*,
No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ............................51

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)....................................................................................28, 51, 53

*In re Quigley Co., Inc.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007)...................................................................................24

*In re Rath Packing Co.*,
55 B.R. 528 (Bankr. N.D. Iowa 1985) ..................................................................................47

*In re Sorenson Commc'ns, Inc.*,
Case No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) ....................................................39

*In re Sound Radio, Inc.*,
93 B.R. 849 (Bankr. D.N.J. 1988) ........................................................................................29

*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010) .....................................................................................50

*In re Spansion, Inc.*,
No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. Apr. 16, 2010) ............................51

*In re T-H New Orleans Ltd. P'ship*,
116 F.3d 790 (5th Cir. 1997) ...............................................................................................37

**TABLE OF AUTHORITIES (CONT'D)**

*In re Texas Equip. Co., Inc.*,
   283 B.R. 222 (Bankr. N.D. Tex. 2002) .................................................................59

*In re Theatre Holding Corp.*,
   22 B.R. 884 (Bankr. S.D.N.Y. 1982) ....................................................................59

*In re Trenton Ridge Inv'rs, LLC*,
   461 B.R. 440 (Bankr. S.D. Ohio 2011) ...........................................................37, 44

*In re Tribune Co.*,
   464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208
   (Bankr. D. Del. 2011) ...........................................................................39, 62, 63

*In re Tribune Co.*,
   476 B.R. 843 (Bankr. D. Del. 2012) .....................................................................23

*In re Tribune Co.*,
   477 B.R. 465 (Bankr. D. Del. 2012) (Carey, J.) .............................................. *passim*

*In re Tribune Media Co.*,
   799 F.3d 272 (3d Cir. 2015).............................................................................59, 64

*United States v. Reorganized CF & I Fabricators of Utah, Inc.*,
   518 U.S. 213 (1996) .............................................................................................35

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ................................................................................ *passim*

*In re W.R. Grace & Co.*,
   729 F.3d 311 (3d Cir. 2013)..................................................................................24

*In re W.R. Grace & Co.*,
   729 F.3d 332 (3d Cir. 2013)..................................................................................37

*In re Wash. Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ..........................................................48, 49, 51

*In re Wash. Mut., Inc.*,
   461 B.R. 200 (Bankr. D. Del. 2011) .....................................................................37

*In re Wash. Mut., Inc.*,
   No. 08-12229 (MFW), 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012)...........23

*Williams v. Placid Oil Co. (In re Placid Oil Co.)*,
   753 F.3d 151 (5th Cir. 2014) ...............................................................................72

*In re WorldCom, Inc.*,
   No. 02-135333(AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003).......28

## TABLE OF AUTHORITIES (CONT'D)

*Wright v. Owens Corning*,
   679 F.3d 101 (3d Cir. 2012) ..................................................................72

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ......................................43, 48, 77

**Statutes**

11 U.S.C. § 101(51D)(B) ......................................................................47

11 U.S.C. § 345 ......................................................................................60

11 U.S.C. § 363 ......................................................................................30

11 U.S.C § 502(c) ..................................................................................54

11 U.S.C. § 503(b) ..........................................................................*passim*

11 U.S.C. § 506(b) ..................................................................................31

11 U.S.C. § 510(b) ...........................................................................18, 77

11 U.S.C. § 524(g) .................................................................................67

11 U.S.C. § 1103 .....................................................................................53

11 U.S.C. § 1112(b) ................................................................................66

11 U.S.C. § 1114 .....................................................................................42

11 U.S.C. § 1114(a) ................................................................................42

11 U.S.C. § 1114(e) ................................................................................42

11 U.S.C § 1122 ................................................................................22, 24

11 U.S.C. § 1122(a) ................................................................................22

11 U.S.C. § 1123 ...........................................................................*passim*

11 U.S.C. § 1123(a) .......................................................................*passim*

11 U.S.C. § 1123(b) ................................................................................47

11 U.S.C. § 1125 .........................................................................22, 28, 29

11 U.S.C. § 1125(b) ................................................................................28

11 U.S.C. § 1126 .........................................................................18, 22, 28

11 U.S.C. § 1126(c) ................................................................................35

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

11 U.S.C. § 1126(f) ........................................................................................................35

11 U.S.C. § 1126(g) .......................................................................................................35

11 U.S.C. § 1129 ....................................................................................................... *passim*

11 U.S.C. § 1129(a) .................................................................................................... *passim*

11 U.S.C. § 1129(b) .................................................................................................... *passim*

11 U.S.C. § 1129(c) .......................................................................................................47

11 U.S.C § 1129(d) .......................................................................................................47

11 U.S.C. § 1129(e) .......................................................................................................47

28 U.S.C. § 1930 ..........................................................................................................41

**Rules**

Fed. R. Bankr. P. 3003(c) ..............................................................................................74

Fed. R. Bankr. P. 3020(e) ..............................................................................................43

Fed. R. Bankr. P. 7023 ..............................................................................................69, 70

Fed. R. Civ. P. 23 ......................................................................................................69, 70

Fed. R. Civ. P. 62(a) .....................................................................................................59

Fed. R. Civ. P. 62(d) ..................................................................................................3, 59

**Other Authorities**

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978
    U.S.C.C.A.N. 5936 .............................................................................................22, 28

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978
    U.S.C.C.A.N. 5787 .........................................................................................22, 26, 28

Energy Future Holdings Corp. ("EFH Corp."), its direct subsidiaries, Energy Future

Intermediate Holding Company, LLC ("EFIH") and EFIH Finance Inc. (together with EFIH, the

"EFIH Debtors"), and certain of EFH Corp.'s other direct and indirect subsidiaries (collectively,

and as defined in the Plan, the "EFH/EFIH Debtors") file this memorandum of law (this "Brief")

in support of confirmation of the *First Amended Joint Plan of Reorganization of Energy Future*

*Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH*

*Debtors Pursuant to Chapter 11 of the Bankruptcy Code*, filed on February 15, 2018 [D.I.

12654] (as modified, amended, or supplemented from time to time prior to Confirmation,

the "Plan").[2]   In support of confirmation of the Plan, and in response to the objections thereto

(the "Objections" and, the parties raising the Objections, the "Objectors"),[3]  the EFH/EFIH

Debtors respectfully state as follows.[4]

## Preliminary Statement

1.      The EFH/EFIH Debtors' Plan should be confirmed.  PUCT Approval, for the first

time, is unanimously supported by all intervenors and is within sight.  Sempra has completed the

---

[2]     Capitalized terms used but not defined in this Brief have the meanings ascribed to them in the Plan.

[3]     The following parties filed Objections:  (a) NEE [D.I. 12369] (the "NEE Objection"); (b) The United States Trustee (the "UST") [D.I. 12344]; (c) Shirley Fenicle, individually and as successor-in-interest to the Estate of George Fenicle, William Fahy, John H. Jones, David Heinzmann, Harold Bissell, Kurt Carlson, Robert Albini, individually and as successor to the Estate of Gino Albini, and Denis Bergscheinder  (the "Asbestos Objectors") [D.I. 12500-1]; and Mr. Robert J. Miller [D.I. 11587, D.I. 11872].

Denis Bergschneider filed a joinder to the Objection filed by the Asbestos Objectors [D.I. 12379].

The following parties filed reservation of rights:  (a) Delaware Trust Company ("EFIH First Lien Notes Trustee") [D.I. 12351]; (b) Computershare Trust Company, N.A. and Computershare Trust Company of Canada ("EFIH Second Lien Notes Trustee") [D.I. 12374]; (c) American Stock Transfer & Trust Company, LLC ("EFH Indenture Trustee") [D.I. 12371]; and (d) UMB Bank, N.A. ("PIK Trustee") [D.I. 12393].  Such parties are continuing to revise the proposed Confirmation Order, but the EFH/EFIH Debtors do not believe any of the parties that filed reservations of rights have any objections to Plan confirmation.

[4]     The exhibits referenced herein are included as exhibits to the *Declaration of Jonathan F. Ganter, Esq. in Support of the Debtors' Memorandum of Law in Support of Confirmation of the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith.

financings necessary to close on its $9.45 billion investment. All other necessary regulatory approvals are in hand, including from the IRS. As the EFH/EFIH Debtors approach their fourth year in chapter 11, ***emergence is finally, at long last, on the horizon***.

2.    Three primary objections stand between the EFH/EFIH Debtors and emergence from bankruptcy—the Asbestos Objection, the NEE Objection, and the Miller Objections.[5] Of these objections, ***only one actually raises section 1123 and section 1129 considerations under the Bankruptcy Code***—the Asbestos Objection, pursuant to which the Asbestos Objectors are raising the same "good faith" and "due process" grounds that have been raised, briefed, argued, and rejected at least eight times already in these chapter 11 cases. The Miller Objections are untimely collateral attacks on the long-ago consummated exchange that left behind the EFIH Unexchanged Notes and should be overruled.

3.    NEE's Objection relates to the $275 million NEE Termination Fee that has been disallowed in its entirety. NEE argues that (a) the Plan requires the EFH/EFIH Debtors to satisfy all Allowed Administrative Claims in full, in Cash; (b) the size of its currently disallowed, contingent Claim is $275 million; and (c) if there is a Final Order in its favor regarding the NEE Proceedings, its disallowed $275 million Claim will become an Allowed Administrative Claim. The EFH/EFIH Debtors agree. And, to that end, the EFH/EFIH Debtors are agreeing to fund the NEE Plan Reserve, pursuant to which $275 million will be reserved and released to NEE in the event such a Final Order is entered. As set forth herein, $275 million is the maximum amount to which NEE could become entitled pursuant to the Plan, the NEE Merger

---

[5]    The EFH/EFIH Debtors understand that the U.S. Trustee's reservation of rights with respect to the requested Confirmation Order rulings regarding section 503(b) will be addressed through an evidentiary presentation by the EFH Notes Trustee and the Supporting Creditors

Agreement, applicable case law, and NEE's own Objection. ***With the NEE Plan Reserve, NEE's objections under section 1123 and section 1129 should be fully and finally resolved.***

4.    The ancillary objection NEE has raised—unrelated to Plan confirmation standards or conditions to the EFH Effective Date—is that the NEE Plan Reserve should come with "no strings attached."  In other words, NEE argues that it should have a free option to pursue its disallowed Claim for an undetermined and potentially lengthy period of time without ever having to compensate Holders of <u>Allowed</u> Unsecured Claims for the opportunity cost associated with the funds in the NEE Plan Reserve in the event NEE ultimately never obtains entry of a Final Order in connection with the NEE Proceedings in its favor.  There is no basis for such an assertion in law or equity.

5.    ***First***, as a preliminary matter, NEE's assertion does not bear on Plan confirmation.  The amount, if any, that a non-Debtor (NEE) should have to compensate Holders of <u>Allowed</u> Claims as a result of damages caused by such non-Debtor has no bearing on the EFH/EFIH Debtors, their estates, or Claims asserted against them.  Nevertheless, the issue is ripe for adjudication at Plan confirmation because, as the Court noted in its ruling denying a stay of the Reconsideration Order, Holders face an immediate, irreparable harm with respect to the $275 million if those funds are reserved for NEE—but such Holders are not compensated for their lost opportunity cost in the event NEE ultimately loses.  The NEE Plan Reserve, combined with NEE's insistence that it cannot be required to compensate Holders for damages at any point, has now created the risk of immediate, irreparable harm for such Holders.  ***Second***, NEE is positioned like any other litigant who is pursuing an appeal and hoping for a reversal of fortune.  As Rule 62(d) of the Federal Rules of Civil Procedure makes clear, that hope comes at a price—the posting of a bond or other form of security or undertaking to protect the appellee

against harm from the appellant's pursuit of such an appeal (as described herein, the "NEE Undertaking Provision").

6.      In short, and as is so often the case, the price of success for NEE is lower than the price of failure.  If it successfully obtains a Final Order in its favor in connection with the NEE Proceedings, it will get exactly what it bargained for: $275 million.  If it does not, it will have to pay the price to those Holders whose Plan distributions were stayed while NEE hoped for its reversal of fortune.

7.      For these reasons, as will be set forth in greater detail below and in the record at trial, the Court should overrule the Objections and confirm the Plan as it relates to the EFH/EFIH Debtors.

## Background

### I.    The Path to the Sempra Plan.

#### A.    The Hunt Plan.

8.      Initial Restructuring Efforts and the Hunt Merger.  Beginning in mid-2014, the EFH/EFIH Debtors embarked on an extensive third-party marketing process to sell EFH Corp's economic interests in Oncor, including a stalking horse bidding process, as well as negotiations of restructuring alternatives with various creditor constituencies.[6]  These efforts eventually led the EFH/EFIH Debtors and the TCEH Debtors, Hunt Consolidated, Inc. and certain of its co-investors (collectively, the "Hunt Consortium"), and virtually all significant TCEH stakeholders to enter into a plan support agreement (the "Hunt PSA").[7]  The Hunt PSA contemplated a merger

---

[6]    *See Order (A) Approving Revised Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [D.I. 3295].

[7]    The TCEH Debtors and EFH Shared Services Debtors emerged from chapter 11 on October 3, 2016 [D.I. 9742] (the "TCEH Effective Date").  The terms "TCEH Debtors" and "EFH Shared Services Debtors" shall refer to such entities as they existed prior to the TCEH Effective Date.  The terms "Reorganized TCEH" and "Reorganized EFH Shared Services Debtors" shall refer to such entities on and after the TCEH Effective Date.

sponsored by the Hunt Consortium and members of the TCEH Unsecured Ad Hoc Group (the "Hunt Merger"), pursuant to which EFIH's interest in Oncor would be converted to a real estate investment trust (a "REIT").  The Hunt Merger was conditioned upon, among other things, approval by the Public Utility Commission of Texas (the "PUCT").  The Bankruptcy Court approved the EFH/EFIH Debtors' entry into the Hunt PSA on September 18, 2015, and confirmed the plan of reorganization implementing the transactions contemplated by the Hunt Merger on December 9, 2015 [D.I. 6097, 7285] (the "Hunt Plan").  In parallel with the Hunt Plan, the EFH/EFIH Debtors obtained Bankruptcy Court approval of an unprecedented settlement agreement that resolved billions of dollars in potential litigation related to three broad categories of prepetition claims:  (a) inter-Debtor Claims; (b) claims against the TCEH First Lien Creditors; and (c) claims against the Sponsors and against the EFH/EFIH Debtors' directors and officers (the "Settlement Agreement") [D.I. 7243].[8]  The Settlement Agreement remains binding on all parties.

9.    PUCT Hurdles for the Hunt Merger.  On March 24, 2016, however, the PUCT entered an order regarding the Oncor change of control application submitted by the Hunt Consortium and Oncor (the "Hunt PUCT Order").  However, the Hunt PUCT Order did not include all of the PUCT approvals required to consummate the Hunt Merger, including with respect to the terms of the initial lease between Oncor AssetCo LLC (a wholly-owned subsidiary of Oncor) and OEDC (requiring a separate proceeding for such approval).[9]  As a result and as permitted by the Hunt PSA, the TCEH First Lien Creditors delivered a Plan Support Termination

---

[8]    Additional details regarding the expansive scope of prepetition claims settled and released by the Settlement Agreement are set forth in the *Motion of Energy Future Holdings Corp.*, et al., *to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement* [D.I. 5249].

[9]    *See, e.g.*, Ex. A, Mar. 24, 2016 PUCT Order ¶ 191-92.

Notice (as defined in the Hunt PSA) to the EFH/EFIH Debtors and the Required Investor Parties (as defined in the Hunt PSA), which caused the Hunt Plan to become null and void.  Shortly thereafter, the EFH/EFIH Debtors terminated the merger agreement governing the Hunt Merger.

10.     Restructuring Considerations Following Termination.  Following the termination of the Hunt Merger agreement, three primary considerations drove the EFH/EFIH Debtors' restructuring efforts.  *First*, because of the expiration of statutory exclusivity, the TCEH First Lien Creditors indicated a willingness to pursue a taxable separation of EFH Shared Services Debtors and the TCEH Debtors from EFH Corp.  Such a taxable separation would, in light of the rulings ultimately received from the Internal Revenue Service, likely have triggered a massive tax obligation at EFH Corp. and a taxable separation of the EFIH Debtors from EFH Corp. (likely triggering another massive tax obligation).  *Second*, at various points in the EFH/EFIH Debtors' chapter 11 cases, different creditor constituencies had expressed an interest in purchasing EFH Corp.'s indirect economic interest in Oncor, but these expressions of interest had never coalesced into an actionable proposal, either because the parties could not agree on mutually acceptable financing terms, or because the parties' parochial interests left them irreparably divided.  *Third*, years of formal and informal efforts to market EFH Corp.'s economic interests in Oncor provided key intelligence regarding the value potential purchasers ascribed to such economic interests.  With these considerations in mind, the EFH/EFIH Debtors filed a revised chapter 11 plan on May 1, 2016 (within minutes of terminating the Hunt Merger agreement).  With respect to the TCEH Debtors and the EFH Shared Services Debtors, the Plan reflected the Alternative Restructuring Terms set forth in the Hunt PSA (as defined therein). With respect to the EFH/EFIH Debtors, the Plan contemplated either a standalone equitization or

an investment by existing creditors and/or third-parties to purchase EFH's indirect economic interests in Oncor.

###    B.    Development of the NEE Plan.

11.    Development of the NEE Merger Agreement.  Substantially contemporaneously with the filing of the revised plan on May 1, 2016, the EFH/EFIH Debtors reached out to potential investors that had previously expressed an interest in Oncor.  After contacting eighteen potential strategic and financial bidders, signing nondisclosure agreements with eight potential bidders, and engaging in extensive negotiations with three bidders, on July 28, 2016, the boards of directors and managers of EFH Corp. and EFIH approved the execution of a merger agreement and a plan support agreement with NextEra Energy, Inc. ("NEE," the "NEE Merger Agreement," and the "NEE PSA," respectively).[10]  The Bankruptcy Court entered an order on September 19, 2016 [D.I. 9584] authorizing the EFH/EFIH Debtors' entry into the NEE Merger Agreement and the NEE PSA, including a $275 million termination fee as an administrative expense claim in the event of certain termination events under the NEE Merger Agreement (the "NEE Termination Fee").[11]  That same day, the Bankruptcy Court entered an order [D.I. 9585] approving the *Amended Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al*., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9616] and authorizing the EFH/EFIH Debtors to solicit votes to accept or reject the *Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al*., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9612] (as amended from time to time, the

---

[10]    For more information regarding the Oncor marketing process, see the *Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9190].

