# **EXHIBIT B**


# SEMPRA ENERGY

# FORM 8-K
### (Current report filing)

## Filed 01/12/18 for the Period Ending 01/09/18

| | |
|---|---|
| Address | 488 8TH AVENUE |
| | P O BOX 129400 |
| | SAN DIEGO, CA, 92101 |
| Telephone | 6196962000 |
| CIK | 0001032208 |
| Symbol | SRE |
| SIC Code | 4932 - Gas and Other Services Combined |
| Industry | Multiline Utilities |
| Sector | Utilities |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com

© Copyright 2018, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

### Date of Report (Date of earliest event reported): January 9, 2018

# SEMPRA ENERGY
#### (Exact name of registrant as specified in its charter)

| CALIFORNIA | 1-14201 | 33-0732627 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 488 8th AVENUE, SAN DIEGO, CALIFORNIA | 92101 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

#### Registrant's telephone number, including area code (619) 696-2000

#### (Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company:  ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act:  ☐

**Item  8.01     Other Events.**

On January 12, 2018, Sempra Energy (the " Company ") closed the public offering and sale of $500,000,000 aggregate principal amount of the Company's Floating Rate Notes due 2019 (the " 2019 Floating Rate Notes "), $700,000,000 aggregate principal amount of the Company's Floating Rate Notes due 2021 (the " 2021 Floating Rate Notes "), $500,000,000 aggregate principal amount of the Company's 2.400% Notes due 2020 (the " 2020 Notes "), $500,000,000 aggregate principal amount of the Company's 2.900% Notes due 2023 (the " 2023 Notes "), $1,000,000,000 aggregate principal amount of the Company's 3.400% Notes due 2028 (the " 2028 Notes "), $1,000,000,000 aggregate principal amount of the Company's 3.800% Notes due 2038 (the " 2038 Notes ") and $800,000,000 aggregate principal amount of the Company's 4.000% Notes due 2048 (the " 2048 Notes " and, together with the 2019 Floating Rate Notes, the 2021 Floating Rate Notes, the 2020 Notes, the 2023 Notes, the 2028 Notes and the 2038 Notes, the " Notes "). Proceeds to the Company (after deducting underwriting discounts but before other expenses estimated at approximately $7,500,000) for the Notes were 99.850% of the principal amount of the 2019 Floating Rate Notes, 99.550% of the principal amount of the 2021 Floating Rate Notes, 99.564% of the principal amount of the 2020 Notes, 99.021% of the principal amount of the 2023 Notes, 98.649% of the principal amount of the 2028 Notes, 98.043% of the principal amount of the 2038 Notes and 97.779% of the principal amount of the 2048 Notes. The sale of the Notes was registered under the Company's Registration Statement on Form S-3 (Registration No. 333-220257),as amended. The 2019 Floating Rate Notes will mature on July 15, 2019, the 2021 Floating Rate Notes will mature on January 15, 2021, the 2020 Notes will mature on February 1, 2020, the 2023 Notes will mature on February 1, 2023, the 2028 Notes will mature on February 1, 2028, the 2038 Notes will mature on February 1, 2038 and the 2048 Notes will mature on February 1, 2048.

The 2019 Floating Rate Notes will bear interest at a per annum rate equal to the 3 Month LIBOR Rate (as defined), which rate will be reset quarterly, plus 25 basis points. The 2021 Floating Rate Notes will bear interest at a per annum rate equal to the 3 Month LIBOR Rate, which rate will be reset quarterly, plus 50 basis points. Interest on the 2019 Floating Rate Notes and the 2021 Floating Rate Notes will accrue from January 12, 2018 and will be payable quarterly in arrears on January 15, April 15, July 15 and October 15 of each year, beginning on April 15, 2018, and at their respective maturity dates, subject to possible adjustment of such interest payment dates pursuant to the terms of the 2019 Floating Rate Notes and 2021 Floating Rate Notes, respectively.

The 2020 Notes will bear interest at the rate of 2.400% per year. The 2023 Notes will bear interest at the rate of 2.900% per year. The 2028 Notes will bear interest at the rate of 3.400% per year. The 2038 Notes will bear interest at the rate of 3.800% per year. The 2048 Notes will bear interest at the rate of 4.000% per year. Interest on the 2020 Notes, the 2023 Notes, the 2028 Notes, the 2038 Notes and the 2048 Notes will accrue from January 12, 2018 and will be payable semi-annually in arrears on February 1 and August 1 of each year, beginning on August 1, 2018.

The 2019 Floating Rate Notes will not be subject to redemption at the option of the Company. At the Company's option, the Company may redeem some or all of the 2021 Floating Rate Notes at any time on or after January 14, 2019 at a redemption price equal to 100% of the principal amount, plus accrued and unpaid interest, if any. At the Company's option, the Company may redeem some or all of the 2020 Notes, the 2023 Notes, the 2028 Notes, the 2038 Notes or the 2048 Notes at any time at the respective redemption prices provided therein, plus accrued and unpaid interest, if any.

The Company intends to use the net proceeds from the offering to finance a portion of the cost of its proposed merger (the " Merger ") with Energy Future Holdings Corp. and to pay related fees and expenses. However, if the Company does not consummate the Merger on or prior to December 1, 2018, or if, on or prior to such date, the merger agreement is terminated, the Company will be required to redeem all of the outstanding Notes (other than the 2028 Notes) at a redemption price equal to 101% of the principal amount of the Notes it is required to redeem plus accrued and unpaid interest, if any. The 2028 Notes are not subject to special mandatory redemption. If the Company is required to redeem Notes under those circumstances, the Company may use all or a portion of the net proceeds from the sale of the Notes to pay all or a portion of the redemption price of the Notes the Company is required to redeem and the Company intends to use any remaining net proceeds for general corporate purposes, which may include, in the Company's sole discretion, voluntary redemption of its 6% Mandatory Convertible Preferred Stock, Series A, repayment of other debt, including repayment of commercial paper, capital expenditures, investments and possibly, repurchases of the Company's common stock at the discretion of the Company's board of directors.

The respective forms of the Notes are included in Exhibit 4.1. The Notes were issued pursuant to an indenture dated as of February 23, 2000 between the Company and U.S. Bank National Association, as successor trustee, which is incorporated by reference as Exhibit 4.2. Further information regarding the sale of the Notes is contained in the underwriting agreement, dated January 9, 2018, which is attached hereto as Exhibit 1.1.

**Item  9.01     Financial Statements and Exhibits.**

(d)     *Exhibits.*

| Exhibit Number | Description |
| --- | --- |
| 1.1 | Underwriting Agreement, dated January 9, 2018, between Sempra Energy and the several underwriters named therein. |
| 4.1 | Officers' Certificate of the Company, including the form of Floating Rate Note due 2019, the form of Floating Rate Note due 2021, the form of 2.400% Note due 2020, the form of 2.900% Note due 2023, the form of 3.400% Note due 2028, the form of 3.800% Note due 2038 and the form of 4.000% Note due 2048. |
| 4.2 | Indenture dated as of February 23, 2000 (Exhibit 4.1 of the Company's registration statement on Form S-3 File No. 333-153425, filed on September 11, 2008, is incorporated herein by reference). |
| 5.1 | Opinion of Latham & Watkins LLP. |
| 23.1 | Consent of Latham & Watkins LLP (contained in the opinion filed as Exhibit 5.1 hereto). |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

SEMPRA ENERGY

Date: January 12, 2018

By:  /s/ Trevor I. Mihalik
      Name: Trevor I. Mihalik
      Title: Senior Vice President, Controller and Chief
      Accounting Officer

**Exhibit 1.1**

**EXECUTION VERSION**

Sempra Energy

Floating Rate Notes due 2019
Floating Rate Notes due 2021
2.400% Notes due 2020
2.900% Notes due 2023
3.400% Notes due 2028
3.800% Notes due 2038
4.000% Notes due 2048

———————————

Underwriting Agreement

———————————

January 9, 2018

RBC Capital Markets, LLC
200 Vesey Street, 8th Floor
New York, New York 10281

Morgan Stanley & Co. LLC
1585 Broadway
New York, New York 10036

Barclays Capital Inc.
745 Seventh Avenue
New York, New York 10019

    As Representatives of the several Underwriters

Ladies and Gentlemen:

    Sempra Energy, a California corporation (the " **Company** "), confirms its agreement with each of the Underwriters named in Schedule I hereto (collectively, the " **Underwriters** ," which term shall also include any underwriter substituted as hereinafter provided in Section 9 hereof), for whom RBC Capital Markets, LLC, Morgan Stanley & Co. LLC and Barclays Capital Inc. are acting as representatives (the " **Representatives** "), with respect to the issue and sale by the Company and the purchase by the Underwriters, acting severally and not jointly, of $500,000,000 aggregate principal amount of the Company's Floating Rate Notes due 2019 (the " **2019 Floating Rate Notes** "), $700,000,000 aggregate principal amount of the Company's Floating Rate Notes due 2021 (the " **2021 Floating Rate Notes** "), $500,000,000 aggregate principal amount of the Company's 2.400% Notes due 2020 (the " **2020 Fixed Rate Notes** "), $500,000,000 aggregate principal amount of the Company's 2.900% Notes due 2023 (the " **2023 Fixed Rate Notes** "), $1,000,000,000 aggregate principal amount of the Company's 3.400%

Notes due 2028 (the " **2028 Fixed Rate Notes** "), $1,000,000,000 aggregate principal amount of the Company's 3.800% Notes due 2038 (the " **2038 Fixed Rate Notes** ") and $800,000,000 aggregate principal amount of the Company's 4.000% Notes due 2048 (the " **2048 Fixed Rate Notes,** " and, together with the 2019 Floating Rate Notes, the 2021 Floating Rate Notes, the 2020 Fixed Rate Notes, the 2023 Fixed Rate Notes, the 2028 Fixed Rate Notes and the 2038 Fixed Rate Notes, the " **Securities** "). The Securities are to be issued pursuant to an indenture dated February 23, 2000 (the " **Indenture** ") between the Company and U.S. Bank National Association, as successor trustee to U.S. Bank Trust National Association (the " **Trustee** "). The term "Indenture," as used herein, includes the Officers' Certificate (as defined in the Indenture) establishing the form and terms of the Securities pursuant to Sections 201 and 301 of the Indenture. The Company plans to enter into a calculation agent agreement with U.S. Bank National Association, as calculation agent, dated as of the Time of Delivery, relating to the Securities (the " **Calculation Agent Agreement** ").

The Company has entered into an Agreement and Plan of Merger dated as of August 21, 2017 and a Waiver Agreement dated as of October 3, 2017, in each case as amended and supplemented, if applicable, and as the same may be amended and supplemented after the date hereof (collectively, the " **Merger Agreement** ," which term, as used herein, includes all exhibits, schedules and attachments thereto, in each case as amended or supplemented, if applicable) with Energy Future Holdings Corp. (" **EFH** "), Energy Future Intermediate Holding Company LLC (" **EFIH** ") and Power Play Merger Sub I, Inc. (now known as Sempra Texas Merger Sub I, Inc., the " **Merger Subsidiary** "), pursuant to which EFH will be merged with the Merger Subsidiary with EFH continuing as the surviving entity of such merger (the " **Merger** "). In relation to the Merger, the Company has also entered into a plan support agreement dated as of August 21, 2017 (the " **Plan Support Agreement** ") with EFH and certain other parties named therein and a letter agreement dated August 25, 2017 (the " **Letter Agreement** "), with the Merger Subsidiary, Oncor Electric Delivery Holdings Company LLC (" **Oncor Holdings** ") and Oncor Electric Delivery Company LLC (" **Oncor** ").

The Company has filed with the Securities and Exchange Commission (the " **Commission** ") an automatic shelf registration statement on Form S-3 (No. 333-220257), which registration statement became effective upon filing under Rule 462(e) of the rules and regulations of the Commission (the " **Rules and Regulations** ") under the Securities Act of 1933, as amended (the " **Act** "). Such registration statement covers the registration of the Securities (among other securities) under the Act. Such registration statement, as amended through the date hereof (including by post-effective amendment No. 1 thereto) and including the information deemed pursuant to Rule 430B under the Rules and Regulations to be part of the registration statement at the time of its effectiveness with respect to the offering contemplated by this Agreement and all documents incorporated or deemed to be incorporated by reference therein through the date hereof, but excluding any Form T-1 (as defined below), is hereinafter referred to as the " **Registration Statement** ." The Company proposes to file with the Commission pursuant to Rule 424(b) of the Rules and Regulations the Prospectus Supplement (as defined in Section 5(h) hereof) relating to the Securities and the prospectus dated January 2, 2018 (the " **Base Prospectus** "), and has previously advised you of all further information (financial and other) with respect to the Company set forth therein. The Base Prospectus together with the Prospectus Supplement (as defined below), in their respective forms on the date hereof (being the forms in which they are to be filed with the Commission pursuant to Rule 424(b) of the Rules

2

and Regulations), including all documents incorporated or deemed to be incorporated by reference therein through the date hereof, are hereinafter referred to as, collectively, the " **Prospectus** ," except that if any revised prospectus or prospectus supplement shall be provided to the Underwriters by the Company for use in connection with the offering and sale of the Securities which differs from the Prospectus (whether or not such revised prospectus or prospectus supplement is required to be filed by the Company pursuant to Rule 424(b) of the Rules and Regulations), the term "Prospectus" shall refer to such revised prospectus or prospectus supplement, as the case may be, from and after the time it is first provided to the Underwriters for such use. The term " **Preliminary Prospectus** ," as used in this Agreement, means the preliminary prospectus supplement dated January 9, 2018 and filed with the Commission on January 9, 2018 pursuant to Rule 424(b) of the Rules and Regulations, together with the Base Prospectus used with such preliminary prospectus supplement in connection with the marketing of the Securities, in each case as amended or supplemented by the Company, including all documents incorporated or deemed to be incorporated by reference therein through the date thereof. Unless the context otherwise requires, all references in this Agreement to documents, financial statements and schedules and other information which is "contained," "included," "stated," "described in" or "referred to" in the Registration Statement, the Preliminary Prospectus or the Prospectus (and all other references of like import) shall be deemed to mean and include all such documents, financial statements and schedules and other information which is or is deemed to be incorporated by reference in the Registration Statement, the Preliminary Prospectus or the Prospectus, as the case may be; and all references in this Agreement to amendments or supplements to the Registration Statement, the Preliminary Prospectus or the Prospectus shall be deemed to mean and include the filing of any document under the Securities Exchange Act of 1934, as amended (the " **Exchange Act** "), after the date of this Agreement which is or is deemed to be incorporated by reference in the Registration Statement, the Preliminary Prospectus or the Prospectus, as the case may be.

At or prior to 5:30 p.m. (New York City time) on the date hereof, which was the time when sales of the Securities were first made (such time, the " **Applicable Time** "), the Company had prepared the following information (collectively the " **Pricing Disclosure Package** "): the Preliminary Prospectus and each "free-writing prospectus" (as defined pursuant to Rule 405 of the Rules and Regulations) listed on Schedule II hereto.

1. The Company represents and warrants to each Underwriter as of the date hereof (such date being hereinafter referred to as the " **Representation Date** "), as of the Applicable Time, and as of the Time of Delivery referred to in Section 4 as follows:

(a) No order preventing or suspending the use of the Preliminary Prospectus has been issued by the Commission, and the Preliminary Prospectus, at the time of filing thereof, complied in all material respects with the Act and did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided , however , that the representations and warranties in this subsection (a) shall not apply to statements in or omissions from the Preliminary Prospectus made in reliance upon and in conformity with information furnished to the Company in writing by any Underwriter through the Representatives expressly for use in the Preliminary Prospectus.

3

(b) The Pricing Disclosure Package, at the Applicable Time, did not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided , however , that the representations and warranties in this subsection (b) shall not apply to statements in or omissions from the Pricing Disclosure Package made in reliance upon and in conformity with information furnished to the Company in writing by any Underwriter through the Representatives expressly for use in such Pricing Disclosure Package.

(c) The Company (including its agents and representatives, other than the Underwriters in their capacity as such) has not prepared, made, used, approved or referred to and will not prepare, make, use, approve or refer to any "written communication" (as defined in Rule 405 of the Rules and Regulations) that constitutes an offer to sell or solicitation of an offer to buy the Securities (each such communication by the Company or its agents and representatives other than the Underwriters in their capacity as such (other than a communication referred to in clauses (i), (ii) and (iii) below) an " **Issuer Free Writing Prospectus** ") other than (i) any document not constituting a prospectus pursuant to such Section 2(a)(10)(a) of the Act or Rule 134 of the Rules and Regulations, (ii) the Preliminary Prospectus, (iii) the Prospectus, (iv) the documents listed on Schedule II hereto and (v) any electronic road show or other written communications, in each case approved in writing in advance by the Representatives. Each such Issuer Free Writing Prospectus complied in all material respects with the Act, has been or will be (within the time period specified in Rule 433 of the Rules and Regulations) filed (to the extent required thereby) in accordance with the Act and when taken together with the Preliminary Prospectus accompanying, or delivered prior to delivery of, such Issuer Free Writing Prospectus, did not, and at the Time of Delivery will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided , however , that the representations and warranties in this subsection (c) shall not apply to statements in or omissions from any Issuer Free Writing Prospectus made in reliance upon and in conformity with information furnished to the Company in writing by any Underwriter through the Representatives expressly for use in any Issuer Free Writing Prospectus. Each Issuer Free Writing Prospectus, as of its issue date and at all subsequent times through the completion of the public offer and sale of the Securities or until any earlier date that the Company notified or notifies the Representatives as described in Section 5(c) with respect to such Issuer Free Writing Prospectus, did not, does not and will not include any information that conflicted, conflicts or will conflict with the information contained in the Registration Statement, the Prospectus or the Preliminary Prospectus that has not been superseded or modified.

(d) The Registration Statement is an "automatic shelf registration statement" as defined under Rule 405 of the Rules and Regulations that became effective not earlier than three years prior to the date hereof; and no notice of objection of the Commission to the use of such registration statement or any post-effective amendment thereto pursuant to Rule 401(g)(2) of the Rules and Regulations has been received by the Company. The Registration Statement, at the respective times the Registration Statement and any post-effective amendments thereto became effective, and the Registration Statement and the Prospectus, as of the Representation Date, complied and comply in all material respects with the requirements of the Act and the Rules and Regulations (including Rule 415(a) of the Rules and Regulations), and the Trust Indenture Act of 1939, as amended (the " **Trust Indenture Act** "), and the rules and regulations of the Commission

4

under the Trust Indenture Act, and the Registration Statement did not and as of the Representation Date and at the Time of Delivery does not and will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. No order suspending the effectiveness of the Registration Statement has been issued under the Act and no proceedings for that purpose or pursuant to Section 8A of the Act against the Company or related to the offering of the Securities have been instituted or are pending or, to the knowledge of the Company, are contemplated by the Commission, and any request on the part of the Commission for additional information has been complied with. The Prospectus, at the Representation Date (unless the term "Prospectus" refers to a prospectus which has been provided to the Underwriters by the Company for use in connection with the offering of the Securities which differs from the Prospectus filed with the Commission pursuant to Rule 424(b) of the Rules and Regulations, in which case at the time it is first provided to the Underwriters for such use) and at the Time of Delivery, does not and will not include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided , however , that the representations and warranties in this subsection (d) shall not apply to statements in or omissions from the Registration Statement or Prospectus made in reliance upon and in conformity with information furnished to the Company in writing by any Underwriter through the Representatives expressly for use in the Registration Statement or the Prospectus or the information contained in any Statement of Eligibility and Qualification of a trustee under the Trust Indenture Act filed as an exhibit to the Registration Statement (a " **Form  T -1** ").

(e) The documents filed by the Company and incorporated or deemed to be incorporated by reference into the Registration Statement, the Prospectus and the Pricing Disclosure Package pursuant to Item 12 of Form S-3 under the Act, at the time they were or hereafter are filed with the Commission, complied and will comply in all material respects with the requirements of the Exchange Act and the rules and regulations of the Commission thereunder and, when read together and with the other information in the Registration Statement, the Prospectus and the Pricing Disclosure Package, at the respective times the Registration Statement and any amendments thereto became effective, at the Representation Date, at the Applicable Time and at the Time of Delivery, did not, do not and will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(f) The Company and its subsidiaries, taken as a whole, have not sustained since the date of the latest audited financial statements included or incorporated by reference in the Prospectus any material loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Pricing Disclosure Package and the Prospectus; and, since the date as of which information is given in the Pricing Disclosure Package and the Prospectus, there has not been any material change in the capital stock or long-term debt of the Company or any of its subsidiaries or any material adverse change, or any development involving a prospective material adverse change, in or affecting the general affairs, management or consolidated financial position, shareholders' equity

5

or results of operations of the Company and its subsidiaries, taken as a whole, otherwise than as set forth or contemplated in the Pricing Disclosure Package and the Prospectus.

(g) The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of California, with power and authority (corporate and other) to own its properties and conduct its business as described in the Pricing Disclosure Package and the Prospectus, and has been duly qualified as a foreign corporation for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole; and each of Southern California Gas Company, a California corporation ( **"SCGC"** ), San Diego Gas & Electric Company, a California corporation ( **"SDG&E"** ), Pacific Enterprises, a California corporation ( **"PE"** ), Enova Corporation, a California corporation ( **"Enova"** ), Sempra Global, a Delaware corporation ( **"Global"** ), Pacific Enterprises International, a California corporation (" **PEI** "), and Sempra Energy International, a California corporation (" **SEI** " and, together with SCGC, SDG&E, PE, Enova, Global and PEI, the **"Significant Subsidiaries"** ), has been duly incorporated or organized and is validly existing as a corporation or a limited liability company in good standing under the laws of its jurisdiction of incorporation or organization.

(h) The Company has an authorized capitalization as set forth in the Pricing Disclosure Package and the Prospectus, and all of the issued shares of capital stock of the Company have been duly and validly authorized and issued and are fully paid and non-assessable and conform to the description thereof contained in the Pricing Disclosure Package and the Prospectus; and all of the issued shares of capital stock of each Significant Subsidiary have been duly and validly authorized and issued, are fully paid and non-assessable and, except for the outstanding preferred stock of SCGC, are owned directly or indirectly by the Company, free and clear of all liens, encumbrances, equities or claims.

(i) The Securities have been duly authorized for issuance and sale by the Company and, when the Securities are issued and delivered pursuant to this Agreement, the Securities will have been duly executed by the Company and, when authenticated in the manner provided for in the Indenture and delivered against payment of the purchase price therefor specified in this Agreement, the Securities will have been duly delivered by the Company and will constitute valid and legally binding obligations of the Company entitled to the benefits provided by the Indenture and enforceable in accordance with their terms, subject, as to enforcement, to bankruptcy, insolvency, receivership, liquidation, fraudulent conveyance, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles; the Indenture has been duly authorized, executed and delivered by the Company and duly qualified under the Trust Indenture Act and constitutes a valid and legally binding agreement of the Company enforceable in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, receivership, liquidation, fraudulent conveyance, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles; and the Indenture conforms in all material respects, and the Securities will conform in

6

all material respects, to the descriptions thereof contained in the Pricing Disclosure Package and the Prospectus, as amended or supplemented.

(j) This Agreement has been duly authorized, executed and delivered by the Company.

(k) The Calculation Agent Agreement has been duly authorized by the Company and, at the Time of Delivery, will have been duly executed and delivered by the Company and will constitute a valid and legally binding agreement of the Company, enforceable in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, receivership, liquidation, fraudulent conveyance, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(l) The issue and sale of the Securities and the compliance by the Company with all of the provisions of the Securities, the Indenture, the Calculation Agent Agreement and this Agreement, and the consummation of the transactions herein and therein contemplated will not (i) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any contract, indenture, mortgage, deed of trust, loan agreement, note, lease or other agreement or instrument to which the Company or any of its Significant Subsidiaries is a party or by which the Company or any of its Significant Subsidiaries is bound or to which any of the properties or assets of the Company or any of its Significant Subsidiaries is subject, (ii) result in any violation of the provisions of the Articles or Certificate of Incorporation or Certificate of Formation or Bylaws or Limited Liability Company Agreement of the Company or any of its Significant Subsidiaries, or (iii) result in any violation of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its Significant Subsidiaries or any of their respective properties, except, solely in the case of clauses (i) and (iii) above, for such conflicts, breaches, violations or defaults that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole; and no consent, approval, authorization, order, registration or qualification of or with any such court or governmental agency or body is required for the issue and sale of the Securities or the consummation by the Company of the transactions contemplated by this Agreement, the Calculation Agent Agreement or the Indenture, except such as have been obtained under the Act and the Trust Indenture Act and such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky laws in connection with the purchase and distribution of the Securities by the Underwriters.

(m) The statements set forth in the Pricing Disclosure Package and the Prospectus, as amended or supplemented, under the captions "Description of Debt Securities" and "Description of the Notes," insofar as they purport to constitute a summary of the terms of the Securities or the Indenture, and under the captions "Plan of Distribution" and "Underwriting," insofar as they purport to describe the provisions of the laws and documents referred to therein, are accurate, complete and fair in all material respects.

(n) Neither the Company nor any of its Significant Subsidiaries is (i) in violation of its Articles or Certificate of Incorporation or Certificate of Formation or Bylaws or Limited

7

Liability Company Agreement or (ii) in default in the performance or observance of any material obligation, agreement, covenant or condition contained in any contract, indenture, mortgage, deed of trust, loan agreement, note, lease or other agreement or instrument to which it is a party or by which it or any of its properties may be bound, except in the case of clause (ii) for such defaults which, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on the consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole.

