**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| *Debtors*. | (Jointly Administered) |

**DECLARATION OF JEFFREY ROSENBAUM FILED IN SUPPORT OF THE E-SIDE
DEBTORS' APPLICATION FOR ALLOWANCE AS AN ADMINISTRATIVE EXPENSE
THE ELLIOTT FUNDS' FEES AND EXPENSES INCURRED IN MAKING A
SUBSTANTIAL CONTRIBUTION TO THE E-SIDE DEBTORS' ESTATES**

I, Jeffrey Rosenbaum, hereby declare as follows:

1.      I am a portfolio manager at Elliott Management Corporation.  Elliott Management Corporation manages and provides investment advisory services for Elliott Associates, L.P., Elliott International, L.P., The Liverpool Limited Partnership, and Gatwick Securities LLC (collectively "Elliott" or the "Elliott Funds").

2.      I submit this declaration in support of the E-Side Debtors' request that up to $35 million in fees and expenses incurred by Elliott be allowed as an administrative expense in the EFH Debtors and EFIH Debtors (the "E-Side Debtors") chapter 11 bankruptcy cases pursuant to 503(b)(3)(D) and the Court of Appeals for the Third Circuit's decision in *Lebron v. Mecham Financial Inc.*, 27 F.3d 937 (3d Cir. 1994).

3.      The statements in this Declaration are based on my personal knowledge.  If called to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of Elliott.

4.      Pursuant to the Plan Support Agreement, the E-Side Debtors have requested a finding that up to $35 million of Elliott's fees and expenses are an allowed administrative claim

against EFIH under the EFH/EFIH Plan.[1]  [D.I. 11801-2].  It is Elliott's position, however, that Elliott has administrative claims against both the EFH and EFIH estates.  Elliott also reserves the right to request that Elliott's fees and expenses in excess of $35 million be allowed as an administrative claim against both the EFH and EFIH estates (which request has not yet been formally made or filed, or accepted by any of the EFH/EFIH Debtors).

5.    I understand that, in order to be allowable administrative expenses, the expenses must be "actual" and "necessary" expenses incurred by a creditor "in making a substantial contribution in a case under chapter 9 or 11 of this title." 11 U.S.C. § 503(b)(3)(D).  I understand that the test for determining whether a creditor has made a substantial contribution looks to whether the creditor's efforts "resulted in an actual and demonstrable benefit to the debtor's estate and the creditors." *Lebron*, 27 F.3d at 944.

6.    I believe Elliott's efforts in the chapter 11 cases commenced by the E-Side Debtors in the United States Bankruptcy Court for the District of Delaware on April 29, 2014 (the "Chapter 11 Cases") have resulted in actual, tangible, and demonstrable benefit to the E-Side Debtors and all E-Side creditors and consequently that Elliott's request for fees and expenses up $35 million as an administrative expense should be allowed.

7.    Elliott's substantial contributions to the E-Side Debtors and their creditors include, but are not limited to, the following:

    a.  *First*, Elliott secured a critical adjournment of the hearing date to approve the E-Side Debtors' proposed transaction with Berkshire Hathaway Energy Company ("Berkshire" and the "Berkshire Transaction"), whereby Berkshire would have acquired the E-Side Debtors' indirect interest in Oncor Electric Delivery Company ("Oncor") for $9 billion.  During the extended period secured by Elliott, Sempra Energy ("Sempra") emerged with a superior proposal to acquire Oncor (the "Sempra Transaction").  Sempra ultimately agreed to acquire Oncor for $9.45 billion.  As a result, the E-Side Debtors' estates will receive $450 million more

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Elliott Reply or, if not defined in the Elliott Reply, in the EFH/EFIH Plan.

cash consideration than they would have received under the Berkshire Transaction (not accounting for the additional 2017 dividend payments addressed below).

b. *Second*, Elliott successfully obtained an order disallowing a $275 million termination fee sought by NextEra Energy, Inc. ("NextEra" and the "NextEra Termination Fee"); and

c. *Third*, Elliott sought to enforce the E-Side Debtors' contractual rights against Sempra regarding the E-Side Debtors' interests in Oncor's 2017 quarterly dividends, which ultimately resulted in a settlement supported by Elliott and approved by this Court. The settlement will deliver an additional $31 million to the E-Side Debtors' estates.

