Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    In re:                          :

5                                    :    Chapter 11

6    ENERGY FUTURE HOLDINGS          :    Case No. 14-10979

7    CORP., et al.,                  :

8            Debtors.                :    (Jointly Administered)

9    _____:

10

11                                   United States Bankruptcy Court

12                                   824 North Market Street

13                                   Wilmington, Delaware

14                                   February 26, 2018

15                                   10:07 a.m. - 5:27 p.m.

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:   UNKNOWN

1    HEARING re First Amended Joint Plan of Reorganization of

2    Energy Future Holdings Corp., Energy Future Holding Company,

3    LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the

4    Bankruptcy Code [D.I. 12653; filed February 15, 2018]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4        Attorneys for the Debtors

5

6    BY:  MARK MCKANE

7        MARC KIESELSTEIN

8        APARNA YENAMANDRA

9

10   STEVENS & LEE

11        EFIH Conflicts Counsel

12

13   BY:  JOSEPH H. HUSTON, JR.

14        EVAN B. COREN

15

16   LANDIS RATH & COBB LLP

17        Attorneys for NextEra

18

19   BY:  MATTHEW MCGUIRE

20

21   NORTON ROSE FULBRIGHT LLP

22        Attorneys for NextEra

23

24   BY:  ERIC DAUCHER

25        ROBIN BALL

Page 4

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorney for the U.S. Trustee

3

4    BY:  RICHARD L. SCHEPACARTER

5

6    PACHULSKI STANG ZIEHL & JONES LLP

7         Attorneys for Second Lein Indenture Trustee

8

9    BY:  GREG HOROWITZ

10         COLIN R. ROBINSON

11

12    KLEHR HARRISON HARVEY BRANZBURG LLP

13         Attorneys for UMB Bank Indenture Trustee

14

15    BY:  RAYMOND LEMISCH

16

17    FOLEY & LARDNER LP

18         Attorneys for UMB Bank Indenture Trustee

19

20    BY:  HAROLD KAPLAN

21

22    AKIN GUMP STRAUSS HAUER & FELD LLP

23         Attorney for UMB Bank Indenture Trustee

24

25    BY:  CHRIS CARTY

1  NIXON PEABODY

2       Attorneys for America Stock Transfer

3

4  BY:  RICHARD PEDRONE

5       MORGAN NIGHAN

6

7  WHITE & CASE LLP

8       Attorneys for Sempra Energy

9

10  BY:  THOMAS LAURIA

11       J. CHRISTOPHER SHORE

12       MATTHEW C. BROWN

13

14  HOGAN MCDANIEL

15       Attorneys for Asbestos Claimants

16

17  BY:  DANIEL K. HOGAN

18

19  FOX ROTHSCHILD LLP

20       Attorneys for Sempra Energy

21

22  BY:  JEFFREY SCHLERF

23

24

25

1  ROPES & GRAY LLP

2      Attorneys for Elliott

3

4  BY:  GREGG GALARDI

5

6  BAYARD PA

7      Attorneys for Elliott

8

9  BY:  ERIN FAY

10

11  BIELLI & KLAUDER, LLC

12      Attorneys for EFH Corp. DDs

13

14  BY:  DAVID KLAUDER

15

16  HOGAN MCDANIELS

17      Attorneys for Farmstead Capital, Alta Fundamental, P.

18      Schoenfeld Asset, Jeffries

19

20  BY:  GARVAN MCDANIEL

21

22

23

24

25

1   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

2        Attorneys for Farmstead Capital, Alta Fundamental, P.

3        Schoenfeld Asset, Jeffries

4

5   BY:  ANDREW GLENN

6

7   CROSS & SIMON

8        Attorneys for EA Steel

9

10  BY:  JOSEPH GREY

11

12  ROPES & GRAY LLP

13       Attorneys for Delaware Trust, as Trustee

14

15  BY:  MARK SOMERSTEIN

16

17  WILMER CUTLER PICKERING HALE & DORR

18       Attorneys for EFIH ILS

19

20  BY:  ISLEY GOSTIN

21

22  COLE SCHOTZ P.C.

23       Attorneys for EFIH ILS

24

25  BY:  J. KATE STICKLES

1    KOBRE & KIM

2        Attorneys for DTC as IT for Senior Secured Noteholders

3

4    BY:  JEREMY C. HOLLEMBEAK

5

6    BAYARD PA

7        Attorneys for DTC as IT for Senior Secured Noteholders

8

9    BY:  GIANCLAUDIO FINIZIO

10

11   VENABLE LLP

12       Attorneys for PIMCO

13

14   BY:  JEFFREY SABIN

15       JAMIE EDMONSON

16

17   MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

18       Attorneys for E-Side Committee

19

20   BY:  MARK A. FINK

21

22   SULLIVAN & CROMWELL

23       Attorneys for E-Side Committee

24

25   BY:  BRIAN GLUECKSTEIN

1    POTTER ANDERSON & CORROON LLP

2        Attorneys for EFIH DIP Agent

3

4    BY:  R. STEPHEN MCNEIL

5

6    RICHARDS, LAYTON & FINGER, P.A.

7        Attorneys for the Debtor

8

9    BY:  DANIEL J. DEFRANCESCHI

10        JASON M. MADRON

11

12    ALSO PRESENT TELEPHONICALLY:

13

14    SAM N. ASHURAEY

15    NEGISA BALLUKU

16    PEG A. BRICKLEY

17    CHRISTOPHER L. CARTER

18    ALLISTER CHAN

19    MARK A. CODY

20    MARK FLANNAGAN

21    JOSEPH A. FLORCZAK

22    CHRISTOPHER FONG

23    GREGG M. GALARDI

24    LAITH J. HAMDAN

25    TAYLOR B. HARRISON

1    JEREMY HOLLEMBEAK

2    DEBORAH KENNEDY

3    DEMETRA L. LIGGINS

4    CATHERINE LOTEMPIO

5    STEPHEN LUDOVICI

6    HAL F. MORRIS

7    JOANNA S. NEWDECK

8    DAVID NGUYEN

9    JOSEPH A. PACK

10    ANDREW ROSENBLATT

11    ERIK SCHNEIDER

12    NOAH M. SCHOTTENSTEIN

13    JOHN SIVETZ

14    FREDERIC SOSNICK

15    JESSICA STEINHAGEN

16    NACIF TAOUSSE

17    AMER TIWANA

18    MICHAEL J. WALSH

19    MEGAN WASSON

20    JAMILA WILLIS

21    PETER YOUNG

22    MICHAEL FIRESTEIN

23

24

25

1                    P R O C E E D I N G S

2            CLERK:  All rise.

3            THE COURT:  Please be seated.  Good morning.  Ms.

4    Yenamandra.

5            MS. YENAMANDRA:  Good morning, Your Honor.  Aparna

6    Yenamandra from Kirkland & Ellis on behalf of the Debtors.

7    Your Honor, we have a brief opening presentation today.  We

8    have hard copies of the deck for Your Honor and your staff.

9    If I may approach.

10            THE COURT:  Yes, please.  Thank you very much.

11            MS. YENAMANDRA:  So, Your Honor, it is my

12    privilege to kick things off today.  I will be brief, which

13    I think we're all hopeful will be the theme of the day.

14            Your Honor, after four years in Chapter 11, two

15    years of prepetition efforts, three merger agreement, four

16    confirmation hearings, six disclosure statement orders, as

17    of November the end of my 20s, 10 scheduling orders,

18    millions of pages in discovery, enough tax testimony and

19    briefing I think to last all of us a lifetime, we are

20    finally in front of Your Honor today requesting confirmation

21    of the Sempra plan and consummation of a transaction that I

22    think we all believe can and will close.

23            So starting with the highlights.  Every voting

24    class voted in favor of this plan in overwhelming numbers.

25    That is not a surprise, given that when we signed the merger

1    agreement with Sempra, the merger agreement included an

2    exhibit of regulatory commitments, pursuant to which Sempra

3    agreed to preserve the ring fence.

4            And that's why, as we stand here today, the change

5    of control application filed by Sempra and Oncor has the

6    support the PUCT staff and the unanimous support of all key

7    interveners.  I think it is safe to say this is a level of

8    support we have not previously seen with respect to that

9    application.

10            And so, after a long hard-fought battle, three

11   objections stand before the Debtors and confirmation, and

12   ultimately, emergence which could be as little as two weeks

13   from today.

14            The first objection comes from NextEra.  I think -

15   - we believe, and I think you'll hear the same from the

16   NextEra folks, NextEra wants this plan to consummate.  They

17   want the Debtors to be out of Chapter 11 as much as anybody

18   else.  Their remaining objection is on the parameters of the

19   confirmation order as they relate to the release of the 275

20   million.

21            Similarly, Elliott also wants this plan to

22   consummate.  Their remaining objections, again, relate to

23   provisions in the confirmation order regarding the

24   imposition of the reserve in the first place.

25            The remaining two objections come from Mr. Miller,

1   who objects to the treatment of certain EFIH unsecured notes

2   following a prepetition exchange that long ago consummated,

3   and the asbestos objectors who are raising the due process

4   and good faith concerns that Your Honor has heard and ruled

5   upon many times in the past.

6          So, in short, what are the Debtors seeking today:

7   we're seeking confirmation of a plan reflecting the

8   transactions contemplated by the Sempra merger agreement;

9   we're seeking approval of a $275 million termination fee on

10  account of the disallowed, currently on appeal, NextEra

11  break fee, which we believe should resolve NextEra's plan

12  objection.

13         And as will become clear, the Debtors and their

14  stakeholders have worked in good faith over the last several

15  weeks to significantly narrow the scope of dispute, so we

16  can limit what we need to present to Your Honor today.  And

17  where we couldn't narrow the scope of the dispute to adjourn

18  to a later date, those issues that do not need to be fully

19  and finally resolved prior to the EFH effective date.

20         To that end, the plan achieves key E-side goals.

21  Again, as I noted, every voting class voted in favor of the

22  plan.  PUCT staff and all key interveners are on board.

23  Other key regulatory approvals have either already been

24  received, i.e., from the IRS and FERC or in the process of

25  being received, i.e., the PUCT and the FCC.

1          Finally, this would all be for naught if this

2   transaction impaired the approved and consummated tax-free

3   T-side spin or didn't preserve the tax-free nature of the

4   sale of EFH's indirect economic interests in Oncor.  This

5   transaction preserves both and avoids tax Armageddon, a

6   phrase I'm sure Your Honor misses not seeing in every single

7   brief.

8          By infusing 9.45 billion of equity into the

9   reorganized Debtors, this transaction maximizes enterprise

10  value for the benefit of EFH and EFIH creditors.  It's 9.45,

11  pursuant to the merger agreement, with an additional 31

12  million coming in from the 9019 settlement Your Honor

13  approved a week or so ago.

14          As I noted, we've narrowed the scope of issues in

15  front of Your Honor today.  We've adjourned those issues

16  that are not an impediment to the effective date.  And

17  finally, this transaction provides a clean and debt-free

18  balance sheet to reorganize EFH and reorganize EFIH,

19  including, importantly, the reorganized EFH's -- EFH Debtors

20  agreement to not incur new debt for a period of time post-

21  emergence.

22          And finally, at the risk of stating the obvious,

23  this transaction brings finality and closure to the Debtors

24  long winding journey through Chapter 11.

25          So, Your Honor, we'll flip through these next

1    slides pretty quickly.  What they basically set forth is

2    each of the 1129(a) elements and which of our proposed

3    witnesses will address each element.  The key takeaway here

4    is that for the fast majority of 1129(a) elements, no party

5    is objecting.  Again, this slide shows that all classes

6    voted in favor, nearly 100 percent in every instance.

7            So that takes us to the objections.  We'll start

8    by mentioning the U.S. Trustee objection.  Over the last

9    several weeks, the U.S. Trustee, the Debtors, the Elliott

10   funds, and the EFH notes trustee have been working to reach

11   agreement on the evidentiary record necessary to support the

12   proposed 503(b) findings in the confirmation order, as well

13   as the subsequent payment of reasonable and documented fees

14   and expenses for the benefit of the Elliott funds, as well

15   as EFH notes trustee.

16           The confirmation order virtually mirrors the

17   language that was in the prior confirmation order, and makes

18   clear that those fees will be subject to both fee committee

19   review and ultimate approval by the Bankruptcy Court.

20           So I won't speak for Mr. Schepacarter, but I

21   believe with these agreements, the U.S. Trustee's objection

22   is resolved today, subject to the appropriate evidentiary

23   record being set forth.

24           So that leaves us with NextEra, the asbestos

25   objectors, and Mr. Miller.  So we'll start with NextEra.

1    And, Your Honor, the headline here is that the Debtors have

2    agreed to support the funding of a $275 million reserve to

3    be funded on the later of the effective date and entry of an

4    order allocating the 275 funding as between EFH and EFIH.

5    In the Debtor's view, this should resolve NextEra's plan

6    objection.

7              As Your Honor saw in the filings last night, it

8    does not resolve NextEra plan objection.  And so taking a

9    step back.  Over the last several weeks, the Debtors,

10   Elliott, and NextEra have worked in good faith and robustly

11   to try and broker a global deal to resolve NextEra's plan

12   objection.

13             Global piece is not broken out, so we have done

14   what we've done many times over the course of these cases,

15   which is we have drafted, filed, and our now advocating for

16   a middle-of-the-road approach.  NextEra doesn't like this

17   approach; Elliott doesn't like this approach.  And I think

18   as Mr. Kieselstein famously said in May of 2016, "If nobody

19   likes what we're doing, that means we're probably doing the

20   right thing."

21             And so, as we think about what each of the parties

22   wants and how the Debtors landed on their proposed

23   resolution, what NextEra wants is a $275 million reserve

24   that will remain untouched until entry of a final order in

25   connection with the reconsideration appeal and the Debtor's

1    related adversary complaint related to the termination fee,

2    with no ability to revisit that reserve, as well as a

3    preservation of certain claims against the reorganized

4    Debtors.  On the other side of the spectrum is Elliott, who

5    wants no reserve.

6           So the Debtors have proposed a solution that works

7    right down the middle.  We will fund a $275 million reserve,

8    but we will build in a safety valve that allows us to

9    revisit that reserve at a later date pursuant to separate

10   motion and separate order of the Court.

11          And, Your Honor, we've intentionally drafted the

12   language broadly.  We have not preordained the type of

13   scenarios that may justify revisiting the NextEra plan

14   reserve.

15          As we learn many times in these cases, facts and

16   circumstances change unpredictably.  That is a -- that is

17   the lesson I think we've all learned through four

18   confirmation trials and in six disclosure statement orders.

19   So we've not tried to preordain what facts and circumstances

20   may justify revisiting the order.

21          Instead, we've drafted it broadly and put our

22   faith in the judicial system that the only circumstance in

23   which the order reserve will be revisited is upon separate

24   motion of the Court, full notice to parties, and the

25   presentation of whatever evidence is appropriate under the

1   circumstances.

2          We believe this approach truly is right down the

3   middle.  It protects NextEra and the creditors because facts

4   and circumstances could change in a way that benefits

5   NextEra, and they could change in a way that benefits the

6   creditors.  Everybody's rights are preserved to fight about

7   that another day.

8          At the same time, Your Honor, it's important to

9   make clear that under the Sempra merger agreement -- and Mr.

10  McKane and Miss Terteryan will discuss this more during the

11  testimony in closing -- Sempra has agreed to take only two

12  categories of claims on a post-effective date basis.  One is

13  the reinstated asbestos claim; the other is a very narrow

14  category of real property tax liens.  That's it.

15         If they have any exposure to any other type of

16  claim post-emergence, they are not obligated to close.  So

17  any provision in the order that could exposure them to the

18  NextEra termination fee on a post-effective date basis

19  threatens the entirety of the Sempra transaction, to the

20  detriment of 17 separate classes of creditors.

21         As a result, the Debtors think their solution

22  appropriately balances competing interests, doesn't

23  prejudice any party, and protects the sanctity of

24  consummating the Sempra transaction.

25         As to the asbestos objection.  Your Honor, the

1    asbestos objectors once again argue that the Debtors are not

2    acting in good faith, and that unmanifested claimants are

3    being deprived of due process.

4            As the evidence will show, the Debtors worked in

5    good faith to protect and maximize value for the asbestos

6    claimants through a variety of measures, including

7    establishing the bar date procedures, negotiating with every

8    bidder for the reinstatement of timely filed asbestos claims

9    in accordance with the EFH/EFIH committee settlement that

10   was approved in late 2015.

11           And perhaps most vitally, ensuring that the

12   reinstatement of the intercompany claims held by the LSGT

13   Debtors would be preserved.  And as the evidence will show,

14   any other treatment of the asbestos objectors would have

15   been to the detriment of every other creditor class.

16           Finally, as to the due process objection.  Your

17   Honor has already ruled on this multiple times.  The plan

18   does not distinguish between manifested and unmanifested

19   claims.  And as the evidence will show, the Debtors engaged

20   in an exhaustive publication notice process that clearly

21   satisfied the due process standard.

22           So, finally, that takes us to the Miller

23   objections.  Mr. Miller objects to the treatment of certain

24   of the EFIH unsecured notes on the basis that those notes

25   are being improperly treated in connection with the

1   prepetition bond exchange.  That exchange has -- was

2   consummated in accordance with applicable law, has long

3   since closed, and any separate treatment of the EFIH

4   unsecured notes at issue would create discriminate issues as

5   between that class and the other class of EFIH unsecured

6   notes.

7          Moreover, Mr. Miller has not filed a claim.  If he

8   did file it at this point, it wouldn't be timely.  In any

9   event, even if it was timely, it would be subordinated to

10  his current Class B-6 claim and does not give him the relief

11  that he's requesting in any event.

12         So, Your Honor, with that, the Debtors and their

13  stakeholders are prepared for these Chapter 11 cases to come

14  to a close.  We think the objections are narrow.  And the

15  primary objection from NextEra and Elliott largely revolves

16  around drafting issues, not consummation of the plan, which

17  all parties are supportive of.

18         We're continuing to work through the confirmation

19  order language we filed last night, including with the PIK

20  trustee and certain of the EFIH unsecured noteholders.  And

21  at the end of today after the close of the evidentiary

22  record, we'd ask that Your Honor overrule the remaining

23  objections and confirm the plan.

24         THE COURT:  Thank you.

25         MS. YENAMANDRA:  Unless Your Honor has any

1    questions, that is the end of the Debtors' presentation.

2              THE COURT:  I do not.  Thank you very much.  Mr.

3    Galardi?

4              MR. GALARDI:  Good morning, Your Honor.  Gregg

5    Galardi on behalf of Elliott.

6              Your Honor, first -- and we'll just it as notice

7    that I'll make this statement every time.  The first page

8    says the following: Elliot supports consummation of the

9    Sempra transaction; Elliott does.  Elliott supports

10   confirmation of the plan.  Elliott is not changing its vote

11   regarding any of the plan provision.  We want confirmation

12   of the plan.

13             Our only issue, as you will hear later on and as I

14   think counsel has mentioned, is the legal basis on the

15   reserve.  Your Honor had a telephonic hearing.  And as a

16   result, the Debtors have done what I would do as a Debtor's

17   lawyer -- tried to go right down the middle.

18             What you will from Elliott is you can't really go

19   right down the middle on 1129(a)(9)(a).  And in light of

20   NextEra's not having a motion to estimate claims, Your

21   Honor, frankly, we'll argue -- we will argue, you don't have

22   the authority to approve a reserve today.

23             That is a confirmation order issue.  It is not a

24   confirmation issue.  And I stand in support of confirming

25   the plan, consummating the Sempra transactions, but

Page 22

1    reserving my arguments on that.

2           THE COURT:  Okay.  Thank you, Mr. Galardi.  Mr.

3    Pedone?  Good morning.

4           MR. PEDONE:  Good morning, Your Honor.  Richard

5    Pedone for American Stock Transfer, the EFH indenture

6    trustee.  We too support confirmation, Your Honor.  We're

7    pleased that we've worked through the issues and the

8    administrative claim with the U.S. Trustee.

9           I rise to state that we still have concerns about

10   the confirmation order and, in particular, how any reserve

11   or other amounts may be allocated between the states, and

12   we're continuing to work on that throughout the day with the

13   Debtors.

14          THE COURT:  But the -- my understanding is that

15   the allocation issue is reserved for a future date.  But

16   you're concerned about the language to make sure that

17   happens correctly; is that what the issue is?

18          MR. PEDONE:  Your Honor, the plan the parties

19   voted for provided for distributions to be made.  The plan

20   that -- the order that's in effect doesn't actually control

21   a timeline.  So that language was put in last night that

22   could delay distributions, and we're working with everyone

23   on a mechanic we hope speeds up the issues and satisfies us.

24   But right now, we reserve our rights on the changes made

25   last night.

1            THE COURT:  All right.

2            MR. PEDONE:  Thank you.

3            THE COURT:  I didn't get to -- I don't think I got

4    to those changes in the order.  I got about halfway through

5    the order.

6            MS. YENAMANDRA:  There's 172 paragraphs.

7            THE COURT:  Yes.

8            MS. YENAMANDRA:  That is understandable.  Just in

9    response to Mr. Pedone's comments, he is correct that what

10   the order essentially says is that distributions will need

11   to be held back either in full or in part pending an entry

12   on the allocation piece.

13           THE COURT:  Okay.

14           MS. YENAMANDRA:  We're working with the EFIH

15   unsecureds and the PIK trustee to make clear that we will

16   make at least a partial distribution for the EFIH funds on

17   the effective date or as soon as practical thereafter.  And

18   to be clear, the plan says that we would make a distribution

19   to those folks, but not -- it does not commit us to make a

20   distribution to EFH creditors on the effective date.

21           Our EFIH and EFH disinterested directors and their

22   advisors have reviewed that language and are supportive of

23   it, and they continue to try and work through the allocation

24   issues.

25           THE COURT:  Okay.  Anyone else?  Mr. Glueckstein.

1          MR. GLUECKSTEIN:  Good morning, Your Honor.  Very

2     briefly, Brian Glueckstein, Sullivan & Cromwell for the E-

3     side committee.

4          The committee does support confirmation of the

5     plan and entry of an appropriate confirmation order.  We

6     have been reviewing the language that's been inserted on the

7     allocation issue.  And, of course, it's important that

8     distributions are made promptly.  We continue to talk to

9     everybody over the course of the day on the language as well

10    with respect to the allocation issue, but we expect we'll

11    work through that without an issue.  And, otherwise, support

12    confirmation today, Your Honor.

13         THE COURT:  There's an obvious answer to that, of

14    course, which is to reach an agreement on allocation.  It's

15    only been an open issue for four years.  Mr. Hogan.

16         MR. HOGAN:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MR. HOGAN:  Daniel Hogan on behalf of what has

19    been referred to as the asbestos objectors, Your Honor.

20         Your Honor, our tent has gotten a little bit

21    bigger since I last appeared in front of you with regard to

22    confirmation objection, in that there's additional

23    unmanifested asbestos objectors who have signed on to our

24    objection, and so, I just wanted the record to be clear as

25    to that.

1              My clients include Shirley Fenicle, David William

2     Fahy, John H. Jones, David Heinzmann, Harold Bissell, Kurt

3     Carlson, Robert Albini, individually and as successor in

4     interest to the estate of Geno Albini, and Dennis

5     Burgschneider.

6              Your Honor, deja vu all over again, I think, is a

7     term that could be applied to this case, especially from my

8     perspective, Your Honor.  I stand here before you with the

9     unenviable task of trying to convince you that the plan that

10    is being proposed violates the due process of unmanifested

11    asbestos claimants.  I understand that, Your Honor.

12             The other day, I was watching -- flipping around

13    through the television.  I saw "Groundhog Day."  And it

14    wasn't lost on me that I feel like I keep waking up and

15    appearing before you on this podium --

16             THE COURT:  Sure.

17             MR. HOGAN:  -- and making these arguments, only to

18    be denied, and I get that.  And so, today's presentation by

19    the asbestos objectors will be brief.  There'll be a few

20    pointed issues that we'll try to address, Your Honor.  But

21    the long and short of it, Your Honor, is that we are here;

22    we can test the plan.  We believe that the treatment of the

23    unmanifested asbestos claimants who did not timely file

24    claims is unconstitutional.  We have gone and done a fair

25    amount of heavy lifting prior to today to draw in through

1    stipulation certain of the record that's already been

2    created for your benefit, for my benefit, really for

3    everyone's benefit.

4           Today, you will hear and see certain evidence from

5    certain of the unmanifested asbestos claimants who actually

6    worked for these -- for these Debtors, who were manifested -

7    - who manifested asbestos-related injuries and who, in fact,

8    were diagnosed with asbestos-related injuries after the bar

9    date, and who were also unaware of the bar date.

10          You'll hear that the Debtors and Sempra continued

11   with the same exact treatment largely of the unmanifested

12   asbestos claimants who did not file proofs of claims.  And

13   then again at the end of the evidence, Your Honor, I will

14   return and, yet again, try one last time to persuade you

15   that the treatment of these claims and the reliance on the

16   Grossman case is inappropriate.

17          Thank you, Your Honor.

18          THE COURT:  Thank you.  Yes, sir.

19          MR. DAUCHER:  Good morning, Your Honor.

20          THE COURT:  Good morning.

21          MR. DAUCHER:  Eric Daucher on behalf of NextEra

22   Energy, Inc.  I'd like to start by thanking the Court first

23   for your prompt attention to our motion in limine last week.

24   Your rulings on that motion had substantially narrowed the

25   issues that remain in dispute.

1          Since that ruling, we've had what I would

2     characterize, and what I think the Debtors would

3     characterize, as very productive discussions with the

4     Debtors.  And as a result, we've reached the point where the

5     Debtors and NextEra have agreed that the Debtors will

6     establish a $275 million reserve on account of NextEra's

7     administrative expense claims.

8          Pursuant to your Court's -- excuse me -- pursuant

9     to Your Honor's ruling, the issue of a bond or interest on

10    that reserve has also been taken off the table.

11         So the only outstanding issue at this point is

12    whether that reserve will remain in place in a sufficient

13    amount to satisfy NextEra's claims if and when they are

14    ultimately allowed, or whether it can be revisited and

15    undercut before that occurs.

16         So what are these claims that NextEra is trying to

17    protect.  First and foremost, we have a $275 million claim

18    on account of the termination fee.  Your Honor is very

19    familiar with the facts of that claim, and so I won't repeat

20    the history of it today.

21         I do want to offer one clarification, however.

22    Despite any rumblings to the contrary Your Honor may have

23    heard, NextEra is not seeking interest on that claim; we're

24    not seeking to expand the scope of the reserve.  We want a

25    flat 275 million.

1          Second, NextEra has asserted, purely in the

2    alternative to the termination fee claim, an administrative

3    expense on account on some of the out-of-pocket expenses it

4    incurred attempting to close the transaction with the

5    Debtors.

6          All told, that administrative expense request

7    amounts to a little over $59.5 million.  But because it's

8    purely in the alternative to the termination fee claim -- it

9    hasn't been adjudicated -- it doesn't expand the amount of

10   the reserve that NextEra is seeking.

11         So with that said, NextEra's remaining objection

12   is really very simple.  In our view, administrative expense

13   claims need to be paid in full in cash, regardless of

14   whether they are allowed before or after the effective date

15   of the plan.  I don't think that's in dispute.

16         The difficulty is you, of course, don't

17   necessarily know what claims will ultimately be allowed at

18   the very end of the day.  There's an easy mechanism, which

19   is establishment of a reserve, and the Debtors have agreed

20   to do that here.

21         The plan, as Your Honor previously acknowledged,

22   also addresses this properly.  On its face, Article 6(a) of

23   the plan compels the Debtors to reserve for potential

24   administrative expense claims, and they've now agreed to do

25   that.  And there's one point I want to flag for Your Honor

1   on that language.  It doesn't compel the Debtors to reserve

2   for allowed administrative expense claims; after all,

3   allowed administrative expense claims get paid on the

4   effective date.  The whole point of their reserve is to

5   protect against claims that may become allowed down the

6   road.

7            So as reflected in the amended proposed

8   confirmation order the Debtors filed last night, the Debtors

9   are now on board with the $257 million reserve.  But they've

10  thrown us one last curveball: they've included language,

11  which is found in Paragraph 149 of their new proposed order

12  and there's some related language in Paragraph 151, which

13  would provide what they've characterized as an escape valve

14  from the reserve.

15           There's not a clear definition of when the order

16  could be revisited, when the amount could be overturned,

17  what could happen to that amount.  But needless to say, a

18  reserve that may not be there to pay claims, at the end of

19  the day if they're ultimately allowed, doesn't do the job.

20  So it's a problem, but it's a fixable problem.

21           NextEra has provided its own version of the

22  confirmation language with corresponding paragraphs.  We've

23  put that on the docket at Docket #12749 -- apologies.  And

24  those revisions provide a clear structure for how and when

25  the cash will be released from the reserve.  And we've set

1    it up in a way that, in our view at least, there's no

2    possibility of any remaining liability for Sempra, as long

3    as the money is left in the reserve.

4            Now, the Debtors have suggested that there's some

5    need for a potential escape value.  Circumstances may

6    change, you may need to come back and look at that order

7    again.

8            Rule 60 is always on the table, Your Honor, and if

9    we've learned anything from these cases, it's that Elliott

10   knows how to file a motion for reconsideration when it think

11   it's appropriate.  We don't need to build into the order the

12   idea that it can simply be revisited under unspecified

13   standards at some later date.  So I think our revisions

14   solve the problem.

15           One other point, we've also included NextEra as a

16   party that wouldn't have liability in respect to the

17   reserve.  That's simply there to ensure that we aren't

18   revisiting at a later date the idea that the reserve should

19   bear some rate of interest or that some security needs to be

20   provided in respect with the order.

21           THE COURT:  I didn't rule on that.  My ruling was

22   very clear: it was a timeliness ruling with regard to

23   relevancy.  So it's not a revisit issue; it's a never been

24   decided issue.

25           MR. DAUCHER:  My understanding of your ruling,

1    Your Honor -- and I apologize if I misunderstood -- was that

2    you had ruled that Kramer's testimony needed to be excluded,

3    specifically because it was not relevant to confirmation

4    because NextEra's objection was not akin to a stay pending

5    appeal, which would carry with it the possibility of

6    interest.

7              THE COURT:  I agree.  But it also specifically

8    said that if you were to seek a stay pending appeal, for

9    example, of denial of the confirma- -- or, sorry, don't get

10   excited -- approval of the confirmation order, that we would

11   revisit it.

12             MR. DAUCHER:  And that --

13             THE COURT:  Not visit, we would deal with it.

14             MR. DAUCHER:  And that NextEra fully agree with.

15   And I apologize if I wasn't clear.

16             THE COURT:  All right.  Well, I haven't seen your

17   language, so I'm not sure how you're trying to walk that

18   line.

19             MR. DAUCHER:  Understood, Your Honor.  I have a --

20   may I approach, Your Honor?

21             THE COURT:  Yes.

22             MR. DAUCHER:  So what I've just handed Your Honor

23   is a copy of the notice that we filed last night containing

24   NextEra's proposed language.  For your convenience, we've

25   included in that filing a redline reflecting the differences

1     between NextEra's proposal and the Debtors.

2           In our view, that language eliminates any

3     possibility of their being an insufficient reserve if and

4     when NextEra's claim is ultimately allowed.  By doing that,

5     it also eliminates any possibility of there being further

6     liability for the reorganized Debtors.  And so, we take off

7     the table any idea of the Sempra transaction being

8     endangered.

9           Adoption of that proposed language would fully

10    resolve NextEra's objection to confirmation.  Thank you,

11    Your Honor.

12          THE COURT:  You're welcome.  Anything else?

13    Anyone else wish to be heard before we turn to the Debtor's

14    case?  Okay, I hear none.  Mr. McKane?

15          MR. McKANE:  Your Honor, we have a statement we

16    need to make on the record to start the evidentiary

17    presentation.

18          THE COURT:  All right, Miss Yenamandra.

19          MS. YENAMANDRA:  Thank you, Your Honor.  This will

20    be quick.  As Your Honor may recall, we originally, many

21    iterations ago, filed a joint plan for the T-side and the E-

22    side, eventually split those into two plans when we

23    bifurcated the emergence efforts.

24          As a result of that, we just -- we spoke to the

25    TCH first lien agent and wanted to make a statement on the

1   record making it absolutely clear that nothing in this plan

2   or this confirmation order affects or impairs the ongoing

3   dispute between certain of the TCH first lien creditors

4   related to the allocation of adequate protection, which is

5   still on appeal.

6           THE COURT:  Okay.

7           MS. YENAMANDRA:  And I understand counsel for the

8   TCH first lien agent is in the Courtroom and will echo my

9   sentiments.

10          THE COURT:  Okay, thank you.

11          MR. HOLLEMBEAK:  Good morning, Your Honor.  Jeremy

12  Hollembeak of Kobre & Kim.  We represent Delaware Trust

13  Company.

14          THE COURT:  Yes.

15          MR. HOLLEMBEAK:  Solely in its capacity as the T-

16  side first lien indentured trustee.  And, excuse me,

17  counsel's correct.  There were some changes that appeared

18  and the plan modification appear in the plan week before

19  last that prompted us to propose additional language that

20  appears in Paragraph 96 of the confirmation order.

21          The purpose of which is to make clear -- and this

22  is the trustee's position -- that nothing about the E-side

23  plan or E-side confirmation order should have any impact

24  upon the T-side allocation disputes which are all pending at

25  various stages of appeal at this point.

1              We've previewed that language with all of the

2      other parties to the allocation disputes.  We took a few --

3      we took all the comments that we received from that.  And

4      that's -- those changes appear in Paragraph 96 of the

5      confirmation order.

6              THE COURT:  Okay.  Thank you.

7              MR. HOLLEMBEAK:  That's all.  Thank you.

8              THE COURT:  Mr. McKane.

9              MR. McKANE:  Thank you, Your Honor.  The first two

10     witnesses, I believe, are by declaration.  They are Mr.

11     Rosenbaum of Elliott and Ms. Goldstein of the EFIH indenture

12     trustee.  I understand that counsel for Ropes & Gray and

13     Nixon Peabody respectively will make that proffer and move

14     those into evidence.

15             THE COURT:  Okay, thank you.  Mr. Galardi.

16             MR. GALARDI:  Yes, Your Honor.  To move things

17     along very quickly, Mr. Rosenbaum is in the Courtroom today.

18     We did file a declaration; it can be found at Docket #12695,

19     was filed on February 22nd of this year.  Mr. Rosenbaum

20     would verify the statements set forth in the declaration.

21     We've worked with the Debtors and the U.S. Trustee.

22             We don't believe there's cross-examination.  We'd

23     like to put two or three other clarifications on the record.

24     One is, the declaration is, in part, submitted as a result

25     of the plan support agreement that Elliott entered into,

1    which the Debtors -- and this is important -- it was the

2    EFIH Debtors that were to seek a finding of the confirmation

3    order, that they would support a substantial contribution

4    claim of up to $35 million for Elliott.

5            That did not necessarily cap us, and as I think

6    was previewed with Your Honor, there will be in the order

7    38.  The Debtors have reserved all rights with respect to

8    that amount.  EFH, to be clear, has reserved all rights.

