# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

Marc Kieselstein, P.C.
To Call Writer Directly:
(312) 862-3029
marc.kieselstein@kirkland.com

300 North LaSalle
Chicago, Illinois 60654

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

March 27, 2018

**By Email**

The Honorable Christopher S. Sontchi
United States Bankruptcy Judge
United States Bankruptcy Court
District of Delaware
824 Market Street, 5th Floor
Wilmington, Delaware 19801

Re:   *In re Energy Future Holdings Corp., et al.*, Case No. 14-10979

Dear Judge Sontchi:

On behalf of the EFH Plan Administrator Board, we write this letter to not only respond to the letters filed by (a) NextEra Energy, Inc. [D.I. 12853] ("NextEra") and (b) UMB Bank, N.A., as Indenture Trustee, Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott") [D.I. 12859], each in connection with the *Application of NextEra Energy, Inc. for Allowance and Payment of Administrative Claim* [D.I. 12671] (the "Application") and Elliott's motion to dismiss or, in the alternative, grant summary judgment on the Application [D.I. 12844] (the "Motion"), but also to contextualize for the Court how the relief requested in the Application and Motion affect ongoing negotiations regarding the allocation of Subject Claims (as defined below). **Although we understand that certain creditors at EFH and EFIH have an agreement in principle on an allocation of the Subject Claims (as defined below), it is not clear whether all creditor constituencies will be supportive of such settlement (which, in any event, has not yet been documented).** Notwithstanding such potential settlement, we write to update the Court on the harmful effect of the unresolved allocation negotiations on Plan distributions to date (which effects will only worsen as more time goes by). As described herein, the EFH Plan Administrator Board seeks the Court's guidance to remedy this situation.

First, with respect to the timing of the Motion, the EFH Plan Administrator Board will adhere to whatever briefing schedule the Court determines is in the best interests of all parties and the best use of time and resources.

## KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
March 27, 2018
Page 2

Second, as all parties are aware, in advance of the March 9, 2018 EFH Effective Date (as defined in the *Order Confirming the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 12763] (the "Confirmation Order," and the plan of reorganization confirmed thereto, the "Plan"),[1] the Disinterested Directors and Managers of EFH and EFIH had been discussing a potential settlement of the allocation of certain Claims between EFH and EFIH, specifically with respect to: (a) the $275 million NEE Termination Fee; (b) the professional fees and expenses incurred by the EFH/EFIH Committee (expected to be approximately $40 million to $50 million in the aggregate, which fees have historically been paid approximately 50% by EFH and 50% by EFIH); and (c) the fees and expenses associated with the Supporting Creditors' Substantial Contribution Ruling (up to $38 million, $3 million of which is subject to separate application and is not subject to the Substantial Contribution Ruling) (collectively, the "Subject Claims").

As the Debtors' counsel stated at the EFH Confirmation Hearing, while the Disinterested Directors and Managers of EFH and EFIH had been negotiating an allocation of the Subject Claims (including, from time to time, consulting with principal creditors and/or such creditors' advisors), the Debtors did not expect they would reach a settlement as of the EFH Effective Date. Importantly, it was clear to all parties that the timing of Plan distributions would be adversely affected by a delay in reaching agreement on an allocation of the Subject Claims[2]. More specifically, absent an allocation agreement on the Subject Claims, EFH *and* EFIH would each have to hold back Plan distributions in an amount representing the lesser of (a) all available Cash on hand to satisfy Allowed Unsecured Claims under the Plan and (b) the aggregate amount of the Subject Claims.

The economic effect of the "double hold back" is different for EFIH unsecured creditors (*i.e.*, Classes B5 and B6) and EFH unsecured creditors (*i.e.*, Classes A4-A11). After accounting for Cash on hand and the remaining Merger Sub Cash consideration (after satisfaction of the EFIH secured claims), as of the EFH Effective Date, EFIH had approximately $700 million in Cash available for distribution to EFIH unsecured creditors (in addition to separately holding back $38 million on account of the Supporting Creditors' Fees). In comparison, EFH (which

---

[1] Capitalized terms used, but not defined, herein shall have the same meanings set forth in the Plan and Confirmation Order.

