## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
| | ) |
| *Debtors.* | ) (Jointly Administered) |
| | ) |
| | ) <u>Hearing Date</u>: **June 5, 2018 at 11:00 a.m.** |
| | ) <u>Objection Deadline</u>: **May 29, 2018 at 4:00 p.m.** |

### JOINT MOTION OF UMB BANK, N.A., AS INDENTURE TRUSTEE, AND ELLIOTT TO FIX APPROPRIATE ALLOCATION OF CERTAIN RESERVES AND EXPENSES AS BETWEEN THE EFH AND EFIH DEBTORS

UMB Bank, N.A., as Indenture Trustee (the "<u>Trustee</u>") for the unsecured 11.25%/12.25%

Senior Toggle Notes due 2018, and Elliott Associates, L.P., Elliott International, L.P., and The

Liverpool Limited Partnership (collectively, "<u>Elliott</u>" and, together with the Trustee, the

"<u>Movants</u>"), by and through their undersigned counsel, hereby submit this motion (the

"<u>Allocation Motion</u>") pursuant to sections 105(a), 327, 328, 330 and 503(b) of title 11 of the

United States Code (the "<u>Bankruptcy Code</u>") and this Court's order dated September 16, 2014

(the "<u>Interim Compensation Order</u>") [D.I. 2066] for entry of an order fixing an appropriate

allocation of certain reserves and administrative expenses incurred in these chapter 11 cases as

between the estate of Energy Future Holdings Corp. ("<u>EFH</u>") and the estate of Energy Future

Intermediate Holding Company, LLC ("<u>EFIH</u>" and, together with EFH, the "<u>E-Side Debtors</u>").

In support hereof, the Movants respectfully state as follows:

---

[1]     The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

**PRELIMINARY STATEMENT**

By order dated February 27, 2018 (the "E-Side Confirmation Order," [D.I. 12763]), this Court confirmed the E-Side Debtors' chapter 11 plan of reorganization (the "Sempra Plan"). On March 9, 2018 (the "Effective Date"), pursuant to the Sempra Merger Agreement (as defined below), Sempra's acquisition of the E-Side Debtors' approximately 80% economic interest in Oncor (as defined below) was consummated and the Sempra Plan went effective. Consummation of the Sempra transaction was the culmination of the E-Side Debtors' lengthy and expensive quest to complete a restructuring that would result in a tax-free disposition of the Oncor assets and thereby avoid the so-called "Tax Armageddon," which would have saddled EFH with more than $7 billion in tax liabilities and eliminated any recovery for EFH's unsecured creditors. EFIH unsecured creditors, by contrast, were indifferent as to whether any disposition of their interests in Oncor was non-taxable or taxable. Indeed, had the Debtors pursued and consummated a taxable disposition of EFIH's interest in Oncor at the outset of the chapter 11 cases, the EFIH unsecured creditors would have been paid in full. Instead, their recoveries plummeted over nearly four years in a bankruptcy process prosecuted largely for the prospective benefit of the creditors and equity owners of EFH and to the eventual detriment of the creditors of EFIH, whose recoveries were jeopardized in the repeated pursuit of potential plans of reorganization uniquely benefitting EFH.

Although the Effective Date has passed, and EFIH and EFH hold approximately $405.8 million and $300.5 million in cash, respectively, the Plan Administrator Board (the "PAB") has made no distributions to EFH unsecured creditors and only a partial distribution to EFIH unsecured creditors. [D.I. 13067]. This is because substantial portions of administrative expenses—including a $275 million reserve (the "NextEra Plan Reserve") established during

confirmation proceedings on account of the $275 million termination fee (the "NextEra Termination Fee") asserted by NextEra Energy, Inc. ("NextEra") and presently on appeal— remain either unallocated or were allocated improperly.

Thus, the Movants bring this Allocation Motion and request that the Court enter an order determining the EFH and EFIH estates' respective liability with respect to the Material Administrative Expense Claims (as defined below) that are preventing the PAB from making additional distributions to both EFH and EFIH unsecured creditors.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, paragraph 72 of the *Order Confirming the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 12763] and the Interim Compensation Order.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Pursuant to Local Rule 9013-1(f), the Movants consent to entry of a final order with respect to this Allocation Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## RELIEF REQUESTED

3.      By this Allocation Motion,[2] the Movants respectfully request entry of an order allocating the EFH and EFIH Debtors' respective percentage liability with respect to the

---

[2]      The Movants reserve their rights to advance further arguments and put on further evidence as to the proper allocation of the Material Administrative Expense Claims at the hearing on the Allocation Motion.

following four (4) types of administrative expense claims (collectively, the "Material
Administrative Expense Claims"):

    A.     **The NextEra Termination Fee Claims**:  Any administrative claim asserted by
NextEra related to the NextEra Termination Fee, the NextEra Reimbursement
Claim (as defined below), or any reserve established with respect thereto,
including the NextEra Plan Reserve;

    B.     **The E-Side Committee Professional Fee Claims**:  Any allowed administrative
claim asserted by any professional retained by the E-Side Committee (as defined
below);

    C.     **The Debtors' Professional Fee Claims**:  Any allowed administrative claim
asserted by any professional retained by the E-Side Debtors; and

    D.     **The Elliott Substantial Contribution Claim**:  The allowed administrative claim
of Elliott.

    4.     For the reasons set forth below, the Movants request that the Court enter an order
allocating the Material Administrative Expense Claims as follows:

| Material Administrative Expense Claim | EFH | EFIH |
|---|---|---|
| NextEra Termination Fee Claims *($275 million if allowed in full)* | 50% *($137.5 million)* | 50% *($137.5 million)* |
| E-Side Committee Professional Fee Claims *(approximately $48 million)* | 70% *($33.6 million)* | 30% *($14.4 million)* |
| The Debtors' Professional Fee Claims *(approximately $206 million)* | 50% *($103 million)* | 50% *($103 million)* |
| Elliott Substantial Contribution Claim[3] *(approximately $31.7 million)* | 30% *($9.5 million)* | 70% *($22.2 million)* |

---

[3]     On May 11, 2018, Elliott submitted a Statement in Support of Substantial Contribution Claim
Pursuant to 11 U.S.C. §§ 503(b)(3) and 503(b)(4) to the Fee Committee, seeking payment and
reimbursement of $30,236,354.38 in professional fees and $1,438,294.91 in expenses incurred in making
a substantial contribution in these Chapter 11 cases.

5.      Assuming that the E-Side Committee and E-Side Debtor Professional Fee Claims are (i) allowed in the full amount requested, (ii) allocated only against the EFH and EFIH Debtors,[4] and (iii) allocated and paid pursuant to each Professional's suggested allocations, then the maximum amount of E-Side Committee and E-Side Debtors' Professional Fees for which Movants seek to have EFH "reimburse" EFIH is approximately $51.7 million.  This amount consists of approximately $9.7 million for E-Side Committee Professional Claims and $42 million for E-Side Debtors' Professional Fee Claims, respectively.[5]  Accordingly, assuming that the Movants' proposed allocation of the Elliott Substantial Contribution Claim is accepted and the full amount of Elliott's request is approved, the maximum amount that EFH would be required to reimburse EFIH is approximately $61.2 million.

6.      If this maximum reallocation against EFH were to be adopted, the EFH unsecured creditors would still receive a recovery, even if, the Court granted NextEra's Reimbursement Claim for approximately $60 million (as defined below).  In the event, however, that the full amount of the NextEra Termination Fee Claim is allowed, the Movants understand that the proposed allocations set forth above would render the EFH estate administratively insolvent in violation of paragraph 150 of the E-Side Confirmation Order.  Accordingly, in such circumstances, the Movants request that the Court's order allocating the Material Administrative

---

[4]      Despite the express terms of the Interim Compensation Order, a number of the Debtors' professionals seeking final approval of their fees and expenses did not allocate their requested fees and expenses between the E-Side Debtors and the T-Side Debtors (as defined below).  *See, e.g.,* [D.I. 13005, D.I. 13010, D.I. 13024].  Additionally, certain of these professionals seem to be seeking final approval of allowed E-Side Professional Fee Claims against EFIH, despite having only been engaged by (i) TCEH or (ii) TCEH and EFH, but not EFIH.  *See e.g.,* [D.I. 650-4].  Movants expressly reserve, and do not waive, any argument that any such Professional Fee Claims should not be allowed administrative expenses of EFIH or EFH.

