## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | Objection Deadline: June 15, 2018 at 4:00 p.m. |

**COVER SHEETS TO FINAL FEE APPLICATION OF EVERCORE GROUP L.L.C., AS INVESTMENT BANKER AND FINANCIAL ADVISOR TO THE DEBTORS, FOR ALLOWANCE OF AN ADMINISTRATIVE CLAIM FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD FROM APRIL 29, 2014 THROUGH AND INCLUDING MARCH 9, 2018**

| | |
|---|---|
| **Name of Applicant:** | **Evercore Group L.L.C.** |
| Authorized to provide professional services to: | The above-captioned Debtors |
| Date of retention: | September 16, 2014 <br> *nunc pro tunc to* April 29, 2014 |
| Period for which compensation and reimbursement is sought: <br> (the "Fee Period") | April 29, 2014 – March 9, 2018 |
| Compensation sought on a final basis <br> as actual, reasonable and necessary: | $47,500,000.00 |
| Expense reimbursement sought on a final basis <br> as actual, reasonable, and necessary: | $1,016,922.83[2] |

This is a **final** fee application.

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. A complete list of the debtors and the last four digits of their federal tax identification numbers is available at http://www.efhcaseinfo.com.

[2] As described in the *Application of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors To Retain and Employ Evercore Group L.L.C. as Investment Banker and Financial Advisor Effective Nunc Pro Tunc to the Petition Date* [D.I. 651], prior to the Petition Date, the Debtors paid Evercore a reserve against expenses in process as of the Petition Date. As noted in prior fee applications, $29,831.33 of that reserve remained after accounting for such expenses and was applied towards these expenses during these chapter 11 cases. Figure also reflects an aggregate voluntary reduction by Evercore in conjunction with discussions with the Fee Committee and U.S. Trustee.

### Prior Statements, Applications and Allowances[3]

| Filing, Date Filed, D.I. | Period Covered | Total Fees (100%) | Requested | | Approved | | Paid | Holdback/ Amount Due |
|---|---|---|---|---|---|---|---|---|
| | | | Fees | Expenses | Fees | Expenses[4] | | |
| 1st Interim Oct. 31, 2014 D.I. 2700 | April 29 - August 31, 2014 | $7,600,000.00 | $7,600,000.00 | $368,611.55 | $7,600,000.00 | $338,780.22 | $7,938,780.22 | $-- |
| 2nd Interim Mar. 10, 2015 D.I. 3868 | Sept. 1 - Dec. 31, 2014 | $2,100,000.00 | $2,100,000.00 | $203,938.94 | $2,100,000.00 | $203,938.94 | $2,303,938.94 | $-- |
| 3rd Interim June 24, 2015 D.I. 4861 | Jan. 1 - April. 30, 2015 | $2,100,000.00 | $2,100,000.00 | $62,482.62 | $2,100,000.00 | $56,925.17 | $2,156,925.17 | $-- |
| 4th Interim Oct. 29, 2015 D.I. 6763 | May 1 - August 31, 2015 | $2,100,000.00 | $2,100,000.00 | $157,357.49 | $2,100,000.00 | $157,357.49 | $2,257,357.49 | $-- |
| 5th Interim March 7, 2016 D.I. 7990 | Sept. 1 - Dec. 31, 2015 | $2,100,000.00 | $2,100,000.00 | $52,014.38 | $2,100,000.00 | $52,014.42 | $2,152,014.42 | $-- |
| 6th Interim July 18, 2016 D.I. 8939 | Jan. 1 - April 30, 2016 | $2,100,000.00 | $2,100,000.00 | $6,800.73 | $2,100,000.00 | $5,966.77 | $2,105,966.77 | $-- |
| 7th Interim Dec. 2, 2016 D.I. 10323 | May 1 - August 31, 2016 | $2,100,000.00 | $2,100,000.00 | $117,166.92 | $2,100,000.00 | $116,964.04 | $2,216,964.04 | $-- |
| 8th - 10th Interim Nov. 29, 2017 D.I. 12283 | September 1, 2016 - August 31, 2017 | $2,700,000.00 | $540,000.00 (20%) $2,160,000.00 (80%) | $-- | $2,700,000.00 | $-- | $2,144,147.73 | $555,852.27[5] (20%) |
| 11th Interim May 24, 2018 D.I. 13138 | September 1, 2017 - December 31, 2017 | $-- | $-- | $-- | $-- | $-- | $-- | $-- |
| 12th Interim May 24, 2018 D.I. 13139 | January 1, 2018 - March 9, 2018 | $400,000.00 | $80,000.00 (20%) $320,000.00 (80%) | $-- | Pending | $-- | $-- | $80,000.00[6] (20%) $320,000.00[6] (80%) |
| Final May 24, 2018 D.I. [ ] | April 29, 2014 - March 9, 2018 | $24,200,000.00 | $24,200,000.00 (100%) | $84,975.78 | Pending | Pending | $-- | $24,200,000.00[7] (100%) |
| **Grand Total** | | **$47,500,000.00** | **$47,500,000.00** | **$1,053,348.41** | **$22,900,000.00** | **$931,947.05** | **$23,276,094.78** | **$25,155,852.27**[5,7] |

---

[3]   Amount reflects an aggregate voluntary reduction of $5,450,000 by Evercore in conjunction with discussions with the Fee Committee and U.S. Trustee.

[4]   Expenses approved reflect an aggregate voluntary reduction by Evercore in conjunction with discussions with the Fee Committee and U.S. Trustee.

[5]   Includes $15,852.27 of fees related to the 8th – 10th Interim Application allocated to TCEH that were approved but have not yet been paid. Also includes the $540,000.00 8th – 10th Interim Application holdback amount that is being requested under this Application.

[6]   Interim approval of 80% of January and February monthly fees requested under 12th Interim Application, which is being filed contemporaneously with this Application; the approval of those fees pursuant to the Interim Compensation Order is pending.  Approval of the payment of the 20% holdback under the 12th Interim Application ($80,000) is requested under this Application.

