**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

In re:                                Chapter 11

ENERGY FUTURE HOLDINGS
CORP., et al.,                        Case No. 14-10979(CSS)

      Debtors.                   (Jointly Administered)
_____

            United States Bankruptcy Court

            824 North Market Street

            Wilmington, Delaware 19801

            June 5, 2018

            11:08 AM - 1:65 PM

B E F O R E :

HON CHRISTOPHER S. SONTCEHI

U.S. BANKRUPTCY JUDGE

ECR OPERATOR:  LESLIE MURIN

1   HEARING re Reorganized EFH Shared Services Debtors' Fiftieth

2   Omnibus (Substantive) Objection to No Liability and

3   Substantive Duplicate Claims Pursuant to Section 502(b) of

4   the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007,

5   and Local Bankruptcy Rule 3007-1 [D.I. 13081; filed May 4,

6   2018]

7

8   HEARING re Reorganized EFH Shared Services Debtors' Fifty-

9   First Omnibus (Non-Substantive Objection to Certain

10  Improperly Asserted Claims Pursuant to Section 502(b) of the

11  Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and

12  Local Bankruptcy Rule 3007-1 [D.I. 13084; filed May 4, 2018]

13

14  HEARING re  Reorganized EFH Shared Services Debtors' Motion

15  for Entry of Final Decree (A) Closing Their Chapter 11 Cases

16  and (B) Granting Related Relief [D.I. 13086; filed May 4,

17  2018]

18

19  HEARING re Application of Certain Asbestos Creditors

20  Pursuant to 11 U.S.C. § 503(b) for Allowance of an

21  Administrative Claim for Reimbursement of Expenses Incurred

22  in Making a Substantial Contribution in These Chapter 11

23  Cases [D.I. 12926; filed April 9, 2018]

24

25  HEARING re Motion of Certain Asbestos Creditors for Order

1   Requiring Reserve for Administrative Expenses Claims [D.I.

2   12927; filed April 9, 2018]

3

4   HEARING re Joint Motion of UMB Bank, N.A., as Indenture

5   Trustee and Elliott to Fix Appropriate Allocation of Certain

6   Reserves and Expenses as Between the EFH and EFIH Debtors

7   [D.I. 13102; filed May 13, 2018]

8

9   HEARING re Motion of the EFH Plan Administrator Board for

10  Entry of an Order Scheduling Certain Hearing Dates and

11  Deadlines and Establishing Certain Protocols in Connection

12  with the EFH/EFIH Allocation Dispute [D.I. 13113; filed May

13  15, 2018]

14

15  HEARING re Interim Fee Applications

16

17

18

19

20

21

22

23

24  Transcribed by:  Dawn South, Jamie Gallagher, and Tracey

25  Williams

```
 1    A P P E A R A N C E S :

 2    KIRKLAND & ELLIS

 3         Attorney for PAB

 4

 5    BY:  MARC KIESELSTEIN, ESQ.

 6         MARK MCKANE, ESQ.

 7         MCCLAIN THOMPSON, ESQ.

 8         APARNA YENAMANDRA, ESQ.

 9

10    RICHARDS, LAYTON & FINGER

11         Attorneys for PAB

12

13    BY:  DANIEL J. DEFRANCESCHI, ESQ.

14         JASON M. MADRON, ESQ.

15

16    SULLIVAN & CROMWELL

17         Attorney for E-Side Committee

18

19    BY:  BRIAN GLUECKSTEIN, ESQ.

20

21    NIXON PEABODY

22         Attorney for AST as EFH Indenture Trustee

23

24    BY:  RICHARD PEDONE, ESQ.

25
```

1    CROSS & SIMON, LLP
2         Attorney for American Stock Transfer
3
4    BY:  KEVIN MANN, ESQ.
5
6    HOGAN MCDANIEL
7         Attorneys for Creditors
8
9    BY:  DANIEL K. HOGAN, ESQ.
10        GARVAN MCDANIEL, ESQ.
11
12   KASOWITZ BENSON TORRES & FRIEDMAN, LLP
13        Attorney for the Ad Hoc Committee of EFH
14
15   BY:  ANDREW GLENN, ESQ.
16
17   ROPES & GRAY
18        Attorneys for Elliott/UMB
19
20   BY:  GREGG M. GALARDI, ESQ.
21        MATTHEW MCGINNIS, ESQ.
22
23
24
25

1     BAYARD

2          Attorney for Elliott/UMB

3

4     BY:  ERIN FAY, ESQ.

5

6     MONTGOMERY MCCRACKEN WALKER & THOADS LLP

7          Attorney for EFH/EFIH Committee

8

9     BY:  DAVIS LEE WRIGHT, ESQ.

10

11    UNITED STATES DEPARTMENT OF JUSTICE

12         Attorney for the U.S. Trustee

13

14    BY:  RICHARD L. SCHEPACARTER, ESQ.

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.

4          MR. KIESELSTEIN:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. KIESELSTEIN:  Marc Kieselstein, Kirkland &

7    Ellis LLP on behalf of the EFH plan administrator board.

8          Your Honor, with me this morning are my

9    colleagues, Mark McKane, Aparna Yenamandra, and McClain

10   Thompson.

11         Your Honor, we have a seven-item agenda today.

12   The first three items you were good enough to enter orders

13   prior to the hearing.

14         Four through seven break down into two categories.

15   Items four and five relate to the asbestos creditors' 503(b)

16   claim and their motion for a reserve.  I think by agreement

17   we're putting that to the back of the agenda.  So they drew

18   the short straw today.  And then item six and seven relate

19   to the allocation issues.

20         The plan administrative board's view is that those

21   items are sort of intertwined.  I know Mr. Galardi takes a

22   different view.

23         Insofar as we're concerned no substantive relief

24   is being sought on the Elliott motion today, so it's really

25   all about where do we go from here.  That is what's the

1   schedule and who gets to participate.  And in that sense we

2   think items six and seven are intertwined, and it probably

3   makes sense just to -- for each of us to say our piece, but

4   obviously interested in Mr. Galardi's view and of course

5   Your Honor's view.

6          MR. GALARDI:  Your Honor, let's start with -- I do

7   agree that there's no substantive relief on the allocation

8   today.  I do believe that the -- to the extent there's a

9   schedule, but what we can clear the air is the first is that

10  -- and I know Your Honor knows the local rules -- our motion

11  I believe was filed first.

12         And first, yes, there is a schedule.  I have read

13  in the PAB's papers in various terms one, that the Elliott

14  motion should be dismissed, denied.  And then I've also seen

15  well then my motion is maybe a scheduling motion.

16         Just the very first thing I think we need to clear

17  is there is no motion to dismiss that's pending, so I think

18  that Elliott's motion under 9014 should go forward, we are

19  prepared to go forward on what we believe a schedule for

20  that motion is.

21         And our view on the other one is there is no

22  contested matter, there is a jump ball, and frankly there is

23  no contested matter, no party, so that other motion should

24  be denied, which is not to say that there shouldn't be a

25  schedule entered, but we do believe the schedule should be

1    entered and we're prepared to address the schedule and the

2    parties who can participate.  And that's my piece in the

3    first instance.

4              THE COURT:  Okay.  Mr. Kieselstein?

5              MR. KIESELSTEIN:  Your Honor, I think that was our

6    typical long-winded way the both of us of saying more or

7    less the same thing, which is we need to come out of this

8    hearing today with an understanding of what the schedule

9    looks like and who are the parties that get to participate

10   in the substantive debate ultimately about what the

11   allocation issues should look like at the end of the day.

12             THE COURT:  Well I think, you know, it's a little

13   bit of how many angels can we fit on the head of a pin about

14   who has the burden of proof, and you know, what motions

15   should be heard or not.  But I agree with Mr. Kieselstein, I

16   don't agree with Mr. Galardi that there's no contested

17   matter in connection with the plan administrator's motion,

18   and we have objections, it's a motion seeking relief.  I

19   don't see how it's not a contested matter.  But both of them

20   seek the same thing, which is a schedule, and one can almost

21   view the plan administrator's motion to be a

22   response/objection to Mr. Galardi's clients' motion.

23             So since we're going to talk about how to finally

24   get to a point where we're going to resolve this issue,

25   albeit through litigation unfortunately as opposed to

Page 10

1    consent, but so be it, I don't view them as separate matters

2    for all intents and purposes.  I mean we're here to fight

3    about what the scheduling order should look like in

4    connection with the motion seeking substantive relief that's

5    been filed.  And so I agree with you, Mr. Kieselstein, that

6    you know, they're six one, half dozen the other, and they

7    are related.

8            So let's just -- let's talk about, fight about,

9    what the schedule should be.

10           MR. KIESELSTEIN:  Very good, Your Honor.

11           THE COURT:  I don't know if Mr. -- if the real

12   weight of the issue is who gets to go first or --

13           MR. GALARDI:  There's no weight of the issue as to

14   who goes first.  I think the first issue is simply who are

15   the parties that are going to be participating in the

16   schedule.

17           THE COURT:  Okay.

18           MR. KIESELSTEIN:  And that's the first point I

19   want to address, Your Honor.  And, Your Honor, even with EFH

20   I want to accentuate the positive.

21           Your Honor, the last time we spoke about

22   allocation issues was the March 30th status conference, and

23   I'm going to return to that in a minute, but remember at

24   that time no creditor or creditor group was willing to take

25   a substantive position on allocation and no creditor or

1   creditor group was ready to say when they would be ready to

2   take a substantive position, and there was no clear path be

3   it litigation, mediation, arbitration that any party was

4   willing to agree to.  So we have made I think substantial

5   progress at least in terms of teeing the issue up.

6          After a lot of poking and prodding we were please

7   that Elliott filed a motion to actually, you know, get this

8   process rolling.  We obviously filed our scheduling motion

9   around the same time also in an effort to get this off the

10  snide, as they used to say in the old neighborhood.  And so

11  I think at least we now can move forward toward some sort of

12  resolution.

13         And everyone agrees that there should be a

14  schedule.  And as you'll hear the delta between the Elliott

15  schedule and the plan administrator's board schedule is not

16  enormous, so I view that as positive as well.

17         And I'll talk about the differences in the

18  schedule later on, but I want to talk about the first point,

19  which is who gets to participate in this process.

20         Your Honor, I want to start with the telephonic

21  conference that we had in front of Your Honor on March 28th,

22  and Your Honor will recall the primary purpose of that

23  hearing was around NextEra's back-up administrative claim

24  and whether Elliott's objection was ripe.

25         We took the opportunity to raise the issue around

1    allocation, because frankly we were distressed that we were

2    not able to get money out the door to holders of undisputed

3    allowed claims and we didn't think that was an appropriate

4    status quo.

5         And just to refresh Your Honor, at that point in

6    time we were a number of weeks post-emergence, we had made

7    one distribution to the EFIH creditors, we'd made no

8    distribution to the EFH creditors, we were also following

9    many months of fruitless negotiations between the DDs in the

10   run up to the confirmation hearing and emergence.

11        So these issues have been languishing for a great

12   deal of time, and as what I think I referred to as a

13   plaintiff cry to help, we asked Your Honor whether Your

14   Honor thought it would be appropriate for the plan

15   administrator board to be the first mover to put out a

16   substantive proposal and even to seek the Court's approval

17   of it to bind all the other parties.

18        And without the benefit of any briefing, through

19   no fault of Your Honor, Your Honor noted that your view,

20   your initial view was likely that the plan administrator

21   board could be conflicted or would be conflicted with

22   respect to such proposal proving once again that when you

23   shake the tree sometimes it bears fruit and sometimes you

24   get hit in the head with a coconut.

25        So that being said, Your Honor, we're in a

1    different place now than we were two months ago.  In part

2    because Elliott took the initiative and filed its allocation

3    proposal, and again, we're not here and nor is Mr. Galardi

4    seeking substantive relief on that motion today, but we are

5    no longer the first mover or looking to be the first mover,

6    and we are not looking to file our own settlement motion and

7    we wouldn't purport to bind any other parties.

8         So the real issue is can the plan administrator

9    board participate or are there any contractual or ethical

10   constraints that would prevent the plan administrator board

11   and/or its counsel from participating at some stage in the

12   process as an aid to the parties, as an aid for the Court?

13        And we start with the plan administration trust

14   agreement, and we refer to a few of what we believe are the

15   germane provisions in our papers.

16        First we point to 6.3 of the trust agreement.  And

17   by the way, this trust agreement was heavily negotiated with

18   a variety of parties.  Everyone got a chance to look at it,

19   weigh in on it, makes comments to it, so this wasn't one of

20   those dark of night plan supplement documents that no one

21   had had a chance to look at, it had in fact been reviewed

22   and commented on.

23        We start with 6.3, which gives the plan

24   administrator board in the person in Mr. Horton the ability,

25   if he chooses -- if he chose to require -- to retain

Page 14

1  disinterested agents to in essence dupe the disinterested

2  director process that we had pre-emergence, but no

3  obligation to do it, and the decision about whether to do it

4  or not in the sole discretion of the plan administrator

5  board.

6       Section 6.1 talks about the plan administrator

7  board making use of judicial proceedings to protect and

8  enforce the rights to the trust assets by "any method deemed

9  reasonably appropriate, including judicial proceedings."

10 And obviously getting the allocation issues resolved clearly

11 would be consistent with that objective.

12       1.4 of the trust agreement talks about the ability

13 of the PAB to litigate claims in an expeditious and orderly

14 manner, and we obviously view that as subsuming the issues

15 of allocation, which are obviously an impediment to

16 distributions being made.

17       And then the overarching purpose of the trust,

18 which is set forth in 1.4, and it's to aid in the

19 implementation of the plan and confirmation order and what's

20 the paramount goal of the liquidating plan which is in

21 essence what this was post the sale to Sempra, it's to get

22 dollars and recoveries out the door.  That is the duty of

23 the plan administrator board.

24       So in essence the trust was set up with those

25 goals in mind.  And then we take a look at the Delaware

1   trust law, because I believe the argument Elliott is making

2   is, and Your Honor's initial reaction I think perhaps

3   perfectly so, was you've got multiple beneficiaries, how

4   does a trustee take a position of one vis-à-vis the other?

5          And the Delaware law appears to be pretty clear,

6   but while there's a duty of impartiality for a trustee,

7   impartiality is not a paralytic agent.  It doesn't require

8   the trustee not to take a position, it requires a trustee

9   not to take a disparate position for invidious reasons.  In

10  other words be impartial the same way that a judge is

11  impartial, but the fact that a judge is impartial does not

12  mean that a judge can't render a decision which favors one

13  side of a dispute versus the other.

14         And no one has suggested, although people have

15  viewed our participation as unwelcome, but no one has

16  suggested that there's any issue around the plan

17  administrator board's impartiality.  In other words if he

18  were to weigh in he'd weigh in with his good faith honesty

19  belief as to how these allocation issues should shake out.

20         So we believe there's nothing in the trust

21  agreement and there's nothing in Delaware trust law that

22  would preclude the plan administrator board from taking a

23  substantive position, and in fact one could read it as

24  suggesting that in order to break a log jam or facilitate a

25  resolution the plan administrator board should in fact, when

1     appropriate, take a position.

2             The other issue, and these things have gotten

3     conflated somewhat, is the ability of Kirkland & Ellis as

4     counsel to the plan administrator board, to take a position.

5     And it's certainly true that we represented EFH and we

6     represented EFIH in the bankruptcy cases, not with respect

7     to all matters but with respect to most matters, but just to

8     be clear, those engagements with EFH and EFIH are over.

9     They concluded, they terminated by their own terms under the

10    engagement letters at the substantial completion of the

11    substantive work for EFH and EFIH.  And on the effective

12    date EFH emerged, it's now Sempra Texas Holdings Corp., and

13    EFIH emerged as Sempra Texas Intermediate Holding company

14    LLC.  Those are owned and controlled by Sempra, they're

15    represented by White & Case, and importantly they have no

16    stake, legal or financial, in the outcome of the allocation

17    disputes.  They took the asset, they went off, they're

18    running the business, we wish them the best, nothing that's

19    going to happen in this allocation dispute can impact our

20    former clients in any adverse way.

