**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 13102** |

**LIMITED PRELIMINARY STATEMENT OF KIRKLAND & ELLIS**
**LLP AS DEBTORS' COUNSEL IN RESPONSE TO THE JOINT MOTION**
**OF UMB BANK, N.A., AS INDENTURE TRUSTEE, AND ELLIOTT TO FIX**
**APPROPRIATE ALLOCATION OF CERTAIN RESERVES AND EXPENSES AS**
**BETWEEN THE EFH AND EFIH DEBTORS**

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on a final basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

Pursuant to footnote 4 of the *Order Scheduling Certain Dates and Deadlines and Establishing Certain Protocols in Connection with the Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13193] (the "Allocation Scheduling Order"), Kirkland & Ellis LLP ("Kirkland") files this limited preliminary statement (this "Preliminary Statement") regarding certain of the assertions set forth in the *Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13102] (the "Allocation Motion") filed on May 13, 2018 by UMB Bank, N.A. ("UMB"), and Elliott Management Corporation (together with its affiliates, "Elliott" and collectively, with UMB, the "Elliott Creditors"):[2]

## **Preliminary Position**

1.    The Allocation Motion's allegations regarding Kirkland's allocation of its Professional Fee Claims are fundamentally flawed.  Not only does the Allocation Motion misstate the methodology set forth under the Interim Compensation Order regarding the allocation of Collective Benefit Fees, the Allocation Motion also makes a number of factual allegations regarding the proper allocation of Claims, which allegations conflict with the record established in these chapter 11 cases.

---

[2] Capitalized terms used, but not otherwise defined, herein shall have the same meanings ascribed to them in the *First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 12653] (the "Plan").

The inclusion or exclusion of any argument in this Preliminary Statement shall not be used to prejudice Kirkland in relation to any proceeding before the Court, or in any other legal proceeding. Kirkland hereby reserves all rights with respect to the adjudication of the Allocation Motion.

I.      **The Allocation Motion Reflects an Elementary Misunderstanding of the Interim Compensation Order.[3]**

2.      The Allocation Motion's allegations regarding Kirkland's allocation of fees and expenses for services that benefitted each of EFH, EFIH, and TCEH (the "Collective Benefit Fees") reflect a fundamental misunderstanding of the methodology set forth in the Interim Compensation Order.   Specifically, the Allocation Motion states that Kirkland "made no determination" as to the allocation of "approximately $81.3 million [in] Collective Benefit Fees." Allocation Motion, ¶ 69.[4]   As set forth below, the methodology approved pursuant to the Interim Compensation Order does not permit "unallocated" fees—indeed, ***every dollar of fees and expenses Kirkland has recorded and for which it has requested payment has been allocated***, as reflected in the nearly 70 docket entries reflecting Kirkland Monthly Fee Statements and Interim Fee Applications.

3.      Throughout the Fee Period, Kirkland generally allocated the fees and expenses sought in connection with this Final Fee Application "to the applicable Debtors for whose direct

---

[3] For the avoidance of doubt, there are practical limitations to the relief that can be provided in connection with a resolution of the EFH/EFIH Allocation Dispute.   In particular, over the course of a chapter 11 case that spanned nearly four years, hundreds of millions of dollars in professional fees and expenses to retained professionals have been paid by each estate in accordance with the Interim Compensation Order, the Fee Committee Order, and the allocations set forth in the publicly available monthly fee statements and interim fee applications.   At no point has any party-in-interest objected to the allocations set forth in any professional's monthly fee statement or interim fee application (hundreds of which are publicly available on the docket).   It is inappropriate to stay silent in the face of such publicly available information (and the obvious implication that retained professionals were being paid in the ordinary course of business consistent with the Interim Compensation Order).   Moreover, there is simply not enough Cash available in either the EFH Unsecured Creditor Recovery Pool (*i.e.*, the pool of Cash available to satisfy Holders of Allowed EFH Unsecured Claims) or the EFIH Unsecured Creditor Recovery Pool (*i.e.*, the pool of Cash available to satisfy Holders of Allowed EFIH Unsecured Claims) to permit a massive reallocation of such already-paid professional fees and expenses.

