Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4   In re:                          :

5                                   :    Chapter 11

6   ENERGY FUTURE HOLDINGS, Inc.  :

7                                   :    Case No. 14-10979-CSS

8           Debtors.               :    (Jointly Administered)

9   _____:

10

11                              United States Bankruptcy Court

12                              824 North Market Street

13                              Wilmington, Delaware

14                              July 16, 2018

15                              11:00 a.m. - 12:32 p.m.

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  LESLIE MURIN

1   HEARING re Motion of UMB Bank, N.A., as Indenture Trustee,

2   and Elliott for Entry of an Order Shortening Notice with

3   Respect to Joint Motion of UMB Bank, N.A., as Indenture

4   Trustee, and Elliott for Stay of Order Authorizing EFH Plan

5   Administrator Board's Participation in the Allocation

6   Dispute [D.I. 13236; filed June 22, 2018]

7

8   HEARING re Motion of EFH Plan Administrator Board for

9   Authorization to Reimburse Third-Party Discovery Fees and

10  Expenses of Former Directors, Officers, and Manager Incurred

11  in Connection with the EFH/EFIH Allocation Dispute [D.I.

12  13262; filed July 6, 2018]

13

14  HEARING re Interim Fee Applications

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   ROPES & GRAY

4       Attorneys for Elliott & UMB

5

6   BY:  GREGG GALARDI

7

8   BAYARD

9       Attorneys for Elliott & UMB

10

11  BY:  ERIN FAY

12

13  KIRKLAND & ELLIS LLP

14      Attorneys for the Debtors

15

16  BY:  MARK MCKANE

17      APARNA YENAMANDRA

18      PAT VENTOR

19

20  RICHARDS LAYTON & FINGER, P.A.

21      Attorneys for the Debtors

22

23  BY:  JASON MADRON

24

25

1   BIELLI KLAUDER, LLC

2        Attorneys for Dis Directors EFH

3

4   BY:  COREY STEPHENSON

5

6   PROSKAUER ROSE

7        Attorneys for Dis Directors EFH

8

9   BY:  MARK THOMAS

10

11  WHITE & CASE LLP

12       Attorneys for Sempra Energy

13

14  BY:  J. CHRISTOPHER SHORE

15

16  FOX ROTHSCHILD

17       Attorneys for Sempra Energy

18

19  BY:  JEFFREY SCHLERF

20

21  HOGAN MCDANIEL

22       Attorneys for the Ad Hoc EFH Claimants

23

24  BY:  GARVIN MCDANIEL

25

1    NIXON PEABODY

2          Attorneys for the EFH Indenture Trustee, AST

3

4    BY:  RICHARD PEDRONE

5

6    STEVENS & LEE

7          Attorneys for Charles Cremins

8

9    BY:  JOSEPH H. HUSTON, JR.

10

11   JENNER & BLOCK

12         Attorneys for Charles Cremins

13

14   BY:  RICHARD LEVIN

15

16   UNITED STATES DEPARTMENT OF JUSTICE

17         Attorney for the U.S. Trustee

18

19   BY:  RICHARD SCHEPACARTER

20

21

22

23

24

25

1    ALSO PRESENT TELEPHONICALLY:

2

3    SAM N. ASHURAEY

4    MATTHEW C. BROWN

5    ERIC C. DAUCHER

6    GREGG M. GALARDI

7    TAYLOR B. HARRISON

8    DANIEL K. HOGAN

9    ANTHONY HORTON

10   CHRISTIAN JENSEN

11   MARC KIESELSTEIN

12   ERIK SCHNEIDER

13   ANGELO THALASSINOS

14   MARK K. THOMAS

15   PATRICK VENTER

16   BRADY C. WILLIAMSON

17   ANDREW ELKIN

18   MARCO MONTEMAYOR

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.

4              MS. YENAMANDRA:  Good morning, Your Honor.

5              THE COURT:  Good morning, Ms. Yenamandra.

6              MS. YENAMANDRA:  Aparna Yenamandra from Kirkland &

7    Ellis on behalf of the EFH Plan Administrator Board which

8    I'll refer to as the PAB.  I am joined by Mr. McKane and Mr.

9    Patrick Venter from K&E.

10             Your Honor, the only item on today's agenda is the

11   motion filed by the PAB on July 6th ruining another 4th of

12   July for Mr. Venter requesting entry of an order authorizing

13   the PAB to reimburse the reasonable and documented expenses

14   incurred by former directors and officers in the capacity as

15   third parties in the allocation dispute, effective nunc pro

16   tunc to June 11th, which was the date Your Honor entered the

17   first scheduling order.

18             We requested a hearing on this motion on short

19   notice once it became clear that at least some of the

20   parties to the allocation dispute were going to request that

21   former D's and O's to get involved.  More specifically, June

22   29h is the deadline under the scheduling order for the

23   issuance of third-party subpoenas.  All of the former DDs,

24   so Ms. Williamson, Mr. Cremens, and Mr. Evans were all

25   issued subpoenas.  The parties have negotiated a consensual

1   but limited extension of the production deadline.

2           Today is the deadline to issue deposition notices

3   and, of course, it's unclear this early in the schedule

4   whether the former D's and O's will be asked to provide any

5   trial testimony.  So all of which is a long-winded way of

6   saying we thought in light of all those factors, now is the

7   time to get clarity on the issues addressed by the motion.

8   One party objected to the motion.  That is the Elliott

9   creditors.  And prior to filing the objection, they also

10  send the PAB a letter copying counsel, which we attached to

11  our reply as Exhibit 1 at Docket Entry 13287.

12          So, Your Honor, there's a lot of rhetoric in the

13  Elliott objection about why the PAB filed this motion.  So

14  we wanted to start today by just setting the record clear on

15  why we filed this motion.  It wasn't about the PAB

16  arbitrarily picking the path of least resistance with

17  Sempra.  I think the record is clear that we are willing to

18  litigate with Mr. Shore in this case if we need to, whether

19  it's at EFH or TSA.  It wasn't about blindly protecting the

20  former D&Os, and it certainly wasn't about punishing the

21  economic stakeholders for not settling the dispute before

22  now.

23          This motion is only about two things.  Now that we

24  have a schedule and a path to finally resolving the

25  allocation dispute, the PAB wants to ensure that there's no

1    further disruption or delay of that schedule as well as

2    minimize the incremental cost of the process that will be

3    surcharged against the Trust assets.  And to be clear, both

4    of these goals, if achieved, inure to the benefit of the

5    economic stakeholders, not the PAB, not the D&Os, not

6    Sempra.

7             And so the crux of today's dispute comes down to

8    one question: Is the old adage true that you have to spend

9    money to make money?  In other words, to use a frequently

10   cited phrase in this case, is it worth the squeeze to use

11   the Trust assets now on an incremental basis for the sake of

12   mitigating the risks of further delay and destruction to the

13   schedule and potentially greater costs that would be

14   surcharged against the Trust assets.

