1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    In re:                        :

5                                  :    Chapter 11

6    ENERGY FUTURE HOLDINGS CORP., :    Case No. 14-10979(CSS)

7    et al.,                       :

8            Debtors.              :    (Jointly Administered)

9    _____:

10

11

12                               United States Bankruptcy Court

13                               824 North Market Street

14                               Wilmington, Delaware

15                               July 20, 2018

16                               12:58 PM - 4:48 PM

17

18

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR:  LESLIE MURIN

1   HEARING re Motion of EFH Plan Administrator Board for

2   Authorization to Reimburse Third-Party Discovery Fees and

3   Expenses of former directors, Officers, and Manager Incurred

4   in connection with the EFH/EFIH Allocation Dispute [D.I.

5   13262; filed July 6, 2018]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   KIRKLAND & ELLIS LLP

4        Attorneys for the EFH Plan Admin. Board

5

6   BY:  MARK MCKANE

7        APARNA YENAMANDRA

8        M. THOMPSON

9

10  RICHARDS LAYTON & FINGER, P.A

11       Attorneys for the Debtors

12

13  BY:  DANIEL J. DEFRANCESCHI

14

15  ROPES & GRAY

16       Attorneys for Elliott & UMB

17

18  BY:  GREGG GALARDI

19       ANDREW SIMPSON

20

21  BAYARD

22       Attorneys for Elliott & UMB

23

24  BY:  ERIN R. FAY

25

1    HOGAN MCDANIEL

2          Attorneys for the Ad Hoc EFH Claimants

3

4    BY:  GARVAN MCDANIEL

5

6    FOX ROTHSCHILD

7          Attorneys for Sempra Energy

8

9    BY:  CARL NEFF

10

11   WHITE & CASE LLP

12         Attorneys for Sempra Energy

13

14   BY:  J. CHRISTOPHER SHORE

15

16   BIELLI KLAUDER, LLC

17         Attorneys for Dis Directors of EFH

18

19   BY:  DAVID KLAUDER

20

21

22

23

24

25

1    ALSO APPEARING TELEPHONICALLY:

2

3    SAM N. ASHURAEY

4    ERIC C. DAUCHER

5    ANDREW H. ELKIN

6    MICHAEL FIRESTEIN

7    TAYLOR B. HARRISON

8    DANIEL K. HOGAN

9    CHRISTIAN P. JENSEN

10   HOWARD KAPLAN

11   HANNA KUPSKY

12   VINCENT LAZAR

13   JOSEPH A PACK

14   RICHARD PEDONE

15   ERIK SCHNEIDER

16   DANIEL S. SHAMAH

17   ANGELO THALASSINOS

18   BRADY C. WILLIAMSON

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Good afternoon.

4              MR. MCKANE:  Good afternoon, Your Honor.  It's

5    Mark McKane of Kirkland & Ellis, and we're here for the

6    continuation of Monday's hearing on the PAB's motion to

7    authorize reimbursement of fees and expenses for certain

8    officers and directors.  Specifically, it's the evidentiary

9    portion of that hearing.

10             Your Honor, as is our practice, the Debtors have

11   prepared -- sorry, the Debtors -- apologize.  That's going

12   to happen more than once today.  The PAB is continuing the

13   practice of the Debtors in preparing a witness binder for

14   the Court and for its staff.  May I approach?

15             THE COURT:  Yes.  Thank you.

16             MR. MCKANE:  Your Honor, before we call Mr. Horton

17   to the stand, there's a number of documents we'd like to

18   move into evidence.

19             THE COURT:  All right.

20             MR. MCKANE:  And, specifically, just to confirm,

21   our understanding is document -- that Tab 2 -- or, excuse me

22   -- Tab 3, the merger agreement, which has been labeled PAB

23   Exhibit 3, it was admitted on Monday.

24             THE COURT:  Okay.

25             MR. MCKANE:  All right?  And then Tab 4, the EFA's

1    planned administrative trust agreement, was also admitted on

2    Monday.

3            THE COURT:  Okay.

4            MR. MCKANE:  And then Tab 5, which is titled EFA's

5    planned administrative trust agreement, these are the

6    excerpts that were provided to Your Honor on the hearing on

7    Monday, July 16th as a demonstrative.  So, with that, there

8    is a demonstrative aid that we'll use during the course of

9    the hearing that's under Tab 1, but I'm not going to move

10   that into evidence.

11           Your Honor, for the record what we'd ask is that

12   the allocation dispute scheduling order, which is DI13193,

13   be admitted into evidence and be part of the record for

14   these proceedings.

15           THE COURT:  Any objection?

16           MR. GALARDI:  No objection, Your Honor.

17           THE COURT:  It's admitted.

18       (PAB's Trust Agreement Exhibit Entered into Evidence)

19           MR. MCKANE:  Thank you, Your Honor.  Then under

20   Tab 6, Your Honor there's a series of email communications

21   between Mr. Horton, the Trustee of the PAB, and Mr. Jeff

22   Rosenbaum of Elliot Management.  These were produced in

23   discovery that has occurred since Monday through today.

24   They've been provided to opposing counsel.  And we move

25   these email communications into evidence.

1            THE COURT:  Any objection?

2            MR. GALARDI:  No objection, Your Honor.

3            THE COURT:  They're admitted.

4       (PAB's Email Exhibit Entered into Evidence)

5            MR. MCKANE:  Thank you.  Under Tab 7, Your Honor,

6    is -- are the handwritten notes of Mr. Tony Horton, dated

7    July 6, 2018.  These were also produced in discovery between

8    Monday and Today.  We move this into evidence.

9            MR. GALARDI:  No objection, Your Honor.

10           THE COURT:  They're admitted.

11      (PAB's Handwritten Notes Exhibit Entered into Evidence)

12           MR. MCKANE:  Your Honor, Exhibits 8 through 13 are

13   responses and objections filed on Wednesday by former

14   disinterested directors to subpoenas received in the

15   allocation dispute.  Specifically, Tab 8 is the response and

16   objection by Chuck Cremens to the ad hoc EFH Claimant's

17   subpoena; Tab 9 Is Mr. Cremens' response and objection to

18   Elliot and UNB Bank subpoena; Tab 10 is Donald Evans'

19   response and objection to the ad hoc EFH Claimant's

20   subpoena; Tab 11 is Mr. Evans' response and objection to the

21   Elliot UNB subpoena; 12 is Ms. Williamson's response and

22   objections to the ad hoc EFH Claimant's subpoena; and 13 is

23   Mr. Williamson's response and rejections to the Elliot and

24   UNB Bank subpoena.  Your Honor, we move those into evidence

25   as well.

1          MR. GALARDI:  And, yes, there are objections to

2     those, Your Honor.

3          THE COURT:  All right.

4          MR. GALARDI:  A series of objections.  First, Your

5     Honor, with respect to the hearing, note that the date on

6     each one of these is after Monday's hearing.  And, Your

7     Honor, as I made a presentation then, we don't believe that

8     with respect to the discretion in the filing of this motion

9     and prosecution of this motion, evidence that comes after

10    the date of the hearing, even though we've now had this

11    adjourned to this hearing, that that is admissible evidence

12    for the purposes of determining Mr. Horton's discretion.  So

13    we would ask that all A through and including 14 for the

14    purposes of today be not admitted into evidence.

15         MR. MCKANE:  May I respond, Your Honor?

16         THE COURT:  Yes.

17         MR. MCKANE:  I think the key phrase that I heard

18    in the objection was "the filing and prosecution of the

19    motion." And to the extent that we're continuing to press

20    forward in the motion, it is a continuing exercise of Mr.

21    Horton's discretion to ask the Court to rule on the motion.

22    So I believe, based on Mr. Galardi's own objection, he's

23    focusing not just on the discretion of when it was filed but

24    continuing up through today to ask for the ruling.  And

25    based on that, what happened on Wednesday and the positions

1    taken on Wednesday are relevant to reinforcing the decision

2    that was made not just back on the 6th, but the continued

3    prosecution through today.

4           MR. GALARDI:  And, Your Honor, I'd add one other.

5    To the extent that Your Honor even considers to put it in,

6    these are all hearsay and they're not parties to any of

7    these documents.  It can't go in for the truth of the matter

8    asserted.  It at best would go in for the purposes that they

9    have been acknowledged and received.  But, again, I would

10   stand on they're not admissible in the first instance.

11          MR. MCKANE:  And, Your Honor, we're not suggesting

12   -- not that they're more than acknowledged and received, but

13   these are the positions being asserted.  At least that's

14   what they're saying in writing.  I don't know if it's true

15   or not.  I don't know if that's what's in Mr. Cremens' heart

16   or Ms. Williamson's heart, but that's the position that's

17   being asserted and that's what they're going to be used for

18   at the hearing.

19          MR. GALARDI:  And I want to note one other aspect,

20   Your Honor, just so when you're ruling you'll hear this

21   later.  With respect to Mr. Cremens, Mr. Cremens has refused

22   to accept service.  Mr. Levin filed this but we've been

23   unable to actually serve.  And despite all of the efforts

24   we've made, again, Mr. Levin is obviously doing a responsive

25   but Mr. Cremens has not actually been officially served and

1    has refused service and avoided service since we've tried to

2    go forward and pursue it.

3              THE COURT:  All right, thank you.  All right, I'm

4    going to overrule the objection and I will admit Documents

5    8-14.  With regard to the timing, I agree with Mr. McKane,

6    that this is not a snapshot of what was decided five minutes

7    before the motion was filed.  I think this is a continuing

8    issue and I think it has to be a continuing issue.  Because

9    while authority is being sought to reimburse the expenses,

10   no one's actually -- I haven't read any of the new filings,

11   but I assume no one's actually requested reimbursement of

12   something at this point.

13             Regardless, even if they had, the issue would be

14   to exercise your authority that I have ordered all of you

15   have to pay those amounts.  So I think it's relevant.  And,

16   indeed, one of the reasons I continued the hearing until

17   today as opposed to earlier in the week was to allow these

18   documents to come in because we knew they were due on the

19   18th.  So I will admit them.

20             With regard to the hearsay point, there was a bit

21   of a dance.  When you say, "Oh, I'm not asking you for the

22   truth of the matter asserted, I just want to have it

23   admitted for the fact that they've asserted this, whether

24   it's true or not." It's a bit of a delicate dance, frankly.

25   But I think the fact that they've been docketed, and they're

1    signed by attorneys, and they're public statements, at least

2    for the purposes of the assertion that they're made therein,

3    I will admit them.  I will give them, however, not a ton of

4    weight.  Because I think really all we need to know is

5    pretty basic from what they've asserted.  So I will overrule

6    that.

7              With regard to the service of Mr. Cremens, I don't

8    think it's relevant for purposes of what Mr. Levin may have

9    filed or not filed.  And, of course, we'll see how it comes

10   up later in the hearing since it sounds like that's going to

11   occur.  But I don't think it goes to the admissibility of

12   the documents.  So they're admitted.

13       (PAB's Documents 8-14 Exhibit Entered into Evidence)

14             MR. MCKANE:  Your Honor, just two clarifying

15   points.  I believe at one point you said 8 through 14, and

16   we were just asking for 8 through 13.

17             THE COURT:  Oh, I apologize.

18             MR. MCKANE:  And one other clarifying point.

19   These were served but I don't believe the responses are

20   actually on the docket.

21             THE COURT:  Notice of service is probably on the

22   docket, right?

23             MR. MCKANE:  That's correct.  I believe that there

24   may be notices of service but not the actual responses.

25             THE COURT:  Okay, understood.

1          MR. MCKANE:  And then, finally, Your Honor, the

2     last document that we would move into evidence is under Tab

3     14 -- is labeled PAB Exhibit 14.  It's a piece of

4     correspondence from Mr. Shore at White & Case to Mr. Thomas,

5     responding to a demand letter and stating a position on

6     behalf of reorganized EFH.  And we move that into evidence

7     as well.

8          MR. GALARDI:  Your Honor, we have the same

9     objections to this letters.  So that's why I mentioned 14

10    when we did it.

11         THE COURT:  Yeah.

12         MR. GALARDI:  But I thought I would take it --

13         THE COURT:  All right, objection overruled.  It's

14    admitted.

15       (PAB's Exhibit 14 Entered into Evidence)

16         MR. MCKANE:  Thank you, Your Honor.  With that,

17    the PAB calls Mr. Tony Horton to the stand.

18         THE COURT:  All right.  Mr. Horton, I think you

19    know the way.

20         MR. HORTON:  Unfortunately, Your Honor.

21         THE COURT:  Please remain standing for your

22    affirmation, and then when you sit, please adjust yourself

23    as close as possible to the microphone.

24         MR. HORTON:  Yes, sir.

25         CLERK: Please raise your right hand.  Do you

1    affirm you will tell the truth, the whole truth, and nothing

2    but the truth to the best of your knowledge and ability?

3              MR. HORTON:  I do.

4              CLERK: Please state and spell your name for the

5    record.

6              MR. HORTON:  Anthony L.  Horton.  H-O-R-T-O-N.

7              CLERK:  Thank you.

8              MR. HORTON:  Thank you.

9              THE COURT:  Thank you.

10                  DIRECT EXAMINATION OF ANTHONY L.  HORTON

11   BY MR. MCKANE:

12   Q    Good afternoon, Mr. Horton.

13   A    Good afternoon, Mr. McKane and Your Honor.

14             THE COURT:  Afternoon.

15   Q    For the record, Mr. Horton, can you state your current

16   position as it relates to the EFH estates?

17   A    I am currently the plan administrator board.

18   Q    All right, and prior to the position, the plan

19   administrator board, what positions did you hold with

20   regards to EFH?

21   A    At EFH I was the treasurer and ultimately CFO at EFH

22   and EFIH and several of the subsidiaries of the E side.

23             MR. MCKANE:  Your Honor, may I approach the

24   witness to provide him a witness binder?

25             THE COURT:  Yes.

1    A    Thank you, Mr. McKane.

2    Q    And the positions you identified with regards the

3    former debtors, were those positions you held through the

4    effective date?

5    A    Yes, sir.

6    Q    And are you familiar with the motion at issue today?

7    A    I am.

8    Q    If I refer to as the DNO motion -- sorry, the DNO

9    reimbursement motion or the reimbursement motion would you

10   know what I'm referring to?

11   A    I would.

12   Q    All right.  And, sir, is it your understanding that

13   that motion seeks confirmation of your ability to pay the

14   fees and expenses of former directors and officers incurred

15   with regards to third party subpoenas?

16   A    That is correct.

17   Q    And what dispute do those third party subpoenas relate

18   to?

19   A    They relate to the allocation cost dispute amongst, I

20   guess, effectively, EFH and EFIH creditors that hold

21   positions at those levels.

22   Q    And, sir, did you review the reimbursement motion

23   before it was filed?

24   A    I did.

25   Q    Did you authorize its filing?

```
 1    A    I did.

 2    Q    And, sir, did you review a transcript of the hearing

 3    from Monday with regards to the reimbursement motion?

 4    A    I listened to the hearing and I briefed the transcript.

 5    Q    And, sir, are you aware that Mr. Galardi on behalf of

 6    the Elliot creditors stated that he didn't believe that Mr.

 7    Horton had the facts about why the PAB filed the motion?

 8    A    I did hear that.

 9    Q    And do you agree with that assertion?

10    A    I do not.

11    Q    And are you also aware that Mr. Galardi on behalf of

12    the Elliot creditors stated that counsel told you that you

13    were protecting your former co-directors and officers?

14    A    I am aware of that.

15    Q    And is that true?

16    A    That is not true.

17    Q    And, sir, at a high level, why do you seek the relief

18    that is in the reimbursement motion?

19    A    At a high level, the reason I seek the reimbursement is

20    that it's my responsibility as the PAB to protect the assets

21    that are in the trust, the value, the assets that are in the

22    trust for the benefit of all beneficiaries.  And I believe

23    that the motion provides us an opportunity to keep us on

24    track, and provides us with an opportunity to provide

25    distributions to the beneficiaries on the most timely basis
```

1    that I have seen at this point.

2    Q    And is the timely basis or keeping things on track, is

3    that an important factor in getting the value out to the

4    beneficiaries?

5    A    It's certainly from my perspective, having 600 million-

6    plus dollars sitting in a trust -- and we can get into this

7    later -- but earning 1.64 percent versus distributing those

8    assets to the beneficiaries for them to reemploy and earn a

9    higher return is a tremendous opportunity cost for the

10   beneficiaries of the trust.

11   Q    And is it your view that delay has an impact on that

12   opportunity cost?

13   A    Delay -- it's just a time value of money issue.  As we

14   go forward in time, the value of those dollars that are not

15   receiving the required rate of return from the

16   beneficiaries, which are primarily distress funds and hedge

17   funds, is creating a diminution of their value over time.

18   Q    And, sir, are you also -- were the actual costs of the

19   PAB a factor as well?

20   A    Absolutely.

21   Q    Let's -- if you could turn to Tab 1 of your binder.

22   Your Honor...  Are you there, sir?

23   A    I am.

24   Q    Did you help prepare this demonstrative aid to assist

25   you in your testimony today?

1   A    I did.

2           MR. MCKANE:  And, Your Honor, may we publish this?

3           THE COURT:  Sure.

4           MR. MCKANE:  All right.  Put it up on the screen?

5           THE COURT:  It's another EFH timeline.

6           MR. MCKANE:  We even kept the colors.

7           THE COURT:  But they're not lollypops anymore.

8   They're little diamonds.

9   Q    Mr. Horton, what does this chronology show?

10  A    This chronology shows a couple of things.  One is at

11  the top you can see key dates that are related to the filing

12  for the DNO reimbursement motion and a couple of other key

13  dates following that filing.  On the bottom portion of the

14  schedule you see key dates regarding the allocation, cost,

15  dispute, timeline for litigation that we have set forth and

16  approved -- it was approved by the Court in its order.

17  Q    And why did you decide to overlay the reimbursement

18  dispute with the allocation dispute?

19  A    I think you see the interplay between the dates that

20  we're trying to keep in the allocation disputes schedule and

21  how we came to the conclusion, or I came to the conclusion

22  regarding the reimbursement motion filed on July 6th, and

23  how this continues to play out, and keeping that schedule

24  and avoiding delay and additional opportunity cost.

25  Q    Well, you know, are you familiar with the schedule for

1   the allocation dispute that's below the bar?

2   A    Yes.

3   Q    How would you characterize the speed of the allocation

4   dispute?

5   A    From my perspective, and I think that this was

6   discussed with various beneficiaries of the trust, the idea

7   here is to move very rapidly and try to get, again, the

8   funds and the trust disbursed to the beneficiaries as

9   quickly as possible.

10  Q    And did you support the schedule?

11  A    I did.

12  Q    All right, let's walk through the demonstrative, if we

13  can.  The first date is June 15th.  It references a

14  discovery meet and confer.  What did you learn on June 15th?

15  A    On June 15th, my understanding was that there was a

16  discussion between K&E and Ropes & Gray regarding just the

17  scope of the discovery.  What I also learned on that day was

18  that former disinterested directors were going to be

19  subpoenaed or going to call for discovery and deposition,

20  including potentially Mr. Keglevic.  That's what I recall.

21  Q    And what was your reaction when you learned that the

22  former directors and officers would be included in the scope

23  of discovery?

