**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| Debtors. | RE: 1833 |
| | (Jointly Administered) |

**AD HOC EFH CLAIMANTS' MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY**
**OF HOWARD ABRAMS AND BRADLEY ROBINS**

**[REDACTED]**
*CONFIDENTIAL – FILED UNDER TEMPORARY SEAL*
**SUBJECT TO PROTECTIVE ORDER**

The Ad Hoc EFH Claimants,[1] by and through their undersigned counsel Kasowitz Benson Torres LLP and Hogan ♦ McDaniel, respectfully request that the Court exclude the testimony of Howard Abrams and Bradley Robins from the hearing concerning the *Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott, to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* (the "Allocation Motion") [D.I. 13102.]

## PRELIMINARY STATEMENT[2]

1.      Nearly four years ago, the Debtors moved this Court for the approval of bidding procedures for the disposition of the E-Side Debtors' most valuable asset, their 80.03% indirect interest in Oncor.  At the time, the Debtors made very clear two things:  (1) their preference was that the disposition be structured in a way to avoid taxes, but (2) they were "open to all value-maximizing alternatives."  At around the same time – again, nearly four years ago – the Debtors filed an Omnibus Tax Memorandum, which detailed the potential catastrophic consequences to the Debtors of a taxable restructuring.  While the Tax Memo specifically noted that any tax payable as a result of a taxable restructuring – estimated to be over $6 billion – would initially be payable solely by EFH, it set forth a number of ways in which the IRS or EFH fiduciaries could seek to impose that tax on, or collect that tax from, EFIH.  In approving the Debtors' proposed bidding procedures, this Court recognized that the decision to pursue a non-taxable restructuring

---

[1] The Ad Hoc EFH Claimants include (a) Alta Fundamental Advisers LLC, (b) Angelo, Gordon & Co., L.P., (c) Apollo Management Holdings L.P., (d) Brookfield Asset Management, Inc., and (e) Farmstead Capital Management, LLC, and certain of their related funds.  (*Verified Amended Statement of Kasowitz Benson Torres LLP and Hogan ♦ McDaniel Pursuant to Bankruptcy Rule 2019* [D.I. No. 13327], ¶¶ 3-4.)

[2] Terms not defined herein shall have the meaning ascribed to them in the *First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code*, dated February 15, 2018 [D.I. 12653.]

was an appropriate exercise of the Debtors' business judgment, and emphasized the Debtors'

willingness to consider taxable alternatives:  as the Court said, "the debtors have made a point of

being open to such transactions and I'm going to hold them to it."

2.      Four years later, after four major E-Side restructuring proposals, three confirmed

E-Side plans, and hundreds of millions of dollars in fees and expenses, Elliott and UMB have

decided the time is ripe to attack the analysis set forth in the Omnibus Tax Memorandum and,

indirectly, the Debtors' business judgment that it informed, to justify their draconian reallocation

of fees and expenses.

3.      Specifically, Elliott and UMB have sought to admit the testimony of two

purported experts, Howard Abrams and Bradley Robins.  Mr. Abrams seeks to opine that the

Omnibus Tax Memorandum is blatantly wrong:  notwithstanding what the Debtors' fiduciaries

(including the EFIH disinterested manager) believed at the time, EFIH would not be liable under

federal tax law for any taxes imposed on EFH.  Mr. Robins seeks to piggyback on Mr. Abrams'

conclusions, opining that, because EFIH would not be liable for the taxes resulting from a

taxable restructuring, the pursuit of a non-taxable restructuring served to benefit primarily EFH

(or, more specifically, it benefitted EFH and EFIH equally until 2016, at which time it served

primarily to benefit EFH).

4.      The opinions of Mr. Abrams and Mr. Robins are flawed and incorrect.  But, more

importantly, the opinions they offer constitute improper collateral attacks on numerous decisions

by the Debtors' fiduciaries (including EFIH's disinterested manager) to pursue a non-taxable

disposition of the Debtors' interests in Oncor, as well as the Court's approval of those decisions,

and ignore the crucial (and indisputable) fact that the Debtors remained willing to entertain

proposals for a taxable restructuring throughout these Chapter 11 Cases.  In other words, Elliott

and UMB seek to use their experts to relitigate issues that have already been decided and which are irrelevant in any event. These attempts to question the Debtors' business judgment are not appropriate or relevant to this allocation dispute, which centers on how to allocate certain administrative expenses incurred in these cases – not whether those administrative expenses (and the strategies that led to them) were reasonable in the first place.

