**Exhibit 3**

1

2          Q.     Fair enough.

3                 Do you recall that there was an issue

4     regarding the procedures for the sale of Oncor?

5          A.     I don't remember.  I know that there

6     were bidding procedure issues, and I believe I was

7     even deposed at that time.  But I don't remember

8     the specifics of this four years ago.

9          Q.     Let me see if I can refresh your

10     recollection.  Do you recall the company decided

11     it wished to market its interests in Oncor fairly

12     early on in the proceeding?

13                 MR. McGINNIS:  Objection.

14          A.     I do -- I do remember that that is the

15     case that we factually went out to market Oncor,

16     actually the interest that we held in Oncor.

17          Q.     You understand that there was -- some

18     creditors objected and that there was a hearing

19     before the bankruptcy court on the issue?

20          A.     Yeah, again, I don't remember the

21     specifics of it.

22          Q.     Do you recall there being an issue

23     whether or not the marketing of Oncor should show

24     a preference for a taxable transaction versus a

25     nontaxable transaction?

1

2          A.    I do remember the broad outline of that

3     debate.

4          Q.    What do you recall about that debate?

5          A.    I recall that the debtors' advisors

6     were very uniform in the view that it was

7     appropriate to move forward on bidding procedures

8     to have a nontaxable transaction and that I,

9     actually with independent counsel, corroborated

10    their views through our own tax gang and felt that

11    it was appropriate to do so, to pursue the bidding

12    procedures through a nontaxable transaction.

13         Q.    Do you recall what matters you

14    considered in reaching that conclusion?

15         A.    I actually remember I have an affidavit

16    on that, so you probably can go back and check

17    that specifically.  But the matters that were --

18    that come to mind at this point were we felt that

19    it would maximize the value for the EFIH estate

20    because of the possibility of a large 6-7 billion

21    dollar tax liability that might arise through a

22    deconsolidation.

23              And that would come indirectly through

24    the possibility of EFH being the one that would be

25    first hit with the check, and then they could

1

2     check the box and it could flow down to EFIH.

3          At the same time, for context we felt

4     that having the possibility of a creditor in the

5     form of the IRS showing up at the eleventh hour

6     with a $7 billion claim would put the whole case

7     in jeopardy for being able to be confirmed.

8          And there was a third that comes to

9     mind that I remember Evercore believing that

10    prospective bidders wouldn't be interested in

11    pursuing a situation that was -- didn't have that

12    tax issue all tied up.  And therefore it was a

13    nontaxable process that we went through.

14         Q.   At any time during the course of

15    proceeding, were you ever presented with a taxable

16    transaction for the sale of Oncor that was worthy

17    of consideration?

18         A.   Not that I recall.

19         Q.   Did the issue of pursuing a nontaxable

20    versus taxable transaction come up again following

21    this -- the approval of the bidding procedures

22    that's the subject of this Exhibit Number 3?

23         A.   Well, it just came up now through the

24    motion by Elliott that it is being questioned as

25    to whether or not that was a problem.

 1

 2          Q.     Prior to the Elliott motion, do you

 3     recall any other context in which the argument was

 4     made that EFIH should pursue a taxable

 5     transaction?

 6          A.     I don't remember.

 7          Q.     When did you stop being a director of

 8     EFIH?

 9          A.     Six or seven months ago.  Everyone

10     resigned at the time that Sempra -- when the plan

11     was confirmed.

12          Q.     Was that early in 2018?

13          A.     Yes, March of 2018.

14          Q.     So from the spring of 2014 to the

15     spring of 2018, you were on the board for about

16     approximately four years?

17          A.     Yes.

18          Q.     And during that time period did you

19     continue to support restructuring transactions

20     were in the best interest of EFIH and its

21     constituents?

22          A.     Absolutely.  EFIH -- I was an advocate

23     for EFIH in terms of maximizing the value for EFIH

24     and the stakeholders.

