**<u>Exhibit 5</u>**

1       A.      That's my recollection.

2       Q.      Do you recall whether Mr. Rosenbaum, at

3  that time or thereafter, articulated this argument

4  to you, or others that you're aware of, on behalf

5  of debtors?

6          MR. MCGINNIS:  Objection.

7  BY MR. GLENN:

8       Q.      Him personally.

9       A.      I do not recall.  I honestly do not

10 recall.

11      Q.      Now, during the course of the Chapter

12 11 cases, did you ever receive a written offer for

13 Encore or the assets of the E-SIDE debtors that

14 would be taxable?

15      A.      Me or the company?

16      Q.      You or the company.

17      A.      The only one that I can recall was

18 right, I don't know the exact date, but there was

19 a letter sent to Mr. Keglevic, I believe, and that

20 would have been in May, maybe June, of 2017

21 timeframe at a very high level, from Elliott

22 Capital.  And I think that Mr. Rosenbaum had sent

23 that.  I wasn't intimately focused on that.  I was

24 running around trying to put some fires out.

25      Q.      Understood.  A lot of fires in this

1  case.  So, do you understand what became of the
2  offer that was presented by Elliott and
3  Mr. Rosenbaum that you just testified to?
4       A.     Yeah, again --
5                  (Interruption.)
6  BY MR. GLENN:
7       Q.     Do you want us to reask the question,
8  sir?
9       A.     If you don't mind.
10      Q.     Sure.  Do you understand what became of
11 the offer that was presented by Elliott and
12 Mr. Rosenbaum that you just testified to?
13      A.     I can recall the process, vaguely, and
14 Mr. Keglevic is actually interacting with
15 Mr. Rosenbaum.  As I said before, I was involved
16 in other matters at that point in time.
17             Mr. Keglevic and I spoke periodically
18 about it, and my summation of it is, it went
19 nowhere, ultimately.  And I think the Elliott
20 management went forward and tried to do an
21 equitization plan that was tax-free.
22      Q.     Are you aware of any written offers
23 that were taxable that would have yielded more
24 value than any of the nontaxable transactions that
25 the debtors ultimately pursued in these cases?

1     A.    Again, the only taxable transaction
2  that I recall was the one that was submitted in a
3  letter.  And I don't know that that -- I wouldn't
4  characterize that as a complete term sheet.  That
5  is the only one that I'm aware of.
6     Q.    Okay.  But are you aware of any offers
7  in writing, that would have yielded more value to
8  the EFIH estate that were taxable?
9     A.    No.
10    Q.    So, is it your view, sir, that pursuing
11 the tax-free transactions that the debtors pursued
12 during these cases maximized value for the EFIH
13 bankruptcy estate?
14    A.    That is my true belief, yes.  That the
15 nontaxable transactions that we attempted to
16 consummate at various points in time and then
17 ultimately did, provided the highest and best
18 value for EFIH.
19    Q.    Okay, thank you.  Now let's talk about
20 the Nextera breakup fee.  At the time the breakup
21 fee was approved by the bankruptcy court, do you
22 understand what cash consideration would have
23 flowed into EFH from the sale of Encore, as
24 opposed to the assumption of the asbestos
25 liabilities?