**Exhibit 9**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re<br><br>ENERGY FUTURE HOLDINGS CORP., *et al.*,<br><br>　　　　*Debtors.* | ) Chapter 11<br>)<br>) Case No. 14-10979 (CSS)<br>)<br>) (Jointly Administered)<br>) |

**DECLARATION OF BRADLEY A. ROBINS**

I, Bradley A. Robins, declare as follows:

**I.     QUALIFICATIONS**

1.     I make this Declaration in connection with Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott") and UMB Bank, N.A. ("UMB")'s Joint Motion to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors [D.I. 13102] (the "Allocation Motion").

2.     I am a Partner of Ducera Partners LLC ("Ducera"), an investment banking firm which has its principal office at 499 Park Avenue, 16th Floor, New York, NY 10022.

3.     I have extensive experience with restructuring and reorganization matters and financing transactions.  Prior to joining Ducera in 2016, I was a senior professional and then Head of Financial Advisory & Restructuring for North America at Greenhill & Co from 2001 through 2016.  Prior to that, I was a Senior Vice President in the Financial Restructuring Group at Houlihan Lokey Howard & Zukin from 1999 through 2001.  Prior to that, I was an associate in the Creditors' Rights Department at Wachtell, Lipton, Rosen, & Katz from 1991 through 1998.  I graduated *cum laude* from The University of Pennsylvania Law School in 1990.

1

4.      A copy of my curriculum vitae, which summarizes my qualifications and professional experience is included as **Exhibit 1** to this Declaration. I have not provided any testimony in the past four years, nor have I authored any publications in the past ten years.

## II.    ENGAGEMENT

5.      Ducera has been retained by Elliott and UMB in connection with the above-captioned chapter 11 cases (the "Chapter 11 Cases").

6.      I have been asked by counsel for Elliott and UMB to consider the appropriate processes to maximize value for creditors of Energy Future Intermediate Holding Company LLC ("EFIH") in a taxable or a tax-free sale or other disposition of Energy Future Holdings Corp. ("EFH")'s subsidiaries (or the assets thereof), whether through a stand-alone sale or restructuring transaction or as part of a plan or reorganization in the Chapter 11 Cases. Counsel for Elliott and UMB asked me to consider (i) the Debtors' exploration and pursuit of a tax-free disposition of Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings") from 2014 through 2016 and (ii) the Debtors' exploration and pursuit of a tax-free disposition of Oncor Holdings in 2017 and thereafter, and to opine on the net benefits of the Debtors' aforementioned explorations and pursuits to EFH, on the one hand, and EFIH, on the other hand.[1]

7.      While my work on this matter is ongoing, this Declaration summarizes my current opinions given the information available to me to date. I may consider any additional materials, if produced, and modify or supplement my Declaration as necessary.

8.      Ducera was paid $500,000.00 to provide potential testimony in connection with the confirmation proceedings in the Chapter 11 Cases, regardless of the outcome of those proceedings. Ducera did not testify at the plan confirmation hearing in February 2018. Ducera is not being paid

---

[1]    Any capitalized terms undefined herein shall have the same meaning ascribed to them in the Allocation Motion [D.I. 13102].

2

any additional compensation for this Declaration or potential testimony in connection with the allocation dispute in the Chapter 11 Cases.

9. All matters set forth herein are based upon (a) my personal knowledge, (b) my review of relevant documents, (c) information supplied to me by counsel for Elliott and UMB, and (d) analyses prepared by Ducera. If called upon to testify, I could and would testify competently to the facts set forth herein.

10. A list of the documents I relied on in forming my opinions is included as **Exhibit 2** to this Declaration. In connection with my anticipated trial testimony in this matter, I may create demonstratives that refer or relate to the matters discussed in this Declaration or in my deposition testimony. I have not yet created any such demonstratives as of the date of this Declaration.

