# EXHIBIT A

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                      :

                                :   Chapter 11

6   ENERGY FUTURE HOLDINGS       :

    CORP.,  et al.,             :   Case No. 14-10979(CSS)

7                               :

            Debtors.            :   (Jointly Administered)

8   _____

9

10

11

12                          United States Bankruptcy Court

13                          824 North Market Street

14                          Wilmington, Delaware

15

16

17                          October 17, 2014

18                          9:25 AM - 2:45 PM

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

Page 2

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Extending the Period Within Which the

3    Debtors May Remove Luminant Generation Company, LLC v. Titus

4    County Appraisal District [D.I. 1990; filed September 10,

5    2014]

6

7    HEARING re Motion for Entry of an Order Authorizing

8    Wilmington Savings Fund Society, FSB to File Under Seal (I)

9    an Unredacted Version of its Objection to Motion of Energy

10   Future Holdings Corp., et al., for Entry of an Order (A)

11   Approving Bidding Procedures, (B) Scheduling an Auction and

12   Related Deadlines and Hearings, and (C) Approving the Form

13   and Manner of Notice Thereof and (II) Exhibits 1 and 2 to

14   the Declaration of Jeremy B. Coffey in Support of the

15   Objection [D.I. 2370; filed October 10, 2014]

16

17   HEARING re Motion of Energy Future Holdings Corp., et al.,

18   for Entry of an Order (A) Approving Bidding Procedures, (B)

19   Scheduling an Auction and Related Deadlines and Hearings,

20   and (C) Approving the Form and Manner of Notice Thereof

21   [D.I. 2087; filed September 19, 2014]

22

23

24   Transcribed by:  Dawn South, Sherri A. Breach, and Pamela A.

25   Skaw

1   A P P E A R A N C E S :

2   KIRKLAND & ELLIS

3        Attorneys for the Debtors

4

5   BY:  MARK MCKANE, ESQ.

6        STEVE HESSLER, ESQ.

7        BRIDGET O'CONNOR, ESQ.

8        BRYAN STEPHANY, ESQ.

9        EDWARD SASSOWER, ESQ.

10

11  RICHARD LAYTON & FINGER

12       Attorneys for the Debtors

13

14  BY:  DANIEL J. DEFRANCESCHI, ESQ.

15       JASON M. MADRON, ESQ.

16

17  PAUL, WEISS, RIFKIND, WHARTON & GARRISON

18       Attorneys for Ad Hoc Committee of TCEH First Lien

19       Creditors

20

21  BY:  ALAN W. KORNBERG, ESQ.

22       JACOB ADLESTEIN, ESQ.

23

24

25

1    BROWN RUDNICK

2         Attorneys for Christiana Trust

3

4    BY:  EDWARD WEISFELNER, ESQ.

5         JEFFREY L. JONAS, ESQ.

6         JONATHAN MARSHALL, ESQ.

7

8    UNITED STATES DEPARTMENT OF JUSTICE

9         Attorneys for the U.S. Trustee

10

11   BY:  W. BRADLEY RUSSELL, ESQ.

12        ELLEN SLIGHTS, ESQ.

13

14   AKIN GUMP STRAUSS HAUER & FELT LLP

15        Attorney for Ad Hoc Committee of EFIH Unsecured

16        Noteholders

17

18   BY:  SCOTT ALBERINO, ESQ.

19        IRA DIZENGOFF, ESQ.

20        ABID QURESHI, ESQ.

21        ROB BOLLER, ESQ.

22

23

24

25

1   SHEARMAN & STERLING

2         Attorneys for Duetsche Bank AG New York Branch

3

4   BY:   FREDRIC SOSNICK, ESQ.

5         NED SOSNICK, ESQ., ESQ.

6

7   POTTER ANDERSON & CORROON LLP

8         Attorneys for Deutsche Bank AG New York Branch

9

10  BY:   JEREMY RYAN, ESQ.

11        R. STEPHEN MCNEILL, ESQ.

12

13  ROPES & GRAY LLP

14        Attorneys for CSC Trust Company of Delaware

15

16  BY:   D. ROSS MARTIN, ESQ.

17        ANDREW DEVORE, ESQ.

18        KEITH WOFFARD, ESQ.

19

20  COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

21        Attorneys for CSC Trust Company of Delaware

22

23  BY:   KATE STICKLES, ESQ.

24        WARREN USATINE, ESQ.

25

1  DRINKER BIDDLE & REATH LLP

2       Attorneys for Citibank, N.A.

3

4  BY:  HOWARD A. COHEN, ESQ.

5       ROBERT K. MALONE, ESQ.

6

7  BINGHAM MCCUTCHEN LLP

8       Attorney for Pacific Investment Management Co. LLC

9

10  BY:  JEFFREY SABIN, ESQ.

11

12  WHITE & CASE LLP

13       Attorneys for Ad Hoc Group of TCEH Unsecured

14       Noteholders

15

16  BY:  J. CHRISTOPHER SHORE, ESQ.

17       TOM LAURIA, ESQ.

18

19  CROSS & SIMON, LLC

20       Attorney for Fidelity Management & Research Company

21

22  BY:  MICHAEL JOSEPH JOYCE, ESQ.

23

24

25

1   POLSINELLI

2        Attorneys for the Committee

3

4   BY:  CHRIS WARD, ESQ.

5        JUSTIN EDELSON, ESQ.

6

7   MORRISON & FOERSTER

8        Attorneys for the Committee

9

10  BY:  CHARLES KERR, ESQ.

11       BRETT MILLER, ESQ.

12       ALEX LAWRENCE, ESQ.

13       DAN HARRIS, ESQ.

14       TODD GOREN, ESQ.

15

16  KLEHR HARRISON HARVY BRANZBURG LLP

17       Attorney for UMB Bank, Indenture Trust

18

19  BY:  RAYMOND H. LEMISCH, ESQ.

20

21  THE HOGAN FIRM

22       Attorney for the Ad Hoc Committee EFH Legacy

23

24  BY:  GARVAN MCDANIEL, ESQ.

25

1   NIXON PEADOBY

2        Attorney for AST

3

4   BY:  RICHARD PEDONE, ESQ.

5        LEE HARRINGTON, ESQ.

6

7   FOX ROTHSCHILD

8        Attorney for TCEH Unsecured Ad Hoc Group

9

10  BY:  JEFFREY SCHLERF, ESQ.

11

12  ASHBY & GEDDES

13       Attorney for Christiana Trust

14

15  BY:  GREG TAYLOR, ESQ.

16

17  PACHULSKI STANG ZIEHL & JONES

18       Attorneys for EFIH Second Lien Group

19

20  BY:  LAURA DAVIS JONES, ESQ.

21       COLIN R. ROBINSON, ESQ.

22

23

24

25

1   KRAMER LEVIN

2        Attorneys for EFIH Second Lien Group

3

4   BY:  TOM MAYER, ESQ.

5        GREG HOROWITZ, ESQ.

6        ALICE BYOWITZ, ESQ.

7

8   MORRIS JAMES LLP

9        Attorney for Law Debenture

10

11  BY:  STEPHEN M. MILLER, ESQ.

12

13  PATTERSON BELKNAP WEBB & TYLER

14        Attorney for Law Debenture

15

16  BY:  BRIAN GUINEY, ESQ.

17

18  FOLEY & LARDNER

19        Attorney for UMB Indenture Trustee

20

21  BY:  MARK HEBBELN, ESQ.

22

23

24

25

1   SEWARD KISSEL

2       Attorney for Wilmington Trust

3

4   BY:  ARLENE ALVES, ESQ.

5

6   BROWN & CONNERY

7

8   BY:  DONALD LUDMAN, ESQ.

9

10  YOUNG CONAWAY STARGATT & TAYLOR

11      Attorney for First Lien Creditors

12

13  BY:  PAULINE K. MORGAN, ESQ.

14

15  CHIPMAN BROWN

16      Attorney for the Ad Hoc Committee of EFIH Unsecured

17      Noteholders

18

19  BY:  MARK OLIVERE, ESQ.

20

21  LANDIS RATH & COBB

22      Attorney for NextEra Energy Resources

23

24  BY:  ADAM LANDIS, ESQ.

25

1    CHADBOURNE & PARKE

2          Attorney for NextEra Energy Resources

3

4    BY:  HOWARD SEIFE, ESQ.

5

6    WOMBLE CARLYLE

7          Attorney for Fluor

8

9    BY:  KEVIN MANGAN, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. HESSLER:  Good morning, Your Honor.  For the

5     record Steve Hessler of Kirkland & Ellis, counsel to the

6     debtors.

7              Your Honor, today is the hearing on the debtors'

8     bidding procedures motion.

9              Before getting started with opening arguments,

10    with Your Honor's permission, I think there are a few

11    housekeeping mattering to address.

12             THE COURT:  Okay.

13             MR. HESSLER:  Your Honor, the first is there was

14    one remaining item on the docket which had to do with the

15    sealing motion of Wilmington Savings Fund Society.  My

16    understanding is there are no pending issues with that

17    order, but I don't believe it's been entered yet.

18             THE COURT:  Well, I can't -- and it's short, so I

19    have a hearing.

20             Mr. Taylor, good morning.

21             MR. TAYLOR:  Good morning, Your Honor.  Greg

22    Taylor of Ashby & Geedes on behalf of WSFS.

23             We did file the motion to seal to comply with our

24    obligations under the stipulated protective order.  I'm not

25    aware of any objections or any issues being raised with it.

1    I do have a form of order with me --

2              THE COURT:  All right.

3              MR. TAYLOR:  -- if Your Honor would like.

4              THE COURT:  Please approach.  Does anyone wish to

5    be heard?

6              All right, I'll approve the order.  Thank you.

7              So we're done, right?

8         (Laughter)

9              MR. HESSLER:  Your Honor, the second item --

10   second housekeeping matter is the present form of the order

11   and the bidding procedures themselves.

12             As you're reminded, the proposed bidding

13   procedures order was attached as Exhibit A to the motion,

14   and the actual bidding procedures themselves were Exhibit 1

15   to Exhibit A.

16             In response to certain requests for clarifications

17   or modifications by various bidders, creditors, and Oncor

18   also, the debtors have made some update to the proposed

19   order and the procedures.

20             Most significantly, Your Honor, until literally

21   about one minute before the start of the hearing, the

22   debtors were negotiating language around a protocol of

23   allowance to share with reviewing parties a very limited

24   amount of information about the round one and round two bids

25   received during the stalking horse bidding process.  To be

Page 14

1    very clear information to be shared are not include the

2    value of the bids or the identity of the bidders.

3              Your Honor, the debtors also have agreed to remove

4    a limitation that had been present in the NDAs that bidders

5    need debtor consent to talk to creditors.

6              Your Honor, as a result of those modifications, as

7    well as some other negotiations between the parties, the

8    debtors are pleased to note this morning that we believe we

9    resolved the objections of three key parties, and those

10   three would be the TCEH first lien holders, the EFI second

11   lien holders, and the EFIH unsecured holders.

12             Your Honor, I'll discuss that development further

13   in my opening when I get to it, but I wanted to mention at

14   the outset to highlight that we are, as we speak, tailoring

15   the order and the procedures with these updates, and we will

16   distribute redline copies to the Court and parties hopefully

17   by the lunch break, Your Honor.

18             THE COURT:  Okay.

19             MR. HESSLER:  Your Honor, the final -- third and

20   final housekeeping item is the choreography of the hearing.

21             The parties did meet and confer yesterday and

22   generally agreed to the following.  As to opening statements

23   15 minutes for the debtors, followed by 10 minutes each for

24   the official committee, the ad hoc group of TCH secureds,

25   the TCH second liens, and the EFIH first liens.  In other

1    words, Your Honor, all of the remaining objectors.  And then

2    ten minutes total for the remaining parties to subdivide

3    amongst themselves.

4            The goal of that, Your Honor, was to hopefully be

5    done with opening statements by 10:30 or 11:00 this morning.

6            At that point, Your Honor, the debtors will

7    proceed with their direct of Mr. Will Hiltz of Evercore,

8    followed by his cross, and then the debtors' direct of

9    Mr. Paul Keglevic, our CFO and co-COO, followed by his

10   cross.

11           Your Honor, the goal of that schedule amongst the

12   parties was hopefully to be finished with the debtors'

13   witnesses by approximately 3:00 or 4 p.m., subject of course

14   to the Court's schedule.  I know there were some emails from

15   chambers yesterday with regard to Your Honor's schedule this

16   afternoon.

17           THE COURT:  Yeah, I have a -- that I must attend

18   -- a local rules committee meeting at 3 p.m., and that --

19   I'm not sure how long that's going to last.  It'll last at

20   least an hour and a half.  So -- and also there's -- about

21   5:00 or so there's going to be building maintenance which

22   will knock out the elevators, which will make life

23   interesting.

24           So what we'll do is close for the day at 3:00

25   rather than reconvening after, and I have cleared all day

1    Tuesday, so we will, to the extent necessary, which

2    certainly probably will not be an issue, certainly by

3    Monday, and I have another hearing at 10:00 that I can't

4    move, so -- it involves a pro se party -- so Monday we'll

5    start at 11:00 and go to 5:00, 6:00, somewhere in there, and

6    then Tuesday, to the extent necessary, we'll start at -- I

7    opened up the wrong day, sorry -- 9:30.  This is a change.

8    And go for the day.  So you may not have gotten that last

9    change, or the first.

10             MR. HESSLER:  Thank you, Your Honor.  When --

11             THE COURT:  I'm sorry, I just want to make sure.

12   Fifteen for the debtor, ten for the committee, the ad hoc,

13   TCH, unsecured, the WSFS, and the second lien EFIH?

14             MR. HESSLER:  First lien EFIH.

15             THE COURT:  First lien.  Oh, yes, okay,

16   Mr. Martin's client.  All right.

17             MR. HESSLER:  So, Your Honor, within the witnesses

18   after the debtors have put on their two witnesses we'll see

19   where on the timeline that falls, but again, we're going to

20   endeavor to do it as efficiently as possible today.

21             The remaining possible witnesses will be -- I'm

22   sorry -- at that point the objectors will determine whether

23   they intend to call Mr. David Ying, also of Evercore, and

24   Tony Horton, the debtors' treasurer.

25             Your Honor, our understanding is the remaining

1    possible witnesses are Mr. Chuck Cremmons, who is an EFIH

2    independent director, Mr. Hugh Sawyer, who is a TCEH

3    independent director, and Mr. David Kurtz of Lazard, who is

4    the committees' financial advisor.

5              Your Honor, we appreciate the Court providing us

6    with the hearing times that it has done so, and the debtors

7    intent, as I said, to be very efficient in our presentations

8    and stay within the framework agreed to by the parties.

9              Does Your Honor have any questions before I turn

10   to our opening statement?

11             THE COURT:  No.

12             MR. HESSLER:  Your Honor --

13             THE COURT:  Yes.

14             MR. HESSLER:  Yes.

15             THE COURT:  Who's Mr. Horton work for?

16             MR. HESSLER:  The debtors, he's their treasurer.

17             THE COURT:  Okay.  Okay.  Go ahead.

18             MR. HESSLER:  Your Honor, for our opening

19   statement I to have a short (indiscernible - 9:42:52).  May

20   I approach with a company?

21             THE COURT:  Yes.

22             MR. HESSLER:  And we do have as many copies as

23   we've been able to print in the last half hour, but we do

24   have copies for parties in the courtroom.

25             THE COURT:  Okay.  Thank you.

1          (Pause)

2               MR. HESSLER:  If you can turn to the slide number

3     1, which is really just an overview slide, Your Honor, this

4     is a preview -- the presentation this morning with regard to

5     the opening is organized into four primary topics.

6               The first is to reiterate the scope of the relief

7     being sought, that it is entirely procedural, it is not

8     substantive at all, it is procedural relief that we are

9     seeking through this motion.

10              Secondly, Your Honor, we want to walk through

11    quickly the chronology of the events that bring us to today,

12    as well as the timeline of the proposed stalking horse

13    process and the proposed auction process.

14              Third, Your Honor, we want to highlight for the

15    Court as a preview of the testimony that will be provided

16    today, the widespread advantages that are provided by the

17    debtors moving forward under the proposed bidding

18    procedures.

19              And finally, Your Honor, we do want to have a

20    quick summary of the remaining objections and our responses

21    to those arguments.

22              Next slide, please.  Your Honor, turning to the

23    next slide, which is the scope of the procedural relief

24    requested.

25              Your Honor, we believe that the objectors

Page 19

1    essentially are challenging a motion that we have not filed,

2    arguing this release that we have not requested, and are

3    attempting to prevent a parade of horribles that are not

4    before this Court.

5            At the risk of belaboring the obvious I want to

6    emphasize at the outset that we believe the relief we are

7    seeking is very narrow and it's entirely procedural.

8            Just going through the columns, Your Honor, we are

9    seeking to establish typical procedural deadlines and

10   bidding requirements.  We are not today seeking approval of

11   any transaction, any sale, and certainly not a plan of

12   reorganization.

13           Your Honor, the bidding procedures expressly state

14   that parties may provide bids in any structure.  This

15   includes most significantly a tax-free transaction or a

16   taxable transaction.  It necessarily follows that we are not

17   mandating bids be submitted with any structure.

18           Lastly, Your Honor, the motion does seek to

19   establish a process by which the debtors ultimately will

20   return to this Court to seek multiple approvals.  First of a

21   stalking horse bidder, second of an auction winner, and

22   ultimately we will be back before the Court on a plan of

23   reorganization.  But the bidding procedures motion itself

24   does not foreclose any rights of any creditor or other party

25   in interest to object to that stalking horse motion, to

1   object to the auction, or to object ultimately to plan

2   confirmation.

3            Next slide, please.  Your Honor, the chronology,

4   which I know the Court is familiar with, but helpful for us

5   to walk through it quickly.  It provides some context as to

6   how we got to today's hearing.

7            Obviously the petition date was April 29th.

8            Within a couple weeks after that the debtors filed

9   the EFIH second lien DIP motion, that motion had in it a

10  conversion option for the equity of EFH.

11           After getting through the EFIH first lien DIP and

12  other first and second day motions we started the second

13  lien DIP hearing on June 30th and July 1st.

14           Within a week after that, Your Honor, the debtors

15  had adjourned the EFIH second lien DIP hearing.

16           About a week or so after that NextEra filed with

17  this Court, and otherwise provided to the debtors, an

18  improved proposal.

19           Within about a week after that, Your Honor, up to

20  July 23rd, the debtors' boards approved the termination of

21  the RSA and the withdrawal of the EFIH second lien DIP.

22           Very soon after that, and when we're highlighting

23  the weeks of October 4th and 11th, the debtors began meeting

24  with all of the key stakeholders in this case to preview the

25  proposed marketing process that we are now before the Court

1    to address.

2              Your Honor, by the end of the month, August 26th

3    specifically, the debtors' boards decided and the debtors

4    that day filed a notice of intent to pursue the marketing

5    process that we're here to address today.

6              Soon thereafter, the week of September 8th, the

7    debtors conferred with all of their stakeholders to preview

8    the proposed bidding procedures.

9              Soon thereafter, September 13th, we shared a draft

10   of the motion and a draft of the bidding procedures with all

11   of these stakeholders, which we then subsequently filed by

12   September 19th.

13             And then here we are today, Your Honor, on the

14   proposed bidding procedures.

15             Next slide, please.  Your Honor, this is the

16   timeline, and this graphic illustrates the overall construct

17   and timing for how we would like to conduct the stalking

18   horse selection and auction.  There are three points that I

19   would like to emphasize on this timeline.

20             First there are the key dates.  I will not

21   endeavor to walk through all of them, but I do want to note

22   an October 23rd deadline for the round one bids, a

23   November 21 deadline for the round two bids, the filing of a

24   stalking horse motion as soon as possible thereafter, which

25   would be up for approval at a hearing in mid January -- or

1    excuse me -- early to mid January, followed by an auction in

2    early mid January -- excuse me -- early to mid February, of

3    course all subject to the Court's availability.

4           The second point that I want to emphasize that is

5    reflected by this timeline, Your Honor, is the design of the

6    process.  There's essentially two stages, and this is most

7    directly indicated by the two brackets right underneath the

8    arrow.  There's a stalking horse bidding process and an open

9    bidding process.

10          This first stage, the stalking horse bidding

11   process, this is to be conducted confidentiality for reasons

12   that we will touch on in my opening and that will be

13   discussed at length in the directs and I suspect it's going

14   to be a significant focus of this hearing.  That however

15   will be followed, Your Honor, by an open bidding process in

16   which the debtors will announce publicly and seek approval

17   for a proposed stalking horse and then conduct an auction as

18   well, consistent with conventional bankruptcy practice.

19          The third point that I think is illustrated by

20   this timeline, Your Honor, is the extent of creditor

21   involvement in crafting these procedures.

22          As noted in the prior slide, which is the

23   chronology, the debtors began discussing these proposed

24   bidding procedures with creditors in early August, over two

25   months ago.  And, Your Honor, this very timeline, there may

1    have been one or two small changes to it, but essentially

2    this very timeline itself was provided to and discussed with

3    all creditors and with bidders in early September.

4              The upshot, Your Honor, is we believe this has

5    been a deliberative and consultative process, it's been

6    designed to -- to craft the optimal form of bidding

7    procedures, to maximize value to be obtained for all

8    stakeholders throughout this marketing process.

9              Next slide, please.  Your Honor, turning to the

10   next slide.  This is a summary of what we would argue are

11   the advantages of the proposed bidding procedures.  Most

12   importantly, Your Honor, these procedures have been

13   carefully designed to maximize value.

14             As I highlighted there's a two-stage process that

15   very deliberately comports with the experience and exception

16   of the participants in both stages.

17             At stage I, which we're calling the stalking horse

18   bidding process, we believe -- and you're going to hear

19   testimony to this effect today -- that the community, the

20   universe of likely bidders to participate in this auction

21   will be very familiar with and most comfortable with a

22   confidential MMA stalking horse selection and auction

23   process.

24             We then proceed to stage II, Your Honor.  Stage

25   II, which is the open bidding process, this is going to be

1    approval of the stalking horse and ultimately the auction,

2    this will involve full participation of the debtors'

3    stakeholders in a conventional court supervised auction.

4            So stage I is going to be very familiar to the

5    bidders, and stage II is going to be very familiar to all of

6    the debtors' stakeholders.

7            The second advantage, Your Honor.  We believe the

8    bidding procedures provides certainty to all involved.  The

9    debtors, to bidders, to stakeholders.  Having court ordered

10   bid deadlines will encourage participants to put forth their

11   best offers on a structured and predetermined timeline.

12           Your Honor, this was a focus of the objections to

13   the EFI second lien DIP.  There was a lot of specific

14   criticism about shouldn't you have gone to court, gotten

15   court approval for deadlines that you can use to maintain

16   order over the process and have as, you know, constructive

17   and comprehensive participation in the process as possible?

18   We listened to those arguments, and the result is a bidding

19   procedures that attempts to address those arguments, Your

20   Honor.

21           Thirdly, we believe the bidding procedures advance

22   plan negotiations by providing a potential foundation for a

23   plan.  There's a certain amount of criticism that has come

24   in that the bidding procedures are premature, that they

25   should be done within the context of plan confirmation.  Our

1    view, Your Honor, that determining who would be the future

2    owner of the economic interests in Oncor, that's a critical

3    step in the plan formation process.  Once we have that

4    identified we believe that's going to further tie

5    negotiations.

6              Similarly, Your Honor, getting clarity around the

7    amount and form of distributable value for this asset, that

8    is going to encourage stakeholders to be engaged

9    constructively in the plan formation process.  We believe

10   that is going to be helpful for the debtors and for all

11   stakeholders in negotiating a plan to understand the

12   distributable value involved.

13             Next slide, please.  Your Honor, the next slide,

14   timely and reasonableness to the bidding process.  This is a

15   very high level preview of the debtors' presentation on

16   direct today.

17             As I mentioned we're going to have two witnesses.

18   Mr. Will Hiltz of Evercore, who is the debtors' lead M&A

19   advisor on the auction, as well as Mr. Paul Keglevic, who we

20   know the Court is very familiar with, the debtors' CFO and

21   co-CRO.

22             Your Honor, their testimony is going to address

23   the following key questions.

24             First, why this process -- again, their testimony

25   will emphasize these bidding procedures are going to

1    maximize value through a well-designed process familiar

2    first in the market and then to the debtors' stakeholders.

3            Again, Your Honor, we think it's very important to

4    note that many of the features of the bidding procedures

5    were actually requested by many of the objectors to this

6    process.

7            The second point that they will testify to, Your

8    Honor, the second key question, why now?  Again, they're

9    going to have extensive testimony on these points which we

10   think is quite straightforward.  There are positive market

11   conditions for going concern sales at this point in time.

12   Similarly, Your Honor, there is widespread availability of

13   credit to facilitate the transaction.  There is presently

14   strong bidder interests in the transaction, Your Honor.  And

15   we also believe that there are overwhelming benefits to all

16   of the debtors' stakeholders of securing a floor on the

17   value that can be obtained for this asset, Your Honor.

18           Next slide, please.  Slide seven, the universe of

19   objectors at a glance.  As I mentioned we printed this about

20   45 minutes ago and it's already outdated.

21           The -- most importantly the limited objections

22   that are reflected in orange of the TCEH first liens and the

23   EFIH unsecured, I'm now happy to say, Your Honor, that we

24   believe those have been resolved, and then there had been an

25   objection originally filed by the EFIH second liens, and

1    that objection has been resolved as well.

2            Therefore, Your Honor, what are we left with,

3    who's objecting?  It's essentially two constituencies.  The

4    first is the EFIH first liens.

5            Your Honor, the EFIH first lien holders, these are

6    senior lenders who have already been repaid in full.  In

7    full.  Their sole interest in this case at this point is a

8    contingent make-whole claim that is massively oversecured

9    and is the subject for present litigation.  So we think that

10   context is critical, Your Honor, for evaluating the merit

11   and substance of their objection.

12           On the other side, Your Honor, we have the TCH

13   junior creditors, specifically the second liens, the ad hoc

14   group of unsecured, and the official committee.  Your Honor,

15   these are junior creditors of an estate that does not own

16   the economic interest in the asset being marketed.

17           I think we also have, Your Honor, we believe a

18   demonstrated obvious interest in this case being delayed as

19   long as possible.

20           So therefore, Your Honor, we will address all of

21   their objections on substance, but believe that context also

22   is important for understanding the matter -- or the reasons

23   in which they're bringing their objection, Your Honor.

24           Next slide, please.  Slide eight, this goes to the

25   substance of the objections, it's necessarily high level.

1    But, Your Honor, we've sort of categorized them into maybe

2    four categories of objections.

3           One was that they've requested the Court should

4    not allow the sealing of bids during the stalking horse

5    bidding process.  Our response on this we believe is

6    straightforward.  The full disclosure of all information

7    regarding the bids that is going to significantly deter

8    participation of the entities that we believe are going to

9    be participating in the bidding process.  So we believe it

10   would otherwise suppress and chill bidding.

11          We also believe, Your Honor, the limited protocol

12   with regard to information about bidding effectively

13   addresses these objections, and we look forward to

14   presenting that protocol as soon as it's concluded, but we

15   believe that this is going provide sufficient grounds for

16   overruling any remaining objections on this front, Your

17   Honor.

18          Secondly, there have been -- there's been

19   significant criticism to the extent that supposedly our

20   structure is designed to entrench -- our bidding procedures

21   are designed to entrench a tax-free bid.

22          Your Honor, we've said this in our pleadings,

23   we've said it multiple times, and I'll say it from the

24   podium today, the bidding procedures expressly allow bidders

25   to submit a bid predicated on any structure.

1          There also has been a fair amount of criticism,

2     Your Honor, that although we're saying that in our

3     proceeding procedures the fact that the debtors have

4     otherwise expressed their view that they believe a tax-free

5     structure is optimal, somehow undermines the bidding

6     procedures.  We do not think that's correct, Your Honor.  We

7     believe that we have the prerogative as debtors in

8     possession of expressing the estate's view based on years of

9     analysis as what would be the optimal structure; however, we

10    are saying point-blank, if we are incorrect and if a bidder

11    has a better structure, if a bidder can come in, if

12    creditors can somehow demonstrate that a better structure

13    exists -- we don't think it does -- but believes it exists

14    we will consider that and we will vet it and we will analyze

15    it, and ultimately we will be before the Court with our

16    determination as to what is the optimal structure.  But we

17    have not precluded any specific form of structure, Your

18    Honor, or insisted upon any form of structure.

19          The other objections, Your Honor, we think are

20    more minor.  There's been some argument that the debtors

21    lack in corporate authority to file this motion, a whole lot

22    has been seized on the notion that the debtors did not --

23    excuse me -- that the debtors' boards did not vote on the

24    specific filing of the bid procedures motion.  This

25    completely overlooks, Your Honor, the fact that the boards

1   did explicitly authorize the termination of RSA, as well as

2   the initiation of the marketing process, and it was those

3   two keyboard decisions that really provided for the

4   imperatives that are carried out in the motion.  The motion

5   and the bidding procedures are simply the follow on of those

6   boards' decisions, and the filing of the motion and the

7   filing of the bid procedures were both expressly authorized

8   by the debtors' co-chief restructuring officers who have

9   been delegated by the board with the authority to handle

10  such decisions such as the actual filing of the motion.

11           Lastly, Your Honor, there have been some arguments

12  that the motion be -- should be subject to entire fairness

13  review due to conflicts between the estates.  We've set this

14  forth in our papers.  Again, our reply is quite simple.

15  There's no self-interest or conflict in the bidding

16  procedures, there's no transaction being proposed before the

17  Court that otherwise needed to be scrutinized for fair

18  dealing or fair price.  We believe that objection, Your

19  Honor, can be overruled.

20           Your Honor, that's the end of this presentation, I

21  actually came in right on time at 15 minutes.

22           To state for all the reasons that you're going to

23  hear, we hope that the bidding procedures are, you know,

24  ultimately approved at the conclusion of the testimony.  We

25  believe the design and proposal are both a sound exercise of

1    the debtors' business judgment, and we believe that's going

2    to be reinforced through the testimony of our witnesses as

3    well as the excessive pleadings that we filed.

4              THE COURT:  Okay.  Thank you.

5              MR. HESSLER:  Thank you, Your Honor.  I will cede

6    the podium to I believe Mr. Kornberg of Paul, Weiss, who

7    wants to speak next.

8              MR. KORNBERG:  Good morning, Your Honor.  Alan

9    Kornberg of Paul, Weiss, Rifkind, Wharton & Garrison on

10   behalf of ad hoc committee of TCEH first lien creditors.

11             Your Honor, as stated in the limited objection

12   that we filed, our committee supports the debtors' efforts

13   to monotize EFH's indirect equity interest at Oncor.

14             We agree with the debtors that approval of the bid

15   procedures is an important first step in maximizing the

16   value of the debtors' estates and facilitating their exit

17   from Chapter 11.  And we believe that those goals, Your

18   Honor, are in the best interest of everyone in this

19   courtroom.

20             We filed a limited objection because we had

21   discreet but important concerns about the transparency of

22   the stalking horse process.  We have worked around the clock

23   to resolve those concerns with the debtors, and as

24   Mr. Hessler mentioned, subject to seeing revised language

25   during the course of the day, we hope we'll be in a position

1    to formally withdraw our limited objection.

2            Your Honor, I want to reiterate another point that

3    Mr. Hessler made, and that is that the relief that's being

4    sought today is very limited in scope.  It's important

5    relief, but nonetheless, it is very limited, and we hope

6    that we will not be diverted to matters that should be

7    properly be addressed when a transaction is actually

8    presented for creditor and Court approval.

9            But many, many, many of the issues and objections

10   raised today relate to a transaction that has not yet been

11   formulated and has not yet been presented.

12           Thank you, Your Honor.

13           MR. PEDONE:  Good morning, Your Honor.  Richard

14   Pedone for American Stock Transfer, indenture trustee at

15   EFH, the holding company.

16           We want to reiterate our support expressed in our

17   statement in support of the debtors' sale procedures.

18           The debtors are soundly within the exclusive

19   period here, they're looking for procedures that are going

20   to determine the value of what is the key asset.  All

21   indications are that there's sufficient value in that asset,

22   that it will flow up to the unsecured creditors of EFH, and

23   this process will determine the value, will identify parties

24   with expressed interests, and the objecting parties'

25   concerns with regard to what a plan would look like, how

1    their potential intercompany claims might be determined,

2    should all be reserved for later on in the case.

3              We wholly support the debtors' motion.

4              Thank you.

5              THE COURT:  Thank you.

6              Mr. Weisfelner.

7              MR. WEISFELNER:  Thank you, Your Honor.

8              The objecting parties flipped the coin and I lost.

9    Your Honor, Edward Weisfelner, Brown Rudnick, together with

10   Mr. Taylor, and my partner Jeff Jonas, for the second lien

11   trustee WSFS, as well as an ad hoc group of second lien

12   holders that hold more than a majority of the second lien

13   debt on the T side of the equation.

14             Your Honor, the evidence that you're about to hear

15   will demonstrate beyond preadventure that these procedures

16   have been designed and are fully expected to result in a

17   stalking horse auction and an open auction at which the only

18   transaction contemplated or possible is one that's

19   consistent with the debtors' advertised optimal efficient

20   tax structure.

21             In other words, Your Honor, and the evidence will

22   prove this, the only thing that's really for sale in these

23   procedures is the reorganized equity of EFH.

24             Your Honor, just on the demonstrative that we

25   have, and I'll try my best to turn it to Your Honor.  Your

1  Honor, I don't know whether or not you've had the

2  inclination or the opportunity to review the debtors'

3  50-page tax memorandum.

4          THE COURT:  I have actually, yes.

5          MR. WEISFELNER:  But I think it's critically

6  important that you understand that the debtors -- and you'll

7  hear this through testimony -- fully expect that the offer

8  that will result from these procedures is for the investment

9  in reorganized EFH equity, an asset that doesn't exist, is

10 not now, and never will be property of any of the debtors'

11 estates.

12          There is no realistic possibility, despite their

13 lip service to the contrary, that there will be any

14 alternative transaction forthcoming, and no intention by

15 these debtors to approve any alternative transaction in the

16 unlikely event that in the next six days someone shows up

17 for the first time to give an alternative transaction.

18          And, Your Honor, understand when we talk about the

19 debtors' efficient optimal structure, which requires that

20 the bidder come in and bid only for the reorganized equity

21 of EFH, the alternatives, a sale, for example, of EFH's

22 equity interest in EFIH gives rise to a taxable transaction

23 and is foreboden.

24          Likewise, asking for a sale of EFIH equity in the

25 non-debtor entity, Oncor Electric -- I can't even read it

1    from here -- is likewise a taxable transaction and is

2    foreboden.

3         As a technical matter the debtor tells you that

4    what they're in essence looking to sell is the economic

5    stake in Oncor.  Oncor is within a ringed fence, its equity

6    is owned by a non-debtor entity, which I think is important

7    in terms of the statute that the debtor is operating under.

8         And Your Honor will understand that this is the

9    exact same tax structure the debtors proffered as part of

10   the withdrawn RSA and the now abandoned second lien DIP

11   proposal.

12        What you have in front of you, Judge, is RSA 2.1,

13   but we have the exact same problems on this transaction as

14   we had on day one of the cases.  It's predicated on a tax

15   structure that the evidence will demonstrate doesn't

16   maximize value, doesn't maximize creditor recoveries, and

17   indeed on the T side of the equation this tax structure

18   deprives the T side estate of billions of dollars of value,

19   and we'll demonstrate that through the witness' testimony.

20        The deprivation of value of the T side comes in

21   two specific forms.

22        Number one, as advertised to all of the bidders

23   you need both an E side plan of reorganization and a T side

24   plan of reorganization.  And on the T side plan you need

25   likewise a tax-free spin, which requires that the T side

Page 36

1    estate give up two critical pots of value.  Number one, you

2    have to avoid the taxable consequences of a step up in

3    basis.  A step up in basis would otherwise allow the owner

4    of the T side assets to depreciate the value of those assets

5    over time.

6            The evidence you'll hear is that step up in basis

7    is valued somewhere in the multi-billion dollar range.  That

8    value is going to be gone never to arrive again under any

9    plan of reorganization possible if these procedures are

10   approved.

11           The other form of value that dissipates on the

12   T side of the equation -- Your Honor knows that in a typical

13   Chapter 11 case net operating losses, which potentially have

14   lots of value in the future often get dissipated, completely

15   used up by among other things cancellation of indebtedness

16   income.

17           Well a very interesting bit of tax engineering is

18   proposed to be on the T side of the equation as part of this

19   optimal tax structure.

20           You heard counsel for the TCEH first liens talk

21   about their support for this motion, and consequently the

22   support for the tax structure, which was reflected in the

23   fact that they signed onto the RSA at the beginning of the

24   case, the issue again was whether they were going to insist

25   on a transaction that gave them a step up in basis worth

1    billions of dollars, or would instead forego that step up in

2    basis, and the bargain that was struck, and it's spelled out

3    in the tax memo, is they're going to get a partial step up

4    in basis.

5              How do they get a partial step up in basis?  Those

6    NOLs generated by the T side operating companies made

7    available to EFH pursuant to the tax sharing agreements for

8    which EFH needs to compensate the T side of the equation are

9    now going to be reserved and used for the exclusive benefit

10   of the first lien creditors that allow them to burn the NOLs

11   before cancellation of indebtedness income occurs, and when

12   we asked how much is that worth, the NOLs, we were told in

13   deposition, and you'll hear at trial, an estimated

14   $2 billion.

15             So what's before you if you believe, and Your

16   Honor, I firmly am of the view that after you hear the

17   testimony you likewise will conclude that while the debtor

18   disingenuously tells you we're looking for any bid at all,

19   any bid at all, you can come in with any transaction, they

20   won't consider, they won't get, they won't anoint anything

21   other than a tax-free transaction.  Once that bid is

22   anointed you have a guaranteed tax structure that goes into

23   place and limits what a plan of reorganization can provide

24   in terms of value, because the values would have already

25   been dissipated.

1              Your Honor, it's only in the context of an

2      acknowledgment that what we're really here about is to set

3      up procedures, not for a sale of an asset that the debtor

4      owns or is going to own or will ever own, but we're here

5      setting up a procedure that permits for an investment in an

6      asset that doesn't exist and that no debtor for any point in

7      time, even at confirmation, will ever own.  And, Your Honor,

8      we believe that stretches the bounds of 363 and 105 beyond

9      the point of reasonableness, and, Your Honor, at massive

10     cost to the estate.

11              Your Honor can only imagine I'm sure the

12     professional costs associated with the numerous objections

13     that have been filed, the massive cost of all the parties in

14     interest who have appeared in court today, and the massive

15     cost -- and you'll hear evidence about this -- that the

16     estates will incur ongoing down the record to get approval

17     for the sale of an asset that doesn't exist, that they don't

18     own, and they'll never own.

19              Now if you accept the fiction that it's the

20     economic value of Oncor that's being sold you still have a

21     jurisdictional problem, we all do, and that is that the

22     property interests that they ultimately look to sell, Oncor,

23     isn't an asset that is owned by any debtor in possession.

24              Next issue.  There is no basis to seek to sell

25     substantially all estate assets outside of plan of

1    reorganization when the asset in question is increasing in

2    value, and you will hear testimony to that effect from the

3    debtors own witnesses.

4         Oncor is not a melting ice cube.  Every metric of

5    valuation produced by the debtors over the near term,

6    midterm, and long term demonstrate that Oncor is increasing

7    in value.

8         Your Honor, these procedures of approval will not

9    only contemplate a plan or plans for both the E side and the

10   T side -- and by the way, it's not a plan any time in the

11   future whenever we get around to it -- this structure, the

12   bids require that the plans on both the E side and T side be

13   confirmed no later than December of 2015.  And, Your Honor,

14   that's before any business plan has been produced by these

15   debtors, before that business plan can be analyzed,

16   discussed, negotiated, and if necessary, litigated over,

17   before these debtors have given us the semblance of a plan

18   outline, let alone filed, negotiated with any of their

19   creditor constituents, the first element of a plan

20   construct.  And of course they contemplate doing all of this

21   outside the protections of disclosure and voting.

22         Aside from our jurisdictional concerns, Judge, you

23   will hear evidence of a complete abandonment of any

24   semblance of proper corporate governance in proceeding

25   forward to lock in the debtors' preferred tax structure.

1              The testimony will demonstrate that there was no

2     vote on filing or prosecuting this motion, no board vote on

3     the tax structure evidenced in the tax memo filed not

4     coincidentally before this hearing and in connection with

5     the bids that their soliciting, the boards never approved

6     this filing, the boards didn't approve the conclusions that

7     were reached in the tax memo.

8              The motion is indeed predicated on the assumption

9     -- and I want to underscore that -- the assumption, not any

10    advice or any analysis, but the assumption that now is "a

11    good time" to sell the asset.  Not the best time, not the

12    right time, but a good time.  And why is it a good time to

13    sell is asset?  They'll tell you because we have -- and I've

14    seen the words throughout their presentation -- we have a

15    robust bidding process under way.

16             You will hear the debtors' testimony that at best

17    they expect a grant total of somewhere between two and four

18    bidders being part of any part of this process, and the

19    evidence will demonstrate that while market conditions

20    haven't changed between the date of the filing of this case

21    and today, and there is no testimony that's going to tell

22    you that those same markets conditions are going to change a

23    whit between now and confirmation of a plan under their

24    scenario at the end of 2015, what's changed is we have a

25    robust bidding process consisting of some two to four

1    interested parties.  But the debtors' witnesses will tell

2    you that having put Oncor on the market as part of their

3    second lien DIP facility at a ridiculously low valuation of

4    course you're going to see market participants that come in

5    and say well if you're going to dispose of it at that low

6    value here's my bid.  That's the market interest that

7    they're relying on on moving forward today.

8              Your Honor, also you're going to hear that there's

9    been absolutely no fiduciary on the T side of the estate

10   who's considered, properly analyzed, or even thought about

11   how the adoption of this bidding procedure and the ultimate

12   efficient, or what they call optimum tax structure, could

13   substantially prejudice the creditors on the T side.

14             Your Honor, when you hear the rest of the evidence

15   we believe you'll conclude that the debtors' prosecution of

16   this motion over the near unanimous opposition of all of the

17   creditors on the E side and the T side, but for those whose

18   procedural concerns were solved a couple of minutes ago.

19             THE COURT:  It's -- you're at 15 minutes,

20   Mr. Weisfelner.

21             MR. WEISFELNER:  Your Honor, I'm going conclude as

22   quickly as I possible can.

23             Your Honor, I think I'll leave the rest of my

24   arguments to my colleagues, because I think they're the same

25   themes that have been sounded in all of our pleadings.

1              THE COURT:  Okay.  Thank you.

2              MR. SHORE:  Good morning, Your Honor.  Chris Shore

3    from White & Case on behalf of the ad hoc group of TCH

4    unsecured notes.

5              We've been before Your Honor in this case and

6    others on 363 issues, and I haven't heard anybody talk yet

7    about what the -- what has to happen here.

8              The debtors need to put on evidence demonstrating

9    to the Court that they are making a sound business decision

10   in good faith, not the decision to sell to a particular

11   purchaser, but just a decision that Mr. Weisfelner was

12   laying out.  We're taking the assets out to market right now

13   to sell EFH post-reorg equity before we have a plan or file.

14   That is an extraordinary decision to make, and quite frankly

15   unprecedented.  We were unable to find any instance in which

16   somebody went out to market to sell post-reorg with a plan

17   not even negotiated.

18             I'm going to say this about good faith right now.

19   Part of the reason I think people showed up and objected in

20   such force to this is there's a suspicion that this isn't

21   really about managing risk and capitalizing on an asset.  It

22   can't be because there's no proof of risk or that they're

23   going to be able to capitalize on the asset in the form they

24   want.  But this was just a way to resurrect the RSA and RSA

25   2.0.  And quite frankly, the fact that the PICs and the TCH

1    first liens have signed back on to the process, which

2    replicates RSA 1.0 isn't a great surprise.

3            So but let me focus on sound business purpose, and

4    from our perspective that has three elements.

5            One, there actually has to have been a decision

6    made by an appropriate decision maker.

7            Two, the decision makers must exercise their

8    duties of loyalty and care in exercising that business

9    decision.

10           And three, the act they decide to take must have

11   some tangible business purpose, it must do something.

12           So all we're going to focus on, and I didn't even

13   see my objection listed on the chart that you were shown my

14   objection is the debtors can't meet, based on the record we

15   see, that they have a sound business purpose for what

16   they're doing here, that is out trying to sell forward post-

17   reorg equity before a plan is on file.

18           The first issue, the right decision makers.  There

19   is, and you will see a huge disconnect between the facts

20   about what the boards have been doing and what's been

21   represented to you.

22           The witnesses have all testified there was no

23   board action with respect to this.  Counsel said in seeking

24   to restrict the discovery of board makers the important

25   point is we're not moving on the basis of any sort of board

1   action here.  That's in the October 2 transcript.  Now we

2   get the explanation having seen the objections, of course

3   the board approved this?

4           We're not disputing the board was advised, but we

5   are unaware of any approval, and I'm not certain that saying

6   that the boards approved it helps, because we then get to

7   the issue of the duty of care and the duty of loyalty and

8   the soundness of the decision.

9           The presumption is that they informed themselves

10  under the business judgment rule.  The fact is they did

11  almost nothing to inform themselves about whether they

12  should be marketing post-reorg equity at the this time in

13  the case.

14          As Mr. Weisfelner noted, they still say it's a

15  good time.  Can I say it's a great time, no, it's a good

16  time to market.  There's a risk that the assets may decline

17  in value, there's a possibility they may appreciate in

18  value.  There was no volatility analysis, no consideration

19  of any alternatives other than pursuing this structure, no

20  valuation done.

21          You just heard a trial with the Filsinger report

22  and saw the Filsinger report which took me two hours to

23  read, that was to support a $20 million payment to insiders.

24  We're talking about marketing $10 billion of assets and

25  there is not a single writing in the record that any officer

Page 45

1    or director looked at which would establish that these

2    assets are at risk, they must be sold now, or that they can

3    be sold in this kind of structure.  There is instead a total

4    reliance in this case on the existence of bidders without

5    any basis to understand why they're here.  If the debtors

6    had a valuation they could said well these bids are

7    exceeding our valuation, but they didn't do that.

8             So everyone is just speculating why the bidders

9    are here, and the reliance on the professionals.  Should we

10   market now?  Yes.  Without any testing at all, without

11   requiring any analysis, quite frankly, without even doing

12   any due diligence into the advisors they were questioning as

13   to whether they even had the business acumen to answer a

14   question about selling post-reorg equity at this time.

15            Then the question is the duty of loyalty.  And we

16   raised the issue on the duty of loyalty, particularly with

17   respect to TCEH.

18            This sale process affects TCEH in three material

19   ways, none of which are being protected.

20            That case protocol order that Your Honor signed

21   requires that the debtors be assisting us in investigating

22   claims TCH has against the E side.  Those claims don't have

23   to be filed until after -- after the chart you just saw the

24   assets going to be sold.

25            How can we be fairly investigating whether or not

1    TCEH, who where Oncor originally came from, has a claim to

2    those assets when the debtors are out selling that to a

3    third party and those claims are going to be senior to the

4    equity interests that the debtors are holding?

5            Two, they just told you that we are -- we want an

6    extension of exclusivity, right, so we can negotiate with

7    our people.  The T -- there's no negotiation going on.  They

8    just said any negotiation of a T side plan is on hold until

9    we find out what Oncor is worth.  So six months of the eight

10   month exclusivity is going to be hostile to the T side

11   creditors who are trying to figure out a way to get involved

12   in the plan process.

13           And three, Mr. Weisfelner's chart is incorrect.

14   The -- there's not $600 million of debt up at EFIH, there's

15   a $773 million unconditional, non-contingent, allowed claim

16   that nobody has objected to from TCH up into that entity.

17   In other words, if they decide to sell now and chop off the

18   value the party that gets hurt is the T side.  They can say,

19   well, we can exercise a fiduciary out, but they're going to

20   have to pay a break fee is what you'll hear, and that break

21   fee comes at the expense of the last creditors, the

22   unsecured at EFH.

23           And three, even assuming we had some decision

24   makers with the authority to do it, and even assuming they

25   had exercised their duty of care and duty of loyalty what

1    are we getting here?  Which raises in my mind three

2    questions, which is where my questioning going to go of the

3    witnesses.

4            Does it address the right risks?  If the point

5    here is to avoid the situation in which the low beta

6    business suddenly becomes a volatile business, this is a T&D

7    utility that we're talking about, if that's the purpose

8    those are risks everybody has in Chapter 11.

9            Is there a possibility that the credit markets

10   might dry up, that the ability to get exit finance is not

11   here?  Well they certainty aren't giving you any evidence of

12   that.  They're in fact saying it's a good market for it

13   right now.  But even if that were the case that doesn't

14   excuse them from doing the normal thing, which is to run

15   their case, negotiate a plan, and then figure whether they

16   need plan sponsors, not presell the plan sponsorship.

17           Two, can the product they're trying to do minimize

18   the risks?  And you'd hear a lot of question about that.

19   Which is are you really going get a buyer to do this?

20   Again, what they want is a commitment -- firm commitment,

21   $10 billion of capital at risk for 18 months with no walk

22   rights except for specific Oncor max, specific performance

23   remedy against them, the debtors get to walk for a break

24   fee, and a small one they're hoping for.  A completely

25   asymmetrical product that nobody says exists right now and

1    which the witnesses have said just requires us to speculate,

2    we hope it's out there.

3           But this is not a costless transaction for them to

4    chase that hope, because the debtors aren't fulfilling, and

5    particularly the TCH debtors, aren't fulfilling their duties

6    right now.  They are spending money doing this, but also,

7    they are not carrying out their exclusivity obligations

8    while this is going on, and they are not fulfilling their

9    obligations under the case protocol, and they're putting the

10   assets at risk.

11          The reason you pay an investment advisor millions

12   of dollars to run a process is not because there's an easy

13   button for this, but rather it is a delicate process which

14   can go wrong.  And what's totally devoid of any support in

15   the record is that the costs which I have just laid out

16   outweigh the benefits or the prospected benefit.

17          What they're doing here instead of doing what

18   debtors normally do, which is run the business, negotiate a

19   plan, and then go out and find exit finance, they're turning

20   that on its head and running all these other unknown risks.

21          What we're saying is, notwithstanding the debtor

22   saying we're just doing the normal thing here, we're just

23   asking the debtors to do the normal thing here because

24   there's nothing extraordinary which requires them to abandon

25   that and come up with this brand new process for managing

1    risk or creating a plan structure or anything else.

2            THE COURT:  Thank you, Mr. Shore.

3            Mr. Miller.

4            MR. MILLER:  Good morning, Your Honor.  Brett

5    Miller of Morrison & Foerster on behalf of the official

6    committee of unsecured creditors.

7            The primary concern of the committee, and

8    Mr. Weisfelner and Mr. Shore really hit home on this, is

9    that we're looking at RSA 2.1 with a twist, no one supports

10   it except the debtors.

11           So what are we doing on this path?  The debtor

12   says it's only procedural.  Well, it's a procedure that

13   requires a confirmed plan of reorganization by the end of

14   2015.

15           So what do we need to get to a confirmed plan by

16   the end of 2015?  Well, Mr. Shore and Mr. Weisfelner pointed

17   out that there are other T side issues and E side issues

18   that are going on.  The biggest one for the creditors'

19   committee -- two points for the creditors' committee is we

20   have a November 28th deadline to seek standing and bring

21   claims against the TCEH first liens, clearly that's going to

22   be a major plan sticking point, which doesn't even get going

23   until the end of November, assume that a complaint gets

24   filed and then the committee moves down the path we're

25   talking some time into 2015 for a hopeful, possible

1    resolution with the TCEH first liens, and then we've got a

2    February 28th deadline to bring interdebtor claims as well

3    as causes of action against third parties, including the

4    sponsors.

5              Well there again we're looking at mid 2015 for any

6    possible -- possible starting point for plan negotiations

7    that will allow the T side debtors and the E side debtors to

8    come together and have something that can satisfy this

9    bidding process, this possible buyer who's essentially

10   buying into a royal rumble.

11             There is $40 billion of holders of debt who are

12   going to be fighting for every penny.  Not just every penny

13   that comes from the Oncor sale, but every penny from the

14   intercompany claims, every penny from the potential causes

15   of action against third parties.

16             I mean we're nowhere near having the ability to

17   say that by December 2015 there will be an ability to have a

18   confirmed plan.

19             It's chaos, it's a black hole, and by starting

20   today when an ice cube is clearly not melting it's a

21   mistake, and the committee cannot support the bidding

22   process, cannot support the first step into RSA 2.1, and

23   thinks that this motion should be denied.

24             Thanks.

25             THE COURT:  Thank you, Mr. Miller.

 1          Mr. Martin.

 2          MR. MARTIN:  Your Honor, Ross Martin of Ropes &

 3    Gray for Delaware Trust Company as indenture trustee for the

 4    EFIH first lien ten percent notes.  I just have a few quick

 5    notes that I'd like to make, Your Honor.

 6          What you're going to hear in the testimony is that

 7    there was no consideration of a balancing of interests among

 8    the debtors in this multi-debtor case, and instead the

 9    conflicts among the debtors in entering into this process

10    were entirely ignored.

11          There were no relevant separate board meetings,

12    even though the debtors previously had had separate board

13    meetings, it's something they knew how to do and didn't do

14    here.

15          There were no special committees, even though

16    there is specific expertise both of advisors and some of the

17    principals involved have experience with those kinds of

18    governance structures before.

19          There was no analysis of these issues from the

20    EFIH perspective and how this process will affect EFIH and

21    the risks to EFHI creditors from it.

22          And just to make that specific, what was not

23    considered is that this process sets up a transaction, their

24    proposed preferred transaction, in order to eliminate a tax

25    coming from a transaction on the EFIH side which may not

1    matter at all, because depending on the resolution on the

2    T side there could be a tax twice as large at the EFH level,

3    and if that -- if that's how it turns out then it may be

4    highly to the advantage of EFIH to have a taxable structure

5    instead if there are already massive tax claims at the

6    parent company.

7              Now, let me briefly address why this is an issue

8    for today in this -- in what the debtors call procedural

9    context.  There's really two reasons for that.

10             First, as the debtors own chart shows you and

11   we'll show you a different version, which was the version

12   they gave to us back in September which they highlighted, in

13   six days their going to eliminate bidders.  This is not the

14   usual process that we see in 363 sales which is they want to

15   liken this to, in six days they're cutting the number of

16   bidders down.

17             Their only cure for this is something else that's

18   unusual.  They want the Court to approve today a 30-day bid

19   window at the end of this.  Normally at the bidding

20   procedures hearing you have a litigation about the length of

21   our bidding window, that's what bid procedures are about,

22   and you have that litigation in the context of actually

23   having a stalking horse in place, seeing what that bid is

24   going to be.

25             It's interesting, they don't want approval today

Page 53

1    of the break fee, they don't want approval of other -- some

2    other elements of the auction, but they want the 30-day

3    window today before any of us, the Court, or even they know

4    who that stalking horse bidder is going to be.  And I would

5    submit that that takes this well outside of what Mr. Hessler

6    called the usual procedures format.

7              What we intend from Delaware Trust's perspective,

8    Your Honor, is to elicit specific testimony on specific

9    issues, this upcoming bid deadline, the decision making

10   process, and this debtor request to set the 30-day window

11   later, and the effects of all those things.

12             We believe that the bidding process can go forward

13   but not at any cost, it has to go forward with specific

14   remedies and fixes, we've suggested them in our pleadings,

15   we've filed the proposed form of order, and otherwise to put

16   this more simply and to close, this process that the debtors

17   are moving forward on and is designed to produce a fete

18   compli at the end of the day, affects Delaware Trust's

19   rights for a simple reason.

20             Yes, there is a litigation ongoing about our make-

21   whole claim, but everyone knows that one of the possible

22   paths of that litigation is that the make-whole claim may

23   turn on the solvency of our docs, and instead they're doing

24   a transaction where the money is going to flow somewhere

25   else and that money can be diverted away.  That's why we're

1    here.

2           The reason we care about the procedures is that

3    the structure they're using can affect the outcome of that

4    litigation.  This is not a generalized objection.  If that

5    -- if that issue can be solved some other way we're happy to

6    try to address that, but we have a very discreet concrete

7    reason to be here and interest in the type of bids that come

8    out of this.

9           Thank you, Your Honor.

10          THE COURT:  You're welcome.

11      (Pause)

12          THE COURT:  Oh, I'm sorry, is that it for

13   openings?  It is?  Okay, I'm sorry, we're going to take a

14   short break and then we'll turn to the witness.

15          MS. O'CONNOR:  Okay, Your Honor.

16          THE COURT:  You snuck up on me there.

17      (Recess at 10:39 a.m.)

18          THE CLERK:  All rise.

19          THE COURT:  Please be seated.  Now what happened?

20          UNIDENTIFIED SPEAKER:  She used to be quiet until

21   she had children.  Eventually though, you just get quieter.

22          UNIDENTIFIED SPEAKER:  (Indiscernible - 10:48:51).

23          MR. HESSLER:  Your Honor, hi.  For the record,

24   Steve Hessler, Kirkland and Ellis on behalf of the  debtors.

25   We moved too quickly, apparently.  There was the -- United

```
 1   States Government wanted to make a statement and we said of

 2   course, go --

 3            THE COURT:  Okay.  I was actually -- I thought

 4   they would so --

 5            MR. HESSLER:  Okay.  Thank you.

 6            THE COURT:  -- yes.  Thank you.

 7            MR. RUSSELL:  Good morning, Your Honor.  Bradley

 8   Russell for the United States.  I was sitting at the back of

 9   the courtroom and I just didn't stand up fast enough.  The

10   United States filed its limited objection to the bid

11   procedures motion only to make it clear that the United

12   States would likely oppose any transaction that creates a

13   large and unpayable tax liability.  The United States does

14   not otherwise oppose the bid procedures motion.

15            THE COURT:  Okay.  Thank you.

16            MR. RUSSELL:  Thank you, Your Honor.

17            THE COURT:  All right.  Now we can go.

18            MR. KERR:  Your Honor, Charles Kerr for the

19   official committee.  I just wanted to indicate what I left

20   on your desk.  We've given you three set -- three binders

21   that make up a list of the exhibits that the parties have

22   discussed and included for today's hearing.  I've given a

23   set to the witness, I've given a set to the debtors so I

24   just want to make sure you knew what was -- what those pile

25   of stuff on your desk was.  Okay?
```

1          THE COURT:  All right.  Thank you.

2          MR. KERR:  Okay.

3          MR. SHORE:  But let me add, Your Honor, we haven't

4    agreed that they're admissible yet.  That's just the set

5    that we're going to talk about later about what's moving in

6    and not.

7          THE COURT:  Very good.  I understand.  Thank you.

8          MS. O'CONNOR:  Morning, Your Honor.

9          THE COURT:  Morning.

10         MS. O'CONNOR:  Believe that we are now actually

11   ready.  Bridget O'Connor with Kirkland and Ellis on behalf

12   of the debtors.  We're calling Mr. Hiltz on direct.

13         THE COURT:  Sir, could you stand, please?

14         THE CLERK:  Please raise your right hand.

15      (Witness sworn)

16         THE CLERK:  Please state and spell your name for

17   the record.

18         MR. WILHOLTZ:  My name is William, middle initial

19   O, last name Hiltz, H-I-L-T-Z.

20         THE CLERK:  Thank you.

21         MS. O'CONNOR:  May I proceed?

22         THE COURT:  Yes.

23   DIRECT EXAMINATION

24   BY MS. O'CONNOR:

25   Q    Good morning, Mr. Hiltz.

1    A    Good morning.

2    Q    Could you please introduce yourself to the Court?

3    A    Yes, again, my name is William O. Hiltz.

4    Q    Where are you employed?

5    A    I'm employed at Evercore.

6    Q    What is your current position there?

7    A    I'm a senior managing director, head of the general

8    advisory group and head of our special committee execution

9    group.

10   Q    In that position, what do your duties entail?

11   A    At Evercore, most of the partners are either industry

12   specialists or product specialists.  There are three of the

13   senior bankers who are generalists.  That includes Roger

14   Altman, our chairman, myself, another gentleman named

15   Eduardo Mestre.  So I work across a wide variety of

16   industries, work on a number of our firms large transactions

17   and some of our larger clients.

18   Q    Let's talk a little bit about your background.  Where

19   did you go to school?

20   A    I have an undergraduate degree from Dartmouth College

21   and an MBA in finance from the Wharton School of University

22   of Pennsylvania.

23   Q    And how about your previous work before Evercore, what

24   did you do before you started there?

25   A    Sure.  I've been in the investment banking business for

Page 58

```
 1   38 years.  I joined Dillon, Read and Company upon graduation
 2   from business school in 1976.  I worked at Dillon, Read
 3   until 1982 primarily in the energy sector.  In 1982, I
 4   became a partner at Smith Barney responsible for their
 5   activities in the Southwest which were primarily oil and gas
 6   related but also included some airlines.  I stayed at Smith
 7   Barney until 1995.  During my period there, I ran at varying
 8   times the energy group, the general industrial group, the
 9   transportation group and the high yield and merchant banking
10   group.
11            In 1995, I returned to Dillon, Read.  I ran the
12   Dillon, Read energy group until Dillon, Read was acquired by
13   Swiss Bank and Swiss Bank currently -- concurrently acquired
14   by UBS.  During that time, I ran the worldwide energy effort
15   for UBS and I joined Evercore in the year 2000.
16   Q    How much experience do you have in the mergers and
17   acquisitions field?
18   A    I have extensive experience in mergers and
19   acquisitions.
20   Q    Can you describe in broad terms that experience?
21   A    Sure.  Again, rather than going back before Evercore,
22   I'll just discuss some of the major things I've worked on
23   since I've been at Evercore.  As I said, I work across a
24   variety of industry segments.  So, for example, the first
25   deal I did when I got to Evercore was General Mills, the
```

1    acquisition of Pillsbury from Diageo.  I have also sold

2    Haagen-Dazs for General Mills and I sold Snack Ventures

3    Europe for General Mills.  I've done a couple of other

4    transactions in the food space, generally.  I sold American

5    Italian Pasta Corporation to Ralcorp.  Two years ago, I

6    advised the board of Kraft on the split-up of Kraft and the

7    spinoff of their North American grocery business which was

8    about a $30 billion transaction.

9           I last year sold a food broker in an auction

10   called Anderson Bing and Worldwide.  I'm currently selling

11   another company in the food space through an auction

12   process.  I've done quite a bit in the technology area over

13   the years.  I conducted an auction process to sell a

14   subsidiary of EBS called UGS/PLM in a several billion dollar

15   transaction.  I represented EDS in its sale to Hewlett

16   Packard.  It was a $14 billion transaction.  I represented

17   ACS and the special committee of the board of ACS in ACS's

18   sale to Xerox, roughly an $8 billion transaction, and, most

19   recently, I advised the special committee of the board of

20   Dell in the sale of Dell to Silver Lake and Michael Dell and

21   I'm looking at a $24 billion transaction.

22           I've done some transactions in the financial

23   services area.  I represented Swiss Re in its $10 billion

24   acquisition of GE's insurance businesses.  I represented

25   Swiss Re as well when Warren Buffett made their $3 billion

1   investment in Swiss Re at the time of the financial crisis.

2   I advised Credit Suisse on the sale of its insurance

3   subsidiary, Winterthur through AXA, the French insurer, for

4   $12 billion Euros and then I've done a lot in the energy

5   sector.  About 10 days ago, I advised Oxy on the spinoff of

6   its California Resources Corporation which is this

7   California operations, about a $15 billion spinoff.  I've

8   done a number of other energy transactions in the last 12

9   months.  About 18 months ago, I sold McMoRan to Freeport-

10  McMoRan.  Was also the advisor to BP in its negotiation for

11  the U.S. Government over the oil spill.

12  Q    And if you would, could you try to move your

13  microphone, the -- kind of slide that towards you a little

14  bit or --

15  A    Sure.

16  Q    -- bring it down?

17  A    Sure.

18  Q    Great.  Mr. Hiltz, do you have experience in

19  restructuring?

20  A    I have -- though I -- I'm certainly not a restructuring

21  expert, I stipulate that, but I have had some experience in

22  restructurings, four or five.  I was involved in the Eastern

23  Airlines restructuring and testified in court in that

24  matter.  I was involved in the Continental Airlines

25  restructuring in 1993.  I led the group that sold

1    Continental to Air Partners, Mr. David Bonderman's entity,

2    and Air Canada.  I was involved in the Northwest bankruptcy,

3    again, primarily in discussions about a merger between

4    Northwest and Delta.  I was involved in the GM bankruptcy

5    which included an attempt by GM to merge with Chrysler prior

6    to declaring bankruptcy and then I also spent time on the

7    attempt to do -- conduct an out-of-court exchange offer to

8    avoid filing bankruptcy and I worked with David Ying on the

9    CIT prepack bankruptcy.

10   Q    And what about experience with working with regulated

11   utilities?

12   A    I have limited experience working with regulated

13   utilities.  I did advise the board of Aquila over a number

14   of years which included one asset sale transaction and then

15   the final transaction for Aquila which was its acquisition

16   by Great Plains and that was also coupled with an asset

17   transaction to a third party on a simultaneous basis.

18   Q    Turning to this matter, when did you become involved

19   with the Energy Futures Holdings engagement?

20   A    The beginning of the third week of August.  I'd say

21   it's about the 18th of August.

22   Q    And why did you become involved?

23   A    I became involved at the request of Roger Altman, our

24   chairman, and David Ying.

25   Q    Did you have an understanding as to why they asked you

1    to get involved in that matter?

2    A    Well, they explained that they had been going through a

3    process of negotiating with NextEra and conducting a

4    relatively short and somewhat limited market test in an

5    attempt to develop a stalking horse bid and that they felt

6    that they were going to need to go into a different kind of

7    process that would be longer.  We -- they needed someone to

8    help design what that process would look like and someone

9    with more regular way emanate A (ph) experience to help them

10   implement that process.

11   Q    Can you describe what your role has been on the team at

12   Evercore?

13   A    Sure.  I mean, upon arriving, I spent a lot of time

14   working not only with the people at Evercore but, obviously,

15   with K&E both on the tax side, the restructuring side, and

16   the M&A side as well as the relevant individuals of the

17   company and, obviously, in consultation with the board, in

18   designing a set of bidding procedures that we thought would

19   maximize value.  Since we completed the design of those

20   procedures, we've, obviously, been handling the logistics

21   associated with the process that we're going through right

22   now.  My expectation is that I will have a large role in

23   evaluating the bids that we receive, negotiating contract

24   terms and eventual selection of the stalking horse process

25   but I will, obviously, be doing that again in conjunction

```
1    with the varying experts at K&E and at the company and my

2    colleagues in other areas at Evercore.

3    Q    In terms of that Evercore team, who else do you work

4    with on this engagement?

5    A    Primarily David Ying and Sesh Raghavan, Bo Yee, Jerry

6    Madigan.

7    Q    And what are their respective areas of expertise that

8    they bring to the project?

9    A    All of those individuals are restructuring experts with

10   the except of -- exceptance (sic) of Sesh and Sesh is our

11   utility expert.

12   Q    In addition to the Evercore team, who else do you work

13   with on the bidding procedures efforts?

14   A    Well, as I said, the relevant professionals at K&E

15   which includes not only bankruptcy professionals but M&A

16   professionals from K&E and tax professionals and then again

17   a series of people at the company.

18   Q    Have you reviewed the bidding procedures motion?

19   A    Yes.

20   Q    And if you'd turn to the skinny binder that we handed

21   you, the first tab there, if you could flip to the first

22   tab?  It's Docket No. 2087.

23   A    Yes.

24   Q    Do you recognize that as the bidding procedures motion?

25   A    Yes, I do.
```

1    Q    Did you review that before it was filed?

2    A    Yes, I did.

3    Q    And have you also submitted a declaration in support of

4    that motion?

5    A    I have.

6    Q    And behind the second tab there at Docket 2088, is that

7    your declaration?

8    A    Yes, it is.

9    Q    What role specifically did you have in developing the

10   bidding procedures described in the motion?

11   A    Well, I think probably the primary contribution that I

12   made was to advance the concept that, unlike a typical

13   bankruptcy stalking horse process where you choose a

14   stalking horse not in a competitive auction environment,

15   necessarily, and without the kind of same degree of

16   structure that you would have in an out-of-court process,

17   that it made sense to -- given some particular reasons that

18   I'll come to in a minute -- is it made sense to, in effect,

19   take a typical out-of-bankruptcy two-stage sealed big

20   auction process as the method for choosing the stalking

21   horse process and append that to the normal open auction

22   that you traditionally see in bankruptcy.  So rather than a

23   short stalking horse selection process followed by a long

24   open auction process, we've really reversed that and gone to

25   a longer stalking horse process with a shorter open auction

1    process.

2            Now, the reasons for coming to that decision are

3    several fold.  First, in the course of the earlier marketing

4    effort where we were telling bidders -- we didn't give them

5    a definitive date but we told them, you know, we would need

6    to get something from you by no later than the end of August

7    and that we might actually sign up a stalking horse bid

8    sooner than that.  Several potential bidders indicated that,

9    while they thought they could get to a bid that would be

10   competitive or superior to NextEra's bid, that they needed

11   more time and they could not meet that time frame.

12            There were also bidders who actually refused to

13   sign NDA's because they said look, your process is just too

14   short, we can't deal with that so we're not going to waste

15   our time.  So input from the bidders that they needed more

16   time was quite important.

17            We also got input from varying creditor

18   constituencies, particularly Lazard.  Lazard expressed the

19   view that we should have a longer stalking horse process and

20   they further expressed the view that utilities, generally

21   being conservative by nature, might be less likely to

22   participate in an open auction process.  They had -- they

23   said that there are very few instances where a utility

24   strategic has jumped a deal that had been signed up by

25   another utility and they felt that, therefore, the stalking

1    horse process was the most important part because they had

2    reservations as to whether people would participate in the

3    open auction process.

4              Now, we reviewed some data on that point and, yes,

5    we felt Lazard was accurate, that there were only a limited

6    number of circumstances where one strategic utility had

7    jumped another strategic utility's deal.  I didn't feel

8    quite as strongly as Lazard that, you know, the open auction

9    -- that no one would participate in the open auction.  I

10   think it's possible there are some aggressive players who

11   will but, nevertheless, I thought their concern had some

12   validity to it and that was another reason why we opted for

13   a longer stalking horse process and a shorter open auction

14   process.

15             With respect to the structure of our up-front

16   process, i.e., two stages and sealed bids, that's quite a

17   common structure.  I think everyone accepts the fact that

18   that two-stage sealed bid process is effective at creating

19   the best possible value and it's not just value in economic

20   terms, it's value in contract terms.  One of the

21   disadvantages, again, that I felt existed in purely

22   selecting a stalking horse without a competitive auction

23   process was that the contract that you negotiate with him

24   then becomes the basis for bidding an open auction and,

25   effectively, you get drawn down to the lowest level because

1    there's been no real competition in terms of negotiating

2    those contract terms.  So for all those reasons, we designed

3    the process that we did.

4    Q    And --

5              THE COURT:  You said -- I'm sorry, you said that a

6    two-stage sealed process is common.  Common where?

7              THE WITNESS:  Outside of bankruptcy, sir.

8    BY MS. O'CONNOR:

9    Q    Mr. Hiltz, what, in your view, is the overall purpose

10   of these bidding procedures?

11   A    The overall purpose of these bidding procedures is to

12   maximize not only the economic value but the contract terms

13   and certainty associated with the bid for the benefit of the

14   estates as a whole.

15   Q    Let's talk about the timing of the procedures.  When

16   did the debtors first decide to market the Oncor assets?

17   A    This was, obviously, before my involvement but I

18   believe the debtors first decided the -- to market the Oncor

19   assets following the receipt of the NextEra bid on

20   July 16th.  That bid was important in at least two respects.

21   Obviously, it offered a more attractive value than had been

22   offered in the context of the second lien dip and, secondly,

23   it also showed us a structure that we had not been aware of

24   that would allow us to sell the entirety of a reorganized

25   EFH in a tax free format that would avoid a very substantial

1    tax liability.  So that was really -- the receipt of that

2    bid and understanding that bid represented something of a

3    watershed event and, again, caused the company to elect to

4    move forward both to negotiate with NextEra and to solicit

5    other interest.

6    Q    And --

7              MR. SHORE:  Motion to strike, Your Honor, lack of

8    personal knowledge.  The answer started out that was before

9    my time and then we had a long narrative answer about things

10   that happened before his time.  We have other witnesses who

11   are percipient and can answer that question later.

12             THE COURT:  Ms. O'Connor?

13             MS. O'CONNOR:  As the lead M&A point person with

14   the Evercore team, Mr. Hiltz, through his work, is well

15   aware of the time line through the docket and otherwise of

16   the facts that preceded his work and the work that he work

17   -- based his own work on.

18             THE COURT:  I don't think he can testify as to

19   debtor intent before he had any knowledge of what was going

20   on.  I think it's hearsay so motion to strike's granted.

21   You can put -- you can get through that through witnesses

22   who were actually there at the time.

23             MS. O'CONNOR:  Okay.

24             THE COURT:  It's one thing -- let me expand.  It's

25   one thing for him to talk about, generally speaking, what

1    his team is doing and him having knowledge of his team as

2    they're operating.  I don't expect him to be on every call

3    but it's another thing for him to be testifying about what

4    the debtor thought at a time when he wasn't involved in the

5    process.

6              MS. O'CONNOR:  Great.  Well, we can move on and

7    others can speak to that largely going to the time line so

8    we'll focus on that.

9    BY MS. O'CONNOR:

10   Q    Mr. Hiltz, what was the date of the NextEra bid?

11   A    July 16th.

12   Q    And after that bid had been publicly filed, what did

13   your team undertake at that point?

14   A    They began contacting other parties and sending out

15   teaser material and attempting to get people to sign NDA's

16   and get them into the electronic data room.

17   Q    During that period, was Evercore, on behalf of the

18   company, only negotiating with NextEra?

19   A    No, as I said, we were out soliciting other interest.

20   I believe that, in total, 31 parties were contacted.

21   Twenty-two of them expressed interest in receiving a teaser

22   and six parties ultimately signed nondisclosure agreements

23   and were given access to the data room.

24   Q    And, in the course of that process, did your team

25   receive feedback from potential bidders or even creditors

1    during that window?

2    A    Oh yes, I think, as I stated before, we got a variety

3    of feedback from creditor -- excuse me, from bidders, most

4    of which related to the time frame that was under

5    discussion.  You know, what we told them at that point was,

6    again, we're -- they knew we were negotiating with NextEra.

7    They'd all seen the NextEra bid.  We told them that they

8    should be back to us no later than the end of August if they

9    had a proposal but that we couldn't give them any assurance

10   that we wouldn't sign something up prior to that and, on the

11   basis of being told that, again, several bidders signed

12   NDA's but told -- and told us that they thought they could

13   get to superior proposals but said that the time frame

14   wasn't sufficient for them and asked for more time and a

15   couple of other bidders said no, we're not even going to

16   bother to sign an NDA because the time frame is just too

17   short.

18   Q    I believe you meant -- referred to the teaser.  If you

19   could turn to the third tab in your binder, that's

20   Exhibit 14, do you recognize that document?

21   A    Yes, I do.

22   Q    And what is the document attached there?

23   A    That document is the teaser that was sent out to the

24   initial group that was contacted at the end of July.

25   Q    And why did you provide these initial teaser materials?

1   A    Well, in a process like this, you almost always provide

2   teaser material.  It's really designed to just elicit

3   interest in participating in the transaction.  It provides,

4   you know, some limited information but, again, it's designed

5   to just give a prospective bidder a quick view so that he

6   can make a judgment about whether it's something he'd like

7   to pursue.

8   Q    What did that teaser say about the contemplated

9   transaction at that point?

10  A    In what specific regard?  Are you referring to the

11  structure?

12  Q    The structure of the transaction.

13  A    Yeah, it said that we were contemplating a tax free

14  acquisition of the reorganized equity of EFH.

15  Q    And why did it specify that at that point?

16  A    Well, it -- as I said earlier, one -- once we looked at

17  the NextEra structure, we realized that this was an

18  attractive structure that achieved the objectives that we

19  were looking to achieve; namely, to be able to divest of our

20  economic interest in Oncor without suffering a roughly $3.4

21  billion tax liability.  This structure provided for that.

22  We thought it was an efficient structure and, therefore, we

23  suggested that bidders consider this structure because we

24  believed it were.

25  Q    And we'll come back to the tax free structure in a bit

1    but of the 31 potential bidders, how many actually received

2    the teaser?

3    A    As I said, it was 22.

4    Q    Turning to the initial change to the two-stage

5    marketing process that you described --

6              THE COURT:  I'm sorry, 22 people received a

7    teaser?

8              THE WITNESS:  Correct.

9              THE COURT:  Thank you.

10   BY MS. O'CONNOR:

11   Q    When did the debtors and your Evercore team, working

12   with the debtors, decide to move to a two-stage marketing

13   process?

14   A    Well, again, that was under discussion at the time I

15   was asked to join the team.  I think we had board calls

16   regarding that I want to say on the 22nd of August and there

17   was a second call, I think, a day or two later.  So it was

18   right around the 24th or the 25th of August that a decision

19   to proceed with a two-stage process was made.

20   Q    And what was that decision based on from your

21   perspective?

22   A    Well, you know, we discussed -- I think the benefits,

23   we discussed the two-stage process.  I certainly discussed

24   with the board the rationale behind the process that we'd

25   laid out.  One of the concerns was that we might lose the

1   NextEra bid.  I think it -- the NextEra bid was widely

2   viewed by the advisors, by the company and by the board as

3   being an attractive bid and so there were some questions as

4   to whether going forward with this two-stage process would

5   cause NextEra to withdraw its offer.  NextEra had been

6   trying to drive us to signing agree -- an agreement by the

7   end of August and had put drop dead dates like that in their

8   proposal.  Evercore's advice to the company and the board at

9   that point was that, yes, NextEra might withdraw their

10  offer.  In fact, probably would withdraw their offer but

11  that didn't mean that NextEra wouldn't come back and

12  participate in the process.

13  Q    At that point after this change to the two-stage

14  process, what additional efforts were made to reach out to

15  potential bidders?

16  A    Well, when we elected to extend the process, we

17  immediately began calling all of the participants in the

18  process including those who had signed teasers but had not

19  gone ahead and signed nondisclosure agreements to let them

20  know that we were changing our process and that they would

21  have more time.  We told them that we anticipated that it

22  would probably be a two-stage auction process.  We told them

23  at that point that we contemplated first-round bids would be

24  due sometime in late October.  We did not give them any

25  specific dates but made it clear that we were moving to a

Page 74

1   longer process and at that time, we also expanded out the

2   list of people who we contact.

3   Q    And what about the initial 31 potential bidders that

4   you had previously contacted, any additional messaging?

5   A    Well, again, we went back to the 22 who had signed

6   teasers -- who had received teasers and didn't just outright

7   say on the phone no, I'm not interested.

8   Q    Other than the change to the two-stage process, were

9   there any other changes that were made during that next

10  stage of development?

11  A    Well, I mean, shortly after we began calling these

12  bearing -- or bidders and advising them that there was going

13  to be a longer process, we undertook a process for

14  soliciting feedback from the creditors.  That process began

15  I want to say the Tuesday after Labor Day.  We had a series

16  of six or seven calls with varying creditor constituencies,

17  explained to those constituencies what we were planning on

18  doing, gave them a time line so that they would understand

19  what our dates looked like, talked about the bidding

20  procedures and solicited their input.  And I would say that,

21  in summary, we got two major objections from those

22  discussions with creditors and those two major objections

23  were, number one, you need to be more open to a taxable

24  transaction or other form of transaction than what you have

25  proposed and, number two, we generally object to the sealed

1   bid nature of the process and feel that there should be more

2   disclosure and participation by the creditors in that

3   process.

4   Q    Based on the feedback on the tax free structure or the

5   availability of a taxable structure, did -- was there a

6   decision made to change the process in response to that?

7   A    Yes, there was.

8   Q    And when was that decision made?

9   A    That decision was, again, talked about in the period

10  beginning just after Labor Day up until the filing of the

11  bidding procedures motion.  I would say that the final

12  decision was made in the few days before filing the bidding

13  procedures motion, maybe a week before.

14  Q    And how and when was that change communicated to

15  potential bidders?

16  A    When we filed the bidding procedures motion, we sent

17  out bidding procedures to everyone who had received a teaser

18  and that included both the term sheet which indicated a

19  willingness to consider a taxable transaction and,

20  subsequently, to sending that material out on the 19th, we

21  began the process of calling by prioritizing first everyone

22  who had signed NDA's but then also calling people who had

23  received teasers but had not yet signed NDA's to emphasize

24  the fact that we were now prepared to consider a taxable

25  transaction.

1    Q    And have you or your team received any feedback from

2    bidders in response to that change, potential bidders?

3    A    The only feedback we've received has been a question as

4    to why we would consider a taxable transaction.  I think

5    when people understand our tax position, putting aside the

6    complexities of the bankruptcy, they understand that we

7    would incur a very large tax liability in a taxable sale.

8    They also understand that for a bidder to -- if a bidder

9    makes a taxable offer, he does get a step up in basis but

10   that step up in basis is never enough to compensate us for

11   our tax liability.  So no one could understand why anyone

12   would bid in a taxable format because it's very difficult

13   for them to make a taxable bid that provides as much

14   economic value to us unless they are prepared to make an

15   uneconomic bid.

16   Q    Turning back to the bidding procedures motion itself,

17   do you have an understanding as to why that motion was filed

18   with the Court?

19   A    Yes, I think we felt that court approval of a bidding

20   procedures motion would give bidders some confidence in the

21   process, that it would encourage bidders to participate,

22   they would know the dates that were required, they would

23   understand that there were rules to the road and that the

24   Court had approved those and we think that's conducive to

25   healthy participation in the process and making it more

1    competitive.

2    Q    But those -- the procedures of the rules of the road

3    for the process, could you just give a brief overview of how

4    the process undertakes to identify a stalking horse bidder?

5    A    Sure.  We have an initial bid period that, obviously,

6    ran from in some cases for some of these bidders, you know,

7    sometime in July up to a first-round bid date in late

8    October.  On that first-round bid date, they are expected to

9    submit their first-round bids.  These are indications.

10   They're not binding, definitive bids but they are

11   indications that lay out the amount of consideration, the

12   structure of their transaction, the form of consideration,

13   et cetera.  At that time, we will narrow down the list of

14   bids.  I might just add that I have never said that we would

15   only receive four or five -- two to four bids.  I said that

16   in a second round, we would narrow the number of bids down

17   to two or four bidders and we would then in the second round

18   proceed to allow them to do further due diligence.  They

19   would have access to management and, importantly, we would

20   begin the process of negotiating the terms of their

21   agreements.  So you'll see when you look at the time line

22   that we select the bidders to move to the second round.

23   We'd provide them with a markup of our definitive agreement

24   and we ask for them to give us feedback -- give us a marked

25   copy back on the 7th of November.  The reason for that is so

1    that we can try to give them guidance on terms in their

2    definitive documentation that are troublesome to us, areas

3    where we think they can improve their contract terms before

4    they submit their final bids.

5              Final bids are due, again, at the end of the third

6    week of October and at that time, they submit final bids

7    with the tentative documentation.

8              THE COURT:  You said third week of October.  You

9    meant November?

10             THE WITNESS:  I meant November.  I'm sorry, I

11   misspoke.

12   BY MS. O'CONNOR:

13   Q    If in round 2, the debtors and your team receive a bid

14   that's higher than any of the bids you had received in

15   round 1, what would you anticipate doing with such a bid?

16   A    And that bidder was not a bidder in round 1, I take it

17   you're saying?

18   Q    Yes.

19   A    Well, again, look, we would like to have a process

20   where people followed the rules of the road but you can't

21   insure that and, obviously, to the extent that we got a bona

22   fide offer, even if it came in outside of our process, that

23   appeared to offer better value, you know, we've got a

24   fiduciary obligation to our client to maximize value and so

25   we would consider that offer along with the other offers

1    that were in Phase 2.

2    Q    Will the debtor's selection of a --

3    A    And I just should add that that's a good example of one

4    of the reasons why we need the flexibility to alter bidding

5    procedures is just that kind of unanticipated circumstance

6    might cause us to need to change bidding procedures.  You

7    know, again, as I sit here today, I don't see any reason why

8    we need to change procedures but if an occurrence like that

9    comes across, we need to have the flexibility to change the

10   procedures, to do what's best in our client's interest.

11   Q    Will the debtor's selection of a stalking horse be

12   submitted to the Court for approval?

13   A    Yes, it will.

14   Q    And if the Court approves that stalking horse bidder,

15   what's the next step after that?

16   A    We'd go to an open auction.

17   Q    And how will the winner of the auction be determined?

18   A    The open auction?

19   Q    Yes.

20   A    Yeah.  It'll be determined based on, you know, the

21   criteria that I believe are laid out in the bidding

22   procedures motion.  Again, it's a question not only of value

23   but of varying terms in the merger contract relating to both

24   conditionality and relating to downside protection and our

25   ability to exercise a fiduciary out.  It would include

1    issues like their regulatory out, the definition of a Mack

2    clause.  There are a variety of contractual issues that we

3    need to think about, not just pure value.  A classic example

4    would be if, you know, the best value had a drop dead date

5    that was 30 days down the road or three months down the

6    road, we all know it's not feasible to get a plan confirmed

7    in that kind of a period of time so we would reject that

8    bid.  So we've got to look at a combination of economic

9    terms as well as contractual terms in reaching a

10   determination as to what's the best overall fit.

11   Q    Turning to the -- one of the elements of the procedures

12   that the bids -- the bidders' identities would be sealed,

13   could you explain the basis for that element of the

14   procedures?

15   A    Sure.  There are two things we are trying to protect

16   again or two elements to that question.  The first is the

17   identity of the bidders.  The second is the actual level of

18   bids.  Let's talk first about the identity of the bidders.

19   To begin with, we have signed nondisclosure agreements with

20   a variety of bidders that prevent us from disclosing their

21   identity.  That's not uncommon.  In fact, it's quite common

22   that you sign those kinds of agreements and the reason for

23   that is that these are public companies and they don't want

24   their participation in an auction process for a big asset

25   like this to become public.  If it does become public, it

1    may cause them disclosure obligations and, frankly, may have

2    an impact on the trading prices of their securities.  So if

3    you're a 15, $20 billion utility and you are bidding on

4    another 10 to $18 billion utility and you're -- that

5    information gets out in the marketplace, it can definitely

6    have an impact on your share price and if your -- if part of

7    your bid is in your stock, then you're disadvantaging your

8    own bid.  So there are many, many good reasons why companies

9    don't want their identity known and, again, we've signed

10   agreements with these companies saying we will not disclose

11   their name.

12           Now, with respect to the second element which is

13   the disclosure of the level of bids, that's even more

14   straightforward.  At the end of the first round, if we

15   disclose the level of bids and that information leaks into

16   the market, you are running a very significant risk that

17   someone who was prepared to be quite aggressive in the

18   second round realizes by virtue of the level of the first

19   round bids that eh, I don't have to put my best foot

20   forward, I can get away with bidding something less.  So

21   that's information that's potentially damaging to the

22   process.  It would chill the bids in the second round if it

23   was released and I believe it's in the best interest of

24   maximizing value for the debtor to keep those -- the level

25   of those bids confidential.

1    Q    Why haven't the debtors agreed to -- been able to agree

2    to provide the bid information to creditors on a

3    confidential or a protected basis?

4    A    Well, I just think the practical reality is that leaks

5    are a risk in any merger and acquisition transaction and,

6    given the number of parties that we have here, that risk

7    would increase exponentially given the number of people who

8    would have access to that information.

9    Q    Another area that has received some attention in the

10   objections is the ability of potential bidders to

11   communicate with creditors.  Can they do that under the

12   terms of the NDA's and the procedures here?

13   A    Well, up until this morning, the answer to that was

14   yes, they could do that but only with our consent.  However,

15   I think, as Mr. Hessler suggested earlier, we're prepared to

16   drop that consent requirement for discussions with

17   creditors.  We are not prepared, however, to drop the other

18   piece of that which is we're requiring that bidders not

19   enter into any exclusive arrangements with creditors.

20   Q    Can you explain why that piece is important to keep in

21   place?

22   A    Sure.  Again, we are trying to prevent someone from

23   locking up a transaction by arranging an exclusive

24   arrangement with what may be the key security in voting for

25   the plan when he's not the best offer.  So we want a level

1    playing field for all bidders.  If a creditor is willing to

2    do something for one bidder, we want him to be willing to do

3    that for all bidders and that just allows us to maximize the

4    outcome for the estate.

5    Q    You alluded to it earlier briefly but do the bidding

6    procedures reserve the debtor's rights to change elements of

7    the process going forward?

8    A    Yes, they do.

9    Q    And why is that?

10   A    Again, as I sit here today, I don't anticipate making

11   any meaningful change to the bidding procedures but it's

12   impossible to anticipate the circumstances where we might

13   want to make sure a change.  For example, if one of the

14   bidders who has already made a bid and who we know is a

15   serious player says to me oh, my gosh, I need two more days,

16   you know, I want to the flexibility to knock that bid date

17   back by two days as opposed to immediately kicking him out

18   of the process.  It's nothing more than that.

19   Q    Mr. Hiltz, do you have an opinion as to whether the

20   procedures will maximize the value of the economic interest

21   in Oncor?

22   A    I believe that they will.

23   Q    And can you explain that -- the basis for that opinion?

24   A    Well, again, you know, it's widely demonstrated outside

25   of bankruptcy that a two-stage auction process is an

1    effective method for achieving the best possible value.

2    It's also a very effective method for not only getting the

3    best value but getting the best contract terms and, again, I

4    don't think you can view either one of those in isolation.

5    So, as we think about a best bid, it's going to be a

6    combination of both economics and contract terms but I think

7    the two-staged process for choosing the stalking horse,

8    again, avoids the risk that utilities may not want to

9    participate in the open market process, the open auction,

10   and yet we still have the open auction.  So in a sense,

11   we've got, if you will, the best of both worlds.  We've got

12   a very competitive process up front that's typical for

13   outside bankruptcy combined with the safeguard, if you will,

14   provided by the open auction on the back end.

15   Q    Why do you believe it's appropriate to undertake this

16   process now?

17   A    I believe there are four or five reasons why it's

18   appropriate to undertake this process now.  First of all,

19   our general market conditions.  General market conditions

20   are very good.  Again, I can't say that they will not be

21   better but they are certainly, by any objective standard,

22   very good right now.

23        If you look at the level of interest rates which,

24   obviously, have continued to come down over the past couple

25   of days, they are very attractive both on an absolute and on

1    a relative basis.  Conditions in the credit markets with

2    respect to the liquidity, availability of credit as well as

3    the cost of credit are extremely attractive right now.  Both

4    the Dow Jones average generally but also the utility stocks

5    and particularly the transmission and distribution stocks

6    have performed well.  They're within a couple of percent of

7    their 52-week high despite the market corrections in the

8    last couple of days.  So the stocks have performed well and

9    are at high levels.  They're at high levels on a valuation

10   basis.  So if we look at price earnings ratios or total

11   enterprise value to EBITA, again, the valuation of stocks

12   looks healthy.

13           Finally, we have two other factors.  We have a bid

14   and that bid, I think, is widely viewed by Evercore and by

15   the company and by the board as being an attractive bid.  In

16   addition, we have --

17           THE COURT:  You mean the --

18           THE WITNESS:  -- a large number of parties --

19           THE COURT:  All right.  You mean the NextEra bid?

20           THE WITNESS:  Yes, I do, sir.  In addition, we

21   have a large number of parties engaged in the process.  I

22   stated earlier that in the earlier process, we had six

23   people who had signed nondisclosure agreements.  We now have

24   12 people who have signed nondisclosure agreements and are

25   in the process.  So we have the makings for a robust

1    auction.

2              Finally, I certainly agree with the comment that

3    was made earlier, I'm not contending that Oncor is a melting

4    ice cube but neither is there any reason either on the up

5    side or on the downside to expect unusual performance out of

6    Oncor.  Oncor is not experiencing any operational

7    difficulties which might be a reason not to sell.  Neither

8    am I expecting some huge upsurge in their results that would

9    be a reason not to sell.

10             So the factors, the general market conditions, the

11   factors with respect to the current valuation of utility

12   stocks generally, the fact that we have an attractive big

13   that compares favorably to both comparable companies and

14   precedent transactions and the fact that there is nothing

15   specific with respect to Oncor to suggest that this is a bad

16   time to sell leads me to conclude that it's an appropriate

17   time.

18   BY MS. O'CONNOR:

19   Q    And, by the same token, what would be the harm in

20   waiting to conduct this auction at a later date?

21   A    I can't say that there would be harm.  I'm not going to

22   predict that the value of Oncor would go down but, in my

23   experience, when companies have decided to sell an asset,

24   they view time as risk.  So if you're in a circumstance

25   where you've decided to sell an asset where the value that

1    you can receive today represents a good value, I've never in

2    38 years of experience had a client tell me please go slow,

3    let's wait.  The only circumstance under which I am told to

4    go slower is if I need to to enhance a competitive process,

5    potentially like we're doing here, but in terms of gee,

6    let's wait for six months and see what happens, I've never

7    come across that.

8    Q    What if you lock in a transaction pursuant to this

9    process and market conditions do improve?

10   A    Well, again, I would hope and expect that we would have

11   a fiduciary out in our contract.  That fiduciary out would

12   allow us to terminate our agreement with the stalking horse

13   bidder to take advantage of a superior proposal or to pursue

14   a stand-alone reorganization.  The termination fees

15   associated with such a right are generally about two to

16   three percent of the equity value of the company outside of

17   bankruptcy.

18   Q    And what about the reverse, if the value of Oncor

19   assets declines and the buyer wanted to walk away from the

20   deal?

21   A    Yes, we would hope for an asymmetrical benefit to

22   ourselves and that benefit could come either in the form of

23   specific performance where our protection would be,

24   theoretically, unlimited on the down side or it could come

25   in the form of a liquidated damages provision but it's quite

1    -- and, obviously, then our downside would be limited to the

2    amount of the liquidated damages provision but it is quite

3    common in my experience that sellers are able to achieve

4    asymmetrical results in the negotiation of the termination

5    fee versus specific performance or liquidated damages fee.

6    I'll just give you one or two examples.

7            So, for example, in the Dell transaction where,

8    again, I represented the seller, the termination fee in the

9    Dell transaction if I entered into a deal with someone who

10   qualified during the go-shop period of which there were two

11   was $184 million -- excuse me, $180 million.  The liquidated

12   damages provision, if Silver Lake and Michael Dell walked,

13   was $750 million.  The American Italian Pasta sale to

14   Ralcorp, also a transaction I worked on personally, three

15   percent of the equity fee for us to terminate, Ralcorp

16   specific performance.  If you looked at the AT&T direct TV

17   deal which I didn't work on but Evercore did, liquidated

18   damage provision equal to ten percent of the deal value and

19   that actually got triggered.  AT&T paid a $4.1 billion

20   liquidated damages provision when they couldn't get

21   regulatory approval.  So there are lots of examples out

22   there in real life that show that these asymmetrical

23   arrangements are not atypical.

24   Q    The process here has been referred to as establishing a

25   floor on the value of Oncor.  Can you explain why these

1      procedures do that, in your view?

2      A      Well, again, to greater and lesser degrees.  In

3      specific performance, if the market went way down and the

4      buyer refused to close for that reason -- obviously, there

5      are other reasons he can close -- I mean, there are other

6      ways out of the contract.  He could -- we could have a Mack

7      which would allow him to exit the deal.  We could have

8      failure of a regulatory condition but, assuming it's not a

9      Mack or a regulatory condition or some other element of the

10     contract and it's merely the fact that the buyer perceives

11     the value of Oncor goes down and wants to get out of the

12     deal, under specific performance, we can sue him for the

13     amount of our damages which would, theoretically, be the

14     decline in the value of Oncor.  So specific performance

15     gives you, quote, full downside protection.  Liquidated

16     damages provision does not give you full protection, it

17     gives you protection only to the extent of the liquidated

18     damages provision.  So if we had a $500 million liquidated

19     damages provision, if the buyer is acting rationally, if the

20     value of Oncor goes down by 400, he won't terminate, he'll

21     go ahead and buy Oncor even though it's worth $400 million

22     less because the alternative is paying 500 million.

23              On the other hand, if the value of Oncor goes down

24     by $700 million, he will elect to terminate the transaction

25     and pay us the 500 million.  So we will have received

Page 90

1    partial downside protection to the extent of the liquidated

2    damages provision but not full in that instance.

3    Q    Thank you, Mr. Hiltz.  That's all I have at this time.

4              THE COURT:  Thank you.  Just before we go, what's

5    going to be the order, just so I know?  Mr. Weisfelner

6    obviously starting and Mr. Shore --

7              MR. SHORE:  Second.

8              THE COURT:  Mr. Kerr and that's it?  Mr. Martin?

9    Some?  Anyone else is going to want to cross-examine the

10   witness?  Okay.  Again, let's just take a very short recess

11   and we'll get right into Mr. Weisfelner.

12              Sorry, this will be the case in any recess but

13   I'll just say it once, hopefully.  You may not discuss the

14   substance of your testimony while you're still under cross

15   with any person, not just a lawyer, any person.

16              THE WITNESS:  Understood.

17              THE COURT:  Okay.  Very good.  Just short.

18              UNIDENTIFIED SPEAKER:  Short?

19              THE COURT:  Yeah.

20              (Recess at 11:40 a.m.)

21              THE CLERK:  All rise.

22              THE COURT:  Please be seated.

23   CROSS-EXAMINATION

24   BY MR. WEISFELNER:

25   Q    Mr. Hiltz, I think you testified that you first got

1    involved in these cases during the third week of August.

2    Did I hear that correctly?

3    A    The beginning of the third week.  Yes.

4    Q    Okay.  So you've been in this case for a little less

5    than two months as of today?

6    A    That's correct.

7    Q    And you were brought in to manage the Encore sale

8    process for the Evercore team, correct?

9    A    That's correct.

10   Q    By the time you came on board, however, the decision to

11   dispose of the Evercore estate had already been made, isn't

12   that correct?

13   A    Of the Encore estate?

14   Q    Yes.

15   A    Okay.  I'm sorry.  You said -- you said Evercore.

16           THE COURT:  You did.

17           MR. WEISFELNER:  I did?  I apologize.  I meant the

18   Encore estate.  And I'm reading it here, too, and I still

19   pronounced it wrong.

20      (Laughter)

21           THE WITNESS:  Yeah.

22           MR. WEISFELNER:  The Encore estate.

23           THE COURT:  You want my glasses?  You want to help

24   participate in the geneses of the Encore --

25           MR. WEISFELNER:  Evercore.

1          THE COURT:  Evercore --

2          MR. WEISFELNER:  Evercore estate.

3      (Laughter)

4          THE COURT:  I don't think so.

5   BY MR. WEISFELNER:

6   Q    Now as I understand it you gave a confirmatory view to

7   the board of directors or one of the debtors' boards

8   regarding the timing of the sale, isn't that correct?

9   A    I gave a statement. I can't recall if it was to the

10  board or to Paul Keglevic, but one of the two, yes, a

11  confirmatory sale -- comment that I thought that it was a

12  good time to sell.

13  Q    Okay.  And I think you told us at your deposition that

14  you thought the question, "Is this a good time to sell," was

15  directed at you personally by someone, it could have been

16  Paul Keglevic, but you're not sure, correct?

17  A    That's correct.

18  Q    And you think that the question and answer, "Is this a

19  good time to sell," "Yes, I think this is a good time to

20  sell," that took place during one of two board meetings that

21  you've personally participated in, correct?

22  A    I think so, but it might have been outside the board

23  meeting.  I just can't recall for sure.

24  Q    Okay.  But it is the case that since you've been on

25  board, a little under two months, you've attended a grand

1    total of two board meetings, correct?

2    A    Two or three, I'm not sure which.  It might be three.

3    Q    Okay.

4    A    Telephonic.

5    Q    Well, you recall during your deposition you told us you

6    had been at a grand total of two depo -- two board meetings?

7    A    That could be.

8    Q    Well, okay.

9    A    I'm --

10   Q    One way or the other, was it two or was it three?

11   A    I believe it may have been three, but I can't recall

12   for sure.

13   Q    Okay.  When was the last board meeting that you

14   remember participating in?

15   A    Well, I participated in a board call yesterday, but

16   prior to that I think it was, if my memory serves me

17   correctly, the fifth of September.

18   Q    Okay.  So I think we've now clarified the disconnect.

19            By the time your second deposition was over, you

20   had attended a grand total of two board meetings, correct?

21   A    I think that's correct.

22   Q    And the only other board meeting that you participated

23   in occurred after your deposition was over, correct?

24   A    Yes.  That's correct.

25   Q    When was that last board meeting, which took place

1    after your deposition concluded first scheduled, if you

2    know?

3    A    It was scheduled, I think, within the last 36 hours.

4    Q    Now, again, going back to the question, "Is this a good

5    time to sell," and your answer, "Yes, I think it's a good

6    time to sell," which as far as you can recall probably took

7    place at one of the two telephonic board meetings, although

8    you indicated it might have taken place outside of a board

9    call?

10   A    Yes.

11   Q    And by the way, just so that we're clear, the board

12   meetings that we're talking about were both telephonic,

13   correct?

14   A    Yes.

15   Q    You didn't participate in any face to face meetings

16   with any of the board members?

17   A    No.

18   Q    That was true then and it's true till today, isn't that

19   correct?  You have never met any of the boards face to face?

20   A    I believe that's correct.

21   Q    And by the time you were asked to give your opinion,

22   "Is this a good time to sell," and you responded, "Yes, I

23   think this is a good time to sell," at that point you had

24   been on the case for, what, a few days?

25   A    Yes, four or five days.

1    Q    I want to make sure as we go forward that you and I are

2    on the same page with regard to certain definitional terms

3    because I know during your deposition when we asked you

4    about an optimum tax structure you rejected that notion.  Do

5    you recall that?

6    A    Yes, I did.

7    Q    And instead you wanted to talk about an efficient tax

8    structure, correct?

9    A    That's correct.

10   Q    And you recognized, however, that the debtors, in fact,

11   used the term optimal tax structure in their various

12   pleadings?

13   A    I recognize that.

14   Q    Okay.  So would you agree with me that for the purposes

15   of questions whether I call it an efficient tax structure or

16   the optimal tax structure, we know what we're talking about,

17   don't we?

18   A    Yes, we do.  The only point that I would make is that

19   there could be a tax structure that we are not aware of

20   that's better.  As I said earlier, we don't have a monopoly

21   on intelligence, so that's my reluctance to term it an

22   optimal structure.  I do think it's an efficient structure.

23   Q    By the way, the efficient tax structure that you think

24   someone may come up with a better idea for was developed by

25   these debtors, I think the opening argument was over years,

1    isn't that accurate?

2    A    I don't know the answer to that.

3    Q    Well, do you know how long it took for the K&E tax

4    lawyers that you testified on your direct you've been

5    consulting with, how long have they been in the process of

6    constructing this efficient tax structure?

7    A    I don't know the answer to that.

8    Q    Okay.  Well, you do know, don't you, that the same

9    efficient tax structure underscored the debtors' RSA

10   correct?

11   A    A similar tax structure.  Yes.

12   Q    And a similar efficient tax structure underscored the

13   second lien DIP facility, correct?

14   A    That's my understanding.

15   Q    So is it therefore fair for us to assume that at least

16   as of the filing of the Chapter 11 case back in April, that

17   the debtor had worked up to that point to identify an

18   efficient tax structure and maintained the view that that

19   was an efficient tax structure throughout that period of

20   time?

21   A    I can't answer that.  I don't have any specific

22   knowledge of how long they were working on the tax

23   structure.

24   Q    Do you know whether or not the efficient tax structure

25   was ever vetted by the professionals that represented the

1    non-debtors parties to the RSA?

2    A    I have no knowledge of that.

3    Q    Would you presume that the signatories to the RSA had

4    to have bought on to the "efficient tax structure"?

5    A    I would presume that, but I have no direct knowledge of

6    it.

7    Q    Why would you presume it if you have no direct

8    knowledge?

9              MS. O'CONNOR:  Your Honor, for the same basis that

10   --

11             THE COURT:  You're going to need a microphone, Ms.

12   O'Connor.

13             MS. O'CONNOR:  Your Honor, for the same basis that

14   the objection came in on direct, but this is going to work

15   or events that happened before Mr. Hiltz' time and he

16   wouldn't be the appropriate witness.  He doesn't have the

17   firsthand knowledge on this information.

18             MR. WEISFELNER:  Oh -- oh, contraire.  He's being

19   offered as the debtors' expert to tell us that now is a good

20   time, if not the best time, to sell and that the program

21   that he's developing and most importantly is the point

22   person to run is going to maximize value.  That's what he's

23   being offered for.  I'm entitled to test the basis of that,

24   in effect, expert opinion that the process he's developed

25   will maximize value.  Our contention is of course it won't,

1    and I'm entitled to ask him these questions.

2          But I'll move on in terms of, you know, what

3    transpired to develop this structure before he got here.  He

4    speculated from the bench that we don't have a monopoly on

5    smart ideas and that we could very well see another

6    transaction that fits within our efficient tax structure,

7    but we haven't thought of it yet.  And I'm trying to test

8    that --

9          THE COURT:  Okay.  I understand.

10          MR. WEISFELNER:  -- angle.

11          THE COURT:  Okay.  Response.

12          MS. O'CONNOR:  Well, if -- he said he'd move on.

13    That's one thing.  But the questions that I'm -- that just

14    preceded this that I'm objecting to are asking him about

15    specific analyses and whether they were done in April.  They

16    don't go to his expert opinions.  And that -- that's the

17    basis of the objection.  They're asking him for things that

18    he just wasn't involved in and that's the basis -- that's

19    the objection.

20          MR. WEISFELNER:  All right.  I will move on, Your

21    Honor.

22          THE COURT:  Okay.  Move on.

23          MR. WEISFELNER:  I just want to make sure that

24    we're all clear.  I think I'm -- if I could just approach --

25          THE COURT:  Go --

1          MR. WEISFELNER:  -- the board.

2    BY MR. WEISFELNER:

3    Q    When we talked about the efficient tax structure -- and

4    that was the tax structure that was described in the

5    debtors, I think, 50 page tax memorandum that was recently

6    filed?

7    A    Correct.

8    Q    And you've reviewed that tax memorandum?

9    A    Yes, I have.

10   Q    And are -- do you know one way or the other whether or

11   not any of the debtors' boards approved of the filing of the

12   tax memorandum?  Do you know one way or the other?

13   A    I don't know.

14   Q    Do you know whether any of the boards of the debtors

15   ever approved the conclusions or statements contained in the

16   tax memorandum?

17   A    I don't know.

18   Q    But in designing the sale process that you're in charge

19   of running from Evercore's (sic) perspective, you're

20   accepting the integrity of the so-called efficient tax

21   structure, correct?

22   A    Based on discussions with the tax people at V&E and

23   with the tax people at the company, and based on the

24   background that I was given with respect to the structure in

25   the RSA, I believe that this is a structure that

1    accomplishes the primary issue that we were trying to avoid

2    which is a taxable sale that results in a $3.4 billion tax

3    liability at the EFH level.

4    Q    So then the answer to my question is yes, correct?

5    A    Please restate your question.

6    Q    In designing the sale process as the point person in

7    charge, you designed the sale process assuming the integrity

8    of the analysis that goes behind the so-called efficient tax

9    structure?  Yes or no?

10   A    Yes, after discussing it with the appropriate tax

11   experts.

12   Q    Okay.  You didn't discuss it with the board or any

13   boards of the debtor, did you?

14   A    Not specifically.

15   Q    Well, how about generally did you discuss it with any

16   of the board members?

17   A    I didn't have any personal discussions, but I think

18   it's --

19   Q    Okay.  So then the answer would be no to my question?

20              THE COURT:  Please don't interrupt the witness,

21   Mr. Weisfelner.

22              MR. WEISFELNER:  Go ahead.

23              THE WITNESS:  But the board reviewed the bidding

24   procedures.  The board, you know, was aware of the teaser

25   that was sent out.  This tax structure has been on the table

1   for quite some period of time and I have no reason to

2   believe that the board doesn't support going forward with

3   this tax structure.

4   BY MR. WEISFELNER:

5   Q    Just so I understand the mechanics of how the tax

6   efficient transaction works, first of all, on the EFH side,

7   it -- instead of reorganized EFH stock being sold or an

8   investment being solicited, you are instead to get an offer

9   that called for the sale of EFH Corp's 100 percent equity

10  ownership in EFIH.

11         My question for you is based on what you know

12  would that trigger a taxable event?

13  A    Yes, I believe it would.

14  Q    And it would be outside the scope of the preferred or

15  efficient tax structure, correct?

16  A    Well, if what you're talking about is a taxable sale of

17  EFIH it would be a different form of structure than the one

18  we had proposed.

19  Q    And outside the scope of the efficient structure that

20  --

21  A    Again, if someone was willing to pay enough money in a

22  taxable purchase of EFIH to produce an amount of net after

23  tax proceeds up at EFIH, I'm sure that's a structure we

24  would be happy to consider.

25  Q    And I'm going to get into that.  All I'm asking you is

1    taxable or non-taxable.  If it's taxable does it fit within

2    the structure or it doesn't.  We'll get into the economics

3    of it in a bit.

4    A    Well, it's obviously a different structure so, no, it

5    doesn't fit within the structure.

6    Q    Okay.  Likewise, if EFIH were to sell its ownership in

7    Encore Holdings, would that give rise, as far as you know,

8    to a taxable or a non-taxable transaction?

9    A    A taxable transaction.

10   Q    Okay.  And, by the way, at your deposition you thought

11   that it was EFIH that owned the equity in Encore --

12   A    I --

13   Q    -- isn't that right?

14   A    I misspoke.  I actually knew that that wasn't the case.

15   Q    Okay.

16   A    SO you're right.  I did misspeak in my deposition.

17   Q    So now today we understand, do we not, that the entity

18   that owns the Encore estate is a non-debtor entity, correct?

19   A    It's within the ring fence.  Yes.

20   Q    It's a non-debtor entity, correct?

21   A    Correct.

22   Q    Okay.  Actually, you understand that Encore Holdings is

23   within the ring fence or just Encore?

24   A    No.  Encore Holdings is within the ring fence.

25        (Pause)

1   Q    Now in order to achieve the optimal or efficient tax

2   structure you need to have a plan or plans on both the E

3   side and the T side, isn't that right?

4   A    That's correct.

5   Q    At some point during your direct you said something

6   about the non-feasibility of getting to a plan within 30

7   days.  Do you remember that part of your direct?

8   A    Yes.

9   Q    In other words, you said that if you got a proposal

10  that said, I'll put up a hundred gazillion dollars for the

11  reorganized EFH stocks so long as you could deliver it to me

12  within 30 days, you wouldn't put a lot of value on that

13  claim because of the lack of feasibility of getting to a

14  plan within 30 days, right?

15  A    Well, for a hundred gazillion dollars I might change my

16  view.

17       (Laughter)

18  Q    If -- fair enough.

19       THE COURT:  Well, let me -- do I get any of that?

20       (Laughter)

21       THE COURT:  It was -- you might have a due process

22  problem, even for a hundred gazillion dollars.

23  BY MR. WEISFELNER:

24  Q    If a bid came in after or within 20 percent of the

25  NextEra expression of interests that's since been withdrawn,

1    and the condition to that bid was you've got to get to a

2    confirmable plan on both the T side and the E side within 30

3    days, in your view would that offer be one that could be

4    accepted by these debtors in exercising their fiduciary duty

5    to creditors?

6    A    No.

7    Q    Have you ever given any advice to any of the boards of

8    directors of these debtors as to the likelihood of getting

9    to a confirmation of an E side and T side plan by December

10   of 2015?

11   A    No.

12   Q    To your knowledge has anybody, any professional, given

13   that advice to any of the boards of these debtors?

14   A    Not that I'm aware of, but that doesn't mean it hasn't

15   happened.

16   Q    I can only talk about your awareness.

17   A    Right.

18   Q    Now you're the Evercore person that was responsible for

19   the final design of the proposed bidding procedures and all

20   of its logistics, right?

21   A    Well, in conjunction with the M&A people from K&E, the

22   bankruptcy people from K&E and the people at the company in

23   terms of the group that participated in designing the plan.

24   Yes, I --

25   Q    So --

1    A     -- am the person responsible for executing the

2    logistics.

3    Q     Well, you're also more substantively at Evercore that's

4    going to be responsible for negotiations with respect to

5    buyers, isn't that right, at least from the Evercore side?

6    A     I don't think I'll be the sole person from Evercore

7    involved in that.  Obviously, to the extent that those

8    negotiations involve restructuring issues, I would expect

9    David to be involved.  I would expect Sesh to be involved on

10   issues surrounding, you know, regulatory outs and other

11   items that are specific to the utility industry.  You know,

12   we work as a team at Evercore and I would not expect to be

13   the sole person doing those negotiations.

14   Q     Well, the negotiation of the contract that you're

15   looking for, the way this process is designed, and assuming

16   that we get bids that conform to the optimal or efficient

17   tax structure, the debtor is looking to put the stock of

18   reorganized EFH to a buyer some 12 to 14 months out

19   regardless of market conditions or drops in Encore value?

20   A     Well, again, as I said, the optimal thing to get in

21   that regard would be specific performance.  I'm not going to

22   sit here today and say we are going to get specific

23   performance.  We may only get a liquidated damages

24   provision.

25            What I would say is that it's quite common, in

1    fact, very common in transactions like this that the seller

2    gets an asymmetrical benefit; that the termination fee that

3    I pay in connection with my fiduciary out is less onerous

4    than either the specific performance remedy or the

5    liquidation -- liquidated damages remedy that the buyer pays

6    if he elects to walk.

7    Q    You've got to help me understand this because, you

8    know, maybe I'm starting to see an annuity running for the

9    rest of my professional life.

10            The value of the liquidated damages provision, in

11   fact, the value of the asymmetrical specific performance

12   remedy is going to be as good as the creditworthiness of

13   your counterparty, the bidder here, correct?

14   A    Of course.

15   Q    So if market conditions change or any part of the

16   market conditions that you talked about like utilities going

17   into the toilet such that the value of Encore has dropped,

18   if we're looking at a strategic buyer, chances are the value

19   available to that strategic buyer is going to drop with the

20   rest of the utility market.  Am I fair in assuming that?

21   A    I'm not sure what you're implying.

22   Q    What I'm implying is that your bidder may not be money

23   good for the specific performance remedy or the liquidated

24   damages remedy and we'll be in the courtroom next door in

25   their bankruptcy proceeding trying to collect.

1    A    Well, again, we would make a judgment with respect to

2    the entity that we were dealing with.  These are regulated

3    utilities providing a critical service, so it's not clear to

4    me that the number of circumstances under which they might

5    go bankrupt and be unable to pay specific performance are

6    necessarily all that common.  But we would obviously make a

7    judgment.  To the extent we were dealing with a smaller

8    company where the liquidated damages provision were

9    essentially going to be a big burden, then we would opt for

10   a liquidated damages provision.

11           And as you'll note our term sheet is set up

12   requiring a deposit, so they'll -- we'll already have the

13   money and we're insulated in that regard against a

14   bankruptcy by the purchaser because it's been deposited in

15   an escrow account.

16   Q    Well, how big is the deposit?

17   A    That's to be negotiated.

18   Q    How big do you anticipate the deposit in your

19   experience as an M&A specialist outside of the bankruptcy

20   field, how large of a deposit do you intend to negotiate for

21   the --

22   A    I --

23   Q    -- debtors to --

24   A    I can't answer that because I hope that the competitive

25   process that we're going through is going to help us to

1    maximize that.

2    Q    Even --

3    A    I gave you an -- I gave an example in my direct

4    testimony.  AT&T in its acquisition of T-Mobile agreed to a

5    liquidated damage provision equal to ten percent of the

6    value of the company, or $4 billion.

7    Q    And tell us why that's relevant to a sale of a

8    regulated utility in a Chapter 11 process in your

9    experience?

10   A    I'm not sure why you would think it isn't relevant.

11   They're both companies in regulated industries.  They're

12   comparable periods of time to closing.  In fact, the drop

13   dead date in the AT&T transaction is exactly the same 12-

14   month period that we're contemplating here.  I think it's

15   quite a good analogy outside of the bankruptcy context, and

16   in that regard I would defer to my bankruptcy colleagues.

17   Q    Uh-huh.  Under the bidding procedures that you've

18   helped design and that are before the Court for approval,

19   when would the form of contract that contains all of these

20   terms, amount of deposit, whether you're successful in

21   achieving your asymmetrical deal, you've been able to set a

22   floor, what the breakup fee looks like, what the specific

23   performance or liquidated damage clause looks like, when is

24   that form of contract under your procedures going to be made

25   available for the first time to this court or the creditors

1    for review?

2    A    Well, again, prior to this morning it would not have

3    been made available to the creditors until after we had

4    signed the stalking horse bid.  I think part of the

5    agreement that we're discussing with the varying creditor

6    groups to solicit their support of our motion involves

7    sharing limited information with regard to those items and

8    understanding and receiving their input on how they view

9    varying tradeoffs.

10   Q    I'm trying to understand who this deal was made with.

11   Do you know which creditor constituents are now going to

12   have an opportunity to review the terms of the contract

13   before the debtor comes into court seeking --

14   A    They're --

15   Q    -- approval of it?

16   A    They don't have an opportunity to review the contract.

17   We've agreed to consult with them and to provide them with

18   information on certain aspects of the contracts.

19   Q    Okay.  So let me go back to my question, then.

20   A    All right.

21   Q    Under the bidding procedures that you've designed, when

22   would the form of contract first be made available for

23   creditor or court review?

24   A    And I answered that.  After the signing of the stalking

25   horse agreement.

1   Q     Okay.  So --

2   A     What I'm suggesting is that there have now been some

3   changes to that, and as Mr. Hessler, you know, spoke about

4   early in -- this morning, there are some changes and those

5   changes involve us giving some limited information to

6   creditors with respect to certain items in the contract.

7   We're not going to give everyone a contract from each bidder

8   because that discloses too much information.

9             But, for example, if one guy is paying $200

10  million more, but has a work -- worse liquidated damages

11  provision than the other, I want to understand how creditors

12  view that trade-off.  If one guy's got a worse regulatory

13  out, but is paying more money, I want to understand how

14  creditors view that trade-off.  And that --

15  Q     Which creditors --

16  A     -- that kind of --

17  Q     Which creditors understanding are you soliciting, do

18  you know?  Do you know which creditors the debtor intends to

19  solicit a view from?

20  A     I believe we would agree to provide that information to

21  all creditors.

22  Q     What's the basis for this belief?

23  A     That was my understanding.

24  Q     That -- which came from where?

25  A     Again, I've not been -- other than discussing what

1    information I would be prepared to share with creditors,

2    I've not been involved in the negotiation between the

3    lawyers as to which creditors would see that information.

4    Q    All right.  Let's move on to another topic.

5              As I understand it before September the debtors

6    were in negotiations with NextEra and those negotiations

7    intended to result in having NextEra be the stalking horse

8    for an eventual sale process, correct?

9    A    Partially correct.  I think the debtor was negotiating

10   with NextEra to see if they could reach an agreement that

11   would be sufficiently attractive to allow NextEra to be the

12   stalking horse.  But at the same time they were soliciting

13   bids from other parties.

14   Q    And you were the Evercore representative or at least

15   one of the Evercore representatives that were involved in

16   negotiations with NextEra at that time frame, during that

17   time frame, correct?

18   A    Only quite briefly.  The NextEra bid had been under

19   negotiation before my arrival on the scene.  I attended one

20   day of negotiating with NextEra over contract terms and then

21   the decision was made to go to a wider process and

22   negotiations with NextEra ceased.

23   Q    Okay.  And I think you gave a couple of reasons why

24   there was a shift away from the effort to get NextEra signed

25   up as a stalking horse, and I think one of the things you

1   testified to was you decided to make that change going to a

2   two-stage process, in part, because of the input that you

3   got from Lazard?

4   A    That's correct.

5   Q    Lazard --

6            THE COURT:  Can somebody help me out, and I just

7   forget, who does Lazard represent?

8            MR. WEISFELNER:  Lazard is the financial advisor

9   to the official creditors' committee.

10           THE COURT:  Okay.  Thank you.  Sorry.

11  BY MR. WEISFELNER:

12  Q    And when you got that advice from Lazard you knew that

13  they were the financial advisor to the official creditors'

14  committee?

15  A    I did.

16  Q    Okay.  Now -- and Lazard basically told you, listen,

17  strategics in the utilities phase don't usually bid against

18  each other.  They don't like to jump somebody else's deal?

19  A    That's correct.

20  Q    And at the point in the process where you were working

21  with NextEra with a view towards anointing them at the

22  stalking horse, you only had six NDAs signed up at that

23  point, correct?

24  A    That's correct.

25  Q    And when you eventually went to the longer process you

1    doubled the number of NDAs to, I think you said 12 or 13?

2    A    Twelve, I believe.

3    Q    Okay.  So it looks like Lazard's suggestions panned

4    out?

5    A    I think they were a good suggestion.

6    Q    Okay.  And I think you also told us that you shifted to

7    a two-stage process because a number of the bidders

8    complained that time's too short for them to get their act

9    together?

10   A    That's correct.

11   Q    But just as I understand it, at this point you believe

12   that the most likely bidders in the process you've designed

13   have already completed whatever due diligence they're going

14   to need in order to compete for the stalking horse slot?

15   A    No.

16   Q    So you believe that there's more due diligence that's

17   going to be done within the next six days by prospective

18   bidders?

19   A    Correct.

20   Q    And do you think that that's critical due diligence in

21   terms of them getting to their bid?

22   A    I can't answer specifically.  There are an enormous

23   number of due diligence requests.  We keep track of how many

24   of those requests are filled.  Obviously, we have

25   conversations with bidders to make sure that critical items

1    that they need to enable them to make their bid are in hand.

2           So, yes, I think due diligence will continue over

3    the next six days and I think it will continue in Phase 2 of

4    the process.  I don't have any reason to believe right now

5    that any particular bidder has said to me, I need more time

6    because I don't have items that are critical to my first

7    round bid.

8    Q    Well, but are you at all concerned that since you're

9    going to cut down the number of bidders between round one

10   and round two, and people are still conducting due diligence

11   and there's only six days left to go, are you here advising

12   this Court as one of the prime designers of the sale process

13   and the leader at Evercore on the M&A side that everything's

14   kosher?

15   A    In essence, yes.  I'm not aware of any bidder who is

16   saying to me, I'm lacking critical due diligence items and

17   will be unable to meet your deadline.

18   Q    Okay.  So then you would agree with me that the most

19   likely bidders have completed whatever due diligence they

20   think they would need in order to compete for the stalking

21   horse slot?

22   A    Well, again, due diligence will continue in the second

23   round.  I mean, these bidders haven't even had a chance to

24   meet with management yet.  They will do that in the second

25   round.  So I'm not suggesting that everyone has completed

1   their due diligence.  This is a non-binding indication in

2   the first round and I have every reason to believe that they

3   have received all of the critical information they need to

4   make a non-binding preliminary bid.

5   Q    See, I'm having difficulty understanding, you know, you

6   gave two reasons why you shifted from the normal in-court

7   bankruptcy process to a two-stage process in bankruptcy

8   where first you get to the stalking horse and then you go to

9   an open auction.  And the one thing you told us was you took

10  advice from creditors' committee financial advisor that you

11  got to have a stalking horse bidding process because if you

12  don't, you'll wind up losing strategics who traditionally,

13  in the utility space don't jump other people's bids, right?

14  So that was one reason.

15  A    They expressed that view.  That was one of the factors

16  we considered in arriving at the process that we did.

17  Q    Right.  And the other factor I thought you had

18  testified to was that bidders were complaining that they

19  didn't have enough time.  And I'm trying to figure out what

20  was the timing issue that bidders were complaining about

21  that caused you to decide to go to a two-stage process?

22  A    The timing issue was the fact that we were telling them

23  that they needed to give us bids in the end of August, and

24  now we've given them till the third week of October.  So

25  they had received substantially more time and, again, as we

1    sit here today I'm not receiving any calls from bidders

2    telling me, I'm lacking critical due diligence items and I

3    can't meet your time frame.

4              THE COURT:  How many NDAs did you have signed when

5    you were telling people they had until the end of August?

6              THE WITNESS:  Six.

7    BY MR. WEISFELNER:

8    Q    Now see, at your deposition I thought you identified a

9    third reason why you shifted to a two-stage process, but it

10   wasn't covered, I don't recall, in your direct.  Didn't you

11   also tell us that the other reason for shifting to a two-

12   stage process was because negotiations with NextEra weren't

13   going very well?  Do you recall that?

14   A    I think I said we didn't feel we had much negotiating

15   leverage with NextEra.

16   Q    And that failure or that lack, rather, of negotiating

17   leverage was of a concern to you in terms of this

18   asymmetrical proposition that you're looking for?

19   A    I don't think I had defined it as being confined to the

20   asymmetrical proposition.  And, Your Honor, I would look for

21   some guidance to you as to whether I should be discussing

22   the specifics of the negotiation with NextEra.

23   Q    Well, this is a bid that they've withdrawn, correct?

24   A    Well, that doesn't necessarily mean they won't be back

25   in the process.  I just don't want to prejudice the process.

1    I would just look for some guidance from you, sir.

2              THE COURT:  What's the position of the debtors?

3         (Pause)

4              THE COURT:  Mr. Weisfelner, could you give her

5    some --

6              MR. WEISFELNER:  Oh, I apologize.  I'm sorry.

7              MS. O'CONNOR:  I think -- it would be our position

8    that disclosing details of bids even from a past --

9              THE COURT:  Well, wait a minute.  Wasn't the --

10   the NextEra bid was public.

11             MR. WEISFELNER:  Yes, it was.

12             THE WITNESS:  But the negotiations of the contract

13   terms are not public.

14             THE COURT:  Oh, you can get into that.

15   Absolutely.

16             MR. WEISFELNER:  Thank you.

17             THE COURT:  Oh, wait a minute.  Somebody wants to

18   be heard.

19             MS. O'CONNOR:  And I would just also add

20   importantly that any negotiations after the public -- what

21   became public I think would be part of what we think should

22   still be protected, and that, you know, blend into this

23   process now.  So --

24             MR. SEIFE:  Your Honor, Howard Seife, Chadbourne &

25   Parke for NextEra.

1          The discussions and negotiations which Mr.

2    Weisfelner now is asking about is after the filing of the

3    public bid.  We view those as confidential and NextEra may

4    yet be a bidder.  So we would join the debtor in keeping

5    that confidential.

6          THE COURT:  At that time were you party to an NDA

7    with the debtors?

8          MR. SEIFE:  Yes, we were.

9          THE COURT:   All right.

10          MR. WEISFELNER:  I'm going to move on, Judge --

11          THE COURT:  Okay.

12          MR. WEISFELNER:  -- because I don't know that it's

13    cost effective to keep pursuing this.  I just want to make

14    sure that we establish one thing.

15    BY MR. WEISFELNER:

16    Q    Among the things you hope to achieve, but you haven't

17    yet achieved is a contract that has some of the terms you've

18    previously identified; that being a narrow MAC clause,

19    right?

20    A    Correct.

21    Q    You want to try and force the bidder to try and lock up

22    a significant portion of their equity value for over a year,

23    correct?

24    A    Well, I want a significant liquidated damages

25    provision.  Yes.

1  Q    Or, alternatively, and your preference would be to get

2  a specific performance feature, correct?

3  A    Again, that would depend on the entity.

4  Q    Okay.  And I think you told us that getting those

5  provisions, what you've review -- what you view as an

6  asymmetrical contract will require the debtor to agree to

7  some form of a break-up fee, correct?

8  A    Well, we would want a break-up fee in the context of

9  having a fiduciary out.  We're not going to get a fiduciary

10  out for nothing.  But on balance I would rather have a

11  fiduciary out with a break-up fee than no fiduciary out at

12  all.

13  Q    Well --

14           THE COURT:  What was -- what was the -- I'm sorry.

15  I'm trying to -- what was the first -- there were two issues

16  that you just went over, and the second one was the

17  liquidated damages clause or specific performance and I'm

18  blanking on the one -- the first -- the one --

19           MR. WEISFELNER:  Well, the only other one we've

20  talked about was the MAC--

21           THE COURT:  The MAC --

22           MR. WEISFELNER:  -- the MAC clause.

23           THE COURT:  Okay.

24  BY MR. WEISFELNER:

25  Q    Can you define for the record what a MAC clause is?

1    A    It's a material adverse change clause.

2              THE COURT:  Sorry.

3    Q    And as I understand the debtors' intention through

4    Evercore to negotiate this contract, you're not going to

5    give -- as best as you can avoid it you're not going to give

6    a bidder the opportunity to walk if general market

7    conditions change, are you?

8    A    We're going to try not to and these days most MAC

9    clauses exclude changes in general market conditions.  We're

10   looking for what's called a company specific MAC.

11   Q    And by company specific you mean related specifically

12   to Encore itself?

13   A    That's correct.

14   Q    And its operations?

15   A    That's correct.

16   Q    And how it's managed?

17   A    I'm not sure about how it's managed.  But --

18   Q    Well, suppose they lost the entirety of their senior

19   executives.  They walked out the door tomorrow.  Would that

20   likely be materially adverse change?

21   A    I don't think so.

22   Q    Okay.  Anything else that you can help educate us on on

23   what a typical non-market change company specific MAC clause

24   would entail?

25   A    Well, I mean, it could be a significant regulatory

1   change.  For example, in this industry there are lots of

2   things that it could be.  But, again, I would defer to the

3   K&E lawyers with respect to the specific drafting of the MAC

4   provision.

5   Q    Which of the debtors in this EFH corporate structure

6   will become liable for the break-up fee?

7   A    I'm not sure I know the answer to that question.

8   Q    Well, let's go back and at least talk about the

9   magnitude.  I think you told us at your deposition that the

10  break-up fee could be in the range of 150 to $200 million

11  without holding you firm to it.  That's what you thought you

12  would have to give up in your ultimate negotiations,

13  correct?

14  A    Something like that.  Yes.

15  Q    All right.  And sitting here today you know that that

16  number, that range is higher than the entirety of the

17  unencumbered value that the debtors have previously

18  indicated may be left available to junior TCEH creditors,

19  correct?

20  A    But, of course, you understand, I assume --

21  Q    Can I just get the yes or no and then you can --

22  A    Well, yes --

23  Q    -- give me your explanation.

24         THE COURT:  It's yes or no.  You can answer the

25  question and then give an explanation.

1            THE WITNESS:  Okay.  Would you repeat the

2    question?

3            MR. WEISFELNER:  Sure.

4    BY MR. WEISFELNER:

5    Q    Isn't the size of the break-up fee that you're going

6    to have to commit to higher than the total value of

7    unencumbered assets that the debtors have previously

8    indicated are available to TCEH general unsecured creditors?

9    A    Yes.

10   Q    Okay.  Anything you want to add to explain --

11           THE COURT:  Now you can explain your answer.  I

12   would just like you to --

13           THE WITNESS:  Sure.

14           THE COURT:  I think Mr. Weisfelner has a point.

15   You answer it and then explain it.

16           THE WITNESS:  The -- well, the only circumstances

17   under which we pay this break-up fee is to take advantage of

18   an otherwise debtor offer.  So it's an ability of us to get

19   out -- we've -- we've already at this point decided that we

20   like whatever deal we've signed up; that it's a good deal

21   for the estate as taken as a whole.

22           It's only if we're offered a better deal where we

23   can elect to pay the termination fee to take advantage of a

24   better deal.  So by definition we're only going to do that

25   if we're better off than we were versus the deal we

1    initially approved.

2              THE COURT:  Well, it -- what you're also looking

3    for is an out that would kick in if values decline at the

4    purchaser level, correct?

5              THE WITNESS:  Well, that -- no, not exactly.  It

6    depends on the form of consideration that we take.  But if

7    at any point -- we have signed up a deal now that we like.

8    We're committed to it, but we have an out and that out

9    allows us to terminate the deal or the payment of a

10   termination fee in order to accept a superior proposal.

11             THE COURT:  Your point on if there were value

12   deflation would be that's the point where the debtors would

13   seek perhaps specific performance of the liquidated damages

14   clause.

15             THE WITNESS:  Well, that's if the -- the buyer is

16   refusing to close.

17             MR. WEISFELNER:  Okay.  So let's go back --

18             THE COURT:  So --

19             MR. WEISFELNER:  Oh, I'm sorry.

20             THE COURT:  I'm sorry.  I'm just trying to -- so

21   -- well, I'm doing your job for you.

22             MR. WEISFELNER:  Well, you may be doing a much

23   better job than me, but I get help from Mr. Shaw.  You

24   don't.  So let me try this one more time.

25   BY MR. WEISFELNER:

1   Q    You said that -- and you did it with a kind of giggle

2   which I really appreciate -- that, listen, I shouldn't worry

3   about a break-up fee because the only time you're going to

4   pay the break-up fee is when you're going to exercise your

5   fiduciary duty out, so you're going to pay the fee happily

6   because the value of the estate rose, right?  Is that what

7   you're telling me?

8   A    Because we're going to accept the superior offer.

9   Q    Right.  But guess what?  If I didn't pay a break-up fee

10  and I didn't sell the asset when it was a good time to sell,

11  but I sold the asset pursuant to a plan of reorganization

12  and the values went up, I would have realized the benefit of

13  the values going up without having to pay a break-up fee,

14  isn't that --

15  A    Well --

16  Q    -- true, yes or no?

17  A    Yes, it is.

18  Q    Thank you.

19          Now sitting here today in the event that the

20  break-up fee is triggered, which estate would pay the break-

21  up fee?

22  A    I answered earlier I'm not sure.

23  Q    No.  I asked you which debtors would have to agree to

24  put up the break-up fee.  You said you didn't know.  Now I

25  asked you a different question.

1           THE COURT:  Well, he --

2    Q    Which debtor --

3           THE COURT:  Which he answered.  He doesn't know.

4           MR. WEISFELNER:  Well, he doesn't know either

5    question.

6    Q    Who has to agree to put it up and who has to pay for

7    it?

8    A    Well, if and when it's triggered.  Then I misunderstood

9    your first question.  I thought your first question was who

10   paid it.

11   Q    Okay.

12   A    It's not put up by anyone.  There's no escrow --

13   Q    No.  I understand that.  But who has --

14   A    -- on the break-up --

15   Q    -- to agree to a contract that contains a break-up fee?

16   A    Again, I believe that would be approved by the EA --

17   EFI -- excuse me -- the EFH board including the

18   representatives of the TCEH side, the independent director

19   from that side and the independent director from EFIH.

20   Q    Do you understand that the EFH board of directors

21   contains an independent board member who looks out for the T

22   side?

23   A    Yes.

24   Q    And do you understand that the EFH board that contains

25   a fiduciary who looks out for the E side of the equation?

1   A    I do.

2   Q    Now your deposition, you didn't know who Hugh Sawyer

3   was, correct?

4   A    That's correct.  I didn't know the names of the two

5   respective independent directors.

6   Q    And so you didn't know who Mr. Cremmons was either?

7   A    I just said I didn't know the names of the two

8   independent directors.

9   Q    Okay.  But you know who they are right now?

10  A    Yes, I do.

11  Q    Okay.  And you still -- and it's your understanding

12  that those two gentlemen sit on the board of EFH?

13  A    That's my understanding.

14  Q    Okay.  Would it surprise you to know that neither of

15  them sits on the board of EFH?

16  A    Yes.

17  Q    Okay.  Well, I represent to you that neither of them

18  sits on the board.  Hold on.  Get ready to be surprised.

19  That's my representation to you.  Neither of them sit on the

20  board.  Does that change your testimony --

21            THE COURT:  Neither of them sit on the EFH board.

22  Q    None of them sit on the EFH board.  Does that change

23  your testimony in any regard?

24  A    Only to the extent that they are not involved in the

25  approval of any stalking horse transaction.

1   Q    So the stalking horse transaction from your perspective

2   will be approved at the EFH corporate parent level, correct?

3   A    Correct.

4   Q    Okay.  Now I think -- who are your primary contacts at

5   the debtors' management level with regard to the bidding

6   procedures?

7   A    Paul Keglevic, Stacy Dore, Tony Horton, Andy Wright,

8   Michael Carter.

9   Q    Now your deposition you initially told us that you

10   didn't know who John Young was, correct?

11   A    I just had forgotten.

12   Q    Okay.  Well, later on you testified at your deposition

13   that you knew he worked for EFH, but you didn't know what

14   his title was, correct?

15   A    That's correct.  I was confused.

16   Q    Okay.  Now you do know, don't you, that John Young is

17   the chairman of the board, chief executive officer and

18   president of EFH?

19   A    I believe that's incorrect.

20   Q    How is it incorrect?

21   A    I believe Don Evans is the chairman of the board.

22   Q    Of?

23   A    EFH.

24   Q    Do you know what title John Young has at EFH?

25   A    I believe he's the chief executive officer, president

1    and chief executive officer.

2           THE COURT:  He's got you on that one.

3       (Laughter)

4           MR. WEISFELNER:  No.  He's got whoever filled in

5    the blanks.

6       (Laughter)

7           MR. WEISFELNER:  But, ultimately, he's got me is

8    absolutely right, Your Honor.

9           THE COURT:  And I only know because I just spent

10   three days hearing about it in connection with the incentive

11   compensation.

12      (Laughter)

13   BY MR. WEISFELNER:

14   Q   Now you're aware that despite the time and effort that

15   -- well, let me ask you this question.  You've spent time

16   educating the boards with regards to the sales process?

17   A   We've had two telephone calls about that.  Yes.

18   Q   Okay.  And you're aware, are you not, that no formal

19   vote was taken to approve the procedures, right?

20   A   I am aware of that.

21   Q   And in terms of making a determination about the timing

22   of the sale, Evercore has never presented to the boards, any

23   of the boards of directors any formal valuation analysis of

24   the estate's stake in Encore, correct?

25   A   That's correct.

1   Q    But there's nothing that would prevent Evercore from

2   doing that analysis, presenting to the boards a formal

3   valuation of Encore?

4   A    There's nothing to prevent it.  Again, we have for --

5   ever since the beginning of our engagement here 18 months or

6   so ago been monitoring varying indicia of value that's

7   updated weekly.  I think we have a good sense as to what

8   values are.  But, no, we have not to date given a formal

9   presentation.  I would --

10  Q    Have you given any --

11  A    -- I would --

12  Q    -- any other --

13  A    I haven't finished my answer.

14  Q    I'm sorry.

15  A    I would expect that prior to signing any stalking horse

16  bid we would give more formal valuation materials to the

17  board of EFH and those materials would be similar to what a

18  board outside of bankruptcy would receive in the context of

19  a cannas subpoena.

20  Q    What -- why wouldn't you, if you're in a position to do

21  that analysis for the board before going forward with the

22  bidding procedures motion, why wouldn't you have given it to

23  them before now?  Why are you waiting until you take a

24  stalking horse bid for them --

25  A    We're --

1    Q    -- from them for approval?

2    A    We're waiting to compare our valuation of Encore to a

3    particular transaction that we have in hand.

4    Q    But why couldn't you give them the baseline of the

5    value of Encore already?

6    A    Well, again, I think we've been talking about value

7    with the board over an extended period of time, with the

8    company over an extended period of time.  I think people are

9    quite familiar with the zip code, if you will, of value.

10   And, again, the formal presentation as to value will be

11   given before they sign the stalking horse agreement.

12              MR. WEISFELNER:  Your Honor, I'm going to move to

13   strike his last answer on the basis that he said, we've been

14   giving the board all sorts of valuation stuff in the past.

15              THE WITNESS:  No, I didn't.

16              MR. WEISFELNER:  He's been around for two months

17   and I'll -- I'll ask the question to support my motion to

18   strike.

19              THE COURT:  Yeah.

20   BY MR. WEISFELNER:

21   Q    Have you, sir, or to your knowledge anyone else at

22   Evercore given to the boards any analysis that would go to

23   the ultimate value of its stake in Encore outside of a

24   bidding process?

25   A    Not to my knowledge.

1           THE COURT:  I'm sorry.  You're going to have --

2           MR. WEISFELNER:  I'm going to move to strike his

3      prior answer.

4           THE COURT:  Ms. O'Connor.

5           MS. O'CONNOR:  He was asking about his team.  The

6      question asked about his team, Your Honor.  I think he can

7      answer that question.  So as to -- in terms of the motion to

8      strike.

9           MR. WEISFELNER:  Because what his team does is

10     irrelevant unless it gets to the board.  I don't care that

11     his team are a bunch of smart people.  I care whether my

12     directors are fulfilling their duty --

13          THE COURT:  Okay.

14          MR. WEISFELNER:  -- by finding out what the answer

15     their very expensive financial advisors have created for

16     them.

17          THE COURT:  Okay.  I'll grant the motion to strike

18     the previous answer to the one that was just -- the follow-

19     up answer.  That answer is stricken.

20          MR. SASSOWER:  Your Honor, I --

21          THE COURT:  It -- it makes the question to the --

22     irrelevant because it hasn't been answered, but --

23          MR. WEISFELNER:  Let me -- let me move on.

24          THE COURT:  Mr. Sassower.

25          MR. SASSOWER:  Yeah.  Just for clarification.  At

1    the end of that answer he also said that when we get to the

2    point in the process where we will take the stalking horse

3    he will then advise the board on value.

4              I just wanted to clarify, so you're seeking to

5    strike that part?

6              MR. WEISFELNER:  Oh, no.  I want to underscore

7    that.  I want to underscore --

8         (Laughter)

9              MR. WEISFELNER:  -- and emphasize that

10   notwithstanding the fact that there was no reason that he

11   couldn't give a valuation up until today, he won't give a

12   valuation until there's a stalking horse presented.

13             THE COURT:  Okay.

14             MR. WEISFELNER:  So I don't want to strike it.  I

15   want to emphasize it.

16             MR. SASSOWER:  Good.

17             THE COURT:  I understand --

18             MR. WEISFELNER:  Thanks.

19             THE COURT:  -- where we are.  All right.

20             MR. SASSOWER:  Thank you.

21             THE COURT:  Thank you.

22   BY MR. WEISFELNER:

23   Q    I want to go back to your credentials for a minute.

24   You're the chairman, I think you said, of Evercore's special

25   committee execution group.  Is that correct?

1    A    That's correct.

2    Q    In that capacity you oversee all of your firm's

3    assignments where there's a perceived conflict at the board

4    level or there are concerns over affiliated party

5    transactions.  Is that right?

6    A    That's correct.

7    Q    Now you've never consulted with either the independent

8    directors -- let me restate it.  The creditors were a little

9    confused as to who is on what board.

10           You've never consulted with either Mr. Cremmons or

11   Mr. Sawyer about any potential conflicts or affiliated party

12   transactions that are impacted by the sale process, have

13   you?

14   A    No.

15   Q    You gave no advice to the rest of the board or boards

16   on potential conflicts that currently exist or could arise

17   in the future in connection with these sale procedures, have

18   you?

19   A    No.  I was never asked to.

20   Q    Even though you're the chairman of Evercore's special

21   committee did you offer any advice?

22   A    Well, there is no special committee that has been

23   formed here.

24   Q    Okay.  Again, you're here and your expertise is as an

25   M&A specialist?

1    A    That's correct.

2    Q    You're not a restructuring expert, are you?

3    A    No, I am not.

4    Q    And the last time you testified in bankruptcy court was

5    over 20 years ago?

6    A    That's correct.

7    Q    And the bulk of your M&A expertise is outside the

8    utilities phase, correct?

9    A    I think I stated that in my direct testimony.

10   Q    And your point is what, that you don't want me to go

11   over it again?

12   A    It's fine.

13   Q    Oh, okay.  And, indeed, the only work you've done in

14   this space was for a company called Aquila (ph)?  Is that

15   right?

16   A    That's correct.

17   Q    And Aquila wasn't a Chapter 11 debtor, were they?

18   A    No.

19   Q    Now before the debtor made the decision to open up this

20   process to any structure and all structures.  And by the

21   way, when -- when was that decision made to now accept

22   transactions in either a taxable or a tax-free structure?

23   A    A few days prior to the filing of the bidding

24   procedures motion.  I don't know the exact date.

25   Q    Okay.  So we had bidding procedures motions filed on

1    September 19th.  Let's assume that you're right.  It was

2    about a week before that.  So you're telling me that the

3    decision eventually to accept all bids of any form, taxable

4    or non-taxable, was first made in this case on or about

5    September 12th, correct?

6    A    Correct.

7    Q    And who made the decision to now for the first time

8    accept taxable and non-taxable transactions?

9    A    The company.

10   Q    When you say the company, to your knowledge did the

11   board of directors ever vote to open up the bidding process

12   to allow for the receipt and consideration of both taxable

13   and non-taxable transactions?

14   A    I don't believe there was such a vote.

15   Q    You never advised the boards, did you, about the wisdom

16   of opening up the transaction to now receive taxable versus

17   non-taxable transactions?

18   A    Not that I specifically recall.

19   Q    All of the teaser materials that you spoke about that

20   were sent out before the bidding procedures motion was filed

21   told prospective bidders that any bid they submitted had to

22   conform with the efficient or optimal tax structure, isn't

23   that true?

24   A    I don't know that it said that it had to, but it was

25   certainly a recommended structure.

1    Q    Well, now you're going to have to turn to your narrow

2    book.  Right.  This is documents that your counsel took you

3    through on direct.

4    A    Yeah.

5    Q    I want you to find under the tab headed Exhibit 14 --

6    A    Uh-huh.

7    Q    -- a cover email and page 2 starts, presentations to

8    prospective investor with Evercore's name on it.  Do you

9    have that document?

10   A    Yes.

11   Q    It's Exhibit 14.  Okay.  Now I want you to flip that

12   book, still in the introduction section.  Are you there?

13   A    Yes.

14   Q    On the top the first bullet point is EFH or the

15   company?

16   A    Yeah.

17   Q    Okay.  The third bullet point down, why don't you read

18   that out loud?

19   A    "The company is pursuing a restructuring transaction,

20   the TCEH spinoff, whereby on the emergence date TCEH will

21   separate from EFH on a tax-free basis and reorganized EFH

22   would continue to own 100 percent of EFIH and its 80 percent

23   interest in Encore."

24   Q    Okay.  Now go down to the next bullet point on the next

25   page.

1    A    Uh-huh.

2    Q    Can you read that one out loud?

3    A    "The company is reaching out to potential acquirers and

4    investors to participate in an investment process with

5    respect to reorganized EFH with the objective of raising

6    combination of cash and equity to fund distributions to

7    creditors under a plan of reorganization."

8    Q    Okay.  So I ask you again, having read that exhibit,

9    isn't it true that prior to filing the motion, the only

10    teasers that went out to prospective buyers told them that

11    you were looking for a tax-free optimal efficient

12    transaction?

13    A    Yes.

14    Q    Okay.  And the first time that your prospective bidders

15    understood they could bid in any way, shape or form they

16    chose to, was as of the filing of the motion on September

17    19th, correct?

18    A    That is correct.

19    Q    Indeed there were talking points -- I'm going to skip

20    that.  Well, I mentioned it.  Evercore helped design talking

21    points for the chief executive officer, Mr. Young, to go out

22    to prospective bidders to talk about them getting involved

23    in a sale process.  Do you recall that?

24    A    In the July time frame, yes.

25    Q    Okay.  And the talking points that were created for Mr.

1   Young in anticipation of conversations with bidders

2   contained as their second bullet point the need to structure

3   bids consistent with the optimal or efficient tax structure,

4   correct?

5   A    Correct.

6   Q    When we talked about selling EFH equity -- and point of

7   fact you can't sell 100 percent of the reorganized EFH

8   equity and still comport with the optimum tax structure, can

9   you?

10  A    Well, we can sell it for a combination of cash and

11  stock.  If what you mean is we can't sell 100 percent of it

12  for cash, you're correct.

13  Q    Well, could you sell 100 percent of the EFH reorganized

14  equity, period?  Could you sell it for whatever the

15  consideration is; 100 percent of it you could sell?

16  A    My belief is yes, but I'm not a tax expert.

17  Q    Oh, are you aware of that portion of the tax memo that

18  talked about the requirement for continuity of interest?

19  A    Well, but that's what I'm referring to which is we can

20  do it through a -- I guess we're arguing about the

21  definition of a sale.  We can do it through a merger where

22  they're talking stock.  So I'm viewing that as also

23  constituting "a sale."

24  Q    Well, let's talk about the stock portion of the

25  bidder's consideration.

1    A    Right.

2    Q    The way this transaction is currently contemplated, the

3    bidder will first offer to acquire less than 100 percent of

4    the reorganized EFH stock.  The majority of the EFH

5    reorganized stock will be distributed to creditors on the E

6    side who will then be obligated to take that stock and give

7    it back to the buyer, or a merger entity if the buyer drops,

8    in exchange for some other consideration, either stock of

9    the acquiring company or cash, isn't that right?

10   A    Well, again, I think the structure has evolved so that

11   what you're describing is not quite accurate.  The way we

12   view it now is that there will be an intercompany loan

13   between the buyer and EFH.  That intercompany loan, the cash

14   from that will be used to satisfy obligations down below,

15   and that EFH -- and, again, depending on the level of the

16   bid.  But then EFH will be acquired for a -- in a stock for

17   stock merger.

18   Q    But again, sir --

19              THE COURT:  What happens to the loan?

20              THE WITNESS:  The loan disappears and the

21   consolidation of the two entities I've loaned money to

22   myself.

23              MR. WEISFELNER:  Again -- and again, I stipulate

24   that again, you know, I have a general understanding of the

25   tax structure, I'm not a tax expert.

1          THE COURT:  Is that -- do you know whether that

2     structure you just mentioned is in the tax memo?

3          THE WITNESS:  I believe -- I'm not sure whether

4     it's specifically in the tax memo.  It is I believe outlined

5     in the term sheet.

6          MR. WEISFELNER:  We may want to get into this with

7     Mr. Keglevic.

8          THE COURT:  Okay.

9     BY MR. WEISFELNER:

10    Q    So, in your last answer you talked about maybe we're

11    debating whether we have a sale or an investment here.

12         Putting aside whether one refers to this as a sale

13    procedure or you're really soliciting investments, you agree

14    with me, do you not, as a matter of just pure corporate M&A,

15    the asset that's the subject after the investment or sale,

16    that being reorganized EFH securities, doesn't currently

17    exist?

18    A    That's correct.

19    Q    Can you recall in your 30 plus years as an M&A banker

20    ever marketing reorganized securities?

21    A    No, I can't personally, but I've discussed this point

22    with members of my team, and I understand that there are

23    other examples where that has -- where a sale process has

24    been commenced prior to a plan of reorganization.

25    Q    Okay.  In your deposition though, because you must have

1    had these -- you had those conversations with your team

2    after you were deposed, right?

3    A    That's correct.

4    Q    At your deposition you told us you couldn't recall in

5    your years as an M&A banker ever marketing or selling

6    reorganized equity, right?

7    A    Personally that's correct.

8    Q    Okay.  And do you have the details of any of these

9    other examples that your team told you about after your

10   deposition was over about the sale of reorganized equity in

11   a bankruptcy proceeding?

12   A    No, I do not.

13           MR. WEISFELNER:  Your Honor, I'm going to move to

14   strike his answer about him talking to his team about other

15   examples of the sale of reorganized equity.

16           THE COURT:  I don't think it was -- I'm not going

17   to strike it, I think it's of minimal weight at best.

18   BY MR. WEISFELNER:

19   Q    Did you ever tell the board during your two or three

20   board calls that you personally were never aware of or

21   hadn't participated ever in an effort to market or sell

22   reorganized equity?

23   A    No.

24   Q    Now, there was a time, wasn't there, where the debtors

25   contemplated bringing in another financial advisor to assist

1    in the sale process, correct?

2    A    That's correct.

3    Q    The debtors contemplated bringing in Bank of

4    America/Merrill Lynch to assist in the sale process?

5    A    That's correct.

6    Q    And ultimately the debtors' management determined not

7    to engage Bank of America/Merrill Lynch because of

8    conflicts, they were creditors up at the DIP level?

9    A    That's my understanding.

10   Q    And that decision, not to employ Bank of America and

11   Merrill Lynch, that left Evercore and you in charge on the

12   FA side; isn't that right?

13   A    That's correct.

14   Q    Okay.

15          MR. WEISFELNER:  Your Honor, I'm about to launch

16   into a different line.  I don't know what your preference is

17   in terms of a break.

18          THE COURT:  What I'd prefer to do is since we're

19   having to quit at 3:00 and we're in the middle of this

20   witness is to push through all the way 'til say 2:30 to 2:45

21   before we take that break, before my 3 o'clock meeting.  So

22   we'll skip through lunch and push on, if that's all right.

23          MR. WEISFELNER:  Yes.

24   BY MR. WEISFELNER:

25   Q    Now, bidders are aware that under the optimal tax

1    partition structure the outside date for achieving

2    confirmation of the plan or plans is 12/15, right?

3    A    Correct.

4    Q    And that 12/15 deadline was something that was

5    established by the debtors in their discussions with

6    prospective bidders; is that correct?

7    A    I don't know that it was established based on

8    discussions with prospective bidders.

9    Q    Well how was the 12/15 deadline established?

10   A    I believe the 12/15 deadline represented the overlap

11   of, if you will, of two timelines.

12            One is the normal drop-dead date in typical

13   utility transactions, which is about 12 months, and so we

14   were presenting buyers with a time frame that they were

15   accustomed to and accustomed to seeing outside of

16   bankruptcy.

17            By the same token I think people felt that

18   12/31/15 provided adequate time to try to reach consensus on

19   a plan of reorganization, and that if those two time frames

20   overlapped the bidder would be able to emerge at the

21   earliest possible date from bankruptcy.

22   Q    See I guess you and I have a communication problem.  I

23   keep asking about whether something happened or not and how

24   it came be and you explain the justification for doing it.

25   So I'm going to ask you the question again.

1           Who determined that the drop-dead date would be

2     12/15?  Not why, but who determined that that should be the

3     drop-dead date, do you know?

4     A    I don't recall who specifically determined it.  It was

5     something that we discussed amongst ourselves and came to a

6     consensus and was included in the term sheet.

7     Q    When you say you discussed amongst yourselves, very

8     specifically did you give any advice to any of the debtors'

9     boards about the propriety of using a 12/15 deadline, yes or

10    no?

11    A    No.

12    Q    Are you aware of anybody else in your presence giving

13    advice to any of the debtors' boards about the propriety of

14    selecting 12/15 as the drop-dead date, yes or no?

15    A    No.

16    Q    Did you ever give any advice to the debtors about the

17    probability -- when I say you now I mean Evercore generally

18    because I know you're not a restructuring expert.

19           To your knowledge did anybody on the Evercore team

20    opine to the board on the probability of being able to get

21    to a plan or plans in these cases on or before 12/15?

22    A    Not in a board meeting that I've been on.

23    Q    Okay.  Have you given -- you meaning Evercore or anyone

24    at Evercore to your knowledge -- given any advice to the

25    debtors' management regarding the likelihood of getting to a

Page 145

1    plan on both the E side and the T side prior to 12/15?

2    A    Not that I recall.

3    Q    By the way, when we talk about a 12/15 deadline for

4    getting to confirmation, do you know if that requirement is

5    going to be a final, non-appealable order that triggers a

6    drop-dead date?

7    A    I don't know the answer to that question, I -- it was

8    confirmation of a plan by that date that could be extended

9    for another six months if we were awaiting regulatory

10   approval.

11   Q    Okay.  And now you're the point person on negotiations

12   of this contract provision.

13           Was the issue of -- let me ask you this question.

14           In your opinion as the guy -- the M&A expert here,

15   could you close this transaction -- would you seek to close

16   this transaction during the pendency of an appeal from a

17   Bankruptcy Court order approving confirmation?

18   A    I could think likely not, but I would defer to K&E and

19   my restructuring colleagues for that judgment.

20   Q    Do you have any idea the typical length of an appeal

21   period from an order confirming a plan of reorganization?

22   A    No, I do not.

23   Q    Did you ever discuss with the board or aware of any

24   discussions that took place at the board level about whether

25   or not the drop-dead date of 12/15 should be a final, non-

1    appealable order or just an order of the Bankruptcy Court?

2    A    No, I did not.

3    Q    Okay.  We've established before that the decision to

4    solicit any and all bids, be they taxable or not taxable,

5    was first made about a week before the September 19th motion

6    was filed.  But the debtor bother, did it, or Evercore

7    didn't send out any new teasers reflecting the fact that

8    you'd now made a switch and you're not only just looking for

9    deals consistent with your efficient tax structure, but now

10   you're looking for any deals be they taxable or non-taxable;

11   isn't that right?

12   A    That's correct.

13   Q    And you told us at your deposition that you thought it

14   was either Paul Keglevic or Stacey Dore, one of the two

15   chief restructuring officers, that probably made the

16   decision to solicit taxable transactions for the first time,

17   right?

18   A    I think they would be the ultimate decision maker on

19   that.

20   Q    But it wasn't a board decision as far as you're aware?

21   A    No, I'm not aware that it was.

22   Q    Okay.  In a hypothetical transaction where the bidder

23   isn't locked into bidding for reorganized EFH equity, what

24   is it that the buyer -- let me ask it a different way.

25         What is it in an alternative transaction that's

1    for sale to somebody that steps forward with an alternative

2    transaction?

3    A    Well again, what's for sale is the 80 percent economic

4    interest in Oncor, that could be acquired by bidding in a

5    taxable transaction for 100 percent of the stock of EFIH or

6    the stock of Oncor Holdings.

7    Q    Is cash on the balance sheet of any of these entities

8    for sale in the now anything goes mode?

9    A    No, although as I explained in my deposition we're

10    dealing with two liabilities, a $30 million OPEB liability

11    and a $14 million asbestos liability.

12        In the context of the acquisition of reorganized

13    EFH there's a contemplation that we may elect to leave

14    $44 million in cash to offset those liabilities, so it would

15    be a wash to the buyer.  Obviously the ultimate decision

16    will depend whether the buyer agrees that that's an

17    appropriate offset.  If he doesn't we'll have to deal with

18    those liabilities in some other manner.

19    Q    Can you tell me where in the motion, which is at docket

20    2087 that you testified to, and any of its exhibits and the

21    procedures, that tells me that a buyer who has the put in an

22    expression of interest in six days understands that they're

23    not buying and they can't buy all of the cash, but they may

24    be asked to assume liabilities like OPEB or asbestos

25    liability?

1   A    Well again, there's information in the data room with

2   respect to those liabilities, and we're talking about an

3   equal cash offset.

4            So in the context of a bid for the entity as a

5   whole this the likely a subject for negotiation in the

6   second round, it's not something that would have a material

7   impact on anyone's bid.

8   Q    Okay.  I guess my point is the first time you ever told

9   the world that you're soliciting bids for taxable versus

10  non-taxable transactions was the September 19th filing of

11  the motion.  You didn't send out new teasers to the parties

12  whose old teasers said you can only buy or invest in

13  reorganized EFH stock.

14           Now you're soliciting any transaction of any shape

15  or form, but you're not selling all the cash that's on

16  anyone's balance sheet, you may do this swap with OPEB

17  liability and/or asbestos liability with enough cash to

18  cover it, but where is a bidder who for the first time on

19  September 19th understands they could submit any bid they

20  want?  How do I know what's for sale and what's not for sale

21  unless I've been in the data room and I've been talking to

22  the debtors?

23  A    Well, that's right, you need to be in the data room and

24  talking with the debtors, but I don't think there's any lack

25  of clarity amongst the bidders as to what it is we are

1    selling.  We are clearly not selling cash that's been

2    accumulating at either EFIH or at EFH, that cash is being

3    used to satisfy the debt that exists in those entities.

4    Q    Okay.  So --

5    A    I don't think -- I'm not finished.

6    Q    I'm sorry.

7    A    So I don't think that there's any lack of clarity on

8    the part of bidders as to what they are buying.

9            There is this one small issue of are they going to

10   assume the OPEB and asbestos liabilities offset by an equal

11   amount of cash or aren't they?  But that's not a big issue

12   in the context of first round bids.

13   Q    Okay.  To the extent that any of the E side debtors

14   have claims against other E side debtors, are those inter E

15   side claims for sale?

16   A    No.

17   Q    How do I know that as a prospective bidder who got the

18   bidding procedures motion on the 19th and I'm scurrying

19   around to put together a bid by your deadline?

20   A    Well, again, most of the parties were in the process

21   before the 19th, they've had plenty of time to do this, and

22   I think they all know that the only thing we are selling is

23   the 80 percent economic interest in Oncor, and we've made it

24   very clear that we are going to deliver to them in that

25   context a clean EFH reorganized EFH without any liabilities

1    or material assets other than that.

2    Q    Okay.  So you're telling us that all of the bidders

3    understand that what they're going to be buying is

4    reorganized EFH?

5    A    To the extent that they want to bid for EFH.

6              I think it's equally clear to the bidders that if

7    they're contemplating, for example, a purchase of EFIH that

8    it would be also appropriately cleansed such that all they

9    were buying was the 80 percent economic interest in Oncor.

10   I honestly don't think there's any confusion amongst the

11   buyers on that point.

12   Q    Okay.  To the extent that the E side of the equation --

13   the E companies have claims against the T side of the

14   equation are you selling those claims?

15   A    I responded to that previously, no, we're not.

16   Q    Okay.  Now let me ask you a different question.

17              Suppose, if you will, that the E side of the --

18   I'm sorry -- the T side of the house had claims against the

19   E side of the house.

20   A    Uh-huh.

21   Q    That's a liability on the -- potential liability on the

22   E side of the house, correct?

23   A    Correct.

24   Q    Okay.  You talk about asking the buyers to assume

25   certain liabilities like OPEB and like asbestos.  Are the

1    buyers in this new transaction that you've announced that

2    you're now prepared to consider, are they picking up the

3    liability that may exist on the T side of the house?

4    A    I assume not.

5    Q    You assume not.  Are you aware --

6    A    Clearly in the context of the transaction that we had

7    outlined the purchase of the reorganized EFH stock --

8    Q    Uh-huh.

9    A    -- all of those claims and potential liabilities are

10   taken part of as part of the plan of reorganization.

11   Q    Ah ha.

12   A    So they don't exist at the time the buyer buys it, and

13   his obligation to buy EFH is conditioned upon us delivering

14   a clean reorganized EFH free of any claims from the T side.

15   Q    So in other words the debtors in effect are taking on

16   the obligation from the perspective of the bidder, the

17   successful bidder, that they will be able to deliver

18   reorganized EFH securities free and clear of all liens,

19   claims, and encumbrances, correct?

20   A    That's correct.

21   Q    Okay.  Now let me ask you this question.  Are you aware

22   of the details of the claims or causes of action that any of

23   the junior creditors on the T side have asserted against the

24   E side of the house?

25   A    Only generally and to the extent you made me aware of

1    them in my deposition.

2    Q    Okay.  Well let's see how good of a job I did educating

3    you.

4           Are you aware of the fact that certain of the

5    unsecured creditors on the T side of the house have

6    evidenced in argument that suggests that they have an

7    entitlement to go into the ring fence and obtain the value

8    or Oncor back to the T side of the house?

9    A    I'm aware that you made those claims.

10   Q    Well you're not aware that I made those claims

11    because --

12   A    The T side creditors made those claims.

13   Q    Okay.  So now let me ask you a question.  If it turns

14   out, as often does that Mr. Shore is right, and there is a

15   viable effective entitlement by the T side of the house, to

16   reach into the ring fence and pull on Oncor out -- are you

17   with me so far in my hypothetical?  Then you're selling ice

18   in winter aren't you?

19   A    Of course with a result and a circumstance for the

20   transaction that we would have signed up came close.

21   Q    And in order to be in the position not to sell ice in

22   winter you've got to make sure, from the perspective of the

23   seller, that his claims go away, right?

24   A    Or aren't valid, right.

25   Q    And which of the debtors are ultimately going to take

1    up arms against Mr. Shore and MOFO and potentially Brown

2    Rudnick's clients in order to fight us off on our claims

3    against the E side of the house?

4    A    I think that's a question probably better directed to

5    Kirkland & Ellis or someone else.  I'm not familiar with how

6    that litigation is proceeding.

7    Q    Do you know who the largest creditor is on the -- who

8    the largest creditor of EFH Corporation is today?

9    A    Well if you're defining creditor to include the

10   $777 million claim, yes, it would be the unsecured creditors

11   of TCEH.

12   Q    Has anyone told you --

13   A    I'm not sure it's the unsecured.

14   Q    Has anyone told you to disregard that claim?

15   A    No.

16   Q    What do you suppose in the context of these bidding

17   procedures is going to happen to that claim?

18   A    That claim has essentially no relevance to the buyer,

19   and it has no relevance to the buyer because whatever amount

20   of consideration he is paying up at EFH that's the -- that's

21   the numerator.  The denominator is the number of claims.  So

22   all it does is affect the recoveries of creditors up at EFH,

23   it has no impact on him as a buyer.

24   Q    Okay.  You're of the view, are you not, that a taxable

25   transaction, the one that you only recently announced you

1    will accept, is "unlikely to produce the best value for the

2    estate"?

3    A    That's correct.

4    Q    And by estate you mean the collective estates of all of

5    the debtors, correct?

6    A    That's correct.

7    Q    And you've previously testified that a bidder to win

8    the stalking horse auction or ultimately the open auction

9    would in effect have to pay roughly $5 billion more in a

10   taxable transaction than in a tax-free optimal efficient

11   transaction, correct?

12   A    Correct.

13   Q    And you believe that it's highly unlikely that anybody

14   is going to submit such a bid; isn't that right?

15   A    That's correct.

16   Q    And indeed in your view the fact that the debtor

17   announced some time before September 19th that they're now

18   accepting any and all bids, that decision was neither

19   important or material; isn't that right?

20   A    Well, again, that's correct, and I believe that the

21   reason why we are unlikely to receive taxable bids is fairly

22   straightforward.

23   Q    I asked you a different question.  We're having the

24   same --

25   A    Okay.

1    Q     -- problem.

2          Isn't it your view that the debtors' decision to

3    open up the process to now accept potential transactions

4    that are taxable, that decision in your view was neither

5    material nor important, correct?

6    A     Correct, because I believe it's unlikely that we will

7    receive bids in a taxable format.

8    Q     You got a lot of reaction, did you not, from bidders

9    when they heard that you were moving from a we're only

10   selling you organized EFH security in a tax-free transaction

11   to now we'll accept whatever bid you want to give us, right?

12   You got a lot of reaction?

13   A     We got some reaction.

14   Q     Well among the reactions you got are -- and I want to

15   make sure I get this right -- "What are you talking about?"

16   Wasn't that one of the reactions you got?

17   A     That's correct.

18   Q     And wasn't another reaction you got, "Who would do this

19   deal as a taxable transaction?"  Did you get that reaction?

20   A     Yes, we did.

21   Q     Did you get the reaction, "It makes no sense at all."

22   A     Yes.

23   Q     Did you get the reaction, "Are you guys crazy?"

24   A     Yes.

25   Q     In fact the bidders who heard for the first time when

1    the debtor filed the motion that you're now accepting bids

2    of any stripe or shape, be they taxable or untaxable, just

3    didn't understand how that would work for the debtors; isn't

4    that accurate?

5    A     Correct.

6    Q     And just to wrap this part up, you agree, do you not,

7    that any bidder who wants to win the stalking horse position

8    or ultimately the open auction can only bid on a tax-free

9    transaction?

10   A     No.

11   Q     Well, now you're going to have to turn to at least

12   three parts of your deposition we published just that?

13   A     I believe -- let me answer further.  Okay.  He doesn't

14   have to bid in a tax-free transaction, but I don't believe

15   there's anyone out here who will bid in a taxable way that

16   will produce an equivalent amount of proceeds.

17   Q     Now as part --

18   A     I believe he would have to make an uneconomic decision

19   to do that, and that's the reason why I don't believe we

20   will receive any taxable bids.

21   Q     If a bidder wants to win the auction that you've

22   devised, yes or no, that bidder can only bid in a tax-free

23   manner?

24   A     If he's rational economically.

25   Q     So you believe that any bidder interested in winning

1    the sharehold -- the stalking horse position is ultimately

2    as a practical matter going have to conform to your

3    efficient or optimal tax structure, correct?

4    A    Or some other structure that's equally tax efficient.

5    Q    All right.  I now want to switch focus and talk about

6    the concept of value maximization.  And for the next series

7    of questions, and I know this is going to be hard for you,

8    but I want you to assume with me that everybody in the

9    courtroom could care less about EFH's tax status.  Okay?

10   Can you work with me?  We don't care if there's $1 worth of

11   stranded tax or $12 billion worth of stranded tax at the

12   year base level.  Can you work with me?

13   A    Uh-huh.

14   Q    Okay.

15            THE COURT:  We'll assume everyone accept the IRS

16   is all right with that.

17        (Laughter)

18            MR. WEISFELNER:  Well, I -- and, Your Honor, I can

19   assure you the sponsors, but I'm asking in a hypothetical

20   sense.

21            THE COURT:  Yes, of course.

22   BY MR. WEISFELNER:

23   Q    Let's assume nobody cares about stranded tax of EFH.

24            Let's further assume that there is no enforceable

25   tax sharing agreement that could take those tax liabilities

1    and push them down the E side of the house.

2    A    Uh-huh.

3    Q    Okay?  Now let me ask you the question.  If I'm looking

4    to maximize value in a sale of the Oncor estate, which is

5    going to derive more value, a tax-free transaction or

6    taxable transaction?

7    A    Given all the assumptions that you are making the

8    answer is a taxable transaction is likely to produce a

9    higher value.

10   Q    Okay.  And you understand that in a taxable

11   transaction, a buyer, and I'm not going to (indiscernible -

12   1:16:15) specific, I'm going to ask you a buyer generally.

13   A buyer is going to be willing to pay for an asset that it

14   can depreciate over time.

15   A    Are you -- so if what you're referring to is pay for

16   the step up in tax bases the answer is yes.

17   Q    And theoretically we could go about figuring out what

18   the present value of a step up in tax basis would be on the

19   E side of the house if we wanted to, right?

20   A    Correct.

21   Q    And in fact you gave us an estimate of what that step

22   up could be worth to a buyer on the E side, correct?

23   A    I gave you an analysis that showed that it could be

24   worth as much as $2 billion, but I believe my testimony also

25   stated that a buyer might not pay that, that he would take

1    into account the risk that the regulators would not allow

2    him to realize the full value of the step up, and that

3    because that step up was the result of a stranded tax

4    liability that the IRS might litigate.

5             So the amount at the end of the day he would

6    actually be willing to pay is hard to determine.  But, yes.

7    Q    You had a better answer at your deposition quite

8    frankly.  I'll tell you what your better answer was.

9             Yes you told us that, hey, the fact that you have

10   a foregone step up in basis that would be worth $2 billion

11   in the utility context it's not all that important, because

12   number one, the regulators may not let you pass that through

13   your rate structure.  Given you're not a utility expert, but

14   that's what you told us.

15            Number two you told us that, well you really have

16   to be concerned that even in a taxable transaction the IRS

17   may come after you, but I asked you to assume that there is

18   no enforceable way to push it down, but still the IRS could

19   change regulations or --

20   Q    I didn't know we were referring to the tax sharing --

21            MS. O'CONNOR:  Objection, Your Honor.

22   BY MR. WEISFELNER:

23   Q    Okay.  Tax share.  And then --

24            THE COURT:  Wait a minute.  Sorry, Mr. Weisfelner.

25            MS. O'CONNOR:  In terms of who's testifying here

Page 160

1    and what he's doing with the deposition we've lost track of

2    it a little bit.  I don't know if he's trying to impeach.

3    He suggested that he was referring to Mr. Hiltz' deposition.

4    I don't believe there was any opportunity for impeachment

5    yet.  And then he went on at some length from there.  So I'm

6    not sure exactly where we are at this point.  But if it's

7    impeachment it seems to be improper.

8              MR. WEISFELNER:  I'm not trying to impeach him,

9    I'm trying to refresh his recollection that he told us that

10   there were three reasons why the $2 billion step up in basis

11   may not be worth $2 billion.

12             THE COURT:  I think it's a fair questions.

13   BY MR. WEISFELNER:

14   Q    And the third reason you told us was that a strategic

15   buyer in order to really gain the advantage of that step up

16   in basis is going to have to dispose of the asset.

17   A    No, I -- that's not exactly what I said.

18             In my deposition I stated that I was unclear as to

19   whether he could achieve the step up in the taxable -- in

20   the depreciable asset base or whether it would be in the

21   stock of Oncor.  If it was only in the stock of Oncor he

22   would have to sell the shares to realize the value of the

23   step up.  Subsequent to that I am aware that he can achieve

24   a step up in the depreciable assets.

25   Q    Okay.  Now you're looking at bids -- illustrative bids,

1    and based on, you know, the bids that we had and were then

2    withdrawn, you think that there's ultimately enough value in

3    this sale going forward to take care of all of the claims at

4    the EFIH level, correct?

5    A    I believe so.

6    Q    So that would be the first lien claims, the second lien

7    claims, and what we refer to as the EFIH PIC claim?

8    A    Well, again, as you know the calculation as to what

9    those claims will be at the time of confirmation is a

10   relatively complex one, it involves a series of assumptions

11   with respect to the outcome of the very make-whole

12   litigation, the question of whether the PICs receive their

13   contract rate or the applicable federal rate, and it also is

14   a function of the performance of Oncor and dividend payments

15   between now and the expected closing date, and you've got to

16   assume a closing date.

17           So there are a lot of assumptions, but based on

18   what we think are a reasonable set of assumptions we believe

19   that there's a high likelihood that we will receive a bid

20   that will clear the EFIH stack based on the amount of

21   liabilities that I'm aware of today.

22   Q    And that includes -- just going back -- that includes

23   covering all of the make-whole premium claims that you're

24   aware of?

25   A    Not all of them.  I said I've made a set of assumptions

1   that I think are reasonable.

2   Q    Okay.  But I thought you told us that if all of the

3   assumptions that you're presently working with are correct

4   that there will be residual value from this transaction that

5   flows up to the EFH corporate level, correct?

6   A    I believe that's likely, yes.

7   Q    And you estimated the value that could flow up the EFH

8   Corporation based not on the auction that's ability to take

9   place, but based on the expressions of interests you've

10  gotten so far, that you thought the number could be as

11  higher as $7 million; is that correct?

12  A    I was making assumptions about the outcome of

13  litigation.

14  Q    Understood.  So in effect if this transaction puts

15  $700 million up at the EFH corporate level then we're

16  running this auction, are we not, for the benefit of EFH

17  creditors and their ultimate equity holders, right?  Because

18  everybody else on the inside is taken care of.

19  A    I'm not -- with respect to the E side?

20  Q    Yeah.

21  A    Yes.

22  Q    But after the E side the only purpose to run this

23  auction today is to benefit the unsecured debt at the parent

24  holding company level and their ultimate shareholders?

25  A    No, I don't think that's accurate.  I think that in

1    order to achieve a consensual plan of reorganization

2    defining the pot that is available to satisfy all sorts of

3    objections is in the best interest of all creditors.

4    Q    Okay.  Now let's explore that a little bit further,

5    because we talked about the E side of the house, let's talk

6    about the T side of the house.

7              Again for the proposed sale that you're looking

8    for authority to begin the process on, we're most likely to

9    see winning bids or any bids being for the reorganized

10   equity of EFH, correct?

11   A    Correct.

12   Q    And in order for that bid ultimately to be consummated

13   and for the debtors' estates to get the benefit of it you

14   have to have a plan of reorganization on the T side of the

15   house, correct?

16   A    That's correct.

17   Q    And under the terms of that plan of reorganization you

18   understand, do you not, that you're hoping to get the E side

19   -- the T side creditors, and in particular the first lien

20   holders, to agree to do a transaction on a tax-free basis,

21   correct?

22   A    Correct.

23   Q    If the first liens were to refuse to do a tax-free spin

24   we're all wasting our time and energy, correct?

25   A    Correct.

1  Q    Here now sitting here today have the T side first lien

2  creditors agreed to do a tax-free spin?

3  A    No, they agreed to do it in the context of a second

4  lien DIP financing.

5  Q    And the RSA.

6  A    And the RSA.

7  Q    Okay.  Which is now terminated.

8  A    Correct.

9  Q    Did you read the objection they filed in connection

10  with today's motion?

11  A    I did, but I don't recall it specifically.

12  Q    Do you remember it saying that, hey, guys, when this

13  extra value flows up to EFH if we don't get a piece of it

14  you can forget about your tax-free spin?  Didn't you read

15  that that way?

16  A    Well, that's obviously why I made the comment that

17  maximizing the amount of proceeds up at EFH is helpful in

18  reaching consensus on an overall plan of reorganization,

19  because there are going to be issues that need to be

20  settled, and defining the amount of consideration that's

21  available I think there stimulate discussions amongst the

22  parties.

23  Q    Okay.  So what you're telling me is where the E side

24  creditors are all done taking care of go back to Mr. Shore's

25  analogy, they're on the plane in first class, they got their

1    caviar, they got their lobster, they got the lobster and

2    caviar because they're getting principal plus they're going

3    to get premium, interest, make-wholes, contract rate versus

4    federal rate.  So we've got value that comes up to EFH and

5    it could be as much as $700 million, and you know that the

6    first liens are insisting on a piece of that, so we should

7    do this transaction because there'll be more value available

8    to the T side to get to a plan of reorganization.  Is that

9    what you want us --

10   A    Wherever it's going to be there should be other claims

11   at EFH that the T side could allege that I don't know about

12   yet, but it seems to me that maximizing the value at EFH is

13   in the best interest of all creditors, and that's the basis

14   upon which we're proceeding.

15            And I -- the alternative that you seem to want to

16   pursue or imply, a taxable transaction coupled with a

17   taxable deconsolidation locks in today a roughly $7 billion

18   total tax liability without knowing in fact whether that's

19   necessary.

20   Q    Perfect, let's go there.  Let's start there.

21            So we're doing this entire transaction, we're

22   incurring all the expenses for you to begin to conduct a

23   controversial and objected to sale process in order to avoid

24   their being billions of dollars of tax liability at the EFH

25   level.  Is that a fair summary?

1    A    Yes.

2    Q    Okay.  Now, the ability of EFH to ultimately effect any

3    of the debtor entities or their creditors is really a

4    function -- leave the IRS out of this for a time being.

5    When the debtor gets around to it I'll give him a idea as to

6    how I would negotiate with the IRS to make the IRS risk

7    disappear.  Another day.

8         IRS aside, you've got a $7 billion tax claim.

9    A    Right.

10   Q    EFH could conceivably push that liability or some

11   portion of that liability down to the EFIH side where it

12   would compete with, maybe even trump the claims of the EFH

13   creditors, correct?

14   A    Correct.

15   Q    Okay.  And you're aware, are you not, that there is a

16   controversy between the EFIH creditors and EFH on the

17   enforceability of that or the ability to push that down

18   successfully under the tax sharing agreement?

19   A    I am aware of that.

20   Q    You're aware of that.  Okay.  And that issue has not

21   been resolved yet, has it?

22   A    Correct.

23   Q    And as far as you know there's no independent fiduciary

24   on the E side of the house who's thrown up their hands and

25   say, I give up, the debtor is right, they can push this tax

1    liability down on me all day long?

2    A    No.

3    Q    Okay.  Mr. Cremmons, the independent board member,

4    maybe on the EFH board, maybe on some other board, we're not

5    sure, he hasn't told you, hey, I give up, has he?

6    A    No.

7    Q    Okay.  Likewise on the T side you're aware that the EFH

8    position is that they could somehow figure out a way to push

9    down the liability onto the T side of the equation, correct?

10   A    Correct.

11   Q    And you recognize that there is some debate as to

12   whether or not EFH would be successful in bringing those

13   liabilities down?

14   A    Correct.

15   Q    You're aware of that?

16   A    Yes, I am.

17   Q    Are you aware of whether or not Mr. Sawyer has thrown

18   up his hands and say, I give up, I accept that all those

19   liabilities could be pushed down upon me?

20   A    No.

21   Q    Okay.  Are you likewise aware -- well maybe you're not

22   -- but in the bankruptcy context we don't necessarily as

23   creditors have to rely on what Mr. Sawyer tells us, what the

24   boards tell us.  If we think that there are valid claims or

25   defenses, we as creditors could ask the Bankruptcy Court for

1    authority to stand in the shoes of our debtor and either

2    defend ourselves or prosecute claims that we think we have?

3    A    Yes.

4    Q    Okay.  And again, you're not aware of any fiduciary on

5    the T side acknowledges that there's any circumstance under

6    which EFH could push claims down to the T side of the house?

7    A    No.

8    Q    Okay.  And again, just to make sure I'm clear, if among

9    the claims that the T side junior creditors have reaches

10   into this ring fence that you in effect have been asked to

11   sell ice in the winter, assuming again that you're only ever

12   accepting a deal for reorganized EFH stock, this is not a

13   matter of a numerator and a denominator, this is a matter of

14   you don't own the asset that you're looking to sell.

15   A    That's correct.  I would agree that if there are claims

16   asserted down within the ring fenced entities that that will

17   be a circumstance under which this transaction could not

18   close.

19           But the points that I would make with respect to

20   the tax sharing agreement and with respect to the EFIH

21   position are that our transaction can't or won't be able to

22   close if you make a series of assumptions, and that series

23   of assumptions is number one, the tax sharing agreement

24   doesn't obligate EFIH for the tax liability that's created.

25   We agree that that's uncertain at this point in time.

1              Number two that we don't get enough value to pay

2      off the EFIH creditors.  If we get enough value to pay off

3      the EFIH creditors it doesn't matter what the tax agreement

4      says.  And why would we accept now with those things being

5      unknown a taxable transaction that locks in a $3.4 billion

6      tax liability when it may not be necessary to do so?

7      Q     But you may --

8      A     Now if we reach a point -- if we reach a point down the

9      road where these matters become crystallized and EFIH

10     creditors cannot be paid off and the tax sharing agreement

11     is found not to be able to push that tax liability down then

12     we'll go to the buyer in the tax exempt transaction and ask

13     him to propose a taxable transaction.  Or you'll go to --

14     we'll go to other buyers and ask them to propose a taxable

15     transaction.  But that set of circumstances doesn't exist

16     right now, and so why would you accept a taxable transaction

17     that locks in a liability of $3.4 billion?

18     Q     Well I've got a different question, why would you go

19     forward with a marketing effort at all, not whether it's

20     taxable or non-taxable, but --

21     A     For all the reasons that we've described, not the least

22     of which is if we don't go forward with this now and wait

23     for all these other issues to be decided you're going to

24     postpone the emergence of the debtor from Chapter 11 for a

25     significant period of time.

1           THE COURT:  We're going to take a recess.  Ten or

2      15 minutes.

3           MR. WEISFELNER:  Thank you, Judge.

4         (Recess at 1:31 p.m.)

5           THE CLERK:  All rise.

6           THE COURT:  Please be seated.  Stop talking.

7      Hello.  Thank you.

8           I hate to crimp your style Mr. Weisfelner but

9      unless you're showing him the chart, if you could stay at

10     the podium.

11          MR. WEISFELNER:  Yes, sir.

12          THE COURT:  It's a little distracting for me.

13          MR. WEISFELNER:  I apologize.

14          THE COURT:  It's okay.

15          MR. WEISFELNER:  Well, and now, of course, I want

16     to show him the chart.

17          THE COURT:  Well, that's --

18          (Laughter)

19     CROSS-EXAMINATION (Resumed)

20     BY MR. WEISFELNER:

21     Q    And here's my question and it comes from your last

22     answer, just before we broke.

23          And I want to make sure I understand what you

24     said.

25          Understanding that there are potential claims that

1    the E side estates, or their creditors, may have against

2    EFIH that may ultimately dip down all the way into the

3    ringed fence.

4    A    The T side creditors?

5    Q    The T side creditors may have.  Further understanding

6    that there are open issues with regard to the enforceability

7    of tax sharing agreements that would allow for the push down

8    of tax liabilities, I think what you said, just before the

9    break was, hey, look, if ultimately these issues get

10   resolved in a certain fashion, you may be required, or you

11   may desire, to go back to the stalking horse bidder or the

12   winning bidder, for that matter, and renegotiate in light of

13   new facts on the ground.  Did I understand you to say that?

14   A    Correct.

15   Q    The decision to go forward with a transaction that may

16   have to be altered depending on facts on the ground, weeks

17   or months from now, as opposed to waiting for the facts on

18   the ground to be resolved and then try and market an

19   investment or try and find a plan sponsor, who made the

20   decision that we would do it this way?

21          Let's go forward.  Let's get a bidder.  Let's

22   anoint the bidder as a stalking horse.  Let's try and

23   resolve all of these issues and, if need be, based on the

24   resolution of those issues, we'll go back to the stalking

25   horse versus resolve the issues, understand their

1    resolution, get rid of that risk and then go out and find

2    the necessary investor.  Who made the decision to do "A"

3    versus "B"?

4    A    I believe the management or the board of EFH.

5    Q    When you say, you believe the board of EFH, were you,

6    personally, involved in any discussions with the board of

7    EFH pursuant to which the board was asked to make a choice

8    and they, in fact, made that choice?

9    A    Not with respect to commencing the overall process.  I

10   was there when the board considered as to whether to sign up

11   NextEra versus going for the extended process.

12   Q    Okay.  But, again, to your knowledge was the board ever

13   given a choice between "A" and "B" and asked to choose

14   between the two?  You understand what I mean by "A" and "B"?

15   A    "A" is sell now; "B" is wait.

16   Q    Yeah.

17   A    No, I'm not aware.

18   Q    Okay.  Now did Evercore, to your knowledge, ever

19   provide any of the boards with an analysis of the impact on

20   pricing of whatever it is that you're selling, in a

21   situation where you first resolve the issues and then you go

22   out for a marketing program versus let's go out for a

23   marketing program, anoint the bidder then try and solve the

24   problems.  And if we can or we can't, we may have to go back

25   to the buyer and renegotiate.  Any analysis like that done?

1   A      No.

2   Q      You'd agree with me, would you not, that there is

3   depressive dynamic on the price you may ultimately get even

4   in a tax free situation because of execution risk when

5   viewed from the buyer's perspective.

6   A      It's not clear that there will be a discount as a

7   result of execution risk.  The process --

8   Q      But --

9   A      -- it's -- I'll finish my answer if you don't mind.

10           We've got a time frame, again, that represents

11  some element of risk that is consistent with what utility

12  buyers deal with all the time.  There is, obviously, the

13  added incremental execution risk that we can't reach

14  agreement with respect to a plan.

15           The buyers, to date, seem comfortable accepting

16  that risk based on the level of bids that I've seen.

17  There's no tangible evidence that any significant discount

18  is being applied and one hopes that through the competitive

19  process any discount is minimized because the winning

20  bidder's going to have to do that in order to be successful.

21  Q      What, if anything, have you done to assist the board in

22  understanding what depressive price, if any, may be

23  occasioned by asking your bidders to take on execution risk?

24  A      There's been no specific analysis done on that point.

25  Q      And just so that we're crystal clear, you've never been

1    involved in negotiations among creditors towards the

2    development of a plan of reorganization; correct?

3    A    No.

4    Q    You've never been involved in approval of a plan of

5    reorganization; have you?

6    A    Well, yeah, I was involved back in Continental on an

7    approval but it was a long time ago and I don't have a good

8    recollection of it.

9    Q    Alright.  You understand, don't you, that for a plan to

10   get approved in any bankruptcy case, you ultimately need the

11   votes of impaired creditor classes; correct?

12   A    I understand that.

13   Q    But you don't know, sitting here today, do you, which

14   creditors on the E side are going to ultimately be impaired

15   and therefore entitled to cast votes; do you?

16   A    Not with certainty because it's going to be a function

17   of how many claims there might be at EFH and other matters.

18   Although my guess is it's going to be at the EFH level.

19   Q    Okay.  But I think your prior testimony was while there

20   was no certainty, you think you'll clear a price that takes

21   care of all of the EFIH creditors, in full, even with their

22   make-wholes, even with the potential premium claims.

23   A    I think, again, we believe, based on assumptions with

24   respect to which make-wholes that we will achieve that.

25   Q    Okay.  And if you assume that the tax structure

1    requires some continuity of interests, meaning some existing

2    creditors have to remain in the investment, they can't be

3    cashed out in full --

4    A    Correct.

5    Q    -- even if there's enough value to compensate all of

6    those creditors, they're likely to be entitled to vote

7    because they'll -- they're not getting cash.  They're

8    getting something other than cash as part of their

9    consideration.

10   A    I don't necessarily accept that assumption.  I think as

11   we further refine the tax assumption, the tax structure, I

12   can see a very good possibility that all EFIH creditors are

13   satisfied in cash.

14   Q    Okay.  That new structure is not reflected in the tax

15   memo that you read; is it?

16   A    Well, it's just a modification of the NextEra structure

17   but the original NextEra bid required more stock in order to

18   achieve the continuity of interest than we believe now may

19   be necessary so that the mix of consideration between cash

20   and stock can be more heavily weighted towards that.

21   Q    I got it.  That's because you're going to create, in

22   your buyer, a creditor debtor relationship.  In other words,

23   they'll be a creditor by the time this transaction occurs

24   and in their capacity as creditor, they can take the

25   reorganized equity without triggering the stock.  Do I have

1    it basically right?

2    A    Again, I'm not a tax lawyer.  I don't think it needs to

3    be an inter-company loan.  It could also be loan arranged

4    with third parties.

5    Q    But in any --

6    A    You wouldn't have --

7    Q    -- event, you wouldn't have -- you would have to

8    establish the bidder as a creditor; correct?

9    A    Not necessarily to the extent that funds could be

10   arranged from a third party.

11   Q    Okay.  Sitting here today --

12          THE COURT:  In any event, it would involve a loan?

13          THE WITNESS:  Yes, sir.

14   BY MR. WEISFELNER:

15   Q    Alright.  Has anyone at Evercore told the debtors or

16   given them an analysis, when I said debtors, I mean the

17   debtors' boards, of what the likely terms of that lender

18   arrangement would be?

19   A    No, we've not gotten that far.

20   Q    What the cost of that lending arrangement would be?

21   A    No.

22   Q    Sitting here today, do you know which creditors on the

23   T side of the house are impaired and entitled to vote?

24   A    No, I don't know.

25   Q    At your deposition, you told us that you thought that

1  all of the creditors on the T side were impaired.

2  A    Well, again, that -- I thought I had seen some form of

3  analysis.  Based on further discussion, what I saw, I

4  believe, was a summary of the RSA and under that the T side

5  first liens were received a hundred percent of the stock,

6  implying that they may be impaired and certainly the

7  creditors below them were impaired.

8  Q    Okay.  I think early in your involvement, yes or no,

9  were you told that the second liens and the general

10  unsecured creditors, in other words, the entirety of the

11  unsecured creditors and its constituents, were out of the

12  money?  Were you told that?

13  A    I don't recall whether I was told that or whether I

14  drew that conclusion from looking at the effect of the RSA.

15  Q    Okay.  I'm going to ask you to take a look at your

16  deposition.  So, for the benefit of those people in the

17  room --

18            THE COURT:  Do you have an exhibit number I can

19  look at?

20            MR. WEISFELNER:  I don't know if it was marked.

21  (Indiscernible - 2:02:35).  May I approach?

22            THE COURT:  This is not in my binders?

23            MR. WEISFELNER:  I don't know if it is or isn't

24  and I apologize, Your Honor.  But (indiscernible - 2:02:50)

25  looking.  I'm looking at the thicker deposition at page 175.

```
 1              (Pause)

 2    BY MR. WEISFELNER:

 3    Q    Sir, do you recall your deposition being taken, at

 4    least the first time, on October the 6th?

 5    A    Yes.

 6    Q    And can you recall being asked, on page 173, being

 7    asked the following question, and now I'm quoting, at some

 8    point during your testimony regarding the existence or lack

 9    thereof of any conflict, you made reference to, and I'm

10    going to quote:  "the out of the money T side."

11              Do you recall that testimony?

12              And the answer you gave was:  yes, uh-huh.

13              The question then goes on to ask:  what's the

14    basis for your conclusion that there are creditors who are

15    "out of the money on the T side"?

16              And did you give the following answer:  "My

17    discussions with David Ying, and reviewing some creditor

18    recovery analysis, I believe."

19    A    Yes.

20    Q    And then later on, asking about your understanding that

21    there are out of the money T side creditors, on page 175,

22    you were asked:  And on the basis of that review, that being

23    the written analysis you testified to, you have concluded

24    that there are out of money T side creditors.

25              And you gave the answer:  "That's my
```

1    understanding, yes."

2              The question was asked:  "And, again, your

3    understanding is based on this written analysis that you

4    have seen?"

5              Your answer:  Discussions with David Ying and a

6    written valuation that I saw.

7              Do you recall those questions and giving those

8    answers?

9    A    I do.

10   Q    Okay.  Now, let me ask you a question.  The written

11   analysis that you testified to, did it contain, for example,

12   a discounted cash flow?

13   A    No.

14   Q    Did it, for example, contain a comparative transaction

15   analysis?

16   A    No.

17   Q    Did it contain a comparable multiples analysis?

18   A    No.

19   Q    Did it contain a bond trading analysis?

20   A    No.  I believe, as I stated earlier, that I was

21   mistaken and what I looked at was an analysis of recoveries

22   under the RSA, which showed the -- a hundred percent of the

23   stock going to the TCEH first liens.

24   Q    So it was based on what the RSA provided for, that

25   being all of the value going to the first liens, that you

1   concluded that the junior T side creditors were out of the

2   money; correct?

3   A    That and discussions with David Ying.

4   Q    Okay.  Do you have any idea how it is that the debtors

5   in signing the RSA and concluding that the T side junior

6   creditors were out of the money, what valuation did they

7   ever get from Evercore to underscore that part of the

8   analysis?

9   A    I don't know.

10  Q    Well, do you think that if David Ying had an analysis

11  that was based on a DCF he would have showed it to you?

12  A    I assume he might have but I -- again, I was looking at

13  an awful lot of material in a very short period of time, in

14  an attempt to understand how the sale of Oncor fit into the

15  overall restructuring but, obviously, my attention was far

16  more focused on Oncor and the E side and not on the T side.

17  I wanted to understand briefly about the T side and what was

18  contemplated but I did not spend any time looking at the

19  valuation on the T side.

20  Q    Isn't it --

21  A    I'm sorry.

22  Q    Isn't it true that Evercore has never provided a formal

23  valuation of the T side to the debtors or any of their

24  boards of directors?

25  A    Not to my knowledge.

1            MS. O'CONNOR:  Objection, Your Honor.  I'm going

2    to object to relevance to that question and if line

3    continues.

4            THE COURT:  Yea.  Where are we headed here?

5            MR. WEISFELNER:  Well, we're only going to this.

6    I'm talking about execution risks so I'll jump over

7    valuations and talk about execution risks.

8            THE COURT:  Okay.  If you see your counsel

9    standing up sort of waving, you probably should wait before

10   you answer.

11           (Laughter)

12   BY MR. WEISFELNER:

13   Q    You talked about execution risks and I think what you

14   said to the Court, or your testimony is that you believe

15   that the competitive process that you hope will ensue will

16   ensure that bidders don't take a deduct on what they're

17   prepared to pay for execution risk because they're other

18   bidders there that are competing as well.  Is that the sum

19   and substance of what you're tell us.

20   A    I didn't use the word, ensure.  I think I said it would

21   minimize any discount.

22   Q    Okay.  Have you given any sort of analysis to the --

23   any of the boards as to what level of discount, if any, we

24   can expect in going forward on a sale transaction that has

25   execution risk?

1   A    You asked that question earlier and I responded, no.

2   And I'll response again, no.

3   Q    Okay.  What about to the boards?  I mean, what about to

4   the management.  Did you give the management any analysis --

5   A    No.

6   Q    -- regarding the level of discount that could be

7   established by execution risk?

8   A    No.

9   Q    And just so that we're all clear, execution risk

10  includes the timing to get the confirmation; right?

11  A    Well, again, the timing to get the confirmation given

12  the drop dead date that we've put in here is consistent with

13  the timing in any other utility merger.

14  Q    In or out of bankruptcy?

15  A    It doesn't really matter.  The timing is the same.

16  Q    Okay.  Well, out of bankruptcy, do you have the

17  obligation in a utilities transaction to resolve inter-

18  company claims?

19  A    Excuse me, rephrase the question.  I --

20  Q    In a utility transaction outside of bankruptcy --

21  A    Yes.

22  Q    -- is there an obligation before you can go for and

23  obtain regulatory approvals, the need to resolve inter-

24  company claims?

25  A    Generally, no.

1   Q    In a utility transaction outside of bankruptcy, and

2   putting aside the time to get to regulatory compliance, is

3   there a need to establish whether or not the selling company

4   is entitled to push tax liability down to its subsidiaries?

5   A    No.  I'm referring to the time frame that's

6   contemplated in our transaction, which includes both

7   resolving all the uncertainty surrounding a plan of

8   reorganization and obtaining regulatory approval and

9   comparing that to the time frame that a utility would face

10  outside bankruptcy and I'm asserting those time frames are

11  the same.

12  Q    Okay.   I want to move into to what I hope will be the

13  ultimate topic of your cross and that is your contention

14  that now is the right time to sell.

15          And you talked a lot about market factors and, I

16  think, you included in your market factors, and tell me if

17  I've missed anything, the general market conditions are very

18  good now, interest rates are low, credit markets are good,

19  both in terms of availability and the cost of credit, that

20  utility stocks and, in particular, in the transmission and

21  distribution segment of utility stocks are doing well and

22  that the PE ratios and the EBIDTA ratio values look very

23  healthy.

24          Under the general heading of general market

25  conditions; did I miss anything?

1    A    No.

2    Q    Okay.

3    A    Well, yes, perhaps one thing which is as evidence of

4    the attraction of general market conditions the volume of

5    M&A transactions is up from materially 1.2 trillion year-to-

6    date this year versus a number below a trillion last year

7    and I take that as further evidence that market conditions

8    are good.

9    Q    Okay.  Defining market conditions as you and I have

10   just done, can  you tell me yes or no, are the market

11   conditions that are currently extant the same, better or

12   worse than they were when this bankruptcy proceeding

13   commenced in April?

14   A    They're slightly better but not materially so.

15   Q    Okay.  Now the debtors, in light of the good market

16   conditions that existed as of the time of the filing, did

17   not determine, did they, to sell their interests in Oncor at

18   an open auction; did they?

19   A    That's correct.

20   Q    Instead, they sought to dispose of their economic

21   interests in Oncor pursuant to the RSA and the second lien

22   DIP facility; right?

23   A    Correct.

24   Q    The only real change that makes now a good time to

25   sell, as I understand it, is the fact that NextEra has

1    emerged and you hope for other bidders to emerge as well.

2    A    That's one factor.

3    Q    What other factors other than a spurt in the M&A

4    market?

5    A    Again, we have a structure that now enables us to sell

6    EFH in its entirety, and I assuming a merger transaction

7    with stock constitutes a sale, sell EFH in its entirety on a

8    tax-free basis to a third party who's not a creditor and

9    that was not clear back at the time of the RSA.

10   Q    By the way, the debtors continued to press their second

11   lien DIP motion even after the NextEra bid emerged; isn't

12   that right?

13   A    Only for a day or two, as I understand it.  Three days,

14   I think, the 16th and then the 18th through the 19th, they

15   came before the Court and said they were going to terminate

16   the RSA.

17   Q    Well, we keep hearing about a robust auction process.

18   In point of fact, you currently anticipate somewhere between

19   two and four bidders reaching round two of this.

20   A    That's our election to do that.

21   Q    But --

22   A    And I said that that number would be greater if we

23   received bids that were tightly clustered.

24   Q    Okay.  I wasn't asking for preference or desire, I was

25   asking for what you currently anticipate based on all of

1    your knowledge and expertise.  You currently anticipate

2    receiving somewhere between two and four bidders reaching

3    round two; correct?

4    A    Reaching round two, yes --

5    Q    Okay.

6    A    -- unless bids are tightly clustered, as I said, in

7    which case it would be more.

8    Q    Now you agree that NextEra surfaced because the RSA and

9    second lien DIP proposal valued Oncor at a low value.

10   A    At a lower value than they were prepared to pay.

11   Q    Well, they were willing to pay more than the low value

12   that was inherent in the second lien DIP facility.

13   A    There's a difference between a lower value and a low

14   value.

15   Q    Alright.  Well, do we know whether or not the value

16   that was inherent in the second lien DIP for Oncor was or

17   wasn't a low value?

18   A    I haven't specifically looked at that but the value was

19   about $16.5 billion.  The value that NextEra is paying is

20   roughly nine percent higher than that number.  It would

21   depend on which companies, in looking at, you'd look at

22   precedent transactions, comparable company analysis, and my

23   belief is that that value, while not being the highest

24   value, would be a value that, in fact, would have fallen

25   within the range of multiples implied by precedent

1   transaction analysis and comparable company analysis.

2           Now, obviously, NextEra was willing to pay nine

3   percent more and that's terrific.  We're happy that they're

4   there.

5   Q    I'm just trying to figure out whether or not the market

6   interest in encore, to the extent that, in fact, it goes

7   beyond NextEra, whether that's a function of the fact that

8   the market perceived, that the $16 billion valuation

9   inherent --

10  A    Sixteen and a half.

11  Q    Sixteen and a half billion dollar valuation inherent in

12  your RSA was too low of a value.

13  A    Well, they obviously were prepared to pay a higher

14  value.

15  Q    Okay.  Let me ask you a different question.

16  A    On the face of it, that's true.

17  Q    Let me ask you a different question.  Did the debtors

18  in proposing and pursuing the RSA and the second lien DIP

19  have Evercore perform a valuation of Oncor so as to

20  determine whether or not the sixteen and a half billion

21  dollar value was a good, bad or indifferent value?  Yes or

22  no?

23  A    Not that I'm aware of but I wasn't involved at that

24  time.

25  Q    Okay.  But you do know that as of now the debtors have

1    not performed a valuation of Oncor using precedent or any

2    other transactional analysis you'd like to tell us whether

3    or not the price that's being offered in this auction, at

4    this stage, is good, bad or indifferent.

5    A    Well, first of all, as I said earlier, we will provide

6    the board with an analysis of the value of Oncor prior to

7    the board signing up any stalking horse bid as we would

8    normally do in any transaction out of bankruptcy in

9    association with delivering a fairness opinion.  Point one.

10           Point two, with respect to determining whether the

11   NextEra bid was attractive, we did not perform a formal

12   valuation, like we will before the board, or like we will

13   provide to the board before it makes a decision.  However,

14   we did compare the NextEra bid to comparable company trading

15   analysis, precedent transaction analysis, looked at the

16   EBIDTA multiples implied by the NextEra bid, looked at the

17   price earnings ratios implied by the NextEra bid and came to

18   the conclusion that this was an attractive bid that should

19   be pursued.

20   Q    Uh-huh.  Now, I'm trying to hone in on what you just

21   told us.

22           It is your current intention that before a

23   stalking horse bid can be, or s hold be, anointed by any of

24   the boards, they need to have available to them a formal

25   valuation.

1   A    I didn't term it a formal valuation.  I said we would

2   provide valuation materials to them, consistent with the

3   kind of materials that we would provide in connection with a

4   fairness opinion.

5   Q    Okay.  Well, then let's measure it against what you'd

6   normally provide in a fairness opinion.

7            Would I see a discounted cash flow?

8   A    Yes.

9   Q    Would I see a comparative transactions analysis?

10  A    Yes.

11  Q    Would I see a comparable multiples analysis?

12  A    Yes.

13  Q    Will I see bond trading price analysis?

14  A    No.

15  Q    Okay.  Other than the three standard valuation metrics

16  that we just talked about; what other elements of the

17  valuation will you be giving to the boards in connection

18  with their anointing a stalking horse bid that you normally

19  see given to boards as part of a fairness opinion?

20  A    Well, as part of a fairness opinion, there are a

21  variety of indicia that relate to public companies, i.e.,

22  premiums that are paid over the current market price, and

23  things -- research analyst estimates of target prices.

24  There are a variety of things that you could look at if this

25  was a public company that we can't in this situation.

1   Q    In your years of experience as an M&A expert, when you

2   are selling a company or its assets and you come up with a

3   fairness opinion, are you required to take that fairness

4   opinion and share it with or show it to creditors of your

5   client?

6   A    We're -- it's published in a proxy statement normally.

7   Q    Well, but that's after the fact; correct?  In other

8   words --

9   A    No.

10  Q    -- before you render a --

11  A    Prior to a shareholder vote.

12  Q    Okay.  But it's prior to a shareholder vote on the

13  transaction.

14  A    Correct.

15  Q    Okay.  So now that we're in a bankruptcy and I

16  recognize it's not your milieu, you're going to go to the

17  board with a formal or what I call a formal valuation.  I

18  recognize you view it as sort of identical to a fairness

19  opinion, although it contains the same elements I'm used to

20  working with and I know the Court's used to working with.

21          At what point, if any, in this process that you've

22  designed in terms of logistics, is that valuation that you

23  present to the board so that they can conclude whether to

24  anoint the stalking horse?  When does that get shared with

25  any of the creditors for their input, their discussion,

1    their critique?

2    A    Not clear that it does get shared.  The creditors, if

3    they believe we're going forward with a transaction that

4    they believe is too low, will have the ability to object

5    before the stalking horse bid is approved but it's not clear

6    to me that that information that's provided to the board

7    will be shared with the creditors.

8    Q    But, again, just so I'm crystal clear, there's no

9    reason why Evercore, as financial advisor, couldn't have

10   done that valuation last month; correct?

11   A    Well, again, as I said earlier, we constantly monitor

12   indicia of value.  But, no, we have not prepared a formal

13   valuation.  But, of course, we will do so before asking the

14   board to sign an agreement with a stalking horse bidder.

15   Q    And we're so close to the end that I really ask you

16   once again to listen to my question as opposed you answering

17   whatever question was in your mind.

18          What, to your knowledge, prevented Evercore, if

19   anything, from presenting a valuation to the board regarding

20   the E side prior to today?  What prevented them from doing

21   it?

22          Why is Evercore waiting to present that formal

23   valuation to the board in connection with their decision to

24   anoint a stalking horse?  Why?

25   A    Normally, we do that in conjunction evaluating a

1    particular bid.  We get a bid.  We decide it's something we

2    want to consider.  We go before the board and say, here's

3    the bid.  Here's the valuation.  And that's the comparison

4    and why you accept it.  That's kind of normal course.

5    Q    And are you aware that normal course for debtor-in-

6    possession, in terms of dealing as a fiduciary with their

7    creditors on when their valuations ought to be done and

8    shared?  Are you aware of that?

9    A    I'm not.

10   Q    Okay.  Almost done.

11             You haven't done any analysis to how modest a

12   change in general market conditions could affect the values

13   for Oncor down the road; have you?

14   A    No.

15   Q    And no one asked you for that analysis?

16   A    No.

17   Q    No one asked you for a range of upside versus downside?

18   A    No.

19   Q    Nothing along those lines, to your knowledge, has ever

20   been presented to the debtors' boards; is that correct?

21   A    That's correct.

22   Q    You admitted to us that future values could fluctuate,

23   in your view, 10 to 20 percent.

24   A    That's correct.

25   Q    And you told us that they could fluctuate 10 to 20

1    percent either on the upside or the downside; isn't that

2    correct?

3    A    That's correct.

4    Q    Have you formed any expert opinion as to the likelihood

5    of any market risk materializing within the next 12 to 18

6    months?

7    A    Well, again, I'm not an expert in predicting the

8    markets or predicting interest rates.  My own personal

9    opinion is that, as I said in my deposition, that it is more

10   likely that market conditions would deteriorate as opposed

11   to improve over the next 12 to 18 months.

12   Q    But, again, you haven't formed any expert opinion; have

13   you?

14   A    Well, and again, all you've got to do is read the

15   newspaper every day.  There's a widespread expectation in

16   the bond market that the Fed at some point is going to stop

17   its quantitative easing.  That expectation existed, you

18   know, 12 months ago and, in fact, did not materialize, but

19   there continues to be an expectation that as the Fed

20   discontinues its quantitative easing, the equity markets may

21   run into some problems.

22   Q    The metrics for Oncor, have you taken an opportunity to

23   familiar yourself with Oncor's operation s or their

24   projections?

25   A    To some degree, yes.

1    Q    What does that mean, to some degree?

2    A    Again, I've reviewed the projections.

3    Q    And what are the significant operating metrics that you

4    reviewed for the Oncor business?

5    A    Revenue, EBIDTA, capital expenditures, dividends.

6    Q    Let's take revenue and EBIDTA.  Over what period of

7    time has Oncor projected its revenue and EBIDTA results?

8    A    It's either 2017 or 2018.  I can't recall specifically.

9    Q    Okay.  So at least two years beyond the drop dead date

10   for getting plans done in this case?

11   A    Correct.

12   Q    Over that period of time, does Oncor project its

13   revenues going up or down?

14   A    Up.

15   Q    During that period of time, does Oncor project that its

16   EBIDTA is going either up or down?

17   A    Up.

18           MR. WEISFELNER:  Your Honor, if I can just have a

19   second, I might be able to wrap up.

20           (Pause)

21           MR. WEISFELNER:  Your Honor, that's (indiscernible

22   - 2:26:23).

23           THE COURT:  Thank you.  Mr. Shore.

24           MR. SHORE:  Could I just try to carve out a little

25   area, 15 minutes or --

1          THE COURT:  Yea.  We have 20 to 25 minutes left

2     before we have to break.  So why don't you do what you can?

3          MS. SHORE:  (Indiscernible - 2:26:40).

4          THE COURT:  We'll obviously break at a time that

5     makes sense for you.  I'm not trying to jam you up on the

6     flow of your cross examination.  Obviously, we're not going

7     to finish.

8          MR. SHORE:  It's alright.  .

9     CROSS-EXAMINATION

10    BY MR. SHORE:

11    Q    Look, I'll tell you right now, Mr. Hiltz,

12    (indiscernible - 2:26:52) basically met now twice.

13    A    Yes.

14    Q    I'm going to ask you a bunch of questions later about

15    what I was saying in my opening, which is with respect to

16    the decision to go out to market, who made it, when was it

17    made and all that.

18          But I'm going to follow up now, since we have a

19    little short time today, on some questions that were asked

20    about the structure of the deal.  And I take it from your

21    answers what you're telling the Court is, you believe you're

22    going to get some bids for a tax-free transaction that will

23    allow the debtors to exercise a fiduciary out with some

24    break fee that has to be paid.

25    A    Correct.

1  Q    Alright.  Let's -- I'm only going to talk about two

2  alternate transactions out there.  And I think with the

3  first one, whether you call it taxable or non-taxable,

4  you're drawing a distinction, aren't you, between headline

5  proceeds and distributable value in giving your answers;

6  right?  Do you understand my question?

7  A    Yes.

8  Q    Okay.  In this taxable transaction we're talking about,

9  you actually have a higher headline number in your stock

10  purchase agreement or plan support agreement or whatever it

11  is; right?

12  A    In all likelihood.

13  Q    Right.  And what you're saying is, what you want to do

14  -- what you're doing now is telling bidders, we have to

15  determine now what one aspect of the distribution of that

16  is; right?  Which is that we're not going to have to

17  distribute money to the IRS; right?

18  A    Well, again, I'm defining it a little more narrowly

19  than perhaps you are.

20  Q    Can you answer my question?  If -- sir, you can answer

21  yes or no, or I don't know and then your counsel can follow

22  up with all the questions they want.

23        So let me ask again.

24  A    Uh-huh.

25  Q    In the taxable -- or the non-taxable transaction you've

1    been testifying about --

2    A    Uh-huh.

3    Q    -- what you're doing is talking about distributable

4    value to existing creditors; right?

5    A    Yes.

6    Q    And what you're saying is, we don't want to create a

7    new creditor class, the IRS, to whom we'd have to distribute

8    the headline proceeds.

9    A    Correct.

10   Q    Alright.  Now when we talk about distributable value,

11   do you know enough about bankruptcy to know that

12   distributable value is going to depend on a whole host of

13   factors about what claims exist; right?

14   A    Correct.

15   Q    And so you're going to have to have a determination of

16   where the IRS claim would reside; right?

17   A    Correct.

18   Q    And you don't know, now, where that IRS claim would

19   reside because you know there's a dispute as to which estate

20   would take that liability?

21   A    Correct.

22   Q    And you don't know what the priority of that claim is,

23   right, whether it's going to be an administrative claim or a

24   pre-petition, unsecured claim, or some other form of claim;

25   do you?

1    A    Correct.

2    Q    And you don't know what other claims exist within the

3    box where that administrative claim, or unsecured claim,

4    would lie; right?

5    A    Correct.

6    Q    All that kind of stuff is what happens in a plan;

7    right?  You at least know that.

8    A    Yes.

9    Q    Right.  And, for example, the IRS might want to

10   compromise whatever claim it had if a structure came forward

11   that paid them an acceptable amount; right?

12   A    I'm not sure that the IRS would.  I think that that's

13   ignoring the fact that they're giving away the value of the

14   step-up.  So --

15   Q    Sir, do you have any experience ever negotiating a

16   claim with the IRS in bankruptcy?

17   A    No.  Nope.

18   Q    Okay.  So you're answering the question that you don't

19   expect that the IRS would compromise is just rank

20   speculation; isn't it?

21   A    It's speculation (indiscernible - 2:30:34).

22   Q    Okay.  Now let's talk about one of the consequences of

23   not figuring this out now because, as I think you said,

24   there's -- you're expecting there's going to be a break fee

25   that's going to have to be paid; right?

1   A    I didn't say it's going to have to be paid.

2   Q    No, you're expecting that there's going to be a break

3   fee --

4   A    right.

5   Q    -- that the debtors are going to have to pay to

6   exercise their fiduciary out?

7   A    Only if they exercise their fiduciary out.

8         MR. SHORE:  If I may approach the (indiscernible -

9   2:31:00) and I'll try to keep my voice up.

10        THE COURT:  That'll work.

11  BY MR. SHORE:

12  Q    Mr. Weisfelner was asking you questions about the

13  claims from the T side over the EFIH; right?

14  A    Yes.

15  Q    Alright.  Let me clarify that.  You do understand that

16  what's being talked about are claims that TCEH or EXCH or

17  other debtors would have against the E side; right?

18  A    Correct.

19  Q    And you understand that Evercore is retained by the T

20  side as well; right?

21  A    I do.

22  Q    And there are dual duties that maximize the value for

23  the T side as well; right?

24  A    I do.

25  Q    Alright.  Now, let's talk about the win here.  Not my

1   claim, but TCH sues and gets a billion dollar claim into

2   EFIH.  You understand that?

3   A    Uh-huh.

4   Q    Aright.  Now if a billion claim came over there, that

5   would change your assumptions about how much distributable

6   value there was at EFIH; right?  On a amount per claim

7   basis; correct?

8   A    Yes.

9   Q    And it may be that you have this great transaction with

10   this new bidder, but you can't clear the hurdle because one

11   of your estates to whom you owed a duty is determined to

12   have a big claim in there; right?

13   A    Correct.

14   Q    Alright.  And then the issue's going to be where the

15   tax resides because if the tax resides just up at EFH and it

16   can't push the tax down, if you just look from the EFIH

17   perspective, just those two variables, a claim in and no

18   claim down, this taxable transaction would be superior for

19   EFIH creditors; right?

20   A    Given all the assumptions that you're making which are

21   not reflective of the situation we find ourselves in today,

22   the answer is yes.

23   Q    Okay.  I gave you two, two hypotheticals; right?  Did I

24   give you more than two?

25   A    Well, there are implicitly three hypotheticals.

1    Q    Okay.  Well, let's deal with the first one that EFH

2    can't push the tax down.  That's a contractual dispute that

3    you know is life; right?

4    A    I understand that.

5    Q    And you haven't done any analysis, have you,

6    (indiscernible - 2:33:13) that?

7    A    Personally, no.

8    Q    No.  You've just relied on the tax memorandum which was

9    paid for -- or which was prepared by the lawyers for all of

10   the debtors in coming to your conclusion that my

11   hypothetical is somehow invalid?

12   A    And some discussions with K&E tax lawyers and the

13   company tax counsel; yes.

14   Q    Okay.  But never anybody who was acting independently

15   for EFIH?

16   A    Well, again, I believe the EFH owns a duty to all the

17   creditors and their professionals and management are

18   conducting themselves accordingly.

19   Q    Right.  So you tell me what you're relying upon is the

20   EFH officer, Paul Keglevic, and the EFIH officer,

21   Paul Keglevic, the CFO, right, getting together in his mind

22   which estate is liable for the tax?

23   A    I'm relying on Kirkland & Ellis as well.

24   Q    Okay.  Now, the second hypothetical that I gave you was

25   the TCEH has a billion dollar claim into EFIH.  You've done

1    no analysis of that; have you either?

2    A    No.

3    Q    And you understand that those two issues, we're going

4    to get to the third one in a second, the two issues that I

5    gave you are issues that are going to be resolved in

6    connection with a plan; right?

7    A    Right.

8    Q    Who owes the tax and whether T side has claims in the

9    EFIH.

10   A    I understand that.

11   Q    Okay.  What was the third part of the hypothetical?

12   A    The level of the bid.

13   Q    The level of the bid.  You're right.  So -- but that

14   would just affect the amount of the claim going in; right?

15   Sol if a bid went up $2 billion, then it would be better if

16   I had a $2 billion claim in --

17   A    Well, again if the --

18   Q    -- correct?

19   A    -- amount of the claim went up by a billion and the

20   amount of our bid went up by two billion, I'd assert we're

21   going to be able to clear the EFIH creditor stack and then

22   there's no reason to incur a $3.4 billion liability that the

23   estate can otherwise avoid.

24   Q    Right.  Avoid or settle with or settle with the IRS.

25   A    Well, I don't think you're going to be able to settle

1   it.  But that's my own personal opinion.

2   Q    Alright.  So what we have here is a situation in which

3   you can't really tell what transaction's going to be

4   superior until some of these issues are resolved; right?

5   A    Well, what we can tell is that, as we know it right

6   now, a taxable transaction locks in a $3.4 billion gain when

7   -- excuse me, a tax liability when it may not be necessary

8   to do that.

9   Q    I'm going to --

10  A    So why would we elect to pursue a taxable transaction

11  when we may not have to?  Why wouldn't we let events unfold?

12  If we don't need to, then our optimal tax structure works.

13  It relieves the estate of a $3.4 billion liability.

14           If we get to the point where we can't complete the

15  TCIH stack or the reasons that you posited and the tax

16  sharing agreement is found not to be -- not to make them

17  liable, if all of those things happen, then we could turn

18  and switch this to a taxable transaction, amongst other

19  alternatives that we would consider at the time.

20  Q    And pay the tax.  Right.  And then pay the break fee.

21  That's all I'm getting at.

22  A    No, you don't have to necessarily pay the break fee.

23  What if the initial bidder is the bidder who agrees to pay

24  as much in a taxable transaction?  Then we don't necessarily

25  pay the break fee.

1   Q    Right.  But don't forget, the reason you're entering

2   into this transaction right now is because market conditions

3   might deteriorate; right?

4   A    One of the reasons.

5   Q    Right.  And so if market conditions deteriorated and

6   Oncor is worth less, you're telling me that in your

7   experience as an M&A advisor, that that buyer is going to

8   willing change the contract to help you out with -- and

9   produce another bid without demanding the break fee or

10  getting out of the contract?

11  A    Well, if he still wants to own it and is prepared to

12  pay something more on a taxable basis, I don't know what the

13  net effect will be, but, again, this will still be a

14  circumstance where this is an attractive asset.  He was the

15  best buyer originally on a tax-free basis.  No reason to

16  assume that he's not necessarily the best buyer on a taxable

17  basis.  But, we'll see.

18           And if it turns out he's not, you're right, we'll

19  have to pay the break fee.

20  Q    Now, what -- one thing is for certain, is it not, that

21  there isn't going to be a tax if there isn't a sale; right?

22  A    That's true.

23  Q    Right.  So when we start talking about risks and what

24  kind of structures we're going to put forward, the do

25  nothing possibility now, let's just get on with figuring out

1    what these issues are and leave the Oncor estate there,

2    isn't going to trigger any tax?

3    A    That's correct.

4    Q    Alright.  Now the other thing you're doing, and let's

5    get away from taxable, when you're talking and locking in

6    structures, another thing that you're doing is you're

7    telling all the bidders, they are not permitted to bid on

8    the T side; right?

9    A    Well,  not -- the T side is not for sale right now.

10   Q    Not for sale.  So let's talk about -- so one of my wins

11   in this case is I prove that there's a billion dollar claim

12   over there and that the tax can't be pushed down and that

13   may create more distributable value at TCH; right?

14   A    Correct.

15   Q    Right.  Another way to create more distributable value

16   at TCH is to create a transaction which the T side -- you

17   clear the T side and allow the company to come out the way

18   it exists now.

19   A    That's possible.

20   Q    Right.  So if I win that one, if I'm able to show that

21   we can clear the whole stack and I can keep the company

22   together --

23   A    Clear the T side stack?

24   Q    Yea.  You don't -- you haven't seen it -- you haven't

25   seen a value -- have you -- well, I see your head turning to

1     the side.  Have you performed a valuation that says that T

2     side creditors are out of the money?

3     A     No.

4     Q     Okay.

5     A     But --

6     Q     So you don't have any basis as you sit here today that

7     says, we can't put together a transaction that clears the T

8     side; right?

9     A     I haven't performed a valuation but my understanding,

10    based on discussions with David and others, is that that's

11    highly unlikely.

12    Q     Well, do you know whether David's done a valuation?

13    A     Well, as I said, we constantly monitor indicia of value

14    for all of these entities and no, we have not done a formal

15    valuation.

16    Q     And what's the value date on these constant monitoring?

17    It's now; right?

18    A     Correct.

19    Q     It's not monitoring it at confirmation?

20    A     No.

21    Q     Right?  In fact, market conditions may change rapidly

22    in the energy space that could put the T side into the

23    money; right?

24    A     It's possible.

25    Q     Right.  So, in that win, what ends up happening is, you

1    have to exercise your fiduciary out to say, no, sorry, we're

2    not selling to you E side bidder.  We're keeping the company

3    together.

4    A    If you want to do a stand-alone plan that does not

5    incorporate the sale of the E side and you elect to do that

6    prior to the drop dead date in the contract, yes, you would

7    have to pay the termination fee.

8    Q    Right.  So the fact is that the T -- now, do you doubt

9    that a -- going through the -- getting enough value to go

10   all the way through the T stack would be a homerun for the T

11   side creditors, who employ you?

12   A    Yes.  It would be.

13   Q    Right.  But what this transaction does is it creates a

14   situation in which in order to trot the bases on the

15   homerun, someone's going to have to pay a break fee.

16   A    Well, again, if this transaction -- if we thought that

17   there were buyers out there for the T side and we go forward

18   with the transaction as currently anticipated, there's

19   nothing to prevent a buyer from coming and buying the T side

20   after the spinoff.

21   Q    Right.  But I -- but when they buy the T side after the

22   spinoff, there's the tax issue that we've got to deal with;

23   right?

24   A    Yes.

25   Q    The same tax issue that exists on the E side.

```
 1    A    If they buy the T side after the spinoff?  No.

 2    Q    No.  If they buy the T side before we get to the plan

 3    on the spinoff.

 4    A    Well, if they buy the T side before we get to the plan,

 5    I just posited a circumstance where you go ahead with the

 6    spinoff and if someone subsequently buys the T side.

 7    Q    Right.  But then --

 8    A    It doesn't -- that doesn't --

 9    Q    -- we -- right.  Well, at the end of the day, in that

10    transaction, you're doing a taxable transaction; right?

11    Because you're spinning the two off.

12    A    I --

13    Q    In other words, you're --

14    A    I --

15    Q    -- creating a tax situation in one estate or the other.

16    A    No, I --

17    Q    You're misunderstanding --

18             THE COURT:  Stop.  Stop.  Stop.  You can't

19    interrupt each other.

20             THE WITNESS:  Okay.

21    BY MR. SHORE:

22    Q    If one structure that we know isn't going to create any

23    tax, is if we just leave EFH in place with all its

24    subsidiaries and try to do a plan with that; right?

25    A    Correct
```

1    Q    Okay.  You're positing now that what we got to do and

2    we'll get to the reasons why we got to do it on Monday,

3    you're positing what we got to do now is put together a

4    transaction in which we're splitting the company apart;

5    right?

6    A    I'm saying that that's a transaction that we believe

7    works and is efficient today from a tax standpoint.

8    Q    And that's creating tax issues that we have navigate

9    around; right?

10   A    Correct.

11   Q    And it's causing the T side creditors to have to

12   navigate around the tax structure and the E side creditors

13   to have to navigate around a structure; right?

14   A    Correct.

15   Q    And you understand that part of the plan process and

16   the negotiation between people is trying to figure out a way

17   to either hold the company together or come up with a way

18   that you -- the tax burdens are shared fairly between the

19   various estates?

20   A    Correct.

21   Q    And what you're doing now, though, is you're seeking to

22   go out and get a contract in place by the end of the year

23   before that negotiation has taken place, which, at best, at

24   best is going to risk, if you're going to have to pay a lot

25   of money if someone actually does what the debtors say they

1    couldn't do, which is deal with Olympus and people together.

2    A    Well, again, if the company is able to consensually

3    enter into a stand-alone plan of reorganization and to do

4    that by 12/15 and decides that's better, yes.  You would pay

5    the termination fee under that set of circumstances.

6    Q    Right.  And just so I'm clear, have you heard anything

7    in the boards, in the two board meetings you attended, or

8    the three board meetings you attended, where anybody just

9    said, you know what we should do, we should probably just

10   get on with the process of people negotiating a plan and

11   we'll worry about selling the Oncor estate later?

12   A    No.

13            MR. SHORE:  That's it for today, Your Honor.

14            THE COURT:  Alright.  Thank you.

15            Just a minute before everyone starts to leave.

16   Sir, you're excused.  However, you may not discuss the

17   substance of your testimony over the weekend.

18            THE WITNESS:  I know.

19            MR. SHORE:  And I'd ask, Your Honor, that that

20   includes, because I had it happen in a case, and I just

21   don't want the witness to get sideways on it, that includes

22   reading emails and doing other things like that, that are --

23   that relate to the testimony.

24            THE COURT:  Correct.  That's correct.

25            Thank you.  We're going to reconvene at 11 a.m. on

Page 211

1   Monday.  Like I said, I have a 10 a.m. hearing.  No one's

2   going to be able to have access to the courtroom until after

3   that hearing.  And just to follow up on something that

4   happened this morning, I don't have staff available to

5   monitor the safety of the courthouse at seven thirty in the

6   morning.  So nobody's allowed up on the floor until eight.

7   If you want your people here earlier, they'll have to stay

8   in the lobby.  But I can't have people wandering around the

9   floor without a CSO in place.  It's not safe.

10          So I just want to make those two points.  And

11  because I have a hearing at 10:00 on Monday, I'd ask you --

12  you'll have to clean up your areas and start over on Monday.

13  Okay?

14          Thank you very much.

15      (A chorus of thank you)

16      (Whereupon, these proceedings concluded at 2:45 p.m.)

17

18

19

20

21                  * * * * *

22

23

24

25

1                         I N D E X

2

3                           RULINGS

4                                                      Page

5    Motion to Seal                                    13

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            I N D E X

2                        W I T N E S S E S

3    WITNESS                  BY                        PAGE

4    WILLIAM O. HILTZ         MS. O'CONNOR               56

5                            MR. WEISFELLER              90

6                            MR. SHORE                  195

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 214

1              C E R T I F I C A T I O N

2

3    I, Dawn South and Pamela A. Skaw, certify that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Dawn          Digitally signed by Dawn South
                   DN: cn=Dawn South, o, ou,
6    South         email=digital1@veritext.com,
                   c=US
                   Date: 2014.10.20 12:01:56 -04'00'

7    Dawn South

     AAERT Certified Electronic Transcriber CET**D-408

8

9    Pamela A      Digitally signed by Pamela A
                   Skaw
                   DN: cn=Pamela A Skaw, o, ou,
10   Skaw          email=digital1@veritext.com,
                   c=US
                   Date: 2014.10.20 12:02:44 -04'00'

11

     Veritext

12

     330 Old Country Road

13

     Suite 300

14

     Mineola, NY 11501

15

16

     Date:  October 18, 2014

17

18

19

20

21

22

23

24

25

**&**

**&**  3:2,11,17 4:14
5:1,7,13,20 6:1,12
6:19,20 7:7 8:12,17
9:13,18 10:6,10,21
11:1 12:5,22 31:9
42:3 49:5 51:2
117:24 153:5
201:23

**1**

**1**  2:13 13:14 18:3
78:15,16 157:10
**1.0**  43:2
**1.2**  184:5
**10**  2:4,15 14:23
44:24 47:21 59:23
60:5 81:4 192:23,25
211:1
**100**  101:9 136:22
138:7,11,13,15
139:3 147:5
**105**  38:8
**10:00**  16:3 211:11
**10:30**  15:5
**10:39**  54:17
**10:48:51**  54:22
**11**  1:5 31:17 36:13
47:8 96:16 108:8
134:17 169:24
210:25
**11501**  214:14
**11:00**  15:5 16:5
**11:40**  90:20
**11th**  20:23
**12**  60:4,8 85:24
105:18 108:13
113:1 143:13
157:11 193:5,11,18
**12/15**  143:2,4,9,10
144:2,9,14,21 145:1
145:3,25 210:4
**12/31/15**  143:18
**12th**  135:5
**13**  113:1 212:5
**13th**  21:9

**14**  59:16 70:20
105:18 136:5,11
147:11
**14-10979**  1:6
**15**  14:23 30:21
41:19 60:7 81:3
170:2 194:25
**150**  121:10
**16**  187:8
**16.5**  186:19
**16th**  67:20 69:11
185:14
**17**  1:17
**173**  178:6
**175**  177:25 178:21
**18**  47:21 60:9 81:4
129:5 193:5,11
214:16
**180**  88:11
**184**  88:11
**18th**  61:21 185:14
**19**  2:21
**195**  213:6
**1976**  58:2
**1982**  58:3,3
**1990**  2:4
**1993**  60:25
**1995**  58:7,11
**19th**  21:12 75:20
135:1 137:17 146:5
148:10,19 149:18
149:21 154:17
185:14
**1:16:15**  158:12
**1:31**  170:4
**1st**  20:13

**2**

**2**  2:13 37:14 44:1
78:13 79:1 114:3
136:7 158:24
159:10 160:10,11
202:15,16
**2.0.**  42:25
**2.1**  35:12 49:9 50:22
**20**  44:23 81:3
103:24 134:5
192:23,25 195:1

**200**  110:9 121:10
**2000**  58:15
**2014**  1:17 2:5,15,21
214:16
**2015**  39:13 40:24
49:14,16,25 50:5,17
104:10
**2017**  194:8
**2018**  194:8
**2087**  2:21 63:22
147:20
**2088**  64:6
**21**  21:23
**22**  72:3,6 74:5
**22nd**  72:16
**2370**  2:15
**23rd**  20:20 21:22
**24**  59:21
**24th**  72:18
**25**  195:1
**25th**  72:18
**26th**  21:2
**28th**  49:20 50:2
**29th**  20:7
**2:02:35**  177:21
**2:02:50**  177:24
**2:26:23**  194:22
**2:26:40**  195:3
**2:26:52**  195:12
**2:30**  142:20
**2:30:34**  198:21
**2:31:00**  199:9
**2:33:13**  201:6

**3**

**3**  15:18 59:25
142:21
**3.4**  71:20 100:2
169:5,17 202:22
203:6,13
**30**  52:18 53:2,10
59:8 80:5 103:6,12
103:14 104:2
140:19 147:10
**300**  214:13
**30th**  20:13
**31**  69:20 72:1 74:3

**330**  214:12
**36**  94:3
**363**  38:8 42:6 52:14
**38**  58:1 87:2

**4**

**4**  15:13 108:6
**4.1**  88:19
**40**  50:11
**400**  89:20,21
**408**  214:7
**44**  147:14
**45**  26:20
**4th**  20:23

**5**

**5**  154:9
**50**  34:3 99:5
**500**  89:18,22,25
**52**  85:7
**56**  213:4
**5:00**  15:21 16:5

**6**

**600**  46:14
**6:00**  16:5
**6th**  178:4

**7**

**7**  162:11 165:17
166:8
**700**  89:24 162:15
165:5
**750**  88:13
**773**  46:15
**777**  153:10
**7th**  77:25

**8**

**8**  59:18
**80**  136:22 147:3
149:23 150:9
**824**  1:13
**8th**  21:6

**9**

**90**  213:5
**9:25**  1:18
**9:30**  16:7

**9:42:52**  17:19

**a**

**a.m.**  54:17 90:20
  210:25 211:1
**aaert**  214:7
**abandon**  48:24
**abandoned**  35:10
**abandonment**
  39:23
**abid**  4:20
**ability**  47:10 50:16
  50:17 79:25 82:10
  122:18 162:8 166:2
  166:17 191:4
**able**  17:23 42:23
  71:19 82:1 88:3
  108:21 143:20
  144:20 151:17
  168:21 169:11
  194:19 202:21,25
  205:20 210:2 211:2
**absolute**  84:25
**absolutely**  41:9
  117:15 128:8
**accept**  38:19 123:10
  124:8 134:21 135:3
  135:8 154:1 155:3
  155:11 157:15
  167:18 169:4,16
  175:10 192:4
**acceptable**  198:11
**accepted**  104:4
**accepting**  99:20
  154:18 156:1
  168:12 173:15
**accepts**  66:17
**access**  69:23 77:19
  82:8 211:2
**accomplishes**  100:1
**account**  107:15
  159:1
**accumulating**  149:2
**accurate**  66:5 96:1
  139:11 156:4
  162:25 214:4
**accustomed**  143:15
  143:15

**achieve**  71:19 88:3
  103:1 118:16
  160:19,23 163:1
  174:24 175:18
**achieved**  71:18
  118:17
**achieving**  84:1
  108:21 143:1
**acknowledges**
  168:5
**acknowledgment**
  38:2
**acquire**  139:3
**acquired**  58:12,13
  139:16 147:4
**acquirers**  137:3
**acquiring**  139:9
**acquisition**  59:1,24
  61:15 71:14 82:5
  108:4 147:12
**acquisitions**  58:17
  58:19
**acs**  59:17,17
**acs's**  59:17
**act**  43:10 113:8
**acting**  89:19 201:14
**action**  43:23 44:1
  50:3,15 151:22
**activities**  58:5
**actual**  13:14 30:10
  80:17
**acumen**  45:13
**ad**  3:18 4:15 6:13
  7:22 8:8 10:16
  14:24 16:12 27:13
  31:10 33:11 42:3
**adam**  10:24
**add**  56:3 77:14 79:3
  117:19 122:10
**added**  173:13
**addition**  63:12
  85:16,20
**additional**  73:14
  74:4
**address**  12:11 21:1
  21:5 24:19 25:22
  27:20 47:4 52:7

54:6
**addressed**  32:7
**addresses**  28:13
**adequate**  143:18
**adjourned**  20:15
**adlestein**  3:22
**administered**  1:7
**administrative**
  197:23 198:3
**admissible**  56:4
**admitted**  192:22
**adoption**  41:11
**advance**  24:21
  64:12
**advantage**  24:7
  52:4 87:13 122:17
  122:23 160:15
**advantages**  18:16
  23:11
**adverse**  120:1,20
**advertised**  33:19
  35:22
**advice**  40:10 73:8
  104:7,13 112:12
  115:10 133:15,21
  144:8,13,16,24
**advise**  61:13 132:3
**advised**  44:4 59:6
  59:19 60:2,5 135:15
**advising**  74:12
  114:11
**advisor**  17:4 25:19
  48:11 60:10 112:8
  112:13 115:10
  141:25 191:9 204:7
**advisors**  45:12
  51:16 73:2 131:15
**advisory**  57:8
**affect**  51:20 54:3
  153:22 192:12
  202:14
**affiliated**  133:4,11
**afternoon**  15:16
**ag**  5:2,8
**aggressive**  66:10
  81:17

**ago**  22:25 26:20
  41:18 59:5 60:5,9
  129:6 134:5 174:7
  193:18
**agree**  31:14 73:6
  82:1 86:2 95:14
  110:20 114:18
  119:6 124:23 125:6
  125:15 140:13
  156:6 163:20
  168:15,25 173:2
  186:8
**agreed**  14:3,22 17:8
  56:4 82:1 108:4
  109:17 164:2,3
**agreement**  73:6
  77:23 87:12 109:5
  109:25 111:10
  130:11 157:25
  166:18 168:20,23
  169:3,10 173:14
  191:14 196:10,10
  203:16
**agreements**  37:7
  69:22 73:19 77:21
  80:19,22 81:10
  85:23,24 171:7
**agrees**  147:16
  203:23
**ah**  151:11
**ahead**  17:17 73:19
  89:21 100:22 208:5
**air**  61:1,2
**airlines**  58:6 60:23
  60:24
**akin**  4:14
**al**  1:6 2:1,10,17
**alan**  3:21 31:8
**alberino**  4:18
**alex**  7:12
**alice**  9:6
**allege**  165:11
**allow**  28:4,24 36:3
  37:10 50:7 67:24
  77:18 87:12 89:7
  111:11 135:12
  159:1 171:7 195:23

205:17
allowance 13:23
allowed 46:15 211:6
allows 83:3 123:9
alluded 83:5
alright 174:9
 176:15 186:15
 195:8 196:1 197:10
 199:15,25 200:14
 203:2 205:4 210:14
alter 79:4
altered 171:16
alternate 196:2
alternative 34:14
 34:15,17 89:22
 146:25 147:1
 165:15
alternatively 119:1
alternatives 34:21
 44:19 203:19
altman 57:14 61:23
alves 10:4
america 142:4,7,10
american 34:12
 59:4,7 88:13
amount 13:24 24:23
 25:7 29:1 77:11
 88:2 89:13 101:22
 108:20 149:11
 153:19 156:16
 159:5 161:20
 164:17,20 198:11
 200:6 202:14,19,20
analogy 108:15
 164:25
analyses 98:15
analysis 29:9 40:10
 44:18 45:11 51:19
 100:8 128:23 129:2
 129:21 130:22
 158:23 172:19,25
 173:24 176:16
 177:3 178:18,23
 179:3,11,15,17,19
 179:21 180:8,10
 181:22 182:4
 186:22 187:1,1

188:2,6,15,15 189:9
 189:11,13 192:11
 192:15 201:5 202:1
analyst 189:23
analyze 29:14
analyzed 39:15
 41:10
anderson 5:7 59:10
andrew 5:17
andy 127:7
angle 98:10
announce 22:16
announced 151:1
 153:25 154:17
annuity 106:8
anoint 37:20 171:22
 172:23 190:24
 191:24
anointed 37:22
 188:23
anointing 112:21
 189:18
answer 45:13 68:8
 68:9,11 82:13 92:18
 94:5 96:2,7,21
 100:4,19 107:24
 113:22 121:7,24
 122:11,15 129:13
 130:13 131:3,7,14
 131:18,19,19 132:1
 140:10 141:14
 145:7 156:13 158:8
 158:16 159:7,8
 170:22 173:9
 178:12,16,25 179:5
 181:10 196:20,20
 200:22
answered 109:24
 124:22 125:3
 131:22
answering 191:16
 198:18
answers 179:8
 195:21 196:5
anticipate 78:15
 83:10,12 107:18
 185:18,25 186:1

anticipated 73:21
 207:18
anticipation 138:1
anybody 42:6
 104:12 144:12,19
 154:13 201:14
 210:8
anyone's 148:7,16
apart 209:4
apologize 91:17
 117:6 170:13
 177:24
apparently 54:25
appeal 145:16,20
appealable 145:5
 146:1
appeared 38:14
 78:23
append 64:21
applicable 161:13
applied 173:18
appraisal 2:4
appreciate 17:5
 44:17 124:2
approach 13:4
 17:20 98:24 177:21
 199:8
appropriate 43:6
 84:15,18 86:16
 97:16 100:10
 147:17
appropriately
 150:8
approval 19:10
 21:25 22:16 24:1,15
 31:14 32:8 38:16
 39:8 44:5 52:25
 53:1 76:19 79:12
 88:21 108:18
 109:15 126:25
 130:1 145:10 174:4
 174:7 183:8
approvals 19:20
 182:23
approve 13:6 34:15
 40:6 52:18 128:19

approved 20:20
 30:24 36:10 40:5
 44:3,6 76:24 99:11
 99:15 123:1 125:16
 127:2 174:10 191:5
approves 79:14
approving 2:11,12
 2:18,20 145:17
approximately
 15:13
april 20:7 96:16
 98:15 184:13
aquila 61:13,15
 134:14,17
area 59:12,23 82:9
 194:25
areas 63:2,7 78:2
 211:12
argue 23:10
arguing 19:2
 138:20
argument 29:20
 95:25 152:6
arguments 12:9
 18:21 24:18,19
 30:11 41:24
aright 200:4
arlene 10:4
arms 153:1
arranged 176:3,10
arrangement 82:24
 176:18,20
arrangements
 82:19 88:23
arranging 82:23
arrival 111:19
arrive 36:8
arriving 62:13
 115:16
arrow 22:8
asbestos 147:11,24
 148:17 149:10
 150:25
ashby 8:12 12:22
aside 39:22 76:5
 140:12 166:8 183:2

**asked** 37:12 61:25
70:14 72:15 94:21
95:3 124:23,25
131:6 133:19
147:24 154:23
159:17 168:10
172:7,13 178:6,7,22
179:2 182:1 192:15
192:17 195:19
**asking** 34:24 48:23
98:14,17 101:25
118:2 131:5 143:23
150:24 157:19
173:23 178:20
185:24,25 191:13
199:12
**aspect** 196:15
**aspects** 109:18
**assert** 202:20
**asserted** 151:23
168:16
**asserting** 183:10
**asset** 25:7 26:17
27:16 32:20,21 34:9
38:3,6,17,23 39:1
40:11,13 42:21,23
61:14,16 80:24
86:23,25 124:10,11
140:15 158:13
160:16,20 168:14
204:14
**assets** 36:4,4 38:25
42:12 44:16,24 45:2
45:24 46:2 48:10
67:16,19 87:19
122:7 150:1 160:24
190:2
**assignments** 133:3
**assist** 141:25 142:4
173:21
**assisting** 45:21
**associated** 38:12
62:21 67:13 87:15
**association** 188:9
**assume** 49:23 96:15
121:20 135:1
147:24 149:10

150:24 151:4,5
157:8,15,23,24
159:17 161:16
174:25 180:12
204:16
**assuming** 46:23,24
89:8 100:7 105:15
106:20 168:11
185:6
**assumption** 40:8,9
40:10 175:10,11
**assumptions** 158:7
161:10,17,18,25
162:3,12 168:22,23
174:23 200:5,20
**assurance** 70:9
**assure** 157:19
**ast** 8:2
**asymmetrical** 47:25
87:21 88:4,22 106:2
106:11 108:21
116:18,20 119:6
**at&t** 88:16,19 108:4
108:13
**attached** 13:13
70:22
**attempt** 61:5,7 62:5
180:14
**attempting** 19:3
69:15
**attempts** 24:19
**attend** 15:17
**attended** 92:25
93:20 111:19 210:7
210:8
**attention** 82:9
180:15
**attorney** 4:15 6:8
6:20 7:17,22 8:2,8
8:13 9:9,14,19 10:2
10:11,16,22 11:2,7
**attorneys** 3:3,12,18
4:2,9 5:2,8,14,21
6:2,13 7:2,8 8:18
9:2
**attraction** 184:4

**attractive** 67:21
71:18 73:3 84:25
85:3,15 86:12
111:11 188:11,18
204:14
**atypical** 88:23
**auction** 2:11,19
18:13 19:21 20:1
21:18 22:1,17 23:20
23:22 24:1,3 25:19
33:17,17 53:2 59:9
59:11,13 64:14,20
64:21,24,25 65:22
66:3,8,9,13,22,24
73:22 79:16,17,18
80:24 83:25 84:9,10
84:14 86:1,20 115:9
154:8,8 156:8,21
162:8,16,23 184:18
185:17 188:3
**august** 21:2 22:24
61:20,21 65:6 70:8
72:16,18 73:7 91:1
115:23 116:5
**authority** 29:21
30:9 46:24 163:8
168:1
**authorize** 30:1
**authorized** 30:7
**authorizing** 2:7
**availability** 22:3
26:12 75:5 85:2
183:19
**available** 37:7
106:19 108:25
109:3,22 121:18
122:8 163:2 164:21
165:7 188:24 211:4
**average** 85:4
**avoid** 36:2 47:5
61:8 67:25 100:1
120:5 165:23
202:23,24
**avoids** 84:8
**awaiting** 145:9
**aware** 12:25 67:23
68:15 95:19 100:24

104:14 114:15
128:14,18,20
138:17 141:20
142:25 144:12
145:23 146:20,21
151:5,21,25 152:4,9
152:10 160:23
161:21,24 166:15
166:19,20 167:7,15
167:17,21 168:4
172:17 187:23
192:5,8
**awareness** 104:16
**awful** 180:13
**axa** 60:3

**b**

**b** 1:21 2:11,14,18
172:3,13,14,15
**back** 19:22 43:1
52:12 55:8 58:21
70:8 71:25 73:11
74:5 76:16 77:25
83:17 84:14 94:4
96:16 109:19
116:24 121:8
123:17 132:23
139:7 152:8 161:22
164:24 171:11,24
172:24 174:6 185:9
**background** 57:18
99:24
**bad** 86:15 187:21
188:4
**balance** 119:10
147:7 148:16
**balancing** 51:7
**bank** 5:2,8 7:17
58:13,13 142:3,7,10
**banker** 140:19
141:5
**bankers** 57:13
**banking** 57:25 58:9
**bankrupt** 107:5
**bankruptcy** 1:1,12
1:23 22:18 61:2,4,6
61:8,9 63:15 64:13
64:19,22 67:7 76:6

83:25 84:13 87:17
104:22 106:25
107:14,19 108:15
108:16 115:7,7
129:18 134:4
141:11 143:16,21
145:17 146:1
167:22,25 174:10
182:14,16,20 183:1
183:10 184:12
188:8 190:15
197:11 198:16
**bargain** 37:2
**barney** 58:4,7
**base** 157:12 160:20
**based** 29:8 43:14
68:17 72:20 75:4
79:20 99:22,23
101:11 143:7 161:1
161:17,20 162:8,9
171:23 173:16
174:23 177:3 179:3
179:24 180:11
185:25 206:10
**baseline** 130:4
**bases** 158:16 207:14
**basically** 112:16
176:1 195:12
**basis** 36:3,3,6,25
37:2,4,5 38:24
43:25 45:5 61:17
66:24 70:11 76:9,10
80:13 82:3 83:23
85:1,10 97:9,13,23
98:17,18 110:22
130:13 136:21
158:18 159:10
160:10,16 163:20
165:13 178:14,22
185:8 200:7 204:12
204:15,17 206:6
**bearing** 74:12
**began** 20:23 22:23
69:14 73:17 74:11
74:14 75:21
**beginning** 36:23
61:20 75:10 91:3

129:5
**behalf** 12:22 31:10
42:3 49:5 54:24
56:11 69:17
**belaboring** 19:5
**belief** 110:22
138:16 186:23
**believe** 12:17 14:8
18:25 19:6 23:4,18
24:7,21 25:4,9
26:15,24 27:17,21
28:5,8,9,11,15 29:4
29:7 30:18,25 31:1
31:6,17 37:15 38:8
41:15 53:12 56:10
67:18 69:20 70:18
79:21 81:23 83:22
84:15,17 93:11
94:20 99:25 101:2
101:13 110:20
113:2,11,16 114:4
115:2 125:16
127:19,21,25
135:14 140:3,4
143:10 154:13,20
155:6 156:13,14,18
156:19,25 158:24
160:4 161:5,18
162:6 172:4,5
174:23 175:18
177:4 178:18
179:20 181:14
191:3,4 195:21
201:16 209:6
**believed** 71:24
**believes** 29:13
**belknap** 9:13
**bench** 98:4
**benefit** 37:9 48:16
67:13 87:21,22
106:2 124:12
162:16,23 163:13
177:16
**benefits** 26:15
48:16 72:22
**best** 24:11 31:18
33:25 40:11,16

66:19 79:10 80:4,10
81:19,23 82:25 84:1
84:3,3,5,11 97:20
120:5 141:17 154:1
163:3 165:13
204:15,16 209:23
209:24
**beta** 47:5
**better** 29:11,12
78:23 84:21 95:20
95:24 122:22,24,25
123:23 153:4 159:7
159:8 184:11,14
202:15 210:4
**beyond** 33:15 38:8
187:7 194:9
**bid** 24:10 28:21,25
29:24 30:7 31:14
34:20 37:18,19,21
41:6 52:18,21,23
53:9 55:10,14 62:5
65:7,9,10 66:18
67:13,19,20 68:2,2
69:10,12 70:7 73:1
73:1,3 75:1 76:12
76:13,15 77:5,7,8
78:13,15 80:8 81:7
81:8 82:2 83:14,16
84:5 85:13,14,15,19
103:24 104:1 109:4
111:18 112:17
113:21 114:1,7
115:4 116:23
117:10 118:3
129:16,24 135:21
137:15 139:16
148:4,7,19 149:19
150:5 154:14
155:11 156:8,14,15
156:22 161:19
163:12 175:17
185:11 188:7,11,14
188:16,17,18,23
189:18 191:5 192:1
192:1,3 202:12,13
202:15,20 204:9
205:7

**bidder** 19:21 26:14
29:10,11 34:20 53:4
71:5 76:8,8 77:4
78:16,16 79:14 83:2
87:13 106:13,22
110:7 114:5,15
118:4,21 120:6
139:3 143:20
146:22 148:18
149:17 151:16,17
154:7 156:7,21,22
156:25 171:11,12
171:21,22 172:23
176:8 191:14
200:10 203:23,23
207:2
**bidder's** 138:25
173:20
**bidders** 13:17 14:2
14:4 23:3,20 24:5,9
28:24 35:22 40:18
45:4,8 52:13,16
65:4,8,12,15 69:25
70:3,11,15 71:23
72:1 73:15 74:3,12
75:15 76:2,2,20,21
77:6,17,22 80:12,17
80:18,20 82:10,18
83:1,3,14 113:7,12
113:18,25 114:9,19
114:23 115:18,20
116:1 135:21
137:14,22 138:1
142:25 143:6,8
148:25 149:8 150:2
150:6 155:8,25
173:23 181:16,18
185:1,19 186:2
196:14 205:7
**bidding** 2:11,18
12:8 13:11,12,14,25
18:17 19:10,13,23
21:8,10,14 22:8,9
22:10,15,24 23:6,11
23:18,25 24:8,18,21
24:24 25:14,25 26:4
28:5,9,10,12,20,24

29:5 30:5,15,23
40:15,25 41:11 50:9
50:21 52:19,21
53:12 62:18 63:13
63:18,24 64:10
66:24 67:10,11
74:19 75:11,12,16
75:17 76:16,19 79:4
79:6,21 81:3,20
83:5,11 100:23
104:19 108:17
109:21 115:11
127:5 129:22
130:24 134:23,25
135:11,20 146:23
147:4 149:18
153:16
**biddle** 6:1
**bids** 13:24 14:2
19:14,17 21:22,23
28:4,7 39:12 40:5
45:6 54:7 62:23
66:16 73:23 77:9,10
77:14,15,16 78:4,5
78:6,14 80:12,18
81:13,15,19,22,25
105:16 111:13
115:13,23 117:8
135:3 138:3 146:4
148:9 149:12
154:18,21 155:7
156:1,20 160:25,25
161:1 163:9,9
173:16 185:23
186:6 195:22
**big** 64:19 80:24
86:12 107:9,16,18
149:11 200:12
**biggest** 49:18
**billion** 36:7 37:14
44:24 47:21 50:11
59:8,14,16,18,21,23
59:25 60:4,7 71:21
81:3,4 88:19 100:2
108:6 154:9 157:11
158:24 159:10
160:10,11 165:17

166:8 169:5,17
186:19 187:8,11,20
200:1,4 201:15
202:15,16,19,20,22
203:6,13 205:11
**billions** 35:18 37:1
165:24
**binder** 63:20 70:19
**binders** 55:20
177:22
**binding** 77:10
115:1,4
**bing** 59:10
**bingham** 6:7
**bit** 36:17 57:18
59:12 60:14 71:25
102:3 160:2 163:4
**black** 50:19
**blank** 29:10
**blanking** 119:18
**blanks** 128:5
**blend** 117:22
**bo** 63:5
**board** 30:9 40:2
43:23,24,25 44:3,4
51:11,12 59:6,17,19
61:13 62:17 72:15
72:24 73:2,8 85:15
91:10 92:7,10,20,22
92:25 93:1,6,13,15
93:20,22,25 94:7,8
94:11,16 99:1
100:12,16,23,24
101:2 125:17,20,21
125:24 126:12,15
126:18,20,21,22
127:17,21 129:17
129:18,21 130:7,14
131:10 132:3 133:3
133:9,15 135:11
141:19,20 144:20
144:22 145:23,24
146:20 167:3,4,4
172:4,5,6,7,10,12
173:21 188:6,7,12
188:13 190:17,23
191:6,14,19,23

192:2 210:7,8
**boards** 20:20 21:3
29:23,25 30:6 40:5
40:6 43:20 44:6
92:7 94:19 99:11,14
100:13 104:7,13
128:16,22,23 129:2
130:22 133:15
135:15 144:9,13
167:24 172:19
176:17 180:24
181:23 182:3
188:24 189:17,19
192:20 210:7
**boller** 4:21
**bona** 78:21
**bond** 179:19 189:13
193:16
**bonderman's** 61:1
**book** 136:2,12
**bother** 70:16 146:6
**bought** 97:4
**bounds** 38:8
**box** 198:3
**bp** 60:10
**brackets** 22:7
**bradley** 4:11 55:7
**branch** 5:2,8
**brand** 48:25
**branzburg** 7:16
**breach** 2:24
**break** 14:17 46:20
46:20 47:23 53:1
54:14 119:7,8,11
121:6,10 122:5,17
124:3,4,9,13,20,20
124:24 125:14,15
142:17,21 171:9
195:2,4,24 198:24
199:2 203:20,22,25
204:9,19 207:15
**breakup** 108:22
**brett** 7:11 49:4
**brian** 9:16
**bridget** 3:7 56:11
**brief** 77:3

**briefly** 52:7 83:5
111:18 180:17
**bring** 18:11 49:20
50:2 60:16 63:8
**bringing** 27:23
141:25 142:3
167:12
**broad** 58:20
**broke** 170:22
**broker** 59:9
**brought** 91:7
**brown** 4:1 10:6,15
33:9 153:1
**bryan** 3:8
**buffett** 59:25
**building** 15:21
**bulk** 134:7
**bullet** 136:14,17,24
138:2
**bunch** 131:11
195:14
**burden** 107:9
**burdens** 209:18
**burn** 37:10
**business** 31:1 39:14
39:15 42:9 43:3,8
43:11,15 44:10
45:13 47:6,6 48:18
57:25 58:2 59:7
194:4
**businesses** 59:24
**button** 48:13
**buy** 89:21 147:23
148:12 151:13
207:21 208:1,2,4
**buyer** 47:19 50:9
87:19 89:4,10,19
105:18 106:5,18,19
123:15 139:7,7,13
146:24 147:15,16
147:21 151:12
153:18,19,23
158:11,12,13,22,25
160:15 169:12
172:25 175:22
204:7,15,16 207:19

buyer's 173:5
buyers 105:5
  137:10 143:14
  150:11,24 151:1
  169:14 173:12,15
  207:17
buying 50:10
  147:23 149:8 150:3
  150:9 207:19
buys 151:12 208:6
byowitz 9:6

**c**

c 2:12,20 3:1 12:1
  214:1,1
calculation 161:8
california 60:6,7
call 16:23 41:12
  52:8 69:2 72:17
  93:15 94:9 95:15
  190:17 196:3
called 53:6 59:10,14
  99:20 100:8 101:9
  120:10 134:14
calling 23:17 56:12
  73:17 74:11 75:21
  75:22
calls 72:15 74:16
  116:1 128:17
  141:20
canada 61:2
cancellation 36:15
  37:11
cannas 129:19
capacity 133:2
  175:24
capital 47:21 194:5
capitalize 42:23
capitalizing 42:21
care 43:8 44:7
  46:25 54:2 131:10
  131:11 157:9,10
  161:3 162:18
  164:24 174:21
carefully 23:13
cares 157:23
carlyle 11:6

carried 30:4
carrying 48:7
carter 127:8
carve 194:24
case 1:6 6:12 20:24
  27:7,18 33:2 36:13
  36:24 40:20 42:3,5
  44:13 45:4,20 47:13
  47:15 48:9 51:8
  90:12 91:4 92:24
  94:24 96:16 102:14
  135:4 174:10 186:7
  194:10 205:11
  210:20
cases 35:14 77:6
  91:1 144:21
cash 137:6 138:10
  138:12 139:9,13
  147:7,14,23 148:3
  148:15,17 149:1,2
  149:11 175:7,8,13
  175:19 179:12
  189:7
cashed 175:3
cast 174:15
categories 28:2
categorized 28:1
cause 73:5 79:6
  81:1
caused 68:3 115:21
causes 50:3,14
  151:22
causing 209:11
caviar 165:1,2
ceased 111:22
cede 31:5
certain 13:16 24:23
  44:5 95:2 109:18
  110:6 150:25 152:4
  171:10 204:20
certainly 16:2,2
  19:11 60:20 72:23
  84:21 86:2 135:25
  177:6
certainty 24:8
  47:11 67:13 174:16
  174:20

certified 214:7
certify 214:3
cet 214:7
cetera 77:13
cfo 15:9 25:20
  201:21
chadbourne 11:1
  117:24
chairman 57:14
  61:24 127:17,21
  132:24 133:20
challenging 19:1
chambers 15:15
chance 114:23
chances 106:18
change 16:7,9 40:22
  72:4 73:13 74:8
  75:6,14 76:2 79:6,8
  79:9 83:6,11,13
  103:15 106:15
  112:1 120:1,7,20,23
  121:1 126:20,22
  159:19 184:24
  192:12 200:5 204:8
  206:21
changed 40:20,24
changes 23:1 74:9
  110:3,4,5 120:9
changing 73:20
chaos 50:19
chapter 1:5 31:17
  36:13 47:8 96:16
  108:8 134:17
  169:24
charge 99:18 100:7
  142:11
charles 7:10 55:18
chart 43:13 45:23
  46:13 52:10 170:9
  170:16
chase 48:4
chief 30:8 127:17
  127:25 128:1
  137:21 146:15
children 54:21
chill 28:10 81:22

chipman 10:15
choice 172:7,8,13
choose 64:13
  172:13
choosing 64:20 84:7
chop 46:17
choreography
  14:20
chorus 211:15
chose 137:16
chris 7:4 42:2
christiana 4:2 8:13
christopher 1:22
  6:16
chronology 18:11
  20:3 22:23
chrysler 61:5
chuck 17:1
circumstance 79:5
  86:24 87:3 152:19
  168:5,17 204:14
  208:5
circumstances 66:6
  83:12 107:4 122:16
  169:15 210:5
cit 61:9
citibank 6:2
claim 27:8 46:1,15
  53:21,22 103:13
  153:10,14,17,18
  161:7 166:8 197:16
  197:18,22,23,24,24
  198:3,3,10,16 200:1
  200:1,4,6,12,17,18
  201:25 202:14,16
  202:19 205:11
claims 33:1 45:22
  45:22 46:3 49:21
  50:2,14 52:5 149:14
  149:15 150:13,14
  150:18 151:9,14,19
  151:22 152:9,10,12
  152:23 153:2,21
  161:3,6,7,9,23
  165:10 166:12
  167:24 168:2,6,9,15
  170:25 174:17,22

182:18,24 197:13
198:2 199:13,16
202:8
**clarification** 131:25
**clarifications** 13:16
**clarified** 93:18
**clarify** 132:4 199:15
**clarity** 25:6 148:25
149:7
**class** 164:25 197:7
**classes** 174:11
**classic** 80:3
**clause** 80:2 108:23
118:18 119:17,22
119:25 120:1,23
123:14
**clauses** 120:9
**clean** 149:25 151:14
211:12
**cleansed** 150:8
**clear** 14:1 55:11
73:25 94:11 98:24
107:3 149:24 150:6
151:18 161:20
168:8 173:6,25
174:20 182:9 185:9
191:2,5,8 200:10
202:21 205:17,21
205:23 210:6
**cleared** 15:25
**clearly** 49:21 50:20
149:1 151:6
**clears** 206:7
**clerk** 12:2 54:18
56:14,16,20 90:21
170:5
**client** 16:16 78:24
87:2 190:5
**client's** 79:10
**clients** 57:17 153:2
**clock** 31:22
**close** 15:24 53:16
89:4,5 123:16
145:15,15 152:20
168:18,22 191:15
**closing** 108:12
161:15,16

**clustered** 185:23
186:6
**cobb** 10:21
**code** 130:9
**coffey** 2:14
**cohen** 6:4
**coin** 33:8
**coincidentally** 40:4
**cole** 5:20
**colin** 8:21
**colleagues** 41:24
63:2 108:16 145:19
**collect** 106:25
**collective** 154:4
**college** 57:20
**columns** 19:8
**combination** 80:8
84:6 137:6 138:10
**combined** 84:13
**come** 24:23 29:11
34:20 37:19 41:4
48:25 50:8 54:7
64:18 71:25 73:11
84:24 87:7,22,24
95:24 159:17 190:2
205:17 209:17
**comes** 35:20 46:21
50:13 79:9 109:13
165:4 170:21
**comfortable** 23:21
173:15
**coming** 51:25 65:2
201:10 207:19
**commenced** 140:24
184:13
**commencing** 172:9
**comment** 86:2
92:11 164:16
**commit** 122:6
**commitment** 47:20
47:20
**committed** 123:8
**committee** 3:18
4:15 7:2,8,22 10:16
14:24 15:18 16:12
27:14 31:10,12 49:6
49:7,19,19,24 50:21

55:19 57:8 59:17,19
112:9,14 115:10
132:25 133:21,22
**committees** 17:4
51:15
**common** 66:17 67:6
67:6 80:21 88:3
105:25 106:1 107:6
**communicate** 82:11
**communicated**
75:14
**communication**
143:22
**community** 23:19
**companies** 37:6
80:23 81:8,10 86:13
86:23 108:11
150:13 186:21
189:21
**company** 2:3 5:14
5:21 6:20 17:20
32:15 51:3 52:6
58:1 59:11 62:17
63:1,17 68:3 69:18
73:2,8 85:15 87:16
99:23 104:22 107:8
108:6 120:10,11,23
130:8 134:14 135:9
135:10 136:15,19
137:3 139:9 162:24
176:3 182:18,24
183:3 186:22 187:1
188:14 189:25
190:2 201:13
205:17,21 207:2
209:4,17 210:2
**comparable** 86:13
108:12 179:17
186:22 187:1
188:14 189:11
**comparative** 179:14
189:9
**compare** 130:2
188:14
**compares** 86:13
**comparing** 183:9

**comparison** 192:3
**compensate** 37:8
76:10 175:5
**compensation**
128:11
**compete** 113:14
114:20 166:12
**competing** 181:18
**competition** 67:1
**competitive** 64:14
65:10 66:22 77:1
84:12 87:4 107:24
173:18 181:15
**complained** 113:8
**complaining** 115:18
115:20
**complaint** 49:23
**complete** 39:23
203:14
**completed** 62:19
113:13 114:19,25
**completely** 29:25
36:14 47:24
**complex** 161:10
**complexities** 76:6
**compli** 53:18
**compliance** 183:2
**comply** 12:23
**comport** 138:8
**comports** 23:15
**comprehensive**
24:17
**compromise** 198:10
198:19
**conaway** 10:10
**conceivably** 166:10
**concept** 64:12 157:6
**concern** 26:11 49:7
66:11 116:17
**concerned** 114:8
159:16
**concerns** 31:21,23
32:25 39:22 41:18
72:25 133:4
**conclude** 37:17
41:15,21 86:16
190:23

concluded 28:14
94:1 178:23 180:1
211:16
concluding 180:5
conclusion 30:24
177:14 178:14
188:18 201:10
conclusions 40:6
99:15
concrete 54:6
concurrently 58:13
condition 89:8,9
104:1
conditionality
79:24
conditioned 151:13
conditions 26:11
40:19,22 84:19,19
85:1 86:10 87:9
105:19 106:15,16
120:7,9 183:17,25
184:4,7,9,11,16
192:12 193:10
204:2,5 206:21
conducive 76:24
conduct 21:17
22:17 61:7 86:20
165:22
conducted 22:11
59:13
conducting 62:3
114:10 201:18
confer 14:21
conferred 21:7
confidence 76:20
confidential 23:22
81:25 82:3 118:3,5
confidentiality
22:11
confined 116:19
confirmable 104:2
confirmation 20:2
24:25 38:7 40:23
104:9 143:2 145:4,8
145:17 161:9
182:10,11 206:19

confirmatory 92:6
92:11
confirmed 39:13
49:13,15 50:18 80:6
confirming 145:21
conflict 30:15 133:3
178:9
conflicts 30:13 51:9
133:11,16 142:8
conform 105:16
135:22 157:2
confused 127:15
133:9
confusion 150:10
conjunction 62:25
104:21 191:25
connection 40:4
106:3 128:10
133:17 164:9 189:3
189:17 191:23
202:6
connery 10:6
consensual 163:1
consensually 210:2
consensus 143:18
144:6 164:18
consent 14:5 82:14
82:16
consequences 36:2
198:22
consequently 36:21
conservative 65:21
consider 29:14
37:20 71:23 75:19
75:24 76:4 78:25
101:24 151:2 192:2
203:19
consideration 44:18
51:7 77:11,12 123:6
135:12 138:15,25
139:8 153:20
164:20 175:9,19
considered 41:10
51:23 115:16
172:10
consistent 22:18
33:19 138:3 146:9

173:11 182:12
189:2
consisting 40:25
consolidation
139:21
constant 206:16
constantly 191:11
206:13
constituencies 27:3
65:18 74:16,17
constituents 39:19
109:11 177:11
constitutes 185:7
constituting 138:23
construct 21:16
39:20
constructing 96:6
constructive 24:16
constructively 25:9
consult 109:17
consultation 62:17
consultative 23:5
consulted 133:7,10
consulting 96:5
consummated
163:12
contact 74:2
contacted 69:20
70:24 74:4
contacting 69:14
contacts 127:4
contain 179:11,14
179:17,19
contained 99:15
138:2
contains 108:19
125:15,21,24
190:19
contemplate 39:9
39:20
contemplated 33:18
71:8 73:23 139:2
141:25 142:3
180:18 183:6
contemplating
71:13 108:14 150:7

contemplation
147:13
contending 86:3
contention 97:25
183:13
context 20:5 24:25
27:10,21 38:1 52:9
52:22 67:22 108:15
119:8 129:18
147:12 148:4
149:12,25 151:6
153:16 159:11
164:3 167:22
continental 60:24
61:1 174:6
contingent 27:8
46:15
continue 114:2,3,22
136:22
continued 84:24
185:10
continues 181:3
193:19
continuity 138:18
175:1,18
contract 62:23
66:20,23 67:2,12
78:3 79:23 84:3,6
87:11 89:6,10
105:14 108:19,24
109:12,16,22 110:6
110:7 111:20
117:12 118:17
119:6 120:4 125:15
145:12 161:13
165:3 204:8,10
207:6 209:22
contracts 109:18
contractual 80:2,9
201:2
contraire 97:18
contrary 34:13
contribution 64:11
controversial
165:23
controversy 166:16

conventional 22:18
24:3
conversations
113:25 138:1 141:1
conversion 20:10
coo 15:9
copies 14:16 17:22
17:24
copy 77:25
corp 1:6 2:1,10,17
corp's 101:9
corporate 29:21
39:24 121:5 127:2
140:14 162:5,15
corporation 59:5
60:6 153:8 162:8
correct 29:6 72:8
91:6,8,9,12 92:8,16
92:17,21 93:1,20,21
93:23,24 94:13,19
94:20 95:8,9 96:10
96:13 99:7,21 100:4
101:15 102:18,20
102:21 103:4
106:13 111:8,9,17
112:4,19,23,24
113:10,19 116:23
118:20,23 119:2,7
120:13,15 121:13
121:19 123:4 126:3
126:4 127:2,3,10,14
127:15 128:24,25
132:25 133:1,6
134:1,6,8,16 135:5
135:6 137:17,18
138:4,5,12 140:18
141:3,7 142:1,2,5
142:13 143:3,6
146:12 150:22,23
151:19,20 154:3,5,6
154:11,12,15,20
155:5,6,17 156:5
157:3 158:20,22
161:4 162:3,5,11
163:10,11,15,16,21
163:22,24,25 164:8
166:13,14,22 167:9

167:10,14 168:15
171:14 174:2,11
175:4 176:8 180:2
184:19,23 186:3
190:7,14 191:10
192:20,21,24 193:2
193:3 194:11
195:25 197:9,14,17
197:21 198:1,5
199:18 200:7,13
202:18 205:3,14
206:18 208:25
209:10,14,20
210:24,24
corrections 85:7
correctly 91:2
93:17
corroon 5:7
cost 38:10,13,15
53:13 85:3 118:13
176:20 183:19
costless 48:3
costs 38:12 48:15
couldn't 70:9
counsel 12:5 36:20
43:23 136:2 181:8
196:21 201:13
counterparty
106:13
country 214:12
county 2:4
couple 20:8 41:18
59:3 70:15 84:24
85:6,8 111:23
coupled 61:16
165:16
course 15:13 22:3
31:25 39:20 41:4
44:2 55:2 65:3
69:24 97:25 106:14
121:20 152:19
157:21 170:15
191:13 192:4,5
court 1:1,12 12:3,12
12:18 13:2,4 14:16
14:18 15:17 16:11
16:15 17:5,11,13,15

17:17,21,25 18:15
19:4,20,22 20:4,17
20:25 24:3,9,14,15
25:20 28:3 29:15
30:17 31:4 32:8
33:5 34:4 38:14
41:19 42:1,9 49:2
50:25 52:18 53:3
54:10,12,16,19 55:3
55:6,15,17 56:1,7,9
56:13,22 57:2 60:23
61:7 64:16 67:5
68:12,18,24 72:6,9
76:18,19,24 78:8
79:12,14 85:17,19
90:4,8,17,19,22
91:16,23 92:1,4
97:11 98:9,11,22,25
100:20 103:19,21
108:18,25 109:13
109:23 112:6,10
114:12 115:6 116:4
117:2,4,9,14,17
118:6,9,11 119:14
119:21,23 120:2
121:24 122:11,14
123:2,11,18,20
125:1,3 126:21
128:2,9 130:19
131:1,4,13,17,21,24
132:13,17,19,21
134:4 139:19 140:1
140:8 141:16
142:18 145:17
146:1 157:15,21
159:24 160:12
167:25 170:1,6,12
170:14,17 176:12
177:18,22 181:4,8
181:14 185:15
194:23 195:1,4,21
199:10 208:18
210:14,24
court's 15:14 22:3
190:20
courthouse 211:5

courtroom 17:24
31:19 55:9 106:24
157:9 211:2
cover 136:7 148:18
covered 116:10
covering 161:23
craft 23:6
crafting 22:21
crazy 155:23
create 175:21 197:6
205:13,15,16
208:22
created 131:15
137:25 168:24
creates 55:12
207:13
creating 49:1 66:18
208:15 209:8
credentials 132:23
credit 26:13 47:9
60:2 85:1,2,3
183:18,19
creditor 19:24
22:20 32:8 35:16
39:19 65:17 70:3
74:16 83:1 109:5,11
109:23 153:7,8,9
174:11 175:22,23
175:24 176:8
178:17 185:8 197:7
202:21
creditors 3:19
10:11 13:17 14:5
22:24 23:3 27:13,15
29:12 31:10 32:22
37:10 41:13,17
46:11,21 49:6,18,19
51:21 69:25 74:14
74:22 75:2 82:2,11
82:17,19 104:5
108:25 109:3 110:6
110:11,14,15,17,18
110:21 111:1,3
112:9,13 115:10
121:18 122:8 133:8
137:7 139:5 142:8
151:23 152:5,12

153:10,22 162:17
163:3,19 164:2,24
165:13 166:3,13,16
167:23,25 168:9
169:2,3,10 171:1,4
171:5 174:1,14,21
175:2,6,12 176:22
177:1,7,10,11
178:14,21,24 180:1
180:6 190:4,25
191:2,7 192:7 197:4
200:19 201:17
206:2 207:11
209:11,12
**creditworthiness**
106:12
**cremmons** 17:1
126:6 133:10 167:3
**crimp** 170:8
**crisis** 60:1
**criteria** 79:21
**critical** 25:2 27:10
36:1 107:3 113:20
113:25 114:6,16
115:3 116:2
**critically** 34:5
**criticism** 24:14,23
28:19 29:1
**critique** 191:1
**cro** 25:21
**cross** 6:19 15:8,10
90:9,14,23 170:19
183:13 195:6,9
**crystal** 173:25
191:8
**crystallized** 169:9
**csc** 5:14,21
**cso** 211:9
**css** 1:6
**cube** 39:4 50:20
86:4
**cure** 52:17
**current** 57:6 86:11
188:22 189:22
**currently** 58:13
59:10 133:16 139:2
140:16 184:11

185:18,25 186:1
207:18
**cut** 114:9
**cutting** 52:15

**d**

**d** 5:16 12:1 212:1
213:1 214:7
**d.i.** 2:4,15,21
**damage** 88:18
108:5,23
**damages** 87:25 88:2
88:5,12,20 89:13,16
89:18,19 90:2
105:23 106:5,10,24
107:8,10 110:10
118:24 119:17
123:13
**damaging** 81:21
**dan** 7:13
**daniel** 3:14
**dartmouth** 57:20
**data** 66:4 69:16,23
148:1,21,23
**date** 20:7 40:20
65:5 69:10 77:7,8
80:4 83:16 86:20
108:13 129:8
134:24 136:20
143:1,12,21 144:1,3
144:14 145:6,8,25
161:15,16 173:15
182:12 184:6 194:9
206:16 207:6
214:16
**dates** 21:20 73:7,25
74:19 76:22
**david** 16:23 17:3
61:1,8,24 63:5
105:9 178:17 179:5
180:3,10 206:10
**david's** 206:12
**davis** 8:20
**dawn** 2:24 214:3,7
**day** 15:24,25 16:7,8
20:12 21:4 31:25
35:14 52:18 53:2,10
53:18 72:17 74:15

75:10 111:20 159:5
166:7 167:1 185:13
193:15 208:9
**days** 34:16 52:13,15
60:5 75:12 80:5
83:15,17 84:25 85:8
94:24,25 103:7,12
103:14 104:3
113:17 114:3,11
120:8 128:10
134:23 147:22
185:13
**dazs** 59:2
**dcf** 180:11
**dead** 73:7 80:4
108:13 143:12
144:1,3,14 145:6,25
182:12 194:9 207:6
**deadline** 21:22,23
49:20 50:2 53:9
114:17 143:4,9,10
144:9 145:3 149:19
**deadlines** 2:12,19
19:9 24:10,15
**deal** 58:25 65:14,24
66:7 87:20 88:9,17
88:18 89:7,12
108:21 109:10
112:18 122:20,20
122:22,24,25 123:7
123:9 147:17
155:19 168:12
173:12 195:20
201:1 207:22 210:1
**dealing** 30:18 107:2
107:7 147:10 192:6
**deals** 146:9,10
**debate** 167:11
**debating** 140:11
**debenture** 9:9,14
**debt** 33:13 46:14
50:11 149:3 162:23
**debtor** 14:5 16:12
34:25 35:3,6,7
37:17 38:3,6,23
48:21 49:11 51:8
53:10 68:19 69:4

81:24 96:17 100:13
102:18,20 105:17
109:13 110:18
111:9 118:4 119:6
122:18 125:2
134:17,19 146:6
154:16 156:1 166:3
166:5,25 168:1
169:24 175:22
192:5
**debtor's** 79:2,11
83:6
**debtors** 1:7 2:3 3:3
3:12 12:6,7 13:18
13:22 14:3,8,23
15:6,8,12 16:18,24
17:6,16 18:17 19:19
20:8,14,17,20,23
21:3,3,7 22:16,23
24:2,6,9 25:10,15
25:18,20 26:2,16
29:3,7,20,22,23
30:8 31:1,12,14,16
31:23 32:17,18 33:3
33:19 34:2,6,10,15
34:19 35:9 39:3,5
39:15,17,25 40:16
41:1,15 42:8 43:14
45:5,21 46:2,4
47:23 48:4,5,18,23
49:10 50:7,7 51:8,9
51:12 52:8,10 53:16
54:24 55:23 56:12
67:16,18 72:11,12
78:13 82:1 92:7
95:10,25 96:9 97:1
97:19 99:5,11,14
104:4,8,13 107:23
111:5 117:2 118:7
120:3 121:5,17
122:7 123:12
124:23 127:5
141:24 142:3,6
143:5 144:8,13,16
144:25 148:22,24
149:13,14 151:15
152:25 154:5 155:2

156:3 163:13
176:15,16,17 180:4
180:23 184:15
185:10 187:17,25
192:20 195:23
199:5,17 201:10
209:25
**december** 39:13
50:17 104:9
**decide** 43:10 46:17
67:16 72:12 115:21
192:1
**decided** 21:3 67:18
86:23,25 112:1
122:19 169:23
**decides** 210:4
**decision** 42:9,10,11
42:14 43:5,6,7,9,18
44:8 46:23 53:9
65:2 72:18,20 75:6
75:8,9,12 91:10
111:21 134:19,21
135:3,7 142:10
146:3,16,18,20
147:15 154:18
155:2,4 156:18
171:15,20 172:2
188:13 191:23
195:16
**decisions** 30:3,6,10
**declaration** 2:14
64:3,7
**declaring** 61:6
**decline** 44:16 89:14
123:3
**declines** 87:19
**deconsolidation**
165:17
**deduct** 181:16
**defend** 168:2
**defenses** 167:25
**defer** 108:16 121:2
145:18
**define** 119:25
**defined** 116:19
**defining** 153:9
163:2 164:20 184:9

196:18
**definitely** 81:5
**definition** 80:1
122:24 138:21
**definitional** 95:2
**definitive** 65:5
77:10,23 78:2
**deflation** 123:12
**defranceschi** 3:14
**degree** 57:20 64:15
193:25 194:1
**degrees** 89:2
**delaware** 1:2,14
5:14,21 51:3 53:7
53:18
**delayed** 27:18
**delegated** 30:9
**deliberately** 23:15
**deliberative** 23:5
**delicate** 48:13
**deliver** 103:11
149:24 151:17
**delivering** 151:13
188:9
**dell** 59:20,20,20
88:7,9,12
**delta** 61:4
**demanding** 204:9
**demonstrate** 29:12
33:15 35:15,19 39:6
40:1,19
**demonstrated**
27:18 83:24
**demonstrating** 42:8
**demonstrative**
33:24
**denied** 50:23
**denominator**
153:21 168:13
**department** 4:8
**depend** 119:3
147:16 186:21
197:12
**depending** 52:1
139:15 171:16
**depends** 123:6

**depo** 93:6
**deposed** 141:2
**deposit** 107:12,16
107:18,20 108:20
**deposited** 107:14
**deposition** 37:13
92:13 93:5,19,23
94:1 95:3 102:10,16
116:8 121:9 126:2
127:9,12 140:25
141:4,10 146:13
147:9 152:1 156:12
159:7 160:1,3,18
176:25 177:16,25
178:3 193:9
**depreciable** 160:20
160:24
**depreciate** 36:4
158:14
**depressive** 173:3,22
**deprivation** 35:20
**deprives** 35:18
**derive** 158:5
**describe** 58:20
62:11
**described** 64:10
72:5 99:4 169:21
**describing** 139:11
**design** 22:5 30:25
62:8,19 104:19
108:18 137:20
**designed** 23:6,13
26:1 28:20,21 33:16
53:17 67:2 71:2,4
100:7 105:15
109:21 113:12
190:22
**designers** 114:12
**designing** 62:18
99:18 100:6 104:23
**desire** 171:11
185:24
**desk** 55:20,25
**despite** 34:12 85:7
128:14
**details** 117:8 141:8
151:22

**deter** 28:7
**deteriorate** 193:10
204:3
**deteriorated** 204:5
**determination**
29:16 80:10 128:21
197:15
**determine** 16:22
32:20,23 159:6
184:17 187:20
196:15
**determined** 33:1
79:17,20 142:6
144:1,2,4 200:11
**determining** 25:1
188:10
**deutsche** 5:8
**develop** 62:5 98:3
**developed** 95:24
97:24
**developing** 64:9
97:21
**development** 14:12
74:10 174:2
**devised** 156:22
**devoid** 48:14
**devore** 5:17
**diageo** 59:1
**didn't** 94:15 100:17
127:10 130:15
**difference** 186:13
**different** 52:11 62:6
101:17 102:4
124:25 142:16
146:24 150:16
154:23 169:18
187:15,17
**difficult** 76:12
**difficulties** 86:7
**difficulty** 115:5
**diligence** 45:12
77:18 113:13,16,20
113:23 114:2,10,16
114:19,22 115:1
116:2
**dillon** 58:1,2,11,12
58:12

**dip** 20:9,11,13,15
20:21 24:13 35:10
41:3 67:22 96:13
142:8 164:4 171:2
184:22 185:11
186:9,12,16 187:18
**direct** 15:7,8 25:16
56:12,23 88:16 96:4
97:5,7,14 103:5,7
108:3 116:10 134:9
136:3
**directed** 92:15
153:4
**directly** 22:7
**director** 17:2,3 45:1
57:7 125:18,19
**directors** 92:7
104:8 125:20 126:5
126:8 128:23
131:12 133:8
135:11 180:24
**directs** 22:13
**disadvantages**
66:21
**disadvantaging**
81:7
**disappear** 166:7
**disappears** 139:20
**disclose** 81:10,15
**discloses** 110:8
**disclosing** 80:20
117:8
**disclosure** 28:6
39:21 75:2 81:1,13
**disconnect** 43:19
93:18
**discontinues** 193:20
**discount** 173:6,17
173:19 181:21,23
182:6
**discounted** 179:12
189:7
**discovery** 43:24
**discreet** 31:21 54:6
**discuss** 14:12 58:22
90:13 100:12,15
145:23 210:16

**discussed** 22:13
23:2 39:16 55:22
72:22,23,23 140:21
144:5,7
**discussing** 22:23
100:10 109:5
110:25 116:21
**discussion** 70:5
72:14 177:3 190:25
**discussions** 61:3
74:22 82:16 99:22
100:17 118:1 143:5
143:8 145:24
164:21 172:6
178:17 179:5 180:3
201:12 206:10
**disingenuously**
37:18
**dispose** 41:5 91:11
160:16 184:20
**dispute** 197:19
201:2
**disputing** 44:4
**disregard** 153:14
**dissipated** 36:14
37:25
**dissipates** 36:11
**distinction** 196:4
**distracting** 170:12
**distributable** 25:7
25:12 196:5 197:3
197:10,12 200:5
205:13,15
**distribute** 14:16
196:17 197:7
**distributed** 139:5
**distribution** 85:5
183:21 196:15
**distributions** 137:6
**district** 1:2 2:4
**diverted** 32:6 53:25
**divest** 71:19
**dividend** 161:14
**dividends** 194:5
**dizengoff** 4:19
**docket** 12:14 63:22
64:6 68:15 147:19

**docs** 53:23
**document** 70:20,22
70:23 136:9
**documentation**
78:2,7
**documents** 136:2
**doing** 39:20 43:16
43:20 45:11 47:14
48:6,17,17,22 49:11
53:23 62:25 69:1
74:18 78:15 87:5
105:13 123:21,22
129:2 143:24 160:1
165:21 183:21
191:20 196:14
197:3 205:4,6
208:10 209:21
210:22
**dollar** 36:7 59:14
187:11,21 200:1
201:25 205:11
**dollars** 35:18 37:1
48:12 103:10,15,22
165:24
**don** 127:21
**donald** 10:8
**don't** 134:10
**door** 106:24 120:19
**dore** 127:7 146:14
**doubled** 113:1
**doubt** 207:8
**dow** 85:4
**downside** 79:24
86:5 88:1 89:15
90:1 192:17 193:1
**draft** 21:9,10
**drafting** 121:3
**drawing** 196:4
**drawn** 66:25
**drew** 177:14
**drinker** 6:1
**drive** 73:6
**drop** 73:7 80:4
82:16,17 106:19
108:12 143:12
144:1,3,14 145:6,25
182:12 194:9 207:6

**dropped** 106:17
**drops** 105:19 139:7
**dry** 47:10
**dual** 199:22
**due** 30:13 45:12
73:24 77:18 78:5
103:21 113:13,16
113:20,23 114:2,10
114:16,19,22 115:1
116:2
**duetsche** 5:2
**duties** 43:8 48:5
57:10 199:22
**duty** 44:7,7 45:15
45:16 46:25,25
104:4 124:5 131:12
200:11 201:16
**dynamic** 173:3

**e**

**e** 1:21,21 3:1,1 12:1
12:1 35:23 39:9,12
41:17 45:22 49:17
50:7 103:2 104:2,9
125:25 139:5 145:1
149:13,14,14
150:12,13,17,19,22
151:24 153:3 158:1
158:19,22 162:19
162:22 163:5,18
164:23 166:24
171:1 174:14
180:16 191:20
199:17 207:2,5,25
209:12 212:1 213:1
213:2,2 214:1
**ea** 125:16
**earlier** 65:3 71:16
82:15 83:5 85:22,22
86:3 95:20 124:22
179:20 182:1 188:5
191:11 211:7
**earliest** 143:21
**early** 22:1,2,2,24
23:3 110:4 177:8
**earnings** 85:10
188:17

easing 193:17,20
eastern 60:22
easy 48:12
ebidta 183:22
  188:16 194:5,6,7,16
ebita 85:11
ebs 59:14
economic 25:2
  27:16 35:4 38:20
  66:19 67:12 71:20
  76:14 80:8 83:20
  147:3 149:23 150:9
  184:20
economically
  156:24
economics 84:6
  102:2
ecr 1:25
edelson 7:5
eds 59:15
eduardo 57:15
educate 120:22
educating 128:16
  152:2
edward 3:9 4:4 33:9
effect 23:19 39:2
  64:18 97:24 151:15
  154:9 162:14 166:2
  168:10 177:14
  204:13
effective 66:18 84:1
  84:2 118:13 152:15
effectively 28:12
  66:25
effects 53:11
efficient 17:7 33:19
  34:19 41:12 71:22
  95:7,15,22,23 96:6
  96:9,12,18,19,24
  97:4 98:6 99:3,20
  100:8 101:6,15,19
  103:1 105:16
  135:22 137:11
  138:3 146:9 154:10
  157:3,4 209:7
efficiently 16:20

effort 58:14 65:4
  111:24 128:14
  141:21 169:19
efforts 31:12 63:13
  73:14
efh 7:22 20:10
  32:15,22 33:23 34:9
  34:21 37:7,8 42:13
  46:22 52:2 67:25
  71:14 100:3 101:6,7
  101:9 103:11
  105:18 121:5
  125:17,20,24
  126:12,15,21,22
  127:2,13,18,23,24
  129:17 136:14,21
  136:21 137:5 138:6
  138:7,13 139:4,4,13
  139:15,16 140:16
  146:23 147:13
  148:13 149:2,25,25
  150:4,5 151:7,13,14
  151:18 153:8,20,22
  155:10 157:23
  162:5,7,15,16
  163:10 164:13,17
  165:4,11,12,24
  166:2,10,12,16
  167:4,7,12 168:6,12
  172:4,5,7 174:17,18
  185:6,7 200:15
  201:1,16,20 208:23
efh's 31:13 34:21
  157:9
efhi 51:21
efi 14:10 24:13
  125:17
efih 4:15 8:18 9:2
  10:16 14:11,25
  16:13,14 17:1 20:9
  20:11,15,21 26:23
  26:25 27:4,5 34:22
  34:24 46:14 51:4,20
  51:20,25 52:4
  101:10,17,22,23
  102:6,11 125:19
  136:22 147:5 149:2

150:7 161:4,7,20
  166:11,16 168:20
  168:24 169:2,3,9
  171:2 174:21
  175:12 199:13
  200:2,6,16,19
  201:15,20,25 202:9
  202:21
eh 81:19
eight 27:24 46:9
  211:6
either 57:11 84:4
  86:4 87:22 106:4
  125:4 126:6 133:7
  133:10 134:22
  139:8 146:14 149:2
  168:1 193:1 194:8
  194:16 202:1
  209:17
elect 68:3 89:24
  122:23 147:13
  203:10 207:5
elected 73:16
election 185:20
electric 34:25
electronic 69:16
  214:7
elects 106:6
element 39:19
  80:13 81:12 89:9
  173:11
elements 43:4 53:2
  80:11,16 83:6
  189:16 190:19
elevators 15:22
elicit 53:8 71:2
eliminate 51:24
  52:13
ellen 4:12
ellis 3:2 12:5 54:24
  56:11 153:5 201:23
else's 112:18
email 136:7
emails 15:14 210:22
emanate 62:9
emerge 143:20
  185:1

emerged 185:1,11
emergence 136:20
  169:24
emphasize 19:6
  21:19 22:4 25:25
  75:23 132:9,15
employ 142:10
  207:11
employed 57:4,5
enable 114:1
enables 185:5
encore 91:7,13,18
  91:22,24 102:7,11
  102:18,22,23,24
  105:19 106:17
  120:12 128:24
  129:3 130:2,5,23
  136:23 187:6
encourage 24:10
  25:8 76:21
encumbrances
  151:19
endeavor 16:20
  21:21
ends 206:25
energy 1:6 2:1,9,17
  10:22 11:2 58:3,8
  58:12,14 60:4,8
  61:19 163:24
  206:22
enforceability
  166:17 171:6
enforceable 157:24
  159:18
engage 142:7
engaged 25:8 85:21
engagement 61:19
  63:4 129:5
engineering 36:17
enhance 87:4
enormous 113:22
ensue 181:15
ensure 181:16,20
entail 57:10 120:24
enter 82:19 210:3
entered 12:17 88:9

entering 51:9 204:1
enterprise 85:11
entire 30:12 165:21
entirely 18:7 19:7
  51:10
entirety 67:24
  120:18 121:16
  177:10 185:6,7
entities 28:8 139:21
  147:7 149:3 166:3
  168:16 206:14
entitled 97:23 98:1
  174:15 175:6
  176:23 183:4
entitlement 152:7
  152:15
entity 34:25 35:6
  46:16 61:1 102:17
  102:18,20 107:2
  119:3 139:7 148:4
entrench 28:20,21
entry 2:2,7,10,18
environment 64:14
equal 88:18 108:5
  148:3 149:10
equally 150:6 157:4
equation 33:13
  35:17 36:12,18 37:8
  125:25 150:12,14
  167:9
equity 20:10 31:13
  33:23 34:9,20,22,24
  35:5 42:13 43:17
  44:12 45:14 46:4
  71:14 87:16 88:15
  101:9 102:11
  118:22 137:6 138:6
  138:8,14 141:6,10
  141:15,22 146:23
  162:17 163:10
  175:25 193:20
equivalent 156:16
escrow 107:15
  125:12
esq 3:5,6,7,8,9,14
  3:15,21,22 4:4,5,6
  4:11,12,18,19,20,21

5:4,5,5,10,11,16,17
  5:18,23,24 6:4,5,10
  6:16,17,22 7:4,5,10
  7:11,12,13,14,19,24
  8:4,5,10,15,20,21
  9:4,5,6,11,16,21
  10:4,8,13,19,24
  11:4,9
essence 35:4 114:15
essentially 19:1
  22:6 23:1 27:3 50:9
  107:9 153:18
establish 19:9,19
  45:1 118:14 176:8
  183:3
established 143:5,7
  143:9 146:3 182:7
establishing 88:24
estate 27:15 35:18
  36:1 38:10,25 41:9
  83:4 91:11,13,18,22
  92:2 102:18 122:21
  124:6,20 154:2,4
  158:4 197:19
  201:22 202:23
  203:13 205:1
  208:15 210:11
estate's 29:8 128:24
estates 30:13 31:16
  34:11 38:16 67:14
  154:4 163:13 171:1
  200:11 209:19
estimate 158:21
estimated 37:13
  162:7
estimates 189:23
et 1:6 2:1,10,17
  77:13
europe 59:3
euros 60:4
evaluating 27:10
  62:23 191:25
evans 127:21
event 34:16 68:3
  101:12 124:19
  176:7,12

events 18:11 97:15
  203:11
eventual 62:24
  111:8
eventually 54:21
  112:25 135:3
evercore 15:7 16:23
  25:18 57:5,11,23
  58:15,21,23,25
  62:12,14 63:2,3,12
  68:14 69:17 72:11
  85:14 88:17 91:8,11
  91:15,25 92:1,2
  104:18 105:3,5,6,12
  111:14,15 114:13
  120:4 128:22 129:1
  130:22 137:20
  142:11 144:17,19
  144:23,24 146:6
  172:18 176:15
  180:7,22 187:19
  191:9,18,22 199:19
evercore's 73:8
  99:19 132:24
  133:20 136:8
everybody 47:8
  157:8 162:18
everything's 114:13
evidence 33:14,21
  35:15 36:6 38:15
  39:23 40:19 41:14
  42:8 47:11 173:17
  184:3,7
evidenced 40:3
  152:6
evolved 139:10
exact 35:9,13
  134:24
exactly 108:13
  123:5 160:6,17
examination 56:23
  90:23 170:19 195:6
  195:9
examine 90:9
example 34:21
  58:24 79:3 80:3
  83:13 88:7 108:3

110:9 121:1 150:7
  179:11,14 198:9
examples 88:6,21
  140:23 141:9,15
exceeding 45:7
  acceptance 63:10
exception 23:15
excessive 31:3
exch 199:16
exchange 61:7
  139:8
exclude 120:9
exclusive 32:18
  37:9 82:19,23
exclusivity 46:6,10
  48:7
excuse 22:1,2 29:23
  47:14 70:3 88:11
  125:17 182:19
  203:7
excused 210:16
executing 105:1
execution 57:8
  132:25 173:4,7,13
  173:23 181:6,7,13
  181:17,25 182:7,9
executive 127:17,25
  128:1 137:21
executives 120:19
exempt 169:12
exercise 30:25 43:7
  46:19 79:25 124:4
  195:23 199:6,7
  207:1
exercised 46:25
exercising 43:8
  104:4
exhibit 13:13,14,15
  70:20 136:5,11
  137:8 177:18
exhibits 2:13 55:21
  147:20
exist 34:9 38:6,17
  133:16 140:17
  151:3,12 169:15
  197:13 198:2

existed 66:21
184:16 193:17
existence 45:4
178:8
existing 175:1 197:4
exists 29:13,13
47:25 149:3 205:18
207:25
exit 31:16 47:10
48:19 89:7
expand 68:24
expanded 74:1
expect 34:7 40:17
69:2 86:5 87:10
105:8,9,12 129:15
181:24 198:19
expectation 62:22
193:15,17,19
expected 33:16 77:8
161:15
expecting 86:8
198:24 199:2
expenditures 194:5
expense 46:21
expenses 165:22
expensive 131:15
experience 23:15
51:17 58:16,18,20
60:18,21 61:10,12
62:9 86:23 87:2
88:3 107:19 108:9
190:1 198:15 204:7
experiencing 86:6
expert 60:21 63:11
97:19,24 98:16
134:2 138:16
139:25 144:18
145:14 159:13
190:1 193:4,7,12
expertise 51:16
63:7 133:24 134:7
186:1
experts 63:1,9
100:11
explain 80:13 82:20
83:23 88:25 122:10
122:11,15 143:24

explained 62:2
74:17 147:9
explanation 44:2
121:23,25
explicitly 30:1
explore 163:4
exponentially 82:7
expressed 29:4
32:16,24 65:18,20
69:21 115:15
expressing 29:8
expression 103:25
147:22
expressions 162:9
expressly 19:13
28:24 30:7
extant 184:11
extend 73:16
extended 130:7,8
145:8 172:11
extending 2:2
extension 46:6
extensive 26:9
58:18
extent 16:1,6 22:20
28:19 78:21 89:17
90:1 105:7 107:7
126:24 149:13
150:5,12 151:25
176:9 187:6
extra 164:13
extraordinary
42:14 48:24
extremely 85:3

**f**

f 1:21 214:1
fa 142:12
face 94:15,15,19,19
183:9 187:16
facilitate 26:13
facilitating 31:16
facility 41:3 96:13
184:22 186:12
fact 29:3,25 36:23
42:25 44:10 47:12
66:17 73:10 75:24
80:21 86:12,14

89:10 95:10 106:1
106:11 108:12
115:22 132:10
138:7 146:7 152:4
154:16 155:25
158:21 159:9
165:18 172:8
184:25 185:18
186:24 187:6,7
190:7 193:18
198:13 206:21
207:8
factor 115:17 185:2
factors 85:13 86:10
86:11 115:15
183:15,16 185:3
197:13
facts 43:19 68:16
171:13,16,17
failure 89:8 116:16
fair 29:1 30:17,18
96:15 103:18
106:20 160:12
165:25
fairly 45:25 154:21
209:18
fairness 30:12
188:9 189:4,6,19,20
190:3,3,18
faith 42:10,18
fallen 186:24
falls 16:19
familiar 20:4 23:21
24:4,5 25:20 26:1
130:9 153:5 193:23
far 94:6 102:7
146:20 152:17
162:10 166:23
176:19 180:15
fashion 171:10
fast 55:9
favorably 86:13
feasibility 103:6,13
feasible 80:6
feature 119:2
features 26:4

february 22:2 50:2
fed 193:16,19
federal 161:13
165:4
fee 46:20,21 47:24
53:1 88:5,5,8,15
106:2 108:22 119:7
119:8,11 121:6,10
122:5,17,23 123:10
124:3,4,5,9,13,20
124:21,24 125:15
195:24 198:24
199:3 203:20,22,25
204:9,19 207:7,15
210:5
feedback 69:25
70:3 74:14 75:4
76:1,3 77:24
feel 66:7 75:1
116:14
fees 87:14
felt 4:14 62:5 65:25
66:5,21 76:19
143:17
fence 35:5 102:19
102:23,24 152:7,16
168:10 171:3
fenced 168:16
fete 53:17
fiction 38:19
fide 78:22
fidelity 6:20
fiduciary 41:9
46:19 78:24 79:25
87:11,11 104:4
106:3 119:9,9,11,11
124:5 125:25
166:23 168:4 192:6
195:23 199:6,7
207:1
field 58:17 83:1
107:20
fifteen 16:12
fifth 93:17
fight 153:2
fighting 50:12

**figure** 46:11 47:15
115:19 167:8 187:5
209:16
**figuring** 158:17
198:23 204:25
**file** 2:8 12:23 29:21
42:13 43:17
**filed** 2:4,15,21 19:1
20:8,16 21:4,11
26:25 31:3,12,20
38:13 39:18 40:3
45:23 49:24 53:15
75:16 76:17 99:6
134:25 135:20
146:6 156:1 164:9
**filing** 21:23 29:24
30:6,7,10 40:2,6,20
61:8 75:10,12 96:16
99:11 118:2 134:23
137:9,16 148:10
184:16
**filled** 113:24 128:4
**filsinger** 44:21,22
**final** 14:19,20 61:15
75:11 78:4,5,6
104:19 145:5,25
**finally** 18:19 85:13
86:2
**finance** 47:10 48:19
57:21
**financial** 17:4 59:22
60:1 112:8,13
115:10 131:15
141:25 191:9
**financing** 164:4
**find** 42:15 46:9
48:19 136:5 171:19
172:1 200:21
**finding** 131:14
**fine** 134:12
**finger** 3:11
**finish** 173:9 195:7
**finished** 15:12
129:13 149:5
**firm** 7:21 47:20
121:11

**firm's** 133:2
**firmly** 37:16
**firms** 57:16
**first** 3:18 10:11
12:13 14:10,25 16:9
16:14,15 18:6 19:20
20:11,12 21:20
22:10 25:24 26:2,22
27:4,4,5 31:10,15
34:17 36:20 37:10
39:19 43:1,18 49:21
50:1,22 51:4 52:10
58:24 63:21,21 65:3
67:16,18 73:23
75:21 77:7,8,9
80:16,18 81:14,18
84:18 90:25 94:1
101:6 108:25
109:22 114:6 115:2
115:8 119:15,18
125:9,9 135:4,7
136:14 137:14
139:3 146:5,16
148:8,18 149:12
155:25 161:6
163:19,23 164:1,25
165:6 172:21 177:5
178:4 179:23,25
188:5 196:3 201:1
**firsthand** 97:17
**fit** 80:10 102:1,5
180:14
**fits** 98:6
**five** 60:22 77:15
84:17 94:25
**fixes** 53:14
**flexibility** 79:4,9
83:16
**flip** 63:21 136:11
**flipped** 33:8
**floor** 26:16 88:25
108:22 211:6,9
**flow** 32:22 53:24
162:7 179:12 189:7
195:6
**flows** 162:5 164:13

**fluctuate** 192:22,25
**fluor** 11:7
**focus** 22:14 24:12
43:3,12 69:8 157:5
**focused** 180:16
**foerster** 7:7 49:5
**fold** 65:3
**foley** 9:18
**follow** 30:5 131:18
195:18 196:21
211:3
**followed** 14:23 15:8
15:9 22:1,15 64:23
78:20
**following** 14:22
25:23 67:19 178:7
178:16
**follows** 19:16
**food** 59:4,9,11
**foot** 81:19
**force** 42:20 118:21
**foreboden** 34:23
35:2
**foreclose** 19:24
**forego** 37:1
**foregoing** 214:3
**foregone** 159:10
**forget** 112:7 164:14
204:1
**forgotten** 127:11
**form** 2:12,20 13:1
13:10 23:6 25:7
29:17,18 36:11
42:23 53:15 74:24
77:12 87:22,25
101:17 108:19,24
109:22 119:7 123:6
135:3 137:15
148:15 177:2
197:24
**formal** 128:18,23
129:2,8,16 130:10
180:22 188:11,24
189:1 190:17,17
191:12,22 206:14
**formally** 32:1

**forman** 5:20
**format** 53:6 67:25
76:12 155:7
**formation** 25:3,9
**formed** 133:23
193:4,12
**forms** 35:21
**formulated** 32:11
**forth** 24:10 30:14
**forthcoming** 34:14
**forward** 18:17
28:13 39:25 41:7
43:16 53:12,13,17
68:4 73:4 81:20
83:7 95:1 101:2
129:21 147:1 161:3
169:19,22 171:15
171:21 181:24
191:3 198:10
204:24 207:17
**found** 169:11
203:16
**foundation** 24:22
**four** 18:5 28:2
40:17,25 60:22
77:15,15,17 84:17
94:25 185:19 186:2
**fox** 8:7
**frame** 65:11 70:4,13
70:16 111:16,17
116:3 137:24
143:14 173:10
183:5,9
**frames** 143:19
183:10
**framework** 17:8
**frankly** 42:14,25
45:11 81:1 159:8
**fredric** 5:4
**free** 19:15 28:21
29:4 35:25 37:21
67:25 71:13,25 75:4
134:22 136:21
137:11 151:14,18
154:10 155:10
156:8,14,22 158:5
163:20,23 164:2,14

173:4 185:8 195:22
204:15
**freeport** 60:9
**french** 60:3
**front** 28:16 35:12
66:15 84:12
**fsb** 2:8
**fulfilling** 48:4,5,8
131:12
**full** 24:2 27:6,7 28:6
89:15,16 90:2 159:2
174:21 175:3
**fully** 33:16 34:7
**function** 161:14
166:4 174:16 187:7
**fund** 2:8 12:15
137:6
**funds** 176:9
**further** 14:12 25:4
65:20 77:18 156:13
157:24 163:4 171:5
175:11 177:3 184:7
**future** 1:6 2:1,10,17
25:1 36:14 39:11
133:17 192:22
**futures** 61:19

**g**

**g** 12:1
**gain** 160:15 203:6
**garrison** 3:17 31:9
**garvan** 7:24
**gas** 58:5
**gazillion** 103:10,15
103:22
**ge's** 59:24
**geddes** 8:12
**gee** 87:5
**geedes** 12:22
**general** 57:7 58:8
58:25 59:2,3 84:19
84:19 86:10 120:6,9
122:8 139:24 177:9
183:17,24,24 184:4
192:12
**generalists** 57:13
**generalized** 54:4

**generally** 14:22
59:4 65:20 68:25
74:25 85:4 86:12
87:15 100:15
144:17 151:25
158:12 182:25
**generated** 37:6
**generation** 2:3
**geneses** 91:24
**gentleman** 57:14
**gentlemen** 126:12
**getting** 12:9 20:11
25:6 47:1 84:2,3
103:6,13 104:8
113:21 119:4
137:22 144:25
145:4 165:2 175:7,8
194:10 201:21
203:21 204:10
207:9
**giggle** 124:1
**give** 34:17 36:1 65:4
70:9 71:5 73:24
76:20 77:3,24,24
78:1 88:6 89:16
94:21 102:7 110:7
115:23 117:4 120:5
120:5 121:12,23,25
129:16 130:4
132:11,11 139:6
144:8,16 155:11
166:5,25 167:5,18
178:16 182:4
200:24
**given** 39:17 55:20
55:22,23 64:17
69:23 82:6,7 99:24
104:7,12 115:24
129:8,10,22 130:11
130:22 144:23,24
158:7 159:13
172:13 176:16
181:22 182:11
189:19 200:20
**gives** 34:22 89:15
89:17

**giving** 47:11 110:5
130:14 144:12
179:7 189:17 196:5
198:13
**glance** 26:19
**glasses** 91:23
**gm** 61:4,5
**go** 16:5,8 17:17 47:2
48:14,19 53:12,13
55:2,17 57:19 62:6
79:16 86:22 87:2,4
88:10 89:21 90:4
95:1 98:16,25
100:22 107:5
109:19 111:21
114:11 115:8,21
121:8 123:17
130:22 132:23
134:10 136:24
137:21 152:7,23
158:17 164:24
165:20 169:12,13
169:14,18,22
171:11,15,21,24
172:1,21,22,24
182:22 190:16
192:2 195:16 207:9
207:17 208:5
209:22
**goal** 15:4,11
**goals** 31:17
**goes** 27:24 37:22
89:11,20,23 100:8
147:8 178:13 187:6
**going** 15:19,21
16:19 19:8 22:13
23:18,25 24:4,5
25:4,8,10,17,22,25
26:9,11 28:7,8,15
30:22 31:1 32:19
36:8,24 37:3,9 38:4
40:21,22 41:4,5,8
41:21 42:18,23
43:12 45:24 46:3,7
46:10,19 47:2,19
48:8 49:18,21,22
50:12 51:6 52:13,24

53:4,24 54:13 56:5
58:21 62:2,6,21
65:14 68:19 69:7
70:15 73:4 74:12
83:7 84:5 86:21
90:5,9 94:4 97:11
97:14,22 101:2,25
105:4,21,22 106:12
106:16,19 107:9,25
107:25 108:24
109:11 110:7 112:1
113:13,17 114:9
116:13 118:10
119:9 120:4,5,8
122:5,24 124:3,4,5
124:8,13 129:21
130:12 131:1,2
136:1 137:19
141:13,16 143:25
145:5 149:9,24
150:3 152:25
153:17 154:14
156:11 157:2,7
158:5,11,12,13
160:16 161:3,22
164:19 165:2,10
169:23 170:1
172:11 173:20
174:14,16,18
175:21 177:15
178:10 179:23,25
181:1,5,24 185:15
190:16 191:3
193:16 194:13,16
195:6,14,18,22
196:1,16 197:12,15
197:23 198:24,25
199:1,2,5 200:14
202:3,5,14,21,25
203:3,9 204:7,21,24
205:2 207:9,15
208:22 209:24,24
210:25 211:2
**good** 12:3,4,20,21
31:8 32:13 40:11,12
40:12 42:2,10,18
44:15,15 47:12 49:4

55:7 56:7,25 57:1
79:3 81:8 84:20,22
87:1 90:17 92:12,14
92:19,19 94:4,5,22
94:23 97:19 106:12
106:23 108:15
113:5 122:20
124:10 129:7
132:16 152:2 174:7
175:12 183:18,18
184:8,15,24 187:21
188:4
**goren** 7:14
**gosh** 83:15
**gotten** 16:8 24:14
162:10 176:19
**governance** 39:24
51:18
**government** 55:1
60:11
**graduation** 58:1
**grand** 92:25 93:6
93:20
**grant** 40:17 131:17
**granted** 68:20
**graphic** 21:16
**gray** 5:13 51:3
**great** 43:2 44:15
60:18 61:16 69:6
200:9
**greater** 89:2 185:22
**greg** 8:15 9:5 12:21
**grocery** 59:7
**ground** 171:13,16
171:18
**grounds** 28:15
**group** 6:13 8:8,18
9:2 14:24 27:14
33:11 42:3 57:8,9
58:8,8,9,10,12
60:25 70:24 104:23
132:25
**groups** 109:6
**guaranteed** 37:22
**guess** 124:9 138:20
143:22 148:8
174:18

**guidance** 78:1
116:21 117:1
**guiney** 9:16
**gump** 4:14
**guy** 110:9 145:14
**guy's** 110:12
**guys** 155:23 164:12

## h

**h** 7:19 56:19
**ha** 151:11
**haagen** 59:2
**half** 15:20 17:23
187:10,11,20
**hand** 56:14 89:23
114:1 130:3
**handed** 63:20
**handle** 30:9
**handling** 62:20
**hands** 166:24
167:18
**happen** 42:7 153:17
203:17 210:20
**happened** 54:19
68:10 97:15 104:15
143:23 211:4
**happening** 206:25
**happens** 87:6
139:19 198:6
**happily** 124:5
**happy** 26:23 54:5
101:24 187:3
**hard** 157:7 159:6
**harm** 86:19,21
**harrington** 8:5
**harris** 7:13
**harrison** 7:16
**harvy** 7:16
**hate** 170:8
**hauer** 4:14
**he'll** 89:20
**head** 48:20 57:7,8
205:25
**headed** 136:5 181:4
**heading** 183:24
**headline** 196:4,9
197:8

**healthy** 76:25 85:12
183:23
**hear** 23:18 30:23
33:14 34:7 36:6
37:13,16 38:15 39:2
39:23 40:16 41:8,14
46:20 47:18 51:6
91:2
**heard** 13:5 36:20
42:6 44:21 117:18
155:9,25 210:6
**hearing** 2:1,7,17
12:7,19 13:21 14:20
16:3 17:6 20:6,13
20:15 21:25 22:14
40:4 52:20 55:22
128:10 185:17
211:1,3,11
**hearings** 2:12,19
**hearsay** 68:20
**heavily** 175:20
**hebbeln** 9:21
**hello** 170:7
**help** 62:8,9 91:23
106:7 107:25 112:6
120:22 123:23
204:8
**helped** 108:18
137:20
**helpful** 20:4 25:10
164:17
**helps** 44:6
**hessler** 3:6 12:4,5
12:13 13:9 14:19
16:10,14,17 17:12
17:14,16,18,22 18:2
31:5,24 32:3 53:5
54:23,24 55:5 82:15
110:3
**hewlett** 59:15
**hey** 159:9 164:12
167:5 171:9
**hi** 54:23
**high** 25:15 27:25
58:9 85:7,9,9
161:19

**higher** 78:14 121:16
122:6 158:9 162:11
186:20 187:13
196:9
**highest** 186:23
**highlight** 14:14
18:14
**highlighted** 23:14
52:12
**highlighting** 20:22
**highly** 52:4 154:13
206:11
**hiltz** 15:7 25:18
56:12,19,25 57:3
60:18 67:9 68:14
69:10 83:19 90:3,25
97:15 160:3 195:11
213:4
**hit** 49:8
**hoc** 3:18 4:15 6:13
7:22 8:8 10:16
14:24 16:12 27:13
31:10 33:11 42:3
**hogan** 7:21
**hold** 33:12 46:8
126:18 188:23
209:17
**holders** 14:10,11,11
27:5 33:12 50:11
162:17 163:20
**holding** 32:15 46:4
121:11 162:24
**holdings** 1:6 2:1,10
2:17 61:19 102:7,22
102:24 147:6
**hole** 50:19
**home** 49:8
**homerun** 207:10,15
**hon** 1:22
**hone** 188:20
**honestly** 150:10
**honor** 12:4,7,13,21
13:3,9,20 14:3,6,12
14:17,19 15:1,4,6
15:11 16:10,17,25
17:5,9,12,18 18:3
18:10,14,19,22,25

19:8,13,18 20:3,14
20:19 21:2,13,15
22:5,15,20,25 23:4
23:9,12,24 24:7,12
24:20 25:1,6,13,22
26:3,8,12,14,17,23
27:2,5,10,12,14,17
27:20,23 28:1,11,17
28:22 29:2,6,18,19
29:25 30:11,19,20
31:5,8,11,18 32:2
32:12,13 33:7,9,14
33:21,24,25 34:1,18
35:8 36:12 37:16
38:1,7,9,11 39:8,13
41:8,14,21,23 42:2
42:5 45:20 49:4
51:2,5 53:8 54:9,15
54:23 55:7,16,18
56:3,8 68:7 97:9,13
98:21 116:20
117:24 128:8
130:12 131:6,20
141:13 142:15
157:18 159:21
177:24 181:1
194:18,21 210:13
210:19
**honor's** 12:10 15:15
**hope** 30:23 31:25
32:5 48:2,4 87:10
87:21 107:24
118:16 181:15
183:12 185:1
**hopeful** 49:25
**hopefully** 14:16
15:4,12 90:13
**hopes** 173:18
**hoping** 47:24
163:18
**horowitz** 9:5
**horribles** 19:3
**horse** 13:25 18:12
19:21,25 21:18,24
22:8,10,17 23:17,22
24:1 28:4 31:22
33:17 52:23 53:4

62:5,24 64:13,14,21
64:23,25 65:7,19
66:1,13,22 77:4
79:11,14 84:7 87:12
109:4,25 111:7,12
111:25 112:22
113:14 114:21
115:8,11 126:25
127:1 129:15,24
130:11 132:2,12
154:8 156:7 157:1
171:11,22,25 188:7
188:23 189:18
190:24 191:5,14,24
**horton** 16:24 17:15
127:7
**host** 197:12
**hostile** 46:10
**hour** 15:20 17:23
**hours** 44:22 94:3
**house** 150:18,19,22
151:3,24 152:5,8,15
153:3 158:1,19
163:5,6,15 166:24
168:6 176:23
**housekeeping** 12:11
13:10 14:20
**howard** 6:4 11:4
117:24
**huge** 43:19 86:8
**hugh** 17:2 126:2
**huh** 108:17 136:6
137:1 150:20 151:8
157:13 158:2
178:12 188:20
196:24 197:2 200:3
**hundred** 103:10,15
103:22 177:5
179:22
**hurdle** 200:10
**hurt** 46:18
**hypothetical** 146:22
152:17 157:19
201:11,24 202:11
**hypotheticals**
200:23,25

**i**

**i.e.** 66:16 189:21
**ice** 39:4 50:20 86:4
152:17,21 168:11
**idea** 95:24 145:20
166:5 180:4
**ideas** 98:5
**identical** 190:18
**identified** 25:4
116:8 118:18
**identify** 32:23 77:4
96:17
**identities** 80:12
**identity** 14:2 80:17
80:18,21 81:9
**ignored** 51:10
**ignoring** 198:13
**ii** 2:13 23:24,25
24:5
**illustrated** 22:19
**illustrates** 21:16
**illustrative** 160:25
**imagine** 38:11
**immediately** 73:17
83:17
**impact** 81:2,6 148:7
153:23 172:19
**impacted** 133:12
**impaired** 174:11,14
176:23 177:1,6,7
**impeach** 160:2,8
**impeachment** 160:4
160:7
**imperatives** 30:4
**implement** 62:10
**implicitly** 200:25
**implied** 186:25
188:16,17
**imply** 165:16
**implying** 106:21,22
177:6
**important** 26:3
27:22 31:15,21 32:4
34:6 35:6 43:24
65:16 66:1 67:20
82:20 154:19 155:5
159:11

**importantly** 23:12
26:21 77:19 97:21
117:20
**impossible** 83:12
**improper** 160:7
**improve** 78:3 87:9
193:11
**improved** 20:18
**incentive** 128:10
**inclination** 34:2
**include** 14:1 79:25
153:9
**included** 55:22 58:6
61:5,14 75:18 144:6
183:16
**includes** 19:15
57:13 63:15 161:22
161:22 182:10
183:6 210:20,21
**including** 50:3
73:18 125:17
**income** 36:16 37:11
**incorporate** 207:5
**incorrect** 29:10
46:13 127:19,20
**increase** 82:7
**increasing** 39:1,6
**incremental** 173:13
**incur** 38:16 76:7
202:22
**incurring** 165:22
**indebtedness** 36:15
37:11
**indenture** 7:17 9:19
32:14 51:3
**independent** 17:2,3
125:18,19,21 126:5
126:8 133:7 166:23
167:3
**independently**
201:14
**indicate** 55:19
**indicated** 22:7 65:8
75:18 94:8 121:18
122:8
**indication** 115:1

**indications** 32:21
77:9,11
**indicia** 129:6
189:21 191:12
206:13
**indifferent** 187:21
188:4
**indirect** 31:13
**indiscernible** 17:19
54:22 158:11
177:21,24 194:21
195:3,12 198:21
199:8 201:6
**individuals** 62:16
63:9
**industrial** 58:8
**industries** 57:16
108:11
**industry** 57:11
58:24 105:11 121:1
**inform** 44:11
**information** 13:24
14:1 28:6,12 71:4
81:5,15,21 82:2,8
97:17 109:7,18
110:5,8,20 111:1,3
115:3 148:1 191:6
**informed** 44:9
**inherent** 186:12,16
187:9,11
**initial** 56:18 70:24
70:25 72:4 74:3
77:5 203:23
**initially** 123:1 127:9
**initiation** 30:2
**input** 65:15,17
74:20 109:8 112:2
190:25
**inside** 162:18
**insiders** 44:23
**insist** 36:24
**insisted** 29:18
**insisting** 165:6
**instance** 42:15 90:2
**instances** 65:23
**insulated** 107:13

**insurance** 59:24
60:2
**insure** 78:21
**insurer** 60:3
**integrity** 99:20
100:7
**intelligence** 95:21
**intend** 16:23 53:7
107:20
**intended** 111:7
**intends** 110:18
**intent** 17:7 21:4
68:19
**intention** 34:14
120:3 188:22
**inter** 149:14 176:3
182:17,23
**intercompany** 33:1
50:14 139:12,13
**interdebtor** 50:2
**interest** 19:25 27:7
27:16,18 30:15
31:13,18 34:22
38:14 41:6 54:7
68:5 69:19,21 71:3
71:20 79:10 81:23
83:20 84:23 136:23
138:18 147:4,22
149:23 150:9 163:3
165:3,13 175:18
183:18 187:6 193:8
**interested** 41:1 74:7
156:25
**interesting** 15:23
36:17 52:25
**interests** 25:2 26:14
32:24 38:22 46:4
51:7 103:25 162:9
175:1 184:17,21
**interrupt** 100:20
208:19
**introduce** 57:2
**introduction**
136:12
**invalid** 201:11
**invest** 148:12

**investigating** 45:21
45:25
**investment** 6:8 34:8
38:5 48:11 57:25
60:1 101:8 137:4
140:11,15 171:19
175:2
**investments** 140:13
**investor** 136:8
172:2
**investors** 137:4
**involve** 24:2 105:8
110:5 176:12
**involved** 24:8 25:12
46:11 51:17 60:22
60:24 61:2,4,18,22
61:23 62:1 69:4
91:1 98:18 105:7,9
105:9 111:2,15
126:24 137:22
172:6 174:1,4,6
187:23
**involvement** 22:21
67:17 177:8
**involves** 16:4 109:6
161:10
**ira** 4:19
**irrelevant** 131:10
131:22
**irs** 157:15 159:4,16
159:18 166:4,6,6,8
196:17 197:7,16,18
198:9,12,16,19
202:24
**isolation** 84:4
**issue** 16:2 36:24
38:24 43:18 44:7
45:16 52:7 54:5
100:1 115:20,22
145:13 149:9,11
166:20 207:22,25
**issue's** 200:14
**issues** 12:16,25 32:9
42:6 49:17,17 51:19
53:9 80:1,2 105:8
105:10 119:15
164:19 169:23

171:6,9,23,24,25
172:21 202:3,4,5
203:4 205:1 209:8
**it'll** 15:19 79:20
**italian** 59:5 88:13
**item** 12:14 13:9
14:20
**items** 105:11 109:7
110:6 113:25 114:6
114:16 116:2
**i'm** 93:2 116:2
138:16

---

**j**

**j** 3:14 6:16
**jacob** 3:22
**jam** 195:5
**james** 9:8
**january** 21:25 22:1
22:2
**jason** 3:15
**jeff** 33:10
**jeffrey** 4:5 6:10
8:10
**jeremy** 2:14 5:10
**jerry** 63:5
**job** 123:21,23 152:2
**john** 127:10,16,24
**join** 72:15 118:4
**joined** 58:1,15
**jointly** 1:7
**jonas** 4:5 33:10
**jonathan** 4:6
**jones** 8:17,20 85:4
**joseph** 6:22
**joyce** 6:22
**judge** 1:23 35:12
39:22 118:10 170:3
**judgment** 31:1
44:10 71:6 107:1,7
145:19
**july** 20:13,20 67:20
69:11 70:24 77:7
137:24
**jump** 112:18 115:13
181:6
**jumped** 65:24 66:7

**june** 20:13
**junior** 27:13,15
    121:18 151:23
    168:9 180:1,5
**jurisdictional** 38:21
    39:22
**justice** 4:8
**justification** 143:24
**justin** 7:5

**k**

**k** 6:5 10:13
**k&e** 62:15 63:1,14
    63:16 96:3 104:21
    104:22 121:3
    145:18 201:12
**kate** 5:23
**keep** 81:24 82:20
    113:23 118:13
    143:23 185:17
    199:9 205:21
**keeping** 118:4
    207:2
**keglevic** 15:9 25:19
    92:10,16 127:7
    140:7 146:14
    201:20,21
**keith** 5:18
**kerr** 7:10 55:18,18
    56:2 90:8
**kevin** 11:9
**key** 14:9 20:24
    21:20 25:23 26:8
    32:20 82:24
**keyboard** 30:3
**kick** 123:3
**kicking** 83:17
**kind** 45:3 60:13
    62:6 64:15 79:5
    80:7 110:16 124:1
    189:3 192:4 198:6
    204:24
**kinds** 51:17 80:22
**kirkland** 3:2 12:5
    54:24 56:11 153:5
    201:23
**kissel** 10:1

**klehr** 7:16
**knew** 51:13 55:24
    70:6 102:14 112:12
    127:13
**knock** 15:22 83:16
**know** 15:14 20:4
    24:16 25:20 30:23
    34:1 53:3 65:5 66:8
    70:5 71:4 72:22
    73:20 76:22 77:6
    78:23 79:7,20 80:4
    80:6 83:14,16,24
    90:5 94:2 95:3,16
    96:2,3,7,8,24 98:2
    99:10,12,13,14,17
    100:24 101:11
    102:7 105:10,11
    106:8 109:11 110:3
    110:18,18 115:5
    117:22 118:12
    121:7,15 124:24
    125:3,4 126:2,4,6,7
    126:9,14 127:10,13
    127:16,24 128:9
    134:24 135:24
    139:24 140:1
    142:16 143:7 144:3
    144:18 145:4,7
    148:20 149:17,22
    153:7 157:7 159:20
    160:2 161:1,8 165:5
    165:11 166:23
    174:13 176:22,24
    177:20,23 180:9
    186:15 187:25
    190:20 193:18
    196:21 197:11,11
    197:18,19,22 198:2
    198:7 201:3 203:5
    204:12 206:12
    208:22 210:9,18
**knowing** 165:18
**knowledge** 68:8,19
    69:1 96:22 97:2,5,8
    97:17 104:12
    130:21,25 135:10
    144:19,24 172:12

**172**:18 180:25
    186:1 191:18
    192:19
**known** 81:9
**knows** 36:12 53:21
**kornberg** 3:21 31:6
    31:8,9
**kosher** 114:14
**kraft** 59:6,6
**kramer** 9:1
**kurtz** 17:3

**l**

**l** 4:5 56:19
**labor** 74:15 75:10
**lack** 29:21 68:7
    103:13 116:16
    148:24 149:7 178:8
**lacking** 114:16
    116:2
**laid** 48:15 72:25
    79:21
**lake** 59:20 88:12
**landis** 10:21,24
**language** 13:22
    31:24
**lardner** 9:18
**large** 52:2 55:13
    57:16 62:22 76:7
    85:18,21 107:20
**largely** 69:7
**larger** 57:17
**largest** 153:7,8
**lastly** 19:18 30:11
**late** 73:24 77:7
**laughter** 13:8 91:20
    92:3 103:17,20
    128:3,6,12 132:8
    157:17 170:18
    181:11
**launch** 142:15
**laura** 8:20
**lauria** 6:17
**law** 9:9,14
**lawrence** 7:12
**lawyer** 90:15 176:2
**lawyers** 96:4 111:3
    121:3 201:9,12

**lay** 77:11
**laying** 42:12
**layton** 3:11
**lazard** 17:3 65:18
    65:18 66:5,8 112:3
    112:5,7,8,12,16
**lazard's** 113:3
**lead** 25:18 68:13
**leader** 114:13
**leads** 86:16
**leaks** 81:15 82:4
**leave** 41:23 147:13
    166:4 205:1 208:23
    210:15
**led** 60:25
**lee** 8:5
**left** 27:2 55:19
    114:11 121:18
    142:11 195:1
**legacy** 7:22
**lemisch** 7:19
**lender** 176:17
**lenders** 27:6
**lending** 176:20
**length** 22:13 52:20
    145:20 160:5
**leonard** 5:20
**leslie** 1:25
**lesser** 89:2
**level** 25:15 27:25
    52:2 66:25 80:17
    81:13,15,18,24
    82:25 84:23 100:3
    123:4 127:2,5 133:4
    139:15 142:8
    145:24 157:12
    161:4 162:5,15,24
    165:25 173:16
    174:18 181:23
    182:6 202:12,13
**levels** 85:9,9
**leverage** 116:15,17
**levin** 9:1
**liabilities** 147:10,14
    147:18,24 148:2
    149:10,25 150:25
    151:9 157:25

161:21 167:13,19
171:8
**liability**  55:13 68:1
71:21 76:7,11 100:3
147:10,11,25
148:17,17 150:21
150:21 151:3 159:4
165:18,24 166:10
166:11 167:1,9
168:24 169:6,11,17
183:4 197:20
202:22 203:7,13
**liable**  121:6 201:22
203:17
**lie**  198:4
**lien**  3:18 8:18 9:2
10:11 14:10,11
16:13,14,15 20:9,11
20:13,15,21 24:13
27:5 31:10 33:10,11
33:12 35:10 37:10
41:3 51:4 67:22
96:13 161:6,6
163:19 164:1,4
184:21 185:11
186:9,12,16 187:18
**liens**  14:25,25 26:22
26:25 27:4,13 36:20
43:1 49:21 50:1
151:18 163:23
165:6 177:5,9
179:23,25
**life**  15:22 88:22
106:9 201:3
**light**  171:12 184:15
**likelihood**  104:8
144:25 161:19
193:4 196:12
**liken**  52:15
**likewise**  34:24 35:1
35:25 37:17 102:6
167:7,21
**limitation**  14:4
**limited**  13:23 26:21
28:11 31:11,20 32:1
32:4,5 55:10 61:12
62:4 66:5 71:4 88:1

109:7 110:5
**limits**  37:23
**line**  68:15 69:7
74:18 77:21 142:16
181:2
**lines**  192:19
**lip**  34:13
**liquidated**  87:25
88:2,5,11,17,20
89:15,17,18 90:1
105:23 106:5,10,23
107:8,10 108:5,23
110:10 118:24
119:17 123:13
**liquidation**  106:5
**liquidity**  85:2
**list**  55:21 74:2
77:13
**listed**  43:13
**listen**  112:16 124:2
191:16
**listened**  24:18
**literally**  13:20
**litigate**  159:4
**litigated**  39:16
**litigation**  27:9
52:20,22 53:20,22
54:4 153:6 161:12
162:13
**little**  57:18 60:13
91:4 92:25 133:8
160:2 163:4 170:12
194:24 195:19
196:18
**llc**  2:3 6:8,19
**llp**  4:14 5:7,13 6:1,7
6:12 7:16 9:8
**loan**  139:12,13,19
139:20 176:3,3,12
**loaned**  139:21
**lobby**  211:8
**lobster**  165:1,1
**local**  15:18
**lock**  39:25 87:8
118:21
**locked**  146:23

**locking**  82:23 205:5
**locks**  165:17 169:5
169:17 203:6
**logistics**  62:20
104:20 105:2
190:22
**long**  15:19 27:19
39:6 64:23 68:9
96:3,5,22 103:11
167:1 174:7
**longer**  62:7 64:25
65:19 66:13 74:1,13
112:25
**look**  28:13 32:25
38:22 62:8 65:13
77:21 78:19 80:8
84:23 85:10 116:20
117:1 171:9 177:15
177:19 183:22
186:21 189:24
195:11 200:16
**looked**  45:1 71:16
74:19 88:16 179:21
186:18 188:15,16
**looking**  32:19 35:4
37:18 49:9 50:5
59:21 71:19 105:15
105:17 106:18
116:18 120:10
123:2 137:11 146:8
146:10 158:3
160:25 163:7
168:14 177:14,25
177:25 180:12,18
186:21
**looks**  85:12 108:22
108:23 113:3
125:21,25
**lose**  72:25
**losing**  115:12
**losses**  36:13
**lost**  33:8 120:18
160:1
**lot**  24:13 29:21
47:18 60:4 62:13
103:12 155:8,12
161:17 180:13

183:15 209:24
**lots**  36:14 88:21
121:1
**loud**  136:18 137:2
**low**  41:3,5 47:5
183:18 186:9,11,13
186:17 187:12
191:4
**lower**  186:10,13
**lowest**  66:25
**loyalty**  43:8 44:7
45:15,16 46:25
**ludman**  10:8
**luminant**  2:3
**lunch**  14:17 142:22
**lynch**  142:4,7,11

## m

**m**  3:15 9:11
**m&a**  25:18 62:16
63:15 68:13 104:21
107:19 114:13
133:25 134:7
140:14,19 141:5
145:14 184:5 185:3
190:1 204:7
**mac**  118:18 119:20
119:21,22,25 120:8
120:10,23 121:3
**mack**  80:1 89:6,9
**madigan**  63:6
**madron**  3:15
**magnitude**  121:9
**maintain**  24:15
**maintained**  96:18
**maintenance**  15:21
**major**  49:22 58:22
74:21,22
**majority**  33:12
139:4
**maker**  43:6 146:18
**makers**  43:7,18,24
46:24
**making**  42:9 53:9
76:25 83:10 128:21
158:7 162:12
200:20

makings 85:25
malone 6:5
manage 91:7
managed 120:16,17
management 6:8,20
    77:19 114:24 127:5
    142:6 144:25 172:4
    182:4,4 201:17
managing 42:21
    48:25 57:7
mandating 19:17
mangan 11:9
manner 2:13,20
    147:18 156:23
mark 3:5 9:21
    10:19
marked 77:24
    177:20
market 1:13 26:2
    26:10 40:19 41:2,4
    41:6 42:12,16 44:16
    45:10 47:12 62:4
    67:16,18 81:16 84:9
    84:19,19 85:7 86:10
    87:9 89:3 105:19
    106:15,16,20 120:6
    120:9,23 141:21
    171:18 183:15,16
    183:17,24 184:4,7,9
    184:10,15 185:4
    187:5,8 189:22
    192:12 193:5,10,16
    195:16 204:2,5
    206:21
marketed 27:16
marketing 20:25
    21:4 23:8 30:2
    44:12,24 65:3 72:5
    72:12 140:20 141:5
    169:19 172:22,23
marketplace 81:5
markets 40:22 47:9
    85:1 183:18 193:8
    193:20
markup 77:23
marshall 4:6

martin 5:16 51:1,2
    51:2 90:8
martin's 16:16
massive 38:9,13,14
    52:5
massively 27:8
material 45:18
    69:15 71:2 75:20
    120:1 148:6 150:1
    154:19 155:5
    180:13
materialize 193:18
materializing 193:5
materially 120:20
    184:5,14
materials 70:25
    129:16,17 135:19
    189:2,3
matter 13:10 27:22
    35:3 52:1 60:24
    61:18 62:1 140:14
    157:2 168:13,13
    169:3 171:12
    182:15
mattering 12:11
matters 32:6 169:9
    174:17
max 47:22
maximization 157:6
maximize 23:7,13
    26:1 35:16,16 62:19
    67:12 78:24 83:3,20
    97:22,25 108:1
    158:4 199:22
maximizing 31:15
    81:24 164:17
    165:12
mayer 9:4
mba 57:21
mccutchen 6:7
mcdaniel 7:24
mckane 3:5
mcmoran 60:9,10
mcneill 5:11
mean 50:16 62:13
    73:11 74:11 85:17
    85:19 89:5 104:14

114:23 116:24
    120:11,25 138:11
    144:17 154:4
    172:14 176:16
    182:3 194:1
meaning 144:23
    175:1
meaningful 83:11
meant 70:18 78:9
    78:10 91:17
measure 189:5
mechanics 101:5
meet 14:21 43:14
    65:11 114:17,24
    116:3
meeting 15:18
    20:23 92:23 93:13
    93:22,25 142:21
    144:22
meetings 51:11,13
    92:20 93:1,6,20
    94:7,12,15 210:7,8
meisel 5:20
melting 39:4 50:20
    86:3
member 125:21
    167:3
members 94:16
    100:16 140:22
memo 37:3 40:3,7
    138:17 140:2,4
    175:15
memorandum 34:3
    99:5,8,12,16 201:8
memory 93:16
mention 14:13
mentioned 25:17
    26:19 31:24 137:20
    140:2
merchant 58:9
merely 89:10
merge 61:5
merger 61:3 79:23
    82:5 138:21 139:7
    139:17 182:13
    185:6

mergers 58:16,18
merit 27:10
merrill 142:4,7,11
messaging 74:4
mestre 57:15
met 94:19 195:12
method 64:20 84:1
    84:2
metric 39:4
metrics 189:15
    193:22 194:3
michael 6:22 59:20
    88:12 127:8
microphone 60:13
    97:11
mid 21:25 22:1,2,2
    50:5
middle 56:18
    142:19
midterm 39:6
milieu 190:16
miller 7:11 9:11
    49:3,4,5 50:25
million 44:23 46:14
    46:15 88:11,11,13
    89:18,21,22,24,25
    110:10 121:10
    147:10,11,14
    153:10 162:11,15
    165:5
millions 48:11
mills 58:25 59:2,3
mind 47:1 173:9
    191:17 201:21
mineola 214:14
minimal 141:17
minimize 47:17
    181:21
minimized 173:19
minor 29:20
minute 13:21 64:18
    117:9,17 132:23
    159:24 210:15
minutes 14:23,23
    15:2 26:20 30:21
    41:18,19 170:2
    194:25 195:1

missed  183:17
misspeak  102:16
misspoke  78:11
  102:16
mistake  50:21
mistaken  179:21
misunderstanding
  208:17
misunderstood
  125:8
mix  175:19
mma  23:22
mobile  108:4
mode  147:8
modest  192:11
modification
  175:16
modifications  13:17
  14:6
mofo  153:1
monday  16:3,4
  209:2 211:1,11,12
money  48:6 53:24
  53:25 101:21
  106:22 107:13
  110:13 139:21
  177:12 178:10,15
  178:21,24 180:2,6
  196:17 206:2,23
  209:25
monitor  191:11
  206:13 211:5
monitoring  129:6
  206:16,19
monopoly  95:20
  98:4
monotize  31:13
month  21:2 46:10
  108:14 191:10
months  22:25 46:9
  47:21 60:9,9 80:5
  87:6 91:5 92:25
  105:18 129:5
  130:16 143:13
  145:9 171:17 193:6
  193:11,18

morgan  10:13
morning  12:3,4,20
  12:21 14:8 15:5
  18:4 31:8 32:13
  42:2 49:4 55:7 56:8
  56:9,25 57:1 82:13
  109:2 110:4 211:4,6
morris  9:8
morrison  7:7 49:5
motion  2:1,7,9,17
  12:8,15,23 13:13
  18:9 19:1,18,23,25
  20:9,9 21:10,24
  29:21,24 30:4,4,6
  30:10,12 33:3 36:21
  40:2,8 41:16 50:23
  55:11,14 63:18,24
  64:4,10 68:7,20
  75:11,13,16 76:16
  76:17,20 79:22
  109:6 129:22
  130:17 131:7,17
  134:24 135:20
  137:9,16 146:5
  147:19 148:11
  149:18 156:1
  164:10 185:11
  212:5
motions  20:12
  134:25
move  16:4 60:12
  68:4 69:6 72:12
  77:22 98:2,12,20,22
  111:4 118:10
  130:12 131:2,23
  141:13 183:12
moved  54:25
moves  49:24
moving  18:17 41:7
  43:25 53:17 56:5
  73:25 155:9
multi  36:7 51:8
multiple  19:20
  28:23
multiples  179:17
  186:25 188:16
  189:11

murin  1:25

**n**

n  3:1 12:1 212:1
  213:1,2 214:1
n.a.  6:2
name  56:16,18,19
  57:3 81:11 136:8
named  57:14
names  126:4,7
narrative  68:9
narrow  19:7 77:13
  77:16 118:18 136:1
narrowly  196:18
nature  65:21 75:1
navigate  209:8,12
  209:13
nda  70:16 118:6
nda's  65:13 69:15
  70:12 75:22,23
  82:12
ndas  14:4 112:22
  113:1 116:4
near  39:5 41:16
  50:16
necessarily  19:16
  27:25 64:15 107:6
  116:24 167:22
  175:10 176:9
  203:22,24 204:16
necessary  16:1,6
  39:16 165:19 169:6
  172:2 175:19 203:7
ned  5:5
need  14:5 35:23,24
  42:8 47:16 49:15
  62:6 65:5 74:23
  79:4,6,8,9 80:3
  83:15 87:4 97:11
  103:2 113:14 114:1
  114:5,20 115:3
  138:2 148:23
  164:19 171:23
  174:10 182:23
  183:3 188:24
  203:12
needed  30:17 62:7
  65:10,15 115:23

needs  37:8 176:2
negotiate  46:6
  47:15 48:18 66:23
  68:4 107:20 120:4
  166:6
negotiated  39:16,18
  42:17 107:17
negotiating  13:22
  25:11 62:3,23 67:1
  69:18 70:6 77:20
  111:9,20 116:14,16
  198:15 210:10
negotiation  46:7,8
  60:10 88:4 105:14
  111:2,19 116:22
  148:5 209:16,23
negotiations  14:7
  24:22 25:5 50:6
  105:4,8,13 111:6,6
  111:16,22 116:12
  117:12,20 118:1
  121:12 145:11
  174:1
neither  86:4,7
  126:14,17,19,21
  154:18 155:4
net  36:13 101:22
  204:13
never  34:10 36:8
  38:18 40:5 76:10
  77:14 87:1,6 94:19
  128:22 133:7,10,19
  135:15 141:20
  173:25 174:4
  180:22 201:14
nevertheless  66:11
new  5:2,8 48:25
  146:7 148:11 151:1
  171:13 175:14
  197:7 200:10
newspaper  193:15
nextera  10:22 11:2
  20:16 62:3 67:19
  68:4 69:10,18 70:6
  70:7 71:17 73:1,1,5
  73:5,9,11 85:19
  103:25 111:6,7,10

111:11,16,18,20,22
111:24 112:21
116:12,15,22
117:10,25 118:3
172:11 175:16,17
184:25 185:11
186:8,19 187:2,7
188:11,14,16,17
**nextera's** 65:10
**nine** 186:20 187:2
**nixon** 8:1
**nobody's** 211:6
**nols** 37:6,10,12
**non** 34:25 35:6
46:15 97:1 102:1,8
102:18,20 103:6
115:1,4 120:23
135:4,8,13,17 145:5
145:25 146:10
148:10 169:20
196:3,25
**nondisclosure**
69:22 73:19 80:19
85:23,24
**nope** 198:17
**normal** 47:14 48:22
48:23 64:21 115:6
143:12 192:4,5
**normally** 48:18
52:19 188:8 189:6
189:18 190:6
191:25
**north** 1:13 59:7
**northwest** 61:2,4
**note** 14:8 21:21
26:4 107:11
**noted** 22:22 44:14
**noteholders** 4:16
6:14 10:17
**notes** 42:4 51:4,5
**notice** 2:13,20 21:4
**notion** 29:22 95:4
**notwithstanding**
48:21 132:10
**november** 21:23
49:20,23 77:25 78:9
78:10

**number** 18:2 35:22
36:1 52:15 57:16
60:8 61:13 66:6
74:23,25 77:16 82:6
82:7 85:18,21 107:4
113:1,7,23 114:9
121:16 153:21
159:12,15 162:10
168:23 169:11
177:18 184:6
185:22 186:20
196:9
**numerator** 153:21
168:13
**numerous** 38:12
**ny** 214:14

**o**

**o** 1:21 12:1 56:19
57:3 213:4 214:1
**o'clock** 142:21
**o'connor** 3:7 54:15
56:8,10,11,21,24
67:8 68:12,13,23
69:6,9 72:10 78:12
86:18 97:9,12,13
98:12 117:7,19
131:4,5 159:21,25
181:1 213:4
**object** 19:25 20:1,1
74:25 181:2 191:4
**objected** 42:19
46:16 165:23
**objecting** 27:3
32:24 33:8 98:14
**objection** 2:9,15
26:25 27:1,11,23
30:18 31:11,20 32:1
43:13,14 54:4 55:10
97:14 98:17,19
159:21 164:9 181:1
**objections** 12:25
14:9 18:20 24:12
26:21 27:21,25 28:2
28:13,16 29:19 32:9
38:12 44:2 74:21,22
82:10 163:3

**objective** 84:21
137:5
**objectives** 71:18
**objectors** 15:1
16:22 18:25 26:5,19
**obligate** 168:24
**obligated** 139:6
**obligation** 78:24
151:13,16 182:17
182:22
**obligations** 12:24
48:7,9 81:1 139:14
**obtain** 152:7 182:23
**obtained** 23:7 26:17
**obtaining** 183:8
**obvious** 19:5 27:18
**obviously** 20:7
62:14,17,20,25
67:17,21 77:5 78:21
84:24 88:1 89:4
90:6 102:4 105:7
107:6 113:24
147:15 164:16
173:12 180:15
187:2,13 195:4,6
**occasioned** 173:23
**occurred** 93:23
**occurrence** 79:8
**occurs** 37:11 175:23
**october** 1:17 2:15
20:23 21:22 44:1
73:24 77:8 78:6,8
115:24 178:4
214:16
**offer** 34:7 61:7 73:5
73:10,10 76:9 78:22
78:23,25 82:25
101:8 104:3 122:18
124:8 133:21 139:3
**offered** 67:21,22
97:19,23 122:22
188:3
**offers** 24:11 78:25
**officer** 44:25 127:17
127:25 128:1
137:21 201:20,20

**officers** 30:8 146:15
**official** 14:24 27:14
49:5 55:19 112:9,13
**offset** 147:14,17
148:3 149:10
**oh** 16:15 54:12 70:2
83:15 97:18,18
117:6,14,17 123:19
132:6 134:13
138:17
**oil** 58:5 60:11
**okay** 12:12 14:18
16:15 17:17,17,25
31:4 42:1 54:13,15
55:3,5,15,25 56:2
68:23 90:10,17 91:4
91:15 92:13,24 93:3
93:8,13,18 95:14
96:8 98:9,11,22
100:12,19 102:6,10
102:15,22 109:19
110:1 111:23
112:10,16 113:3,6
114:18 118:11
119:4,23 120:22
122:1,10 123:17
125:11 126:9,11,14
126:17 127:4,12,16
128:18 131:13,17
132:13 133:24
134:13,25 136:11
136:17,24 137:8,14
137:25 140:8,25
141:8 142:14
144:23 145:11
146:3,22 148:8
149:4,13 150:2,12
150:16,24 151:21
152:2,13 153:24
154:25 156:13
157:9,14 158:3,10
159:23 160:25
162:2 163:4 164:7
164:23 166:2,15,20
167:3,7,21 168:4,8
170:14 172:12,18
174:19,25 175:14

176:11 177:8,15
179:10 180:4 181:8
181:22 182:3,16
183:12 184:2,9,15
185:24 186:5
187:15,25 189:5,15
190:12,15 192:10
194:9 196:8 198:18
198:22 200:23
201:1,14,24 202:11
206:4 208:20 209:1
211:13
**old** 148:12 214:12
**olivere** 10:19
**olympus** 210:1
**once** 25:3 37:21
71:16 90:13 191:16
**oncor** 13:17 25:2
31:13 34:25 35:5,5
38:20,22 39:4,6
41:2 46:1,9 47:22
50:13 67:16,18
71:20 83:21 86:3,6
86:6,15,22 87:18
88:25 89:11,14,20
89:21,23 147:4,6
149:23 150:9 152:8
152:16 158:4
160:21,21 161:14
180:14,16 184:17
184:21 186:9,16
187:19 188:1,6
192:13 193:22
194:4,7,12,15 204:6
205:1 210:11
**oncor's** 193:23
**one's** 211:1
**onerous** 106:3
**ongoing** 38:16
53:20
**opeb** 147:10,24
148:16 149:10
150:25
**open** 22:8,15 23:25
33:17 64:21,24,25
65:22 66:3,8,9,13
66:24 74:23 79:16

79:18 84:9,9,10,14
115:9 134:19
135:11 154:8 155:3
156:8 171:6 184:18
**opened** 16:7
**opening** 12:9 14:13
14:22 15:5 17:10,18
18:5 22:12 95:25
135:16 195:15
**openings** 54:13
**operating** 35:7
36:13 37:6 69:2
194:3
**operation** 193:23
**operational** 86:6
**operations** 60:7
120:14
**operator** 1:25
**opine** 144:20
**opinion** 83:19,23
94:21 97:24 145:14
188:9 189:4,6,19,20
190:3,4,19 193:4,9
193:12 203:1
**opinions** 98:16
**opportunity** 34:2
109:12,16 120:6
160:4 193:22
**oppose** 55:12,14
**opposed** 83:17
171:17 191:16
193:10
**opposition** 41:16
**opt** 107:9
**opted** 66:12
**optimal** 23:6 29:5,9
29:16 33:19 34:19
36:19 95:11,16,22
103:1 105:16,20
135:22 137:11
138:3 142:25
154:10 157:3
203:12
**optimum** 41:12
95:4 138:8
**option** 20:10

**orange** 26:22
**order** 2:2,7,10,18
12:17,24 13:1,6,10
13:13,19 14:15
24:16 45:20 51:24
53:15 90:5 103:1
113:14 114:20
123:10 145:5,17,21
146:1,1 152:21
153:2 160:15 163:1
163:12 165:23
173:20 175:17
207:14
**ordered** 24:9
**organized** 18:5
155:10
**original** 175:17
**originally** 26:25
46:1 204:15
**ought** 192:7
**outcome** 54:3 83:4
161:11 162:12
**outdated** 26:20
**outline** 39:18
**outlined** 140:4
151:7
**outright** 74:6
**outs** 105:10
**outset** 14:14 19:6
**outside** 38:25 39:21
53:5 67:7 78:22
83:24 84:13 87:16
92:22 94:8 101:14
101:19 107:19
108:15 129:18
130:23 134:7 143:1
143:15 182:20
183:1,10
**outweigh** 48:16
**overall** 21:16 67:9
67:11 80:10 164:18
172:9 180:15
**overlap** 143:10
**overlapped** 143:20
**overlooks** 29:25
**overruled** 30:19

**overruling** 28:16
**oversecured** 27:8
**oversee** 133:2
**overview** 18:3 77:3
**overwhelming**
26:15
**owed** 200:11
**owes** 202:8
**owned** 35:6 38:23
102:11
**owner** 25:2 36:3
**ownership** 101:10
102:6
**owns** 38:4 102:18
201:16
**oxy** 60:5

**p**

**p** 3:1,1 12:1
**p.m.** 15:13,18 170:4
211:16
**pa** 5:20
**pachulski** 8:17
**pacific** 6:8
**packard** 59:16
**page** 34:3 95:2 99:5
136:7,25 177:25
178:6,21 212:4
213:3
**paid** 88:19 125:10
169:10 189:22
195:24 198:11,25
199:1 201:9
**pamela** 2:24 214:3
**panned** 113:3
**papers** 30:14
**parade** 19:3
**parent** 52:6 127:2
162:23
**parke** 11:1 117:25
**part** 35:9 36:18
40:18,18 41:2 42:19
66:1 81:6 103:7
106:15 109:4 112:2
117:21 132:5 149:8
151:10,10 156:6,17
175:8 180:7 189:19
189:20 202:11

209:15
**partial** 37:3,5 90:1
**partially** 111:9
**participants** 23:16
24:10 41:4 73:17
**participate** 23:20
65:22 66:2,9 73:12
76:21 84:9 91:24
94:15 137:4
**participated** 92:21
93:15,22 104:23
141:21
**participating** 28:9
71:3 93:14
**participation** 24:2
24:17 28:8 75:2
76:25 80:24
**particular** 42:10
64:17 114:5 130:3
163:19 183:20
192:1
**particularly** 45:16
48:5 65:18 85:5
**parties** 13:23 14:7,9
14:16,21 15:2,12
17:8,24 19:14 32:23
32:24 33:8 38:13
41:1 50:3,15 55:21
69:14,20,22 82:6
85:18,21 97:1
111:13 148:11
149:20 164:22
176:4
**partition** 143:1
**partner** 33:10 58:4
**partners** 57:11 61:1
**parts** 156:12
**party** 16:4 19:24
46:3,18 61:17 118:6
133:4,11 176:10
185:8
**pass** 159:12
**pasta** 59:5 88:13
**path** 49:11,24
**paths** 53:22
**patterson** 9:13

**paul** 3:17 15:9
25:19 31:6,9 92:10
92:16 127:7 146:14
201:20,21
**pauline** 10:13
**pause** 18:1 54:11
102:25 117:3 178:1
194:20
**pay** 46:20 48:11
89:25 101:21 106:3
107:5 122:17,23
124:4,5,9,13,20
125:6 154:9 158:13
158:15,25 159:6
169:1,2 181:17
186:10,11 187:2,13
199:5 203:20,20,22
203:23,25 204:12
204:19 207:7,15
209:24 210:4
**paying** 89:22 110:9
110:13 153:20
186:19
**payment** 44:23
123:9
**payments** 161:14
**pays** 106:5
**pe** 183:22
**peaboby** 8:1
**pedone** 8:4 32:13
32:14
**pendency** 145:16
**pending** 12:16
**pennsylvania** 57:22
**penny** 50:12,12,13
50:14
**people** 42:19 46:7
62:14 63:17 66:2
69:15 72:6 74:2
75:22 76:5 78:20
82:7 85:23,24 99:22
99:23 104:21,22,22
114:10 116:5 130:8
131:11 143:17
177:16 209:16
210:1,10 211:7,8

**people's** 115:13
**perceived** 133:3
187:8
**perceives** 89:10
**percent** 51:4 85:6
87:16 88:15,18
101:9 103:24 108:5
136:22,22 138:7,11
138:13,15 139:3
147:3,5 149:23
150:9 177:5 179:22
186:20 187:3
192:23 193:1
**percipient** 68:11
**perfect** 165:20
**perform** 187:19
188:11
**performance** 47:22
86:5 87:23 88:5,16
89:3,12,14 105:21
105:23 106:4,11,23
107:5 108:23 119:2
119:17 123:13
161:14
**performed** 85:6,8
188:1 206:1,9
**period** 2:2 32:19
58:7 69:17 75:9
77:5 80:7 88:10
96:19 101:1 108:14
130:7,8 138:14
145:21 169:25
180:13 194:6,12,15
**periods** 108:12
**permission** 12:10
**permits** 38:5
**permitted** 205:7
**person** 68:13 90:15
90:15 97:22 100:6
104:18 105:1,6,13
145:11
**personal** 68:8
100:17 193:8 203:1
**personally** 88:14
92:15,21 140:21
141:7,20 172:6
201:7

**perspective** 43:4
51:20 53:7 72:21
99:19 127:1 151:16
152:22 173:5
200:17
**petition** 20:7 197:24
**ph** 62:9 134:14
**phase** 79:1 112:17
114:3 134:8
**phone** 74:7
**pic** 161:7
**picking** 151:2
**pics** 42:25 161:12
**piece** 82:18,20
164:13 165:6
**pile** 55:24
**pillsbury** 59:1
**place** 37:23 52:23
82:21 92:20 93:25
94:7,8 145:24 162:9
208:23 209:22,23
211:9
**plains** 61:16
**plan** 19:11,22 20:1
24:22,23,25 25:3,9
25:11 32:25 35:23
35:24,24 36:9 37:23
38:25 39:9,10,14,15
39:17,19 40:23
42:13,16 43:17 46:8
46:12 47:15,16,16
48:19 49:1,13,15,22
50:6,18 80:6 82:25
103:2,6,14 104:2,9
104:23 124:11
137:7 140:24 143:2
143:19 144:21
145:1,8,21 151:10
163:1,14,17 164:18
165:8 171:19
173:14 174:2,4,9
183:7 196:10 198:6
202:6 207:4 208:2,4
208:24 209:15
210:3,10
**plane** 164:25

**planning** 74:17
**plans** 39:9,12 103:2
 143:2 144:21
 194:10
**player** 83:15
**players** 66:10
**playing** 83:1
**pleadings** 28:22
 31:3 41:25 53:14
 95:12
**please** 12:3 13:4
 18:22 20:3 21:15
 23:9 25:13 26:18
 27:24 54:19 56:13
 56:14,16 57:2 87:2
 90:22 100:5,20
 170:6
**pleased** 14:8
**plenty** 149:21
**plm** 59:14
**plus** 140:19 165:2
**pm** 1:18
**podium** 28:24 31:6
 170:10
**point** 15:6 16:22
 22:4,19 26:7,11
 27:7 29:10 32:2
 38:6,9 43:25 47:4
 49:22 50:6 66:4
 68:13 69:13 70:5
 71:9,15 73:9,13,23
 94:23 95:18 96:17
 97:21 100:6 103:5
 112:20,23 113:11
 122:14,19 123:7,11
 123:12 132:2
 134:10 136:14,17
 136:24 138:2,6
 140:21 145:11
 148:8 150:11 160:6
 168:25 169:8,8
 173:24 178:8
 185:18 188:9,10
 190:21 193:16
 203:14
**pointed** 49:16

**points** 21:18 26:9
 49:19 137:19,21,25
 168:19 211:10
**polsinelli** 7:1
**portion** 118:22
 138:17,24 166:11
**posited** 203:15
 208:5
**positing** 209:1,3
**position** 31:25 57:6
 57:10 76:5 117:2,7
 129:20 152:21
 156:7 157:1 167:8
 168:21
**positive** 26:10
**possession** 29:8
 38:23 192:6
**possibility** 34:12
 44:17 47:9 175:12
 204:25
**possible** 16:20,21
 17:1 21:24 24:17
 27:19 33:18 36:9
 41:22 49:25 50:6,6
 50:9 53:21 66:10,19
 84:1 143:21 205:19
 206:24
**post** 42:13,16 43:16
 44:12 45:14
**postpone** 169:24
**pot** 163:2
**potential** 24:22 33:1
 50:14 65:8 69:25
 72:1 73:15 74:3
 75:15 76:2 82:10
 133:11,16 137:3
 150:21 151:9 155:3
 170:25 174:22
**potentially** 36:13
 81:21 87:5 153:1
**pots** 36:1
**potter** 5:7
**practical** 82:4 157:2
**practice** 22:18
**pre** 197:24
**preadventure** 33:15

**preceded** 68:16
 98:14
**precedent** 86:14
 186:22,25 188:1,15
**precluded** 29:17
**predetermined**
 24:11
**predicated** 28:25
 35:14 40:8
**predict** 86:22
**predicting** 193:7,8
**prefer** 142:18
**preference** 119:1
 142:16 185:24
**preferred** 39:25
 51:24 101:14
**prejudice** 41:13
 116:25
**preliminary** 115:4
**premature** 24:24
**premium** 161:23
 165:3 174:22
**premiums** 189:22
**prepack** 61:9
**prepared** 75:24
 76:14 81:17 82:15
 82:17 111:1 151:2
 181:17 186:10
 187:13 191:12
 201:9 204:11
**prerogative** 29:7
**presell** 47:16
**presence** 144:12
**present** 13:10 14:4
 27:9 158:18 190:23
 191:22
**presentation** 18:4
 25:15 30:20 40:14
 129:9 130:10
**presentations** 17:7
 136:7
**presented** 32:8,11
 128:22 132:12
 192:20
**presenting** 28:14
 129:2 143:14
 191:19

**presently** 26:13
 162:3
**president** 127:18,25
**press** 185:10
**presume** 97:3,5,7
**presumption** 44:9
**prevent** 19:3 80:20
 82:22 129:1,4
 207:19
**prevented** 191:18
 191:20
**preview** 18:4,15
 20:24 21:7 25:15
**previous** 57:23
 131:18
**previously** 51:12
 74:4 118:18 121:17
 122:7 150:15 154:7
**price** 30:18 81:6
 85:10 173:3,22
 174:20 188:3,17
 189:13,22
**prices** 81:2 189:23
**pricing** 172:20
**primarily** 58:3,5
 61:3 63:5
**primary** 18:5 49:7
 64:11 100:1 127:4
**prime** 114:12
**principal** 165:2
**principals** 51:17
**print** 17:23
**printed** 26:19
**prior** 22:22 61:5
 70:10 93:16 109:2
 129:15 131:3
 134:23 137:9
 140:24 145:1
 174:19 188:6
 190:11,12 191:20
 207:6
**prioritizing** 75:21
**priority** 197:22
**pro** 16:4
**probability** 144:17
 144:20

**probably** 16:2
64:11 73:10,22 94:6
146:15 153:4 181:9
210:9
**problem** 38:21
103:22 143:22
155:1
**problems** 35:13
172:24 193:21
**procedural** 18:7,8
18:23 19:7,9 41:18
49:12 52:8
**procedure** 38:5
41:11 49:12 140:13
**procedures** 2:11,18
12:8 13:11,13,14,19
14:15 18:18 19:13
19:23 21:8,10,14
22:21,24 23:7,11,12
24:8,19,21,24 25:25
26:4 28:20,24 29:3
29:6,24 30:5,7,16
30:23 31:15 32:17
32:19 33:15,23 34:8
36:9 38:3 39:8
52:20,21 53:6 54:2
55:11,14 62:18,20
63:13,18,24 64:10
67:10,11,15 74:20
75:11,13,16,17
76:16,20 77:2 79:5
79:6,8,10,22 80:11
80:14 82:12 83:6,11
83:20 89:1 100:24
104:19 108:17,24
109:21 127:6
128:19 129:22
133:17 134:24,25
135:20 147:21
149:18 153:17
**proceed** 15:7 23:24
56:21 72:19 77:18
**proceeding** 29:3
39:24 106:25
141:11 153:6
165:14 184:12

**proceedings** 211:16
214:4
**proceeds** 101:23
156:16 164:17
196:5 197:8
**process** 13:25 18:13
18:13 19:19 20:25
21:5 22:6,8,9,11,15
23:5,8,14,18,23,25
24:16,17 25:3,9,14
25:24 26:1,6 28:5,9
30:2 31:22 32:23
40:15,18,25 43:1
45:18 46:12 48:12
48:13,25 50:9,22
51:9,20,23 52:14
53:10,12,16 59:12
59:13 62:3,7,8,10
62:21,24 64:13,16
64:20,21,23,24,25
65:1,13,19,22 66:1
66:3,13,14,16,18,23
67:3,6 69:5,24 71:1
72:5,13,19,23,24
73:4,12,14,16,18,20
73:22 74:1,8,13,13
74:14 75:1,3,6,21
76:21,25 77:3,4,20
78:19,22 80:24
81:22 83:7,18,25
84:7,9,12,16,18
85:21,22,25 87:4,9
88:24 91:8 96:5
97:24 99:18 100:6,7
103:21 105:15
107:25 108:8 111:8
111:21 112:2,20,25
113:7,12 114:4,12
115:7,7,11,16,21
116:9,12,25,25
117:23 128:16
130:24 132:2
133:12 134:20
135:11 137:4,23
140:23 142:1,4
149:20 155:3 163:8
165:23 172:9,11

173:7,19 181:15
185:17 190:21
209:15 210:10
**produce** 53:17
101:22 154:1
156:16 158:8 204:9
**produced** 39:5,14
**product** 47:17,25
57:12
**professional** 38:12
104:12 106:9
**professionals** 45:9
63:14,15,16,16
96:25 201:17
**proffered** 35:9
**program** 97:20
172:22,23
**project** 63:8 194:12
194:15
**projected** 194:7
**projections** 193:24
194:2
**pronounced** 91:19
**proof** 42:22
**proper** 39:24
**properly** 32:7 41:10
**property** 34:10
38:22
**proposal** 20:18
30:25 35:11 70:9
73:8 87:13 103:9
123:10 186:9
**proposals** 70:13
**propose** 169:13,14
**proposed** 13:12,18
18:12,13,17 20:25
21:8,14 22:17,23
23:11 30:16 36:18
51:24 53:15 74:25
101:18 104:19
163:7
**proposing** 187:18
**proposition** 116:18
116:20
**propriety** 144:9,13
**prosecute** 168:2

**prosecuting** 40:2
**prosecution** 41:15
**prospected** 48:16
**prospective** 71:5
113:17 135:21
136:8 137:10,14,22
143:6,8 149:17
**protect** 80:15
**protected** 45:19
82:3 117:22
**protection** 79:24
87:23 89:15,16,17
90:1
**protections** 39:21
**protective** 12:24
**protocol** 13:22
28:11,14 45:20 48:9
**prove** 33:22 205:11
**provide** 19:14 28:15
37:23 70:25 71:1
77:23 82:2 109:17
110:20 172:19
188:5,13 189:2,3,6
**provided** 18:15,16
20:17 23:2 30:3
71:21 84:14 143:18
179:24 180:22
191:6
**provides** 20:5 24:8
71:3 76:13
**providing** 17:5
24:22 107:3
**provision** 87:25
88:2,12,18,20 89:16
89:18,19 90:2
105:24 106:10
107:8,10 108:5
110:11 118:25
121:4 145:12
**provisions** 119:5
**proxy** 190:6
**public** 80:23,25,25
117:10,13,20,21
118:3 189:21,25
**publicly** 22:16
69:12

**published** 156:12
190:6
**pull** 152:16
**purchase** 101:22
150:7 151:7 196:10
**purchaser** 42:11
107:14 123:4
**pure** 80:3 140:14
**purely** 66:21
**purpose** 43:3,11,15
47:7 67:9,11 162:22
**purposes** 95:14
**pursuant** 37:7 87:8
124:11 172:7
184:21
**pursue** 21:4 71:7
87:13 165:16
203:10
**pursued** 188:19
**pursuing** 44:19
118:13 136:19
187:18
**push** 142:20,22
158:1 159:18
166:10,17,25 167:8
168:6 169:11 171:7
183:4 200:16 201:2
**pushed** 167:19
205:12
**put** 16:18 24:10
41:2 42:8 53:15
68:21 73:7 81:19
103:10,12 105:17
124:24 125:6,12
147:21 149:19
182:12 204:24
206:7,22 209:3
**puts** 162:14
**putting** 48:9 76:5
140:12 183:2

**q**

**qualified** 88:10
**quantitative** 193:17
193:20
**question** 26:8 39:1
45:14,15 47:18
68:11 76:3 79:22

80:16 92:14,18 94:4
100:4,5,19 101:11
109:19 121:7,25
122:2 124:25 125:5
125:9,9 128:15
130:17 131:6,7,21
143:25 145:7,13
150:16 151:21
152:13 153:4
154:23 158:3
161:12 169:18
170:21 178:7,13
179:2,10 181:2
182:1,19 187:15,17
191:16,17 196:6,20
198:18
**questioning** 45:12
47:2
**questions** 17:9
25:23 47:2 73:3
95:15 98:1,13 157:7
160:12 179:7
195:14,19 196:22
199:12
**quick** 18:20 51:4
71:5
**quickly** 18:11 20:5
41:22 54:25
**quiet** 54:20
**quieter** 54:21
**quit** 142:19
**quite** 26:10 30:14
42:14,25 45:11
59:12 65:16 66:8,16
80:21 81:17 87:25
88:2 101:1 105:25
108:15 111:18
130:9 139:11 159:7
**quote** 89:15 178:10
**quoting** 178:7
**qureshi** 4:20

**r**

**r** 1:21 3:1 5:11 8:21
12:1 214:1
**raghavan** 63:5
**raise** 56:14

**raised** 12:25 32:10
45:16
**raises** 47:1
**raising** 137:5
**ralcorp** 59:5 88:14
88:15
**ran** 58:7,11,14 77:6
**range** 36:7 121:10
121:16 186:25
192:17
**rank** 198:19
**rapidly** 206:21
**rate** 159:13 161:13
161:13 165:3,4
**rates** 84:23 183:18
193:8
**rath** 10:21
**ratio** 183:22
**rational** 156:24
**rationale** 72:24
**rationally** 89:19
**ratios** 85:10 183:22
188:17
**raymond** 7:19
**reach** 73:14 111:10
143:18 152:16
169:8,8 173:13
**reached** 40:7
**reaches** 168:9
**reaching** 80:9 137:3
164:18 185:19
186:2,4
**reaction** 155:8,12
155:13,18,19,21,23
**reactions** 155:14,16
**read** 34:25 44:23
58:1,2,11,12,12
136:17 137:2,8
164:9,14 175:15
193:14
**reading** 91:18
210:22
**ready** 56:11 126:18
**real** 67:1 88:22
184:24
**realistic** 34:12

**reality** 82:4
**realize** 159:2
160:22
**realized** 71:17
124:12
**realizes** 81:18
**really** 18:3 30:3
33:22 38:2 42:21
47:19 49:8 52:9
64:24 68:1 71:2
124:2 140:13
159:15 160:15
166:3 182:15
191:15 203:3
**reason** 42:19 48:11
53:19 54:2,7 66:12
77:25 79:7 80:22
86:4,7,9 89:4 101:1
114:4 115:2,14
116:9,11 132:10
154:21 156:19
160:14 191:9
202:22 204:1,15
**reasonable** 161:18
162:1
**reasonableness**
25:14 38:9
**reasons** 22:11 27:22
30:22 52:9 64:17
65:2 67:2 79:4 81:8
84:17 89:5 111:23
115:6 160:10
169:21 203:15
204:4 209:2
**reath** 6:1
**recall** 92:9,23 93:5
93:11 94:6 95:5
116:10,13 135:18
137:23 140:19
141:4 144:4 145:2
164:11 177:13
178:3,6,11 179:7
194:8
**receipt** 67:19 68:1
135:12
**receive** 62:23 69:25
77:15 78:13 87:1

129:18 135:16
154:21 155:7
156:20 161:12,19
**received** 13:25 72:1
72:6 74:6 75:17,23
76:1,3 78:14 82:9
89:25 115:3,25
177:5 185:23
**receiving** 69:21
109:8 116:1 186:2
**recess** 54:17 90:10
90:12,20 170:1,4
**recognize** 63:24
70:20 95:13 167:11
190:16,18
**recognized** 95:10
**recollection** 160:9
174:8
**recommended**
135:25
**reconvene** 210:25
**reconvening** 15:25
**record** 12:5 38:16
43:14 44:25 48:15
54:23 56:17 119:25
214:4
**recoveries** 35:16
153:22 179:21
**recovery** 178:18
**redline** 14:16
**refer** 161:7
**reference** 178:9
**referred** 70:18
88:24
**referring** 71:10
138:19 158:15
159:20 160:3 183:5
**refers** 140:12
**refine** 175:11
**reflected** 22:5 26:22
36:22 175:14
**reflecting** 146:7
**reflective** 200:21
**refresh** 160:9
**refuse** 163:23
**refused** 65:12 89:4

**refusing** 123:16
**regard** 15:15 18:4
28:12 32:25 71:10
95:2 105:21 107:13
108:16 109:7
126:23 127:5 171:6
**regarding** 28:7
72:16 92:8 144:25
178:8 182:6 191:19
**regardless** 105:19
**regards** 128:16
**regular** 62:9
**regulated** 61:10,12
107:2 108:8,11
**regulations** 159:19
**regulators** 159:1,12
**regulatory** 80:1
88:21 89:8,9 105:10
110:12 120:25
145:9 182:23 183:2
183:8
**reinforced** 31:2
**reiterate** 18:6 32:2
32:16
**reject** 80:7
**rejected** 95:4
**relate** 32:10 189:21
210:23
**related** 2:12,19 58:6
70:4 120:11
**relating** 79:23,24
**relationship** 175:22
**relative** 85:1
**relatively** 62:4
161:10
**release** 19:2
**released** 81:23
**relevance** 153:18,19
181:2
**relevant** 51:11
62:16 63:14 108:7
108:10
**reliance** 45:4,9
**relied** 201:8
**relief** 18:6,8,23 19:6
32:3,5

**relieves** 203:13
**reluctance** 95:21
**rely** 167:23
**relying** 41:7 201:19
201:23
**remain** 175:2
**remaining** 12:14
15:1,2 16:21,25
18:20 28:16
**remedies** 53:14
**remedy** 47:23 106:4
106:5,12,23,24
**remember** 93:14
103:7 164:12
**reminded** 13:12
**remove** 2:3 14:3
**render** 190:10
**renegotiate** 171:12
172:25
**reorg** 42:13,16
43:17 44:12 45:14
**reorganization**
19:12,23 35:23,24
36:9 37:23 39:1
49:13 87:14 124:11
137:7 140:24
143:19 145:21
151:10 163:1,14,17
164:18 165:8 174:2
174:5 183:8 210:3
**reorganized** 33:23
34:9,20 67:24 71:14
101:7 103:11
105:18 136:21
137:5 138:7,13
139:4,5 140:16,20
141:6,10,15,22
146:23 147:12
148:13 149:25
150:4 151:7,14,18
163:9 168:12
175:25
**repaid** 27:6
**repeat** 122:1
**rephrase** 182:19
**replicates** 43:2

**reply** 30:14
**report** 44:21,22
**represent** 112:7
126:17
**representation**
126:19
**representative**
111:14
**representatives**
111:15 125:18
**represented** 43:21
59:15,16,23,24 68:2
88:8 96:25 143:10
**represents** 87:1
173:10
**request** 53:10 61:23
**requested** 18:24
19:2 26:5 28:3
**requests** 13:16
113:23,24
**require** 39:12 119:6
**required** 76:22
171:10 175:17
190:3
**requirement** 82:16
138:18 145:4
**requirements** 19:10
**requires** 34:19
35:25 45:21 48:1,24
49:13 175:1
**requiring** 45:11
82:18 107:12
**research** 6:20
189:23
**reservations** 66:2
**reserve** 83:6
**reserved** 33:2 37:9
**reside** 197:16,19
**resides** 200:15,15
**residual** 162:4
**resolution** 50:1 52:1
171:24 172:1
**resolve** 31:23
171:23,25 172:21
182:17,23
**resolved** 14:9 26:24
27:1 166:21 171:10

[resolved - sale]                                                                                      Page 33

171:18 202:5 203:4
**resolving** 183:7
**resources** 10:22
11:2 60:6
**respect** 43:23 45:17
66:15 81:12 85:2
86:11,15 99:24
105:4 107:1 110:6
121:3 137:5 148:2
161:11 162:19
168:19,20 172:9
173:14 174:24
188:10 195:15
**respective** 63:7
126:5
**respects** 67:20
**responded** 94:22
150:15 182:1
**response** 13:16 28:5
75:6 76:2 98:11
182:2
**responses** 18:20
**responsible** 58:4
104:18 105:1,4
**rest** 41:14,23 106:9
106:20 133:15
**restate** 100:5 133:8
**restrict** 43:24
**restructuring** 30:8
60:19,20,23,25
62:15 63:9 105:8
134:2 136:19
144:18 145:19
146:15 180:15
**restructurings**
60:22
**result** 14:6 24:18
33:16 34:8 111:7
152:19 159:3 173:7
**results** 86:8 88:4
100:2 194:7
**resumed** 170:19
**resurrect** 42:24
**retained** 199:19
**return** 19:20
**returned** 58:11

**revenue** 194:5,6,7
**revenues** 194:13
**reverse** 87:18
**reversed** 64:24
**review** 30:13 34:2
64:1 109:1,12,16,23
119:5 178:22
**reviewed** 63:18
66:4 99:8 100:23
194:2,4
**reviewing** 13:23
178:17
**revised** 31:24
**richard** 3:11 8:4
32:13
**rid** 172:1
**ridiculously** 41:3
**rifkind** 3:17 31:9
**right** 13:2,6,7 16:16
22:7 30:21 40:12
42:12,18 43:18 46:6
47:4,13,25 48:6
55:17 56:1,14 62:21
72:18 84:22 85:3,19
87:15 90:11 98:20
102:13,16 103:3,14
104:17,20 105:5
109:20 111:4 114:4
115:13,17 118:9,19
121:15 124:6,9
126:9 128:8,19
132:19 133:5
134:15 135:1 136:2
139:1,9 141:2,6
142:12,22 143:2
146:11,17 148:23
152:14,23,24
154:14,19 155:11
155:15 157:5,16
158:19 162:17
166:9,25 169:16
176:1 182:10
183:14 184:22
185:12 195:11
196:6,11,13,16,17
197:4,13,16,23
198:4,7,9,11,25

199:4,13,17,20,23
200:6,12,19,23
201:3,19,21 202:6,7
202:13,14,24 203:4
203:5,20 204:1,2,3
204:5,18,21,23
205:8,9,13,15,20
206:8,17,21,23,25
207:8,13,21,23
208:7,9,10,24 209:5
209:9,13 210:6
**rights** 19:24 47:22
53:19 83:6
**ring** 102:19,23,24
152:7,16 168:10,16
**ringed** 35:5 171:3
**rise** 12:2 34:22
54:18 90:21 102:7
170:5
**risk** 19:5 42:21,22
44:16 45:2 47:21
48:10 49:1 81:16
82:5,6 84:8 86:24
159:1 166:6 172:1
173:4,7,11,13,16,23
181:17,25 182:7,9
193:5 209:24
**risks** 47:4,8,18
48:20 51:21 181:6,7
181:13 204:23
**road** 76:23 77:2
78:20 80:5,6 169:9
192:13 214:12
**rob** 4:21
**robert** 6:5
**robinson** 8:21
**robust** 40:15,25
85:25 185:17
**roger** 57:13 61:23
**role** 62:11,22 64:9
**room** 69:16,23
148:1,21,23 177:17
**ropes** 5:13 51:2
**rose** 124:6
**ross** 5:16 51:2
**rothschild** 8:7

**roughly** 59:18
71:20 154:9 165:17
186:20
**round** 13:24,24
21:22,23 73:23 77:7
77:8,9,16,17,22
78:13,15,16 81:14
81:18,19,22 114:7,9
114:10,23,25 115:2
148:6 149:12
185:19 186:3,4
**royal** 50:10
**rsa** 20:21 30:1
35:10,12 36:23
42:24,24 43:2 49:9
50:22 96:9 97:1,3
99:25 164:5,6 177:4
177:14 179:22,24
180:5 184:21 185:9
185:16 186:8
187:12,18
**rudnick** 4:1 33:9
**rudnick's** 153:2
**rule** 44:10
**rules** 15:18 76:23
77:2 78:20
**rulings** 212:3
**rumble** 50:10
**run** 47:14 48:12,18
97:22 162:22
193:21
**running** 48:20
81:16 99:19 106:8
162:16
**russell** 4:11 55:7,8
55:16
**ryan** 5:10

**s**

**s** 1:22 3:1 12:1
188:23 193:23
213:2,2,2
**sabin** 6:10
**safe** 211:9
**safeguard** 84:13
**safety** 211:5
**sale** 19:11 32:17
33:22 34:21,24 38:3

38:17 45:18 50:13
59:15,18,20 60:2
61:14 76:7 88:13
91:7 92:8,11 99:18
100:2,6,7 101:9,16
108:7 111:8 114:12
128:22 133:12,17
137:23 138:21,23
140:11,12,15,23
141:10,15 142:1,4
147:1,3,8 148:20,20
149:15 158:4 161:3
163:7 165:23
180:14 181:24
185:7 204:21 205:9
205:10 207:5
**sales** 26:11 52:14
128:16
**sassower** 3:9 131:20
131:24,25 132:16
132:20
**satisfied** 175:13
**satisfy** 50:8 139:14
149:3 163:2
**savings** 2:8 12:15
**saw** 44:22 45:23
177:3 179:6
**sawyer** 17:2 126:2
133:11 167:17,23
**saying** 29:2,10 44:5
47:12 48:21,22
78:17 81:10 114:16
164:12 195:15
196:13 197:6 209:6
**says** 47:25 49:12
83:15 169:4 206:1,7
**scenario** 40:24
**scene** 111:19
**schedule** 15:11,14
15:15
**scheduled** 94:1,3
**scheduling** 2:11,19
**schlerf** 8:10
**school** 57:19,21
58:2
**schotz** 5:20

**scope** 18:6,23 32:4
101:14,19
**scott** 4:18
**scrutinized** 30:17
**scurrying** 149:18
**se** 16:4
**seal** 2:8 12:23 212:5
**sealed** 64:19 66:16
66:18 67:6 74:25
80:12
**sealing** 12:15 28:4
**seated** 12:3 54:19
90:22 170:6
**second** 8:18 9:2
13:9,10 14:10,25
16:13 19:21 20:9,12
20:12,15,21 22:4
24:7,13 26:7,8,25
27:13 33:10,11,12
35:10 41:3 64:6
67:22 72:17 77:16
77:17,22 80:17
81:12,18,22 90:7
93:19 96:13 114:22
114:24 119:16
138:2 148:6 161:6
164:3 177:9 184:21
185:10 186:9,12,16
187:18 194:19
201:24 202:4
**secondly** 18:10
28:18 67:22
**section** 136:12
**sector** 58:3 60:5
**secureds** 14:24
**securing** 26:16
**securities** 81:2
140:16,20 151:18
**security** 82:24
155:10
**see** 16:18 41:4
43:13,15,19 52:14
64:22 77:21 79:7
87:6 98:5 106:8
111:3,10 115:5
116:8 143:22 152:2
163:9 175:12 181:8

189:7,9,11,13,19
204:17 205:25
**seeing** 31:24 52:23
143:15
**seek** 19:18,20 22:16
38:24 49:20 123:13
145:15
**seeking** 18:9 19:7,9
19:10 43:23 109:13
132:4 209:21
**seen** 40:14 44:2
70:7 173:16 177:2
179:4 205:24,25
**segment** 183:21
**segments** 58:24
**seife** 11:4 117:24,24
118:8
**seized** 29:22
**select** 77:22
**selecting** 66:22
144:14
**selection** 21:18
23:22 62:24 64:23
79:2,11
**self** 30:15
**sell** 35:4 38:22,24
40:11,13 42:10,13
42:16 43:16 46:17
59:13 67:24 86:7,9
86:16,23,25 92:12
92:14,19,20 94:5,6
94:22,23 97:20
102:6 124:10,10
138:7,10,11,13,14
138:15 141:21
152:21 160:22
168:11,14 172:15
183:14 184:17,25
185:5,7
**seller** 88:8 106:1
152:23
**sellers** 88:3
**selling** 45:14 46:2
59:10 138:6 141:5
148:15 149:1,1,22
150:14 152:17
155:10 172:20

183:3 190:2 207:2
210:11
**semblance** 39:17,24
**send** 146:7 148:11
**sending** 69:14 75:20
**senior** 27:6 46:3
57:7,13 120:18
**sense** 64:17,18
84:10 129:7 155:21
157:20 195:5
**sent** 70:23 75:16
100:25 135:20
**separate** 51:11,12
136:21
**september** 2:4,21
21:6,9,12 23:3
52:12 93:17 111:5
135:1,5 137:16
146:5 148:10,19
154:17
**series** 63:17 74:15
157:6 161:10
168:22,22
**serious** 83:15
**serves** 93:16
**service** 34:13 107:3
**services** 59:23
**sesh** 63:5,10,10
105:9
**set** 30:13 38:2 53:10
55:20,23,23 56:4
62:18 107:11
108:21 161:18,25
169:15 210:5
**sets** 51:23
**setting** 38:5
**settle** 202:24,24,25
**settled** 164:20
**seven** 26:18 74:16
211:5
**seward** 10:1
**shape** 137:15
148:14 156:2
**share** 13:23 81:6
111:1 159:23 190:4
**shared** 14:1 21:9
190:24 191:2,7

192:8 209:18
**sharehold** 157:1
**shareholder** 190:11
190:12
**shareholders**
162:24
**shares** 160:22
**sharing** 37:7 109:7
157:25 159:20
166:18 168:20,23
169:10 171:7
203:16
**shaw** 123:23
**shearman** 5:1
**sheet** 75:18 107:11
140:5 144:6 147:7
148:16
**sherri** 2:24
**shift** 111:24
**shifted** 113:6 115:6
116:9
**shifting** 116:11
**shoes** 168:1
**shop** 88:10
**shore** 6:16 42:2,2
49:2,8,16 56:3 68:7
90:6,7 152:14 153:1
194:23,24 195:3,8
195:10 199:8,11
208:21 210:13,19
213:6
**shore's** 164:24
**short** 12:18 17:19
54:14 62:4 64:23
65:14 70:17 90:10
90:17,18 113:8
180:13 195:19
**shorter** 64:25 66:13
**shortly** 74:11
**shouldn't** 124:2
**show** 52:11 88:22
170:16 190:4
205:20
**showed** 42:19 67:23
158:23 179:22
180:11

**showing** 170:9
**shown** 43:13
**shows** 34:16 52:10
**sic** 63:10 99:19
**side** 27:12 33:13
35:17,18,20,23,23
35:24,25 36:4,12,18
37:6,8 39:9,10,12
39:12 41:9,13,17,17
45:22 46:8,10,18
49:17,17 50:7,7
51:25 52:2 62:15,15
62:16 86:5 87:24
101:6 103:3,3 104:2
104:2,9,9 105:5
114:13 125:18,19
125:22,25 139:6
142:12 145:1,1
149:13,14,15
150:12,13,17,18,19
150:22 151:3,14,23
151:24 152:5,8,12
152:15 153:3 158:1
158:19,22 162:19
162:22 163:5,6,14
163:18,19 164:1,23
165:8,11 166:11,24
167:7,9 168:5,6,9
171:1,4,5 174:14
176:23 177:1,4
178:10,15,21,24
180:1,5,16,16,17,19
180:23 191:20
199:13,17,20,23
202:8 205:8,9,16,17
205:23 206:1,2,8,22
207:2,5,11,17,19,21
207:25 208:1,2,4,6
209:11,12
**sideways** 210:21
**sign** 65:7,13 69:15
70:10,16 80:22
130:11 172:10
191:14
**signatories** 97:3
**signed** 36:23 43:1
45:20 65:24 69:22

70:11 73:18,19 74:5
75:22,23 80:19 81:9
85:23,24 109:4
111:24 112:22
116:4 122:20 123:7
152:20
**significant** 22:14
28:19 81:16 118:22
118:24 120:25
169:25 173:17
194:3
**significantly** 13:20
19:15 28:7
**signing** 73:6 109:24
129:15 180:5 188:7
**silver** 59:20 88:12
**similar** 96:11,12
129:17
**similarly** 25:6 26:12
**simon** 6:19
**simple** 30:14 53:19
**simply** 30:5 53:16
**simultaneous** 61:17
**single** 44:25
**sir** 56:13 67:7 85:20
117:1 130:21
139:18 170:11
176:13 178:3
196:20 198:15
210:16
**sit** 79:7 83:10
105:22 116:1
126:12,19,21,22
206:6
**sits** 126:15,18
**sitting** 55:8 121:15
124:19 164:1
174:13 176:11,22
**situation** 47:5
172:21 173:4
189:25 200:21
203:2 207:14
208:15
**six** 34:16 46:9 52:13
52:15 69:22 74:16
85:22 87:6 112:22
113:17 114:3,11

116:6 145:9 147:22
**sixteen** 187:10,11
187:20
**size** 122:5
**skaw** 2:25 214:3
**skinny** 63:20
**skip** 137:19 142:22
**slide** 18:2,3,22,23
20:3 21:15 22:22
23:9,10 25:13,13
26:18,18 27:24,24
60:13
**slightly** 184:14
**slights** 4:12
**slot** 113:14 114:21
**slow** 87:2
**slower** 87:4
**small** 23:1 47:24
149:9
**smaller** 107:7
**smart** 98:5 131:11
**smith** 58:4,6
**snack** 59:2
**snuck** 54:16
**society** 2:8 12:15
**sol** 202:15
**sold** 38:20 45:2,3,24
59:1,2,4,9 60:9,25
101:7 124:11
**sole** 27:7 105:6,13
**solicit** 68:4 109:6
110:19 146:4,16
**solicited** 74:20
101:8
**soliciting** 40:5
69:19 74:14 110:17
111:12 140:13
148:9,14
**solve** 172:23
**solved** 41:18 54:5
**solvency** 53:23
**somebody** 42:16
112:6,18 117:17
147:1
**someone's** 207:15
**somewhat** 62:4

**sontchi** 1:22
**soon** 20:22 21:6,9
  21:24 28:14
**sooner** 65:8
**sorry** 16:7,11,22
  54:12,13 67:5 72:6
  78:10 90:12 91:15
  112:10 117:6
  119:14 120:2
  123:19,20 129:14
  131:1 149:6 150:18
  159:24 180:21
  207:1
**sort** 28:1 43:25
  181:9,22 190:18
**sorts** 130:14 163:2
**sosnick** 5:4,5
**sought** 18:7 32:4
  184:20
**sound** 30:25 42:9
  43:3,15
**sounded** 41:25
**soundly** 32:18
**soundness** 44:8
**south** 2:24 214:3,7
**southwest** 58:5
**space** 59:4,11
  115:13 134:14
  206:22
**speak** 14:14 31:7
  69:7
**speaker** 54:20,22
  90:18
**speaking** 68:25
**special** 51:15 57:8
  59:17,19 132:24
  133:20,22
**specialist** 107:19
  133:25
**specialists** 57:12,12
**specific** 24:13 29:17
  29:24 35:21 47:22
  47:22 51:16,22 53:8
  53:8,13 71:10 73:25
  86:15 87:23 88:5,16
  89:3,12,14 96:21
  98:15 105:11,21,22

106:4,11,23 107:5
  108:22 119:2,17
  120:10,11,23 121:3
  123:13 158:12
  173:24
**specifically** 21:3
  27:13 64:9 100:14
  113:22 120:11
  135:18 140:4 144:4
  144:8 164:11
  186:18 194:8
**specifics** 116:22
**specify** 71:15
**speculate** 48:1
**speculated** 98:4
**speculating** 45:8
**speculation** 198:20
  198:21
**spell** 56:16
**spelled** 37:2
**spend** 180:18
**spending** 48:6
**spent** 61:6 62:13
  128:9,15
**spill** 60:11
**spin** 35:25 163:23
  164:2,14
**spinning** 208:11
**spinoff** 59:7 60:5,7
  136:20 207:20,22
  208:1,3,6
**split** 59:6
**splitting** 209:4
**spoke** 110:3 135:19
**sponsor** 171:19
**sponsors** 47:16 50:4
  157:19
**sponsorship** 47:16
**spurt** 185:3
**stacey** 146:14
**stack** 161:20 202:21
  203:15 205:21,23
  207:10
**stacy** 127:7
**staff** 211:4
**stage** 22:10 23:14
  23:17,24,24 24:4,5

64:19 66:18 67:6
  72:4,12,19,23 73:4
  73:13,22 74:8,10
  83:25 112:2 113:7
  115:7,21 116:9,12
  188:4
**staged** 84:7
**stages** 22:6 23:16
  66:16
**stake** 35:5 128:24
  130:23
**stakeholders** 20:24
  21:7,11 23:8 24:3,6
  24:9 25:8,11 26:2
  26:16
**stalking** 13:25
  18:12 19:21,25
  21:17,24 22:8,10,17
  23:17,22 24:1 28:4
  31:22 33:17 52:23
  53:4 62:5,24 64:13
  64:14,20,23,25 65:7
  65:19,25 66:13,22
  77:4 79:11,14 84:7
  87:12 109:4,24
  111:7,12,25 112:22
  113:14 114:20
  115:8,11 126:25
  127:1 129:15,24
  130:11 132:2,12
  154:8 156:7 157:1
  171:11,22,24 188:7
  188:23 189:18
  190:24 191:5,14,24
**stand** 55:9 56:13
  87:14 168:1 207:4
  210:3
**standard** 84:21
  189:15
**standing** 49:20
  181:9
**standpoint** 209:7
**stang** 8:17
**stargatt** 10:10
**start** 13:21 16:5,6
  165:20 204:23
  211:12

**started** 12:9 20:12
  57:24 68:8
**starting** 50:6,19
  90:6 106:8
**starts** 136:7 210:15
**state** 19:13 30:22
  56:16
**stated** 31:11 70:2
  85:22 134:9 158:25
  160:18 179:20
**statement** 17:10,19
  32:17 55:1 92:9
  190:6
**statements** 14:22
  15:5 99:15
**states** 1:1,12 4:8
  55:1,8,10,12,13
**status** 157:9
**statute** 35:7
**stay** 17:8 170:9
  211:7
**stayed** 58:6
**step** 25:3 31:15 36:2
  36:3,6,25 37:1,3,5
  50:22 76:9,10 79:15
  158:16,18,21 159:2
  159:3,10 160:10,15
  160:19,23,24
  198:14
**stephany** 3:8
**stephen** 5:11 9:11
**steps** 147:1
**sterling** 5:1
**steve** 3:6 12:5 54:24
**sticking** 49:22
**stickles** 5:23
**stimulate** 164:21
**stipulate** 60:21
  139:23
**stipulated** 12:24
**stock** 32:14 81:7
  101:7 105:17
  138:11,22,24 139:4
  139:5,6,8,16,17
  147:5,6 148:13
  151:7 160:21,21
  168:12 175:17,20

175:25 177:5
179:23 185:7 196:9
**stocks** 85:4,5,8,11
86:12 103:11
183:20,21
**stop** 170:6 193:16
208:18,18,18
**straightforward**
26:10 28:6 81:14
154:22
**stranded** 157:11,11
157:23 159:3
**strategic** 65:24 66:6
66:7 106:18,19
160:14
**strategics** 112:17
115:12
**strauss** 4:14
**street** 1:13
**stretches** 38:8
**stricken** 131:19
**strike** 68:7 130:13
130:18 131:2,8,17
132:5,14 141:14,17
**strike's** 68:20
**stripe** 156:2
**strong** 26:14
**strongly** 66:8
**struck** 37:2
**structure** 19:14,17
28:20,25 29:5,9,11
29:12,16,17,18
33:20 34:19 35:9,15
35:17 36:19,22
37:22 39:11,25 40:3
41:12 44:19 45:3
49:1 52:4 54:3
64:16 66:15,17
67:23 71:11,12,17
71:18,21,22,23,25
75:4,5 77:12 95:4,8
95:11,15,16,19,22
95:22,23 96:6,9,11
96:12,18,19,23,24
97:4 98:3,6 99:3,4
99:21,24,25 100:9
100:25 101:3,15,17

101:19,23 102:2,4,5
103:2 105:17 121:5
134:20,22 135:22
135:25 138:2,3,8
139:10,25 140:2
143:1 146:9 157:3,4
159:13 174:25
175:11,14,16 185:5
195:20 198:10
203:12 208:22
209:12,13
**structured** 24:11
**structures** 51:18
134:20 204:24
205:6
**stuff** 55:25 130:14
198:6
**style** 170:8
**subdivide** 15:2
**subject** 15:13 22:3
27:9 30:12 31:24
140:15 148:5
**submit** 28:25 53:5
77:9 78:4,6 148:19
154:14
**submitted** 19:17
64:3 79:12 135:21
**subpoena** 129:19
**subsequent** 160:23
**subsequently** 21:11
75:20 208:6
**subsidiaries** 183:4
208:24
**subsidiary** 59:14
60:3
**substance** 27:11,21
27:25 90:14 181:19
210:17
**substantial** 67:25
**substantially** 38:25
41:13 115:25
**substantive** 18:8
**substantively** 105:3
**successful** 108:20
151:17 167:12
173:20

**successfully** 166:18
**suddenly** 47:6
**sue** 89:12
**sues** 200:1
**suffering** 71:20
**sufficient** 28:15
32:21 70:14
**sufficiently** 111:11
**suggest** 86:15
**suggested** 53:14
71:23 82:15 160:3
**suggesting** 110:2
114:25
**suggestion** 113:5
**suggestions** 113:3
**suggests** 152:6
**suisse** 60:2
**suite** 214:13
**sum** 181:18
**summary** 18:20
23:10 74:21 165:25
177:4
**superior** 65:10
70:13 87:13 123:10
124:8 200:18 203:4
**supervised** 24:3
**support** 2:14 32:16
32:17 33:3 36:21,22
44:23 48:14 50:21
50:22 64:3 101:2
109:6 130:17
196:10
**supports** 31:12 49:9
**suppose** 120:18
150:17 153:16
**supposedly** 28:19
**suppress** 28:10
**sure** 15:19 16:11
38:11 55:24 57:25
58:21 60:15,17
62:13 77:5 80:15
82:22 83:13 92:16
92:23 93:2,12 95:1
98:23 101:23
106:21 108:10
113:25 118:14
120:17 121:7 122:3

122:13 124:22
140:3 152:22
153:13 155:15
160:6 167:5 168:8
170:23 198:12
**surfaced** 186:8
**surprise** 43:2
126:14
**surprised** 126:18
**surrounding**
105:10 183:7
**suspect** 22:13
**suspicion** 42:20
**swap** 148:16
**swiss** 58:13,13
59:23,25 60:1
**switch** 146:8 157:5
203:18
**sworn** 56:15

**t**

**t** 33:13 35:17,18,20
35:23,24,25 36:4,12
36:18 37:6,8 39:10
39:12 41:9,13,17
46:7,8,10,18 49:17
50:7 52:2 56:19
103:3 104:2,9 108:4
125:21 145:1
150:13,18 151:3,14
151:23 152:5,8,12
152:15 163:6,14,19
164:1 165:8,11
167:7,9 168:5,6,9
171:4,5 176:23
177:1,4 178:10,15
178:21,24 180:1,5
180:16,17,19,23
199:13,19,23 202:8
205:8,9,16,17,23
206:1,7,22 207:8,10
207:10,17,19,21
208:1,2,4,6 209:11
213:2 214:1,1
**t&d** 47:6
**tab** 63:21,22 64:6
70:19 136:5

**table** 100:25
**tailoring** 14:14
**take** 43:10 54:13
64:19 78:16 87:13
90:10 122:17,23
123:6 129:23 132:2
139:6 142:21
152:25 157:25
158:25 161:3 162:8
170:1 173:23
175:24 177:15
181:16 184:7 190:3
194:6 195:20
197:20
**taken** 94:8 122:21
128:19 151:10
162:18 178:3
193:22 209:23
**takes** 53:5 174:20
**talk** 14:5 34:18
36:20 42:6 56:5
57:18 67:15 68:25
80:18 95:7 104:16
121:8 137:22
138:24 145:3
150:24 157:5 163:5
181:7 196:1 197:10
198:22 199:25
205:10
**talked** 74:19 75:9
99:3 106:16 119:20
138:6,18 140:10
163:5 181:13
183:15 189:16
199:16
**talking** 44:24 47:7
49:25 94:12 95:16
101:16 130:6
137:19,20,25
138:22 141:14
148:2,21,24 155:15
170:6 181:6 196:8
197:3 204:23 205:5
**tangible** 43:11
173:17
**target** 189:23

**tax** 19:15 28:21
29:4 33:20 34:3
35:9,14,17,25 36:17
36:19,22 37:3,7,21
37:22 39:25 40:3,3
40:7 41:12 51:24
52:2,5 55:13 62:15
63:16 67:25 68:1
71:13,21,25 75:4
76:5,7,11 95:4,7,11
95:15,16,19,23 96:3
96:6,9,11,12,18,19
96:22,24 97:4 98:6
99:3,4,5,8,12,16,20
99:22,23 100:2,8,10
100:25 101:3,5,15
101:23 103:1
105:17 134:22
135:22 136:21
137:11 138:3,8,16
138:17 139:25,25
140:2,4 142:25
146:9 154:10
155:10 156:8,14,22
157:3,4,9,11,11,23
157:25,25 158:5,16
158:18 159:3,20,23
163:20,23 164:2,14
165:18,24 166:8,18
166:25 168:20,23
168:24 169:3,6,10
169:11,12 171:7,8
173:4 174:25
175:11,11,14 176:2
183:4 185:8 195:22
200:15,15,16 201:2
201:8,12,13,22
202:8 203:7,12,15
203:20 204:15,21
205:2,12 207:22,25
208:15,23 209:7,8
209:12,18
**taxable** 19:16 34:22
35:1 36:2 52:4
74:23 75:5,19,24
76:4,7,9,12,13
100:2 101:12,16,22

102:1,1,1,8,8,9
134:22 135:3,4,8,8
135:12,13,16,17
146:4,4,10,10,16
147:5 148:9,10
153:24 154:10,21
155:4,7,19 156:2,15
156:20 158:6,8,10
159:16 160:19
165:16,17 169:5,13
169:14,16,20,20
196:3,3,8,25,25
200:18 203:6,10,18
203:24 204:12,16
205:5 208:10
**taylor** 8:15 10:10
12:20,21,22 13:3
33:10
**tceh** 3:18 6:13 8:8
14:10 17:2 26:22
31:10 36:20 45:17
45:18 46:1 49:21
50:1 121:18 122:8
125:18 136:20,20
153:11 179:23
199:16 201:25
**tch** 14:24,25 16:13
27:12 42:3,25 45:22
46:16 48:5 200:1
205:13,16
**tcih** 203:15
**team** 62:11 63:3,12
68:14 69:1,1,13,24
72:11,15 76:1 78:13
91:8 105:12 131:5,6
131:9,11 140:22
141:1,9,14 144:19
**teaser** 69:15,21
70:18,23,25 71:2,8
72:2,7 75:17 100:24
135:19
**teasers** 73:18 74:6,6
75:23 137:10 146:7
148:11,12
**technical** 35:3
**technology** 59:12

**telephone** 128:17
**telephonic** 93:4
94:7,12
**tell** 40:13,21 41:1
87:2 97:19 108:7
116:11 141:19
147:19 159:8
167:24 181:19
183:16 184:10
188:2 195:11
201:19 203:3,5
**telling** 65:4 115:22
116:2,5 124:7 135:2
150:2 164:23
195:21 196:14
204:6 205:7
**tells** 35:3 37:18
147:21 167:23
**ten** 15:2 16:12 51:4
88:18 108:5 170:1
**tentative** 78:7
**term** 39:5,6 75:18
95:11,21 107:11
140:5 144:6 189:1
**terminate** 87:12
88:15 89:20,24
123:9 185:15
**terminated** 164:7
**termination** 20:20
30:1 87:14 88:4,8
106:2 122:23
123:10 207:7 210:5
**terms** 35:7 37:24
58:20 62:24 63:3
66:20,20 67:1,2,12
77:20 78:1,3 79:23
80:9,9 82:12 84:3,6
87:5 95:2 98:2
104:23 108:20
109:12 111:20
113:21 116:17
117:13 118:17
128:21 131:7
142:17 159:25
163:17 176:17
183:19 190:22
192:6

terrific 187:3
test 62:4 97:23 98:7
testified 43:22
  60:23 90:25 96:4
  112:1 115:18
  127:12 134:4
  147:20 154:7
  178:23 179:11
testify 26:7 68:18
testifying 69:3
  159:25 197:1
testimony 18:15
  23:19 25:22,24 26:9
  30:24 31:2 34:7
  35:19 37:17 39:2
  40:1,16,21 51:6
  53:8 90:14 108:4
  126:20,23 134:9
  158:24 174:19
  178:8,11 181:14
  210:17,23
testing 45:10
thank 13:6 16:10
  17:25 31:4,5 32:12
  33:4,5,7 42:1 49:2
  50:25 54:9 55:5,6
  55:15,16 56:1,7,20
  72:9 90:3,4 112:10
  117:16 124:18
  132:20,21 170:3,7
  194:23 210:14,25
  211:14,15
thanks 50:24
  132:18
themes 41:25
theoretically 87:24
  89:13 158:17
thereof 2:13,20
  178:9
thicker 177:25
thing 33:22 47:14
  48:22,23 68:24,25
  69:3 98:13 105:20
  115:9 118:14
  149:22 184:3
  204:20 205:4,6

things 36:15 53:11
  58:22 68:9 80:15
  98:17 111:25
  118:16 121:2 169:4
  189:23,24 203:17
  210:22
think 12:10 22:19
  26:3,10 27:9,17
  29:6,13,19 34:5
  35:6 41:23,24 42:19
  64:11 66:10,17
  68:18,20 70:2 72:15
  72:17,22 73:1 76:4
  76:19,24 78:3 80:3
  82:4,15 84:4,5,6
  85:14 90:25 92:4,13
  92:18,19,22 93:16
  93:18,21 94:3,5,23
  95:22,23,25 98:24
  99:5 100:17 105:6
  108:10,14 109:4
  111:9,23,25 113:1,5
  113:6,20 114:2,3,20
  116:14,19 117:7,21
  117:21 119:4
  120:21 121:9
  122:14 127:4 129:7
  130:6,8 131:6
  132:24 134:9
  139:10 141:16,17
  143:17 145:18
  146:18 148:24
  149:5,7,22 150:6,10
  153:4 160:12 161:2
  161:18 162:1,25,25
  164:21 167:24
  168:2 171:8 174:19
  174:20,23 175:10
  176:2 177:8 180:10
  181:13,20 183:16
  185:14 196:2
  198:12,23 202:25
thinks 50:23
third 14:19 18:14
  22:19 46:3 50:3,15
  61:17,20 70:19 78:5
  78:8 91:1,3 115:24

116:9 136:17
  160:14 176:4,10
  185:8 202:4,11
thirdly 24:21
thirty 211:5
thought 41:10 55:3
  62:18 65:9 66:11
  69:4 70:12 71:22
  92:11,14 98:7
  102:10 115:17
  116:8 121:11 125:9
  146:13 162:2,10
  176:25 177:2
  207:16
three 14:9,10 21:18
  43:4,10 45:18 46:13
  46:23 47:1 55:20,20
  57:12 80:5 87:16
  88:14 93:2,2,10,11
  128:10 141:19
  156:12 160:10
  185:13 189:15
  200:25 210:8
thrown 166:24
  167:17
tie 25:4
tightly 185:23 186:6
till 94:18 115:24
time 26:11 30:21
  34:17 36:5 38:7
  39:10 40:11,11,12
  40:12,12 44:12,15
  44:15,16 45:14
  49:25 58:14 60:1
  61:6 62:13 65:11,11
  65:15,16 68:9,10,15
  68:22 69:4,7 70:4
  70:13,14,16 72:14
  73:21 74:1,18 77:13
  77:21 78:6 80:7
  86:16,17,24 90:3
  91:10 92:12,14,19
  92:19 93:19 94:5,6
  94:21,22,23 96:20
  97:15,20,20 101:1
  108:12,25 111:12
  111:16,17 114:5

115:19,25 116:3
  118:6 123:24 124:3
  124:10 128:14,15
  130:7,8 134:4 135:7
  137:14,24 141:24
  143:14,18,19
  146:16 148:8,18
  149:21 151:12
  154:17 155:25
  158:14 161:9
  163:24 166:4
  168:25 169:25
  173:10,12 174:7
  175:23 178:4
  180:13,18 183:2,5,9
  183:10,14 184:16
  184:24 185:9
  187:24 194:7,12,15
  195:4,19 203:19
time's 113:8
timeline 16:19
  18:12 21:16,19 22:5
  22:20,25 23:2 24:11
timelines 143:11
timely 25:14
times 17:6 28:23
  58:8
timing 21:17 67:15
  92:8 115:20,22
  128:21 182:10,11
  182:13,15
title 127:14,24
titus 2:3
today 12:7 16:20
  18:11,16 19:10 21:5
  21:13 23:19 25:16
  28:24 32:4,10 38:14
  40:21 41:7 50:20
  52:8,18,25 53:3
  79:7 83:10 87:1
  91:5 94:18 102:17
  105:22 116:1
  121:15 124:19
  132:11 153:8
  161:21 162:23
  164:1 165:17
  174:13 176:11,22

191:20 195:19
200:21 206:6 209:7
210:13
today's  20:6 55:22
164:10
todd  7:14
toilet  106:17
token  86:19 143:17
told  37:12 46:5 65:5
70:5,7,11,12,12
73:21,22 87:3 92:13
93:5 112:16 113:6
115:9 119:4 121:9
127:9 135:21
137:10 141:4,9
146:13 148:8
153:12,14 159:9,14
159:15 160:9,14
162:2 167:5 176:15
176:25 177:9,12,13
188:21 192:25
tom  6:17 9:4
tomorrow  120:19
tony  16:24 127:7
top  136:14
topic  111:4 183:13
topics  18:5
total  15:2 40:17
45:3 69:20 85:10
93:1,6,20 122:6
165:18
totally  48:14
touch  22:12
track  113:23 160:1
trade  110:12,14
tradeoffs  109:9
trading  81:2 179:19
188:14 189:13
traditionally  64:22
115:12
transaction  19:11
19:15,16 26:13,14
30:16 32:7,10 33:18
34:14,15,17,22 35:1
35:13 36:25 37:19
37:21 48:3 51:23,24
51:25 53:24 55:12

59:8,15,16,18,21
61:14,15,17 71:3,9
71:12 74:24,24
75:19,25 76:4 77:12
82:5,23 87:8 88:7,9
88:14 89:24 98:6
101:6 102:8,9
108:13 126:25
127:1 130:3 135:16
136:19 137:12
139:2 145:15,16
146:22,25 147:2,5
148:14 151:1,6
152:20 153:25
154:10,11 155:10
155:19 156:9,14
158:5,6,8,11 159:16
162:4,14 163:20
165:7,16,21 168:17
168:21 169:5,12,13
169:15,16 171:15
175:23 179:14
181:24 182:17,20
183:1,6 185:6 187:1
188:8,15 190:13
191:3 195:22 196:8
196:25 200:9,18
203:6,10,18,24
204:2 205:16 206:7
207:13,16,18
208:10,10 209:4,6
transaction's  203:3
transactional  188:2
transactions  57:16
59:4,22 60:8 86:14
106:1 133:5,12
134:22 135:8,13,17
143:13 146:16
148:10 155:3 184:5
186:22 189:9 196:2
transcribed  2:24
transcriber  214:7
transcript  44:1
214:4
transfer  32:14
transmission  85:5
183:20

transparency  31:21
transpired  98:3
transportation  58:9
treasurer  16:24
17:16
trial  37:13 44:21
trigger  101:12
205:2
triggered  88:19
124:20 125:8
triggering  175:25
triggers  145:5
trillion  184:5,6
trot  207:14
troublesome  78:2
true  94:18,18
124:16 135:23
137:9 180:22
187:16 204:22
214:4
trump  166:12
trust  4:2 5:14,21
7:17 8:13 10:2 51:3
trust's  53:7,18
trustee  4:9 9:19
32:14 33:11 51:3
try  33:25 54:6
60:12 78:1 118:21
118:21 120:8
123:24 143:18
171:18,19,22
172:23 194:24
199:9 208:24
trying  43:16 46:11
47:17 73:6 80:15
82:22 98:7 100:1
106:25 109:10
115:19 119:15
123:20 160:2,8,9
187:5 188:20 195:5
209:16
tuesday  16:1,6
74:15
turn  17:9 18:2
33:25 53:23 54:14
63:20 70:19 136:1
156:11 203:17

turning  18:22 23:9
48:19 61:18 72:4
76:16 80:11 205:25
turns  52:3 152:13
204:18
tv  88:16
twelve  113:2
twenty  69:21
twice  52:2 195:12
twist  49:9
two  13:24 16:18
21:23 22:6,7,24
23:1,14 25:17 27:3
30:3 35:21 36:1
40:17,25 43:7 44:22
46:5 47:17 49:19
52:9 59:5 64:19
66:16,18 67:6,20
69:21 72:4,12,17,19
72:23 73:4,13,22
74:8,21,22,25 77:15
77:17 80:15,16
83:15,17,25 84:7
85:13 87:15 88:6,10
91:5 92:10,20,25
93:1,2,6,6,10,20
94:7 112:2 113:7
114:10 115:6,7,21
116:9,11 119:15
126:4,7,12 128:17
130:16 139:21
141:19 143:11,19
146:14 147:10
159:15 169:1
172:14 185:13,19
185:19 186:2,3,4
188:10 194:9 196:1
200:17,23,23,24
202:3,4,20 208:11
210:7 211:10
tyler  9:13
type  54:7
typical  19:9 36:12
64:12,19 84:12
120:23 143:12
145:20

**u**

**u.s.** 1:23 4:9 60:11
**ubs** 58:14,15
**ugs** 59:14
**uh** 108:17 136:6
  137:1 150:20 151:8
  157:13 158:2
  178:12 188:20
  196:24 197:2 200:3
**ultimate** 41:11
  121:12 130:23
  146:18 147:15
  162:17,24 183:13
**ultimately** 19:19,22
  20:1 24:1 29:15
  30:24 38:22 69:22
  128:7 142:6 152:25
  154:8 156:8 157:1
  161:2 163:12 166:2
  171:2,9 173:3
  174:10,14
**umb** 7:17 9:19
**unable** 42:15 107:5
  114:17
**unanimous** 41:16
**unanticipated** 79:5
**unaware** 44:5
**uncertain** 168:25
**uncertainty** 183:7
**unclear** 160:18
**uncommon** 80:21
**unconditional**
  46:15
**undergraduate**
  57:20
**undermines** 29:5
**underneath** 22:7
**underscore** 40:9
  132:6,7 180:7
**underscored** 96:9
  96:12
**understand** 25:11
  34:6,18 35:8 45:5
  56:7 74:18 76:5,6,8
  76:11,23 92:6 98:9
  101:5 102:17,22
  106:7 109:10

110:11,13 111:5
113:11 120:3
121:20 125:13,20
125:24 132:17
140:22 150:3 156:3
158:10 163:18
170:23 171:13,25
172:14 174:9,12
180:14,17 184:25
185:13 196:6
199:15,19 200:2
201:4 202:3,10
209:15
**understanding**
  12:16 16:25 27:22
  61:25 68:2 76:17
  96:14 109:8 110:17
  110:23 115:5
  126:11,13 139:24
  142:9 170:25 171:5
  173:22 178:20
  179:1,3 206:9
**understands** 147:22
  148:19
**understood** 90:16
  137:15 162:14
**undertake** 69:13
  84:15,18
**undertakes** 77:4
**undertook** 74:13
**uneconomic** 76:15
  156:18
**unencumbered**
  121:17 122:7
**unfold** 203:11
**unidentified** 54:20
  54:22 90:18
**united** 1:1,12 4:8
  54:25 55:8,10,11,13
**universe** 23:20
  26:18
**university** 57:21
**unknown** 48:20
  169:5
**unlimited** 87:24
**unpayable** 55:13

**unprecedented**
  42:15
**unredacted** 2:9
**unsecured** 4:15
  6:13 8:8 10:16
  14:11 16:13 26:23
  27:14 32:22 42:4
  46:22 49:6 122:8
  152:5 153:10,13
  162:23 177:10,11
  197:24 198:3
**untaxable** 156:2
**unusual** 52:18 86:5
**upcoming** 53:9
**update** 13:18
**updated** 129:7
**updates** 14:15
**upshot** 23:4
**upside** 192:17 193:1
**upsurge** 86:8
**usatine** 5:24
**use** 24:15 181:20
**usual** 52:14 53:6
**usually** 112:17
**utilities** 61:11,13
  65:20 84:8 106:16
  107:3 112:17 134:8
  182:17
**utility** 47:7 63:11
  65:23,25 66:6 81:3
  81:4 85:4 86:11
  105:11 106:20
  108:8 115:13
  143:13 159:11,13
  173:11 182:13,20
  183:1,9,20,21
**utility's** 66:7

**v**

**v** 2:3
**v&e** 99:22
**valid** 152:24 167:24
**validity** 66:12
**valuation** 39:5 41:3
  44:20 45:6,7 85:9
  85:11 86:11 128:23
  129:3,16 130:2,14
  132:11,12 179:6

180:6,19,23 187:8
187:11,19 188:1,12
188:25 189:1,2,15
189:17 190:17,22
191:10,13,19,23
192:3 206:1,9,12,15
**valuations** 181:7
  192:7
**value** 14:2 23:7,13
  25:7,12 26:1,17
  31:16 32:20,21,23
  35:16,18,20 36:1,4
  36:8,11,14 37:24
  38:20 39:2,7 41:6
  44:17,18 46:18
  62:19 66:19,19,20
  67:12,21 76:14
  78:23,24 79:22 80:3
  80:4 81:24 83:20
  84:1,3 85:11 86:22
  86:25 87:1,16,18
  88:18,25 89:11,14
  89:20,23 97:22,25
  103:12 105:19
  106:10,11,17,18
  108:6 118:22
  121:17 122:6
  123:11 124:6 129:6
  130:5,6,9,10,23
  132:3 152:7 154:1
  157:6 158:4,5,9,18
  159:2 160:22 161:2
  162:4,7 164:13
  165:4,7,12 169:1,2
  175:5 179:25 186:9
  186:10,11,13,14,15
  186:17,18,19,23,24
  186:24 187:12,14
  187:21,21 188:6
  191:12 196:5 197:4
  197:10,12 198:13
  199:22 200:6
  205:13,15,25
  206:13,16 207:9
**valued** 36:7 186:9
**values** 37:24 123:3
  124:12,13 129:8

183:22 192:12,22
**variables** 200:17
**variety** 57:15 58:24
70:2 80:2,20 189:21
189:24
**various** 13:17 95:11
209:19
**varying** 58:7 63:1
65:17 74:16 79:23
109:5,9 129:6
**ventures** 59:2
**veritext** 214:11
**version** 2:9 52:11
52:11
**versus** 88:5 122:25
135:16 148:9 165:3
171:25 172:3,11,22
184:6 192:17
**vet** 29:14
**vetted** 96:25
**viable** 152:15
**view** 25:1 29:4,8
37:16 65:19,20 67:9
71:5 84:4 86:24
89:1 92:6 96:18
103:16 104:3 109:8
110:12,14,19
112:21 115:15
118:3 119:5 139:12
153:24 154:16
155:2,4 190:18
192:23
**viewed** 73:2 85:14
173:5
**viewing** 138:22
**virtue** 81:18
**voice** 199:9
**volatile** 47:6
**volatility** 44:18
**volume** 184:4
**vote** 29:23 40:2,2
128:19 135:11,14
175:6 176:23
190:11,12
**votes** 174:11,15
**voting** 39:21 82:24

**w**

**w** 3:21 4:11 213:2
**wait** 87:3,6 117:9
117:17 159:24
169:22 172:15
181:9
**waiting** 86:20
129:23 130:2
171:17 191:22
**walk** 18:10 20:5
21:21 47:21,23
87:19 106:6 120:6
**walked** 88:12
120:19
**wandering** 211:8
**want** 16:11 18:10
18:14,19 19:5 21:21
22:4 32:2,16 40:9
42:24 46:5 47:20
52:14,18,25 53:1,2
55:24 72:16 74:15
80:23 81:9 82:25
83:2,13,16 84:8
90:9 91:23,23 95:1
98:23 110:11,13
116:25 118:13,21
118:24 119:8
122:10 132:6,7,14
132:15,23 134:10
136:5,11 140:6
148:20 150:5
155:11,14 157:5,8
165:9,15 170:15,23
183:12 192:2
196:13,22 197:6
198:9 207:4 210:21
211:7,10
**wanted** 14:13 55:1
55:19 87:19 95:7
132:4 158:19
180:17
**wants** 31:7 89:11
117:17 156:7,21
204:11
**ward** 7:4
**warren** 5:24 59:25

**wash** 147:15
**wasn't** 102:14
**waste** 65:14
**wasting** 163:24
**watershed** 68:3
**waving** 181:9
**way** 39:10 40:15
42:24 46:11 54:5
62:9 89:3 93:10
94:11 95:23 99:10
99:12 102:10
105:15 134:21
137:15 139:2,11
142:20 145:3
146:24 156:15
159:18 164:15
167:8 171:2,20
185:10 205:15,17
207:10 209:16,17
**ways** 45:19 89:6
**we've** 17:23 28:1,22
28:23 30:13 42:5
50:1 53:14,15 55:20
62:20 64:24 76:3
78:23 80:8 81:9
84:11,11 93:18
109:17 115:24
119:19 122:19,19
122:20 128:17
130:6,13 146:3
149:23 160:1 165:4
169:21 173:10
176:19 182:12
207:22
**webb** 9:13
**week** 20:14,16,19
21:6 61:20 75:13
78:6,8 85:7 91:1,3
115:24 135:2 146:5
**weekend** 210:17
**weekly** 129:7
**weeks** 20:8,23
171:16
**weight** 141:17
**weighted** 175:20
**weisfeller** 213:5

**weisfelner** 4:4 33:6
33:7,9 34:5 41:20
41:21 42:11 44:14
49:8,16 90:5,11,24
91:17,22,25 92:2,5
97:18 98:10,20,23
99:1,2 100:21,22
101:4 103:23 112:8
112:11 116:7 117:4
117:6,11,16 118:2
118:10,12,15
119:19,22,24 122:3
122:4,14 123:17,19
123:22,25 125:4
128:4,7,13 130:12
130:16,20 131:2,9
131:14,23 132:6,9
132:14,18,22
139:23 140:6,9
141:13,18 142:15
142:23,24 157:18
157:22 159:22,24
160:8,13 170:3,8,11
170:13,15,20
176:14 177:20,23
178:2 181:5,12
194:18,21 199:12
**weisfelner's** 46:13
**weiss** 3:17 31:6,9
**welcome** 54:10
**went** 42:16 74:5
89:3 112:25 119:16
124:12 137:10
160:5 202:15,19,20
**wharton** 3:17 31:9
57:21
**whit** 40:23
**white** 6:12 42:3
**wholes** 165:3
174:22,24
**wholly** 33:3
**wide** 57:15
**widely** 73:1 83:24
85:14
**wider** 111:21
**widespread** 18:16
26:12 193:15

**wilholtz**  56:18
**william**  56:18 57:3
  213:4
**willing**  83:1,2
  101:21 158:13
  159:6 186:11 187:2
  204:8
**willingness**  75:19
**wilmington**  1:14
  2:8 10:2 12:15
**win**  154:7 156:7,21
  199:25 205:20
  206:25
**wind**  115:12
**window**  52:19,21
  53:3,10 70:1
**winner**  19:21 79:17
**winning**  156:25
  163:9 171:12
  173:19
**wins**  205:10
**winter**  152:18,22
  168:11
**winterthur**  60:3
**wisdom**  135:15
**wish**  13:4
**withdraw**  32:1 73:5
  73:9,10
**withdrawal**  20:21
**withdrawn**  35:10
  103:25 116:23
  161:2
**witness**  35:19 54:14
  55:23 56:15 67:7
  72:8 78:10 85:18,20
  90:10,16 91:21
  97:16 100:20,23
  116:6 117:12 122:1
  122:13,16 123:5,15
  130:15 139:20
  140:3 142:20
  176:13 208:20
  210:18,21 213:3
**witnesses**  15:13
  16:17,18,21 17:1
  25:17 31:2 39:3
  41:1 43:22 47:3

**woffard**  5:18
**womble**  11:6
**word**  181:20
**words**  15:1 33:21
  40:14 46:17 103:9
  151:15 175:22
  177:10 190:8
  208:13
**work**  17:15 57:15
  57:16,23 58:23 63:3
  63:12 68:14,16,16
  68:16,17 88:17
  97:14 105:12
  110:10 134:13
  156:3 157:10,12
  199:10
**worked**  31:22 58:2
  58:22 61:8 88:14
  96:17 127:13
**working**  61:10,12
  62:14 72:11 96:22
  112:20 162:3
  190:20,20
**works**  101:6 203:12
  209:7
**world**  148:9
**worlds**  84:11
**worldwide**  58:14
  59:10
**worry**  124:2 210:11
**worse**  110:10,12
  184:12
**worth**  36:25 37:12
  46:9 89:21 157:10
  157:11 158:22,24
  159:10 160:11
  204:6
**wrap**  156:6 194:19
**wright**  127:7
**writing**  44:25
**written**  178:23
  179:3,6,10
**wrong**  16:7 48:14
  91:19
**wsfs**  12:22 16:13
  33:11

48:1 68:10,21

**x**

**x**  212:1 213:1
**xerox**  59:18

**y**

**yea**  181:4 195:1
  205:24
**yeah**  15:17 71:13
  79:20 90:19 91:21
  130:19 131:25
  136:4,16 162:20
  172:16 174:6
**year**  58:15 59:9
  118:22 157:12
  184:5,6,6 209:22
**years**  29:8 58:1
  59:5,13 61:14 87:2
  95:25 134:5 140:19
  141:5 190:1 194:9
**yee**  63:5
**yesterday**  14:21
  15:15 93:15
**yield**  58:9
**ying**  16:23 61:8,24
  63:5 178:17 179:5
  180:3,10
**york**  5:2,8
**young**  10:10 127:10
  127:16,24 137:21
  138:1

**z**

**z**  56:19
**ziehl**  8:17
**zip**  130:9