## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) Chapter 11 |
|  | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
|  | ) |
| *Debtors.* | ) (Jointly Administered) |
|  | ) |

**FINAL WRITTEN SUBMISSION OF UMB BANK, N.A., AS INDENTURE
TRUSTEE, AND ELLIOTT IN SUPPORT OF JOINT MOTION TO FIX
APPROPRIATE ALLOCATION OF CERTAIN RESERVES
AND EXPENSES AS BETWEEN THE EFH AND EFIH DEBTORS**

Dated:  August 30, 2018

**BAYARD, P.A.**
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Evan T. Miller (No. 5364)
600 N. King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
scousins@bayardlaw.com
efay@bayardlaw.com
emiller@bayardlaw.com

**ROPES & GRAY LLP**
Gregg M. Galardi
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090
Gregg.Galardi@ropesgray.com

*Counsel for UMB Bank, N.A., as Trustee, and Elliott*

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

**TABLE OF CONTENTS**

I.  **APPLICABLE LEGAL STANDARD** ............................................................... 2

II. **ANY LIABILITY WITH RESPECT TO THE TERMINATION FEE CLAIMS SHOULD BE ALLOCATED 50% TO EFH AND 50% TO EFIH** ............. 5

    A.    The Termination Fee Was Increased By $165 Million, or 60%, in Exchange for Additional "Gets" Intended to Benefit EFH Creditors .................... 5

    B.    The NextEra Transaction Was Pursued by the E-Side Debtors to Avoid Potential Adverse Tax Consequences for the E-Side Debtors ............................. 10

    C.    The Ad Hoc EFH Claimants' and EFH Trustee's Arguments to Impose All or Nearly All of the Termination Fee on EFIH are Without Merit ...................... 11

III. **ANY ALLOWED PROFESSIONAL FEE CLAIMS OF KIRKLAND AND EVERCORE SHOULD BE ALLOCATED 50% TO EFH AND 50% TO EFIH** ............................................................................................................... 14

    A.    The Allocation of Collective Benefit Fees Based on the Direct Benefit Fee Ratio as Required by the Interim Compensation Order is Legally Flawed .......... 16

    B.    The Classification of Fees as "Direct Benefit Fees" or "Collective Benefit Fees" and the Application of that Distinction Overlooks the Critical Fact that EFIH Unsecured Creditors Were Projected to Receive 100% Recoveries for Much of the Cases ........................................................................ 17

    C.    A Cursory Review of the Direct Benefit Fees and the Collective Benefits Fees Requested by Kirkland Supports Reallocating Allowed Fees Equally Between EFH and EFIH ................................................................................ 18

    D.    Kirkland's Fees Must Be Reallocated Because the Timekeeper Directive Resulted in EFIH Paying a Significant Portion of the Actual and Necessary Costs of Preserving the EFH Estate .................................................... 20

    E.    Kirkland's Fees Must Also Be Reallocated Because the Revised Allocation Methodology Used After October 2016 Was Not Court Approved and Is Flawed ........................................................................................ 23

    F.    Evercore's Fees and Expenses Should Be Allocated Equally Between EFH and EFIH ............................................................................................ 24

IV. **THE E-SIDE COMMITTEE PROFESSIONAL FEE CLAIMS SHOULD BE ALLOCATED 70% TO EFH AND 30% TO EFIH** ................................... 27

    A.    Sullivan Professional Fees and Expenses ............................................................ 28

    B.    Montgomery Professional Fees and Expenses .................................................... 31

    C.    AlixPartners Professional Fees and Expenses .................................................... 32

    D.    Guggenheim Professional Fees and Expenses .................................................... 33

V.  **THE ELLIOTT SUBSTANTIAL CONTRIBUTION CLAIM SHOULD BE ALLOCATED 30% TO EFH AND 70% TO EFIH** ................................... 34

A.    Terminating the NextEra Plan Support Agreement to Seek an Alternative Restructuring Transaction .................................................................................... 35

B.    Opposing Berkshire Transaction and Committing to the Sempra Transaction ......................................................................................................... 36

C.    Obtaining an Order Disallowing the $275 Million Termination Fee ................... 37

D.    Negotiating the Sempra Plan and Related Documents and Advocating for Creditor Distributions in Connection with Plan Confirmation Proceedings ........ 37

E.    Facilitating the Oncor Dividend Settlement ........................................................ 37

F.    Facilitating Resolution of the Vistra Tax Dispute ............................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Commercial Fin. Servs., Inc.*,
  246 F.3d 1291 (10th Cir. 2001) ...............................................................3

*In re Eagle Creek Subdivision, LLC*,
  No. 08-04292-8-JRL, 2009 WL 313383 (Bankr. E.D.N.C. Feb. 5, 2009) ...............................3

*In re Hechinger Inv. Co. of Del.*,
  298 F.3d 219 (3d Cir. 2002).........................................................................3, 12

*In re Integrated Res., Inc.*,
  147 B.R. 650 (S.D.N.Y. 1992)........................................................................13

*In re Kroh Bros. Dev. Co.*,
  105 B.R. 515 (Bankr. W.D. Mo. 1989)..............................................................23

*Lebron v. Mechen Fin. Inc.*,
  27 F.3d 937 (3d Cir. 1994)............................................................................4

*In re O'Brien Envtl. Energy, Inc.*,
  181 F.3d 527 (3d Cir. 1999)......................................................................12, 13

*In re Trans World Airlines, Inc.*,
  145 F.3d 124 (3d Cir. 1998)..........................................................................2

*In re Tropicana Entm't., LLC*,
  No. 08-10856 (KJC), 2014 WL 7450610 (Bankr. D. Del. Dec. 30, 2014).....................4, 5, 23

*In re WorldSpace, Inc.*,
  No. 08-12412 PJW, 2010 WL 4739929 (Bankr. D. Del. June 2, 2010) ...............................13

*In re Worldwide Direct, Inc.*,
  334 B.R. 112 (Bankr. D. Del. 2005) .................................................................4

**Statutes**

11 U.S.C. § 330(a)(3)(C) ..............................................................................3

11 U.S.C. § 503(b)(1)(A).............................................................................2, 3

**Other Authorities**

78 Fed. Reg. No 116. ........................................................................................................4

Fed. R. Bankr. P. 2016 ...................................................................................................15

Oxford English Dictionary, *available at* https://en.oxforddictionaries.com.................................21

3 COLLIER ON BANKRUPTCY § 330.04[1] (Alan N. Resnick & Henry J. Sommer
 eds., 16th ed. rev.) .................................................................................................3, 5, 15

In accordance with this Court's *Second Amended Order Scheduling Certain Dates and Deadlines and Establishing Certain Protocols in Connection with the Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13373] (the "Allocation Scheduling Order"), UMB Bank, N.A., as Indenture Trustee ("UMB") for the unsecured 11.25%/12.25% Senior Toggle Notes due 2018, and Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott" and, together with UMB, the "Movants"), by and through their undersigned counsel, hereby submit this final written submission in support of their motion (the "Allocation Motion")[1] for entry of an order fixing an appropriate allocation of certain reserves and administrative expenses incurred in these chapter 11 cases as between the estate of Energy Future Holdings Corp. ("EFH") and the estate of Energy Future Intermediate Holding Company, LLC ("EFIH" and, together with EFH, the "E-Side Debtors").[2]  In support, Movants respectfully state as follows:

## SUMMARY OF PROPOSED ALLOCATION

Movants request that the Court enter an order fixing the allocation of the EFH and EFIH estates' respective liability with respect to the Material Administrative Expense Claims as follows:

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Allocation Motion.

[2]    For ease of reference, Movants refer herein to the allocation of Material Administrative Expense Claims as between "EFH" and "EFIH."  As made clear in the *First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (the "Sempra Plan"), however, the allocation is actually between the "EFH Debtors" and the "EFIH Debtors."  The EFH Debtors means, collectively, (a) EFH Corp., (b) Ebasco Services of Canada Limited, (c) EEC Holdings, Inc., (d) EECI, Inc., (e) EFH Australia (No. 2) Holdings Company, (f) EFH Finance (No. 2) Holdings Company, (g) EFH FS Holdings Company, (h) EFH Renewables Company LLC, (i) Generation Development Company LLC, (j) LSGT Gas Company LLC, (k) LSGT SACROC, Inc., (l) NCA Development Company LLC, and (m) TXU Receivables Company.  [D.I. 12653] Art I.A.91.  The EFIH Debtors means, collectively, (a) EFIH and (b) EFIH Finance.  [D.I. 12653], Art. I.A.148.

| Material Administrative Expense Claim | Proposed Allocation to EFH | Proposed Allocation to EFIH |
|---|---|---|
| Termination Fee Claims<br>(*$275,000,000 if allowed in full*)[3] | **50%**<br>(*$137,500,000*) | **50%**<br>(*$137,500,000*) |
| E-Side Debtors' Professional Fee Claims (Kirkland and Evercore only)<br>(*$136,903,558.88*) | **50%**<br>(*$68,451,779.44*) | **50%**<br>(*$68,451,779.44*) |
| E-Side Committee Professional Fee Claims (all professionals)<br>(*$48,005,807.17*) | **70%**<br>(*$33,604,065.02*) | **30%**<br>(*$14,401,742.15*) |
| Elliott Substantial Contribution Claim<br>(*$30,068,488.73*) | **30%**<br>(*$9,110,546.62*) | **70%**<br>(*$21,047,942.11*) |

Movants contend that the proposed allocations are fair and reasonable based on the evidence to be presented because the allocations accurately reflect the actual and necessary costs and expenses incurred in preserving EFH and EFIH as required by the applicable law.[4]

## I.    APPLICABLE LEGAL STANDARD

1.    To qualify as an administrative expense of a particular debtor, the expense must be an "actual, necessary cost[] and expense[] of *preserving* t[hat] [debtor's] estate." 11 U.S.C. § 503(b)(1)(A) (emphasis added); *In re Trans World Airlines, Inc.*, 145 F.3d 124, 136 (3d Cir. 1998) ("administrative expenses are allowable only for the actual, necessary costs and expenses of preserving the estate." (internal quotations omitted)). Thus, the Material Administrative Expense Claims may be allocated to EFH, EFIH, or both estates only if the expense was an actual, necessary cost of ***preserving*** one or both of those estates, respectively.

---

[3]    In the event that the full amount of the Termination Fee Claim is allowed, Movants understand that the proposed allocations set forth above may render the EFH estate administratively insolvent. Accordingly, in such circumstance, Movants request that the Court's order allocating the Material Administrative Expense Claims further provide that the Material Administrative Expense Claims allocated to EFH be adjusted (to the extent necessary) to provide EFH unsecured creditors with no less than $10 million of distributable value.

[4]    The Allocation Motion assumes that the Material Administrative Expense Claims are allowed in full. Movants do not waive and expressly reserve their right to contest the allowed amount of any administrative expense, including the Material Administrative Expense Claims.

