**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |

**FINAL SUBMISSION OF EFH PLAN
ADMINISTRATOR BOARD OBJECTING TO THE JOINT MOTION
OF UMB BANK, N.A., AS INDENTURE TRUSTEE, AND ELLIOTT
TO FIX APPROPRIATE ALLOCATION OF CERTAIN RESERVES
AND EXPENSES AS BETWEEN THE EFH AND EFIH DEBTORS**

Pursuant to paragraph 8(a) of the *Second Amended Order Scheduling Certain Dates and Deadlines and Establishing Certain Protocols in Connection with the Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13373] (as may have been and as may be amended from time to time, the "Allocation Scheduling Order"), the EFH Plan Administrator Board (the "PAB") provides this final written submission (this "Final Submission") regarding the allocation of Material Administrative Expense Claims in response to the *Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13102] (the "Allocation Motion").[1]

---

[1] This Final Submission is in furtherance of the Preliminary Statement of EFH Plan Administrator Board to the Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors (the "Preliminary Statement").

Capitalized terms used, but not otherwise defined, herein shall have the same meanings ascribed to them in the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy

The PAB respectfully states as follows:[2]

### Statement

1.    Foregoing the typical bullish and punchy preliminary statement, this Final Submission instead reflects the PAB's long-standing role in the dispute on the Material Administrative Expense Claims as a fiduciary presenting the economic stakeholders and, as appropriate, the Court with the various key (and often competing) considerations underpinning the allocation of such Claims and the PAB's holistic balancing of such competing considerations. *Part I* addresses the history of the Material Administrative Expense Claims and efforts to resolve or narrow the bid-ask spread on the allocation of such Claims. *Part II* sets forth the key global considerations the PAB used to evaluate each category of Material Administrative Expense Claim. *Parts III.A.* through *D* analyze each individual category of Material Administrative Expense Claim, presenting allocation considerations shared by both EFH and EFIH (in other words, how each of EFH and EFIH benefitted from the incurrence of such Material Administrative Expense Claim) and then considerations unique to EFH, on the one hand, and EFIH, on the other hand.  As the PAB has stated throughout the last five months, its goal is to

---

Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code [D.I. 12653].

In accordance with the Allocation Scheduling Order, the Preliminary Statement was not filed with the United States Bankruptcy Court for the District of Delaware (the "Court"), but was served upon the following parties: Elliott, UMB Bank, N.A., the Ad Hoc EFH Claimants (as defined in the *Verified Statement of Kasowitz Benson Torres LLP and Hogan McDaniel Pursuant to Bankruptcy Rule 2019* [D.I. 12900]) and the EFH Indenture Trustee (as defined in D.I. 13148).  The PAB's counsel effectuated service via electronic mail on June 29, 2018.

[2] The PAB makes several references to documents and factual records and findings established in prior hearings in front of the Court.  The PAB intends to provide the evidentiary bases for including such references in this Final Submission at the hearing to consider the Allocation Motion.

2

not drive a specific economic result, but rather to ensure that the record the Court uses to arrive at a ruling is as thorough, well-developed, accurate, and well-balanced as possible.[3]

I.      **The Long and Winding Road on the Material Administrative Expense Claims.**

2.      The history of the Material Administrative Expense Claims is well-known to this Court. It is entwined with—and a companion piece to—the history of these massive and massively complex chapter 11 cases. Prior to the EFH Effective Date, the Disinterested Directors and Managers of EFH and EFIH had been engaged in negotiations surrounding a potential settlement of certain of the Material Administrative Expense Claims. These negotiations did not yield a settlement.

3.      In connection with such negotiations, on or around February 21, 2018, the EFH Debtors executed confidentiality agreements (the "Confidentiality Agreements") with certain Holders of Claims against the EFH Debtors. Pursuant to the Confidentiality Agreements, EFH agreed to disclose publicly after a specified period of time that such parties had engaged in negotiations concerning such dispute, although such negotiations had not yielded a settlement, as well as certain information regarding cash projections and creditor recoveries as of the proposed EFH Effective Date. This disclosure was filed on the Court's docket on February 28, 2018 [D.I. 12769] (the "Cash Projections").

---

[3]     For the avoidance of doubt, the proceedings related to the Allocation Motion and the hearing scheduled to commence on September 5th do not relate to the *allowance* of any of the Material Administrative Expense Claim, only the *allocation* of such Claim to the EFH estate and the EFIH estate, as applicable. The PAB does not disagree with the Elliott Creditors' assertions in the *UMB and Elliott's Opposition to the Ad Hoc EFH Claimants' Motion in Limine to Exclude the Testimony of Howard Abrams and Bradley Robins* [D.I. 13399] that, pursuant to *In re Trans World Airlines, Inc.*, 145 F.3d 124, 136 (3d Cir. 1998) "[a]dministrative expenses are allowable only for the actual, necessary costs and expenses of preserving the estate." As applied to the instant circumstances, however, there is a presumption that the amount of any Allowed Material Administrative Expense Claim satisfies the standard set forth in *Trans World* with respect to the amount of such Allowed Claim, with the dispute centering on which particular estate received the benefit. Any other interpretation inappropriately allows the Elliott Creditors to use the Allocation Motion as a proxy for an omnibus disallowance motion.

4.      Before and after entry of the Allocation Scheduling Order, the PAB and the Parties (as defined in the Allocation Scheduling Order) continued the earlier efforts to consensually resolve the allocation of all or a subset of the Material Administrative Expense Claims, in an effort to minimize the expense, time, and risks faced by unsecured creditors of EFH and EFIH of the Court's ultimate ruling on the allocation of Material Administrative Expense Claims. Unfortunately, these efforts were similarly unavailing.

5.      Following the EFH Effective Date, the PAB urged interested parties to either reach a proposed settlement on the Material Administrative Expense Claims or otherwise agree to a process for presenting the dispute to this Court. Indeed, on several separate occasions, the economic stakeholders discussed processes for mediation or arbitration of the EFH/EFIH Allocation Dispute. Ultimately, to propel the process forward, the PAB filed the *Motion of the EFH Plan Administrator Board for Entry of an Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols in Connection with the EFH/EFIH Allocation Dispute* [D.I. 13113], seeking to establish a discovery and trial schedule to resolve the allocation of the Material Administrative Expense Claims. The Court approved such schedule on June 11, 2018 [D.I. 13193], and the Elliott Creditors, the PAB, the Ad Hoc EFH Claimants, and the EFH Indenture Trustee have been working to comply with the terms of such schedule over the last nearly three months.

6.      As the Former EFH/EFIH Debtors have frequently lamented to the Court and all parties-in-interest at the EFH Confirmation Hearing, the failure to allocate the Material Administrative Expense Claims prior to—or since—the EFH Effective Date has adversely affected the timing of Plan distributions. Five months after the EFH Effective Date, over half a billion dollars for unsecured creditor distributions remains safely tucked away in the EFH/EFIH

Cash Distribution Account. EFH and EFIH unsecured creditors have not only been unable to receive—and redeploy to better and higher uses—their Plan distributions, but the costs of litigating the Material Administrative Expense Claims have further reduced those anticipated distributions.

7.    In the Preliminary Statement, the PAB chose not to put forth a proposal to allocate the Material Administrative Expense Claims—in the vain hope that the economic stakeholders could settle on their own—but instead focused on correcting what it knew to be various factual inaccuracies set forth in the Allocation Motion. Other stakeholders have expressed their preliminary positions through filings pursuant to the process outlined in the Allocation Scheduling Order.[4] The transmission of this information improved each of the key EFH/EFIH economic stakeholders' understanding of each other's initial positions with regards to the allocation of Material Administrative Expense Claims. Leading up to the filing of this Final Submission, the PAB has continued attempts to broker a settlement, but it remains clear that the Parties hold substantially differing positions such that consensual resolution is not possible as of the time of this filing. As the economic stakeholders have failed to bridge the gap between their preliminary statements' proposals, and because the PAB firmly believes each side has taken extreme positions, the PAB considered itself duty-bound to refine its evaluation of the allocation

---

[4]    The following documents were filed in response to the Allocation Motion: (a) *Limited Preliminary Statement of Kirkland & Ellis LLP as Debtors' Counsel in Response to the Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13255]; (b) *Reservation of Rights of NextEra Energy, Inc. Regarding the Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13147]; and (c) *Statement and Preliminary Objection of Ad Hoc EFH Claimants to Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13168].

In accordance with paragraph 8(a) of the Allocation Scheduling Order, each Party (as defined in the Allocation Scheduling Order) is to file a final written submission by August 30, 2018).

of the Material Administrative Expense Claims and ultimately developed the proposal set forth below.

## II.    Considerations Informing the PAB's Proposal.

8.    On the EFH Effective Date, the former EFH/EFIH Debtors emerged with approximately (a) $209 million available for Plan distributions to Holders of Allowed Unsecured Claims against the EFH Debtors and (b) $690 million available for Plan distributions to Holders of Allowed Unsecured Claims.  These amounts translated to the following Plan recoveries:  (a) approximately 15% for Class A4, Class A6, Class A7 (*i.e.*, the EFH funded debt Claims as well as the EFH Swap Claims); (b) approximately 10% for Class A11 (the TCEH Settlement Claim); (c) approximately 100% for Class A5, Class A8, and Class A9 (which Classes are the recipients of the TCEH Settlement Claim Turnover Distributions); and (d) approximately 38% for Class B5 and Class B6 (*i.e.*, the EFIH unsecured funded debt Claims).

9.    Importantly, these projected Plan recoveries: (a) did not include any allocation of the NEE Termination Fee Claims at EFH or EFIH; (b) assumed 100% of the Elliott Substantial Contribution Claim would be allocated to EFIH (consistent with the terms of the Confirmation Order and Sempra Plan Support Agreement); (c) assumed no reallocation of Debtor Professional Fee Claims and EFH/EFIH Committee Professional Fee Claims (which EFH/EFIH Committee Professional Fee Claims have generally been allocated 50% (EFH) / 50% (EFIH) by the respective Professionals); and (d) did not reflect Plan recoveries associated with either residual amounts left in the EFH Professional Fee Escrow Account and EFIH Professional Fee Escrow Amount (after entry of, and satisfaction of, the Final Orders approving the Final Fee Applications) or residual amounts left after winding down the EFIH Debtors and EFH Debtors.

