**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al*., | Case No. 14-10979 (CSS) |
| | RE: [D.I. 1833] |
| Debtors. | (Jointly Administered) |

**FINAL WRITTEN SUBMISSION OF AD HOC EFH CLAIMANTS IN SUPPORT OF THEIR OBJECTION TO JOINT MOTION OF UMB BANK, N.A., AS INDENTURE TRUSTEE, AND ELLIOTT TO FIX APPROPRIATE ALLOCATION OF CERTAIN RESERVES AND EXPENSES AS BETWEEN THE EFH AND EFIH DEBTORS**[1]

**[REDACTED]**
*CONFIDENTIAL – FILED UNDER TEMPORARY SEAL*
**SUBJECT TO PROTECTIVE ORDER**

---

[1]    Terms not defined herein shall have the meaning ascribed to them in the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code, dated February 15, 2018 [D.I. 12653] (the "Plan").

The Ad Hoc EFH Claimants,[2] by and through their undersigned counsel Kasowitz Benson Torres LLP and Hogan McDaniel, hereby submit this final written submission in support of their objection (the "Objection") to the *Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13102] (the "Allocation Motion").  In support of their Objection, the Ad Hoc EFH Claimants respectfully represent as follows:

## PRELIMINARY STATEMENT

The Allocation Motion rises – and ultimately falls – on Movants' absurd predicate that the Debtors ran these Chapter 11 Cases *primarily* to benefit EFH.  The reality that EFH exited the Chapter 11 Cases with little distributable value for its unsecured creditors, especially compared with the billions of dollars that Sempra paid EFIH and EFIH in turn distributed to its unsecured creditors proves that Movants are simply and disingenuously manufacturing this "dispute" to snatch additional value for themselves at the expense of EFH's creditors.  That the NextEra Break-Up Fee is attributable to assets EFIH sold -- and solely for consideration EFIH received proves that EFIH alone is responsible for payment of this fee.  EFH was "out of the money" in the NextEra transaction.  It is nonsensical – and unprecedented -- to burden out of the money equity by imposition of a fee that generated no income to that equity.  It is also nonsensical to reallocate payment of professional fees when Movants failed to challenge the Debtors' professionals' business judgment allocating fees in real-time and now have no substantial competent evidence (or actually any evidence) necessary to have this Court substitute its

---

[2]    The Ad Hoc EFH Claimants include (a) Alta Fundamental Advisers LLC, (b) Angelo, Gordon & Co., L.P., (c) Apollo Management Holdings L.P., (d) Brookfield Asset Management Inc., and (e) Farmstead Capital Management, LLC, and each of their related funds.  *Verified Amended Statement of Kasowitz Benson Torres LLP and Hogan ♦ McDaniel Pursuant to Bankruptcy Rule 2019* [D.I. 13327] at ¶¶ 3-4.

judgment.[3]

The Allocation Motion also fails as a substantive matter.  First, the Movants argue that EFH should bear *half* of the NextEra Break-Up Fee even though EFH creditors stood to gain nothing from the NextEra transaction and in fact received no cash from Sempra.  Asking this Court to defy the Third Circuit's *O'Brien* decision, the Movants ignore the fundamental operation of break-up fees:  that they are paid from the sale waterfall.  This normally occurs from the first dollars generated from a replacement transaction, such that equity already bears the burden of the expense by a reduction in the waterfall.  For example, had there been an additional $300 million in transaction consideration, $275 million would go to NextEra and $25 million to EFIH until its creditors were paid in full.  If it only took $10 million to do so, then EFH's creditors would receive only $15 million rather than the full $290 million that exceeds EFIH's solvency.  Here, where EFIH remained insolvent after full application of the transaction consideration, shifting any portion of the NextEra Break-Up Fee up to EFH would be punitive.

Analyzing the purported benefit of the NextEra transaction to  EFH also proves the point: given EFIH's insolvency due to (1) the amount of the Oncor consideration and (2) the amount of EFIH claims (including the Makewhole Claims), EFH received no cash consideration from the disposition of its subsidiary's interest in Oncor.  Indeed, because EFH received nothing from its subsidiary's transaction, any break-up fee the Court directs to EFH bears no relation to the assets EFIH sold.  As a result, it makes no sense for EFH to pay any portion of the NextEra Break-Up Fee, let alone the $137.5 million proposed by Movants.

---

[3]    The Ad Hoc EFH Claimants did not take Movants' bait to act equally disingenuously to argue for an even greater allocation in EFH's favor.  Rather, the Ad Hoc EFH Claimants recognize that two levels of business judgment support the allocations.  And, having spent the time and money observing Movants failed attempt to gin up a record to the contrary, ██████████████████████████████████, the Ad Hoc EFH Claimants simply ask the Court to uphold the reasoned decisions of those with knowledge.

Similarly, *reallocation* of a substantial portion of the E-Side professional fees and expenses to EFH above the amount EFH already has agreed to bear is unsupportable. Reallocation requires that the Court second-guess allocation determinations that the professionals and the Debtors made in real-time during the Chapter 11 Cases pursuant to the allocation provision in the Interim Compensation Order that the parties carefully negotiated, the fee examiner approved, the Debtors and Committee filed publicly subject to review and objection by any party in interest, and without any party raising a single objection related to allocation, approved by the Court.  Movants fail to explain the basis for why the Court should reconsider each allocation decision now.  Instead, the Ad Hoc EFH Claimants contend that the Court should simply afford the appropriate business judgment deference to the determinations already made.

Moreover, the remarkable underlying argument that the Debtors' and Committee's professionals' work primarily benefited EFH lacks merit.  Movants posit that only EFH was interested in avoiding what has been called "Tax Armageddon."  Yet, in reality all of the E-Side Debtors were concerned with the tax ramifications of any transaction disposing of Oncor. Indeed, EFIH, its independent directors, and its principal unsecured creditors acknowledged that EFIH was at risk from any stranded tax liability.

The Movants' argument that EFIH's (not EFH's) litigation seeking disallowance of the Makewhole Claims was for EFH's benefit is similarly nonsensical.  The Makewhole Claims arose out of loan documents to which EFIH, not EFH, was party.  And, it was the Makewhole Claims that were the biggest driver in EFIH unsecured creditor recoveries.  Although EFH would indirectly benefit from EFIH's solvency, a party bears its own litigation expense and mere potential, unrealized benefit is insufficient to shift the subsidiary's litigation expenses to its shareholder.  Like the NextEra Break-Up Fee, EFH as EFIH's equity holder *already* bears this

3

cost by the unavailability of funds to flow up.

Finally, EFH should not pay 30% of Elliott's potential Substantial Contribution Claim because EFH did not directly benefit from Elliott's work.  Indeed, Elliott expended resources for the benefit of EFIH to help its own recovery value.  Elliott is not able to point to a single dollar of value that EFH received as a result of its efforts.  As with all of the other allegations in the Allocation Motion, the supposed direct benefit to EFH is amorphous and overwhelmingly concerns conditions – the threat of a taxable transaction that would yield higher value -- that never materialized.

The Ad Hoc EFH Claimants respectfully request that the Court reject Elliott's unfair attempt to grab additional money from EFH's creditors' much lower recoveries.  Movants seek only to have EFH maintain its limited fund of cash that has been long-promised to its unsecured creditors.  The Movants never generated this cash, and they cannot claim it based on efforts they undertook to maximize their own recoveries – procuring the Sempra transaction and opposing the NextEra Break-Up Fee -- during these cases.

## BACKGROUND

### A.    Procedural History of the Allocation Dispute.

1.      On February 15, 2018, Energy Future Holdings Corp. ("EFH"), Energy Future Intermediate Holding Company LLC ("EFIH"), and the other "E-Side" debtors filed the Plan. D.I. 12653.  On February 27, 2018, this Court entered an order confirming the Plan.  D.I. 12763. The effective date of the Plan (the "Effective Date") occurred on March 9, 2018.

2.      Prior to the Effective Date, EFH and the EFIH attempted to negotiate an allocation of certain administrative expenses between the two estates.  *Motion of the EFH Plan Administrator Board for Entry of an Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols in Connection with the EFH/EFIH Allocation Dispute* [D.I.

