Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4   In re:                          :

5                                   :    Chapter 11

6   ENERGY FUTURE HOLDINGS CORP., :    Case No. 14-10979 (CSS)

7   et al.,                         :

8           Debtors.                :    (Jointly Administered)

9   _____:

10

11                                  United States Bankruptcy Court

12                                  824 North Market Street

13                                  Wilmington, Delaware

14                                  September 5, 2018

15                                  9:33 a.m. - 6:16 p.m.

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:   LESLIE MURIN

1   HEARING re Joint Motion of UMB Bank, N.A., as Indenture

2   Trustee, and Elliott to Fix Appropriate Allocation of

3   Certain Reserves and Expenses as Between the EFH and EFIH

4   Debtors [D.I. 13102; filed May 13, 2018]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS

4         Attorneys for Debtor

5

6    BY:  MARK E. MCKANE

7

8    CROSS & SIMON, LLC

9         Attorneys for Elliott Associates, L.P., Elliott

10        International, L.P. and The Liverpool Limited

11        Partnership

12

13   BY:  KEVIN S. MANN

14

15   ROPES & GRAY LLP

16        Attorneys for Elliott Associates, L.P., Elliott

17        International, L.P. and The Liverpool Limited

18        Partnership

19

20   BY:  GREGG M. GALARDI

21        MATTHEW L. MCGINNIS

22        DANIEL S. EVANS

23        CHRISTIAN REIGSTAD

24        PETER L. WELSH

25

```
 1   HOGAN MCDANIEL

 2        Attorneys for the Ad Hoc EFH

 3

 4   BY:  GARVAN MCDANIEL

 5

 6   BAYARD, P.A.

 7        Attorneys for Elliott Associates, L.P., Elliott

 8        International, L.P. and The Liverpool Limited

 9        Partnership

10

11   BY:  ERIN FAY

12

13   KASOWITZ BENSON TORRES

14        Attorneys for the Ad Hoc EFH

15

16   BY:  DAVID S. ROSNER

17        ANDREW K. GLENN

18        MATTHEW B. STEIN

19        SHAI SCHMIDT

20        GAVIN D. SCHRYVER

21        DAVID MARK

22        ANDREW ELKIN

23

24

25
```

1    NIXON PEABODY LLP

2         Attorneys for EFH Indenture Trustee

3

4    BY:  RICHARD C. PEDONE

5         MORGAN C. NIGHAN

6

7    RICHARD, LAYTON & FINGER, P.A.

8         Attorneys for Plan Administration Board

9

10   BY:  DANIEL J. DEFRANCESCHI

11        JASON M. MADRONE

12

13   ROSNER LAW GROUP

14        Attorneys for Horton & Kaylevic

15

16   BY:  SCOTT J. LEONHARDT

17

18   ALSO PRESENT TELEPHONICALLY:

19

20   SAM N. ASHURAEY

21   ROBIN D. BALL

22   MATTHEW C. BROWN

23   JEREMY CARTON

24   BRYAN CHEW

25   MING DANG

1    KEVIN HANRAHAN

2    PATRICK J. HOLOHAN

3    RAJESH JEGADEESH

4    CHRISTIAN P. JENSEN

5    JOSEPH LENZ

6    JINGWEN LIU

7    JEREMY MATICAN

8    TINA MOSS

9    DAVID NGUYEN

10   ERIK SCHNEIDER

11   MICHAEL C. SCOTT

12   DANIEL S. SHAMAH

13   JESSICA STEINHAGEN

14   PATRICIA J. VILLAREAL

15   BRADY C. WILLIAMSON

16   JAMILA WILLIS

17   PATRICK VINTER

18   MARIA CHUTCHIAN

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. GALARDI:  Good morning, Your Honor.

5              THE COURT:  Mr. Galardi.

6              MR. GALARDI:  Good morning, Your Honor.  For the

7    record, Gregg Galardi on behalf of UMB and Elliott.  This is

8    the hearing for UMB and Elliott's motion to allocate certain

9    expenses.

10             Your Honor has allotted us today, tomorrow and

11   Friday.  With no further ado I'd like to move into the

12   opening statement?

13             THE COURT:  That's fine.

14             MR. GALARDI:  Thank you.  If I may approach, Your

15   Honor, with paper copies of the opening.  There will be

16   slides, too.

17             THE COURT:  All right.

18        (Pause)

19             THE COURT:  Go ahead.

20             MR. GALARDI:  Okay.  Your Honor, first -- so this

21   is the allocation dispute.  Moving to the first slide.  I

22   wanted to make absolutely clear what this is not about.

23   First, it is important to note that we are not challenging

24   the Board's disinterested -- the Board's judgment or the

25   Disinterested Directors' judgment.

1        We are not contending, as many of the papers may

2   have seemed to say, that the Debtors should have pursued a

3   taxable transaction.  Important, we're making very simple

4   points, which I think all parties have agreed, at least one

5   of them, first that a nontaxable transaction benefited all

6   Debtors.  Our contention is simply that EFIH should not pay

7   90 percent or nearly 90 percent of the cost of actually

8   pursuing such a tax free transaction.  We are also

9   contending that when you consider the value of a tax free

10   transaction, that should go to the allocation of the next

11   termination fee.  And also, it should go to a balancing, and

12   when Your Honor is asked to balance the value to EFH of the

13   Elliott substantial contribution claim.

14        Second, Your Honor, we are not collaterally

15   attacking the interim compensation order.  That order

16   specifically provides, as we've highlighted in Paragraph 4,

17   that the allocation is subject to challenge and disgorgement

18   until a final allowance, by the Court, of the fees.  We are

19   saying that the direct and collective benefit mechanism did

20   not work, it resulted in what we believe an unfair result.

21        Third, we're not challenging the allowance of any

22   professional fees at all.  And importantly, we are not

23   alleging that any of the retained professionals

24   intentionally slanted fees, put their finger on the scale,

25   or moved any fees to the EFIH, intentionally, consciously or

1    any -- with any improper motive.

2            Your Honor, this is what this is all about, the

3    material expense claims.  And I think each party has given

4    you their own form of this document, so let's move through

5    the ones we are talking about.

6            First, Your Honor, when you go to review the

7    dispute, there is governing law and it cannot be lost under

8    the circumstances.  First, as Your Honor well knows, Section

9    503(b) governs the general administrative expenses and it's

10   got to be an actual necessary cost and expense of preserving

11   the estate.  It doesn't say necessarily enhancing it, it

12   says preserving the estate.

13           One of the big issues, Your Honor, is going to be

14   the issue of hindsight.  Your Honor knows I made an argument

15   with respect to the breakup fee that said you could look at

16   it with hindsight.  Parties have cited that.  One of the

17   questions here is, I think, a legal issue for -- Your

18   Honor's going to have to decision, breakup fees, substantial

19   contribution claims, regular administrative claims, to what

20   extent, if any, can you, in the context of a breakup fee or

21   a fee claim, use hindsight.

22           THE COURT:  I don't think I used hindsight in my

23   opinions granting your motion, if I --

24           MR. GALARDI:  Correct, Your Honor.  You put a

25   footnote in and said, I'm not going to rely on it, and now

1    I've dealt with the appeal where NextEra says you did rely

2    on it, but you said you didn't rely on it.  I just want to

3    make it clear, we did make the argument, you said some

4    suggestive things, but did not rely on it the NextEra deal.

5            With respect to professional fees, however, Your

6    Honor, the standard is clear, it's statutory.  An award of

7    fees is made for services beneficial at the time at which

8    the service was rendered.  And Your Honor has a duty,

9    regardless of whether anybody filed any objections to fees,

10   to independently review fees and making findings.

11           Finally, Your Honor, with respect to Elliott's

12   substantial contribution claim, there is hindsight.  You

13   have to do the service and you have to show a contribution.

14   To understand the contribution you have to, under the Lebron

15   Standard, show a connection and as Judge Shannon has said,

16   hindsight may be appropriate in that circumstance.  So

17   there's a series of standards to apply.

18           Your Honor, going now to the NextEra termination

19   fee.  What we believe the evidence will show, among many

20   other things, is from the period of July 21st to July 29th,

21   2016, there were certain gives and gets.  The gives to

22   NextEra was an increase in the breakup fee from 165 to 275.

23   The gets from NextEra were 360 million of cash, the

24   assumption of asbestos liabilities with the purchase price

25   being used to set aside a 250 million reserve, and a release

1    of the matching right.

2           We believe, as a result of that transaction, and

3    there will be a factual dispute about how this benefited

4    parties, with those changes there was residual value for EFH

5    and there was value for EFIH.  As Your Honor will also hear,

6    by way of the disclosure statement and seeing Mr.

7    Keglevics's written, there was a backstop, that if Your

8    Honor's decision was not reversed by the time of the

9    consummation of the transaction, EFIH PIK creditors could be

10   made whole.

11          The evidence will then show that from September

12   12th to 19th, in the resolution of the EFH creditor

13   rejections there were further bids.  Three creditor

14   constituencies, the EFH Trustee, a party to this pleading --

15   to this matter, Fidelity, Contrarian all withdrew their

16   objections.  And the Ad Hoc TCEH Committee, of which certain

17   of those members are ad hoc claimants, they all withdrew

18   their objections or stood up in support of the transaction.

19   And why did they do so?  Because there was an additional 300

20   million of cash given, and $150 million reduction of the

21   asbestos reserve, which was cash which went to the residual

22   value expected.

23          And Your Honor, subsequently, because in part of

24   these events, approved two substantial contribution claims,

25   based, in part, on these efforts.  One, the EFH Trustee,

1   which was approved in context of the NextEra plan

2   confirmation.  And subsequently Fidelity, in an amount not

3   less than $20 million.

4           Your Honor, with respect to the E-side Committee

5   fees, what the evidence we will show is that there was a

6   critical period in which the E-side Committee was very

7   active.  October 27th of 2014, it's appointment date,

8   through November 25th, 2015 and what we will call the EFH

9   beneficiary settlement date.  Your Honor may recall that was

10  in the context of the hunt plan and what was call the global

11  settlement.  What the E-Side Committee's professional fees

12  and primary roles were, as set forth in Mr. Horton's

13  declaration, as well as in Mr. Rosenbaum's declaration is,

14  they investigated potential insider and other claims

15  belonging solely to EFH, they contested the global

16  settlement, including the allowance of the $700 million by

17  TCEH against EFH, and they negotiated the EFH beneficiary

18  settlement, which as I mentioned was already -- was approved

19  on November 25th.

20          Importantly, that settlement required a limited E-

21  Side Committee role going forward.  So what the evidence

22  will show is that with respect to the professional fees they

23  weren't allocated by the interim compensation order, 89

24  percent of the primary counsel fees were incurred prior to

25  the EFH settlement, beneficiary settlement, 97 percent of

1    their primarily financial advisor was incurred prior to the

2    EFH beneficiary settlement, Montgomery McCracken, who also

3    did conflicts counsel, 83 of their fees were incurred prior

4    to the EFH beneficiary settlement.  The only other

5    professional is Guggenheim and that has a transaction fee

6    and we will go through evidence as to how that gets balanced

7    and what was done.  That fee, however, was paid in the

8    fourth quarter, so we think it lopsides the numbers for

9    Guggenheim.

10          Your Honor, next on the issue of Kirkland and

11   Evercore fees, we're going to put in evidence to show that

12   there were four critical periods for Your Honor to evaluate

13   their fees and the balance of their fees and how they were

14   allocated.

15          First, we'll call it the pre E-side Committee

16   appointment.  Now, Your Honor, we're going to use, just for

17   the sake of the interim compensation order and monthly fee

18   applications, you see every day either beings on the first

19   or the last day of the month, so we put that as April 29th,

20   the filing date to the last day, October 31st.  Then there

21   was an initial sale period, we can call that the hunt

22   period, which was November 1st to March 31st, 2016.  We'll

23   call the next period the NextEra transaction period, which

24   begins April 1st of 2016 and ends on April 30th of 2017.

25   And then we'll call it the Elliott substantial contribution

1    period, which is really all of the litigation with Elliott

2    in the final part of these cases.

3            What the evidence will show is EFIH paid nearly

4    nine times more than EFH for the Kirkland legal services

5    throughout this case.  EFIH paid 90 percent of the services

6    related to what we believe are EFH asbestos matters.  EFIH

7    paid 90 percent for services related to multiple E-side

8    plans and disclosure statements, though there was never a

9    plan separate for EFH.  And EFIH paid 90 to 100 percent for

10   services related to the make whole litigation, although as

11   the evidence will indicate, the PIK bonds, the unsecured

12   debt at EFIH for most of that period was trading above par

13   and the plans provided that the PIK holders would be paid in

14   full.

15           And Your Honor, what we are saying about this is

16   not that Kirkland didn't apply, in good faith, the order.

17   It's simple that the extrapolation methodology, from the

18   direct to the collective, simply did not work and a mere

19   look at the appearance of the nine times is sufficient to

20   say that didn't work, let's go back.

21           Finally, Your Honor, with respect to Elliott's

22   substantial contribution claim, I'll start with Your Honor

23   taking judicial notice, as usual, of who's behind our side

24   and who is behind the other side and the opposition that we

25   faced throughout.  The seats just happened to run out on the

1    other side.

2              What the evidence will show, is there is one

3    period that we are going to focus on, it is the end of the

4    case from the day that Elliott began the PSA litigation

5    through Sempra confirmation.  Elliott, as Your Honor has

6    heard, got approved a substantial contribution claim on the

7    EFIH side of up to 35 million, and has filed a claim, as

8    Your Honor asked me about, I think, a couple weeks ago, $30

9    million.  And Elliott is going to contend and will show, by

10   way of evidence, that the E-side both benefited from their

11   efforts.

12             One, there was the reconsideration order that

13   disallowed the NextEra termination fee claim.  And Your

14   Honor, once you decide how the percentage of that claim is,

15   you can factor that in as to how Elliott actually benefited

16   EFH.  They negotiated an increased Sempra merger

17   consideration.  They negotiated, and Your Honor will recall

18   there was a lot of behind the scenes matters about the

19   dividend with respect to whether the dividend payments under

20   the merger agreement ultimately resulting in an Oncor

21   dividend that went both to EFH and EFIH.

22             And though everybody wants to say, oh, this was a

23   foregone conclusion, there was a tax free transaction, the

24   asbestos reserve and the EFH beneficiary statement all were

25   preserved.  That was not clear, as Your Honor will read in

1    our objections, whether you move to liquidation or not.  And

2    the only point here, again, Your Honor, is in weighing the

3    benefit you should be weighing also the benefit that this

4    provided to EFH.  Thank you.

5            THE COURT:  Thank you, Mr. Galardi.

6            Yes, I'll hear from the Ad Hoc.  Yeah.

7            MR. ROSNER:  Good morning, Your Honor.

8            THE COURT:  Good morning.

9            MR. ROSNER:  David Rosner of Kasowitz Benson &

10   Torres.  We represent five non-Elliott EFH creditors that

11   for these purposes are representing all of the EFH

12   creditors.

13           We're here today because we're seeking basically

14   to protect the EFH estate from an unlawful forced

15   distribution of $200 million, an invasion into what is only

16   being distributed to the EFH creditors which is their cash

17   on hand, no dollars other than the cash on hand, the $202

18   million.  If you grant the motion that's pending before you,

19   the estate, the EFH estate will be rendered administrative

20   insolvent.

21           Now, there's a footnote that says, well, let's

22   leave, you know, up to $10 million behind so that we meet

23   the confirmation order that Your Honor entered, but the

24   effect of movant's motion is to render this estate, after

25   four years, completely administrative insolvent, with a view

1    that the benefit it received is all of the money that EFH

2    had.  This trial, this hearing is about value and benefit.

3    The movants have the burden of proof.  They cannot meet it.

4              The evidence that you will see, both from the

5    direct and what you will see in court today, there is

6    literally no competent evidence that supports their

7    position, and that's because there's never been a court

8    decision, ever, that's held out of the money equity liable

9    for the costs of its subsidiary's asset sale, the Oncor

10   sale, or the litigation of its subsidiary.  And for these

11   purposes, you need to look at EFH as being out of the money

12   in the sense of the EFIH capital structure, because EFH sits

13   as the equity holder of EFIH and no funds were distributed

14   to EFH by virtue of being the equity holder.  The Court

15   would be setting that precedent, which no court has done.

16             So what the movants, and even the path to directly

17   seek to have this Court do, is to convert this proceeding

18   basically into an equitable mixing bowl, which is how Mr.

19   Horton will describe this, rather than a legal analysis.

20   But the Supreme Court has admonished bankruptcy courts over

21   and over again that whatever equitable powers that remain in

22   this court are those that are within the confines of the

23   bankruptcy code itself.

24             And section 503(b)(1)(A) is legal and specific and

25   it leaves no room for hypothetical benefits of speculative

1    benefits, nor any room for a middle ground.  This is a

2    trial, not a mediation.  And here we need to get to the

3    right answer.

4           Words matter.  Can you -- I have a slide, I don't

5    have the entire opening on slides, I just have four slides

6    that I'd like to show to Your Honor.

7           THE COURT:  Okay.

8           MR. ROSNER:  So can we put up the first one, the

9    Summary of Dispute, please?

10          So here's the words that matter for this

11   proceeding and for the evidence that Your Honor is going to

12   see.

13          THE COURT:  Give me a second.

14          MR. ROSNER:  Sure.

15          THE COURT:  There we go.  Much better.  Go ahead.

16          MR. ROSNER:  And words of the statute and case law

17   matter.  11 USC 503(b)(1)(A) says the actual necessary costs

18   and expense of preserving, here, EFH's estate.  The case law

19   says that in order to demonstrate it, there must be a

20   benefit to that estate from the asserted administrative

21   expenses.

22          So, you know, what do those words mean?  Actual

23   means existing in fact or reality.  Actually existing.

24   Necessary means that it was needed for the estate.  And what

25   is a benefit?  A benefit is a result or effect, not a

1    hypothetical or speculation, that's a potential not an

2    actual and that's an important distinction from the evidence

3    that you're going to see.

4           So factually, you're not going to see any

5    evidence, Your Honor, that shows that the Chapter 11 cases

6    here primarily benefited EFH.  What you're going to see is

7    that the E-side Chapter 11 cases were necessary to monetize

8    Oncor, EFIH's main asset, to effectuate the Sempra plan.

9    There was a distribution from that sale to the EFIH

10   creditors of in excess of $9.8 billion from the sale of

11   their assets.  The distribution to EFH was zero from the

12   sale of those assets, the distribution will be 202 million

13   exclusively from EFH's cash on hand, none from the sale.

14          So the evidence is going to show that the actual

15   and necessary costs and expenses of the Oncor sale related

16   to the Oncor sale and you're going to see the same for the

17   litigation of the make whole.

18          The evidence is going to show, and this is the

19   critical distinction, I think, in this case, is that the

20   only assertable EFH benefit specifically from the make whole

21   -- excuse me, specifically from the breakup fee was

22   potential or projected, which is the opposite of actual.

23   The evidence will show that in all cases the projected or

24   potential benefit to EFIH was incidental and indirect only

25   from where it sits in the waterfall, only by virtue of it

1    being equity that would be paid in full after EFIH's

2    creditors were paid in full.

3           So what you're witnessing, Your Honor, over the

4    next couple of days, is basically an assessment of equity.

5    And it's a forced capital contribution of equity into an

6    insolvent estate.  So the most significant matter we think

7    that you're going to deal with, Your Honor, is the NextEra

8    breakup fee.  And the movants think that half of that, 137

9    and a half million dollars, should be visited on the EFH

10   estate.  The PAB believes that 55 million, or 20 percent,

11   which is simply just illegal under these provisions of the

12   bankruptcy code and applicable law, again, no court has ever

13   had a Debtor's subsidiary sell its assets for which its

14   estate received 100 percent of the proceeds and then shifted

15   the related expenses from that to the out of the money

16   equity.  It's never happened.

17           THE COURT:  Well, we've got two problems that.

18   One, the NextEra transaction never closed, so you can't sort

19   of say, they got this, they didn't get this, that never

20   happened.  Second, when the fee was initially approved, of

21   course it's been subsequently undone, and that's on appeal,

22   but when it was approved, your client wasn't -- your

23   client's creditors were in the money.

24           MR. ROSNER:  Your Honor, to take those points, I

25   actually disagree with them, respectfully --

1            THE COURT:  Of course.

2            MR. ROSNER:  -- I disagree with them.

3            THE COURT:  Disagree away.

4            MR. ROSNER:  The NextEra --

5            THE COURT:  The Court takes a presumption that

6    everything is done respectfully.

7            MR. ROSNER:  And I appreciate that, Your Honor.

8            THE COURT:  I'll let you know when you miss that.

9            MR. ROSNER:  Okay.  The -- it is a termination fee

10   in this instance, it's not a breakup fee.  And that's what's

11   -- the only thing that makes this unusual is that what would

12   normally happen is, is that the $275 million would be paid

13   out of additional proceeds, let's say $300 million.

14           THE COURT:  Right.

15           MR. ROSNER:  But, who would be bearing the burden

16   of that termination fee?  The $300 million wouldn't be going

17   to EFH and then EFH would then have the ability to pay, it

18   would still be going to EFIH.  It's only where EFH sits in

19   the capital structure.  So in essence, Your Honor, this is a

20   double burdening of the equity.  In all instances equity is

21   already bearing the cost of the termination fee, because

22   let's say there was $300 million, 275 million of it would go

23   to NextEra, 25 million of it would go to EFIH.  Equity has

24   already burned the 275 million because it's not getting it,

25   it's not going upstream.  So the termination fee -- and all

1    the termination fee did here was bring in, you know, we have

2    Sempra, which was for less money, but we have a Sempra

3    transaction.  But no benefit came from paying the 275

4    because equity always is already always paying it because

5    it's just where it sits in the capital structure.

6              And secondly, Your Honor, I'm going to get to

7    this, there's a slide on this, the boards of directors, the

8    Disinterested Boards of Directors specifically took the

9    point about determining whether this was an approvable

10   transaction on the basis of the make wholes being disallowed

11   as they sat at that time, or the make wholes being

12   ultimately allowed.  And they understood, at the time they

13   approved this transaction, and there's a Board deck that

14   supports this, and it will -- and it has been moved into

15   evidence or will be moved into evidence, is that they

16   recognized that at that point there was no value that was

17   going up to EFH in the instance in which the make wholes

18   were ultimately allowed by the Third Circuit.

19             And I'll get to the numbers in a second, Your

20   Honor, but even if you were going to say that, well, at that

21   time there was the possibility that EFH would be in the

22   money, or its creditors would be in the money, first of all,

23   it was only 471 million out of a $9.8 billion transaction.

24   Secondly, it was contingent, it was a possibility, it was

25   potential.  And we now know it never happened.

1           And the fact that we reserved for this allocation

2     hearing for today is because we need to look at the facts as

3     to what actually happened, otherwise what was the point of

4     reserving on allocation?  If it only meant what facts were

5     known at that time, then it could have been decided at that

6     time.  But we now know the outcome.  And the code requires

7     an actual benefit.  The code requires that's something that

8     exists, something that is a result or effect.  And we now

9     know what is actually the result and the effect and that is

10    the EFH creditors got nothing and there was no benefit from

11    the 275 million.

12          So what we need -- can I go to the second slide?

13          THE COURT:  No, I just -- I mean, yes.  We'll save

14    this for closing.

15          MR. ROSNER:  I mean, I'm happy to answer.

16          THE COURT:  Well, I mean, you know, EFIH didn't

17    get anything either.  Nobody got -- the only people to get a

18    benefit out of this breakup fee is NextEra.  The creditors,

19    no creditor got a benefit out of it --

20          MR. ROSNER:  Well, if --

21          THE COURT:  -- of course that's why I reconsidered

22    it and struck it.

23          MR. ROSNER:  And rightly --

24          THE COURT:  And, you know, a question that nobody

25    kind of addressed that I'm not going to ask you to address

1    right now, but to save for closing, is whether because of

2    the pending appeal, I mean, this is even an advisory opinion

3    you're asking me to address as to what the allocation would

4    be on something that's actually not currently allowed.  But

5    at the same time, I won't make you go through this exercise

6    again and spend all this money because every bit of it comes

7    out of the creditors' pocket.  So I am -- I have struggled,

8    as I've read these documents, to figure out what to do

9    there, because I don't want to waste time, I don't want to

10   waste money, but, you know, whether it's an advisory opinion

11   or not is jurisdictional so it's something we'll have to

12   talk about.

13            Mr. Galardi?

14            MR. GALARDI:  Your Honor, -- and I don't mean to

15   interrupt.  You do have the reserve which is a live issue.

16   And this does go to the allegation --

17            THE COURT:  There is a reserve.  Yes, there is a

18   reserve, but that's been decided.

19            MR. GALARDI:  Not allocation, Your Honor.  And

20   that is what is holding up creditor -- again --

21            THE COURT:  Well, whether to have a reserve has

22   been decided, and that's -- you appealed that, I think.

23            MR. GALARDI:  Yes, we did.

24            THE COURT:  Okay.

25            MR. GALARDI:  Yes, Your Honor --

1           THE COURT:  Which is fine.  I'm not -- it's fine.

2    But that divests me of jurisdiction to decide that.

3           MR. GALARDI:  But I'm just talking about a

4    jurisdictional issue as to --

5           THE COURT:  Yeah.

6           MR. GALARDI:  -- why there's a live dispute that

7    will help get money out of the door.

8           THE COURT:  Yeah.

9           MR. ROSNER:  But we do need to -- and look, it's -

10   -

11          THE COURT:  I'm sorry to throw you off.

12          MR. ROSNER:  No, you didn't.  And it's a serious

13   question as to we viewed it, we actually talked about moving

14   this hearing to a date after the Third Circuit decided the

15   issue of reconsideration, scheduling made sense for it to

16   stay today, but it's a real live issue as to whether we're

17   dealing with -- you know, the Court giving advice as to what

18   ultimately going to happen.

19          But substantively, at the time that the

20   termination fee or the breakup fee was allowed, there was a

21   view that it would yield a sale of assets that would yield

22   recoveries along a waterfall.  And we have to look at those

23   recoveries to determine where the value of that $275 million

24   breakup fee or termination fee was actually -- actually went

25   to.

1          Even if you take your example, Your Honor, of what

2     possibly could have happened at that time, it was possibly

3     $471 million that would have upstreamed up to the equity.

4     Even on that basis, that's 4.8 percent of the proceeds.

5     So the evidence will not support assigning any portion of

6     the NextEra breakup fee to EFH.  Mr. Horton will testify

7     specifically that what the NextEra transaction provided to

8     EFH was an opportunity for a greater recovery.  Now, it

9     didn't, and that's potential versus actual.  And the

10    bankruptcy court does not permit the determination of an

11    administrative fee on the basis of something that is

12    potential as opposed to something that was actual.  The

13    bankruptcy code does not permit the Court to assess equity

14    for a sale that occurred at the subsidiary.

15          What if EFH wasn't even in bankruptcy, for

16    example?  Would this Court approve the sale of EIFH, its

17    asset, Oncor, and then enter an order sending an

18    administrative claim related to the termination expense out

19    of court to a nondebtor shareholder?  It couldn't, and the

20    results shouldn't be any different in bankruptcy because

21    it's the waterfall that implicates where -- that indicates

22    where the EFH -- where EFH recovers and is only by virtue of

23    being equity.

24          So, that's why, for example, the Bankruptcy Code

25    says "actual" and not "potential" and not "opportunity" and

1    not "speculative." And this really -- allocation is a little

2    bit of a misnomer because at this point, this really is kind

3    of a break-up fee hearing in and of itself because what

4    Elliott is saying is that they want to have $137,500 million

5    dollars paid in exchange for the certainty of EFH getting

6    nothing.  The PAB wants the Court to approve a $55,000,000

7    million-dollar assessment to EFH for, again, the certainty

8    of getting nothing, and no -- O'Brien, no other case really

9    permits that outcome, and no evidence that Your Honor is

10   going to see is going to indicate that, at the time or

11   subsequently, there was that kind of benefit that was going

12   to EFH.  EFH was just simply an equity holder, and if the

13   money flowed up, the money flowed up, and double-burdening

14   equity, having it get no proceeds, and then actually making

15   it pay for the privilege of getting no proceeds just doesn't

16   make any sense.

17          Now, the same is true on the make whole.  There's

18   -- I'm sorry, there -- it's no answer to the EFH creditors

19   to say that, well, if the make whole had been ultimately

20   disallowed, there would have been money.  That's ultimately

21   not what happened, but even at the time, it wasn't a very

22   material distribution that was going up.  I think that the

23   break-up fee is so critical to today's outcome that -- can

24   we look at the break-up fee arithmetic for a minute?

25          THE COURT:  Well, wait a minute.  It depends on

1      when you're talking about, because the make whole litigation

2      started in 2014, and in 2015, I confirmed a plan that

3      unimpaired EFH creditors.

4                MR. ROSNER:  EFIH creditors.

5                THE COURT:  That -- no, EFH.

6                MR. ROSNER:  EFH, okay.

7                THE COURT:  Everybody.  The whole E-side.

8      Wouldn't that be great, if the whole E-side was unimpaired?

9      And now, that plan ultimately didn't -- the conditions to

10     effectiveness weren't met because they didn't get the kind

11     of PUCT approval they wanted.  So, for the first -- 2014 --

12     two years of the case, while the litigation of the make

13     whole was going on, including the decision by me, and, I

14     think, the affirmance of the District Court, EFH creditors

15     were unimpaired.  So, it's not -- you can't say there was

16     just a trickle of benefit going up the waterfall because all

17     of that trickle of benefit, actually, was substantially

18     relying on the fact that the make whole litigation would be

19     successful.

20                However, both, for the NextEra transaction and the

21     Hunt plan, had it gone effect -- yeah, for both of those

22     plans, had those plans gone effective and then subsequently,

23     the make whole had been unsuccessful, actually, neither of

24     the EFIH or the EFH creditors would have been affected

25     because under both of those plans, correct me if I'm wrong,

1    Mr. Kieselstein, but under both of those plans, once they

2    gone -- once they had gone effective, the buyer bore the

3    risk of the make whole litigation.

4            MR. KIESELSTEIN:  We'll double check, Your Honor,

5    but I'm 90 percent sure that's right, yes.

6            THE COURT:  Okay, so, until 2016, or, excuse me,

7    until 2000 -- yeah, until November 2016, the EFH creditors

8    were benefitting from the make whole litigation.  And, at

9    least in the first plan, were benefitting to the tune of

10   being unimpaired.

11           MR. ROSNER:  Well, I'll get back to the make whole

12   litigation in a minute as to the legal standards for

13   approval, but in actuality, if they were benefitting from

14   the make whole litigation, it was only by virtue of what the

15   cash consideration would have been and would have gone to

16   EFH by virtue of that being successful --

17           THE COURT:  Right.

18           MR. ROSNER:  -- and there was no cash

19   consideration that went to EFH, and --

20           THE COURT:  Well, there was.  There was -- that's

21   what I'm saying.  There was an entire unimpaired cash

22   consideration in the first plan, and in the second plan, I

23   can't remember what the payout was, but it was $650, 60, I

24   mean -- Mr. Pedone will remember.  It was the mid --

25   somewhere in the 50, 60 percent range.  Maybe 40.  Somewhere

1    in there, 40 to 60, I think, under the NextEra plan.

2              MR. ROSNER:  Right, and under the NextEra --

3              THE COURT:  But that all fell apart with Judge

4    Ambrose's decision.  I understand that.  And that --

5              MR. ROSNER:  Right.

6              THE COURT:  -- that's everything was trading at

7    above par at EFIH, and everything was very good for them,

8    and of course, it started to look bad for them and extremely

9    bad for your clients, once that decision and then the

10   settlement, which was a couple months later, once that was

11   approved, it was not good.

12             MR. ROSNER:  And for that reason, Your Honor,

13   we're here at this trial to determine what was the actual

14   benefit from approval of the NextEra breakup fee to the

15   actual creditors and what did they actually recover.  And

16   from the Bankruptcy Court's perspective, you have to look at

17   where -- you have to follow the money and determine, where

18   was that money going to go, where did it ultimately go, is

19   it right to --

20             THE COURT:  Right, and I -- well, I think --

21   that's the nub, right?  When do I decide?  Do I decide as of

22   September 2016 where the money would go, or do I decide

23   sitting here in 2018 where the money did go, which was

24   nowhere?  So, nobody got anything, so I don't know.  I'm

25   sorry, I keep interrupting, I'm sorry.

1          MR. ROSNER:  No, that's okay, Your Honor.

2          THE COURT:  This is opening argument.

3          MR. ROSNER:  Yes, but Your Honor --

4          THE COURT:  I should shut up and listen.

5          MR. ROSNER:  No, but Your Honor, you're right, and

6     the determination, under both circumstances, almost yields

7     the same -- to the same place, because, I believe, I think

8     that the law is, is that for you -- you need to determine

9     what was the actual benefit, the actual necessary benefit to

10    EFH.  It's very hard to see there being an actual benefit to

11    EFH when there was no consideration that actually flowed to

12    it, and I don't believe that, to double down on that and

13    actually assess the equity for the cost of getting no

14    distribution is going to comport with 503(b).  Otherwise,

15    there's a real problem with 503(b) if it would allow for

16    that form of outcome.

17          Secondly, I do note that the allocation, if it's

18    only based upon what facts were known at that time, then the

19    decision could have been made at that time.  There would

20    have been no reason to reserve for it, and to reserve for

21    the hearing until today because what we need to do is look

22    at what the outcome was, and you need to, for --

23    particularly in a bankruptcy where benefit is determined by

24    dollars and cents.  And the NextEra breakup fee arithmetic,

25    I think, bears this out in a manner that really crystalizes,

1     where was the benefit of the NextEra transaction, and I'm

2     going to get to the point, Your Honor, about what cash was

3     actually flowing up from the NextEra transaction.  Do you

4     have this arithmetic slide in front of you, Your Honor?

5          THE COURT:  That's -- I unfortunately do.

6          MR. ROSNER:  Then I'll --

7          THE COURT:  All I'll say is, thank you for the

8     large font.

9          MR. ROSNER:  Well, it's actually very simple, and

10    I tried to write this out in a way for myself to make it

11    simple, to make it arithmetic.  But, Your Honor, at the

12    breakup fee hearing, I used the number of 1.47 percent as a

13    determination of what was the amount of $275 on the total

14    Oncor TEV, and that's from the hearing, I believe it's Page

15    121 of the transcript, Lines 4 through 10.  And so, the 1.47

16    percent was Your Honor's number.

17         THE COURT:  I made that up?

18         MR. ROSNER:  Well, you did -- I don't think you

19    made it up.

20         THE COURT:  Well --

21         MR. ROSNER:  It's arithmetically correct.

22         THE COURT:  Okay.

23         MR. ROSNER:  So, you were correct when you said,

24    of the TEV, it's 1.47 percent.  And if you go down the

25    arithmetic from the analysis of, what was the benefit to

1   EFH, in terms of the cash benefit, it was zero.  And so,

2   there would be no breakup fee that led to any benefit.  If

3   you looked at this, and one of the arguments that Elliott

4   makes is that, well, wait a minute, the asbestos

5   liabilities, which have a value of about $58 million

6   dollars, were assumed as part of the transaction, and that's

7   a direct benefit to EFH.  Okay, 1.47 percent of that is

8   actually $852,000 of a $275 million-dollar breakup fee, .31

9   percent.

10          If you actually were going to take that argument

11  to its logical conclusion, the cash benefit of the asbestos

12  claims having been assumed as part of the sale is actually

13  only $7.7 million dollars because that's the amount, the

14  13.7 cents that those claims would have gotten, or actually

15  13.2, if they were part of the claims body.  So, there was

16  actually a $7.7 million-dollar benefit from the assumption,

17  from the perspective of EFH's creditors.  So, that's

18  $113,000 of the -- a $275 million-dollar breakup fee.

19          The point that you were raising a couple of times,

20  and I tried to respond to, is the $471 million dollars,

21  which is what was projected to possibly go to EFH from the

22  NextEra transaction if the make whole disallowance was

23  affirmed by the Third Circuit.  Now, I wrote down here next

24  to it, no make whole, no discount, and no discount means,

25  I'm not discounting this number by the risk of the

1    litigation.  The risk that it would be reversed, and we know

2    that it was reversed, so therefore, the risk couldn't be

3    zero, but even on -- at zero, it only yields $6.9 million

4    dollars of the entire breakup fee that would be the benefit,

5    assuming 100 percent certainty that the make wholes would be

6    disallowed to the EFH creditors, to the EFH estate.

7            Now, that's on the total Oncor TEV.  The reason I

8    did the second column and going through the same exact

9    hypotheticals -- or actuals, I should say, not

10   hypotheticals, is that if you looked at the breakup fee as a

11   percentage of what actually was -- what went to the EFIH

12   estate, it's actually $9.84 billion, were the proceeds, that

13   deals with the minority interests and deals with the Oncor

14   debt.  So, of that, it's really a 2.79 percent breakup fee,

15   which is within the norms, and you'll hear from Mr. Strom in

16   his testimony that that's basically where breakup fees shake

17   out.

18           But, so using that number, just looking at the

19   EFIH proceeds, again, cash, zero.  Zero breakup fee.  I'm

20   sorry, the EFH proceeds.  Cash to EFH is zero.  Asbestos,

21   again, assuming the full assumed liability of $58 million

22   dollars yields only a $1.6 million-dollar benefit from the

23   termination fee.

24           THE COURT:  Where's the $58 million coming from?

25           MR. ROSNER:  The $58 million-dollar number is the

1    assumed present value -- I'm sorry?

2              MAN:  Disclosure statement.

3              MR. ROSNER:  It's from the disclosure statement,

4    assumed present value of the asbestos liabilities.

5              THE COURT:  All right.

6              MR. ROSNER:  And that's the number -- and I don't

7    believe there's a dispute on that number.  It's part of the

8    record.  But of that $58 million, again, I just run the math

9    again, or the arithmetic --

10             THE COURT:  Well, that's an assumption, it's not

11   an actual finding, or --

12             MR. ROSNER:  Yes, it's based on the historical --

13             THE COURT:  And there's no limit, actually.  Those

14   liabilities are assumed, period.

15             MR. ROSNER:  That's correct, but there is a

16   natural limit as to what those claims would have been paid

17   in any event, which is no more than the 13.7 cents that the

18   EFH creditors got, or using $58-, it's 13.2 cents.  If it

19   was even a higher number, then it would have been even a

20   lower recovery.  At most, it was $7.7 million dollars of

21   benefit to EFH which, on this higher breakup fee percentage

22   based upon just the EFIH proceeds, is only $214,000 of

23   actual benefit.

24             And again, turning back to your point about the

25   $471 million dollars, here, at most, it would be a $13

1    million-dollar benefit that -- and that's if there was no

2    discount based upon litigation.  If you even apply a 50

3    percent discount based upon the risk that the make wholes

4    would ultimately be allowed, which they were, it would be a

5    $6.5 million-dollar benefit from the breakup fee.  That's

6    it.  And the evidence -- no evidence that you will see, from

7    the movants or from any other party, will change the fact

8    that that was the benefit that the NextEra transaction

9    yielded to the EFH estates.

10            Now, I have one more slide that I want to put in

11   front of Your Honor, which is not arithmetic -- well, mostly

12   it's not arithmetic, but it just shows what the EFH and EFIH

13   boards looked at, at the time that the NextEra transaction

14   was being approved.

15            THE COURT:  Now we've got to find all of them.

16            MR. ROSNER:  Okay.

17            THE COURT:  All right, go ahead.

18            MR. ROSNER:  Yes, and this is from the board DEC,

19   this is a document in an exhibit for this trial, and this is

20   what the boards looked at, and the only reason I'm showing

21   you this document, Your Honor, is to show you the two

22   columns that the board looked at on the day before the

23   hearing before Your Honor on approval for the breakup, and

24   if you see at the top in yellow, they ran this two ways.

25   They said, no make whole and with make whole.  So, the

1    boards, when they were exercising their business judgment in

2    adopting this, were taking the view that there were two

3    scenarios, and they recognized that the breakup fee itself,

4    under the scenario of with make wholes, if you go down to

5    the bottom, the second highlighted line, Excess Value from

6    EFIH, from the sale of Oncor, it yields zero with the make

7    whole.

8              So, the boards took a look at that at the time

9    that they were approving the transaction, and, in their

10   business judgment, they approved it, understanding that the

11   transaction could have been, and ultimately was, solely for

12   the benefit of EFIH.  So, there wasn't a view that the board

13   was saying that this was ultimately going to be a cash

14   benefit to EFH.  It was a recognition that it could be

15   solely a benefit to EFIH.  So, again, $471 million dollars

16   is the max, and it ultimately didn't turn out to be the

17   case.

18             There really is nothing different about the

19   breakup fee hearing -- not calling this a breakup fee

20   hearing, but the breakup fee here, and in any other cases,

21   other than, there were no excess proceeds to pay it.  but

22   again, if there were excess proceeds to pay it, that would

23   have just gone through the capital structure and it would

24   have all gone to EFIH until their creditors were paid in

25   full, and then it would have gone to EFH.  And that's where

1    the benefit is demonstrated.  And no evidence that Your

2    Honor sees will change that fact.

3            Now, in terms of the Debtors' professional fees,

4    just moving off of the breakup fee for a minute, the movants

5    want to shift $42 million dollars in the Debtors' fees over

6    to the EFH estate.  Importantly, you're going to -- you're

7    facing the decision when you look at this record of a

8    methodology versus no methodology, whether one is evidence

9    whether one is no evidence.  And in fact, as to some of the

10   witnesses, or at least one of the witnesses, we have a

11   standing objection which will be argued before that witness

12   as to whether there's any competent evidence even being

13   offered, and that involves Mr. Horton.  But the movants,

14   Elliott, has absolutely no evidence, will demonstrate no

15   methodology to support their reallocation.  In fact, Mr.

16   Rosenbaum, who will be testifying, will readily admit that

17   they came up with their splits, their 50/50, through his

18   musings on a, quote, "holistic view of the case."  That is

19   evidence that it is arbitrary, that is evidence that it is

20   baseless, and it cannot sustain the movant's burden.

21           The evidence -- the actual evidence will

22   demonstrate that the Debtors' professionals allocated their

23   fees in accordance with an interim compensation order.  They

24   -- it will demonstrate that they did it in accordance before

25   the interim compensation order with an RSA, that the EFIH

1    creditors specifically negotiated and approved.  Actually,

2    Mr. Rosenbaum, then when he was at York Capital, was part of

3    those negotiations.  The Debtors stayed within that

4    methodology.  That was an actual methodology.  Those binding

5    instruments, a court order, had the professionals divide

6    direct and indirect accordance with the methodology.  It was

7    rational, it was party-negotiated, court-approved

8    methodology.

9            The evidence will show that the Debtors comported

10   with that methodology, and they allocated their fees with

11   the requisite oversight of all of the parties.  The evidence

12   will also show that the Debtors' legal team looked at the

13   allocations and found them to be sufficient, in their

14   business judgment.  There is no evidence that will show any

15   other methodology that can defeat -- to have this Court

16   substitute its business judgment or its view over the

17   Debtors' professionals' business judgment, the Debtors'

18   business judgment, the RSA, the interim compensation order,

19   and the fact that no party -- and the fee committee, and

20   that no party has objected.

21           So, no party here, other than the existing

22   methodology -- the existing allocations has any proposed

23   allocation methodology that is supported by any evidence

24   either in the record or to be introduced into the record.

25   And even on the movants' identified subjects of tax

1    Armageddon, make whole claims, the TCEH settlement, and the

2    asbestos claims, they have no evidence that demonstrates a

3    reason for reallocation, or a methodology for reallocation.

4    The tax Armageddon argument, first and foremost, is also

5    purely a hypothetical.  The evidence will demonstrate

6    conclusively that there was no taxable transaction that was

7    ever proposed, and that's the beginning and the end of the

8    analysis.  How can EFH be held liable for costs associated

9    with valued loss, let's say at EFIH, for a transaction that

10   never existed?

11            And the evidence, importantly, will also

12   demonstrate that EFH was not the only one that was concerned

13   about a tax Armageddon but that all of the estates were

14   concerned about it, that the Debtors' fiduciaries, including

15   EFIH's independent director who testified, and EFIH's

16   unsecured creditors believe that the risks were real

17   significant.  The benefit of the non-taxable benefitted

18   everybody, and for that reason, the Debtors' professionals

19   allocated that as a collective benefit.

20            On the make whole claims, Your Honor, there is no

21   credible evidence or argument that litigation concerning a

22   potential liability arising under the EFIH secured

23   facilities provides a direct benefit to EFH, other than by

24   virtue of it being in the waterfall.  EFH is not a party to

25   those instruments.  EFH is not a party to those litigations.

1    An estate bears the burdens of its objections and allowance

2    or disallowance of claims against it.  It's actually --

3    they're making both arguments.  On the one hand, they're

4    saying EFH should be responsible for anything associated

5    with asbestos liabilities because those claims were at EFH,

6    and on the other hand, they're saying, well, the claims

7    against us at EFIH, that should be a shared liability.

8    That's an inconsistent position.  EFIH make wholes should be

9    solely the responsibility of -- because they were the only

10   ones party to that transaction.

11         Of the asbestos claims, the last comment I'll make

12   on the Debtors' professional fees, the Debtors allocated the

13   work regarding the specific claims to EFH.  Work related to

14   the reinstatement was allocated as a collective benefit.

15   The evidence demonstrates that reinstatement was a

16   collective benefit enabling plan confirmation and sale

17   execution.  All estates, the evidence demonstrates,

18   preferred reinstatement to avoid delays and the costs of a

19   channeling injunction.  The understanding of the asbestos

20   claims was necessary for due diligence.  So, even if the

21   courts accepted their arguments, they have no methodology to

22   propose any kind of allocation that is supported by any kind

23   of evidence, and they will present no evidence on

24   methodology.

25         Your Honor, the same point from the record is made

1   as to the committee's professional expenses.  The request to

2   reallocate the committee's is without support in the record.

3   The movants base the request on just an unproven, from an

4   evidentiary standpoint, perception of the committee's work.

5   The committee was a fiduciary to both estates.  The

6   committee worked for both estates.  They rely on the

7   improper assumption, of course, that EFIH was solvent, which

8   it wasn't.  And there will be no evidence in the record,

9   through the trial over the next couple of days,

10  substantiating the proposed split that they make, or not

11  enough -- there -- no evidence to actually undo the 50/50

12  split that the Debtors have approved up to this point.

13          And in fact, there would be a real problem with

14  both 330 and 503(b) if, in fact, this amount of fees could

15  be associated with an estate for which there was actually no

16  recovery from the actual event of the case, which was the

17  sale of Oncor.  On the substantial contribution, which is my

18  -- the final point of today's -- of this hearing, there is

19  no evidence, Your Honor, that will be submitted that Elliott

20  worked at any time to benefit a Debtor other than EFIH or a

21  creditor other than itself.  I understand that we're not

22  arguing today the substantial contribution, and I understand

23  the fee committee is looking at it, but Elliott will not be

24  able to point to a single dollar that EFH received by virtue

25  of its -- of the -- of its efforts.  The separate

1     transaction did not provide any benefit to EFH.

2           The reconsideration, which I believe is roughly

3     $3.1 million, I -- maybe the arguments in the record will

4     reflect as to why there should be no part of the NextEra

5     breakup fee attributable to EFH.  However, if there is, the

6     small piece, the $1.6 million, then maybe an aliquot

7     percentage of the substantial contribution.  And basically,

8     the termination of the NextEra PSA saved interest at EFIH,

9     again, there was no secured debt at EFH, and there was no

10    interest being burned at EFH, so that benefit went

11    specifically to EFIH.

12          Your Honor, we urge the Court, when it's looking

13    at the evidence, to think about this from the perspective of

14    the actual benefit that EFH creditors and the EFH estate

15    gained specifically from the NextEra termination fee.  The

16    evidence will conclusively demonstrate, and the -- the

17    applicable legal principles that apply here will

18    demonstrate, that EFIH should bear the breakup fee, that the

19    Court should not disturb the business judgment of the

20    professionals, and that Elliott's efforts, if there were

21    substantial contribution, benefitted the EFIH estate and not

22    EFH.

23          THE COURT:  Thank you.

24          MR. ROSNER:  Thank you, Your Honor.

25          THE COURT:  Lots to think about.  Mr. Pedone, can

1    you make this even more unclear?

2            MR. PEDONE:  No, I -- I will simplify it, Your

3    Honor.

4            THE COURT:  Okay.

5            MR. PEDONE:  Could I actually -- could we put up

6    your second-to-last slide with the breakouts, the 1.47 and

7    the 2 point -- yes, the arithmetic slide, please?

8            Your Honor, it's easy to think about this and say,

9    is this determination that you need to make unhinged from

10   the law and purely equitable or equitable at all?  And we do

11   not believe that it is.  EFH Indentured Trustee believes

12   that O'Brien and other cases govern, and that this Court

13   needs to put itself back in the shoes of the Debtors at the

14   time that the breakup fee, termination fee, was approved.

15   It needs to consider that that fee would only be payable if

16   the transaction didn't occur, the parties were contemplating

17   at that time that the fee would only be payable if there was

18   a better transaction.  Nobody stood before this Court and

19   said we actually expect that fee will be payable on the

20   circumstances that occurred.

21           And putting yourself back there in those -- in

22   that time, when the parties didn't get to an agreement or

23   the Debtors didn't propose the allocation, the Court has to

24   apply O'Brien and its progeny, and you have to say, under

25   that case law, what fee would the law allow to be applied to

1    EFH?  And when you look at this table, you get a pretty good

2    breakout.  The Court itself said 1.47 percent of total

3    enterprise value.  I think the more appropriate way to look

4    at it might be the 2.79 percent of the actual consideration

5    paid, and let's recall, that consideration was paid to EFIH

6    under the documents at the time.

7            I don't think anybody in the room believed that

8    anything other than a cap of these numbers -- and I -- you

9    will not hear testimony that somebody sitting in the room at

10   the time believed a 50 percent breakup fee could be imposed

11   on EFH.  You couldn't have done it if you had testimony.

12   You couldn't have said, I'm imposing a breakup fee on EFH

13   that will bring it to the brink of administrative insolvency

14   and EFH will benefit from that.  And at that time, the Court

15   recognized that the risk of the make whole hitting was real.

16           So, I ask you to fast-forward to the disclosure

17   statement hearing where I stood before you on behalf of EFH

18   and said, we need a resolicitation on behalf of EFH.

19   Because, post-breakup fee -- post-make whole fee world, it

20   significantly changed circumstance.  And this Court said no,

21   we're not going to have resolicitation at EFH because, as

22   the disclosure statement said, and everybody knew, it was a,

23   quote, "giant risk" that that could occur.  And I said you

24   have to sit here today and take that "giant risk" factor

25   that presumably everybody knew about and knew that it could

1    happen, apply it to the $471 million dollars and bring your

2    discount in, and you come out with a smaller breakup fee

3    than the $13 million apportioned.  And that's how, I

4    believe, it should be looked at.

5             What could have been imposed on EFH at that point

6    in time, and you get a number that is significantly lower

7    than the PAB is asking for and is certainly significantly

8    lower than Elliott is asking for.  And then, of course, if

9    you look, in fact, in hindsight and say, what was the

10   benefit, and we can actually look at hindsight, then you

11   would come up with, no portion of the fee is appropriately

12   attributable.  Your Honor, turning to professional fees --

13            THE COURT:  That's because if I had known, or

14   understood, let's put it that way, not known, understood

15   that this fee would be payable in these circumstances, I

16   wouldn't have approved it, but that's water under the

17   bridge.

18            MR. PEDONE:  Your Honor, I think EFIH might have -

19   - I think there -- in hindsight, there was a certain amount

20   of rolling the dice on the best deal available --

21            THE COURT:  Mm-hmm.

22            MR. PEDONE:  -- at that time, and the parties took

23   the risk, and EFIH clearly could afford to take the risk

24   with $9.8 billion coming to it.  EFH would not have taken

25   that risk --

1           THE COURT:  Fair point.

2           MR. PEDONE:  -- if it thought that it could bear

3    50 percent.  You won't hear testimony from any board member

4    that they thought they -- it was remotely conceivable.  You

5    are going to hear --

6           THE COURT:  I'm pretty sure you would have

7    objected.

8           MR. PEDONE:  I'm quite sure I would have objected

9    and I'm quite sure I continue to believe that resolicitation

10   was appropriate, that the Court recognized and said there

11   was a giant risk at that time --

12          THE COURT:  Yeah.

13          MR. PEDONE:  -- and that risk was assumed, and

14   here we are today, and there has to be a looking back at

15   that time and saying, what could we have imposed on EFH at

16   that point in time for a break fee?  And the case law is 3

17   to 6 percent.  You can't -- you can take the value that

18   would flow to them, tag them with 3 to 6 percent.  You can't

19   say that they had some other great benefit.

20          Now, we have the asbestos number, I think the $58

21   million is a rational way of doing it.  you take $58 million

22   in benefit, should discount it, yes, but regardless, we come

23   out with ridiculously low numbers not worth this litigation

24   on the asbestos.  But I would note that, as Mr. Keglevic's

25   testified at the NOL trial, I'll call it, when we split

1    these cases up, the NOLs that were transferred had

2    significant value.  And while Elliott is focused on

3    asbestos, and asbestos has been the focus of the litigation

4    because that's a presumed benefit, there were a lot of gives

5    and gets, to use Mr. McKane's favorite term, in the deal

6    that allowed EFH to go along with this.  No one said, oh,

7    they're taking asbestos, so this is a great deal.  You had

8    the Debtor saying you have to get out of bankruptcy, it's

9    costing $50 million dollars per month at EFIH for the delay,

10   we have to live with the asbestos.  We can't fight them.

11   So, we allow the class to become unimpaired at EFH, they get

12   assumed in full, despite what could, and everybody knew what

13   could happen -- potentially could happen to the rest of the

14   EFH creditors, that burden was put on to get to the deal

15   that led to a consensual plan.

16          There were an enormous number of gives and gets,

17   including EFH giving away its NOLs without consideration,

18   including EFH getting the asbestos liabilities assumed, but

19   we can't just focus on one of them and say, let's measure

20   that as a significant number.  But that's not the -- the

21   asbestos number is not the material number driving this.

22   It's professional fees, and it's the break fee, and I've

23   outlined on the break fee.

24          Turning to professional fees, I think it's

25   important, and neither of the parties who are primarily

1   litigating this are actually here other than the PAB, it's

2   questionable whether they're primarily litigating this, they

3   work here, as the Debtors.  But when the interim fee order

4   was being negotiated and was ultimately improved, the grand

5   battle was between the T-side and the E-side.  I don't

6   believe that there was any testimony where EFIH was standing

7   up and saying, we need to figure out how to apportion fees

8   with EFH later on.  That wasn't what it was about.  That

9   reservation of rights sentence, and that's what it is, it's

10  not a sentence that says, there shall be, at the end of

11  these cases, a de novo review of every line item of fees to

12  see where it should be allocated, it's a reservation of

13  rights tucked in to allow it to be revisited, so parties

14  could move forward.

15          And what that means today is, Elliott's burden,

16  dozens upon dozens, if not perhaps a hundred or more,

17  interim fee applications later, where this Court signs off

18  on the interim payments, where the fee committee with a

19  representative of the Debtor sitting there on the fee

20  committee, looking at the fees, approved them on an interim

21  basis with the allocation laid out very clearly, everybody

22  could see what the allocation that was occurring is done.

23  Now, Elliott is here trying to revisit that.  At the very

24  least Elliott is trying to undo the Debtors' earliest --

25  earlier business judgment, certainly trying to undo

1    Kirkland's earlier business judgment, and trying to undo

2    this Court's interim blessing of the process and the way it

3    was running for four years.

4            The exact standard for such a revisiting on a

5    vague sentence like that, that says something can be

6    revisited, well, it's not written in the code, but it

7    certainly must be a heightened standard, and I'd submit it's

8    certainly, at least, unwinding the Debtors' business

9    judgment enough, if not higher, and I'd say that the fee

10   allocations should remain as they are, not -- and not

11   changed in any way.  And I'll reserve my comments with

12   regard to the committee fee allocation until I see what the

13   evidence is.  I don't believe that there's actually going to

14   be any evidence that's admissible that supports reallocating

15   the committee fees at all.  Thank you.

16           THE COURT:  Thank you, Mr. Pedone.  Ms.

17   Yenamandra.

18           MS. YENAMANDRA:  Good morning, Your Honor.  Aparna

19   Yenamandra from Kirkland & Ellis on behalf of the PAB.  Your

20   Honor, the PAB is not going to be doing a full throttle

21   opening today, we're just going to make a few opening

22   remarks and then move towards today's adventure

23   presentation.

24           So, first of all, at the risk of stating the

25   obvious, our sole focus here is just to get a fair and

1    equitable resolution that allows us to release plan

2    distributions.  I thought it would be fun sitting on $671

3    million.  As it turns out, it's not.  The only party that's

4    actually gotten a plan distribution, to date, has been the

5    Elliot creditors with respect to their EFIH position, and

6    so, we believe that after waiting for more than four years

7    for a confirmed plan to go effective, the remaining

8    creditors shouldn't have to wait any longer than they need

9    to.

10                   Secondly, the PAB did not want to have to be the

11   third man in this hockey fight by putting out a proposal.

12   That is my first sports metaphor in this case, but Mr.

13   Kieselstein tells me there are lots of fights in hockey

14   matches, so it is appropriate.

15                   THE COURT:  They're games, by the way.  Nice try.

16                   MR. KIESELSTEIN:  It's a work in process.

17                   MS. YENAMANDRA:  Heads will roll.  What we really

18   wanted is for the economic stakeholders to either reach

19   agreement or, absent that, at least be able to bridge the

20   gap between their competing proposals and their final

21   submissions, and that's why we didn't put a proposal in our

22   initial statement, which was served but not filed,

23   consistent with the scheduling order, but despite those

24   efforts and the collective group's efforts, the parties have

25   not been able to bridge the gap, so, here we are.

1            And then finally, a lot of what you will hear over

2     the next couple of days is going to be argument as to issues

3     that have been directly and indirectly already litigated to

4     resolution in front of this Court, or after-the-fact

5     opinions on those same issues.  The PAB doesn't think it's

6     appropriate for, really, any party to use this proceeding as

7     an opportunity to present alternative histories replete with

8     what-ifs and hypothetical scenarios, particularly given the

9     long and extensive history of these Chapter 11 cases.  And

10    so, much of what you will hear from the PAB and its

11    witnesses will really just be an effort to ensure the record

12    that ultimately supports Your Honor's final ruling is

13    accurate, thorough, well-balanced and based on facts, not

14    conjecture or speculation.

15            And finally, with that, Your Honor, the only other

16    thing I'll say is, in perhaps a career-limiting move, I can

17    answer the question that you posed to Mr. Kieselstein about

18    what the Hunt plan and NextEra plan said.  So, the Hunt

19    plan, which was live from August 2015 to May 2016,

20    unimpaired EFH creditors and EFIH creditors.  It had a

21    condition precedent to the effective date that allowed the

22    Hunts to effectively terminate the deal and walk away if the

23    -- if Your Honor's ruling disallowing the make whole claims

24    was reversed, repealed or remanded before the effective

25    date.  So, you know, open question on what would have

1    happened if the make whole -- Your Honor's decision had been

2    reversed pending the closure of the Hunt case.  Your Honor

3    is correct, if the make whole reversal had come after the

4    Hunt deal had closed, because all the creditors were

5    unimpaired, the Hunts would have effectively had to fork

6    over whatever was allowed on the make wholes, as well as

7    continue to make sure the rest of the unsecured creditors

8    were unimpaired.

9         Under the NextEra deal, from between July 2016 and

10   the Third Circuit opinion on November 2016, under that deal,

11   again, there was the same condition precedent that allowed

12   NextEra to walk if Your Honor's make whole decision was

13   reversed, repealed or remanded prior to the effective date.

14   During that time period, EFH creditors were impaired.  There

15   was a -- what we called a top-up provision for the EFIH

16   unsecured creditors that said during that period, if there

17   was a reversal, repeal or remand of Your Honor's ruling, and

18   NextEra agreed to waive the closing condition, they would

19   infuse enough cash consideration to make sure that the make

20   wholes were paid in the allowed amount, and that the PICs --

21   the EFIH unsecureds would continue to get paid in full.

22        So, unless Your Honor has any questions, that is--

23        THE COURT:  But after the -- if, hypothetically,

24   the NextEra plan had been -- well, it was confirmed, but it

25   had been approved by the PUCT and gone effective, and then

1    after that, the Third Circuit reversed me, my memory is that

2    NextEra would have been liable for that.

3            MS. YENAMANDRA:  NextEra would have been liable

4    for that -- for that obligation, yes, but it -- but after

5    the Third Circuit opinion we --

6            THE COURT:  Oh, I understand.

7            MS. YENAMANDRA:  -- eliminated the top-up

8    provision.  Yeah.

9            THE COURT:  Yeah, yeah, yeah, it went --

10   everything went awry.  Yeah.

11           MS. YENAMANDRA:  Yes.  Correct.

12           THE COURT:  It was a big event --

13           MS. YENAMANDRA:  Yes.

14           THE COURT:  -- in the case, to say the least.

15   Okay.

16           MS. YENAMANDRA:  That's it for us, Your Honor --

17           THE COURT:  Thank you.

18           MS. YENAMANDRA:  -- unless you have anything else,

19   I think we're ready to move to the evidentiary

20   presentations.

21           THE COURT:  All right, thank you very much.  We

22   just about hit an hour and a half as we talked about, so

23   we're on target.  We are going to take a short nature break,

24   and then we'll reconvene as soon as possible.  And I guess

25   we're going to hear argument about some objections to Mr.

1    Husnick's direct.

2            MAN 1:  I don't even know if --

3            THE COURT:  There are none?

4            MR. MCKANE:  There are no objections to Mr.

5    Husnick, it's going to be Mr. Horton, and so we'll see if

6    that -- essentially at the end of the day.

7            MAN 1:  No, we'll go right to Mr. Husnick.

8            THE COURT:  All right, we'll go right to Mr.

9    Husnick, and you're going to put him on for some

10   supplemental direct?

11           MR. MCKANE:  Correct, Your Honor.

12           THE COURT:  Okay, very good.  Five minutes, okay?

13        (Recess)

14           CLERK:  All rise.

15           THE COURT:  Please be seated.  Call Mr. Husnick.

16           MR. MCKANE:  Your Honor, yes, please.  The Plan

17   Administrative Board calls Mr. Chad Husnick to the stand.

18           THE COURT:  All right.  Where is he?  There he is.

19   I'm sorry -- it's okay, Leslie.  Mr. Husnick, as a member of

20   our bar admitted pro hoc vitae, you're an officer of the

21   Court and your affirmation is not required.

22           MR. HUSNICK:  Thanks, Your Honor.

23           MR. MCKANE:  Your Honor, just for the record, what

24   you have on your ledge there is a large witness binder, due

25   to the size of some of the fee applications for Mr. Husnick

1   as well as a tablet that contains the electronic version of

2   all the exhibits in the case.

3           THE COURT:  Okay.

4           MR. MCKANE:  All right.

5           THE COURT:  Please be seated.

6           DIRECT EXAMINATION OF CHAD HUSNICK

7   BY MR. MCKANE:

8   Q   Mr. Husnick, can you please state your name and

9   corporate affiliation for the record?

10  A   Sure.  My name is Chad John Husnick, H-U-S-N-I-C-K.  I'm

11  a partner in the restructuring group at Kirkland & Ellis,

12  LLP, and Kirkland & Ellis, International, LLP.

13          MR. MCKANE:  Your Honor, request permission to

14  treat the witness as hostile.

15          THE COURT:  Granted.

16  Q   Now, Mr. Husnick, why are you here today?

17  A   I am here today to provide fact testimony regarding the

18  allocation dispute, as a partner at Kirkland & Ellis.

19  Q   And sir, did you prepare a declaration in anticipation

20  of your testimony today?

21  A   I did.

22  Q   And if you open up your witness binder that's on your

23  credenza, or ledge there, and so you'd turn to the first

24  tab.

25  A   I'm there.

```
1   Q     You see the document with the header on top, PAB-DIR

2   Husnick?

3   A     I do.

4   Q     And sir, is this the declaration you prepared in

5   support of the PAB's final submission in response to the

6   pending allocation motion?

7   A     It is.

8   Q     And sir, is the information contained in this document

9   true and accurate, to the best of your recollection and

10  knowledge?

11  A     It is, with one exception that I'd like to call to your

12  attention.

13  Q     Please do so.

14  A     In Paragraph 31, the second sentence, I would strike

15  this sentence, upon completion of the actual calculation, it

16  was determined that there would be an approximately 3.4 and

17  a $4 million-dollar swing to EFIH and for EFIH's benefit, so

18  this statement, once we were able to complete the

19  calculation, turned out to be incorrect.

20  Q     All right, so if we were to strike the second sentence

21  in Paragraph 31 on Page 11 of your declaration, the

22  remainder of the declaration, it remains true and correct to

23  the best of your knowledge?

24  A     That's correct.

25            MR. MCKANE:  Your Honor, with that sentence
```

Page 58

1    stricken, we'd move the declaration into evidence.

2              THE COURT:  Any objection?

3              MAN:  No objection.

4              MAN:  No objection.

5              THE COURT:  It's admitted without objection.

6              MR. MCKANE:  Thank you, Your Honor.

7    Q    Mr. Husnick, can you describe at a high level your role

8    at Kirkland & Ellis's invoicing and billing process with

9    respect to these cases?

10   A    Sure.  As a partner at Kirkland, I was responsible for

11   overseeing a team of attorneys, Kirkland & Ellis attorneys

12   and paraprofessionals in connection with the preparation of

13   and submission of the Kirkland & Ellis monthly fee

14   statements, interim fees, applications and the final fee

15   application.

16   Q    And sir, what steps did Kirkland implement to ensure

17   that the fees and expenses were properly being allocated by

18   timekeepers?

19   A    So, what we did at Kirkland is we realized, in light of

20   the negotiations over the restructuring support agreement

21   pre-petition, that allocation amongst the various Debtor

22   silos was going to be a very important issue in the Chapter

23   11 cases.  So, we developed a protocol, we always have a

24   billing memorandum that goes to all billers on a Chapter 11

25   case.  We do that in every case.  In this case, we

1    highlighted in the billing memorandum that there were

2    certain issues unique to this case, including the

3    requirement that we allocate across the various Debtor

4    silos.

5        So, when we drafted that billing memorandum, it

6    reflected that there were going to be allocation

7    requirements.

8    Q    Right, and so, in addition to the guidance that you

9    provide to timekeepers on the front end, was there a backend

10   process of review before invoices were submitted to the

11   Debtors and the Court?

12   A    Yes.  There's a significant process that we go through

13   at Kirkland & Ellis to ensure that we protect

14   confidentiality and privilege of our clients' business

15   because we're putting stuff out there on the public record,

16   but at the same time, we use that process to go through and

17   ensure that matters were, to the best of our ability,

18   appropriately allocated.  That's a, as I discuss in the

19   declaration, usually a four-round process.  Each round had

20   kind of its own unique purpose and, for the first three

21   rounds, it was generally done by paraprofessionals and

22   restructuring associates, and then the fourth round was

23   reviewed by partners, again, all for the purposes of

24   ensuring appropriate redaction or elimination of the

25   privileged and confidential information as well as

1    appropriate allocation across the Debtors.

2    Q    All right, well, let's -- you mentioned the billing

3    memorandum as part of the guidance that was provided, is

4    that correct?

5    A    Yes.

6    Q    All right, and if you could, with your binders, I ask

7    you to turn to the document marked PAB-EX-026.

8                THE COURT:  Which one?  I'm sorry.

9                MR. MCKANE:  2-6, sir.

10               THE COURT:  Yeah, no problem.

11               MR. MCKANE:  It's two-thirds of the way through.

12               THE COURT:  Yeah, I got it.

13   A    I see it.

14   Q    Okay, and Mr. Husnick, do you recognize Exhibit 26?

15   A    I do.

16   Q    What is it?

17   A    It is a memorandum from Edward Sassower to all Energy

18   Future Holdings Corporation billers.  Edward was the

19   responsible billing attorney on the matter, so he sent the

20   memo out to all billers.  This is the memo that I was

21   referring to.

22   Q    And sir, is a billing memorandum prepared in the

23   ordinary course of Kirkland's business?

24   A    Correct.  As I said, we prepare a billing memorandum

25   for each Chapter 11 case to ensure that we comply with the

1    rules of preparation of our fee statements and fee

2    applications.

3    Q    And when was it distributed?

4    A    The memo says it was drafted in May 4th, I believe it

5    was circulated around that same time.  It would have been

6    within the first week or so of the commencement of these

7    Chapter 11 cases.

8    Q    Did you receive a copy of this billing memorandum?

9    A    I did.

10   Q    And is this a true and accurate copy of the billing

11   memorandum?

12   A    It appears to be a true and accurate copy of the

13   memorandum.

14          MR. MCKANE:  Your Honor, I move it into evidence.

15          MAN:  No objection.

16          THE COURT:  It's admitted.

17          MR. MCKANE:  Thank you.

18   Q    Sir, can -- at a high level, can you just summarize the

19   guidance that was provided to timekeepers in the Chapter 11

20   cases as reflected in this memorandum?

21   A    Yeah.  I think that I would put it into three buckets.

22   The first bucket would be just general information related

23   to how to keep time in a Chapter 11 case, and we send this

24   out because there are a lot of attorneys who work on the

25   case that are not restructuring lawyers by trade, and

1    therefore, not naming any names, needs some guidance on how

2    to put together an appropriate time entry in a bankruptcy

3    matter for compliance with the U.S. Trustee guidelines and

4    the Court's local rules.

5        Number two was to identify the matter numbers in which

6    billers could bill their time, and number three was to

7    emphasize, and this is where this one is a bit unique, is to

8    emphasize the importance of the allocation across the

9    various Debtor and estates, and in Appendix A, we did

10   provide some additional guidance to billers because not all

11   the billers, as you can imagine, there was over 300 lawyers

12   and paraprofessionals over the course of these cases,

13   working on these matters.  Not everyone was familiar with

14   the interim compensation order, so we provided guidance.

15   Q    All right, let's go to Appendix A, which is the Bates

16   No. 671 on the bottom of the page.  So, you've referenced

17   particular guidance with regard to allocation issues.  Is

18   the highlighted language that's called out on your screen

19   what you're referring to?

20   A    It is.

21   Q    Okay, and can you explain to the Court what guidance

22   you were trying to provide with regard to the use of the

23   "all matters" as opposed to the estate-specific matters?

24   A    What we were explaining to billers is that we had to

25   keep track of time across three silos with a fourth that

1    would be collective benefit.  So, we explained to all the

2    billers that we had a separate set of matter numbers for

3    all, separate for TCEH/EFCH, separate for EFIH and its

4    subsidiary and separate for the EFH Debtors.  And we

5    explained that if the principal beneficiary of principal

6    involvement was a particular Debtor, you should bill that as

7    a direct benefit fee to that silo.  If there were multiple

8    principal beneficiaries or it wasn't clear that it

9    principally involved multiple subsidiaries, then you would

10   bill it into a collective benefit matter number.

11   Q    And Mr. Husnick, were you involved personally in the

12   process of reviewing proposed time entries and time

13   allocation across all these matter numbers before these

14   invoices were submitted?

15   A    Yes.

16   Q    All right, can you describe that process in a little

17   more detail?  You mentioned it was a multi-level process.

18   A    The process of allocating or the process of how we

19   determined what should be allocated where and all of that?

20   Q    The process of the -- the review process that was done

21   after any particular Kirkland professional entered the

22   proposed time in a proposed manner for a proposed amount of

23   time.

24   A    Understood.  So, our billing team would prepare, at the

25   completion of each month, a draft invoice.  The draft

1    invoice could be thousands of pages long with tens of

2    thousands of time entries.  What we would do is divvy that

3    up amongst the various associates in the working group on

4    the billing team.  Those associates would review the time

5    entries for privileged, confidential information, but as

6    well, a very keen focus in that first and early rounds was

7    the movement of time.  Because what's very important is for

8    the billing team down in the administration, it's very

9    difficult to keep moving time back and forth.

10        So, we tried to focus those early rounds to getting the

11   time in the right bucket, and then by the third round,

12   things should be settling down and time entries should be

13   getting pretty pristine.  The fourth round is a quality

14   check that's done by one or more partners in the

15   restructuring group, and then we go ahead and we submit the

16   draft invoice, it becomes a final invoice, along with the

17   monthly fee statement.

18   Q    And sir, over the course of these cases, approximately

19   how many time entries did you and your team review?

20   A    Over 150,000 time entries across roughly 15,000 pages

21   of invoices.

22   Q    And sir, was the review process perfect?

23   A    I'd like to say yes, but unfortunately, I suspect there

24   was no perfection.

25   Q    All right, and sir, after you'd done that entire

1    review, Kirkland submits its monthly fee statements, is that

2    correct?

3    A    That's correct.  We would file the monthly fee

4    statement on the docket, which kicked off a 21-day objection

5    period for parties in interest who received service of the

6    monthly fee statement.  We also simultaneously would submit

7    the monthly fee statement to the fee review committee once

8    it was appointed, as well as to the client.

9    Q    Okay, and the client being whom?

10   A    It would be EFH, TCEH and EFIH generally represented by

11   Ms. Dore and Mr. Keglevic.

12   Q    All right, and sir, after the monthly statements, there

13   are interim fee applications that are filed?

14   A    Correct.  So, after the 21-day period passes, if no one

15   objected, we file a certification of no objection and 80

16   percent of the fees would be paid at that point in time, 100

17   percent of the expenses, again, assuming no one objected.

18   If there was an objection, we would have had to take time to

19   work that out.  Approximately once every 120 days, we would

20   file an interim fee application, which is a slightly more

21   involved piece of work product where we would explain on a

22   matter-by-matter basis a summary of what we did during the

23   interim fee period.  It's at that point that we would engage

24   in more intense negotiations with the fee review committee

25   about exactly what happened.

1    Q    Sir, let me -- with regard to monthly fee applications,

2    to your knowledge, did any creditor ever object to a

3    Kirkland & Ellis monthly fee application?

4    A    To my knowledge, no.

5    Q    And sir, with regard to the interim fee applications,

6    to your knowledge, did a creditor ever file a formal

7    objection with regard to a Kirkland interim fee application?

8    A    To my knowledge, no party ever filed a formal objection

9    to our fee applications.

10   Q    All right, and sir, after all the interim fee

11   applications were done, was there a final fee application

12   submitted?

13   A    There was a final fee application submitted after the

14   EFH Debtors emerged from Chapter 11.

15   Q    And sir, were there any objections filed by creditors

16   to the final fee application?

17   A    The objection deadline for parties in interest other

18   than the fee review committee has expired and no party filed

19   any objection to that fee application.  The fee review

20   committee has a separate objection deadline and we continue

21   to be in discussions with the fee review committee.

22   Q    And sir, so, to your knowledge, when was the first time

23   that a party in interest, like a creditor, ever filed a

24   formal objection with regard to Kirkland billing practices?

25   A    A formal objection to our billing I don't think ever

1    happened.  I think there was assertions in the pleading

2    filed on the allocation motion by the Elliott creditors,

3    I'll use that term loosely, I think there's some other

4    creditors in there, but Elliott, related to how the time was

5    allocated.

6    Q    Sir, in your binder, I'd like to flip forward to, I

7    think, the largest document in the case, the PAB Exhibit 24,

8    the First Day Declaration of Mr. Keglevic.

9    A    I'm there.

10   Q    Sir, based on your work in the case, are you generally

11   familiar with Mr. Keglevic's declaration and its exhibits?

12   A    I am.

13   Q    Sir, was this filed on the docket in the Chapter 11 on

14   April 29th, 2014?

15   A    Correct, it was filed at Docket No. 98 on April 29th.

16   Q    And to your knowledge, is this a true and correct of

17   Mr. Keglevic's First Day Declaration and its attachments?

18   A    Yes.

19            MR. MCKANE:  Your Honor, I'd move this into

20   evidence.

21            MAN 1:  No objection, Your Honor.

22            MAN 2:  No objection.

23            THE COURT:  It's admitted.

24        (Debtor's Exhibit Entered Into Evidence)

25            MR. MCKANE:  Thank you, Your Honor.

```
1    Q    Mr. Husnick, there are pages on the upper right-hand

2    side, this is why we use the docketed copy.  Could I ask you

3    to turn to Page 285 of 464?

4    A    I'm there.

5    Q    All right.  Sir, are you familiar with --

6              THE COURT:  Hang on, sorry, I'm not.

7              MR. MCKANE:  I apologize, Your Honor.

8              THE COURT:  No, no, that's okay, I'm slow.  Just

9    give me a second.  285?

10             MR. MCKANE:  285, Your Honor, yes, sir.

11             THE COURT:  Okay, I'm there.

12   Q    And let me just lay down basic questions.  Mr. Husnick,

13   are you familiar with the restructuring support agreement or

14   the RSA?

15   A    I am.  Well, you're talking about the first one, right?

16   The one that was executed in April?

17   Q    Correct.

18   A    We've had several.

19   Q    Well, and that's the difference between an RSA and a

20   PSA, right?

21   A    Ah, you got me.

22   Q    All right.  And you're familiar with the term sheet

23   that was attached to the RSA, right?

24   A    I am, thank you.

25   Q    And sir, what I have directed your attention to is part
```

1    of the term sheet of the PSA, and in particular the entry

2    regarding Allocation of Professional Fees, do you see that,

3    sir?

4    A    I do see that, and I see that it's part of the term

5    sheet attached to the restructuring support agreement.

6    Q    Okay, were you -- are you familiar with the genesis of

7    this proposed allocation of professional fees that was in

8    the original restructuring support agreement?

9    A    I am.

10   Q    Okay, what was the genesis?

11   A    So, when we were negotiating the overall deal with the

12   EFIH, TCEH, First Liens of the EFIH unsecured creditors, the

13   PIK note holders and then the EFH unsecured creditors,

14   predominately Fidelity, one of the key concerns amongst the

15   constituents, in addition to the allocation of equity and

16   other consideration under the plan was how professional fees

17   and other administrative costs associated with the cases

18   were going to be split up amongst the estates.  And I recall

19   that there were discussions between the principals, both the

20   principals for the Debtors as well as the principals for

21   certain of the creditors, about exactly how this could get

22   allocated, and there were budgets at the time that proposed

23   different allocations, I can't remember the exact numbers,

24   but ultimately, what came out of that discussion was what is

25   drafted here, which is a formula, or methodology, for

1    allocating fees, because the parties believed that it was

2    not possible, at that time, to appropriately allocate the

3    fees based on just saying what a budget was going to be.  I

4    think there was -- various constituencies felt that their

5    silo was going to have more litigation than the other silo

6    and I, frankly, think that they were all wrong.

7    Q    Mr. Husnick, was this allocation of professional fees

8    agreed to by the parties to the restructuring support

9    agreement?

10   A    Correct.  This formulation that's set forth here was

11   agreed to by the parties who signed the restructuring

12   support agreement, which would have included the Debtor

13   entities that ultimately commenced Chapter 11.  They weren't

14   Debtors at the time.  The EFIH PIK note holders, the ad hoc

15   group that was represented by Akin Gump, and the Fidelity

16   and some of the EFH stakeholders and the TCEH First Lien

17   holders.

18   Q    And sir, to the best of your knowledge, can you recall

19   some of the holders of the PIK notes that were members of

20   the EFIH ad hoc committee?

21   A    I do.  The group was largely comprised of York Capital,

22   Third Avenue, Avenue Capital and GSO, if I remember

23   correctly.

24   Q    And who was the portfolio manager in charge of the

25   investment of -- with regard to EFIH at York Capital at that

1   time?

2   A    To the best of my knowledge, and the person who had the

3   most involvement in these negotiations personally was Mr.

4   Jeff Rosenbaum.

5   Q    Okay.  Sir, I want to direct your attention to what's

6   been marked as PAB Exhibit 34.  Mr. Husnick, are you

7   familiar with the interim comp order?

8   A    I am.

9   Q    And do you recognize Exhibit 34 as the -- what was

10  colloquially referred to the interim comp order?

11  A    Yes, I do.

12  Q    And sir, can you turn to Page 2 of that -- Page 3 of

13  that document, Section 2(b)?

14  A    I'm there.

15  Q    Okay.  Do you recognize Section 2(b)?

16  A    I do.  This is the -- sorry.

17  Q    What is it?

18  A    This is the provision that would memorialize or sets

19  forth the protocol or methodology pursuant to which the

20  professionals were directed to allocate their fees under the

21  interim compensation order.  It tracks very closely what was

22  set forth in the restructuring support agreement.

23  Q    Why does it track closely -- why does the language for

24  the allocation of professional fees in the interim

25  compensation order track closely to the language on that

1    same issue in the restructuring support agreement?

2    A    So, at the time we filed the motion to establish

3    interim compensation procedures, it had been relatively

4    early in the Chapter 11 cases.  At that time, the

5    restructuring support agreement and the term sheet embedded

6    in there was still extant and had not yet been terminated.

7    Our view was in drafting the interim compensation order that

8    we would include and incorporate that allocation mechanism,

9    largely because that's the allocation mechanism that had the

10   support of creditors from all three silos, at least those

11   creditors who had signed onto the RSA at that time.

12   Q    And sir, to your knowledge, did any creditor formally

13   object to the proposed entry of the interim compensation

14   order?

15   A    No.

16   Q    Did any creditor contact Kirkland & Ellis informing

17   them that they thought the allocation provisions in the

18   interim comp order were inadequate or deficient in any way?

19   A    Not to my knowledge before the order was entered.

20   Q    Or, since the order has been entered?

21        THE COURT:  Mr. Husnick -- I'm sorry, can I

22   interrupt?

23        MR. HUSNICK:  Yes, sir.

24        THE COURT:  This is dated in September.  Do you

25   recall why it took five months?

1           MR. HUSNICK:  I do.

2           THE COURT:  Can you tell me?

3           MR. HUSNICK:  There were a few objections filed to

4    retention applications by the TCEH ad hoc committee, Mr.

5    Shore and his clients.

6           THE COURT:  Mm hmm.

7           MR. HUSNICK:  One of the objections was, to

8    Kirkland & Ellis, there was a retention -- all retention-

9    related and compensation-related stuff was kind of pushed

10   out, and then in the September timeframe, we had reached

11   agreement on the protocol to resolve conflicts matters.  It

12   was an order Your Honor entered around that time --

13          THE COURT:  Right.

14          MR. HUSNICK:  -- and then this order followed up.

15          THE COURT:  Right, and that was after the RSA was

16   terminated?

17          MR. HUSNICK:  Correct.

18          MR. MCKANE:  Correct.

19          MR. HUSNICK:  The RSA was terminated, I believe,

20   in August.

21          THE COURT:  July?  August, okay.

22          MR. HUSNICK:  No, July, you're right.

23          MR. MCKANE:  July.

24          THE COURT:  Thank you.  Sorry to interrupt.

25          MR. MCKANE:  No, not at all, Your Honor.

1    Q    Mr. Husnick, I apologize.  I just had one other

2    question on that, because you had limited your earlier

3    testimony about objections to up through the entry of the

4    order.  Since the entry of the order, up until the filing of

5    the allocation motion, are you aware of any creditor

6    formally objecting to the validity or the feasibility of the

7    interim compensation order?

8    A    No, you're correct.  What I was after was the

9    allocation motion.

10   Q    Okay.  All right.  Mr. Husnick, are you aware of an

11   assertion made by Elliott and UMB in their final submission

12   that there was approximately $4 million dollars' worth of

13   plan-related expenses that were billed to a direct benefit

14   matter number, specifically EFIH Matter No. 76?

15   A    I am.

16   Q    Okay.  And sir, did you look into that issue?

17   A    I did.

18   Q    And based on your review, what did you learn about the

19   assertion that there was $4 million dollars of plan-related

20   efforts that were directly billed to EFIH?

21   A    That it was incorrect.

22   Q    And so, sir, let me direct your attention to AH Exhibit

23   157.  It's two after the one you're on.

24   A    Got it.

25   Q    And sir, for the record, this is a notice of fee

1    statement and the actual 29th monthly fee statement of

2    Kirkland & Ellis.  Do you recognize it?

3    A    I do.

4    Q    Okay.  And is this a true and accurate copy of Kirkland

5    & Ellis's 29th monthly fee statement?

6    A    It appears to be, yes.

7              MR. MCKANE:  Your Honor, we move it into evidence.

8              MAN 1:  No objection.

9              MAN 2:  No objection.

10             THE COURT:  It's admitted.

11        (Debtor's Exhibit Entered Into Evidence)

12   Q    Mr. Husnick, can I direct your attention to the page

13   with the Bates number on the bottom, 13?

14   A    Yes.

15             MAN:  I'm sorry, what?

16             MR. MCKANE:  Thirteen, on the bottom.

17   Q    Mr. Husnick, can you briefly explain what page this

18   Bates No. 13 is, with regard to the 29th monthly fee

19   application?

20   A    Absolutely.  So, with each monthly fee statement, we

21   filed a summary chart - you can see that that's usually

22   Exhibit A to the monthly fee statements, that lays out in

23   summary fashion the various matter numbers to which Kirkland

24   & Ellis billed time during that particular month.  And so,

25   you can see, as I laid out at the beginning, we have all

1    buckets, TCEH buckets, EFIH buckets, you don't see any EFH

2    buckets here because there were no direct fees that month.

3    Q    And sir, can you look to the fourth line from the

4    bottom on the Matter No. 76?

5    A    Oh -- there is one.  Yeah.

6    Q    You there?

7    A    Yeah.

8    Q    It says a reference to EFIH Plan and Disclosure

9    Statement, right?

10   A    Yeah.  Just to correct what I just said, Matter No. 90,

11   right?  What cut off there is actually an EFH-only matter

12   number, but I'm there on Matter No. 76.

13   Q    Okay.  And sir, is this part of -- is this -- as part

14   of your investigation, what did you learn about Matter 76

15   including that line entry and the footnote below?

16   A    Yeah, so when I read the allocation motion -- or the

17   Elliott brief, it caused me to think about, you know, in

18   what circumstance were we billing direct time related to the

19   plan to EFIH, because I did not think it would be correct.

20   So, I went back and I looked, along with Ms. Yenamandra, who

21   I can do nothing without, and we went through the fee

22   statements and ultimately determined that what was going on

23   here, this time period is very relevant, because we noticed

24   that the time in this matter number was lumped between a

25   period beginning around June 2016 and September 2016.  Prior

1    to June 2016, there was a very small handful of time

2    entries.  Between that time period of June 2016 and

3    September of 2016, there was approximately $4 million

4    dollars.

5         What I -- as we looked into the monthly fee statements,

6    we determined it -- keep in mind what was going on in the

7    case overall.

8              THE COURT:  Right.

9    A    In May, the Hunt plan was terminated.  We immediately,

10   prior to terminating the Hunt plan and the Hunt RSA,

11   negotiated with the TCEH First Liens that we were going to

12   pivot to a split of the estates.

13             THE COURT:  Right.

14   A    At that point in time, it became clear that our Matter

15   No. 21, which is where we had billed all Plan and Disclosure

16   Statement time for collective benefit of all Debtors was, in

17   effect, going to be stale because TCEH was going to have its

18   own plan and EFH and EFIH were likely to have their own

19   plans.  So, what we did, because we did not have a matter

20   number at that time that was open for people to enter time

21   into is we used Matter No. 76 as well as a couple of other

22   EFIH matter numbers, and we dropped a footnote to explain

23   that those matter numbers were going to be allocated in the

24   fashion that we were allocating collective benefit numbers

25   at this point in time, which was 90 percent to EFIH and 10

1    percent to EFH Corp, which is corresponding debt amounts.

2        So, we disclosed here.  Ultimately, then, when you hit

3    September and the TCEH Debtors emerge, we then recast Matter

4    No. 21 as a collective benefit plan for just EFH and EFIH

5    and time going forward related to the plan was put into that

6    matter number.

7    Q    And so --

8            THE COURT:  So -- just let me interrupt.  So, is

9    allocating at 90/10 roughly equivalent to how it would have

10   been allocated if it was just allocated as collective in

11   that instance?

12           MR. HUSNICK:  It's a fantastic question.

13   Historically, it actually works out to be very close to

14   90/10 over how the allocation worked out.  If you look,

15   going forward, this is the correction I made to my

16   declaration at the outset --

17           THE COURT:  Right.

18           MR. HUSNICK:  -- if you were to apply -- because

19   we did continue to track it in that fashion.  If you were to

20   apply the methodology as we were applying it, it would

21   result in another $3.4- to $4 million dollars being

22   allocated to EFH rather than EFIH.

23           THE COURT:  Okay.

24           MR. HUSNICK:  So, I think I've answered your

25   question?

1          THE COURT:  Yeah, that's fine.

2   Q    And just to highlight one point, over the course of

3   these cases, if you were just to look at the entire amount

4   of time, relative E-side for collective benefit, what was --

5   what's the approximate ratio that would have been done?

6   A    E-side versus T-side?

7   Q    E-side -- EFH to EFIH.

8   A    EFH to EFIH.  It was roughly 90/10, if I remember doing

9   that calculation correctly.  This may have changed it a half

10  a percentage point.

11  Q    Okay.  Mr. Husnick, just a couple of -- just quick

12  points before we wrap up.  Let's talk about asbestos time

13  for a moment.

14  A    Sure.

15  Q    Sir, are you aware that Elliott and UMB as the movants

16  contend, the time entries hitting on the phrase -- the

17  terms, "asbestos," "Fenicle" or "Kazen" should be allocated

18  as direct benefit fees to EFH?

19  A    I am aware of that.

20  Q    Do you agree with that contention?

21  A    I do not.

22  Q    Why not?

23  A    Two reasons.  First, Mr. Fenicle -- or Ms. -- Mr.

24  Fenicle and Ms. Fahy were actually members of the Official

25  Committee of Unsecured Creditors for EFH and EFIH.  Mr.

1    Kazen was their representative on the EFH/EFIH Committee, so

2    at times, we were talking with Mr. Kazen about his clients,

3    about the positions of the committee.  So, for that reason,

4    I'm not certain that those time entries would have all

5    related to asbestos issues in particular, although I would

6    stipulate that they probably mostly did.

7         But second is, I think that Mr. Fenicle -- Mr. Kazen,

8    certainly, was very actively involved in a lot of different

9    issues in the case, so, our engagement with him would not

10   necessarily have been a direct benefit --

11            THE COURT:  Who was Mr. -- I don't remember Mr.

12   Kazen.  Who's Mr. --

13            MR. HUSNICK:  Mr. Kazen?

14            THE COURT:  Yeah.

15            MR. HUSNICK:  He is the -- I would say one of the

16   six asbestos plaintiffs law firms that originally filed a

17   motion to appear in the case.  He then -- he represents

18   Fenicle and Fahy, Mr. Hogan is his Delaware counsel.

19            THE COURT:  Local, okay.

20   Q    And so, Mr. Hogan was -- Mr. Kazen was Mr. Hogan's co-

21   counsel out in Oakland, California?

22   A    Correct.

23   Q    Okay.  So, you mentioned a number of workstreams that

24   Kirkland did that touched on asbestos.  Was one of those the

25   asbestos bar date?

1    A     Yes, one of those was the asbestos bar date.

2    Q     And how does -- is the asbestos bar date a collective

3    benefit?

4    A     So, stepping back from who -- from bar dates generally,

5    when we file a motion to establish a bar date, the motion

6    moves to establish a bar date for all entities in the

7    corporate structure.  So, that would have been a collective

8    benefit motion.  When we -- if you want to focus and

9    bifurcate, there was never a separate asbestos bar date

10   motion filed.  It was litigation in the context of the

11   overall bar date motion, and admittedly, there was focus on

12   asbestos-related issues.  But those claims that were

13   ultimately asserted were against multiple Debtors, not just

14   the EFH Debtors as asserted.  There were actually claims

15   filed against the TCEH Debtors, the EFH Debtors and certain

16   of its -- or the EFH Debtor and certain of its subsidiaries

17   and there were claims asserted against the EFIH Debtors.

18   Q     Sir, one of the other workstreams was the structuring

19   and prosecution of joint plans for reorganization?

20   A     Correct.

21   Q     How does addressing arguments raised by asbestos

22   claimants in joint plans a collective benefit?

23   A     What we needed to do in these Chapter 11 cases was get

24   the plans confirmed and get the cases as part of Chapter 11,

25   and it took us a long time to get that done.  But what we

1    didn't need to do was impose on the estate a significantly

2    longer period of time and the costs associated with

3    attempting to do anything other than reinstate asbestos

4    claims.  The harm of taking that time to go on and try and

5    do a 524(g) channeling injunction or any other treatment of

6    the asbestos claims would have been the continued accrual of

7    interest at EFIH to the tune of $50 million dollars a month.

8    That was simply not sustainable for the long term, and we

9    realized, and I say we collectively as the Debtors, and the

10   disinterested directors for each of the silos who were

11   weighing in on these issues ultimately concluded that the

12   right approach to asbestos was to reinstate.

13        But there was a limitation on reinstatement.

14   Reinstatement would have the effect of drawing the attention

15   of a purchaser who was going to have to honor those

16   reinstated obligations, and in our discussions, both in the

17   informal marketing process for the indirect interests in

18   Oncor and the formal marketing process of the indirect

19   interests in Oncor was that they wanted a bar date

20   established for asbestos claims and they were not willing to

21   buy the assets without the bar date.  So, that was both --

22   I've tied together the bar date and then the plan because

23   all of our efforts in dealing with asbestos claims both at

24   the bar date stage and in responding to confirmation

25   objections and negotiating resolutions of those objections

1    was focused on getting plans confirmed for EFIH and Debtors

2    and the EFH Debtors.

3    Q    Okay.  Mr. Husnick, just two more topics, briefly.  Are

4    you aware that Elliott and UMB are contending in the

5    allocation motion that Kirkland's allocation of collective

6    fees after the T-side emerged in October of 2016 was

7    improper?

8    A    I am.

9    Q    And sir, have you reviewed the interim fee application

10   since the TCEH emergence?

11   A    I have.

12   Q    And so, what is -- what was the allocation approach

13   that was used and why was it used?

14   A    What I mentioned earlier in my response on the monthly

15   fee statement for that post-May period was a recognition

16   that there was going to be a bifurcation in the estates and

17   a need to address that issue.  What we realized and thought

18   would be true and ultimately turned out to be true was that

19   there would be circumstances in which there would be de

20   minimis or very small -- or that is de minimis -- de minimis

21   or zero direct benefit fees during the period after TCEH had

22   left the estate.  So, the order, we went back to the order

23   and we looked at the order, and the order is silent on

24   circumstances in which there would be very small fees or no

25   fees billed directly to estates, and that would have created

1    an anomaly in the application of the formula.

2        So, what we did is we said, and we looked at various

3    different ways to allocate the fees, post-emergence to

4    address that -- or post-TCEH emergence to address that

5    issue, and ultimately concluded that we would do a split on

6    a 90/10 basis, which happened to tie to the amount of the

7    debt at EFH versus EFIH.

8    Q    Mr. Husnick, one final question -- set of questions.

9    What happens -- can you explain to the Court the impacts of

10   moving -- potentially moving fees from direct benefit of one

11   estate to direct benefit of another estate?

12   A    Yes.  So, there's two effects, and it depends on which

13   way they're moving and how they're moving, but if you take

14   fees from -- and I'll just give specific examples without

15   numbers because I'm not a numbers guy, but if you take fees

16   from EFIH and their direct benefit fees and move those into

17   a collective fee benefit -- or a collective benefit

18   category, and that time period relates to pre-TCEH spin,

19   what we're doing is causing the allocation mechanism to

20   increase the amount of fees that would bill to TCEH, which

21   was not contemplated, certainly, under the plan at the time

22   that that was confirmed.  And the reason is, is because what

23   I call -- or we call on the team, the swing effect, which

24   is, when you move a little bit from direct to indirect -- or

25   direct to collective, you cause the shift in the collective

1    benefit number.  And so, that's one effect is, you could

2    affect the TCEH number.

3        The other effect is that it can magnify the number

4    significantly.  So, if you move $1 million dollars of time

5    from EFIH into collective benefit or into direct benefit,

6    more so if you move it into direct benefit, it creates a

7    huge swing effect, because what you're doing is you're

8    changing the ratio of direct benefit fees by a million, but

9    then you multiply that times the entire collective benefit

10   fee.  So, just moving a million dollars can have a massive

11   swing.  For the record, the $3.4 or $4 million dollars that

12   I pointed out, if we'd have continued to apply the formula,

13   Your Honor, that -- what -- it takes into consideration the

14   swing effect.

15   Q    And just to be precise, the reason that the swing

16   effect exists is because it's the relatively low amount of

17   direct billing fees to the larger amount of collective

18   benefit fees, thereby creating that multiplier?

19   A    Correct.  It is a much, much larger bucket for

20   collective benefit fees.

21   Q    Okay.

22       MR. MCKANE:  Your Honor, I don't have any more

23   questions for Mr. Husnick at that time, that I'm allowed to

24   ask, that -- but we do have some exhibits we'd like to move

25   in.  Would you prefer that we do it now or do you want us to

1    --

2            THE COURT:  Yeah, let's do it now.

3            MR. MCKANE:  Okay.  And all of these exhibits have

4    been exchanged between the parties and the lists have

5    already been shared.  There were some preliminary objections

6    raised, just a handful.  I don't know if they're still going

7    to be asserted, so I'm happy to roll through the list and do

8    the best reading I can.

9            THE COURT:  Can I see it?

10           MR. MCKANE:  Of course.  May I approach?

11           THE COURT:  Can I see those?  Yes.  Okay.

12           MR. MCKANE:  Your Honor, may I proceed?

13           THE COURT:  Yes.

14           MR. MCKANE:  Your Honor, at this time, the plan

15   administrator board moves into evidence, if they haven't

16   done it already, AH-EX-24, AH-EX-106, AH-EX-171, AH-EX-174,

17   AH-EX-204, AH-EX-233.  PAB-EX-3, PAB-EX-4, PAB-EX-24, PAB-

18   EX-25, PAB-EX-26, PAB-EX-28, PAB-EX-31, PAB-EX-32, PAB-EX-

19   33, PAB-EX-44 --

20           THE COURT:  No, no, it's 34, not 33.

21           MAN 3:  Thirty-three.

22           MR. MCKANE:  Oh, I'm sorry.  Guaranteed to happen

23   at least once, Your Honor.

24           THE COURT:  That's all right.

25           MR. MCKANE:  I apologize.  Let me do it again.

1    PAB-EX-34, 44, 319, 439, 478, 584, 641 and 703.

2         THE COURT:  Okay, any objection?

3         MAN 1:  No objection.

4         MAN 2:  No objection.

5         THE COURT:  All right, they're admitted without

6    objection.

7         (Debtor's Exhibits AH-EX-24, AH-EX-106, AH-EX-171, AH-

8    EX-174, AH-EX-204, AH-EX-233, PAB-EX-3, PAB-EX-4, PAB-EX-24,

9    PAB-EX-25, PAB-EX-26, PAB-EX-28, PAB-EX-31, PAB-EX-32, PAB-

10   EX-34, PAB-EX-44 PAB-EX-319, PAB-EX-439, PAB-EX-478, PAB-EX-

11   584, PAB-EX-641 and PAB-EX-703 Entered Into Evidence)

12        MR. MCKANE:  And Your Honor, we just ask that you

13   take judicial notice of PAB-EX-670.

14        THE COURT:  Which is what?

15        MR. MCKANE:  Great question.

16        THE COURT:  I can look, I just can't see -- maybe.

17        MR. MCKANE:  We're pulling it up, Your Honor.  It

18   is the joint motion of Elliott and UMB.

19        THE COURT:  Oh, okay.  Yeah.  Any objection to

20   taking judicial notice of the motion?

21        MAN 1:  No objection.

22        MAN 2:  None, Your Honor.

23        THE COURT:  Okay, the Court will take judicial

24   notice.

25        MR. MCKANE:  All right, Your Honor, the PAB has no

1    further questions of Mr. Husnick at this time.

2              THE COURT:  Okay, very good.  How are we going to

3    go?  We'll start with Elliott?  All right, Mr. McGINNIS?

4              MR. MCGINNIS:  Your Honor, I believe Mr. Pedone

5    has something he wanted to say, for a moment?

6              MR. PEDONE:  Your Honor, just to clarify, with

7    regard to the exhibits that are being admitted by the PAB

8    and the ad hoc group, they're also admitted for the use of

9    the EFH indentured trustee.  I don't believe I need to be

10   separately moving but want to make sure there's no objection

11   from either (indiscernible) that we need to use them.  Do

12   you have reason -- everybody agree --

13             THE COURT:  Well, I guess evidence is admitted,

14   it's admitted.  It doesn't really matter who is going to use

15   it.  Once it's in, it's in.

16             MR. PEDONE:  Thank you.

17             THE COURT:  Okay.

18             MR. MCGINNIS:  Your Honor, I also have a witness.

19   May I approach?

20             THE COURT:  Okay, please approach.  Do you have a

21   copy for Ms. Werkheiser, if you don't mind?

22             MR. MCGINNIS:  Your Honor, Matt McGinnis for the

23   movants.  May I proceed?

24             THE COURT:  Yes.

25             CROSS-EXAMINATION OF CHAD HUSNICK

1    BY MR. MCGINNIS:

2    Q     Good morning, Mr. Husnick.

3    A     Good morning, Mr. McGINNIS.

4    Q     So, in your direct testimony, you spoke about, I

5    believe, a mistake that you had identified in the allocation

6    of time.  Did I understand that correctly?

7    A     Not sure I said a mistake in the allocation of time.  I

8    don't think that's what I said.

9    Q     Can you describe again, just briefly, what was the

10   mistake that you referred to with respect to the disclosure

11   statement time?

12           THE COURT:  What?

13   A     I don't know what you're talking about.

14           THE COURT:  I don't know what you're talking

15   about.

16   Q     I'm sorry, maybe I misunderstood.  You had referred to

17   Matter code 76, which referred to EFIH plan time, is that

18   right?

19   A     I did, yes.

20   Q     Okay, and can you describe what you had identified in

21   that entry with respect to September of 2016?

22   A     Yes.  What I was observing is that, in response to a

23   statement made in the Elliott allocation brief, not the

24   motion but the brief, where the assertion was that time was

25   billed direct -- for the direct benefit of EFIH in Matter

1    No. 76, and when I went back and looked at, and ultimately

2    is borne out in the footnote, is that, at that time, while

3    it was billed into Matter No. 76, which had previously been

4    treated as a direct benefit matter number, we actually

5    allocated that time, as we had been allocating time for

6    collective benefit fees.

7    Q    And now, that entry, as it appears, also appears in the

8    final fee application that Kirkland submitted, is that

9    right?

10   A    Well, the time entry would have -- because we do the

11   allocations on a month-by-month basis and the fees are paid

12   on a month-by-month basis, it would have carried through all

13   the way to the end.  It wouldn't be -- there wouldn't be any

14   change to the final fee app.  There wouldn't be a

15   reallocation of a collective benefit number because the

16   benefits are actually -- the collective benefit is allocated

17   a month-by-month basis.

18   Q    And so, as a practical matter, the reason that EFIH was

19   charged approximately $4 million dollars for that time was a

20   result of the 90 percent / 10 percent allocation of

21   collective benefit time to EFIH, is that right?

22   A    You're still not following me.

23   Q    Okay.

24   A    $4 million dollars is the total amount that was in

25   there.  What you see in the footnote is that we allocated

1    that $4 million dollars on a collective benefit basis, so 90

2    percent of the $4 million would have been billed to EFIH, 10

3    percent to EFH.

4    Q    Okay, thank you.  Now, you also testified on direct

5    about Paragraph 2(b) of the interim compensation order,

6    correct?

7    A    Yes, sir.

8    Q    And your testimony was that no party had objected to

9    Kirkland's allocation of fees, pursuant to the interim

10   compensation order, correct?

11   A    That's my recollection.

12   Q    Now, just to make sure I understand your testimony,

13   you're not testifying that the allocations that Kirkland has

14   put in its fee applications are binding on this Court,

15   correct?

16   A    I am not testifying on --

17           THE COURT:  That sounds like a legal --

18   A    Yeah.

19           THE COURT:  -- question, not a factual one.

20   Q    Okay, but you understand, sir, that the Court may

21   revisit those allegations, as provided in the interim

22   compensation order, correct?

23   A    I believe what the interim compensation order says is

24   that parties may object until the order is final, although I

25   would say, as time rolls on, as does anything in Chapter 11,

1   things become more solidified, just like an exclusivity

2   motion.  The longer you're in Chapter 11, the higher the

3   hurdle it is to challenge and get a further extension of

4   exclusivity.  Here, the longer you wait to challenge an

5   allocation, the more it's going to hammer you.

6   Q    But you agree, sir, that the interim compensation order

7   does provide that the allocation of fees and expenses among

8   Debtors are subject to challenge and disgorgement until

9   final allowance by the Court, correct?

10  A    I agree with that, until final allowance by the Court.

11  Q    And that provision, sir, was negotiated to ensure that

12  interested parties were able to revisit how allocations

13  proposed by the professionals shook out, correct?

14  A    It was negotiated by parties to the agreement at that

15  time to ensure that the formula, as it was applied, because

16  it was negotiated pre-petition, would actually work, and no

17  party challenged the application of the formula and how it

18  was working throughout roughly four years of Chapter 11.

19  Q    All right.  Now, you'd also testified a little bit

20  about direct benefit fees and collective benefit fees, and,

21  as I understood it, your testimony is that a fee would be a

22  direct benefit fee if it could be principally or primarily

23  for the benefit of a single Debtor, correct?

24  A    Agreed.

25            THE COURT:  Someone on the phone.  We're getting

1    some interference on the phone.  Could you please -- if

2    you're appearing by phone, it's a privilege, not a right.

3    If you'll please silence your phone.  If we continue to get

4    interference, we will drop your call.  Go ahead.

5    A    Can you repeat the question?

6    Q    I will repeat the question if I can remember it.  You

7    understood, sir, that a fee could be a direct benefit fee if

8    it provided a principal or primary benefit to a single

9    Debtor, correct?

10   A    Correct.  That is how we gave the guidance at Kirkland.

11   Q    And that means, sir, that Kirkland could still treat

12   some fees as direct benefit fees, even though that fee

13   provided a benefit to more than one Debtor, right?

14   A    There could be indirect benefits to other Debtors.

15   Predominantly, the way I looked at it was, who was the

16   Debtor that we were representing at the time on the issue.

17   Q    Now, let's go back to, also, the billing memorandum

18   which you also testified about.  I believe you have a

19   witness binder that I handed you, sir, the -- you'll see

20   that it's -- contains a lot of documents that will look

21   suspiciously familiar from your direct testimony, although

22   the exhibit numbers will occasionally be different because

23   they're from the Elliott set rather than --

24   A    Okay, I'll use yours.

25   Q    -- the Debtor's set.  If you could please turn to ELX-

1    011, which is the billing memo.

2    A     I'm there.

3              THE COURT:  And tell me what tab that is?

4              MR. HUSNICK:  Three.

5              MR. MCGINNIS:  Three, Your Honor.

6              THE COURT:  Thank you.

7    Q     And, just to make sure we've got the sequence correct,

8    this was sent before the interim compensation order was in

9    place, correct?

10   A     That's correct.

11   Q     And Kirkland did not send a different memorandum after

12   the interim compensation order was in place?

13   A     We updated from -- occasionally and recirculated this

14   memorandum, but no, we did not resend the memo after the

15   interim compensation order was entered.

16   Q     And just to be clear, you're not aware of any other

17   document that describes the methodology that Kirkland

18   employed to allocate time among the various Debtors,

19   correct?

20   A     Not in this phase, no -- or, not in this fashion, no.

21   Q     Let's turn to Page 7, which is the appendix that Mr.

22   McCann asked you some questions about.  And numbers one

23   through four, this is the direction to timekeepers about how

24   that time should be allocated, is that right?

25   A     That's correct.

1    Q    Where -- with all being the collective benefit and then

2    numbers two, three and four referring to the direct benefits

3    that could be provided to TCEH, EFIH or EFH, correct, sir?

4    A    That's correct.

5    Q    Now, so far as you know, this description was never

6    provided to anyone outside of Kirkland, correct?

7    A    No, our billing memorandum -- our memoranda are

8    generally kept confidential within Kirkland & Ellis.

9    Q    And you're not aware of Kirkland ever discussing its

10   interpretation of direct benefit fees or collective benefit

11   fees with the Debtors at around this time, correct?

12   A    Not to my recollection.

13   Q    And I assume the same is the case also for the Debtors'

14   boards.  There was no discussion between Kirkland and the

15   Debtors' boards as to how Kirkland would be allocating its

16   fees among the states, correct?

17   A    I'm not actually certain that's correct because, as I

18   said in my deposition, there were significant focus around

19   the allocation of professional fees in connection with the

20   negotiation of the restructuring support agreement and the

21   term sheet and the resolution of that was embedded in the

22   term sheet as we discussed in my direct, Paragraph 2(b), I

23   believe, of what was then later embodied in Paragraph 2(b)

24   in the order.  The boards would have been, I suspect, made

25   noted -- or made aware of that because it was a very key

1    focal point in the discussions and perhaps one of the last

2    issues open.

3    Q    So, just to be clear, though, you don't specifically

4    recall that discussion.  You suspect one may have occurred,

5    but you don't recall whether that --

6    A    I know we shared with the board the term sheet and

7    restructuring support agreement.

8    Q    Okay, and that, sir was in connection with the RSA, not

9    the interim compensation order, correct?

10   A    Correct, we did not specifically discuss with the board

11   the interim compensation order that embedded the RSA.

12   Q    All right, so let's talk a little bit more about the --

13            THE COURT:  Sorry to interrupt.  Did you discuss

14   it with Ms. Dore or Mr. Keglevic?

15            MR. HUSNICK:  We would have shared motions.  I

16   don't specifically recall discussing.  We would normally

17   share motions with Ms. Dore before we filed.  Mr. Keglevic

18   would not have been involved in an administrative motion

19   like this.  So -- but I don't specifically recall discussing

20   that motion with her.

21            THE COURT:  Okay.

22   Q    And you also don't, I believe, specifically recall any

23   discussions with the disinterested directors for either EFH

24   or EFIH either, correct?

25   A    They would have been in the board discussions that I

1    just referenced --

2    Q    Okay.

3    A    -- but nothing specific to the interim compensation

4    order.

5    Q    All right, so let's talk a little bit about the

6    allocation methodology, which you testified about.  So, just

7    quickly -- and I don't think this is in dispute, parties

8    would allocate to the direct benefit fees and then the

9    proportion between the direct benefit fees would determine

10   the collective benefit fee allocation, is that right?

11   A    That sounds correct, yes.

12   Q    Okay.  Now, at some point, Kirkland became concerned

13   that there could be a situation where one estate had zero or

14   very little direct benefit fees, which could skew the

15   allocation.  Is that fair?

16   A    Correct.  If it were zero, it'd be mathematically

17   impossible to calculate, as Siri told me this morning, it's

18   indiscernible.

19   Q    And if it was a small number, it still would be

20   mathematically possible, though, right?

21   A    It's mathematically possible if it's a very small

22   number, but what it does is, it has the effect, because of

23   the swing effect that I talked about, of skewing the number.

24   Q    Right, so sometimes that methodology as set forth in

25   Paragraph 2(b) can produce a result that Kirkland thought

1    was unfair.

2    A    We were concerned at that time that it could produce an

3    unfair result.

4    Q    Well, and you thought it could actually produce an

5    inequitable result, if it was applied, correct?

6    A    I'm not sure if I would use the word inequitable, but I

7    won't take issue, in theory could produce an inequitable

8    result.

9    Q    Okay.  At some point, that situation came to pass, in

10   Kirkland's estimation, correct?  The concern about so --

11   that's a fair question, let me clarify the question.  At

12   some point, Kirkland became so concerned about the small

13   amount of direct benefit fees that it changed the allocation

14   that applied for collective benefit fees, correct?

15   A    When TCEH left the system and we were only billing time

16   to EFH and EFIH, and the time was almost exclusively related

17   to getting another plan confirmed and negotiating another

18   sale transaction, that time would have been collective

19   benefit time, and we were concerned there would not have

20   been a lot of direct benefit time at that point, and that

21   could have skewed it.  I think the one thing that we felt

22   that was direct benefit time at that time that would have

23   caused the skewing was the make whole litigation because we

24   believe that is a direct benefit fee, and if there was make

25   whole litigation going on during that period of time, it

1    would have had the effect of tilting all of the collective

2    benefit fees to EFIH.

3    Q    Fair to say, sir, that after October 2016, when the --

4    for the TCEH effective date, that your view was that nearly

5    all of the services that Kirkland performed were for the

6    collective benefit of EFH and EFIH?

7    A    I wouldn't say all.  I'd have to go back and look.

8    Again, make whole was one that I do not agree was a

9    collective benefit expenditure.

10   Q    Okay, well, just to clarify the record here, sir, if we

11   can actually turn to Paragraph 27 of your written direct,

12   which should be at Paragraph 1 -- excuse me, Tab 1 in the

13   witness binder.

14           THE COURT:  Which paragraph?

15           MR. MCGINNIS:  Paragraph 27, sir, on Page 9 on

16   your --

17   Q    And you see, sir, Mr. Husnick, the end of Paragraph 27,

18   you state: "nearly all of Kirkland services performed for

19   the EFH and EFIH Debtors after the TCEH effective date were

20   the collective benefit of both --

21   A    Yeah, but --

22   Q    "-- the EFH and EFIH Debtors."

23   A    Yeah, that is my expectation.  I'm just highlighting

24   one category where I know there were significant billings.

25   Q    Understood.  Understood.  Now, I believe you also said

1    that when Kirkland was presented with the situation, they

2    determined that the interim compensation order was silent on

3    how fees should be allocated in that situation, correct?

4    A    Yes.  The order just says you apply the formula.  It

5    doesn't speak to, provided, however, if it gets to a low

6    number, this is what you should do, and that's the

7    observation.  It's silent, in effect.

8    Q    Right, and it actually says "shall allocate fees in

9    this way," correct?

10   A    I believe it does.

11   Q    Okay, and Kirkland, at that point, did not go seek

12   clarification from the Court or take any steps to modify the

13   interim compensation order, correct?

14   A    We did not.  We just -- we put it in our monthly fee

15   statement what we were doing.

16   Q    But Kirkland did go ahead and change that allocation,

17   as you said, because it thought if it had continued to apply

18   the same allocation methodology, it would have been unfair,

19   is that right?

20   A    It could have, in theory, produced an inequitable

21   result.  Hard to know until you actually do it.

22   Q    But you're fairly confident, I think, that it -- the

23   original allocation methodology would have resulted in an

24   inequitable allocation if it had continued.  Is that

25   correct?

1    A    With the benefit of hindsight, having now re-run the

2    collective numbers and knowing how it shook out, would I say

3    that moving $3.4 million to $4 million up?  I don't think

4    that's a material change when you have $189 million dollars

5    of fees, so is that an inequitable or unfair result?  I

6    don't know that I would go that far.  But again, that's with

7    the benefit of hindsight and gone back and applied the

8    formula to all the months post-TCEH emergence.

9    Q    Okay, sir, again, just for the -- to make sure the

10   record is clear here, if you could take a look at the first

11   sentence of Paragraph 28 of your written direct.  It should

12   be right afterwards.  "Given the limited direct benefit fees

13   to the EFH Debtors on the one hand and the EFIH Debtors on

14   the other hand, during the period following TCEH's

15   emergence, Kirkland's original allocation methodology would

16   have resulted in an inequitable allocation had it applied."

17   A    Again, that was our expectation, and as we ran the

18   numbers, we, as I said at the very beginning of the direct

19   testimony, we determined that that number is actually $3.4

20   million going the other way.

21   Q    Now, the methodology that you switched to for

22   collective benefit fees was the -- what's been referred to

23   as this 90/10 allocation methodology.

24   A    Correct.

25   Q    And that was based on, I believe what you said was the

1    relative debt at EFH and EFIH, correct?

2    A    Correct.  It -- I don't know that it's, like,

3    mathematically precise.  I think it's approximately.  I

4    can't remember the exact numbers of debt, but I remember it

5    being --

6    Q    You mean not exactly 90 percent and 10 percent but --

7    A    Right.

8    Q    -- somewhere around them.

9    A    Yeah, somewhere in that --

10   Q    But to be clear, it was based on Kirkland's calculation

11   of the relative debt at EFH and EFIH, is that right?

12   A    That's generally the -- yes.

13   Q    And Kirkland calculated that relative debt as of the

14   petition date, is that correct?

15   A    I don't recall what numbers we used to get to that.  I

16   would imagine we did, but I don't specifically recall if --

17   Q    Okay.  Yes, I think you would have imagined that it was

18   as of the petition --

19   A    I would -- if I were asked to do it today --

20   Q    Okay.

21   A    -- that's the number I would have probably used.

22   Q    All right, would you --

23   A    I would not have accrued interest or whatever during

24   that.

25   Q    All right, and is it fair to say, sir, that the

1 relative debt burdens of the two estates could have changed

2 between the petition date and the date that Kirkland

3 actually began implementing this methodology two and a half

4 years later?

5 A    Yes, because interest would have continued to accrue,

6 and I believe the number would have been further stilted

7 towards EFIH.

8 Q    And if there was a paydown of any debt between April of

9 2014 and October 2016, the actual ratio could have changed

10 as well, correct?

11 A    Well, I -- no because the paydown for that debt would

12 have been done using DIP funds and the DIP funds are debt.

13 So, we would have included that.

14 Q    Now, when Kirkland prepared and determined the

15 allocation methodology to use in October of 2016, did you

16 consider what Mr. Keglevic specified the debt was in his

17 First Day Declaration that's been filed at the time of the

18 bankruptcy?

19 A    I don't specifically recall that.

20 Q    And so, sitting here today, you don't know if the debt

21 numbers that are actually in Mr. Keglevic's First Day

22 Declaration actually support the 90/10 allocation that

23 Kirkland had applied?

24 A    I don't have his declaration -- I mean, I have it in

25 front of me, but I'd have to go back and get out a

1   calculator to run the numbers.

2   Q    Okay, and you don't know that if you ran the cal -- the

3   numbers and calculated them based on the numbers in that,

4   that it would actually lead to a meaningfully different

5   ratio between EFH and EFIH debt?

6   A    I suspect it's in the vicinity of that.  I don't know.

7   Q    All right.  Now, we had talked -- you talked a little

8   bit -- I'm sorry, did I -- I didn't interrupt you, did I?

9   Okay.  You had spoken a little bit about how Kirkland shared

10  the change in the allocation methodology, correct?  And I

11  believe in your written direct, you said that it was

12  discernible.

13  A    Correct.

14  Q    Is that right?  Did Kirkland explain the methodology to

15  -- in its fee applications in any public sense?

16  A    We did explain first in the monthly fee statements, in

17  the footnote, we explained that we were doing 90/10, which

18  was relative to debt.  That's the footnote that I just

19  explained, and the first time that we did that I think was

20  in June 2017, if I remember correctly.  Or '16, sorry.  We

21  also then, in the final fee application, explained in a much

22  more higher -- or much more detail exactly why we did and

23  what we did so that everybody had an opportunity to take a

24  look at that.

25  Q    Now, the methodology -- the change in methodology that

1    Kirkland employed was actually October of 2016, correct?

2    A    I believe October '16, we definitely did change the

3    methodology, but what you're seeing from the monthly fee

4    statements is we actually started to implement that in June

5    of 2016, once we realized that EFH and EFIH and EFH, on the

6    other hand, were going to their separate ways.  TCEH on one

7    hand, EFH and EFIH on the other.

8    Q    And is your testimony, sir, that beginning in October

9    2016, Kirkland continued to disclose the 90/10 allocation

10   methodology based on debt in its fee applications?

11   A    No, what we did -- what I'm saying it's discernible is

12   by looking at the fees that were actually billed, if you

13   divide them out and you can determine that we were doing it

14   on that basis.

15   Q    Right.  So, beginning in October of 2016, someone could

16   look at the math and figure out that the collective benefit

17   was allocated 90 percent and 10 percent, but maybe the

18   direct benefit had a different number -- a different

19   percentage, correct?

20   A    Correct.

21   Q    But there was no explanation in the fee applications

22   beginning in October 2016 or thereafter as to why that

23   change had occurred?

24   A    No, it was in the monthly fee statements.

25   Q    Did Kirkland disclose or discuss this change in

1    allocation methodology with the Debtors' boards?

2    A    I don't believe we discussed it with the Debtors'

3    boards.

4    Q    And I take it, then, that you also had no discussion

5    with the disinterest directors about it, correct?

6    A    I know we talked with the disinterested directors about

7    fee allocation around those times because that was one of

8    the issues that was being negotiated amongst the

9    disinterested directors was allocation of fees.  So, I have

10   no doubt in my mind that we talked to them about different

11   issues.  This one in particular, the 90/10, I can't recall.

12   Q    All right, and you also don't recall informing the E-

13   side committee or any professionals -- other professionals

14   about the methodology change that Kirkland had applied,

15   correct?

16   A    Not about the methodology.  What we informed them of is

17   budgeting.  We gave everybody in this case probably more

18   budgets than we want to admit were created about

19   professional fees, administrative costs generally, and so,

20   those numbers would have been shared with other parties and

21   they would have seen -- and actually, I do remember there

22   being pushback from people saying, hey, wait, that's too

23   much.  That's too much for EFIH, that's too much for EFH.

24   And the budgets were discussed.  I mean, budgeting was a

25   very rigorous activity at EFH.

1  Q    Right, and what, If I understand it, parties were

2  pushing back on there was the total amount of fees that a

3  particular estate --

4  A    Not necessarily.

5  Q    Do you recall, sir, any specific conversations with

6  anyone in which they pushed back on the 90/10 allocation

7  methodology?

8  A    Not specific.  I remember questions about specific

9  dollar amounts from internal folks at the company.  I can't

10  remember if it was Legal or -- but we had a lot of

11  conversations about budgeting and how fees were being

12  allocated.  I don't specifically recall saying "90/10".

13            THE COURT:  Any budgeting conversations with the

14  independent directors?

15            MR. HUSNICK:  The independent directors were very

16  aware of professional fees and I remember them being briefed

17  at board meetings.  I don't know if it was a quarterly basis

18  or a monthly basis, Your Honor, but they had asked --

19  Chairman Evans would request to be briefed on the amount of

20  professional fees and how they were being allocated across

21  the Debtors' estates, and I remember Ms. Williamson asking

22  why this much and what are we doing here and is there any

23  way to reduce professional fees overall?  So, they were very

24  involved in it, but I don't specifically recall the 90/10

25  discussion with them.

1   Q    Sir, I believe you also don't recall any discussions

2   with the fee committee about allocation, correct?

3   A    Not specifically, no.

4   Q    All right.  You also testified on direct a little bit

5   about asbestos.  And if I understood your testimony, sir,

6   you had indicated that asbestos claims were asserted against

7   a variety of Debtors across the spectrum, is that right?

8   A    Correct.

9   Q    And that included EFIH Debtors?

10  A    Yeah, I can't remember if it was EFIH or EFIH Finance,

11  but I know there were -- I can't even remember how many

12  claims.  It was not a huge amount, but there were claims.

13  Q    Sir, approximately how many claims of reorganization

14  did the Debtors file in this case?

15  A    (witness laughs)

16  Q    Approximately.

17  A    I know that we filed -- I would -- you'd laugh if I

18  said two because I actually think there was only -- there

19  was actually only one because we did it as a joint plan and

20  all the way to the end, we held onto that joint plan.  But,

21  how many drafts of it, I have no idea.

22  Q    To your knowledge, in any of the one or hundreds of

23  plans that were filed, did any of those plans include a

24  class of asbestos claims at EFIH?

25  A    No.  What we did is we call those EFH legacy claims and

1    they were all asbestos claims and we filed interim -- not

2    interim.  We filed claims objection -- wrong Debtor claims

3    objections against the claims that were asserted against

4    EFIH to move them over to, I believe, either EFH or the LSGT

5    Gas Debtors.  My point is that now, EFIH has the benefit of

6    a bar date because nobody can come back and sue EFIH for

7    asbestos because we have the bar date.

8    Q    But you'd agree, sir, that the asbestos claims against

9    the EFIH Debtors were mistakes, right?  They were asserted

10   against the wrong Debtor.

11   A    My assertion would be that they were wrong Debtor

12   claims.  Does an asbestos plaintiff come up with a reverse

13   veil-piercing argument?  Certainly.  I've seen more creative

14   arguments from the asbestos part.

15   Q    Ah, but there was a provision, sir, in the plan -- in

16   the bar order that actually corrected that and made sure

17   that the claims that were -- asbestos claims that were

18   asserted against EFIH were corrected and asserted against a

19   claim that actually owned a facility where asbestos could

20   have been an issue, correct?

21   A    Because we had the bar date and because I had claims

22   administration procedures that allowed me to file a wrong

23   Debtor objection to move them over, we had the benefit for

24   EFIH and EFIH Finance of their knowing there would not be

25   any asbestos liability --

1    Q     Right, any --

2    A     -- going forward.

3    Q     -- I'm sorry.  I'm sorry for interrupting.  And you

4    believe that was a collective benefit to the estates because

5    it related to plan issues overall, correct?

6    A     The bar date was for all Debtors.  We're not talking

7    about a plan issue here.  We're talking about the bar date.

8    The bar date was for all Debtors.

9    Q     Now, in terms of Kirkland's allocation of asbestos

10   time, Mr. McKane had asked you some questions about one of

11   the asbestos plaintiff's attorneys and one of the asbestos

12   plaintiffs.  Do you recall that?

13   A     I do.

14   Q     The asbestos plaintiff, Ms. Fenicle, I believe, she was

15   an EFH creditor, correct?

16   A     I believe she was EFH and LSGT Gas Debtors.  I think

17   that's right.  I don't remember if she asserted two claims

18   or one claim.  I can't recall.

19   Q     And Mr. Kazan?

20   A     Kazan.

21   Q     Kazan, I apologize.  Mr. Kazan, he was an asbestos

22   plaintiff asserting claims against the EFH estate, is that

23   correct?

24   A     No.  No, he was counsel to Fenicle and Fahy.

25   Q     I'm sorry, I'm sorry, yes --

1    A    Mr. Fenicle and Ms. Fahy.

2    Q    -- that's what I mean to -- I apologize.  I apologize.

3    He was the lawyer, correct?

4    A    Correct.

5    Q    All right.  Now, in connection with your preparation

6    for your testimony today, have you seen a summary prepared

7    of the asbestos fees that Kirkland charged as a collective

8    benefit to EFH and EFIH?

9    A    I believe I've seen a summary that you attached to your

10   pleading, which was based on the flagged key terms that you

11   searched.  I've also had discussions with my team.  I don't

12   know that I -- I can't recall seeing a written summary of

13   that time but I've discussed it.

14   Q    I apol -- yes, the summary I was referring to was the

15   summary --

16   A    Oh, your summary.

17   Q    -- prepared by my clients.

18   A    Okay.

19   Q    Not by something -- by your team.  And you have an

20   understanding that that summary identified about $2.75

21   million dollars in fees that Kirkland charged as collective

22   benefit fees that related to asbestos, Mr. Kazan or Ms.

23   Fenicle, correct?

24   A    I do.

25   Q    And earlier, you had talked about the swing effect,

Page 112

1    essentially, from moving time from either collective benefit

2    or direct benefit or vice versa, correct?

3    A    Correct.

4    Q    And would you agree with me, sir, that moving $2.75

5    million dollars of collective benefit fee time to EFH direct

6    benefit fee time would have a significant impact on the

7    allocation of fees?

8    A    Yeah, I can't tell you exactly what it is, but it would

9    be -- it would have the swing effect that I mentioned

10   because it would be -- it would increase or change the

11   proration and --

12   Q    And do you have a rough -- actually, let me just show

13   you the document.

14           MR. MCGINNIS:  If we could turn to ELX-659,

15   please, which, Your Honor, you can find at Tab 8 --

16           THE COURT:  Okay.

17           MR. MCGINNIS:  -- of the witness binder.

18   Q    And in particular, Mr. Husnick, if you can turn to Page

19   17 of that document.  Now, first off, sir -- I apologize,

20   just let me know when you're ready.

21   A    I'm there.

22   Q    Sir, you understand that this is Kirkland's final fee

23   application in this case?

24   A    It appears to be, yes.

25   Q    And on Page 17, you'll see that there's a chart that

1    summarizes Kirkland's proposed allocation of direct benefit

2    and collective benefit fees between EFH, EFIH and TCEH.   Do

3    you see that?

4    A    I do.

5    Q    Approximately how -- what is the amount of direct

6    benefit fees charged to EFH?

7    A    It is -- if I'm in the wrong -- or right box, I think

8    it's $1.955 million and some change.

9    Q    So, adding $2.75 million dollars to that number is

10   going to have a significant impact on the proportion of

11   direct benefit fees between EFH and EFIH, correct?

12   A    It would certainly change the numbers.  Yeah, it's

13   probably going to be significant when you multiply that,

14   okay.

15   Q    Now, you'd also testified a little bit about the make

16   whole litigation, and Kirkland viewed time spent on

17   litigation for the -- or the make whole litigation as a

18   direct benefit fee allocated to EFIH, correct?

19   A    Correct.  EFIH was the only defendant in the make whole

20   litigation.

21   Q    And sir, do you understand that, while that litigation

22   was ongoing, the Debtors represented in disclosure

23   statements and plans that EFIH unsecured claims were

24   projected to be paid in full?

25   A    I can't specifically recall various points in time but

1     based on the conversation and the colloquy that we had

2     earlier with counsel and their preliminary statements, I

3     believe that to be correct.

4     Q    And the Debtors' position in the make whole litigation

5     was that the make whole claims should be disallowed,

6     correct?

7     A    The Debtors' position -- the EFIH Debtors' position was

8     that the make whole claim should be disallowed.

9     Q    And if that claim had succeeded, EFH creditors would

10    get the benefit of those additional proceeds, correct?

11    A    If the claim had been completely disallowed, it depends

12    on the value of the other assets in the EFIH bucket and

13    whether EFH, in effect the equity holder, would get a

14    recovery out of EFIH.

15    Q    Now, the resolution of the make whole litigation also

16    presented a plan confirmation issue, correct?

17    A    Resolution of the make whole litigation -- there were

18    aspects of the make whole disputes that were discussed in

19    confirmation issues.  For example, in the Hunt plan, we

20    discussed at length and litigated until we settled with

21    Judge Gross as the mediator, whether or not we were able to

22    preserve the liens, which would have been a lien on

23    reorganized EFIH.

24            THE COURT:  Oh, yeah.  I remember that.

25    A    And only EFIH.  And so, we were having those

1    discussions around that time.  But it was all in connection

2    with trying to resolve the objection of the First Liens, the

3    EFIH First Liens and the Second Liens, the EFIH Second

4    Liens, to confirmation of the joint plan for EFIH and EFH.

5    Q    Sir, is it -- I believe it's accurate to say that both

6    at least the Hunt and the NextEra plans included specific

7    provisions that addressed how the make whole litigation

8    could impact either confirmation or the purchaser's ability

9    to terminate, depending on the result before confirmation,

10   is that correct??

11   A    There were significant provisions in both plans that

12   addressed the -- how the litigation was going to proceed and

13   what the settlement/resolution was.  It was very clear that

14   the Hunts were going to argue that the plan was -- or that

15   the appeal was equitably moot once they confirmed, so,

16   rightfully so, Mr. Anker and Mr. Brody were very concerned

17   and watching that during the plan negotiation.  So, we made

18   a lot of tweaks to the plan with Judge Gross's help.

19   Q    And that, again, that aspect of the make whole dispute

20   was it presented a plan confirmation issue, correct?

21   A    It was -- there was plan objections that were addressed

22   at a plan confirmation hearing.

23   Q    All right.  Mr. Husnick, at the end of your written

24   direct testimony, you also discussed some of the fees and

25   expenses incurred in connection with the Debtors' tax-

1    related plan restructuring services, do you recall that?

2    A    I do.

3    Q    And, for your reference, if you turn to your written

4    direct, this is at Paragraph 45 or thereabouts, and this is

5    at Tab 1, Your Honor.

6            THE COURT:  All right.

7    Q    Now, in your written direct, you testified that the

8    possibility of a multi-billion-dollar stranded tax posed

9    grave litigation and regulatory risks to all Debtors,

10   correct?

11   A    Agreed.

12   Q    And you discuss a number of means by which EFIH or TCEH

13   could have been liable for that tax liability -- for EFH's

14   tax liability, correct?

15   A    Correct.

16   Q    Now, just to be clear, I don't think this is

17   controversial, you're not an expert in tax law, correct?

18   A    I am not.

19   Q    And the testimony you have in here, essentially, is a

20   summary of some of the issues that are discussed in what's

21   been referred to as the omnibus tax memorandum, correct?

22   A    Correct.  This is a summary of what the Debtors were

23   thinking and what we summarized in our omnibus tax

24   memorandum at the request of the Court.

25   Q    And you'd agree, sir, that in all events, EFH would be

1    directly liable to the IRS for federal income taxes in the

2    event of a taxable sale for EFIH's economic interest in

3    Oncor, correct?

4    A    That is my understanding, correct.

5    Q    And you did mention in your testimony that EFH could

6    have considered a check-the-box election for EFIH if it

7    wanted to, correct?

8    A    Correct.

9    Q    And you have an understanding that the check-the-box

10   election in that circumstance would have caused the

11   potential for additional tax liability even if EFH Group

12   remained consolidated at that time, correct?

13   A    Can you say that one more time, please?

14   Q    Fair enough --

15            THE COURT:  Yeah, I don't understand that one.

16   Q    -- that was a mouthful, I apologize.  You're aware,

17   sir, that the tax memorandum explains that the check-the-box

18   may actually cause additional tax liability even if EFH

19   Group remains consolidated or pursues a tax-free separation?

20   A    Yes, I am aware of that.

21   Q    And the tax memorandum also says that the Debtors

22   believe that a check-the-box election would be an adverse

23   outcome for all parties, correct?

24   A    Correct, it would have been mutually-assured

25   destruction.

1    Q    You took my question right out of my mouth with your

2    answer.  Now, you mentioned that the IRS could actually seek

3    to change the law or issue proposed regulations that would

4    enable it to collect taxes directly from EFIH, correct?

5    A    Yeah, my understanding is that they could pass

6    regulations and change the law.

7    Q    But as you sit here today, you're not aware of the IRS

8    ever actually changing the law or its regulations with

9    respect to disregarded entities, correct?

10   A    Not to my knowledge.  I am certain they've changed the

11   law on something generally related to that, but I think what

12   you're after here is putting a disregarded entity on the

13   hook for tax and no, I'm not aware of a change to the law

14   referring --

15   Q    Now, you also mentioned in your written direct

16   testimony that EFIH could have been held liable for EFH's

17   taxes under tax-sharing agreements, correct?

18   A    Correct.

19   Q    But you're aware, sir, that certain EFIH creditors

20   actually contested whether those agreements were

21   enforceable?

22   A    It's possible.  I don't recall specifically whether

23   somebody said they were unenforceable.  I know they were

24   incredibly concerned about that claim.

25   Q    You also understand --

1   A     They being -- I'm sorry.

2   Q     No, go ahead.

3   A     If I may finish, they being the EFIH PIK holders.

4   There was a huge level of discussion pre-petition about

5   converting the EFIH PIK holders into third lien notes in

6   order to avoid exactly that claim.

7   Q     You also understand that creditors, though, contested

8   whether the tax-sharing agreements would even apply to taxes

9   upon a disposition of Oncor, right?

10  A     I'm not sure I remember hearing that argument.  It's

11  possible, I mean, there were a lot of pages and a lot of ink

12  spilled on tax issues in this case.

13  Q     At the end of the day, I believe your conclusion in

14  your written direct, though, is that both EFH and EFIH

15  benefitted collectively from Debtors' pursuit of a tax-free

16  transaction, is that correct?

17  A     We billed EFH and EFIH and they were both billed as

18  collective benefit for tax-related issues.

19  Q     And the practical effect of that was that EFIH paid

20  approximately nine times more for that work than EFH did,

21  correct?

22  A     That is correct because the relative value of how much

23  money you spend on things as Debtors' counsel always takes

24  into consideration the value that you're trying to preserve.

25  So, it doesn't surprise me that EFIH would have paid a

1    larger chunk of that, and that's what was negotiated in the

2    formula, was a recognition of that.

3             MR. MCGINNIS:  No further questions, Your Honor.

4             THE COURT:  Thank you.  Who's going next?  Okay.

5    Do you need a break, Mr. Husnick?

6             MR. HUSNICK:  Yeah, I want to get a water too, if

7    I can.

8             THE COURT:  Yeah, okay.  We'll take a very short

9    break.  I want to try to push through this as much as we

10   can.  I'm going to shoot for a 1:00 lunch break, so, I --

11   short break.  Mr. Husnick, you may not discuss the substance

12   of your testimony with anybody during the break.

13            MR. HUSNICK:  I was always looking for an excuse

14   not to talk to Mr. McCann.

15            (break)

16            CLERK:  All rise.

17            THE COURT:  Please be seated.  Yes, sir?

18            MR. STEIN:  Yes, again, Your Honor, for the

19   record, Matthew Stein, Kasowitz Benson Torres on behalf of

20   the ad hoc EFH claimants.

21            THE COURT:  Okay.

22            MR. STEIN:  I see you need more binders, so if I

23   can, may I approach?

24            THE COURT:  Yeah.  We're used to it.  Thank you.

25   Mr. Husnick, you can shove those over, on the -- that's what

1    that shelf's for, get them out of your way.

2              MR. HUSNICK:  Paper clips as well?

3              THE COURT:  I think that cost like $10,000 because

4    this is the government.  Yes.

5              MR. HUSNICK:  Thank you.

6              THE COURT:  But it's handy.

7              CROSS-EXAMINATION of CHAD HUSNICK

8    BY MR. STEIN:

9    Q    Good afternoon, Mr. Husnick.

10   A    Good afternoon, Mr. Stein.

11   Q    You were asked earlier today about the change in

12   Kirkland's methodology as to the allocation from the

13   specific language that was in the interim compensation

14   order.  Do you remember that?

15   A    I do.

16   Q    Was the 90/10 split that Kirkland agreed -- that

17   Kirkland used consistent with Kirkland's view of the

18   relative benefit of its -- of the fees?

19   A    What we did to calculate that was we did the debt

20   analysis.  We felt that the debt analy -- you know, the

21   90/10 split based on debt was fair and that's what we

22   implemented.

23   Q    You were also asked earlier today about the make whole

24   and I just wanted to clarify a couple of points.  EFH never

25   intervened in make whole litigation, is that correct?

```
                                                      Page 122
 1    A    EFH?

 2    Q    Correct.

 3    A    That is my recollection is they did not intervene in

 4    the make whole litigation.

 5    Q    And because they did not intervene in the make whole

 6    litigation, Kirkland never performed any services for EFH in

 7    connection with that litigation?

 8              MR. MCKANE:  Objection.

 9              THE COURT:  Basis?

10              MR. MCKANE:  Calls for a legal conclusion, Your

11    Honor.

12              THE COURT:  No, it doesn't.  Overruled.

13    A    Can you repeat the question, please?

14    Q    Sure.  Because EFH never intervened in the make whole

15    litigation, Kirkland & Ellis never performed any services

16    for EFH in connection with that litigation, is that correct?

17    A    I believe that to be correct.

18    Q    Going back for a moment to the 90/10 split, was the

19    90/10 split also consistent with the consideration that EFIH

20    eventually received from the Semper transaction relative to

21    the consideration received by EFH?

22    A    I don't have the exact calculation of -- I mean, of how

23    the split -- what I would view the consideration as is the

24    preservation of the cash at EFH versus the consideration

25    that was coming into EFIH for distribution to both secured
```

1    creditors and EFIH -- or, I'm sorry, secured creditors and

2    unsecured creditors, the PIKs.  So, I don't know what that

3    calculation works out to be.  It's probably somewhere in the

4    vicinity of 90/10.  It might actually be less for EFH.

5    Q    Okay.  I now want to turn your attention to your

6    written direct, Tab 7 in your binder, Your Honor.  It's

7    specifically Paragraph 33 on Page 11.

8    A    I'm there.

9    Q    And I want to direct your attention to the second

10   sentence in that paragraph.  Do you see where it says: "I am

11   not aware that the Debtors expressly consented to the E-

12   committee's allocation of professional fees or expenses"?

13   A    I see it.

14   Q    But you are aware that the Debtors -- but you are aware

15   that the Debtors were cognizant of how the E-side committee

16   allocated its professional fees, correct?

17   A    The Debtors would have received invoices from the E-

18   side committee and the Debtors would have paid those

19   invoices to the extent that parties in interest including

20   the Debtors did not file an objection to the allowance of

21   those fees.

22   Q    And that allocation was 50 percent to EFH and 50

23   percent to EFIH, correct?

24   A    That's my understanding.

25   Q    Okay, and Kirkland was also aware of that allocation,

1    correct?

2    A    To the extent I was reviewing the applications, I could

3    have been aware, but I don't specifically recall, I think I

4    testified in my deposition when I became aware of that or if

5    it was in connection with this litigation.

6    Q    Are you aware that Guggenheim, who was the financial

7    advisor to the committee -- to the E-side committee

8    disclosed such allocation in its interim fee applications?

9    A    I have not read that portion of the Guggenheim fee

10   application.

11   Q    Okay.  But even if it wasn't you, are you aware that

12   Kirkland reviewed the E-side committee's fee applications

13   during the course of the case?

14   A    I would imagine someone at the firm has reviewed the

15   fee application.  I know the Debtors would have been aware

16   of what was requested, because again, through the budgeting

17   exercise, we would have built in what the anticipated

18   payments were, based upon the amounts listed in the final

19   fee application.  That was a very important part of

20   establishing the escrows that Ms. Yenamandra was in charge

21   of.

22   Q    And the same answer would apply to why the Debtors were

23   also aware of the E-side committee's allocation?

24   A    I believe that's correct, yes.

25   Q    And the fee examiner also reviewed the applications --

1    the interim fee applications of the E-side committee,

2    correct?

3    A    We don't have a fee examiner here, we have a fee review

4    committee but yes, the fee review committee would have

5    reviewed all applications filed by retained professionals.

6    Q    And you're not aware of any objection that the fee

7    review committee raised with respect to the allocations made

8    by the E-side committee, are you?

9    A    I am not specifically aware of that.  I do know -- I am

10   aware that the EF -- or, I'm sorry, that the fee review

11   committee raised issues with the continued billing of

12   monthly fees during periods in which the case was at a slow-

13   down, and I think that was largely in response to Judge

14   Sontchi's comments about his concern on the same issue, but

15   beyond that, I'm not aware of them raising any objections.

16   Q    Right, so specifically with respect to the allocation,

17   you're not aware of any concern that was raised by that fee

18   review committee?

19   A    Not to my -- not to my knowledge, but I am not -- to be

20   clear, neither the -- the Debtor professionals were not

21   privy to discussions between the fee review committee and

22   other professionals.  It's -- there may be members of the

23   fee review committee who know what was discussed, but I do

24   not.

25   Q    And you're also aware of no objection by any party in

1    these cases to any of the fee applications of the E-side

2    committee professionals with respect to the allocation

3    issues that we're discussing?

4    A    As far as I recall, I'm not aware.

5              MR. STEIN:  I have no further questions, Your

6    Honor.

7              THE COURT:  Thank you.  Mr. Pedone?  There you go.

8    There you go.  All right, Mr. McKane, any -- oh, I'm sorry,

9    yes, Mr. McKane, any redirect?

10             MR. MCKANE:  No redirect, Your Honor.

11             THE COURT:  Okay.  I think we're done, thank you.

12   Thank you, Mr. Husnick.

13             MR. HUSNICK:  Thank you, Your Honor.

14             MR. MCGINNIS:  Actually, Your Honor, I have two

15   follow-up redirect question and a response.

16             THE COURT:  Okay, I apologize, I should have

17   asked.

18             MR. MCGINNIS:  Really just two.

19             THE COURT:  Call it re-cross, so.

20             MR. MCGINNIS:  Re-something.

21             MR. HUSNICK:  Do I need the binder?

22             MR. MCGINNIS:  No binders.  Seriously.

23             MR. HUSNICK:  Okay.

24                RE-CROSS-EXAMINATION OF CHAD HUSNICK

25   BY MR. MCGINNIS:

1   Q    Mr. Husnick, I believe you testified that Kirkland did

2   not provide services to EFH in connection with the make

3   whole litigation, correct?

4   A    What I was specifically asked is about that adversary

5   proceeding and the litigation.  I believe that's correct,

6   but I didn't have the fee statements in front of me to

7   confirm that we've never billed an ounce of time.  I don't

8   know.

9   Q    Okay, and with respect to the make whole issues as a

10  whole, do you believe Kirkland provided services to EFIH

11  that benefitted its equity holder, EFH?

12  A    Can you say that one more time?

13  Q    Do you believe that Kirkland provided services to EFIH

14  that benefitted its equity holder, EFH, with respect to the

15  make whole issues?

16  A    There was an indirect benefit, not a direct benefit.

17  Q    Thank you.

18          THE COURT:  All right.  Any further questions by

19  any party?  Thank you, Mr. Husnick.  You may step down.

20  Let's see -- Mr. Abrams -- excuse me, Professor Abrams is

21  next.  Can we start, or should we take a break?

22          MR. MCKANE:  Well, Your Honor, Mr. Husnick has to

23  get to Richmond, Virginia.  Can he be excused?

24          THE COURT:  Any objection to allowing Toys 'R' Us

25  to share in our company of Mr. Husnick in allowing him to

1    leave?  All right, thank you, sir.  Good to see you.

2              MR. HUSNICK:  Thank you, Your Honor.

3              MR. GALARDI:  Do you want to break for lunch?

4              MAN 4:  Yes.

5              THE COURT:  Okay, we'll break?  All right, we'll

6    break for lunch.  It's 12:30. We will try very, very hard to

7    all be back in our seats, ready to go at 1:30, and as I

8    mentioned during our morning meeting, I do have a short

9    meeting in the District Court at 2:45, so we'll break at

10   2:40 for that meeting.  Mr. Galardi, you were going to say -

11   -

12             MR. GALARDI:  I was just going to ask you about

13   the time of your break, Your Honor, that --

14             THE COURT:  Yeah, I think it'll be 2:40, so that

15   gives me time to get over there.  It's a short walk.  All

16   right, we're adjourned -- or, excuse me, we're in recess.

17             MR. GALARDI:  Thank you, Your Honor.

18        (Recess)

19             CLERK:  All rise.

20             THE COURT:  Please be seated.

21             MS. FAY:  Good afternoon, Your Honor.  Erin Fay on

22   behalf of a buyer for the L.A. funds and UMB as Trustee.

23   We'll proceed with our next witness, which is Howard Abrams,

24   in just a minute.  I rise to introduce two of my co-counsel,

25   Mr. Christian Reigstad and Mr. Peter Welsh --

1          MR. WELSH:  Good morning, Your Honor.

2          MS. FAY:  -- from Ropes & Gray.  Mr. Welsh has

3    been before you on telephonic calls, but never before you in

4    person.  And Mr. Reigstad -- we filed a pro hac motion for

5    him yesterday, but the order has not been entered, so we ask

6    that he be admitted (indiscernible) for today's proceedings.

7          THE COURT:  Yes, of course.  Sorry.

8          MS. FAY:  And Mr. Welsh has been pro hac-ed.

9          THE COURT:  Sorry we haven't processed that

10   paperwork yet.

11         MS. FAY:  Not a problem.  Thank you, Your Honor.

12         THE COURT:  Your welcome.

13         MR. WELSH:  Thank you, Your Honor.

14         THE COURT:  Your welcome.  All right.

15         MR. REIGSTAD:  For the record, Christian Reigstad

16   from Ropes and Gray on behalf of Elliott and UMB.  At this

17   time, Elliott and UMB call Professor Howard Abrams to the

18   stand.

19         THE COURT:  All right.  Professor?  Please take

20   the stand, sir, and remain standing for your affirmation.

21         CLERK:  Please raise your right hand.  Do you

22   affirm that you will tell the truth, the whole truth and

23   nothing but the truth to the best of your knowledge and

24   ability?

25         PROF. ABRAMS:  I do.

1          CLERK:  Please state and spell your name for the

2     record.

3          PROF. ABRAMS:  Howard Abrams.  H-O-W-A-R-D A-B-R-

4     A-M-S.

5          CLERK:  Thank you.

6          THE COURT:  Thank you.  Please be seated,

7     Professor.  If you could adjust your chair to be as close to

8     the microphone as possible that would be very much

9     appreciated.

10          MR. REIGSTAD:  Your Honor, we have a copy of

11     Professor Abrams' written direct testimony, if I may

12     approach.

13          THE COURT:  Okay.

14          MR. REIGSTAD:  May I proceed, Your Honor?

15          THE COURT:  You may.

16             DIRECT EXAMINATION OF HOWARD ABRAMS

17     BY MR. REIGSTAD:

18     Q    Professor Abrams, by whom are you currently employed?

19     A    Harvard University.

20     Q    What is your position at Harvard University?

21     A    I'm the William K. Jacobs, Junior visiting professor of

22     law.

23     Q    And how long have you been a professor of law?

24     A    35 years.

25     Q    And what area of law do you focus on?

1   A    Federal income taxation.

2   Q    And have you focused on that area of law for the

3   entirety of your 35 years as a professor of law?

4   A    Yes.

5   Q    Did you prepare a written direct in anticipation of

6   your testimony today?

7   A    I did.

8   Q    Is that the document that I handed to you a moment ago?

9   A    It is not.

10        MR. REIGSTAD:  Your Honor, may I approach and hand

11  him a copy of this written direct?

12        THE COURT:  Yes.  (Indiscernible) say, it's going

13  to be a short direct.

14        MR. REIGSTAD:  Your Honor, do you have a copy of

15  the Howard Abrams direct or the Bradley Robins direct?

16        THE COURT:  I have Professor Abrams' direct.

17        MR. REIGSTAD:  Okay, so I think it was just you,

18  and you as well.  Sorry for the confusion.

19  Q    Do you have a copy of your written direct testimony

20  now, Professor Abrams?

21  A    I do.

22  Q    Okay.  And is your written direct true and accurate to

23  the best of your knowledge?

24  A    It is.

25        MR. REIGSTAD:  Okay.  Your Honor, we move

1       Professor Abrams' written direct into evidence.

2               THE COURT:  Any objection?

3               MR. MCKANE:  No objection, Your Honor.

4               MAN 2:  No objection.

5               THE COURT:  It's admitted.

6           (Trustee's Exhibit Entered Into Evidence)

7               MR. REIGSTAD:  Okay.  And we don't have any

8       further questions at this time, subject to any redirect.

9               THE COURT:  Okay.  Cross?

10              MR. MCKANE:  (Indiscernible).

11              THE COURT:  Yeah, yeah.  More binders.

12              MR. MCKANE:  Your Honor, we do have some cross.

13              THE COURT:  Okay.

14              MAN 1:  And my colleague is providing a binder of

15      potential documents that we may use during the examination.

16              THE COURT:  All right.  Professor, I don't know

17      what's up there but if there are any other binders in your

18      way, feel free to put them on the sideboard.

19              MR. ABRAMS:  Thank you.

20              THE COURT:  You're welcome.

21                  CROSS-EXAMINATION OF HOWARD ABRAMS

22      BY MARK MCKANE:

23      Q    Good afternoon, Professor.

24      A    Good afternoon.

25      Q    Now, sir, you were engaged by Elliott and UMB for this

1    testimony; correct?

2    A    Yes.

3    Q    And your assignment was to consider the tax

4    consequences of a taxable sale or other disposition of EFIH

5    or the assets thereof; correct?

6    A    It was to render opinions on very specific questions.

7    Q    Did you say very specific questions?

8    A    Yes, sir.

9    Q    And was one of those very specific questions the tax

10   consequences of a taxable sale or other disposition of EFIH

11   or their assets thereof?

12   A    It was concerning that, but it wasn't the -- I would

13   not describe it as the subject, in my opinion.

14   Q    Okay.  Sir, in your binder --

15   A    Yes.

16   Q    In the first tab, you see it says, "Howard Abrams

17   Direct."  Are you there, sir?

18   A    Yes.

19   Q    And, sir, if you could turn to Paragraph 8?  You see

20   the first sentence in Paragraph 8?

21   A    Yes.

22   Q    All right.  And after reviewing the first sentence of

23   Paragraph 8, where you say, "I have been asked by counsel

24   for Elliott and UMB to consider the tax consequences of a

25   taxable sale or other deposition of Energy Future

1    Intermediate Holdings, EFIH, or their assets thereof."  Do

2    you see that, sir?

3    A    I do.

4    Q    Does that refresh your recollection as to what you were

5    asked to do?

6    A    I considered and rendered opinions on very specific

7    questions.

8    Q    And your analysis was limited to federal tax law;

9    correct?

10   A    That's correct.

11   Q    And you were also asked to consider the possibility of

12   whether the Internal Revenue Service would impose a tax

13   liability on EFIH in connection with a sale or disposition.

14   A    A sale or disposition of what?

15   Q    Of EFIH.

16   A    Yes.

17   Q    And when you were asked to consider the tax

18   consequences of a taxable sale of EFIH, you were not asked

19   to render an opinion on state law implications of that

20   taxable disposition; correct?

21   A    That's correct.

22   Q    And you were not asked to consider the contractual

23   implications of a taxable disposition of EFIH; correct?

24   A    That's correct.

25   Q    And, in fact, you determined that the potential

1  contractual means by which EFIH could be found liable for

2  federal income tax, potentially, but a sale of its parent

3  was not relevant to your analysis; correct?

4  A    It was not relevant to the conclusion that I rendered;

5  yeah.

6  Q    And before submitting your written direct, you prepared

7  a declaration for disclosure purposes as part of these

8  proceedings; you remember that, sir?

9  A    Yes.

10  Q    And from the time that you were engaged to the time

11  that you finalized that declaration, am I correct you spent

12  15 hours on this engagement?

13  A    You asked me earlier if that was the approximate time,

14  and I said yes, and I still believe it was an approximate

15  estimate.

16  Q    So the best of your recollection, the best estimate

17  you've got, it took you 15 hours to render your expert

18  opinions; correct?

19  A    Again, it's an approximate.  It could've been a little

20  more or a little less.

21  Q    Sure.  And, sir, this isn't your first time ever

22  testifying; correct?

23  A    That's correct.

24  Q    You testified in the litigation involving Williams and

25  Energy Transfer Equity; correct?

1    A    Yes.

2    Q    And that was here in the Delaware Chancery Court;

3    correct?

4    A    Yes.

5    Q    And the subject of that tax opinion was an acquisition

6    that required certain opinions from lawyers to close; right?

7    A    I'm sorry, you said the subject of that tax opinion?

8    Q    Yes.

9    A    Did you mean my testimony?

10   Q    Your -- I'll ask it again.  The subject of your

11   testimony related to a tax opinion that was necessary to be

12   issued by a set of lawyers for the transaction to close;

13   correct?

14   A    Yes.

15   Q    And in the specific level of the opinion that was

16   necessary in that case was a should level opinion; correct?

17   A    Yes.

18   Q    And you testified that no reasonable tax attorney could

19   opine other than to provide that should-level opinion;

20   right?

21   A    Yes.

22   Q    And your opinion was ultimately rejected by the

23   Chancery Court; correct?

24   A    The Court said he did not agree; yes.

25   Q    All right.  And in fact, you went so far in your

1    opinion as to say the firm involved, Latham and Watkins,

2    could've been acting in bad faith in suppressing a should-

3    level opinion; correct?

4    A    Yes.

5    Q    And that was also rejected by the Chancery Court;

6    correct?

7    A    Yes.

8    Q    And those findings by the Chancery Court have not been

9    revisited by any Appellate Court; correct?

10    A    Not to my knowledge.

11    Q    Now, sir, you would agree with me, I think, that

12    whether taxes may be imposed as a result of a transaction is

13    something a potential buyer would take into consideration;

14    right?

15    A    Under the appropriate circumstances, yes.

16    Q    And it's your opinion that since EFIH is a disregarded

17    entity, that only EFH would be liable to the IRS for income

18    taxes from a taxable disposition of Oncor; correct?

19    A    Yes.

20    Q    And that's under the federal income tax laws and

21    regulations as currently written; correct?

22    A    Yes.

23    Q    And, sir, you take the position in your testimony, I

24    believe, your written testimony, that the omnibus tax

25    memorandum is wrong in suggesting that the IRS

1    (indiscernible) change the tax law; right?

2    A    In a way that it was suggested in the omnibus tax

3    memorandum; yes.

4    Q    Right.  You reject that assertion in the omnibus tax

5    memorandum; correct?

6    A    I do.

7    Q    And you state in your testimony that the IRS is bound

8    by the Department of Treasury regulations; right?

9    A    Correct.

10   Q    And it's those Treasury regulations that result in EFH

11   and not EFIH bearing the tax liability if EFIH sold its

12   interest to Oncor in a taxable sale; right?

13   A    Yes.

14   Q    Now, you agree with me the Department of Treasury can

15   change current tax regulations if it believes it's

16   appropriate to do so; right?

17   A    Yes.

18   Q    And the Treasury Department can issue temporary

19   regulations that would change existing rules; correct?

20   A    Yes.

21   Q    And in fact, in the past, the Department of Treasury

22   and the IRS have issued temporary regulations without going

23   through all the steps necessary normally under the

24   Administrative Procedures Act; right?

25   A    Yes.

1    Q    And you agree that the Treasury Department can issue

2    final regulations that would change existing tax rules;

3    right?

4    A    In the abstract, yes.

5    Q    And the Treasure Department can publish notice of

6    intent to change existing tax regulations; right?

7    A    Yes.

8    Q    And, now, setting aside for a moment the Treasure

9    Department's ability to change the tax laws, a parent

10   corporation can elect for a wholly-owned limited liability

11   corporation to be treated as a C corp rather than a

12   disregarded entity for federal income tax purposes; correct?

13   A    Technically, it's the subsidiary that makes the

14   election.

15   Q    All right.  So it's your testimony that it's not the

16   parent's election, it's the subsidiary's election?

17   A    It's the subsidiary's but because it's controlled, in

18   practical terms I agree with you.

19   Q    Okay.  So in practical terms, the parent can effectuate

20   the change of the tax status of the limited liability

21   corporation; correct?

22   A    Under the appropriate circumstances, yes.

23   Q    And that's commonly referred to as a check the box

24   election; right?

25   A    It is.

1    Q    And it's your opinion that absent a check the box

2    election, if EFIH had sold its interest in Oncor, the IRS

3    would have no direct right to the proceeds; correct?

4    A    If what?  If what had took place?

5    Q    I'm sorry?

6    A    If what took place?

7    Q    Oh, sorry.  It's your opinion that absent a check the

8    box election, if EFIH had sold its interest on Oncor, right,

9    through a taxable sale, that the IRS would have no right to

10   the proceeds of an EFIH sale.

11   A    No direct right.

12   Q    No direct.

13   A    Correct.

14   Q    Okay.  But, sir, you don't have any understanding as to

15   whether EFH as a tax payer in this case could have made a

16   check the box election during the course of these

17   proceedings; right?

18   A    I did not render an opinion on that, no.

19   Q    All right.  And in fact, you have (indiscernible)

20   understanding of whether they could or not; correct?

21   A    I don't have nearly enough facts, nor have I thought

22   about it, yes.

23   Q    And, sir, you have no understanding as to why EFH may

24   have elected not to make the check the box election in this

25   case; correct?

1    A    I have no knowledge about that.

2    Q    And, sir, if you could turn to a moment in your written

3    direct, Paragraph 22.

4    A    I have it in front of me.

5    Q    All right.  So you see the last sentence in Paragraph

6    22?

7    A    Yes.

8    Q    Right.  You're referring to the IRS claims against the

9    parent can only be satisfied out of (indiscernible) assets,

10   you know, through a certain manner, and then you cite as

11   authority Footnote 5.  Are you with me?

12   A    Are you looking at the last sentence?

13           THE COURT:  You're at the wrong paragraph; 21, you

14   mean.

15           MR. REIGSTAD:  I do mean 21.  I apologize.  It's a

16   typo.

17   Q    Yes, I'm looking at Paragraph 21.

18   A    Then let me go back and look at that paragraph.

19   Q    Thank you, sir.

20   A    Yes.

21   Q    All right.  And so you're citing as support for the --

22   your assertion, Footnote 5 which is CCA 2002.35.023.  You

23   see that?

24   A    Conclusion 2 in that CCA.

25   Q    Correct.

```
                                              Page 142

 1    A      Yes.

 2    Q      And CCA means chief counsel advice; correct?

 3    A      Yes.

 4    Q      And, sir, that CCA, I believe, is PAB Exhibit 1 in your

 5    binder.

 6    A      Yes.

 7    Q      And you're familiar with this CCA, sir, right?

 8    A      I am.

 9    Q      You cite conclusion two as your authority for that

10    proposition; right?

11    A      I do.

12    Q      But there are other conclusions as well; correct?

13    A      There are.

14    Q      Right.  The CCA also discussed state law tax matters;

15    correct?

16    A      Yes.

17    Q      And earlier you testified you didn't consider state law

18    tax consequences that could be associated with a taxable

19    transaction; right?

20    A      Yes.

21    Q      But CCA you cite for your opinions suggest that there's

22    a possibility of liability for disregarding an entity like

23    EFH under potential state law theories; correct?

24           THE COURT:  EFIH.

25           MR. REIGSTAD:  I'm sorry.  I'm so sorry, Your
```

1    Honor.

2              THE COURT:  It's okay.  Just for the record.  I

3    want it correct in the record.

4    A    Conclusion 2.

5    Q    Right.  You say Conclusion 2, but there are other

6    conclusions that suggest that there are state law theories

7    that the Internal Revenue Service could use to assert

8    liability against a disregarded entity like EFIH?

9    A    Yes.

10   Q    All right.  And that's Conclusion 5; right?

11   A    Yes.

12   Q    And it would be opinion in the CCA, chief counsel

13   advice, that the service could pursue an alter ego theory of

14   liability against disregarded entities; right?

15   A    I didn't rely on Conclusion 5, so I don't want to claim

16   expertise in what it says.

17   Q    But you considered CCA 5.  It's on the list.  That CCA

18   is on the list of documents you considered; correct?

19   A    I cited for Conclusion 2 and for nothing else.

20   Q    Well, sir, isn't it true that this CCA -- under the

21   CCA, a theory that was advanced was that the service could

22   pursue an alter ego theory against a disregarded entity?

23   A    As I just said, because I didn't rely on Conclusion 5,

24   I'm not comfortable telling you what Conclusion 5 says.

25   Q    All right, well, sir, let me ask you this.  You gave

1    deposition in this case; correct?

2    A    I did.

3    Q    And did I ask you this question and did you give me

4    this answer.  So, it was the opinion -- and just for folks,

5    I have the deposition transcript and I can direct your

6    attention to it.  The deposition transcript is the third tab

7    in.  You with me, sir?  The third tab in of your binder.

8    It's the one that says, "Abrams Deposition Transcript."

9    A    I'm sorry, I'm having difficulty finding it.  I've

10   looked --

11   Q    It might be in front of where you're looking, sir.

12   A    Okay.

13            THE COURT:  It's right before PAV-1.

14   A    I'm sorry.  I (indiscernible) past it.  Thank you.

15   Yes.

16   Q    Okay.

17   A    I apologize.

18   Q    No, not a problem, sir, and I'm asking you to turn to

19   Page 44.

20   A    Yes, Page 44.

21   Q    So these are four-by-ones, and so I'm looking for

22   Transcript page 44.

23   A    Thank you.

24   Q    Are you with me?

25   A    Page 44.  I am.

1    Q    All right.  And, sir, in Lines 15 through 19, did I ask

2    you this question and did you give me this answer?

3    Question:  So it was the opinion of the associate area

4    counsel that the service could pursue an alter ego theory;

5    correct?  Answer:  That -- it might be a possibility to

6    assert an alter ego theory; yes.

7    A    Yes, that's what it says.

8    Q    And so -- and there are other theories that were

9    identified in the CCA that you cite as authority; correct?

10   A    I'm sorry.  Could you say that again, please?

11   Q    There were other state law theories that are cited and

12   acknowledged in this CCA that you relied on in your written

13   direct; correct?

14   A    Yes.

15   Q    And another one of the state law theories was a nominee

16   theory of liability; right?

17   A    As best I recall, yes.  As best I recall, yes.

18   Q    Okay.  And another theory that was advanced -- another

19   state law theory (indiscernible) referred to as a transferee

20   theory; correct?

21   A    I believe that's true but I haven't refreshed my

22   recollection recently.

23   Q    And the reason why is that you limited yourself solely

24   to federal tax law and didn't wade into whether the IRS had

25   other weapons at its availability; correct?

1    A    Yes.

2    Q    Now, you also didn't evaluate any potential contractual

3    theories by which the disregarded entity could be held

4    liable; correct?

5    A    Yes.

6    Q    But you're aware that the disregarded entity at issue,

7    EFIH, did enter into certain contractual obligations

8    relating to tax; right?

9    A    I believe that to be true.

10   Q    And one of those obligations is what you referred to on

11   the documents that you considered as the federal and state

12   income tax allocation agreement; right?

13   A    Yes.

14   Q    But you did no analysis on whether EFIH would be liable

15   to EFH pursuant to that agreement; right?

16   A    I have done no analysis on that; correct.

17   Q    And you determined it wasn't relevant to the analysis

18   that you had done; correct?

19   A    Correct.

20   Q    Okay.  No, no.  Now, in addition to what you did about

21   evaluating disregarded entities' liability you also

22   evaluated whether -- and you opined on what's referred to as

23   a step up in basis; right?

24   A    Yes.

25   Q    All right.  And you know what a step up in basis is;

1   right?

2   A    Yes.

3   Q    And you testified, I believe, in your written direct

4   that a purchaser in a taxable sale of a disregarded entity

5   will take a cost basis in the assets because either the

6   transaction will be treated as a purchase of the disregarded

7   entity's assets.  Is that right?

8   A    Yes.

9   Q    And assuming that a transferee's fair market value

10  basis exceeded the transferor's adjusted basis, that basis

11  increase is valuable because it generates higher deductions

12  over the recovery life of the assets and reduces gains

13  realized on the disposition of the asset.

14  A    I don't think you said that right, but I know what

15  you're after.

16  Q    We're in the same neighborhood?

17  A    Fair market value being higher than adjusted basis will

18  give the addition of depreciation.

19  Q    Right.  You get depreciation over time and then

20  possible shorter -- smaller gain on disposition.

21  A    And under current law, there might be an immediate

22  deduction that's greater.

23  Q    Okay.  All right.  And you believe that a purchaser

24  should be willing to pay more, a greater amount, for the

25  asset because of those tax advantages; right?

1    A    In general, should be willing to pay more.

2    Q    And it's your opinion, Professor, that under current

3    federal income tax law if EFIH and Oncor Holdings

4    appreciated beyond their basis, a purchaser in a taxable

5    sale would've benefitted from that stepped-up basis; right?

6    A    That is not my conclusion.

7    Q    Well, it's not -- that's not your opinion, but that's

8    an assertion that you made in your written direct; correct?

9    A    You'll need to show me where you believe I made that.

10    Q    Paragraph 30.  Apologize for speaking over you.

11    A    My written direct?

12    Q    Yes, sir.  It's the first sentence of your written

13    direct.  You see, sir, where is says, "If EFIH and Oncor

14    Holdings appreciated beyond their basis, a purchaser of EFIH

15    or Oncor Holdings in a taxable sale would've benefitted from

16    a stepped-up basis."

17    A    Yes.

18    Q    You agree with that; right?

19    A    I do.

20    Q    Wonderful.  And the reason they benefitted is that

21    depreciation opportunity we discussed; correct?

22    A    That's correct.

23    Q    All right.  Now, in Paragraph 30, right, you value the

24    after-tax benefit of the basis step up at $2.037 billion;

25    correct?

1   A     Yes.

2   Q     All right.  But that's not your calculation; right?

3   A     It's my calculation based on numbers that were given to

4   me.

5   Q     Right.  And those numbers were given to you by Ropes

6   and Gray based on work that was done by Evercore; correct?

7   A     I believe that's correct; yes.

8   Q     And in fact, there are depreciation schedules that were

9   prepared by Evercore based on a illustrative sale of -- or

10  hypothetical sale of the assets on the E-side; correct?

11  A     Well, the information I was given said that the sale

12  price was illustrative, but it did not indicate that the

13  depreciation schedules were illustrative.

14  Q     Right.  And the depreciation schedules are a look-

15  through to the assets that were owned by this entity because

16  that's what's being depreciated, the value of the assets;

17  right?

18  A     That's correct.

19  Q     And because this is a utility, a transmission and

20  distribution facility, those are long dated assets; correct?

21  A     I'm not an expert on the assets held by such companies,

22  no.  I don't know.

23  Q     So you don't know what the actual assets are, you just

24  know here's the depreciation schedule, it's got 15 years on

25  one column, 20 years on another, and I'm going to rely on

1    it?

2    A    That's correct.

3    Q    All right.  And, sir, based on the work you've done to

4    prepare to testify, you know that the analysis that was done

5    and that present value calculation that was done based on

6    those depreciation schedules was a draft; right?

7    A    I recall a discussion about whether it was finalized or

8    not, but to call it a draft, I'm not comfortable telling you

9    precisely where they were.

10   Q    Okay, so you're prepared to say you understand they may

11   not have been finalized, but you don't know if it was a

12   draft?

13   A    yes.

14   Q    Okay.  And the depreciation value of the $2 billion was

15   derived by -- they essentially calculated that present value

16   of the depreciation of those assets with an illustrative TEV

17   or total enterprise value; right?

18   A    Correct.

19   Q    And that illustrative value was $18 billion; right?

20   A    I believe that's correct.  I don't have it in front of

21   me.

22   Q    Well, and it wasn't based -- these weren't based on

23   actual transactions; right?

24   A    I don't know where the figure came from.

25   Q    Well, because -- is it your understanding that this

1    work was done by Evercore in the Summer of 2014?

2    A    That date seems right.

3    Q    And based on what was told you about this case, are you

4    aware of any transaction that was either confirmed by a plan

5    or that closed in Summer 2014?

6    A    I am not.

7    Q    Okay.  And you're not offering an opinion on the

8    availability of a taxable spinoff or taxable transaction to

9    any of these debtors; are you?

10   A    I am no.

11   Q    And you're not opining on whether a transaction with an

12   enterprise value of $18 billion was advisable; right?

13   A    I am no.

14   Q    And you're aware that the calculation that you're

15   relying on is just a net present value calculation; right?

16   A    Well, I did the net present value calculation.  That's

17   with -- in my statement.

18   Q    And that net present value calculation doesn't take

19   into consideration factors like whether a regulator could

20   prevent a purchaser from benefitting from the step-up;

21   right?

22   A    That's correct.

23   Q    All right.  And in your written direct, you cite a

24   document referred to as the tax matters agreement; correct?

25   A    I believe so.

1    Q    Okay.  And you didn't rely on the tax matters agreement

2    in rendering any of your opinions; correct?

3    A    That's correct.

4    Q    And you didn't analyze the extent to which that --

5    under that agreement EFIH would be jointly liable with EFH

6    for any tax liability from a transaction involving Oncor

7    that would've caused reorganized TCEH to become taxable;

8    right?

9    A    I did not.

10   Q    And you didn't analyze any of the conditions that

11   needed to be satisfied in order to effectuate a taxable

12   disposition of Oncor under the tax matters agreement; right?

13   A    I did no.

14   Q    And, sir, you also didn't analyze the extent to which

15   the Public Utility Commission of Texas would allow a

16   purchaser of EFIH interest in Oncor to benefit from a step

17   up in basis; right?

18   A    I did not.

19   Q    And you didn't analyze whether the Public Utility

20   Commission of Texas would pass the benefit of a step-up on

21   to rate payers; right?

22   A    I did not consider that (indiscernible).

23   Q    And you have no opinion about whether the Public

24   Utility Commission of Texas could lower rates collected by

25   Oncor to account for a stepped-up basis the purchaser

1    receives as a result of a taxable transaction?

2    A    I have no opinion on that.

3    Q    And now, if you turn back to Paragraph 27 of your

4    statement.

5              THE COURT:  (Indiscernible) direct?

6              MR. MCKANE:  In direct, sir.  Page 9.  First

7    sentence.

8    Q    You with me?

9    A    I am.

10   Q    You see the first sentence where it says, "Because a

11   basis increase offers tax advantages, a purchaser should be

12   willing to pay a greater amount for the asset."  You with

13   me?

14   A    I am.

15   Q    You agree with that; right?

16   A    I do.

17   Q    And that statement doesn't take into consideration

18   whether a regulator would be able to take away the tax

19   advantage of a step-up; right?

20   A    That's correct.

21   Q    Now, sir, you don't believe the Internal Revenue

22   Service has the authority to prevent parties from

23   benefitting from any stepped-up basis resulting from a

24   transaction that has left behind a stranded tax liability;

25   right?

1   A    You've asked a very broad, abstract question.  That's

2   why I'm pausing.

3   Q    Sure.

4   A    I don't believe the IRS has the authority to deny a

5   cost basis on a taxable purchase, even if there's a stranded

6   tax liability.  Is that good enough?

7   Q    So, as I hear you -- just make sure we're all on the

8   same page -- you don't think the IRS has the authority to

9   block a purchaser from recognizing a stepped-up cost basis

10  even in the scenario where the transaction strands a tax?

11  A    That's correct.

12  Q    Okay.  And in fact, you believe based on your knowledge

13  of applicable IRS rules and regulations, the IRS is unlikely

14  to pursue and extremely unlikely to succeed in holding a

15  disregarded entity liable for federal income tax arising out

16  of a sale; right?

17  A    Yes.

18  Q    Now, in this case, you understand that the potential

19  tax liability generated from a taxable sale of EFIH's

20  interest in Oncor on the E-side was potentially of the

21  magnitude of $3.4 billion; right?

22  A    I've been given figures like that, yes.

23  Q    Right.  And you're aware from reading the omnibus tax

24  memorandum that EFH, a bankrupt entity, may have very little

25  value to satisfy that tax liability; right?

1    A    I read that; yes.

2    Q    And you have no reason to believe otherwise?

3    A    I have no knowledge of it either way.

4    Q    And you understand from reading the tax memorandum that

5    at least the debtors believe there's a very real possibility

6    the IRS will anticipate the potential for a large stranded

7    tax liability and therefore oppose any plan of

8    reorganization that EFIH or TCH that would include a taxable

9    sales transaction?

10   A    I don't know what the debtors believe.

11   Q    (Indiscernible).

12   A    I don't know what the debtors believe.

13   Q    You don't know what the believe, you just know what you

14   read; right?

15   A    Correct.

16   Q    And you read that statement in the omnibus tax

17   memorandum?

18   A    I did.

19   Q    Okay.  And do you believe the IRS would take steps --

20   any steps available to it to block a purchaser from

21   benefitting from a step up in basis in the event of a $3

22   billion stranded tax?

23   A    I don't have nearly enough information to answer that

24   question.

25   Q    So you can't render an opinion sitting here today about

1    what steps the IRS would or would not take in that scenario;

2    correct?

3    A    That's correct.

4    Q    And then, sir, finally with regards to your belief that

5    the IRS doesn't have the authority to take the steps we

6    talked about earlier to block a purchaser from benefitting

7    from a step up when there's a stranded tax, you're familiar

8    with Section 337 of the Internal Revenue Code; right?

9    A    I am.

10   Q    And you expressly did not rely on Section 337 in

11   rendering the opinions contained in your written direct;

12   correct?

13   A    Yes, I did not.

14   Q    Right.  And if we could put Section 337 up on the

15   screen, it's also in your binder, I believe.  It's Exhibit

16   738.  Are you with me, sir?

17   A    I am.

18   Q    In particular, I'm focusing on Section D.

19   A    Yes.

20   Q    Right?  You see that, sir?  You see in Section D --

21   this is the code.  This is the Internal Revenue Code;

22   correct?

23   A    Yes, it is.

24   Q    And in Section 337(d) it states, "The secretary shall

25   prescribe such regulations as may be necessary or

1    appropriate to carry out the purposes of the amendments

2    including in Subheading 1, regulations to ensure that such

3    purposes may not be circumvented through the use of any

4    provision of laws or regulations or through the use of

5    regulated investment company, real estate investment trust,

6    or other tax exempt entity."  You see that, sir?

7    A    I do.

8    Q    Okay.  Now, you believe that Section 337(d) is

9    insufficient authority for the revenue service or the

10   Department of Treasury to issue regulations to prevent a

11   buyer from realizing the benefits of a step up in basis when

12   the transaction renders a stranded tax; right?

13   A    It's irrelevant; yes.

14   Q    You say it's irrelevant because that is insufficient

15   authority -- insufficient grant from Congress of power;

16   correct?

17   A    It's not a grant that has anything to do with that

18   issue you're describing.

19   Q    I'm sorry; say that again?

20   A    It's not a grant of authority that addresses -- that

21   can address the issue you're describing.

22   Q    I understand your point.  So basically it's a grant of

23   authority, but it doesn't cover the issue we're talking

24   about?

25   A    Correct.

1   Q    Right.  And so prior to your engagement in this case,

2   you've never written on or stated an opinion on the scope of

3   the IRS authority under Section 337 to address that issue;

4   right?

5   A    That's correct.

6   Q    And, sir, you're not aware of any other tax scholar or

7   professor who has written on or rendered an opinion that

8   Section 337 of the Internal Revenue Code doesn't provide the

9   Internal Revenue Service with sufficient authority to issue

10  regulations in the scenario that we're discussing; right?

11  A    That's correct.

12  Q    And so your knowledge, there's no body of scholarship

13  on the issue of whether Section 337 of the Internal Revenue

14  Code is sufficient to prevent -- to empower the service to

15  prevent the step up in the scenario we're talking about;

16  right?

17  A    That's correct.

18  Q    And, sir, you don't have an opinion on whether if the

19  IRS took that action, right, took a step to either issue a

20  notice of intent to issue regs, to block a transaction,

21  whether that notice alone would be enough to chill a buyer

22  that was potentially engaging in that transaction?

23  A    I do not.

24  Q    And you're not aware of any circuit-level authority in

25  the Courts of Appeals of the United States where there's an

1    opinion that Section 337 of the Internal Revenue Code is so

2    narrow that the IRS couldn't rely on it for authority to act

3    in the scenario we've been talking about; right?

4    A    That's correct.

5    Q    And you're not aware of any tax court decision that

6    says that Section 337 Internal Revenue Code is so narrow

7    that it doesn't provide the authority necessary for the

8    service to act in the scenario we've been discussing; right?

9    A    That's correct.

10   Q    And you're not aware of any decision by any Court or

11   arbitration panel that has rendered a ruling that Section

12   337 of the code is so narrow that it doesn't grant the IRS

13   sufficient authority to act in that scenario; right?

14   A    That's correct.

15   Q    But even if all of that were true, you agree that

16   ultimately Congress could change the laws to the extent

17   necessary to ensure the IRS had authority to prevent the

18   purchaser from taking the step up in basis in that scenario;

19   right?

20   A    Yes, I believe they have the authority.

21             MR. MCKANE:  All right.  I have no further

22   questions.

23             THE COURT:  All right.  Thank you.  I won't bet on

24   Congress doing anything.  Further questions?

25             MR. SCHRYVER:  I do, Your Honor.  Gavin Schryver,

Page 160

1   Kasowitz, Benson, Torres on behalf of the Ad Hoc EFH

2   Claimants.  Just have a very few questions.

3                    CROSS-EXAMINATION OF HOWARD ABRAMS

4   BY MR. SCHRYVER:

5   Q    Mr. Abrams, good to see you again.  Keep that binder in

6   front of you.  If you could turn to your written direct?

7   A    Yes.

8   Q    And if you could turn to Heading C which is on Page 8.

9   A    Yes, I have it in front of me.

10  Q    So that says -- in Heading C, you say that, "As a

11  general rule, assuming a DE" -- and there I believe you mean

12  disregarded entity?

13  A    Yes.

14  Q    "Assuming a disregarded entity's assets are

15  appreciated, a buyer will pay more to acquire a DE in a

16  taxable transaction than in a tax-free transaction because

17  the sale will result in a step up in basis that benefits the

18  buyer."  Did I read that correctly?

19  A    I believe you did.

20  Q    And that's one of your opinions in this case?

21  A    It is.

22  Q    Now, you discussed there what a "buyer" would pay;

23  right?

24  A    I don't give any particular numbers, if that's what

25  you're asking.

Page 161

1    Q    You used the word buyer.

2    A    yes.

3    Q    Now, are you aware of a single purchaser that ever came

4    to the debtors and proposed a taxable transaction?

5    A    No.

6    Q    So the buyer in your opinion is not a specific entity

7    or person?

8    A    No.

9    Q    It's a hypothetical buyer?

10   A    Yes.

11   Q    Okay.  Now, you've never worked for the IRS; correct?

12   A    That's correct.

13   Q    And you've never interacted with the IRS in connection

14   with a transaction under review where there is a potential

15   risk of a stranded tax?

16   A    That's correct.

17   Q    And in your career, you've never worked in any capacity

18   on any Chapter 11 restructuring matters?

19   A    That's not correct.

20   Q    I have your deposition testimony.  Will you turn to

21   your deposition, sir?

22   A    My deposition?  Yes.

23   Q    Yes.  And if you could turn to Page 168.  And again, as

24   Mr. McKane noted, it's four pages per page --

25   A    Thank you.

1    Q    So I'm looking for Page 168 of the transcript, not of

2    the documents.

3    A    Yes.

4    Q    Now, if you look at Line 25 through Line 6 of the next

5    page, it says, "During your time in your professional career

6    or your academic career, have you ever worked in any

7    capacity on Chapter 11 restructuring matters?"  Your answer,

8    "I don't believe so; no."  Do you have any reason to believe

9    that does not accurately reflect your testimony at your

10   deposition?

11   A    That does.

12   Q    (Indiscernible).

13   A    It does reflect what I said.  It's accurate as to that.

14         MR. SCHRYVER:  Okay.  I have no further questions.

15         THE COURT:  Redirect?

16         MR. REIGSTAD:  Very briefly, Your Honor.

17            REDIRECT EXAMINATION OF HOWARD ABRAMS

18   BY MR. REIGSTAD:

19   Q    Professor Abrams, do you recall Mr. McKane asked you

20   some questions about Section 337 of the Internal Revenue

21   Code?

22   A    I do.

23   Q    And I believe you testified that that, in your view,

24   was not relevant to your analysis; is that right?

25   A    Yes.

1    Q     Why?

2    A     337(d), the provision that he was quoting, gives

3    authority to the treasury to write regulations to ensure

4    that the repeal of the general utilities doctrine cannot be

5    evaded through complex or unanticipated transactions.  The

6    general utilities doctrine, the repeal of it, stands for the

7    proposition that if appreciated assets are removed from

8    corporate solution, there must be corporate level tax

9    imposed on the transaction.  In my opinion, I assume that

10   when these assets are sold it's a taxable event so there is

11   no evasion of general utilities.  Evasion would be if you

12   would get a step up in basis without there being a corporate

13   tax.  Here, there is on.  General utilities is not about

14   collection.  It's about the taxable event itself.

15            MR. REIGSTAD:  No further questions.

16            THE COURT:  would you like to re-cross on that,

17   Mr. McKane?  You don't have to.

18            MR. MCKANE:  No, no, Your Honor.

19            THE COURT:  It's always optional.

20            MR. MCKANE:  It's -- just a few questions.

21            RECROSS EXAMINATION OF HOWARD ABRAMS

22   BY MR. MCKANE:

23   Q    Your view about the scope of Section 337 is solely

24   based on -- you're basically saying to the Court that tax

25   was triggered and whether it is satisfiable or not is

1    irrelevant to your conclusion; right?

2    A    I just testified it's irrelevant to 337(d).

3    Q    Yeah.  Your point is essentially that you think

4    2337(d)'s scope stops at essentially whether a tax is

5    triggered, irrespective of whether it's then later

6    collected; correct?

7    A    That's correct.

8    Q    All right.  Do you have any understanding based on the

9    work you've done to testify today whether the IRS actually

10    made an appearance in this case and specifically said that

11    they would object to any transaction in a plan of

12    reorganization that would trigger a stranded tax?

13    A    I believe at my deposition you showed me a document

14    that contained that assertion.

15    Q    And that's the sole basis of your understanding;

16    correct?

17    A    Yes.

18            MR. REIGSTAD:  No further questions.

19            THE COURT:  All right.  Thank you, sir.

20            MR. ABRAMS:  Thank you.

21            THE COURT:  Thank you very much.  Any objection to

22    Professor Abrams being excused?

23            MR. MCKANE:  None, Your Honor.

24            THE COURT:  All right.  Thank you, sir.  You may

25    leave if you wish or hang around for the fun.  Let's

1    continue on, if we can.

2              MR. WELSH:  Good afternoon, Your Honor.  Peter

3    Welsh from Ropes and Gray on behalf of Elliott.

4              THE COURT:  Yes.

5              MR. WELSH:  Your Honor, we call Bradley Robins as

6    our next witness.

7              THE COURT:  Okay.  Mr. Robins?  Please take the

8    stand, sir, and remain standing for your affirmation.

9              CLERK:  Please raise your right hand.  Do you

10   affirm that you will tell the truth, the whole truth and

11   nothing but the truth to the best of your knowledge and

12   ability?

13             MR. ROBINS:  I do.

14             CLERK:  Please state and spell your name for the

15   record?

16             MR. ROBINS:  My name is Bradley A. Robins, B-R-A-

17   D-L-E-Y, middle initial A, R-O-B-I-N-S.

18             CLERK:  Thank you.

19             THE COURT:  Thank you, Mr. Robins.  Please make

20   yourself comfortable and stay as close to the microphone as

21   possible.  And get all that stuff out of your way because I

22   bet there's more coming.

23             MR. WELSH:  Your Honor, I have some copies of Mr.

24   Robins' written direct.  May I approach?

25             THE COURT:  Yes, you may.

1          MR. WELSH:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. WELSH:  Your Honor, may I proceed?

4          THE COURT:  You may.

5          MR. WELSH:  Thank you, Your Honor.

6              DIRECT EXAMINATION OF BRADLEY ROBINS

7     BY MR. WELSH:

8     Q    Mr. Robins, where are you currently employed?

9     A    I am currently employed at Ducera Partners.

10    Q    And Ducera is a financial advisory firm?

11    A    Yes, it is.

12    Q    And you're employed as a restructuring professional and

13    financial advisor?

14    A    Correct.

15    Q    Can you just very briefly summarize your experience as

16    a restructuring professional and financial advisor?

17    A    Sure.  I began my career as an attorney at Wachtell,

18    Lipton, Rosen, and Katz in the creditors (indiscernible)

19    group.  From there, I went to Houlihan, Lokey, Howard, and

20    Zukin in the financial restructuring group there and then

21    from there I helped start the restructuring group at

22    Greenhill and I was there until about two years ago when I

23    joined Ducera.

24    Q    And, Mr. Robins, you're here today offering expert

25    testimony in this proceeding; is that correct?

1    A    That is correct.

2    Q    Mr. Robins, do you recognize the copy of the written

3    declaration -- written direct that I handed to you a moment

4    ago?

5    A    I do.

6    Q    Does that appear to be a true and accurate copy of your

7    written direct for this proceeding?

8    A    It does.

9          MR. WELSH:  Your Honor, I move Mr. Robins direct

10    into evidence.

11          THE COURT:  Any objection?

12          MAN 1:  No objection.

13          THE COURT:  It's admitted.

14        (CREDITOR'S EXHIBIT ENTERED INTO EVIDENCE)

15          MR. WELSH:  Thank you, Your Honor.  I have no

16    further questions at this time but will reserve redirect.

17          THE COURT:  Of course.  Cross?

18          MR. MCKANE:  Yes, Your Honor.  Your Honor, we have

19    some cross binders --

20          THE COURT:  All right.

21          MR. MCKANE:  -- that we will use with our

22    examination.  May we approach the witness and the Court?

23          THE COURT:  Yes.

24            CROSS-EXAMINATION OF BRADLEY ROBINS

25    BY MR. MCKANE:

1    Q    Good afternoon, Mr. Robins.

2    A    Good afternoon.

3              THE COURT:  He's good.

4              MR. MCKANE:  (Indiscernible).

5              THE COURT:  No, I'm good, thanks.  I drink my own

6    water.

7              MR. MCKANE:  Your Honor, we have until 2:40; is

8    that correct?

9              THE COURT:  Yeah.

10             MR. MCKANE:  Okay.

11             THE COURT:  We won't cut it too -- I mean, give me

12   a little wiggle room, but yes, 2:40.

13             MR. MCKANE:  Yep.  No worries.  Whenever you --

14   I'll try to time it so we're at a break point.

15             THE COURT:  Okay.

16   Q    Mr. Robins, before you accepted this engagement and

17   before you joined Ducera, you were at Greenhill; right?

18   A    That is correct.

19   Q    And while you were at Greenhill, you were the financial

20   advisor to the TCH Independent (indiscernible) manager, Mr.

21   Sawyer; right?

22   A    That is correct.

23   Q    And you co-led the Greenhill engagement on behalf of

24   Mr. Sawyer; right?

25   A    Yes.

1   Q    And that was a material engagement for Greenhill;

2   correct?

3   A    It was.

4   Q    And, in fact, you departed Greenhill shortly after the

5   T-side emerged and joined Ducera; correct?

6   A    It was shortly before, actually, but yes.

7   Q    And you started Ducera in November of '16; correct?

8   A    Yes.

9   Q    So let's start with some of the assumptions that you

10  made that helped you form your opinions; okay?

11  A    Yes.

12  Q    All right.  So, sir, the first tab in your binder is

13  your written direct.  Okay?  And, sir, if you could turn to

14  Page 8, Paragraph 26.  Are you there, sir?

15  A    Yes.

16  Q    Yeah.  I see, the question I'm going to have is on Page

17  8.  It rolls over.

18  A    Okay.

19  Q    Okay?  It's the last sentence of that paragraph.  Are

20  you with me, sir?

21  A    Yes.

22  Q    And it states, "I understand from Professor Abrams that

23  the IRS would not likely be able to successfully hold EFIH

24  liable for the resulting tax liabilities under existing

25  federal income tax laws."  You see that, sir?

1    A    I do.

2    Q    But you didn't speak to Professor Abrams; correct?

3    A    I did not.

4    Q    Ropes and Gray conveyed that to you; correct?

5    A    They did.

6    Q    And you're not a tax expert, are you?

7    A    I am not.

8    Q    And you didn't independently evaluate the accuracy or

9    the scope of Professor Abrams' opinion; right?

10   A    No.

11   Q    And you didn't separately evaluate what actions the IRS

12   could take to impose liability on EFIH; correct?

13   A    Correct.

14   Q    And you didn't evaluate what potential exposure EFIH

15   would have under various state law theories; correct?

16   A    Correct.

17   Q    And you didn't evaluate the check the box election;

18   right?

19   A    Correct.

20   Q    I'm sorry, sir?

21   A    Correct.

22   Q    Thank you.  Now, sticking with that first tab again, if

23   we could transition to the next paragraph, Paragraph 27.

24   A    Yes.

25   Q    And there's another sentence that starts, "I

1    understand."  Are you with me, sir?  It says, "I understand

2    from Ropes and Gray."

3    A    I am.

4    Q    All right.  And that sentence says, "I understand from

5    Ropes and Gray that any effort by EFH to pursue a check the

6    box election would likely require Bankruptcy Court relief

7    from the automatic stay and that EFH would face multiple

8    hurdles to impose some or all of it's tax liability on

9    EFIH."  You see that, sir?

10   A    I do.

11   Q    And then you received another assumption from Ropes and

12   Gray in the following sentence; correct?

13   A    Yes.

14   Q    And that sentence says, "I understand also from Ropes

15   and Gray that any claims by EFH for indemnity under any tax

16   sharing agreements (indiscernible) subject to litigation and

17   EFH's ability to prevail on any such claims is uncertain."

18   Right?

19   A    Correct.

20   Q    Now, you didn't test either of those assumptions that

21   Ropes and Gray gave you; correct?

22   A    I did not specifically test them.

23   Q    And you don't know how Ropes and Gray formulated those

24   conclusions; right?

25   A    Not specifically.

1   Q    And you didn't undertake any independent evaluation of

2   the accuracy of either of those assumptions; correct?

3   A    I did not, but in my experience they seemed reasonable

4   assumptions and I made -- I would (indiscernible) them.

5   Q    So just based on your general experience, you got these

6   assumptions, you're like that sounds good enough for me, and

7   then you went and you moved on?

8   A    Well, I've been doing this for, like, over 20 years, so

9   based on experience they seemed reasonable to me, so yes.

10  Q    All right.  Well, so you didn't do any analysis of how

11  long any tax sharing agreement litigation would run; right?

12  A    Correct.

13  Q    And you have no idea how much that litigation will

14  cost; right?

15  A    Correct.

16  Q    And, sir, solvency, and in particular the solvency of

17  EFIH, is a factor in the opinions you rendered; correct?

18  A    It is.

19  Q    And in fact -- but you're not offering a valuation

20  opinion; right?

21  A    Correct.

22  Q    You assume EFIH was likely solvent for a period of time

23  from 2014 to 2016; right?

24  A    Yes, based on disclosure statements that said they were

25  being paid in full under those transactions; yes.

1  Q    And you did rely on the statements in the disclosure

2  statement; right?

3  A    Yeah.

4  Q    But in fact --

5         THE COURT:  Under transactions that were never

6  successful?

7         MR. ROBINS:  Correct.

8         MR. MCKANE:  Right, right.

9  Q    And in fact, the solvency of EFIH is a fundamental fact

10 differentiating your first and second opinions; right?

11 A    Yes.

12 Q    And you based your entire solvency assumption with

13 regards to EFIH on two indicia; right?

14 A    Correct.

15 Q    One of them was the projected recoveries in the PIK

16 notes in the debtor's disclosure statements; right?

17 A    Yep.

18 Q    And the other was on PIK note trading prices; correct?

19 A    Correct.

20 Q    And you're extrapolating out the projected value of the

21 trading prices for the PIK notes on all of the EFIH estate;

22 correct?

23 A    Primarily, I was looking at the projected recovery in

24 the disclosure statements as the basis for what you're

25 referring to.

1    Q    Right, disclosure statements and therefore any

2    assumptions that were made or closing conditions that were

3    built into the transactions and that the disclosure

4    statement related to carried through with that disclosure

5    statement; right?

6    A    Yeah.

7    Q    And, sir, with the trading prices you know as a

8    valuation professional that using trading prices of debt is,

9    at most, a secondary indicator of enterprise value; right?

10   A    Correct.

11   Q    And primary indicators of enterprise value would be

12   things like discounted cash flows and comparable company

13   transactions and (indiscernible) transactions; right?

14   A    Correct.

15   Q    And you didn't do that kind of classic investment

16   banker enterprise valuation; right?

17   A    I did not.

18   Q    And you learned at some point in time that the PIK

19   trading prices fell below par; correct?

20   A    Yes.

21   Q    And that was generally after the Third Circuit oral

22   argument in September of 2016; right?

23   A    Yes, yes.

24   Q    And that was because ultimately there was an order

25   rendered by the Third Circuit allowing make-whole claims

1    that put the PIKs behind $800 million in liabilities; right?

2    A    That sounds roughly right.  I don't remember exactly,

3    but yes.

4    Q    Approximately; right?

5    A    Yeah.  That sounds right.

6    Q    And, sir, that $800 million of additional liability in

7    front of the PIKs had a material impact on the projected

8    recoveries of the PIKs; right?

9    A    It did.

10   Q    And to determine solvency, you need to look.  You had

11   to look at the enterprise value of the debtors and the

12   liabilities of the debtors; right?

13   A    Correct.

14   Q    And you know that the risk of the make-wholes was

15   always in those projected plans; right?

16   A    The risk was, but they were premised on that risk not

17   effectuating, so that's how the recoveries were based.

18   Q    It was a closing condition of the transactions that the

19   make-whole ruling by Judge Sontchi not be reversed,

20   remanded, or revisited; correct?

21   A    That is correct.

22   Q    All right.  Let's talk about the bid procedures in

23   these cases; okay?  You understand that in 2014, the debtors

24   were authorized to solicit bids for sale of the E-side

25   assets in any form; right?

1    A    Yes.

2    Q    And it's your understanding that the debtors were open

3    to pursuing any all bids; right?

4    A    They were open to it, but it conveyed pretty clearly a

5    strong desire for a tax-free transaction, for good reason.

6    Q    For a tax-free transaction; correct?

7    A    Yes.

8    Q    They were open to whatever came in, but they made clear

9    that in their view, based on their assessment of the risk,

10   including in the tax memorandum that a tax-free transaction

11   looked more attractive to them; correct?

12   A    Yes.

13   Q    All right.  But you're not disputing that the actual

14   bid procedures order and the bid procedures approved by the

15   Court made clear that the debtors were authorized to solicit

16   procedures to acquire in any form and employ any structure

17   whether taxable or tax free, an E-side transaction?

18   A    I am not disputing that.

19   Q    And you think a tax-free transaction on the E-side was

20   value maximizing; right?

21   A    Yes.

22   Q    But you weren't asked to render an opinion on whether a

23   tax-free transaction was value maximizing; right?

24   A    I was not asked to render that opinion.

25   Q    And, sir, you're not aware of the PIK noteholders or

1    any group of ad hoc noteholder on at EFIH supporting a

2    taxable deal; are you?

3    A     No, not specifically.

4    Q     And you're not aware of any tax proposal for the E-side

5    that the debtors received; right?

6    A     Correct.

7    Q     And you're not even aware of a terms sheet that they

8    received; correct?

9    A     Correct.

10   Q     And you're not offering an opinion on the availability

11   of a taxable sale on the E-side; right?

12   A     Correct.

13   Q     Now if we could turn to Paragraph 38.  And then Page

14   12, the sentence that starts on Page 12, rolls over,

15   starting with the words, "Assuming."  You with me, sir?

16   A     Yes.

17   Q     All right.  And that sentence says, "Assuming the

18   debtor's investment banker's estimates reference to above

19   are correct, the increased proceeds from a taxable

20   transaction would have been more than offset the costs

21   incurred by prolonging consummation of a taxable transaction

22   until 2018 and resulted in a greater recovery to EFI's

23   creditors."  You see that, sir?

24   A     I do.

25   Q     Sir, what you're referring to there, that's a

1    hypothetical transaction; right?

2    A    Correct.

3    Q    Okay.  No one has ever identified a buyer that would do

4    this transaction; correct?

5    A    Not to my knowledge.

6    Q    And you're not offering an opinion regarding the

7    purchase price that could have been obtained for the sale of

8    Oncor Holdings in a taxable transaction; are you?

9    A    No.

10   Q    And that's because you're not aware of any purchaser

11   willing to pay the proposed $2 to $3 billion for the step up

12   in basis; right?

13   A    Correct.

14   Q    And you didn't actually do the analysis to calculate

15   the value and step up in basis, right?

16   A    Correct.

17   Q    Right.  That work came from Evercore analysis, right?

18   A    Correct.

19   Q    And that was a draft analysis that wasn't finalized

20   back in 2014, right?

21   A    Correct.

22   Q    And that's based on an illustrative sale price, right?

23   A    That's right.

24   Q    And this whole analysis, the reason why there was an

25   analysis necessary by Evercore was because to calculate a

1    step up in basis you have to determine what the net present

2    value will be of that basis, right?

3    A    Yes.

4    Q    Right.  Because essentially the basis is an opportunity

5    to take advantage of a tax attribute over time, right?

6    A    Yes.

7    Q    And it's tied to the value of the assets, right?

8    A    Correct.

9    Q    And the assets here are long dated assets with 15 and

10   20-year depreciation schedules, right?

11   A    Correct.

12   Q    And so you've got to figure out what's the tax value

13   over those 15 to 20 years and then use a discount rate to

14   bring it back to net present value, right?

15   A    That's right.

16   Q    And that's what Mr. (indiscernible)'s team at Evercore

17   did, right?

18   A    That's what they did.

19   Q    But you're not offering an opinion on the value of a

20   step up basis, right?

21   A    No I'm not.

22   Q    And you have no opinion as to what value and what

23   discounting to that value a purchaser would take.  Let me

24   say that again, that's terrible.  You have no opinion on

25   what value or what discounting a purchaser would do on the

1    ability to capture that step up in basis, right?

2    A    That's correct.

3    Q    Now, even in the scenario where you find somebody, you

4    find a buyer that's going to pay for that step up, you also

5    have to assume that that hypothetical buyer is going to be

6    able to keep the value of that basis through the regulatory

7    process, right?

8    A    That's right.

9    Q    Because unless Professor Abrahms, you know that these

10   are regulated assets, right?

11   A    Correct.

12   Q    And the Public Utility Commission of Texas could force

13   the buyer to give up the value of the step up, correct?

14   A    That is correct.

15   Q    Or they could force the buyer to share the value of

16   that step up with the ratepayers of Oncor, correct?

17   A    Yes.

18   Q    All right.  And you recall the Hunt Plan, right?

19   A    I do.

20   Q    And that contemplated a conversion of the E-side into a

21   REIT, correct?

22   A    Correct.

23   Q    And the Hunts ascribed material value to the ability to

24   convert the E-side into a REIT, correct?

25   A    Yes.

1    Q    And in its ruling on the change of control application,

2    the Public Utility Commission of Texas put restrictions on

3    the Hunts ability to capture the tax benefits associated

4    with the REIT, right?

5    A    That's right.

6    Q    And effectively, the Public Utility Commission of Texas

7    forced the Hunts to share some of the tax benefits they were

8    obtaining from the reconversion, right?

9    A    Correct.

10   Q    And the Hunts as a result exercised their right not to

11   close the deal.

12   A    Correct.

13   Q    Now, in addition to the Public Utility Commission of

14   Texas, there is a concern that the Internal Revenue Service

15   or the Department of Treasury would take steps to prevent a

16   purchaser from benefiting from a step up basis in a

17   transaction that left a stranded tax, right?

18   A    Yes.

19   Q    and the likelihood that a purchaser could be prevented

20   from obtaining the benefit of the step up was not something

21   you considered, right?

22   A    I'm not sure I agree with that.

23   Q    Let me say it this way.  The values that you ascribed

24   in your charts to the step up in basis, right, those are net

25   present value values, correct?

1    A    Correct.

2    Q    There's no additional discounting off that face value

3    for regulatory risk associated with not being able to

4    capture the value ascribed by the net present value

5    calculation, correct?

6    A    Correct.  I simply took Evercore's work and used that

7    as the basis for the assumption.

8    Q    Right.  And to the extent that the $2 billion

9    valuation, that net present valuation, had additional risks

10   associated with it, either a Public Utility Commission risk

11   or an IRS risk, that's going to reduce that face value of $2

12   billion, right?

13   A    Correct.

14   Q    And in your declaration you added a statement that

15   you're not offering any opinions on the effect of federal or

16   state law or federal or state claims that could result as

17   account of a taxable spin-off or disposition of Oncor,

18   right?

19   A    Could you repeat that please?

20   Q    Yeah, that was bad.  I'm sorry about that.  It's

21   paragraph 11.

22           THE COURT:  That clock is actually a little slow.

23   Can we take a break?

24           MR. MCKANE:  Yeah, we can break now.  Sure.

25           THE COURT:  Okay, we're going to take a short

1    recess.  My staff will let you know when I'm ready to go

2    again.  Sir, Mr. Robbins, you may not discuss the substance

3    of your testimony with any person during the break.  Okay?

4            MR. ROBBINS:  Okay.  Understood.

5            THE COURT:  Thank you.

6        (Recess)

7            CLERK:  All rise.  Please be seated.

8            THE COURT:  Okay, half an hour, not too bad.

9    Sorry for the break.

10           MR. McKANE:  Not at all, Your Honor.  I

11   understand.

12   Q    Mr. Robbins, I think where we left off, we were looking

13   to paragraph 11 of your testimony.  And it's the end of page

14   three, roll over to page four.  Are you with me, sir?

15   A    Yes, I am.

16   Q    And you see the statement there, where you say, "I am

17   not offering any opinions on the effect of any federal or

18   state tax laws, or federal or state claims that could result

19   from a taxable spinoff or other disposition of Encore

20   Holding."  You see that, sir?

21   A    I do.

22   Q    And you stand by that statement, right?

23   A    I do.

24   Q    But sir, you understand that the IRS made clear in

25   these cases that the IRS would consider a number of

1    alternatives for preventing a step-up in basis when there is

2    a standard tax, right?

3    A    Yes.

4    Q    And, in fact, the Department of Justice objected to the

5    Debtor's bid procedures motions raising that issue, correct?

6    A    Correct.

7    Q    And you understood that it was the stated position of

8    the United States government that they would oppose any plan

9    of reorganization that yielded a stranded tax, right?

10   A    Yes.

11   Q    And the magnitude of that standard tax was $3.4

12   billion, right?

13   A    That was the estimate, yes.

14   Q    And you expected that if the Debtors wanted to pursue a

15   taxable deal for the E side, that's the United States

16   government would (indiscernible), right?

17   A    Yes.

18   Q    And you were involved, you were evaluating this issue

19   for the T side, right?

20   A    I was.

21   Q    And TCEH, that's an LLC, right?

22   A    Yes.

23   Q    It's a (indiscernible) entity, right?

24   A    Correct.

25   Q    So, when you're doing this analysis for your prior work

1    as a financial advisor for the T side, you're similarly

2    situated to EFIH with regard to many of these risks, right?

3    A    That's right.

4    Q    And sir, in preparing your analysis, you didn't do any

5    assessment of the time, cost of delay associated with the

6    protracted plan confirmation process, right?

7    A    Not specifically, because, again, it would affect both

8    EFH's interest in doing a taxable transaction as well as the

9    FIH.  So, either way, when you factored in that risk to

10   weigh cost it favors a tax-free transaction.  But that's

11   true of the FH and the FIH.

12   Q    And we'll get there in a minute, but of those two

13   entities, EFH and EFIH, only one has an interest that's

14   accruing as a cash pay obligation, right?

15   A    Only one does.  And one, I think everyone pretty much

16   understood, had a significant administrative claim for the

17   tax liability as well.

18   Q    And let's go through that.  So, based on your overall

19   experience, you know the government has a number of tools

20   available to it, to attack a plan of reorganization, right?

21   A    Correct.

22   Q    And the government could oppose the motion to approve

23   the underlying sale or merger agreement, right?

24   A    It could.

25   Q    The government could oppose the proposed confirmation

Page 186

```
 1    of the plan, right?

 2    A    Yeah.

 3    Q    And, to your point earlier, if the IRS asserted a claim

 4    for a stranded tax, that's an administrative claim, right?

 5    A    I would expect it is, yes.

 6    Q    And an administrative claim at the EFIH level would be

 7    senior to the PIK note holders, correct?

 8    A    It would be senior to the PIK note holders, that --

 9    obviously true at the EFH level as well.

10    Q    Right.  And sir, the Debtors, to the extent that

11    there's an administrative claim that could not be satisfied,

12    that it's your understanding based on your restructuring

13    experience, that those debtors couldn't emerge from chapter

14    11, correct?

15    A    Correct.

16    Q    And a contractual claim, to the extent that it arose

17    under the tax sharing agreement, that would potentially be a

18    general unsecured claim, right?

19    A    Right.

20    Q    And a contractual claim for a TSA claim, that is

21    asserted by EFH, the parent, against EFIH, would be a claim

22    that would be likely be pari passu to the PIKs in a plan,

23    correct?

24    A    Correct.

25    Q    And if EFH had asserted a claim against EFIH for a tax
```

1    of $3.4 billion that was pari to the PIKs, rough numbers,

2    given the size of a $3.4 billion tax claim relative to the

3    size of the PIKs, that would dilute their recoveries by two-

4    thirds, right?

5    A    Rough numbers, yes.

6    Q    And you'd expect that those are the kind of risks the

7    Debtors were evaluating concerning whether to put together a

8    plan, right?

9    A    Yes.

10   Q    And, in fact, the Debtors did consider those risks,

11   correct?

12   A    Correct.

13   Q    Now, let's go to your chart.  In your written direct

14   you did two charts, right?  One from EFH perspective and one

15   from an EFIH perspective, correct?

16   A    Correct.

17   Q    Let's go to the second chart, the EFIH perspective.

18   And if we can just put that up on the screen while we walk

19   through this.  Sir, I'm going to get to the chart in a

20   minute.  I just have a couple of initial questions.  In your

21   analysis, you're evaluating the incremental benefits that

22   may be available based on -- in addition to what's already

23   there from a tax-free basis, if the Debtors were to pursue a

24   taxable loan, right?

25   A    Correct.

1    Q    And, in fact, in doing that, just to cut through it,

2    it's a relative benefit analysis, correct?

3    A    Could you just explain that?

4    Q    Sure.  So, basically, what you're saying yourself is,

5    you know, you are only looking at the, essentially, the

6    variable of the value of the step up relative to the

7    potential risks of a claim being asserted against the

8    (indiscernible), correct?

9    A    Yeah.  It's essentially looking at -- if you pursue a

10   taxable transaction, the cost of that, the biggest cost is

11   the tax liability.  So, it looks at, for each entity, the

12   likelihood or the percentage of that tax to be assessed to

13   that entity, and it would compare that to the potential

14   incremental proceeds that would come in from the, again,

15   hypothetical higher cash price for a taxable deal.

16   Q    Okay.  And that's the key, the potential incremental

17   proceeds, right?

18   A    Correct.

19   Q    All right.  And sir, while you're evaluating the

20   potential incremental proceeds, as you've done in this

21   analysis, you specifically do not take into consideration

22   the $9 billion of distributable value in the tracks, that

23   may be available to EFIH in a tax-free transaction, right?

24   A    No.  Again the difference, the two differences between

25   taxable and tax free is in the taxable we have this massive

1    tax liability, so that's the negative, obviously.  And then

2    comparing that to the incremental proceeds.  So, just that

3    delta between taxable and non-taxable, using those

4    assumptions.

5    Q    Right.  And then that's what this analysis says because

6    it's in that incremental benefit that you're focusing on,

7    right?

8    A    Correct.

9    Q    Okay.  And you agree that you need to risk discount the

10   value of that potential benefit, that potential step up in

11   basis for, for example, the Public Utility Commission risk

12   or the IRS risk, right?

13   A    Absolutely.

14   Q    And because you took that -- and let's just talk about

15   the values you have here.

16   A    Sure.

17   Q    The left-hand column you have -- that's $1.8 billion,

18   right?

19   A    Correct.

20   Q    That's $1.8 billion for a projected value of the net

21   present value of a step up in basis, right?

22   A    Yes, that's the low end of the Evercore estimate.

23   Q    And you're taking this from Evercore, where Evercore

24   basically did a net present value calculation of the step up

25   at an assumed value, right?

1    A    That's right.

2    Q    And the illustrative value that generated this $1.8

3    billion is $18 billion in the hypothetical transaction,

4    right?

5    A    I think that's --

6    Q    And it's $18 billion and an eight percent discount rate

7    to bring those values back to present day, right?

8    A    That sounds right, yeah.

9    Q    Okay.  And so, that's the left-hand column.  In the

10   middle column, the 2 billion and 68 million -- you there,

11   sir?

12   A    Sixty-nine, yes.

13   Q    Sixty-nine million, sorry about that.

14   A    That's all right.

15   Q    That value is, again, a calculation of a net present

16   value done by Evercore, right?

17   A    That's right.

18   Q    And the work there is, again, assumed $18 billion

19   illustrative transaction, right?

20   A    Yes.

21   Q    And then a different discount rate.  It's a six percent

22   discount rate, bringing that back to present value, right?

23   A    That's right.

24   Q    Okay.  And so, and that yields the $2 billion number,

25   right?

1   A     Correct.

2   Q     Then you get to the third number, right?

3   A     Yeah.

4   Q     And the third number is $3.5 billion, $3.514, right?

5   A     Correct.

6   Q     All right.  And that number is based not on an $18

7   billion illustrative value, but on a $25 billion

8   illustrative value, right?

9   A     Yeah, I think that's right.  It's the high estimate in

10   the materials that Evercore (indiscernible).

11   Q     And the high value -- you're not aware of any buyer,

12   anywhere, at any point in time that, as I suggested, that

13   the E side, the estate was worth $25 billion, right?

14   A     I am not.

15   Q     And in fact, you don't think that that's a plausible

16   scenario, correct?

17   A     Personally, no.

18   Q     So, personally, you would say if we -- and if the Court

19   were to conclude it is absolutely not plausible or

20   reasonable that a buyer is going to come forward and pay $25

21   billion in enterprise value, we could take out that right-

22   hand column, right?

23   A     Certainly.  And I think a board looking at this

24   probably would have as well, you know, as they tried to

25   gauge what's reasonable I would assume they would do that as

1    well.

2    Q    And if you were the TCH financial advisor advising Mr.

3    Sawyer at a time where they're saying we should consider

4    whether we're going to get $25 billion for the E side, and

5    you, on the T side had a potential client in the E side,

6    you'd be telling Mr. Sawyer, "I do not believe a $25 billion

7    enterprise value is reasonable or likely in this

8    transaction," correct?

9    A    I suppose.

10   Q    All right.  So, whatever these values are, the net

11   present values that are up on top, you then have to risk

12   discount them for the likelihood that a buyer is going to be

13   able to actually actualize this value, this net present

14   value, right?

15   A    Look, what you're going to do is decide whether you

16   wanted to really run a process and find a buyer to do this

17   or not.  You need to have a bid that either would show this

18   or not, and then you'd compare that to the tax liability and

19   you'd make a decision which way you'd want to go.

20   Q    Well, you're focusing on the imposition of the tax

21   liability.  What I'm talking for you is, there's another

22   risk that you didn't factor in, which is the Public Utility

23   Commission of Texas basically saying, "I'm not going to let

24   you capture that value.  I'm going to force you to share it

25   with the rate payers," right?

1    A    What you're missing is, you would, hypothetically, do a

2    taxable transaction, but only do it if you actually had a

3    transaction; you would have a transaction with a number that

4    would reflect all that.  So, you would compare that, think

5    about what you thought your tax risk was and these other

6    risks, and you'd make a decision.

7    Q    And the issues that I'm struggling with is the

8    purchaser is going to say I have the ability to potentially

9    get this stuff up in basis, right?  And I'm willing to pay -

10   - let's use $18 billion -- I'm willing to pay $18 billion

11   for this transaction.

12   A    Right.

13   Q    And I'm looking at this value, just on a net present

14   value basis, of $2 billion, right?  I'm just using the

15   middle column.

16   A    Yeah.

17   Q    And if it's worth $2 billion, right, I don't get that

18   $2 billion of value day one, I have to pay for it.  But I

19   don't want to -- able to capture that over 15 or 20 years

20   based on my depreciation, right?

21   A    Correct.

22   Q    Okay.  And if I'm the buyer and I'm looking at this

23   potential $2 billion, I have to ask myself, what are

24   potential risks that I'm not able to capture all that value?

25   And I'm coming out of pocket on the front end, contractually

1    agreeing to pay a certain price, and I don't know until six

2    months, nine months, 12 months later, whether the Public

3    Utility Commission of Texas is going to say whether I get to

4    keep the $2 billion of value or whether I have to share some

5    of it with the right payers, right?

6    A    You would factor all that in and determine your price.

7    That's all I'm saying.

8    Q    Right.  And so, what you were really saying is it's

9    very unlikely that a buyer is actually going to pay 100

10   percent dollars for the potential net present value.  You're

11   going to have to reduce this amount by the buyer's

12   perception of risks, that I'm not actually going to

13   actualize that full $2 billion.

14   A    You don't know until you actually have a bid in hand.

15   Again, the whole point of this is that Evercore did an

16   analysis that made these assumptions and suggested there

17   could be, potentially, more proceeds.  A bidder might look

18   at that and just consider, look, should we consider going

19   that route, and seeing if it comes fruition or not.  I think

20   what my opinion is, and my testimony is, that the board

21   decided to go tax free, both boards did; it benefitted both

22   of them.  And there's very good and clear reasons why they

23   both wanted to pursue a tax-free transaction.  The

24   (indiscernible) this is that there are these scenarios based

25   on things that Evercore said -- Evercore, the investment

1   banker for the Debtor -- said you could (indiscernible) at

2   least pause and think about the question of should we push

3   harder for a taxable transaction in this scenario.  And

4   that's all this says.  Again, you wouldn't hypothetically

5   incur the tax liability and hope someone shows up with two

6   billion extra dollars.

7   Q    Understood that you're not suggesting that it's a

8   hypothetical where you incur the tax first and then see if

9   the money shows up second, but is it your testimony that you

10  think that the boards at the EFH level or the EFIH level

11  didn't maximize enterprise value by pursuing a tax-free

12  transaction?

13  A    Please repeat that.

14  Q    Sure.  You understand those boards are charged, under

15  Delaware law and Texas law, with the duty to maximize

16  enterprise value, right?

17  A    Correct.

18  Q    You're not opining that they didn't maximize enterprise

19  value by pursuing the transaction it did, right?

20  A    Far from it, just the opposite.

21  Q    And in fact, but here what you're suggesting is could

22  they, or should they have evaluated further a taxable

23  transaction based on this perception that a buyer would pay

24  more for a step up, right?

25  A    No.  The question is just, are there scenarios where it

1    would have benefitted EFIH to pursue a taxable transaction?

2    Q    Sir -- I apologize, go ahead.

3    A    And there are, at least hypothetical, scenarios one

4    might have come up with.  That's the only point.  But it's

5    not that they should have done that.  You know, frankly, you

6    look at -- nobody here is questioning the business judgment

7    of the Debtors.  Let's be very clear.  My opinion is that

8    both estates benefitted from a tax-free transaction.

9    Q    Sir, what I'm struggling with is, in part because you

10   were there, you were an advisor to the T side,

11   (indiscernible) director during these discussions.  Isn't it

12   true the Debtors' boards did consider these scenarios and

13   did evaluate whether there's a taxable transaction?

14   A    The Debtors -- yeah, I mean look, the view was pretty

15   clearly that a taxable transaction was not going to be value

16   maximizing.  As you pointed out earlier, they did put in the

17   bid procedures.  Look, if someone has a -- can surprise us,

18   we'll look at it.  Now, again, this point about being after

19   2017, it's at least theoretically possible that the

20   independent at EFIH no longer look at it 100 percent

21   dollars, would say, "Maybe I should revisit it."  That's the

22   only point here.

23   Q    Right.  And based on your experience and everything you

24   observed as advisor to the T side, do you have any

25   understanding as to whether Mr. Cremens didn't fully

1    evaluate all the options available once it became clear that

2    the EFIH estate was not going to receive 100 percent value?

3    A    I wasn't at any EFIH meeting, and in 2017 I wasn't

4    involved in the case, so I don't know.

5    Q    Let's go back to the chart for a second.  So, you're

6    projecting out the step up to $2 billion.  You don't know if

7    a buyer is going to pay a full $2 billion, right, because

8    you've got certain risks, and one of those risks is the one

9    we talked about with the PUCT saying, "I'm not going to let

10   you capture all that risk."

11   A    That's correct.

12   Q    Another risk you have is the value that's being put

13   forward here by Evercore, it's a tax attribute, right?

14   A    That's right.

15   Q    The tax law, and because of these, they're elongated

16   assets, you've got to make an assumption about whether the

17   tax laws are going to change in the next 15 to 20 years,

18   right?

19   A    Correct.

20   Q    And, in fact, the corporate tax law did change just

21   three years after this analysis was done, right?

22   A    Yeah, that's right.

23   Q    And under the current tax laws, corporate tax went from

24   15 percent down to 21 percent, right?

25   A    Say that again.

1   Q   The corporate tax rate went from 35 percent -- I'm

2   sorry -- 35 percent down to 21 percent, right?

3   A   I believe that's correct, yes.

4   Q   So, if the value here is $2 billion based on a

5   corporate tax rate of 35 percent, right, this value would

6   drop by a third or more given the fact that for the vast

7   majority of this depreciation schedule that we're looking

8   at, the tax rate is 21 percent instead of 35 percent.

9   A   That sounds right.

10   Q   Now, let's talk about the left-hand side.  Left-hand

11   side here at EFH is a percentage tax liability forecasting

12   out the likelihood of a tax that could be imposed down at

13   the EFIH level, right?

14   A   Correct.

15   Q   And the way you ran the analysis, you just ran the

16   analysis assuming that the liability, the $3.4 billion

17   illustrative liability is coming in as an administrative

18   claim, right?

19   A   Wherever it comes in, yes, that's right.

20   Q   Okay.  You understand there could be a contractual

21   claim that could come in, in addition to this risk, right?

22   A   In addition, but it's an alternative risk.  You can pay

23   the administrative claim and the contract claim.

24   Q   All right.  So, when you wrote this and you had the

25   zero to 100 gradation, for the percent tax liability, is

1    that based on federal tax risk or all tax risk?  Federal tax

2    risk, state claims, the whole nine?

3    A    That would just assume total tax risk.

4    Q    Okay.  But the fact that you didn't take in

5    consideration, specifically in this two variable analysis,

6    is time, right?

7    A    Correct.

8    Q    Because you know that the tax matters agreement bars

9    any taxable transaction for a period of time after the T

10   side (indiscernible), correct?

11   A    That's correct.  Just to be clear, so that's true that

12   it's not factored in here, it's not factored in the EFH

13   side, right.  That time issue, is an incentive for both

14   estates to pursue a tax-free transaction, do it quickly.

15   Q    But here, in the EFIH analysis, what you're saying is,

16   essentially, you're trying to evaluate whether it makes

17   sense, green; or it doesn't make sense, red; (indiscernible)

18   this analysis, and it's just looking at value and potential

19   liability.  It doesn't factor in the time and the cost

20   associated with pursuing this path, right?

21   A    That's correct.

22   Q    Okay.  And in your declaration, you make reference that

23   the taxable deal would not occur until October of 2018,

24   right?

25   A    I say that I understand -- we can look at it exactly --

1    but my understanding was that there was a potential

2    inability to get a injunction until that time.  So, I

3    assumed -- as I thought about it, you know, that it wouldn't

4    happen before that.

5    Q    And that's an acknowledgment of the two-year window in

6    which the T side had the ability to enjoin the E side,

7    including EFH, from pursuing a taxable transaction, right?

8    A    That's right.

9    Q    And it was your understanding that EFIH would need to

10   wait until the TMI's two-year moratorium passed to

11   consummate a taxable deal, right?

12   A    I know they didn't have an understanding.  I think I

13   just included a sentence that even if you assumed that time

14   had to pass, and interest and expenses were paid, and that

15   came off the top, you could still envision scenarios where

16   this might make sense.  That's all.

17   Q    Well, and sir, we'll get to the cost of that time in a

18   minute, but in the variables, there are only two variables,

19   you also didn't take into consideration the lost opportunity

20   cost to an EFIH creditor of waiting, potentially, two more

21   years to get their proceeds and then redeploy them into

22   potentially profitable assets, right?

23   A    Correct.

24   Q    And so, we know that the EFIH estate was accruing $50

25   million a month in secured interest, right?

1    A    Correct.

2    Q    And that's a cash-pay obligation, right?

3    A    Yes.

4    Q    And to the extent that the secured interest accrued at

5    $50 million a month, that reduces recoveries for the PIKs,

6    assuming a fixed, or a constant distributable value, right?

7    A    For the PIKs and for EFH creditors as well.

8    Q    And in your analysis of what it would cost to prosecute

9    this type of transaction, to potentially get this step up in

10   value, you assumed an additional $10 million a month for

11   professional fees, right?

12   A    Yes.

13   Q    So, what we're really talking about is to go down this

14   path, we're looking at a potential $60 million a month in a

15   burn rate, right?

16   A    Yes.

17   Q    And your analysis, we start that process at or around

18   the time when the NextEra plan failed, right?

19   A    Yes.

20   Q    And you assumed that that taxable transaction would be

21   consummated in October of 2018, right?

22   A    I don't really specifically assume any of that.  I just

23   said if you think about that contractual overlay against

24   this analysis, might it still make sense?  If, for example,

25   the costs of that were going to be $5 billion, then this

1    might be a shorter discussion we're having right now.  But

2    that was the only point of that.

3    Q    So, you know that there's the two-year moratorium and

4    that expires in October of 2018.

5    A    Right.

6    Q    And we know that the NextEra deal failed and was

7    ultimately terminated approximately July of 2016, right?

8    A    Correct.

9    Q    And so, what we're really talking about is a 16- to 18-

10   month potential window, theoretically, that may it may take

11   before there could be a consummation of a taxable

12   transaction, a hypothetical transaction, on the E side,

13   right?

14   A    Potentially.

15   Q    So, if you're a board member evaluating this around the

16   time of the NextEra deal, you know that based on an analysis

17   like yours, that you're looking at $60 million a month in

18   burn rate for approximately 16 to 18 months, right?

19   A    Right.

20   Q    And you know, as a financial advisor, that 16 million

21   times 16 or 16 million times 18 yields approximately 960 to

22   1.08 billion in cost for that period of time, right?

23   A    That's right.

24   Q    So, in looking at the analysis and factoring just those

25   costs, using, say, the middle column, right, if the cost of

1    pursuing it were a 1.8 billion, right, even under this

2    scenario, even if there was a 20 percent chance of tax

3    liability, the costs of pursuing it, of the 1.8 billion, are

4    roughly pari to what the result would be, right?

5    A    Correct.

6    Q    And that's assuming you get a full $2 billion, you get

7    a buyer to pay for all that, recognizing that there's tax

8    risk and PCT risk associated with that.

9    A    Right.  But you wouldn't sit around and assume that.

10   You would either -- can make a decision whether you thought

11   it was worth looking for a taxable buyer or not.  And this

12   analysis doesn't say that's what should have happened.  And

13   I think, as I've testified, clearly, I don't think that's

14   what should have happened.  The point is the tax-free deal

15   benefitted both estates.  And the only point of this is in

16   the post-2017 period, there is at least some arguments one

17   might make for EFIH to consider a taxable, in ways that were

18   stronger than EFH, where my opinion for EFH, it never would

19   have made sense to do a taxable deal.

20   Q    So, very basic level, you believe that it never would

21   have made sense for EFH to go down taxable deal.

22   A    Correct.

23   Q    And that there may be a scenario under which EFIH would

24   go down that path, right?

25   A    There potentially could have been, yes.

1   Q    There potentially could have been, but yet -- one of

2   the things we know about this case is that it's very public.

3   A    Correct.

4   Q    Right?  Nothing about this transaction -- strike that -

5   - you're not aware of any buyer, through this highly public

6   restructuring, ever coming forward and proposing a deal,

7   either before or after the NextEra transaction failed, that

8   was taxable, right?

9   A    Correct.

10  Q    And if the Court concludes that's the facts, my

11  findings are there was no taxable deal, this was an

12  efficient marketplace, there was public information about

13  this, and not taxable deal ever surfaced -- that's

14  sufficient for the Court to disregard the remainder of your

15  analysis, right?

16  A    I don't think so.  I mean, again, my opinion is that

17  the tax-free transaction benefited both estates.  That would

18  still clearly support that.  And then the question is

19  whether there was -- again, it's a little bit nuanced in the

20  relative benefit between the pre-2017 period and afterwards.

21  But it's my opinion, in both cases, that both estates

22  benefited from pursuing a tax-free transaction.

23          THE COURT:  What would it benefit to EFH in

24  pursuing any reorganization after the NextEra deal

25  collapsed, as opposed to simply converting to chapter seven,

1    liquidating its assets and paying off its noteholders, and

2    cutting off the burn of the expenses of the chapter 11?

3            MR. ROBINS:  At EFH?

4            THE COURT:  Yeah.

5            MR. ROBINS:  It's my understanding from the tax

6    memo that that would have triggered the tax as well; that

7    sort of any transaction at EFH would have triggered the tax

8    liability because the negative basis, and that would have

9    created administrative expenses at EFH that would wipe out

10   the unsecureds at EFH.

11           THE COURT:  So, if EFIH did a deal, even if EFH

12   was in seven, EFH would get the tax liability?

13           MR. ROBINS:  That was my understanding but I'll

14   defer to others here in the room.

15           THE COURT:  Okay, thank you.

16   Q    And just one final question, Mr. Robins, beyond your,

17   the conclusion that you reached, that both estates

18   benefitted, you're not able to say with any certainty

19   whatsoever, which one benefitted more?

20   A    I'm really not.

21   Q    I have no more questions.

22           THE COURT:  Thank you, Mr. McKane.

23           MR. WELSH:  No questions, Your Honor, for

24   (indiscernible).

25           THE COURT:  Okay, redirect?

1            MR. WELSH:  Just a few lines on redirect, Your

2     Honor.

3            THE COURT:  All right.

4              REDIRECT EXAMINATION OF BRADLEY ROBINS

5     BY MR. WELSH:

6     Q    Mr. Robins, just with regard to your last bit of

7     testimony on the tax matters agreement, when was the Sempra

8     plan effective, do you recall?

9     A    I think it became effective early this year.

10    Q    Does March sound approximately right?

11    A    Yeah, March, yes.

12    Q    So, in terms of the testimony that Mr. McKane was

13    eliciting with respect to the time value effects on interest

14    rate burn, professional fee burn, is that relevant, that

15    time period between the time the Sempra plan went effective

16    and the October 2018 date under the tax matters agreement,

17    relative to your analysis of the effects of that on the

18    potential model?

19    A    Potentially, it would reduce that amount.  But again,

20    that amount would impact both estates so to me it's not a

21    significant difference.

22    Q    In terms of your evaluation -- strike that.  Can you

23    talk a little about how you evaluated the economic benefits

24    to EFH, EFIH, the relative benefits to EFH, EFIH, on the one

25    hand compared to contractual undertakings and agreements

1   that may have been entered into during the course of the

2   case, such as the tax matters agreement?  Can you just talk

3   about how those two concepts interact in your analysis?

4   A    The analysis was primarily focused on the benefit of

5   avoiding a tax in a tax-free transaction, and comparing that

6   and thinking about that compared to the potential cost of

7   reduced proceeds.  I think the, you know, the contractual

8   issues would certainly be an overlay and something a board

9   would consider, but it was not a driving factor in my

10  thinking.

11  Q    Would the contractual issues apply to more process

12  issues; how to get from here to there?  What might affect

13  how to get from there to there, as opposed to the relative

14  benefits to each estate of pursuing a taxable versus tax-

15  free alternative?

16  A    Yes.

17  Q    Let me just ask a few questions about the testimony

18  that Mr. McKane elicited with respect to the PUCT's supposed

19  ability to deny the benefit of a taxable transaction, or

20  take away some of the benefit of the taxable transaction.

21  Do you remember that testimony?

22  A    Yes.

23  Q    Do you have an understanding, Mr. Robins, of the term

24  ring fence?

25  A    Of what?

1    Q    Ring fence?

2    A    Yes.

3    Q    What does ring fence mean to you?

4    A    To me it means, when the original LBO was set up, the

5    PUCT insisted that Encore be organized with minority

6    stockholders and independent directors so that, to the

7    extent the parent company got into financial trouble, Encore

8    would not be affected by that.

9    Q    So, I think you said it, just to clarify, where in the

10   corporate structure does the ring fence exist?

11   A    Encore Holdings.

12   Q    And where in the corporate structure does the PUCT's

13   regulatory authority exist?

14   A    At that level at Encore.

15   Q    And where in the corporate structure would a step up in

16   basis from a taxable transaction occur?

17   A    In my understanding as a non-tax person, is either in

18   the stock of Encore, or in the assets of Encore, but I'm not

19   certain.

20   Q    Sorry, which entity in the corporate structure would

21   receive, effectively, the tax benefit of a step up in basis?

22   A    I think Encore Holdings would.

23   Q    Okay.  And does the PUCT have regulatory authority over

24   the tax attributes of entities above Encore?

25   A    No.

1           MR. WELSH:  I have no further questions, Your

2     Honor.

3           THE COURT:  Re-cross?

4           MR. McKANE:  Oh yes.

5           THE COURT:  I thought so.

6            RE-CROSS-EXAMINATION OF BRADLEY ROBINS

7     BY MR. McKANE)

8     Q    Mr. Robins, I need to explore that last line of

9     questions.  I recognize you may not be an expert in the

10    Texas PURPA regulatory scheme, or the actions of the Public

11    Utility Commission of Texas.

12    A    Yes.

13    Q    But is it your opinion that the Public Utility

14    Commission of Texas couldn't block Encore Delivery or Encore

15    Holdings from making a dividend to their parents, their new

16    owners, if they thought it was inconsistent with their

17    statutory obligations?

18    A    Yeah, I don't know that I believe they could prevent

19    that.

20    Q    And so, you understand that the ring fence that

21    currently exists for Encore and Encore Holding, fully

22    empowers solely Encore to make the decision as to whether

23    it's appropriate and under what circumstances does the

24    (indiscernible) give them to the parent, right?

25    A    That sounds -- I have no reason to disagree with that.

```
1    Q    That sounds like something you've heard before, right?

2    A    I have no reason to disagree with that.

3    Q    The purchaser here, the new parent, would be outside

4    that ring fence, right?

5    A    Correct.

6    Q    And you understand the purchaser who is going to be

7    paying this money for this step up in basis, is going to be

8    solely subject to the ring-fenced entity (indiscernible)

9    decision as to whether to declare a dividend up to the

10   parent, right?

11   A    To declare dividends, yes.

12   Q    Right.  And you don't know whether the regulator can go

13   to conditions and under what circumstances that Encore can

14   declare those dividends, right?

15   A    Correct.

16   Q    Now, the binder in front of you, sir?

17   A    Yes.

18   Q    If you could turn to PAB X329.  Are you there, sir?

19   A    I am.

20   Q    All right.  As you see, it's PAB X329 on the top -- you

21   with me?

22   A    Yes.

23   Q    And you also see it says "Robins 12" below?

24   A    Yes.

25   Q    Right, because we used this in your deposition, right?
```

1    A    Correct.

2    Q    Okay.  Because this is the order by the Public Utility

3    Commission of Texas with regards to the change of control

4    application by Encore Electric Delivery Company and others

5    relating to the Hunt deal, right?

6    A    Correct.

7    Q    Because you recognize those names Ovation acquisition

8    one, and Ovation acquisition two, and Sherry, as hub-related

9    entities, correct?

10   A    I do.

11   Q    And sir, if I could direct your attention to page nine,

12   and the page numbers are up on top.  Do you see the last

13   paragraph, middle of the page that starts, "Subject to"?

14   A    I do.

15   Q    You see specifically where it says, quote, "Subject to

16   the results of the rule making on federal income tax

17   expense, if Ovation acquisition one elects to be taxed as a

18   REIT and exposes rate payers to the risks associated with

19   this structure," comma, "... any reduction in their federal

20   income tax expense resulting from the use if the REIT

21   structure may be reflected in rates such that the savings

22   are shared with the rate payers."  You see that, sir?

23   A    I do.

24   Q    And is that statement consistent with your

25   understanding of the actions actually taken by the Public

1    Utility Commission of Texas with regards to the Hunt

2    transaction?

3    A    It is.

4    Q    And is it your understanding that that statement was a

5    but-for cause for the Hunt transaction failing?

6    A    That is my understanding.

7    Q    I have no further questions.

8              THE COURT:  Anything else?

9              MR. WELSH:  Nothing further, Your Honor.

10             THE COURT:  Thank you, Mr. Robins.

11             MR. ROBINS:  Thank you.

12             THE COURT:  All right.  I have Mr. Horton next on

13   the list.

14             MR. McKANE:  Your Honor, just to remind you, there

15   is an issue, I think, with regards to the scope of Mr.

16   Horton's testimony that we may want to argue in advance of

17   actually him taking the stand.

18             THE COURT:  Yeah, well let's do that then.

19             MR. NESTOR:  Good afternoon, you know, Mike

20   Nestor, Kirkland & Ellis on behalf of the PAB.  I've

21   actually prepared highlighted copies of that written direct

22   which I'm prepared to hand up, and cede the podium for the

23   objections.

24             THE COURT:  Okay.  Please hand up the highlighted

25   copies.  Who's going first?

1          MR. GLENN:  Sorry, Your Honor.  Your Honor, for

2     the record, Andrew Glenn, Kasowitz Benson Torres LLP, on

3     behalf of the ad hoc committee.  Our primary objection to

4     Mr. Horton's testimony is rooted in section, Federal Rule of

5     Evidence Rule 701.  Mr. Horton purports in the relevant

6     provisions that we have highlighted in our objection, to

7     provide opinion testimony as to the outcome of the

8     allocation motion.  Were he identified as an expert he would

9     have been required to disclose his methodology for how he

10    comes up to specific allocations that have been proposed by

11    the PAB.  He didn't do that.  So, he's been proffered, you

12    know, as a lay witness in this case.

13          I'd like to draw your attention to the relevant

14    provisions very briefly, starting with paragraph six.  Mr.

15    Horton's testimony -- strike that.  Mr. Horton's testimony

16    sets forth the PAB's allocation proposal, in paragraph six,

17    and highlights the considerations that went into Mr.

18    Horton's opinions.  Just to highlight one particular

19    example, bullet point three in paragraph six says that he

20    weighted the litigation risk for each estate in litigating

21    the allocation of each material administrative expense claim

22    in this case.  He then provides in paragraph seven his

23    proposed allocation for each of the disputed buckets.

24          Now, if Your Honor then proceeds onto paragraph

25    26, and he says there, "Based on the foregoing, and weighing

1     the relative strengths and weaknesses of the arguments of

2     the estates, the PA believes in that allocation for that

3     particular bucket."

4            Moving onto paragraph 52, based on the foregoing,

5     and weighing the relative strengths and weaknesses of the

6     arguments of both estates, the PA believes in the allocation

7     of the substantial contribution claim.

8            The Third Circuit has cautioned in a case I will

9     site, Hirst v. the Inverness Hotel Corp., 544 Fed 3rd 221,

10    that opinion testimony on the ultimate issue before the

11    Court is seldom allowed.  Now, we don't dispute that Mr.

12    Horton can testify as to whether something was a benefit to

13    a particular state or not.  What we are contesting, Your

14    Honor, is his use of a number attached to his perception of

15    a benefit without any explanation and just a conclusion.  He

16    testified to, in his deposition, was that for most of the

17    categories he considered all these things and viewed them

18    as, I think he used a mixing bowl, or a mixing bucket, and

19    came out with the number.  There's no methodology that links

20    the factual underpinnings of the benefits to those specific

21    numbers.

22            Now, the Third Circuit, in this opinion, says that

23    whatever rational perceptions that -- whatever perceptions

24    that the witness articulates as a lay opinion expert, has to

25    be rationally linked to a conclusion, and seldom is it

1    allowed that those conclusions are the ultimate facts that

2    the Court has to conclude.  But particularly because he has

3    set forth that all these things are a mixing bowl, what he's

4    essentially saying in his testimony is that he is weighing

5    the relative strengths and weaknesses of the arguments that

6    each side is making, as opposed to specifically linking the

7    facts to his conclusion.  So, he's usurping Your Honor's

8    ultimate duty in this case.

9            Now, I understand this is not a jury trial, and I

10   understand Your Honor is well equipped to be able to weigh

11   these things if Your Honor chooses to allow it.  But we

12   think that the evidence is so scarce, both with Elliott --

13   and this will come up with Mr. Rosenbaum's testimony, where

14   he's going to take the stand and do the exact same thing --

15   that this is the only evidence that we think, for most of

16   the reallocation that are going to be proposed.  So, if it

17   gets in there might be some evidence; if it doesn't get in,

18   our position is going to be one that's inevitably appealed,

19   that there is no evidence.  So, we think that this testimony

20   does not past muster for lay witness testimony.  It's

21   usurping Your Honor's role.  It's not based on any

22   methodology that we can cross-examine people on because

23   they've admitted that there is no methodology that supports

24   it.  It's based solely on their overall judgment.  It's

25   based on perception of litigation risk, which is not proper

1     testimony for even an opinion witness on whether something

2     is or is not of benefit.  Your Honor gets to decide whether

3     something is right or wrong in this litigation.

4              So, for all those reasons we ask that those

5     portions of the testimony be stricken.  The PAB is free to

6     argue, as a matter of law, anything it wants on any specific

7     allocation that it thinks is appropriate.  But Mr. Horton is

8     not competent to testify that those allocations are or are

9     not correct.  Thank you.

10             THE COURT:  Mr. Pedone?

11             MR. PEDONE:  Your Honor, Richard Pedone on behalf

12    of American Stock Transfers, Indenture Trustee.  Your Honor,

13    I wish to emphasize the objection that the ad hoc group is

14    putting forward, and also to emphasize the lack of relevance

15    to Mr. Horton's view of litigation risk.  And, effectively,

16    when you look at what they're seeking to admit, it's Mr.

17    Horton saying, "I drew a line down the middle and based upon

18    the litigation risk in this mixing bowl, this is where I

19    believe this case should come out," -- simply not relevant.

20    As we highlighted at the beginning and our opening, we

21    believe the case is connected, and the outcome, in

22    particular, on the (indiscernible) fee is connected to an

23    O'Brien analysis early on.  Mr. Horton's views on this as an

24    observer trustee of the trust, where his actions are not

25    being litigated, or inaction is not being litigated, simply

1    is not relevant to the end proceeding.  This is for the

2    Court to determine.  And so, we join the objection.  Thank

3    you.

4              THE COURT:  You're welcome.  Does Elliott wish to

5    chime in on this?

6              MR. McGINNIS:  Your Honor, Matt McGinnis on behalf

7    of Elliott and UMB.  We take no position and do not object

8    to the testimony that the ad hoc has identified.  We do have

9    a separate objection --

10             THE COURT:  Yes, I see that.

11             MR. McGINNIS:  -- (indiscernible) to a different

12   paragraph.

13             THE COURT:  Okay.  All right.

14             MR. NESTOR:  Thank you, Your Honor.  Again, for

15   the record, Mike Nestor of Kirkland & Ellis on behalf of the

16   PAB.  Your Honor, Mr. Horton is a fiduciary, as sole member

17   of the PAB exercising his duty of care.  He has made a

18   proposal in the PAB submission, and his written direct

19   testimony explains why he has made the proposal he has.  Mr.

20   Horton is also the former Treasurer and CFO of EFH and EFIH.

21   He has firsthand knowledge of the issues on which he

22   testifies in these paragraphs.  He has performed an

23   extensive investigation in support of the positions set

24   forth in the PAB submission.  And these paragraphs explain

25   why Mr. Horton has made the proposal he has.

1           Taking some of the objections in turn, relevance,

2    you know, with respect to the relevance objection, Mr.

3    Horton's testimony in these paragraphs is clearly relevant.

4    He's listed the factors he considered and the ultimate

5    position he has taken in the PAB submission.  There as a 408

6    objection.  We don't believe that this is a 408

7    communication.  We believe that objection should be

8    overruled.

9           Going to the lay opinion testimony objection,

10   frankly, you know, we're not proffering Mr. Horton's

11   proposed allocation or his thinking behind it as expert

12   testimony under rule 702, under which there would be certain

13   disclosure requirements and certain questions about

14   methodology.  Here, business judgement does not equal expert

15   testimony.  Even if this testimony couldn't be considered

16   lay opinion under rule 701, rather than simply Mr. Horton's

17   stated basis for the propositions underlying the PAB

18   submission, his testimony satisfied the three factors of FRE

19   701.  First, the testimony is rationally based on the

20   witness's perception.  Mr. Horton lived these cases.  He was

21   involved in the relevant workstreams for which fees are

22   being allocated, including the negotiation of the NextEra

23   termination fee.  He also informed himself as fiduciary to

24   the PAB by interviewing professionals, as well as speaking

25   with the disinterested directors about their negotiations

1    regarding the allocation dispute.  And his proposal is based

2    on these perceptions.

3              Second, the testimony is helpful to clearly

4    understanding the witness's testimony, or to determining a

5    fact in issue.  As an initial matter, the ad hoc claimants

6    have objected to the charts themselves, summarizing the PAB

7    proposal, the Elliott proposal and the ad hoc proposal.

8    These charts are clearly helpful to understanding Mr.

9    Horton's testimony.  As to the paragraphs either summarizing

10   the PAB's proposal or stating the basis therefore, they're

11   helpful to determining a fact in which, which is what estate

12   received a benefit of certain (indiscernible).

13             As I've just described, and Mr. Horton will

14   describe when he testifies, he has reflected on both his

15   past experiences with the Debtors and the investigation he

16   undertook as a member of the PAB to formulate the

17   submissions set forth in the PAB submission.

18             Notably, Your Honor, the ad hoc claimants

19   supported the PAB's participation in this proceeding as a

20   party because Mr. Horton would be helpful here.  And so, we

21   believe the helpfulness prong is satisfied as well.

22             And third, Mr. Horton is not being offered as a

23   scientific expert within the scope of 702.  We never said he

24   was.  He is a fiduciary that has set forth his position and

25   the basis therefore.  His written testimony is akin to that

1    of a disinterested director that has undertaken an effort to

2    evaluate the strength and weaknesses of certain claims, and

3    filed a declaration in support of a rule 9019 motion, except

4    here Mr. Horton has actually lived these cases, lived

5    through the workstreams, and has even more to offer to the

6    record.

7            Your Honor, we believe that if this testimony were

8    to be stricken the DD statements evaluating the relative

9    strengths and weaknesses of litigation claims, and in

10   respect to the TCEH 9019 settlement could have been stricken

11   as well.

12           Ultimately, Your Honor, we believe the ad hoc's

13   objections go more to weight than admissibility and they

14   will have an opportunity to cross-examine Mr. Horton on

15   these paragraphs.

16           With respect to the Elliott objection to the last

17   paragraph, that's the Vasquez estimation of asbestos

18   liability, I think, Your Honor, we're prepared to handle

19   that (indiscernible) forgo admission of that paragraph and

20   handle it accordingly.

21           THE COURT:  I'm sorry, can I strike that

22   paragraph?

23           MR. NESTOR:  We'll strike that paragraph and rely

24   on live testimony.

25           THE COURT:  Okay.  Where are you?  There you are.

1   Anything further?  To see you people over there ...

2            MR. GLENN:  Thank you, Your Honor.  This is not a

3   9019 motion.  And this is not a matter of defending business

4   judgment on allocation decisions that a board of directors

5   has made.  That type of evidence goes to state of mind and

6   good faith.  What they're trying to do is take a bunch of

7   testimony about his perceptions of benefit, which we are

8   willing to allow in because they're more intangible.  What

9   the problem is, is numbers, because the numbers are not

10  rationally connected to everything preceding it.  They're

11  just a bunch of numbers that are put out there.  There's --

12  if we had expert testimony he would be forced to defend the

13  methodology, just like those two experts did.  He shouldn't

14  get a blank check to say what he wants just because he was

15  there without justifying the numbers.  And it doesn't pass

16  muster under rule 701.  Thank you.

17           THE COURT:  You're welcome.  All right.  We're

18  going to take a recess and we'll think about this one.

19       (Recess)

20           CLERK:  All rise.  Please be seated.

21           THE COURT:  Take your time.  All right.  Thank you

22  for the time.  Just so the record is clear, the Paragraph --

23  let me get it right -- 60, Paragraph 60 is stricken.  The

24  remaining objections are to Paragraph 6, Paragraph 7,

25  Paragraph 8.  But not the chart on Paragraph 8 or including

1    the chart?

2              MR. GLENN:  Including the chart.

3              THE COURT:  Okay, so Paragraph 8, Paragraph 26,

4    52, and that's it.  Okay.  The Court is going to sustain the

5    objection.  I do find that the conclusions in the reference

6    paragraphs are relevant; indeed, they're the entire point of

7    the trial.

8              However, I do find that it is in the nature of lay

9    opinion testimony that goes to the ultimate issue before the

10   Court.  And it is that ultimate issue before the Court

11   binding which makes the conclusions inadmissible.  It's

12   certainly, the PAB is welcome to, as they did in their

13   pretrial briefing and in their post-trial briefing, advocate

14   for specific conclusions as to allocation based on the

15   facts.

16             But the ultimate decision as to what the proper

17   allocation is is the Courts.  The parties can argue.  But

18   really, at the end of the day, it's exactly what you're

19   asking me to do, which is to come up with the right

20   allocation.

21             So expert testimony, either under -- as an expert

22   or as a lay opinion, the testimony to the ultimate issue can

23   be admitted, but it is very rarely done.  I have fought

24   against it in my 12-plus years on the bench when it has come

25   up.

1          And I think that's the proper thing to do in this

2     instance, so the Court will sustain the objection and strike

3     those relevant paragraphs.

4          Mr. -- I don't know who -- I forget.  I'm sorry,

5     I'm losing track of everybody, so many people.  Is there --

6     we're putting Mr. Horton on?  Is there supplemental direct?

7          MR. THOMPSON:  Yes, Your Honor.  McClain Thompson

8     from Kirkland & Ellis on behalf of the EFH Plan

9     Administrator Board.

10          THE COURT:  Okay.

11          MR. THOMPSON:  And would call Mr. Horton to the

12     stand.

13          THE COURT:  Mr. Horton.

14          MR. HORTON:  Your Honor.

15          THE COURT:  Good afternoon.  Good to see you

16     again.  If you please would, remain standing and take your

17     affirmation.

18      (WITNESS ANTHONY HORTON SWORN IN)

19          CLERK:  Please raise your right hand.  Do you

20     affirm you will tell the truth, the whole truth and nothing

21     but the truth to the best of your knowledge and ability?

22          MR. HORTON:  I do.

23          CLERK:  Please state and spell your name for the

24     record.

25          MR. HORTON:  Anthony Horton, H-O-R-T-O-N.

1              CLERK:  Thank you.

2              THE COURT:  Thank you.  Please be seated, make

3     yourself comfortable.

4              MR. HORTON:  Thank you.

5              THE COURT:  And stay as close to the microphone as

6     possible.

7              MR. HORTON:  Thank you, sir.

8              THE COURT:  And I'm sure they told you, but I took

9     your name in vain yesterday in case you were being a slow

10    talker.

11             MR. HORTON:  I hadn't heard that.

12             THE COURT:  Oh, well. (Laughter) They're

13    protecting me.

14             MR. HORTON:  I'm from Texas, I'm a slow talker.

15             THE COURT:  I was just -- yeah, I was just

16    kidding.

17             MR. THOMPSON:  Your Honor, one note for the

18    record.  The movants did serve a trial subpoena on Mr.

19    Horton in his individual capacity.  Kirkland & Ellis does

20    not represent Mr. Horton in that capacity.  Representing Mr.

21    Horton today in that capacity are Chris Esbrook from Esbrook

22    Law in Chicago.

23             MR. ESBROOK:  Good morning, Your Honor.

24             MR. THOMPSON:  Scott Leonhardt from the Rosner Law

25    Group here in Wilmington.

1          THE COURT:  Very good.

2          MR. THOMPSON:  Your Honor, as has been our

3     practice, we are prepared witness binders.  May I approach?

4          THE COURT:  Yes.  So I think it's unlikely we'll

5     finish Mr. Horton today.  I was planning on going a little

6     later than normal because of the break this afternoon so I

7     could attend my meeting.  So we could shoot to finding a

8     stopping place, say, between 6:00 and 6:30.  Let's shoot for

9     that, or wherever there is an appropriate time.  I don't --

10    it depends on who's got the witness at that moment.

11         MR. THOMPSON:  Your Honor, for purposes of

12    timekeeping, I anticipate about a 30-minute direct.

13         THE COURT:  All right, so an hour, okay.

14    (Laughter)

15         MR. HORTON:  For the slow talking.

16         THE COURT:  It's not you; it's lawyer.  You always

17    double what the lawyer says something's going to take, and

18    that's usually how long it takes.  They taught me that in

19    judge school.  Let's get started.

20              DIRECT EXAMINATION OF ANTHONY R. HORTON

21    BY MR. THOMPSON:

22    Q    Mr. Horton, could you please state your name for the

23    record?

24    A    Anthony R. Horton.

25    Q    And what is your current position?

1   A    I am the -- currently, I'm the Plan Administrator Board

2   for EFH and EFIH.

3   Q    And previously, did you hold positions with the

4   Debtors?

5   A    I did.

6   Q    And briefly, what are those positions?

7   A    At emergence, I was Executive Vice President and CFO.

8   Prior positions were Senior Vice President and Treasurer.  I

9   was a director of several of the Debtors.  Those were my

10  positions.

11  Q    Mr. Horton, are you familiar with Elliott's allocation

12  motion?

13  A    I am.

14  Q    And that motion seeks to allocate administrative

15  expenses between EFH and EFIH.

16  A    That's correct.

17  Q    And you are fiduciary for both of those estates, right?

18  A    That is correct.

19  Q    And as a fiduciary, why did you propose an allocation?

20  A    Given where we've been since emergence and, you know,

21  trying to facilitate multiple settlements and having failed

22  at that.  Reading the various -- reading the Elliott motion,

23  reading the initial statements, I felt as though the parties

24  were -- remain far apart.  I think that I could provide some

25  factual information that may be helpful to the Court and

1     keep the record as clean as possible.  I know there might be

2     different perceptions of what happened during the case or

3     during the negotiations, so I just wanted to ensure that I

4     provided that information.

5               MR. GLENN:  Excuse me for a moment, Your Honor.

6     I'm not objecting to that question or answer because it was

7     by way of background, but the question was why did he

8     propose an application.  If the questioning goes beyond

9     anything about those allocations, I stand on the motion I

10    previously made.

11              THE COURT:  All right.  I think that's correct.

12    Certainly, he can talk about the factual underpinnings, but

13    let's stay away -- let's stay away from the conclusion.

14              MR. THOMPSON:  Understood.

15    Q    And, Mr. Horton, the PAB's allocation proposal is set

16    forth in the PAB's final submission.

17    A    That's correct.

18    Q    Filed on the docket last Friday.

19    A    That is correct.

20    Q    And, Mr. Horton, did you prepare a declaration in

21    anticipation of your testimony today?

22    A    I did.

23    Q    Could you please turn to Tab marked DIR-Horton in your

24    binder?

25    A    Yes.

1    Q    Is this a copy of that declaration?

2    A    It is.

3    Q    Is the information contained therein true and accurate

4    to the best of your belief?

5    A    It is.

6              MR. THOMPSON:  Your Honor, at this time, the PAB

7    would ask that the Court admit the declaration, subject to

8    Your Honor's ruling and removing Paragraph 60, into

9    evidence.

10             THE COURT:  Any objection?

11             MR. GLENN:  No objection.

12             MR. McGINNIS:  No objection.

13             THE COURT:  It's admitted, subject to my ruling a

14   few minutes ago on the record striking certain paragraphs

15   and striking Paragraph 60.

16   Q    Mr. Horton, the submission sets forth the PAB's

17   allocation proposal; is that correct?

18   A    That's correct.

19   Q    Okay.  And you understand there's four buckets of

20   claims generally.

21   A    I do.

22   Q    Okay.  Let's walk through the considerations that form

23   your proposal on each bucket.

24   A    Okay.

25   Q    Starting with the NextEra termination fee.  How -- what

1   factors did you consider in formulating your proposal?

2          THE COURT:  We're going to need to readjust this.

3   Want a break?  You want to take a break, Mr. McKane?

4          MR. McKANE:  You want to give us five minutes,

5   Your Honor?

6          THE COURT:  Yup.

7          MR. McKANE:  Thank you.

8      (BREAK)

9          CLERK:  All rise.

10          THE COURT:  Please be seated.  Okay.  Are we all

11   set?

12          MR. THOMPSON:  Yes, sir.  Again, for the record,

13   Your Honor, McClain Thompson, Kirkland & Ellis, on behalf of

14   the PAB.

15   Q    Mr. Horton, given the Court's ruling and counsel's

16   objection, for the remainder of the exam, we'll focus on the

17   facts.  Is that okay with you?

18   A    We'll give it a shot.

19   Q    Mr. Horton, based on your experience in these cases and

20   evaluation of the issues, what are the key facts that you

21   would highlight as it relates to the NextEra termination

22   fee?

23   A    Again, I was on the front lines of the negotiations

24   with NextEra.  If I -- leading up to the increase in the

25   break fee, there are a lot of give and takes, a lot of

1   dynamics going on regarding the negotiations themselves.

2   Clearly, the value, we had a match right.  There was the

3   assumption of the asbestos claims were still at question.

4   We were considering our overall negotiating tactics at that

5   point in time and that was around July 27th of 2016.

6          At that point in time, there was a $200 million

7   increase in the price.  A $250 million escrow account was

8   set aside for asbestos claims.  As part of that, again,

9   considering the negotiating dynamics, I negotiated with

10  NextEra to allow, to the extent we could convince them that

11  the claim was -- claims were lower, that that would release

12  the incremental amount of the 250 in the escrow account, or

13  if I could find an insurance policy, which we eventually

14  did.  They dropped the match right at that point in time.

15         Shortly thereafter, the very next day, we went

16  back to NextEra with an ask for $150 million increase in

17  price and a reverse breakup fee.  We got $110 million

18  increase in the price.  And at that point in time, we

19  cleared the PIKS, they were getting 100 percent recovery.

20         Importantly, on September 19th, that is when the

21  amended merger agreement was approved.  That's when the

22  breakup fee or the termination fee was approved.  We had

23  worked over the weekend of, you know, September 17th and

24  18th.  Fidelity was involved in that process.  I had

25  conversations with Bidder B and NextEra.

1            And coming out of those negotiations and coming

2     out the hearing, we had approval of the assumption of the

3     asbestos claims, or reinstatement of asbestos claims; we had

4     old tabs that were being assumed.  It was a non-taxable

5     transaction.  We had an increase in price of $300 million

6     and, again, $150 million of the asbestos claim -- excuse me

7     -- asbestos escrow was being released.  It was roughly $471

8     million coming up from EFIH to EFH.  I think the PIKs were

9     getting approximately $1.7/$2 billion of cash.

10            Fidelity had got -- I don't think on that

11     particular day, but later on, Fidelity got a substantial

12     contribution claim of $20 million.  So we actually got that

13     approved on September the 19th, and that was the total

14     package as I think about it.  Excuse me, Your Honor.

15     Q    Mr. Horton, you spoke about the September timeframe.

16     Anything else later in that year?

17     A    Yeah.  So then other considerations were -- what

18     happened on November -- what happened in November of 2016

19     was the Third Circuit reversed the make-whole ruling from

20     the Bankruptcy Court and for allowing the make-wholes; $471

21     million was drained from EFH in that instance, and about --

22     the PIKs were impaired about 165 million.

23            Other facts -- I'm going to try not to say

24     considered, but other facts that I would like to lay out.

25     Is in February 20 of 2018, there were negotiations going on

1    between the various parties regarding these matters, except

2    for -- I don't think the retaining professionals was part of

3    that, those negotiations.

4           I went back and looked at the record.  I spoke to

5    disinterested directors' counsel.  I got a view as to how

6    far apart the parties were.  I know where the disinterested

7    directors were on not only the breakup fee, but the other

8    matters, so that was a fact.  I don't believe I can, you

9    know, provide that fact in actual numbers.  I'll leave that

10   to the Court, but that was certainly a fact.

11          There were the initial statements filed by the

12   various parties.  There were depositions that were provided

13   by the various parties, which I read through.  And so, from

14   the break fee, again, I took all of those factors.  I

15   considered those factors.  We can ignore the numbers, but

16   that's how -- those are the facts that I think were

17   important to the process.

18   Q    Okay.  Mr. Horton, in focusing on the facts, let's go

19   to the next bucket, which is professional fees both at the

20   Debtor and committee levels.  What are the key -- based on

21   your experience and evaluation, what are the facts that you

22   would highlight?

23   A    My belief is the foundation for the retaining

24   professionals and how the allocations actually occurred or

25   should have occurred were based upon the interim comp order.

1    The interim comp order, the basis for that or the -- I think

2    the interim comp order was an offshoot of the RSA.  Which

3    had, at that point in time when we were negotiating the RSA,

4    there was discussions about payments being made at that

5    point in time, actually at the signing of the RSA.

6            I wasn't part of the negotiations regarding the

7    fee allocations pre-filing of the case.  But I feel one of

8    the key facts, I think, for retaining professionals is that

9    interim compensation order and whether or not the

10   professionals were effectively reasonably in compliance with

11   that interim compensation order.

12           And I did some work and some investigative work,

13   either looking through the depositions or through interviews

14   directly with the retained professionals -- I had K&E do

15   some of those interviews; I was involved in some of the

16   interviews with the professionals -- tell us, tell me how

17   you are actually allocating or how did you allocate the

18   professional fees.

19           With regards to Kirkland & Ellis, I had those

20   conversations directly myself, and interviewed Kirkland &

21   Ellis, (indiscernible) and Patrick Venter regarding how they

22   were allocating fees throughout the case.  And it's kind of

23   a deference to the professionals.  I feel like they were

24   trustworthy and competent with no economic incentive to

25   allocate their fees to one particular estate or another.

1          So I started, you know, I start with those as the

2    foundation.  Were they in -- I deferred to them and, again,

3    they were involved in the activities day to day.  They knew

4    where their time was being spent, what activities were

5    important, and how they ultimately -- what was direct, what

6    was, you know, collective.  And I deferred to them, but I

7    also went back and confirmed, either through the interview

8    process or through the depositions, for example, of the E-

9    committee, Mr. Fleckenstein, so that's how I came to it.

10   Those are the facts that I think are important and relevant.

11   Q    Mr. Horton, turning to Elliott's substantial

12   contribution claim, based on your experience and Elliott's

13   involvement in this case, what facts, again, would you

14   highlight for the Court?

15   A    I would highlight the -- they were involved.  Clearly,

16   when NextEra appeared that it was not going to close,

17   Elliott became involved in the process.  I know there was

18   the PSA litigation.  But they became involved in the process

19   in trying to create an alternative path and try to keep some

20   competitive tension in the process.

21          I also feel like that process provided a bit of a

22   backstop.  In the event Bidder B or Sempra didn't show up,

23   what was going to be that alternative; was it successful?

24   You know, that's -- I don't know.  I couldn't give you a

25   good read on that.  But it was certainly an activity that

1    provided a fallback for the estate, including, you know,

2    financings and so forth.  I believe that benefit EFIH, with

3    no doubt, quite substantially.

4            The other consideration or other fact was that, I

5    think it was in July, possibly later, but they had -- they

6    filed a motion for reconsideration of the break fee.  I

7    think that was -- could be very beneficial to the estate.

8    It is at this point in time and we'll see how it all plays

9    out.  But that was very beneficial in providing -- I

10   consider leverage in, you know, potential settlements in

11   negotiations.

12           Shortly after signing the Sempra transaction,

13   there was a dividend dispute; whether or not Sempra owed a

14   dividend to -- it really wasn't Sempra -- whether or not

15   Oncor owed a dividend to EFIH.  And the tangential benefit

16   to EFH in that instance was part of that dividend was going

17   toward -- going to Oncor Electric Delivery Holdings, which

18   was -- they were utilizing that dividend to pay taxes to

19   EFH.

20           Also as part of that settlement, there was some

21   discussion about who would bear the risk of any audit or any

22   claim from the IRS from the years 2017 and 2018.  There was

23   discussion that that should be retained by the creditors;

24   that was settled.  And that certainly would have impacted

25   EFH and certainly would have impacted EFIH.

1              And then lastly, one consideration is that Vistra

2       had done a dividend recap.  They had utilized some of the

3       earnings and profit credit that we had within the system

4       they felt like they utilized.  And under the TMA, Elliott

5       stepped in and tried to litigate that matter or resolve that

6       matter in favor of EFH.

7              We, as the Debtors, I can recall, Mr. Keglevic and

8       myself, talking about this.  We felt like it would be

9       beneficial to EFH and the overall estate.  Had we had the

10      Sempra transaction not closed, to have the opportunity to

11      have that E&P, so that if we ended up doing an equitization

12      plan, we'd have that E&P available to do some type of

13      dividend to the new equity holders.

14             So those are the facts that I considered in the

15      Elliott substantial contribution.

16      Q    And just to switch back very briefly on professional

17      fees, Mr. Horton.  I believe you testified that you deferred

18      to the professionals, at least initially; is that an

19      accurate characterization of your testimony?

20      A    That's correct.

21      Q    And without, you know, without putting any numbers on

22      it or how your evaluation of the factors; as to the

23      committee professional fees, what is -- what are some

24      additional facts that you would consider highlighting?

25      A    On the E-committee fees -- and, again, I go back to

1    what I consider to be the foundation or the anchor for

2    retaining professionals -- is the interim comp order and its

3    direction or framework for guidance, if you'd prefer, of

4    allocating fees amongst the estates.  And the direct

5    benefits being billed directly to the extent you were doing

6    -- had a service that was or an activity that was directly

7    benefiting an estate, then you would bill that estate

8    directly: EFH, EFIH, TCH at the beginning.

9            And to the extent there were collective benefits,

10   then you would -- the professionals would allocate those

11   collective benefits based upon a ratio of the direct

12   benefits for a particular estate versus the total direct

13   benefits for all the estates.

14           I reviewed, and I did a lot of this work toward

15   the end.  I tried to review the facts of how the E-committee

16   actually allocated their fees and expenses.  And it appeared

17   to me that they were not within the construct or the

18   framework of the interim compensation order.  I feel like it

19   needed to be more nuanced.  It appeared to me that it's like

20   I had two -- there's two parties.  And, again, I know the

21   U.S. Trustee appointed them to represent EFH and EFIH

22   estates.

23           So my view and from reading the testimony or

24   deposition of Mr. Gluckstein and from just the history, that

25   it was, like, there's two creditors, let me -- we'll just

1    bill it 50/50.  And I thought in looking at the interim comp

2    order, it was more nuanced than that and required a better,

3    more fulsome allocation of their fees.

4           I can, I think the work that -- they did a lot of

5    great work; there's no doubt about it.  The work that they

6    did in the E-committee settlement for the reinstatement of

7    asbestos was very, you know, very helpful.  I think that

8    benefited the EFH, the turnover provisions in the -- for the

9    non-qualified plan.  Ultimately, as part of that settlement,

10   so long as, you know, every plan continued to meet those

11   general requirements of the E-committee settlement, they

12   were going to be less involved in the case, and I saw those

13   benefits as EFH.

14          EFIH -- excuse me -- the collective benefits

15   between EFH and EFIH in the activities: certainly, the

16   asbestos bar date; they were reviewing different tax issues.

17   Although they may not have been driving those two

18   activities, they were certainly involved in doing work for

19   both estates in that regard.  They were part of the global

20   settlement agreement.  And, you know, that provided

21   tremendous value, I believe, to both estates, given the

22   various claims.

23          And based upon, you know, that, I believe the

24   collective -- excuse me -- the global settlement provided

25   more benefit to EFH than EFIH.  But the collective benefits,

1    I just didn't feel like were within the construct of the

2    interim comp order.

3    Q    Thank you, Mr. Horton.

4              MR. THOMPSON:  Your Honor, I have no further

5    direct at this time.  I understand that Mr. Esbrook does not

6    have any questions on direct.  I do have some exhibit issues

7    -- or exhibits to move into the record.

8              THE COURT:  Let's wait for cross before we do the

9    exhibits.  Okay?  All right.  Who's going first?  You guys

10   disagreed on something.  Who's going to pay for it?

11             MR. McGINNIS:  I'll pay for it, Your Honor.  Your

12   Honor, we have additional witness binders.

13             THE COURT:  Oh, terrific.  Good.

14             MR. McGINNIS:  May I approach?

15              CROSS-EXAMINATION OF ANTHONY R. HORTON

16   BY MR. MCGINNIS:

17   Q    Good afternoon, Mr. Horton.  Nice to see you.

18   A    Good afternoon.

19             MR. MCGINNIS:  Matt McGinnis -- for the record,

20   Matt McGinnis on behalf of Elliott and UMB.

21   Q    Mr. Horton, just one factual thing I wanted to clear up

22   very briefly.  In the PAB's witness binder, I wanted to

23   direct your attention to a particular exhibit, and that's

24   PAB -- excuse me -- PABX435.

25   A    Which tab are you in, sir?

1    Q    The tab, I believe, will actually be titled PABX435,

2    sir.

3              THE COURT:  No.

4    A    I have tab numbers, so...

5              THE COURT:  Which binder (indiscernible)?

6    A    Oh, the PAB binder?

7    Q    I am -- yes.  Sorry, I am in the PAB binder, Mr.

8    Horton.

9    A    My old --

10   Q    Yes.

11   A    The old one.

12   Q    Yeah, the old binder.

13   A    Sorry.

14   Q    Not the new binder.

15   A    Apologies.

16             THE COURT:  Which one?

17             MR. MCGINNIS:  The PAB binder --

18             THE COURT:  Yeah, yeah, which I --

19             MR. MCGINNIS:  PAB book.  Okay.  So, it's PABX435.

20   A    Yes, sir.

21   Q    And Mr. Horton, you were here for opening statement

22   this morning, correct?

23   A    I was.

24   Q    And did you hear Mr. Rosner's opening statement and

25   discussion of analysis of the make-whole claims?

Page 241

1    A    I did.

2    Q    And just to set the timeframe, PABX435, can you tell us

3    what this is?

4    A    It appears to be restructuring update to the Board of

5    EFH, EFIH and EFCH, TCEH, and EFIH Finance, dated September

6    30th, 2016.

7    Q    And so, just to set the timeframe, September 30th, 2016

8    was after the Board approved the NextEra merger agreement,

9    correct?

10   A    That is correct.

11   Q    And if I can direct your attention to page ending

12   77943, do you recognize this page, sir?

13   A    I do.

14   Q    And do you recognize this as the analysis that was

15   included in Mr. Rosner's opening statement earlier today?

16   A    Yes, I do.

17   Q    All right.  And just -- it says at the top, as of

18   9/18/16, but this is included in the September 30th, 2016

19   Board book, correct?

20   A    Yes.  I think that the -- yes, to your -- to answer

21   your question.  And the reference to September 18th of 2016

22   was reflecting the terms of the transaction at that point in

23   time.

24   Q    Fair enough.  And the Board was considering this

25   information, though, on September 30th, after it had already

1    approved the NextEra merger agreement, correct?

2    A    That is correct.

3    Q    Thank you.  You can actually set that binder to the

4    side now so that we don't --

5    A    Thank you.

6    Q    And actually, just one follow-up question on that, Mr.

7    Horton.  Do you happen to recall the date of the 3rd

8    Circuit's argument on the make-whole litigation?

9    A    I don't recall the date.  I think the impetus for this

10   particular slide was -- it was after -- the 9/30 slide was

11   after that and the Board was requesting an evaluation of

12   what are the implications if the make-wholes are reversed.

13   Q    Thank you.  All right, so Mr. Horton, I want to spend a

14   little bit of time talking about the Debtors' professionals'

15   fees.  And if I could just start by directing your attention

16   to Paragraph 9 of your written direct, and if you're in the

17   Elliott UMB binder, that would be at Tab 1, sir.

18   A    Okay.  Where from there?

19   Q    I'm sorry?

20   A    Yes, I'm in Tab 1.

21   Q    Okay.

22   A    Which --

23   Q    Paragraph 9 --

24   A    Thank you.

25   Q    -- Page 6.  And this, I believe, just to be clear, is

1   one of the paragraphs that the Ad Hoc Committee did not --

2   or the Court did not strike from your testimony.  And one of

3   the statements you provide in this is that you believe that

4   the professionals' allocations of their fees warrants

5   deference, correct?

6   A    I agree.  Yes, sir.

7   Q    And one of the bases for that was that you referred to

8   their -- to the work that they did in compliance with the

9   interim compensation order.  Is that fair?

10  A    I think you asked me did I give them deference, and the

11  answer to that is yes.

12  Q    Okay.  And one of the reasons you gave deference to the

13  professionals' allocations was based upon your review of

14  their work in relationship to the interim compensation

15  order.  Is that correct?

16  A    I gave them deference because, one, I considered them

17  to be, you know, competent, trustworthy professionals, and

18  one of the key controls of any (indiscernible) process.  I

19  didn't see that they had, you know, any economic incentive

20  to skew the allocations any particular way.  And then

21  thirdly, because they were the ones actively involved in

22  managing their staff and their team, and monitoring their

23  work, that's why I gave them deference.

24  Q    Okay.  Well, let me ask you this.  Was compliance with

25  the interim compensation order a factor in your

1    determination that you should defer to their allocations of

2    fees?

3    A    It is a -- I deferred and then I confirmed whether that

4    -- if you will, I tried to confirm from a high level whether

5    they -- that deference was indeed warranted.

6    Q    And so, was part of that confirming whether

7    professionals complied with the interim compensation order?

8    A    Reasonably complied, yes.

9    Q    Okay.  And what do you mean by reasonably complied?

10   A    Well, the interim comp order, it had an intent.  I

11   think the intent was correct.  I think it made a lot of

12   sense.  Was it perfect?  Of course, no process is perfect.

13   And the adherence to that process, did I expect it to be

14   perfect?  No, I expected them to exer- -- the professionals

15   to exercise the reasonable judgment in their professional

16   views as to how the different activities applied to the

17   various estates.  Was it direct, was it collective, and do I

18   think any of them can do that to perfection?  No.  Do I

19   think there is a reasonableness standard that should be

20   applied to any process?  Yes.

21   Q    But your view, just to be clear, is that the Court

22   should nonetheless defer to a professional's allocations of

23   fees, even if there was not perfect compliance with the

24   interim compensation order.  Is that correct?

25   A    Again, I just don't think the standard of perfection is

1    appropriate in my judgment.  I think a reasonable allocation

2    methodology or approach that -- would it be perfect?

3    Everyone can shoot holes at this, throw knives at it, that

4    each one of the professionals.  The question is, did it make

5    the standards of reasonable -- if it's going to be, you

6    know, well within the range of the amounts that should have

7    been allocated.

8    Q    All right.  Let's take a look at the interim

9    compensation order, which is ELX-029, for the record, and

10   will be --

11   A    Which tab is that --

12   Q    Yes, I apologize.  I'm checking.  Tab 8.  And if I can

13   direct your attention to Paragraph 2-B of Tab 8, which we've

14   seen before?

15   A    Yes, sir.

16   Q    And now this is the paragraph that sets forth the

17   allocation methodology we've been discussing, correct?

18   A    Yes, sir.

19   Q    And it defines direct benefit fees and collective

20   benefit fees?

21   A    Yes.

22   Q    And your view, sir, is that a direct benefit fee is a

23   fee that's incurred solely for the benefit of a specific

24   debtor, correct?

25   A    Yes, sir.

1    Q    And you were in the court room earlier today for Mr.

2    Husnick's testimony, correct?

3    A    No.  I wasn't there to listen to it.

4    Q    Oh, fair enough.  You had -- in connection with your

5    review of the professionals' fees, you did have an

6    opportunity to review the 30(b)(6) deposition transcript of

7    Kirkland, correct?

8    A    I'm not sure I reviewed his 30(b)(6).

9    Q    You did not?

10   A    His?  No, I'm not sure.

11   Q    Okay.  So, as part of --

12   A    I'm not sure that I did.  I read his deposition -- not

13   to interrupt you; I apologize.

14   Q    No worries.

15   A    I read his deposition.  Again, there was a significant

16   number of depositions.  I may have perused his 30(b)(6).  I

17   did not focus on it or memorize it.

18   Q    All right, so you did -- but you do recall reviewing a

19   deposition transcript from Mr. Husnick?

20   A    Again --

21   Q    Whether or not it was a 30(b)(6) deposition?

22   A    And I did read it.

23   Q    Okay.  Fair --

24   A    I realize that he was designated as a 30(b)(6) witness.

25   I just didn't read all of the items on the list.

1    Q    All right.  Do you have an understanding that

2    Kirkland's view of direct benefit fees was a fee that

3    principally or primarily benefited a particular Debtor?

4    A    Yes, sir.

5    Q    And would you agree with me that solely and primarily

6    means something different?

7    A    Again, I am again using it in the context of

8    reasonableness and judgment of the professional.  When you

9    say solely, maybe I overstated that and didn't understand

10   your question.  But so be it; it's answered.  My view is

11   that, you know, there is a standard here and I expect that

12   the professionals can determine whether that direct benefit

13   and the bidding of that direct benefit was reasonable and

14   complied with this interim comp order.

15   Q    I understand that, sir.  But just -- my question was a

16   simple question.  Do you understand and agree with me that

17   the concept of solely, or the meaning of solely and

18   primarily is different?

19   A    You used the word concept, and I was talking in

20   conceptual terms as well.  And so, conceptually -- and if we

21   could get to, you know, a definition of direct benefits,

22   could it be solely conceptually?  Yes.  Is that practical?

23   Probably not.

24   Q    All right.  Did you ever discuss -- actually, let me

25   take that a different way?  You actually don't recall

1    discussing with Kirkland what the appropriate concept or

2    definition of direct benefit fees was, correct?

3    A    Again, I think the interim compensation order provides

4    that that's in the judgment of the professionals.  It's

5    their responsibility.  My responsibility as a Debtor and as

6    the PAB was to effectively review at a very high level were

7    they following the interim comp order.  And it gives them

8    latitude as to, I believe, their judgment as to how these

9    direct benefits and services should be billed to the various

10   estates.

11   Q    So, just to be clear, though, you don't recall actually

12   discussing the definition or concept of direct benefit fees

13   with Kirkland, correct?

14   A    I don't recall doing that, no, sir.

15   Q    And I believe you also don't recall discussing that

16   with Evercore or any of the other Debtors' professionals,

17   right?

18   A    No, sir.

19   Q    All right.  Now, throughout these cases, it's fair to

20   say there has been a lot of fee applications filed by a lot

21   of people, correct?

22   A    Yes.

23   Q    And you have not reviewed any of the Debtors'

24   professionals' fee applications before they were filed with

25   the Court, correct?

1    A     Before they were filed with the Court?

2    Q     Let me clarify.  You don't recall reviewing any of the

3    Debtors' fee applications, correct?

4    A     I do recall reviewing some of them.

5    Q     You do?

6    A     I sit on the Fee Committee.

7    Q     Okay.  So, if you testified at your deposition, did you

8    quest- -- well, let's do this a different way.  You were

9    deposed in this case, correct, sir?

10   A     I was.

11   Q     Okay.  More than once?

12   A     Must we go there?

13            MR. MCGINNIS:  May I approach the witness, Your

14   Honor?

15            THE COURT:  Yes.

16   Q     All right.  Mr. Horton, you were deposed in this case?

17   A     I was.

18   Q     In this particular allocation dispute?

19   A     Yes, sir.

20   Q     If I can direct your attention to Volume 1 of your

21   transcript?

22   A     Yes, sir.

23   Q     Page 33, Line 19 through 21?

24            THE COURT:  Which tab?  I'm sorry.

25   (indiscernible)

1        MR. MCGINNIS:  (indiscernible) why don't you put

2   it up on the screen.  I do -- if you would like --

3        THE COURT:  Yeah, put it up on the screen.

4        MR. MCGINNIS:  Okay.

5        THE COURT:  That's better.

6   A   (indiscernible)

7   Q   Sorry, Volume 1, which is date -- August 9, 2018.

8   A   Which page?

9   Q   Page 33, Lines 19 through 21.  "Question:  Did you

10  personally review any of the Debtors' professional fee

11  applications?  Answer:  I did not."  Sir, did you get --

12  were you asked that question and did you give that answer?

13  A   I can't -- I'm just trying to read what was said above

14  it because...  Yep, I can -- I did say that.  And I was

15  referring to -- as part of that process.

16  Q   And just to be clear, there were people in legal at the

17  Debtors' that did review the fee applications, correct?

18  A   There were people in -- there were people in legal that

19  reviewed the legal fee applications and invoices.  And there

20  were people in the financial organization who reported to

21  me, and some that did not, that were reviewing the financial

22  advisors' invoices and fee applications.  And my reference

23  was, again, to those -- to that process that I was outlining

24  to you.  I did not go through that process and review those

25  the applications.  I had other individuals doing that.

1  Q    And --

2  A    And my answer to you a moment ago was yes, as part of

3  the Fee Committee, I did review -- I have reviewed some fee

4  applications.

5  Q    And what were the dates that you were on the Fee

6  Committee, sir?

7  A    It would've been -- I'm guessing here -- and Mr.

8  Keglevic was actually the -- I'd have to look back at the

9  date.  I don't recall.

10  Q    Mr. Horton, you also don't recall if the Debtors ever

11  requested additional information in order to assess the

12  Debtor professionals' allocations of the fees and expenses

13  between EFH and EFIH, correct?

14  A    I do not know.  As I said, there was a -- and in my

15  deposition I said there were professionals working for Ms.

16  Ms. Doré, Cecily Gooch, who was the special counsel for

17  restructuring, Andy Wright, the associate general counsel,

18  were reviewing the legal invoices, and I said in my

19  deposition that Mr. Carter, Mr. Maldovan, and Ms. Dobrey

20  were reviewing either financial or all of them.  But I did

21  not -- I don't have knowledge of what their conversations

22  were back and forth.

23  Q    And sir, you also -- as far as you know, the Debtors'

24  Boards for EFH and EFIH also did not review those fee

25  applications, correct?

1    A    I couldn't answer that.  I don't know what the

2    disinterested directors were doing, whether they were

3    reviewing those or not.  I don't know if the Board members

4    were either.

5    Q    Now, would you agree with me, sir, that allocation of

6    administrative expenses between EFH and EFIH is a conflict

7    matter?

8    A    I believe that pre-emergence, that was certainly deemed

9    as and handled as a conflict matter.  There's certainly

10   differences of opinion between the two groups today.  When

11   you say conflict matter, it depends on who you're referring

12   to.

13   Q    And you expected, sir, that if it was a conflict matter

14   that the disinterested directors would have played a role in

15   those allocation issues, correct?

16   A    If it was a conflict matter, I would expect them to be

17   -- they would play a role in a conflict matter, yes.  Not

18   everything that they did was a conflict matter, though.

19   Q    Now, sir, in connection with your review of the

20   Debtors' professionals' fees, you at some point learns that

21   Kirkland began allocating his fees at some point, 90 percent

22   to EFIH and 10 percent to EFH, correct?

23   A    I recognized, and it was determined that they were

24   allocating the fees according to the debt at EFH and EFIH,

25   and I think the resultant math of that was approximately 90

1    percent to EFIH and 10 percent to EFH.

2    Q    Now, you didn't learn about that at the time that that

3    allocation change happened, though, correct?

4    A    I think the first time that I was aware of that change

5    would have been some time maybe in the summer of 2017,

6    Something like that.

7    Q    So, there's been testimony that the (indiscernible)

8    allocation occurred in October 2016, so approximately nine

9    months later, roughly?

10   A    Approximately, maybe.

11   Q    Now, when you learned that Kirkland had started

12   allocating the collective benefit fees, 90 percent to EFIH

13   and 10 percent to EFH, based on debt, did you ask anyone how

14   Kirkland had determined the amount of debt to each of the

15   respective states?

16   A    I think that it was actually post-emergence that I

17   asked the rationale for it.  I believe -- and I can't say

18   this with 100 percent certainty' it's been a very long case

19   with lots of changes and so forth -- but I believe that I

20   had a conversation with Christy Dobrey, who was our

21   assistant controller at that point in time, which would have

22   like June of 2017, something like that.  I posed a question

23   to her about how the fees were being allocated.  I heard the

24   fees -- the retained professional fees, and it was more

25   broad -- was a statement that I heard that professional fees

1    for everyone was going -- was 90/10, and I asked Ms. Dobrey

2    a question.  In fact, I looked back at the email chain and I

3    asked her a question.  That is all the professionals

4    allocating 90/10.  I just didn't know, so...

5    Q    And did you follow up with Kirkland at all to

6    understand how Kirkland had arrived at a 90 percent 10

7    percent allocation?

8    A    I did that at a later date, and it would have been

9    post-emergence.

10   Q    Okay.  And what did Kirkland explain to you about how

11   they had arrived at the 90 percent 10 percent allocation?

12   A    My understanding is at the time that either it was

13   contemplated that there were going to be two separate --

14   basically two separate plans, and TECH was going to be, you

15   know, separate and independent from EFH and EFIH in terms of

16   a process perspective in the moving forward of consummating

17   a plan and emerging from bankruptcy, that at that point in

18   time, Kirkland looked at the work and the services that they

19   felt like they were going to be performing for EFH and EFIH

20   were going to be essentially all collective benefits.  And

21   the amount of direct benefits was going to be so small that

22   it made no sense to track that.  And it was -- they then

23   utilized a methodology and they changed the methodology

24   from, you know, tracking of time and so forth to an

25   allocation based upon the debt.  And I inquired as to who

1   they'd spoken to at the company as to whether that made

2   sense, and they told me that they had spoken to Mr.

3   Keglevic.

4   Q    Okay.  But your understanding --

5   A    And (indiscernible).

6   Q    I apologize.

7   A    And I apologize for talking over you.

8   Q    Your understanding, sir, is that one of the reasons

9   that Kirkland made this change was because it no longer made

10  sense to track the amount of direct benefit fees for EFH and

11  EFIH?

12  A    Yes, because of the -- their explanation to me was that

13  because the work was more around -- going to be more around

14  merger agreement for both parties, plans of reorganization,

15  disclosure statements, tax, PLRs, which were going to be

16  benefiting both estates, that was the explanation I was

17  given, sir.

18  Q    Did you ask him what date they used to calculate the

19  ratio of debt between the estates?

20  A    I don't recall at that particular point in time if I

21  ask that question.

22  Q    Did you take any steps, sir, to ensure that their

23  calculation of the ratio of debt between EFH and EFIH was

24  correct?

25  A    I did look at -- I kind of did some math of debt of

1    each estate, and it was roughly the 90/10 number.  So, I

2    could see how they were getting to those numbers.

3    Q    And was this based on debt as of the summer of 2017

4    when you were looking at it?

5    A    It would have likely been in that timeframe, yes, sir.

6    I can't say for certain.

7    Q    Now, you also indicated, Mr. Horton, that your

8    understanding was that Kirkland had informed Mr. Keglevic of

9    this change in allocation methodology, correct?

10   A    That's my understanding.

11   Q    Did you ever speak with Mr. Keglevic to see if he

12   agreed or approved of the change in allocation methodology?

13   A    I did not.

14   Q    Sir, in connection with the review of Debtors'

15   professionals' fees and your conclusion that that allocation

16   -- that their allocation warrants deference, did you

17   consider whether the 90/10 allocation methodology of

18   Kirkland complies with the interim compensation order?

19   A    I did, indeed.  In fact, I went back, and I reviewed it

20   more than one time.  And ultimately, I again go back to the

21   principle that there is, you know, no economic incentive for

22   these professionals to allocate their fees, you know, to --

23   or skew their fees to one estate or another.  I view these

24   professionals as competent and trustworthy.  Again, which I

25   continue to say, is a key factor of any process, any

1   internal control, any kind of control, and I believe that

2   they were best positioned to make that determination.  And I

3   believe that the fit -- although they had changed their

4   rationale and their logic and their approach, I think it fit

5   within the construct of the interim, order.

6   Q    All right, so --

7   A    And that's my judgment.

8   Q    All right.  So, just to be clear though, your judgment

9   is that an allocation based on debt complies with Paragraph

10  2(b) of the interim compensation order, correct?

11  A    I believe that.

12  Q    All right.  Does Paragraph 2(b) say anything about

13  allocations based on debt?

14  A    It doesn't say allocations based on anything.

15  Q    You believe it doesn't say anything about allocations

16  based on anything?

17  A    Time.  It doesn't say based on time.  It's about what

18  services, was it direct or collective.

19  Q    Do you --

20  A    But it doesn't say -- it doesn't say -- from my

21  perspective, again; I don't want to go too far out here --

22  but from my perspective, it doesn't give a specific

23  methodology or technique for allocation --

24  Q    Do you understand, sir --

25  A    -- of tracking -- of determining direct benefits versus

1    indirect --

2            THE COURT:  You've got to watch out for those --

3    A    -- collective.

4            THE COURT:  -- Texas pauses.  He's like the

5    antithesis to Mr. McKane.  It's like you've got fast-forward

6    and slow.  No, I'm just teasing you all.

7            MR. MCGINNIS:  Don't let me get Hessler in here.

8    Q    Sir, you do understand that Paragraph 2(b) specifies

9    that collective benefit fees should be allocated based on

10   the respective proportions or ratios of direct benefit fees

11   for the estates, though, correct?

12   A    Yes.

13   Q    All right.  And you di understand that what Kirkland

14   was doing was allocating collective benefit fees, 90 percent

15   to EFIH and 10 percent to EFH, based on debt, correct?

16   A    Which -- I agree with that, which is a method for

17   determining that the amount of direct benefits for each one

18   of those estates was related to the amount of debt.

19   Q    You understand that the 2(b) uses the word "shall",

20   correct, when it refers to the allocation methodology?

21   A    Okay.

22   Q    And you understand that that typically means that the -

23   - something is mandatory, in legal terms?

24   A    I'm not a lawyer.

25   Q    Fair enough.  Now, sir, you've heard some testimony

1    today and in the deposition transcripts about asbestos

2    claims, correct?

3    A    Some.

4    Q    Okay.  Do you have an understanding of how Kirkland

5    billed or allocated its time with respect to asbestos

6    claims?

7    A    At a very high level.  I would again refer you to Mr.

8    Husnick at a very high level.  I don't have the level of

9    detail that he has.

10   Q    Well, is that one of the things that you reviewed when

11   reaching your conclusion that the professionals' allocations

12   warrant a deference?

13   A    I didn't go down into individual activities.  I think

14   the general -- the general example -- or, excuse me --

15   explanation that I got was that to the extent there was

16   litigation regarding a specific matter, that litigation was

17   charged as a direct benefit to that related estate.  But

18   asbestos, I just don't recall specifically how that was

19   allocated.

20   Q    All right.  Do you have an understanding that at least

21   some of Kirkland's work in connection with asbestos claims

22   was billed as a collective benefit to both EFH and EFIH?

23   A    I recall that.

24   Q    I'm sorry?

25   A    I do recall that.

1    Q    Okay.  And you understand, again, that at least as --

2    after October 2016, Kirkland was allocating that collective

3    benefit time 90 percent to EFIH and 10 percent to EFH,

4    correct?

5    A    Mathematically, as a result of the debt.

6    Q    And as a practical matter, that meant that EFIH was

7    paying nine times more for that asbestos work than EFH.  Do

8    you understand that?

9    A    I think that's a 9-1 ration, yes, sir.

10   Q    All right.  Does that make sense to you?

11   A    In a lot of respects it does.  It seems reasonable to

12   me.  At that point in time we were again doing merger

13   agreements, we were doing plans of reorganizations,

14   confirmation hearings, a lot of tax work, PLR type work,

15   trying to get a transaction closed and approved, disclosure

16   statements.  That makes sense.

17   Q    And it makes sense because you've -- if I understand

18   what you're saying, some of the asbestos work related to

19   joint plan confirmation issues.  Is that right?

20   A    That's part of the reason, yes.

21   Q    And you think it's fair that EFIH paid nine times as

22   much for that work than EFH?

23   A    I believe the methodology that they applied in terms of

24   the interim comp order fit within the interim comp order.

25   Q    Sir, do you think that Kirkland's work on asbestos

1    claims primarily benefited a particular estate?

2    A    Asbestos claims?

3    Q    Yes.

4    A    In terms of litigating a claim?

5    Q    No, just any Kirkland fees.  Let me state the question

6    again so it's clear.  Do you think that Kirkland's work in

7    connection with asbestos claims asserted against EFH

8    provided a primary benefit to EFH, EFIH, or both?

9             MR. GLENN:  Objection to that question.  It's --

10            THE COURT:  Yeah --

11            MR. GLENN:  -- completely vague.

12            THE COURT:  Well, it's not vague.  It's exact --

13            MR. GLENN:  And it's --

14            THE COURT:  It's just opened the door to

15    everything I just excluded.  You're asking him what the

16    proportion should be, and you just had a -- I just excluded

17    that testimony.

18            MR. MCGINNIS:  Your Honor, to be --

19            THE COURT:  If you want to open that door, that's

20    fine, but the evidence is going to go back in the record.

21            MR. MCGINNIS:  Well, Your Honor, to be clear, I'm

22    not asking for a number at all.

23            THE COURT:  Yeah, you are.  You just asked him --

24    five questions ago, you just asked him if he thought 9 to 1

25    was a good number.

Page 262

1          MR. MCGINNIS:  Your Honor, respect --

2          THE COURT:  And he disagreed.

3          MR. MCGINNIS:  Yeah, but --

4          THE COURT:  Well, then the next answer on

5    redirect, I think, is what is the good number?  You disagree

6    with 9 to 1, what do you think the new number -- you've

7    opened that door.

8          MR. MCGINNIS:  Fair enough, Your Honor.

9          THE COURT:  So, it's up to you.  And I know you

10   didn't move to exclude that testimony.

11         MR. MCGINNIS:  Right.  We actually -- to be clear,

12   we --

13         MAN 1:  (indiscernible)

14         MR. MCGINNIS:  The door can be as open as

15   (indiscernible).

16         THE COURT:  So, it's up -- Mr. Glenn, who just --

17         MR. GLENN:  Yeah.

18         THE COURT:  -- who just objected.

19         MR. GLENN:  You're not consenting to open

20   (indiscernible).

21         THE COURT:  But I think it's -- you know...  Well,

22   I'll let Mr. Glenn object if he wants.  I'm sorry.  I

23   shouldn't be inserting myself.

24         MR. GLENN:  We object to that on both the basis,

25   Your Honor, whether he believes something is fair or not is

1    irrelevant.  The question was very vague because it related

2    to all the asbestos work under every category that Kirkland

3    ever billed.  In addition, we stand on our objection on the

4    lay opinion.

5              THE COURT:  Sustained.  You can rephrase or try to

6    rephrase.

7              MR. MCGINNIS:  I understand.  Thank you, Your

8    Honor.  Let me move on from that one for the moment.

9    Q    Mr. Horton, in connection with your review of

10   Kirkland's fees and your determination that their allocation

11   warranted deference, did you review how Kirkland allocated

12   fees in connection with the EFIH DIP financing?

13   A    I think -- and I believe I did.  I didn't -- it was a

14   conversation.  It wasn't like a review of their -- how they

15   actually allocated or their invoices.  I had a conversation

16   with them.

17   Q    And do you have an understanding of where that time was

18   allocated?

19   A    My understanding is that time was allocated at EFIH.

20   Q    Do you believe that DIP financing allow the Debtors as

21   a whole to operate during these cases and get to a confirmed

22   plan?

23   A    Which DIP financing?  We had four or five of them.

24   Q    Fair enough.  With respect to any of Kirkland's work on

25   the DIP financing, do you believe that work allowed the

1   Debtors as a whole to move towards a plan?

2            MR. HORTON:  Am I allowed to answer that --

3            THE COURT:  Yes, you are.

4            MR. HORTON:  (indiscernible)

5            THE COURT:  Yes, you are.

6            MR. HORTON:  Okay.

7   A    My view --

8            THE COURT:  The problem earlier wasn't --

9            MR. HORTON:  Yeah.  It's hard --

10           THE COURT:  The problem earlier was pegging it to

11  a number.  I understand.  Just don't worry.  We'll make sure

12  you don't say anything wrong.

13           MR. HORTON:  Yeah.

14  A    My view is cash was not going from EFIH to EFH during

15  the case.  The financing, the first lien financing, I'll

16  give you an example, is when we dipped everyone out at the

17  very beginning, that was to lower the cost to EFIH and

18  reduce the cost -- the interest burn at EFIH.  But there was

19  no cash going during the case between EFH and EFIH.  There

20  were no dividends going up.

21           So, I don't know how it did directly or indirectly

22  benefit EFH.  I guess someone could come up with some

23  theory.  But I believe that the DIP financing benefited EFH

24  almost exclusively.

25  Q    I'm sorry, did you say EFH or EFIH?

1    A    Benefited EFIH.  I may have said EFH.

2    Q    Thank you.

3              MAN 1:  I was wondering (indiscernible) --

4              MR. HORTON:  Apologies.

5              THE COURT:  You did say EFH, but you're correcting

6    it to EFIH.

7              MR. HORTON:  Yes, sir.

8              THE COURT:  Okay.  It's an alphabet soup.  It's

9    easy to get messed up.

10             MR. HORTON:  EFH, eternal hell and fire

11   (indiscernible).

12   Q    Mr. Horton, in connection to your -- with your review

13   of the Debtors' professionals' fees, did you review the fees

14   of Richards, Layton & Finger?

15   A    I did a review.  Again, some of it was direct --

16   directly from myself.  Others were regarding -- I did that

17   through K&E.  I had, as I said, Patrick (indiscernible)

18   reach out to RLF.  I got an oral review from him as to the

19   answers.

20   Q    Do you have an understanding of how Richards, Layton &

21   Finger allocated its fees between EFH and EFIH throughout

22   these cases?

23   A    I'd have to look back.  I don't recall everyone

24   specifically.  It was kind of a review of exceptions.  Is

25   someone doing something out of the ordinary or outside of

1    the confines or the framework of the interim comp order.

2    And I didn't find anyone come -- that I saw, come forward,

3    like you are not -- you're not complying.

4    Q    So, sir, you don't recall that Richards, Layton &

5    Finger allocated 35 percent of its time to EFIH and

6    approximately 65 percent to EFH, correct?

7    A    I would assume that the professionals at RLF had their

8    rationale, reasoning.  They knew what services that they

9    were providing and for whom, and they allocated it

10   accordingly.

11   Q    Did a concern you at all that the allocation of fees

12   between -- that Kirkland & Ellis performed, and Richards,

13   Layton and Finger performed were inconsistent?

14   A    No.  I mean, they're two different firms doing two

15   different activities, what RLF does.  And again, I couldn't

16   tell you precisely what they do.  I couldn't tell you

17   precisely how all the efforts that Kirkland & Ellis have

18   done for this case.  I know they're professionals.  And I

19   don't see those two roles as being the same.  But what do I

20   know?

21   Q    And sir, what's your conclusion that Richard Layton &

22   Finger's allocation of 35 percent of their fees to EFIH and

23   Kirkland & Ellis's allocation of approximately 90 percent of

24   its fees to EFIH were both within the range of reasonable,

25   warranting deference?

1      MR. GLENN:  Objection.  I think that calls for a

2  lay opinion because of the reason we talked about before.

3  He's asking him whether it's fair to (indiscernible) those

4  numbers.  So, I think that's (indiscernible).

5      MR. MCGINNIS:  Your Honor, may I be heard?

6      THE COURT:  Yes, of course.

7      MR. MCGINNIS:  The testimony that I'm seeking

8  relates to a paragraph in Mr. Horton's direct -- written

9  direct that Mr. Glenn did not object to.  It relates to the

10  opinion that he offered in that paragraph that the Debtors'

11  -- the allocation of Debtors' professionals' fees should be

12  warranted deference.  It does not call for a specific

13  opinion.  It simply asks whether two allocations with very

14  different numbers both warrants deference.

15      THE COURT:  I'll allow that.  You can answer, Mr.

16  Horton.

17  A    I'm not sure what the question is --

18      THE COURT:  Oh.

19  A    You're referring to --

20  Q    I was worried you were going to ask me that, sir.

21  A    What's the question, and what are you referring to?

22  So, what paragraph are you referring to in my declaration?

23  Q    I will state a clearer question for the record, if I

24  can.  Did it concern...  Sir, in connection with your

25  conclusion that the professionals' allocations of fees

1    warranted deference, did you determine that Richards, Layton

2    & Finger's allocation of approximately 35 percent of its

3    fees to EFIH, and Kirkland's allocation of approximately 90

4    percent of its fees to EFIH, both were within the range of

5    reasonableness and warranted deference?

6    A    What mattered to me was the language in 2(b) and

7    whether or not I felt like the professional was operating

8    within the framework, the construct of 2(b), not whether or

9    not it was a reasonable ratio or an unreasonable ratio.

10   Were they following 2(b)?  And that's for others to judge as

11   to whether or not that was what -- that seems like that's

12   unreasonable that 35 and 65 is unreasonable compared to

13   90/10.

14           My approach was give deference and then verify

15   whether or not they were following the order of the Court as

16   best I could and under my judgment.

17           THE COURT:  Or as Ronald Reagan would say, trust

18   but verify.  Yeah.

19           MR. HORTON:  Yes, sir.  Trust and verify.

20   Q    So, Mr. Horton, this talk about that a little bit.

21   Let's talk about what you did to verify.  I believe that on

22   your direct testimony you spoke a little bit about working

23   with Kirkland to review the allocations that the various

24   professionals had performed, correct?

25   A    I did that, yes.  I had conversations with Mr.

1    Maldovan, again, who is now Treasurer of Vistra and formally

2    Assistant Treasurer, Vice President of EFH.  I had

3    conversations with Michael Carter, not only after the fact,

4    but along the way, just as a matter of controls.  But I got

5    more specific in my questions, in my conversations, either

6    indirectly or directly through K&E.  But I talked to Andy

7    Wright, who is our associate General Counsel.  I talked to

8    Christy Dobrey, who is now the Controller of Vistra,

9    previously Assistant Controller at EFH, and had multiple

10   conversations verifying.

11   Q    All right, and --

12   A    And again, part of -- again, not to talk over -- and I

13   read depositions.

14   Q    All right.  And you read the depositions that were

15   taken in connection with this case, correct?

16   A    I would say --

17   Q    Now, with respect --

18   A    I would say generally, yes.

19   Q    I --

20            THE COURT:  May I interrupt.  I'm sorry, can we

21   have a very short recess, and then we'll push on to a 6:30

22   stop, okay?  All right.

23        (Recess)

24            MR. MCKANE:  May I proceed, Your Honor?

25            THE COURT:  You may.  We will go until 6:30.  If

1    you're done, if you finish before that and we've only got 10

2    or 15 minutes, we'll stop sooner, because it doesn't make

3    any sense to cut somebody off in the middle of their

4    examination.  But take all the time you want, Mr. McKane.

5              MR. MCKANE:  Thank you, Your Honor.

6              THE COURT:  It's your time to burn.

7    Q    Mr. Horton, I think when we broke, we were speaking

8    about the investigation you performed into the Debtor's

9    professional's fees, do you recall that?

10   A    I do.

11   Q    Okay.  And you had interviewed a number of people,

12   correct?

13   A    That's correct.

14   Q    And Kirkland interviewed a number of people on your

15   behalf, correct?

16   A    That's correct.

17   Q    And with respect to Kirkland, you interviewed two

18   associates, correct?

19   A    I think Ms. Aparna Yenamandra is a partner, I'm not

20   sure.

21             THE COURT:  Congratulations.

22   A    She should be, if she's not.  She might be an

23   associate, I don't know.

24   Q    (indiscernible)

25   A    I consider her a partner, so, yes.

1    Q    And you did not review any of the Kirkland fee

2    applications in connection with that review of Kirkland's

3    allocations, though, did you?

4    A    I did not.

5    Q    In fact, the number of documents you reviewed

6    throughout this investigation you performed was actually

7    very limited, correct?

8    A    Relative to the fee applications that have been filed,

9    yes.

10   Q    Now, you also reviewed the fee allocations for the E-

11   side committee professionals, correct?

12   A    I did.

13   Q    And in connection with that review, and your assessment

14   of the allocations performed by those professionals, did you

15   consider whether EFIH was solvent at the time that the work

16   was performed?

17   A    EFIH was solvent at the time the work was performed?

18   Well, there's lots of measures of solvency, so what measure

19   are you using?

20   Q    Let me ask it another way.  You understand, sir, that

21   at various points throughout this case, the EFIH creditors

22   were expected to receive full payment on their claims,

23   correct?

24   A    No, I'm not going to agree with that.

25   Q    You understand --

1    A    I think it's too broad.  I'm not going to agree with a

2    statement that broad.

3    Q    You understand that under particular proposed plans in

4    this case, that EFIH creditors were expected to receive 100

5    percent.

6    A    At various points in time, yes.

7    Q    And did you believe that that fact was relevant to the

8    allocation of E-side committee fees at various points

9    throughout this case?

10   A    No.

11   Q    Why not?

12   A    One, I just don't believe that -- first off, you're

13   saying various points in time.  So I'm not sure what that

14   relates to, and how that relates to the fee allocation.  I

15   don't understand the relevance.  Maybe you can educate me,

16   but I don't see the relevance of that, no.

17   Q    Well, you understand, sir, that if EFIH creditors are

18   expected to receive 100 cents on the dollar, that EFH

19   creditors' recoveries are the focus of any efforts to

20   enhance recoveries at that point, correct?

21   A    So again, without going through the history of this

22   case and all -- again, you're saying 100 percent recoveries

23   at various points in time -- I mean, if you look pre-RSA,

24   they weren't expecting to -- if you look at the trading

25   prices, for example, which you guys used, you're trading

1    below par.  Every time a plan was either, it failed or

2    didn't get approved, your securities traded down.

3          In other words, we did not know whether EFIH was

4    solvent or not until we had a plan, in which required a

5    tremendous amount of work to even get a setup for this plan,

6    that whether it's taxable or non-taxable, or whether we had

7    make wholes or didn't have make wholes, whether asbestos was

8    being assumed or not, we had to have a plan that an

9    investor, if you were going to do your acquisition plan, or

10   a buyer was willing to step into.

11         And actually, it approved into close.  And until

12   that happened, all of that work needed to happen -- to

13   occur, and all of that was a setup benefit for my

14   perspective, for EFIH and EFH, period.  No one's going to

15   step into all this uncertainty and this risk, the tax risk.

16         And so if you're implying because there was a

17   potential hypothetical or even a transaction, there was

18   always risk that that transaction didn't close, and that

19   EFIH did not actually -- and of course we saw several times,

20   it didn't close.  So the relationship between the allocation

21   and that measure, I don't understand.

22   Q    Okay.  So let me go back.  I have a couple more

23   questions on asbestos, and the work that Kirkland performed

24   on the asbestos bar date order.  Do you believe that EFH

25   received more benefit from an asbestos bar date than EFIH?

1    A    I'm sorry, I was expecting him to object.

2              MR. GLENN:  Yeah, I'm going -- I don't know where

3    that -- I don't know what that means.  I'm debating that.  I

4    think that's a lay opinion, it's a vague question.  I don't

5    know how you measure more or less without numbers, so I'm

6    going to thank Mr. Horton.

7              MR. HORTON:  I'm sorry, Your Honor, I shouldn't

8    have --

9              THE COURT:  We don't want to be too -- levity is

10   good, but can you say it again?  Because I want to listen to

11   it again.

12             MR. MCKANE:  The question again?

13             THE COURT:  Yes.

14             MR. MCKANE:  I wasn't sure if it was the question

15   or the objection.

16             THE COURT:  No, no, the question.

17             MR. MCKANE:  The question.  Do you believe EFH

18   received more benefit from an asbestos bar date order than

19   EFIH?

20             THE COURT:  No, that's okay, that's okay.  You can

21   answer that question.

22   A    Thank you, sir.  My view, as I just said a moment ago,

23   is there were several risks, significant risk, tax risks,

24   there were risks regarding make-wholes, there was risk

25   regarding asbestos, and no transaction was going to get

1    executed until we came up with solutions to get investors or

2    buyers comfortable to step -- this is the utility industry.

3    They don't take risk.  And to get a buyer to step into

4    buying EFIH or EFH, you pick whichever one, until those

5    risks are mitigated, and managed, and understood, there was

6    no transaction going to happen.

7              In my view, it benefitted both estates, was it a

8    dollar more or five dollars more, I don't know.  But that

9    work was fundamental and foundational to getting any

10   transaction done.

11   Q    All right, so just to be clear, you don't know if EFH

12   or EFIH received more benefit from an asbestos bar date

13   order, correct?

14   A    I think they both -- I believe they both received

15   benefit.

16   Q    Do you believe they both benefitted equally?

17   A    I don't know what your measure is, so I can't answer

18   the question.  You can look at total unsecured claims, if

19   you want to look at that level of who could have benefitted.

20   You could look at total amount of claims and consideration.

21   Q    Fair to say, sir, that you think that the question of

22   how to assess whether one estate or another estate is

23   benefitting from particular work is a difficult or

24   impossible question to answer?

25   A    Difficult, yes.

1   Q    And with respect to this issue, you cannot determine

2   which estate benefitted more, correct?

3   A    Again, I would need to do a lot of analytical analysis,

4   and think about it back and forth.  I think what matters,

5   and I think to the heart of where you're going is, did the

6   professionals, when they were doing the work, how did they

7   view it, how are they spending their time, and for who's

8   benefit?  The bar date, it provided a setup for an overall

9   transaction.

10  Q    And in connection with your review of the Debtors'

11  professionals' allocations, and your determination that

12  those allocations warranted deference, did you give

13  consideration to which estate benefitted from the particular

14  work at issue?

15  A    The professionals were the ones that were tasked with

16  the determination of how their work was being -- their time,

17  their work, their efforts were being spent on various

18  matters, and whether it was a direct benefit or collective

19  benefit to the estate.  And then they had a methodology for

20  allocating those expenses.

21  Q    All right, so you did not -- as part of your review,

22  you did not consider which estate benefitted, correct?  You

23  left that to the professionals?

24  A    I left it to the interim comp order, Section 2(b), were

25  they in compliance with it?

1          (Off-topic Discussion)

2     Q    Sir, in connection with your review, did you review how

3     the PAB, or consider how -- excuse me, how Kirkland is

4     allocating its time in connection with its representation of

5     PAB in these proceedings?

6     A    Again --

7               MR. GLENN:  Objection, relevance.

8               THE COURT:  Yeah, what's the relevance?  What's

9     the relevance?

10              MR. MCKANE:  Well, Your Honor, to the extent that

11    the allocation is different than what Kirkland was doing

12    during the case, I think that that would be relevant, and

13    make it more likely than not that one allocation is

14    appropriate, versus another.

15              THE COURT:  How?

16              MR. MCKANE:  Well, for example, if the allocation

17    was 50-50 (indiscernible), but it was 90-10 before, I think

18    that casts doubt on the appropriateness of the 90-10

19    allocation.

20              THE COURT:  Sustained.  Objection sustained.  I

21    don't know what they're doing with the PAB is relevant.

22    Q    Mr. Horton, you had testified, I believe, that you were

23    on the Fee Committee, is that right?

24    A    I am on the Fee Committee, yes.

25    Q    And I recall, I don't think you know precisely when you

1  were on the Fee Committee.  Do you recall approximately how

2  long you were on the Fee Committee?

3  A    I just don't recall.  It seems like it was some time in

4  the spring of 2017.  But I just don't know.  If I knew the

5  date, then I could do the math and tell you how long.  But I

6  just don't know the date.

7  Q    Fair enough, fair enough.  And you believe that you

8  were a member of the Fee Committee, correct?  Not Mr.

9  Keglevic, at that time?

10 A    Mr. Keglevic was the member.  I was there and had his

11 proxy in the event that he couldn't attend.  That was the

12 general agreement.  I attended all the meetings.  I think

13 Mr. Keglevic attended all of them, but maybe one.  but I may

14 be mistaken on that?

15 Q    Okay.  But Mr. Keglevic was the official member, you

16 participated in the meetings.  Is that accurate?

17 A    Yes.

18 Q    Do you know if the Fee Committee reviewed the

19 allocations of fees by the Debtor's professionals at the

20 time that you participated in Fee Committee meetings?

21 A    I don't recall that topic ever being addressed or

22 brought up.

23 Q    And it sounds like you attended most of the meetings,

24 correct?

25 A    Most of the meetings, when there was a change to Mr.

1   Keglevic from Cecily Gooch.

2   Q    I apologize, just a couple more questions.

3   A    That's okay.

4   Q    So Mr. Horton, just a couple of additional questions

5   about E-side committee fees.

6   A    Yes, sir.

7   Q    Did you consider the composition of the E-side

8   committee in reviewing the allocations of E-side committee

9   professional fees?

10  A     No, I didn't.  I knew there were originally five E-side

11  committee members, as I recall.  I'm doing this from memory.

12  And Pete Tinkham was the chairman, someone stepped off.

13  That's the composition.  I didn't think about it in terms of

14  members as a method for allocation.

15  Q    Did you consider whether the members of the E-side

16  committee had claims against EFIH, versus -- excuse me,

17  versus -- withdrawn.  Did you consider whether the member of

18  the E-side committee were EFH creditors as opposed to EFIH

19  creditors, in assessing the appropriateness of the

20  allocations of the E-side committee fees?

21  A    No, again, I focused more on the work and the efforts

22  that were performed.

23  Q    And in connection with the work performed by the E-side

24  Committee professionals, did you consider their role in

25  investigating potential insider and other claims belonging

1    to EFH?

2    A    I don't recall that, no.

3    Q    And did you consider the work by E-side committee

4    professionals, in connection with the global settlement

5    among Debtors, including the allowance of the $700 million

6    claim by TCEH against EFH?

7    A    Would you mind repeating that?  I'm sorry, it's a long

8    question.  I apologize.

9    Q    And I apologize, I realize it was a long question.

10   A    It is getting late.

11   Q    And I am near the end, Mr. Horton.  In connection with

12   your review of the E-side committee allocations, did you

13   consider their work in connection with contesting the global

14   settlement among Debtors, including the allowance of a $700

15   million claim by TCEH against EFH?

16   A    That's a long question.  I considered their

17   participation in the global settlement as part of that, yes.

18   Q    And did you also consider their negotiation of an EFH

19   beneficiary settlement in 2015?

20   A    I considered the E-committee settlement, which included

21   that, yes.

22             MR. MCKANE:  No further questions.  Thank you, Mr.

23   Horton.

24             THE COURT:  Thank you, Mr. McKane.  Mr. Glenn, you

25   have questions, but I'm sure it's going to take more than 15

Page 281

1    minutes.

2              MR. GLENN:  Yes, Your Honor.

3              THE COURT:  Mr. Pedone, are you going to have

4    questions of Mr. Horton?

5              MR. PEDONE:  Five or ten minutes, Your Honor, but

6    I'll go after Mr. Glenn --

7              THE COURT:  Okay, and of course redirect, right?

8              MR. MCKANE:  Your Honor, Mr. McKane for PAV.  I've

9    conferred with Mr. Glenn, and we actually think that we can

10   complete Mr. Horton in relatively efficient fashion tomorrow

11   morning.

12             THE COURT:  Okay.

13             MR. MCKANE:  Right, so, and actually I recognize

14   we're giving him the night to -- but I think it would

15   actually enable him to synthesize the examination.

16             THE COURT:  All right, well we had for tomorrow,

17   we have to get Mr. Keglevic up and done.

18             MR. MCKANE:  We do.  I would say based on my

19   internal estimates, and I'll let counsel speak for

20   themselves, but we're ahead of schedule.

21             THE COURT:  Okay, all right.  We're going to

22   recess for the evening.  We will reconvene at 9:30 tomorrow

23   morning.  I don't think there's a need to meet at 9:00

24   tomorrow, but if you want to do so, we can.  No?  You'll get

25   a little extra sleep.

Page 282

1          MR. MCKANE:  Your Honor, we're not aware of us --

2    for you, hopefully.  But we're not aware of any issues that

3    require an (indiscernible) --

4          THE COURT:  Okay, that's fine.  So we'll reconvene

5    at 9:30.  And Mr. Horton, during our overnight recess, you

6    may not discuss the substance of your testimony with any

7    person.  Okay, very good.  Thank you.  You can leave

8    everything.  We are in recess until tomorrow at 9:30.  Have

9    a good evening.

10          (Whereupon these proceedings were concluded at

11    6:16 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 283

1              C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya          Digitally signed by Sonya Ledanski
                     Hyde
                     DN: cn=Sonya Ledanski Hyde, o,
     Ledanski Hyde   ou, email=digital1@veritext.com,
                     c=US
7                    Date: 2018.09.06 17:02:18 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 6, 2018

**&**

**&**  3:3,8,15 5:7,14
  16:9 50:19 56:11
  56:12,18 58:8,11
  58:13 59:13 66:3
  72:16 73:8 75:2,5
  75:24 95:8 122:15
  129:2 212:20
  217:15 223:8
  224:19 229:13
  233:19,20 265:14
  265:20 266:4,12
  266:17,21,23
  268:2

**0**

**011**  94:1
**026**  60:7
**029**  245:9

**1**

**1**  17:24 18:17 55:2
  55:7 67:21 75:8
  85:4 87:3,21
  99:12,12 116:5
  132:14 142:4
  144:13 157:2
  167:12 242:17,20
  249:20 250:7
  261:24 262:6,13
  265:3
**1.08**  202:22
**1.47**  32:12,15,24
  33:7 44:6 45:2
**1.6**  34:22 43:6
**1.7**  231:9
**1.8**  189:17,20
  190:2 203:1,3
**1.955**  113:8
**10**  16:22 32:15
  77:25 90:20 91:2
  102:6 105:17
  201:10 252:22
  253:1,13 254:6,11

258:15 260:3
  270:1
**10,000**  121:3
**100**  14:9 20:14
  34:5 65:16 194:9
  196:20 197:2
  198:25 230:19
  253:18 272:4,18
  272:22
**106**  86:16 87:7
**11**  1:5 18:17 19:5
  19:7 52:9 57:21
  58:23,24 60:25
  61:7,19,23 66:14
  67:13 70:13 72:4
  81:23,24 91:25
  92:2,18 123:7
  161:18 162:7
  182:21 183:13
  186:14 205:2
**110**  230:17
**113,000**  33:18
**11501**  283:23
**12**  177:14,14
  194:2 210:23
  222:24
**120**  65:19
**121**  32:15
**12:30**  128:6
**12th**  11:12
**13**  2:4 35:25 46:3
  75:13,18
**13.2**  33:15 35:18
**13.7**  33:14 35:17
**13102**  2:4
**137**  20:8
**137,500**  27:4
**14-10979**  1:6
**15**  135:12,17
  145:1 149:24
  179:9,13 193:19
  197:17,24 270:2
  280:25

**15,000**  64:20
**150**  11:20 230:16
  231:6
**150,000**  64:20
**157**  74:23
**16**  104:20 105:2
  169:7 202:9,18,20
  202:21,21
**165**  10:22 231:22
**168**  161:23 162:1
**17**  112:19,25
**171**  86:16 87:7
**174**  86:16 87:8
**17th**  230:23
**18**  150:19 151:12
  190:3,6,18 191:6
  193:10,10 202:9
  202:18,21
**189**  101:4
**18th**  230:24
  241:21
**19**  145:1 249:23
  250:9
**19th**  11:12 230:20
  231:13
**1:00**  120:10
**1:30**  128:7
**1st**  13:22,24

**2**

**2**  44:7 67:22 71:12
  71:13,15 75:9
  87:4,22 91:5
  95:22,23 97:25
  132:4 141:24
  143:4,5,19 150:14
  178:11 182:8,11
  190:10,24 193:14
  193:17,18,23
  194:4,13 197:6,7
  198:4 203:6 231:9
  245:13 257:10,12
  258:8,19 268:6,8
  268:10 276:24

**2-6**  60:9
**2.037**  148:24
**2.75**  111:20 112:4
  113:9
**2.79**  34:14 45:4
**20**  12:3 20:10
  149:25 172:8
  179:10,13 193:19
  197:17 203:2
  231:12,25
**200**  16:15 230:6
**2000**  29:7
**2002.35.023.**
  141:22
**2014**  12:7 28:2,11
  67:14 103:9 151:1
  151:5 172:23
  175:23 178:20
**2015**  12:8 28:2
  52:19 280:19
**2016**  10:21 13:22
  13:24 29:6,7
  30:22 52:19 53:9
  53:10 76:25,25
  77:1,2,3 83:6
  89:21 99:3 103:9
  103:15 105:1,5,9
  105:15,22 172:23
  174:22 202:7
  230:5 231:18
  241:6,7,18,21
  253:8 260:2
**2017**  13:24 104:20
  196:19 197:3
  203:16 204:20
  235:22 253:5,22
  256:3 278:4
**2018**  1:14 2:4
  30:23 177:22
  199:23 201:21
  202:4 206:16
  231:25 235:22
  250:7 283:25

**202**   16:17 19:12
**204**   86:17 87:8
**21**   65:4,14 77:15
   78:4 141:13,15,17
   197:24 198:2,8
   249:23 250:9
**214,000**   35:22
**21st**   10:20
**22**   141:3,6
**221**   214:9
**233**   86:17 87:8
**2337**   164:4
**24**   67:7 86:16,17
   87:7,8
**25**   21:23 86:18
   87:9 162:4 191:7
   191:13,20 192:4,6
**250**   10:25 230:7
   230:12
**25th**   12:8,19
**26**   60:14 86:18
   87:9 169:14
   213:25 222:3
**27**   99:11,15,17
   153:3 170:23
**275**   10:22 21:12
   21:22,24 22:3
   23:11 25:23 32:13
   33:8,18
**27th**   12:7 230:5
**28**   86:18 87:9
   101:11
**285**   68:3,9,10
**29th**   10:20 13:19
   67:14,15 75:1,5
   75:18
**2:40**   128:10,14
   168:7,12
**2:45**   128:9

**3**

**3**   47:16,18 71:12
   86:17,21 87:8
   155:21 178:11

**3.1**   43:3
**3.4**   57:16 78:21
   85:11 101:3,19
   154:21 184:11
   187:1,2 198:16
**3.5**   191:4
**3.514**   191:4
**30**   15:8 148:10,23
   225:12 246:6,8,16
   246:21,24
**300**   11:19 21:13
   21:16,22 62:11
   231:5 283:22
**30th**   13:24 241:6
   241:7,18,25
**31**   33:8 57:14,21
   86:18 87:9
**319**   87:1,10
**31st**   13:20,22
**32**   86:18 87:9
**33**   86:19,20 123:7
   249:23 250:9
**330**   42:14 283:21
**337**   156:8,10,14
   156:24 157:8
   158:3,8,13 159:1
   159:6,12 162:20
   163:2,23 164:2
**34**   71:6,9 86:20
   87:1,10
**35**   15:7 130:24
   131:3 198:1,2,5,8
   266:5,22 268:2,12
**360**   10:23
**38**   177:13
**3rd**   214:9 242:7

**4**

**4**   8:16 32:15 57:17
   74:12,19 77:3
   78:21 85:11 86:17
   87:8 90:19,24
   91:1,2 101:3
   128:4

**4.8**   26:4
**40**   29:25 30:1
**408**   218:5,6
**42**   38:5
**439**   87:1,10
**44**   86:19 87:1,10
   144:19,20,22,25
**45**   116:4
**464**   68:3
**471**   22:23 26:3
   33:20 35:25 37:15
   46:1 231:7,20
**478**   87:1,10
**4th**   61:4

**5**

**5**   1:14 141:11,22
   143:10,15,17,23
   143:24 201:25
**50**   29:25 36:2
   45:10 47:3 48:9
   82:7 123:22,22
   200:24 201:5
**50-50**   277:17
**50/50**   38:17 42:11
   238:1
**503**   9:9 17:24
   18:17 31:14,15
   42:14
**52**   214:4 222:4
**524**   82:5
**544**   214:9
**55**   20:10
**55,000,000**   27:6
**58**   33:5 34:21,24
   34:25 35:8,18
   47:20,21
**584**   87:1,11

**6**

**6**   47:17,18 162:4
   221:24 242:25
   246:6,8,16,21,24
   283:25

**6.5**   36:5
**6.9**   34:3
**60**   29:23,25 30:1
   201:14 202:17
   221:23,23 228:8
   228:15
**641**   87:1,11
**65**   266:6 268:12
**650**   29:23
**659**   112:14
**670**   87:13
**671**   51:2 62:16
**68**   190:10
**6:00**   225:8
**6:16**   1:15 282:11

**7**

**7**   94:21 123:6
   221:24
**7.7**   33:13,16 35:20
**700**   12:16 280:5
   280:14
**701**   213:5 218:16
   218:19 221:16
**702**   218:12 219:23
**703**   87:1,11
**738**   156:16
**76**   74:14 76:4,12
   76:14 77:21 89:17
   90:1,3
**77943**   241:12

**8**

**8**   112:15 133:19
   133:20,23 160:8
   169:14,17 221:25
   221:25 222:3
   245:12,13
**80**   65:15
**800**   175:1,6
**824**   1:12
**83**   13:3
**852,000**   33:8
**89**   12:23

| 9 |
| --- |

**9**  99:15 153:6
188:22 242:16,23
250:7 261:24
262:6
**9-1**  260:9
**9.8**  19:10 22:23
46:24
**9.84**  34:12
**9/18/16**  241:18
**9/30**  242:10
**90**  8:7,7 14:5,7,9
29:5 76:10 77:25
90:20 91:1 102:6
105:17 252:21,25
253:12 254:6,11
258:14 260:3
266:23 268:3
**90-10**  277:17,18
**90/10**  78:9,14 79:8
84:6 101:23
103:22 104:17
105:9 106:11
107:6,12,24
121:16,21 122:18
122:19 123:4
254:1,4 256:1,17
268:13
**9019**  220:3,10
221:3
**960**  202:21
**97**  12:25
**98**  67:15
**9:30**  281:22 282:5
282:8
**9:33**  1:15

| a |
| --- |

**a.m.**  1:15
**ability**  21:17
59:17 115:8
129:24 139:9
165:12 171:17
180:1,23 181:3

193:8 200:6
207:19 223:21
**able**  42:24 51:19
51:25 57:18 92:12
114:21 153:18
169:23 180:6
182:3 192:13
193:19,24 205:18
215:10
**abrahms**  180:9
**abrams**  127:20,20
128:23 129:17,25
130:3,3,16,18
131:15,20 132:19
132:21 133:16
144:8 160:3,5
162:17,19 163:21
164:20,22 169:22
170:2
**abrams'**  130:11
131:16 132:1
170:9
**absent**  51:19
140:1,7
**absolutely**  7:22
38:14 75:20
189:13 191:19
**abstract**  139:4
154:1
**academic**  162:6
**accepted**  41:21
168:16
**account**  152:25
182:17 230:7,12
**accrual**  82:6
**accrue**  103:5
**accrued**  102:23
201:4
**accruing**  185:14
200:24
**accuracy**  170:8
172:2

**accurate**  52:13
57:9 61:10,12
75:4 115:5 131:22
162:13 167:6
228:3 236:19
278:16 283:4
**accurately**  162:9
**acknowledged**
145:12
**acknowledgment**
200:5
**acquire**  160:15
176:16
**acquisition**  136:5
211:7,8,17 273:9
**act**  138:24 159:2,8
159:13
**acting**  137:2
**action**  158:19
**actions**  170:11
209:10 211:25
216:24
**active**  12:7
**actively**  80:8
243:21
**activities**  234:3,4
238:15,18 244:16
259:13 266:15
**activity**  106:25
234:25 237:6
**actual**  9:10 18:17
18:22 19:2,14,22
23:7 26:9,12,25
30:13,15 31:9,9
31:10 35:11,23
38:21 39:4 42:16
43:14 45:4 57:15
75:1 103:9 149:23
150:23 176:13
232:9
**actuality**  29:13
**actualize**  192:13
194:13

**actuals**  34:9
**ad**  4:2,14 11:16,17
16:6 70:14,20
73:4 88:8 120:20
160:1 177:1 213:3
216:13 217:8
219:5,7,18 220:12
243:1
**added**  182:14
**adding**  113:9
**addition**  59:8
69:15 146:20
147:18 181:13
187:22 198:21,22
263:3
**additional**  11:11
21:13 62:10
114:10 117:11,18
175:6 182:2,9
201:10 236:24
239:12 251:11
279:4
**address**  23:25
24:3 83:17 84:4,4
157:21 158:3
**addressed**  23:25
115:7,12,21
278:21
**addresses**  157:20
**addressing**  81:21
**adherence**  244:13
**adjourned**  128:16
**adjust**  130:7
**adjusted**  147:10
147:17
**administered**  1:8
**administration**
5:8 64:8 109:22
**administrative**
9:9,19 16:19,25
18:20 26:11,18
45:13 55:17 69:17
96:18 106:19

138:24 185:16 186:4,6,11 198:17 198:23 205:9 213:21 226:14 252:6

**administrator** 86:15 223:9 226:1

**admissibility** 220:13

**admissible** 50:14

**admission** 220:19

**admit** 38:16 106:18 216:16 228:7

**admitted** 55:20 58:5 61:16 67:23 75:10 87:5 88:7,8 88:13,14 129:6 132:5 167:13 215:23 222:23 228:13

**admittedly** 81:11

**admonished** 17:20

**ado** 7:11

**adopting** 37:2

**advance** 212:16

**advanced** 143:21 145:18

**advantage** 153:19 179:5

**advantages** 147:25 153:11

**adventure** 50:22

**adversary** 127:4

**adverse** 117:22

**advice** 25:17 142:2 143:13

**advisable** 151:12

**advising** 192:2

**advisor** 13:1 124:7 166:13,16 168:20 185:1

192:2 196:10,24 202:20

**advisors** 250:22

**advisory** 24:2,10 166:10

**advocate** 222:13

**affect** 85:2 185:7 207:12

**affiliation** 56:9

**affirm** 129:22 165:10 223:20

**affirmance** 28:14

**affirmation** 55:21 129:20 165:8 223:17

**affirmed** 33:23

**afford** 46:23

**afternoon** 121:9 121:10 128:21 132:23,24 165:2 168:1,2 212:19 223:15 225:6 239:17,18

**ago** 15:8 131:8 166:22 167:4 228:14 251:2 261:24 274:22

**agree** 79:20 88:12 92:6,10 99:8 109:8 112:4 116:25 136:24 137:11 138:14 139:1,18 148:18 153:15 159:15 181:22 189:9 243:6 247:5,16 252:5 258:16 271:24 272:1

**agreed** 8:4 53:18 70:8,11 92:24 116:11 121:16 256:12

**agreeing** 194:1

**agreement** 15:20 44:22 51:19 58:20 68:13 69:5,8 70:9 70:12 71:22 72:1 72:5 73:11 92:14 95:20 96:7 146:12 146:15 151:24 152:1,5,12 172:11 185:23 186:17 199:8 206:7,16 207:2 230:21 238:20 241:8 242:1 255:14 278:12

**agreements** 118:17,20 119:8 171:16 206:25 260:13

**ah** 68:21 74:22 86:16,16,16,16,17 86:17 87:7,7,7,7,8 87:8 109:15

**ahead** 7:19 18:15 36:17 64:15 93:4 100:16 119:2 196:2 281:20

**akin** 70:15 219:25

**al** 1:7

**aliquot** 43:6

**allegation** 24:16

**allegations** 91:21

**alleging** 8:23

**allocate** 7:8 59:3 70:2 71:20 84:3 94:18 97:8 100:8 226:14 233:17,25 237:10 256:22

**allocated** 12:23 13:14 38:22 39:10 40:19 41:12,14 49:12 58:17 59:18 63:19 67:5 69:22

77:23 78:10,10,22 79:17 90:5,16,25 94:24 100:3 105:17 107:12,20 113:18 123:16 218:22 237:16 245:7 253:23 258:9 259:5,19 263:11,15,18,23 265:21 266:5,9

**allocating** 63:18 70:1 77:24 78:9 90:5 95:15 233:17 233:22 237:4 252:21,24 253:12 254:4 258:14 260:2 276:20 277:4

**allocation** 2:2 7:21 8:10,17 23:1 23:4 24:3,19 27:1 31:17 39:23 41:22 44:23 49:21,22 50:12 56:18 57:6 58:21 59:6 60:1 62:8,17 63:13 67:2 69:2,7,15 70:7 71:24 72:8,9 72:17 74:5,9 76:16 78:14 83:5 83:5,12 84:19 89:5,7,23 90:20 91:9 92:5,7 95:19 97:6,10,15 98:13 100:16,18,23,24 101:15,16,23 103:15,22 104:10 105:9 106:1,7,9 107:6 108:2 110:9 112:7 113:1 121:12 123:12,22 123:25 124:8,23 125:16 126:2

146:12 213:8,16
213:21,23 214:2,6
216:7 218:11
219:1 221:4
222:14,17,20
226:11,19 227:15
228:17 238:3
245:1,17 249:18
252:5,15 253:3,8
254:7,11,25 256:9
256:12,15,16,17
257:9,23 258:20
263:10 266:11,22
266:23 267:11
268:2,3 272:8,14
273:20 277:11,13
277:16,19 279:14
**allocations** 39:13
39:22 50:10 69:23
90:11 91:13 92:12
125:7 213:10
216:8 227:9
232:24 233:7
243:4,13,20 244:1
244:22 251:12
257:13,14,15
259:11 267:13,25
268:23 271:3,10
271:14 276:11,12
278:19 279:8,20
280:12
**allotted** 7:10
**allow** 31:15 44:25
48:11 49:13
152:15 215:11
221:8 230:10
263:20 267:15
**allowance** 8:18,21
12:16 41:1 92:9
92:10 123:20
280:5,14
**allowed** 22:12,18
24:4 25:20 36:4

48:6 52:21 53:6
53:11,20 85:23
109:22 214:11
215:1 263:25
264:2
**allowing** 127:24
127:25 174:25
231:20
**allows** 51:1
**alphabet** 265:8
**alter** 143:13,22
145:4,6
**alternative** 52:7
198:22 207:15
234:19,23
**alternatives** 184:1
**ambrose's** 30:4
**amended** 230:21
**amendments**
157:1
**american** 216:12
**amount** 12:2
32:13 33:13 42:14
46:19 53:20 63:22
79:3 84:6,20
85:16,17 90:24
98:13 107:2,19
108:12 113:5
147:24 153:12
194:11 206:19,20
230:12 253:14
254:21 255:10
258:17,18 273:5
275:20
**amounts** 78:1
107:9 124:18
245:6
**analy** 121:20
**analysis** 17:19
32:25 40:8 121:20
134:8 135:3
146:14,16,17
150:4 162:24

172:10 178:14,17
178:19,24,25
184:25 185:4
187:21 188:2,21
189:5 194:16
197:21 198:15,16
199:5,15,18 201:8
201:17,24 202:16
202:24 203:12
204:15 206:17
207:3,4 216:23
240:25 241:14
276:3
**analytical** 276:3
**analyze** 152:4,10
152:14,19
**anchor** 237:1
**andrew** 4:17,22
213:2
**andy** 251:17
269:6
**anker** 115:16
**anomaly** 84:1
**answer** 18:3 23:15
27:18 52:17 118:2
124:22 144:4
145:2,5 155:23
162:7 227:6
241:20 243:11
250:11,12 251:2
252:1 262:4 264:2
267:15 274:21
275:17,24
**answered** 78:24
247:10
**answers** 265:19
**anthony** 223:18
223:25 225:20,24
239:15
**anticipate** 155:6
225:12
**anticipated**
124:17

**anticipation**
56:19 131:5
227:21
**antithesis** 258:5
**anybody** 10:9
45:7 120:12
**aparna** 50:18
270:19
**apart** 30:3 226:24
232:6
**apol** 111:14
**apologies** 240:15
265:4
**apologize** 68:7
74:1 86:25 110:21
111:2,2 112:19
117:16 126:16
141:15 144:17
148:10 196:2
245:12 246:13
255:6,7 279:2
280:8,9
**app** 90:14
**appeal** 10:1 20:21
24:2 115:15
**appealed** 24:22
215:18
**appeals** 158:25
**appear** 80:17
167:6
**appearance** 14:19
164:10
**appeared** 234:16
237:16,19
**appearing** 93:2
**appears** 61:12
75:6 90:7,7
112:24 241:4
**appellate** 137:9
**appendix** 62:9,15
94:21
**applicable** 20:12
43:17 154:13

**application** 58:15
65:20 66:3,7,11
66:13,16,19 75:19
83:9 84:1 90:8
92:17 104:21
112:23 124:10,15
124:19 181:1
211:4 227:8
**applications**
13:18 49:17 55:25
58:14 61:2 65:13
66:1,5,9,11 73:4
91:14 104:15
105:10,21 124:2,8
124:12,25 125:1,5
126:1 248:20,24
249:3 250:11,17
250:19,22,25
251:4,25 271:2,8
**applied** 44:25
92:15 98:5,14
101:7,16 103:23
106:14 244:16,20
260:23
**apply** 10:17 14:16
36:2 43:17 44:24
46:1 78:18,20
85:12 100:4,17
119:8 124:22
207:11
**applying** 78:20
**appointed** 65:8
237:21
**appointment** 12:7
13:16
**apportion** 49:7
**apportioned** 46:3
**appreciate** 21:7
**appreciated** 130:9
148:4,14 160:15
163:7
**approach** 7:14
82:12 83:12 86:10

88:19,20 120:23
130:12 131:10
165:24 167:22
225:3 239:14
245:2 249:13
257:4 268:14
**appropriate** 2:2
10:16 45:3 47:10
51:14 52:6 59:24
60:1 62:2 137:15
138:16 139:22
157:1 209:23
216:7 225:9 245:1
248:1 277:14
**appropriately**
46:11 59:18 70:2
**appropriateness**
277:18 279:19
**approvable** 22:9
**approval** 28:11
29:13 30:14 36:23
231:2
**approve** 26:16
27:6 185:22
**approved** 11:24
12:1,18 15:6
20:20,22 22:13
30:11 36:14 37:10
39:1,7 42:12
44:14 46:16 49:20
53:25 176:14
230:21,22 231:13
241:8 242:1
256:12 260:15
273:2,11
**approving** 37:9
**approximate** 79:5
135:13,14,19
**approximately**
57:16 64:18 65:19
74:12 77:3 90:19
102:3 108:13,16
113:5 119:20

175:4 202:7,18,21
206:10 231:9
252:25 253:8,10
266:6,23 268:2,3
278:1
**april** 13:19,24,24
67:14,15 68:16
103:8
**arbitrary** 38:19
**arbitration**
159:11
**area** 130:25 131:2
145:3
**argue** 115:14
212:16 216:6
222:17
**argued** 38:11
**arguing** 42:22
**argument** 9:14
10:3 31:2 33:10
40:4,21 52:2
54:25 109:13
119:10 174:22
242:8
**arguments** 33:3
41:3,21 43:3
81:21 109:14
203:16 214:1,6
215:5
**arising** 40:22
154:15
**arithmetic** 27:24
31:24 32:4,11,25
35:9 36:11,12
44:7
**arithmetically**
32:21
**armageddon** 40:1
40:4,13
**arose** 186:16
**arrived** 254:6,11
**articulates** 214:24

**asbestos** 10:24
11:21 14:6 15:24
33:4,11 34:20
35:4 40:2 41:5,11
41:19 47:20,24
48:3,3,7,10,18,21
79:12,17 80:5,16
80:24,25 81:1,2,9
81:12,21 82:3,6
82:12,20,23 108:5
108:6,24 109:1,7
109:8,12,14,17,19
109:25 110:9,11
110:11,14,21
111:7,22 220:15
230:3,8 231:3,3,6
231:7 238:7,16
259:1,5,18,21
260:7,18,25 261:2
261:7 263:2 273:7
273:23,24,25
274:18,25 275:12
**ascribed** 180:23
181:23 182:4
**ashuraey** 5:20
**aside** 10:25 139:8
230:8
**asked** 8:12 15:8
94:22 102:19
107:18 110:10
121:11,23 126:17
127:4 133:23
134:5,11,17,18,22
135:13 154:1
162:19 176:22,24
243:10 250:12
253:17 254:1,3
261:23,24
**asking** 24:3 46:7,8
107:21 144:18
160:25 222:19
261:15,22 267:3

**asks** 267:13
**aspect** 115:19
**aspects** 114:18
**assert** 143:7 145:6
**assertable** 19:20
**asserted** 18:20
  81:13,14,17 86:7
  108:6 109:3,9,18
  109:18 110:17
  186:3,21,25 188:7
  261:7
**asserting** 110:22
**assertion** 74:11,19
  89:24 109:11
  138:4 141:22
  148:8 164:14
**assertions** 67:1
**assess** 26:13 31:13
  251:11 275:22
**assessed** 188:12
**assessing** 279:19
**assessment** 20:4
  27:7 176:9 185:5
  271:13
**asset** 17:9 19:8
  26:17 147:13,25
  153:12
**assets** 19:11,12
  20:13 25:21 82:21
  114:12 133:5,11
  134:1 141:9 147:5
  147:7,12 149:10
  149:15,16,20,21
  149:23 150:16
  160:14 163:7,10
  175:25 179:7,9,9
  180:10 197:16
  200:22 205:1
  208:18
**assigning** 26:5
**assignment** 133:3
**assistant** 253:21
  269:2,9

**associate** 145:3
  251:17 269:7
  270:23
**associated** 40:8
  41:4 42:15 69:17
  82:2 142:18 181:3
  182:3,10 185:5
  199:20 203:8
  211:18
**associates** 3:9,16
  4:7 59:22 64:3,4
  270:18
**assume** 95:13
  163:9 172:22
  180:5 191:25
  199:3 201:22
  203:9 266:7
**assumed** 33:6,12
  34:21 35:1,4,14
  47:13 48:12,18
  189:25 190:18
  200:3,13 201:10
  201:20 231:4
  273:8
**assuming** 34:5,21
  65:17 147:9
  160:11,14 177:15
  177:17 198:16
  201:6 203:6
**assumption** 10:24
  33:16 35:10 42:7
  171:11 173:12
  182:7 197:16
  230:3 231:2
**assumptions**
  169:9 171:20
  172:2,4,6 174:2
  189:4 194:16
**assured** 117:24
**attached** 68:23
  69:5 111:9 214:14
**attachments**
  67:17

**attack** 185:20
**attacking** 8:15
**attempting** 82:3
**attend** 225:7
  278:11
**attended** 278:12
  278:13,23
**attention** 57:12
  68:25 71:5 74:22
  75:12 82:14 123:5
  123:9 144:6
  211:11 213:13
  239:23 241:11
  242:15 245:13
  249:20
**attorney** 60:19
  136:18 166:17
**attorneys** 3:4,9,16
  4:2,7,14 5:2,8,14
  58:11,11 61:24
  110:11
**attractive** 176:11
**attributable** 43:5
  46:12
**attribute** 179:5
  197:13
**attributes** 208:24
**audit** 235:21
**august** 52:19
  73:20,21 250:7
**authority** 141:11
  142:9 145:9
  153:22 154:4,8
  156:5 157:9,15,20
  157:23 158:3,9,24
  159:2,7,13,17,20
  163:3 208:13,23
**authorized**
  175:24 176:15
**automatic** 171:7
**availability**
  145:25 151:8
  177:10

**available** 46:20
  155:20 185:20
  187:22 188:23
  197:1 236:12
**avenue** 70:22,22
**avoid** 41:18 119:6
**avoiding** 207:5
**award** 10:6
**aware** 74:5,10
  79:15,19 83:4
  94:16 95:9,25
  107:16 117:16,20
  118:7,13,19
  123:11,14,14,25
  124:3,4,6,11,15
  124:23 125:6,9,10
  125:15,17,25
  126:4 146:6 151:4
  151:14 154:23
  158:6,24 159:5,10
  161:3 176:25
  177:4,7 178:10
  191:11 204:5
  253:4 282:1,2
**awry** 54:10

**b**

**b** 1:21 4:18 9:9
  17:24 18:17 31:14
  31:15 42:14 71:13
  71:15 91:5 95:22
  95:23 97:25 130:3
  165:16,17 230:25
  234:22 245:13
  246:6,8,16,21,24
  257:10,12 258:8
  258:19 268:6,8,10
  276:24
**back** 14:20 29:11
  35:24 44:13,21
  47:14 64:9 76:20
  81:4 83:22 90:1
  93:17 99:7 101:7
  103:25 107:2,6

109:6 122:18
128:7 141:18
153:3 178:20
179:14 190:7,22
197:5 230:16
232:4 234:7
236:16,25 251:8
251:22 254:2
256:19,20 261:20
265:23 273:22
276:4
**backend** 59:9
**background**
227:7
**backstop** 11:7
234:22
**bad** 30:8,9 137:2
182:20 183:8
**balance** 8:12
13:13
**balanced** 13:6
52:13
**balancing** 8:11
**ball** 5:21
**bank** 2:1
**banker** 174:16
195:1
**banker's** 177:18
**bankrupt** 154:24
**bankruptcy** 1:1
1:11,23 17:20,23
20:12 26:10,13,15
26:20,24 30:16
31:23 48:8 62:2
103:18 171:6
231:20 254:17
**bar** 55:20 80:25
81:1,2,4,5,6,9,11
82:19,21,22,24
109:6,7,16,21
110:6,7,8 238:16
273:24,25 274:18
275:12 276:8

**bars** 199:8
**base** 42:3
**based** 11:25 31:18
35:12,22 36:2,3
52:13 67:10 70:3
74:18 101:25
102:10 104:3
105:10 111:10
114:1 121:21
124:18 149:3,6,9
150:3,5,22,22
151:3 154:12
163:24 164:8
172:5,9,24 173:12
175:17 176:9
178:22 185:18
186:12 187:22
191:6 193:20
194:24 195:23
196:23 198:4
199:1 202:16
213:25 214:4
215:21,24,25
216:17 218:19
219:1 222:14
229:19 232:20,25
234:12 237:11
238:23 243:13
253:13 254:25
256:3 257:9,13,14
257:16,17 258:9
258:15 281:18
**baseless** 38:20
**bases** 243:7
**basic** 68:12
203:20
**basically** 16:13
17:18 20:4 34:16
43:7 157:22
163:24 188:4
189:24 192:23
254:14

**basis** 22:10 26:4
26:11 49:21 65:22
84:6 90:11,12,17
91:1 105:14
107:17,18 122:9
146:23,25 147:5
147:10,10,10,17
148:4,5,14,16,24
152:17,25 153:11
153:23 154:5,9
155:21 157:11
159:18 160:17
163:12 164:15
173:24 178:12,15
179:1,2,4,20
180:1,6 181:16,24
182:7 184:1
187:23 189:11,21
193:9,14 205:8
208:16,21 210:7
218:17 219:10,25
233:1 262:24
**bates** 62:15 75:13
75:18
**battle** 49:5
**bayard** 4:6
**bear** 43:18 47:2
235:21
**bearing** 21:15,21
138:11
**bears** 31:25 41:1
**began** 15:4 103:3
166:17 252:21
**beginning** 40:7
75:25 76:25
101:18 105:8,15
105:22 216:20
237:8 264:17
**begins** 13:24
**behalf** 7:7 45:17
45:18 50:19
120:19 128:22
129:16 160:1

165:3 168:23
212:20 213:3
216:11 217:6,15
223:8 229:13
239:20 270:15
**beings** 13:18
**belief** 156:4 228:4
232:23
**believe** 8:20 10:19
11:2 14:6 31:7,12
32:14 35:7 40:16
43:2 44:11 46:4
47:9 49:6 50:13
51:6 61:4 73:19
88:4,9 89:5 91:23
93:18 95:23 96:22
98:24 99:25
100:10 101:25
103:6 104:11
105:2 106:2 108:1
109:4 110:4,14,16
111:9 114:3 115:5
117:22 119:13
122:17 124:24
127:1,5,10,13
135:14 137:24
142:4 145:21
146:9 147:3,23
148:9 149:7
150:20 151:25
153:21 154:4,12
155:2,5,10,12,13
155:19 156:15
157:8 159:20
160:11,19 162:8,8
162:23 164:13
192:6 198:3
203:20 209:18
216:19,21 218:6,7
219:21 220:7,12
232:8 235:2
236:17 238:21,23
240:1 242:25

243:3 248:8,15
252:8 253:17,19
257:1,3,11,15
260:23 263:13,20
263:25 264:23
268:21 272:7,12
273:24 274:17
275:14,16 277:22
278:7
**believed** 45:7,10
70:1
**believes** 20:10
44:11 138:15
214:2,6 262:25
**belonging** 12:15
279:25
**bench** 222:24
**beneficial** 10:7
235:7,9 236:9
**beneficiaries** 63:8
**beneficiary** 12:9
12:17,25 13:2,4
15:24 63:5 280:19
**benefit** 8:19 16:3
16:3 17:1,2 18:20
18:25,25 19:20,24
22:3 23:7,10,18
23:19 27:11 28:16
28:17 30:14 31:9
31:9,10,23 32:1
32:25 33:1,2,7,11
33:16 34:4,22
35:21,23 36:1,5,8
37:12,14,15 38:1
40:17,19,23 41:14
41:16 42:20 43:1
43:10,14 45:14
46:10 47:19,22
48:4 57:17 63:1,7
63:10 74:13 77:16
77:24 78:4 79:4
79:18 80:10 81:3
81:8,22 83:21

84:10,11,16,17,17
85:1,5,5,6,8,9,18
85:20 89:25 90:4
90:6,15,16,21
91:1 92:20,20,22
92:23 93:7,8,12
93:13 95:1,10,10
97:8,9,10,14
98:13,14,19,20,22
98:24 99:2,6,9,20
101:1,7,12,22
105:16,18 109:5
109:23 110:4
111:8,22 112:1,2
112:5,6 113:1,2,6
113:11,18 114:10
119:18 121:18
127:16,16 148:24
152:16,20 181:20
188:2 189:6,10
204:20,23 207:4
207:19,20 208:21
214:12,15 216:2
219:12 221:7
235:2,15 238:25
245:19,20,22,23
247:2,12,13 248:2
248:12 253:12
255:10 258:9,10
258:14 259:17,22
260:3 261:8
264:22 273:13,25
274:18 275:12,15
276:8,18,19
**benefited** 8:5 11:3
15:10,15 19:6
204:17,22 238:8
247:3 261:1
264:23 265:1
**benefiting** 181:16
237:7 255:16
**benefits** 17:25
18:1 90:16 93:14

95:2 157:11
160:17 181:3,7
187:21 206:23,24
207:14 214:20
237:5,9,11,12,13
238:13,14,25
247:21 248:9
254:20,21 257:25
258:17
**benefitted** 40:17
43:21 119:15
127:11,14 148:5
148:15,20 194:21
196:1,8 203:15
205:18,19 275:7
275:16,19 276:2
276:13,22
**benefitting** 29:8,9
29:13 151:20
153:23 155:21
156:6 275:23
**benson** 4:13 16:9
120:19 160:1
213:2
**best** 46:20 57:9,23
59:17 70:18 71:2
86:8 129:23
131:23 135:16,16
145:17,17 165:11
223:21 228:4
257:2 268:16
**bet** 159:23 165:22
**better** 18:15 44:18
238:2 250:5
**beyond** 125:15
148:4,14 205:16
227:8
**bid** 175:22 176:14
176:14 184:5
192:17 194:14
196:17
**bidder** 194:17
230:25 234:22

**bidding** 247:13
**bids** 11:13 175:24
176:3
**bifurcate** 81:9
**bifurcation** 83:16
**big** 9:13 54:12
**biggest** 188:10
**bill** 62:6 63:6,10
84:20 237:7 238:1
**billed** 74:13,20
75:24 77:15 83:25
89:25 90:3 91:2
105:12 119:17,17
127:7 237:5 248:9
259:5,22 263:3
**billers** 58:24
60:18,20 62:6,10
62:11,24 63:2
**billing** 58:8,24
59:1,5 60:2,19,22
60:24 61:8,10
63:24 64:4,8
66:24,25 76:18
85:17 93:17 94:1
95:7 98:15 125:11
**billings** 99:24
**billion** 19:10
22:23 34:12 46:24
116:8 148:24
150:14,19 151:12
154:21 155:22
178:11 182:8,12
184:12 187:1,2
188:22 189:17,20
190:3,3,6,10,18
190:24 191:4,7,7
191:13,21 192:4,6
193:10,10,14,17
193:18,23 194:4
194:13 195:6
197:6,7 198:4,16
201:25 202:22
203:1,3,6 231:9

**binder** 55:24
56:22 67:6 93:19
99:13 112:17
123:6 126:21
132:14 133:14
142:5 144:7
156:15 160:5
169:12 210:16
227:24 239:22
240:5,6,7,12,14
240:17 242:3,17
**binders** 60:6
120:22 126:22
132:11,17 167:19
225:3 239:12
**binding** 39:4
91:14 222:11
**bit** 24:6 27:2 62:7
84:24 92:19 96:12
97:5 104:8,9
108:4 113:15
204:19 206:6
234:21 242:14
268:20,22
**blank** 221:14
**blessing** 50:2
**block** 154:9
155:20 156:6
158:20 209:14
**board** 5:8 22:13
36:18,22 37:12
47:3 55:17 86:15
96:6,10,25 107:17
191:23 194:20
202:15 207:8
221:4 223:9 226:1
241:4,8,19,24
242:11 252:3
**board's** 7:24,24
**boards** 22:7,8
36:13,20 37:1,8
95:14,15,24 106:1
106:3 194:21

195:10,14 196:12
251:24
**body** 33:15
158:12
**bonds** 14:11
**book** 240:19
241:19
**bore** 29:2
**borne** 90:2
**bottom** 37:5 62:16
75:13,16 76:4
**bound** 138:7
**bowl** 17:18 214:18
215:3 216:18
**box** 113:7 117:6,9
117:17,22 139:23
140:1,8,16,24
170:17 171:6
**bradley** 131:15
165:5,16 166:6
167:24 206:4
209:6
**brady** 6:15
**break** 27:3,23,24
47:16 48:22,23
54:23 120:5,9,10
120:11,12,15
127:21 128:3,5,6
128:9,13 168:14
182:23,24 183:3,9
225:6 229:3,3,8
229:25 232:14
235:6
**breakout** 45:2
**breakouts** 44:6
**breakup** 9:15,18
9:20 10:22 19:21
20:8 21:10 23:18
25:20,24 26:6
30:14 31:24 32:12
33:2,8,18 34:4,10
34:14,16,19 35:21
36:5,23 37:3,19

37:19,20 38:4
43:5,18 44:14
45:10,12,19 46:2
230:17,22 232:7
**bridge** 46:17
51:19,25
**brief** 76:17 89:23
89:24
**briefed** 107:16,19
**briefing** 222:13
222:13
**briefly** 75:17 83:3
89:9 162:16
166:15 213:14
226:6 236:16
239:22
**bring** 22:1 45:13
46:1 179:14 190:7
**bringing** 190:22
**brink** 45:13
**broad** 154:1
253:25 272:1,2
**brody** 115:16
**broke** 270:7
**brought** 278:22
**brown** 5:22
**bryan** 5:24
**bucket** 61:22
64:11 85:19
114:12 214:3,18
228:23 232:19
**buckets** 61:21
76:1,1,1,2 213:23
228:19
**budget** 70:3
**budgeting** 106:17
106:24 107:11,13
124:16
**budgets** 69:22
106:18,24
**built** 124:17 174:3
**bullet** 213:19

**bunch** 221:6,11
**burden** 17:3
21:15 38:20 48:14
49:15
**burdening** 21:20
27:13
**burdens** 41:1
103:1
**burn** 201:15
202:18 205:2
206:14,14 264:18
270:6
**burned** 21:24
43:10
**business** 37:1,10
39:14,16,17,18
43:19 49:25 50:1
50:8 59:14 60:23
196:6 218:14
221:3
**buy** 82:21
**buyer** 29:2 128:22
137:13 157:11
158:21 160:15,18
160:22 161:1,6,9
178:3 180:4,5,13
180:15 191:11,20
192:12,16 193:22
194:9 195:23
197:7 203:7,11
204:5 273:10
275:3
**buyer's** 194:11
**buyers** 275:2
**buying** 275:4

**c**

**c** 3:1 5:4,5,22 6:11
6:15 7:1 56:10
139:11 160:8,10
283:1,1
**cal** 104:2
**calculate** 97:17
121:19 178:14,25

255:18
calculated  102:13
  104:3 150:15
calculation  57:15
  57:19 79:9 102:10
  122:22 123:3
  149:2,3 150:5
  151:14,15,16,18
  182:5 189:24
  190:15 255:23
calculator  104:1
california  80:21
call  12:8,10 13:15
  13:21,23,25 47:25
  55:15 57:11 84:23
  84:23 93:4 108:25
  126:19 129:17
  150:8 165:5
  223:11 267:12
called  53:15 62:18
calling  37:19
calls  55:17 122:10
  129:3 267:1
can't  155:25
cap  45:8
capacity  161:17
  162:7 224:19,20
  224:21
capital  17:12 20:5
  21:19 22:5 37:23
  39:2 70:21,22,25
capture  180:1
  181:3 182:4
  192:24 193:19,24
  197:10
care  217:17
career  52:16
  161:17 162:5,6
  166:17
carried  90:12
  174:4
carry  157:1

carter  251:19
  269:3
carton  5:23
case  1:6 14:5 15:4
  18:16,18 19:19
  27:8 28:12 37:17
  38:18 42:16 44:25
  47:16 51:12 53:2
  54:14 56:2 58:25
  58:25,25 59:2
  60:25 61:23,25
  67:7,10 77:7 80:9
  80:17 95:13
  106:17 108:14
  112:23 119:12
  124:13 125:12
  136:16 140:15,25
  144:1 151:3
  154:18 158:1
  160:20 164:10
  197:4 204:2 207:2
  213:12,22 214:8
  215:8 216:19,21
  224:9 227:2 233:7
  233:22 234:13
  238:12 249:9,16
  253:18 264:15,19
  266:18 269:15
  271:21 272:4,9,22
  277:12
cases  14:2 19:5,7
  19:23 37:20 44:12
  48:1 49:11 52:9
  58:9,23 61:7,20
  62:12 64:18 69:17
  72:4 79:3 81:23
  81:24 126:1
  175:23 183:25
  204:21 218:20
  220:4 229:19
  248:19 263:21
  265:22

cash  10:23 11:20
  11:21 16:16,17
  19:13 29:15,18,21
  32:2 33:1,11
  34:19,20 37:13
  53:19 122:24
  174:12 185:14
  188:15 201:2
  231:9 264:14,19
casts  277:18
categories  214:17
category  84:18
  99:24 263:2
cause  84:25
  117:18 212:5
caused  76:17
  98:23 117:10
  152:7
causing  84:19
cautioned  214:8
cca  141:22,24
  142:2,4,7,14,21
  143:12,17,17,20
  143:21 145:9,12
cecily  251:16
  279:1
cede  212:22
cents  31:24 33:14
  35:17,18 272:18
certain  2:3 7:8
  10:21 11:16 46:19
  59:2 69:21 80:4
  81:15,16 95:17
  118:10,19 136:6
  141:10 146:7
  194:1 197:8
  208:19 218:12,13
  219:12 220:2
  228:14 256:6
certainly  46:7
  49:25 50:7,8 80:8
  84:21 109:13
  113:12 191:23

207:8 222:12
  227:12 232:10
  234:25 235:24,25
  238:15,18 252:8,9
certainty  27:5,7
  34:5 205:18
  253:18
certification
  65:15
certified  283:3
cfo  217:20 226:7
chad  55:17 56:6
  56:10 88:25 121:7
  126:24
chain  254:2
chair  130:7
chairman  107:19
  279:12
challenge  8:17
  92:3,4,8
challenged  92:17
challenging  7:23
  8:21
chance  203:2
chancery  136:2
  136:23 137:5,8
change  36:7 38:2
  90:14 100:16
  101:4 104:10,25
  105:2,23,25
  106:14 112:10
  113:8,12 118:3,6
  118:13 121:11
  138:1,15,19 139:2
  139:6,9,20 159:16
  181:1 197:17,20
  211:3 253:3,4
  255:9 256:9,12
  278:25
changed  45:20
  50:11 79:9 98:13
  103:1,9 118:10
  254:23 257:3

changes 11:4
253:19
changing 85:8
118:8
channeling 41:19
82:5
chapter 1:5 19:5,7
52:9 58:22,24
60:25 61:7,19,23
66:14 67:13 70:13
72:4 81:23,24
91:25 92:2,18
161:18 162:7
186:13 204:25
205:2
characterization
236:19
charge 70:24
124:20
charged 90:19
111:7,21 113:6
195:14 259:17
chart 75:21
112:25 187:13,17
187:19 197:5
221:25 222:1,2
charts 181:24
187:14 219:6,8
check 29:4 64:14
117:6,9,17,22
139:23 140:1,7,16
140:24 170:17
171:5 221:14
checking 245:12
chew 5:24
chicago 224:22
chief 142:2 143:12
chill 158:21
chime 217:5
chooses 215:11
chris 224:21
christian 3:23 6:4
128:25 129:15

christopher 1:22
christy 253:20
269:8
chunk 120:1
chutchian 6:18
circuit 22:18
25:14 33:23 53:10
54:1,5 158:24
174:21,25 214:8
214:22 231:19
circuit's 242:8
circulated 61:5
circumstance
10:16 45:20 76:18
117:10
circumstances 9:8
31:6 44:20 46:15
83:19,24 137:15
139:22 209:23
210:13
circumvented
157:3
cite 141:10 142:9
142:21 145:9
151:23
cited 9:16 143:19
145:11
citing 141:21
claim 8:13 9:21
10:12 14:22 15:6
15:7,13,14 26:18
109:19 110:18
114:8,9,11 118:24
119:6 143:15
185:16 186:3,4,6
186:11,16,18,20
186:20,21,25
187:2 188:7
198:18,21,23,23
213:21 214:7
230:11 231:6,12
234:12 235:22
261:4 280:6,15

claimants 11:17
81:22 120:20
160:2 219:5,18
claims 9:3,19,19
11:24 12:14 33:12
33:14,15 35:16
40:1,2,20 41:2,5,6
41:11,13,20 52:23
81:12,14,17 82:4
82:6,20,23 108:6
108:12,12,13,24
108:25 109:1,2,2
109:3,8,12,17,17
109:21 110:17,22
113:23 114:5
141:8 171:15,17
174:25 182:16
183:18 199:2
220:2,9 228:20
230:3,8,11 231:3
231:3 238:22
240:25 259:2,6,21
261:1,2,7 271:22
275:18,20 279:16
279:25
clarification
100:12
clarify 88:6 98:11
99:10 121:24
208:9 249:2
class 48:11 108:24
classic 174:15
clean 227:1
clear 7:22 10:3,6
15:25 63:8 77:14
94:16 96:3 101:10
102:10 115:13
116:16 125:20
176:8,15 183:24
194:22 196:7
197:1 199:11
221:22 239:21
242:25 244:21

248:11 250:16
257:8 261:6,21
262:11 275:11
cleared 230:19
clearer 267:23
clearly 46:23
49:21 176:4
196:15 203:13
204:18 218:3
219:3,8 230:2
234:15
clerk 7:2 55:14
120:16 128:19
129:21 130:1,5
165:9,14,18 183:7
221:20 223:19,23
224:1 229:9
client 20:22 65:8
65:9 192:5
client's 20:23
clients 30:9 59:14
73:5 80:2 111:17
clips 121:2
clock 182:22
close 78:13 130:7
136:6,12 165:20
181:11 224:5
234:16 273:11,18
273:20
closed 20:18 53:4
151:5 236:10
260:15
closely 71:21,23
71:25
closing 23:14 24:1
53:18 174:2
175:18
closure 53:2
code 17:23 20:12
23:6,7 26:13,24
50:6 89:17 156:8
156:21,21 158:8
158:14 159:1,6,12

162:21
**cognizant** 123:15
**collapsed** 204:25
**collaterally** 8:14
**colleague** 132:14
**collect** 118:4
**collected** 152:24
    164:6
**collection** 163:14
**collective** 8:19
    14:18 40:19 41:14
    41:16 51:24 63:1
    63:10 77:16,24
    78:4,10 79:4 81:2
    81:7,22 83:5
    84:17,17,25,25
    85:5,9,17,20 90:6
    90:15,16,21 91:1
    92:20 95:1,10
    97:10 98:14,18
    99:1,6,9,20 101:2
    101:22 105:16
    110:4 111:7,21
    112:1,5 113:2
    119:18 234:6
    237:9,11 238:14
    238:24,25 244:17
    245:19 253:12
    254:20 257:18
    258:3,9,14 259:22
    260:2 276:18
**collectively** 82:9
    119:15
**colloquially** 71:10
**colloquy** 114:1
**column** 34:8
    149:25 189:17
    190:9,10 191:22
    193:15 202:25
**columns** 36:22
**come** 46:2,11
    47:22 53:3 109:6
    109:12 188:14

191:20 196:4
198:21 215:13
216:19 222:19,24
264:22 266:2,2
**comes** 24:6
    194:19 198:19
    213:10
**comfortable**
    143:24 150:8
    165:20 224:3
    275:2
**coming** 34:24
    46:24 122:25
    165:22 193:25
    198:17 204:6
    231:1,1,8
**comma** 211:19
**commenced** 70:13
**commencement**
    61:6
**comment** 41:11
**comments** 50:11
    125:14
**commission**
    152:15,20,24
    180:12 181:2,6,13
    182:10 189:11
    192:23 194:3
    209:11,14 211:3
    212:1
**committee** 11:16
    12:4,6,21 13:15
    39:19 42:5,6,23
    49:18,20 50:12,15
    65:7,24 66:18,20
    66:21 70:20 73:4
    79:25 80:1,3
    106:13 108:2
    123:15,18 124:7,7
    125:1,4,4,7,8,11
    125:18,21,23
    126:2 213:3
    232:20 234:9

236:23,25 237:15
238:6,11 243:1
249:6 251:3,6
271:11 272:8
277:23,24 278:1,2
278:8,18,20 279:5
279:8,8,11,16,18
279:20,24 280:3
280:12,20
**committee's** 12:11
    42:1,2,4 123:12
    124:12,23
**commonly** 139:23
**communication**
    218:7
**comp** 71:7,10
    72:18 232:25
    233:1,2 237:2
    238:1 239:2
    244:10 247:14
    248:7 260:24,24
    266:1 276:24
**companies** 149:21
**company** 107:9
    127:25 157:5
    174:12 208:7
    211:4 255:1
**comparable**
    174:12
**compare** 188:13
    192:18 193:4
**compared** 206:25
    207:6 268:12
**comparing** 189:2
    207:5
**compensation**
    8:15 12:23 13:17
    38:23,25 39:18
    62:14 71:21,25
    72:3,7,13 73:9
    74:7 91:5,10,22
    91:23 92:6 94:8
    94:12,15 96:9,11

97:3 100:2,13
121:13 233:9,11
237:18 243:9,14
243:25 244:7,24
245:9 248:3
256:18 257:10
**competent** 17:6
    38:12 216:18
    233:24 243:17
    256:24
**competing** 51:20
**competitive**
    234:20
**complete** 57:18
    281:10
**completely** 16:25
    114:11 261:11
**completion** 57:15
    63:25
**complex** 163:5
**compliance** 62:3
    233:10 243:8,24
    244:23 276:25
**complied** 244:7,8
    244:9 247:14
**complies** 256:18
    257:9
**comply** 60:25
**complying** 266:3
**comport** 31:14
**comported** 39:9
**composition**
    279:7,13
**comprised** 70:21
**conceivable** 47:4
**concept** 247:17,19
    248:1,12
**concepts** 207:3
**conceptual**
    247:20
**conceptually**
    247:20,22

concern 98:10
125:14,17 181:14
266:11 267:24
concerned 40:12
40:14 97:12 98:2
98:12,19 115:16
118:24
concerning 40:21
133:12 187:7
concerns 69:14
conclude 191:19
215:2
concluded 82:11
84:5 282:10
concludes 204:10
conclusion 15:23
33:11 119:13
122:10 135:4
141:24 142:9
143:4,5,10,15,19
143:23,24 148:6
164:1 205:17
214:15,25 215:7
227:13 256:15
259:11 266:21
267:25
conclusions
142:12 143:6
171:24 215:1
222:5,11,14
conclusively 40:6
43:16
condition 52:21
53:11,18 175:18
conditions 28:9
152:10 174:2
210:13
conferred 281:9
confident 100:22
confidential 59:25
64:5 95:8
confidentiality
59:14

confines 17:22
266:1
confirm 127:7
244:4
confirmation 12:2
15:5 16:23 41:16
82:24 114:16,19
115:4,8,9,20,22
185:6,25 260:14
260:19
confirmed 28:2
51:7 53:24 81:24
83:1 84:22 98:17
115:15 151:4
234:7 244:3
263:21
confirming 244:6
conflict 252:6,9
252:11,13,16,17
252:18
conflicts 13:3
73:11
confusion 131:18
congratulations
270:21
congress 157:15
159:16,24
conjecture 52:14
connected 216:21
216:22 221:10
connection 10:15
58:12 95:19 96:8
111:5 115:1,25
122:7,16 124:5
127:2 134:13
161:13 246:4
252:19 256:14
259:21 261:7
263:9,12 265:12
267:24 269:15
271:2,13 276:10
277:2,4 279:23
280:4,11,13

consciously 8:25
consensual 48:15
consented 123:11
consenting 262:19
consequences
133:4,10,24
134:18 142:18
consider 8:9
44:15 103:16
133:3,24 134:11
134:17,22 142:17
152:22 183:25
187:10 192:3
194:18,18 196:12
203:17 207:9
229:1 235:10
236:24 237:1
256:17 270:25
271:15 276:22
277:3 279:7,15,17
279:24 280:3,13
280:18
consideration
15:17 29:15,19,22
31:11 45:4,5
48:17 53:19 69:16
85:13 119:24
122:19,21,23,24
137:13 151:19
153:17 188:21
199:5 200:19
235:4 236:1
275:20 276:13
considerations
213:17 228:22
231:17
considered 117:6
134:6 143:17,18
146:11 181:21
214:17 218:4,15
231:24 232:15
236:14 243:16
280:16,20

considering 230:4
230:9 241:24
consistent 51:23
121:17 122:19
211:24
consolidated
117:12,19
constant 201:6
constituencies
11:14 70:4
constituents
69:15
construct 237:17
239:1 257:5 268:8
consummate
200:11
consummated
201:21
consummating
254:16
consummation
11:9 177:21
202:11
contact 72:16
contained 57:8
156:11 164:14
228:3
contains 56:1
93:20
contemplated
84:21 180:20
254:13
contemplating
44:16
contend 15:9
79:16
contending 8:1,9
83:4
contention 8:6
79:20
contested 12:15
118:20 119:7

**contesting** 214:13
280:13
**context** 9:20 12:1
12:10 81:10 247:7
**contingent** 22:24
**continue** 47:9
53:7,21 66:20
78:19 93:3 165:1
256:25
**continued** 82:6
85:12 100:17,24
103:5 105:9
125:11 238:10
**contract** 198:23
**contractual**
134:22 135:1
146:2,7 186:16,20
198:20 201:23
206:25 207:7,11
**contractually**
193:25
**contrarian** 11:15
**contribution** 8:13
9:19 10:12,13,14
11:24 13:25 14:22
15:6 20:5 42:17
42:22 43:7,21
214:7 231:12
234:12 236:15
**control** 181:1
211:3 257:1,1
**controlled** 139:17
**controller** 253:21
269:8,9
**controls** 243:18
269:4
**controversial**
116:17
**conversation**
114:1 253:20
263:14,15
**conversations**
107:5,11,13

230:25 233:20
251:21 268:25
269:3,5,10
**conversion**
180:20
**convert** 17:17
180:24
**converting** 119:5
204:25
**conveyed** 170:4
176:4
**convince** 230:10
**copies** 7:15
165:23 212:21,25
**copy** 61:8,10,12
68:2 75:4 88:21
130:10 131:11,14
131:19 167:2,6
228:1
**corp** 1:6 78:1
139:11 214:9
**corporate** 56:9
81:7 163:8,8,12
197:20,23 198:1,5
208:10,12,15,20
**corporation** 60:18
139:10,11,21
**correct** 9:24 28:25
32:21,23 35:15
53:3 54:11 55:11
57:22,24 60:4,24
65:2,3,14 67:15
67:16 68:17 70:10
73:17,18 74:8
76:10,19 80:22
81:20 85:19 91:6
91:10,15,22 92:9
92:13,23 93:9,10
94:7,9,10,19,25
95:3,4,6,11,16,17
96:9,10,24 97:11
97:16 98:5,10,14
100:3,9,13,25

101:24 102:1,2,14
103:10 104:10,13
105:1,19,20 106:5
106:15 108:2,8
109:20 110:5,15
110:23 111:3,4,23
112:2,3 113:11,18
113:19 114:3,6,10
114:16 115:10,20
116:10,14,15,17
116:21,22 117:3,4
117:7,8,12,23,24
118:4,9,17,18
119:16,21,22
121:25 122:2,16
122:17 123:16,23
124:1,24 125:2
127:3,5 133:1,5
134:9,10,20,21,23
134:24 135:3,11
135:18,22,23,25
136:3,13,16,23
137:3,6,9,18,21
138:5,9,19 139:12
139:21 140:3,13
140:20,25 141:25
142:2,12,15,23
143:3,18 144:1
145:5,9,13,20,25
146:4,16,18,19
148:8,21,22,25
149:6,7,10,18,20
150:2,18,20
151:22,24 152:2,3
153:20 154:11
155:15 156:2,3,12
156:22 157:16,25
158:5,11,17 159:4
159:9,14 161:11
161:12,16,19
164:6,7,16 166:14
166:25 167:1
168:8,18,22 169:2

169:5,7 170:2,4
170:12,13,15,16
170:19,21 171:12
171:19,21 172:2
172:12,15,17,21
173:7,14,18,19,22
174:10,14,19
175:13,20,21
176:6,11 177:6,8
177:9,12,19 178:2
178:4,13,16,18,21
179:8,11 180:2,11
180:13,14,16,21
180:22,24 181:9
181:12,25 182:1,5
182:6,13 184:5,6
184:24 185:21
186:7,14,15,23,24
187:11,12,15,16
187:25 188:2,8,18
189:8,19 191:1,5
191:16 192:8
193:21 195:17
197:11,19 198:3
198:14 199:7,10
199:11,21 200:23
201:1 202:8 203:5
203:22 204:3,9
210:5,15 211:1,6
211:9 216:9
226:16,18 227:11
227:17,19 228:17
228:18 236:20
240:22 241:9,10
241:19 242:1,2
243:5,15 244:11
244:24 245:17,24
246:2,7 248:2,13
248:21,25 249:3,9
250:17 251:13,25
252:15,22 253:3
255:24 256:9
257:10 258:11,15

258:20 259:2
260:4 266:6
268:24 269:15
270:12,13,15,16
270:18 271:7,11
271:23 272:20
275:13 276:2,22
278:8,24
**corrected**  109:16
109:18
**correcting**  265:5
**correction**  78:15
**correctly**  70:23
79:9 89:6 104:20
160:18
**corresponding**
78:1
**cost**  8:7 9:10
21:21 31:13 121:3
147:5 154:5,9
172:14 185:5,10
188:10,10 199:19
200:17,20 201:8
202:22,25 207:6
264:17,18
**costing**  48:9
**costs**  17:9 18:17
19:15 40:8 41:18
69:17 82:2 106:19
177:20 201:25
202:25 203:3
**couldn't**  159:2
**could've**  135:19
137:2
**counsel**  12:24
13:3 80:18,21
110:24 114:2
119:23 128:24
133:23 142:2
143:12 145:4
232:5 251:16,17
269:7 281:19

**counsel's**  229:15
**country**  283:21
**couple**  15:8 20:4
30:10 33:19 42:9
52:2 77:21 79:11
121:24 187:20
273:22 279:2,4
**course**  20:21 21:1
23:21 30:8 42:7
46:8 60:23 62:12
64:18 79:2 86:10
124:13 129:7
140:16 167:17
207:1 244:12
267:6 273:19
281:7
**court**  1:1,11 7:3,5
7:13,17,19 8:18
9:22 16:5,8 17:5,7
17:14,15,17,20,22
18:7,13,15 20:12
20:17 21:1,3,5,5,8
21:14 23:13,16,21
23:24 24:17,21,24
25:1,5,8,11,17
26:10,13,16,19
27:6,25 28:5,7,14
29:6,17,20 30:3,6
30:20 31:2,4 32:5
32:7,17,20,22
34:24 35:5,10,13
36:15,17 39:5,7
39:15 43:12,19,23
43:25 44:4,12,18
44:23 45:2,14,20
46:13,21 47:1,6
47:10,12 49:17
50:16 51:15 52:4
53:23 54:6,9,12
54:14,17,21 55:3
55:8,12,15,18,21
56:3,5,15 58:2,5
59:11 60:8,10,12

61:16 62:21 67:23
68:6,8,11 72:21
72:24 73:2,6,13
73:15,21,24 75:10
77:8,13 78:8,17
78:23 79:1 80:11
80:14,19 84:9
86:2,9,11,13,20
86:24 87:2,5,14
87:16,19,23,23
88:2,13,17,20,24
89:12,14 91:14,17
91:19,20 92:9,10
92:25 94:3,6
96:13,21 99:14
100:12 107:13
112:16 114:24
116:6,24 117:15
120:4,8,17,21,24
121:3,6 122:9,12
126:7,11,16,19
127:18,24 128:5,9
128:14,20 129:7,9
129:12,14,19
130:6,13,15
131:12,16 132:2,5
132:9,11,13,16,20
136:2,23,24 137:5
137:8,9 141:13
142:24 143:2
144:13 153:5
159:5,10,23
162:15 163:16,19
163:24 164:19,21
164:24 165:4,7,19
165:25 166:2,4
167:11,13,17,20
167:22,23 168:3,5
168:9,11,15 171:6
173:5 176:15
182:22,25 183:5,8
191:18 204:10,14
204:23 205:4,11

205:15,22,25
206:3 209:3,5
212:8,10,12,18,24
214:11 215:2
216:10 217:2,4,10
217:13 220:21,25
221:17,21 222:3,4
222:10,10 223:2
223:10,13,15
224:2,5,8,12,15
225:1,4,13,16
226:25 227:11
228:7,10,13 229:2
229:6,10 231:20
232:10 234:14
239:8,13 240:3,5
240:16,18 243:2
244:21 246:1
248:25 249:1,15
249:24 250:3,5
258:2,4 261:10,12
261:14,19,23
262:2,4,9,16,18
262:21 263:5
264:3,5,8,10
265:5,8 267:6,15
267:18 268:15,17
269:20,25 270:6
270:21 274:9,13
274:16,20 277:8
277:15,20 280:24
281:3,7,12,16,21
282:4
**court's**  30:16 50:2
62:4 229:15
**courts**  17:20
41:21 158:25
222:17
**cover**  157:23
**create**  234:19
**created**  83:25
106:18 205:9

creates 85:6
creating 85:18
creative 109:13
credenza 56:23
credible 40:21
credit 236:3
creditor 11:12,13
  23:19 24:20 42:21
  66:2,6,23 72:12
  72:16 74:5 110:15
  200:20
creditors 11:9
  16:10,12,16 19:10
  20:2,23 22:22
  23:10,18 24:7
  27:18 28:3,4,14
  28:24 29:7 30:15
  33:17 34:6 35:18
  37:24 39:1 40:16
  43:14 48:14 51:5
  51:8 52:20,20
  53:4,7,14,16
  66:15 67:2,4
  69:12,13,21 72:10
  72:11 79:25 114:9
  118:19 119:7
  123:1,1,2 166:18
  177:23 201:7
  235:23 237:25
  271:21 272:4,17
  272:19 279:18,19
creditor's 167:14
cremens 196:25
critical 12:6 13:12
  19:19 27:23
cross 3:8 88:25
  121:7 126:19,24
  132:9,12,21 160:3
  163:16 167:17,19
  167:24 209:3,6
  215:22 220:14
  239:8,15

crystalizes 31:25
css 1:6
current 138:15
  147:21 148:2
  197:23 225:25
currently 24:4
  130:18 137:21
  166:8,9 209:21
  226:1
cut 76:11 168:11
  188:1 270:3
cutting 205:2

d

d 4:20 5:21 7:1
  130:3 156:18,20
  156:24 157:8
  163:2 164:2,4
  165:17
d.i. 2:4
dang 5:25
daniel 3:22 5:10
  6:12
date 12:7,9 13:20
  25:14 51:4 52:21
  52:25 53:13 80:25
  81:1,2,5,6,9,11
  82:19,21,22,24
  99:4,19 102:14
  103:2,2 109:6,7
  109:21 110:6,7,8
  151:2 206:16
  238:16 242:7,9
  250:7 251:9 254:8
  255:18 273:24,25
  274:18 275:12
  276:8 278:5,6
  283:25
dated 72:24
  149:20 179:9
  241:5
dates 81:4 251:5
david 4:16,21 6:9
  16:9

day 13:18,19,20
  15:4 36:22 55:6
  65:4,14 67:8,17
  103:17,21 119:13
  190:7 193:18
  222:18 230:15
  231:11 234:3,3
days 20:4 42:9
  52:2 65:19
dd 220:8
de 49:11 83:19,20
  83:20 160:11,15
deadline 66:17,20
deal 10:4 20:7
  46:20 48:5,7,14
  52:22 53:4,9,10
  69:11 177:2
  181:11 184:15
  188:15 199:23
  200:11 202:6,16
  203:14,19,21
  204:6,11,13,24
  205:11 211:5
dealing 25:17
  82:23
deals 34:13,13
dealt 10:1
debating 274:3
debt 14:12 34:14
  43:9 78:1 84:7
  102:1,4,11,13
  103:1,8,11,12,16
  103:20 104:5,18
  105:10 121:19,20
  121:21 174:8
  252:24 253:13,14
  254:25 255:19,23
  255:25 256:3
  257:9,13 258:15
  258:18 260:5
debtor 3:4 42:20
  48:8 49:19 58:21
  59:3 62:9 63:6

70:12 81:16 92:23
  93:9,13,16 109:2
  109:10,11,23
  125:20 195:1
  232:20 245:24
  247:3 248:5
  251:12
debtor's 20:13
  93:25 184:5 270:8
  278:19
debtors 1:8 2:4
  8:2,6 38:3,5,22
  39:3,9,12,17,17
  40:14,18 41:12,12
  42:12 44:13,23
  49:3,24 50:8
  59:11 60:1 63:4
  66:14 69:20 70:14
  77:16 78:3 81:13
  81:14,15,15,17
  82:9 83:1,2 92:8
  93:14 94:18 95:11
  95:13,15 99:19,22
  101:13,13 106:1,2
  107:21 108:7,9,14
  109:5,9 110:6,8
  110:16 113:22
  114:4,7,7 115:25
  116:9,22 117:21
  119:15,23 123:11
  123:14,15,17,18
  123:20 124:15,22
  151:9 155:5,10,12
  161:4 175:11,12
  175:23 176:2,15
  177:5 184:14
  186:10,13 187:7
  187:10,23 196:7
  196:12,14 219:15
  226:4,9 236:7
  242:14 248:16,23
  249:3 250:10,17
  251:10,23 252:20

256:14 263:20
264:1 265:13
267:10,11 276:10
280:5,14
**debtor's** 67:24
75:11 87:7 173:16
177:18
**dec** 36:18
**decide** 15:14 25:2
30:21,21,22
192:15 216:2
**decided** 23:5
24:18,22 25:14
194:21
**decision** 9:18 11:8
17:8 28:13 30:4,9
31:19 38:7 53:1
53:12 159:5,10
192:19 193:6
203:10 209:22
210:9 222:16
**decisions** 221:4
**deck** 22:13
**declaration** 12:13
12:13 56:19 57:4
57:21,22 58:1
59:19 67:8,11,17
78:16 103:17,22
103:24 135:7,11
167:3 182:14
199:22 220:3
227:20 228:1,7
267:22
**declare** 210:9,11
210:14
**deduction** 147:22
**deductions**
147:11
**deemed** 252:8
**defeat** 39:15
**defend** 221:12
**defendant** 113:19

**defending** 221:3
**defer** 205:14
244:1,22
**deference** 233:23
243:5,10,12,16,23
244:5 256:16
259:12 263:11
266:25 267:12,14
268:1,5,14 276:12
**deferred** 234:2,6
236:17 244:3
**deficient** 72:18
**defines** 245:19
**definitely** 105:2
**definition** 247:21
248:2,12
**defranceschi** 5:10
**delaware** 1:2,13
80:18 136:2
195:15
**delay** 48:9 185:5
**delays** 41:18
**delivery** 209:14
211:4 235:17
**delta** 189:3
**demonstrate**
18:19 38:14,22,24
40:5,12 43:16,18
**demonstrated**
38:1
**demonstrates**
40:2 41:15,17
**deny** 154:4 207:19
**departed** 169:4
**department** 138:8
138:14,18,21
139:1,5 157:10
181:15 184:4
**department's**
139:9
**depending** 115:9
**depends** 27:25
84:12 114:11

225:10 252:11
**deposed** 249:9,16
**deposition** 95:18
124:4 133:25
144:1,5,6,8
161:20,21,22
162:10 164:13
210:25 214:16
237:24 246:6,12
246:15,19,21
249:7 251:15,19
259:1
**depositions**
232:12 233:13
234:8 246:16
269:13,14
**depreciated**
149:16
**depreciation**
147:18,19 148:21
149:8,13,14,24
150:6,14,16
179:10 193:20
198:7
**derived** 150:15
**describe** 17:19
58:7 63:16 89:9
89:20 133:13
219:14
**described** 219:13
**describes** 94:17
**describing** 157:18
157:21
**description** 95:5
**designated** 246:24
**desire** 176:5
**despite** 48:12
51:23
**destruction**
117:25
**detail** 63:17
104:22 259:9

**determination**
26:10 31:6 32:13
44:9 244:1 257:2
263:10 276:11,16
**determine** 25:23
30:13,17 31:8
97:9 105:13
175:10 179:1
194:6 217:2
247:12 268:1
276:1
**determined** 31:23
57:16 63:19 76:22
77:6 100:2 101:19
103:14 134:25
146:17 252:23
253:14
**determining** 22:9
219:4,11 257:25
258:17
**developed** 58:23
**di** 258:13
**dice** 46:20
**didn't** 44:16,22
44:23 51:21 82:1
104:8 127:6
142:17 143:15,23
145:24 146:2
152:1,4,10,14,19
170:2,8,11,14,17
171:20 172:1,10
174:15 178:14
**difference** 68:19
188:24 206:21
**differences**
188:24 252:10
**different** 26:20
37:18 69:23 80:8
84:3 93:22 94:11
104:4 105:18,18
106:10 190:21
217:11 227:2
238:16 244:16

247:6,18,25 249:8
266:14,15 267:14
277:11
**differentiating**
173:10
**difficult** 64:9
275:23,25
**difficulty** 144:9
**diligence** 41:20
**dilute** 187:3
**dip** 103:12,12
263:12,20,23,25
264:23
**dipped** 264:16
**dir** 57:1 227:23
**direct** 8:19 14:18
17:5 33:7 39:6
40:23 55:1,10
56:6 63:7 71:5
74:13,22 75:12
76:2,18 79:18
80:10 83:21 84:10
84:11,16,24,25
85:5,6,8,17 89:4
89:25,25 90:4
91:4 92:20,22
93:7,12,21 95:2
95:10,22 97:8,9
97:14 98:13,20,22
98:24 99:11
101:11,12,18
104:11 105:18
108:4 112:2,5
113:1,5,11,18
115:24 116:4,7
118:15 119:14
123:6,9 127:16
130:11,16 131:5
131:11,13,15,15
131:16,19,22
132:1 133:17
135:6 140:3,11,12
141:3 144:5

145:13 147:3
148:8,11,13
151:23 153:5,6
156:11 160:6
165:24 166:6
167:3,7,9 169:13
187:13 211:11
212:21 217:18
223:6 225:12,20
234:5 237:4,11,12
239:5,6,23 241:11
242:16 244:17
245:13,19,22
247:2,12,13,21
248:2,9,12 249:20
254:21 255:10
257:18,25 258:10
258:17 259:17
265:15 267:8,9
268:22 276:18
**directed** 68:25
71:20
**directing** 242:15
**direction** 94:23
237:3
**directly** 17:16
52:3 74:20 83:25
117:1 118:4
233:14,20 237:5,6
237:8 264:21
265:16 269:6
**director** 40:15
196:11 220:1
226:9
**directors** 7:25
22:7,8 82:10
96:23 106:5,6,9
107:14,15 208:6
218:25 221:4
232:5,7 252:2,14
**disagree** 20:25
21:2,3 209:25
210:2 262:5

**disagreed** 239:10
262:2
**disallowance**
33:22 41:2
**disallowed** 15:13
22:10 27:20 34:6
114:5,8,11
**disallowing** 52:23
**discernible**
104:12 105:11
**disclose** 105:9,25
213:9
**disclosed** 78:2
124:8
**disclosure** 11:6
14:8 35:2,3 45:16
45:22 76:8 77:15
89:10 113:22
135:7 172:24
173:1,16,24 174:1
174:3,4 218:13
255:15 260:15
**discount** 33:24,24
36:2,3 46:2 47:22
179:13 189:9
190:6,21,22
192:12
**discounted**
174:12
**discounting** 33:25
179:23,25 182:2
**discuss** 59:18
96:10,13 105:25
116:12 120:11
183:2 247:24
282:6
**discussed** 95:22
106:2,24 111:13
114:18,20 115:24
116:20 125:23
142:14 148:21
160:22

**discussing** 95:9
96:16,19 126:3
158:10 159:8
245:17 248:1,12
248:15
**discussion** 69:24
95:14 96:4 106:4
107:25 119:4
150:7 202:1
235:21,23 240:25
277:1
**discussions** 66:21
69:19 82:16 96:1
96:23,25 108:1
111:11 115:1
125:21 196:11
233:4
**disgorgement**
8:17 92:8
**disinterest** 106:5
**disinterested** 7:24
7:25 22:8 82:10
96:23 106:6,9
218:25 220:1
232:5,6 252:2,14
**disposition** 119:9
133:4,10 134:13
134:14,20,23
137:18 147:13,20
152:12 182:17
183:19
**dispute** 7:21 9:7
11:3 18:9 25:6
35:7 56:18 97:7
115:19 214:11
219:1 235:13
249:18
**disputed** 213:23
**disputes** 114:18
**disputing** 176:13
176:18
**disregard** 204:14

**disregarded**
118:9,12 137:16
139:12 143:8,14
143:22 146:3,6,21
147:4,6 154:15
160:12,14
**disregarding**
142:22
**distinction** 19:2
19:19
**distributable**
188:22 201:6
**distributed** 16:16
17:13 61:3
**distribution** 16:15
19:9,11,12 27:22
31:14 51:4 122:25
149:20
**distributions** 51:2
**district** 1:2 28:14
128:9
**disturb** 43:19
**divests** 25:2
**divide** 39:5
105:13
**dividend** 15:19,19
15:21 209:15
210:9 235:13,14
235:15,16,18
236:2,13
**dividends** 210:11
210:14 264:20
**divvy** 64:2
**dobrey** 251:19
253:20 254:1
269:8
**docket** 65:4 67:13
67:15 227:18
**docketed** 68:2
**doctrine** 163:4,6
**document** 9:4
36:19,21 57:1,8
60:7 67:7 71:13

94:17 112:13,19
131:8 151:24
164:13
**documents** 24:8
45:6 93:20 132:15
143:18 146:11
162:2 271:5
**doesn't** 52:5
88:14 119:25
151:18 153:17
156:5 157:23
158:8 159:7,12
270:2
**doing** 47:21 50:20
79:8 84:19 85:7
100:15 104:17
105:13 107:22
159:24 172:8
184:25 185:8
188:1 236:11
237:5 238:18
248:14 250:25
252:2 258:14
260:12,13 265:25
266:14 276:6
277:11,21 279:11
**dollar** 27:7 33:8
33:16,18 34:22,25
36:1,5 42:24
57:17 107:9 116:8
272:18 275:8
**dollars** 16:17 20:9
27:5 31:24 33:6
33:13,20 34:4,22
35:20,25 37:15
38:5 46:1 48:9
74:12,19 77:4
78:21 82:7 85:4
85:10,11 90:19,24
91:1 101:4 111:21
112:5 113:9
194:10 195:6
196:21 275:8

**don't** 76:1 88:21
89:8 96:3,16,19
96:22 102:16
103:19 106:12
107:12,24 108:1
124:3 132:7,16
140:14,21 143:15
147:14 149:22,23
150:11,20,24
153:21 154:4,8
155:10,12,13,23
158:18 160:24
162:8 163:17
171:23 175:2
272:12,15,16
273:21 274:9
275:3,11 278:3,4
278:6 280:2
**door** 25:7 261:14
261:19 262:7,14
**dore** 65:11 96:14
96:17
**doré** 251:16
**double** 21:20
27:13 29:4 31:12
225:17
**doubt** 106:10
235:3 238:5
277:18
**dozens** 49:16,16
**draft** 63:25,25
64:16 150:6,8,12
178:19
**drafted** 59:5 61:4
69:25
**drafting** 72:7
**drafts** 108:21
**drained** 231:21
**draw** 213:13
**drawing** 82:14
**drew** 216:17
**drink** 168:5

**driving** 48:21
207:9 238:17
**drop** 93:4 198:6
**dropped** 77:22
230:14
**ducera** 166:9,10
166:23 168:17
169:5,7
**due** 41:20 55:24
**duty** 10:8 195:15
215:8 217:17
**dynamics** 230:1,9

**e**

**e** 1:21,21 3:1,1,6
7:1,1 12:4,6,11,20
13:15 14:7 15:10
19:7 28:7,8 49:5
79:4,6,7 106:12
123:11,15,17
124:7,12,23 125:1
125:8 126:1
149:10 154:20
165:17 175:24
176:17,19 177:4
177:11 180:20,24
184:15 191:13
192:4,5 200:6
202:12 234:8
236:25 237:15
238:6,11 271:10
272:8 279:5,7,8
279:10,15,18,20
279:23 280:3,12
280:20 283:1
**e&p** 236:11,12
**earlier** 49:25 50:1
74:2 83:14 111:25
114:2 121:11,23
135:13 142:17
156:6 186:3
196:16 241:15
246:1 264:8,10

earliest 49:24
early 64:6,10 72:4
 206:9 216:23
earnings 236:3
easy 44:8 265:9
economic 51:18
 117:2 206:23
 233:24 243:19
 256:21
ecro 1:25
ed 129:8
educate 272:15
edward 60:17,18
ef 125:10
efch 63:3 241:5
effect 16:24 18:25
 23:8,9 28:21
 77:17 82:14 84:23
 85:1,3,7,14,16
 97:22,23 99:1
 100:7 111:25
 112:9 114:13
 119:19 182:15
 183:17
effective 28:22
 29:2 51:7 52:21
 52:24 53:13,25
 99:4,19 206:8,9
 206:15
effectively 52:22
 53:5 181:6 208:21
 216:15 233:10
 248:6
effectiveness
 28:10
effects 84:12
 206:13,17
effectuate 19:8
 139:19 152:11
effectuating
 175:17
efficient 204:12
 281:10

effort 52:11 171:5
 220:1
efforts 11:25
 15:11 42:25 43:20
 51:24,24 74:20
 82:23 266:17
 272:19 276:17
 279:21
efh 2:3 4:2,14 5:2
 8:12 11:4,12,14
 11:25 12:8,15,17
 12:17,25 13:2,4
 14:4,6,9 15:16,21
 15:24 16:4,10,11
 16:14,16,19 17:1
 17:11,12,14 19:6
 19:11,20 20:9
 21:17,17,18 22:17
 22:21 23:10 26:6
 26:8,15,22,22
 27:5,7,12,12,18
 28:3,5,6,14,24
 29:7,16,19 31:10
 31:11 33:1,7,21
 34:6,6,20,20
 35:18,21 36:9,12
 37:14,25 38:6
 40:8,12,23,24,25
 41:4,5,13 42:24
 43:1,5,9,10,14,14
 43:22 44:11 45:1
 45:11,12,14,17,18
 45:21 46:5,24
 47:15 48:6,11,14
 48:17,18 49:8
 52:20 53:14 63:4
 65:10 66:14 69:13
 70:16 76:1,11
 77:18 78:1,4,22
 79:7,8,18,25 80:1
 81:14,15,16 83:2
 84:7 88:9 91:3
 95:3 96:23 98:16

99:6,19,22 101:13
 102:1,11 104:5
 105:5,5,7 106:23
 106:25 108:25
 109:4 110:15,16
 110:22 111:8
 112:5 113:2,6,11
 114:9,13 115:4
 116:25 117:5,11
 117:18 119:14,17
 119:20 120:20
 121:24 122:1,6,14
 122:16,21,24
 123:4,22 127:2,11
 127:14 137:17
 138:10 140:15,23
 142:23 146:15
 152:5 154:24
 160:1 171:5,7,15
 185:13 186:9,21
 186:25 187:14
 195:10 198:11
 199:12 200:7
 201:7 203:18,18
 203:21 204:23
 205:3,7,9,10,11
 205:12 206:24,24
 217:20 223:8
 226:2,15 231:8,21
 235:16,19,25
 236:6,9 237:8,21
 238:8,13,15,25
 241:5 251:13,24
 252:6,22,24 253:1
 253:13 254:15,19
 255:10,23 258:15
 259:22 260:3,7,22
 261:7,8 264:14,19
 264:22,23,25
 265:1,5,10,21
 266:6 269:2,9
 272:18 273:14,24
 274:17 275:4,11

279:18 280:1,6,15
 280:18
efh's 18:18 19:13
 33:17 116:13
 118:16 185:8
efh's 171:17
efih 2:3 8:6,25
 11:5,9 14:3,5,6,9
 14:12 15:7,21
 17:12,13 19:9,24
 21:18,23 23:16
 28:4,24 30:7
 34:11,19 35:22
 36:12 37:6,12,15
 37:24 38:25 40:9
 40:22 41:7,8 42:7
 42:20 43:8,11,18
 43:21 45:5 46:18
 46:23 48:9 49:6
 51:5 52:20 53:15
 53:21 57:17 63:3
 65:10 69:12,12
 70:14,20,25 74:14
 74:20 76:1,8,19
 77:18,22,25 78:4
 78:22 79:7,8,25
 80:1 81:17 82:7
 83:1 84:7,16 85:5
 89:17,25 90:18,21
 91:2 95:3 96:24
 98:16 99:2,6,19
 99:22 101:13
 102:1,11 103:7
 104:5 105:5,7
 106:23 108:9,10
 108:10,24 109:4,5
 109:6,9,18,24,24
 111:8 113:2,11,18
 113:19,23 114:7
 114:12,14,23,25
 115:3,3,4 116:12
 117:6 118:4,16,19
 119:3,5,14,17,19

119:25 122:19,25
123:1,23 127:10
127:13 133:4,10
134:1,13,15,18,23
135:1 137:16
138:11,11 140:2,8
140:10 142:24
143:8 146:7,14
148:3,13,14 152:5
152:16 155:8
169:23 170:12,14
171:9 172:17,22
173:9,13,21 177:1
185:2,13 186:6,21
186:25 187:15,17
188:23 195:10
196:1,20 197:2,3
198:13 199:15
200:9,20,24
203:17,23 205:11
206:24,24 217:20
226:2,15 231:8
235:2,15,25 237:8
237:21 238:14,15
238:25 241:5,5
251:13,24 252:6
252:22,24 253:1
253:12 254:15,19
255:11,23 258:15
259:22 260:3,6,21
261:8 263:12,19
264:14,17,18,19
264:25 265:1,6,21
266:5,22,24 268:3
268:4 271:15,17
271:21 272:4,17
273:3,14,19,25
274:19 275:4,12
279:16,18
**efih's** 19:8 20:1
40:15,15 57:17
117:2

**efih's** 154:19
**efi's** 177:22
**ego** 143:13,22
145:4,6
**eifh** 26:16
**eight** 190:6
**either** 13:18 23:17
39:24 51:18 88:11
96:23,24 109:4
112:1 115:8 147:5
151:4 155:3
158:19 171:20
172:2 182:10
185:9 192:17
203:10 204:7
208:17 219:9
222:21 233:13
234:7 251:20
252:4 254:12
269:5 273:1
**elect** 139:10
**elected** 140:24
**election** 117:6,10
117:22 139:14,16
139:16,24 140:2,8
140:16,24 170:17
171:6
**electric** 211:4
235:17
**electronic** 56:1
**elects** 211:17
**elicited** 207:18
**eliciting** 206:13
**eliminated** 54:7
**elimination** 59:24
**elkin** 4:22
**elliot** 51:5
**elliott** 2:2 3:9,9,16
3:16 4:7,7 7:7
8:13 13:25 14:1
15:4,5,9,15 16:10
27:4 33:3 38:14
42:19,23 46:8

48:2 49:23,24
67:2,4 74:11
76:17 79:15 83:4
87:18 88:3 89:23
93:23 129:16,17
132:25 133:24
165:3 215:12
217:4,7 219:7
220:16 226:22
234:17 236:4,15
239:20 242:17
**elliott's** 7:8 10:11
14:21 43:20 49:15
226:11 234:11,12
**ellis** 3:3 50:19
56:11,12,18 58:11
58:13 59:13 66:3
72:16 73:8 75:2
75:24 95:8 122:15
212:20 217:15
223:8 224:19
229:13 233:19,21
266:12,17
**ellis's** 58:8 75:5
266:23
**elongated** 197:15
**elx** 93:25 112:14
245:9
**email** 254:2
**embedded** 72:5
95:21 96:11
**embodied** 95:23
**emerge** 78:3
186:13
**emerged** 66:14
83:6 169:5
**emergence** 83:10
84:3,4 101:8,15
226:7,20 252:8
253:16 254:9
**emerging** 254:17
**emphasize** 62:7,8
216:13,14

**employ** 176:16
**employed** 94:18
105:1 130:18
166:8,9,12
**empower** 158:14
**empowers** 209:22
**enable** 118:4
281:15
**enabling** 41:16
**encore** 183:19
208:5,7,11,14,18
208:18,22,24
209:14,14,21,21
209:22 210:13
211:4
**ended** 236:11
**ends** 13:24
**energy** 1:6 60:17
133:25 135:25
**enforceable**
118:21
**engage** 65:23
**engaged** 132:25
135:10
**engagement** 80:9
135:12 158:1
168:16,23 169:1
**engaging** 158:22
**enhance** 272:20
**enhancing** 9:11
**enjoin** 200:6
**enormous** 48:16
**ensure** 52:11
58:16 59:13,17
60:25 92:11,15
157:2 159:17
163:3 227:3
255:22
**ensuring** 59:24
**enter** 26:17 77:20
146:7
**entered** 16:23
63:21 67:24 72:19

72:20 73:12 75:11
87:11 94:15 129:5
132:6 167:14
207:1
**enterprise** 45:3
150:17 151:12
174:9,11,16
175:11 191:21
192:7 195:11,16
195:18
**entire** 18:5 29:21
34:4 64:25 79:3
85:9 173:12 222:6
**entirety** 131:3
**entities** 70:13 81:6
118:9 143:14
185:13 208:24
211:9
**entities'** 146:21
**entity** 118:12
137:17 139:12
142:22 143:8,22
146:3,6 147:4
149:15 154:15,24
157:6 160:12
161:6 184:23
188:11,13 208:20
210:8
**entity's** 147:7
160:14
**entries** 63:12 64:2
64:5,12,19,20
77:2 79:16 80:4
**entry** 62:2 69:1
72:13 74:3,4
76:15 89:21 90:7
90:10
**envision** 200:15
**equal** 218:14
**equally** 275:16
**equipped** 215:10
**equitable** 17:18
17:21 44:10,10

51:1
**equitably** 115:15
**equitization**
236:11
**equity** 17:8,13,14
20:1,4,5,16 21:20
21:20,23 22:4
26:3,13,23 27:12
27:14 31:13 69:15
114:13 127:11,14
135:25 236:13
**equivalent** 78:9
**erik** 6:10
**erin** 4:11 128:21
**esbrook** 224:21
224:21,23 239:5
**escrow** 230:7,12
231:7
**escrows** 124:20
**essence** 21:19
**essentially** 55:6
112:1 116:19
150:15 164:3,4
179:4 188:5,9
199:16 215:4
254:20
**establish** 72:2
81:5,6
**established** 82:20
**establishing**
124:20
**estate** 9:11,12
16:14,19,19,24
18:18,20,24 20:6
20:10,14 34:6,12
38:6 41:1 42:15
43:14,21 62:23
82:1 83:22 84:11
84:11 97:13 107:3
110:22 157:5
173:21 191:13
197:2 200:24
207:14 213:20

219:11 233:25
235:1,7 236:9
237:7,7,12 256:1
256:23 259:17
261:1 275:22,22
276:2,13,19,22
**estates** 36:9 40:13
41:17 42:5,6 62:9
69:18 77:12 83:16
83:25 103:1
107:21 110:4
196:8 199:14
203:15 204:17,21
205:17 206:20
214:2,6 226:17
237:4,13,22
238:19,21 244:17
248:10 255:16,19
258:11,18 275:7
**estimate** 135:15
135:16 184:13
189:22 191:9
**estimates** 177:18
281:19
**estimation** 98:10
220:17
**et** 1:7
**eternal** 265:10
**evaded** 163:5
**evaluate** 13:12
146:2 170:8,11,14
170:17 196:13
197:1 199:16
220:2
**evaluated** 146:22
195:22 206:23
**evaluating** 146:21
184:18 187:7,21
188:19 202:15
220:8
**evaluation** 172:1
206:22 229:20
232:21 236:22

242:11
**evans** 3:22 107:19
**evasion** 163:11,11
**evening** 281:22
282:9
**event** 35:17 42:16
54:12 117:2
155:21 163:10,14
234:22 278:11
**events** 11:24
116:25
**eventually** 122:20
230:13
**evercore** 13:11
149:6,9 151:1
178:17,25 179:16
189:22,23,23
190:16 191:10
194:15,25,25
197:13 248:16
**evercore's** 182:6
**everybody** 15:22
28:7 40:18 45:22
45:25 48:12 49:21
88:12 104:23
106:17 223:5
**evidence** 10:19
11:11 12:5,21
13:6,11 14:3,11
15:2,10 17:4,6
18:11 19:2,5,14
19:18,23 22:15,15
26:5 27:9 36:6,6
38:1,8,9,12,14,19
38:19,21,21 39:9
39:11,14,23 40:2
40:5,11,21 41:15
41:17,23,23 42:8
42:11,19 43:13,16
50:13,14 58:1
61:14 67:20,24
75:7,11 86:15
87:11 88:13 132:1

132:6 167:10,14
213:5 215:12,15
215:17,19 221:5
228:9 261:20
**evidentiary** 42:4
54:19
**ex** 60:7 86:16,16
86:16,16,17,17,17
86:17,17,18,18,18
86:18,18,18,19
87:1,7,7,7,8,8,8,8
87:8,8,9,9,9,9,9
87:10,10,10,10,10
87:10,11,11,13
**exact** 34:8 50:4
69:23 102:4
122:22 215:14
261:12
**exactly** 65:25
69:21 102:6
104:22 112:8
119:6 175:2
199:25 222:18
**exam** 229:16
**examination** 56:6
88:25 121:7
126:24 130:16
132:15,21 160:3
162:17 163:21
166:6 167:22,24
206:4 209:6
225:20 239:15
270:4 281:15
**examine** 215:22
220:14
**examiner** 124:25
125:3
**example** 26:1,16
26:24 114:19
189:11 201:24
213:19 234:8
259:14 264:16
272:25 277:16

**examples** 84:14
**exceeded** 147:10
**exception** 57:11
**exceptions** 265:24
**excess** 19:10 37:5
37:21,22
**exchange** 27:5
**exchanged** 86:4
**exclude** 262:10
**excluded** 261:15
261:16
**exclusively** 19:13
98:16 264:24
**exclusivity** 92:1,4
**excuse** 19:21 29:6
99:12 120:13
127:20 128:16
227:5 231:6,14
238:14,24 239:24
259:14 277:3
279:16
**excused** 127:23
164:22
**executed** 68:16
275:1
**execution** 41:17
**executive** 226:7
**exempt** 157:6
**exer** 244:14
**exercise** 24:5
124:17 244:15
**exercised** 181:10
**exercising** 37:1
217:17
**exhibit** 36:19
60:14 67:7,24
71:6,9 74:22
75:11,22 93:22
132:6 142:4
156:15 167:14
239:6,23
**exhibits** 56:2
67:11 85:24 86:3

87:7 88:7 239:7,9
**exist** 208:10,13
**existed** 40:10
**existing** 18:23,23
39:21,22 138:19
139:2,6 169:24
**exists** 23:8 85:16
209:21
**expect** 44:19
186:5 187:6
244:13 247:11
252:16
**expectation** 99:23
101:17
**expected** 11:22
184:14 244:14
252:13 271:22
272:4,18
**expecting** 272:24
274:1
**expenditure** 99:9
**expense** 9:3,10
18:18 26:18
211:17,20 213:21
**expenses** 2:3 7:9
9:9 18:21 19:15
20:15 42:1 58:17
65:17 74:13 92:7
115:25 123:12
200:14 205:2,9
226:15 237:16
251:12 252:6
276:20
**experience** 166:15
172:3,5,9 185:19
186:13 196:23
229:19 232:21
234:12
**experiences**
219:15
**expert** 116:17
135:17 149:21
166:24 170:6

209:9 213:8
214:24 218:11,14
219:23 221:12
222:21,21
**expertise** 143:16
**experts** 221:13
**expired** 66:18
**expires** 202:4
**explain** 62:21
65:21 75:17 77:22
84:9 104:14,16
188:3 217:24
254:10
**explained** 63:1,5
104:17,19,21
**explaining** 62:24
**explains** 117:17
217:19
**explanation**
105:21 214:15
255:12,16 259:15
**explore** 209:8
**exposes** 211:18
**exposure** 170:14
**expressly** 123:11
156:10
**extant** 72:6
**extension** 92:3
**extensive** 52:9
217:23
**extent** 9:20
123:19 124:2
152:4,14 159:16
182:8 186:10,16
201:4 208:7
230:10 237:5,9
259:15 277:10
**extra** 195:6
281:25
**extrapolating**
173:20
**extrapolation**
14:17

extremely 30:8
154:14

**f**

f 1:21 283:1
face 171:7 182:2
182:11
faced 14:25
facilitate 226:21
facilities 40:23
facility 109:19
149:20
facing 38:7
fact 18:23 23:1
28:18 36:7 38:2,9
38:15 39:19 42:13
42:14 46:9 52:4
56:17 134:25
136:25 138:21
140:19 149:8
154:12 169:4
172:19 173:4,9,9
184:4 187:10
188:1 191:15
195:21 197:20
198:6 199:4 219:5
219:11 232:8,9,10
235:4 254:2
256:19 269:3
271:5 272:7
factor 15:15 45:24
172:17 192:22
194:6 199:19
207:9 243:25
256:25
factored 185:9
199:12,12
factoring 202:24
factors 151:19
218:4,18 229:1
232:14,15 236:22
facts 23:2,4 31:18
52:13 140:21
204:10 215:1,7

222:15 229:17,20
231:23,24 232:16
232:18,21 233:8
234:10,13 236:14
236:24 237:15
factual 11:3 91:19
214:20 226:25
227:12 239:21
factually 19:4
fahy 79:24 80:18
110:24 111:1
failed 201:18
202:6 204:7
226:21 273:1
failing 212:5
fair 47:1 50:25
97:15 98:11 99:3
102:25 117:14
121:21 147:9,17
241:24 243:9
246:4,23 248:19
258:25 260:21
262:8,25 263:24
267:3 275:21
278:7,7
fairly 100:22
faith 14:16 137:2
221:6
fallback 235:1
familiar 62:13
67:11 68:5,13,22
69:6 71:7 93:21
142:7 156:7
226:11
fantastic 78:12
far 95:5 101:6
126:4 136:25
195:20 226:24
232:6 251:23
257:21
fashion 75:23
77:24 78:19 94:20
281:10

fast 45:16 258:5
favor 236:6
favorite 48:5
favors 185:10
fay 4:11 128:21
128:21 129:2,8,11
feasibility 74:6
february 231:25
fed 214:9
federal 117:1
131:1 134:8 135:2
137:20 139:12
145:24 146:11
148:3 154:15
169:25 182:15,16
183:17,18 199:1,1
211:16,19 213:4
fee 8:11 9:15,20
9:21 10:19,22
13:5,7,17 15:13
19:21 20:8,20
21:9,10,16,21,25
22:1 23:18 25:20
25:20,24,24 26:6
26:11 27:3,23,24
30:14 31:24 32:12
33:2,8,18 34:4,10
34:14,19,23 35:21
36:5 37:3,19,19
37:20 38:4 39:19
42:23 43:5,15,18
44:14,14,15,17,19
44:25 45:10,12,19
45:19 46:2,11,15
47:16 48:22,23
49:3,17,18,19
50:9,12 55:25
58:13,14 61:1,1
63:7 64:17 65:1,3
65:6,7,7,13,20,23
65:24 66:1,3,5,7,9
66:10,11,13,16,18
66:19,19,21 74:25

75:1,5,18,20,22
76:21 77:5 83:9
83:15 84:17 85:10
90:8,14 91:14
92:21,22 93:7,7
93:12 97:10 98:24
100:14 104:15,16
104:21 105:3,10
105:21,24 106:7
108:2 112:5,6,22
113:18 124:8,9,12
124:15,19,25
125:1,3,3,4,6,10
125:17,21,23
126:1 127:6
206:14 216:22
218:23 228:25
229:22,25 230:17
230:22,22 232:7
232:14 233:7
235:6 245:22,23
247:2 248:20,24
249:3,6 250:10,17
250:19,22 251:3,3
251:5,24 271:1,8
271:10 272:14
277:23,24 278:1,2
278:8,18,20
feel 132:18 233:7
233:23 234:21
237:18 239:1
fees 8:18,22,24,25
9:18 10:5,7,9,10
12:5,11,22,24
13:3,11,13,13
34:16 38:3,5,23
39:10 41:12 42:14
46:12 48:22,24
49:7,11,20 50:15
58:14,17 65:16
69:2,7,16 70:1,3,7
71:20,24 76:2
79:18 83:6,21,24

83:25 84:3,10,14
84:15,16,20 85:8
85:17,18,20 90:6
90:11 91:9 92:7
92:20,20 93:12,12
95:10,11,16,19
97:8,9,14 98:13
98:14 99:2 100:3
100:8 101:5,12,22
105:12 106:9,19
107:2,11,16,20,23
111:7,21,22 112:7
113:2,6,11 115:24
121:18 123:12,16
123:21 125:12
201:11 218:21
232:19 233:18,22
233:25 236:17,23
236:25 237:4,16
238:3 242:15
243:4 244:2,23
245:19,20 246:5
247:2 248:2,12
251:12 252:20,21
252:24 253:12,23
253:24,24,25
255:10 256:15,22
256:23 258:9,10
258:14 261:5
263:10,12 265:13
265:13,21 266:11
266:22,24 267:11
267:25 268:3,4
270:9 272:8
278:19 279:5,9,20
**fell** 30:3 174:19
**felt** 70:4 98:21
121:20 226:23
236:4,8 254:19
268:7
**fence** 207:24
208:1,3,10 209:20
210:4

**fenced** 210:8
**fenicle** 79:17,23
79:24 80:7,18
110:14,24 111:1
111:23
**fh** 185:11
**fidelity** 11:15 12:2
69:14 70:15
230:24 231:10,11
**fiduciaries** 40:14
**fiduciary** 42:5
217:16 218:23
219:24 226:17,19
**fight** 48:10 51:11
**fights** 51:13
**figure** 24:8 49:7
105:16 150:24
179:12
**figures** 154:22
**fih** 185:9,11
**file** 65:3,15,20
66:6 81:5 108:14
109:22 123:20
**filed** 2:4 10:9 15:7
51:22 65:13 66:8
66:15,18,23 67:2
67:13,15 72:2
73:3 75:21 80:16
81:10,15 96:17
103:17 108:17,23
109:1,2 125:5
129:4 220:3
227:18 232:11
235:6 248:20,24
249:1 271:8
**filing** 13:20 74:4
233:7
**final** 8:18 14:2
42:18 51:20 52:12
57:5 58:14 64:16
66:11,13,16 74:11
84:8 90:8,14
91:24 92:9,10

104:21 112:22
124:18 139:2
205:16 227:16
**finalized** 135:11
150:7,11 178:19
**finally** 10:11
14:21 52:1,15
156:4
**finance** 108:10
109:24 241:5
**financial** 13:1
124:6 166:10,13
166:16,20 168:19
185:1 192:2
202:20 208:7
250:20,21 251:20
**financing** 263:12
263:20,23,25
264:15,15,23
**financings** 235:2
**find** 36:15 112:15
180:3,4 192:16
222:5,8 230:13
266:2
**finding** 35:11
144:9 225:7
**findings** 10:10
137:8 204:11
**fine** 7:13 25:1,1
79:1 261:20 282:4
**finger** 5:7 8:24
265:14,21 266:5
266:13
**finger's** 266:22
268:2
**finish** 119:3 225:5
270:1
**fire** 265:10
**firm** 124:14 137:1
166:10
**firms** 80:16
266:14

**first** 7:20,21,23
8:5 9:6,8 13:15,18
18:8 22:22 28:11
29:9,22 40:4
50:24 51:12 56:23
59:20 61:6,22
64:6 66:22 67:8
67:17 68:15 69:12
70:16 77:11 79:23
101:10 103:17,21
104:16,19 112:19
115:2,3 133:16,20
133:22 135:21
148:12 153:6,10
169:12 170:22
173:10 195:8
212:25 218:19
239:9 253:4
264:15 272:12
**firsthand** 217:21
**fit** 257:3,4 260:24
**five** 16:10 55:12
72:25 229:4
261:24 263:23
275:8 279:10
281:5
**fix** 2:2
**fixed** 201:6
**flagged** 111:10
**fleckenstein** 234:9
**flip** 67:6
**flow** 47:18
**flowed** 27:13,13
31:11
**flowing** 32:3
**flows** 174:12
**focal** 96:1
**focus** 15:3 48:3,19
50:25 64:6,10
81:8,11 95:18
130:25 229:16
246:17 272:19

focused 48:2 83:1
  131:2 207:4
  279:21
focusing 156:18
  189:6 192:20
  232:18
folks 107:9 144:4
follow 30:17
  126:15 242:6
  254:5
followed 73:14
following 90:22
  101:14 171:12
  248:7 268:10,15
font 32:8
footnote 9:25
  16:21 76:15 77:22
  90:2,25 104:17,18
  141:11,22
force 180:12,15
  192:24
forced 16:14 20:5
  181:7 221:12
forecasting
  198:11
foregoing 213:25
  214:4 283:3
foregone 15:23
foremost 40:4
forget 223:4
forgo 220:19
fork 53:5
form 9:4 31:16
  169:10 175:25
  176:16 228:22
formal 66:6,8,24
  66:25 82:18
formally 72:12
  74:6 269:1
former 217:20
formula 69:25
  84:1 85:12 92:15
  92:17 100:4 101:8

120:2
formulate 219:16
formulated
  171:23
formulating 229:1
formulation 70:10
forth 12:12 64:9
  70:10 71:19,22
  97:24 213:16
  215:3 217:24
  219:17,24 227:16
  228:16 235:2
  245:16 251:22
  253:19 254:24
  276:4
forward 12:21
  45:16 49:14 67:6
  78:5,15 110:2
  191:20 197:13
  204:6 216:14
  254:16 258:5
  266:2
fought 222:23
found 39:13 135:1
foundation
  232:23 234:2
  237:1
foundational
  275:9
four 13:12 16:25
  18:5 50:3 51:6
  59:19 92:18 94:23
  95:2 144:21
  161:24 183:14
  228:19 263:23
fourth 13:8 59:22
  62:25 64:13 76:3
framework 237:3
  237:18 266:1
  268:8
frankly 70:6
  196:5 218:10

fre 218:18
free 8:8,9 15:23
  117:19 119:15
  132:18 160:16
  176:5,6,10,17,19
  176:23 185:10
  187:23 188:23,25
  194:21,23 195:11
  196:8 199:14
  203:14 204:17,22
  207:5,15 216:5
friday 7:11
  227:18
front 32:4 36:11
  52:4 59:9 103:25
  127:6 141:4
  144:11 150:20
  160:6,9 175:7
  193:25 210:16
  229:23
fruition 194:19
full 14:14 20:1,2
  34:21 37:25 48:12
  50:20 53:21
  113:24 172:25
  194:13 197:7
  203:6 271:22
fully 196:25
  209:21
fulsome 238:3
fun 51:2 164:25
fundamental
  173:9 275:9
funds 17:13
  103:12,12 128:22
further 7:11
  11:13 88:1 92:3
  103:6 120:3 126:5
  127:18 132:8
  159:21,24 162:14
  163:15 164:18
  167:16 195:22
  209:1 212:7,9

221:1 239:4
  280:22
future 1:6 60:18
  133:25

**g**

g 7:1 82:5
gain 147:20
gained 43:15
gains 147:12
galardi 3:20 7:4,5
  7:6,7,14,20 9:24
  16:5 24:13,14,19
  24:23,25 25:3,6
  128:3,10,12,17
games 51:15
gap 51:20,25
garvan 4:4
gas 109:5 110:16
gauge 191:25
gavin 4:20 159:25
general 9:9 61:22
  148:1 160:11
  163:4,6,11,13
  172:5 186:18
  238:11 251:17
  259:14,14 269:7
  278:12
generally 59:21
  65:10 67:10 81:4
  95:8 102:12
  106:19 118:11
  174:21 228:20
  269:18
generated 154:19
  190:2
generates 147:11
genesis 69:6,10
getting 21:24 27:5
  27:8,15 31:13
  48:18 64:10,13
  83:1 92:25 98:17
  230:19 231:9
  256:2 275:9

280:10
**giant** 45:23,24
  47:11
**give** 18:13 68:9
  84:14 144:3 145:2
  147:18 160:24
  168:11 180:13
  209:24 229:4,18
  229:25 234:24
  243:10 250:12
  257:22 264:16
  268:14 276:12
**given** 9:3 11:20
  52:8 101:12 149:3
  149:5,11 154:22
  187:2 198:6
  226:20 229:15
  238:21 255:17
**gives** 10:21,21
  48:4,16 128:15
  163:2 248:7
**giving** 25:17
  48:17 281:14
**glenn** 4:17 213:1
  213:2 221:2 222:2
  227:5 228:11
  261:9,11,13
  262:16,17,19,22
  262:24 267:1,9
  274:2 277:7
  280:24 281:2,6,9
**global** 12:10,15
  238:19,24 280:4
  280:13,17
**gluckstein** 237:24
**go** 7:19 8:10,11
  9:6 13:6 14:20
  18:15,15 21:22,23
  23:12 24:5,16
  30:18,18,22,23
  32:24 33:21 36:17
  37:4 48:6 51:7
  55:7,8 59:12,16

62:15 64:15 82:4
  88:3 93:4,17 99:7
  100:11,16 101:6
  103:25 119:2
  126:7,8 128:7
  141:18 183:1
  185:18 187:13,17
  192:19 194:21
  196:2 197:5
  201:13 203:21,24
  210:12 220:13
  232:18 236:25
  249:12 250:24
  256:20 257:21
  259:13 261:20
  269:25 273:22
  281:6
**goes** 58:24 221:5
  222:9 227:8
**going** 9:13,18,25
  10:18 12:21 13:11
  13:16 15:3,9
  18:11 19:3,4,6,14
  19:16,18 20:7
  21:16,18,25 22:6
  22:17,20 23:25
  25:18 27:10,10,11
  27:22 28:13,16
  30:18 31:14 32:2
  33:10 34:8 37:13
  38:6 45:21 47:5
  50:13,20,21 52:2
  54:23,25 55:5,9
  58:22 59:6 69:18
  70:3,5 76:22 77:6
  77:11,17,17,23
  78:5,15 82:15
  83:16 86:6 88:2
  88:14 92:5 98:25
  101:20 105:6
  110:2 113:10,13
  115:12,14 120:4
  120:10 122:18

128:10,12 131:12
  138:22 149:25
  169:16 180:4,5
  182:11,25 187:19
  191:20 192:4,12
  192:15,23,24
  193:8 194:3,9,11
  194:12,18 196:15
  197:2,7,9,17
  201:25 210:6,7
  212:25 215:14,16
  215:18 218:9
  221:18 222:4
  225:5,17 229:2
  230:1 231:23,25
  234:16,23 235:16
  235:17 238:12
  239:9,10 245:5
  254:1,13,14,19,20
  254:21 255:13,15
  261:20 264:14,19
  264:20 267:20
  271:24 272:1,21
  273:9,14 274:2,6
  274:25 275:6
  276:5 280:25
  281:3,21
**gooch** 251:16
  279:1
**good** 7:3,4,6 14:16
  16:7,8 30:7,11
  45:1 50:18 55:12
  88:2 89:2,3 121:9
  121:10 128:1,21
  129:1 132:23,24
  154:6 160:5 165:2
  168:1,2,3,5 172:6
  176:5 194:22
  212:19 221:6
  223:15,15 224:23
  225:1 234:25
  239:13,17,18
  261:25 262:5

274:10 282:7,9
**gotten** 33:14 51:4
**govern** 44:12
**governing** 9:7
**government** 121:4
  184:8,16 185:19
  185:22,25
**governs** 9:9
**gradation** 198:25
**grand** 49:4
**grant** 16:18
  157:15,17,20,22
  159:12
**granted** 56:15
**granting** 9:23
**grave** 116:9
**gray** 3:15 129:2
  129:16 149:6
  165:3 170:4 171:2
  171:5,12,15,21,23
**great** 28:8 47:19
  48:7 87:15 238:5
**greater** 26:8
  147:22,24 153:12
  177:22
**green** 199:17
**greenhill** 166:22
  168:17,19,23
  169:1,4
**gregg** 3:20 7:7
**gross** 114:21
**gross's** 115:18
**ground** 18:1
**group** 5:13 56:11
  64:3,15 70:15,21
  88:8 117:11,19
  166:19,20,21
  177:1 216:13
  224:25
**group's** 51:24
**groups** 252:10
**gso** 70:22

**guaranteed** 86:22
**guess** 54:24 88:13
  264:22
**guessing** 251:7
**guggenheim** 13:5
  13:9 124:6,9
**guidance** 59:8
  60:3 61:19 62:1
  62:10,14,17,21
  93:10 237:3
**guidelines** 62:3
**gump** 70:15
**guy** 84:15
**guys** 239:9 272:25

**h**

**h** 56:10 130:3
  223:25
**hac** 129:4,8
**half** 20:8,9 54:22
  79:9 103:3 183:8
**hammer** 92:5
**hand** 16:17,17
  19:13 41:3,6 68:1
  101:13,14 105:6,7
  129:21 131:10
  165:9 189:17
  190:9 191:22
  194:14 198:10,10
  206:25 212:22,24
  223:19
**handed** 93:19
  131:8 167:3
**handful** 77:1 86:6
**handle** 220:18,20
**handled** 252:9
**handy** 121:6
**hang** 68:6 164:25
**hanrahan** 6:1
**happen** 21:12
  25:18 46:1 48:13
  48:13 86:22 200:4
  242:7 273:12
  275:6

**happened** 14:25
  20:16,20 22:25
  23:3 26:2 27:21
  53:1 65:25 67:1
  84:6 203:12,14
  227:2 231:18,18
  253:3 273:12
**happens** 84:9
**happy** 23:15 86:7
**hard** 31:10 100:21
  128:6 264:9
**harder** 195:3
**harm** 82:4
**harvard** 130:19
  130:20
**haven't** 129:9
  145:21
**header** 57:1
**heading** 160:8,10
**heads** 51:17
**hear** 11:5 16:6
  34:15 45:9 47:3,5
  52:1,10 54:25
  154:7 240:24
**heard** 15:6 210:1
  224:11 253:23,25
  258:25 267:5
**hearing** 2:1 7:8
  17:2 23:2 25:14
  27:3 31:21 32:12
  32:14 36:23 37:19
  37:20 42:18 45:17
  115:22 119:10
  231:2
**hearings** 260:14
**heart** 276:5
**heightened** 50:7
**held** 17:8 40:8
  108:20 118:16
  146:3 149:21
**hell** 265:10
**help** 25:7 115:18

**helped** 166:21
  169:10
**helpful** 219:3,8,11
  219:20 226:25
  238:7
**helpfulness**
  219:21
**here's** 149:24
**hessler** 258:7
**hey** 106:22
**he's** 168:3
**high** 58:7 61:18
  191:9,11 244:4
  248:6 259:7,8
**higher** 35:19,21
  50:9 92:2 104:22
  147:11,17 188:15
**highlight** 79:2
  213:18 229:21
  232:22 234:14,15
**highlighted** 8:16
  37:5 59:1 62:18
  212:21,24 213:6
  216:20
**highlighting**
  99:23 236:24
**highlights** 213:17
**highly** 204:5
**hindsight** 9:14,16
  9:21,22 10:12,16
  46:9,10,19 101:1
  101:7
**hirst** 214:9
**historical** 35:12
**historically** 78:13
**histories** 52:7
**history** 52:9
  237:24 272:21
**hit** 54:22 78:2
**hitting** 45:15
  79:16
**hmm** 46:21 73:6

**hoc** 4:2,14 11:16
  11:17 16:6 55:20
  70:14,20 73:4
  88:8 120:20 160:1
  177:1 213:3
  216:13 217:8
  219:5,7,18 243:1
**hoc's** 220:12
**hockey** 51:11,13
**hogan** 4:1 80:18
  80:20
**hogan's** 80:20
**hold** 169:23 226:3
**holder** 17:13,14
  27:12 114:13
  127:11,14
**holders** 14:13
  69:13 70:14,17,19
  119:3,5 186:7,8
  236:13
**holding** 24:20
  154:14 183:20
  209:21
**holdings** 1:6
  60:18 134:1 148:3
  148:14,15 178:8
  208:11,22 209:15
  235:17
**holes** 245:3
**holistic** 38:18
**holohan** 6:2
**hon** 1:22
**honor** 7:4,6,10,15
  7:20 8:12,14 9:2,6
  9:8,13,14,24 10:6
  10:8,11,18 11:5
  11:23 12:4,9
  13:10,12,16 14:15
  14:21,22 15:5,8
  15:14,17,25 16:2
  16:7,23 18:6,11
  19:5 20:3,7,24
  21:7,19 22:6,20

24:14,19,25 26:1
27:9 29:4 30:12
31:1,3,5 32:2,4,11
36:11,21,23 38:2
40:20 41:25 42:19
43:12,24 44:3,8
46:12,18 50:18,20
52:15 53:2,22
54:16 55:11,16,22
55:23 56:13 57:25
58:6 61:14 67:19
67:21,25 68:7,10
73:12,25 75:7
82:15 85:13,22
86:12,14,23 87:12
87:17,22,25 88:4
88:6,18,22 94:5
107:18 112:15
116:5 120:3,18
122:11 123:6
126:6,10,13,14
127:22 128:2,13
128:17,21 129:1
129:11,13 130:10
130:14 131:10,14
131:25 132:3,12
143:1 159:25
162:16 163:18
164:23 165:2,5,23
166:1,3,5 167:9
167:15,18,18
168:7 183:10
205:23 206:2
209:2 212:9,14
213:1,1,24 214:14
215:10,11 216:2
216:11,12 217:6
217:14,16 219:18
220:7,12,18 221:2
223:7,14 224:17
224:23 225:2,11
227:5 228:6 229:5
229:13 231:14

239:4,11,12
249:14 261:18,21
262:1,8,25 263:8
267:5 269:24
270:5 274:7
277:10 281:2,5,8
282:1
**honor's** 9:18 11:8
32:16 52:12,23
53:1,12,17 215:7
215:21 228:8
**hook** 118:13
**hope** 195:5
**hopefully** 282:2
**horton** 5:14 17:19
26:6 38:13 55:5
212:12 213:5
214:12 216:7,17
217:16,20,25
218:20 219:13,20
219:22 220:4,14
223:6,11,13,14,18
223:22,25,25
224:4,7,11,14,19
224:20,21 225:5
225:15,20,22,24
226:11 227:15,20
227:23 228:16
229:15,19 231:15
232:18 234:11
236:17 239:3,15
239:17,21 240:8
240:21 242:7,13
249:16 251:10
256:7 263:9 264:2
264:4,6,9,13
265:4,7,10,12
267:16 268:19,20
270:7 274:6,7
277:22 279:4
280:11,23 281:4
281:10 282:5

**horton's** 12:12
212:16 213:4,15
213:15,18 216:15
216:23 218:3,10
218:16 219:9
267:8
**hostile** 56:14
**hotel** 214:9
**houlihan** 166:19
**hour** 54:22 183:8
225:13
**hours** 135:12,17
**howard** 128:23
129:17 130:3,16
131:15 132:21
133:16 160:3
162:17 163:21
166:19
**hub** 211:8
**huge** 85:7 108:12
119:4
**hundred** 49:16
**hundreds** 108:22
**hunt** 12:10 13:21
28:21 52:18,18
53:2,4 77:9,10,10
114:19 115:6
180:18 211:5
212:1,5
**hunts** 52:22 53:5
115:14 180:23
181:3,7,10
**hurdle** 92:3
**hurdles** 171:8
**husnick** 55:5,7,9
55:15,17,19,22,25
56:6,8,10,16 57:2
58:7 60:14 63:11
68:1,12 70:7 71:6
72:21,23 73:1,3,7
73:14,17,19,22
74:1,10 75:12,17
78:12,18,24 79:11

80:13,15 83:3
84:8 85:23 88:1
88:25 89:2 94:4
96:15 99:17
107:15 112:18
115:23 120:5,6,11
120:13,25 121:2,5
121:7,9 126:12,13
126:21,23,24
127:1,19,22,25
128:2 246:19
259:8
**husnick's** 55:1
246:2
**hyde** 2:25 283:3,8
**hypothetical**
17:25 19:1 40:5
52:8 149:10 161:9
178:1 180:5
188:15 190:3
195:8 196:3
202:12 273:17
**hypothetically**
53:23 193:1 195:4
**hypotheticals**
34:9,10

**i**

**idea** 108:21
172:13
**identified** 39:25
89:5,20 111:20
145:9 178:3 213:8
217:8
**identify** 62:5
**ifs** 52:8
**ignore** 232:15
**illegal** 20:11
**illustrative** 149:9
149:12,13 150:16
150:19 178:22
190:2,19 191:7,8
198:17

imagine  62:11
  102:16 124:14
imagined  102:17
immediate  147:21
immediately  77:9
impact  112:6
  113:10 115:8
  175:7 206:20
impacted  235:24
  235:25
impacts  84:9
impaired  53:14
  231:22
impetus  242:9
implement  58:16
  105:4
implemented
  121:22
implementing
  103:3
implicates  26:21
implications
  134:19,23 242:12
implying  273:16
importance  62:8
important  7:23
  8:3 19:2 48:25
  58:22 64:7 124:19
  232:17 234:5,10
importantly  8:22
  12:20 38:6 40:11
  230:20
impose  82:1
  134:12 170:12
  171:8
imposed  45:10
  46:5 47:15 137:12
  163:9 198:12
imposing  45:12
imposition  192:20
impossible  97:17
  275:24

improper  9:1 42:7
  83:7
improved  49:4
inability  200:2
inaction  216:25
inadequate  72:18
inadmissible
  222:11
incentive  199:13
  233:24 243:19
  256:21
incidental  19:24
include  72:8
  108:23 155:8
included  70:12
  103:13 108:9
  115:6 200:13
  241:15,18 280:20
including  12:16
  28:13 40:14 48:17
  48:18 59:2 76:15
  123:19 157:2
  176:10 200:7
  218:22 221:25
  222:2 235:1 280:5
  280:14
income  117:1
  131:1 135:2
  137:17,20 139:12
  146:12 148:3
  154:15 169:25
  211:16,20
inconsistent  41:8
  209:16 266:13
incorporate  72:8
incorrect  57:19
  74:21
increase  10:22
  84:20 112:10
  147:11 153:11
  229:24 230:7,16
  230:18 231:5

increased  15:16
  177:19
incredibly  118:24
incremental
  187:21 188:14,16
  188:20 189:2,6
  230:12
incur  195:5,8
incurred  12:24
  13:1,3 115:25
  177:21 245:23
indemnity  171:15
indenture  2:1 5:2
  216:12
indentured  44:11
  88:9
independent
  40:15 107:14,15
  168:20 172:1
  196:20 208:6
  254:15
independently
  10:10 170:8
indicate  14:11
  27:10 149:12
indicated  108:6
  256:7
indicates  26:21
indicator  174:9
indicators  174:11
indicia  173:13
indirect  19:24
  39:6 82:17,18
  84:24 93:14
  127:16 258:1
indirectly  52:3
  264:21 269:6
indiscernible
  88:11 97:18 129:6
  131:12 132:10
  138:1 140:19
  141:9 144:14
  145:19 152:22

153:5 155:11
  162:12 166:18
  168:4,20 171:16
  172:4 174:13
  179:16 184:16,23
  188:8 191:10
  194:24 195:1
  196:11 199:10,17
  205:24 209:24
  210:8 216:22
  217:11 219:12
  220:19 233:21
  240:5 243:18
  249:25 250:1,6
  253:7 255:5
  262:13,15,20
  264:4 265:3,11,17
  267:3,4 270:24
  277:17 282:3
individual  224:19
  259:13
individuals
  250:25
industry  275:2
inequitable  98:5,6
  98:7 100:20,24
  101:5,16
inevitably  215:18
informal  82:17
information  57:8
  59:25 61:22 64:5
  149:11 155:23
  204:12 226:25
  227:4 228:3
  241:25 251:11
informed  106:16
  218:23 256:8
informing  72:16
  106:12
infuse  53:19
initial  13:21 51:22
  165:17 187:20
  219:5 226:23

232:11
**initially** 20:20
  236:18
**injunction** 41:19
  82:5 200:2
**ink** 119:11
**inquired** 254:25
**inserting** 262:23
**insider** 12:14
  279:25
**insisted** 208:5
**insolvency** 45:13
**insolvent** 16:20,25
  20:6
**instance** 21:10
  22:17 78:11 223:2
  231:21 235:16
**instances** 21:20
**instruments** 39:5
  40:25
**insufficient** 157:9
  157:14,15
**insurance** 230:13
**intangible** 221:8
**intense** 65:24
**intent** 139:6
  158:20 244:10,11
**intentionally** 8:24
  8:25
**interact** 207:3
**interacted** 161:13
**interest** 43:8,10
  65:5 66:17,23
  82:7 102:23 103:5
  117:2 123:19
  138:12 140:2,8
  152:16 154:20
  185:8,13 200:14
  200:25 201:4
  206:13 264:18
**interested** 92:12
**interests** 34:13
  82:17,19

**interference** 93:1
  93:4
**interim** 8:15
  12:23 13:17 38:23
  38:25 39:18 49:3
  49:17,18,20 50:2
  58:14 62:14 65:13
  65:20,23 66:5,7
  66:10 71:7,10,21
  71:24 72:3,7,13
  72:18 74:7 83:9
  91:5,9,21,23 92:6
  94:8,12,15 96:9
  96:11 97:3 100:2
  100:13 109:1,2
  121:13 124:8
  125:1 232:25
  233:1,2,9,11
  237:2,18 238:1
  239:2 243:9,14,25
  244:7,10,24 245:8
  247:14 248:3,7
  256:18 257:5,10
  260:24,24 266:1
  276:24
**intermediate**
  134:1
**internal** 107:9
  134:12 143:7
  153:21 156:8,21
  158:8,9,13 159:1
  159:6 162:20
  181:14 257:1
  281:19
**international** 3:10
  3:17 4:8 56:12
**interpretation**
  95:10
**interrupt** 24:15
  72:22 73:24 78:8
  96:13 104:8
  246:13 269:20

**interrupting**
  30:25 110:3
**intervene** 122:3,5
**intervened** 121:25
  122:14
**interview** 234:7
**interviewed**
  233:20 270:11,14
  270:17
**interviewing**
  218:24
**interviews** 233:13
  233:15,16
**introduce** 128:24
**introduced** 39:24
**invasion** 16:15
**inverness** 214:9
**investigated**
  12:14
**investigating**
  279:25
**investigation**
  76:14 217:23
  219:15 270:8
  271:6
**investigative**
  233:12
**investment** 70:25
  157:5,5 174:15
  177:18 194:25
**investor** 273:9
**investors** 275:1
**invoice** 63:25 64:1
  64:16,16
**invoices** 59:10
  63:14 64:21
  123:17,19 250:19
  250:22 251:18
  263:15
**invoicing** 58:8
**involved** 63:9,11
  65:21 80:8 96:18
  107:24 137:1

184:18 197:4
  218:21 230:24
  233:15 234:3,15
  234:17,18 238:12
  238:18 243:21
**involvement** 63:6
  71:3 234:13
**involves** 38:13
**involving** 135:24
  152:6
**irrelevant** 157:13
  157:14 164:1,2
  263:1
**irrespective** 164:5
**irs** 117:1 118:2,7
  137:17,25 138:7
  138:22 140:2,9
  141:8 145:24
  154:4,8,13,13
  155:6,19 156:1,5
  158:3,19 159:2,12
  159:17 161:11,13
  164:9 169:23
  170:11 182:11
  183:24,25 186:3
  189:12 235:22
**isn't** 135:21
  143:20
**issue** 9:14,17
  13:10 24:15 25:4
  25:15,16 58:22
  72:1 74:16 83:17
  84:5 93:16 98:7
  109:20 110:7
  114:16 115:20
  118:3 125:14
  138:18 139:1
  146:6 157:10,18
  157:21,23 158:3,9
  158:13,19,20
  184:5,18 199:13
  212:15 214:10
  219:5 222:9,10,22

276:1,14
**issued** 136:12
  138:22
**issues** 9:13 52:2,5
  59:2 62:17 80:5,9
  81:12 82:11 96:2
  106:8,11 110:5
  114:19 116:20
  119:12,18 125:11
  126:3 127:9,15
  193:7 207:8,11,12
  217:21 229:20
  238:16 239:6
  252:15 260:19
  282:2
**it'd** 97:16
**it'll** 128:14
**item** 49:11
**items** 246:25
**it's** 131:12 132:5
  135:19 137:16
  138:10,15 139:13
  139:15,15,16,17
  139:17 140:1,7
  141:15 143:2,17
  144:8,13 148:2,7
  148:12 149:3,24
  156:15,15 157:13
  157:14,17,20,22
  161:9,24 162:13
  163:10,14,19,20
  164:2,5 167:13
  169:19 171:8
  176:2 179:7
  182:20
**i'll** 136:10 168:14
**i'm** 75:15 130:21
  136:7 140:5
  141:17 142:25,25
  143:24 144:9,9,14
  144:18,21 145:10
  149:21,25 150:8
  154:2 156:18

157:19 162:1
168:5 169:16
170:20 179:21
181:22 182:20
183:1 274:3
**i've** 144:9 154:22
  172:8

**j**

**j** 5:10,16 6:2,14
**jacobs** 130:21
**jamila** 6:16
**jason** 5:11
**jeff** 71:4
**jegadeesh** 6:3
**jensen** 6:4
**jeremy** 5:23 6:7
**jessica** 6:13
**jingwen** 6:6
**john** 56:10
**join** 217:2
**joined** 166:23
  168:17 169:5
**joint** 2:1 81:19,22
  87:18 108:19,20
  115:4 260:19
**jointly** 1:8 152:5
**joseph** 6:5
**judge** 1:23 10:15
  30:3 114:21
  115:18 125:13
  175:19 225:19
  268:10
**judgement** 218:14
**judgment** 7:24,25
  37:1,10 39:14,16
  39:17,18 43:19
  49:25 50:1,9
  196:6 215:24
  221:4 244:15
  245:1 247:8 248:4
  248:8 257:7,8
  268:16

**judicial** 14:23
  87:13,20,23
**july** 10:20,20 53:9
  73:21,22,23 202:7
  230:5 235:5
**june** 76:25 77:1,2
  104:20 105:4
  253:22
**junior** 130:21
**jurisdiction** 25:2
**jurisdictional**
  24:11 25:4
**jury** 215:9
**justice** 184:4
**justifying** 221:15

**k**

**k** 4:17 56:10
  130:21
**k&e** 233:14
  265:17 269:6
**kasowitz** 4:13
  16:9 120:19 160:1
  213:2
**katz** 166:18
**kaylevic** 5:14
**kazan** 110:19,20
  110:21,21 111:22
**kazen** 79:17 80:1
  80:2,7,12,13,20
**keen** 64:6
**keep** 30:25 61:23
  62:25 64:9 77:6
  160:5 180:6 194:4
  227:1 234:19
**keglevic** 65:11
  67:8 96:14,17
  103:16 236:7
  251:8 255:3 256:8
  256:11 278:9,10
  278:13,15 279:1
  281:17
**keglevic's** 47:24
  67:11,17 103:21

**keglevics's** 11:7
**kept** 95:8
**kevin** 3:13 6:1
**key** 69:14 95:25
  111:10 188:16
  229:20 232:20
  233:8 243:18
  256:25
**kicked** 65:4
**kidding** 224:16
**kieselstein** 29:1,4
  51:13,16 52:17
**kind** 23:25 27:2
  27:11 28:10 41:22
  41:22 59:20 73:9
  174:15 187:6
  233:22 255:25
  257:1 265:24
**kirkland** 3:3
  13:10 14:4,16
  50:19 56:11,12,18
  58:8,10,11,13,16
  58:19 59:13 63:21
  65:1 66:3,7,24
  72:16 73:8 75:2,4
  75:23 80:24 90:8
  91:13 93:10,11
  94:11,17 95:6,8,9
  95:14,15 97:12,25
  98:12 99:5,18
  100:1,11,16
  102:13 103:2,14
  103:23 104:9,14
  105:1,9,25 106:14
  111:7,21 113:16
  121:16,17 122:6
  122:15 123:25
  124:12 127:1,10
  127:13 212:20
  217:15 223:8
  224:19 229:13
  233:19,20 246:7
  248:1,13 252:21

253:11,14 254:5,6
254:10,18 255:9
256:8,18 258:13
259:4 260:2 261:5
263:2,11 266:12
266:17,23 268:23
270:14,17 271:1
273:23 277:3,11
**kirkland's** 50:1
60:23 83:5 91:9
98:10 101:15
102:10 110:9
112:22 113:1
121:12,17 247:2
259:21 260:25
261:6 263:10,24
268:3 271:2
**knew** 45:22,25,25
48:12 234:3 266:8
278:4 279:10
**knives** 245:3
**know** 16:22 18:22
21:8 22:1,25 23:6
23:9,16,24 24:10
25:17 30:24 34:1
52:25 55:2 76:17
86:6 89:13,14
95:5 96:6 99:24
100:21 101:6
102:2 103:20
104:2,6 106:6
107:17 108:11,17
111:12 112:20
118:23 121:20
123:2 124:15
125:9,23 127:8
132:16 141:10
146:25 147:14
149:22,23,24
150:4,11,24
155:10,12,13,13
171:23 174:7
175:14 180:9

183:1 185:19
188:5 191:24
194:1,14 196:5
197:4,6 199:8
200:3,12,24 202:3
202:6,16,20 204:2
207:7 209:18
210:12 212:19
213:12 218:2,10
223:4 226:20
227:1 230:23
232:6,9 234:1,6
234:17,24,24
235:1,10 236:21
237:20 238:7,10
238:20,23 243:17
243:19 245:6
247:11,21 251:14
251:23 252:1,3
254:4,15,24
256:21,22 262:9
262:21 264:21
266:18,20 270:23
273:3 274:2,3,5
275:8,11,17
277:21,25 278:4,6
278:18
**knowing** 101:2
109:24
**knowledge** 57:10
57:23 66:2,4,6,8
66:22 67:16 70:18
71:2 72:12,19
108:22 118:10
125:19 129:23
131:23 137:10
141:1 154:12
155:3 158:12
165:11 178:5
217:21 223:21
251:21
**known** 23:5 31:18
46:13,14

**knows** 9:8,14

**l**

**l** 3:21,24 165:17
**l.a.** 128:22
**l.p.** 3:9,10,16,17
4:7,8
**lack** 216:14
**laid** 49:21 75:25
**language** 62:18
71:23,25 121:13
268:6
**large** 32:8 55:24
155:6
**largely** 70:21 72:9
125:13
**larger** 85:17,19
120:1
**largest** 67:7
**lastly** 236:1
**late** 280:10
**latham** 137:1
**latitude** 248:8
**laugh** 108:17
**laughs** 108:15
**laughter** 224:12
225:14
**law** 5:13 9:7 18:16
18:18 20:12 31:8
44:10,25,25 47:16
80:16 116:17
118:3,6,8,11,13
130:22,23,25
131:2,3 134:8,19
138:1 142:14,17
142:23 143:6
145:11,15,19,24
147:21 148:3
170:15 182:16
195:15,15 197:15
197:20 216:6
224:22,24
**laws** 137:20 139:9
157:4 159:16

169:25 183:18
197:17,23
**lawyer** 111:3
225:16,17 258:24
**lawyers** 61:25
62:11 136:6,12
**lay** 68:12 213:12
214:24 215:20
218:9,16 222:8,22
231:24 263:4
267:2 274:4
**lays** 75:22
**layton** 5:7 265:14
265:20 266:4,13
266:21 268:1
**lbo** 208:4
**lead** 104:4
**leading** 229:24
**learn** 74:18 76:14
253:2
**learned** 174:18
253:11
**learns** 252:20
**leave** 16:22 128:1
164:25 232:9
282:7
**leaves** 17:25
**lebron** 10:14
**led** 33:2 48:15
168:23
**ledanski** 2:25
283:3,8
**ledge** 55:24 56:23
**left** 83:22 98:15
153:24 181:17
183:12 189:17
190:9 198:10,10
276:23,24
**legacy** 108:25
**legal** 9:17 14:4
17:19,24 29:12
39:12 43:17 91:17
107:10 122:10

250:16,18,19
251:18 258:23
283:20
**length** 114:20
**lenz** 6:5
**leonhardt** 5:16
224:24
**leslie** 1:25 55:19
**let's** 164:25 169:9
175:22
**level** 58:7 61:18
63:17 119:4
136:15,16,19
137:3 158:24
163:8 186:6,9
195:10,10 198:13
203:20 208:14
244:4 248:6 259:7
259:8,8 275:19
**levels** 232:20
**leverage** 235:10
**levity** 274:9
**liabilities** 10:24
33:5 35:4,14 41:5
48:18 169:24
175:1,12
**liability** 34:21
40:22 41:7 109:25
116:13,14 117:11
117:18 134:13
138:11 139:10,20
142:22 143:8,14
145:16 146:21
152:6 153:24
154:6,19,25 155:7
170:12 171:8
175:6 185:17
188:11 189:1
192:18,21 195:5
198:11,16,17,25
199:19 203:3
205:8,12 220:18

**liable** 17:8 40:8
54:2,3 116:13
117:1 118:16
135:1 137:17
146:4,14 152:5
154:15 169:24
**lien** 70:16 114:22
119:5 264:15
**liens** 69:12 77:11
114:22 115:2,3,3
115:4
**life** 147:12
**light** 58:19
**likelihood** 181:19
188:12 192:12
198:12
**limit** 35:13,16
**limitation** 82:13
**limited** 3:10,17
4:8 12:20 74:2
101:12 134:8
139:10,20 145:23
271:7
**limiting** 52:16
**line** 37:5 49:11
76:3,15 162:4,4
209:8 216:17
249:23
**lines** 32:15 145:1
206:1 229:23
250:9
**linked** 214:25
**linking** 215:6
**links** 214:19
**lipton** 166:18
**liquidating** 205:1
**liquidation** 16:1
**list** 86:7 143:17,18
212:13 246:25
**listed** 124:18
218:4
**listen** 31:4 246:3
274:10

**lists** 86:4
**literally** 17:6
**litigate** 236:5
**litigated** 52:3
114:20 216:25,25
**litigating** 49:1,2
213:20 261:4
**litigation** 14:1,10
15:4 17:10 19:17
28:1,12,18 29:3,8
29:12,14 34:1
36:2 40:21 47:23
48:3 70:5 81:10
98:23,25 113:16
113:17,17,20,21
114:4,15,17 115:7
115:12 116:9
121:25 122:4,6,7
122:15,16 124:5
127:3,5 135:24
171:16 172:11,13
213:20 215:25
216:3,15,18 220:9
234:18 242:8
259:16,16
**litigations** 40:25
**little** 27:1 63:16
84:24 92:19 96:12
97:5,14 104:7,9
108:4 113:15
135:19,20 154:24
168:12 182:22
204:19 206:23
225:5 242:14
268:20,22 281:25
**liu** 6:6
**live** 24:15 25:6,16
48:10 52:19
220:24
**lived** 218:20 220:4
220:4
**liverpool** 3:10,17
4:8

**llc** 3:8 184:21
**llp** 3:15 5:1 56:12
56:12 213:2
**loan** 187:24
**local** 62:4 80:19
**logic** 257:4
**logical** 33:11
**lokey** 166:19
**long** 52:9 64:1
81:25 82:8 130:23
149:20 172:11
179:9 225:18
238:10 253:18
278:2,5 280:7,9
280:16
**longer** 51:8 82:2
92:2,4 196:20
255:9
**look** 9:15 14:19
17:11 23:2 25:9
25:22 27:24 30:8
30:16 31:21 37:8
38:7 45:1,3 46:9
46:10 74:16 76:3
78:14 79:3 87:16
93:20 99:7 101:10
104:24 105:16
141:18 149:14
162:4 175:10,11
192:15 194:17,18
196:6,14,17,18,20
199:25 216:16
245:8 251:8
255:25 265:23
272:23,24 275:18
275:19,20
**looked** 33:3 34:10
36:13,20,22 39:12
46:4 76:20 77:5
83:23 84:2 90:1
93:15 144:10
176:11 232:4
254:2,18

**looking** 34:18
42:23 43:12 47:14
49:20 105:12
120:13 141:12,17
144:11,21 162:1
173:23 183:12
188:5,9 191:23
193:13,22 198:7
199:18 201:14
202:17,24 203:11
233:13 238:1
256:4
**looks** 188:11
**loosely** 67:3
**lopsides** 13:8
**losing** 223:5
**loss** 40:9
**lost** 9:7 200:19
**lot** 15:18 48:4
52:1 61:24 80:8
93:20 98:20
107:10 115:18
119:11,11 229:25
229:25 237:14
238:4 244:11
248:20,20 260:11
260:14 276:3
**lots** 43:25 51:13
253:19 271:18
**low** 47:23 85:16
100:5 189:22
**lower** 35:20 46:6
46:8 152:24
230:11 264:17
**lsgt** 109:4 110:16
**lumped** 76:24
**lunch** 120:10
128:3,6

**m**

**m** 3:20 5:11 130:4
**madrone** 5:11
**magnify** 85:3

**magnitude** 154:21
184:11
**main** 19:8
**majority** 198:7
**making** 8:3 10:10
27:14 41:3 209:15
211:16 215:6
**maldovan** 251:19
269:1
**man** 35:2 51:11
55:2,7 58:3,4
61:15 67:21,22
75:8,9,15 86:21
87:3,4,21,22
128:4 132:4,14
167:12 262:13
265:3
**managed** 275:5
**manager** 70:24
168:20
**managing** 243:22
**mandatory**
258:23
**mann** 3:13
**manner** 31:25
63:22 141:10
**march** 13:22
206:10,11
**maria** 6:18
**mark** 3:6 4:21
132:22
**marked** 60:7 71:6
227:23
**market** 1:12
147:9,17
**marketing** 82:17
82:18
**marketplace**
204:12
**massive** 85:10
188:25
**match** 230:2,14

**matches** 51:14
**matching** 11:1
**material** 9:3
27:22 48:21 101:4
169:1 175:7
180:23 213:21
**materials** 191:10
**math** 35:8 105:16
252:25 255:25
278:5
**mathematically**
97:16,20,21 102:3
260:5
**matican** 6:7
**matt** 88:22 217:6
239:19,20
**matter** 11:15 18:4
18:10,17 20:6
60:19 62:3,5 63:2
63:10,13 65:22,22
74:14,14 75:23
76:4,10,11,12,14
76:24 77:14,19,21
77:22,23 78:3,6
88:14 89:17,25
90:3,4,18 216:6
219:5 221:3 236:5
236:6 252:7,9,11
252:13,16,17,18
259:16 260:6
269:4
**mattered** 268:6
**matters** 14:6
15:18 59:17 62:13
62:23,23 73:11
142:14 151:24
152:1,12 161:18
162:7 199:8 206:7
206:16 207:2
232:1,8 276:4,18
**matthew** 3:21
4:18 5:22 120:19

**max** 37:16
**maximize** 195:11
195:15,18
**maximizing**
176:20,23 196:16
**mccann** 94:22
120:14
**mcclain** 223:7
229:13
**mccracken** 13:2
**mcdaniel** 4:1,4
**mcginnis** 3:21
88:3,4,18,22,22
89:1,3 94:5 99:15
112:14,17 120:3
126:14,18,20,22
126:25 217:6,6,6,11
228:12 239:11,14
239:16,19,19,20
240:17,19 249:13
250:1,4 258:7
261:18,21 262:1,3
262:8,11,14 263:7
267:5,7
**mckane** 3:6 55:4
55:11,16,23 56:4
56:7,13 57:25
58:6 60:9,11
61:14,17 67:19,25
68:7,10 73:18,23
73:25 75:7,16
85:22 86:3,10,12
86:14,22,25 87:12
87:15,17,25
110:10 122:8,10
126:8,9,10 127:22
132:3,10,12,22
153:6 159:21
161:24 162:19
163:17,18,20,22
164:23 167:18,21
167:25 168:4,7,10
168:13 173:8

182:24 183:10
205:22 206:12
207:18 209:4,7
212:14 229:3,4,7
258:5 269:24
270:4,5 274:12,14
274:17 277:10,16
280:22,24 281:8,8
281:13,18 282:1
**mckane's** 48:5
**mean** 18:22 23:13
23:15,16 24:2,14
29:24 102:6
103:24 106:24
111:2 119:11
122:22 136:9
141:14,15 160:11
168:11 196:14
204:16 208:3
244:9 266:14
272:23
**meaning** 247:17
**meaningfully**
104:4
**means** 18:23,24
33:24 49:15 93:11
116:12 135:1
142:2 208:4 247:6
258:22 274:3
**meant** 23:4 260:6
**measure** 48:19
271:18 273:21
274:5 275:17
**measures** 271:18
**mechanism** 8:19
72:8,9 84:19
**mediation** 18:2
**mediator** 114:21
**meet** 16:22 17:3
238:10 281:23
**meeting** 128:8,9
128:10 197:3
225:7

**meetings** 107:17
278:12,16,20,23
278:25
**member** 47:3
55:19 202:15
217:16 219:16
278:8,10,15
279:17
**members** 11:17
70:19 79:24
125:22 252:3
279:11,14,15
**memo** 60:20,20
61:4 94:1,14
205:6
**memoranda** 95:7
**memorandum**
58:24 59:1,5 60:3
60:17,22,24 61:8
61:11,13,20 93:17
94:11,14 95:7
116:21,24 117:17
117:21 137:25
138:3,5 154:24
155:4,17 176:10
**memorialize**
71:18
**memorize** 246:17
**memory** 54:1
279:11
**mention** 117:5
**mentioned** 12:18
60:2 63:17 80:23
83:14 112:9 118:2
118:15 128:8
**mere** 14:18
**merger** 15:16,20
185:23 230:21
241:8 242:1
255:14 260:12
**messed** 265:9
**met** 28:10

**metaphor** 51:12
**method** 258:16
279:14
**methodology**
14:17 38:8,8,15
39:4,4,6,8,10,15
39:22,23 40:3
41:21,24 69:25
71:19 78:20 94:17
97:6,24 100:18,23
101:15,21,23
103:3,15 104:10
104:14,25,25
105:3,10 106:1,14
106:16 107:7
121:12 213:9
214:19 215:22,23
218:14 221:13
245:2,17 254:23
254:23 256:9,12
256:17 257:23
258:20 260:23
276:19
**michael** 6:11
269:3
**microphone** 130:8
165:20 224:5
**mid** 29:24
**middle** 18:1
165:17 190:10
193:15 202:25
211:13 216:17
270:3
**mike** 212:19
217:15
**million** 10:23,25
11:20,20 12:3,16
15:7,9 16:15,18
16:22 19:12 20:9
20:10 21:12,13,16
21:22,22,23,24
22:23 23:11 25:23
26:3 27:4,7 33:5,8

33:13,16,18,20
34:3,21,22,24,25
35:8,20,25 36:1,5
37:15 38:5 43:3,6
46:1,3 47:21,21
48:9 51:3 57:17
74:12,19 77:3
78:21 82:7 85:4,8
85:10,11 90:19,24
91:1,2 101:3,3,4
101:20 111:21
112:5 113:8,9
175:1,6 190:10,13
200:25 201:5,10
201:14 202:17,20
202:21 230:6,7,16
230:17 231:5,6,8
231:12,21,22
280:5,15
**mind** 77:6 88:21
106:10 221:5
280:7
**mineola** 283:23
**ming** 5:25
**minimis** 83:20,20
83:20
**minority** 34:13
208:5
**minute** 27:24,25
29:12 33:4 38:4
128:24 185:12
187:20 200:18
225:12
**minutes** 55:12
228:14 229:4
270:2 281:1,5
**misnomer** 27:2
**missing** 193:1
**mistake** 89:5,7,10
**mistaken** 278:14
**mistakes** 109:9
**misunderstood**
89:16

**mitigated** 275:5
**mixing** 17:18
214:18,18 215:3
216:18
**mm** 46:21 73:6
**model** 206:18
**modify** 100:12
**moment** 79:13
88:5 122:18 131:8
139:8 141:2 167:3
225:10 227:5
251:2 263:8
274:22
**monetize** 19:7
**money** 17:1,8,11
20:15,23 22:2,22
22:22 24:6,10
25:7 27:13,13,20
30:17,18,22,23
119:23 195:9
210:7
**monitoring**
243:22
**montgomery** 13:2
**month** 13:19 48:9
63:25 75:24 76:2
82:7 90:11,11,12
90:12,17,17
200:25 201:5,10
201:14 202:10,17
**monthly** 13:17
58:13 64:17 65:1
65:3,6,7,12 66:1,3
75:1,5,18,20,22
77:5 83:14 100:14
104:16 105:3,24
107:18 125:12
**months** 30:10
72:25 101:8 194:2
194:2,2 202:18
253:9
**moot** 115:15

**moratorium**
200:10 202:3
**morgan** 5:5
**morning** 7:3,4,6
16:7,8 50:18 89:2
89:3 97:17 128:8
129:1 224:23
240:22 281:11,23
**moss** 6:8
**motion** 2:1 7:8
9:23 16:18,24
57:6 67:2 72:2
74:5,9 76:16
80:17 81:5,5,8,10
81:11 83:5 87:18
87:20 89:24 92:2
96:18,20 129:4
185:22 213:8
220:3 221:3
226:12,14,22
227:9 235:6
**motions** 96:15,17
184:5
**motive** 9:1
**mouth** 118:1
**mouthful** 117:16
**movant's** 16:24
38:20
**movants** 17:3,16
20:8 36:7 38:4,13
39:25 42:3 79:15
88:23 224:18
**move** 7:11 9:4
16:1 49:14 50:22
52:16 54:19 58:1
61:14 67:19 75:7
84:16,24 85:4,6
85:24 109:4,23
131:25 167:9
239:7 262:10
263:8 264:1
**moved** 8:25 22:14
22:15 172:7

**movement** 64:7
**moves** 81:6 86:15
**moving** 7:21
25:13 38:4 64:9
84:10,10,13,13
85:10 88:10 101:3
112:1,4 214:4
254:16
**multi** 63:17 116:8
**multiple** 14:7 63:7
63:9 81:13 171:7
226:21 269:9
**multiplier** 85:18
**multiply** 85:9
113:13
**murin** 1:25
**musings** 38:18
**muster** 215:20
221:16
**mutually** 117:24

**n**

**n** 3:1 5:20 7:1
56:10 165:17
223:25 283:1
**n.a.** 2:1
**name** 56:8,10
130:1 165:14,16
223:23 224:9
225:22
**names** 62:1 211:7
**naming** 62:1
**narrow** 159:2,6
159:12
**natural** 35:16
**nature** 54:23
222:8
**near** 280:11
**nearly** 8:7 14:3
99:4,18 140:21
155:23
**necessarily** 9:11
80:10 107:4

**necessary** 9:10
18:17,24 19:7,15
31:9 41:20 136:11
136:16 138:23
156:25 159:7,17
178:25
**need** 17:11 18:2
23:2,12 25:9 31:8
31:21,22 44:9
45:18 49:7 51:8
82:1 83:17 88:9
88:11 120:5,22
126:21 148:9
175:10 189:9
192:17 200:9
209:8 229:2 276:3
281:23
**needed** 18:24
81:23 152:11
237:19 273:12
**needs** 44:13,15
62:1
**negative** 189:1
205:8
**negotiated** 12:17
15:16,17 39:1,7
49:4 77:11 92:11
92:14,16 106:8
120:1 230:9
**negotiating** 69:11
82:25 98:17 230:4
230:9 233:3
**negotiation** 95:20
115:17 218:22
280:18
**negotiations** 39:3
58:20 65:24 71:3
218:25 227:3
229:23 230:1
231:1,25 232:3
233:6 235:11
**neighborhood**
147:16

neither 28:23
    48:25 125:20
nestor 212:19,20
    217:14,15 220:23
net 151:15,16,18
    179:1,14 181:24
    182:4,9 189:20,24
    190:15 192:10,13
    193:13 194:10
never 14:8 17:7
    20:16,18,19 22:25
    40:10 81:9 95:5
    121:24 122:6,14
    122:15 127:7
    129:3 158:2
    161:11,13,17
    173:5 203:18,20
    219:23
new 209:15 210:3
    236:13 240:14
    262:6
nextera 10:1,4,18
    10:22,23 12:1
    13:23 15:13 20:7
    20:18 21:4,23
    23:18 26:6,7
    28:20 30:1,2,14
    31:24 32:1,3
    33:22 36:8,13
    43:4,8,15 52:18
    53:9,12,18,24
    54:2,3 115:6
    201:18 202:6,16
    204:7,24 218:22
    228:25 229:21,24
    230:10,16,25
    234:16 241:8
    242:1
nguyen 6:9
nice 51:15 239:17
nighan 5:5
night 281:14

nine 14:4,19
    119:20 190:12,13
    194:2 199:2
    211:11 253:8
    260:7,21
nixon 5:1
nol 47:25
nols 48:1,17
nominee 145:15
non 16:10 40:17
    189:3 208:17
    231:4 238:9 273:6
nondebtor 26:19
nontaxable 8:5
normal 225:6
normally 21:12
    96:16 138:23
norms 34:15
north 1:12
notably 219:18
note 7:23 31:17
    47:24 69:13 70:14
    173:18 186:7,8
    224:17
noted 95:25
    161:24
noteholder 177:1
noteholders
    176:25 205:1
notes 70:19 119:5
    173:16,21
notice 14:23 74:25
    87:13,20,24 139:5
    158:20,21
noticed 76:23
november 12:8,19
    13:22 29:7 53:10
    169:7 231:18,18
novo 49:11
nuanced 204:19
    237:19 238:2
nub 30:21

number 32:12,16
    33:25 34:18,25
    35:6,7,19 46:6
    47:20 48:16,20,21
    48:21 62:5,6
    63:10 74:14 75:13
    76:12,24 77:20
    78:6 80:23 85:1,2
    85:3 90:4,15
    97:19,22,23 100:6
    101:19 102:21
    103:6 105:18
    113:9 116:12
    183:25 185:19
    190:24 191:2,4,6
    193:3 214:14,19
    246:16 256:1
    261:22,25 262:5,6
    264:11 270:11,14
    271:5
numbers 13:8
    22:19 45:8 47:23
    62:5 63:2,13
    69:23 75:23 77:22
    77:23,24 84:15,15
    93:22 94:22 95:2
    101:2,18 102:4,15
    103:21 104:1,3,3
    106:20 113:12
    149:3,5 160:24
    187:1,5 211:12
    214:21 221:9,9,11
    221:15 232:9,15
    236:21 240:4
    256:2 267:4,14
    274:5
ny 283:23

**o**

o 1:21 7:1 130:3
    165:17 223:25,25
    283:1
o'brien 27:8 44:12
    44:24 216:23

oakland 80:21
object 66:2 72:13
    91:24 164:11
    217:7 262:22,24
    267:9 274:1
objected 39:20
    47:7,8 65:15,17
    91:8 184:4 219:6
    262:18
objecting 74:6
    227:6
objection 38:11
    58:2,3,4,5 61:15
    65:4,15,18 66:7,8
    66:17,19,20,24,25
    67:21,22 75:8,9
    87:2,3,4,6,19,21
    88:10 109:2,23
    115:2 122:8
    123:20 125:6,25
    127:24 132:2,3,4
    164:21 167:11,12
    213:3,6 216:13
    217:2,9 218:2,6,7
    218:9 220:16
    222:5 223:2
    228:10,11,12
    229:16 261:9
    263:3 267:1
    274:15 277:7,20
objections 10:9
    11:16,18 16:1
    41:1 54:25 55:4
    66:15 73:3,7 74:3
    82:25,25 86:5
    109:3 115:21
    125:15 212:23
    218:1 220:13
    221:24
obligation 54:4
    185:14 201:2
obligations 82:16
    146:7,10 209:17

**observation** 100:7
**observed** 196:24
**observer** 216:24
**observing** 89:22
**obtained** 178:7
**obtaining** 181:8
181:20
**obvious** 50:25
**obviously** 186:9
189:1
**occasionally**
93:22 94:13
**occur** 44:16 45:23
199:23 208:16
273:13
**occurred** 26:14
44:20 96:4 105:23
232:24,25 253:8
**occurring** 49:22
**october** 12:7
13:20 83:6 99:3
103:9,15 105:1,2
105:8,15,22
199:23 201:21
202:4 206:16
253:8 260:2
**offer** 220:5
**offered** 38:13
219:22 267:10
**offering** 151:7
166:24 172:19
177:10 178:6
179:19 182:15
183:17
**offers** 153:11
**officer** 55:20
**official** 79:24
278:15
**offset** 177:20
**offshoot** 233:2
**oh** 15:22 48:6
54:6 76:5 86:22
87:19 111:16

114:24 126:8
140:7 209:4
224:12 239:13
240:6 246:4
267:18
**okay** 7:20 18:7
21:9 24:24 28:6
29:6 31:1 32:22
33:7 36:16 44:4
54:15 55:12,12,19
56:3 60:14 62:21
65:9 68:8,11 69:6
69:10 71:5,15
73:21 74:10,16
75:4 76:13 78:23
79:11 80:19,23
83:3 85:21 86:3
86:11 87:2,19,23
88:2,17,20 89:20
90:23 91:4,20
93:24 96:8,21
97:2,12 98:9
99:10 100:11
101:9 102:17,20
104:2,9 111:18
112:16 113:14
120:4,8,21 123:5
123:25 124:11
126:11,16,23
127:9 128:5
130:13 131:17,22
131:25 132:7,9,13
133:14 139:19
140:14 143:2
144:12,16 145:18
146:20 147:23
150:10,14 151:7
152:1 154:12
155:19 157:8
161:11 162:14
165:7 168:10,15
169:10,13,18,19
175:23 178:3

182:25 183:3,4,8
188:16 189:9
190:9,24 193:22
198:20 199:4,22
205:15,25 208:23
211:2 212:24
217:13 220:25
222:3,4 223:10
225:13 228:19,22
228:24 229:10,17
232:18 239:9
240:19 242:18,21
243:12,24 244:9
246:11,23 249:7
249:11 250:4
254:10 255:4
258:21 259:4
260:1 264:6 265:8
269:22 270:11
273:22 274:20,20
278:15 279:3
281:7,12,21 282:4
282:7
**old** 231:4 240:9
240:11,12 283:21
**omnibus** 116:21
116:23 137:24
138:2,4 154:23
155:16
**once** 15:14 29:1,2
30:9,10 57:18
65:7,19 86:23
88:15 105:5
115:15 197:1
249:11
**oncor** 15:20 17:9
19:8,15,16 26:17
32:14 34:7,13
37:6 42:17 82:18
82:19 117:3 119:9
137:18 138:12
140:2,8 148:3,13
148:15 152:6,12

152:16,25 154:20
178:8 180:16
182:17 235:15,17
**one's** 273:14
**ones** 9:5 41:10
144:21 243:21
276:15
**ongoing** 113:22
**open** 52:25 56:22
77:20 96:2 176:2
176:4,8 261:19
262:14,19
**opened** 261:14
262:7
**opening** 7:12,15
18:5 31:2 50:21
50:21 216:20
240:21,24 241:15
**operate** 263:21
**operating** 268:7
**operator** 1:25
**opine** 136:19
**opined** 146:22
**opining** 151:11
195:18
**opinion** 24:2,10
53:10 54:5 133:13
134:19 136:5,7,11
136:15,16,19,22
137:1,3,16 140:1
140:7,18 143:12
144:4 145:3 148:2
148:7 151:7
152:23 153:2
155:25 158:2,7,18
159:1 161:6 163:9
170:9 172:20
176:22,24 177:10
178:6 179:19,22
179:24 194:20
196:7 203:18
204:16,21 209:13
213:7 214:10,22

214:24 216:1
218:9,16 222:9,22
252:10 263:4
267:2,10,13 274:4
**opinions** 9:23
52:5 133:6 134:6
135:18 136:6
142:21 152:2
156:11 160:20
169:10 172:17
173:10 182:15
183:17 213:18
**opportunity** 26:8
26:25 52:7 104:23
148:21 179:4
200:19 220:14
236:10 246:6
**oppose** 155:7
184:8 185:22,25
**opposed** 26:12
62:23 204:25
207:13 215:6
279:18
**opposite** 19:22
195:20
**opposition** 14:24
**optional** 163:19
**options** 197:1
**oral** 174:21
265:18
**order** 8:15,15
12:23 13:17 14:16
15:12 16:23 18:19
26:17 38:23,25
39:5,18 49:3
51:23 62:14 71:7
71:10,21,25 72:7
72:14,18,19,20
73:12,14 74:4,4,7
83:22,22,23,23
91:5,10,22,23,24
92:6 94:8,12,15
95:24 96:9,11

97:4 100:2,4,13
109:16 119:6
121:14 129:5
152:11 174:24
176:14 211:2
232:25 233:1,2,9
233:11 237:2,18
238:2 239:2 243:9
243:15,25 244:7
244:10,24 245:9
247:14 248:3,7
251:11 256:18
257:5,10 260:24
260:24 266:1
268:15 273:24
274:18 275:13
276:24
**ordinary** 60:23
265:25
**organization**
250:20
**organized** 208:5
**original** 69:8
100:23 101:15
208:4
**originally** 80:16
279:10
**ounce** 127:7
**outcome** 23:6
27:9,23 31:16,22
117:23 213:7
216:21
**outlined** 48:23
**outlining** 250:23
**outset** 78:16
**outside** 95:6 210:3
265:25
**ovation** 211:7,8
211:17
**overall** 69:11 77:7
81:11 107:23
110:5 185:18
215:24 230:4

236:9 276:8
**overlay** 201:23
207:8
**overnight** 282:5
**overruled** 122:12
218:8
**overseeing** 58:11
**oversight** 39:11
**overstated** 247:9
**owed** 235:13,15
**owned** 109:19
139:10 149:15
**owners** 209:16

## p

**p** 3:1,1 6:4 7:1
**p.a.** 4:6 5:7
**p.m.** 1:15
**pa** 214:2,6
**pab** 20:10 27:6
46:7 49:1 50:19
50:20 51:10 52:5
52:10 57:1 60:7
67:7 71:6 86:17
86:17,17,17,18,18
86:18,18,18,19
87:1,8,8,8,9,9,9,9
87:9,9,10,10,10
87:10,10,11,11,13
87:25 88:7 142:4
210:18,20 212:20
213:11 216:5
217:16,17,18,24
218:5,17,24 219:6
219:16,17 222:12
228:6 229:14
239:24 240:6,7,17
240:19 248:6
277:3,5,21
**pab's** 57:5 213:16
219:10,19 227:15
227:16 228:16
239:22

**pabx435** 239:24
240:1,19 241:2
**package** 231:14
**page** 32:14 57:21
62:16 68:3 71:12
71:12 75:12,17
94:21 99:15
112:18,25 123:7
144:19,20,22,25
153:6 154:8 160:8
161:23,24 162:1,5
169:14,16 177:13
177:14 183:13,14
211:11,12,13
241:11,12 242:25
249:23 250:8,9
**pages** 64:1,20
68:1 119:11
161:24
**paid** 13:7 14:3,5,7
14:9,13 20:1,2
21:12 27:5 35:16
37:24 45:5,5
53:20,21 65:16
90:11 113:24
119:19,25 123:18
172:25 200:14
260:21
**panel** 159:11
**paper** 7:15 121:2
**papers** 8:1
**paperwork**
129:10
**par** 14:12 30:7
174:19 273:1
**paragraph** 8:16
57:14,21 91:5
95:22,23 97:25
99:11,12,14,15,17
101:11 116:4
123:7,10 133:19
133:20,23 141:3,5
141:13,17,18

148:10,23 153:3
169:14,19 170:23
170:23 177:13
182:21 183:13
211:13 213:14,16
213:19,22,24
214:4 217:12
220:17,19,22,23
221:22,23,24,24
221:25,25 222:3,3
228:8,15 242:16
242:23 245:13,16
257:9,12 258:8
267:8,10,22
**paragraphs**
217:22,24 218:3
219:9 220:15
222:6 223:3
228:14 243:1
**paraprofessionals**
58:12 59:21 62:12
**parent** 135:2
139:9,19 141:9
186:21 208:7
209:24 210:3,10
**parents** 209:15
**parent's** 139:16
**pari** 186:22 187:1
203:4
**part** 11:23,25
14:2 33:6,12,15
35:7 39:2 43:4
60:3 68:25 69:4
76:13,13 81:24
109:14 124:19
135:7 196:9 230:8
232:2 233:6
235:16,20 238:9
238:19 244:6
246:11 250:15
251:2 260:20
269:12 276:21
280:17

**participated**
278:16,20
**participation**
219:19 280:17
**particular** 62:17
63:6,21 69:1
75:24 80:5 106:11
107:3 112:18
156:18 160:24
172:16 213:18
214:3,13 216:22
231:11 233:25
237:12 239:23
242:10 243:20
247:3 249:18
255:20 261:1
272:3 275:23
276:13
**particularly**
31:23 52:8 215:2
**parties** 8:4 9:16
11:4 39:11 44:16
44:22 46:22 48:25
49:13 51:24 65:5
66:17 70:1,8,11
86:4 91:24 92:12
92:14 97:7 106:20
107:1 117:23
123:19 153:22
222:17 226:23
232:1,6,12,13
237:20 255:14
**partner** 56:11,18
58:10 270:19,25
**partners** 59:23
64:14 166:9
**partnership** 3:11
3:18 4:9
**party** 9:3 11:14
36:7 39:7,19,20
39:21 40:24,25
41:10 51:3 52:6
66:8,18,23 91:8

92:17 125:25
127:19 219:20
**pass** 98:9 118:5
152:20 200:14
221:15
**passed** 200:10
**passes** 65:14
**passu** 186:22
**path** 17:16 199:20
201:14 203:24
234:19
**patricia** 6:14
**patrick** 6:2,17
233:21 265:17
**pause** 7:18 195:2
**pauses** 258:4
**pausing** 154:2
**pav** 144:13 281:8
**pay** 8:6 21:17
27:15 37:21,22
147:24 148:1
153:12 160:15,22
178:11 180:4
185:14 191:20
193:9,10,18 194:1
194:9 195:23
197:7 198:22
201:2 203:7
235:18 239:10,11
**payable** 44:15,17
44:19 46:15
**paydown** 103:8
103:11
**payer** 140:15
**payers** 152:21
192:25 194:5
211:18,22
**paying** 22:3,4
205:1 210:7 260:7
**payment** 271:22
**payments** 15:19
49:18 124:18
233:4

**payout** 29:23
**pct** 203:8
**peabody** 5:1
**pedone** 5:4 29:24
43:25 44:2,5
46:18,22 47:2,8
47:13 50:16 88:4
88:6,16 126:7
216:10,11,11
281:3,5
**pegging** 264:10
**pending** 16:18
24:2 53:2 57:6
**people** 23:17
77:20 106:22
215:22 221:1
223:5 248:21
250:16,18,20
270:11,14
**percent** 8:7,7
12:24,25 14:5,7,9
20:10,14 26:4
29:5,25 32:12,16
32:24 33:7,9 34:5
34:14 36:3 45:2,4
45:10 47:3,17,18
65:16,17 77:25
78:1 90:20,20
91:2,3 102:6,6
105:17,17 123:22
123:23 190:6,21
194:10 196:20
197:2,24,24 198:1
198:2,2,5,8,8,25
203:2 230:19
252:21,22 253:1,1
253:12,13,18
254:6,7,11,11
258:14,15 260:3,3
266:5,6,22,23
268:2,4 272:5,22
**percentage** 15:14
34:11 35:21 43:7

79:10 105:19
188:12 198:11
**perception** 42:4
194:12 195:23
214:14 215:25
218:20
**perceptions**
214:23,23 219:2
221:7 227:2
**perfect** 64:22
244:12,12,14,23
245:2
**perfection** 64:24
244:18,25
**performed** 99:5
99:18 122:6,15
217:22 266:12,13
268:24 270:8
271:6,14,16,17
273:23 279:22,23
**performing**
254:19
**period** 10:20 12:6
13:21,22,23,23
14:1,12 15:3
35:14 53:14,16
65:5,14,23 76:23
76:25 77:2 82:2
83:15,21 84:18
98:25 101:14
172:22 199:9
202:22 203:16
204:20 206:15
273:14
**periods** 13:12
125:12
**permission** 56:13
**permit** 26:10,13
**permits** 27:9
**person** 71:2 129:4
161:7 183:3
208:17 282:7

**personally** 63:11
71:3 191:17,18
250:10
**perspective** 30:16
33:17 43:13
187:14,15,17
254:16 257:21,22
273:14
**perused** 246:16
**pete** 279:12
**peter** 3:24 128:25
165:2
**petition** 58:21
92:16 102:14,18
103:2 119:4
**phase** 94:20
**phone** 92:25 93:1
93:2,3
**phrase** 79:16
**pick** 275:4
**pics** 53:20
**piece** 43:6 65:21
**piercing** 109:13
**pik** 11:9 14:11,13
69:13 70:14,19
119:3,5 173:15,18
173:21 174:18
176:25 186:7,8
**piks** 123:2 175:1,7
175:8 186:22
187:1,3 201:5,7
230:19 231:8,22
**pivot** 77:12
**place** 31:7 94:9,12
140:4,6 225:8
**plaintiff** 109:12
110:14,22
**plaintiff's** 110:11
**plaintiffs** 80:16
110:12
**plan** 5:8 12:1,10
14:9 19:8 28:2,9
28:21 29:9,22,22

30:1 41:16 48:15
51:1,4,7 52:18,18
52:19 53:24 55:16
69:16 74:13,19
76:8,19 77:9,10
77:15,18 78:4,5
82:22 84:21 86:14
89:17 98:17
108:19,20 109:15
110:5,7 114:16,19
115:4,14,17,18,20
115:21,22 116:1
151:4 155:7
164:11 180:18
184:8 185:6,20
186:1,22 187:8
201:18 206:8,15
223:8 226:1
236:12 238:9,10
254:17 260:19
263:22 264:1
273:1,4,5,8,9
**planning** 225:5
**plans** 14:8,13
28:22,22,25 29:1
77:19 81:19,22,24
83:1 108:23,23
113:23 115:6,11
175:15 254:14
255:14 260:13
272:3
**plausible** 191:15
191:19
**play** 252:17
**played** 252:14
**plays** 235:8
**pleading** 11:14
67:1 111:10
**please** 7:3 18:9
44:7 55:15,16
56:5,8 57:13
88:20 93:1,3,25
112:15 117:13

120:17 122:13
128:20 129:19,21
130:1,6 145:10
165:7,9,14,19
182:19 183:7
195:13 212:24
221:20 223:16,19
223:23 224:2
225:22 227:23
229:10
**plr** 260:14
**plrs** 255:15
**plus** 222:24
**pm** 282:11
**pocket** 24:7
193:25
**podium** 212:22
**point** 16:2 22:9,16
23:3 27:2 32:2
33:19 35:24 41:25
42:12,18,24 44:7
46:5 47:1,16
65:16,23 77:14,25
79:2,10 96:1
97:12 98:9,12,20
100:11 109:5
157:22 164:3
168:14 174:18
186:3 191:12
194:15 196:4,18
196:22 202:2
203:14,15 213:19
222:6 230:5,6,14
230:18 233:3,5
235:8 241:22
252:20,21 253:21
254:17 255:20
260:12 272:20
**pointed** 85:12
196:16
**points** 8:4 20:24
79:12 113:25
121:24 271:21

272:6,8,13,23
**policy** 230:13
**portfolio** 70:24
**portion** 26:5
46:11 124:9
**portions** 216:5
**posed** 52:17 116:8
253:22
**position** 17:7 41:8
51:5 114:4,7,7
130:20 137:23
184:7 215:18
217:7 218:5
219:24 225:25
**positioned** 257:2
**positions** 80:3
217:23 226:3,6,8
226:10
**possibility** 22:21
22:24 116:8
134:11 142:22
145:5 155:5
**possible** 54:24
70:2 97:20,21
118:22 119:11
130:8 147:20
165:21 196:19
224:6 227:1
**possibly** 26:2,2
33:21 235:5
**post** 45:19,19
83:15 84:3,4
101:8 203:16
222:13 253:16
254:9
**potential** 12:14
19:1,22,24 22:25
26:9,12,25 40:22
117:11 132:15
134:25 137:13
142:23 146:2
154:18 155:6
161:14 170:14

188:7,13,16,20
189:10,10 192:5
193:23,24 194:10
199:18 200:1
201:14 202:10
206:18 207:6
235:10 273:17
279:25
**potentially** 48:13
84:10 135:2
154:20 158:22
186:17 193:8
194:17 200:20,22
201:9 202:14
203:25 204:1
206:19
**power** 157:15
**powers** 17:21
**practical** 90:18
119:19 139:18,19
247:22 260:6
**practice** 225:3
**practices** 66:24
**pre** 13:15 58:21
84:18 92:16 119:4
204:20 233:7
252:8 272:23
**precedent** 17:15
52:21 53:11
**preceding** 221:10
**precise** 85:15
102:3
**precisely** 150:9
266:16,17 277:25
**predominantly**
93:15
**predominately**
69:14
**prefer** 85:25
237:3
**preferred** 41:18
**preliminary** 86:5
114:2

**premised** 175:16
**preparation**
58:12 61:1 111:5
**prepare** 56:19
60:24 63:24 131:5
150:4 227:20
**prepared** 57:4
60:22 103:14
111:6,17 135:6
149:9 150:10
212:21,22 220:18
225:3
**preparing** 185:4
**prescribe** 156:25
**present** 5:18 35:1
35:4 41:23 52:7
150:5,15 151:15
151:16,18 179:1
179:14 181:25
182:4,9 189:21,24
190:7,15,22
192:11,13 193:13
194:10
**presentation**
50:23
**presentations**
54:20
**presented** 100:1
114:16 115:20
**preservation**
122:24
**preserve** 114:22
119:24
**preserved** 15:25
**preserving** 9:10
9:12 18:18
**president** 226:7,8
269:2
**presumably** 45:25
**presumed** 48:4
**presumption** 21:5
**pretrial** 222:13

**pretty** 45:1 47:6
64:13 176:4
185:15 196:14
**prevail** 171:17
**prevent** 151:20
153:22 157:10
158:14,15 159:17
181:15 209:18
**prevented** 181:19
**preventing** 184:1
**previously** 90:3
226:3 227:10
269:9
**price** 10:24
149:12 178:7,22
188:15 194:1,6
230:7,17,18 231:5
**prices** 173:18,21
174:7,8,19 272:25
**primarily** 13:1
19:6 48:25 49:2
92:22 173:23
207:4 247:3,5,18
261:1
**primary** 12:12,24
93:8 174:11 213:3
261:8
**principal** 63:5,5,8
93:8
**principally** 63:9
92:22 247:3
**principals** 69:19
69:20,20
**principle** 256:21
**principles** 43:17
**prior** 12:24 13:1,3
53:13 76:25 77:10
158:1 184:25
226:8
**pristine** 64:13
**privilege** 27:15
59:14 93:2

**privileged** 59:25
64:5
**privy** 125:21
**pro** 55:20 129:4,8
**probably** 80:6
102:21 106:17
113:13 123:3
191:24 247:23
**problem** 31:15
42:13 60:10
129:11 144:18
221:9 264:8,10
**problems** 20:17
**procedures** 72:3
109:22 138:24
175:22 176:14,14
176:16 184:5
196:17
**proceed** 86:12
88:23 115:12
128:23 130:14
166:3 269:24
**proceeding** 17:17
18:11 52:6 127:5
166:25 167:7
217:1 219:19
**proceedings**
129:6 135:8
140:17 277:5
282:10 283:4
**proceeds** 20:14
21:13 26:4 27:14
27:15 34:12,19,20
35:22 37:21,22
114:10 140:3,10
177:19 188:14,17
188:20 189:2
194:17 200:21
207:7 213:24
**process** 50:2
51:16 58:8 59:10
59:12,16,19 63:12
63:16,17,18,18,20

63:20 64:22 82:17
82:18 180:7 185:6
192:16 201:17
207:11 230:24
232:17 234:8,17
234:18,20,21
243:18 244:12,13
244:20 250:15,23
250:24 254:16
256:25
**processed** 129:9
**produce** 97:25
98:2,4,7
**produced** 100:20
**product** 65:21
**prof** 129:25 130:3
**professional** 8:22
10:5 12:11,22
13:5 38:3 41:12
42:1 46:12 48:22
48:24 63:21 69:2
69:7,16 70:7
71:24 95:19
106:19 107:16,20
107:23 123:12,16
162:5 166:12,16
174:8 201:11
206:14 232:19
233:18 236:16,23
244:15 247:8
250:10 253:24,25
268:7 279:9
**professional's**
244:22 270:9
**professionals** 8:23
38:22 39:5,17
40:18 43:20 71:20
92:13 106:13,13
125:5,20,22 126:2
218:24 232:2,24
233:8,10,14,16,23
236:18 237:2,10
242:14 243:4,13

243:17 244:7,14
245:4 246:5
247:12 248:4,16
248:24 251:12,15
252:20 254:3
256:15,22,24
259:11 265:13
266:7,18 267:11
267:25 268:24
271:11,14 276:6
276:11,15,23
278:19 279:24
280:4
**professor** 127:20
129:17,19 130:7
130:11,18,21,23
131:3,16,20 132:1
132:16,23 148:2
158:7 162:19
164:22 169:22
170:2,9 180:9
**proffered** 213:11
**proffering** 218:10
**profit** 236:3
**profitable** 200:22
**progeny** 44:24
**projected** 19:22
19:23 33:21
113:24 173:15,20
173:23 175:7,15
189:20
**projecting** 197:6
**prolonging**
177:21
**prong** 219:21
**proof** 17:3
**proper** 215:25
222:16 223:1
**properly** 58:17
**proportion** 97:9
113:10 261:16
**proportions**
258:10

**proposal** 51:11,21
177:4 213:16
217:18,19,25
219:1,7,7,7,10
227:15 228:17,23
229:1
**proposals** 51:20
**propose** 41:22
44:23 226:19
227:8
**proposed** 39:22
40:7 42:10 63:12
63:22,22,22 69:7
69:22 72:13 92:13
113:1 118:3 161:4
178:11 185:25
213:10,23 215:16
218:11 272:3
**proposing** 204:6
**proposition**
142:10 163:7
**propositions**
218:17
**proration** 112:11
**prosecute** 201:8
**prosecution** 81:19
**protect** 16:14
59:13
**protecting** 224:13
**protocol** 58:23
71:19 73:11
**protracted** 185:6
**provide** 43:1
56:17 59:9 62:10
62:22 92:7 127:2
136:19 158:8
159:7 213:7
226:24 232:9
243:3
**provided** 14:13
16:4 26:7 60:3
61:19 62:14 91:21
93:8,13 95:3,6

100:5 127:10,13
227:4 232:12
234:21 235:1
238:20,24 261:8
276:8
**provides** 8:16
40:23 213:22
248:3
**providing** 132:14
235:9 266:9
**provision** 53:15
54:8 71:18 92:11
109:15 157:4
163:2
**provisions** 20:11
72:17 115:7,11
213:6,14 238:8
**proxy** 278:11
**psa** 15:4 43:8
68:20 69:1 234:18
**public** 59:15
104:15 152:15,19
152:23 180:12
181:2,6,13 182:10
189:11 192:22
194:2 204:2,5,12
209:10,13 211:2
211:25
**publish** 139:5
**puct** 28:11 53:25
197:9 208:5,23
**puct's** 207:18
208:12
**pulling** 87:17
**purchase** 10:24
147:6 154:5 178:7
**purchaser** 82:15
147:4,23 148:4,14
151:20 152:16,25
153:11 154:9
155:20 156:6
159:18 161:3
178:10 179:23,25

181:16,19 193:8
210:3,6
**purchaser's** 115:8
**purely** 40:5 44:10
**purpa** 209:10
**purports** 213:5
**purpose** 59:20
**purposes** 16:11
17:11 59:23 135:7
139:12 157:1,3
225:11
**pursuant** 71:19
91:9 146:15
**pursue** 143:13,22
145:4 154:14
171:5 184:14
187:23 188:9
194:23 196:1
199:14
**pursued** 8:2
**pursues** 117:19
**pursuing** 8:8
176:3 195:11,19
199:20 200:7
203:1,3 204:22,24
207:14
**pursuit** 119:15
**push** 120:9 195:2
269:21
**pushback** 106:22
**pushed** 73:9 107:6
**pushing** 107:2
**put** 8:24 9:24
13:11,19 18:8
36:10 44:5,13
46:14 48:14 51:21
55:9 61:21 62:2
78:5 91:14 100:14
132:18 156:14
175:1 181:2 187:7
187:18 196:16
197:12 221:11
250:1,3

**putting** 44:21
51:11 59:15
118:12 216:14
223:6 236:21

**q**

**qualified** 238:9
**quality** 64:13
**quarter** 13:8
**quarterly** 107:17
**quest** 249:8
**question** 23:24
25:13 52:17,25
74:2 78:12,25
84:8 87:15 91:19
93:5,6 98:11,11
118:1 122:13
126:15 144:3
145:2,3 154:1
155:24 169:16
195:2,25 204:18
205:16 227:6,7
230:3 241:21
242:6 245:4
247:10,15,16
250:9,12 253:22
254:2,3 255:21
261:5,9 263:1
267:17,21,23
274:4,12,14,16,17
274:21 275:18,21
275:24 280:8,9,16
**questionable** 49:2
**questioning** 196:6
227:8
**questions** 9:17
53:22 68:12 84:8
85:23 88:1 94:22
107:8 110:10
120:3 126:5
127:18 132:8
133:6,7,9 134:7
159:22,24 160:2
162:14,20 163:15

163:20 164:18
167:16 187:20
205:21,23 207:17
209:1,9 212:7
218:13 239:6
261:24 269:5
273:23 279:2,4
280:22,25 281:4
**quick** 79:11
**quickly** 97:7
199:14
**quite** 47:8,9 235:3
**quote** 38:18 45:23
211:15
**quoting** 163:2

**r**

**r** 1:21 3:1 7:1
127:24 130:3,3
165:16,17 223:25
225:20,24 239:15
283:1
**raise** 129:21 165:9
223:19
**raised** 81:21 86:6
125:7,11,17
**raising** 33:19
125:15 184:5
**rajesh** 6:3
**ran** 36:24 101:17
104:2 198:15,15
**range** 29:25 245:6
266:24 268:4
**rarely** 222:23
**rate** 152:21
179:13 190:6,21
190:22 192:25
198:1,5,8 201:15
202:18 206:14
211:18,22
**ratepayers** 180:16
**rates** 152:24
211:21

**ratio** 79:5 85:8
  103:9 104:5
  237:11 255:19,23
  268:9,9
**ration** 260:9
**rational** 39:7
  47:21 214:23
**rationale** 253:17
  257:4 266:8
**rationally** 214:25
  218:19 221:10
**ratios** 258:10
**reach** 51:18
  265:18
**reached** 73:10
  205:17
**reaching** 259:11
**read** 15:25 24:8
  76:16 124:9 155:1
  155:14,16 160:18
  232:13 234:25
  246:12,15,22,25
  250:13 269:13,14
**readily** 38:16
**reading** 86:8
  154:23 155:4
  226:22,22,23
  237:23
**readjust** 229:2
**ready** 54:19
  112:20 128:7
  183:1
**reagan** 268:17
**real** 25:16 31:15
  40:16 42:13 45:15
  155:5 157:5
**reality** 18:23
**realize** 246:24
  280:9
**realized** 58:19
  82:9 83:17 105:5
  147:13

**realizing** 157:11
**reallocate** 42:2
**reallocating** 50:14
**reallocation** 38:15
  40:3,3 90:15
  215:16
**really** 14:1 27:1,2
  27:8 31:25 34:14
  37:18 51:17 52:6
  52:11 88:14
  126:18 192:16
  194:8 201:13,22
  202:9 205:20
  222:18 235:14
**reason** 30:12
  31:20 34:7 36:20
  40:3,18 80:3
  84:22 85:15 88:12
  90:18 145:23
  148:20 155:2
  162:8 176:5
  178:24 209:25
  210:2 260:20
  267:2
**reasonable**
  136:18 172:3,9
  191:20,25 192:7
  244:15 245:1,5
  247:13 260:11
  266:24 268:9
**reasonableness**
  244:19 247:8
  268:5
**reasonably**
  233:10 244:8,9
**reasoning** 266:8
**reasons** 79:23
  194:22 216:4
  243:12 255:8
**recall** 12:9 15:17
  45:5 69:18 70:18
  72:25 96:4,5,16
  96:19,22 102:15

102:16 103:19
  106:11,12 107:5
  107:12,24 108:1
  110:12,18 111:12
  113:25 116:1
  118:22 124:3
  126:4 145:17,17
  150:7 162:19
  180:18 206:8
  236:7 242:7,9
  246:18 247:25
  248:11,14,15
  249:2,4 251:9,10
  255:20 259:18,23
  259:25 265:23
  266:4 270:9
  277:25 278:1,3,21
  279:11 280:2
**recap** 236:2
**recast** 78:3
**receive** 61:8 197:2
  208:21 271:22
  272:4,18
**received** 17:1
  20:14 42:24 65:5
  122:20,21 123:17
  171:11 177:5,8
  219:12 273:25
  274:18 275:12,14
**receives** 153:1
**recess** 55:13
  128:16,18 183:1,6
  221:18,19 269:21
  269:23 281:22
  282:5,8
**recirculated**
  94:13
**recognition** 37:14
  83:15 120:2
**recognize** 60:14
  71:9,15 75:2
  167:2 209:9 211:7
  241:12,14 281:13

**recognized** 22:16
  37:3 45:15 47:10
  252:23
**recognizing** 154:9
  203:7
**recollection** 57:9
  91:11 95:12 122:3
  134:4 135:16
  145:22
**reconsideration**
  15:12 25:15 43:2
  235:6
**reconsidered**
  23:21
**reconvene** 54:24
  281:22 282:4
**reconversion**
  181:8
**record** 7:7 35:8
  38:7 39:24,24
  41:25 42:2,8 43:3
  52:11 55:23 56:9
  59:15 74:25 85:11
  99:10 101:10
  120:19 129:15
  130:2 143:2,3
  165:15 213:2
  217:15 220:6
  221:22 223:24
  224:18 225:23
  227:1 228:14
  229:12 232:4
  239:7,19 245:9
  261:20 267:23
  283:4
**recover** 30:15
**recoveries** 25:22
  25:23 173:15
  175:8,17 187:3
  201:5 272:19,20
  272:22
**recovers** 26:22

**recovery** 26:8
  35:20 42:16
  114:14 147:12
  173:23 177:22
  230:19
**recross** 163:21
**red** 199:17
**redaction** 59:24
**redeploy** 200:21
**redirect** 126:9,10
  126:15 132:8
  162:15,17 167:16
  205:25 206:1,4
  262:5 281:7
**reduce** 107:23
  182:11 194:11
  206:19 264:18
**reduced** 207:7
**reduces** 147:12
  201:5
**reduction** 11:20
  211:19
**refer** 259:7
**reference** 76:8
  116:3 177:18
  199:22 222:5
  241:21 250:22
**referenced** 62:16
  97:1
**referred** 71:10
  89:10,16,17
  101:22 116:21
  139:23 145:19
  146:10,22 151:24
  243:7
**referring** 60:21
  62:19 95:2 111:14
  118:14 141:8
  173:25 177:25
  250:15 252:11
  267:19,21,22
**refers** 258:20

**reflect** 43:4 162:9
  162:13 193:4
**reflected** 59:6
  61:20 211:21
  219:14
**reflecting** 241:22
**refresh** 134:4
**refreshed** 145:21
**regard** 50:12
  62:17,22 66:1,5,7
  66:24 70:25 75:18
  88:7 185:2 206:6
  238:19
**regarding** 41:13
  56:17 69:2 178:6
  219:1 230:1 232:1
  233:6,21 259:16
  265:16 274:24,25
**regardless** 10:9
  47:22
**regards** 156:4
  173:13 211:3
  212:1,15 233:19
**regs** 158:20
**regular** 9:19
**regulated** 157:5
  180:10
**regulations** 118:3
  118:6,8 137:21
  138:8,10,15,19,22
  139:2,6 154:13
  156:25 157:2,4,10
  158:10 163:3
**regulator** 151:19
  153:18 210:12
**regulatory** 116:9
  180:6 182:3
  208:13,23 209:10
**reigstad** 3:23
  128:25 129:4,15
  129:15 130:10,14
  130:17 131:10,14
  131:17,25 132:7

  141:15 142:25
  162:16,18 163:15
  164:18
**reinstate** 82:3,12
**reinstated** 82:16
**reinstatement**
  41:14,15,18 82:13
  82:14 231:3 238:6
**reit** 180:21,24
  181:4 211:18,20
**reject** 138:4
**rejected** 136:22
  137:5
**rejections** 11:13
**related** 14:6,7,10
  19:15 20:15 26:18
  41:13 61:22 67:4
  73:9,9 74:13,19
  76:18 78:5 80:5
  81:12 98:16 110:5
  111:22 116:1
  118:11 119:18
  136:11 174:4
  211:8 258:18
  259:17 260:18
  263:1
**relates** 84:18
  229:21 267:8,9
  272:14,14
**relating** 146:8
  211:5
**relationship**
  243:14 273:20
**relative** 79:4
  102:1,11,13 103:1
  104:18 119:22
  121:18 122:20
  187:2 188:2,6
  204:20 206:17,24
  207:13 214:1,5
  215:5 220:8 271:8
**relatively** 72:3
  85:16 281:10

**release** 10:25 51:1
  230:11
**released** 231:7
**relevance** 216:14
  218:1,2 272:15,16
  277:7,8,9
**relevant** 76:23
  135:3,4 146:17
  162:24 206:14
  213:5,13 216:19
  217:1 218:3,21
  222:6 223:3
  234:10 272:7
  277:12,21
**relied** 145:12
**relief** 171:6
**rely** 9:25 10:1,2,4
  42:6 143:15,23
  149:25 152:1
  156:10 159:2
  173:1 220:23
**relying** 28:18
  151:15
**remain** 17:21
  50:10 129:20
  165:8 223:16
  226:24
**remainder** 57:22
  204:14 229:16
**remained** 117:12
**remaining** 51:7
  221:24
**remains** 57:22
  117:19
**remand** 53:17
**remanded** 52:24
  53:13 175:20
**remarks** 50:22
**remember** 29:23
  29:24 69:23 70:22
  79:8 80:11 93:6
  102:4,4 104:20
  106:21 107:8,10

107:16,21 108:10
108:11 110:17
114:24 119:10
121:14 135:8
175:2 207:21
**remind**  212:14
**remotely**  47:4
**removed**  163:7
**removing**  228:8
**render**  16:24
133:6 134:19
135:17 140:18
155:25 176:22,24
**rendered**  10:8
16:19 134:6 135:4
158:7 159:11
172:17 174:25
**rendering**  152:2
156:11
**renders**  157:12
**reorganization**
81:19 108:13
155:8 164:12
184:9 185:20
204:24 255:14
**reorganizations**
260:13
**reorganized**
114:23 152:7
**repeal**  53:17
163:4,6
**repealed**  52:24
53:13
**repeat**  93:5,6
122:13 182:19
195:13
**repeating**  280:7
**rephrase**  263:5,6
**replete**  52:7
**reported**  250:20
**represent**  16:10
224:20 237:21

**representation**
277:4
**representative**
49:19 80:1
**represented**  65:10
70:15 113:22
**representing**
16:11 93:16
224:20
**represents**  80:17
**request**  42:1,3
56:13 107:19
116:24
**requested**  124:16
251:11
**requesting**  242:11
**require**  171:6
282:3
**required**  12:20
55:21 136:6 213:9
238:2 273:4
**requirement**  59:3
**requirements**
59:7 218:13
238:11
**requires**  23:6,7
**requisite**  39:11
**resend**  94:14
**reservation**  49:9
49:12
**reserve**  10:25
11:21 15:24 24:15
24:17,18,21 31:20
31:20 50:11
167:16
**reserved**  23:1
**reserves**  2:3
**reserving**  23:4
**residual**  11:4,21
**resolicitation**
45:18,21 47:9
**resolution**  11:12
51:1 52:4 95:21

114:15,17 115:13
**resolutions**  82:25
**resolve**  73:11
115:2 236:5
**respect**  9:15 10:5
10:11 12:4,22
14:21 15:19 51:5
58:9 89:10,21
118:9 125:7,16
126:2 127:9,14
206:13 207:18
218:2 220:10,16
259:5 262:1
263:24 269:17
270:17 276:1
**respectfully**  20:25
21:6
**respective**  253:15
258:10
**respects**  260:11
**respond**  33:20
**responding**  82:24
**response**  57:5
83:14 89:22
125:13 126:15
**responsibility**
41:9 248:5,5
**responsible**  41:4
58:10 60:19
**rest**  48:13 53:7
**restrictions**  181:2
**restructuring**
56:11 58:20 59:22
61:25 64:15 68:13
69:5,8 70:8,11
71:22 72:1,5
95:20 96:7 116:1
161:18 162:7
166:12,16,20,21
186:12 204:6
241:4 251:17
**result**  8:20 11:2
18:25 23:8,9

78:21 90:20 97:25
98:3,5,8 100:21
101:5 115:9
137:12 138:10
153:1 160:17
181:10 182:16
183:18 203:4
260:5
**resultant**  252:25
**resulted**  8:20
100:23 101:16
177:22
**resulting**  15:20
153:23 169:24
211:20
**results**  26:20
211:16
**retained**  8:23
125:5 233:14
235:23 253:24
**retaining**  232:2
232:23 233:8
237:2
**retention**  73:4,8,8
**revenue**  134:12
143:7 153:21
156:8,21 157:9
158:8,9,13 159:1
159:6 162:20
181:14
**reversal**  53:3,17
**reverse**  109:12
230:17
**reversed**  11:8
34:1,2 52:24 53:2
53:13 54:1 175:19
231:19 242:12
**review**  9:6 10:10
49:11 59:10 63:20
64:4,19,22 65:1,7
65:24 66:18,19,21
74:18 125:3,4,7
125:10,18,21,23

161:14 237:15
243:13 246:5,6
248:6 250:10,17
250:24 251:3,24
252:19 256:14
263:9,11,14
265:12,13,15,18
265:24 268:23
271:1,2,13 276:10
276:21 277:2,2
280:12
**reviewed** 59:23
83:9 124:12,14,25
125:5 237:14
246:8 248:23
250:19 251:3
256:19 259:10
271:5,10 278:18
**reviewing** 63:12
124:2 133:22
238:16 246:18
249:2,4 250:21
251:18,20 252:3
279:8
**revisit** 49:23
91:21 92:12
196:21
**revisited** 49:13
50:6 137:9 175:20
**revisiting** 50:4
**richard** 5:4,7
216:11 266:21
**richards** 265:14
265:20 266:4,12
268:1
**richmond** 127:23
**ridiculously** 47:23
**right** 7:17 11:1
18:3 21:14 24:1
29:5,17 30:2,5,19
30:20,21 31:5
35:5 36:17 54:21
55:7,8,8,18 56:4

57:20 59:8 60:2,6
62:15 63:16 64:11
64:25 65:12 66:10
68:1,5,15,20,22
68:23 73:13,15,22
74:10 76:9,11
77:8,13 78:17
82:12 86:24 87:5
87:25 88:3 89:18
90:9,21 92:19
93:2,13 94:24
96:12 97:5,10,20
97:24 100:8,19
101:12 102:7,11
102:22,25 104:7
104:14 105:15
106:12 107:1
108:4,7 109:9
110:1,17 111:5
113:7 115:23
116:6 118:1 119:9
125:16 126:8
127:18 128:1,5,16
129:14,19,21
132:16 133:22
136:6,20,25
137:14 138:1,4,8
138:12,16,24
139:3,6,15,24
140:3,8,9,11,17
140:19 141:5,8,21
142:7,10,14,19
143:5,10,10,14,25
144:13 145:1,16
146:8,12,15,23,25
147:1,7,14,19,23
147:25 148:5,18
148:23,23 149:2,2
149:5,14,17 150:3
150:6,17,19,23
151:2,12,15,21,23
152:8,12,17,21
153:15,19,25

154:16,21,23,25
155:14 156:8,14
156:20 157:12
158:1,4,10,16,19
159:3,8,13,19,21
159:23 160:23
162:24 164:1,8,19
164:24 165:9
167:20 168:17,21
168:24 169:12
170:9,18 171:4,18
171:24 172:10,11
172:14,20,23
173:2,8,8,10,13
173:16 174:1,5,9
174:13,16,22
175:1,2,4,5,8,12
175:15,22,25
176:3,13,20,23
177:5,11,17 178:1
178:12,15,17,17
178:20,22,23
179:2,4,5,7,10,14
179:15,17,20
180:1,7,8,10,18
180:18 181:4,5,8
181:10,17,21,24
182:8,12,18
183:22 184:2,9,12
184:16,19,21,23
185:2,3,6,14,20
185:23 186:1,4,10
186:18,19 187:4,8
187:14,24 188:17
188:19,23 189:5,7
189:12,18,21,25
190:1,4,7,8,14,16
190:17,19,22,23
190:25 191:2,4,6
191:8,9,13,21,22
192:10,14,25
193:9,12,14,17,20
194:5,5,8 195:16

195:19,24 196:23
197:7,13,14,18,21
197:22,24 198:2,5
198:9,13,18,19,21
198:24 199:6,13
199:20,24 200:7,8
200:11,22,25
201:2,6,11,15,18
201:21 202:1,5,7
202:13,18,19,22
202:23,25 203:1,4
203:9,24 204:4,8
204:15 206:3,10
209:24 210:1,4,10
210:12,14,20,25
210:25 211:5
212:12 216:3
217:13 221:17,21
221:23 222:19
223:19 225:13
226:17 227:11
230:2,14 239:9
241:17 242:13
245:8 246:18
247:1,24 248:17
248:19 249:16
257:6,8,12 258:13
259:20 260:10,19
262:11 269:11,14
269:22 275:11
276:21 277:23
281:7,13,16,21
**rightfully** 115:16
**rightly** 23:23
**rights** 49:9,13
**rigorous** 106:25
**ring** 207:24 208:1
208:3,10 209:20
210:4,8
**rise** 7:2 55:14
120:16 128:19,24
183:7 221:20
229:9

risk   29:3 33:25
  34:1,2 36:3 45:15
  45:23,24 46:23,23
  46:25 47:11,13
  50:24 161:15
  175:14,16,16
  176:9 182:3,10,11
  185:9 189:9,11,12
  192:11,22 193:5
  197:10,12 198:21
  198:22 199:1,1,2
  199:3 203:8,8
  213:20 215:25
  216:15,18 235:21
  273:15,15,18
  274:23,24 275:3
risks   40:16 116:9
  182:9 185:2 187:6
  187:10 188:7
  193:6,24 194:12
  197:8,8 211:18
  274:23,23,24
  275:5
rlf   265:18 266:7
  266:15
road   283:21
robbins   183:2,4
  183:12
robin   5:21
robins   131:15
  165:5,7,13,16,16
  165:19 166:6,8,24
  167:2,9,24 168:1
  168:16 173:7
  205:3,5,13,16
  206:4,6 207:23
  209:6,8 210:23
  212:10,11
robins'   165:24
role   12:21 58:7
  215:21 252:14,17
  279:24

roles   12:12 266:19
roll   51:17 86:7
  183:14
rolling   46:20
rolls   91:25 169:17
  177:14
ronald   268:17
room   17:25 18:1
  45:7,9 168:12
  205:14 246:1
rooted   213:4
ropes   3:15 129:2
  129:16 149:5
  165:3 170:4 171:2
  171:5,11,14,21,23
rosen   166:18
rosenbaum   38:16
  39:2 71:4
rosenbaum's
  12:13 215:13
rosner   4:16 5:13
  16:7,9,9 18:8,14
  18:16 20:24 21:2
  21:4,7,9,15 23:15
  23:20,23 25:9,12
  28:4,6 29:11,18
  30:2,5,12 31:1,3,5
  32:6,9,18,21,23
  34:25 35:3,6,12
  35:15 36:16,18
  43:24 224:24
rosner's   240:24
  241:15
rough   112:12
  187:1,5
roughly   43:2
  64:20 78:9 79:8
  92:18 175:2 203:4
  231:7 253:9 256:1
round   59:19,19
  59:22 64:11,13
rounds   59:21 64:6
  64:10

route   194:19
rsa   38:25 39:18
  68:14,19,23 72:11
  73:15,19 77:10
  96:8,11 233:2,3,5
  272:23
rule   160:11
  211:16 213:4,5
  218:12,16 220:3
  221:16
rules   61:1 62:4
  138:19 139:2
  154:13
ruling   52:12,23
  53:17 159:11
  175:19 181:1
  228:8,13 229:15
  231:19
run   14:25 35:8
  101:1 104:1
  172:11 192:16
running   50:3

s

s   1:22 3:1,13,22
  4:16 6:12 7:1
  56:10 130:4
  165:17
sake   13:17
sale   13:21 17:9,10
  19:9,10,12,13,15
  19:16 25:21 26:14
  26:16 33:12 37:6
  41:16 42:17 98:18
  117:2 133:4,10,25
  134:13,14,18
  135:2 138:12
  140:9,10 147:4
  148:5,15 149:9,10
  149:11 154:16,19
  160:17 175:24
  177:11 178:7,22
  185:23

sales   155:9
sam   5:20
sassower   60:17
sat   22:11
satisfiable   163:25
satisfied   141:9
  152:11 186:11
  218:18 219:21
satisfy   154:25
save   23:13 24:1
saved   43:8
savings   211:21
saw   238:12 266:2
  273:19
sawyer   168:21,24
  192:3,6
saying   8:19 14:15
  27:4 29:21 37:13
  41:4,6 47:15 48:8
  49:7 70:3 105:11
  106:22 107:12
  163:24 188:4
  192:3,23 194:7,8
  197:9 199:15
  215:4 216:17
  260:18 272:13,22
says   9:12 10:1
  16:21 18:17,19
  26:25 49:10 50:5
  61:4 76:8 91:23
  100:4,8 117:21
  123:10 133:16
  143:16,24 144:8
  145:7 148:13
  153:10 159:6
  160:10 162:5
  171:1,4,14 177:17
  189:5 195:4
  210:23 211:15
  213:19,25 214:22
  225:17 241:17
scale   8:24

scarce 215:12
scenario 37:4
  154:10 156:1
  158:10,15 159:3,8
  159:13,18 180:3
  191:16 195:3
  203:2,23
scenarios 37:3
  52:8 194:24
  195:25 196:3,12
  200:15
scenes 15:18
schedule 149:24
  198:7 281:20
schedules 149:8
  149:13,14 150:6
  179:10
scheduling 25:15
  51:23
scheme 209:10
schmidt 4:19
schneider 6:10
scholar 158:6
scholarship
  158:12
school 225:19
schryver 4:20
  159:25,25 160:4
  162:14
scientific 219:23
scope 158:2
  163:23 164:4
  170:9 212:15
  219:23
scott 5:16 6:11
  224:24
screen 62:18
  156:15 187:18
  250:2,3
searched 111:11
seated 7:3 55:15
  56:5 120:17
  128:20 130:6

183:7 221:20
  224:2 229:10
seats 14:25 128:7
second 8:14 18:13
  20:20 22:19 23:12
  29:22 34:8 37:5
  44:6 57:14,20
  68:9 80:7 115:3,3
  123:9 173:10
  187:17 195:9
  197:5 219:3
secondary 174:9
secondly 22:6,24
  31:17 51:10
secretary 156:24
section 9:8 17:24
  71:13,15 156:8,10
  156:14,18,20,24
  157:8 158:3,8,13
  159:1,6,11 162:20
  163:23 213:4
  276:24
secured 40:22
  43:9 122:25 123:1
  200:25 201:4
securities 273:2
see 13:18 17:4,5
  18:12 19:3,4,6,16
  27:10 31:10 36:6
  36:24 49:12,22
  50:12 55:5 57:1
  60:13 69:2,4,4
  75:21,25 76:1
  86:9,11 87:16
  90:25 93:19 99:17
  112:25 113:3
  120:22 123:10,13
  127:20 128:1
  133:16,19 134:2
  141:5,23 148:13
  153:10 156:20,20
  157:6 160:5
  169:16,25 171:9

177:23 183:16,20
  195:8 210:20,23
  211:12,15,22
  217:10 221:1
  223:15 235:8
  239:17 243:19
  256:2,11 266:19
  272:16
seeing 11:6 105:3
  111:12 194:19
seek 17:17 100:11
  118:2
seeking 16:13
  216:16 267:7
seeks 226:14
seen 106:21
  109:13 111:6,9
  245:14
sees 38:2
seldom 214:11,25
sell 20:13
semper 122:20
sempra 15:5,16
  19:8 22:2,2 206:7
  206:15 234:22
  235:12,13,14
  236:10
send 61:23 94:11
sending 26:17
senior 186:7,8
  226:8
sense 17:12 25:15
  27:16 104:15
  199:17,17 200:16
  201:24 203:19,21
  244:12 254:22
  255:2,10 260:10
  260:16,17 270:3
sent 60:19 94:8
sentence 49:9,10
  50:5 57:14,15,20
  57:25 101:11
  123:10 133:20,22

141:5,12 148:12
  153:7,10 169:19
  170:25 171:4,12
  171:14 177:14,17
  200:13
separate 14:9
  42:25 63:2,3,3,4
  66:20 81:9 105:6
  217:9 254:13,14
  254:15
separately 88:10
  170:11
separation 117:19
september 1:14
  11:11 30:22 72:24
  73:10 76:25 77:3
  78:3 89:21 174:22
  230:20,23 231:13
  231:15 241:5,7,18
  241:21,25 283:25
sequence 94:7
series 10:17
serious 25:12
seriously 126:22
serve 224:18
served 51:22
service 10:8,13
  65:5 134:12 143:7
  143:13,21 145:4
  153:22 157:9
  158:9,14 159:8
  181:14 237:6
services 10:7 14:4
  14:5,7,10 99:5,18
  116:1 122:6,15
  127:2,10,13 248:9
  254:18 257:18
  266:8
set 10:25 12:12
  63:2 70:10 71:22
  84:8 93:23,25
  97:24 136:12
  208:4 215:3

217:23 219:17,24
227:15 229:11
230:8 241:2,7
242:3
**sets** 71:18 213:16
228:16 245:16
**setting** 17:15
139:8
**settled** 114:20
235:24
**settlement** 12:9
12:11,16,18,20,25
12:25 13:2,4
30:10 40:1 115:13
220:10 235:20
238:6,9,11,20,24
280:4,14,17,19,20
**settlements**
226:21 235:10
**settling** 64:12
**setup** 273:5,13
276:8
**seven** 204:25
205:12 213:22
**shai** 4:19
**shake** 34:16
**shamah** 6:12
**shannon** 10:15
**share** 96:17
127:25 180:15
181:7 192:24
194:4
**shared** 41:7 86:5
96:6,15 104:9
106:20 211:22
**shareholder**
26:19
**sharing** 118:17
119:8 171:16
172:11 186:17
**sheet** 68:22 69:1,5
72:5 95:21,22
96:6 177:7

**shelf's** 121:1
**sherry** 211:8
**shift** 38:5 84:25
**shifted** 20:14
**shoes** 44:13
**shook** 92:13 101:2
**shoot** 120:10
225:7,8 245:3
**shore** 73:5
**short** 54:23 120:8
120:11 128:8,15
131:13 182:25
269:21
**shorter** 147:20
202:1
**shortly** 169:4,6
230:15 235:12
**shot** 229:18
**shouldn't** 274:7
**shove** 120:25
**show** 10:13,15,19
11:11 12:5,22
13:11 14:3 15:2,9
18:6 19:14,18,23
36:21 39:9,12,14
112:12 148:9
192:17 234:22
**showed** 164:13
**showing** 36:20
**shows** 19:5 36:12
195:5,9
**shut** 31:4
**side** 12:4,6,11,21
13:15 14:7,23,24
15:1,7,10 19:7
28:7,8 49:5,5 68:2
79:4,6,6,7 83:6
106:13 123:15,18
124:7,12,23 125:1
125:8 126:1
149:10 154:20
169:5 175:24
176:17,19 177:4

177:11 180:20,24
184:15,19 185:1
191:13 192:4,5,5
196:10,24 198:10
198:11 199:10,13
200:6,6 202:12
215:6 242:4
271:11 272:8
279:5,7,8,10,15
279:18,20,23
280:3,12
**sideboard** 132:18
**signed** 70:11
72:11
**significant** 20:6
40:17 48:2,20
59:12 95:18 99:24
112:6 113:10,13
115:11 185:16
206:21 246:15
274:23
**significantly**
45:20 46:6,7 82:1
85:4
**signing** 233:5
235:12
**signs** 49:17
**silence** 93:3
**silent** 83:23 100:2
100:7
**silo** 63:7 70:5,5
**silos** 58:22 59:4
62:25 72:10 82:10
**similarly** 185:1
**simon** 3:8
**simple** 8:3 14:17
32:9,11 247:16
**simplify** 44:2
**simply** 8:6 14:18
20:11 27:12 82:8
182:6 204:25
216:19,25 218:16
267:13

**simultaneously**
65:6
**single** 42:24 92:23
93:8 161:3
**sir** 56:19 57:4,8
58:16 60:9,22
61:18 64:18,22,25
65:12 66:1,5,10
66:15,22 67:6,10
67:13 68:5,10,25
69:3 70:18 71:5
71:12 72:12,23
74:16,22,25 76:3
76:13 79:15 81:18
83:9 91:7,20 92:6
92:11 93:7,11,19
95:3 96:8 99:3,10
99:15,17 101:9
102:25 105:8
107:5 108:1,5,13
109:8,15 112:4,19
112:22 113:21
115:5 116:25
117:17 118:19
120:17 128:1
129:20 132:25
133:8,14,17,19
134:2 135:8,21
137:11,23 140:14
140:23 141:2,19
142:4,7 143:20,25
144:7,11,18 145:1
148:12,13 150:3
152:14 153:6,21
156:4,16,20 157:6
158:6,18 161:21
164:19,24 165:8
169:12,13,14,20
169:25 170:20
171:1,9 172:16
174:7 175:6
176:25 177:15,23
177:25 183:2,14

183:20,24 185:4
186:10 187:19
188:19 190:11
196:2,9 200:17
210:16,18 211:11
211:22 224:7
229:12 239:25
240:2,20 241:12
242:17 243:6
245:15,18,22,25
247:4,15 248:14
248:18 249:9,19
249:22 250:11
251:6,23 252:5,13
252:19 255:8,17
255:22 256:5,14
257:24 258:8,25
260:9,25 265:7
266:4,21 267:20
267:24 268:19
271:20 272:17
274:22 275:21
277:2 279:6
**siri** 97:17
**sit** 45:24 118:7
203:9 249:6
**site** 214:9
**sits** 17:12 19:25
21:18 22:5
**sitting** 30:23 45:9
49:19 51:2 103:20
155:25
**situated** 185:2
**situation** 97:13
98:9 100:1,3
**six** 80:16 190:21
194:1 213:14,16
213:19
**sixty** 190:12,13
**size** 55:25 187:2,3
**skew** 97:14
243:20 256:23

**skewed** 98:21
**skewing** 97:23
98:23
**slanted** 8:24
**sleep** 281:25
**slide** 7:21 18:4
22:7 23:12 32:4
36:10 44:6,7
242:10,10
**slides** 7:16 18:5,5
**slightly** 65:20
**slow** 68:8 125:12
182:22 224:9,14
225:15 258:6
**small** 43:6 77:1
83:20,24 97:19,21
98:12 254:21
**smaller** 46:2
147:20
**sold** 138:11 140:2
140:8 163:10
**sole** 50:25 164:15
217:16
**solely** 12:15 37:11
37:15 41:9 145:23
163:23 209:22
210:8 215:24
245:23 247:5,9,17
247:17,22
**solicit** 175:24
176:15
**solidified** 92:1
**solution** 163:8
**solutions** 275:1
283:20
**solvency** 172:16
172:16 173:9,12
175:10 271:18
**solvent** 42:7
172:22 271:15,17
273:4
**somebody** 45:9
118:23 180:3

270:3
**something's**
225:17
**sontchi** 1:22
175:19
**sontchi's** 125:14
**sonya** 2:25 283:3
283:8
**soon** 54:24
**sooner** 270:2
**sorry** 25:11 27:18
30:25,25 34:20
35:1 55:19 60:8
68:6 71:16 72:21
73:24 75:15 86:22
89:16 96:13 104:8
104:20 110:3,3,25
110:25 119:1
123:1 125:10
126:8 129:7,9
131:18 136:7
140:5,7 142:25,25
144:9,14 145:10
157:19 170:20
182:20 183:9
190:13 198:2
208:20 213:1
220:21 223:4
240:7,13 242:19
249:24 250:7
259:24 262:22
264:25 269:20
274:1,7 280:7
**sort** 20:18 205:7
**sound** 206:10
**sounds** 91:17
97:11 172:6 175:2
175:5 190:8 198:9
209:25 210:1
278:23
**soup** 265:8
**speak** 100:5 170:2
256:11 281:19

**speaking** 148:10
218:24 270:7
**special** 251:16
**specific** 17:24
41:13 62:23 84:14
97:3 107:5,8,8
115:6 121:13
133:6,7,9 134:6
136:15 161:6
213:10 214:20
216:6 222:14
245:23 257:22
259:16 267:12
269:5
**specifically** 8:16
19:20,21 22:8
26:7 39:1 43:11
43:15 74:14 96:3
96:10,16,19,22
102:16 103:19
107:12,24 108:3
113:25 118:22
123:7 124:3 125:9
125:16 127:4
164:10 171:22,25
177:3 185:7
188:21 199:5
201:22 211:15
215:6 259:18
265:24
**specified** 103:16
**specifies** 258:8
**spectrum** 108:7
**speculation** 19:1
52:14
**speculative** 17:25
27:1
**spell** 130:1 165:14
223:23
**spend** 24:6 119:23
242:13
**spending** 276:7

**spent** 113:16
135:11 234:4
276:17
**spilled** 119:12
**spin** 84:18 182:17
**spinoff** 151:8
183:19
**split** 42:10,12
47:25 69:18 77:12
84:5 121:16,21
122:18,19,23
**splits** 38:17
**spoke** 89:4 231:15
232:4 268:22
**spoken** 104:9
255:1,2
**sports** 51:12
**spring** 278:4
**staff** 183:1 243:22
**stage** 82:24
**stakeholders**
51:18 70:16
**stale** 77:17
**stand** 55:17
129:18,20 165:8
183:22 212:17
215:14 223:12
227:9 263:3
**standard** 10:6,15
50:4,7 184:2,11
244:19,25 247:11
**standards** 10:17
29:12 245:5
**standing** 38:11
49:6 129:20 165:8
223:16
**standpoint** 42:4
**stands** 163:6
**start** 14:22 88:3
127:21 166:21
169:9 201:17
234:1 242:15

**started** 28:2 30:8
105:4 169:7
225:19 234:1
253:11
**starting** 177:15
213:14 228:25
**starts** 170:25
177:14 211:13
**state** 56:8 99:18
130:1 134:19
138:7 142:14,17
142:23 143:6
145:11,15,19
146:11 165:14
170:15 182:16,16
183:18,18 199:2
214:13 221:5
223:23 225:22
261:5 267:23
**stated** 158:2 184:7
218:17
**statement** 7:12
11:6 15:24 35:2,3
45:17,22 51:22
57:18 64:17 65:4
65:6,7 75:1,1,5,20
76:9 77:16 83:15
89:11,23 100:15
151:17 153:4,17
155:16 173:2
174:4,5 182:14
183:16,22 211:24
212:4 240:21,24
241:15 253:25
272:2
**statements** 14:8
58:14 61:1 65:1
65:12 75:22 76:22
77:5 104:16 105:4
105:24 113:23
114:2 127:6
172:24 173:1,16
173:24 174:1

220:8 226:23
232:11 243:3
255:15 260:16
**states** 1:1,11
95:16 156:24
158:25 169:22
184:8,15 253:15
**stating** 50:24
219:10
**status** 139:20
**statute** 18:16
**statutory** 10:6
209:17
**stay** 25:16 165:20
171:7 224:5
227:13,13
**stayed** 39:3
**stein** 4:18 120:18
120:19,22 121:8
121:10 126:5
**steinhagen** 6:13
**step** 127:19
146:23,25 148:24
151:20 152:16,20
153:19 155:21
156:7 157:11
158:15,19 159:18
160:17 163:12
178:11,15 179:1
179:20 180:1,4,13
180:16 181:16,20
181:24 184:1
188:6 189:10,21
189:24 195:24
197:6 201:9
208:15,21 210:7
273:10,15 275:2,3
**stepped** 148:5,16
152:25 153:23
154:9 236:5
279:12
**stepping** 81:4

**steps** 58:16
100:12 138:23
155:19,20 156:1,5
181:15 255:22
**sticking** 170:22
**stilted** 103:6
**stipulate** 80:6
**stock** 208:18
216:12
**stockholders**
208:6
**stood** 11:18 44:18
45:17
**stop** 269:22 270:2
**stopping** 225:8
**stops** 164:4
**stranded** 116:8
153:24 154:5
155:6,22 156:7
157:12 161:15
164:12 181:17
184:9 186:4
**strands** 154:10
**street** 1:12
**strength** 220:2
**strengths** 214:1,5
215:5 220:9
**stricken** 58:1
216:5 220:8,10
221:23
**strike** 57:14,20
204:4 206:22
213:15 220:21,23
223:2 243:2
**striking** 228:14,15
**strom** 34:15
**strong** 176:5
**stronger** 203:18
**struck** 23:22
**structure** 17:12
21:19 22:5 37:23
81:7 176:16
208:10,12,15,20

211:19,21
**structuring** 81:18
**struggled** 24:7
**struggling** 193:7
196:9
**stuff** 59:15 73:9
165:21 193:9
**subheading** 157:2
**subject** 8:17 92:8
132:8 133:13
136:5,7,10 171:16
210:8 211:13,15
228:7,13
**subjects** 39:25
**submission** 57:5
58:13 74:11
217:18,24 218:5
218:18 219:17
227:16 228:16
**submissions** 51:21
219:17
**submit** 50:7 64:15
65:6
**submits** 65:1
**submitted** 42:19
59:10 63:14 66:12
66:13 90:8
**submitting** 135:6
**subpoena** 224:18
**subsequently**
11:23 12:2 20:21
27:11 28:22
**subsidiaries** 63:9
81:16
**subsidiary** 17:10
20:13 26:14 63:4
139:13
**subsidiary's** 17:9
**subsidiary's**
139:16,17
**substance** 120:11
183:2 282:6

**substantial** 8:13
9:18 10:12 11:24
13:25 14:22 15:6
42:17,22 43:7,21
214:7 231:11
234:11 236:15
**substantially**
28:17 235:3
**substantiating**
42:10
**substantively**
25:19
**substitute** 39:16
**succeed** 154:14
**succeeded** 114:9
**successful** 28:19
29:16 173:6
234:23
**successfully**
169:23
**sue** 109:6
**sufficient** 14:19
39:13 158:9,14
159:13 204:14
**suggest** 142:21
143:6
**suggested** 138:2
191:12 194:16
**suggesting** 137:25
195:7,21
**suggestive** 10:4
**suite** 283:22
**summarize** 61:18
166:15
**summarized**
116:23
**summarizes** 113:1
**summarizing**
219:6,9
**summary** 18:9
65:22 75:21,23
111:6,9,12,14,15
111:16,20 116:20

116:22
**summer** 151:1,5
253:5 256:3
**supplemental**
55:10 223:6
**support** 11:18
26:5 38:15 42:2
57:5 58:20 68:13
69:5,8 70:8,12
71:22 72:1,5,10
95:20 96:7 103:22
141:21 204:18
217:23 220:3
**supported** 39:23
41:22 219:19
**supporting** 177:1
**supports** 17:6
22:14 50:14 52:12
215:23
**suppose** 192:9
**supposed** 207:18
**suppressing** 137:2
**supreme** 17:20
**sure** 18:14 29:5
47:6,8,9 53:7,19
56:10 58:10 79:14
88:10 89:7 91:12
94:7 98:6 101:9
109:16 119:10
122:14 135:21
154:3,7 166:17
181:22 182:24
188:4 189:16
195:14 224:8
246:8,10,12
264:11 267:17
270:20 272:13
274:14 280:25
**surfaced** 204:13
**surprise** 119:25
196:17
**suspect** 64:23
95:24 96:4 104:6

**suspiciously**
93:21
**sustain** 38:20
222:4 223:2
**sustainable** 82:8
**sustained** 263:5
277:20,20
**swing** 57:17 84:23
85:7,11,14,15
97:23 111:25
112:9
**switch** 236:16
**switched** 101:21
**sworn** 223:18
**synthesize** 281:15
**system** 98:15
236:3

**t**

**t** 49:5 79:6 83:6
169:5 184:19
185:1 192:5
196:10,24 199:9
200:6 223:25
283:1,1
**tab** 56:24 94:3
99:12 112:15
116:5 123:6
133:16 144:6,7
169:12 170:22
227:23 239:25
240:1,4 242:17,20
245:11,12,13
249:24
**table** 45:1
**tablet** 56:1
**tabs** 231:4
**tactics** 230:4
**tag** 47:18
**take** 20:24 26:1
33:10 45:24 46:23
47:17,21 54:23
65:18 84:13,15
87:13,23 98:7

100:12 101:10
104:23 106:4
120:8 127:21
129:19 137:13,23
147:5 151:18
153:17,18 155:19
156:1,5 165:7
170:12 179:5,23
181:15 182:23,25
188:21 191:21
199:4 200:19
202:10 207:20
215:14 217:7
221:6,18,21
223:16 225:17
229:3 245:8
247:25 255:22
270:4 275:3
280:25
**taken**  46:24
211:25 218:5
269:15
**takes**  21:5 85:13
119:23 225:18
229:25
**talk**  24:12 79:12
96:12 97:5 120:14
175:22 189:14
198:10 206:23
207:2 227:12
268:20,21 269:12
**talked**  25:13
54:22 97:23 104:7
104:7 106:6,10
111:25 156:6
197:9 267:2 269:6
269:7
**talker**  224:10,14
**talking**  9:5 25:3
28:1 68:15 80:2
89:13,14 110:6,7
157:23 158:15
159:3 192:21

201:13 202:9
225:15 236:8
242:14 247:19
255:7
**tangential**  235:15
**target**  54:23
**tasked**  276:15
**taught**  225:18
**tax**  8:8,9 15:23
39:25 40:4,13
115:25 116:8,13
116:14,17,21,23
117:11,17,18,19
117:21 118:13,17
119:8,12,15,18
133:3,9,24 134:8
134:12,17 135:2
136:5,7,11,18
137:20,24 138:1,2
138:4,11,15 139:2
139:6,9,12,20
140:15 142:14,18
145:24 146:8,12
147:25 148:3,24
151:24 152:1,6,12
153:11,18,24
154:6,10,15,19,23
154:25 155:4,7,16
155:22 156:7
157:6,12 158:6
159:5 160:16
161:15 163:8,13
163:24 164:4,12
169:24,25 170:6
171:8,15 172:11
176:5,6,10,10,17
176:19,23 177:4
179:5,12 181:3,7
181:17 183:18
184:2,9,11 185:10
185:17 186:4,17
186:25 187:2,23
188:11,12,23,25

189:1 192:18,20
193:5 194:21,23
195:5,8,11 196:8
197:13,15,17,20
197:23,23 198:1,5
198:8,11,12,25
199:1,1,3,8,14
203:2,7,14 204:17
204:22 205:5,6,7
205:12 206:7,16
207:2,5,5,14
208:17,21,24
211:16,20 238:16
255:15 260:14
273:15 274:23
**taxable**  8:3 40:6
40:17 117:2 133:4
133:10,25 134:18
134:20,23 137:18
138:12 140:9
142:18 147:4
148:4,15 151:8,8
152:7,11 153:1
154:5,19 155:8
160:16 161:4
163:10,14 176:17
177:2,11,19,21
178:8 182:17
183:19 184:15
185:8 187:24
188:10,15,25,25
189:3,3 193:2
195:3,22 196:1,13
196:15 199:9,23
200:7,11 201:20
202:11 203:11,17
203:19,21 204:8
204:11,13 207:14
207:19,20 208:16
231:4 273:6,6
**taxation**  131:1
**taxed**  211:17

**taxes**  117:1 118:4
118:17 119:8
137:12,18 235:18
**tceh**  11:16 12:17
40:1 63:3 65:10
69:12 70:16 73:4
76:1 77:11,17
78:3 81:15 83:10
83:21 84:4,18,20
85:2 95:3 98:15
99:4,19 101:8
105:6 113:2
116:12 152:7
184:21 220:10
241:5 280:6,15
**tceh's**  101:14
**tch**  155:8 168:20
192:2 237:8
**team**  39:12 58:11
63:24 64:4,8,19
84:23 111:11,19
179:16 243:22
**teasing**  258:6
**tech**  254:14
**technically**
139:13
**technique**  257:23
**telephonic**  129:3
**telephonically**
5:18
**tell**  73:2 94:3
112:8 129:22
165:10 223:20
233:16,16 241:2
266:16,16 278:5
**telling**  143:24
150:8 192:6
**tells**  51:13
**temporary**  138:18
138:22
**ten**  281:5
**tens**  64:1

**tension** 234:20
**term** 48:5 67:3
  68:22 69:1,4 72:5
  82:8 95:21,22
  96:6 207:23
**terminate** 52:22
  115:9
**terminated** 72:6
  73:16,19 77:9
  202:7
**terminating** 77:10
**termination** 8:11
  10:18 15:13 21:9
  21:16,21,25 22:1
  25:20,24 26:18
  34:23 43:8,15
  44:14 218:23
  228:25 229:21
  230:22
**terms** 33:1 38:3
  79:17 110:9
  111:10 139:18,19
  177:7 206:12,22
  241:22 247:20
  254:15 258:23
  260:23 261:4
  279:13
**terrible** 179:24
**terrific** 239:13
**test** 171:20,22
**testified** 40:15
  47:25 91:4 92:19
  93:18 97:6 108:4
  113:15 116:7
  124:4 127:1
  135:24 136:18
  142:17 147:3
  162:23 164:2
  203:13 214:16
  236:17 249:7
  277:22
**testifies** 217:22
  219:14

**testify** 26:6 150:4
  164:9 214:12
  216:8
**testifying** 38:16
  91:13,16 135:22
**testimony** 34:16
  45:9,11 47:3 49:6
  56:17,20 74:3
  89:4 91:8,12
  92:21 93:21
  101:19 105:8
  108:5 111:6
  115:24 116:19
  117:5 118:16
  120:12 130:11
  131:6,19 133:1
  136:9,11 137:23
  137:24 138:7
  139:15 161:20
  162:9 166:25
  183:3,13 194:20
  195:9 206:7,12
  207:17,21 212:16
  213:4,7,15,15
  214:10 215:4,13
  215:19,20 216:1,5
  217:8,19 218:3,9
  218:12,15,15,18
  218:19 219:3,4,9
  219:25 220:7,24
  221:7,12 222:9,21
  222:22 227:21
  236:19 237:23
  243:2 246:2 253:7
  258:25 261:17
  262:10 267:7
  268:22 282:6
**tev** 32:14,24 34:7
  150:16
**texas** 152:15,20
  152:24 180:12
  181:2,6,14 192:23
  194:3 195:15

209:10,11,14
  211:3 212:1
  224:14 258:4
**thank** 7:14 16:4,5
  32:7 43:23,24
  50:15,16 54:17,21
  58:6 61:17 67:25
  68:24 73:24 88:16
  91:4 94:6 120:4
  120:24 121:5
  126:7,11,12,13
  127:17,19 128:1,2
  128:17 129:11,13
  141:19 144:14,23
  159:23 161:25
  164:19,20,21,24
  165:18,19 166:1,2
  166:5 167:15
  170:22 183:5
  205:15,22 212:10
  212:11 216:9
  217:2,14 221:2,16
  221:21 224:1,2,4
  224:7 229:7 239:3
  242:3,5,13,24
  263:7 265:2 270:5
  274:6,22 280:22
  280:24 282:7
**thanks** 55:22
  168:5
**that's** 46:16
  134:10,21,24
  135:23 137:20
  139:23 143:10
  145:7,21 147:22
  148:7,7,22 149:2
  149:7,16,18 150:2
  150:20 151:16,22
  152:3 153:20
  154:1,11 156:3
  158:5,11,17 159:4
  159:9,14 160:20

160:24 161:12,16
  161:19 164:7,15
  175:17 177:25
  178:10,22,23
  179:15,16,18,24
  180:2,4,8 181:5
  182:11
**theoretically**
  196:19 202:10
**theories** 142:23
  143:6 145:8,11,15
  146:3 170:15
**theory** 98:7
  100:20 143:13,21
  143:22 145:4,6,16
  145:18,19,20
  264:23
**thereabouts** 116:4
**thereof** 133:5,11
  134:1
**there's** 142:21
  154:5 155:5 156:7
  158:12,25 165:22
  170:25 182:2
**thing** 21:11 52:16
  98:21 215:14
  223:1 239:21
**things** 10:4,20
  64:12 92:1 119:23
  174:12 194:25
  204:2 214:17
  215:3,11 259:10
**think** 8:4 9:3,17
  9:22 13:8 15:8
  19:19 20:6,8
  24:22 27:22 28:14
  30:1,20 31:7,25
  32:18 43:13,25
  44:8 45:3,7 46:18
  46:19 47:20 48:24
  52:5 54:19 61:21
  66:25 67:1,3,7
  70:4,6 76:17,19

78:24 80:7 89:8
97:7 98:21 100:22
101:3 102:3,17
104:19 108:18
110:16 113:7
116:16 118:11
121:3 124:3
125:13 126:11
128:14 131:17
137:11 147:14
154:8 164:3
176:19 183:12
185:15 190:5
191:9,15,23 193:4
194:19 195:2,10
200:12 201:23
203:13,13 204:16
206:9 207:7 208:9
208:22 212:15
214:18 215:12,15
215:19 220:18
221:18 223:1
225:4 226:24
227:11 231:8,10
231:14 232:2,16
233:1,8 234:10
235:5,7 238:4,7
241:20 242:9
243:10 244:11,11
244:18,19,25
245:1 248:3
252:25 253:4,16
257:4 259:13
260:9,21,25 261:6
262:5,6,21 263:13
267:1,4 270:7,19
272:1 274:4
275:14,21 276:4,4
276:5 277:12,17
277:25 278:12
279:13 281:9,14
281:23

**thinking**  116:23
207:6,10 218:11
**thinks**  216:7
**third**  8:21 22:18
25:14 33:23 51:11
53:10 54:1,5
64:11 70:22 119:5
144:6,7 174:21,25
191:2,4 198:6
214:8,22 219:22
231:19
**thirdly**  243:21
**thirds**  60:11 187:4
**thirteen**  75:16
**thirty**  86:21
**thompson**  223:7,7
223:11 224:17,24
225:2,11,21
227:14 228:6
229:12,13 239:4
**thorough**  52:13
**thought**  47:2,4
51:2 72:17 83:17
97:25 98:4 100:17
140:21 193:5
200:3 203:10
209:5,16 238:1
261:24
**thousands**  64:1,2
**three**  11:13 59:20
61:21 62:6,25
72:10 86:21 94:4
94:5 95:2 183:14
197:21 213:19
218:18
**throttle**  50:20
**throw**  25:11 245:3
**tie**  84:6
**tied**  82:22 179:7
**tilting**  99:1
**time**  10:7 11:8
22:11,12,21 23:5
23:6 24:5,9 25:19

26:2 27:10,21
31:18,19 36:13
37:8 42:20 44:14
44:17,22 45:6,10
45:14 46:6,22
47:11,15,16 53:14
59:16 61:5,23
62:2,6,25 63:12
63:12,22,23 64:2
64:4,7,9,11,12,19
64:20 65:16,18
66:22 67:4 69:22
70:2,14 71:1 72:2
72:4,11 73:12
75:24 76:18,23,24
77:1,2,14,16,20
77:20,25 78:5
79:4,12,16 80:4
81:25 82:2,4
84:18,21 85:4,23
86:14 88:1 89:6,7
89:11,17,24 90:2
90:5,5,10,19,21
91:25 92:15 93:16
94:18,24 95:11
98:2,15,16,18,19
98:20,22,22,25
103:17 104:19
110:10 111:13
112:1,5,6 113:16
113:25 115:1
117:12,13 127:7
127:12 128:13,15
129:17 132:8
135:10,10,13,21
147:19 162:5
167:16 168:14
172:22 174:18
179:5 185:5
191:12 192:3
199:6,9,13,19
200:2,13,17
201:18 202:16,22

206:13,15,15
221:21,22 225:9
228:6 230:5,6,14
230:18 233:3,5
234:4 235:8 239:5
241:23 242:14
253:2,4,5,21
254:12,18,24
255:20 256:20
257:17,17 259:5
260:3,12 263:17
263:19 266:5
270:4,6 271:15,17
272:6,13,23 273:1
276:7,16 277:4
278:3,9,20
**timeframe**  73:10
231:15 241:2,7
256:5
**timekeepers**
58:18 59:9 61:19
94:23
**timekeeping**
225:12
**times**  14:4,19
33:19 80:2 85:9
106:7 119:20
202:21,21 260:7
260:21 273:19
**tina**  6:8
**tinkham**  279:12
**titled**  240:1
**tma**  236:4
**tmi's**  200:10
**today**  7:10 16:13
17:5 23:2 25:16
31:21 42:22 45:24
47:14 49:15 50:21
56:16,17,20
102:19 103:20
111:6 118:7
121:11,23 131:6
155:25 164:9

166:24 224:21
225:5 227:21
241:15 246:1
252:10 259:1
**today's** 27:23
42:18 50:22
**today's** 129:6
**told** 97:17 151:3
224:8 255:2
**tomorrow** 7:10
281:10,16,22,24
282:8
**tools** 185:19
**top** 36:24 53:15
54:7 57:1 192:11
200:15 210:20
211:12 241:17
**topic** 277:1
278:21
**topics** 83:3
**torres** 4:13 16:10
120:19 160:1
213:2
**total** 32:13 34:7
45:2 90:24 107:2
150:17 199:3
231:13 237:12
275:18,20
**touched** 80:24
**toys** 127:24
**track** 62:25 71:23
71:25 78:19 223:5
254:22 255:10
**tracking** 254:24
257:25
**tracks** 71:21
188:22
**trade** 61:25
**traded** 273:2
**trading** 14:12
30:6 173:18,21
174:7,8,19 272:24
272:25

**transaction** 8:3,5
8:8,10 11:2,9,18
13:5,23 15:23
20:18 22:3,10,13
22:23 26:7 28:20
32:1,3 33:6,22
36:8,13 37:9,11
40:6,9 41:10 43:1
44:16,18 98:18
119:16 122:20
136:12 137:12
142:19 147:6
151:4,8,11 152:6
153:1,24 154:10
155:9 157:12
158:20,22 160:16
160:16 161:4,14
163:9 164:11
176:5,6,10,17,19
176:23 177:20,21
178:1,4,8 181:17
185:8,10 188:10
188:23 190:3,19
192:8 193:2,3,3
193:11 194:23
195:3,12,19,23
196:1,8,13,15
199:9,14 200:7
201:9,20 202:12
202:12 204:4,7,17
204:22 205:7
207:5,19,20
208:16 212:2,5
231:5 235:12
236:10 241:22
260:15 273:17,18
274:25 275:6,10
276:9
**transactions**
150:23 163:5
172:25 173:5
174:3,13,13
175:18

**transcribed** 2:25
**transcript** 32:15
144:5,6,8,22
162:1 246:6,19
249:21 283:4
**transcripts** 259:1
**transfer** 135:25
**transferee** 145:19
**transferee's** 147:9
**transferor's**
147:10
**transferred** 48:1
**transfers** 216:12
**transition** 170:23
**transmission**
149:19
**treasure** 139:5,8
**treasurer** 217:20
226:8 269:1,2
**treasury** 138:8,10
138:14,18,21
139:1 157:10
163:3 181:15
**treat** 56:14 93:11
**treated** 90:4
139:11 147:6
**treatment** 82:5
**tremendous**
238:21 273:5
**trial** 17:2 18:2
30:13 36:19 42:9
47:25 215:9 222:7
222:13 224:18
**trickle** 28:16,17
**tried** 32:10 33:20
64:10 191:24
236:5 237:15
244:4
**trigger** 164:12
**triggered** 163:25
164:5 205:6,7
**trouble** 208:7

**true** 27:17 57:9,22
61:10,12 67:16
75:4 83:18,18
131:22 143:20
145:21 146:9
159:15 167:6
185:11 186:9
196:12 199:11
228:3 283:4
**trust** 157:5 216:24
268:17,19
**trustee** 2:2 5:2
11:14,25 44:11
62:3 88:9 128:22
216:12,24 237:21
**trustee's** 132:6
**trustworthy**
233:24 243:17
256:24
**truth** 129:22,22
129:23 165:10,10
165:11 223:20,20
223:21
**try** 51:15 82:4
120:9 128:6
168:14 231:23
234:19 263:5
**trying** 49:23,24
49:25 50:1 62:22
115:2 119:24
199:16 221:6
226:21 234:19
250:13 260:15
**tsa** 186:20
**tucked** 49:13
**tune** 29:9 82:7
**turn** 37:16 56:23
60:7 68:3 71:12
93:25 94:21 99:11
112:14,18 116:3
123:5 133:19
141:2 144:18
153:3 160:6,8

161:20,23 169:13
177:13 210:18
218:1 227:23
**turned** 57:19
83:18
**turning** 35:24
46:12 48:24
234:11
**turnover** 238:8
**turns** 51:3
**tweaks** 115:18
**two** 11:24 20:17
28:12 36:21,24
37:2 60:11 62:5
74:23 79:23 83:3
84:12 95:2 103:1
103:3 108:18
110:17 126:14,18
128:24 142:9
166:22 173:13
185:12 187:3,14
188:24 195:5
199:5 200:5,10,18
200:20 202:3
207:3 211:8
221:13 237:20,20
237:25 238:17
252:10 254:13,14
266:14,14,19
267:13 270:17
**type** 201:9 221:5
236:12 260:14
**typically** 258:22
**typo** 141:16

**u**

**u** 56:10
**u.s.** 1:23 62:3
237:21
**ultimate** 214:10
215:1,8 218:4
222:9,10,16,22
**ultimately** 15:20
22:12,18 25:18

27:19,20 28:9
30:18 36:4 37:11
37:13,16 49:4
52:12 69:24 70:13
76:22 78:2 81:13
82:11 83:18 84:5
90:1 136:22
159:16 174:24
202:7 220:12
234:5 238:9
256:20
**umb** 2:1 7:7,8
74:11 79:15 83:4
87:18 128:22
129:16,17 132:25
133:24 217:7
239:20 242:17
**unanticipated**
163:5
**uncertain** 171:17
**uncertainty**
273:15
**unclear** 44:1
**underlying**
185:23 218:17
**underpinnings**
214:20 227:12
**understand** 10:14
30:4 42:21,22
54:6 89:6 91:12
91:20 107:1
112:22 113:21
117:15 118:25
119:7 150:10
154:18 155:4
157:22 169:22
171:1,1,4,14
175:23 183:11,24
195:14 198:20
199:25 209:20
210:6 215:9,10
228:19 239:5
247:9,15,16 254:6

257:24 258:8,13
258:19,22 260:1,8
260:17 263:7
264:11 271:20,25
272:3,15,17
273:21
**understanding**
37:10 41:19
111:20 117:4,9
118:5 123:24
140:14,20,23
150:25 164:8,15
176:2 186:12
196:25 200:1,9,12
205:5,13 207:23
208:17 211:25
212:4,6 219:4,8
247:1 254:12
255:4,8 256:8,10
259:4,20 263:17
263:19 265:20
**understood** 22:12
46:14,14 63:24
92:21 93:7 99:25
99:25 108:5 183:4
184:7 185:16
195:7 227:14
275:5
**undertake** 172:1
**undertaken** 220:1
**undertakings**
206:25
**undertook** 219:16
**undo** 42:11 49:24
49:25 50:1
**undone** 20:21
**unenforceable**
118:23
**unfair** 8:20 98:1,3
100:18 101:5
**unfortunately**
32:5 64:23

**unhinged** 44:9
**unimpaired** 28:3
28:8,15 29:10,21
48:11 52:20 53:5
53:8
**unique** 59:2,20
62:7
**united** 1:1,11
158:25 184:8,15
**university** 130:19
130:20
**unlawful** 16:14
**unproven** 42:3
**unreasonable**
268:9,12,12
**unsecured** 14:11
40:16 53:7,16
69:12,13 79:25
113:23 123:2
186:18 275:18
**unsecureds** 53:21
205:10
**unsuccessful**
28:23
**unusual** 21:11
**unwinding** 50:8
**update** 241:4
**updated** 94:13
**upper** 68:1
**upstream** 21:25
**upstreamed** 26:3
**urge** 43:12
**usc** 18:17
**use** 9:21 13:16
48:5 52:6 59:16
62:22 67:3 68:2
88:8,11,14 93:24
98:6 103:15
132:15 143:7
157:3,4 167:21
179:13 193:10
211:20 214:14

**uses** 258:19
**usual** 14:23
**usually** 59:19
75:21 225:18
**usurping** 215:7,21
**utilities** 163:4,6
163:11,13
**utility** 149:19
152:15,19,24
180:12 181:2,6,13
182:10 189:11
192:22 194:3
209:11,13 211:2
212:1 275:2
**utilized** 236:2,4
254:23
**utilizing** 235:18

**v**

**v** 214:9
**vague** 50:5 261:11
261:12 263:1
274:4
**vain** 224:9
**validity** 74:6
**valuable** 147:11
**valuation** 172:19
174:8,16 182:9,9
**value** 8:9,12 11:4
11:5,22 17:2
22:16 25:23 33:5
35:1,4 37:5 45:3
47:17 48:2 114:12
119:22,24 147:9
147:17 148:23
149:16 150:5,14
150:15,17,19
151:12,15,16,18
154:25 173:20
174:9,11 175:11
176:20,23 178:15
179:2,7,12,14,19
179:22,23,25
180:6,13,15,23

181:25 182:2,4,4
182:11 188:6,22
189:10,20,21,24
189:25 190:2,15
190:16,22 191:7,8
191:11,21 192:7
192:13,14,24
193:13,14,18,24
194:4,10 195:11
195:16,19 196:15
197:2,12 198:4,5
199:18 201:6,10
206:13 230:2
238:21
**valued** 40:9
**values** 181:23,25
189:15 190:7
192:10,11
**variable** 188:6
199:5
**variables** 200:18
200:18
**variety** 108:7
**various** 58:21
59:3 62:9 64:3
70:4 75:23 84:2
94:18 113:25
170:15 226:22
232:1,12,13
238:22 244:17
248:9 268:23
271:21 272:6,8,13
272:23 276:17
**vasquez** 220:17
**vast** 198:6
**veil** 109:13
**venter** 233:21
**verify** 268:14,18
268:19,21
**verifying** 269:10
**veritext** 283:20
**versa** 112:2

**version** 56:1
**versus** 26:9 38:8
79:6 84:7 122:24
207:14 237:12
257:25 277:14
279:16,17
**vice** 112:2 226:7,8
269:2
**vicinity** 104:6
123:4
**view** 16:25 25:21
37:2,12 38:18
39:16 72:7 99:4
121:17 122:23
162:23 163:23
176:9 196:14
216:15 232:5
237:23 244:21
245:22 247:2,10
256:23 264:7,14
274:22 275:7
276:7
**viewed** 25:13
113:16 214:17
**views** 216:23
244:16
**villareal** 6:14
**vinter** 6:17
**virginia** 127:23
**virtue** 17:14 19:25
26:22 29:14,16
40:24 42:24
**visited** 20:9
**visiting** 130:21
**vistra** 236:1 269:1
269:8
**vitae** 55:20
**volume** 249:20
250:7

**w**

**w** 130:3
**wachtell** 166:17

**wade** 145:24
**wait** 27:25 33:4
51:8 92:4 106:22
200:10 239:8
**waiting** 51:6
200:20
**waive** 53:18
**walk** 52:22 53:12
128:15 187:18
228:22
**want** 10:2 24:9,9
27:4 36:10 38:5
51:10 71:5 81:8
85:25 88:10
106:18 120:6,9
123:5,9 128:3
143:3,15 192:19
193:19 212:16
229:3,3,4 242:13
257:21 261:19
270:4 274:9,10
275:19 281:24
**wanted** 7:22
28:11 51:18 82:19
88:5 117:7 121:24
184:14 192:16
194:23 227:3
239:21,22
**wants** 15:22 27:6
216:6 221:14
262:22
**warrant** 259:12
**warranted** 244:5
263:11 267:12
268:1,5 276:12
**warranting**
266:25
**warrants** 243:4
256:16 267:14
**wasn't** 42:8 49:8
133:12 146:17
150:22 178:19
274:14

waste  24:9,10
watch  258:2
watching  115:17
water  46:16 120:6
  168:6
waterfall  19:25
  25:22 26:21 28:16
  40:24
watkins  137:1
way  11:6 15:10
  32:10 45:3 46:14
  47:21 50:2,11
  51:15 60:11 72:18
  84:13 90:13 93:15
  100:9 101:20
  107:23 108:20
  121:1 132:18
  138:2 155:3
  165:21 181:23
  185:9 192:19
  198:15 227:7
  243:20 247:25
  249:8 269:4
  271:20
ways  36:24 84:3
  105:6 203:17
we've  8:16 20:17
  36:15 68:18 94:7
  127:7 226:20
  245:13,17 270:1
weaknesses  214:1
  214:5 215:5 220:2
  220:9
weapons  145:25
week  61:6
weekend  230:23
weeks  15:8
weigh  185:10
  215:10
weighing  16:2,3
  82:11 213:25
  214:5 215:4

weight  220:13
weighted  213:20
welcome  129:12
  129:14 132:20
  217:4 221:17
  222:12
welsh  3:24 128:25
  129:1,2,8,13
  165:2,3,5,23
  166:1,3,5,7 167:9
  167:15 205:23
  206:1,5 209:1
  212:9
went  11:21 15:21
  25:24 29:19 34:11
  43:10 54:9,10
  76:20,21 83:22
  90:1 136:25
  166:19 172:7
  197:23 198:1
  206:15 213:17
  230:15 232:4
  234:7 256:19
weren't  150:22
  176:22
werkheiser  88:21
we'll  128:23
we're  147:16
  154:7 157:23
  158:10,15 168:14
  182:25
we've  159:3,8
whatsoever
  205:19
what's  132:17
  146:22 149:16
  179:12
whichever  275:4
wholes  22:10,11
  22:17 34:5 36:3
  37:4 41:8 53:6,20
  175:14 231:20
  242:12 273:7,7

274:24
wholly  139:10
wiggle  168:12
william  130:21
williams  135:24
williamson  6:15
  107:21
willing  82:20
  147:24 148:1
  153:12 178:11
  193:9,10 221:8
  273:10
willis  6:16
wilmington  1:13
  224:25
window  200:5
  202:10
wipe  205:9
wish  164:25
  216:13 217:4
withdrawn
  279:17
withdrew  11:15
  11:17
witness  38:11
  55:24 56:14,22
  88:18 93:19 99:13
  108:15 112:17
  128:23 165:6
  167:22 213:12
  214:24 215:20
  216:1 223:18
  225:3,10 239:12
  239:22 246:24
  249:13
witness's  218:20
  219:4
witnesses  38:10
  38:10 52:11
witnessing  20:3
wonderful  148:20
wondering  265:3

won't  159:23
  168:11
word  98:6 161:1
  247:19 258:19
words  18:4,10,16
  18:22 177:15
  273:3
work  8:20 14:18
  14:20 41:13,13
  42:4 49:3 51:16
  61:24 65:19,21
  67:10 92:16
  119:20 149:6
  150:3 151:1 164:9
  178:17 182:6
  184:25 190:18
  233:12,12 237:14
  238:4,5,5,18
  243:8,14,23
  254:18 255:13
  259:21 260:7,14
  260:14,18,22,25
  261:6 263:2,24,25
  271:15,17 273:5
  273:12,23 275:9
  275:23 276:6,14
  276:16,17 279:21
  279:23 280:3,13
worked  42:6,20
  78:14 161:11,17
  162:6 230:23
working  62:13
  64:3 92:18 251:15
  268:22
works  78:13
  123:3
workstreams
  80:23 81:18
  218:21 220:5
world  45:19
worried  267:20
worries  168:13
  246:14

**worry**  264:11
**worth**  47:23 74:12
  191:13 193:17
  203:11
**would've**  251:7
**wouldn't**  90:13,13
**would've**  148:5
  148:15 152:7
**wrap**  79:12
**wright**  251:17
  269:7
**write**  32:10 163:3
**written**  11:7 50:6
  99:11 101:11
  104:11 111:12
  115:23 116:3,7
  118:15 119:14
  123:6 130:11
  131:5,11,19,22
  132:1 135:6
  137:21,24 141:2
  145:12 147:3
  148:8,11,12
  151:23 156:11
  158:2,7 160:6
  165:24 167:2,3,7
  169:13 187:13
  212:21 217:18
  219:25 242:16
  267:8
**wrong**  28:25 70:6
  109:2,10,11,22
  113:7 137:25
  141:13 216:3
  264:12
**wrote**  33:23
  198:24

**x**

**x329**  210:18,20

**y**

**y**  165:17
**yeah**  16:6 25:5,8
  28:21 29:7 47:12

  54:8,9,9,9,10
  60:10,12 61:21
  76:5,7,10,16 79:1
  80:14 86:2 87:19
  91:18 99:21,23
  102:9 108:10
  112:8 113:12
  114:24 117:15
  118:5 120:6,8,24
  128:14 132:11,11
  135:5 164:3 168:9
  169:16 173:3
  174:6 175:5
  182:20,24 186:2
  188:9 190:8 191:3
  191:9 193:16
  196:14 197:22
  205:4 206:11
  209:18 212:18
  224:15 231:17
  240:12,18,18
  250:3 261:10,23
  262:3,17 264:9,13
  268:18 274:2
  277:8
**year**  179:10 200:5
  200:10 202:3
  206:9 231:16
**years**  16:25 28:12
  50:3 51:6 92:18
  103:4 130:24
  131:3 149:24,25
  166:22 172:8
  179:13 193:19
  197:17,21 200:21
  222:24 235:22
**yellow**  36:24
**yenamandra**
  50:17,18,19 51:17
  54:3,7,11,13,16
  54:18 76:20
  124:20 270:19

**yep**  168:13 173:17
  250:14
**yesterday**  129:5
  224:9
**yield**  25:21,21
**yielded**  36:9 184:9
**yields**  31:6 34:3
  34:22 37:6 190:24
  202:21
**york**  39:2 70:21
  70:25
**you'll**  148:9
**you're**  132:20
  141:8,13,21 142:7
  144:11 146:6
  147:15 150:10
  151:7,11,14,14
  154:23 156:7
  157:18,21 158:6
  158:24 159:5,10
  160:25 163:24
  166:12,24 170:6
  172:6,19 173:20
  173:24 176:13,25
  177:4,7,10,25
  178:6,10 179:19
  182:15
**you've**  135:17
  150:3 154:1 158:2
  161:11,13,17
  164:9 179:12
**yup**  229:6

**z**

**zero**  19:11 33:1
  34:3,3,19,19,20
  37:6 83:21 97:13
  97:16 198:25
**zukin**  166:20

**,**

**'s**  164:4 179:16