[11]    NEE Merger Agreement § 8.5(b).  In the event the NEE Termination Fee is triggered, all parties have reserved their rights regarding the allocation of the NEE Termination Fee to the EFH Debtors, on the one hand, and the EFIH Debtors, on the other hand.

"Prior NEE Plan") from Holders of Claims and Interests against the EFH/EFIH Debtors who were entitled to vote.

12.    The Makewhole Opinion.  Among other key terms, the NEE Plan required that the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims (collectively, the "Makewhole Claims") be Disallowed Makewhole Claims (*i.e.*, that the order that had been issued by the Bankruptcy Court disallowing such Claims not be stayed, reversed, or remanded on appeal as of the EFH Effective Date) as a condition to the occurrence of the EFH Effective Date (the "Makewhole Condition").  On November 17, 2016, just three weeks before the hearing to consider confirmation of the Prior NEE Plan was scheduled to commence, the United States Court of Appeals for the Third Circuit (the "Third Circuit") issued an opinion regarding the Makewhole Claims (the "Makewhole Opinion").  As a result of the Makewhole Opinion, the Makewhole Claims were neither Disallowed Makewhole Claims nor Allowed Makewhole Claims: in other words, the Makewhole Condition Precedent could no longer be satisfied.

13.    Confirmation of the NEE Plan.  Responding to the Makewhole Opinion, the EFH/EFIH Debtors filed a revised plan of reorganization and disclosure statement seeking to resolicit certain Classes with Claims asserted against the EFIH Debtors whose treatment under the existing plan had changed as a result of the Makewhole Opinion.[12]  Seven weeks later, on February 17, 2017, at the same time the *Eighth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al*., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10853] as it applies to the EFH/EFIH Debtors (the "NEE Plan") was confirmed, the EFH/EFIH Debtors negotiated an agreement in principle with significant holders of EFIH First Lien Note Claims and

---

[12]    *See Disclosure Statement for the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al., *Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors* [D.I. 10533] (as further amended by D.I. 10534), which the Court approved on January 4, 2018.

holders of EFIH Second Lien Note Claims, pursuant to which the parties agreed on the types of Claims asserted by such holders that would become Allowed Claims, as well as the Allowed amount of such Claims (the "EFIH Settlement").[13]  On March 24, 2017, the Bankruptcy Court entered an order approving the EFIH Settlement and binding non-consenting holders of EFIH First Lien Note Claims and holders of EFIH Second Lien Note Claims (as well as consenting holders and the EFH/EFIH Debtors) to the EFIH Settlement (defined in the Plan as the EFIH Secureds Settlement Approval Order).[14]

14.    PUCT Hurdles for the NEE Merger Agreement.  The occurrence of the effective date with regards to the NEE Plan was subject to a number of conditions precedent, including obtaining change-of-control regulatory approval from the PUCT.  On April 13, 2017, the PUCT entered an order (the "NEE PUCT Order") finding that the transactions contemplated by the NEE Plan, in their current form, were not in the "public interest."[15]  In the absence of approval from the PUCT, the NEE Plan and the transactions contemplated by the NEE Merger Agreement could not be consummated.  Although the PUCT did not approve the transactions contemplated by the NEE Plan and the NEE Merger Agreement, the EFH/EFIH Debtors continued to comply with their obligations under the NEE Merger Agreement (including by filing *amicus curae* briefs in support of NEE's appellate efforts in connection with the PUCT's ruling).  At the same time,

---

[13]    *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Approving the EFIH Settlement Between the Debtors, Certain Holders of EFIH First Lien Note Claims, Certain Holders of EFIH Second Lien Note Claims, and Certain Holders of EFIH Unsecured Note Claims* [D.I. 10858].

[14]    *Order Approving the EFIH Settlement by and Among the Debtors, Certain Holders of EFIH First Lien Note Claims, Certain Holders of EFIH Second Lien Note Claims, and Certain Holders of EFIH Unsecured Note Claims* [D.I. 11048].

[15]    *Notice of Order Entered by the Public Utility Commission of Texas in the Administrative Proceeding Related to the Change of Control Application of Oncor Electric Delivery Company, LLC* et al. [D.I. 11152].

the EFH/EFIH Debtors began to explore alternative restructuring options (as permitted by the NEE Merger Agreement).

## C.    Elliott's Involvement and the BHE Plan.

15.    Elliott Emerges as a Key Player.  In early May 2017, Elliott Associates, L.P., Elliott International, L.P. and the Liverpool Limited Partnership (collectively with Elliott Management Corporation, for and on behalf of itself and its associates, "Elliott"), who then purported to be the largest holder of EFIH unsecured note claims, commenced an adversary proceeding against the EFH/EFIH Debtors.  Elliott sought a ruling that the plan support agreement entered into between the EFH/EFIH Debtors and certain holders of EFIH Unsecured Note claims in January 2017 could not be enforced against Elliott.  While the EFH/EFIH Debtors prepared to respond to that adversary proceeding, they simultaneously encouraged Elliott to engage in productive negotiations regarding an alternative restructuring proposal in the event the NEE Merger Agreement was terminated.  Ultimately, the EFH/EFIH Debtors and Elliott executed a confidentiality agreement in mid-May 2017 and an agreement between the parties to stay the adversary proceeding.  Over the next several weeks, the EFH/EFIH Debtors assisted Elliott in its efforts to develop a comprehensive restructuring proposal.  Despite the parties' efforts, there remained significant open issues in Elliott's proposal, and ultimately the parties' discussions did not yield an actionable path forward.

16.    Development of the BHE Merger Agreement.  In late June 2017, Berkshire Hathaway Energy Company ("BHE") submitted a proposal that largely preserved the structure of the NEE transaction.  After several weeks of intense negotiations, the EFH/EFIH Debtors determined it was in the best interests of their stakeholders to terminate the NEE Merger Agreement and seek approval from the Bankruptcy Court of a merger agreement with BHE.  The EFH/EFIH Debtors and BHE negotiated the terms of a merger agreement (the "BHE Merger

Agreement"), a plan of reorganization, a scheduling order, and a disclosure statement. Importantly, at the time the BHE Merger Agreement was executed by EFH and EFIH, the transactions contemplated by the BHE Merger Agreement were supported by the key parties in interest to the PUCT regulatory process, including the PUCT staff.  The EFH/EFIH Debtors believed that the support of these key parties would facilitate a more consensual PUCT approval process to the transactions contemplated by the BHE Merger Agreement (a stumbling block in the Hunt and NEE deals).  The EFH/EFIH Debtors proceeded forward with the BHE Merger Agreement, filing a motion to schedule Bankruptcy Court approval of the BHE Merger Agreement for late August 2017.

### D.    The Reconsideration Order and Subsequent NEE Proceedings.

17.    NEE Termination Fee Litigation.  Following the termination by EFH and EFIH of the NEE Merger Agreement, (a) the Elliott Funds filed the *Motion to Reconsider in Part the September 19, 2016 Order [D.I. 9584] Approving the NextEra Termination Fee* [D.I. 11636] (the "Reconsideration Motion"), seeking to reconsider the September 2016 Bankruptcy Court order approving the NEE Merger Agreement and the NEE Termination Fee; and (b) NEE filed the *Application of NextEra Energy, Inc. for Payment of Administrative Claim* [D.I. 11649] (the "NEE Application"), seeking payment of the NEE Termination Fee.  On August 3, 2017, the EFH/EFIH Debtors commenced an adversary proceeding against NEE, seeking a declaration that the NEE Termination Fee had not become due and payable.[16]

18.    On October 18, 2017, the Bankruptcy Court entered an order, granting the relief requested in the Reconsideration Motion and denying the NEE Application [D.I. 12075] (the "Reconsideration Order").  On December 11, 2017, the Bankruptcy Court entered an order

---

[16]    *See Adversary Complaint* [D.I. 11668] (the "NEE Adversary Proceeding").

denying NEE's request to stay the Reconsideration Order [D.I. 12327]. On January 17, 2018, the

Third Circuit granted the joint petition of the NEE, the EFH/EFIH Debtors, and the Elliott Funds,

seeking a direct, expedited appeal of the Reconsideration Order.[17] As of the date hereof, the

parties are complying with the briefing schedule set by the Third Circuit (collectively the appeal

on the Reconsideration Order and the NEE Adversary Proceeding, the "NEE Proceedings").

**E.    Exit on the Horizon: The Sempra Plan and Merger Agreement.**

19.    Sempra Makes a Superior Proposal. In mid-August 2017, as permitted by the

BHE Merger Agreement, the EFH/EFIH Debtors received an alternative transaction proposal

from Sempra Energy ("Sempra") that largely preserved the structure of the BHE transaction, but

which contemplated a materially increased purchase price. Substantially contemporaneously

therewith, Elliott indicated that it had purportedly purchased a large position in certain EFH

unsecured notes as well as increased its EFIH unsecured note holdings. With its new purported

position, the EFH/EFIH Debtors faced certain significant hurdles in pursuing confirmation of a

plan of reorganization that did not reflect Elliott's support, including the plan of reorganization

contemplated by the BHE Merger Agreement. Following additional negotiations, the EFH/EFIH

Debtors (a) obtained a commitment from Elliott to support and not object to a Sempra-led

transaction and (b) obtained agreement with Elliott and Sempra that the EFH/EFIH Debtors

would not pursue confirmation of a plan of reorganization reflecting the Sempra transaction until

the PUCT entered an order approving such contemplated transaction. On August 21, 2017, EFH

and EFIH terminated the BHE Merger Agreement and entered into a merger agreement with

Sempra (the "Merger Agreement") and a plan support agreement with Sempra and Elliott (the

"Sempra Plan Support Agreement").

---

[17]    While the EFH/EFIH Debtors, the Elliott Funds, and NEE did not agree on all of the bases of expedited relief,
all parties supported an expedited direct appeal.

20.     On September 6, 2017, the Bankruptcy Court approved EFH/EFIH Debtors' entry into and performance under the Sempra Plan Support Agreement and the Merger Agreement, and approved the disclosure statement with respect to the Plan.  Solicitation versions of the Plan and EFH Disclosure Statement were then filed by the EFH/EFIH Debtors on September 11, 2017 [Docket Nos. 11887 and 11889].  Solicitation is complete.[18]

21.     Path to PUCT Approval.  On October 5, 2017, Oncor and Sempra submitted their joint regulatory approval application to the PUCT (the "PUCT Application") regarding the change of control of Oncor contemplated by the Merger Agreement.  ***As of the date hereof, all intervenors and the staff of the PUCT have executed a stipulation supporting the PUCT Application***.  This is an unprecedented level of support that was not seen in connection with prior change of control applications filed with the PUCT in support of the EFH/EFIH Debtors' prior restructuring efforts.  As a result of these developments, on February 15, 2018, the PUCT canceled the merits hearing regarding the PUCT Application (previously scheduled for February 21 and 23, 2018) and instructed that a proposed order approving the PUCT Application be prepared for potential consideration at the PUCT's upcoming open meeting on March 8, 2018. In addition, although not a condition to the transactions contemplated by the Sempra Merger Agreement, Sempra has obtained the financing necessary to consummate the Merger.[19]  With unparalleled levels of consensus in the PUCT regulatory process and likely PUCT regulatory approval, available financing, and the support of their largest creditor, the EFH/EFIH Debtors are finally poised to exit from chapter 11.

---

[18]    Voting Report, ¶ 7.

[19]    *See,* e.g., Ex. B, Sempra Energy, Form 8-K (Jan. 12, 2018).

II.     **Plan Confirmation Objections Are Either Not Section 1123 or Section 1129 Issues or Are Narrow in Scope.**

A.      **The NEE Objection: Notwithstanding Applicable Case Law, the EFH/EFIH Debtors are Prepared to Reserve $275 Million—Leaving Open No Section 1123 or Section 1129 Issues for Plan Confirmation.**

22.     In connection with Plan confirmation, NEE argues that (a) the EFH/EFIH Debtors should establish a reserve in the amount of the NEE Termination Fee ($275 million) ***with "no strings attached"***—*i.e.*, with no potential additional exposure to NEE in the event NEE does not prevail by Final Order in connection with the NEE Proceedings and (b) its rights to pursue amorphous Claims in excess of the NEE Termination Fee against the Reorganized Debtors should be preserved.

23.     As set forth herein, both of these objections should be overruled.  As to the first point, the EFH/EFIH Debtors are prepared to reserve $275 million—the maximum amount NEE could ever be entitled to on account of the NEE Termination Fee under the Plan, the NEE Merger Agreement, and applicable case law (such $275 million reserve, the "<u>NEE Plan Reserve</u>").  Indeed, as set forth in greater detail in Section III.A below, NEE has never argued that it is entitled to any amounts in addition to $275 million, nor could it argue that it is entitled to such amounts under the Plan, the NEE Merger Agreement, or applicable Third Circuit case law.  Thus, if the NEE Plan Reserve ensures that the Plan requirement that all Allowed Administrative Claims be paid, in full, in Cash, and the NEE Plan Reserve ensures that NEE will receive 100% of the maximum amount of its Allowed Administrative Claim (in the event it is Allowed by Final Order), ***there are no outstanding issues under section 1123 or section 1129 of the Bankruptcy Code to be addressed in connection with NEE's Objection.***  As to the second point, as set forth in greater detail in Section III.B below, the Sempra Merger Agreement (which was approved by Final Order and with respect to which approval NEE did not raise any

objections) eliminates Sempra's obligation to consummate the Merger if the Confirmation Order exposes the Reorganized Debtors to any risk on the satisfaction of Claims (other than the negotiated and limited categories of Claims set forth therein).[20]

24.    The NEE Plan Reserve does, however, raise non-Plan confirmation issues that are ripe for adjudication.  *First*, NEE's insistence that the NEE Plan Reserve come with "no strings"—*i.e.*, no obligation that NEE could ever be required to compensate Holders for the delay in Plan distributions in the event of a Final Order against NEE in connection with the NEE Proceedings—implicitly makes the NEE Plan Reserve *function as a stay of Plan distributions* to such Holders for the benefit of NEE and without requiring NEE to post any kind of bond (as is typical under such circumstances).  Recognizing the harm to creditors by the lost opportunity costs of delayed distributions, courts impose bonding requirements on the front end.[21]  Failure to do so here would give NextEra a "free option" to pursue its appeal on the backs of the EFH/EFIH Debtors' unsecured creditors.

25.    The issue of compensation from *non-Debtors* (NEE) on account of *damages* suffered by such Holders (*e.g.*, lost opportunity cost) while a disappointed Claimant pursues its disallowed Claim for a potentially significant length of time has nothing to do with section 1123 or section 1129 of the Bankruptcy Code.  Such compensation (described herein as the "NEE Undertaking Provision") would not come from the EFH/EFIH Debtors or their estates and such

---

[20]    The NEE Objection was filed over three months after approval of the Sempra Merger Agreement (which NEE did not contest).  The NEE Objection therefore contradicts NEE's position during the hearing on the Reconsideration Motion, wherein NextEra argued that Elliott's prior failure to contest the NEE Merger Agreement precluded post-approval evaluation of the NEE Merger Agreement. Ex. C, 9/19/2017 Hr'g Tr. at 32:6-10.

[21]    *See, e.g.*, *In re Tribune Co.*, 477 B.R. 465, 480-81 (Bankr. D. Del. 2012) (Carey, J.) (requiring $1.5 billion supersedeas bond to pursue appeal that would delay creditor distributions).

delay in Plan distributions are not caused by the EFH/EFIH Debtors, thereby taking the issue

outside the scope of section 1123 and section 1129 of the Bankruptcy Code.

26.    ***Second***, the time is ripe for addressing the NEE Undertaking Provision.    In

denying a stay of the Reconsideration Order, this Court aptly noted that a stay was not necessary

because the $275 million at issue was "not going anywhere until confirmation. . .so there [was]

no immediate irreparable harm risk."    The Court stated that the parties "can deal with these

issues and will deal with these issues fully at the time of confirmation of a plan."[22]   That time is

here.  That time is now.

**B.    The Asbestos Plaintiffs' Objection Has Already Been Adjudicated and Overruled.**

27.    The Asbestos Objectors raise the same arguments grounded on "good faith" and

"due process" that have been addressed and rejected by this Court no less than eight times in

these chapter 11 cases.  As was established with respect to prior plans, has been evidenced on the

record at several hearings, and as set forth in greater detail below in Section III.C.ii, this Plan (a)

was proposed in good faith to maximize value for all the EFH/EFIH Debtors, including the

LSGT Debtors, and their respective creditors; (b) does not violate due process by discharging

unmanifested asbestos claims; and (c) continues to offer the Asbestos Objectors Reinstatement of

their preserved Claims, in full, with no limits or caps imposed by the Plan on the recovery of any

ultimately Allowed Claim (*i.e.*, the very truest sense of Unimpairment).   **Indeed, since the**

**execution of the EFH/EFIH Committee Settlement in November 2015—over two years**

**ago—every Plan iteration has contemplated the exact same treatment of the preserved**

**asbestos Claims: Reinstatement and, therefore, Unimpairment**.   Moreover, the Asbestos

Objectors have had multiple opportunities to be heard, albeit unsuccessfully, on whether the Plan

---

[22]    Ex. D, 12/11/17 Hr'g Tr. at 50:1-5.

violates the due process rights of unmanifested asbestos claimants who failed to timely preserve their claims. As the EFH/EFIH Debtors have established time and again, and as they will establish at Confirmation, there is simply no better plan treatment available for the LSGT Debtors' creditors, and the identical due process arguments the Asbestos Objectors have raised repeatedly in these chapter 11 cases should be overruled yet again.