(o) Other than as set forth in the Pricing Disclosure Package and the Prospectus, (i) there are no legal or governmental proceedings pending to which the Company or any of its subsidiaries is a party or of which any property of the Company or any of its subsidiaries is the subject, except for such proceedings which, if determined adversely to the Company or any of its subsidiaries, would not reasonably be expected individually or in the aggregate to have a material adverse effect on the consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole and (ii) to the best of the Company's knowledge, no such proceedings are threatened or contemplated by governmental authorities or threatened by others.

(p) The Company is not and after giving effect to the offering and sale of the Securities, will not be, an "investment company," as such term is defined in the Investment Company Act of 1940, as amended (the **"Investment Company Act"** ).

(q) Deloitte & Touche LLP, who have certified certain financial statements of the Company and its subsidiaries, taken as a whole, is an independent registered public accounting firm as required by the Act and the Rules and Regulations and the rules and regulations of the Public Company Accounting Oversight Board.

(r) To the Company's knowledge, Deloitte & Touche LLP, who have certified certain financial statements of EFH and its subsidiaries, taken as a whole, is an independent registered public accounting firm with respect to EFH as required under Rule 101 of the AICPA's Code of Professional Conduct and its interpretations and rulings.

(s) To the Company's knowledge, Deloitte & Touche LLP, who have certified certain financial statements of Oncor Holdings and its subsidiaries, taken as a whole, is an independent registered public accounting firm as required by the Act and the Rules and Regulations and the rules and regulations of the Public Company Accounting Oversight Board.

(t) The financial statements of the Company and its consolidated subsidiaries included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus present fairly in all material respects the consolidated financial position of the Company and its consolidated subsidiaries as of the dates indicated and the consolidated results of their operations for the periods specified; and, except as stated therein, such financial statements have been prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis. The pro forma financial statements and the related notes thereto included and incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus present fairly in all material respects the information shown therein, have been prepared in accordance with the

8

Commission's rules and guidelines with respect to pro forma financial statements and have been properly compiled on the bases described therein, and the assumptions used in the preparation thereof are reasonable and the adjustments used therein are appropriate to give effect to the transactions and circumstances referred to therein. To the Company's knowledge, the financial statements of EFH and its consolidated subsidiaries included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus present fairly in all material respects the consolidated financial position of EFH and its consolidated subsidiaries as of the dates indicated and the consolidated results of their operations for the periods specified; and, except as stated therein, to the Company's knowledge, such financial statements have been prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis. To the Company's knowledge, the financial statements of Oncor Holdings and its consolidated subsidiaries included or incorporated by reference in the Registration Statement, the Pricing Disclosure Package and the Prospectus present fairly in all material respects the consolidated financial position of Oncor Holdings and its consolidated subsidiaries as of the dates indicated and the consolidated results of their operations for the periods specified; and, except as stated therein, to the Company's knowledge, such financial statements have been prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis.

(u) The Company and each of its consolidated subsidiaries maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles in the United States and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any material differences.

(v) The Company and each of its consolidated subsidiaries maintain "disclosure controls and procedures" (as such term is defined in Rule 13a-15(e) under the Exchange Act); such disclosure controls and procedures are effective.

(w) The Company and its subsidiaries possess such certificates, authorities or permits issued by the appropriate state, federal, local or foreign regulatory agencies or bodies necessary to conduct their businesses as described in the Pricing Disclosure Package and the Prospectus, except where the failure to possess such certificates, authorities or permits, individually or in the aggregate, would not have a material adverse effect on the consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole; and neither the Company nor any of its subsidiaries has received any notice of proceedings relating to the revocation or modification of any such certificate, authority or permit which, individually or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would have a material adverse effect on the consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole.

9

(x) The Company and its subsidiaries are in compliance with, and conduct their respective businesses in conformity with, all applicable state, federal, local and foreign laws and regulations relating to the operation and ownership of a public utility, including, without limitation, those relating to the distribution and transmission of natural gas, except to the extent that any failure so to comply or conform would not individually or in the aggregate have a material adverse effect on the consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole.

(y) The Company and its subsidiaries hold all franchises, certificates of public convenience and necessity, permits, licenses and easements necessary to own, operate and maintain their properties as described in the Pricing Disclosure Package and the Prospectus, except to the extent that such failure, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on the consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole.

(z) Except as otherwise described in the Pricing Disclosure Package and the Prospectus and except as would not, singly or in the aggregate, result in a material adverse effect on the consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole, (A) neither the Company nor any of its subsidiaries is in violation of any federal, state, local or foreign statute, law, rule, regulation, ordinance, code, policy or rule of common law or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent, decree or judgment, relating to pollution or protection of human health, the environment (including without limitation, ambient air, surface water, groundwater, land surface or subsurface strata) or wildlife, including, without limitation, laws and regulations relating to the release or threatened release of chemicals, pollutants, contaminants, wastes, toxic substances, hazardous substances, petroleum or petroleum products (collectively, " **Hazardous Materials** ") or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials (collectively, " **Environmental Laws** "), (B) the Company and its subsidiaries have all permits, authorizations and approvals required under any applicable Environmental Laws and are each in compliance with their requirements, (C) there are no pending or, to the knowledge of the Company, threatened, administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violations, investigations or proceedings relating to any Environmental Law against the Company or any of its subsidiaries and (D) there are no events or circumstances that might reasonably be expected to form the basis of an order for clean-up or remediation, or an action, suit or proceeding by any private party or governmental body or agency, against or affecting the Company or any of its subsidiaries relating to Hazardous Materials or any Environmental Laws.

(aa) To the knowledge of the Company, all representations and warranties made by EFH and EFIH in the Merger Agreement are true and correct (without giving effect to any limitation as to "materiality" or "Company Material Adverse Effect" (as defined in the Merger Agreement) or similar limitation as set forth therein), except in each case where the failure to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole, assuming the consummation of the transactions contemplated by the Merger Agreement.

10

(bb) To the knowledge of the Company, since September 30, 2017, there has not been any material adverse change, or any development involving a prospective material adverse change, in or affecting the general affairs, management or consolidated financial position, shareholders' equity or results of operations of EFH and its subsidiaries (including Oncor), taken as a whole.

(cc) The statements set forth in (i) the Pricing Disclosure Package and the Prospectus, as amended or supplemented (if applicable), under the caption "Summary Information—Recent Developments—Proposed Acquisition of Energy Future Holdings Corp.," (ii) the Company's Form 8-K filed with the Commission on August 25, 2017 under the captions "Acquisition of Energy Future Holdings Corp.," "Agreement and Plan of Merger" and "Plan Support Agreement", (iii) the Company's Form 8-K filed with the Commission on August 28, 2017 under the caption "Oncor Letter Agreement," (iv) the Company's Form 8-K filed with the Commission on October 6, 2017, including the information under Item 1.01 and Item 8.01, (v) the Company's Form 8-K filed with the Commission on October 10, 2017, including the information under Item 8.01 and in Exhibit 99.1 thereto, and (vi) the Company's Form 8-K filed with the Commission on December 15, 2017 describing, among other things, the Stipulation (as defined therein), insofar as they purport to constitute a summary of the terms of the Merger, the Merger Agreement, the Plan Support Agreement, the Letter Agreement and the Stipulation, are accurate and fair summaries in all material respects.

(dd) To the knowledge of the Company, no event or condition has occurred or exists that has terminated or would permit termination of the Merger Agreement and no change in the terms of the Merger, the Merger Agreement, the Plan Support Agreement or the Letter Agreement has occurred which, individually or in the aggregate, could reasonably be expected to have a material adverse effect on the consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole, assuming the consummation of the transactions contemplated by the Merger Agreement.

2. The Company understands that upon authorization by the Representatives of the release of the Securities, the several Underwriters propose to offer the Securities for sale upon the terms and conditions set forth in the Prospectus, as amended or supplemented.

3. On the basis of the representations and warranties herein contained and subject to the terms and conditions herein set forth, the Company agrees to sell to each Underwriter, severally and not jointly, and each Underwriter, severally and not jointly, agrees to purchase from the Company, at 99.850% of the principal amount thereof in the case of the 2019 Floating Rate Notes, 99.550% of the principal amount thereof in the case of the 2021 Floating Rate Notes, 99.564% of the principal amount thereof in the case of the 2020 Fixed Rate Notes, 99.021% of the principal amount thereof in the case of the 2023 Fixed Rate Notes, 98.649% of the principal amount thereof in the case of the 2028 Fixed Rate Notes, 98.043% of the principal amount thereof in the case of the 2038 Fixed Rate Notes and 97.779% of the principal amount thereof in the case of the 2048 Fixed Rate Notes, the aggregate principal amount of Securities set forth in Schedule I opposite the name of such Underwriter, plus any additional principal amount of Securities which such Underwriter may become obligated to purchase pursuant to the provisions of Section 9 hereof.

11

4. Payment of the purchase price for, and delivery of certificates for, the Securities shall be made at the office of Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 or at such other place as shall be agreed upon by the Representatives and the Company, at 10:00 a.m. (New York City time), on January 12, 2018, or such other time not later than ten business days after such date as shall be agreed upon by the Representatives and the Company (such time and date of payment and delivery being herein called the "**Time of Delivery**"). Payment shall be made to the Company by wire transfer of Federal (same day) funds to the account specified by the Company to the Representatives at least forty-eight hours in advance against delivery to the Representatives for the respective accounts of the Underwriters of certificates for the Securities to be purchased by them. Certificates for the Securities shall be in such authorized denominations and registered in such names as the Representatives may request upon at least forty-eight hours prior notice to the Company. It is understood that each Underwriter has authorized the Representatives, for its account, to accept delivery of, receipt for, and make payment of the purchase price for, the Securities which it has agreed to purchase. RBC Capital Markets, LLC, individually and not as representative of the Underwriters, may (but shall not be obligated to) make payment of the purchase price for the Securities to be purchased by any Underwriter whose check has not been received by the Time of Delivery, but such payment shall not release such Underwriter from its obligations hereunder. The certificates for the Securities will be made available for examination and packaging by the Representatives not later than 10:00 a.m. (New York City time), on the last business day prior to the Time of Delivery in New York, New York.

5. The Company agrees with each of the Underwriters:

(a) To prepare the Prospectus, as amended or supplemented, in a form approved by the Representatives and to file such Prospectus pursuant to Rule 424(b) under the Act not later than the Commission's close of business on the second business day following the date hereof or, if applicable, such earlier time as may be required by Rule 424(b); to make no further amendment or any supplement to the Registration Statement or Prospectus, as amended or supplemented, after the date hereof and on or prior to the Time of Delivery which shall be reasonably disapproved by the Representatives promptly after reasonable notice thereof; to advise the Representatives promptly of any such amendment or supplement after the Time of Delivery and furnish the Representatives with copies thereof; to file promptly all reports and any definitive proxy or information statements required to be filed by the Company with the Commission pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act for so long as the delivery of a prospectus is required in connection with the offering or sale of the Securities, and during such same period to advise the Representatives, promptly after it receives notice thereof, of the time when any amendment to the Registration Statement has been filed or becomes effective or any supplement to the Prospectus or any amended Prospectus has been filed with the Commission, of the issuance by the Commission of any stop order or of any order preventing or suspending the use of any prospectus relating to the Securities, of the suspension of the qualification of the Securities for offering or sale in any jurisdiction, of the initiation or threatening of any proceeding for any such purpose, or of any examination pursuant to Section 8(e) of the Act concerning the Registration Statement, or of the Company becoming the subject of a proceeding under Section 8A of the Act in connection with the offering of the Securities, or of any request by the Commission for the amending or supplementing of the Registration Statement or Prospectus or for additional information; and, in the event of the

12

issuance of any such stop order or of any such order preventing or suspending the use of any prospectus relating to the Securities or suspending any such qualification, to promptly use reasonable best efforts to obtain the withdrawal of such order;

(b) To prepare a final term sheet or sheets, as the case may be (in either such case, the " **Final Term Sheet** ") reflecting the final terms of the Securities, in the form of Schedule III hereto (except that the Final Term Sheet may also include information regarding the credit ratings of the Securities and such other information as the Company and the Representatives may agree), and file such Final Term Sheet as an "issuer free writing prospectus" pursuant to Rule 433 prior to the close of business two business days after the date hereof; provided that the Company shall furnish the Representatives with copies of such Final Term Sheet a reasonable amount of time prior to such proposed filing and will not use or file any such document to which the Representatives or counsel to the Underwriters shall reasonably object;

(c) If at any time after the date hereof any events shall have occurred as a result of which any Issuer Free Writing Prospectus, as then amended or supplemented, would conflict with the information in the Registration Statement, the Preliminary Prospectus or the Prospectus or would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or, if for any other reason it shall be necessary to amend or supplement any Issuer Free Writing Prospectus, to notify the Representatives and, upon their request, to file such document and to prepare and furnish without charge to each Underwriter as many copies as the Representatives may from time to time reasonably request of an amended or supplemented Issuer Free Writing Prospectus that will correct such conflict, statement or omission or effect such compliance;

(d) Promptly from time to time to take such action as the Representatives may reasonably request to qualify the Securities for offering and sale under the securities laws of such domestic jurisdictions and (with the prior consent of the Company) foreign jurisdictions as the Representatives may request and to comply with such laws so as to permit the continuance of sales and dealings therein in such jurisdictions for as long as may be necessary to complete the distribution of the Securities, provided that in connection therewith the Company shall not be required to qualify as a foreign corporation or to file a general consent to service of process in any jurisdiction;

(e) Prior to 10:00 a.m., New York City time, on the second business day succeeding the date hereof, or such later time or date as agreed to by the Company and the Representatives, and from time to time, to furnish the Underwriters with copies of the Prospectus in New York City, as amended or supplemented, in such quantities as the Representatives may reasonably request, and, if the delivery of a prospectus is required at any time in connection with the offering or sale of the Securities and if at such time any event shall have occurred as a result of which the Prospectus as then amended or supplemented would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made when such Prospectus is delivered, not misleading, or, if for any other reason it shall be necessary during such same period to amend or supplement the Prospectus or to file under the Exchange Act any document incorporated by reference in the Prospectus in order to comply with the Act, the Exchange Act or

13

the Trust Indenture Act, to notify the Representatives and upon their request to file such document and to prepare and furnish without charge to each Underwriter and to any securities dealer participating in the offering of the Securities as many copies as the Representatives may from time to time reasonably request of an amended Prospectus or a supplement to the Prospectus which will correct such statement or omission or effect such compliance;

(f) To make generally available to its securityholders as soon as practicable, but in any event not later than fifteen months after the date hereof, an earnings statement of the Company and its consolidated subsidiaries (which need not be audited) complying with Section 11(a) of the Act and the Rules and Regulations (including, at the option of the Company, Rule 158);

(g) During the period beginning from the date hereof and continuing to and including the later of (i) the termination of trading restrictions for the Securities, as notified to the Company by the Representatives, but only if the Representatives shall have notified the Company in writing at the Time of Delivery that such trading restrictions have not been terminated, and (ii) the Time of Delivery, not to offer, sell, contract to sell or otherwise dispose of any debt securities of the Company which mature more than one year after such Time of Delivery and which are substantially similar to the Securities, without the prior written consent of the Representatives;

(h) Immediately following the execution of this Agreement, the Company will prepare a prospectus supplement, dated the date hereof (the " **Prospectus Supplement** "), containing the terms of the Securities, the plan of distribution thereof and such other information as may be required by the Act or the Rules and Regulations or as the Representatives and the Company deem appropriate, and will file or transmit for filing with the Commission in accordance with Rule 424(b) of the Rules and Regulations copies of the Prospectus (including such Prospectus Supplement);

(i) To apply the net proceeds from the sale of the Securities as set forth in the Prospectus; and

(j) The Company represents and agrees that, unless it obtains the prior consent of the Representatives, and each Underwriter represents and agrees that, unless it obtains the prior consent of the Company and the Representatives, it has not made and will not make any offer relating to the Securities that would constitute an Issuer Free Writing Prospectus, or that would otherwise constitute a "free writing prospectus," as defined in Rule 405, required to be filed with the Commission; provided , however , that the prior written consent of the Representatives and the Company shall be deemed to have been given in respect of the Final Term Sheet and any other Issuer Free Writing Prospectuses included in Schedule II hereto; and provided further , however , that prior to the preparation of the Final Term Sheet in accordance with Section 5(b), the Underwriters are authorized to use the information with respect to the final terms of the Securities in communications conveying information relating to the offering to investors. Any such free writing prospectus consented to by the Company and the Representatives or otherwise permitted by the immediately preceding sentence is hereinafter referred to as a " **Permitted Free Writing Prospectus** ." For purposes of clarity, it is understood and agreed that the term Issuer

14

Free Writing Prospectus, as used in this Agreement, includes all Permitted Free Writing Prospectuses.

6. The Company covenants and agrees with the several Underwriters that the Company will pay or cause to be paid the following: (i) the fees, disbursements and expenses of the Company's counsel and accountants in connection with the registration of the Securities under the Act and all other expenses in connection with the preparation, printing and filing of the Registration Statement, the Preliminary Prospectus, any Permitted Free Writing Prospectus and the Prospectus and amendments and supplements thereto and the mailing and delivering of copies thereof to the Underwriters and dealers; (ii) the cost of printing or producing any Agreement among Underwriters, this Agreement, the Indenture, any Blue Sky and Legal Investment Memoranda, closing documents (including any compilations thereof) and any other documents in connection with the offering, purchase, sale and delivery of the Securities; (iii) all expenses in connection with the qualification of the Securities for offering and sale under state securities laws as provided in Section 5(d) hereof, including the reasonable fees and disbursements of counsel for the Underwriters in connection with such qualification and in connection with the Blue Sky and Legal Investment Memoranda; (iv) any fees charged by securities rating services for rating the Securities; (v) any filing fees incident to, and the reasonable fees and disbursements of counsel for the Underwriters in connection with, any required review by The Financial Industry Regulatory Authority, Inc. of the terms of the sale of the Securities (up to a maximum aggregate amount of $5,000); (vi) the cost of preparing the Securities; (vii) the fees and expenses of the Trustee and any agent of the Trustee and the reasonable fees and disbursements of counsel for the Trustee in connection with the Indenture and the Securities; (viii) any fees and expenses in connection with listing the Securities and the cost of registering the Securities under Section 12 of the Exchange Act; and (ix) all other costs and expenses incident to the performance of its obligations hereunder which are not otherwise specifically provided for in this Section. It is understood, however, that, except as provided in this Section, and Sections 8 and 11 hereof, the Underwriters will pay all of their own costs and expenses, including the fees of their counsel, transfer taxes on resale of any of the Securities by them, and any advertising expenses connected with any offers they may make.

7. The obligations of the Underwriters shall be subject, in the discretion of the Representatives, to the condition that all representations and warranties and other statements of the Company in or incorporated by reference in this Agreement are, at and as of the Time of Delivery, true and correct, the condition that the Company shall have performed all of its obligations hereunder theretofore to be performed, and the following additional conditions:

(a) The Prospectus, as amended or supplemented, shall have been filed with the Commission pursuant to Rule 424(b) within the applicable time period prescribed for such filing (without reliance on Rule 424(b)(8) of the Rules and Regulations and in accordance with Section 5(a) hereof); no stop order suspending the effectiveness of the Registration Statement or any part thereof shall have been issued and no proceeding for that purpose shall have been initiated or threatened by the Commission; and all requests for additional information from the Commission shall have been complied with to the Representatives' reasonable satisfaction.

(b) Counsel for the Underwriters shall have furnished to the Representatives such written opinion or opinions, dated the Time of Delivery, with respect to the Registration

15

Statement and the Prospectus, as amended or supplemented, as well as such other related matters as the Representatives may reasonably request, and such counsel shall have received such papers and information as they may reasonably request to enable them to pass upon such matters.

(c) The Company's general counsel, or any associate or assistant general counsel of the Company, shall have furnished to the Representatives a written opinion, dated the Time of Delivery, in the form previously agreed and satisfactory to the Representatives.

(d) Latham & Watkins LLP shall have furnished to the Representatives their written opinion or opinions and negative assurances letter, dated the Time of Delivery, in the forms previously agreed and satisfactory to the Representatives.

(e) On the date hereof at a time prior to the execution of this Agreement, Deloitte & Touche LLP shall have furnished to the Representatives a letter with respect to the Company, dated the date hereof, in form and substance satisfactory to the Representatives, containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters, and at the Time of Delivery, Deloitte & Touche LLP shall have furnished to the Representatives a letter dated the Time of Delivery reaffirming the statements made in their letter dated the date hereof, except that the specified date referred to in such letter delivered on the Time of Delivery shall be a date not more than three days prior to the Time of Delivery, and with respect to such letter dated the Time of Delivery, as to such other matters as the Representatives may reasonably request and in form and substance satisfactory to the Representatives.

(f) On the date hereof at a time prior to the execution of this Agreement, Deloitte & Touche LLP shall have furnished to the Representatives a letter with respect to EFH, dated the date hereof, in form and substance satisfactory to the Representatives, containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters, and at the Time of Delivery, Deloitte & Touche LLP shall have furnished to the Representatives a letter dated the Time of Delivery reaffirming the statements made in their letter dated the date hereof, except that the specified date referred to in such letter delivered on the Time of Delivery shall be a date not more than three days prior to the Time of Delivery, and with respect to such letter dated the Time of Delivery, as to such other matters as the Representatives may reasonably request and in form and substance satisfactory to the Representatives.

(g) On the date hereof at a time prior to the execution of this Agreement, Deloitte & Touche LLP shall have furnished to the Representatives a letter with respect to Oncor Holdings, dated the date hereof, in form and substance satisfactory to the Representatives, containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters, and at the Time of Delivery, Deloitte & Touche LLP shall have furnished to the Representatives a letter dated the Time of Delivery reaffirming the statements made in their letter dated the date hereof, except that the specified date referred to in such letter delivered on the Time of Delivery shall be a date not more than three days prior to the Time of Delivery, and with respect to such letter dated the Time of Delivery, as to such other matters as the Representatives may reasonably request and in form and substance satisfactory to the Representatives.

16

(h) (i) The Company and its subsidiaries, taken as a whole, shall have not sustained since the date of the latest audited financial statements included or incorporated by reference in the Prospectus, as amended prior to the date hereof, any material loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Pricing Disclosure Package and the Prospectus, as amended prior to the date hereof, and (ii) since the respective dates as of which information is given in the Pricing Disclosure Package and the Prospectus, as amended prior to the date hereof, there shall not have been any material change in the capital stock or long-term debt of the Company or any of its subsidiaries or any material adverse change, or any development involving a prospective material adverse change, in or affecting the general affairs, management or consolidated financial position, shareholders' equity or results of operations of the Company and its subsidiaries, taken as a whole, in each case otherwise than as set forth or contemplated in the Pricing Disclosure Package and the Prospectus, as amended prior to the date hereof, the effect of which, in any such case described in clause (i) or (ii), is in the judgment of the Representatives so material and adverse to the Company and its subsidiaries, taken as a whole, as to make it impracticable or inadvisable to proceed with the public offering or the delivery of the Securities on the terms and in the manner contemplated in the Pricing Disclosure Package and the Prospectus as first amended or supplemented.

(i) At or after the Applicable Time (i) no downgrading shall have occurred in the rating accorded any of the Company's debt securities by any "nationally recognized statistical rating organization," as that term is defined by the Commission for purposes of Section 3(a)(62) under the Exchange Act, and (ii) no such organization shall have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of the Company's debt securities, in each case described in clause (i) or (ii) other than such a downgrade or announcement as set forth or contemplated in the Pricing Disclosure Package and the Prospectus in the fifth, sixth and seventh paragraphs under the caption "Summary Information—Recent Developments—Proposed Acquisition of Energy Future Holdings Corp—Closing Conditions to Merger."

(j) On or after the date hereof there shall not have occurred any of the following: (i) a suspension or material limitation in trading in securities generally on the New York Stock Exchange; (ii) a suspension or material limitation in trading in the Company's securities on the New York Stock Exchange or the NASDAQ Global Market; (iii) a general moratorium on commercial banking activities declared by either Federal or New York or California State authorities or a material disruption in commercial banking or securities settlement or clearance services in the United States; or (iv) the outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, or other calamity or crisis or any change or development involving a prospective change in national or international political, financial or economic conditions, if the effect of any such event specified in this clause (iv) in the judgment of the Representatives (A) is material and adverse and (B) makes it impracticable or inadvisable to proceed with the public offering or the delivery of the Securities on the terms and in the manner contemplated in the Pricing Disclosure Package and the Prospectus as first amended or supplemented.

17

(k) The Company shall have complied with the provisions of Section 5(e) hereof with respect to the furnishing of prospectuses on the second business day succeeding the date hereof.

(l) The Company shall have furnished or caused to be furnished to the Representatives at the Time of Delivery a certificate of officers of the Company satisfactory to the Representatives as to the accuracy of the representations and warranties of the Company herein at and as of the Time of Delivery, as to the performance by the Company of all of its obligations hereunder to be performed at or prior to the Time of Delivery, as to the matters set forth in subsections (a) and (h) of this Section and as to such other matters as the Representatives may reasonably request.

8. (a) The Company will indemnify and hold harmless each Underwriter against any losses, claims, damages or liabilities, joint or several, to which such Underwriter may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in the Preliminary Prospectus, the Registration Statement, any Issuer Free Writing Prospectus, the Prospectus or any other prospectus relating to the Securities, or any amendment or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse each Underwriter for any legal or other expenses reasonably incurred by such Underwriter in connection with investigating or defending any such action or claim as such expenses are incurred; provided , however , that the Company shall not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in the Preliminary Prospectus, the Registration Statement, any Issuer Free Writing Prospectus, the Prospectus or any other prospectus relating to the Securities or any amendment or supplement thereto in reliance upon and in conformity with written information furnished to the Company by any Underwriter through the Representatives expressly for use therein.