8.    This not an exhaustive description of Elliott's contributions to the E-Side Debtors' estates and their creditors. Nonetheless, the three events described above alone will result in **approximately $756 million** in additional value to the E-Side Debtors' estates that will be available for creditor recoveries.

9.    Elliott's actions went beyond what Elliott needed to do protect its own interests and benefitted all creditors. Elliott took such actions before there was any agreement by the E-Side Debtors to support a $35 million allowed administrative expense claim for substantial contribution. In that regard, Elliott's efforts led to an increase in distributable value by approximately $756 million. This additional value will not only result in increased recoveries to EFIH creditors, but also EFH creditors (by potentially increasing the amount of cash available for distribution to such creditors) as a result of the Reconsideration Order (which was obtained as a result of Elliott's motion). Specifically, by obtaining the Reconsideration Order and increasing creditor recoveries, Elliott helped to limit potential confirmation disputes for all parties involved.

10.    The work performed by Elliott and its professionals was (and continues to be) critical to obtaining this enhanced value for the E-Side Debtors and its creditors. Elliott faced opposition in response to each of the above efforts. Indeed, the E-Side Debtors opposed Elliott's efforts to adjourn the hearing date for approval of the Berkshire Transaction and to disallow the

NextEra Termination Fee.  As a result, without Elliott's involvement, the E-Side Debtors' estates would not have received the enhanced value described above.

11.    The fees and expenses incurred by Elliott during the course of its value-enhancing initiatives were and are actual, necessary, and reasonable.  Indeed, Elliott's requested fees and expenses represent a small percentage of the actual, tangible, and demonstrable value that Elliott helped to secure for the E-Side Debtors' estates and creditors.

12.    I provide more detail on Elliott's principal contributions below.

**I.    Elliott Obtained An Extended "Go Shop" Period That Paved The Way For Sempra's Superior $9.45 Billion Offer – $450 Million More Than The Proposed Berkshire Merger Agreement.**

12.     First, as a result of Elliott's actions, the E-Side Debtors received a superior competing offer from Sempra to acquire Oncor for $9.45 billion – $450 million more cash consideration than the proposed merger agreement with Berkshire ("the Berkshire Merger Agreement").

13.    As the Court is aware, on July 7, 2017, the E-Side Debtors terminated their merger agreement with NextEra (the "NextEra Merger Agreement").  That same day, the E-Side Debtors entered into the Berkshire Merger Agreement, whereby Berkshire would acquire the E-Side Debtors' interest in Oncor for $9 billion, subject to a $270 million termination fee.  [D.I. 11430]

14.    The Berkshire Merger Agreement specified a 45-day "go shop" window during which the E-Side Debtors could, in the exercise of their fiduciary duties, consider competing proposals.  That 45-day "go shop" window was set to expire on August 21, 2017.  The E-Side Debtors requested that the hearing to approve the Berkshire Merger Agreement be scheduled for August 10, 2017.

15.     To maximize the "go shop" window set forth in the Berkshire Merger Agreement, on July 19, 2017, Elliott moved to adjourn the hearing on approval of the Berkshire Merger Agreement. [D.I. 11506].  Both the E-Side Debtors and Berkshire opposed Elliott's request.

16.     On July 26, 2017, following a full day evidentiary hearing at which Elliott's counsel and professionals presented evidence in support of adjournment, the Court adjourned the hearing on approval of the Berkshire Merger Agreement from August 10 to August 21, 2017.

17.     The additional 11 days were critical.  On or around August 15, 2017, the E-Side Debtors received a $9.3 billion competing offer from Sempra – $300 million more than the Berkshire Merger Agreement.

18.     Elliott was an active participant in negotiations with Sempra.  Sempra initially offered to acquire Oncor for $9.3 billion, an offer the E-Side Debtors would not accept.  Elliott negotiated to increase Sempra's purchase price by $150 million and subsequently, together with the E-Side Debtors, secured other regulatory commitments from Sempra that increased the likelihood that the E-Side Debtors' proposed merger agreement with Sempra (the "Sempra Merger Agreement") would obtain regulatory approval.