9    Elliott does believe it's benefited both, but I wanted to

10   make that clear.

11           The second thing, Your Honor, that we did resolve

12   with the U.S. Trustee is this application, pursuant to the

13   procedures, will go to the fee committee, be reviewed by the

14   fee committee, and come back to Your Honor.

15           I don't know if anyone wants to cross-examine Mr.

16   Rosenbaum, but he is in the Courtroom today.

17           THE COURT:  Does anyone wish to cross-examine Mr.

18   Rosenbaum?  I hear none.  I don't need to put him on the

19   stand, but I have a question that I think I can ask you, Mr.

20   Galardi.

21           MR. GALARDI:  Sure.

22           THE COURT:  That seems like a really large number

23   to me for, even in this case.  And I'm wondering what, if

24   you can tell me, approximately how much Elliott funds have

25   incurred in professional fees in this case through today in

Page 36

1    relation to the $38 million you're seeking.

2            MR. GALARDI:  Between -- I'm going to make

3    somewhat of a guess, but it's an educated guess.  Between

4    Mollis, (indiscernible), and various law firms, including

5    most predominantly my own firm, it's probably around $29 to

6    $31 million as of today.

7            Obviously, much of that is in connection with one,

8    it's opposition to the NextEra deal, and then ultimately,

9    the support of the Sempra deal as detailed in Mr.

10   Rosenbaum's declaration; two, obviously am still incurring

11   fees on the NextEra breakup fee issue; and then three, to a

12   lesser extent, but still facts, as Your Honor approved the

13   settlement of that $31 million.  That it.

14           For the sake of clarity, Your Honor, and, again,

15   full disclosure.  Mr. Schepacarter asks, as I've made clear

16   before, I represent Elliott, not the substantial or majority

17   creditors that had the fee committee matters; that does not

18   include those fees.  And they're not being --

19           THE COURT:  Oh, is this not --

20           MR. GALARDI:  They're not being sought as part of

21   the substantial contribution claim, which was a concern of

22   Mr. Schepacarter's.

23           THE COURT:  That's Brown Hagy?

24           MR. GALARDI:  Yes.

25           THE COURT:  Okay.  All right.  Mr. Rosenbaum, do

1    you disagree with anything your attorney just said with

2    regard to that range of funds?

3              MR. ROSENBAUM:  I agree.

4              THE COURT:  He agrees.  Let the record reflect he

5    agrees.  Okay, I have no questions.

6              MR. GALARDI:  Thank you, Your Honor.

7              THE COURT:  You're welcome.  Mr. Pedone.

8              MR. PEDONE:  Good morning, Your Honor.  Richard

9    Pedone on behalf of American Stock Transfer, the indenture

10   trustee.  Your Honor, as has been explained, we've worked

11   through our issues with the U.S. Trustee's objection, and

12   have come up with the written direct that has been submitted

13   to Court and as part of the package I believe that is on the

14   Court's electronic file.

15             And, Your Honor, Miss Goodstein is in the

16   Courtroom and is prepared to testify.  I understand from

17   last evening's meet and confer that no party intends to

18   cross-examine her, but she is here.

19             THE COURT:  Does anyone object to the submission

20   of the declaration as into evidence?  I hear none.  And I

21   did not ask this witness, Mr. Rosenbaum, so let me ask it as

22   well so the record is clear.  Did anyone object to the

23   submission -- admission of Mr. Rosenbaum's declaration in

24   support of the plan?

25             All right.  I hear none, so that's not a problem.

1     So both declarations are admitted, Mr. Rosenbaum and Ms. --

2              MR. PEDONE:  Goodstein, Erica Goodstein.

3              THE COURT:  Goodstein, I apologize.

4              MR. PEDONE:  That's okay.  Thank you.

5              THE COURT:  Does anyone wish to cross-examine Ms.

6     Goodstein?  Let me ask you the same question I just asked

7     Mr. Galardi.  What's -- what are we talking about fee-wise?

8              MR. PEDONE:  Your Honor, as you know, you made a

9     substantial contribution finding in February of 2017.  Up

10    and through that date, our total fees, including Baker Tilly

11    related to the NOL litigation apportionment, the multiple

12    trials we participated in.  Up until that date, we were at

13    approximately $17 million in total fees.

14             The new finding today relates to less than 2.5

15    million in fees from February '17 forward.  Primarily, the

16    most recent fees are Nixon Peabody's fees.  We've had very

17    little in the way of financial advisor fees.

18             THE COURT:  Okay.  Thank you.

19             MR. PEDONE:  Thank you.  Your Honor, sorry.  May

20    Miss Goodstein be excused?

21             THE COURT:  Yes, Miss Goodstein may be excused.

22             MR. PEDONE:  Thank you.

23             THE COURT:  Mr. Rosenbaum, you may be excused as

24    well if you wish.  You'll miss a good show if you leave

25    though.

1          MR. McKANE:  Your Honor, again, for the record,

2    Mark McKane of Kirkland & Ellis.  For today's purposes, even

3    though there are a multitude of boxes, we had I believe

4    discussed with the parties and the Court the use of iPads

5    for the full record.  We will continue to have hard copies

6    of witness binders for live examinations, but we have those

7    iPads for Your Honor and your staff.  May I approach?

8          THE COURT:  Yes.  And just so the record is clear,

9    we're going to give these back at the end of the day.

10          MR. McKANE:  And, Your Honor, in the past, we've

11    had problems with their battery life, so we have chargers as

12    well.

13          THE COURT:  Okay.

14          MR. McKANE:  But we need those back too.

15          THE COURT:  A charger, I could use.  Thank you.

16          MR. McKANE:  And, Your Honor, Ms. Anna Terteryan

17    will handle our first live witness, Mr. Tony Horton.

18          THE COURT:  Very good.  Ms. Terteryan, welcome.

19          MS. TERTERYAN:  Good morning, Your Honor.  Anna

20    Terteryan, Kirkland & Ellis, on behalf of the Debtors.  The

21    Debtors calls as their first witness, Mr. Tony Horton.

22          THE COURT:  Mr. Horton, good to see you again.

23    Please remain standing for your affirmation.

24      [WITNESS SWORN IN]

25          CLERK:  Please raise your right hand.  Do you

1  affirm you will tell the truth, the whole truth, and nothing

2  but the truth to the best of your knowledge and ability?

3          MR. HORTON:  I do.

4          CLERK:  Please state and spell your name for the

5  record.

6          MR. HORTON:  Anthony Horton, last name H-O-R-T-O-

7  N.

8          CLERK:   Thank you.

9          MR. HORTON:  Thank you.

10          THE COURT:  Mr. Horton, please be seated and be as

11  close to the mic as you can.  Yes, Mr. McKane, you may

12  approach.

13              DIRECT EXAMINATION OF ANTHONY HORTON

14  BY MS. ANNA TERTERYAN:

15  Q    All right.  Good morning, Mr. Horton.

16  A    Good morning.

17  Q    What positions do you hold with EFH Corp. and EFIH?

18  A    At EFH and EFIH, I am the CFO, Executive Vice

19  President, and Treasurer.

20  Q    How long have you held those positions?

21  A    As Treasurer, since 2004.  And Executive Vice President

22  and CFO since October 2016.

23  Q    And what positions do you hold at the four debtor

24  entities that we call the LSGT Debtors?

25  A    I am the President and Treasurer of each one of those

1   entities.  I am the Director of all of those entities,

2   except for LSGT Gas, and I am the manager.

3   Q    Mr. Horton, did you prepare a declaration in

4   anticipation of your testimony today?

5   A    I did.

6   Q    Could you please turn to the tab that says DDIR Horton

7   in your binder?  Is this a copy of that declaration?

8   A    It is indeed.

9   Q    And is the information in your declaration true and

10  accurate to the best of your knowledge?

11  A    It is.

12  Q    Your Honor, I move to admit Mr. Horton's declaration in

13  evidence.

14          THE COURT:  Any objection?

15          MR. HOGAN:  No objection.

16          THE COURT:  Oh, thank you, Mr. -- sorry, Mr.

17  Hogan, I stepped on your -- so Mr. Hogan says no objection.

18  Any other objection?

19          MAN 1:  No objection, Your Honor.

20          THE COURT:  Okay, it's admitted.

21  Q    All right.  Let's start with a brief overview of how

22  the Debtors got to this plan and the proposed transaction

23  with Sempra.  Were you involved in negotiating restructuring

24  alternatives for the Debtors after the NextEra plan was

25  terminated?

1    A    I was.

2    Q    At a high level, please describe your involvement in

3    the restructuring negotiations.

4    A    I was involved in the restructuring negotiations really

5    beginning late May and through June in discussions with

6    Elliott regarding equitization of the E-side.  Additionally,

7    I had -- I was involved directly, along with the team, the

8    EFH team -- (indiscernible), Andy Wright, and other advisors

9    as we had negotiations with Berkshire and, ultimately,

10   Sempra.

11   Q    What was the goal of those negotiations?

12   A    To get the highest and best value for the estate.  And

13   from our perspective, that meant not only price, it also

14   meant regulatory certainty given that we had had a couple of

15   failed transactions regarding regulatory approval.

16   Q    Could you please turn to the DDEM tab in your binder,

17   and specifically, at DDEM Horton 2?

18   A    Yes.

19          MS. TERTERYAN:  Is it all right if we publish,

20   Your Honor?

21          THE COURT:  Yes.

22   Q    Did you help prepare this demonstrative to aid in your

23   testimony today, Mr. Horton?

24   A    I did.

25   Q    And what does it show generally?

1    A     Generally, it shows our negotiation path with -- at the

2    top in black, it's kind of difficult to see the distinction

3    in the color.  But black on the top is our negotiations and

4    how those transpired over time with Berkshire.  And in the

5    bottom, it demonstrates our discussions in negotiations with

6    Sempra in blue through the September 6th hearing.

7    Q     And the green, I believe, Miss Dore used to call them

8    lollipops?

9    A     I think that's what someone called it, lollipops.  Yes,

10   I guess that's a green color, and that's joint meeting of

11   the boards.

12   Q     All right.  There's a lot on this timeline, but I just

13   want to touch on a few of the points.  I see the BHE merger

14   agreement was executed on July 7th.  Did that agreement have

15   a milestone for approval by the Court?

16   A     It did have a milestone; it was a 45-day milestone, as

17   I recall, that the merger agreement and the plan needed to

18   be approved by August 21st, as I recall.

19   Q     And the timeline also notes that the Debtors began

20   discussions with Sempra in mid to late July.  When those

21   discussions with Sempra started, the Debtors were still

22   working towards approving a deal with BHE, correct?

23   A     Right.  I'd -- or kind of mid to late July, I was

24   receiving phone calls from a banker, and it was for an

25   undisclosed counterparty at that point in time.  And so,

1    there was discussions amongst myself, Andy Wright, and Andy

2    Calder regarding the potential buyer -- bidder for this --

3    for the EFH and its indirect interest in Oncor.  And at that

4    time, we were continuing our discussions and negotiations

5    with Berkshire, and it was predominantly around the

6    termination construct, and we continued that negotiation

7    really all the way through the August 20th date.

8    Q    What was the Debtors' goal in negotiating with Sempra?

9    A    Once again, our goal was to get the highest, you know,

10   value, highest and best value for the estate.  Clearly,

11   again, it meant not only price, but, you know, regulatory

12   certainty.  Sempra, at that point in time, was well behind

13   Berkshire in terms of where they were.  From a regulatory

14   perspective, Berkshire had a tremendous amount of momentum

15   in Austin for, you know, regulatory approval.

16   Q    Could you briefly summarize the course of the Debtors'

17   negotiations with Sempra in August 2017?

18   A    Yeah.  Again, as I discussed, we had some early

19   conversations on a no-name basis with -- I'll name the bank

20   -- with RBC banker.  And eventually, they signed an NDA in

21   August of -- August 10th of 2017.  They provided a term

22   sheet on August 11th.  They sent over a draft of their

23   documentation of the merger agreement and documentation.  We

24   asked them to start with the existing merger agreement.

25   August 17th, they made an offer of $9.3 billion.

1          We discussed that internally.  There were some

2    high-level discussions, I believe, with the Elliott advisors

3    at that point in time.  Our general belief and feedback from

4    the Elliott advisors was that was not going to be enough,

5    given how far behind Sempra was in terms of regulatory

6    approval.  Their structure was not as clean as it is today.

7    And so, the general feel was that the $9.3 billion was not

8    going to be sufficient enough.

9          Mr. Keglevic and I had conversations back and

10   forth with Sempra and with the Elliott advisors.  And,

11   ultimately, what we did is we said, at this point in time,

12   it's probably better for the two counterparties -- Elliott

13   and Sempra -- to negotiate with one another instead of

14   having the Debtor representatives negotiate those, you know,

15   the final terms.

16         And I believe those negotiations occurred between

17   Ropes & Gray and White & Case.  And clearly, there was

18   conversations amongst the principals as well.

19   Q    Did Sempra eventually make an offer that the Debtors

20   accepted?

21   A    Yes.  On August 20th, they increased their price from

22   $9.3 billion to $9.45 billion dollars.  That evening, I was

23   actually prepping for the August 21st hearing for the

24   Berkshire -- approval of the Berkshire transaction, at the

25   same time simultaneously, discussions regarding the Sempra

1    transaction.  And we took it to the board, took the

2    transaction to the board that evening.

3    Q    Did you participate in that board meeting?

4    A    I did.

5    Q    Did you recommend that the board accepts Sempra's

6    offer?

7    A    We did.  It was a long discussion.  It was a very

8    difficult decision.  I would say that we had -- you know,

9    the tradeoffs here were that you had Berkshire with a lower

10   price, with a tremendous amount of regulatory support at

11   that point in time, had a lot of interveners in the PUCT

12   staff signed up at that point in time.  As I recall, we had

13   an issue with potential confirmation.  And as you can see

14   here on the chart, Elliott files notice of disapproval of

15   the Berkshire transaction on August 16th.

16            Versus Sempra with a higher value, and a little

17   bit more complex -- a more complex capital structure, less -

18   - far less regulatory support.  They were just getting

19   started, but we had greater certainty of confirmation, given

20   that Elliott was supporting that transaction.

21   Q    And how did the value of Sempra's offer compare to the

22   existing BHE deal?

23   A    As I recall, it was -- Berkshire at that point in time

24   was 9 billion, and Sempra was 9.45 billion, so clearly 450

25   million more in value.

1    Q    What happened after the board meeting?

2    A    We completed the documentation that evening.  And on

3    the 21st, the merger agreement and the PSA was executed, and

4    we filed that with the Court.

5    Q    When was the Sempra merger agreement approved?

6    A    As I recall, September 6th.

7    Q    Mr. Horton, go ahead and turn to DDEM Horton 1 in your

8    binder.  And can we pull that up?  Did you help prepare this

9    demonstrative to aid in your testimony as well?

10   A    I did.

11   Q    And what does this demonstrative show?

12   A    It represents the organizational and legal structure of

13   the LSGT debtors, as we refer to them, and the intercompany

14   claims and loss and between the different entities at LSGT.

15   And it also reflects a receivable from LSGT Gas from EFH

16   Corp.  Clearly, those receivables and claims were impaired,

17   given the insolvency of EFH, but that's what that

18   represents.  And the amounts are as of the petition date.

19   Q    So to be clear, the receivable from EFH Corp to LSGT

20   Gas is money that EFH Corp owed LSGT Gas.

21   A    That's correct.

22   Q    How does the plan treat the LSGT debtors' intercompany

23   claims?

24   A    It reinstates the intercompany claims amongst the

25   debtors, including the receivable from EFH Corp to LSGT Gas.

1   Q    And are those amounts reinstated in full?

2   A    Yes, they will be.

3   Q    How does this treatment compare to the treatment of the

4   LSGT debtors' claims in prior plans?

5   A    The same.

6   Q    How does the plan treat asbestos-related claims?

7   A    It -- asbestos claims that were timely filed,

8   manifested or unmanifested, they will be reinstated.  Those

9   that were not timely filed will be discharged.

10  Q    And when you say timely filed, what do you mean by

11  that?

12  A    As you're aware, and I think most of us are aware,

13  there was a bar date that was established and approved by

14  the Court, so filed before the bar date.

15  Q    So does that mean that preserved manifested asbestos

16  claims are being reinstated in the plan?

17  A    That is correct.

18  Q    And does that mean that preserved unmanifested asbestos

19  claims are also being reinstated in the plan?

20  A    That is correct.

21  Q    How does this treatment compare to the treatment of

22  asbestos claims in prior plans?

23  A    It's the same.

24  Q    What's your understanding of whether the plan's

25  treatment of both asbestos claims and the intercompany

1    claims, if consistent with the Debtor's November 2015

2    settlement with the E-side official committee?

3    A    It's consistent with the settlement, with the

4    committee.

5    Q    And generally, what does that settlement require?

6    A    Reinstatement of the intercompany claims and the

7    preservation of the claim -- timely filed claims.

8    Q    Are you aware that certain holders of asbestos claims,

9    who we sometimes refer to as the asbestos objectors, Mr.

10   Hogan's clients, have alleged that the plan, as put forth

11   for the LSGT debtors, is not proposed in good faith?

12   A    I am aware of that.

13   Q    Do you agree?

14   A    I do not agree with that.

15   Q    Could you explain why the plan is proposed in good

16   faith and maximizes value for the LSGT debtors?

17   A    From my perspective, these intercompany claims are

18   impaired at this point in time.  They -- the LSGT Gas

19   Company, it has a receivable from EFH; that receivable is

20   impaired.  Now that we have gone forth and we are

21   reorganizing EFH, restructuring EFH, we've maximized the

22   value, from my perspective.  We have a -- it will have a

23   well-capitalized structure for EFH, reorganized EFH, $9.45

24   billion of equity, no debt at EFH or EFIH as parent company

25   that has an enterprise value of roughly $50 billion.  So you

1    have now-unimpaired claims in intercompany claims from EFH

2    and throughout the legal structure of LSGT.  In addition to

3    that, as we've discussed, the preserved claims will be

4    reinstated and the asbestos claims.

5    Q    What, if anything, did the Debtors and their advisors

6    discuss with Sempra and its advisors about the asbestos

7    claims?

8    A    We went back -- we actually did due diligence or

9    performed due diligence with Sempra on the history of the

10   claims.  I note that through my advisors, they got copies of

11   the Vasquez report, reviewed the Vasquez report, have an

12   understanding of the amount of the claims, the magnitude of

13   the claims.  The discussion was that the claims needed to be

14   preserved and reinstated; the intercompany claims between

15   the LSGT entities and EFIH need to be reinstated.

16   Q    Did the Debtors ever ask Sempra to ignore the bar date

17   and agree to reinstate all asbestos claims whether preserved

18   or not?

19   A    No, we did not, not that I'm aware of.

20   Q    Why not?

21   A    We'd had this -- we'd had the long history with the bar

22   date.  We've had bidders as far back as the Hunts, NextEra,

23   Berkshire, all wanting that bar date.  We felt strongly that

24   the bar date was an important feature to bring in the

25   maximum value, not only to e EFH, but to actually being able

1   to reinstate the intercompany claims at the LSGT entities

2   and preserving and reinstating the claims for asbestos

3   claims.

4          It had been approved by the Court on two separate

5   occasions, and it was consistent with the settlement that we

6   had with the unsecured creditor's committee.

7   Q    Mr. Horton, are the LSGT debtors' intercompany claims

8   general unsecured claims?

9   A    Yes, they would be if we weren't reinstating them

10  Q    And why is reinstatement of the intercompany claims

11  better than treating them as general unsecured claims

12  against EFH and their relevant entities?

13  A    The way I think about it, and in the discussions I have

14  had with others, is that if we made the LSGT debtors' claims

15  unsecured and I really looked toward the LSGT Gas claim to

16  EFH.  And EFH has 700 million of unsecured claims through

17  the notes that we're all aware of.  We have the TCH $700

18  million claim.  It was almost $600 million of intercompany

19  claim from LSGT Gas to EFH.

20          I round that and total that to roughly $2 billion.

21  You have roughly 200 million of distributable cash, and it

22  would state we actually emerge, so you're getting roughly 10

23  cents on the dollar recovery. Versus the approach that we

24  have taken here, which is to reinstate all of the

25  intercompany claims, to reinstate and preserve the timely

1   filed asbestos claims, where I believe there is a strong,

2   strong possibility that all of those claims -- any claims

3   that comes through and is due and payable will be paid 100

4   cents on the dollar.

5   Q    And, Mr. Horton, are you aware that the asbestos

6   objectors have suggested, once again, that a channeling

7   injunction and Section 524(g) trust would have been a

8   superior path to pursue?

9   A    I heard that discussion.

10  Q    Do you agree with that?

11  A    I don't.  We looked at that back in 2016 with a NextEra

12  transaction.  I leaned and worked -- leaned on and worked

13  with my general counsel, Miss Dore and her assistant and Mr.

14  Andy Wright.  And we had the discussion, along with Kirkland

15  & Ellis, you know, what's the benefit of a channeling trust

16  or the 524(g) trust.

17            And we came to the conclusion -- I came to the

18  conclusion, based on feedback from Miss Dore, the other

19  professionals, Mr. Wright, and just the practical reality of

20  where we were actually going to get funds to fund a trust

21  such as that.  Given the limited amount of funds that we had

22  at EFH, where was I going to get that cash?  I was going to

23  have to go get it from other EFH creditors.  It just doesn't

24  -- it just wasn't practical, particularly given the

25  alternative that we ultimately ended up with.

1   Q    How did you expect the other EFH creditors might react

2   to trying to fund such a trust?

3   A    I think that would have been a very, very difficult

4   task of taking money from unsecured creditors and funding a

5   trust, when we had bidders assuming -- effectively assuming

6   the asbestos claims and agreeing to reinstate all of the

7   intercompany claims of the LSGT debtors.

8   Q    And if the Debtors pursued either of the alternatives

9   that we just discussed -- treating the intercompany claims

10  as general unsecured claims or pursuing a trust -- what's

11  your understanding of how that would affect the E-side

12  official committee settlement?

13  A    My understanding is that it would violate the

14  settlement agreement.

15  Q    Let's turn briefly to feasibility.  Do you have a view

16  as to whether the plan is feasible?

17  A    I do have a view as to whether the plan is feasible,

18  and I absolutely believe that it's feasible.  We have a

19  restructured EFH that has no debt at EFIH, no debt at EFH,

20  it's $9.45 billion of equity value at a very strong well-

21  capitalized parent with an enterprise value of $49 to $50

22  billion.  I feel very strongly that the plan is feasible.

23  Q    Do the asbestos proofs of claim that have been filed

24  against the debtors change your view as regarding

25  feasibility?

1   A    It does not.  We've seen the intercompany claim between

2   LSGT Gas, the receivable that it has from EFH, and the

3   equity value, from my perspective, dwarfs that intercompany

4   claim.  There's more than enough equity cushion to sustain

5   the structure that we've put in place for LSGT debtors.

6   Q    Do you recall that the NextEra merger agreement had a

7   set-aside of $100 million in an asbestos escrow account?

8   A    I do.

9   Q    Is there a similar mechanism in the Sempra transaction?

10  A    No.

11  Q    Does the absence of such a set-aside here impact your

12  feasibility analysis?

13  A    No, not at all.

14  Q    Why not?

15  A    Again, as I said just a few moments ago, there's $9.45

16  billion of equity value at the reorganized restructured

17  debtor EFH, no debt at EFH or EFIH; in fact, the -- Sempra's

18  made a commitment to the PUCT that there will be no debt at

19  those levels.  The need for $100 million set-aside escrow, I

20  don't think that that's necessary at all.  You've got the

21  intercompany claim, again, from LSGT Gas to the restructured

22  EFH.  I think that was an accounting mechanism that Sempra

23  put in place for purposes of managing their earnings and

24  their accounting process.

25  Q    I may have misheard.  Did you say that Sempra put in

1   place or NextEra?

2   A    I'm sorry, NextEra.

3   Q    And did the --

4            THE COURT:  Miss Terteryan, my memory is that,

5   yeah, that was an accounting mechanism to keep it off the

6   balance sheet and was not a cap on their liability; is that

7   correct?

8            MR. HORTON:  That is correct.

9   Q    Did the BHE merger have such a set-aside?

10  A    I'm sorry, the B --?

11  Q    The BHE merger agreement from last year --

12  A    The BH -- the Berkshire?

13  Q    -- did that have a set-aside in it?

14  A    No.  No, it did not.

15  Q    In your declaration, you briefly discussed that the

16  Debtors have to allocate expenses between EFH and EFIH,

17  including for the termination fee reserve.  Could that

18  allocation of expenses affect your conclusion that the plan

19  is feasible?

20  A    No, it does not.

21  Q    Why not?

22  A    There's plenty of -- again, as I keep going back,

23  sufficient equity, more than sufficient equity at EFH.  The

24  distributable funds that are available for unsecured

25  creditors is far greater than the 275 million.  I've seen

1    scenarios of the allocations, you know, amongst EFH and EFIH

2    and what those negotiations look like.  I have seen no

3    scenario where EFH would be administratively insolvent or

4    EFIH would be administratively insolvent, so it does not

5    affect my belief on the feasibility.

6    Q    When you say you've seen no scenario, what do you mean

7    by that?

8    A    I meant in terms of negotiations back and forth.  I

9    personally had the professionals run some scenarios, what I

10   would consider, worse-case scenarios -- high end allocation

11   to each one of the entities, in terms of these fees.  And,

12   again, it does not change my view as to whether EFH or EFIH

13   would be administratively solvent.

14   Q    Let's turn to NextEra's confirmation objection.

15            THE COURT:  Can we take -- I'm sorry.  May we take

16   a short recess?

17            MS. TERTERYAN:  Of course.

18            THE COURT:  All right, five minutes.

19       (Recess)

20            CLERK:  All rise.

21            THE COURT:  Please be seated.  You may proceed.

22   Q    All right.  Mr. Horton, you ready?

23   A    I am ready when you are.

24   Q    So, let's turn to NextEra's confirmation objection.

25   Are you aware that NextEra is requesting a reserve of $275

1    million in the event that it prevails in its appeal of the

2    Court's reconsideration order?

3    A    I am aware.

4    Q    How do the Debtors propose to resolve NextEra's

5    objection?

6    A    To set aside $275 million.

7    Q    Mr. Horton, are you also aware of NextEra's objection

8    that it should be able to pursue the $275 million

9    termination against the reorganized Debtors or Sempra?

10   A    Yes.

11   Q    Could you turn to DX-1001 in your binder?  And if you

12   flip to Page 2 of 105 when you're looking at the pagination

13   at the top.

14   A    2 of 105?

15   Q    Yes.  Do you recognize this document?

16   A    I do.

17   Q    What is it?

18   A    It is the Sempra merger agreement.

19   Q    And if you turn to Page 86 of 105, at the top, looking

20   at Section 7.1(e) of the merger agreement.  Is this one of

21   the conditions to closing the Sempra merger?

22   A    Yeah, I'm getting to that section.

23   Q    Take your time.

24   A    Yes, it is.

25            THE COURT:  Mr. Horton, keep your voice up, if you

1    don't mind.

2         MR. HORTON:  You bet.  My apologizes.

3         THE COURT:  It's okay.

4    Q    All right.  And we've got it highlighted on the screen,

5    but I'll read it for the record.  It says -- where it says,

6    "Under the plan of reorganization and subject to the

7    treatment of claims provided therein, at the effective time

8    all administrative claims, DIP claims, and claims, each as

9    defined in the plan of reorganization, other than the Legacy

10   general unsecured claims against the EFH debtors as defined

11   in the plan, will no longer be the obligation of the E-side

12   Debtors."  Do you see where it says that?

13   A    I do.

14   Q    Why is this closing condition in the merger agreement?

15   A    Sempra, as well as the other buyers, all wanted a very

16   clean and clear reorganized EFH that they were purchasing.

17   They didn't want any additional claims other than the ones

18   that we discussed here.

19   Q    If NextEra were allowed to maintain claims against the

20   reorganized Debtors, post emergence, what's your

21   understanding of how that would affect Sempra's obligation

22   to close?

23   A    This is a condition precedent to closing and they would

24   have the opportunity and they wouldn't have the obligation

25   to close.

1    Q    Mr. Horton, do you believe the plan maximizes value for

2    the Debtors' estates?

3    A    I do.

4    Q    How so?

5    A    We've had, again, a couple of failed transactions, you

6    know, for regulatory purposes and -- you know, the

7    regulators are doing their job.  And we have a transaction

8    today that has significant -- tremendous, I'll say

9    tremendous, regulatory support, unanimous support from the

10   PUCT staff as well as the key intervenors.

11          On February 15th, as I understand it, the PUCT

12   Commission directed the PUCT staff to write an order for

13   consideration on March 8th.  And whether or not they will

14   approve it on that date, I'm sure that they will approve

15   shortly thereafter if they don't approve on March 8th.  So

16   we have regulatory support.

17       We have a entity, after it's been reorganized with

18   $9.45 billion of equity value, no debt at EFH, no debt at

19   EFIH, a commitment that there will be no debt at that level,

20   there's not a condition to drag out the minority owners.  We

21   have the support of our largest, I'm looking back there, the

22   support of our largest creditor and so it is a value

23   maximizing opportunity.  It proceeded much quicker than we

24   anticipated through the regulatory process.

25          Sempra and Oncor management did an outstanding job

1    of getting it to this place and to this point.  The

2    structure that Sempra put in place, versus where we started,

3    it's much simpler, it's much cleaner, it's a very strong

4    capital structure.  So, that's my view.

5            MS. TERTERYAN:  Your Honor, the Debtors have no

6    further questions for Mr. Horton at this time.  I would like

7    to move in some exhibits that were cited in his written

8    direct or provided source material for the demonstratives.

9            THE COURT:  Okay.

10           MS. TERTERYAN:  And may I approach with the green

11   sheet?

12           THE COURT:  Yes, you may.  Thank you very much.

13           MS. TERTERYAN:  All right. And I'll just read

14   these into the record.  The starred ones on the green sheet

15   are subject to the stipulation we have with Mr. Hogan that's

16   already been entered by Your Honor.  So DX-125, DX-248, DX-

17   298 and DX-390 have already been stipulated.

18           And then we would move DX-1000, DX-1001, DX-1004,

19   DX-1017, DX-1080, 1085, 1093 and 1094.  Those are from his

20   written direct.

21           And we move DX-1012, 1022, 1033, 1034, 1035, 1036,

22   1037, 1038, 1039, 1040, 1041, 1042, 1043, 1044, 1045, 1046

23   and 1047.

24           And we also submit DDEM-Horton-1 and DDEM-Horton-2

25   for demonstrative purposes only.

1            THE COURT:  Any objection to the admission of any

2    of these documents?

3            MR. HOGAN:  No, Your Honor.

4            THE COURT:  They're admitted without objection.

5        (DX-1000, DX-1001, DX-1004, DX-1017, DX-1080, DX-1085,

6    DX-1093 and DX-1094 Received into Evidence)

7        (DX-1012, DX-1022, DX-1033 through DX-1047 Received

8    into Evidence)

9            MR. MCKANE:  Your Honor, Mark McKane of Kirkland &

10   Ellis.  The -- NextEra has -- another NextEra, excuse me.

11   NextEra has raised a concern about whether admitting these

12   documents into evidence, for the purposes of this

13   proceeding, could somehow have some spillover implications

14   to the extent that there is a dispute about the termination

15   fee, either in this court or another court, and the

16   admissibility of those records in those courts.

17            We just want to make absolutely clear that, you

18   know, that the Debtors have agreed with NextEra that they

19   would not take the position that your admission of these

20   documents into evidence for the purposes of the confirmation

21   proceeding will have any spillover implications for other

22   proceedings in front of Your Honor.

23            THE COURT:  Do you have any problem with that?

24            MR. BALL:  Your Honor, with that understanding, we

25   don't have any objection to the admission of these exhibits.

```
 1              THE COURT:  All right.

 2              MR. HOGAN:  Thank you, Your Honor.

 3              THE COURT:  The Court will agree with that.

 4              MS. TERTERYAN:  Thank you, Your Honor.

 5              THE COURT:  You're welcome.

 6              MS. TERTERYAN:  With that, I tender the witness.

 7              THE COURT:  All right.  Mr. Hogan?

 8              MR. HOGAN:  Thank you, Your Honor.  If I would, I

 9    need to have one moment --

10              THE COURT:  Yes.

11              MR. HOGAN:  -- to have a conversation about these

12    exhibits?

13              THE COURT:  Of course.

14         (Counsel confer)

15              MR. HOGAN:  Thank you, Your Honor.

16              THE COURT:  You're welcome.

17                CROSS EXAMINATION OF ANTHONY HORTON

18    BY MR. HOGAN:

19    Q    Good morning, Mr. Horton.  How are you today?

20    A    Good morning, Mr. Hogan.  Just fine.  Thank you.

21    Q    Good.  Mr. Horton, if I could ask you, you know,

22    obviously this has been a difficult case for you, obviously,

23    in terms of the number of times you've had to testify, had

24    your deposition taken.  And to that end, I'm curious to

25    know, what did you do to prepare for today's testimony?
```

1    A    I went back and read prior testimony, I clearly read my

2    declaration, reviewed the organizational structure, legal

3    structure of the LSGT entities.  That's predominantly it.

4    Reviewed the time line, clearly.

5    Q    Thank you.  And just so I'm clear, your role with

6    regard to the four asbestos Debtors as we know them, has

7    that changed since the last time you testified before the

8    Court at the confirmation hearing in February of 2017?

9    A    No, sir.

10   Q    Okay.  Turn to your testimony.  If I could, the due

11   diligence, your declaration and your prior testimony is such

12   that you spearheaded, for the Debtors, the due diligence

13   process as it relates to the various bidders.  Is that a

14   fair characterization of your testimony?

15   A    I would say that I coordinated, rather than

16   spearheaded.  Clearly there were experts and others that

17   were closer to the data, the analysis, than myself.  You

18   know, I think I mentioned in my testimony, previous

19   testimony, that Mike Hunter headed up a lot of that effort.

20   Q    Okay.  But you were clearly involved in that process?

21   A    I was involved, aware.

22   Q    And would that hold true for not only the NextEra

23   transaction, but also ultimately the Sempra transaction,

24   true?

25   A    Yes, sir.

1    Q    And before Sempra entered into the picture, what about

2    with Elliott, the same holds true that you were involved in

3    the due diligence process as it relates to Elliott?

4    A    Yeah, coordination, pointing people to the right

5    people, getting them to -- coordinated together.

6    Q    Okay.  Let's talk for a minute about the Elliott

7    involvement.  If you would, I'd ask you to take a look, you

8    have a iPad up there?

9    A    I have an iPad, I have a binder.

10   Q    All right.  I'd ask you to take a look at the iPad, and

11   if you would, go to DX-1049, if you would.  And I'll give

12   you a minute to get that set up.

13   A    There's a file that says "2018 Confirmation," is that

14   the file that you want me to open?

15   Q    Well, there should be Debtors' Exhibits, there should

16   be a folder called "Debtors' Exhibits"; do you see that?