[2] Although EFH and EFIH were not dissolved on the EFH Effective Date, since the EFH Plan Administrator Board is a single entity that is responsible for administering the EFH/EFIH Cash Distribution Account and resolving Claims and Causes of Action retained by the estates, and Reorganized EFH and Reorganized EFIH are owned by Sempra, we believe a conflict no longer exists between EFH and EFIH, but recognize that other parties may have different positions. The Disinterested Directors and Managers ceased to serve their respective estates upon the EFH Effective Date.

Case 14-10979-CSS   Doc 12866   Filed 03/27/18   Page 3 of 7

## KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
March 27, 2018
Page 3

does not receive the benefit of any Merger Sub Cash consideration) had approximately $209 million in Cash available for distribution to EFH unsecured creditors, as of the EFH Effective Date. For the avoidance of doubt, EFH Cash on hand as of the EFH Effective Date is kept segregated from EFIH Cash on hand as of the EFH Effective Date in the EFH/EFIH Cash Distribution Account.

The aggregate amount of the Subject Claims, as described above, is approximately $333 million to $338 million (*i.e.*, the sum of (a) $275 million (on account of the NEE Termination Fee); (b) a re-allocation of 50% of the EFH/EFIH Committee Fees ($20 million to $25 million); and (c) $38 million (on account of the maximum amount of Supporting Creditors' Fees)).

As a result, the Confirmation Order and the EFH Plan Administration Trust Agreement (a Plan Supplement document that governed the EFH Plan Administrator Board's administration of the EFH/EFIH Cash Distribution Account) both contained a number of provisions addressing the Subject Claims:

- *First*, the Confirmation Order stated that EFH's share of the $275 million NEE Termination Fee could not exceed the Cash available at EFH as of the EFH Effective Date necessary to satisfy all Allowed Administrative Claims against the EFH Debtors and Allowed Priority Claims against the EFH Debtors (*i.e.*, the approximately $209 million described above). Confirmation Order, ¶ 150.

- *Second*, the Confirmation Order stated that the EFH Plan Administrator Board would make a partial distribution to EFIH unsecured creditors within five business days following the EFH Effective Date, *provided* such distribution did not include a distribution of funds attributable to—and that might leave unsatisfied—any Subject Claims asserted by EFH against EFH or the Cash at EFIH necessary to satisfy all Allowed Administrative Claims against EFIH and Allowed Priority Claims against EFIH. Confirmation Order, ¶ 151(1).

- *Third*, the Confirmation Order stated that the EFH Plan Administrator Board *could*, *but was not required to* make a partial Plan distribution to EFH unsecured creditors prior to entry of an order allocating the NEE Termination Fee. Confirmation Order, ¶ 151(2); *provided* such distribution did not include a distribution of funds attributable to—and that might leave unsatisfied—any Subject Claims asserted by EFIH against EFH or the Cash at EFH necessary to satisfy all Allowed Administrative Claims against EFIH and Allowed Priority Claims against EFIH. Confirmation Order, ¶ 151(1).

- *Fourth*, the Confirmation Order stated that the EFH Plan Administrator Board would file a motion seeking entry of an order allocating the NEE Termination Fee and make

3

RLF1 19063612v.1

The Honorable Christopher S. Sontchi
March 27, 2018
Page 4

> commercially reasonable efforts to seek entry of an order within 40 days of filing such motion. Confirmation Order, ¶ 152.
>
> - **Fifth**, the Confirmation Order stated that the EFH Plan Administration Trust Agreement would clarify that the "negotiation, resolution, settlement, and litigation" concerning the Subject Claims shall each constitute a Conflict Matter (as defined in the EFH Plan Administration Trust Agreement). Confirmation Order, ¶ 153.
>
> - **Sixth**, the EFH Plan Administration Trust Agreement [D.I. 12798-4] states that the EFH Plan Administration Trust may, but is not required to, appoint agents to address matters that, prior to the EFH Effective Date, would have been addressed by the Disinterested Directors and Managers (the "Conflicts Matters"). Such agents would not take direction from the EFH Plan Administration Trust solely with respect to such matters. EFH Plan Administration Trust Agreement, 6.3.

Taken as a whole, the Confirmation Order, Plan, and EFH Plan Administration Trust Agreement were intended to allow the EFH Plan Administrator Board to maximize early distributions to creditors while balancing the outstanding allocation of the Subject Claims. Following the EFH Effective Date, the EFH Plan Administrator Board has been engaged in intensive negotiations with key EFH and EFIH creditor constituencies regarding a potential allocation of the Subject Claims. As stated above, although we understand that certain EFH and EFIH creditors very recently reached an agreement in principle on the allocation of the Subject Claims, such agreement has not yet been documented and it is not clear yet whether other EFH and EFIH creditor constituencies will be supportive.