[5]      As noted above, Movants have been unable to determine how all amounts paid to certain of the Debtors' professionals have been allocated as between the E-Side Debtors and the T-Side Debtors (as defined below).  Accordingly, if the Allocation Motion is granted, EFH would need to reimburse EFIH approximately $38 million for the fees already paid with respect to the E-Side Debtor Professional Claims and an additional amount of $4 million for amounts requested but not yet paid.

Expense Claims further provide that the Material Administrative Expenses Claims allocated to EFH be adjusted to provide EFH unsecured creditors with no less than $10 million of distributable value.

## BACKGROUND

### A.    Commencement of the Chapter 11 Cases.

7.    On April 29, 2014 (the "Petition Date"), the E-Side Debtors and Texas Competitive Electric Holdings Company LLC ("TCEH") and certain of its subsidiaries (collectively, the "T-Side Debtors")[6] filed voluntary petitions for relief with this Court under chapter 11 of the Bankruptcy Code.  The chapter 11 cases were jointly administered for procedural purposes only. [D.I. 849].

8.    As of the Petition Date, EFH was a holding company that owned interests in two main businesses.  EFH, through its ownership of TCEH, owned 100% of the interest in the T-Side Debtors' business of, among other things, electricity generation and lignite/coal mining. EFH also owned a number of businesses with significant asbestos liabilities.  EFH, through its ownership interest in EFIH, also indirectly owned an approximately 80% economic interest in the regulated business of Oncor Electric Delivery Co. LLC ("Oncor"), the largest transmission and distribution system in Texas.  [D.I. 98].  As the Debtors entered chapter 11, their hope was "to restructure their balance sheets and retain their position as leaders in the Texas electricity market."  [D.I. 37 ¶ 9].

9.    A critical challenge of the Debtors' restructuring efforts was crafting a disposition of Debtors' interest in Oncor that avoided a potentially crippling income tax liability—the so-called "Tax Armageddon" that would have eliminated *any* recovery for EFH's stakeholders.  As Paul Keglevic, the Executive Vice President, Chief Financial Officer, and Co-Chief

---

[6]    The E-Side Debtors and the T-Side Debtors are collectively referred to herein as the "Debtors."

Restructuring Officer of EFH, stated in his First Day Declaration, avoiding adverse tax consequences that may "trigger in excess of *$6 billion* of aggregate tax liability" was one of the "key issues" driving prepetition restructuring negotiations. [D.I. 98 ¶ 15] (emphasis in original). Mr. Keglevic made clear that the Debtors "were firmly of the view that the significant litigation and regulatory risk related to triggering massive deconsolidation-related tax liabilities that may be left impaired at EFH Corp. justified a focus on tax-free and tax-efficient transactions." *Id.* ¶ 163.

10.    Critically, however, the *only* debtor that faced this "Tax Armageddon" was EFH. This was because EFIH and TCEH were considered "disregarded entities" for federal income tax purposes. This means simply that EFIH and TCEH do not exist in the eyes of the IRS. Consequently, as the taxpaying corporate parent, EFH would be liable for any federal income tax liabilities attributable to the income or gain generated by EFIH, TCEH, or any subsidiaries thereof. *See* [D.I. 2296 at 4] (a taxable disposition "likely would result in EFH being left with a potential tax liability of *$7 billion* **or more**." (emphasis in original)); *see also id.* at 8 ("***For purposes of the Debtors' reorganization, it is important to keep in mind that these principles mean that any taxable disposition by EFH of EFIH or TCEH—including a transfer of the assets of, or the equity interests in, those entities—would generate a significant federal income tax liability that the IRS would seek to collect from EFH and not EFIH or TCEH***" (emphasis in original)).

11.    For that reason, from at least the Petition Date through the consummation of the Sempra transaction, the Debtors pursued a tax-free disposition that was principally for the benefit of EFH and its stakeholders. Indeed, for nearly the first three years of the chapter 11 cases, EFIH was solvent and its creditors were likely to receive full payment in a chapter 7

liquidation.  [D.I. 6124; D.I. 10564].  In fact, with few exceptions, between the Petition Date and September 2016, the EFIH unsecured 11.25%/12.25% senior toggle notes (the "PIK Notes") generally traded above par.  *See* **Exhibit A**.

12.     To the very end, the E-Side Debtors touted the avoidance of "Tax Armageddon" as one of the major achievements of these chapter 11 cases.  *See, e.g.*, **Exhibit B** E-Side Debtors' Opening Demonstrative for Plan Confirmation Hearing, Feb. 26, 2018, at slide 4 (explaining that the Sempra Plan (detailed below) achieves key E-Side goals, including the avoidance of "Tax [A]rmageddon").  But this achievement was largely obtained at the expense of significantly diminished EFIH unsecured creditor recoveries resulting from the accrual of interest and professional fees and the repeated failure to consummate multiple transactions seeking to avoid Tax Armageddon.

**B.     The Formation of the E-Side Committee and Retention of Professionals.**

13.     On May 13, 2014, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed an official committee of unsecured creditors of Energy Future Competitive Holdings Company LLC ("EFCH"), TCEH, the direct and indirect Debtor subsidiaries of EFCH and TCEH, and EFH Corporate Services Company (the "T-Side Committee").  [D.I. 420].

14.     On October 27, 2014, the U.S. Trustee formed a separate official committee of unsecured creditors of EFH, EFIH, EFIH Finance, Inc., and EECI, Inc. (the "E-Side Committee"). [D.I. 2570].  Throughout the chapter 11 cases, the E-Side Committee was principally composed of EFH creditors rather than EFIH creditors.  Four of the five members held claims against EFH (Peter Tinkham, $569,572 against EFH; Shirley Fenicle, $5,000,000 against EFH and asbestos debtors; David William Fahy, $250,000 against EFH; American Stock Transfer & Trust Company, LLC, $500 million against EFH as primary obligor, with a portion guaranteed by EFIH).  Upon

information and belief, with the exception of one partial guaranty claim against EFIH, *no member had claims against EFIH*.

15.    The majority of professionals retained by the Debtors represented both EFH and EFIH. These professionals include Kirkland & Ellis LLP ("Kirkland"); the Debtors' counsel; Evercore Group L.L.C. ("Evercore"), the Debtors' investment banker; and Alvarez & Marsal North America, LLC ("Alvarez"), the Debtors' restructuring advisor. This Allocation Motion addresses only expenses incurred by these professionals, and not those incurred by professionals only representing a single debtor.

16.    Pursuant to the Interim Compensation Order, all Professionals (defined as the Debtors' professionals and any professional retained by any official committee) were required to "allocate any fees and expenses sought in connection with each Monthly Fee Statement to the applicable Debtors for whose direct benefit such expenses were incurred," [D.I. 2066], *see also* [D.I. 658]. None of the E-Side Committee's Professionals allocated their fees to a Debtor, and only certain of the Debtors' professionals did so.

## C.    The Three Proposed Tax-Free Transactions.

17.    The E-Side Debtors' efforts to avoid Tax Armageddon began well before the Petition Date. As part of its initial chapter 11 restructuring efforts, EFH, various creditors, and certain other parties entered into a multi-party restructuring support agreement (the "RSA"). The RSA contemplated, among other things, (a) a restructuring of the T-Side Debtors' business by means of a tax-free spin-off, (b) EFH seeking certain private letter rulings from the Internal Revenue Service to confirm that the asset transfer transactions would be treated as a tax-free transaction, and (c) the E-Side Debtors and T-Side Debtors commencing chapter 11 cases. [D.I. 6097-1].