[7]   Excludes expenses of $84,975.78 still pending

**Professionals**

Evercore professionals rendering services during the Fee Period were:

| Professional | Title | Total Hours |
|---|---|---:|
| Roger Altman | Senior Managing Director | 29.00 |
| William Hiltz | Senior Managing Director | 437.50 |
| David Ying | Senior Managing Director | 2,980.50 |
| Stephen Goldstein | Senior Managing Director | 669.00 |
| Qazi Fazal | Senior Managing Director | 54.75 |
| Brendan Panda | Senior Managing Director | 25.00 |
| Chuck McMullan | Senior Managing Director | 23.00 |
| Laurie Coben | Senior Managing Director | 9.50 |
| Jeremy Matican | Managing Director | 3,720.00 |
| Bo Yi | Managing Director | 2,913.00 |
| Sesh Raghavan | Managing Director | 1,008.00 |
| Neal Patel | Vice President | 4,393.00 |
| Lisa Levitte | Vice President | 2,520.50 |
| Andrew Longley | Associate | 55.50 |
| Vadim Levit | Analyst | 1,719.50 |
| Harvey Li | Analyst | 1,447.00 |
| Aashik Rao | Analyst | 1,047.50 |
| Connor Boyce | Analyst | 777.50 |
| Andrew Kilbourne | Analyst | 557.50 |
| Brian Smith | Analyst | 461.50 |
| Vishnu Kalugotla | Analyst | 331.50 |
| Rene Negron | Analyst | 94.00 |
| Kush Javia | Analyst | 90.00 |
| Steven Peterson | Analyst | 65.00 |
| Michael Lim | Analyst | 5.50 |
| **Total** | | **25,434.75** |

**Hours by Matter**

Hours expended by these professionals by matter during the Fee Period were:

| Matter Number | Matter Description | Total Hours |
|:---:|:---:|---:|
| 1 | General Case Administration | 1,846.75 |
| 2 | Due Diligence | 661.25 |
| 3 | Capital Structure and Debt Capacity Analysis | 286.50 |
| 4 | Financing | 1,229.50 |
| 5 | Asset Sales and Other M&A Activity | 3,404.25 |
| 6 | Valuation and Recoveries Analysis | 4,450.75 |
| 7 | General Financial Analysis and Research | 2,890.75 |
| 8 | Plan of Reorganization | 2,120.75 |
| 9 | Board Communications | 1,846.00 |
| 10 | Creditor Communication and Due Diligence | 1,681.75 |
| 11 | Court Testimony and Litigation Support | 3,711.50 |
| 12 | Travel | 496.00 |
| 13 | Evercore Retention | 227.50 |
| 14 | Fee Application | 581.50 |
| **Total** | | **25,434.75** |

**Summary of Expenses by Category**

Note: Expenses by category exclude aggregate voluntary reduction by Evercore in conjunction with discussions with the Fee Committee and U.S. Trustee

| Matter Number | Matter Description | Total Expenses |
|---|---|---|
| 1 | General Case Administration | $18,887.21 |
| 2 | Due Diligence | 2,690.94 |
| 3 | Capital Structure and Debt Capacity Analysis | 391.20 |
| 4 | Financing | 2,230.42 |
| 5 | Asset Sales and Other M&A Activity | 9,926.29 |
| 6 | Valuation and Recoveries Analysis | 6,695.00 |
| 7 | General Financial Analysis and Research | 3,638.10 |
| 8 | Plan of Reorganization | 6,421.36 |
| 9 | Board Communications | 7,673.13 |
| 10 | Creditor Communication and Due Diligence | 7,036.42 |
| 11 | Court Testimony and Litigation Support | 773,077.36 |
| 12 | Travel | 48,245.64 |
| 13 | Evercore Retention | 153,309.20 |
| 14 | Fee Application | 13,126.16 |
| **Total** | | **$1,053,348.41** |
| Less: Adjustments[8] | | (36,425.58) |
| **Adjusted Total** | | **$1,016,922.83** |

---

[8]  Expenses approved reflect an aggregate voluntary reduction by Evercore in conjunction with discussions with the Fee Committee and U.S. Trustee.

## Summary of Expenses by Category Allocation

Note: Expenses by category exclude aggregate voluntary reduction by Evercore in conjunction with discussions with the Fee Committee and U.S. Trustee

(Allocation of fees is described in paragraph 14 of the fee application filed together with these cover sheets.)

| Expense Category | EFH Corp. | EFIH | TCEH | Collective | Total |
|---|---|---|---|---|---|
| Air / Rail Travel | $-- | $5,520.07 | $14,506.23 | $40,773.20 | $60,799.50 |
| Copies and Shipping | -- | -- | -- | 1,058.20 | 1,058.20 |
| Legal / Professional Fees | -- | -- | -- | 919,411.90 | 919,411.90 |
| Local Ground Transportation | 118.63 | 1,556.05 | 1,012.11 | 5,891.69 | 8,578.48 |
| Meals | 598.36 | 3,520.11 | 1,589.40 | 11,867.43 | 17,575.30 |
| Research | -- | -- | -- | 2,723.31 | 2,723.31 |
| Telecom | 7.95 | 47.97 | 78.82 | 227.43 | 362.17 |
| Travel Ground Transportation | 75.00 | 1,036.07 | 1,753.16 | 11,433.56 | 14,297.79 |
| Travel Lodging | -- | 4,050.43 | 3,064.59 | 16,330.00 | 23,445.02 |
| Travel Meals | -- | 848.46 | 919.82 | 3,328.47 | 5,096.75 |
| **Total** | **$799.94** | **$16,579.16** | **$22,924.13** | **$1,013,045.19** | **$1,053,348.41** |
| Less: Adjustments [9] | | | | | (36,425.58) |
| **Adjusted Total** | | | | | **$1,016,922.83** |

---

[9]  Expenses approved reflect an aggregate voluntary reduction by Evercore in conjunction with discussions with the Fee Committee and U.S. Trustee.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | Objection Deadline: June 15, 2018 at 4:00 p.m. |

**FINAL FEE APPLICATION OF EVERCORE GROUP L.L.C., AS**
**INVESTMENT BANKER AND FINANCIAL ADVISOR TO THE DEBTORS,**
**FOR ALLOWANCE OF AN ADMINISTRATIVE CLAIM FOR COMPENSATION AND**
**REIMBURSEMENT OF EXPENSES FOR THE PERIOD FROM APRIL 29, 2014**
**THROUGH AND INCLUDING MARCH 9, 2018**

Evercore Group L.L.C. (collectively, "Evercore"), investment banker and financial advisor for the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby submits its final fee application (the "Fee Application") for allowance of compensation for professional services provided and reimbursement of actual and necessary expenses, each as described in the cover sheet hereto, that Evercore provided in the above-captioned period (the "Fee Period").