21            And that takes me to the model rules of

22    professional conduct which have been adopted in this

23    district, and in particular model Rule 1.9 which talks about

24    duties to former clients.  And I'm not going to go through

25    each element, but two of the elements that one has to steer

1   clear of is you have to make sure that the interest of the

2   second client, i.e., the PAB, because we are now

3   representing the PAB, we were engaged by the PAB, cannot be

4   materially adverse to the interest of the former client.

5   And here, as we said, they are not because there is no knock

6   on effect however this allocation dispute comes out, 90/10,

7   10/90, there's no impact on reorganized EFH and reorganized

8   EFIH.

9          The other prong that I think is relevant for our

10  purposes and must be avoided is the present client's matter

11  must either be the same as the matter the lawyer worked on

12  for the first client or substantially related matter, that

13  is you can't have those two things be related.

14          And again, not an issue because during the case

15  when EFH and EFIH were our clients we, Kirkland, did not get

16  involved in allocation matters or in the intercompany

17  issues, that's why disinterested directors were brought in

18  and why they hired Proskauer on the one hand for EFH and

19  Provath Jenner (ph) for EFIH.

20          So we never represented the debtors on those

21  issues, and though at least two of the prongs that could be

22  problematic in the context of the model rules are not a

23  problem for us representing the PAB in this case.

24          So I think that goes to the can the PAB

25  participate in this process and can Kirkland represent the

1    PAB in doing so?

2         I think that takes us to the question of whether

3    and how it makes sense for the PAB to weigh in on this

4    matter.  We are not looking to step on the feet of the

5    economic stakeholders.  If they are able to reach a deal and

6    it's a deal that's at arms length we will happily hold our

7    peace, we're not looking to impose our views, but there are

8    scenarios, Your Honor, where we think it may be important

9    for the PAB to weigh in and helpful for the PAB to weigh in.

10        The first scenario is where people trade out.  We

11   have seen in this case throughout parties come, parties go,

12   no one is restricted at this point in time.  Neither Elliott

13   nor any member of the Kasowitz group insofar as we are

14   aware, couldn't go sell their claims tomorrow, Elliott could

15   change their waiting, they could become geared in a

16   different direction, and the Kasowitz group could go from

17   being a large and meaningful group to a splinter group

18   that's not really all that motivated to get a fair outcome

19   for EFH.  And we've seen this play out before.

20        You'll remember, Your Honor, when we were trying

21   to get support for the Sempra plan we were in negotiations

22   with Fidelity, the largest EFH holder.  Those were

23   critically important support items to get, and you know, one

24   day we woke up and Fidelity was gone having been an active

25   player for three years and their claims were owned by

1    another party.  That could easily play out again here, but

2    who's going to be here regardless for the long haul?

3    Hopefully not that long a haul.  The plan administrator

4    board.  We don't get to sell, we're here, we have a

5    responsibility which we're going to see through.

6           And so if there's a change in the balance of

7    power, if you have a large group on one side and now a rump

8    group on the other, the adversarial processes could break

9    down, and so we think in that circumstance it makes sense

10   for the PAB to be able to weigh in, again, with its honest,

11   unbiased view, and no one has suggested that our view would

12   be anything other than honesty or unbiased, it might be

13   right or wrong, but that's a different issue.

14          And that takes me to my next point, which is the

15   role of the honesty broker.  We've seen this play out many

16   times going all the way back to the CRO term sheet where

17   someone who doesn't have a direct economic stake but has a

18   duty to try to bring resolution can actually contribute

19   something positive to the process, and that's really all

20   we're looking to have the opportunity but not the obligation

21   to do at some point in this process.

22          And finally, Your Honor, I think it's fair to say

23   that no one knows the history better of the issues that are

24   subject to the allocation dispute, be it the NextEra break-

25   up fee, the way fees were allocated for the committee, or

1   professional fees in general, no one has lived through all

2   of those chapters the way Mr. Horton, the personification of

3   the PAB, and his advisors have.  So again, we think we can

4   be helpful and we think we certainly have the latitude to

5   weigh in.

6          And I'll apologize again for putting Your Honor in

7   the position I did on March 28th, but I think when one takes

8   a reasoned and deliberate look at it I think that's the

9   inevitable conclusion.

10         I'm now going to point out one particular item in

11  terms of our alleged inability to participate or the PAB's

12  inability to participate, and that's the allocation of

13  professional fees.

14         So pursuant to an order that Your Honor entered

15  early in this case debtor professionals, a variety of debtor

16  professionals were under an obligation to allocate fees

17  between the estates as best they could in a contemporaneous

18  fashion or close to contemporaneous fashion, and we have

19  done that.  We, Kirkland, others, A&M, Deloitte, Evercore,

20  Filsinger (ph), we have done those things pursuant to Your

21  Honor's order all throughout this case, and we cited a whole

22  bunch of the docket numbers for the monthly applications

23  where we laid out our methodology.  And no party has ever

24  objected to the allocations set forth in those monthly fee

25  statements or interim fee applications.

1    And I understand interim means interim and things

2    are subject to revisitation down the road, but the idea that

3    having allocated all along the way we cannot defend, explain

4    our allocation as to why it was appropriate and justified,

5    that seems to us an extreme and untenable position.

6    And I would add that given the magnitude of fees

7    that have gotten paid over though these many years the idea

8    of going back to square one and revisiting allocation is

9    impractical to the extreme and there might not be even

10    enough money in the estates or in the board to go back and

11    say all of that should have been allocated to EFH and EFHI.

12    Whether that amounts to a laches argument or some other sort

13    of argument that could be for another day, it's just

14    practically speaking not possible.  So I wanted to speak to

15    that.

16    Your Honor, that's my argument with respect to

17    participation.  I'm sure Mr. Glueckstein will want to speak

18    to the committees' ability to participate because I know

19    Elliott has objected to that as well.  Does it make sense

20    for me to have Mr. Galardi or others speak to that issue

21    before I get into the final points of the scheduling order?

22    THE COURT:  No, let's deal with this threshold

23    issue first.  So --

24    MR. KIESELSTEIN:  Any questions for me, Your

25    Honor?

1           THE COURT:  No.

2           MR. GALARDI:  Do you want to do just PAB first?

3           THE COURT:  Yeah, let's -- well no, let me here

4      from Mr. Glueckstein.

5           MR. GLUECKSTEIN:  Good morning, Your Honor.  For

6      the record Brian Glueckstein, Sullivan & Cromwell, for the

7      E-side creditors' committee.

8           On the participation issue, Your Honor, it's our

9      position that the E-side committee should be permitted to be

10     a participating party as is being contemplated under the

11     scheduling order.

12          And similar to Mr. Kieselstein's remarks as far as

13     what we're asking to do, this is not a situation where when

14     Your Honor was visiting, for example, the intercompany

15     issues a couple years ago where we're talking about coming

16     forward with a motion that's entitled to deference of the

17     9019 or otherwise.  What we're talking about is

18     participation in an adversarial process both in discovery

19     and if the committee deems it appropriate and forms a

20     consensus view on the facts and circumstances to weigh in

21     substantively on the appropriate allocation between the

22     estates.  And, Your Honor, we believe that that is both

23     appropriate and in fact necessary here under the

24     circumstances.

25          The E-side committee is a single committee that

1    has duties to the creditor body as a whole consisting of

2    creditors of EFH, EFIH, EFIH Finance, and EECI without

3    distinction.

4         The creditor body -- unsecured creditor body is

5    diverse with differently situated creditors who have had

6    differing individual interests on many issues throughout

7    these cases, and throughout the E-side committee has

8    considered the different creditor perspectives and

9    discharged its duties to the creditor body as a whole and

10   will continue to do so here, Your Honor.

11        The allocation dispute is suggested in the

12   pleadings as effectively what is shaping up to be,

13   especially if the PAB and the committee were to be excluded,

14   at this point, you know, a two-party dispute between Elliott

15   and the Kasowitz group of EFH holders.

16        But in fact, Your Honor, the committees'

17   constituency contains a variety of creditors who are

18   situated in different ways.  At EFHI while Elliott has a

19   controlling position they do not hold all of the unsecured

20   claims at EFIH.  There are other creditors, there are small

21   creditors at EFIH.  The creditor body is even more diverse

22   at EFH where there's both funded debt, large and small

23   holders represented and unrepresented before Your Honor both

24   in this dispute and throughout these cases.  There are

25   creditors at EFH who didn't voluntarily buy into a creditor

1    position whose claims are contractually advantaged by the

2    E-side committee settlement that was approved by this Court

3    in 2015.  And the committee, Your Honor, has the same duties

4    collectively to all of these creditors as we've had

5    throughout the cases.

6         It is imperative we submit, Your Honor, that the

7    committee, a fiduciary to all large and small creditors,

8    represented and unrepresented, have a voice in this dispute.

9         The process here is also critical.  The fact --

10   one or more of the core duties of the committee is to be in

11   a position to inform the creditor body, to understand and

12   report to the constituency at large about developments and

13   the path to resolution, to be involved in discussions as

14   appropriate, and certainly to be able to present a point of

15   view to Your Honor in the context of litigation.

16        Elliott has suggested in their papers as a single

17   creditor they seek to disqualify the committee and sideline

18   it entirely from the process, and we submit, Your Honor,

19   there's simply no basis to do so.  And we would ask the

20   question -- one might ask the question, exactly what Elliott

21   is afraid of?  I mean perhaps that the committee is going to

22   come forward with a proposal that is in fact reasonable.

23        All we're asking to do is have the opportunity to

24   participate in the process and make a proposal from our

25   perspective that we think is fair and reasonable to the

1    creditor body as a whole.  Absent that we're stuck with a

2    situation where non-fiduciary creditors are the only parties

3    advocating -- well represented and advocating for their

4    positions on both sides of the dispute without any other

5    points of view to provide perspective to Your Honor.

6          The committee certainly has lived the issues

7    throughout these cases on all of these issues that are going

8    to be important in the question of how to resolve this

9    dispute ultimately.

10         And again, Your Honor, the committee is not

11   seeking any sort of deference under -- we're not bring

12   forward a settlement proposal, we're not filing a motion

13   under 9019, the scheduling order is contemplating

14   submissions from the participating parties following

15   discovery that will lead to a contested hearing where the

16   parties will have an opportunity to advocate for a potential

17   resolution and allocation of these disputed material

18   administrative expenses.

19         There are many examples where -- situations where

20   a committee has had an important role in a resolution of

21   such disputes.  For example, in the Enron case Judge

22   Gonzales recognized the role of the committee in a process

23   for revolving an allocation dispute.

24         And in fact we submit, Your Honor, that the Court

25   would need to adopt the position that the committee is so

1    inherently conflicted that it could never take a substantive

2    point of view with respect to issues of allocation or that

3    could affect an individual creditor's position in order to

4    get to the result that Elliott is advocating for.

5            Certainly the committee would have the ability in

6    a different context to come in, and there's case law to that

7    effect, to come in and object to a creditor's claim if they

8    were asserting something that was unfair.

9            We don't know where this dispute is going to go.

10   What we do know is that over the extended period of time

11   where the creditors have been discussing this issue they

12   have not been able to reach a resolution, we have not seen

13   material progress being made, hence that's why we're here

14   today to present a litigation schedule to bring this issue

15   before Your Honor.

16           So we would submit, Your Honor, that there is no

17   inherent conflict here.  The singular committee should have

18   the ability to, as its done throughout these cases, to

19   participate in the litigation, certainly to take into

20   consideration the views of all of its constituents, and if

21   it reaches a consensus view offer a position that it

22   believes fair and appropriate on the basis of the issues

23   presented.  And we would submit, Your Honor, that sidelining

24   the committee at this juncture and prohibiting its

25   participation and its weighing in on these issues would

1   certainly be potentially prejudicial to the creditor body as

2   a whole and certainly to those creditors who are not

3   represented by the two litigants in the room today.

4           Thank you, Your Honor.

5           THE COURT:  Thank you.

6           Mr. Galardi?

7           MR. GALARDI:  Your Honor, I'm going to start with

8   the committee first.

9           Your Honor, I don't know how anyone says we don't

10  have any basis.  What I'd like to hand up to Your Honor is

11  the confirmation order.  If I may approach?

12          THE COURT:  Yes.  Thank you.

13          MR. GALARDI:  Your Honor, I'm just going to start

14  with the committee because I think it's the simplest.  If

15  you would turn to page 63 of the committee plan -- of the

16  plan.

17          I agree with Mr. Kieselstein on a number of points

18  and I'll go through, but the plan, the confirmation order,

19  and the trust agreement were all highly negotiated.

20          The plan, paragraph 123 says the committee is

21  dissolved except for four things.

22          One, claims or applications and any relief related

23  thereto for compensation by professionals and requests for

24  allowance of administrative claims.

25          Two, appeals from the EFH confirmation order to

1   which the committee is a party.

2          Three, any matters relating to the amended --

3   order amending stipulation and order appointing the fee

4   committee and granting relief.

5          Four, any matters, including any appeals related

6   to adversary proceeding Case No. 17-50942 and NextEra's

7   request for an allowance of a payment of any related

8   administrative claims, collectively the limited purposes.

9          This is not including but limited to.  It is not

10  anything other than the committee has been dissolved.

11         As Mr. Glueckstein said, the allocation issue was

12  out there, the confirmation order addressed allocation

13  issues.  The committee did not include allocation issues.

14  It by the confirmation order is dissolved.  Leave aside

15  conflict issues, it is dissolved, it has no authority,

16  confirmation order governs, confirmation order governs plan,

17  it's not in the plan, end of story.

18         With respect to the conflict, Your Honor, yes,

19  every committee deals with individual claims, but this, Your

20  Honor, is beneficiaries of an EFH estate, beneficiaries of

21  an EFIH estate, and the fiduciary, which Mr. Glueckstein

22  says they were to both, is going to take a position as to

23  shifting a zero sum game between one estate and the other.

24  And this language by itself doesn't preclude the committees'

25  participate the conflict issue.

1          And this is not -- and I'll get to it with

2     Kirkland & Ellis and I made this clear -- this is not about

3     Sullivan not being able to represent the committee on these

4     matters, it's not about Sullivan being a witness on their

5     committee fees, those are other issues that we have to get

6     to if they get there, but the fact of the matter is the

7     confirmation order governs, the committee is not retained.

8          At the very most if you read a very broad reading

9     of one they can come in and talk about the substantial

10    contribution claim of Elliott, but that's a substantive

11    objection to the claim, not an allocation issue.

12         So we would argue the committee did not get

13    reserved, it's been dissolved, it has no standing.

14         Now let's go back to Mr. Kieselstein's arguments.

15    Mr. Kieselstein started, Your Honor, with the trust

16    agreement, so let me hand up to Your Honor the trust

17    agreement.

18         (Pause)

19         MR. GALARDI:  Now he ran through a number of

20    provisions, Your Honor, but I want to start not with 6.3 but

21    with 9.7.  And 9.7 specifically says any conflict or

22    inconsistency between the plan and the confirmation order

23    and the confirmation order shall govern, and then before

24    that it says that any inconsistency between the plan

25    confirmation order and the trust agreement the plan and

1    confirmation order.  So this is third document that would be

2    relevant to the discussion.  That said, I actually don't

3    believe that there's an inconsistency, Your Honor.

4            Let's start with what Mr. Kieselstein started

5    with.  6.3, Your Honor, you're either going to need evidence

6    on this or you're going to need to recall what this

7    provision was intended to govern.

8            The parties negotiated this exactly for the reason

9    that if there was an allocation issue we believed that they

10   had to put in a disinterested director, a disinterested EFH

11   agent, and a disinterested EFIH because it was a conflict

12   matter.  Mr. Kieselstein says it may but doesn't have to.