[4] The Elliott Creditors do not cite a source for this figure.

3

benefit such fees and expenses were incurred"[5] (the "Direct Benefit Fees"), in accordance with

the Interim Compensation Order.  For example, services performed in connection with the EFIH

DIP Facility were billed as Direct Benefit Fees solely to EFIH.    Alternatively, services

performed in connection with negotiations with the TCEH Committee were billed as Direct

Benefit Fees solely to TCEH.  In each case, Kirkland timekeepers billed their time to EFIH-only,

or TCEH-only specific client matter numbers (*i.e.*, time was tracked to each particular estate, as

reflected in the invoices publicly filed with each of Kirkland's Interim Fee Applications).

4.    Moreover, and as required by the Interim Compensation Order, in situations

where Kirkland believed fees and expenses were incurred for the collective benefit of the EFH,

EFIH, and TCEH Debtors, Kirkland generally allocated such fees and expenses "to each Debtor

in the same proportion that the amount of Direct Benefit Fees incurred by [Kirkland] for such

Debtor bears to the total amount of Direct Benefit Fees incurred by [Kirkland] for all of the

Debtors"[6] (the "Collective Benefit Fees").[7]    In each case, Kirkland timekeepers billed their time

to client matter numbers that had the prefix [ALL], and the fees incurred for the aggregate [ALL]

---

[5] *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [D.I. 2066] (the "Interim Compensation Order").

[6] *Id.*

[7] Interim Compensation Order, ¶ 2(b) ("Each Professional shall allocate (the "Fee and Expense Allocation") any fees and expenses sought in connection with each Monthly Fee Statement to the applicable Debtors for whose direct benefit such fees and expenses were incurred (the "Direct Benefit Fees").  To the extent a Professional incurs fees or expenses for the collective benefit of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC and Texas Competitive Electric Holdings Company LLC (the "Collective Benefit Fees"), **such fees and expenses shall be allocated to each Debtor in the same proportion that the amount of Direct Benefit Fees incurred by such Professional for such Debtor bears to the total amount of Direct Benefit Fees incurred by such Professional for all of the Debtors** (the "Collective Fee Allocation") (emphasis added).

RLF1 19592628v.1

client matter numbers represented the total Collective Benefit Fees.[8]  In doing so, Kirkland was already adhering to the methodology included in the Interim Compensation Order (which methodology was heavily negotiated with various creditor constituencies prior to entry of the Interim Compensation Order).

5.      Following the TCEH Effective Date, in the event Kirkland timekeepers performed services that benefitted the EFH Debtors, the EFIH Debtors, and the Reorganized TCEH Debtors, Kirkland timekeepers billed such time to client matter numbers that had the prefix [ALL E-SIDE] and [Reorganized TCEH], as applicable (as reflected in the invoices Kirkland publicly filed with its Interim Fee Applications file after the TCEH Effective Date).  This adjustment was contemplated by the Interim Compensation Order, which requires Collective Benefit Fees to be "allocated to each ***Debtor*** in the same proportion that the amount of Direct Benefit Fees incurred by such Professional ***for such Debtor*** bears to the total amount of Direct Benefit Fees incurred by such Professional for all of the ***Debtors***."  Interim Compensation Order, ¶ 2(b) (emphasis added).  In other words, the Collective Benefit Fees can only be allocated among Debtors, so following the TCEH Effective Date, all work performed for the benefit of Reorganized TCEH was separately tracked.

---

[8]  By way of illustrative example, assume in a particular Monthly Fee Statement for services performed prior to the TCEH Effective Date, Kirkland timekeepers billed (a) $100 in fees to EFH-only, for services that directly benefitted EFH; (b) $200 in fees to EFIH-only, for services that directly benefitted EFIH; (c) $500 in fees to TCEH-only, for services that directly benefitted TCEH; and (d) $12,000 in fees for services that collectively benefitted each of EFH, EFIH, and TCEH.  *First*, in such Monthly Fee Statement, Kirkland would request compensation of $10,240—*i.e.*, 80% of all fees billed in such month.  *Second*, with respect to the Direct Benefit Fees, Kirkland would request EFH to pay $80 (*i.e.*, 80% of $100), EFIH to pay $160 (*i.e.*, 80% of $200), and TCEH to pay $400 (*i.e.*, 80% of $500), for a total of $640 in Direct Benefit Fees.  *Third*, with respect to the Collective Benefit Fees, Kirkland would request (a) EFH to pay 12.5% (*i.e.*, $80/$640), or $1,200; (b) EFIH to pay 25% (*i.e.*, $160/$640), or $3,000; and (c) TCEH to pay 62.5% (*i.e.*, $400/$640), or $7,500.  As a result, the allocation of fees and expenses to EFH, EFIH, and TCEH changed each month depending on whether there was comparatively more services performed for the benefit of a single estate as opposed to all of the Debtors' estates.