15             And so to answer the question and viewed through

16   the applicable documents and case law, the PAB analyzed

17   carefully a number of competing considerations that

18   ultimately led to the filing of the motion.  I think

19   everyone agrees that the D&Os and the process in general

20   would benefit from the D&Os having counsel.  So that

21   effectively left us with three options on how to address the

22   fees and expenses incurred by the D&Os: option 1, Sempra

23   case; option 2, the D&Os pay their own way; or option 3, the

24   PAB uses the discretion it has under the Trust agreement to

25   reimburse the fees and expenses.

```
 1              And so we'd like to discuss each of these in turn.
 2    I also have excerpted versions of the relevant provisions
 3    cited by both the PAB and the Elliott creditors if Your
 4    Honor would like a copy.
 5              THE COURT:  Okay.  Yes, I would.
 6              Mr. Galardi?
 7              MR. GALARDI:  Your Honor, there's no witness here
 8    yet.  And I just heard a lot of facts, so if she's going to
 9    put a witness on, I'd like to go right to the witness.  If
10    there's no witness --
11              THE COURT:  We don't need a witness.
12              MR. GALARDI:  Okay.
13              MS. YENAMANDRA:  May I approach?
14              THE COURT:  And this isn't an issue of fact that
15    anyone can dispute.  Did you serve the discovery?
16              MR. GALARDI:  We served discovery, Your Honor, but
17    there is no --
18              THE COURT:  To expect them to respond?
19              MR. GALARDI:  Excuse me?
20              THE COURT:  To expect them to respond?
21              MR. GALARDI:  Oh, yes, we do, Your Honor.
22              THE COURT:  Do you think it's going to cost money
23    to respond to discovery?
24              MR. GALARDI:  The issue is whether there is a
25    significant expense.  And as she said, there are three
```

1    issues.  She said it specifically, so I'll take my time when

2    you go.  But if Your Honor is already ready to rule, then

3    rule.

4              THE COURT:  No, I'm not ready to rule.  My point

5    --

6              MR. GALARDI:  Well, Your Honor, you are in the

7    sense that you said there is no evidentiary issue here.

8    There are evidentiary issues here.

9              THE COURT:  What are they?

10             MR. GALARDI:  Okay.  One, is it an exercise of the

11   PAB's discretion?  Two --

12             THE COURT:  That's a fact -- that's not an issue

13   of fact.  It's a question of looking at the documents.

14             MR. GALARDI:  That's fine.  Once Your Honor

15   decides that that's in the documents and you can read them

16   and it's unambiguous under the documents, which again is a

17   legal issue which Your Honor can rule, then the question is

18   is he exercising his discretion appropriately.  What were

19   the factors that he balanced under the circumstances?  There

20   is no witness here to tell you that.

21             THE COURT:  All right.  Fair enough.

22             Is there any witness, Ms. Yenamandra?

23             MS. YENAMANDRA:  Your Honor, we don't have a

24   witness.  We don't have Mr. Curtin in the courtroom today,

25   and he didn't file an affidavit.  But I think what we're

1    asking Your Honor to do, and I would have gotten there, is

2    that we'd ask that the merger agreement and the Trust

3    agreement, which have been approved by the Court, cited

4    probably a hundred times by now and are fully available on a

5    final form basis, we'd ask that Your Honor take judicial

6    notice of the provisions and have the agreements themselves

7    moved into evidence.

8              THE COURT:  I have no problem taking the

9    agreements into evidence and reviewing them.  I think

10   they've been approved by the Court.  They are what they are.

11   And I think, however, I'm certainly willing to listen to

12   testimony as to -- not testimony, excuse me, argument as to

13   what they mean and argument just as to whether they're

14   ambiguous.  And I think I can fully preserve the right for

15   -- to grant Mr. Galardi's request to put a witness on if I

16   believe we get to a factual dispute.  And if that's -- if

17   there's a question of fact, then we'll have to figure out

18   how to proceed without a witness.

19             And I apologize to Mr. Galardi if I came across --

20   well, I did come across overly terse, so I apologize, Mr.

21   Galardi.  So please approach.  I don't like those non-

22   apology apologies where you apologize if the -- only to the

23   extent the other person was offended, you know.

24             MR. GALARDI:  And, Your Honor, you know I was not

25   -- so it's okay.  You don't have to apologize to me for

1    being terse.

2           MS. YENAMANDRA:  So, Your Honor, I'd like to start

3    with what I described as option 1, which is that Sempra

4    case.  There are two potentially relevant provisions in the

5    merger agreement that are implicated by the circumstances

6    facing us today, 6.8a and 6.8b.  6.8a is the provision that

7    obligates Sempra to indemnify the former D&Os under certain

8    circumstances, those circumstances being when they become

9    legally obligated to pay solely as a result of judgments,

10   fines, losses, claims, damages, and settlements, or

11   liabilities; arising out of any claim, action, dispute,

12   proceeding, or investigation; arising out of or related to

13   -- and I'm paraphrasing this last part -- their service as a

14   manager, director, or officer of the former debtors.

15          So on this provision, well, I'd like to make three

16   points.  First, the underlying proceeding here which is the

17   allocation dispute, does not arise out of their service as

18   former directors.  This dispute relates to the allocation of

19   post-petition claims.  None of those claims are claims

20   against the former directors.  None of those claims have

21   arisen as a result of their service to the former debtors.

22   They are simply third parties in this dispute which is about

23   allocating claims that have been incurred by the estates.

24          Second, had the intent of 6.8a been to cover

25   former D&Os in their more general involvement in any

1    proceeding, such language certainly could have been

2    included.  And in our motion and reply, we cited a number of

3    other analogous provisions where parties have included

4    language essentially saying that the indemnification covers

5    any involvement that the former D&Os have in a litigation.

6    That language is not here.

7              THE COURT:  So let me ask you this.  Let's assume

8    this is tighter language than what you might see.  You point

9    that out in your reply.  That's an argument that Sempra is

10   not responsible for these indemnification fees.  So why

11   should the Trust bear the risk of loss in the event that

12   Sempra is not responsible as opposed to the D&Os who, you

13   know, served quite well and certainly that would be the case

14   for Mr. Williams and Mr. Evans but also Mr. Cremens.

15             But why aren't they on their own to fight with

16   Sempra about indemnification?  If they don't, they don't.

17   And they were the D&Os, although they weren't necessarily

18   the ones responsible for negotiating the merger agreement

19   and they're not protected.  They're not protected.  And why

20   should the Trust protect them?

21             Isn't -- I know you said it was about one thing,

22   but I'm thinking about it a little differently.  I'm

23   thinking that this is all about who bears the risk of loss

24   if Sempra's not responsible for indemnifying these people.

25   And the question is should the risk of loss be born by the

1   Trust and then sort of derivatively by the creditors or

2   should it be born by the directors who were compensated for

3   being directors when they were directors.

4           MS. YENAMANDRA:  Sure.  So I think a couple of

5   responses to that.  One, just as a sort of gatekeeping item,

6   nothing in the relief we were seeking was intended to serve

7   as a waiver of any rights any of the parties may have under

8   the merger agreement.  And Mr. Levin in in the room, Mr.

9   Thomas is on the phone, they will tell you themselves that

10  they are fully prepared to seek whatever claims they think

11  they're entitled to seek against Sempra.

12          But taking your second question --

13          THE COURT:  yeah.  I mean I'm assuming someone's

14  going to go after Sempra.  So whether it's the -- and I

15  understand Sempra disagrees that they might be --

16          MS. YENAMANDRA:  Sure.

17          THE COURT:  -- liable.  No problem.  But it's

18  either going to be the D&Os directly because they've had to

19  bear the cost themselves or it's going to be the Trust sort

20  of indirectly because they're going to somehow by subrogated

21  to whatever rights the indemnified parties have, and they're

22  going to end up suing Sempra.  So some of these are going to

23  go after Sempra for this.