24  A    My reaction was "Okay.  And who's going to pay for

25  these costs?  The cost of this discovery?" Again, very

1   focused on maintaining the value of the trust and leakage.

2   Q    And did you consider whether the former directors and

3   officers were going to have to pay the costs?

4   A    I did.

5   Q    All right.  And what steps did you direct folks to take

6   after learning this on June 15th?

7   A    Once I learned that this was becoming an issue, I

8   instructed my counsel to go look at different alternatives.

9   The ones that I suggested were the merger agreement -- is

10  there some type of indemnification in the merger agreement?

11  The DNO policy -- is there, you know, a way for those to be

12  paid by the DNO policy?  The implication for the directors

13  and officers paying for those fees themselves.  And, lastly,

14  the plan administrator board's ability to pay those fees as

15  well.

16  Q    All right.  The next date is June 16th and refers to a

17  reimbursement meet and confer.  What do you understand about

18  that meet and confer?

19  A    I think you said June 16th.

20  Q    Oh, I apologize.  June 26th.  I apologize, sir.

21  A    Yeah, my understanding was -- and I get reports from

22  Aparna and K&E about these meetings after they happened or

23  actually before.  Some days -- sometimes I get indications

24  of, you know, a meeting's coming up.  We want to let you

25  know -- be aware of it.  And are you okay with it?  So, on

1    that date --

2              MR. GALARDI:  Your Honor, may I interrupt for a

3    second.  I think it's incurring outgoing --

4              THE COURT:  I can't hear you.

5              MR. GALARDI:  I'm sorry, Your Honor.  With respect

6    to -- he just didn't testify to firsthand knowledge; this

7    was based on a report.  So I think he's testifying form

8    hearsay at this point, and I'd ask him to stop at that

9    point.

10             MR. MCKANE:  Your Honor, I'm asking him what his

11   understanding is.  Understanding is coming from counsel --

12   it goes to the state of mind in terms of making a decision

13   to move forward.  Whether it's exactly a 100 percent report

14   or not, it goes to his state of mind as the PAB in terms of

15   learning about the dispute and what steps he took based on

16   the report he received.

17             THE COURT:  The objection is overruled.  You may

18   proceed.

19   Q    So, Mr. Horton, I was asking you about the report you

20   received about the meet and confer on reimbursement issues

21   on June 26th.

22   A    Yeah.  So it's my understanding that -- again, this was

23   an all-hands-on-deck meeting.  It included Proskauer, it

24   included K&E, it included Ropes & Gray, I think Jenner Block

25   was on the -- in fact, I was told Jenner Block was on the

1   call.  And, again, there was a discussion about the scope of

2   the discovery.  And the topic was raised by K&E regarding

3   the cost and who was going to pay that.

4           MR. GALARDI:  So, Your Honor, may I object again?

5   Now we hear about a report not produced in discovery,

6   reporting about conversations where third parties were

7   involved.  We did not receive that, we did not have an

8   opportunity --

9           THE COURT:  I didn't hear anything about a formal

10  report.  I think --

11          MR. GALARDI:  He just said --

12          THE COURT:  An oral report.

13          MR. MCKANE:  I'll clarify, Your Honor.  I'll be

14  happy to clarify.

15          THE COURT:  Okay.

16  Q    The report, was that an oral report that you received?

17  A    I received a phone call oral report after the meeting.

18  An update.

19          THE COURT:  A phone call oral report or...?

20          MR. HORTON:  I'm sorry, sir?

21          THE COURT:  Something in writing, Mr. Horton?

22          MR. HORTON:  No, sir.

23          THE COURT:  Okay.  Go ahead.

24  Q    Sorry.  Mr. Horton, you were explaining that the report

25  you received about the meet and confer -- what steps did you

1   ask be taken based on the report you received about the meet

2   and confer about reimbursement issues on June 26th?

3   A    Again, it was a phone call, it was an update.  What I

4   understood from the call was that there was resistance from

5   Ropes & Gray that their client was saying that they did not

6   feel like the plan administrator board should reimburse

7   those costs or pay for those costs.  There was a question as

8   to the DNO and whether the DNO policy would cover it.  And

9   there was a request that the DNO policy be distributed to

10  the various parties.  And my understanding is on the 29th,

11  that was delivered.  I instructed my counsel to continue to

12  evaluate the alternatives, to try to reach out to other

13  parties in the matter, such as the ad hoc committee counsel,

14  Mr. Pedone, the indentured trustee at EFH, to try to get an

15  understanding of how they felt about this particular matter.

16  Q    And to be clear, sir, when you refer to the ad hoc

17  committee, you're referring to the ad hoc committee of EFH

18  holders?

19  A    That's correct.

20  Q    And they're represented by the Kasowitz firm?

21  A    Yes, sir.

22  Q    And when you refer to Mr. Pedone, he is counsel for the

23  EFH indentured trustee?

24  A    That's correct.

25  Q    And did you instruct your counsel to provide the DNO

1   policy to the parties in the allocation dispute?

2   A    Yes.

3   Q    And all this activity about potential reimbursement

4   issues, is this before the subpoenas are actually served?

5   A    Yes, sir.

6   Q    And, sir, the subpoenas, when were they served?

7   A    June 29th.

8   Q    And did you, during this time period, learn the

9   positions of any of the beneficiaries to the trust with

10  regards to whether -- how -- should there be an

11  reimbursement of cost and, if so, by whom?

12  A    Yeah, again, there was dialogue and my understanding

13  was more at the professional levels that the belief was that

14  the plan administrator board should not reimburse the

15  expenses for the discovery for the disinterested directors.

16  Q    Did you learn specifically the position of Elliot's

17  creditors with regards to whether the POB should be

18  reimbursing these costs in advance of filing the motion?

19  A    Absolutely.

20  Q    And when did you first learn that?

21  A    I first learned -- I learned about their general

22  concern, the way I would describe it -- it's the way it was

23  kind of presented, is a general reluctance to allow the PAB

24  to -- or support the PAB in paying for or reimbursing for

25  the disinterested directors' costs for discovery and the

1   depositions and the subpoena.  I officially -- not

2   officially -- I heard definitively on July 2nd from a call

3   from Aparna that stated that Ropes & Gray had -- excuse me -

4   - communicated to her that they were definitely taken the

5   position that Sempra -- excuse me, that Elliot believed

6   Ropes & Gray believe that Sempra should bear those expenses.

7   Q    Yeah.  And just for the record, while Aparna may have a

8   single name status like Cher or Madonna, for the record,

9   you're referring to Ms. Yenamandra?

10  A    Ms. Yenamandra.

11  Q    All right, thank you.

12          MR. HORTON:  Are you okay, Your Honor, if I call

13  her Aparna?

14          THE COURT:  You can call her whatever you want.

15  I'm calling her Ms. Yenamandra.  I'll be working for her

16  someday, I'm pretty sure.

17  Q    Mr. Horton, you learned of the Elliot position form Ms.

18  Yenamandra on July 2nd.  Did you also learn of the Sempra

19  position on or around this time?

20  A    I did.  I asked Aparna, have we talked to Sempra?  Have

21  we had communication with their counsel?  What position are

22  they taking?  And it was communicated to me that they said

23  they had in one case had talked to their counsel -- excuse

24  me, to their client, and they were absolutely not going to

25  pay.

1    Q    And, sir, did you have an understanding of the position

2    of the (indiscernible) directors?  Was that relayed to you

3    as well with regards to whether they would voluntarily move

4    forward with incurring these costs?

5    A    My understanding, the communication to me was that they

6    said they would not move forward until they understood who

7    was going to bear that cost.

8    Q    Did you speak with anyone else in or around this time

9    in advance of filing the motion about who could pay the fees

10   and expenses associated with this third party discovery?

11   A    On July 5th, I had a conversation with Mr. Rosenbaum,

12   and he had raised the concern that the plan administrator

13   board may take a position that the plan administrator board

14   should reimburse the cost of the disinterested directors in

15   terms of the discovery.  And he said, "Where are you on your

16   thought process?" I said, "I am continuing to investigate

17   and get input, and I am leaning toward asking for the

18   ability for the plan administrator board to reimburse those

19   costs, but I have not made that final decision."

20   Q    All right.

21   A    "I expect that there would be a motion filed."

22   Q    Before we go further, just to clarify, Mr. Rosenbaum --

23   what is his position at Elliot Capital?

24   A    My understanding is he is a portfolio manager at Elliot

25   Management.

1    Q    And does his portfolio include the EFH investments?

2    A    That's my understanding.

3    Q    Sir, I'm going to come back to Mr. Rosenbaum.  In this

4    early July time period, did you do any work on your own to

5    evaluate the DNL policy, with regards to whether that was an

6    avenue for potential reimbursement?

7    A    On July 5th, I had conversations with Kirkland & Ellis.

8    I wanted to hear their perspective on two things:  the

9    merger agreement itself and -- they had Mr. Pruitt look at

10   it.  He has some experience in indemnification matters and

11   DNO.  In fact, I had talked to him a few years back, as we

12   were preparing for our DNO policy going into bankruptcy.  So

13   I received that input.

14           I also reached out to my DNO broker, who I've

15   worked with, Chris McBee with Lockton.  I reached out to

16   him, worked with him for ten years.  I ran the program, the

17   DNO policy programs for ten years.  I worked to put this

18   particular policy in place, which included a six-year

19   runoff, which is customary in these situations.  So at the

20   moment that EFH emerged, the runoff would begin.

21           I called him on the 5th and I wanted to hear his

22   views.  And I explained the situation, that we had some

23   third party witnesses that were going to be part of an

24   allocation dispute or litigation, and that they were going

25   to be incurring expenses associated with fulfilling that

1    role.  We talked about it for -- at length.  I asked him "Do

2    you think this is going to be covered under the DNO policy?"

3    I had already had my view prior to talking to him.  I wanted

4    to hear his perspective.  He replied, because none of the

5    directors and officers have a claim against them, it was his

6    strong opinion that this would not be covered under the DNO

7    policy.

8              And so, I said, "I understand.  Is -- should we

9    file a claim?" He said, "You can always file a claim.  It's

10   going to take some time." And he said, "But I can almost

11   guarantee you it's going to be rejected."

12   Q    And this is the input you received from Mr. McBee, your

13   insurance broker?

14   A    Yes, sir.

15   Q    All right.  And, sir, did you also evaluate the merger

16   agreement itself?

17   A    I did.

18   Q    And what did you look at and what did you conclude?

19   A    I looked at 6.8A, I also read 6.8B.  I was involved,

20   Your Honor, in -- with Andy Wright, my general counsel, in

21   working with Sempra on pulling together the language.

22   Clearly, me not being a lawyer, I wasn't in the deep, deep

23   legal aspects of it.  There was -- the conversation was

24   around, okay, we're going to provide -- there's going to be

25   indemnification for directors and officers in their capacity

1    at EFH and EFIH and other subsidiaries.  The link to that --

2    and it was going to be a six-year indemnification.  The link

3    to that was the ensuring that we had DNO insurance, runoff

4    DNO insurance of six years to mirror and have the symmetry

5    for the indemnification.  So have the DNO insurance, which

6    is, again, coverage for claims against the DNO officers.

7           So, I read that, thought about the negotiations,

8    thought about the DNO policy, and with that and the input

9    from my DNO broker, as well as input from Kirkland & Ellis,

10   I came to a conclusion.

11   Q    Yeah.  And did you ever evaluate what would happen if

12   you brought an action against Sempra regarding under the

13   merger agreement, to enforce the merger agreement?  To

14   consider the cost and timing?

15   A    Absolutely.

16   Q    And what did you -- what factors did you take into

17   consideration with regards to a potential litigation against

18   Sempra?

19   A    Well, again, my view was that if I took action against

20   the DNO policy itself, or took action against Sempra, that

21   that was going to turn into some form of litigation, and

22   that that was going to create delay on the schedule and slow

23   down -- defer the disbursement of the funds to the

24   beneficiaries for some period of time and, you know, two,

25   three, four weeks or longer.  And that became a great

1    concern of mine.

2    Q    And did that concern about delay -- did it matter

3    whether the PAB brought that lawsuit or the DNOs brought

4    that lawsuit?

5    A    Again, there were lots of -- there were options that I

6    was looking at.  One of the options was tell the DNOs we're

7    not going to cover these costs.  And so, going down that

8    path, then I considered, okay, they can go to Sempra and

9    demand reimbursement, and I -- from my perspective, that was

10   going to take additional time, and I felt like it would be

11   at least two, three, four weeks or longer.  They could

12   certainly go after the DNO policy itself.  And I felt very

13   strongly that that was going to take time to get geared up,

14   get prepared, get it filed.

15          And then -- and I know I'm going a step further,

16   but I considered the Rule 45 of the Bankruptcy Code, that

17   they would have that action.  And in having -- in taking

18   that action, there was going to be, again, that delay.  And

19   I've got this time value -- money with the delay.  And it

20   may end up particularly with the Rule 45, the whole entire

21   cost -- we wait and the entire cost boomerangs back to the

22   PAB.  And as this litigation is going on, the PAB may get

23   dragged in to the litigation, so additional costs there.

24          So, that was the, for lack of a better term, the

25   calculus that I was going through in evaluating what to do.

1    Q    Mr. Horton, let me transition back to your discussions

2    with Mr. Rosenbaum.  You mentioned you had discussions with

3    him prior -- you know, prior to filing the motion.

4    A    I did.  On the 5th and the 6th.

5    Q    And did you also discuss -- just more generally, have

6    you had discussions with Mr. Rosenbaum about the allocation

7    dispute?

8    A    I have had conversations with Mr. Rosenbaum since

9    emergence multiple times about multiple issues.  I have had,

10   you know, rather open and candid dialogue in both

11   directions.  And so, yeah, I spent a lot of time.

12   Q    All right.  And did you speak with Mr. Rosenbaum in the

13   first week of July prior to filing the reimbursement motion?

14   A    I did.  He -- I think he called me on July 2nd.  I was

15   actually traveling that day and I was on my way home.  I

16   wasn't sure what he was calling about.  And then on July 4th

17   -- I spent a lot of time with Mr. Rosenbaum last year on

18   July 4th with the Berkshire transaction.  And so, on July

19   4th, I had a lot of people at my house and so forth.  I

20   decided I'd wait and talk to him on the 5th.

21        And I did.  And he raised a concern, as I said

22   before, about the plan administrator board reimbursing the

23   expenses.  And he said he had heard that I -- I can't

24   remember if he said you may file a motion or that, you know,

25   you're considering, you know, making these payments.  Where

1    are you on that?  I said, "I'm continuing to evaluate it.

2    It's a tough decision.  Let me do a little bit more homework

3    today and I will call you back."

4    Q    All right.  During that call, did you have any

5    discussions about what the potential costs of discovery

6    would be for these third parties to respond to the subpoenas

7    they received?

8    A    Not on July 5th.  On July 6th, after I had completed my

9    research and began formulating a very strong view.  The

10   motion had -- I'd already seen a preliminary view of the

11   motion.  We got into a very long conversation, and Mr.

12   Rosenbaum did quote a number to me.  And he said, "Look, I

13   think it's going to be very costly.  I think it's going to

14   be $800,000."

15   Q    So, the number that Mr. Rosenbaum provided you was

16   $800,000 to respond to the third party discovery?

17   A    Yeah, the reimbursement expense and cost would've been

18   $800,000.

19   Q    And did you do any, you know, evaluation of cost,

20   relative cost in or around this time?

21   A    I'd been thinking about the cost and what it might be

22   all along through this process.  Clearly, I sit on the Fee

23   Committee.  I see -- I've seen -- I've been through this

24   case.  I've seen where -- how expenses, professional

25   expenses can accumulate.  I understand a lot of the process.

1    But following my conversation with Mr. Rosenbaum on the 6th,

2    I sat down -- because this number of 800,000 -- I said, "You

3    know what?  That seems a little higher than I thought it

4    would be." So, I sat down and ran a scenario.  Tried a

5    stress test -- you know, what my thinking was.  And, you

6    know, am I really on target?  Because I had a number,

7    $500,000-$600,000 range in my mind.  And I thought, you

8    know, he said 800.  I should sit down...  I've got

9    experience with the Fee Committee.  I should sit down and

10   pressure test this and make sure I understand the tradeoff

11   between the opportunity cost and what it may cost for this

12   litigation.

13   Q    Sir, if you could just turn to Tab 7 of your binder?

14   A    Yes, sir.

15   Q    Sir, you mentioned in your last answer a stress test

16   that you did to evaluate the opportunity cost versus the

17   cost of litigation or reimbursement.  What -- can you --

18           MR. HORTON:  Your Honor, do you recall when I made

19   fun of Phil Anker and his writing?

20   Q    Mr. Horton, can you explain --

21           MR. HORTON:  I was multitasking -- I was

22   multitasking reading the emotion and --

23           THE COURT:  Got it.

24           MR. HORTON:  -- working through the analysis.

25   Q    All right.  Mr. Horton, can you explain to the Court

1    the analysis you did starting at the top with the number

2    that looks like 625?

3    A     That number is 625 million.  This is calculus that I

4    have been thinking about since the day we emerged.  You

5    know, pre-emergence.  We were all about maximizing the value

6    of the estate, and let's get out as quick as possible

7    because we had the burn of the first and the second lien.

8    And so that element I clearly brought over into the post-

9    emergence, post-administrator board role.

10              So, we have, roughly, 625 million.  We made some

11   distributions to EFHI.  But there's still, roughly, 625

12   million.  This is like, late-May, mid-June numbers.

13   Q     It's $625 million in the trust accounts?

14   A     In the trust account cash.  And then there's, roughly,

15   35 million, 38 million is more accurate -- but 35 million

16   that would go to the beneficiaries, the non-qual

17   beneficiaries, if indeed that claim is allowed depending on

18   how the allocation issues are decided.  So I backed that

19   out.  And there's about $590 million that would be available

20   if I could distribute that cash immediately to distress

21   funds and hedge funds.  And I estimated that their required

22   rate of return was, roughly, 12 percent.

23              And I think that could be somewhat conservative.

24   But I remember the PIK notes were, roughly, 12 percent.  PIK

25   unsecured notes were, roughly, 12 percent.  And I plugged

1    that in.  I back out the 1.64, which is what we are earning,

2    a whopping 1.64 in the money market accounts at Citi.  And

3    we went and got a --

4    Q    And, sir, I'm just going to have you pause right there.

5    When you say "we"...?

6    A    We, the plan administrator board and the beneficiaries,

7    we are getting this return.

8    Q    So, the 1.65 -- 4, is the percent, the interest rate

9    that's being earned?

10   A    The annual interest rate that we are getting.

11   Originally it was .5.  They made an exception for me and we

12   bumped it to 1.64.  It's not a lot of money but it's million

13   bucks -- 6 million bucks on an annual basis at least pays

14   for my salary and some expenses.

15          Back to the story here, to the analysis.  So,

16   that's, roughly, you know, 10 percent differential from the

17   opportunity cost to what they are earning in the money

18   market account times 590.  So I rounded the numbers and it's

19   actually even more conservative.  590 million times 10

20   percent is $59 million a year.

21   Q    And what does that $59 million a year represent, in

22   your mind?

23   A    In my mind, it is the opportunity cost of the funds,

24   not having the access to those dollars, to redeploy them

25   into other investments.  And so it's an opportunity cost to

1   the beneficiaries.  So, it's a loss of value to them for us

2   continuing to hold these dollars in trust.