5.     EFIH's fiduciaries decided, for the reasons set forth publicly in the Omnibus Tax Memorandum, that pursuing a non-taxable restructuring was in the best interests of, and would benefit, EFIH and its creditors. This Court initially determined that the Debtors "satisfied the business judgment standard under Section 363(b)" when it approved the Debtor's proposed bidding procedures in November 2014, and reaffirmed its approval each time it confirmed chapter 11 plans that incorporated a non-taxable restructuring, and Elliott/UMB simply may not challenge that approval now, years after the fact.

6.     That is particularly the case since the Debtors remained willing to entertain taxable restructuring proposals (as recognized by this Court). Absent any evidence that EFIH's repeated decisions to pursue a non-taxable restructuring foreclosed consideration of a taxable transaction, the opinions of Mr. Abrams and Mr. Robins are not helpful in any way to the trier of fact. Even assuming, *arguendo*, that there would have been no adverse consequences to EFIH from pursuing a taxable transaction, there is not even a scintilla of evidence that there was a taxable transaction that (i) could have closed and (ii) that would have yielded more value to EFIH. Tellingly, the expert reports cite none, and the Debtors' representatives have confirmed during their depositions that there was no such transaction. Because of this, the expert opinions are irrelevant. Moreover, Elliott and UMB fail to link their expert reports to any reasonable reallocation.

7.     This Court should reject Elliott/UMB's efforts to turn the hearing on their

Allocation Motion into a contested litigation over the propriety of the 2014 tax analysis that has

underpinned much of the Debtors' (and the Court's) efforts in these cases for the past four years.

The proposed testimony of Mr. Abrams and Mr. Robins is inappropriate and irrelevant, and must

be excluded.

## BACKGROUND

### A.     The Tax Issues Implicated by the Debtors' Restructuring

#### 1.   "Tax Armageddon" and the Tax Memo

8.     Even before the petition date, the Debtors and their fiduciaries recognized that a

restructuring of the Debtors' businesses could have significant tax consequences.  ([D.I. 98]

(First Day Declaration), ¶¶ 15 & n.8, 16-18, 158-63, 167-70.)  Specifically, any taxable sale or

reorganization of either of the Debtors' lines of business – the E-Side or the T-Side – could

trigger massive, multi-billion-dollar tax liabilities, an outcome described colloquially as "Tax

Armageddon."  (*Id.*, ¶¶ 15 & n.8, 18, 158, 162.)

9.     The background of the Debtors' potential tax liabilities are described at length in

an Omnibus Tax Memorandum (the "Tax Memo"), filed by the Debtors in October 2014 in order

to "provide the Court and other parties in interest with the tax framework for the Debtors'

chapter 11 reorganization and certain relief the Debtors may seek in these proceedings." ([D.I.

2296] (Omnibus Tax Memorandum) at 3.)  The Tax Memo sets forth an objective assessment of

the risks relating to a taxable restructuring of the Debtors' debts.  (*Id.* at 3-4; Ex. 1 ███████

████████████  As set forth in the Tax Memo, those risks exist at all levels of the Debtors'

corporate structure.  Because EFIH and TCEH are what is known as "disregarded entities," EFH,

as the parent corporation, is liable for any federal income tax liabilities attributable to the income

or gain generated by those entities.  ([D.I. 2296] (Omnibus Tax Memorandum) at 4.)  Of course,

EFH is a holding company with comparably fewer assets than its subsidiaries, and a taxable event at one or more of EFH's disregarded-entity subsidiaries could give rise to a significant tax liability at EFH that EFH would be unable to pay, *i.e.*, a so-called "stranded tax." (*Id.* at 4, 12-13.)

10.    However, as set forth in the Tax Memo, there are a number of ways in which the IRS and/or EFH's fiduciaries, faced with such a multi-billion-dollar stranded tax, could seek to impose tax liabilities on the disregarded-entity subsidiaries whose actions gave rise to the tax in the first place.  First, the IRS could oppose any plan of reorganization that resulted in a stranded tax.  ([D.I. 2296] (Omnibus Tax Memorandum) at 15-16.)  Second, the IRS could change its own rule interpretations, issue modified guidance, or even implement new rules, that have the effect of imposing the tax liability on EFH's subsidiaries, or of eliminating some of the benefits of a taxable transaction by limiting the buyer's ability to take advantage of the "stepped-up basis" in the assets involved.  (*Id.* at 16-18.)  Third, the IRS could seek to impose the tax directly on the disregarded entities based on a variety of state-law theories, such as alter ego.  (*Id.* at 19.)  Fourth, EFH fiduciaries – faced with a multi-billion-dollar tax liability that the company could not pay – could exercise their right to "check-the-box," revoking EFIH's and/or TCEH's status as a disregarded entity, and rendering them severally liable for EFH's tax liabilities.  (*Id.* at 20-21.)  Finally, EFH could seek reimbursement of the tax from EFIH and/or TCEH through the parties' Tax Sharing Agreement ("TSA"), which allocates the taxes of EFH across the various entities of the EFH corporate family.  (*Id.* at 19-20.)