25          Q.     Do you recall this whole time period

Page 33

1

2      did EFIH ever pursue transactions that you were

3      opposed to?

4           A.    That would be hard to do because I was

5      the independent director.  So I don't -- I don't

6      remember anything like that.

7           Q.    So let's go through some of these.

8      There was a plan involving Hunt.  Do you remember

9      the Hunt plan?

10          A.    I do.

11          Q.    Did you support the Hunt plan?

12          A.    I did.

13          Q.    There was a plan involving the

14     separation of TCEH.  Did you support that plan?

15          A.    I did.

16          Q.    And then there was an NextEra plan.

17     Did you support that plan?

18          A.    The NextEra plan, yes, I did.

19          Q.    And then finally the Sempra plan, which

20     was confirmed?

21          A.    I did.

22          Q.    Let me turn to the subject of

23     allocations more specifically, which are the

24     subject of this dispute.  Are you familiar with

25     the fact that the court had entered an order

1

2      gang corroborated the assessment of Kirkland and

3      Evercore; is that right?

4              MR. LEVIN:  Objection, privilege.

5          Q.   Just calling for a "yes" or "no."

6              MR. LEVIN:  I think we can review the

7          record as to what he testified as to.  I don't

8          want a privilege waiver here.

9              MR. McGINNIS:  I understand.  I

10         understand.

11         Q.   Did you ever instruct anyone to solicit

12     bids for a potential taxable transaction?

13         A.   I don't remember.

14         Q.   Did you give it consideration?

15             MR. PEDONE:  Objection.

16         A.   There was substantial discussion, as I

17     previously testified, around the taxable/

18     nontaxable transactions, and there was I think

19     unanimity in the view that the nontaxable

20     transaction was in the best interests of EFIH.

21         Q.   And do you recall discussing that with

22     other EFIH board members?

23         A.   To the extent that they were part of

24     the bidding procedures, yes, in that process where

25     they had to approve the bidding procedures on the

Page 72

1
2    would bother me.
3        Q.    Just to return briefly to everyone's
4    favorite subject, taxes, was your view that tax
5    issues between EFH and EFIH was an actual or
6    potential conflict?
7                MR. PEDONE:   Objection.
8        A.    It sounds like a word game, because it
9    is potential until it actually occurs.  So at the
10   time of the discussion our advisors -- and
11   ultimately this was litigated around the bidding
12   procedures -- determined that the potential for
13   that tax liability was so great that we took a
14   strategic position to go for a nontax transaction
15   so that we wouldn't have the taxable
16   deconsolidation.
17       Q.    Do you believe that EFH and EFIH were
18   differently situated with respect to tax issues?
19       A.    We discussed this earlier, that they
20   were differently situated practically speaking
21   because the EFH was the taxpayer of record; and to
22   the extent that there was a claim by the IRS, it
23   would have gone to EFH on a direct basis with the
24   potential that it would then be -- then be --
25   there would be a check the box at EFH which would

Page 73

1

2     make EFIH joint and severally responsible for

3     those taxes.

4          Q.    So is that a "yes"?

5               MR. PEDONE:  Objection.

6          A.    It's a "yes" to the extent that there

7     was a practical differentiation on the functional

8     responsibility.  EFH was the taxpayer of record.

9     To the extent that they ended up with a claim, an

10    IRS claim, of $7 billion, then there was the

11    potential that they would check the box and EFIH

12    would become joint and several on that tax.

13               So fundamentally at the end of the day

14    the risk of having EFIH be liable for $7 billion

15    worth of taxes was an actual concern, not a -- not

16    a -- what did you call -- what was the difference

17    between actual and -- your question was

18    something --

19         Q.    Yeah, so I think I used the word

20    "conflict."  What I want to see is do you agree,

21    whether it's actual or potential, that there was a

22    conflict between EFH and EFIH with respect to tax

23    issues.

24         A.    Not as it related to the strategy of

25    selling this company.