### III. SUMMARY OF EXPERT OPINIONS

11. Based on my education, training, and experience with restructuring and reorganization matters and financing transactions, and the information and analyses discussed within this Declaration, my opinions are summarized as follows:

    a. From 2014 through 2016, when EFIH was likely solvent, the Debtors' exploration and pursuit of a tax-free disposition of Oncor Holdings was beneficial to both EFH and EFIH.

    b. Beginning in 2017 and thereafter, when EFIH was no longer solvent, the Debtors' exploration and pursuit of a tax-free disposition of Oncor Holdings continued to clearly benefit EFH, but the net benefit to EFIH is materially less clear, the precise extent of which I do not believe can be calculated to a reasonable degree of certainty.

    c. At no point during the four-year span of these Chapter 11 Cases did the Debtors' exploration and pursuit of a tax-free disposition of Oncor Holdings benefit EFIH more than EFH.

12. In forming my opinions, I do not reach any conclusions regarding the business judgment of advisors to EFH and EFIH in ultimately approving a tax-free sale of Oncor Holdings.

## IV. BACKGROUND

### A. Structure of EFH and its Subsidiaries.

13. As of April 29, 2014 (the "Petition Date"), EFH owned interests in two main businesses. EFH, through its ownership of Texas Competitive Electric Holdings Company LLC ("TCEH"), owned 100% of the interest in the T-Side Debtors' business of, among other things, electricity generation and lignite/coal mining. EFH, through its ownership interest in EFIH, also indirectly owned an approximately 80% economic interest in the regulated business of Oncor Holdings, the largest electricity transmission and distribution system in Texas.

14. EFIH and TCEH were "disregarded entities" for federal income tax purposes. It is my understanding that this meant that EFIH and TCEH were essentially ignored by the Internal Revenue Service (the "IRS") for federal income tax purposes, and EFIH's and TCEH's assets and liabilities, together with any items of taxable income, expense, loss, gain, deduction, and credit attributable to those assets and liabilities, were treated as though they were owned and/or generated directly by EFH. As a result, as the taxpaying corporate parent, EFH—and not EFIH or TCEH— would be liable for any federal income tax liabilities attributable to the income or gain generated by EFIH, TCEH, or any subsidiaries thereof absent any state law doctrine or "check-the-box" election on behalf of EFIH and/or TCEH to treat such entities as corporations for federal income tax purposes.

**B.    The Debtors' Initial Marketing of Oncor Holdings.**

15.    The Debtors began to market the Oncor Holdings asset on July 24, 2014.

16.    On October 1, 2014, the Debtors filed the Omnibus Tax Memorandum [D.I. 2296] (the "Tax Memorandum"), which explained that a taxable disposition of the Debtors' assets "likely would result in EFH being left with a potential tax liability of $7 billion or more."[2]

17.    I understand that the Debtors colloquially referred to this massive tax liability as "Tax Armageddon." Avoiding a taxable disposition of EFIH and TCEH was at the forefront of concern in these Chapter 11 Cases. This is because the occurrence of "Tax Armageddon" would dramatically reduce any expected recoveries for EFH creditors.

**C.    The Proposed Transactions.**

18.    From August 2015 through July 2017, the Debtors entered into three transactions—none of which were ultimately consummated.

19.    First, in August 2015, the Debtors pursued a REIT reorganization strategy in a transaction with Hunt Consolidated, Inc. ("Hunt"). In December 2015, the Court confirmed a reorganization plan contingent upon consummating the Hunt transaction (the "Hunt Plan"). The Hunt Plan provided for a tax-free sale of Oncor Holdings. Under the Hunt Plan, holders of unsecured claims against EFIH were projected to receive a 100% recovery.[3] The Hunt Plan fell apart following Texas regulators' conditional approval of a REIT transaction in March 2016, which ultimately caused the E-Side Debtors' counterparty to withdraw from the transaction in May 2016.

20.    Thereafter, the E-Side Debtors and T-Side Debtors decided to bifurcate the plan confirmation process to allow for a more expeditious reorganization of the T-Side Debtors. As a

---

[2]    *Omnibus Tax Memorandum* [D.I. 2296] at 4 (emphasis omitted).
[3]    *Hunt Disclosure Statement* [D.I. 6124] at 21.