2.      In assessing whether an expense "preserved" an estate, courts look to the date on which the expense was incurred.  *See In re Hechinger Inv. Co. of Del.*, 298 F.3d 219, 225 (3d Cir. 2002) ("Section 503(b)(1)(A) does not give administrative priority to wages, salaries, or commissions due to be paid after the commencement of the case.  It looks to the time when the services were rendered not when they were scheduled for payment" (internal quotation marks and emphasis omitted)); *see also In re Commercial Fin. Servs., Inc.*, 246 F.3d 1291, 1295 (10th Cir. 2001) (to determine administrative priority, courts look to "when the acts giving rise to a liability took place, not when they accrued").

3.      Moreover, Bankruptcy Code section 330 expressly provides that fees of retained professionals must be reasonable and necessary to the administration of the particular debtor's case at the time the services were rendered.  *See* 11 U.S.C. § 330(a)(3)(C) (an award for fees is made for services "beneficial ***at the time at which the service was rendered.***") (emphasis added).  Thus, the fee approval process must be done on a debtor-by-debtor basis.  *See also In re Eagle Creek Subdivision, LLC*, No. 08-04292-8-JRL, 2009 WL 313383, at *3 (Bankr. E.D.N.C. Feb. 5, 2009) ("Section 330(a) of the Bankruptcy Code allows for the payment of professionals' fees that are necessary or beneficial ***to the case in which they are incurred***.  11 U.S.C. § 330(a).  It follows that ***each case must stand on its own*** when determining the allocation of professionals' fees among parallel debtors.") (emphasis added); 3 COLLIER ON BANKRUPTCY § 330.04[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ("Expenses are deemed 'actual' when they are in fact incurred rather than based upon guesswork, formula or pro rata allocation, and when they are obviously ***attributable to a bankruptcy client***.") (emphasis added); *see also Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in Larger Chapter 11 Cases*, 78 Fed. Reg. No 116 (June

17, 2013) (in evaluating professional fee applications, the U.S. Trustee will consider "whether the applicant has prorated shared expenses where appropriate between the estate and other cases and has adequately explained the basis for any such proration").[5]

4.      Substantial contribution claims, however, may be reviewed slightly differently. While substantial contribution fees and expenses must still be reasonable and necessary, the applicant must "show a 'causal connection' between the service and the contribution." *In re Worldwide Direct, Inc.*, 334 B.R. 112, 121–22 (Bankr. D. Del. 2005); *see also Lebron v. Mechen Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) (an applicant should be reimbursed for fees and expenses where its efforts have "foster[ed] and enhance[d] . . . the progress of reorganization"); *Opinion*, dated Aug. 1, 2018 [D.I. 13332] (an applicant's fees and expenses may be reimbursable where they "directly, materially, and demonstrably benefit the creditors generally" (internal quotations omitted)). In making such a determination, it is appropriate for a court to assess the reasonableness of substantial contribution claims with the benefit of hindsight. *See Worldwide Direct*, 334 B.R. at 121.

5.      Therefore, to allocate the Material Administrative Expense Claims properly, this Court must look at the facts and circumstances that existed at the time the service was rendered and determine whether any part of the expense for that service was an actual and necessary expense of preserving or enhancing the EFH, EFIH, or both estates. If more than one of the Debtors' estates was preserved, the Court must allocate the expense among or between those estates to reflect the relative benefits received by each estate. Otherwise, at least one estate is

---

[5]      In *Tropicana*, Judge Carey was called upon to allocate the fees and expenses of retained professionals and other administrative expenses among multiple debtors that were not previously allocated. *See In re Tropicana Entm't., LLC*, No. 08-10856 (KJC), 2014 WL 7450610 (Bankr. D. Del. Dec. 30, 2014). In that case, Judge Carey allocated the administrative expenses determining which estate principally benefited from each expense and rejected an "allocation based solely on the amount of debt . . .[because the allocation] would be inequitable." *Id.* at *6. As set forth below, the Interim Compensation Order set forth a different standard that proved to be unworkable and leads to inequitable results.

paying more than its actual and necessary costs.  While the Court may have some latitude in making the allocation, the allocation must be based on a "principled approach" that reflects the estate or estates that primarily benefitted from the service.  *In re Tropicana Entm't.*, 2014 WL 7450610 at *6; 3 COLLIER ON BANKRUPTCY § 330.04[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ("Expenses are deemed 'actual' when they are in fact incurred rather than based upon guesswork, formula or pro rata allocation, and when they are obviously attributable to a bankruptcy client.").  Movants contend that their proposed allocations reflect a principled approach that accurately reflects which applicable E-Side Debtors' estate primarily benefitted from the Material Administrative Expense Claims.

## II.    ANY LIABILITY WITH RESPECT TO THE TERMINATION FEE CLAIMS SHOULD BE ALLOCATED 50% TO EFH AND 50% TO EFIH

6.    Although this Court has disallowed both the NextEra Termination Fee and NextEra's $60 million administrative claim request, it must still determine the allocation of any such expense (to the extent it becomes allowed) and the existing $275 million reserve.  As the evidence will demonstrate, although both EFH and EFIH were intended to be and would have been the actual beneficiaries of the NextEra transaction, the facts and circumstances surrounding the negotiation of the Termination Fee justify allocating more than 50% of any Termination Fee liability to EFH.  Nonetheless, Movants only request that the potential liability be allocated equally between EFH and EFIH.

## A.    The Termination Fee Was Increased By $165 Million, or 60%, in Exchange for Additional "Gets" Intended to Benefit EFH Creditors

7.    As the evidence will show, the negotiations resulting in NextEra's selection as the "stalking horse bidder" and the granting of the $275 million Termination Fee were primarily, if not entirely, focused on the potential recoveries of EFH unsecured creditors.  The final "gets" from NextEra were (a) negotiated by and in exchange for EFH unsecured creditors withdrawing

their objections to the NextEra transaction and Termination Fee, for which two of the EFH unsecured creditors were found, in part, to have provided a substantial contribution *to EFH*, and (b) intended and expected to actually benefit the EFH unsecured creditors.

8.    Specifically, in June 2016, the E-Side Debtors began merger negotiations with NextEra and one other bidder ("Bidder 2").[6]  By the end of July 2016, four "key points" remained open: (i) the cash purchase price; (ii) the amount of the termination fee; (iii) the requested match right; and (iv) the treatment of potential asbestos liabilities arising out of certain EFH operations.[7]  On July 27, 2016, to improve its bid, NextEra (a) increased its cash purchase price by $200 million, (b) agreed to assume and reinstate all asbestos liabilities of EFH, setting aside $250 million of the cash in escrow to satisfy the potential asbestos liabilities (the "Asbestos Escrow"),[8] and (c) dropped its request for a "match right" with respect to any competing bid.[9]

9.    The Debtors advised NextEra that this was not enough, and the next day, NextEra further increased the cash purchase price by an additional $110 million.[10]  In response to these "gives" by NextEra, the E-Side Debtors gave into NextEra's request to increase the termination fee in the merger agreement from $110 million to $275 million.[11]  These improvements in value, all of which were to inure solely to the benefit of EFH unsecured creditors, were not matched by

---

[6]    *See* Declaration of Paul Keglevic in Support of Confirmation of the Seventh Amended Plan of Reorganization as it Applies to the E-Side Debtors, dated Feb. 10, 2017 (the "Keglevic 2/10/17 Decl.") ¶¶ 16–17.

[7]    *Id.* ¶ 17.

[8]    Any balance remaining in the Asbestos Escrow at the end of its term was to be paid over to charity.  [D.I. 9190-2] § 1.7(c).

[9]    *Id.*

[10]    *Id.*

[11]    *See* Sept. 19, 2016 Hr'g Tr. [D.I. 9606] at 52:9–15; Preliminary Statement of the EFH Plan Administrator Board to the Allocation Motion, dated June 29, 2018 (the "PAB Position Statement") ¶¶ 9–10 ("In summary, during a 48-hour window: (a) the Debtors agreed to an increased Termination Fee, and (b) NextEra agreed to a $300 million increase in its bid price, reinstated asbestos liabilities, and the dropping of a match right.").

Bidder 2.  Consequently, the Debtors selected NextEra as the "stalking horse" bidder,[12] executed the NextEra Merger Agreement, and moved this Court for an order (the "<u>NextEra Merger Motion</u>") approving the NextEra Merger Agreement and the $275 million Termination Fee. [D.I. 9190].

10.    Notwithstanding the additional value resulting from the negotiations in late July 2016, the Debtors still faced opposition to the NextEra Merger Agreement and, specifically, the Termination Fee.  This opposition came solely from the following EFH unsecured creditors: (i) the EFH Trustee;[13] (ii) Contrarian Capital Management, LLC ("<u>Contrarian</u>");[14] (iii) Fidelity Management & Research Company ("<u>Fidelity</u>");[15] and (iv) certain asbestos claimants (the "<u>Asbestos Claimants</u>").[16]  Prior to the hearing on the NextEra Merger Motion (the "<u>NextEra Sale Hearing</u>"), negotiations continued among the Debtors, NextEra, and certain of the EFH objectors.

11.    These negotiations proved largely successful.  As of the commencement of the NextEra Sale Hearing, all objections, other than the Asbestos Claimants' objection, were

---

[12]    *See* Keglevic 2/10/17 Decl. ¶ 17 (noting that Bidder 2's bid was insufficient because, among other things, it "offered no excess value for the EFH unsecured creditors.").

[13]    *EFH Indenture Trustee's Objection to Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9399].

[14]    *Objection and Joinder of Contrarian Capital Management, LLC to Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9402].  Contrarian was a holder of EFH Legacy Notes and was initially a member of the Ad Hoc EFH Claimants.  [D.I. 7031; D.I. 12900].  Contrarian was represented by the same legal counsel currently representing the Ad Hoc EFH Claimants.  [D.I. 9402].

[15]    *Objection of Certain Funds and Accounts Advised or Sub-Advised by Fidelity Management Research Company or Its Affiliates to Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9397] (the "<u>Fidelity Objection</u>").  Fidelity held various EFH LBO Note Claims and EFH Legacy Note Claims, and well as certain EFIH Second Lien Note Claims.  [D.I. 6989-1].  The EFIH Second Lien Note Claims were to be paid in full, however, and the Fidelity Objection raised concerns of Fidelity in its capacity as an EFH creditor.  *See* Fidelity Objection ¶ 32.