10.    To be clear, for each of the Material Administrative Expense Claims, competing considerations weigh in favor of allocating amounts to EFH on the one hand, and EFIH on the

6

other hand. Among other things, these competing considerations take the form of: (a) the factual underpinnings for each Material Administrative Expense Claim; (b) potential, alternative interpretations of such factual underpinnings; (c) the relative litigation risk for each estate in litigating the allocation of each Material Administrative Expense Claim; (d) the extensive and established record in these chapter 11 cases on a number of the Material Administrative Expense Claims; and (e) the complex and lengthy history of these chapter 11 cases, which informs the considerations that existed at the time the Claims were incurred *and* based on later-developed facts. In particular, the many twists and turns of these cases affect the vantage points from which the Material Administrative Expense Claims are viewed and raise legitimate questions as to how one measures over time, prospectively, retrospectively, and in between, how allocations should be ultimately adjudged. There is no single absolute frame of reference. Thus, the allocation process does not lend itself to a false precision, and should be approached with both a healthy dose of humility and deference to the Professionals who allocated fees and expenses contemporaneously, consistent with the authority set forth in the Interim Compensation Order.

11.    As described in greater detail herein, the PAB evaluated the allocation of each of the Material Administrative Expense Claims through the prism of each of the factors described above to arrive at the below (the "Proposed Allocations"):[5]

---

[5]    If the midpoint proposals set forth above are ultimately approved by the Court, and without factoring in any other potential Allowed Administrative Claims at EFH or EFIH, the recovery for Holders of Allowed Unsecured Claims will be as follows: (a) approximately 9% for Class A4, Class A6, Class A7 (*i.e.*, the EFH unsecured funded debt Claims as well as the EFH Swap Claims); (b) approximately 4% for Class A11 (the TCEH Settlement Claim); (c) approximately 100% for Class A5, Class A8, and Class A9 (which Classes are the recipients of the TCEH Settlement Claim Turnover Distributions); and (d) approximately 29% for Class B5 and Class B6 (*i.e.*, EFIH unsecured funded debt Claims).

The figures set forth below reflect the aggregate cash to be moved, as applicable: (a) from the EFH Unsecured Creditor Recovery Pool account into the EFH Professional Fee Escrow and from the EFIH Professional Fee Escrow into the EFIH Unsecured Creditor Recovery Pool account (in case with respect to the EFH/EFIH Committee Fees); (b) with respect to the NEE Termination Fee Claim, into the NEE Plan Reserve; and (c) from the EFIH Administrative Claims account in the EFH/EFIH Cash

7

| Material Administrative Expense Claim | EFH Range | Deducts from EFH Cash for EFH Unsecured Creditors Based on Midpoint | EFIH Range | Deducts/Additions from EFIH Cash for EFIH Unsecured Creditors Based on Midpoint |
|---|---|---|---|---|
| NEE Termination Fee Claims ($275 million) | 18%-22% | (-) $55 million | 78%-82% | (-) $220 million |
| EFH/EFIH Committee Professional Fee Claims (approximately $48 million)[6] | 86%-90% | (-) $21.89 million[7] | 10% to 14% | (+) $21.89 million |
| Elliott Substantial Contribution Claim (approximately $31.7 million)[8] | 36%-44% | (-) $12.68 million | 56%-64% | (+) $12.68 million |
| The Debtors' Professional Fee Claims | Professional Fee Claims shall be allocated between EFH and EFIH as set forth in each Professional's Final Fee Application (and in such amounts as shall be set forth in the Final Orders approving each such Final Fee Application). | | | |
| Total Deductions | $89.57 million | | $185.43 million | |

Distribution Account to the EFIH Unsecured Creditor Recovery Pool account and from the EFIH Unsecured Creditor Recovery Pool account into the EFH Administrative Claims Account (with respect to the Elliott Substantial Contribution Claim).

[6] This figure assumes the EFH/EFIH Committee's Professionals Fees are Allowed in the amounts requested in the respective Final Fee Applications.

[7] If the allocation of 88% of the $48 million of EFH/EFIH Committee Professional Fees to EFH is approved, the total incremental *costs* to the EFH estate is $18.24 million, as compared to a historical 50% allocation of $48 million. However, of the approximately $48 million requested for final approval pursuant to the EFH/EFIH Committee's Professionals' Final Fee Applications, approximately $41 million has already been paid pursuant to Bankruptcy Court orders entered approving the EFH/EFIH Committee's Professionals Interim Fee Applications and CNOs which will require a cash payment of $21.89 million from EFH.

The $21.89 million figure set forth above reflects the sum of the following: (a) an additional 38% of already paid EFH/EFIH Committee Fees (representing the difference between the proposed 88% allocation to EFH of such Fees and the historical 50% allocation to EFH of such Fees and Expenses, as applied to the $41 million that has already been paid) which represents a "true up" payment of $15.58 and (b) a final payment of $6.16 million to account for the difference between the maximum amount of to-be-paid EFH/EFIH Committee Fees and the already paid EFH/EFIH Committee Fees (in other words, 88% of approximately $7 million, the difference between $48 million and $41 million).

[8] This figure assumes the Elliott Creditors are ultimately paid the maximum amount of their Substantial Contribution Claim of approximately $31.7 million (as set forth in the Allocation Motion).

III.    **Considerations for Each Category of Material Administrative Expense Claims.**

    A.    **NEE Termination Fee Claims.**

        1.    **Execution of the Merger Agreement in July 2016: The Increase in the Termination Fee was Achieved as Part of a Global Deal that Benefited All Creditors.**

12.    The Allocation Motion requests that the Court allocate the Allowed NEE Termination Fee Claim equally between EFH and EFIH.  In particular, the Elliott Creditors make two arguments:  (a) the final increase in the NEE Termination Fee (from $110 million to $275 million) directly led to increased recoveries for EFH creditors, and therefore, the EFH creditors should bear half of the NEE Termination Fee, which roughly approximates the increase in the NEE Termination Fee and (b) NEE assumed asbestos liabilities in exchange for the $165 million increase to the NEE Termination Fee, and that such agreement to assume only benefited EFH.  As the factual record established at the hearing held on September 19, 2016, the need for the NEE Termination Fee at the time it was approved, including the increases in the NEE Termination Fee (from $110 million to $275 million), inured to the benefit of both EFH and EFIH unsecured creditors.[9]  Nothing in the record supports the Elliott Creditors' allegation that "NextEra assumed the [asbestos] liabilities . . . in exchange for a $165 million increase to the termination fee."[10]  As would be expected in a transaction valued at $18.8 billion, the increase in the NEE Termination Fee was one of many "gives and gets" during negotiations in late July 2016.[11]

---

[9]    *Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9190], ¶ 26.

[10]    Allocation Motion, ¶ 39.

[11]    08/02/2018 P. Keglevic Dep. Tr. 44:3-8 ("It moved up to 275, which was, by the way, much more consistent with the Buffett termination fee, and we got, you know, a higher price . . . [A]ll of the things go together.  So we didn't just negotiate in a vacuum the break fee.").

13.     In particular, on July 27, 2016 (two days before the NEE Merger Agreement was executed), NEE agreed to increase its purchase price by $200 million and simultaneously agreed to eliminate a match right—both of which factored into the decision of EFH and EFIH to agree to an increase in the NEE Termination Fee.   NEE's agreement to drop the match right in particular preserved the flexibility for EFH and EFIH to benefit from an alternative proposal on either economic or non-economic terms without the chilling effect of an overhanging match right.[12]

14.     ***Only one day later***, and without any further concessions from EFH and EFIH, NEE agreed to an additional purchase price increase of $110 million.   With this additional distributable value, all EFIH unsecured creditors were projected to receive a 100% recovery, absent a Final Order Allowing the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims.[13]

> **2.     Increase in Distributable Value Paved the Way for EFH Plan Support: The EFH Creditors' Litigation Risk Regarding Allocation of the Termination Fee.**

15.     Following an initial filing of the NEE PSA and NEE Merger Agreement with the Bankruptcy Court on August 3, 2016, NEE, EFH, and EFIH continued to engage in negotiations on the NEE Merger Agreement.   On September 18, 2016, NEE agreed to increase its purchase price by $300 million to $4.4 billion (for a total contribution of $9.8 billion, after accounting for the satisfaction of EFIH First Lien DIP Facility obligations).   Additionally, NEE agreed to release an additional approximately $150 million held in reserve for purposes of satisfying the

---

[12]     *EFH/EFIH Debtors Omnibus Reply to Objections to Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9536], ¶¶ 17-18; 08/02/2018 P. Keglevic Dep. Tr. 44:18-20 ("[The match right] was one of the things that we fought very hard to get out, you know, to get rid of.").

[13]     08/09/2018 T. Horton Dep. Tr. 64:5-14.

Reinstated Asbestos Claims (although such reserve did not operate as a cap on the satisfaction of such Reinstated Claims). The result of this increased purchased price and release of $150 million resulted in an additional $450 million of distributable value. This additional value was projected to inure entirely to the benefit of EFH creditors at the time[14] As a result of this additional distributable value, Fidelity, the largest single Holder of EFH unsecured Claims, withdrew its objection to the NEE Merger Agreement and NEE PSA plan and became party to the NEE PSA.[15] With the support of Fidelity, a path to the confirmation of a (largely consensual) plan at EFH was paved. And a legally consensual plan at EFH paved the way for a confirmed plan at EFIH (the reverse is also true). Given the extensive and highly integrated "gives and gets" associated with negotiating the execution of, and approval of, the NEE Merger Agreement, those parties that benefited from an increased purchase price (*i.e.*, EFH creditors such as Fidelity) also received some benefit from the approval of the NEE Termination Fee.[16]

### 3. Third Circuit Makewhole Opinion Changes the Landscape: The EFIH Creditors' Litigation Risk Regarding Allocation of the Termination Fee.

16. Of course, EFIH unsecured creditors also benefited from the approval of the NEE Termination Fee and therefore should bear responsibility for a portion of any Allowed NEE

---

[14] *See* 08/02/2018 P. Keglevic Dep. Tr. 135:21-23 ("Yeah, you're reading it exactly right. [EFH creditors] would have gotten 471 additional money over the water -- again, over the waterfall [if Makewhole Claims were disallowed].")