4

13113] (the "Scheduling Motion"), ¶ 5.  Unfortunately, those efforts were unsuccessful.  *Id.*

3.       On May 13, 2018, Elliott Associates L.P., Elliott International, L.P., the Liverpool Limited Partnership (collectively, "Elliott"), and UMB Bank, N.A. ("UMB" and together with Elliott, the "Movants") filed the Allocation Motion.  In the Allocation Motion, Elliott seeks to allocate and/or reallocate several categories of administrative expenses incurred or potentially incurred by the E-Side Debtors.  In particular, the Allocation Motion centers on the allocation of: (1) a $275 million plan reserve to pay a break-up fee (the "Break-Up Fee") asserted by NextEra Energy, Inc. ("NextEra") that is currently disputed;[4] (2) professional fees incurred by the EFH/EFIH Committee (the "Committee's Fees"); (3) professional fees incurred by the EFH Debtors and the EFIH Debtors (the "Debtors' Fees"); and (4) Elliott's asserted substantial contribution claim (the "Substantial Contribution Claim").  Among other things, the Movants have asked the Court to allocate:  (i) the Break-Up Fee (if it becomes payable) on a 50%/50% basis between EFH and EFIH; (ii) the Debtors' Fees (which Movants have limited to those incurred by Kirkland & Ellis LLP and Kirkland & Ellis International LLP ("Kirkland") and Evercore) on a 50%/50% basis between the two estates, (iii) the Committee's Fees 70% to EFH and 30% to EFIH, and (iv) the Substantial Contribution Claim 30% to EFH and 70% to EFIH.[5]

4.       Movants rely on several very general and very unpersuasive arguments that do not square with the history of these cases.  Specifically, Movants allege that:

- Administrative fees from the NextEra Plan Reserve should be split 50% EFH and 50% EFIH because:  (1) the EFIH-sponsored sale of Oncor "saved" EFH from a "Tax Armageddon"; (2) an $165 million increase in the Break-Up Fee was exchanged for

---

[4]    Whether the Break-Up Fee will be allowed as an administrative expense is a matter currently pending on appeal before the Third Circuit.  *NextEra Energy, Inc. v. Energy Future Holdings Corp., et al. (In re Energy Future Holdings, Inc.)*, No. 18-1109 (3d Cir. 2018) (the "NextEra Appeal").  NextEra also asserted an administrative claim in the alternative in the event its Break-Up Fee claim is disallowed.

[5]    Because the amounts in dispute significantly exceed the approximately $200 million available for distribution by EFH under the Plan (none of which came from the Sempra sale and all of which came from EFH cash), the Allocation Motion proposes that notwithstanding Movants' allocation demands no less than $10 million of distributable value should remain at EFH.  Allocation Motion, ¶6.

increased hypothetical (though concededly not actual) recoveries to EFH's creditors; and (3) after the proposed NextEra transaction failed, the E-Side Debtors still managed to successfully pursue a tax-exempt transaction.  Allocation Motion at 9-14, 20-22.

- The Committee's Fees should be split 70% EFH and 30% EFIH because the Committee incurred fees primarily in connection with (1) the TCEH settlement; (2) litigation regarding EFIH "make-whole" claims (concededly owed by EFIH not EFH); and (3) the NextEra transaction and plan, all of which purportedly were primarily for the benefit of EFH.  Allocation Motion at 14-17, 23-26.

- The Debtors' Fees should be split 50% EFH and 50% EFIH (concededly far different from how the Debtors self-allocated pursuant to Court order), because:  they primarily were incurred (1) to avoid "Tax Armageddon," including all of the work performed in connection with the numerous plans and sale motions filed in this proceeding; (2) to challenge the EFIH "make-whole" claims which, if successful (they were not), would have potentially yielded funds to flow up to EFH; and (3) for the TCEH settlement and Sempra's assumption of EFH asbestos liability.  In particular, Movants assert (again in the face of the Debtors' self-allocation) that Kirkland's "collective benefit" fees should be adjusted from 90% EFIH and 10% EFH to 50% each because it's work supposedly was primarily for EFH's benefit. Allocation Motion at 14-17, 27-32.

- At least 30% of Elliott's Substantial Contribution Claim should be allocated to EFH because:  (1) Elliott allegedly moved the estates toward a restructuring transaction that avoided a "Tax Armageddon" and facilitated a "value-maximizing" transaction with Sempra; and (2) Elliott obtained an order, currently on appeal, reconsidering the Break-Up Fee.  Allocation Motion at 17-18, 32-33.

### B.    Commencement of the Chapter 11 Cases.

5.      EFH and numerous subsidiaries (collectively, the "Debtors") filed chapter 11 bankruptcy petitions on April 29, 2014 (the "Petition Date").  The cases (the "Chapter 11 Cases") are viewed as the largest and most complex bankruptcies ever and include multiple debtors.  The Chapter 11 Cases are jointly administered but not substantively consolidated.  *Final Order Directing Joint Administration of the Debtors' Chapter 11 Cases* [D.I. 849].

6.      The Debtors include Energy Future Competitive Holdings Company LLC ("EFCH") and its subsidiary, Texas Competitive Electric Holding Company, LLC ("TCEH," and together with EFCH, the "T-Side Debtors").  The Debtors also include EFH's wholly-owned subsidiary, EFIH (with EFH, the "E-Side Debtors").  EFH is the ultimate parent of all the debtor

Case 14-10979-CSS    Doc 13419    Filed 08/30/18    Page 8 of 42

and non-debtor entities.  *Declaration of Paul M. Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* [D.I. 98] (the "First Day Declaration"), ¶ 44.

7.    Oncor Electric Delivery Company LLC ("Oncor"), a non-debtor entity, was owned 80% by EFIH at the commencement of the Chapter 11 Cases.  *Id.*, ¶¶ 19, 44.  Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings") was a wholly owned subsidiary of EFIH, and Oncor was owned 80% by Oncor Holdings.  *Id.*, ¶ 20.  The monetization of EFIH's interest in Oncor was a critical component of the E-Side Debtors' reorganization efforts with, as in any bankruptcy, proceeds first paid EFIH's creditors, and if those creditors were paid in full, flowing into EFH's estate to pay its creditors.  This latter event, of course, never happened.

**C.    The Framework of Professional Fee Allocation Among Debtors.**

8.    Prior to the Petition Date, the Debtors and certain creditors, including unsecured creditors of EFIH, executed a restructuring support agreement (the "RSA") that contemplated a tax-free spin-off of TCEH, the deleveraging of EFIH through a $2 billion DIP loan, which would be converted to equity in EFH post-emergence, and a framework for settling certain makewhole claims of EFIH's secured creditors (the "Makewhole Claims").  First Day Declaration ¶ 17.

9.    Critically, as it relates to the instant dispute, the parties to the RSA also agreed upon a framework to allocate professional fees incurred during the Chapter 11 Cases among the Debtors.  Creditors of EFIH, ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████;

Horton Dep. at 13:2-10 (admitting that the RSA negotiations "predominantly" involved the EFIH PIK holders); ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████.

10.    With respect to such allocation, the RSA provided, in pertinent part, that:

> Any professional fees (the "Professional Fees") incurred by professionals retained by the Debtors (the "Debtors' Professionals") shall be allocated to, and paid by, the applicable Debtors for whose direct benefit such Professional Fees were incurred (the "Direct Benefit Fees"). To the extent a Professional Fee is incurred for the collective benefit of the EFH Debtors, EFIH Debtors, and TCEH Debtors (the "Collective Benefit Fees"), such Professional Fees shall be allocated to each Debtor in the same proportion that the amount of Direct Benefit Fees incurred by such Debtor's Professional for such Debtor bears to the total amount of Direct Benefit incurred by such Debtor's Professional for all of the Debtors, on a monthly basis in connection with the Debtor's Professional's fee application (the "Collective Fee Allocation").

D.I. No. 505, at Ex. 2, Ex. A at 24.

11.    Accordingly, the RSA provided that the determination of which Debtor is responsible for the fees incurred during the Chapter 11 Cases is a function of whether one or more Debtors received a "*direct benefit*." █████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ This differentiation between direct and indirect benefits and the reliance on the Debtors' professionals' business judgment are essential to a proper allocation. *Indirect* benefits – while constituting value that EFH may have received from the reorganization of each of the Debtors as the ultimate corporate parent – did not drive the allocation determination; rather, Debtors' *direct* benefits established the framework. ██████

████████████████████████████████████████████████████████

█████████████████████████████████████████.

12.    In this latter regard, the allocation formulation in the RSA was incorporated into the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for* Professionals, entered by the Court on September 16, 2014 [D.I. 2066] (the "Interim

Compensation Order"). ███████████████████████████████████████████.

13.     By vesting responsibility for the allocation of professional fees in the Debtors'

professionals, the Interim Compensation Order treated such allocation as any other component of

a professional's fee application with critical reliance on such professionals' judgment.  Just as

the reasonableness of a professional's fees are subject to objection by interested parties, so too

were the allocation decisions made by each professional and disclosed in their fee statements.