### C.    The Miller Objection Contravenes Applicable Bankruptcy Law.

28.    Finally, the last Plan objection comes from Mr. Robert J. Miller. On July 24, 2017, Robert J. Miller filed an objection [D.I. 11587] (the "First Miller Objection") to the BHE Plan. Subsequently, Mr. Miller directly submitted to the Court the *Objection of Certain EFIH 9.75% Due 10/15/19 1st Lien Bondholders CUSPI 292681AA1 (the "Unexchanged Bonds") to Confirmation of the Plan and Merger Agreement and Disclosure Statement* (the "Second Miller Objection," and together with the First Miller Objection, collectively, the "Miller Objections").[23] The Miller Objections were submitted purportedly on behalf of unidentified holders of EFIH Unexchanged Notes. Although the Second Miller Objection was filed in part as a challenge to confirmation of the Sempra Merger Agreement and the EFH Disclosure Statement, the Court properly overruled this objection in those contexts.[24]

29.    The Miller Objections insist that the EFH/EFIH Debtors separately classify and pay the EFIH Unexchanged Notes in full, notwithstanding that Holders of EFIH Senior Toggle Notes (which are *pari passu* with the EFIH Unexchanged Notes) are expected to receive a recovery of less than 50 percent. As described herein, the Miller Objections should be overruled because the proposed change would violate the prohibition in section 1129(b)(1) against unfair

---

[23]    The Court subsequently docketed the Second Miller Objection on September 7, 2017 [D.I. 11872].

[24]    Ex. E, 9/6/17 Hr'g Tr. at 26:4-9.

discrimination, as there is no legal basis to treat the EFIH Unexchanged Notes and the EFIH Senior Toggle Notes differently—the bond exchange in question was consummated consistent with the applicable indentures and non-bankruptcy law. Assuming arguendo, even if Mr. Miller had held a claim related to the exchange that left behind the EFIH Unexchanged Notes, such claim (a) was not timely filed and preserved, and (b) would, in any event, be subordinated pursuant to section 510(b) to the Claims already held by Holders of EFIH Unexchanged Notes.[25]

### III.     Confirmation Solicitation and Notification Process.

30.     As required by section 1126 of the Bankruptcy Code, the EFH/EFIH Debtors solicited votes from the Holders of Claims or Interests in Impaired Classes receiving a recovery under the Plan, with all other Classes deemed to accept or reject the Plan as applicable.

### A.     Unimpaired and Deemed to Accept.

31.     Holders of Claims and Interests in the following Classes are Unimpaired and therefore were deemed to accept the Plan. While the EFH/EFIH Debtors did not solicit votes from Holders of Claims and Interests in such Classes, the EFH/EFIH Debtors mailed to them a notice regarding the Confirmation Hearing, as required under the EFH Disclosure Statement Order.[26]

| Class | Claims and Interests | Status |
|---|---|---|
| Class A1 | Other Secured Claims Against the EFH Debtors | Unimpaired |
| Class A2 | Other Priority Claims Against the EFH Debtors | Unimpaired |
| Class A3 | Legacy General Unsecured Claims Against the EFH Debtors | Unimpaired |
| Class B1 | Other Secured Claims Against the EFIH Debtors | Unimpaired |

---

[25]   As noted in the Preliminary Statement, and as set forth in Section I.D below, the U.S. Trustee's reservation of rights with respect to the requested Confirmation Order rulings regarding section 503(b) will be addressed through an evidentiary presentation by the EFH Notes Trustee and the Supporting Creditors.

[26]   *See Affidavit of Service of Solicitation Materials for the EFH/EFIH Debtors* [D.I. 12157], at Exhibit 1, Exhibit 4.

| Class | Claims and Interests | Status |
|-------|---------------------|--------|
| Class B2 | Other Priority Claims Against the EFIH Debtors | Unimpaired |
| Class B3 | EFIH First Lien Note Claims | Unimpaired |
| Class B4 | EFIH Second Lien Note Claims | Unimpaired |
| Class B9 | Interest in EFIH | Unimpaired |

**B.      Fully Impaired and Deemed to Reject.**

32.      Holders of Claims or Interests in the following Classes will not receive any recovery under the Plan and therefore were deemed to reject the Plan.  While the EFH/EFIH Debtors did not solicit votes from Holders of Claims in such Classes, the EFH/EFIH Debtors mailed to them a notice regarding the Confirmation Hearing, as required under the EFH Disclosure Statement Order.[27]

| Class | Claims and Interests | Status |
|-------|---------------------|--------|
| Class A13 | Non-EFH Debtor Intercompany Claims | Impaired |
| Class A15 | Interests in EFH Corp. | Impaired |
| Class B8 | Non-EFH Debtor Intercompany Claims | Impaired |
| Class B10 | Interests in EFIH Finance | Impaired |

**C.      Intercompany Claims and Interests Subject to Reinstatement or Discharge and Deemed to Accept or Reject.**

33.      With respect to inter-Debtor Claims and Interests between EFH/EFIH Debtors in the same "debt silo" (for example, Claims between one EFIH Debtor and another EFIH Debtor), the EFH/EFIH Debtors retained the ability to either reinstate or cancel and release such Claims on the Effective Date to facilitate ordinary operations or the maintenance of existing organizational structures.  The EFH/EFIH Debtors holding these Claims and Interests are deemed to have accepted or rejected the Plan.  The EFH/EFIH Debtors were not required to

---

[27]    *See Affidavit of Service of Solicitation Materials for the EFH/EFIH Debtors* [D.I. 12157], at Exhibit 1, Exhibit 4.

solicit votes from the EFH/EFIH Debtors holding these Claims and Interests or serve such Debtors with any other type of notice in connection with solicitation.[28]    Notably, the intercompany claims held by the LSGT Debtors are being Reinstated.[29]

| Class | Claims and Interests | Status |
|-------|---------------------|--------|
| Class A12 | EFH Debtor Intercompany Claims | Unimpaired/ Impaired |
| Class A14 | Interests in EFH Debtors Other Than EFH Corp. | Unimpaired/ Impaired |
| Class B7 | EFIH Debtor Intercompany Claims | Unimpaired/ Impaired |

## IV.    Voting Results.

34.    The voting results, as reflected in the *Certification of Ballots* [D.I. 12164] (the "Voting Report"), are summarized in the following table (with ranges reflecting variance by individual Debtor, as set forth in greater detail in the Voting Report):

| Class | Claims and Interests | Percent of Number Accepting | Percent of Amount Accepting | Result |
|-------|---------------------|----------------------------|----------------------------|--------|
| Class A4 | EFH Legacy Note Claims | Approximately 94% | Approximately 100% | Accepted |
| Class A5 | EFH Unexchanged Note Claims | 100% | 100% | Accepted |
| Class A6 | EFH LBO Note Primary Claims | 100% | 100% | Accepted |
| Class A7 | EFH Swap Claims | 100% | 100% | Accepted |
| Class A8 | EFH Non-Qualified Benefit Claims | Approximately 98% | Approximately 100% | Accepted |
| Class A9 | General Unsecured Claims Against EFH Corp. | 100% | 100% | Accepted |
| Class A10 | General Unsecured Claims Against the EFH Debtors Other Than EFH Corp. | No votes were returned in this Class except with respect to LSGT Gas Company LLC (and the 1 Claim that voted, voted in favor of the Plan). | | |
| Class A11 | TCEH Settlement Claim | 100% | 100% | Accepted |
| Class B5 | EFH LBO Note Guaranty Claims | 100% | 100% | Accepted |

---

[28]    *See Affidavit of Service of Solicitation Materials for the EFH/EFIH Debtors* [D.I. 12157], at Exhibit 1, Exhibit 4.

[29]    *See* Plan, Art. III.B.12.

| Class | Claims and Interests | Percent of Number Accepting | Percent of Amount Accepting | Result |
|-------|---------------------|----------------------------|----------------------------|--------|
| Class B6 | General Unsecured Claims Against the EFIH Debtors | Approximately 97% | Approximately 100% | Accepted |

35.     As set forth above and in the Voting Report, Classes A4, A5, A6, A7, A8, A9, A10, A11, B5, and B6 voted to accept the Plan, exclusive of any acceptance by insiders.[30]  Thus, there is an impaired consenting class of non-insider claims at each Debtor with a class of impaired Claims.  Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

36.     Notwithstanding the deemed rejection of the Plan by Classes A14, A16, B8, and B10, the Plan satisfies the "cramdown" requirements under section 1129(b) of the Bankruptcy Code, as described in more detail below, and is, therefore, confirmable.

## Argument

37.     This Brief is divided into three parts.  Part I establishes the Plan's compliance with each of the applicable requirements for confirmation.  Part II establishes that certain of the discretionary contents of the Plan, including the Plan's Releases, are appropriate and should be approved.  Part III establishes that the Objections to the Plan should be overruled.  For the reasons stated herein and in light of the evidentiary support to be offered at the EFH Confirmation Hearing, the EFH/EFIH Debtors respectfully request that the Bankruptcy Court find that the EFH/EFIH Debtors have satisfied their burden and confirm the Plan.

## I.     The Plan Satisfies the Requirements to Confirm a Plan Under the Bankruptcy Code.

38.     To confirm the Plan, the Bankruptcy Court must find that the EFH/EFIH Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the

---

[30]     See Voting Report, at Exhibit B.

evidence.[31]    As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.

**A.    The Plan Fully Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

39.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.[32]    The principal aim of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[33]    Accordingly, the determination of whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.

**i.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

40.    Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[34]    Because claims only need to be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining to classify claims

---

[31]    *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 & n.15 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

[32]    11 U.S.C. § 1129(a)(1).

[33]    *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368; *see also Genesis Health*, 266 B.R. at 599 ("The legislative history reflects that the applicable provisions of chapter 11 includes sections such as section 1122 and 1123, governing classification and contents of plan." (internal quotation marks and alterations omitted)).

[34]    11 U.S.C. § 1122(a).

together.[35]   Likewise, the Third Circuit has recognized that plan proponents may place similar claims into ***different*** classes so long as there is a reasonable basis to do so[36]—for example, where members of a class have different legal rights.[37]

41.    Here, each of the Claims or Interests in a particular Class with Claims against, or Interests in, the EFH/EFIH Debtors is substantially similar to the other Claims or Interests in such Class, and there is a reasonable basis for the separate classification of Claims among such Classes.   In general, the Plan's classification scheme follows the EFH/EFIH Debtors' capital structure.   The Plan first classifies Claims and Interests into four subcategories: subcategory A for the EFH Debtors and subcategory B for the EFIH Debtors, which represents the two primary "debt" silos governing the EFH/EFIH Debtors.   From there, Claims are generally categorized by priority, by Secured versus Unsecured status, by type, or based on unique factors associated with particular series of debt.[38]

---

[35]   *See In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012) (recognizing that plan proponents have "discretion" in classifying claims under a plan of reorganization); *In re W.R. Grace & Co.*, 475 B.R. 34, 109-10 (D. Del. 2012) ("Plan proponents and bankruptcy courts have considerably broad discretion in deciding how to classify claims.").

[36]   *In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014) ("[A] corollary to that rule is that the 'grouping of similar claims in different classes' is permitted so long as the classification is 'reasonable.'" (quoting *In re Jersey Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987))); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) (stating that "each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (stating that similar claims may be placed in separate classes so long as such classification is reasonable).

[37]   *See, e.g.*, *In re Wash. Mut., Inc.*, No. 08-12229 (MFW), 2012 WL 1563880, at *12 (Bankr. D. Del. Feb. 24, 2012) (permitting separate classification of notes issued by same issuer where each debenture had "slightly different legal rights"); *In re Kaiser Aluminum Corp.*, No. 02-10429(JKF), 2006 WL 616243, at *5-6 (Bankr. D. Del. Feb. 6, 2006) (permitting classification scheme after consideration of creditors' legal rights), *aff'd*, 343 B.R. 88 (D. Del. 2006); *In re Exide Techs.*, 303 B.R. 48, 79-80 (Bankr. D. Del. 2003) (stating that there may be a basis for separately classifying creditors of the same priority level); *see also In re Mirant Corp.*, No. 03-46590DML11, 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007) (permitting separate classification because holders of claims had different legal interests in the debtor's estate).

[38]   Plan, Art. III.A.

42.     Because the Plan classifies Claims and Interests based upon their different rights and attributes, the Plan satisfies section 1122 of the Bankruptcy Code, and no party has asserted otherwise.

     **ii.**     **The Plan Satisfies the Seven Mandatory Plan Requirements of Sections 1123(a) of the Bankruptcy Code.**

43.     The seven applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of the treatment and classification of claims, the equal treatment of claims within classes, and the mechanics of implementing the plan.   The Plan satisfies each of these requirements.

44.     ***Specification of Classes, Impairment, and Treatment.***   The first three requirements of section 1123(a) are that the plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise nature of their treatment under the Plan.[39]   The Plan—in particular, Article III—satisfies these three requirements by setting forth these specifications in detail, and no party has asserted otherwise.[40]

45.     ***Equal Treatment.***   The fourth requirement of section 1123(a) is that the plan must "provide the same treatment for each claim or interest of a particular class."[41]   Courts in Delaware construe this provision to require "only approximate equality," not "precise

---

[39]   11 U.S.C. § 1123(a)(1)-(3).

[40]   Plan, Art. III.A-B.

[41]   11 U.S.C. § 1123(a)(4).

equality."[42]   Importantly, in analyzing equal treatment, courts examine whether particular class members "give up the same degree of consideration for their distribution under the plan."[43]

46.     Here, the Plan provides for identical treatment within each Class.  Accordingly, the Plan satisfies 1123(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

47.     ***Adequate Means for Implementation.***  The fifth requirement of 1123(a) is that a plan provide adequate means for its implementation.[44]  The Plan, together with the documents and forms of agreement included in the Plan Supplement (including the Merger Agreement), provides a detailed blueprint for the transactions that underlie the Plan.[45]

48.     The Merger Agreement sets forth the means for implementation of the key transaction underlying the Plan:  In turn, Article IV.B.5 of the Plan sets forth the means for implementation of the Merger and establishes the steps and mechanisms for using the consideration provided by the Merger and Cash on hand as of the EFH Effective Date to fund distributions to Holders of Allowed Claims against the EFH/EFIH Debtors.[46]  Unlike earlier transactions, the Plan contemplates an all-Cash distribution to Holders of Allowed Claims.  In addition to these core transactions, the Plan sets forth the other critical mechanics for emergence, such as the dissolution of certain subsidiaries, the establishment and termination of certain agreements, and the settlement of intercompany accounts.

---

[42]   *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (quoting *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)).

[43]   *W.R. Grace & Co.*, 475 B.R. at 121.

[44]   11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include:  retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.  *Id.*

[45]   *See* Plan Supplement, <u>Exhibit G</u>.

[46]   Plan, Art. IV.B.5.

49.     The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents or forms of agreements included in the Plan Supplement.[47]  This includes, for example, certain amended and restated LLC agreements, the Oncor Letter Agreement (which sets forth the rights and obligations of the Plan Sponsor and certain Oncor entities in connection with the Merger transaction), and the EFH Plan Administration Trust Agreement (which governs the EFH Plan Administration Trust, which is overseen by the EFH Plan Administrator Board and which administers the EFH/EFIH Cash Distribution Account and certain Retained Causes of Action).  Pursuant to the TCEH Confirmation Order, the Separation Agreement and the Tax Matters Agreement were approved as to all Debtors.  Critically, no debt documents were filed in the Plan Supplement because the Merger does not contemplate the incurrence of new funded debt at EFIH or EFH Corp.  Thus, the Plan satisfies section 1123(a)(5), and no party has asserted otherwise.

50.     ***Non-Voting Stock.***  The sixth requirement of section 1123(a) is that a plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.[48]  As one court explained, this subsection "prevents the issuance of a class of stock without the ***possibility*** of exercising ***any*** vote."[49]  Its legislative history indicates that it is primarily meant to protect the interests of a debtor's prepetition creditors and stockholders receiving equity under the plan.[50]

---

[47]   Plan Supplement, at <u>Exhibit A</u>, <u>Exhibit H</u>, <u>Exhibit I</u>, <u>Exhibit L</u>.

[48]   *See* 11 U.S.C. § 1123(a)(6).

[49]   *In re Ahead Commc'ns Sys., Inc.*, 395 B.R. 512, 518 (D. Conn. 2008) (emphases added).

[50]   S. Rep. No. 95-989, at 10 (1978) ("As public investors are likely to be junior or subordinated creditors or stockholders, it is essential for them to have legislative assurance that their interests will be protected.").

51.      Here, no prepetition creditors or stockholders are receiving equity under the Plan. Nevertheless, the Plan provides that the New Organizational Documents of Reorganized EFH will prohibit the issuance of non-voting stock.[51] Thus, the Plan complies with the requirements of section 1123(a)(6), and no party has asserted otherwise.

52.      ***Selection of Officers and Directors.***      Finally, section 1123(a)(7) of the Bankruptcy Code requires that the plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[52]  The Plan provides that as of the EFH Effective Date, the terms of the existing boards of directors of the EFH/EFIH Debtors will expire and the initial New Boards (consisting of eight directors, selected by the Plan Sponsor) will take over.[53]

53.      On October 20, 2017, the EFH/EFIH Debtors filed the Plan Supplement, which disclosed the New Boards and the initial directors and officers of Reorganized EFH and Reorganized EFIH.  Specifically, the EFH/EFIH Debtors disclosed (a) a list of five individuals expected to serve as the officers of New HoldCo and Intermediary HoldCo; (b) a list of five individuals expected to serve as the initial officers of Reorganized EFH and Reorganized EFIH; (c) the individual expected to serve as the initial sole member of the board of directors of Reorganized EFH and Reorganized EFIH. The identity of any other directors, to the extent determined prior to the EFH Effective Date, or any changes to those directors and officers

---

[51]   Plan Supplement, at Ex. A., Article XII.

[52]   11 U.S.C. § 1123(a)(7).

[53]   Plan, Art. IV.J.

already identified will be disclosed prior to the EFH Effective Date.[54]   The EFH/EFIH Debtors anticipate that current directors and officers will serve after the Confirmation Date until the Effective Time.   In addition, in the Plan Supplement, the EFH/EFIH Debtors identified Mr. Anthony Horton (current Executive Vice President and Chief Financial Officer for the EFH/EFIH Debtors) as the member of the EFH Plan Administrator Board.[55]   Therefore, the Plan satisfies the requirements of sections 1123(a)(1)–(7) of the Bankruptcy Code, and no party has asserted otherwise.