(b) Each Underwriter, severally and not jointly, will indemnify and hold harmless the Company against any losses, claims, damages or liabilities to which the Company may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in the Preliminary Prospectus, the Registration Statement, any Issuer Free Writing Prospectus, the Prospectus or any other prospectus relating to the Securities, or any amendment or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in the Preliminary Prospectus, the Registration Statement, any Issuer Free Writing Prospectus, the Prospectus or any other prospectus relating to the Securities, or any such amendment or supplement thereto in reliance upon and in conformity with written information furnished to the Company by such Underwriter through the Representatives expressly for use therein, it being understood and agreed that the only such information consists of the following: the information in the fourth paragraph of text under the caption "Underwriting" in the

18

Preliminary Prospectus and the Prospectus concerning the terms of the offering by the Underwriters; and the information in the eighth, ninth and tenth paragraphs of text (solely with respect to the statements attributable to the Underwriters), under the caption "Underwriting" in the Preliminary Prospectus and the Prospectus, insofar as such information relates to stabilization, penalty bids, overallotment, short positions and purchases to cover short positions by the Underwriters; and will reimburse the Company for any legal or other expenses reasonably incurred by the Company in connection with investigating or defending any such action or claim as such expenses are incurred.

(c) Promptly after receipt by an indemnified party under subsection (a) or (b) above of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under such subsection, notify the indemnifying party in writing of the commencement thereof; but the omission so to notify the indemnifying party shall not relieve it from any liability which it may have to any indemnified party under such subsection to the extent it is not materially prejudiced as a result thereof and in any event shall not relieve it from any liability otherwise than under such subsection. In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party under such subsection for any legal expenses of other counsel or any other expenses, in each case subsequently incurred by such indemnified party, in connection with the defense thereof other than reasonable costs of investigation; provided , however , that the Representatives shall have the right to employ counsel to represent jointly the Underwriters and their respective directors, officers, employees, agents and controlling persons who may be subject to liability arising out of any claim in respect of which indemnity may be sought by the Underwriters against the Company under this Section 8, if the Representatives shall have reasonably concluded that there may be one or more legal defenses available to the Underwriters and their respective directors, officers, employees, agents and controlling persons that are different from or additional to those available to the Company and its officers, directors, employees and controlling persons, and the fees and expenses of a single separate counsel for the Underwriters and their respective directors, officers, employees, agents and controlling persons (in addition to local counsel) shall be paid by the Company. The indemnifying party shall not be liable for any settlement or compromise of, or the consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification may be sought hereunder effected without the prior written consent of the indemnifying party (which consent shall not be unreasonably withheld), but, if settled or compromised with the indemnifying party's consent, or if judgment shall be entered following consent to the entry of such judgment given with the indemnifying party's consent, or if there shall otherwise be a final judgment for the plaintiff, the indemnifying party agrees to indemnify and hold harmless each indemnified party against any and all losses, claims, damages, liabilities and expenses, joint or several, by reason of such settlement, compromise or judgment, as the case may be. No indemnifying party shall, without the written consent of the indemnified party (which consent shall not be unreasonably withheld), effect the settlement or compromise of, or consent to the entry of any judgment with

19

respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified party is an actual or potential party to such action or claim) unless such settlement, compromise or judgment (i) includes an unconditional release of the indemnified party from all liability arising out of such action or claim and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party.

(d) If the indemnification provided for in this Section 8 is unavailable to or insufficient to hold harmless an indemnified party under subsection (a) or (b) above in respect of any losses, claims, damages or liabilities (or actions in respect thereof) referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (or actions in respect thereof) in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand, and the Underwriters on the other, from the offering of the Securities contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, or if the indemnified party failed to give the notice required under subsection (c) above, then in each case each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Company on the one hand and the Underwriters on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof), as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and the Underwriters on the other shall be deemed to be in the same proportion as the total net proceeds from the offering of the Securities contemplated by this Agreement (before deducting expenses) received by the Company bear to the total underwriting discounts and commissions received by the Underwriters. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company on the one hand or the Underwriters on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Company and the Underwriters agree that it would not be just and equitable if contribution pursuant to this subsection (d) were determined by pro rata allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this subsection (d). The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above in this subsection (d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this subsection (d), no Underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the Securities underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages which such Underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The obligations of the Underwriters in this subsection (d) to contribute are several in proportion to their respective underwriting obligations with respect to the Securities and not joint.

20

(e) The obligations of the Company under this Section 8 shall be in addition to any liability which the Company may otherwise have and shall extend, upon the same terms and conditions, to each director, officer, employee and agent of any Underwriter and each person, if any, who controls any Underwriter within the meaning of the Act; and the obligations of the Underwriters under this Section 8 shall be in addition to any liability which the respective Underwriters may otherwise have and shall extend, upon the same terms and conditions, to each officer, director and employee of the Company and to each person, if any, who controls the Company within the meaning of the Act.

9. (a) If any Underwriter shall default in its obligation to purchase the Securities which it has agreed to purchase under this Agreement, the Representatives may in their discretion arrange for themselves or another party or other parties to purchase such Securities on the terms contained herein. If within thirty-six hours after such default by any Underwriter the Representatives do not arrange for the purchase of such Securities, then the Company shall be entitled to a further period of thirty-six hours within which to procure another party or other parties reasonably satisfactory to the Representatives to purchase such Securities on such terms. In the event that, within the respective prescribed period, the Representatives notify the Company that they have so arranged for the purchase of such Securities, or the Company notifies the Representatives that it has so arranged for the purchase of such Securities, the Representatives or the Company shall have the right to postpone the Time of Delivery for a period of not more than seven days, in order to effect whatever changes may thereby be made necessary in the Registration Statement or the Prospectus, as amended or supplemented, or in any other documents or arrangements, and the Company agrees to file promptly any amendments or supplements to the Registration Statement or the Prospectus which in the opinion of the Representatives may thereby be made necessary. The term **"Underwriter"** as used in this Agreement shall include any person substituted under this Section with like effect as if such person had originally been a party to this Agreement.

(b) If, after giving effect to any arrangements for the purchase of the Securities of a defaulting Underwriter or Underwriters by the Representatives and the Company as provided in subsection (a) above, the aggregate principal amount of the Securities which remains unpurchased does not exceed one-eleventh of the aggregate principal amount of the Securities, then the Company shall have the right to require each non-defaulting Underwriter to purchase the principal amount of Securities which such Underwriter agreed to purchase under this Agreement and, in addition, to require each non-defaulting Underwriter to purchase its pro rata share (based on the principal amount of Securities which such Underwriter agreed to purchase under this Agreement) of the Securities of such defaulting Underwriter or Underwriters for which such arrangements have not been made; but nothing herein shall relieve a defaulting Underwriter from liability for its default.

(c) If, after giving effect to any arrangements for the purchase of the Securities of a defaulting Underwriter or Underwriters by the Representatives and the Company as provided in subsection (a) above, the aggregate principal amount of the Securities, as referred to in subsection (b) above, or if the Company shall not exercise the right described in subsection (b) above to require non-defaulting Underwriters to purchase Securities of a defaulting Underwriter or Underwriters, then this Agreement shall thereupon terminate, without liability on the part of

21

any non-defaulting Underwriter or the Company, except for the expenses to be borne by the Company and the Underwriters as provided in Section 6 hereof and the indemnity and contribution agreements in Section 8 hereof; but nothing herein shall relieve a defaulting Underwriter from liability for its default.

10. The respective indemnities, agreements, representations, warranties and other statements of the Company and the several Underwriters, as set forth in this Agreement or made by or on behalf of them, respectively, pursuant to this Agreement, shall remain in full force and effect, regardless of any investigation (or any statement as to the results thereof) made by or on behalf of any Underwriter or any controlling person of any Underwriter, or the Company or any officer or director or controlling person of the Company, and shall survive delivery of and payment for the Securities.

11. If this Agreement shall be terminated pursuant to Section 9 hereof, the Company shall not then be under any liability to any Underwriter with respect to the Securities except as provided in Sections 6 and 8 hereof; but, if for any other reason Securities are not delivered by or on behalf of the Company as provided herein, the Company will reimburse the Underwriters through the Representatives for all out-of-pocket expenses approved in writing by the Representatives, including fees and disbursements of counsel, reasonably incurred by the Underwriters in making preparations for the purchase, sale and delivery of the Securities, but the Company shall then be under no further liability to any Underwriter with respect to the Securities except as provided in Sections 6 and 8 hereof.

12. In all dealings hereunder, the Representatives of the Underwriters shall act on behalf of each of such Underwriters, and the parties hereto shall be entitled to act and rely upon any statement, request, notice or agreement on behalf of any Underwriter made or given by such Representatives jointly or by such of the Representatives, if any, as may be designated for such purpose in this Agreement.

All statements, requests, notices and agreements hereunder shall be in writing, and if to the Underwriters shall be delivered or sent by mail, overnight courier or facsimile transmission to RBC Capital Markets, LLC, 200 Vesey Street, 8th Floor, New York, New York 10281, Attention: Transaction Management, Facsimile: (646) 291-1469; Morgan Stanley & Co. LLC, 1585 Broadway, New York, New York 10036, Attention: Investment Banking Division, Facsimile: (212) 507-8999, with a copy to the Legal Department; and Barclays Capital Inc., 745 Seventh Avenue, New York, New York 10019, Attention: Syndicate Registration, Facsimile: 646-834-8133; and if to the Company shall be delivered or sent by mail or overnight courier to Sempra Energy, 488 8 th Avenue, San Diego, California 92101, Attention: Secretary, with a copy to the General Counsel; provided , however , that any notice to an Underwriter pursuant to Section 8(c) hereof shall be delivered or sent by mail, overnight courier or facsimile transmission to such Underwriter at its address set forth in its Underwriters' Questionnaire, or email or facsimile transmission constituting such Questionnaire, which address will be supplied to the Company by the Representatives upon request. Any such statements, requests, notices or agreements shall take effect upon receipt thereof.

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the Underwriters are required to obtain, verify and record

22

information that identifies their respective clients, including the Company, which information may include the name and address of their respective clients, as well as other information that will allow the Underwriters to properly identify their respective clients.

13. This Agreement shall be binding upon, and inure solely to the benefit of, the Underwriters, the Company and, to the extent provided in Sections 8 and 10 hereof, the directors, officers, employees and agents of each Underwriter, the officers, directors and employees of the Company and each person who controls the Company or any Underwriter, and their respective heirs, executors, administrators, successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement. No purchaser of any of the Securities from any Underwriter shall be deemed a successor or assign by reason merely of such purchase.

14. The Company acknowledges and agrees that the Underwriters are acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the offering of the Securities contemplated hereby (including in connection with determining the terms of the offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other person. The Company agrees that it will not claim that the Underwriters have rendered advisory services of any nature or respect, or owe an agency, fiduciary or similar duty to the Company, in connection with the transactions contemplated hereby or the process leading thereto. Additionally, neither the Representatives nor any other Underwriter is advising the Company or any other person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Underwriters shall have no responsibility or liability to the Company with respect thereto. Any review by the Underwriters of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Underwriters and shall not be on behalf of the Company.

15. Time shall be of the essence of this Agreement. As used herein, **"business day"** shall mean, unless otherwise expressly stated, any day when the Commission's office in Washington, D.C. is open for business.

16. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

17. This Agreement may be executed by any one or more of the parties hereto in any number of counterparts, each of which shall be deemed to be an original, but all such respective counterparts shall together constitute one and the same instrument.

**(Signature Page Follows)**

23

If the foregoing is in accordance with your understanding, please sign and return to us one for the Company and for each of the Representatives plus one for each counsel counterparts hereof.

Very truly yours,

Sempra Energy

By: /s/ Kathryn J. Collier
        Name:  Kathryn J. Collier
        Title:    Vice President and Treasurer

[Signature Page to Underwriting Agreement—January 2018 Offering]

Accepted as of the date hereof:

RBC Capital Markets, LLC

By:      /s/ John Sconzo
Name:    John Sconzo
Title:    Managing Director

Morgan Stanley & Co. LLC

By:      /s/ Yurij Slyz
Name:    Yurij Slyz
Title:    Executive Director

Barclays Capital Inc.

By:      /s/ Robert Stowe
Name:    Robert Stowe
Title:    Managing Director

On behalf of each of the Underwriters

[Signature Page to Underwriting Agreement—January 2018 Offering]

SCHEDULE I

| Underwriter | Principal Amount of 2019 Floating Rate Notes | Principal Amount of 2021 Floating Rate Notes | Principal Amount of 2020 Fixed Rate Notes | Principal Amount of 2023 Fixed Rate Notes | Principal Amount of 2028 Fixed Rate Notes | Principal Amount of 2038 Fixed Rate Notes | Principal Amount of 2048 Fixed Rate Notes |
|---|---|---|---|---|---|---|---|
| RBC Capital Markets, LLC | $175,000,000 | $245,000,000 | $ 175,000,000 | $ 175,000,000 | $ 350,000,000 | $ 350,000,000 | $ 280,000,000 |
| Morgan Stanley & Co. LLC | 175,000,000 | 245,000,000 | 175,000,000 | 175,000,000 | 350,000,000 | 350,000,000 | 280,000,000 |
| Barclays Capital Inc. | 50,000,000 | 70,000,000 | 50,000,000 | 50,000,000 | 100,000,000 | 100,000,000 | 80,000,000 |
| BBVA Securities Inc. | 25,000,000 | 35,000,000 | 25,000,000 | 25,000,000 | 50,000,000 | 50,000,000 | 40,000,000 |
| HSBC Securities (USA) Inc. | 25,000,000 | 35,000,000 | 25,000,000 | 25,000,000 | 50,000,000 | 50,000,000 | 40,000,000 |
| Santander Investment Securities Inc. | 25,000,000 | 35,000,000 | 25,000,000 | 25,000,000 | 50,000,000 | 50,000,000 | 40,000,000 |
| SG Americas Securities, LLC | 25,000,000 | 35,000,000 | 25,000,000 | 25,000,000 | 50,000,000 | 50,000,000 | 40,000,000 |
| Total | $500,000,000 | $700,000,000 | $ 500,000,000 | $ 500,000,000 | $1,000,000,000 | $1,000,000,000 | $ 800,000,000 |

Schedule I-1

SCHEDULE II

Free Writing Prospectus dated January 9, 2018

Schedule II-1

SCHEDULE III

Issuer Free Writing Prospectus
Filed Pursuant to Rule 433
Registration Statement No. 333-220257

**Sempra Energy**

Final Term Sheet
January 9, 2018

Floating Rate Notes due 2019
Floating Rate Notes due 2021
2.400% Notes due 2020
2.900% Notes due 2023
3.400% Notes due 2028
3.800% Notes due 2038
4.000% Notes due 2048

This free writing prospectus relates only to the securities described below and should be read together with Sempra Energy's preliminary prospectus supplement dated January 9, 2018 (the "Preliminary Prospectus Supplement"), the accompanying prospectus dated January 2, 2018 and the documents incorporated and deemed to be incorporated by reference therein.

| | |
|---|---|
| Issuer: | Sempra Energy (the "Company") |
| Trade Date: | January 9, 2018 |
| Settlement Date: | January 12, 2018 (T+3) |
| Special Mandatory Redemption: | If the Company does not consummate the Merger (as defined under "Description of the Notes" in the Preliminary Prospectus Supplement) on or before 5:00 p.m. (New York City time) on December 1, 2018, or if, on or prior to such date, the Merger Agreement (as defined under "Description of the Notes" in the Preliminary Prospectus Supplement) is terminated, the Company will be required to redeem all of the outstanding Floating Rate Notes due 2019, Floating Rate Notes due 2021, 2.400% Notes due 2020, 2.900% Notes due 2023, 3.800% Notes due 2038 and 4.000% Notes due 2048 on the Special Mandatory Redemption Date (as defined under "Description of the Notes" in the Preliminary Prospectus Supplement) at a redemption price equal to 101.000% of the principal amount thereof plus accrued and unpaid interest, if any, to, but excluding, the Special Mandatory Redemption Date.<br><br>The 3.400% Notes due 2028 are not subject to special |

mandatory redemption. A failure to consummate the Merger or termination of the Merger Agreement will not trigger the special mandatory redemption of the 3.400% Notes due 2028.

See "Description of the Notes—Special Mandatory Redemption" in the Preliminary Prospectus Supplement for the definitions of "Merger," "Merger Agreement," and "Special Mandatory Redemption Date" and for further terms and provisions applicable to special mandatory redemption.

**Floating Rate Notes due 2019**

| | |
|---|---|
| Securities Offered: | Floating Rate Notes due 2019 (the "2019 Floating Rate Notes") |
| Aggregate Principal Amount Offered: | $500,000,000 |
| Interest Payment Dates: | January 15, April 15, July 15 and October 15 of each year, commencing April 15, 2018 (subject to possible adjustment of such interest payment dates as described in the Preliminary Prospectus Supplement under the caption "Description of the Notes – Interest Rate and Maturity – Floating Rate Notes"). Interest on the 2019 Floating Rate Notes will also be payable at maturity. |
| Maturity: | July 15, 2019 |
| Coupon: | A rate per annum equal to the 3 Month LIBOR Rate (as defined in the Preliminary Prospectus Supplement), adjusted quarterly as described in the Preliminary Prospectus Supplement, plus 25 basis points, accruing from January 12, 2018 (the "original issue date") |
| Determination of Interest Rate: | The interest rate on the 2019 Floating Rate Notes for the period from and including their original issue date to but excluding the interest payment date for the 2019 Floating Rate Notes falling in April 2018 will be a rate per annum equal to the 3 Month LIBOR Rate, determined as of the second London banking day (as defined in the Preliminary Prospectus Supplement) immediately preceding the original issue date of the 2019 Floating Rate Notes, plus 25 basis points. Interest on the 2019 Floating Rate Notes will be reset on each interest payment date for the 2019 Floating Rate Notes (for purposes of this paragraph, each of these dates is |

Schedule III-2

called an "interest reset date"), beginning with the interest reset date falling in April 2018, and will be a per annum rate equal to the 3 Month LIBOR Rate, determined as of the second London banking day immediately preceding the applicable interest reset date, plus 25 basis points. The interest rate on the 2019 Floating Rate Notes will in no event be higher than the maximum rate permitted by New York law as the same may be modified by United States law of general application. The initial Interest Period (as defined in the Preliminary Prospectus Supplement) for the 2019 Floating Rate Notes will be the period beginning on, and including, the original issue date of the 2019 Floating Rate Notes to, but excluding, the interest payment date for the 2019 Floating Rate Notes falling in April 2018.

For additional information concerning the computation of interest on the 2019 Floating Rate Notes, see "Description of the Notes—Interest Rate and Maturity—Floating Rate Notes" in the Preliminary Prospectus Supplement.

| | |
|---|---|
| Price to Public: | 100.000%, plus accrued interest, if any |
| No Optional Redemption: | The 2019 Floating Rate Notes are not redeemable at the option of the Company. |
| CUSIP: | 816851 BC2 |
| ISIN: | US816851BC20 |
| Joint Book-Running Managers: | RBC Capital Markets, LLC<br>Morgan Stanley & Co. LLC<br>Barclays Capital Inc. |
| Co-Managers: | BBVA Securities Inc.<br>HSBC Securities (USA) Inc.<br>Santander Investment Securities Inc.<br>SG Americas Securities, LLC |

**Floating Rate Notes due 2021**

| | |
|---|---|
| Securities Offered: | Floating Rate Notes due 2021 (the "2021 Floating Rate Notes") |
| Aggregate Principal Amount Offered: | $700,000,000 |
| Interest Payment Dates: | January 15, April 15, July 15 and October 15 of each year, commencing April 15, 2018 (subject to possible |

adjustment of such interest payment dates as described in the Preliminary Prospectus Supplement under the caption "Description of the Notes—Interest Rate and Maturity—Floating Rate Notes"). Interest on the 2021 Floating Rate Notes will also be payable at maturity.

| | |
|---|---|
| Maturity: | January 15, 2021 |
| Coupon: | A rate per annum equal to the 3 Month LIBOR Rate (as defined in the Preliminary Prospectus Supplement), adjusted quarterly as described in the Preliminary Prospectus Supplement, plus 50 basis points, accruing from January 12, 2018 (the "original issue date") |
| Determination of Interest Rate: | The interest rate on the 2021 Floating Rate Notes for the period from and including their original issue date to but excluding the interest payment date for the 2021 Floating Rate Notes falling in April 2018 will be a rate per annum equal to the 3 Month LIBOR Rate, determined as of the second London banking day (as defined in the Preliminary Prospectus Supplement) immediately preceding the original issue date of the 2021 Floating Rate Notes, plus 50 basis points. Interest on the 2021 Floating Rate Notes will be reset on each interest payment date for the 2021 Floating Rate Notes (for purposes of this paragraph, each of these dates is called an "interest reset date"), beginning with the interest reset date falling in April 2018, and will be a per annum rate equal to the 3 Month LIBOR Rate, determined as of the second London banking day immediately preceding the applicable interest reset date, plus 50 basis points. The interest rate on the 2021 Floating Rate Notes will in no event be higher than the maximum rate permitted by New York law as the same may be modified by United States law of general application. The initial Interest Period (as defined in the Preliminary Prospectus Supplement) for the 2021 Floating Rate Notes will be the period beginning on, and including, the original issue date of the 2021 Floating Rate Notes to, but excluding, the interest payment date for the 2021 Floating Rate Notes falling in April 2018. |

For additional information concerning the computation of interest on the 2021 Floating Rate Notes, see "Description of the Notes—Interest Rate and Maturity—Floating Rate Notes" in the Preliminary

Schedule III-4

Prospectus Supplement.

| | |
|---|---|
| Price to Public: | 100.000%, plus accrued interest, if any |
| Optional Redemption Provision: | The 2021 Notes will not be redeemable at the option of the Company prior to January 14, 2019. On and after January 14, 2019, 100.000% of the principal amount. See the Preliminary Prospectus Supplement for further terms and provisions applicable to optional redemption. |
| CUSIP: | 816851 BD0 |
| ISIN: | US816851BD03 |
| Joint Book-Running Managers: | RBC Capital Markets, LLC<br>Morgan Stanley & Co. LLC<br>Barclays Capital Inc. |
| Co-Managers: | BBVA Securities Inc.<br>HSBC Securities (USA) Inc.<br>Santander Investment Securities Inc.<br>SG Americas Securities, LLC |

**2.400% Notes due 2020**

| | |
|---|---|
| Securities Offered: | 2.400% Notes due 2020 |
| Aggregate Principal Amount Offered: | $500,000,000 |
| Interest Payment Dates: | February 1 and August 1, commencing August 1, 2018. |
| Maturity: | February 1, 2020 |
| Coupon: | 2.400%, accruing from January 12, 2018 |
| Benchmark Treasury: | 1.875% due December 31, 2019 |
| Benchmark Treasury Yield: | 1.968% |
| Spread to Benchmark Treasury: | + 50 basis points |
| Yield to Maturity: | 2.468% |
| Price to Public: | 99.864%, plus accrued interest, if any |
| Optional Redemption Provision: | Make whole call at Adjusted Treasury Rate (as defined in the Preliminary Prospectus Supplement) + 10 basis points. See the Preliminary Prospectus Supplement for the definition of "Adjusted Treasury Rate" and for further terms and provisions applicable to optional redemption. |
| CUSIP: | 816851 BE8 |

ISIN:                                              US816851BE85

Joint Book-Running Managers:                       RBC Capital Markets, LLC
                                                   Morgan Stanley & Co. LLC
                                                   Barclays Capital Inc.

Co-Managers:                                       BBVA Securities Inc.
                                                   HSBC Securities (USA) Inc.
                                                   Santander Investment Securities Inc.
                                                   SG Americas Securities, LLC

**2.900% Notes due 2023**

Securities Offered:                                2.900% Notes due 2023

Aggregate Principal Amount Offered:                $500,000,000

Interest Payment Dates:                            February 1 and August 1, commencing August 1, 2018.

Maturity:                                          February 1, 2023

Coupon:                                            2.900%, accruing from January 12, 2018

Benchmark Treasury:                                2.125% due December 31, 2022

Benchmark Treasury Yield:                          2.331%

Spread to Benchmark Treasury:                      + 65 basis points

Yield to Maturity:                                 2.981%

Price to Public:                                   99.621%, plus accrued interest, if any

Optional Redemption Provision:                     Prior to January 1, 2023, make whole call at Adjusted Treasury Rate (as defined in the Preliminary Prospectus Supplement) + 10 basis points. On and after January 1, 2023, 100.000% of the principal amount. See the Preliminary Prospectus Supplement for the definition of "Adjusted Treasury Rate" and for further terms and provisions applicable to optional redemption.

CUSIP:                                             816851 BF5

ISIN:                                              US816851BF50

Joint Book-Running Managers:                       RBC Capital Markets, LLC
                                                   Morgan Stanley & Co. LLC
                                                   Barclays Capital Inc.
                                                   Santander Investment Securities Inc.