19.     The Sempra Merger Agreement offered significant improvements over the Berkshire Merger Agreement, including:

    a)  An additional $450 million to be paid to the E-Side Debtors' estates; and

    b)  A termination fee of $190 million – $80 million less than the proposed Berkshire termination fee.

20.     Finally, despite this higher and better offer by Sempra, the E-Side Debtors were only prepared to pivot to the Sempra Transaction and a related plan of reorganization if Elliott supported the Sempra Transaction and entered into a plan support agreement.  Elliott agreed to do so, and consequently on August 21, 2017, the E-Side Debtors terminated the Berkshire

Merger Agreement and entered into the Sempra Merger Agreement. The Court ultimately approved the E-Side Debtors entering into the merger agreement with Sempra on September 20, 2017.

## II.    Elliott Sought And Obtained An Order Disallowing The $275 Million NextEra Termination Fee.

21.    Second, Elliott successfully challenged the NextEra Termination Fee that would have provided a $275 million payment to NextEra at the expense of the E-Side Debtors' creditors.

22.    As the Court is aware, in September 2016, the Court entered an order (the "NextEra Termination Fee Order") that, among other things, (a) authorized the E-Side Debtors to enter into the NextEra Merger Agreement, and (b) authorized the E-Side Debtors to pay NextEra a $275 million Termination Fee as an allowed administrative expense to the extent it became due and payable under the terms and conditions of the NextEra Merger Agreement.  [D.I. 9584].

23.    Following the E-Side Debtors' termination of the NextEra Merger Agreement, Elliott sought reconsideration of the NextEra Termination Fee Order.   [D.I. 11636] (the "Reconsideration Motion").   Elliott's Reconsideration Motion sought disallowance of the NextEra Termination Fee Order on the grounds that (i) it incorrectly authorized the E-Side Debtors to pay the NextEra Termination Fee when no regulatory approval was obtained for the proposed NextEra merger transaction and the E-Side Debtors were forced to terminate the NextEra Merger Agreement to pursue an alternative transaction, and (ii) it would confer no benefit on the E-Side Debtors' estates.   No other creditor joined Elliott's motion.   The Reconsideration Motion was not only opposed by NextEra, but also the E-Side Debtors.  [D.I. 11879].

6

24.    Following a hearing, the Court granted Elliott's Reconsideration Motion [D.I. 11998], and denied NextEra's request for approval of the Termination Fee as an administrative expense.  [D.I. 12075].

25.    NextEra has appealed the Reconsideration Order to the U.S. Court of Appeals for the Third Circuit.  Elliott intends to vigorously oppose NextEra's appeal and as the primary appellee will continue to incur substantial fees and expenses in doing so for the benefit of the E-Side Debtors' estates and creditors.

### III.    Elliott Pursued The E-Side Debtors' Interest In Oncor's 2017 Quarterly Dividends That Resulted In A $31 Million Settlement.

26.    Third, Elliott was instrumental in negotiating with the E-Side Debtors and Sempra to secure a $31 million settlement for the E-Side Debtors' estates in connection with a dispute concerning the payment of Oncor's 2017 quarterly dividends.

27.    The treatment of Oncor's 2017 quarterly dividends was an important aspect of the August 2017 negotiations of the Sempra Merger Agreement, in which Elliott participated.  In particular, the parties specifically negotiated the payment of dividends:

> [P]rovided, further, that (i) it is expected that Oncor will pay a dividend to Oncor Holdings and that Oncor Holdings will pay such dividend to EFIH in respect of amounts earned by Oncor during the period starting as of October 1, 201 7 and ending on December 31, 2017 (such a dividend, a "2017 Dividend"), (ii) if the Closing occurs prior to the *payment* of such 2017 Dividend to EFIH, then the Cash Deposit Amount shall be increased by an amount equal to seventy-five percent (75%) of the *actual* 2017 Dividend (the "Payable Dividend Amount"), and the Surviving Company shall deliver, or cause to be delivered, such Payable Dividend Amount by wire transfer of immediately available funds to the EFH/EFIH Cash Distribution Account within five (5) Business Days following receipt by EFIH of such 2017 Dividend, and (iii) if the Closing occurs at any time following the *payment* of any 2017 Dividend, then the Cash Deposit Amount shall be reduced by an amount equal to twenty-five percent (25%) of the *actual* 2017 Dividend.  [D.I. 11801 § 1.7].