17              THE COURT:  You've got to keep opening --

18              MR. HORTON:  Yeah.

19              THE COURT:  -- folders to get there.  What number,

20   Mr. Hogan?

21              MR. HOGAN:  It's DX-1049, Your Honor.

22              THE COURT:  Okay.

23              MR. HORTON:  It's not popping up.  Just --

24              THE COURT:  Counsel, can you help your client?

25              MR. HOGAN:  Yeah.  May I?

Page 65

```
 1              THE COURT:  Yeah.

 2         (Pause)

 3              MR. HORTON:  Thank you.

 4    Q    Are you there, Mr. Horton?

 5    A    I am, sir.  Thank you.

 6    Q    And if you would, go to Page 2 of that document, which

 7    is a Bates Number of EFH-06536548, as I believe.  And

 8    there's --

 9    A    Page -- I have Page 2 of 75 and it says --

10    Q    Yes, sir.

11    A    -- EFH, the last three digits is 541, which is the

12    title page.

13    Q    If you would turn to Page 2 of that document, where it

14    reads at the top, "Key Deal Considerations Proposed Elliott

15    Plan"; do you see that?

16    A    My apologies.  Which DX number?

17              MR. HOGAN:  Permission to approach the witness,

18    Your Honor?  I may be able to short circuit this, if I

19    could?

20              THE COURT:  Yeah.  I'm not seeing it either.

21         (Pause)

22              MR. MCKANE:  Your Honor, for the record, I believe

23    it's Page 9 of 75, in the lower -- in the bottom.

24         (Pause)

25              THE COURT:  Thank you, Mr. McKane.
```

1   Q    I want to direct your attention to the statement that

2   reads, "Reinstatement of Asbestos Claims.  Elliott has also

3   indicated that it believes the reorganized EFIH can assume

4   the liabilities of the reinstated asbestos claims against

5   reorganized EFH in exchange for a cash payment from EFH to

6   EFIH."  Can you tell me what that's about, if you know?

7   A    One, it's a long time ago and it's a detail that I

8   don't have a hundred percent recollection.  It is -- if I

9   recall, and again, it was a very high level discussion that

10  EFIH would take on the asbestos claims for a cash payment to

11  EFH.  Excuse me, EFH to EFIH.  Yes.

12  Q    So a cash payment would be made to EFH in exchange for

13  those claims going to EFIH?

14  A    No, sir.  Other direction.  EFIH would take on and

15  assume those claims, so long as EFH provided a cash payment

16  to EFIH.

17  Q    I see.  And do you remember what the amount of the cash

18  payment was presumed to be?

19  A    I don't think that was ever discussed.

20  Q    Okay.  And is, in fact, is this construct part of the

21  current plan that's before the Court today?

22  A    No, sir.  I think our response -- I was thinking back

23  on it, our response to Elliott, as I recall, and actually

24  Mr. Keglevic provided the response and I was on the call, so

25  I don't know if this was hearsay or not, but Mr. Keglevic

1    said --

2           THE COURT:  This is bankruptcy court, we really

3    don't worry about the Rules of Evidence very much.

4           MR. HORTON:  Thank you, Your Honor.

5           THE COURT:  You're welcome.

6           MR. HORTON:  Mr. Keglevic said, you're going to

7    have to accept the claims regardless, so -- as part of the

8    equitization plan.

9    Q    Thank you.  Turning to the deal with Sempra, this

10   construct that we just talked about, that's not part of the

11   Sempra plan, is it, as I refer to it?

12   A    Yeah, well you said NextEra and then we sent to Sempra,

13   so I'm sorry.

14   Q    Right.  And so -- right, I'm turning now to Sempra.

15   It's not part of the Sempra transaction at all?

16   A    No, sir.

17   Q    Okay.  Now at Sempra -- in terms of Sempra, you

18   testified, on your direct examination, that there was at

19   least a brief consideration or a conversation about whether

20   or not you should do a 524; is that a fair statement?

21   A    No.  I don't recall that conversation at all with

22   Sempra.

23   Q    So when Sempra came on board there was a conversation

24   about the asbestos liabilities; is that a fair statement?

25   A    There was.

1  Q    And in terms of what was discussed, what was discussed

2  in terms of the asbestos liabilities?  Was it just, we've

3  got a ruling from the court already, we're going to stick

4  with the ruling that we have or we're going to stick with

5  the construct that we have?  Is that a fair way to

6  characterize it?

7  A    I wouldn't say that we stated that we had a ruling from

8  the court, but the construct was contained within the merger

9  agreement and the plan that was provided to Sempra.  And you

10 saw that they marked up the plan.  And in the merger

11 agreement, if you'd go back to the time line I think that

12 date was August 15th or -- roughly, they sent over a mark-up

13 of the agreement.  And in the agreement was the assumption

14 and the reinstatement of the intercompany claims and the

15 assumption.  We use the term "assumption" a lot, if you'll

16 bear with me on that, but assumption of the asbestos claims.

17 Q    You testified earlier in your direct examination about

18 the salient change between NextEra and the Sempra plan that

19 relates to the asbestos claims was this escrow component; do

20 you recall that testimony?

21 A    I recall us discussing the 100 million and whether or

22 not the 100 million was part of the Sempra plan.  I think

23 the question was also asked as to whether it was part of the

24 Berkshire plan.

25 Q    And in fact it's not part of the Sempra plan, that's

1    correct?

2    A     That is correct, sir.

3    Q     And so if a claim is made post-confirmation, post-

4    effective date, by someone who has timely asserted an

5    asbestos claim against EFH, what's the process?  How does

6    that -- how is that likely to work, if you know?

7    A     I don't know that I know specifically.  My general

8    understanding, so again, we haven't worked out all of the

9    mechanics, I don't know that Sempra's worked out all of the

10   mechanics themselves.

11         But there is a intercompany claim, and just as an

12   example, and this is illustrative, it's not meant to be, you

13   know, actual, factual.  But there's a claim, as you

14   described, it was timely filed and it is a legitimate claim

15   and it's been proven that, you know, someone is ill and has

16   a claim.  I would assume that that would, and again, this is

17   a hypothetical, assume that it would go to -- through EECI.

18   ECEI (sic) has a receivable from LSGT Gas.  LSGT Gas could

19   call whatever that amount, let's just do a hypothetical

20   amount, let's assume it's a million dollars.

21   Q     Okay.

22   A     A million dollars, LSGT Gas asks for funds from LSGT --

23   excuse me, EECI asks for funds from LSGT Gas.  LSGT Gas asks

24   for payment on the intercompany claim from reorganized EFH.

25   And that's how the funds would flow, would be my guess.  But

1    they could do it directly, indirectly, and there's lots of

2    different ways that that could happen.

3    Q    Okay.  And just so I'm clear, the Sempra plan, is it

4    conditioned on the PUCT approval?

5    A    The plan, is it conditioned -- they would have to --

6    you know, clearly they would have to have PUCT approval to

7    close the plan.  Yes.

8    Q    Turning, if I could, to the termination fee.  There's

9    this allocation issue that's out there that we've heard will

10   be addressed at some point later than today as I understand

11   it.  But as it relates to the asbestos Debtors, is there any

12   opportunity or chance that that allocation issue is going to

13   eat into those intercompany claims that you have stated are

14   going to be reinstated?

15   A    I see -- with $9.45 billion of equity value, and that

16   the 725 has been set aside from the estate, I see no

17   impairment in that 9.45 billion or effect to the LSGT

18   Debtors.

19   Q    I believe you testified, on direct, that from your

20   perspective there's more than enough equity there; isn't

21   that right?  Isn't that how you characterized it?

22   A    More than enough equity cushion there I think is what I

23   said.

24   Q    If I could, I wanted to direct your attention to DX-

25   1076, which is, again, on your iPad.  It's only, I think,

1    one page, so hopefully you won't have any difficulty finding

2    that image.

3              MR. HOGAN:  That's DX-1076, Your Honor.

4              THE COURT:  Um hmm.

5              MR. HOGAN:  And let me know when you're there.

6              THE COURT:  It says --

7              MR. HORTON:  No TIFF.

8              THE COURT:  -- "No TIFF included for this record."

9    I don't know what that means.  It can't be good.

10             MR. HOGAN:  That means --

11             MS. TERTERYAN:  Your Honor, the next one over is

12   also labeled, and it's in Excel.  I think it should open on

13   the iPad just fine.

14             THE COURT:  Sorry?  I can't hear you, I'm sorry.

15             MS. TERTERYAN:  The next one over in that list is

16   also labeled 1076 --

17             MR. HORTON:  Oh, there's an Excel file, sir.

18             MS. TERTERYAN:  -- and it's a green Excel file.

19             THE COURT:  Oh, it's --

20             MS. TERTERYAN:  It will open.

21             MR. HORTON:  Yeah, I see that chart.

22             THE COURT:  You really are pushing the envelope.

23   I need my 17 year old son here to press all these buttons

24   for me.  That's how it works at home.

25             Okay.  Got it.

1            MR. HOGAN:  Thank you, Your Honor.

2    Q    Mr. Horton, you have the Ebasco asbestos litigation

3    chart in front of you; do you see that?

4    A    I don't see a title as that.  I see the chart, there's

5    some data on the chart.  It says --

6    Q    What does it say at --

7    A    -- it has a year.

8    Q    -- the very top?

9    A    It says "DX-1076, DX-432 EFH-0658."  I don't see that.

10   Maybe --

11   Q    Mr. Horton, could -- does it look like this?

12            THE COURT:  No.

13            MR. HORTON:  No.

14            MS. TERTERYAN:  Your Honor, if I could help Mr.

15   Hogan?  The way it shows up on the iPads, there's two tabs.

16   And if you click on the tab labeled "Chart 1" that should

17   get you closer to what Mr. Hogan is looking at.

18            MR. HOGAN:  Thank you.  Your Honor --

19            MR. HORTON:  Yeah, it looks like yours, except it

20   doesn't have the squiggly line and it doesn't -- your chart,

21   your bar charts are taller, but other than that it looks

22   like that.  Kind of.  Sort of.

23   Q    So we're both technologically impaired.

24   A    I --

25   Q    I get that.

1    A    -- I'm right there.  I'm looking for the IT guy

2    already, so.

3    Q    You don't know who prepared this document, do you?

4    A    I do not.

5    Q    And you didn't prepare this document?

6    A    I can assure you of that.  No.

7              THE COURT:  I'm sorry, did you have your -- Mr.

8    Hogan, did you take Mr. Horton's deposition in connection

9    with today's hearing?

10             MR. HOGAN:  No, we did not, Your Honor.

11             THE COURT:  Okay.  I was just curious.  Okay.

12   Q    What does this chart purport to show, if you know?

13   A    You know, look, I could speculate as to what it's

14   trying to show.  I don't know if this is complete.  I can

15   give -- you know, it lists year-by-year, the number of

16   lawsuits received by year, total annual spend for each year,

17   how much was settled and I would assume that's what would be

18   paid to the lawyers and potentially the parties -- the party

19   that was -- had a claim.

20   Q    Okay.  So --

21   A    And an annual defense amount.

22   Q    Okay.  Thank you.  If I told --

23   A    What doesn't --

24   Q    Oh, I'm sorry.

25   A    -- (indiscernible) is the total spend and so again,

1    it's -- look, it's speculation on my part what it says.

2    Q    If I told you that this is part of the Debtors'

3    exhibits, EFH's Exhibits, in terms of what they intend to

4    offer into evidence, does that surprise you, in light of the

5    fact that you don't know what this is?  Or -- and I don't

6    want to put word sin your mouth, I don't mean to

7    mischaracterize that, but it sounds to me as if you've not

8    seen this before?

9    A    I have not studied this before, no.

10   Q    Would it be fair to say that this chart represents a

11   characterization of the history of asbestos claims against

12   the EFH Debtors, prepetition?

13              MS. TERTERYAN:  Objection, Your Honor.  It's clear

14   Mr. Horton is merely speculation as to the exhibit, so

15   further questions on that point lack foundation.

16              MR. HOGAN:  Your Honor, if I may be heard?

17              THE COURT:  Yeah, of course.

18              MR. HOGAN:  Thank you.  Your Honor, this is a

19   document that the Debtors produced as part of their trial

20   exhibits.  This is from the Debtors' records, Mr. Horton is

21   here on behalf of the Debtors.  These are the Debtors

22   documents.  These are -- this is part of their evidence

23   about the treatment of asbestos claims and the history of

24   asbestos claims.

25        Our argument, ultimately, about Grossman, Your Honor,

1    as I prefaced in my opening, is about the inapplicability of

2    the -- or the appropriateness of applying that case to these

3    facts.  Grossman is about a case where there was no prior

4    history of asbestos claims against that Debtor.  We'll set

5    aside the temporal aspect of Grossman, where the Third

6    Circuit was forced to look back 20 years and make a

7    determination about whether it was appropriate to discharge

8    a claim, that's a separate issue, but as it relates to the

9    issue of whether this Debtor, these Debtors have a history

10   of asbestos claims against them and were aware of that

11   history at the time that they filed their bankruptcy, this

12   document demonstrates it better than anything I could

13   produce.

14             THE COURT:  Well --

15             MS. TERTERYAN:  Your Honor, may I respond?

16             THE COURT:  Do -- yes.

17             MS. TERTERYAN:  Mr. Hogan can characterize the

18   document however he wants.  First of all, we haven't moved

19   it in evidence in this proceeding yet.  Second of all, he

20   has not established foundation to ask Mr. Horton further

21   questions about the document.  To the extent he wishes to

22   ask other --

23             THE COURT:  Well --

24             MS. TERTERYAN:  -- relevant questions to Mr.

25   Horton --

1            THE COURT:  -- the Debtors have stated, numerous

2     times, that they had pre-petition asbestos claims, albeit it

3     not large -- large in number or amount.  But you're not

4     walking away from that?

5            MS. TERTERYAN:  Not at all.  Just simply concerned

6     to ask question -- to have Mr. Hogan ask questions of Mr.

7     Horton about a document that Mr. Horton says he doesn't

8     really -- he isn't familiar with.

9            THE COURT:  Well, are you going to object to its

10    admissibility if it's moved into evidence?

11           MR. MCKANE:  No, Your Honor.

12           MS. TERTERYAN:  No, Your Honor.

13           MR. MCKANE:  I mean, it's not surprising Mr.

14    Horton, as the CFO, is not familiar with the legal spend.

15    And they'll have an opportunity to ask these questions of

16    Mr. Wright, who is the general counsel.

17           THE COURT:  All right.  I'll sustain the

18    objection.  Mr. Horton has testified that he's vaguely

19    familiar with this, at best.  But I think you have judicial

20    estoppel on an argument that the Debtor wasn't aware of

21    asbestos liability prior to the petition date.  I mean, as

22    to the actual, you know, number of suits and amount of

23    suits, I think that's been put into evidence previously as

24    well, it's certainly been in briefs.

25           MS. TERTERYAN:  Yes.

1           THE COURT:  So, I don't --

2           MR. HOGAN:  It has been, Your Honor.

3           THE COURT:  Okay.  So I don't think -- and they

4    don't -- they aren't going to object to the admission of the

5    document, so I think you've got as much as you need, Mr.

6    Hogan.

7           MR. HOGAN:  Thank you, Your Honor.  I agree.

8           THE COURT:  You're welcome.

9           MR. HOGAN:  Thank you.

10          THE COURT:  Certainly enough to support your

11   argument about Grossmans.

12          MR. HOGAN:  Thank you, Your Honor.

13          THE COURT:  You're welcome.

14          MR. HOGAN:  Okay.  Bear with me, Your Honor.  Just

15   a second.

16   Q    Mr. Horton, if I could, I want to -- you have your

17   binder in front of you.  You have your demonstratives in

18   front of you, if you would, which is the D-Horton DEM-1, I

19   believe?  Which shows the various companies.

20   A    The legal structure?

21   Q    Yes, sir.

22   A    Yes, sir.

23   Q    Thank you.  So as it relates to each of these entities,

24   and I'll be brief on this, the amount of the claims, $84

25   million, $404 million and the $502 million, those are all

1    claims that exist below LSGT Gas Company; isn't that

2    correct?

3    A    Those are claims from each one of those entities.  So

4    let's just be specific, so maybe I can answer your question.

5    Q    Thank you.

6    A    EECI has a receivable of $84 million from LSGT Gas.

7    EECI Holdings, Inc. has $404 million to -- receivable from

8    LSGT Gas.  And LSGT SACROC, Inc., has $502 million -- $502

9    million receivable from LSGT Gas, LLC.  Again, these amounts

10   are as of the petition date.

11   Q    And you recall, from prior testimony, we've covered it

12   numerous times, there's an interest component to those that

13   will accrue at the effective date; is that a fair

14   characterization, generally, of your earlier testimony?

15   A    The notes will be reinstated and as part of that

16   reinstatement there will be the accrual of the interest.

17   Q    On each one of those claims?

18   A    On each one of those claims.

19   Q    And just so --

20   A    To the extent that there's interest owed.

21   Q    To the extent that there's interest owed.  And it's

22   your understanding that there is interest owed; isn't that

23   correct?

24   A    I -- on some, but I'm not sure on all.

25   Q    Okay.  And I know I asked you this in February 2017 and

1    I'll ask it again, and I think I know the answer, but I have

2    to ask it.  And that is, have you done the calculations on

3    what those interest payments would be?

4    A    I've actually done, just myself, calculations on the

5    EECI, Inc. and the LSGT Gas assuming end of March 2018. I --

6    just for my own curiosity I did the calculation.

7    Q    And for my curiosity, could you tell me what your

8    calculation came up with?

9    A    For EECI, Inc. to LSGT Gas, the number was

10   approximately 130 million.  And for LSGT Gas to EFH the

11   number was roughly 675 million.

12   Q    And so on the effective date, how is that effectuated?

13   How are those interest payments effectuated?  Is it a book

14   entry?

15   A    It is an accrual entry and will accrue to the balance

16   of the note, of the claim.

17   Q    And then from that point forward interest will continue

18   to accrue?

19   A    Yes.  As I understand it.

20   Q    Now, after the effective date, what would your

21   involvement be with the reorganized Debtors, if any?

22   A    With the reorganized Debtors, at this point in time I

23   have no agreement.  There's conversation that we're going to

24   -- a few of us will stay on till the end of March to finish

25   up the financials and so forth.

1    Q    The plan provides for a EFH administrator.  Are you

2    familiar with that term?

3    A    Yeah, the Plan Administrator Board?

4    Q    Yes.

5    A    Yes, sir.

6    Q    And do you know who will make up that board?

7    A    I will.

8    Q    You will?

9    A    Yes, sir.

10   Q    But that will be something separate and distinct from

11   the reorganized Debtors, fair characterization?

12   A    That is fair.

13   Q    Okay.  And who will you be answerable to in that regard

14   as being a part of the -- that board?

15   A    To the -- effectively remain -- the estate and the

16   creditors as it remains.

17   Q    There's been an automatic stay in place in this case

18   since each of the Debtors filed for bankruptcy; you

19   understand that?

20   A    I do.

21   Q    And you understand that upon the effective date, or

22   shortly thereafter, the injunctions and stays will be

23   lifted; is that your understanding?

24   A    Generally speaking, yes.

25   Q    And so is it your anticipation that there's going to be

1    some level of activity, as it relates to timely filed

2    asbestos claims and the reassertion of those claims and the

3    prosecution of those claims now that the injunction and the

4    stay have been lifted.

5    A    From my perspective that's a legal question and how

6    that process will work out.

7    Q    I'm not asking you --

8    A    And what day it starts and what day it begins, I don't

9    know.  What I can tell you is, we have a plan in place for

10   these claims and the asbestos -- timely filed asbestos

11   claims, manifested or unmanifested, we have a process for

12   that.  And what day that ultimately occurs, if that's, you

13   know, 12:01 on March 9th or, you know, one second after it

14   closes, I don't know.  But I know we have a process for

15   that.  Once, again, you have a claim or someone has a claim

16   we do have a process for that to proceed forward.

17   Q    Thank you.  And could you direct me to where in the

18   plan, or in the confirmation order, or in any of the

19   supporting plan supplemental documents that that process is

20   laid out?  You said you have a plan to deal with these

21   claims after the effective date, what's the plan?

22   A    The plan calls for the reinstatement of the

23   intercompany claims between these entities as we have

24   discussed, including the claim from LSGT Gas to EFH and the

25   preservation of any claim -- proof of claim for asbestos,

1    has also been -- that have been timely filed has also been

2    laid out in the plan.

3    Q    What I mean is, in terms of individual claimants

4    asserting their -- having the ability to reassert their

5    claims in a state court, as opposed to in bankruptcy court,

6    is there any written plan about how that process will

7    unfold, as it relates to these timely filed claims?

8    A    I don't know.  I'm not a lawyer.  I would assume that

9    if you were going to file a claim in state court you would

10   follow their processes and procedures.  And -- but, you

11   know, in terms of we actually laying that process and

12   procedure for whatever state it is into this plan, no, we

13   didn't do that, that I'm aware of.

14   Q    Thank you.

15            MR. HOGAN:  Let me just check my notes, Your

16   Honor.  I may be done.  No further questions.  Thank you,

17   Your Honor.

18            THE COURT:  Thank you, Mr. Hogan.

19            Anyone else wish to cross examine the witness?

20            MR. BALL:  I have questions, Your Honor.

21            THE COURT:  Okay.

22            MR. BALL:  We have witness binders.  May we

23   approach?

24            THE COURT:  I can't hear a word you're saying.

25            MR. BALL:  We have witness binders.  May we

1    approach?

2           THE COURT:  Yes.  Thank you.  You've got a copy

3    for my clerk, please?

4           MR. BALL:  Do you need more?

5           THE COURT:  No, one's enough.  Right?

6               CROSS EXAMINATION OF ANTHONY HORTON

7    BY MR. BALL:

8    Q    Good afternoon, Mr. Horton.  I'm Robin Ball from Norton

9    Rose representing NextEra.  And I have a few questions for

10   you.

11   A    Okay.  Good afternoon.

12   Q    Mr. Horton, you're aware that Section 1129(a)(9) of the

13   bankruptcy code requires that allowed administrative expense

14   claims be paid in full in cash?

15   A    Yes.

16   Q    Okay.  And I think you testified earlier today that

17   part of the -- what the Debtors plan to do here is to

18   reserve 275 million towards the NextEra termination fee; is

19   that right?

20   A    That's correct.

21   Q    All right.  Are you familiar with the terms of the

22   order the Debtors proposed last night?

23   A    What terms specifically are you referring to?  I --

24   Q    Well, there's several of them.  And I -- maybe the best

25   way to do it is just to show it to you and see if you can

1  speak to it.  If you would look at Exhibit 58 in your

2  binder?  Sir, do you recognize that?  There's a notice of

3  filing followed by copies of a proposed order and then a

4  redline proposed order.  Do you see that?

5  A    I do.

6  Q    Okay.  And if you look at the clean proposed order, at

7  Page 28 of 80 at the top, I think that might be the easiest

8  way to direct you to it.

9  A    I'm at that page.  Yes, sir.

10  Q    Okay.  And you see Paragraph 57 there?

11  A    I do.

12  Q    All right. And do you see that one of the findings that

13  the Debtors are asking for in Subsection D of Paragraph 57

14  is that, "The evidence establishes that the EFH, EFIH

15  Debtors would have sufficient funds available to meet their

16  obligation under the plan, including sufficient amounts of

17  cash to reasonably ensure payment of, among other allowed

18  claims, allowed administrative claims"; do you see that

19  portion of the text?

20  A    I do.

21  Q    And is that one of the findings that the Debtors are

22  asking for here today?

23  A    Yes.

24  Q    Okay.  Let me ask you to look in your binder, we'll

25  come back to the order; I have more questions about it.  But

1    let me ask you to look in your binder at Exhibit NX-50.  Let

2    me know when you're there.

3    A    You said 50?

4    Q    050.

5         THE COURT:  There is no -- NX-50.

6         MR. HORTON:  There is no --

7         MR. MCKANE:  There is no 050.

8         MR. BALL:  Oh, I'm sorry.  Doing the wrong -- the

9    --

10        MR. HORTON:  Don't make us get the iPad out.  I'm

11   just kidding.

12        MR. BALL:  Can you put it up on the screen?

13        MAN:  5-0?

14        MR. BALL:  Yes, please.

15   Q    I'm sorry.  Can I ask Mr. Horton if you would find NX-

16   050 in your -- on the screen in your iPad?

17   A    You want me to look at the iPad?

18   Q    If you would, please.

19   A    Okay.  Sure.

20   Q    I apologize.

21   A    No, that's all right.  It's okay.

22   Q    I believed it was in there.

23        MR. MCKANE:  We have 5001, is that what you're --

24        MS. TERTERYAN:  No, NX, not DX.

25        MR. BALL:  No, 50.

1          (Pause)

2     Q    I believe the wrong exhibit got removed, so I apologize

3     for that.

4     A    So DX --

5     Q    NX.

6     A    NX, we're going to NX now.

7     Q    050.  Okay.  Do you still have the Debtors' binder, the

8     original binder the Debtors gave you?

9     A    Yes, sir.

10              THE COURT:  It's there.

11    Q    Yes?  We can short circuit this because the same

12    document is in there.

13    A    The -- yeah, yeah.

14    Q    I apologize for that.

15    A    No worries.

16    Q    If you could look at the Debtors' binder at the exhibit

17    that's DX-1000.  And let me know when you've found that.

18    A    Yes, I'm at that tab, sir.

19    Q    Okay.  And do you recognize that as a copy of the first

20    amended joint plan that the Debtors filed on or about

21    February 15, 2018?

22    A    I do see that.

23    Q    And if I could ask you to look at Page 7 at Article

24    1(a)(16).

25    A    Page 7 of 98?

1    Q    7 of 98.  At the top of the page.  Do you see that

2    there's a definition of allowed in Paragraph 16 on that

3    page?  It's about near the end.

4    A    Yes, I do see that.

5    Q    Okay.  And do you see that there is, in Subsection C,

6    and particularly I want to direct your attention to C and C-

7    4, C provides that a claim is allowed -- "That claim or

8    interest that is upheld or otherwise allowed."  And then

9    skipping down to 4, "by final order including any such claim

10   to which Debtors had objected or which the bankruptcy court

11   had disallowed prior to such final order"; do you see that?

12   A    I do see that.

13   Q    All right. Do you understand that then that a final

14   order can result in a claim that had previously been

15   disallowed by the bankruptcy court becoming an allowed

16   claim?

17   A    Are you asking if the two -- this --

18              THE COURT:  You know, this is -- I'm sorry to

19   interrupt.  This is legal argument about the terms of the

20   plan and disclosure statement and order.  It has nothing to

21   do with the factual knowledge of this witness.  This -- you

22   can make all these arguments, based on the documents, when

23   we get to argue your objection.

24              MR. BALL:  Okay.  Thank you, Your Honor.

25   Q    Mr. Horton, you're aware of the $275 million

1    administrative fee claim, correct?

2    A    I am aware of the 275 and that NextEra's objecting to

3    whether or not that's a claim or not.  I am aware of that.

4    Q    And you're aware that that issue is currently upon

5    appeal with the Third Circuit, correct?

6    A    I am aware of that.

7    Q    And if NextEra is successful on its appeal, and then is

8    also successful in litigating the adversary proceeding the

9    Debtors brought about the termination fee, upon entry of a

10   final order you understand that NextEra's claim for the

11   termination fee would become an allowed fee claim -- allowed

12   claim under the plan?

13            MS. TERTERYAN:  Objection, Your Honor.  Again, it

14   calls for legal argument, legal conclusions and speculation

15   by the witness.

16            MR. BALL:  I don't believe it calls for that.  I

17   just want to understand this witness's understanding because

18   I'm going to have questions about whether there will be

19   money to pay the claim in those circumstances.

20            THE COURT:  Well, I'm going to sustain the

21   objection.  I think you can present him with a hypothetical,

22   assuming it is an allowed claim, do you understand that

23   there's money to pay it or not.  But I don't want him to

24   opine on the legal --

25            MR. BALL:  On the legal --

1          THE COURT:  -- language of the plan and -- which

2     is, I'm sure, contested.  So, that's not Mr. Horton's job.

3     Q    All right.  Mr. Horton, let me ask you to look back at

4     Exhibit DX-58 -- NX-58, sorry.  That's in the binder we

5     provided.

6     A    Page 28?

7     Q    It's NX-58 and I'm going to send you to Page 74 of 80.

8     A    74 of 80.  Correct.

9     Q    Okay.

10    A    I'm there, sir.

11    Q    All right.  And are these the provisions you -- that --

12    in the proposed order that -- in which the Debtors are

13    proposing to reserve the 275 million for -- in the NextEra

14    NEE plan reserve?

15    A    Are you in Paragraph 144 or are you in Paragraph 146?

16    Q    146.  I see there's no 145, but it's the next one after

17    144.

18          MR. MCKANE:  Heads will roll, Your Honor.

19    Q    So I'm looking at Paragraphs 146 through 151.  In the

20    section entitled "The NEE Plan --"

21    A    I understand.  I want to read through it, if you're

22    going to ask me a question about it, if you just mind.

23    It'll just take one second.

24    Q    Yeah.

25    A    Okay.  I've scanned over it.  Go ahead.

1    Q    All right.  Are you familiar with those provisions?

2    Have you reviewed them before?

3    A    I'm familiar with the general concept, yes.

4    Q    Okay.  So in general, the Debtors are proposing to set

5    aside a reserve of 275 million, correct?

6    A    That is correct.

7    Q    Are there provisions here under which that amount might

8    -- of the reserve, might be reduced to less than 275 million

9    before there is a final order on the termination fee

10   litigation?

11              MS. TERTERYAN:  Objection, Your Honor.  Calls for

12   a legal conclusion.  Calls for a legal conclusion.

13              THE COURT:  No, I'll allow that.  I think it calls

14   for an understanding of the plain meaning of the document.

15   Overruled.

16              MR. HORTON:  Under certain circumstances, as I

17   understand it, through conversations with my advisors, I

18   understand that under certain circumstances, a court order

19   for example, that the 275 could be reduced.

20   Q    All right.  And that could happen before there is a

21   final order on those termination fee litigation?

22   A    That's my understanding.

23   Q    All right.  And in those circumstances, if there is

24   less than 275 million retained in a reserve, and NextEra

25   succeeds on its termination fee claims, and gets a final

1    order in its favor, how would the claim be paid at that

2    point?

3    A    Look, I can tell you how I understand the language.

4    How the Court ultimately makes that determination, if you

5    bring it to the Court, makes a determination as to why that

6    it makes sense for the 275 to be reduced, I think that would

7    be something to be addressed at that point in time.  I can't

8    speculate on your hypothetical.  But to the extent there was

9    a court order, I'm assuming that there would be rationale

10   behind that in consideration of your concern regarding the

11   275.  Beyond that, I don't know.

12   Q    Would the Debtors have funds left, at that juncture, to

13   pay the 275, if NextEra succeeds on its claim of the 275?

14   A    There's a possibility that it would not.

15   Q    And in that circumstance, would the Debtors be able to

16   pay the claim if NextEra finally succeeds on its claim for

17   the termination fee?

18   A    If we don't have the 275 we wouldn't be able to pay the

19   275.

20   Q    Okay.  I just want to make sure I understand.  It is

21   possible that you will not have the funds and in that

22   circumstance would be unable to pay because you had not

23   reserved the 275; is that fair?

24   A    If the Court so determines that I would think that

25   that's a possibility or a hypothetical.  Yes.

1    Q    Mr. Horton, are you familiar with NextEra's alternative

2    claim for -- administrative claim for approximately $60

3    million that was presented as an alternative to its

4    termination fee claim?

5    A    I've heard of it.  Yes.

6    Q    Okay.  And you understand that that claim has not

7    currently been adjudicated by the Court?

8    A    It's my understanding.

9    Q    Right.  It's not been allowed or disallowed at this

10   juncture?

11   A    That's my understanding.

12   Q    In the event that NextEra is unsuccessful on its

13   termination fee claim, that -- but succeeds on the claim for

14   the $60 million, approximately $60 million, how would that

15   claim be paid as you -- if you understand?  If you

16   understand how it would be paid, can you tell me?

17           MS. TERTERYAN:  Your Honor, incomplete

18   hypothetical.  Calls for speculation.

19           THE COURT:  Yeah.  Overruled.  If you can.

20           MR. BALL:  I'll -- I can rephrase it, I think.

21           THE COURT:  Go ahead.

22   Q    If that would help you, Mr. Horton?

23   A    Anything would help at this point.

24   Q    You understand that we have an alternative claim for 60

25   million.  In the -- under the Debtors' proposal for a

1    reserve -- for reserving, is there any provision for a

2    reserve to be maintained for that $60 million in the event

3    that NextEra is not successful on its termination fee claim?

4    A    I'm not aware of any claims specifically for the $60

5    million.

6    Q    And if the -- NextEra loses on its termination fee

7    claim, is it your understanding that under the Debtors'

8    proposal, those funds would be released?

9    A    That's my understanding, yes.

10   Q    And used to pay creditors?

11   A    That's my understanding.

12   Q    And so in those circumstances would the Debtors be able

13   to pay NextEra's $60 million expense claim?

14   A    I don't know.  I -- again, it's a hypothetical.  I

15   don't -- I'm not sure that it will ever be allowed.  It's

16   not an allowed claim today.  I don't --

17   Q    And I'm asking if it is allowed, at that juncture, if

18   we succeed on the 60 million, will there be funds available,

19   would the Debtors have reserves or funds left that they can

20   use to satisfy the 60 million at that juncture?

21   A    Let me answer the question as I -- best I can.  We are

22   not setting aside $60 million, extra dollars, for your fees

23   at this point in time.

24   Q    And there's no agreement by the Debtors to use a

25   portion of the 275 as a reserve for that purpose; is that

1    right?

2    A    We are setting no dollars aside for the 60 million of

3    your expenses.

4    Q    Do you have an understanding, under the Debtors'

5    proposed order, whether it would be possible for a party to

6    make a motion the week after the plan goes effective to have

7    the $275 million reserve reduced?

8    A    I do understand that.

9    Q    Okay.  And what -- your understanding is that they

10   would be able to do that?

11   A    With court approval, yes.

12          MR. BALL:  No further questions, Your Honor.

13          THE COURT:  Thank you.

14          Any other cross?  Redirect?

15          MS. TERTERYAN:  No, Your Honor.

16          THE COURT:  Thank you, Mr. Horton.

17          MR. HORTON:  Mr. Sontchi, thank you.

18          THE COURT:  You're welcome.

19          MR. HORTON:  I want to acknowledge your

20   perseverance and dedication to this case.

21          THE COURT:  Well, I -- if I transferred it to one

22   of my colleagues they'd kill me.  But thank you, I

23   appreciate that.

24          Mr. McKane?

25          MR. MCKANE:  Your Honor, we are making real

1     progress today.

2            And Jane Sullivan is in the courtroom.  She has

3     tabulated the votes and filed a declaration.  And I'd yield

4     the podium to my colleague, Mr. McClain Thompson, to handle

5     the admission of her declaration.

6            THE COURT:  Thank you.

7            Mr. Thompson, good afternoon.

8            MR. THOMPSON:  Good afternoon.  Your Honor, for

9     the record, McClain Thompson, Kirkland & Ellis, on behalf of

10    the Debtors.