As discussions were ongoing, on March 19, 2018, the EFH Plan Administrator Board made a partial distribution to Holders in Class B6, in the aggregate amount of $375 million (which distribution left enough EFIH Cash to satisfy the aggregate exposure on the Subject Claims). The EFH Plan Administrator Board is in the process of preparing a partial distribution to Holders in Class B5 (again, which distribution will leave enough EFIH Cash to satisfy the aggregate exposure on the Subject Claims).

Unlike EFIH unsecured creditors, EFH unsecured creditors have not received a Plan distribution to date. Moreover, all EFIH unsecured classes are funded debt classes, while EFH has several Classes of Claims that reflect non-funded debt (*e.g.*, the EFH Non-Qualified Benefits Class (Class A8)). As the Court is aware, since the filing of the chapter 11 cases, the Debtors have worked to obtain relief on behalf of such holders (collectively, the "Non-Qualified Beneficiaries"). In particular, the Debtors obtained relief early in the chapter 11 cases to make periodic payments to non-insider, non-C suite level Non-Qualified Beneficiaries in accordance with the applicable plan documents and subject to certain caps. *See Order Authorizing Certain of the Debtors to Continue Honoring Obligations to Retirees and Non-Insider Employees on*

4

# KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
March 27, 2018
Page 5

*Account of Non-Qualified Benefit Programs* [D.I. 1816]; *Order (Second) Authorizing Certain of the Debtors to Honor Obligations to Certain Retirees on Account of Non-Qualified Benefit Programs* [D.I. 4633]. Perhaps most significantly, the Debtors and the EFH/EFIH Committee agreed as part of the EFH/EFIH Committee Settlement that the Non-Qualified Beneficiaries would participate in the TCEH Settlement Claim Turnover Distribution (as detailed in the Plan). Under the Plan, the TCEH Settlement Claim Turnover Distribution is capped at $37.8 million and the Non-Qualified Beneficiaries share is capped at $30 million—in other words, the Non-Qualified Beneficiaries represent the largest share of the TCEH Settlement Claim Turnover Distribution.

This result was important to EFH. The Non-Qualified Beneficiaries represent current and former leaders with the Debtors' businesses, industry, and communities. As a result, and unlike many of the other Classes of creditors, the Non-Qualified Beneficiaries helped stabilize the Debtors' workforce at a time when attrition was high, particularly during the early stages of the chapter 11 cases. Importantly, many of the retirees that are Non-Qualified Beneficiaries have been receiving such payments for over twenty years and rely on such payments to meet basic living costs (*i.e.*, while the non-insider Non-Qualified Beneficiaries have been receiving periodic monthly payments during the chapter 11 cases, they have been deprived of the most significant piece of their recovery—the remaining lump sum payments—since the Petition Date). These retirees are, by and large, in the 70-90 year age range and, in many instances, do not have access to other funds.

As it became clear that EFH and EFIH would be in a position to emerge from chapter 11 by early March, the EFH Plan Administrator Board, Vistra, and the various trustees that administer the Non-Qualified Benefits programs began the complicated process to terminate such programs and satisfy the Non-Qualified Beneficiaries' Claims under the Plan. The EFH Plan Administrator Board, Vistra, and the trustees were positioned to make such Plan distributions on or about March 31, 2018. Vistra's involvement in the Plan distribution is vital—Vistra has the infrastructure and base of knowledge critical to calculating Plan distributions for each of the several hundred Non-Qualified Beneficiaries, as well as the relationship with the half a dozen trustees that manage the underlying rabbi trusts. To date, Vistra has taken a lead role in assisting with the payment of the Non-Qualified Beneficiary Claims, despite being under no obligation to do so. Replacing Vistra with not only risk further delaying the payments, but would also likely require the EFH Plan Administrator Board to incur costs and expenses to the detriment of EFH creditors.