18.     After filing the cases, the E-Side Debtors received competing transaction offers from third parties that the E-Side Debtors believed would maximize value.  As a result, the E-Side Debtors terminated the RSA, but then pursued only restructuring transactions, including a tax-free spin-off of TCEH, to avoid significant adverse tax consequences for EFH.  [D.I. 1697].

### *i.     Initial Restructuring Efforts and the Failed Hunt Transaction.*

19.     On April 14, 2015, the E-Side and T-Side Debtors filed a chapter 11 plan providing for a tax-free spin-off of the T-Side Debtors and one of three forms of transactions for EFH and EFIH: a merger, an equity investment, or a standalone reorganization.  The E-Side Debtors were concurrently soliciting bids on a potential sale transaction and exploring a potential transaction to be consummated through the filed chapter 11 plan whereby EFH's interest in Oncor would be converted into a real estate investment trust ("REIT").

20.     In August 2015, the Debtors pursued the REIT reorganization strategy in a transaction with Hunt Consolidated, Inc. ("Hunt"), and in December of the same year confirmed a reorganization plan contingent upon consummating the Hunt transaction (the "Hunt Plan").  Under the Hunt Plan, holders of unsecured claims against EFIH were projected to receive a 100% recovery.  [D.I. 6124].  The Hunt Plan, however, failed when PUCT refused to approve the REIT transaction and consequently, in May 2016, the Hunt plan support agreement and merger agreement were terminated.

21.     Thereafter, the E-Side Debtors and T-Side Debtors decided to bifurcate the plan confirmation process to allow for a more expeditious reorganization of the T-Side Debtors.  As a result, on August 29, 2016, the T-Side Debtors confirmed a chapter 11 plan that provided for (a) the execution of a transaction resulting in a step-up in the tax basis of certain of TCEH's assets and (b) the spin-off of reorganized TCEH and certain of its direct and indirect subsidiaries (the "T-Side Plan").  The T-Side Plan became effective on October 3, 2016.

> ii.    *The Failed NextEra Transaction and Subsequent Reconsideration of the NextEra Termination Fee.*

22.    While the T-Side Debtors sought confirmation of the T-Side Plan, the E-Side Debtors solicited proposals for a transaction involving Oncor.  In July 2016, after months of negotiations with various interested parties, the E-Side Debtors entered into a merger agreement with NextEra (the "NextEra Merger Agreement") which was subject to various conditions precedent, including regulatory approval from PUCT.

23.    On August 3, 2016, the E-Side Debtors moved this Court for an order (the "Sale Motion") authorizing them to enter into the NextEra Merger Agreement and approving provisions that would, under certain circumstances, entitle NextEra to a $275 million termination fee (the "NextEra Termination Fee," as also defined above) payable by the E-Side Debtors.  [D.I. 9190].  Following the hearing on the proposed sale on September 19, 2016 (the "Sale Hearing"), the Court entered an order approving the NextEra Merger Agreement (the "NextEra Approval Order").

24.    In furtherance of the NextEra transaction, the Debtors also filed a chapter 11 plan (the "NextEra Plan") and related disclosure statement (the "NextEra Disclosure Statement"). The NextEra Plan revealed that the failure of the Hunt Plan had little impact on EFIH unsecured creditor recoveries.  As set forth in the NextEra Disclosure Statement and the accompanying liquidation analysis, holders of general unsecured claims against EFIH were projected to receive a 100% recovery under the NextEra Plan and an approximately 98% recovery in a chapter 7 liquidation.  And critically, this analysis ignored the possibility of a liquidation of the EFIH Debtors in a deconsolidation transaction that would have enabled EFIH unsecured creditors to receive the value obtained from a sale of its indirect interest in Oncor.  [D.I. 10564-5].

25.    The projected recoveries for EFH creditors were, however, greatly dependent on the consummation of the NextEra transaction.  For example, holders of unsecured Class A4 and A7 claims against EFH were projected to receive a 50% recovery in the event the NextEra transaction was consummated, but only between 0% and 7.2% in a chapter 7 liquidation.   Holders of unsecured Class A3 and A9 claims against EFH were projected to receive a 100% recovery if the NextEra transaction were consummated, but only between 0% and 7.2% in a chapter 7 liquidation.

26.    Further, pursuant to the NextEra Merger Agreement, NextEra agreed to assume and reinstate all asbestos liabilities against EFH and set aside an initial amount of $250 million of the merger transaction purchase price in escrow to satisfy potential asbestos liabilities.  [D.I. 9606 at 14, 33, 73].  In subsequent negotiations leading up to approval of the NextEra Merger Agreement, NextEra agreed to increase the purchase price by $300 million and release $150 million of the asbestos escrow to the estates (dropping the escrow from $250 million to $100 million), resulting in an additional $450 million of distributable value, which counsel for the E-Side Debtors' explained "***virtually quadrupled the recoveries of the EFH unsecured creditors***." *Id.* at 14:22-23 (emphasis added); *see also id.* at 87:14-21 ("I think it's worth mentioning once again that as a result of the negotiations over the weekend, we have an increase of $450 million in distributable value, quadrupling the potential recoveries for the EFH creditors.").  NextEra only agreed to do so, however, in exchange for an increase of $165 million in the NextEra Termination Fee, from $110 million to $275 million.  *See id.* at 23:16-20; *see also id.* at 52:9-12.

27.    On February 17, 2017, this Court entered an order confirming the NextEra Plan.  [D.I. 10859].  The NextEra Plan was never consummated because on April 13, 2017, PUCT entered an order denying the parties' application for approval of the NextEra transaction, finding that the NextEra transaction would not be in the public interest.  PUCT also denied NextEra's

two requests for reconsideration, and on July 6, 2017, the E-Side Debtors terminated the NextEra Merger Agreement and announced their entry into a merger agreement with Berkshire Hathaway Energy Company ("Berkshire," and the "Berkshire Merger Agreement").  [D.I. 11424].

28.     On July 29, 2017, Elliott filed a motion (the "Reconsideration Motion") seeking reconsideration of the NextEra Approval Order to the limited extent that the order authorized the E-Side Debtors to pay the $275 million NextEra Termination Fee when NextEra failed to obtain PUCT approval and the E-Side Debtors were forced to terminate the NextEra Merger Agreement and pursue a transaction for value considerably lower than the NextEra transaction.  [D.I. 11636]. On September 19, 2017, this Court granted the Reconsideration Motion.  [D.I. 11921].  NextEra subsequently appealed the Court's order to the Third Circuit.  That appeal remains pending. NextEra has also submitted an administrative expense claim for approximately $60 million, which purportedly represents the expenses it claims to have incurred in connection with the NextEra transaction (the "NextEra Reimbursement Claim").  [D.I. 12671].  The Movants have requested summary dismissal of the NextEra Reimbursement Claim.  [D.I. 12844].

### iii.     The Failed Berkshire Plan and the Confirmed Sempra Plan.

29.     As noted above, following PUCT's denial of the NextEra transaction, the E-Side Debtors entered into a merger agreement with Berkshire.  Prior to the hearing on approval of the Berkshire Merger Agreement, the E-Side Debtors received a competing proposal from Sempra Energy ("Sempra") that preserved the basic tax-free structure contemplated by the Berkshire transaction, but provided greater overall consideration for the E-Side Debtors' estates. Accordingly, the E-Side Debtors terminated the Berkshire Merger Agreement and entered into a merger agreement with Sempra (the "Sempra Merger Agreement").