**Jurisdiction and Applicable Standards**

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  A complete list of the debtors and the last four digits of their federal tax identification numbers is available at http://www.efhcaseinfo.com.

3.       The bases for and standards governing the relief requested herein are sections 327, 328, and 330 of chapter 11 of title 11 of the United States Code, (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the *Order Authorizing the Employment and Retention of Evercore Group L.L.C. as investment banker and financial advisor for the Debtors and Debtors in Possession* Nunc Pro Tunc *to the Petition Date*, dated September 16, 2014 [D.I. 2056] (the "Retention Order"), attached hereto as **Exhibit A**, the *Stipulation and Order Appointing a Fee Committee*, dated August 21, 2014 [D.I. 1896] (the "Fee Committee Order"), the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals*, dated September 16, 2014 [D.I. 2066] (the "Interim Compensation Order"), Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), and the United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. §330 (the "Appendix A Guidelines").

## Case Background

4.       On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.       On June 5, 2014, the Court entered an order [D.I. 849] authorizing the joint administration and procedural consolidation of the Debtors' chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

6.       On May 13, 2014, the United States Trustee for Region 3 (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the

Bankruptcy Code (the "<u>TCEH Committee</u>") [D.I. 420]. On October 27, 2014, the U.S. Trustee appointed another official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "<u>EFH Committee</u>" and, together with the TCEH Committee, the "<u>Committees</u>") [D.I. 2570].

7.      On August 21, 2014, the Court appointed a fee committee (the "<u>Fee Committee</u>"). No other trustee or examiner has been appointed in these chapter 11 cases.

8.      A description of the Debtors' businesses, the reasons for commencing the chapter 11 cases, and the relief sought from the Court to allow for a smooth transition into chapter 11 are set forth in the declaration of Paul Keglevic in support of Debtors' first day motions, filed on April 29, 2014 [D.I. 98] and incorporated herein by reference.

<strong><u>Preliminary Statement</u></strong>

9.      During the Fee Period, Evercore provided necessary and requested investment banking and financial advisory services to the Debtors. A summary of these services is provided below.

<strong><u>The Debtors' Retention of Evercore</u></strong>

10.      The Retention Order was entered on September 16, 2014, is attached hereto as **<u>Exhibit A</u>** and is incorporated by reference. The Retention Order approves Evercore's Fee and Expense Structure (as defined therein), pursuant to section 328 of the Bankruptcy Code, subject to the terms of the Retention Order. (Accordingly, compensation is sought pursuant to sections 328 and not 330 of the Bankruptcy Code, but subject to the terms of the Retention Order.)

4

11.     As approved by the Retention Order, the Debtors engaged Evercore to provide the

following services:[2]

(a) reviewing and analyzing the Debtors' business, operations, and financial projections;

(b) advising and assisting the Debtors in a Restructuring, Financing, and/or Sale, if the Debtors determine to undertake such a Transaction;

(c) providing financial advice in developing and implementing a Restructuring, which would include:

(i)     assisting the Debtors in developing a restructuring plan or plan of reorganization, including a plan of reorganization pursuant to the Bankruptcy Code (any such plans are referred to generically as the "Plan");

(ii)    advising the Debtors on tactics and strategies for negotiating with various stakeholders regarding the Plan;

(iii)   providing testimony, as necessary, with respect to matters on which Evercore has been engaged to advise the Debtors in any proceedings before the Court; and

(iv)   providing the Debtors with other financial restructuring advice as Evercore and the Debtors may deem appropriate;

(d) if the Debtors pursue a Financing, assisting the Debtors in:

(i)     structuring and effecting a Financing;

(ii)    identifying potential Investors and, at the Debtors' request, contacting such Investors; and

(iii)   working with the Debtors in negotiating with potential Investors.

(e) if the Debtors pursue a Sale, assisting the Debtors in:

(i)     structuring and effecting a Sale;

(ii)    identifying interested parties and/or potential acquirors and, at the Debtors' request, contacting such interested parties and/or potential acquirors; and

---

[2]     This summary is presented for convenience purposes only.  The Retention Order is controlling in all respects. Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Retention Order.

(iii)    advising the Debtors in connection with negotiations with potential interested parties and/or acquirors and aiding in the consummation of a Sale.

12.    The particular terms of Evercore's engagement are detailed in the engagement letter attached to the Retention Order.  The approved Fee and Expense Structure may be summarized as follows:[3]

(a) **Monthly Fee:**  $525,000 per month until a Restructuring or termination of Evercore's engagement.

(b) **Restructuring Fee:**   $35 million for simultaneous Restructuring(s) of TCEH/EFCH and EFIH.  But if a first Restructuring concerns only one of TCEH/EFCH and EFIH, then a portion of the $35 million Restructuring Fee will then be due based on time allocation and the remainder of $35 million due if and when a second Restructuring occurs.  In either case, the aggregate Restructuring Fee is payable only once.  There is no Restructuring Fee for certain modifications of existing obligations under the Debtors' existing liability management program or similar programs, certain immaterial modifications and modifications agreed by the Debtors.

(c) **Sale Fee:** $9 million, payable once, for a Sale of all or substantially all of either or both of TCEH/EFCH and EFIH.  Sales that give rise to a Sale Fee also give rise to a Restructuring Fee.

(d) **DIP Financing Fee:** $11 million, payable once, for a first lien DIP Financing. Half of the DIP Financing Fee is due upon DIP Financing commitment, with the balance due upon approval of the DIP Financing by the Court.

(e) **Credits:**

(i)    *Monthly Fee Credit*:  The first eight Monthly Fees, and the amount by which each subsequent Monthly Fee exceeds $400,000 (which will be $125,000 for a Monthly Fee of $525,000), are creditable against the Restructuring Fee.

(ii)    *DIP Financing Fee Credit*:  $3 million of the DIP Financing Fee is creditable against the Restructuring Fee.

---

[3]    This summary is presented for convenience purposes only and is not an exhaustive reflection of the fee and expense terms set forth in the Retention Order, which is controlling in all respects. Fee structure does not reflect an aggregate voluntary reduction of $5,450,000 by Evercore in conjunction with discussions with the Fee Committee and U.S. Trustee.