13   That didn't give them the permission to deal with the

14   allocation issues.  In fact it was exactly for that reason,

15   because this was a conflict matter, that we believed you had

16   to have to, and I think the EFH trustee says that in their

17   papers.  But let's assume that's not true, it's a trust

18   agreement.  What do we know about the trust agreement?  It

19   has to specifically provide for the power.

20           Let's go to 6.1.  Mr. Kieselstein went through 1-A

21   through R very quickly, but again, it's not including but

22   limited to here and it gives a series of provisions.  Not

23   one of those provisions say they have the authority to

24   resolve an allocation issue.  It does say they can go to

25   disputed claims and interest, we all know what that is.  It

1    does say they can administer and adjust the claims registry,

2    but it doesn't say anything about taking on an issue that we

3    all knew that the confirmation issue was a big issue.  They

4    actually put conflict matters in the confirmation order, but

5    it doesn't say that in 6.1.

6           Now, Your Honor, let's go back to another

7    provision in this same document.  If you go back to 3.1, the

8    duration of the trust, and again, it says what it can do.

9    It continues until object and reconcile disputed claims,

10   settle and compromise disputed claims, and authorize and

11   make disbursements of the cash and otherwise terminate the

12   trust as soon as practical.  It doesn't say that it

13   continues while the allocation issue is pending.

14          Let's go to 1.4, resolution of claims.  Again, it

15   says file, withdraw, litigate, judgment, objections to

16   claims.  This is not an objection to claim.  Settle or

17   compromise any disputed claims.  Define term under the plan

18   without any further notice or action.  Direct the

19   administration adjustment of the claims registry.

20   Distribute the trust asset.  Nothing about allocation, but

21   we all knew this issue was coming.

22          Let's go to 1.2 which says the purpose of the

23   trust.  The purpose of the trust is to administer the trust

24   assets consistent with the plan and the confirmation order

25   on behalf and for the benefit of the beneficiaries and to

1    serve as the mechanism for distributing trust assets and

2    utilizing trust assets for the benefits of the

3    beneficiaries.  It keeps going on but it doesn't say, they

4    just say they're going to be distributing, they're going to

5    be utilizing those assets for those purposes and for the

6    benefit, this is a trust and there are two funds and they're

7    going to use the trust assets.

8            Let's go to L of the beginning of this.  It says

9    the trustee shall have the powers necessary to implement the

10   provisions of this agreement, including the power to

11   preserve and maintain the trust assets.  Nothing is

12   depleting them other than they're spending money.  Object to

13   reconciled claims against the EFH/EFIH debtors.  Settle or

14   compromise disputed claims or interest.  Distribute to or

15   utilize trust assets for the benefit of the beneficiaries.

16   Comply with any tax reporting obligations.  And utilize the

17   trust assets to satisfy tax obligations.  And otherwise

18   perform the functions and take on the actions provided for

19   or permitted in the plan, the confirmation order, the

20   agreement, or in any agreement executed pursuant to the

21   plan.  They've not cited an agreement that said they can

22   take this on.

23           And, Your Honor, G says again the same thing, the

24   trust is to administer the trust solely for the benefit of

25   the notes and the other holders of the allowed claims.

1       To the extent that that's inconsistent, Your

2   Honor, now let's go to the plan, which is a second document

3   and turn to -- I think I've already handed it up, Your

4   Honor.

5           THE COURT:  No.

6           MR. GALARDI:  Then I'll hand that one up.  Let's

7   -- I think I did hand up to plan.  I didn't hand up to order

8   or did I -- oh, no, I handed up the order, not the plan.

9           THE COURT:  I have the order, not the plan.

10          Thank you.  There we go.

11          MR. GALARDI:  Your Honor, if you look at page 69

12  of the plan.  I'm sorry, let's go to page 70 of the plan.

13  It says the rights and powers of the EFH plan administrator

14  board.  The board shall be authorized to direct the

15  disbursing agents to make distributions, you can read on on

16  that but it's a distributions.  And again, the same

17  language, the EFH plan administrator board may, but is not

18  required, to establish governance and organizational

19  documents and they can appoint people.  So there's nothing

20  in here about allocation.

21          If you go now to the confirmation order, Your

22  Honor, which I handed up before.

23          THE COURT:  Uh-huh.

24          MR. GALARDI:  Page 69, paragraph 134.  On or

25  before the EFH effective date the EFH/EFIH debtors shall

1    create a trust pursuant to the EFH plan trust agreement

2    which shall govern the rights and obligations -- rights and

3    duties of EFH plan administrator board with respect to the

4    EFH plan administration trust consistent with the plan.

5         The primary purpose of the EFH plan administrator

6    trust shall -- I put numbers here but they're not there --

7    shall be acting as a disbursing agent under the plan,

8    administering the EFH/EFIH cash distribution account

9    consistent with the plan, liquidating or otherwise resolving

10   claims that may be entitled to distributions from the

11   EFH/EFIH cash distribution account, and pursuing and

12   resolving in the EFH plan administrator's discretion causes

13   of action, the plan administrator board is permitted to

14   pursue or settle under the plan.

15        There's nothing in the order that says, despite

16   we're all talking about the allocation issues, that the plan

17   administrator had a right to take a substantive position on

18   an allocation dispute.

19        Now, Your Honor, let's go to some of the remarks

20   that Mr. Kieselstein said, because I think it was important.

21        One, I do want to be clear that at this point we

22   are not seeking and never did think to seek to disqualify

23   Kirkland & Ellis because we thought the plan administrator

24   could not participate, but I want to take a few of his

25   remarks up because they raise some issues, and you know, I

1   want to take facts that he said that I don't think are true.

2           One, he talks about the risk of selling out of the

3   position.  Your Honor, though they keep wanting to say we

4   only represent Elliott, we represent UMB as the trustee of

5   the EFH notes for exactly the reason, and our engagement

6   continues as a representative of UMB as the trustee for the

7   EFIH notes regardless of who holds them.  So there is no

8   risk whether Elliott sells out or not that we will be here

9   to the end with UMB.  So I think that that is not a valid

10  risk.

11          Second he says I want to be the honest broker and

12  we're going to say at the end, you know, we're the only one

13  with the history, we're the only one that knows all the

14  facts.  But wait, he started his conversation to make clear

15  that that is a former client of his and that there is no

16  conflict, but if you're giving factual history and giving

17  away advice what was the former client there may be a

18  conflict.

19          And why do we need the honest broker?  The

20  litigation, adversary proceedings, contested matters doesn't

21  necessarily have to have fiduciaries or honest brokers

22  deciding at the last minute let's come in and take a

23  position.

24          There is no doubt the debtor will be a witness

25  here.  There is no doubt that Kirkland & Ellis will be a

1    witness here because they have allocated fees, we understand

2    those fees to be allocated at the direction of the debtor or

3    with the consent of the debtor.  That is an issue that will

4    be raised in this case.

5         What legal advice was given, we're going to have a

6    natty issue of privilege.  How do you resolve the allocation

7    issues, and they go to whether there are certain waivers of

8    privileges.  We have one entity, just to give an idea of

9    what's going to happen, that now has succeeded to the two

10   sides EFH and EFIH.  Don't know if there's a waiver of

11   privilege, don't know if there can be an assertion of

12   privilege.  This will be an issue if we get to very broad

13   discovery, which we hope not to have.

14        So, Your Honor, it's very fast to say well it's a

15   former client but I would be the honest broker because I

16   represented that former client and I'm going to give you our

17   perspective as the person most knowledgeable as the former

18   client, but don't worry about the former client issue

19   because it's really not a conflict here.

20        So, Your Honor, under those circumstances, given

21   the plan, we think that they cannot under the trust

22   agreement appear -- they being the PAB -- cannot appear.  We

23   think the clear terms of the plan anticipated, which they

24   chose not to do and Your Honor raised it again, I'm the one

25   always saying advisory opinion, Your Honor raised it.  We

1    put in the plan exactly the mechanism that we said the PAB

2    could do if they wanted to weigh in on the allocation issue,

3    that is get two disinterested directors just as Your Honor

4    recommended before and go ahead and put that honest -- those

5    two people in.  They've chosen not to do so, we gave names

6    for them to do so, they chose not to do so, and so now it's

7    not the fact that the PAB just doesn't have standing to come

8    in and say I think Your Honor was right, this is not a

9    potential conflict, this is an actual conflict.  This is

10   shifting positions.

11        It's also the debtors having taken a position or

12   blessed a position on allocation of professional fees that

13   will be questioned.  We have questioned it.

14        Your Honor, and I'll go back to the final order.

15   Now, Mr. Kieselstein said, well you know, we relied on this

16   order, it was an interim order, we did what we told we would

17   do.  Your Honor, that order expressly provides, as Your

18   Honor is well aware, that at the end of the case it's

19   without parties -- it's without objection, reservation of

20   rights, parties can object to the allocation of fees.

21        We stood that order is a final order, we have the

22   right to object, we have to right to allocate.  We had tried

23   to resolve this before confirmation and we've not been able

24   to do so, so we had to file that motion.  But it can't be

25   that just because this case lasted longer and the fees are

1   so much that no one can go back now and say these fees

2   should not have been incurred.  Just like Your Honor is

3   going to have to go back on substantial contribution claims.

4          So, Your Honor, we don't think the PAB needs to be

5   an honest broker here.  We don't think it's appropriate.  We

6   don't think it has its authority.  We're actually trying to

7   avoid certain litigation on privilege.

8          Your Honor, I'll go back to the trust agreement,

9   there can be motions to remove the PAB that Your Honor will

10  have to decide.  If they take an allocation position that's

11  an inherent conflict of interest, it's an actual conflict of

12  interest.  There is nothing that has changed just because

13  Elliott was the mover that allows them to come in and make a

14  substantive position.

15         So, Your Honor, we think that those two parties,

16  the committee because they were -- it's not a -- they've

17  been dissolved except with respect to limited purposes, and

18  the PAB should not be parties to the allocation motion.

19         Thank you.

20         THE COURT:  Thank you.

21         MR. GLUECKSTEIN:  Your Honor, if I may.  Brian

22  Glueckstein, Sullivan Cromwell.  If I could just respond

23  quickly to Mr. Galardi's focus of his comments today with

24  respect to the committee, which is paragraph 123 of the

25  confirmation order.

1           And you know, the confirmation order says what it

2   says, but I think Your Honor the question here and what I

3   haven't heard Mr. Galardi suggest is that -- he says well

4   there would be this -- still this inherent conflict issue of

5   some sort, but there isn't an issue with respect to the

6   committee discharging its duties as its done throughout this

7   case.

8           And I would submit, Your Honor, that the

9   circumstances that we face today are very different than we

10  faced at the time of the confirmation hearing.

11          The confirmation order also contemplates bringing

12  this matter before the Court within 40 days to get to an

13  order, and of course for a number of reasons that hasn't

14  happened.

15          We are now facing a situation where Elliott has

16  staked out a position before the Court in litigation that

17  has a real potential to wipe out the EFH estate.  That's not

18  something that the Court or frankly the committee believes

19  it can stand by and at least not participate in a process to

20  understand those holders of claims who are not the

21  sophisticated parties who are litigating this issue in the

22  room today that are the beneficiary of the EFH committee

23  settlement amongst other small holders at EFH and EFIH to

24  have a voice in the room and the ability to participate in

25  the litigation.

1          There has been no independent fiduciaries

2     appointed to represent on a fiduciary level.  And sure, of

3     course as Your Honor knows litigants can litigate all the

4     time contested matters, but there are many creditors of

5     these estates who are not represented by Mr. Galardi and by

6     the Kasowitz group who have a very real stake in the outcome

7     here.

8          And so we would suggest, Your Honor, that

9     regardless of how the confirmation order reads that Your

10    Honor exercise discretion to allow the committee to

11    participate.

12         Thank you.

13         THE COURT:  You're welcome.

14         MR. PEDONE:  Your Honor, Richard Pedone on behalf

15    of the EFH indenture trustee.

16         Your Honor, the trust agreement clearly authorized

17    the PAB to appoint disinterested directors for conflict

18    matters, and the allocation issues are conflict matters.

19    When that provision was negotiated the EFH indenture trustee

20    expected that if this scenario arose or frankly it would be

21    brought by the disinterested directors the disinterested

22    agents post-effective date would step in and work on the

23    dispute.

24         It was beyond imagination frankly of the EFH

25    trustee and maybe to our error but certainly not in the

1  disclosure statement that the battle would be borne solely

2  by creditors who may or may not even be beneficiaries under

3  the definitions of the trust agreement going forward.

4           And so we believe as the Court works through the

5  issues of who can stand in place here and litigate the issue

6  and who can't, it clearly has to bear in mind that there

7  needs to be a fiduciary looking out for all creditors and

8  would ask that the relief that the Court affords both now as

9  it determines this issue and in connection with the actual

10  scheduling in the litigation moving forward address those

11  issues, because it's certainly imaginable that the Kasowitz

12  group, who appear to be well poised, well represented, face

13  a situation where they end up with the members of that group

14  trading out and this Court is then faced with litigation

15  part way along perhaps their claims were purchased by

16  Elliott, perhaps they sold to other parties, but there's no

17  one standing before this Court to finish the litigation, and

18  the schedule needs to accommodate somebody else stepping in

19  in that scenario if that someone else isn't clearly made

20  clear as a fiduciary to go forward today.

21           Thank you, Your Honor.

22           THE COURT:  You're welcome.

23           Mr. Kieselstein?

24           MR. GLENN:  Good morning, Your Honor.  Andrew

25  Glenn, Kasowitz Benson Torres LLP on behalf of the ad hoc

1    committee of EFH.

2           We did not file papers on this matter and we're

3    not taking any position on this matter other than we're

4    fighting over a limited fund of cash, and it seems to me

5    that if Your Honor is going to grant one or the other party

6    the right to participate in the litigation to which we have

7    no objection that it's not duplicative and that there's only

8    one so we can maximize recoveries and be more efficient in

9    the process moving forward.

10          Thank you.

11          THE COURT:  Well let me just address, this is

12   going to cost what it's going to cost, it's going to cost

13   more than it should, but the parties have every ability to

14   avoid that by settling.  They've been unable to settle, so

15   be it, that's fine, but litigation in due process costs a

16   lot of money and it comes right out of the creditors'

17   recoveries.

18          Mr. Kieselstein?

19          MR. KIESELSTEIN:  Good morning, Your Honor.  Marc

20   Kieselstein again on behalf of the EFH plan administrator

21   board.  Just a few brief points.

22          Your Honor, first I want to deal with

23   Mr. Galardi's parsing of the trust agreement, because I

24   think his vision of what the trustee can do is kind of a

25   crabbed and rigid version and it's actually not consistent

Page 43

1    with trust law generally, and even with the document he

2    didn't read the lead in to 6.1, which I'll read, and it says

3    powers of the trustee, it says the trustee shall have all of

4    the rights, powers, and privileges expressly set forth in

5    the plan, the confirmation order, this agreement, and as

6    otherwise provided by applicable law.

7         Let me stop there, because we've cited law which

8    talks about the ability of the trustee under a Delaware

9    trust to take a position on one set of beneficiaries vis-à-

10   vis another if it's not motivated by some invidious purpose,

11   and this is such a circumstance.

12        Continuing in 6.1, subject to the other provisions

13   herein the trustee shall have the power to undertake the

14   following actions and any powers reasonably incidental

15   thereto which the trustee in its reasonable discretion deems

16   necessary or appropriate to fulfill the purpose of the

17   trust.

18        What's the purpose of the trust?  Ultimately it's

19   to get money out the door to the beneficiaries as

20   expeditiously and as fairly as possible.

21        Continuing, until otherwise specifically limited

22   or restricted by this agreement the plan or the confirmation

23   order.

24        There's nothing in any of those documents that say

25   when it's an allocation issue the PAB must appoint

1    disinterested directors and if it does not may not

2    participate in trying to put out its view on what an

3    appropriate and fair solution is.  That could have been

4    drafted as a mandatory requirement, it was not.  That has

5    implications.