6.       In addition, TCEH is differently situated than EFH and EFIH.  Among other key differences, TCEH had unique tax considerations, over 5,000 employees, and was the sole operating arm of the Debtors' three "silos."   As a result, as compared to EFH and EFIH, Kirkland performed comparably more services that were for the direct benefit of TCEH as compared to services that were for the direct benefit of EFH and EFIH—both essentially holding companies.  With the occurrence of the TCEH Effective Date, the diversity of issues as between EFH and EFIH narrowed (particularly with the occurrence of the EFH/EFIH Committee Settlement).

7.       The primary focus on the "E-side" was the sale of *EFH Corp.'s* indirect economic interest in Oncor, the proceeds of which would be used to satisfy, primarily, *EFIH* creditors, and the consummation of which would terminate professional fee burn at both EFH and EFIH.  As a result, the vast majority of services Kirkland performed for the EFH/EFIH Debtors following the TCEH Effective Date were for the collective benefit of both EFH and EFIH.  With limited Direct Benefit Fees, the methodology set forth above did not work as applied.  By way of illustrative example, assume in a particular Monthly Fee Statement for services performed after the TCEH Effective Date, Kirkland timekeepers billed (a) $0 in fees to EFH-only, for services that directly benefitted EFH; (b) $100 in fees to EFIH-only, for services that directly benefitted EFIH; and (c) $12,000 in fees for services that collectively benefitted each of EFH and EFIH.  Using the methodology set forth above, the requested fees and expenses would be allocated as follows: (a) EFH would pay $0 in EFH Direct Benefit Fees; (b) EFIH would pay $80 in EFIH Direct Benefit Fees (*i.e.*, 80% of $100), for a total of $80 in Direct Benefit Fees; (c) EFH would pay $0 in Collective Benefit Fees; and (d) EFIH would pay 100% (*i.e.*, $80/$80) of Collective Benefit

RLF1 19592628v.1

Fees.  In this illustrative example, EFIH is paying a disproportionate share of Collective Benefit

Fees incurred for the benefit of both EFH and EFIH.

8.       As a result, Kirkland allocated the Collective Benefit Fees for services performed

for the EFH/EFIH Debtors following the TCEH Effective Date by the relative debt at EFH and

EFIH (with EFH and EFIH paying 100% of any respective Direct Benefit Fees), to mirror the

relative creditor constituencies that were benefitting from each estate's efforts to maximize value

for its respective estate.  In particular, before accounting for that certain EFIH second lien

paydown in mid-2015, EFIH had approximately $12.36 billion in debt as compared to

approximately $1.42 billion in debt at EFH—in other words, EFIH carried approximately 90% of

the debt load across the EFH/EFIH Debtors.  Consequently, following the TCEH Effective Date,

Kirkland allocated any Collective Benefit Fees 10% to EFH and 90% to EFIH.

9.       Importantly, as a result of this methodology, ***the allocation of Collective Benefit***

***Fees in a particular month is formulaic.***  In other words, the allocation methodology

automatically forces the allocation of Collective Benefit Fees, rendering the Elliott Creditors'

allegations on "unallocated" Collective Benefit Fees facially meritless.

10.      Forced to confront this fact, and as set forth below, the Elliott Creditors spend

several pages in the Allocation Motion identifying alleged defaults in Kirkland's allocation of its

Direct Benefit Fees.