24          So, again, why, but that's my point, and they

25  might win and they might lose.  If they win, it's a net zero

1    for the estate.  In fact, you could argue a net positive for

2    the reasons you said earlier about moving the case forward,

3    not having to delay to trial, having a more efficient

4    production of documents, et cetera.  Or it's a loss, at

5    which point who bears it, and that's the real issue here,

6    right?  Should it be the Trust/creditors to bear that loss

7    or should it be the directors themselves?

8              MS. YENAMANDRA:  Sure, Your Honor.  And from our

9    perspective, unfortunately, all roads lead to there being

10   litigation with somebody on who bears these costs.

11             THE COURT:  Absolutely.

12             MS. YENAMANDRA:  And from our perspective, under a

13   number of those scenarios, whether directly or indirectly,

14   the PAB could very well be part of that litigation.  So just

15   taking each scenario in turn, if it's litigation between the

16   former D&Os and Sempra, the PAB as the successor to one of

17   the parties that negotiated the merger agreement and thereby

18   who could have relevant knowledge as to what the intent was

19   on the interpretation of that provision very well could

20   become part of that litigation, in which case costs incurred

21   by the PAB -- and I'm sure Mr. Galardi will contest this --

22   could arguably be satisfied from the Trust assets.

23             So that's scenario one in which even without any

24   of this relief, we may be in a situation where Trust assets

25   are being used for purposes of litigating who bears these

1    costs.  The alternative is that we didn't file this motion,

2    the D&Os had their litigation with Sempra, maybe the PAB

3    gets pulled into it, maybe they don't.  If they're

4    unsuccessful, they then come back to Your Honor, file the

5    same motion that we filed, and the PAB again as the

6    administrator of the assets that are in quest, again, likely

7    gets pulled into the litigation.

8            So the whole genesis of this motion was starting

9    with the first principle that somebody is litigating these

10   fees and expenses.  In a number of those scenarios, the PAB,

11   whether voluntarily or involuntarily, could get pulled into

12   those proceedings and the costs imposed on the PAB could

13   come out of the Trust assets.  So we're essentially trying

14   to find what is the path, knowing that we're going to end up

15   using Trust assets in this litigation very likely one way or

16   the other, what is the path of least resistance and how can

17   we minimize the amount of Trust assets we're using.

18           THE COURT:  Fair point.  Okay.  You can run

19   through the language now.  Sorry I interrupted.  I'm in a

20   feisty mood.

21           MS. YENAMANDRA:  So that's sort of the crux of why

22   we think 6.8a doesn't apply.  6.8b, which I'll run through

23   just faster because I don't think there's an actual point of

24   contention, is a provision that required EFH to obtain tail

25   coverage prior to emergence for the benefit of the former

1    D&Os.  EFH did obtain that tail coverage.  We attached the

2    applicable provisions to our motion.

3          But that coverage, in essence, only covers claims

4    that have been brought by EA Enforcement Authority, which is

5    defined as a law enforcement authority or governmental

6    authority unless the instant tracks where the claims have

7    been brought by institutional investors and hedge funds

8    doesn't fall within that coverage.

9          And as Your Honor rightfully flagged and as I

10   think everybody's aware, we know Elliott doesn't agree with

11   this interpretation.  We know the former DDs have reserved

12   their rights as to the interpretation of these provisions

13   for the reasons we just discussed.  And what that tells us

14   is that all other things being equal, there will be a

15   dispute as to Sempra's obligations to cover the D&Os under

16   these facts.  How long could that satellite litigation take?

17   I don't know.  How could it affect or derail our allocation

18   schedule?  I stopped trying to predict what could affect

19   things in this case.

20         And, again, with the PAB dragged -- be dragged

21   into the fight, I don't know, but arguably there's a

22   scenario in which the PAB could be dragged into the fight

23   given that it's a fight about the interpretation of a

24   provision in a bilateral contract.  The PAB's predecessor is

25   the one who negotiated and signed that contract.

1          So, again, not only do we believe that 6.8a and b

2     do not obligation Sempra under these circumstances, the fact

3     that there will be litigation on that, that could drain a

4     greater amount of Trust assets then what is currently is at

5     issue for us meant that pursuing claims against Sempra was,

6     in fact, not the path of least resistance and did not

7     achieve the two goals of the PAB.

8          So that takes us to option 2.  The D&Os could pay

9     their own costs and expenses.  And on this one, let's start

10    with some first principles.  The review of documents that

11    could be produced by the D&Os, all other things being equal,

12    are going to raise some complicated issues.  They're going

13    to raise 408 issues.  They're going to raise privilege

14    issues, all issues where they would benefit from counsel.

15    And given that this is EFH and there have been a lot of

16    twists and turns in this case, I think it's safe to say that

17    counsel should be Jenner and Proskauer instead of bringing

18    in new people that have not had to live the case.

19          And, finally, these are individuals.  So the net

20    results of all of this is that the cost could be

21    significant.  And absent other relief, those costs would be

22    imposed on the individuals and who may very well come back

23    to Your Honor and ask for the same relief I'm asking for

24    today.

25          And so from our perspective, and as we set out in

1    our motion and our reply, Rule 45 is designed to address a

2    situation just like that.  And I'm happy to go into further

3    detail in what was in our reply, but I think we laid it out

4    in great detail there.  We think that given that the

5    expenses are going to be --

6              THE COURT:  Well, and Mr. Galardi made the point

7    that Rule 45 may cover this but it has its own limitations

8    and perhaps, more importantly, its own procedures, which

9    we're not following.

10             MS. YENAMANDRA:  Yes.  I appreciate --

11             THE COURT:  You're saying Rule 45 would cover

12   this.  Let's -- I think your argument is let's do X and X

13   doesn't comply with Rule 45.  But that doesn't matter

14   because if we were to go through the process of Rule 45,

15   we'd get to X.  So let's cut it short.

16             MS. YENAMANDRA:  Correct.

17             THE COURT:  And his argument is, well, no, because

18   there are limitations on what you're entitled to under Rule

19   45 that would narrow what you're asking for as opposed to

20   what you're asking for.  So under Rule 45, it would be X

21   minus Y result as opposed to X result under your motion.

22             MS. YENAMANDRA:  And the Y component of that part,

23   we think can be addressed potentially in provisions or

24   limitations in the order.  We don't think it changes the X

25   part of it.  The X is -- we filed the motion that at the end

1    of the day the D&Os would file themselves but they'd file it

2    five months into the process when we're staring down a

3    September trial date and everyone should be focused on

4    something else.

5              THE COURT:  Understood.

6              MS. YENAMANDRA:  So that takes us, I think, to

7    option 3, which is the PAB reimburse the fees and expenses

8    out of the Trust assets.  And, Your Honor, as we've walked

9    through option 1 and 2, the PAB did not arrive at this

10   decision easily.  This was a carefully thought-out decision

11   that was based on the risks and costs really of any other

12   party paying these expenses and the fact that, again, all

13   roads lead to litigation and most of those roads lead to the

14   PAB participating in that litigation and generating costs

15   that would be charged against the Trust assets.

16             And as we set out in our papers, I'm happy to go

17   into greater detail, the trust agreement, we believe, gives

18   the PAB the discretion to satisfy these fees and expenses.