3            So, I took the 59 million and divided by 12

4   months, it's $5 million a month of opportunity cost.  And

5   I'm not even including the 35 million in that, that would go

6   to the nonqualified beneficiary, which is probably more like

7   a 6 percent return.  That's a couple million bucks.  So it

8   all rounds to, roughly, 5 million a month.  You divide that

9   by four, you're at 1.25 million a week that we're burning

10  through in terms of opportunity cost for reinvestment for

11  the investors.  Or the beneficiaries and investors.

12  Q    And that's how you would think about the opportunity --

13  the lost opportunity cost for the money sitting in the trust

14  account?

15  A    Plus the fact that -- that's the opportunity cost, but

16  plus there's expenses that we're also burning.

17  Q    And with regard to those expenses, is that reflected in

18  part on the remainder of this page?

19  A    No.  There's other expenses...  All I'm saying is 5

20  million just of opportunity cost.  These are expenses for

21  like, my salary, my retention.  There's other expenses.  You

22  know, administrative expenses and so forth that are not

23  included in that 5 million.  So it'd actually be a little

24  higher if we could get rid of -- you know, make the

25  distribution and get rid of all the professionals that are

1    hanging around the case, and they could redeploy this

2    capital.

3          So that's my way of thinking of it.  But I mean,

4    it's simple.  We simplified it.  Tried to be conservative.

5    So, that's how I think about it.

6    Q    Okay.  Mr. Horton, after you did that analysis for the

7    opportunity cost and other costs, did you also evaluate what

8    would be the cost of responding to the third party

9    discovery?

10   A    I did.

11   Q    And is that also reflected on this page on Exhibit 7?

12   A    Yes, sir.

13   Q    All right.  And would you walk the Court through that

14   analysis?

15   A    Yes, sir.  So, you'll see on the page, I have Proskauer

16   and Jenner.  I put Kirkland & Ellis down below.  I thought,

17   ah, they're going to be outside.  I don't know if there are

18   going to be any dollars.  And I thought, now, there's a

19   chance that I get dragged in to that matter somehow and the

20   PAB starts spending dollars for Kirkland to represent me or

21   the PAB.

22          So I went ahead and just put three firms down at,

23   again, no offense to the professionals in the room.  Mr.

24   Galardi and I talked about this.  You know, no matter where

25   I go, it seems like there's always four lawyers in any

1    proceeding.  So I said, four lawyers, three firms at $1,200

2    blended rate.  Sitting on the Fee Committee, I got an idea,

3    a real good idea of what the blended rate is for these law

4    firms and maybe this is a little high but, again, I'm trying

5    to be conservative.  And I thought, you know, depositions

6    could take -- but with prep -- take a few days, and then

7    testimony, maybe it's 40 hours.  And then I got to thinking

8    about the discovery, and that's going to take some time.

9    So, I put 80 hours in here.

10             So, it's 80 hours per person for three firms at

11   $1,200 an hour.  And I got to $1.15 million.

12   Q    So that 80 hours, is it 80 hours per person for 320

13   hours per firm?

14   A    Yes, sir.

15   Q    Okay.  I'm sorry, please continue in your explanation

16   of the calculus here.

17   A    So, I thought, look, there can be overhead expenses,

18   there can be, you know, other issues that arise.  For

19   example, this process here -- there can be someone else

20   needs -- some other professional needs to be involved.  So I

21   added 30 percent to that cost and got to a total of $1.5

22   million.

23   Q    And how did this analysis factor into your decision

24   whether to file a motion and seek the ability to reimburse

25   the former directors and officers?

1    A    So, the way I thought about it, again, is the other

2    path seemed to have delay risk, significantly more delay

3    risk, litigation risk.  And so as I thought about this

4    particular going down the path, I looked at the 5 million a

5    month divided by 4.  It's 1.25 million.

6           So, at $1.5 million of cost, with 100 percent

7    certainty that I am actually going to recover for the trust

8    the $1.5 million, I have a burn rate of 1.25 for a week.  So

9    I have to get this completed -- get this litigation

10   completed within eight-nine days with 100 percent certainty.

11   And if I probability weighted our ability to get the 1.5

12   million, let's say 50 percent, for example -- there's a

13   50/50 chance that we win, we, being the trust, the PAB and

14   the trust -- that we win -- so that's $750,000 from a cost

15   perspective probability weighted.

16           And so that -- you know, I've been thinking about

17   it, and I've been thinking about this opportunity cost.

18   Again, Mr. Rosenbaum's a smart guy, very insightful.  I

19   thought, I should test this, you know, and that's what I

20   did.

21   Q    And, sir, did this stress test ultimately lead to a

22   conclusion as to whether to proceed forward with PAB

23   reimbursement?

24   A    This along with the work I had done on the

25   probabilities and on getting reimbursement from Sempra

1   immediately, the DNO policy immediately, the issue of me

2   telling the disinterested directors "You know what?  We're

3   not paying." And then going through this process.  And I

4   don't know all the details of how this Rule 45 works with

5   the Bankruptcy Code, but it seemed like a delay.  You know,

6   two, three, four weeks.  And it just -- for me, the cost

7   versus the benefit just didn't money out.

8   Q    Sir, you mentioned that you spoke with Elliot Capital

9   one of the beneficiaries of the trust.  Around the time you

10  filed the motion, did you try to get input from other

11  beneficiaries about whether to proceed forward down this

12  path?

13  A    Yeah.  I did ask that K&E reach out to Kasowitz, and

14  Mr. Pedone see, you know, what -- how they felt about this.

15  I also reached out to -- that night, on the night of July

16  6th, I reached out to Phil Brown.  Left him a message that I

17  was going to file a motion.  And I didn't want to catch him

18  off guard, and I wanted to have his thoughts.  I didn't hear

19  back from him.

20  Q    Mr. Horton, before you proceed, let's just clarify for

21  the record who Mr. Brown is.

22  A    This is Phil Brown with PSAM, if I didn't say that.

23  It's a hedge fund.

24  Q    And PSAM is a holder of --

25  A    At EFH.

1    Q    So, Mr. Brown is a representative of PSAM, a holder of

2    EFH notes?

3    A    Yeah.

4    Q    I'm sorry.  And did you enter --

5    A    Yes, sir.

6    Q    Did you speak with Mr. Brown either immediately before

7    or after filing the motion?

8    A    I spoke to him -- I called him again on July 7th.  I'd

9    already spoken to Mr. Rosenbaum earlier that morning.  I

10   spoke to Phil Brown after that, later in the afternoon.  And

11   I said, "Look, I filed this motion.  I want to make sure

12   you're aware of it.  It's around this reimbursement of

13   expenses." He said, "Yes, I'm aware of the issue." He had

14   spoken to Mr. Rosenbaum.  I don't know all the details of

15   their conversation.

16          I said, "Look, I want a little sanity check on

17   this.  Of course I can always pull the motion if I need to.

18   What do you think?  I mean, what is your preference?  What

19   do you think I should do on this?" And his view was that we

20   absolutely should reimburse for the DNO cost, the directors'

21   and officers' cost...

22          MR. GALARDI:  Your Honor, move to strike as

23   hearsay.

24          MR. MCKANE:  Your Honor, whether it's true or not,

25   it goes to the state of mind as to what his understanding

Page 42

1    was in terms of proceeding forward with the motion.

2              THE COURT:  No, I disagree.  Sustained.

3              MR. MCKANE:  Okay.  All right.

4    Q    You spoke with PSAM as a beneficiary, right?

5    Immediately afterwards?

6    A    I did.

7    Q    All right.  Based -- after having that conversation,

8    did you pull the motion?

9    A    No, sir.

10   Q    All right.  After the motion was filed, objections came

11   in, correct?

12   A    After -- yeah, the motion was filed, an objection came

13   in.

14   Q    An objection came in.  And what was the objection?

15   A    The objection was that the plan administrator board did

16   not have the authority to make these -- to take on the

17   liabilities.  It was --

18   Q    And who filed that objection?

19   A    Elliot and UMB.

20   Q    All right, did the EFH ad hoc committee take a

21   position?

22   A    They did.

23   Q    And what was their position?

24   A    They were supportive of the reimbursement.

25   Q    And is PCM a member of the ad hoc EFH committee, to

1    your knowledge?

2    A    No, sir, he is not.

3    Q    All right.  At the time you filed the -- sorry?

4    A    To my knowledge.

5    Q    Not to your knowledge.  At the time you filed the

6    motion, had the former disinterested directors file formal

7    responses and objections to the subpoenas?

8    A    No, sir.

9    Q    Okay.  And if we go back to the demonstrative, Tab 1 of

10   your binder -- so when did the former disinterested

11   directors serve responses and objections?

12   A    On July 18th.

13   Q    And if I -- and have you had the opportunity to just

14   familiarize yourself generally with those positions?  The

15   positions taken by the former disinterested directors in

16   those responses?

17   A    I read through them.  I read through them, yes, and I

18   have a general knowledge of their responses.

19   Q    Let me direct your attention to Tab 8 of your binder.

20   Are you there, sir?

21   A    Yes, sir.

22   Q    Is -- are these the responses and objections of Mr.

23   Cremens, as the former disinterested manager of EFIH?

24   A    It is, it is.

25   Q    All right.  And if you could turn to Page 5 of that

1    objection paragraph 13?

2    A    Yes, sir.

3    Q    At the bottom of the page where it starts

4    "Accordingly"?

5    A    Yes, sir.

6    Q    Do you see the sentence that starts "Accordingly..."

7    and rolls over to Page 6?  Can you --

8    A    "Accordingly, the former EFIH disinterested

9    director..." -- is that where you are?

10   Q    Yes.

11   A    Okay.

12   Q    Do you see that, sir?

13   A    Yes, sir.

14   Q    Can you just read that sentence to yourself?

15   A    Yes, sir.  I've read it before.

16   Q    In laymen's terms, what is your understanding of Mr.

17   Cremens' position with regards to whether he will proceed

18   forward in responding further to these subpoena requests

19   absent a ruling or a determination of reimbursement?

20   A    It effectively says until the Court grants the motion,

21   the Court determines that reorganized EFIH is liable to

22   indemnify the former disinterested EFIH disinterested EFIH -

23   - disinterested -- management for his costs and expenses,

24   including attorney fees for responding, or the ad hoc EFH

25   claimants agree to reimburse, or otherwise indemnify -- they

1    would -- they won't respond to the request.

2    Q    And are you surprised by the position taken by Mr.

3    Cremens?

4    A    No, I'm not surprised at all.

5    Q    And why not, sir?

6    A    There were conversations with their counsel prior to

7    filing this objection.  It was certainly my expectation that

8    they would object.  So I understand.

9    Q    And, sir, these responses and objections were served

10   when?

11   A    July 18th.

12   Q    That's Wednesday?

13   A    Yeah, Wednesday.

14   Q    And, sir, when are documents -- under the scheduling

15   order for the allocation dispute, what is the deadline to

16   produce responsive documents to your understanding?

17   A    July 23rd.

18   Q    Monday?

19   A    Monday.

20   Q    And, sir, is it your understanding that Ms. Williamson

21   and Mr. Evans have taken similar positions in their

22   responses and objections?

23   A    Yes, sir.

24   Q    Sir, if you could turn to Tab 10 of your binder?  And,

25   sir, Tab 10 is Mr. Evans' objections and responses to a

1    subpoena.  Do you see that, sir?

2    A    Yes, sir.

3    Q    And, in particular, can you turn to Page 7 of Exhibit

4    10?

5    A    Yes, sir.

6    Q    All right.  In the middle of Response 1, there's a

7    sentence that starts "Evans' further objection to this

8    request on the grounds that as a third party to search

9    review and produce all non-privileged materials arguably

10   covered by the scope of this request in conjunction with the

11   other requests, if any such material exists, would require

12   at least 50-100 lawyer hours." Do you see that, sir?  Do you

13   see that sentence?

14   A    I do.

15   Q    All right.  You had estimated 320 lawyer hours, sir, is

16   that right, when you were doing your calculus?

17   A    Yes, sir.

18   Q    Are you surprised by the position --

19   A    (indiscernible) 320 hours, but can I --

20   Q    Please explain.

21   A    320 hours, but you also have to realize I added a 30

22   percent to the total cost.  30 percent adder for incremental

23   costs for other professionals that might have to get

24   involved.

25   Q    And this is 50-100 lawyer hours just to respond to the

1    documents; not dealing with any deposition notices?

2    A    That is correct.

3    Q    Okay.  And, sir, just to wrap up very briefly, do you

4    believe that using trust assets to reimburse the fees and

5    expenses of former directors and officers is a reasonable

6    exercise in your discretion under the trust?

7    A    I do.

8    Q    And why is that, sir?

9    A    It is my strong belief that it is my responsibility to

10   all the beneficiaries of the trust -- it's my responsibility

11   to protect their assets, the value of their assets, and do -

12   - so long as the expenditures that I am making actually are

13   reasonable.  But it's back to my opportunity cost analysis

14   that says, you know, delay with the time value of money and

15   the lost opportunity cost for the beneficiaries is quite

16   substantial.  This avoids additional delay and as we, again,

17   get emergence, trying to cut off the burn of the opportunity

18   cost as fast as possible.

19          MR. MCKANE:  Your Honor, no further questions at

20   this time.  I pass the witness.

21          THE COURT:  Anyone in favor of the motion wish to

22   ask any questions?  All right, we'll take a short recess and

23   then we'll turn to cross.  Mr. Horton, during the break you

24   may not discuss the substance of your testimony with any

25   person.

1          MR. HORTON:  Yes, sir.

2          THE COURT:  Very good.  Take a short break.

3      (Recess)

4          CLERK:  All rise.

5          THE COURT:  Please be seated.  You may proceed.

6          MR. GALARDI:  Your Honor, first, before

7   proceeding.  One, I forgot to congratulate you on taking

8   Chief Judge last time.

9          THE COURT:  Oh, thank you.

10          MR. GALARDI:  And second, I apologize for Friday

11   afternoon.  I see you're sort of somewhat in discomfort.

12   Hopefully, we won't keep you here too long.  I'll move as

13   quickly as I can.

14          THE COURT:  Thank you.  Unfortunately, my back is

15   acting up.

16          MR. GALARDI:  Okay.

17          THE COURT:  It'll hurt as much here as it hurts

18   anywhere else, so it doesn't matter.

19          MR. GALARDI:  I'm not sure that that's true, but

20   I'll accept it.  Your Honor, if I may approach the witness.

21          THE COURT:  Yes.

22          MR. HORTON:  Thank you, Mr. Galardi.

23          MR. GALARDI:  I'll approach, Your Honor.

24          THE COURT:  Yes, please.  Thank you.

25              CROSS-EXAMINATION OF MR. HORTON

```
1    BY MR. GALARDI:

2    Q    Mr. Horton, you're asking the Court to approve the PAB

3    reimbursing the costs and expenses, and I'm going to call

4    them the former Ds and Os.  I know it's -- whether it's the

5    former disinterested directors and Mr. Keglevic and

6    potentially you, or whether it's just for the sake of

7    argument or sake of this question, can we agree that when I

8    say former Ds and Os, I'm talking about the disinterested

9    directors and at least Mr. Keglevic?  I won't -- and we can

10   consider you, but I understand that there was a subpoena

11   served on your after the fact, so I'll keep you out of this

12   for that purpose.

13   A    Yes, sir.

14   Q    Okay.  And when I talk about the reimbursement motion,

15   I've handed you the motion of EFH Plan Administrator Board

16   for authorization to reimburse third-party discovery fees

17   and costs of former directors, officers, manager incurred in

18   connection with the EFH/EFIH allocation dispute.  And that

19   was the motion that you and Mr. McKane were discussing when

20   you either called it the reimburse the D&O motion or the

21   reimbursement motion, correct?

22   A    Yes, sir.

23   Q    And this is the motion that you authorized to be filed

24   on July 6, correct?

25   A    That is correct.
```

1    Q    And pursuant to that motion, you're seeking to -- the

2    PAB to reimburse expenses and costs of the former directors

3    and officers, correct?

4    A    That is correct.

5    Q    Okay.  And are you reimbursing them after the former

6    directors and officers have actually made payment to their

7    counsel?

8    A    I think that would be something that -- a detail that

9    we'd need to work out.

10    Q    Well, is it a detail that you're seeking the Court's

11    authority now to advance them prior to paying, or are you

12    seeking them to reimburse after the disinterested directors

13    pay?

14    A    I am seeking to have -- to reimburse them after they

15    pay and after we have seen the invoices, if you will, from

16    the -- from the potential Proskauer and Jenner & Block.

17    Q    And what I want to understand, I want to be --

18    A    Let me -- it's -- let me look.  I want to think about

19    that.  I think that, you know, as I think about it.  Yes,

20    and that we would pay -- we would just pay Jenner & Block

21    and pay -- we would pay Jenner & Block and we'd pay

22    Proskauer directly.

23    Q    So you are not insisting that the former directors and

24    officers actually come out of pocket prior to reimbursement.

25    A    That's correct.

1    Q    So there is really no reimbursement; it's advancement

2    of their costs.

3    A    Okay.

4    Q    Do you disagree?

5    A    Again, there's a -- there's a cost that is incurred;

6    and, otherwise, they would have to pay it.  So rather than

7    them have to pay it, we're paying for them.  The definition

8    of reimbursement, it's a fine line there.

9    Q    Okay.  But do you have any knowledge as you sit here

10   today that those directors and officers are guaranteeing

11   that if you don't pay it, Jenner & Block or Proskauer will

12   be able to seek those payments from the disinterested

13   directors or the former directors and officer?

14   A    Are you asking me if the Court approves a motion that

15   allows me to need the PAB to make those payments?  And we --

16   I don't make those payments, that they're going to be

17   guaranteed by those parties?

18   Q    Will the -- yeah, will the former directors and

19   officers have to make those payments?  I would ask you to

20   look at me, Mr. Horton?

21   A    Excuse me?

22          MR. GALARDI:  I would ask Mr. Horton to look at

23   me, as opposed to Mr. McKane, Your Honor.  I'm just trying

24   to --

25          MR. HORTON:  I'm not looking at Mr. McKane.

1          MR. GALARDI:  Okay, I'm sorry.  I wanted to make

2     eye contact with you.

3          MR. HORTON:  I'm sorry.

4          THE COURT:  He doesn't have to look at you.

5          MR. GALARDI:  Okay, that's fine.  He can look at

6     the Court or anyplace else.

7     Q    I'm asking you, do you have an understanding that the

8     former officers and directors --

9          THE COURT:  Wait a minute.  Are you implying Mr.

10    McKane's giving him signals?

11         MR. GALARDI:  No, I'm not, Your Honor.

12         THE COURT:  Mr. Galardi, come on.

13         MR. GALARDI:  I'm not.  I'm just making a

14    statement that I'd like to have the eye contact.  I'm sorry,

15    Your Honor, for suggesting anything of the sort.  Mr.

16    Horton, do you want the question read back?

17         MR. HORTON:  Sure.

18         MR. GALARDI:  I'll re-ask it again.

19         MR. HORTON:  Please, if you don't mind.

20    Q    Is it your understanding if a fee or expense is not

21    reimbursed or paid by the PAB, that Jenner or Proskauer will

22    have -- still have the right to go against their client for

23    payment of that fee and expense?