## 2.  The Debtors – Including EFIH – Seek a Tax-Free Restructuring

11.    The record before this Court is clear that the Debtors carefully considered and assessed the risks associated with the potential tax liabilities identified in the Tax Memo.

Indeed, this was true even before these Chapter 11 Cases were filed:  the Debtors' prepetition restructuring efforts – including an attempt to restructure the Debtors' debts in a consolidated fashion (known as "Project Olympus"), followed by a restructuring support agreement ("RSA") that contemplated a tax-free spin-off of TCEH, and the deleveraging of EFIH through a $2 billion DIP loan, which would be converted into equity in EFH post-emergence, as well as a framework for settling certain makewhole claims of secured creditors of EFIH – were designed to implement a non-taxable reorganization in order to avoid those tax liabilities.  ([D.I. 98] (First Day Declaration), ¶ 17.)  Each of those potential transactions was supported by creditor groups throughout the EFH corporate family.  For example, EFIH unsecured creditors were ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  These potential transactions were also approved by the Debtors' fiduciaries, each of whom carefully considered and relied on the tax analysis described in the Tax Memo.  For example, EFIH's board – including its disinterested manager, Charles Cremens – voted to approve the RSA, and Mr. Cremens specifically testified at his deposition that "fundamentally at the end of the day the risk of having EFIH be liable for $7 billion worth of taxes was an actual concern . . . ."  (Ex. 3 (Cremens Dep.) at 72:17-73:18; *see also id.* at 29:22-31:13 (nontaxable transaction "would maximize the value for the EFIH estate," due to risks identified in Tax Memo, which were "corroborated" by EFIH's independent tax counsel at Cravath, Swaine & Moore LLP); *id.* at 46:11-20 ("There was substantial discussion . . . around the taxable/nontaxable transactions, and there was I think unanimity in the view that the nontaxable transaction was in the best interests of EFIH."); Ex. 1 ████████████████████

6

████████████████████████████████████████████████

████████████████████████████████████████████████

12.     After the RSA was terminated in July 2014 [D.I. 1697], the Debtors pursued four different transactions seeking to monetize the E-Side's interests in Oncor:  a transaction with Hunt Consolidated, Inc. and certain co-investors (the "Hunt Plan"); a transaction with NextEra Energy, Inc. (the "NextEra Plan"); a transaction with Berkshire Hathaway (the "Berkshire Transaction"); and a transaction with Sempra Energy, Inc. (the "Sempra Plan"), which went effective on March 9, 2018.  [D.I. 7285, 10859, 11430, 12763.]  Each one of these transactions had two things in common:  (1) they involved a non-taxable spin-off, merger or other monetization of the Debtors' interests in Oncor, and (2) they were approved by the Debtors' fiduciaries as being in the best interests of each of the Debtors' estates – including EFIH.  Thus, EFIH's disinterested manager voted to approve each of these transactions.  (Ex. 3 (Cremens Dep.) at 32:18-33:21 (EFIH disinterested director testifying that he supported each transaction).)

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

13.     The preference of EFIH and the other Debtors for a non-taxable restructuring was litigated early on in the case, after the RSA was terminated and before the Debtors sought approval of the Hunt Plan, NextEra Plan, Berkshire Transaction, or Sempra Plan.  Specifically, in September 2014, the Debtors sought the Court's approval of bidding procedures for the sale of the Debtors' interests in Oncor.  [D.I. 2087] (Bidding Procedures Motion).  In their motion, the Debtors acknowledged that their preferred transaction structure was non-taxable.  (*Id.*, ¶ 36.)  In

approving the Debtors' proposed bidding procedures, this Court specifically deferred to the

Debtors' business judgment in seeking their preferred tax structure for the sale of the Debtors'

interest in Oncor.  During the hearing, the Court recognized that the question before it was

whether it should "endorse the debtors' business judgment that this is the right time *and manner*

to market the Oncor business."  ([D.I. 2699] (Bidding Procedures Tr.) at 14:16-18 (emphasis

added).)  In particular, the Court recognized that, while the Debtors were "seeking competitive

bids to enter into a transaction of any type with regard to Oncor," the Debtors "made it clear . . .

that they favor their preferred tax plan."  (*Id.* at 15:9-14.)  In fact, objectors during the Bidding

Procedures Hearing – including certain EFIH creditors – *specifically argued* "that the debtors

[were] making a critical error in pursuing their preferred tax transaction at all."  (*Id.* at 25:4-6.)