5

result, on August 29, 2016, the T-Side Debtors confirmed a chapter 11 plan providing for (a) the execution of a transaction resulting in a step-up in the tax basis of certain of TCEH's assets and (b) the spin-off of reorganized TCEH and certain of its direct and indirect subsidiaries (the "T-Side Plan"). The T-Side Plan became effective on October 3, 2016 (the "T-Side Effective Date").

21. In connection with the T-Side Plan, the E-Side Debtors and Reorganized TCEH entered into a Tax Matters Agreement whereby Reorganized TCEH had the ability to seek injunctive relief blocking any attempt by the E-Side Debtors to effectuate a taxable disposition of their interests in Oncor Holdings for two years, through October 2018.

22. Second, while the T-Side Debtors sought confirmation of the T-Side Plan, the E-Side Debtors solicited proposals for a transaction involving Oncor Holdings. NextEra proposed a merger transaction (the "NextEra Plan") to acquire the E-Side Debtors' ownership interest in Oncor Holdings, and on September 19, 2016, the Court approved the NextEra Merger Agreement. The NextEra Merger Agreement provided for a tax-free sale of Oncor Holdings. At the time the NextEra Merger Agreement was entered into, holders of unsecured claims against EFIH were projected to receive a 100% recovery.[4] Like the Hunt Plan, the NextEra Plan failed when Texas regulators refused to approve the NextEra Plan.

23. Third, following Texas regulators' denial of the NextEra Plan, the E-Side Debtors entered into a merger agreement with Berkshire Hathaway Energy Company ("Berkshire," and the "Berkshire Merger Agreement") on July 6, 2017. The Berkshire Merger Agreement was structured similarly to that of the NextEra Merger Agreement, and similarly, contemplated a tax-free sale of Oncor Holdings. At the time the Berkshire Merger Agreement was entered into, holders of unsecured claims against EFIH were projected to receive 18% recovery under the Berkshire Plan.[5]

---

[4] *NextEra Disclosure Statement* [D.I. 9616] at 27.
[5] *Berkshire Disclosure Statement* [D.I. 11427] at 28.

24. On August 15, 2017, the E-Side Debtors received a competing proposal from Sempra that preserved the basic tax-free structure contemplated by the Berkshire Merger Agreement, but provided greater overall consideration for the E-Side Debtors' estates. Accordingly, the E-Side Debtors terminated the Berkshire Merger Agreement and entered into a merger agreement with Sempra (the "Sempra Merger Agreement").

### D. The Consummated Transaction.

25. On September 11, 2017, the E-Side Debtors filed a chapter 11 plan (the "Sempra Plan") and related disclosure statement centered on the proposed Sempra merger transaction. The Court entered an order (the "E-Side Confirmation Order") on February 27, 2018 confirming the Sempra Plan, and on March 9, 2018, the Sempra Plan became effective.

26. Like the three proposed transactions that preceded the Sempra Plan, the Sempra Plan also provided for a tax-free sale of Oncor Holdings. At the time the Sempra Merger Agreement was entered into, holders of unsecured claims against EFIH were projected to receive a 23-39% recovery under the Sempra Plan.[6]

## V. BASIS FOR EXPERT OPINION

### A. The Debtors' Exploration and Pursuit of a Tax-Free Disposition of Oncor Holdings From 2014-16 Benefited Both EFH and EFIH.

27. I understand that a principal goal of EFH in 2014, and continuing throughout these Chapter 11 Cases, was avoiding a taxable disposition of Oncor Holdings. This is because as the parent entity of disregarded LLC subsidiaries, EFH was liable for any federal income tax liabilities attributable to any income and/or gain generated by Oncor Holdings. I understand from the Debtors' Tax Memorandum that there was a 100% chance that EFH would be saddled with a multi-billion tax liability in the event of a taxable disposition of Oncor Holdings. Absent a substantial

---

[6] *Sempra Disclosure Statement* [D.I. 11889] at 30.

7

shifting of this tax liability onto EFH's subsidiaries, a multi-billion tax liability on EFH would have resulted in reduced recoveries for EFH creditors. I understand from Professor Abrams that the IRS would not likely be able to successfully hold EFIH liable for the resulting tax liabilities under existing federal income tax laws.