[16]    *Objection of Shirley Fenicle, William Fahy, and John H. Jones to Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into Performance Under Plan Support Agreement* [D.I. 9398].

resolved with NextEra agreeing to (a) further increase the cash purchase price by $300 million and (b) reduce the Asbestos Escrow from $250 million to $100 million.[17]

12.    As Debtors' counsel made clear, these agreements by NextEra were expected to benefit EFH and its unsecured creditors.[18] *First*, the $300 million increase in the cash purchase price together with the $150 million reduction of the Asbestos Escrow was expected to "quadrupl[e] the potential recoveries for the EFH creditors." Sept. 19, 2016 Hr'g Tr. [D.I. 9606] at 87:14-21 ("I think it's worth mentioning once again that as a result of the negotiations over the weekend, we have an increase of $450 million in distributable value, quadrupling the potential recoveries for the EFH creditors.").[19] *Second*, because asbestos claims were only asserted against EFH, the reinstatement of such liabilities and their assumption by NextEra (a) eliminated certain unsecured claims at EFH, (b) increased other EFH unsecured creditors' *pro rata* recoveries, and (c) left EFH asbestos creditors unimpaired under the NextEra Plan.[20] *Third*, by

---

[17]    Keglevic 2/10/17 Decl. ¶ 19.  Fidelity, Contrarian, and the EFH Trustee withdrew their objections to the NextEra Merger Agreement, with Fidelity joining a plan support agreement with respect to the NextEra Plan (as defined below).  *See* Sept. 19, 2016 Hr'g Tr. [D.I. 9606] at 14:22–15:3; *Id.* at 29:2–9 ("Nevertheless, in the last two days the Debtors have continued to negotiate with NextEra and have reached agreement on another $300 million increase in the purchase price, bringing the cash purchase price to $4.4 billion. With this increase, and certain accounting adjustments made with respect to the cash purchase price, the Debtors have brokered the support of the EFH indentured trustee, Fidelity and Contrarian."); *see also* Amended and Restated Plan Support Agreement [D.I. 9584].

[18]    Sept. 19, 2016 Hr'g Tr. [D.I. 9606] at 14:18–15:3 ("the result is an additional $450 million of distributable value, a significant increase in recoveries for the EFH Legacy Notes and the TCEH intercompany claim . . . And when I say significant, I mean it virtually quadrupled the recoveries of the EFH unsecured creditors."). The Debtors made this representation because they projected  a 100% recovery to EFIH unsecured creditors, with all additional consideration from the NextEra transaction flowing to EFH creditors.  *See* NextEra Merger Motion ¶ 1 ("the EFH/EFIH Debtors project that, assuming among other things a first quarter 2017 emergence, EFIH secured debt will be repaid in full, EFIH unsecured claims will receive an estimated 100% recovery, and creditors of EFH Corp. will receive a recovery based, in part, on the adjusted estimated cash on hand at EFH Corp., plus anticipated additional cash.").

[19]    *See also* Keglevic 2/10/17 Decl. ¶ 19 ("the additional distributable value nearly quadrupled the recoveries of the EFH unsecured creditors.").  As the evidence will show, these statements rested on the Debtors' position that the EFIH unsecured creditors were unimpaired or would receive 100% on account of their unsecured claims.

[20]    *See* Sept. 19, 2016 Hr'g Tr. [D.I. 9606] at 90:5–8 (NextEra's agreement to assume and reinstate asbestos liabilities means "[a]sbestos liabilities here are going to be paid going forward and they truly are going to be unimpaired").

eliminating the match right, competitive bidding and a higher purchase price became more likely, thus further enhancing potential recoveries for EFH unsecured creditors.[21]

13.    Despite having filed no objection, counsel to the *ad hoc* committee of TCEH first lien creditors (the "Ad Hoc TCEH Committee") rose in support of the NextEra transaction, stating that as the economic beneficiaries of a $700 million TCEH settlement claim against EFH,[22] "[w]e were very pleased with this morning's announcement in terms of the revised deal terms and the economic impact that's going to have ***for EFH unsecured creditors*** . . . ." (emphasis added).[23]   Three members of the Ad Hoc TCEH Committee that supported approval of the NextEra Merger Agreement are members of the Ad Hoc EFH Claimants and continue to hold claims against EFH solely through their share of the TCEH settlement claim.[24]   Neither they nor the Ad Hoc TCEH Committee contested the Termination Fee or the fact that it was unallocated at the time of approval of the NextEra Merger Agreement.

14.    Additionally, after the NextEra Merger Agreement was approved, the EFH Trustee argued that it should be awarded a substantial contribution claim ***against EFH*** based on its role in improving the terms of the NextEra Merger Agreement for EFH unsecured creditors. Specifically, at the NextEra Plan confirmation hearing, the EFH Trustee's counsel argued that although it was initially "preparing to litigate over the merger agreement, and in particular, the

---

[21]    *See* Sept. 19, 2016 Hr'g Tr. [D.I. 9606] at 25:6-13 ("NextEra finally agreed to drop the match right.  This was important to the Debtors because they viewed the match right as a value inhibiting term, particularly in a bankruptcy context.  Debtors believed that potential bidders likely would depress their bids, or not bid to account for the burdens imposed by the match right.  At the same time, the Debtors agreed to increase the termination fee to a market amount, $275 million.").

[22]    Sept. 19, 2016 Hr'g Tr. [D.I. 9606] at 107:6–14.

[23]    *Id.* at 107:14–18.

[24]    *Compare Eighth Supplemental Verified Statement of the Ad Hoc Committee of TCEH First Lien Creditors Pursuant to Bankruptcy Rule 2019* [D.I. 9672] (listing Angelo Gordon & Co., L.P., Apollo Management Holdings L.P., and Brookfield Asset Management as members), *with Verified Amended Statement of Kasowitz Benson Torres LLP and Hogan McDaniel Pursuant to Bankruptcy Rule 2019* [D.I. 13327] (listing Angelo Gordon & Co., L.P., Apollo Management Holdings L.P., and Brookfield Asset Management as members holding TCEH Settlement Claims).

breakup fee contained within that merger agreement," it instead participated in negotiations with NextEra and because of the "leverage [it] created" additional value was offered, including "a purchase price increase of, approximately, $400 million." [25]   The Court granted the EFH Trustee's request for a substantial contribution claim against EFH, even though much of the value was no longer available to the EFH unsecured creditors. [26]

15.    And finally, the Debtors subsequently moved for allowance of a substantial contribution claim on behalf of Fidelity, in large part because of its objection, its efforts to increase NextEra's purchase price, and its willingness to enter into a plan support agreement in favor of the NextEra Plan.  This claim, which was ***solely against EFH***, was approved by the Court in an amount not to exceed $20 million. [27]

**B.    The NextEra Transaction Was Pursued by the E-Side Debtors to Avoid Potential Adverse Tax Consequences for the E-Side Debtors**

16.    Leaving aside the financial benefits and the negotiations, the NextEra transaction also provided ***all of the Debtors*** the benefit of avoiding Tax Armageddon.  In particular, as was made clear at the outset of the Debtors' cases, [28] and at the bid procedures hearings held in

---

[25]    Feb. 16, 2017 Hr'g Tr. [D.I. 10864] at 158:3–160:2.

[26]    Feb. 17, 2017 Hr'g Tr. [D.I. 10865] at 20:13–22:13 (granting the EFH Trustee a substantial contribution claim even after the Third Circuit Decision (as defined herein) made clear that the purchase price increases would not result in additional value to EFH creditors).

[27]    [D.I. 10948; D.I. 11050].

[28]    Paul Keglevic, the Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of EFH, stated in his First Day Declaration that the Debtors "were firmly of the view that the significant litigation and regulatory risk related to triggering massive deconsolidation-related tax liabilities that may be left impaired at EFH Corp. justified a focus on tax-free and tax-efficient transactions."  [D.I. 98] ¶ 163.

August 2015.[29] a tax-free transaction was the Debtors' preferred transaction because it provided the optimal tax structure to preserve value for both EFH and EFIH creditors.[30]

17.    There is ample evidence that the NextEra transaction and NextEra Plan were pursued, at least in part, to further all of the Debtors' long-stated goal of avoiding "Tax Armageddon."  Indeed, this point was made clear at the hearing to confirm the NextEra Plan— *see* Feb. 16, 2017 Hr'g Tr. [D.I. 10864] at 136:20–24 (noting that "we have a tax-free transaction on the E-Side" and "the [NextEra] plan structure avoids" Tax Armageddon)—just as it was at the hearings on the Hunt[31] and Sempra Plans.[32]

## C.    The Ad Hoc EFH Claimants' and EFH Trustee's Arguments to Impose All or Nearly All of the Termination Fee on EFIH are Without Merit

18.    Movants understand that the Ad Hoc EFH Claimants and the EFH Trustee intend to argue that 100% or nearly all of any Termination Fee Claim be allocated to EFIH because EFIH received and was intended to receive nearly all of the cash consideration from the NextEra transaction.  Their argument is legally and factually flawed.  Moreover, the EFH Trustee is taking a position inconsistent with the basis on which its counsel argued, and the Court approved, the EFH Trustee having a substantial contribution claim *solely against EFH*.

19.    *First*, as set forth above, this Court must review the expected benefit from the Termination Fee at the time it was approved and determine whether EFH, EFIH, or both estates

---

[29]    At the hearing to consider the bid procedures, the Court specifically recognized that the Debtors "have made it clear however that they favor their preferred tax plan."  Nov. 3, 2014 Hr'g Tr. [D.I. 2699] at 15:10–12; *see also id.* at 25:15–18 ("In making its ruling the Court is specifically not opining on the merits of the debtors' -- merits of the debtors' proposed course of action nor its preferred tax structure.").

[30]    *See Omnibus Tax Memorandum* filed on October 1, 2014 [D.I. 2296] (the "Tax Memorandum") at 21–22 (noting that, in light of the Tax Armageddon issues, the "proposed path forward" was a tax-free deconsolidation).

[31]    *See* Dec. 2, 2015 Hr'g Tr. [D.I. 7254] at 30–31 (discussing benefits of tax-free transaction).

[32]    *See* Feb. 26, 2018 Hr'g Tr. [D.I. 12770] at 14:1–7 (noting that the Sempra Plan "preserve[s] the tax-free nature of the sale of EFH's indirect economic interests in Oncor" and "avoids Tax Armageddon").

were preserved or enhanced by the Termination Fee.  *See Hechinger Inv.*, 298 F.3d at 225.[33]  As detailed above, the specific "gets" from NextEra were for the benefit of EFH unsecured creditors, and the Debtors' "give" was a $165 million increase in the termination fee.  Thus, the Ad Hoc EFH Claimants' and the EFH Trustee's apparent opposition to EFH paying any portion of the Termination Fee rests on the Court (i) finding that these negotiations were irrelevant, and (ii) relying on hindsight to find that the EFH estate received no benefit because of the Third Circuit's subsequent November 17, 2016 decision on the make-whole premiums (the "<u>Third Circuit Decision</u>").  This Court cannot find that the negotiations were irrelevant, and Section 503(b) requires it to look at the circumstances at the time of the transaction.  Also, even if the Court could rely on hindsight, it cannot be selective.  Viewed as of today, the NextEra transaction and the Termination Fee benefitted *neither* EFH nor EFIH, and there is no basis in the record to conclude that *all* of the closing risk and *all* of the make-whole appeal risk should be imposed on EFIH unsecured creditors.