[15] *See Amended Disclosure Statement for the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors* [D.I. 10565] ("NEE Disclosure Statement"), at 10

[16] *See* 08/02/2018 P. Keglevic Dep. Tr. 45:2:6, 11-13 ("[A]ll the litigators in this room would like it to be quid pro quo for every, you know, specific thing. It just doesn't work like that. There are lots of puts and takes . . . So, you know, whether it was the match right or the increased price or -- you just can't tell.").

Termination Fee Claims.[17] *First*, to the extent the increase in distributable value that caused Fidelity to withdraw its NEE Merger Agreement objection and support the NEE PSA, Fidelity's action ultimately inured to the benefit of EFIH unsecured creditors. In other words, at the time the NEE Merger Agreement (including the NEE Termination Fee) was approved, EFH unsecured creditors were slated to get the entire benefit of the 11th hour $450 million increase in distributable value, *but only if EFIH unsecured creditors were actually paid in full at closing*. In contrast, at the time the NEE Merger Agreement was approved, it was clear that the increase in distributable value would inure to the benefit of the EFIH unsecured creditors if the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims ever became Allowed by Final Order.

17.     Following the Third Circuit Makewhole Opinion, the EFIH unsecured creditors' risk-mitigation strategy proved to be insightful. Now faced with an impending Final Order Allowing significant senior secured Claims, EFIH unsecured creditors (including the Elliott Creditors' predecessors) faced two choices: (a) negotiate for participation and consent rights in any future litigation or settlement of the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims or (b) withdraw support of the NEE Plan and develop an alternative proposal that provides a greater recovery to EFIH unsecured creditors. Holders of over 66 2/3% of the aggregate principal amount of the EFIH Unsecured Notes opted for the former, and in so doing, made the decision as sophisticated investors to increase their distributable value through litigation and settlement of the EFIH First Lien Makewhole Claims and EFIH Second Lien

---

[17] *See* 08/17/2018 B. Williamson Dep. Tr. 12:19-25, 13:1. ("There is a substantial difference in who -- what is secured and unsecured. And there is a substantial difference in what someone -- what the different estates would get if -- in each of the transactions. So to say that [EFH] should take 50 percent of that when we are a much smaller, with far less debt and far less part of the situation, I think that's not appropriate.").

12

Makewhole Claims.[18]  The effect of this agreement (and in the absence of an alternative, superior proposal) was that the EFH Unsecured Creditor Recovery Pool would only consist of the Cash on hand at EFH.[19]

18.    **Second**, while EFH could not sustain in chapter 11 indefinitely, the adequacy of Cash at EFH was relatively stable as compared to EFIH (largely due to the absence of secured debt at EFH).  Cash at EFIH—a holding company that has no independent business operations—was primarily dependent on dividend distributions from Oncor Electric Delivery Company LLC ("Oncor") and the EFIH First Lien DIP Facility.  The dividend distributions in particular were never guaranteed, and the payment of such amounts were, from time to time, the subject of dispute and controversy.[20]  Moreover, absent additional Court relief, the EFIH First Lien DIP Facility offered a finite level of credit (and along with the EFIH Second Lien DIP Facility, accrued interest at almost a million dollars per day, to the detriment of holders of EFIH unsecured debt).  Given the overwhelming (and often unknown) complexities of these cases, these facts support an argument that it was more critical to EFIH than EFH to expedite exit from chapter 11.

---

[18] *See* NEE Disclosure Statement, at § I.C.I.

[19] *See id.* at 24.

[20] *See, e.g., Motion of Energy Future Holdings Corp., et al., for Entry of an Order Approving the Settlement Between the Debtors and Sempra and Approving the Agreed Amendment to the Merger Agreement* [D.I. 12571], at 7 (describing disputes among the EFH/EFIH Debtors, the Elliott Creditors, and Sempra with regard to the declaration and payment of Q3 2017 and Q4 2017 dividends); *Declaration of Anthony R. Horton in Support of the Motion of the EFH/EFIH Debtors for Order Authorizing the EFH/EFIH Debtors to Consent to Oncor's Entry into the Sharyland Merger Agreement* [D.I. 11837-3], at 2 (noting that the new capital structure following a holistic rate case stipulation required an equity infusion in Oncor of $250 million that could be funded from "decreased dividend payments [from Oncor to EFIH] over a period of time").

RLF1 19926498v.1

**B.    The Elliott Creditors' Substantial Contribution Claim.**

    **1.    The Elliott Creditors' Contributions to These Chapter 11 Cases Benefited Both the EFH and EFIH Creditors.**

19.    Since purchasing Fidelity's EFH Unsecured Claims and increasing their holdings of EFIH Unsecured Claims, the Elliott Creditors have, among other things: (a) supported the Sempra transaction (which increased distributable value for EFIH creditors, but not EFH creditors); and (b) facilitated a settlement with the EFH/EFIH Debtors and Oncor (the "Oncor Dividend Settlement"), which increased distributable value for both EFH and EFIH creditors and avoided potentially costly tax litigation for EFH regarding its obligations to Oncor or Oncor Electric Delivery Holdings Company LLC for tax years 2017 and 2018.[21]  The Oncor Dividend Settlement resulted in a $31 million payment from Sempra to the EFH/EFIH Debtors' estates (the vast majority of which was paid to EFIH) and the resolution of a dispute that could have delayed or otherwise inhibited confirmation of the Plan and/or the occurrence of the EFH Effective Date.

    **2.    The EFH Creditors' Litigation Risk Regarding Allocation of the Elliott Creditors' Substantial Contribution Claim.**

20.    The Elliott Creditors' most tangible benefit to EFH creditors was through (a) the filing of *The Elliott Funds' Motion to Reconsider in Part the September 19, 2016 Order [DKT. no 9584] Approving the NextEra Termination Fee* [D.I. 11636] (the "Reconsideration Motion") and (b) its participation in the tax allocation dispute between EFH and Vistra Energy Corp., which had substantial implications for the EFH estate, if successful.  If successfully affirmed on appeal, the Court's order approving the Reconsideration Motion will reduce the Claims at EFH and increase distributable value to EFH creditors.  Unlike at EFIH, where increases in

---

[21]    *Order Approving the (I) Settlement Between the Debtors and Sempra and (II) the Agreed Amendment to the Merger Agreement* [D.I. 12631].

distributable value generally do not inure to the benefit of creditors other than EFIH Unsecured Creditors, this increased distributable value at EFH would inure to the benefit of creditors aside from the Elliott Creditors.[22]

### 3. The EFIH Creditors' Litigation Risk Regarding Allocation of the Elliott Creditors' Substantial Contribution Claim.[23]

21.     It is undisputed that the Elliott Creditors are the largest holder of EFIH unsecured debt.[24]  And the Elliott Creditors have made it clear that with regards to the EFH/EFIH Allocation Dispute, their advocacy efforts are focused on reducing allocations to EFIH.  For each dollar of Material Administrative Expense Claims that is allocated to EFIH, the Elliott Creditors stand to lose approximately $.73 in distributable value.  And, for each dollar of Material Administrative Expense Claims that is allocated to EFH (so long as EFH remains administratively solvent), the Elliott Creditors stand to lose approximately $.35 in distributable value.  Therefore, on a net basis, the Elliott Creditors earn approximately $.38 for each dollar of Material Administrative Expense Claims reallocated from EFIH to EFH.

### C.     EFH/EFIH Committee Fees.

22.     The PAB believes that the EFH/EFIH Committee's most significant value-add during these Chapter 11 Cases was the negotiation of the EFH/EFIH Committee Settlement, in resolution of the EFH/EFIH Committee's objections to the global Settlement Agreement and Hunt Plan.  The EFH/EFIH Committee Settlement's key provisions included: (a) an agreement

---

[22]  But, as exemplified by the Makewhole Opinion, the order granting the Motion to Reconsider may be reversed, which would again raise the question of "frame of reference."

[23]  The figures presented in this paragraph are estimates and are based on the information presented in the *Statement of Ropes & Gray LLP and Bayard, P.A., Pursuant to Federal Rule of Bankruptcy Procedure 2019* [D.I. 12895].

[24]  *See Statement of Ropes & Gray LLP and Bayard, P.A., Pursuant to Federal Rule of Bankruptcy Procedure 2019* [D.I. 12895] (noting that as of April 3, 2018, the Elliott Creditors held approximately $1.2 billion in EFIH Unsecured Note Claims).

15

by the EFH/EFIH Debtors that Class A3 Claims would be Reinstated (and in the absence of such Reinstatement, the EFH/EFIH Committee could terminate its support of the agreement); (b) the TCEH Turnover Distribution; and (c) a "gag" provision limiting the EFH/EFIH Committee's further participation in the Chapter 11 Cases, provided there was no breach of the EFH/EFIH Committee Settlement. In addition to being an agreement in resolution of *global* Hunt Plan and Settlement Agreement objections (and therefore paving the path to a more consensual Settlement Order approval hearing and Hunt Plan confirmation hearing for EFIH and EFH), the "gag" provision reduced the Fee and Expense accrual of the EFH/EFIH Committee's Professionals, for the benefit of EFIH and EFH unsecured creditors.

### 1.    The EFH Creditors' Litigation Risk Regarding Allocation of the EFH/EFIH Committee Fees.

23.    There are a number of arguments that weigh in favor of allocating more of the EFH/EFIH Committee Fees to EFH. *First*, while resolving the EFH/EFIH Committee's global Hunt Plan and Settlement Agreement objections, the EFH/EFIH Committee Settlement primarily addressed EFH Claims (*i.e.*, Reinstated Class A3 Claims and the TCEH Turnover Distribution). *Second*, while EFIH only has unsecured funded debt Claims, EFH has various Classes of non-funded unsecured debt. Thus, in addition to the EFH/EFIH Committee's representation by Sullivan & Cromwell LLP and Montgomery McCracken Walker & Rhoads LLP, qualified counsel has represented the EFIH unsecured creditors throughout these chapter 11 cases.[25]

---

[25]    At the beginning of these cases, Akin Gump Strauss Hauer & Feld LLP represented EFIH Unsecured Noteholders and Foley & Lardner LLP represented UMB Bank, N.A. as EFIH Unsecured Notes Trustee. On or around March 2017, the Elliott Funds retained Ropes & Gray LLP ("Ropes") and Bayard, P.A. ("Bayard") to represent them in connection with the chapter 11 cases. *See Statement of Ropes & Gray LLP and Bayard, P.A., Pursuant to Federal Rule of Bankruptcy Procedure 2019* [D.I. 12895]. In March 2018, the EFIH Unsecured Notes Trustee, acting at the direction of the Elliott Funds (as holders of a majority in principal of the EFIH Unsecured Notes) also retained Ropes and Bayard.