Additionally, the Debtors reviewed the allocations themselves, providing an additional layer of

business judgment scrutiny, to ensure that professionals properly allocated their fees and

expenses. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████; Horton Dep. at 24:2-13 ("[T]here was a legal team that was reviewing the

legal bills and invoices."); Cremens Dep. at 34:17-35:1 ("[T]he professionals had an allocation

methodology and the management of the company was very much responsible for being quality

assurance around how that was being done.").

**D.     Monthly Compensation Applications Allocate Debtors' Professional Fees Pursuant to the Interim Compensation Order Without Objection.**

14.     The Debtors' professionals filed numerous monthly fee statements and interim fee

applications pursuant to the Interim Compensation Order throughout the course of the Chapter

11 Cases.  All of the evidence indicates that the allocation of fees made by the Debtors'

professionals in these fee statements and applications was reasonable in accordance with the

Interim Compensation Order.

15.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

16.    ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████.

17.    The allocation of Evercore's fees similarly tracked the procedure in the Interim Compensation Order.  For example, Evercore allocated work related to the asbestos claims to EFH, Matican Dep. at 25, work related to the Makewhole Claims to EFIH, *id.* at 26, and work related to plan confirmation as a collective benefit, *id.* at 26:18-27:9, 30:1-25.  The actual allocation percentages fluctuated on a monthly basis, reflecting the work performed and the active exercise by Evercore (which submitted the allocations) and the Debtors (which approved

them) of their business judgment to allocate fees appropriately.

18.    No party *ever* objected to *any* of the allocations contained in *any* of the Monthly Fee Statements or Interim Fee Applications. ███████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████

19.    Indeed, until the Allocation Motion was filed on May 13, 2018, no party had formally challenged the Debtors' allocation of fees as an issue with the Court.  Moreover, the Movants still have not offered any basis or methodology to support their proposed 50/50 reallocation of the Debtors' Fees. ███████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████    Instead, Movants' proposed allocation is simply an arbitrary amount designed only to move as much expense as possible to EFH. ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████

**E.    Appointment of Committee of Unsecured Creditors of the E-Side Debtors.**

20.    On October 27, 2014, the United States Trustee for the District of Delaware appointed the official committee of unsecured creditors of EFH and EFIH (the "Committee"). D.I. 2570.

21.    Although the E-Side Debtors paid the Committee's professionals' fees, the

Committee's fiduciary duties (including the fiduciary duties of their professionals) run to the unsecured creditors of the E-Side Debtors.  Thus, the Committee's actions were not "for the direct benefit" of any Debtor; they were for the collective benefit of the E-Side Debtors' unsecured creditors.  ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

22.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

23.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

24.    Here again, no party *ever* objected to *any* of the allocations contained in *any* of the dozens of monthly fee statements or the interim fee applications filed by the Committee's professionals during the pendency of the Chapter 11 Cases.

**F.    The Restructuring Efforts of the E-Side Debtors.**

25.    Rather than identifying specific tasks that the Debtors supposedly errantly allocated, the Movants focus on a handful of major events in the Chapter 11 Cases and then seek

to extrapolate a reallocation without any explainable methodology or supporting evidence. Instead, they resort to revisionist history to justify their distorted view of the estates that benefited from the work performed during the Chapter 11 Cases.

### 1.    The Sale Process and Avoidance of "Tax Armageddon".

26.    From the inception of the Chapter 11 Cases, all Debtors, including EFIH, concluded, in the proper exercise of their business judgment, that a taxable transaction to monetize Oncor presented a serious risk to the recoveries of all creditors and posed potentially insurmountable execution risks.  However, according to the Movants, the *benefits* of a non-taxable transaction inured primarily to EFH, and not to EFIH (at least after 2017), and therefore the *costs* related to pursuing such a non-taxable transaction should be borne solely by EFH, and not by EFIH.  The Movants' position is contrary to all evidence and representations presented to this Court and what this Court has held throughout the Chapter 11 Cases.

27.    First, all parties to this case recognized that the benefits of a non-taxable transaction inured to the benefit of all Debtors.  Early in the case, the Debtors prepared and filed their *Omnibus Tax Memorandum*, dated October 1, 2014 [D.I. 2296] (the "Tax Memo"), outlining the Debtors' views of the risks of pursuing a taxable disposition of the Debtors. ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

- EFH would have a fiduciary obligation to consider a "check-the-box" election for EFIH.  Tax Memo at 20-21.

- The IRS could successfully oppose a transaction stranding an unpayable tax at EFH and put the tax instead on EFIH.  *Id.* at 15-16.

- Even if the IRS failed to impose a taxable transaction of EFIH, it could potentially prevent EFIH's new owners from enjoying the stepped-up basis from that transaction.  *Id.* at 16-17.

- A taxable transaction would likely lead to protracted litigation over responsibility for a "stranded" tax based on a variety of different legal theories.  *Id.* at 17-20.

28.     The Debtors' fiduciaries, including EFIH's independent directors, believed that these were serious risks for EFIH and its creditors.  Cremens Dep. at 29:22-31:13, 46:11-20, 72:17-73:18 (testimony of EFIH disinterested director that nontaxable transaction "would maximize the value for the EFIH estate," due to risks identified in the Tax Memo, which were "corroborated" by EFIH's independent tax counsel at Cravath, Swain & Moore LLP, and that "the risk of having EFIH be liable for $7 billion worth of taxes was an actual concern").

29.     The unsecured creditors of EFIH, ████████████████████████████████, agreed with that assessment.  The prepetition RSA, executed by a controlling majority of the EFIH unsecured creditors provided for a tax-free restructuring.  *See Motion of Energy Future Holdings Corp.,* et al. *for Entry of an Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay* [D.I. 505] at 16-17; ████████ ████████████████████████ ; Horton Dep. Tr. at 75:12-21; ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████████; ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████. 

30.     The Bankruptcy Court also agreed that the E-Side Debtors properly exercised their business judgment to pursue a tax-free disposition of Oncor when it approved the *Motion of*

14

*Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [D.I. 2087] (the "Bid Procedures Motion"), which made clear the Debtors' preference for a tax-efficient deal structure. *Order (A) Approving Revised Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [D.I. 3295] (the "Bid Procedures Order"). Importantly, neither UMB nor any unsecured noteholder of EFIH opposed the Bid Procedures Motion on the grounds that the Debtors preferred a tax-free transaction.

31.     During the hearing on the Bid Procedures Motion, Keglevic testified that the Tax Memo was objective regarding tax risks and that the RSA, which was premised on a non-taxable transaction, was approved by EFIH's board, and which was not opposed by the EFIH unsecured noteholders. D.I. 2579 (10/28/2014 Bid Procedures Hr'g Tr. at 117:6-13, 129:12-18). As a result, the Court entered an order on January 14, 2015, approving the Bid Procedures Motion based on its finding that the procedures were "fair, reasonable, and appropriate under the circumstances and designed to maximize the value received for the sale of the Debtor's economic interest in Oncor" and that "[t]he votes of the Debtors' boards and the votes of the disinterested managers and directors of EFH Corp., EFH, EFCH, and TCEH . . . were . . . a fair, reasonable, and appropriate exercise of business judgment by the Debtors." D.I. 3295 at 2; *see also,* D.I. 2699 (transcript of November 3, 2014 bench ruling).

32.     Critical to the irrelevance of this tax "issue" here, *the Debtors always allowed for the possibility of a taxable transaction if it would maximize value. See* ███████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. However, the

record is clear that the Debtors *never received a viable taxable alternative*.  *See* Cremens Dep. at 31:14-18 (EFIH disinterested director testifying that he did not recall ever being "presented with a taxable transaction for the sale of Oncor that was worthy of consideration"); ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████.  Indeed, the sole supposedly potentially taxable transaction that Movants can identify was strategically floated by Rosenbaum himself.  And even Rosenbaum never formally made this so-called "proposal" and Elliott never pursued one.  ████████████████████████████████████

████████████████████████████████; Horton Dep. at 76:11-78:9 ("I wouldn't characterize that as a complete term sheet.").

33.    Equally important, even if Movants are correct (they are not) that Debtors' preference for a non-taxable transaction was solely or largely for the benefit of EFH, Movants cannot point to a single increased cost incurred by the Debtors as a result of that preference.  ██

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Every dollar spent on professional fees relating to the disposition of Oncor inured solely to EFIH's benefit:  EFH's creditors did not receive *any* distributions from this sale in the plan the Court ultimately confirmed.

34.    Accordingly, Movants' speculative concerns and arguments that EFIH somehow "sacrificed" value because the Debtors did not pursue a taxable transaction fail on the facts.