### B.   The EFH/EFIH Debtors Have Complied Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

54.    Section 1129(a)(2) requires that the plan ***proponents*** comply with applicable provisions of the Bankruptcy Code.   Case law and legislative history indicate that this section principally reflects the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code,[56] which prohibits the solicitation of plan votes without a court-approved disclosure statement.[57]

55.    Here, the EFH/EFIH Debtors, as Plan proponents, have satisfied section 1125 of the Bankruptcy Code.   The Bankruptcy Court approved the EFH Disclosure Statement as

---

[54]   *Id; In re Charter Commc'ns*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the known directors."); *In re Am. Solar King Corp.,* 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however.  If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

[55]   Plan Supplement, at Exhibit F.

[56]   *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re WorldCom, Inc.*, No. 02-135333(AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) ("The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code."); *In re Lapworth*, No. 97-34259DWS, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 3, 1998) ("The legislative history of [section] 1129(a)(2) specifically identifies compliance with the disclosure requirements of [section] 1125 as a requirement of [section] 1129(a)(2)."); S. Rep. No. 95-989, at 126; H.R. Rep. No. 95-595 at 412.

[57]   11 U.S.C. § 1125(b).

containing adequate information on September 6, 2017, and the EFH/EFIH Debtors solicited and

tabulated votes on the Plan in accordance with the Solicitation Procedures approved by the

Bankruptcy Court.  The EFH/EFIH Debtors timely mailed the notices to non-voting creditors as

described in the Solicitation Procedures.[58]  Accordingly, the EFH/EFIH Debtors have satisfied

the requirements of section 1125 of the Bankruptcy Code and therefore have satisfied the

requirements of section 1129(a)(2) of the Bankruptcy Code with respect to the Plan, and no party

has asserted otherwise.

### C. The EFH/EFIH Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).

56.     The Bankruptcy Code requires that the proponent of a plan of reorganization

propose the plan "in good faith and not by any means forbidden by law."[59]  In assessing the good

faith standard, courts consider whether the plan: (1) fosters a result consistent with the objectives

of the Bankruptcy Code; (2) has been proposed with honesty, good intentions, and a basis for

expecting that the reorganization can be effectuated; and (3) exhibits a fundamental fairness in

dealing with creditors.[60]

57.     Courts look to the reorganization plan itself to determine whether the plan seeks

relief consistent with the Bankruptcy Code.[61]    To that end, the fundamental purpose of

chapter 11 is to enable a company in financial distress to restructure its balance sheet, reorganize

its business operations, and avoid the adverse economic effects associated with disposing of

---

[58]    *See Affidavit of Service of Solicitation Materials for the EFH/EFIH Debtors* [D.I. 12157], at Exhibit 1, Exhibit 4.

[59]    11 U.S.C. § 1129(a)(3).

[60]    *W.R. Grace & Co.*, 475 B.R. at 87-88.

[61]    *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *see also In re Sound Radio, Inc.*, 93 B.R. 849, 854 (Bankr. D.N.J. 1988).

assets at their liquidation value.[62]  Minimizing litigation through compromise is likewise favored in bankruptcy.[63]

58.    Here, the Plan will shed over $9 billion in prepetition funded debt obligations in Cash, and, importantly, without incurring new funded debt as part of the reorganization efforts. It also preserves the hard-fought EFH/EFIH Committee Settlement, pursuant to which Legacy General Unsecured Claims against the EFH Debtors and the Claims and Interests held by the LSGT Debtors will be Reinstated and thereby rendered Unimpaired.  Effectuating these value maximizing transactions and settlements is the good-faith purpose of the Plan.

59.    As described above, in prosecuting these chapter 11 cases, the EFH/EFIH Debtors have left no stone unturned, and, indeed, have considered numerous alternatives, including, a tax-free spin of Oncor, a tax-efficient spin of Oncor, an equitization of Claims asserted against the EFH/EFIH Debtors, a separation of the EFIH Debtors from EFH Corp. through a transaction under section 363 of the Bankruptcy Code, pursuit of definitive documentation with all, viable purchasers, and everything in between.  The end result comes after years of exploring all viable options for an EFH/EFIH Debtors' restructuring with existing creditor constituencies and third parties.   The EFH/EFIH Debtors have thoroughly evaluated the resulting Restructuring Transactions and believe that the Plan will be consummated.   Accordingly, the EFH/EFIH Debtors respectfully submit that the Plan satisfies section 1129(a)(3) of the Bankruptcy Code. The Asbestos Objectors assert that the Plan was not proposed in good faith.  As set forth in

---

[62]    *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *see also In re B.D. Int'l Disc. Corp.*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start"); *In re Bonded Mailings, Inc.*, 20 B.R. 781, 785 (Bankr. E.D.N.Y. 1982) (holding Bankruptcy Code's policy of equitable distribution amongst creditors should not be thwarted by actions of a single creditor).

[63]    *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." (internal quotation marks and alterations omitted)).

greater detail below, the EFH/EFIH Debtors wholly disagree with such assertions (for many of the same reasons previously raised by such claimants and previously dismissed by this Court).

**D.    The Plan Provides for Bankruptcy Court Approval of Certain Payments (Section 1129(a)(4)).**

60.    The Bankruptcy Code requires that professional fees and expenses related to the case and paid under the plan be approved by the court as reasonable or subject to approval of the court as reasonable.[64]  Whether a payment is reasonable is a case-by-case inquiry that turns on who makes the payment, who receives it, and the effect of such payments on the estate.[65]  As one court explained, as to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[66]

61.    Here, the professional fees and expenses related to the case and paid under the Plan primarily fall into five categories:  (a) fees and expenses paid under the EFIH First Lien DIP Order; (b) reasonable and documented fees allowed under section 506(b) of the Bankruptcy Code and the EFIH First Lien Note Indentures and EFIH Second Lien Note Indenture (collectively, the "Secured Creditor Fees"); (c) fees and expenses payable pursuant to a finding of "substantial contribution" under section 503(b) of the Bankruptcy Code; and (d) fees and expenses satisfied pursuant to a "charging lien".

---

[64]    11 U.S.C. § 1129(a)(4).

[65]    *In re Cajun Elec. Power Coop., Inc.*, 150 F.3d 503, 517 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate."); *see also In re Congoleum Corp.*, No. 09-4371, 2010 WL 1850182, at *5 (D.N.J. May 7, 2010) (quoting same); *In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) ("The determination whether a payment is reasonable under § 1129(a)(4) requires an analysis of the issue of reasonableness based on the facts and circumstances of the payments.").

[66]    *Cajun Elec.*, 150 F.3d at 517.

62.     *First*, the fees and expenses payable under the EFIH First Lien DIP Order are subject to pre-existing review procedures.  All of the fees and expenses payable under the EFIH First Lien DIP Order must be reasonable and documented and, to the extent they are not, the EFIH Debtors will file an objection to such fees and expenses with the Bankruptcy Court.

63.     *Second*, the fees and expenses payable to Holders of EFIH First Lien Note Claims and EFIH Second Lien Note Claims have already been approved by the Bankruptcy Court pursuant to the EFIH Secureds Settlement Approval Order.

64.     *Third*, subject to the satisfaction of appropriate evidentiary burdens at the Confirmation Hearing, paragraph 107 of the proposed Confirmation Order contemplates that the Bankruptcy Court may find that certain parties—in particular, the Supporting Creditors (*e.g.*, Elliott) and the EFH Notes Trustee—have made a substantial contribution to these chapter 11 cases.  Any fees and expenses payable in connection with such findings will be subject to both review by the Fee Committee and approval by the Bankruptcy Court.[67]

65.     *Fourth*, any payments made pursuant to a "charging lien" do not require any incremental funding by the EFH/EFIH Debtors.  Fees made pursuant to a "charging lien" represent funds that would have otherwise been distributed to Holders of Allowed Unsecured Claims at EFH and EFIH.

66.     Under the circumstances, given (a) the existing review process for fees and expenses payable under the EFIH First Lien DIP Order; (b) the entry of the EFIH Secureds Settlement Approval Order, pursuant to which the Bankruptcy Court has already approved the documented fees incurred by Holders of EFIH First Lien Note Claims and EFIH Second Lien

---

[67]   This Court previously authorized payment of approximately $5.5 million to the EFH Notes Trustee outside of a charging lien advance in connection with the Hunt Plan.  *See Order Approving Settlement Among Debtors, EFH Committee, EFH Notes Trustee, and Certain Other Parties* [D.I. 7143].

Note Claims; (c) the contemplated Fee Committee and Bankruptcy Court review and approval process related to fees and expenses paid in connection with a finding under section 503(b) of the Bankruptcy Code; and (d) the remaining fees and expenses represent funds that would have otherwise been distributed to Holders of Allowed Unsecured Claims, the Bankruptcy Court should approve the provisions of the Plan that provide for payment of fees and expenses under the Plan as reasonable and find that the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

### E.    The EFH/EFIH Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5)).

67.    The Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[68]  It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[69]  Lastly, it requires that the plan proponent have disclosed the identity of insiders to be retained by the reorganized debtor and the nature of their compensation.[70]  In construing section 1129(a)(5), courts have long made clear that, to the extent the debtor is unable to identify these individuals by name at the time of confirmation, the debtor nonetheless satisfies this requirement so long as directors will be appointed consistent with the company's organizational documents and applicable state and federal law.[71]

---

[68]    11 U.S.C. § 1129(a)(5)(A)(i).

[69]    *Id.* § 1129(a)(5)(A)(ii).

[70]    *Id.* § 1129(a)(5)(B).

[71]    *Charter Commc'ns*, 419 B.R. at 260 n.30 ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the *known* directors."); *Am. Solar King*, 90 B.R. at 815  ("The subsection does not (and cannot) compel the debtor to do the impossible, however.  If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

68.     As described in detail in Section I.A.ii of the Argument, *supra*, the EFH/EFIH Debtors have supplied all available information with respect to the identity of the directors and officers to serve on the New HoldCo and Intermediary HoldCo Boards as well as the Reorganized EFH and Reorganized EFIH Boards.[72]   The current directors and officers of the EFH/EFIH Debtors will serve until the Effective Time (as defined in the Merger Agreement).   In addition, in the Plan Supplement filed on October 20, 2017, the EFH/EFIH Debtors identified Mr. Anthony Horton (current Executive Vice President and Chief Financial Officer for the EFH/EFIH Debtors) as the member of the EFH Plan Administrator Board.[73]   Accordingly, the EFH/EFIH Debtors have satisfied the requirements of section 1129(a)(5), and no party has asserted otherwise.

**F.     The Plan Does Not Provide for Any Rate Changes Requiring Governmental Approval (Section 1129(a)(6)).**

69.     The Bankruptcy Code requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."[74]   The Plan is expressly conditioned on a number of regulatory approvals, but does not, however, provide for any rate changes that require the approval of the relevant regulatory agencies.   Thus, this provision of the Bankruptcy Code is inapplicable to the Plan, and no party has asserted otherwise.

---

[72]   Plan Supplement, at Exhibit E.

[73]   Plan Supplement, at Exhibit F.

[74]   11 U.S.C. § 1129(a)(6).

G.    **The Plan Is In the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)).**

70.    The best interests of creditors test requires that, "[w]ith respect to each impaired class of claims or interests," members of such class that have not accepted the plan will receive at least as much as they would in a hypothetical chapter 7 liquidation.[75]  Where the plan provides for less than full recoveries on claims, a debtor generally satisfies the test by comparing recoveries in a hypothetical liquidation with the estimated recoveries under the plan of reorganization.[76]

71.    Here, the EFH Disclosure Statement includes a customary liquidation analysis,[77] which demonstrates that each Class of Claims against the EFH/EFIH Debtors will receive equal to or more under the Plan than it would in a hypothetical liquidation.  No party contests this analysis or conclusion.  Therefore, the Plan satisfies the best interests of creditors test.

H.    **The Plan Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8).**

72.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept a plan or be unimpaired under a plan.[78]  As discussed above while all

---

[75]    *Id.* § 1129(a)(7).

[76]    *See 203 N. LaSalle St. P'ship*, 526 U.S. at 442 n.13; *see also United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation"); *In re Century Glove, Inc.*, Civ. A Nos. 90-400-SLR & 90-401-SLR, 1993 WL 239489, at *7 (D. Del. Feb. 10, 1993).

[77]    EFH Disclosure Statement, at Exhibit E.

[78]    11 U.S.C. § 1129(a)(8). A class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than half in number of the claims in that class actually vote to accept the plan. *Id.* § 1126(c). A class that is not impaired under a plan, and the creditors in that class, are conclusively presumed to have accepted the plan. *Id.* § 1126(f). A class is deemed to have rejected a plan if the plan provides that the holders of claims or interests in that class do not receive or retain any property under the plan on account of such claims or interests. *Id.* § 1126(g).

Voting Classes voted to accept the Plan,[79] Classes A13, A15, B8, and B10 are deemed to have rejected the Plan and, therefore, the EFH/EFIH Debtors cannot satisfy section 1129(a)(8) of the Bankruptcy Code.  Nevertheless, the Plan may still be confirmed because, as set forth in Sections I.O and III.A of the Argument in this Brief, *infra*, the EFH/EFIH Debtors have satisfied the impaired consenting class requirement under section 1129(a)(10) and the requirements for cramdown under section 1129(b).

> **I.    The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Claims (Section 1129(a)(9)).**

73.    The Bankruptcy Code generally requires that claims entitled to administrative or other priority must be repaid in full in cash or receive certain other specified treatment.[80]  Here, the Plan generally provides that Allowed Administrative Claims and Other Priority Claims, including Priority Tax Claims, will be repaid in full, in cash or receive other treatment rendering them Unimpaired.[81]  Therefore, the Plan complies with section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.  The NEE Objection challenges the EFH/EFIH Debtors' ability to satisfy this section of the Bankruptcy Code, which Objection should be overruled as set forth in Section II.A, *supra*.

> **J.    At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)).**

74.    Section 1129(a)(10) of the Bankruptcy Code provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.[82]  As detailed herein and in the Voting Report, all of the voting

---

[79]    Voting Report, at <u>Exhibit B</u>.

[80]    11 U.S.C. § 1129(a)(9).

[81]    *See* Plan, Art. II.A.1, III.B.2, III.B.18.

[82]    11 U.S.C. § 1129(a)(10).

classes have accepted the Plan, exclusive of any acceptances by insiders.[83]  And, importantly, the

Plan has been accepted by a Voting Class with respect to each Debtor, as illustrated by the chart

included with the Voting Report.[84]    Therefore, the Plan satisfies the requirements of

section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.

### K.    The Plan Is Feasible (Section 1129(a)(11)).

75.    Feasibility refers to the Bankruptcy Code's requirement that plan confirmation

must not be "likely to be followed by the liquidation, or the need for further financial

reorganization, of the debtor . . . , unless such liquidation or reorganization is proposed in the

plan."[85]    Under this standard, it is well-established that the success of the plan need only be

"reasonably likely," not "guaranteed."[86]    Indeed, "a relatively low threshold of proof will satisfy

§ 1129(a)(11) so long as adequate evidence supports a finding of feasibility."[87]

### i.    The Merger is Reasonably Likely to Close.

76.    There is no question that Sempra is incentivized to close the Merger.  *First*, in

advance of Plan confirmation, Sempra agreed to infuse another $31 million into the EFH/EFIH

Debtors' estates to avoid otherwise value-destructive litigation related to certain Oncor dividend

and Oncor TSA issues that could have derailed (or delayed) closing. [88]    *Second*, Sempra has

---

[83]    *See* Voting Report, at <u>Exhibit B</u>.

[84]    *See* Voting Report, at <u>Exhibit B</u>.

[85]    11 U.S.C. § 1129(a)(11).

[86]    *In re W.R. Grace & Co.*, 729 F.3d 332, 348 (3d Cir. 2013); *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) ("All the bankruptcy court must find is that the plan offer 'a reasonable probability of success.'" (quoting *In re Landing Assoc., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993))).

[87]    *In re Brice Rd. Devs., L.L.C.*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008) (internal quotation marks omitted); *see also In re Wash. Mut., Inc.*, 461 B.R. 200, 252 (Bankr. D. Del. 2011) (quoting "low threshold of proof" standard); *In re Trenton Ridge Inv'rs, LLC*, 461 B.R. 440, 479 (Bankr. S.D. Ohio 2011) (same).

[88]    Additional information regarding such settlement is set forth in the *Motion of Energy Future Holdings Corp.*, et al., *for Entry of an Order Approving the Settlement Between the Debtors and Sempra and Approving the Agreed*

completed the financing necessary to consummate the Merger.[89]  ***Third***, Sempra has worked diligently to ensure the regulatory hurdles that plagued previous emergence efforts do not prevent consummation of the Merger—as a result, for the first time in the EFH/EFIH Debtors' chapter 11 cases, all intervenors and the PUCT Staff are now supportive of the Sempra-Oncor PUCT Application.  On the brink of consummation of the Plan that has unparalleled regulatory support and that contemplates funding from Sempra, a Fortune 500, diversified energy company with an enterprise value of more than $49 billion, and the necessary committed financing already in hand, there is no reason to doubt the likelihood of the consummation of the transactions contemplated by the Sempra Merger Agreement.

### ii.    Key Regulatory Approvals are Already in Hand or Are Likely.

77.    The fact that a plan depends on regulatory and tax approvals does not change the statutory feasibility standard.  It is not clear that the requirements of section 1129(a)(11) apply to conditions precedent to the consummation of a Plan as opposed to the ability of the reorganized debtor to satisfy its obligations under the plan ***after*** consummation of the plan.  Nevertheless, to the extent pre-consummation requirements are to be considered in connection with the feasibility analysis, "[i]t is not at all unusual for consummation of a Chapter 11 plan to be conditioned upon the expectation of approval by regulatory authorities, and courts have not typically held up confirmation of a plan to wait for issuance of such approvals."[90]  Numerous courts have approved chapter 11 plans that are conditioned on regulatory approvals, including state public

---

*Amendment to the Merger Agreement* [D.I. 12571], which Motion was granted pursuant to the *Order Approving the Settlement Between the Debtors and Sempra and Approving the Agreed Amendment to the Merger Agreement* [D.I. 12631].