Co-Managers:                                       BBVA Securities Inc.
                                                   HSBC Securities (USA) Inc.
                                                   SG Americas Securities, LLC

### 3.400% Notes due 2028

| | |
|---|---|
| Securities Offered: | 3.400% Notes due 2028 |
| Aggregate Principal Amount Offered: | $1,000,000,000 |
| Interest Payment Dates: | February 1 and August 1, commencing August 1, 2018. |
| Maturity: | February 1, 2028 |
| Coupon: | 3.400%, accruing from January 12, 2018 |
| Benchmark Treasury: | 2.250% due November 15, 2027 |
| Benchmark Treasury Yield: | 2.553% |
| Spread to Benchmark Treasury: | + 93 basis points |
| Yield to Maturity: | 3.483% |
| Price to Public: | 99.299%, plus accrued interest, if any |
| Optional Redemption Provision: | Prior to November 1, 2027, make whole call at Adjusted Treasury Rate (as defined in the Preliminary Prospectus Supplement) + 15 basis points. On and after November 1, 2027, 100.000% of the principal amount. See the Preliminary Prospectus Supplement for the definition of "Adjusted Treasury Rate" and for further terms and provisions applicable to optional redemption. |
| CUSIP: | 816851 BG3 |
| ISIN: | US816851BG34 |
| Joint Book-Running Managers: | RBC Capital Markets, LLC<br>Morgan Stanley & Co. LLC<br>Barclays Capital Inc.<br>BBVA Securities Inc. |
| Co-Managers: | HSBC Securities (USA) Inc.<br>Santander Investment Securities Inc.<br>SG Americas Securities, LLC |

### 3.800% Notes due 2038

| | |
|---|---|
| Securities Offered: | 3.800% Notes due 2038 |
| Aggregate Principal Amount Offered: | $1,000,000,000 |
| Interest Payment Dates: | February 1 and August 1, commencing August 1, 2018. |
| Maturity: | February 1, 2038 |
| Coupon: | 3.800%, accruing from January 12, 2018 |

Schedule III-7

| | |
|---|---|
| Benchmark Treasury: | 2.750% due August 15, 2047 |
| Benchmark Treasury Yield: | 2.898% |
| Spread to Benchmark Treasury: | + 98 basis points |
| Yield to Maturity: | 3.878% |
| Price to Public: | 98.918%, plus accrued interest, if any |
| Optional Redemption Provision: | Prior to August 1, 2037, make whole call at Adjusted Treasury Rate (as defined in the Preliminary Prospectus Supplement) + 15 basis points. On and after August 1, 2037, 100.000% of the principal amount. See the Preliminary Prospectus Supplement for the definition of "Adjusted Treasury Rate" and for further terms and provisions applicable to optional redemption. |
| CUSIP: | 816851 BH1 |
| ISIN: | US816851BH17 |
| Joint Book-Running Managers: | RBC Capital Markets, LLC<br>Morgan Stanley & Co. LLC<br>Barclays Capital Inc.<br>SG Americas Securities, LLC |
| Co-Managers: | BBVA Securities Inc.<br>HSBC Securities (USA) Inc.<br>Santander Investment Securities Inc. |

**4.000% Notes due 2048**

| | |
|---|---|
| Securities Offered: | 4.000% Notes due 2048 |
| Aggregate Principal Amount Offered: | $800,000,000 |
| Interest Payment Dates: | February 1 and August 1, commencing August 1, 2018 |
| Maturity: | February 1, 2048 |
| Coupon: | 4.000%, accruing from January 12, 2018 |
| Benchmark Treasury: | 2.750% due August 15, 2047 |
| Benchmark Treasury Yield: | 2.898% |
| Spread to Benchmark Treasury: | + 118 basis points |
| Yield to Maturity: | 4.078% |
| Price to Public: | 98.654%, plus accrued interest, if any |
| Optional Redemption Provision: | Prior to August 1, 2047, make whole call at Adjusted Treasury Rate (as defined in the Preliminary |

Prospectus Supplement) + 20 basis points. On and after August 1, 2047, 100.000% of the principal amount. See the Preliminary Prospectus Supplement for the definition of "Adjusted Treasury Rate" and for further terms and provisions applicable to optional redemption.

| | |
|---|---|
| CUSIP: | 816851 BJ7 |
| ISIN: | US816851BJ72 |
| Joint Book-Running Managers: | RBC Capital Markets, LLC<br>Morgan Stanley & Co. LLC<br>Barclays Capital Inc.<br>HSBC Securities (USA) Inc. |
| Co-Managers: | BBVA Securities Inc.<br>Santander Investment Securities Inc.<br>SG Americas Securities, LLC |

**<u>All Securities Offered Hereby</u>**

| | |
|---|---|
| Total Net Proceeds: | Approximately $4,938.2 million, after deducting underwriting discounts but before deducting estimated offering expenses payable by the Company |

**No PRIIPs KID – No PRIIPs key information document ("KID") has been prepared as not available to retail in EEA.**

**The issuer has filed a registration statement (including a prospectus) with the SEC for the offering to which this communication relates. Before you invest, you should read the prospectus in that registration statement and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering. You may get these documents for free by visiting EDGAR on the SEC website at *www.sec.gov* . Alternatively, the issuer, any underwriter or any dealer participating in the offering will arrange to send you the prospectus if you request it by calling RBC Capital Markets, LLC toll-free at 1-866-375-6829, by calling Morgan Stanley & Co. LLC toll-free at 1-866-718-1649 or by calling Barclays Capital Inc. toll-free at 1-888-603-5847.**

**Any legends, disclaimers or other notices that may appear below are not applicable to this communication and should be disregarded. Such legends, disclaimers or other notices have been automatically generated as a result of this communication having been sent via Bloomberg or another system.**

Schedule III-9

Sempra Energy

**OFFICERS' CERTIFICATE**
**(Pursuant to Sections 201 and 301 of the Indenture)**

January 12, 2018

The undersigned, Trevor I. Mihalik, Senior Vice President, Controller and Chief Accounting Officer, and Kathryn B. Collier, Vice President and Treasurer, respectively, of Sempra Energy, a California corporation (the " Company "), hereby certify as follows:

The undersigned, having read the appropriate provisions of the Indenture dated as of February 23, 2000 (the " Indenture ") between the Company and U.S. Bank National Association, as successor Trustee to U.S. Bank Trust National Association (the " Trustee "), including Sections 201, 301 and 303 thereof and the definitions in such Indenture relating thereto, and certain other corporate documents and records, and having made such examination and investigation as, in the opinion of the undersigned, each considers necessary to enable the undersigned to express an informed opinion as to whether or not the conditions set forth in the Indenture relating to the establishment of the terms of $500,000,000 aggregate principal amount of the Company's Floating Rate Notes due 2019 (the " 2019 Floating Rate Notes "), $700,000,000 aggregate principal amount of the Company's Floating Rate Notes due 2021 (the " 2021 Floating Rate Notes "), $500,000,000 aggregate principal amount of the Company's 2.400% Notes due 2020 (the " 2020 Notes "), $500,000,000 aggregate principal amount of the Company's 2.900% Notes due 2023 (the " 2023 Notes "), $1,000,000,000 aggregate principal amount of the Company's 3.400% Notes due 2028 (the " 2028 Notes "), $1,000,000,000 aggregate principal amount of the Company's 3.800% Notes due 2038 (the " 2038 Notes ") and $800,000,000 aggregate principal amount of the Company's 4.000% Notes due 2048 (the " 2048 Notes " and, together with the 2019 Floating Rate Notes, the 2021 Floating Rate Notes, the 2020 Notes, the 2023 Notes, the 2028 Notes and the 2038 Notes, the " Notes ") and the form of certificate evidencing the Notes of each series have been complied with, and whether the conditions in the Indenture relating to the authentication and delivery by the Trustee of the Notes of each series have been complied with, certify that (1) the terms of the Notes of each series were established by the undersigned pursuant to authority delegated to them by resolutions duly adopted by the Board of Directors of the Company at meetings held on February 23, 2017, September 22, 2017 and November 9, 2017 (collectively, the " Resolutions ") and such terms are as set forth in and incorporated by reference into Annex I hereto, (2) the form of certificate evidencing the Notes of each series was established by the undersigned pursuant to authority delegated to them by the Resolutions and shall be in substantially the form attached as Annex II-A, Annex II-B, Annex II-C, Annex II-D, Annex II-E, Annex II-F or Annex II-G, as applicable, hereto, (3) true, complete and correct copies of the Resolutions, which were duly adopted by the Board of Directors of the Company and are in full force and effect on the date hereof, are attached as exhibits to the Certificate of the Secretary of the Company of even date herewith, and (4) the form and terms of the Notes of each series have been established pursuant to Sections 201 and 301 of the Indenture and comply with the Indenture and, in the opinion of the undersigned, all conditions provided for in the Indenture (including, without limitation, those set forth in Sections 201, 301 and 303 of the Indenture) relating to the establishment of the terms of the Notes of each series and the form of certificate

[Officers' Certificate — Indenture]

evidencing the Notes of each series, and relating to the execution, authentication and delivery of the Notes of each series, have been complied with.

This certificate may be executed by the parties hereto in counterparts, each of which when so executed shall be deemed to be an original, with the same effect as if the signatures thereto and hereto were on the same instrument, but all such counterparts shall together constitute but one and the same instrument.

*(Signature Page Follows)*

[Officers' Certificate — Indenture]

IN WITNESS WHEREOF, we have hereunto set our hands as of the date first written above.

/s/ Trevor I. Mihalik
Trevor I. Mihalik
Senior Vice President, Controller and
Chief Accounting Officer

/s/ Kathryn J. Collier
Kathryn J. Collier
Vice President and Treasurer

[Officers' Certificate — Indenture]

ANNEX I

Capitalized terms used in this Annex I and not otherwise defined herein have the same definitions as in the Indenture referred to in the Officers' Certificate of which this Annex I constitutes a part.

(1) Seven series of debt securities are established hereby and shall be known and designated, respectively, as follows: (a) the "Floating Rate Notes due 2019" (the " 2019 Floating Rate Notes "), (b) the "Floating Rate Notes due 2021" (the " 2021 Floating Rate Notes "), (c) the "2.400% Notes due 2020" (the " 2020 Notes "), (d) the "2.900% Notes due 2023" (the " 2023 Notes "), (e) the "3.400% Notes due 2028" (the " 2028 Notes "), (f) the "3.800% Notes due 2038" (the " 2038 Notes ") and (g) the "4.000% Notes due 2048" (the " 2048 Notes "). The 2019 Floating Rate Notes, the 2021 Floating Rate Notes, the 2020 Notes, the 2023 Notes, the 2028 Notes, the 2038 Notes and the 2048 Notes are hereinafter sometimes called, collectively, the " Securities " or the " Notes ".

(2) The aggregate principal amount of the Securities of each series which may be authenticated and delivered under the Indenture is limited to $500,000,000 in the case of the 2019 Floating Rate Notes, $700,000,000 in the case of the 2021 Floating Rate Notes, $500,000,000 in the case of the 2020 Notes, $500,000,000 in the case of the 2023 Notes, $1,000,000,000 in the case of the 2028 Notes, $1,000,000,000 in the case of the 2038 Notes and $800,000,000 in the case of the 2048 Notes, except for Securities of any such series authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Securities of the same series pursuant to Sections 304, 305, 306, 906 or 1106 of the Indenture and except for any Securities of any such series which, pursuant to Section 303 of the Indenture, are deemed never to have been authenticated and delivered under the Indenture. However, each series of Securities may be re-opened by the Company for the issuance of additional Securities of the same series, so long as any such additional Securities of such series (i) have the same form and terms (other than offering price, the date of issuance and, if applicable, the date from which interest thereon shall begin to accrue and the first interest payment date), and carry the same right to receive accrued and unpaid interest (if any), as the Securities of such series theretofore issued and (ii) shall form a single series under the Indenture with the Securities of such series theretofore issued; provided that such additional Securities of such series are fungible with the Securities of such series theretofore issued for United States Federal income tax purposes; provided, however, that, notwithstanding the foregoing, no series of Securities may be re-opened if the Company has effected defeasance with respect to the Securities of such series pursuant to Section 1302 of the Indenture or has effected satisfaction and discharge with respect to the Securities of such series pursuant to Section 401 of the Indenture.

(3) The Securities of each series are to be issued only as registered securities without coupons. The Securities of each series shall be issued in book-entry form and represented by one or more global Securities (the " Global Securities ") of such series, the initial depositary (the " Depositary ") for the Global Securities of such series shall be The Depository Trust Company and the depositary arrangements shall be those employed by whoever shall be the Depositary with respect to the Global Securities of such series from time to time. Notwithstanding the foregoing, certificated Securities of any series in definitive form may be issued in exchange for

Global Securities of such series under the circumstances contemplated by Section 305 of the Indenture.

(4) The Securities shall be sold by the Company to the several underwriters (the " <u>Underwriters</u> ") named in <u>Schedule I</u> to the Underwriting Agreement dated January 9, 2018 among the Company and RBC Capital Markets, LLC, Morgan Stanley & Co. LLC and Barclays Capital Inc., as representatives of the Underwriters (the " <u>Underwriting Agreement</u> "), at a price equal to 99.850% of the principal amount of the 2019 Floating Rate Notes, 99.550% of the principal amount of the 2021 Floating Rate Notes, 99.564% of the principal amount of the 2020 Notes, 99.021% of the principal amount of the 2023 Notes, 98.649% of the principal amount of the 2028 Notes, 98.043% of the principal amount of the 2038 Notes and 97.779% of the principal amount of the 2048 Notes, and the initial price to the public of the Securities shall be 100.000% of the principal amount of the 2019 Floating Rate Notes, 100.000% of the principal amount of the 2021 Floating Rate Notes, 99.864% of the principal amount of the 2020 Notes, 99.621% of the principal amount of the 2023 Notes, 99.299% of the principal amount of the 2028 Notes, 98.918% of the principal amount of the 2038 Notes and 98.654% of the principal amount of the 2048 Notes (in each case plus accrued and unpaid interest, if any), and underwriting discounts and commissions shall be 0.150% of the principal amount of the 2019 Floating Rate Notes, 0.450% of the principal amount of the 2021 Floating Rate Notes, 0.300% of the principal amount of the 2020 Notes, 0.600% of the principal amount of the 2023 Notes, 0.650% of the principal amount of the 2028 Notes, 0.875% of the principal amount of the 2038 Notes and 0.875% of the principal amount of the 2048 Notes.

(5) The Securities of each series shall not be repayable or redeemable at the option of the Holders prior to the Stated Maturity of the principal of the Securities of such series (except as provided in Article V of the Indenture) and shall not be subject to a sinking fund or analogous provision.

(6) The Borough of Manhattan, The City of New York is hereby designated as a Place of Payment for the Securities of each series.

(7) The Company hereby appoints the Trustee, acting through its Corporate Trust Office in the Borough of Manhattan, The City of New York, as the Company's agent for the purposes specified in Section 1002 of the Indenture with respect to the Securities of each series; provided, however, subject to Section 1002 of the Indenture, the Company may at any time remove the Trustee as its office or agency in the Borough of Manhattan, The City of New York designated for such purposes with respect to the Securities of any series and may from time to time designate one or more other offices or agencies for such purposes with respect to the Securities of any series and may from time to time rescind such designation, so long as the Company shall at all times maintain an office or agency for such purposes with respect to the Securities of each series in the Borough of Manhattan, The City of New York.

(8) The Securities of each series shall be issued in denominations of $2,000 and integral multiples of $1,000 in excess thereof.

(9) The principal of, premium, if any, and interest on the Securities of each series shall be payable in U.S. dollars.

(10) Section 1303 of the Indenture shall not apply to the Securities of any series.

(11) The Securities of each series shall not be convertible into or exchangeable for other securities.

(12) Anything in the Indenture or the Securities of any series to the contrary notwithstanding, payments of the principal of, premium, if any, and interest on the Global Securities of each series shall be made by wire transfer to the Depositary or its nominee or to any successor Depositary or nominee, whichever shall be the registered Holder of such Global Securities of such series from time to time.

(13) To the extent that any provision of the Indenture or the Securities of any series provides for the payment of interest on overdue principal of, premium, if any, or interest on, the Securities of such series, then, to the extent permitted by law, interest on such overdue principal, premium, if any, and interest shall accrue at the rate of interest borne by the Securities of such series.

(14) The Securities of each series shall have such other terms and provisions as are set forth in the form of certificate evidencing the Securities of such series attached as Annex II-A, Annex II-B, Annex II-C, Annex II-D, Annex II-E, Annex II-F or Annex II-G, as applicable, to the Officers' Certificate of which this Annex I constitutes a part, all of which terms and provisions are incorporated by reference in and made a part of this Annex I as if set forth in full herein.

(15) As used in the Indenture with respect to the Securities of any series and in the certificates evidencing the Securities of such series, all references to "premium" on the Securities of such series shall mean any amounts (other than accrued interest) payable upon the redemption of any Securities of such series in excess of 100% of the principal amount of such Securities.

(16) Subsection (5) of Section 501 of the Indenture shall not be applicable to the Securities of any series and, insofar as Section 501 of the Indenture is applicable to the Securities of any series, subsection (5) of Section 501 of the Indenture is hereby deleted in its entirety and replaced with the following text and any references in the Indenture to subsection (5) of Section 501 thereof shall, insofar as it relates to the Securities of any series, be disregarded, *mutatis mutandis* :

"(5) [omitted intentionally]; or".

ANNEX II-A

Form of Certificate Evidencing the Floating Rate Notes due 2019

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TO THE CORPORATION OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SEMPRA ENERGY

Floating Rate Notes due 2019

$ [●]

No. 00[●]                                                                                              CUSIP No. 816851 BC2
                                                                                                       ISIN No. US816851 BC20

Sempra Energy, a corporation duly organized and existing under the laws of the State of California (herein called the " Corporation ," which term includes any successor Person under the Indenture hereinafter referred to), for value received, hereby promises to pay to CEDE & CO., or registered assigns, the principal sum of [●] Million Dollars ($[●]) on July 15, 2019 (the " Maturity Date "), and to pay interest thereon from January 12, 2018 (the " Original Issue Date ") or from the most recent date to which interest has been paid or duly provided for on the Securities (as defined on the reverse hereof) of this series, quarterly in arrears on January 15, April 15, July 15 and October 15 of each year (each, an " Interest Payment Date "), beginning on April 15, 2018, and on the Maturity Date at the Applicable Rate (as defined below), until the principal hereof is paid or made available for payment, *provided* that any principal hereof or (to the extent that the payment of such interest shall be legally enforceable) premium, if any, or interest hereon which is not paid when due shall bear interest at the Applicable Rate from the respective dates such amounts are due until they are paid or made available for payment, and such interest shall be payable on demand; and provided, further that if any Interest Payment Date (other than (a) the Interest Payment Date falling on the Maturity Date of the Securities of this series and (b) any Interest Payment Date falling on the Special Mandatory Redemption Date (as defined on the reverse hereof), if any, for the Securities of this series) is not a Floating Rate Business Day (as defined below), such Interest Payment Date will be moved to, and will be, the immediately succeeding Floating Rate Business Day, except that if such immediately succeeding Floating Rate Business Day is in the immediately succeeding calendar month, such Interest Payment Date (other than (a) the Interest Payment Date falling on the Maturity Date of the Securities of this series and (b) any Interest Payment Date falling on the Special Mandatory Redemption Date, if any, for the Securities of this series) will be moved to, and will be, the immediately preceding Floating Rate Business Day. If the Maturity Date or the Special Mandatory Redemption Date, if any, of the Securities of this series is not a Floating Rate Business Day, the Corporation will pay interest, principal and premium, if any, due on the Maturity Date or the Special Mandatory Redemption Date, as the case may be, on the immediately succeeding day that is a Floating Rate Business Day as if such payment were made on the date such payment was originally due, and no interest will accrue on the amounts so payable for the period from and after the Maturity Date or the Special Mandatory Redemption Date, as the case may be, to the immediately succeeding Floating Rate Business Day.

The term " Applicable Rate " means a per annum interest rate determined as follows: the Applicable Rate for the period from and including the Original Issue Date to but excluding the Interest Payment Date falling in April

2018 will be a per annum rate equal to the 3 Month LIBOR Rate (as defined below), determined as of the second London Banking Day (as defined below) immediately preceding the Original Issue Date, plus 25 basis points, and the Applicable Rate will be reset on each Interest Payment Date (each of these dates is called an " Interest Reset Date "), beginning with the Interest Reset Date falling in April 2018, and will be a per annum rate equal to the 3 Month LIBOR Rate, determined as of the second London Banking Day immediately preceding the applicable Interest Reset Date, plus 25 basis points. The interest rate on this Security will in no event be higher than the maximum rate permitted by New York law as the same may be modified by United States law of general application.

Interest payable on any Interest Payment Date or on the Special Mandatory Redemption Date, if any, or the Maturity Date shall be the amount of interest accrued from, and including, the immediately preceding Interest Payment Date in respect of which interest has been paid or duly provided for on the Securities of this series (or from and including the Original Issue Date if no interest has been paid or duly provided for) to, but not including, such Interest Payment Date or the Special Mandatory Redemption Date or the Maturity Date, as the case may be.

The 3 Month LIBOR Rate will be determined by the Calculation Agent (as defined on the reverse hereof) in accordance with the following provisions:

" 3 Month LIBOR Rate " means the rate for deposits in U.S. dollars for the 3-month period commencing on the applicable Interest Reset Date which appears on Reuters Screen LIBOR01 Page (as defined below) at approximately 11:00 a.m., London time, on the second London Banking Day prior to such Interest Reset Date (the second London Banking Day prior to any Interest Reset Date being referred to as an " Interest Determination Date "). If this rate does not appear on the Reuters Screen LIBOR01 Page at approximately 11:00 a.m., London time, on such Interest Determination Date, the Calculation Agent will determine the rate on the basis of the rates at which deposits in U.S. dollars are offered by four major banks in the London interbank market selected by the Calculation Agent at approximately 11:00 a.m., London time, on such Interest Determination Date to prime banks in the London interbank market for a period of three months commencing on such Interest Reset Date and in a principal amount equal to an amount not less than U.S. $1,000,000 that is representative for a single transaction in such market at such time. In such case, the Calculation Agent will request the principal London office of each of the aforesaid major banks to provide a quotation of such rate. If at least two such quotations are provided, the rate for that Interest Reset Date will be the arithmetic mean of the quotations, and, if fewer than two quotations are provided as requested, the rate for that Interest Reset Date will be the arithmetic mean of the rates quoted by three major banks in New York City selected by the Calculation Agent, at approximately 11:00 a.m., New York City time, on such Interest Determination Date for loans in U.S. dollars to leading European banks for a period of three months commencing on that Interest Reset Date and in a principal amount equal to an amount not less than U.S. $1,000,000 that is representative for a single transaction in such market at such time; provided, however, that if the banks selected as aforesaid by the Calculation Agent are not quoting such rates as mentioned in this sentence, the 3 Month LIBOR Rate commencing as of such Interest Reset Date will remain the 3 Month LIBOR Rate determined as of the Interest Determination Date for the immediately preceding Interest Reset Date. Solely for purposes of this paragraph, the term "Interest Reset Date" shall be deemed to include the Original Issue Date.

The term " London Banking Day " means any day on which dealings in U.S. dollars are transacted in the London interbank market. The term " Floating Rate Business Day " means any day (1) that is a Business Day (as defined in the Indenture (as defined on the reverse hereof) in The City of New York, and (2) that is also a London Banking Day.

The term " Reuters Screen LIBOR01 Page " means the display designated on page "LIBOR01" on Reuters (or such other page as may replace the LIBOR01 page on that service or any successor service for the purpose of displaying London interbank offered rates for U.S. dollar deposits of major banks).

U.S. Bank National Association will initially act as Calculation Agent for the Securities of this series until such time, if any, as the Corporation shall appoint a successor Calculation Agent. The Calculation Agent will, upon the request of the Holder of this Security, provide the interest rate then in effect on this Security. All calculations made by the Calculation Agent in the absence of manifest error shall be conclusive for all purposes and binding on the Corporation and the Holder of this Security. The Corporation may appoint a successor Calculation Agent with the written consent of the Trustee.

2

All percentages resulting from any calculation of the interest rate with respect to this Security will be rounded, if necessary, to the nearest one-hundred thousandth of a percentage point, with five one-millionths of a percentage point rounded upwards (for example, 9.876545% (or .09876545) being rounded to 9.87655% (or .0987655) and 9.876544% (or .09876544) being rounded to 9.87654% (or .0987654); and all dollar amounts in or resulting from any such calculation will be rounded to the nearest cent (with one-half cent being rounded upwards).

The amount of interest for each day the Securities of this series are outstanding (the " <u>Daily Interest Amount</u> ") will be calculated by dividing the interest rate in effect on the Securities of this series on that day by 360 and multiplying the result by the principal amount of the Securities of this series. The amount of interest payable on the Securities of this series on any Interest Payment Date or on the Special Mandatory Redemption Date, if any, or the Maturity Date will be calculated by adding the Daily Interest Amounts for the Securities of this series for each day in the applicable Interest Period (as defined below). The term "Interest Period" means the period beginning on, and including, an Interest Payment Date to, but excluding, the next succeeding Interest Payment Date or the Special Mandatory Redemption Date or the Maturity Date, as the case may be; provided that the initial Interest Period for the Securities of this series will be the period beginning on, and including, the Original Issue Date to, but excluding, the Interest Payment Date falling in April 2018. The amount of interest payable on the Securities of this series on any day, other than an Interest Payment Date or the Special Mandatory Redemption Date or the Maturity Date, on which interest on the Securities of this series is due and payable will be calculated by adding the Daily Interest Amounts for the Securities of this series for each day from and including the most recent date to which interest on the Securities of this series has been paid or duly provided for to but excluding the date such payment of interest is due.

The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th calendar day (whether or not a Floating Rate Business Day), immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for on any Interest Payment Date will forthwith cease to be payable to the Holder on such Regular Record Date by virtue of having been such Holder and may either be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Securities of this series not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Securities of this series may be listed, and upon such notice as may be required by such exchange, all as more fully provided in said Indenture.