28.    In October 2017, the timing and certainty of the distribution of Oncor's 3Q2017 and 4Q2017 dividends became unclear when, among other things, Oncor declared payment of

the 3Q2017 but conditioned payment on "an additional equity contribution [] made to Oncor from members totaling approximately $250 million." Oncor 2017 Q3-Report, n. 8. As a result, there was a disagreement between Sempra, on the one hand, and Elliott, on the other hand, concerning the E-Side Debtors' estates' right to receive their contractually negotiated dividend payments.

29.    To resolve this matter, Elliott and its counsel along with the E-Side Debtors and their counsel engaged in multiple conferences with Sempra and others.

30.    These efforts ultimately resulted in an agreement to settle the parties' dispute. That settlement agreement, which was recently approved by the Court, requires Sempra to pay the E-Side Debtors' estates $31 million as consideration for the 2017 quarterly dividends and in resolution of certain tax issues.

## IV.    The Fees And Expenses Incurred By Elliott In Providing A Substantial Contribution Are Actual, Necessary, And Reasonable.

31.    The fees and expenses incurred by Elliott, including its professional fees and expenses, were actual, necessary, and reasonable. These fees and expenses were an important component of Elliott's substantial contribution to the estates, as they enhanced the value of the estates by approximately $756 million.

32.    Elliott relied on the services of multiple law firms, including Ropes & Gray LLP and Bayard P.A., as well as other financial advisors and consultants. Among other things, Elliott's professionals (a) engaged in extensive negotiations with the E-Side Debtors, Sempra, and other interested parties in an effort to ensure maximum value for the estates, (b) prepared numerous pleadings and motions in connection with the E-Side Debtors' proposed restructuring transactions and the NextEra Termination Fee, (c) prepared and conducted extensive discovery

of the E-Side Debtors and various transaction counterparties, including Berkshire, and (d) participated in numerous hearings concerning the above issues.

33.    The efforts of the professionals retained by Elliott were not duplicative of those of any other party in interest or estate professional.  Indeed, Elliott was often the only party willing to pursue the issues described above and that ultimately resulted in substantially increased value for the estates.

34.    Elliott, moreover, has already incurred the fees and expenses associated with the work performed its professionals, and it did so with no assurance of repayment by the estates.

35.    Importantly, approval of Elliott's request for an administrative expense should be viewed in the context of its position as substantial creditor of both the EFH and EFIH Debtors. Specifically, if Elliott's fees and expenses are allowed as an administrative expense, Elliott will nonetheless bear (i) approximately 77% of the burden of any allowed substantial contribution claim against the EFIH Debtors, because Elliott holds approximately 77% of the allowed unsecured claims against the EFIH Debtors, and (ii) approximately 35% of any allowed substantial contribution claim against the EFH Debtors, because Elliott holds approximately 35% of the allowed unsecured claims against the EFH Debtors.

36.    As set forth above, Elliott will also continue to incur fees and expenses after the Effective Date of any EFH/EFIH Plan (based on the existing confirmation schedule and assuming that the EFH/EFIH Plan is confirmed and becomes effective), including in connection with NextEra's appeal of the Reconsideration Order.  In connection with the E-Side Debtors' request that up to $35 million in fees and expenses incurred by Elliott be allowed as an administrative expense, Elliott is seeking a reserve to cover those costs and expenses.  To the

extent that reserve is not used, the E-Side Debtors will be able to use such excess to make distributions to their respect creditor constituencies.

37.    Finally, although I believe the fees and expenses incurred by Elliott are actual, necessary, and reasonable, Elliott will provide additional detail and backup documentation regarding its fees and expenses for review by the Office of the United States Trustee consistent with the procedures previously approved by this Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on February 22, 2018.

*/s/ Jeffrey Rosenbaum*
Jeffrey Rosenbaum