11           As Mr. McKane said, we'd like to introduce the

12    written direct of Ms. Sullivan at this time.  As Your Honor

13    knows, she's the executive vice president at Epic Bankruptcy

14    Solutions and is the director of their solicitation team.

15           Her declaration describes the solicitation and

16    voting processes for the Debtors' plan.  She filed her

17    declaration on the docket on November 1, 2017 at Docket

18    Number 12164. The Debtors also served her declaration on the

19    parties last Thursday.

20           Consistent with past practice, we have prepared

21    witness binders.

22           THE COURT:  Okay.

23           MR. THOMPSON:  May I approach?

24           THE COURT:  Yes.  Thank you.

25           MR. THOMPSON:  And Your Honor, Ms. Sullivan's

1    declaration is at the first tab, which has been marked DDIR-

2    Sullivan.

3              THE COURT:  Um hmm.

4              MR. THOMPSON:  In her declaration Ms. Sullivan

5    describes the creditor classes entitled to vote, Epic's

6    process for receiving and reviewing ballots, as well as

7    Epic's process for tabulating the ballots cast.

8              Her declaration includes three exhibits, which are

9    in the binder as well.  Exhibit A is a schedule of the

10   voting classes.  Exhibit B shows the voting results by each

11   voting class.  And, Your Honor, we would note that Exhibit B

12   reflects that all classes entitled to vote on the plan voted

13   to accept it.  And then finally, Exhibit C, shows a report

14   of two ballots that were excluded and the reasons for

15   excluding them.

16             With that, Your Honor, the Debtors would ask that

17   you would admit Ms. Sullivan's declaration into evidence,

18   including the exhibits to it.

19             THE COURT:  Is there any objection?

20             MR. HOGAN:  No.

21             THE COURT:  Okay.  Hearing no objection,

22   declaration of Ms. Sullivan at Docket 12164 is admitted

23   without objection, including its exhibits.

24        (DDIR-Sullivan Received into Evidence)

25             MR. THOMPSON:  Thank you, Your Honor.  And as Mr.

1    McKane said, Ms. Sullivan is in the courtroom if Your Honor

2    has any questions.  We have not received -- no parties

3    indicated their intent to question her.

4              THE COURT:  All right. Does anyone wish to cross

5    examine the witness?

6              MR. HOGAN:  No, Your Honor.

7              THE COURT:  All right.  I hear none.  I have no

8    questions.

9              MR. THOMPSON:  And may Ms. Sullivan be excused?

10             THE COURT:  She may.  Thank you very much.

11             MR. THOMPSON:  Your Honor, we would next turn to

12   Mr. Stuart.

13             THE COURT:  All right.

14             MR. THOMPSON:  If that's okay?

15             THE COURT:  Yes.

16             MR. THOMPSON:  Mr. Stuart is a managing director

17   at Alvarez and Marsal, the Debtors' restructuring advisor.

18             As of prior confirmation proceedings, Mr. Stuart

19   has prepared a liquidation analysis for purposes of

20   evaluating whether the plan satisfies Section 1129(a)(7) of

21   the bankruptcy code.  The Debtors' served Mr. Stuart's

22   declaration on the participating parties last Thursday.

23   There have been no objections to that.  And we have prepared

24   a binder.  And may I approach?

25             THE COURT:  Yes, you may.  Thank you.  Thank you.

1          MR. THOMPSON:  Mr. Stuart's declaration, again, is

2     at the first tab.

3          THE COURT:  Um hmm.

4          MR. THOMPSON:  And with Your Honor's permission, I

5     would make a brief proffer of Mr. Stuart's testimony?

6          THE COURT:  Any objection to the use of a proofer?

7          MR. HOGAN:  No, sir.

8          THE COURT:  All right.  I hear none.

9          MR. THOMPSON:  Your Honor, if called to testify

10    Mr. Stuart would describe his conclusion that the plan does

11    satisfy the best interest of creditors test under Section

12    1129(a)(7).  His analysis shows that the implied

13    reorganization value under the plan is greater than the

14    estimated recoveries in a liquidation, for all classes.  His

15    declaration includes additional details about the

16    assumptions and limitations that inform that analysis.

17          I would note for Your Honor that there are four

18    exhibits to the report and those illustrate the liquidation

19    analysis, assuming different outcomes regarding the NextEra

20    termination fee.  Exhibit A shows the recoveries assuming

21    the termination fee never becomes allowed, or due and

22    payable.  Exhibit B shows the recoveries, assuming it does

23    become allowed and all 275 million would be allocated to

24    EFIH.  Exhibit C is the same set up, becomes allowed -- I'm

25    sorry, becomes due and payable and all 275 million is

1    allocated to EFH.  Exhibit D is then a comparison.

2            And the take away, Your Honor, is that in each

3    scenario Mr. Stuart concludes that the estimated recoveries

4    for all classes are greater under the plan than they would

5    be in a hypothetical liquidation.

6            With that, the Debtors would request that Your

7    Honor admit Mr. Stuart's declaration, including the exhibits

8    into it, into evidence.

9            THE COURT:  Any objection?

10            MR. HOGAN:  Your Honor, no objection.  But I want

11    the record to be clear that we have designated testimony

12    from Mr. Stuart from prior confirmation hearings, we've

13    stipulated with the Debtors as to the admissibility of that

14    prior testimony.  And so long as it's clear that that's

15    coming in or will come in, we have no objection.

16            MR. THOMPSON:  And Your Honor, Mr. Stephanie will

17    introduce that stipulation and ask that Your Honor admit

18    that evidence formally.  It has been stipulated and Your

19    Honor has entered that stipulation.

20            THE COURT:  Yes.  Okay.  It's admitted, the

21    declaration and the exhibits are admitted without objection.

22    And of course the proffer is admitted.

23        (DDIR-Stuart Received into Evidence)

24            THE COURT:  Does anyone wish to cross examine the

25    witness?

1           MR. HOGAN:  No, Your Honor.

2           MAN:  No, Your Honor.

3           THE COURT:  Okay.  I --

4           MR. THOMPSON:  And Mr. Stuart is here if Your

5    Honor has questions.

6           THE COURT:  Very good.  I have no questions.

7           MR. THOMPSON:  And just as one housekeeping

8    matter, I do have green sheets for Mr. Stuart and Ms.

9    Sullivan.  They are largely blank.

10           THE COURT:  Thank you, Mr. Thompson.

11           MR. MCKANE:  Your Honor, we are proceeding with

12    great speed.  We only have two witnesses left.

13           THE COURT:  Okay.

14           MR. MCKANE:  And then -- and also the admission of

15    the asbestos doc stipulation and one relevance objection.

16    Your Honor, if it's suitable or acceptable to Your Honor, we

17    could break for lunch at this time?

18           THE COURT:  Any objection?  They never objection.

19           MR. HOGAN:  No objection.

20           THE COURT:  They don't object to lunch.  No, of

21    course.  Yes, that's fine.  We'll take lunch now.  We'll try

22    to reconvene as close as possible to 1:30.  Thank you.

23           MR. MCKANE:  Thank you, Your Honor.

24           MR. HOGAN:  Thanks, Your Honor.

25        (Recess)

1          CLERK:  All rise.

2          THE COURT:  Please be seated.  Excuse me, sorry.

3     Good afternoon.

4          MR. GANTER:  Good afternoon, Your Honor.  For the

5     record, Jonathan Ganter of Kirkland & Ellis on behalf of the

6     Debtors.  Your Honor, at this time, the Debtors would like

7     to introduce the written -- the declaration of Mr. David

8     Ying.

9          Mr. Ying is a senior managing director at

10    Evercore, the Debtor's financial advisors. No party is

11    challenging feasibility, but as with prior confirmation

12    proceedings, Mr. Ying has examined the feasibility of the

13    plan for purposes of evaluating whether the plan satisfies

14    the requirements of Section 1129(a)(11) of the Bankruptcy

15    Code.

16         Your Honor, the Debtors served Mr. Ying's

17    declaration on the participating parties last Thursday. And

18    consistent with our past practice, we prepared a binder for

19    the Court, if I could approach?

20         THE COURT:  Yes.  Thank you.

21         MR. GANTER:  Your Honor, Mr. Ying's declaration is

22    at the first and only tab of the binder that I just gave

23    you. It's at (indiscernible) marked DVIR Ying.  And with

24    Your Honor's permission, I would make a brief proffer of Mr.

25    Ying's testimony.

1            THE COURT:  Any objection to a proffer?

2            MAN:  No sir.

3            MR. HOGAN:  No objection.

4            THE COURT:  Okay.  You may proceed.

5            MR. GANTER:  Your Honor, if called to testify, Mr.

6    Ying would describe the Debtor's efforts to (indiscernible)

7    market Oncor the implied value of the bids for Oncor, and

8    its conclusion that the plan is feasible for purposes of

9    Section 1129(a)(11).

10            In Mr. Ying's opinion, it is highly likely the

11   reorganized EFH and reorganized EFIH will be able to satisfy

12   future obligations. To reach that conclusion, Mr. Ying

13   considered the $9.45 billion of equity capital that Sempra

14   is contributing for the Debtor's 80 percent economic

15   interest in Oncor.

16            Sempra's substantial financial resources and

17   ability to raise third party debt financing and a cash

18   distribution, distributions expect to flow (indiscernible)

19   Oncor.

20            Your Honor, Mr. Ying's declaration includes

21   additional details regarding the Debtor's multi-year

22   marketing processes for Oncor. The implied value of Sempra's

23   bid, compared to the other bid received during the summer of

24   2017 marketing process, and a pure trading group analysis of

25   the Sempra bid.

1          With that, Your Honor, the Debtors would request

2    that the Court admit Mr. Ying's declaration into evidence.

3    And again, that's DVIR Ying.

4          THE COURT:  Any objection?

5          MR. HOGAN:  Your Honor, the only issue I have is

6    again, this is predicated on the stipulation that we're

7    going to deal with next about our exhibits from the prior

8    proceedings, and those items being introduced into evidence.

9    We have no issue with this proffer.

10          THE COURT:  Okay, understood.

11          MR. HOGAN:  Thank you.

12          THE COURT:  Anyone else?  No?  All right, it's

13    admitted subject to that reservation.

14

15          (DVIR Ying Admitted Into Evidence)

16          MR. GANTER:  Thank you, Your Honor.  No party has

17    indicated that they intend to question Mr. Ying, but he is

18    present in the court room, if Your Honor would like to ask

19    him any questions.

20          THE COURT:  All right.  Does anyone wish to cross-

21    examine Mr. Ying?

22          MAN:  No, Your Honor.

23          MR. HOGAN:  No, Your Honor.

24          THE COURT:  Okay.  I have no questions.

25          MR. GANTER:  And Mr. -- Your Honor, we also have,

1    consistent with our past practice, a green sheet with

2    Exhibits, certainly Exhibits cited in Mr. Ying's

3    declaration, which we would like to move into evidence,

4    pursuant to the stipulation that my partner, Bryan Stephany

5    is going to address accurately.

6              THE COURT:  Okay.  Please approach.

7              MR. STEPHANY:  Thank you.

8              THE COURT:  Thank you.

9              MR. GANTER:  And with that, Your Honor, I will

10   cede the podium to Bryan Stephany.

11             THE COURT:  All right.

12             MR. STEPHANY:  Good afternoon, Your Honor.

13             THE COURT:  Good afternoon.

14             MR. STEPHANY:  For the record, Bryan Stephany,

15   Kirkland & Ellis on behalf of the Debtors.  Your Honor,

16   before addressing the asbestos stipulations, we have a--the

17   Debtor's had a number of exhibits that were identified on

18   their Exhibit List, which we'd seek to either move into

19   evidence or ask the Court to take judicial notice of.  And

20   we've prepared a -- the traditional green sheet, if I may

21   approach?

22             THE COURT:  You may.  Before we -- as you're doing

23   that, we did not admit these Ying exhibits.  Are we going to

24   admit them on the list?  One is identified as being subject

25   to the stipulation, but the others don't appear to be, so I

1    just want to make sure the record's clear.

2            MR. GANTER:  Your Honor, yes, we would like to

3    move those exhibits into evidence, with the caveat that the

4    one is subject to the stipulation.

5            THE COURT:  All right, so DX80 is -- can we make

6    that?

7            MR. HOGAN:  Yes, Your Honor, subject to the

8    stipulation.

9            THE COURT:  Okay, it's admitted.

10           (Exhibit DX80 Admitted Into Evidence)

11           THE COURT:  And DX1086 through 1092 are admitted.

12           MR. HOGAN:  No objection.

13           (DX1086 through DX1092 Admitted Into Evidence)

14           MR. GANTER:  Thank you, Your Honor.

15           THE COURT:  Thank you.

16           MR. STEPHANY:  Your Honor, turning back to the

17   additional exhibits from the Debtors that we would seek to

18   either move into evidence or take judicial notice of, we

19   have not been advised of any objection to these exhibits,

20   and we've conferred with Mr. Hogan and also pursuant to this

21   stipulation that Mr. McKane articulated earlier, limiting

22   the admissibility for purposes of this confirmation

23   proceeding, not other -- any other proceedings.

24           Pursuant to those, in my understanding, is that

25   there are no objections to these exhibits, and we would ask

1    to move them in.  And I can do that in two parts.  Those we

2    are admitting, and those we are seeking judicial notice for.

3                 THE COURT:  Okay.

4                 MR. STEPHANY:  For the exhibits that the Debtors

5    seek to admit, I'll do ranges here to expedite, it's DX1029

6    through 1032, DX1048 all the way to DX1077, and then DX1081

7    to DX1085.  And the Debtors would seek to admit all of those

8    exhibits into evidence.

9                 THE COURT:  Any objection?

10               MR. HOGAN:  No, Your Honor.

11               THE COURT:  It's admitted.  They're admitted.

12               (Exhibits DX1029-1032, DX1048-1077, DX1081-1085

13   Admitted Into Evidence)

14               MR. STEPHANY:  And for the second category, Your

15   Honor, the exhibits that the Debtors would ask the Court to

16   take judicial notice of, again, I'll do ranges to expedite

17   it, DX1002 and 1003, DX1006 through DX1011, DX1013 through

18   DX1016, DX1018 through DX1021, and DX1023 through DX1028.

19   We would ask the Court to take judicial notice of those.

20               THE COURT:  Any objection?

21               MAN:  No sir.

22               MR. HOGAN:  No, Your Honor.

23               THE COURT:  The Court will take judicial notice of

24   those exhibits.

25               MR. STEPHANY:  Thank you, Your Honor.

1          THE COURT:  You're welcome.

2          MR. STEPHANY:  Turning now to the asbestos

3    objectors, the stipulations with the asbestos objectors, as

4    Your Honor is aware, from the previous -- that Mr. McKane

5    and Mr. Hogan provided during the pre-trial conference, the

6    asbestos objectors and the Debtors have worked

7    collaboratively to streamline the evidentiary presentation,

8    considering asbestos related issues for purposes of this

9    hearing.

10          The results of those efforts is -- are

11    memorialized in three stipulations, all of which have been

12    entered on the docket, and ordered by the Court.  And with

13    Your Honor's permission, I'd briefly ask to summarize those

14    stipulations for purposes of the record.

15          And I'm sorry -- and additionally, there is one

16    evidentiary dispute concerning certain exhibits that the

17    asbestos objectors intend to admit and we're prepared to

18    argue that as well, at this time.  But beginning with the

19    uncontested matters, we recognize, like I said, that each of

20    these has been entered by the Court, and is on the docket.

21    But we do have courtesy copies for the Court and Mr. Hogan,

22    for purposes of this proffer in summary.

23          THE COURT:  Okay, please approach.

24          MR. STEPHANY:  Thank you.

25          THE COURT:  Thank you.

1          MR. HOGAN:  Thank you.

2          MR. STEPHANY:  Your Honor, beginning with the most

3    recent one, which would be the third in your packet, this

4    order was entered by the Court this past Friday at Docket

5    Entry 12703.  The Debtors and the asbestos objectors worked

6    together to designate large portions of prior -- of the

7    record from prior proceedings, both the December 2016 motion

8    to dismiss hearing, as well as the February 2017

9    confirmation hearing with respect to the NextEra plan.

10          As detailed in the stipulation, the materials from

11   both hearings that have been designated, include exhibits,

12   written directs, hearing demonstratives, and designated

13   portions of both the deposition transcripts, as well as

14   hearing transcripts.

15          All of those materials, including the color coded

16   designations for the hearing transcripts and designation

17   transcripts -- deposition transcripts, excuse me -- were

18   delivered to the Court this morning, and are here in the

19   courtroom today, to be included in the Court's record.

20          Rather than reading all of those items into the

21   record, we would ask simply that Your Honor admit the

22   evidence that's identified in the stipulation in order, at

23   Docket Entry 12703, subject to the terms therein.

24          THE COURT:  Mr. Hogan?

25          MR. HOGAN:  No objection, Your Honor.

1          THE COURT:  I wouldn't think so.  The exhibits and

2     other documents are admitted, or judicial notice is taken of

3     them, including the hearing transcripts and the deposition

4     transcripts as identified, and the hard copies that have

5     been delivered to chambers without objection, and pursuant

6     to the exact terms of the stipulation in the order the Court

7     approved on February 23rd, at Docket 12703.

8          (Docket 12703 Admitted Into Evidence)

9          MR. STEPHANY:  Thank you, Your Honor.

10          MR. HOGAN:  Thank you.

11          MR. STEPHANY:  The second stipulation, Your Honor,

12     that we'd like to address is that which was entered by the

13     Court on December 1st, 2017 at Docket Entry 12294.  And as

14     Your Honor may recall, last February's confirmation hearing,

15     the Debtors called Dr. Thomas Vasquez from Ankura Consulting

16     Group to provide a forecast of the total nominal costs to

17     result, pending a future asbestos-related claims against the

18     E side Debtors, and to obviate the need to recall Mr. -- Dr.

19     Vasquez, the parties have agreed, pursuant to that

20     stipulation, that Dr. Vasquez's opinion shall be admissible

21     in these proceedings for the purposes of the Debtor's

22     affirmative case under 1129 of the Bankruptcy Code, but does

23     not serve as a cap or a floor on the amounts actually due or

24     any determination as to the (indiscernible) of liability.

25          Dr. Vasquez's opinion is reflected in the written

1    direct declaration that he submitted in connection with last

2    year's confirmation hearing.  And that declaration was

3    amongst the materials that the parties had designated,

4    pursuant to the prior stipulation that we just discussed,

5    and was admitted into the evidence.

6            THE COURT:  All right, for purposes of the record,

7    I've already entered these orders, but for purposes of the

8    record, I'm happy to incorporate that order into the record

9    for today, and incorporate its terms and its Docket 12294

10   approved on December 1, 2017.

11           MR. HOGAN:  Thank you, Your Honor.  With one

12   caveat, just so I'm clear, Your Honor.

13           THE COURT:  Yes?

14           MR. HOGAN:  I am an army of one.  And accordingly,

15   I just need to confirm, and in one of the breaks, I'll do

16   it, that the provision in Paragraph 2 of that stipulation

17   and order regarding the confirmation language, so the

18   language in the confirmation order, I just need to confirm

19   that that language in fact exists within the confirmation

20   order.  And I'll -- that's on me, but again, I'm an army of

21   one, Your Honor.

22           THE COURT:  No, of course.  And I'm not -- I'm

23   right there with you.  I'm an army of three, so I got you

24   triple.  Absolutely, we'll allow you to make sure that's

25   true.  And if not, we'll reopen the issue, whether the Court

1      will approve the stipulation, for purposes of this record.

2                MR. HOGAN:  Thank you.

3                THE COURT:  You're welcome.

4                MR. STEPHANY:  Thank you, Your Honor.  And Your

5      Honor, turning to the third and final stipulation that the

6      Debtors have reached with the asbestos objectors.  It's the

7      order approving the party's stipulation that the Court has

8      entered on January 30th, 2017, Docket Entry Number 12547.

9                This stipulation concerns the affidavits and other

10     documents that the asbestos objectors attached to their

11     confirmation brief at Exhibits A through D.  And there's

12     multiple subparts of this.  They were also identified on the

13     asbestos objector's exhibit list as AX157, which is the

14     entire objection in all exhibits.  But like I said, we're

15     focused on Exhibits A through D and their subparts.

16               The stated purpose of that evidence is to

17     establish the client -- the asbestos objector's clients

18     standing to object to the plan.  And it consists of medical

19     records, employment histories, and affidavits that, among

20     other things, indicate that the individual plan is to not

21     receive personal notice of the asbestos bar date.

22               The Debtors, as reflected in the stipulation, the

23     Debtors are not objecting to this evidence on authenticity,

24     hearsay, or other grounds, in -- with respect to one

25     exception, and that is that the Debtors simply reserve the

1    right to object to the relevance of that information.

2            And we are -- we understand that the asbestos

3    objectors intend to seek to admit those documents and

4    exhibits attached to their confirmation objection.  And we

5    take the position that that information is not relevant to

6    these confirmation proceedings.  And we're prepared to argue

7    that relevance objection now, if Your Honor would so like.

8            THE COURT:  Just give me a moment.  I'm reading

9    it.  Mr. Hogan, would you like to deal with this now?

10           MR. HOGAN:  Well, Your Honor, I haven't actually

11   used it to cross-examine anybody.

12           THE COURT:  Well, that's why.  I mean, we can

13   preserve it for a later time, if that's...

14           MR. HOGAN:  I would prefer.  I mean --

15           THE COURT:  Okay.

16           MR. HOGAN:  -- I believe the next matter is Mr.

17   Wright, and I was going to utilize it during his cross-

18   examination.  So, we can address it at that time if you're

19   fine with that, Your Honor.

20           THE COURT:  Any objection?

21           MR. STEPHANY:  Your Honor, we're happy to proceed

22   however the Court would like.  We are prepared -- we believe

23   it's a categorical objection to all of the information

24   contained in Exhibits A through D.  But, we're happy to

25   address that now or later --

1          THE COURT:  All right.  We'll let him use it, and

2     then when he uses it, you can raise the objection and we'll

3     talk about it then.

4          MR. STEPHANY:  Thank you, Your Honor.

5          THE COURT:  Six of one, half dozen of the other.

6     But it's his document, so I think we should defer to Mr.

7     Hogan as to how he'd like to put them before the Court.

8          MR. HOGAN:  Thank you, Your Honor.

9          MR. STEPHANY:  Understood.

10          THE COURT:  You're welcome.

11          MR. HOGAN:  Your Honor, if I could --

12          THE COURT:  However, can we otherwise take notice

13     of the stipulation and order?  Because I think the way the

14     stip and order is written, it preserves the relevance

15     objection to be dealt with and then it has a lot of

16     provisions that deal with what happens if I allow the

17     evidence in.  So, I think we can take notice of the

18     stipulation and order for the record?

19          MR. HOGAN:  Please, certainly.

20          THE COURT:  Yeah.  We'll do that.  And that's

21     incorporating the stipulation and order approved by the

22     Court on January 31, 2018, Docket 12547.

23          MR. HOGAN:  Thank you, Your Honor.  Just one more

24     bit of housekeeping, Your Honor.  Daniel Hogan on behalf of

25     the asbestos objectors.  Your Honor, with regard to our

1    other exhibits, that being AX-118 through AX-164, with AX-

2    157 carved out, because that's the objection that we just

3    discussed, I would just ask the Court to take judicial

4    notice of those filings.  They are all filings made within

5    the foundation of this proceeding.

6              THE COURT:  Any objection?

7              MR. STEPHANY:  No objection, Your Honor.

8              THE COURT:  All right.  Court takes judicial

9    notice of those filings.

10             MR. HOGAN:  Thank you, Your Honor.

11             THE COURT:  So, next witness?  Who's next?

12             MR. SOWA:  Good afternoon, Your Honor.  For the

13   record, Justin Sowa, of Kirkland & Ellis, on behalf of the

14   Debtors.  At this time, the Debtors will call Andrew Wright.

15             THE COURT:  Very good.  Good afternoon, Mr.

16   Wright.

17             MR. WRIGHT:  Hello.

18             THE COURT:  Please take the stand and remain

19   standing for your affirmation.

20             CLERK:  Please raise your right hand.  Do you

21   affirm you will tell the truth, the whole truth, and nothing

22   but truth to the best of your knowledge and ability?

23             MR. WRIGHT:  I do.

24             CLERK:  Please state and spell your name for the

25   record.

1            MR. WRIGHT:  Andrew Wright, A-N-D-R-E-W, W-R-I-G-

2    H-T.

3            CLERK:  Thank you.

4            MR. SOWA:  And Your Honor, we have a witness

5    binder for Mr. Wright, if I may approach?

6            THE COURT:  You may.

7            MR. SOWA:  Thanks.

8            MR. WRIGHT:  Thank you.

9            MR. SOWA:  May I proceed?

10           THE COURT:  Yes, you may.

11              DIRECT EXAMINATION OF ANDREW WRIGHT

12   BY MR. SOWA:

13   Q    Good afternoon, Mr. Wright.

14   A    Good afternoon.

15   Q    Mr. Wright, what is your current position with the

16   Debtors?

17   A    I am the Executive Vice President, General Counsel and

18   Secretary.

19   Q    Of which entity?

20   A    Of all of the Debtors, all the E-side Debtors.

21   Q    And how long have you held those positions?

22   A    Since October of 2016.

23   Q    And what position did you hold prior to October 2016?

24   A    I was the Vice President and Deputy General Counsel of

25   the Debtors.

1   Q    Mr. Wright, did you prepare a declaration in

2   anticipation of your testimony here today?

3   A    Yes, I did.

4   Q    And can you please turn to the tab of your binder

5   labeled D-DIR Wright?

6   A    Okay.

7   Q    Do you recognize this document?

8   A    Yes, I do.

9   Q    And what you recognize it to be?

10  A    It's my declaration, my written declaration, that was

11  filed with the Court.

12  Q    And is this declaration true and accurate to the best

13  of your knowledge?

14  A    It is.

15           MR. SOWA:  Your Honor, we would move D-DIR Wright

16  2018 into evidence.

17           MR. HOGAN:  No objection.

18           THE COURT:  Okay.

19           MR. STEPHANY:  No objection.

20           THE COURT:  It's admitted.

21       (D-DIR Wright 2018 Admitted into Evidence)

22  Q    Mr. Wright, when did you first become involved in the

23  Debtors' restructuring efforts?

24  A    I've been involved since day one.  So, we began

25  planning for the eventual bankruptcy of the Debtors a few

1    years before we filed, so I'd say 2012 timeframe.

2    Q    Can you please give an overview of your role and

3    involvement in those restructuring efforts over the course

4    of the Chapter 11 cases?

5    A    Sure.  I've been heavily involved in all aspects of the

6    cases from the beginning, as I said, prior to the bankruptcy

7    filing, the so-called liability management program that we

8    went through.  But then once we filed for bankruptcy,

9    numerous plans, disclosure statements, I think Sempra Merger

10   Agreement is the fourth one that we negotiated and a lot of

11   the corporate governance issues, also the financing efforts,

12   the DIPs that we put in place along the way.  So, at a high

13   level, that's what I've been involved with.

14   Q    And over the course of that, have you worked with the

15   Debtors' advisors?

16   A    Yes, I've worked with both our legal advisors and our

17   financial advisors.

18   Q    Now, turning to the current plan --

19   A    Okay.

20   Q    -- were you involved in the Debtors' negotiations with

21   Sempra that led to the transactions contemplated by the

22   plan?

23   A    Yes, I was.

24   Q    Can you describe your involvement in that process?

25   A    Sure.  Mr. Keglevic, Mr. Horton and I were deeply

1    involved in negotiating both the plan and the merger

2    agreement with Sempra, while we were also at the same time

3    working to get the Berkshire Hathaway Merger Agreement

4    approved.  At the same time, we were working with our

5    creditor group, in particular Elliot, with respect to the

6    plan support agreement that was ultimately signed.  So, I

7    was heavily involved in all of those negotiations.

8    Q    Were you involved in diligence efforts associated with

9    the Bershire and Sempra processes?

10   A    Yes, of course.  With respect to both of them, both of

11   them were big M&A transactions, and both parties did the

12   sort of standard typical diligence exercise that you would

13   expect for transactions of that nature.

14   Q    And were you involved in the development of the

15   documents underlying the transactions?

16   A    Yes.  I didn't have the pen on them, but I certainly

17   oversaw the lawyers that were drafting them, at least from

18   the Debtors' perspective.

19   Q    So, is it safe to say you're familiar with the plan and

20   the merger agreement?

21   A    Yes.

22   Q    Okay.  Now I'd like to turn to some more recent events.

23   Are you aware that the Debtors filed debtors a confirmation

24   order last night?

25   A    Yes, I am.

1    Q    And are you aware that that order includes a reserve

2    construct for the benefit of NextEra?

3    A    Yes, I am.

4    Q    Now, how much money is that reserve being funded with

5    at closing?

6    A    $275 million.

7    Q    And where does that money go?

8    A    It goes into an escrow account.

9    Q    Do you know the details of the escrow account?

10   A    It's proposed that it would be with Citibank and the

11   parties, NextEra, the Debtors, and the plan administrator

12   board would negotiate in good faith the terms of that escrow

13   agreement.

14   Q    Who's responsible for overseeing the escrow?

15   A    Following closing, it'll be the plan administrator

16   board.

17   Q    That does that confirmation order address allocation of

18   the sources of funding for that reserve?

19   A    No.  It was my understanding that that allocation issue

20   will be decided at a later date and the negotiations are

21   ongoing between the disinterested directors at EFH and EFIH

22   with respect to it.

23   Q    Do you have an understanding of how that reserve could

24   be modified?

25   A    The only way that I understand it could be modified is

1    by order of the Court.

2    Q    And do you have any understanding of if that

3    modification needs to be consistent with the terms of the

4    plan?

5    A    Yes, it does.

6    Q    And what happens if the reserve is not modified, say at

7    the time of a final order resolving the NextEra

8    (indiscernible)?

9    A    Well, it depends on who wins, I guess, in the appeal or

10   what the final order says.  So if ultimately, NextEra is

11   found -- is the winner, then the $275 goes to NextEra.  If

12   NextEra is not the winner, by final non-appealable order,

13   then the $275 goes to the creditors.

14   Q    Now, why did the Debtors choose this approach with

15   regard to the reserve?

16   A    Well, we wanted -- we wanted, as Ms. Yenamandra said at

17   the beginning, we wanted to provide flexibility.  But at the

18   same time, providing that flexibility we wanted protection

19   for both sides so that either side can make any argument

20   they would like in front of the Court, and they'd have to

21   live by the Court's order.

22   Q    Is it your understanding that all parties rights are

23   protected under this construct?

24   A    That's the intent, yes.

25   Q    All right, I'd like to turn back to the plan and the

1    merger agreement now.

2    A    Okay.

3    Q    Mr. Horton testified earlier about some of the steps

4    that led to the development of the plan merger.  Now I'd

5    like to talk through what's necessary to get from here to

6    the finish line.

7    A    Okay.

8    Q    Now, you said you're familiar with the plan and the

9    merger agreement.  Are you familiar with the conditions to

10   closing the merger and the plan?

11   A    Yes.

12   Q    And what are the significant conditions to closing?

13   A    Well, there's a number of them.  There's the typical

14   bring-down of the reps and warranties and covenants in the

15   merger agreement.  There is a no material adverse effect

16   condition in the merger agreement.  There is a number of

17   regulatory approvals that have to be received before the

18   merger agreement, or the merger could be consummated.

19   Obviously, one thing that has to happen is that this Court

20   would have to confirm the plan of reorganization.  I'd say

21   those are the material ones.

22   Q    Are there any tax aspects that are --

23   A    Oh, yeah.  There is two things related to tax.  There

24   is a number of legal opinions that are given by the outside

25   law firms.  Those are condition to closing.  And also, the

1    receipt of the supplemental PLR from the IRS.  In both

2    instances, those are meant to affirm the tax free nature of

3    the spin that was done with Vistra, or the T-side, in

4    October of 2016.

5    Q    Now, had you been involved in the party's efforts to

6    obtain these regulatory approvals?

7    A    Yes, I have.

8    Q    And what's been the nature of your involvement?

9    A    I've worked hand-in-hand with both opposing counsel and

10   our own set of regulatory counsel.  And as you might

11   imagine, each of these are very particular in nature, and so

12   we've had specific regulatory counsel for each one of our --

13   each one of these items.

14   Q    And what specific regulatory approvals are necessary

15   for the merger to close?

16   A    Well, there's a number of them.  I mentioned the

17   supplemental private letter ruling from the IRS, the Public

18   Utility Commission of Texas must approve the change of

19   control or indirect change of control of Oncor.  The Federal

20   Energy Regulatory Commission under the (indiscernible) also

21   has to approve.  The Federal Communication Commission, the

22   FCC, has an approval here as well.  And then there is a

23   regulator in Vermont because of the captive insurance

24   company that's based in Vermont that also has to approve the

25   transaction.

1   Q    Okay.  Let's take each of these in turn.

2   A    Okay.

3   Q    Did you assist with the preparation of a demonstrative

4   to assist your testimony today?

5   A    Yes, I did.

6   Q    If you look at your binder, the tab is labeled D-DEM.

7   The document within it is labeled D-DEM Wright 1.  Do you

8   recognize this document?

9   A    Yes, I do.

10  Q    Is that the demonstrative that you had prepared?

11  A    Yes, it is.

12  Q    Okay.  So, starting with PUCT, why is PUCT approval

13  required for this merger?

14  A    Well, as I mentioned before, there is an indirect

15  change of control of Oncor, as when Sempra acquires

16  reorganized EFH and effectively a new parent company,

17  indirect parent company of Oncor.  And under the rules and

18  regulations of the Public Utility Commission in Texas, their

19  consent is required.

20  Q    Can you describe the PUCT process for this transaction

21  up through last week?

22  A    Sure.  I know we've gone through this a couple of times

23  before, but -- and the process has generally been the same

24  in each one of these.  But a change of control application

25  was filed in October of last year by both Sempra and Oncor.

1    That change of control application contained a number of --

2    a bunch of information about the transaction.  Also

3    contained a number of commitments that Sempra would make to

4    the Public Utility Commission.

5              Shortly after that happened, a -- what I'll call

6    kind of a discovery phase began, and there were a number of

7    requests for information filed by certain intervenors in the

8    PUC staff with respect to the transaction.  Simultaneous, as

9    that was ongoing, there was negotiation between the key

10   intervenors, the PUC staff, Oncor and Sempra with respect to

11   the list of commitments that Sempra and Oncor would make as

12   part of the transaction.  And I'm happy to say that shortly

13   before Christmas, the PUC staff, Sempra, Oncor and what I'll

14   call the key intervenors came to an agreement on a set of

15   commitments, and they entered into a stipulation, which was

16   filed with the Public Utility Commission.

17             Over the course of the next four to six weeks,

18   Sempra and Oncor continued to work with the remaining

19   intervenors to try to gain their support.  And eventually

20   they got to that point.  A few weeks ago, all of the

21   intervenors agreed to the stipulation, slightly modified

22   from what was published in late December.

23             The PUC had scheduled a hearing on the merits for

24   the application for late February, last week, actually.  And

25   because of the unanimity in support of the transaction, the

Page 125

1    PUC cancelled that hearing.  And at their last open meeting,

2    they discussed it, and that brings us sort of to the current

3    time.

4    Q    And that last open meeting, was that the February 15th,

5    2018 meeting?