Importantly, for several reasons, the EFH Plan Administrator Board was preparing to make such Plan distributions even while the allocation of the Subject Claims was outstanding. **First**, the Confirmation Order expressly authorized the EFH Plan Administrator to make such Plan distributions in its discretion, subject to the provisions set forth in paragraph 151(1) (described above). **Second**, the aggregate amount of distributions to the Non-Qualified

5

## KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
March 27, 2018
Page 6

Beneficiaries that would result in such Holders being paid in full is approximately $30 million. In order for the Non-Qualified Beneficiaries to be paid in full, there must be at least approximately $73 million in EFH cash.[3] In other words, there must be at least $73 million in EFH cash available for EFH unsecured creditors in order to ensure that the Non-Qualified Beneficiaries (as well as the other two Classes of Claims that are entitled to participate in the TCEH Settlement Claim Turnover Distributions) receive a 100% recovery on account of their Claims. **Importantly, as far as we are aware, however, at no point in the pre EFH Effective Date or post EFH Effective Date negotiations did any creditor or Disinterested Director or Manager pursue an allocation of the Subject Claims that would result in EFH having less than $73 million in EFH Cash**. *Third*, as described above, many of the Non-Qualified Beneficiaries have a dire need for their Plan distribution.

Recently, however, certain of EFIH's creditors have indicated their intent to request entry of a Bankruptcy Court order allocating the Subject Claims such that EFH Cash would fall below $73 million. In connection with these recent developments, such creditors have also indicated that they may seek a re-allocation of other Claims—other than the Subject Claims—which litigation could paralyze Plan distributions.

In light of such threatened litigation, and the potential exposure to the EFH Plan Administrator Board and other Classes of EFH creditors, if such Order were to be entered, the EFH Plan Administrator Board has determined not to make the scheduled March 31, 2018.

As a result, we believe it would be appropriate for the Court to set a deadline of April 4, 2018 (or thereabouts) for any party in interest to submit to the Court their views on (and justifications for) allocation of the Subject Claims so such matter can be set for further hearing.[4]

---

[3] More specifically, for the Non-Qualified Beneficiaries to be paid in full, they must receive the maximum amount of the TCEH Settlement Claim Turnover Distribution to which Class A8 is entitled under the Plan ($30 million). The TCEH Settlement Claim Turnover Distribution represents a deduction of the Plan recovery that would otherwise go to the former TCEH first lien creditors on account of the TCEH Settlement Claim. For the TCEH Settlement Claim to receive a Plan recovery of an amount sufficient to make a turnover to Holders of EFH Beneficiary Claims (*i.e.*, Class A5, Class A8, and Class A9), the TCEH Settlement Claim must receive at least $36 million. If the TCEH Settlement Claim is entitled to less than $36 million in Plan recovery, then the Holders of EFH Beneficiary Claims will not receive the maximum amount of the TCEH Settlement Claim Turnover Distribution and, therefore, will not be paid in full.

[4] Indeed, such a ruling has precedent in these chapter 11 cases. As the Court may recall, in connection with consummation of the TCEH plan, the TCEH First Lien Agent, the TCEH Supporting First Lien Creditors, and the TCEH First Lien Notes Trustee agreed to submit one to two page letter briefs to the Court detailing proposals for calculation of the TCEH First Lien Dispute Reserve [D.I. 9696]. On September 30, 2016, the Court entered the *Order Establishing Plan Reserve for TCEH First Lien*

# KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
March 27, 2018
Page 7

The EFH Plan Administrator Board requests the Court's guidance in determining whether it views such a path as appropriate.

                                                      Sincerely,

                                                      */s/ Marc Kieselstein*

                                                      Marc Kieselstein, P.C.

cc:    Chad J. Husnick, Esq., Kirkland & Ellis LLP
        Mark McKane, Esq., Kirkland & Ellis LLP
        Aparna Yenamandra, Esq., Kirkland & Ellis LLP
        Mark D. Collins, Esq., Richards, Layton & Finger, P.A.
        Daniel J. DeFranceschi, Esq., Richards, Layton & Finger, P.A.
        Jason M. Madron, Esq., Richards, Layton & Finger, P.A.
        Thomas Lauria, Esq., White & Case LLP
        Christopher Shore, Esq., White & Case LLP
        Brian Glueckstein, Esq., Sullivan & Cromwell LLP
        Andrew Dietderich, Esq., Sullivan & Cromwell LLP
        Gregg Galardi, Esq., Ropes & Gray LLP
        Keith Wofford, Esq., Ropes & Gray LLP

---

*Creditor Plan Distribution Allocation Dispute* [D.I. 9718], upon consideration of the various proposed letter briefs.

RLF1 19063612v.1