30.     On September 11, 2017, the E-Side Debtors filed a chapter 11 plan (the "Sempra Plan") and related disclosure statement centered on the proposed Sempra merger transaction.

[D.I. 11889-5].    On February 27, 2018, the Court entered the E-Side Confirmation Order confirming the Sempra Plan, and on March 9, 2018, the Sempra Plan became effective.    In connection with the Sempra Plan and E-Side Confirmation Order, the E-Side Debtors established the NextEra Plan Reserve, a $275 million discretionary reserve on account of the disputed NextEra Termination Fee.    Pursuant to the E-Side Confirmation Order, the Court deferred any ruling on the appropriate allocation as between EFH and EFIH of the NextEra Plan Reserve (and the NextEra Termination Fee itself in the event such fee is ultimately found to be an allowed administrative expense) and various other administrative expenses against the E-Side Debtors' estates.    [D.I. 12763].

**D.    The Central Issues Driving the E-Side Debtors' Restructuring Efforts in the Chapter 11 Cases.**

31.    The Debtors' unwavering and costly effort to avoid Tax Armageddon is critical to this Court's allocation of the Material Administrative Claims between the EFH and EFIH estates. Additionally, from the outset, the E-Side Debtors expended significant resources objecting to the so-called "make-whole" claims—a dispute which, had it been successful, would have inured primarily, if not entirely, to the benefit of EFH.    And finally, since the consummation of the T-Side Plan and entry into the NextEra Merger Agreement, two additional important restructuring objectives emerged:    (i) maintenance of the TCEH settlement and (ii) pursuit of a transaction in which asbestos claims against the EFH Debtors are assumed.    Each of these forces has been driven by, and resulted in, direct benefits to the EFH estate and its creditors.

> **i.    The Avoidance of Tax Armageddon and Pursuit of a Tax-Free Restructuring Transaction.**

32.    As set forth above, from the outset, the E-Side Debtors' restructuring efforts were driven by a self-imposed perceived need to avoid "Tax Armageddon" through a tax-free

disposition, which was the only scenario under which EFH unsecured creditors would receive a distribution.

33.     EFIH unsecured creditors, by contrast, were indifferent as to whether a restructuring transaction was taxable or non-taxable, due to its status as a disregarded entity for federal income tax purposes.  Thus, had the Debtors pursued and consummated a taxable transaction sale from the beginning, EFIH unsecured creditors would have been paid in full.  Indeed, as the three confirmed plans of reorganization amply demonstrate, the Debtors' efforts to avoid Tax Armageddon over nearly four years was a significant detriment to EFIH creditor recoveries.  [D.I. 10565; 11889].

### ii.     The Make-Whole Dispute.

34.     Shortly after these cases were filed, EFIH declared that it reserved the right to redeem some or all of its outstanding secured notes.  *See In re Energy Future Holdings Corp*., 842 F.3d 247, 252 (3d Cir. 2016).  In response, indenture trustees for certain EFIH noteholders asserted an entitlement to make-whole premiums under the applicable indentures.  At the time these claims were asserted, EFIH was solvent, and its unsecured creditors were expected to receive at or near 100% recoveries, whether under a plan of reorganization or in a liquidation.  [D.I. 6110; 10564-5].  Because of the E-Side Debtors' corporate structure, any funds in excess of the amount needed to pay EFIH unsecured creditors in full could be used for distributions to EFH creditors.  Accordingly, disallowance of the EFIH noteholders' make-whole premiums—and the Debtors' efforts in contesting noteholders' entitlement to these premiums— would inure to the benefit of EFH creditors.

35.     In two separate opinions, this Court agreed with the Debtors' professionals and held that the noteholders were not entitled to the make-whole premiums.  These decisions were then appealed to the Third Circuit, which heard oral argument on September 27, 2016.  On

November 17, 2016, approximately two and a half years after the make-whole litigation was commenced, the Third Circuit reversed and found that EFIH was required to pay make-whole premiums to the noteholders. *See Energy Future Holdings Corp.*, 842 F.3d at 261.

### iii.    *Preserving the TCEH Settlement.*

36.    A critical deal point in the Debtors' repeated efforts to secure a tax-free disposition was the TCEH Settlement.   On November 23, 2015, EFH, EFIH, the E-Side Committee, TCEH, and certain first lien creditors of TCEH, among others, entered into a Settlement and Support Agreement (the "TCEH/EFH Settlement Agreement") to resolve certain litigation, claims, and other disputes among the parties, including a $700 million intercompany claim by TCEH against EFH that was allowed pursuant to a prior agreement and order (the "TCEH Settlement Claim").   Pursuant to the terms of the TCEH/EFH Settlement Agreement, TCEH agreed to segregate, hold in trust, assign, and turn over to holders of EFH Beneficiary Claims (as defined in the Sempra Plan) any recovery received by TCEH on account of the TCEH Settlement Claim up to an amount not to exceed $37.8 million in the aggregate (the "TCEH Settlement Claim Turnover Amount").

37.    EFH Beneficiary Claims consist solely of claims against EFH, which means that EFH and its creditors were the sole beneficiaries of the agreement by TCEH to turn over a portion of its TCEH Settlement Claim.   This settlement was incorporated into the Sempra Plan and will enhance recoveries for various EFH creditors. It was a task on which the E-Side Committee spent considerable time, and for which EFIH unsecured creditors are now improperly being asked to shoulder a significant portion of the cost.

### iv.    *Claims Relating to Alleged Asbestos Exposure.*

38.    As of the Petition Date, certain of the EFH Debtors faced significant claims relating to asbestos exposure at power plants.  [D.I. 11890].  Consequently, during the chapter 11

cases, the E-Side Debtors implemented a complex and comprehensive system for addressing asbestos claims and notifying potential claimants, which alone cost approximately $2 million. Feb. 26, 2018 Hr'g Tr. 229:15-22. Approximately 32,000 proofs of claim were filed on account of purported manifested and unmanifested asbestos-related bodily injuries, and the most recent liquidation analysis filed by the E-Side Debtors lists asbestos liabilities totaling approximately $58 million. [D.I. 11889].

39. The assumption of asbestos liabilities became a critical deal term in the Debtors' negotiations with NextEra. But it was a deal term that mattered *only* to EFH because, if NextEra assumed the liabilities—as it agreed to do, in exchange for a $165 million increase to the termination fee—asbestos creditors would remain an unimpaired class for purposes of plan confirmation.

## E.    Elliott's Contributions to the Chapter 11 Cases.

40. Elliott was an active participant in the chapter 11 Cases. Its efforts benefited both EFIH and EFH. Pursuant to the Sempra plan support agreement (the "Sempra Plan Support Agreement"), the E-Side Debtors requested a finding that up to $35 million of Elliott's fees and expenses are an allowed administrative claim against EFIH under the Sempra Plan (the "E-Side Debtors' Allowance Application"). [D.I. 11801-2]. Elliott's substantial contributions have included the following:

    a.    *First*, Elliott secured a critical adjournment of the hearing date to approve the E-Side Debtors' proposed transaction with Berkshire, whereby Berkshire would have acquired the E-Side Debtors' indirect interest in Oncor for $9 billion. During the extended period secured by Elliott, following and as a result of direct negotiations with Elliott, Sempra emerged with a superior proposal to acquire Oncor. Sempra ultimately agreed to acquire Oncor for $9.45 billion. As a result, the E-Side Debtors' estates will receive $450 million more cash consideration than they would have received under the Berkshire transaction (not accounting for the additional 2017 dividend payments addressed below);

b.   *Second*, Elliott successfully obtained an order disallowing the $275 million NextEra Termination Fee sought by NextEra; and

c.   *Third*, Elliott sought to enforce the E-Side Debtors' contractual rights against Sempra regarding the E-Side Debtors' interests in Oncor's 2017 quarterly dividends, which ultimately resulted in a settlement supported by Elliott and approved by this Court.  The settlement will deliver an additional $31 million to the E-Side Debtors' estates.