These credits are conditioned on full payment and final approval of the related fees and are subject to allocation.

(f) **Allocation:**  Evercore's fees have been allocated in order to align them with the Debtors' economic structure and the interests of the Debtors' economic stakeholders.

  (i)   *Timekeeping*:  To facilitate allocation, Evercore's professionals will record whether hours expended providing services are attributable to TCEH/EFCH, EFIH, or EFH specifically, or are instead attributable more than one of these.

  (ii)   *Monthly Fee*:  Monthly Fees will be allocated to TCEH/EFCH, EFIH, and EFH in proportion to time spent by Evercore on each during the month.

  (iii)   *Restructuring Fee*:  The Restructuring Fee will be allocated amongst as many of TCEH/EFCH, EFIH, and EFH as are related to the Restructuring, in proportion to all allocated time spent by Evercore on each.

  (iv)   *Sale Fee*:  The Sale Fee will be allocated amongst as many of TCEH/EFCH, EFIH, and EFH as are related to the Sale(s), in proportion to all allocated time spent by Evercore on each.

  (v)   *DIP Financing Fee*:  The DIP Financing Fee will be allocated in proportion to the third-party DIP financing commitments provided by bank lenders, if any, relating to each of TCEH/EFCH, EFIH, and EFH.

  (vi)   *Credits:*  The Monthly Fee credit and the DIP Financing Fee credit will each be allocated to TCEH/EFCH, EFIH, and EFH in proportion to their allocable share of the underlying Monthly Fees or DIP Financing Fee.

  (vii)   *Alternate Allocation*:  Subject to Court approval, the Debtors and Evercore may later agree to alter the allocations described in furtherance of the alignment goals described above.

(g) **Expenses:** The Debtors will pay reasonable and documented out-of-pocket expenses, including reasonable and documented cost of counsel.

### Description of Fees and Expenses

13.    Typical of investment bankers of its kind, Evercore is not compensated by the hour, but through a structure of fixed fees and related compensation, such as was approved by

the Retention Order.  Accordingly, certain information appropriate to consideration of the fee requests of hourly-rate compensated professionals, such as blended rates or maturation, does not exist for Evercore.

14.     Evercore's fees and expenses during the Fee Period have been allocated as follows:[4]

| Debtors | Time | Fees | Expenses |
|---------|------|------|----------|
| EFH Corp. | 20.7% | $9,837,490.41 | $157,252.74 |
| EFIH | 55.0% | 26,146,702.48 | 532,083.38 |
| TCEH | 24.2% | 11,515,807.09 | 364,012.29 |
| **Total** | **100.0%** | **$47,500,000.00** | **$1,053,348.41** |

**<u>Summary of Services Rendered During the Fee Period</u>**

15.     Evercore provided extensive professional services to the Debtors in connection with these chapter 11 cases, all at the direction of the Debtors or their counsel.  These services were performed at a high level of quality and were often subject to significant time constraints. These services were necessary to address a multitude of critical issues both unique to these chapter 11 cases and typically faced by large corporate debtors in similar cases of this magnitude and complexity.

16.     To provide a meaningful summary of its services provided on behalf of the Debtors and their estates, Evercore has established, in accordance with its internal procedures, certain subject matters categories (each, a "<u>Matter Category</u>") in connection with these chapter 11 cases.

17.     The following is a summary, by Matter Category, of the most significant professional services provided by Evercore during the Fee Period.  This summary is organized in

---

[4]     As summarized above, Monthly Fee and expenses are allocated to Debtors based on time. Expenses by category exclude aggregate voluntary reduction by Evercore in conjunction with discussions with the Fee Committee and U.S. Trustee.

accordance with Evercore's internal system of matter numbers.  The detailed descriptions below and the time records attached as **Exhibit B** demonstrate that Evercore was deeply involved in performing services for the Debtors on a daily basis, often including night and weekend work, to meet the needs of the Debtors' estates in these chapter 11 cases.

(a)      <b>General Case Administration, Matter Category 1</b>

Total hours:  1,846.75

18.      This category includes time spent by Evercore along, or in conjunction with the Debtors and their counsel and other professionals, in connection with the status or strategy of the case.  This category also includes time spent on general administration and management of the cases and review of court documents filed by the Debtors and other parties-in-interest, except as such related to retention. Furthermore, other work and analysis that is not included in a more specific Matter Category is included in this category.

19.      During the Fee Period, Evercore had frequent update calls with the Debtors and the Debtors' counsel, Kirkland & Ellis LLP, and its other advisors to further the Debtors' case in an efficient and effective manner. Evercore also had numerous internal calls to discuss upcoming events in the case and discuss strategy. Evercore also attended many court hearings in person and telephonically.

(b)      <b>Due Diligence, Matter Category 2</b>

Total hours:  661.25

20.       This category includes time spent by Evercore extending its understanding of the businesses of the Debtors, including by means of management calls, management meetings, document review, site visits, internal discussions and analysis.  This category also includes time spent by Evercore extending its understanding of the industry in which the Debtors operate, understanding and conducting analysis of the Debtors' business plan, including reviewing,

9

discussing and analyzing key operational and financial assumptions in the business plan, and reviewing other relevant industry-related documents and performing analysis.

21.     During the Fee Period, Evercore continued to perform general business due diligence in order to become familiar with the nature of the various operations, inter-company relationships and other operating and financial information that are necessary in providing restructuring and financial advisory services. Evercore's due diligence involved numerous on-site meetings, site visits and telephonic meetings with senior management of the Debtors and their other professionals. The subjects reviewed included: (a) multiple iterations of financial projections for TCEH and Oncor prepared and provided by the Debtors, including Oncor REIT financials prepared by Oncor and the Debtors related to the Hunt transaction as well as other projections which served as the basis for creditor restructuring negotiations and various contemplated sale transactions throughout the case,   (b) key assumptions related to the projections, (c) certain historical financial results of the Debtors, (d) the operating, legal, and financial reporting structures, (e) the current and potential legal and tax structure of the Debtors and their subsidiaries, including REIT tax and other structuring matters related to the Hunt transaction and other transactions contemplated by the Debtors and their stakeholders, (f) relevant industry information, (g) the Debtor's operational sites and (h) numerous other matters, including ongoing status of the Asbestos / OPEB litigation and related claims. Evercore also spent significant time reviewing dataroom files and staying abreast of new developments at Oncor.