6           There's also a catch-all at the end of 6.1 that

7    says nothing contained herein shall be deemed to restrict or

8    impair any rights of the EFH plan administrator board, the

9    supporting creditors, EFIH unsecured notes trustee, or the

10   EFH notes trustee under the plan or confirmation order

11   including paragraph 156 of the confirmation order as

12   applicable.

13          So we think consistent with the document,

14   consistent with overarching principles of trust law, and for

15   the reasons that I talked about previously, which I did not

16   hear Mr. Galardi refute, there is no economic or legal

17   impact on EFH -- reorganized EFH or EFIH, that's a fact.

18   They just take their assets and they've moved on.  They're

19   not impacted by this dispute.

20          With regard, Your Honor, to the scenario where

21   there's trading, which we've seen (indiscernible) throughout

22   this entire case, I didn't follow Mr. Galardi's point that

23   if Elliott sells out there's still UMB.  There still may be

24   UMB, who's directing UMB?  UMB no longer has a majority

25   owner telling them how to prosecute the litigation or

1    whether to prosecute the litigation.

2         Elliott could solve this problem easily, they

3    could buy everyone's claim, and they've gone -- they're gone

4    a far piece toward doing that.  If it's left pocket, right

5    pocket for them and nobody else is impacted we wouldn't be

6    standing here, Your Honor.

7         And I want to just note that Elliott I think has

8    actually been vehemently opposed to the idea of a new set of

9    disinterested directors, and we all understand the getting

10   up to speed, the expense, the time, the delay of doing that,

11   which is why it's discretionary in our view not mandatory.

12        So for all those reasons, Your Honor, and with I

13   think the best of good faith we would simply ask for the

14   opportunity later in the process to be able to weigh in with

15   our view of an appropriate allocation.

16        THE COURT:  All right.

17        MR. GALARDI:  Your Honor, two points.  Well

18   probably three.

19        One, it's a contested matter, so to simply say

20   weigh in later, let them file their objection if they're

21   going to file an objection.  We do have an objection because

22   trust law says you have to represent the fiduciaries, the

23   beneficiaries of your trust.

24        The fact of the matter is if they take a position

25   as Your Honor ruled before when it came to the disinterested

Page 46

1    directors they are taking by definition a position adverse

2    to one set of beneficiaries or the other.  Period, end of

3    story.  There can't be any question about that.  So they

4    should not be able to participate.

5           There are fiduciaries to two distinct groups of

6    creditors with two distinct cash funds.  To take any

7    position is by definition in conflict.

8           And the mere fact that they didn't appoint an

9    independent director right off the bat we have concerns.  We

10   were hopeful to get a settlement.  The mere fact that the

11   disinterested directors didn't come to this Court with a

12   settlement which we tried to do that's an unfortunate, it's

13   going to cost this estate a lot of money.  Your Honor, is

14   right, people will bear the cost, but that's not a reason to

15   say well just because they didn't do it now they get to

16   participate, because it was their own choice to -- not to do

17   and it there's plenty of things in this case as Your Honor

18   is aware where we've taken one position, including this,

19   where they're taken exact will the opposite position.

20          So they can't lay that at our doorstep.  It's at

21   their doorstep and we would ask them to not be a party to

22   the litigation.

23          With respect to Mr. Pedone I just want to hold off

24   with respect to the EFH trustee and their request to when we

25   get to that, but I just thought I'd leave that on the

1    record.

2         THE COURT:  Okay.  All right.  We're going take a

3    short recess.

4         (Recessed at 12:06 p.m.; reconvened at 12:17 p.m.)

5         THE CLERK:  All rise.

6         THE COURT:  Please be seated.  All right.  Thank

7    you for your submissions.  I'm going to deal with the E-side

8    committee issue first because I think it's easier.

9         The E-side committee wishes to participate as a

10   fiduciary to both the EFIH and EFH estates.  I don't think

11   there's an inherent conflict in doing that, and the

12   committees often have to deal with estates, and indeed the

13   E-side has done that for the last three years and the T-side

14   had to do it as well in trying to figure out how to proceed

15   towards a plan and ultimately a resolution of the cases.

16        But the problem that the E-side committee has is

17   the confirmation order, which I think is crystal clear.  The

18   committee has been dissolved as committees usually are at

19   the effective date of the confirmation of a plan except for

20   limited purposes, and these purposes I think are narrow and

21   specifically delineated, and I don't think a reasonable read

22   of the loaded purposes is defined in the confirmation order

23   include this allocation dispute between EFIH and EFH.

24        So with regard to the EFH or E-side committee,

25   excuse me, I am not going to allow them to participate in

1    the litigation.

2         Moving to the plan administrator board and

3    Kirkland & Ellis, it's the much more thorny question, it

4    relies on harmonizing -- reading the various agreements,

5    harmonizing them, and trying to come up with the answer.

6         I think that there's certainly an argument that

7    the powers of the plan administration board or PAB are not

8    as narrowly defined as Mr. Galardi would argue that they

9    are, for example, there is the reference to the power to act

10   under applicable law and the argument that under Delaware

11   trust law that can be quite broad, although has to be

12   carefully exercised when you have conflicting beneficiaries.

13   And there are other parts of the agreement, as pointed out

14   by Mr. Kieselstein, that I think can be read more broadly

15   than Mr. Galardi lays out, but Mr. Galardi's position is not

16   without weight.

17        Were the plan administration board participating

18   pursuant to independent fiduciaries hiring their own

19   attorneys, et cetera, I don't think there'd be any question

20   that they could participate in the allocation dispute.  They

21   are not doing that for whatever reason, which is fine, but

22   it creates more of a problem for the Court.

23        I am not comfortable ruling today on this issue

24   without a more careful consideration of the papers and more

25   specifically really climbing through the documents, which

Page 49

1    frankly I didn't do in preparation for today.  I mean I

2    obviously read the papers, but I didn't crawl through the

3    various elements of the orders and plan.

4         So I am going to kick the can down the road a

5    little on this issue and take it under advisement not to

6    issue an opinion or think about it for six months but to

7    hopefully think about it for more than six minutes and give

8    a more careful response.

9         Having said that I am going to allow the plan

10   administration board and Kirkland & Ellis to participate in

11   the argument about what an appropriate schedule will be,

12   because (a), I think I want a fiduciary to chime in, I think

13   Mr. Pedone is correct, I am somewhat concerned about turning

14   this litigation over to pure creditors who don't act as

15   fiduciaries for people who may not be participating in the

16   process, and it was that that made Mr. Glueckstein's appeal

17   somewhat difficult to overrule because it raises a real

18   concern.  And if I do allow the plan administration board to

19   participate I think I can't undo the omelet, they need to

20   have actually been there at the time we decide what the

21   schedule will be.

22        So I am going to allow them to participate through

23   the balance of this hearing.  I'll think about whether they

24   can participate going forward either fully or on a limited

25   basis and get you a response probably by phone, you know,

1    relatively quickly.  I don't -- it'd take a long time to

2    write this out, so I think -- and it wouldn't benefit

3    anybody to have to wait that long -- so I'll get you

4    something pretty quick and we'll just get everybody on the

5    phone.

6                    MR. GALARDI:  Your Honor, just -- I don't know if

7    it'll be helpful for you because I think we both did what

8    I'll call an after the fact job on this issue.  Would you

9    like us to submit a very short letter laying out the

10   positions or --

11                   THE COURT:  Mr. Kieselstein?

12                   MR. KIESELSTEIN:  We're happy to do that, Your

13   Honor, if you think it'd be helpful.

14                   THE COURT:  That'd be great.  Yep, that'd be fine.

15                   MR. GALARDI:  Friday?

16                   THE COURT:  Well let me -- I'm --

17                   MR. GALARDI:  I mean we can submit it to you

18   Friday if you want to take --

19                   THE COURT:  Well I'm just looking at my own

20   schedule because I'm kind of out -- in and out this week.

21   Well I'd really like to ruin Ms. Yenamandra's weekend.

22        (Laughter)

23                   THE COURT:  So I'm so tempted to say Monday.  I

24   don't know, what --

25                   MS. YENAMANDRA:  Better me than (indiscernible),

1    Your Honor.

2              THE COURT:  Mr. Kieselstein, do you care about

3    when you're going to --

4              UNIDENTIFIED SPEAKER:  About her weekend, no.

5              THE COURT:  About Ms. Yenamandra?

6              MR. KIESELSTEIN:  For the record, absolutely.

7    Yes, that's what's more important.  But we can accommodate

8    whatever schedule Your Honor --

9              THE COURT:  Why don't we do it Monday.

10             MR. KIESELSTEIN:  Okay.

11             MR. GALARDI:  So you'd like submissions on Monday?

12             THE COURT:  Yeah, noon.  Noon Monday okay?

13             MR. GALARDI:  That's fine, Your Honor.

14             MR. KIESELSTEIN:  Letter, briefs --

15             THE COURT:  Letters.

16             MR. KIESELSTEIN:  Certain length?  Five pages?

17             MR. GALARDI:  Five pages --

18             THE COURT:  Five-page letters, that's fine.  If

19   you want to -- you don't need to attach -- I got the

20   documents so you don't need to attach the documents.  If

21   there's something I don't have that you think is important I

22   guess you could attach that.

23             MR. GALARDI:  I think the only thing is I think

24   Mr. Kieselstein has given some Delaware trust law, we'll

25   probably submit some Delaware trust law, which is that's it,

1    but we'll give you cites and cases if that's --

2              THE COURT:  Very good.

3              MR. GALARDI:  Thank you.

4              THE COURT:  All right.  So let's turn it to the

5    next issue, which is -- I'll hear -- you're both begging for

6    the -- you're going to fight for the podium.

7              MR. KIESELSTEIN:  Whatever you want.

8              MR. GALARDI:  Your Honor, I think maybe I do want

9    to address -- and this isn't saying that the person can't be

10   a party -- but I do want to address the EFH trustee request,

11   because I think it goes to the party and then we'll go to

12   the schedule once we get everybody at the table.

13             THE COURT:  All right.

14             MR. GALARDI:  Your Honor, hopefully you have in

15   front of Your Honor the filing by the EFH trustee, and I

16   believe they cited correctly to the plan what they can and

17   cannot do, and it is not the same as the committee, but on

18   page -- paragraph 7, page 4, and I'll let you go to --

19             THE COURT:  Yeah, give me a second.

20             MR. GALARDI:  -- the pleading.  Yes.

21             THE COURT:  I got to find it.

22        (Pause)

23             THE COURT:  Page --

24             MR. GALARDI:  It's page 4, Your Honor, at the top

25   of the page.  It's the pour over paragraph 7, but it really

1   is the top of the page where they --

2          THE COURT:  Yes.  Got it.

3          MR. GALARDI:  Your Honor, I don't disagree with

4   the EFH indenture trustee that these are the five things

5   that they are authorized to do under the plan, and -- but if

6   you look at them, again, I'm sure I'll be accused of reading

7   them too narrowly -- but the only one that seems to have any

8   right for the EFH trustee to appear is five, which allows

9   the EFH indenture trustee to appear in the Chapter 11 cases

10  on any proceeding in which they are or may become a party.

11         And I think it's significant, Your Honor, because

12  it's going to go to the timing and what role they play in

13  here, because I keep hearing this word participant, and when

14  I think of the world and I think about appeals I think who's

15  on what side of the V, who's on the appellant, who's on the

16  (indiscernible).

17         And so for Mr. Pedone to come in and say, well you

18  know, we're going to check the fiduciary, but you know, we

19  might not -- we may be there, we may not be there, you know,

20  let's do this.  Now I think they have to choose.  I think

21  they have to choose to be a party in the contested matter,

22  and that means they'll have to whenever we go to the

23  deadlines go in and be a party.

24         Now, I do want to point out, and I think Your

25  Honor knows this, the EFH indenture trustee, as Your Honor

1  will recall from that notice of disapproval, unlike the UMB

2  trustee Elliott who owns 70 percent of the EFH -- I think

3  it's over 70 percent -- of the EFH notes has not directed

4  the trustee to appear, will not indemnify that trustee for

5  any action here, but they can go ahead and participate.  But

6  I want to -- there's two questions.  One is, is it AFT or is

7  it the EFH indenture trustee?  Leave that aside.  I'm not

8  saying they can't be a party, but they have to be a party,

9  to be a party they have to file an objection, they have to

10  take a position.  They can't just sit around and wait.

11        Now, when you look at the relief they want with

12  respect to the schedule I do think it's important to see the

13  relief, because this goes in again to Your Honor's statement

14  about fees and costs, but I think it is important.

15        On paragraph 15, page 7 it says the following.

16  First, the allocation to dispute be approved by 9019.  I

17  don't think anybody here thinks that there's going to be a

18  settlement that does not come back to the Court, at least

19  Elliott and UMB do not believe that.  So we agree with that.

20        The PAB or another fiduciary.  I know you found

21  that somewhat compelling.  We disagree, Your Honor, but I

22  think you've said maybe a fiduciary, you'll deal with that

23  on PAB.

24        That the EFH indenture trustee be authorized to

25  actively litigate the allocation dispute.  Well I don't

1    think he needs to be authorized by this Court.  Either the

2    plan says he can do it or the plan says he can't, but four

3    is the additional relief and I don't want to get us in

4    trouble because I think the EFH or the plan administrator

5    board said they may support a 503(b) claim.

6            Consistent with the terms of the EFH confirmation

7    order, the EFH indenture trustee's reasonable fees and

8    expenses incurred in connection be paid by the PAB.  We

9    would object, Your Honor, on two grounds.

10           First is, as I said before, I'm not sure who the

11   party is here, whether it's AST, whether it's the indenture

12   trustees, they certainly don't have the majority creditor

13   directing them to participate.  Certainty we will contend

14   that they can't surcharge as we've mentioned.  And I don't

15   think this Court can say consistent with the confirmation

16   order, Your Honor made a finding of a substantial

17   contribution claim.  But at least the last time I looked,

18   503(b) ends at consummation.  You can't make a 503(b)

19   substantial contribution claim after the consummation of a

20   plan.

21           So -- but we have no issue with the EFH indenture

22   trustee being clear who they represent, coming in and being

23   a party, taking a position, and then you don't have to

24   decide the issue, but we did want to make it known that we

25   do not think it's a PAB.  And if it's a PAB, it's going to

1    be an EFH drain, not an EFIH drain.

2         MR. PEDONE:  Your Honor, coming into this hearing,

3    the matter, the schedule, who would be parties is a bit in

4    flux and the language in the confirmation order, the

5    language in the plan itself provide for my client to have a

6    variety of roles related to distributions.  And how far that

7    could be expanded, how far it should it be expanded, I'm not

8    presenting an argument today.

9         The debtors' scheduling motion made us a

10   participating property.  The responsive paper that we filed

11   to the scheduling motion was also an objection to Elliott's

12   motion, in which we called it fundamentally unfair on the

13   assumption that they would be for the scheduling and

14   briefing.  We didn't go into detail, but we have objected to

15   Elliott's allocation motion and we are a party, we believe,

16   going forward.  And as the amended order the debtors have

17   provided indicates it's people who filed preliminary

18   objections prior to the 29th.  Our parties going forward, I

19   believe that puts AST as indenture trustee squarely within

20   the objecting parties going forward.

21        If there's any question on that, whether we're

22   timely within it, then I'd ask that the order make us a

23   party going forward.

24        Our role going forward, potential litigation

25   concerning what the plan meant for our role going forward,

1    all frankly depends on who is in the litigation and who is

2    leading.  AST does not intend that it should be leading,

3    needs to lead, but I can imagine the way this hearing is

4    going that there's a situation where there actually isn't a

5    fiduciary stepping up, and something needs to be resolved,

6    and AST's rights to come back, in particular when faced with

7    a motion that advocates for the complete wipe out of any

8    distribution to claimants and the administrative insolvency

9    may require AST to come back.  And I think that would

10   actually be the type of circumstances where we would be

11   authorized to deal with distributions, etcetera, under the

12   plan.