**II.     The Allocation Motion Overly Simplifies and Misstates Various Facts**
**        Underpinning Kirkland's Allocation of Direct Benefit Fees.**

11.      In particular, the Elliott Creditors point to EFH as the primary if not sole

beneficiary for a variety of services that in reality provided overarching benefits to all Debtors.

The Allocation Motion ignores the shared problems, shared concerns, and shared risks that stood

between both EFH and EFIH and emergence from chapter 11, the navigation of which ultimately

7

resulted in the occurrence of the EFH Effective Date this past March, and the benefits of which the Elliott Creditors reaped.

A.    **Kirkland and Other Professionals Navigated EFIH Through Various Extremely Complex Hurdles to Maximize EFIH Creditor Recoveries**.

12.    The Elliott Creditors argue that the majority of Direct Benefit Fees allocated to EFIH were incurred at a point in these chapter 11 cases where EFIH was solvent, and thus EFH inured all benefit for such efforts.  This argument ignores the obvious (and direct) benefits to EFIH from Kirkland's efforts in unlocking and monetizing value and in consummating the Plan. In suggesting that EFIH's solvency was at all times assured, the Elliott Creditors ignore the various potential obstacles that emerged throughout these chapter 11 cases, each of which put EFIH's ability to satisfy EFIH unsecured claims in jeopardy, and some of which are described below.  Critically, with the question of EFIH's solvency perpetually fluctuating, EFIH owed a fiduciary duty to its creditors—a fiduciary duty that required it and its advisors to dedicate time and resources in pursuit of a value maximizing transaction for EFIH.

13.    ***First***, Kirkland paved the way for the initial negotiations and framework on a comprehensive value-maximizing restructuring transaction for the EFH/EFIH Debtors.  In parallel with the efforts of the Disinterested Directors and Managers, the Debtors' co-CROs, advised by Kirkland, led the development of a plan term sheet that was based on proposals and feedback received from the Debtors' creditors.  The plan term sheet reflected a global restructuring transaction that contemplated, among other things, (a) a standalone equitization, a merger, or an equity investment in the EFH/EFIH Debtors, together with a tax-free spinoff of TCEH; (b) a proposal for allocating purchase price consideration offered in connection with an EFH/EFIH transaction; (c) a comprehensive schedule to litigate and resolve all open material issues; and (d) incorporation of the eventual Disinterested Director Settlement.  The plan term

sheet served as the basis for the initial plan of reorganization the Debtors filed on April 14, 2015 [D.I. 4142], which ultimately yielded the Hunt Merger transaction less than four months later (as described below).

14.     This was no small achievement.  As set forth in the Disclosure Statement, prior to circulation of the plan term sheet and initial plan filing, restructuring negotiations had stalled as each key creditor constituency retreated to its own parochial corner.  The unsecured creditors at EFIH suffered the most from ongoing delay (as a result of the interest accrual on the EFIH Second Lien Notes and EFIH First Lien DIP Facility)—and, conversely, benefitted the most from Kirkland's efforts to drive the process forward.  In addition, while the Disinterested Director Settlement was the product of an intensive process among the disinterested directors, Kirkland led the efforts to ensure the Disinterested Director Settlement would survive termination of the Hunt plan—what was colloquially referred to as one-half of "disarmament and drag."  In the absence of this result, the Disinterested Director Settlement may have disintegrated by its own terms following termination of the Hunt Merger (as defined below), and again following termination of the NEE plan.  In each case, the Disinterested Directors and Managers would have had to obtain approval of a new settlement and re-litigate with key creditor constituencies.  Such protracted litigation would have depleted value across all of the estates, to the direct detriment of the EFIH unsecured creditors.

15.     Having kick-started widespread creditor negotiations on a global reorganization, Kirkland led efforts to consummate a value-maximizing plan of reorganization that would allow the EFH/EFIH Debtors to emerge from bankruptcy, combatting regulatory and market forces that depressed purchase price considerations.  Initially, Kirkland negotiated and documented a merger with Hunt Consolidated, Inc. and certain of its co-investors (the "Hunt Merger") that

contemplated total enterprise value of approximately $12.5 billion.  *See Debtors' Memorandum of Law In Support of Confirmation of Joint Plan of Reorganization* [D.I. 6647].  On March 24, 2016, the Public Utility Commission of Texas (the "PUCT") entered an order regarding the change of control application required to consummate the Hunt Merger, but did not include all of the required PUCT approvals.  Due to the inadequacy of this order, the Hunt Merger was terminated.