19   And the reason why goes back to what the purpose of the

20   Trust is, which is to administer the assets on behalf of and

21   for the benefit of the beneficiaries.

22             But the Elliott creditors argue that because

23   payment of the fees and expenses reduces the Trust assets

24   available for plan distributions, payment of those fees and

25   expenses isn't necessary.  But that is overly simplistic for

1   at least three reasons: one, again, to the extent the PAB is

2   part of that satellite litigation, that's going to generate

3   costs that will come out of the Trust assets; two, to the

4   extent that litigation is, in fact, the satellite litigation

5   and isn't being conducted within the schedule, I don't think

6   any of us can predict how that could affect the allocation

7   schedule; and three, their argument conflates cost of the

8   Trust versus cost of the Trustee.

9           The trust agreement enables the PAB to incur costs

10  for the Trust even if they're not costs directly incurred by

11  the Trustee.  This is exactly those kinds of costs being

12  incurred by the Trust to prevent further delay to the

13  process and to avoid distracting satellite litigation that

14  may ultimately be more damaging to plan distributions.

15          So, when viewed through that prism, you know, 4.1

16  and 6.1 which both parties detailed in their pleadings,

17  basically put the obligation to preserve, protect, liquidate

18  and distribute the Trust assets in the hands of the PAB.

19  And given that the reason we're filing this motion is, in

20  fact, to prevent further depletions of the Trust assets, we

21  think we fall squarely within what the mandates of the trust

22  agreement are.

23          So, Your Honor, with that, having totally gone off

24  of my talking points, I'm happy to answer any other

25  questions you may have.  Again, I noted Mr. Levin is in the

1    courtroom and Mr. Thomas is in the phone as well if you'd

2    like to hear from them.

3              THE COURT:  Of course.  Thank you.

4              Let's see.  Is there anyone else in favor of the

5    motion that wishes to be heard?

6              Mr. Levin?  Let's start with people in the

7    courtroom.  Good morning.

8              MR. LEVIN:  Good morning, Your Honor.

9              THE COURT:  Long time.

10             MR. LEVIN:  Richard Levin, Jenner & Block, LLP,

11   for Charles Cremins, former disinterested manager of EFIH,

12   LLC.

13             A few points, we use the word Sempra as a

14   shorthand.  We all understand that it's reorganized EFH that

15   is the liable party here.  I'll continue to use Sempra, but

16   I know we're talking about reorganized EFH.

17             Your Honor, we don't fully understand why the PAB

18   is arguing that reorganized EFH is not liable.  In any

19   event, we disagree with their position.  And that issue is

20   not before the Court today in any formal fashion.  And what

21   we -- the point I want to make is in ruling on the motion,

22   to the extent the Court relies on the PAB's argument that

23   Sempra is not liable, we ask that that not be a binding

24   ruling on that issue.

25             We've noticed that Elliott Associates has a

1    tendency to appeal rulings that go against them.  And should

2    there be an adverse ruling to Elliott in this case and they

3    appeal it and obtain a reversal, we would not like a binding

4    ruling against us that Sempra is not liable.

5           The only other point, Your Honor, you noted there

6    might be a benefit if -- to the PAB if Sempra is liable and,

7    therefore, pays the expenses of the former disinterested

8    directors and managers and officers.  I think that's a nice

9    theoretical idea, but by the time the Sempra litigation, if

10   any, gets resolved, the discovery will be over.  So that I

11   don't think should factor into Your Honor's consideration.

12          THE COURT:  Thank you, Mr. Levin.

13          MR. LEVIN:  I'd be happy to answer any questions.

14          THE COURT:  No questions.

15          MR. LEVIN:  Thank you.

16          THE COURT:  Mr. McDaniel?

17          MR. MCDANIEL:  Good morning, Your Honor.  Garvin

18   McDaniel for the ad hoc EFH claimants.  Your Honor, we

19   support the relief requested in the motion with respect to

20   the reimbursement of the former disinterested directors and

21   managers fees and expenses as set forth in the motion.  We

22   believe the request makes sense.  It keeps continuity.

23   Hopefully, they can keep the same counsel and that the

24   schedule can proceed without delay.

25          THE COURT:  Thank you.

1          MR. MCDANIEL:  That's all I have, Your Honor.

2     Thank you.

3          THE COURT:  Anyone else in the court?  Mr. Shore?

4          MR. SHORE:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. SHORE:  Chris Shore from White & Case on

7     behalf of Sempra and reorganized EFH and EFIH.

8          I agree with Mr. Levin.  This is a reorganized

9     EFIH/EFH issue.  Still no one has made an indemnification

10    claim under the agreement.  I know we're all jumping to the

11    this is going to be litigated.  I'm not sure why it would be

12    litigated in the context of this case.  We're talking about

13    miniscule amounts of fees for a reimbursement of third-party

14    witness defense.  It should not be a lot of money, and we're

15    probably spending more of it today on this motion and

16    anticipating litigation than just resolve it.

17          THE COURT:  All right.  Thank you, Mr. Shore.

18          Anyone on the phone?

19          MR. THOMAS:  Good morning, Your Honor.  Mark

20    Thomas with Proskauer.  If I may?

21          THE COURT:  Of course.  Good morning.

22          MR. THOMAS:  Thank you, Your Honor.  Mark Thomas

23    on behalf of Don Evans and Billy Williams, the former

24    disinterested directors of EFH.

25          Your Honor, I think you hit the nail on the head

1    in terms of this being a risk-shifting issue and who would

2    bear the risk of loss.  And as you just heard, the EFH

3    creditors represented by the ad hoc claimants group supports

4    the motion and they are willing to share and bear that risk

5    of loss.

6            I think, Your Honor, in this context of the

7    allocation dispute and discovery relating thereto, Elliott

8    is completely adverse to the EFH estate and Elliott does not

9    act as an EFH creditor in this or any allocation dispute as

10   proven by their motion which, in essence, argues that all

11   EFH cash should pay administrative claims leaving literally

12   nothing but perhaps $10 million for EFH creditors.

13           So for all the reasons everyone's set forth, I

14   think at least as to the EFH estate, the PAB motion should

15   be granted.  Thank you.

16           THE COURT:  Thank you, Mr. Thomas.

17           Mr. Galardi?

18           MR. GALARDI:  I will be longer than the last

19   three.  First, let me take on Mr. Thomas' remark.  With

20   respect to the allocation dispute, we are clearly on the

21   EFIH side, but with respect to this matter, as a beneficiary

22   of both, assume we lose that dispute, we're still coming out

23   of our pocket in a significant amount.  So I don't think it

24   is purely an EFIH/EFH issue.  This is a beneficiary issue.

25           I heard Mr. McDaniel, so I'm going to go back to

1    that.  At least the pleading said, now if he wats to say he

2    doesn't care about subrogation anymore, the pleading was

3    very clear.  As long as there is an assignment or

4    subrogation of those rights, he may not care.  I didn't hear

5    him give up on that.

6           And that to me begins a very important point.

7    Counsel can get up and say, you know, well, everybody's

8    reserving their rights on 6.8a and 6.8b.  And I'm happy that

9    everybody is reserving their rights, Your Honor.  But the

10   fact of the matter is the PAB has already taken a position

11   in pleadings and at this podium that it is not reimbursable.