24    A    I do not know.

25    Q    Now, Mr. Horton, if you would turn to the motion.  And

1    I would ask you to look there -- the motion is Docket No.

2    13262.  And if you go past the motion, you'll see a second

3    document, Exhibit A, which is the proposed order, correct?

4    A    I'm sorry.  Where are you, sir?

5    Q    The motion that I've given you.  There's the motion,

6    which is under Docket 13262.  It says Page 1 of 15 at the

7    top.  Go through the first 15 pages.

8    A    Yes, sir.

9    Q    And then you'll have -- after that, you'll have a

10   notice, three pages, and then you'll have an Exhibit A,

11   which is a proposed order, which is Exhibit A

12   A    Okay.

13   Q    And if you would look at Paragraph 2 of this order.

14   And Paragraph 2 is where you're asking for, upon receipt of

15   their detailed and reasonable expenses and otherwise, on

16   terms consistent with the EF plan administration trust

17   agreement to make disbursements to the disinterested

18   directors and officers for fees and expenses incurred in

19   connection with the EFH/EFIH allocation dispute, effective

20   nunc pro tunc to June 11th, 2018.  Did I read that phrase

21   correctly?

22   A    You did.

23   Q    Okay.  Now, and then it goes on to various subsections

24   about how you would do that.  It's a hundred percent from

25   the EFH for certain, hundred percent from the EFIH side, and

1    then a 50/50 for other fees; is that correct?

2    A    That's correct.

3    Q    Now, in considering the motion, have you -- is there

4    any authority, as you sit here today, to pay -- before the

5    Court enters an order, to pay or reimburse the expenses of

6    the former directors and officers?

7             MR. McKANE:  I'm going to object because it calls

8    for a legal conclusion.  He can state his understanding.

9             THE COURT:  State your understanding.

10   A    My understanding is, I do have that authority.  We came

11   to Court to bring this issue.  Instead of, you know, in the

12   dark of the night, me making those kinds of decisions, we

13   brought this motion to the Court.  We knew that there was

14   some debate about my authority; we knew that there was some

15   concern.  I'm a Trustee.  It is my view that it is better to

16   bring this issue to the Court and to get a ruling and a

17   determination to make certain of it.  But it is my belief

18   that I do have that authority.

19   Q    So is it your belief that you don't need the Court

20   order?

21   A    I would have to talk to my counsel about that.

22   Q    Okay.  Is it -- is it your belief that you could have

23   paid these fees effective as of June 11th without a Court

24   order?

25   A    Again, it's somewhat controversial.  You asked me what

1    I thought; we're bringing it to Court.  I'm bringing it to

2    Court.

3    Q    Is there anything in the record or anything that you

4    know of that says, if you do not grant the relief back to

5    June 11th, that will somehow delay the schedule?

6    A    And the significance of June 11th?  I'm sorry.

7    Q    Your motion I just read.  You looked at the Paragraph 2

8    of the order.  You're seeking relief to pay fees back to

9    June 11th, 2018; isn't that correct?

10   A    That's correct.

11   Q    And as you sit here today, any fees that have been

12   incurred, they've been incurred at the risk of those former

13   directors and officers; isn't that correct?

14   A    That is correct, from the PAB.

15   Q    Correct.  And, in fact, you've seen a number of

16   exhibits where they have filed responses and objections to

17   the actual discovery, correct?

18   A    Yes, sir.

19   Q    And they did that without any guarantee of

20   reimbursement as of today, correct?

21   A    That is correct.

22   Q    And that has not put any risk on the delay of the

23   schedule so far; isn't that correct?

24   A    Again, up to this point, there's been no delay.  If the

25   Court denies the motion, then I believe that it will create

1    significant delay.

2    Q    Okay.  And is there -- and we'll explore that in a

3    second.  Is there anyone, other than you, that will be

4    determining the reasonableness of the fees submitted?

5    A    I believe that I have the capability to evaluate the

6    reasonableness of the -- of the expenses.  However, as I've

7    indicated before, if we want to set up a process where

8    others are evaluating, including potentially engaging the

9    fee committee, I would be open to that conversation.

10   Q    But have you insisted on any process at the time of

11   filing of the motion?

12   A    No.

13   Q    Have you, as you sit here today, insisted on any

14   process, other than you reviewing the reasonableness of the

15   fees?

16   A    I have not insisted, no.

17   Q    And have you advised any of the former directors and

18   officers that you might have a different process for

19   determining the reasonableness of the fees, other than you

20   as the PAB reviewing those fees?

21   A    No, sir.

22   Q    Now, is there a possibility that you pay fees that are

23   not reasonable?

24   A    Is there a possibility, you mean, in error?

25   Q    Yeah, an error.

1   A    I think there's a possibility for human error in many

2   processes.

3   Q    Okay.  And is there a possibility that as you get

4   bills, the bills get larger and larger?  And you say, maybe

5   I shouldn't have paid as much as I've paid during the course

6   of the discovery.

7   A    I don't -- I don't understand the hypothetical.

8   Q    If you look at your motion, it says that you, upon

9   receipt of detailed and reasonable fees and expenses.

10  A    Where are you reading from?

11  Q    I'm sorry, the order, Paragraph 2.

12  A    Okay.

13  Q    I apologize.  It says, the EFH Plan Administrator Board

14  is hereby authorized, upon the receipt of detailed and

15  reasonable fees and expenses -- I'll skip the next phrase --

16  to make disbursements to the disinterested directors and

17  officers for fees expenses incurred in connection with the

18  EFH/EFIH allocation dispute.  I read that correctly?

19  A    Yes, sir.

20  Q    So do you expect to get all of the bills at one time or

21  over the course of time?

22  A    I'm going to expect that I would get the bills over the

23  course of time initially.

24  Q    And is it possible --

25  A    Go ahead.

1    Q     Go ahead.  I'm sorry, I interrupted you.

2    A     No, no.

3    Q     And is it possible that in hindsight, you might

4    determine that I shouldn't have paid as much as I actually

5    paid, although it looked reasonable at the time?

6    A     My belief is that, if there was a situation where I had

7    overpaid, for example, I would have the capability to go

8    back and ask for reimbursement.

9    Q     And who would you ask for that reimbursement of your

10   reimbursement from?

11   A     From the professionals.

12   Q     Okay.  And, but this language says that you would be

13   making the payments to the disinterested directors and the

14   officers, correct?

15   A     It does say that; maybe that's an adjustment we need to

16   make in the order.

17   Q     And do you have any agreement, anything in writing,

18   that allows you, without the costs and expense, to seek such

19   a reimbursement, from whether it's the professionals or the

20   disinterested directors or the former directors?

21   A     I think that's, again, something that we could work out

22   in the order.

23   Q     But as you sit here today, you have no such document.

24   A     No, sir.

25   Q     And you have no such -- you've not made that a

1   condition to having this motion go forward; is that correct?

2   A    I think the condition is that the fees and expenses be

3   reasonable.

4   Q    Now, is there anything that you've sought in this

5   relief that conditions upon -- the reimbursement being

6   conditioned upon your obtaining an assignment of the former

7   directors' and officers' rights against Sempra -- I'm sorry,

8   I don't want to use Sempra -- against reorganized EFH?

9   A    So would you explain that and give me an example

10  potentially?

11  Q    Are you seeking an assignment of any of the rights of

12  the former directors and officers in exchange for your

13  agreement to pay their fees and costs with respect to

14  discovery?

15  A    We haven't gotten into that level of detail, but that

16  seems reasonable.

17  Q    But as you sit here today, you have no agreement to

18  that effect.

19  A    No, I don't not.

20  Q    And as you sit here today, you've not conditioned your

21  payment of those fees and costs on having such an agreement,

22  correct?

23  A    That's correct.

24  Q    And do you have anything, as you sit here today, that

25  entitles you to subrogate to their rights against

1    reorganized EFH?  And we had a discussion yesterday about

2    the word subrogation.  You have a common understanding of

3    what that word means?

4    A    I do.

5    Q    Okay.  And do you have anything today, as you sit here

6    today, that allows you to subrogate to their rights under

7    the merger agreement?

8    A    No.

9    Q    And do you believe, as you sit here today, if you do

10   not reimburse the directors' and officers' fees, you now

11   have a claim under the merger agreement as the PAB for fees

12   and expenses?

13   A    Ask the question again.  I apologize.

14   Q    As you sit here today --

15   A    Yes.

16   Q    -- and assuming you do not reimburse the fees and

17   expenses of the former officers and directors, do you, the

18   PAB, have any claims under the plan and the merger agreement

19   against Semp- -- against reorganized EFH for your own fees

20   and expenses?

21   A    My own personal?

22   Q    Your own, PABs.

23   A    I'm sorry, okay.

24   Q    The PAB's fees and expenses.

25   A    I don't know.  That would require a discussion with the

1    -- my legal team.

2    Q    But you don't -- you don't know of any such claim as

3    you sit here today.

4    A    Claim?

5    Q    Claim against the reorganized EFH.

6    A    No, we don't have a claim.

7    Q    Now, Mr. Horton, I believe you said when we -- when you

8    were looking at Demonstrative 1, which is Exhibit 1 in the

9    binder.  I believe you said that, you know, once there was

10   the discovery meet and confer, you asked the question after

11   that as to who would pay the fees and expenses of the former

12   directors and officers, correct --

13   A    I apologize.

14   Q    -- you were entitled to.

15   A    I'm coming --

16   Q    I'm sorry.

17   A    -- back to where you are.  And you're on what date?  I

18   apologize.

19   Q    I'm on the --

20   A    June 15th date?

21   Q    I believe that that's the date that you testified to;

22   that you, at that point, was when you raised the question as

23   to who would be potentially paying the fees and expenses of

24   the former directors and officers.

25   A    That's correct.

```
1    Q    And in exercising your decision to pay the fees and

2    expenses of the former directors and officers and what --

3    let me just clarify because I keep using the word you and

4    your.  What I mean by the you and your in all these

5    instances is, you as the PAB and yours as the PAB's.  Okay?

6    I'm not going to talk about you personally as a former

7    director and officer today.

8    A    That's the yours, the PAB?

9    Q    Yours, the PAB's rights and interests.

10   A    I got you.

11   Q    Only it's your process, okay?

12   A    Apostrophe s, got it.

13   Q    Thank you.  Okay, so going back.  So in exercising the

14   PAB's discretion, or your discretion, to pay the fees and

15   expenses, did you believe that the participation of the

16   former officers and directors was important in addressing

17   the allocation dispute or motion?

18   A    I believe that the -- I believe that Elliott felt like

19   it was important.  Clearly, they issued this -- they were

20   going to issue a subpoena, at least they were discussing

21   issuing subpoenas, so I have to believe that it was

22   important to the process of the scheduling of litigation for

23   it to be important.

24   Q    And the PAB is a party in that litigation, correct?

25   A    I have the ability to be a party in that litigation,
```

1    yes.

2    Q    And you are a party in that litigation now, correct?

3    A    When you say I am now.

4    Q    The PAB is party to the scheduling order as a result of

5    His Honor's ruling, correct?

6    A    Again, I have the ability to participate in the

7    litigation.

8    Q    Okay.  And do you -- and what is the relationship --

9    and what is your understanding of the rela- -- let's strike

10   that.  And the former directors and officers are

11   participating in that litigation as a result of services

12   that they performed as former officers and directors to the

13   Debtors, correct?

14   A    That's my understanding, yes.

15   Q    And based on analysis and your testimony today, you --

16   and I'll paraphrase -- I think you thought of three possible

17   alternatives for addressing the fees and costs of the former

18   directors.  And if I get these wrong, please let me know.

19   One is to let them individually pursue reorganized EFH or

20   the insurance carrier for coverage for the fees and

21   expenses; is that correct, that's one of them?

22   A    That is one.

23   Q    Second was, to leave them on their own to pay their own

24   fees and costs or to figure out what to do about those fees

25   and costs, correct?

1    A     That is correct.

2    Q     And then the third one was to do what you actually did,

3    exercise the PAB's discretion and assume the liability for

4    those reasonable fees and expenses, correct?

5    A     That is correct.

6    Q     Okay.  Now, let's talk about -- and you spent some time

7    on letting them specifically pursue reorganized EFH or the

8    insurance carrier, and I'm going to focus on that now.

9    A     Okay.

10   Q     Now, Mr. Horton, you decided not to require the former

11   director -- the former directors and officers to pursue

12   reorganized EFH or the insurance carriers, correct?

13   A     Say that last -- would you repeat that?

14   Q     Sure, sure.

15   A     Because it was a little bit confusing.

16   Q     Mr. Horton, you decided not to require the former

17   directors and officers to pursue reorganized EFH under the

18   merger agreement or the insurance carriers, correct?

19   A     No, sir.

20   Q     Did you require that they do so?

21   A     No, sir.

22   Q     So you did not require them, as a condition, to

23   agreeing to reimburse their fees and expenses, did you?

24   A     I did not require them to pursue?  Is that --

25   Q     Let me ask you this.  As part of your -- a part of your

1    agreeing to reimburse the fees and expenses, have you

2    insisted that the former directors and officers assert

3    claims under the merger agreement and under the plan against

4    reorganized EFH?

5    A    No, I have not.

6    Q    And as part of an agreement to reimburse the fees and

7    expenses of the former directors and officers, have you

8    insisted that they file a claim with the insurance carrier?

9    A    I have not.

10   Q    Am I right that you did not insist that they do either

11   of those because that path may delay the schedule that's

12   reflected in Demonstrative 1, one of the reasons?

13   A    Again, sir, are you referring to there is in place a

14   motion, an order that is in place?

15   Q    No.  I'm asking you, when you made the decision and you

16   exercised your discretion, okay.  One of the things that I

17   thought you testified that was, in exercising your

18   discretion not to require them to go under the merger

19   agreement, not to go into the insurance carrier was your

20   concern that by requiring that before you reimbursed, that

21   would delay the litigation schedule.

22   A    Before I reimbursed?

23   Q    Yes.

24   A    Or before I had an order that said I could reimburse?

25   Q    Either one.

1    A    Okay.  So from my perspective, if we don't have an

2    order to reimburse the parties for their expenses, the DDs

3    for their expenses, then I believe that is going to delay

4    the schedule, because they're saying, stop, I'm not going

5    forward until I understand whether I'm going to be

6    reimbursed or not.

7    Q    Okay.  So when was your concern about the delay?

8    A    It's always been a concern about the delay.

9    Q    Two, the other concern you had was, you do not believe

10   that there is a claim to be asserted under the merger

11   agreement or the insurance policy; isn't that correct?

12   A    I believe that, you know, that I don't believe that

13   there's a claim.  And even if there is a claim and they make

14   -- and I say to -- we end up with an order that -- the order

15   is denied, let me say it like that.  The order is denied and

16   they go make -- they make a claim either with an D&O or with

17   Sempra, then -- or they come back through Rule 45, there is

18   going to be a delay; that is the point.

19   Q    So, again, coming back to a delay in the schedule,

20   correct?

21   A    It's about a delay in the schedule, yes.

22   Q    Now, you also testified that you don't believe that

23   there is a right to reimbursement under the plan or merger

24   agreement or under the D&O policy because no claim has been

25   asserted against the former directors and officers; is that

1    correct?

2    A    That's correct.

3    Q    And at any time, did you consider whether any such

4    claim could be asserted against the directors and officers

5    to trigger coverage?

6    A    By whom?

7    Q    By you.

8    A    By me.

9    Q    By you.

10         MR. McKANE:  Objection to form.  I mean, just to

11   clarify, is he asking did he consider whether this issue or

12   did he consider whether he should pursue a claim against the

13   directors and officers (indiscernible)?

14         MR. GALARDI:  I'm asking --

15         THE COURT:  Yeah, clarify, please.

16         MR. GALARDI:  Sure.

17         THE COURT:  Or rephrase.

18   Q    Did you, as the PAB, ever consider whether any claim

19   could be asserted against the formers and directors in

20   connection with the allocation dispute that might trigger

21   insurance coverage or 6.8 of the merger agreement?

22   A    I did not.

23   Q    So it's fair to say that you do not believe there is

24   any claim from the former directors and officers, as we sit

25   here today, under 6.8 of the merger agreement and under the

1    insurance contract, so that was not a viable option; is that

2    correct?

3    A    I believe that, you know, so it was not a viable

4    option.  And if it were, it is a very high-risk option.

5    Q    Okay.  And so, based on that conclusion, is it fair to

6    say that there were only two courses left: one, they pay

7    their own cost; or two, somebody else pays their costs and

8    expenses.

9    A    Or three, they go through Rule 45 and force us to --

10   when we of -- and the cost is shifted to the PAB.

11   Q    And I considered that someone else, so we'll take that

12   up right now, okay?

13   A    Someone else?

14   Q    Well, under 45, your understanding is, they go through

15   45 and someone else must bear the cost of that discovery; is

16   that correct?

17   A    Someone else, yes.

18   Q    So it's either them or someone else.

19   A    Fair enough.

20   Q    Okay.  Now, and you understood that the former

21   directors and officers could seek relief under Rule 45,

22   didn't you?

23   A    Yes.

24   Q    And you also understand or agree that the PAB has no

25   contractual obligation to reimburse the fees and expenses of

1    the former directors and officers, correct?

2              MR. McKANE:  Objection.  He can state his

3    understanding.  I mean, it calls for a legal conclusion.

4              MR. GALARDI:  Mr. Horton.

5              THE COURT:  Just state your understanding, if you

6    have one.

7    A    Could you repeat the question?

8    Q    Sure.  Mr. Horton, do you have any understanding as to

9    whether you, the PAB, has a contractual obligation to

10   reimburse the fees and expenses of the former directors and

11   officers?

12   A    I do not believe we have a contractual obligation.

13   Q    And that's why you're exercising your discretion,

14   correct?

15   A    That is correct.

16   Q    Now, with respect to Rule 45, has the PAB, as a party,

17   served any discovery on the former officers and directors?

18   A    No, sir.

19   Q    And is it your understanding that nonetheless under

20   Rule 45, the former directors and officers can shift the

21   cost to the PAB, even though it did not seek any discovery

22   from the former directors and officers?

23   A    As I told you earlier, I don't have a great deal of

24   understanding of Rule 45.  What I -- my point about the Rule

25   45 is, that is a process that is going to take additional

```
 1   time.

 2   Q    So, again, it's not whether or not it could be shifted.

 3   Again, you're concerned about the delay that might be caused

 4   by a Rule 45 motion.

 5   A    I am concerned about that.

 6   Q    But you're not concerned that the expense could be

 7   shifted to the PAB because the expense cannot be shifted

 8   because the PAB has served no discovery on the former

 9   directors and officers, correct?

10   A    Again, I'm not a Rule 45 expert.  So, yes, I am

11   concerned that dollars could be shifted, but that wasn't

12   material in my determination for filing the motion.

13   Q    But in your thought process, did you get the input of

14   Kirkland & Ellis, and did you consider the fact that under

15   Rule 45, the fees and expenses could not be shifted to you

16   as the PAB because you weren't serving the former officers

17   and directors with discovery?

18            MR. McKANE:  Objection, Your Honor, it's compound.

19   The question is whether he got input from Kirkland & Ellis.

20   If he can say yes or no, the question would be answered.  I

21   think going beyond that starts to pierce the privilege --

22            THE COURT:  Of course.

23            MR. McKANE:  -- into the substance.

24            THE COURT:  All right.  Do you understand the

25   question?  We don't want the advice.
```

1              MR. GALARDI:  I don't want the advice.

2              THE COURT:  I don't even want whether they gave

3      you advice.  Did you ask for advice is the question.