In the end, however, the Court concluded that the Debtors "satisfied the business judgment

standard" (*id.* at 17:19-25), and specifically held that "[t]he business judgment standard correctly

requires deference to a debtor's business and reorganization strategy." (*Id.* at 25:15-25.)  And,

after EFIH's disinterested manager, Charles Cremens, voted to approve the Revised Bidding

Procedures (which included the Debtors' preference for a non-taxable transaction) – consistent

with the Court's earlier admonition that Mr. Cremens, as EFIH's independent fiduciary, occupies

an "important position[] in this bankruptcy case," and was required to "act vigorously" in that

role (*id.* at 19:13-16) –  the Court determined that his vote was "***a fair, reasonable, and

appropriate exercise of business judgment by the Debtors.***"  ([D.I. 3295] (Bidding Procedures

Order), ¶ 2 (emphasis added).)

        14.     The Court was correct to find that EFIH's preference for a non-taxable

restructuring was a matter of business judgment.  Courts in the Third Circuit have authorized

transactions outside the ordinary course of business when the transaction has a sound business

purpose and is proposed in good faith.  *See In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re*

*Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson*

*Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del.

2008).  Moreover, courts have generally recognized that a corporate fiduciary's selection among

various transaction structures is within the fiduciary's business judgment.  *In re Metaldyne*

*Corp.*, 409 B.R. 661, 667-70 (Bankr. S.D.N.Y. 2009) (applying business judgment rule in

connection with Debtors' choice of stalking horse bidder); *In re Global Crossing Ltd.*, 295 B.R.

726, 744 n.58 ("Efforts to maximize value not infrequently require choosing one of a number of

options, more than one of which may be reasonable . . . . [T]he Court does not believe that it is

appropriate for a bankruptcy court to substitute its own business judgment for that of the Debtors

and their advisors, so long as they have satisfied the requirements articulated in caselaw."); *In re*

*Idearc Inc.*, 423 B.R. 138, 154, (Bankr. N.D. Tex. 2009) (confirming plan and holding that

transactions contemplated thereunder, which preserved the Debtors' tax attributes, "represent the

exercise of the sound business judgment of the Debtors"), *aff'd.*, 662 F.3d 315 (5th Cir. 2011).

### 3.  The Debtors Remained Open to a Taxable Transaction

15.     As noted above, the Debtors expressly preferred a non-taxable disposition of the

Debtors' interests in Oncor, and the Court expressly recognized that this preference was a matter

within the Debtors' considered business judgment.  But, notwithstanding the Debtors' *preference*

for a non-taxable transaction, the indisputable record evidence is clear that the Debtors remained

open to a taxable one.  For example, the Debtors stated in the Bidding Procedures Motion that

the Debtors "are open to all value-maximizing alternatives and will thus consider bids in any

form."  ([D.I. 2087] (Bidding Procedures Motion), ¶ 7.)  The Tax Memo noted that "[t]he

Debtors are not wedded to any particular structure, and are willing to consider any value-

maximizing alternative a creditor or potential third-party acquirer would like to present." ([D.I. 2296] (Omnibus Tax Memorandum) at 48.) ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

16.     The Debtors' willingness to consider taxable transactions was endorsed – in fact, ordered – by this Court.  During the hearing concerning the Debtors' Bidding Procedures Motion, the Court expressly extended the bidding timeline in order to allow for the formulation of alternative transactions, "in order for the Debtors' statement that they are open to any transaction to be anything more than lip service."  ([D.I. 2699] (Bidding Procedures Tr.) at 22:6-12.)  Indeed, the Court acknowledged that the Debtors' financial advisor "is probably correct that such an alternative transaction is unlikely," but stated that "the debtors have made a point of being open to such transactions and I'm going to hold them to it."  (*Id.*)