28. I understand from the Debtors' Tax Memorandum that if a taxable transaction of Oncor Holdings were consummated, EFH might be able to shift some, or even all, of EFH's tax liability on EFIH by pursing a "check-the-box" election to treat EFIH as a corporation for federal income tax purposes or asserting claims against EFIH pursuant to tax sharing agreements. I understand from Ropes & Gray that any effort by EFH to pursue a "check-the-box" election would likely require bankruptcy court relief from the automatic stay and that EFH would face multiple hurdles to impose some or all of its tax liability on EFIH. I understand also from Ropes & Gray that any claims by EFH for indemnity under any tax sharing agreements would be subject to litigation and EFH's ability to prevail on any such claims is uncertain.

29. I understand also that a taxable sale of Oncor Holdings could have added significant value to EFIH by providing a purchaser with a step-up in basis that in turn, could have resulted in an increased purchase price of as much as $2-3 billion.[7] Though I have not independently calculated the amount of any increased purchase price, an increase in the purchase price of Oncor Holdings would likely result in more money to EFIH and in turn, likely increased recoveries to EFIH creditors (keeping any other variables constant).

30. I further understand that from 2014 through 2016, EFIH was likely solvent. In other words, the proceeds from the disposition of Oncor Holdings likely would be sufficient to pay

---

[7] Hiltz Dep. Tr., dated October 6, 2014, at 99:12-103-23; *see also* Hiltz Exhibit 16 (Evercore Oncor Tax Analysis, EFH-EVR090003152); Hiltz Exhibit 17 (Evercore Oncor Tax Analysis, EFH-EVR090003169).

8

EFIH creditors in full regardless of whether a taxable transaction (at a higher purchase price) or non-taxable transaction (at a lower purchase price) of Oncor Holdings were consummated. Consistent with this understanding, holders of unsecured claims against EFIH were projected to receive a 100% recovery under both the Hunt Plan and the NextEra Plan.[8]

31. I further understand that from 2014 through 2016, advisors of EFH and EFIH recommended the pursuit of a tax-free transaction of Oncor Holdings. Moreover, the two restructuring plans entered into during this period (the Hunt Plan and NextEra Plan) both provided for a tax-free spin of Oncor Holdings.

32. Based on my experience and professional judgment, for the period 2014 through 2016, I believe that the Debtors' exploration and pursuit of a tax-free disposition of Oncor Holdings was beneficial to both EFH and EFIH. In reaching this opinion, I consider the costs, risks, and benefits to both EFH and EFIH of entering into a taxable versus a non-taxable transaction for the period 2014 through 2016.

33. <u>First</u>, with respect to EFH, as I explained above, I understand that EFH stakeholders had no realistic option other than a tax-free transaction; if a taxable transaction were consummated, EFH would face a multi-billion dollar tax liability that would have dramatically reduced recoveries of EFH creditors. Thus, for EFH, the risks and costs of a taxable transaction were considerable, far outweighed the likely benefits of a taxable transaction, and tipped the balance decidedly in favor of a non-taxable transaction.

34. <u>Second</u>, with respect to EFIH, during the period 2014 through 2016 EFIH was likely solvent and therefore, its creditors would not benefit from any potential gain in purchase price that could be obtained if a taxable transaction were consummated. As explained above, this

---

[8] *Hunt Disclosure Statement* [D.I. 6124] at 21; *NextEra Disclosure Statement* [D.I. 9616] at 27.

9

is because EFIH creditors were expected to recover in full in a tax-free transaction. Thus, there was thus no significant benefit to EFIH creditors of pursuing a taxable alternative during this period. In contrast, there was some small risk to EFIH of pursuing a taxable alternative in that the E-Side Debtors' believed the IRS or EFH could attempt to impose tax liability on EFIH. Given EFIH's likely solvency during this period, there was no reason for EFIH to take *any* tax risk associated with a taxable transaction (even if the risk were as low as 1%), especially when EFH (EFIH's shareholder) strongly preferred a tax-free transaction. In sum, during the period 2014 through 2016, it is my view that the effort and expense to pursue a tax-free transaction benefitted both EFH and EFIH.