20.    *Second*, the Ad Hoc EFH Claimants' argument rests on an incorrect view of break-up fees and termination fees and, in essence, collaterally attacks this Court's approval of the Termination Fee.   Movants are not aware of any case law supporting the position that a termination fee or break-up fee must be allocated among debtors in proportion to the cash

---

[33]    In the Reconsideration Motion, Elliott contended that in some circumstances a Court may review whether an administrative expense resulted in an actual benefit using hindsight.  [D.I. 11636] ¶ 52.  While the Court agreed it may do so, the Court did not actually use hindsight in reaching its decision.  *Opinion* [D.I. 11998] at 31 n.87 (stating that the Court was "not judging whether the Termination Fee is payable based on hindsight.  Rather, the point is that *had the facts been properly understood at the time the Court approved the Termination Fee it would not have done so* because the *O'Brien* standard was not satisfied." (emphasis added)).  In any event, hindsight cannot inform the question as to which entity's assets were intended to be preserved at the time of the transaction, and that is the critical fact in determining the allocation of the expense.  Indeed, it was exactly on that basis that the Court granted the EFH Trustee a substantial contribution claim.  The Third Circuit Decision changed who would get the benefit, but it did not, in the Court's mind, undermine the EFH Trustee's efforts to secure $400 million in additional value for the EFH creditors.  *See* Feb. 17, 2017 Hr'g Tr. [D.I. 10865] at 20:13–22:13 (granting the EFH Trustee a substantial contribution claim even after the Third Circuit Decision made clear that the purchase price increases would not result in additional value to EFH creditors).

consideration that each particular debtor's creditors would receive.  Taken to its logical conclusion, that would mean that a court may only approve a break-up or termination fee in connection with a sale by multiple debtors if each particular debtor's allocation of the full break-up or termination fee were not more than a certain percentage of the cash consideration it would actually receive.  This is not the standard, and certainly not what happened here.  Indeed, if that were the standard, the Court could not have approved the Termination Fee without determining the proper allocation at the NextEra Sale Hearing.

21.     As this Court knows, termination and break-up fees are reviewed for reasonableness based on many factors.  These include whether the size of the break-up fee would chill bidding, the extent to which the fee is necessary to induce a bidder to enter into the stalking horse agreement, and the total value expected to be provided to the sellers (including the assumption of liabilities) in connection with the transaction.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *In re WorldSpace, Inc.*, No. 08-12412 PJW, 2010 WL 4739929, at *4 (Bankr. D. Del. June 2, 2010); *In re Integrated Res., Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992).  Using that standard, the Court approved the Termination Fee, finding that it would not chill bidding given the size of the transaction relying on Oncor's total enterprise value, taking into consideration the amount of existing debt issued by Oncor and Oncor's market capitalization.[34]

22.     In sum, the evidence will show that the NextEra transaction was beneficial to ***both*** EFH and EFIH (as well as TCEH).  It will also establish that $165 million, or 60%, of the $275 million Termination Fee was given to NextEra in exchange for financial and other benefits

---

[34]   *See* Sept. 19, 2016 Hr'g Tr. [D.I. 9606] at 66:5-13 (E-Side Debtors' counsel proffering the testimony of Mr. Hiltz and noting that the break-up fee amount was evaluated "as a percent of the total enterprise value"); *Id.* at 121:4–10 (J. Sontchi explaining that "you have to look at [the Termination Fee] approximately from a percentage basis, that's at, I believe, approximately 1.47 percent of TEV as we sit here today based on the most recent changes to the deal.  That's an appropriate number for a case of this size.").

intended to preserve and enhance the recoveries of EFH unsecured creditors. And finally, the evidence will demonstrate that the E-Side Debtors, the Disinterested Directors, and critical EFH creditors, including the EFH Trustee and the Ad Hoc TCEH Committee, supported Court approval of the Termination Fee knowing that (a) the allocation issue was unresolved, (b) an appeal to the Third Circuit with respect to the make-whole premiums was pending, and (c) the Termination Fee might be payable in at least some circumstances when the NextEra transaction did not close.[35] Thus, although Movants contend that this Court could reasonably allocate 60% or more of any liability for the Termination Fee to EFH, Movants only request that any liability be shared by EFH and EFIH equally.

## III.    ANY ALLOWED PROFESSIONAL FEE CLAIMS OF KIRKLAND AND EVERCORE SHOULD BE ALLOCATED 50% TO EFH AND 50% TO EFIH

23.    Kirkland and Evercore allocated approximately 89% and 73% of their requested fees, respectively, to EFIH. These allocations are materially different from all of the other E-Side Debtors' retained professionals.[36] More importantly, these allocations cannot stand based on applicable law, even though they are presented as resting on the methodology set forth in the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals*, dated September 16, 2014 [D.I. 2066] (the "Interim Compensation Order").

24.    Specifically, paragraph 2(b) of the Interim Compensation Order provided:

> Each Professional shall allocate (the "Fee and Expense Allocation") any fees and expenses sought in connection with each Monthly Fee Statement

---

[35]    Sept. 19, 2016 Hr'g Tr. [D.I. 9606] at 87:6–12 ("The Debtors are not, however, seeking to allocate that $275 million amongst the two estates, and this is very important to certain of the resolutions that I announced earlier today. Any allocation of the $275 million by and among EFIH on one hand and EFH on the other is an issue reserved for a day if it ever becomes relevant or it ever becomes a real issue."); Sept. 19, 2017 Hr'g Tr. [D.I. 11921] at 22:1–14 (Debtors' counsel noting that agreeing to the Termination Fee "was a calculated risk worth taking" based on, among other things, the expectation of "substantial recoveries at the EFH box" and that "everyone went into this with their eyes wide open").

[36]    Kirkland allocated approximately 90% of its Direct Benefit Fees to EFIH and approximately 10% to EFH whereas, Richards Layton & Finger, the Debtors' Delaware counsel, allocated only approximately 35% of its Direct Benefit Fees to EFIH and approximately 65% to EFH. [D.I. 13016-3].

to the applicable Debtors for whose benefit such fees and expenses were incurred (the "Direct Benefit Fees"). To the extent a Professional incurs fees or expenses for the collective benefit of [EFH], [EFIH], and [TCEH] (the "Collective Benefit Fees"), such fees and expenses shall be allocated to each Debtor in the same proportion that the amount of Direct Benefit Fees incurred by such Professional for such Debtor bears to the total amount of Direct Benefit Fees incurred by such Professional for all of the Debtors.[37]

[D.I. 2066] ¶ 2(b).[38]

25.    As the evidence will show, neither Kirkland nor Evercore timekeepers used a consistent standard for categorizing services as "Direct Benefit Fees." More importantly, even if they had, this Court may not properly conclude that by using the formulaic approach dictated by paragraph 2(b) (*i.e.*, the Direct Benefit Fee Ratio), it can find that the resulting allocation of their respective "Collective Benefit Fees" constitutes the actual and necessary expenses of preserving the respective EFH and EFIH estates, as required by Bankruptcy Code sections 330 and 503(b). 11 U.S.C. §§ 330 and 503(b); *see also* 3 Collier on Bankruptcy § 330.04[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ("Expenses are deemed 'actual' when they are in fact incurred rather than based upon guesswork, formula or pro rata allocation, and when they are obviously ***attributable to a bankruptcy client.***") (emphasis added).

---

[37]    The proportion that the amount of Direct Benefit Fees incurred by a Professional for a Debtor in a particular month bears to the total amount of Direct Benefit Fees incurred by such Professional for all of the Debtors during such month is referred to herein as the "Direct Benefit Fee Ratio."

[38]    The Interim Compensation Order expressly provided that each professional's allocation of fees and expenses was "subject to later challenge and disgorgement until final allowance by the Court." [D.I. 2066] ¶ 4 ("All fees and expenses paid to Professionals under the Compensation Procedures (***including, for the avoidance of doubt, the allocation of such fees and expenses among the Debtors***) are subject to challenge and disgorgement until final allowance by the Court." (emphasis added)). Accordingly, under both the express terms of the Interim Compensation Order as well as applicable law requiring this Court's approval of final fee applications (Fed. R. Bankr. P. 2016), this Court retained full authority to allocate or reallocate professional fees until such fees and allocation were finally allowed, as acknowledged by Evercore and Kirkland. *See, e.g.*, Evercore's Eighteenth Monthly Application for Compensation for the Period from August 1, 2015 to August 21, 2015 [D.I. 6734] ¶¶ 3 & 4 (stating that Evercore's proposed allocations are "tentative" and that "reallocation may be required."); Kirkland's Twelfth Interim Fee Application for the Period from January 1, 2018 to March 8, 2018 [D.I. 12961] ¶ 27 (stating that its allocation is "proposed"); Deposition Transcript of Chad Husnick, dated Aug. 10, 2018 ("Husnick Dep. Tr.") at 21:8–19 ("folks requested that there be a reservation of rights in the interim compensation order that allowed people to revisit how allocations shook out at any particular time").

**A.     The Allocation of Collective Benefit Fees Based on the Direct Benefit Fee Ratio as Required by the Interim Compensation Order is Legally Flawed**

26.     Under applicable law, if a professional fee is reimbursable by a particular debtor, there must be a showing that the professional fee was an actual and necessary expense to preserve or enhance that debtor's estate.  *See* 11 U.S.C. § 330(a).  Importantly, even assuming professionals properly recorded and billed time as Direct Benefit Fees when working on matters solely for the benefit of a particular Debtor, there is no logical or legal basis on which this Court may find that using the monthly Direct Benefit Fee Ratio to fix the allocation of Collective Benefit Fees (which, by definition, benefited more than one Debtor) will result in an allocation that reflects the actual and necessary expenses of EFH and EFIH.  Indeed, as Kirkland readily admits, in certain situations this allocation methodology "did not work as applied."[39]

27.     For example, in any given month, Kirkland could incur $0 in EFH Direct Benefit Fees, $50,000 in EFIH Direct Benefit Fees, and $2,000,000 in Collective Benefit Fees.  In this example, EFIH would be charged 100% of the Collective Benefit Fees, even though these fees are, by definition, actual and necessary to preserving *both* EFH and EFIH.

28.     The above example is not hypothetical.  In February 2016, Kirkland timekeepers entered no time categorized as EFH Direct Benefit Fees, $56,243.10 as EFIH Direct Benefit Fees, and $470,381.93 as E-Side Debtor Collective Benefit Fees.[40]  Applying the Interim Compensation Order's allocation formula, Kirkland allocated 100% of those Collective Benefit Fees to EFIH.[41]  Thus, even assuming that professional fees were properly categorized as either

---

[39]   *Limited Preliminary Statement of Kirkland & Ellis LLP as Debtors' Counsel in Response to the Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13255] (the "Kirkland Position Statement") ¶ 7 (acknowledging that in any month where there were limited Direct Benefit Fees for a particular Debtor, "the methodology set forth [in the Interim Compensation Order] did not work as applied").

[40]   [D.I. 8149] ¶ 2.

[41]   *Id.*

16

"Direct Benefit Fees" or "Collective Benefit Fees," the Interim Compensation Order's formulaic methodology to allocating Collective Benefit Fees is logically and legally flawed.