24.    In contrast, the primary advocates for EFH unsecured creditors advocated for the EFH funded debt Claims (*i.e.*, counsel for the EFH Indenture Trustee and Fidelity). Aside from the asbestos claimants, the non-funded debt Claims rarely had sophisticated and long-term counsel in place (although, as issues arose during the case, such Holders would retain counsel from time to time). Given this existing representation, there is an argument that the EFH/EFIH Committee's counsel played a more significant advocacy role for EFH unsecured creditors while EFIH unsecured creditors had separate advocates for virtually the entire duration of the Chapter 11 Cases.

2.    **The EFIH Creditors' Litigation Risk Regarding Allocation of the EFH/EFIH Committee Fees.**

25.    Conversely, there are a number of arguments that weigh in favor of allocating a portion of the EFH/EFIH Committee Fees to EFIH.[26] As a preliminary matter, on October 27, 2014, the U.S. Trustee appointed the EFH/EFIH Committee as a statutory committee to protect the unsecured creditors of **both** EFH and EFIH [D.I. 2570].[27] The EFH/EFIH Committee fulfilled this role.

26.    Moreover, the EFH/EFIH Committee objected to the Hunt Plan and the related Plan Support Agreement[28] These objections articulated a concern that the failure of the T-Side

---

[26] 08/08/2018 B. Glueckstein Dep. Tr. 70:9-14 ("[EFIH benefited] [i]n a number of ways, but most important of which it brought to a close and paved the path to confirmation of the plan, of which EFIH creditor -- the EFIH creditor body, by that juncture in the case, was -- was largely supportive.").

[27] *Id.* 22:21-25, 23:1, 10-13 ("The committee was appointed to represent the interests of creditors, unsecured creditors, as a collective whole, as creditor committees do, for the benefit of the creditors of four of the E-side estates, EFH, EFIH, EECI Inc. and EFIH Finance . . . [T]he role of the committee was to represent, as I said, had a fiduciary duty, collectively, to the unsecured creditor body of those four estates.").

[28] *See Trial Brief and Omnibus Objection of the EFH Official Committee to (I) Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement and (II) Confirmation of the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the*

Junior Creditor Consortium (as defined in the Hunt PSA Objection but generally consisting of those Holders of Class C4 Claims who were contemplated to own Reorganized EFH Equity under the Hunt Plan) to fund its commitment under the Hunt Plan would delay the effective date of the Hunt Plan, and would trigger a 50-day period (on top of the April 1, 2015 milestone date) for the T-Side Junior Creditor Consortium to secure replacement financing. As has been articulated by various parties throughout these cases, delays in the emergence process created additional interest rate accruals and professional fee burn, ***primarily to the detriment of EFIH unsecured creditors***.[29]

27.     Finally, as noted above, it is true that the EFIH creditors enjoyed the representation of various retained counsel to protect their interests, in addition to the EFH/EFIH Committee. That being said, however, EFH creditors also retained a bevy of professionals.[30]

---

*Bankruptcy Code* [D.I. 6627] ("Hunt Plan Objection"); *Objection of the EFH Official Committee to the Motion of Energy Future Holdings Corp., et al., to Authorize the Debtors to Enter into and Perform Under the Plan Support Agreement* [D.I. 5700] ("Hunt PSA Objection"); 08/08/2018 B. Glueckstein Dep. Tr. 67:5-8 ("[T]he committee was an objector to the Hunt plan as proposed at that time. It was subsequently modified before confirmation.").

[29]    *See, e.g., EFH/EFIH Debtors' Reply In Support of the Motion of the EFH/EFIH Debtors for Entry of an Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols in Connection with Confirmation of the Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11553], ¶ 17 ("With every passing month, the EFIH Debtors burn over $50 million in interest expense on account of the EFIH DIP facility and the EFIH second lien notes, (to the detriment of the very stakeholders that are now asking the Debtors to further delay their path to emergence . . . .)"); *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Approving the Settlement Between the Debtors and Sempra and Approving the Agreed Amendment to the Merger Agreement* [D.I. 12571], ¶ 27 ("With an approximate $50 million in monthly interest burn, the Debtors and their stakeholders benefit by eliminating any potential delays in confirming and consummating the Plan and Merger Agreement."); 08/24/2018 B. Robins Dep. Tr. 160:5-25, 161:1-3 (noting that during the effectiveness of the Tax Matters Agreement interest would continue to accumulate at $50 million a month and would reduce recoveries of EFIH Unsecured Creditors); 08/09/2018 T. Horton Dep. Tr. 20:17-22.

[30]    Notably, the EFH Indenture Trustee (represented by Nixon Peabody LLP) acted on behalf of Holders of all funded debt at EFH; Kasowitz Benson Torres LLP and Hogan McDaniel represented the Ad Hoc EFH Claimants; special asbestos counsel represented Holders of Legacy General Unsecured Claims against the EFH Debtors; Squire Patton Boggs LLP represented Holders of EFH Non-Qualified Benefit Claims; and Fried, Frank, Harris, Shriver & Jacobson LLP represented Fidelity, the largest EFH

Those most likely to benefit from the EFH/EFIH Committee's guidance were holders of EFH unsecured trade debt, which amounted to less than $5 million in total.

> **D.    The Process for Allocation of Professional Fees was Reasonable and in Good Faith, and No Reallocation of Professional Fees is Warranted.**
>
> **1.    Interim Compensation Process**

28.    On September 16, 2014, the Court entered the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [D.I. 2066] (the "Interim Compensation Order"). The Interim Compensation Order outlined the procedures for Professionals to seek compensation and reimbursement of expenses in these chapter 11 cases. Among other things, the Interim Compensation Order (a) provided procedures for the allocation of Fees and Expenses between the three primary estates that would benefit from the efforts of Professionals: EFH, EFIH, and TCEH and (b) left the decision on allocation of Professional Fees in the hands of each Professional (each of which was best suited to determine how its services benefited each respective estate).

29.    Because the three primary estates all had overlapping yet different debt, and varying operational, and restructuring considerations it was imperative that the Interim Compensation Order's procedures provided a fair and transparent method for inter-estate allocation. These goals were accomplished through the separation, on one hand, of Fees and Expenses directly incurred by certain Debtors (the "Direct Benefit Fees") and on the other hand, fees or expenses incurred for the collective benefit of one or more Debtors (the "Collective Benefit Fees"). Pursuant to the provisions of the Interim Compensation Order, each Professional allocated Collective Benefit Fees in the same proportion that the amount of Direct Benefit Fees

---

stakeholder for a substantial portion of these chapter 11 cases. Additionally, Holders of the TCEH Settlement Claim were sophisticated investors who were unlikely to determine their strategic direction from the EFH/EFIH Committee.

incurred by such Professional for such Debtor bore to the total amount of Direct Benefit Fees incurred by such Professional for all of the Debtors.[31]

30.    As a result of this allocation method, (a) the allocation of Fees and Expenses to EFH, EFIH, and TCEH changed each month, depending on whether there was comparatively more services performed for the benefit of a single estate as opposed to all of the Debtors' estates and (b) the allocation of Collective Benefit Fees was the direct product of the relative Direct Benefit Fees of each estate for such month.

31.    Specifically, throughout these cases (and as reflected on the hundreds of filings on the Court's docket) each Professional sought compensation through the filing of a monthly fee statement (each, a "Monthly Fee Statement") for payment of 80% of fees and 100% of expenses incurred during the preceding month. All parties had until 4:00 p.m. 21 days after the service of such statement to review the request and raise any objections. ***No party ever raised an objection.*** Upon the expiration of this period, a Professional could file a certificate of no objection (a "CNO") with the Court with respect to the unopposed portion of its Monthly Fee Statement. After a CNO was filed with the Court, each Professional submitted to the Debtors (a) a copy of the CNO and (b) an invoice expressly setting forth the allocation of 80% of fees and 100% of the expenses detailed in the CNO and Monthly Fee Statement. Following submission of the foregoing, the Debtors processed payment of the permitted 80% of fees and 100% of expenses in accordance with such allocation.

---

[31]    Interim Compensation Order, ¶ 2(b) ("Each Professional shall allocate (the "Fee and Expense Allocation") any fees and expenses sought in connection with each Monthly Fee Statement to the applicable Debtors for whose direct benefit such fees and expenses were incurred (the "Direct Benefit Fees"). To the extent a Professional incurs fees or expenses for the collective benefit of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC and Texas Competitive Electric Holdings Company LLC (the "Collective Benefit Fees"), **such fees and expenses shall be allocated to each Debtor in the same proportion that the amount of Direct Benefit Fees incurred by such Professional for such Debtor bears to the total amount of Direct Benefit Fees incurred by such Professional for all of the Debtors** (the "Collective Fee Allocation") (emphasis added).

20

32.    Beginning with the period ending August 31, 2014, and at three-month intervals thereafter, each Professional was permitted to file with the Court an interim fee application ("Interim Fee Application") for compensation and reimbursement of expenses sought in the Monthly Fee Statements during such interim period.  Each Professional negotiated the approval and allowance of the Fees and Expenses set forth in the Interim Fee Application with the Fee Committee.  Following such negotiations, the Fee Committee would file a report for each Interim Fee Application, detailing the agreed-upon deductions of the Fees and Expenses sought in connection with each such Interim Fee Application.  In connection with such report, the Fee Committee would file a proposed form of order.   Following entry of such order, each Professional submitted to the Debtors (a) a copy of such order and (b) an invoice expressly setting forth the allocation of the 20% holdback requested in such Interim Fee Application (after taking into account any agreed-upon adjustments with the Fee Committee and any unpaid Monthly Fee Statements).   Following submission of the foregoing, the Debtors processed payment of the allowed and unpaid amounts in accordance with such allocation.