### 2.    Makewhole Dispute.

35.    The Movants claim that the cost of challenging the prepayment premiums (the "Makewhole Claims") that EFIH allegedly owed pursuant to its first and second lien facilities

should be borne equally by EFH and EFIH.  Because they assert that EFIH was solvent (it was

not), Elliott claims that EFH bore the risk of the Makewhole Claims being allowed.  Here, the

factual record completely belies the Movants' contentions.

36.    The RSA – to which the EFIH unsecured creditors were a party, i█████████

████████████████████████ – specifically required EFIH to commence litigation to

challenge the payments.  *See* D.I. 505, Ex. A, Ex. 2 (RSA) at 5; R███████████████

████████████████████████████████████████████████

██████████████.  Thus, the EFIH PIK holders were concerned with the potential dilution

from the Makewhole Claims.

37.    EFIH – and <u>not</u> EFH – was the party to the operative loan agreements that gave

rise to the Makewhole Claims.  Accordingly, only EFIH had the requisite contractual privity to

vest it with standing to challenge the Makewhole Claims.  Moreover, the primary beneficiary of

the disallowance of the claims would have been the EFIH unsecured creditors, who stood next in

line in the waterfall.

38.    Following extensive litigation, the Court disallowed the Makewhole Claims and

the District Court affirmed.  *In re Energy Future Holdings Corp.*, 539 B.R. 723 (Bankr. D. Del.

2015), *aff'd sub nom. In re: Energy Future Holdings Corp.*, 2016 WL 1451045 (D. Del. Apr. 12,

2016).  On November 17, 2016, the Third Circuit reversed the decisions of the Bankruptcy Court

and the District Court disallowing the Makewhole Claims.  *In re Energy Future Holdings Corp.*,

842 F.3d 247 (3d Cir. 2016).  At the time of the Third Circuit decision, the Debtors were about to

commence the hearing to confirm the NextEra Energy, Inc. ("NextEra") plan (the "NextEra

Plan").  *Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain*

*Protocols in Connection with Confirmation of the Debtors' Joint Plan of Reorganization as it*

*Relates to the EFH/EFIH Debtors* [D.I. 9381]. ████████████████████

████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████

39.     Accordingly, even if this Court were to focus solely on "benefit" as a theoretical concept divorced from the practical reality that neither EFH nor its creditors could challenge the Makewhole Claims and that the only "benefit" from such a challenge derived from EFH's equity interest in EFIH, ███████████████████ EFH derived *no* direct benefit from the challenge to the Makewhole Claims based on an economic recovery analysis. *See* Horton Dep. at 23:10-19 (explaining view that there was a direct benefit for EFIH in the litigation.).

40.     It is crystal clear that only the estate that has claims disallowed benefits from such disallowance. Here EFH, EFIH's shareholder, also happens to be in bankruptcy and that seems to be Movants' confusion. If EFH were not, would this Allocation Motion even exist? Of course not, Movants can cite no example (because there is none) of a bankruptcy court assessing a <u>non-debtor</u> shareholder for a debtor's professional expenses in objecting to claims. But under Movants' strained theory, that non-debtor shareholder hypothetically "benefited" from the debtor-subsidiary's claim disallowance and the Court should *directly* assess the non-debtor

shareholder for the expense.[6]  Even worse, Movants contend that that shareholder "benefited"

even if, as here, the debtor-subsidiary remained insolvent and no actual funds flowed up to the

shareholder!  This is nonsensical.

### 3.    TCEH Settlement and Assumption of Asbestos Claims.

41.    Movants highlight two other issues as supposed EFH benefits in their misguided

attempt to reallocate the Debtors' Fees and Committee's Fees:  the TCEH Settlement and

Sempra's assumption of asbestos claims.  The Movants, however, fail to acknowledge that both

of these issues were gating items whose resolution was required before any plan of the E-Side

Debtors could be confirmed.

42.    The Debtors agreed early on in the case that any proposed plan must provide for

assumption of the asbestos claims.  As a result, its inclusion in the plan – while providing a

benefit to EFH – also benefited all estates by resolving potential litigation and preventing any

unnecessary delay and incurrence of significant additional expenses.

43.    Moreover, the Debtors were required to reinstate any "Legacy General Unsecured

Claims," meaning asbestos claims, under any "Alternative Restructuring," pursuant to the

EFH/EFIH Committee Settlement. [D.I. 11889] at 93, 112.  As a result, because EFIH stood to

benefit from the confirmation of any plan after the entry of the EFH/EFIH Committee

Settlement, EFIH benefitted from resolution of the asbestos claims.  *See* Horton Dep. at 20:9-

21:22 (testifying that the assumption of asbestos liabilities was "part of the give and take of

getting a transaction done," and that "therefore . . . because the entire transaction benefitted both

EFH and EFIH, it as for the benefit of EFH and EFIH"); ██████████████████████

███████████████████████████████████████████████████████████████

---

[6]    The Court need only observe that, had EFH successfully objected to claims against it, the Court would not,
indeed legally could not, shift the costs of EFH's claims disallowance to the non-debtor sponsors.

asbestos . . . [a]nd in fact, that drove us to why we needed a bar date, because we couldn't have

sold the company unless we put a fence around what the sizable liability was.").  Additionally,

the size of any asbestos claims was relatively minor, with a present value of approximately $58

million as of the filing of the Sempra Disclosure Statement.  D.I. 11889 at 112; *see also* Horton

Dep. at 79:17-81:6 (testifying that asbestos liabilities were in the $45 to $55 million range).

44.    Also, as EFIH's disinterested director Mr. Cremens has testified previously,

approval of the TCEH Settlement was in EFIH's best interests.  *Motion of Energy Future*

*Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to*

*Enter into and Perform under the Settlement Agreement* [D.I. 5249], ¶ 230 ("[The] Disinterested

Directors concluded that the Inter-Debtor Settlement was reasonable in light of their assessment

of each of the individual claims being released.  In agreeing to the settlement amount, moreover,

the Disinterested Directors also took into account the significant benefits from a *global*

*resolution* of *all inter-Debtor Litigation*") (emphasis added); *Direct Testimony of Charles H.*

*Cremens (Disinterested Manager of Energy future Intermediate Holding Company LLC)*,  ¶ 63

(testifying that in exercising his fiduciary duties of care and loyalty to the EFIH estate,  "the

EFIH estate received substantial benefits from . . . the Settlement Agreement even if the risks

materialized and the [Hunt] merger was not consummated . . . . The EFIH estate . . . still receives

the substantial benefits of disarmament and global peace . . . .").

**G.    The NextEra Break-Up Fee**.

45.    After commencing the Chapter 11 Cases, the Debtors received an offer from

NextEra to purchase equity in the reorganized EFH, the highest and best offer the Debtors had

received.  Bid Procedures Motion, ¶¶ 18-19.  As a result, the Debtors terminated the RSA

pursuant to a "fiduciary out" provision, and initiated a competitive marketing process for the sale

of EFH's/EFIH's economic interests in Oncor.  *Id.*, ¶¶ 19-21.

46.     On December 9, 2015, after the Court approved the Bid Procedures Order, the
Court confirmed a plan (the "Hunt Plan") to sell EFH's/EFIH's interest in Oncor to Hunt
Consolidated, Inc. and certain co-investors ("Hunt"), through the use of a real estate investment
trust.  D.I. 7285.  The Hunt Plan contemplated a merger in which EFH's/EFIH's interests in
Oncor would be converted to a real estate investment trust.  *Id.*  The effectiveness of the Hunt
Plan was conditioned on approval from the Public Utility Commission of Texas (the "PUCT").
Having failed to obtain approval on acceptable terms, the Hunt Plan did not close.  D.I. 12666,
¶¶ 8-9.

47.     On May 2, 2016, the day after the Hunt Plan was terminated, NextEra made a new
proposal to acquire the E-Side Debtors' interests in Oncor.  *Declaration of Paul Keglevic in
Support of Confirmation of Seventh Amended Plan of Reorganization as it Applies to the E-Side
Debtors* (the "Keglevic Declaration"), ¶ 14.  After NextEra's proposal, a second bidder
("Bidder 2") also came forward with a bid to acquire Oncor.  NextEra and Bidder 2 submitted
competing bids throughout June and July of 2016.  *Id.*, ¶ 16.

48.     Ultimately, NextEra won the bidding contest and the Debtors entered into a
merger agreement with NextEra on July 29, 2016 (the "Merger Agreement"), which was
subsequently amended on September 18, 2016 (the "Amended Merger Agreement," and with the
Merger Agreement, the "NextEra Merger Agreements").  *Id.*, ¶ 18.