[89]    *See,* e.g., Ex. B, Sempra Energy, Form 8-K (January 12, 2018).

[90]    *Indianapolis Downs,* 486 B.R. 286, 298 (Bankr. D. Del. 2013).

utility commission approvals, FCC approvals, and FERC approvals.[91]  In the regulatory context,

Delaware bankruptcy courts emphasize that the likelihood of success need only be "reasonable"

to show feasibility and have found plans feasible despite significant post-confirmation regulatory

conditions.[92]

78.    Here, the occurrence of the EFH Effective Date is expressly conditioned on the

EFH Debtors receiving all authorizations, consents, and regulatory approvals, including, most

significantly, from the PUCT, FERC, and the FCC, as applicable.  These regulatory processes

would be necessary in one form or another under virtually any plan of reorganization that

involved EFH's indirect economic interest in Oncor.

79.    On October 5, 2017, Oncor and Sempra submitted the PUCT Application to the

PUCT regarding the change of control of Oncor contemplated by the Merger Agreement.  *As of

the date hereof, there are no intervenors that object to the PUCT Application, and all

intervenors and the PUCT staff have executed a stipulation in support of the PUCT

Application*.  The PUCT is likely to consider approval of the PUCT Application on March 8,

---

[91]    *See, e.g.*, *In re Lightsquared Inc.*, Case No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015) [D.I. 2276] (Federal Communications Commission); *In re Sorenson Commc'ns, Inc.*, Case No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) [D.I. 180] (Federal Communications Commission); *In re Edison Mission Energy*, Case No. 12-49219 (JPC) (Bankr. N.D. Ill. Mar. 11, 2014) [D.I. 2206] (Federal Energy Regulatory Commission); *In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) [D.I. 10367] (Federal Aviation Administration and Department of Transportation); *In re DBSD N. Am.*, Case No. 09-13061 (REG) (Bankr. S.D.N.Y. July 5, 2011) [D.I. 1159] (Federal Communications Commission); *In re Majestic Star Casino, LLC*, Case No. 09-14136 (KG) (Bankr. D. Del. Mar 10, 2011) [D.I. 1059] (State gaming regulators); *In re Citadel Broad. Corp.*, Case No. 09-17442 (BRL) (Bankr. S.D.N.Y. May 19, 2010) [D.I. 369] (Federal Communications Commission); *In re Hawaiian Telecom Commc'ns, Inc.*, Case No. 08-02005 (Bankr. D. Haw. Dec. 30, 2009) [D.I. 1570] (Hawaii Public Utilities Commission and the Federal Communications Commission); *In re Maxcom Telecommunicaciones, S.A.B. de C.V.*, Case No. 13-11839 (PJW) (Bankr. D. Del. Sept. 10, 2013) [D.I. 148] (the Mexican Government under Mexican telecommunications law); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) (Federal Trade Commission); *In re Global Crossings, Ltd.*, Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Dec. 26, 2002) [D.I. 2586] (Federal Communications Commission).

[92]    *See Indianapolis Downs*, 486 B.R. at 299; *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011).

2018, and the EFH/EFIH Debtors are hopeful that the PUCT will approve the PUCT Application very soon thereafter.

80.    Additionally, the EFH/EFIH Debtors have already obtained the necessary approvals from the FERC and IRS.  On December 12, 2017, FERC approved the Merger transaction, finding that the transaction was consistent with the public interest.  Sempra, EFH, and EFIH entered into a waiver agreement on October 6, 2017, under which the parties to the Merger Agreement agreed not to pursue a filing or obtain clearance under the Hart-Scott-Rodino Act, as the parties believed that such a filing is not required for the Sempra transaction.  As a result of this agreement, early termination of the waiting period under the Hart-Scott-Rodino Act is not a condition to the consummation of the Sempra transaction.  The IRS has issued a private letter ruling to EFH that satisfies the requirements of the Plan and the Merger Agreement.  The EFH/EFIH Debtors believe the Merger Agreement meets the regulatory requirements for approval and, in light of the above, that they remain on track to achieving an EFH Effective Date in March 2018.

### iii.    Reorganized EFH Will Be Financially Sound.

81.    When assessing the feasibility of a reorganized company as a going concern, courts may assess various factors with respect to the commercial viability of the new entity, including capital structure, earning capacity, economic conditions, and management strength— although earning capacity is generally the most important metric.[93]

82.    The Plan is feasible.  First, and most significantly, the Plan will extinguish all funded debt at EFH Corp. and EFIH without imposing new funded debt obligations.  Aside from

---

[93]    *W.R. Grace.*, 475 B.R. at 115  ("The bankruptcy court can consider a wide array of factors in determining a plan's feasibility, including assessment of the debtor's capital structure, the earning power of the business, economic conditions, and the ability of the corporation's management.  Most importantly, the debtor must provide the bankruptcy court with an estimate of its future earning capacity."  (citation omitted)); *see also Indianapolis Downs*, 486 B.R. at 298 (listing similar factors).

the fact that the Plan Sponsor has agreed to provide an approximate $9.45 billion equity infusion into Reorganized EFH in connection with the Merger, future Oncor financial projections further demonstrate that the EFH/EFIH Debtors will be able to satisfy all of their obligations under the Plan.[94]

83.    Second, and for the avoidance of doubt, if the NEE Termination Fee becomes an Allowed Claim, such Allowed Claim will be satisfied only from the NEE Plan Reserve.  None of the Reorganized EFH Debtors, Reorganized EFIH Debtors, nor the Plan Sponsor (or any of its related entities) will bear any liability with respect to such Allowed Claim.  Therefore, the potential for such significant Claims becoming Allowed is irrelevant to an analysis of whether Reorganized EFH and Reorganized EFIH will be financially sound and, thus, to the feasibility of the Plan.

84.    Finally, Sempra, the ultimate parent of Reorganized EFH and Reorganized EFIH, has strong investment-grade credit ratings from multiple ratings agencies.[95]  With an enterprise value of over $49 billion, Sempra is well-positioned—and, given its over $9.45 billion in equity investment, well-incentivized—to manage Reorganized EFH as a going-concern.  Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.    The Plan Provides For the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

85.    The Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[96]  The Plan includes an express provision requiring payment of all fees under

---

[94]    *See* EFH Disclosure Statement, at Exhibit D.

[95]    *See* Ex. F, Sept. 30, 2017 Sempra Energy Consolidated, SEC Form 10-Q, at 102, 108.

[96]    11 U.S.C. § 1129(a)(12).

28 U.S.C. § 1930.[97]   The Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

### M.    The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.

86.    The Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[98]   "Retiree benefits" is defined under section 1114(a) of the Bankruptcy Code as medical benefits.[99] Article IV.O of the Plan provides that on and after the EFH Effective Date, the payment of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will continue in accordance with applicable law.  Accordingly, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code, and no party has asserted otherwise.

### N.    Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.

87.    A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan, and no party has asserted otherwise.  Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan because the EFH/EFIH Debtors are not subject to any domestic support obligations.[100]   Section 1129(a)(15) is inapplicable because no EFH Debtor or EFIH Debtor is an "individual" as defined in the Bankruptcy Code.[101]   Section 1129(a)(16) is inapplicable because

---

[97]    Plan, Art. XII.C.

[98]    11 U.S.C. § 1129(a)(13).

[99]    Section 1114(a) defines "retiree benefits" as: " . . . payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." 11 U.S.C. § 1114(e) (emphasis added).

[100]    *See* 11 U.S.C. § 1129(a)(14).

[101]    *See id.* § 1129(a)(15).

the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[102]

### O. The Waiver of the 14-Day Stay Period is Appropriate.

88. Pursuant to the proposed Confirmation Order, the EFH/EFIH Debtors are requesting a waiver of the 14-day period provided under Rule 3020(e). Every day EFIH is in chapter 11, the EFIH Debtors incur nearly a million in interest burn under the EFIH First Lien DIP Facility and EFIH Second Lien Notes, collectively—a 14-day period translates to $14 million in leaked value that would have otherwise gone to EFIH unsecured creditors. Moreover, given (a) the likelihood that the PUCT considers approval of the fully consensual PUCT Application at the open meeting on March 8, 2018, and (b) the extraordinarily low likelihood that any party will successfully post the nearly $10 billion bond that would be necessary to stay the effectiveness of the Confirmation Order, there is no reason to further delay closing of the Merger and chapter 11 emergence. The EFH/EFIH Debtors should be permitted to close and declare the EFH Effective Date if and as soon as PUCT approval is obtained.

### P. The Plan Complies with Section 1129(b) of the Bankruptcy Code.

89. Section 1129(b)(1) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in section 1129(b) are satisfied.[103] To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not

---

[102]   *See id.* § 1129(a)(16).

[103]   *See* 11 U.S.C. § 1129(b).

"discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[104]

> ### i.    The Plan Does Not Unfairly Discriminate with Respect to Impaired Classes that have not Voted to Accept the Plan (Section 1129(b)(1)).

90.    All of the Impaired Classes of Claims entitled to vote on the Plan have voted in favor of the Plan.  However, Classes A13, A15, B8, and B10 are deemed to have rejected the Plan (collectively, the "Dissenting Classes").  Notwithstanding that the Plan has not been accepted by all Impaired Classes, *no party has objected on the basis that the Plan "discriminates unfairly."*

91.    The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.[105]  Rather, courts typically examine the facts and circumstances of the particular case to determine whether a plan discriminates unfairly.[106]  Generally, courts have held that a plan is unfairly discriminatory in violation of section 1129(b) only if an impaired non-accepting class receives value that is materially inferior to that received by a class entitled to equal priority, absent a reasonable justification.[107]  "The appropriate inquiry focuses on discrimination among categories of creditors who hold similar legal claims against the debtor,

---

[104]    *See* 11 U.S.C. § 1129(b)(1); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'").

[105]    *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established").

[106]    *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis …"); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[107]    *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654 (9th Cir. 1997); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000) (noting that one of the "the hallmarks of the various tests" is "whether there is a reasonable basis for the discrimination…."); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

*i.e.* 'Administrative Claims,' 'Secured Claims,' 'Priority Claims,' etc."[108]  A plan does not unfairly discriminate where it provides different treatment to classes that hold dissimilar claims or interests.[109]  Likewise, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for the disparate treatment.[110]  The unfair discrimination requirement, which involves a comparison of classes, is distinct from the equal treatment requirement of section 1123(a)(4), which involves a comparison of the treatment of claims within a particular class.

92.     The Plan does not unfairly discriminate against the Dissenting Classes because all similarly situated holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.

93.     The Dissenting Classes, each of which was deemed to reject the Plan, consist entirely of inter-Debtor Claims or Interests in EFH or EFIH.  Importantly, the treatment of each such Class is largely consensual:  the Holder of each applicable Claim or Interest in such Classes is either an EFH Debtor or an EFIH Debtor, or, with respect to the Holders of Class A15 Claims, party to the Hunt PSA approved by the Bankruptcy Court in September 2015.  In addition, Classes A15 and B10 consist of equity interests, which are not similarly situated—legally or otherwise—to any other Class.  Therefore, the Plan does not discriminate unfairly with respect to the Dissenting Classes.

---

[108]  *See Corestates Bank, N.A. v. United Chemical Technologies, Inc.*, 202 B.R. 33, 47 (E.D. Pa. 1996); *see also In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 495 (Bankr. S.D. Ohio 2011).

[109]  *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[110]  *Aztec Co.*, 107 B.R. at 590.

### ii.    The Plan Is Fair and Equitable.

94.    The Plan is fair and equitable with respect to all Classes that are deemed to reject the Plan.  For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority" rule, which prohibits a junior creditor or equity holder from receiving recovery on account of its junior claims or interests until all senior creditors have received a full recovery on account of their senior claims.[111]

95.    Classes A15 and B10 are the most junior Classes at their respective silos and claims in more senior Classes are not being paid in full. Therefore, the absolute priority rule is satisfied as to such Classes.  As to Classes A13 and B8, the only Classes of Claims junior to these Classes that may receive any recovery under the Plan are Class A14 (Interests in EFH Debtors Other than EFH Corp.) and Class B9 (Interests in EFIH).  But to the extent these Classes receive any recovery at all, it is simply to maintain the EFH/EFIH Debtors' prepetition organizational structure for the administrative benefit of the Reorganized Debtors and has no economic substance.  Courts have recognized that such technical preservations for the purpose of corporate formalities do not violate the absolute priority rule.[112]  Accordingly, the Plan is "fair

---

[111]    11 U.S.C. § 1129(b)(2)(B)(ii); 11 U.S.C. § 1129(b)(2)(C)(ii); *see also 203 N. LaSalle*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).   That latter condition is the core of what is known as the 'absolute priority rule.'") *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 463 (2d Cir. 2007) ("This provision codifies the judge-made 'absolute priority rule,' which provided that any plan of reorganization in which 'stockholders [a]re preferred before the creditor, [is] invalid.'" (quoting *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005))).

[112]    *See In re ION Media Networks, Inc.*, 419 B.R. 585, 661 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.

### Q.   The Plan Complies with Sections 1129(c)-(e) of the Bankruptcy Code.

96.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.   Section 1129(c), prohibiting confirmation of multiple plans, is not implicated because there is only one proposed plan of reorganization.[113]

97.    The Plan also complies with section 1129(d) because the primary purpose of the Plan is not to avoid taxes or securities laws.  The primary purpose of the Plan is to restructure the EFH/EFIH Debtors' balance sheets by shedding tens of billions of dollars of funded debt through the execution of certain tax-efficient structures made possible by the Internal Revenue Code and the Private Letter Ruling.[114]

98.    Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the EFH/EFIH Debtors' chapter 11 cases is a "small business case."[115]  Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

## II.   The Discretionary Contents of the Plan Are Appropriate.

99.    The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent

---

[113]   11 U.S.C. § 1129(c).

[114]   *See, e.g.*, *In re 300 Washington St. LLC*, 528 B.R. 534, 554 (Bankr. E.D.N.Y. 2015) ("A debtor may still benefit from avoidance of tax liabilities through its plan, provided that this is not the plan's primary purpose."); *In re Rath Packing Co.*, 55 B.R. 528, 536 (Bankr. N.D. Iowa 1985) ("[T]he Court holds 'the principal purpose' should be strictly construed and essentially means 'most important.'").

[115]   11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,566,050[] (excluding debt owed to 1 or more affiliates or insiders)."  *Id.* § 101(51D)(B).

with the applicable provisions of this title."[116]  For the reasons discussed below, the Bankruptcy

Court should approve the Plan Releases and the other discretionary provisions of the Plan.

### A.    The Debtor Releases in the Plan Are Appropriate.

100.    Courts in Delaware and elsewhere generally analyze five factors when

determining whether a debtor's release of non-debtors is appropriate, commonly known as the

*Zenith* or *Master Mortgage* factors.  The analysis includes an inquiry into whether there is:

"(1) an identity of interest between the debtor and non-debtor such that a suit against the non-

debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-

debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of

the plan and release by creditors and interest holders; and (5) the payment of all or substantially

all of the claims of the creditors and interest holders under the plan."[117]  These factors are

"neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in

determining fairness of a debtor's releases.[118]

101.    Here, the Bankruptcy Court's findings in connection with the Settlement

Agreement and the TCEH Confirmation Order are informative.  All of the alleged legacy

litigation claims arose prepetition, in connection with the EFH/EFIH Debtors' 2007 LBO, as

well as its predecessor and successor transactions, including various Liability Management

Program transactions.  The temporal scope of the postpetition claims that are covered by the

releases—up to the EFH Effective Date rather than up to the earlier Settlement Agreement

effective date—is therefore immaterial.

---

[116]  *Id.* § 1123(b)(1)-(6).

[117]  *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) and *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)).

[118]  *Id.* (citing *Master Mortg.*, 168 B.R. at 935).

102.    An analysis of the *Master Mortgage* factors demonstrates that the releases of the

Prepetition Sponsors and the EFH/EFIH Debtors' directors and officers should be approved.

a.    ***First***, an identity of interest exists between the EFH Debtors and the Prepetition Sponsors as well as the EFH Debtors and the EFH Debtors' directors and officers because the EFH Debtors are required to indemnify each of the Sponsors and the directors and officers for any liability they incur as a result of any claims brought against the Prepetition Sponsors.[119]

b.    ***Second***, the Prepetition Sponsors and directors and officers have made substantial contributions to the Plan.  The Prepetition Sponsors consented to the allowance of the $700 million TCEH Settlement Claim, which primes their equity interests, and they transferred their residual equity interests to the TCEH unsecured creditors in the event of any topping bid.[120]  Beyond all this, the Prepetition Sponsors and the directors and officers have also made significant non-monetary contributions to this restructuring, including their participation in 141 board of directors and committee meetings in 2015, 2016, and 2017.[121]

c.    ***Third***, the releases are essential to the Plan because they allow the EFH/EFIH Debtors to move forward with the restructuring without tackling lengthy and complex litigation against the EFH/EFIH Debtors' directors and officers.[122]

d.    ***Fourth***, the Plan Releases have substantial support of the creditors entitled to vote on the Plan.

---

[119]    *See id.* at 347 (holding that an identity of interest existed between the directors/officers and the debtors where the debtors had to indemnify directors/officers for claims asserted against them); *Charter Commc'ns*, 419 B.R. at 259 (holding that "[t]he indemnification obligations between the Debtors and their directors, officers, agents, and professionals produce an identity of interest"); *Master Mortg.*, 168 B.R. at 935 (noting that the identity of interest is "usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor").

[120]    Even if the excess value at EFH Corp. is not ultimately realized, forgoing the *right* to this potential recovery was critical to enabling the global settlement that is integral to the Plan as it applies to the TCEH Debtors and EFH Shared Services Debtors.  *See In re Blitz U.S.A., Inc.*, Nos. 2007, 2008, 2005 & 2014, 2014 WL 2582976, at *4 (Bankr. D. Del. Jan. 30, 2014) (holding that consideration provided by Wal-Mart constitutes a substantial contribution where part of the consideration included agreement to relinquish valuable insurance rights).