Payment of the principal of (and premium, if any) and interest on this Security will be made at the office or agency of the Corporation maintained for that purpose in the Borough of Manhattan, The City of New York, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts; *provided* , *however* , that at the option of the Corporation payment of interest may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register or by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Trustee at least 15 days prior to the date for payment by the Person entitled thereto. Notwithstanding the foregoing, so long as the Holder of this Security is the Depositary or its nominee, payment of the principal of (and premium, if any) and interest on this Security will be made by wire transfer of immediately available funds.

Reference is hereby made to the further provisions of this Security set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Security shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

**[Signature Page Follows]**

3

IN WITNESS WHEREOF, the Corporation has caused this instrument to be duly executed.

SEMPRA ENERGY

By: _____
Name:    Kathryn J. Collier
Title:    Vice President and Treasurer

Attest:

By: _____
Name:    Maria Angelica Espinosa
Title:    Vice President — Compliance and Governance and
         Corporate Secretary

This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION

As successor Trustee to
         U.S. Bank Trust National Association

By: _____
         Authorized Signatory

Dated: _____

4

(REVERSE OF SECURITY)

This Security is one of a duly authorized issue of securities of the Corporation (herein called the " Securities "), issued and to be issued in one or more series under an Indenture, dated as of February 23, 2000 (herein called the " Indenture ," which term shall have the meaning assigned to it in such instrument), between the Corporation and U.S. Bank National Association, as successor trustee to U.S. Bank Trust National Association (herein called the " Trustee ," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a statement of the respective rights, limitation of rights, duties and immunities thereunder of the Corporation, the Trustee and the Holders of the Securities and of the terms upon which the Securities are, and are to be, authenticated and delivered. This Security is one of the series designated on the face hereof.

In connection with the issuance of the Securities of this series, the Corporation has entered into a Calculation Agent Agreement dated as of January 12, 2018 (as the same may be amended or supplemented from time to time and including any successor agreement thereto, the " Calculation Agreement ") with U.S. Bank National Association, as calculation agent (in such capacity herein called the " Calculation Agent ," which term includes any successor thereto under the Calculation Agreement).

If the Corporation does not consummate the Merger (as defined below) on or before 5:00 p.m. (New York City Time) on December 1, 2018, or if, on or prior to such date, the Merger Agreement (as defined below) is terminated (each, a " Special Mandatory Redemption Event "), the Corporation will redeem all of the outstanding Securities of this series, in whole and not in part, on the Special Mandatory Redemption Date (as defined below) at a Redemption Price equal to 101% of the principal amount of the Securities of this series plus accrued and unpaid interest, if any, to, but excluding, the Special Mandatory Redemption Date (the " Special Mandatory Redemption "). Notwithstanding the foregoing provisions of this paragraph, installments of interest on any Securities of this series that are due and payable on any Interest Payment Date falling on or prior to the Special Mandatory Redemption Date will be payable on such Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date according to the terms of the Securities of this series and the Indenture.

The Corporation will cause the notice of Special Mandatory Redemption to be mailed, with a copy to the Trustee, within five business days after the occurrence of a Special Mandatory Redemption Event, to each Holder of Securities of this series at its registered address. Such notice shall state, in addition to the other matters required by the Indenture, that a Special Mandatory Redemption Event has occurred (and shall describe generally the nature of such event) and that all of the outstanding Securities of this series will be redeemed on the Redemption Date set forth in such notice (which shall be a business day that is no earlier than three business days and no later than 30 days after the date such notice is given) (the " Special Mandatory Redemption Date "). Once notice of Special Mandatory Redemption is mailed, the Securities of this series will become due and payable on the Special Mandatory Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Special Mandatory Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation is required to effect a Special Mandatory Redemption of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price. Unless the Corporation defaults in payment of the Redemption Price of the Securities of this series on the Special Mandatory Redemption Date, on and after the Special Mandatory Redemption Date interest will cease to accrue on the Securities of this series. For purposes of clarity, it is understood and agreed that notice of Special Mandatory Redemption shall be given to the Holders of all of the Special Mandatory Redemption Notes (as defined below) on the same day and that all of the Special Mandatory Redemption Notes shall have the same Special Mandatory Redemption Date and it is further understood and agreed that the term " Maturity ," as used in the Indenture with respect to the Securities of this series, includes the Special Mandatory Redemption Date, if any. Any Special Mandatory Redemption shall otherwise be effected in accordance with the applicable provisions of the Indenture, except that any requirement in the Indenture that notice of redemption be given not less than 30 nor more than 60 days prior to the Redemption Date shall be superseded by the foregoing provisions of this paragraph. As used in this paragraph, " business day " means any day (other than a Saturday or a Sunday) on which banking institutions in The City of New York are not authorized or obligated by law or executive order to remain closed.

Anything in the Indenture or the Securities of this series to the contrary notwithstanding, no supplemental indenture or other amendment or supplement to the Indenture that is applicable to the Securities of this series, no

5

amendment or supplement to the Securities of this series, and no waiver given by the Holders of the Securities of this series, shall, without the consent of the Holder of each outstanding Security of this series, change the obligation of the Corporation to redeem all of the Securities of this series on the Special Mandatory Redemption Date, if any, reduce the Redemption Price (including accrued and unpaid interest, if any) payable upon a Special Mandatory Redemption of the Securities of this series or extend the time for payment of such Redemption Price.

For purposes of the Special Mandatory Redemption provisions set forth in the three immediately preceding paragraphs, the following terms have the meaning set forth below:

" Merger " means the merger of Energy Future Holdings Corp. (" EFH ") with an indirect, wholly owned subsidiary of the Corporation, with EFH continuing as the surviving company and an indirect, wholly owned subsidiary of the Corporation, and as a result of which the Corporation shall acquire an indirect 100% membership interest in Oncor Electric Delivery Holdings Company LLC and an indirect 80.03% membership interest in Oncor Electric Delivery Company LLC (" Oncor ").

" Merger Agreement " means the Agreement and Plan of Merger dated August 21, 2017, as supplemented by the Waiver Agreement dated October 3, 2017, among the Corporation, an indirect wholly owned subsidiary of the Corporation and EFH (the indirect owner of 80.03% of the outstanding membership interests in Oncor) and Energy Future Intermediate Holding Company, LLC (a wholly owned subsidiary of EFH), as the same may be amended or supplemented from time to time.

" Special Mandatory Redemption Notes " means the Securities of this series, the Corporation's Floating Rate Notes due 2021, the Corporation's 2.400% Notes due 2020, the Corporation's 2.900% Notes due 2023, the Corporation's 3.800% Notes due 2038 and the Corporation's 4.000% Notes due 2048, including the Securities of each such series originally issued on January 12, 2018 and any additional Securities of any such series that may be issued after such date.

The Securities of this series are not subject to redemption at the option of the Corporation.

The Indenture contains provisions for defeasance at any time of the entire indebtedness of this Security upon compliance with certain conditions set forth in the Indenture.

If an Event of Default with respect to the Securities of this series shall occur and be continuing, the principal of and accrued and unpaid interest on the Securities of this series may be declared due and payable in the manner and with the effect provided in the Indenture.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Corporation and the rights of the Holders of the Securities of each series affected under the Indenture at any time by the Corporation and the Trustee with the consent of the Holders of a majority in principal amount of the Securities of each series at the time Outstanding affected thereby. The Indenture contains provisions permitting the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding with respect to which a default under the Indenture shall have occurred and be continuing, on behalf of the Holders of all Securities of such series, to waive, with certain exceptions, such past default with respect to such series and its consequences. The Indenture also permits the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding, on behalf of the Holders of all Securities of such series, to waive compliance by the Corporation with certain provisions of the Indenture. Any such consent or waiver by the Holder of this Security shall be conclusive and binding upon such Holder and upon all future Holders of this Security and of any Security issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Security.

As provided in and subject to the provisions of the Indenture, the Holder of this Security shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default with respect to the Securities of this series, the Holders of not less than 25% in principal amount of the Securities of this series at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee, such Holder or Holders shall have offered the

Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall not have received from the Holders of a majority in principal amount of Securities of this series at the time Outstanding a direction inconsistent with such request, and the Trustee shall have failed to institute any such proceeding, for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Security for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Security or of the Indenture shall alter or impair the obligation of the Corporation, which is absolute and unconditional, to pay the principal of and premium, if any, and interest on this Security at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Security is registrable in the Security Register, upon surrender of this Security for registration of transfer at the office or agency of the Corporation in any place where the principal of and any premium and interest on this Security are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Corporation and the Security Registrar duly executed by, the Holder hereof or his attorney duly authorized in writing, and thereupon one or more new Securities of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Securities of this series are issuable only in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Securities of this series are exchangeable for a like aggregate principal amount of Securities of this series and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Security for registration of transfer, the Corporation, the Trustee and any agent of the Corporation or the Trustee may treat the Person in whose name this Security is registered as the owner hereof for all purposes, whether or not this Security be overdue, and neither the Corporation, the Trustee nor any such agent shall be affected by notice to the contrary.

This Security shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles thereof.

All terms used in this Security which are defined in the Indenture and not defined herein shall have the meanings assigned to them in the Indenture.

7

ANNEX II-B

Form of Certificate Evidencing the Floating Rate Notes due 2021

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TO THE CORPORATION OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SEMPRA ENERGY

Floating Rate Notes due 2021

$[ ● ]

No. 00[ ● ]

CUSIP No. 816851 BD0
ISIN No. US816851 BD03

Sempra Energy, a corporation duly organized and existing under the laws of the State of California (herein called the " Corporation ," which term includes any successor Person under the Indenture hereinafter referred to), for value received, hereby promises to pay to CEDE & CO., or registered assigns, the principal sum of [ ● ] Million Dollars ($[ ● ]) on January 15, 2021 (the " Maturity Date "), and to pay interest thereon from January 12, 2018 (the " Original Issue Date ") or from the most recent date to which interest has been paid or duly provided for on the Securities (as defined on the reverse hereof) of this series, quarterly in arrears on January 15, April 15, July 15 and October 15 of each year (each, an " Interest Payment Date "), beginning on April 15, 2018, and on the Maturity Date at the Applicable Rate (as defined below), until the principal hereof is paid or made available for payment, *provided* that any principal hereof or (to the extent that the payment of such interest shall be legally enforceable) premium, if any, or interest hereon which is not paid when due shall bear interest at the Applicable Rate from the respective dates such amounts are due until they are paid or made available for payment, and such interest shall be payable on demand; and provided, further that if any Interest Payment Date (other than (a) the Interest Payment Date falling on the Maturity Date of the Securities of this series and (b) any Interest Payment Date falling on a Redemption Date (including, without limitation, the Special Mandatory Redemption Date (as defined on the reverse hereof), if any) for the Securities of this series, provided that this clause (b) shall only be applicable to the Securities of this series that are being redeemed on such Redemption Date and not to any Securities of this series that are not being redeemed on such Redemption Date) is not a Floating Rate Business Day (as defined below), such Interest Payment Date will be moved to, and will be, the immediately succeeding Floating Rate Business Day, except that if such immediately succeeding Floating Rate Business Day is in the immediately succeeding calendar month, such Interest Payment Date (other than (a) the Interest Payment Date falling on the Maturity Date of the Securities of this series and (b) any Interest Payment Date falling on a Redemption Date (including, without limitation, the Special Mandatory Redemption Date, if any) for the Securities of this series, provided that this clause (b) shall only be applicable to the Securities of this series that are being redeemed on such Redemption Date and not to any Securities of this series that are not being redeemed on such Redemption Date) will be moved to, and will be, the immediately preceding Floating Rate Business Day. If the Maturity Date or any Redemption Date (including, without limitation, the Special Mandatory Redemption Date, if any) of the Securities of this series is not a Floating Rate Business Day, the Corporation will pay interest, principal and premium, if any, due on the Maturity Date or such Redemption Date, as the case may be, on the immediately succeeding day that is a Floating Rate Business Day as if such payment were made on the date such payment was originally due, and no interest will accrue on the amounts so payable for the

period from and after the Maturity Date or such Redemption Date, as the case may be, to the immediately succeeding Floating Rate Business Day.

The term " Applicable Rate " means a per annum interest rate determined as follows: the Applicable Rate for the period from and including the Original Issue Date to but excluding the Interest Payment Date falling in April 2018 will be a per annum rate equal to the 3 Month LIBOR Rate (as defined below), determined as of the second London Banking Day (as defined below) immediately preceding the Original Issue Date, plus 50 basis points, and the Applicable Rate will be reset on each Interest Payment Date (each of these dates is called an " Interest Reset Date "), beginning with the Interest Reset Date falling in April 2018, and will be a per annum rate equal to the 3 Month LIBOR Rate, determined as of the second London Banking Day immediately preceding the applicable Interest Reset Date, plus 50 basis points. The interest rate on this Security will in no event be higher than the maximum rate permitted by New York law as the same may be modified by United States law of general application.

Interest payable on any Interest Payment Date or Redemption Date or on the Maturity Date shall be the amount of interest accrued from, and including, the immediately preceding Interest Payment Date in respect of which interest has been paid or duly provided for on the Securities of this series (or from and including the Original Issue Date if no interest has been paid or duly provided for) to, but not including, such Interest Payment Date or Redemption Date or the Maturity Date, as the case may be.

The 3 Month LIBOR Rate will be determined by the Calculation Agent (as defined on the reverse hereof) in accordance with the following provisions:

" 3 Month LIBOR Rate " means the rate for deposits in U.S. dollars for the 3-month period commencing on the applicable Interest Reset Date which appears on Reuters Screen LIBOR01 Page (as defined below) at approximately 11:00 a.m., London time, on the second London Banking Day prior to such Interest Reset Date (the second London Banking Day prior to any Interest Reset Date being referred to as an " Interest Determination Date "). If this rate does not appear on the Reuters Screen LIBOR01 Page at approximately 11:00 a.m., London time, on such Interest Determination Date, the Calculation Agent will determine the rate on the basis of the rates at which deposits in U.S. dollars are offered by four major banks in the London interbank market selected by the Calculation Agent at approximately 11:00 a.m., London time, on such Interest Determination Date to prime banks in the London interbank market for a period of three months commencing on such Interest Reset Date and in a principal amount equal to an amount not less than U.S. $1,000,000 that is representative for a single transaction in such market at such time. In such case, the Calculation Agent will request the principal London office of each of the aforesaid major banks to provide a quotation of such rate. If at least two such quotations are provided, the rate for that Interest Reset Date will be the arithmetic mean of the quotations, and, if fewer than two quotations are provided as requested, the rate for that Interest Reset Date will be the arithmetic mean of the rates quoted by three major banks in New York City selected by the Calculation Agent, at approximately 11:00 a.m., New York City time, on such Interest Determination Date for loans in U.S. dollars to leading European banks for a period of three months commencing on that Interest Reset Date and in a principal amount equal to an amount not less than U.S. $1,000,000 that is representative for a single transaction in such market at such time; provided, however, that if the banks selected as aforesaid by the Calculation Agent are not quoting such rates as mentioned in this sentence, the 3 Month LIBOR Rate commencing as of such Interest Reset Date will remain the 3 Month LIBOR Rate determined as of the Interest Determination Date for the immediately preceding Interest Reset Date. Solely for purposes of this paragraph, the term " Interest Reset Date " shall be deemed to include the Original Issue Date.

The term " London Banking Day " means any day on which dealings in U.S. dollars are transacted in the London interbank market. The term " Floating Rate Business Day " means any day (1) that is a Business Day (as defined in the Indenture (as defined on the reverse hereof) in The City of New York, and (2) that is also a London Banking Day.

The term " Reuters Screen LIBOR01 Page " means the display designated on page " LIBOR01 " on Reuters (or such other page as may replace the LIBOR01 page on that service or any successor service for the purpose of displaying London interbank offered rates for U.S. dollar deposits of major banks).

U.S. Bank National Association will initially act as Calculation Agent for the Securities of this series until such time, if any, as the Corporation shall appoint a successor Calculation Agent. The Calculation Agent will, upon the request of the Holder of this Security, provide the interest rate then in effect on this Security. All calculations made by the Calculation Agent in the absence of manifest error shall be conclusive for all purposes and binding on the Corporation and the Holder of this Security. The Corporation may appoint a successor Calculation Agent with the written consent of the Trustee.

All percentages resulting from any calculation of the interest rate with respect to this Security will be rounded, if necessary, to the nearest one-hundred thousandth of a percentage point, with five one-millionths of a percentage point rounded upwards (for example, 9.876545% (or .09876545) being rounded to 9.87655% (or .0987655) and 9.876544% (or .09876544) being rounded to 9.87654% (or .0987654); and all dollar amounts in or resulting from any such calculation will be rounded to the nearest cent (with one-half cent being rounded upwards).

The amount of interest for each day the Securities of this series are outstanding (the " <u>Daily Interest Amount</u> ") will be calculated by dividing the interest rate in effect on the Securities of this series on that day by 360 and multiplying the result by the principal amount of the Securities of this series. The amount of interest payable on the Securities of this series on any Interest Payment Date or Redemption Date or the Maturity Date will be calculated by adding the Daily Interest Amounts for the Securities of this series for each day in the applicable Interest Period (as defined below). The term " <u>Interest Period</u> " means the period beginning on, and including, an Interest Payment Date to, but excluding, the next succeeding Interest Payment Date or Redemption Date or the Maturity Date, as the case may be; provided that the initial Interest Period for the Securities of this series will be the period beginning on, and including, the Original Issue Date to, but excluding, the Interest Payment Date falling in April 2018. The amount of interest payable on the Securities of this series on any day, other than an Interest Payment Date or Redemption Date or the Maturity Date, on which interest on the Securities of this series is due and payable will be calculated by adding the Daily Interest Amounts for the Securities of this series for each day from and including the most recent date to which interest on the Securities of this series has been paid or duly provided for to but excluding the date such payment of interest is due.

The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th calendar day (whether or not a Floating Rate Business Day), immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for on any Interest Payment Date will forthwith cease to be payable to the Holder on such Regular Record Date by virtue of having been such Holder and may either be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Securities of this series not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Securities of this series may be listed, and upon such notice as may be required by such exchange, all as more fully provided in said Indenture.

Payment of the principal of (and premium, if any) and interest on this Security will be made at the office or agency of the Corporation maintained for that purpose in the Borough of Manhattan, The City of New York, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts; *provided* , *however* , that at the option of the Corporation payment of interest may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register or by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Trustee at least 15 days prior to the date for payment by the Person entitled thereto. Notwithstanding the foregoing, so long as the Holder of this Security is the Depositary or its nominee, payment of the principal of (and premium, if any) and interest on this Security will be made by wire transfer of immediately available funds.

Reference is hereby made to the further provisions of this Security set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

3

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Security shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

**[Signature Page Follows]**

4

IN WITNESS WHEREOF, the Corporation has caused this instrument to be duly executed.

SEMPRA ENERGY

By: _____
Name:    Kathryn J. Collier
Title:      Vice President and Treasurer

Attest:

By: _____
Name:    Maria Angelica Espinosa
Title:      Vice President – Compliance and
              Governance and Corporate Secretary

This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION

As successor Trustee to
  U.S. Bank Trust National Association

By: _____
      Authorized Signatory

Dated: _____

5

(REVERSE OF SECURITY)

This Security is one of a duly authorized issue of securities of the Corporation (herein called the " Securities "), issued and to be issued in one or more series under an Indenture, dated as of February 23, 2000 (herein called the " Indenture ," which term shall have the meaning assigned to it in such instrument), between the Corporation and U.S. Bank National Association, as successor trustee to U.S. Bank Trust National Association (herein called the " Trustee ," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a statement of the respective rights, limitation of rights, duties and immunities thereunder of the Corporation, the Trustee and the Holders of the Securities and of the terms upon which the Securities are, and are to be, authenticated and delivered. This Security is one of the series designated on the face hereof.

In connection with the issuance of the Securities of this series, the Corporation has entered into a Calculation Agent Agreement dated as of January 12, 2018 (as the same may be amended or supplemented from time to time and including any successor agreement thereto, the " Calculation Agreement ") with U.S. Bank National Association, as calculation agent (in such capacity herein called the " Calculation Agent ," which term includes any successor thereto under the Calculation Agreement).

If the Corporation does not consummate the Merger (as defined below) on or before 5:00 p.m. (New York City Time) on December 1, 2018, or if, on or prior to such date, the Merger Agreement (as defined below) is terminated (each, a " Special Mandatory Redemption Event "), the Corporation will redeem all of the outstanding Securities of this series, in whole and not in part, on the Special Mandatory Redemption Date (as defined below) at a Redemption Price equal to 101% of the principal amount of the Securities of this series plus accrued and unpaid interest, if any, to, but excluding, the Special Mandatory Redemption Date (the " Special Mandatory Redemption "). Notwithstanding the foregoing provisions of this paragraph, installments of interest on any Securities of this series that are due and payable on any Interest Payment Date falling on or prior to the Special Mandatory Redemption Date will be payable on such Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date according to the terms of the Securities of this series and the Indenture.

The Corporation will cause the notice of Special Mandatory Redemption to be mailed, with a copy to the Trustee, within five business days after the occurrence of a Special Mandatory Redemption Event, to each Holder of Securities of this series at its registered address. Such notice shall state, in addition to the other matters required by the Indenture, that a Special Mandatory Redemption Event has occurred (and shall describe generally the nature of such event) and that all of the outstanding Securities of this series will be redeemed on the Redemption Date set forth in such notice (which shall be a business day that is no earlier than three business days and no later than 30 days after the date such notice is given) (the " Special Mandatory Redemption Date "). Once notice of Special Mandatory Redemption is mailed, the Securities of this series will become due and payable on the Special Mandatory Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Special Mandatory Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation is required to effect a Special Mandatory Redemption of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price. Unless the Corporation defaults in payment of the Redemption Price of the Securities of this series on the Special Mandatory Redemption Date, on and after the Special Mandatory Redemption Date interest will cease to accrue on the Securities of this series. For purposes of clarity, it is understood and agreed that notice of Special Mandatory Redemption shall be given to the Holders of all of the Special Mandatory Redemption Notes (as defined below) on the same day and that all of the Special Mandatory Redemption Notes shall have the same Special Mandatory Redemption Date and it is further understood and agreed that the term " Maturity ," as used in the Indenture with respect to the Securities of this series, includes the Special Mandatory Redemption Date, if any. Any Special Mandatory Redemption shall otherwise be effected in accordance with the applicable provisions of the Indenture, except that any requirement in the Indenture that notice of redemption be given not less than 30 nor more than 60 days prior to the Redemption Date shall be superseded by the foregoing provisions of this paragraph. As used in this paragraph, " business day " means any day (other than a Saturday or a Sunday) on which banking institutions in The City of New York are not authorized or obligated by law or executive order to remain closed.

Anything in the Indenture or the Securities of this series to the contrary notwithstanding, no supplemental indenture or other amendment or supplement to the Indenture that is applicable to the Securities of this series, no

6

amendment or supplement to the Securities of this series, and no waiver given by the Holders of the Securities of this series, shall, without the consent of the Holder of each outstanding Security of this series, change the obligation of the Corporation to redeem all of the Securities of this series on the Special Mandatory Redemption Date, if any, reduce the Redemption Price (including accrued and unpaid interest, if any) payable upon a Special Mandatory Redemption of the Securities of this series or extend the time for payment of such Redemption Price.

For purposes of the Special Mandatory Redemption provisions set forth in the three immediately preceding paragraphs, the following terms have the meaning set forth below:

" Merger " means the merger of Energy Future Holdings Corp. (" EFH ") with an indirect, wholly owned subsidiary of the Corporation, with EFH continuing as the surviving company and an indirect, wholly owned subsidiary of the Corporation, and as a result of which the Corporation shall acquire an indirect 100% membership interest in Oncor Electric Delivery Holdings Company LLC and an indirect 80.03% membership interest in Oncor Electric Delivery Company LLC (" Oncor ").

" Merger Agreement " means the Agreement and Plan of Merger dated August 21, 2017, as supplemented by the Waiver Agreement dated October 3, 2017, among the Corporation, an indirect wholly owned subsidiary of the Corporation and EFH (the indirect owner of 80.03% of the outstanding membership interests in Oncor) and Energy Future Intermediate Holding Company, LLC (a wholly owned subsidiary of EFH), as the same may be amended or supplemented from time to time.

" Special Mandatory Redemption Notes " means the Securities of this series, the Corporation's Floating Rate Notes due 2019, the Corporation's 2.400% Notes due 2020, the Corporation's 2.900% Notes due 2023, the Corporation's 3.800% Notes due 2038 and the Corporation's 4.000% Notes due 2048, including the Securities of each such series originally issued on January 12, 2018 and any additional Securities of any such series that may be issued after such date.

On and after January 14, 2019, the Corporation may at its option redeem the Securities of this series, at any time in whole or from time to time in part, at a Redemption Price equal to 100% of the principal amount of the Securities of this series being redeemed, plus accrued and unpaid interest on the Securities of this series being redeemed to the Redemption Date.

If the Corporation redeems Securities of this series at its option, then, notwithstanding the foregoing, installments of interest on the Securities of this series that are due and payable on any Interest Payment Date falling on or prior to a Redemption Date for the Securities of this series will be payable on that Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date, according to the terms of the Securities of this series and the Indenture.

The Corporation will mail notice of any optional redemption at least 30 days but not more than 60 days before the Redemption Date to each Holder of the Securities of this series to be redeemed. Once notice of redemption is mailed, the Securities of this series called for optional redemption will become due and payable on the Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation elects to redeem all or a portion of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price.