6    A    Yes, it was.

7    Q    Now, did you attend that meeting?

8    A    No, I did not.

9    Q    Were you able to watch it in some form?

10   A    Yes.  The meetings of the PUC are streamed over the

11   Internet, and so I was in Chicago doing some prep work and

12   for this hearing, actually, and we listened to it live, yes.

13   Q    Okay.  And are you aware that those livestreams are

14   recorded and then posted on the PUCT's website?

15   A    Yes, I am.

16          MR. SOWA:  Your Honor, we actually have a short

17   clip from that hearing prepared.  We have marked it as DX-

18   1096.  With your permission, we'd ask to play the video.

19   It's about two minutes long.

20          THE COURT:  Okay.

21       (Video begins)

22          WOMAN 1:  Okay.  Agenda Item Number 1747675, which

23   is the Oncor Sempra merger.  I again want to thank all the

24   parties for the hard work they've put into this.  I know it

25   took a lot of hard work to get us here.  What I would like

1   to do is to cancel the hearing and delegate to

2   (indiscernible) to prepare a proposed order for the -- I'd

3   like for the March 8th meeting, but you don't want me to

4   (indiscernible) date, right?

5            MAN 1:  We're on our way there, I think.

6            WOMAN 1:  Okay.  Anyway, that's where I am, and

7   I'll see what you're all going to agree.

8            WOMAN 2:  I agree.

9            WOMAN 1:  Okay.  You don't think (indiscernible)?

10           MAN 2:  No, ma'am, but I would also say that there

11  is a pre-hearing scheduled at 1:30 this afternoon in this

12  case, and given the case that the hearing's cancelled, the

13  judge will be issuing an order as quick as he can cancelling

14  that pre-hearing conference.

15           WOMAN 1:  And I understand you all are in from

16  California.  Welcome to Texas.

17           WOMAN 2:  We love being here.

18           WOMAN 1:  Come back and see us any time.  Thank

19  you all very much.  And Mr. Nye, where are you?  Why are you

20  sitting over there?  You're not on staff.  (indiscernible)

21  enjoy the staff?  Thank you for all you all's hard work

22  throughout this.  I notice -- oh, Mr. (indiscernible),

23  please stand up too.  I know it's been a very painful

24  process for you all, and thank you very much for all you all

25  have done.  And Bryan (indiscernible), we couldn't have

Page 127

1    gotten here without Bryan leadership on this.

2              BRYAN:  (indiscernible)

3              WOMAN 1:  Thank you all.  Anything else on that?

4              WOMAN 2:  I feel like we should have a

5    (indiscernible) I don't know (indiscernible).

6              WOMAN 1:  That's more (indiscernible).

7              WOMAN 2:  Yeah.

8              WOMAN 1:  Okay.

9         (Video ends)

10             THE COURT:  Why didn't we do that in April of

11   2015?  I don't understand.

12        (Laughter)

13             MR. SOWA:  Would've loved to.

14   Q    So, Mr. Wright, in light of that video --

15             THE COURT:  I've confirmed two plans that they've

16   tagged, so maybe I should tag their approval.

17        (Laughter)

18             MR. SOWA:  Please no.

19   Q    Mr. Wright, in light of that video, and your

20   understanding of the negotiations and with the assumption

21   that Judge Sontchi's threat is hollow --

22        (Laughter)

23   Q    -- what is your understanding of the current state of

24   play with regard to the PUCT's approval of this merger

25   agreement?

1    A    Sure.  So you heard in the video that the Commission

2    has requested their staff -- and that was the person sitting

3    in front of them -- to develop an order approving the change

4    of control application.  And the PUC has an open meeting

5    scheduled on March 8th, in a couple of weeks -- or less than

6    a couple of weeks now, I guess.  And they will take that

7    application up at that time.  I have a feeling that there

8    will be some discussion about it.  There may be hopefully

9    only some small edits, if any.  And then our expectation is

10   that they will move forward and approve the application.

11   Q    Now, turning from the PUCT to the other regulatory

12   approvals, starting with the FCC, why is FCC approval needed

13   for this transaction?

14   A    The FCC approval is needed because Oncor itself owns a

15   number of wireless FCC licenses.  In effect, they're -- I

16   call them sort of super walkie-talkies out in the field.

17   They use these walkie-talkies to talk back and forth and

18   they have FCC licenses, Spectrum licenses, associated with

19   them.  And so as a fairly ministerial matter, the FCC needs

20   to approve the transaction because there's a change of

21   control of Oncor.

22   Q    And what's the status of those approvals?

23   A    Well, those applications were submitted earlier this

24   year.  We expect that in the next seven to 10 days we should

25   get approval of those applications.  We don't know at this

1     point of any substantive issues, and don't expect any.

2     Q     So, do you have any expectation that those FCC

3     approvals should hold up closing?

4     A     No, I do not.

5     Q     Turning to FERC, what is the status of the FERC

6     approvals?

7     A     Well, we received the approval from the FERC in late

8     year, December 11th, 2017.

9     Q     Now, turning to the Vermont Department of Financial

10    Regulation, why are those approvals necessary?

11    A     Well, one of the subsidiaries, it's a non-debtor

12    subsidiary.  VFH is a captive insurance company.  Many

13    captive insurance companies are incorporated in the state of

14    Vermont.  This is a captive insurance company that deals

15    with some of the worker's comp claims with respect to

16    discontinued operations of the former gas company.  And as a

17    matter of course, if there is a change of control of a

18    captive insurance in Vermont, they are required to approve

19    that transaction.  And they did so late last year.

20    Q     And then turning to the tax rulings, what is the status

21    of those tax rulings?

22    A     Well, again, we've received a supplemental private

23    letter ruling from the IRS.  We got that late last year in

24    November, actually.  And it did confirm that the spin of

25    Vistra or the T-side Debtors back in October 2016, that its

1    treatment or characterization remains in effect, assuming we

2    close the Sempra transaction.

3    Q    So, that means the tax free spin is preserved?

4    A    Yes.

5    Q    And I believe you also mentioned some tax opinions

6    that'll be coming from the law firms.  What's the status of

7    those?

8    A    Well, at this point, those drafts of those opinions

9    have been circulated among the law firms.  I'm unaware of

10   any substantive issues.  I have no doubt that there's some

11   small tweaks going on with respect to the drafting, but no

12   substantive issues, and expect that they would be delivered

13   when we're otherwise ready to close the transaction.

14   Q    Mr. Wright, in your view, are there any remaining

15   significant regulatory impediments to closing this

16   transaction?

17   A    I do not believe so.

18   Q    And when is your expectation that the Debtors will be

19   able to emerge from bankruptcy?

20   A    Well, hopefully -- I hope that on March 8th that the

21   PUC will formally approve the transaction.  And our plan,

22   our working plan, is that we will close the day after.

23        MR. SOWA:  Your Honor, I have no further

24   questions.  I do have a few more exhibits to move into

25   evidence.  I have a green sheet.

1          THE COURT:  Please approach.  Thank you.

2          MR. SOWA:  Your Honor, at this time, the Debtors

3     would move into evidence the exhibits cited in Mr. Wright's

4     written direct that have not yet been moved in.  Those are

5     Exhibits DX-1005, DX-1095, and DX-1096.

6          THE COURT:  Any objection?

7          MR. HOGAN:  No, sir.

8          THE COURT:  All right.  They're admitted.  Oh --

9          MR. BALL:  Your Honor, with the same stipulation

10    that Mr. McKane made earlier about use of further

11    proceedings, no objection from us.

12         THE COURT:  Okay.  The stipulation is in force,

13    and they are admitted subject to that stipulation.

14       (Exhibits DX-1005, DX-1095 and DX-1096 Admitted into

15    Evidence)

16         MR. SOWA:  Thank you, Your Honor.  At this time,

17    we can pass the witness.

18         THE COURT:  Does anyone wish to cross-examine the

19    witness?

20         MR. BALL:  I do, Your Honor.

21         THE COURT:  All right.

22         MR. BALL:  Your Honor, we have witness binders.

23    May we approach?

24         THE COURT:  Yes.

25              CROSS-EXAMINATION OF ANDREW WRIGHT

Page 132

1    BY MR. BALL:

2    Q    Good afternoon, Mr. Right.  I'm Robin Ball, counsel for

3    NextEra.  And I have a few questions for you.

4    A    Okay.

5    Q    Obviously about the NextEra reserve issues.

6    A    Okay.

7    Q    Under -- the Debtors now propose to reserve $275

8    million in an escrow account, as you discussed on direct,

9    right?

10   A    That's correct.

11   Q    But there is a -- under the plan language that -- the

12   order plan confirmation order language the Debtors have

13   proposed, there's a possibility that that amount could be

14   lowered pursuant to Court order before there is a final

15   order on the NextEra termination fee litigation.  Is that

16   consistent with your understanding?

17   A    If the Court so orders, yes.

18   Q    Okay.  And in that circumstance, if NextEra ultimately

19   prevails on the termination fee litigation, I understand

20   from Mr. Horton's testimony earlier today that there would

21   not be -- that there was not a guarantee that there would be

22   adequate funds to pay the NextEra claim in those

23   circumstances?

24   A    That's correct.

25   Q    Okay.  And so, when you say there is adequate

1   protection for NextEra, would you agree that there is

2   actually adequate protection for NextEra only so long as the

3   $275 million is maintained?

4   A    I don't know that I -- I don't know the exact words I

5   used.  Adequate protection, I know, is a bankruptcy term of

6   art, so I don't want to --

7   Q    Well --

8   A    Maybe you could rephrase what you're asking me?

9   Q    At the end of the day, there may not be enough money to

10  pay NextEra the $275 if you don't keep it in escrow.  Is

11  that fair?

12  A    That's correct.

13  Q    And the Debtors' proposal -- are you aware of NextEra's

14  separate application in the alternative, except for the

15  expense application for approximately $59.5 million in

16  expenses that it incurred?

17  A    I am aware of it, yes.

18  Q    And the Debtors' proposed order makes no provision for

19  reserving and respective (indiscernible), is that right?

20  A    That's correct.  Although in the alternative, you said

21  it's in the alternative, so it would come out of the $275.

22  Q    Well, the Debtor's proposed order doesn't actually say

23  that, does it?

24  A    Uh --

25  Q    And if it would help you, the proposed order is Exhibit

1    58 in your binder, and the operative language starts at

2    Paragraph -- I believe it's 146.

3    A    Yes, I see it.

4    Q    So, there's no provision there.  If you're looking at

5    Paragraph 146 through 151, there's no provision there for

6    any reserving in respect of the $60 million, even if the

7    alternative scenario that you discussed for the termination

8    fee --

9    A    It's not expressly called out.

10   Q    But you would expect there to be a reserve available

11   for that in the event that NextEra's termination fees claim

12   is rejected?  That's your anticipation?

13   A    If the Court so orders.

14   Q    Okay.  The provision that's in Paragraph 146 for

15   further -- for modification -- I'm sorry.  In Paragraph 149,

16   for modification of the plan reserve amount, do you see

17   that?

18   A    Yes.

19   Q    Okay.  Now, there are other reserves under this plan

20   besides the reserves for NextEra's termination fee claim,

21   right?

22   A    Yes, I'm aware generally that there are.  Yes.

23   Q    All right.  There are other reserves for general

24   administrative claims, property tax claims, other kinds of

25   reserves?

Page 135

1   A     Professional fees, yes.

2   Q     Okay.  And none of them is subject to a similar

3   provision permitting modification pursuant to subsequent

4   Court order, is it?

5   A     I don't know.  You'd have to show me.  But I think that

6   anyone could come ask for a modification anytime they want.

7   Q     Well, if that's the case, then why do you need that

8   provision in the order here for the NextEra plan and not for

9   any of the other reserve -- for the NextEra claim, and not

10  for any of the other reserve?

11  A     I think this, as I said, is meant to protect each party

12  and give the maximum flexibility to the Debtor as we move

13  forward.

14  Q     Let me ask, you have a proviso there that says any such

15  modification shall at all times be consistent with Article 6

16  of the plan?

17  A     Yes.

18  Q     Do Debtors understand that limitation to prevent the

19  amount of the reserve from being reduced below $275 before

20  there's a final order on NextEra's termination fee claim?

21           MR. SOWA:  Objection, Your Honor.  It's calling

22  for a legal conclusion.

23           THE COURT:  He's general counsel.

24           MR. SOWA:  He's not a bankruptcy lawyer.

25           THE COURT:  Oh, he --

1         MR. BALL:  I'm asking if his understanding --

2         THE COURT:  He just testified up and down about

3    what the plan says, so, overruled.

4    A    Can you re-ask the question?

5    Q    Yeah.  I'm just trying to understand.  You've said that

6    any modification has to be consistent with Article 6.

7    A    Yes.

8    Q    And I'm asking whether you have an understanding --

9    whether that in fact operates to prevent a reduction in the

10   amount of the reserve for the NextEra termination fee claim.

11   Does that requirement a reduction in that reserve amount

12   before the adjudication of -- to a final order of NextEra's

13   termination fee claims.

14   A    I don't think that's what it says.  I just -- it needs

15   to be consistent with the mechanics that are set forth in

16   the plan.

17   Q    All right.  So, notwithstanding that limitation, it's

18   still possible in your view that the $275 million reserve

19   could be reduced?

20   A    If the Court orders it to be, yes.

21         MR. BALL:  I would pass the witness, Your Honor.

22         THE COURT:  Okay.  Mr. Hogan.

23         MR. HOGAN:  Thank you, Your Honor.

24             CROSS-EXAMINATION OF ANDREW WRIGHT

25   BY MR. HOGAN:

1    Q    Good afternoon, Mr. Wright.

2    A    Good afternoon.

3    Q    So your testimony, essentially, we've been over this a

4    hundred times, I know, and you were heavily involved.  So

5    let's just cut right to the issues that I have.  You

6    mentioned a liability management program that existed

7    prepetition.  You were involved in that.  Do you recall

8    that?

9    A    Yes.

10   Q    And I presume that that liability management program

11   included particularly the asbestos claims that have been

12   asserted against the various debtors prepetition; is that a

13   fair statement?

14   A    No, that's not a fair statement.  The liability

15   management program had to do with trying to find a way to

16   extend and refinance the funded debt at EFH/EFIH and TCH.

17   It had nothing to do with asbestos.

18   Q    Okay.  In terms of the NextEra plan, you were heavily

19   involved in the negotiation of that, correct?

20   A    Yes, I was.

21   Q    And presumably, you were heavily involved in the Hunt

22   negotiation as well, correct?

23   A    Yes.

24   Q    Okay.  And, in turn, obviously in this instance, you

25   were involved in the Sempra negotiations, correct?

Page 138

1    A    Correct.

2    Q    And when Sempra started their negotiations, presumably

3    the Debtors provided certain information to Sempra regarding

4    the asbestos issues; is that a fair statement?

5    A    They did some diligence, yes, as Mr. Horton talked

6    about this morning, yes.

7    Q    And were you involved in that process?

8    A    Yes.

9    Q    And did you provide any information to Sempra --

10   A    Yes.

11   Q    -- with regard to asbestos?  What generally did you

12   provide Sempra?

13   A    We provided a copy of the INCR report.  I believe we

14   probab- -- I believe we gave them a copy of the AON report

15   that had been generated at the time of the NextEra

16   transaction.  I think I facilitated a call among someone at

17   the Sempra -- on the Sempra team and our asbestos expert,

18   Mr. Hunter, who I believe you've talked to before.

19   Generally, that's what the diligence that went on.

20   Q    You'll recall in the leadup to the NextEra plan that

21   there was testimony and evidence replete throughout the

22   record, including the various presentations made to the

23   board, about the NextEra due diligence and how fulsome and

24   how complete that due diligence was.  Do you recall that?

25   A    Are you talking about with respect to asbestos issues?

1   Q     Yes.

2   A     Yes.  I would characterize their diligence efforts as

3   full and complete.  That's a fair assessment, yes.

4   Q     Okay.  And in looking at what's been produced in this

5   case, and particularly regarding the board decks and the

6   presentations made to the board, would I be going out on a

7   limb if I were to say that in looking at what the Debtor's

8   produced for purposes of trial today in its exhibits, that

9   it appears that the record is almost entirely devoid of

10  conversations between the Debtor and Sempra regarding the

11  issues of asbestos?

12  A     I don't think I would characterize it that way at all.

13  As I said earlier, Sempra did their diligence at a fairly

14  high level.  They were moving fast because we were -- they

15  were, in effect, in an auction process with Berkshire

16  Hathaway.  We were getting close to approving the Berkshire

17  Hathaway agreement, and they needed -- they knew they needed

18  to produce a higher and better offer.  But I don't think

19  it's a fair statement to say that we didn't have discussions

20  with them about the asbestos issues.  They asked us

21  questions about them.

22  Q     Okay, so they asked you some questions.  But did they

23  engage in the fulsome -- the fulsome due diligence that

24  NextEra had undertaken?  That's my question.

25  A     Well, I think -- I think it's fair to say that a lot of

1    things in this case that built on themselves as we'd gone

2    along.  And, look, you've had -- after the Hunt transaction,

3    you've had three very sophisticated public utilities that

4    are traded on the New York Stock Exchange -- I guess

5    Berkshire Hathaway's parent company traded on the New York

6    Stock Exchange -- that are very capable of assessing the

7    risks in these things.

8            I think -- I can't speak directly for Sempra, but

9    it wouldn't surprise me that they relied partly on what

10   NextEra, their predecessor NextEra, and Berkshire had done

11   in this respect.  And they knew they had to come to the

12   table with a higher and better offer, and so they asked the

13   questions they thought they needed to ask and moved forward.

14   Q    It would then be fair to say that they, likewise, then

15   relied on certain representations made by EFH with regard to

16   the treatment of those asbestos claims; would that be a fair

17   statement?

18   A    I'd call it representations.  But I think they -- they

19   relied -- they relied certainly on the representations that

20   are contained in the merger agreement; and they also relied

21   on the transaction structure that is set forth in the plan

22   and the merger agreement in which the asbestos liabilities

23   are reinstated, along with the intercompany payables and

24   receivables are reinstated.

25   Q    But I think it would be fair to say that the Sempra

1   transaction, as it relates to asbestos claims, is markedly

2   different from the NextEra transaction; isn't it?

3   A    I don't -- I don't think that's a fair characterization

4   at all.  How is it different?

5   Q    Well, you'll recall in the NextEra transaction that

6   there was $100 million escrow for asbestos claims; do you

7   recall that?

8   A    I don't think I'd call it an escrow.  I think it was an

9   accounting reserve set up by NextEra because they --

10  primarily, as I understood it, it was being done for

11  accounting purposes to level out their earnings as asbestos

12  claims came and it had to be paid.  It was not -- I don't

13  think it's proper to say it was a separate escrow that funds

14  could be used for asbestos.  In the NextEra transaction, it

15  was uncapped, and it's uncapped here as well.

16  Q    Agreed.  But the merger agreement between NextEra and

17  EFH provided an escrow agreement that was initially $250

18  million; do you recall that?

19  A    I recall that, yes.

20  Q    And then that was reduced to $100 million; do you

21  recall that?

22  A    Yes, I recall it.

23  Q    So it was an escrow, wasn't it?

24  A    Look, I call it a reserve; you call it an escrow.

25  Q    Okay, fair enough.  Regarding the allocation issue,

Page 142

1     we've heard some testimony about that from you, as well as

2     from Mr. Horton.

3     A     Yes.

4     Q     And my takeaway from that is that it's something that's

5     going to be decided; we're kicking that can down the road

6     effectively.  Is that a fair characterization?

7     A     Well, I don't know if we're kicking the can down the

8     road.  But, yes, it will be decided at a future date.

9     Q     And what affect, if any, will that allocation issue or

10    the resolution of that issue have on the asbestos debtors?

11    A     None that I'm aware of.

12    Q     Well, as I understand it, the proceeds on that

13    allocation issue are going to come partially -- some from

14    EFIH estates, correct?

15    A     Yes.

16    Q     And some from the EFH estates; is that correct?

17    A     Yes.

18    Q     And is there any possibility that some portion of what

19    is designated on the EFI- -- EFH side will, in fact, come

20    from some of those asbestos debtors?

21    A     I'm not sure I understand; but, no, I don't think so.

22    Look, at the end of the day, the intercompany claims between

23    the asbestos debtors and EFH will be reinstated.  And, well,

24    and really, those obligations on a go-forward basis will be

25    reorganized EFH's obligations.  And as Mr. Horton said

1    earlier or testified earlier today, those obligations, in

2    effect, will be backstopped by the 9.5 -- $9.45 billion

3    equity contribution or equity that that Sempra, the parent,

4    would have in reorganized EFH.

5    Q    Now the treatment of the intercompany claims, I believe

6    your testimony was that that treatment remains the same as

7    between the NextEra plan and the Sempra plan; fair

8    characterization of your testimony?

9    A    I think that's right, yes.

10   Q    Okay.  Was there any discussion with Sempra about a

11   change to that -- the treatment of those claims?

12   A    Not with me, no.

13   Q    And was there any discussion with Sempra concerning a

14   different treatment as it relates to the asbestos claims?

15   A    Not that I'm aware of.

16   Q    You'll recall during your testimony back in February of

17   2017 that we discussed the possibility of a 524(g).  Do you

18   recall that testimony generally?

19   A    Yes.

20   Q    And you'll recall generally -- and if you don't, tell

21   me, please -- that at one point, NextEra approached the

22   Debtors about a potential -- potential, not a final --

23   possibility of at least exploring whether a 524(g)

24   channeling injunction would be appropriate; do you recall

25   that?

1   A    Yes, they did.

2   Q    And do you recall what your testimony was about why

3   that wasn't pursued?

4   A    Generally, yes.

5   Q    And could you tell me what your recollection is?

6   A    Well, my recollection is that we obviously were at an

7   impasse with respect to the asbestos entities with NextEra.

8   They did not want to, in effect, buy the asbestos entities.

9   And we said, as the Debtors, that if you're going to buy

10  Oncor, you're buying reorganized EFH and you get the

11  asbestos entities.  There was a bunch of negotiation on that

12  point, a lot of diligence, as I said earlier, and one idea

13  was that was floated was this trust concept that you talked

14  about.

15  Q    And do you recall testifying that one of the

16  justifications for not pursuing it was that it was going to

17  take too long; do you recall that?

18  A    Yes, that was one of the reasons that we talked about

19  at the time.

20  Q    And that was in February of, what, 2017, correct?

21  A    I don't remember exactly when that negotiation took

22  place.

23  Q    No, I meant your testimony.

24  A    Oh, the testimony, yes.

25  Q    Now, if I could, I want to direct your attention to AX-

1    157, if you would, and you're going to have to use the

2    dreaded iPad for that.

3    A    Okay.  AX?

4    Q    AX-157.  Yes, sir, please.

5    A    Is that under asbestos folder; is that --

6    Q    It would be, yes, sir.

7    A    AX-157.

8           MR. HOGAN:  For the record, Your Honor, that's

9    just a notice of filing of the unsealed objection of the

10   various asbestos objectors.

11   Q    And if you would, Mr. Wright, I'm going to ask you to

12   go to what would be Page 51 of that document,

13   electronically, Page 51 as it were.

14   A    At the top, it says 449.

15          MR. HOGAN:  Permission to approach the witness,

16   Your Honor.  I can short circuit this a little bit.

17          THE COURT:  Sure.

18          MR. WRIGHT:  I'm sorry.

19          MR. SOWA:  At Page 51 is the signature block.

20          MR. HOGAN:  Your Honor, the Declaration of Beth

21   Dore.  It's actually 2 of 3.  It's 12 --

22          THE COURT:  Yup, I see it.

23          MR. HOGAN:  Thank you.

24          THE COURT:  Thank you.

25          MR. SOWA:  Your Honor, this is one of the exhibits

1    subject to the objection that we described before testimony

2    began.  I'll cede the podium to Mr. Stephany to the extent

3    we're going to --

4              THE COURT:  Okay.

5              MR. SOWA:  -- hear this now.

6              THE COURT:  Yup.

7              MR. HOGAN:  Your Honor, if I would, I guess the

8    simplest way for me to do this is to proffer why we believe

9    that this is relevant.

10             THE COURT:  Okay, go ahead.

11             MR. HOGAN:  Okay?  Your Honor, so as the Court's

12   well aware, this is a claimant who did not manifest until

13   after the bar date.

14             THE COURT:  Mm-hmm.

15             MR. HOGAN:  They worked at one of the Debtor's

16   plants.  They were diagnosed with asbestos-related disease

17   after the bar date.  And their testimony, pursuant to this

18   stipulation and the declarations, is that they were unaware

19   of the bar date.

20             THE COURT:  Mm-hmm.

21             MR. HOGAN:  So these claimants -- this is a

22   claimant who -- whose claim will be discharged by this plan.

23             THE COURT:  Mm-hmm.

24             MR. HOGAN:  And it's evidence of their work

25   history, their medical diagnosis, and their lack of

1    knowledge of the bar date.  And for those reasons, we

2    believe it's relevant to the issue of standing.  Thank you.

3           THE COURT:  You're welcome.

4           MR. STEPHANY:  Your Honor, again, for the record,

5    Brian Stephany, Kirkland & Ellis, on behalf of the Debtors.

6    We obviously object, as I said before, to the relevance of

7    this and the other documents contained at Exhibits A through

8    D, which is AX-157.

9           Your Honor, without agreeing or disputing the

10   accuracy of Mr. Hogan's characterization, we haven't probed

11   that information at all.  But the asbestos objectors have

12   raised a facial due process challenge.  The evidence that

13   Mr. Hogan is seeking to admit speaks to -- could only speak

14   to and be relevant to an as-applied due process challenge;

15   and specifically, an as-applied due process challenge to the

16   bar date.

17          The only question before the Court for purposes of

18   the plan and the 1129 factors, is whether or not the

19   discharge in the plan for asbestos objectors who did not

20   file a claim before that bar date is permissible.

21          And the Debtors would respectfully submit that

22   evidence of alleged employment, exposure, medical records,

23   or notice, whether or not the individual received notice,

24   has no bearing on the question of whether or not the

25   discharge contained in the plan is permissible as a matter

1    of law under the Bankruptcy Code.

2          And I'll pause there, Your Honor.  To the extent

3    Mr. Hogan has other issues, I may have responses, other

4    reasons, for example.

5          THE COURT:  Okay.

6          MR. HOGAN:  Your Honor, and this is a real-world

7    issue.  These people, specifically contained in these

8    affidavits, have serious illnesses, and the discharge that

9    this plan will effectuate will discharge those claims.

10   They've objected to this plan based on the due process

11   argument.  And their ability to do that is predicated on a

12   demonstration to the Court that they -- that these factors

13   existed; that they worked for this debtor, that they were

14   diagnosed after the bar date, and that they had no knowledge

15   of the bar date.

16         As this plan is implemented and you sign the order

17   confirming this plan, these claims will be discharged.  We

18   have made a conscious decision to proceed this way -- and

19   it's all right to do that as claimants -- to make a

20   determination on how we want to proceed in this case, and

21   these -- this evidence is relevant to the treatment of these

22   claims.  And, ultimately, Your Honor, we believe that this

23   evidence should be admitted.

24         MR. STEPHANY:  Your Honor, if I may respond

25   briefly?  Your Honor, as the Court has repeatedly recognized

1    in the past, there is a process that exists for claimants to

2    later challenge the discharge as it applies to them.  We are

3    not disputing that these individual claimants may have the

4    opportunity or ability to challenge that discharge again at

5    a later point, but this particular evidence has no relevance

6    to the question of whether or not this plan that's before

7    the Court is confirmable.

8              THE COURT:  Well, I -- I'm going to disagree with

9    the Debtors, overrule the objection, and allow the use and

10   ultimately, I suppose, the admission of these documents.  I

11   think it goes to whether -- I do believe the question of

12   constitutionality goes to whether the plan can be confirmed.

13   I can't confirm an unconstitutional plan or without

14   removing, obviously, what would be the unconstitutional

15   provisions.

16             I've previously ruled that I believe that the bar

17   date and the discharge that has been before the Court

18   previously are consistent with due process and

19   constitutionality, but we're going to decide that issue.  I

20   will decide that issue again based on the merits of the

21   arguments I hear today or tomorrow.

22             But in any event, I do think it is relevant.  I

23   understand the distinction, and I think it's an important

24   distinction, between the facial challenge versus the as-

25   applied challenge.

Page 150

1            And, but I don't think for purposes of giving

2    these people a fair opportunity to be heard at confirmation

3    that I'm going to delve too nicely into the nicety of that

4    distinction.  I'm going to take a broad look at this and

5    give them an opportunity to have their day in Court and be

6    heard on whether the plan should be confirmed.  So objection

7    is overruled.

8            MR. HOGAN:  Thank you, Your Honor.  Your Honor,

9    since we're dealing with it, at this point, I'd like to move

10   AX-157 into the record, just so that I don't miss it later,

11   Your Honor.

12           THE COURT:  Any other objections to that document?

13           MR. STEPHANY:  No, Your Honor.

14           THE COURT:  Thank you.  AX-157 is admitted.

15           MR. HOGAN:  Thank you, Your Honor.  Just moving on

16   -- and, again, Your Honor, thank you for that.  That

17   obviously saves not only the Court, but all of the gallery

18   from me delving into those issue.

19           And the other point I would make with regard to

20   that exhibit -- that admission, Your Honor, is that that

21   document has been redacted.

22           THE COURT:  I was going to ask that because I

23   noticed that there was, for example, social security

24   records.  So that's been redacted?

25           MR. HOGAN:  Yes, sir.  So there's a standing, PPI,

1   and so that's already been taken care of.  That's separate

2   and distinct from the confidentiality order that you entered

3   in this case.

4              THE COURT:  Okay.

5              MR. HOGAN:  Just so we're clear.  Thank you.

6   Q    Mr. Wright, if I could, I just want to turn now to your

7   understanding -- and you don't need to look at that exhibit

8   anymore if you care not to.  I'm done asking you about that

9   exhibit.

10  A    Okay, okay.

11  Q    If I could, I want to try and understand.  I spoke with

12  Mr. Horton earlier about the process going forward.

13  A    Yes.

14  Q    I'm not so naive as to expect that this plan isn't

15  going to be confirmed.  I'll be frank with you.  And so,

16  what I want to try and understand from you is, what happens

17  to these asbestos claims, to your knowledge?  Not these

18  specifically, but the ones that are unen- -- that are timely

19  filed asbestos claims.  What happens, to your knowledge,

20  with these claims the day after the effective date, if you

21  know?

22  A    Well, they will have been reinstated, and they will be

23  obligations of the asbestos debtors, while no longer -- the

24  reorganized asbestos entities who will be indirectly owned

25  by s Sempra.  And I guess it's up to you; they're your

1    clients.  What are they going to do next?  I don't know.

2              MR. HOGAN:  No more questions.  Thank you, Your

3    Honor.

4              THE COURT:  You're welcome.  Do you have a cross,

5    Mr. Galardi?

6              MR. GALARDI:  Your Honor, I'm not sure whether I

7    am technically cross or rehabilitation.  But I think now

8    would be a time to because I'm going to ask question about

9    the order in his testimony that was given by -- elicited by

10   NextEra.

11             THE COURT:  Any objection by the Debtors?

12             MR. McKANE:  Your Honor, we did speak with Mr.

13   Galardi about this.  We would view this as almost friendly

14   redirect; and, therefore, we are --

15             MR. GALARDI:  Almost friendly.

16             MR. McKANE:  -- we are very cognizant of Elliott's

17   obligations under the PSA, and we think that Mr. Galardi

18   will honor those.

19             THE COURT:  All right, go ahead.

20             MR. GALARDI:  Thank you, Your Honor.

21             CROSS/REDIRECT EXAMINATION OF ANDREW WRIGHT

22   BY MR. GALARDI:

23   Q   Mr. Wright, you testified before that the Debtors

24   determined to set a reserve in the amount of $275 million,

25   correct?

1   A    Correct.

2   Q    And it's your understanding that subject to a Court

3   order, that reserve might, in fact, be reduced.

4   A    It could be modified, yes.

5   Q    Okay.  Now, in setting the reserve, did you consider

6   whether or not NextEra might have remedies absent a reserve?

7   A    No.  We looked at the remedy that they had under the

8   merger agreement.

9   Q    I'm sor- -- under the merger agreement.  Did you

10  consider whether or not NextEra may be able to pursue

11  disgorgement from creditors if they received the money?

12  A    Yes.

13  Q    Okay.  And what did you determine; was there a legal

14  remedy that NextEra might have in that circumstance?

15          MR. BALL:  Objection, it calls for a legal

16  conclusion.

17          THE COURT:  Overruled.

18  A    Yes.

19  Q    And do you believe they have a potential disgorgement

20  remedy?

21  A    That'll be up to the Court.

22  Q    Okay.  Now, did you consider whether NextEra had a

23  remedy to seek stay pending appeal of the rec- -- strike

24  that.  If I use the phrase reconsideration order, would you

25  understand that phrase?

1    A    Yes.  I guess I'd want to know reconsideration of what.

2    Q    Sure.  You're familiar that Elliott pursued

3    reconsideration of the termination fee, the $275 million

4    claim that NextEra secured, correct?

5    A    Yes, I'm very aware of it, yes.

6    Q    Okay.  And in connection with that, received an order

7    from this Court saying that it was proper to reconsider and

8    that that termination fee be disallowed by this Court,

9    correct?

10   A    Yes.  In general terms, that's what the order said,

11   yes.

12   Q    Okay.  And I'm going to call that the reconsideration

13   order.

14   A    Okay.

15   Q    And you're familiar that that order is now currently on

16   appeal, correct?

17   A    Yes.

18   Q    And your understanding is that that's on appeal in the

19   Third Circuit, correct?

20   A    Correct.

21   Q    Do you have an understanding of whether NextEra sought

22   a stay pending appeal of the reconsideration order in this

23   Court?

24   A    Yes, I understand that they did.

25   Q    And what is your understanding with respect to whether

1   it obtained such relief?

2   A    It was denied.

3   Q    Okay.  Do you know whether NextEra ever sought stay

4   pending appeal in the District Court of the District of

5   Delaware?

6            MR. BALL:  I'm going to object that this is

7   outside the scope of cross.

8            THE COURT:  I disagree.  I think it's relevant to

9   the questions about the reserve -- what it's there for, how

10  it got there -- that was explored both on direct and by your

11  cross, so I'll allow it.

12  A    Can you re-ask the question?

13  Q    To the best of your knowledge, did NextEra ever seek a

14  stay of the reconsideration order from the United States

15  District Court for the District of Delaware?

16  A    To be honest, I don't know.  I know we, in effect, sort

17  of skipped the District Court step and went to the appeal of

18  the Third Circuit, but I -- so I don't know procedurally

19  what they did at the District Court.

20  Q    Okay.  Do you know whether they've ever sought a

21  reconsideration order from the Third Circuit Court of

22  Appeals?  A stay of the reconsider- -- thank you very much

23  back there.  Did they ever seek a stay pending appeal from

24  the Third Circuit with respect to the reconsideration order?

25  A    I don't know off the top of my head.  I know they've

1    appealed Judge Sontchi's ruling with respect to the

2    reconsideration order.