[D.I. 12695].

41.    In addition to the above-listed contributions, Elliott also enhanced and benefited the reorganization efforts of both the EFH and EFIH estates by: (i) making a financing proposal that, in turn, would have immediately reduced estate financing costs and pursuing discussions and negotiations with the Debtors and third parties regarding alternative transactions that ultimately were pursued by the Debtors once it became clear that the proposed NextEra transaction was not viable; (ii) spearheading a resolution of a tax allocation dispute between EFH and Vistra Energy Corp. ("Vistra") that had substantial implications for the EFH estate; and (iii) serving as the primary creditor representative in negotiating the Sempra Plan and related documents and advocating for creditor distributions in connection with Sempra Plan confirmation proceedings.

**F.    The Parties' Allocation Discussions.**

42.    Prior to confirmation of the Sempra Plan, Elliott engaged in extensive negotiations with counsel to the Disinterested Directors regarding allocation disputes, but a resolution could not be reached.  Prior and subsequent to confirmation, the Movants have engaged in negotiations with certain unsecured creditors of EFH regarding an appropriate allocation of the NextEra Plan Reserve and various other administrative expenses, but thus far the parties have not been able to reach an agreement on any allocation issues.  [D.I. 12769-3].

**ARGUMENT**

**I.   THE COURT SHOULD ALLOCATE ALLOWED ADMINISTRATIVE EXPENSES BASED ON THE INTENDED BENEFICIARY OF THE POST-PETITION TRANSACTION THAT GAVE RISE TO THE EXPENSE INCURRED AT THE TIME THE EXPENSE WAS INCURRED.**

43.   Courts apply a two-part test in determining whether an expense qualifies as an administrative expense for an estate: "(1) the expense must have arisen from a post-petition transaction between the creditor and the debtor, and (2) the expense must have been 'actual and necessary' to preserve the estate." *In re New Century TRS Holdings, Inc.*, 446 B.R. 656, 661 (Bankr. D. Del. 2011) (internal citation omitted); *see also* 11 U.S.C. § 503(b) ("[T]here shall be allowed administrative expenses . . . including, the actual, necessary costs and expenses of preserving the estate."). Nothing in section 503(b) of the Bankruptcy Code authorizes the imposition of expenses upon a particular estate if those expenses were only necessary for the preservation of the estate of a different debtor. An expense may thus only be borne by a particular estate (and its creditors) if it was necessary for the preservation of that particular debtor's estate.

44.   For this reason, when allocating professional fees and administrative expenses among multiple debtors, courts typically consider which debtor or debtors directly benefit(s) from the services at issue. For example, in *In re Tropicana Entertainment, LLC*, No. 08-10856 (KJC), 2014 WL 7450610 (Bankr. D. Del. Dec. 30, 2014), the court allocated expenses between two debtor groups by determining an appropriate percentage of expenses each estate should bear. *Id.* at *6. In so doing, the court looked principally to which estate benefited from the expense, observing that an "allocation based solely on the amount of debt . . . would be inequitable." *Id.* Critically, when assessing the benefit provided to an estate, courts look to the date on which the expense was incurred, not the date that it might be due and payable. *See In re Hechinger Inv. Co. of Del.*, 298 F.3d 219, 225 (3d Cir. 2002) ("Section 503(b)(1)(A) does not give rise to administrative

priority to wages, salaries, or commissions due to be paid after the commencement of the case.  It looks to the time when the services were rendered not when they were scheduled for payment" (internal quotation marks and emphasis omitted)); *see also In re Commercial Fin. Servs., Inc.*, 246 F.3d 1291, 1295 (10th Cir. 2001) (to determine administrative priority, courts look to "when the acts giving rise to a liability took place, not when they accrued").

45.     Accordingly, in determining the proper allocation of the E-Side Debtors' estates' liability with respect to the Material Administrative Expense Claims, the Court should look to the estate that was expected to benefit, and not to the amount of claims held by creditors against an estate.  Moreover, the Court should look to the facts and circumstances that existed at the time a particular expense was incurred to determine which estate was expected to benefit from the expense.

## II.    ANY LIABILITY WITH RESPECT TO THE NEXTERA TERMINATION FEE CLAIMS SHOULD BE ALLOCATED EQUALLY BETWEEN EFH AND EFIH.

46.     To the extent that NextEra has or will have an allowed administrative expense claim for either the NextEra Termination Fee Claim or the NextEra Reimbursement Claim (or any reserve established thereof), the allocation of any such administrative claims (or any reserve) must reflect the reality that EFH was the direct primary intended beneficiary of the NextEra transaction and the Termination Fee.

47.     As the record of the Sale Hearing and the restructuring efforts of the E-Side Debtors up to the Sale Hearing amply demonstrate, the NextEra transaction was intended to primarily benefit the creditors of EFH.  *First*, as the liquidation analyses at the time of the Hunt transaction and the NextEra transaction make clear, regardless of whether a transaction was consummated, the unsecured creditors of EFIH were projected to receive a 100% recovery.  [D.I. 6124].  In contrast, EFH unsecured creditor recoveries would have been significantly different under the Hunt and the

NextEra transactions.  [D.I. 10564-5].  This significant swing in recoveries ignores the effects of "Tax Armageddon," which would have eliminated any recovery for EFH unsecured creditors recoveries and may have left EFH administratively insolvent.

48.   ***Second***, negotiations regarding the amount of the NextEra Termination Fee illustrate that the E-Side Debtors agreed to it in exchange for changes to the proposed NextEra Merger Agreement, which principally benefited EFH and its unsecured creditors.  Specifically, in exchange for a $165 million increase in the NextEra Termination Fee—from $110 million to $275 million—NextEra agreed to increase the purchase price by $300 million and release $150 million of the asbestos escrow to the estates (lowering the escrow from $250 million to $100 million).  As the Debtors' counsel emphasized to the Court at the Sale Hearing, these changes resulted in an additional $450 million of distributable value for the estates that ***"virtually quadrupled the recoveries of the EFH unsecured creditors."***  [D.I. 9606 at 14:22-23] (emphasis added); *see also id*. at 87:14-20 ("I think it's worth mentioning once again that as a result of the negotiations over the weekend, ***we have an increase of $450 million in distributable value, quadrupling the potential recoveries for the EFH creditors.***  That comes as a result of a $300 million bid increase, purchase price increase, and a release of $150 million from the asbestos escrow account." (emphasis added)).  And quite tellingly, the EFH Notes Trustee and certain EFH noteholders, who initially objected to the NextEra transaction, agreed to support the transaction because of this purchase price increase.  *See id*. at 29:2-9 ("Nevertheless, in the last two days the Debtors have continued to negotiate with NextEra and have reached agreement on another $300 million increase in the purchase price, bringing the cash purchase price to $4.4 billion.  With this increase, and

certain accounting adjustments made with respect to the cash purchase price, the Debtors have

brokered the support of the EFH indentured trustee, Fidelity and Contrarian.").[7]

49.     Additionally, as part of the modifications, NextEra still agreed to assume and

reinstate **all asbestos liabilities,** while simply reducing the set-aside of the purchase price held in

escrow to $100 million to satisfy any potential asbestos liabilities.  These asbestos claims were only

asserted against the EFH Debtors and, thus, NextEra's assumption of asbestos liabilities directly

benefited only the EFH estates.  Additionally, because NextEra assumed the asbestos liabilities,

asbestos creditors remained unimpaired.

50.     **Third,** in addition to receiving increased consideration from NextEra, the EFH

Debtors were also the primary beneficiary of NextEra's agreement to waive its requested "match

right."  [D.I. 9606 at 25:5-13].  The Debtors' counsel touted the fact that "as "as a result of the

negotiations over the weekend, **we have an increase of $450 million in distributable value,**

**quadrupling the potential recoveries for the EFH creditors.**"  *Id.* at 87:14-17 (emphasis added).

EFIH unsecured creditors, by contrast, were already projected to obtain a full recovery.  [D.I.