### (c)      Capital Structure and Debt Capacity Analysis, Matter Category 3

Total hours:  286.50

22.     This category includes time spent by Evercore evaluating the existing and pro forma capital structure and debt capacity of the Debtors.

23.     The primary focus during the Fee Period related to the analysis of the Debtors' respective pro forma capital structures, including debt capacity and cost of debt. Evercore also performed services relating to the EFIH second lien bond repayment that occurred during the case to achieve cost savings. In addition, Evercore performed substantial analysis surrounding the potential standalone capitalization of the Debtors and collaborated with co-advisors to evaluate the debt capacity and capital structuring of the standalone entities. Further, Evercore monitored and analyzed the capital markets to determine the appetite for the financing that would be required to properly capitalize the Debtors post-emergence.

**(d)     Financing, Matter Category 4**

Total hours:  1,229.50

24.     This category includes time spent by Evercore evaluating various DIP and exit financing alternatives, including communicating with prospective lenders regarding DIP and exit financing, as well as managing the request-for-proposal process, conducting supporting diligence and structuring and negotiating the terms of both financings.

25.     During the Fee Period, the Debtors were able to close on two of the largest DIP financings ever completed: the $4.5 billion TCEH DIP facility and the $5.4 billion EFIH first lien DIP facility. The DIP facilities were a culmination of a significant amount of work by the Debtors and Evercore. In addition, in connection with the EFIH first lien DIP facility, Evercore assisted the Debtors, along with their other professionals, in developing the EFIH first lien settlement offer and giving EFIH first lien creditors the opportunity to exchange their claims into the EFIH first lien DIP facility and settle their alleged makewhole claims. Following the funding of the EFIH first lien DIP facility, Evercore evaluated EFIH second lien DIP financing alternatives and the potential repayment of existing EFIH debt, including partial repayment of the existing EFIH second lien notes. Ultimately, Evercore also assisted in the refinancing of the

TCEH DIP facility and the EFIH first lien DIP facility. The new TCEH facility provided both: (i) financing prior to exit in order to refinance the existing DIP and (ii) committed exit financing for the TCEH Debtors to facilitate TCEH's emergence from bankruptcy in a cost-effective and timely manner. The new, upsized EFIH facility allowed the Debtors to gain incremental liquidity needed to fund the ongoing marketing process for the sale of the Debtors' Oncor interest while also providing immediate cash savings to the estate. During the course of this refinancing, Evercore constructed a presentation for the ratings agencies in order to obtain the requisite credit rating for the new facility and assisted the Debtors in evaluating, structuring and executing the refinancing.

26.     Finally, prior to the consummation of the Sempra Energy ("Sempra") merger, Evercore worked with the E-side Debtors to evaluate, structure and ultimately execute an early retirement of the EFIH first lien DIP facility to minimize breakage fees and maximize savings to the estate. Concurrently, Evercore monitored and analyzed Sempra's capital raise process to track the progress of the merger process.

(e)     **Asset Sales and Other M&A Activity, Matter Category 5**

Total hours:  3,404.25

27.     This category includes time spent by Evercore advising the Debtors on the sale of the Debtors' assets, including creating and distributing process letters and other marketing materials, contacting potential buyers, assisting potential buyers with due diligence, structuring a potential transaction and negotiating with buyers.  In addition, this category includes time spent by Evercore on any other M&A activity of the Debtors.

28.     During the Fee Period, Evercore conducted an extensive marketing process (both formal and informal) for the Debtors' indirect economic interest in Oncor. Beginning in the summer of 2014, the Debtors asked Evercore to assess the market for Oncor and to devise a sales

process to maximize its value and provide the maximum distributable value to creditors. Following receipt of Court approval to conduct a two-stage marketing process, Evercore and the Debtors circulated a process letter to more than fifty potential strategic and financial bidders. Over the following weeks, Evercore facilitated diligence calls and meetings with the Debtors' advisors and management, and a number of interested bidders met with Oncor management.

29.     Ultimately, Evercore and the Debtors received three Round 1 bids—from NextEra Energy, Inc. ("NextEra"), the Hunt Group, and an ad hoc group of EFIH PIK noteholders. Evercore and the Debtors met with each bidder individually in the ensuing weeks to structure and negotiate terms of the bids while pursuing initiatives to increase the total and distributable value of the bids.

30.     Evercore and the Debtors received two Round 2 bids—one from NextEra and one from a consortium of investors led by the Hunt Group (the "Hunt Consortium") that included an EFIH PIK noteholder group. Evercore evaluated the Round 2 bids and determined that the distributable value available to creditors remained too low to garner significant creditor support. In late June 2015, Evercore and the Debtors determined that the Oncor bidding process had not yielded a sufficiently high offer to justify selecting a stalking horse.

31.     After the formal Oncor marketing process terminated, an ad hoc group of TCEH unsecured creditors submitted a compromise proposal to the Debtors that contemplated a Hunt Consortium-sponsored merger with reorganized EFH Corp., which also encompassed the settlement of T-Side creditor claims against the E-Side. In August 2015, the Debtors, the Hunt Consortium and an ad hoc group of TCEH unsecured creditors entered into a plan support agreement that contemplated the merger which involved converting Oncor into a REIT.

32.     The Court confirmed the plan of reorganization associated with the merger (the "Hunt Plan") on December 9, 2015 [D.I. 7285]. Due to regulatory uncertainty, however, an ad hoc group of TCEH first lien creditors delivered a plan support termination notice on May 1, 2016, rendering the Hunt Plan null and void. Nonetheless, the Debtors retained the benefits of the creditor settlement proposals agreed to in the context of the Hunt Group proposal. In May 2016, the Debtors and Evercore promptly refreshed the Oncor marketing process, contacting eighteen potential strategic and financial bidders, most of which had previously shown interest in Oncor, and sent process letters to fifteen of them.  Following pointed negotiations between the bidders, Evercore and the Debtors, negotiations progressed to definitive documentation with NextEra and one other bidder. Throughout negotiations, Evercore sought to use the multi-bidder dynamic to obtain the highest and otherwise best terms and conditions, with a particular focus on maximizing the overall value of the bids.