13          So with regard to Mr. Galardi's response, so to

14   speak, we believe we are a party.  We will be a

15   participating party in the litigation going forward.  If

16   anybody here is objecting to that, I'd ask that we clarify

17   that now.  And then with regard to how active we are, we're

18   going to wait and see exactly who the participants are in

19   the litigation and we'll determine at that point what role

20   is appropriate.  And if relief needs to be sought with

21   regard to payment because there's a dispute over payment and

22   the existing mechanisms in the plan for us to be paid, AST

23   to be paid for matters related to the distribution, we'll

24   promptly bring that to the Court so the litigation can

25   proceed smoothly and efficiently.  Thank you.

1          MR. GALARDI:  Your Honor, brief -- just quickly.

2     We don't object to their being a party.  But when you make

3     the schedule, we want them to comply with the schedule.  We

4     agree that what they filed is a preliminary objection.  This

5     is a scheduling hearing.  When it comes time to file an

6     objection to the positions and say to the Court either they

7     file a statement, in which case they're part of the

8     litigation, they take a position, or they're out.  It's --

9     you've got to have people's positions stated in writing so

10    that we can go forward with the litigation and do the

11    allocations.

12          As to fees, it's another issue.  As to the plan, I

13    don't agree with his reading of the plan.  But that's

14    something we can deal with subsequently with AST directly.

15          MR. PEDONE:  Your Honor, just very briefly.  We're

16    happy to comply with the schedule and the range of schedules

17    that are being discussed.  They're all something that AST

18    can live with.  So we won't be participating in that

19    discussion.  Thank you.

20          THE COURT:  All right.  Well, yes, I will allow

21    American Stock Transfer as EFH indenture trustee to

22    participate as a party.  I think that the catchall in

23    paragraph is very broad.  There's certainly a party in

24    interest.  And I think fair enough a party as one would

25    typically think of a party.  Obviously they're -- have no

1    conflict issues in that, you know, they are squarely in the

2    EFH camp.  I am not touching fees.  Proceed at your own

3    risk.  We'll figure out who pays you at a later date.  But

4    just so we're clear, there's no reliance interest being

5    created here.  You're proceeding at your own risk.

6              MR. PEDONE:  I understand, Your Honor.  Thank you.

7              THE COURT:  Okay, you're welcome.  And you know,

8    Mr. Galardi raises a point.  If there are parties that are

9    allowed to participate who sort of sit back in the wings and

10   wait, and aren't really actively involved, that's fine.

11   But, you know, I don't want to all of a sudden there's a

12   resolution reached, or it's time to file an appeal and

13   somebody has just been sitting around not taking a position

14   suddenly is moving forward very quickly and trying to mess

15   things up.  So if you're going to participate, participate.

16             Is that it?  Anybody else want to participate?

17             MR. GALARDI:  Your Honor, I'll -- of course, I

18   have one more.  Fortunately, Your Honor, NextEra and we, I

19   believe, have an agreement and it may never come to --

20   regardless of scheduling orders and we'll deal with that

21   next.  NextEra was concerned because Your Honor has

22   established a 275 reserve.  We made it clear that in some

23   sense if it got reversed and there's not enough money, that

24   we'd leave 10 million.

25             We're going to put language in whatever order

Page 60

1    ultimately comes out, and I think Mr. Kieselstein would have

2    no objection, that whether it's the reserve or whether it's

3    the ultimate payment, the same treatment would be with

4    reserve.  It depends on when the Third Circuit rules and how

5    many appeals of that.

6              So there will always be a certain amount of money

7    left that they will always be covered, as long as there's

8    the reserve, for $275 million.  And the allocation issue

9    will be adjusted to reflect that $275 million issue, but

10   only one $275 million issue will be reserved for them until

11   Your Honor orders otherwise.

12             THE COURT:  Okay.  All right.

13             MR. GALARDI:  On the schedule, I don't know -- I

14   would suggest Your Honor really working backwards from when

15   Your Honor would be prepared to hear this thing.  I think

16   the parties, I'll leave it to Mr. Glenn, but I think Mr.

17   Kieselstein -- we think it should be as soon as possible.

18   We gave a July 31st date.  Mr. Kieselstein, I think, came

19   back with an early September date.  But it's really Mr.

20   Glenn who may have the issue of whether it should be longer

21   than that period.  And then it's obviously Your Honor's

22   calendar, if I recall, we messed up Your Honor's August, as

23   well as our own, last year.  We don't want to do that again.

24             MR. GLUECKSTEIN:  Your Honor, if I may for one

25   moment please, Your Honor?

1          THE COURT:  Yeah.

2          MR. GLUECKSTEIN:  Your Honor, Brian Glueckstein

3     from Sullivan & Cromwell.

4          I understand Your Honor's ruling with respect to

5     the committee and I understand it in terms of the scheduling

6     issues.  I do think because there's -- the very first one

7     was the order.  And presumably, we're not going to be heard

8     with respect to the order itself.  But understanding now

9     that the committee is sidelined from this, I think the

10    debtors propose it in their form of order.  We would submit,

11    Your Honor, there needs to be a date built in after today

12    for other creditors to come forward and seek to become a

13    participating party in this litigation in an individual

14    capacity.  Because to the extent there were individual

15    creditors who might have been relying on the committee or

16    somebody else, to have a retroactive deadline before today,

17    not knowing the lay of the land would be prejudicial.

18         So we would just ask whatever schedule is entered

19    now going forward, that there be some date after today where

20    other creditors can come forward and seek to become a

21    participating party in the litigation in their individual

22    capacity.  Thank you.

23         MR. GALARDI:  Your Honor, I'm sure you'll find it

24    surprising that we disagree with that.  We filed a motion

25    with an objection deadline.  We were asked to adjourn it.

1    We didn't.  We told parties to file their objections, at

2    least a preliminary objection.  So we don't see any basis to

3    extend the objection.

4              I don't know if the five committee members somehow

5    relied on them, if they want to file an objection.  I guess

6    I don't.  I think they can piggyback on that.  But other

7    than that, I don't see why a new deadline needs to be

8    established.

9              THE COURT:  I agree.  I don't think that's

10   necessary.  I guess if the committee members in their

11   individual capacities, Mr. Glueckstein wants to participate,

12   they can file a notice to that effect by next Monday.

13             MR. GLUECKSTEIN:  Thank you.

14             MR. KIESELSTEIN:  Your Honor, Marc Kieselstein

15   again for the --

16             THE COURT:  But again, that's in their individual

17   capacity.

18             MR. GLUECKSTEIN:  Understood.

19             MR. KIESELSTEIN:  Marc Kieselstein again for the

20   PAB, Your Honor --

21             THE COURT:  And I'm sorry, I'm interrupting again

22   because I'm doing this on the fly, I don't think unimpaired

23   creditors have standing.  So two of your members I don't

24   think are eligible.  Go ahead.

25             MR. KIESELSTEIN:  Marc Kieselstein again for the

1    PAB, Your Honor.

2          We had put in our proposed schedule, our redline

3    schedule, a June 7th, that's two days from now, notice of

4    intent because we thought it was not appropriate to have a

5    deadline that was actually operative before the schedule

6    actually got entered.  We don't think that's much of an

7    indulgence or much of an imposition to go to June 7th rather

8    than May 29th, particularly in light of -- this was not a

9    substantive hearing and it was pretty clear early on it

10   wasn't going to be a substantive hearing.

11         THE COURT:  All right, so I cut you off.  I

12   apologize.

13         No, I am going to agree with Mr. Galardi on this

14   one.  I think the parties that care about this issue are

15   here, have given an indication of their interest, and this

16   has been no secret and I don't think we need to open that

17   up.

18         MR. KIESELSTEIN:  Okay.

19         THE COURT:  So you want to talk about trial?  I --

20         MR. GALARDI:  Your Honor, you're a participant.

21   Well, again, we've said July.

22         THE COURT:  Yeah, I think that's unrealistic.

23         MR. GALARDI:  Okay.  That's fine.  Your Honor,

24   I --

25         THE COURT:  I mean, look, these issues have been

Page 64

1    percolating for literally years, but more recently for

2    leading up to the plan in February and well after that.  And

3    if it were that simple and that easy to pony it up for

4    litigation in five weeks, you would have settled.

5            MR. GALARDI:  Well, maybe it's all of those

6    conversations that prepares us for a trial in five weeks,

7    Your Honor.  I see it a little bit differently since there's

8    been a lot of work done by a lot of people on all of these

9    issues.

10            As you know, the ad hoc committee of EFH claimants

11    filed a settlement offer.  So they obviously had something

12    that was publicly disclosed.  Again, whether five weeks is

13    unreasonable, I don't think so.  But I understand Your

14    Honor's calendar.  The committee who we've just -- at least

15    we are aligned on one thing.  August 15th was a good day.

16    I'm not sure what your August is like, Your Honor.  I don't

17    want to get into September because of the holidays and that

18    is always a very difficult period of time.

19            And I think, you know, mid-August is 60 days, Your

20    Honor, 65 days.  So that is at least a reasonable time

21    period if we can't do it by July 31st.  But I'll let Mr.

22    Glenn comment on his needs.

23            MR. GLENN:  Thank you, Your Honor.  Andrew Glenn

24    for the record.

25            Your Honor, we would be prepared to have a trial

1    the first or second week of September.  I think that, you

2    know, we're now in early June already so no one sent out any

3    document requests, no depositions have been scheduled, and

4    then we're going to bleed into the heat of summer where

5    people have family vacation schedules and the like.

6         So I think, you know, we're talking about a

7    difference of around 30 days or so.  I don't think this is a

8    huge difference, but it's important to us because we have a

9    different view about what potentially needs to be done to

10   solve the allocation issue.  And all of the witnesses are

11   out of my control.

12        THE COURT:  So it was a little unclear to me from

13   the document.  I mean, how long -- I mean, I assume this

14   isn't a one day deal.

15        MR. KIESELSTEIN:  You know, Your Honor, it really

16   depends on how deep into the layers of history people really

17   are inclined to burrow.

18        THE COURT:  Right.  And we don't know until --

19        MR. KIESELSTEIN:  We don't know.  And the other

20   thing I would point out, Your Honor, while Mr. McKane is a

21   document-producing machine, and has the scars to prove it,

22   you know, with the PAB we're down to a one man band

23   basically, Mr. Horton.  And while we have a repository of

24   documents, we simply don't have, you know, the manpower at

25   the client to move as quickly as we've done previously when

1    we've tried to move heaven and earth.

2         We also have the issue of witnesses, who will be,

3    in essence, third party witnesses when they would have been

4    previously debtor witnesses.  And we're going to have to

5    deal with those issues.  Not that I'm expecting, you know,

6    problems or non-cooperation, but logistics, people's

7    priorities are going to be different when they don't work

8    for the debtor anymore.

9         So I think September is more reasonable, frankly.

10        THE COURT:  It's tough, though, because the Jewish

11   holidays are right smack dab in the middle of the week this

12   year.

13        MR. KIESELSTEIN:  I haven't managed to convert Mr.

14   McKane or Ms. Yenamandra.  I've been working on them, Judge,

15   but to no avail so far.

16        MR. GALARDI:  He's willing to give up her Jewish

17   holidays.

18        MR. KIESELSTEIN:  Exactly.

19        MR. GALARDI:  Your Honor, again, we have a

20   different view of the discovery.  We don't think it's as

21   detailed.  Your Honor has sat through the cases.  There's

22   plenty of documents.  My understanding is that the PAB's

23   repository of documents either has been or will be turned on

24   because everybody agreed to the cost.

25        One of their statements is that's all out there,

1    so no one has got to repeat it.  It's just going into the

2    due diligence room.  I think that --

3                THE COURT:  All right.

4                MR. GALARDI:  -- more than covers most of the

5    discovery.

6                THE COURT:  All right.  Four days, August 27th,

7    28th, 29th, and 30th.  That's Monday through Thursday before

8    Labor Day.  I'll give you the full day each day.  And as we

9    get closer -- is that going to be a problem, Mr. McKane?

10               MR. MCKANE:  No, Your Honor.

11               THE COURT:  Okay.  As we get closer, let's set a

12   -- some sort of trial, pretrial, maybe in early August and

13   I'll decide whether I need to -- whether we're going to do

14   it as a time trial or exactly who's going to be

15   participating.  We'll know by then, obviously, well before

16   then, whether the PAB is a party or not.  Is that all right?

17   Does that work with everyone's -- I'm sure that's prime

18   vacation schedule.  But the problem is if we bleed over into

19   September, I am out for a week for conferences.  We've got

20   two sets of Jewish holidays.  Labor Day thrown in there.  We

21   start to bleed into almost October and that just, to me,

22   seems excessive.

23               But if people have a problem with that week, speak

24   now or forever hold your peace.

25               MR. GLENN:  I had previously informed Mr. Galardi

Page 68

1    that I'm away on vacation that week.

2              THE COURT:  That week?

3              MR. GLENN:  I'll cancel the plans if that's what

4    we have to do, but --

5              THE COURT:  All right.  All right.  No, I don't

6    want to do that.  Well --

7              MR. GALARDI:  I was canceling mine.

8              THE COURT:  You never vacation.

9              MR. GALARDI:  No one wants me on vacation with

10   them, Your Honor.

11             THE COURT:  I've known you a long time.  There's

12   no vacation.

13        (Pause)

14             MR. GALARDI:  Your Honor, I don't think it's going

15   to take four days.  Two days is about as --

16             MR. GLENN:  Two to three max.

17             THE COURT:  Okay.  Then we'll do the next week.

18   All right.  We'll do September 5th, 6th, and 7th.  That's

19   Wednesday, Thursday, Friday after Labor Day, so --

20             MR. GLENN:  Thank you, Your Honor.

21             THE COURT:  -- people don't have to travel on

22   Labor Day.  How does that work?

23             MR. MCKANE:  Your Honor, it's Mark McKane.

24   Shockingly, we had proposed the 5th.  And it's in large part

25   the --

Page 69

1          THE COURT:  Well, I'm not just agreeing with you,

2    it's --

3          MR. MCKANE:  We understand that.

4          THE COURT:  -- independent judgment based on --

5          UNIDENTIFIED SPEAKER:  Yes, Your Honor.  He gets

6    up to take glory for that one.

7          THE COURT:  -- based on wisdom and years of

8    experience.

9          MR. MCKANE:  Yeah, after four years, sometimes you

10   just get lucky.  And we had proposed interim dates.  We can

11   always tweak those dates with the feedback of Mr. Galardi

12   and Mr. Glenn and their teams.  And we'll --

13         THE COURT:  Mr. Pedone.

14         MR. MCKANE:  And Mr. Pedone as well.  And what

15   we'll do is consistent with our practice.  We think we'll

16   get to an agreed two interim dates and submit that to you

17   probably at the end of the week.

18         THE COURT:  That's fine.  I'm here Friday, so

19   don't feel rushed to get it here before then.

20         MR. MCKANE:  Yeah.  That's fair.  Your Honor,

21   there are, as you know, in our schedule, we had had dates

22   about -- at the end of the schedule about would -- the PAB

23   would take a position.  As you know, we're seeking authority

24   at this point, not saying we definitely would.

25         THE COURT:  Yes.

1      MR. MCKANE:  But we'll put that in brackets, I

2  guess, you know, to see how this all plays out.  But we can

3  work -- given what you've said about notices of intent and

4  everything else, there is no actually immediate date that we

5  can't work around and at least bind ourselves through

6  agreement until the order is entered.

7      THE COURT:  Okay.  Work with Ms. Gadson to come --

8  or do you have a pretrial date built into your order?

9      MR. MCKANE:  You know, we --

10      MR. GALARDI:  Your Honor, I would ask that we just

11  simply work back now and take it separate and submit an

12  order.