16.     Only after contacting eighteen potential strategic and financial bidders, signing nondisclosure agreements with eight potential bidders, and engaging in extensive negotiations with three bidders, were the Debtors able to come to terms on an alternative merger agreement with a new merger party: NextEra, Inc. ("NextEra").  Due in part to a recognition of the regulatory complexities associated with consummating a plan of reorganization, the total enterprise value of the NextEra transaction represented a decrease in distributable value of over $2 billion as compared to the Hunt Merger.  Following the failed attempt to consummate a plan of reorganization with NextEra (the "NEE Plan")—marked by the PUCT's April 13, 2017 entry of an order determining that the transactions contemplated under the NEE Plan were not in the "public interest"—the EFH/EFIH Debtors went back to the drawing board.[9]

17.     At all times, the potential recoveries to *all* creditors were clearly in peril.  EFIH's financing facility was set to mature on June 30, 2017 and contained a liquidity maintenance covenant of $150 million.  If EFIH cash fell below this threshold, the lenders could have immediately declared an event of default, potentially putting EFIH on a path to liquidation.  If

---

[9] *Notice of Order Entered by the Public Utility Commission of Texas in the Administrative Proceeding Related to the Change of Control Application of Oncor Electric Delivery Company, LLC et al.* [D.I. 11152].

EFIH were forced to convert to a chapter 7, it is difficult to predict the actions a chapter 7 trustee could have taken (not to mention the expensive and distracting effects of such actions).

18.     Additionally, the risk existed following the PUCT Order—which clarified the burdensome conditions that would be required for regulatory approval of any plan—that the Debtors would not be able to find a purchaser for EFH's economic interest in Oncor, or one at a price that would provide 100% recoveries to all EFIH creditors.  If such a scenario manifested, the Debtors would have pursued an equitization whereby EFIH creditors would convert their claims into Reorganized EFH equity.  Such a plan would not have been possible under the EFIH DIP Facility without the consent of the lenders thereto, and therefore, a path to exit from chapter 11 would have been unclear.  At minimum, it was clear that any potential purchaser would seek to purchase Oncor at a substantial discount.

19.     Eventually, the Debtors were able to achieve additional post-petition financing and eventually consummated a merger agreement with Sempra Energy that provided distributable value of $9.45 billion.  Although the Elliott Creditors were not party to these cases during the vast majority of these events, the Claims their predecessors held benefitted from these efforts.  The history above is instructive in highlighting the constant risk of depleted EFIH recovery that was present throughout these chapter 11 cases.  This risk was mitigated, and ultimately resolved, through the efforts of Kirkland and other Professionals.

**B.     All of the Estates Benefitted from Kirkland's Efforts to Consummate a Tax-Free Transaction**.

20.     ***Second***, Kirkland's allocation of tax-related work to EFIH was fair given the size of the EFIH estate and the significant benefit EFIH incurred from Kirkland's tax-related work. Much of Kirkland's tax-related work was to avoid a taxable separation of TCEH and EFIH from EFH that would result in secured creditors at each of TCEH and EFIH potentially foreclosing on

11

collateral.   The Debtors were concerned that such a transaction would trigger tax liability in excess of $7 billion.   If this scenario manifested itself, following a deconsolidation of EFIH and TCEH from EFH, EFH would have had minimal value to satisfy the tax liability, which would have likely remain stranded at EFH, thus presenting litigation and regulatory risks to all of the estates.