12   So to give them a subrogation right or an assignment right

13   is to basically give it to a party who represents us, the

14   beneficiaries as well as the EFH claimants, well, they

15   already said they don't believe in the litigation.

16          So that is -- and we don't have Mr. Horton here to

17   testify as to why he takes that interpretation or why he

18   reached out, but I think it's important to note right off

19   the bat that there was three options.  One of them we'll

20   call it reorganized EFH/EFIH.  And Mr. Horton reached out,

21   considered the proposals, didn't consult with us or when he

22   consulted with us, knows we would oppose it -- I'm not sure

23   if he consulted with the EFH claimants.  He's not here to

24   testify to say he talked to anybody about this other than

25   his counsel -- and made a decision despite, as Mr. Shore

1    made clear, there is no demand that has actually been made

2    by the directors themselves.  They've taken no self-help

3    remedy.

4            So that's the first one.  So -- and frankly, I

5    don't think whether there's an indemnification under 6.8a or

6    b is relevant, as Your Honor pointed out in the first

7    instance, right?  This is a risk of loss.  So now we come to

8    the next two that they've gone through.  We don't -- it's

9    not an insurance claim.  It's not unusual for insurance

10   coverage to say we don't pay if there's no claims.

11           So Your Honor, should they pay their own costs and

12   expenses or should the PAB consensually and with discretion

13   reach out and pay those expenses when the Trustee has not

14   asked for it?  There's no evidence in the record yet that

15   they've made a demand on the PAB.  There's no factual record

16   -- Mr. Shore uses the word "miniscule."  There has been no

17   motion by the D&Os to say it's been an overburdened

18   discovery.  It's just simply Counsel saying, well, we're

19   going to have 408 issues, we're going to have privilege

20   issues.  We can see when the documents come.  There is no

21   Rule 45 motion.

22           And simply the PAB says he did not arrive at this

23   decision lightly.  He's not here to tell us that.  He says,

24   I have the discretion under the trust agreement.  I'll go

25   through the language.  So it's I'm going to be involved in

1    some satellite litigation, and I'm going to be dragged in.

2    So, instead, I'm going to take the affirmative step as our

3    Trustee and reach out and say I'm going to reimburse these

4    expenses when there's no request, there's no demand, and he

5    only has the discretion at best.

6            Let's now go through the documents, Your Honor.

7    Again, if you're going to -- if Your Honor finds that these

8    documents are unambiguous, then rule as a matter of law.

9    But she gave the best argument for why these documents are

10   at best ambiguous and, frankly, clear that he doesn't have

11   the discretion.  The allocation issue was on the table at

12   the time this document was negotiated.  The allocation

13   issue, the argument that Sempra is not included is, well,

14   the parties could have easily put it in the merger

15   agreement.  The parties could have easily put it in that

16   document.

17           The fact of the matter is that they didn't, so

18   it's not there.  That argument applies equally here.  The

19   allocation dispute was a dispute at the time of the trust

20   agreement.  There is no language in this document that

21   expressly says the PAB has the authority to pay those fees.

22   Now, the purpose of the Trust is to administer the assets

23   for the benefit of the beneficiaries.  The Trust assets are

24   to be distributed by the Trustee to the beneficiaries.

25           So now they go to Section 4.1.  Your Honor, we put

1   in our papers they have to be liabilities or expenses of the

2   Trust incurred or assumed by the Trust or obligations of the

3   Trust.  Now, Counsel says, well, we have the discretion and,

4   essentially they're saying, Your Honor, we're coming in here

5   and asking you for authority to assume these liabilities

6   despite there not being a demand, despite no 45 motion, and

7   despite there being at least some avenue that they may go

8   against reorganized EFH and EFIH.

9           But I don't have to tell you why I'm exercising

10  that discretion.  There's discovery. We may get into

11  ligation.  We're not in the satellite litigation.  It may be

12  expensive, but in that sense, we're only defending it.  We

13  even decided to take the affirmative step, have a motion,

14  file a motion, go against adversaries.  The beneficiaries is

15  his adversaries.

16          So simply speaking, Your Honor, I don't see how

17  4.1 helps them.  If you go to 6.1, 6.1, again, has to be

18  created, incurred, or assumed by the Trust.  He's decided to

19  assume it because of the potential of satellite litigation.

20  With respect to expenses, we do not know.  We haven't had a

21  motion to quash the subpoena.  We've had no showing of what

22  the expense in addition to the expense on the PAB is, which

23  Your Honor made a party.  And we have no factual records to

24  say they're significant.

25          And as Your Honor notes and gave me my argument

1    before is 45 doesn't apply yet.  There has to be procedures.

2    There has to be a significance.  There has to be an

3    evidentiary showing that somehow -- they could say, well,

4    it's irrelevant.  They're going to get there.  But the fact

5    of the matter is there's no showing of significant expenses

6    at this time.  There's not even a response to our subpoenas

7    for documents to come back and show they're overburdened.

8    We didn't negotiate.  There's no putting it back on the

9    parties.

10           He just decided to assume as our Trustee to assume

11   the expenses saying I'm going to be the judge of reasonable,

12   but there's not even a reporting in here.  It's just

13   whatever's in his discretion he can do absolutely without

14   appearing in front of this Court and giving you the business

15   reasons and testimony.  That just can't be the case when

16   somebody reaches out as a Trustee and says, we'll spend your

17   money because, well, we'll probably have to spend some of it

18   later anyway.  I don't see any argument or a basis in the

19   documents.

20           Your Honor, I don't think these documents are

21   absolutely clear that it grants the discretion.  If Your

22   Honor wants to make a legal ruling on that, I understand it.

23   And if Your Honor then makes that legal ruling, I don't have

24   any evidence from the PAB testifying as to how he exercised

25   his discretion.  For example, I do not have what are the

1    costs of that satellite litigation, what are -- let me go

2    through the list of things we don't have.  What's the

3    budget?  Why did I agree to assign when I took the position

4    -- or subrogate when I took the position that the 6.8

5    doesn't apply?  No evidence of a demand on the PAB, no

6    evidence of the significance, no evidence of the documents

7    that would need to be produced by the D&Os separate from the

8    documents that would need to be produced by the PAB.

9            So there's no factual basis.  So we'd ask Your

10   Honor to deny the motion.

11           THE COURT:  Thank you, Mr. Galardi.

12           Ms. Yenamandra?

13           MS. YENAMANDRA:  Thank you, Your Honor.  Very

14   quickly, just a couple of points.  One, to be clear, we are

15   not relying on Rule 45 as an independent basis for this

16   authority.

17           THE COURT:  I understand.

18           MS. YENAMANDRA:  We believe the trust agreement --

19   and I'll touch upon a couple of Mr. Galardi's points in a

20   second -- gives us the discretion and that's the basis of

21   relief we need.  But Rule 45, we cited and have discussed

22   today because we think it helps, as Mr. Thomas said, inform

23   the allocation of risk/loss question.

24           Second, just from a first principles basis, the

25   fact that two parties do not have the same interpretation of

1    the document doesn't mean that the document is ambiguous.

2    With that logic, we would be in front of Your Honor and

3    courts across the country every day every time there was a

4    contract dispute.

5            Third, the argument that the trust agreement

6    doesn't specifically delineate that the Trustee has

7    discretion with respect to the allocation dispute in

8    particular, Your Honor, this is an argument you've heard

9    just a couple of weeks ago on the PAB participation order.