4      A    Regarding whether or not the PAB could.

5      Q    Whether the former officers and directors could shift

6      fees and expenses to the PAB under Rule 45.

7      A    I don't recall.  But there was another question.

8      Q    I can -- I'll ask the other question.  Do you have any

9      understanding as to whether fees and expenses could be

10     shifted to the PAB if it did not serve discovery on the

11     former officers and directors?

12     A    Again, I don't know.

13     Q    So that didn't go into your exercising the discretion,

14     correct?

15     A    No.  Again, it's to the delay of the process.  And I

16     did say that there's a potential risk -- I don't know what

17     it is, but that was not -- that was not the primary driver.

18     It was about the delay in the process.

19     Q    Okay.  So let's talk a little bit about that delay,

20     okay?  Now, was your concern that the directors and

21     officers, based on conversations you had, that they would

22     not cooperate with the discovery or produce documents until

23     they knew some third party would pay fees and expenses?

24     A    That was my concern.

25     Q    Now, as you just read into the record the responses,

1    has that concern come to fruition?

2    A    Yes.

3    Q    And does that mean that they will cooperate and not

4    move to quash discovery if the PAB reimburses their fees and

5    expenses?

6    A    I believe that the process will advance.

7    Q    Do you have anything in writing that says, we will only

8    reimburse your fees and expenses if you cooperate and do not

9    try to change the schedule?

10   A    I do not have anything in writing.

11   Q    Did you consider asking for any such commitment from

12   any of the former directors and officers prior to filing a

13   motion telling them you would reimburse their fees and

14   expenses?

15   A    Apologies.  What was the question again?  My apologies.

16            MR. GALARDI:  Can I ask it to be read back?

17            THE COURT:  Do you need a break, Mr. Horton, or

18   are you all right?

19            MR. HORTON:  I'm okay.

20            THE COURT:  Oh, okay.  I think it's hard to

21   concentrate if -- answering lots of questions.  We don't

22   read back, but we can play back.

23            MR. GALARDI:  I don't know if I like that.  Let me

24   just ask it again.

25   Q    Sir, let's get that --

1           THE COURT:  We can do it; it just takes a second.

2      [AUDIO PLAYED BACK]

3  Q     Do you understand the question?

4  A     No, honestly, I did not.

5  Q     So that's fine, because it actually takes two questions

6  back, so let me go forward.  First, as you sit here today

7  and the day you filed the motion, there is no commitment

8  from the former officers and directors to cooperate with

9  discovery, even if you pay their fees and expenses.

10 A     No, there's no written requirement, no, sir.

11 Q     Okay.  And at no time have you asked them to make such

12 a commitment; isn't that correct?

13 A     That is correct.

14 Q     And you would concede then that there is still a risk

15 of discovery -- a risk of delay even if you pay those fees

16 and costs, correct?

17 A     My understanding is that they are currently doing work

18 for discovery.  We did discuss this with them -- I did not,

19 Kirkland did -- that they are in the process of doing the

20 work in the background for the fees and expenses.  And I

21 don't know if they can keep the exact schedule, but my

22 understanding is, it is likely that they will.

23 Q     And they are doing that right now knowing the risk that

24 the motion could be denied, correct?

25 A     That is correct.

1    Q    And they are doing that right now knowing that there is

2    a chance that any decision might ultimately be appealed,

3    correct?

4    A    I don't know that.

5    Q    Okay.  Now, Mr. Horton, would you please turn to what I

6    think is behind Tab 5 of the binder?  And if you need a

7    break, let me know.  We're almost up to an hour here or 40

8    minutes.  I think it's Tab 5; it's the one page, I call it

9    PAB-11.

10              THE COURT:  It's the demonstrative?

11              MR. GALARDI:  No, I'm sorry, then it's not 5.  Let

12   me see what it's -- it's 7, two odd numbers off.  Sorry, No.

13   7.

14              THE COURT:  Oh, the handwritten notes.

15              MR. GALARDI:  Yes, the handwritten notes.

16              THE COURT:  Okay.

17              MR. GALARDI:  Okay, my apology.

18   Q    Could you turn to that?

19   A    I have.

20   Q    Okay.  Now, is this the only written financial analysis

21   that you performed prior to filing the reimbursement motion?

22   A    It is the only that I prepared, yes.

23   Q    And the entire financial analysis that you did before

24   seeking to the motion is on this half a page; isn't that

25   correct?

1    A    That is correct.

2    Q    Okay.  Now, I want to walk through this analysis so I

3    understand it.  You started with $625 million, correct?

4    A    That's correct.

5    Q    And then you subtracted $35 million, which I think you

6    referred to as the non-qualified distribution, non-qualified

7    holders, right?

8    A    Potential distribution, yes.

9    Q    Okay.  And you did that for simplicity's sake, because

10   it's the case that any dollar that you pay could put at risk

11   some of that distribution, correct, or not?

12   A    No.  I excluded that because they had a different rate

13   of return.

14   Q    Okay.  And what is the rate of return that you believe

15   they have?

16   A    I would guess it would be in the 6 to 6-1/2 percent.

17   Q    Okay.  And you believe it's your fiduciary obligation

18   to protect that lost opportunity costs, correct?

19   A    I believe it is my duty to maximize the value, maintain

20   the value of the trust and the assets, yes.

21   Q    Okay.  And in doing that, you thought that was a

22   significant concern to avoid the delay and make sure they

23   didn't lose that opportunity cost, correct?

24   A    That's correct.

25   Q    And so, you subtracted that number out and you took the

1   $590 million number, correct?

2   A    I did.

3   Q    And if today, you were able to distribute all of the

4   money out, that would go to what we'll call institutional

5   holders, correct?

6   A    That's correct.

7   Q    Okay.  And when you determined what the cost to the

8   institutional holders would be, I believe you used 12

9   percent, correct?

10   A    I did.

11   Q    And thought that might even be light, as I recall your

12   testimony today.

13   A    That's correct.

14   Q    Okay.  And then you subtracted what the interest rate

15   is that they're getting on the current funds, which is about

16   1.64 percent, to come up with a roughly 10 percent number,

17   correct?

18   A    That's correct.

19   Q    Now, with respect to the 12 percent, is it your

20   testimony that that was the concern you had for those

21   unsecured creditors lost value?

22   A    That is correct.

23   Q    And you believed it was part of your fiduciary

24   obligation to proceed, even though you knew Elliott would

25   oppose, to make sure we didn't -- that the institutional

1    lenders did not lose that 12 percent value, correct?

2    A    Elliott opposed, and I have other beneficiaries who may

3    have a different view than Elliott.

4    Q    Okay.  But it was your view, and perhaps theirs, that

5    that 12 percent return was a significant reason for you to

6    exercise your discretion and try to keep the schedule.

7    A    Yes.

8    Q    Now, let's go to the $590 million.  How much of that is

9    reserved for the NextEra breakup fee?

10   A    275.

11   Q    Okay.  And is there anything that can happen before

12   September 5th that will allow that $275 million breakup fee

13   get distributed?

14   A    Before when?

15   Q    Before September 5th, the trial date.

16   A    It's my belief that if the Third Circuit does not

17   overturn the ruling of Judge Sontchi, that there is an

18   opportunity for those dollars to be returned and

19   distributed.

20   Q    Okay.  Were you part of -- you were part of the

21   management team that determined to establish that reserve,

22   correct, the $275 million reserve.

23   A    I think that was -- I was part of the management team

24   that collectively negotiated that agreement.

25   Q    And at that point, you did not negotiate any interest

1    rate to be paid on that reserve, did you?

2    A    My understanding that there was an ask by Elliott, and

3    that ask was denied by the Court.

4    Q    That's your understanding?

5    A    That's my understanding.

6    Q    You don't have the understanding that the Debtors made

7    a request and did not seek -- a request to use their

8    discretion and seek aside a reserve without paying --

9    without requiring interest.  You don't have any recollection

10   of that.

11   A    I don't recall that.

12   Q    So now, if you can't distribute 275 million of the 590

13   by September 5th, that's roughly -- I did some math -- 46.6

14   percent of 590; isn't that correct?

15        MR. McKANE:  Objection, Your Honor.  Is he asking

16   him to do the math or is it a hypothetical?

17        MR. GALARDI:  I'll give you a hypothetical.

18   Q    If the 275 cannot be distributed, how much money can be

19   distributed by September 5th at best?

20   A    315.

21   Q    And is the PAB in the position with respect to

22   everything else ready to distribute funds on September 5th,

23   that 315?

24   A    Are you asking me that if we have resolved all the

25   issues?

1    Q     No.  What I'm asking you, sir --

2    A     Okay.

3    Q     -- is if once the allocation, let's assume the

4    allocation dispute is finally resolved by this Court on

5    September 5th, is the PAB ready and able to distribute the

6    $315 million that is not being held up by the NextEra

7    reserve order?

8    A     I believe in approximately.

9    Q     All of it.

10   A     Approximately.

11   Q     Okay.

12            THE COURT:  Unless you appeal, Mr. Galardi.

13            MR. GALARDI:  Again, there's stays, there's all

14   sorts of things.

15            THE COURT:  All sorts of stuff.

16            MR. GALARDI:  There's all sorts of nuances.

17   Understood, Your Honor.  I heard something from Mr. Shore in

18   the back, but I can't remember.

19   Q     Now, Mr. Horton, do you have an understanding of what

20   percentage of the creditors entitled to a distribution is

21   represented by UMB and Elliott on the EFIH side?

22   A     EFIH is roughly 70 percent is what I understand.

23   Q     Well, UMB is the Trustee for all of the noteholders,

24   correct?

25   A     I'm sorry.  I thought you said Elliott in UMB.  I

1    didn't understand your question, okay.  All of it.

2    Q    So roughly 100 percent of it, correct?

3    A    That's correct.

4    Q    Okay.  And now, with respect to the EFH side, what is

5    your understanding of what Elliott's position is with

6    respect to that percentage?

7    A    It is 40 percent roughly.

8    Q    So in determining to proceed with the motion, you

9    determined to proceed in the face of almost unanimous

10   opposition by the EFIH creditors and a 30 percent opposition

11   by the EFH creditors, correct?

12            MR. McKANE:  Objection to form.

13            THE COURT:  Overruled.

14   A    I proceeded under the responsibility of protecting the

15   trust assets for the benefit of all beneficiaries; that is

16   what I'm required to do as the DOD.

17   Q    Understood.  Who would lose the most if there is a

18   delay in the schedule?

19   A    Under this calculation, who would lose the most from an

20   opportunity cost perspective?

21   Q    Yes.

22   A    The EFIH and part of EFH.

23   Q    But Elliott would be one of the big losers, wouldn't

24   it?

25   A    They would lose the opportunity, yes.

```
1    Q     And UMB, who represents the balance of the EFIH
2    noteholders, they would be a big loser, correct?
3    A     That's correct.
4    Q     And those are the parties that served the discovery on
5    the former officers and directors, correct, one of the
6    parties that served --
7    A     It's one.
8    Q     One of the parties that served it on the former
9    directors and officers, correct?
10   A     That's correct.
11   Q     Okay.  And they are the parties, under Rule 45, that
12   the EFH or EFIH directors could try to shift costs to,
13   correct?
14   A     I agree with that.
15   Q     Okay.  But you decided to avoid that and agree to
16   reimburse the fees and expenses nonetheless, correct?
17   A     I did, because the analysis did not include, again,
18   whether the 45 million was going to be shifted to Elliott or
19   to the PAB.  It was about the delay and the ability to shift
20   -- ability to distribute those dollars to the -- to the
21   beneficiaries.  I have a responsibility to all
22   beneficiaries, just -- not just to UMB and Elliott.
23   Q     And did you discuss with those other beneficiaries that
24   you were assuming costs that they might not ever have to
25   bear?
```

1   A     I think that would have been even more beneficial to

2   them if I had said, and by the way, you may not have to pay

3   for these costs."  They're still going to say, if you delay

4   this, I am going to lose the opportunity to reinvest these

5   dollars.

6   Q     Now, again -- now, let's look at the second line of

7   your analysis.  There's three firms and four people at $1200

8   an hour, 80 hours, 1.15, plus the 30 percent contingency is

9   what I understood that to be to $1.5 million, correct?

10  A     Yes, sir.

11  Q     Okay.  So I want to take each of the firms separately

12  and to start with Kirkland.  Are the fees of the three firms

13  here solely with respect to the costs of discovery with

14  respect to the former officers and directors, or are there

15  also included in this the cost of the PAB?

16  A     It was an estimate for Kirkland & Ellis if they were to

17  get in involved in the discovery and if I were to get

18  involved.  This is really about if I were going to get

19  involved in that process.

20  Q     And I know that that I asked you an odd question.  When

21  you say I, are you saying --

22  A     The PAB.

23  Q     Okay, so let me ask this.  The costs of the PAB are

24  already going to be incurred because it's a party to the

25  litigation, correct?

1    A    Again, it's my belief that the PAB may be involved and

2    may need to have representation.  I don't know to what

3    extent.

4    Q    But when you did the analysis, I'm trying to figure out

5    what's the extra costs part of the analysis.  I understand

6    Proskauer.  Proskauer represents Ms. Williamson and Mr.

7    Evans, correct?

8    A    Correct.

9    Q    Okay.  And when you analyzed that, did you distinguish

10   that one firm, they're going to need more or less than Mr.

11   Levin's firm to represent Mr. (indiscernible)?

12   A    This was a stress test, so I'm trying to be

13   conservative.  And the higher the cost, as I'd explained to

14   you the other day, for example, yesterday -- for example, if

15   the cost was $20 million.  So the higher the cost, the more

16   likely the PAB is going to say, you know what, it's worth

17   the risk and the delay, so I was trying to be conservative.

18   If it was $20 million, we all know it's a very simple

19   answer: let's delay, we can delay a long time.

20   Q    You're also assuming in that there would be a delay,

21   correct?

22   A    My belief is that if we go down the path and say, these

23   -- the disinterested -- to the disinterested directors, we

24   are not -- I am not -- and I say we collectively, I've done

25   this before -- we, and the beneficiaries, are not going to

1    reimburse you.  I believe through these different avenues

2    that there's going to be a significant delay.

3    Q    Let me ask you.  You used the example today and you

4    used it in your deposition of the $20 million, then clearly,

5    it may be worth the delay, right?  That was your example

6    yesterday and today?

7    A    Yes, because the cost outweighs the benefit.

8    Q    Okay.  Being concerned about that, did you require or

9    did you set, for any particular professional, a budget that

10   had a limit as to what you -- what fees and expenses you

11   would reimburse?

12   A    No, I've never seen that, no.

13   Q    You did not do that.

14   A    No.

15   Q    You did not do that with Proskauer.

16   A    No, sir.

17   Q    You did not do that with Kirkland.

18   A    No, sir.

19   Q    You did not even have a budget for you as a PAB to set

20   the limit on fees for Kirkland & Ellis for the case.

21   A    No, sir.

22   Q    And you did not do that for Jenner.

23   A    No, sir.

24   Q    And you don't believe that any such budget would put it

25   -- would have a value here in determining whether or not to

1    reimburse fees and costs of third parties?

2    A    I have been in this case for four years and I have

3    watched the litigation.  And I have saw -- I have seen the

4    litigation get to levels and go in directions that no one

5    could predict, and I have the seen the expenses get very,

6    very high.  And if we have a fee committee set up for a

7    reason, is because it is very difficult to budget these

8    different costs.  It's just very difficult.

9    Q    Well, if it's difficult, isn't it difficult to control,

10   Mr. Horton?

11   A    Yes, sir.

12   Q    And so, isn't it part of your job as the Trustee for

13   the PAB to actually control those costs?

14   A    I control those costs by rejecting unreasonable

15   activities, unreasonable fees.

16   Q    And you don't think that there would be any value, and

17   in exercising your discretion, you made no effort to say, I

18   will reimburse fees and expenses up to X dollars.

19   A    It's up to reasonable expenses, I think is the

20   standard.

21   Q    But you did not set any budgetary cap on any

22   professional.

23   A    No.

24   Q    And you also don't have any agreement that by funding

25   the costs and expenses of the former officers and directors,

1   that they will not contest discovery, seek to delay

2   production, move to quash the subpoenas.

3   A     You said a lot right there and very quickly.

4   Q     So you have no agreement by the former directors and

5   officers that they will not seek to contest discovery.

6   A     I do not.

7   Q     And you put no limit on the costs in any effort they

8   have to contest discovery, correct?

9   A     I don't understand that question.

10  Q     Did you limit any of the fees by saying, if you contest

11  discovery, I will not reimburse them?

12  A     I did not.

13  Q     And, indeed, haven't you agreed that if they contest

14  discovery, you will reimburse the reasonable costs and fees?

15  A     I have not said that, no.

16  Q     Well, you're going to reimburse reasonable costs and

17  fees, correct, if granted.

18  A     Again, if they're reasonable, yes.

19  Q     And are you going to say today that if they contest

20  discovery, those expenses are not reasonable?

21  A     That could be the case.

22  Q     Are you going to say they can't spend -- so, as you sit

23  here today, they've just filed response.  Are you saying

24  today that you will not reimburse them if they contest

25  discovery?

1          MR. McKANE:  Objection, asked and answered.

2          THE COURT:  Yeah, twice.  Sustained.

3    Q    Do you have any understanding that by reimbursing those

4    fees and expenses, you've actually potentially made the

5    dispute over the scope of discovery more expensive?

6          MR. McKANE:  Objection.  The question is --

7          MR. GALARDI:  I asked him --

8          MR. McKANE:  No, the question, as a factual

9    predicate, does the opposite of what he answered, so it's an

10   improper question.

11   Q    Mr. Horton, is it possible that by your agreement to

12   reimburse the fees and expenses of Proskauer that Mr. Evans

13   and Ms. Williamson may use such fees and expenses to contest

14   discovery?

15   A    I don't believe so.

16   Q    You don't believe they will do that.

17   A    No.

18   Q    And do you believe that Jenner & Block will not use

19   fees and expenses to contest the discovery propounded by

20   Elliott?

21   A    I don't believe so.

22          MR. GALARDI:  Your Honor, may I take a five-minute

23   break?

24          THE COURT:  Absolutely.  We're going to take a

25   short recess.  Mr. Horton, don't talk to anybody.

```
 1            MR. HORTON:  Yes, sir.

 2        (Recess)

 3            CLERK:  All rise.

 4            THE COURT:  Please be seated.  You may proceed.

 5            MR. GALARDI:  Thank you, Your Honor.  I'm hoping

 6    not to be too much longer, Your Honor, but --

 7            THE COURT:  Okay.  Whatever time you need.

 8            MR. GALARDI:  Thank you very much.

 9            THE COURT:  You're welcome.

10    Q    Mr. Horton, earlier, Mr. McKane asked you whether you

11    had reviewed the transcript in which Ms. Yenamandra had made

12    certain representations as to what you would testify today

13    in Court, correct?

14    A    That's correct.

15    Q    And in one of those representations, there was a

16    discussion that the PAB was concerned about being dragged

17    into -- and I think she used the word satellite litigation?

18    A    That's correct.

19    Q    And was that one of your concerns?

20    A    It's not my primary concern, but it certainly is a

21    concern of -- that -- you know, additional expenses and so

22    forth associated with a satellite litigation.  There's

23    certainly additional cost.

24    Q    Okay.  And what was the satellite litigation that you

25    are concerned that you would be dragged into?
```

1   A    I would think that there's a risk that a litigation

2   with Sempra or the D&O or potentially -- I don't know --

3   again, I've told you this before, Rule 45.