17.     In the end, the record is clear that no party came forward with a viable proposal for a taxable transaction – much less a taxable transaction that would provide the Debtors with more value than the non-taxable transactions considered and approved by the Debtors' fiduciaries, including the EFIH disinterested manager.  *See* Cremens Dep. at 31:14-18 (EFIH disinterested director testifying that he did not recall ever being "presented with a taxable transaction for the sale of Oncor that was worthy of consideration"); ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████████; [D.I. 2510] (10/17/14 Bidding Procedures Tr.) at 74-76 (Evercore witness stating that, after bidders were informed that Debtors would consider a taxable transaction, the only feedback from potential buyers was why the Debtors would consider a taxable transaction since, such a bid would be uneconomic due to potential liability); Matican Dep. at 97-98 (Evercore witness testifying that Evercore, the Debtors' investment banker, never received any term sheets from existing creditors or third parties for a taxable transaction involving EFIH).[3]  Of course, the fact that no one came forward with a viable taxable transaction proposal is hardly surprising:  the Court itself specifically found credible the testimony of the Debtors' financial advisor during the Bidding Procedures Hearing that it was "unlikely the debtors will receive bids other than some version of the debtors' preferred tax structure."  ([D.I. 2699] (Bidding Procedures Tr.) at 12:20-22.)

### B.    The Tax Matters Agreement

18.    Following confirmation of the T-Side Plan, on October 3, 2016, the E-Side Debtors entered into a Tax Matters Agreement with Vistra, the reorganized T-Side entity.  That agreement obligated the E-Side to pursue a tax-free transaction.  (Ex. 6 (Tax Matters Agreement), §§ 6.01(d), 8.01.)  EFIH was a party to this agreement, and the agreement – and the obligation of the E-Side Debtors not to pursue a taxable restructuring that would trigger tax obligations for the T-Side – was specifically approved by the Court.  ([D.I. 9421], ¶¶ 132, 136.)

---

[3]  Although Elliott/UMB has identified a purported taxable proposal made by Jeff Rosenbaum of Elliott, the record is clear and undisputed that Rosenbaum never made a fully formed or detailed proposal, and never pursued his proposal in any event.  (*See* Ex. 1 ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████; Ex. 5 (Horton Dep.) at 76:11-24, 77:10-78:9 ("I wouldn't characterize that as a complete term sheet.").)

Elliott acquired its interests in the E-Side Debtors after this agreement was put in place.  (Ex. 2

███████████████████████  Thus, Elliott has no basis to complain about the Debtors'

pursuit of a tax-free transaction because it knew about this obligation even before it bought E-

Side debt.

### C.    The Allocation Motion

19.    On May 13, 2018, Elliott and UMB filed the Allocation Motion [D.I. 13102.]

Through the Allocation Motion, Elliott and UMB seek to reallocate hundreds of millions of

dollars in fees incurred (or potentially to be incurred) by the E-Side Debtors during the course of

their Chapter 11 Cases.  In particular, the Allocation Motion seeks to allocate the fees and

expenses of the Debtors' counsel (Kirkland & Ellis) and financial advisor (Evercore) 50% to

EFH and 50% to EFIH, and to allocate the fees and expenses of the professionals retained by the

EFH/EFIH Committee 70% to EFH and 30% to EFIH.  ([D.I. 13102] (Allocation Motion), ¶ 4.)

20.    Elliott/UMB's justification for their proposed reallocation of the fees incurred by

Kirkland, Evercore and the UCC is not a detailed or reasonable analysis of the specific fees and

expenses incurred by the Debtors' professionals, but is instead primarily their attempt to

relitigate the Debtors' exercise of their business judgment in preferring a non-taxable

restructuring over a taxable one.  Thus, Elliott and UMB state – without any evidence – that the

pursuit of a taxable transaction caused EFIH's recoveries to "plummet[] over nearly four years,"

from "accrual of interest and professional fees and the repeated failure to consummate multiple

transactions seeking to avoid Tax Armageddon."  ([D.I. 13102] (Allocation Motion) at 2, 8.)

According to Elliott and UMB, the *benefits* of a non-taxable transaction inured solely to EFH,

and not to EFIH (since, as discussed above, EFH would be liable in the first instance for any tax

incurred as a result of the disposition of Oncor), and therefore the *costs* related to pursuing such a

non-taxable transaction should be borne solely by EFH, and not by EFIH.  (*Id.* at 14-15, 18, 20-
21, 25-26, 28, 31-32.)