### B. The Debtors' Exploration and Pursuit of a Tax-Free Disposition of Oncor Holdings From 2017 Benefited EFH To a Greater Extent Than EFIH.

35. I understand that there was a material change to EFIH unsecured creditors' projected recoveries in 2017. At this point, trading prices of the PIK notes indicated that EFIH was no longer solvent. When the NextEra Merger Agreement was approved on September 19, 2016, the PIK Notes were trading above par at $101.75. By the time Texas regulators rejected the NextEra Plan on April 13, 2017, the PIK notes had fallen below par to $30.13—a more than 70% drop.[9] As a result, EFIH unsecured creditors were no longer expected to be paid in full.

36. I further understand that in 2017, advisors of EFH and EFIH recommended the pursuit of a tax-free transaction of Oncor Holdings. And, as previously, the two restructuring plans entered into during this period (the Berkshire Plan and the Sempra Plan) both provided for a tax-free spin of Oncor Holdings.

37. Based on my experience and professional judgment, for the period 2017 and thereafter, I believe that the decision to explore and pursue a tax-free disposition of Oncor Holdings

---

[9] *Exhibit A to the Allocation Motion* [D.I. 13102-2].

benefited EFH to a relatively greater extent than EFIH, as compared to the benefits to each from the exploration and pursuit of tax-free transactions in the 2014-16 period. In reaching this opinion, I consider the costs, risks, and benefits to both EFH and EFIH of entering into a taxable versus a non-taxable transaction for the period 2017 and thereafter.

38.  First, with respect to EFH, as was the case in 2014 through 2016, EFH stakeholders continued to have no realistic option other than a tax-free transaction. Again, as was the case in 2014 through 2016, for EFH, the risks of a taxable transaction far outweighed the potential benefits of a taxable transaction, and continued to make a non-taxable transaction the clearly preferred alternative for EFH, and indeed, the only viable alternative for EFH. The below chart (**Chart 1**) illustrates the expected value delta for a taxable transaction at EFH (i) in 2014-16 and (ii) in 2017 and thereafter.

*($ in Millions)*

| | | | 2014 - 2016 Expected Value Delta for Taxable Transaction[1] | | | | | 2017 and Thereafter[3] Expected Value Delta for Taxable Transaction[1] | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Percentage Tax Liability | $1,801[2] | $2,069[2] | $3,514[2] | | Percentage Tax Liability | $1,801 | $2,069 | $3,514 |
| EFH | High | 50% | $101 | $369 | $1,814 | EFH | 50% | ($899) | ($631) | $814 |
| | | 60% | (239) | 29 | 1,474 | | 60% | (1,239) | (971) | 474 |
| | | 70% | (579) | (311) | 1,134 | | 70% | (1,579) | (1,311) | 134 |
| | V. High | 80% | (919) | (651) | 794 | | 80% | (1,919) | (1,651) | (206) |
| | | 90% | (1,259) | (991) | 454 | | 90% | (2,259) | (1,991) | (546) |
| | | 100% | (1,599) | (1,331) | 114 | | 100% | (2,599) | (2,331) | (886) |

**Note:** Analysis assumes Oncor tax liability of $3.4bn. Source: Hiltz Deposition, October 6th, 2014
(1) Increased sale price from taxable transaction per Evercore illustrative Oncor tax analysis. Source: Evercore Oncor Tax Analysis, September 25th, 2014
(2) Assumes hypothetical scenario where all excess proceeds go to EFH to illustrate "best-case" scenario.
(3) Assumes first $1.0bn of incremental proceeds flow to EFIH creditors prior to EFH for illustrative purposes only.