**B.      The Classification of Fees as "Direct Benefit Fees" or "Collective Benefit Fees" and the Application of that Distinction Overlooks the Critical Fact that EFIH Unsecured Creditors Were Projected to Receive 100% Recoveries for Much of the Cases**

29.      As Movants will show, from the Petition Date through the date of the Third Circuit Decision, EFIH creditors were projected to receive a 100% recovery on their unsecured claims.  For this reason, potential recoveries for the EFH estate were the primary, if not the sole, focus of the E-Side Debtors' Board and management, and even the EFIH Disinterested Director, given their fiduciary obligations.[42]  And regardless of whether the professionals were technically working "directly" for EFH or EFIH:  (i) every dollar spent at EFH was a dollar deduction from the EFH cash available to EFH unsecured creditors, and (ii) every earned or saved dollar by EFIH was a dollar increase in the residual value of EFIH that was also expected to be distributed to EFH for its unsecured creditors.  For this reason, "the applicable Debtor for whose benefit such fees and expenses were incurred" before the Third Circuit Decision was primarily, if not solely, EFH, which means that all "Direct Benefit Fees" could be attributed to EFH.  While Movants do not make that request, a review of certain fees classified as EFIH Direct Benefit Fees illustrates why solvency is important and reallocation is appropriate.

30.      Fees associated with the make-whole claims are just one example.  Prior to the Third Circuit Decision, the Debtors incurred significant fees litigating various make-whole claims by holders of secured debt at EFIH and TCEH.  On the E-Side, all or nearly all of these fees were incurred prior to November 2016, and all or nearly all of the fees were placed in EFIH

---

[42]    Deposition Transcript of Charles Cremens, dated Aug. 3, 2018 ("Cremens Dep. Tr.") at 65:10–15 ("Again, it wasn't something that was from my perspective a material issue relative to all of the other strategic things going on for a substantial part of the case because there was an optimism that we were going to have a full payout for EFIH creditors.").

Direct Benefit Fee matter codes.[43]  Thus, EFH has not been required to pay any percentage of these fees, notwithstanding the fact that EFH would have received all or nearly all of the benefits from this Court's make-whole ruling.[44]  At the very least, those fees should have been classified as "Collective Benefit Fees" because they were incurred for the benefit of EFH (increasing its residual interest in EFIH) and EFH unsecured creditors.  That change in classification would have reduced not only EFIH's Direct Benefit Fee liability, but also EFIH's share of the Collective Benefit Fees (assuming the mechanical approach of paragraph 2(b) was followed).

C.    **A Cursory Review of the Direct Benefit Fees and the Collective Benefits Fees Requested by Kirkland Supports Reallocating Allowed Fees Equally Between EFH and EFIH**

31.    Kirkland characterized approximately $19.5 million of its fees and expenses as Direct Benefit Fees for either EFH or EFIH.  *See* [D.I. 13019] ¶ 28.  Of this amount, Kirkland allocated approximately $17.6 million, or approximately 90% of all Direct Benefit Fees, to EFIH, with the remaining 10% of Direct Benefit Fees allocated to EFH.  [D.I. 13019] ¶ 24.  While not intentionally seeking to overburden the EFIH, a cursory review of Kirkland's final fee application reveals that numerous timekeepers placed time in EFIH "Direct Benefit Fees" matter categories for services that were undeniably in part attributable and beneficial to EFH, regardless of whether EFIH was solvent.  For example, although EFIH never filed a separate plan and disclosure statement, timekeepers billed over $4 million in fees to the EFIH Direct Benefit Fee

---

[43]    [D.I. 13019], Ex. G & ¶¶ 91–93 ([EFIH] Contested Matters and Adversary Proceedings (Matter No. 68)—Total EFIH Fee Request is $9,297,535.00; [EFIH] Cash Collateral/DIP Financing/Make-whole Issues (Matter No. 66)—Total EFIH Fee Request is $4,531,286.00).

[44]    The Debtors' and their professionals' efforts in contesting the make-whole claims and seeking disallowance was for the benefit of EFH creditors because they were fighting to preserve and maximize EFH creditor recoveries. Indeed, in the PAB Position Statement, the PAB admits that "if the Makewhole Claims were disallowed by Final Order, the incremental value from an increased purchase price would flow to EFH creditors."  PAB Position Statement ¶ 12; *see also id.* ¶ 20 ("under the consummated Sempra Plan—all else being equal—the disallowance of the Makewhole Claims would have inured benefit to EFH.").

Plan/Disclosure Statement category (Matter No. 76) and $0 to the same matter category for EFH.[45]

32.    Kirkland's final fee application also reflects approximately $84.2 million in E-Side Collective Benefit Fees.[46]  Kirkland timekeepers were directed to enter time in a "Collective Benefit Fee" task code when the primary Debtor beneficiary was "not discernable or clear."[47] Notwithstanding the inability of a timekeeper to identify which E-Side Debtor benefitted more from the services, from the Petition Date through October 2016, application of the formulaic methodology set forth in paragraph 2(b) resulted in EFIH bearing approximately 88%, or approximately $50.1 million, of Kirkland's E-Side Debtor Collective Benefit Fees.  After October 2016, when Kirkland unilaterally changed its allocation methodology,[48] EFIH was burdened with 90%, or approximately $24.1 million, of Kirkland's E-Side Collective Benefit Fees.[49]

33.    Again, a cursory review of Kirkland's final fee application shows that this allocation of Kirkland's Collective Benefit Fees does not reflect a proper allocation of the actual and necessary expenses of preserving the EFH and EFIH estates.  For example, approximately 88% of the following Collective Benefit Fee matter categories were charged to EFIH: (i) Plan and Disclosure Statements (Matter No. 21) in the approximate amount of $35.2 million; (ii) Tax Issues (Matter No. 29) in the approximate amount of $12.7 million; (iii) Contested Matters & Adversary Proceedings (Matter No. 9) in the approximate amount of $45 million (including time spent addressing asbestos and Termination Fee issues); (iv) Retiree & Empl. Issues/OPEB

---

[45]    [D.I. 13019], Ex. G

[46]    *Id.* ¶ 28.

[47]    Husnick Dep. Tr. 50:19–51:3.

[48]    Kirkland Position Statement ¶ 4.

[49]    A substantial percentage of these fees were incurred contesting actions taken by EFIH's largest creditor Elliott, UMB, and other significant EFIH creditors.

(Matter No. 26) in the approximate amount of $4.9 million (even though EFIH had few, if any, employees), and (v) Claims Administration & Objections (Matter No. 8) in the approximate amount of $3.9 million (including time spent addressing asbestos claims against EFH).[50]  But this Court cannot properly find that the actual and necessary cost and expense to EFH for these matter categories was only approximately 12%, as application of the Direct Benefit Fee Ratio would require.

**D.      Kirkland's Fees Must Be Reallocated Because the Timekeeper Directive Resulted in EFIH Paying a Significant Portion of the Actual and Necessary Costs of Preserving the EFH Estate**

34.      As explained above, EFIH has been asked to shoulder too much of  Kirkland's fees and expenses.  In that respect, the Movants do not contend that those fees were not reasonable or that this result was intentional.  It was, however, the result of a timekeeping directive that resulted in too much subjective judgment and an improper formulaic approach to the Collective Benefit Fees.

35.      Specifically, as is standard and appropriate, after the commencement of these chapter 11 cases, Kirkland provided a directive to timekeepers for keeping time (the "Timekeeping Directive").[51]  That Timekeeping Directive stated that a Direct Benefit Fee was one that "principally" benefitted one particular Debtor, which Kirkland interpreted as meaning one particular Debtor was the "primary" beneficiary of the service.[52]  As the evidence will establish, timekeepers allocated their fees quite differently and inconsistently. [53]    More

---

[50]    *See* [D.I. 13019], Ex. G.

[51]    ELX 11.

[52]    Husnick Dep. Tr. 43:21–44:5.

[53]    For example, on 9/16/16, one Kirkland timekeeper—referred to herein as "KE1"—billed 2.6 hours spent preparing an exhibit list for the NextEra Merger Agreement hearing to the "[All] Contested Matters & Adv. Proceeding" task code (*see* [10840-10]), whereas on 9/1/16, another Kirkland timekeeper—referred to herein as "KE2"—billed 2.1 hours spent reviewing and analyzing objections to the motion to approve the NextEra

importantly, the Timekeeping Directive for "Direct Benefit Fees" undermines the application of the formulaic methodology set forth in paragraph 2(b) to calculate a proper allocation of Collective Benefit Fees.

36.    "Principally" means "for the most part" or "mainly."[54]  It is different from "solely" which means "not involving anyone or anything else" or "only."[55]  Consequently, Kirkland's timekeepers were instructed to categorize a service that "for the most part" or "mainly" benefitted a particular Debtor as a Direct Benefit Fee.  That Debtor would, however, then bear 100% of the expense for the service, even though another Debtor would have actually received some benefit, which benefit might be significant.  Thus, given this Timekeeping Directive and assuming it was rigorously applied by all Kirkland timekeepers, the Direct Benefit Fees attributable to either EFH or EFIH do not reflect the actual and necessary expenses of those respective Debtors.

37.    Small changes to Direct Benefit Fees, moreover, have big consequences.  Even though Kirkland's Direct Benefit Fees only totaled approximately $19.5 million, around 90% of those Direct Benefit Fees were allocated to EFIH, which means it is highly likely that EFH was a significant "free rider."  Critically, this problem is literally multiplied because of the formulaic application of paragraph 2(b) and the allocation it requires with respect to "Collective Benefit Fees."

---

Merger Agreement and drafting a reply to the same to the "[EFIH] Plan/Disclosure Statement" task code (*Id.*), notwithstanding that the objections to the NextEra Merger Agreement were filed by EFH creditors.  As another example, on 9/29/16, a third Kirkland timekeeper—referred to herein as "KE3"—billed 4.6 hours spent addressing plan confirmation discovery issues to the "[EFIH] Plan/Disclosure Statement" task code (*Id.*), whereas on 10/3/16, KE3 billed 6.7 hours spent addressing plan confirmation discovery issues to the "[All E-Side] Plan/Disclosure Statement" task code (*Id.*).

[54]    *See* Oxford English Dictionary, *available at* https://en.oxforddictionaries.com.

[55]    *Id.*

38.    If "Direct Benefit Fees" were "principally," "primarily," or "mostly" for benefit of a particular Debtor, then "Collective Benefit Fees" were fees that were not "mainly" or "for the most part" for the benefit of either EFH or EFIH.  Essentially acknowledging this, Kirkland believed that time entries were to be billed to "Collective Benefit Fee" tasks when the services were provided to multiple Debtor beneficiaries and the primary beneficiary "was not discernable or clear."[56]  In that circumstance, there is no reason to allocate the fee for the service other than equally between or among the relevant Debtors' estates.    Paragraph 2(b) of the Interim Compensation Order, however, required otherwise; it required Collective Benefit Fees to be allocated based on the ratio of the particular Debtor's Direct Benefit Fees to the total Direct Benefit Fees for all Debtors (*i.e.*, the Direct Benefit Fee Ratio).  *See* Interim Compensation Order ¶ 2(b).  Thus, instead of Kirkland's Collective Benefit Fees being allocated equally between EFH and EFIH, they were allocated between 88% and 90% to EFIH even though there is no basis to find that either percentage of the Collective Benefit Fees reflected the actual and necessary expenses of preserving the EFIH estate.