33.    As a complement to the process set forth in the Interim Compensation Order, the Debtors' legal team also reviewed the invoices accompanying Monthly Fee Statements.[32]  The PAB understands that various members of the Debtors' legal team engaged directly with professionals from time to time with respect to negotiations on time entries reflected in a particular Monthly Fee Statement, requests for additional information regarding the services associated with Fees and Expenses, and dynamic staffing discussions.[33]

---

[32]  08/02/2018 P. Keglevic Dep. Tr. 80:4-8 ("The other thing I'm aware of is the bills went through our legal department first. So, you know, I was the co-CRO, and then even when I became full CRO and the CEO, all the bills went through the legal department.").

[33]  08/09/2018 T. Horton Dep. Tr. 31:25, 32:1-8.

21

34.     Finally, after a CNO was filed, each Professional would submit the CNO, together with a statement of proposed allocation consistent with what was disclosed in the corresponding Monthly Fee Statement, to the Debtors' accounting and treasury teams.  Members of those teams would confirm the mathematical calculation of the Professional's proposed allocation, adjust budget forecasts accordingly, and issue the appropriate wires authorized under the CNO.[34] Through this process, the PAB understands that members of the Debtors' legal, accounting and treasury team would, from time to time, directly engage with Professionals to better understand such Professional's proposed allocation and its implications on budget forecasts

35.     Ignoring the reasonable process detailed above, the Allocation Motion and the Elliott Creditors' efforts in the EFH/EFIH Allocation Dispute have focused on the alleged failure of Kirkland and Evercore to allocate Professional Fees and Expenses properly as between EFH and EFIH.[35]  The PAB has reviewed the factual record in these chapter 11 cases, additional information gathered through the discovery process, and live depositions of Professionals (including representatives from Kirkland and Evercore).  As detailed herein, the PAB believes that Professionals, including both Kirkland and Evercore, generally executed a detailed and reasonable process for allocating Fees and Expenses that adhered to the Interim Compensation Order and was consistent with the discretion afforded to the Professionals pursuant to the Interim

---

[34] *Id.* 32:9-25.

[35]  Although the Allocation Motion identified Alvarez & Marsal, Deloitte & Touche, Evercore, and Filsinger as professionals with allegedly 'unallocated' Fees and Expenses, the PAB understands that the Elliott Creditors have largely limited their focus to Kirkland and Evercore. *See* Allocation Motion, ¶ 61.  As a result, this Final Submission focuses primarily on the allocation process used by each of Kirkland and Evercore.

To the extent the Elliott Creditors present to the Court, in any form, any arguments related to the allocation (or failure to allocate) of the Fees and Expenses of Alvarez & Marsal, Deloitte & Touche, Filsinger, or any other Professional, the PAB reserves all rights to respond to the Court at the appropriate time.

Compensation Order. The PAB does not propose that the Court revisit those Professionals'

reasonable exercise of the Interim Compensation Order's discretion.

### 2.    Kirkland's Compliance with Interim Compensation Process

### (A)    Overview of Kirkland's Time-Entry and Invoice Review Process.

36.    The allocation of Professional Fees is not a scientific or binary process, and

depends upon the totality of the record in the case. This is particularly true when determining

what Fees and Expenses constitute "Collective Benefit Fees" on the one hand, or Direct Benefit

Fees on the other hand.[36] The Allocation Motion states that Kirkland "made no determination"

as to the allocation of "approximately $81.3 million [in] Collective Benefit Fees."[37] There does

not appear to be any support for this figure in the Allocation Motion itself and the PAB is not

aware of any other support for these assertions.

37.    Throughout these cases, Kirkland engaged in an intensive and iterative process for

preparing and reviewing invoices. As a preliminary matter, Kirkland opened over 75 matter

codes (a matter of public record, as reflected in each of the twelve Interim Fee Applications

Kirkland filed) in order to provide as much transparency into the services it was providing the

Debtors as well as the allocation of Fees and Expenses associated with such services.[38] These

included matter numbers labeled "ALL"—to indicate Collective Benefit services—as well as

matter numbers with a prefix of [EFH], [EFIH], and [TCEH]—to indicate Direct Benefit

---

[36] *See In re Tropicana Entm't, LLC*, Case No. 08-10856 (KJC), 2014 WL 7450610, at *6 (Bankr. D. Del. Dec. 30, 2014) (stating that "[t]he Professionals, themselves, have noted the difficulty in allocating their fees between the two Debtor groups," and later "acknowledging the difficulty, not only for the Professionals, but for the Court as well, of reaching a fair and principled result, and recognizing that many services benefited both Debtor groups.")

[37] Allocation Motion, ¶ 69

[38] 08/10/2018 C. Husnick Dep. Tr. 60:10-14 ("And depending on the case, we may add a couple of matter numbers. In this case, we added probably 60 or 70 matter numbers because this was a unique case in where we were billing into different silos for different debtors.").

23

services. In addition, the PAB understands that the Kirkland team drafted a billing memorandum that provided internal guidance for best practices in billing procedures, to limit the amount of time spent moving time entries to the correct matter number. At the end of each month, and in preparation for the filing of a Monthly Fee Application, Kirkland's billing team generated all time entered and closed during a specific month into a detailed invoice. Prior to the filing of any such detailed invoice, Kirkland restructuring attorneys—ranging from junior associates to partners—conducted four rounds of invoice review. The emphasis on this review was on moving time to the appropriate matter number, minimizing the extent to which time billed by different attorneys to the same issue was billed to different matter numbers, and removing privileged and confidential information.[39]

38.     As set forth above, at the same time Kirkland filed its Monthly Fee Statements on the docket, it submitted them to the Debtors' legal team for review and, from time to time, directly engaged with members of the Debtors' legal team to discuss specific time entries and/or specific workstreams (*e.g.*, the need for such workstream, the staffing of such workstream, and the expected completion of such workstream).[40]

**(B)     Kirkland's Application of the Interim Compensation Order.**

39.     The PAB believes that Kirkland's allocation throughout the chapter 11 cases was in adherence with the methodology of the Interim Compensation Order. Starting with first principles, Kirkland allocated Fees and Expenses performed for the direct benefit of certain estates as Direct Benefit Fees. For example, Kirkland's time related to the EFIH First Lien DIP

---

[39] Throughout these chapter 11 cases, Kirkland has used over 130 matter numbers, some of which are specific to certain estates.

[40] 08/02/2018 P. Keglevic Dep. Tr. 80:4-8 ("The other thing I'm aware of is the bills went through our legal department first. So, you know, I was the co-CRO, and then even when I became full CRO and the CEO, all the bills went through the legal department.").

24

Facility was billed as EFIH Direct Benefit Fees (and to EFIH-only client-matter numbers), and negotiations with TXU Retail LLC customers were billed to TCEH Direct Benefit Fees (and to TCEH-only client-matter numbers) in accordance with the Interim Compensation Order.

40.    Prior to the TCEH Effective Date, in situations where Kirkland found that Fees and Expenses were incurred for the collectively benefit of more than one estate, Kirkland allocated such Fees and Expenses proportionally to the amount of Direct Benefit Fees incurred by such estate. This methodology worked prior to the TCEH Effective Date because as the sole operating silo, there were a host of operational services that were performed primarily for TCEH (*i.e.*, TCEH Direct Benefit Fees). Moreover, after the termination of the Hunt Plan, when the Debtors determined to pursue a joint Plan on separate timelines for confirmation and emergence for TCEH and the EFH Shared Services Debtors on the one hand and EFIH and EFH on the other hand, services performed as to the former were billed as Direct Benefit Fees for TCEH.

41.    Following the TCEH Effective Date, the PAB understands that Kirkland separately tracked work performed for the benefit of Reorganized TCEH. The primary remaining issue for the EFH/EFIH Debtors was the sale of EFH Corp.'s indirect economic interest in Oncor to enable EFH and EFIH to emerge from chapter 11. As described below, the vast majority of these services were for the collective benefit of both EFH and EFIH. Given the limited Direct Benefit Fees, Kirkland's initial methodology for allocation did not work as applied.[41]

---

[41] "By way of illustrative example, assume in a particular Monthly Fee Statement for services performed after the TCEH Effective Date, Kirkland timekeepers billed (a) $0 in fees to EFH-only, for services that directly benefitted EFH; (b) $100 in fees to EFIH-only, for services that directly benefitted EFIH; and (c) $12,000 in fees for services that collectively benefitted each of EFH and EFIH. Using the methodology set forth above, the requested fees and expenses would be allocated as follows: (a) EFH would pay $0 in EFH Direct Benefit Fees; (b) EFIH would pay $80 in EFIH Direct Benefit Fees (*i.e.*, 80% of $100), for a total of $80 in Direct Benefit Fees; (c) EFH would pay $0 in Collective Benefit Fees; and (d) EFIH would pay 100% (*i.e.*, $80/$80) of Collective Benefit Fees. In this illustrative example,

42.     To account for these changing circumstances, the PAB understands that Kirkland allocated post-TCEH Effective Date Collective Benefit Fees by the relative debt at EFH and EFIH to reflect the creditor constituencies that were benefitting from such estate's efforts to maximize value for its respective estate.  This resulted in a post-TCEH Effective Date allocation of Kirkland's Collective Benefit Fees of approximately 10% to EFH and approximately 90% to EFIH, which result mitigated the risk to *both* EFH *and* EFIH that in a particular month, a miniscule amount of Direct Benefit Fees incurred by one estate would result in a disproportionate allocation of Collective Benefit Fees by such estate.[42]  The Allocation Motion cites a court memorandum to assert that the EFH/EFIH Debtors' post-TCEH Effective Date allocation was improper.[43]  Instead, the Allocation Motion asserts that allocation should be based on the estate that was expected to benefit from services.[44]

### (C)     Analysis of Specific Services Provided By Kirkland and Related Allocation of Fees Incurred.

43.     The Allocation Motion and the Elliott Creditors' efforts in the EFH/EFIH Allocation Dispute have focused on three specific categories of services in which Kirkland

---

EFIH is paying a disproportionate share of Collective Benefit Fees incurred for the benefit of both EFH and EFIH." *Limited Preliminary Statement of Kirkland & Ellis LLP as Debtors' Counsel in Response to the Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13255], ¶ 7.