49.     On September 19, 2016, the Court entered an order authorizing the E-Side
Debtors to enter into the Amended Merger Agreement.  *Order (A) Authorizing Entry into Merger
Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into Performance Under
Plan Support Agreement* [D.I. 9584] (the "NextEra Order").  The NextEra Order provided, in
pertinent part, that in the event a Break-Up Fee becomes payable "the EFH Debtors, on the one

hand, and the EFIH Debtors, on the other hand, either will agree on the allocation of the [Break-Up] Fee between their respective estates (and seek Bankruptcy Court approval of such allocation) or each estate reserves the right to request that the Bankruptcy Court determine the appropriate allocation of the [Break-Up] Fee between the EFH Debtors and the EFIH Debtors . . . ." NextEra Order, at 2.

50.    Although the NextEra Order contemplated that the parties would allocate the Break-Up Fee, the parties did not prescribe the manner in which such allocation would be determined or even whether allocation of the Break-Up Fee was necessary.  Instead, the parties deferred resolution of the issue.  *See* Cremens Dep. at 56:8-18 (allocation of the Break-Up Fee was "not necessary at that time because there was a lot of unknown").

51.    Ultimately, the EFH estate did not receive any benefit from the NextEra transaction other than avoiding the dilution that the asbestos claims would have caused to other EFH unsecured creditors.  Indeed, because the Makewhole Claims were allowed, as set forth above, the entirety of the cash consideration that the E-Side Debtors would have received upon the closing of the Amended Merger Agreement would have been paid solely to EFIH's creditors. *See* D.I. 10310 (12/1/16 Hrg. Tr.) at 19 (noting that if Makewhole Claims are allowed, EFH creditors will receive no payments from the Oncor transaction); ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Horton Dep. at 109:1-7

(noting that EFIH PIK holders would receive approximately only a 45% recovery under the NextEra Plan if the Makewhole Claims were allowed).

52.     Nor do the facts support an agreement by EFH to increase the Break-Up Fee in exchange for an increase in the merger consideration to EFH, as alleged by the Movants. Allocation Motion ¶26. █████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

████████████████████████████████

53.     ██████████████████████████████ the Break-Up Fee did not increase in exchange for an increase in cash consideration – the Break-Up Fee was already at $275 million when the original Merger Agreement was executed.  Similarly, the assumption of asbestos claims was not a negotiated benefit to EFH that resulted in a higher Break-Up Fee.  Instead, the assumption of the asbestos claims was a deal point that benefited all E-Side Debtors who were obligated to reinstate the asbestos claims under any plan pursuant to the November 2015 EFH/EFIH committee settlement.  *See* D.I. 11889 at 93; D.I. 9606 (9/19/16 Hrg. Tr.) at 72-73; Horton Dep. at 20:9-21:22 (assumption of asbestos claims "was for the benefit of [] EFH and EFIH"); ███████████████████████████████████████████████████████ Moreover, even if this benefit – totaling $58 million,[7] amounting to less than 1% of the total consideration – is ascribed to EFH, it cannot account for the $165 million increase in the Break-Up Fee alleged by the Movants, nor can it justify the Movants' proposal to allocate $137.5

---

[7]    [D.I. 11889] at 112.

million of the Break-Up Fee to EFH.  Instead, the increase of the Break-Up Fee was directly attributable to NextEra's decision to drop its demand for a "match right."  *See* D.I. 9536.

54.     On July 7, 2017, following the PUCT's rejection of the transaction contemplated in the Amended Merger Agreement, EFH and EFIH delivered a notice terminating the Amended Merger Agreement, which caused the NextEra Plan to be null and void.  D.I. 11572, Ex. A at 2.

55.     After the NextEra Plan was terminated, the Court granted a motion for reconsideration of its prior approval of the Break-Up Fee, and disallowed the Break-Up Fee in its entirety.  D.I. 12075.  That issue is now pending on appeal before the Third Circuit.  *NextEra Energy, Inc. v. Energy Future Holdings Corp., et al. (In re Energy Future Holdings, Inc.)*, No. 18-1109 (3d Cir. 2018) (the "NextEra Break-Up Fee Appeal").

## **OBJECTION**

### I.     **No Basis Exists To Allocate The Break-Up Fee To EFH.**

56.     Movants have failed to establish that there is any basis in the Bankruptcy Code to allocate any portion of the Break-Up Fee to EFH.  Instead, they couch their argument in generalized equitable principles and a generalized concept of benefit detached from case law and the facts and circumstances present here, and urge the Court to simply "split the baby."

57.     Among other provisions of the Bankruptcy Code, the Movants argue that 11 U.S.C. § 105(a) entitles them to the reallocation of professional fees.  Standing alone, Section 105 of the Bankruptcy Code does not authorize the Court to grant the relief sought – in any form. Based on language from the Supreme Court's decision in *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988), courts have held that certain uses of Section 105(a) are beyond the scope of the bankruptcy courts' equitable powers.  Specifically, in *Ahlers*, the Supreme Court stated that "*whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code*."  *Id.* at 206 (emphasis added); *see also Law v.*

*Siegel*, 571 U.S. 415, 427-28 (2014) (holding that bankruptcy court was prohibited from acting pursuant to section 105, where doing so "contravene[d] express provisions of the Code").

58.     Thus, in order to obtain the relief they seek, Movants must show that their proposed allocation of the Break-Up Fee is permitted by the Bankruptcy Code.  Because they cannot, their proposed allocation should be rejected.

**A.     Section 503 of the Bankruptcy Code and Third Circuit Case Law Precludes Any Allocation of the Break-Up Fee to EFH.**

59.     The Third Circuit analyzes whether a break-up fee is warranted under a heightened scrutiny test pursuant to which the critical question is whether the fee is "actually necessary" in benefiting and preserving the debtor's estate.  *See* 11 U.S.C. 503(b); *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999).

60.     Specifically, the Third Circuit in *O'Brien* focused on the language of Section 503(b)(1)(A) of the Bankruptcy Code, which requires that the requested expense provided an actual and necessary benefit to the estate.  *O'Brien*, 181 F.3d at 535-38.  In so doing, the court noted that the standard was more exacting, and required that the movant show more than simply a permissible purpose or speculative benefit.  *Id.*  Of particular import here, the *O'Brien* test looks beyond whether a benefit *could have been conferred* by allowing the fees, and instead asks whether the granting of fees provided an *actual* benefit that was *necessary* to the estate.  As a result, the test is necessarily retrospective.  *Id.*

61.     Elliott concedes as much and is estopped from arguing to the contrary.  *See* NextEra Break-Up Fee Appeal [D.I. 003112867867], filed March 5, 2018 (the "Elliott Brief" or "Elliott Br.") at 24-26, 33-34, 40-46.  In particular, Elliott has argued that, with respect to the Break-Up Fee, there was no benefit to the estates "to pay a break-up fee . . . many, many times

the amount expended in pursuit of approval," where a closing condition failed to occur, "thus

making the transaction impossible to complete and forcing Debtors to pursue a *lower-value*

alternative," and resulting in the "payment of hundreds of millions of dollars," which was "a

recipe for destroying the estate, not preserving it."  Elliott Br. at 25, 42-43 (emphasis in original).

62.     Accordingly, just as the Ad Hoc Claimants contend, Elliott argues that the Court

must consider subsequent events in the bankruptcy case in determining whether an

administrative expense provides a substantial benefit to an estate.  *Id.*  Elliott cited ample

authority for this proposition in the Elliott Brief, including binding Third Circuit authority.[8]

63.     The Movants cannot now argue that the result should be different with respect to

the Allocation Motion than what Elliott filed in *its own* brief.  Any attempt to distinguish the

cases cited in the Elliott Brief as specific to the context of break-up fees would be inapposite, as

Elliott has already conceded (correctly) in the Elliott Brief that the analysis with respect to a

break-up fee is no different than for any other administrative expense.  Elliott Br. at 40 ("[T]he

allowability of break-up fees, *like that of any other administrative expenses*, depends on the

requesting party's ability to show that the *fees were actually necessary to preserve the value of

the estate*.") (first emphasis added) (quoting *Reliant Energy*, 594 F.3d at 206).  This settled Third

Circuit law should govern here.