[121]    *See In re Exide Techs.*, 303 B.R. 48, 74 n.37 (Bankr. D. Del. 2003) (declining to hold that "the price of a release of officers, directors and others must always involve the contribution of tangible 'assets' or that efforts alone of officers and directors are never sufficient to warrant such a release.").

[122]    *See In re Key3Media Grp., Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005); *see Wash. Mut.*, 442 B.R. at 347 (holding the releases were reasonable because in light "of the complex and interrelated claims that the Debtors, JPMC and the FDIC have to virtually every asset in the Debtors' estates, it is hard to imagine what plan the Debtors could propose without the resolution of those claims first").

Accordingly, the Bankruptcy Court should approve the Debtor Releases, and no party has asserted otherwise.

### B.  The Third-Party Releases in the Plan are Appropriate.

103.  The Third Circuit has identified the factors necessary to approve nonconsensual third-party releases.  Specifically, the Third Circuit has explained that the "hallmarks" of permissible nonconsensual third-party releases would be "fairness, necessity to the reorganization, and specific factual findings to support these conclusions."[123]  In so holding, the Third Circuit recognized that there was a split in the Circuits regarding the permissibility of nonconsensual third-party releases and that given such a divide, the Third Circuit would review nonconsensual third-party releases on a case-by-case basis.[124]  Delaware courts that have subsequently ruled on this issue have looked at, among other things, whether (a) the releasee has provided critical contribution to the debtor's plan and (b) whether the release is fair to the nonconsenting creditors (*i.e.*, whether the nonconsenting creditor was compensated for their contributions).[125]  Further, interested parties have received sufficient notice of the releases.[126]

104.  Here, the factors identified by the Third Circuit counsel in favor of the nonconsensual third-party releases in the Plan.  Most importantly, no Class has voted to reject the Plan and no party objects to the proposed releases.

---

[123]  *In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000).

[124]  *Id.* at 212.

[125]  *See In re Spansion, Inc.*, 426 B.R. 114, 145 (Bankr. D. Del. 2010) (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001) (describing the factual conclusions that may support nonconsensual third-party releases).

[126]  In both the Plan and EFH Disclosure Statement, the releases (as well as the injunction enforcing the releases) were conspicuously set off in **bold** font.  Moreover, in soliciting votes on the Plan, the EFH/EFIH Debtors sent ballots to all impaired stakeholders unambiguously providing in **bold** or all capital letters that stakeholders could vote for or against the Plan or abstain from voting and opt out of the third-party releases contained in the Plan.

## C.    The Plan's Exculpation Provisions Are Appropriate.

105.    Exculpation provisions that apply only to estate fiduciaries, and are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[127]    Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the EFH/EFIH Debtors' restructuring.[128]

106.    Here, the Plan's definition of Exculpated Parties includes the following estate fiduciaries:

> (a) the EFH/EFIH Debtors; (b) the Committees and each of their respective members; and (c) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.[129]

107.    The Exculpated Parties have participated in good faith in formulating and negotiating the Plan, and they should be entitled to protection from exposure to any lawsuits filed

---

[127]    *See Wash. Mut.*, 442 B.R. at 350-51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

[128]    *See PWS Holding*, 228 F.3d at 245 (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion, Inc.*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. Apr. 16, 2010) (same).

[129]    Plan, Art. I.A.199.

by disgruntled creditors or other unsatisfied parties.  ***Indeed, no party has objected to the proposed exculpations set forth in the Plan***.

108.    Moreover, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Bankruptcy Court must reach in confirming the Plan.

109.    ***First***, as discussed above, this Court must find, under section 1129(a)(2), that the EFH/EFIH Debtors have complied with the applicable provisions of the Bankruptcy Code. Additionally, this Court must find, under section 1129(a)(3), that the plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the EFH/EFIH Debtors and, by extension, to the EFH/EFIH Debtors' officers, directors, employees, and professionals.  Further, these findings imply that the Plan was negotiated at arm's length and in good faith.  Here, as discussed above, the EFH/EFIH Debtors and their officers, directors, and professionals actively negotiated with holders of claims and interests across the EFH/EFIH Debtors' capital structure throughout these chapter 11 cases.  Accordingly, the Bankruptcy Court's findings of good faith vis-à-vis the EFH/EFIH Debtors' chapter 11 cases should also extend to the Exculpated Parties.

110.    ***Second***, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan that has paved the way for a successful reorganization of the EFH/EFIH Debtors, and likely would not have been so inclined to participate in the plan process without the promise of exculpation. Exculpation for parties participating in the plan process is appropriate where plan negotiations

could not have occurred without protection from liability.[130]  In addition, it is well established that the liability of statutory committees and their professionals under section 1103 of the Bankruptcy Code is limited to acts of gross negligence and willful misconduct, making their inclusion as Exculpated Parties entirely appropriate.[131]

111.    The EFH/EFIH Debtors therefore request that this Court approve the Plan's exculpation provisions with respect to such EFH/EFIH Debtors and adopt the appropriate standard of liability for the Exculpated Parties with respect to the EFH/EFIH Debtors' chapter 11 cases.

### D.    The Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained In the Plan.

112.    The Plan's injunction provision simply provides the enforcement mechanism for the releases and exculpation provisions of the Plan.  This injunction generally provides that all entities are permanently enjoined from prosecuting or otherwise pursuing claims released or exculpated under the Plan.[132]   The Plan's release and exculpation provisions would be substantially weakened without the injunction provision.  Moreover, the injunction provided in the Plan is consistent with other injunctions approved in this district.

---

[130]    *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[131]    *See PWS Holding*, 228 F.3d at 246-47 (holding that the appropriate standard of liability under section 1103 is "willful misconduct or *ultra vires* acts," and approving an exculpation of the creditors committee and its professionals subject only to liability for willful misconduct or gross negligence).

[132]    The Plan's injunction provision applies to the discharge of claims against and interests in the EFH/EFIH Debtors.  *See* Plan, Art. VIII.F.

III.    **The Bankruptcy Court Should Overrule the Objections to the Plan.**

A.    **The NEE Objection: The NEE Plan Reserve Resolves NEE's Section 1123 and Section 1129 Plan Confirmation Objections But Raises Non-Confirmation Issues Ripe for Contemporaneous Adjudication**.

i.    **The Maximum Amount of NEE's Allowed Claim Under the Plan, the NEE Merger Agreement, and Applicable Case Law is Exactly What is in the NEE Plan Reserve: $275 Million**.

113.    Notwithstanding the fact that the EFH/EFIH Debtors would be well within their rights to seek (and obtain) a finding in connection with Plan confirmation that the NEE Termination Fee should be estimated at zero,[133] the EFH/EFIH Debtors recognize the risk that NEE faces in the event the NEE Termination Fee is ultimately deemed an Allowed Claim and it is required to pursue "clawbacks" of Plan distributions to recover on account of such Claim. Thus, the EFH/EFIH Debtors are prepared to escrow the maximum amount ($275 million) to which NEE could ever be entitled under the NEE Merger Agreement.

114.    Nothing in the NEE Objection, the Plan, the NEE Merger Agreement, or applicable case law support a scenario in which NEE could ever recover more than $275 million on account of the NEE Termination Fee. NEE correctly points out that the Plan provides that all Allowed Administrative Claims will be satisfied in full, in Cash. This, in turn, requires an

---

[133]    Section 502(c) of the Bankruptcy Code provides that the court shall estimate, for purposes of allowance, "any contingent or unliquidated claim, the fixing or liquidation of which . . . would unduly delay the administration of the case." 11 U.S.C. § 502(c). In applying section 502(c) of the Bankruptcy Court, a decision in this Circuit, *In re Innovasystems, Inc.*, 2014 WL 7235527 (Bankr. D. N.J. 2014) provides guidance. There, the claimant argued in favor of estimating its claim at an amount greater than $0 because it intended to pursue another appeal in which it might prevail (after being denied relief during the first appellate process). Endorsing an "all or nothing" approach to claims estimation (*i.e.*, estimating a claim at either the full asserted amount or at $0), the court held that because the claimant had already been denied relief in previous adjudication, its intention to pursue another avenue of appeal did not give rise to a likelihood of success. Therefore, the court estimated the contingent claims at $0. Additionally, the Third Circuit has rejected efforts to estimate contingent claims at an amount that is such claim's present value multiplied by their probability of success upon full adjudication (*e.g.*, where a contingent claim has a 40% probability of success, discounting such claim for distribution purposes by 60%). *See, e.g., Bittner v. Borne Chem. Co.*, 691 F.2d 134 (3d Cir. 1982) (affirming the bankruptcy court's decision to employ an "all or nothing" method instead of a risk-adjusted method on the basis that the latter method could unfairly subject creditors with liquidated claims to the interests of claimants who are more likely than not to ultimately be denied relief).

analysis of how much could ever become Allowed on account of the NEE Termination Fee Claim.  The principal amount of the NEE Termination Fee is $275 million.  The only scenario in which NEE could be entitled to any amounts in addition to the $275 million is if it was entitled to either (a) any kind of interest (whether postpetition, post-EFH Effective Date, or post-Final Order) in addition to the principal amount or (b) some form of damages related to delays in distribution if it does not receive a Plan distribution upon entry of a Final Order resolving the NEE Proceedings in its favor.  As an initial matter, ***at no point has NEE ever asserted that it is entitled to any kind of interest, whether postpetition, post-EFH Effective Date, or post-Final Order, in addition to the NEE Termination Fee***.  Putting that aside, there is no basis in the Plan, the NEE Merger Agreement, or applicable case law for either interest or damages.

115.    *First*, nothing in the Plan provides that Administrative Claims are entitled to any kind of interest for the period between the date such Claims become due and the date they are paid.  *Second*, the NEE Merger Agreement itself provides that the NEE Termination Fee will be $275 million—no additional amounts for interest, no expenses in addition to the $275 million, simply $275 million.  *Third*, the Bankruptcy Code and the case law do not support giving NEE that which it did not negotiate for itself in the NEE Merger Agreement.  In *In re Am. Int'l Airways, Inc.*, the court held that (a) the right of an administrative claimant to interest is not specifically provided for anywhere in 11 U.S.C. § 503(b)(1) and (b) if the authority to award interest is not specifically provided for in the Bankruptcy Code, then the court should not insert it into the specific Claim.[134]    The court noted that there is an exception to this general rule—if the

---

[134]    77 B.R. 490, 493-94 (Bankr. E.D. Pa. 1987).

underlying contract contemplates interest as part of the administrative claim.[135]   Here, the

exception does not trump the general rule given that NEE (an extremely sophisticated party) did

not negotiate for postpetition, post-EFH Effective Date, or post-Final Order interest.

116.    ***Fourth***, there is no possible scenario in which NEE suffers "damages" related to

the NEE Termination Fee.  Either there is a Final Order resolving the NEE Proceedings in NEE's

favor—in which case NEE will promptly receive the $275 million for which it bargained and to

which it would be entitled under the Plan—or there is a Final Order resolving the NEE

Proceedings against NEE—in which case it has no Claim on the NEE Termination Fee under the

Plan.

ii.     **The NEE Plan Reserve Eliminates NEE's Section 1123 and Section 1129 Plan Objections**.

117.    Having not asserted any other Claim other than the NEE Termination Fee, and

given (a) the EFH/EFIH Debtors' willingness to provide the NEE Plan Reserve and (b) the

guidance provided by the applicable case law, the language of the NEE Merger Agreement, and

the Plan regarding the maximum amount of the NEE Termination Fee, the NEE Plan Reserve

***fully resolves all section 1123 and section 1129 issues raised by NEE's Objection***.

118.    But, in the spirit of "for every action, there is an equal and opposite reaction,"

NEE's insistence that the NEE Plan Reserve come with "no strings attached"—allowing NEE to

freely, and without risk, pursue a Final Order in its favor in connection with the NEE

Proceedings—in turn harm Holders of Allowed Unsecured Claims by depriving them of their

Plan distributions.  This is where the NEE Undertaking Provision—*i.e.*, compensation from NEE

to the Holders of Allowed Unsecured Claims in the event of, and at the time of, entry of a Final

---

[135]   *Id*. at 495 ("We also believe that, in certain extraordinary circumstances, interest can be included as part of an administrative claim. A debtor's agreement to pay such interest, in a post-petition contract, as we indicated below, constitutes, in our view, such an instance.").

Order resolving the NEE Proceedings against NEE—comes into play. As described below, because the NEE Undertaking Provision contemplates funding from a non-Debtor party (NEE) to compensate Holders from injury suffered as a result of such non-Debtor party's actions, the NEE Undertaking Provision does not implicate section 1123, section 1129, or the ability of the EFH/EFIH Debtors to consummate the Merger.[136]

### iii. The NEE Plan Reserve Functions a Stay of Plan Distributions.

#### a. The Plan Prohibitions on <u>The Debtors</u> Paying <u>Interest</u> on Allowed Unsecured Claims Do Not Foreclose the Right of Such Holders To Obtain <u>Damages</u> from <u>Third-Parties</u> for Injuries Attributable to Such Third-Parties.

119.    NextEra's reliance on Article VI.A of the Plan as an argument against the NEE Undertaking Provision is misplaced.

120.    That section provides:

> Except as otherwise provided in the Plan (including with respect to the Allowed EFIH First Lien Claims and Allowed EFIH Second Lien Claims) Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the EFH Effective Date.

Plan, Art. VI.A (Timing and Calculation of Amounts to Be Distributed)

121.    Article VI.A merely provides that the **_EFH/EFIH Debtors_** may not provide unsecured creditors with **_interest_** for opportunity cost that results from the **_pendency_** of the bankruptcy cases. Misconstruing the plain language, NextEra advocates for a reading that bars **_third parties_** from compensating unsecured creditors with **_damages_** that result from delays in **_post-effective date distributions_**. In other words, Article VI.A of the Plan restrains the EFH/EFIH Debtors from using estate assets to increase the Plan distribution to Holders of

---

[136]    For the avoidance of doubt, there are no conditions precedent to consummation in the Merger Agreement or the Plan that are implicated by the NEE Undertaking Provision.

Allowed Unsecured Claims.  It has no bearing or relevance on the rights of such Holders to pursue non-Debtor third-parties for damages.  Indeed, the very same argument would allow NEE to pursue damages against such Holders if, in the absence of the NEE Plan Reserve, NEE was forced to "clawback" Plan distributions following entry of a Final Order resolving the NEE Proceedings in its favor.[137]  Thus, given that the Plan does not prohibit Claim Holders from pursuing or receiving damages from non-Debtor third parties, the question becomes whether such Holders are indeed entitled to damages under the present circumstances.

> **b.**    **A Party Seeking to Stay Plan Distributions to Allowed Claim Holders Pending an Appeal Must Post a Bond to Compensate Holders for the Opportunity Costs Created By the Delay.**

122.    NEE's demand for the NEE Plan Reserve effectively revisits the Bankruptcy Court's order on December 11, 2017 [D.I. 12327], denying a stay of the Reconsideration Order. In declining to grant a stay to NEE, this Court observed that it "comes down to whether money will flee the estate before they have an opportunity to have their appellate rights fully litigated on the merits of the appeal" and that, given that the Sempra Merger transaction was still pending before the PUCT on a then-unknown timeline, the question was "simply premature" as "a plan stands between NextEra and harm."[138]  This Court concluded that the $275 million at issue is "not going anywhere until confirmation so I don't think there is immediate irreparable harm risk at this time" and that the parties "can deal with these issues and will deal with these issues fully at the time of confirmation of a plan."[139]

---

[137]    NextEra's reliance on Article VI.A's language that "regardless of whether such distributions are delivered on or at any time after the EFH Effective Date" similarly misplaced.  That language is intended to capture situations where a disputed Claim does not become Allowed until after the EFH Effective Date.

[138]    Ex. D, 12/11/17 Hr'g Tr. at 48:2-7, 49:4, 49:13.

[139]    *Id.* at 50:1-5.

123.    Having now arrived at confirmation, the EFH/EFIH Debtors are providing for the NEE Plan Reserve.  The EFH/EFIH Debtors are not, however, prepared to ***absolve NEE of the injury that its pursuit of its disallowed Claim imposes on Holders of currently Allowed Claims and no involvement in the NEE Proceedings***.  Rule 62(d) of the Federal Rules of Civil Procedure provides that "[i]f an appeal is taken, the appellant may obtain a stay by supersedeas bond," except in limited circumstances not applicable here.[140]  The rule is clearly written—the path to obtaining a stay is through a bond.[141]

124.    The protection of a supersedeas bond is necessary to compensate for the stay of distributions that could otherwise be made—holders of allowed claims have a "justified expectation" of receiving timely distributions and must be compensated when those expectations are thwarted.[142]  This is because "interfering" with distributions is a "serious business" that effects an "obvious injury" that prejudices the waiting Holders of Allowed Claims.[143]  A party that seeks to prevent otherwise-ready distributions from being paid deprives recipients of the ability to invest those distributions in pursuit of profit and, instead, confines the funds in an

---

[140]    The limited exceptions are a judgment in an action for injunction or receivership or related to patent infringement.  Fed. R. Civ. P. 62(a).

[141]    Courts in this jurisdiction and others routinely reference Rule 62(d) in "analyzing whether to order movants to post a bond in support of a stay pending an appeal of a bankruptcy court order."  *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 350 (S.D.N.Y. 2007).

[142]    *In re Motors Liquidation Co.*, 539 B.R. 676, 683 (Bankr. S.D.N.Y. 2015); *see also In re Tribune Co.*, 477 B.R. 465, 480-81 (Bankr. D. Del. 2012) (Carey, J.) (requiring $1.5 billion supersedeas bond and noting need to balance against the "grave harm to thousands of parties who have been waiting . . . to obtain sizeable distributions from a group of bankrupt estates") (quoting *ACC Bondholder Group v. Adelphia Commc'n Corp. (In re Adelphia Commc'n Corp.),* 361 B.R. 337, 367-68 (S.D.N.Y. 2007)); *In re Chemtura Corp.*, 2010 WL 4638898, at *8 (Bankr. S.D.N.Y. 2010) ("The public interest . . . recognizes the desirability of implementing the legitimate expectations of creditors . . . to get paid"); *In re Texas Equip. Co., Inc.*, 283 B.R. 222 (Bankr. N.D. Tex. 2002) (stating that a supersedeas bond should include damages for delay); *see also In re Tribune Media Co.*, 799 F.3d 272, 281 (3d Cir. 2015) ("The purpose of requiring such a 'bond in a bankruptcy court is to indemnify the party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court.'") (quoting *In re Theatre Holding Corp.,* 22 B.R. 884, 885 (Bankr. S.D.N.Y. 1982)).