Unless the Corporation defaults in payment of the Redemption Price of any Securities of this series or portions thereof called for redemption at the option of the Corporation, on and after the Redemption Date interest will cease to accrue on the Securities of this series or portions thereof called for redemption.

In the event of redemption of this Security in part only, a new Security or Securities of this series and of like tenor in an aggregate principal amount equal to the unredeemed portion of the principal hereof will be issued in the name of the Holder hereof upon the cancellation hereof.

The Indenture contains provisions for defeasance at any time of the entire indebtedness of this Security upon compliance with certain conditions set forth in the Indenture.

7

If an Event of Default with respect to the Securities of this series shall occur and be continuing, the principal of and accrued and unpaid interest on the Securities of this series may be declared due and payable in the manner and with the effect provided in the Indenture.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Corporation and the rights of the Holders of the Securities of each series affected under the Indenture at any time by the Corporation and the Trustee with the consent of the Holders of a majority in principal amount of the Securities of each series at the time Outstanding affected thereby. The Indenture contains provisions permitting the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding with respect to which a default under the Indenture shall have occurred and be continuing, on behalf of the Holders of all Securities of such series, to waive, with certain exceptions, such past default with respect to such series and its consequences. The Indenture also permits the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding, on behalf of the Holders of all Securities of such series, to waive compliance by the Corporation with certain provisions of the Indenture. Any such consent or waiver by the Holder of this Security shall be conclusive and binding upon such Holder and upon all future Holders of this Security and of any Security issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Security.

As provided in and subject to the provisions of the Indenture, the Holder of this Security shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default with respect to the Securities of this series, the Holders of not less than 25% in principal amount of the Securities of this series at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee, such Holder or Holders shall have offered the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall not have received from the Holders of a majority in principal amount of Securities of this series at the time Outstanding a direction inconsistent with such request, and the Trustee shall have failed to institute any such proceeding, for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Security for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Security or of the Indenture shall alter or impair the obligation of the Corporation, which is absolute and unconditional, to pay the principal of and premium, if any, and interest on this Security at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Security is registrable in the Security Register, upon surrender of this Security for registration of transfer at the office or agency of the Corporation in any place where the principal of and any premium and interest on this Security are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Corporation and the Security Registrar duly executed by, the Holder hereof or his attorney duly authorized in writing, and thereupon one or more new Securities of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Securities of this series are issuable only in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Securities of this series are exchangeable for a like aggregate principal amount of Securities of this series and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Security for registration of transfer, the Corporation, the Trustee and any agent of the Corporation or the Trustee may treat the Person in whose name this Security is registered as the owner

8

hereof for all purposes, whether or not this Security be overdue, and neither the Corporation, the Trustee nor any such agent shall be affected by notice to the contrary.

This Security shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles thereof.

All terms used in this Security which are defined in the Indenture and not defined herein shall have the meanings assigned to them in the Indenture.

9

ANNEX II-C

Form of Certificate Evidencing the 2.400% Notes due 2020

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TO THE CORPORATION OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SEMPRA ENERGY

2.400% Notes due 2020

No. 00 [ ● ]                                                                                                                        $ [●]

CUSIP No. 816851 BE8

ISIN No. US816851 BE85

Sempra Energy, a corporation duly organized and existing under the laws of the State of California (herein called the " Corporation ," which term includes any successor Person under the Indenture hereinafter referred to), for value received, hereby promises to pay to CEDE & CO., or registered assigns, the principal sum of [●] Million Dollars ($[●]) on February 1, 2020 (the " Maturity Date "), and to pay interest thereon from January 12, 2018 or from the most recent date to which interest has been paid or duly provided for, semi-annually in arrears on February 1 and August 1 in each year (each, an " Interest Payment Date "), commencing August 1, 2018 and on the Maturity Date at the rate of 2.400% per annum, until the principal hereof is paid or made available for payment, provided that any principal hereof or (to the extent that the payment of such interest shall be legally enforceable) premium, if any, or interest hereon which is not paid when due shall bear interest at the rate of 2.400% per annum from the respective dates such amounts are due until they are paid or made available for payment, and such interest shall be payable on demand.

Interest on this Security shall be calculated on the basis of a 360-day year consisting of twelve 30-day months. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest, which shall be the January 15 or July 15 (whether or not a Business Day), as the case may be, immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for on any Interest Payment Date will forthwith cease to be payable to the Holder on such Regular Record Date by virtue of having been such Holder and may either be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Securities of this series not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Securities of this series may be listed, and upon such notice as may be required by such exchange, all as more fully provided in said Indenture.

Payment of the principal of (and premium, if any) and interest on this Security will be made at the office or agency of the Corporation maintained for that purpose in the Borough of Manhattan, The City of New York, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and

private debts; provided, however, that at the option of the Corporation payment of interest may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register or by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Trustee at least 15 days prior to the date for payment by the Person entitled thereto. Notwithstanding the foregoing, so long as the Holder of this Security is the Depositary or its nominee, payment of the principal of (and premium, if any) and interest on this Security will be made by wire transfer of immediately available funds.

Reference is hereby made to the further provisions of this Security set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Security shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

**[Signature Page Follows]**

2

IN WITNESS WHEREOF, the Corporation has caused this instrument to be duly executed.

SEMPRA ENERGY

By: _____
Name:    Kathryn J. Collier
Title:    Vice President and Treasurer

Attest:

By: _____
Name:    Maria Angelica Espinosa
Title:    Vice President – Compliance and Governance and
         Corporate Secretary

This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION

As successor Trustee to
   U.S. Bank Trust National Association

By: _____
      Authorized Signatory

Dated: _____

3

(REVERSE OF SECURITY)

This Security is one of a duly authorized issue of securities of the Corporation (herein called the " Securities "), issued and to be issued in one or more series under an Indenture, dated as of February 23, 2000 (herein called the " Indenture, " which term shall have the meaning assigned to it in such instrument), between the Corporation and U.S. Bank National Association, as successor trustee to U.S. Bank Trust National Association (herein called the " Trustee, " which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a statement of the respective rights, limitation of rights, duties and immunities thereunder of the Corporation, the Trustee and the Holders of the Securities and of the terms upon which the Securities are, and are to be, authenticated and delivered. This Security is one of the series designated on the face hereof.

If the Corporation does not consummate the Merger (as defined below) on or before 5:00 p.m. (New York City Time) on December 1, 2018, or if, on or prior to such date, the Merger Agreement (as defined below) is terminated (each, a " Special Mandatory Redemption Event "), the Corporation will redeem all of the outstanding Securities of this series, in whole and not in part, on the Special Mandatory Redemption Date (as defined below) at a Redemption Price equal to 101% of the principal amount of the Securities of this series plus accrued and unpaid interest, if any, to, but excluding, the Special Mandatory Redemption Date (the " Special Mandatory Redemption "). Notwithstanding the foregoing provisions of this paragraph, installments of interest on any Securities of this series that are due and payable on any Interest Payment Date falling on or prior to the Special Mandatory Redemption Date will be payable on such Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date according to the terms of the Securities of this series and the Indenture.

The Corporation will cause the notice of Special Mandatory Redemption to be mailed, with a copy to the Trustee, within five business days after the occurrence of a Special Mandatory Redemption Event, to each Holder of Securities of this series at its registered address. Such notice shall state, in addition to the other matters required by the Indenture, that a Special Mandatory Redemption Event has occurred (and shall describe generally the nature of such event) and that all of the outstanding Securities of this series will be redeemed on the Redemption Date set forth in such notice (which shall be a business day that is no earlier than three business days and no later than 30 days after the date such notice is given) (the " Special Mandatory Redemption Date "). Once notice of Special Mandatory Redemption is mailed, the Securities of this series will become due and payable on the Special Mandatory Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Special Mandatory Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation is required to effect a Special Mandatory Redemption of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price. Unless the Corporation defaults in payment of the Redemption Price of the Securities of this series on the Special Mandatory Redemption Date, on and after the Special Mandatory Redemption Date interest will cease to accrue on the Securities of this series. For purposes of clarity, it is understood and agreed that notice of Special Mandatory Redemption shall be given to the Holders of all of the Special Mandatory Redemption Notes (as defined below) on the same day and that all of the Special Mandatory Redemption Notes shall have the same Special Mandatory Redemption Date and it is further understood and agreed that the term " Maturity ," as used in the Indenture with respect to the Securities of this series, includes the Special Mandatory Redemption Date, if any. Any Special Mandatory Redemption shall otherwise be effected in accordance with the applicable provisions of the Indenture, except that any requirement in the Indenture that notice of redemption be given not less than 30 nor more than 60 days prior to the Redemption Date shall be superseded by the foregoing provisions of this paragraph. As used in this paragraph, " business day " means any day (other than a Saturday or a Sunday) on which banking institutions in The City of New York are not authorized or obligated by law or executive order to remain closed.

Anything in the Indenture or the Securities of this series to the contrary notwithstanding, no supplemental indenture or other amendment or supplement to the Indenture that is applicable to the Securities of this series, no amendment or supplement to the Securities of this series, and no waiver given by the Holders of the Securities of this series, shall, without the consent of the Holder of each outstanding Security of this series, change the obligation of the Corporation to redeem all of the Securities of this series on the Special Mandatory Redemption Date, if any, reduce the Redemption Price (including accrued and unpaid interest, if any) payable upon a Special Mandatory Redemption of the Securities of this series or extend the time for payment of such Redemption Price.

4

For purposes of the Special Mandatory Redemption provisions set forth in the three immediately preceding paragraphs, the following terms have the meaning set forth below:

"  Merger " means the merger of Energy Future Holdings Corp. (" EFH ") with an indirect, wholly owned subsidiary of the Corporation, with EFH continuing as the surviving company and an indirect, wholly owned subsidiary of the Corporation, and as a result of which the Corporation shall acquire an indirect 100% membership interest in Oncor Electric Delivery Holdings Company LLC and an indirect 80.03% membership interest in Oncor Electric Delivery Company LLC (" Oncor ").

"  Merger Agreement " means the Agreement and Plan of Merger dated August 21, 2017, as supplemented by the Waiver Agreement dated October 3, 2017, among the Corporation, an indirect wholly owned subsidiary of the Corporation and EFH (the indirect owner of 80.03% of the outstanding membership interests in Oncor) and Energy Future Intermediate Holding Company, LLC (a wholly owned subsidiary of EFH), as the same may be amended or supplemented from time to time.

"  Special Mandatory Redemption Notes " means the Securities of this series, the Corporation's Floating Rate Notes due 2019, the Corporation's Floating Rate Notes due 2021, the Corporation's 2.900% Notes due 2023, the Corporation's 3.800% Notes due 2038 and the Corporation's 4.000% Notes due 2048, including the Securities of each such series originally issued on January 12, 2018 and any additional Securities of any such series that may be issued after such date.

The Corporation may at its option redeem the Securities of this series, at any time in whole or from time to time in part, at a Redemption Price for any Redemption Date equal to the greater of the following amounts:

     (1)     100% of the principal amount of the Securities of this series being redeemed on that Redemption Date; or

     (2)     the sum of the present values of the remaining scheduled payments of principal and interest on the Securities of this series being redeemed on that Redemption Date (not including any portion of any payments of interest accrued to that Redemption Date), discounted to that Redemption Date on a semi-annual basis at the Adjusted Treasury Rate (as defined below) plus 10 basis points, as determined by the Independent Investment Banker (as defined below),

plus, in each case, accrued and unpaid interest on the Securities of this series being redeemed to the Redemption Date.

If the Corporation redeems Securities of this series at its option, then (a) notwithstanding the foregoing, installments of interest on the Securities of this series that are due and payable on any Interest Payment Date falling on or prior to a Redemption Date for the Securities of this series will be payable on that Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date, according to the terms of the Securities of this series and the Indenture and (b) the Redemption Price will, if applicable, be calculated on the basis of a 360-day year consisting of twelve 30 day months.

For purposes of the optional redemption provisions set forth in the two immediately preceding paragraphs, the following terms have the meanings set forth below:

"  Adjusted Treasury Rate " means, with respect to any Redemption Date for the Securities of this series, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"  Comparable Treasury Issue " means, with respect to any Redemption Date for the Securities of this series, the United States Treasury security selected by the Independent Investment Banker as having a maturity comparable to the remaining term of the Securities of this series to be redeemed on such Redemption Date that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Securities of this series.

5

" <u>Comparable Treasury Price</u> " means, with respect to any Redemption Date for the Securities of this series, (A) the average of the Reference Treasury Dealer Quotations for such Redemption Date or (B) if only one Reference Treasury Dealer Quotation is received, such quotation.

" <u>Independent Investment Banker</u> " means, with respect to any Redemption Date for the Securities of this series, one of the Reference Treasury Dealers appointed by the Corporation to act as the " <u>Independent Investment Banker</u> ."

" <u>Reference Treasury Dealers</u> " means, with respect to any Redemption Date for the Securities of this series, (A) RBC Capital Markets, LLC, Morgan Stanley & Co. LLC and Barclays Capital Inc. (or their respective affiliates which are Primary Treasury Dealers (as defined below)), and their respective successors; *provided, however* , that if any of the foregoing shall cease to be a primary U.S. Government securities dealer in the United States (a " <u>Primary Treasury Dealer</u> "), the Corporation will substitute therefor another Primary Treasury Dealer; and (B) any other Primary Treasury Dealer(s) selected by the Corporation.

" <u>Reference Treasury Dealer Quotation</u> " means, with respect to each Reference Treasury Dealer and any Redemption Date for the Securities of this series, the average, as determined by the Corporation, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Corporation by such Reference Treasury Dealer at 5:00 p.m. (New York City time) on the third Business Day preceding such Redemption Date. As used in the preceding sentence, " <u>Business Day</u> " means any day (other than a Saturday or Sunday) on which banking institutions in The City of New York are not authorized or obligated by law or executive order to remain closed.

The Corporation will mail notice of any optional redemption at least 30 days but not more than 60 days before the Redemption Date to each Holder of the Securities of this series to be redeemed. Once notice of redemption is mailed, the Securities of this series called for optional redemption will become due and payable on the Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation elects to redeem all or a portion of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price.

Unless the Corporation defaults in payment of the Redemption Price of any Securities of this series or portions thereof called for redemption at the option of the Corporation, on and after the Redemption Date interest will cease to accrue on the Securities of this series or portions thereof called for redemption.

In the event of redemption of this Security in part only, a new Security or Securities of this series and of like tenor in an aggregate principal amount equal to the unredeemed portion of the principal hereof will be issued in the name of the Holder hereof upon the cancellation hereof.

The Indenture contains provisions for defeasance at any time of the entire indebtedness of this Security upon compliance with certain conditions set forth in the Indenture.

If an Event of Default with respect to the Securities of this series shall occur and be continuing, the principal of and accrued and unpaid interest on the Securities of this series may be declared due and payable in the manner and with the effect provided in the Indenture.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Corporation and the rights of the Holders of the Securities of each series affected under the Indenture at any time by the Corporation and the Trustee with the consent of the Holders of a majority in principal amount of the Securities of each series at the time Outstanding affected thereby. The Indenture contains provisions permitting the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding with respect to which a default under the Indenture shall have occurred and be continuing, on behalf of the Holders of all Securities of such series, to waive, with certain exceptions, such past default with respect to such series and its consequences. The Indenture also permits the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding, on behalf of the Holders of all

6

Securities of such series, to waive compliance by the Corporation with certain provisions of the Indenture. Any such consent or waiver by the Holder of this Security shall be conclusive and binding upon such Holder and upon all future Holders of this Security and of any Security issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Security.

As provided in and subject to the provisions of the Indenture, the Holder of this Security shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default with respect to the Securities of this series, the Holders of not less than 25% in principal amount of the Securities of this series at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee, such Holder or Holders shall have offered the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall not have received from the Holders of a majority in principal amount of Securities of this series at the time Outstanding a direction inconsistent with such request, and the Trustee shall have failed to institute any such proceeding, for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Security for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Security or of the Indenture shall alter or impair the obligation of the Corporation, which is absolute and unconditional, to pay the principal of and premium, if any, and interest on this Security at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Security is registrable in the Security Register, upon surrender of this Security for registration of transfer at the office or agency of the Corporation in any place where the principal of and any premium and interest on this Security are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Corporation and the Security Registrar duly executed by, the Holder hereof or his attorney duly authorized in writing, and thereupon one or more new Securities of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Securities of this series are issuable only in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Securities of this series are exchangeable for a like aggregate principal amount of Securities of this series and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Security for registration of transfer, the Corporation, the Trustee and any agent of the Corporation or the Trustee may treat the Person in whose name this Security is registered as the owner hereof for all purposes, whether or not this Security be overdue, and neither the Corporation, the Trustee nor any such agent shall be affected by notice to the contrary.

This Security shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles thereof.

All terms used in this Security which are defined in the Indenture and not defined herein shall have the meanings assigned to them in the Indenture.

7

ANNEX II-D

Form of Certificate Evidencing the 2.900% Notes due 2023

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TO THE CORPORATION OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SEMPRA ENERGY

2.900% Notes due 2023

$ [ ● ]

No. 00[ ● ]

CUSIP No. 816851 BF5

ISIN No. US816851 BF50

Sempra Energy, a corporation duly organized and existing under the laws of the State of California (herein called the " Corporation ," which term includes any successor Person under the Indenture hereinafter referred to), for value received, hereby promises to pay to CEDE & CO., or registered assigns, the principal sum of [ ● ] Million Dollars ($[ ● ]) on February 1, 2023 (the " Maturity Date "), and to pay interest thereon from January 12, 2018 or from the most recent date to which interest has been paid or duly provided for, semi-annually in arrears on February 1 and August 1 in each year (each, an " Interest Payment Date "), commencing August 1, 2018 and on the Maturity Date at the rate of 2.900% per annum, until the principal hereof is paid or made available for payment, provided that any principal hereof or (to the extent that the payment of such interest shall be legally enforceable) premium, if any, or interest hereon which is not paid when due shall bear interest at the rate of 2.900% per annum from the respective dates such amounts are due until they are paid or made available for payment, and such interest shall be payable on demand.

Interest on this Security shall be calculated on the basis of a 360-day year consisting of twelve 30-day months. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest, which shall be the January 15 or July 15 (whether or not a Business Day), as the case may be, immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for on any Interest Payment Date will forthwith cease to be payable to the Holder on such Regular Record Date by virtue of having been such Holder and may either be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Securities of this series not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Securities of this series may be listed, and upon such notice as may be required by such exchange, all as more fully provided in said Indenture.

Payment of the principal of (and premium, if any) and interest on this Security will be made at the office or agency of the Corporation maintained for that purpose in the Borough of Manhattan, The City of New York, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and

private debts; provided, however, that at the option of the Corporation payment of interest may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register or by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Trustee at least 15 days prior to the date for payment by the Person entitled thereto. Notwithstanding the foregoing, so long as the Holder of this Security is the Depositary or its nominee, payment of the principal of (and premium, if any) and interest on this Security will be made by wire transfer of immediately available funds.

Reference is hereby made to the further provisions of this Security set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Security shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

**[Signature Page Follows]**

2

IN WITNESS WHEREOF, the Corporation has caused this instrument to be duly executed.

SEMPRA ENERGY

By: _____

Name:  Kathryn J. Collier

Title:    Vice President and Treasurer

Attest:

By: _____

Name:  Maria Angelica Espinosa

Title:    Vice President – Compliance and Governance and
          Corporate Secretary

This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION

As successor Trustee to
  U.S. Bank Trust National Association

By: _____

      Authorized Signatory

Dated: _____

3

This Security is one of a duly authorized issue of securities of the Corporation (herein called the " Securities "), issued and to be issued in one or more series under an Indenture, dated as of February 23, 2000 (herein called the " Indenture, " which term shall have the meaning assigned to it in such instrument), between the Corporation and U.S. Bank National Association, as successor trustee to U.S. Bank Trust National Association (herein called the " Trustee, " which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a statement of the respective rights, limitation of rights, duties and immunities thereunder of the Corporation, the Trustee and the Holders of the Securities and of the terms upon which the Securities are, and are to be, authenticated and delivered. This Security is one of the series designated on the face hereof.

If the Corporation does not consummate the Merger (as defined below) on or before 5:00 p.m. (New York City Time) on December 1, 2018, or if, on or prior to such date, the Merger Agreement (as defined below) is terminated (each, a " Special Mandatory Redemption Event "), the Corporation will redeem all of the outstanding Securities of this series, in whole and not in part, on the Special Mandatory Redemption Date (as defined below) at a Redemption Price equal to 101% of the principal amount of the Securities of this series plus accrued and unpaid interest, if any, to, but excluding, the Special Mandatory Redemption Date (the " Special Mandatory Redemption "). Notwithstanding the foregoing provisions of this paragraph, installments of interest on any Securities of this series that are due and payable on any Interest Payment Date falling on or prior to the Special Mandatory Redemption Date will be payable on such Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date according to the terms of the Securities of this series and the Indenture.

The Corporation will cause the notice of Special Mandatory Redemption to be mailed, with a copy to the Trustee, within five business days after the occurrence of a Special Mandatory Redemption Event, to each Holder of Securities of this series at its registered address. Such notice shall state, in addition to the other matters required by the Indenture, that a Special Mandatory Redemption Event has occurred (and shall describe generally the nature of such event) and that all of the outstanding Securities of this series will be redeemed on the Redemption Date set forth in such notice (which shall be a business day that is no earlier than three business days and no later than 30 days after the date such notice is given) (the " Special Mandatory Redemption Date "). Once notice of Special Mandatory Redemption is mailed, the Securities of this series will become due and payable on the Special Mandatory Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Special Mandatory Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation is required to effect a Special Mandatory Redemption of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price. Unless the Corporation defaults in payment of the Redemption Price of the Securities of this series on the Special Mandatory Redemption Date, on and after the Special Mandatory Redemption Date interest will cease to accrue on the Securities of this series. For purposes of clarity, it is understood and agreed that notice of Special Mandatory Redemption shall be given to the Holders of all of the Special Mandatory Redemption Notes (as defined below) on the same day and that all of the Special Mandatory Redemption Notes shall have the same Special Mandatory Redemption Date and it is further understood and agreed that the term " Maturity ," as used in the Indenture with respect to the Securities of this series, includes the Special Mandatory Redemption Date, if any. Any Special Mandatory Redemption shall otherwise be effected in accordance with the applicable provisions of the Indenture, except that any requirement in the Indenture that notice of redemption be given not less than 30 nor more than 60 days prior to the Redemption Date shall be superseded by the foregoing provisions of this paragraph. As used in this paragraph, " business day " means any day (other than a Saturday or a Sunday) on which banking institutions in The City of New York are not authorized or obligated by law or executive order to remain closed.

Anything in the Indenture or the Securities of this series to the contrary notwithstanding, no supplemental indenture or other amendment or supplement to the Indenture that is applicable to the Securities of this series, no amendment or supplement to the Securities of this series, and no waiver given by the Holders of the Securities of this series, shall, without the consent of the Holder of each outstanding Security of this series, change the obligation of the Corporation to redeem all of the Securities of this series on the Special Mandatory Redemption Date, if any, reduce the Redemption Price (including accrued and unpaid interest, if any) payable upon a Special Mandatory Redemption of the Securities of this series or extend the time for payment of such Redemption Price.

4

For purposes of the Special Mandatory Redemption provisions set forth in the three immediately preceding paragraphs, the following terms have the meaning set forth below:

" <u>Merger</u> " means the merger of Energy Future Holdings Corp. (" <u>EFH</u> ") with an indirect, wholly owned subsidiary of the Corporation, with EFH continuing as the surviving company and an indirect, wholly owned subsidiary of the Corporation, and as a result of which the Corporation shall acquire an indirect 100% membership interest in Oncor Electric Delivery Holdings Company LLC and an indirect 80.03% membership interest in Oncor Electric Delivery Company LLC (" <u>Oncor</u> ").

" <u>Merger Agreement</u> " means the Agreement and Plan of Merger dated August 21, 2017, as supplemented by the Waiver Agreement dated October 3, 2017, among the Corporation, an indirect wholly owned subsidiary of the Corporation and EFH (the indirect owner of 80.03% of the outstanding membership interests in Oncor) and Energy Future Intermediate Holding Company, LLC (a wholly owned subsidiary of EFH), as the same may be amended or supplemented from time to time.

" <u>Special Mandatory Redemption Notes</u> " means the Securities of this series, the Corporation's Floating Rate Notes due 2019, the Corporation's Floating Rate Notes due 2021, the Corporation's 2.400% Notes due 2020, the Corporation's 3.800% Notes due 2038 and the Corporation's 4.000% Notes due 2048, including the Securities of each such series originally issued on January 12, 2018 and any additional Securities of any such series that may be issued after such date.

Prior to January 1, 2023 (the "Par Call Date"), the Corporation may at its option redeem the Securities of this series, at any time in whole or from time to time in part, at a Redemption Price for any Redemption Date equal to the greater of the following amounts:

(1)    100% of the principal amount of the Securities of this series being redeemed on that Redemption Date; or

(2)    the sum of the present values of the remaining scheduled payments of principal and interest on the Securities of this series being redeemed on that Redemption Date (not including any portion of any payments of interest accrued to that Redemption Date) that would be due if such Securities of this series matured, and accrued and unpaid interest was payable, on the Par Call Date, discounted to that Redemption Date on a semi-annual basis at the Adjusted Treasury Rate (as defined below) plus 10 basis points, as determined by the Independent Investment Banker (as defined below),

plus, in each case, accrued and unpaid interest on the Securities of this series being redeemed to that Redemption Date.