3    Q    Okay.  Now, I think you have in front of you -- I hope

4    you do -- DX-1000.

5    A    Just a second.  Let me see if I can -- got four

6    binders.

7    Q    To help you find it, it is the plan of reorganization.

8    A    Okay.  Yes, I have it.

9    Q    Okay.  And what I'd like you to turn to is -- I have it

10   marked as Docket #12653, Page 77 of 98.

11   A    77 you said?

12   Q    Yes, 77 of 98.

13   A    Okay.  Yes, I'm here.

14   Q    Okay.  And you'll see there's a subsection in that plan

15   that is estimation of claims, correct?

16   A    Yes.

17   Q    Okay.  And if you would go -- and I'm going to look at

18   the right side of the page.  One, two, three, four -- about

19   seven lines down, it starts with the phrase,

20   notwithstanding.  Do you see that?

21   A    Yes.

22   Q    And it says, notwithstanding any provision to the plan

23   -- to the contrary in the plan, a claim that has been

24   expunged from the claim's registry, but that is either

25   subject to appeal or has been the subject of a final order,

1    shall be deemed to be estimated at zero dollars unless

2    otherwise ordered by the Bankruptcy Court.  Did I read that

3    correctly?

4    A    You missed the word not.  So or has not been the

5    subject.

6    Q    I am sorry.  Has not been the subject of a final order,

7    correct?

8    A    Yes, it says what it says, yes.

9    Q    So as you sit here today, has the termination fee 275

10   claim been disallowed?

11   A    It's been disallowed by this Court, yes.

12   Q    Okay.  And under the plan, that claim would be

13   estimated at zero, correct?

14   A    Let me reread this.  Unless otherwise ordered by the

15   Bankruptcy Court, yes.

16   Q    Okay.  Has NextEra to date sought a motion to estimate

17   the claim at any amount other than zero?

18   A    I'm not aware that they have.

19   Q    Okay.  And are you aware of any order by this

20   Bankruptcy Court that, as you sit here today, that gives

21   them an estimated claim of $275 million?

22   A    No.

23          MR. GALARDI:  No further questions, Your Honor.

24          THE COURT:  All right.  Any cross that's arisen as

25   a result of that, because I think that I need to give you an

1    opportunity to respond.

2              MR. BALL:  Yes, Your Honor, just a couple of

3    questions.

4              THE COURT:  Yeah, please.

5                 RECROSS-EXAMINATION OF ANDREW WRIGHT

6    BY MR. BALL:

7    Q    Mr. Wright, are you aware that NextEra in its plan

8    objection objected to the provisions of the plan that were

9    just referenced by Mr. Galardi?

10   A    I'm not specifically aware of it, but I'm not

11   surprised.

12   Q    Are you aware that neither the Debtor nor Mr. Galardi

13   responded to that objection in their papers?

14   A    I'm not aware of that.

15             MR. BALL:  Nothing further, Your Honor.

16             THE COURT:  All right.  Redirect?  Are we

17   switching?

18             MR. McKANE:  Your Honor, I don't believe there are

19   any parties that have any additional questions for Mr.

20   Wright.

21             THE COURT:  Oh, do you have any redirect though?

22             MR. McKANE:  We do not have redirect.

23             THE COURT:  Oh, okay.

24             MR. McKANE:  We're good.

25             THE COURT:  Sorry.

1          MR. McKANE:  We're good.

2          THE COURT:  Thank you, Mr. Wright.

3          MR. WRIGHT:  Thank you.

4          THE COURT:  You may step down.

5          MR. McKANE:  Your Honor, at this point in time,

6     the Debtors rest their case-in-chief.

7          THE COURT:  Excellent, all right.  How are we

8     going to go from here?  What's the proposal?

9          MR. McKANE:  Your Honor --

10         THE COURT:  Does Sempra have something to put on?

11    No?  Okay.

12         MR. McKANE:  Yeah.  So, Your Honor, my

13    understanding is that maybe some of the plan supporters, in

14    particular, Mr. Galardi for Elliott, would like to move in

15    certain documents that have been identified by others in

16    support of the case.

17         My understanding, based on all the pretrial

18    efforts, is that, consistent with earlier confirmation

19    proceedings, the objectors have put in their case through

20    our case-in-chief.  I'm not aware that they have any

21    rebuttal witnesses to call.

22         MR. BALL:  One objection.  We want to move some

23    stuff in through --

24         MR. McKANE:  They want to move some documents into

25    evidence as well.  I think we'll be able to do that without

1    objection in the next -- over the next 10 to 15 minutes.

2    And the Debtors are prepared to go straight to closing

3    arguments starting as early as 3:10 if you want.

4              THE COURT:  Okay.  Well, at some point, we'll take

5    a break.  Let's move the furniture around with the exhibits,

6    unless you need some time to get organized.  Mr. Galardi?

7              MR. GALARDI:  Your Honor, again, as a plan

8    supporter, the only documents that I would actually be

9    making sure that Your Honor has are NextEra documents.  And

10   then the three documents that we'd ask Your Honor to just

11   take -- four documents we'd ask Your Honor to take judicial

12   notice.  So if it makes sense for NextEra to go and I can

13   check off their documents, that's all I have.

14             THE COURT:  Okay.

15             MR. BALL:  Your Honor, we're making a request for

16   judicial notice of our exhibits 1 through 58, all of which

17   are items on file with this Court on its docket or are items

18   that are Court of Appeal orders on file in the Court of

19   Appeals docket in the appeal of the NextEra termination fee

20   litigation.

21             THE COURT:  Okay.

22             MR. BALL:  And it is my understanding that there -

23   - from the meet and confers that there's no objection to

24   that.

25             THE COURT:  Any objection?  All right.  The Court

1    takes judicial notice of NextEra Exhibits 1 through 58.

2           MR. BALL:  Thank you, Your Honor.

3           THE COURT:  Mr. Galardi.

4           MR. GALARDI:  So, Your Honor, the only documents

5    we'd ask Your Honor to take judicial notice of that NextEra

6    did not cover are the following:

7           (1) Elliott's reply in support of its

8    reconsideration motion, which is found at Docket 11905.  And

9    I don't believe -- maybe I missed the number, there was what

10   I called the reconsideration opinion, as opposed to the

11   reconsideration order, which is at Docket #11998.  Those

12   were with respect to the Elliott motion for reconsideration.

13          All of the documents they mentioned on the stay

14   pending appeal are fine with Elliott.  There was the claim

15   for administrative expense, and this was the original claim

16   for 275, Your Honor.  There is a document, Elliott's

17   preliminary objection to NextEra's application for payment

18   of administrative claim; it's at Docket 11666.  I didn't

19   catch it on their number, so we'd ask that to be -- judicial

20   notice of that.

21          And then, Your Honor, today, they put in NextEra's

22   proposed confirmation order modifications.  I don't know if

23   that was moved into evidence.

24          THE COURT:  It was not.

25          MR. GALARDI:  But that is at Docket 12749, and I

1    think we should have that into the evidence as well.

2              THE COURT:  Okay.  Any objection to judicial

3    notice of those documents?

4              MR. McKANE:  With recognition for judicial notice

5    as opposed to evidence; no objection.

6              MR. BALL:  No objection.

7              THE COURT:  Court will take judicial notice of

8    those document items.

9              MR. GALARDI:  Thank you, Your Honor.

10             THE COURT:  You're welcome.  Mr. Pedone.

11             MR. PEDONE:  Your Honor, Appendix A to the

12   Goodstein Declaration was a list of pleadings that we had

13   filed in the case referenced by docket number.  I would ask

14   the Court to take judicial notice of them.  I don't think I

15   need to be moving them into evidence; they're not evidence.

16             THE COURT:  Right.

17             MR. PEDONE:  Just notice.

18             THE COURT:  I will do so.

19             MR. PEDONE:  Thank you.

20             THE COURT:  Any other evidence; anything under

21   judicial notice?  Okay, the Court hears none.  That'll close

22   the evidentiary record.  We're going to take a 10-minute

23   recess, and then I'll hear argument at approximately 3:05.

24             MR. GALARDI:  Thank you, Your Honor.

25        (Recess)

1                CLERK:  All rise.  Please be seated.

2                MR. MCKANE:  Your Honor, just, we have left hard

3      copies of a slide presentation.  Can't be an EFH closing

4      without a slide deck for Your Honor.  And we also have it up

5      on the screen as well.  For the record, Mark McKane of

6      Kirkland and Ellis.  And before I begin, Mr. Kieselstein

7      would like to address the Court at the end of the hearing to

8      express his gratitude and all of our gratitude on behalf of

9      the, everything you and your staff have done for us over the

10     last four years.  But I'll let him do it more eloquently

11     than I ever could.  Also, and also in terms of public

12     disclosures and PSA announcements, Mr. Lauria has asked

13     desperately on behalf of his client that you not exact

14     revenge on the PCT any time soon.  But again, the Sempra

15     team is also very grateful for your efforts as well.

16                THE COURT:  I like to tell very bad jokes, so,

17     just call that a very bad joke.

18                MR. MCKANE:  Fair enough, Your Honor. Your Honor,

19     we're here with overwhelming support for this plan. All

20     voting classes that EFH and EFIH have voted to accept;

21     Elliott the largest creditor supports consummation of the

22     plan; all of the indentured trustees support confirmation;

23     the EFH Committee supports, and we have widespread

24     regulatory support at levels never seen in any other

25     iteration of the plan. As Mr. Horton noted in his

1     declaration, this is the highest and best offer for the

2     Debtors indirect interest in Oncor and it absolutely

3     maximizes the value of the EFH and EFIH estates.

4           Your Honor, the recoveries in this plan fall into

5     one of five categories, as we spell out on slide three.  And

6     there is a parallel set of recoveries for EFIH as well.

7     That's just the overall structure of our plan.  There is no

8     doubt that we have satisfied all of the 1129 standards.  We

9     have provided, you know, in the next set of slides, the

10    identification of which 1129 standard, what the provision

11    is, what the overview of the evidence has been -- and he

12    witness.  Critically, there are extremely few objections

13    here.  Your Honor, we have an 1129A3 objection to good

14    faith. We think we've overwhelmingly established that for

15    Mr. Horton and Mr. Wright.  We'll discuss that with regards

16    to the LSGT Debtors in more detail.

17          There are no objections for A-4 through A-8.  On

18    A-9, Your Honor, we believe the Debtor proposed plan reserve

19    should resolve the Nextra plan objection.  Obviously, they

20    disagree.  We can address that in further detail as well.

21    And then, there are no objections for A-11 through A-16, as

22    well.

23          With regards to the cramdown requirements, the

24    plan is, on its face, fair and equitable, and that both of

25    our witnesses have established that as well, both our live

1    witnesses.

2          Remarkably, Your Honor, no party is contesting the

3    discretionary contents of the plan.  Now, that includes all

4    the releases, the injunction provisions, the exculpations

5    and the Sempra good faith finding.  Now, we acknowledge that

6    this was not part of the necessary elements for

7    confirmation; that there is an outstanding issue regarding

8    the allocation of cost, especially administrative cost,

9    between EFH and EFIH.  Your Honor, the Kirkland team wants

10   to convey how much begging, cajoling, yelling, pleading --

11   we've, on bended knee, gone to the Disinterested Directors

12   and their advisors asking them to resolve these issues.

13   They have been at it for months.  We cannot commit that they

14   will get there before the effective date, but we have built

15   in a backup scenario.

16          THE COURT:  What happened is because, on the

17   effective date, they go away.

18          MR. MCKANE:  Well, they certainly think that --

19   yes, that it could go away.  Now, the plan administrative

20   board, through Mr. Horton, is empowered then to allocate and

21   identify two independents to finish that process, and the

22   final -- so, that's one fallback -- and then the final

23   fallback is, you know, if that doesn't work, privately,

24   there have been discussions about do you try to get a

25   mediator back involved to address these issues?  But even if

Page 166

1   that doesn't work, we present it to Your Honor.

2            THE COURT:  Okay.

3            MR. MCKANE:  But this will get done.  And we are

4   working with --

5            THE COURT:  Just, I mean, what's the timeframe?

6   Are you thinking you'll be back to me in April?  July?

7            MR. MCKANE:  So, Your Honor, there's a couple of

8   factors there.  One, you know --

9            THE COURT:  There's no -- my understanding is

10  there's no actual distributions that we stop the interest

11  rate, or that there are no distributions; or do we not stop

12  the interest rate?

13           MR. MCKANE:  So, we would cut off -- so, the way

14  the plan works, as currently constructed with the order, and

15  the order is moving to enable this all to happen, as the

16  order that you've seen, enables as soon as we go effective,

17  that we cut off the interest rate burden, we pay off all the

18  secured debt.  What would not be paid, initially, was the

19  unsecured debt.  Now, there is a means by which we can do

20  the math to basically say, you know, worst case scenario for

21  EFH, what's the number in a worst-case scenario for EFIH?

22  What's the number?  There's money left over in both

23  scenarios.  Under the revised proposed order that we're

24  going to be, hopefully, presenting to Your Honor tonight,

25  that money will go out the door.  So, there will be an

1    initial distribution as soon as reasonably practicable to

2    unsecured creditors after the effective date.  So, it might

3    be on the effective date, it might be the following day,

4    just as soon as practicable thereafter.

5              Now, with regards to the allocation determination,

6    what we put forward, I believe, is 40 days after the

7    effective date, that no less than -- you know, no more than

8    40 days after the effective date, we will put that issue to

9    Your Honor if we can't get it resolved before them.

10             THE COURT:  Okay.

11             MR. MCKANE:  Your Honor, the voting results is,

12   Ms. Sullivan tabulated, all classes of claims at EFH voted

13   for the plan.  And the same is true with the classes of

14   claims eligible to vote at EFIH.

15             Now, turning to the objections, and we call it a

16   partial objection for the reason that we committed to put in

17   the $275 million.  Now, what they object is there's no

18   ability to reserve -- to revisit the reserve, excuse me,

19   prior to the entry of a final non-appealable order in

20   connection with the reconsideration order, and the Debtor's

21   adversary proceeding.  And it's based on that -- no

22   revisiting -- that it violates 1129(a)(9) in the bankruptcy

23   code, and a demand that the reorganized debtors not be

24   discharged from liability for the termination fee, unless

25   Your Honor signs their version of the order.  We think that

1    Your Honor should overrule their objection in their

2    entirety, but recognize that we are putting in the 275

3    consistent with our order.  So, because of that, we think

4    we've absolutely satisfied the plan.

5            With regards to 1129(a)(9), they're asking you to

6    weight into a legal argument that we just don't think you

7    need to go to.  No party has argued that a reserve is

8    necessary to satisfy disallowed administrative claims in all

9    cases to satisfy 1129(a)(9).  That would paralyze

10   distributions under plans of reorganizations for frivolous

11   administrative claims, and we're not aware of any case that

12   has come forward with that result.

13           Basically, we have a hypothetical that will work

14   through Your Honor.  It comes down to this:  You could

15   confirm this plan.  And before the administrative bar date,

16   someone could come forward and put forward a facial claim

17   for a billion dollar administrative plan.  So, says, you

18   know, I'm filing an administrative claim for a billion

19   dollars.  We don't think that the filing of that claim, in

20   and of itself, would freeze distributions in all scenarios.

21   That can't be the law.  That can't be right.  And we don't

22   even think NextEra is arguing that.

23           So, what do we do, Your Honor?  We put forward

24   what Debtors do.  A practical, pragmatic, nonprejudicial

25   solution.  We'll reserve the 275 in the plan reserve, even

1    though we don't think we have to, and I think some of the

2    evidence you heard today is quite telling.

3           Counsel for NextEra directed Mr. Horton to

4    paragraph 57 of the proposed findings, with regards to

5    administrative claims.  And there, the language is telling.

6    We don't have to, in all circumstances, in all scenarios,

7    reserve the amount of money.  It has to be, quote,

8    reasonably sure.  That was the language that's in the

9    findings, that's reasonably assured that we'll be able to

10   satisfy the administrative claim.  And what we're seeing

11   here, Your Honor, is if a billion dollar administrative

12   claim comes in that we think is baseless, we should be able

13   to object to that.  We should be able to get to a ruling on

14   that.  We should be able to make a determination that is not

15   reasonable, that that would ever be true.  And before you

16   get to a final non-appealable order, meaning running the

17   appellate chain, we should be able to move forward.  There

18   has to be some reasonableness component built into

19   1129(a)(9).

20          Let me go further.  Take their scenario, the 275.

21   If the Third Circuit affirms your ruling and expressly says

22   there is no benefit to the estate in a scenario in which a

23   bitter -- is allowed, and under a contract, $275 million,

24   and there is no higher and better offer that materializes

25   thereafter; if the Third Circuit expressly says that for the

1    275, and the Court denies rehearing en banc, and they stake

2    a cert petition on a non-circuit split issue, on a flyer,

3    that is not a final non-appealable order, but it is very

4    hard for us to understand how we couldn't release at least

5    some portion of the 275. And in that specific scenario, when

6    you have the Third Circuit affirming Your Honor with the

7    express finding that there is no clear benefit to the

8    estate, how is it possible that they could be entitled to

9    $60 million, $30 million, $15 million for what is a late-

10   filed backup plan for the same scenario?  They can never

11   satisfy the quintessential element of, is it an

12   administrative claim?  And in that scenario, while it's not

13   a final order, because they're still running their appellate

14   process, we think consistent with the findings in the order

15   and 1129(a)(9), we should be able to release those bonds.

16          Now, what do they demand in exchange?  Right, they

17   say that Sempra should be on the hook; the reorganized

18   debtors should be on the hook, just as a backup

19   protectionary point.  We tried to walk them back from that.

20   We tried to explain to them, that is the nuclear option.

21   Why?  Because the merger agreement, which they did not

22   object to at the hearing, is very, very plain on this.

23   Section 7(1)(e) spelled this out.  If additional obligations

24   beyond those that are expressly identified flow through to

25   the reorganized debtors, Sempra doesn't have to close.  And

1       the last thing anybody wants to do is jeopardize the closing

2       of this transaction.  But that is essentially what they

3       want.  They want to say to Your Honor, if you don't agree to

4       our language, you don't agree to our proposed order, impose

5       a condition that gives Sempra a walk right, and as much as

6       they want this transaction, we all know that parties on

7       change facts, on change scenarios, might want to renegotiate

8       some terms.  And the last thing we want is a renegotiation

9       of terms.

10              So, Your Honor, we don't think it's appropriate to

11      condition that type of language.  We think it's baseless for

12      them to argue that the reorganized debtors could possibly

13      have exposure here.  They didn't object to this exact

14      condition at the merger agreement hearing, and we think it's

15      a baseless objection to the order.

16              Now, we put in what we called a safety valve.

17      This is the ability for Your Honor, for the parties, to

18      revisit the 275.  It's not an escape valve, as counsel

19      suggested in their opening statement, it's a safety valve,

20      right.  The plan reserve amount -- this is paragraph 149 --

21      may be modified pursuant to a separate bankruptcy order,

22      provided, however, that such modification shall be

23      consistent with article six of the plan.  That's not

24      remarkable.  That's not news.  And the reason why we think

25      it should be able to be revisited by separate order, and not

1    under 60(b) and not under 59(b), is there are multiple

2    hypothetical scenarios that we can identify whereby you,

3    Your Honor, would be asked to evaluate whether it's

4    appropriate to maintain the reserve that wouldn't be

5    directly tied to the confirmation order.

6              So, Your Honor, that's why we wrote it this way.

7    We could not legislate all the scenarios that could be

8    addressed before and, basically, in advance.  We're not that

9    smart.  So, we put in the language of we'll leave it open,

10   everyone will reserve rights.  And ultimately, as I think

11   Mr. Horton said, we have the faith in the judicial system,

12   we have faith in the process.  We'll come back in front of

13   Your Honor and address those issues.

14             Now, an argument came up this afternoon.  Well,

15   you didn't set aside another 60 million for the backup plan.

16   Now, Your Honor, this claim came in last week, right.  I

17   will tell you that there are serious legal deficiencies with

18   that claim.  The immediate reaction was that's claim

19   splitting.  You can't double down and ask for two different

20   reviews on the same issue.  If they had any additional

21   claims they should have brought it earlier when they filed

22   their earlier application -- not asking for a ruling on any

23   of those issues at this time.

24             But all we can say is this:  You have the ability,

25   under our proposed order, to revisit the reserve, including

1    based on what the Third Circuit says.  But there is no way

2    we should have to do a separate reserve for 60 million

3    separate from the 275, and further delay distributions to

4    other unsecured creditors.  Like, it's simple math -- 60 is

5    less than 275.  We don't think that they're entitled to 60.

6    We don't think they're entitled to anything.  But at a

7    minimum, you have the ability and you have the discretion,

8    based on a separate motion and a separate evaluation of the

9    record, at that time, as to what the reserve should be.

10           Now, what I would say, Your Honor, is none of this

11   is news.  None of this is remarkable because our plan has

12   always contemplated the possibility of a future estimation.

13   We provided for the estimation of claims, including the

14   estimation of claims before or after the effective date.

15   This is section 7(c) of the plan, right.  And that's before

16   and after the effective date, the debtors or the reorganized

17   debtors, with the consent of plan sponsors, where with

18   respect to any disputed claim, have the ability to estimate.

19   Now, disputed claims, again, not remarkable; disputed claims

20   includes disputed administrative claims, administrative

21   claims being a subset of claims.  That's definitions 13 --

22   sorry, paragraphs -- definition 13 and definition 69 in

23   article A-1 of the plan.  But there's no need to pre-

24   litigate any of these issues at this time, because the

25   reserve, the reservation of rights does harm to no party.

1            Now, Elliott has their concerns.  They don't

2     think, based on our own plan, any reserve is appropriate in

3     the order.  But we think we all agree that what they're

4     arguing about is the scope of the order.  They voted for the

5     plan.  They stand by the plan.  We've heard them say they

6     want the plan consummated as quickly as possible, so we

7     viewed their argument as solely tied to the order.

8            Now, the fact that we're putting forward our

9     proposed order, we don't view as a modification of plan.

10    That's not right.  The order is based on a proposed

11    resolution of issues.  That's an interpretation of the plan,

12    not a modification of the plan.  And the Debtors are doing

13    exactly what you expect Debtors to do:  Between Elliott and

14    NextEra, we're proposing a practical solution to the

15    problem?

16            Briefly, Your Honor, Mr. Miller made, filed an

17    objection in the case.  I don't mean to belabor the point at

18    all.  He seeks to separately classify and have EFIH

19    unexchanged notes paid in full.  Your Honor, the bond

20    exchange that happened was a pre-petition bond exchange.  It

21    was for qualified institutional buyers.  That's consistent

22    with what the indentures allowed for and applicable non-

23    bankruptcy law allowed for.  There's no basis under the

24    bankruptcy law for us to be able to differentiate the

25    parties, or the creditors, in the manner that Mr. Miller

1   wants.  And, consistent with 1129(b)(1), we believe that

2   they are probably classified together.

3              Now, turning to the asbestos objection, Your

4   Honor, the asbestos objectors assert that the plan was not

5   filed in good faith, and it proposed, by means forbidden by

6   law specifically because it violates due process.  And, once

7   again, we think these arguments should be overruled.  The

8   trial records show that the Debtors fought hard to achieve a

9   value maximizing result for the LSGT Debtors and their

10  creditors.  The Debtors specifically negotiated to preserve

11  identified asbestos claims and reinstate the receivables.

12  And, as the Court ruled multiple times, setting the bar date

13  for unmanifested asbestos claims in these circumstances does

14  satisfy due process.

15             Your Honor, I know there was a kerfuffle about one

16  exhibit here, but the Debtors are not suggesting in any way

17  that they didn't previously have asbestos claims.  We

18  recognize that.  But the spending there was low.  We've had

19  that record.  Previously it's been in earlier proceedings.

20  We're not manufacturers of asbestos.  We don't sell

21  asbestos.  But, nonetheless, as Mr. Horton recognized in

22  earlier declarations, we've had a spend rate, for example,

23  from 2009 to 2013, expenses related to asbestos claims ran

24  about $2 million a year.  We're not running from that at

25  all.  That is a true fact.  It doesn't mean Grossman's?

1    doesn't apply.  I'll respond to asbestos objectors'

2    arguments in reply as needed, but Grossman's? is appropriate

3    here.  And of the LSGT Debtor's, filed for a very reasonable

4    reason:  you addressed this in your motion to dismiss

5    hearing almost, sadly, a year and a half ago.  The LSGT

6    Debtors were cash flow negative at the time of the petition

7    date.  Their inter-company claims were the only assets, and

8    they were against an insolvent entity.  And there was a risk

9    that they were going to get cut off.  And so, that's why the

10   LSGT debtor's filed.

11            Now, as previously had been the case, the plan

12   addresses the LSGT debtors' reasons for filing.

13   Specifically, we reinstated the intercompany claims to

14   ensure full funding for the LSGT debtors' liabilities, and

15   we were able to reinstate the asbestos claims and preserve

16   the committee settlement.  But none of that was a foregone

17   conclusion.  And I think, ultimately, one of the big

18   problems we have with the asbestos objectors is they don't

19   appreciate what we did, what we're able to do, because it

20   wasn't easy or guaranteed by any stress of the imagination.

21            Your Honor, you've seen this chart many, many

22   times.  This is the inter-company claims.  They flow up from

23   the LSGT debtors to EFH.  Notably, Mr. Horton did go back

24   and update, just for his own purposes, what the interest

25   rate would be, because if you reinstate the claims, you have

1    to satisfy all the obligations that accrued during, and up

2    until the effective date, from petition to effective date.

3    That means there's interest amounts, and so these amounts

4    will be larger.  And, frankly, that's a good thing in that

5    there'll be more assets available to satisfy asbestos claims

6    to the extent there are asbestos claims.  And what we would

7    emphasize here is the historical filing of claims has

8    largely been at EECI Inc., that's the bottom left.  That

9    entity has a claim up to LSGT Gas.  As of the petition date,

10   it was $84 million.  With Mr. Horton's testimony today,

11   that's now, as of the projected effective date, to be $130

12   million.  Then LSGT Gas has a larger claim up to EFH which,

13   at the petition date, as this chart shows, is 560, and is

14   now projecting to be, forecasted to be $675 million.

15           So, in other words, through the process of the

16   reorganization, through the Debtors' efforts to work with

17   buyers, we've been able to reinstate and take what are

18   previously, you know, impaired assets, and then have a

19   wholly-solvent entity, be able to satisfy larger volumes of

20   assets for claims that may be coming in the future.

21           Now, the funding far exceeds, we think, the

22   asbestos liability.  And we say that because the post

23   emergence date, asbestos projections are forecasted to have

24   a net present value of $36.4 million in the most likely

25   scenario, and $54 million in a less likely scenario.  That

1    was the Dr. Vasquez report that we heard about, that we've

2    heard testimony about previously.  He took a conservative

3    approach.  He evaluated what the liabilities would be even

4    in a scenario in which the car date didn't hold.  He took

5    the historical run rate and forecasted it forward for those

6    asbestos -- for the entire life of asbestosis, or the entire

7    life at which -- how long would it be from the end of

8    operations until such time as other people might be exposed?

9    And it was through that more conservative approach, you

10   know, setting aside whether the bar date would hold or not,

11   that he reached these numbers on a net present value basis.

12            So, when we talk about the claims of the assets of

13   $130 million for EECI, indirectly from EEFH, flowing down

14   through to EECI, you have to say we have multiples of assets

15   available to satisfy those projected liabilities.

16            And Your Honor, this is where we have decided that

17   it was never a foregone conclusion, the bar date was never

18   the objective of the LSGT debtors.  It was a necessary, but

19   not sufficient condition to get bidders to agree to take, to

20   reinstate that the structure of these debtors, including

21   these liabilities.

22            And while we were able to reach an agreement with

23   the EFH committee, a settlement, in which we agreed to

24   reinstate and preserve the asbestos claims in full, it was

25   never a foregone conclusion.  We had to convince each buyer

1  to do so.

2          Now, I know there was a series of questions about

3  the simple level of due diligence and other treatment with

4  regard to Sempra.  I don't think Mr. Hogan is giving the

5  Debtors any credit if he tries to somehow focus on only the

6  30- to 45-day period in which Sempra emerged and tried to be

7  higher and better than the other offers.  All of the bidders

8  in this case built on the mountain of due diligence that had

9  been done previously.

10         And I say that, for example, there is no doubt

11  that someone in Sempra's position, who is trying to do

12  higher and better, would do their own due diligence, satisfy

13  themselves, but also be very aware of the fact that they're

14  competitors, right?  NextEra was willing to take this

15  liability.  Berkshire is willing to take this liability.

16  And, importantly, Sempra is trying to beat Berkshire.

17  They're trying to be higher or better across the board.  So,

18  they might be better on price, but if they're not better on

19  other terms, our board will consider this.  And you heard

20  the testimony that in evaluating whether Sempra truly was

21  higher and better than Berkshire, it wasn't just price.

22  There were other conditions as well, including regulatory,

23  you know, the regulatory support, and timing.

24         One of the big factors that the board considered

25  during this period was, could they close as quickly as

1    Berkshire?  Now, we're in a situation where we're going to

2    be able to close months faster than we thought we would be.

3    And so, all the creditors who are going to get a benefit of

4    the waterfall, are going to actually see better recoveries

5    than we thought, because the burn rate on the interest we

6    cut off faster, and there will be a truer, higher amount of

7    the 9.45 versus the 9 billion that Berkshire has offered.

8    But all of that was a factor.

9            It's hard for anyone to reasonably accept that

10   somehow Sempra didn't do sufficient due diligence.  We were

11   able to get them here and, frankly, I don't think you could

12   fault the Debtors for having reached a conclusion by the

13   fall of last year that reinstatement was a preferred path to

14   a 524(g) trust or leaving them, as general unsecured claims.

15   We heard the testimony from Mr. Horton that if there are

16   general unsecured claims, those inter-company receivables

17   would get 10 cents on the dollar.  That's -- no one wants

18   that scenario.

19           And a trust -- the testimony is, again, not

20   controversial or controverted. If you were in the fall of

21   last -- if you were in the spring -- or, sorry -- August of

22   last year, and we hadn't started down the path of a trust,

23   it would take time to go down that path, and it would take

24   money.  Where that money would come from, we don't know.

25   We've always struggled with the potential risk of EFH

1    insolvency from an administrative insolvency.  But we don't

2    have that problem.  We're fortunate we don't have that

3    problem but that was always a factor.

4            And more importantly, time.  We wanted to close

5    and cut off the interest burden as quickly as possible.  So,

6    while Mr. Hogan may fault us for not going down a 524(g)

7    path earlier, that issue was consistently revisited as we

8    approached each of the buyers.  No great surprise we didn't

9    reengage with (indiscernible) on that when the Debtors had

10   concluded that this was the best path forward.

11           Now, the one thing I would add, Your Honor, that I

12   haven't touched on in this page is Your Honor has recognized

13   that a 524(g) trust is not required to address asbestos

14   claims, and ultimately I think what we're going to hear from

15   Mr. Hogan is while he doesn't want to say you have to go

16   down that path, ultimately if you read his brief, if you

17   hear it at closing arguments, he's going to ask the Third

18   Circuit to argue that you have to go down that path.

19           Now, what's remarkable here, Your Honor, is at one

20   point we get criticized for not going forward and having a

21   legal representative or -- you know, and that -- frankly,

22   that's a language and that's a structure that applies to

23   future claimants not unmanifested claimants, and that's a

24   key distinction that Grossman's makes.

25           But Your Honor, what we're struck by is -- and

1    this is -- we're not criticizing Mr. Hogan, but Mr. Hogan's

2    clients are internally conflicted.  Mr. -- Fenicle and Fahy,

3    two of his clients, are -- were unmanifested individuals who

4    filed proofs of claim.  They're not affected by the

5    discharge in any way, right?  Others of his clients did not

6    file proofs of claim and are -- and are then raising a

7    discharge argument.  Fenicle and Fahy are actually putting

8    themselves in a disadvantage by going down this path because

9    if you look at what the alternatives are, right, they're

10   facing a potential lower recovery than the reinstatement

11   approach that we put forward here.

12          Now, one thing, Your Honor, that we've notice more

13   and more in the asbestos briefing is the asbestos

14   (indiscernible) really put forward what we think is a false

15   dichotomy.  The plan doesn't distinguish between manifested

16   and unmanifested claims, especially with regard to

17   administrative claims.  The plan says that all claims who

18   filed -- all claimants, excuse me, who filed timely proofs

19   of claims have preserved their claim.  And that makes sense

20   to us.

21          Now, in Grossman's, the Third Circuit recognized

22   that unmanifested asbestos claims are dischargeable

23   consistent with requirements of due process, and that's

24   where we get into the future claimants versus unmanifested

25   distinction.  But unmanifested claimants are present claims

1    because they've been exposed and they're on notice.  And so,

2    Your Honor, what we struggle with is we're not saying --

3    we're not trying to draw some distinction between manifested

4    and unmanifested that requires different representations or

5    anything along those lines.  All we're saying is if you file

6    the proof of claim, you're not subject to the discharge.

7    And you're on notice.  And that's why Mullane is the proper

8    analysis and the proper lens by which to evaluate the due

9    process argument.  There, publication -- Mullane recognized

10   that publication notice satisfies due process for unknown

11   claimants as long as it's reasonably calculated under the

12   circumstances to apprise those unknown claimants of the

13   pendency of the action and to afford them the opportunity to

14   present their objections.  That's exactly what we've done.

15   And we identified in our briefing and here to Your Honor

16   that the Courts have consistently filed Mullane -- the

17   Mullane standard to discharge claims of unsecured creditors.

18   That was in Chemtura.  That was in the In re: Placid Oil

19   case as specifically as it related to asbestos claims.

20            Now, this is where we really differ with the

21   asbestos objectives.  Their analogy (indiscernible) which

22   dealt with notice to a mentally incompetent person we think

23   is just grossly misplaced.  So, we believe -- we look at the

24   same facts and obviously we argue them from different

25   perspectives but we look and we see -- we sent out notice

1    and we received nearly 10,000, you know, claims from

2    unmanifested claimants that were filed just in the eastside.

3    Nearly 10,000 unmanifested claimants filed proofs of claim

4    on the eastside.  To us, that is vindication and validation

5    that our process worked, right?

6            The asbestos bar date notice from our perspective

7    in terms of due process is really no different than the due

8    process evaluations for any contingent predator, right?

9    They haven't manifested an injury yet but they've had the

10   activity.  And we all know that a bar date applies to

11   contingent creditors.  You may not have the full realization

12   of the injury yet, but if you've had the activity that gives

13   rise to the potential injury later, you need to file a proof

14   of claim.  The definition of claim captures you in that

15   regard.  And we see no material distinction between an

16   unmanifested asbestos agent who is being told in a separate

17   notice -- and I'll get to that in a minute -- in a separate

18   notice that you may have a proof of claim that may be

19   eliminated and someone else in a separate scenario who has a

20   contingent claim where the activity occurred by the injury

21   has not manifested.

22           Grossman's specifically identified that type of

23   scenario, the unmanifested claimant and that's why it

24   applies here.  Grossman's and Mullane absolutely give this

25   Court the pathway that you've adopted in the past.  And

1     while he -- while Mr. Hogan has issues, his issues aren't

2     with you, Your Honor.  His issues are with the Third

3     Circuit.  He needs to change the law to prevail.  And the

4     reason we say that is it is hard for us to accept that this

5     type of noticing program with this type of language is not

6     acceptable.