10564-5].  Thus, if and to the extent there was a higher bid, NextEra's removal of the "match

right" would inure to the benefit of EFH unsecured creditors and would not benefit EFIH creditors.

51.     Thus, leaving aside any allocation of the originally proposed termination fee of $110

million, the EFH Debtors and their estates should bear most, if not all, of the $165 million increase in

the NextEra Termination Fee.  So, while it would be entirely reasonable for the Court to allocate

far more than half of an allowed administrative expense related to the NextEra Termination Fee

to EFH, the Movants only request that any allowed NextEra Termination Fee Claim (and any

associated reserve) be shared equally by EFH and EFIH.

---

[7]     Based on the efforts of these EFH unsecured creditors, the Court subsequently approved
substantial contribution claims based largely on their efforts on behalf of EFH in connection with the
NextEra transaction.  [D.I. 11050].

### III.    AT LEAST 70% OF THE E-SIDE COMMITTEE PROFESSIONAL FEE CLAIMS SHOULD BE ALLOCATED TO EFH.

52.    The E-Side Committee, which was comprised almost exclusively of EFH creditors, retained several professionals to assist in the chapter 11 cases.  The fees and expenses incurred by the E-Side Committee's professionals are listed on **Exhibit C**.  Despite the express terms of the Interim Compensation Order, none of the E-Side Committee's professionals allocated any of their fees and expenses to either EFH or EFIH.  Based on the scope of each E-Side Committee professional's retention and the underlying purpose and timing of the work performed by each professional, Movants contend that at least 70% of work performed by the E-Side Committee's professionals was for the direct and primary benefit of EFH unsecured creditors.

#### A.    Over 80% of the E-Side Committee's Professional Fee Claims Were Expended in Connection with the Two Failed Plans That Would Have Primarily Benefited EFH Unsecured Creditors.

53.    The overwhelming majority of the fees for which the E-Side Committee's professionals seek approval were incurred during periods when EFIH was solvent, and accordingly when those professionals were primarily protecting the interests of EFH unsecured creditors.  Thus, work during such periods principally benefited EFH unsecured creditor recoveries.

54.    Under the Hunt and NextEra Plans, EFIH unsecured creditors were projected to receive a 100% recovery.  Moreover, until early October 2016—days after the Third Circuit's oral argument in the make-whole litigation, and only weeks before the Third Circuit's opinion— the trading prices of the PIK Notes generally (though not always) exceeded par.  *See* **Exhibit A**. And critically, the E-Side Committee's professionals incurred the vast majority of fees and

expenses before October 2016—when only EFH recoveries were at risk, and when EFH stood to benefit from the professionals' work.  In particular:

- ***39%*** of the E-Side Committee's professional fees were incurred prior to the TCEH settlement in November 2015,

- ***77%*** were incurred prior to the Third Circuit's opinion in the make-whole litigation in November 2016,

- ***80%*** were incurred prior to the NextEra Plan confirmation in February 2017, and

- ***81%*** were incurred prior to PUCT's first denial of the NextEra transaction in April 2017.

*See* **Exhibit D.**

55.    Movants' proposed allocation of 70% of the E-Side Committee's professionals' expenses to EFH is conservative.  The final fee application of the E-Side Committee's financial advisor, Guggenheim Securities LLC ("Guggenheim"), confirms as much.  Although nearly half of Guggenheim's total fees (including a $6 million success fee) did not become due and payable until 2018 (after confirmation of the NextEra Plan), the work supporting any such success fee was performed much earlier.  *See* **Exhibit D** (only 47% of Guggenheim's fees were incurred prior to April 2017); *see also* [D.I. 12998 at 9] ($6 million transaction fee in Guggenheim's last interim fee period, which spans January 1, 2018 to March 9, 2018).  Indeed, an aggregation of the hours incurred by Guggenheim in its interim fee applications reveals that approximately ***70%*** of Guggenheim's hours were incurred *before* the TCEH settlement in November 2015 and approximately ***90%*** of Guggenheim's hours were incurred *before* confirmation of the NextEra Plan in February 2017.  *See* [D.I. 3572; 4662; 6495; 7829; 8720; 9791; 10830; 11345; 11972; 12647; 12998].  That work benefited EFH, not EFIH, and EFH creditors should bear the expense for it.

**B.     The E-Side Committee Professional Fee Claims Reflect Substantial Efforts on Behalf of EFH Unsecured Creditor Recoveries.**

56.     Though the E-Side Committee was obligated to protect the interests of both the EFH and EFIH unsecured creditors, most of the E-Side Committee's professionals' efforts were aimed at maximizing recoveries for EFH unsecured creditors. This was not because they ignored their obligations to EFIH unsecured creditors. It is simply because EFIH was solvent for most of the duration of the chapter 11 cases and, thus, the E-Side Committee was obligated to maximize value that exclusively would benefit only EFH unsecured creditors.

57.     For example, the E-Side's Committee's lead bankruptcy counsel, Sullivan & Cromwell (also the E-Side Committee's most costly professional at more than $24 million), devoted 50% of its incurred fees ($12 million) to tasks related to "Plan and Disclosure Statement" matters, 8% of its total incurred fees ($1.8 million) to tasks related to "Tax" matters, 7% of its total incurred fees ($1.6 million) to tasks related to "Asset Disposition," and 4% of its total incurred fees ($939,000) to tasks related to "Intercompany Claims," including the TCEH Settlement claim. [D.I. 13002 at 6]; *see also id.* ¶ 18 (describing "Asset Disposition" task code as including "matters relating to the Debtors' various processes for the disposition of the EFH Debtors' ownership interest in Oncor," including "the auction process, the proposed transaction with Hunt, the proposed transaction with NextEra, the proposed transaction with Berkshire Hathaway and the ultimate transaction with Sempra"); *id* ¶ 37 (describing "Plan and Disclosure Statement" task code as including "review[], analy[sis] and negotiat[ion] of several proposed plans of reorganization in these chapter 11 cases"); *id.* ¶ 44 (describing "Tax" task code as including "assistance . . . in understanding the significant tax issues involved in these chapter 11 cases" and "review[], comment[] and discuss[ion] with the Debtors many tax-related motions and the revised tax matters agreement"); *id.* ¶ 54 (describing "Intercompany Claims" as "claims among the Debtors whether

held by or against the EFH Debtors"). As discussed above, these tasks were for the primary benefit of the EFH estate.

58. The vast majority of the work performed by the E-Side Committee's financial advisor, Guggenheim, was likewise primarily for the benefit of EFH. Guggenheim's principal focus was to provide financial advice and assistance in connection with the E-Side Committee's efforts to consummate a tax-free restructuring transaction. [D.I. 12998-1]. As was the case for Sullivan & Cromwell, Guggenheim devoted a substantial amount of time to activities that principally benefited the EFH estate, including over 50% of its total hours billed to "Analysis, Presentations and Diligence" and approximately 15% on tasks relating to "Plan or Reorganization Review / Analysis and Negotiations." [D.I. 12998 at 37]; *see also id.* ¶ 14(a) (describing "Analysis, Presentations and Diligence" task code as including, without limitation, time spent "reviewing and performing various analyses in connection with evaluating the Debtors' business plans"); *id.* ¶ 14(d) (describing "Plan of Reorganization Review / Analysis and Negotiations" task code as including, without limitation, time spent "reviewing proposed plans of reorganization and associated disclosure statements and related exhibits, performing analyses in connection with the various proposed plans . . . and summarizing key terms and implications of these key proposed plans").