33.     After three months of intensive multiparty negotiations, the boards of EFH Corp. and EFIH approved the execution of a merger agreement (the "NextEra Merger Agreement") and plan support agreement (the "NextEra PSA") with NextEra on July 28, 2016. The parties executed the NextEra Merger Agreement on July 29, 2016.

34.     Ahead of the September 19, 2016 hearing to seek Court approval of the NextEra Merger Agreement and NextEra PSA, additional negotiations led by Evercore resulted in an increase of approximately $450 million in the consideration offered by NextEra, which would further enhance value to the Debtors' estate and the associated creditor recoveries.

35.     On April 13, 2017, the Public Utility Commission of Texas (the "PUCT") entered an order finding that the transactions contemplated by the NextEra Merger Agreement and related plan of reorganization (the "NextEra Plan") were not in the public interest. Despite

multiple appeals, it became clear that there was risk that the PUCT would not approve the transactions contemplated by the NextEra Merger Agreement, and so Evercore and the Debtors engaged in discussions with a variety of parties regarding a potential "backup" plan. Three parties executed new confidentiality agreements and indicated potential interest in participating in a transaction for EFH Corp.'s indirect economic interest in Oncor. Berkshire Hathaway Energy Company, an Iowa corporation ("BHE") that had previously expressed interest in purchasing EFH Corp.'s indirect economic interest in Oncor, also engaged with the Debtors pursuant to a previously executed confidentiality agreement. In connection with such confidentiality agreements, Evercore and the Debtors engaged in robust negotiations with BHE and Elliott Capital Management ("Elliott"), a large holder of EFIH funded debt.

36.    After initial negotiations, on June 23, 2017, the Debtors received an initial backup proposal from BHE that largely preserved the structure of the NextEra Plan. Following intensive negotiations (made possible by BHE's willingness to preserve the NextEra Plan structure), on July 7, 2017, EFH Corp. and EFIH executed a merger agreement (the "BHE Merger Agreement") with BHE and certain affiliated parties.

37.    Prior to the hearing to consider approval of the BHE Merger Agreement, on August 15, 2017, Evercore and the Debtors received an alternative proposal from Sempra that largely preserved the structure of the transaction contemplated by the BHE Merger Agreement and the NextEra Merger Agreement and of the existing "ring-fence" around Oncor. Following several days of hard-fought, good-faith negotiations, and consistent with the terms of the BHE Merger Agreement, on August 21, 2017, the Debtors determined that the Sempra proposal represented a Superior Proposal (as defined in the BHE Merger Agreement) that maximized recoveries for creditors of the Debtors. Accordingly, on August 21, 2017, the Debtors (a)

terminated the BHE Merger Agreement in accordance with its terms, (b) authorized EFH Corp. and EFIH to enter into a merger agreement with Sempra Power Play Merger Sub I, Inc. and (c) entered into a plan support agreement with Sempra and certain supporting EFIH unsecured creditors. Ultimately, the Sempra transaction served to mark the culmination of more than six years of consistent and substantial effort on the part of Evercore, its co-advisors and the management team to maximize value to all creditors while moving the Debtors out of bankruptcy as expediently as possible.

> **(f)     Valuation and Recoveries Analysis, Matter Category 6**

> Total hours:  4,450.75

38.     This category includes time spent by Evercore preparing and analyzing the valuation of the Debtors' businesses, including valuation of TCEH, valuation of Oncor and analyzing creditor recoveries in various scenarios.

39.     Evercore spent a considerable amount of time performing valuation work in connection with the Debtors' various plans of reorganization. Evercore spent time: (a) understanding industry dynamics, including commodity price trends, (b) researching capital market conditions and valuation drivers, (c) reviewing the historical and projected financial performance, business and valuation drivers of publicly-traded comparable companies, (d) reviewing operational and valuation metrics of comparable companies over time, (e) reviewing valuation metrics of comparable precedent transactions, (f) considering a range of estimates of the weighted average cost of capital of the reorganized company, (g) preparing a comprehensive and flexible valuation model and (h) conducting various sensitivity analyses, among other things. Ultimately, Evercore was required to prepare a formal valuation in connection with the disclosure statement prepared for the TCEH plan, which required substantial review of the Debtors' business plan and capital markets. Evercore also analyzed the feasibility of both the

TCEH and EFH/EFIH plans of reorganization and worked to value the TCEH TRA asset conveyed under the T-side plan.

40.    Additionally, Evercore spent a considerable amount of time analyzing the distributable value to creditors implied by various plan proposals and merger proposals put forward by various stakeholder groups to determine the optimal course of action to maximize the value to the estate. These analyses were revised numerous times and iterated substantially as the path to emergence evolved.

> **(g)    General Financial Analysis and Research, Matter Category 7**
>
> Total hours:  2,890.75

41.    This category includes time spent by Evercore preparing general financial analyses and conducting research that is not included in more specific Matter Categories.

42.    During the Fee Period, Evercore, at the request of the Debtors and their other professionals, performed numerous analyses, including, but not limited to, liquidity projections, claims calculations under various scenarios, calculation of alleged makewhole claims, implications of new financing, calculations of original issuance discount, tax calculations, warrant calculations, exit costs and emergence cash analysis and adjustments. Evercore has also monitored the Debtors' debt trading prices and conducted general financial and restructuring-related research. In addition, Evercore led the sizing, construction and organization of a number of escrow accounts relating to ongoing creditor disputes that threatened to impede progress of plan negotiations. These escrow accounts proved critical throughout the case, as the Debtors were able to progress through negotiations despite numerous intercreditor disputes.

> **(h)    Plan of Reorganization, Matter Category 8**
>
> Total hours:  2,120.75

43.     This category includes time spent by Evercore assisting the Debtors in developing the plan, Disclosure Statement and related documentation.

44.     Evercore had extensive discussions with the Debtors and their other professionals related to the plan, including strategy, alternative timelines, feedback from stakeholders and settlements with the various constituents.  Evercore assisted in the negotiation, preparation and ultimate filing of multiple plans of reorganization and disclosure statements related to the Hunt Consortium's proposal, the TCEH standalone proposal, the NextEra transaction, the BHE transaction and the Sempra transaction. Further, Evercore negotiated and structured numerous plan support agreements relating to the aforementioned proposals.

(i)     **Board Communication, Matter Category 9**

Total hours:  1,846.00

45.     This category includes time spent by Evercore participating in meetings, conference calls and various correspondences with the Debtors' Boards of Directors. The category also includes time spent drafting and developing presentations to the Boards of Directors and responding to the Boards' due diligence requests.