13      THE COURT:  Yeah.  Call Ms. Gadson and get a day.

14      MR. MCKANE:  So we had -- I -- somewhere around --

15  you know, I just talked to counsel (indiscernible) about do

16  you want to do an interim date, an early date in August?  I

17  mean --

18      MR. GALARDI:  Do you want to do an August 27th

19  date?  Can somebody from your --

20      THE COURT:  No, Mr. Glenn is unavailable.

21      MR. GALARDI:  Well, but he just nodded yes, Your

22  Honor.

23      MR. GLENN:  Why don't we do this, we'll make that

24  date work for a conference, that's fine.

25      THE COURT:  For a conference.

1          MR. MCKANE:  Your Honor, can I make a suggestion.

2    We benefited in the past in advance of trials of having like

3    an initial pretrial conference while we had a better sense

4    of the shape of things and then one relatively close to the

5    hearing.

6          Obviously we're not suggesting that everyone come

7    in on Labor Day, but if we had a date in early August where

8    even if we just did it telephonically, we'd have a much

9    better sense of --

10          THE COURT:  Yeah, we can always do it by phone.

11          MR. GALARDI:  Your Honor, may I sort of just

12   interrupt and give him a little hip check here.  They're not

13   even yet a party, so I would really --

14          THE COURT:  But I just told him --

15          MR. GALARDI:  I don't know, but --

16          THE COURT:  I just -- Mr. Galardi, listen when I

17   speak.  I said he could fully participate in the scheduling

18   issues.

19          MR. GALARDI:  I understand, but we can -- okay,

20   that's fine, Your Honor, but controlling and setting these

21   dates, we're going to get to the protocol and everything

22   else.  So there are some other issues that we want to

23   address.

24          THE COURT:  All right.  Well, hopefully setting --

25   agreeing on pretrial conferences won't be that difficult.

1           MR. GALARDI:  That's correct, Your Honor.

2           THE COURT:  It certainly doesn't hurt to have

3    people on the phone to just check in.  So how about August

4    6th, it's a Monday?

5           MR. MCKANE:  That would be great, Your Honor.

6    Thank you.

7           THE COURT:  And then you're going to be in San

8    Francisco.  Do you want to do it in the afternoon?

9           MR. MCKANE:  That would be wonderful, Your Honor.

10          THE COURT:  So we'll set it for 2:00 p.m. and that

11   will be by phone.  So you can build that into your order.

12   And then for one closer to trial, we'll do the 27th again at

13   2:00 and then we'll decide -- that one might be on an in-

14   person, but we can figure that out as we get closer if

15   people really want to participate by phone from the beach or

16   something, that probably won't be a problem.  We'll assume

17   it's live at this point.

18          But -- and one of the things I'd like you to think

19   about, you know, I know you said three days, but if the last

20   12 and a half years have taught me anything, these things

21   can spin out of control.  So think about whether you want to

22   do a time trial.  It's worked well in these cases as we've

23   winnowed the number of participants, it's become less

24   necessary to have quite as much procedure.  But I'm using

25   them in a lot of my cases and I'm finding them very helpful.

1    So think about that going forward.

2              MR. MCKANE:  We will, Your Honor.  Thank you.

3              MR. GALARDI:  Thank you.  And then I guess we'll

4    just work on the rest of the order?

5         (Pause)

6              THE COURT:  I'll get you an answer.  I mean, I

7    shouldn't promise but if you get me that brief Monday, I'll

8    get you an answer by the end of next week.  Let me just make

9    sure I'm not foolishly agreeing to something that's not

10   doable.  Boy, that week looks bad.

11             Okay, just -- if you get it -- get me the brief by

12   the 11th, I'll get you an answer by the 18th --

13             MR. MCKANE:  Fantastic.  Thank you.

14             THE COURT:  -- about exactly what the PAB will be

15   doing going forward.

16             MR. MCKANE:  Your Honor, there's one --

17             THE COURT:  And if there are any change -- I'm not

18   saying you should, but if you change your mind about how you

19   want to proceed versus independent directors or whatever,

20   please let the Court know.

21             MR. MCKANE:  We will.  Your Honor, there's one

22   issue that regardless of our -- the PAB's involvement

23   impacts all of the parties involved.  And it relates to --

24   Elliott is -- there has been a protocol, a discovery

25   protocol in the case.  It is colloquial known at the

Page 74

1    Stephanie (ph) protocol, because Brian Stephanie more than

2    anybody else led the charge working with the U.S. Trustee

3    and others.  It's four years old.  It is applied in every

4    facet of litigation, whether it be an adversary proceeding

5    or otherwise.

6          And more than almost any other process in this

7    case, it's worked.  And so we have suggested, as probably

8    the primary target of most discovery on a go-forward basis,

9    that the protocol still apply.  It is what governed the

10   repository that we're turning back on and we think it should

11   apply here.  Elliott does not agree.

12         MR. GALARDI:  Your Honor, it's -- again, I want to

13   start where we started.  First of all, highly confidential

14   and confidential information is no longer applicable with a

15   liquidating debtor.  So we don't think the protocol should

16   be just whole cloth accepted.  We agree we can work with

17   them about documents being confidential or not confidential,

18   but it shouldn't be simply well it's worked for four years,

19   again with their former clients, and now they're protecting

20   it because the PAB may have succeeded.

21         I said, this is going to come down to privilege

22   issues.  It's going to come down to confidential issues.

23   It's going to come down to a series of challenges and I'm

24   not sure that the protocol --

25         THE COURT:  Don't you have -- I'm sorry to

1    interrupt.  Don't you have obligation -- wouldn't the plan

2    administration board have an obligation as the successor to

3    the debtors in possession to protect if confidential

4    information that may relate to the businesses that have been

5    reorganized on the T-side are sold on the E-side?

6              MR. GALARDI:  But that's -- even if that's true,

7    Your Honor, which I agree should seem sense, that's not with

8    respect to EFH and EFIH.  And (indiscernible) has their

9    materials.  So this goes to allocation issues.  It goes to

10   fee apps.  It goes to other information.

11             THE COURT:  All right.

12             MR. GALARDI:  Taxes.  So it's not the same issue.

13             MR. MCKANE:  Your Honor, the key word that you

14   just heard from Elliott's counsel is fee apps.  This is, you

15   know, and I'm not trying to (indiscernible), but this also

16   relates to an effort that had previously been made to get

17   access to certain materials that might be used for the fee

18   review committee and they're (indiscernible).  Who gets

19   access to that information and who does not, the protocols

20   and the protective order in terms of the double

21   classification, you know, has been applied to the entire

22   body of materials that we're about to turn back on to allow

23   Elliott and others to review.

24             And that two-tier review about whether certain

25   individuals can see it or whether it's outside counsel eyes'

1    only is one of our areas of concern.  And it could spill

2    over into fee apps.

3                MR. GALARDI:  Your Honor, first of all, I don't

4    represent Elliott on that, nor do I represent the other

5    objector.  But even leaving that aside, this goes to Board

6    minutes.  It goes to decisions made with respect -- and

7    look, it's out there, the tax allocation, what they did with

8    the tax Armageddon, those issues.  That is front and center

9    of how the fees were allocated.  It's front and center about

10   the break of fee issue and how everything is done.

11               There is information there and it can't be simply

12   that it's highly confidential or not confidential just

13   because it was four years ago and it was a business

14   decision.  Those decisions have all been made.  They have

15   consummated a plan.  There is no longer tax Armageddon.

16   Those documents don't have to be confidential.

17               THE COURT:  Well, I'm not, as you sit here, I

18   can't make that call just sitting here because I don't know.

19   I don't know --

20               MR. GALARDI:  But they want to make the call the

21   opposite way, Your Honor, and that's what I'm insisting.

22               THE COURT:  But even under their protocol, you

23   have the right to come in and ask for documents to be

24   changed.

25               MR. MCKANE:  That's correct, Your Honor.  And in

1   fact, that was one of the keys points that the United States

2   Trustee had baked into the process.  And to be fair, all

3   we're asking is as a presumptive matter that those prior

4   designations apply until someone raises to us is this still

5   confidential?

6           I don't want to get a 20 page document saying

7   agree -- everyone one of these documents is no longer

8   confidential.  But rather than saying we have to re-

9   designate or re-review stuff, you know to do

10  confidentiality --

11          THE COURT:  No, we're not spending that money.

12          MR. MCKANE:  -- it should have --

13          THE COURT:  No, we need to be reasonable about the

14  money, too, because --

15          MR. MCKANE:  Exactly.

16          THE COURT:  -- that work has already been -- I

17  think the "Stephanie protocol" should apply.

18          MR. MCKANE:  Thank you, Your Honor.

19          MR. GALARDI:  That's fine, Your Honor.

20          THE COURT:  Anything else for this subpart?  No?

21          MR. GALARDI:  No, I think we're almost done with

22  our subparts too.

23          MR. MCKANE:  I believe that this is the end of the

24  allocation subpart.

25          THE COURT:  Okay.  Mr. Hogan, how long do you

1    think your matter is going to take?  I know you've been

2    sitting very patiently even though you were number four on

3    the agenda.

4              MR. HOGAN:  Thank you, Your Honor.  Daniel Hogan

5    on behalf of the certain asbestos creditors.

6              Your Honor, I don't anticipate a very lengthy

7    presentation.  It's fairly straightforward.

8              THE COURT:  Okay.  And we do have several

9    objectors, though.  So --

10             MR. HOGAN:  I understand.

11             THE COURT:  Thankfully, I had a hearty breakfast,

12   so I'll leave you all to your hunger pangs.  So can we take,

13   say, five minutes and then we'll proceed?  All right?

14             MR. HOGAN:  Certainly, Your Honor.

15        (Recessed at 12:58 p.m.; reconvened at 1:09 p.m.)

16             THE CLERK:  All rise.

17             THE COURT:  Please be seated.  You may proceed.

18             MR. HOGAN:  Good afternoon, Your Honor.  Daniel

19   Hogan of Hogan McDaniel on behalf of the certain asbestos

20   creditors seeking reimbursement expenses, substantial

21   contribution application, Your Honor, I'm sure you're

22   familiar.  Your Honor, I'll be brief.

23             From our perspective this is an intellectually

24   consistent position that we're taking.  Obviously the Court

25   is aware we've appealed the confirmation order, and it's our

Page 79

1    -- from our perspective, to the extent that we're successful

2    in that endeavor it will be effectively a ruling to the

3    effect that we've substantially contributed to this case,

4    which is sort of a backing into it, I understand, and that's

5    not what I'm asking the Court to do, but nevertheless we

6    have to make this application.

7         I'm not going to handicap whether I expect you to

8    rule one way or another, that's your job, you know, that's

9    not my place to do, I'm here to create a record as I've done

10   repeatedly throughout this case on behalf of the asbestos

11   creditors.

12        The certain asbestos creditors seek reimbursement

13   for costs incurred in connection with their efforts to

14   protect the rights of asbestos victims who as of the

15   asbestos bar date had not yet suffered cognizable injuries

16   caused by prepetition exposure to the debtors' asbestos and

17   who did not timely file claims, but who have since suffered

18   or will suffer injuries in the future.

19        Our application is supported by the declarations

20   of Joseph Frank, Jona Koski (ph), Leslie Kellaher (ph), and

21   myself.  The statutory predicate, as I'm sure the Court is

22   aware, is 503(b)(3)(d) as well as (b)(4).

23        In terms of the background, Your Honor, the

24   certain asbestos creditors have made substantial

25   contributions in this case by taking on the role of a court-

1    appointed representative.

2              As the Court is well aware they have fought

3    tirelessly to shine a light on the nature and extent of the

4    asbestos liabilities held by the asbestos debtors, these

5    efforts were required repeatedly as the debtors toggled and

6    pivoted from one plan to another.

7              The services performed on behalf of the CAC were

8    for the benefit of unmanifested asbestos claimants who did

9    not timely file a proof of claim.

10              The CAC are entitled to reimbursement for their

11    expenses predicated on the Code of course and the expenses

12    incurred in making these contributions are actual,

13    necessary, and reasonable.

14              As the Court is aware Section 503(b) of the Code

15    provide that is when a creditor has made a substantial

16    contribution in the Chapter 11 case the court shall allow an

17    administrative expense claim for the creditor's actual and

18    necessary cost and expenses, including reasonable fees and

19    attorneys' fees.

20              The applicable test to determine whether a party

21    has made a substantial contribution within the meaning of

22    503(b)(d)(3) is whether the efforts of the applicants

23    resulted in an actual and demonstrable benefit to the

24    debtors' estates and to its creditors.

25              The Third Circuit has also recognized that most

1   activities of an interested party which contribute to an

2   estate of course also benefit the party to some degree, and

3   is thus instructed that the existence of self-interest

4   cannot in and of itself preclude reimbursement.

5            Here the actions taken by the CAC were designed to

6   benefit others who would foreseeably be interested in the

7   estate, namely absent unmanifested asbestos creditors who

8   did not file proofs of claims.

9            Ms. Fenicle (ph) and Mr. Fahey, who have been the

10  drivers force in their efforts to protect the interest of

11  these absent claimants, clearly have not acted in their own

12  self-interest.  The Court in fact recognized that fact as

13  recently as February of this year during the confirmation

14  hearing.

15           The CAC continues in those efforts as I mentioned

16  earlier, Your Honor, by pursuing an appeal of the

17  confirmation order insofar as it would discharge those

18  claims.  In doing so certain -- the CAC have worked to fill

19  the gap caused by the absence of a court-appointed estate

20  representative for unmanifested asbestos claims and it

21  played a leadership role that normally would have been

22  expected of an estate compensated professional.

23           From the outset of these cases, Your Honor, the

24  debtors have pursued their goal of discharging as many

25  unmanifested asbestos claims as possible.  Certain asbestos

1    creditors have shouldered the cost of opposing the debtors'

2    efforts.   Their actions were not designed primarily to serve

3    their own interest and thus would have been undertaken

4    absent an expectation of reimbursement from the estate.

5              If the certain asbestos creditors are successful

6    in their appeal from the confirmation order their efforts

7    will unquestionably be proven to result in an actual and

8    demonstrable benefit to the estate.

9              In their persistent efforts to secure confirmation

10   of a plan that is favorable to all creditors they have

11   played a role that should be played by an estate

12   representative and thus have made a substantial contribution

13   to this case.

14             In response to some of the arguments that you'll

15   hear from the PAB regarding their opposition to this motion

16   the debtors have worked tirelessly in this case to ensure

17   that highly solvent asbestos debtors could shed future

18   liabilities for unmanifested asbestos claims without

19   compensation for those asbestos victims, many of whom have

20   not yet suffered injury or are unaware that their rights are

21   being affected.

22             In the absence of an unconflicted estate

23   representative charged with protecting the interest of

24   unmanifested asbestos claimants certain asbestos creditors

25   have taken on that role.   Their actions were for the benefit

1   of others and transcend their own self-protection.

2        The PAB has argued that the legal fees and

3   expenses for which reimbursement is sought in this

4   application were paid by counsel for certain asbestos

5   creditors rather than by the creditors themselves.  They are

6   correct in that regard.  Mr. Kaison's (ph) firm, two other

7   firms, as are outlined in our declarations, Your Honor, paid

8   those fees.  That's not in dispute.  But the PAB is

9   incorrect however that the fees and expenses are not

10  allowable as administrative expenses because they were not

11  paid for by the creditors themselves.

12       Section 503(b) provides that a court shall allow

13  an administrative expense, reasonable compensation for

14  professional services rendered by an attorney or for an

15  accountant of an entity whose expenses is allowed under

16  503(b)(3)(d) and reimbursement for actual and necessary

17  expenses incurred by such attorney.  The plain language of

18  503(b)(4) does not require that the creditor themselves have

19  paid the attorneys' fees.

20       Your Honor, there are strong policy reasons for

21  why a creditor shouldn't have to pay the attorneys' fees in

22  order for the claim to be allowed.  The purpose of the

23  statute providing for the allowances of substantial

24  contribution is to encourage creditor participation.