21.    As described in the *Omnibus Tax Memorandum* [D.I. 2296] (the "Omnibus Tax Memorandum") filed on October 1, 2014, it is possible that if a taxable separation of TCEH and EFIH from EFH occurred, an EFH fiduciary would have considered a "check-the-box" election for EFIH and/or TCEH (or its subsidiaries).   Omnibus Tax Memorandum, at 20.   Such an election may have caused EFIH and/or TCEH to become taxable as corporations for federal income tax purposes, and thus severally liable for EFH's tax liability.   Still, whether or not EFH executed the check-the-box election, the risk remained that the IRS could pursue tax claims against EFIH's valuable assets (*e.g.*, EFIH's equity interest in Oncor) on account of EFH's liability.   At minimum, the resulting litigation to address the potential for joint and several liability on the potential stranded tax would have likely taken an extraordinarily long time to resolve—and the EFIH unsecured creditors would bear the cost of that delay in the form of additional interest on the EFIH First Lien DIP Facility and EFIH Second Lien Notes.   Due to the work of Kirkland and other professionals, the "Tax Armageddon" scenario and its bevvy of attendant complications were feared, but never realized.

**C.      EFIH Creditors were the Primary Beneficiaries of Kirkland's Efforts With Respect to the Makewhole Litigation**.

22.      ***Third***, Kirkland billed its fees and expenses related to the litigation of the Makewhole Claims to EFIH (the "EFIH Makewhole Litigation").[10]  Any distributions to EFH creditors were dependent on both the distributable value under a plan of reorganization *and* the result of the EFIH Makewhole Litigation.  In other words, the EFH creditors stood to benefit from the EFIH Makewhole Litigation if and only if: (a) the Makewhole Claims were disallowed and (b) the EFH/EFIH Debtors executed a comprehensive restructuring that delivered sufficient value to the estates.  In contrast, EFIH unsecured creditors (*i.e.*, the Elliott Creditors) would directly benefit, on a dollar-for-dollar basis from the disallowance of the Makewhole Claims. Because (a) EFH was not a party to the indentures underlying the EFIH First Lien Notes or the EFIH Second Lien Notes, or the EFIH Makewhole Litigation and (b) EFH creditors only incidentally benefitted from the disallowance of the Makewhole Claims under particular valuations, Kirkland's efforts related to the EFIH Makewhole Litigation were billed primarily to EFIH.

**D.      Kirkland's Efforts With Respect to Alleged Asbestos Claims Benefitted Both EFH and EFIH**.

23.      ***Fourth***, Kirkland's allocation of asbestos-related fees accurately reflected the intertwined relationship between asbestos issues and the goal of achieving a value-maximizing plan to both EFH and EFIH.  For example, Kirkland's efforts in litigating for the Asbestos Bar Date Order helped to clarify the universe of potential asbestos claims against EFH.  Merger

---

[10]  For the avoidance of doubt, fees and expenses incurred in connection with the Makewhole Claims (but unrelated to the EFIH Makewhole Litigation) were generally billed as Collective Benefit Fees.  For example, Kirkland's efforts to resolve the objections raised by the EFIH Secured Creditors in connection with confirmation of the NextEra plan (including with respect to the EFIH Secureds Settlement Approval Order) were billed as Collective Benefit Fees because EFH and EFIH both benefitted from confirmation of the NextEra plan.

parties valued this clarity, and if it was not available, the consummated plan of reorganization would have provided a materially lower distributable value.  In other words, if asked to assume an unknown and uncapped amount of current and future asbestos liability, potential purchasers would have demanded a lower purchase price in exchange.  **Such a decrease in purchase price would have directly reduced distributions to the EFIH unsecured creditors**.

24.    At the same time, Kirkland's contributions ultimately resulted in a Plan that reinstated asbestos claims.  This reinstatement was key in engendering the support of the EFH/EFIH Committee, and avoiding the cost of protracted litigation.  Kirkland's efforts in developing the Plan's asbestos construct therefore provided a substantial benefit to both EFH and EFIH creditors, as reflected in Kirkland's allocation of its fees and expenses.

25.    In short, Kirkland adhered to the Interim Compensation Order and allocated Direct Benefit Fees and Collective Benefit Fees—without complaint—in a manner that was fair and reasonable to all creditor constituencies.  Kirkland's allocation accurately reflects the substantial benefits conferred to EFIH creditors from Kirkland's efforts in these extremely complex bankruptcy proceedings.

[*Remainder of page intentionally left blank.*]

Dated: June 29, 2018
        Wilmington, Delaware

/s/ Chad J. Husnick, P.C.

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Brian E. Schartz, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com
                aparna.yenamandra@kirkland.com
-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com