10   The lack of specificity isn't what's outcome-determinative

11   here.  The fact is the trust agreement gives the Trustee

12   powers incidental to the purpose of the Trust.  And this

13   power that he's trying to exercise today is one of the

14   purposes of the Trust.

15           And, finally, Mr. Galardi mentioned reporting of

16   the fees and expenses generated by the D&Os.  Your Honor, we

17   have no issue with that.  We're happy to be extremely

18   transparent in what's getting paid and what's being

19   requested.  And we are happy to formulate whatever language

20   in the order as necessary to that point.

21           THE COURT:  Thank you.

22           MS. YENAMANDRA:  Thank you, Your Honor.

23           THE COURT:  Mr. Levin?

24           MR. LEVIN:  Your Honor, Mr. Galardi said there's

25   been no demand by the disinterested manager on the PAB.  In

1   fact, there was.  And to the extent Mr. Galardi might argue

2   that I'm trying to introduce evidence from the lectern, I'd

3   now make a demand on the PAB on behalf of Mr. Clemens.

4            THE COURT:  All right.  Thank you, Mr. Levin.

5            Any --

6            MR. THOMAS:  Your Honor?

7            THE COURT:  Yes?

8            MR. THOMAS:  I'm sorry.  If I may, Mark Thomas.

9   One, just briefly, the arguments about Rule 45, you know, is

10  noted in Elliott's reply.  The written objection has to sort

11  of set forth the triggering mechanism for Rule 45 fee-

12  shifting.  That objection is not due until July 18th.  So,

13  you know, if this motion isn't granted, we'll be right back

14  before Your Honor on the same thing when we object to

15  discovery, not produce anything, force Elliott to file a

16  motion to compel, and then we'll be arguing fee-shifting

17  again.

18            THE COURT:  All right.  Well, thank you very much.

19  Let me say a few things and then talk about a path forward.

20  So I do think that the PAB's motion at bottom is an issue of

21  who bears the risk that the directors and officers will not

22  be indemnified by reorganized EFH.

23            It is quite possible that the reorganized EFH will

24  pay and indemnify these directors.  I am sure that that

25  business decision will depend on a variety of things,

1    including A, their understanding of the language about

2    whether or not they're required to do so and, B, the cost

3    that they're asked to be reimbursed.  Is it worth litigating

4    over $50,000?  Maybe.  Is it worth litigating over five

5    million?  Oh, most certainly.

6         So there is a risk that the reorganized EFH will

7    not indemnify these directors.  That risk plays -- you know,

8    quantifying that risk is difficult.  One way to quantify it

9    is to have your own interpretation of the language about

10   whether they're required to do so or not.  I am not going to

11   weigh in on what I think that language means, but I will say

12   that I think there is certainly a litigation risk that it

13   means -- there are two different sides of what it means

14   being pursued here, or maybe more, but basically two camps

15   of what it means.  And I think it's an issue that might need

16   to be decided by a judge based on facts and law.  So there

17   is risk associated with whether or not these people will be

18   indemnified.

19        So then, okay, we've got a risk that these people

20   may not be indemnified.  Who should bear the risk of loss

21   there?  Should it be the PAB or should it be the directors

22   and officers themselves?

23        Deciding whether -- who should bear that risk, I

24   think, is the next question of fact and law.  First, it

25   requires the PAB and, more importantly, the PAB trustee to

1    have the authority to assume that liability.  I think that,

2    in this instance, is a question of law.  I think that the

3    language granting that discretion is not ambiguous and that

4    I -- and I think that the trustee does have that discretion.

5            Second, all right, is it should I allow, as the

6    judge, the trustee of the trust to assume that liability

7    possibly to the detriment of some of the trust beneficiaries

8    who have objected?  Some of the trust beneficiaries have not

9    objected or sort of not objected.  That is a question of

10   fact about whether the exercise of the trustee, Mr. Horton's

11   discretion to assume that liability is reasonable and should

12   be approved by the Court.

13           Issues that go into whether that exercise of that

14   discretion is reasonable or not include without limitation

15   what he thinks 6.8A and B mean, how much he thinks the D&Os

16   are going to have to pay to defend the discovery or

17   participate in the discovery, and a variety of other reasons

18   that he's discussed or has been represented that he

19   discussed to the Court.

20           Do we decide that issue, which at the end of the

21   day it comes down to?  Should this Court approve the

22   trustee's exercise of his discretion under the documents to

23   assume the liability of the directors' and officers'

24   participation in discovery requires evidence?  So Mr.

25   Galardi was right.  There is an evidentiary issue.

1          Mr. Horton is not here, so we have sort of two

2     ways to go forward.  One would probably not be ideal, but

3     I'm certainly willing to do it, which is to get him on the

4     phone this afternoon.  I assume he's in Texas currently.  So

5     to get him on the telephone and have him -- or by video, I

6     suppose, if possible, and have him testify that way this

7     afternoon.

8          That's not ideal for a number of reasons.  One,

9     I'm sure the PAB counsel would like to prep Mr. Horton for

10    his testimony.  Second, receipt of especially telephonic

11    evidence is disfavored because it's impossible for the Court

12    to discern demeanor.  It's also very difficult with

13    speakerphones to -- people start to talk over each other,

14    and you can't hear each other, and it's very difficult -- it

15    would be very difficult for Mr. Galardi to cross.

16         But time is somewhat of the essence here because

17    the discovery is happening in real time.  The other thing is

18    to continue the hearing to a date that we can all agree on

19    to have the evidentiary portion of the hearing.

20         I am not willing to simply deny the motion for

21    lack of providing evidence, but I am willing to continue the

22    hearing to a date where we can have evidence.

23         MR. GALARDI:  Your Honor, may I address the Court?

24         THE COURT:  Yes, you may.  You know -- go ahead.

25    I'm not going to predict what you're going to say.  I almost

```
1    tried, but no.

2              MR. GALARDI:  Actually, Your Honor, I think Mr.

3    Thomas said it.  And again, there's a response due on July

4    19th to the discovery.  Whether anyone in this courtroom

5    wants to believe it or not, we would like to try to keep the

6    expense down.  I don't know what Mr. Horton can say today

7    about his projections of the cost and expense, but I would

8    advocate that you let the parties -- right, this is a

9    reimbursing motion.  It's not an advancement --

10             THE COURT:  When -- it's due Thursday?

11             MR. GALARDI:  I think it's the 19th.  I don't

12   know.  We may have given Mr. --

13             WOMAN:  It's the 18th.

14             MR. GALARDI:  18th.

15             THE COURT:  So due Wednesday.

16             MR. GALARDI:  Yes, so there is a process for

17   discovery where people can come back, and Mr. Thomas has

18   already said, I'm not producing anything, but I don't think

19   that's really going to be his response.

20             This is a reimbursement motion.  It's not an

21   advancement motion.  I would really prefer that this play

22   out for a week or two so Your Honor could actually get the

23   facts of what the discovery is and the cost.

24             MR. MCKANE:  Your Honor it's -- yeah.  No, no. I

25   didn't want -- are you done?
```

1           MR. GALARDI:  That's okay.  I think I'm done.

2           MR. MCKANE:  Your Honor, it's Mark McKane of

3   Kirkland & Ellis.

4           THE COURT:  I was mistaken, by the way.  I thought

5   you were going to ask to depose Mr. Horton, but --

6           MR. GALARDI:  I haven't said no to that.

7           MR. MCKANE:  So, Your Honor, is -- just as we

8   thought through this motion and this way -- I'm not saying

9   there's a lot of distance between I think where the PAB is

10  and where Mr. Galardi is on this.  Once you have determined

11  as a matter of law that he has the discretion, since it is a

12  reimbursement motion, what we're really saying is the

13  decision about how he exercises it is what he's going to be

14  -- he elects to reimburse when it's presented to him.