4   Q    Okay.

5   A    So, these different potential litigations that I could

6   get dragged into.

7   Q    Okay.  So, let's talk about each of the ones you just

8   mentioned.  Let's talk about the potential in a Sempra or a

9   D&O litigation, correct?  Now, absent the PAB assuming the

10  costs and expenses of the former officers and directors,

11  isn't it the case that the PAB's only role in that

12  litigation would be as a witness?

13  A    I can't predict that.

14  Q    Do you have any understanding that the PAB could assert

15  a claim against Sempra if it does not reimburse the costs

16  and expenses of the former officers and directors?

17          MR. MCKANE:  Objection, asked and answered, three

18  times.

19          THE COURT:  Sustained.

20          MR. GALARDI:  Fine.  That's fine.

21  Q    Mr. Horton, if the PAB takes an assignment of the

22  former directors and officers' claims, after paying their

23  costs and expenses, would the PAB pursue those claims

24  against reorganized EFH?

25  A    A decision hasn't been made, but it's something to

1    consider, yes.

2    Q    Okay.  Would it be more expensive to be a plaintiff or

3    a witness in any litigation with the reorganized EFH?

4    A    If -- it's difficult to say, but probably being the

5    plaintiff.  But that's my guess.

6    Q    So, it actually may be --

7    A    That's a guess.

8    Q    Okay.  So, it actually may be the case that you've

9    increased the cost if you take the assignment of a

10   litigation from the former directors and officers; isn't

11   that correct?

12            THE COURT:  Increased the cost of what?  Because I

13   think, if you're talking about increasing the opportunity

14   cost --

15            MR. GALARDI:  Litigation cost.  I'm sorry, Your

16   Honor; I should clarify.

17            THE COURT:  Okay.

18            MR. GALARDI:  Thank you.

19   Q    So, as -- if you take an assignment of the former

20   directors and officers' claims against reorganized EFH, to

21   the extent they have any claims, and you pursue those claims

22   as a plaintiff, it's potentially more costly than what being

23   a witness in such litigation would be; isn't that correct?

24   A    You used the word potentially, so I'll agree.

25   Q    Now, but your position is:  there is no claim that the

1    former directors and officers can actually pursue against

2    reorganized EFH; isn't that correct?

3    A    That's correct.

4    Q    So, there's no reason you would ever pursue such a

5    claim, even if you got an assignment, correct?

6    A    Unclear at this point.

7    Q    But you've stated there is no claim in papers filed

8    with this Court, correct?

9    A    Yes, sir.

10   Q    And have you -- are you at all concerned -- I know I'm

11   going to use a legal phrase -- with being estopped from ever

12   pursuing that claim, even if you took an assignment?

13            MR. MCKANE:  Objection, Your Honor.  He can state

14   his understanding, to the extent he has one.

15            THE COURT:  Yes.  I agree.

16   A    I don't know the answer.

17   Q    Okay.  But, when you -- going back to Exhibit 7, and

18   determined that you may incur $1.5 million in fees, you

19   really don't believe those fees will ever be reimbursed from

20   reorganized EFH, do you?

21   A    I think it is a -- I don't -- I think it's a very low

22   probability.

23   Q    Now, Mr. Horton, you said you considered the

24   alternative that the former directors and officers might pay

25   their own fees, correct?

1    A     That we would ask them to pay their own fees, that's

2    correct.

3    Q     Okay.  And you stated that there were two reasons -- I

4    think you stated two reasons why you didn't pursue that

5    avenue.  One was, again, the risk of a delay to the

6    schedule.  And two, this might also relate -- result in what

7    I think Ms. Yenamandra said would be satellite litigation.

8    Correct?

9    A     That's correct, I believe.

10   Q     Okay.  Did you also concern yourself with whether or

11   not the former directors and officers could afford to pay

12   the litigation costs?

13   A     Consider whether they personally could pay?

14   Q     Yes.

15   A     Is that out of their own pocket?

16   Q     Yes.

17   A     I don't know their financial situation.

18   Q     But did you consider it in making a decision to -- in

19   making your decision as the PAB, did you consider whether or

20   not they might be able to afford those costs personally?

21   A     No.

22   Q     Okay.  And did you do any analysis as to whether or not

23   they might be able to afford those costs personally?

24   A     No.

25   Q     And did you do any analysis as to how much fees and

1    expenses or -- they had received over the course of their

2    tenure with the EFH/EFIH Debtors in making your decision to

3    determine the fees -- whether to reimburse the fees and

4    costs of the former directors and officers?

5    A    I'm sorry; I'm not -- I don't --

6    Q    Sorry.  Did --

7    A    EFH paid the fees?  Is that what you're asking?

8    Q    I'm asking you:  did -- let's ask it this way; I'll --

9    it's a long question, so I'm going to try to make it simple.

10   A    Okay.

11   Q    Did you do any analysis of what Mr. Cremens has been

12   paid from the EFIH Estate during the course of his tenure as

13   a disinterested director of EFIH?

14   A    You meant the -- his personal receipt?

15   Q    His personal, yes, his personal receipt of funds.

16   A    No, my understanding is that we're not going to pay

17   their disinterested director fees.  I was not agreeing to

18   that.

19   Q    No, I understand that.  But I'm asking you -- Mr.

20   Cremens served from some day after the petition date through

21   the effective date of the Debtors' -- the EFIH cases,

22   correct?

23   A    Yes, sir.

24   Q    And he was paid, personally, some compensation during

25   that period, correct?

1    A    Yes, sir.

2    Q    And did you do any analysis of how much his total

3    payment of personal -- how much total personal compensation

4    he received during that period of time in deciding whether

5    to now pay his potential fees and expenses with respect to

6    the discovery?

7    A    I don't see any relevance to that, no.

8    Q    So, the answer is you did not do that?

9    A    I don't see any relevance to that, no.

10   Q    Okay.  And you didn't do that with respect to Mr.

11   Evans?

12   A    No, sir.

13   Q    And you didn't do that with respect to Ms. Williamson?

14   A    No, sir.

15   Q    And you didn't do that with Ms. -- with respect to Mr.

16   Keglevic?

17   A    No, sir.

18   Q    Now, I would ask you to look back at what I believe is

19   Tab 1; it's that schedule.  Now, you noted on this schedule

20   that the former directors and officers' obligation to serve

21   responses and objections to the discovery were -- I believe

22   it's yesterday or two days ago, July 18th, correct?

23   A    To serve the responses and objections, yes, sir.

24   Q    Okay.  And you look at your binder, and I believe it's

25   Tabs 8-13; those responses were in fact filed on July 18th,

1    correct?

2    A     That's correct.

3    Q     Okay.  Now -- and those responses, as you read before,

4    provide that the former directors and officers would not be

5    producing documents until there is a determination that

6    someone other than themselves pays their fees and expenses

7    for responding to the discovery, correct?

8    A     That's my understanding.

9    Q     Okay.  And are you generally familiar with the fact

10   that discovery is paid by the party on whom the discovery is

11   sought, unless there is a Court order shifting the cost to a

12   third party?

13   A     That's my understanding.

14   Q     Okay.

15   A     Unless there's some other remedy.

16   Q     Again, unless they shift it to some other party or

17   person or entity, okay; my correction.  Now -- and when

18   you're concerned about the delay, you've used, I think, the

19   two- or three-week delay phrase a number of times during

20   your testimony today, is that correct?

21   A     I tried to do that to be conservative.

22   Q     Okay.

23   A     I said two or three weeks, four; I don't know how long.

24   Q     Okay.  Now, is there anything on the schedule or the

25   scheduling order that you know, if there were a dispute

1    under Rule 45 or with respect to discovery, that that

2    dispute could not be resolved and the trial still go forward

3    on September 5th?

4    A    So, are you suggesting that they do not know who's

5    going to reimburse them or if they're going to be

6    reimbursed?  Is that the question?

7    Q    Correct.

8    A    So --

9    Q    So, they have filed, now, responses to objections.

10   A    Yes, sir.

11   Q    Correct.  And now it's to the parties who they filed

12   those responses to decide to resolve those objections or

13   move to compel production; is that your understanding?

14   A    That's my understanding.

15   Q    And, absent reimbursement, that would be the normal

16   discovery process with third parties, correct?

17   A    Yes.

18   Q    And it's your understanding that that could be resolved

19   within 2-3 weeks, maybe longer, maybe less?

20   A    That's correct.

21   Q    Okay.  And you've not allowed that process to play out

22   by filing this motion; isn't that correct?

23             MR. MCKANE:  Objection, Your Honor.

24             THE COURT:  Basis?  I mean --

25             MR. MCKANE:  Well, now, to be honest,

1    argumentative.  There's no --

2              THE COURT:  I can't --

3              MR. MCKANE:  Sorry.  There's no foundation for him

4    to be able to speculate as to what would be in other

5    people's heads based on the filing of this motion.

6              MR. GALARDI:  Your Honor, he's speculated all day

7    what's in other people's heads based on the papers he has

8    seen.

9              MR. MCKANE:  Your Honor, he's testified as to the

10   positions taken by -- you know, in writing.  Like, what Mr.

11   Williamson -- what Ms. Williamson, Mr. Cremens, or Mr. Evans

12   will do next or what was driving this timing is not

13   something either -- unless he knows based on conversations

14   with counsel.  And there's been no foundation for that.  So,

15   the initial objection was there's no foundation to establish

16   that he would be speculating for that answer.  He didn't

17   bother to ask what his -- whether he knows or not what

18   they'll do next.

19             THE COURT:  All right, why don't you take it step

20   by --

21             MR. GALARDI:  Excuse me?  I'll take it step by

22   step?

23             THE COURT:  Yeah.

24             MR. GALARDI:  Thanks, Your Honor.

25             THE COURT:  Sorry; I mumbled.

1    Q    Have you had discovery disputes in -- during the EFH

2    bankruptcy cases before?

3    A    Okay.

4    Q    Have you had any?

5    A    I'm sure we did.

6    Q    Okay.  And has Judge Sontchi scheduled hearings or

7    telephone conferences to resolve such discovery issues when

8    they come up?

9    A    I would assume so, yes.

10   Q    And do you believe Judge Sontchi has an appreciation of

11   the importance of the September 5 trial date?

12   A    I believe he does.

13   Q    Okay.  And do you recall that you as the PAB actually

14   had initially suggested a trial date after September 5?

15   A    I understand.  Yes, I did.

16   Q    And that the parties that pushed for the September 5

17   dates was UMB and Elliott, correct?

18   A    That's my understanding, yes.

19   Q    Okay.  And those are the parties that have the

20   financial interests in keeping that date, correct?

21   A    Yes, it is.

22   Q    Okay.  And do you have any understanding, as you sit

23   here today, that, in the event -- and, as you sit here

24   today, the former directors and officers have filed

25   responses and objections saying, "I will not produce

1    documents until somebody tells me or there's a Court order

2    saying who's paying my fees and expenses," correct?

3    A    That's correct.

4    Q    And is there any reason you don't think that that can

5    be resolved and still have the trial by September 5th?

6    A    There's a lot of reasons.  I don't know what those

7    reasons are.

8    Q    So, you don't know what those reasons are, so they

9    couldn't have been part of your decision, correct?

10   A    Let me say it slightly different.  There are reasons

11   that it could be delayed, right?

12   Q    There are also reasons it could not be delayed; isn't

13   that correct, Mr. Horton?

14   A    That is correct.

15   Q    And --

16   A    That's the probability weighting of -- I don't know how

17   to probability-weight that.

18   Q    And that's really up to the Court, the parties who are

19   subject to the discovery, and the parties who serve

20   discovery, correct?

21   A    That is correct.

22   Q    And you have used your discretion to intervene and

23   shorten and preempt that process, correct?

24   A    I believe that there's going to -- I'm going to

25   continue to say this.  I believe that not agreeing to make

1    the payments, the reimbursements, is going to create a

2    delay.

3    Q    Is it going to create a delay or is it a risk of delay,

4    sir?

5    A    I believe it's going to create a delay.  That's what I

6    believe.  I cannot predict with certainty at all whether it

7    will or will not.  But I believe it will create a delay.

8    Q    And that delay will be a delay of the September 5th

9    trial date?

10   A    That's correct.

11              MR. GALARDI:  One second, Your Honor?

12              THE COURT:  Mm hmm.

13              MR. GALARDI:  Your Honor, that's all for me.

14              THE COURT:  All right.  Thank you.  Any other

15   cross?  All right.  Redirect?

16              MR. MCKANE:  No redirect, Your Honor.

17              THE COURT:  All right.  Thank you, Mr. Horton.

18              MR. HORTON:  Thank you.

19              THE COURT:  You may step down.

20              MR. MCKANE:  Your Honor, Mr. -- may Mr. Horton be

21   excused from the courtroom, just so that he may catch a

22   flight?

23              THE COURT:  Mr. Galardi?

24              MR. GALARDI:  Yes.  I didn't hear what you said.

25              MR. MCKANE:  May he be excused?

1           MR. GALARDI:  Yes, he may.  I have no problem with

2     his being excused.

3           THE COURT:  All right, yes, sir.  Have a safe trip

4     home.

5           MR. HORTON:  Thank you.

6           MR. MCKANE:  Thank you, Your Honor.  Your Honor,

7     unless you need a break, we'd be prepared to close.

8           THE COURT:  Why don't you go right ahead and

9     close, since we just took a break?

10          MR. MCKANE:  Really?  No staples?  Your Honor, may

11    I approach?

12          THE COURT:  Yep.  That's no problem.

13          MR. MCKANE:  Your Honor, we have prepared this,

14    but I will severely truncate it in light of the examinations

15    today.

16          THE COURT:  Okay.

17          MR. MCKANE:  All right.  That's fine.  So, we're

18    here basically on the -- it's a continuation of the hearing

19    on Monday.  And, on Monday, Your Honor determined as a

20    matter of law that the trust agreement -- that, under the

21    trust agreement, the PAB had the discretion to reimburse the

22    former directors and officers for fees and expenses incurred

23    with the EFH/EFIH case dispute.  So, today's issue is really

24    to determine, as a matter of fact, whether the PAB's

25    exercise of its discretion should be approved by the Court.

1          All right.  The trust agreement permits the PAB to

2    take any action "in its reasonable discretion" that it deems

3    necessary to -- or appropriate to fulfill the purposes of

4    the trust.  That's Section 6.1 of the trust.  Today's

5    hearing was about whether the PAB properly exercised that

6    trust in its reasonable discretion to make the commitment to

7    reimburse reasonable expenses and to file the motion in the

8    first place.  Today's hearing was not about the

9    reasonableness of those yet-to-be-incurred fees and

10   expenses, despite what you heard in cross-examination.

11         Now, the standard, Your Honor, that you're being

12   asked to apply here is an abuse of discretion standard.  The

13   Supreme Court has ruled that Courts should apply a

14   deferential standard while reviewing a trustee's exercise of

15   its discretionary authority governing the trust in question.

16   That's the Firestone Tire v. Bruch case from 1989.  And

17   specifically what is the standard?  It's an abuse of

18   discretion standard.  And, Your Honor, you've heard nothing

19   today to suggest that Mr. Horton abused his discretion in

20   any way by making the commitment to reimburse reasonable

21   fees and expenses and file the motion.

22         As an initial step, Your Honor, the PAB determined

23   that the projected fees and expenses were higher than the

24   former directors and officers would be willing to pay.

25   Elliott Capital projected those fees and expenses to be

1    approximately $800,000, according to Jeff Rosenbaum, the

2    portfolio manager for this matter.  The PAB projected the

3    fees and expenses would be approximately $1.5 million.  In

4    determining a path forward, the PAB considered what options

5    would maximize value for all the beneficiaries of the

6    Estate.

7              The PAB did not seek reimbursement to win favor

8    from the former directors and officers.  There's been no

9    suggestion of that.  And the PAB recognized that reasonable

10   people would not voluntarily step up to this level of cost

11   without having at least a portion of those costs covered.

12             So, what do we see?  We see, Your Honor, that

13   there's a reasonable exercise of discretion on the front

14   end.  In evaluating the paths forward, the PAB considered

15   what options would be available.  A key factor in

16   determining the value-maximizing path forward, similar to

17   the approach that they took when they were representing the

18   Debtors, Mr. Horton applied an actual cost and an

19   opportunity cost analysis of what would happen if there were

20   delays in the proceeding to resolve the EFH/EFIH allocation

21   dispute.

22             Ultimately, the PAB concluded that a commitment to

23   pay reasonable and documented fees and expenses reduced

24   those costs associated with the delay by mitigating the

25   disruption to the schedule, while also minimizing the lost

1    opportunity costs associated with further delays in

2    distributions.

3              Your Honor, I'm going to skip through a bunch of

4    this.  But, on that point, what did we hear in response?

5    What we heard was that Mr. Galardi said, from Elliott, "We

6    are the primary beneficiaries.  You must do what we say.  We

7    are directing you because we represent UMB and Elliott.

8    That's 70 percent of the EFIH portion of the beneficiaries."

9              They've said, on Monday and earlier, they don't --

10   they're not here making these objections on behalf of their

11   EFH holdings.  It's only based on their EFIH holdings.  And

12   that, because they're the majority holder, we -- the PAB

13   must do as they direct.

14             That is not the law.  That is not what the trust

15   agreement says about whether the Trustee has discretion.

16   And it certainly isn't an abuse of his discretion if he --

17   if the Trustee concludes, based on what he analyzes at the

18   tie, that, in a reasonable exercise of his discretion, it's

19   appropriate to incur those costs to minimize the overall

20   expense.  He's not obligated to take their direction in that

21   way.

22             So, what else do we hear?  We hear that they

23   should've had a budget, that he didn't get a budget from the

24   officers.  Your Honor, I struggle to imagine how it is

25   possible, in a litigation environment against Elliott

1    Capital, to determine what a reasonable budget would be on

2    the front end.  You have to take it as it comes.

3              The benefit that we have from Mr. Horton is that

4    he's been a member of the fee committee for over a year, he

5    understands their process, he -- and he is going to apply

6    that type of process in terms of looking at these fees and

7    negotiating those fees.  So, there's no budget.  But that's

8    not a -- that's not something you would expect to see in

9    this type of environment.

10             What else do we hear?  We hear, "You didn't

11   condition the commitment to reimburse on their cooperation

12   and their withdrawal of any objections that they have."

13   Your Honor, I'm not certain that Mr. Horton could have

14   conditioned that withdrawal.  If the decision -- if the

15   directors had a valid objection to over-broad discovery,

16   right, it would arguably be inappropriate to basically

17   condition -- pin it on a waiver of a valid argument.

18             They have what arguments they have.  We will work

19   with them on steps going forward.  We have agreed in the

20   order to reimburse reasonable fees.  But to condition the

21   payment of fees on a surrendering of valid objections, which

22   is what was being suggested by Mr. Galardi, is significantly

23   inappropriate.