> **D.    Movants' Experts and Their Proposed Testimony**

21.    In support of the Allocation Motion, Elliott and UMB seek to offer the testimony
of two purported experts, Howard Abrams and Bradley Robins.

22.    ***Howard Abrams.***  According to his expert disclosures, Mr. Abrams intends to
testify concerning "the tax consequences of a taxable sale or other disposition" of EFIH's
interests in Oncor, and "the possibility of the Internal Revenue Service imposing tax liability on
EFIH in connection with any such sale or disposition."  (Ex. 7 (Abrams Report) ¶ 5.)
Mr. Abrams has three overarching opinions:  (1) "the owner of a disregarded entity is liable for
the federal income tax on any gain from the sale of the disregarded entity or its asset, not the
disregarded entity"; (2) "because a [DE, or disregarded entity] is not liable for the parent's
federal income tax, the IRS has no recourse against the DE's assets and may only seek recourse
against the parent's ownership of DE subject to claims of senior creditors of the parent and all
creditors of the DE"; and (3) "[a]s a general rule, assuming the DE's assets are appreciated, a
buyer will pay more to acquire a DE in a taxable transaction than in a tax-free transaction
because the sale will result in a step-up in basis that benefits the buyer."  (Ex. 8 (Abrams
Deposition) at 25:24-27:17; Ex. 7 (Abrams Report) at 2-10.)

23.    Although Mr. Abrams purports to opine concerning "the possibility of the Internal
Revenue Service imposing tax liability on EFIH," he actually addresses only one of the ways
identified in the Tax Memo by which the IRS could seek to impose tax liability on EFIH, *i.e.*, by
implementing a regulation that would permit it to seek payment of taxes directly from a
disregarded entity.  (Ex. 7 (Abrams Report) ¶¶ 16-20.)  For example, Mr. Abrams has formed no

opinions whatsoever regarding (i) the ability of the IRS to seek payment of taxes from EFIH through various theories arising under state law (such as veil-piercing, alter ego, nominee liability and transfer liability) (Ex. 8 (Abrams Deposition) at 37:19-38:21, 44:15-46:18); (ii) the ability of EFH to "check-the-box" and make EFIH a regarded entity for tax purposes (*id.* at 48:7-51:7); (iii) the ability of EFH to assert claims against EFIH and/or Oncor for their share of any tax liability under the parties' tax sharing agreements, or to seek to prevent the consummation of a restructuring that would violate those agreements (*id.* at 55:14-19, 59:10-62:6, 68:10-71:9); or (iv) the ability of the E-Side Debtors to consummate a taxable disposition of Oncor notwithstanding their obligations under the Tax Matters Agreement (*id.* at 74:24-75:15).

24.    ***Bradley Robins.***  According to his expert disclosures, Mr. Robins intends to testify concerning "the appropriate process to maximize value for creditors of [EFIH] in a taxable or a tax-free sale or other disposition" of Oncor.  (Ex. 9 (Robins Report) ¶ 6.)  Based on his acceptance of Mr. Abrams' opinions that "the IRS would not likely be able to successfully hold EFIH liable for the resulting tax liabilities *under existing federal income tax laws*" (*id.*, ¶ 27 (emphasis added) (and apparently ignoring the state-law or contractual avenues available to the IRS and/or EFH)), Mr. Robins seeks to testify that "the Debtors' exploration and pursuit of a tax-free disposition of Oncor Holdings" (1) "was beneficial to both EFH and EFIH" from 2014 through 2016; (2) "continued to clearly benefit EFH" beginning in 2017, "but the net benefit to EFIH is materially less clear"; and (3) was never more beneficial to EFIH than EFH.  (*Id.* ¶ 11.)[4]

---

[4]  Elliott and UMB also seek to offer the expert testimony of Mr. Robins to rebut the expert testimony of the Ad Hoc EFH Claimants' own expert, Steven Strom.  The Ad Hoc EFH Claimants do not seek to exclude through this motion that portion of Mr. Robins' testimony.

## ARGUMENT

I.    **MOVANTS' EXPERTS' ATTEMPTS TO SECOND-GUESS THE DEBTORS' BUSINESS JUDGMENT FOUR YEARS AFTER THE FACT ARE ENTIRELY IRRELEVANT TO THIS DISPUTE AND SHOULD BE EXCLUDED**

25.    Admissibility of expert testimony is governed by Federal Rule of Evidence 702, made applicable to this matter by Federal Rule of Bankruptcy Procedure 9017.  Under Rule 702, courts must serve as "gatekeep[ers]" to "ensur[e] that an expert's testimony both rests on a reliable foundation *and is relevant to the task at hand*" before admitting or considering the testimony for any purpose.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 597 (1993) (emphasis added).  As a result, the proponent of the expert testimony bears the burden of showing by a preponderance of the evidence that proffered expert testimony is both relevant and reliable.  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144-45 (3d Cir. 2000); *In re W.R. Grace & Co.*, 355 B.R. 462, 471-72 (Bankr. D. Del. 2006).