39.  Second, with respect to EFIH, the material change to EFIH unsecured creditors' projected recovery in 2017 signaled a potential change in EFIH's prior cost-benefit calculus. Because EFIH was now insolvent, EFIH creditors could have benefited from the higher proceeds

11

of a taxable transaction. As I explained above, I understand that a taxable sale of Oncor could have added significant value to a buyer of Oncor Holdings by providing a step-up in basis, which, in turn, could have led to an increased purchase price estimated by the Debtors' investment bankers to be in the $2-$3 billion range.[10] Moreover, even though Reorganized TCEH could have sought injunctive relief blocking any attempt by the Debtors to effectuate a taxable disposition through October 2018, this threat of injunctive relief did not per se preclude agents of EFIH from considering a taxable disposition in Oncor Holdings. Assuming the Debtors' investment bankers' estimates referred to above are correct, the increased proceeds from a taxable transaction would have more than offset the costs incurred by prolonging consummation of a taxable transaction until October 2018, and resulted in greater recovery to EFIH creditors. As a result, the benefit to EFIH of pursuing a non-taxable disposition of Oncor Holdings in 2017 was less obvious than it was in the period from 2014 through 2016. The below chart (**Chart 2**) illustrates the expected value delta for a taxable transaction at EFIH (i) in 2014-16 and (ii) in 2017 and thereafter.

---

[10]    Hiltz Dep. Tr., dated October 6, 2014 at 99:12-103:23; *see also* Hiltz Exhibit 16 (Evercore Oncor Tax Analysis, EFH-EVR090003152); Hiltz Exhibit 17 (Evercore Oncor Tax Analysis, EFH-EVR090003169).

*($ in Millions)*

| | Percentage Tax Liability | 2014 - 2016[1] Expected Value Delta for Taxable Transaction | | | | Percentage Tax Liability | 2017 and Thereafter Expected Value Delta for Taxable Transaction | | |
|---|---|---|---|---|---|---|---|---|---|
| | | $1,801[2] | $2,069[2] | $3,514[2] | | | $1,801[2] | $2,069[2] | $3,514[2] |
| EFIH / Low | 0% | $0 | $0 | $0 | EFIH / Low | 0% | $1,801 | $2,069 | $3,514 |
| | 10% | (340) | (340) | (340) | | 10% | 1,461 | 1,729 | 3,174 |
| | 20% | (680) | (680) | (680) | | 20% | 1,121 | 1,389 | 2,834 |
| | 30% | (1,020) | (1,020) | (1,020) | | 30% | 781 | 1,049 | 2,494 |
| Med | 40% | (1,360) | (1,360) | (1,360) | Med | 40% | 441 | 709 | 2,154 |
| | 50% | (1,700) | (1,700) | (1,700) | | 50% | 101 | 369 | 1,814 |
| | 60% | (2,040) | (2,040) | (2,040) | | 60% | (239) | 29 | 1,474 |
| High | 70% | (2,380) | (2,380) | (2,380) | High | 70% | (579) | (311) | 1,134 |
| | 80% | (2,720) | (2,720) | (2,720) | | 80% | (919) | (651) | 794 |
| | 90% | (3,060) | (3,060) | (3,060) | | 90% | (1,259) | (991) | 454 |
| V. High | 100% | (3,400) | (3,400) | (3,400) | V. High | 100% | (1,599) | (1,331) | 114 |

**Note:** Analysis assumes Oncor tax liability of $3.4bn. Source: Hiltz Deposition, October 6th, 2014
(1) EFIH assumed to be solvent during 2014 - 2016, thus EFIH would not receive any excess proceeds.
(2) Increased sale price from taxable transaction per Evercore illustrative Oncor tax analysis. Source: Evercore Oncor Tax Analysis, September 25th, 2014

40.     I have not calculated the degree to which EFH benefited more than EFIH from a tax-free disposition of Oncor Holdings in 2017 and thereafter. Based on my assessment of the factors above, I do not think that I would be able to calculate these numbers to a reasonable degree of certainty.