39.    One of the clearest examples of this problem is the timekeepers' recording of time related to Asbestos matters.  Kirkland billed approximately $2.75 million in asbestos-related time as Collective Benefit Fees.[57]  As the Court well knows, all allowed asbestos claims would have been claims against EFH Debtors.  Had timekeepers followed the Timekeeping Directive and entered these time entries to the applicable Debtor that "primarily" benefitted from the services, the time would constitute EFH Direct Benefit Fees.  Using the Direct Benefit Fee Ratio, that relatively small reallocation of $2.75 million of Collective Benefit Fees to EFH's Direct Benefit

---

[56]    Husnick Dep. Tr. 50:19–51:3.

[57]    This figure includes only time-entries specifically using the words "asbestos," "Fenicle," or "Kazan."  To the extent asbestos-related work was performed with timekeepers not utilizing such words but, rather, using more vague terminology (*e.g.*, "bar date motion" or "bar date order"), such figure would be even higher.

Fees would, by itself, result in EFIH's total share of the Collective Benefit Fees being decreased from approximately $74 million to approximately to $54 million, and EFH's allocation of the Collective Benefit Fees increasing from approximately $9.8 million to approximately $33 million.  This change alone would mean that EFH owes the EFIH estate a total of approximately $20 million for excess fees paid.

**E.    Kirkland's Fees Must Also Be Reallocated Because the Revised Allocation Methodology Used After October 2016 Was Not Court Approved and Is Flawed**

40.    Recognizing the flaws in the Interim Compensation Order's allocation methodology, Kirkland admits to having abandoned that methodology in October 2016.  *See* Kirkland Position Statement ¶ 8 [D.I. 13255].   At that time, Kirkland simply commenced allocating 90% of all Collective Benefit Fees to EFIH and 10% to EFH based on the total debt of each Debtor as of the Petition Date.  *Id.*  This change was not proper and cannot be used as a basis for approving Kirkland's allocation of fees after October 2016 for two simple reasons.

41.    *First*, Kirkland did not obtain Court approval to employ this alternative method for allocating professional fees. The first notice it provided regarding this change was in its final fee application,[58] and no other professional used this methodology.

42.    *Second*, this method for allocating professional fees was expressly rejected by Judge Carey in *Tropicana.* As Judge Carey explained in that case:

> [T]he LandCo Debtor's proposed 90/10 allocation fails to consider that the Debtors, part of an extensive and intertwined corporate family, were managed and operated as a single enterprise for a large part of the bankruptcy case. Chapter 11 debtors and their professionals must undertake many time-consuming and expensive tasks, regardless of the size of the estate or the number of creditors. ***An allocation based solely on the amount of debt or number of casino properties would be inequitable***.

---

[58]    [D.I. 13019] ¶ 33.

No. 08-10856 (KJC), 2014 WL 7450610, *6 (Bankr. D. Del. Dec. 30, 2014) (emphasis added); *see also In re Kroh Bros. Dev. Co.*, 105 B.R. 515, 524 (Bankr. W.D. Mo. 1989) (rejecting allocation based upon total indebtedness of different obligors, noting that "[t]he court does not condone this type of allocation of fees and expenses because it makes the court's determination of reasonableness and necessity impossible").

**F.    Evercore's Fees and Expenses Should Be Allocated Equally Between EFH and EFIH**

43.    In its final fee application, Evercore allocated $9,994,743.15 or approximately 27% in fees and expenses to EFH and $26,678,785.86 or approximately 73% in fees and expenses to EFIH.  This allocation was based on Evercore timekeepers categorizing their time as they believed it was attributable to EFH or EFIH during a particular month.  [D.I. 13140] ¶ 12(f). Evercore does not provide any additional explanation or support for the proposed allocation, but adds in each of its monthly fee applications that the proposed allocations are "tentative" and that "reallocation may be required."  *See*, *e.g.*, [D.I. 6734] ¶¶ 3 & 4.  A review of Evercore's fee applications reveals that reallocation is indeed required.

44.    *First*, Evercore admittedly sent no communication to its timekeepers explaining how to distinguish between "Direct Benefit Fees" and "Collective Benefits Fees,"[59] thereby leaving it to the subjective judgment of each Evercore timekeeper—25 in total.  That judgment led to different classifications for different timekeepers.[60]  And critically, while Evercore's representative agreed that the proper interpretation of "Direct Benefit Fees" would be those fees

---

[59]    Matican Dep. Tr. at 53:18–25.

[60]    [D.I. 10323-2] (*compare* two Evercore timekeepers—referred to herein as "EV1" and "EV2"—listing all "valuation" time entries under "EFIH" *with* two other Evercore timekeepers—referred to herein as "EV3" and "EV4"—listing all "valuation" time entries under "All" Debtors).

for services that were "solely" for the benefit of a particular Debtor,[61] Evercore's timekeepers did not actually apply that standard[62] and, thus, their personal allocation of Direct Benefit Fees and Collective Benefit Fees is flawed and of little or no legal relevance to this Court's determination as to whether the fees were actual and necessary to preserve the EFH, EFIH, or both estates.

45.    *Second*, a review of Evercore's time entries also reveals numerous instances of improperly allocated time. For example, in Evercore's Seventh Interim Fee Application for the period of May 1, 2016 through August 31, 2016, two individual time keepers—EV1 and EV2—recorded more than 97% of their total hours (133.5 hours out of 137.5 hours) as Direct Benefit Fees to EFIH. This was improper, as these EFIH-allocated hours included numerous entries such as "EFH Asbestos Call," "EFH Tax Call," "EFH Valuation Discussion," "Tax Discussion," and "Valuation Discussion," none of which could reasonably be interpreted to be solely, or even primarily, to preserve the EFIH estate.[63] This is especially true given the time period in which the entries were made—when EFIH creditors were projected to receive full payment of their unsecured claims.[64]

46.    Moreover, it is plain that no single standard was uniformly applied by the Evercore timekeepers. For example, other Evercore timekeepers categorized valuation-related time entries during the same period as Collective Benefit Fees.[65] Additional examples of time improperly allocated *solely* to EFIH as Direct Benefit Fees contained in a single Evercore interim fee application include entries for (i) "EFIH/EFH analysis," (ii) "Analysis for EFH/EFIH

---

[61]    Deposition Transcript of Jeremy Matican, dated Aug. 9, 2018 ("Matican Dep. Tr.") at 23:7–11 (noting that a Direct Benefit Fee was one that was "solely" for the benefit of a particular debtor).

[62]    *See*, *e.g.*, [D.I. 10323-2] (billing "Asbestos," "Tax," and "Valuation" services as EFIH Direct Benefit Fees).

[63]    [D.I. 10323-2].

[64]    *See*, *e.g.*, NextEra Merger Motion ¶ 1 ("the EFH/EFIH Debtors project that, assuming among other things a first quarter 2017 emergence . . . EFIH unsecured claims will receive an estimated 100% recovery.").

[65]    [D.I. 10323-2] (*e.g.*, EV3 and EV4 listing all "valuation" time entries under "All" Debtors).

contingencies," (iii) "Call with K&E/A&M/EVR re: requests from EFIH and EFH unsecured indenture trustees," (iv) "Listened to UMB and AST calls," (v) "Call with advisors to EFH and EFIH Unsecured trustee," and (vi) "Call with Company and K&E tax re. alternate EFH/EFIH structures."[66]

47.    Misallocations such as these greatly skewed Evercore's allocation of not only monthly fees, but also the $22.2 million E-Side Restructuring Fee and $9 million Sale Fee which were allocated based on the Direct Benefit Fee Ratio.

48.    *Third*, approximately 85% of Evercore's total hours were prior to September 1, 2016, when EFIH unsecured creditors were projected to be paid in full even in a hypothetical liquidation scenario.  As the Debtors' investment banker, the majority of Evercore's time during this period was spent on general restructuring transactions, valuations and analyses, plans of reorganization, and general litigation assistance.  For example, (a) 13.4% of Evercore's time was spent on Asset Sales and Other M&A Activity, (b) 17.5% of its time was spent on Valuation and Recoveries Analysis, (c) 11.4% of its time was spent on General Financial Analysis and Research, (d) 8.3% of its time was spent on Plans of Reorganization, and (e) 14.6% of its time was spent on Court Testimony and Litigation Support.  [D.I. 13140].  Most of Evercore's remaining time was spent on general case activities, such as General Case Administration, Due Diligence, Travel, Retention Application, and Fee Application matters.  *Id.* Yet, Evercore allocated approximately 73% of this time to EFIH, even though the efforts were arguably primarily for the benefit of EFH.

49.    Evercore's proposed allocation of its fixed transaction fees is also arbitrary and fails to reflect the actual and necessary expenses of EFH and EFIH.  One fee—an $11 million

---

[66]    *See* Evercore First Interim Fee Application for the Period of April 29, 2014 to August 31, 2014 [D.I. 2700].

DIP Financing Fee—was improperly allocated entirely between TCEH and EFIH, notwithstanding that Evercore agrees that such fee also benefitted EFH's estate.[67]  In addition, the Restructuring Fee and Sale Fee were triggered upon consummation of the Sempra Plan, and then allocated 76% and 70%, respectively, to EFIH based on Evercore's total hours for each estate.  This methodology ignores the following facts: (a) Evercore never prepared any separate materials for an EFIH-only transaction; (b) both EFH and EFIH benefitted at least equally from any restructuring transaction; (c) EFIH creditors were expected to be paid in full for much of the cases; and (d) TCEH benefitted from hours spent on the NextEra and Sempra transactions because such transactions were designed to be non-taxable in part to preserve the non-taxable nature of the TCEH transaction.

50.    Therefore, given the time periods involved, Evercore's services provided a greater benefit to EFH but, at a minimum, benefitted both E-Side estates and the T-Side estates equally. Accordingly, a 50/50 allocation of Evercore's E-Side fees and expenses as between EFH and EFIH is reasonable and appropriate.

## IV.    THE E-SIDE COMMITTEE PROFESSIONAL FEE CLAIMS SHOULD BE ALLOCATED 70% TO EFH AND 30% TO EFIH

51.    The E-Side Committee's professionals did not use the allocation methodology set forth in paragraph 2(b) of the Interim Compensation Order because they did not believe they provided a direct benefit to any Debtor.[68]  Instead, three of the four E-Side Committee

---

[67]    *See* Matican Dep. Tr. at 68:3–69:7 (acknowledging that the DIP facilities benefitted EFH by providing it time to pursue an M&A transaction, and that "[t]he DIP facilities assisted in financing the case, and the case encompassed all three estates.").