[42]     *Id.* ¶ 8 ("In particular, before accounting for that certain EFIH second lien paydown in mid-2015, EFIH had approximately $12.36 billion in debt as compared to approximately $1.42 billion in debt at EFH—in other words, EFIH carried approximately 90% of the debt load across the EFH/EFIH Debtors. Consequently, following the TCEH Effective Date, Kirkland allocated any Collective Benefit Fees 10% to EFH and 90% to EFIH.").

[43]     Allocation Motion, ¶ 44 (citing *Tropicana*, 2014 WL 7450610, at *6).  Although the Elliott Creditors improperly cite this bench memorandum to support their position, Judge Carey also noted that a proposal that "fail[ed] to account for the large disparity in the size of the operations or amount of debt held by the two groups of Debtors" was not appropriate.  Additionally, the facts in this case show that allocation based on the amount of debt was considered prior to the filing of the bankruptcy.  08/17/2018 B. Williamson Dep. Tr. 73:16-25 (noting that allocation of professional fees based on estate debt was considered by the board prior to the bankruptcy filing).

[44]     Allocation Motion, ¶ 45.

26

allegedly misallocated its Fees and Expenses: (a) Fees related to services provided in connection with asbestos Claims; (b) Fees related to services provided in connection with the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims; and (c) Fees related to services provided in connection with efforts to consummate a tax-free transaction at TCEH, EFIH, and EFH.

### (1)   Asbestos-Related Services.

44.   The Allocation Motion rests on the premise that creditors asserted asbestos-related claims against the EFH Debtors, not the EFIH Debtors. [45]   Although that is factually true[46], in reality, *all* estates benefitted from the Debtors' asbestos-related work.[47]

45.   The Elliott Creditors argue that the Debtors' asbestos-related time amounted to discrete, silo-specific claims objection work.  That does not square with the record:  the Debtors "never defended against an asbestos claim" and "never litigated the merits of an asbestos claim in these cases." *See* 08/10/2018 C. Husnick Dep. Tr. 113:13-15.  Instead, "asbestos issues permeated many different areas of this case," and "there is no single way of allocating time spent related to an asbestos matter, because it covered across a host of different tasks." *See id.* at 113:22-24, 114:12-13.  Much of the Debtors' asbestos-related time centered on (a) the asbestos bar date and (b) confirming several joint plans of reorganization over due process objections (and

---

[45]   Allocation Motion, ¶ 39.

[46]   08/02/2018 Keglevic Dep. Tr. 106:15-16 ("It was a -- having somebody assume the asbestos liability was a positive to the EFH estate.").

[47]   *Id.* 111:4-11 ("We, you know, always knew that it would be -- you know, all estates would be harmed if we didn't get an assumption of asbestos, because now we have this amount -- you know, we have the asbestos bar who was active in all of the cases get -- take us through all kinds of series of litigation as to, you know, who ultimately is going to be responsible for this amount.").

defending those confirmed plans on appeal).[48]

46.    *First*, the bar date-related work benefited EFIH.  The asbestos bar date helped clarify the universe of potential liabilities and provided a foundation on which potential strategic and financial partners could formulate a proposal. *See, e.g.*, 08/02/2018 P. Keglevic Dep. Tr. 111:13-15 ("we couldn't have sold the company unless we put a fence around what the sizable liability was").  Without the asbestos bar date—and less certainty about the extent of the liabilities—potential purchasers would have discounted their purchase price.  That would have resulted in lower distributable value and a dollar-for-dollar reductions in the distributions to EFIH unsecured creditors.[49]

47.    *Second*, the Debtors' asbestos-related efforts culminated in a joint plan of reorganization that reinstated timely-preserved asbestos liabilities.  The reinstatement construct was a key component of the EFH/EFIH Committee Settlement.  As discussed above, reaching a compromise with the EFH/EFIH Committee avoided the costs of protracted litigation—both directly in terms of professional fees and in terms of lost opportunity costs from secured interest burn. *See* 08/02/2018 P. Keglevic Dep. Tr. 112:13-16 ("if we didn't resolve [the asbestos issues] positively, it would have affected all estates, because it could have been a barrier to emergence" and noting "$25 million a month [of cash-pay obligations] on the [EFIH] second lien").  Further,

---

[48] 08/10/2018 C. Husnick Dep. Tr. at 118:18-25, 119:1 ("So I believe there was -- the only order that was up -- that I can remember sitting here at the moment were related to confirmation orders for plans involving EFIH, EFH, and, in certain circumstances the first time around, TCEH.  So that time would have been allocated as a collective benefit, because the plan related to all three silos, or two in the case of the NextEra and Sempra plan.").

[49] The asbestos bar date also weakened any feasibility-based confirmation objection. *See* 08/02/2018 P. Keglevic Dep. Tr. 111:15-23 ("ultimately . . . if we didn't have somebody to take it off . . . our hands, the EFH estate -- I certainly believe that the asbestos bar would have argued that the EFH estate post-sale wouldn't have enough proceeds to cover the potential liability, and I think that would have been an objection that could have cost all the estates a lot more time and energy and litigation in the case").

EFIH could restructure its debts only by consummating a *joint* plan of reorganization with EFH that addressed the Debtors' asbestos liabilities.  Resolving asbestos claims might have mattered *only* to EFH, *if* EFIH consummated a different (and taxable) transaction separate from EFH.  That construct never materialized because no creditor or third-party was willing to stake any capital on a transaction where EFIH went on its own.

### (2)    EFIH First Lien Makewhole and EFIH Second Lien Makewhole-Related Services.

48.    With respect to Kirkland's services related to the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims, the Allocation Motion states that "disallowance of the EFIH noteholders' make-whole premiums—and the Debtors' efforts in contesting noteholders' entitlement to these premiums—would inure to the benefit of EFH creditors."  *See* Allocation Motion, ¶ 34.  It is clear that (a) at nearly all valuations, disallowing such Makewhole Claims would inure to the benefit of the EFIH unsecured creditors and (b) at some valuations, disallowing such Makewhole Claims would inure to the benefit of the EFH unsecured creditors.[50]  Negotiating consensus wherever possible with the Holders of EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims particularly in the context of the various plans of reorganization and disclosure statements, however, generally inured to the benefit of *all* unsecured creditors by paving the path to emergence. The PAB understands that this is reflected in Kirkland's Fees and Expenses—time billed to (a) *litigating the allowance of such Makewhole Claims* was billed as EFIH Direct Benefit Fees while (b) other matters related to such Makewhole Claims (including with respect to negotiating Disclosure Statement and Plan

---

[50]    08/02/2018 P. Keglevic Dep. Tr. 65:20-22 ("Well, we don't have to speculate.  When [Makewhole Claims] were allowed, the EFIH creditors were not paid in full."), 135:21-23 ("Yeah, you're reading it exactly right.  [EFH creditors] would have gotten 471 additional money over the water -- again, over the waterfall [if Makewhole Claims were disallowed].").

objections, negotiating and documenting the EFIH Secureds Settlement, and negotiating a potential path forward following the Third Circuit Makewhole Opinion in late December 2016) were billed as Collective Benefit Fees.

49.    With respect to the former, EFIH and EFIH Finance were the Debtor entities on the EFIH First Lien Indenture and EFIH Second Lien Indenture, and therefore the defendants to the suits filed by the EFIH First Lien Indenture Trustee and EFIH Second Lien Trustee.[51] EFH was not a party to such actions and no one ever attempted to add EFH as a party to such actions.

50.    With respect to the latter, the Allocation Motion focuses on EFIH's alleged solvency, arguing that until the Third Circuit Makewhole Opinion was issued, EFIH was "solvent" because EFIH unsecured creditors were expected to receive a 100% recovery (and thus, all efforts to disallow the Makewhole Claims prior to that date were primarily for the benefit of EFH creditors).[52] This statement misses two key points. Over the passage of time, complications in the Chapter 11 Cases and increasing regulatory hurdles depressed the amount of consideration potential purchasers were willing to infuse into Reorganized EFH. While all potential purchasers were prepared to infuse enough Cash to satisfy Secured Claims at EFIH (to

---

[51]  *See Delaware Trust Company v. Energy Future Intermediate Holding Company LLC, EFIH Finance Inc.*, Adv. Proceeding 14-50363-CSS [D.I. 1]; *Computershare Trust Company, N.A. v. Energy Future Intermediate Holding Company LLC, EFIH Finance Inc.*, Adv. Proceeding 14-50405-CSS [D.I. 1]; 08/10/2018 C. Husnick Dep. Tr. 45:17-25, 46:2-3 ("The make-whole dispute was commenced by the indenture trustee of the EFIH -- or representing the EFIH first lien bonds, and then later by the EFIH second lien bonds. That complaint, or adversary complaint, was filed against EFIH and was prime -- was triggered by EFIH's motion to repay the EFIH first lien debt with the second lien DIP. So, in that circumstance, we were representing EFIH in defending against an adversary proceeding related to the make-whole provisions.").

[52]  *See* 08/24/2018 B. Robins Dep. Tr. 47:23-25, 48:2-6 ("I looked at really two things. One was the expected recovery in the disclosure statements under the different plans for EFIH unsecured creditors, and then in the Elliott's allocation motion, there was a chart that showed the bond pricing at various points during the case, so I looked at that also.").

avoid an extremely difficult "cram" fight at plan confirmation), there was less certainty as to the

recovery for EFIH unsecured creditors[53]:

- *Hunt Plan: $12.6 Billion.* Initially, Kirkland advised the Debtors in connection with the Hunt Plan, which contemplated total enterprise value of approximately $12.6 billion.[54] Following the March 24, 2016 entry of a PUCT order (the "PUCT Order") that did not include all of the required approvals to consummate the merger, the Hunt Merger was terminated.

- *NEE Plan: $10.0 Billion / $2.5 Billion Reduction:* The EFH/EFIH Debtors then executed a merger agreement with NEE, which contemplated a purchase price of $10.0 billion, a $2.5 billion reduction. Once again, the PUCT entered an order forestalling a change of control application: on April 13, 2017, the PUCT entered an order determining that the NEE transaction was not in the public interest. This ruling created additional uncertainty around the EFH/EFIH Debtors' emergence from bankruptcy, and in the event a reorganization was achieved, the amount of distributable value to EFH and EFIH creditors.