64.     Moreover, even if the Third Circuit determines that the Break-Up Fee is valid –

---

[8]     *See, e.g.*, *In re Reliant Energy Channelview LP*, 594 F.3d 200, 208 (3d Cir. 2010) (stating that "Bankruptcy Court's decision was shown to be correct" based on subsequent higher bid placed on the debtor's assets); *O'Brien Envtl. Energy*, 181 F.3d at 535, 537 (finding that prospective purchaser could not meet "heavy burden" to allow administrative expense where $4.25 million break-up fee request was undermined by the fact the "winning bid was no more than $1,000,000 higher than Calpine's final offer"); *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954-55 (1st Cir. 1976) (declining to award priority to pay for employees' severance based upon unrejected contract where the claims, which related to pre-petition services, did not provide any value to the debtor-in-possession); *In re President Casinos, Inc.*, 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004) (relying on *O'Brien* and denying application for break-up fee, finding no benefit to the estate based on multiple contingencies to closing controlled by events outside the bankruptcy case).

necessarily concluding that the E-Side Debtors benefited from the Break-Up Fee – the Court must apply the same test to determine whether EFH received any benefit from the Break-Up Fee necessary to its estate.

65.     The Movants' allocation position not only is at odds with Third Circuit law on the allowability of break-up fees, but it relies on ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ But, some undefined, subjective notion of reasonableness is not the standard employed by the Third Circuit.

66.     Instead, as shown below, when the Third Circuit's legal standard is applied and the Court determines whether EFH actually benefited from the Break-Up Fee, there can be no question that that fee must be allocated solely to EFIH.

**B.     The Facts and Circumstances of the Chapter 11 Cases
Preclude Any Allocation of the Break-Up Fee to EFH.**

67.     In seeking to offload $137.5 million of the Break-Up Fee onto EFH, the Movants make two fundamental errors.  First, Movants wholly ignore how break-up fees are paid:  from the first dollars of consideration received from a subsequent sale prior to any distribution to creditors.[9]  Second, Movants focus on speculative recoveries to EFH under the NextEra Plan that EFH would have realized only if the Makewhole Claims were denied.  As every party to these Chapter 11 Cases is intimately aware, that did not happen, and not only was EFH set to receive zero cash consideration at the time the NextEra Plan was confirmed, but in fact EFH received

---

[9]     This case was no exception, §8.06(b) of the NextEra Merger Agreement, specifically provides that a Break-Up Fee is only payable if an "alternative transaction is consummated."  D.I. 9584-1 at 107.  The relevant "alternative transaction" was the Sempra Plan.

limited value and zero cash consideration from the eventual sale of Oncor.  Instead, all of the more than $9 billion in cash consideration related to the sale of Oncor was received by EFIH.

68.    Movants present no authority for their departure from the standard and accepted practice of using "first dollars" derived from the replacement transaction to pay a break-up fee. Case law provides that, in a multi-debtor case, a debtor is liable for a break-up fee *only to the extent that it received value for the assets sold.  See In re Capmark Fin. Grp. Inc.*, Case No. 09-13684 (CSS), 2009 WL 8519872 (Bankr. D. Del. Feb. 19, 2010) (bidding procedures order in a multi-debtor case providing that each debtor is responsible only for the pro rata portion of the break-up fee attributable thereto, based on the amounts allocable to the purchase price consideration such debtor is to receive); *In re Metaldyne Corp.*, Case No. 09-13412 (MG), 2009 Bankr. LEXIS 5113, at *16 n.3 (Bankr. S.D.N.Y. June 25, 2009) ("each of the Metaldyne Companies shall be liable for its pro rata share of the Break-up Fee based upon the value to be received by such Metaldyne Company under the Successful Bid for the Powertrain Assets.").

69.    Here, a single asset was sold, and that asset – Oncor Holdings – was owned solely by EFIH.  Thus, under this Court's own precedent regarding break-up fee allocations, the Court should allocate the break-up fee solely to EFIH.

70.    Allocating the Break-Up Fee to EFIH as the seller of Oncor Holdings makes perfect sense.  EFH did not own Oncor Holdings, and did not receive any direct value from the sale; its only benefit from the transaction was indirect, in its capacity as the ultimate owner of EFIH.  But most importantly, EFH, as equity, *already* has borne the full amount of the Break-Up Fee.  Any termination or break-up fee, including the Break-Up Fee here reduces the consideration that otherwise would flow through a debtor's capital structure yielding residual value, if any, *less the break-up fee* to equity.  Thus, if EFIH were solvent at the time of the

transaction, EFH would receive the increase in value of a subsequent offer, less $275 million; meaning EFH is paying the Break-Up Fee.  The fact that EFIH remained insolvent after the Debtors terminated the NextEra transaction cannot legally, factually, or practically result in anything different.  Because EFIH was insolvent at the time of the transaction, then EFH for sure received no benefit at all, and it would simply be punitive to put any of the Break-Up Fee on EFH's creditors.

71.     Rather than recognizing this economic reality, Movants seek to require EFH to pay 50% of the Break-Up Fee entirely with funds it held even before the Break-Up Fee was proposed.  The mere fact that EFH is not (yet) administratively insolvent and has distributable cash from other sources is not a basis for charging it 50% of the Break-Up Fee.  Doing so would defeat the whole purpose of the break-up fee:  to provide value to a debtor's estate.

72.     Even if the Court departs from this precedent (and economic reality), the facts and circumstances of the Chapter 11 Cases also prove that EFH did not benefit from the Break-Up Fee and, in accordance with Third Circuit law, should not bear any responsible for it.

73.     It is indisputable that EFH was allocated no share of the cash consideration under either the NextEra transaction as confirmed (and for which the Break-Up Fee was incurred) or the Sempra transaction.  For that reason, EFH should not be allocated any share of the Break-Up Fee, either. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████.

74.     First, the possibility that the Third Circuit would allow the Makewhole Claims rendered any cash consideration to be received by EFH utterly speculative, even at the time the Break-Up Fee was first negotiated.  Prior case law in this District has held that determination of

whether a break-up fee is reasonable is dependent upon the cash consideration proposed in a sale – not speculative consideration or additional benefits that may arise out of the transaction.[10]

75.    This case law is particularly applicable here, where the Third Circuit *did* allow the Makewhole Claims, wiping out any cash value that EFH could have hoped to obtain from the NextEra transaction.  Because EFH received no cash and because it already indirectly effectively incurred the entire Break-Up Fee, it should not be liable to additionally pay any portion of the Break-Up Fee.

76.    ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

██████████.

77.    This outcome is also supported by the testimony that the Ad Hoc EFH Claimant's expert, Steven Strom will provide at trial.  Specifically, Mr. Strom will testify that:

- Breakup fees in Chapter 11 cases are based on the consideration provided by the purchasers.  I am not aware of any other metrics that are used to determine breakup

---

[10]    *See, e.g.*, *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. Jan. 8, 2009) [D.I. 3182], Hr'g Tr. at 32:9-20 (holding that the break-up fee should be calculated based only on the cash component of the sale; the equity component offered by the stalking horse was excluded from the analysis as "too speculative"); *In re First Place Fin. Corp.*, Case No. 12-12961 (BLS) (Bankr. D. Del. Nov. 15, 2001) [D.I. 125], Hr'g Tr. at 31 (for purposes of determining whether a break-up fee was reasonable, the only relevant metric is whether it is within a reasonable proportion to the sale consideration; post-closing capital committed by the would-be buyer is irrelevant); *In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1997) (declining to measure break-up fee against "value of transaction" and instead analyzing "size of the fees relative to the consideration to be realized by the debtors").

fees in Chapter 11 cases for Section 363 sales.

- Consideration includes cash, notes or equity paid by the purchaser plus assumption of any specific liabilities or debt pursuant to a credit bid.

- Breakup fees for 363 sales in large bankruptcy cases examined ranged from 0.69% to 4.76%.  The average breakup fee is 2.87% of consideration and the median is 3.0%.

- In the cases reviewed and in his experience, breakup fees are expressed as fixed dollar amounts or as a specific percentage (i.e., not a sliding scale) of consideration. In other words, a breakup fee applies to the entirety of the consideration provided by a potential purchaser – not the marginal consideration proposed immediately prior to the execution of an agreement.  When expressed as a fixed dollar amount the ratio of the breakup fee to consideration is typically 3.0%.

- In the cases reviewed and in his experience, breakup fees are not applied, or at least not fully applied, to contingent consideration.  That is, breakup fees are lower as a percentage of the total consideration received where some portion of that consideration is conditional or contingent on external events.

78.     Based on these general opinions, Mr. Strom concluded and will testify that:

- First, the Break-Up Fee in this case is consistent with his experience, as it amounted to 2.957% of the total consideration to be paid by NextEra under the Merger Agreement, and 2.798% of the total consideration to be paid by NextEra under the Amended Merger Agreement.