[143]    *Motors Liquidation*, 539 B.R. at 683–84.

account that is subject to the restrictions of section 345 of the Bankruptcy Code, which necessarily limits potential yield.[144]   A stay of distributions thus creates significant opportunity costs for Holders of Allowed Claims, which Courts routinely recompense through the imposition of a bond while preserving another claimant's right to appeal.[145]

125.    Judge Gerber's decision in *Motors Liquidation* is particularly instructive due to the similarities to the present situation:

- **There, as here, the appellant had made and lost its argument not in connection with confirmation, but the earlier order nonetheless implicated the timing of otherwise ready distributions:**

  o    **There, as here, the stayed order effectively disallowed the parties' claims.**   In *Motors Liquidation*, the Ignition Switch Plaintiffs were barred from recovering against the GUC Trust unless they had timely filed a proof of claim or against New GM.[146]   Here, the Reconsideration Order denied NEE's motion for an administrative claim for the NEE Termination Fee, barring it from recovering against the cash on hand that will otherwise be distributed to Holders of General Unsecured Claims.

  o    **There, as here, the earlier order effectively disallowed claims.**   In *Motors Liquidation*, the GUC Trust intended to make an incremental $135 million distribution in mid-November 2015, approximately one month after the order granting the stay was entered.[147]   Here, the EFH/EFIH Debtors expect to be able to make initial distributions less than a month following entry of the EFH Confirmation Order.

---

[144]    *See Tribune*, 477 B.R. at 481.

[145]    *See, e.g.*, *Adelphia*, 361 B.R. at 342  (balancing the "substantial and important right" to appeal a lower court ruling against the risks to the estates and creditors posed by granting a stay pending appeal "*conditioned* upon the posting of a superedeas bond" (emphasis in original)); *Motors Liquidation*, 539 B.R. at 687–92 (considering opportunity costs resulting from delayed distributions when calculating the amount of a bond to be required); *Tribune*, 477 B.R. at 481 (same); *see also Chemtura*, at *9 ("[A] bond may sometimes be a practical alternative where the injury to the estate caused by delay is merely a matter of money, and, while serious, would not be irreparable.").

[146]    *See* Judgment, *In re Motors Liquidation Company*, No. 09-50026 (Bankr. S.D.N.Y. Jun. 1, 2015), ECF No. 13177; *see also* Decision on Motion to Enforce Sale Order, *In re Motors Liquidation Company*, No. 09-50026 (Bankr. S.D.N.Y. Apr. 15, 2015), ECF No. 13109.

[147]    *Motors Liquidation*, 539 B.R. at 680.

126.     Judge Gerber held that a bond was "necessary" because there "can be no serious dispute that GUC Trust Unitholders will be prejudiced by a delay in distributions when the underlying assets would continue to draw a 0.12% yield while the stay is in place, and those assets would generate much higher yields after receipt by their recipients."[148]  Noting that the posting of a bond is not strictly mandatory and is a matter within the court's discretion, Judge Gerber emphasized that "if the movant seeks the imposition of a stay without a bond, ***the applicant has the burden of demonstrating why the court should deviate from the ordinary full security requirement***."[149]   The District Court for the District of Delaware recognized this placement of the burden on the appellant in *In re W.R. Grace & Co.*[150]

127.     The EFH/EFIH Debtors submit that there is no reason to stray from the convention of protecting Holders of Allowed Claims and their justified expectation of receiving timely distributions.  This is particularly true here, where the EFH/EFIH Debtors propose a solution that is less imposing than the traditional bond.  That is, although courts require the security to be posted in the form of supersedeas bonds, the EFH/EFIH Debtors are not asking the Court to require NEE to post anything prior to entry of a Final Order that is adverse to NEE (provided that NEE remains investment grade).   Instead, as explained above, the NEE Undertaking Provision would require NEE to pay opportunity cost damages only upon entry of a Final Order against NEE in connection with the NEE Proceedings (or NEE would have to otherwise cash collateralize its undertaking upon a downgrade in NEE's credit rating that renders NEE not investment grade as measured by Standard & Poors' or Moody's).  This represents, in

---

[148]   *Motors Liquidation*, 539 B.R. at 686.

[149]   *Id*. (emphasis added).

[150]   475 B.R. 34, 209 (D. Del. 2012) ("It has been recognized that 'if the movant seeks the imposition of a stay without a bond, the applicant has the burden of demonstrating why the court should deviate from the ordinary full security requirement.'" (citing *In re Gen. Motors Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009))).

the EFH/EFIH Debtors' view, an extremely fair overture given that the typical requirement is for the movant to post a bond in the full amount **immediately**.[151]

> ### c. The Size of the NEE Undertaking Provision Must Adequately Reflect Holders' Opportunity Costs.

128.    Courts employ a relatively straightforward formula to determine an amount that adequately captures claimholders' opportunity costs:  the holders' anticipated rate of return in their investments, multiplied by the amount of distribution being delayed and the duration of that delay.[152]

129.    *Anticipated Rate of Return.*  In *Tribune*, Judge Carey accepted expert testimony that conservatively calculated the holders' anticipated rate of return based on an index "commonly used" to analyze the high yield market.[153]  In *Motors Liquidation*, Judge Gerber held that the anticipated rate of return "is a function of the particular yields that could be obtained on various types of alternate investments, and, if more than one type of investment were considered, the mix—and consequent weighting—of the investments that GUC Trust Unitholders might make."[154]  Taking into account the identity of the GUC Trust Unitholders (at least 47% were hedge funds), Judge Gerber identified four different types of investments that Unitholders might make with their distributions (hedge fund investments, equities, fixed income, or money market)

---

[151]  *See e.g.*, *Motors Liquidation*, 539 B.R. at 692.

[152]  *See Motors Liquidation*, 539 B.R. at 687–92 ("The yield that we should assume as the alternative yield that we could expect the universe of GUC Trust Beneficiaries to obtain if their distributions were not stayed is a function of (1) the duration of the time during which the distribution would be delayed if stayed, and (2) the yield on the alternative investments that could be made if the distribution could be made as planned."); *Tribune*, 477 B.R. at 481–82 (stating that any of the debtors' three proposals for determining the size of the bond could have been appropriate under the circumstances and choosing the most conservative approach that included calculations of opportunity cost, which was the proposal the debtors most vigorously pursued).

[153]  *Tribune*, 477 B.R. at 481.

[154]  *Motors Liquidation*, 539 B.R. at 687.

and the yields for each.[155]   In identifying such yields, the court fashioned a compromise, choosing a rate of return for three of the investment types that fell in between the rates the proposals generated.[156]   The court derived a blended anticipated rate of return by finding the weighted average of the rates of return for each investment.[157]   Notably, Judge Gerber refused to assume the GUC Trust could attain higher yields, noting that the GUC Trust's worry that it could trigger a requirement to comply with the Investment Company Act was "entirely reasonable."[158]

130.    ***Duration of Delay.***  In *Tribune*, Judge Carey relied on historical data compiled by the Administrative Office of the United States Courts that reflected a median time of 24.3 months from filing in lower court to Court of Appeals disposition, which was the only evidence with respect to the potential duration of delay presented by the parties.[159]   In *Motors Liquidation*, Judge Gerber analyzed the complexity of the issues to be evaluated on appeal, suggesting more intricacy weighs in favor of anticipating a longer duration.[160]

---

[155]   *Id.* at 689–90 (assuming that the 47% that were hedge funds would invest in hedge fund investments and the remaining 53% would invest in the four types of possible investments in equal numbers).

[156]   Finding that use of a straightforward 10-year mean would, by definition, understate results 50% of the time and create "too high a risk," but that a weighted average of the third-best year from the last ten years of annual investment returns for each asset class would cover 80% of all outcomes and, therefore, be "too aggressive," Judge Gerber adjusted a trimmed mean upward by one-third of the difference between the mean and the weighted average of the third-best year.  *Id.* at 689.

[157]   *Id.* at 691.

[158]   *Id.* at 688 n. 37.

[159]   *Tribune*, 477 B.R. at 479 n.15.

[160]   See *Motors Liquidation*, 539 B.R. at 687–88.

131.    The EFH/EFIH Debtors request that the Court adopt a similar approach in calculating the amount of the NEE Undertaking Provision.[161]  To aid the Court in its analysis, the EFH/EFIH Debtors will submit evidence identifying an appropriate rate of return.

>    iv.    **The Proposed Confirmation Order Provisions Implementing the NEE Plan Reserve.**

132.    Based on the foregoing, the EFH/EFIH Debtors are prepared to set forth the following language in the proposed Confirmation Order:

- **The NEE Plan Reserve.**  The EFH/EFIH Debtors agree to reserve $275 million in the NEE Plan Reserve, with the exact allocation of such reserve as between EFH and EFIH to be determined pursuant to separate Bankruptcy Court order (such order, which may also address the allocation of other Allowed Claims as between EFH and EFIH, the "Allocation Order");[162]

- **Release of the NEE Plan Reserve.**  Either (a) the NEE Plan Reserve will be released to the EFH/EFIH Cash Distribution Account (in a manner consistent with the Allocation Order) upon entry of a Final Order against NEE in connection with the NEE Proceedings or (b) the NEE Plan Reserve will be released to an account designated by NEE upon entry of a Final Order in favor of NEE in connection with the NEE Proceedings.  For the avoidance of doubt, none of the Reorganized EFH/EFIH Debtors, the Plan Sponsor and/or their affiliates shall have any liability or obligations with respect to the NEE Plan Reserve or NEE Termination Fee.

133.    The EFH/EFIH Debtors would propose that the NEE Undertaking Provision be set forth in a separate Bankruptcy Court order, given that the inclusion of such provision does not implicate Plan confirmation or the ability for the EFH/EFIH Debtors to consummate the Merger and achieve the EFH Effective Date.  In advance of the hearing to consider Plan confirmation, the EFH/EFIH Debtors anticipate filing a proposed form of order on the NEE

---

[161]    In a sign of the wisdom of these approaches, the Third Circuit referred to Judge Carey's analysis as "well-considered and as convincing as the alchemy of valuation in bankruptcy can be."  *In re Tribune Media Co.*, 799 F.3d 272, 282 (3d Cir. 2015).

[162]    Additional provisions regarding the Allocation Order will also be set forth in the proposed Confirmation Order.

Undertaking Provision (which form of order will ultimately reflect the Bankruptcy Court's rulings in connection with the NEE Objection and the issues raised herein).

> ### B. Allowing NEE to Pursue Additional, Amorphous Claims Against the Reorganized Debtors Threatens the Merger Transaction On the Brink of Consummation.

134.    NEE also argues that it should be permitted to retain the ability under the Confirmation Order to pursue Claims against the Reorganized Debtors. *First*, for all the reasons set forth above, the maximum amount NEE could ever be entitled to on account of the NEE Termination Fee is $275 million, which amount is being funded, in full, in Cash, into the NEE Plan Reserve. *Second*, under Section 7.1(e) of the Sempra Merger Agreement (which was approved by a Final Order of this Court), it is a condition to closing that all Administrative Claims, DIP Claims and other Claims (other than the Legacy General Unsecured Claims Against the EFH Debtors (as defined in the Plan), and certain property tax Claims secured by liens on real property), be discharged and not be obligations of the Reorganized EFH/EFIH Debtors, and that such Claims will be paid only from the Accessible Account Deposit (as defined in the Sempra Merger Agreement).   Sempra is not obligated to close the Merger if, pursuant to the Plan, the Reorganized Debtors could be liable for any Claims other than the two narrow categories, Legacy General Unsecured Claims Against the EFH Debtors, and certain property tax Claims secured by liens on real property.   The potential post-Effective Time exposure of the Reorganized Debtors to Claims was a critical negotiation point, and all parties (not just Sempra and the EFH/EFIH Debtors) believed that the Legacy General Unsecured Claims Against the EFH Debtors, if any, were the only material post-Effective Time exposure the Reorganized Debtors may face.   Here, NEE's demand that it be entitled, pursuant to the Confirmation Order, to retain its rights to pursue claims against the Reorganized Debtors falls into the category of

cutting off one's nose to spite one's face.  In an effort to protect itself under the Plan, NEE

endangers the consummation of the Plan itself.  The NEE Objection should be overruled.

### C.    The Bankruptcy Court Should Overrule the Asbestos Objectors' Objection and Joinder.

#### i.    The Plan Was Proposed In Good Faith.

135.    Ignoring the evidence and the Bankruptcy Court's prior rulings in these chapter

11 cases, the Asbestos Objectors once again accuse the EFH/EFIH Debtors of self-dealing and

continue to press their theme that there is "no valid reorganizational purpose for discharging"

unpreserved unmanifested asbestos claims.[163]  As the record shows, however, the EFH/EFIH

Debtors fought hard to achieve the value-maximizing results for the LSGT Debtors and their

creditors—full reinstatement of their intercompany claims and preserved asbestos claims, both

backed by a solvent Reorganized EFH Corp.[164]  To achieve these results, the EFH/EFIH Debtors,

among other things, (a) sought and obtained approval of the Asbestos Bar Date to better

understand the LSGT Debtors' potential asbestos liabilities and provide more certainty to

prospective bidders, (b) committed to full reinstatement of the LSGT Debtors' intercompany

claims and preserved asbestos claims in a settlement agreement with the Official Committee of

Unsecured Creditors of EFH Corp., EFIH, EFIH Finance, Inc., and EECI, Inc. (the "Official

Committee"), and (c) engaged in significant—and successful—negotiations with potential

purchasers to convince them to reinstate identified asbestos claims.

136.    It bears repeating that any other treatment of asbestos claims would have had dire

effects for all the EFH/EFIH Debtors' creditor constituencies, including asbestos claimants.

---

[163]    Asbestos Objectors' Obj. 28, 37-38.

[164]    *See Opinion* denying *Motion of Shirley Fenicle, David William Fahy, John H. Jones, and David Heinzmann to Dismiss Chapter 11 Petitions of Asbestos Debtors EECI, Inc., EEC Holding, Inc., LSGT Sacroc, Inc., and LSGT Gas Co. LLC Pursuant to 11 U.S.C. § 1112(b)* [D.I. 10414] (the "MTD Opinion") at 3.

First, there is no evidence that Sempra or any other bidder was ultimately willing to accept anything other than a discharge of unpreserved asbestos claims. And, any other treatment would have materially harmed the largely impaired EFH and EFIH creditors, likely rendering the EFH/EFIH Debtors' restructuring infeasible. For example, establishing a channeling injunction and trust under section 524(g) of the Bankruptcy Code would require funding. Yet, funding from the limited EFH cash on hand both would threaten administrative insolvency for EFH and would cap the available recoveries to the LSGT Debtors' creditors at amounts below the values of their intercompany claims. This is in addition to the enormous amount of additional time from such a process, which would deplete recoveries through the incurrence of additional professional fees and DIP interest. In contrast, reinstatement of the intercompany claims makes available maximum potential recoveries for asbestos claimants who took steps to preserve their claims.

137. Indeed, the only realistic alternative to the Plan's treatment of asbestos claims and the LSGT Debtors' intercompany claims is liquidation, which would be materially worse for all stakeholders. The Asbestos Objectors' good faith arguments rest on a critical, flawed premise— that the LSGT Debtors and their creditors could recover 100 cents for their claims in a non-reinstatement scenario. If discharged, asbestos claimants would likely share in the same pro rata recovery as general unsecured claims against EFH Corp. As this Court has ruled, "the inapplicability of the Asbestos Bar Date and this Court's [January 2015] Opinion, which the Asbestos [Objectors] did not appeal, [would come] at the expense of the holders of preserved asbestos claims against the LSGT Debtors - claimants who would receive a small fraction of what they could receive if LSGT Gas's intercompany claims against EFH Corp. are not

reinstated."[165]   In other words, the discharge of unmanifested asbestos claims of individuals who failed to file a proof of claim is necessary to protect recoveries for claimants who exercised their right to file claims against the LSGT Debtors (including certain Asbestos Objectors themselves).

138.    In short, the Asbestos Objectors' assertions—that the plan is proposed in bad faith and that the discharge of unpreserved asbestos claims lacks a valid reorganizational purpose— are unsupported by the facts and reality of the limited restructuring alternatives available to the EFH/EFIH Debtors after six years of restructuring efforts.

###   ii.    The Discharge of Unmanifested Asbestos Claims Does Not Violate Due Process.

139.    The Asbestos Objectors also argue that discharging the claims of unmanifested claimants who did not file proofs of claim violates due process.  This argument has been rejected repeatedly in the course of these chapter 11 proceedings, including (1) litigation related to establishing an asbestos bar date, (2) the unsuccessful motion to appoint a separate legal representative for unmanifested asbestos claimants, (3) the unsuccessful disclosure statement objection raised in connection with the Hunt Plan, (4) the unsuccessful objection raised in connection with the global settlement agreement, (5) the unsuccessful objection raised in connection with the hearing to confirm the Hunt plan, (6) the unsuccessful motion to file a class proof of claim on behalf of all unmanifested claimants, (7) the unsuccessful objection raised in connection with a request to delay consideration of the NEE Termination Fee and the NEE Plan Support Agreement, (8) the unsuccessful motion to dismiss the LSGT Debtors' chapter 11 cases for lack of good faith, and (9) the unsuccessful objection raised in connection with the hearing to confirm the NEE Plan.  In the context of Plan confirmation, the Asbestos Objectors' due process objection fails yet again.

---

[165]   *Id.* at 27 (citing *In re Energy Future Holdings Corp.*, 522 B.R. 520 (Bankr. D. Del. 2015)).