On and after the Par Call Date, the Corporation may at its option redeem the Securities of this series, at any time in whole or from time to time in part, at a Redemption Price equal to 100% of the principal amount of the Securities of this series being redeemed, plus accrued and unpaid interest on the Securities of this series being redeemed to the Redemption Date.

If the Corporation redeems Securities of this series at its option, then (a) notwithstanding the foregoing, installments of interest on the Securities of this series that are due and payable on any Interest Payment Date falling on or prior to a Redemption Date for the Securities of this series will be payable on that Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date, according to the terms of the Securities of this series and the Indenture and (b) the Redemption Price will, if applicable, be calculated on the basis of a 360-day year consisting of twelve 30-day months.

For purposes of the optional redemption provisions set forth in the three immediately preceding paragraphs, the following terms have the meanings set forth below:

" <u>Adjusted Treasury Rate</u> " means, with respect to any Redemption Date for the Securities of this series, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, assuming a

5

price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

" Comparable Treasury Issue " means, with respect to any Redemption Date for the Securities of this series, the United States Treasury security selected by the Independent Investment Banker as having a maturity comparable to the remaining term of the Securities of this series to be redeemed on such Redemption Date (assuming that the Securities of this series matured on the Par Call Date) that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Securities of this series (assuming that the Securities of this series matured on the Par Call Date).

" Comparable Treasury Price " means, with respect to any Redemption Date for the Securities of this series, (A) the average of the Reference Treasury Dealer Quotations for such Redemption Date or (B) if only one Reference Treasury Dealer Quotation is received, such quotation.

" Independent Investment Banker " means, with respect to any Redemption Date for the Securities of this series, one of the Reference Treasury Dealers appointed by the Corporation to act as the " Independent Investment Banker ."

" Reference Treasury Dealers " means, with respect to any Redemption Date for the Securities of this series, (A) RBC Capital Markets, LLC, Morgan Stanley & Co. LLC and Barclays Capital Inc. (or their respective affiliates which are Primary Treasury Dealers (as defined below)), and their respective successors; *provided, however* , that if any of the foregoing shall cease to be a primary U.S. Government securities dealer in the United States (a " Primary Treasury Dealer "), the Corporation will substitute therefor another Primary Treasury Dealer; and (B) any other Primary Treasury Dealer(s) selected by the Corporation.

" Reference Treasury Dealer Quotation " means, with respect to each Reference Treasury Dealer and any Redemption Date for the Securities of this series, the average, as determined by the Corporation, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Corporation by such Reference Treasury Dealer at 5:00 p.m. (New York City time) on the third Business Day preceding such Redemption Date. As used in the preceding sentence, " Business Day " means any day (other than a Saturday or Sunday) on which banking institutions in The City of New York are not authorized or obligated by law or executive order to remain closed.

The Corporation will mail notice of any optional redemption at least 30 days but not more than 60 days before the Redemption Date to each Holder of the Securities of this series to be redeemed. Once notice of redemption is mailed, the Securities of this series called for optional redemption will become due and payable on the Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation elects to redeem all or a portion of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price.

Unless the Corporation defaults in payment of the Redemption Price of any Securities of this series or portions thereof called for redemption at the option of the Corporation, on and after the Redemption Date interest will cease to accrue on the Securities of this series or portions thereof called for redemption.

In the event of redemption of this Security in part only, a new Security or Securities of this series and of like tenor in an aggregate principal amount equal to the unredeemed portion of the principal hereof will be issued in the name of the Holder hereof upon the cancellation hereof.

The Indenture contains provisions for defeasance at any time of the entire indebtedness of this Security upon compliance with certain conditions set forth in the Indenture.

If an Event of Default with respect to the Securities of this series shall occur and be continuing, the principal of and accrued and unpaid interest on the Securities of this series may be declared due and payable in the manner and with the effect provided in the Indenture.

6

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Corporation and the rights of the Holders of the Securities of each series affected under the Indenture at any time by the Corporation and the Trustee with the consent of the Holders of a majority in principal amount of the Securities of each series at the time Outstanding affected thereby. The Indenture contains provisions permitting the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding with respect to which a default under the Indenture shall have occurred and be continuing, on behalf of the Holders of all Securities of such series, to waive, with certain exceptions, such past default with respect to such series and its consequences. The Indenture also permits the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding, on behalf of the Holders of all Securities of such series, to waive compliance by the Corporation with certain provisions of the Indenture. Any such consent or waiver by the Holder of this Security shall be conclusive and binding upon such Holder and upon all future Holders of this Security and of any Security issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Security.

As provided in and subject to the provisions of the Indenture, the Holder of this Security shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default with respect to the Securities of this series, the Holders of not less than 25% in principal amount of the Securities of this series at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee, such Holder or Holders shall have offered the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall not have received from the Holders of a majority in principal amount of Securities of this series at the time Outstanding a direction inconsistent with such request, and the Trustee shall have failed to institute any such proceeding, for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Security for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Security or of the Indenture shall alter or impair the obligation of the Corporation, which is absolute and unconditional, to pay the principal of and premium, if any, and interest on this Security at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Security is registrable in the Security Register, upon surrender of this Security for registration of transfer at the office or agency of the Corporation in any place where the principal of and any premium and interest on this Security are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Corporation and the Security Registrar duly executed by, the Holder hereof or his attorney duly authorized in writing, and thereupon one or more new Securities of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Securities of this series are issuable only in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Securities of this series are exchangeable for a like aggregate principal amount of Securities of this series and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Security for registration of transfer, the Corporation, the Trustee and any agent of the Corporation or the Trustee may treat the Person in whose name this Security is registered as the owner hereof for all purposes, whether or not this Security be overdue, and neither the Corporation, the Trustee nor any such agent shall be affected by notice to the contrary.

7

This Security shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles thereof.

All terms used in this Security which are defined in the Indenture and not defined herein shall have the meanings assigned to them in the Indenture.

8

ANNEX II-E

Form of Certificate Evidencing the 3.400% Notes due 2028

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TO THE CORPORATION OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SEMPRA ENERGY

3.400% Notes due 2028

$ [ ☐ ]

No. 00[ ☐ ]

CUSIP No. 816851 BG3

ISIN No. US816851 BG34

Sempra Energy, a corporation duly organized and existing under the laws of the State of California (herein called the " Corporation ," which term includes any successor Person under the Indenture hereinafter referred to), for value received, hereby promises to pay to CEDE & CO., or registered assigns, the principal sum of [ ☐ ] Million Dollars ($[ ☐ ]) on February 1, 2028 (the " Maturity Date "), and to pay interest thereon from January 12, 2018 or from the most recent date to which interest has been paid or duly provided for, semi-annually in arrears on February 1 and August 1 in each year (each, an " Interest Payment Date "), commencing August 1, 2018 and on the Maturity Date at the rate of 3.400% per annum, until the principal hereof is paid or made available for payment, provided that any principal hereof or (to the extent that the payment of such interest shall be legally enforceable) premium, if any, or interest hereon which is not paid when due shall bear interest at the rate of 3.400% per annum from the respective dates such amounts are due until they are paid or made available for payment, and such interest shall be payable on demand.

Interest on this Security shall be calculated on the basis of a 360-day year consisting of twelve 30-day months. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest, which shall be the January 15 or July 15 (whether or not a Business Day), as the case may be, immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for on any Interest Payment Date will forthwith cease to be payable to the Holder on such Regular Record Date by virtue of having been such Holder and may either be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Securities of this series not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Securities of this series may be listed, and upon such notice as may be required by such exchange, all as more fully provided in said Indenture.

Payment of the principal of (and premium, if any) and interest on this Security will be made at the office or agency of the Corporation maintained for that purpose in the Borough of Manhattan, The City of New York, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and

private debts; provided, however, that at the option of the Corporation payment of interest may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register or by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Trustee at least 15 days prior to the date for payment by the Person entitled thereto. Notwithstanding the foregoing, so long as the Holder of this Security is the Depositary or its nominee, payment of the principal of (and premium, if any) and interest on this Security will be made by wire transfer of immediately available funds.

Reference is hereby made to the further provisions of this Security set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Security shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

**[Signature Page Follows]**

2

IN WITNESS WHEREOF, the Corporation has caused this instrument to be duly executed.

SEMPRA ENERGY

By: _____
Name:   Kathryn J. Collier
Title:    Vice President and Treasurer

Attest:

By: _____
Name:   Maria Angelica Espinosa
Title:    Vice President – Compliance and Governance and
            Corporate Secretary

This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION

As successor Trustee to
     U.S. Bank Trust National Association

By: _____
       Authorized Signatory

Dated: _____

3

(REVERSE OF SECURITY)

This Security is one of a duly authorized issue of securities of the Corporation (herein called the " Securities "), issued and to be issued in one or more series under an Indenture, dated as of February 23, 2000 (herein called the " Indenture, " which term shall have the meaning assigned to it in such instrument), between the Corporation and U.S. Bank National Association, as successor trustee to U.S. Bank Trust National Association (herein called the " Trustee, " which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a statement of the respective rights, limitation of rights, duties and immunities thereunder of the Corporation, the Trustee and the Holders of the Securities and of the terms upon which the Securities are, and are to be, authenticated and delivered. This Security is one of the series designated on the face hereof.

Prior to November 1, 2027 (the "Par Call Date"), the Corporation may at its option redeem the Securities of this series, at any time in whole or from time to time in part, at a Redemption Price for any Redemption Date equal to the greater of the following amounts:

(1)    100% of the principal amount of the Securities of this series being redeemed on that Redemption Date; or

(2)    the sum of the present values of the remaining scheduled payments of principal and interest on the Securities of this series being redeemed on that Redemption Date (not including any portion of any payments of interest accrued to that Redemption Date) that would be due if such Securities of this series matured, and accrued and unpaid interest was payable, on the Par Call Date, discounted to Redemption Date on a semi-annual basis at the Adjusted Treasury Rate (as defined below) plus 15 basis points, as determined by the Independent Investment Banker (as defined below),

plus, in each case, accrued and unpaid interest on the Securities of this series being redeemed to that Redemption Date.

On and after the Par Call Date, the Corporation may at its option redeem the Securities of this series, at any time in whole or from time to time in part, at a Redemption Price equal to 100% of the principal amount of the Securities of this series being redeemed, plus accrued and unpaid interest on the Securities of this series being redeemed to the Redemption Date.

If the Corporation redeems Securities of this series at its option, then (a) notwithstanding the foregoing, installments of interest on the Securities of this series that are due and payable on any Interest Payment Date falling on or prior to a Redemption Date for the Securities of this series will be payable on that Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date, according to the terms of the Securities of this series and the Indenture and (b) the Redemption Price will, if applicable, be calculated on the basis of a 360-day year consisting of twelve 30-day months.

For purposes of the optional redemption provisions set forth in the three immediately preceding paragraphs, the following terms have the meanings set forth below:

" Adjusted Treasury Rate " means, with respect to any Redemption Date for the Securities of this series, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

" Comparable Treasury Issue " means, with respect to any Redemption Date for the Securities of this series, the United States Treasury security selected by the Independent Investment Banker as having a maturity comparable to the remaining term of the Securities of this series to be redeemed on such Redemption Date (assuming that the Securities of this series matured on the Par Call Date) that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Securities of this series (assuming that the Securities of this series matured on the Par Call Date).

4

" <u>Comparable Treasury Price</u> " means, with respect to any Redemption Date for the Securities of this series, (A) the average of the Reference Treasury Dealer Quotations for such Redemption Date or (B) if only one Reference Treasury Dealer Quotation is received, such quotation.

" <u>Independent Investment Banker</u> " means, with respect to any Redemption Date for the Securities of this series, one of the Reference Treasury Dealers appointed by the Corporation to act as the " <u>Independent Investment Banker</u> ."

" <u>Reference Treasury Dealers</u> " means, with respect to any Redemption Date for the Securities of this series, (A) RBC Capital Markets, LLC, Morgan Stanley & Co. LLC and Barclays Capital Inc. (or their respective affiliates which are Primary Treasury Dealers (as defined below)), and their respective successors; *provided, however* , that if any of the foregoing shall cease to be a primary U.S. Government securities dealer in the United States (a " <u>Primary Treasury Dealer</u> "), the Corporation will substitute therefor another Primary Treasury Dealer; and (B) any other Primary Treasury Dealer(s) selected by the Corporation.

" <u>Reference Treasury Dealer Quotation</u> " means, with respect to each Reference Treasury Dealer and any Redemption Date for the Securities of this series, the average, as determined by the Corporation, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Corporation by such Reference Treasury Dealer at 5:00 p.m. (New York City time) on the third Business Day preceding such Redemption Date. As used in the preceding sentence, " <u>Business Day</u> " means any day (other than a Saturday or Sunday) on which banking institutions in The City of New York are not authorized or obligated by law or executive order to remain closed.

The Corporation will mail notice of any optional redemption at least 30 days but not more than 60 days before the Redemption Date to each Holder of the Securities of this series to be redeemed. Once notice of redemption is mailed, the Securities of this series called for optional redemption will become due and payable on the Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation elects to redeem all or a portion of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price.

Unless the Corporation defaults in payment of the Redemption Price of any Securities of this series or portions thereof called for redemption at the option of the Corporation, on and after the Redemption Date interest will cease to accrue on the Securities of this series or portions thereof called for redemption.

In the event of redemption of this Security in part only, a new Security or Securities of this series and of like tenor in an aggregate principal amount equal to the unredeemed portion of the principal hereof will be issued in the name of the Holder hereof upon the cancellation hereof.

The Indenture contains provisions for defeasance at any time of the entire indebtedness of this Security upon compliance with certain conditions set forth in the Indenture.

If an Event of Default with respect to the Securities of this series shall occur and be continuing, the principal of and accrued and unpaid interest on the Securities of this series may be declared due and payable in the manner and with the effect provided in the Indenture.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Corporation and the rights of the Holders of the Securities of each series affected under the Indenture at any time by the Corporation and the Trustee with the consent of the Holders of a majority in principal amount of the Securities of each series at the time Outstanding affected thereby. The Indenture contains provisions permitting the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding with respect to which a default under the Indenture shall have occurred and be continuing, on behalf of the Holders of all Securities of such series, to waive, with certain exceptions, such past default with respect to such series and its consequences. The Indenture also permits the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding, on behalf of the Holders of all Securities of such series, to waive compliance by the Corporation with certain provisions of the Indenture. Any such

5

consent or waiver by the Holder of this Security shall be conclusive and binding upon such Holder and upon all future Holders of this Security and of any Security issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Security.

As provided in and subject to the provisions of the Indenture, the Holder of this Security shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default with respect to the Securities of this series, the Holders of not less than 25% in principal amount of the Securities of this series at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee, such Holder or Holders shall have offered the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall not have received from the Holders of a majority in principal amount of Securities of this series at the time Outstanding a direction inconsistent with such request, and the Trustee shall have failed to institute any such proceeding, for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Security for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Security or of the Indenture shall alter or impair the obligation of the Corporation, which is absolute and unconditional, to pay the principal of and premium, if any, and interest on this Security at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Security is registrable in the Security Register, upon surrender of this Security for registration of transfer at the office or agency of the Corporation in any place where the principal of and any premium and interest on this Security are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Corporation and the Security Registrar duly executed by, the Holder hereof or his attorney duly authorized in writing, and thereupon one or more new Securities of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Securities of this series are issuable only in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Securities of this series are exchangeable for a like aggregate principal amount of Securities of this series and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Security for registration of transfer, the Corporation, the Trustee and any agent of the Corporation or the Trustee may treat the Person in whose name this Security is registered as the owner hereof for all purposes, whether or not this Security be overdue, and neither the Corporation, the Trustee nor any such agent shall be affected by notice to the contrary.

This Security shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles thereof.

All terms used in this Security which are defined in the Indenture and not defined herein shall have the meanings assigned to them in the Indenture.

6

ANNEX II-F

Form of Certificate Evidencing the 3.800% Notes due 2038

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TO THE CORPORATION OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SEMPRA ENERGY

3.800% Notes due 2038

$ [●]

No. 00[●]

CUSIP No. 816851 BH1

ISIN No. US816851 BH17

Sempra Energy, a corporation duly organized and existing under the laws of the State of California (herein called the " Corporation ," which term includes any successor Person under the Indenture hereinafter referred to), for value received, hereby promises to pay to CEDE & CO., or registered assigns, the principal sum of [●] Million Dollars ($[●]) on February 1, 2038 (the " Maturity Date "), and to pay interest thereon from January 12, 2018 or from the most recent date to which interest has been paid or duly provided for, semi-annually in arrears on February 1 and August 1 in each year (each, an " Interest Payment Date "), commencing August 1, 2018 and on the Maturity Date at the rate of 3.800% per annum, until the principal hereof is paid or made available for payment, provided that any principal hereof or (to the extent that the payment of such interest shall be legally enforceable) premium, if any, or interest hereon which is not paid when due shall bear interest at the rate of 3.800% per annum from the respective dates such amounts are due until they are paid or made available for payment, and such interest shall be payable on demand.

Interest on this Security shall be calculated on the basis of a 360-day year consisting of twelve 30-day months. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest, which shall be the January 15 or July 15 (whether or not a Business Day), as the case may be, immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for on any Interest Payment Date will forthwith cease to be payable to the Holder on such Regular Record Date by virtue of having been such Holder and may either be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Securities of this series not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Securities of this series may be listed, and upon such notice as may be required by such exchange, all as more fully provided in said Indenture.

Payment of the principal of (and premium, if any) and interest on this Security will be made at the office or agency of the Corporation maintained for that purpose in the Borough of Manhattan, The City of New York, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and

private debts; provided, however, that at the option of the Corporation payment of interest may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register or by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Trustee at least 15 days prior to the date for payment by the Person entitled thereto. Notwithstanding the foregoing, so long as the Holder of this Security is the Depositary or its nominee, payment of the principal of (and premium, if any) and interest on this Security will be made by wire transfer of immediately available funds.

Reference is hereby made to the further provisions of this Security set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Security shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

**[Signature Page Follows]**

2

IN WITNESS WHEREOF, the Corporation has caused this instrument to be duly executed.

SEMPRA ENERGY

By: _____
Name:   Kathryn J. Collier
Title:     Vice President and Treasurer

Attest:

By: _____
Name: Maria Angelica Espinosa
Title:   Vice President – Compliance and Governance and Corporate Secretary

This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION

As successor Trustee to
   U.S. Bank Trust National Association

By: _____
      Authorized Signatory

Dated: _____

3

(REVERSE OF SECURITY)

This Security is one of a duly authorized issue of securities of the Corporation (herein called the " Securities "), issued and to be issued in one or more series under an Indenture, dated as of February 23, 2000 (herein called the " Indenture, " which term shall have the meaning assigned to it in such instrument), between the Corporation and U.S. Bank National Association, as successor trustee to U.S. Bank Trust National Association (herein called the " Trustee, " which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a statement of the respective rights, limitation of rights, duties and immunities thereunder of the Corporation, the Trustee and the Holders of the Securities and of the terms upon which the Securities are, and are to be, authenticated and delivered. This Security is one of the series designated on the face hereof.

If the Corporation does not consummate the Merger (as defined below) on or before 5:00 p.m. (New York City Time) on December 1, 2018, or if, on or prior to such date, the Merger Agreement (as defined below) is terminated (each, a " Special Mandatory Redemption Event "), the Corporation will redeem all of the outstanding Securities of this series, in whole and not in part, on the Special Mandatory Redemption Date (as defined below) at a Redemption Price equal to 101% of the principal amount of the Securities of this series plus accrued and unpaid interest, if any, to, but excluding, the Special Mandatory Redemption Date (the " Special Mandatory Redemption "). Notwithstanding the foregoing provisions of this paragraph, installments of interest on any Securities of this series that are due and payable on any Interest Payment Date falling on or prior to the Special Mandatory Redemption Date will be payable on such Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date according to the terms of the Securities of this series and the Indenture.

The Corporation will cause the notice of Special Mandatory Redemption to be mailed, with a copy to the Trustee, within five business days after the occurrence of a Special Mandatory Redemption Event, to each Holder of Securities of this series at its registered address. Such notice shall state, in addition to the other matters required by the Indenture, that a Special Mandatory Redemption Event has occurred (and shall describe generally the nature of such event) and that all of the outstanding Securities of this series will be redeemed on the Redemption Date set forth in such notice (which shall be a business day that is no earlier than three business days and no later than 30 days after the date such notice is given) (the " Special Mandatory Redemption Date "). Once notice of Special Mandatory Redemption is mailed, the Securities of this series will become due and payable on the Special Mandatory Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Special Mandatory Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation is required to effect a Special Mandatory Redemption of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price. Unless the Corporation defaults in payment of the Redemption Price of the Securities of this series on the Special Mandatory Redemption Date, on and after the Special Mandatory Redemption Date interest will cease to accrue on the Securities of this series. For purposes of clarity, it is understood and agreed that notice of Special Mandatory Redemption shall be given to the Holders of all of the Special Mandatory Redemption Notes (as defined below) on the same day and that all of the Special Mandatory Redemption Notes shall have the same Special Mandatory Redemption Date and it is further understood and agreed that the term " Maturity ," as used in the Indenture with respect to the Securities of this series, includes the Special Mandatory Redemption Date, if any. Any Special Mandatory Redemption shall otherwise be effected in accordance with the applicable provisions of the Indenture, except that any requirement in the Indenture that notice of redemption be given not less than 30 nor more than 60 days prior to the Redemption Date shall be superseded by the foregoing provisions of this paragraph. As used in this paragraph, " business day " means any day (other than a Saturday or a Sunday) on which banking institutions in The City of New York are not authorized or obligated by law or executive order to remain closed.

Anything in the Indenture or the Securities of this series to the contrary notwithstanding, no supplemental indenture or other amendment or supplement to the Indenture that is applicable to the Securities of this series, no amendment or supplement to the Securities of this series, and no waiver given by the Holders of the Securities of this series, shall, without the consent of the Holder of each outstanding Security of this series, change the obligation of the Corporation to redeem all of the Securities of this series on the Special Mandatory Redemption Date, if any, reduce the Redemption Price (including accrued and unpaid interest, if any) payable upon a Special Mandatory Redemption of the Securities of this series or extend the time for payment of such Redemption Price.

4

For purposes of the Special Mandatory Redemption provisions set forth in the three immediately preceding paragraphs, the following terms have the meaning set forth below:

" Merger " means the merger of Energy Future Holdings Corp. (" EFH ") with an indirect, wholly owned subsidiary of the Corporation, with EFH continuing as the surviving company and an indirect, wholly owned subsidiary of the Corporation, and as a result of which the Corporation shall acquire an indirect 100% membership interest in Oncor Electric Delivery Holdings Company LLC and an indirect 80.03% membership interest in Oncor Electric Delivery Company LLC (" Oncor ").

" Merger Agreement " means the Agreement and Plan of Merger dated August 21, 2017, as supplemented by the Waiver Agreement dated October 3, 2017, among the Corporation, an indirect wholly owned subsidiary of the Corporation and EFH (the indirect owner of 80.03% of the outstanding membership interests in Oncor) and Energy Future Intermediate Holding Company, LLC (a wholly owned subsidiary of EFH), as the same may be amended or supplemented from time to time.

" Special Mandatory Redemption Notes " means the Securities of this series, the Corporation's Floating Rate Notes due 2019, the Corporation's Floating Rate Notes due 2021, the Corporation's 2.400% Notes due 2020, the Corporation's 2.900% Notes due 2023 and the Corporation's 4.000% Notes due 2048, including the Securities of each such series originally issued on January 12, 2018 and any additional Securities of any such series that may be issued after such date.

Prior to August 1, 2037 (the "Par Call Date"), the Corporation may at its option redeem the Securities of this series, at any time in whole or from time to time in part, at a Redemption Price for any Redemption Date equal to the greater of the following amounts:

(1)     100% of the principal amount of the Securities of this series being redeemed on that Redemption Date; or

(2)     the sum of the present values of the remaining scheduled payments of principal and interest on the Securities of this series being redeemed on that Redemption Date (not including any portion of any payments of interest accrued to that Redemption Date) that would be due if such Securities of this series matured, and accrued and unpaid interest was payable, on the Par Call Date, discounted to that Redemption Date on a semi-annual basis at the Adjusted Treasury Rate (as defined below) plus 15 basis points, as determined by the Independent Investment Banker (as defined below),

plus, in each case, accrued and unpaid interest on the Securities of this series being redeemed to that Redemption Date.

On and after the Par Call Date, the Corporation may at its option redeem the Securities of this series, at any time in whole or from time to time in part, at a Redemption Price equal to 100% of the principal amount of the Securities of this series being redeemed, plus accrued and unpaid interest on the Securities of this series being redeemed to the Redemption Date.

If the Corporation redeems Securities of this series at its option, then (a) notwithstanding the foregoing, installments of interest on the Securities of this series that are due and payable on any Interest Payment Date falling on or prior to a Redemption Date for the Securities of this series will be payable on that Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date, according to the terms of the Securities of this series and the Indenture and (b) the Redemption Price will, if applicable, be calculated on the basis of a 360-day year consisting of twelve 30-day months.

For purposes of the optional redemption provisions set forth in the three immediately preceding paragraphs, the following terms have the meanings set forth below:

" Adjusted Treasury Rate " means, with respect to any Redemption Date for the Securities of this series, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, assuming a

5

price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

" Comparable Treasury Issue " means, with respect to any Redemption Date for the Securities of this series, the United States Treasury security selected by the Independent Investment Banker as having a maturity comparable to the remaining term of the Securities of this series to be redeemed on such Redemption Date (assuming that the Securities of this series matured on the Par Call Date) that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Securities of this series (assuming that the Securities of this series matured on the Par Call Date).