7              This is DX-68.  This is the type of notice that

8     was sent to the former employees, the former workers.  If

9     you or a family member ever worked at a power plant, you

10    could have been exposed to asbestos.  And specifically, how

11    could this affect me?  You could also be exposed by coming

12    into contact with another person who worked at a power

13    plant, for example if asbestos was brought home on your

14    spouse or your parent's clothing.  And what happens if you

15    do nothing?  If you do not submit a claim and later develop

16    asbestos-related disease, you will not be eligible for

17    compensation.  That notice and that program and our efforts

18    there reaffirm that we absolutely satisfied the Mullane

19    framework for due process.

20             Now, to my earlier point about Fenicle and Fahy,

21    their claims are preserved and will be reinstated.  They're

22    not subject to the discharge and they really have no grounds

23    to object because under Class A-3, they get that treatment.

24    Now, with regard to the other claimant objectors, Jones,

25    Heinzmann, Bissell, Carlson, Albini, and Bergschneider, they

1    have not attempted to file a proof of claim and they have

2    not made, as of yet, an as-applied due process argument.

3    But those options are available to them and that is an

4    important factor here.  You evaluate due process on a facial

5    basis and on an as-applied later.  And those avenues are

6    available to those objectors.  That's something that this

7    Court has consistently emphasized.

8              And turning to their legal framework, how they try

9    to address the due process arguments, Your Honor, contrary

10   to their argument there has been no deprivation through this

11   plan.  It's not a permanent or even a temporary deprivation

12   at stake because as the claimants have shown, if they show

13   that the did not receive due process, they did not receive

14   the notice, if they make that showing then the confirmation

15   order has no impact on them.  Because if the confirmation

16   order could not have discharged their claims, then as a

17   result the claims will be deemed to have not have been

18   discharged.  That's what Grossman's says.  And the fact that

19   a claimant would have to take steps to establish their due

20   process arguments, that is the legal process that we have

21   put forward.  If the legal framework of due process has been

22   facial on the front-end and as-applied thereafter, that is

23   not a deprivation of anyone's right.

24             And Your Honor, all we're saying is that the

25   asbestos objectors have raised these arguments before.  Your

1    Honor has rejected them repeatedly nine separate times that

2    we identify here.  And we frankly ask that you just reaffirm

3    your rulings from before.  We don't believe the evidence

4    here has been materially different in any way as it relates

5    to the asbestos objectors.  We recognize and frankly we have

6    great respect for Mr. Hogan, for how he's handled himself in

7    dealing with these arguments and how he's helped us

8    streamline these proceedings.  We're not trying to, you

9    know, do anything more than ask that we move -- it's time to

10   move forward.  We're trying to go from this court either up

11   to the District Court or -- and then probably to the Third

12   Circuit, but we believe that Your Honor is squarely within

13   Third Circuit law to, you know -- for the legal structure

14   that you've created here with the bar date and the

15   discharge.  And we fully recognize that, you know, the Third

16   Circuit may revisit itself in Grossman's.  We don't think

17   that's actually right or will ultimately be the result.  But

18   we ask that Your Honor confirm the plan given where we are

19   right now.

20          The one thing we would always -- frankly, we've

21   never had the opportunity to say before is that for the

22   first time the Debtor stand poised to emerge bankruptcy in

23   just two weeks.  We ask that you give us that opportunity.

24          THE COURT:  Thank you.  Before you step down, Mr.

25   McKane -- I'm sorry -- could you address what I think is --

1   I agree with you that Mr. Hogan is an outstanding lawyer and

2   has acted extraordinarily professionally in all these

3   matters, and I'm sure he's tired of losing and he -- but he

4   takes it with an extremely professional attitude and I do

5   appreciate that, I think he had an issue he raised with two

6   of the witnesses that I think is based on a misunderstanding

7   of the plan.  That issue is how the -- how this ongoing

8   dispute --

9              MR. MCKANE:  The allocation issue.

10             THE COURT:  -- over allocation between the EFH and

11   EFIH creditors could affect asbestos claimants, and I think

12   it's -- I don't think it -- that's applicable to them at all

13   but maybe you could flesh it out for me.

14             MR. MCKANE:  Your Honor, I'm happy to do so, and I

15   -- and while Mr. (indiscernible) -- he was absolutely right

16   in his answer, he didn't elaborate.  So, let me elaborate.

17   The allocation issue with regard to how to handle the

18   administrative claims really relates to the estates, right?

19   And with regard -- the way our plan is structured,

20   reorganized EFH and the reorganized LSGT Debtors aren't

21   going to receive any recoveries from those estates, right,

22   because those claims are being reinstated and those inter-

23   company receivables are being reinstated.  That is the

24   treatment under the plan.  And that treatment, the

25   reinstatement of inter-company payables and receivables and

1  the reinstatement of those claims is not affected in any way

2  with regard to an allocation of how administrative costs

3  will be paid out between the EFH estate and the EFIH estate.

4          Really, the parties that are affected by that

5  allocation issue are the unsecured creditors, unsecured

6  noteholders at EFH, and the picks at EFIH.  Those are the

7  two creditor constituencies that ultimately, based on that

8  allocation, will receive slightly more or slightly less

9  because the two primary estates have to address how to pay

10  out those administrative claims and let the waterfall fall

11  forward.

12          Because their claims, the LSGT Debtors' claims are

13  being reinstated and those inter-company liabilities and

14  payables are being reinstated, in essence -- and my

15  bankruptcy brothers are going to cringe here -- they're not

16  really part of that waterfall.  So, that's -- it's just a

17  separate treatment that's unaffected.

18          THE COURT:  Right.  So, even if all the cost --

19  all the money was allocated to EFIH, they wouldn't -- the

20  asbestos claimants wouldn't see more --

21          MR. MCKANE:  No.

22          THE COURT:  -- than they're otherwise getting,

23  which is they're reinstated in full.  And if all the money

24  was allocated to EFH, they wouldn't see less --

25          MR. MCKANE:  That's --

```
 1                THE COURT:  -- because they're going to get paid

 2    by Sempra in any event.

 3                MR. MCKANE:  That's exactly right.  Their assets -

 4    - those -- they have claims against those Debtors and those

 5    assets that those estates have are solely those inter-

 6    company receivables.

 7                THE COURT:  Okay.  That's what I thought.  All

 8    right.  Thank you.

 9                MR. MCKANE:  Thank you, Your Honor.

10                THE COURT:  Mr. Galardi?

11                MR. GALARDI:  Your Honor, just on that last point.

12    I was going like this because I think it's exactly the

13    opposite --

14                THE COURT:  All right.

15                MR. GALARDI:  -- if all of the money went the

16    other way.  Your Honor, let me -- may I approach Your Honor

17    with a closer --

18                THE COURT:  But the bottom line is, it doesn't

19    matter.

20                MR. GALARDI:  The bottom line is it doesn't matter

21    and we agree.

22                THE COURT:  Okay.

23                MR. GALARDI:  May I approach, Your Honor?

24                THE COURT:  Yes, of course.

25                MR. GALARDI:  I'm not sure (indiscernible).
```

1            THE COURT:  Oops.  Sorry.  They're just one of me.

2            MR. GALARDI:  If you can't do the screen, that's

3    okay.  If you can do it, great.  We're going to get some --

4    we're trying to get it up on -- ready to go?  Good.  That

5    moves it forward.  Thank you.  I'll try my best.

6            THE COURT:  Those are touch screens at the podium,

7    by the way.  It's real high-tech.

8            MR. GALARDI:  Let me just practice one.  There we

9    go.  Wow.

10           Your Honor, first, I'm going to try -- Mr. McKane

11   and I and the Debtors have talked through these issues.

12   Some -- so, some of the examples, he's gives us our view.  I

13   think just to the very high level, let's just start with

14   what we understand our dispute to be.  And we've titled this

15   -- it's a response to the confirmation objection and it's a

16   response to the proposed confirmation order.

17           So, we think that the Court has to face two legal

18   issues today.  One, whether Section 1129(a)(9)(A) requires

19   the court to reserve the full amount of the disallowed

20   administrative expense that is subject to appeal.  NextEra's

21   position is yes.  Our position is no.  And I believe the

22   Debtors have said their position is no but they have to read

23   some reasonableness into it.  Then, the second question is

24   whether under Section 1129(a)(9)(A) or some other provision

25   the court has the authority to reserve the full amount of

Page 192

1   the disallowed administrative expense at these hearings.

2   And the Debtors have NextEra have both proposed forms of

3   order that say, "Your Honor, even if you're not required,

4   today is a proper day to establish a reserve."  Elliott's

5   position is that's just simply not the case.

6           To please the Debtors once again, to be clear with

7   the court, what is not at issue is the plan can be

8   confirmed.  Elliott supports the plan being confirmed.

9   Elliott is not changing its votes.  But what's important,

10  Your Honor, is if the court holds that Section 1129(a)(9)(A)

11  requires a reserve, then the Court overrule our objection,

12  approve the reserve, confirm the plan.  We say that is a

13  legal error.

14          If the court holds that 1129(a)(9) does not

15  require reserve, then we're asking you to overrule NextEra's

16  objection, confirm the plan, and not include the Debtors'

17  language.

18          THE COURT:  I want to ask you this.

19          MR. GALARDI:  Yes.

20          THE COURT:  Regardless of required, not required,

21  it's the Debtors' plan and the Debtor can do more than the

22  Debtors' required to meet the confirmation standards.  The

23  question isn't whether they were required to do something.

24  They propose to do something they're not required to do, but

25  that's the proposal.

1          MR. GALARDI:  Well, Your Honor, I think that's --

2          THE COURT:  And I think you can read the plan, the

3   provisions I've seen, to indicate that this is already baked

4   into the plan, although there are -- you have the -- you do

5   have the estimate issue you raised.  But -- so, I guess my

6   point simply being 1129(a)(9)(A) really isn't the question.

7          MR. GALARDI:  Your Honor, we fundamentally

8   disagree with that.

9          THE COURT:  Okay.

10          MR. GALARDI:  And yes, the Debtor can do more.

11   Yes, the Debtor has as I -- as Section 7-C was set forth,

12   they have the right to estimate.  The question is do they

13   have to do that at today's confirmation hearing and is the

14   procedurally proper in light of an objection to

15   confirmation, not pending motion to estimate, no request to

16   estimate, and the parties seeking the 275 says you can't

17   even estimate under Section 502(c).

18          So, Your Honor, you have a procedural issue.

19   We're not debating that in the proper circumstances the

20   Debtors could establish that reserve as an extra.  But as a

21   requirement for confirmation and as a procedural matter

22   today, our view is that's both premature on the -- doing the

23   reserve -- there's no request -- and it's not required under

24   1129(a)(9).  We think that is exactly the issue.  So, it's

25   not that 1129(a)(9) is not effective.  It is absolutely the

1    critical provision.

2              So, let me see if I can catch up with -- just so

3    you understand the argument, Your Honor, on -- I'm going to

4    see if I can read that (indiscernible).  The first thing is

5    -- and we believe there are three grounds essentially or two

6    grounds really, statutory language as well as simple public

7    policy.  As Mr. McKane said, the Debtors want to read a

8    reasonableness element into 1129(a)(9).  We don't think you

9    can.

10             First, as Your Honor is very well aware,

11   1129(a)(9)(A) says the claim has to be allowed.  That's very

12   simple.  But remember, we're talking about administrative

13   claims, not unsecured, prepetition claims.  To be an allowed

14   claim, Congress has said something very specific.  You have

15   to file a request and the Court has to have allowed it.

16   There has to have actually been a hearing distinct from

17   502(c).  And restructuring lawyers, we get a little sloppy

18   about disputed claims, allowed claims, and there is a

19   concession as I like to say to the shortness of life with

20   respect to disputed claims.  And there are distinctions to

21   be drawn.  But I think it's important to note it has to be

22   after a notice and hearing, otherwise it's not an allowed

23   claim.  Congress has said that in 503.

24             Now, if you got to 102, it says, "What's a notice

25   and hearing?"  It simply says, "After such notice, as is

1  appropriate in the particular circumstances and such

2  opportunity for a hearing as appropriate."  It doesn't say

3  after all appeal.  It doesn't require anything more than a

4  single hearing.

5          Your Honor, our fundamental view is that if a

6  claim has not been allowed, has been in fact disallowed,

7  1129 simply does not -- (a)(9) does not apply.  This fee has

8  been disallowed.  No one in this courtroom can disagree that

9  your order disallowed it.  No one can disagree that it was

10  after notice and a hearing.  (Indiscernible) court case says

11  exactly that, Your Honor.  It says "not necessary once an

12  adjudication at the trial level has been made disallowing

13  the claim."  (Indiscernible), though the court did not take

14  an appeal because at the same confirmation hearing said

15  we're -- you're not having a claim, they basically said they

16  didn't have standing.

17          And Your Honor, this is distinguishable.  And I

18  think this is very important for Your Honor to consider in

19  the context of that $60 million claim.  If you look at the

20  Spansion decision, it says, "Look, this is short life,

21  right?  We have administrative claims.  There's an

22  administrative claims bar date.  But no one has determined

23  that.  That's what we call the disputed claims.

24          Now, I understand that plan is different.  But the

25  fact of the matter is that is a legitimate reserve.  We

1   don't have an objection today for the $60 million reserve

2   because no one has adjudicated it.  But if it's adjudicated

3   disallowed, that claim -- we all know that -- we all believe

4   NextEra will go up to the Appellate Court, to the Supreme

5   Court.  Your Honor does not have to hold a reserve for all

6   of that.  What Spansion says is you get your day in court,

7   you have to confirm the plan, and you have to make a reserve

8   for those kinds of unadjudicated claims but not disallowed

9   claims.

10          So, Your Honor, we think Your Honor cannot grant a

11  reserve and we think it's procedurally improper without a

12  motion today to foist a reserve on the Creditor

13  constituency.  Now, Your Honor, I want to address some of

14  the comments, because part of the hearing and part of this

15  today is a result of your granting the motion in limine and

16  then making some preliminary comments.

17          Your Honor suggested, and again no ruling, that a

18  reserve is -- and it's been suggested today -- a reserve is

19  the only way to protect NextEra.  That's simply not the

20  case.  First, NextEra has already in the say pending appeal

21  conceded that it can seek disgorgement from Creditors.

22  That's what they have said.

23          Second, there is clearly the right to seek a stay

24  pending appeal of the reconsideration order.  They tried it

25  here.  They failed to do it in the District Court while it

1    had jurisdiction.  They failed to do it in the Third Circuit

2    yet today.

3              Finally, Your Honor, Your Honor said, "Well, it's

4    premature" -- it's too cute by half I think the words were -

5    - "to talk about our argument about a partial stay pending

6    appeal.  That may be true, but they still have that remedy

7    as of today.  If Your Honor grants the confirmation order

8    without a reserve, they will, just as the Creditors in

9    Tribune do, have a right to seek a stay pending appeal and

10   can seek a stay of the partial distributions of 275, but

11   they're now trying to shift the burden.

12             Standard litigation, loser has to either take the

13   risk or pursue the appeal.  They lost on the reconsideration

14   order and they should have to either post a bond -- and

15   we're not going to get into the interest but you're shifting

16   it around.

17             Also, Your Honor, we do believe if you grant the

18   reserve, you are prejudicing Elliott's and the appellant's

19   rights in the Third Circuit.  One, as Your Honor well knows,

20   many arguments in the Appellate Court are your failure to

21   pursue the appropriate stays.  Your Honor is being asked to

22   give a stay.  Two, by giving a reserve, you're granting

23   suggestion to the Third Circuit that somehow your decision

24   was not proper, you're uncomfortable with it.  Now, I

25   understand Your Honor has suggested that, but Your Honor

1    denied a stay pending appeal and you disallowed the claim.

2    We all understand that that could be reversed, but we will

3    see that in pleadings.

4              The finding of a reserve is inconsistent with the

5    stay pending appeal.

6              THE COURT:  I don't think I expressed that I was

7    uncomfortable with my decision.

8              MR. GALARDI:  You expressed a tough one.

9              THE COURT:  I'm very comfortable with my decision.

10   I am not sure how an Appellate Court with consider my

11   position.

12             MR. GALARDI:  Fair characterization, Your Honor.

13   And then finally, Your Honor, we have a fourth remedy which

14   they've issued.  They've not said they want to do it, but

15   the fact of the matter is under the plan and consistent with

16   the plan as pointed out, their claim has been estimated at

17   zero unless this Court -- they obtain an order otherwise.

18   That's what Section 7-C says.  They've chosen again as a

19   litigation strategy not to seek that relief.  And so, we

20   think -- and they actually contend you can't give that

21   relief.

22             Public policy-wise, Your Honor, this is simply

23   inconsistent with the public policy of the bankruptcy law.

24   Expedite administration of the bankruptcy estate.

25   Liquidation and distribution.  Their interpretation

1    literally taken is one, you must have a reserve until the

2    final appeal is done, and two, you can't estimate a claim no

3    matter how reasonable it is or not.

4            So, Your Honor, in some ironic sense we prefer to

5    have lost the stay pending appeal argument, if you think

6    about it.  If we had not had a stay -- if they got a stay

7    pending appeal, Your Honor would have taken up the interest,

8    the bond.  We're not getting that now according to Your

9    Honor's ruling.  And if you get a reserve, what you have in

10   NextEra's order is that they will get to have that reserve

11   for all time, no reconsideration or a standard on

12   reconsideration or on 60-B.  We think that that is improper,

13   Your Honor.

14           And as far as the statutory construction, Your

15   Honor is familiar with the law that says, "Avoid

16   constructions that produce odd or absurd results."  But the

17   fact of the matter, tomorrow a personal injury claim can be

18   brought against a company for a billion dollars in

19   administrative claim.  That could stop confirmation and

20   these Debtors would have to in fact put money aside and

21   either could not confirm a plan under 1129(a)(9) or come

22   back an estimation.  But, as NextEra says, you can't have

23   that estimation.

24           It's not a discretionary matter, Your Honor.  It

25   is a straight reading of the bankruptcy code.  So, our

1    conclusion, Your Honor, is 1129(a)(9)(A) doesn't require a

2    reserve and they have remedies.  Your Honor doesn't

3    presently have the authority to grant a reserve based on

4    estimation when the plan said zero.  I understand their

5    objection.  And they have adequate remedies.  Any questions

6    for me, Your Honor?

7              THE COURT:  Not on that.

8              MR. GALARDI:  Thank you, Your Honor.

9              THE COURT:  Mr. Shore?

10             MR. SHORE:  Very briefly, Your Honor.  Chris Shore

11   from White & Case on behalf of Sempra.  I just rose to say

12   one thing.  We received the NextEra comments to the

13   conformation order.  We do not accept those comments which

14   would open the possibility of the reorganized Debtors

15   picking up liability other than that which is expressly

16   agreed to, which is the asbestos claims and the property

17   tax.  We'll be providing a line edit to the existing

18   confirmation order.  I know there are a couple of things

19   moving that's going to make it perfectly clear that the

20   reorganized Debtors are not responsible for those fees.

21             THE COURT:  Thank you, Mr. Shore.  Let's see.  Mr.

22   Pedone?

23             MR. PEDONE:  Your Honor, we've been in discussion

24   with the Debtor about some modifications to the form of

25   order that's on file today and I just want to make three

1    notes that I believe were in agreement and items will be

2    incorporated into the order later this evening.

3              THE COURT:  Okay.

4              MR. PEDONE:  First, it will be clarified that any

5    party in interest can file a motion or adversary proceeding

6    to compel the resolution of the allocation issue.  So, we --

7    if the disinterested directors don't get there --

8              THE COURT:  Say that again?

9              MR. PEDONE:  Certainly.  It will be clarified that

10   any party in interest can file a motion or adversary

11   proceeding to compel the resolution of the allocation issue.

12             THE COURT:  Okay.

13             MR. PEDONE:  So, in the event that this is not

14   resolved by the disinterested directors --

15             THE COURT:  To compel -- I don't understand.  To

16   compel the resolution?

17             MR. PEDONE:  To seek an order of --

18             THE COURT:  Or to seek a --

19             MR. PEDONE:  I'm sorry, Your Honor.  Yeah.

20             THE COURT:  -- resolution.

21             MR. PEDONE:  To seek a resolution.

22             THE COURT:  Okay.

23             MR. PEDONE:  To have this court enter an order to

24   determine --

25             THE COURT:  A declaratory judgment.

1          MR. PEDONE:  I'm not quite sure if it would be a

2    motion or a declaratory judgment action, but we could seek

3    the appropriate relief in court --

4          THE COURT:  Okay.

5          MR. PEDONE:  -- so that we're not bound by a

6    timeline that the Debtors may or may not be able to adhere

7    to --

8          THE COURT:  Understood.

9          MR. PEDONE:  -- or the Debtors don't exist.

10   Second, the plan administrator -- there's a plan

11   administration agreement that's part of the plan supplement.

12   The order is going to provide that that will be amended in

13   some way so that the -- I'm sorry -- that that will be

14   amended in some way so that the plan administrator can very

15   clearly appoint representatives of the two different estates

16   to address the issue post-effective date.  We're not

17   confident that the current draft is clear in that regard.

18         THE COURT:  Okay.

19         MR. PEDONE:  So, the issue can be resolved later.

20   Finally, Your Honor, the third point is that the plan

21   administrator will have the discretion to make interim

22   distributions at EFH if the plan administrator in their

23   discretion determines that that could occur while the issue

24   is still being resolved.

25         THE COURT:  Understood.

1            MR. PEDONE:  And with those three points, we

2    believe our issues with the order -- form of order will be

3    addressed.  Finally, Your Honor, as you know, we have a

4    request for allowance of our administrative claim.  I don't

5    believe I need to address that any further.  The declaration

6    is in and I believe the Court is able to take notice of the

7    contributions we've made in the case.  If the Court has any

8    questions, I'll answer them but won't make any further

9    argument.

10            THE COURT:  I don't have any questions.  I am

11    going to address that and Elliott's similar request when I

12    rule on confirmation, however.

13            MR. PEDONE:  Okay.

14            THE COURT:  I don't have any questions.

15            MR. PEDONE:  Thank you.

16            THE COURT:  There's a gentleman in the back who I

17    -- apologize.

18            MR. CARTY:  Your Honor, Christopher Carty of Akin

19    Gump Strauss Hauer & Feld for UMB Bank NA as the EFIH pick

20    Trustee.

21            THE COURT:  Good afternoon.

22            MR. CARTY:  The Trustee supports confirmation;

23    however, the Trustee filed a reservation of rights that

24    included the reserve issue.  And I rise briefly just to say

25    the Trustee joins in Elliott's arguments as articulated by

1   Mr. Galardi.

2          THE COURT:  Okay.  Thank you.  Anyone else before

3   I turn it over to the objectors?  Actually, if I could -- if

4   we could take, say, five minutes.  It's --I need more often

5   breaks as we get later in the day.  My -- I get tired.  But

6   if we could just take, say, five minutes and then I'll hear

7   from the objectors.

8          MAN 1:  Thank you, Your Honor.

9       (Recess)

10         CLERK:  All rise.

11         THE COURT:  Please be seated.  Excuse me.  Have

12  you flipped coins?  Mr. Glueckstein.

13         MR. GLUECKSTEIN: Your Honor, just so the record is

14  complete, I said it this morning, Brian Glueckstein,

15  Sullivan Cromwell, for the E-Side Committee.  Just so the

16  record is complete here at closing, the E-Side Committee

17  does support confirmation of the plan, entry of an

18  appropriate confirmation order.  We do agree with the

19  further changes that have been discussed over the course of

20  the day, and that Mr. Pedone put on the record.

21         The plan, as has been alluded to in the testimony

22  over the course of the day does preserve and effectuate the

23  E-Side Committee settlement agreement that was approved by

24  this Court November of 2015, and so we do believe it is time

25  to permit -- and we're happy to see the debtors hopefully

1    emerge from bankruptcy in short order.

2            Your Honor, to the extent that any -- the Court is

3    inclined to set any sort of reserve today, we do think it is

4    imperative that the Court retain flexibility to provide the

5    opportunity for that to be modified in the future, as

6    circumstances develop (indiscernible).  Thank you.

7            THE COURT:  Thank you, Mr. Glueckstein.  Mr.

8    Hogan?

9            MR. HOGAN:  Thank you, Your Honor.  Thank you for

10   your comments earlier, too.  I very appreciated that.

11           THE COURT:  You're welcome.

12           MR. HOGAN:  Your Honor, the definition of insanity

13   is taking the same action over and over again and hoping for

14   a different result.  So, don't lock me up, Your Honor,

15   please.

16           Your Honor, I'll start this with a short story.

17           THE COURT:  Okay.

18           MR. HOGAN:  Grossmans, long before it was Third

19   Circuit precedent, to me it was just a hardware store.  I

20   grew up in Upstate New York.  My father was a lawyer and he

21   would renovate houses on the side and he would hire -- he

22   used his sons, myself includes, to do some of the

23   renovations.  He would have me steam wallpaper off the

24   walls, only to come in the next day and say, these walls all

25   have to come out, and -- go get drywall down at Grossmans,

Page 206

1    and so I would.

2           Fast forward 25 years, and I'm practicing law here

3    in Delaware and -- with co-counsel, the (indiscernible)

4    appear, and we take their case and bring it up to the

5    Bankruptcy Court, District Court, ultimately to the Third

6    Circuit; and you're very familiar, obviously, with the

7    Grossman's opinion.

8           We're here today to talk about due process, Your

9    Honor, and ultimately that's our argument.  It's a legal

10   argument.  It's our position that the plan is proposed by a

11   means which is forbidden by law, that discharging

12   unmanifested asbestos claims in these cases would violate

13   due process.  Bankruptcy Code 1129(a) provides that a Court

14   shall confirm a plan only if it is proposed in good faith

15   and not proposed by a means forbidden by law, including the

16   Constitution, obviously.

17          Ultimately, Your Honor, from our position, the

18   adequacy of the notice on the notice plan and the adequacy

19   of the notice in this case is dependent on the circumstances

20   in this case.  In Moline, the Supreme Court held that due

21   process requires notice reasonably calculated under all

22   circumstances to apprise interested parties of the pendency

23   of the action and to afford them an opportunity to present

24   their objections.

25          Moline focused on the means of actually informing

1    the individuals.  After the Moline, the Court's aware, the

2    Supreme Court was presented with circumstances in the

3    (indiscernible) case.  In that case, the Court had to decide

4    whether someone who had been noticed who was in competent

5    not represented by a guarding, whether their due process was

6    satisfied.

7            The debtors' notice to the asbestos claimants here

8    who were not represented by an independent estate fiduciary

9    was a mere gesture, and not reasonably calculated to

10   effectively reach those individuals, and does not meet the

11   requirements of a lien, such as notice directed to an

12   incompetent person not represented by a guardian, does not

13   suffice.

14           The unmanifested asbestos claimants could not

15   possibly be identified by themselves or by the debtors.  As

16   the Court is aware, in (indiscernible), the Supreme Court

17   recognized the impediments to the provisions of adequate

18   notice to claimants who had no perceptible asbestos-related

19   diseases.  That case involved an effort to provide an opt-

20   out notice for a class action.

21           In this instance, Your Honor, due process requires

22   that unmanifested asbestos claimants must be adequately

23   represented in this bankruptcy proceeding, and they weren't.

24   Your Honor, it's our perspective that the construct of this

25   case, the multiple plans, the multiple confirmations, that's

1    the debtors' construct.  The debtors came to you, they asked

2    for a bar date.  The debtors objected and opposed the

3    appointment of a representative to represent future

4    claimants.  That's the construct that we find ourselves in

5    today, and that's the construct which gives rise to the

6    failings of due process.

7            In these cases, the debtors, as you know,

8    vigorously and successfully oppose the appointment of that

9    legal representative.  The debtors have also argued that

10   their asbestos liabilities were not material, and that the

11   debtors' bankruptcies were not a result of asbestos

12   liabilities.  The debtors have since acknowledged, however,

13   that the asbestos debtors' bankruptcies were indeed asbestos

14   driven and did not do so long after this Court had already

15   declined to appoint a legal representative.

16           The three-fold inquiry set forth by the Supreme

17   Court in Mathews versus Eldridge and the Connecticut versus

18   (indiscernible) show that due process has not been afforded.

19   The objectors to not contend -- we don't contend that it's

20   not possible to ever discharge unmanifested asbestos claims

21   in a matter that comports a due process, but that such a

22   discharge is not constitutionally permissible; whereas, here

23   there's been no legal representative and where there's been

24   no other protections of their rights afforded to these

25   claimants.

1          Your Honor, one of the issues raised was about

2    whether or not there was any deprivation.  There are private

3    interests of these claimants, and they're significant.  The

4    private interests of unmanifested asbestos claimants are

5    significant.  The right to pursue an action for damages

6    caused by a (indiscernible) is a private interest of

7    historical and continuing importance.

8          Discharging these claims will deprive the

9    unmanifested asbestos claimants of their right to pursue an

10   otherwise valid claim and to obtain compensation for their

11   injuries.  That erroneous deprivation is certain and the

12   value of additional safeguards is apparent.  The debtors

13   have no legitimate countervailing purpose or interest and

14   the governmental in ensuring equitable treatment of

15   claimants mitigates against discharge.

16          The debtors have asserted, Your Honor, that the

17   bidders insisted that unmanifested asbestos claims be

18   discharged. The evidence shows, however, that in July of

19   2016, NextEra -- at the time the winning bidder -- suggested

20   that the debtors pursue a 524(g).  The debtors have asserted

21   that if a bidder had agreed to assume liability of all

22   unmanifested asbestos claims, that such a concession would

23   undoubtedly come at a material and significant cost to the

24   detriment of all the other EFH Corp. and EFIH stakeholders.

25          Essentially, the debtors are arguing that

1    unmanifested asbestos claims is justified -- that

2    discharging them was justified -- because it increases the

3    purchase price resulting in a higher payment to creditors of

4    the asbestos debtors' parents, EFH Corp. and lower the

5    asbestos related liabilities of the reorganized debtors and

6    their new owners.

7            But discharging a group of claims of one

8    creditor's in order to benefit the parent, is not a

9    legitimate purpose. The relevant governmental interest here

10   is the interest of ensuring equity of distribution among the

11   various creditors.  The unmanifested asbestos claims cannot

12   be discharged under the circumstances of this case.  The

13   issue before this Court is whether unmanifested asbestos

14   claims in these circumstances would violate due process.

15           The objectors know, however, that they are not

16   aware of any case in which a Court has entered an order

17   discharging unmanifested asbestos claims without

18   compensation; whereas, here the debtors are aware of a

19   significant number of such claims which would arise in the

20   future.

21           I elicited the testimony.  You saw it.  There was

22   a history right before the filing, and we would argue that

23   that demonstrates clearly that they were aware of the

24   history, which is entirely counter to what we saw in

25   Grossman's.  The Court has to determine whether discharging

1    unmanifested asbestos claims would violate due process

2    before this plan can be confirmed.

3           Now, I understand we've talked about Grossman's,

4    Your Honor.  I understand your position on Grossman.  So,

5    let me just take one last shot at attempting to get you to

6    see it my way.  Grossman's was a case, as I said, where the

7    Mrs. Van Brunt didn't manifest until well after the case had

8    been terminated.  The Court went through the process.  It

9    made a change about how a claim is defined, what gives rise

10   to a claim.  But as soon as it made that inquiry and made

11   that determination, it immediately turned to whether or not

12   due process had been satisfied or could be satisfied.  And

13   in doing so, it looked at 524(g).  And it's our position

14   that that is the appropriate analysis.  It's not that you

15   have to do 524(g), but when you look at all the factors,

16   524(g) is the desired outcome.

17          Now, from our perspective, Your Honor, we look at

18   Grossman's as a case where it was done from a temporal

19   aspect.  Before Grossman's, it worked a certain way.  After

20   Grossman's, now we have this new calculus.  But the point

21   remains that a retrospective case-by-case analysis has to be

22   -- it has to be mandated that way.  The mischaracterization

23   of the Third Circuit's decision in Grossman is apparent from

24   our perspective.  The plan of reorganization in Grossman's

25   was confirmed in December 1997.  Almost 10 years later, she

1    was exposed to asbestos.

2           Both the Bankruptcy Court and the District Court

3    relying on Third Circuit decision in Frenville found that

4    when the plan was confirmed, Mrs. Van Brunt did not have a

5    claim within the meaning of Section 1015 of the Bankruptcy

6    Code and that her claims had not accrued under state law

7    until 2007 when she was diagnosed.  Obviously, the Court

8    overturned that, and the Court determined that a claim

9    arises when an individual is exposed pre-petition to a

10   product or other conduct giving rise to an injury.  The

11   Court remanded it, and when doing so, the Court asked and

12   indicated that a number of factors would be considered.

13          And those factors included the circumstances of

14   the initial exposure, when -- whether and when the claimant

15   was aware of their vulnerabilities to asbestos, whether the

16   notice of the claim bar date came to their attention,

17   whether the claimant was a known or unknown creditor,

18   whether the claimant had a (indiscernible) claim at the time

19   of the bar date, and other circumstances specific to the

20   parties, including whether it was reasonable or possible for

21   the debtor to establish a trust for future claims.

22          Nothing in the Third Circuit opinion in Grossman

23   could be read as supporting a proposition that in deciding

24   whether the plan meets the requirements for confirmation,

25   this Court cannot consider whether the plan's discharge

1    provisions would violate due process.  Nor does Grossman

2    suggest that the Court may consider the due process

3    retrospectively only on a case-by-case basis where a

4    claimant falls ill and challenges the discharge of her

5    claim.

6            Indeed, such a role would be directly contrary to

7    the Supreme Court's instruction in (indiscernible) that

8    before issuing an order that would deprive a person of

9    property without notice, a Court must ensure that the order

10   comports with due process.

11           Your Honor, our other argument relates to the

12   issue of the plan not being proposed in good faith, and

13   obviously that's an 1129(a)(3) objection.  The good faith

14   standard requires that the plan be proposed with honesty,

15   good intentions, and a basis for expecting that

16   reorganization can be effected with results consistent with

17   the objectives and purposes of the bankruptcy code.  That

18   determination requires a factual inquiry of the totality of

19   the circumstances and the subjective intent of the plan

20   proponents as one of the factors to be considered.

21           Your Honor, it's our position that a lack of good

22   faith is evident here because the debtors have sought to

23   delay or frustrate the legitimate efforts of creditors to

24   enforce their rights.  Here the plan was not proposed in

25   good faith with honesty and good intentions.

1          Instead of dealing fairly with and seeking to

2    minimize the recovery of the asbestos victims, the debtors

3    have proposed a plan which would delay or frustrate

4    legitimate efforts of unmanifested asbestos claimants to

5    enforce their rights while steadfastly refusing to provide

6    any protection to these claimants.

7          And for those reasons, Your Honor, we ask that the

8    plan not be confirmed.  Thank you.

9          THE COURT:  Thank you, Mr. Hogan.  NextEra?

10          MR. DAUCHER:  Good morning, Your Honor.  Eric

11    Daucher from Norton Rose Fulbright on behalf of NextEra, and

12    I realize I just said, "good morning."  We're well into the

13    afternoon at this point.