59. Accordingly, Movants submit that based on the overwhelming percentage of E-Side Committee's professionals' fees expended prior to confirmation of the NextEra Plan and the specific tasks performed by the E-Side Committee's professionals, 70% of the E-Side Committee's Professional Fee Claims should be allocated to EFH, with the remainder allocated to EFIH.

## IV.  THE DEBTORS' PROFESSIONAL FEE CLAIMS SHOULD BE SHARED EQUALLY BY EFH AND EFIH.

60.      The Debtors jointly retained numerous professionals to assist them in the chapter 11 cases.  The fees and expenses incurred by these professionals are identified in **Exhibit E**.  Movants respectfully submit that these fees should be split evenly (50/50) between the EFH and EFIH Debtors.

### A.  The E-Side Debtors' Professionals' Unallocated Fees and Expenses Should Be Shared Equally.

61.      Most of the E-Side Debtors' professionals—including Alvarez, Deloitte & Touche, Evercore, and Filsinger Energy Partners—did not attempt to determine which estate or estates benefited from their work, or in what proportion, but instead left their fees and expenses unallocated.

62.      These unallocated fees—which total 51% (or $106 million) of Debtors' professionals' fee claims—should be allocated equally between EFH and EFIH.  Significantly, the overwhelming majority of the Debtors' professionals' unallocated fees were actually incurred during periods when EFIH was considered solvent.  In particular:

- *94%* of total unallocated fees for the Debtors' professionals were incurred prior to the Third Circuit's opinion in the make-whole litigation in November 2016,

- *96%* were incurred prior to the NextEra Plan confirmation in February 2017, and

- *97%* were incurred prior to PUCT's first denial of the NextEra transaction in April 2017.

*See* **Exhibit D**.[8]

---

[8]      The Movants have been unable to determine whether the amounts incurred as of each particular date include fees already allocated to the T-Side Debtors.  Even if that is the case, however, the Movants note that the percentage of E-Side Committee's professional fees as of each date (which fees included no work for T-Side Debtors) is directionally consistent with the percentages included in this section and therefore corroborates their reliability.

63.    A review of the underlying fee applications further shows that key tasks that account for substantial expenses were principally for the benefit of EFH, not EFIH.  For example, the vast majority of the work performed by the Debtors' restructuring advisor Alvarez and investment banker Evercore was not necessary for preserving the EFIH estate.  Instead, the work of these professionals principally focused on providing financial advice and assistance in connection with the E-Side Debtors' efforts to consummate a tax-free restructuring transaction.  *See* [D.I. 2700-1] (Evercore engaged by the Debtors to "provide the Company with general investment banking advice and to advise it in connection with any Restructuring, Financing and/or Sale"); [D.I. 13004-4] (Alvarez engaged by the Debtors to provide consulting services "to improve the Company's financial performance . . . and assist the Company in an assessment of its longer term strategic alternatives").

64.    The fact that Evercore's and Alvarez's efforts primarily benefited EFH is further reflected in the amount of time that each spent on projects related to the efforts to identify and analyze potential restructuring transactions.  Evercore dedicated over 50% of its total time in these chapter 11 cases to "Asset Sales and Other M&A Activity," "Valuation and Recovery Analysis," "General Financial Analysis and Research," and "Plan of Reorganization."[9]  Alvarez likewise dedicated over 50% of its total fees in these chapter 11 cases to "Bankruptcy Support," "Claims," "Contracts," and "POR /  Disclosure Statement."  *See, e.g.*, [D.I. 13004 at 19] (explaining that Alvarez's "POR / Disclosure Statement" task code includes "advising and assisting the Debtors with the Plan of Reorganization and Disclosure Statement," as well as preparation for the "various solicitation efforts" and multiple "confirmation hearings").  Of Evercore's and Alvarez's remaining

---

[9]    Like Guggenheim, Evercore's interim fee applications for each task code are set forth in hours, with a total fees figure for each interim period also included.  As of the filing of this Allocation Motion, Evercore has not submitted a final fee application.  Movants reserve their rights to seek allocation of any fees incurred by Evercore for the period September 1, 2017 through the present and/or amend the Allocation Motion, in the event Evercore submits a final fee application.

time, there are multiple fees devoted to ministerial tasks such as coordination/communication, fee

applications, and travel time that should be allocated at least equally to both estates.

**B.      Kirkland's *Direct* Benefit Fees and Expenses Should Be Shared Equally by EFH and EFIH.**

65.      Unlike most of the Debtors' professionals, Kirkland allocated portions of its fees—

approximately $18.9 million—to EFH or EFIH, respectively (the "Direct Benefit Fees"), based on

its determination that such services "solely" benefited a particular estate.  *See* [D.I. 2066 ¶ 2(b)]

(Interim Compensation Order); *see also* [13019 ¶ 29] (Kirkland final fee application explaining

that "services performed in connection with the EFIH DIP Facility were billed as Direct Benefit

Fees *solely* to EFIH" (emphasis added)).  In particular, Kirkland allocated approximately 90% of

these Direct Benefit Fees to EFIH, with the remaining 10% to EFH.  [D.I. 13019 at 24].[10]

66.      Movants contend that Kirkland's allocation is incorrect and improper.  The Direct

Benefit Fees charged to EFIH were not "solely" for the benefit of EFIH, as Kirkland claims.  Rather,

these fees were, at best, for the collective benefit of the E-Side estates, and should accordingly be

allocated evenly (50/50) between EFH and EFIH.

67.      The timing of the work underlying the Direct Benefit Fees is critical.  In particular,

the overwhelming majority of Kirkland's Direct Benefit Fees were incurred when EFIH was

solvent, and accordingly when any plan could have benefited only EFH unsecured creditors.  In

particular:

- *88%* of Kirkland's Direct Benefit Fees were incurred prior to the Third Circuit's opinion in the make-whole litigation in November 2016,

- *98%* were incurred prior to the NextEra Plan confirmation in February 2017, and

---

[10]      Debtors' Delaware counsel, Richards Layton & Finger ("RLF"), also allocated portions of their fees to EFH ($1.4 million) and to EFIH ($760,000), respectively.  Tellingly, this allocation is wildly inconsistent with that employed by Kirkland, which at a minimum calls into question the reliability of Kirkland's allocation of 90% of the fees to EFIH.  Regardless, given the small amount at issue, the Movants do not challenge RLF's allocation of portions of their fees to EFH and EFIH.

- *99%* were incurred prior to PUCT's first denial of the NextEra transaction in April 2017.

*See* **Exhibit D**.  Although the vast majority of this work benefited EFH unsecured creditors, EFIH unsecured creditors are being asked to bear the vast majority of these fees and expenses.

68.    This is likewise confirmed by a review of the tasks that Kirkland has classified as for the "direct benefit" of EFIH.  Many of these tasks were, in reality, principally for the benefit of EFH unsecured creditors.  In particular, much of the Direct Benefit Fees allocated to EFIH were incurred in connection with the make-whole dispute and the NextEra transaction.  *See* [D.I. 13019 at 27-29] (three task codes comprising 97% of all EFIH Direct Benefit Fees: (i) "[EFIH] Cash Collat./DIP Finan./Makewhole" ($4.5 million); (ii) "[EFIH] Contested Matters & Advers. Pro." ($9.3 million); and (iii) "[EFIH] Plan and Disclosure Statements" ($4 million)).  As discussed above, each of these tasks was principally for the benefit of EFH—and at a minimum was not "solely" for the benefit of EFIH.  Thus, imposing 90% of the total Direct Benefit Fees for such tasks on EFIH—which were not necessary to preserve the estate—violates section 503(b).