46.     During the Fee Period, Evercore, along with the Debtors' other professionals, participated in numerous discussions with the Debtors' Boards of Directors and the conflicts advisors on a broad range of topics, including, but not limited to, the DIP facilities, certain EFIH settlement motions, the plans of reorganization and support agreements, the sale of the Debtors' interests in Oncor, communications with creditors and other parties-in-interest, the Debtors' financial results and projections, developments in the chapter 11 cases, overview of key dates and timelines and general strategic and other issues relating to the chapter 11 process.

      **(j)**      **Creditor Communication and Due Diligence, Matter Category 10**

Total hours:  1,681.75

47.      This category includes time spent by Evercore negotiating and discussing a wide range of issues with creditors, the Committees, other parties-in-interest and their respective advisors. The category also includes time spent drafting and developing presentations and other materials for creditors and other parties-in-interest and in responding to their due diligence requests.

48.      During the Fee Period, Evercore responded to the informational requests from creditors and other parties-in-interest by interfacing with the relevant personnel at the Debtors and other advisors to the Debtors. Evercore also prepared for and participated in various in-person and telephonic meetings with creditors and their respective financial and legal advisors. Evercore assisted the Debtors with preparing due diligence and presentation materials for creditor meetings and discussions.

49.      The Debtors and their advisors, including Evercore, participated in numerous in-person and telephonic meetings with individual stakeholders and creditor constituents to better understand their respective interests and facilitate constructive dialogue with and among the creditors regarding the plan. The Debtors and their advisors, including Evercore, also held several global plan conferences with creditor constituents at EFH and EFIH on the one hand, and TCEH on the other. In addition, the Debtors and their advisors, including Evercore, participated in numerous in-person and telephonic meetings with individual stakeholders and creditor constituents to better understand their respective interests. All of these efforts were intended to facilitate constructive dialogue with and among the creditors regarding the plan and promote constructive proposals, which multiple constituents have shared with the Debtors at various points in the case. Of particular note of late, Evercore liaised with Elliott with regards to both an

equitization proposal and the multiple proposals to provide a second lien DIP facility. Evercore worked diligently to analyze and negotiate with Elliott to achieve the best results for all creditors. In summary, creditor communications and due diligence efforts have required a significant amount of Evercore's resources due to the large number of parties-in-interest in these chapter 11 cases and our efforts to further the plan and sale processes, among others.

        **(k)**       **Court Testimony and Litigation Support, Matter Category 11**

       Total hours:  3,711.50

50.     This category includes time spent by Evercore preparing for and providing declarations, depositions, in-court testimonies and other litigation support to the Debtors, in coordination with the Debtors' counsel and other professionals. The category also includes time spent responding to document requests and subpoenas.

51.     Evercore's court testimony and litigation support-related efforts have been significant during these chapter 11 cases.  Evercore assisted the Debtors, along with their other professionals, with preparing motions for the DIP facilities and certain EFIH settlements, among others. In connection with these motions, Evercore professionals, including David Ying and Stephen Goldstein, provided five declarations, in-court testimony on four occasions and depositions on three occasions. In addition, Evercore spent time gathering and reviewing documents in connection with multiple discovery requests by various parties. Evercore also assisted the Debtors and their legal advisors in preparing responses to objections and conducting depositions of various objecting parties throughout the case. In addition, Evercore assisted the Debtors, along with their other advisors, with preparing the bid procedures motion, in connection with which William Hiltz of Evercore provided a declaration, deposition and in-court testimony, and the EFIH second lien bond paydown motion, in connection with which David Ying of Evercore ultimately provided two declarations. Evercore also provided feasibility analysis and expert testimony related to the TCEH and the EFH/EFIH Plans of

Reorganization. Further, Evercore professionals submitted declarations in support of the sale of Oncor to NextEra Energy, BHE and Sempra Energy.

52.      In addition, Evercore spent significant time gathering and reviewing documents in connection with multiple discovery requests by various parties. Evercore has also worked with Kirkland & Ellis LLP to assist the Debtors in ongoing litigation and negotiation processes with Elliott. Evercore's litigation support efforts during the Fee Period have assisted the Debtors' efforts to drive the case forward in a productive manner and ultimately confirm the Debtors' plans of reorganization.

### (l)      Travel, Matter Category 12

Total hours:  496.00

53.      This category includes time spent traveling to and from the Debtors' offices, to Court hearings or to other destinations on the Debtors' behalf.

### (m)      Evercore Retention, Matter Category 13

Total hours:  227.50

54.      This category includes time spent by Evercore preparing and reviewing its Retention Application, including negotiations with the Unsecured Creditors' Committee  in connection with retention.

### (n)      Fee Application, Matter Category 14

Total hours:  581.50

55.      This category includes time spent by Evercore preparing and reviewing its Monthly Fee Statements and Fee Applications. The Category also includes the efforts to ensure that all expenses charged were incurred in conjunction with time spent by Evercore professionals working on projects related to the Debtors and that all of the Evercore time records comply with the Guidelines, applicable provisions of the Bankruptcy Code, and the orders of this Court.

## Calculation of Holdback / Fee Amount Due

56.     Evercore is requesting approval and payment of its earned but unpaid Restructuring Fee and Sale Fee (less applicable crediting), its monthly fees requested under the 12th Interim Fee Application as well as the portion of fees previously approved in the 8th - 10th Interim Fee Applications that was held back in accordance with applicable procedures.   The calculation of payable fees is outlined below:

| Fee | Amount |
| --- | --- |
| Success Fee | $35,000,000 |
| Sale Fee | 9,000,000 |
| Less: DIP Fee Crediting | (3,000,000) |
| Less: Success Fee Paid Pre-Filing | (8,750,000) |
| Less: Monthly Crediting & Voluntary Reduction Based on Agreement With Fee Committee | (8,050,000) |
| **Final Fee Due** | **$24,200,000** |
| Plus: 8th - 10th Interim Application Hold-Back Amount | 540,000 |
| Plus: 8th - 10th Interim Application Remaining TCEH Amount | 15,852 |
| Plus: Fees Requested Under 12th Interim Application | 400,000 |
| **Total Fees Due Under Final Fee Application** | **$25,155,852** |

## Actual and Necessary Expenses Incurred by Evercore

57.     The expenses for which Evercore requests reimbursement for the Fee Period, detailed on **Exhibit C**, are actual and necessary direct, non-overhead costs incurred in the course of rendering services to the Debtors. Evercore has charged internal black and white copies at 10¢ per page and color copies at 50¢ per page, consistent with the Fee Committee guidance, which reflects a discount to Evercore's standard copy charges. Consistent with the Fee Committee guidance, Evercore has charged in-office meals at cost, subject to a cap of $20.00 per person for each meal, and out-of-office meals at cost, subject to a cap of $40.00 per person for each meal, each reflecting a discount to Evercore's standard meal policy.   Evercore charges external copying and computer research at the provider's cost without markup. Only clients who actually use services of the types described are separately charged for such services. The effect of

including such expenses as part of the overhead of Evercore would impose that cost upon clients who do not require such extensive services.