25       Your Honor, I have two motions pending today.  I

1    have of course the reserve motion, and the reserve motion

2    goes hand in hand with the substantial contribution motion

3    in that to the extent that the Court grants a motion for

4    substantial contribution and there aren't any funds

5    available to satisfy the claim then the priority rules of

6    the Bankruptcy Code are not going to be satisfied.  And so

7    in making this application I've of course brought forth the

8    reserve motion and I rely on those papers in that regard.

9         I also move into evidence, if I could, Your Honor,

10   the four declarations which are attached to both the

11   application as well as to our reply.

12        THE COURT:  Any objection?

13        MR. THOMPSON:  Your Honor, if I can speak to

14   Mr. Hogan.

15        THE COURT:  Uh-huh.

16        MR. THOMPSON:  We -- Your Honor, no objection.

17   Yesterday we worked with Mr. Hogan understand he'll be

18   making a few modifications to the declarations before they

19   are admitted.

20        THE COURT:  Okay.  Can you identify yourself for

21   the record just so the transcript is clear?

22        MR. THOMPSON:  Apologies.  McClain Thompson from

23   Kirkland & Ellis on behalf of the PAB.

24        THE COURT:  Thank you, Mr. Thompson.

25        MR. HOGAN:  Your Honor, I'd like to just reserve a

1    little bit of time in the event that I hear some new

2    arguments or something that I haven't addressed from the

3    various objectors to my motions.

4              Thank you.

5              THE COURT:  All right.  So when are we going to

6    make the changes to the declarations?

7              MR. HOGAN:  Your Honor, I can submit modified

8    declarations or we can have a sidebar and make a

9    representation to the Court.  The changes to the

10   declarations are very discrete.  And so let me, if I could,

11   just have a moment --

12             THE COURT:  Yes, of course.

13             MR. HOGAN:  -- and we will create a record.

14             THE COURT:  Okay.  Just want to make sure the

15   record is clear.

16             MR. HOGAN:  Thank you.

17             MR. THOMPSON:  Mr. Hogan, we can walk through the

18   changes now if that's okay with Your Honor.

19             MR. HOGAN:  Sure.

20             THE COURT:  That's fine.

21             MR. THOMPSON:  Your Honor, these declarations are

22   at the back of the application.  We're not concerned with

23   Ms. Kellaher's declaration, that was attached to the reply,

24   the PAB has no objection to that as submitted.

25             Attached to the application were Mr. Hogan's

1   declaration, that's at Docket No. 12926-2, Mr. Frank's

2   declaration, that's at 12926-7, and Ms. Koski's declaration

3   at 12926-13.

4           The sentences that we have an agreement to strike

5   are identical in those declarations.  The first, Your Honor,

6   is at paragraph 3, the last sentence of paragraph 3.  And

7   for illustration purposes maybe we use Mr. Hogan's

8   declaration at 12926-2.  It's a statement that no separate

9   legal representative was appointed in these bankruptcy cases

10  to represent unmanifested asbestos claimants.  Understand we

11  have an agreement that Mr. Hogan is striking that sentence.

12          MR. HOGAN:  That's correct, Your Honor.

13          THE COURT:  Okay.

14          MR. THOMPSON:  Next, Your Honor, is the second

15  sentence of paragraph 4, the actions taken by Ms. Fenicle

16  and Mr. Fahey are those that ordinarily would have been

17  expected of an estate compensated representative, and I

18  think we've agreed to strike the sentence there as well.

19          MR. HOGAN:  No problem, Your Honor.  Again, these

20  are essentially legal arguments --

21          THE COURT:  Uh-huh.

22          MR. HOGAN:  -- which I've made, and so I have no

23  problem with striking the declaration.

24          The one point I would make with regard to

25  Mr. Frank's declaration is that in fact it was amended and

Page 87

1    there's a subsequent docket entry.  I don't have that number

2    in front of me, but I -- we amended Mr. Frank's declaration

3    to address certain inconsistencies in his math; however, it

4    didn't change with regard to the statements contained in the

5    declaration.

6                THE COURT:  Okay.

7                MR. HOGAN:  Thank you.

8                THE COURT:  That's fine.  Anything further,

9    Mr. Thompson?

10               MR. HOGAN:  Thank you, Your Honor.

11               MR. THOMPSON:  Yes.  And again, Your Honor, for

12   the record McClain Thompson from Kirkland & Ellis on behalf

13   of the PAB.

14               THE COURT:  Okay.  Anymore changes to the

15   declaration?

16               MR. THOMPSON:  Oh, apology.  No, Your Honor.

17               THE COURT:  No, no problem.  All right, they're

18   admitted as modified.

19         (Four Declarations were admitted)

20               MR. HOGAN:  Thank you.

21               THE COURT:  You may proceed.

22               MR. THOMPSON:  Your Honor, the PAB has two primary

23   objections to the application.  The first is there is no

24   qualifying occurrence by a creditor as required under

25   503(b)(3)(d).  The second is even if the application were

Page 88

1    properly asserted the applicants cannot satisfy the Lebron

2    (ph) standard.

3         If it's okay with Your Honor I would start with

4    that second issue, the Lebron standard.

5         As Your Honor knows the -- Lebron controls in this

6    circuit, it sets a high standard because a substantial

7    contribution claim elevates a creditor to administrative

8    expense status, increases that creditor's overall recovery,

9    and it does so by spreading that creditor's costs on the

10   backs of other creditors.

11        Mr. Hogan acknowledges Lebron, but the application

12   doesn't really deal with it.  Instead they make two

13   arguments.

14        The first is this, that we are a de facto

15   creditors' committee.  We think it's simply not true that

16   the applicants operated as a de facto committee in this

17   case.  There was a statutory committee in this case and this

18   Court has declined multiple efforts by the applicants to

19   represent others.

20        I would request that Your Honor take judicial

21   notice of Docket No. 25703313 and 3403, those are the U.S.

22   Trustee's notices of appointment of the E-side committee in

23   this case, they are appointed to represent the interest of

24   unsecured creditors of -- including EECI, including all of

25   the clients of the applicants here.

1          MR. HOGAN:  No objection.

2          THE COURT:  Judicial notice is taken.

3          MR. THOMPSON:  And as Your Honor knows the clients

4     of the law firm applicants, specifically Ms. Fenicle and

5     Mr. Fahey, are members of that estate compensated fiduciary.

6          THE COURT:  Uh-huh.

7          MR. THOMPSON:  Your Honor, the application spends

8     a lot of time criticizing Your Honor's 2015 ruling where you

9     declined to appoint an unmanifested -- a separate

10    unmanifested claims representative.  And I think it's

11    important to go back to what was actually argued in the

12    motion, and that's at Docket No. 5072 at paragraph 11,

13    "Today the unmanifested claimants have no one who can appear

14    before this Court and be heard on their behalf."

15         Your Honor rejected that argument and denied the

16    motion at Docket No. 5265.  That order was not appealed and

17    we don't think they can collaterally attack it now three

18    years later.

19         I would also highlight Your Honor's order denying

20    the motion to certify a class proof of claim which was

21    another effort by these law firms to act as a representative

22    of others.  That order is at Docket No. 7283.

23         So we believe the premise of the application

24    fails.  There was a statutory committee and this Court has

25    declined prior efforts by these law firms to represent

1    others.  Because the premise fails we don't think you need

2    -- Your Honor needs to reach the cases they cite, but we

3    would note that they go -- they need to go outside of the

4    Third Circuit, they go beyond Lebron.  We have distinguished

5    them in our briefs, and I think it's important at the end to

6    note that appellants do not cite, let alone they don't cite

7    any case law let along controlling case where members of an

8    estate compensated fiduciary, here Ms. Fenicle and Mr.

9    Fahey, could also recover their fees in their capacity as a

10   de facto committee.

11        Turning to the second argument they make, which is

12   let's just hit pause until the appeal is decided.  We don't

13   think that works either and for a couple reasons.

14        One, if the appeal is granted there's no way to

15   predict what the ultimate relief would be.  That relief

16   could be worse for asbestos creditors.  In that circumstance

17   they certainly could not satisfy Lebron.  But no matter the

18   outcome of the appeal they will not have increased the size

19   of a pie, they will not have generated value.  All they

20   might do is increase the number of constituents who may be

21   able to assert a claim against Sempra.

22        First we think that result is fundamentally at

23   odds with Your Honor's Section 363(m) finding, but in any

24   event it would not increase the size of the estate nor would

25   it technically increase the portion of the estate made

Page 91

1   available to creditors.

2           And just a level set, Your Honor, on the Lebron

3   analysis.  The first plan that the debtors proposed for

4   confirmation ahead of reinstatements construct.  The last

5   plan had a reinstatement construct as did every plan in

6   between.  Nothing has changed as a result of the applicants

7   participation in these cases.  Had the applicants been

8   successful we might be looking at a 524(g) trust and that

9   would be to the detriment of the 10,000 unmanifested

10  claimants who are being reinstated against a highly solvent

11  parent and it would be to the detriment of the 17,000

12  manifested claimants who are being reinstated against a

13  highly solvent parent.

14          And along the way in defending against the attacks

15  on the reinstatement construct the debtors expended

16  significant resources.  There were disclosure statement

17  objections, there was the class group of claim fight,

18  there's the motion to dismiss, there have been the appeals,

19  and ultimately the debtors' unsecured creditors have borne

20  those costs.  Those are the same unsecured creditors whose

21  recoveries have been compromised as this case goes on, and

22  we don't think they need to bear -- be burdened with another

23  $400 million.  And we think that's particularly the case

24  here where the application is asserted by law firms on

25  behalf of law firms.

1       Your Honor, the application is brought under

2   Section 503(b)(3)(d) and Section 503(b)(4).

3       Did I say 400 million, I meant four million.  I

4   apologize.

5       (Laughter)

6       MR. THOMPSON:  Same -- we have the same argument,

7   Your Honor.

8       (Laughter)

9       MR. THOMPSON:  Section 503(b)(3)(d) I just want to

10  go to the language real quick.  It says -- it provides for

11  administrative claims status for the actual necessary

12  expenses incurred by a creditor in making a substantial

13  contribution.  Then go to Section (b)(4) and it provides for

14  the reasonable compensation for professional services

15  rendered by an attorney of an entity whose expense is

16  allowed under going back to (3) and making -- and as

17  Mr. Hogan noted no creditor has incurred any expense here.

18  The law firms at issue are not creditors of these estates.

19      As Your Honor might remember they are among the PI

20  -- what was referred to as Your Honor's bar date opinion as

21  the PI law firms.  They sought standing at the beginning of

22  the case and were denied.

23      To be clear, the PAB is not arguing that a

24  contingency arrangement could never satisfy Section

25  503(b)(3)(d), but that's not the case.  As I said, we have

1    law firms seeking reimbursement on behalf of law firms, we

2    have not heard from other creditors who support the

3    application, we have not heard from Mr. Kazin (ph) or

4    Mr. Early (ph) or Mr. Gorey (ph), and nothing in the record

5    indicates that this is a creditor driven exercise or a

6    creditor authorized exercise, and we think that is

7    inconsistent with Section 503(b)(3)(d).

8              Unless the Court has any questions turn it over to

9    the other objectors.

10             THE COURT:  Thank you, Mr. Thompson.

11             MR. THOMPSON:  Thank you.

12             THE COURT:  Mr. Schepacarter.

13             MR. THOMPSON:  Your Honor, could I reserve a few

14   moments at the end?

15             THE COURT:  Yes, of course.

16             MR. THOMPSON:  Thank you.  I'm sorry, to address

17   the reserve.

18             THE COURT:  Yes.

19             MR. THOMPSON:  I didn't know if we wanted to take

20   that motion up separately or --

21             THE COURT:  No, let's -- we only get to a reserve

22   if I -- I think we only get to a reserve if I allow a claim,

23   so we'll deal with the claim first.

24             MR. THOMPSON:  Thank you, Your Honor.

25             THE COURT:  You're welcome.  Mr. Schepacarter,

Page 94

1    good afternoon.

2              MR. SCHEPACARTER:  Thank you, Your Honor.

3              THE COURT:  Good afternoon.

4              MR. SCHEPACARTER:  Good afternoon, Richard

5    Schepacarter for the United States Trustee.  I don't want to

6    repeat some of what Mr. Thompson has stated, but I probably

7    will, because like Mr. Hogan I want to create a record as

8    well.

9              The certain asbestos creditors, after failing in

10   their objections to the debtor's now-confirmed plans, seek

11   allowance of a present and a future administrative claim

12   totaling nearly $4 million for reimbursement and prospective

13   reimbursement of professional fees and expenses incurred --

14   and to be incurred in these cases.  The substantial

15   contribution that the applicants assert appears to be based

16   on a litany of unsuccessful motions and objections that they

17   filed in these cases, as well as the yet unresolved efforts

18   to overturn the Sempra plan order that's now on appeal.

19             But, however, simply put, the applicants have

20   failed to satisfy the substantial contribution standard set

21   forth by the Third Circuit and Section 503, literally the

22   language.

23             As we know, 503(b)(3)(D), which is sort of the key

24   provision here, provides for the award of administrative

25   expenses from the estate for the actual necessary expenses

1    incurred by the creditor in making a substantial

2    contribution in the case.  Section 503(b) provides for the

3    allowance of reasonable compensation for professional

4    services rendered by an attorney or an accountant of an

5    entity whose expense is allowable under 503(b)(3).

6            As numerous courts have observed, these provisions

7    are narrowly construed so that administrative expenses can

8    be held at a minimum.

9            Under Lebron in the Third Circuit, a creditor

10   makes a substantial contribution if and only if its efforts

11   provide an actual and demonstrable benefit to the estate and

12   to creditors.  Furthermore, to be compensable under Section

13   503(b)(3)(D), the creditor's activity must have benefited

14   the estate as a whole.  Activities which are designed

15   primarily to benefit or to serve the applicant's own

16   interest are not compensable, because they would have been

17   undertaken absent the expectation of reimbursement from the

18   estate.

19           Under Lebron, one of the key provisions is that

20   creditors are presumed to act in their own interest until

21   they satisfy the Court that their efforts have transcended

22   self-protection.  Section 503(b), "Applicants must prove by

23   a preponderance of the evidence that they made a substantial

24   contribution and extensive participation in the case is

25   simply not enough to justify a substantial contribution

1    award."

2            Here the applicants have failed to prove that the

3    purported services in this case were not incurred for their

4    separate benefit, as well as certain similarly situated

5    creditors, and they cannot point to any activities that they

6    undertook for the benefit of the estate as a whole.

7            Additionally, all of the motions, joinders and

8    objections filed by the applicants were unsuccessful.  As a

9    result, they cannot point to any material benefit to the

10   estate that resulted from their actions.

11           As the application makes clear, all of the actions

12   were designed to secure a greater share of the debtor's

13   estate for themselves and for the asbestos creditors

14   generally, a result that would have come at the expense of

15   the non-asbestos stakeholders.  Regardless of their merits,

16   these actions which would have benefited only a subset of

17   the debtor's creditors if successful are a textbook example

18   of the kind of self-interested services excluded from

19   compensation under 503.

20           Such with the case in the Sentinel Management

21   Group that we cited where the court held that an ad hoc

22   committee did not make a substantial contribution where the

23   committee's actions were incurred for the benefit of the

24   creditors it represented, but not the estate as a whole.

25           Nevertheless, the applicants urged the Court to

1    compel payment of their legal fees based on the alleged need

2    for an official representative to protect their rights in

3    these cases.  That argument ignores the fact that two

4    asbestos creditors who are applicants here served as members

5    of the official committee, which had its own estate-

6    compensated counsel.  Although the applicants would have

7    plainly preferred that this Court appoint a separate

8    asbestos-only committee or fiduciary to protect their

9    interests, this Court declined to do so in August of 2015.