15          And so in some ways, we think Your Honor's ruling

16  on the law as it relates to the interpretation of the trust

17  agreement is kind of all I think we can do right now.  And

18  then when (indiscernible) Proskauer present reimburse

19  requests and he says, I am agreeing to reimburse this but

20  not that, or however he does, that is the exercise of that

21  discretion.  And that's why I think, you know -- that's the

22  issue we wanted to fly for you as to how you want to

23  proceed.

24          THE COURT:  Okay.  I don't know if that satisfies

25  your directors, but --

1        MR. MCKANE:  Well, and I guess what I'd say is,

2   you know, I'd like the opportunity to confer with them, but,

3   you know, when I heard Mr. Galardi's approach to that,

4   actually it did resonate.  And so if we could have the

5   opportunity to confer with the directors and officers, you

6   know, I think it'd be helpful.

7        THE COURT:  Mr. Galardi?

8        MR. GALARDI:  Your Honor, there's two things.  And

9   I want to be clear about your ruling because I think I am,

10  but I want to make it clear.  I think when you talked about

11  6.8 and 6.9, that was going to the exercise of this

12  discretion and whether it was reasonable or not.  What you

13  ruled is a matter of law, which we happen to disagree with.

14       THE COURT:  Fair enough.

15       MR. GALARDI:  But you ruled as a matter of law

16  that you believe the documents, Section 4161, provide him

17  with that discretion.  Did I get that part right?

18       THE COURT:  Yes.  I thought it was clear, but yes.

19       MR. GALARDI:  Okay.  Good.  So now --

20       THE COURT:  I'm specifically not ruling --

21       MR. GALARDI:  Exactly.

22       THE COURT:  -- on 6.8 or 6.9, and --

23       MR. GALARDI:  Right.  So -- and I think Mr. McKane

24  and I probably much closer on exactly a way to not spend a

25  lot of money coming back.  I'm reserving all my rights on

1    the appeal on the discretion issue.  Your Honor knows that.

2    Leave that aside.

3              THE COURT:  Appeal away.

4              MR. GALARDI:  But on the --

5              THE COURT:  You know how I know it's -- you know

6    how I know it's Tuesday?

7              MR. GALARDI:  I'm appearing on appeal.

8              THE COURT:  You're appealing something.  Every

9    Tuesday.

10             MR. GALARDI:  Well, if we schedule a Wednesday, we

11   can pick another day of the week, Your Honor, but that's

12   okay.

13             With respect to the discretion point, first, I

14   know you somewhat misspoke, not intentionally, but it's not

15   Mr. Horton's directors and officers.  They are the former

16   directors and officers of The EFH and EFIH, which happened

17   -- Mr. Horton is one as well, and I hope Your Honor

18   understands that's --

19             THE COURT:  I remember.

20             MR. GALARDI:  -- one of the challenges to

21   discretion that we'll use.  I don't have a problem having a

22   hearing later when they actually get the fees because I do

23   believe it's a reimbursement issue.

24             MR. MCKANE:  And I'll be the first to say that I

25   stumbled over my words when I referenced the DVs because we

1    all acknowledged that they are third parties, so --

2              THE COURT:  Right, and look, I'm doing the best I

3    can.  I just -- I said "PAB" and not "Debtor." I think

4    that's the first time, so, you know, I'm working on it.  But

5    if I misspoke, obviously Mr. Horton has no directors and

6    officers and never did.  He was an officer of many of the

7    debtors, if not all of them, and the people we're really

8    talking about, I believe -- although, I guess there is a

9    possibility Mr. Keglevic is going to be subpoenaed.

10             MR. MCKANE:  Mr. Keglevic has been identified

11   preliminarily --

12             THE COURT:  Right.

13             MR. MCKANE:  -- as a person from whom they will

14   seek a deposition as well.

15             THE COURT:  Okay.  But currently appearing in

16   front of the Court are, again, the former disinterested

17   directors.

18             MR. MCKANE:  Your Honor, if it helps, Ms.

19   Yenamandra reminds me that PAB stands for Protect All

20   Beneficiaries.

21             THE COURT:  That's a -- no comment.  So do you

22   want to -- so should we take a break and give you an

23   opportunity -- Mr. Thomas is on the phone, so you're going

24   to have to reach out to him by cell I guess.

25             MR. MCKANE:  Yeah.  Your Honor, if we could have

1    just even 10 to 15 minutes to make sure that, you know, at

2    least to confer with the --

3                 THE COURT:  Sure.

4                 MR. MCKANE:  -- proposed counsel.

5                 THE COURT:  We'll shoot for 15.  If you need more,

6    let us know.  If you need less, let us know.  I won't go

7    anywhere.

8                 MR. GALARDI:  Thank you, Your Honor.

9                 THE COURT:  You're welcome.  We're in recess.

10                (Recess)

11                MR. GALARDI:  -- what has gone on today.

12                THE COURT:  I was going to say, was the mic on?

13                WOMAN:  It was, but the audio -- I mean, it's

14   recording, but I just --

15                MR. GALARDI:  Oh, okay.

16                WOMAN:  I just unmuted it because I had to mute it

17   for the --

18                THE COURT:  Okay.  All right.  Because I was

19   having trouble hearing.

20                MR. GALARDI:  All right.  So, Your Honor,

21   reflecting back, here is our issue.  And Your Honor has seen

22   our letter, and in our letter, which again, honest broker

23   that they are, accused him of bad judgment, we don't believe

24   Mr. Horton as he sits here today.  One, they knew there was

25   a motion on.  He didn't come.  We actually think it should

1    be denied.

2            Two, Your Honor is giving --

3            THE COURT:  I've already said I'm not going to do

4    that.

5            MR. GALARDI:  I understand, Your Honor said that,

6    but then Your Honor has given two paths.  I would like to

7    have Mr. Horton's testimony today because I don't believe

8    Mr. Horton has the facts that this counsel has told them to

9    protect people that were his former directors and officers,

10   so we would request that he -- whether we have to -- we'll

11   arrange a video testimony today in Dallas, if that's

12   necessarily, but this was the time and place for this

13   hearing, so we believe that if he's going to defend the

14   discretion, I want to know the facts.  Your Honor listed

15   some, I listed some.  We would've been entitled to

16   examination today.  We're entitled to examination today, so

17   we would ask that he be put on the stand today.

18           THE COURT:  Thank you.  Mr. McKane.

19           MR. MCKANE:  Your Honor, I just have to respond.

20   And to be absolutely clear, we are -- you gave us two paths.

21   We are firmly electing one, and we're opposing the other in

22   that -- with the question of the discretion.  The discretion

23   is how to, you know, how to apply it.  The question for

24   today is, as was clearly briefed was do the governing

25   documents allow him to exercise that discretion?  And that's

1   clearly the answer in the -- that's been sought.