24             THE COURT:  What about the subrogation point?

25             MR. MCKANE:  Your Honor, on the --

1            THE COURT:  Not to get you off your outline.

2            MR. MCKANE:  No, I apologize.  Well, there is no

3     outline at this point, Your Honor.  We're just going

4     forward.  But Ms. Aparna wants to address something.  Look,

5     on the subrogation point --

6            THE COURT:  Ms. Aparna?

7            MR. MCKANE:  Ms. Aparna.

8            THE COURT:  How is Ms. Cher?  (Laughter)  Ms.

9     Yenamandra.

10            MR. MCKANE:  Ms. Yenamandra.  Do you want to

11     address subrogation?

12            MS. YENAMANDRA:  Sure.  Your Honor, I was just

13     unprofessionally handing Mr. McKane a note on this point.

14     Having just discussed it with the folks from Kasowitz, we

15     wanted to make clear that nothing in -- it was never our

16     intent, and so I think I said it on Monday and I'd like to

17     say it again for the record, as discussed with the Kasowitz

18     folks, nothing in this order is intended to affect, let

19     alone impair or prejudice, the rights that any other party

20     may have under the merger agreement to assign any claims

21     that they have.  That includes the DDs, who have those

22     claims now, and they can assign those claims as they see

23     fit.  We will not stand in the way of that matter with this

24     order.

25            THE COURT:  All right.  Now, but if their

1    obligations are paid by the PAB --

2              MS. YENAMANDRA:  Correct.  If their obligations

3    are paid by the PAB --

4              THE COURT:  Shouldn't the PAB have the right to

5    pursue their claims of indemnification against reorganized

6    EFH?  Or is it that, if -- well, they would never have an

7    incentive to.  So, if they --

8              MR. MCKANE:  Your Honor --

9              THE COURT:  If their expenses get paid -- if the

10   DDs' expenses get paid by PAB, and they don't assign their

11   claims against reorganized EFH, but, if they pursue those

12   claims against EFIH and get any kind of recovery, they would

13   have to return the money to the PAB?

14             MS. YENAMANDRA:  Your --

15             MR. MCKANE:  Right.

16             THE COURT:  But they would never have any

17   incentive --

18             MS. YENAMANDRA:  Correct, Your Honor.  It's a --

19             THE COURT:  -- to pursue those claims against

20   reorganized EFH, because --

21             MS. YENAMANDRA:  It's like a very bad LSAT

22   problem.

23             THE COURT:  Right.

24             MS. YENAMANDRA:  Our belief is that the DDs, if

25   they wanted to, they could assign those claims to the PAB

1    right now.  And they said as much in their responses to our

2    motion.  Their better option, and probably also from the

3    Creditors' perspective, is that they don't assign the claims

4    to the PAB now that we've staked out our position on 6.8,

5    but assign those claims to the Creditors themselves, so

6    whether that's Kasowitz, Elliott, or some combination

7    thereof.

8            And so, the intent of what I said on the record

9    was to make it abundantly clear that, to the extent the

10   Creditors wanted to have direct engagement with the DDs as

11   to the assignment of those claims, they're, of course, more

12   than welcome to.

13           THE COURT:  Well, then, don't I -- don't then I

14   need something in the order, assuming I approve it, approve

15   the motion, that directs the recipients of any of these

16   funds to return them to the PAB in the event they get

17   payment for the same claims twice?  But then the PAB is not

18   going to -- hopefully, soon, not exist.  So, that might mean

19   the PAB needs to stay open.  Only I don't want --

20           MS. YENAMANDRA:  Sure.  The trust agreement has a

21   --

22           THE COURT:  I love lawyers, but I don't want

23   anybody to get paid twice.

24           MS. YENAMANDRA:  The trust agreement has a

25   provision requiring the trust to stay open -- and you're

1    going to balk at this a little bit, but it's in there -- for

2    six years, post-effective date.

3              THE COURT:  Oh.  Oh, great.

4              MS. YENAMANDRA:  So, someone will be there to make

5    that payment.  But, to Your Honor's point about including a

6    provision making it clear that obviously there's no double-

7    counting if the Creditors are successful against reorganized

8    EFH, that money comes back into the trust, we have no

9    objection to adding something like that.

10             THE COURT:  All right.  Thank you, Ms. Aparna.

11   You all right, Mr. McKane?

12             MR. MCKANE:  This transcript is going to be really

13   tough to live with at times.

14             THE COURT:  No, it's kidding.  It's -- everybody

15   at K&E is going to have it by Monday.

16             MR. MCKANE:  It's going out fast.  (Laughter)

17   Your Honor, ultimately, when we have a step back, and we

18   look at what's gone on here, you know, we're always in a

19   position to stand by and defend the decisions that were

20   made.

21             But, ultimately, what we're seeing, through the

22   motion, through the discovery that was served this week,

23   through the deposition, through the multi-hour, hour-plus,

24   examination of Mr. Horton, is essentially what Elliott

25   Capital's view is, with regards to the PAB, is to just --

1    they would love for -- to get the PAB out of this allocation

2    dispute, get them out of their way.  And they would actually

3    expend cost and spend time to do that, because, ultimately,

4    what their view is, with the PAB out of the way, they'll

5    catch some of that back, in terms of the ultimate resolution

6    of the allocation dispute.

7              We saw that with the letter that was filed, with

8    the efforts to move -- remove Mr. Horton or suggestion that

9    that is coming.  We fully anticipate that they may file a

10   motion to remove Mr. Horton.

11             But, when you stop and say to yourself, whatever

12   agenda they have -- and they may have a right to pursue it;

13   they may not; we'll defend it as needed.  But, for the

14   question here about what's doing right by beneficiaries,

15   right, Mr. Horton, as the PAB, has properly analyzed the

16   issue of allocating what are the costs, including the

17   opportunity costs, associated with potential delay, and has

18   done what he believes is undeniably the right thing to do,

19   and clearly, based on the evidence, is the right thing to

20   do, to advance the issue forward for all beneficiaries, not

21   just Elliott Capital.

22             THE COURT:  Thank you, Mr. McKane.

23             MR. MCKANE:  Thank you, Your Honor.

24             THE COURT:  You should go.  Did the lights just go

25   out?  That was weird.  Yes.

1           MR. SHORE:  Good afternoon, Your Honor. Chris

2     Shore from White & Case on behalf of reorganized EFH.

3           THE COURT:  Good afternoon, Mr. Shore.

4           MR. SHORE:  With respect to this issue of

5     assignment to Creditors, that's not relief requested in the

6     motion, and I don't think you should be handling it in the

7     order.  And let me just walk through an example:  Elliott

8     forces the DDs to run up $10 million of expense, then it

9     gets paid by the trust, and then Elliott brings a $10

10    million lawsuit against reorganized EFH to get that recover

11    for its own.  I think that raises a whole host of issues

12    that aren't framed in the motion, right?

13          The motion requested that there be a payment made

14    if someone gets a right of subrogation because they have

15    paid it.  That's one thing.  That would be the trust coming.

16    But we're not -- certainly not consenting to have the Court

17    enter any order that permits an assignment of anybody's

18    rights under the merger right now.

19          THE COURT:  Thank you, Mr. Shore.  Mr. Galardi?

20          MR. GALARDI:  Your Honor, I'll take the

21    subrogation point up first, just because I think the

22    testimony is clear.  Subrogation is worthless in this

23    circumstance because the PAB has stated its position.  It

24    would be the one paying; it subrogates; it clearly has said

25    there is no claim.  They're estopped from pursuing it.  So,

1    I don't think there's any solution there.

2            As to the assignment, Your Honor, I understand Mr.

3    Shore's position.  I also don't understand how it would be a

4    direct assignment with a subrogation right at the same time.

5    I'm not sure the documents work that way.  And I'm sure that

6    there is a collateral estoppel effect.

7            Let's go back to the fundamental principle of the

8    trust law.  And the trust is supposed to act solely for the

9    benefit of its beneficiaries, and Elliott and UMB do not

10   dispute that there are no beneficiaries here.  Okay?  We do

11   --

12           THE COURT:  Well, let me ask you that, because

13   this keeps coming up.  And I think there's -- I think your

14   position is not right.  So, I think you've taken the

15   position that, as a practical matter, since the Trustee has

16   to exercise its discretion for the benefit of the

17   beneficiaries, and that your client, at least at the EFIH

18   level, is either a holder or indenture trustee for the

19   entirety of that group, ergo the Trustee has to do what the

20   beneficiaries want.

21           MR. GALARDI:  Absolutely not.

22           THE COURT:  That's not the law, right?

23           MR. GALARDI:  That's not the law, and I agree with

24   you.

25           THE COURT:  Okay.  Okay.

1           MR. GALARDI:  I'm agreeing with you, Your Honor.

2    There's nothing that prevents Mr. Horton from saying, "I

3    will consider all of the interests.  And, even if 75 percent

4    or 80 percent of the people want something, I can make a

5    different decision."

6           THE COURT:  Right, even if 100 percent want

7    something.  I mean, you know, look, I have kids.  I'm kind

8    of --

9           MR. GALARDI:  Your Honor, you're not really a

10   Trustee, Your Honor, and it's a different -- it's a very

11   much different circumstance under trust law.

12          THE COURT:  Well, yes and no, because, I mean,

13   look, when I make decisions about them, it's -- I'm trying

14   to do what's best for them.  And sometimes, often, it's

15   exactly what they don't want.

16          MR. GALARDI:  Your Honor, but there is a fine --

17   and, again, we'll go through the cases if you need to.

18   There is a difference between a trustee and being

19   paternalistic.

20          THE COURT:  Yes.

21          MR. GALARDI:  And this is a trustee.

22          THE COURT:  Understood.

23          MR. GALARDI:  And that is paternalism.  You can

24   make the decision as an adult for your children.

25          THE COURT:  But if -- in the exercise -- in

1    exercising his discretion, if Mr. Horton thinks your client

2    is wrong to make the decision they want, he has that right.

3             MR. GALARDI:  No one -- Your Honor has found that

4    the contract provides him with that discretion.

5             THE COURT:  Right.

6             MR. GALARDI:  And he has that right.  So, we now

7    come back to what we were here about.

8             THE COURT:  Yes, okay.

9             MR. GALARDI:  Has he discharged his discretion?

10            THE COURT:  Yes, you're correct, Mr. Galardi.

11            MR. GALARDI:  And so, now --

12            THE COURT:  So, he has no -- he doesn't have carte

13   blanche to do whatever he wants.

14            MR. GALARDI:  Doesn't have carte blanche, Your

15   Honor.  And then let's take the other aspects of this.  It

16   doesn't mean that you can simply do anything you want,

17   because the contract does not provide it's absolute

18   discretion.  And the case law is quite clear that a trust

19   can be given absolute discretion, and it wasn't in this

20   instance.

21            Second, we have to take the uncontested fact that

22   Mr. Horton is also a former officer and director.  How you

23   weigh that in this calculation is up to you, Your Honor.

24   But that is one thing, if this was a board, it's an

25   interested transaction, whether we want to admit it or not.

1          Now let's go to the discretion.  When you expect a

2     trustee -- just like when I expect you to be a parent and go

3     through weighing all the alternatives, first, do you have to

4     make a decision and do you have to do it at the time?  Or

5     can you let things play out?  I think Your Honor made the

6     observation last hearing, and the observation is still true;

7     namely, this is all about the risk of loss.  Who is going to

8     bear the cost, the disinterested directors, the former Ds

9     and Os, or the PAB?

10         Mr. Horton is absolutely clear he has no

11    requirement to pay these fees and expenses.  There is

12    nothing Your Honor ruled; there's nothing in the document

13    that requires it.  So, now the question is:  what's the

14    American rule?  You pay your own fees and costs.

15         Mr. Horton then comes in and says, "They're not

16    willing to do so; that's on their presentation.  Can't see

17    whether they are -- they can afford it.  Can't see that.

18    But because they're not willing to do so, I am going to

19    shift that American rule," which Your Honor hasn't had the

20    opportunity to do under a Rule 45 motion, "and I'm going to

21    assume the cost, because I think it's better for all of my

22    beneficiaries.  And that's a cost I will never be

23    reimbursed."  Why?  Because he's admitted that he cannot

24    pursue reorganized EFH, and there's no claim asserted, and

25    so he is not going to spend the money on that.  So, that is

1    a lost cost.

2              He decided to do that, the evidence -- without a

3    request, without a demand, without an obligation.  That was

4    the first discretionary decision.  Did he have to make that

5    decision then?  Could he -- and Your Honor has seen the

6    exhibit -- make the decision at the time there is actually a

7    dispute as to whether or not the discovery is too

8    burdensome, whether the costs should be shifted, whether the

9    director -- the former directors and officers?  Why change

10   the rule now?  Why reach out and use your discretion then?

11             But let's assume Your Honor could get over his

12   exercising the discretion at that point to change the

13   American discovery rule.  The fact of the matter is, yes, in

14   a half a piece of paper, to stress test, he made the

15   calculation.  The calculation didn't take account of the

16   fact that $275 million may not go out.  It relied on a 12

17   percent interest rate, which Your Honor has ruled before

18   Creditors are entitled to any distribution until the time

19   that they get the distribution.

20             Now, if he wants to use that lost cost, there is

21   the certain irony that he's the same person as a management

22   team that never sought from NextEra the percentage to give

23   Elliott, the other Creditors, now his beneficiaries, a

24   financial recovery for the delay that that reserved.  So, I

25   think it's a little bit disingenuous.

1          Next, litigation costs money.  We all understand

2   it.  Budgets for a financial person, budgets for this Court,

3   DIP budgets, should have an estimate of the amount.  It

4   should have a budgeted amount.  And, if you're interested in

5   protecting all of the beneficiaries, leave aside Elliott,

6   leave aside UMB, leave aside the Ad Hoc Committee Members,

7   he did not determine that there was a budget necessary.

8   Why?  Because he can't predict.

9          But we're going to leave it to his sole discretion

10  to find out what's reasonable as the expenses add up.  Not

11  after the fact, not make them spend their own money and

12  reimburse it; he's advancing.  The motion said

13  reimbursement, but he's advancing the cost to these

14  professionals as they go, as these disputes arise.  They are

15  going to rely on it, and they have all the reason in the

16  world to fight the discovery.

17          Well, let's have the fight about the discovery,

18  because that's what Rule 45 was intended to do.  It was to

19  say -- and I understand this is partially against our own

20  interest, Your Honor.  We may come in; Your Honor may say,

21  "Look, Elliott's going to pay those fees."  I may shift it.

22  We'll have an evidentiary hearing on whether those are in

23  fact significant to those parties at that time, in the

24  amounts, and are we being unreasonable, and is their former

25  knowledge sufficient to say, even if they're significant,

1   which is what the case law under 45 says, they still have to

2   pay those expenses.

3          We can have the discussion that Mr. Horton didn't

4   decide to have.  Do they have the ability to do this?  Is it

5   really going to be that burdensome after the PAB?  Will it

6   really delay the schedule?

7          Your Honor can look at that schedule.  Even if we

8   have the discovery dispute, we'd built in, because of the

9   other person's schedules at the end of August, frankly, we

10  have a written submission -- I think it's August 11th or

11  12th.  Then we don't have a hearing till the 5th.  There is

12  a period of time that other witness depositions can be done

13  if we have that fight.  There is time by which we can

14  resolve the discovery disputes.

15         I know nobody wants to spend the month of August

16  fighting over these things.  But we also have a status

17  conference on August 1st, where we could resolve some of

18  these discovery disputes.

19         So, he exercised his discretion, preempted Rule

20  45, did so on a half a piece of paper, using a number and a

21  return which Your Honor, I believe, has said is not

22  appropriate for unsecured creditors.  But even if it were,

23  he didn't use it when there's 275.  He's counting on,

24  perhaps, the Third Circuit, and we all hope the Third

25  Circuit rules before September 5th.

1          But, Your Honor -- exactly, Your Honor; we don't

2     know if they will.  We understand there will be appeals no

3     matter what.  We also understand that we'll have another

4     dispute:  can we distribute that 275?  Your Honor has a

5     standard in that order saying cause. So, only some part of

6     that is really to be distributed.

7          So, again, when it comes to his discretion, no one

8     is asking those parties to waive.  That was the absurdity of

9     it.  You don't ask them to waive.  You have no guarantees

10    they won't move to quash.  You have no guarantees that the

11    discovery will get done.  You have none of those issues

12    resolved.  Yet Mr. Horton has stepped out and burdened all

13    the beneficiaries with costs which he has already admitted

14    will not be reimbursable from either insurance or the

15    reorganized EFH.

16          So, Your Honor, this is not dishonesty on Mr.

17    Horton's part.  It's good intentions.  But that's not the

18    standard on abuse of discretion.  You can have the best

19    intentions as a trustee and still have "abused your

20    discretion."  As my former judge used to like to say,

21    "Didn't properly exercise your discretion," because it

22    didn't have to be an abuse.  It's just you could disagree

23    with it.

24          That's why he came to the Court.  He doesn't even

25    need to come to the Court by his own testimony, Your Honor.

1    And I's questionable whether this has jurisdiction to decide

2    this issue.  But we'll leave that one aside and say he

3    didn't carry his burden that he consider, under the

4    circumstances -- he did a lot of things, but he didn't

5    consider, under the circumstances, all the things that were

6    reasonably available to consider, including budgets, cost,

7    demands, rights, obligations, ability to go.

8              And, when he did that, it turned out to be a half

9    a piece of paper and conversations with legal counsel, and

10   focused on the Sempra -- sorry, the reorganized EFH

11   reimbursement.  So, we do believe he failed to exercise the

12   discretion as our Trustee.  Thank you.

13             THE COURT:  Thank you, Mr. Galardi.  Reply?

14             MR. MCKANE:  Very briefly, Your Honor.  Halfway

15   through Mr. Galardi's presentation, he specifically said

16   that, if there was going to be a Rule 45 hearing, there

17   would be an evidentiary hearing on burdens and costs along

18   the way.  That almost by -- that statement in and of itself

19   almost proves the point on delay.

20             You get out that schedule and you look at it; the

21   burden responses came in on Wednesday.  We are not aware of

22   any efforts to meet and confer between the third parties and

23   Elliott and UMB, as well as the EFH parties that served

24   discovery.  Even if something came before Your Honor and got

25   teed up, you look at:  could it go any faster than the

1    expedited motion that we filed on June 6th?  That's 14 days

2    ago.  That's two weeks ago.

3              To the extent that we are in this world and we're

4    looking at a two-week delay starting sometime mid-next week,

5    you're pushing out no documents, moving out all of the

6    depositions.  They are -- you know, according -- you know,

7    based on this process, they're looking at more than a half-

8    dozen depositions.  This schedule moves.  And when this

9    schedule moves, the costs, the opportunity costs, which are

10   what Mr. Horton focused on, are clear.

11             So, I think Mr. Galardi's own closing argument

12   proves the point.  With the evidentiary hearing that we know

13   that we he would insist on, we would not keep this schedule.

14             The other argument that I just think is wholly

15   disrespectful of Mr. Horton and everything that you've heard

16   today --

17             THE COURT:  I'll just say the problem with moving

18   the schedule is, based on my schedule, the Jewish holidays,

19   et cetera, it's not just moving it a week.