26.    Rule 702 specifically provides that expert testimony must "help the trier of fact . . . to determine a fact in issue."  Fed. R. Evid. 702.  To meet this test, an expert's opinions must "speak[] clearly and directly to an issue in dispute in the case."  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995).  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591; *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (expert's testimony "must be relevant for the purposes of the case and must assist the trier of fact").

27.    Here, the purported expert testimony that Elliott and UMB seek to offer is entirely irrelevant to this allocation dispute, and should be excluded.  The record is clear and undisputed that the Debtors relied on the tax analysis at the time, as set forth in the Tax Memo, in exercising their business judgment and preferring a non-taxable transaction.  (*Supra*, 6-10.)  This Court specifically agreed that the Debtors were exercising their business judgment in that regard.

(*See* D.I. 2699 (Bidding Procedures Tr.) at 17:19-25, 25:15-25; D.I. 3295 (Bidding Procedures

Order), ¶ 2.)  It does not matter whether Elliott's and UMB's purported experts disagree (at least

in part) with the Debtors' contemporaneous analysis, or with the decisions that the Debtors'

fiduciaries made based on that analysis.  The purpose of this allocation dispute is not to explore

whether those decisions, or the analysis on which they were based, is right or wrong – indeed, if

anything, the propriety of those decisions, from a business judgment standpoint, has already been

determined by this Court – but to determine how the costs that flowed from those decisions

should be allocated among the Debtors' estates.  In other words, EFIH's fiduciaries – including

its disinterested manager, Charles Cremens – made the reasoned decision to pursue various non-

taxable transactions, and EFIH must bear the costs of that decision.  EFIH's creditors cannot

seek to reallocate the fees arising from that decision merely because they now claim it was

erroneous.

28.    The irrelevance of the testimony offered by Elliott/UMB's experts is particularly

evident in light of the indisputable record that the Debtors were open to pursuing a taxable

transaction, but that none were forthcoming.  Even if Mr. Abrams and Mr. Robins are correct –

and the Tax Memo is wrong – that a taxable transaction would have provided significant value to

EFIH, would not have triggered any tax obligations on the part of EFIH, and could have been

confirmed on a reasonable schedule notwithstanding the objections of the IRS or attempts by

EFH and its creditors to hold EFIH liable for any stranded tax – their opinions are entirely

irrelevant absent any evidence that such a transaction was ever proposed to the Debtors, or that

the Debtors prevented interested parties from proposing such a transaction.  The evidence is

precisely to the contrary:  the Debtors specifically stated that they were "open to all value-

maximizing alternatives" ([D.I. 2087] (Bidding Procedures Motion), ¶ 7), and this Court

specifically ordered that the Debtors ensure that that statement be "more than lip service" ([D.I. 2699] (Bidding Procedures Tr.) at 22:6-12.)  And the fact that no viable taxable transaction was ultimately proposed to the Debtors is not only evidence that the opinions of Mr. Robins and Mr. Abrams are incorrect, but also establishes that those opinions are irrelevant:  even if Mr. Robins and Mr. Abrams are correct that a taxable transaction would have been beneficial to EFIH, and EFIH's fiduciaries' preference for non-taxable transactions over taxable ones was an inappropriate exercise of their business judgment and subject to collateral attack (notwithstanding the Court's express holding to the contrary), that fact would have no bearing on the allocation dispute unless there was some taxable transaction that was rejected or otherwise not pursued as a result.  There is no evidence of that, and thus the opinions of Mr. Robins and Mr. Abrams have no relevance to this dispute and should be excluded.