## VI.     CONCLUSION

41.     From 2014 through 2016, I believe that the Debtors' exploration and pursuit of a tax-free disposition of Oncor Holdings benefited (a) EFH in that it averted a multi-billion dollar tax liability that would have significantly impacted, if not eliminated, EFH unsecured creditor recoveries, and (b) EFIH in that EFIH did not need to take on any risk, however remote, associated

13

with a taxable transaction given that its unsecured creditors were expected to be paid in full even with a non-taxable transaction.  In comparison, beginning in 2017 and thereafter, when EFIH was no longer solvent, I believe that the Debtors' exploration and pursuit of a tax-free disposition of Oncor Holdings benefited EFH to a relatively greater extent than EFIH as compared to the benefits to each from the exploration and pursuit of tax-free transactions in the 2014-16 period, the precise extent of which I do not believe can be calculated to a reasonable degree of certainty.

42. Overall, at no point during the four-year span of these Chapter 11 Cases did the Debtors' exploration and pursuit of a tax-free disposition of Oncor Holdings benefit EFIH more than EFH.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the foregoing are true and correct to the best of my information and belief.

Executed on August 19, 2018
Long Island, New York

                                                               */s/* Bradley A. Robins
                                                               Bradley A. Robins

**Exhibit 1**

# BRADLEY A. ROBINS
499 Park Ave, 16th Floor, New York, New York, 10022
(212) 671-9709 | brobins@ducerapartners.com

## PROFESSIONAL EXPERIENCE

**Ducera Partners LLC** — New York, NY
*Partner*  11/2016 – Present
- Responsible for identifying and originating new clients and assignments and for leading execution teams for clients

**Greenhill & Co.** — New York, NY
*Head of Financial Advisory & Restructuring for North America*  01/2001 – 10/2016
- Led or co-led dozens of engagements, including Chapter 11 bankruptcies, restructurings, strategic alternatives, distressed and non-distressed sales, exchange offers, and mergers, representing both the debtor side and creditor side
- Provided testimony in court and/or via deposition more than a dozen cases, representing both the debtor side and the creditor side
- Headed the Financial Advisory & Restructuring Group in North America
- Responsible for quality control of work product for all deal teams in group
- Responsible for recruiting and reviewing group members

**Houlihan Lokey Howard & Zukin** — New York, NY
*Senior Vice President, Financial Restructuring Group*  01/1999 – 01/2001
- Worked on a variety of deals, including Chapter 11 bankruptcies, restructurings, strategic alternatives, distressed and non-distressed sales, exchange offers, and mergers, representing both the debtor side and creditor side

**Wachtell, Lipton, Rosen & Katz** — New York, NY
*Associate, Creditors' Rights Department*  09/1991 – 12/1998
- Worked on dozens of cases representing creditors in and out of court, including Chapter 11 bankruptcies, restructurings, strategic alternatives, distressed and non-distressed sales, exchange offers, and mergers
- Active in recruiting, mentoring, and reviewing junior associates

## EDUCATION

**The University of Pennsylvania Law School** — Philadelphia, PA
*Juris Doctor, cum laude, Order of the Coif*  1990

**Middlebury College** — Middlebury, VT
*Bachelor of Arts in Economics, cum laude*  1986

**BRADLEY A. ROBINS: DOCUMENTS CONSIDERED**

| Document Title | Bates/Docket |
|---|---|
| Ying Declaration | D.I. 478 |
| Evercore Tax Considerations Presentation | EFH90001508 |
| Hiltz Ex. 16 (Evercore Oncor Tax Analysis) | EFH-EVR090003152 |
| Hiltz Ex. 17 (Evercore Oncor Tax Analysis) | EFH-EVR090003169 |
| Omnibus Tax Memorandum | D.I. 02296 |
| Hiltz Deposition Transcript (Oct. 6, 2014) | |
| Hunt Disclosure Statement | D.I. 6124 |
| NextEra Disclosure Statement | D.I. 9616 |
| Sempra Disclosure Statement | D.I. 11889 |
| Berkshire Disclosure Statement | D.I. 11427 |
| Debtors' Reply to Objections to Berkshire Merger | D.I. 11761 |
| Tax Matters Agreement | |
| Amended and Restated Tax Sharing Agreement | |
| Federal and State Income Tax Allocation Agreement | |
| Allocation Motion | D.I. 13102 |
| Kirkland Preliminary Statement | D.I. 13255 |