[68]    *See, e.g.*, [D.I. 11926] (Sullivan stating that "the fees and expenses of S&C have been incurred for the benefit of the EFH Committee and not for the direct benefit of any Debtor. Accordingly, no allocation of such fees and expenses is proposed at this time by S&C."); [D.I. 12502] (Montgomery stating that "the fees and expenses of MMWR are for the benefit of the EFH Committee and not for the direct benefit of any Debtor and, accordingly, no allocation is proposed at this time by MMWR"); [D.I. 11034] (AlixPartners stating that "[t]he fees of AlixPartners are for the benefit of the EFH Committee and not the direct benefit of any Debtor and, accordingly, no allocation is proposed at this time by AlixPartners").

professionals left it to the Debtors to allocate,[69] and the remaining E-Side Committee professional, Guggenheim, "proposed" a 50/50 allocation without any explanation or back-up and expressly recognized that a reallocation may be required.[70]

52.    As the evidence will demonstrate, most of the E-Side Committee's professionals' efforts were focused on preserving and enhancing EFH for the benefit of its unsecured creditors. Moreover, the vast majority of the Committee professionals' fees, $38 million or approximately 86%, were incurred when EFIH was projected to be solvent.[71]  Additionally, a substantial portion of those fees and expenses were actually incurred before the end of November 2015 when the Court approved a settlement between the Debtors and the E-Side Committee, which required the E-Side Committee to minimize its involvement in these cases.[72]

A.    **Sullivan Professional Fees and Expenses**

53.    Sullivan, the E-Side's Committee's lead bankruptcy counsel, incurred fees and expenses totaling $24,469,360.91 during these cases.  Approximately 89%, or approximately $22 million, of Sullivan's total fee request was incurred on or prior to the Court approving the settlement at the end of November 2015, and approximately 95%, or approximately $23.4 million, of Sullivan's fees and expenses were incurred prior to October 31, 2016, 17 days before the Third Circuit Decision.

---

[69]   Arguably this was a conflict matter that should have been addressed by the Disinterested Directors, but none of the Disinterested Directors ever reviewed fee applications to determine whether professional fees were being allocated properly.  *See*, *e.g.*, Cremens Dep. Tr. at 59:9–13 ("Q: I believe you testified that you were not reviewing the fee applications as they were submitted throughout the case.  Is that fair to say? A: That's correct.").

[70]   [D.I. 12644] (Guggenheim proposing a 50/50 allocation while noting that "[t]o the extent necessary, reallocation of the fees and expenses set forth above will occur in interim and/or final fee applications.").

[71]   These figures do not include Guggenheim's transaction fee.

[72]   [D.I. 7143-1] at § 6(b) (E-Side Committee agreed to "use reasonable efforts to minimize its participation in the Chapter 11 Cases").

54.     As the Court undoubtedly recalls, the E-Side Committee was formed after the EFH Trustee sought appointment of an EFH-only Committee,[73] and when it was appointed it consisted primarily of holders of EFH unsecured claims.[74]  Thus, it should not be surprising that the E-Side Committee opposed a proposed settlement among TCEH, EFH, and EFIH (the "TCEH Settlement") that provided TCEH with a $700 million allowed claim against EFH.

55.     The E-Side Committee's opposition involved taking extensive discovery and filing a 132-page trial brief on October 23, 2015 (the "Trial Brief") in which the E-Side Committee argued, among other things, that (a) the EFH estate was unjustifiably releasing valuable claims against third parties, including against TCEH, EFH's directors and officers, and EFH's equity holders, and (b) TCEH should not be given an allowed intercompany claim in the amount of $700 million against the EFH estate.  [D.I. 6627].

56.     The TCEH Settlement was the subject of a multi-week trial in November 2015. Ultimately, the E-Side Committee agreed to support the TCEH Settlement after negotiating a separate settlement agreement, approved in November 2015 (the "EFH Beneficiary Settlement"). Pursuant to the EFH Beneficiary Settlement (a) TCEH agreed to segregate, hold in trust, assign, and turn over to holders of Beneficiary Claims (as defined in the EFH Beneficiary Settlement) against EFH any recovery received by TCEH on account of the TCEH Settlement Claim up to an amount not to exceed $37.8 million in the aggregate and (b) the Debtors agreed to amend their proposed restructuring plan to provide for a reinstatement of all asbestos claims against EFH. [D.I. 7143].  Because of the EFH Beneficiary Settlement, holders of EFH Beneficiary Claims were expected to receive a 100% recovery under an EFH plan of reorganization.  *Id.*

---

[73]     *See* [D.I. 1676].
[74]     *See* [D.I. 3313].

57.    In its final fee application, Sullivan recorded time on these matters primarily to the "Plan and Disclosure Statement" project category, which accounts for approximately 50% of Sullivan's total fee request.   As to that matter, Sullivan explains "*[i]mmense resources* were devoted to preparing and filing the EFH Committee's trial brief and omnibus objection to the settlement motion and confirmation of the plan, along with the necessary trial documents and witness testimony."  [D.I. 13002] ¶ 38 (emphasis added).  Critically, the E-Side Committee made clear in its Trial Brief that the intended beneficiary of these services were the EFH unsecured creditors, stating:

> [T]he EFH Committee takes as a premise that all EFIH creditors will be paid in full in priority to EFH creditors. Accordingly, this Objection is concerned only with value to the E-side Debtors collectively, measured by return to EFH unsecured creditors as the likely fulcrum class in the circumstances when the settlement would be relevant.

[D.I. 6627] at 34 n.4.  Sullivan incurred $9,607,132.82—more than 40% of its total fees and expenses for the entirety of these cases—while this particular matter was being litigated.  [D.I. 13002] at 2.

58.    A consideration of the above and a review of Sullivan's other efforts support allocating 70% of its fees to EFH.  For example, EFH benefitted at least equally, if not more, from:

- approximately $1,829,000 in fees to "Tax" matters;[75]
- approximately $1,619,000 in fees to "Asset Disposition" matters;[76]

---

[75]    *Id.* ¶ 44 (describing "Tax" task code as including "assistance . . . in understanding the significant tax issues involved in these chapter 11 cases" and "review[], comment[] and discuss[ion] with the Debtors many tax-related motions and the revised tax matters agreement" and in participating in the "Vistra tax dispute," which directly implicated EFH tax attributes).

[76]    *Id.* ¶ 18 (describing "Asset Disposition" task code as including "matters relating to the Debtors' various processes for the disposition of the EFH Debtors' ownership interest in Oncor," including "the auction process, the proposed transaction with Hunt, the proposed transaction with NextEra, the proposed transaction with Berkshire Hathaway and the ultimate transaction with Sempra").

- approximately $939,000 in fees to "Intercompany Claims" matters, which primarily involved the TCEH Settlement Claim;[77]

- approximately $822,000 in fees to "Claims Administration and Objections" matters, and Sullivan concedes that "[a] substantial portion of time spent in this category includes asbestos matters;"[78]

- approximately $240,000 in fees to "Claims Investigations" matters, which includes "diligence and legal research regarding potential claims relating to the Debtors' 2007 leveraged buyout;"[79] and

- approximately $195,000 in fees to "Employee Benefits and Pensions" matters, even though EFIH had no employees or pension obligations.

See [D.I. 13002 at 6].

## B.    Montgomery Professional Fees and Expenses

59.    Montgomery, the E-Side Committee's Delaware and conflicts counsel, incurred fees and expenses totaling $5,839,803.50 during these cases, and more than 90% of Montgomery's total fees and expenses were incurred prior to the Third Circuit Decision.   Of that amount, $3,092,902.03 (or more than 54% of these fees and expenses) was incurred during the four-month period when the E-Side Committee was primarily litigating the TCEH/EFH claims and settlement issues (the "E-Side Committee Litigation").  [D.I. 12986] at 3 & 9.

60.    Montgomery's specific task codes also reflect that certain services were rendered solely to preserve and potentially augment the EFH estate.  Montgomery devoted more than 40% of its incurred fees ($2,341,235.50) to tasks relating to "Derivative Litigation Investigation," which involved an "intensive" investigation of potential claims against Kravis Roberts & Co. L.P., TPG Capital, L.P., and Goldman, Sachs & Co., *in their capacities as equity owners of EFH*.  [D.I. 12986] at 9; [D.I. 7868] ¶ 34.  This potential litigation would have been brought on

---

[77]   *Id.* ¶ 54 (describing "Intercompany Claims" as including "particularly claims by the EFH Debtors against the TCEH Debtors, or by the TCEH Debtors against the EFH Debtors").

[78]   *Id.* ¶ 26.

[79]   *Id.* ¶ 52.

behalf of and for the sole benefit of the EFH unsecured creditors.[80]  Additionally, Montgomery

incurred an additional $521,786.50 (or 9.1% of its total fees) under "Asbestos-Related Matters."

[D.I. 12986] at 9.  As discussed above, all allowed asbestos claims would have been against EFH

Debtors.

61.    The remaining categories of fees were primarily for the benefit of EFH unsecured

creditors, but at most, should be allocated equally with EFIH.  *See* [D.I. 12986] at 9 ($1,280,071

or approximately 22.3% of fees incurred on the "Plan and Disclosure Statement" matters;

$520,120 or approximately 9.1% of fees incurred on "Case Administration" matters; and $450,208

or approximately 7.9% of fees incurred on "Hearings").

## C.    AlixPartners Professional Fees and Expenses

62.    AlixPartners, the E-Side Committee's restructuring advisor, incurred fees and

expenses totaling $3,543,795.31 during these cases.  [D.I. 13012].  An overwhelming ***99%*** of

AlixPartners' total fees and expenses were incurred prior to the Third Circuit Decision.  *Id.*

Moreover, AlixPartners incurred more than a third of its fees, $1,219,857.10, during the four-

month period involving the E-Side Committee Litigation, and concedes that the majority of the

work performed during this period was in connection with the $700 million TCEH Settlement

Claim in favor of TCEH against EFH.  [D.I. 13012] at 2; [D.I. 7854] ¶ 42.

63.    AlixPartners' fee application also makes clear that EFH was the primary, if not

sole, beneficiary of the vast majority of its work, as it categorizes: (i) $891,812.50 or

approximately 27.5% of its total fees and expenses as "Potential Litigation: Solvency/Valuation"

matters; (ii) $575,172.50 or approximately 17.7% of its total fees and expenses on "Potential

Litigation: Other" matters.  Both of these matters primarily involved work relating to the TCEH

---

[80]    [D.I. 6627] ¶ 143 (Montgomery "has filed a supplemental statement (the 'Conflicts Counsel Supplement')
setting forth the view of the EFH Committee that the EFH estate has valuable claims against the Controlling
Owners that are compromised by the Intersilo Settlement.").

Settlement Claim and the analysis of other claims and causes of action as between TCEH and EFH. *See* [D.I. 7854] ¶¶ 35–36. As to the other entries, EFIH should carry no more than 50% of the balance of the fees requested. *See* [D.I. 13012] at Schedule 2 ($286,890.50 or approximately 8.8% of fees incurred on "Fee Applications and Retention" matters; $240,161.00 or approximately 7.4% of fees incurred on "Business Analysis" matters; and $208,556.00 or approximately 6.4% of fees incurred on "UCC Meetings").