- *Sempra Plan: Up to $9.45 Billion / Minimum $550 Million Reduction:* Following the termination of the NEE transaction, the EFH/EFIH Debtors executed a merger agreement with Sempra, which contemplated a purchase price of up to $9.45 billion, a minimum $550 million reduction from the NEE purchase price.[55]

51.    *Second*, compounding the declining purchase price consideration, *every version of the Plan filed between the Bankruptcy Court's disallowance of the Makewhole Claims and the Third Circuit Makewhole Opinion contained a condition precedent to the EFH Effective Date, allowing the proposed purchaser to terminate the transaction if the Bankruptcy Court order disallowing such Claims was stayed, reversed, or remanded on appeal prior to the EFH*

---

[53] Prior to and immediately after the Petition Date, EFIH unsecured debt traded below par. Trading prices changed throughout the course of the chapter 11 cases, reflecting the uncertainties in valuation of the Hunt and NEE transactions at various stages. Following the Makewhole Opinion, EFIH unsecured debt did not trade above par.

[54] *See* Energy Future Holdings Corp. 8K (Aug. 9, 2015) (noting that the investor group led by Hunt Consolidated, Inc. committed to invest or raise approximately $12.6 billion of equity and debt).

[55] *See Debtors' Memorandum of Law In Support of Confirmation of the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 12666], ¶ 82 ([T]he Plan Sponsor has agreed to provide an approximate $9.45 billion equity infusion into Reorganized EFH in connection with the Merger.").

*Effective Date.*[56]  In fact, at many points prior to the entry of the Makewhole Opinion, all EFIH

unsecured debt traded below par.  In other words, with the threat of an adverse ruling on the

Makewhole Claims (which risk materialized in the Third Circuit Makewhole Opinion), the EFIH

unsecured creditors were never guaranteed a 100% recovery and thus had every incentive to

advocate for EFIH to litigate the disallowance of the Makewhole Claims.[57]

52.    This is in addition to the growing sentiment through these chapter 11 cases that

perhaps *no sale* of Oncor could simultaneously meet the PUCT's requirements for approval and

appeal to creditors as a value-maximizing option.  Following the termination of that certain

Restructuring Support and Lock-Up Agreement, dated as of April 29, 2014, the EFH/EFIH

Debtors pursued equitization proposals that held the support of Holders of EFIH Second Lien

Debt and EFH debt.  These proposals failed during the early stages of such proposals, due to lack

of adequate financing.  And, following the failure of the Hunt transaction to consummate, a

growing understanding for the complexities of PUCT approval created an additional hurdle to

alternative proposals involving a sale of Oncor.  This sentiment was amplified following entry of

the PUCT Order.[58]

---

[56]  *See Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 7187], § IX.B.9; *Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 8355], § IX.D.8; *Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 8421], § IX.D.8; *Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9612], § IX.D.10.

[57]  08/10/2018 C. Husnick Dep. Tr. 130:24-25, 131:2-21 (describing why holders of EFIH unsecured debt were incentivized to pursue the disallowance of the Makewhole Claims).

[58]  Following the PUCT Order, creditor constituencies including the Elliott Funds approached the EFH/EFIH Debtors with a proposal for an equitization plan. *See* 08/02/2018 P. Keglevic Dep. Tr. 97:2-5 ("It had a lot of missing details, and one of our concerns about it was that it would be a taxable transaction, and there -- there was no proof that it would be beneficial to the estate.").  For various reasons, the EFH/EFIH Debtors did not view this plan as actionable. *Id.* at 98:20-25 ("So absent that one letter that I remember, which was, I think, not very long, there were never and details or support give, but

53.     At the same time, EFH unsecured creditors benefitted from consensus with the

EFIH Secured Creditors (the same way EFIH unsecured creditors benefitted from the peace

created by the EFH/EFIH Committee Settlement).  As a result, the PAB understands that time

billed for services provided in the context of the *joint* EFH/EFIH Plan, *joint* EFH/EFIH

Disclosure Statement, and the evergreen EFIH Secureds Settlement Agreement were generally

billed as Collective Benefit Fees.

**(3)**     **Tax-Related Plan Structuring.**

**(a)**     **EFIH Was Exposed to Litigation and Economic Risk In the Event of a Taxable Deconsolidation of EFH from EFIH.**[59]

54.     Starting in July 2012 and continuing for approximately the next two years, all of

the Debtors engaged in extensive discussions and negotiations with creditors to avoid a taxable

separation of TCEH and EFIH from EFH that would result in secured creditors at each of TCEH

and EFIH potentially foreclosing on their respective collateral or, in the case of EFIH, a taxable

disposition of its assets to a purchaser (such transaction, a "Taxable Sale Transaction").[60]  All of

---

certainly as a fiduciary, I - you know, like we did in the bid procedures, I would have considered anything anybody put forth that had any substance to it."). *See generally EFH/EFIH Debtors' Reply In Support of the Motion of the EFH/EFIH Debtors for Entry of an Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols in Connection with Confirmation of the Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11553].

[59] While this subsection focuses on the "check-the-box" and IRS-related risk, a taxable separation of EFH from EFIH also created potential inter-estate litigation risk regarding: (a) whether EFIH could be held liable under the Competitive Tax Sharing Agreement for any tax arising from a taxable disposition of Oncor; (b) whether Oncor and/or Oncor Holdings could have been liable for any tax arising from a taxable disposition of Oncor; and (c) efforts by EFH and EFIH to pursue a taxable separation in violation of the Tax Matters Agreement (putting aside that under the Tax Matters Agreement, EFH and EFIH would have been jointly liable to Reorganized TCEH if such taxable disposition of Oncor caused the spin-off of Reorganized TCEH to be taxable).  Neither Professor Abrams nor Mr. Robins appear to have evaluated any of these risks.

[60] 08/03/2018 C. Cremens Dep. Tr. 46:16-20 ("There was substantial discussion, as I previously testified, around the taxable/nontaxable transactions, and there was I think unanimity in the view that the nontaxable transactions was in the best interests of EFIH.").

33

the Debtors were concerned that a Taxable Sale Transaction could trigger a tax liability in excess

of $7 billion for EFH[61] (a concern that only grew following the IRS's decision in July 2016 (and

indications earlier in the year about the IRS's potential position on the issue) to treat TCEH's

debt as "non-recourse" for federal income tax purposes).[62]    In this scenario, following a

deconsolidation of EFIH and TCEH from EFH, EFH would not have had sufficient assets, on its

own, to pay even a small fraction of this tax liability.    The possibility of a multi-billion dollar

stranded tax posed grave litigation and regulatory risks to all of the Debtors—and, potentially,

any acquirer of the assets of EFIH and TCEH.

55.    The Allocation Motion asserts that the Debtors' efforts to avoid a Taxable

Transaction only benefitted EFH.  *See* Allocation Motion, ¶ 33 ("EFIH unsecured creditors, by

contrast, were indifferent as to whether a restructuring transaction was taxable or  non-taxable,

due to its status as a disregarded entity for federal income tax purposes.").    This assertion

contradicts the record in these chapter 11 cases.[63]

56.    ***Check-the-Box Risk of Mutually Assured Destruction***.  As described in the

*Omnibus Tax Memorandum* [D.I. 2296] ("Omnibus Tax Memorandum") filed on October 1,

2014—and other pleadings—it is possible that if a Taxable Sale Transaction was pursued, an

EFH fiduciary would have considered a "check-the-box" election for EFIH and/or TCEH (or its

---

[61] As well as certain of EFH's corporate subsidiaries and, as discussed below, potentially certain of its subsidiaries treated as disregarded entities for federal income tax purposes.

[62] 08/03/2018 C. Cremens Dep. Tr. 73:13-15 ("So fundamentally at the end of the day the risk of having EFIH be liable for $7 billion worth of taxes was an actual concern . . .").

[63] *See* 08/02/2018 P. Keglevic Dep. Tr. 94:13-16, 20-24 ("I certainly think there were benefits to all parties, including EFH, because EFH was the taxpayer.  And so, while they could have checked the box . . . it's unfair to say it benefited, in my opinion, just one estate.  I think it benefited all the estates, and that was the position I took with the court and with the creditors and with our boards during the process."); 08/24/2018 B. Robins Dep. Tr. 173:18-22 ("And, look, the risks we've been talking about were real risks and there's a lot of good reasons for EFIH to pursue a tax-free sale and they probably agreed with that and decided to do it.").

34

subsidiaries).[64]   If a check-the-box election was successfully made, EFIH and/or TCEH would

have become liable for any federal tax liability.[65]   Neither Professor Abrams nor Mr. Robins

evaluated this issue.

57.     ***Change in Applicable Rules or IRS Approach Creates IRS Litigation Risk.***

Throughout the chapter 11 process, the Debtors were aware that the IRS and Department of

Justice ("DOJ") would challenge any transaction giving rise to a stranded tax.  The DOJ made

that perfectly clear in its limited objection to the Bidding Procedures Motion.[66]   Although there

was (and is) ***non-binding*** IRS authority indicating that the IRS could not pursue claims against a

disregarded entity in the absence of the application of state law theories of liability such as alter

ego, veil piercing, and the like, there was a real risk that the IRS could change its position or

Treasury could change the rules.  Putting aside the non-binding nature of such IRS authority,

such authority has never been tested in a situation with a multi-billion stranded tax liability

where alternative transactions were obviously available.

> **(b)     An EFIH Taxable Separation May Not Have
> Provided Significant Value.**

58.     The Allocation Motion asserts that a taxable disposition of Oncor would, in fact,

have increased EFIH creditor recoveries.  In the abstract, they are right:  step-ups are generally

---

[64]   Omnibus Tax Memorandum, at 20; 08/02/2018 P. Keglevic Dep. Tr. 33:24-25, 34:2-3 ("Then you get into which entity had the risk.  Was it the taxpayers or was it the subsidiaries, EFIH or TCEH, because of check the box?").

[65]   Omnibus Tax Memorandum at 20-21; 08/17/2018 B. Williamson Dep. Tr. 24:16-21 ("And as you know, this was a complex tax structure, so there were a variety of different things that could be done. For example, if that tax all set up at EFH, which was like a holding company, EFH could check the box and force the taxes down."), 34:17 ("[A check-the-box election] was discussed at the full board level.").