- Second, the 2.798% Break-Up Fee (in the case of the Amended Merger Agreement) applies to the *entirety* of the consideration to be paid by NextEra – all $9.827 billion (under the Amended Merger Agreement).  From the perspective of an individual debtor receiving a portion of the NextEra Plan consideration under the Amended Merger Agreement, every dollar of consideration received is associated with $.028 in Break-Up Fee.

- Third, applying this methodology to the cash consideration provided by NextEra, as of the Original Merger Agreement, (i) $273.4 million of the Break-Up Fee would apply (and should be allocated) to EFIH and $1.6 million of the Breakup Fee would apply (and should be allocated) to EFH if the Makewhole Claims were disallowed, and (ii) all of the Breakup Fee would apply (and should be allocated) to EFIH and none would apply (and should be allocated) to EFH if Makewhole Claims were allowed; and, as of the Amended Merger Agreement, (iii) $261.7 million of the Breakup Fee would apply (and should be allocated) to EFIH and $13.3 million of the Break-Up Fee would apply (and should be allocated) to EFH if the Makewhole Claims were disallowed; and (iv) all of the Break-Up Fee would apply (and should be allocated) to EFIH and none would apply (and should be allocated) to EFH if Makewhole Claims were allowed.

- Fourth, due to the contingent nature of any consideration to be received by EFH as a result of the pending Makewhole Claim appeal, less of the Breakup Fee should be allocated to EFH – i.e., the allocation should be closer to scenarios (ii) and (iv) as set

31

forth above.

- Fifth, a Break-Up Fee is typically payable by the entity receiving the direct benefit of the transaction. Accordingly, it would not be typical to assess a Break-Up Fee against the owner of an equity interest, merely because a portion of the proceeds may be up streamed to the equity holder. Here, irrespective of the outcome of the Makewhole Claims, the only direct benefit received by EFH is the assumption of the legacy claims totaling $58 million. Accordingly, any Breakup Fee payable by EFH should be 2.80% of $58 million or $1,624,000. Moreover, even this amount overstates the Breakup Fee relating to the legacy claims, since EFH creditors only received a fractional benefit from the assumption of any EFH legacy liabilities, equivalent to the prevailing percentage recovery to EFH unsecured creditors at the time, multiplied by the estimated present value of the legacy claims.

79.      Even if the Court were to consider the assumption of asbestos claims as value that the NextEra transaction provided to EFH – the only value that could directly be ascribed to EFH – EFH should still bear only a small fraction of the $137.5 million proposed by the Movants. Based on Strom's testimony that a reasonable break-up fee would be 3%, if the Court were to consider the $58 million in value that EFH received from the Sempra transaction, then its share of the Break-Up Fee would equal – at most - $1.74 million.

80.      Accordingly, the Court should deny Movants' request to allocate a portion of the Break-Up Fee to EFH.

## II.      There Exists No Basis To Second-Guess The Debtors' And Committee's Professionals And Reallocate Their Fees Among The E-Side Debtors.

81.      The Movants' request to reallocate the professional fees incurred in this case is a brazen attempt to rewrite the history of the Chapter 11 Cases and claim, despite the billions of dollars EFIH received through the Sempra transaction (and the zero dollars received by EFH), that EFIH was not the prime beneficiary of the services provided by the Debtors' and Committee's professionals. The Court should deny Movants' attempt to reallocate fees that the Debtors and the professionals, using their business judgment, allocated without objection.

**A.    The Court Should Defer to the Debtors' and Committee's Allocation of Professional Fees That Were Determined in <u>Accordance With the Interim Compensation Order Without Objection</u>.**

82.    This Court should defer to the determination of Debtors' and Committee's professionals, approved by the Debtors, who made their allocation decisions in real time as the Chapter 11 Cases progressed in accordance with the procedure set forth in the Interim Compensation Order.  That procedure required the Debtors to allocate "Direct Benefit Fees" among the EFH, EFIH and TCEH Debtors, and to allocate "Collective Benefit Fees" to each Debtor in the same proportion as the Direct Benefit Fees.  Dkt. No. 2066.

83.    The record establishes that the professionals in this case complied with the Interim Compensation Order, maintained appropriate and adequate procedures for allocating their fees among the Debtors' estates, and followed those procedures throughout these Chapter 11 Cases.  This is evidenced by the multiple layers of review that every professional fee allocation underwent before the professionals were paid. ███████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████ At no point in this entire process did *anyone* challenge any of the professionals' fee allocations – until now, when Movants implicitly claim that ███████████████████████████████████████████████ ██████████████████████████████████████████████.

84.     Movants' attempt to undo retroactively the professionals' efforts to carefully and accurately comply with the Interim Compensation Order and the methodology set forth therein is particularly inappropriate since Movants' own arguments for recalculating the professionals' allocations rely on no methodology at all – ██████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ .

85.     Moreover, the fact that the Debtors and their professional engaged in the exercise of contemporaneously allocating fees distinguishes this case from *In re Tropicana Entn't, LLC*, Case No. 09-10856 (KJC), 2014 WL 7450610 (Bankr. D. Del. Dec. 30, 2014), cited by the Movants.  Allocation Motion at 19.  In *Tropicana*, the Court rejected the debtors' proposed <u>after-the-fact</u> allocation of fees and enforced its own allocation "based on the court's own experience" because the professionals had failed to allocate many of their fees in real time.  In contrast, here, ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ .

86.     Instead of *Tropicana*, the Court should look to other, more factually analogous, cases for guidance.  For instance, in *In re Asarco, LLC*, Case No. 05-21207, 2011 WL 2975716 (Bankr. S.D. Tex. July 20, 2011), the court upheld counsel's allocation of fees where counsel allocated the services it performed between the debtors according to who was the beneficiary of such services, noting that "[i]n large, long, complex cases, the Court should look at the totality of circumstances and not nitpick fee entries."  *Id.* at *17.  Similarly, in *In re Amdura Corp.*, 139 B.R. 963 (Bankr. D. Colo. 1992), the Court entered a "fee order" that contained a procedure to deal with the allocation of billings among multiple debtors similar to the procedure in the Chapter 11 Cases here.

87.    In upholding the allocation of fees, the *Amdura* court relied on the fact that:

> [t]he fee application submitted by [counsel] evidences that **efforts were made by the firm to establish a billing system which would enable the attorneys to identify with some degree of particularity the Debtor for whom services were being provided** . . . . **In certain circumstances services were provided by [counsel] which, the firm believed, benefited more than one, but not all, of the Debtors. In those instances, the firm attempted to allocate, on a pro rata basis, the time and charges involved to those Debtors which were so benefited**.    That time allocation is explicitly disclosed with respect to the particular time entry in the revised fee application filed with the Court.

*Id*. at 971 (emphasis added).

88.    The same logic used by the court in *Amdura* applies here.  Rather than apply the analytically flawed (actually nonexistent) methodology offered by Movants, this Court should accept the contemporaneous allocations made by the Debtors' and Committee's professionals.

89.    Moreover, given the importance of the allocation of professional fees to the parties, and the incorporation into the RSA and the Interim Compensation Order of a specific framework, it was reasonable to expect that any objection to allocation (as was the case for an objection to any aspect of a professional's request for payment) would be made timely prior to any set objection deadline.  The absence of any such objections in light of the procedures that the parties created deserves great deference.

**B.**    **The Facts and Circumstances of the Case Do Not Support Fee Reallocation.**

90.    Even if this Court endeavors to undertake a review of the facts that transpired during these Chapter 11 Cases and examine whether the allocation decisions were appropriate – a review that would be far more substantial than the analysis Movants have offered in support of their Allocation Motion – such a review should not change the outcome.

91.    In arguing that the allocation of the Debtors' Fees and Committee's Fees must be reallocated, Movants seek to rewrite the history of the Chapter 11 Cases by contending that the

cases were administered primarily to avoid a "Tax Armageddon," in which EFH – purportedly alone – would face $7 billion in tax liability in the event that a taxable sale of the Oncor assets occurred.  This assertion is belied by the extensive record in this case.  Movants also contend that the Debtors' and Committee's professionals inappropriately characterized the work that they performed related to the Makewhole Claims, the TCEH Settlement, and the asbestos claims. Again, these assertions misconstrue the actual events that transpired and the benefit that EFIH received from the work related to each of these events.

92.     Movants' reallocation theory also suffers from a fundamental flaw that distorts their entire analysis:  that EFIH's presumed solvency meant that the cases were predominantly run for the benefit of EFH.  This is highly ironic now given that EFIH is not solvent.  It also incorrectly assumes that EFIH received no value even though the Chapter 11 Cases resulted in substantial distributions to EFIH as set forth in the confirmed plan.  The solvency of an entity has no bearing on whether a benefit was conveyed.