140.   In its 2015 published opinion—which no party appealed—this Court concluded that a discharge of unmanifested claims may be appropriate if an appropriate notice program is implemented.[166]   The Court specifically noted that under *In re Grossman's, Inc.*, 607 F.3d 114 (3d Cir. 2010), unmanifested claims "may be discharged on a case by case basis under the totality of the circumstances."[167]   In June 2015, after eight months of collaboration with the EFH Committee, the EFH/EFIH Debtors developed and obtained Court approval of a notice plan (the "Notice Plan"), which was ultimately successfully executed.[168]   The Court subsequently ruled on several occasions that the Notice Plan was "reasonably calculated to provide notice to unmanifested claimants," has rejected repeated collateral attacks on the Asbestos Bar Date and Notice Order, and should do so again here.[169]   Moreover, as the Court has also ruled, individual claimants may argue the Notice Plan was unconstitutional as applied to their claim.[170]

---

[166]   *In re Energy Future Holdings Corp.*, 522 B.R. 520, 527 (Bankr. D. Del. 2015).

[167]   *Id.* at 530.

[168]   *See* Ex. G, 8/11/15 Hr'g Tr. at 116:5-6 ("The E-side committee fought hard and long in connection with the details of the notice that went out."); *Order (A) Setting Bar Date for Filing Asbestos Proofs of Claim, (B) Approving the Form of and Manner for Filing Asbestos Proofs of Claim, and (C) Approving Notice Thereof* [D.I. 5171] (the "Asbestos Bar Date and Notice Order").

[169]   *See, e.g.,* Ex. H, 12/3/15 Hr'g Tr. at 57:16-22, 62:2-7; Ex. I, 9/19/16 Hr'g Tr. at 119:14-120:5; *Order Denying Motion of Charlotte Liberda and Curtis Liberda to Appoint Legal Representative* [D.I. 5265], (denying motion to appoint separate legal representation for unmanifested asbestos claimants); *Order (A) Approving the Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates, (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan, and (D) Approving the Manner and Forms of Notice and Other Related Documents* [D.I. 6131]; *Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9584]; Ex. J, 9/21/15 Hr.'g Tr. at 55:14-56:8; *Order Denying the Amended Motion for Application of Fed. R. Bankr. P. 7023 to this Proceeding and to Certify a Class Pursuant to FRCP Rule 23* [D.I. 7383]; Ex. K, 12/16/15 Hr'g Tr. at 83:11-21 (recognizing that to "certify[] a class solely for purposes of filing a proof of claim . . . would be in effect a collateral attack on what this Court has already done, which is set a bar date . . . and establish[] and approv[e] an elaborate noticing procedure that cost several million dollars designed to provide a notice as adequately as possible to as many possible claimants as possible.  None of those matters have been appealed, and they are final orders."); MTD Opinion at 27 ("The Court can only assume that this [motion to dismiss the LSGT Debtors' chapter 11 cases] is another collateral attack on the Asbestos Bar Date Order, which is a final non-appealable order.").

[170]   *See, e.g.,* Ex. I, 9/19/16 Hr'g Tr. at 119:23-120:3 ("[T]he rights of [unmanifested claimant] to come in and object to that discharge [on due process grounds] at a later date ***are fully preserved*.**" (emphasis added)).

Inexplicably, however, none of the Asbestos Objectors who failed to timely preserve their unmanifested asbestos claims has attempted to submit a late-filed proof of claim.   They have opted instead to attempt to derail the EFH/EFIH Debtors' enterprise-wide restructuring efforts by attacking wholesale the discharge of unpreserved unmanifested claims.

141.    As this Court has found on numerous occasions, the Unmanifested Claimants' due process rights are protected here.   In particular, (i) the fact that nearly 14,000 unmanifested proofs of claim were filed shows that Unmanifested Claimants are not incapable of receiving constitutionally adequate notice; (ii) the EFH Committee adequately represented the interests of Unmanifested Claimants in the Chapter 11 Cases; (iii) publication notice can suffice to provide notice to unknown claimants; and (iv) although *Mullane* provides the appropriate due process test here, the proposed discharge is also constitutional under *Connecticut v. Doehr*.

142.    ***First***, notice to the Unmanifested Claimants clearly was not impossible.   The Asbestos Objectors rely heavily on *Covey* to argue that constitutionally sufficient notice to Unmanifested Claimants is futile because Unmanifested Claimants are functionally incompetent.[171]   The record proves otherwise.   As part of the Notice Plan, which the EFH Committee helped craft, the EFH/EFIH Debtors identified and sent direct notice to over 70,000 known or likely asbestos claimants and provided extensive publication notice for those they could not directly reach.[172]   Even if the Unmanifested Claimants were unaware of their potential injuries, the notice announced: "**If you or a family member ever worked at a power plant, you could have been exposed to asbestos.   To keep your right to compensation if you**

---

[171]   Asbestos Objectors' Obj. 12-16.

[172]   *See Declaration of James Katchadurian in Support of Debtors' Objection to the Amended Motion for Application of Fed. R. Bankr. P. 7023 to this Proceedings and to Certify a Class Pursuant to FRCP 23* [D.I. 7292] ¶ 4.

become ill in the future (or have asbestos-related illness today), you **must** submit a claim by **December 14, 2015, at 5:00 p.m., prevailing Eastern Time.**"[173]    Thus, whether or not the Unmanifested Claimants may have known of their Unmanifested Claims prior to receiving the EFH/EFIH Debtors' notice, having received this notice, they should have become aware of their claims and the measures necessary to protect them.    The Notice Plan was successful: nearly 14,000 Unmanifested Claims were filed with the Court, including nearly 10,000 Unmanifested Claims—like Ms. Fenicle's own claim—against the EFH/EFIH Debtors.

143.    ***Second***, besides their misplaced reliance on *Covey*, Asbestos Objectors also cite to pre-*Grossman's* cases to argue that unmanifested claimants are "future claimants," who must be adequately represented throughout the bankruptcy process if their claims are to be resolved.[174] This is incorrect.    In *Grossman's*, the Third Circuit, sitting *en banc*, acknowledged that unmanifested claims could be discharged in bankruptcy, in accordance with due process.[175]    The *Grossman's* court drew a line between the claims of ***future*** claimants who had not yet been exposed to asbestos and the claims of ***unmanifested*** claimants who had already been exposed to the debtor's conduct or product, but had not yet manifested any injuries.    In drawing that distinction, the Third Circuit  overruled *Frenville* (which treated unmanifested claims as future claims, exempting them from bankruptcy discharge).[176]    Although the Asbestos Objectors continue to improperly conflate unmanifested claims and future claims, the law is clear, and the Plan concerns only the former.

---

[173]    *See* Asbestos Bar Date and Notice Order, at Exhibit 4 (Publication Notice) (emphasis in original).

[174]    Asbestos Objectors' Obj. 17, 21 (citing *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2014)).

[175]    *In re Grossman's*, 607 F.3d at 127-128.

[176]    *Id.* at 121.

144.    That said, the interests of unmanifested claimants were represented in these chapter 11 cases by the EFH Committee, who, among other things, (i) "fought hard" to craft a comprehensive Notice Plan designed to reach unmanifested claimants,[177] and (ii) secured a settlement requiring the EFH/EFIH Debtors to reinstate the LSGT Debtors' intercompany claims and preserved asbestos proofs of claim.[178]   As the Court has repeatedly ruled, no additional, separate representation was necessary.[179]

145.    *Third*, even if the EFH/EFIH Debtors failed to reach every single potential claimant directly, it does not follow that discharge of any Unmanifested Claims violates due process.   The standard for determining whether a discharge notice satisfies the due process rights of unknown claimants comes from the Supreme Court's decision in *Mullane* and its progeny. For decades courts have applied *Mullane* as the relevant test for due process before discharging the claims of unknown claimants in bankruptcy.   Those cases held that publication notice suffices so long as it is "reasonably calculated, under all the circumstances, to apprise [unknown claimants] of the pendency of the action and afford them an opportunity to present their objections."[180]   Here, as in *Mullane*, *In re Placid*, and *Chemtura*, the unknown Unmanifested Claimants received clear publication and other constructive notice.

---

[177]  Ex. G, 8/11/15 Hr'g Tr. at 116:5-6.

[178]  *Notice of Settlement Among Debtors, EFH Committee, EFH Notes Trustee, Plan Sponsors, Consenting TCEH First Lien Creditors, and TCEH Committee* [D.I. 7090-1], § 6.

[179]  *See, e.g. Order Denying Motion of Charlotte Liberda and Curtis Liberda to Appoint Legal Representative* [D.I. 5265] (denying motion to appoint separate legal representation for unmanifested asbestos claimants).

[180]  *Mullane v. Cent. Hanover Bank & Trust*, 339 U.S. 306, 314 (1950); *accord Chemetron Corp. v. Jones*, 72 F.3d 341, 348-49 (3d Cir. 1995) (applying *Mullane*'s "reasonably calculated" test and holding that publication notice of bar date was sufficient to satisfy the requirements of due process for unknown creditors); *Wright v. Owens Corning,* 679 F.3d 101, 107-08 (3d Cir. 2012) (applying *Mullane*); *In re Chemtura Corp.*, 505 B.R. 427, 430-31 (S.D.N.Y. 2015) (applying *Mullane* and holding that publication notice that informed unmanifested claimants of the existence and nature of their unmanifested claims provided sufficient process to allow for the subsequent discharge of those claims); *Williams v. Placid Oil Co. (In re Placid Oil Co.)*, 753 F.3d 151, 154-58 (5th Cir. 2014) (applying *Mullane* and holding that publication notice that did not even include asbestos-specific claim

146.    **Fourth**, the Asbestos Objectors' reliance on *Connecticut v. Doehr* is misplaced. Yet, even under *Doehr*'s balancing of interests, the Plan's discharge of unpreserved Unmanifested Claims is constitutional here for three reasons.[181]

147.    One, the interests that will be affected by the discharge in the Plan are a contingent interest—not all Unmanifested Claimants who did not preserve their claim will suffer an injury because only a portion of Unmanifested Claimants will ever manifest asbestos-related injury.  Those who do manifest and seek to bring a claim against the LSGT Debtors will have to show that they either preserved their claim or did not receive due process.

148.    Two, the Asbestos Objectors' argument that even "temporary or partial impairments to property rights" warrant due process protection misses the mark.[182]  If Unmanifested Claimants can show that they did not receive due process, then the Confirmation Order could not have discharged their claims.[183]  In other words, their claims will be deemed never to have been discharged by the Plan; thus, no deprivation will have occurred.  Further, the requirement that the Unmanifested Claimants make such a due process showing is not itself a "deprivation" of the underlying claim.  Therefore, the risk of erroneous deprivation is non-existent.

---

information was sufficient to discharge an unknown asbestos claimant's prepetition claims) ("We decline to articulate a new rule that would require more specific notice for unknown, potential asbestos claimants.").

[181]  *Doehr* applied a balance of interests test to determine the process due before pre-judgment attachment of property, requiring consideration of: (1) the private interest that will be affected by the prejudgment measure, (2) the risk of erroneous deprivation, and (3) the interest of the party seeking prejudgment remedy, "with due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections."  *Connecticut v. Doehr*, 501 U.S. 1, 11 (1991).

[182]  Asbestos Objectors' Obj. 20, 22 (citing *Doehr*, 501 U.S. at 12).

[183]  *See In re Grossman's*, 607 F.3d at 127-128.

149.    Three, strong legislative policy and the EFH/EFIH Debtors' substantial interests are at stake.  The Asbestos Objectors ignore the mandate under the Federal Rules of Bankruptcy Procedure that a bankruptcy court "shall" set a bar date for claims.[184]  The Asbestos Objectors also contend that, although "[i]n most reorganization cases, the goal of providing the debtors a fresh start weighs heavily in favor of discharging claims for which proofs of claims were not filed," the LSGT Debtors "are not seeking a discharge . . . to obtain a fresh start."[185]  Yet, the record shows that identifying and conducting diligence on the quantum of the LSGT Debtors' asbestos liabilities was an important factor in potential purchasers' decisions to take on those liabilities and agree to reinstate the intercompany claims that would satisfy those liabilities.  To upset the Plan's treatment of asbestos claims would jeopardize the enterprise-wide restructuring efforts and would be unfair to those asbestos claimants who *did* timely preserve their claims.

150.    In light of the statutory scheme, bankruptcy policy, and the interests of the EFH/EFIH Debtors and other parties in these proceedings, on the one hand, weighed against the ability of Unmanifested Claimants to bring an as-applied due process challenge if they someday manifest injuries, on the other, the Plan's proposed discharge of unpreserved unmanifested claims is constitutional.

**D.      The Requested 503(b) Findings are Appropriate, Narrowly-Tailored, and Subject to Fee Committee Review and Bankruptcy Court Approval.**

151.    The proposed Confirmation Order requests a finding that the EFH Notes Trustee and the Supporting Creditors (*i.e.*, those creditors party to the Sempra Plan Support Agreement) have made a substantial contribution to the EFH/EFIH Debtors' chapter 11 cases and, therefore,

---

[184]   Fed. R. Bankr. P. 3003(c).

[185]   Asbestos Objectors' Obj. 29-30.

are entitled to the payment of their fees and expenses, ***subject to Fee Committee review and approval by the Bankruptcy Court***.

152.    The EFH Unsecured Notes Trustee not only refrained from prosecuting any objections to Plan confirmation (even in the absence of a protective indemnity), all remaining Holders of Claims at EFH Corp.—many of whom are represented by sophisticated counsel—are either unaffected by such relief or have not objected to such relief.  There are eight Impaired Classes of Claims at EFH:  Classes A4, A5, A6, A7, A8, A9, A10, and A11.  ***Five*** of these Classes are unaffected by the requested relief: (a) the EFH Notes Trustee serves as Indenture Trustee for Class A4 and Class A6; and (b) Classes A5, A8, and A9 comprise the EFH Beneficiary Claims and, as a result, are expected to be paid in full through a combination of a Pro Rata distribution from the EFH Creditor Recovery Pool and TCEH Settlement Claim Turnover Distribution.  ***No Holder in any of the remaining Classes objected to payment of the EFH Indenture Trustee's Fees***:  (x) Class A7 consists of the EFH Swap Claims, the vast majority of which have been settled pursuant to the *Order Establishing Procedures for the Liquidation by Third Parties of Claims on Account of Certain Hedging and Trading Arrangements* [D.I. 1957]; (y) the EFH/EFIH Debtors estimate that there are less than a dozen asserted Claims in Class A10; and (z) Reorganized TCEH is the only Holder of a Class A11 Claim.  Consequently, it is not surprising that no Holder of a Claim in Class A7, Class A10, or Class A11 has objected to the Plan.

153.    Additionally, the Supporting Creditors helped facilitate entry into the Sempra Merger Agreement—including Sempra's willingness to increase its purchase price by $150 million to obtain Elliott's support to the PSA (and then, pursuant to the Dividend-TSA Settlement, an additional $31 million), for the benefit of Holders of Allowed Unsecured Claims.

Moreover, the Supporting Creditors' significant holdings at EFH and EFIH and ongoing discussions with the EFH Notes Trustee helped ensure that all Voting Classes voted to accept the Plan.  In addition, the Sempra Plan Support Agreement limits the Supporting Creditors' fees to $35 million.  Sempra Plan Support Agreement, § 4.03(a)(xvii).

154.    Given (a) the absence of objection from any Holders of Claims; (b) the contemplated Fee Committee review and approval by the Bankruptcy Court of the requested fees and expenses; (c) the cap on the Supporting Creditors' Fees; and (d) the role of both the EFH Notes Trustee and the Supporting Creditors to facilitate a largely consensual Plan confirmation process,  the EFH/EFIH Debtors believe the requested findings under section 503(b) of the Bankruptcy Code and payment of fees and expenses incurred by the EFH Notes Trustee and the Supporting Creditors provisions are an appropriate exercise of the EFH/EFIH Debtors' business judgment.

### E.    The Bankruptcy Court Should Overrule the Objections of Mr. Robert Miller.

155.    Finally, the Miller Objections should be overruled.  Mr. Miller demands that the EFH/EFIH Debtors ignore fundamental principles enshrined in the Bankruptcy Code to separately classify and pay *in full* the EFIH Unexchanged Notes while Holders of EFIH Senior Toggle Notes (which are *pari passu* with the EFIH Unexchanged Notes) are expected to receive a recovery of less than 50 percent.[186]   This demand is premised on a wholly unsupported argument that the exchange offer that left behind the "stub" of the EFIH Unexchanged Notes was unfair to noteholders who were not qualified institutional buyers and, thus, not permitted to participate.  To the contrary, the bond exchange was conducted consistent with the applicable

---

[186]    EFH Disclosure Statement § I.G.

indentures and non-bankruptcy law,[187] and Mr. Miller offers no evidence or legal argument to the contrary.  Therefore, there is no reason to treat Holders of EFIH Unexchanged Notes differently from Holders of EFIH Senior Toggle Notes.  Such Holders have identical rights; the Bankruptcy Code demands they be treated identically.[188]

156.    Importantly, even if there were any potentially meritorious claims arising out of the exchange, such claims were (a) not timely asserted or properly preserved prior to the Bar Date and (b) would result in, at best, claims that would be subordinated to these Holders' existing Class B6 Claims, pursuant to section 510(b) of the Bankruptcy Code.  Mr. Miller calls for a remedy that is neither warranted nor provided for under applicable law.  Accordingly, the EFH/EFIH Debtors respectfully submit the Miller Objections must be overruled.

## Conclusion

157.    For the reasons set forth herein, the EFH/EFIH Debtors respectfully request that this Court confirm the Plan and enter the Confirmation Order.

[*Remainder of page intentionally left blank.*]

---

[187]    EFH Disclosure Statement § III.G.1.

[188]    11 U.S.C. § 1129(b)(1); *see also In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'").  Class B6 (which includes the EFIH Unexchanged Notes) voted to accept the Plan.  *See* Voting Report, at Exhibit B.

Dated: February 17, 2018
Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Brian E. Schartz, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com
                aparna.yenamandra@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Co-Counsel to the EFH/EFIH Debtors and Debtors in Possession