" Comparable Treasury Price " means, with respect to any Redemption Date for the Securities of this series, (A) the average of the Reference Treasury Dealer Quotations for such Redemption Date or (B) if only one Reference Treasury Dealer Quotation is received, such quotation.

" Independent Investment Banker " means, with respect to any Redemption Date for the Securities of this series, one of the Reference Treasury Dealers appointed by the Corporation to act as the " Independent Investment Banker ."

" Reference Treasury Dealers " means, with respect to any Redemption Date for the Securities of this series, (A) RBC Capital Markets, LLC, Morgan Stanley & Co. LLC and Barclays Capital Inc. (or their respective affiliates which are Primary Treasury Dealers (as defined below)), and their respective successors; *provided, however* , that if any of the foregoing shall cease to be a primary U.S. Government securities dealer in the United States (a " Primary Treasury Dealer "), the Corporation will substitute therefor another Primary Treasury Dealer; and (B) any other Primary Treasury Dealer(s) selected by the Corporation.

" Reference Treasury Dealer Quotation " means, with respect to each Reference Treasury Dealer and any Redemption Date for the Securities of this series, the average, as determined by the Corporation, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Corporation by such Reference Treasury Dealer at 5:00 p.m. (New York City time) on the third Business Day preceding such Redemption Date. As used in the preceding sentence, " Business Day " means any day (other than a Saturday or Sunday) on which banking institutions in The City of New York are not authorized or obligated by law or executive order to remain closed.

The Corporation will mail notice of any optional redemption at least 30 days but not more than 60 days before the Redemption Date to each Holder of the Securities of this series to be redeemed. Once notice of redemption is mailed, the Securities of this series called for optional redemption will become due and payable on the Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation elects to redeem all or a portion of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price.

Unless the Corporation defaults in payment of the Redemption Price of any Securities of this series or portions thereof called for redemption at the option of the Corporation, on and after the Redemption Date interest will cease to accrue on the Securities of this series or portions thereof called for redemption.

In the event of redemption of this Security in part only, a new Security or Securities of this series and of like tenor in an aggregate principal amount equal to the unredeemed portion of the principal hereof will be issued in the name of the Holder hereof upon the cancellation hereof.

The Indenture contains provisions for defeasance at any time of the entire indebtedness of this Security upon compliance with certain conditions set forth in the Indenture.

If an Event of Default with respect to the Securities of this series shall occur and be continuing, the principal of and accrued and unpaid interest on the Securities of this series may be declared due and payable in the manner and with the effect provided in the Indenture.

6

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Corporation and the rights of the Holders of the Securities of each series affected under the Indenture at any time by the Corporation and the Trustee with the consent of the Holders of a majority in principal amount of the Securities of each series at the time Outstanding affected thereby. The Indenture contains provisions permitting the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding with respect to which a default under the Indenture shall have occurred and be continuing, on behalf of the Holders of all Securities of such series, to waive, with certain exceptions, such past default with respect to such series and its consequences. The Indenture also permits the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding, on behalf of the Holders of all Securities of such series, to waive compliance by the Corporation with certain provisions of the Indenture. Any such consent or waiver by the Holder of this Security shall be conclusive and binding upon such Holder and upon all future Holders of this Security and of any Security issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Security.

As provided in and subject to the provisions of the Indenture, the Holder of this Security shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default with respect to the Securities of this series, the Holders of not less than 25% in principal amount of the Securities of this series at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee, such Holder or Holders shall have offered the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall not have received from the Holders of a majority in principal amount of Securities of this series at the time Outstanding a direction inconsistent with such request, and the Trustee shall have failed to institute any such proceeding, for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Security for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Security or of the Indenture shall alter or impair the obligation of the Corporation, which is absolute and unconditional, to pay the principal of and premium, if any, and interest on this Security at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Security is registrable in the Security Register, upon surrender of this Security for registration of transfer at the office or agency of the Corporation in any place where the principal of and any premium and interest on this Security are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Corporation and the Security Registrar duly executed by, the Holder hereof or his attorney duly authorized in writing, and thereupon one or more new Securities of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Securities of this series are issuable only in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Securities of this series are exchangeable for a like aggregate principal amount of Securities of this series and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Security for registration of transfer, the Corporation, the Trustee and any agent of the Corporation or the Trustee may treat the Person in whose name this Security is registered as the owner hereof for all purposes, whether or not this Security be overdue, and neither the Corporation, the Trustee nor any such agent shall be affected by notice to the contrary.

7

This Security shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles thereof.

All terms used in this Security which are defined in the Indenture and not defined herein shall have the meanings assigned to them in the Indenture.

8

ANNEX II-G

Form of Certificate Evidencing the 4.000% Notes due 2048

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TO THE CORPORATION OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SEMPRA ENERGY

4.000% Notes due 2048

$ [ □ ]

No. 00[ □ ]

CUSIP No. 816851 BJ7
ISIN No. US816851 BJ72

Sempra Energy, a corporation duly organized and existing under the laws of the State of California (herein called the "Corporation," which term includes any successor Person under the Indenture hereinafter referred to), for value received, hereby promises to pay to CEDE & CO., or registered assigns, the principal sum of [ □ ] Million Dollars ($[ □ ]) on February 1, 2048 (the "Maturity Date"), and to pay interest thereon from January 12, 2018 or from the most recent date to which interest has been paid or duly provided for, semi-annually in arrears on February 1 and August 1 in each year (each, an "Interest Payment Date"), commencing August 1, 2018 and on the Maturity Date at the rate of 4.000% per annum, until the principal hereof is paid or made available for payment, provided that any principal hereof or (to the extent that the payment of such interest shall be legally enforceable) premium, if any, or interest hereon which is not paid when due shall bear interest at the rate of 4.000% per annum from the respective dates such amounts are due until they are paid or made available for payment, and such interest shall be payable on demand.

Interest on this Security shall be calculated on the basis of a 360-day year consisting of twelve 30-day months. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest, which shall be the January 15 or July 15 (whether or not a Business Day), as the case may be, immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for on any Interest Payment Date will forthwith cease to be payable to the Holder on such Regular Record Date by virtue of having been such Holder and may either be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Securities of this series not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Securities of this series may be listed, and upon such notice as may be required by such exchange, all as more fully provided in said Indenture.

Payment of the principal of (and premium, if any) and interest on this Security will be made at the office or agency of the Corporation maintained for that purpose in the Borough of Manhattan, The City of New York, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and

private debts; provided, however, that at the option of the Corporation payment of interest may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register or by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Trustee at least 15 days prior to the date for payment by the Person entitled thereto. Notwithstanding the foregoing, so long as the Holder of this Security is the Depositary or its nominee, payment of the principal of (and premium, if any) and interest on this Security will be made by wire transfer of immediately available funds.

Reference is hereby made to the further provisions of this Security set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Security shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

**[Signature Page Follows]**

2

IN WITNESS WHEREOF, the Corporation has caused this instrument to be duly executed.

SEMPRA ENERGY

By: _____
Name:    Kathryn J. Collier
Title:    Vice President and Treasurer

Attest:

By: _____
Name:  Maria Angelica Espinosa
Title:    Vice President – Compliance and Governance and
      Corporate Secretary

This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION

As successor Trustee to
   U.S. Bank Trust National Association

By: _____
    Authorized Signatory

Dated: _____

3

(REVERSE OF SECURITY)

This Security is one of a duly authorized issue of securities of the Corporation (herein called the " Securities "), issued and to be issued in one or more series under an Indenture, dated as of February 23, 2000 (herein called the " Indenture, " which term shall have the meaning assigned to it in such instrument), between the Corporation and U.S. Bank National Association, as successor trustee to U.S. Bank Trust National Association (herein called the " Trustee, " which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a statement of the respective rights, limitation of rights, duties and immunities thereunder of the Corporation, the Trustee and the Holders of the Securities and of the terms upon which the Securities are, and are to be, authenticated and delivered. This Security is one of the series designated on the face hereof.

If the Corporation does not consummate the Merger (as defined below) on or before 5:00 p.m. (New York City Time) on December 1, 2018, or if, on or prior to such date, the Merger Agreement (as defined below) is terminated (each, a " Special Mandatory Redemption Event "), the Corporation will redeem all of the outstanding Securities of this series, in whole and not in part, on the Special Mandatory Redemption Date (as defined below) at a Redemption Price equal to 101% of the principal amount of the Securities of this series plus accrued and unpaid interest, if any, to, but excluding, the Special Mandatory Redemption Date (the " Special Mandatory Redemption "). Notwithstanding the foregoing provisions of this paragraph, installments of interest on any Securities of this series that are due and payable on any Interest Payment Date falling on or prior to the Special Mandatory Redemption Date will be payable on such Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date according to the terms of the Securities of this series and the Indenture.

The Corporation will cause the notice of Special Mandatory Redemption to be mailed, with a copy to the Trustee, within five business days after the occurrence of a Special Mandatory Redemption Event, to each Holder of Securities of this series at its registered address. Such notice shall state, in addition to the other matters required by the Indenture, that a Special Mandatory Redemption Event has occurred (and shall describe generally the nature of such event) and that all of the outstanding Securities of this series will be redeemed on the Redemption Date set forth in such notice (which shall be a business day that is no earlier than three business days and no later than 30 days after the date such notice is given) (the " Special Mandatory Redemption Date "). Once notice of Special Mandatory Redemption is mailed, the Securities of this series will become due and payable on the Special Mandatory Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Special Mandatory Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation is required to effect a Special Mandatory Redemption of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price. Unless the Corporation defaults in payment of the Redemption Price of the Securities of this series on the Special Mandatory Redemption Date, on and after the Special Mandatory Redemption Date interest will cease to accrue on the Securities of this series. For purposes of clarity, it is understood and agreed that notice of Special Mandatory Redemption shall be given to the Holders of all of the Special Mandatory Redemption Notes (as defined below) on the same day and that all of the Special Mandatory Redemption Notes shall have the same Special Mandatory Redemption Date and it is further understood and agreed that the term " Maturity ," as used in the Indenture with respect to the Securities of this series, includes the Special Mandatory Redemption Date, if any. Any Special Mandatory Redemption shall otherwise be effected in accordance with the applicable provisions of the Indenture, except that any requirement in the Indenture that notice of redemption be given not less than 30 nor more than 60 days prior to the Redemption Date shall be superseded by the foregoing provisions of this paragraph. As used in this paragraph, " business day " means any day (other than a Saturday or a Sunday) on which banking institutions in The City of New York are not authorized or obligated by law or executive order to remain closed.

Anything in the Indenture or the Securities of this series to the contrary notwithstanding, no supplemental indenture or other amendment or supplement to the Indenture that is applicable to the Securities of this series, no amendment or supplement to the Securities of this series, and no waiver given by the Holders of the Securities of this series, shall, without the consent of the Holder of each outstanding Security of this series, change the obligation of the Corporation to redeem all of the Securities of this series on the Special Mandatory Redemption Date, if any, reduce the Redemption Price (including accrued and unpaid interest, if any) payable upon a Special Mandatory Redemption of the Securities of this series or extend the time for payment of such Redemption Price.

4

For purposes of the Special Mandatory Redemption provisions set forth in the three immediately preceding paragraphs, the following terms have the meaning set forth below:

" Merger " means the merger of Energy Future Holdings Corp. (" EFH ") with an indirect, wholly owned subsidiary of the Corporation, with EFH continuing as the surviving company and an indirect, wholly owned subsidiary of the Corporation, and as a result of which the Corporation shall acquire an indirect 100% membership interest in Oncor Electric Delivery Holdings Company LLC and an indirect 80.03% membership interest in Oncor Electric Delivery Company LLC (" Oncor ").

" Merger Agreement " means the Agreement and Plan of Merger dated August 21, 2017, as supplemented by the Waiver Agreement dated October 3, 2017, among the Corporation, an indirect wholly owned subsidiary of the Corporation and EFH (the indirect owner of 80.03% of the outstanding membership interests in Oncor) and Energy Future Intermediate Holding Company, LLC (a wholly owned subsidiary of EFH), as the same may be amended or supplemented from time to time.

" Special Mandatory Redemption Notes " means the Securities of this series, the Corporation's Floating Rate Notes due 2019, the Corporation's Floating Rate Notes due 2021, the Corporation's 2.400% Notes due 2020, the Corporation's 2.900% Notes due 2023 and the Corporation's 3.800% Notes due 2038, including the Securities of each such series originally issued on January 12, 2018 and any additional Securities of any such series that may be issued after such date.

Prior to August 1, 2047 (the "Par Call Date"), the Corporation may at its option redeem the Securities of this series, at any time in whole or from time to time in part, at a Redemption Price for any Redemption Date equal to the greater of the following amounts:

(1)    100% of the principal amount of the Securities of this series being redeemed on that Redemption Date; or

(2)    the sum of the present values of the remaining scheduled payments of principal and interest on the Securities of this series being redeemed on that Redemption Date (not including any portion of any payments of interest accrued to that Redemption Date) that would be due if such Securities of this series matured, and accrued and unpaid interest was payable, on the Par Call Date, discounted to that Redemption Date on a semi-annual basis at the Adjusted Treasury Rate (as defined below) plus 20 basis points, as determined by the Independent Investment Banker (as defined below),

plus, in each case, accrued and unpaid interest on the Securities of this series being redeemed to that Redemption Date.

On and after the Par Call Date, the Corporation may at its option redeem the Securities of this series, at any time in whole or from time to time in part, at a Redemption Price equal to 100% of the principal amount of the Securities of this series being redeemed, plus accrued and unpaid interest on the Securities of this series being redeemed to the Redemption Date.

If the Corporation redeems Securities of this series at its option, then (a) notwithstanding the foregoing, installments of interest on the Securities of this series that are due and payable on any Interest Payment Date falling on or prior to a Redemption Date for the Securities of this series will be payable on that Interest Payment Date to the Holders thereof as of the close of business on the Regular Record Date immediately preceding such Interest Payment Date, according to the terms of the Securities of this series and the Indenture and (b) the Redemption Price will, if applicable, be calculated on the basis of a 360-day year consisting of twelve 30-day months.

For purposes of the optional redemption provisions set forth in the three immediately preceding paragraphs, the following terms have the meanings set forth below:

" Adjusted Treasury Rate " means, with respect to any Redemption Date for the Securities of this series, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, assuming a

5

price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Comparable Treasury Issue" means, with respect to any Redemption Date for the Securities of this series, the United States Treasury security selected by the Independent Investment Banker as having a maturity comparable to the remaining term of the Securities of this series to be redeemed on such Redemption Date (assuming that the Securities of this series matured on the Par Call Date) that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Securities of this series (assuming that the Securities of this series matured on the Par Call Date).

"Comparable Treasury Price" means, with respect to any Redemption Date for the Securities of this series, (A) the average of the Reference Treasury Dealer Quotations for such Redemption Date or (B) if only one Reference Treasury Dealer Quotation is received, such quotation.

"Independent Investment Banker" means, with respect to any Redemption Date for the Securities of this series, one of the Reference Treasury Dealers appointed by the Corporation to act as the "Independent Investment Banker."

"Reference Treasury Dealers" means, with respect to any Redemption Date for the Securities of this series, (A) RBC Capital Markets, LLC, Morgan Stanley & Co. LLC and Barclays Capital Inc. (or their respective affiliates which are Primary Treasury Dealers (as defined below)), and their respective successors; *provided, however* , that if any of the foregoing shall cease to be a primary U.S. Government securities dealer in the United States (a "Primary Treasury Dealer"), the Corporation will substitute therefor another Primary Treasury Dealer; and (B) any other Primary Treasury Dealer(s) selected by the Corporation.

"Reference Treasury Dealer Quotation" means, with respect to each Reference Treasury Dealer and any Redemption Date for the Securities of this series, the average, as determined by the Corporation, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Corporation by such Reference Treasury Dealer at 5:00 p.m. (New York City time) on the third Business Day preceding such Redemption Date. As used in the preceding sentence, "Business Day" means any day (other than a Saturday or Sunday) on which banking institutions in The City of New York are not authorized or obligated by law or executive order to remain closed.

The Corporation will mail notice of any optional redemption at least 30 days but not more than 60 days before the Redemption Date to each Holder of the Securities of this series to be redeemed. Once notice of redemption is mailed, the Securities of this series called for optional redemption will become due and payable on the Redemption Date at the applicable Redemption Price, plus accrued and unpaid interest to the Redemption Date, and will be paid upon surrender thereof for redemption. If the Corporation elects to redeem all or a portion of the Securities of this series, that redemption will not be conditional upon receipt by the Paying Agent or the Trustee of monies sufficient to pay the Redemption Price.

Unless the Corporation defaults in payment of the Redemption Price of any Securities of this series or portions thereof called for redemption at the option of the Corporation, on and after the Redemption Date interest will cease to accrue on the Securities of this series or portions thereof called for redemption.

In the event of redemption of this Security in part only, a new Security or Securities of this series and of like tenor in an aggregate principal amount equal to the unredeemed portion of the principal hereof will be issued in the name of the Holder hereof upon the cancellation hereof.

The Indenture contains provisions for defeasance at any time of the entire indebtedness of this Security upon compliance with certain conditions set forth in the Indenture.

If an Event of Default with respect to the Securities of this series shall occur and be continuing, the principal of and accrued and unpaid interest on the Securities of this series may be declared due and payable in the manner and with the effect provided in the Indenture.

6

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Corporation and the rights of the Holders of the Securities of each series affected under the Indenture at any time by the Corporation and the Trustee with the consent of the Holders of a majority in principal amount of the Securities of each series at the time Outstanding affected thereby. The Indenture contains provisions permitting the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding with respect to which a default under the Indenture shall have occurred and be continuing, on behalf of the Holders of all Securities of such series, to waive, with certain exceptions, such past default with respect to such series and its consequences. The Indenture also permits the Holders of not less than a majority in principal amount of the Securities of any series at the time Outstanding, on behalf of the Holders of all Securities of such series, to waive compliance by the Corporation with certain provisions of the Indenture. Any such consent or waiver by the Holder of this Security shall be conclusive and binding upon such Holder and upon all future Holders of this Security and of any Security issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Security.

As provided in and subject to the provisions of the Indenture, the Holder of this Security shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default with respect to the Securities of this series, the Holders of not less than 25% in principal amount of the Securities of this series at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee, such Holder or Holders shall have offered the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall not have received from the Holders of a majority in principal amount of Securities of this series at the time Outstanding a direction inconsistent with such request, and the Trustee shall have failed to institute any such proceeding, for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Security for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Security or of the Indenture shall alter or impair the obligation of the Corporation, which is absolute and unconditional, to pay the principal of and premium, if any, and interest on this Security at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Security is registrable in the Security Register, upon surrender of this Security for registration of transfer at the office or agency of the Corporation in any place where the principal of and any premium and interest on this Security are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Corporation and the Security Registrar duly executed by, the Holder hereof or his attorney duly authorized in writing, and thereupon one or more new Securities of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Securities of this series are issuable only in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Securities of this series are exchangeable for a like aggregate principal amount of Securities of this series and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Security for registration of transfer, the Corporation, the Trustee and any agent of the Corporation or the Trustee may treat the Person in whose name this Security is registered as the owner hereof for all purposes, whether or not this Security be overdue, and neither the Corporation, the Trustee nor any such agent shall be affected by notice to the contrary.

7

This Security shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles thereof.

All terms used in this Security which are defined in the Indenture and not defined herein shall have the meanings assigned to them in the Indenture.

8

Exhibit 5.1

12670 High Bluff Drive
San Diego, California 92130
Tel: +1.858.523.5400 Fax: +1.858.523.5450
www.lw.com

## LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | Rome |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

January 12, 2018

Sempra Energy
488 8th Avenue
San Diego, California 92101

Re:    Registration Statement No. 333-220257—Issuance of $500,000,000 aggregate principal amount of the Company's Floating Rate Notes due 2019, $700,000,000 aggregate principal amount of the Company's Floating Rate Notes due 2021, $500,000,000 aggregate principal amount of the Company's 2.400% Notes due 2020, $500,000,000 aggregate principal amount of the Company's 2.900% Notes due 2023, $1,000,000,000 aggregate principal amount of the Company's 3.400% Notes due 2028, $1,000,000,000 aggregate principal amount of the Company's 3.800% Notes due 2038 and $800,000,000 aggregate principal amount of the Company's 4.00% Notes due 2048

Ladies and Gentlemen:

We have acted as special counsel to Sempra Energy, a California corporation (the " **Company** "), in connection with the Company's issuance of $500,000,000 aggregate principal amount of the Company's Floating Rate Notes due 2019 (the " ***2019 Floating Rate Notes*** "), $700,000,000 aggregate principal amount of the Company's Floating Rate Notes due 2021 (the " ***2021 Floating Rate Notes*** "), $500,000,000 aggregate principal amount of the Company's 2.400% Notes due 2020 (the " ***2020 Notes*** "), $500,000,000 aggregate principal amount of the Company's 2.900% Notes due 2023 (the " ***2023 Notes*** "), $1,000,000,000 aggregate principal amount of the Company's 3.400% Notes due 2028 (the " ***2028 Notes*** "), $1,000,000 aggregate principal amount of the Company's 3.800% Notes due 2038 (the " ***2038 Notes*** ") and $800,000,000 aggregate principal amount of the Company's 4.000% Notes due 2048 (the " ***2048 Notes*** " and, together with the 2019 Floating Rate Notes, the 2021 Floating Rate Notes, the 2020 Notes, the 2023 Notes, the 2028 Notes and the 2038 Notes, the " **Notes** ") under an Indenture, dated as of February 23, 2000, between the Company and U.S. Bank National Association, as successor Trustee to U.S. Bank Trust National Association (the " **Trustee** "), and an officers' certificate, dated January 12, 2018, setting forth the terms of the Notes (together, the " **Indenture** "), and pursuant to a registration statement on Form S-3 under the Securities Act of 1933, as amended (the " **Act** "), filed with the Securities and Exchange Commission (the

" *Commission* ") on August 30, 2017 (Registration No. 333-220257), as amended by post-effective Amendment No. 1 thereto filed with the Commission on January 2, 2018 (as so filed and amended the " *Registration Statement* "), and an underwriting agreement, dated January 9, 2018, between the underwriters named therein and the Company.

This opinion is being furnished in connection with the requirements of Item 601(b)(5) of Regulation S-K under the Act, and no opinion is expressed herein as to any matter pertaining to the contents of the Registration Statement or related prospectus, other than as expressly stated herein with respect to the issue of the Notes.

As such counsel, we have examined such matters of fact and questions of law as we have considered appropriate for purposes of this letter. With your consent, we have relied upon certificates and other assurances of officers of the Company and others as to factual matters without having independently verified such factual matters. We are opining herein as to the internal laws of the State of New York and the general corporation law of the State of California, and we express no opinion with respect to the applicability thereto, or the effect thereon, of the laws of any other jurisdiction or, in the case of California, any other laws, or as to any matters of municipal law or the laws of any local agencies within any state.

Subject to the foregoing and the other matters set forth herein, it is our opinion that, as of the date hereof, the Notes have been duly authorized by all necessary corporate action of the Company and are the legally valid and binding obligations of the Company, enforceable against the Company in accordance with their terms.

Our opinion is subject to: (i) the effect of bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium or other similar laws relating to or affecting the rights and remedies of creditors; (ii) the effect of general principles of equity, whether considered in a proceeding in equity or at law (including the possible unavailability of specific performance or injunctive relief), concepts of materiality, reasonableness, good faith and fair dealing, and the discretion of the court before which a proceeding is brought; (iii) the invalidity under certain circumstances under law or court decisions of provisions providing for the indemnification of or contribution to a party with respect to a liability where such indemnification or contribution is contrary to public policy; and (iv) we express no opinion as to (a) any provision for liquidated damages, default interest, late charges, monetary penalties, make-whole premiums or other economic remedies to the extent such provisions are deemed to constitute a penalty, (b) consents to, or restrictions upon, governing law, jurisdiction, venue, arbitration, remedies, or judicial relief, (c) the waiver of rights or defenses contained in Section 515 of the Indenture, (d) any provision requiring the payment of attorneys' fees, where such payment is contrary to law or public policy, (e) any provision permitting, upon acceleration of the Notes, collection of that portion of the stated principal amount thereof which might be determined to constitute unearned interest thereon, (f) waivers of broadly or vaguely stated rights and (g) the severability, if invalid, of provisions to the foregoing effect.

With your consent, we have assumed (a) that the Indenture and the Notes (collectively, the " *Documents* ") have been duly authorized, executed and delivered by the parties thereto other than the Company, (b) that the Documents constitute legally valid and binding obligations of the

**January 12, 2018**
**Page 3**

parties thereto other than the Company, enforceable against each of them in accordance with their respective terms, and (c) that the status of the Documents as legally valid and binding obligations of the parties is not affected by any (i) breaches of, or defaults under, agreements or instruments, (ii) violations of statutes, rules, regulations or court or governmental orders, or (iii) failures to obtain required consents, approvals or authorizations from, or make required registrations, declarations or filings with, governmental authorities.

This opinion is for your benefit in connection with the Registration Statement and may be relied upon by you and by persons entitled to rely upon it pursuant to the applicable provisions of the Act. We consent to your filing this opinion as an exhibit to the Company's Form 8-K dated January 12, 2018 and to the reference to our firm contained in the prospectus for the offering of the Notes under the heading "Legal Matters." In giving such consent, we do not thereby admit that we are in the category of persons whose consent is required under Section 7 of the Act or the rules and regulations of the Commission thereunder.

Very truly yours,

/s/ Latham & Watkins LLP