14          THE COURT:  Okay.

15          MR. DAUCHER:  But I'm not the only one who's

16    confused, it turns out.  What I just heard from the debtors

17    was indicative of deep confusion.  I want to set the record

18    straight on a few points.

19          First, NextEra is not asking for an extra reserve.

20    We're not asking for 275 plus 60.  The 60 is purely

21    subsidiary of the 275.

22          Second, we're not asking to impose liability on

23    the reorganized debtors.  That's actually what we're trying

24    to prevent.

25          The reality is that administrative claims need to

1    be paid in full in cash, and if they aren't paid on the

2    effective date, they have to be paid at some later point.

3    We've asked for a reserve to be established to address

4    exactly that reality.  As long as there's $275 million firm

5    in a reserve, there's no possibility of there being

6    spillover liability to Sempra.

7            That's why we're so concerned, aside from the fact

8    that we might not get the money.  If you cut holes in this

9    reserve, there's the possibility that a year from now

10   NextEra has a claim that exceeds the amount of the reserve

11   and somebody's left footing the bill.  Now, it's perhaps

12   true as Mr. Galardi has suggested, that we could come after

13   creditors for that money.

14           But it's also true under the caselaw that's out

15   there that under the right circumstances, the reorganized

16   debtors can get stuck with the bill.  There are multiple

17   circuit level decisions that hold exactly that.  By asking

18   for creditors to be provided with a premature -- I think my

19   phrase was escape hatch, your phrase is safety valve -- the

20   reality is that you create the potential for shifting risk

21   from unsecured creditors, where that risk belongs, to the

22   reorganized debtors.

23           To be clear, again, that's a result that NextEra

24   is looking to avoid.  And I believe our language does avoid

25   it.  The solution is really quite simple.  A reserve should

1    be maintained in an amount that's sufficient to satisfy

2    NextEra's claims in full.

3            Now I want to briefly touch on Elliott's remaining

4    or new arguments, depending on how you want to characterize

5    them.  Initially, Elliott had argued that debtors can't be

6    compelled to establish a reserve.  That's passed us by.  The

7    debtors have now agreed to establish a $275 million reserve.

8    Article 6(a) of the plan says that the debtors are going to

9    reserve says that the debtors are going to reserve; they're

10   now following through on that.

11           I don't understand Elliott to have ever contended

12   in the past that the debtors couldn't reserve, and to the

13   extent that's their contention, there's a weight of

14   authority to the contrary.  Now, Elliott cited a interesting

15   range of authorities.  We've gone to the Southern District

16   of Texas, we've gone to the Southern District of Ohio; all

17   of which gives the impression that the Third Circuit has

18   never spoken to exactly this issue.  But you'd be wrong in

19   thinking that.

20           In fact, the Third Circuit has squarely held that

21   a debtor should reserve for a disallowed administrative

22   expense claim that goes up on appeal even in the absence of

23   a stay pending appeal.  (Indiscernible) Philadelphia

24   Newspapers case.  Now that -- and that's at 690 F. 3d. 161,

25   the (indiscernible) is 171.

1          Now, Philadelphia Newspapers is ultimately a case

2    about equitable mootness, and I won't try to disguise that.

3    But in addressing the equitable mootness question, the Third

4    Circuit looked at exactly the question poste here, whether a

5    debtor was required to or should have reserved for an

6    administrative expense claim that was disallowed, an appeal

7    was taken, there was no stay pending appeal.

8          And the Third Circuit unambiguously concluded that

9    a reserve was proper.  Here's what the Third Circuit said,

10   just so there's absolutely no doubt.  "Moreover, the CSMI

11   parties' appeal of the Bankruptcy Court's disallowance of

12   its requests categorize the requests as disputed

13   administrative expense claims.  Under the plan, the debtors

14   should have set aside sufficient funds in the distribution

15   account to fulfill the requests if the CSMI parties

16   prevailed on appeal and the requests later became allowed

17   claims."

18         Now, we can quibble about whether that literally

19   means that in all cases administrative expense claims that

20   go up on appeal must be reserved for in full.  We heard

21   hypotheticals about the random billion dollar claim that

22   gets lobbed in to create, you know, wrench in the gears,

23   disrupt a plan.  That's not the hypothetical -- that

24   hypothetical is not the situation we're dealing with here.

25         We're talking about a claim in a known amount that

1    was, at one point approved, is now disapproved, and while

2    reasonable minds can differ about where that appeal is

3    ultimately headed, Your Honor did acknowledge that NextEra

4    has at least a probability more than a negligible

5    probability of success on the merits.  We're not talking

6    about the hypothetical the debtors have suggested here.

7           And the Third Circuit's holding there cuts cleanly

8    through any remaining argument, certainly that the debtors

9    can't establish a reserve consistent with the law.  That's

10   just -- that's out the window where the Third Circuit didn't

11   know what they were talking about.  It also cuts cleanly

12   through this attempt to distinguish in all cases between

13   disallowed administrative expense claims that go up on

14   appeal and disputed administrative expense claims.

15          As the Third Circuit stated, "A disallowed

16   administrative expense claim becomes a disputed claim the

17   moment an appeal is taken."  The moment an appeal of that

18   disallowance is taken.  That's the law.  We think it's more

19   than sufficient to mandate a reserve in the full amount of

20   NextEra's claim.  It's certainly enough to prove that a

21   reserve can be established where we have agreement between

22   the debtors and NextEra.

23          Beyond the law supporting the establishment of a

24   reserve, the equities are also strongly in favor of a

25   reserve.  As Your Honor noted, the integrity of the judicial

1    process stands to suffer in the absence of a reserve.

2              The plan here calls for all unreserved assets of

3    the debtors to be distributed out to creditors either on the

4    effective date or as soon as practicable after the effective

5    date, and I understand that creditors are actively pushing

6    to make those distributions happen quickly, and if I were

7    their counsel, I'd be doing the same thing.

8              And while NextEra's appeal is proceeding rapidly,

9    it's not expected to be completed before the Third -- sorry,

10   before the effective date occurs which, I believe, is

11   scheduled for -- anticipated for March 9th.  If funds are

12   not reserved in full, or in the alternative, if this reserve

13   is allowed to be revisited and pillaged sometime before

14   NextEra's appeal is resolved, NextEra has no remedy against

15   the debtors' estates.

16             THE COURT:  I'm going to interrupt you for a

17   minute.  I'm just -- You know, that makes you think I'm

18   going to pillage the reserve?  What are you scared of?  I'm

19   going to give you the reserve, it's not like (indiscernible)

20   already spoke Thursday about why I thought it was

21   appropriate to give you the reserve.  What do you think I'm

22   going to do?

23             MR. DAUCHER:  Your Honor, it's not what we think

24   you're going to do.

25             THE COURT:  Well, I'm the guy that signs the

1    order.

2            MR. DAUCHER:  I appreciate that.  I appreciate

3    that.  It's what we, perhaps, think litigious parties are

4    going to do and we anticipate appeals of any orders denying

5    a reduction in the reserve.  We understand that under some

6    dramatic circumstances, if it looks like one party or the

7    other is trying to string this out just to inflict pain on

8    the other side, it may be appropriate to revisit this

9    number.

10           In fact, if it was as simple as one side wins at

11   the Third Circuit level and the money comes out or it

12   doesn't and we set aside considerations of en banc review or

13   (indiscernible) understanding that those are long shots

14   under the best of circumstances, that's the sort of thing

15   NextEra could live with and we offered up.

16           Something else we offered up was if that

17   reconsideration was tied to a real standard, like Rule

18   60(d).  Our problem is the idea that there is this free-

19   floating, amorphous, this number can be revisited language

20   in the order.  Because what that invites, is a week from now

21   -- and you heard the testimony on that -- or two weeks from

22   now, we have another motion back in front of Your Honor

23   seeking to cut down that reserve, and we are right back here

24   today having this fight all over again.  That's what we want

25   to avoid.

1      We are deeply prepared to be reasonable.  It is

2  the utterly amorphous standard that we're being asked to

3  accept that bothers NextEra.

4      If I can -- unless Your Honor --

5      THE COURT:  No, that's fine.

6      MR. DAUCHER:  So, as I was saying, if the money

7  leaves, NextEra doesn't have a remedy against the debtors'

8  estates.  Now, that doesn't mean NextEra agrees that the

9  appeal is necessarily moved, as Mr. Galardi, I believe,

10  noted.  We've said in our papers that we think there are

11  potential remedies, one, against creditors, and two, against

12  the reorganized debtors.  Now, as I've already said,

13  remedies against the reorganized debtors are bad for

14  everybody.  Because if that's what's on the table, you do

15  risk, as you've heard today, several walking away or of

16  renegotiating a deal.  We don't want that.

17      But in either case, Courts in this district have

18  recognized on multiple occasions, including in some of the

19  cases cited by Mr. Galardi such as the Tribune case, that

20  putting creditors, claimants in the position where their

21  only remedy is to seek disgorgement constitutes irreparable

22  harm.  So, while it may be true that there are some other

23  things in the future NextEra could maybe do to recover some

24  of this money, maybe, if it goes out of the reserve, that's

25  a tough road and it is a path that Courts have recognized

1     (indiscernible) irreparable harm.

2              Now, counterbalanced against that harm is only a

3     limited arm from establishing (indiscernible) -- from

4     establishing a reserve, excuse me, in full.  First, a full

5     reserve doesn't endanger the Sempra plan.  As long as the

6     money is perfectly set aside, there's absolutely no

7     possibility of any further recourse against the reorganized

8     debtors.

9              I will acknowledge that it's true that fully

10    maintaining a reserve may, at the end of the day, delay some

11    distributions that would otherwise flow to unsecured

12    creditors.  But the plan itself in Article 6 says that

13    distributions to unsecured creditors may be delayed by and

14    are entirely contingent upon the establishment of

15    appropriate reserves.  That's not new, and that's the deal

16    that Elliott signed up to support.

17             In sum, NextEra believes that both the law and the

18    equities are firmly on the side establishing the full and

19    inviolable reserve.  We have the debtors' agreement as to

20    their being a full reserve.  We're simply asking for the

21    Court's help in ensuring that the reserve remains intact

22    until the ongoing dispute is resolved.

23             One final point, if you'll indulge me, that I want

24    to circle back and touch on.  We've heard now for the first

25    time some suggestion that because NextEra hasn't moved to

1    estimate its claim, a reserve can't be established.  One,

2    that's just not consistent with what the Third Circuit seems

3    to have said in Philadelphia Newspapers.

4            But in any case, the provisions of the plan

5    highlighted by Mr. Galardi relating to immediately reducing

6    or estimating disallowed claims at zero dollars, one, as a

7    provision of a plan it isn't effective until the plan is

8    confirmed and goes effective, so it's not as though NextEra

9    had some obligation to it already; but two, those are

10   exactly the portions of the plan that NextEra objected to,

11   not in the footnote, not in the paragraph, entire Roman 3 of

12   NextEra's objection to the plan was addressed at exactly

13   those provisions.  And neither the debtors nor Elliott stood

14   up to say anything in answer to that objection.  This is the

15   first we're hearing about it, and I think it should be

16   disregarded for that reason.  Thank you.

17           THE COURT:  You're welcome.  Thank you.  Mr.

18   McKane?

19           MR. MCKANE:  Two minutes, Your Honor?

20           THE COURT:  Yeah.

21           MR. MCKANE:  And I will be fairly brief and out of

22   respect to Mr. Hogan, (indiscernible) rest on our papers and

23   our argument before as relates to the asbestos objections.

24           If you had no idea about anything else that

25   happened today, and you walked into this courtroom when

1    counsel for NextEra was making that argument, you would

2    think we'd be fighting about whether there should be a

3    reserve set at all.

4            We're here saying $275 million, subject to

5    revisiting based on future circumstances down the road.  We

6    can't predict what that's going to be.  It's just the

7    billion dollar hypothetical.  We have flagged a fundamental

8    issue.  The Third Circuit affirms Your Honor, you know,

9    finding that there is no benefit to the estate under that

10   circumstance here, because there was no higher and better

11   order.  They want, in their own language -- this isn't us

12   making this up -- in their own language they want to say,

13   you know what, only release 215.

14           There is no possible scenario under which that

15   could possibly be anything other than 275, because how could

16   you ever establish that you're going to be able to establish

17   a benefit for the 60 that wouldn't be (indiscernible) the

18   275.

19           But, Your Honor, we don't need to be litigating

20   this now.  We don't.  This is all just pre-litigating and

21   posturing for down the road.  We've -- all we ask is that we

22   keep the language in there, everyone reserves their rights,

23   parties can come in.  We have great faith in you and the

24   judicial system more generally to evaluate these issues, and

25   we ask that you enter the order that we put forth.  Thank

1    you.

2            THE COURT:  Thank you.  Mr. Galardi?

3            MR. GALARDI:  Very, very briefly, Your Honor.

4    One, I think that you noticed the confirmation said that

5    this would be required and rejections would have to be

6    seeking estimation, so I don't think that that's the valid

7    argument.

8            Second is, Your Honor, as you're well aware having

9    gone through two conferences, it was Elliott's position that

10   if there were to be a reserve, it was subject to the

11   interest rate.  Your Honor's ruled on the interest rate.

12           We disagree with the legal view that, one, we

13   think you do need to make the finding on 11(a)(9).  Your

14   Honor, we understand the plan.  We are not saying that no

15   reserve could ever be established.  We just think this is

16   not the day to put that reserve into that confirmation

17   order, because we have a disallowed claim at zero today.

18   That's all.  Thank you.

19           THE COURT:  Thank you.  All right.  Thank you very

20   much.  I'm going to take a recess and then I'll come out and

21   rule.  Shouldn't be very long.  I just want to check things

22   and go and have a look at this case cited by NextEra and I

23   want to look again at the language.  Do you have a redline

24   of the order -- confirmation order handy?

25           MR. MCKANE:  I'm sure we do.  I believe it's

1      attached to the final we did last night.

2              THE COURT:  Yeah, I don't have that handy.

3              MR. BALL:  It is (indiscernible) 58 in the witness

4      binders, Your Honor.  It's -- the final from last night

5      (indiscernible).

6              THE COURT:  NextEra 58?  Has that got the

7      blackline in it?  Oh, I got it.  I got it.  I'm good.  I'm

8      good.

9              MR. MCKANE:  Your Honor, Page 22 of our

10     (indiscernible) from our perspective.

11             THE COURT:  Okay.

12             MR. DAUCHER:  Your Honor, if it's helpful, we have

13     extra copies of the case we cited available.

14             THE COURT:  That's what Ms. Werkheiser's doing,

15     so, we'll get it.  All right.  We're in recess.

16         (Recess)

17             CLERK:  All rise.

18             THE COURT:  Please be seated.  Okay, well first,

19     as always, with the attorneys that have been appearing in

20     front of me in this case throughout the last four years, I

21     want to complement all involved on their professionalism,

22     their efficiency, working together to present an efficient

23     presentation to the Court, and their presentations to the

24     Court, which were very good.

25             I'd particularly like to give a shout out to the

1    Kirkland & Ellis associates and young partners who appeared

2    today to present witnesses, present argument, and so they

3    all did an excellent job.  And I'd love to see other firms

4    give younger attorneys an opportunity to take those kind of

5    risks and have those kinds of opportunities in the future.

6           Most of what we did today is uncontested, and I'm

7    going to deal with that very quickly and then I'll talk

8    about the remaining objections.  But the record clearly

9    establishes that subject to talking about the objections,

10   that the uncontested 1129 factors are clearly met.  And the

11   Sempra merger is by far the highest and best outstanding

12   offer for the Debtors and the best possible road to exit.

13          I would like to congratulate Sempra and their

14   professionals for navigating the regulatory hurdles that

15   exist in this case, and being so flexible in their approach

16   to the PUCT, which led to the ability for that matter to be

17   completely uncontested and well on its way to approval.  And

18   I do sincerely congratulate them on that.  So, there's no

19   question that the plan is the best situation as we sit here

20   today.

21          Let's see.  Two and a half years ago in December

22   2015, we had a plan unimpaired, the E-side, and we're not

23   there today, obviously, and that's unfortunate.  A lot of

24   things have happened to get the unsecured creditors at EFIH

25   and EFH from unimpaired to a recovery that is certainly less

1    than 100 cents on the dollar.

2              At the same time, there's been a lot of work to

3    make the best of a tough situation, and obviously getting

4    Berkshire Hathaway to the table and then getting Sempra to

5    beat out Berkshire was to the benefit of the unsecured

6    creditors.  And I congratulate the Debtors for that, and I

7    congratulate Elliot for its role in that, as well as the E-

8    side Committee and American Stock Transfer.

9              So, I still have the objections.  First, the

10   objection to Mr. Miller.  First of all, Mr. Miller did not

11   appear today in court or on the telephone to prosecute that

12   objection, but the Court will deal with it on the merits

13   nonetheless.

14             Mr. Miller's complaint is about a transaction that

15   occurred prepetition where his secured bonds were

16   refinanced, and those who weren't eligible institutions were

17   not able to participate in that, and those bonds became

18   unsecured.  We dealt with this previously in this case.

19   That was a transaction that occurred under applicable

20   nonbankruptcy law, or was consistent with that law, and the

21   remedy, if anything, expired on that issue many years ago.

22             It is, of course, unfortunate that small holders

23   were not necessarily able to preserve their secured status,

24   but that is not a question for this Court, hasn't been

25   properly put before this Court, and certainly hasn't been

1    preserved for this Court to rule upon.  And I won't say more

2    on that.

3              And to create a special recovery for unsecured

4    creditors and treat them like secured creditors, which is

5    basically what Mr. Miller asks for, would be to create an

6    unfair discrimination issue and make the plan not

7    confirmable.  So, that objection is overruled.

8              With regard to the asbestos claimants, I'm

9    actually -- I'm glad that Mr. Hogan introduced the evidence

10   about the actual claimants who were injured and have

11   asbestos injuries, because it points out to the Court

12   something that I'm very cognizant of, but also makes clear

13   on the record that this is a serious decision that affects

14   real people's lives.

15             And it may be cold comfort to those people, but I

16   take it very seriously and I take it very personally, and do

17   not make the rulings that I'm making in connection with the

18   bar date and discharge lightly at all.  However, as I have

19   ruled numerous times now in this case, I believe that the

20   use of the asbestos bar date and notice program that

21   happened as a result, the $2 million notice program that

22   happened as a result of the order approving the asbestos bar

23   date, was proper, was supported by the evidence, and was

24   consistent with due process.

25             Applying that bar date to the discharge at this

1    time I believe is also justified by the facts and is

2    entirely appropriate and consistent with due process and

3    applicable law.  I think it specifically allowed by the

4    Grossman's case, which is controlling 3rd Circuit precedent.

5    The 524(g) plan injunction is available, but not required.

6    And it may even be preferable.  But again, it's not

7    required, and I don't believe due process requires it in

8    this instance.

9           The reason the Debtors have pursued, and the

10   evidence supports this -- have pursued the bar date and this

11   discharge, which actually you obviously have to work in

12   tandem, the bar date and discharge was to maximize the

13   recovery to other asbestos claimants.

14          And this is true through the E-side Committee

15   settlement that was approved in 2015, and has been followed

16   through in the NextEra deal, and in the Berkshire deal, and

17   now in the Sempra deal, that reinstates timely filed claims,

18   manifested and unmanifested, reinstates those claims in

19   full, and provides a funding mechanism that is far superior

20   to the existing funding mechanism in that the parent

21   ultimately responsible for those claims is a highly solvent

22   entity with a market cap of $50 billion or so, and an

23   ability to raise third-party financing.

24          This sort of pits certain claimants against other

25   claimants, and that puts them in a very difficult position.

1    And I don't fault -- Mr. McKane points out that Fenicle and

2    Fahy sort of working against their own interests in

3    objecting because they had reinstated claims.  You know,

4    people sometimes act against their economic interests based

5    on nonmonetary reasons.

6              And I'm not going to guess why Fenicle & Fahy

7    support this, but -- or do not support this -- but I

8    certainly don't fault them for taking these actions.  They

9    may be acting to preserve an idea or a belief of theirs

10   that's more important to them than whether or not they get

11   paid.  That said, I take it seriously, but I am going to

12   overrule the objection.

13             Now, what I'd like to do is specifically

14   incorporate a couple of my previous rulings on this matter

15   so I don't spend the next 30 minutes going through the

16   various items.  Specifically, my rulings at the NextEra

17   planning confirmation, the NextEra plan -- excuse me,

18   NextEra disclosure statement.  I also dealt with this, I

19   believe, preliminary at the Hunt plan disclosure statement

20   and confirmation hearing.  And of course, I specifically

21   wrote on this in regard to the asbestos bar date, as well as

22   the motion to dismiss.

23             So, the Court is incorporating those holdings,

24   those rulings, in this ruling.  So, for appellate purposes,

25   I believe this would be part of the -- those would be part

1    of the record.  All right.

2         That leaves us with the issue about the $275

3    million reserve for the -- to protect NextEra in connection

4    with their currently disallowed $275 million administrative

5    claim that's on appeal before the 3rd Circuit.

6         As I said on Thursday -- I stand by what I said on

7    Thursday and I'll flesh it out a little bit.  I don't

8    believe that it is necessary to satisfy 1129(a)(9) for this

9    Court to -- or for the Debtors to reserve $275 million for a

10   currently disallowed administrative claim.  It's not

11   necessary.

12        At the same time, I believe it is permissible for

13   the Debtors to reserve this money in order to pay,

14   potentially pay, what's currently a disallowed claim.  And I

15   think the language -- and I checked the opinion during the

16   break and it's kind of dicta, but at least it acknowledges

17   the proposition, you know, specifically under the plan, the

18   Debtors should have set aside sufficient funds in the

19   distribution of capital to fulfill the request that the CSMI

20   parties prevail on appeal and the requests later became

21   allowed claims.  That's done in the context of a different

22   issue that's really a note to the aside.  But it indicates

23   the 3rd Circuit, or at least Judge Ambrose's acknowledgment

24   that setting aside a reserve for a currently disallowed

25   claim on appeal is permissible.

1            So, then where am I?  Well, it's the Debtors' plan

2    and the Debtors have chosen under their own plan to do what

3    they are allowed to do, which is set aside a reserve.  So, I

4    think that deals with the Elliot response that they're not

5    allowed to do what they want -- what they're preserving --

6    what they're promoting or what they're trying to do in a

7    sense, which is set aside the reserve.  I think it

8    satisfies, for the most part, NextEra's objection, which is

9    you have to set aside a reserve.

10           Now, what NextEra's not going to like is what I

11   say next, which is the Debtors are not required to set aside

12   a reserve specifically for their late filed $60 million

13   administrative expense claim.  And late may not be a

14   technical legal term here, but it was a week ago, and we've

15   been around for a little while.  So, it was on the verge of

16   confirmation.

17           But I don't think -- and I'm not going to require

18   the Debtors to make that reserve.  They're not required to

19   do it because it's not an allowed claim, because it was an

20   added-in claim and no order has been entered allowing it.

21   I'm sure it's disputed.  And it's again, a question of

22   permission.  They don't propose to do it and I'm certainly

23   not going to require them to do it.

24           Now, it's in the alternative, as it's been said

25   several times, and I appreciate that, and we can deal with

1    that at the future time.  But I think the language in the

2    confirmation order as it exists today is sufficient, and I

3    don't think we need to carve out this mechanism that's in

4    the NextEra proposed language to have a set-aside, even if

5    they lose on the $275 million claim.

6              With one caveat, I think that the language

7    proposed by the Debtors is perfectly adequate to set aside

8    the reserve and protect all the parties, including NextEra,

9    but also the creditors.  I think having this thing set up

10   for all eternity without an ability to revisit it would be a

11   mistake.  However, I don't think it should be revisited on a

12   whim.

13             And my screen just went blank.  Excuse me.

14             Can't be set aside on a whim, so I think it's

15   important that there be some sort of standard built in to

16   when that motion can be granted.  I think a reconsideration

17   standard under 60(b), for example, is too high.  I was spit-

18   balling ideas in the back, but I don't want to draft

19   language for you.  But, you know, something along the --

20   yes, Mr. McKane?

21             MR. MCKANE:  Your Honor, if I could just note that

22   I believe the language specifically refers back to Section

23   6(a) of the plan, and you know, to the extent that there is

24   language referencing the reserve in the last two lines of

25   that Paragraph 6(a), it may not be perfect for NextEra, but

1    we believe it's not an amorphous standard.

2              THE COURT:  So, what's the standard?

3              MR. MCKANE:  Your Honor, I need to confer with Ms.

4    Yenamandra for a second, because I can't read her

5    handwriting.

6              Your Honor, the current language simply just

7    references back to 6(a), and that's in --

8              THE COURT:  All right.

9              MR. MCKANE:  You know, but we can also

10   specifically spell out for good cause shown.

11             THE COURT:  Well, that's what I was going to

12   suggest, good cause shown or material change in

13   circumstances.

14             MR. MCKANE:  Yeah.

15             THE COURT:  Something along those lines.

16             MR. MCKANE:  Okay.

17             THE COURT:  But I don't want to draft the language

18   for you, but that's the idea.

19             MR. MCKANE:  We'll work on that language.  Good

20   cause shown has some well-established case law that'd be

21   helpful.

22             THE COURT:  Okay.  So, I'm going to overrule the

23   NextEra objection, overrule the sort of not-objection

24   objection of Elliott -- I don't want anybody getting in

25   trouble under the PSA -- permit the reserve of $275 million

1    and approve the Debtors' language, except subject to

2    tweaking, setting aside a good cause standard in connection

3    with any motion to change the amount of the reserve.

4              And then I think I've dealt with all open issues.

5    What am I missing?

6              MR. MCKANE:  Your Honor, we expressly had

7    requested a waiver of the 14-day period, and there had been

8    no objections to it.

9              THE COURT:  No, absolutely.  Happy to do that.

10             MR. MCKANE:  Thank you, Your Honor.

11             THE COURT:  Cause clearly shown, given the

12   situation.

13             MR. MCKANE:  Thank you, Your Honor.  Before we

14   break for the day, I do believe Mr. Kieselstein would like

15   to address the Court.

16             THE COURT:  Let me rule, though.

17             MR. GALARDI:  Your Honor, just -- and all joking

18   aside, it's a quasi-objection.  I think what I would like

19   you to do is to overrule our objection to the plan language.

20             THE COURT:  Okay.

21             MR. GALARDI:  Because -- and I understand the

22   standard of we want to put a good cause and materiality.

23   That, again, if we made the procedural argument, today's not

24   the time.

25             THE COURT:  Mm hmm.

1          MR. GALARDI:  So, I'd like that to be officially

2     overruled so I can be "an aggrieved party".

3          THE COURT:  All right.  You are always aggrieved,

4     Mr. Galardi.

5          MR. GALARDI:  I am.

6          THE COURT:  Overruled.

7          MR. GALARDI:  Because I do it to others as well.

8     I thank --

9          THE COURT:  The Elliott funds objection is

10    overruled.  And unless you've got anything further, I'm

11    going to just say I'm going to confirm the plan.  But I

12    don't want to hold you up.

13         MR. MCKANE:  Well, no, I was just going to remind

14    Your Honor, you were going to touch on the 503(b).

15         THE COURT:  Oh, thank you.  The 503(b) is a little

16    strange here because there are no objections pending to it.

17    And a fundamental philosophy of mine when it comes to

18    operating as a bankruptcy judge is not to get in the way of

19    consensus, especially when it promotes a resolution of a

20    case.

21         So, I'm not going to, but I'm going to put a

22    couple comment -- well, a couple tweaks on this.  And this

23    applies to Elliott and American Stock Transfer.  I will

24    absolutely find that both Elliott and American Stock

25    Transfer took actions in the case that provided a

1     substantial contribution to the estates, and clearly meet

2     the appropriate -- excuse me -- the applicable law.

3              In particular, the work that resulted in having

4     Sempra here, was very much a result of many people working

5     hard, but absolutely a result of Elliott's participation, as

6     well as, I believe, American Stock Transfer's work as...

7              What troubles me, and I can't -- I'm not -- I

8     can't put my hand on it today, because I don't have the

9     records.  What troubles me is there was clearly actions

10    taken by both parties that were just in the nature of

11    promoting their own interests.  And I'm a little worried

12    about making a blanket finding of substantial contribution.

13    So, what I'd like to do is I will approve the reserves, no

14    problem.  I'll make the finding of substantial contribution.

15    Obviously, reserve on the reasonableness of the fees, which

16    everybody has already agreed to.  But I'd also like to

17    reserve on whether the fees that are sought are related to

18    the substantial contribution that was -- a substantial

19    contribution that was made to the estate.  And we can have a

20    full-throated discussion about that at a future date.  But

21    I'll definitely -- the $38 million reserve is fine.  I'll

22    definitely make a general finding of substantial

23    contribution.

24              Is there a reserve for American Stock Transfer?  I

25    don't...  No, no reserve, so you don't have to worry about

1    that.

2            MR. MCKANE:  No, Your Honor, they don't need a

3    separate reserve.

4            THE COURT:  Okay.  So, that's all I wanted to

5    raise with regard to that.  So, with that caveat that needs

6    to be built in, I suppose the confirmation order -- and of

7    course, subject to seeing a final confirmation order,

8    hopefully tomorrow, I will confirm the plan.  And I hope

9    very heartedly that it's a -- goes effective very shortly.

10           MR. MCKANE:  Thank you, Your Honor.

11           THE COURT:  You're welcome.  Mr. Kieselstein?

12           MR. KIESELSTEIN:  If you can abide it, Your Honor.

13   Just a few minutes' worth.

14           THE COURT:  I don't know if I can.

15           MR. KIESELSTEIN:  Your Honor, you once told me in

16   another case that the Court always considers itself thanked.

17   And that's a noble sentiment, but given the circumstances of

18   these cases, I think it would be positively indecent not to

19   spend a minute or two expressing my firm's thanks.  And I

20   think this is one time I can speak for everyone in the

21   courtroom and everyone on the phone in expressing our

22   collective thanks for everything Your Honor and your staff

23   has done.

24           Let me first observe, Your Honor, I watched also

25   today as a lot of young lawyers, who have gone through a

1   baptism of fire on this case and who have come into their

2   own -- and I'm talking on all sides of the courtroom --

3   doing a spectacular job.  And while it's very gratifying,

4   it's also a little terrifying, because I know they're in the

5   back plotting Mr. McKane and my rapid demise.  But I guess

6   that's the nature of the beast.

7           Your Honor, as we thought about this whole journey

8   we've been on collectively together, we went through the

9   entire catalog of Greek myth to see if any of them applied.

10  So, we thought about Odysseus on his way back from the

11  Trojan wars, getting waylaid at the Island of Cyclops and

12  the temptations of the Sirens, and all the rest.  We thought

13  about Sisyphus pushing that huge boulder up the

14  mountainside, only to have to repeat it endlessly, day after

15  day.

16          Our personal favorite was Prometheus, who stole

17  fire from the Gods, was chained to a rock, and had his liver

18  eaten every day, only to have it regenerate overnight.  And

19  that one seemed on some points particularly applicable.

20          But that's Greek mythology, Your Honor.  It's

21  iconic.  No one's going to be talking about this case

22  millennia from now, other than maybe us, if this case

23  doesn't get consummated in the next couple of weeks, which

24  we are very helpful that it will.

25          I even went to my Rabbi, Your Honor, and asked if

1    it was appropriate for the Jewish prayer of thanksgiving

2    after an arduous journey is completed, whether it was

3    appropriate to invoke it in this context.  And he said, no,

4    that's a sacrilege, get out of my office.

5              So, I guess it boils down to something more

6    prosaic, Your Honor.  This is been a long, hard, difficult

7    slog.  We all get, you know, paid a king's ransom to do the

8    work, and we have battalions of lawyers and advisors facing

9    this weight.  Your Honor, you're an army of three or four.

10   And we are so appreciative of everything the Court has done.

11   Your staff, which is unflappable, approachable, always

12   upbeat somehow in dealing with our unreasonable and

13   incessant demands.  We greatly appreciate that.  The

14   Marshals who forever have to remind me to take the wires out

15   of my briefcase before I run it through the metal detector.

16   And really, it's just a collective effort to accommodate a

17   case of this size and complexity.

18             And Your Honor, I know in particular, Your Honor,

19   we have imposed on you so many times, including on your

20   vacations, and none of us will ever forget you cutting short

21   your college tour with your son to come back and handle a

22   particularly nettlesome situation.  Now, if it were my sons,

23   I'm not that fond of them, it would've been --

24             THE COURT:  I like my kids.

25             MR. KIESELSTEIN:  But you like your kids, so I

1   know what an imposition that was.  So, we're grateful, we

2   think Your Honor, and we hope not to have to darken your

3   door on this case.

4              THE COURT:  Yeah.

5              MR. KIESELSTEIN:  But we hope to see you in many

6   others, Your Honor.

7              THE COURT:  All right.  Thank you, Mr.

8   Kieselstein.  It's of course embarrassing, but really

9   appreciated.  So, thank you very much.  And my shout-out

10  would absolutely go to my staff, other than Richard here.

11  He's too new.  And everybody else who does a fantastic job.

12  So, it's very nice of you to say that.  And I'm not going to

13  say anymore because there's still work to be done.  And

14  you've thanked me once before and it didn't work out so

15  well.

16             MR. KIESELSTEIN:  True.

17             THE COURT:  So, I won't say anymore except this

18  case has been the experience of a lifetime, and I feel very

19  lucky to be presiding over it.  And a lot of that has to do

20  with how tremendous the lawyering has been.  And I do -- I

21  feel very privileged.  Anyway, enough of that.

22             Did you send me an order?

23             MR. MCKANE:  Yes, Your Honor.  Do you want us to

24  come in tomorrow, say 1:00, to walk you through it?  We

25  hoped it would be final by then.

Page 243

1                THE COURT:  Sure.  I've got nothing -- I've got

2     nothing going on.

3                MAN 1:  The royal (indiscernible).

4                MR. MCKANE:  Yeah.

5                THE COURT:  That's -- I mean I think you can do it

6     under certification of counsel.

7                MR. MCKANE:  Very good.  Very good, Your Honor.

8                THE COURT:  That's fine with me, unless there is

9     an open issue.  If there's an open issue, we'll see you at

10    1:00.  Otherwise, send it over under COC and I'll sign it.

11               MR. MCKANE:  Thank you, Your Honor.

12               THE COURT:  You're welcome.  We're adjourned.

13               MR. MCKANE:  Your Honor, we expressly had

14    requested a waiver of the 14-day period, and there had been

15    no objections to it.

16               THE COURT:  No, absolutely.  Happy to do that.

17                              * * * * *

18

19

20

21

22

23

24

25

Page 244

1                          I N D E X

2

3                          RULINGS

4    DESCRIPTION                              PAGE         LINE

5

6    NextEra and Elliott Objections Overruled    235          22

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 245

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya                 Digitally signed by Sonya Ledanski
                           Hyde
                           DN: cn=Sonya Ledanski Hyde, o,
     Ledanski Hyde         ou, email=digital1@veritext.com,
7                          c=US
                           Date: 2018.02.28 14:40:27 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 28, 2018