### C.    Kirkland's *Collective* Benefit Fees and Expenses Should Also Be Shared Equally by EFH and EFIH.

69.    For the balance of Kirkland's fees—approximately $81.3 million (the "Collective Benefit Fees")—Kirkland made no determination as to whether one or both of the EFH and EFIH estates benefited.  It nonetheless allocated *90%* of these fees to EFIH, on the ground that the allocation of Collective Benefit Fees should match its allocation of the Direct Benefit Fees. This methodology is fundamentally flawed in two respects.  First, as set forth above, the Direct Benefit Fees should be shared equally.  Second, even if a different allocation of Direct Benefit Fees was warranted, when a particular expense cannot be said to benefit one debtor more than another (as is the case with Kirkland's Collective Benefit Fees), the fees and expenses should be

allocated equally between both debtors.  Indeed, any other allocation of administrative expenses would violate section 503(b), especially given the underlying facts.

70.     Here, the vast majority of Kirkland's work underlying the Collective Benefit Fees occurred during periods when EFIH was considered solvent, and thus could only (or at a minimum) principally benefit EFH.  In particular:

- *65%* of Kirkland's Collective Benefit Fees were incurred prior to the Third Circuit's opinion in the make-whole litigation in November 2016,

- *71%* were incurred prior to the NextEra Plan confirmation in February 2017, and

- *78%* were incurred prior to PUCT's first denial of the NextEra transaction in April 2017.

*See* **Exhibit D**.  Once again, although the vast majority of work was performed to benefit EFH, the vast majority of the fees and expenses (90%) was allocated to EFIH.

71.     Moreover, many of the tasks that Kirkland categorized as providing a "collective benefit" benefited the E-Side Debtors equally or EFH disproportionately, exacerbating the misallocation of "Direct Benefit" made by Kirkland. For example, Kirkland allocated over $35 million of fees incurred in connection with work on plan and disclosure statements to EFIH: (i) approximately $4 million as a "direct benefit"; and (ii) approximately $31.5 million as a "collective benefit" (90% of $35 million).  *See* [D.I. 13019 at 27-29].  There is simply no reasonable basis for EFIH unsecured creditors to bear such a disproportionate share of fees and expenses for a task that benefited both the EFH and EFIH Debtors.  Kirkland also charged significant expenses associated with pursuing a tax-free transaction (which likely could have been avoided had the Debtors considered or pursued a taxable transaction at the outset of the cases).  Yet the $12 million Kirkland incurred in fees on tax issues nevertheless was allocated 90% to EFIH. *Id.*  To be sure, EFIH benefited from some of this work.  But so did EFH, which plainly had more to gain from a tax-free transaction.

72.    In addition, fees incurred by Kirkland in connection with asbestos issues were primarily billed to the collective benefit "[All E-Side] Contested Matter and Adversary Proceeding" and "[All E-Side] Claims Administration & Objections" task codes, for which fees totaled approximately $45 million and $3.9 million, respectively.  Yet, all asbestos claims and liabilities were against EFH and certain of its debtor subsidiaries *other than* EFIH.  It would therefore be inappropriate and contrary to administrative expense jurisprudence to allocate 90% of asbestos-related fees to EFIH.  For these reasons, the Movants respectfully submit that EFH and EFIH should share equally the cost of Debtors' professionals.[11]

## V.    AT LEAST 30% OF THE ELLIOTT SUBSTANTIAL CONTRIBUTION CLAIM SHOULD BE ALLOCATED TO EFH.

73.    As described above, Elliott made a substantial contribution in these cases within the meaning of section 503(b) of the Bankruptcy Code.  This substantial contribution benefited both the EFH and EFIH estates by no less than $756 million, thus significantly increasing recoveries for all unsecured creditors.  EFH should bear at least 30% of Elliott's substantial contribution in exchange for the direct benefits that it received.

74.    *First*, after it became clear the proposed merger transaction with NextEra could not be consummated, Elliott moved the estates toward an alternative tax-free restructuring transaction, primarily in order to avoid triggering Tax Armageddon and to eliminate or reduce the exorbitant burn on the estates.  Elliott's efforts expedited resolution of these cases and minimized an ongoing $50 million or more per month interest rate burn to secured lenders.  Elliott's termination of the Plan Support Agreement and efforts to secure an alternative tax-free

---

[11]    While the Sempra Plan addresses the allocation of professional fees, *see* [D.I. 11887 at Art II. A. 2(d)], it does not eliminate the need to satisfy section 503(b) with respect to the allocation of administrative expenses among multiple debtors.  Further, the Sempra Plan makes clear that proposed allocations of fees are not binding absent final approval by the Court.  *See id.* ("For the avoidance of doubt, *all* Professional Fee Claims against any of the EFH/EFIH Debtors that accrue prior to the EFH Effective Date are subject to final approval by the Bankruptcy Court." (emphasis added)).

restructuring transaction principally benefited the EFH estate because these efforts were driven by the need to avoid Tax Armageddon.

75.     **Second**, Elliott opposed the Berkshire transaction and facilitated the superior Sempra transaction. As a result of Elliott's actions, the E-Side Debtors ultimately received a value-maximizing offer from Sempra to acquire Oncor for $9.45 billion—$450 million more cash consideration than the proposed merger agreement with Berkshire. While Sempra conferred a greater cash benefit to EFIH, it conferred an even greater benefit to EFH by assuming significant tax and asbestos liabilities against EFH, which otherwise would have materially reduced EFH recoveries.

76.     **Third**, Elliott obtained an order disallowing the $275 million NextEra Termination Fee, which would have been paid at the expense of the E-Side Debtors' creditors. As discussed above, the NextEra transaction principally benefited the EFH estate because it (i) avoided Tax Armageddon; (ii) resulted in improvements in distributions to EFH creditors over the chapter 7 alternative; (iii) released $150 million of the asbestos escrow to the estates, resulting in an additional $450 million of distributable value for the estates, which significantly increased available EFH creditor recoveries; and (iv) assumed and reinstated all asbestos liabilities and set aside $100 million of the purchase price in escrow to satisfy any potential asbestos liabilities, all of which were against EFH, which guaranteed a significant liability that would have materially reduced EFH recoveries.

77.     **Fourth**, Elliott negotiated the Sempra Plan and related documents and advocated for creditors in connection with the Sempra Plan confirmation proceedings. As previously discussed, the primary motivation behind the commencement of these cases was for EFH to consummate restructuring transactions that did not involve a taxable disposition of EFIH or TCEH.

EFIH creditors stood to benefit equally from any transaction advanced by the Debtors, whatever the tax consequences.  As a result, Elliott's efforts with respect to the Sempra Plan confirmation proceedings conferred a substantial benefit on EFH.  EFH should accordingly bear its fair share of the expense.

## **NOTICE**

78.     Notice of this Motion has been provided to (a) counsel to the Debtors (b) counsel to the PAB, (c) the Office of the United States Trustee for the District of Delaware, and (d) parties entitled to receive notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Movants respectfully submit that no other or further notice is required.

[*Text Continues on the Next Page*]

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Movants respectfully request that this Court enter an order (a) allocating the Material Administrative Expense Claims as follows: (i) NextEra Termination Fee Claims: 50% EFH and 50% EFIH; (ii) E-Side Committee Professional Fee Claims: 70% EFH and 30% EFIH; (iii) the Debtors' Professional Fee Claims: 50% EFH and 50% EFIH; and (iv) Elliott Substantial Contribution Claim: 30% EFH and 70% EFIH, and (b) granting the Movants such other and further relief as is just and proper.

Wilmington, Delaware
Date: May 13, 2018

**BAYARD, P.A.**

*/s/ Erin R. Fay*
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Evan T. Miller (No. 5364)
600 N. King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
scousins@bayardlaw.com
efay@bayardlaw.com
emiller@bayardlaw.com

–and–

**ROPES & GRAY LLP**
Keith H. Wofford (admitted *pro hac vice*)
Gregg M. Galardi
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090
Keith.Wofford@ropesgray.com
Gregg.Galardi@ropesgray.com

*Counsel for Elliott and UMB Bank, N.A., as Trustee*