58.    During the Fee Period, expenses were incurred by Evercore's legal counsel in connection with Evercore's retention; preparation of fee applications; and document collection, review and production conducted at the request of, in consultation with, and for the benefit of the Debtors.    These discovery expenses primarily involved collection, review and production of documents in Evercore's possession that were potentially responsive to discovery requests served on the Debtors.    Evercore's counsel reviewed these materials in order to identify and withhold privileged materials and materials that reflected confidential information belonging to clients from other engagements.    The potentially responsive materials not falling into either of these categories were then provided to Debtors' counsel for responsiveness review.    These legal expenses were necessary and beneficial to the Debtors' estates in enabling them to retain the investment banker of their choice and to comply with their discovery obligations.

**Reasonable and Necessary Services Provided by Evercore**

59.    The foregoing professional services provided by Evercore on behalf of the Debtors during the Fee Period were reasonable, necessary and appropriate to the administration of these chapter 11 cases and related matters.

60.    The time constraints imposed by the circumstances of these chapter 11 cases required Evercore's professionals to devote substantial time during the evenings and on weekends to perform services on behalf of the Debtors.    These services were essential to meet deadlines, respond to daily inquiries from various creditors and other parties-in-interest on a timely basis, and satisfy the demands of the Debtors' businesses and ensure the orderly administration of their estates.    Consistent with Evercore policy, Evercore professionals who worked late in the evenings or on weekends were reimbursed for their reasonable meal and

transportation costs.  Evercore's regular practice is not to include components for those charges when establishing fee structures, but rather to charge its clients for these and all other out-of-pocket disbursements incurred during the regular course of the rendition of services.

61.     In addition, due to the location of the Debtors' businesses, counsel, creditors and other parties-in-interest in relation to Evercore's offices, frequent multi-party telephone conferences involving numerous parties were required.  On certain occasions, the exigencies and circumstances of these chapter 11 cases required overnight delivery of documents and other materials.  The disbursements for such services are not included in Evercore's overhead and Evercore has made every effort to minimize its disbursements in these chapter 11 cases.  The actual expenses incurred in providing professional services were necessary, reasonable and justified under the circumstances to serve the needs of the Debtors in these chapter 11 cases.

62.     No understanding exists between Evercore and any other person for the sharing of compensation sought by Evercore, other than as permitted by section 504 of the Bankruptcy Code.

### Certification of Compliance and Waiver

63.     The undersigned representative of Evercore certifies that he has reviewed the requirements of Local Rule 2016-2 and that the Application substantially complies with that Local Rule except to the extent waived by the Retention Order or otherwise modified by orders of this Court and related guidance of the Fee Committee. To the extent that the Application does not comply in all respects with the requirements of Local Rule 2016-2, as so modified, Evercore respectfully submits that such deviations are not material and respectfully requests that any such requirement be waived.

### Reservation of Rights and Notice

64.     Notice of this Monthly Fee Statement has been or will shortly be provided to all parties that have entered their appearance pursuant to Bankruptcy Rule 2002 and by hand or overnight delivery on: (i) the Debtors, 1601 Bryan Street, 43rd Floor, Dallas, TX, 75201, Attn: Andrew M. Wright and Cecily Gooch; (ii) co-counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Brian E. Schartz and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654, Attn: Chad Husnick; (iii) co-counsel to the Debtors, Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, DE 19801, Attn: Daniel DeFranceschi and Jason Madron; (iv) Roberta A. DeAngelis, the United States Trustee for Region 3, J. Caleb Boggs Federal Building, 844 King Street, Room 2207, Wilmington, DE 19801, Attn: Richard L. Schepacarter and U.S. Department of Justice, Office of the U.S. Trustee, U.S. Federal Building, 201 Varick Street, Room 1006, New York, NY 10014, Attn: Andrea B. Schwartz; (v) counsel for the agent of the EFIH First Lien DIP Financing Facility, Shearman & Sterling LLP, 599 Lexington Avenue, New York, NY 10022, Attn: Ned Schodek and Fredric Sosnick; (vi) counsel for the agent of the TCEH DIP Financing Facility, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, NY 10005, Attn: Evan Fleck and Matthew Brod; (vii) counsel to the TCEH Committee, Morrison & Foerster LLP, 250 W. 55th Street, New York, NY 10019, Attn: Lorenzo Marinuzzi and Jennifer Marines; (viii) counsel to the Fee Committee, Godfrey & Kahn, S.C., One East Main Street, Madison, WI 53703, Attn: Katherine Stadler and Carla Andres; (ix) co-counsel to the EFH Committee, Sullivan & Cromwell, LLP, 125 Broad Street, New York, NY 10004-2498, Attn. Judith Fiorini and Alexa Kranzley; and (x) co-counsel to the EFH Committee, Montgomery McCracken, Walker & Rhoads, LLP, 1105 North Market Street, 15th Floor, Wilmington, DE 19801, Attn: Natalie D. Ramsey and Davis Lee Wright.

## No Prior Request

65.     No prior application for the relief requested herein has been made to this or any other court.

*[Remainder of page is intentionally blank.]*

WHEREFORE, Evercore respectfully requests that the Court enter an order awarding the compensation and reimbursements described herein on a final basis, authorizing and directing the Debtors to pay Evercore such fees and expenses to the extent not already paid and granting such other relief as is appropriate under the circumstances.

Dated: May 24th, 2018
New York, New York

/s/ _____
David Ying
Senior Managing Director
Evercore Group L.L.C.