10           Indeed, it is instructive that even after this

11   Court denied the motion for the appointment of a legal

12   representative, the applicants continued to litigate

13   extensively in the case, including the filing of a far-

14   reaching appeal of the Sempra confirmation order.  As Lebron

15   has cautioned, substantial contributions are generally only

16   awarded for actions that would not have been performed but

17   for the expectation of reimbursement from the estate.  The

18   fact that the applicants continue to file objections and to

19   appeal their losses even after their request for an official

20   legal representative was denied undercuts the argument that

21   their actions were taken with any expectation of

22   reimbursement.

23           Even if the applicants could overcome the hurdle

24   of showing that their actions were not self-interested, the

25   request for reimbursement of the fees is fatally flawed

Page 98

1   because they cannot point to a single instance in which they
2   positively affected the outcome of the cases.

3        Although the application and the record of these
4   cases reveal a long list of failed motions and objections by
5   the applicant, none appear to have achieved a successful
6   result for the applicants or the creditors whose interest
7   that they represent.  In particular, and as we set forth in
8   our papers, there is a number of unsuccessful motions: the
9   opposition to the bar date motion, the joinder in the motion
10  to appoint a legal representative, the class --
11  certification of a class proof of claim motion, the motion
12  to dismiss the Chapter 11 cases, and the number of appeals
13  that have been filed in this case.

14       The applicants also based their request on a
15  substantial contribution on their belief that they will
16  succeed in overturning the Sempra plan confirmation order.
17  This request is premature at best and especially as the
18  application offers no basis for the belief that such a
19  result is likely.

20       Apart from this, it is notable that all of the
21  applicants' alleged contributions related to failed
22  litigation efforts.  Not only did the applicants fail to
23  achieve a positive result for themselves, they caused the
24  estate and its professionals to incur added costs and delays
25  in responding to their objections, but apart from this, this

1   end result was exactly the same as if the applicants had

2   never filed their objections and motions at all.  This is

3   the antithesis of a substantial contribution in bankruptcy.

4         As I stated, the applicants have not overcome the

5   presumption that they acted in their own self interests.

6   The applicants are all members of the asbestos creditor

7   class and either have present claims with manifested

8   symptoms or claims due to prepetition exposure to asbestos

9   whose symptoms have yet to manifest.  Therefore, to make a

10   substantial contribution to the case, the applicants'

11   activities need to benefit the estate as a whole and parties

12   beyond those who are similarly situated in order to merit

13   reimbursement of reasonable professional fees and expenses.

14         Merely acting on one's behalf does not on its own

15   benefit the estate as a whole, but rather it is the

16   equivalent of an individual creditor seeking payment of its

17   own claim.

18         It should be recognized that the Sempra plan

19   covered at least 24 classes of claims, with the EFH estates

20   alone having 14 separate classes of claims.  The asbestos

21   claims are grouped within the EFH class A-3 claims, which

22   are the legacy general unsecured claims against the EFH

23   debtors.  These other claims asserted against certain of the

24   EFH debtors derive from or were based upon liabilities

25   relating to asbestos or certain qualified post-employment

1    benefits relating to discontinued operations of certain

2    subsidiaries of the EFH debtors.  The class A-3 claims were

3    deemed unimpaired under the plan because, except to the

4    extent that the holder of such claim agrees to a less

5    favorable treatment, each class A-3 claim holder shall

6    receive reinstatement of such claim on the effective date in

7    accordance with Section 1124 of the Bankruptcy Code.

8            The applicants' efforts were undertaken on behalf

9    of asbestos claimants both manifested and un-manifested, and

10   all of the applicant group members fall within this group.

11   However, in an attempt to fashion some sort of nuanced

12   distinction among the asbestos claimants, the applicants

13   attempt to draw a line between un-manifested claimants who

14   have filed proofs of claim and those who have not.  Simply

15   this is a distinction without a difference in that they are

16   all asbestos creditors and class A-3 members.

17           The applicants' argument that the Sentinel case is

18   inapposite because the applicants here only represent the

19   interests of the un-manifested asbestos claimants, but not

20   the un-manifested asbestos claimants who have not filed

21   proofs of claim, and that the Sentinel ad hoc committee

22   represented only its own interest during that bankruptcy

23   proceeding; however, this is precisely the situation we have

24   here.  The applicants here consisting of both manifested and

25   un-manifested asbestos claimants are acting for and on

Page 101

1    behalf of all asbestos claimants, be they manifested or un-

2    manifested and regardless if they filed proofs of claim or

3    not.  This is incongruous and akin to a committee stating

4    that its charge and constituency are the general unsecured

5    creditors, but not those general unsecured creditors who

6    have not yet filed proofs of claim.

7              Lastly, as the Sentinel court stated and not

8    unlike in this case, had the court found in that case that

9    the ad hoc committee's motion included efforts that provided

10   a substantial contribution in Sentinel, such case would have

11   been denied in the face of the expenses the ad hoc committee

12   caused the plan proponents to incur as they attempted to

13   confirm the amended plan in that case.  Simply put, while

14   the Sentinel ad hoc committee's counsel may have generally

15   benefited the ad hoc committee, they certainly did not --

16   and this is a quote -- "foster and enhance rather than

17   retard and interrupt the progress of the plan proponent's

18   efforts or the plan confirmation process."  That's Sentinel

19   at 499.

20             In closing, the applicants have simply not proven

21   that they meet the strictures of 503(b), nor have they

22   satisfied the requirements that the Third Circuit recognized

23   and espoused in Lebron.

24             Thank you, Your Honor.

25             THE COURT:  Thank you, Mr. Schepacarter.

1           Mr. Galardi?

2           MR. GALARDI:  Nothing to add, Your Honor.

3           THE COURT:  Okay.  Mr. Hogan?

4           MR. HOGAN:  I'll be brief, Your Honor.  Two

5    things, Your Honor, just so that the record is entirely

6    clear.  I draw the Court's attention, of course, to the

7    appointment of the E-side committee, including two asbestos

8    creditors, two of my clients, Shirley Fenicle and David

9    William Fahey, as members of the E-side committee.  However,

10   Your Honor, as you're well aware, no committee was appointed

11   to represent the interests of creditors with claims against

12   the other asbestos debtors, being EEC Holdings, Inc.; LSGT

13   Gas Company, LLC; and LSGT SacRock, Inc.  No separate estate

14   representative was appointed to represent un-manifested

15   asbestos claimants.

16          As to the other point, Your Honor, I would draw

17   your attention to the Western Asbestos case, that is 318

18   B.R. 527, that's out of the Northern District of California,

19   and it allows, Your Honor, that rather -- and states simply

20   that an attorney whose fees and expenses form the basis of

21   an administrative claim represents the creditor who makes a

22   substantial contribution and it contains no explicit

23   requirement for the incurrence of fees by the creditor, it

24   simply refers to the rendering of legal services.  Thus, if

25   the certain asbestos creditors establish that they made a

1    substantial contribution in these cases, 503(b)(4) mandates

2    that the Court allow an administrative expense reasonable

3    compensation for their attorneys' fees and expenses.

4            Thank you, Your Honor.

5            THE COURT:  You're welcome.

6            Mr. Thompson, anything further?

7            MR. THOMPSON:  Just briefly.

8            THE COURT:  Yes.

9            MR. THOMPSON:  Your Honor, on the point about the

10   other three asbestos debtors, only 92 claims were asserted

11   against those entities, those three entities, EEC Holdings,

12   LSGT Gas, LSGT SacRock.  Of those 92 claims, there was also

13   a duplicative claim against either EFH Corp. or EECI and

14   both of those constituencies are represented by the

15   committee.

16           On the Western Asbestos case, Your Honor, it's

17   never been cited in a court in this circuit.  It's certainly

18   been criticized, including by Judge Lynch in the Olsen

19   decision, 334 B.R. 104 at 107.

20           I think we admit that Section 503(b)(3)(D) and

21   (b)(4) is not a model of clarity in the Code, but what it

22   does say is that the creditor has to have an expenses and

23   the record is clear that no creditor here has incurred an

24   expenses.

25           Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Thompson.

2          All right, I'm going to deny the motion for a

3     number of reasons.  This of course has been a long journey

4     in this case in general and in connection with asbestos

5     creditors, asbestos victims, starting way back with the

6     formation of the committee in 2014, with the asbestos bar

7     date, with the motions to appoint a representative, the

8     motion to file a class proof of claim; the settlement that

9     was embodied in the plan in 2015, which has carried forward

10    in all subsequent plans, including the plan that was

11    ultimately confirmed and ultimately went effective in this

12    instance.

13         And Mr. Hogan on behalf of his clients has

14    vigorously and often against overwhelming numbers fought for

15    his clients, and they have been somewhat unsuccessful and

16    he's handled that with grace and professionalism, which I

17    truly appreciate.

18         You know, the issue here today is whether these

19    creditors on behalf, really acting on behalf of the un-

20    manifested asbestos claimants, as we've come to know them,

21    and of course these are people who had not yet manifested

22    injury at the time of the bar date and did not file a claim

23    at the time of the bar date, and whether the fees and

24    expenses that were fronted by the law firms to pay for those

25    services, but nonetheless, of course, the clients directed

1    the activities, whether those provided -- that money and

2    those efforts provided a substantial contribution to the

3    debtor's estate under 503(b).

4            I don't think that they did for a number of

5    reasons, but before we even get that, assume arguendo that

6    there was some sort of substantial contribution, I think

7    that the case law fairly requires the creditor to have born

8    the expense.  And the payment law firm on behalf of an

9    entity who has a substantial contribution plan I don't think

10   saves the day, I think the case law finding that the

11   creditor had to actually incur the expense is the right case

12   law and is the case law I support.

13           So, out of the gate, I find that because of the

14   way the expenses were paid forgoes the ability to award a

15   503(b) claim.  Nonetheless, dealing with the merits, if

16   you're going to act as a de facto representative or a de

17   facto official committee or unofficial committee on behalf

18   of certain creditors, you do so at your own risk, but you

19   also have to nonetheless meet the Lebron standard, and that

20   committee -- just being a committee or being a

21   representative isn't enough.  That committee or

22   representative capacity has to result in some positive

23   actions that benefit all creditors and the estates as a

24   whole, and that just isn't the case here.

25           With all due respect to the clients and to their

1    attorneys, they have fought really against the debtors'

2    ability to reorganize for several years.  Their actions --

3    well, at least on behalf of the manifested claimants and the

4    un-manifested claimants that filed claims, everything that

5    needed to be done was done in December 2015 and has stayed

6    steady since then, and continuing to oppose plans that left

7    certain creditors unimpaired with solvent parties

8    responsible for payment I think has been counterproductive.

9         I certainly get it, I mean, I understand the

10   motivation.  I understand the desire to protect those who

11   did not file claims who have yet not manifested injuries,

12   but that action on behalf of those creditors didn't result

13   in any changes to the plan or to the case that benefited

14   those creditors, they remain un-benefited.  And while it's

15   possible that the separate plan confirmation order will be

16   overturned on appeal, I find that frankly unlikely and, even

17   if it does occur, I have no idea what the effect of that

18   would be with regard to the claimants, but if it was undone

19   in a way that opened up the ability for all asbestos

20   claimants to pursue claims against Sempra, I'm not sure how

21   Sempra would reply to that, but if it were not to pay all of

22   those claims, again, it would be contrary to the interests

23   of asbestos claimants in general.

24        There simply hasn't been a material benefit to the

25   estate as a whole or really to the majority of asbestos

Page 107

1   creditors by these activities and Lebron sets a high

2   standard that has to be met, and I don't think under the

3   facts as they've developed over the last four years and as

4   presented here today, I just don't think the standard has

5   been met.

6          So I'm going to deny the motion and I think also

7   deny the reserve motion as moot.

8          MR. HOGAN:  Thank you, Your Honor.  I appreciate

9   your ruling and understand in its entirety.  I would ask,

10  Your Honor, for some indulgence with regard to certifying

11  your decision with regard to the reserve motion --

12         THE COURT:  Yes.

13         MR. HOGAN:  -- so that we can take that up on

14  appeal.

15         THE COURT:  Yes.  I'll enter an order -- what do

16  you mean by certifying my decision?  Certifying it for

17  direct appeal?

18         MR. HOGAN:  Yes, sir.

19         THE COURT:  Where is the current confirmation

20  objection?

21         MR. HOGAN:  The current confirmation objection is

22  being briefed, Your Honor.

23         THE COURT:  At the District Court or --

24         MR. HOGAN:  That's correct.

25         THE COURT:  So why shouldn't this go where the

1    District Court is and kind of keep it all together?

2         MR. HOGAN:  Well, ideally that would be probably

3    in the best -- in everyone's best interest, Your Honor, so

4    that at some point they would likely be consolidated.

5         THE COURT:  Right.  Any objection to certifying it

6    to the -- I'd have to think about it, but -- catch you on

7    the fly there, Mr. McKane.

8         MR. MCKANE:  Yeah, Your Honor, shockingly, I'm

9    actually up to speed on direct certification issues these

10   days for another case.  I don't understand how -- why we

11   would take this directly to the Third if the underlying

12   matter, the actual confirmation order and the asbestos

13   issues are being currently briefed in front of the district

14   court.

15        THE COURT:  Yeah, I agree, yeah.

16        MR. MCKANE:  I don't see -- to be fair, I mean,

17   here we go, I don't think you can satisfy 158(d)(2)(A), 1,

18   2, 3 are in the hole, because it's not as if there's a --

19   they haven't said that there's no case law in the Third,

20   they haven't said there's conflicting decisions, and I don't

21   understand how it would advance the proceedings.

22        So I think it should go to the district court, not

23   the Third Circuit.

24        THE COURT:  Okay, fair enough.  Yeah, I'm not

25   going to certify it.  You of course don't need my

1    permission, you can ask them directly.

2              MR. HOGAN:  Of course.  Thank you.

3              THE COURT:  And feel free to do that.

4              MR. HOGAN:  Thank you.

5              THE COURT:  They know my name.

6         (Laughter)

7              THE COURT:  The Court will enter orders denying

8    the first motion for the reasons set forth on the record and

9    the second issue is moot.

10             MR. THOMPSON:  Your Honor, we have orders

11   prepared, if it would help for the Court.

12             THE COURT:  Please approach.

13        (Pause)

14             MR. THOMPSON:  Your Honor, what I've handed up is

15   the order -- McClain Thompson, for the record, from Kirkland

16   & Ellis -- what I've handed up is an order denying the

17   motion for the reserve as moot, which I think is consistent

18   with what Your Honor requested.  I have shared a proposed

19   form of order with Mr. Hogan.

20             MR. HOGAN:  No objection to that, Your Honor.

21             THE COURT:  You saved me the trouble, thank you.

22             MR. THOMPSON:  Your Honor, I also have a proposed

23   form of order for the substantial contribution application,

24   if that would be helpful for the Court as well.

25             THE COURT:  Please approach.

Page 110

1        (Pause)

2            MR. HOGAN:  No objection to that form of order,

3    Your Honor.

4            MR. THOMPSON:  And we request that Your Honor,

5    consistent with its rulings, enter those proposed forms of

6    order.

7            THE COURT:  Yes, I have signed both.  Thank you

8    very much.  It's good advocacy.  I often tell my law clerks

9    to always have an order, even one denying your opponent's

10   motion here, so well done.

11           MR. THOMPSON:  Thank you.

12           THE COURT:  And an excellent argument by all

13   parties.  Thank you.

14           Anything further for today?

15           MR. GALARDI:  That's it, Your Honor.

16           MR. HOGAN:  Nothing further, Your Honor.

17           THE COURT:  All right, we're adjourned.

18       (A chorus of thank you)

19       (Whereupon these proceedings were concluded at 1:54 PM)

20

21

22

23

24

25

["

C E R T I F I C A T I O N

We, Dawn South, Jamie Gallagher, and Tracey Williams,
certify that the foregoing transcript is a true and accurate
record of the proceedings.

_____

Dawn South

Certified Electronic Transcriber

_____

Jamie Gallagher

Certified Electronic Transcriber

_____

Tracey Williams

AAERT Certified Electronic Transcriber CET**152

Date:  June 6, 2018

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501