2          THE COURT:  Well, I mean, your motion contemplated

3   me granting.  I mean, you gave me an order that would've --

4   a form of order that would've proved the exercise of its

5   discretion.

6          MR. MCKANE:  And Ms. Yenamandra specifically said

7   to the extent they want specific procedures about the

8   application of that discretion, including, you know, per the

9   reporting, he is prepared to provide that.  That was what we

10   were trying to distinguish, which is the request on the

11   front end of can he do this, which is an interpretation of

12   the documents, as opposed to, okay, this is what he's

13   proposing to do.  That's why -- and I'm not suggesting Ms.

14   Yenamandras is inarticulate.

15          THE COURT:  Again, I mean --

16          MR. MCKANE:  I think she was proposing --

17          THE COURT:  I have a lot of respect for you and

18   Ms. Yenamandra.  You're kind of, I don't know, backpedaling

19   a little bit here.  That was a -- the discretion thing was

20   certainly a piece of your motion and a piece of the

21   briefing, but not -- it certainly wasn't all of it.

22          MR. MCKANE:  We recognize that, Your Honor.

23          THE COURT:  Okay.

24          You look like you want to say something else.

25          MR. GALARDI:  Your Honor, I'm just pointing out

1   the motion was much broader, and I think Your Honor hit it.

2   It's far broader than simply, oh, we're going to have a

3   legal interpretation of the documents.  That's not what the

4   motion said.  He wanted to do it.  Reimburse him, and we'll

5   tell you after the fact.

6           I want to know what he has now in his mind as to

7   the budget, the amounts, why he has made the motion because

8   this goes to whether or not we could try to remove him with

9   or without cause under the document itself.

10          THE COURT:  Remove him?  Wait a minute.

11          MR. GALARDI:  I'm sorry?

12          THE COURT:  Did you say remove him?

13          MR. GALARDI:  Your Honor, the document provides

14   that you can.  If he's abused his discretion or exercised

15   it, we will take the next step.

16          THE COURT:  All right.  Well, I'm not going to

17   have a hurry-up hearing this afternoon to give you knives to

18   throw at Mr. Horton.  You may have them, but I'm not doing

19   it.  The question is the issue before me.

20          MR. GALARDI:  Correct.

21          THE COURT:  Not giving you ammunition to get rid

22   of him.

23          MR. GALARDI:  And you're --

24          THE COURT:  Which you can do.  You know, whatever.

25   Do whatever you're going to do, but --

1          MR. GALARDI:  Your Honor, you're 100 percent

2      right.  This is one step in the whole process.

3          THE COURT:  Right.

4          MR. GALARDI:  The fact of the matter is he says he

5      has discretion.  We understand your ruling.  We disagree.

6      We want to know on what basis he reached out and decided to

7      assume these costs.

8          MR. MCKANE:  And, Your Honor, assumed what costs?

9      He hasn't taken any costs yet until he does the approval.

10     But, Your Honor, what was just mentioned by Mr. Galardi

11     about the letter and about what he's trying to establish a

12     record of is exactly what he wants the second, you know,

13     aspect of a hearing on and why we think an adjournment is

14     appropriate.

15         What he's trying to do and what his client has

16     clear done in a direct letter of communication from his

17     client to Mr. Horton is he wants to have Mr. Horton removed.

18     He wants to develop a factual record to the extent that he

19     can, and he won't be able to, to have him removed.

20         THE COURT:  All right.

21         MR. GALARDI:  Your Honor, they put it on an

22     expedited motion with a motion to shorten because the

23     expenses are accruing immediately.  He must have an

24     understanding.  That's the decision.

25         THE COURT:  Okay.  All right.  We're not going to

1    do it today.  I was really focused on that, interestingly

2    enough, to the -- because, again, it was on a motion to

3    shorten, and I was assuming that the debtors -- see?  The

4    PAB wanted it heard immediately.  It's kind of interesting

5    that now it's flipped, but I certainly understand Mr.

6    Galardi's position.

7            Let me propose this.  I'm looking at my calendar.

8    And Mr. Galardi has a point.  I mean, you -- look, Mr.

9    Horton approved the motion.  The motion's broader than

10   simply seeking the question of whether Mr. Horton has

11   discretion, and it was scheduled for today on short notice.

12   Mr. Galardi and client incurred the cost of opposing it and

13   preparing.  I think he has a right -- not a right, but I

14   think it's fair that it be heard and he be heard in an

15   expeditious manner.  I think ask for a motion to shorten,

16   you're kind of stuck with an expedited basis.

17           However, there are a couple things.  One, we don't

18   even know what the discovery responses are going to be, and

19   they're due Wednesday, and I'm out Wednesday and Thursday.

20   So what I would propose is we continue this hearing until 1

21   p.m. on Friday.

22           MR. GALARDI:  Your Honor --

23           THE COURT:  For an evidentiary hearing.

24           MR. GALARDI:  Your Honor, again, you're allowing

25   him to create a record that was not the record at the time

1   the motion was filed.

2           THE COURT:  I know.  I understand.

3           MR. GALARDI:  That's simply not an appropriate

4   thing for a motion.

5           THE COURT:  We can go through that --

6           MR. GALARDI:  He can refile it.  If the motion has

7   been --

8           THE COURT:  How would it be any different, Mr.

9   Galardi?  You can -- you're going to have an opportunity to

10  cross-examine Mr. Horton.  If he lies about what he thought

11  when the motion was filed versus what he thinks today, and

12  if you're able to expose that, you know, he'll be charged

13  with perjury.

14          MR. GALARDI:  Okay, Your Honor, and you know that

15  that's not going to happen with Kirkland on his side.  It's

16  all the prep.  It's all with respect to people that he

17  served as board members with, Your Honor.  That is not an

18  adequate response.

19          THE COURT:  I refuse to sit here today and assume

20  Mr. Horton is going to act in bad faith.

21          MR. GALARDI:  I'm not suggesting he will.

22          THE COURT:  I've known that man for over four

23  years.

24          MR. GALARDI:  I'm not suggesting he will.

25          THE COURT:  And I know Mr. McKane, and I know Ms.

1    Yenamandra.  I don't know you, sir.  They're not going to

2    act in bad faith.  They're going to do their best to prepare

3    their witness, and you're going to do your best to tear him

4    up on cross-examination.  That's the way it works.  It's no

5    different from if we'd gone to the end of the day today

6    without getting a resolution and we didn't have Mr. Horton

7    on the stand yet, and I had to continue it to Friday.  It's

8    no different.

9              MR. GALARDI:  Your Honor --

10             THE COURT:  I've ruled.

11             MR. GALARDI:  Thank you.

12             THE COURT:  All right.  The day is -- from a --

13   scheduling for people's calendars, is Friday at 1:00

14   acceptable?

15             MR. MCKANE:  We'll make it happen, Your Honor.

16             THE COURT:  I'm sorry, Mr. McKane?

17             MR. MCKANE:  I mean, Your Honor, there are

18   obligations I have on the West Coast, but I'll move them.

19   I'll move them.

20             THE COURT:  Okay.  Thank you.  I appreciate that.

21   Friday at 1:00.  We're in recess until then.

22             MR. MCKANE:  Thank you.

23             (Whereupon these proceedings were concluded at

24   12:32 PM)

25                       * * * * *

1          C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya

7    Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2018.07.17 15:40:00 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  July 17, 2018