20             MR. MCKANE:  I understand, Your Honor.

21             THE COURT:  You're into October.

22             MR. MCKANE:  We did this exercise --

23             THE COURT:  One day means October.

24             MR. MCKANE:  And, Your Honor, we agree.  We were

25   here during the scheduling fight before, and we were working

1    through this schedule to try to make this hold.  And we all

2    agreed that this is tight but we're going to get it done.

3    Interjecting delay to this schedule creates serious problems

4    and material delay.

5             The other argument, Your Honor, I just have to

6    respond to is Mr. Galardi basically came forward with the

7    classic "good heart, empty head" argument.  And I'm sorry;

8    that is disrespectful of the man who testified for two

9    hours.  Mr. Horton thoroughly analyzed the issue.  He

10   testified to it for two hours.  The fact that he scribbled

11   out some notes to kind of crystallize the accounting of that

12   can't be used against him as suggesting that's the only

13   basis for his efforts.  He clearly exercised his discretion

14   in a reasonable manner.  Thank you, Your Honor.

15            THE COURT:  Thank you.

16            MR. GALARDI:  May I say one thing, Your Honor?

17            THE COURT:  Yes, you may, Mr. Galardi.

18            MR. GALARDI:  Your Honor, what I was saying,

19   moving out the schedule, it wasn't the September 5th date.

20   We were all aware of that.  It was, if Your Honor looks at

21   that schedule and the time by which discovery has to be done

22   under --

23            THE COURT:  You're saying there's some cushion in

24   late August.

25            MR. GALARDI:  August 12th to September 5th is

1   still a good three and a half to four weeks.  Now, we ruined

2   everybody's August last year; I understand that; don't want

3   to do it.  But I'm not sure that we're not ruining it

4   already.

5           THE COURT:  Well, in our State Court now,

6   according to the Supreme Court last week, we're not allowed

7   to work in August.  (Laughter)  I'm working for the wrong

8   boss.  All right.  I'm going to take a brief recess.  Then

9   I'll come out and rule.

10          (Recess)

11          THE COURT:  Please be seated.  Okay.  Thank you

12  very much for your submissions.  I'll cut to the chase and

13  then fill in.  I am going to grant the motion, with some

14  limitations, and overrule the objection.  And this is a

15  follow-up on the rulings that I made -- I think it was

16  Monday.  Was it Monday?

17          MR. MCKANE:  Yes, Your Honor.

18          THE COURT:  Where I found that, as a matter of

19  law, the PAB had the ability to make -- or discretion to

20  make these payments that are -- it seeks under the motion.

21  But however, there was an issue as to whether that

22  discretion was being reasonably applied.  And that was a

23  mixed question of law and fact, and that's why we had an

24  evidentiary hearing today and we went through in some detail

25  -- Mr. Horton went through in some detail, on direct and

1    cross, for a good two hours or so, the -- what he did, what

2    he thought, why he filed the motion, why he continues to

3    prosecute it.

4           Importantly, as a trust -- a Trustee, excuse me,

5    over a trust, the duties of which are both assigned in the

6    law and in the contract, he has a requirement to act on

7    behalf of the beneficiaries.  Not at the behest of them, as

8    I discussed with Mr. Galardi, but certainly he has to

9    exercise his discretion within a certain standard.  And, as

10   pointed out, that standard is somewhat deferential and

11   generally is considered an abuse of discretion standard.

12          So, the question is whether Mr. Horton's decision

13   to reimburse -- and we can talk about that in just a second,

14   the use of that word -- the reasonable fees and expenses of

15   Ms. Williamson and Mr. Evans and Mr. Cremens and Mr.

16   Keglevic, and possibly others, I suppose, whether that was a

17   -- was reasonable.  And I find that it was.

18          Was it perfect?  Did Mr. Horton consider every

19   nuance, turn over every stone that could be turned in making

20   his decision?  No.  But I think that he did a thorough

21   examination of the issue.  He spoke at length with the

22   beneficiaries.  He consulted at length with counsel.  He

23   talked to an insurance broker that provides insurance for

24   the company.  And he jotted down some notes.  And, you know,

25   notes are notes; that doesn't mean -- you know, three lines

1    doesn't mean there was three lines of thought that went into

2    something.  It's just a note.

3          But he considered intensely and with some detail

4    the key component, I think, for him, which was the

5    opportunity costs that his lost -- or incurred, I guess, is

6    a better word -- the opportunity cost that's incurred on the

7    Creditors every day, minute, hour that their distribution,

8    whatever it is, will actually be paid.

9          So, in making his decision, he did not believe

10   that the PAB was required to make these distributions, but

11   rather that it benefited the beneficiaries to avoid lengthy

12   litigation that would be -- require a movement in the

13   schedule that would incur higher opportunity costs than the

14   direct costs associated with paying for the discovery.

15         Is it possible that this could all be done,

16   including a contested Rule 45 procedure, here -- or, I

17   guess, possibly in Texas, but here?  Yeah, it might happen.

18   I appreciate the shout-out to the Court being aware of the

19   deadline, and doing everything the Court can do, within

20   reason, to accommodate emergencies.  But I don't know if I

21   could do that evidentiary hearing and contested issues in

22   the next six weeks.  I don't know how long that would take;

23   I don't know how my schedule would work.

24         I think, if we start to get into a contested fight

25   over whether -- over who's going to pay for this discovery,

1    and the discovery is not going to happen -- well, A, who's

2    going to pay for the discovery, and, B, whether the

3    discovery happens before or after that decision is made, I

4    think there is a significant probability that the trial date

5    moves.  And I don't think that helps anybody.  So, I think

6    Mr. Horton's key question, in the exercise of his

7    discretion, was correct, that there is a significant issue

8    here of delay.

9            I said I was assiduously not deciding what the

10   Sempra merger agreement meant on Monday, and I continue to

11   not say what I think the Sempra merger agreement means in

12   connection with whether there's indemnification rights here.

13   However, I will say I think there is a significant

14   litigation risk that the indemnification obligations do not

15   run to the DDs.

16           That creates a situation where it's even more

17   critical to avoid delay, to step up and pay these fees,

18   because it really means we're talking about a Rule 45

19   contested issue being the only way to shift those costs.

20   And thus, there would be more focus on really fighting that

21   litigation tooth and nail.  And that would be a difficult --

22   possibly a difficult litigation, might get into the personal

23   wealth of the directors, and nobody likes that.  It could be

24   quite, quite messy and time-consuming.

25           And I think -- again, I don't get into what I

Page 127

1    think the D&O coverage in the insurance policy is.  But I

2    think there is also a significant risk there is no coverage

3    here.

4              There is a -- so, to cut it short, I think that

5    the facts and circumstances show me, based on the evidence

6    and the Court's experience, that it was certainly a

7    reasonable exercise of Mr. Horton's discretion as Trustee to

8    incur the costs and expenses of the directors and officers.

9    However, there is, I think, a limit on that.

10             I think Mr. Galardi, I think, in cross, actually,

11   made a terrific -- number of terrific points, but most of

12   which went to, you know, things to put in the order if the

13   motion was granted.  It's more than "just don't approve the

14   motion."

15             But one of them, I think, is, you know, were we

16   going into a black hole here, and God knows what it's going

17   to cost.  And, you know, Proskauer and the -- all the firms

18   here -- everybody here is excellent at their job and charges

19   accordingly.  So, it won't be cheap.  And so, I am going to

20   limit the authority at this point, without coming back and

21   asking for more authority, to 1.5 million in the aggregate.

22             Mr. Horton can make the review; he doesn't need to

23   give that -- I do not want to give the fee committee

24   anything more to do; they're busy enough as it is.  And

25   that's a very inefficient way to review costs, to a certain

1   extent.  When the numbers in the -- when the fee app numbers

2   get small enough, using the fee committee actually -- you

3   eclipse any savings.  So, Mr. Horton can do that himself.

4   He doesn't need to share it with anybody else.

5          He also has the authority to pay the law firms

6   directly.  I think Mr. Galardi is right; I think that's

7   advancement, not reimbursement.  And -- but I think it's --

8   I don't think it's a difference.  It doesn't really matter.

9   But it is advancement.  But, since there's -- especially

10  since there's no entitlement to indemnification that's

11  triggering the advancement, the distinction between

12  advancement and reimbursement, or advancement and

13  indemnification, doesn't matter.

14         However, if the recipients, law firm recipients,

15  receive double payment, or payment of any of these fees from

16  another source, they're going to need to be directed to

17  disgorge them back to the trust.  I was going to require

18  subrogation or an assignment of -- to Creditors, but I'm

19  convinced by the arguments that that would be unwise.  I

20  don't think it would accomplish anything.  I think we can

21  leave those issues open and see how it proceeds.  But nobody

22  gets double-paid.  And, if they get double-paid, they have

23  to pay the trust back.

24         I struggle with this idea, which is whether to

25  require the recipients of the funds to cooperate with

1    discovery.  I haven't read the subpoenas, so I don't know if

2    they're overly broad.  And, I mean, I skimmed the pages that

3    were pointed out to me in the responses, so I don't know

4    what the objections are.  So, I don't want to put the DDs,

5    the former officers and directors, into a position where

6    they can't reasonably respond based on overly broad

7    discovery, et cetera.

8              But, having paved the way to cooperation, I think

9    it's important that they cooperate.  So, I will request the

10   parties to discuss putting some -- I'm going to ask you to

11   submit an order under COC in consultation with each other --

12   ask you to come up with some language that basically

13   requires them to reasonably participate in discovery.  And

14   we can -- and then we can figure out if the fees to do that

15   are reasonable.  I mean, a lot of reasonableness in here,

16   but --

17             MR. MCKANE:  Yeah.

18             THE COURT:  You get the idea.

19             MR. MCKANE:  We do, Your Honor.  And, in fact, Ms.

20   Aparna was suggesting that maybe what we make explicit in

21   the order that one of the factors on reasonableness is --

22   that the PAB should consider is the efforts of the third

23   parties to maintain the (indiscernible) schedule and

24   cooperate.  So, that could be an explicit factor, maybe.

25             THE COURT:  I'd rather make it a condition to

1    getting the money at all.  So, it's sort of an under -- it's

2    almost like an undertaking.  So, let's do it that way, if

3    that's all right.  Sorry, Ms. Yenamandra.  But I can --

4              MR. MCKANE:  We'll work it out.

5              THE COURT:  All right.  That's my ruling.  Are

6    there any questions?

7              MR. MCKANE:  Your Honor, can we just confirm

8    that's interlocutory, that the order is now (indiscernible)?

9              MR. GALARDI:  Actually --

10             THE COURT:  That's not my decision.

11             MR. GALARDI:  That's not --

12             THE COURT:  That's not my call.  I'd love to, but

13   it's not my call.

14             MR. GALARDI:  Yeah, you know, he jumped the gun on

15   me, Your Honor.  And I did want to ask one question.  And it

16   is a sensitive one.  Are the fees and expenses in filing and

17   prosecuting the motion for reimbursement themselves part of

18   -- go to that $1.5 million cap?  If necessary --

19             THE COURT:  I'm just thinking.

20             MR. GALARDI:  -- I can give you the deposition

21   testimony from yesterday that those were included in that

22   number.

23             MR. MCKANE:  No -- well, I don't want to get into

24   a thing with Mr. Galardi about what the actual testimony

25   was.  But, with regards to the involvement of Kirkland, what

1    he said was, to the extent that that -- you know, he was

2    asked about the costs to date.  He said, well, one way you

3    could think about that was it would fall into the 30 percent

4    that got you from 1.15 to 1.5.  But, Your Honor, I agree

5    that, at this point in time, that --

6             THE COURT:  I'm assuming you would like the

7    Kirkland money in the 1.5?

8             MR. GALARDI:  Your Honor, as of Monday, I believe

9    it was already $225,000 just to file the motion before he

10   went through this process.  So, I would like that money in

11   there.

12            THE COURT:  Let me think about that one.  I got to

13   think about that one.

14            MR. MCKANE:  Okay.  Understood, Your Honor.

15            THE COURT:  The other thing is I was a little --

16   I'm a little sensitive about the allocation.  I don't want

17   to create an issue where there's not an issue, but --

18            MR. MCKANE:  Your Honor, just to give you context

19   on the allocation --

20            MR. GALARDI:  There is an issue.

21            THE COURT:  Yeah, I'm sure there is an issue.

22            MR. MCKANE:  In other aspects of the discovery

23   process, for example, the PAB was asked to turn on the

24   document repository that was -- that housed the production

25   previously done by the Debtors.  And, in that context, the

1    EFH and EFIH Creditors had agreed to a 50/50 allocation of

2    those costs.  That is the -- so -- and that was true, I

3    believe, both for the document repository and some ancillary

4    third-party discovery tools.

5             And so, we -- I give you that context because

6    that's a running cost that the Creditors are -- have agreed

7    to be allocated in that manner.  And that was the basis for

8    which we said that's 50/50 here, too.

9             For those -- for people like Mr. Keglevic, as

10   opposed to someone like Mr. Cremens --

11            THE COURT:  Oh, no, yeah, Cremens, it goes to

12   EFIH, and Williamson, EFH.  I don't think that's a problem.

13            MR. MCKANE:  It's not.  I don't think so.

14            THE COURT:  Okay.  It's just Mr. Keglevic, 50/50.

15   Can we leave that as an open issue?

16            MR. MCKANE:  And, Your Honor, just for context --

17   but you may have picked this up over the course of the day -

18   - the other Creditors served Mr. Horton with a deposition

19   notice on Monday night.  So, he would also potentially be

20   deposed in his capacity before the PAB.  So, it might pick

21   up Mr. Horton, too.

22            MR. GALARDI:  One second, Your Honor.  Your Honor,

23   I don't think -- since our motion actually requested 50/50

24   for -- in, let's say, Kirkland fees and those, we don't have

25   -- with respect to that third bucket, the Kirkland fees, to

1   the extent they get dragged into that 1.5, and the Keglevic,

2   that 50/50 is fine.

3           THE COURT:  Oh, okay.  All right.

4           MR. GALARDI:  So, you don't have to open that can

5   of worms.

6           THE COURT:  Okay, good.  I'm going to say no, the

7   fees associated with prosecuting this motion are not

8   included in the 1.5 million.  Look, they had to -- the point

9   is reimburse -- you know, the costs of reimbursement caused

10  by the discovery.  I don't think it was unreasonable to seek

11  Court approval.  Obviously, it was opposed.  I think it goes

12  to more of a management of the process as opposed to

13  management of the discovery issue.

14          MR. GALARDI:  Your Honor, we think it was an

15  additional expense for their benefit, so, if they had had to

16  make the motions, it would have been absorbed by Proskauer

17  Jenner, and we would have had the same issue, again going

18  back to Rule 55 -- 45.  We think it should be in that cost.

19  He decided to take it on and take it on for their benefit.

20  So, we think it should go to the 1.5.

21          THE COURT:  I understand, but I disagree.

22          MR. GALARDI:  Your Honor, on the final

23  interlocutory -- and I know we've had this dispute before on

24  an order.  It's going to come up, Your Honor, I'm sure, but

25  I just want Your Honor -- and I don't know how to do this

1    other than to say, if this were simply a reimbursement

2    motion on a third-party litigation in some State Court, and

3    Your Honor entered this order, I don't think there's any

4    dispute that it would be a final order that could be subject

5    to appeal.

6              I think the issue here -- and this, I think, is

7    where Mr. -- and I'm just saying this because there may --

8    it's Friday, Your Honor.  So, maybe the way you know it's

9    Friday is there may be an appeal at some point.  But --

10             THE COURT:  Which is fine.  It's okay.

11             MR. GALARDI:  I understand, Your Honor.

12             THE COURT:  I don't take it personally, believe

13   me.

14             MR. GALARDI:  No, I understand you don't.  Just

15   like I don't take terse comments personally, either.

16   (Laughter)

17             THE COURT:  Terse?

18             MR. GALARDI:  That's your word, Your Honor.  But

19   there is an issue because this is related to the allocation

20   issue.

21             THE COURT:  Yeah.

22             MR. GALARDI:  Now, I happen to think it is a fully

23   separate issue.  I just want you to understand that.

24             THE COURT:  Sure.

25             MR. GALARDI:  But Your Honor has also added

1    another dimension -- and I'm just trying to be candid --

2    that, since there's a reasonable fee, it may not be a final

3    order, because you haven't actually approved the fees or

4    done the fees, so there's another aspect of this.

5              THE COURT:  Well, I'm not -- I mean --

6              MR. GALARDI:  Going to approve the fees.

7              THE COURT:  Right.  The fees are approved, as long

8    as they're reasonable, up to $1.5 million.

9              MR. GALARDI:  Yeah.

10             THE COURT:  There is nothing left for me to do.

11             MR. GALARDI:  Okay.

12             THE COURT:  But I don't decide if something is

13   interlocutory or not.  That's the Appellate Court.

14             MR. GALARDI:  I understand.  We have that --

15   correct.  I have it, Your Honor.

16             THE COURT:  But if you want to just say don't -- I

17   mean, sometimes I put final -- I do put, in orders, final,

18   often.  It's part of my form.

19             MR. GALARDI:  Right.

20             THE COURT:  But I have no problem with you leaving

21   that out of this order, and --

22             MR. GALARDI:  Well, I would certainly not want to

23   put it in.  I think Mr. McKane will want to take it out.

24   But we can leave it --

25             MR. MCKANE:  You can call me Mr. (indiscernible).

1          MR. GALARDI:  What did I say?

2          MR. MCKANE:  No, it's all right.  Sounds good.

3          MR. GALARDI:  All right.  We'll just leave it at

4     that, Your Honor.  I appreciate it, and thank you for your

5     time.

6          THE COURT:  Let's put -- yeah, okay, all right.

7     Okay.

8          MR. GALARDI:  Thank you, Your Honor.

9          THE COURT:  You're welcome.

10          MR. GALARDI:  I appreciate the time.

11          THE COURT:  No problem.

12          MR. MCKANE:  Your Honor, thank you for your time.

13          THE COURT:  All right.

14          MR. MCKANE:  And let me just, first of all,

15     apologize on behalf of the Kirkland team that we didn't

16     congratulate you earlier on your elevation to Chief Judge.

17          THE COURT:  Oh, Jesus.  Do you know what that

18     involves?  More meetings and the same amount of money.

19     (Laughter)  But thank you very much.  And also, you know,

20     being next in line.

21          MR. MCKANE:  Yeah.

22          THE COURT:  It's like congratulating someone on

23     becoming king, you know.  It's like, you know, "Your dad

24     died; congratulations."  All right.

25          MR. MCKANE:  Your Honor, we will file on COC.

1          THE COURT:  Okay.  Thank you.  Have a great

2   weekend.  We're adjourned.

3          MR. MCKANE:  Thank you, Your Honor.

4          MR. GALARDI:  Thank you.

5                         * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      I N D E X

2

3                      RULINGS

4    DESCRIPTION                              PAGE        LINE

5

6    Motion Approved                          135         7

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya                    Digitally signed by Sonya
                               Ledanski Hyde
                               DN: cn=Sonya Ledanski Hyde, o,
7     Ledanski Hyde            ou, email=digital1@veritext.com,
                               c=US
                               Date: 2018.07.23 15:59:57 -04'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  July 23, 2018