## II.     THERE IS NO CONNECTION BETWEEN THE PROPOSED TESTIMONY OF MOVANTS' EXPERTS AND THE ISSUES BEFORE THE COURT

29.     Even assuming that a viable taxable transaction had been proposed during the course of the Debtors' Chapter 11 Cases, the proposed testimony of Mr. Abrams and Mr. Robins is still irrelevant to this dispute.  Even if, as Mr. Abrams concludes in his expert report, EFH would likely have to bear the burden of all tax liability in a taxable transaction (a conclusion he never even fully makes, since he has expressly declined to challenge the Tax Memo's analysis of various methods, other than federal tax law, by which the IRS and/or EFH could seek to hold EFIH liable for taxes arising from the disposition of Oncor), and even if, as Mr. Robins concludes, a taxable transaction would have led to greater recoveries for EFIH (at least from 2017 onwards), neither expert attempts to connect these conclusions with Elliott and UMB's proposed allocation of administrative expenses.  Federal Rule of Evidence 702 requires that expert testimony "fit the issues in the case."  *Schneider*, 320 at 404.  To be admissible, the

testimony "must be relevant for the purposes of the case and must assist the trier of fact."  *Id.*  As

the Supreme Court set forth in *Daubert*,  Federal Rule 702's "helpfulness" standard requires a

"valid scientific connection to the pertinent inquiry as a precondition to admissibility."  509 U.S.

at 591-92.  Here, there is no such connection:  Mr. Abrams and Mr. Robins offer opinions that

are untethered in any way to the 50/50 and 70/30 allocations proposed by Elliott and UMB.  As

such, they provide no assistance to the Court in evaluating whether those allocations are

accurate, or whether they are (as they appear to be) pulled out of thin air.  They have no

"scientific connection to the pertinent inquiry," and are inadmissible.

### III.    MR. ABRAMS SEEKS TO OFFER IMPERMISSIBLE LEGAL OPINIONS

30.    Mr. Abrams' testimony also should be excluded because it will constitute an

impermissible legal opinion.  *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir.

2006) ("an expert witness is prohibited from rendering a legal opinion"); *Cantor v. Perelman*,

No. CIVA 97-586 KAJ, 2006 WL 3462596, at *4 (D. Del. Nov. 30, 2006) (prior to bench trial,

excluding experts' opinions concerning directors' fiduciary duties as improper legal opinions).

Based on his "knowledge of relevant tax and other law" (Ex. 7 (Abrams Report, ¶ 8)),

Mr. Abrams seeks to testify concerning the "tax consequences" of a taxable disposition of

EFIH's interest in Oncor, including whether EFIH (versus EFH) would be "liable" for any taxes

relating to that disposition, and in particular whether the IRS may, under the Administrative

Procedure Act and I.R.C. § 7805, implement regulations allowing it to seek such taxes directly

from EFIH (*id.* at 2-7.)  Essentially, Mr. Abrams seeks to testify concerning the application of

law (in this case, tax law) to the facts of this case.  That testimony is inappropriate and should be

excluded.  *See Stobie Creek Investments LLC v. United States*, 608 F.3d 1366, 1383 (Fed. Cir.

2010) ("Because proper interpretation of the tax laws and Treasury Circular 230 are issues of

law, it was not an abuse of discretion to exclude expert testimony related to those questions.");

*Fontenot v. Safety Council of Sw. La.*, No. 2:16-CV-84, 2017 WL 3588223, at *2 (W.D. La.

Aug. 16, 2017) (excluding expert testimony concerning "the applicability and interpretation of

the treasury regulation" in part "because expert witnesses may not render conclusions of law").

<u>**CONCLUSION**</u>

WHEREFORE, the Ad Hoc EFH Claimants respectfully request that this Court enter an

order precluding and excluding the testimony of Elliott/UMB's proposed experts, Howard

Abrams and Bradley Robins.

Dated:  August 24, 2018
            Wilmington, Delaware

Respectfully submitted,

HOGAN ♦ MCDANIEL

By: _/s/ Garvan F. McDaniel_____
Garvan F. McDaniel, Esq. (DE #4167)
1311 Delaware Avenue
Wilmington, Delaware 19806
Telephone:  (302) 656-7540
Facsimile:  (302) 656-7599
Email:  gfmcdaniel@dkhogan.com

– and –

KASOWITZ BENSON TORRES LLP
David S. Rosner, Esq.
Andrew K. Glenn, Esq.
Matthew B. Stein, Esq.
Gavin D. Schryver, Esq.
David J. Mark, Esq.
Shai Schmidt, Esq.
Andrew H. Elkin, Esq.
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800
Email:  drosner@kasowitz.com
            aglenn@kasowitz.com
            mstein@kasowitz.com
            gschryver@kasowitz.com
            dmark@kasowitz.com
            sschmidt@kasowitz.com
            aelkin@kasowitz.com

*Co-Counsel to the Ad Hoc EFH Claimants*