### D.    Guggenheim Professional Fees and Expenses

64.    Guggenheim, the E-Side Committee's investment banker, has requested payment of total fees and expenses of $14,152,847.45, consisting of monthly fees totaling approximately $8.25 million, a transaction fee of $8 million,[81] and $412,390.46 in expenses. [D.I. 12998]. Guggenheim's principal focus in these cases was to provide financial advice and assistance in connection with the E-Side Committee's efforts to help the E-Side Debtors consummate a tax-free restructuring transaction. [D.I. 12998-1].

65.    While Guggenheim's fees were not based on total hours spent, those hours reflect Guggenheim's efforts on behalf of the E-Side Debtors. More than 88% of Guggenheim's hours were expended prior to the Third Circuit Decision, and nearly 30% of its hours were expended during the four-month period supporting the E-Side Committee Litigation. More than 50% of Guggenheim's hours were billed to "Analysis, Presentations and Diligence," which included substantial work relating to the TCEH/EFH claims and settlement, and approximately 15% of its hours were billed to "Plan of Reorganization Review / Analysis and Negotiations." [D.I. 12998] at 37. Given these services, and the time in which Guggenheim was most heavily involved in these cases, all or substantially all of Guggenheim's monthly fees and expenses should be allocated to EFH.

---

[81]    A portion of the monthly fees have been credited against the transaction fee. *See* [D.I. 12988], Ex. A.

66.     Guggenheim has also requested a transaction fee in the amount of $8 million.  In that regard, Guggenheim's engagement agreement provided that it would receive transaction fee payable upon consummation of *any* E-Side Debtor restructuring transaction.  *Id.* ¶ 8.   The transaction fee was thus a contingent liability of both EFH and EFIH as of the date the Court approved Guggenheim's retention on January 13, 2015.  Guggenheim's services were all but complete by December 2015, and certainly before the Third Circuit Decision, and it played no role with respect to securing the Sempra transaction which triggered its payment.  Therefore, the transaction fee may properly be allocated 70% to EFH.

## V.     THE ELLIOTT SUBSTANTIAL CONTRIBUTION CLAIM SHOULD BE ALLOCATED 30% TO EFH AND 70% TO EFIH

67.     In the E-Side Confirmation Order, the Court found that Elliott made a substantial contribution in the E-Side Debtors' chapter 11 cases and, therefore, was granted an Allowed Administrative Claim (as defined in the Sempra Plan) pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code in an aggregate amount of up to $35 million for fees and expenses incurred by Elliott in connection with its substantial contribution.  [D.I. 12763] ¶ 109.  Elliott's substantial contribution enhanced the value of the E-Side Debtors' estates by no less than $756 million in the aggregate, thus significantly increasing recoveries for *all* unsecured creditors.

68.     Elliott's efforts fell into six categories that preserved and benefitted both the EFH and EFIH estates, and the fees Elliott incurred were reasonable and the expenses were actual and necessary.  Because Elliott's efforts preserved and enhanced the EFH estate, Movants request that 30% of any allowed substantial contribution claim Elliott is awarded be paid by EFH.

A.    **Terminating the NextEra Plan Support Agreement to Seek an Alternative Restructuring Transaction**

69.    Approximately $3.7 million, or just over 12% of Elliott's substantial contribution claim, was incurred in connection with moving the estates toward an alternative restructuring transaction once it became clear that the PUCT was likely to deny the NextEra transaction. To that end, Elliott sought to confirm its ability to pursue an alternative restructuring plan for either or both EFH and EFIH that could be consummated by December 2017, as well as financing that would decrease the cash burn at EFIH (which was diminishing all EFIH unsecured creditor recoveries).[82]   These initial proposals were only met with opposition from the Debtors who contended, among other things, that pursuing any such alternative would violate a plan support agreement that Elliott had not signed nor approved.

70.    Notwithstanding its disagreement, Elliott ultimately agreed to work cooperatively by agreeing with the Debtors to only pursue a reorganization plan that would (i) not propose a deconsolidation that would trigger Tax Armageddon, (ii) not change the treatment of asbestos claims against EFH, (iii) allow existing cash at EFH for distributions to the EFH unsecured creditors, and (iv) have the E-Side Debtors exit from bankruptcy by December 2017.   In so doing, Elliott unquestionably took steps to preserve value at EFH at a time when Elliott was not a creditor of EFH, and these efforts ultimately resulted in Elliott being able to negotiate a higher value from Sempra, challenge the Termination Fee, and support the Debtors' efforts to secure modifications to its financing arrangements.[83]

---

[82]    *See* [D.I. 11761] ¶ 2 ("The EFIH Debtors burn approximately $50 million per month in interest rate obligations alone (without factoring in professional fee obligations at the EFIH Debtors or EFIH Debtors)").

[83]    *See* [D.I. 11318; D.I. 11388].

**B.      Opposing Berkshire Transaction and Committing to the Sempra Transaction**

71.      Approximately $19.8 million, or approximately 66% of Elliott's requested substantial contribution claim, was incurred in connection with Elliott (i) opposing the proposed merger transaction with Berkshire Hathaway Energy Company ("Berkshire"), (ii) soliciting interest and financing for its own transaction, and (iii) negotiating and ultimately convincing the Debtors to proceed with the financially superior Sempra transaction.   Over the Debtors' objection, Elliott secured a critical eleven (11) day adjournment of the hearing date to approve the proposed transaction with Berkshire.   And despite this Court having described Elliott as having "bought a ticket on the Titanic," during the period from July 26, 2017 (the date the Court granted Elliott the short extension) and August 21 (the adjourned hearing date), Elliott expended significant time and expense:

- litigating its objection to the Berkshire agreement, including the Debtors' request to potentially burden the EFH and EFIH estates with an additional unallocated $270 million termination fee that was similar in material respect to the NextEra Termination Fee this Court ultimately disallowed;

- assembling a consortium of parties interested in a tax-free transaction valued at $300 to 400 million more than the Berkshire transaction; and

- negotiating the final terms of Sempra merger agreement, which the Debtors' boards had previously rejected despite offering a substantially higher cash price than Berkshire.

72.      As a result, the E-Side Debtors' estates received $450 million more in cash consideration than they would have received under the Berkshire transaction, and EFH was able to confirm a plan of reorganization that: (i) reinstated the Asbestos Claims; (ii) provided creditor classes A5, A8, and A9 with the nearly $38 million that had been agreed to in the EFH Beneficiary Settlement;[84] and (iii) avoided a deconsolidation transaction.

---

[84]    Under the EFH Beneficiary Settlement, up to (i) $30 million was to be provided to holders of Allowed EFH Non-Qualified Benefit Claims (Class A8), (ii) $5.8 million was to be provided to holders of Allowed EFH

**C.      Obtaining an Order Disallowing the $275 Million Termination Fee**

73.      In the face of the Debtors' and NextEra's objections, Elliott also expended approximately $3.4 million, or just over 11% of its substantial contribution claim, in connection with obtaining an order disallowing the $275 million Termination Fee.  Elliott's efforts benefitted both estates and, if the order is affirmed on appeal, will allow for enhanced creditor recoveries for both the EFH and EFIH estates.

**D.      Negotiating the Sempra Plan and Related Documents and Advocating for Creditor Distributions in Connection with Plan Confirmation Proceedings**

74.      After the Debtors finally agreed to proceed with the Sempra transaction, Elliott incurred approximately $1.5 million, or less than 5% of its substantial contribution claim, in connection with negotiating the Sempra Plan and related ancillary documents as well as advocating for both EFH and EFIH unsecured creditor matters relating to the Sempra Plan and confirmation proceedings, including opposing any reserve for NextEra (without the Debtors' support).  Elliott's overall efforts in connection with the Sempra Plan inured to the benefit of both estates and all creditors.

**E.      Facilitating the Oncor Dividend Settlement**

75.      After the Sempra Plan was filed, Elliott incurred approximately $680,000, or just over 2% of its substantial contribution claim, in connection with negotiating a $31 million payment by Sempra to the E-Side Debtors' estates to resolve a dispute over payment of certain of Oncor's 2017 quarterly dividends.  Elliott's efforts benefitted both estates as $27.25 million of the settlement amount was paid to EFIH for distribution to EFIH unsecured creditors and $3.75 million was paid to EFH for distribution to EFH unsecured creditors.  [D.I. 12571] ¶ 22.  The

---

Unexchanged Note Claims (Class A5), and (iii) $2 million was to be provided to holders of Allowed EFH General Unsecured Claims (Class A9).  [D.I. 7143-1].

settlement also resolved various open tax issues and disputes as between Oncor and EFH that provided additional value for EFH.  *Id.*

**F.      Facilitating Resolution of the Vistra Tax Dispute**

76.      After the Sempra Plan was filed, Elliott also incurred approximately $1.1 million, or approximately 3.5% of its substantial contribution claim, in connection with efforts to obtain a resolution of a tax allocation dispute between EFH and Vistra in connection with a tax matters agreement between the parties.  EFH, as the party to the tax matters agreement, was most affected by this dispute, and Elliott's efforts were expended to help preserve valuable tax attributes of EFH for the benefit of its estate.  Thus, EFH was the primary beneficiary of these contributions by Elliott.

77.      Accordingly, while it is reasonable for both estates to share Elliott's substantial contribution claim equally, Elliott is willing to agree to allocate its substantial contribution claim 70% to EFIH and 30% to EFH.

**RESERVATION OF RIGHTS**

78.      Elliott reserves the right to amend, modify, or supplement this submission prior to the conclusion of the trial on the Allocation Motion, and further reserves the right to assert additional arguments and put on further evidence as to the proper allocation of the Material Administrative Expense Claims at such trial.

[*Text Continues on the Next Page*]

## CONCLUSION

WHEREFORE, for the foregoing reasons, Movants respectfully request that this Court enter an order (a) allocating the Material Administrative Expense Claims as follows: (i) Termination Fee Claims: 50% EFH and 50% EFIH; (ii) the E-Side Debtors' Kirkland and Evercore Professional Fee Claims: 50% EFH and 50% EFIH; (iii) E-Side Committee Professional Fee Claims: 70% EFH and 30% EFIH; and (iv) Elliott's substantial contribution claim: 30% EFH and 70% EFIH, and (b) granting Movants such other and further relief as is just and proper.

Wilmington, Delaware
Date:  August 30, 2018

**BAYARD, P.A.**

*/s/ Erin R. Fay*
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Evan T. Miller (No. 5364)
600 N. King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
scousins@bayardlaw.com
efay@bayardlaw.com
emiller@bayardlaw.com

–and–

**ROPES & GRAY LLP**
Gregg M. Galardi
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090
Gregg.Galardi@ropesgray.com

*Counsel for UMB Bank, N.A., as Trustee, and Elliott*