[66]   *See United States' Limited Objection to the Debtors' Motion to Approve Bidding Procedures* [D.I. 2454].

35

valuable and purchasers will generally pay more for a tax basis step-up. But it's far from clear that a purchaser would have done so here, for a number of reasons.[67]

59.    It is critical to remember that Oncor is a regulated utility. Its economic value derives from the rates it is permitted to charge to customers by the PUCT. The value of a tax basis step-up is generally created because the tax basis step-up results in higher depreciation deductions, resulting in lower taxable income and, accordingly, cash tax savings. For that very reason, however, it is quite possible that the PUCT simply would have lowered any permitted recovery of tax expense—in other words, the PUCT could simply have reduced rates charged to ratepayers to account for these tax savings, with the purchaser receiving little or no economic benefit from the step-up. Indeed, the failure of the Hunt transaction was caused, in part, by the PUCT's disapproval of any structure that would allow potential purchasers to obtain the tax benefits associated with putting Oncor into a so-called "REIT" structure.[68] Additionally, the Treasury may have promulgated regulations that would prevent any purchaser from obtaining a tax basis step-up in a stranded tax scenario. Professor Abrams believes that the Treasury would have been without such authority, but in stating his opinion did not consider one of the prime sources of statutory authority that concerned the Debtors.[69]

---

[67] 08/24/2018 B. Robins Dep. Tr. 82:10-17 (noting that a purchaser would be unlikely to make an exchange for $2 billion in step-up net present value when there was an immediate obligation to pay $3.4 billion in income tax).

[68] The PUCT found that the risks of the proposed transaction required more protections for ratepayers including that "any reduction in [the Hunt-entity's] federal income-tax expense resulting from the use of the REIT structure may be reflected in rates such that the savings are shared with ratepayers." *Order*, PUCT Docket No. 45188, *Joint Report and Application of Oncor Electric Delivery Company LLC, et al.*, Mar. 24, 2016, at 9. *See* 08/02/2018 P. Keglevic Dep. Tr. 34:12-14 ("[T]he highest bid that came out of the Hunt deal was associated with a belief that they can convert to REIT, and a taxable deal killed it.").

[69] Specifically, under Section 337(d) of the Internal Revenue Code, Treasury has extremely broad authority to enact regulations aimed at avoidance of so-called "General Utilities Repeal." The basic jist of General Utilities Repeal was to avoid the ability of shareholders to receive property from corporations

          **(c)**     **No Party Ever Came Forward With a Proposal for a Taxable Transaction.**

60.     Finally—and most fundamentally—throughout these Chapter 11 Cases, the Debtors have encouraged all interested parties to participate in, and make proposals for, comprehensive restructuring solutions. *As set forth below, despite multiple inflection points in which any creditor could come forward with an alternative proposal, and multiple requests by the Debtors in the form of the Bidding Procedures Motion, the CRO Term Sheet, and countless formal and informal meetings, no creditor constituency ever came forward with a proposal contemplating a taxable transaction.*[70]

| Period of Time | Key Tax Considerations | Support from / Proposals from EFH/EFIH unsecured creditors |
|---|---|---|
| Restructuring Support Agreement (April 29, 2014 - July | Contemplated a tax-free transaction. | Supported by largest EFIH unsecured creditors and largest |

---

with a step-up in tax basis without paying tax on the built-in gain in such property. Treasury may have been able to take other approaches, as well, or suggested to Congress that a change in law be enacted to stop the offending transaction. Indeed, the Debtors had another scare in these cases regarding a change in law: at the end of 2015, Congress prohibited so-called "REIT spinoffs." While the provision that was ultimately promulgated contained a grandfathering provision that would have saved the Hunt transaction, the initial statute did not and need not have. The Debtors had no reason to be confident that Congress would not, if alerted, act to prevent a purchaser to obtain tax benefits that depended on a multi-billion stranded tax being created.

[70] 08/02/2018 P. Keglevic Dep. Tr. 37:22, 24-25, 38:2, 4-5, 8-13 ("I think we went on record . . . indicated that it's in the best interest of all of the estates to do a tax-free transaction. However, some parties had objected or commented . . . that we were foreclosing what could be a better opportunity of a taxable transaction . . . we, in court and in the bidding procedures, amended them to say we would accept any bid, taxable or non-taxable, and then consider them one at a time instead of foreclosing the option without understanding what a taxable transaction would look like."). The record shows that the Debtors made it clear to parties that they would have considered a taxable transaction if it were in the best interests of the estates. 08/02/2018 P. Keglevic Dep. Tr. 38:19-22, 39:4-11 ("We completed the bidding procedures, and no taxable transaction was brought forth for us to specifically consider . . . I mean, if it was in the best interest of the estate, as a fiduciary, I was happy to see it. But we had run so many scenarios and had so many discussions with different creditors, that while somebody suggested that was the case, I think the vast majority of them didn't believe it to be true. And ultimately it turned out not to be true. **We did not receive a bid.**") (emphasis added); 08/24/2018 B. Robins Dep. Tr. 65:19-25 (confirming that the Debtors made clear that any and all offers for Oncor would be considered).

| | | EFH unsecured creditor. |
|---|---|---|
| Termination of RSA to End of Informal Marketing Process (~August 1, 2014 - September 19, 2014) | Informal marketing process imposed no limits on taxable v. tax-free transaction.<br><br>The proposed Bidding Procedures Motion [D.I. 2087] expressly invited and permitted proposals contemplating a taxable transaction. | No proposals from existing creditors or viable third-party proposals. |
| Formal Bid Process to End of Stalking Horse Period (~September 19, 2014 - ~ July 30, 2015) | Circulation of CRO Term Sheet, which contemplated a tax-free TCEH spin and one of (a) a standalone investment; (b) an equitization; or (c) a merger of EFH/EFIH. No formal limits on pursuit of taxable vs. non-taxable deal at EFH/EFIH. | No stalking horse ultimately selected; no-creditor-driven proposals despite multiple in-person and telephonic meetings before and after circulation of the CRO term sheet. |
| Hunt Transaction (~August 1, 2015 - May 1, 2016) | Contemplated a REIT, which could not be consummated in the event of a taxable transaction. | Ultimately supported by largest EFIH creditors and largest EFH unsecured creditor. |
| End of Hunt Transaction - Execution of NEE Transaction (~May 2, 2016 - July 29, 2016) | Exclusivity terminated; TCEH first lien creditors threatened a taxable transaction. The Debtors filed a Plan that expressly reflected a willingness to explore a taxable transaction. | No proposals from existing creditors or viable third-party proposals.<br><br>Largest EFIH unsecured creditors and largest EFH unsecured creditor ultimately supported the NEE Transaction. |
| Confirmation of TCEH Debtors and EFH Shared Services Debtors' Plan (August 2016) | TCEH plan contemplated a tax-free spin of TCEH and TMA "you break it, you buy it" provision effectively prohibited a taxable EFH/EFIH transaction. | EFH creditor objections to confirmation overruled; no alternative proposals from any existing EFH/EFIH creditors. |

### 3.      Evercore's Compliance with Interim Compensation Process.

61.      Like Kirkland, Evercore allocated its fees into different fee categories based upon

the nature of the work and the estates that related to specific work.  To the extent that work was

performed solely for the benefit of a specific estate, such Fees and Expenses were billed as

38

Direct Benefit Fees.[71] The PAB understands that prior to the TCEH Effective Date, Evercore allocated its Fees and Expenses into four categories: TCEH/EFCH; EFIH; EFH; and ALL. The first three categories represented Evercore's Direct Benefit Fees, and were billed directly to each respective estate. The "ALL" category represented the Collective Benefit Fees, and these Fees were allocated proportionately to each estate depending on the proportion of Direct Benefit Fees allocated to such estate within a particular time period. Following the TCEH Effective Date, Evercore allocated its Fees and Expenses into three categories: EFIH; EFH; and ALL, allocating the "ALL" Fees proportionately to each estate depending on the proportion of Direct Benefit Fees allocated to EFH or EFIH within a particular time period. The PAB believes that Evercore's allocation was in adherence with the methodology of the Interim Compensation Order.

62.    Evercore's process for complying with the Interim Compensation Order differed from Kirkland's. The PAB does not view these differences as surprising, given that the Interim Compensation Order deferred to the discretion of Professionals in determining specific processes for determining appropriate allocation of Collective Benefit Fees and Direct Benefit Fees. Given that Professionals such as Kirkland and Evercore performed work of a different nature during these chapter 11 cases—and that each independently determined procedures for allocation—it is rational that every Professional would have a unique allocation process.

63.    The PAB understands that, as opposed to a written document providing guidance, Evercore timekeepers relied on a listing of fee categories summarized in a Microsoft Excel file and internal discussions to determine whether time was attributable to EFH or EFIH.[72] Although

---

[71] 08/09/2018 J. Matican Dep. Tr. 60:2-5 ("Mechanically, if it related specifically to one estate, it was allocated directly to the estate; and if it touched multiple estates, then it was collective.").

[72] *Id.* 51:22-25, 52:2-3.

formalized guidance appears to have been absent, the PAB believes that the factual record highlights Evercore's thorough and conscientious process in allocating Fees and Expenses. Specifically, the Evercore team regularly discussed the appropriateness of certain allocations, reviewed time entries internally, conferred with their counsel regarding Evercore's Fees and Expenses, and typically shared invoices with the Debtors for review prior to filing any Monthly Fee Application.[73]

## CONCLUSION

64.    For the foregoing reasons, the PAB respectfully requests that the Court enter an order: (a) allocating the Material Administrative Expense Claims in accordance with the Proposed Allocations; (b) and denying the Allocation Motion and the requested allocation and reallocation of Material Administrative Expense Claims requested therein.

*[Remainder of page intentionally left blank.]*

---

[73] *Id.* 34:5-12, 62:3-10.

Dated: August 30, 2018
       Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:        collins@rlf.com
            defranceschi@rlf.com
            madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Brian E. Schartz, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        edward.sassower@kirkland.com
            stephen.hessler@kirkland.com
            brian.schartz@kirkland.com
            aparna.yenamandra@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
            marc.kieselstein@kirkland.com
            steven.serajeddini@kirkland.com

*Co-Counsel to the EFH Plan Administrator Board*