### 1.     Tax Armageddon Was a Threat to All E-Side Debtors.

93.     The issues concerning a potential taxable sale of Oncor was thoroughly litigated in connection with the Bid Procedures Motion by several parties in interest, including EFIH creditors.  Numerous creditor groups filed objections to the Bid Procedures Motion.  For example, Delaware Trust Company ("Delaware Trust"), the indenture trustee for EFIH's senior notes, objected on the ground that the Debtors attempted to "pre-bake the market" for a non-taxable transaction, to the detriment of EFIH and its creditors.  D.I. 2385 at 4.  In particular, Delaware Trust asserted that potential buyers would pay more for Oncor in a taxable transaction, that the tax liability would be "stranded" at EFH, and that the independent director of EFIH was not properly performing his fiduciary duties.  *Id.* at 9-22.

94.     As discussed above, in the Tax Memo, the Debtors concluded that because EFH is

a holding company without assets to satisfy a $7 billion tax liability, the IRS would likely oppose any sale that would result in such a large "stranded liability" from its disregarded subsidiaries. D.I. 2296 at 4, 15-17.  The Debtors also outlined a number of potential contingencies that could result in tax liability at EFIH if the IRS did not successfully prevent a taxable transaction from occurring, as well as ways to mitigate that liability.  *Id.* at 5, 10, 18-19.  Thus, because the recoveries of EFIH's creditors also were at significant risk from a taxable transaction, a tax-free deconsolidation was in the best interests of all constituencies.

95.    The Court, after a four-day evidentiary hearing on the merits, found that the Debtors' bidding procedures would be considered a valid exercise of business judgment, after obtaining approval from each Debtor's board.  *Id.* at 18:11-19:2, 25:4-25.  The Court rejected Delaware Trust's contention that the Debtors were singularly focused on tax-free transactions, and found that time would be needed to allow for such alternative transactions to be formulated, even though such alternative transactions were unlikely to occur.  *Id.* at 12:20-22, 15:9-14, 22:6-12.  The Court also credited the testimony of Evercore, the Debtors' financial advisors, that a taxable transaction was "unlikely" because potential buyers would be concerned about the risks of such a transaction.  *Id.* at 22.  The Court subsequently entered the Bid Procedures Order.

96.    Thus, the Court has already recognized the clear risk that neither the IRS (which would litigate the matter), nor EFH (which would do the same), nor potential bidders (who might not even bid), would simply accept a taxable transaction that left a stranded tax at EFH.  The issue of whether avoiding a "Tax Armageddon" was solely a benefit to EFH or was a benefit to both the EFH and EFIH estates was thus settled nearly four years ago when the Court granted the Bid Procedures Order.  *Id.*

97.    Indeed, as set forth in detail above, Cremens, EFIH's independent director, has

acknowledged the reality of the tax risk to EFIH and that it was in EFIH's best interest to avoid a taxable transaction. The evidence establishes that EFIH's unsecured creditors agreed, including

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████.

98.     As avoidance of a taxable transaction was in all parties' interest – and Movants have made no effort to specifically identify any additional time spent because such a transaction was pursued (and cannot in any event) – there is no basis to reallocate the fees incurred by the Debtors and the Committee.

### 2.     EFIH Was the Direct Beneficiary of the Makewhole Claims Dispute.

99.     Next, Movants argue that litigation of the Makewhole Claims did not directly benefit EFIH – even though the claims arose out of EFIH's secured loans and EFIH was the objecting party. Movants' assertion that EFH was the direct beneficiary of a contractual argument with respect to a contract to which it was not a party is nonsensical. Indeed, Movants' rationale for why EFIH was not a direct beneficiary – its purported solvency – is entirely circular. EFIH's solvency was dependent upon disallowance of the Makewhole Claims. The fact that the Makewhole Claims were allowed, in large part, resulted in EFIH's inability to distribute payment in full to its unsecured creditors.

100.     Accordingly, Movants' attempt to argue now that they were not the beneficiaries of the Makewhole Claims litigation is unfounded.

### 3. The TCEH Settlement and Assumption of the Asbestos Claims Enabled Confirmation of the Plan Benefitting All E-Side Debtors.

101. Movants also assert that EFH was the direct beneficiary of the TCEH Settlement and the Debtors' assumption of asbestos claims. However, Movants' assertion fails to address the fact that these two issues were critical components of the larger plan negotiation and confirmation process, and that resolution of these two issues paved the way for plan confirmation that benefited *all* E-Side Debtors – including EFIH.

102. More fundamentally, Movants are attempting to cherry-pick a handful of events (and related fee entries) that transpired during the over nearly four-year history of the Chapter 11 Cases – the precise type of nitpicking that the *Asarco* court counseled against in favor of the business judgment of debtors and their professionals. ███████████████████████ ███████████████████ as set forth above, establishes that the Court can and should defer to the real-time allocation of the Debtors' Fee and Committee's Fees that were made pursuant to the Interim Compensation Order, and that have never been the subject of a single objection by any party until now. Indeed, a contrary holding would open up a Pandora's box of fee litigation in all future multi-debtor, large-format cases in this District.

## III. Movants' Claim For Substantial Contribution, If Awarded, Is Related To Work Performed Entirely For The Direct Benefit Of EFIH.

103. To the extent the Court awards Elliott its claim for substantial contribution, none of it should be classified as an administrative expense of EFH. Any benefit to EFH is, at best, vague, and Elliott makes no effort to substantiate the expenses it alleges EFH should bear.

104. First, Movants assert that they moved the estates to an alternative tax-free proposal after the NextEra deal collapsed, "primarily in order to avoid triggering Tax Armageddon," and that such efforts "principally benefited the EFH estate because these efforts were driven by the need to avoid Tax Armageddon." However, the assertion that a tax-free

transaction principally benefited EFH is without merit.  Moreover, Movants sought a new deal to

sell EFIH's interests in Oncor after the NextEra deal collapsed because such a transaction was

necessary for Movants to receive any distribution on their claims; and the fact that the

transaction that ended up being confirmed was a non-taxable one is a function of the fact that no

party was ever interested in proposing a taxable transaction.  As a result, this rationale does not

justify forcing EFH to bear the costs of Elliott's substantial contribution claim.

105.    Second, Movants assert that Elliott "facilitated" the Sempra transaction.

However, the Sempra transaction provided no benefit to EFH – the entirety of the $9.45 billion

paid by Sempra benefited EFIH, with zero cash consideration reaching EFH.  Although the

Sempra plan required Sempra to assume asbestos liabilities, so did every other E-Side plan; and

those liabilities amount to $58 million, or less than 1% of the total deal consideration.  Movants'

claim that EFH should pay 30% of Elliott's expenses is simply baseless.

106.    Third, Movants argue that Elliott obtained an order disallowing the Break-Up Fee.

First, this claim is simply premature given that the issue remains on appeal.  Second, more

importantly, for the reasons discussed above, the Break-Up Fee solely benefited EFIH, as will

any efforts to disallow the Break-Up Fee, since disallowance of the Break-Up Fee will still not

result in EFH or its creditors receiving any cash distribution from the Sempra transaction.

107.    Movants' arguments in support of its request to shift 30% of the substantial

contribution claim to EFH ignore the facts and circumstances of the Chapter 11 Cases, and in

particular the actual outcomes achieved through the plan confirmed by the Court.  Accordingly,

the Court should deny Movants' request.

## <u>CONCLUSION</u>

WHEREFORE, the Ad Hoc EFH Claimants respectfully request that this Court enter an

order denying all relief requested in the Allocation Motion.

Dated: August 30, 2018
      Wilmington, Delaware

                    HOGAN ♦ MCDANIEL

                    By: */s/ Garvan F. McDaniel*
                    Garvan F. McDaniel, Esq. (DE #4167)
                    1311 Delaware Avenue
                    Wilmington, Delaware 19806
                    Telephone:  (302) 656-7540
                    Facsimile:  (302) 656-7599
                    Email: gfmcdaniel@dkhogan.com

                        – and –

                    KASOWITZ BENSON TORRES LLP
                    David S. Rosner, Esq.
                    Andrew K. Glenn, Esq.
                    Matthew B. Stein, Esq.
                    Gavin D. Schryver, Esq.
                    David J. Mark, Esq.
                    1633 Broadway
                    New York, New York 10019
                    Telephone:  (212) 506-1700
                    Facsimile:  (212) 506-1800
                    Email: drosner@kasowitz.com
                           aglenn@kasowitz.com
                           mstein@kasowitz.com
                           gschryver@kasowitz.com
                           dmark@kasowitz.com

                    *Co-Counsel to the Ad Hoc EFH Claimants*