1  UNITED STATES BANKRUPTCY COURT

2  DISTRICT OF DELAWARE

3

4  In re:                          :

5                                  :    Chapter 11

6  ENERGY FUTURE HOLDINGS CORP., :    Case No. 14-10979(CSS)

7  ET AL.,                         :

8           Debtors.              :    (Jointly Administered)

9  _____:

10

11

12                              United States Bankruptcy Court

13                              824 North Market Street

14                              Wilmington, Delaware

15                              September 6, 2018

16                              9:38 AM

17

18

19

20

21  B E F O R E :

22  HON CHRISTOPHER S. SONTCHI

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO OPERATOR:  UNKNOWN

1    HEARING re Evidentiary Trial on Allocation Matter

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4        Attorneys for the EFH Plan Administration Board

5

6    BY:  MARK MCKANE

7        APARNA YENAMANDRA

8        MARC KIESELSTEIN

9        ANNA TERTERYAN

10       MICHAEL ESSER

11

12   NIXON PEABODY LLP

13       Attorneys for American Stock Transfer

14

15   BY:  MORGAN NIGHAN

16       RICHARD PEDONE

17

18   RICHARDS LAYTON & FINGER, P.A.

19       Attorneys for the Debtors

20

21   BY:  DANIEL J. DEFRANCESCHI

22       JASON M. MADRON

23

24

25

1   ROPES & GRAY LLP

2        Attorneys for Elliott & UMB

3

4   BY:  SAM N. ASHURAEY

5        MATTHEW L. MCGINNIS

6        GREGG M. GALARDI

7

8   KASOWITZ, BENSON & TORRES LLP

9        Attorneys for the Ad Hoc EFH Creditors' Committee

10

11  BY:  ANDREW H. ELKIN

12       ANDREW GLENN

13       DAVID ROSNER

14       MATTHEW STEIN

15       DAVID MARK

16

17  O'MELVENY & MYERS, LLP

18       Attorneys for O'Melveny & Myers, LLP

19

20  BY:  DANIEL S. SHEMAH

21

22  BAYARD, P.A.

23       Attorneys for Elliott & UMB

24

25  BY:  ERIN R. FAY

1    SULLIVAN & CROMWELL LLP

2         Attorney for Official Committee of Unsecured Creditors

3

4    BY:  CHRISTIAN P. JENSEN

5

6    HOGAN MCDANIEL

7         Attorneys for the Ad Hoc EFH Claimants

8

9    BY:  GARVAN MCDANIEL

10

11   PAUL KEGLEVIC - Witness

12   STEVEN STROM – Witness

13   JEFFREY ROSENBAUM - Witness

14

15   ALSO PRESENT TELEPHONICALLY:

16

17   JESSICA STEINHAGEN

18   BRADY C. WILLIAMSON

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Please be seated.  So, I was in a
 3     meeting this morning with the District Court judges, and
 4     Judge Andrew looks over at me and he goes, "Have you ever
 5     been affirmed by the Third Circuit?"
 6          (Laughter)
 7            THE COURT:  I'm like, thanks, that felt -- that
 8     was like a dig at 8:30 in the morning I did not need.  All
 9     right, what's next?
10            MR. MCKANE:  Your Honor, as -- consistent with the
11     parties' efforts to work together on the schedule, my
12     understanding of the sequence again today is, we're actually
13     going to go a little bit out of order --
14            THE COURT:  Yeah.
15            MR. MCKANE:  -- and take Mr. Keglevic first, and
16     then we're going to pick back up with Mr. Horton thereafter,
17     and then, I believe, we're going to focus on the dueling
18     experts on the break fee issue, so, Mr. Strom and then Ms.
19     Robins, and then if we're able to get to him, we'll, I think
20     the end of the day finishes with Mr. Rosenbaum.
21            THE COURT:  So, Ms. Robins is going to be on the
22     stand again?
23            MR. MCKANE:  Yes, Ms. Robins is actually, is my
24     understanding, the Elliott/UMB rebuttal witness to respond
25     to the expert testimony of Mr. Strom, and so, I think the
```

1   request is that he is going to be targeted solely on those

2   issues.

3           THE COURT:  Okay, I understand.  Okay.  All right,

4   Mr. Keglevic.

5           MS. TERTERYAN:  Good morning, Your Honor.  Anna

6   Terteryan, Kirkland & Ellis, on behalf of the EFH Plan

7   Administrator Board.  The EFH Plan Administrator Board calls

8   Mr. Paul Keglevic to the stand.

9           CLERK:  Please raise your right hand.  Do you

10  affirm your word that you will tell the truth, the whole

11  truth, nothing but the truth to the best of your knowledge

12  and ability?

13          MR. KEGLEVIC:  I do.

14          CLERK:  Please state and spell your name for the

15  record.

16          MR. KEGLEVIC:  Paul Keglevic, K-E-G-L-E-V-I-C.

17          CLERK:  Thank you.

18          MS. TERTERYAN:  And Your Honor, Mr. Keglevic is

19  represented by Scott Leonard from the Rosner Law Group, and

20  Chris Esbrook, who is seated here, from Esbrook Law.

21          THE COURT:  Okay, excellent.  Mr. Keglevic,

22  welcome, welcome back.

23          MR. KEGLEVIC:  Thank you, sir.

24          THE COURT:  You thought you were done with this,

25  didn't you?

1          MR. KEGLEVIC:  I did.

2          THE COURT:  I hope you're well.

3          MR. KEGLEVIC:  Thank you.

4          THE COURT:  All right, let's go.

5          DIRECT EXAMINATION OF PAUL KEGLEVIC

6    BY MS. TERTERYAN:

7    Q    Mr. Keglevic, briefly describe your relationship to the

8    former Debtors in these Chapter 11 cases.

9    A    Beginning upon the filing of bankruptcy, at the time of

10   filing of bankruptcy, I was the Executive Vice President and

11   Chief Financial Officer and the Co-Chief Restructuring

12   Officer for all the Debtor entities.

13   Q    What, if any, relationship do you have with the EFH

14   Plan Administrator Board?

15   A    I have none.

16   Q    Are you being compensated for your testimony today?

17   A    I am not.

18   Q    Did you prepare a declaration in anticipation of your

19   testimony here today?

20   A    I did.

21   Q    And if you turn to Tab Pab-Dir-Keglevic in your binder.

22   Do you recognize this document?

23   A    Yes, I do.

24   Q    Is it the document -- is it the declaration you

25   prepared?

```
1   A    Yes, it appears to be.

2   Q    And is the information contained in this document true

3   and accurate to the best of your knowledge?

4   A    It is.

5           MS. TERTERYAN:  Your Honor, I move Pab-Dir-

6   Keglevic into the record.

7           THE COURT:  Any objection?

8           MAN 1:  No objection.

9           MR. MCKANE:  No objection.

10          THE COURT:  It's admitted.

11      (Debtor's Exhibit Entered Into Evidence)

12  Q    Mr. Keglevic, are you familiar with Elliott and UMB's

13  allocation motion?

14  A    I'm sorry, could you repeat?  I didn't hear the last

15  part.

16  Q    Are you familiar with Elliott and UMB's allocation

17  motion?

18  A    Generally, yes.

19  Q    Do you know Mr. Jeff Rosenbaum?

20  A    I do.

21  Q    How do you know Mr. Rosenbaum?

22  A    I knew Mr. Rosenbaum probably pre-filing of the case in

23  2014 when he had a position at York, which was a holder of

24  the PIK notes, and then subsequently, when Mr. Rosenbaum

25  took a position at Elliott and also had ownership in the PIK
```

1   notes and I think some second liens and ultimately, some

2   EFH, if I remember, and worked with him in that capacity

3   probably starting in early to mid-2017.

4   Q    Generally, could you describe your interactions with

5   Mr. Rosenbaum in connection with the Debtors' restructuring

6   efforts?

7   A    It was consistent with interactions with any of the

8   creditors.  We had -- obviously, I was trying to drive

9   consensus and speed and value for the estates and was

10  working with any creditor, any and all, to achieve those

11  objectives.  So, Mr. Rosenbaum was a key part of those --

12  several of the plan support agreements and ultimately, on

13  the E-side confirmation, given his holdings, Elliott was a

14  critical party.  So, Mr. Rosenbaum was active and helpful in

15  both of his roles, and obviously, we didn't agree on

16  everything and he had a job to do and I had a job to do, but

17  we had a lot of interactions, face-to-face meetings, phone

18  calls, letters, et cetera.

19  Q    When the Debtors negotiated with creditors and

20  potential investors, how, if at all, were you kept informed

21  of key negotiations and developments?

22  A    Well, as the Co-CRO, I think most of the discussions

23  with creditors, especially if they were financial of nature,

24  would have been conducted by people who reported to me at

25  EFH and the standing order was, if I could not attend one of

1    those meetings, and I attended many, that they would fill me

2    in on what occurred, and then hopefully, and to the best of

3    our capabilities, we would present to our board where the

4    creditors were and what came up at those meetings.

5    Q    Please turn to Tab Rosenbaum Written Direct in your

6    binder.  Do you recognize this document?

7    A    Yes.

8    Q    What is it?

9    A    I believe it's the written direct testimony of Mr.

10   Rosenbaum in connection with this matter.

11   Q    Have you read Mr. Rosenbaum's Written Direct?

12   A    Yes, I went through it.

13   Q    Could you turn to Page 6, please, of his written

14   direct?

15   A    I'm there.

16   Q    And take a look at Paragraph 19.  Look at the second

17   sentence, which begins: "In addition, Elliott..." are you

18   there?

19   A    Yes.

20   Q    All right.  Do you see the assertion that: "the Debtors

21   had made it clear, both before and after the commencement of

22   the bankruptcy cases that a non-taxable transaction was the

23   only form of a restructuring transaction with which they

24   would proceed on a consensual basis."?  Do you see that?

25   A    Yes.

1    Q    Do you agree or disagree with that assertion?

2    A    I disagree with this assertion.

3    Q    Why do you disagree?

4    A    Look, it is fair to say that, given all the work we had

5    put in, that we thought a taxable transaction had more risk,

6    would take more time, and not necessarily deliver any

7    additional value to the estates.  That being said, this was

8    a matter that was clearly set out in the bid procedures that

9    the Court approved, and the creditors commented on, that

10   while that was our belief, that we were open to any

11   transaction that would increase the value of the estates.

12            And so, while this might have been a bias of mine,

13   I certainly was not the decision-maker.  We had

14   disinterested directors that if they -- that Elliott and

15   other creditors had access to, and in fact, used that access

16   and reported to, but, you know, at the end of the day, our

17   belief was driven by the fact that we had never received a

18   taxable transaction as part of the bidding procedures, and

19   the only transaction that was ever mentioned, and I think it

20   was just very briefly, was Mr. Rosenbaum mentioned to me in

21   2017 about a possibility of a taxable transaction, and I'm

22   sure I said it was skeptical that it could be done and add

23   value and meet the requirements that we had for timeliness.

24            Because recall, there was a significant cash burn

25   per month, $50- to $60 million dollars at EFIH going on.

1    But, I didn't foreclose it and I think it's clear that I

2    didn't have the ability to foreclose somebody bringing

3    anything forward, and especially if it would have been a

4    taxable transaction as contemplated in this proceeding, as I

5    understand it, which would be a taxable spinout of EFIH, it

6    clearly would have been in the authority -- it would have

7    been a conflict matter between EFIH and EFH and that would

8    not have been my decision.  So, while clearly, based on my

9    experience in the case, I was -- I did not think that this

10   would add value, I didn't foreclose the possibility and I

11   didn't have the authority to foreclose the possibility.

12   Q    What did the Debtors communicate to potential investors

13   about their willingness to consider a taxable deal?

14   A    In the bid procedures motion, we just said, bring us a

15   transaction.  We didn't say taxable or non-taxable, and in

16   fact, those words were carefully scrutinized to make sure we

17   didn't foreclose the opportunity for a taxable transaction.

18   Q    Did the Debtors ever receive an actionable taxable

19   transaction term sheet?

20   A    No.  We didn't -- we did not, and not even anything

21   remotely approaching actionable.

22   Q    In your capacity as an executive of EFIH, what

23   responsibility did you have to present a taxable transaction

24   proposal to the EFIH board if you believed that was in the

25   best interests of the estate?

1    A    Well, I would have presented any proposals.  In fact,

2    we talked to the board about every meaningful communication

3    we had with creditors, so it would have been presented to

4    the board, and I think the board as fiduciaries would have

5    had to act on it to the extent that they thought it added

6    value to the estate.

7    Q    And were you also an EFIH board member?

8    A    I was.

9    Q    In your capacity as an EFIH board member, what

10   responsibility did you have to evaluate a taxable proposal,

11   if you believed it was in the best interests of EFIH?

12   A    The same as any other board member would have.  If it

13   would have maximized value for the estate, we had to

14   seriously consider it.

15   Q    Please take a look at the same page, Paragraph 20.  Do

16   you see the assertion in that paragraph that: "The Debtors

17   believed that, in the event of a taxable deconsolidation

18   transaction, EFIH would, in most every circumstance, not be

19   directly liable for a potential tax claim from the IRS?"  Do

20   you see that?

21   A    Yes.

22   Q    From your point of view, is that a fair

23   characterization?

24   A    Well, I think it's a very carefully worded statement.

25   I don't think we ever debated that EFH, as the only C-corp,

Page 15

1    would have been the primary tax payer, but we had -- so this

2    says directly liable and uses, I think, appropriate words,

3    but I think the -- in substance, this basically, in my

4    opinion, the way I read it, makes it seem like the Debtors

5    were not concerned about the liability from triggering this

6    tax at the EFIH level.  And, as we explained in the tax

7    memorandum, and as I outlined in my declaration, that's not

8    the case.  There were several layers of concern associated

9    with triggering a tax with respect to whether that tax

10   would, in fact be, at a minimum, a risk, and ultimately be a

11   liability to EFIH.

12   Q    What were some of the concerns that the Debtors

13   considered that might cause EFIH to be liable for a tax?

14   A    Let me start with the practicality.  Number one, to do

15   a taxable transaction at EFIH, as I understand this

16   hypothetical that's being thrown out, there would be tax

17   incurred at EFH to the tune of at least a couple billion

18   dollars, and that would have to be paid by EFH.  So, the EFH

19   estate would have had to have agreed to the taxable

20   transaction and having a stranded tax that would have caused

21   them to be administratively insolvent.

22          Obviously, that, in my mind, is not something that

23   EFH directors would have ever accepted, and that would have

24   taken a tremendous amount of time to litigate.  Also, in

25   terms of the practical applications, would we have gotten a

1    buyer to pay more under a taxable transaction?  And I don't

2    think, certainly in this situation, that's not a foregone

3    conclusion primarily for two reasons.  One, if I just look

4    at who the ultimate buyer was, it was Sempra.  The purchase

5    price they were paying was putting a significant amount of

6    debt on their balance sheet, and credit agencies were very

7    concerned about that level of debt, and it was always

8    Sempra's position that they couldn't take a rating downgrade

9    at the parent because of the debt.

10          So, putting another $2 billion dollars of debt at

11   their level, if that is the amount of tax benefit that I've

12   seen in the calculations by some of the experts, I think

13   that was a non-starter, just given the amount and their

14   financial situation.  And even if it was a smaller amount,

15   there were significant risk for any buyer to assume that

16   they were going to get the tax basis step-up, number one,

17   because the IRS might have disallowed it, and secondly,

18   because the PUC had just recently denied the pass-through of

19   tax benefits associated with the Hunt transaction.

20          So, the common rate-making formula is the rate

21   payer pays -- has all the equity interests and the assets

22   that it owns, because effectively, it absorbs the risks and

23   return -- the risk and rewards of those assets.  So, it pays

24   the actual costs of those assets, and if the assets diminish

25   in value, that passes to them as well.  So, given the

1    blueprint that the TPUC used with respect to the Hunt, to

2    assume that some owner of the assets that were in the rate

3    base of Oncor would have tax advantages and that the rate

4    payers would be shielded from those tax advantages is a very

5    risky proposition, and, as was proven with the restructure,

6    the thing that killed that deal was the fact that those tax

7    benefits could not be shielded from the rate payer, so

8    therefore, they would not pass through to the owner.

9           So, just on a practical basis, finding somebody to

10   do a taxable transaction, getting EFH to agree in a

11   reasonable period of time to offset the $60 million-dollar a

12   month burn at EFIH, and then finally, have a purchaser agree

13   to pay more, given the inherent regulatory risks were a big

14   concern of mine.

15          And then, the ones that are in the tax memorandum,

16   I think, are pretty clear.  There was the check-the-box

17   risk, there was the enforcement of the tax-sharing

18   memorandum, there was the IRS's ability to use state law,

19   piercing the veil or other things in their toolkit to go

20   after the money, there was another regulatory risk that,

21   would the TPUC be concerned that, if there was a stranded

22   tax, that somebody might push that tax down to the Oncor

23   level?  Because obviously, you follow the money and who has

24   assets and who has the ability to pay, they could

25   potentially get it to Oncor and therefore, would the TPUC

1   approve such a transaction with that risk?  The history of

2   this case indicates that the TPUC was looking for a clean

3   deal and not expecting that risk.

4              And let me look at my direct testimony.  There

5   might be another one, but those are the ones that come to

6   mind -- oh, and -- sorry, and another big one before I get

7   to my testimony was, we had just signed a tax matters

8   agreement with TCEH that said we wouldn't do any

9   transactions of this type for a two-year period.  So, people

10  can argue about different risk, but that is a layering of

11  risk that, in my mind, made this very difficult to

12  contemplate a taxable transaction being in the best

13  interests of EFIH.

14  Q    All right.  Let's talk about the Debtors' interactions

15  with Elliott after Elliott bought into the EFIH PIK notes in

16  these cases.  Do you recognize having discussions with

17  Elliott in April through June of 2017 about potential

18  restructuring alternatives?

19  A    Yeah, probably not the exact dates, but sure.  Once

20  they became an owner of securities and we started to see

21  cracks in the NextEra deal, meaning that the TPUC was

22  concerned about approval and that that deal might not get

23  done, I think it's fair to say, we are looking for another

24  way out, because we were starting to evaluate that the

25  NextEra deal wasn't probable of closing at that point,

1    although we were hopeful, we were concerned, and Elliott

2    brought up the issue of, potentially, a creditor-led deal,

3    which we were very interested in supporting and working with

4    them on.

5    Q    At a high level, please describe the course of the

6    Debtors' discussions with Elliott from April through June

7    2017.

8    A    Well, I would say the majority of the discussions were

9    to deal with the cash burn issue and how to maybe take out

10   the DIP, roll some unsecured paper into secured, et cetera,

11   but it was generally part of a broader transaction to

12   effectively have a creditor-run plan of reorganization that

13   would result in the creditors owning the assets.  So, we

14   looked at pretty much every aspect of what that would take.

15   Q    In Mr. Rosenbaum's written direct, could you turn to

16   Page 5, please?  Paragraph 16.  Do you see the assertion

17   that: "the Debtors did not permit Elliott to separately

18   negotiate alternative financing or restructuring

19   alternatives with third parties."?  Do you see that?

20   A    Yes.

21   Q    Do you agree or disagree with that assertion?

22   A    I'm afraid I disagree.  In fact, I know we issued

23   various waivers to this PIK PSA to give Elliott the

24   opportunity to have those discussions.  When the issue was

25   brought up that they were concerned that -- while I think

1     it's fair to say, since they litigated it, that they thought

2     that they weren't bound by the PIK PSA, they still didn't

3     want to start operating in that fashion without it being

4     adjudicated, and we said, well, rather than adjudicating it,

5     how about a waiver, because there was no reason for us to

6     start to have them not talk to other parties.  We're at a

7     point where we have NextEra having risk and not -- of not

8     closing, we have no other deal on the table.  I can't

9     imagine a scenario why we would have stopped them from being

10    a viable option, and we treated them as a viable option and

11    we took to the board weekly updates, to the extent they were

12    appropriate, of how we were proceeding in the discussions

13    with Elliott at that time.

14    Q    And if you take a look at Paragraph 18 on Page 5, do

15    you see the assertion that, to resolve the PSA litigation

16    that Elliott brought, quote: "Elliott had to agree to a)

17    pursue alternative restructuring transactions to restructure

18    or reorganization the Debtors that the Debtors supported, b)

19    not trigger a taxable deconsolidation transaction involving

20    Oncor, and c) pursue an alternative financing acceptable to

21    the Debtors."  Do you see that?

22    A    I do.

23    Q    Do you agree or disagree with that assertion?

24    A    I'm not -- this one was confusing to me because we

25    never have any document of Elliott agreeing to do anything.

1    As I said, my simple way of understanding this is we had a

2    PIK PSA when Elliott bought in, we gave waivers, they

3    litigated whether it was applicable to them and they stayed

4    the litigation, ultimately, and then finally, the PIK PSA

5    was terminated when the NextEra deal was terminated mutually

6    by the Debtors and Elliott.  So, during that period of time,

7    we didn't get anything, in writing or otherwise, that

8    Elliott had agreed to any additional conditions.

9             I think, under the PIK PSA, and look, I'm not a

10   lawyer, some other lawyer might have to evaluate this.  In

11   my layman terms, we gave enough waivers so they could do

12   anything they wanted to, absent filing a plan on their own,

13   because we didn't have -- exclusivity had gone away and the

14   only protection we had of them filing their own plan was

15   through the PIK PSA, but we said, have any discussions --

16   there was no limitations, in the waivers or otherwise, about

17   a taxable transaction.  And in fact, we were consistently

18   engaged on alternative financing and them being the owners

19   of these assets.  I just don't understand -- this might have

20   been a belief that, because of our hesitancy to accept a

21   taxable transaction, given the reasons I previously

22   outlined, that this is where we were, but this is not

23   legally how they were bound at all.

24   Q    And you stated that the PIK PSA terminated when the

25   NextEra deal terminated.  After the PIK PSA terminated, did

1    the Debtors bind Elliott in any way --

2    A    No, at --

3    Q    -- with respect to pursuing alternatives?

4    A    Excuse me, I should have waited for the end of the

5    question.  No, when the mutual termination of the PIK PSA,

6    there was no restriction on Elliott.  They could have filed

7    their own alternative plan at that point in time, or

8    anything else they wanted to do.  It wasn't until we got

9    agreement on the Sempra deal that, effectively, Elliott

10   agreed to support, by the way, a non-taxable deal.

11   Q    Please turn to Page 7, Paragraph 22 of Mr. Rosenbaum's

12   written direct.

13   A    By the way, I have to compliment the Court.  When I

14   started testifying in this case, I had to flip through the

15   binders.  Now they put it in front of me and even highlight

16   what's -- beats --

17             THE COURT:  That's not me.

18        (Laughter)

19   A    It's fabulous.  The ladies deserve some recognition.

20             THE COURT:  Your tax dollars at work, thank you

21   very much.  I won't tell you how much it cost.

22   Q    All right, in the middle of this paragraph, do you see

23   where it says: "Elliott initially proposed restructuring

24   plans that -- "

25             THE COURT:  I'm sorry, which paragraph are we in?

1          MS. TERTERYAN:  Paragraph 22, Your Honor.

2          THE COURT:  Okay, thank you.

3          MS. TERTERYAN:  Page 7.

4    Q    So, do you see where it says: "Elliott initially

5    proposed restructuring plans that would have, among other

6    things, 1) reallocated professional fees charged to EFH and

7    EFIH and 2) not reinstate the asbestos liabilities that were

8    asserted against EFH," and then, do you see following that,

9    the assertion that: "The Debtors, however, made clear that

10   both of these points were non-starters, and said that

11   negotiations would cease of Elliott did not agree to drop

12   those requests," do you see that?

13   A    Yes.

14   Q    Do you agree or disagree with that assertion?

15   A    Well, I agree with the first part that, in some of our

16   initial meetings that Elliott wanted to have their plan

17   consider reallocation of professional fees and to not

18   reinstate the asbestos liabilities.  I would also tell you,

19   it was clearly my position that these were not going to

20   achieve the objectives of the estate if we reopened these

21   and other matters that we had agreed to in two prior deals,

22   one with Hunt and one with NextEra, and once again, my

23   mindset there was that we were going to now have complete

24   disagreement between EFH disinterested directors and the

25   EFIH disinterested directors and have to start all over to

1    get to a template, to get to a plan, which would take a lot

2    of time.

3            And remember, time was not an enemy of EFH because

4    they continued to get tax cash payments from Oncor, and in

5    fact, their cash was either stable or slightly going up, but

6    the cash burn at EFIH, vis-à-vis an unsecured EFIH creditor

7    was substantial because it was $50- to $60 million dollars a

8    month.  And I thought this was going back to square one.

9    This could have even gone back to pre-TCEH because there

10   were fees allocated between TCEH, EFH and EFIH.  And, given

11   the cash burn and that I thought these were not substantial

12   numbers, and let me be specific: asbestos alone did not deal

13   with that liability at EFH and have no plan on how to deal

14   with it, given the asbestos bar in this case and the

15   difficulty of getting away from those kind of liabilities

16   even in bankruptcy, I thought would be a huge, time-

17   consuming efforts.  And we were talking about a liability in

18   asbestos of $56 million dollars versus a $60 million-dollar

19   a month burn.  It made no sense to me that that would --

20   that we'd dig into that.

21           And even the professional fees weren't of an

22   amount, in my opinion, that I thought would make this

23   valuable.  So, was I clearly skeptical and opposed to using

24   time and effort to go after this type of thing?  Yes, but

25   was I in a position to foreclose it?  No.  They could have

1   gone to the disinterested directors, which they did

2   frequently, Mr. Cremens could have written a letter to our

3   board, which they did on many occasions.  They did not.  So,

4   was this my attitude?  I think it's fair to say it was, but

5   there were reasons why it was my attitude, and it wasn't

6   legally foreclosing Elliott's ability to do what they wanted

7   to do at this point.

8   Q    And Mr. Keglevic, what authority did you have to

9   negotiate and resolve reallocation of professional fees?

10  A    I had zero.  It was a conflict matter.  And in fact, I

11  think we had an email exchange, because early on, I believed

12  Elliott agreed to leave -- put these matters aside and then

13  they arose, and I think we had an email exchange where I

14  said, if I have to get the disinterested directors on the

15  same page and open this matter up, it's going to take a lot

16  of time and expense.

17  Q    And what authority did you personally have to negotiate

18  and resolve potentially not reinstating the asbestos

19  liabilities as they'd been done in the prior two plans?

20  A    Once again, none.

21  Q    Mr. Keglevic, did you recommend that the Debtors'

22  boards accept the $9.45 billion-dollar offer from Sempra on

23  August 20th?

24  A    I did.

25  Q    Why?

1   A    I thought it was the highest, best opportunity for the

2   estates.

3   Q    What basis, if any, is there to support the suggestion

4   that the Debtors forced Elliott into a tax-free transaction

5   at the end of the day?

6   A    I can't imagine that I could force Elliott to do

7   anything, given my authority levels in this case, and

8   certainly, I don't think anybody, even the disinterested

9   directors can force a creditor to sign onto a plan

10  restructuring unless they believe it's in their best

11  interest.  So, I don't understand the basis of the question

12  because I don't believe such authority existed.

13          MS. TERTERYAN:  That's all the questions I have,

14  Your Honor, at this time.

15          THE COURT:  Okay.  Thank you.

16          MS. TERTERYAN:  And may I move the exhibits --

17  some exhibits with Mr. Keglevic into the record at this

18  point?

19          THE COURT:  Yes, you may.

20          MS. TERTERYAN:  All right, and I apologize, but I

21  will hand out the green sheets before I do.  May I approach,

22  Your Honor?

23          THE COURT:  Yeah.  Do you guys need time -- is

24  this fresh to you?

25          MR. MCKANE:  I don't think we have seen this list

1    before.

2            THE COURT:  Okay, then give them to me and we

3    won't move them at this point.  We'll give an opportunity

4    for the other parties to review the list - it's extensive -

5    and decide whether they have any issues.

6            MS. TERTERYAN:  Your Honor, may I note, these are

7    all exhibits that were cited in Mr. Keglevic's written

8    direct, if that helps.

9            MR. MCKANE:  Fair enough, it's going to help.

10   That will help.  And just so Your Honor is aware, I believe

11   the parties are engaged in discussions right now about a

12   process to actually move in the vast majority of the

13   exhibits on a consensual basis, perhaps at the close of

14   evidence.

15           THE COURT:  All right, so we'll hold this for

16   right now without prejudice.

17           MS. TERTERYAN:  Thank you, Your Honor.

18           THE COURT:  All right, who's next?  Mr. Galardi.

19           MR. GALARDI:  Mr. Keglevic, I may have to go old

20   school a little bit on our binder, unfortunately, but if I

21   may (indiscernible) binder.  You may use it as best you can.

22   And actually, let me swap you for the small binder. Us the

23   small binder for (indiscernible) May I approach, Your Honor?

24           THE COURT:  Yes.

25           MR. GALARDI:  Another binder for you.

1            THE COURT:  Yeah, no problem.  Thank you.  That's

2      all right.  Can you share that with Maria?  I don't know if

3      you have room up here for it.

4                  CROSS-EXAMINATION OF PAUL KEGLEVIC

5      BY MR. GALARDI:

6      Q    Mr. Keglevic, as you know, I'm Gregg Galardi and I

7      represent the movants, UMB and Elliott and prior Elliott.

8      And you started your direct examination today and asked if

9      you wanted to correct or was there anything -- was

10     everything in your declaration true, correct and accurate.

11     Do you recall that question?

12     A    Yes.

13     Q    And you answered that it was, correct?

14     A    Yes, to the best of my knowledge.

15     Q    And would you turn to Paragraph 23 of your declaration,

16     please, which is Tab 1 in the small binder.  I think it will

17     be easier to use that.

18            THE COURT:  Or the screen.

19            MR. GALARDI:  And the screen, you're right.

20     That's true.  I'm going to say tab because I'm old school

21     but we'll try to get as much, if he can keep up with me.

22     Q    Now, in Paragraph 23, you say the BE transaction had a

23     total equity value of $9.3 billion dollars, is that correct?

24     A    That's what it says, correct.

25     Q    And is the actual number of the BE transaction back in

1    July of 2017 $9 billion or was it $9.3 billion?

2    A    I don't recall.

3    Q    Okay, so would you please turn to what's marked in the

4    very thick binder, and we'll put it on the screen, I think

5    we're good enough on this one, Tab 2?  And it is ELX-518.

6            THE COURT:  You say it's going to be on the screen

7    --

8            MR. GALARDI:  It's on the screen.  We're going to

9    try to make it easy for you as much as I can, but --

10           MR. KEGLEVIC:  Okay.

11           MR. GALARDI:  -- I never trust whether I gave

12   coordinated instructions to the IT people.

13   Q    Do you recognize this motion?

14   A    Yes, I believe I do.

15   Q    Okay, and this was the motion that the Debtors filed to

16   enter into the Berkshire Hathaway agreement.  That's the

17   BHE, correct?

18   A    Yes.

19   Q    And if you would turn to Page 2 of the motion,

20   Paragraph 1?  And it says that, and if you read the second

21   sentence, it says: "Specifically, BHE will acquire EFH Corp

22   via a three-tier merger with an all-expected cash infusion

23   of approximately $9 billion dollars into the estate," is

24   that correct?

25   A    That's what it says.

1    Q    Does that refresh your recollection that the

2    transaction that was being offered by Berkshire in -- at

3    that timeframe was only $9 billion dollars?

4    A    I think the difference might be the amount of cash at

5    EFIH, but I know they had cash, so I don't know if we added

6    the $9 billion to the amount of cash at EFIH, but that --

7    that might be the reconciling item.

8    Q    Okay, and when you valued in the transaction the Sempra

9    transaction at $9.45 billion, did you add the cash at EFH in

10   that number or was that the face amount purchase price of

11   the transaction?

12   A    That was the face amount in that case.

13   Q    Okay, so that extra 300 should have been added to --

14   then $9.75, right, for Sempra to have gotten the comparison?

15   A    Well, at that point, there was a different amount of

16   cash on hand, but it depends on what use you were making of

17   that number, but yes, to make the $9.3 comparable if that

18   was, in fact, the difference, you'd have to add the --

19   whatever cash was on hand at $9.45.

20   Q    Okay.  Now, if you would go back to your declaration,

21   which is Tab 1, and we'll, again, put this on the screen,

22   what I would like to do is have you look at -- let me strike

23   that, hold on.  In Paragraph 2, I think it is actually

24   Paragraph 8 of the -- your declaration, you discuss that

25   there was an RSA entered into back in 2014, correct?

```
1    A    Yes.

2    Q    Were you party to the negotiations with respect to that

3    RSA?

4    A    I was.

5    Q    And did you have direct negotiations with Mr. Rosenbaum

6    in connection with that RSA?

7              THE COURT:  Mr. Galardi, I know you like to pace--

8              MR. GALARDI:  I'm sorry.

9              THE COURT:  -- but we're going to lose you on the

10   tape --

11             MR. GALARDI:  Oh, I'm sorry.

12             THE COURT:  -- because you're not by the

13   microphone.

14   Q    Did you have a -- any direct conversations with Mr.

15   Rosenbaum with respect to the terms of the RSA?

16   A    I'm sure at some point I had discussions with Mr.

17   Rosenbaum when he was at York.

18   Q    Okay, and did you have any discussions with creditors

19   regarding seeking disallowance of the make-whole claims that

20   were existing at the time of the RSA?

21   A    Yes.

22   Q    Okay, and in the second sentence, in the first -- now

23   if you turn to Paragraph 9, it said: "the RSA required EFIH

24   to seek disallowance of the EFIH First Lien make-whole

25   claims and the EFIH Second Lien make-whole claims."  Is that
```

1    your recollection of the RSA?

2    A    Yes.

3    Q    Now, are there many parties to the RSA?

4    A    Yeah, there were several parties to the RSA.

5    Q    And were there EFH creditors that were parties to the

6    RSA?

7    A    I believe, at least there -- oh, boy, 2014 is a long

8    time ago.  I'm sure you have it.  My recollection was that

9    there was -- that Fidelity was a member of the RSA at that

10   point, but I'm not positive.  We should look.

11   Q    Okay.  We will go back to that.  Now, you say that the

12   EFIH unsecured creditors signed the RSA, even though the

13   transaction embodied in that agreement would not provide

14   them with 100 percent recovery.  Did I read that correct?

15   A    Yes.

16   Q    By "the EFIH unsecured creditors," were you speaking

17   about the PIK notes or just generally unsecured creditors,

18   in your declaration?

19   A    Well, I think it would be both.

20   Q    Okay, and did you have conversations with all unsecured

21   creditors so that when you signed this -- when you were

22   thinking about this sentence in your declaration or were you

23   thinking about specific unsecured creditors when you signed

24   this declaration?

25   A    Well, we're talking about the ones that signed onto the

1    RSA, so the 100 percent recovery would apply to all, but I

2    think in this context, we're talking about the PIK creditors

3    because they were the only unsecured that signed onto the

4    PSA, if my memory is right.

5    Q    With respect to the 100 percent recovery, how did you

6    measure the 100 percent recovery?

7    A    I'd have to go back and look.

8    Q    Well, when you signed your declaration and you said

9    that they signed on despite not receiving 100 percent

10   recovery, what were you thinking?

11   A    I was thinking of the face amount of their principal

12   and accrued interest, I believe.

13   Q    So, was it 100 percent recovery in cash that they were

14   not receiving?

15   A    I don't remember the components.

16   Q    Okay, and let me ask you now to turn to what is Tab 3

17   and I think we'll be able to put it in front of you but Tab

18   3, I'll ask you to take a look at in your binder.  My

19   binder?

20   A    Yes.

21   Q    Okay, is this the RSA agreement, as best you can tell,

22   that we've been discussing?  And we put it up -- and you

23   look at the whole document, but we've put it on the screen

24   too, Mr. Keglevic.

25   A    Yeah, it's difficult to look at a significant document

1    to see if this is the whole thing, but --

2    Q    We can do a paragraph and a sentence, but not a whole

3    document.

4    A    Yes, this looks to be the agreement.

5    Q    Right, and then if you look at the top of the document,

6    it says it was filed 5/16 of 2014, correct?

7    A    That's what it says, yes.

8    Q    Okay, and you'll see the support agreement is by a

9    number of creditors, and there's a long list on that first

10   page that actually goes all the way to the second page, with

11   respect to the number of parties that were parties to this

12   RSA, isn't that correct?

13   A    Yes, a lot of the parties are the Debtors, but there

14   are several creditors as well.

15   Q    Correct, and there were several EFIH unsecured

16   creditors, that Ad Hoc Committee that York was a party of

17   that were signatories to this document, correct?  That's

18   your recollection?

19   A    I'm sorry, could you repeat the question?

20   Q    If you look on Page 2, I'm going to call it 14, Roman

21   XIV, there were consenting EFIH unsecured noteholders.  They

22   signed onto this document, correct?

23   A    Yeah, I'd like to go to see -- you asked me another

24   question on that.  I'd like to see the definition of

25   unsecured noteholders, so I know who signed on.

1    Q    Okay, and --

2    A    I'm sure there's a definition somewhere.

3    Q    Well, there's a definition.  The question is, you're

4    looking for the signatories and I don't have a signed --

5    they didn't provide a signed copy, so, I will move onto

6    another question.  Mr. Keglevic, if -- I'm going to draw

7    your attention to the term sheet that is attached to this

8    document, for those reading the document, it's Page 69 of

9    105 of this document, and turn your attention to Class B5.

10   And Class B5 was the general unsecured claims against EFIH

11   and you'll see in that, if I read it correctly, that they

12   were going to receive 98 percent of the reorganized EFH

13   common stock, correct?

14   A    Yes.

15   Q    And so, when you said they didn't get 100 percent of

16   their recovery, is that what you might have had in mind when

17   you were talking about their not getting 100 percent

18   recovery?

19   A    Yeah, I relied on the impaired entitled to vote column.

20   Q    Okay, you said you relied on the impaired entitled to

21   vote.  Does it -- the fact that they are impaired mean that

22   people -- entities or investment firms that are receiving

23   equity are receiving less than 100 cents in value?

24   A    That was my general layman's impression, yes.

25   Q    And you understand that "impaired" means something

1    under the Bankruptcy Code, correct?

2    A    I'm sure there's a definition under the Bankruptcy

3    Code.

4    Q    Did you track --

5              THE COURT:  Eh, not so much.

6         (Laughter)

7    Q    Did you happen to track, or have someone on your

8    behalf, track trading prices for the PIK notes during the

9    course of the case?

10   A    We did.

11   Q    And at this time, do you know what the PIK notes were

12   trading at?

13   A    I don't.  It was four years ago.

14   Q    Do you know if they were trading over par?

15   A    I think at some points of the exercise, they were

16   trading over par, but remember, I don't know that I would

17   say that the trading price of a security is indicative of an

18   impairment or not, especially the -- it was a very, very

19   low-volume trading associated with those securities.  But

20   it's fair to say that at, I think, at different points of

21   the case, they were trading over par.

22   Q    If you would turn to the next page, if you're turning

23   pages, or if you would look at Class B8, Interest in EFIH

24   Debtors.  Do you see that?

25   A    I do.

1    Q    Who was the holder of the EFIH interest?  I'll ask you

2    to --

3    A    I have to get into more detail to refresh my memory on

4    this.

5    Q    Isn't it the case that EFH Corp was the holder of the

6    interest in EFIH?

7    A    EFH Corp owned a fairly substantial amount of

8    securities in EFIH at a point in time.

9    Q    Okay, and those securities, that equity interest, was

10   unimpaired under this proposal, right?  That's what it says

11   --

12   A    That's what this says, yes.

13   Q    If you look down, you go to Class C4, General Unsecured

14   Claims Against EFH, correct?

15   A    Yes.

16   Q    And that general class of EFH claims under this

17   proposal was going to receive 1 percent of the reorganized

18   EFH common stock, correct?

19   A    Correct.

20   Q    Let me ask you, if you were a future equity holder, was

21   it in your interest -- or let me -- strike that.  Isn't it

22   in your interest as a future equity holder to have had the

23   make-whole claims disallowed?

24            MS. TERTERYAN:  Objection, Your Honor.  Calls for

25   speculation.

1          THE COURT:  Hang on, Mr. Keglevic.  No, it

2    doesn't.  Well, no, I think he can answer that question.

3    Overruled.  Go ahead.

4    A    I haven't done any analysis as to what the interest of

5    that class of securities was.

6    Q    Well, let me ask you, if you're an equity holder of a

7    company and the PIK note -- and there was -- and the make-

8    whole claim was allowed, would you have more or less debt on

9    your company?

10   A    My recollection of the debt that EFH owned of EFIH was

11   ultimately, effectively canceled as part of the settlement

12   agreement associated with the intercompany claims.  So, they

13   -- to suggest that, at that point in time, that they were

14   expecting recovery for those claims against EFIH I think is

15   different than what I remember the facts would be.  I think

16   that was always something that they expected to be a trading

17   chip in the settlement of the intercompany claim.  So, I

18   don't think they approached this as a pure, standalone

19   equity holder of EFIH.  I think that's a stretch.

20   Q    Well, Mr. Keglevic, you -- let's go back to Tab 1, your

21   written direct.

22   A    Yes.

23   Q    You state, in Paragraph 9: "The EFIH --" "required EFIH

24   to seek disallowance of the first and second lien make-whole

25   claims," correct?

1    A    Yes.

2    Q    And you then state, in that same paragraph, that: "the

3    unsecured creditors signed it, even though they weren't

4    getting 100 percent," correct?

5    A    Correct.

6    Q    So, you saw a relationship between their not getting

7    100 percent and the RSA requiring disallowance of those

8    make-whole claims.  Am I misunderstanding why those two

9    sentences are in the same paragraph?

10   A    No, but those all relate to the EFIH unsecured

11   creditors, not the EFH unsecured creditors.

12   Q    Understood, but the EFIH unsecured creditors were going

13   to become the new equity holders of reorganized EFH,

14   correct?

15   A    Correct.

16   Q    And what would have happened if the make-whole claims

17   were allowed?  Where would that debt have been, and how

18   would the EF -- the new equity holders been affected?

19   A    Well, the -- I don't think it matters that the -- I

20   mean, the amount of their claim would have been reduced by

21   the make-whole.

22   Q    And so, there was value to the equity holders --

23   A    The EFIH claim.

24   Q    -- isn't it true that there's value to the new equity--

25   A    Well, only --

1   Q    May I finish my question?  You can finish your answer

2   if I interrupted you.

3   A    No, go ahead.

4   Q    Is there value to the equity holders, the new equity

5   holders, if those make-whole claims were disallowed?

6   A    What new equity holders are you referring to?  After

7   the transaction was contemplated?

8   Q    After the transaction was consummated.

9   A    Yes.  Just -- in fact, the EFIH unsecured creditors

10  would have had their interest diminished whether they were

11  Debtors or new equity holders.  But, where I disagreed was

12  the EFH holders of EFIH notes were not looking at the make-

13  whole in the same fashion, given that it was an intercompany

14  claim and that they were likely, as they did, to trade it

15  against all the other intercompany issues.

16  Q    Okay.

17  A    That was the distinction I was trying to draw.  Sorry

18  if it wasn't clear.

19  Q    Thank you.

20         THE COURT:  Because -- just so I'm clear, because

21  it was four and a half years ago, but EFH owned quite --

22  owned a substantial number of EFIH notes.

23         MR. KEGLEVIC:  Correct.

24         THE COURT:  Okay.

25         MR. KEGLEVIC:  Over a billion dollars, if I

1   remember correctly, or close to.

2            THE COURT:  Is it the other way around?  Did I get

3   it wrong?

4            MR. GALARDI:  It's the other way around, Your

5   Honor.

6            MR. KEGLEVIC:  I'm sorry, yes.  I --

7            THE COURT:  You and I don't -- we're the oldest

8   people in the room, so.  So, EFIH owned EFH notes.

9            MR. GALARDI:  Correct, Your Honor.

10           THE COURT:  Okay.

11           MAN 1:  Over a billion dollars.

12           MR. GALARDI:  Over a billion dollars.

13           THE COURT:  Okay.

14  Q    We'll leave that topic for now.  Mr. Keglevic, will you

15  now turn to Paragraph 10 in your written direct?

16  A    Yes.

17  Q    In the written direct, you say: "In July 2014, the

18  Debtors determined that it was in the best interest of their

19  estates to terminate the RSA and to pursue alternative

20  restructuring proposals, including a potential sale of EFH

21  and EFIH's economic interests in Oncor," is that correct?

22  A    Yes.

23  Q    When the board -- did the boards make that

24  determination?

25  A    They did.

1  Q    That determination was because they believed that there

2  would be higher and more value for EFH and EFIH in a sale of

3  the Oncor interest?

4  A    We still thought -- I think we still liked the original

5  proposal as to Debtors, but we had a lack of support, so it

6  was the creditors' belief, and without the support we

7  needed, we abandoned it and took the approach the creditors

8  recommended.

9  Q    Which creditors were not supportive of that RSA?

10  A    Everybody who wasn't signed on, pretty much.

11  Q    And at that time, did they --

12          THE COURT:  It was quite a hearing --

13          MR. GALARDI:  I understand.

14          THE COURT:  -- Mr. Galardi.

15          MR. GALARDI:  And Your Honor -- not Your Honor,

16  Mr. Keglevic.

17          THE COURT:  I wasn't necessarily on board either.

18  I think that was pretty clear.

19          MR. GALARDI:  I have heard rumors of that, Your

20  Honor, I have seen the transcript.

21          MR. KEGLEVIC:  That was fairly clear to me.

22  Q    That was clear.  And at the same time, did the Debtors

23  receive an unsolicited proposal from NextEra?

24  A    Yes.

25  Q    Did the Debtors determine to go and explore those sales

1    of Oncor assets?

2    A    I'm sorry, could you repeat that again?

3    Q    Did the Debtors therefore terminate the RSA and seek to

4    explore a potential sale of its Oncor assets?

5    A    Yes, we ran a stalking horse process with approved

6    bidding procedures.

7    Q    Did that result in there turning out to be an offer

8    that the Debtors accepted?

9    A    Yes.

10   Q    And that offer was made by the Hunts?

11   A    Among others.

12   Q    Well, let's do it one at a time, I'm going to try to do

13   it --

14   A    well, the Hunt transaction included the TCEH unsecureds

15   --

16            THE COURT:  Right.

17   A    -- and that was an important part of the transaction

18   because effectively, we've got agreements to cease

19   litigation and to sign onto future plans.

20   Q    And we're going to go through all of those, actually.

21   A    Great.

22            MR. GALARDI:  Your Honor, are you -- you are?

23            THE COURT:  No, I'm just trying to -- I know I

24   make faces.  I -- the Hunts were what, five, ten percent of

25   the deal, if I remember right?

1        MR. KEGLEVIC:  Yeah, the Hunts had very little of

2    their own equity in, but were going to get a, I think a

3    promote and an operating fee --

4        THE COURT:  Right.

5        MR. KEGLEVIC:  -- but most of the money came from

6    creditors or was to be raised.

7        THE COURT:  Mm.

8    Q    If you would -- so, eventually, there was a Hunt PSA

9    approved, is that correct?  Plan Support Agreement by

10   various parties to support going forward with the Hunt

11   transaction?

12   A    Yeah, I'm sure you can refer me to it, but I believe

13   that to be right.

14   Q    And with respect to the Hunt transaction, do you recall

15   what the creditors were projected to receive as recoveries

16   under the Hunt plan?

17   A    The highest amount that we had -- it's in my -- I think

18   it was $12 billion equity value.

19   Q    Right, but what was the -- if you would turn to your

20   declaration, I think it's Paragraph 12, but let me go check.

21   Yes, if you'd look at Paragraph 12 of your declaration, so

22   this doesn't become a memory test, under the Hunt

23   transaction, you were right that it was $12 billion dollars,

24   and with that $12 billion dollars, what were the expected

25   recoveries of unsecured creditors?

1    A    Everybody would get paid in full.

2    Q    And by "everybody," you mean all the unsecured

3    creditors at EFIH, correct?

4    A    I do.

5    Q    And all of the unsecured creditors at EFH, correct?

6    A    Correct.

7    Q    You mentioned it before, but -- and at that point, had

8    the Court -- do you recall whether the Court had yet ruled

9    on the make-whole litigation?

10   A    I don't believe they had, but like you said, it's in

11   here somewhere.

12   Q    Let's go to --

13   A    And in fact, I think it was a condition of the deal

14   that it wasn't found that there was a liability for those

15   amounts.

16   Q    Well, let's sort of set ourselves --

17            MR. GALARDI:  Maybe it would be time -- if I could

18   hand up the timeline just to maybe set some timeframes?  You

19   got a demonstrative last night.  Is there an objection if I

20   use that -- the timeline?

21            MR. MCKANE:  No, that's fine.

22            THE COURT:  That would be great.

23            MAN 1:  You used our format.  It looks just like

24   it.

25            MR. GALARDI:  What?  I used your format?  Of

Page 46

1    course I did.

2            THE COURT:  Oh, has it got the lollipops?  Oh, I'm

3    so happy.

4        (Laughter)

5            MR. MCKANE:  Your Honor, for the record, the PAB

6    reserves all rights on licensing with regard to that

7    timeline.

8        (Laughter)

9            MR. GALARDI:  I changed the color.

10           THE COURT:  If you want to talk about IP, you need

11   to go across the street.

12           MR. GALARDI:  I'm going to hand one up to Your

13   Honor.

14           THE COURT:  Thank you.

15   Q    Now, Mr. Keglevic, this probably brings back certain

16   memories that some people don't want to have but what we've

17   put on this is a lot of the dates that are set forth in your

18   declaration, and I'm not introducing it for evidence, but I

19   do think it might help set -- since there's been a lot of

20   questions about the timing and the Court.  Now, do you

21   remember the bid procedures hearing that happened on -- the

22   series of bid procedures hearings that were in October of

23   2014?

24   A    Yes.

25   Q    Okay, and those were contested hearings as to the bid

1    procedures for actually undertaking a sale of the assets of

2    the economic interest in Oncor, correct?

3    A    Correct.

4    Q    And the Court, eventually, on November 3rd entered an

5    opinion approving those bid procedures to go forward.

6    A    Correct.

7    Q    And then, pursuant to those bid procedures, the company

8    solicited the transaction and ultimately, there was a

9    transaction, a PSA with Hunt was approved around September

10   18th, and I'm not holding you to the date, but --

11   A    Yes --

12   Q    -- is that your recollection?

13   A    -- in that timeframe, yes.

14   Q    You mentioned, when I asked you some questions, that

15   there were a number of settlements that needed to be done in

16   connection with actually getting the Hunt plan confirmed, is

17   that correct?

18   A    Yes.

19   Q    There were two particular settlements that, I believe,

20   got done, and let me draw your attention to Tab 9 -- no Tab

21   6 of the binder.  Actually, let us start with Tab 5, I'm

22   sorry.  Tab 5 of the binder.  Now, you may need to look at

23   it because it is one of those documents.  Would you put the

24   -- just the front -- first page of Tab 5 on the screen?  Mr.

25   Keglevic, does this reflect a part of your history in these

1    cases, where there was a settlement with respect to TCEH and

2    what I sometimes refer to it as the global settlement where

3    the sponsors' claims were settled after litigation, and TCEH

4    is granted a $700 million-dollar claim, TCEH against EFIH --

5    A    Yes.

6    Q    -- and I can turn you, just so that we're set -- put in

7    the document, I'll turn to Page 13 of 44 of this file

8    document, and you'll see the $700 TCEH settlement claim.

9              THE COURT:  It's 91 pages, not 44.

10             MR. GALARDI:  I have 13 of 44 up on the top.  I

11   don't know what you might have on my -- no?

12             MR. MCKANE:  It's Tab 5.

13             MR. KEGLEVIC:  No.

14             THE COURT:  No.

15             MR. GALARDI:  Tab 5.  All right.

16             MS. TERTERYAN:  If I might help, Your Honor?  It's

17   an exhibit to the filing, so you have to skip past 91 of 91,

18   and then you'll get to the other --

19             THE COURT:  Thank you.

20             MR. GALARDI:  Thank you very much for the help.

21   Thank you.

22             THE COURT:  13 of 44?

23             MR. GALARDI:  Yes.  And the bottom page is 12 on

24   that page, and there's a -- there's a subparagraph B in the

25   brackets?

1    A    I found the $700 million on Paragraph B settlement.

2    Q    Do you recall that settlement being entered into?

3    A    Yes.

4    Q    And that was a critical settlement -- that also had

5    releases its claims against sponsors and other settlements

6    by the Debtors that helped facilitate going forward with the

7    Hunt plan, correct?

8    A    Correct.

9    Q    The committee objected, the E-side committee objected

10   to this settlement, correct?

11   A    Sorry, I don't recall.

12   Q    But there eventually was a settlement with the E-side

13   committee, do you recall that?

14   A    Yes, it was a separate settlement.

15   Q    And if you would turn to now what's Tab 6 in your

16   binder.  Is this your understanding of the order that

17   actually approved the settlement -- and again, so I don't

18   confuse people any more, there's the actual order and then

19   the settlement is attached to that.

20   A    Yes, this looks like the E-side settlement.

21   Q    Did you participate in the negotiations regarding this

22   settlement with the E-side committee?

23   A    No, I participated in no settlements between any

24   estates because I was conflicted.  It was all done by the

25   disinterested directors and the other parties to the

1    settlement.

2    Q    Do you have an understanding if this settlement

3    agreement authorized certain claims against the EFH Debtors

4    at all?  Do you have any understanding about the settlement,

5    even if you didn't negotiate it?

6    A    I knew the $700 million-dollar number, but I was the

7    Co-CRO and Ms. Doré was much more actively involved with the

8    settlement than I was.

9    Q    Let's turn to Section 4 of Tab 6, and it's called

10   Contractual Claim Subordination.  This is the committee

11   settlement.

12   A    I'm sorry, can you give me the reference again?

13   Q    It is Tab 6, it's Section 4, which, if I look at the

14   pages on the top, is 9 of 34, and it's Section 4 called

15   Contractual Claim Subordination.  And I would ask you to

16   look at Section 4(b) at the definition of the beneficiary

17   claims.

18   A    Okay.

19   Q    Do you have any understanding of this settlement,

20   whereby the beneficiary claims were allowed in certain fixed

21   amounts, I think it's roughly $38 million dollars?

22   A    I don't have a strong recollection of that.  That was

23   not something I was involved with.

24   Q    Do you remember any time in which the E-side committee

25   was excepted to only participate and minimize their

1    participation in the Chapter 11 cases?

2    A    Yes, I remember as -- but just vaguely, as part of the

3    settlement, there was a stand down agreement.

4    Q    Okay, and if you would turn two more pages back, which

5    is now 11 of 34 at the top of the page, again, B, is this --

6    and again, I know you only had a general understanding, is

7    this your understanding of the document in which the

8    committee agreed to minimize its participation in the

9    Chapter 11 cases?

10   A    I'm -- I can't comment on that.  I'm not familiar

11   enough to say whether that ultimately did it or not.

12   Q    Okay.

13            THE COURT:  I'm sorry, can we take a short recess?

14            MR. GALARDI:  Absolutely.

15            THE COURT:  Just five minutes.  Mr. Keglevic, you

16   know the rules, but I'll say them again for the record.  You

17   may not discuss the substance of your testimony with any

18   person during the break.

19            MR. KEGLEVIC:  Yes, sir.

20            THE COURT:  Okay.  And what's -- just so I know,

21   what's Mr. Keglevic's drop-dead time?  Is it the end of the

22   day?

23            MR. KEGLEVIC:  I'm of an age, Your Honor, that I'd

24   like you to change the term.

25            THE COURT:  Oh, yeah, sorry.

1          (Laughter)

2               THE COURT:  What is the last time by which Mr.

3     Keglevic would like to leave, alive?

4               MR. MCKANE:  Approximately 1:30, Your Honor.

5               THE COURT:  Okay, all right.  Good.  Okay, very

6     good.  We'll take a short recess.  We'll push through lunch

7     if we have to.

8               MR. GALARDI:  Yeah, I don't think it can be that

9     long, Your Honor.

10              THE COURT:  Okay.

11         (Recess)

12              CLERK:  All rise.

13              THE COURT:  Please be seated.  Thank you for the

14    break.  You may proceed.

15    Q    Mr. Keglevic, the PUC, you testified on direct that the

16    PUCT denied the Hunt transaction, correct?  Denied approval

17    of it?

18    A    Their order didn't have all the required approvals

19    necessary.

20    Q    And so Hunt didn't have all the required approvals.

21    And so one of the concerns that you mentioned was the fact

22    that it was a REIT transaction, and it denied the requests

23    of the, and I'll call it the Hunts, to pass through the tax

24    benefits, is that correct?

25    A    That's correct.

1    Q    And was it also that they thought that that might

2    invade what's been known as the ring fence conditions?

3    A    Yeah, I guess.  I don't know that had as much to do

4    with the ring fence as it did with just equity to the rate

5    payers.  If the owner wasn't going to pay tax, why should

6    rates include the provisional taxes?

7    Q    And you would agree with me that that's part of the

8    unique structure of the REIT that was put together at that

9    time, correct?

10   A    Yeah.  I mean, a REIT does not pay taxes.

11   Q    Okay.

12   A    So it was --

13   Q    And that was the only REIT transaction that was ever

14   proposed in these cases, correct?

15   A    Correct.

16   Q    Now, once that transaction was terminated -- I think

17   let's started this way, if you started at Paragraph 17 of

18   your declaration, which is Tab 1, that we submitted for

19   today.  It says in Paragraph 17, after vigorous negotiations

20   with bidders and with the approval of the Debtor's boards

21   and disinterested directors, the Debtors entered into a

22   merger agreement with NextEra on July 29th, 2016.

23   A    Yes, it does.

24   Q    Now, did you participate in those vigorous negotiations

25   with bidders?

1   A    Yes, some of them.

2   Q    Okay.  And did you participate in board meetings in

3   which these discussion regarding the negotiations with

4   bidders were discussed?

5   A    Yes.

6   Q    And was the board fully apprised of the negotiations

7   with bidders that were going on with bidders during this

8   period of time?

9   A    To the best of my knowledge, yes.

10  Q    And I would ask you to turn to Tab 8.  Again, we'll put

11  it on the board, in the thick binder that I've provided to

12  you.  And it is ELX-353.  And I would ask you if you have

13  seen this document before.

14  A    I believe I have.

15  Q    Okay, and they're the minutes of a July 22nd joint

16  board meeting, correct?

17  A    That's what they are, yes.

18  Q    Correct, and you are listed here on a number of

19  capacities, EFCH, TCEH, EFIH, the whole alphabet goes on,

20  correct?  So you were at this meeting, correct.

21  A    I believe I was.

22  Q    Okay, and if you would turn to Page 3 of those minutes,

23  you see that there was a discussion at the very top of it.

24  It says Calder then gave an update on negotiations of a

25  merger agreement with NextEra for its purchase of EFH Corp's

1    economic interest in Oncor.  He reviewed NextEra's

2    willingness to take the asbestos liability in exchange for

3    $200 million reduction in its purchase price.  Do you recall

4    that being said at that board meeting?

5    A    Not necessarily, but I'm sure we discussed that, the

6    approach to asbestos.

7    Q    Do you have any doubt that that was discussed at that

8    meeting?

9    A    No.

10   Q    Okay, and it was a straight $200 million reduction in

11   purchase price, correct?

12   A    That's what it says, yes.

13   Q    Correct, and it there had not been that $200 million

14   reduction of purchase price, where would that cash have

15   ultimately gone to?  That $200 million.

16   A    It would have flown through the waterfall to creditors

17   based on their priority.

18   Q    And the first in priority for structural reasons were

19   the EFIH creditors, correct?

20   A    Yes, on the E-side deal, that's absolutely right.  It's

21   EFIH secured, unsecured, and then EFH.

22   Q    Okay, now if you would look down to the -- I guess it's

23   the last paragraph that's got redaction, so it's a little

24   confusing.  You see the name Thomas.  Is that Mark Thomas of

25   Proskauer Rose?

1    A    Yes, I would believe so.

2    Q    Okay.  And if you go after the big redacted for

3    privilege, it says, from the right side, it says he noted --

4    I assume that's Thomas -- EFH Corp's position that it is

5    important that the EFH Corp cash not be used to satisfy EFIH

6    claims but retained for EFH corporate stakeholders.  Did I

7    read that correctly?

8    A    That's what this says.

9    Q    Okay, and then let's read the next sentence.  He also

10   then goes on to say, he also noted the importance to EFH

11   Corp of a buyer assuming asbestos liabilities to protect

12   against an alleged $500 million intercompany claim being

13   asserted against EFH Corp by one of the EFH's Corp's

14   subsidiaries.  Did I read that correctly?

15   A    Yes, you did.

16   Q    Do you have any doubt that Mr. Thomas made those

17   statements to the board at that meeting?

18   A    I don't recall them, but I have no reason to believe

19   the minutes aren't accurate.

20   Q    And are you aware that there was this intercompany --

21   allegation of an intercompany claim that EFH Corp owed

22   certain of its EFH Corporate subsidiaries?

23   A    Once again, I was not invalid in the negation, and

24   while I sat there, I never got into the issues, because I

25   had no -- I wasn't asked my input, I didn't have the

1    authority to settle them.  And I was aware discussions were

2    going on.  I had plenty of other stuff to do in the case.

3    Q    And during this course of this case, have you ever

4    heard of the asbestos claimant saying they were entitled to

5    the proceeds of that $500 million intercompany claim?

6    A    I don't recall a discussion, but it sounds like he was

7    doing some negotiating in this meeting.

8    Q    And so you don't doubt that Mr. Thomas wanted to have

9    that $500 million intercompany claim go away?  Is that

10   correct?

11              MAN 1:  Objection.

12              THE COURT:  I'm sorry?

13              MAN 1:  Your Honor.  It calls for speciation as to

14   Mr. Thomas's state of mind.

15              THE COURT:  Yeah, he can't testify as to what Mr.

16   Thomas -- I believe he can certainly testify as to what he

17   heard, or what his impressions were.  But certainly can't

18   get inside Mr. Thomas's head.

19              MR. GALARDI:  I agree, and I don't think he'll

20   want to be there either.  But you don't have any

21   recollection of the assertion of a $500 million intercompany

22   claim among EFH-only entities?

23              MR. KEGLEVIC:  No, I actually do not.  I never got

24   into what the claims were between the entities and what they

25   were asking for, and what the negotiations were.  Just that

Page 58

```
 1    they were ongoing.

 2             THE COURT:  I'm sorry, was the DD -- what was it?

 3    The NextEra deal, that was --

 4             MR. GALARDI:  There were disinterested directors

 5    at this time.

 6             THE COURT:  Yes, I understand.  That was after the

 7    DD settlement was approved?  That was May, right, 2016?  And

 8    then we're talking about July 2016?

 9             MR. KEGLEVIC:  That's correct, Your Honor.  Yes, I

10    even knew that.

11    Q    That I didn't know.  Now, do you have any understanding

12    of why assuming the asbestos liabilities would in fact,

13    protect EFH cash from the alleged $500 million intercompany

14    claim?

15             MAN 1:  Objection, Your Honor.

16             MS. TERTERYAN:  Objection, Your Honor.  He just

17    testified he doesn't recall that claim.

18             MR. GALARDI:  I just asked if he had any

19    understanding.

20             MR. KEGLEVIC:  I don't recall, and I don't know

21    what his legal theory was in regard to that.  I never took

22    it into consideration, any of my negotiations with NextEra.

23             THE COURT:  I don't want to be a pain to Kirkland,

24    but can we pick one lawyer to do the objecting?

25             MR. GALARDI:  Different firms.  One was the Ad
```

1   Hoc, and one was the PA group.

2           THE COURT:  Different firms. Oh, that's right.  My

3   fault, my apologies.

4           MR. GALARDI:  I got them both to rise, Your Honor.

5           THE COURT:  My apologies, I'm wrong.

6   Q    Now, Mr. Keglevic, did you submit a written declaration

7   in support of the NextEra plan?

8   A    Yes, I believe I did.

9   Q    Okay, and in support of that, did you go through the

10  facts, and the gives and gets that happened in July with

11  respect to the NextEra transaction?

12  A    Yeah, I believe my declaration included all of that.

13  Q    Okay, and as you sit here today, is there any reason to

14  believe -- is there any statement in that declaration that

15  you do not believe is true, correct, and accurate as to the

16  gives and gets, and how you arrived at the NextEra

17  transaction on July 29th -- or how the company arrived to

18  get to the NextEra transaction of July 29th, 2016?

19  A    No, sir.  I do not.

20  Q    Okay, and your declaration, do you also recall in that

21  declaration describing the events subsequent to July 29th,

22  with respect to getting the Court to approve the transaction

23  on September 19th, 2016.

24  A    Now we're getting pretty specific.  Could I see a copy

25  of the declaration so I understand what you're --

1    Q    I think you can.  I'd ask you to turn to Tab -- which

2    tab is it?  7, Tab 7 in the binder.  It is ELX-457.

3    A    I'm there.

4    Q    And I would direct your attention to first Page 10 of

5    this declaration.

6    A    Yes, I'm there.

7    Q    And you've seen that demonstrative before, correct?

8    A    Yes, I believe this was the first question you asked me

9    about, the declaration.  This is what I was referring to.

10   Q    Correct, and then if you look at Paragraph 17, you then

11   describe exactly those events that are set forth in that

12   chart?

13   A    Yes, I did.

14   Q    Okay, and now if you go on to -- and then on Paragraph

15   18, you go on to describe that then you filed a plan of

16   reorganization called the original NextEra plan, and you

17   made a motion to approve the 200 -- you don't say 275, but

18   the termination fee, is that correct?

19   A    Yes, the 275 was in the original merger agreement that

20   we filed with the Court.

21   Q    Right.  And if you look back at Paragraph 17, and the

22   chart, July 21st, before the board meeting that I just had

23   the minutes from, there was an increase in the purchase

24   price of approximately $50 million, correct?  This must be a

25   Kirkland, because it has the lollipops and things like that?

1   A    Yes, before we filed a deal, I know there was 5200 and

2   110 in total.

3   Q    Okay, and if you look at those numbers, July 21st was

4   the 50?

5   A    Yes.

6   Q    There was an assumption of asbestos liabilities at 250

7   million on July 27th.  They dropped the match, right?  Is

8   that correct?

9   A    Correct.

10  Q    And increased the break-up fee.  And the break-up fee

11  was $110 million before that date, and you went up to what

12  you called the market rate of 275.

13  A    That's correct.  I made them consistent with the other

14  bidder we had at that point in time.

15  Q    Okay, and then again, that was still not adequate, so

16  on July 28th, they further increased the purchase price $110

17  million, correct?

18  A    Yes, and I think the importance of that last 110 was to

19  get EFIH paid in full, assuming no make-whole liability.

20  Q    Okay, now when you say that last 110 was to get EFIH

21  paid in full, had you made an assumption at that time, as to

22  the date of the closing of the NextEra transaction?

23  A    I believe we did.

24  Q    And do you recall how long that timeframe was?

25  A    I'm sure I was optimistic, given what ultimately

1   happened.  But I don't recall exactly what date we made the

2   assumption to.

3   Q    But you testified previously that the burn was

4   somewhere between $50 million and $60 million.

5   A    That's right.

6   Q    Okay, so even under those numbers, if it were short two

7   more months, you might have been in the money before that

8   last 110, correct?

9   A    Yeah, the calculation of recovery is very sensitive to

10  the date you exit.

11  Q    Okay.  Now, and in that -- so then you filed, I think

12  you say in this document, even on the top of the August 3rd,

13  you filed the NextEra merger agreement, right?

14  A    That's what it says, correct.

15  Q    And then you filed the NextEra plan and reorganization

16  in early August, correct?  That's Paragraph 18.

17  A    Yeah, I just wanted to follow along with you.  Thank

18  you, yes.

19  Q    Now, was there a provision in the plan or merger

20  agreement that provided anything with respect to the make-

21  whole dispute, that you recall?

22  A    Yeah, my recollection as that it was a conditioned

23  precedent?

24  Q    When you say it's a conditioned precedent, what is your

25  recollection?  And maybe it's easier just to direct you to

1     Paragraph 18 -- I'm going back to another binder -- of your

2     declaration put in evidence today, Paragraph 18.

3     A     I'm sorry, give me the tab again.

4     Q     It's Tab 1.  It's the small, skinny binder that

5     Kirkland provided for you, which will be easier for you to

6     use.

7     A     Thank you.

8     Q     And we'll put it on the screen.  And if you look at the

9     second sentence, it says as with the Hunt Plan, disallowance

10    of the make-whole claims was a conditioned precedent to

11    consummation of the NextEra plan.  That's what you're

12    referring to, correct?

13    A     That is, yes.

14    Q     Okay, now at this time, the Bankruptcy Court had

15    already disallowed the make-whole claims, correct?

16    A     Yes, they had disallowed it.

17    Q     Okay.  And when you say it's a conditioned precedent,

18    if you read the next sentence, what is your understanding?

19    It was, as long as there was no order reversing, remanding,

20    or staying the Bankruptcy Court's order, right?

21    A     Right.

22    Q     So at that time, you were awaiting a Third Circuit

23    decision, correct?

24    A     We were.

25    Q     Okay.  And as long as the Third Circuit didn't rule

1    before consummation, what would have happened if the Third

2    Circuit had, in fact, reversed, as they did?  Who would have

3    borne that financial risk?

4    A    After confirmation?

5    Q    After consummation.

6    A    I'm trying to recall.  I'm sure there's somewhere you

7    can reference me that -- it's not under dispute, I just

8    don't recall.

9    Q    Isn't it the case that NextEra was obligated to pay the

10   make-whole, if it happened that the Third Circuit decision

11   was after the consummation of the transaction?

12   A    That's my recollection, but I wanted to refresh it, but

13   --

14   Q    And that was part of the original deal back in July,

15   correct?

16   A    Yes, if it was before, they could walk away, or agree

17   to pay.  And it was after, they had to assume the liability.

18   Q    Okay, now between the time that you filed the NextEra

19   plan and you had a September 19th hearing, was there

20   creditor objections to the NextEra plan?  And the break-up

21   fee?

22   A    Yes.

23   Q    And do you recall the parties that objected to those

24   claims?

25   A    Fidelity was among them.  I don't have the entire list,

1    but they were a significant EFH creditor, and they objected.

2    Q    Okay, now if you go -- and I hate to go back to a

3    different declaration -- go back to the Tab 7 declaration,

4    Paragraph 19.  In response to those objections, NextEra

5    increased its consideration again to resolve those

6    objections, isn't that correct?

7    A    Well, we continue to negotiate with NextEra to get as

8    much as we could.  But clearly that was a significant help

9    in those negotiations, the fact that we had creditors still

10   not supporting their plan.

11   Q    Correct, and at the bottom of 19, it says that there

12   was an amendment to reflect a $300 million in that cash

13   component, is that correct?

14   A    That's correct.

15   Q    And they also reduced that asbestos escrow, $115

16   million of it, correct?

17   A    Yes, that's the 450 bump that I referred to at the end

18   of the day.

19   Q    Okay.  And the Court approved that termination fee and

20   agreement on September 19th, correct?

21   A    Yes, I believe they did.

22   Q    Okay.  Now, do you recall there being an argument in

23   the Third Circuit regarding the appeal of this Court's

24   decision on the make-whole?

25   A    Yes, I do.

1   Q    And do you recall the date of that oral argument?

2   A    I don't.

3   Q    Okay. What I'd ask you to do is to turn to Tab 10, ELX-

4   430.  And this will be very short with this exhibit, because

5   all I'm going to ask you is if you would look at that

6   published opinion, that's the Third Circuit's opinion.  Is

7   that correct?

8   A    I've not seen it before.

9   Q    Okay.

10  A    I don't for fun look at Court opinions, but I know what

11  it said.

12  Q    Okay, I'm sure you did.  And if you look down below, it

13  says it was argued on September 27th, 2016.

14  A    Where are you referring me to where it says that?  I'm

15  sure you're correct.

16  Q    If you look on the big screen, which will probably be

17  easier for people actually, sometimes.  It says argued the

18  27th, right?

19  A    It says argued September 27th, 2016.

20  Q    Okay, and do you recall that there was a board meeting

21  to discuss, among other things, this oral argument.

22  A    Generally, it obviously was a big event, and I know we

23  had a board meeting very closely to this decision.

24  Q    Okay, and if you would now turn to -- not September 11,

25  to Tab 11, and then I'd ask you to Turn to Tab 11 and

1    identify this document?

2    A    These are the joint board meeting minutes for the

3    September 30, 2016 meeting.

4    Q    Right, and let's jump.  We actually have them as Tabs

5    11 and 12, technically the minutes, the joint minutes are

6    12. But I am going to have you look at what has been marked

7    Tab 11, okay?  And you were present during this board

8    meeting, correct?  (indiscernible) your name is listed under

9    EFIH --

10   A    Best of my knowledge, yes.

11   Q    Okay, now behind this tab, there is a restructuring

12   update, correct?  And if you flip through the pages -- I'm

13   not going to do it on the screen, you see that there was a

14   series of updates regarding a number of matters, correct?

15   A    Correct.

16   Q    Now, you'll see, and I'm going to do Page 13 of 54, or

17   depending upon what makes it easier for you, there is a

18   section called Update on NextEra Transaction.

19   A    I'm there.

20   Q    Now, I think it's a typo or an error.  It says on

21   September 25th, NextEra materially improved the terms of its

22   proposed in two significant ways.  I believe that that was

23   September 15th, right, the weekend before the Court's

24   hearing?

25   A    Whatever we went over in my declaration I think is

1    correct.

2    Q    Okay.  Now, it also notes that there was a meeting with

3    the PUCT on September 22nd, and they had an open meeting

4    with the Commissioners, and they had preliminary comments

5    about the termination fee, is that correct?

6    A    Yes.

7    Q    And they were concerned about thee termination fee, and

8    then the notes go on to say that you were going to advise

9    the Bankruptcy Court of the PCUT's remarks, and you

10   commented that in fact, the Bankruptcy Court addressed the

11   PUT's remarks after a written letter from NextEra and I

12   believe your counsel.

13   A    Yes.

14   Q    Okay, now if you go three more pages back, I believe,

15   to 17 of 54, there is this update on the make-whole,

16   correct?

17   A    That's correct.

18   Q    Okay, and it notes that there was this oral argument on

19   September 27th, and that the panel -- and that you could

20   receive -- at least two months before you would receive a

21   ruling, correct?  If you look at the very bottom, right

22   before the redacted section.  At least two months.

23   A    Yes.

24   Q    Now, if you go back -- I'm going to go now to Page 22

25   of 54, you see this document?

1    A    Yes, I do.

2    Q    And do you believe this document was created -- strike

3    that.  Wasn't this document created so that the board can

4    get an update as to what the ruling on the make-whole, and

5    what effect it would have on the consideration that was

6    negotiated previously, and approved by the Court on

7    September 19th.

8    A    Yes, that's generally what it's doing, is showing the

9    effect of the make-whole on creditor distributions.

10   Q    And this document says as of 9/18, that that was as of

11   having obtained all of that extra consideration resolved in

12   the objections, correct?

13   A    I'm not sure what you mean.  What date -- this is --

14   Q    If you look at the top, it says NextEra proposal as of

15   9/18.  So that would incorporate all those last extra

16   values, correct?

17   A    Yes.  It looks like the extra values that we discussed

18   are in here.

19   Q    Right.  And if you look down below, you see that that's

20   talking about that $471 million down there, and that was as

21   a result of the series of steps, correct?

22   A    That's correct.  You're talking about the excess value

23   from EFIH to EFH creditors.

24   Q    Correct.  And that was as a result of that first step

25   back in July, and that was also as a result of the steps

1    that occurred, and the extra value given right before, and

2    ultimately approved by the Bankruptcy Court on September

3    19th, correct?

4    A    Right.  This was effectively the final deal with

5    NextEra.

6    Q    Okay.  Now, I'm going to turn a little bit now to --

7    did you serve on the Fee Committee, sir?

8    A    Yes, for a brief period of time.

9    Q    And as a member of the Fee Committee, did you

10   participate in any review of fee applications?

11   A    Yes.

12   Q    You actually reviewed fee applications?

13   A    I participated, but generally speaking, I was the new

14   kid on the block.  The Fee Committee, Mr. Gitlin had a

15   process.  He had his legal team go through the bills and the

16   applications, and they only brought to the Committee level

17   exceptions, based on their review.  So I personally did not

18   dive through all the materials of the Fee Committee.

19   Q    And did the Fee Committee review allocation of

20   professional fees between the EFH estate, the EFIH estate,

21   and the TCEH estate?

22   A    Not to the best of my knowledge, while I was on the Fee

23   Committee.

24   Q    Okay, and you believe that was a conflict matter,

25   correct?

1    A    I definitely believe it was a conflict matter.

2    Q    Okay.  Now, were you aware of how Kirkland & Ellis was

3    allocating --

4             THE COURT:  Isn't conflict matter under the -- as

5    defined in the appointment process?

6             MR. GALARDI:  Good question, Your Honor.  Is that

7    ow you understood that, Mr. Keglevic?

8             MR. KEGLEVIC:  The way I meant it, in terms of my

9    answer, was to the extent that there was a disagreement in

10   the allocation of a bill between the estates, I could not

11   solve that disagreement.  Would have to be with the

12   disinterested directors, would have to come to an

13   understanding, or would have to be adjudicated, I guess.

14   But it wasn't the purview of the CRO to determine that

15   allocation.  It was based on the court order, and how the

16   professionals allocated their direct time and indirect time.

17   And that was the process used.  So I don't think it ever

18   came up.

19             THE COURT:  Let me just say, so if the Fee

20   Committee didn't do it, there was a fee application that

21   skewed the -- that did an allocation that maybe was unfair

22   to when either EFH or EFIH, on either hand.  That wasn't

23   your issue.  You would consider that a conflict matter, and

24   the disinterested directors would have to object.

25             MR. KEGLEVIC:  Yes, and to expand a little bit,

1    Your Honor, we had in various board meetings, a listing of

2    all the fees by professionals, including estimated fees to

3    come, showing the allocation between TCEH, EFH, and EFIH

4    that we presented to all the directors.  So they were --

5              THE COURT:  Were the disinterested directors not

6    among them?

7              MR. KEGLEVIC:  They absolutely were among them,

8    and had the opportunity to raise questions, or ask

9    information, which they often did, about -- frankly, it was

10   more about size of fees than it was about allocation

11   matters.  But I think there were some allocation questions

12   raised as well.

13   Q   Your Honor, other than his very last part about, I'd

14   strike it about, that he thinks that there were some

15   allocation issues that were discussed.  I don't think he's

16   based it on any recollection.  Did you recall any such

17   discussions about the allocation of fees among the

18   disinterested directors that you were party to?

19   A   I was at a meeting where Ms. Williamson asked some

20   questions.

21   Q   Asked questions as to --

22   A   Allocation.

23   Q   Allocation.  And was Mrs. Cremens in that same meeting?

24   A   I believe he was.

25   Q   And were there discussions about whether the allocation

1    was proper or improper?

2    A    She raised the question, we explained the basis of how

3    it was done, consistent with the court order.  And I think

4    the discussion concluded.  I don't think Mr. Cremens took a

5    position, or she took a position.

6    Q    Okay, and I think you said, consistent with the court

7    order, did you review the actual interim compensation court

8    order regarding the allocation of fees?

9    A    I don't recall specifically reviewing it, but I have a

10   general understanding of what it says.

11   Q    And did you ever discuss with Kirkland how it was

12   allocating its fees between the EFH estate and the EFIH

13   estate?

14   A    I don't recall ever having a discussion with Kirkland.

15   Q    Do you recall ever saying to Mr. Rosenbaum or anyone

16   else that Kirkland was allocating its fees 90-10?

17   A    I don't recall that discussion.

18   Q    Do you recall anyone at Kirkland ever telling you that

19   they were allocating professional fees 90-10?

20   A    I don't recall ever having that discussion with

21   Kirkland.

22   Q    And I take it you therefore never approved an

23   allocation of 90-10.

24   A    I never approved any allocation, or the payment of any

25   bills.  The bills came in to the Legal Department, which was

1    originally Ms. Doré, and then Mr. Wright.  And then one of

2    the members of the Legal Department, Gooch, Cecily Gooch,

3    also involved in the review, and she was the member of the

4    Fee Committee from when it was formed, until when I came on,

5    late in 2017.

6              So they went -- the Legal Department went through

7    a process.  But I just knew they went through a process,

8    authorized payment, and I was not involved in it.

9    Q    And you don't know whether they went through a process

10   to authorize payment and allowance, or whether they actually

11   allocated among the estates, do you?

12   A    I'm fairly certain they did not do any allocation.

13   They accepted -- they took the bills, and my understanding

14   was they checked for compliance with the order.  So as long

15   as the professionals did it, direct and indirect, they were

16   okay.

17   Q    And do you recall any discussions from anyone that you

18   heard investigating what the basis was for the allocation

19   between -- you called them indirect, you called them

20   collective, between -- among the collective fees that were

21   billed.

22   A    No, the only discussion that took place in allocation

23   was the order came out, and then not until Mr. Rosenbaum

24   brought it up in 2017, in connection with his plan did I

25   hear the matter discussed, other than at board meetings,

1   when the disinterested directors saw the fees, and the

2   amounts allocated, and like I said, I recall one meeting

3   where a question was raised.

4   Q    Okay.  Now, I'd ask you to turn to Tab Number 13.  Now,

5   I understand you have not seen -- you have not reviewed any

6   fee applications by the firm of Kirkland & Ellis, correct?

7   A    Correct.

8   Q    But I'm going to ask you about a footnote, if you would

9   turn to Page -- well, you got to go through the first -- I

10  have it called Page 2 of 3, it is a chart. We'll put it on

11  the screen, because it'll be much easier to put it on the

12  screen.  And I'm going to draw your attention to a footnote.

13  The Footnote 1.  Now, it says amounts billed to EFIH,

14  Matters 69, 70, 73, and 76 are allocated, 90 percent to

15  EFIH, and 10 percent to EFH, reflecting to the corresponding

16  debt amounts.  Did I read that correctly?

17  A    That's what it says.

18  Q    Okay, now would you have any understanding of what

19  those debt amounts would reflect to be 90-10?

20          MAN 1: Objection, Your Honor, foundation.

21          MR. KEGLEVIC:  I didn't --

22          THE COURT:  Hang on.  He's never read this

23  document, so how can he have an opinion as to what it says?

24          MR. GALARDI:  Well, Your Honor, if he can't give

25  an opinion, no third party would understand.  This man is

1    the man that knows all of the debt at the company.  I'm

2    simply asking the question --

3             THE COURT:  But how does he know what Kirkland

4    means by corresponding debt amounts?

5             MR. GALARDI:  Okay, I'll withdraw the question,

6    and I'll ask --

7             THE COURT:  Okay.

8    Q    Mr. Keglevic, did you put in a first-day declaration in

9    connection with these bankruptcy cases?

10   A    I did.

11   Q    Okay.  And what I would ask you to do is to turn to Tab

12   14 of this first-day declaration, which is your first-day

13   declaration.

14   A    It looks like it is, correct.

15   Q    Okay, and if you look at the end, what I would ask you

16   to do is look at the last page, because this time we have a

17   signature on your last page, and that's your signature,

18   correct?  I believe the last page is 85 of 464, but it's the

19   last page in the binder, or that tab.

20   A    That is my signature, on Page 85 of 464.

21   Q    Okay, and now I'd ask you to turn to Page 37 of your

22   declaration, and I'm using the page numbers, as opposed to

23   the file numbers.  But that would have been 40 of 464.

24   A    Yes, I'm there.

25   Q    Okay, and it says as of the petition date, EFH Corp and

1    EFIH had outstanding funded indebtedness of approximately

2    1.929 billion at EFH, and approximately 7.709 billion at

3    EFIH, as summarized in the following table.  Did I read that

4    correctly?

5    A    You did.

6    Q    Now, I am not the best mathematician.  But if I were to

7    round up both of those numbers, I could have said 2 billion

8    and 8 billion, for a total of 10 billion.  Is that pretty

9    accurate?

10   A    You're not a mathematician, so it is what it is.

11   Q    Okay, but when you go more precise, it's only going to

12   go harder.  And so 1.9, or that 2 billion is 20 percent of

13   the debt as of the petition date, isn't it, that EFH had?

14   A    Well, I don't have a calculator, but that seems fairly

15   close.

16   Q    And given that it was a little less than 10, my math

17   tells me it might be 21, 22 percent, correct?

18   A    Yeah.  And it depends on, in the 1929, I think is some

19   of the intercompany debt.  So at this date, it depends on

20   what date you are, but ultimately that was -- they had a

21   negotiation with EFH and EFIH, and gave up that claim, which

22   would have reduced that, I think.  But your math is correct.

23   Q    And so as of the petition date, it would have been a 20

24   percent deb at EFH, and 80 percent debt at EFIH, correct?

25   A    Subject to check, and based on your calculation, yes.

1    Q    So you couldn't -- the debt word, and what we read in

2    the debt, 90-10, can't be the debt as of the petition date,

3    can it --

4              MS. TERTERYAN:  Objection, Your Honor.

5    Foundation.

6              THE COURT:  Hang on, Mr. Keglevic.  Mr. Galardi

7    can you respond?

8              MR. GALARDI:  If it's 20-80, and it's 10-90, and

9    the word is debt --

10             THE COURT:  So the question is, is 20-80 the same

11   as 10-89?

12             MR. GALARDI:  Okay, fine, I'll ask you.  That's

13   one of the questions.

14             THE COURT:  All right, well --

15             MR. GALARDI:  The real question is, could that be

16   the debt that was used to calculate?

17             THE COURT:  There's no way that he is competent to

18   testify to that.

19             MR. GALARDI:  Okay, that's fine, Your Honor.

20             THE COURT:  You can certainly make the argument --

21             MR. GALARDI:  That's fine.  We'll make the

22   argument, Your Honor.  That's fine.  If I may take a break,

23   I may be close to finished.

24             THE COURT:  Yes, we'll take a short recess.  Just

25   let Leslie know when you're ready.

1          MR. GALARDI:  Sure.

2       (Recess)

3          CLERK:  All rise.

4          THE COURT:  Please be seated.

5          MR. SCHRYVER:  Yes, sir.  Good morning, Your

6    Honor.  For the record, Gavin Schryver, Kasowitz Benson

7    Torres on behalf of Ad Hoc EFH claimants.

8          We have, I believe, placed a binder with Your

9    Honor for Mr. -- my examination of Mr. Keglevic.  You should

10   have it in front of you, and Mr. Keglevic also, I believe,

11   has a copy.

12               CROSS-EXAMINATION OF PAUL KEGLEVIC

13   BY MR. SCHRYVER:

14   Q    Good morning, Mr. Keglevic.  If you could turn to Tab 7

15   of the binder that has been handed to you, you'll recognize

16   this document.  You've gone through it a little bit already

17   today.  Is that a copy of your written directive that you

18   submitted on this matter?

19   A    It is my declaration in connection with this matter.

20   Q    And if you could turn to Paragraph of your declaration,

21   it's on Page 5.

22   A    I'm there.

23   Q    In the very first line, you say, "As discussed further

24   below, the debtors signed up five different restructuring

25   transactions over the course of their restructuring, each

1    time after excessive and hard-fought negotiations." Do you

2    see that?

3    A    Yes.

4    Q    And am I correct that those five transactions are the

5    RSA, the Hunt transaction, memory test, the NextEra

6    transaction, the Berkshire transaction, and the Sempra

7    transaction?

8    A    Correct.

9    Q    Correct.  And as you say in the next sentence, none of

10   those transactions contemplated triggering a massive tax

11   liability; do you see that?

12   A    Yes, I do.

13   Q    So all five transactions I just mentioned were

14   structured to be tax free, right?

15   A    They were.

16   Q    And before the debtors signed up -- to use your words--

17   signed up those transactions, did the boards of each of the

18   debtors approve them?

19   A    They did.

20   Q    And you were a director on the board of EFIH, correct?

21   A    I was EFIH and then a couple on the T side, but I was

22   not a director of EFH.

23   Q    But at a minimum, you were a director of EFIH.

24   A    Correct.

25   Q    And as a director of EFIH, did you vote in favor of

1    approving each of those five transactions?

2    A    I did.

3    Q    And when you voted as an EFIH director to approve each

4    of those five transactions, you did so because you believed

5    that each of those transactions was in the best interests of

6    EFIH and its creditors, correct?

7    A    I did.

8    Q    Now, at the bottom of Paragraph 7, you have sentence

9    that says -- well, you say that the separate transaction,

10   and I'm quoting, "maximized the value for both EFH and EFIH

11   and was the best available restructuring alternative for

12   both sides." Do you see that?

13   A    I do.

14   Q    And I assume you still agree with that sentence.

15   A    I do.

16   Q    Would you agree that at the time you voted to approve

17   each of the other four transactions we just discussed -- and

18   that would be the RSA, Hunt, NextEra, and Berkshire -- you

19   believe that each of those transactions maximize value for

20   both EFH and EFIH and was the best available restructuring

21   alternative for both estates at that time.

22   A    I did.

23   Q    Now, in effect, this court ultimately approved three of

24   those transactions, right, the Hunt transaction, the NextEra

25   transaction, and the Sempra transaction, right?

1    A    Correct.  They approved the -- all but the TSA and the

2    Berkshire.

3    Q    Right.  And to the best of your knowledge, when it

4    approved those transactions, did the Court make a finding

5    that each of those transactions was in the best interest of

6    the debtor's estate?

7    A    Yes.  Well, I'm not exactly sure, but I think that was

8    one of the standard tests that the Court had to get past.

9    And I'd also indicate that the creditors took a similar

10   position in voting in favor.

11   Q    Including --

12   A    I'd assume they did the best interest of their personal

13   holdings.

14   Q    And that includes creditors of EFIH.

15   A    Includes creditors of all estates.

16   Q    I want to turn to one of those transactions, in

17   particularly -- particular -- the NextEra transaction.  Now,

18   you recall that on July 29th, 2016, the debtors executed a

19   merger agreement with NextEra.

20   A    I -- that's generally correct.

21   Q    Well, let's just go to a document that Mr. Galardi took

22   you through a bit.  It's at Tab 5 of the binder that we

23   provided you.  And you recognize that that's the declaration

24   you submitted in support of confirmation of the NextEra

25   plan.

1    A    I do recognize it, yes.

2    Q    So I'm going to turn to the same set of paragraphs --

3    pages that -- that Mr. Galardi generally took you through,

4    and I want to drill down a little bit on some of those

5    negotiations, if that's all right.

6    A    Okay.

7    Q    So you see I referenced July 29th.  If you look at Page

8    18, that confirms that the Debtors executed the merger

9    agreement with NextEra on July 29th, correct?

10   A    It does.

11   Q    Now, you -- the debtors were negotiating with both

12   NextEra and another bidder before they executed a merger

13   agreement with NextEra, correct?

14   A    Correct.

15   Q    And if you look at Paragraph 17 in the second sentence,

16   it says by July 27th, Bidder 2 had submitted a revised bid

17   that put it in the lead with respect to distributable value;

18   do you see that?

19   A    I'm sorry.  I lost you. Which paragraph are you on now?

20   Q    Paragraph 17 of the -- of Tab 5, which is your -- I'm

21   sorry, the declaration you submitted.

22   A    Okay.  We're back on Page 10.  I got you.

23   Q    We are back on Page 10.  And I don't know if we can get

24   that on the screen or not, but --

25   A    I'm good.

1    Q    -- either way, you have it front of you.  So is that

2    consistent with your recollection, that as of July 27th, the

3    other bidder was ahead in the negotiations for a transaction

4    with the Debtors?

5    A    Yes.

6    Q    And then at that point, we have the next sentence.  It

7    says, "In turn, NextEra raised its bid by $200 million,

8    agreed to assume the (indiscernible) asbestos liabilities

9    and to escrow $250 million for those labilities, increased

10   the break fee, and dropped the match right, bringing NextEra

11   into the lead once again in terms of distributable value."

12   Do you see that?

13   A    Yes.

14   Q    And is that consistent with your recollection of

15   NextEra raising its bid?

16   A    Yes.  This is much closer to the events than I can

17   recollect today, but I believe that could be factual, as I

18   did then.

19   Q    And you say there that NextEra increased the break fee.

20   They increased the break fee to $275 million, correct?

21   A    Correct.

22   Q    And I believe you said earlier -- I don't recall if it

23   was on direct or Mr. Galardi's cross -- that that matched

24   the termination fee that had been proposed by the other

25   bidders; is that correct?

1    A    It did.

2            MR. GALARDI:  I don't think it was -- that's what

3    his statement was, Your Honor.

4            THE COURT:  I can't hear you.

5            MR. GALARDI:  I don't believe that that was the

6    statement he made, Your Honor.  Mischaracterizes testimony.

7            THE COURT:  Yeah.  Let's -- ask it without

8    referencing to what he said.  You can ask the question.

9    Q    Absolutely.  When the -- when NextEra increased its

10   break fee to $275 million, did that match the break fee that

11   had already been proposed by the other bidder?

12   A    Yes.  I -- it did.

13   Q    And that -- by that, you mean that the break fee

14   proposed by the other bidder was approximately $275 million?

15   A    Yeah.  I -- my recollection, I think it was exactly

16   that amount.  But if not, it was 270, but I think it was

17   275.

18   Q    And at the time that the other bidder had proposed $275

19   million, their -- they had been offering less than what

20   NextEra was proposing in its revised bid, correct?  Not the

21   best question, but --

22   A    When the other bidder had a 275 break fee but was still

23   behind NextEra after this $200 million (indiscernible).

24   Q    Got it.  You also referenced assuming (indiscernible)

25   asbestos liabilities; do you see that?

1    A     Yes.

2    Q     And did you have an opinion at the time of these

3    negotiations of what the present value of that asbestos --

4    of those asbestos liabilities would have been?

5    A     Yeah.  We believed it was substantially less than $250

6    million.  You know, we had been paying -- I think this is on

7    the record from prior testimony -- like $1 million a month,

8    but I don't recall when exactly we got an outside third-

9    party actuarial estimate of the amount, which came out to be

10   56 --

11             MR. GALARDI:  Your Honor, I mean, he's now -- that

12   testimony is not being committed into the record because it

13   was hearsay.  So I move to strike the statement as to the

14   amounts.

15             THE COURT:  Response?

16             MR. SCHRYVER:  I have no objection striking

17   testimony concerning an actuarial report, but I think that

18   Mr. Keglevik's personal opinion, having reviewed plenty of

19   facts documents and evidence as a director and officer of

20   EFH and EFIH is admissible and relevant.

21             MR. GALARDI:  Your Honor, that's still his -- it

22   all relies -- he didn't do an independent investigation.  It

23   still relies on facts and testimony.

24             THE COURT:  I think we can go all the way up to

25   when he started to talk about the actuarial amount.

1          MR. GALARDI:  Exactly, Your Honor, and the numbers

2     that he was going to put out.

3          THE COURT:  Okay.  I'll sustain that objection and

4     strike, I think it's about half a sentence before he was

5     interrupted, and instruct him to stop.  Stop talking.

6          MR. SCHRYVER:  I understand.

7     Q    Let me ask you, though, did you ever do your own

8     analysis of the present value of the asbestos liabilities

9     discussed in Paragraph 17?

10    A    I knew what the actual amount we were paying was, and

11    like I said, I think it was -- I think I misspoke.  I -- it

12    was a very low number per year.  I don't recall exactly what

13    it was, but it was a few million dollars a year, I believe,

14    is what we were paying.

15          So that informed my decision, and we also were in

16    the process of going out and determining what an insurer

17    would take over the liability for, you know, how much that

18    would cost us.  I don't recall at this date that we had it,

19    but I think importantly to note that when we evaluated the

20    other bidder, the other bidder, without going too detailed,

21    has a close business relationship with insurance companies,

22    and we were very confident that they were going to, you

23    know, take over the asbestos liability too.

24          So when we were comparing the two bids, we kind of

25    -- you know, we liked actually the other guys better because

1    they wouldn't -- we wouldn't have an escrow an amount well

2    beyond what we thought the liability actually was, that they

3    were just going to insure it.  But we never got there with

4    Bidder 2.  And as you know, down the road we got NextEra to

5    lower that among to a more reasonable amount.

6              And we also had a provision in the agreement that

7    to the extent NextEra went out and insured that risk at a

8    lower amount than the ultimate escrow that they maintained,

9    that we would receive back the additional amount from that

10   escrow to distribute to the creditors.

11             THE COURT:  Now, my memory -- let me interrupt for

12   a minute.

13             My memory is that while the asbestos annual spend

14   for settlements and attorney's fees had been relatively low

15   prior to the petition date, it had actually -- however, it

16   had spiked a little bit in the year or two before the

17   petition date; is that right?

18             MR. KEGLEVIC:  If it spiked, it might have been

19   (indiscernible) to the prior years, but it was still low

20   millions.  It wasn't over ten.  But I think what happened is

21   when we asked for the bar date, the amount of claims that

22   came in --

23             THE COURT:  Right.

24             MR. KEGLEVIC:  -- grew substantially than, you

25   know, the kind of activity we were seeing.  So, you know, in

1   some respect, we didn't think we could sell the company

2   without doing the bar date because nobody would assume

3   legality if it hadn't been sized.  But we knew when we asked

4   for the bar date the word would get out, and everybody with

5   any kind of claim would file something.  And that's what

6   happened.

7   Q    Did the boards of directors of the debtors form a view

8   as to the benefit of NextEra assuming asbestos liability as

9   discussed in Paragraph 17?

10  A    Yeah. I -- well, I think they were informed primarily

11  the same way I was informed and relied on what we had told

12  them, that we believed it was substantially -- 250 was

13  substantially too high.  This is what we had been paying.

14  We were in the process of obtaining insurance quotes and

15  getting an actuarial study.  I don't have the dates of when

16  we had those in hand as compared to the date we did this,

17  you know, we did the final amount.  But I think it's safe to

18  assume that if you asked any of the directors, they would

19  say it was substantially less than this and, you know.

20          I don't want to put a number on it, but I think

21  less than $100 million was certainly in all of our heads.

22  Q    Understand.  So I want to go back to the negotiations,

23  kind of the back and forth with NextEra.  But at that point,

24  we just completed the sentence that begins "In turn, NextEra

25  raised its bid by $200 million." Now, at that time, the

1    offer on the table at that time, based on the projections

2    used by the debtors at the time, NextEra's proposed purchase

3    price had not fully cleared the EFIH capital structure,

4    correct?

5    A    Correct.

6    Q    So at that time, under -- using the purchase price

7    proposed in that sentence, EFH would receive no excess cash

8    value from the transaction as proposed.

9    A    That's correct.

10   Q    Now, over the next two days -- and we're getting to the

11   next couple sentences -- NextEra raised its bid by another

12   $110 million, correct?

13   A    They did.

14   Q    And only at that point, based on the projections used

15   by the debtors the time, did the deal fully clear the EFIH

16   capital structure and provide excess value to EFH, correct?

17   A    Yes.  That was our -- that's my recollection, and that

18   was our calculation at the time.  But it -- but I think

19   earlier I did as that's sensitive to what date you assume

20   you're going to exit.

21   Q    Correct.  But at the time, the assumptions --

22   A    Based on our best assumptions, that was our belief, and

23   that's what we presented to our board.

24   Q    Understood.  And with that extra $110 million in cash,

25   the DA cleared the capital structure by $53 million,

1    correct?

2    A    Yes, I think that's right, 53, 54.

3    Q    And that was the deal that was agreed to in the NextEra

4    merger agreement signed July 29th, 2016, correct?

5    A    Yeah.  That was the deal we, in fact, I believe filed

6    with the Court for approval.  So our board approved that

7    deal at that point, and we were ready to go get it approved.

8    Q    And that agreement contained the 275 million break-up

9    fee, correct?

10    A    It did.

11    Q    And that break-up fee -- the merger agreement was

12    amended in September of 2016, correct?

13    A    I'm sure it's in here somewhere.

14    Q    It's Paragraph 19, I believe.

15    A    It's September 18 amendment, yes.

16    Q    Yep.  So -- but the termination fee was never changed,

17    correct?

18    A    No.

19    Q    Okay.

20    A    The only thing that was changed was the purchase price

21    went up $300 million, and I believe the asbestos reserve

22    went down -- I'm trying to remember the number -- 100 or 150

23    -- 150 down.  So that provided in total $450 more -- million

24    more dollars of distributable value to the estates.

25    Q    Okay.  And those that did -- that additional

1    compensation provided by NextEra, those were -- those were

2    -- that was additional compensation negotiated by the

3    debtors between July and September.

4    A    Yes.  That was -- you know, I think as we say here,

5    Fidelity was involved and was helpful, frankly, because they

6    were a holdout, so we used that in our negotiations to try

7    to get more.

8    Q    But the debtors were actively negotiating with NextEra

9    to obtain additional compensation --

10   A    Yes.  I --

11   Q    -- (indiscernible).

12   A    I would say that our negotiation strategy was much like

13   the 110 that we just went over, that for a small amount of

14   money, we could clear the PIKs tower, and that was, you

15   know, money well spent, in our mind, for NextEra to pay so

16   that we could argue the EFIH creditors were paid in full.

17   And similarly, when we had no EFH support, we kept pushing

18   saying, you know, if you want this to go quickly and get

19   approval, which they did -- they didn't want to be standing

20   out there for a long period of time -- you know, you need --

21   EFH is getting virtually nothing out of this deal.

22           You got to, you know, buy their support and, you

23   know, the asset's worth more, and so we kept pushing on

24   asbestos because we thought the 250 was overstated.  They

25   agreed to get it down to 100, which as I said, we thought it

1    was a little less than that, but that was in the ballpark.

2    And we got them to come up with the extra $250 million.

3    Q    Understood.

4    A    Or, yes, $250 million.  I'm sorry, 300 -- let me think

5    which number is right -- 300 and 150 were the last two

6    negotiated pieces.  300 was the purchase price, and 150 was

7    the reduction in the asbestos reserve.

8    Q    Understood. You're familiar with the make-whole claims

9    asserted against EFIH by certain of its creditors, right?

10   A    I am.

11   Q    And as you, I believe, discussed earlier -- well, let

12   me just say you understand that this court initially

13   disallowed those claims.

14   A    I currently do.

15   Q    And the district court affirmed that disallowance.

16   A    Yes, they did.  I don't like bringing it up in front of

17   Judge Sontchi, but they did.

18            THE COURT:  That part's not bad.

19            MR. SCHRYVER:  Yeah, that part -- that part was

20   good.

21            THE COURT:  That part was all right.

22            MR. SCHRYVER:  We're still in a good place.

23   Q    Ultimately, however, the Third circuit reversed and

24   allowed the make-whole claims, right?

25   A    They did.

1   Q    and I believe we established earlier that that --

2   actually, I don't think we did establish that.  That

3   occurred in November of 2016, correct?

4   A    Yes, it was after we negotiated the final NextEra

5   agreement.

6   Q    At the time of the negotiations in July of 2016 with

7   NextEra and the other bidder, the make-whole claims were

8   still on appeal with the Third Circuit, correct?

9   A    They were, and therefore -- I think as I discussed with

10  Mr. Galardi, they were a condition precedent to the closing

11  the NextEra deal.

12  Q    And they were still on appeal in September when the --

13  the make-whole claims were still on appeal in September when

14  the merger agreement was amended.

15  A    Correct.  In fact, I think it was amended just

16  literally a week or so before oral arguments.

17  Q    And you understood before -- and the Third Circuit's

18  decision, we discussed, came out in November of 2016, right?

19  You understood that before that -- that's wrong.  You

20  understood before that decision came out that allowing --

21  that a decision allowing the make-whole claims would have a

22  substantial impact on creditor recoveries, correct?

23  A    Oh, absolutely.  We celebrated the decision of the

24  bankruptcy court, but we had, you know, we had often gone to

25  our board with and without, you know, showing the impacts on

1    creditor recoveries with the make-whole claims.  And so we,

2    you know, it was a substantial amount of money, so yes, we

3    tracked it very closely, and we were aware of impact on

4    creditor recoveries.

5    Q    And so it's fair to say that the effect on the

6    distribution waterfall allowing the make-whole claims was

7    discussed at meetings of the debtor's boards of directors

8    prior to November 2016, at least those meetings you

9    attended.

10            MR. GALARDI:  Objection, Your Honor.  Foundation.

11   We have -- objection foundation.  We have no board minutes,

12   no evidence to sustain that -- that reflect the make-whole

13   prior to that September 30th meeting that I have.  This

14   individual's --

15            THE COURT:  Well, that's not a foundation

16   objection.  That's -- well, that's certainly -- that's

17   certainly something you can bring up in re-cross if you

18   want, but he -- if he recalls the board meeting, that

19   doesn't, you know, and there are no minutes, that doesn't

20   necessarily mean, you know, that his recollection is wrong.

21   But you can certainly cross-examine him on that because it

22   might go to whether he's correctly remembering what may or

23   may not have occurred.  So overruled.

24   Q    I assume you don't remember my question.  I'll ask it

25   again, if I can.  Is it fair to say that you attended

1    meetings of the debtors' boards of directors at which the

2    effect on the distribution waterfall to creditors and other

3    stakeholders of allowing the make-whole claims we discussed?

4    A    Yes.  Certainly our directors were aware that it was

5    substantial litigation before the judge and what the majouns

6    involved were, and, you know, we had gone through at that

7    point, as you indicated, a couple of other deals that we,

8    you know, knew what would happen.

9            Now, in the Hunt deal, I think there was enough

10   head room that it didn't affect creditor recoveries.  But in

11   suberect deals, you know, obviously the amount was

12   substantially lower than we were getting in the Hunt deal,

13   and it did affect creditor recovery.

14           So we had discussions.  They certainly -- we laid

15   out what the amounts were by the first lien and second lien.

16   And I recall presenting those schedules to, you know, the

17   board before Judge Sontchi made his ruling.

18           And then, because we thought that ruling would

19   carry the day, we probably didn't show the impact subsequent

20   to that until such time as it was overturned.  But prior to

21   that, we were ware how important of an issue it was, and it

22   was part of almost all the agreements we had with any

23   purchaser and, you know, as part of the original PSA even.

24   So, you know, we had to educate our board on what, you know,

25   the total -- the amounts were such that, you know, over a

1    billion dollars, that it was significant.

2    Q    I think you mentioned just now presenting a document,

3    and I think you might've -- regardless of whether a document

4    was presented at meetings prior to the decision of the Third

5    Circuit, was the effect of the make-whole claims -- of a

6    make-whole allowance on the distribution waterfall discussed

7    at meetings of the debtors' boards of directors that you

8    attended prior to that decision and after the bankruptcy

9    court's decision?

10   A    Yes, because we had to educate our board as to why are

11   we going through the litigation in front of bankruptcy

12   court?  Why is this a condition precedent to, you know,

13   creditor support or a purchaser agreement?  And so we had,

14   you know, I -- I believe there were -- there was documents

15   where at least we calculated the make-wholes and talked --

16   you know, but we certainly beyond that talked about it was a

17   significant amount and what the impacts would be.

18   Q    I believe earlier you testified you voted in favor of

19   the NextEra transaction, the July -- let me ask you, did you

20   vote in favor of the July 2016 merger agreement, the NextEra

21   merger agreement?

22   A    I did.

23   Q    And when you did so, were you aware that the -- that an

24   allowance of the make-wholes would have a substantial effect

25   on recoveries by EFIH creditors?

1    A    Yes, and, in fact, I -- you know, we had a specific

2    provision that it was a condition precedent to NextEra

3    closing that we talked to our board about.  And we had a

4    condition in there that NextEra could assume -- increase its

5    purchase price by the amount of make-wholes if they were

6    allowed.  Obviously, they turned out not to accept that

7    condition but chose to go ahead anyway and took the

8    condition out.

9    Q    In -- ultimately, the make-whole claims were allowed,

10   correct?

11   A    They were.

12   Q    And ultimately, EFH received no cash distribution from

13   the EFIH estate, correct?  From the --

14   A    Correct. The EFIH didn't get paid in full, so

15   therefore, none of the proceeds of the Sempra deal ended up

16   with EFH creditors.

17          MR. SCHRYVER:  One moment.  I have no further

18   questions.  Thank you.

19          THE COURT:  Thank you.  Mr. Pedone.

20          MR. PEDONE:  No, Your Honor.  No questions.

21          THE COURT:  Okay.  Thank you. Redirect?

22          MS. TERTERYAN:  Your Honor, Anna Terteryan,

23   Kirkland & Ellis.  No redirect, but the parties aren't --

24          THE COURT:  Re-cross, Mr. Galardi?

25          MS. TERTERYAN:  Oh, apologies.

1          THE COURT:  Okay.

2          MR. GALARDI:  Just four or five questions.

3   Q    I'm going to take you back to -- I guess now it's Tab 5

4   in the binder you now have in front of you -- and the chart

5   that -- the --

6   A    Yes, sir.

7   Q    Okay, and its right above Paragraph 17, which was on

8   Page 10 of the chart.  Just a few more questions.

9          First, at -- first, at the time of the July board

10  meeting, the July 22nd board meeting, did the -- did the

11  company believe that the Third Circuit -- that the Third

12  Circuit would affirm both the bankruptcy court and the

13  district court?

14         MR. SCHRYVER:  Objection.  Foundation.

15         THE WITNESS:  I --

16         THE COURT:  I'm sorry.  Overruled, he can -- he

17  can speak generally.  Well --

18         MR. GALARDI:  I'll just ask a personal question.

19         THE COURT:  Yeah, ask a personal -- yes.

20         MR. GALARDI:  That's fine, Your Honor.

21  Q    Personal question.  At the time of the July 22nd board

22  meeting, did you believe that the bankruptcy court and the

23  district court would be affirmed by the Third Circuit.

24  A    Put it this way.  We thought the bankruptcy court

25  decision was very positive, and we were very hopeful that it

1    would carry the day, yes.

2    Q    And did you believe that the termination fee would be

3    triggered, that any termination fee would be triggered, if

4    you increased the purchase -- increased the break-up fee to

5    $275 million?

6    A    So the question -- I just want to clarify.

7    Q    Did you believe that the termination fee would be

8    triggered if you increased it from $110 million to $275

9    million?

10            MR. SCHRYVER:  Objection.  Calls for speculation.

11            MR. GALARDI:  I asked him what he believed.

12            THE COURT:  What he believes.  Overruled.

13            MR. KEGLEVIC:  You know, look, I would say that

14   you never sign a deal where you're expecting the break-up

15   fee to be triggered because why would you bother going

16   through the steps?  That being said, I didn't have any more

17   belief when it was the lower number than it was the higher

18   number.  Certainly we're aware that that was a risk and that

19   a lower number on a break-up fee is always, you know, better

20   because it reduces the risk associated with the deal.  But

21   we thought we had a good purchaser, reasonable structure,

22   and we thought that risk was low regardless of the amount.

23   Q    Okay. And if you look at the July 27th bullet that says

24   NEE assumes asbestos liabilities $250 million of escrow,

25   correct?

1    A    Yes.

2    Q    Okay.  And if it were -- wasn't -- and that was a

3    straight deduction from the purchase price, correct?

4    A    It was.

5    Q    And if that deduction did not have occurred and instead

6    you got the $250 million, EFIH creditors would've been paid

7    in full at that point too; isn't that correct?

8    A    Well, I don't know how to separate the pieces of the

9    deal.  They were all thrown in together.  So, I mean, they

10   were paid in full.  I don't know at what point in time

11   because we really negotiated, you know, the 200 in increase,

12   the 250 all around the same time, so I'm not -- I'm not sure

13   what you're asking me.

14   Q    Well, but your testimony was that it was the last 110

15   that got the PIKs paid in full, correct?

16   A    Yes, that is true.

17   Q    Okay, but that assumed that there was $250 million

18   taken out of the purchase price for the asbestos claims,

19   correct?

20   A    That was in the calculation that is implied with the

21   110 getting the PIKs full.  That's correct, but, you know,

22   once again, importantly, we didn't think we had a viable

23   deal without the asbestos being assumed.

24   Q    Understood.  So it's also true that if the escrow was

25   100, as it turned out to be, on July 27th the PIKs would've

1    been paid in full too; isn't that correct?

2    A    That is mathematically correct.

3    Q    And Mr. Keglevic, at any of the board meetings prior to

4    the approval of the NextEra transaction, did the board

5    expressly discuss that if the PUCT simply denies the NextEra

6    transaction that the termination fee would be payable?

7    A    We had a discussion, but it wasn't that simple.  And I

8    can go through why it wasn't that simple.  You probably

9    know, but the reality is that the approval itself did not --

10   the disapproval did not trigger the break-up fee.  They had

11   to walk away from the deal.

12   Q    And was that specifically discussed by -- at that

13   meeting about the likelihood that NextEra would actually

14   walk away from the deal?

15   A    Yeah, I don't recall specifically at that meeting.  I

16   know we had discussions about the uniqueness of that

17   provision.

18   Q    And did the directors, especially the -- and how much

19   cash did the EFH company have at about the time of July 27th

20   or September 19th, 2016?  Cash on hand.

21   A    You walked me through an exhibit that showed $200-some

22   million.  I -- it was probably in, you know, the range of

23   $200 to $300 million in that period, but I'd have to refresh

24   my memory.

25            MR. GALARDI:  No further questions, Your Honor.

1              THE COURT:  Thank you.  Any further questions?

2     No.

3              MR. SCHRYVER:  No, Your Honor.

4              THE COURT:  Okay. You want to go through the

5     exhibits?

6              MS. TERTERYAN:  Yes, Your Honor, very quickly.

7     And I believe the parties have no objection.

8              So, Your Honor, we move ELX 19, and then the

9     following are PAB exhibits, so PAB 22, 33, 39, 47, 108, 277,

10    278, 279, 80 -- 280, excuse me -- 281, 282, 322, 324, 329,

11    333, 334, 368, 390, 395, 399, 400, 410, 429, 430, 431, 437,

12    504, 543, 544, 546, 552, 553, 554, 568, 569, 570, 571, 573,

13    574, 575, 576, 577, 586, 631, and 635.

14             And then, Your Honor, we'd have you take judicial

15    notice of ELX 24, ELX 430, ELX 517, and PABX 555.

16             THE COURT:  Any objections?

17             MR. GALARDI:  No objections, Your Honor.

18             MR. SCHRYVER:  No, Your Honor.

19             THE COURT:  Okay.  They're admitted.

20        (PAB Exhibits 22, 33, 39, 47, 108, 277, 278, 279, 281,

21    282, 322, 324, 329, 333, 334, 368, 390, 395, 399, 400, 410,

22    429, 430, 431, 437, 504, 543, 544, 546, 552, 553, 554, 568,

23    569, 570, 571, 573, 574, 575, 576, 577, 586, 631, and 635

24    Entered Into Evidence)

25             Mr. McKane, that's how you do that, by the way.

1                MR. MCKANE:  Your Honor, I know my skillsets and

2    my limitations.

3                THE COURT:  Yeah.

4                MS. TERTERYAN:  Thank you, Your Honor.

5                THE COURT:  You're welcome.  Mr. Keglevic, you're

6    excused.  Have a safe journey home.

7                MR. KEGLEVIC:  Thank you, Your Honor.

8                THE COURT:  You're welcome.

9                All right.  Who is next on the list?  Is it going

10   to be Mr. Horton again, or?

11               MR. MCKANE:  Yes, Mr. Horton is here, and we bring

12   him back, unless you want to break for lunch.

13               THE COURT:  How long -- how long -- how long do

14   you think -- Mr. Galardi?

15               MR. GALARDI:  45 minutes to an hour.

16               THE COURT:  All right.  Let's push through.

17               MR. MCKANE:  Okay.

18               THE COURT:  Is that okay?

19               MR. MCKANE:  Can we take a short break to get

20   situated --

21               THE COURT:  Yes, of course.

22               MR. MCKANE:  -- for other purposes?  Thank you.

23               THE COURT:  Yep.  Yep.

24        (Recess)

25               THE COURT:  Please be seated.  Could somebody let

1    the people in the hallway know that we're --

2              MAN:  Yes.  Yes, Your Honor.

3              THE COURT:  -- reconvening?  I mean, they may not

4    care, I don't know.  Mr. Horton, you can be seated.

5              MR. HORTON:  Thank you, Your Honor.

6              THE COURT:  Thank you, Mr. Hogan.

7              MAN:  Oh, I'm okay, thank you.

8              THE COURT:  All right.  Okay.  Just trying to

9    help, all right.

10             MR. GLENN:  I guess I'm not that exciting.  Are

11   you ready to proceed, Mr. Horton?

12             MR. HORTON:  I am, Mr. Glenn.  Good morning.

13             MR. GLENN:  Good afternoon.

14             MR. HORTON:  Now it's afternoon, jeez.

15             MR. GLENN:  Time flies.

16             THE COURT:  Morning in Dallas.

17             MR. GLENN:  There you go.

18             MR. HORTON:  Thank you, sir.

19             MR. GLENN:  I'd like to start today with a

20   discussion of the Elliott substantial contribution claim

21   that you testified on your written direct.

22             MR. HORTON:  Okay.

23                  CROSS-EXAMINATION OF ANTHONY HORTON

24   BY MR. GLENN:

25   Q    So, am I correct that you did not review, personally,

1    Elliott's professional fee and expense time records as part

2    of your review of its substantial contribution claim for

3    this matter?

4    A    I did not do it for this matter.  I believe I saw it at

5    the fee committee but not for this matter.  I wouldn't call

6    it a detailed review.  I just glanced over it.

7    Q    You looked at it, in your words, at a high level,

8    correct?  Is that fair?

9    A    Yes, sir.  Yes, sir.

10   Q    Okay.

11   A    Fair point.

12   Q    Now, Elliott's substantial contribution asserted claims

13   approximately $31.7 million dollars, is that right?

14   A    That's my understanding, yes, sir.

15   Q    Okay, I'd like to discuss the elements of the claim

16   that were in your written direct.  Now, you believe, sir,

17   that one of Elliott's primary contributions was supporting

18   the Sempra transaction, is that correct?

19   A    Yes, sir.

20   Q    And you have conceded, in your written direct, that the

21   Sempra transaction produced distributable value only for

22   EFIH creditors, not EFH creditors, correct?

23   A    Distributable value, yes.

24   Q    And the benefit of the Semper transaction was that it

25   provided approximately $150 million dollars of additional

1    cash beyond the other bidder at that time, Berkshire

2    Hathaway, correct?

3    A    I believe it was $150- but I'd have to look back.

4    Q    Okay.  Now, from EFH's perspective, the Berkshire

5    Hathaway transaction and the Sempra transaction did not

6    offer any additional benefit, one versus the other, is that

7    correct?

8    A    I wouldn't go that far.  I wouldn't go that far.

9    Q    You believe that the Sempra transaction produced a

10   different benefit for EFH than Berkshire Hathaway?

11   A    In some respects, yes.

12   Q    Okay, but you haven't identified those in your written

13   direct, have you?

14   A    I don't recall.  A distinction would be regulatory

15   certainty.  Now, again, I don't know if you state it as, I

16   think you said a difference in the benefits.  I think

17   regulatory risk was somewhat lower for Berkshire.

18   Q    Fair enough.  Are you aware, sir, that Elliott is

19   requesting approximately $20.3 million dollars for opposing

20   the Berkshire transaction and committing to the Sempra

21   transaction?

22   A    I'm vaguely aware of it, yes.

23   Q    Okay, so almost two thirds of Elliott's substantial

24   contribution claims involves activities that only produced

25   an economic benefit for EFIH and not EFH, correct?

1    A    I -- again, if you're limiting it to distributable

2    value, yes.  if you think about it in the broader scheme of

3    the entire transaction, which includes, you know, it's a

4    non-taxable transaction and so forth, and the support of

5    Elliott, I think that there is incremental value to EFH.

6    Q    Okay, but the Berkshire transaction was also going to

7    be non-taxable, correct?

8    A    That's my understanding, yes.

9    Q    And you were here for Mr. Keglevic's testimony where he

10   testified -- I'm not going to repeat it, but all the

11   transactions that the boards of this company approve were

12   always taxable -- non-taxable, right?

13   A    That's correct.

14   Q    Thank you.  Now, let's talk about the other buckets

15   that you identified with respect to the Elliott substantial

16   contribution claim.  Elliott is requesting approximately

17   $584,000 for facilitating the Oncor dividend settlement,

18   right?

19   A    I don't know those exact dollars, but they did work on

20   the Oncor dividend, yes.

21   Q    I've prepared a binder for you.

22   A    Okay.

23   Q    It should be on your desk there.  Tab 1, sir.  And turn

24   to Page 12 of that document.  Paragraph 31, there's a bold

25   writing there that says: "Facilitating the Oncor dividend

1    settlement fees: $584,000" and change, does that refresh

2    your recollection?

3    A    Which paragraph?  Yes.

4    Q    Thank you.  Now, that's only approximately two percent

5    of the substantial contribution claim, correct?

6    A    I haven't done that math.  I'll trust your math.

7    Q    It is what it is.  Isn't it the case, sir, that only

8    $3.75 million of the settlement proceeds went to the EFH

9    Debtor?

10   A    From a cash perspective, yes, and as I indicated

11   yesterday, there were other issues outstanding, for example,

12   who was going to be responsible for the 2017 taxes and any

13   disputes regarding the taxes?  Would that remain with the

14   EFH creditors or not?  And that for 2017 and 2018 was

15   resolved as part of that matter, and that could have been

16   multi-millions of dollars.

17   Q    From the EFIH ledger, EFIH got $27.25 million from that

18   settlement, correct?

19   A    From the cash.  Again, you're ignoring the -- I believe

20   you're ignoring the 2017 and 2018 tax.  The dispute over who

21   would owe the tax if there was a reversal of the tax and the

22   tax was owed, and I've seen swings as much as $50 to $60

23   million dollars for any one year.

24   Q    Okay, but you haven't presented any of that analysis on

25   your written direct, correct?

1   A   No, sir.

2   Q   The other bucket I want to talk about next is the

3  substantial contribution claim relating to the disallowance

4  of the NextEra termination fee.  Are you aware, and this is

5  in the Elliott statement again, that $3.3 million dollars is

6  the asserted amount that Elliott incurred for attempting to

7  disallow the NextEra termination fee?

8   A   I'm not aware of the exact amount, but yes.

9   Q   Okay.  If you could turn to Page 9, just so we're on

10  the same page.  Paragraph 18, you see there, the number is

11  approximately $3.3 million dollars, correct?

12   A   I do see those amounts.

13   Q   Okay.  Would you agree with me that there will be no

14  economic benefit to either of the Debtors, EFH or EFIH if

15  the Third Circuit ultimately allows that termination fee in

16  full?

17   A   That would require me to speculate as to what would

18  happen after that.  If it is allowed, there's certainly

19  opportunity, and again, I've been part of a settlement --

20        THE COURT:  Well, any -- I'm sorry, I'm going to

21  interrupt.  I want to correct the record.  Third Circuit is

22  not going to allow the fee.  The question is whether they're

23  going to reverse my disallowance of the fee.  If they do

24  that, we're going to have a trial because there's a pending

25  adversary proceeding that's currently stayed.  So, I just

1    want the record to be clear.

2              MR. GLENN:  And I didn't -- I'm generalizing.  I

3    didn't mean to override the specifics of that process, going

4    forward.

5    A    And that's where I was going with the trial and the

6    risk of the trial as well as having been involved in other

7    negotiations regarding the settlement.  There is a strong

8    chance that there could still remain benefit to both EFIH

9    and EFH because of that reversal.  Excuse me, because of the

10   reconsideration that was -- that occurred in the litigation

11   risk, so I can't agree with your zero.

12   Q    Okay, but they're claiming that money solely in

13   connection with the reconsideration, and if that

14   reconsideration is reversed, there will be no benefit from

15   their work, correct?

16   A    I just -- again, it's speculation and I believe that

17   with all of the uncertainty that has occurred because of the

18   different decisions, I think there is an opportunity for

19   settlement.

20   Q    But you agree with me, sir, we don't know whether what

21   they've done ultimately will or will not benefit the EFH

22   bankruptcy estate, correct?  We don't know what's going to

23   happen.

24   A    No, we do not know whether the Third Circuit is going

25   to reverse Judge Sontchi's ruling, we don't know how the

1   litigation is going to go after the fact, we don't know

2   whether that's going to provide some leverage for

3   negotiations.  We do not know that with any -- 100 percent

4   certainty.

5   Q    Okay, so the other item you cite in your written direct

6   is this dispute over taxes involving Vistra, do you recall

7   that, generally?

8   A    I do.

9   Q    For that, Elliott is claiming a, approximately $1.1

10  million-dollar fee, and to refresh your recollection, that's

11  on Page 11 of that same statement, Paragraph 26.

12  A    Yes.

13  Q    Isn't it the case, sir, that Elliott demanded that EFH

14  commence some sort of a litigation or mediation process

15  against Vistra?

16  A    They certainly requested and demanded -- maybe demanded

17  is the right word.  We, as the Debtors, considered that and

18  we considered the potential value of that dispute and

19  settling that dispute in favor of EFH, and we decided that

20  it made economic sense for EFH to pursue that matter.

21  Q    Okay.  And in fact, EFH was represented by Proskauer

22  because that was a conflict matter, once that litigation

23  started, correct?

24  A    Yeah, I think it was because of Kirkland & Ellis had

25  done a lot of -- had done tax work for TCEH and EFH and so

1   it was a conflict matter.

2   Q    Fair enough.  And isn't it the case, sir, that

3   Proskauer brought that litigation and they lost?

4   A    They brought the litigation.  I believe they brought in

5   an expert to mediate, for lack of a better term, and he

6   ruled in favor of Vistra.

7   Q    And so, EFH lost that litigation.

8   A    Yeah, I guess you could characterize it as that, yes,

9   sir.

10  Q    So, would you agree with me that Elliott is demanding

11  payment from the EFH estate for demanding that EFH bring a

12  litigation, hiring lawyers to prosecute that litigation and

13  then losing that litigation?

14  A    They lost the litigation, I think they were bringing

15  value to EFH by litigating that, understanding what the

16  implications would be if there was ever an equitization.

17  Q    I'll represent to you, and this is just arithmetic,

18  that the buckets that we referred to, the Vistra fees, the

19  Oncor dividend settlement fees, and the NextEra

20  reconsideration fees add up to around 15 percent of the

21  Elliott substantial contribution claim.  Would you agree

22  with me, sir, that not all of that 15 percent, and I don't

23  want you to testify as to numbers, but just whether there

24  was or was not a benefit, that EFIH did benefit from that 15

25  percent that Elliott is claiming?

1          MR. THOMPSON:  Objection, Your Honor.  You've

2     already ruled on this issue.  If counsel wants to open the

3     door on numbers, so be it, but he's asking -- he's not

4     saying give me numbers but he's saying is it zero, and he's

5     asking for backups.

6          MR. GLENN:  I believe Mr. Horton was allowed to

7     testify about whether there was or was not a benefit without

8     opening the door.

9          THE COURT:  I don't remember that.  I don't

10     remember that.

11          MR. GLENN:  He's answered several questions about

12     whether there was a benefit to one estate versus whether

13     there was a benefit to another estate.  I'll withdraw the

14     question and ask it a different way.

15    Q    Would you agree with me, sir, that EFIH benefitted in

16     some way from each of those three buckets?

17          THE COURT:  I'll allow that.

18    A    Certainly.  Certainly, yes.

19    Q    I'd like to talk to you next about the allocation of

20     the NextEra break-up fee.  I know there's been a lot of

21     testimony on that, so I'm going to try to get to it quickly

22     to ask about foundational questions.  Now, you would agree

23     that distributions to EFH from the NextEra deal were

24     dependent on the outcome of the make whole litigation, as

25     Mr. Keglevic testified to?

1   A    I believe that the ruling of the make whole, the

2   reversal of the make whole ruling from the Bankruptcy Court

3   did have an impact on the distributions to EFH and EFIH.

4   Q    And, in your view, while the make whole appeal was

5   pending, the outcome of that was uncertain, and therefore,

6   whether EFH and its creditors would receive the proceeds of

7   the sale was also uncertain?

8   A    It was uncertain as to whether the $471 million was

9   going to go to EFH and it was uncertain as to whether EFIH

10  would have a reduction in its distributable value.  How one

11  -- how you calculate that uncertainty is up to you.

12  Q    Fair enough.  You've not presented a calculation of any

13  kind of the probability of that occurring, as of the time

14  that appeal was pending, have you?

15  A    I think in my deposition, I, at some point,

16  characterized it as a very low probability, that I believed

17  it was a very low probability that it would occur.

18  Q    Okay.  I want to talk to you about the termination of

19  the NextEra agreement.  Would you agree with me that Mr.

20  Rosenbaum and Elliott associates urged the company to

21  terminate the NextEra transaction?

22  A    I don't agree with that.  I don't recall that as being

23  the circumstance.  I just don't.

24  Q    Okay.  Well, the company did terminate the NextEra

25  transaction, correct?

1    A    After, I think it was two reconsideration filings by

2    NextEra that the company eventually exercised its fiduciary

3    duty.  They saw that it -- it appears as though it was not

4    going to go anywhere, and terminated the agreement by

5    executing its fiduciary duty and to move onto another

6    transaction.

7    Q    Okay.  In fact, it terminated that agreement at the

8    time the company identified Berkshire Hathaway as a

9    replacement transaction, correct?

10   A    Berkshire Hathaway, we had, or Bitter B, as we call

11   them, we had gone, the company had been in very detailed

12   negotiations, we had come to a place where we actually had

13   reached agreement and I think we informed Elliott and their

14   counsel the night before and we actually executed the

15   transaction and terminated the agreement, and terminated the

16   NextEra agreement.

17   Q    And do you recall that Elliott, prior to the time that

18   the NextEra transaction was terminated, had approached the

19   company about concerns about the cash burn of waiting for

20   the NextEra transaction to go through?

21   A    I'm sure that conversation came up.  I'm sure it came

22   up.

23   Q    Have you reviewed Mr. Rosenbaum's written direct?

24   A    Very high level.

25   Q    Isn't it the case, sir, that at some point, Elliott

1   associates commenced litigation against the company, so it

2   could pursue alternative transactions?

3   A     I do recall that.

4   Q     Isn't it the case, sir, that that occurred before EFH

5   and the affiliated Debtors terminated the NextEra

6   transaction?

7   A     That's correct.

8   Q     So, you would agree with me that Elliott was interested

9   in pursuing alternative transactions and filed litigation to

10  do so before the company terminate the NextEra transaction,

11  correct?

12  A     Yes, that is correct.

13  Q     So, does that refresh your recollection as to whether

14  Elliott wanted the company to terminate the NextEra

15  transaction?

16  A     My understanding was maybe slightly different, that

17  they were arguing whether or not they were still bound by

18  the PSA and that they were focused on, and again, I can't

19  recall the specifics of them saying terminate the NextEra

20  transaction.  I can recall them being very interested in

21  moving forward with an alternative transaction to try to

22  either consummate that transaction or, as I said yesterday,

23  create some competitive tension for other potential bidders

24  and to provide a backup plan in the event that NextEra was

25  terminated, or another bidder did not show up.

1   Q    I believe there's testimony -- I just want to make sure

2   you agree, that the cash burn was approximately $50 million

3   dollars a month, correct?

4   A    Yeah, I would say somewhere between $40- and $50

5   million.

6   Q    Fair enough, and that's only at the EFIH Debtor level,

7   correct?

8   A    That is correct.

9   Q    And EFH did not have any meaningful, ongoing interest

10   expense at that point, did it?

11   A    It did not.  I would say that, if you were in a

12   waterfall plan, then having burn, interest burn in front of

13   you and accruing additional principal in front of you as

14   EFH, that also is a concern in terms of being able to ever

15   get a distribution, if you will, from EFIH or from a plan.

16   So, to say it was not a concern at all of EFH, I think that

17   would be an understatement.

18   Q    So, would you agree with me, if the number is $40- to

19   $50 million dollars, that the EFIH estate would be better

20   off by terminating that -- the NextEra merger agreement to

21   save more interest expense than the termination fee?

22   A    Well, again, there was a couple of motions filed for

23   reconsideration, so there was a chance, albeit a very long-

24   shot chance that the PUCT could have reconsidered.  So, you

25   tell me, in your judgment, whether or not that was

1    beneficial for them to terminate.  They were -- we allowed

2    them to go forward and seek alternative transactions while

3    those -- while the last reconsideration, I think the first

4    reconsideration may have still been outstanding, but they

5    kind of had the opportunity or the benefit of both worlds,

6    in that circumstance.

7    Q    Okay, but we can agree that the company, EFIH, decided

8    to terminate that transaction because of that concern of the

9    interest burn and the concern that the transaction would not

10   close.

11   A    I think the boards of EFH and EFIH terminated that

12   transaction with the realization that one, it was not going

13   to close.  It could have resulted in additional appeals to

14   various levels in the State of Texas, and that we had an

15   alternative transaction, that being the Berkshire

16   transaction, that we had negotiated and felt like we could

17   execute.  So, it was a fiduciary -- excuse me, a fiduciary

18   decision of the boards and EFH and EFIH.

19   Q    And just so we can close the loop, part of that

20   calculus was the savings on the interest expense to EFIH,

21   correct?

22   A    I would say that that was part of a data point.  Again,

23   there was a lot of factors, as I just mentioned.

24   Q    Thank you.  Did you personally review the NextEra

25   merger agreement?

1    A    I read the merger agreement.  I didn't read -- I read

2    it, I don't have it memorized, but yeah, I read it.

3    Q    Were you aware of the triggers that would cause the

4    break-up for the termination fee to be paid under that

5    agreement?

6    A    I would have to go back through them.

7    Q    Well, I think we've left you a copy of it, and maybe we

8    could put it on the screen.  Okay, that's Exhibit 144, AHX-

9    144, and I'd like you to turn, very briefly, to Page 106.

10   A    I'm not sure where -- I've got a stack of papers and

11   I've got a binder.  I'm not sure where we are.

12              THE COURT:  Can we do it on the screen?  Are you

13   okay doing it on the screen, Mr. Horton?

14              MR. HORTON:  Absolutely.  Absolutely.

15              THE COURT:  Let's -- we'll do it on the screen.

16              MR. GLENN:  Okay, on the screen is fine.  That's

17   probably better.

18              MR. HORTON:  Absolutely.

19              MR. GLENN:  Thank you.  Section 8.5(b), Page 106,

20   I believe.  Oh, yes, on the bottom of the page of 106, not

21   the ECF page at the top.  Are you with me?

22              THE COURT:  We're waiting for the screen.

23              MR. GLENN:  Oh, I'm sorry.  If you could blow up

24   the first -- the top half of that paragraph, I think it

25   would be -- oh, okay.  On the left-hand side.  All right,

Page 121

1    I'd like to focus you on the first -- I'm sorry, that's the

2    wrong section, B. 8.5(b).  Right there, yeah.  Perfect.  It

3    is a lot of words.

4    Q    Okay, so, trying to cut to the chase here.  The lead-in

5    to that is: "If this agreement is terminated, pursuant to

6    this article 8," which concerns termination, it then goes on

7    about six lines down, and then it says: "no later than five

8    days following the consummation --"  I'm sorry, I'll start

9    again.  "If this agreement is terminated, and any

10   alternative transaction is consummated," that's the key

11   point, then about six lines down, it says: "no later than

12   five days following the consummation of such alternative

13   transaction, the Company and EFIH pay to the Parent the

14   termination fee by wire transfer, as directed by Parent, in

15   immediately-available funds."  Do you see that?

16   A    I do see that.

17   Q    So, one of the triggers of this payment is consummation

18   of an alternative transaction, do you see that?

19   A    I do see that.

20   Q    And when you decided to move forward with the Berkshire

21   Hathaway replacement transaction, were you aware that that

22   would be a trigger for the payment of the break-up fee?

23   A    Again, we would have relied on my legal counsel, and

24   our internal legal counsel, and we knew that there was a

25   risk, the board knew that there was a risk to the extent

1    that we had terminated the transaction and consummated

2    another transaction, that the termination fee could be

3    payable by the company.

4    Q    Okay, and --

5    A    By the Debtors, let me say it like that.

6    Q    As you sit here today, you can't recall whether any of

7    the EFIH PIK note holders urged the company to terminate the

8    NextEra transaction in favor of an alternative transaction,

9    can you?

10   A    I can't.  I can't recall that specific -- I just can't.

11   Q    Okay, but by this point in time, you do recall, as you

12   testified earlier, that Elliott had sought to pursue an

13   alternative transaction, correct?

14   A    Yes.

15   Q    Okay, thank you.  I'd like to talk to you --

16   A    Let me add, though, they were pursuing an equitization

17   plan, as I understood -- as I understand it.  I can't recall

18   whether an equitization plan would have terminated this --

19   would have created a requirement to pay a termination fee.

20   I just can't recall that.  There was -- in some plans, if

21   you do an equitization, and I know we had negotiations, I

22   can't recall if that -- an equitization would have actually

23   triggered the $275-, so...

24   Q    Okay.  And you know that the Berkshire transaction

25   would provide no consideration to EFH from the waterfall of

Page 123

1    that transaction, correct?

2    A    The Berkshire plan would not create any cash

3    distributable value to EFH.

4    Q    Are you aware that, had the regulatory process played

5    out, and NextEra not obtained approval, whether a

6    termination fee would or would not be payable?

7    A    Would you mind repeating that?  I apologize.

8    Q    Sure.  if you had played out the regulatory approval

9    process for NextEra, do you know whether the termination fee

10   would or would not have been payable?

11   A    If they had a non-approvable order --

12   Q    Correct.

13   A    -- from the PUCT?

14   Q    Correct.

15   A    It's my understanding that they would not -- the

16   termination fee would not have been owed.  That's my

17   understanding.

18   Q    Did you, or any other directors of -- officers and

19   directors of the Debtors, form a view as to how long that

20   might take?

21   A    I don't recall the conversation as to how long it was--

22   it would take.  I think, certainly there was a consideration

23   that it would take more than a month, more than a couple

24   months.  I just don't know of a specific timeframe.

25   Q    Did you come to the view that it would take less than a

1    year?

2    A    I don't recall anything that specific.

3    Q    Am I correct that there's no written analysis that

4    shows the effect to EFH, as opposed to EFIH, of waiting out

5    that process and the costs that it would take to EFIH -- EFH

6    specifically?

7    A    I don't recall.  I mean, there was discussions around

8    the cash and the cash burn at EFH.  I think you heard Mr.

9    Keglevic say this morning, I said before that, to a certain

10   extent, EFH had a -- basically a floor on its cash because

11   of -- you did have professional fees, to your point, there

12   wasn't any interest burn, so to speak.  They were relying

13   upon tax payments from Oncor for inflows.  Were those 100

14   percent certain?  With all the changes in the tax rules, and

15   we've seen it in the past, with the bonus depreciation and

16   so forth, when no tax payments were coming up from Oncor.

17   So, I know that people were focused on the amount of cash at

18   EFH.  Whether there was a separate analysis that said,

19   you're going to run out of cash in four months, five months,

20   or even a year, I don't recall that.

21   Q    Again, we know that EFIH was incurring $40- to $50

22   million dollars monthly of interest expense.  We talked

23   about that before.  But, you can't testify today as to how

24   much EFH would have incurred by waiting out the regulatory

25   process for the NextEra transaction, can you?

1    A    No, I cannot.

2    Q    So, you don't know whether EFH would have been better

3    off having that play out than sitting here in Court today,

4    being exposed to the risk of payment of the break-up fee,

5    can you?

6    A    Again, the board exercised its fiduciary duties based

7    upon the facts and circumstances at the time, and there

8    absolutely was a risk that EFH would run out of cash, and

9    that certainly was discussed as a risk.  So, no, I don't

10   know with any certainty, but I do know that that was a risk

11   that was considered.

12            MR. GLENN:  Your Honor, do you want to keep going?

13   I'm about to change subjects.  I'll keep going if you want,

14   or --

15            THE COURT:  How much longer do you think you have?

16            MR. GLENN:  Probably about 20 minutes.

17            THE COURT:  Let's keep going.

18            MR. GLENN:  Okay.  So, let's talk --

19            THE COURT:  If you're okay, Mr. Horton?

20            MR. HORTON:  I'm fine.

21            THE COURT:  Yeah.

22   Q    You testified in your written direct about the official

23   creditors committee's professional fees in this case,

24   correct?

25   A    That's correct.

1   Q    And, like the Elliott substantial contribution claim,

2   you did not review the time detail for all the various fee

3   applications in this case, correct?

4   A    I did not review the E-committee's time detail.

5   Q    And, in fact, you had your counsel, either at the

6   company or Kirkland & Ellis review those, correct?

7   A    I wouldn't -- I wouldn't say that no.

8   Q    You don't know who reviewed them?

9   A    When you said, "reviewed them," as part of preparation

10  for this?  I'm sorry, I didn't understand.

11  Q    I was asking a broader question.  Did your counsel

12  review the creditors committee's fee applications?

13              MR. THOMPSON:  Objection, vague, Your Honor, as to

14  what time.  Is it the PAB, or in his capacity as an officer

15  for the Debtor?

16              THE COURT:  Yeah, can you give us a --

17              MR. GLENN:  Sure.  Sure.

18              THE COURT:  -- can you give us a time period and

19  Mr. Horton, if you don't know, you don't know.  That's just

20  -- that's an adequate answer, but go ahead.

21              MR. GLENN:  Fair enough.

22  Q    Pre-PAB, while you were working for the Debtors, you

23  didn't personally review the committee's fee applications,

24  correct?

25  A    No, sir.

1    Q     And the time detail behind those, correct?

2    A     That's correct.

3    Q     Okay, and I think you testified in your written direct

4    or earlier, that Ms. Doré might have done that.

5    A     It could have been.  I don't remember if I -- I said,

6    "retained professionals," so I'm not sure if I was specific

7    regarding the E-committee.  I just can't recall.

8    Q     Who cut the checks to pay the creditors committee?

9    A     Who cut the checks?  You mean which entity?

10   Q     At the company.  At the company.  No, what person?

11   A     Well, we don't -- we typically don't cut checks, so

12   there's a treasury department.  There's a process for --

13   through accounts payable and through accounting that we,

14   when we're going to make a disbursement, we have a

15   disbursement authorization, we have the documentation

16   support and just -- first an authorization.  In this case,

17   it would have been the invoices plus the certificate --

18             THE COURT:  CNO.

19   A     -- certificate of no objections.  I'm sorry.

20             THE COURT:  It's okay, go ahead.

21   A     Yeah, certificate of no objections and then that would

22   come to the treasury department and a wire would be sent

23   out.

24   Q     Okay.  Were those wires sent out 50/50 from EFIH and

25   EFH?

1   A    I don't know.

2   Q    Okay.  Were you here for Mr. Galardi's opening

3   argument?

4   A    Yesterday.

5   Q    Do you recall him presenting percentages of the fees

6   that were incurred before the committee settlement was

7   entered into in late November of 2015?

8   A    I do recall that.

9   Q    Do you recall, before that time, that the E-side

10  committee was involved in discussions about various E-side

11  plans of reorganization?

12  A    My understanding is that they were.  I recall it being

13  -- I'm trying to think of the timeframe.  I can't tell you

14  each one.  I know that, leading up to the Hunt transaction,

15  for example, there was a lot of activity by the E-side

16  committee regarding matters.  So, see, you said several

17  plans of reorganization.

18  Q    I think I misspoke.

19  A    Okay.

20  Q    I don't think there were several.  But you recall that

21  they did work on formulating or negotiating E-side plans

22  before the Hunt transaction came to pass?

23  A    Again, when you say "E-side plans," what are you --

24  which one, specifically, are you referencing?

25  Q    No specific plan.  Do you recall that they were trying

1    to come up --?

2              THE COURT:  Who's the "they"?  I lost the pronoun.

3              MR. GLENN:  -- with a plan -- I'm sorry, the UCC

4    professionals, the UCC and its professionals.

5              THE COURT:  Which one?  The T-side committee or

6    the E-side?

7              MR. GLENN:  Oh, I forgot about the T -- you're --

8    I withdraw all of that because I -- and I'm going to make

9    something very clear for the record.

10   Q    I'm asking you only about the E-side creditors

11   committee.

12   A    Okay.

13   Q    You can ignore the T-side creditors committee for all

14   the questions I'm going to ask you today.

15   A    Okay.

16   Q    Putting aside any specific plan, do you recall that the

17   E-side creditors committee was working towards a plan of

18   reorganization, for the E-side, to maximize value?

19   A    Again, the E-side committee, as I recall, was appointed

20   sometime in October, November, maybe September of 2014.  I

21   can't recall the --

22   Q    Correct.

23   A    -- correct timeframe.  Prior to that, we had the RSA,

24   which was a plan, so they weren't appointed at that point in

25   time.  So, I don't think they were involved in the RSA.  We

1    tried to do a stalking horse bidding process in that summer

2    with I think a -- we went out to multiple parties and ended

3    up having detailed conversations with NextEra, we

4    discontinued that process and we went forward with the

5    bidding procedures.  I think we filed a motion in September

6    of 2014.  It was ultimately in January of 2015, as I recall,

7    we went forward with our bidding procedures, reached out to

8    30+ parties, and went through multiple negotiations during

9    that period of time, and it really came down to probably

10   three.  It was the PIK proposal, the Hunts and NextEra.

11           It looked like -- the Hunts were proposing the

12   restructure, NextEra was more traditional structure.

13   Somewhere along the line, in 2015, probably July of 2015,

14   NextEra dropped their bid roughly a billion dollars.  I

15   think all that's on the record.  And the Hunts, and the

16   unsecured creditors at TCEH came forward with a re-proposal,

17   as I recall.  The fee committee was actively involved, they

18   were objecting to the plan of reorganization --

19           THE COURT:  I'm sorry, you said the fee committee

20   or the --

21           MR. HORTON:  Did I say that?

22           MR. GLENN:  You did.

23           THE COURT:  Yeah, you said fee.

24           MR. HORTON:  Oh, I said E, I think.

25           THE COURT:  Oh, okay, sorry.

1           MR. HORTON: I could have said fee.

2           MR. GLENN:  It sounded like fee.  It sounded like

3     fee.

4           MR. HORTON:  I could have said fee, sorry.

5           THE COURT:  It's okay.

6     A    E-committee.  The E-committee was objecting to the

7     plan, the Hunt plan.

8           THE COURT:  Yeah.

9     A    That's when we got into -- there was a lot of

10    discussions about a global settlement and the E-side

11    committee settlement, so that is the one that I recall most

12    distinctly, that they were involved in, particularly the E-

13    committee settlement.  There was a provision such that, so

14    long as we were -- asbestos was being reinstated and there

15    was the turnover provision for the non-qualified

16    beneficiaries, so long as each plan met those conditions,

17    that they would sit -- I think Mr. Keglevic said, "stand

18    down," and had very limited roles going forward.  That's

19    what I recall from the record.  I don't know if that's

20    several or you consider that one, or how you view their

21    review of subsequent plans of reorganization, but that's --

22    for the record, that's how I understand it.

23    Q    I want to try to finish this up, so I'm going to get to

24    the point.  Before the EFH / EFIH committee settlement, you

25    did not negotiate any of those plans personally with the E-

1   side committee, did you?

2   A    No, I did not.

3   Q    Okay, so you don't know what their involvement was in

4   any plan of reorganization leading up to that point, do you?

5   A    Look, I did my research, my homework, I talked to

6   Kirkland & Ellis, asked the activities that they were

7   involved in.  I also spoke to -- I think it was Andy Wright,

8   but I may be wrong about their involvement.  So, I got a

9   perspective of what they were involved in, and it was

10  primarily, as I put in my declaration, that it was primarily

11  the asbestos and the reinstatement of the asbestos, the

12  turnover provisions for the non-quals, and then, on a

13  collective basis, tax and the global settlement, the

14  asbestos bar date.  Those are the matters that I'm familiar

15  with.

16            MR. GLENN:  Okay, I move to strike that answer as

17  hearsay and without foundation because it was based on -- I

18  think he's testified at the beginning, what other people

19  told him.

20            THE COURT:  I don't think that's what -- I don't

21  think he said that, no.  overruled.

22            MR. GLENN:  Okay.  One moment, Your Honor.

23  Q    I'd like to talk to you very briefly about the asbestos

24  issues.  I believe you were in Court when Mr. Keglevic

25  testified to this, so I'm going to try to streamline it.

1    when the NextEra transaction was proposed, did you, as an

2    officer of this company, have an understanding of the

3    benefit of NextEra's assumption of those asbestos

4    liabilities?

5    A    A benefit?  I can tell you that I believed that the

6    amounts that NextEra had set aside, which was in the escrow

7    account, of $250 million, my personal belief was that the

8    number was smaller.  I had no evidence at that point in

9    time, I wasn't even certain, and I was intimately involved

10   in this part of the process, I had really no idea of what

11   they were looking at to get to the $250 million-dollar

12   number.  I can tell you I had multiple conversations with

13   Mark Hickson with NextEra, and I know that there were

14   conversations directly with Charlie Sieving, their general

15   counsel, I was on some of those calls, and they were

16   absolutely -- I don't want to say paranoid, but they were

17   very, very concerned about not knowing what the -- with all

18   these claims that had come in through the bar date, not

19   knowing what the total liability was.

20            And they were not going to accept the asbestos.  I

21   was told that multiple times.  I felt, for a little while,

22   that was a little bit of negotiating tactics, but when the

23   $250 million came over in escrow, I think they truly

24   believed, and I had a follow-up conversation with them, with

25   the expert, quote, unquote, expert that they had hired who

1    thought it was $300 million.  And so, there was a basis for

2    it.  it was $300 million versus our -- versus the -- and

3    they decided to put $250 million in escrow.

4            What I did, and what I decided to do, I said,

5    look, if I can ever get this number -- convince you that

6    it's a lower number or get an insurance policy that will

7    cover this risk for less money, will you release funds for

8    the benefit of creditors?  So, at that point in time, it

9    didn't matter what I thought.  It mattered what the buyer

10   thought, and the buyer believed it was $300 million-ish, and

11   they put $250 million in escrow.

12   Q    It may not matter what you believed, but I'm asking

13   what the company and its management and directors understood

14   at the time they approved the transaction, at that time.

15   A    We -- at that time, I think there was, from my

16   perspective, uncertainty as to what those numbers were.  We

17   had the history, but we hadn't had the history with the

18   27,000 claims that had come through, and we hired -- K&E

19   hired Encura, I hired Aon Hewitt -- excuse me, Aon Risk, and

20   we went through a process for six weeks or so, to make a --

21   to get an expert opinion from Aon, and to also get a

22   proposal for actually insuring $300 million-ish of potential

23   liabilities.  The amount was north of what was -- north of

24   the $100 million.  We had multiple conversations with their

25   expert.  Ultimately, Encura's report came out and it was

1    roughly $55 million --

2            MR. MCKANE:  Objection, Your Honor.  Hearsay.

3    This is the same hearsay expert testimony.  I'm sure that

4    Mr. Galardi (indiscernible).

5            THE COURT:  Yeah, sustained as to the amount.

6            MR. HORTON:  But I do --

7            THE COURT:  You can't testify as to the amount

8    that they estimated because it's an out=of-court statement,

9    their estimation, and they're not subject to cross-

10   examination and it doesn't fit any of the exceptions.

11           MR. HORTON:  Fair enough.

12           THE COURT:  So, all that leading up was fine, but

13   what they actually said --

14           MR. HORTON:  Right.

15           THE COURT:  You can't testify to that.

16           MR. HORTON:  Fair enough, fair enough.

17           THE COURT:  Yeah.

18   Q    Did the Debtors publish a disclosure statement with

19   their assessment of the amount of the asbestos liability in

20   this Court?

21   A    What period of time?

22   Q    Around the NextEra transaction, or thereafter?

23   A    I can't remember what we put in the disclosure

24   statement.  It seems like it was $55- -- $50- to $60 million

25   dollars --

1    Q    Thank you very much.

2    A    -- was what I recall.

3              MR. GLENN:  No further questions.

4              THE COURT:  Thank you.  All right, we're going to

5    break for -- who's left?  So --

6              MR. THOMPSON:  Your Honor, the PAB does not have

7    any redirect.  We do have some exhibits, but we'd be able to

8    move those into the record pretty quickly.

9              THE COURT:  All right, is there -- are there any

10   questions before the -- left, are there any questions left?

11             MR. MCKANE:  No redirect from the Elliott and UMB

12   left.

13             THE COURT:  Okay.  Mr. Pedone?

14             MR. PEDONE:  No, Your Honor.

15             THE COURT:  No?  Okay.  Hang on, just stick there

16   for a second.  Sorry.

17             MR. THOMPSON:  Your Honor --

18             THE COURT:  All right, then, we'll do the

19   exhibits.  Have you seen the exhibits, Mr. Glenn?

20             MR. GLENN:  I've got a list here, yes.

21             THE COURT:  Okay.

22             MR. THOMPSON:  I distributed it to counsel before

23   --

24             THE COURT:  Okay.

25             MR. THOMPSON:  -- the session and Your Honor, for

1    the record, I'm McClain Thompson, Kirkland & Ellis, on

2    behalf of the PAB.  May I approach with the green sheet,

3    Your Honor?

4              THE COURT:  Yes, please.  Mr. Horton, you can go

5    ahead and step down.  I don't want to keep you captured up

6    there.

7              MR. HORTON:  Thank you, sir.

8              THE COURT:  You're welcome.  Okay, go for it.

9              MR. THOMPSON:  Your Honor, I believe Mr. Glenn and

10   Mr. McGinnis do not have any objections.  I passed these out

11   about an hour ago.  For the record, these are the exhibits

12   cited in Mr. Horton's written direct, with the absence of

13   exhibits that came in during Mr. Husnick's and Mr.

14   Keglevic's testimony.  So, if it's okay with Your Honor,

15   I'll read these numbers into the record?

16             THE COURT:  Yes.

17             MR. THOMPSON:  Okay.  PAB-EXH 29, 48, 156, 244,

18   307, 339, 352, 393, 398, 425, 435, 481, 483, 484, 613, 618,

19   624, 643.

20             THE COURT:  Any objection?

21             MR. MCKANE:  No objection, Your Honor.

22             THE COURT:  No objections, okay.  They're

23   admitted.

24         (PAB Exhibits 29, 48, 156, 244, 307, 339, 352, 393,

25   398, 425, 435, 481, 483, 484, 613, 618, 624, 643 Entered

1   Into Evidence)

2          MR. THOMPSON:  Thank you, Your Honor.

3          THE COURT:  Okay, so, we're going to break for

4   lunch, and then when we come back, we'll have Mr. Strom, is

5   that right?  Okay, whose witness is he?  I forget, I'm

6   sorry.

7          MR. GLENN:  The Ad Hoc Committee's Your Honor.

8          THE COURT:  The Ad Hoc Committee, all right.  And

9   then Mr. Robins is a rebuttal witness.

10         MR. GLENN:  Yes, Your Honor.

11         THE COURT:  And then possibly, Mr. Rosenbaum.

12  We'll see how the afternoon goes.  Okay, very good.  We'll

13  reconvene at 2:15.

14      (Recess)

15         THE COURT:  Please be seated.  somebody let the

16  people in the hallway know we're reconvening.

17         MR. GLENN:  Yes.  Yes, Your honor.

18         MR. HOGAN:  Thank you, Your honor.

19         THE COURT:  Thank you, Mr. Hogan.  All right.

20  Okay.  Just trying to help.  All right.

21            CROSS-EXAMINATION OF ANTHONY HORTON

22  BY MR. GLENN:

23  Q   I guess I'm not that exciting.  Are you ready to

24  proceed, Mr. Horton?

25  A   I am, Mr. Glenn.  Good morning.

1    Q     Good afternoon, actually.

2    A     No, it's afternoon.  Jeez.

3    Q     Time flies.

4          THE COURT:  Morning in Dallas.

5    Q     There you go.

6    A     Thank you, sir.

7    Q     I'd like to start today with a discussion of the

8    Elliott substantial contribution claim that you testified on

9    your written direct.

10         So am I correct that you did not review personally

11   Elliott's professional fee and expense time records as part

12   of your review of its substantial contribution claim for

13   this matter?

14   A    I did not do it for this matter.  I believe I saw it at

15   the fee committee, but not for this matter.  And I wouldn't

16   call it a detailed review.  I just glanced over it.

17         MR. GLENN:  Right. You looked at it, in your

18   words, at a high level, correct?  Is that fair?

19   A    Yes, sir.  Yes, sir.

20   Q    Okay.

21   A    Fair point.

22   Q    Now, Elliott's substantial contribution asserted claim

23   is approximately $31.7 million, is that right?

24   A    That's my understanding.  Yes, sir.

25   Q    Okay.  I'd like to discuss the elements of the claim

1    that were in your written direct.  Now, you believe, sir,

2    that one of Elliott's primary contributions was supporting

3    the Sempra transaction, is that correct?

4    A    Yes, sir.

5    Q    And you have conceded in your written direct that the

6    Sempra transaction produced distributable value only for

7    EFIH creditors, not EFH creditors, correct?

8    Q    Distributable value, yes.

9    A    Okay. And the benefit of the Sempra transaction was

10   that it provided approximately $150 million of additional

11   cash beyond the other bidder at that time, Berkshire

12   Hathaway, correct?

13   A    I believe it was 150, but I'd have to look back.

14   Q    Okay. Now, from EFH's perspective, the Berkshire

15   Hathaway transaction and the Sempra transaction did not

16   offer any additional benefit one versus the other, is that

17   correct?

18   A    I wouldn't go that far.  I wouldn't go that far.

19   Q    You believe that the Sempra transaction produced a

20   different benefit for EFH than Berkshire Hathaway?

21   A    In some respects, yes.

22   Q    Okay.  But you haven't identified those in your written

23   direct, have you?

24   A    I don't recall.  But, you know, a distinction would be

25   regulatory certainty not -- again, I don't know if you

1    stated it as -- I think you said a difference in the

2    benefits.  I think regulatory risk was somewhat lower for

3    Berkshire.

4    Q    Fair enough.  Now, are you aware, sir, that Elliott is

5    requesting approximately $20.3 million for opposing the

6    Berkshire transaction and committing to the Sempra

7    transaction?

8    A    I am vaguely aware of it, yes.

9    Q    Okay.  So almost two-thirds of Elliott's substantial

10   contribution claim involves activities that only produced an

11   economic benefit for EFIH and not EFH, correct?

12   A    Again, if you're limiting it to distributable value,

13   yes.  If you think about it in the broader scheme of the

14   entire transaction, which includes, you know, as a non-

15   taxable transaction and so forth, and the support of

16   Elliott, I think that there is incremental value to EFH.

17   Q    Okay.  But the Berkshire transaction was also going to

18   be non-taxable, correct?

19   A    That's my understanding, yes.

20   Q    And you were her for Mr. Keglevic's testimony where he

21   testified, I'm not going to repeat it, but all the

22   transactions that the boards of this company approved were

23   always non-taxable, right?

24   A    That's correct.

25   Q    Thank you. Now let's talk about the other buckets that

1    you identified with respect to the Elliott substantial

2    contribution claim. Now, Elliott is requesting approximately

3    $584,000 for facilitating the Oncor dividend settlement,

4    right?

5    A    I don't know those exact dollars, but they did work on

6    the Oncor dividend, yes.

7    Q    Okay. I've prepared a binder for you.

8    A    Okay.

9    Q    It should be on your desk there. Tab 1, sir.  If you

10   turn to Page 12 of that document, Paragraph 31 there is a

11   bold writing there that says facilitating the Oncor dividend

12   settlement, fees, $584,000 and change.  Does that refresh

13   your recollection?

14   A    Which paragraph?  Yes.

15   Q    Thank you.  Now, that's only approximately two percent

16   of the substantial contribution claim, correct?

17   A    I haven't done that math.  I'll trust your math.

18   Q    It is what it is.  Isn't it the case, sir, that only

19   $3.75 million of the settlement proceeds went to the EFH

20   debtor?

21   A    From a cash perspective, yes.  And as I indicted

22   yesterday, there were other issues outstanding.  For

23   example, who was going to be responsible for the 2017 taxes

24   and any disputes regarding the taxes, would that remain with

25   the EFH creditors or not and that for 2017 and 2018 was

1    resolved as part of that matter.  And that could have been

2    multimillions of dollars.

3    Q    And from the EFIH ledger, EFIH got $27.25 million from

4    that settlement, correct?

5    A    From the cash.  Again, you're ignoring the -- I believe

6    you're ignoring the 2017 and 2018 tax -- the dispute over

7    who would owe the tax if there was a reversal of the tax and

8    tax was owed.  And I've seen swings as much as, you know, 50

9    to $60 million for any one year.

10   Q    Okay.  But you haven't presented any of that analysis

11   on your written direct, correct?

12   A    No, sir.

13   Q    Now, the other bucket I want to talk about next is the

14   substantial contribution claim relating to the disallowance

15   of the NextEra termination fee.  Are you aware -- and this

16   is in the Elliott statement again -- that $3.3 million is

17   the asserted amount that Elliott incurred for attempting to

18   disallow the NextEra termination fee?

19   A    I'm not aware of the exact amount, but yes.

20   Q    Okay.  If you could turn to Page 9 just so we're on the

21   same page.  Paragraph 18, you see there the number is

22   approximately $3.3 million, correct?

23   A    I do see those amounts.

24   Q    Okay.  Would you agree with me that there will be no

25   economic benefit to either of the debtors, EFH or EFIH, if

1   the Third Circuit ultimately allows that termination fee in

2   full?

3   A    That would require me to speculate as to what would

4   happen after that.  If it is allowed, there's certainly

5   opportunity -- and again, I've been part of --

6           THE COURT:  Well, let me -- I'm sorry, I'm going

7   to correct the record.  Third Circuit is not going to allow

8   the fee.  The question is whether they're going to reverse

9   my disallowance of the fee.  If they do that, we're going to

10  have a trial because there's a pending adversary proceeding

11  that's currently stayed.  So I just want the record to be

12  clear.

13          MR. GLENN:  And I didn't -- I'm generalizing.  I

14  didn't mean to override the specifics of that process going

15  forward.

16  A    And that's where I was going with the trial and the

17  risk of the trial as well as having been involved in other

18  negotiations regarding this settlement, there is a strong

19  chance that there could still remain benefit to both EFIH

20  and EFH because of that reversal -- excuse me, because of

21  the reconsideration that was -- that occurred in the

22  litigation risk.  So I can't agree with your zero.

23  Q    Okay. But they're claiming that money solely in

24  connection with the reconsideration and if that

25  reconsideration is reversed, there will be no benefit from

1    their work, correct?

2    A    I just, again, it's speculation.  And I believe that

3    with all of the uncertainty that has occurred because of the

4    different decisions, I think there's an opportunity for

5    settlement.

6    Q    But you would agree with me, sir, we don't know whether

7    what they've done ultimately will or will not benefit the

8    EFH bankruptcy estate, right?  We don't know what's going to

9    happen.

10   A    No, we do not know whether the Third Circuit is going

11   to reverse Judge Sontchi's ruling, we don't know how the

12   litigation is going to go after the fact.  We don't know

13   whether that's going to provide some leverage for

14   negotiations.  We do not know that with a hundred percent

15   certainty.

16   Q    Okay.  So the other item you cite in your written

17   direct is this dispute over taxes involving Vistra.  Do you

18   recall that generally?

19   A    I do.

20   Q    Okay.  And for that, Elliott is claiming an

21   approximately $1.1 million fee.  And to refresh your

22   recollection, that's on Page 11 of that same statement,

23   Paragraph 26.

24   A    Yes.

25   Q    Okay.  Now, isn't it the case, sir, that Elliott

1    demanded that EFH commence some sort of a litigation or

2    medication process against Vistra?

3    A    They certainly requested and demanded -- maybe demanded

4    is the right word.  We as the Debtors considered that and we

5    considered the potential value of that dispute and settling

6    that dispute in favor of EFH and we decided that it made

7    economic sense for EFH to pursue that matter.

8    Q    Okay.  And in fact EFH was represented by Proskauer

9    because that was a conflict matter once that litigation

10   started, correct?

11   A    Yeah, I think it was because of Kirkland and Ellis had

12   done a lot of -- had done tax work for TCH and EFH, and so

13   it was a conflict matter.

14   Q    Fair enough.  And isn't it the case, sir, that

15   Proskauer brought that litigation and they lost?

16   A    They brought the litigation.  I believe they brought in

17   an expert to mediate, for lack of a better term, and he

18   ruled in favor of Vistra.

19   Q    Okay.  And so EFH lost that litigation.

20   A    Yeah, I guess you could characterize it as that.  Yes,

21   sir.

22   Q    So would you agree with me that Elliott is demanding

23   payment from the EFH estate for demanding that EFH bring

24   litigation, hiring lawyers to prosecute that litigation, and

25   then losing that litigation?

1    A    It lost the litigation.  I think they were bringing

2    value to EFH by litigating that, understanding what the

3    implications would be if there was ever an equitization.

4    Q    Now, I'll represent to you -- and this is just

5    arithmetic -- that the buckets that we refer to, the Vistra

6    fees, the Oncor dividend settlement fees, and the NextEra

7    reconsideration fees add up to around 15 percent of the

8    Elliott substantial contribution claim.

9         Would you agree with me, sir, that not all of that

10   15 percent -- and I don't want you to testify as to numbers,

11   but just whether there was or was not a benefit -- that EFIH

12   did benefit from that 15 percent that Elliott is claiming.

13        MR. MCKANE:  Objection, Your Honor.  You've

14   already ruled on this issue.  If Counsel wants to open the

15   door on numbers, so be it.  But he's asking -- he's not --

16   he's not saying give me numbers, but he's saying is it zero

17   and he's asking for factors.

18        MR. GLENN:  I believe Mr. Horton was allowed to

19   testify about whether there was or was not a benefit without

20   opening the door.

21        THE COURT:  I don't remember that.  I don't

22   remember that.

23        MR. GLENN:  He's answered several questions about

24   whether there was a benefit to one estate versus whether

25   there was a benefit to another estate.  I'll withdraw the

1    question and ask it a different way.

2    Q    Would you agree with me, sir, that EFIH benefitted in

3    some way from each of those three buckets?

4           THE COURT:  I'll allow that.

5    A    Certainly.  Certainly, yes.

6    Q    Okay.  Now, I'd like to talk to you next about the

7    allocation of the NextEra break-up fee.  And I know there's

8    been a lot of testimony on this.  I'm going to try to get

9    through it quickly to ask about foundational questions.

10          Now, you would agree that distributions to EFH

11   from the NextEra deal were dependent on the outcome of the

12   make-whole litigation, as Mr. Keglevic testified to?

13   A    I believe that the ruling of the make-whole, the

14   reversal of the make-whole ruling from the bankruptcy court

15   did have an impact on the distributions to EFH and EFIH.

16   Q    And in your view, while the make-whole appeal was

17   pending, the outcome of that was uncertain.  And therefore

18   whether EFH and its creditors would receive the proceeds of

19   the sale was also uncertain.

20   A    It was uncertain as to whether the 471 million was

21   going to go to EFH and it was uncertain as to whether EFIH

22   would have a reduction in its distributable value.  How one

23   -- how you calculate that uncertainty is, you know, up to

24   you.

25   Q    Fair enough.  And you've not presented a calculation of

1    any kind of the probability of that occurring as of the time

2    that appeal was pending, have you?

3    A    I think in my deposition I at some point characterized

4    it as a very low probability, that I believed it was a very

5    low probability that it would occur.

6    Q    Okay.  Now I want to talk to you about the termination

7    of the NextEra agreement.  Would you agree with me that Mr.

8    Rosenbaum, and Elliott Associates urged the company to

9    terminate the NextEra transaction?

10   A    I don't -- I don't agree with that.  I don't recall

11   that as being the circumstance.  I just don't.

12   Q    Okay.  Well, the company did terminate the NextEra

13   transaction, correct?

14   A    After I think it was two reconsideration filings by

15   NextEra that the company eventually exercised its fiduciary

16   duty.  They saw that it appeared as though it was not going

17   to go anywhere and terminated the agreement by executing its

18   fiduciary duty and to move on to another transaction.

19   Q    Okay.  And in fact it terminated that agreement at the

20   time the company identified Berkshire Hathaway as a

21   replacement transaction, correct?

22   A    Berkshire -- excuse me -- Berkshire Hathaway, we had --

23   our Bidder B as we call them, we had gone -- the company had

24   been in very detailed negotiations.  We had come to a place

25   where we actually had reached agreement.  And I think we

1    informed Elliott and their counsel the night before and we

2    actually executed the transaction and terminated the

3    agreement.

4    Q    Okay.

5    A    And terminated the NextEra agreement.

6    Q    Fair enough.  And do you recall that Elliott, prior to

7    the time that the NextEra transaction was terminated, had

8    approached the company about concerns about the cash burn of

9    waiting for the NextEra transaction to go through?

10   A    I'm sure that conversation came up.  I'm sure it came

11   up.

12   Q    And have you reviewed Mr. Rosenbaum's written direct?

13   A    Very high level.

14   Q    Okay.  Isn't it the case, sir, that at some point

15   Elliott Associates commenced litigation against the company

16   so it could pursue alternative transactions?

17   A    I do recall that.

18   Q    Okay.  Isn't it the case, sir, that that occurred

19   before EFH and the affiliated debtors terminated the NextEra

20   transaction?

21   A    That's correct.

22   Q    Okay.  So you would agree with me that Elliott was

23   interested in pursuing alternative transactions and filed

24   litigation to do so before the company terminated the

25   NextEra transaction, correct?

1    A    Yes, that is correct.

2    Q    Okay.  So does that refresh your recollection as to

3    whether Elliott wanted the company to terminate the NextEra

4    transaction?

5    A    My understanding was maybe slightly different, that

6    they were arguing whether or not they were still bound by

7    the PSA and that they were focused on -- and again, I can't

8    recall the specifics of them saying terminate the NextEra

9    transaction.  I can recall them being very interested in

10   moving forward with an alternative transaction to try to

11   either consummate that transaction or, as I said yesterday,

12   create some competitive tension for other potential bidders

13   and to provide a backup plan in the event that NextEra was

14   terminated or another bidder did not show up.

15   Q    Okay.  Now, I believe there's testimony -- I just want

16   to make sure you agree -- that the cash burn was

17   approximately $50 million a month, correct?

18   A    Yeah, I would say somewhere between 40 and 50 million.

19   Q    Fair enough.  And that's only at the EFIH debtor level,

20   correct?

21   A    That is correct.

22   Q    Okay.  And EFH did not have any meaningful ongoing

23   interest expense at that point, did it?

24   A    It did not.  I would say that if you're in a waterfall

25   plan, then having burn, interest burn in front of you and

1    accruing additional principal in front of you as EFH, that

2    also is a concern in terms of being able to ever get a

3    distribution, if you will, for -- from EFIH or from the

4    plan.  So to say it was not a concern at all of EFH, I think

5    that would be an understatement.

6    Q    So would you agree with me if the number is $40 to $50

7    million, that the EFIH estate would be better off by

8    terminating the NextEra merger agreement to save more

9    interest expense than the termination fee?

10   A    Well, again, there was a couple of motions filed for

11   reconsideration.  So there was a chance, albeit a very long

12   shot chance, that, you know, the PUCT could have

13   reconsidered.  So you tell me, you know, in your judgement

14   whether or not that was, you know, beneficial for them to

15   terminate.

16           They were -- we allowed them to go forward and

17   seek alternative transactions while those -- while the last

18   reconsideration -- I think the first reconsideration may

19   have still been outstanding, but kind of had the opportunity

20   of, you know, the benefit of both worlds in that

21   circumstance.

22   Q    Okay.  But we can agree that the company, EFIH, decided

23   to terminate that transaction because of the concern of that

24   interest burn and the concern that the transaction would not

25   close.

1   A    I think the board -- boards of EFH and EFIH terminated

2   that transaction with the realization that, one, it was not

3   going to -- it was not going to close.  It could have

4   resulted in additional appeals to various levels in the

5   State of Texas, and that we had an alternative transaction,

6   that being the Berkshire transaction, that we had negotiated

7   and felt like we could execute.  So it was a fiduciary

8   response -- excuse me -- fiduciary decision of the boards of

9   EFH and EFIH.

10  Q    Okay.  And just so we can close the loop, part of that

11  calculus was the savings on the interest expense to EFIH,

12  correct?

13  A    I would say that that was part of -- a data point.  And

14  again, there were a lot of factors, as I just mentioned.

15  Q    Thank you. Now, did you personally review the NextEra

16  merger agreement?

17  A    I read the merger agreement.  I didn't read -- I read

18  it.  I don't have it memorized, but yeah, I've read it.

19  Q    Okay.  And were you aware of the triggers that would

20  cause the break-up for the termination fee to be paid under

21  that agreement?

22  A    I would have to go back through them.

23  Q    Okay.  Well, I think we've left you a copy of it.  And

24  maybe we could put it on the screen.  Okay.  That's Exhibit

25  144, AHX-144.  And I'd like you to turn very briefly to Page

1    106.

2    A    I'm not sure where -- I've got a stack of papers and

3    I've got a binder.  I'm not sure where we are.

4             THE COURT:  Can we do it on the screen?  Are you

5    okay doing it on the screen, Mr. Horton?

6             MR. HORTON:  Absolutely.  Absolutely.

7             THE COURT:  We'll do it on the screen.

8             MR. GLENN:  Okay. On the screen is fine. That's

9    probably better.

10   A    Absolutely.

11   Q    Thank you.  Section 8.5(b), Page 106 I believe.  Oh

12   yes, on the bottom of the Page 106, not the ECF page at the

13   top.  Are you with me?

14            THE COURT:  We're waiting for the screen.

15            MR. GLENN:  Oh, I'm sorry.  If you could blow up

16   the top half of that paragraph?  Okay, on the left-hand

17   side.  All right.  I'd like to focus you on the first -- I'm

18   sorry, that's the wrong section.  B, 8.5(b).  Right there,

19   yeah.  Perfect.  It is a lot of words.

20   Q    Okay.  So, trying to cut to the chase here.  The lead

21   into that is if this agreement is terminated pursuant to

22   this Article 8, which concerns termination, it then goes on

23   about six lines down.  And then it says, no later than five

24   days following the consummation -- I'm sorry, I'll start

25   again.

```
1                If this agreement is terminated and any

2     alternative transaction is consummated -- that's the key

3     point.  Then about six lines down it says, "No later than

4     five days following the consummation of such alternative

5     transaction, the company and EFIH pay to the parent the

6     termination fee by wire transfer as directed by parent in

7     immediately available funds."  Do you see that?

8     A    I do see that.

9     Q    Okay.  So one of the triggers of this payment is

10    consummation of an alternative transaction.  Do you see

11    that?

12    A    I do see that.

13    Q    Okay.  And when you decided to move forward with the

14    Berkshire Hathaway replacement transaction, were you aware

15    that that would be a trigger for the payment of the break-up

16    fee?

17    A    Again, I would have relied on my legal counsel and our

18    internal legal counsel.  And we knew that there was a risk.

19    The board knew that there was a risk to the extent that we

20    had terminated the transaction and consummated another

21    transaction, that the transaction fee could be -- could be

22    payable by the company.

23    Q    Okay.  And --

24    A    By the debtors, let me say it like that.

25    Q    As you sit here today, you can't recall whether any of
```

1    the EFIH PIK note holders urged the company to terminate the

2    NextEra transaction in favor of an alternative transaction,

3    can you?

4    A    I can't.  I can't recall that specific -- I just can't.

5    Q    Okay.  But by this point in time you do recall, as you

6    testified earlier, that Elliott had sought to pursue an

7    alternative transaction, correct?

8    A    Yes.

9    Q    Okay.  Thank you.  I'd like to talk to you --

10   A    Let me add though, they were pursuing an equitization

11   plan as I understood -- as I understand it.  I can't recall

12   whether an equitization plan would have terminated this --

13   would have created a requirement to pay a termination fee.

14   I just -- I just can't recall that.  There was -- in some

15   plans you do an equitization, and I know we had

16   negotiations.  I can't recall if an equitization would have

17   actually triggered the 275.

18   Q    Okay.  And you know that the Berkshire transaction

19   would provide no consideration to EFH from the waterfall of

20   that transaction, correct?

21   A    The Berkshire plan would not create any cash

22   distributable value to EFH.

23   Q    Okay.  Now, are you aware that had the regulatory

24   process played out and NextEra not obtained approval,

25   whether at termination fee would or would not be payable?

1    A    Would you mind repeating that?  I apologize.

2    Q    Sure.  If you had played out the regulatory approval

3    process for NextEra, do you know whether the termination fee

4    would or would not have been payable?

5    A    If they had a non-appealable order in the PUCT?

6    Q    Correct.  Correct.

7    A    It's my understanding that they would not -- that the

8    termination fee would not have been owed.  That's my

9    understanding.

10   Q    Okay.  And did you or any other directors of --

11   officers and directors of the debtors form a view as to how

12   long that might take?

13   A    I don't recall a conversation as to how long it would

14   take.  I think certainly there was consideration that it

15   would take more than a month, more than a couple months.  I

16   just don't know of a specific timeframe.  But --

17   Q    Okay.  Did you come to the view that it would take less

18   than a year?

19   A    I don't think -- I don't recall anything that specific.

20   Q    Okay.  And am I correct that there's no written

21   analysis that shows the effect to EFH as opposed to EFIH of

22   waiting out that process and the costs that it would take to

23   EFIH -- EFH specifically?

24   A    I don't recall.  I mean, there was discussions around

25   the cash and the cash burn at EFH.  I think you heard Mr.

1    Keglevic say this morning, I've said before that to a

2    certain extent EFH had basically a floor on its cash because

3    of -- you did have professional fees, to your point.  There

4    wasn't any interest burn so to speak.  They were relying

5    upon tax payments from Oncor for, you know, inflows.  Were

6    those a hundred percent certain with all the changes in the

7    tax rules?  And we've seen it in the past, you know, with

8    the bonus deprecation and so forth when no tax payments were

9    coming up from Oncor.  So I know that people were focused on

10   the amount of cash at EFH.  Whether there was a separate

11   analysis that said you're going to run out of cash in four

12   months, five months, or even a year, I don't recall that.

13   Q    Okay.  Now again, we know that EFIH was incurring 40 to

14   $50 million monthly of interest expenses.  We talked about

15   that before.  But you can't testify today as to how much EFH

16   would have incurred by waiting out the regulatory process

17   for the NextEra transaction, can you?

18   A    No, I cannot.

19   Q    So you don't know whether EFH would have been better

20   off having that play out than sitting here in court today

21   being exposed to the risk of payment of the break-up fee,

22   can you?

23   A    Again, the board exercised its fiduciary duties based

24   upon the facts and circumstances at the time.  And there

25   absolutely was a risk that EFH would run out of cash.  And

1    that certainly was discussed as a risk.  So no, I don't know

2    with any certainty, but I do know that that was a risk that

3    was considered.

4            MR. GLENN:  Your Honor, do you want to keep going?

5    I'm about to change subjects.  I'll keep going if you want.

6    Or --

7            THE COURT:  How much longer do you think you have?

8            MR. GLENN:  Probably about 20 minutes.

9            THE COURT:  Let's keep going.

10           MR. GLENN:  Okay.  So let's --

11           THE COURT:  You're okay, Mr. Horton?  Yeah?

12   Q    Now, you testified in your written direct about the

13   Official Creditor Committee's professional fees in this

14   case, correct?

15   A    That's correct.

16   Q    Okay.  And like the Elliott substantial contribution

17   claim, you did not review the time detail for all the

18   various fee applications in this case, correct?

19   A    I did not review the E Committee's time detail.

20   Q    Okay.  And in fact you had your counsel either at the

21   company or Kirkland and Ellis review those, correct?

22   A    I wouldn't -- I wouldn't say that, no.

23   Q    You don't know who reviewed them?

24   A    When you say reviewed them as part of preparation for

25   this?  I'm sorry, I didn't understand.

1    Q    I was actually asking a broader question.  Did your

2    counsel review the Creditors' Committee's fee applications?

3              MR. THOMPSON:  Objection.  Vague, Your Honor, as

4    to what time the PAB or the capacity of --

5              THE COURT:  Yeah.  Can you give us a --

6              MR. GLENN:  sure.

7              THE COURT:  Can you give us a time period?  And,

8    Mr. Horton, if you don't know, you don't know.  That's just

9    -- that's an adequate answer.  But go ahead.

10             MR. GLENN:  Fair enough.

11   Q    Pre-PAB, while you were working for the Debtors, you

12   didn't personally review the committee's fee applications,

13   correct?

14   A    No, sir.

15   Q    And the time detail behind those, correct?

16   A    That's correct.

17   Q    Okay.  And I think you testified in your written direct

18   or earlier that Ms. Doré might have done that?

19   A    It could have been.  I don't -- I don't remember if I -

20   - I said retained professionals.  So I'm not sure if I was

21   specific regarding the E Committee.  I just can't recall.

22   Q    Okay.  Who cut the checks to pay the creditors'

23   committee?

24   A    Who cut the checks?  Which entity?

25   Q    At the company.  At the company.  No, what person?

1    A    We don't -- typically we don't cut checks.  So there's

2    a treasury department.  There's a -- there's a process for -

3    - through accounts payable and through accounting that we --

4    when we're going to make a disbursement, we have a

5    disbursement authorization, we have the documentation

6    supporting the disbursement authorization.  In this case it

7    would have been the invoices plus the --

8                THE COURT:  CNO.

9    A    Certificate of no objections.  I'm sorry.

10               THE COURT:  That's okay, go ahead.

11   A    Certificate of no objections.  And then that would come

12   to the treasury department and a wire would be sent out.

13   Q    Okay.  Were those wires sent out fifty-fifty from EFIH

14   and EFH?

15   A    I don't know.

16   Q    Okay.  Now, were you here for Mr. Galardi's opening

17   argument?

18   A    Yesterday.

19   Q    Okay.  And do you recall him presenting percentages of

20   the fees that were incurred before the committee settlement

21   was entered into in late November of 2015?

22   A    I do recall that.

23   Q    Okay.  And do you recall before that time that the E-

24   side Committee was involved in discussions about various E-

25   side plans of reorganization?

1    A    My understanding is that they -- they were -- I recall

2    it being -- I'm trying to think of the timeframe.  I can't

3    tell you each one.  I know that leading up to the Hunt

4    transaction for example, there was a lot of activity by the

5    E-side Committee regarding matters.

6    Q    Okay.

7    A    So you said several plans of reorganization.

8    Q    I think I misspoke.

9    A    Okay.

10   Q    I don't think there were several.  But do you recall

11   that they did work on formulating or negotiating E-side

12   plans before the Hunt transaction came to pass?

13   A    Again, when you say E-side plans, what are you -- which

14   one specifically are you referencing?

15   Q    No specific plan.  Do you recall that they were trying

16   to come up with a plan?

17            THE COURT:  Who is they?  I lost the -- I lost the

18   pronoun.

19   A    I'm sorry, the UCC professionals.  The UCC and its

20   professionals.  Sorry.

21            THE COURT:  Which one?  The T-side Committee or

22   the E --

23   Q    I would drop all of that.  Because I -- and I'm going

24   to make something very clear for the record.  I'm asking you

25   only about the E-side Creditors' Committee.

1   A     Okay.

2   Q     Okay.  You can ignore the T-side Creditors' Committee

3   for all the questions I'm going to ask you today.  Putting

4   aside any specific plan, do you recall that the E-side

5   Creditors' Committee was working towards a plan of

6   reorganization for the E-side to maximize value?

7   A     Again, the E-side committee as I recall was appointed

8   some time in October or November, maybe September of 2014.

9   I can't recall the --

10  Q     Correct.

11  A     -- correct timeframe.  Prior to that, we had the RSA,

12  which was a plan.  So they weren't appointed at that point

13  in time.  So I don't think they were involved in the RSA.

14  We tried to do a stalking-horse bidding process in that

15  summer with I think a couple -- we went out to multiple

16  parties and ended up having detailed conversations with

17  NextEra.  We discontinued that process and went forward with

18  the bidding procedures.  I think we filed a motion in

19  September of 2014.  It was ultimately in January of 2015 as

20  I recall we went forward with our bidding procedures,

21  reached out to 30-plus parties, and went through multiple

22  negotiations during that period of time.  And it really came

23  down to probably three.  It was the PIK proposal, the Hunts,

24  and NextEra.  It looked like the Hunts were proposing the

25  restructure.  NextEra was more, you know, more traditional

Page 164

1    structure.

2              Somewhere along the line in 2015, probably July of

3    2015, NextEra dropped their bid, roughly a billion dollars.

4    I think all of that's on the record.  And the Hunts and the

5    unsecured creditors at TCH came forward with a re-proposal

6    as I recall.  The fee committee was actively involved.  They

7    were objecting to the plan of reorganization.

8              THE COURT:  I'm sorry.  You said the fee committee

9    or the --

10             MR. HORTON:  Did I say that?

11             THE COURT:  Yeah, you said fee.

12             MR. HORTON:  E.  I said E I think.

13             THE COURT:  Oh.  Oh, okay, sorry.

14             MR. GLENN:  It sounded like fee.  It sounded like

15   fee.

16             MR. HORTON:  I could have said fee, sir.

17             THE COURT:  That's okay.

18   A    E Committee.  The E Committee was objecting to the

19   plan, the Hunt plan.  That's when we got into -- there was a

20   lot of discussions about a global settlement and the E-side

21   Committee settlement.  So that is the one that I recall most

22   distinctly that they were involved in, particularly the E

23   Committee settlement.  There was a provision such that so

24   long as we were -- asbestos were being -- asbestos was being

25   reinstated and there was the turnover provision for the non-

1    qualified beneficiaries, so long as each plan met those

2    conditions, that they would -- I think Mr. Keglevic said

3    stand down and had very limited roles going forward.  That's

4    what I recall from the record.  I don't know if that's

5    several, or you consider that one, or how you view their

6    review of subsequent plans of reorganization.  But for the

7    record, that's how I understand it.

8    Q    I want to try to finish this up, so I'm going to get to

9    the point.  Before the -- before the EFH, EFHI Committee

10   settlement, you did not negotiate any of those plans

11   personally with the E-Side Committee, did you?

12   A    No, I did not.

13   Q    Okay.  So you don't know what their involvement was in

14   any plan of reorganization leading up to that point, do you?

15   A    Look, I did my research and my homework.  I talked to

16   Kirkland and Ellis, asked the activities that they were

17   involved in.  I also spoke to some -- I think it was Andy

18   Wright, but I may be wrong about their involvement.  So I

19   got a perspective of what they were involved in.  And it was

20   primarily, as I put in my declaration, that it was primarily

21   the asbestos and reinstatement of the asbestos, the turnover

22   provisions for the non-quals.  And then on a collective

23   basis, you know, tax and the global settlement, the asbestos

24   bar date.  Those are the matters that I'm familiar with.

25               MR. GLENN:  Okay.  I move to strike that answer as

1    hearsay and without foundation because it was based on -- I

2    think he's testified at the beginning -- what other people

3    told him.

4              THE COURT:  No, I don't think that's -- I don't

5    think he said that.  No.  Overruled.

6              MR. GLENN:  Okay.  One moment, Your honor.  Okay.

7    Q    I'd like to talk to you very briefly about the asbestos

8    issues.  I believe you were in court when Mr. Keglevic

9    testified about this, so I'm going to try to streamline it.

10   When the NextEra transaction was proposed, did you as an

11   officer of this company have an understanding of the benefit

12   of NextEra's assumption of those asbestos liabilities?

13   A    A benefit?  I can tell you that I believe that the

14   amounts that NextEra had set aside, which was in the escrow

15   account of 250 million, my personal belief was that the

16   number was smaller.  I had no evidence at that point in time

17   -- I wasn't even certain, and I was intimately involved in

18   this part of the process -- I had really no idea of what

19   they were looking at to get to the $250 million number.  I

20   can tell you I had multiple conversations with Mark Hickson

21   with NextEra.  And I know that there were conversations

22   directly with Charlie Sieving, their general counsel.  I was

23   on some of those calls.  And they were absolutely -- I don't

24   want to say paranoid, but they were very, very concerned

25   about not knowing what the -- of all these claims that had

1    come in through the bar date, not knowing what the total

2    liability was.  And they were not going to accept -- they

3    were not going to accept the asbestos.  I was told that

4    multiple times.  I felt for a little while that was a little

5    bit of negotiating tactics.  But when the 250 million came

6    over in escrow, I think they truly believed -- and I had a

7    follow-up conversation with them, with the expert, "expert"

8    that they had hired who thought it was 300 million.  And so

9    there was a basis for it.  It was 300 million versus our --

10   versus the -- and they decided to put 250 million in escrow.

11   What I did and what I sought to do, I said, look, if I can

12   ever get this number -- convince you that it's a lower

13   number or get an insurance policy that will cover this risk

14   for less money, will you release funds for the benefit of

15   creditors.

16          So at that point in time it didn't matter what I

17   thought, it mattered what the buyer believed.  And the buyer

18   believed it was 300 million-ish, and they put 250 million in

19   escrow.

20   Q   It may not matter what you believe, but I'm asking what

21   the company and its management and directors understood at

22   the time they approved the transaction, at that time.

23   A    We -- at that time I think there was from my

24   perspective uncertainty as to what those numbers were.  We

25   had the history, but we hadn't had the history with the

1    27,000 claims that had come through.  And we hired -- Caney

2    hired Ankura, I hired Aon Hewitt -- excuse me - Aon Risk.

3    And we went through a process for six weeks or so to make a

4    -- to get an expert opinion from Aon and also to get a

5    proposal for actually insuring a 300 million-ish of

6    potential liabilities.  The amount was north of what was --

7    north of the hundred million.  We had multiple conversations

8    with their expert.  Ultimately Ankura's report came out and

9    it was roughly 55 million.

10           MR. MCGINNIS:  Objection, Your honor.  Hearsay.

11   This is the same hearsay expert testimony as --

12           THE COURT:  Yeah, sustained.  As to the amount.

13   You can't -- you can't -- you can't testify as to the amount

14   that they estimated because it's an out-of-court statement.

15   Their estimation.  And they're not subject to cross-

16   examination and it doesn't fit any of the exceptions.

17           MR. HORTON:  Fair enough.

18           THE COURT:  So all that leading up was fine.  But

19   what they actually said, you can't -- you can't testify to

20   that.

21           MR. HORTON:  Fair enough.  Fair enough.

22           THE COURT:  Yeah.

23   Q    Did the Debtors publish a disclosure statement with

24   their assessment of the amount of the asbestos liability in

25   this Court?

1    A     What period of time?

2    Q     Around the NextEra transaction or thereafter.

3    A     I can't remember what we put in the -- in the -- in the

4    disclosure statement.  It seems like it was 55, 50 -- 50 to

5    $60 million is what I recall.

6    Q     Thank you very much.  No further questions.

7                THE COURT:  Thank you.  All right.  We're going to

8    break for -- who is left?

9                MR. THOMPSON:  Your honor, the PAB does not have

10   any redirect.  We do have some exhibits, but we'd be able to

11   move those into the record pretty quickly.

12               THE COURT:  All right.  Is there -- are there any

13   questions before the -- left?  Are there any questions left?

14               MR. MCGINNIS:  No redirect from UAF, Elliott and

15   UMB, Your Honor.

16               THE COURT:  Okay.  Mr. Pedone?

17               MR. PEDONE:  No, Your Honor.

18               THE COURT:  No?  Okay.  Hang on.  Just stick there

19   for a sec.  All right, then.  We'll do the exhibits.  Have

20   you seen the exhibits, Mr. Glenn?

21               MR. GLENN:  I have a list here, yes.

22               THE COURT:  Okay.

23               MR. THOMPSON:  I distributed it to Counsel before

24   --

25               THE COURT:  Okay.

1          MR. THOMPSON:  -- this session.  And, yeah, for

2     the record, McClain Thompson, Kirkland and Ellis, on behalf

3     of the PAB.  May I approach with the green sheet, Your

4     Honor?

5          THE COURT:  Yes, please.  Mr. Horton, you can step

6     down.  I won't keep you captured up there.

7          MR. HORTON:  Thank you, sir.

8          THE COURT:  You're welcome.  Okay, go for it.

9          MR. THOMPSON:  Your Honor, I believe Mr. Glenn and

10     Mr. McGINNIS do not have any objections.  I passed these out

11     about an hour ago.  For the record, these are the exhibits

12     cited in Mr. Horton's written direct with the absence of

13     exhibits that came in during Mr. Husnick's and Mr.

14     Keglevic's testimony.  So if it's okay with Your Honor, I'll

15     read these numbers into the record.

16          THE COURT:  Yes.

17          MR. THOMPSON:  Okay.  PAB Exhibit 29, 48, 156,

18     244, 307, 339, 352, 393, 398, 425, 435, 481, 483, 484, 613,

19     618, 624, 643.

20          THE COURT:  Any objection?

21          MR. McGINNIS:  No objection, Your Honor.

22          THE COURT:  No objections.  They're admitted.

23          (Debtor's Exhibits 29, 48, 156, 244, 307, 339, 352,

24     393, 398, 425, 435, 481, 483, 484, 613, 618, 624, and 643

25     Entered Into Evidence)

1           MR. THOMPSON:  Thank you, Your Honor.

2           THE COURT:  Okay.  So we're going to break for

3   lunch.  And then when we come back, we'll have Mr. Strom, is

4   that right?  Okay.  Whose witness is he?  I forget.  I'm

5   sorry.

6           MR. GLENN:  The Ad Hoc Committee.

7           THE COURT:  The Ad Hoc Committee.  All right.  And

8   then Mr. Robins as a rebuttal witness.

9           MR. GLENN:  Yes, Your Honor.

10          THE COURT:  And then possibly Mr. Rosenbaum.

11  We'll see how the afternoon goes.  Okay, very good.  We'll

12  reconvene at 2:15.

13     (Recess)

14          THE COURT:  All right.  Sorry for the delay.

15          MR. MARK:  No problem, Your Honor.  This is David

16  Mark, Kasowitz Benson Torres, for the Ad Hoc creditors.  We

17  call Steven Strom.

18          THE COURT:  Okay.  Mr. Strom, if you'd just remain

19  standing for your affirmation.

20          CLERK:  Please raise your right hand.  Do you

21  affirm your word that you'll tell the truth, the whole

22  truth, and nothing but the truth to the best of your

23  knowledge and ability?

24          MR. STROM:  I do.

25          CLERK:  Please state and spell your name for the

1    record.

2              MR. STROM:  Steven Strom, S-T-E-V-E-N, S-T-R-O-M.

3              CLERK:  Thank you.

4              THE COURT:  Thank you.  Please be seated, sir.

5    It's Strom?

6              MR. STROM:  Strom, correct.

7              THE COURT:  Okay, very good.  And just if you

8    could make sure you're close to the microphone.  Thank you.

9              DIRECT EXAMINATION OF STEVEN STROM

10   BY MR. MARK:

11   Q    Good afternoon, Mr. Strom.  Are you currently employed?

12   A    Yes.

13   Q    By whom?

14   A    Odinbrook Global Advisors.

15   Q    What is the business of Odinbrook?

16   A    Odinbrook is a restructuring advisory firm.

17   Q    Do you have a background in the restructuring industry?

18   A    I do.

19   Q    Can you briefly describe it for the Court?

20   A    I've been involved for almost 30 years now advising

21   companies, creditors, boards, sometimes buyers or other

22   stakeholders in restructuring situations in court and out of

23   court and in and out of the U.S.

24   Q    Mr. Strom, if you look at the last item in Volume 3 --

25   I think for the Court, it'll be your last item in Volume 4,

1    and we'll put it up -- this is the written declaration or

2    written direct.  Mr. Strom, you should have in front of you

3    your written direct.  Do you see it?

4    A    Yes.

5    Q    Is everything in there true and correct, to the best of

6    your knowledge?

7    A    Yes.

8              MR. MARK:  Your Honor, I have no more questions at

9    this time.

10             THE COURT:  Do you want to move the declaration

11   into evidence?

12             MR. MARK:  Yes.

13             THE COURT:  Any objection?  It's admitted.

14        (Declaration Entered Into Evidence)

15             THE COURT:  Cross-examination?

16             MR. WELSH:  Your Honor, for the record, Peter

17   Welsh on behalf of Elliott Management.

18             THE COURT:  That's nice and thin.

19             MR. WELSH:  We also heard you like smaller

20   binders, Your Honor.  May I proceed, Your Honor?

21             THE COURT:  Yes, you may.

22             CROSS-EXAMINATION OF STEVEN STROM

23   BY MR. WELSH:

24   Q    Good afternoon, Mr. Strom.  Mr. Strom, you were here to

25   testify today as an expert on the amount and structure of

1    breakup fees in Section 363, sales and large bankruptcy

2    cases, correct?

3    A    Yes.

4    Q    You're also here to testify today as an expert on the

5    allocation of breakup fees, correct?

6    A    Yes.

7    Q    In your declaration just referred to, you testified

8    about how the NextEra breakup fees should be allocated as

9    between EFH and EFIH, correct?

10    A    Yes.

11    Q    And if you look at -- do you have your declaration in

12    front of you?  Your written direct in front of you?

13    A    Yes.  That's Tab 1, I think, of the binder you gave me?

14    Q    Tab 1 of our binder, yeah.

15    A    Yes.

16    Q    I just wasn't sure which binder you were looking at.

17    A    Yes.

18    Q    So, if you look at Pages 13 and 14 of your written

19    direct, you see Observations and Opinions.  Do you see that?

20    A    Yes.

21    Q    If you turn to Page 14, Paragraph 3 on Page 14, do you

22    see that?

23    A    Yes.

24    Q    Paragraph 3 of your declaration on Page 14, you testify

25    about how the NextEra breakup fee should be allocated, is

1    that correct?

2    A    Yes.

3    Q    According to your testimony, Mr. Strom, as of the

4    original NextEra merger agreement date, it's your expert

5    opinion that if the make whole claims were disallowed, 273.4

6    million of the NextEra breakup fee should be allocated to

7    EFIH.  Do you see that?

8    A    Yes.

9    Q    And 1.6 million of the NextEra breakup fee should be

10   allocated to EFH.  Do you see that?

11   A    Yes.

12   Q    And a little further down, as of the original NextEra

13   merger agreement, if the make whole claims were allowed,

14   it's your expert opinion that none of the NextEra breakup

15   fee should be allocated to EFH, correct?

16   A    Correct.

17   Q    As of the amended NextEra merger agreement date, it's

18   also your expert opinion that if the make whole claims were

19   disallowed, 261.7 million of the NextEra breakup fee should

20   be allocated to EFIH, correct?

21   A    Yes.

22   Q    And 13.3 million of the NextEra breakup fee should be

23   allocated to EFH.  Do you see that?

24   A    Yes.

25   Q    And as of the amended NextEra merger agreement, it's

1    your expert opinion that if the make whole claims were

2    allowed, none of the NextEra breakup fees should be

3    allocated to EFH, correct?

4    A    Correct.

5    Q    Now, in Paragraph 4 on Page 14, it's also your expert

6    opinion that due to the contingent nature of any

7    consideration to be received by EFH, less of the breakup fee

8    should be allocated to EFH, correct?

9    A    Yes.

10   Q    And because of that, it's your opinion that the

11   allocation of the NextEra breakup fee should be closer to

12   Scenarios 2 and 4 in Paragraph 3.  Do you see Romanette ii

13   and iv in Paragraph 3?

14   A    Yes.

15   Q    And so your opinion in 4 is referring back to 2 and 4

16   in Paragraph 3, correct?

17   A    Yes.

18   Q    In allocating the breakup fee, Paragraph 4 of your

19   opinion says that because of what you characterize as the

20   contingent nature of the consideration received by EFH that

21   the allocation should tack toward 2 and 4, meaning, toward

22   no allocation of the break fee to EFH, correct?

23   A    Yes.

24   Q    And then in Paragraph 5 of your declaration, a little

25   further down, you testify that it's also your expert opinion

1   that any question in the NextEra breakup fee allocated to

2   EFH should be no more than 1.624 million, correct?

3   A    Yes.

4   Q    And all of these opinions, Mr. Strom, assume that the

5   allocation of the NextEra breakup fee is based on

6   information available at the time of the NextEra plan

7   negotiations, correct?

8   A    I'm not sure about that assumption.

9   Q    Okay.

10  A    Can you just state that a little bit more slowly or

11  restate just because --

12  Q    Sure, absolutely.  I'm sorry if I went too quickly.

13  Your opinions, Mr. Strom, set forth in 1-5 on Page 14 and 15

14  of your declaration assume that the allocation of the

15  NextEra breakup fee is based on information available at the

16  time of the NextEra plan negotiations, correct?

17  A    I don't think I'm taking a position on what information

18  should be incorporated at various points in time, so I'm not

19  really sure that I understand that assumption.

20  Q    I didn't say you were taking a position; I said the

21  opinions on 1-5 on Pages 14 and 15 assume, don't they,

22  information at the time of the NextEra plan negotiations,

23  correct?

24  A    Well, I'm looking at it in those cases with and without

25  the make whole, which at that point was under litigation.

1    Q    Let's look back on Page 13, okay?  Do you see Paragraph

2    F on Page 13?

3    A    Yes.

4    Q    Okay, can you read Paragraph F along with me, please?

5    A    Yes.

6    Q    "Based on my general opinions above and with the caveat

7    that I take no position on whether the breakup fee may be

8    allocated based on information available at the time of the

9    NextEra plan negotiations or on information that became

10   available later (i.e., the allowance of the make whole

11   claims and EFH creditors set to receive no cash

12   consideration from the NextEra plan had it been

13   consummated), and assume the former solely for the sake of

14   my opinions." Do you see that?

15   A    Yes.

16   Q    "And assume the former solely for the sake of my

17   opinions" refers back to that the view of the allocation

18   issue is based on or should be based on information

19   available at the time of the NextEra plan negotiations, is

20   that correct?

21   A    I'm providing an illustration as to what the outcomes

22   were based on information that wasn't known definitively at

23   the time the merger was entered into.

24   Q    I'm just asking about the words on this page and your

25   expert opinion or testimony, Mr. Strom.  The language -- you

1   assume the former "solely for the sake of my opinions".  The

2   former means that allocation is based on information

3   available at the time of the NextEra plan negotiations,

4   right?  That's the former as distinguished from the latter,

5   which is or on information that became available later,

6   correct?

7   A    Yes.

8   Q    Okay.  And by this you mean that for your expert

9   analysis you're assuming -- again, you take no position on

10  it but you're assuming for purpose of your analysis that the

11  relevant time to evaluate the consideration was to be

12  received -- that was to be received by EFH and EFIH under

13  the NextEra transaction was at or around the time of the

14  NextEra plan negotiations, correct?  That's an assumption in

15  your expert opinion, correct?

16  A    I'm just having a problem reconciling the words here to

17  the language that you're using, which to me seems different.

18  I looked at it as I wanted to present the outcomes with and

19  without the -- you know, with various decisions under the

20  make whole.  And I wasn't taking a position on what

21  information was applicable at a certain time.

22  Q    I understand your testimonies are not taking a position

23  on that.  I'm asking you are the opinions set forth in the

24  remainder of your expert testimony here based on an

25  assumption that allocation is based on information available

1    at the time of the NextEra plan negotiations?

2    A    I suppose from a very big perspective, because I'm not

3    saying which of those scenarios is the applicable one.

4    Q    All right, let's look at Page 7 of your declaration.

5    Actually, Page 7, 8, and 9 of your declaration, Mr. Strom.

6    A    Yes.

7    Q    Page 7, Paragraph 18 reads:  "Specifically at the time

8    of the merger agreement and amended merger agreement, the

9    consideration that was to be received by the various debtors

10   depending on the allowance or allowance of the make whole

11   claims is shown in the charts below." Correct?

12   A    Yes.

13   Q    And then the rest of Paragraph 18 refers to

14   presentations to the Debtor's boards at a July 29th and a

15   September 30th meeting.  Do you see that?

16   A    Yes.

17   Q    And then if you look on Page 8 and Page 9, there are

18   charts modeling creditor recoveries under different

19   scenarios as of the June and September board meetings,

20   correct?

21   A    Yes.

22   Q    And there's -- on Page 9, one of the inputs in the

23   model is make whole versus no make whole, right?

24   A    Yes.

25   Q    And as of July and September of 2016, there had not

Page 181

1    been a decision from the Third Circuit on the make whole,

2    correct?

3    A    Correct.

4    Q    Okay.  So, your information around the consideration

5    that was to be received by the various debtors was based on

6    information at the time of the negotiation of the NextEra

7    merger agreement and amended merger agreement, is that

8    correct?  Isn't that what Paragraph 18 and Page 8 and Page 9

9    reflect?

10   A    Yes.

11   Q    And on Page 9, as of September 18, 2016, the Debtors

12   were -- this is from the Debtors' board presentations,

13   right?

14   A    That's correct.

15   Q    The Debtors were forecasting $471 million in excess

16   value above EFIH recoveries from a NextEra transaction,

17   correct?

18   A    Based on the assumption of no allowance of the make

19   whole, yes.

20   Q    And at that point in time, there had been no decision

21   from the Third Circuit, correct?

22   A    Correct.

23   Q    Mr. Strom, you understand what an administrative

24   expense is, correct?

25   A    Yes.

1   Q    And you understand that there are requirements under

2   the Bankruptcy Code that govern the allocation of

3   administrative expenses to a particular debtor estate,

4   correct?

5   A    Somewhat, yes.

6   Q    Well, you -- you have some understanding --

7        THE COURT:  I'm sorry.  I'm sorry.  Where is that

8   in the Code?

9        MR. WELSH:  Sorry?

10       THE COURT:  Where is that in the Code?

11       MR. WELSH:  Where is...?

12       THE COURT:  Allocation of administrative expense

13   to a specific estate?

14       MR. WELSH:  The imposition of an administrative

15   expense, Your Honor, on a specific estate.

16       THE COURT:  I understand.  I didn't hear -- I

17   don't see -- I don't know where allocate is.  That's my

18   point.

19       MR. WELSH:  Thank you, Your Honor.  I'll clarify.

20   And I apologize for any confusion, Your Honor.

21       THE COURT:  Let's stick to the Code.

22       MR. WELSH:  Okay.  So I'll stick more closely to

23   the Code.

24   Q    You understand that there are requirements under the

25   Bankruptcy Code that govern the imposition of administrative

1    expenses on a particular debtor?

2    A    Generally, yes.

3    Q    Okay.  But you don't know what those requirements are,

4    correct?

5    A    I have not memorized them.  I'm not a lawyer.

6    Q    But you don't know what they are, right?

7    A    I guess I couldn't write them down in a definitional

8    format but I would probably know enough to ask a question

9    about whether an expense should be categorized a certain way

10   based on my practice.

11   Q    You prepared an expert report in this case, Mr. Strom?

12   A    Yes.

13   Q    And you submitted that expert report on or about August

14   20th of 2018?

15   A    Yes.

16   Q    And at the time you prepared and submitted that expert

17   report, you did not know what the requirements under the

18   Bankruptcy Code for imposing an administrative expense on a

19   debtor estate were, did you?

20   A    Correct.

21   Q    And you didn't consider any of those requirements in

22   preparing your expert report, did you?

23   A    No.

24   Q    And you didn't ask anyone -- anyone at Kasowitz or

25   anyone else what those requirements were, did you?

1   A    No.

2   Q    And those requirements did not in any way factor into

3   your expert opinion or your expert testimony here today?

4   A    I suppose not, the way you're asking it.

5   Q    Instead, your expert opinion on allocation of breakup

6   fees here today and the imposition of an expense like a

7   breakup fee on a debtor estate is based on your experience

8   as a financial advisor, correct?

9   A    Yes.

10   Q    Okay.  So let's turn to your experience as a financial

11   advisor, Mr. Strom.  As a financial advisor you've never

12   been involved in a negotiation over the allocation of a

13   breakup fee between jointly administered estates, have you?

14   A    I have not.  I'm not aware that cases existed.

15   Q    And so you've never advised anyone on the allocation of

16   a breakup fee among jointly administered estates, have you?

17   A    It's the same answer.  Correct.

18   Q    Okay.  And same answer to the question that you've

19   never testified about that, correct?

20   A    Correct.

21   Q    And you've never been involved in a restructuring

22   scenario where that issue has been worked through, correct?

23   A    I'm not and I'm not aware of any others either.

24   Q    Okay.  And so it's fair to say you have no experience

25   in allocating breakup fees among jointly administered debtor

1   estates, correct?

2   A    No direct experience because the circumstance hasn't

3   existed.

4   Q    I understand.  More generally, you have no experience

5   with allocating administrative expenses among jointly

6   administered estates, correct?

7   A    Correct.

8   Q    You've never advised anyone concerning allocating

9   administrative expenses among jointly administered debtor

10  estates, correct?

11  A    That's correct.

12  Q    In fact, you've never been involved in a restructuring

13  scenario where any administrative expense had to be

14  allocated among jointly administered debtor estates, isn't

15  that right?

16  A    Yes.

17  Q    Now, Mr. Strom, let's focus on the analysis set forth

18  in your declaration.  In your declaration you testified that

19  the NextEra breakup fee was allowed but not allocated by the

20  Court in its order authorizing the E-side debtors to enter

21  into a merger agreement with NextEra, correct?

22  A    Yes.

23  Q    And because of this, you performed and analysis of the

24  breakup fees that would be paid to a party such as NextEra

25  in the context of the consideration it would provide to EFH

1    and EFIH, correct?

2    A    Yes.

3    Q    And to perform that analysis you first extracted a list

4    from the website service BankruptcyData.com of the 20

5    largest bankruptcies for each year 2012 to 2018, correct?

6    A    Yes.

7    Q    For a similar period you then used the same website to

8    search for cases with sales activity or sales headlines,

9    correct?

10   A    Yes.

11   Q    And you then tracked the names of the relevant large

12   bankruptcy cases with sales activities, correct?

13   A    Yes.

14   Q    You then examined the sales activities to determine

15   which precedent transactions had breakup fees and which did

16   not, correct?

17   A    Yes.

18   Q    That analysis then generated the findings set forth in

19   Appendix A of your declaration, correct?

20   A    Yes.

21   Q    Okay, can you please turn to Appendix A?  It's at the

22   back of your written direct.  Just before your biography.

23   Now, looking at the sales information on Appendix A, Mr.

24   Strom, none of the precedent transactions listed on Appendix

25   A of your declaration involve the allocation of breakup fees

1   among jointly administered debtor estates, correct?

2   A     Correct.  I don't believe any of these are.

3   Q     Your expert testimony does not rely on any precedent

4   cases analyzing the allocation of breakup fees in jointly

5   administered debtor estates, correct?

6   A     It doesn't.  I'm not aware of any.

7   Q     And so "not aware of any" meaning, none of the data in

8   your dataset that support the analysis in your expert

9   opinion involve cases where breakup fees had to be allocated

10  among jointly administered debtor estates, correct?

11  A     Correct.

12  Q     And none of the precedent transactions in your dataset

13  involve, to your knowledge, the allocation of any other

14  administrative expenses among jointly administered debtor

15  estates, correct?

16  A     In these transactions, no.

17  Q     And you didn't look at the allocation of administrative

18  expenses among jointly administered debtor estates, correct?

19  A     I'm not sure I understand that question.

20  Q     You didn't look at any precedent data where the data

21  reflected the allocation of administrative expenses among

22  jointly administered estates, did you?

23  A     Not specifically, no.

24  Q     None of your data on Appendix A speaks to any of that,

25  correct?

1   A     They're substantively consolidated cases, so it

2   wouldn't.

3   Q     Your testimony is all of these cases on Appendix A are

4   substantively consolidated cases?

5   A     Well, they're not independent debtors, they're not

6   multiple debtor cases --

7   Q     They're not --

8   A     -- is another way to say it.

9   Q     The precedent transactions on your Appendix A, none of

10  them are multiple debtor estates?

11  A     Correct.

12  Q     They're all substantively consolidated cases?

13  A     Right.

14  Q     Okay.  And so, therefore, none of those cases involved

15  the allocation of administrative expenses?

16  A     Correct.

17  Q     Correct?  And including the allocation of a breakup

18  fee?

19  A     Correct.

20  Q     And so you included in the dataset for your analysis of

21  data for purposes of opinion on allocation only

22  substantively consolidated cases?  Is that your testimony?

23  A     I tried to find the most relevant cases that I could,

24  and this is the universe that I came up with.

25  Q     And your testimony is a universe of solely

Page 189

1    substantively consolidated cases is most relevant to an

2    expert opinion on allocation?

3    A    In the absence of other data that has specific examples

4    like the situation here, yes.

5    Q    And the data here of exclusively substantively

6    consolidated cases doesn't have any data on allocation of

7    administrative expenses?

8    A    Not that I'm aware of.

9    Q    Okay.  Now, Mr. Strom, I want to go through some of

10   your specific observations and opinions.  Can you turn back

11   to Paragraph 34 of your written direct, please?

12   A    Yes.

13   Q    Mr. Strom, at the end of Paragraph 34F, which we were

14   previously talking about, you state that you have several

15   specific opinions as to the breakup fees -- fee in this

16   case, sorry.  Do you see that?  It's on the carryover from

17   13 to 14 and the language I read is at the very top of 14.

18   Do you see that?

19   A    Yes.

20   Q    So we touched on these a little bit in my opening

21   questions but I want to go through them in a little more

22   detail now.  If you look at your third specific opinion --

23   do you see that, right in the middle of Page 14?

24   A    Yes.

25   Q    Your third specific opinion, Paragraph 34F3 of your

1    declaration concludes that "A fraction, a small portion, or

2    none of the NextEra breakup fee should be allocated to EFH."

3    Is that correct?

4    A    Yes.

5    Q    And in reaching your third opinion in Paragraph 34F3 of

6    your opinions, you explain that you're applying this

7    methodology above to the cash consideration provided by

8    NextEra.  Do you see that?

9    A    Yes.

10   Q    When you say "this methodology above" that refers to

11   the calculation of the 2.8 cents of breakup fees -- of

12   breakup fee in Paragraph F2 above, is that right?

13   A    Yes.

14   Q    And your -- so your specific opinion in Paragraph 34F3

15   builds on Paragraph 34F2, correct?

16   A    Well, from a -- part of the methodology perspective,

17   applying the breakup fee to the amount of consideration,

18   yes.

19   Q    I'm just asking -- your third paragraph references the

20   methodology above.  That means it's building on what is in

21   Paragraph 2 and 1 above, correct?

22   A    It refers to it.  I don't know what "building on" means

23   but it's --

24   Q    It relies on the calculations included in F2 and 1

25   above, correct?

1    A    Okay.

2    Q    Do you agree with that?

3    A    Generally.  I don't -- when you say it relies on, I

4    don't know that it's reliant as building a foundation the

5    way that you're characterizing it.

6    Q    Okay.

7    A    But it certainly refers to it.

8    Q    Fair enough.  So let's go through it a little more

9    carefully, okay?  To get to the 2.8 cent amount that you

10   reference in Paragraph F2 -- do you see that at the very

11   bottom of Paragraph F2, it says .028 in breakup fee?

12   A    Yes.

13   Q    To get at that amount -- we'll talk a little bit more

14   about that amount -- but to get at that amount you performed

15   two calculations, correct?

16   A    Yes.

17   Q    First, you calculated the NextEra breakup fee as a

18   percentage of the total consideration for the NextEra

19   transaction, correct?

20   A    Yes.

21   Q    To perform this calculation you took the total

22   consideration to be paid under the NextEra transaction and

23   divided it by the NextEra breakup fee, correct?

24   A    Yes.

25   Q    That's just simple arithmetic, correct?

1  A    Correct.

2  Q    And nothing more than that, correct?

3  A    Correct.

4  Q    Okay.  Then in Paragraph 34F2 of your declaration, you

5  took the NextEra breakup fee as a percentage of total

6  consideration and reduced it to pennies on the dollar,

7  correct?

8  A    Yes.

9  Q    In other words, the 2.8 cents in breakup fee at the

10 bottom of Paragraph 2 is really just the 2.798 percent

11 breakup fee figure at the top of Paragraph 2 reduced to a

12 per dollar basis, correct?

13 A    Yes.

14 Q    So, 2.798 percent of every dollar is rounded up to 2.8

15 cents, correct?

16 A    Yeah.

17 Q    And Paragraph 34F2 is simply saying that that

18 percentage of every dollar is 2.8 cents, correct?

19 A    Yes.

20 Q    It's just simple arithmetic, again, correct?

21 A    Yes.

22 Q    Nothing more than that?  Correct?

23 A    Yes.

24 Q    Okay.  In Paragraph 34F3, you then just run the output

25 of the arithmetic you performed in 34F1 and 34F2 through

Page 193

1    four different assumed cash distribution scenarios, correct?

2    A    Yes.

3    Q    And there's no...  Strike that.  You're not aware, Mr.

4    Storm, of any precedent case allocating a breakup fee among

5    jointly administered debtor estates in the manner set forth

6    in Paragraphs 34F1, 2, and 3, are you?

7    A    Could you ask that again?

8    Q    You are not aware of a precedent case allocating a

9    breakup fee among jointly administered debtor estates in the

10   manner set forth in Paragraphs 34F1, 2, and 3, are you?

11   A    I'm not.

12   Q    And you have no experience allocating a breakup fee

13   among jointly administered estates in the manner set forth

14   in Paragraph 34F3?

15   A    Correct.

16            THE COURT:  The amended merger agreement that you

17   reference in your testimony is the merger agreement after

18   the Third Circuit has ruled or...?

19            MR. STROM:  It's before.

20            THE COURT:  So, the first one's July and the

21   amended is September?

22            MR. STROM:  Yes.

23            MR. MARK:  Just before the ruling.

24            THE COURT:  All right.

25   Q    Now, Mr. Strom, based on your methodology, I'd like to

1   ask you about a hypothetical transaction, okay?

2   A    Okay.

3   Q    I want you to help me apply your proposed methodology

4   to a hypothetical sale transaction, okay?  Let's suppose

5   that there are two potential bidders bidding for Encore,

6   okay?

7   A    Okay.

8   Q    Bidder A and Bidder A -- oh, I'm sorry, Bidder A and

9   Bidder B we'll call them.  Let's assume that Bidder A is

10  willing to acquire Encore for total consideration that will

11  return 100 cents on the dollar to the unsecured creditors of

12  EFIH, okay?

13  A    Okay.

14  Q    The unsecured creditors of EFH will receive nothing in

15  that transaction, okay?

16  A    Okay.

17  Q    Let's assume that the certainty of closing a

18  transaction with Bidder A is very high, okay?  Near

19  certainty, okay?

20  A    Okay.

21  Q    Now, let's assume that Bidder B is willing to acquire

22  Encore for total consideration that, if consummated, will

23  return 100 cents on a dollar to the unsecured creditors of

24  EFIH and will return an additional $200 million in

25  distributable value to the creditors of EFH.  Okay?

1    A    Okay.

2    Q    And let's also assume that each proposed transaction

3    includes a termination fee of $200 million.

4    A    Okay.

5    Q    Would you agree with me that the original transaction

6    with Bidder A, the transaction proposed by Bidder A, all

7    other things being equal, is a better deal for EFIH

8    unsecured creditors?

9    A    I don't really know that there's enough information

10    there to answer that theoretical.

11    Q    It makes them whole and it has a greater certainty of

12    closing than the transaction proposed by Bidder B.

13              THE COURT:  Well, actually, in your --

14              MR. WELSH:  Sorry, Your Honor.

15              THE COURT:  In your hypothetical you maybe messed

16    up.  You actually didn't mention anything about what the

17    execution risk was with Bidder B.

18              MR. WELSH:  My apologies, Your Honor.  Thank you

19    very much for that clarification.  That is a part of my

20    hypothesis and I left it out.  So thank you very much for

21    clarifying that, Your Honor.

22    Q    So, let's assume that the transaction with Bidder A has

23    a much greater certainty of closing than the transaction

24    with Bidder B.  Okay?

25    A    Okay.

1   Q    Bidder B's transaction is much riskier, has a much

2   lower likelihood of closing.

3          MR. MARK:  Your Honor, objection.  The same

4   grounds.  He's asking hypotheticals about matters that were

5   not addressed in his opinion.

6          MR. WELSH:  Your Honor, I'm asking him to apply

7   his methodology to different factual assumptions, which I

8   think is fair ground for testing an expert's opinion.

9          THE COURT:  Yeah.  Overruled.

10         MR. MARK:  Likelihood of execution was not an

11  issue addressed in the opinion at all.

12         THE COURT:  Okay, overruled.

13  Q    So, are you with me so far, Mr. Strom?

14  A    I think so.

15  Q    The proposed transaction by Bidder A proposes to make

16  EFIH unsecured creditors whole, has a very high likelihood

17  of closing.  The transaction proposed by Bidder B makes the

18  EFIH creditors whole also but adds significant incremental

19  value for EFH unsecured creditors.  Okay, they both have a

20  $200 million termination fee and the likelihood of closing

21  Bidder B's transaction is significantly lower than the

22  likelihood of closing Bidder A's transaction, okay?

23         Now, let's suppose that a deal is signed up with

24  Bidder B, okay?  At the time that deal is signed, the

25  disinterested directors of EFIH and the disinterested

1   directors of EFH approve the deal and do not allocate the

2   potential breakup fee between EFIH and EFH, okay?  You with

3   me?

4   A    Okay.

5   Q    Now, let's suppose the deal with Bidder B does not

6   close and cannot close, okay?  And let's suppose the Debtors

7   then sign a deal with Bidder A for materially less

8   consideration than was originally offered by Bidder A, okay?

9   In that hypothetical scenario, applying the allocation

10  methodology set forth in 34-1, 2, and 3 of your declaration,

11  all of the breakup fee gets allocated to EFIH, correct?

12  A    Could you just run through it again because --

13  Q    Sure.

14  A    -- I'm struggling a little bit.

15            THE COURT:  Oh, it's what happened, okay, so --

16            MR. STROM:  No, I understand.

17            THE COURT:  He's just saying what happened, okay?

18  The next (indiscernible) high risk paid EFH something, it

19  doesn't work out, it gets disapproved, it gets broken, then

20  Berkshire comes in with a lowball offer and EFH is out of

21  the money.  That's what your hypothetical is, right?

22            MR. WELSH:  I was trying to be subtle about that,

23  Your Honor, but --

24            THE COURT:  Well, good try.

25            MR. WELSH:  Yes, that's my hypothetical.

1           THE COURT:  Okay.  So the question is does your

2    opinion apply to the hypothetical, which is actually what

3    occurred, which is what your opinion's based on?  I think

4    the answer's yes but, you know, go ahead.

5    A    Do you want to ask the question?

6    Q    And my question, Mr. Strom, is applying your allocation

7    methodology, allocation methodology set forth in 34-1, 2,

8    and 3 of your declaration, all of the breakup fee in that

9    scenario gets allocated to EFIH, correct?

10   A    Correct.

11   Q    And that's the case even though the EFIH unsecured

12   creditors would've received par in the original transaction

13   proposed by Bidder A?  The very first transaction Bidder A

14   proposed?

15   A    Yes.

16   Q    So they bear all of the termination fee even though

17   they would've been paid par in the transaction with Bidder A

18   that had greater certainty of closing?

19   A    It's also a function of how the waterfall works, right?

20   How the proceeds come.

21   Q    I'm not focused on the waterfall; I'm focused on your

22   allocation methodology, sir, in your opinion, right?  And

23   your allocation methodology in your opinion -- and we can go

24   back to it -- on Page 14, Paragraph 3, right, your

25   allocation methodology based on the arithmetic in Paragraph

1    1 and 2, okay, and an assumption that you apply the 2.8 cent

2    per dollar of transaction consideration to every dollar of

3    transaction consideration in the merger and, therefore,

4    every dollar that every estate receives in transaction

5    consideration, okay?  That allocation methodology, under the

6    hypothetical I just went through, would have EFIH in the

7    backup bid scenario -- would have EFIH bearing all of the

8    termination fee, correct?

9    A    Yes.

10          MR. WELSH:  Just give me one moment, Your Honor,

11   please?

12          THE COURT:  Mm hmm.

13          MR. WELSH:  Thank you.  I have no more questions

14   at this point, Your Honor, but reserve for re-cross, if

15   appropriate, please.

16          THE COURT:  Of course.

17          MR. WELSH:  Thank you, Your Honor.

18          MR. ESSER:  Can I just take a minute, Your Honor?

19          THE COURT:  Yes.

20          MR. ESSER:  Good afternoon, Your Honor.  Mike

21   Esser, Kirkland and Ellis, for the plan administrative

22   board.  I also have some witness binders, if I may approach.

23          THE COURT:  Oh, sure.  Thank you.

24              DIRECT EXAMINATION OF STEVEN STROM

25   BY MIKE ESSER:

1   Q    Good afternoon, Mr. Strom.

2   A    Good afternoon.

3   Q    Mr. Strom, I'd like you to turn to the written direct

4   tab that's in your witness binder.  Same written direct

5   we've been looking at.  It's Tab Strom Written Direct.  And

6   if we could actually turn to Page 3 of that, Paragraph 8.

7   Are you there?

8   A    Yes.

9   Q    And that paragraph provides "In my experience, breakup

10  fees in Section 363 sales are used to induce bidders to

11  expend the time and resources necessary to develop a bid

12  that will be subjected to competition and to induce the

13  bidder to remain committed to the transaction," correct?

14  A    Yes.

15  Q    Okay.  And if you could please turn to Page 7 of your

16  written direct.  And specifically Paragraph 17.  And here

17  you're testifying "At the time of the NextEra negotiations,

18  EFIH was actively litigating the issues of whether EFIH's

19  secured creditors were entitled to make whole claims."

20  Correct?

21  A    Yes.

22  Q    "Although the Bankruptcy Court and the District Court

23  had disallowed the make whole claims following an objection

24  filed by EFIH, that issue was still on appeal to the Third

25  Circuit." Correct?

1   A    Yes.

2   Q    "Allowance of the make whole claims would have a

3   significant effect on the recoveries of the unsecured E-side

4   creditors under the NextEra transaction." Correct?

5   A    Yes.

6   Q    Okay.  And next, if we could turn to Page 10 of your

7   report and look at your chart there.  In looking at your

8   chart on Page 10, you'd agree with me that with the make

9   wholes disallowed, the state of the world at the time of

10  that amended NextEra bid would mean excess value to EFH of

11  $471 million, correct?

12  A    Under the amended merger agreement, yes.

13  Q    Yes.  Now, Mr. Strom, you're not a lawyer, correct?

14  A    I am not.

15  Q    Okay.  You didn't list any legal publications or

16  scholarship predicting the outcome of the make whole appeals

17  in your reliance materials, correct?

18  A    Correct.

19  Q    Okay.  And it's safe to say you didn't review any in

20  preparation for your work, correct?

21  A    Correct.

22  Q    Okay.  You also didn't speak to NextEra or their

23  lawyers about whether they thought the make wholes would

24  ultimately be allowed or disallowed at the time they made

25  their amended bid, correct?

Page 202

1    A    I did not.

2    Q    Okay.  You didn't speak to Kirkland or Debtor

3    principals about whether they thought the make wholes would

4    ultimately be allowed or disallowed at the time they

5    accepted that bid, correct?

6    A    I did not.

7    Q    Okay.  And so you don't know what the parties to the

8    transaction thought about the likelihood of EFH ultimately

9    receiving the $471 million in excess value that the amended

10   NextEra bid could have provided in a no make whole scenario,

11   correct?

12              THE COURT:  Could you just ask that question

13   again?

14              MR. ESSER:  Sure.

15              THE COURT:  That was a pretty long one.

16              MR. ESSER:  Sure.

17   Q    You don't know what the parties to the transaction

18   thought about the likelihood of EFH ultimately receiving the

19   $471 million in excess value to EFH that the amended NextEra

20   bid could have provided in a no make whole scenario,

21   correct?

22   A    Correct.

23   Q    All right.  Now, if we could actually turn to Page 14

24   of your written direct.  And Paragraph 5 there, the second

25   sentence.  You write:  "Accordingly, it would not be typical

1  to assess a breakup fee directly against the owner of an

2  equity interest merely because a portion of the proceeds may

3  be upstreamed to the equity holder." Did I read that

4  correctly?

5  A    Yes.

6  Q    Okay, and you used the word "may" there, correct?

7  A    Yes.

8  Q    Okay, and if we can turn -- you have a couple of

9  exhibits in your binder.  There's one marked PABX435.  If

10  you wouldn't mind turning to that document.

11  A    Okay.

12  Q    And specifically if we could turn to the page --

13  they're Bates Numbered in the lower right hand corner there

14  -- the page ending dash-943.

15         THE COURT:  It's also on the screen, sir, if you

16  just want to look on the screen.

17  A    Yes.

18  Q    Okay, and, sir, this is a chart that is cited in your

19  written testimony, is that correct?

20  A    Yes.

21  Q    And this is actually a slide out of a Debtor board

22  presentation, correct?

23  A    Correct.

24  Q    Okay.  And this chart --

25         THE COURT:  I'm sorry.  Can we take the box off

1    with the Bates Number?

2              MR. ESSER:  Yes.  Thank you.

3              THE COURT:  Thank you.

4    Q    Okay.  And this chart purports to show creditor

5    recoveries from the NextEra bid in two scenarios:  No make

6    whole and with make whole.  It says "No MW" in one column,

7    and "With MW" in the other, correct?

8    A    Yes.

9    Q    Okay.  And in the No MW column it shows $471 million in

10   excess value from EFIH listed in the EFH recovery section

11   runs.  Correct?

12   A    Yes.

13   Q    Correct, okay.  Now, you don't have any reason to

14   believe those funds would not go to an EFH recovery were

15   this transaction to come to pass, correct?

16   A    Correct.

17   Q    Okay.  All right.  I'd just like to clarify a couple

18   parts of your actual opinion.  So if we could flip back to

19   actually the tab in your binder that is your expert report

20   that was served in this case prior to the execution of your

21   written direct.  There's a tab that says Strom Expert

22   Report.

23   A    Yes.

24   Q    And if we could flip to Page 14.  They're numbered in

25   the lower right hand corner.  See that?

1    A    Yes.

2    Q    Okay, I'd like to focus on Paragraph E and the first

3    sentence thereof.  "Fifth, a breakup fee is typically

4    payable by the entity receiving the direct benefit of the

5    transaction." Did I read that correctly?

6    A    Yes.

7    Q    Sir, you were deposed after your counsel served this

8    report in connection with this motion, correct?

9    A    Yes.

10   Q    Okay.  Now I'd like to turn to your written testimony

11   that you've submitted to this Court.  Can we turn back to

12   your written direct exhibit binder?  And specifically go to

13   Page 14 and Paragraph 5.  And look at the first sentence

14   there.  Are you with me, sir?  It's also on the screen in

15   front of you.

16   A    Yes.

17   Q    It reads:  "Fifth, a breakup fee is typically payable

18   by the entity receiving the direct benefit of the

19   transaction out of the proceeds of the replacement

20   transaction." Correct?

21   A    Yes.

22   Q    Okay, so, sir, you changed that sentence between the

23   time your counsel served your expert report and the time you

24   finalized your written direct, correct?

25   A    Yes.

1    Q    Okay.  Now let's go back to your report.  Same page,

2    Page 14 again.  Back to the Storm Report Tab.  Page 14,

3    Paragraph E.  And this time we'll look at the third sentence

4    in which provides:  "Irrespective of the outcome of the make

5    whole claims, the only direct benefit received by EFH is the

6    assumption of the legacy claims totaling $58 million."

7    Correct?  Did I read that right?

8    A    Yes.

9    Q    All right.  Now let's go back to your written direct

10   one more time, last time, and read the corresponding

11   sentence there.  Page 14 of your written direct, Paragraph

12   5, third sentence in.  And it provides here:  "Irrespective

13   of the outcome of the make whole claims..." Excuse me.

14   Here: "Irrespective of the outcome of the make whole claims,

15   the only direct consideration received by EFH is the

16   assumption of the legacy claims totaling $58 million." Did I

17   read that correctly?

18   A    Yes.

19   Q    Okay.  So again, you changed the sentence between the

20   time you finalized your expert report and the time you

21   signed your written testimony with this Court, correct?

22   A    Yes.

23   Q    Okay.  And the difference between these two sentence is

24   that whereas in your original report the sentence focused on

25   the benefit received by EFH, and now this sentence in your

1    written testimony is focused and limited to the

2    consideration received by EFH, correct?

3    A    Yes.

4    Q    Okay.  And that's because you weren't looking at the

5    benefits of the transaction in your report; you were focused

6    on the term "consideration" as you defined it.  Is that

7    right?

8    A    Yes.

9    Q    Okay, sir, if we could turn to the bid procedures

10   order, which is also in your binder as AHX049.  And this

11   document is -- has a Docket ID number at the top, 3295.  And

12   if we could actually turn to the document that's behind it,

13   3295-1 and Page 2 of 16 thereof.  And the second paragraph

14   from the top of the page titled Transaction Bidding

15   Procedures provides:  "These bidding procedures set forth a

16   process by which the Debtors are authorized to solicit

17   proposals...to acquire in any form and employing any

18   structure, whether taxable in whole or in part or tax-free,

19   any or all of the assets or the reorganized equity of EFH

20   Corp or one of its direct or indirect subsidiaries." Did I

21   read that correctly?

22   A    Yes.

23   Q    Okay.  Sir, you're aware that the Debtors were

24   authorized to pursue either a taxable or a tax-free

25   transaction with respect to their assets and subsidiaries,

1    correct?

2    A    Yes.

3    Q    Sir, you were in the courtroom for opening arguments,

4    correct?  Opening statements?

5    A    Yes.

6    Q    Okay.  And you heard your counsel for the Ad Hoc

7    Claimants argue that pursuant to Section 503B1, an approved

8    expense must provide some, quote, "benefit to the Debtor's

9    estate".  Did you hear that argument?

10   A    I heard him reference that, yes.

11   Q    Okay.  And, sir, when you wrote your report, you were

12   aware that a taxable disposition of the Debtor's assets

13   could've resulted in a potential multi-billion dollar tax

14   liability at EFH, correct?

15   A    Yes.

16   Q    Okay.  And you were aware that the NextEra merger

17   agreement contemplated a tax-free disposition of EFH,

18   correct?

19   A    Yes.

20   Q    Okay.

21            MR. ESSER:  No further questions.

22            MR. MARK:  Your Honor, can we break for a couple

23   of minutes?

24            THE COURT:  You need a break?

25            MR. MARK:  Yes.

1          THE COURT:  Yeah, okay.  We'll take a short

2     recess.  Sir, during the break you may not discuss the

3     substance of your testimony with any person.

4          MR. STROM:  Understood.

5          THE COURT:  All right, thank you.

6       (Recess)

7          CLERK:  All rise.

8          THE COURT:  Please be seated.

9          MR. ROSNER:  May I?

10          THE COURT:  Go ahead.

11          MR. ROSNER:  May I proceed?  Sure.

12          THE COURT:  Yes.

13          REDIRECT EXAMINATION OF STEVEN STROM

14     BY MR. ROSNER:

15     Q    Mr. Strom, can you take a look, again, at your

16     declaration and specifically at Paragraph 34 on Page 13.

17     A    Yes.

18     Q    And I'd like you to focus your attention on Paragraph

19     Sub B in which you state that, "Consideration includes cash,

20     notes or equity paid by the purchaser, or its assumption of

21     any specific liabilities or debt pursuant to a credit bid."

22     Do you see that?

23     A    Yes.

24     Q    Can you explain what you had in mind here?

25     A    I was trying to focus on the fact that 363 sales are

1   focused on consideration, tangible things like as are listed

2   here as I've defined them in this report.  My experience in

3   other transaction is that this is what matters in 363 sales

4   and in setting break-up fees.  So that's how I define it

5   here.  It's not intangible benefits, there may be benefits

6   to doing transactions, but transactions aren't measured but

7   in consideration.

8   Q    What about -- have you ever seen 363 sales in which a

9   break-up fee is paid for a contingent consideration?

10  A    It's usually not something that people will apply the

11  general three percent number to as a general rule as I've

12  seen it.

13  Q    I'm sorry, I didn't hear?

14  A    As a general rule that I've seen it, it's not applied

15  to contingent consideration, because that's not

16  consideration.

17  Q    Have you seen cases in which the tax structure of the

18  transaction was a factor in determining the break-up fee?

19  A    No.

20  Q    Let me ask you to look at the next page, Page 14,

21  specifically Paragraph 34(F)(5).  Do you see that on the

22  bottom of Page 14?

23  A    Yes.

24  Q    The first sentence says, "Fifth, a break-up fee is

25  typically payable by the entity receiving the direct benefit

1    of the transaction out of the proceeds of the replacement

2    transaction."  Do you see that?

3    A    Yes.

4    Q    What were you trying to convey here?

5    A    That where the break-up fee is paid, which party pays

6    it is usually a function of the waterfall from the

7    replacement transaction.  As the proceeds from the

8    replacement transaction flow through a waterfall, they're

9    going to run out after application or payment of the break-

10   up fee at a certain point in that waterfall.  That's how

11   I've always seen them be paid, that's how they're usually

12   structured, in terms of bid procedures as well, where you've

13   got a structure where there's just going to be -- an

14   apportioning of the proceeds from a sale.

15           THE COURT:  Well, aren't they -- isn't it usually

16   first dollars out?  I mean, it's -- the first dollars that

17   get paid are the break-up fee and then it goes through the

18   waterfall.  So you have a replacement -- so you got a

19   stalking horse for $100 million and you've got first liens

20   of 110 and second liens of 100.  And you go to an auction,

21   and you come up with a transaction that's $140 million.  So

22   now the first liens get paid in full and the second liens

23   get something, but neither of the first liens or the second

24   liens get anything until the break-up fee is paid.  You see

25   what I'm saying?

1              MR. STROM:  Generally, yes.  I see that

2     perspective, I agree with it.  I think when you look at sort

3     of who's bearing the load, it's going to be the same way

4     that I explained it, but I don't take task at the way that

5     you're describing it from an administrative perspective.

6              THE COURT:  Well, and let me tell you this.  So if

7     you do it that way, the person who's paying the break-up fee

8     in that case is the second liens.  Right?  Because first

9     dollars out means less dollars at the bottom end.  You see

10    what I'm saying?  Their recovery is less because the break-

11    up fee is being paid.

12             MR. STROM:  Right.  But it's still whatever the --

13    people's recoveries are driven by what is the application of

14    the waterfall.  Even when you put the break-up fee at the

15    top of it, where it lies, who pays it and typically you've

16    got a concept where the minimum next bid is going to be the

17    last bid --

18             THE COURT:  Enough to cover it plus something

19    else?  Yeah.

20             MR. STROM:  Correct.

21             THE COURT:  Okay.  Sorry.

22             MR. ROSNER:  No problem.

23    Q    So you were asked a number of questions regarding

24    whether or not you try to predict who would win the make-

25    whole litigation.  Do you recall those questions?

1    A    Yes.

2    Q    From the perspective of the way a break-up fee is

3    typically paid, is trying to predict a make-whole -- the

4    results of the make-whole litigation a relevant issue?

5    A    Could you ask the first part of that -- I'm not sure I

6    understand the whole question.

7    Q    Sure.  If the break-up fee is typically paid out of the

8    waterfall, does trying to anticipate who would win a

9    particular litigation, which could affect the waterfall, a

10   relevant factor?

11   A    If you're going to apply it and include the make-whole,

12   whatever the outcome is, yes.

13   Q    Can you --

14   A    You're changing the amount of liabilities.  You're

15   change, if you will, what I call the height of the

16   waterfalls.

17   Q    Well, since in other words, depending on who wins the

18   make-whole litigation, that would change the waterfall,

19   correct?

20   A    Correct.

21   Q    And what you look to is the waterfall to determine who

22   effectively bears the burden of the break-up fee?

23   A    Correct.

24   Q    So whoever is successful in the make-whole litigation

25   will affect the waterfall, right?

Page 214

1    A    Yes.

2    Q    And therefore in order to determine -- and therefore

3    it's irrelevant to predict who is going to win the make-

4    whole litigation because in the final analysis the break-up

5    fee will be paid out of the waterfall, whatever it is?

6    A    Yes.

7    Q    Now, in one of your earlier answers you were asked

8    about the precedent cases that you considered.

9    A    Yes.

10   Q    And I think you testified in none of those cases did

11   you see examples of allocations of break-up fees among

12   multiple debtors; is that fair?

13   A    Yes.

14   Q    Is that because as far as you can tell these were all

15   single debtor cases?

16   A    Yes.

17   Q    Now, you were also asked a question about substantive

18   consolidation.  Can you explain which -- you understand that

19   substantive consolidation is a situation where multiple

20   debtors are treated as if they are one debtor, right?

21   A    Right.  I meant -- I meant single debtors, those are

22   single debtor cases, the ones I looked at, not substantively

23   consolidated.

24   Q    Just one other thing.  You were asked some questions

25   about your experience relating to break-up fees.  Can you

1    take a look at Paragraph 7 of your declaration?

2    A    Yes.

3    Q    Is this a summary of your experience relating to break-

4    up fees?

5    A    These are some of the cases where there have been

6    break-up fees or where break-up fees were an issue as part

7    of a resolution to the case.

8    Q    But you have been involved in cases where break-up fees

9    were awarded in cases that you worked on?

10   A    Yes, where the court approved break-up fees.  I know

11   because I subsequently looked that Ankura there was a break-

12   up fee that was offered to a strategic buyer.  We got court

13   approval for break-up fees in ATP Oil and Gas.  And in GMX

14   Resources I think that there was a -- it wasn't called a

15   break-up fee, but it was basically a break-up fee provision.

16   The other cases I know that it was talked about.  I think in

17   Borders we had two asset sales that had break-up fees as

18   part of them.  And in Alliance Entertainment there was also

19   a break-up fee to a buyer.  Hollywood Casino we ran an

20   auction process, negotiated the terms of the deals, as well

21   as break-up fees with the various buyers.  And in Windsor

22   Woodmont, got a strategic buyer to come in and including

23   providing them with a break-up fee protection.

24   Q    In addition to these specific cases, have you been

25   involved in other cases where break-up fees were involved?

1    A    Yes.

2              MR. ROSNER:  Okay.  No further questions.

3              THE COURT:  Any further questions by another who

4    wishes to be heard?  No.

5              MR. WELSH:  No, Your Honor.

6              THE COURT:  Okay.

7              MR. ESSER:  No, Your Honor.

8              THE COURT:  All right.  Thank you, sir.  You may

9    step down.

10             MR. STROM:  Thank you.

11             THE COURT:  So I think we have Mr. Robins next?

12             MR. WELSH:  Yes, Your Honor.  For the record,

13   again, Peter Welsh for Elliott.  We'd like to call Mr.

14   Robins next.

15             THE COURT:  All right.

16        (Court and clerk confer)

17             THE COURT:  Mr. Robins, you were sworn in earlier.

18   You're fine.  You're good.  That affirmation is still in

19   place, so continue to tell the truth.

20                REBUTTAL EXAMINATION OF BRADLEY ROBINS

21   BY MR. WELSH:

22   Q    Good afternoon, Mr. Robins.

23   A    Good afternoon.

24   Q    Let's begin, briefly, you covered some of this

25   yesterday, but let's begin, briefly, with where do you

1    currently work?

2    A    I currently work at Ducera Partners.

3    Q    And what is Ducera Partners?

4    A    Ducera Partners is an advisory firm that is involved in

5    M&A transactions, restructurings and private placements.

6    Q    How long have you worked at Ducera?

7    A    For just short of two years.

8    Q    What type of work does Ducera do?

9    A    We advise on M&A transactions, restructurings and

10   financing transactions.

11   Q    Okay.  We covered your background yesterday, your

12   professional background yesterday.  Can you just briefly

13   give a little more color on what your experience is with

14   restructuring and bankruptcy matters?  What kind of matters

15   you've been involved in, what your role has been?

16   A    Sure.  Through the course of my career I've advised

17   companies, boards, investors in restructurings and stressed

18   and distressed M&A transactions and in financing

19   transactions, both as an attorney and as an investment

20   banker.

21   Q    And Mr. Robins, can you briefly describe your

22   experience with break-up fees in bankruptcy sales

23   transactions?

24   A    Yeah.  You know, in many of the restructurings I've

25   been involved in a sale is a component of the -- either the

1   restructuring or a transaction leading up to the

2   restructuring.  And in nearly all of those a break-up fee is

3   required by a purchaser or a potential purchaser.

4   Q    In your experience, Mr. Robins, what purpose does a

5   break-up fee serve in a bankruptcy sale transaction?

6   A    I mean, the purpose is to induce a purchaser to commit

7   to the deal, to spend the time and effort to be involved and

8   go through the process, to give the Debtor the benefit of

9   having a bird-in-hand, effectively, to try to maximize value

10   for the estate.

11   Q    What is the significance of the size of a break-up fee

12   in a bankruptcy sale transaction?

13   A    Well, the primary -- well, two really.  One is to get

14   the purchaser to commit to the transaction.  And as when

15   advising a buyer, you want that to be as large as possible,

16   both to compensate you if you do end up being outbid or not

17   getting the transaction, and second, frankly to try to chill

18   bidding to the extent possible.  When you're advising a

19   company it's the opposite.  You know it's almost always a

20   component of the negotiation, a part of the deal, you want

21   to keep it as small as possible.  And certainly in the

22   bankruptcy context there's court approval, so there's a

23   pretty well-recognized range that people end up agreeing to.

24   Q    Can a break-up fee be too large, in your experience?

25   A    It can be too large.

1    Q    Why is that?

2    A    Well, if it's so large that it's going to prevent other

3    bidders from bidding, you know, it's too large.  And in my

4    experience the court would not approve that.

5    Q    And the reason for that is its effect on potential

6    topping bids?

7    A    Yes.

8              MR. WELSH:  And Your Honor, I should have done

9    this earlier, I'm not sure it's necessary given where we are

10   in this process, but we do offer Mr. Robins as a rebuttal

11   experience to Mr. Strom's expert opinions on break-up fees.

12             THE COURT:  Any objection?  Any objection?

13             MR. ROSNER:  No objection.

14             THE COURT:  All right.  Court so recognizes him.

15             MR. WELSH:  Thank you, Your Honor.

16   Q    Mr. Robins, are you being compensated today for your

17   testimony?

18   A    I -- I'm being compensated for availability for

19   testimony from confirmation to now.  And so no specific

20   compensation for today's appearance.

21   Q    No additional compensation from the confirmation

22   process in 2018 to now?  No additional compensation for this

23   allocation proceeding?

24   A    Correct.

25   Q    Okay.  Has Ducera previously been engaged by Ropes &

1    Gray or Elliott for prior work in this matter, other than

2    the confirmation work you just referenced --

3    A    Yes.

4    Q    -- and this matter?

5    A    So we were retained about a year ago in connection with

6    the Berkshire Hathaway and potential Sempra transaction.

7    And that ended last fall when it was clear that there was

8    going to be a consensual restructuring -- consensual

9    confirmation, or largely consensual.  And so that engagement

10   ended at that point.  And then we were approached again,

11   early this year, to provide testimony in connection with

12   confirmation issues.

13   Q    Mr. Robins, do you understand that for purposes of this

14   proceeding Mr. Steven Strom has been offered as an expert on

15   break-up fees and how they are allocated in bankruptcy

16   sales?

17   A    I do.

18   Q    Are you familiar with Mr. Strom's expert testimony in

19   this proceeding?

20   A    I am.

21   Q    How are you familiar with his testimony?

22   A    I reviewed his report, his declaration, and I was here

23   during his testimony.

24   Q    Based on your understanding of Mr. Strom's testimony

25   and his submissions, prior submissions in this case, do you

1    have any rebuttal opinions about Mr. Strom's expert

2    opinions?

3    A    I have two opinions.

4    Q    Two opinions?

5    A    Yes.

6    Q    What is if your first opinion?

7    A    The first is that the industry data that he replied --

8    relied on his report does not support his methodology or

9    conclusion.

10   Q    Okay.  And what is your second opinion, Mr. Robins?

11   A    The second is that I don't believe there's an industry

12   practice or anything in my experience that I've seen that

13   supports the debtor-by-debtor allocation that he has

14   testified to today.

15   Q    Your first opinion, Mr. Robins, is that Mr. Strom's

16   industry data does not support his methodology or his

17   conclusion; is that right?

18   A    Correct.

19   Q    And what did you do to evaluate Mr. Strom's methodology

20   and his conclusion?

21   A    We reviewed his -- initially, his expert report and

22   looked at the cases -- the cases and bid procedures orders

23   that he cited in the appendix to that report.  We pulled

24   each of those out and reviewed them.

25   Q    And did you review anything else or consider anything

Page 222

1   else that you can think of?

2   A     Not that I can think of.

3   Q     Okay.  Why, in your opinion, Mr. Robins, does the

4   industry data on which Mr. Strom relies not support his

5   methodology or his conclusion?

6   A     Well, again, the issue here is how to allocate, between

7   and amongst debtors, a break-up fee.  So as we looked at the

8   cases that he cited, there were a number of them that were

9   single debtor -- single debtors were selling assets.  It

10  might have been a jointly administered case, but they were

11  single debtors selling the assets, so by definition

12  allocation would not be relevant there.  And in the other

13  cases where there were joint debtors and multiple debtors

14  involved in the sale transaction, there was nothing that we

15  saw in the motion, the underlying agreement or the order

16  that addressed allocation.

17          And the only slight caveat I'd say to that is

18  there were two of the cases that were cited by Mr. Strom

19  where the debtors had agreed to be jointly and severally

20  liable for the break-up fee, and that was specifically in

21  the underlying contract.

22  Q     Okay.  And so in the data set that Mr. Strom relied on

23  of precedent transactions, you reviewed that data set of

24  precedent transactions, correct?

25  A     Correct.

1    Q    And some of those transactions were single debtor

2    bankruptcies?

3    A    Or a single debtor was the seller of the asset at

4    issue.

5    Q    Understood.  And in some cases, multiple debtors were

6    the seller of the asset --

7    A    Correct.

8    Q    -- at issue.  And you identified two cases where the

9    break-up fee in those multi-debtor sale situations was

10   allocated on a joint and several basis, which by definition

11   would be between or more debtors, right?

12   A    Yeah.  And I guess it wasn't -- it wasn't allocated,

13   per se, it just, contractually they jointly and severally

14   agreed to pay.

15   Q    Sorry, I -- that is a very helpful clear clarification.

16   I'm sorry for my question.

17          So in -- you said -- I think you said, too, I just

18   want to be clear on the record, two of your -- of the

19   precedents that you looked at that Mr. Strom relied on

20   involved a contractual joint and several liability

21   arrangement with respect to the termination fee?

22   A    Correct.

23   Q    Okay.  Mr. Robins, are you, based on your review of all

24   of the Strom materials, the opinion, the declaration and the

25   testimony you heard, are you aware of any other support that

1    Mr. Strom offers for his methodology or his conclusion?

2    A    I am not.

3    Q    Are you familiar with an opinion that Mr. Strom offers

4    concerning the allocation of the NextEra termination fee?

5    A    Yes.

6    Q    And briefly, what is Mr. Strom's allocation opinion, to

7    the best of your understanding?

8    A    Essentially that the Court should look at the cash

9    proceeds from the purchase price that would have gone to

10   each debtor had the sale closed and apply the break-up fee

11   ratable on that basis.

12   Q    Where -- do you have Mr. Strom's declaration --

13   A    I don't.

14   Q    -- in front of you?

15   A    No, I don't.

16   Q    Is the binder not still up there?  I'm sorry.

17            FEMALE:  It should be.

18            MR. WELSH:  It should be.  Does everybody else

19   have?

20            FEMALE:  So if you -- it's still the Strom, right

21   here.

22            MR. WELSH:  Sorry.

23            FEMALE:  No, that's fine.  That's what you should

24   have.

25            MR. WELSH:  May I approach, Your Honor?

1           THE COURT:  Um hmm.

2       (Counsel confer)

3   Q    Mr. Robins, if you could take a look at Mr. Strom's

4   declaration.  Where is Mr. Strom's opinion on allocation of

5   the NextEra termination fee reflected in his declaration?

6   A    It's reflected on Pages 13 to 15, primarily 13 and 14.

7   Q    Okay.  And is there any part of the opinion that's

8   focused on the allocation issue with respect to the NextEra

9   termination fee, to your understanding?

10  A    In particular I would focus on Page 14, the

11  Subparagraphs 1, 2 and 3.

12  Q    Okay.  So let's go through 1, 2 and 3 briefly, if we

13  could.  What is your understanding of what Mr. Strom is

14  doing in Paragraph 1 of Page 14?

15  A    So in Paragraph 1 I believe he's looking at the

16  aggregate quantum of the break-up fee and opining that it's

17  consistent with his experience, and that it's a little bit

18  under three percent.  And that's bolstered a bit on the

19  prior page, he notes that based on the cases that he

20  reviewed and his experience, the cases he reviewed had a

21  median of three percent, and in his experience three percent

22  is a fairly typical number.  So the first point just talks

23  about, again, the aggregate break-up fee here in this case,

24  the quantum.

25  Q    And sorry, just so I'm clear.  The Paragraph Number 1

1    on 14, you're saying is, in part, referring back to some of

2    the opinions in Paragraph 34 on Page 13?

3    A    Yes.

4    Q    Okay.  And in particular the three percent analysis

5    that Mr. Strom presents?

6    A    Right.

7    Q    Okay.  Do you understand numbered Paragraph 1 on Page

8    14 to be doing anything other than that?

9    A    I do not.

10   Q    Okay.  So let's move to numbered Paragraph 2 on Page

11   14.  What is your understanding of what Mr. Strom is doing

12   in Paragraph -- numbered Paragraph 2?

13   A    He -- I think implicitly what he's doing is dividing

14   the $275 million break-up fee by the aggregate cash

15   consideration, to come up with the 2.798 percent break-up

16   fee.  And then he's noting that that would represent about

17   2.8 cents on a dollar of consideration.

18   Q    And what's the analysis to -- as far as you understand

19   it, looking at the report, what's the analysis that appears

20   to go into that?  What's the basis of that?

21   A    I think it's just math.

22   Q    Let's look at numbered Paragraph Number 3, what's your

23   understanding of what Mr. Strom is doing in numbered

24   Paragraph Number 3?

25   A    So I believe what he's doing in Paragraph 3 is taking

1    that percentage, the 28 cents -- 2.8 cents per dollar and

2    applying that to the consideration that either EFH or EFIH

3    would have received had the transaction closed in a couple

4    different scenarios.  And so he's basically making an

5    assuming, as I read it, that you would allocate it this way.

6    And I think that -- that assumption is essentially his

7    conclusion as well.

8    Q    So let me pause on that for a moment.  He's making an

9    assumption.  Do you see anything in the report or the --

10   sorry, the declaration that we're looking at right now or

11   the report that Mr. Robins submitted -- or sorry, Mr. Strom

12   submitted in this matter, or his testimony earlier today,

13   that would explain that assumption or provide a basis for

14   that assumption?

15   A    Not that I'm aware of.

16   Q    Okay.  What is the significance of that assumption to

17   Mr. Strom's conclusion?

18   A    I mean, it essentially is the conclusion.  He assumes

19   you allocate it ratably and his opinion is that's what the

20   Court should do.

21   Q    Okay.  Mr. Robins, what, if anything, of Mr. Strom's

22   industry data, supports his purported or proposed allocation

23   of the NextEra termination fee as reflected on Page 14?

24   A    As I mentioned earlier, nothing that I saw in my review

25   of those cases.

1   Q    And what, if anything else, in Mr. Strom's declaration

2   supports his purported allocation of the NextEra termination

3   fee?

4   A    Nothing that I've seen.

5   Q    Mr. Robins, your second opinion is that Mr. Strom's

6   analysis of the NextEra break-up fee, on a debtor-by-debtor

7   basis, is not consistent with industry practice or your

8   professional experience, right?

9   A    Correct.

10  Q    What is the basis for that opinion?

11  A    The basis is just having been working in the

12  restructuring field for over 25 years now.  I -- I just

13  haven't been involved in any negotiation like this, I

14  haven't seen a situation like this, I'm not aware of any

15  precedents where people have negotiated how you would

16  allocate a break-up fee in this sort of situation.  So to my

17  knowledge there's not an industry practice that one could

18  point to.  And in my experience, I don't have experience

19  negotiating this issue that I could point to that would

20  support his approach.

21  Q    Mr. Robins, do you have an opinion on the appropriate

22  allocation of the NextEra break-up fee?

23  A    I do not.

24  Q    Why not?

25  A    Really for the reasons I just described.  That from a--

1    the point of view as a professional or expert, I don't have

2    an opinion, just given my lack of personal experience

3    resolving this issue or knowledge of other cases where it's

4    been done.

5    Q    Okay.  Thank you, Mr. Robins.

6              MR. WELSH:  I have no further questions, Your

7    Honor.

8              THE COURT:  Thank you.  Any cross?

9              MR. ROSNER:  Should we take a brief break, Your

10   Honor?

11             THE COURT:  Yes.  Just don't talk to anyone.

12             MR. ROBINS:  Understood.  Understood.

13        (Recess)

14             CLERK:  All rise.

15             THE COURT:  Please be seated.  Actually, before

16   you start, Mr. Robins, can I ask you a couple questions.  I

17   just want to make sure I heard you correctly at the end, and

18   I think I half missed the question and answer.  Was it your

19   -- the last couple questions were to the effect that you

20   don't have an affirmative opinion as to what the allocation

21   -- you don't have an affirmative expert opinion as to what

22   the allocation between EFIH and EFH should be.

23             MR. ROBINS:  Correct.

24             THE COURT:  Okay.  And why not?

25             MR. ROBINS:  Because in my experience, I haven't

1    personally dealt with this issue, negotiating

2    (indiscernible).  I'm not aware of any industry practice or

3    other (indiscernible) this issue was negotiated by others

4    and became a precedent transaction.

5              THE COURT:  Okay.  Thank you.

6              MR. ROBINS:  Okay.

7    Q    So, Mr. Robins, following up on the Judge's question.

8    I mean, you have heard the testimony that at most EFH could

9    receive $471 million or so in consideration from the NextEra

10   transaction and that EFH would've assumed liabilities with

11   an estimated present value $58 million; correct?

12   A    I'm sorry, that EFH would've assumed what?

13   Q    Liabilities with an estimated present value of $58

14   million; right?  That's what Mr. Strom discussed.

15   A    I think the buyer was going to assumed those.  Right.

16   Q    Yes.

17   A    In terms of cash consideration, that's true.  But as is

18   typically the case, the benefits to a buyer often go beyond

19   the direct cash compensation.

20   Q    And here -- okay, so given that the cash consideration

21   is $471 million and working with Mr. Strom's assumption that

22   the present value of the liabilities assumed were $58

23   million, under those circumstances, if you were advising

24   EFH's board would you have advised them to agree to a break-

25   up fee of $137 million?

1    A      In the context of this transaction?

2    Q      In the context of my question I just asked you.

3    A      I'm just trying to understand the transaction.  In a

4    tax-free transaction?  Were they both --

5    Q      Let's assume it's tax free.  Yes.

6    A      Or taxable.

7    Q      Either or.

8    A      I very well might have, in a tax-free transaction.

9    Yeah.

10   Q      Excuse me?

11   A      In a tax-free transaction -- if this transaction

12   would've helped EFH avoid $3.4 billion of administrative

13   claims, I very well might've advised the board to do that.

14   Q      Well, you also understand that EFH could not have paid

15   the $3.4 billion; right?  The liability would've been

16   stranded.

17   A      Correct, which is why we want to avoid it.

18   Q      Okay, so let's assume it was a taxable transaction.  It

19   was (indiscernible).  Okay, so given the assumption this was

20   a tax-free transaction that EFH would receive 471 in cash,

21   assume $58 million in liabilities, would you advise the

22   board to agree to a $137 million break-up fee?

23   A      In a transaction that would otherwise avoid a $3

24   billion administrative claim, I very well might have; yes.

25   Q      Even though EFH never would've had the ability to pay

1    that administrative claim?

2    A    Correct.

3    Q    And even though the most that EFH could've paid of that

4    administrative claim would've been the couple hundred

5    million dollars in cash on hand and the rest would've been

6    stranded?

7             MR. WELSH:  Your Honor, I'm going to object to the

8    line of questioning going beyond the scope of the direct

9    examination.  His testimony on direct was about Mr. Strom's

10   methodology, not about --

11            THE COURT:  Response?

12            MR. WELSH:  -- this.

13            MR. ROSNER:  Well, he is saying that he has no

14   opinion regarding how break-up fees could be determined

15   under the methodology used by Mr. Strom who basically had a

16   methodology that you look at the cash consideration received

17   by the debtor and you determine the break-up fee based on

18   that cash consideration.  So I'm simply asking him how he

19   would determine a break-up fee under those circumstances.

20            THE COURT:  Well, no.  He criticized Mr. Strom's

21   break-up -- Mr. Strom's analysis in a couple different

22   aspects as to why the Court shouldn't accept it.  He offered

23   no position on what the allocation should be, which is why I

24   asked him because I wanted to be clear for the record and he

25   explained why.  So I think you can explore, if you want, his

1    explanation for why he has no opinion, but I don't think

2    it's fair to give him a bunch of hypotheticals as to, you

3    know, what the break-up fee or termination fee would be

4    under circumstances because he said he had no opinion about

5    it.

6    Q    So in a situation where a debtor is receiving $471

7    million of cash consideration, you've seen those kinds of

8    situations were a debtor is receiving purely cash

9    consideration at a sale; right?

10   A    Single debtor selling an asset, cash consideration, I

11   have seen that.

12   Q    And in your experience, would a debtor agree to pay a

13   break-up fee equal to approximately one-third the amount of

14   the cash consideration -- have you see a case like that?

15            MR. WELSH:  Same objection, Your Honor.

16            THE COURT:  I'll allow that.  You've seen a 33

17   percent break-up fee?

18            MR. ROBINS:  Yeah.  In the context that we just

19   described, single debtor, that's the entire transaction no,

20   and I don't think a Court would approve that.

21            MR. ROSEN:  Okay.  No further questions.

22            THE COURT:  Okay.  Anyone else?  Mr. Pedone?

23            MR. PEDONE:  No questions, Your Honor.

24            THE COURT:  Debtors?  Excuse me, PAB?  I'll never

25   get over that.  Okay.  Any redirect?

1           MR. WELSH:  No redirect, Your Honor.

2           THE COURT:  All right, thank you, sir.

3           MR. ROBINS:  Thank you.

4           THE COURT:  All right.  So that, I believe, gives

5     us Mr. Rosenbaum and I got to tell you I'm a little tired.

6           MR. MCKANE:  Yeah, Your Honor, we were totally

7     expect exactly what you're saying.  We were trying to caucus

8     amongst ourselves to figure out the efficiency of the

9     remainder of the time.  We have a couple issues that at

10    least the PAB is aware of that may need your assistance at

11    some point.  One is, in advance of Mr. Rosenbaum testifying,

12    I believe that there's an objection by the Ad Hoc

13    noteholders with regards to the scope of his testimony

14    significantly relating, I think, to the 701 lay opinion and

15    intrusion into the province of the Court issue that you had

16    with Mr. Horton.

17          THE COURT:  Okay.

18          MR. MCKANE:  So I think there's that issue.  We

19    also -- while we didn't have a pretrial conference this

20    morning, there are some issues that we may want to discuss

21    in a pretrial conference either maybe this afternoon as it

22    relates to the timing of closings and also trying to set a

23    schedule for pre-close trial briefing because -- and that

24    may be better to discuss some of those issues --

25          THE COURT:  In chambers.

1            MR. MCKANE:  Not on the record.  Yes.

2            THE COURT:  Okay.  Shall we -- Ropes and Gray,

3     should we deal with the -- well, you're defending it.

4     Should we deal with the objection?  Is that all right?

5            MR. MCGINNIS:  (Indiscernible), Your Honor.

6            THE COURT:  Okay.  All right, Mr. Glenn.

7            MR. GLENN:  Thank you, Your Honor.  For the

8     record, Andrew Glenn, Kasowitz, Benson, and Torres, for the

9     Ad Hoc Committee.  This is Groundhog Day in terms of the

10    arguments I'm going to make.  As I previewed the other day,

11    the arguments are the same because the testimony is the

12    same.  Mr. Rosenbaum in various parts of his written direct

13    sets forth proposed allocations of the specific disputed

14    buckets just like Mr. Horton did.  I would argue that under

15    a Third Circuit precedent we discussed the other day, it's

16    even more attenuated because Mr. Rosenbaum wasn't even

17    management of the Debtor, so his rational perceptions are

18    even less attenuated -- or more attenuated, I should say, to

19    his lay opinions.  And I can go through the specific

20    paragraphs if you'd like, but that's the general issue.

21            THE COURT:  What are the -- I don't have his

22    declaration handy.

23            MR. MCGINNIS:  Your Honor, I believe we have

24    copies that we can --

25            THE COURT:  Okay.

1           MR. MCGINNIS:  -- hand up a copy.

2           THE COURT:  Yes, please.

3           MR. ESSER:  Your Honor, the PAB also has three

4    objections.

5           THE COURT:  Okay, you're going to have to go to a

6    microphone, so.

7           MR. ESSER:  Apologies, Your Honor.  The PAB also

8    has three objections, so we have a consolidated highlighted

9    version that contains both this set of objections as well as

10   --

11          THE COURT:  Let's use yours, then.

12          MR. ESSER:  Okay.

13          THE COURT:  The PAB's got a highlighted one.  They

14   like highlighting, so they've got a highlighted version.

15   All right, let's go through the document.

16          MR. GLENN:  Sure.  Starting with, I believe --

17          THE COURT:  Page 3?

18          MR. GLENN:  Page 3.

19          THE COURT:  Right.  This isn't -- he's not

20   testifying to a percentage.

21          MR. GLENN:  I'm sorry, the PAB's objection stands.

22   We withdraw the objection at the end there, Paragraph 10.  I

23   think --

24          THE COURT:  Okay, so that's withdrawn.  All right.

25          MR. GLENN:  Yes.

1          THE COURT:  What about --

2          MR. GLENN:  Yeah, we will not --

3          THE COURT:  -- Page 6?

4          MR. GLENN:  -- stand on 20.

5          THE COURT:  So that's withdrawn.

6          MR. GLENN:  Yes.

7          THE COURT:  All right.

8          MR. MCGINNIS:  20 was withdrawn?

9          MR. GLENN:  Yes.  Okay, so the real action starts

10   on the specific allocation disputes.  Paragraph -- it's not

11   highlighted, but Paragraph 37.  We have no problem with the

12   fact that they're presenting the parties' positions, but Mr.

13   Rosenbaum can't testify based on an opinion to those.

14   Starting at Paragraph 38 where he says, "I don't believe

15   there is any specific formula or method.  Instead, the

16   proposed allocation is based on my review of relevant

17   documents just like Mr. Horton did."  Thirty-nine, he

18   believes his proposed allocations set forth are fair and

19   equitable.

20          Forty, the shared equally point.  Forty-two, I

21   would focus only on the to the extent the Court's rulings on

22   those matters reversed on appeal, I believe any such

23   benefits accrued principally to EFH and its unsecured

24   creditors.

25          Paragraph 43 sets forth his proposed allocation.

1    Paragraph 44, the first two sentences do the same thing.

2    There's a PAB objection and then again, his opinions on the

3    committee's benefits following that.  Paragraph 45 presents

4    his allocation.  One second.  We'll withdraw the objection

5    to Paragraph 47.

6            Forty-eight, I would focus that on the sentence

7    where he says, "I do not believe this was appropriate

8    because had Kirkland succeeded," so on and so forth, "the

9    beneficiary would've been EFH creditors.  At the very least,

10   the fees and expenses should be allocated more evenly."

11           THE COURT:  Okay.

12           MR. GLENN:  We'll withdraw the objection to

13   Paragraph 49.  Fifty, I think there's a problem.  They're

14   opinions and there's a foundational problem because he

15   refers to what his counsel did, and his counsel summary so

16   there's no foundation for that.  Fifty-one, the sentence

17   were he talks about the 50-50 allocation and the last

18   sentence where he says that they benefit at least equally.

19   We'll withdraw the objection to Paragraph 55.

20           The last sentence in 56 is another.  We'll

21   withdraw on 56, because there's no allocation in that, so

22   that's fine.  We'll withdraw 58.  Fifty-nine speaks to

23   primary beneficiary.  I think that, again, goes to opinion

24   so I think that's the scope of the dispute.

25           THE COURT:  All right.  Let me hear from the PAB.

1    Oh, I'm sorry --

2              MR. PEDONE:  (Indiscernible).

3              THE COURT:  No, let's -- I'll hear from you, Mr.

4    Pedone.  I'm sorry.

5              MR. PEDONE:  Your Honor, I join the Ad Hoc

6    objection, and I would also note that I continue my

7    relevance objection.  I don't believe that Mr. Rosenbaum's

8    beliefs on the facts of this case are relevant, nor do I

9    believe this his beliefs or what the facts he's saying he

10   believes go to the matters and issues.  I believe under 401

11   they should be excluded.  Thank you.

12             THE COURT:  You're welcome.  PAB?

13             MR. ESSER:  Your Honor, our objections are focused

14   mainly on foundation, speculation, and lack of personal

15   knowledge starting with Paragraph 10 and you'll note that in

16   here each green highlight will start with, "I understand,"

17   but I understand (indiscernible) debtor, so this is going to

18   be a foundation, speculation, lack of personal knowledge.

19   And in particular, drawing your attention to in a nontaxable

20   transaction would yield greater recoveries for creditor

21   constituencies.

22             THE COURT:  Right.

23             MR. ESSER:  On that one.  Jumping ahead to

24   Paragraph 33, again, a foundation, speculation, and lack of

25   personal knowledge objection.  I believe Elliott's objection

1    provided additional value for all estates.

2            THE COURT:   Right.

3            MR. ESSER:   As well as EFIH creditor's saving --

4    protected EFH creditors and EFIH creditors from the

5    possibility of yet another termination fee being opposed,

6    which as I understand it, may have led to administrative

7    insolvency.  We think that's speculation.

8            Paragraph 41, again, foundation, speculation, lack

9    of personal knowledge.  The paragraph begins, "Although I

10   was not personally involved in negotiations concerning the

11   NextEra merger agreement, I understand that," and continues.

12           Paragraph 44, just one sentence herein.  Again,

13   foundation, speculation, lack of personal knowledge.  "I

14   understand that the bulk far greater than 70 percent of the

15   professional fees and expenses of the E-side committee were

16   incurred during a time when EFIH unsecured creditors were

17   projected to receive a full recovery on their claims;

18   whereas, EFH creditors were not expected to be paid in

19   full."

20           And I believe the final objection is in Paragraph

21   51.  Again, foundation, speculation, lack of personal

22   knowledge.  "I understand that most of Evercore's hours were

23   spent prior to November 2016.  I understand that Evercore's

24   primary role in these cases was to assess."  Thank you, Your

25   Honor.

1           THE COURT:  Thank you.  Response?

2           MR. MCGINNIS:  Your Honor, Matt McGinnis on behalf

3     of the movants, for the record.  So, Your Honor, we

4     certainly appreciate your ruling yesterday with respect to

5     Mr. Horton's testimony.  I do think there's a few things

6     that distinguish Mr. Rosenbaum's testimony from that.  I'm

7     going to focus on those.

8           First off, Mr. Horton, as you know, was here in

9     his capacity as trustee in a dispute between two

10    beneficiaries.  Mr. Rosenbaum is here as the authorized

11    representative of a movant speaking to, among other things,

12    the relief that that movant is seeking in this case.  And so

13    he's going to talk about his understanding of the facts, his

14    personal knowledge about some of those facts, and the basis

15    for the relief that the movants seek in the motion that's

16    the subject of these proceedings.

17          Second issue, I think if you look at the Ad Hoc

18    Committee's objections, they go far beyond what the basis of

19    the Court's ruling was yesterday.  And I appreciate that Mr.

20    Glenn did withdraw a number of those objections as we walked

21    through this today, but as I understood Your Honor's ruling

22    yesterday, it was focused in particular on the numbers that

23    Mr. Horton had included within his written direct testimony.

24          But as I think you've seen from the objections

25    that even were not withdrawn by Mr. Glenn today, they seek

Page 242

1   to prevent Mr. Rosenbaum from testifying, not just about the

2   numbers but on his understanding of the analysis that went

3   into the position that movants formulated in connection with

4   the motion that they're filing.

5          Third point, Your Honor, I think to the extent

6   that there's a proverbial door here that could've been

7   opened, the Ad Hoc Committee has already walked right

8   through it.  You have not had the benefit yet of reviewing

9   the deposition designations that I believe will be submitted

10  by the Court -- by the parties tomorrow morning, but you

11  will see in there, Your Honor, that the Ad Hoc claimants

12  deposed Mr. Rosenbaum about many of the numbers that we

13  included in the motion.

14         They have affirmatively designated testimony

15  concerning the basis for his opinions and the statements it

16  includes about the proposed allocations. And then, they

17  actually quote some of that in the final submission brief

18  that they filed last week with the Court.  So at that point,

19  having put that issue in the record, it simply would be

20  unfair to prevent or preclude Mr. Rosenbaum from actually

21  testifying about the basis for the opinions that they now

22  actually quoted.

23         A couple of last points, Your Honor.  In terms of

24  the foundation objections by the PAB, as you know, and

25  there's already been a lot of testimony about this, Mr.

1    Rosenbaum was an employee of York, another major creditor

2    before he arrived at Elliott Management.  He certainly has a

3    foundation and personal knowledge for much of what he speaks

4    about in the earlier portion of this case.

5           Recently, he's obviously been actively involved in

6    this matter for the last year, a little bit more than that.

7    To the extent there's any questions about foundation, I

8    think that that can certainly be cleared up in a live -- a

9    supplemental direct as well.

10          One last point just to address a particular

11   objection that I think was raised with respect to Paragraph

12   50.  Paragraph 50, just so Your Honor has the context for

13   this, it relates to the foundation for a particular Rule

14   1006 summary that the movants will be admitting.  The Rule

15   1006 summary is a calculation and summary of asbestos-

16   related time entries in Kirkland's time entries.

17          After multiple discussions with the parties over

18   the basis for that document, we agreed that so long as we

19   provided the foundation and connection with Mr. Rosenbaum's

20   direct testimony to admit that document, the foundational

21   requirements under Federal Rule of Evidence 1006, that the

22   document could be admitted.  That's why it's included there.

23          There's no requirement in 1006 that the witness

24   needs to be the person that actually typed everything up and

25   did the math themselves, so long as they can testify to what

1    the summary is itself.

2           THE COURT:  Thank you.  Reply?

3           MR. GLENN:  Your Honor, Mr. McGinnis' statement

4    about the deposition designations arose because one of my

5    colleagues yesterday sent around an email saying in light of

6    Your Honor's ruling on Mr. Horton, that we're withdrawing

7    those designations and obviously we're going to withdraw

8    them if Your Honor rules in our favor.  We didn't know what

9    the ruling was going to be, so those designations haven't

10   been submitted to the Court and I don't think they're

11   operative and they haven't been introduced into the

12   evidentiary record as of yet, nor is our brief part of the

13   evidentiary record.  So I don't think there's anything

14   that's changed since Your Honor ruled the other day.  Thank

15   you.

16          THE COURT:  Thank you.  Mr. Pedone?

17          MR. PEDONE:  Nothing further, Your Honor.

18          THE COURT:  Yes?

19          MR. ESSER:  Just briefly, Your Honor.  Again, for

20   the record, Mike Esser for the PAB.  On the foundation and

21   speculation objections, just to make the point, every

22   paragraph starts with "I understand," and that for us is a

23   poker tell that he actually doesn't have first-hand

24   knowledge of those issues, and that is why a foundation

25   objection is proffered there.

1           And then I can just state that as to Paragraph 50,

2     the Rule 1006 summary, that is correct.  As long as he can

3     actually lay the foundation on the stand for these

4     provisions, we will not object (indiscernible).

5           THE COURT:  Okay.  You look like you want to say

6     something, Mr. McGinnis.

7           MR. MCGINNIS:  Yes.  Matt McGinnis, for the

8     record.  Briefly, Your Honor, just to clarify.  And we are

9     confirming and I don't want to overstate the case.  My

10    understanding was that the Ad Hoc claimants withdrew their

11    designations as to Mr. Horton's deposition testimony

12    yesterday, but we are confirming that was the case.  I was

13    not aware that they actually withdrew any designations with

14    respect to Mr. Rosenbaum's deposition.

15          THE COURT:  All right, Mr. Glenn is --

16          MR. GLENN:  That's correct because there's been no

17    ruling yet.

18          THE COURT:  Okay.  so, statement, Mr. Glenn, is

19    that if I sustain your objection, I guess it depends on what

20    I rule, you'll be withdrawing those designations?

21          MR. GLENN:  Yes.  We don't intend to ask the Court

22    to do one thing and subvert it in another way.

23          THE COURT:  Okay.

24          MR. GLENN:  We'll stand by.

25          THE COURT:  All right.  Okay.  I'll let you know

1    in the morning.  I'm going to think about it and I want to

2    read it and take -- there's a lot here and I want to make

3    sure I understand it, so I'll -- we'll deal with this first

4    thing tomorrow morning.

5              MR. PEDONE:  Your Honor, Richard Pedone for the

6    indenture trustee.  We would also be withdrawing our

7    joinder, assuming the ruling, following the Ad Hoc's --

8              THE COURT:  Okay.

9              MR. PEDONE:  Just to be clear.  It'll be

10   withdrawn.

11             THE COURT:  Okay.  So we'll start tomorrow with

12   this ruling and then we'll go to Mr. Rosenbaum.  Based on

13   how I rule, we may -- you may ask for a little time or not,

14   depends on how I rule -- I don't know how I'm going to rule

15   -- to address your examination.  Is there anything further

16   for today before we recess into the mediation room for a

17   chambers conference?

18             MR. MCGINNIS:  Your Honor, just one last point for

19   the record.  To the extent that the Court were to grant the

20   Ad Hoc's objections and strike that testimony and allow them

21   to withdraw their affirmative designations, we would also

22   reserve the right to strike their brief to the extent that

23   it actually relies on and argues over issue that

24   (indiscernible).

25             THE COURT:  All rights reserved.  No problem.  All

Page 247

1    right, we are in recess until tomorrow morning at 9:30.  We

2    will now -- I'll see basically lead counsel group for the

3    parties in the mediation room in a couple minutes for a

4    chambers conference.

5              MAN 1:  Thank you, Your Honor.

6              THE COURT:  All right, thank you.

7         (Whereupon these proceedings were concluded at 4:37 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 248

1                   C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya

6    Ledanski Hyde

7

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2018.09.07 13:24:50 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 7, 2018

## &

**&**  3:3,18 4:1,2,8
4:17,18,23 5:1 7:6
71:2 75:6 98:23
112:24 126:6
132:6 137:1
219:25

## 0

**028**  191:11

## 1

**1**  9:8 23:6 28:16
29:20 30:21 37:17
38:20 41:11 45:23
53:18 57:11,13
58:15 63:4 75:13
75:20 86:7 108:23
142:9 174:13,14
190:21,24 199:1
225:11,12,14,15
225:25 226:7
247:5
**1-5**  177:13,21
**1.1**  112:9 145:21
**1.6**  175:9
**1.624**  177:2
**1.9**  77:12
**1.929**  77:2
**10**  41:15 60:4 66:3
75:15 77:8,16
83:22,23 99:8
201:6,8 236:22
239:15
**10-89**  78:11
**10-90**  78:8
**100**  32:14 33:1,5,6
33:9,13 35:15,17
35:23 39:4,7
89:21 91:22 92:25
101:25 112:3
124:13 134:24
194:11,23 211:19
211:20

**1006**  243:14,15,21
243:23 245:2
**105**  35:9
**106**  120:9,19,20
154:1,11,12
**108**  103:9,20
**11**  1:5 8:8 51:1,5,9
66:24,25,25 67:5
67:7 112:11
145:22
**110**  61:2,11,16,18
61:20 62:8 90:12
90:24 92:13 100:8
101:14,21 211:20
**115**  65:15
**11501**  248:23
**12**  44:18,20,21,23
44:24 48:23 67:5
67:6 108:24
142:10
**13**  48:7,10,22
67:16 75:4 174:18
178:1,2 189:17
209:16 225:6,6
226:2
**13.3**  175:22
**137**  230:25 231:22
**14**  34:20 76:12
174:18,21,21,24
176:5 177:13,21
189:17,17,23
198:24 202:23
204:24 205:13
206:2,2,11 210:20
210:22 225:6,10
225:14 226:1,8,11
227:23
**14-10979**  1:6
**140**  211:21
**144**  120:8,9
153:25,25
**15**  113:20,22,24
147:7,10,12

177:13,21 225:6
**150**  91:22,23 93:5
93:6 106:25 107:3
140:10,13
**156**  137:17,24
170:17,23
**15th**  67:23
**16**  19:16 207:13
**17**  53:17,19 60:10
60:21 68:15 83:15
83:20 87:9 89:9
99:7 200:16
**18**  20:14 60:15
62:16 63:1,2 83:8
91:15 110:10
143:21 180:7,13
181:8,11
**18th**  47:10
**19**  11:16 65:4,11
91:14 103:8
**1929**  77:18
**19th**  59:23 64:19
65:20 69:7 70:3
102:20
**1:30**  52:4

## 2

**2**  16:10 23:7 29:5
29:19 30:23 34:20
75:10 77:7,12
83:16 88:4 176:12
176:15,21 190:21
192:10,11 193:6
193:10 197:10
198:7 199:1
207:13 225:11,12
226:10,12
**2.798**  192:10,14
226:15
**2.8**  190:11 191:9
192:9,14,18 199:1
226:17 227:1
**20**  14:15 77:12,23
125:16 159:8

186:4 237:4,8
**20-80**  78:8,10
**20.3**  107:19 141:5
**200**  55:3,10,13,15
60:17 84:7 85:23
89:25 101:11
102:21,23 194:24
195:3 196:20
**2012**  186:5
**2014**  9:23 30:25
32:7 34:6 41:17
46:23 129:20
130:6 163:8,19
**2015**  128:7 130:6
130:13,13 161:21
163:19 164:2,3
**2016**  53:22 58:7,8
59:18,23 66:13,19
67:3 82:18 91:4
91:12 94:3,6,18
95:8 97:20 102:20
180:25 181:11
240:23
**2017**  10:3 12:21
18:17 19:7 29:1
74:5,24 109:12,14
109:20 142:23,25
143:6
**2018**  1:15 109:14
109:20 142:25
143:6 183:14
186:5 219:22
248:25
**20th**  25:23 183:14
**21**  77:17
**21st**  60:22 61:3
**22**  22:11 23:1
68:24 77:17 103:9
103:20
**22nd**  54:15 68:3
99:10,21
**23**  28:15,22

**24**   103:15
**244**   137:17,24
   170:18,23
**25**   228:12
**250**   61:6 84:9 86:5
   89:12 92:24 93:2
   93:4 100:24 101:6
   101:12,17 133:7
   133:11,23 134:3
   134:11 166:15,19
   167:5,10,18
**25th**   67:21
**26**   112:11 145:23
**261.7**   175:19
**27,000**   134:18
   168:1
**27.25**   109:17
   143:3
**270**   85:16
**273.4**   175:5
**275**   60:17,19
   61:12 84:20 85:10
   85:14,17,18,22
   91:8 100:5,8
   122:23 156:17
   226:14
**277**   103:9,20
**278**   103:10,20
**279**   103:10,20
**27th**   61:7 66:13
   66:18,19 68:19
   83:16 84:2 100:23
   101:25 102:19
**28**   227:1
**280**   103:10
**281**   103:10,20
**282**   103:10,21
**28th**   61:16
**29**   137:17,24
   170:17,23
**29th**   53:22 59:17
   59:18,21 82:18
   83:7,9 91:4

180:14
**2:15**   138:13
   171:12

### 3

**3**   33:16,18 54:22
   75:10 172:24
   174:21,24 176:12
   176:13,16 193:6
   193:10 197:10
   198:8,24 200:6
   225:11,12 226:22
   226:24,25 231:23
   236:17,18
**3.3**   110:5,11
   143:16,22
**3.4**   231:12,15
**3.75**   109:8 142:19
**30**   67:3 130:8
   163:21 172:20
**300**   30:13 65:12
   91:21 93:4,5,6
   102:23 134:1,2,10
   134:22 167:8,9,18
   168:5 248:22
**307**   137:18,24
   170:18,23
**30th**   95:13 180:15
**31**   108:24 142:10
**31.7**   106:13
   139:23
**322**   103:10,21
**324**   103:10,21
**329**   103:10,21
**3295**   207:11
**3295-1**   207:13
**33**   103:9,20
   233:16 239:24
**330**   248:21
**333**   103:11,21
**334**   103:11,21
**339**   137:18,24
   170:18,23

**34**   50:14 51:5
   189:11 209:16
   210:21 226:2
**34-1**   197:10 198:7
**34f**   189:13
**34f1**   192:25 193:6
   193:10
**34f2**   190:15 192:4
   192:17,25
**34f3**   189:25 190:5
   190:14 192:24
   193:14
**352**   137:18,24
   170:18,23
**353**   54:12
**363**   174:1 200:10
   209:25 210:3,8
**368**   103:11,21
**37**   76:21 237:11
**38**   50:21 237:14
**39**   103:9,20
**390**   103:11,21
**393**   137:18,24
   170:18,24
**395**   103:11,21
**398**   137:18,25
   170:18,24
**399**   103:11,21
**3rd**   47:4 62:12

### 4

**4**   50:9,13,14,16
   172:25 176:5,12
   176:15,15,18,21
**40**   76:23 118:4,18
   124:21 151:18
   152:6 158:13
**400**   103:11,21
**401**   239:10
**41**   240:8
**410**   103:11,21
**425**   137:18,25
   170:18,24

**429**   103:11,22
**43**   237:25
**430**   66:4 103:11
   103:15,22
**431**   103:11,22
**435**   137:18,25
   170:18,24
**437**   103:11,22
**44**   48:7,9,10,22
   238:1 240:12
**45**   104:15 238:3
**450**   65:17 91:23
**457**   60:2
**464**   76:18,20,23
**47**   103:9,20 238:5
**471**   69:20 115:8
   148:20 181:15
   201:11 202:9,19
   204:9 230:9,21
   231:20 233:6
**48**   137:17,24
   170:17,23
**481**   137:18,25
   170:18,24
**483**   137:18,25
   170:18,24
**484**   137:18,25
   170:18,24
**49**   238:13
**4:37**   247:7

### 5

**5**   19:16 20:14
   47:21,22,24 48:12
   48:15 79:21 82:22
   83:20 99:3 176:24
   202:24 205:13
   206:12 210:21
**5/16**   34:6
**50**   12:25 24:7
   60:24 61:4 62:4
   109:22 118:2,4,19
   124:21 135:24
   143:8 151:17,18

152:6 158:14
169:4,4 243:12,12
245:1
**50-50**  238:17
**50/50**  127:24
**500**  56:12 57:5,9
57:21 58:13
**503b1**  208:7
**504**  103:12,22
**51**  240:21
**517**  103:15
**518**  29:5
**5200**  61:1
**53**  90:25 91:2
**54**  67:16 68:15,25
91:2
**543**  103:12,22
**544**  103:12,22
**546**  103:12,22
**55**  135:1,24 168:9
169:4 238:19
**552**  103:12,22
**553**  103:12,22
**554**  103:12,22
**555**  103:15
**56**  24:18 86:10
238:20,21
**568**  103:12,22
**569**  103:12,23
**570**  103:12,23
**571**  103:12,23
**573**  103:12,23
**574**  103:13,23
**575**  103:13,23
**576**  103:13,23
**577**  103:13,23
**58**  206:6,16
230:11,13,22
231:21 238:22
**584,000**  108:17
109:1 142:3,12
**586**  103:13,23

**6**

**6**  1:15 11:13 47:21
49:15 50:9,13
237:3
**60**  12:25 17:11
24:7,18 62:4
109:22 135:24
143:9 169:5
**613**  137:18,25
170:18,24
**618**  137:18,25
170:19,24
**624**  137:19,25
170:19,24
**631**  103:13,23
**635**  103:13,23
**643**  137:19,25
170:19,24
**69**  35:8 75:14

**7**

**7**  22:11 23:3 60:2
60:2 65:3 79:14
81:8 180:4,5,7
200:15 215:1
248:25
**7.709**  77:2
**70**  75:14 240:14
**700**  48:4,8 49:1
50:6
**701**  234:14
**73**  75:14
**76**  75:14

**8**

**8**  30:24 54:10 77:8
121:6 154:22
180:5,17 181:8
200:6
**8.5**  120:19 121:2
154:11,18
**80**  77:24 103:10
**824**  1:13

**85**  76:18,20
**8:30**  6:8

**9**

**9**  29:1,23 30:3,6
31:23 38:23 47:20
50:14 110:9
143:20 180:5,17
180:22 181:8,11
**9.3**  28:23 29:1
30:17
**9.45**  25:22 30:9
**9.45.**  30:19
**9.75**  30:14
**9/18**  69:10,15
**90**  75:14
**90-10**  73:16,19,23
75:19 78:2
**91**  48:9,17,17
**943**  203:14
**98**  35:12
**9:30**  247:1
**9:38**  1:16

**a**

**abandoned**  42:7
**ability**  7:12 13:2
17:18,24 25:6
171:23 231:25
**able**  6:19 33:17
118:14 136:7
152:2 169:10
**absence**  137:12
170:12 189:3
**absent**  21:12
**absolutely**  51:14
55:20 72:7 85:9
94:23 120:14,14
120:18 125:8
133:16 154:6,6,10
158:25 166:23
177:12
**absorbs**  16:22
**accept**  21:20
25:22 98:6 133:20

167:2,3 232:22
**acceptable**  20:20
**accepted**  15:23
43:8 74:13 202:5
**access**  12:15,15
**account**  133:7
166:15
**accounting**
127:13 161:3
**accounts**  127:13
161:3
**accrued**  33:12
237:23
**accruing**  118:13
152:1
**accurate**  9:3
28:10 56:19 59:15
77:9 248:4
**achieve**  10:10
23:20
**acquire**  29:21
194:10,21 207:17
**act**  14:5
**action**  237:9
**actionable**  13:18
13:21
**active**  10:14
**actively**  50:7 92:8
130:17 164:6
200:18 243:5
**activities**  107:24
132:6 141:10
165:16 186:12,14
**activity**  88:25
128:15 162:4
186:8
**actual**  16:24
28:25 49:18 73:7
87:10 204:18
**actuarial**  86:9,17
86:25 89:15
**ad**  4:9 5:7 34:16
58:25 79:7 138:7

138:8 171:6,7,16
208:6 234:12
235:9 239:5
241:17 242:7,11
245:10 246:7,20
**add** 12:22 13:10
30:9,18 113:20
122:16 147:7
156:10
**added** 14:5 30:5
30:13
**addition** 11:17
215:24
**additional** 12:7
21:8 88:9 91:25
92:2,9 106:25
107:6 118:13
119:13 140:10,16
152:1 153:4
194:24 219:21,22
240:1
**address** 243:10
246:15
**addressed** 68:10
196:5,11 222:16
**adds** 196:18
**adequate** 61:15
126:20 160:9
**adjudicated** 20:4
71:13
**adjudicating** 20:4
**administered** 1:8
184:13,16,25
185:6,9,14 187:1
187:5,10,14,18,22
193:5,9,13 222:10
**administration**
3:4
**administrative**
181:23 182:3,12
182:14,25 183:18
185:5,9,13 187:14
187:17,21 188:15

189:7 199:21
212:5 231:12,24
232:1,4 240:6
**administratively**
15:21
**administrator** 7:7
7:7 8:14
**admissible** 86:20
**admit** 243:20
**admitted** 9:10
103:19 137:23
170:22 173:13
243:22
**admitting** 243:14
**advance** 234:11
**advantages** 17:3,4
**adversary** 110:25
144:10
**advise** 68:8 217:9
231:21
**advised** 184:15
185:8 217:16
230:24 231:13
**advising** 172:20
218:15,18 230:23
**advisor** 184:8,11
184:11
**advisors** 172:14
**advisory** 172:16
217:4
**affect** 96:10,13
213:9,25
**affiliated** 117:5
150:19
**affirm** 7:10 99:12
171:21
**affirmation**
171:19 216:18
**affirmative**
229:20,21 246:21
**affirmatively**
242:14

**affirmed** 6:5
93:15 99:23
**afraid** 19:22
**afternoon** 105:13
105:14 138:12
139:1,2 171:11
172:11 173:24
199:20 200:1,2
216:22,23 234:21
**age** 51:23
**agencies** 16:6
**aggregate** 225:16
225:23 226:14
**ago** 32:8 36:13
40:21 137:11
170:11 220:5
**agree** 10:15 12:1
17:10,12 19:21
20:16,23 23:11,14
23:15 53:7 57:19
64:16 81:14,16
110:13 111:11,20
113:10,21 114:15
114:22 115:19,22
117:8 118:2,18
119:7 143:24
144:22 145:6
146:22 147:9
148:2,10 149:7,10
150:22 151:16
152:6,22 191:2
195:5 201:8 212:2
230:24 231:22
233:12
**agreed** 15:19 21:8
22:10 23:21 25:12
51:8 84:8 91:3
92:25 222:19
223:14 243:18
**agreeing** 20:25
218:23
**agreement** 18:8
22:9 29:16 32:13

33:21 34:4,8
38:12 44:9 50:3
51:3 53:22 54:25
60:19 62:13,20
65:20 82:19 83:9
83:13 88:6 91:4,8
91:11 94:5,14
97:13,20,21
115:19 116:4,7,13
116:15,16 118:20
119:25 120:1,5
121:5,9 149:7,17
149:19,25 150:3,5
152:8 153:16,17
153:21 154:21
155:1 175:4,13,17
175:25 180:8,8
181:7,7 185:21
193:16,17 201:12
208:17 222:15
240:11
**agreements** 10:12
43:18 96:22
**ahead** 38:3 40:3
84:3 98:7 126:20
127:20 137:5
160:9 161:10
198:4 209:10
239:23
**ahx** 120:8 153:25
**ahx049** 207:10
**al** 1:7
**albeit** 118:23
152:11
**alive** 52:3
**allegation** 56:21
**alleged** 56:12
58:13
**alliance** 215:18
**allocate** 182:17
197:1 222:6 227:5
227:19 228:16

allocated  24:10
  71:16 74:11 75:2
  75:14 174:8,25
  175:6,10,15,20,23
  176:3,8 177:1
  178:8 185:14,19
  187:9 190:2
  197:11 198:9
  220:15 223:10,12
  238:10
allocating  71:3
  73:12,16,19
  176:18 184:25
  185:5,8 193:4,8
  193:12
allocation  2:1
  9:13,16 70:19
  71:10,15,21 72:3
  72:10,11,15,17,22
  72:23,25 73:8,23
  73:24 74:12,18,22
  114:19 148:7
  174:5 176:11,21
  176:22 177:5,14
  178:17 179:2,25
  182:2,12 184:5,12
  184:15 186:25
  187:4,13,17,21
  188:15,17,21
  189:2,6 197:9
  198:6,7,22,23,25
  199:5 219:23
  221:13 222:12,16
  224:4,6 225:4,8
  227:22 228:2,22
  229:20,22 232:23
  237:10,16,25
  238:4,17,21
allocations  214:11
  235:13 237:18
  242:16
allow  110:22
  114:17 144:7

148:4 233:16
  246:20
allowance  74:10
  97:6,24 178:10
  180:10,10 181:18
  201:2
allowed  38:8
  39:17 50:20 93:24
  98:6,9 110:18
  114:6 119:1 144:4
  147:18 152:16
  175:13 176:2
  185:19 201:24
  202:4
allowing  94:20,21
  95:6 96:3
allows  110:15
  144:1
alphabet  54:19
alternative  19:18
  20:17,20 21:18
  22:7 41:19 81:11
  81:21 117:2,9,21
  119:2,15 121:10
  121:12,18 122:8
  122:13 150:16,23
  151:10 152:17
  153:5 155:2,4,10
  156:2,7
alternatives  18:18
  19:19 22:3
amended  91:12
  94:14,15 175:17
  175:25 180:8
  181:7 193:16,21
  201:10,12,25
  202:9,19
amendment  65:12
  91:15
american  3:13
amount  15:24
  16:5,11,13,14
  24:22 30:4,6,10

30:12,15 33:11
  37:7 39:20 44:17
  85:16 86:9,25
  87:10 88:1,5,8,9
  88:21 89:17 92:13
  95:2 96:11 97:17
  98:5 100:22 110:6
  110:8 124:17
  134:23 135:5,7,19
  143:17,19 158:10
  168:6,12,13,24
  173:25 190:17
  191:9,13,14,14
  213:14 233:13
amounts  45:15
  50:21 75:2,13,16
  75:19 76:4 86:14
  96:15,25 110:12
  133:6 143:23
  166:14
analysis  38:4 87:8
  109:24 124:3,18
  143:10 157:21
  158:11 179:9,10
  185:17,23 186:3
  186:18 187:8
  188:20 214:4
  226:4,18,19 228:6
  232:21 242:2
analyzing  187:4
andrew  4:11,12
  6:4 235:8
andy  132:7
  165:17
ankura  168:2
  215:11
ankura's  168:8
anna  3:9 7:5
  98:22
annual  88:13
answer  38:2 40:1
  71:9 126:20
  132:16 160:9

165:25 184:17,18
  195:10 229:18
answered  28:13
  114:11 147:23
answers  214:7
answer's  198:4
anthony  105:23
  138:21
anticipate  213:9
anticipation  8:18
anybody  26:8
anyway  98:7
aon  134:19,19,21
  168:2,2,4
aparna  3:7
apologies  59:3,5
  98:25 195:18
  236:7
apologize  26:20
  123:7 157:1
  182:20
appeal  65:23 94:8
  94:12,13 115:4,14
  148:16 149:2
  200:24 237:22
appealable  157:5
appeals  119:13
  153:4 201:16
appearance
  219:20
appeared  149:16
appears  9:1 116:3
  226:19
appendix  186:19
  186:21,23,24
  187:24 188:3,9
  221:23
applicable  21:3
  179:21 180:3
application  71:20
  211:9 212:13
applications
  15:25 70:10,12,16

75:6 126:3,12,23
159:18 160:2,12
**applied**  210:14
**apply**  33:1 194:3
196:6 198:2 199:1
210:10 213:11
224:10
**applying**  190:6,17
197:9 198:6 227:2
**appointed**  129:19
129:24 163:7,12
**appointment**  71:5
**apportioning**
211:14
**appreciate**  241:4
241:19
**apprised**  54:6
**approach**  26:21
27:23 42:7 55:6
137:2 170:3
199:22 224:25
228:20
**approached**  38:18
116:18 150:8
220:10
**approaching**
13:21
**appropriate**  15:2
20:12 199:15
228:21 238:7
**approvable**
123:11
**approval**  18:22
52:16 53:20 91:6
92:19 102:4,9
123:5,8 156:24
157:2 215:13
218:22
**approvals**  52:18
52:20
**approve**  18:1
59:22 60:17 80:18
81:3,16 108:11

197:1 219:4
233:20
**approved**  12:9
43:5 44:9 47:9
49:17 58:7 65:19
69:6 70:2 73:22
73:24 81:23 82:1
82:4 91:6,7
134:14 141:22
167:22 208:7
215:10
**approving**  47:5
81:1
**approximately**
29:23 52:4 60:24
77:1,2 85:14
106:13,25 107:19
108:16 109:4
110:11 112:9
118:2 139:23
140:10 141:5
142:2,15 143:22
145:21 151:17
233:13
**april**  18:17 19:6
**aren't**  56:19
**argue**  18:10 92:16
208:7 235:14
**argued**  66:13,17
66:19
**argues**  246:23
**arguing**  117:17
151:6
**argument**  65:22
66:1,21 68:18
78:20,22 128:3
161:17 208:9
**arguments**  94:16
208:3 235:10,11
**arithmetic**  113:17
147:5 191:25
192:20,25 198:25

**arose**  25:13 244:4
**arrangement**
223:21
**arrived**  59:16,17
243:2
**article**  121:6
154:22
**asbestos**  23:7,18
24:12,14,18 25:18
55:2,6 56:11 57:4
58:12 61:6 65:15
84:8 85:25 86:3,4
87:8,23 88:13
89:8 91:21 92:24
93:7 100:24
101:18,23 131:14
132:11,11,14,23
133:3,20 135:19
164:24,24 165:21
165:21,23 166:7
166:12 167:3
168:24 243:15
**ashuraey**  4:4
**aside**  25:12
129:16 133:6
163:4 166:14
**asked**  28:8 34:23
47:14 56:25 58:18
60:8 72:19,21
88:21 89:3,18
100:11 132:6
165:16 212:23
214:7,17,24 231:2
232:24
**asking**  57:25 76:2
101:13 114:3,5
126:11 129:10
134:12 147:15,17
160:1 162:24
167:20 178:24
179:23 184:4
190:19 196:4,6
232:18

**aspect**  19:14
**aspects**  232:22
**asserted**  23:8
56:13 93:9 106:12
110:6 139:22
143:17
**assertion**  11:20
12:1,2 14:16
19:16,21 20:15,23
23:9,14 57:21
**assess**  203:1
240:24
**assessment**
135:19 168:24
**asset**  215:17 223:3
223:6 233:10
**asset's**  92:23
**assets**  16:21,23,24
16:24 17:2,24
19:13 21:19 43:1
43:4 47:1 207:19
207:25 208:12
222:9,11
**assistance**  234:10
**associated**  15:8
16:19 36:19 38:12
100:20
**associates**  115:20
117:1 149:8
150:15
**assume**  16:15
17:2 56:4 64:17
81:14 82:12 84:8
89:2,18 90:19
95:24 98:4 177:4
177:14,21 178:13
178:16 179:1
194:9,17,21 195:2
195:22 231:5,18
231:21
**assumed**  101:17
101:23 193:1
230:10,12,15,22

**assumes** 100:24
227:18
**assuming** 56:11
58:12 61:19 85:24
89:8 179:9,10
227:5 246:7
**assumption** 61:6
61:21 62:2 133:3
166:12 177:8,19
179:14,25 181:18
199:1 206:6,16
209:20 227:6,9,13
227:14,16 230:21
231:19
**assumptions**
90:21,22 196:7
**atp** 215:13
**attached** 35:7
49:19
**attempting** 110:6
143:17
**attend** 10:25
**attended** 11:1
95:9,25 97:8
**attention** 35:7,9
47:20 60:4 75:12
209:18 239:19
**attenuated** 235:16
235:18,18
**attitude** 25:4,5
**attorney** 5:2
217:19
**attorney's** 88:14
**attorneys** 3:4,13
3:19 4:2,9,18,23
5:7
**auction** 211:20
215:20
**august** 25:23
62:12,16 183:13
**authority** 13:6,11
25:8,17 26:7,12
57:1

**authorization**
127:15,16 161:5,6
**authorize** 74:10
**authorized** 50:3
74:8 207:16,24
241:10
**authorizing**
185:20
**availability**
219:18
**available** 81:11,20
121:15 155:7
177:6,15 178:8,10
178:19 179:3,5,25
**avoid** 231:12,17
231:23
**awaiting** 63:22
**awarded** 215:9
**aware** 27:10
56:20 57:1 71:2
95:3 96:4 97:23
100:18 107:18,22
110:4,8 120:3
121:21 123:4
141:4,8 143:15,19
153:19 155:14
156:23 184:14,23
187:6,7 189:8
193:3,8 207:23
208:12,16 223:25
227:15 228:14
230:2 234:10
245:13
**a's** 196:22

**b**

**b** 1:21 20:18
48:24 49:1 50:16
51:5 116:10
120:19 121:2,2
149:23 154:11,18
154:18 194:9,21
195:12,17,24
196:17,24 197:5

209:19
**b5** 35:9,10
**b8** 36:23
**back** 6:16 7:22
24:8,9 28:25
30:20,25 32:11
33:7 38:20 46:15
51:4 60:21 63:1
64:14 65:2,3
68:14,24 69:25
83:22,23 88:9
89:22,23 99:3
104:12 107:3
120:6 138:4
140:13 153:22
171:3 176:15
178:1,17 186:22
189:10 198:24
204:18 205:11
206:1,2,9 226:1
**background**
172:17 217:11,12
**backup** 117:24
151:13 199:7
**backups** 114:5
**bad** 93:18
**balance** 16:6
**ballpark** 93:1
**banker** 217:20
**bankruptcies**
186:5 223:2
**bankruptcy** 1:1
1:12,23 8:9,10
11:22 24:16 36:1
36:2 63:14,20
68:9,10 70:2 76:9
94:24 97:8,11
99:12,22,24
111:22 115:2
145:8 148:14
174:1 182:2,25
183:18 186:12
200:22 217:14,22

218:5,12,22
220:15
**bankruptcydata....**
186:4
**bar** 24:14 88:21
89:2,4 132:14
133:18 165:24
167:1
**base** 17:3
**based** 13:8 55:17
70:17 71:15 72:16
77:25 90:1,14,22
125:6 132:17
158:23 166:1
177:5,15 178:6,8
178:18,18,22
179:2,24,25 181:5
181:18 183:10
184:7 193:25
198:3,25 220:24
223:23 225:19
232:17 237:13,16
246:12
**basically** 15:3
124:10 158:2
215:15 227:4
232:15 247:2
**basis** 11:24 16:16
17:9 26:3,11
27:13 73:2 74:18
132:13 134:1
165:23 167:9
192:12 223:10
224:11 226:20
227:13 228:7,10
228:11 241:14,18
242:15,21 243:18
**bates** 203:13
204:1
**bayard** 4:22
**bear** 198:16
**bearing** 199:7
212:3

bears 213:22
beats 22:16
beginning 8:9
  132:18 166:2
begins 11:17
  89:24 240:9
behalf 7:6 36:8
  79:7 137:2 170:2
  173:17 241:2
belief 12:10,17
  21:20 42:6 90:22
  100:17 133:7
  166:15
beliefs 239:8,9
believe 6:17 11:9
  26:10,12 27:10
  29:14 32:7 33:12
  44:12 45:10 47:19
  54:14,21 56:1,18
  57:16 59:8,12,14
  59:15 60:8 61:23
  65:21 67:22 68:12
  68:14 69:2 70:24
  71:1 72:24 76:18
  79:8,10 81:19
  84:17,22 85:5
  87:13 91:5,14,21
  93:11 94:1 97:14
  97:18 99:11,22
  100:2,7 103:7
  106:4,16 107:3,9
  109:19 111:16
  113:4 114:6 115:1
  118:1 120:20
  132:24 137:9
  139:14 140:1,13
  140:19 143:5
  145:2 146:16
  147:18 148:13
  151:15 154:11
  166:8,13 167:20
  170:9 187:2
  204:14 221:11

225:15 226:25
234:4,12 235:23
236:16 237:14,22
238:7 239:7,9,10
239:25 240:20
242:9
believed 13:24
  14:11,17 25:11
  42:1 81:4 86:5
  89:12 100:11
  115:16 133:5,24
  134:10,12 149:4
  167:6,17,18
believes 100:12
  237:18 239:10
beneficial 119:1
  152:14
beneficiaries
  131:16 165:1
  241:10
beneficiary 50:16
  50:20 238:9,23
benefit 16:11 89:8
  106:24 107:6,10
  107:25 110:14
  111:8,14,21
  113:24,24 114:7
  114:12,13 119:5
  133:3,5 134:8
  140:9,16,20
  141:11 143:25
  144:19,25 145:7
  147:11,12,19,24
  147:25 152:20
  166:11,13 167:14
  205:4,18 206:5,25
  208:8 210:25
  218:8 238:18
  242:8
benefits 16:19
  17:7 52:24 107:16
  141:2 207:5 210:5
  210:5 230:18

237:23 238:3
benefitted 114:15
  148:2
benson 4:8 79:6
  171:16 235:8
berkshire 29:16
  30:2 80:6 81:18
  82:2 107:1,4,10
  107:17,20 108:6
  116:8,10 119:15
  121:20 122:24
  123:2 140:11,14
  140:20 141:3,6,17
  149:20,22,22
  153:6 155:14
  156:18,21 197:20
  220:6
best 7:11 9:3 11:2
  13:25 14:11 18:12
  26:1,10 27:21
  28:14 33:21 41:18
  54:9 67:10 70:22
  77:6 81:5,11,20
  82:3,5,12 85:21
  90:22 171:22
  173:5 224:7
better 87:25
  100:19 113:5
  118:19 120:17
  125:2 146:17
  152:7 154:9
  158:19 195:7
  234:24
beyond 88:2
  97:16 107:1
  140:11 230:18
  232:8 241:18
bhe 29:17,21
bias 12:12
bid 12:8 13:14
  46:21,22,25 47:5
  47:7 83:16 84:7
  84:15 85:20 89:25

90:11 130:14
164:3 199:7
200:11 201:10,25
202:5,10,20 204:5
207:9 209:21
211:12 212:16,17
221:22
bidder 61:14
  83:12,16 84:3
  85:11,14,18,22
  87:20,20 88:4
  94:7 107:1 117:25
  140:11 149:23
  151:14 194:8,8,8
  194:9,9,18,21
  195:6,6,12,17,22
  195:24 196:1,15
  196:17,21,22,24
  197:5,7,8 198:13
  198:13,17 200:13
bidders 53:20,25
  54:4,7,7 84:25
  117:23 151:12
  194:5 200:10
  219:3
bidding 12:18
  43:6 130:1,5,7
  163:14,18,20
  194:5 207:14,15
  218:18 219:3
bids 87:24 219:6
big 17:13 18:6
  56:2 66:16,22
  180:2
bill 71:10
billed 74:21 75:13
billion 15:17
  16:10 25:22 28:23
  29:1,1,23 30:3,6,9
  40:25 41:11,12
  44:18,23,24 77:2
  77:2,7,8,8,12 97:1
  130:14 164:3

208:13 231:12,15
231:24
**bills** 70:15 73:25
73:25 74:13
**bind** 22:1
**binder** 8:21 11:6
27:20,21,22,23,25
28:16 29:4 33:18
33:19 47:21,22
49:16 54:11 60:2
63:1,4 76:19 79:8
79:15 82:22 99:4
108:21 120:11
142:7 154:3
174:13,14,16
200:4 203:9
204:19 205:12
207:10 224:16
**binders** 22:15
173:20 199:22
**biography** 186:22
**bird** 218:9
**bit** 6:13 27:20
70:6 71:25 79:16
82:22 83:4 88:16
133:22 167:5
177:10 189:20
191:13 197:14
225:17,18 243:6
**bitter** 116:10
**block** 70:14
**blow** 120:23
154:15
**blueprint** 17:1
**board** 3:4 7:7,7
8:14 11:3 13:24
14:2,4,4,7,9,12
20:11 25:3 41:23
42:17 54:2,6,11
54:16 55:4 56:17
60:22 66:20,23
67:2,7 69:3 72:1
74:25 80:20 90:23

91:6 94:25 95:11
95:18 96:17,24
97:10 98:3 99:9
99:10,21 102:3,4
121:25 125:6
153:1 155:19
158:23 180:19
181:12 199:22
203:21 230:24
231:13,22
**boards** 25:22
41:23 53:20 80:17
89:7 95:7 96:1
97:7 108:11
119:11,18 141:22
153:1,8 172:21
180:14 217:17
**bold** 108:24
142:11
**bolstered** 225:18
**bonus** 124:15
158:8
**borders** 215:17
**borne** 64:3
**bother** 100:15
**bottom** 48:23
65:11 68:21 81:8
120:20 154:12
191:11 192:10
210:22 212:9
**bought** 18:15 21:2
**bound** 20:2 21:23
117:17 151:6
**box** 17:16 203:25
**boy** 32:7
**brackets** 48:25
**bradley** 216:20
**brady** 5:18
**break** 6:18 51:18
52:14 61:10,10
64:20 78:22 84:10
84:19,20 85:10,10
85:13,22 91:8,11

100:4,14,19
102:10 104:12,19
114:20 120:4
121:22 125:4
136:5 138:3 148:7
153:20 155:15
158:21 169:8
171:2 176:22
208:22,24 209:2
210:4,9,18,24
211:5,9,17,24
212:7,10,14 213:2
213:7,22 214:4,11
214:25 215:3,6,6
215:8,10,11,13,15
215:15,17,19,21
215:23,25 217:22
218:2,5,11,24
219:11 220:15
222:7,20 223:9
224:10 225:16,23
226:14,15 228:6
228:16,22 229:9
230:24 231:22
232:14,17,19,21
233:3,13,17
**breakup** 174:1,5
174:8,25 175:6,9
175:14,19,22
176:2,7,11,18
177:1,5,15 178:7
184:5,7,13,16,25
185:19,24 186:15
186:25 187:4,9
188:17 189:15
190:2,11,12,17
191:11,17,23
192:5,9,11 193:4
193:9,12 197:2,11
198:8 200:9 203:1
205:3,17
**brief** 70:8 229:9
242:17 244:12

246:22
**briefing** 234:23
**briefly** 8:7 12:20
120:9 132:23
153:25 166:7
172:19 216:24,25
217:12,21 224:6
225:12 244:19
245:8
**bring** 13:14 95:17
104:11 113:11
146:23
**bringing** 13:2
84:10 93:16
113:14 147:1
**brings** 46:15
**broader** 19:11
108:2 126:11
141:13 160:1
**broken** 197:19
**brought** 19:2,25
20:16 70:6 74:24
113:3,4,4 146:15
146:16,16
**bucket** 110:2
143:13
**buckets** 108:14
113:18 114:16
141:25 147:5
148:3 235:14
**building** 190:20
190:22 191:4
**builds** 190:15
**bulk** 240:14
**bullet** 100:23
**bump** 65:17
**bunch** 233:2
**burden** 213:22
**burn** 12:24 17:12
19:9 24:6,11,19
62:3 116:19 118:2
118:12,12 119:9
124:8,12 150:8

151:16,25,25
152:24 157:25
158:4
**business** 87:21
172:15
**buy** 92:22
**buyer** 16:1,4,15
56:11 134:9,10
167:17,17 215:12
215:19,22 218:15
230:15,18
**buyers** 172:21
215:21
**b's** 196:1,21

**c**

**c** 3:1 5:18 6:1 7:16
14:25 20:20 248:1
248:1
**c4** 37:13
**calculate** 78:16
115:11 148:23
**calculated** 97:15
191:17
**calculation** 62:9
77:25 90:18
101:20 115:12
148:25 190:11
191:21 243:15
**calculations** 16:12
190:24 191:15
**calculator** 77:14
**calculus** 119:20
153:11
**calder** 54:24
**call** 34:20 52:23
106:5 116:10
139:16 149:23
171:17 194:9
213:15 216:13
**called** 50:9,14
60:16 61:12 67:18
74:19,19 75:10
215:14

**calls** 7:7 10:18
37:24 57:13
100:10 133:15
166:23
**canceled** 38:11
**caney** 168:1
**can't** 237:13
**capabilities** 11:3
**capacities** 54:19
**capacity** 10:2
13:22 14:9 126:14
160:4 241:9
**capital** 90:3,16,25
**captured** 137:5
170:6
**care** 105:4
**career** 217:16
**carefully** 13:16
14:24 191:9
**carry** 96:19 100:1
**carryover** 189:16
**case** 1:6 9:22 13:9
15:8 18:2 22:14
24:14 26:7 30:12
36:9,21 37:5 57:2
57:3 64:9 109:7
112:13 113:2
116:25 117:4
125:23 126:3
127:16 142:18
145:25 146:14
150:14,18 159:14
159:18 161:6
183:11 189:16
193:4,8 198:11
204:20 212:8
215:7 220:25
222:10 225:23
230:18 233:14
239:8 241:12
243:4 245:9,12
**cases** 8:8 11:22
18:16 48:1 51:1,9

53:14 76:9 174:2
177:24 184:14
186:8,12 187:4,9
188:1,3,4,6,12,14
188:22,23 189:1,6
210:17 214:8,10
214:15,22 215:5,8
215:9,16,24,25
221:22,22 222:8
222:13,18 223:5,8
225:19,20 227:25
229:3 240:24
**cash** 12:24 19:9
24:4,5,6,11 29:22
30:4,5,6,9,16,19
33:13 55:14 56:5
58:13 65:12 90:7
90:24 98:12
102:19,20 107:1
109:10,19 116:19
118:2 123:2 124:8
124:8,10,17,19
125:8 140:11
142:21 143:5
150:8 151:16
156:21 157:25,25
158:2,10,11,25
178:11 190:7
193:1 209:19
224:8 226:14
230:17,19,20
231:20 232:5,16
232:18 233:7,8,10
233:14
**casino** 215:19
**categorized** 183:9
**caucus** 234:7
**cause** 15:13 120:3
153:20
**caused** 15:20
**caveat** 178:6
222:17

**cease** 23:11 43:18
**cecily** 74:2
**celebrated** 94:23
**cent** 191:9 199:1
**cents** 35:23
190:11 192:9,15
192:18 194:11,23
226:17 227:1,1
**certain** 46:15 50:3
50:20 56:22 74:12
93:9 124:9,14
133:9 158:2,6
166:17 179:21
183:9 211:10
**certainly** 12:13
16:2 26:8 57:16
57:17 78:20 89:21
95:16,17,21 96:4
96:14 97:16
100:18 110:18
112:16 114:18,18
123:22 125:9
144:4 146:3 148:5
148:5 157:14
159:1 191:7
218:21 241:4
243:2,8
**certainty** 107:15
112:4 125:10
140:25 145:15
159:2 194:17,19
195:11,23 198:18
**certificate** 127:17
127:19,21 161:9
161:11
**certified** 248:3
**cetera** 10:18
19:10
**chambers** 234:25
246:17 247:4
**chance** 111:8
118:23,24 144:19
152:11,12

change 51:24
109:1 125:13
142:12 159:5
213:15,18
changed 46:9
91:16,20 205:22
206:19 244:14
changes 124:14
158:6
changing 213:14
chapter 1:5 8:8
51:1,9
characterization
14:23
characterize
113:8 146:20
176:19
characterized
115:16 149:3
characterizing
191:5
charged 23:6
charlie 133:14
166:22
chart 60:12,22
75:10 99:4,8
201:7,8 203:18,24
204:4
charts 180:11,18
chase 121:4
154:20
check 17:16 44:20
77:25
checked 74:14
checks 127:8,9,11
160:22,24 161:1
chief 8:11,11
chill 218:17
chip 38:17
chose 98:7
chris 7:20
christian 5:4

christopher 1:22
circuit 6:5 63:22
63:25 64:2,10
65:23 93:23 94:8
97:5 99:11,12,23
110:15,21 111:24
144:1,7 145:10
181:1,21 193:18
200:25 235:15
circuit's 66:6
94:17
circumstance
14:18 115:23
119:6 149:11
152:21 185:2
circumstances
125:7 158:24
230:23 232:19
233:4
cite 112:5 145:16
cited 27:7 137:12
170:12 203:18
221:23 222:8,18
claim 14:19 38:8
38:17 39:20,23
40:14 48:4,8
50:10,15 56:12,21
57:5,9,22 58:14
58:17 77:21 89:5
105:20 106:2,15
108:16 109:5
110:3 113:21
126:1 139:8,12,22
139:25 141:10
142:2,16 143:14
147:8 159:17
231:24 232:1,4
claimant 57:4
claimants 5:7
79:7 208:7 242:11
245:10
claiming 111:12
112:9 113:25

144:23 145:20
147:12
claims 31:19,25
31:25 35:10 37:14
37:16,23 38:12,14
38:25 39:8,16
40:5 48:3 49:5
50:3,17,20 56:6
57:24 63:10,15
64:24 88:21 93:8
93:13,24 94:7,13
94:21 95:1,6 96:3
97:5 98:9 101:18
106:12 107:24
133:18 134:18
166:25 168:1
175:5,13,18 176:1
178:11 180:11
200:19,23 201:2
206:5,6,13,14,16
231:13 240:17
clarification
195:19 223:15
clarify 100:6
182:19 204:17
245:8
clarifying 195:21
class 35:9,10
36:23 37:13,16
38:5
clean 18:2
clear 11:21 13:1
17:16 23:9 40:18
40:20 42:18,21,22
90:15 92:14 111:1
129:9 144:12
162:24 220:7
223:15,18 225:25
232:24 246:9
cleared 90:3,25
243:8
clearly 12:8 13:6
13:8 23:19 24:23

65:8
clerk 7:9,14,17
52:12 79:3 171:20
171:25 172:3
209:7 216:16
229:14
close 27:13 41:1
77:15 78:23 87:21
119:10,13,19
152:25 153:3,10
172:8 197:6,6
234:23
closed 224:10
227:3
closely 66:23 95:3
182:22
closer 84:16
176:11
closing 18:25 20:8
61:22 94:10 98:3
194:17 195:12,23
196:2,17,20,22
198:18
closings 234:22
cno 127:18 161:8
code 36:1,3 182:2
182:8,10,21,23,25
183:18
colleagues 244:5
collective 74:20
74:20 132:13
165:22
color 46:9 217:13
column 35:19
204:6,9
come 18:5 71:12
72:3 93:2 116:12
123:25 127:22
129:1 133:18
134:18 138:4
149:24 157:17
161:11 162:16
167:1 168:1 171:3

198:20 204:15
211:21 215:22
226:15
**comes** 197:20
**coming** 124:16
158:9
**commence** 112:14
146:1
**commenced** 117:1
150:15
**commencement**
11:21
**comment** 51:10
**commented** 12:9
68:10
**comments** 68:4
**commissioners**
68:4
**commit** 218:6,14
**committed** 86:12
200:13
**committee** 4:9 5:2
34:16 49:9,9,13
49:22 50:10,24
51:8 70:7,9,14,16
70:18,19,23 71:20
74:4 106:5 127:7
127:8 128:6,10,16
129:5,11,13,17,19
130:17,19 131:6,6
131:11,13,24
132:1 138:8
139:15 160:21,23
161:20,24 162:5
162:21,25 163:2,5
163:7 164:6,8,18
164:18,21,23
165:9,11 171:6,7
235:9 240:15
242:7
**committee's**
125:23 126:4,12
126:23 138:7

159:13,19 160:2
160:12
**committee's**
238:3 241:18
**committing**
107:20 141:6
**common** 16:20
35:13 37:18
**communicate**
13:12
**communication**
14:2
**companies** 87:21
172:21 217:17
**company** 38:7,9
47:7 59:17 76:1
89:1 99:11 102:19
108:11 115:20,24
116:2,8,11,19
117:1,10,14 119:7
121:13 122:3,7
126:6 127:10,10
133:2 134:13
141:22 149:8,12
149:15,20,23
150:8,15,24 151:3
152:22 155:5,22
156:1 159:21
160:25,25 166:11
167:21 218:19
**comparable** 30:17
**compared** 89:16
**comparing** 87:24
**comparison** 30:14
**compensate**
218:16
**compensated** 8:16
219:16,18
**compensation**
73:7 92:1,2,9
219:20,21,22
230:19

**competent** 78:17
**competition**
200:12
**competitive**
117:23 151:12
**complete** 23:23
**completed** 89:24
**compliance** 74:14
**compliment** 22:13
**component** 65:13
217:25 218:20
**components** 33:15
**conceded** 106:20
140:5
**concept** 212:16
**concern** 15:8
17:14 118:14,16
119:8,9 152:2,4
152:23,24
**concerned** 15:5
16:7 17:21 18:22
19:1,25 68:7
133:17 166:24
**concerning** 86:17
185:8 224:4
240:10 242:15
**concerns** 15:12
52:21 116:19
121:6 150:8
154:22
**concluded** 73:4
247:7
**concludes** 190:1
**conclusion** 16:3
221:9,17,20 222:5
224:1 227:7,17,18
**condition** 45:13
94:10 97:12 98:2
98:4,7,8
**conditioned** 62:22
62:24 63:10,17
**conditions** 21:8
53:2 131:16 165:2

**conducted** 10:24
**confer** 216:16
225:2
**conference**
234:19,21 246:17
247:4
**confident** 87:22
**confirmation**
10:13 64:4 82:24
219:19,21 220:2,9
220:12
**confirmed** 47:16
**confirming** 245:9
245:12
**confirms** 83:8
**conflict** 13:7
25:10 70:24 71:1
71:4,23 112:22
113:1 146:9,13
**conflicted** 49:24
**confuse** 49:18
**confusing** 20:24
55:24
**confusion** 182:20
**connection** 10:5
11:10 31:6 47:16
74:24 76:9 79:19
111:13 144:24
205:8 220:5,11
242:3 243:19
**consensual** 11:24
27:13 220:8,8,9
**consensus** 10:9
**consenting** 34:21
**consider** 13:13
14:14 23:17 71:23
131:20 165:5
183:21 221:25
**consideration**
58:22 65:5 69:5
69:11 122:25
123:22 156:19
157:14 176:7,20

178:12 179:11
180:9 181:4
185:25 190:7,17
191:18,22 192:6
194:10,22 197:8
199:2,3,5 206:15
207:2,6 209:19
210:1,7,9,15,16
226:15,17 227:2
230:9,17,20
232:16,18 233:7,9
233:10,14
**considered** 15:13
112:17,18 125:11
146:4,5 159:3
214:8
**consistent** 6:10
10:7 61:13 73:3,6
84:2,14 225:17
228:7
**consistently** 21:17
**consolidated**
188:1,4,12,22
189:1,6 214:23
236:8
**consolidation**
214:18,19
**constituencies**
239:21
**consuming** 24:17
**consummate**
117:22 151:11
**consummated**
40:8 121:10 122:1
155:2,20 178:13
194:22
**consummation**
63:11 64:1,5,11
121:8,12,17
154:24 155:4,10
**contained** 9:2
91:8

**contains** 236:9
**contemplate**
18:12
**contemplated**
13:4 40:7 80:10
208:17
**contested** 46:25
**context** 33:2
185:25 218:22
231:1,2 233:18
243:12
**contingent** 176:6
176:20 210:9,15
**continue** 65:7
216:19 239:6
**continued** 24:4
**continues** 240:11
**contract** 222:21
**contractual** 50:10
50:15 223:20
**contractually**
223:13
**contribution**
105:20 106:2,12
107:24 108:16
109:5 110:3
113:21 126:1
139:8,12,22
141:10 142:2,16
143:14 147:8
159:16
**contributions**
106:17 140:2
**conversation**
116:21 123:21
133:24 150:10
157:13 167:7
**conversations**
31:14 32:20 130:3
133:12,14 134:24
163:16 166:20,21
168:7

**convey** 211:4
**convince** 134:5
167:12
**coordinated**
29:12
**copies** 235:24
**copy** 35:5 59:24
79:11,17 120:7
153:23 236:1
**corner** 203:13
204:25
**corp** 1:6 14:25
29:21 37:5,7 56:5
56:11,13,21 76:25
207:20
**corp's** 54:25 56:4
56:13
**corporate** 56:6,22
**correct** 28:9,10,13
28:23,24 29:17,24
30:25 32:14 34:6
34:12,15,17,22
35:13 36:1 37:14
37:18,19 38:25
39:4,5,14,15
40:23 41:9,21
44:9 45:3,5,6 47:2
47:3,6,17 49:7,8
49:10 52:16,24,25
53:9,14,15 54:16
54:18,20,20 55:11
55:13,19 57:10
58:9 59:15 60:7
60:10,18,24 61:8
61:9,13,17 62:8
62:14,16 63:12,15
63:23 64:15 65:6
65:11,13,14,16,20
66:7,15 67:8,12
67:14,15 68:1,5
68:16,17,21 69:12
69:16,21,22,24
70:3,25 75:6,7

76:14,18 77:17,22
77:24 80:4,8,9,20
80:24 81:6 82:1
82:20 83:9,13,14
84:20,21,25 85:20
90:4,5,9,12,16,21
91:1,4,9,12,17
94:3,8,15,22
98:10,13,14
100:25 101:3,7,15
101:19,21 102:1,2
105:25 106:8,18
106:22 107:2,7,25
108:7,13 109:5,18
109:25 110:11,21
111:15,22 112:23
115:25 116:9
117:7,11,12 118:3
118:7,8 119:21
122:13 123:1,12
123:14 124:3
125:24,25 126:3,6
126:24 127:1,2
129:22,23 139:10
139:18 140:3,7,12
140:17 141:11,18
141:24 142:16
143:4,11,22 144:7
145:1 146:10
149:13,21 150:21
150:25 151:1,17
151:20,21 153:12
156:7,20 157:6,6
157:20 159:14,15
159:18,21 160:13
160:15,16 163:10
163:11 172:6
173:5 174:2,5,9
175:1,15,16,20
176:3,4,8,16,22
177:2,7,16,23
178:20 179:6,14
179:15 180:11,20

181:2,3,8,14,17
181:21,22,24
182:4 183:4,20
184:8,17,19,20,22
185:1,6,7,10,11
185:21 186:1,5,9
186:12,16,19
187:1,2,5,10,11
187:15,18,25
188:11,16,17,19
190:3,15,21,25
191:15,19,23,25
192:1,2,3,7,12,15
192:18,20,22
193:1,15 197:11
198:9,10 199:8
200:13,20,25
201:4,11,13,17,18
201:20,21,25
202:5,11,21,22
203:6,19,22,23
204:7,11,13,15,16
205:8,20,24 206:7
206:21 207:2
208:1,4,14,18
212:20 213:19,20
213:23 219:24
221:18 222:24,25
223:7,22 228:9
229:23 230:11
231:17 232:2
245:2,16
**correctly** 35:11
41:1 56:7,14
75:16 77:4 95:22
203:4 205:5
206:17 207:21
229:17
**corresponding**
75:15 76:4 206:10
**cost** 22:21 87:18
**costs** 16:24 124:5
157:22

**couldn't** 78:1
183:7
**could've** 208:13
232:3 242:6
**counsel** 68:12
114:2 116:14
121:23,24 126:5
126:11 133:15
136:22 147:14
150:1 155:17,18
159:20 160:2
166:22 169:23
205:7,23 208:6
225:2 238:15,15
247:2
**country** 248:21
**couple** 15:17
80:21 90:11 96:7
118:22 123:23
152:10 157:15
163:15 203:8
204:17 208:22
227:3 229:16,19
232:4,21 234:9
242:23 247:3
**course** 19:5 36:9
46:1 57:3 79:25
104:21 199:16
217:16
**court** 1:1,12 6:2,3
6:7,14,21 7:3,21
7:24 8:2,4 9:7,10
12:9 22:13,17,20
22:25 23:2 26:15
26:19,23 27:2,15
27:18,24 28:1,18
29:6 31:7,9,12
36:5 38:1 40:20
40:24 41:2,7,10
41:13 42:12,14,17
43:16,23 44:4,7
45:8,8,22 46:2,10
46:14,20 47:4

48:9,14,19,22
51:13,15,20,25
52:2,5,10,13
57:12,15 58:2,6
58:23 59:2,5,22
60:20 63:14 65:19
66:10 68:9,10
69:6 70:2 71:4,15
71:19 72:5 73:3,6
73:7 75:22 76:3,7
78:6,10,14,17,20
78:24 79:4 81:23
82:4,8 85:4,7
86:15,24 87:3
88:11,23 91:6
93:12,15,18,21
94:24 95:15 97:12
98:19,21,24 99:1
99:12,13,16,19,22
99:23,24 100:12
103:1,4,16,19
104:3,5,8,13,16
104:18,21,23,25
105:3,6,8,16
110:20 114:9,17
115:2 120:12,15
120:22 125:3,15
125:17,19,21
126:16,18 127:18
127:20 129:2,5
130:19,23,25
131:5,8 132:20,24
135:5,7,8,12,15
135:17,20 136:4,9
136:13,15,18,21
136:24 137:4,8,16
137:20,22 138:3,8
138:11,15,19
139:4 144:6
147:21 148:4,14
154:4,7,14 158:20
159:7,9,11 160:5
160:7 161:8,10

162:17,21 164:8
164:11,13,17
166:4,8 168:12,14
168:18,22,25
169:7,12,16,18,22
169:25 170:5,8,16
170:20,22 171:2,7
171:10,14,18
172:4,7,19,22,23
172:25 173:10,13
173:15,18,21
182:7,10,12,16,21
185:20 193:16,20
193:24 195:13,15
196:9,12 197:15
197:17,24 198:1
199:12,16,19,23
200:22,22 202:12
202:15 203:15,25
204:3 205:11
206:21 208:24
209:1,5,8,10,12
211:15 212:6,18
212:21 215:10,12
216:3,6,8,11,15
216:16,17 218:22
219:4,12,14,14
224:8 225:1
227:20 229:8,11
229:15,24 230:5
232:11,20,22
233:16,20,22,24
234:2,4,15,17,25
235:2,6,21,25
236:2,5,11,13,17
236:19,24 237:1,3
237:5,7 238:11,25
239:3,12,22 240:2
241:1 242:10,18
244:2,10,16,18
245:5,15,18,21,23
245:25 246:8,11
246:19,25 247:6

**court's** 63:20
65:23 67:23 97:9
**courtroom** 208:3
**court's** 237:21
241:19
**cover** 134:7
167:13 212:18
**covered** 216:24
217:11
**cracks** 18:21
**create** 117:23
123:2 151:12
156:21
**created** 69:2,3
122:19 156:13
**credit** 16:6 209:21
**creditor** 10:10
19:2,12 24:6 26:9
64:20 65:1 69:9
94:22 95:1,4
96:10,13 97:13
159:13 180:18
204:4 239:20
243:1
**creditors** 5:2 10:8
10:19,23 11:4
12:9,15 14:3
19:13 31:18 32:5
32:12,16,17,21,23
33:2 34:9,14,16
39:3,11,11,12
40:9 42:6,7,9 44:6
44:15,25 45:3,5
55:16,19 65:9
69:23 81:6 82:9
82:14,15 88:10
92:16 93:9 96:2
97:25 98:16 101:6
106:22,22 109:14
115:6 125:23
126:12 127:8
129:10,13,17
130:16 134:8

140:7,7 142:25
148:18 160:2,22
162:25 163:2,5
164:5 167:15
171:16 172:21
178:11 194:11,14
194:23,25 195:8
196:16,18,19
198:12 200:19
201:4 237:24
238:9 240:4,4,16
240:18
**creditors'** 4:9
**creditor's** 240:3
**cremens** 25:2
72:23 73:4
**critical** 10:14 49:4
**criticized** 232:20
**cro** 10:22 50:7
71:14
**cromwell** 5:1
**cross** 28:4 79:12
84:23 95:17,21
98:24 105:23
135:9 138:21
168:15 173:15,22
199:14 229:8
**css** 1:6
**currently** 93:14
110:25 144:11
172:11 217:1,2
**cut** 121:4 127:8,9
127:11 154:20
160:22,24 161:1

**d**

**d** 6:1
**da** 90:25
**dallas** 105:16
139:4
**daniel** 3:21 4:20
**dash** 203:14
**data** 119:22
153:13 187:7,20

187:20,24 188:21
189:3,5,6 221:7
221:16 222:4,22
222:23 227:22
**dataset** 187:8,12
188:20
**date** 47:10 61:11
61:22 62:1,10
66:1 69:13 76:25
77:13,19,20,23
78:2 87:18 88:15
88:17,21 89:2,4
89:16 90:19
132:14 133:18
165:24 167:1
175:4,17 248:25
**dates** 18:19 46:17
89:15
**david** 4:13,15
171:15
**day** 6:20 12:16
26:5 51:22 65:18
76:8,12,12 96:19
100:1 235:9,10,15
244:14
**days** 90:10 121:8
121:12 154:24
155:4
**dd** 58:2,7
**dead** 51:21
**deal** 13:13 17:6
18:3,21,22,25
19:2,9 20:8 21:5
21:25 22:9,10
24:12,13 43:25
45:13 55:20 58:3
61:1 64:14 70:4
90:15 91:3,5,7
92:21 94:11 96:9
96:12 98:15
100:14,20 101:9
101:23 102:11,14
114:23 148:11

195:7 196:23,24
197:1,5,7 218:7
218:20 235:3,4
246:3
**deals** 23:21 96:7
96:11 215:20
**dealt** 230:1
**deb** 77:24
**debated** 14:25
**debt** 16:6,7,9,10
38:8,10 39:17
75:16,19 76:1,4
77:13,19,24 78:1
78:2,2,9,16
209:21
**debtor** 8:12 109:9
118:6 126:15
142:20 151:19
182:3 183:1,19
184:7,25 185:9,14
187:1,5,10,14,18
188:6,10 193:5,9
202:2 203:21
214:15,20,22
218:8 221:13,13
222:9 223:1,3,9
224:10 228:6,6
232:17 233:6,8,10
233:12,19 235:17
239:17
**debtor's** 53:20
82:6 95:7 170:23
**debtors** 1:8 3:19
8:8 10:5,19 11:20
13:12,18 14:16
15:4,12 18:14
19:6,17 20:18,18
20:21 21:6 22:1
23:9 25:21 26:4
29:15 34:13 36:24
40:11 41:18 42:5
42:22,25 43:3,8
49:6 50:3 53:21

79:24 80:16,18
82:18 83:8,11
84:4 89:7 90:2,15
92:3,8 96:1 97:7
110:14 112:17
117:5 122:5
123:19 126:22
135:18 143:25
146:4 150:19
155:24 157:11
160:11 168:23
180:9 181:5,11,15
185:20 188:5
197:6 207:16,23
214:12,20,21
222:7,9,11,13,13
222:19 223:5,11
233:24
**debtors'** 181:12
**debtor's** 9:11
180:14 208:8,12
**decide** 27:5
**decided** 112:19
119:7 121:20
134:3,4 146:6
152:22 155:13
167:10
**decision** 12:13
13:8 63:23 64:10
65:24 66:23 87:15
94:18,20,21,23
97:4,8,9 99:25
119:18 153:8
181:1,20
**decisions** 111:18
145:4 179:19
**declaration** 8:18
8:24 15:7 28:10
28:15 30:20,24
32:18,22,24 33:8
44:20,21 46:18
53:18 59:6,12,14
59:20,21,25 60:5

60:9 63:2 65:3,3
67:25 76:8,12,13
76:22 79:19,20
82:23 83:21
132:10 165:20
173:1,10,14 174:7
174:11,24 176:24
177:14 180:4,5
185:18,18 186:19
186:25 190:1
192:4 197:10
198:8 209:16
215:1 220:22
223:24 224:12
225:4,5 227:10
228:1 235:22
**deconsolidation**
14:17 20:19
**deduction** 101:3,5
**defending** 235:3
**define** 210:4
**defined** 71:5
207:6 210:2
**definitely** 71:1
**definition** 34:24
35:2,3 36:2 50:16
222:11 223:10
**definitional** 183:7
**definitively**
178:22
**defranceschi** 3:21
**delaware** 1:2,14
**delay** 171:14
**deliver** 12:6
**demanded** 112:13
112:16,16 146:1,3
146:3
**demanding**
113:10,11 146:22
146:23
**demonstrative**
45:19 60:7

**denied** 16:18
52:16,16,22
**denies** 102:5
**department** 73:25
74:2,6 127:12,22
161:2,12
**dependent** 114:24
148:11
**depending** 67:17
180:10 213:17
**depends** 30:16
77:18,19 245:19
246:14
**deposed** 205:7
242:12
**deposition** 115:15
149:3 242:9 244:4
245:11,14
**deprecation** 158:8
**depreciation**
124:15
**describe** 8:7 10:4
19:5 60:11,15
172:19 217:21
**described** 228:25
233:19
**describing** 59:21
212:5
**deserve** 22:19
**designated** 242:14
**designations**
242:9 244:4,7,9
245:11,13,20
246:21
**desk** 108:23 142:9
**despite** 33:9
**detail** 37:3 126:2
126:4 127:1
159:17,19 160:15
189:22
**detailed** 87:20
106:6 116:11
130:3 139:16

149:24 163:16
**determination**
41:24 42:1
**determine** 42:25
71:14 186:14
213:21 214:2
232:17,19
**determined** 41:18
232:14
**determining**
87:16 210:18
**develop** 200:11
**developments**
10:21
**didn't** 7:25 9:14
10:15 13:2,11,15
13:17,20 20:2
21:7,13 35:5,15
50:5 111:2,3
120:1 126:23
134:9 177:20
182:16 183:21,24
187:17,20 195:16
201:15,19,22
202:2 234:19
244:8
**difference** 30:4,18
107:16 141:1
206:23
**different** 18:10
30:15 36:20 38:15
58:25 59:2 65:3
79:24 107:10
111:18 114:14
117:16 140:20
145:4 148:1 151:5
179:17 180:18
193:1 196:7 227:4
232:21
**difficult** 18:11
33:25
**difficulty** 24:15

**dig** 6:8 24:20
**diminish** 16:24
**diminished** 40:10
**dip** 19:10
**dir** 8:21 9:5
**direct** 8:5 11:5,9
  11:11,14 18:4
  19:15 22:12 27:8
  28:8 31:5,14
  38:21 41:15,17
  52:15 60:4 62:25
  71:16 74:15 84:23
  105:21 106:16,20
  107:13 109:25
  112:5 116:23
  125:22 127:3
  137:12 139:9
  140:1,5,23 143:11
  145:17 150:12
  159:12 160:17
  170:12 172:9
  173:2,3 174:12,19
  185:2 186:22
  189:11 199:24
  200:3,4,5,16
  202:24 204:21
  205:4,12,18,24
  206:5,9,11,15
  207:20 210:25
  230:19 232:8,9
  235:12 241:23
  243:9,20
**directed** 121:14
  155:6
**directive** 79:17
**directly** 14:19
  15:2 133:14
  166:22 203:1
**director** 80:20,22
  80:23,25 81:3
  86:19
**directors** 12:14
  15:23 23:24,25

25:1,14 26:9
  49:25 53:21 58:4
  71:12,24 72:4,5
  72:18 75:1 89:7
  89:18 95:7 96:1,4
  97:7 102:18
  123:18,19 134:13
  157:10,11 167:21
  196:25 197:1
**disagree** 12:1,2,3
  19:21,22 20:23
  23:14
**disagreed** 40:11
**disagreement**
  23:24 71:9,11
**disallow** 110:7
  143:18
**disallowance**
  31:19,24 38:24
  39:7 63:9 93:15
  110:3,23 143:14
  144:9
**disallowed** 16:17
  37:23 40:5 63:15
  63:16 93:13 175:5
  175:19 200:23
  201:9,24 202:4
**disapproval**
  102:10
**disapproved**
  197:19
**disbursement**
  127:14,15 161:4,5
  161:6
**disclosure** 135:18
  135:23 168:23
  169:4
**discontinued**
  130:4 163:17
**discuss** 30:24
  51:17 66:21 73:11
  102:5 106:15
  139:25 209:2

234:20,24
**discussed** 54:4
  55:5,7 69:17
  72:15 74:25 79:23
  81:17 87:9 89:9
  93:11 94:9,18
  95:7 96:3 97:6
  102:12 125:9
  159:1 230:14
  235:15
**discussing** 33:22
**discussion** 54:3,23
  57:6 73:4,14,17
  73:20 74:22 102:7
  105:20 139:7
**discussions** 10:22
  18:16 19:6,8,24
  20:12 21:15 27:11
  31:16,18 57:1
  72:17,25 74:17
  96:14 102:16
  124:7 128:10
  131:10 157:24
  161:24 164:20
  243:17
**disinterested**
  12:14 23:24,25
  25:1,14 26:8
  49:25 53:21 58:4
  71:12,24 72:5,18
  75:1 196:25,25
**disposition**
  208:12,17
**dispute** 62:21
  64:7 109:20 112:6
  112:18,19 143:6
  145:17 146:5,6
  238:24 241:9
**disputed** 235:13
**disputes** 109:13
  142:24 237:10
**distinction** 40:17
  107:14 140:24

**distinctly** 131:12
  164:22
**distinguish** 241:6
**distinguished**
  179:4
**distressed** 217:18
**distributable**
  83:17 84:11 91:24
  106:21,23 108:1
  115:10 123:3
  140:6,8 141:12
  148:22 156:22
  194:25
**distribute** 88:10
**distributed**
  136:22 169:23
**distribution** 95:6
  96:2 97:6 98:12
  118:15 152:3
  193:1
**distributions** 69:9
  114:23 115:3
  148:10,15
**district** 1:2 6:3
  93:15 99:13,23
  200:22
**dive** 70:18
**divided** 191:23
**dividend** 108:17
  108:20,25 113:19
  142:3,6,11 147:6
**dividing** 226:13
**docket** 207:11
**document** 8:22,24
  9:2 11:6 20:25
  33:23,25 34:3,5
  34:17,22 35:8,8,9
  48:7,8 51:7 54:13
  62:12 67:1 68:25
  69:2,3,10 75:23
  79:16 82:21 97:2
  97:3 108:24
  142:10 203:10

207:11,12 236:15
243:18,20,22
**documentation**
127:15 161:5
**documents** 47:23
86:19 97:14
237:17
**doesn't** 44:22
58:17 187:6 189:6
197:19 244:23
**doing** 57:7 69:8
89:2 120:13 154:5
210:6 225:14
226:8,11,13,23,25
**dollar** 17:11 24:18
25:22 48:4 50:6
112:10 133:11
192:6,12,14,18
194:11,23 199:2,2
199:4 208:13
226:17 227:1
**dollars** 12:25
15:18 16:10 22:20
24:7,18 28:23
29:23 30:3 40:25
41:11,12 44:23,24
50:21 87:13 91:24
97:1 106:13,25
107:19 108:19
109:16,23 110:5
110:11 118:3,19
124:22 130:14
135:25 142:5
143:2 164:3
211:16,16 212:9,9
232:5
**don't** 21:19 49:17
57:6,8,19,20
58:23 60:17 64:8
64:25 66:2,10
73:14,20 74:9
111:20,22,25
112:1 115:22,23

127:11,11 177:17
177:21 182:17,17
183:3,6 187:2
190:22 191:3,4
195:9 202:7,17
204:13 229:20,21
233:1,20 235:21
237:14 239:7
244:10,13 245:9
245:21 246:14
**door** 114:3,8
147:15,20 242:6
**doré** 50:7 74:1
127:4 160:18
**doubt** 55:7 56:16
57:8
**downgrade** 16:8
**draw** 35:6 40:17
47:20 75:12
**drawing** 239:19
**drill** 83:4
**drive** 10:8
**driven** 12:17
212:13
**drop** 23:11 51:21
162:23
**dropped** 61:7
84:10 130:14
164:3
**ducera** 217:2,3,4
217:6,8 219:25
**due** 176:6
**dueling** 6:17
**duties** 125:6
158:23
**duty** 116:3,5
149:16,18

---

**e**

**e** 1:21,21 3:1,1 6:1
6:1 7:16,16 10:13
49:9,12,20,22
50:24 55:20 126:4
127:7 128:9,10,15

128:21,23 129:6
129:10,17,18,19
130:24 131:6,6,10
131:12,25 159:19
160:21 161:23,24
162:5,11,13,22,25
163:4,6,7 164:12
164:12,18,18,20
164:22 165:11
172:2,2 185:20
201:3 205:2 206:3
240:15 248:1
**earlier** 84:22
90:19 93:11 94:1
97:18 122:12
127:4 156:6
160:18 214:7
216:17 219:9
227:12,24 243:4
**early** 10:3 25:11
62:16 220:11
**easier** 28:17 62:25
63:5 66:17 67:17
75:11
**easy** 29:9
**ecf** 120:21 154:12
**economic** 41:21
47:2 55:1 107:25
110:14 112:20
141:11 143:25
146:7
**ecro** 1:25
**educate** 96:24
97:10
**ef** 39:18
**efch** 54:19
**effect** 69:5,9
81:23 95:5 96:2
97:5,24 124:4
157:21 201:3
219:5 229:19
**effectively** 16:22
19:12 22:9 38:11

43:18 70:4 213:22
218:9
**efficiency** 234:8
**effort** 24:24 218:7
**efforts** 6:11 10:6
24:17
**efh** 3:4 4:9 5:7 7:6
7:7 8:13 10:2,25
13:7 14:25 15:17
15:18,18,23 17:10
23:6,8,24 24:3,10
24:13 29:21 30:9
32:5 35:12 37:5,7
37:14,16,18 38:10
39:11,13 40:12,21
41:8,20 42:2 45:5
50:3 54:25 55:21
56:4,5,6,10,13,21
56:22 57:22 58:13
65:1 69:23 70:20
71:22 72:3 73:12
75:15 76:25 77:2
77:13,21,24 79:7
80:22 81:10,20
86:20 90:7,16
92:17,21 98:12,16
102:19 106:22
107:10,25 108:5
109:8,14 110:14
111:9,21 112:13
112:19,20,21,25
113:7,11,11,15
114:23 115:3,6,9
117:4 118:9,14,16
119:11,18 122:25
123:3 124:4,5,8
124:10,18,24
125:2,8 127:25
131:24 140:7,20
141:11,16 142:19
142:25 143:25
144:20 145:8
146:1,6,7,8,12,19

146:23,23 147:2
148:10,15,18,21
150:19 151:22
152:1,4 153:1,9
156:19,22 157:21
157:23,25 158:2
158:10,15,19,25
161:14 165:9
174:9 175:10,15
175:23 176:3,7,8
176:20,22 177:2
178:11 179:12
185:25 190:2
194:14,25 196:19
197:1,2,18,20
201:10 202:8,18
202:19 204:10,14
206:5,15,25 207:2
207:19 208:14,17
227:2 229:22
230:8,10,12
231:12,14,20,25
232:3 237:23
238:9 240:4,18
**efh's** 56:13 107:4
140:14
**efhi** 165:9
**efh's** 230:24
**efih** 12:25 13:5,7
13:22,24 14:7,9
14:11,18 15:6,11
15:13,15 17:12
18:13,15 23:7,25
24:6,6,10 30:5,6
31:23,24,25 32:12
32:16 34:15,21
35:10 36:23 37:1
37:6,8 38:10,14
38:19,23,23 39:10
39:12,23 40:9,12
40:22 41:8 42:2
45:3 48:4 54:19
55:19,21 56:5

61:19,20 67:9
69:23 70:20 71:22
72:3 73:12 75:13
75:15 77:1,3,21
77:24 80:20,21,23
80:25 81:3,6,10
81:20 82:14 86:20
90:3,15 92:16
93:9 97:25 98:13
98:14 101:6
106:22 107:25
109:17,17 110:14
111:8 113:24
114:15 115:3,9
118:6,15,19 119:7
119:11,18,20
121:13 122:7
124:4,5,21 127:24
131:24 140:7
141:11 143:3,3,25
144:19 147:11
148:2,15,21
151:19 152:3,7,22
153:1,9,11 155:5
156:1 157:21,23
158:13 161:13
174:9 175:7,20
179:12 181:16
186:1 194:12,24
195:7 196:16,18
196:25 197:2,11
198:9,11 199:6,7
200:18,24 204:10
227:2 229:22
240:3,4,16
**efih's** 41:21
**efih's** 200:18
**eh** 36:5
**eight** 238:6
**either** 24:5 42:17
57:20 71:22,22
84:1 110:14
117:22 126:5

143:25 151:11
159:20 184:23
207:24 217:25
227:2 231:7
234:21
**elements** 106:15
139:25
**elkin** 4:11
**elliott** 4:2,23 6:24
9:12,16,25 10:13
11:17 12:14 18:15
18:15,17 19:1,6
19:17,23 20:13,16
20:16,25 21:2,6,8
22:1,6,9,23 23:4
23:11,16 25:12
26:4,6 28:7,7
105:20 107:18
108:5,15,16 110:5
110:6 112:9,13
113:10,21,25
115:20 116:13,17
116:25 117:8,14
122:12 126:1
136:11 139:8
141:4,16 142:1,2
143:16,17 145:20
145:25 146:22
147:8,12 149:8
150:1,6,15,22
151:3 156:6
159:16 169:14
173:17 216:13
220:1 243:2
**elliott's** 25:6
106:1,12,17
107:23 139:11,22
140:2 141:9
**elliott's** 239:25
**ellis** 3:3 7:6 71:2
75:6 98:23 112:24
126:6 132:6 137:1
146:11 159:21

165:16 170:2
199:21
**elx** 29:5 54:12
60:2 66:3 103:8
103:15,15,15
**email** 25:11,13
244:5
**embodied** 32:13
**employed** 172:11
**employee** 243:1
**employing** 207:17
**encore** 194:5,10
194:22
**encura** 134:19
**encura's** 134:25
**ended** 98:15 130:2
163:16 220:7,10
**enemy** 24:3
**energy** 1:6
**enforcement**
17:17
**engaged** 21:18
27:11 219:25
**engagement** 220:9
**enter** 29:16
185:20
**entered** 9:11
30:25 47:4 49:2
53:21 103:24
128:7 137:25
161:21 170:25
173:14 178:23
**entertainment**
215:18
**entire** 64:25 108:3
141:14 233:19
**entities** 8:12 35:22
57:22,24
**entitled** 35:19,20
57:4 200:19
**entity** 127:9
160:24 205:4,18
210:25

**entries** 243:16,16
**equal** 195:7
 233:13
**equally** 237:20
 238:18
**equitable** 237:19
**equitization**
 113:16 122:16,18
 122:21,22 147:3
 156:10,12,15,16
**equity** 16:21
 28:23 35:23 37:9
 37:20,22 38:6,19
 39:13,18,22,24
 40:4,4,6,11 44:2
 44:18 53:4 203:2
 203:3 207:19
 209:20
**erin** 4:25
**error** 67:20
**esbrook** 7:20,20
**escrow** 65:15 84:9
 88:1,8,10 100:24
 101:24 133:6,23
 134:3,11 166:14
 167:6,10,19
**especially** 10:23
 13:3 36:18 102:18
**essentially** 224:8
 227:6,18
**esser** 3:10 199:18
 199:20,21,25
 202:14,16 204:2
 208:21 216:7
 236:3,7,12 239:13
 239:23 240:3
 244:19,20
**establish** 94:2
**established** 94:1
**estate** 13:25 14:6
 14:13 15:19 23:20
 29:23 70:20,20,21
 73:12,13 82:6

98:13 111:22
113:11 114:12,13
118:19 145:8
146:23 147:24,25
152:7 182:3,13,15
183:19 184:7
199:4 208:9
218:10
**estates** 10:9 12:7
 12:11 26:2 41:19
 49:24 71:10 74:11
 81:21 82:15 91:24
 184:13,16 185:1,6
 185:10,14 187:1,5
 187:10,15,18,22
 188:10 193:5,9,13
 240:1
**estimate** 86:9
**estimated** 72:2
 135:8 168:14
 230:11,13
**estimation** 135:9
 168:15
**et** 1:7 10:18 19:10
**evaluate** 14:10
 18:24 21:10
 179:11 221:19
**evaluated** 87:19
**evenly** 238:10
**event** 14:17 66:22
 117:24 151:13
**events** 59:21
 60:11 84:16
**eventually** 44:8
 47:4 49:12 116:2
 149:15
**evercore's** 240:22
 240:23
**everybody** 42:10
 45:1,2 89:4
 224:18
**evidence** 9:11
 27:14 46:18 63:2

86:19 95:12
103:24 133:8
138:1 166:16
170:25 173:11,14
243:21
**evidentiary** 2:1
 244:12,13
**exact** 18:19
 108:19 110:8
 142:5 143:19
**exactly** 60:11 62:1
 82:7 85:15 86:8
 87:1,12 234:7
**examination** 8:5
 28:4,8 79:9,12
 105:23 135:10
 138:21 168:16
 172:9 173:15,22
 199:24 209:13
 216:20 232:9
 246:15
**examine** 95:21
**examined** 186:14
**example** 109:11
 128:15 142:23
 162:4
**examples** 189:3
 214:11
**excellent** 7:21
**excepted** 50:25
**exceptions** 70:17
 135:10 168:16
**excess** 69:22 90:7
 90:16 181:15
 201:10 202:9,19
 204:10
**excessive** 80:1
**exchange** 25:11
 25:13 55:2
**exciting** 105:10
 138:23
**excluded** 239:11

**exclusively** 189:5
**exclusivity** 21:13
**excuse** 22:4
 103:10 111:9
 119:17 134:19
 144:20 149:22
 153:8 168:2
 206:13 231:10
 233:24
**excused** 104:6
**execute** 119:17
 153:7
**executed** 82:18
 83:8,12 116:14
 150:2
**executing** 116:5
 149:17
**execution** 195:17
 196:10 204:20
**executive** 8:10
 13:22
**exercise** 36:15
**exercised** 116:2
 125:6 149:15
 158:23
**exh** 137:17
**exhibit** 9:11 48:17
 66:4 102:21 120:8
 153:24 170:17
 205:12
**exhibits** 26:16,17
 27:7,13 103:5,9
 103:20 136:7,19
 136:19 137:11,13
 137:24 169:10,19
 169:20 170:11,13
 170:23 203:9
**existed** 26:12
 184:14 185:3
**existing** 31:20
**exit** 62:10 90:20
**expand** 71:25

expect  234:7
expected  29:22
  38:16 44:24
  240:18
expecting  18:3
  38:14 100:14
expend  200:11
expense  25:16
  106:1 118:10,21
  119:20 124:22
  139:11 151:23
  152:9 153:11
  181:24 182:12,15
  183:9,18 184:6
  185:13 208:8
expenses  158:14
  182:3 183:1 185:5
  185:9 187:14,18
  187:21 188:15
  189:7 238:10
  240:15
experience  13:9
  184:7,10,24 185:2
  185:4 193:12
  200:9 210:2
  214:25 215:3
  217:13,22 218:4
  218:24 219:4,11
  221:12 225:17,20
  225:21 228:8,18
  228:18 229:2,25
  233:12
expert  6:25 113:5
  133:25,25 134:21
  134:25 135:3
  146:17 167:7,7
  168:4,8,11 173:25
  174:4 175:4,14,18
  176:1,5,25 178:25
  179:8,15,24
  183:11,13,16,22
  184:3,3,5 187:3,8
  189:2 204:19,21

205:23 206:20
  219:11 220:14,18
  221:1,21 229:1,21
experts  6:18
  16:12
expert's  196:8
explain  190:6
  209:24 214:18
  227:13
explained  15:6
  73:2 212:4 232:25
explanation  233:1
explore  42:25
  43:4 232:25
exposed  125:4
  158:21
expressly  102:5
extensive  27:4
extent  14:5 20:11
  71:9 88:7 121:25
  124:10 155:19
  158:2 218:18
  237:21 242:5
  243:7 246:19,22
extra  30:13 69:11
  69:15,17 70:1
  90:24 93:2
extracted  186:3

**f**

f  1:21 178:2,4
  210:21 248:1
f2  190:12,24
  191:10,11
fabulous  22:19
face  10:17,17
  30:10,12 33:11
faces  43:24
facilitate  49:6
facilitating
  108:17,25 142:3
  142:11
fact  12:15,17
  13:16 14:1 15:10

17:6 19:22 21:17
  24:5 25:10 30:18
  35:21 40:9 45:13
  52:21 58:12 64:2
  65:9 68:10 91:5
  94:15 98:1 112:1
  112:21 116:7
  126:5 145:12
  146:8 149:19
  159:20 185:12
  209:25 237:12
factor  184:2
  210:18 213:10
factors  119:23
  147:17 153:14
facts  38:15 59:10
  86:19,23 125:7
  158:24 239:8,9
  241:13,14
factual  84:17
  196:7
fair  12:4 14:22
  18:23 20:1 25:4
  27:9 36:20 95:5
  95:25 106:8,11
  107:18 113:2
  115:12 118:6
  126:21 135:11,16
  135:16 139:18,21
  141:4 146:14
  148:25 150:6
  151:19 160:10
  168:17,21,21
  184:24 191:8
  196:8 214:12
  233:2 237:18
fairly  37:7 42:21
  74:12 77:14
  225:22
fall  220:7
familiar  9:12,16
  51:10 93:8 132:14
  165:24 220:18,21

224:3
far  107:8,8 140:18
  140:18 196:13
  214:14 226:18
  240:14 241:18
fashion  20:3
  40:13
fault  59:3
favor  80:25 82:10
  97:18,20 112:19
  113:6 122:8 146:6
  146:18 156:2
  244:8
fay  4:25
federal  243:21
fee  6:18 44:3
  60:18 61:10,10
  64:21 65:19 68:5
  68:7 70:7,9,10,12
  70:14,18,19,22
  71:19,20 74:4
  75:6 84:10,19,20
  84:24 85:10,10,13
  85:22 91:9,11,16
  100:2,3,4,7,15,19
  102:6,10 106:1,5
  110:4,7,15,22,23
  112:10 114:20
  118:21 120:4
  121:14,22 122:2
  122:19 123:6,9,16
  125:4 126:2,12,23
  130:17,19,23
  131:1,2,3,4
  139:11,15 143:15
  143:18 144:1,8,9
  145:21 148:7
  152:9 153:20
  155:6,16,21
  156:13,25 157:3,8
  158:21 159:18
  160:2,12 164:6,8
  164:11,14,15,16

174:25 175:6,9,15
175:19,22 176:7
176:11,18,22
177:1,5,15 178:7
184:7,13,16
185:19 188:18
189:15 190:2,12
190:17 191:11,17
191:23 192:5,9,11
193:4,9,12 195:3
196:20 197:2,11
198:8,16 199:8
203:1 205:3,17
210:9,18,24 211:5
211:10,17,24
212:7,11,14 213:2
213:7,22 214:5
215:12,15,15,19
215:23 218:2,5,11
218:24 222:7,20
223:9,21 224:4,10
225:5,9,16,23
226:14,16 227:23
228:3,6,16,22
230:25 231:22
232:17,19 233:3,3
233:13,17 240:5
**fees** 23:6,17 24:10
24:21 25:9 70:20
72:2,2,10,17 73:8
73:12,16,19 74:20
75:1 88:14 109:1
113:18,19,20
124:11 125:23
128:5 142:12
147:6,6,7 158:3
159:13 161:20
174:1,5,8 176:2
184:6,25 185:24
186:15,25 187:4,9
189:15 190:11
200:10 210:4
214:11,25 215:4,6

215:6,8,10,13,17
215:21,25 217:22
219:11 220:15
232:14 238:10
240:15
**felt** 6:7 119:16
133:21 153:7
167:4
**female** 224:17,20
224:23
**fence** 53:2,4
**fidelity** 32:9 64:25
92:5
**fiduciaries** 14:4
**fiduciary** 116:2,5
119:17,17 125:6
149:15,18 153:7,8
158:23
**field** 228:12
**fifth** 205:3,17
210:24
**fifty** 161:13,13
238:13,16,22
**figure** 192:11
234:8
**file** 48:7 76:23
89:5
**filed** 22:6 29:15
34:6 60:15,20
61:1 62:11,13,15
64:18 91:5 117:9
118:22 130:5
150:23 152:10
163:18 200:24
242:18
**filing** 8:9,10 9:22
21:12,14 48:17
242:4
**filings** 116:1
149:14
**fill** 11:1
**final** 70:4 89:17
94:4 214:4 240:20

242:17
**finalized** 205:24
206:20
**finally** 17:12 21:4
**financial** 8:11
10:23 16:14 64:3
184:8,10,11
**financing** 19:18
20:20 21:18
217:10,18
**find** 188:23
**finding** 17:9 82:4
**findings** 186:18
**fine** 45:21 78:12
78:19,21,22 99:20
120:16 125:20
135:12 154:8
168:18 216:18
224:23 238:22
**finger** 3:18
**finish** 40:1,1
131:23 165:8
**finished** 78:23
**finishes** 6:20
**firm** 75:6 172:16
217:4
**firms** 35:22 58:25
59:2
**first** 6:15 23:15
31:22,24 34:9
38:24 47:24 55:18
60:4,8 69:24 75:9
76:8,12,12 79:23
96:15 99:9,9
119:3 120:24
121:1 127:16
152:18 154:17
186:3 191:17
193:20 198:13
205:2,13 210:24
211:16,16,19,22
211:23 212:8
213:5 221:6,7,15

225:22 238:1
241:8 244:23
246:3
**fit** 135:10 168:16
**five** 43:24 51:15
79:24 80:4,13
81:1,4 99:2 121:7
121:12 124:19
154:23 155:4
158:12
**fixed** 50:20
**flies** 105:15 139:3
**flip** 22:14 67:12
204:18,24
**floor** 124:10 158:2
**flow** 211:8
**flown** 55:16
**focus** 6:17 121:1
154:17 185:17
205:2 209:18,25
225:10 237:21
238:6 241:7
**focused** 117:18
124:17 151:7
158:9 198:21,21
206:24 207:1,5
210:1 225:8
239:13 241:22
**follow** 17:23
62:17 133:24
167:7
**following** 23:8
77:3 103:9 121:8
121:12 154:24
155:4 200:23
230:7 238:3 246:7
**footnote** 75:8,12
75:13
**force** 26:6,9
**forced** 26:4
**forecasting**
181:15

**foreclose** 13:1,2
  13:10,11,17 24:25
**foreclosing** 25:6
**foregoing** 248:3
**foregone** 16:2
**forget** 138:5 171:4
**forgot** 129:7
**form** 11:23 89:7
  123:19 157:11
  207:17
**format** 45:23,25
  183:8
**formed** 74:4
**former** 8:8 178:13
  178:16 179:1,2,4
**formula** 16:20
  237:15
**formulated** 242:3
**formulating**
  128:21 162:11
**forth** 46:17 60:11
  89:23 108:4
  124:16 141:15
  158:8 177:13
  179:23 185:17
  186:18 193:5,10
  193:13 197:10
  198:7 207:15
  235:13 237:18,25
  238:8
**forty** 237:20,20
  238:6
**forward** 13:3
  44:10 47:5 49:6
  111:4 117:21
  119:2 121:20
  130:4,7,16 131:18
  144:15 151:10
  152:16 155:13
  163:17,20 164:5
  165:3
**fought** 80:1

**found** 45:14 49:1
**foundation** 75:20
  78:5 95:10,11,15
  99:14 132:17
  166:1 191:4
  238:16 239:14,18
  239:24 240:8,13
  240:21 242:24
  243:3,7,13,19
  244:20,24 245:3
**foundational**
  114:22 148:9
  238:14 243:20
**four** 36:13 40:21
  81:17 99:2 124:19
  158:11 193:1
**fraction** 190:1
**frankly** 72:9 92:5
  218:17
**free** 26:4 80:14
  207:18,24 208:17
  231:4,5,8,11,20
**frequently** 25:2
**fresh** 26:24
**front** 22:15 33:17
  47:24 79:10 84:1
  93:16 97:11 99:4
  118:12,13 151:25
  152:1 173:2
  174:12,12 205:15
  224:14
**full** 45:1 61:19,21
  92:16 98:14 101:7
  101:10,15,21
  102:1 110:16
  144:2 211:22
  240:17,19
**fully** 54:6 90:3,15
**fun** 66:10
**function** 198:19
  211:6
**funded** 77:1

**funds** 121:15
  134:7 155:7
  167:14 204:14
**further** 61:16
  79:23 98:17
  102:25 103:1
  136:3 169:6
  175:12 176:25
  208:21 216:2,3
  229:6 233:21
  244:17 246:15
**future** 1:6 37:20
  37:22 43:19

**g**

**g** 6:1 7:16
**galardi** 4:6 27:18
  27:19,25 28:5,6
  28:19 29:8,11
  31:7,8,11 41:4,9
  41:12 42:13,14,15
  42:19 43:22 45:17
  45:25 46:9,12
  48:10,15,20,23
  51:14 52:8 57:19
  58:4,18,25 59:4
  71:6 75:24 76:5
  78:6,8,12,15,19
  78:21 79:1 82:21
  83:3 85:2,5 86:11
  86:21 87:1 94:10
  95:10 98:24 99:2
  99:18,20 100:11
  102:25 103:17
  104:14,15 135:4
**galardi's** 84:23
  128:2 161:16
**garvan** 5:9
**gas** 215:13
**gavin** 79:6
**general** 35:10,24
  37:13,16 51:6
  73:10 133:14
  166:22 178:6

210:11,11,14
  235:20
**generalizing**
  111:2 144:13
**generally** 9:18
  10:4 19:11 32:17
  66:22 69:8 70:13
  82:20 83:3 99:17
  112:7 145:18
  183:2 185:4 191:3
  212:1
**generated** 186:18
**getting** 17:10
  24:15 35:17 39:4
  39:6 47:16 59:22
  59:24 89:15 90:10
  92:21 96:12
  101:21 218:17
**gitlin** 70:14
**give** 19:23 27:2,3
  50:12 63:3 75:24
  114:4 126:16,18
  147:16 160:5,7
  199:10 217:13
  218:8 233:2
**given** 10:13 12:4
  16:13,25 17:13
  21:21 24:10,14
  26:7 40:13 61:25
  70:1 77:16 219:9
  229:2 230:20
  231:19
**gives** 59:10,16
  234:4
**glanced** 106:6
  139:16
**glenn** 4:12 105:10
  105:12,13,15,17
  105:19,24 111:2
  114:6,11 120:16
  120:19,23 125:12
  125:16,18 126:17
  126:21 129:3,7

130:22 131:2
132:16,22 136:3
136:19,20 137:9
138:7,10,17,22,25
139:17 144:13
147:18,23 154:8
154:15 159:4,8,10
160:6,10 164:14
165:25 166:6
169:20,21 170:9
171:6,9 235:6,7,8
236:16,18,21,25
237:2,4,6,9
238:12 241:20,25
244:3 245:15,16
245:18,21,24
**global** 48:2
131:10 132:13
164:20 165:23
172:14
**gmx** 215:13
**go** 6:13 8:4 17:19
24:24 27:19 30:20
32:11 33:7 34:23
37:13 38:3,20
40:3 42:25 43:20
44:20 45:12 46:11
47:5 56:2 57:9
59:9 60:14,15
65:2,2,3 68:8,14
68:24,24 70:15
75:9 77:11,12
82:21 86:24 89:22
91:7 92:18 95:22
98:7 102:8 103:4
105:17 107:8,8
112:1 115:9 116:4
116:20 119:2
120:6 126:20
127:20 137:4,8
139:5 140:18,18
145:12 148:21
149:17 150:9

152:16 153:22
160:9 161:10
170:8 189:9,21
191:8 198:4,23
204:14 205:12
206:1,9 209:10
211:20 218:8
225:12 226:20
230:18 235:19
236:5,15 239:10
241:18 246:12
**goes** 6:4 34:10
54:19 56:10 121:6
138:12 154:22
171:11 211:17
238:23
**going** 6:13,16,17
6:21 7:1 12:25
16:16 23:19,23
24:5,8 25:15 27:9
28:20 29:6,8 31:9
34:20 35:6,12
37:17 39:12 43:12
43:20 44:2,10
46:12 49:6 53:5
54:7 57:2 63:1
66:5 67:6,13,16
68:8,24 70:6 75:8
75:12 77:11 83:2
87:2,16,20,22
88:3 90:20 97:11
99:3 100:15 104:9
108:6,10 109:12
110:20,22,23,24
111:3,5,22,24
112:1,2 114:21
115:9 116:4
119:12 124:19
125:12,13,17
127:14 129:8,14
131:18,23 132:25
133:20 136:4
138:3 141:17,21

142:23 144:6,7,8
144:9,14,16 145:8
145:10,12,13
148:8,21 149:16
153:3,3 158:11
159:4,5,9 161:4
162:23 163:3
165:3,8 166:9
167:2,3 169:7
171:2 211:9,13
212:3,16 213:11
214:3 219:2 220:8
230:15 232:7,8
235:10 236:5
239:17 241:7,13
244:7,9 246:1,14
**gooch** 74:2,2
**good** 7:5 29:5
52:5,6 71:6 79:5
79:14 83:25 93:20
93:22 100:21
105:12,13 138:12
138:25 139:1
171:11 172:7,11
173:24 197:24
199:20 200:1,2
216:18,22,23
**gotten** 15:25
30:14
**govern** 182:2,25
**grant** 246:19
**granted** 48:4
**gray** 4:1 220:1
235:2
**great** 43:21 45:22
**greater** 195:11,23
198:18 239:20
240:14
**green** 26:21 137:2
170:3 239:16
**gregg** 4:6 28:6
**grew** 88:24

**ground** 196:8
**groundhog** 235:9
**grounds** 196:4
**group** 7:19 59:1
247:2
**guess** 53:3 55:22
71:13 99:3 105:10
113:8 138:23
146:20 183:7
223:12 245:19
**guys** 26:23 87:25

**h**

**h** 4:11
**hadn't** 134:17
**half** 40:21 87:4
120:24 154:16
229:18
**hallway** 105:1
138:16
**hand** 7:9 26:21
30:16,19 45:18
46:12 71:22 89:16
102:20 120:25
154:16 171:20
203:13 204:25
218:9 232:5 236:1
244:23
**handed** 79:15
**handy** 235:22
**hang** 38:1 75:22
78:6 136:15
169:18
**happen** 36:7 96:8
110:18 111:23
144:4 145:9
**happened** 39:16
46:21 59:10 62:1
64:1,10 88:20
89:6 197:15,17
**happy** 46:3
**hard** 80:1
**harder** 77:12

**hasn't** 185:2
**hate** 65:2
**hathaway** 29:16
  107:2,5,10 116:8
  116:10 121:21
  140:12,15,20
  149:20,22 155:14
  220:6
**haven't** 229:25
  244:9,11
**he'll** 57:19
**head** 57:18 96:10
**headlines** 186:8
**heads** 89:21
**hear** 9:14 74:25
  85:4 182:16 208:9
  210:13 238:25
  239:3
**heard** 42:19 57:4
  57:17 74:18 124:8
  157:25 173:19
  208:6,10 216:4
  223:25 229:17
  230:8
**hearing** 2:1 42:12
  46:21 64:19 67:24
**hearings** 46:22,25
**hearsay** 86:13
  132:17 135:2,3
  166:1 168:10,11
**height** 213:15
**help** 27:9,10
  46:19 48:16,20
  65:8 105:9 138:20
  194:3
**helped** 49:6
  231:12
**helpful** 10:14 92:5
  223:15
**helps** 27:8
**hesitancy** 21:20
**hewitt** 134:19
  168:2

**he's** 196:4 197:17
  236:19 239:9
  241:13 243:5
**hickson** 133:13
  166:20
**high** 19:5 89:13
  106:7 116:24
  139:18 150:13
  194:18 196:16
  197:18
**higher** 42:2
  100:17
**highest** 26:1 44:17
**highlight** 22:15
  239:16
**highlighted** 236:8
  236:13,14 237:11
**highlighting**
  236:14
**hired** 133:25
  134:18,19,19
  167:8 168:1,2,2
**hiring** 113:12
  146:24
**history** 18:1 47:25
  134:17,17 167:25
  167:25
**hmm** 199:12
  225:1
**hoc** 4:9 5:7 34:16
  59:1 79:7 138:7,8
  171:6,7,16 208:6
  234:12 235:9
  239:5 241:17
  242:7,11 245:10
**hoc's** 246:7,20
**hogan** 5:6 105:6
  138:18,19
**hold** 27:15 30:23
**holder** 9:23 37:1,5
  37:20,22 38:6,19
  203:3

**holders** 39:13,18
  39:22 40:4,5,6,11
  40:12 122:7 156:1
**holding** 47:10
**holdings** 1:6
  10:13 82:13
**holdout** 92:6
**hollywood** 215:19
**home** 104:6
**homework** 132:5
  165:15
**hon** 1:22
**honor** 6:10 7:5,18
  9:5 23:1 26:14,22
  27:6,10,17,23
  37:24 41:5,9
  42:15,15,20 43:22
  46:5,13 48:16
  51:23 52:4,9
  57:13 58:9,15,16
  59:4 71:6 72:1,13
  75:20,24 78:4,19
  78:22 79:6,9 85:3
  85:6 86:11,21
  87:1 95:10 98:20
  98:22 99:20
  102:25 103:3,6,8
  103:14,17,18
  104:1,4,7 105:2,5
  114:1 125:12
  126:13 132:22
  135:2 136:6,14,17
  136:25 137:3,9,14
  137:21 138:2,7,10
  138:17,18 147:13
  159:4 160:3 166:6
  168:10 169:9,15
  169:17 170:4,9,14
  170:21 171:1,9,15
  173:8,16,20,20
  182:15,19,20
  195:14,18,21
  196:3,6 197:23

  199:10,14,17,18
  199:20 208:22
  216:5,7,12 219:8
  219:15 224:25
  229:7,10 232:7
  233:15,23 234:1,6
  235:5,7,23 236:3
  236:7 239:5,13
  240:25 241:2,3
  242:5,11,23
  243:12 244:3,8,14
  244:17,19 245:8
  246:5,18 247:5
**honor's** 241:21
  244:6
**hope** 8:2
**hopeful** 19:1
  99:25
**hopefully** 11:2
**horse** 43:5 130:1
  163:14 211:19
**horton** 6:16
  104:10,11 105:4,5
  105:11,12,14,18
  105:22,23 114:6
  120:13,14,18
  125:19,20 126:19
  130:21,24 131:1,4
  135:6,11,14,16
  137:4,7 138:21,24
  147:18 154:5,6
  159:11 160:8
  164:10,12,16
  168:17,21 170:5,7
  234:16 235:14
  237:17 241:8,23
  244:6
**horton's** 137:12
  170:12
**horton's** 241:5
  245:11
**hour** 104:15
  137:11 170:11

**hours** 240:22
**huge** 24:16
**hundred** 145:14
158:6 168:7 232:4
**hunt** 16:19 17:1
23:22 43:14 44:8
44:10,14,16,22
47:9,16 49:7
52:16,20 63:9
80:5 81:18,24
96:9,12 128:14,22
131:7 162:3,12
164:19
**hunts** 43:10,24
44:1 52:23 130:10
130:11,15 163:23
163:24 164:4
**husnick's** 137:13
170:13
**hyde** 2:25 248:3,8
**hypothesis** 195:20
**hypothetical**
15:16 194:1,4
195:15 197:9,21
197:25 198:2
199:6
**hypotheticals**
196:4 233:2

**i**

**i.e.** 178:10
**idea** 133:10
166:18
**identified** 107:12
108:15 116:8
140:22 142:1
149:20 223:8
**identify** 67:1
**ignore** 129:13
163:2
**ignoring** 109:19
109:20 143:5,6
**ii** 176:12

**illustration**
178:21
**imagine** 20:9 26:6
**immediately**
121:15 155:7
**impact** 94:22 95:3
96:19 115:3
148:15
**impacts** 94:25
97:17
**impaired** 35:19
35:20,21,25
**impairment** 36:18
**implications**
113:16 147:3
**implicitly** 226:13
**implied** 101:20
**importance** 56:10
61:18
**important** 43:17
56:5 96:21
**importantly**
87:19 101:22
**imposing** 183:18
**imposition** 182:14
182:25 184:6
**impression** 35:24
**impressions** 57:17
**improper** 73:1
**improved** 67:21
**include** 53:6
213:11
**included** 43:14
59:12 188:20
190:24 241:23
242:13 243:22
**includes** 82:14,15
108:3 141:14
195:3 209:19
242:16
**including** 41:20
72:2 82:11 188:17
215:22

**incorporate** 69:15
**incorporated**
177:18
**increase** 12:11
60:23 98:4 101:11
**increased** 61:10
61:16 65:5 84:9
84:19,20 85:9
100:4,4,8
**incremental** 108:5
141:16 196:18
**incurred** 15:17
110:6 124:24
128:6 143:17
158:16 161:20
240:16
**incurring** 124:21
158:13
**indebtedness** 77:1
**indenture** 246:6
**independent**
86:22 188:5
**indicate** 82:9
**indicated** 96:7
109:10
**indicates** 18:2
**indicative** 36:17
**indicted** 142:21
**indirect** 71:16
74:15,19 207:20
**indiscernible**
27:21,23 67:8
84:8 85:23,24
88:19 92:11 135:4
197:18 230:2,3
231:19 235:5
239:2,17 245:4
246:24
**individual's** 95:14
**induce** 200:10,12
218:6
**industry** 172:17
221:7,11,16 222:4

227:22 228:7,17
230:2
**inflows** 124:13
158:5
**information** 9:2
72:9 177:6,15,17
177:22 178:8,9,18
178:22 179:2,5,21
179:25 181:4,6
186:23 195:9
**informed** 10:20
87:15 89:10,11
116:13 150:1
**infusion** 29:22
**inherent** 17:13
**initial** 23:16
**initially** 22:23
23:4 93:12 221:21
**input** 56:25
**inputs** 180:22
**inside** 57:18
**insolvency** 240:7
**insolvent** 15:21
**instruct** 87:5
**instructions** 29:12
**insurance** 87:21
89:14 134:6
167:13
**insure** 88:3
**insured** 88:7
**insurer** 87:16
**insuring** 134:22
168:5
**intangible** 210:5
**intend** 245:21
**interactions** 10:4
10:7,17 18:14
**intercompany**
38:12,17 40:13,15
56:12,20,21 57:5
57:9,21 58:13
77:19

**interest**  26:11
  33:12 36:23 37:1
  37:6,9,21,22 38:4
  40:10 41:18 42:3
  47:2 55:1 82:5,12
  118:9,12,21 119:9
  119:20 124:12,22
  151:23,25 152:9
  152:24 153:11
  158:4,14 203:2
**interested**  19:3
  117:8,20 150:23
  151:9
**interests**  13:25
  14:11 16:21 18:13
  41:21 81:5
**interim**  73:7
**internal**  121:24
  155:18
**interrupt**  88:11
  110:21
**interrupted**  40:2
  87:5
**intimately**  133:9
  166:17
**introduced**
  244:11
**introducing**  46:18
**intrusion**  234:15
**invade**  53:2
**invalid**  56:23
**investigating**
  74:18
**investigation**
  86:22
**investment**  35:22
  217:19
**investors**  10:20
  13:12 217:17
**invoices**  127:17
  161:7
**involve**  186:25
  187:9,13

**involved**  50:7,23
  74:3,8 92:5 96:6
  111:6 128:10
  129:25 130:17
  131:12 132:7,9
  133:9 144:17
  161:24 163:13
  164:6,22 165:17
  165:19 166:17
  172:20 184:12,21
  185:12 188:14
  215:8,25,25 217:4
  217:15,25 218:7
  222:14 223:20
  228:13 240:10
  243:5
**involvement**
  132:3,8 165:13,18
**involves**  107:24
  141:10
**involving**  20:19
  112:6 145:17
**ip**  46:10
**irrelevant**  214:3
**irrespective**  206:4
  206:12,14
**irs**  14:19 16:17
**irs's**  17:18
**ish**  134:10,22
  167:18 168:5
**isn't**  181:8 185:14
  236:19
**issue**  6:18 19:2,9
  19:24 71:23 96:21
  114:2 147:14
  178:18 184:22
  196:11 200:24
  213:4 215:6 222:6
  223:4,8 225:8
  228:19 229:3
  230:1,3 234:15,18
  235:20 241:17
  242:19 246:23

**issued**  19:22
**issues**  7:2 27:5
  40:15 56:24 72:15
  109:11 132:24
  142:22 166:8
  200:18 220:12
  234:9,20,24
  239:10 244:24
**it'll**  75:11
**item**  30:7 112:5
  145:16 172:24,25
**it'll**  172:25 246:9
**it's**  172:5 173:13
  175:4,14,17,25
  176:5,10,25
  184:17,24 186:21
  189:16 190:20,23
  191:4 192:20
  193:19 197:15
  198:19 200:5
  201:19 203:15
  205:14 231:5
  233:2 235:15
  237:10 243:22
**iv**  176:13
**i'd**  193:25 200:3
  204:17 205:2,10
**i'll**  182:19,22
  233:16,24 239:3
  245:25 246:3
  247:2
**i'm**  177:8,12,17
  177:18,24 178:21
  178:24 179:16,23
  180:2 182:7,7
  183:5 184:14,23
  184:23 187:6,19
  189:8 190:19
  193:11 194:8
  196:6 197:14
  198:21,21 203:25
  230:2,12 231:3
  232:7,18 234:5

235:10 236:21
239:1,4 241:6
246:1,14
**i've**  172:20

## j

**j**  3:21
**january**  130:6
  163:19
**jason**  3:22
**jeez**  105:14 139:2
**jeff**  9:19
**jeffrey**  5:13
**jensen**  5:4
**jessica**  5:17
**job**  10:16,16
**join**  239:5
**joinder**  246:7
**joint**  54:15 67:2,5
  222:13 223:10,20
**jointly**  1:8 184:13
  184:16,25 185:5,9
  185:14 187:1,4,10
  187:14,18,22
  193:5,9,13 222:10
  222:19 223:13
**journey**  104:6
**judge**  1:23 6:4
  93:17 96:5,17
  111:25 145:11
**judgement**  152:13
**judges**  6:3
**judge's**  230:7
**judgment**  118:25
**judicial**  103:14
**july**  29:1 41:17
  53:22 54:15 58:8
  59:10,17,18,21
  60:22 61:3,7,16
  64:14 69:25 82:18
  83:7,9,16 84:2
  91:4 92:3 94:6
  97:19,20 99:9,10
  99:21 100:23

101:25 102:19
130:13 164:2
180:14,25 193:20
**jump** 67:4
**jumping** 239:23
**june** 18:17 19:6
180:19

**k**

**k** 7:16
**k&e** 134:18
**kasowitz** 4:8 79:6
171:16 183:24
235:8
**keep** 28:21 125:12
125:13,17 137:5
159:4,5,9 170:6
218:21
**keglevic** 5:11 6:15
7:4,8,13,16,16,18
7:21,23 8:1,3,5,7
8:21 9:6,12 25:8
25:21 26:17 27:19
28:4,6 29:10
33:24 35:6 38:1
38:20 40:23,25
41:6,14 42:16,21
44:1,5 46:15
47:25 48:13 51:15
51:19,23 52:3,15
57:23 58:9,20
59:6 71:7,8,25
72:7 75:21 76:8
78:6 79:9,10,12
79:14 88:18,24
100:13 102:3
104:5,7 114:25
124:9 131:17
132:24 148:12
158:1 165:2 166:8
**keglevic's** 27:7
51:21 108:9
137:14 141:20
170:14

**keglevik's** 86:18
**kept** 10:20 92:17
92:23
**key** 10:11,21
121:10 155:2
**kid** 70:14
**kieselstein** 3:8
**killed** 17:6
**kind** 24:15 87:24
88:25 89:5,23
115:13 119:5
149:1 152:19
217:14
**kinds** 233:7
**kirkland** 3:3 7:6
58:23 60:25 63:5
71:2 73:11,14,16
73:18,21 75:6
76:3 98:23 112:24
126:6 132:6 137:1
146:11 159:21
165:16 170:2
199:21 202:2
238:8
**kirkland's** 243:16
**knew** 9:22 50:6
58:10 74:7 87:10
89:3 96:8 121:24
121:25 155:18,19
**know** 9:19,21
12:16 19:22 28:2
28:6 30:5,5 31:7
34:25 36:11,14,16
43:23 48:11 51:6
51:16,20 53:3
58:11,20 61:1
66:10,22 74:9
76:3 78:25 83:23
86:6 87:17,23,25
88:4,25,25 89:17
89:19 92:4,15,18
92:20,22,23 94:24
94:25 95:2,19,20

96:6,8,11,16,23
96:24,24,25 97:12
97:14,16 98:1
100:13,19 101:8
101:10,11,21
102:9,16,22 104:1
105:1,4 107:15
108:3,19 111:20
111:22,24,25
112:1,3 114:20
122:21,24 123:9
123:24 124:17,21
125:2,10,10 126:8
126:19,19 128:1
128:14 131:19
132:3 133:13
138:16 140:24,25
141:14 142:5
143:8 145:6,8,10
145:11,12,14
148:7,23 152:12
152:13,14,20
156:15,18 157:3
157:16 158:5,7,9
158:13,19 159:1,2
159:23 160:8,8
161:15 162:3
163:25 165:4,13
165:23 166:21
179:19 182:17
183:3,6,8,17
190:22 191:4
195:9 198:4 202:7
202:17 215:10,16
217:24 218:19
219:3 233:3 241:8
242:24 244:8
245:25 246:14
**knowing** 133:17
133:19 166:25
167:1
**knowledge** 7:11
9:3 28:14 54:9

67:10 70:22 82:3
171:23 173:6
187:13 228:17
229:3 239:15,15
239:25 240:9,13
240:22 241:14
243:3 244:24
**known** 53:2
178:22
**knows** 76:1

**l**

**l** 4:5 7:16
**labilities** 84:9
**lack** 42:5 113:5
146:17 229:2
239:14,18,24
240:8,13,21
**ladies** 22:19
**laid** 96:14
**language** 178:25
179:17 189:17
**large** 174:1
186:11 218:15,24
218:25 219:2,3
**largely** 220:9
**largest** 186:5
**late** 74:5 128:7
161:21
**laughter** 6:6
22:18 36:6 46:4,8
52:1
**law** 7:19,20 17:18
**lawyer** 21:10,10
58:24 183:5
201:13
**lawyers** 113:12
146:24 201:23
**lay** 234:14 235:19
245:3
**layering** 18:10
**layers** 15:8
**layman** 21:11

**layman's** 35:24
**layton** 3:18
**lead** 83:17 84:11
  121:4 154:20
  247:2
**leading** 128:14
  132:4 135:12
  162:3 165:14
  168:18 218:1
**leave** 25:12 41:14
  52:3
**led** 19:2 240:6
**ledanski** 2:25
  248:3,8
**ledger** 109:17
  143:3
**left** 120:7,25
  136:5,10,10,12
  153:23 154:16
  169:8,13,13
  195:20
**legacy** 206:6,16
**legal** 58:21 70:15
  73:25 74:2,6
  121:23,24 155:17
  155:18 201:15
  248:20
**legality** 89:3
**legally** 21:23 25:6
**leonard** 7:19
**leslie** 78:25
**letter** 25:2 68:11
**letters** 10:18
**let's** 178:1 180:4
  182:21 184:10
  185:17 191:8
  194:4,9,17,21
  195:2,22 196:23
  197:5,6 206:1,9
  231:5,18 236:11
  236:15 239:3
**level** 15:6 16:7,11
  17:23 19:5 70:16

106:7 116:24
  118:6 139:18
  150:13 151:19
**levels** 26:7 119:14
  153:4
**leverage** 112:2
  145:13
**liabilities** 23:7,18
  24:15 25:19 56:11
  58:12 61:6 84:8
  85:25 86:4 87:8
  100:24 133:4
  134:23 166:12
  168:6 209:21
  213:14 230:10,13
  230:22 231:21
**liability** 15:5,11
  24:13,17 45:14
  55:2 61:19 64:17
  80:11 87:17,23
  88:2 89:8 133:19
  135:19 167:2
  168:24 208:14
  223:20 231:15
**liable** 14:19 15:2
  15:13 222:20
**licensing** 46:6
**lien** 31:24,25
  38:24 96:15,15
**liens** 10:1 211:19
  211:20,22,22,23
  211:24 212:8
**lies** 212:15
**light** 244:5
**liked** 42:4 87:25
**likelihood** 102:13
  196:2,10,16,20,22
  202:8,18
**limitations** 21:16
  104:2
**limited** 131:18
  165:3 207:1

**limiting** 108:1
  141:12
**line** 79:23 130:13
  164:2 232:8
**lines** 121:7,11
  154:23 155:3
**list** 26:25 27:4
  34:9 64:25 104:9
  136:20 169:21
  186:3 201:15
**listed** 54:18 67:8
  186:24 204:10
  210:1
**listing** 72:1
**literally** 94:16
**litigate** 15:24
**litigated** 20:1 21:3
**litigating** 113:15
  147:2 200:18
**litigation** 20:15
  21:4 43:19 45:9
  48:3 96:5 97:11
  111:10 112:1,14
  112:22 113:3,4,7
  113:12,12,13,14
  114:24 117:1,9
  144:22 145:12
  146:1,9,15,16,19
  146:24,24,25
  147:1 148:12
  150:15,24 177:25
  212:25 213:4,9,18
  213:24 214:4
**little** 6:13 27:20
  44:1 55:23 70:6
  71:25 77:16 79:16
  83:4 88:16 93:1
  133:21,22 167:4,4
  175:12 176:24
  177:10 189:20,21
  191:8,13 197:14
  217:13 225:17
  234:5 243:6

246:13
**live** 243:8
**llp** 3:3,12 4:1,8,17
  4:18 5:1
**load** 212:3
**lollipops** 46:2
  60:25
**long** 32:7 34:9
  52:9 61:24 63:19
  63:25 74:14 92:20
  104:13,13,13
  118:23 123:19,21
  131:14,16 152:11
  157:12,13 164:24
  165:1 202:15
  217:6 243:18,25
  245:2
**longer** 125:15
  159:7
**look** 11:16,16
  12:4 14:15 16:3
  18:4 20:14 21:9
  30:22 32:10 33:7
  33:18,23,25 34:5
  34:20 36:23 37:13
  44:21 47:22 50:13
  50:16 55:22 60:10
  60:21 61:3 63:8
  66:5,10,12,16
  67:6 68:21 69:14
  69:19 76:15,16
  83:7,15 100:13,23
  107:3 132:5 134:5
  140:13 165:15
  167:11 172:24
  174:11,18 178:1
  180:4,17 187:17
  187:20 189:22
  201:7 203:16
  205:13 206:3
  209:15 210:20
  212:2 213:21
  215:1 224:8 225:3

226:22 232:16
241:17 245:5
**looked**   19:14
106:7 130:11
139:17 163:24
179:18 214:22
215:11 221:22
222:7 223:19
**looking**   18:2,23
35:4 40:12 133:11
166:19 174:16
177:24 186:23
200:5 201:7 207:4
225:15 226:19
227:10
**looks**   6:4 34:4
45:23 49:20 69:17
76:14
**loop**   119:19
153:10
**lose**   31:9
**losing**   113:13
146:25
**lost**   83:19 113:3,7
113:14 129:2
146:15,19 147:1
162:17,17
**lot**   10:17 24:1
25:15 34:13 46:17
46:19 112:25
114:20 119:23
121:3 128:15
131:9 146:12
148:8 153:14
154:19 162:4
164:20 242:25
246:2
**low**   36:19 87:12
88:14,19 100:22
115:16,17 149:4,5
**lowball**   197:20
**lower**   88:5,8
96:12 100:17,19

107:17 134:6
141:2 167:12
196:2,21 203:13
204:25
**lunch**   52:6 104:12
138:4 171:3

**m**

**m**   3:22 4:6 172:2
**m&a**   217:5,9,18
**madron**   3:22
**maintained**   88:8
**major**   243:1
**majority**   19:8
27:12
**majouns**   96:5
**maker**   12:13
**making**   16:20
30:16 227:4,8
**man**   9:8 41:11
45:23 57:11,13
58:15 75:20,25
76:1 105:2,7
247:5
**management**
134:13 167:21
173:17 235:17
243:2
**manner**   193:5,10
193:13
**marc**   3:8
**maria**   28:2
**mark**   3:6 4:15
55:24 133:13
166:20 171:15,16
172:10 173:8,12
193:23 196:3,10
208:22,25
**marked**   29:3 67:6
203:9
**market**   1:13
61:12
**massive**   80:10

**match**   61:7 84:10
85:10
**matched**   84:23
**materially**   67:21
197:7
**materials**   70:18
201:17 223:24
**math**   77:16,22
109:6,6 142:17,17
226:21 243:25
**mathematically**
102:2
**mathematician**
77:6,10
**matt**   241:2 245:7
**matter**   2:1 11:10
12:8 13:7 25:10
25:15 70:24 71:1
71:4,23 74:25
79:18,19 106:3,4
106:5 109:15
112:20,22 113:1
134:9,12 139:13
139:14,15 143:1
146:7,9,13 167:16
167:20 220:1,4
227:12 243:6
**mattered**   134:9
167:17
**matters**   18:7
23:21 25:12 39:19
67:14 72:11 75:14
128:16 132:14
162:5 165:24
196:4 210:3
217:14,14 237:22
239:10
**matthew**   4:5,14
**maximize**   81:19
129:18 163:6
218:9
**maximized**   14:13
81:10

**mcclain**   137:1
170:2
**mcdaniel**   5:6,9
**mcginnis**   4:5
137:10 168:10
169:14 170:10,21
235:5,23 236:1
237:8 241:2,2
245:6,7,7 246:18
**mcginnis'**   244:3
**mckane**   3:6 6:10
6:15,23 9:9 26:25
27:9 45:21 46:5
48:12 52:4 103:25
104:1,11,17,19,22
135:2 136:11
137:21 147:13
234:6,18 235:1
**mean**   35:21 39:20
45:2 53:10 69:13
85:13 86:11 95:20
101:9 105:3 111:3
124:7 127:9
144:14 157:24
179:8 201:10
211:16 218:6
227:18 230:8
**meaning**   18:21
176:21 187:7
**meaningful**   14:2
118:9 151:22
**means**   35:25 76:4
179:2 190:20,22
212:9
**meant**   71:8
214:21,21
**measure**   33:6
**measured**   210:6
**median**   225:21
**mediate**   113:5
146:17
**mediation**   112:14
246:16 247:3

medication 146:2
meet 12:23
meeting 6:3 54:16
  54:20 55:4,8
  56:17 57:7 60:22
  66:20,23 67:2,3,8
  68:2,3 72:19,23
  75:2 95:13,18
  99:10,10,22
  102:13,15 180:15
meetings 10:17
  11:1,4 23:16 54:2
  72:1 74:25 95:7,8
  96:1 97:4,7 102:3
  180:19
member 14:7,9,12
  32:9 70:9 74:3
members 74:2
memorandum
  15:7 17:15,18
memories 46:16
memorized 120:2
  153:18 183:5
memory 33:4 37:3
  44:22 80:5 88:11
  88:13 102:24
mention 195:16
mentioned 12:19
  12:20 45:7 47:14
  52:21 80:13 97:2
  119:23 153:14
  227:24
merely 203:2
merger 29:22
  53:22 54:25 60:19
  62:13,19 82:19
  83:8,12 91:4,11
  94:14 97:20,21
  118:20 119:25
  120:1 152:8
  153:16,17 175:4
  175:13,17,25
  178:23 180:8,8

181:7,7 185:21
193:16,17 199:3
201:12 208:16
240:11
messed 195:15
met 131:16 165:1
method 237:15
methodology
  190:7,10,16,20
  193:25 194:3
  196:7 197:10
  198:7,7,22,23,25
  199:5 221:8,16,19
  222:5 224:1
  232:10,15,16
michael 3:10
microphone 31:13
  172:8 236:6
mid 10:3
middle 22:22
  189:23
might've 97:3
might'll 231:13
mike 199:20,25
  244:20
million 12:25
  17:11 24:7,18,18
  48:4 49:1 50:6,21
  55:3,10,13,15
  56:12 57:5,9,21
  58:13 60:24 61:7
  61:11,17 62:4,4
  65:12,16 69:20
  84:7,9,20 85:10
  85:14,19,23 86:6
  86:7 87:13 89:21
  89:25 90:12,24,25
  91:8,21,23 93:2,4
  100:5,8,9,24
  101:6,17 102:22
  102:23 106:13,25
  107:19 109:8,17
  109:23 110:5,11

112:10 115:8
118:2,5,19 124:22
133:7,11,23 134:1
134:2,3,10,11,22
134:24 135:1,24
139:23 140:10
141:5 142:19
143:3,9,16,22
145:21 148:20
151:17,18 152:7
158:14 166:15,19
167:5,8,9,10,18
167:18 168:5,7,9
169:5 175:6,9,19
175:22 177:2
181:15 194:24
195:3 196:20
201:11 202:9,19
204:9 206:6,16
211:19,21 226:14
230:9,11,14,21,23
230:25 231:21,22
232:5 233:7
millions 88:20
  109:16
mind 15:22 18:6
  18:11 35:16 57:14
  92:15 123:7 157:1
  203:10 209:24
mindset 23:23
mine 12:12 17:14
mineola 248:23
minimize 50:25
  51:8
minimum 15:10
  80:23 212:16
minute 88:12
  199:18
minutes 51:15
  54:15,22 56:19
  60:23 67:2,5,5
  95:11,19 104:15
  125:16 159:8

208:23 247:3
mischaracterizes
  85:6
missed 229:18
misspoke 87:11
  128:18 162:8
misunderstanding
  39:8
mm 44:7 199:12
model 180:23
modeling 180:18
moment 98:17
  132:22 166:6
  199:10 227:8
money 17:20,23
  44:5 62:7 92:14
  92:15 95:2 111:12
  134:7 144:23
  167:14 197:21
month 12:25
  17:12 24:8,19
  86:7 118:3 123:23
  151:17 157:15
monthly 124:22
  158:14
months 62:7
  68:20,22 123:24
  124:19,19 157:15
  158:12,12
morgan 3:15
morning 6:3,8 7:5
  79:5,14 105:12,16
  124:9 138:25
  139:4 158:1
  234:20 242:10
  246:1,4 247:1
motion 9:13,17
  13:14 29:13,15,19
  60:17 130:5
  163:18 205:8
  222:15 241:15
  242:4,13

**motions** 118:22
  152:10
**movant** 241:11,12
**movants** 28:7
  241:3,15 242:3
  243:14
**move** 9:5 26:16
  27:3,12 35:5
  86:13 103:8 116:5
  121:20 132:16
  136:8 149:18
  155:13 165:25
  169:11 173:10
  226:10
**moving** 117:21
  151:10
**multi** 109:16
  208:13 223:9
**multimillions**
  143:2
**multiple** 130:2,8
  133:12,21 134:24
  163:15,21 166:20
  167:4 168:7 188:6
  188:10 214:12,19
  222:13 223:5
  243:17
**mutual** 22:5
**mutually** 21:5
**mw** 204:6,7,9
**myers** 4:17,18

**n**

**n** 3:1 4:4 6:1
  172:2 248:1
**name** 7:14 55:24
  67:8 171:25
**names** 186:11
**nature** 10:23
  176:6,20
**near** 194:18
**nearly** 218:2
**necessarily** 12:6
  42:17 55:5 95:20

**necessary** 52:19
  200:11 219:9
**nee** 100:24
**need** 6:8 26:23
  46:10 47:22 92:20
  208:24 234:10
**needed** 42:7 47:15
**needs** 243:24
**negation** 56:23
**negotiate** 19:18
  25:9,17 50:5 65:7
  131:25 165:10
**negotiated** 10:19
  69:6 92:2 93:6
  94:4 101:11
  119:16 153:6
  215:20 228:15
  230:3
**negotiating** 57:7
  83:11 92:8 128:21
  133:22 162:11
  167:5 228:19
  230:1
**negotiation** 77:21
  92:12 181:6
  184:12 218:20
  228:13
**negotiations**
  10:21 23:11 31:2
  31:5 49:21 53:19
  53:24 54:3,6,24
  57:25 58:22 65:9
  80:1 83:5 84:3
  86:3 89:22 92:6
  94:6 111:7 112:3
  116:12 122:21
  130:8 144:18
  145:14 149:24
  156:16 163:22
  177:7,16,22 178:9
  178:19 179:3,14
  180:1 200:17
  240:10

**neither** 211:23
**never** 12:17 20:25
  29:11 56:24 57:23
  58:21 73:22,24
  75:22 88:3 91:16
  100:14 184:11,15
  184:19,21 185:8
  185:12 231:25
  233:24
**new** 39:13,18,24
  40:4,6,11 70:13
**nextera** 18:21,25
  20:7 21:5,25
  23:22 42:23 53:22
  54:25 58:3,22
  59:7,11,16,18
  60:16 61:22 62:13
  62:15 63:11 64:9
  64:18,20 65:4,7
  67:18,21 68:11
  69:14 70:5 80:5
  81:18,24 82:17,19
  82:24 83:9,12,13
  84:7,10,15,19
  85:9,20,23 88:4,7
  89:8,23,24 90:11
  91:3 92:1,8,15
  94:4,7,11 97:19
  97:20 98:2,4
  102:4,5,13 110:4
  110:7 113:19
  114:20,23 115:19
  115:21,24 116:2
  116:16,18,20
  117:5,10,14,19,24
  118:20 119:24
  122:8 123:5,9
  124:25 130:3,10
  130:12,14 133:1,6
  133:13 135:22
  143:15,18 147:6
  148:7,11 149:7,9
  149:12,15 150:5,7

150:9,19,25 151:3
  151:8,13 152:8
  153:15 156:2,24
  157:3 158:17
  163:17,24,25
  164:3 166:10,14
  166:21 169:2
  174:8,25 175:4,6
  175:9,12,14,17,19
  175:22,25 176:2
  176:11 177:1,5,6
  177:15,16,22
  178:9,12,19 179:3
  179:13,14 180:1
  181:6,16 185:19
  185:21,24 190:2,8
  191:17,18,22,23
  192:5 200:17
  201:4,10,22
  202:10,19 204:5
  208:16 224:4
  225:5,8 227:23
  228:2,6,22 230:9
  240:11
**nextera's** 55:1
  90:2 133:3 166:12
**nice** 173:18
**nighan** 3:15
**night** 45:19
  116:14 150:1
**nine** 237:17
  238:22
**nixon** 3:12
**non** 11:22 13:15
  16:13 22:10 23:10
  108:4,7,12 123:11
  131:15 132:12
  141:14,18,23
  157:5 164:25
  165:22
**nontaxable**
  239:19

**north** 1:13 134:23
  134:23 168:6,7
**note** 27:6 38:7
  87:19 122:7 156:1
  239:6,15
**noted** 56:3,10
**noteholders** 34:21
  34:25 234:13
**notes** 9:24 10:1
  18:15 32:17 36:8
  36:11 40:12,22
  41:8 68:2,8,18
  209:20 225:19
**notice** 103:15
**noting** 226:16
**november** 47:4
  94:3,18 95:8
  128:7 129:20
  161:21 163:8
  240:23
**number** 15:14
  16:16 28:25 30:10
  30:17 34:9,11
  40:22 47:15 50:6
  54:18 67:14 75:4
  87:12 89:20 91:22
  93:5 100:17,18,19
  110:10 118:18
  133:8,12 134:5,6
  143:21 152:6
  166:16,19 167:12
  167:13 204:1
  207:11 210:11
  212:23 222:8
  225:22,25 226:22
  226:24 241:20
**numbered** 203:13
  204:24 226:7,10
  226:12,22,23
**numbers** 24:12
  61:3 62:6 76:22
  76:23 77:7 87:1
  113:23 114:3,4

134:16 137:15
  147:10,15,16
  167:24 170:15
  241:22 242:2,12
**ny** 248:23

**o**

**o** 1:21 6:1 172:2
  248:1
**object** 71:24
  232:7 245:4
**objected** 49:9,9
  64:23 65:1
**objecting** 58:24
  130:18 131:6
  164:7,18
**objection** 9:7,8,9
  37:24 45:19 57:11
  58:15,16 75:20
  78:4 86:16 87:3
  95:10,11,16 99:14
  100:10 103:7
  114:1 126:13
  135:2 137:20,21
  147:13 160:3
  168:10 170:20,21
  173:13 196:3
  200:23 219:12,12
  219:13 233:15
  234:12 235:4
  236:21,22 238:2,4
  238:12,19 239:6,7
  239:25,25 240:20
  243:11 244:25
  245:19
**objections** 64:20
  65:4,6 69:12
  103:16,17 127:19
  127:21 137:10,22
  161:9,11 170:10
  170:22 236:4,8,9
  239:13 241:18,20
  241:24 242:24
  244:21 246:20

**objectives** 10:11
  23:20
**obligated** 64:9
**observations**
  174:19 189:10
**obtain** 92:9
**obtained** 69:11
  123:5 156:24
**obtaining** 89:14
**obviously** 10:8,15
  15:22 17:23 66:22
  96:11 98:6 243:5
  244:7
**occasions** 25:3
**occur** 115:17
  149:5
**occurred** 11:2
  70:1 94:3 95:23
  101:5 111:10,17
  117:4 144:21
  145:3 150:18
  198:3
**occurring** 115:13
  149:1
**october** 46:22
  129:20 163:8
**odinbrook** 172:14
  172:15,16
**offer** 25:22 43:7
  43:10 90:1 107:6
  140:16 197:20
  219:10
**offered** 30:2 197:8
  215:12 220:14
  232:22
**offering** 85:19
**offers** 224:1,3
**officer** 8:11,12
  86:19 126:14
  133:2 166:11
**officers** 123:18
  157:11

**official** 5:2 125:22
  159:13
**offset** 17:11
**oh** 18:6 31:11
  32:7 46:2,2 51:25
  59:2 94:23 98:25
  105:7 120:20,23
  120:25 129:7
  130:24,25 154:11
  154:15 164:13,13
  194:8 197:15
  199:23 239:1
**oil** 215:13
**okay** 7:3,3,21 23:2
  26:15 27:2 29:3
  29:10,15 30:8,13
  30:20 31:18,22
  32:11,20 33:16,21
  34:8 35:1,20 37:9
  40:16,24 41:10,13
  46:25 50:18 51:4
  51:12,20 52:5,5
  52:10 53:11 54:2
  54:15,22 55:10,22
  56:2,9 59:9,13,20
  60:14 61:3,15,20
  62:6,11 63:14,17
  63:25 64:18 65:2
  65:19,22 66:3,9
  66:12,20,24 67:7
  67:11 68:2,14,18
  70:6,24 71:2 73:6
  74:16 75:4,18
  76:5,7,11,15,21
  76:25 77:11 78:12
  78:19 83:6,22
  87:3 91:19,25
  98:21 99:1,7
  100:23 101:2,17
  103:4,19 104:17
  104:18 105:7,8,22
  106:10,15 107:4
  107:12,23 108:6

108:22 109:24
110:9,13 111:12
112:5,21 115:18
115:24 116:7
119:7 120:8,13,16
120:25 121:4
122:4,11,15,24
125:18,19 127:3
127:20,24 128:2
128:19 129:12,15
130:25 131:5
132:3,16,22
136:13,15,21,24
137:8,14,17,22
138:3,5,12,20
139:20,25 140:9
140:14,22 141:9
141:17 142:7,8
143:10,20,24
144:23 145:16,20
145:25 146:8,19
148:6 149:6,12,19
150:4,14,18,22
151:2,15,22
152:22 153:10,19
153:23,24 154:5,8
154:16,20 155:9
155:13,23 156:5,9
156:18,23 157:10
157:17,20 158:13
159:10,11,16,20
160:17,22 161:10
161:13,16,19,23
162:6,9 163:1,2
164:13,17 165:13
165:25 166:6,6
169:16,18,22,25
170:8,14,17 171:2
171:4,11,18 172:7
177:9 178:1,4
179:8 181:4
182:22 183:3
184:10,18,24

186:21 188:14
189:9 191:1,6,9
192:4,24 194:1,2
194:4,6,7,12,13
194:15,16,18,19
194:20,25 195:1,4
195:24,25 196:12
196:19,22,24
197:2,4,6,8,15,17
198:1 199:1,5
200:15 201:6,15
201:19,22 202:2,7
203:6,8,11,18,24
204:4,9,13,17
205:2,10,22 206:1
206:19,23 207:4,9
207:23 208:6,11
208:16,20 209:1
212:21 216:2,6
217:11 219:25
221:10 222:3,22
223:23 225:7,12
226:4,7,10 227:16
227:21 229:5,24
230:5,6,20 231:18
231:19 233:21,22
233:25 234:17
235:2,6,25 236:5
236:12,24 237:9
238:11 245:5,18
245:23,25 246:8
246:11
**old**   27:19 28:20
248:21
**oldest**   41:7
**once**   18:19 23:22
25:20 53:16 56:23
84:11 101:22
112:22 146:9
**oncor**   17:3,22,25
20:20 24:4 41:21
42:3 43:1,4 47:2
55:1 108:17,20,25

113:19 124:13,16
142:3,6,11 147:6
158:5,9
**ones**   17:15 18:5
32:25 214:22
**one's**   193:20
**ongoing**   58:1
118:9 151:22
**open**   12:10 25:15
68:3 114:2 147:14
**opened**   242:7
**opening**   114:8
128:2 147:20
161:16 189:20
208:3,4
**operating**   20:3
44:3
**operative**   244:11
**operator**   1:25
**opining**   225:16
**opinion**   15:4
24:22 47:5 66:6,6
75:23,25 86:2,18
134:21 168:4
175:5,14,18 176:1
176:6,10,15,19,25
178:25 179:15
184:3,5 187:9
188:21 189:2,22
189:25 190:5,14
196:5,8,11 198:2
198:22,23 204:18
221:6,10,15 222:3
223:24 224:3,6
225:4,7 227:19
228:5,10,21 229:2
229:20,21 232:14
233:1,4 234:14
237:13 238:23
**opinions**   66:10
174:19 177:4,13
177:21 178:6,14
178:17 179:1,23

189:10,15 190:6
219:11 221:1,2,3
221:4 226:2
235:19 238:2,14
242:15,21
**opinion's**   198:3
**opportunity**
13:17 19:24 26:1
27:3 72:8 110:19
111:18 119:5
144:5 145:4
152:19
**opposed**   24:23
76:22 124:4
157:21 240:5
**opposing**   107:19
141:5
**opposite**   218:19
**optimistic**   61:25
**option**   20:10,10
**oral**   66:1,21 68:18
94:16
**order**   6:13 10:25
49:16,18 52:18
63:19,20 71:15
73:3,7,8 74:14,23
123:11 157:5
185:20 207:10
214:2 222:15
**orders**   221:22
**original**   42:4
60:16,19 64:14
96:23 175:4,12
195:5 198:12
206:24
**originally**   74:1
197:8
**outbid**   218:16
**outcome**   114:24
115:5 148:11,17
201:16 206:4,13
206:14 213:12

outcomes  178:21
  179:18
outlined  15:7
  21:22
output  192:24
outside  86:8
outstanding  77:1
  109:11 119:4
  142:22 152:19
override  111:3
  144:14
overruled  38:3
  95:23 99:16
  100:12 132:21
  166:5 196:9,12
overstate  245:9
overstated  92:24
overturned  96:20
ow  71:7
owe  109:21 143:7
owed  56:21
  109:22 123:16
  143:8 157:8
owned  37:7 38:10
  40:21,22 41:8
owner  17:2,8
  18:20 53:5 203:1
owners  21:18
ownership  9:25
owning  19:13
owns  16:22
o'melveny  4:17
  4:18

**p**

p  3:1,1 5:4 6:1
p.a.  3:18 4:22
pa  59:1
pab  8:21 9:5 46:5
  103:9,9,20 126:14
  126:22 136:6
  137:2,17,24 160:4
  160:11 169:9
  170:3,17 233:24

234:10 236:3,7
238:2,25 239:12
242:24 244:20
pabx  103:15
pabx435  203:9
pab's  236:13,21
pace  31:7
page  11:13 14:15
  19:16 20:14 22:11
  23:3 25:15 29:19
  34:10,10,20 35:8
  36:22 47:24 48:7
  48:23,24 51:5
  54:22 60:4 67:16
  68:24 75:9,10
  76:16,17,18,19,20
  76:21,22 79:21
  83:7,22,23 99:8
  108:24 110:9,10
  112:11 120:9,19
  120:20,21 142:10
  143:20,21 145:22
  153:25 154:11,12
  154:12 174:21,21
  174:24 176:5
  177:13 178:1,2,24
  180:4,5,7,17,17
  180:22 181:8,8,11
  189:23 198:24
  200:6,15 201:6,8
  202:23 203:12,14
  204:24 205:13
  206:1,2,2,11
  207:13,14 209:16
  210:20,20,22
  225:10,14,19
  226:2,7,10 227:23
  236:17,18 237:3
pages  36:23 48:9
  50:14 51:4 67:12
  68:14 83:3 174:18
  177:21 225:6

paid  15:18 45:1
  61:19,21 92:16
  98:14 101:6,10,15
  102:1 120:4
  153:20 185:24
  191:22 197:18
  198:17 209:20
  210:9 211:5,11,17
  211:22,24 212:11
  213:3,7 214:5
  231:14 232:3
  240:18
pain  58:23
panel  68:19
paper  19:10
papers  120:10
  154:2
par  36:14,16,21
  198:12,17
paragraph  11:16
  14:15,16 19:16
  20:14 22:11,22,25
  23:1 28:15,22
  29:20 30:23,24
  31:23 34:2 38:23
  39:2,9 41:15
  44:20,21 49:1
  53:17,19 55:23
  60:10,14,21 62:16
  63:1,2 65:4 79:20
  81:8 83:15,19,20
  87:9 89:9 91:14
  99:7 108:24 109:3
  110:10 112:11
  120:24 142:10,14
  143:21 145:23
  154:16 174:21,24
  176:5,12,13,16,18
  176:24 178:1,4
  180:7,13 181:8
  189:11,13,25
  190:5,12,14,15,19
  190:21 191:10,11

192:4,10,11,17,24
193:14 198:24,25
200:6,9,16 202:24
205:2,13 206:3,11
207:13 209:16,18
210:21 215:1
225:14,15,25
226:2,7,10,12,12
226:22,24,25
236:22 237:10,11
237:14,25 238:1,3
238:5,13,19
239:15,24 240:8,9
240:12,20 243:11
243:12 244:22
245:1
paragraphs  83:2
  193:6,10 235:20
paranoid  133:16
  166:24
parent  16:9
  121:13,14 155:5,6
part  9:15 10:11
  12:18 19:11 23:15
  38:11 43:17 47:25
  51:2 53:7 64:14
  72:13 93:19,19,21
  96:22,23 106:1
  109:15 110:19
  119:19,22 126:9
  133:10 139:11
  143:1 144:5
  153:10,13 159:24
  166:18 190:16
  195:19 207:18
  213:5 215:6,18
  218:20 225:7
  226:1 244:12
part's  93:18
participate  49:21
  50:25 53:24 54:2
  70:10

participated
  49:23 70:13
participation  51:1
  51:8
particular  47:19
  82:17 182:3 183:1
  213:9 225:10
  226:4 239:19
  241:22 243:10,13
particularly
  82:17 131:12
  164:22
parties  6:11 19:19
  20:6 27:4,11 32:3
  32:4,5 34:11,11
  34:13 44:10 49:25
  64:23 98:23 103:7
  130:2,8 163:16,21
  202:7,17 242:10
  243:17 247:3
parties'  237:12
partners  217:2,3
  217:4
parts  204:18
  235:12
party  10:14 31:2
  34:16 72:18 75:25
  86:9 185:24 211:5
pass  16:18 17:8
  52:23 128:22
  162:12 204:15
passed  137:10
  170:10
passes  16:25
paul  5:11 7:8,16
  8:5 28:4 79:12
pause  227:8
pay  16:1 17:13,24
  53:5,10 64:9,17
  92:15 121:13
  122:19 127:8
  155:5 156:13
  160:22 223:14

231:25 233:12
payable  102:6
  122:3 123:6,10
  127:13 155:22
  156:25 157:4
  161:3 205:4,17
  210:25
payer  15:1 16:21
  17:7
payers  17:4 53:5
paying  16:5 86:6
  87:10,14 89:13
  212:7
payment  73:24
  74:8,10 113:11
  121:17,22 125:4
  146:23 155:9,15
  158:21 211:9
payments  24:4
  124:13,16 158:5,8
pays  16:21,23
  211:5 212:15
pcut's  68:9
peabody  3:12
pedone  3:16 98:19
  98:20 136:13,14
  169:16,17 233:22
  233:23 239:2,4,5
  244:16,17 246:5,5
  246:9
pending  110:24
  115:5,14 144:10
  148:17 149:2
pennies  192:6
people  10:24 18:9
  29:12 35:22 41:8
  46:16 49:18 66:17
  105:1 124:17
  132:18 138:16
  158:9 166:2
  210:10 218:23
  228:15

people's  212:13
percent  32:14
  33:1,5,6,9,13
  35:12,15,17 37:17
  39:4,7 43:24
  75:14,15 77:12,17
  77:24,24 109:4
  112:3 113:20,22
  113:25 124:14
  142:15 145:14
  147:7,10,12 158:6
  192:10,14 210:11
  225:18,21,21
  226:4,15 233:17
  240:14
percentage
  191:18 192:5,18
  227:1 236:20
percentages  128:5
  161:19
perceptions
  235:17
perfect  121:2
  154:19
perform  186:3
  191:21
performed  185:23
  191:14 192:25
period  17:11 18:9
  21:6 54:8 70:8
  92:20 102:23
  126:18 130:9
  135:21 160:7
  163:22 169:1
  186:7
permit  19:17
person  51:18
  127:10 160:25
  209:3 212:7
  243:24
personal  82:12
  86:18 99:18,19,21
  133:7 166:15

229:2 239:14,18
  239:25 240:9,13
  240:21 241:14
  243:3
personally  25:17
  70:17 105:25
  119:24 126:23
  131:25 139:10
  153:15 160:12
  165:11 230:1
  240:10
perspective  107:4
  109:10 132:9
  134:16 140:14
  142:21 165:19
  167:24 180:2
  190:16 212:2,5
  213:2
peter  173:16
  216:13
petition  76:25
  77:13,23 78:2
  88:15,17
phone  10:17
pick  6:16 58:24
pieces  93:6 101:8
piercing  17:19
pik  9:24,25 18:15
  19:23 20:2 21:2,4
  21:9,15,24,25
  22:5 32:17 33:2
  36:8,11 38:7
  122:7 130:10
  156:1 163:23
piks  92:14 101:15
  101:21,25
place  74:22 93:22
  116:12 149:24
  216:19
placed  79:8
placements  217:5
plan  3:4 7:6,7
  8:14 10:12 19:12

21:12,14 22:7
23:16 24:1,13
26:9 44:9,16
47:16 49:7 59:7
60:15,16 62:15,19
63:9,11 64:19,20
65:10 74:24 82:25
117:24 118:12,15
122:17,18 123:2
128:25 129:3,16
129:17,24 130:18
131:7,7,16 132:4
151:13,25 152:4
156:11,12,21
162:15,16 163:4,5
163:12 164:7,19
164:19 165:1,14
177:6,16,22 178:9
178:12,19 179:3
179:14 180:1
199:21
**plans**  22:24 23:5
25:19 43:19
122:20 128:11,17
128:21,23 131:21
131:25 156:15
161:25 162:7,12
162:13 165:6,10
**play**  125:3 158:20
**played**  123:4,8
156:24 157:2
**please**  6:2 7:9,14
11:5,13 14:15
19:5,16 22:11
28:16 29:3 52:13
79:4 104:25 137:4
138:15 170:5
171:20,25 172:4
178:4 186:21
189:11 199:11,15
200:15 209:8
229:15 236:2

**plenty**  57:2 86:18
**plus**  127:17 161:7
163:21 212:18
**pm**  247:7
**point**  14:22 18:25
20:7 22:7 25:7
26:18 27:3 30:15
31:16 32:10 37:8
38:13 45:7 61:14
84:6 89:23 90:14
91:7 96:7 101:7
101:10 106:11
115:15 116:25
118:10 119:22
121:11 122:11
124:11 129:24
131:24 132:4
133:8 134:8
139:21 149:3
150:14 151:23
153:13 155:3
156:5 158:3
163:12 165:9,14
166:16 167:16
177:25 181:20
182:18 199:14
211:10 220:10
225:22 228:18,19
229:1 234:11
237:20 242:5,18
243:10 244:21
246:18
**points**  23:10
36:15,20 177:18
242:23
**poker**  244:23
**policy**  134:6
167:13
**portion**  190:1
203:2 243:4
**position**  9:23,25
16:8 23:19 24:25
56:4 73:5,5 82:10

177:17,20 178:7
179:9,20,22
232:23 242:3
**positions**  237:12
**positive**  32:10
99:25
**possibility**  12:21
13:10,11 240:5
**possible**  218:15
218:18,21
**possibly**  138:11
171:10
**potential**  10:20
13:12 14:19 18:17
41:20 43:4 112:18
117:23 134:22
146:5 151:12
168:6 194:5 197:2
208:13 218:3
219:5 220:6
**potentially**  17:25
19:2 25:18
**practical**  15:25
17:9
**practicality**  15:14
**practice**  183:10
221:12 228:7,17
230:2
**pre**  9:22 24:9
126:22 160:11
234:23
**precedent**  62:23
62:24 63:10,17
94:10 97:12 98:2
186:15,24 187:3
187:12,20 188:9
193:4,8 214:8
222:23,24 230:4
235:15
**precedents**
223:19 228:15
**precise**  77:11

**preclude**  242:20
**predict**  212:24
213:3 214:3
**predicting**  201:16
**prejudice**  27:16
**preliminary**  68:4
**preparation**
126:9 159:24
201:20
**prepare**  8:18
**prepared**  8:25
108:21 142:7
183:11,16
**preparing**  183:22
**present**  5:15 11:3
13:23 67:7 86:3
87:8 179:18
230:11,13,22
**presentation**
203:22
**presentations**
180:14 181:12
**presented**  14:1,3
72:4 90:23 97:4
109:24 115:12
143:10 148:25
**presenting**  96:16
97:2 128:5 161:19
237:12
**presents**  226:5
238:3
**president**  8:10
**pretrial**  234:19,21
**pretty**  17:16
19:14 42:10,18
59:24 77:8 136:8
169:11 202:15
218:23
**prevent**  219:2
242:1,20
**previewed**  235:10
**previously**  21:21
62:3 69:6 189:14

219:25
**price**  16:5 30:10
36:17 55:3,11,14
60:24 61:16 90:3
90:6 91:20 93:6
98:5 101:3,18
224:9
**prices**  36:8
**primarily**  16:3
89:10 132:10,10
165:20,20 225:6
**primary**  15:1
106:17 140:2
218:13 238:23
240:24
**principal**  33:11
118:13 152:1
**principally**
237:23
**principals**  202:3
**prior**  23:21 25:19
28:7 86:7 88:15
88:19 95:8,13
96:20 97:4,8
102:3 116:17
129:23 150:6
163:11 204:20
220:1,25 225:19
240:23
**priority**  55:17,18
**private**  217:5
**privilege**  56:3
**probability**
115:13,16,17
149:1,4,5
**probable**  18:25
**probably**  9:22
10:3 18:19 46:15
66:16 96:19 102:8
102:22 120:17
125:16 130:9,13
154:9 159:8
163:23 164:2

183:8
**problem**  28:1
171:15 179:16
212:22 237:11
238:13,14 246:25
**procedures**  12:8
12:18 13:14 43:6
46:21,22 47:1,5,7
130:5,7 163:18,20
207:9,15,15
211:12 221:22
**proceed**  11:24
52:14 105:11
138:24 173:20
209:11
**proceeding**  13:4
20:12 110:25
144:10 219:23
220:14,19
**proceedings**
241:16 247:7
248:4
**proceeds**  57:5
98:15 109:8 115:6
142:19 148:18
198:20 203:2
205:19 211:1,7,14
224:9
**process**  27:12
43:5 70:15 71:5
71:17 74:7,7,9
87:16 89:14 111:3
112:14 123:4,9
124:5,25 127:12
130:1,4 133:10
134:20 144:14
146:2 156:24
157:3,22 158:16
161:2 163:14,17
166:18 168:3
207:16 215:20
218:8 219:10,22

**produced**  106:21
107:9,24 140:6,19
141:10
**professional**  23:6
23:17 24:21 25:9
70:20 73:19 106:1
124:11 125:23
139:11 158:3
159:13 217:12
228:8 229:1
240:15
**professionals**
71:16 72:2 74:15
127:6 129:4,4
160:20 162:19,20
**proffered**  244:25
**projected**  44:15
240:17
**projections**  90:1
90:14
**promote**  44:3
**pronoun**  129:2
162:18
**proper**  73:1
**proposal**  13:24
14:10 37:10,17
42:5,23 69:14
130:10,16 134:22
163:23 164:5
168:5
**proposals**  14:1
41:20 207:17
**proposed**  22:23
23:5 53:14 67:22
84:24 85:11,14,18
90:2,7,8 133:1
166:10 194:3
195:2,6,12 196:15
196:17 198:13,14
227:22 235:13
237:16,18,25
242:16

**proposes**  196:15
**proposing**  85:20
130:11 163:24
**proposition**  17:5
**prosecute**  113:12
146:24
**proskauer**  55:25
112:21 113:3
146:8,15
**protect**  56:11
58:13
**protected**  240:4
**protection**  21:14
215:23
**proven**  17:5
**proverbial**  242:6
**provide**  32:13
35:5 90:16 112:2
117:24 122:25
145:13 151:13
156:19 185:25
208:8 220:11
227:13
**provided**  54:11
62:20 63:5 82:23
91:23 92:1 106:25
140:10 190:7
202:10,20 240:1
243:19
**provides**  200:9
206:4,12 207:15
**providing**  178:21
215:23
**province**  234:15
**provision**  62:19
88:6 98:2 102:17
131:13,15 164:23
164:25 215:15
**provisional**  53:6
**provisions**  132:12
165:22 245:4
**psa**  19:23 20:2,15
21:2,4,9,15,24,25

22:5 33:4 44:8
47:9 96:23 117:18
151:7
**publications**
201:15
**publish**  135:18
168:23
**published**  66:6
**puc**  16:18 52:15
**puct**  52:16 68:3
102:5 118:24
123:13 152:12
157:5
**pulled**  221:23
**purchase**  16:4
30:10 54:25 55:3
55:11,14 60:23
61:16 90:2,6
91:20 93:6 98:5
100:4 101:3,18
224:9
**purchaser**  17:12
96:23 97:13
100:21 209:20
218:3,3,6,14
**pure**  38:18
**purely**  233:8
**purported**  227:22
228:2
**purports**  204:4
**purpose**  179:10
218:4,6
**purposes**  104:22
188:21 220:13
**pursuant**  47:7
121:5 154:21
208:7 209:21
**pursue**  20:17,20
41:19 112:20
117:2 122:12
146:7 150:16
156:6 207:24

**pursuing**  22:3
117:9 122:16
150:23 156:10
**purview**  71:14
**push**  17:22 52:6
104:16
**pushing**  92:17,23
**put**  12:5 22:15
25:12 29:4 30:21
33:17,22,23 46:17
47:23 48:6 53:8
54:10 63:2,8
75:10,11 76:8
83:17 87:2 89:20
99:24 120:8
132:10 134:3,11
135:23 153:24
165:20 167:10,18
169:3 173:1
212:14 242:19
**put's**  68:11
**putting**  16:5,10
129:16 163:3

**q**

**qualified**  131:15
165:1
**quals**  132:12
165:22
**quantum**  225:16
225:24
**question**  22:5
26:11 28:11 34:19
34:24 35:3,6 38:2
40:1 60:8 71:6
73:2 75:3 76:2,5
78:10,15 85:8,21
95:24 99:18,21
100:6 110:22
114:14 126:11
144:8 148:1 160:1
177:1 183:8
184:18 187:19
198:1,5,6 202:12

213:6 214:17
223:16 229:18
230:7 231:2
**questioning**  232:8
**questions**  26:13
46:20 47:14 72:8
72:11,20,21 78:13
98:18,20 99:2,8
102:25 103:1
114:11,22 129:14
136:3,10,10
147:23 148:9
163:3 169:6,13,13
173:8 189:21
199:13 208:21
212:23,25 214:24
216:2,3 229:6,16
229:19 233:21,23
243:7
**quickly**  92:18
103:6 114:21
136:8 148:9
169:11 177:12
**quite**  40:21 42:12
**quote**  20:16
133:25 208:8
242:17
**quoted**  242:22
**quotes**  89:14
**quoting**  81:10

**r**

**r**  1:21 3:1 4:25 6:1
172:2 248:1
**raise**  7:9 72:8
171:20
**raised**  44:6 72:12
73:2 75:3 84:7
89:25 90:11
243:11
**raising**  84:15
**ran**  43:5 215:19
**range**  102:22
218:23

**ratable**  224:11
**ratably**  227:19
**rate**  16:20,20 17:2
17:3,7 53:4 61:12
**rates**  53:6
**rating**  16:8
**rational**  235:17
**reached**  116:13
130:7 149:25
163:21
**reaching**  190:5
**read**  11:11 15:4
29:20 32:14 35:11
56:7,9,14 63:18
75:16,22 77:3
78:1 120:1,1,1,2
137:15 153:17,17
153:17,18 170:15
178:4 189:17
203:3 205:5 206:7
206:10,17 207:21
227:5 246:2
**reading**  35:8
**reads**  180:7
205:17
**ready**  78:25 91:7
105:11 138:23
**real**  78:15 237:9
**reality**  102:9
**realization**  119:12
153:2
**reallocated**  23:6
**reallocation**  23:17
25:9
**really**  101:11
130:9 133:10
163:22 166:18
177:19 192:10
195:9 218:13
228:25
**reason**  20:5 56:18
59:13 204:13
219:5

| | | | |
|---|---|---|---|
| **reasonable** 17:11 88:5 100:21 | **recalls** 95:18 | **recommend** 25:21 | **recovery** 32:14 |

reasonable  17:11
  88:5 100:21
reasons  16:3
  21:21 25:5 55:18
  228:25
rebuttal  6:24
  138:9 171:8
  216:20 219:10
  221:1
recall  12:24 28:11
  29:2 44:14 45:8
  49:2,11,13 55:3
  56:18 57:6 58:17
  58:20 59:20 61:24
  62:1,21 64:6,8,23
  65:22 66:1,20
  72:16 73:9,14,15
  73:17,18,20 74:17
  75:2 82:18 84:22
  86:8 87:12,18
  96:16 102:15
  107:14 112:6
  115:22 116:17
  117:3,19,20 122:6
  122:10,11,17,20
  122:22 123:21
  124:2,7,20 127:7
  128:5,8,9,12,20
  128:25 129:16,19
  129:21 130:6,17
  131:11,19 136:2
  140:24 145:18
  149:10 150:6,17
  151:8,9 155:25
  156:4,5,11,14,16
  157:13,19,24
  158:12 160:21
  161:19,22,23
  162:1,10,15 163:4
  163:7,9,20 164:6
  164:21 165:4
  169:5 212:25

recalls  95:18
receive  13:18
  35:12 37:17 42:23
  44:15 68:20,20
  88:9 90:7 115:6
  148:18 178:11
  194:14 230:9
  231:20 240:17
received  12:17
  98:12 176:7,20
  179:12,12 180:9
  181:5 198:12
  206:5,15,25 207:2
  227:3 232:16
receives  199:4
receiving  33:9,14
  35:22,23 202:9,18
  205:4,18 210:25
  233:6,8
recess  51:13 52:6
  52:11 78:24 79:2
  104:24 138:14
  171:13 209:2,6
  229:13 246:16
  247:1
recognition  22:19
recognize  8:22
  11:6 18:16 29:13
  79:15 82:23 83:1
recognized
  218:23
recognizes  219:14
recollect  84:17
recollection  30:1
  32:1,8 34:18
  38:10 47:12 50:22
  57:21 62:22,25
  64:12 72:16 84:2
  84:14 85:15 90:17
  95:20 109:2
  112:10 117:13
  142:13 145:22
  151:2

recommend  25:21
recommended
  42:8
reconciling  30:7
  179:16
reconsideration
  111:10,13,14
  113:20 116:1
  118:23 119:3,4
  144:21,24,25
  147:7 149:14
  152:11,18,18
reconsidered
  118:24 152:13
reconvene  138:13
  171:12
reconvening
  105:3 138:16
record  7:15 9:6
  26:17 46:5 51:16
  79:6 86:7,12
  110:21 111:1
  129:9 130:15
  131:19,22 136:8
  137:1,11,15 144:7
  144:11 162:24
  164:4 165:4,7
  169:11 170:2,11
  170:15 172:1
  173:16 216:12
  223:18 232:24
  235:1,8 241:3
  242:19 244:12,13
  244:20 245:8
  246:19 248:4
records  106:1
  139:11
recoveries  44:15
  44:25 94:22 95:1
  95:4 96:10 97:25
  180:18 181:16
  201:3 204:5
  212:13 239:20

recovery  32:14
  33:1,5,6,10,13
  35:16,18 38:14
  62:9 96:13 204:10
  204:14 212:10
  240:17
redacted  56:2
  68:22
redaction  55:23
redirect  98:21,23
  136:7,11 169:10
  169:14 209:13
  233:25 234:1
reduced  39:20
  65:15 77:22 192:6
  192:11
reduces  100:20
reduction  55:3,10
  55:14 93:7 115:10
  148:22
refer  44:12 48:2
  147:5
reference  50:12
  64:7 191:10
  193:17 208:10
referenced  83:7
  85:24 220:2
references  190:19
referencing  85:8
  128:24 162:14
referred  65:17
  113:18 174:7
referring  40:6
  60:9 63:12 66:14
  176:15 226:1
refers  178:17
  180:13 190:10,22
  191:7 238:15
reflect  47:25
  65:12 75:19 95:12
  181:9
reflected  187:21
  225:5,6 227:23

Case 14-10979-CSS    Doc 13474    Filed 09/07/18    Page 289 of 302

[reflecting - respect]                                              Page 41

reflecting 75:15
refresh 30:1 37:3
  64:12 102:23
  109:1 112:10
  117:13 142:12
  145:21 151:2
regard 46:6 58:21
regarding 31:19
  49:21 54:3 65:23
  67:14 73:8 109:13
  111:7 127:7
  128:16 142:24
  144:18 160:21
  162:5 212:23
  232:14
regardless 97:3
  100:22
regards 234:13
regulatory 17:13
  17:20 107:14,17
  123:4,8 124:24
  140:25 141:2
  156:23 157:2
  158:16
reinstate 23:7,18
reinstated 131:14
  164:25
reinstatement
  132:11 165:21
reinstating 25:18
reit 52:22 53:8,10
  53:13
relate 39:10
related 243:16
relates 234:22
  243:13
relating 110:3
  143:14 214:25
  215:3 234:14
relationship 8:7
  8:13 39:6 87:21
relatively 88:14

release 134:7
  167:14
releases 49:5
relevance 239:7
relevant 86:20
  179:11 186:11
  188:23 189:1
  213:4,10 222:12
  237:16 239:8
reliance 201:17
reliant 191:4
relied 35:19,20
  89:11 121:23
  155:17 221:8
  222:22 223:19
relief 241:12,15
relies 86:22,23
  190:24 191:3
  222:4 246:23
rely 187:3
relying 124:12
  158:4
remain 109:13
  111:8 142:24
  144:19 171:18
  200:13
remainder 179:24
  234:9
remanding 63:19
remarks 68:9,11
remember 10:2
  24:3 33:15 36:16
  38:15 41:1 43:25
  46:21 50:24 51:2
  91:22 95:24 114:9
  114:10 127:5
  135:23 147:21,22
  160:19 169:3
remembering
  95:22
remotely 13:21
reopened 23:20

reorganization
  19:12 20:18 60:16
  62:15 128:11,17
  129:18 130:18
  131:21 132:4
  161:25 162:7
  163:6 164:7 165:6
  165:14
reorganized
  35:12 37:17 39:13
  207:19
repeat 9:14 34:19
  43:2 108:10
  141:21
repeating 123:7
  157:1
replacement
  116:9 121:21
  149:21 155:14
  205:19 211:1,7,8
  211:18
replied 221:7
reply 244:2
report 86:17
  134:25 168:8
  183:11,13,17,22
  201:7 204:19,22
  205:8,23 206:1,2
  206:20,24 207:5
  208:11 210:2
  220:22 221:8,21
  221:23 226:19
  227:9,11
reported 10:24
  12:16
represent 28:7
  113:17 147:4
  226:16
representative
  241:11
represented 7:19
  112:21 146:8

request 7:1
requested 112:16
  146:3
requesting 107:19
  108:16 141:5
  142:2
requests 23:12
  52:22
require 110:17
  144:3
required 31:23
  38:23 52:18,20
  218:3
requirement
  122:19 156:13
  243:23
requirements
  12:23 182:1,24
  183:3,17,21,25
  184:2 243:21
requiring 39:7
research 132:5
  165:15
reserve 91:21
  93:7 199:14
  246:22
reserved 246:25
reserves 46:6
resolution 215:7
resolve 20:15 25:9
  25:18 65:5
resolved 69:11
  109:15 143:1
resolving 229:3
resources 200:11
  215:14
respect 15:9 17:1
  22:3 31:2,15 33:5
  34:11 44:14 48:1
  59:11,22 62:20
  83:17 89:1 108:15
  142:1 207:25
  223:21 225:8

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400

241:4 243:11
245:14
**respects** 107:11
140:21
**respond** 6:24 78:7
**response** 65:4
86:15 153:8
232:11 241:1
**responsibility**
13:23 14:10
**responsible**
109:12 142:23
**rest** 180:13 232:5
**restate** 177:11
**restriction** 22:6
**restructure** 17:5
20:17 130:12
163:25
**restructuring**
8:11 10:5 11:23
18:18 19:18 20:17
22:23 23:5 26:10
41:20 67:11 79:24
79:25 81:11,20
172:16,17,22
184:21 185:12
217:14 218:1,2
220:8 228:12
**restructurings**
217:5,9,17,24
**result** 19:13 43:7
69:21,24,25
**resulted** 119:13
153:4 208:13
**results** 213:4
**retained** 56:6
127:6 160:20
220:5
**return** 16:23
194:11,23,24
**reversal** 109:21
111:9 115:2 143:7
144:20 148:14

**reverse** 110:23
111:25 144:8
145:11
**reversed** 64:2
93:23 111:14
144:25 237:22
**reversing** 63:19
**review** 27:4 70:10
70:17,19 73:7
74:3 105:25 106:2
106:6 119:24
126:2,4,6,12,23
131:21 139:10,12
139:16 153:15
159:17,19,21
160:2,12 165:6
201:19 221:25
223:23 227:24
237:16
**reviewed** 55:1
70:12 75:5 86:18
116:23 126:8,9
150:12 159:23,24
220:22 221:21,24
222:23 225:20,20
**reviewing** 73:9
242:8
**revised** 83:16
85:20
**rewards** 16:23
**richard** 3:16
246:5
**richards** 3:18
**right** 6:9 7:3,9 8:4
11:20 18:14 22:22
26:20 27:11,15,16
27:18 28:2,19
30:14 33:4 34:5
37:10 43:16,25
44:4,13,19,23
48:15 52:5 55:20
56:3 58:7 59:2
60:21 61:7 62:5

62:13 63:20,21
66:18 67:4,23
68:21 69:19 70:1
70:4 78:14 80:14
81:24,25 82:3
83:5 84:10 88:17
88:23 91:2 93:5,9
93:21,24 94:18
99:7 104:9,16
105:8,9 106:13
108:12,18 112:17
120:25 121:2
135:14 136:4,9,18
139:17,23 141:23
142:4 145:8 146:4
154:17,18 169:7
169:12,19 171:4,7
171:14,20 179:4
180:4,23 181:13
183:6 185:15
188:13 189:23
190:12 193:24
197:21 198:19,22
198:24 202:23
203:13 204:17,25
206:7,9 207:7
209:5 212:8,12
213:25 214:20,21
216:8,15 219:14
221:17 223:11
224:20 226:6
227:10 228:8
230:14,15 231:15
233:9 234:2,4
235:4,6 236:15,19
236:24 237:7
238:25 239:22
240:2 242:7
245:15,25 246:22
247:1,6
**rights** 46:6 246:25

**ring** 53:2,4
**rise** 52:12 59:4
79:3 209:7 229:14
**risk** 12:5 15:10
16:15,23 17:17,20
18:1,3,10,11 20:7
64:3 88:7 100:18
100:20,22 107:17
111:6,11 121:25
121:25 125:4,8,9
125:10 134:7,19
141:2 144:17,22
155:18,19 158:21
158:25 159:1,2
167:13 168:2
195:17 197:18
**riskier** 196:1
**risks** 16:22 17:13
**risky** 17:5
**road** 88:4 248:21
**robins** 6:19,21,23
138:9 171:8
216:11,14,17,20
216:22 217:21
218:4 219:10,16
220:13 221:10,15
222:3 223:23
225:3 227:11,21
228:5,21 229:5,12
229:16,23,25
230:6,7 233:18
234:3
**role** 217:15
240:24
**roles** 10:15 131:18
165:3
**roll** 19:10
**roman** 34:20
**romanette** 176:12
**room** 28:3 41:8
96:10 246:16
247:3

ropes 4:1 219:25
  235:2
rose 55:25
rosen 233:21
rosenbaum 5:13
  6:20 9:19,21,22
  9:24 10:5,11,14
  11:5,10 12:20
  31:5,15,17 73:15
  74:23 115:20
  138:11 149:8
  171:10 234:5,11
  235:12,16 237:13
  241:10 242:1,12
  242:20 243:1
  246:12
rosenbaum's
  11:11 19:15 22:11
  116:23 150:12
rosenbaum's
  239:7 241:6
  243:19 245:14
rosner 4:13 7:19
  209:9,11,14
  212:22 216:2
  219:13 229:9
  232:13
roughly 50:21
  130:14 135:1
  164:3 168:9
round 77:7
rounded 192:14
rsa 30:25 31:3,6
  31:15,20,23 32:1
  32:3,4,6,9,12 33:1
  33:21 34:12 39:7
  41:19 42:9 43:3
  80:5 81:18 129:23
  129:25 163:11,13
rule 63:25 210:11
  210:14 243:13,14
  243:21 245:2,20
  246:13,14,14

ruled 45:8 113:6
  114:2 146:18
  147:14 193:18
  244:14
rules 51:16
  124:14 158:7
  166:4
ruling 68:21 69:4
  96:17,18 111:25
  115:1,2 145:11
  148:13,14 193:23
  241:4,19,21 244:6
  244:9 245:17
  246:7,12
rulings 237:21
rumors 42:19
run 19:12 124:19
  125:8 158:11,25
  192:24 197:12
  211:9
runs 204:11

## s

s 1:22 3:1 4:20 6:1
  172:2,2
safe 89:17 104:6
  201:19
sake 178:13,16
  179:1
sale 41:20 42:2
  43:4 47:1 115:7
  148:19 194:4
  211:14 217:25
  218:5,12 222:14
  223:9 224:10
  233:9
sales 42:25 174:1
  186:8,8,12,14,23
  200:10 209:25
  210:3,8 215:17
  217:22 220:16
sam 4:4
sat 56:24

satisfy 56:5
save 118:21 152:8
saving 240:3
savings 119:20
  153:11
saw 39:6 75:1
  106:4 116:3
  139:14 149:16
  222:15 227:24
saying 57:4 73:15
  92:18 114:4,4
  117:19 147:16,16
  151:8 180:3
  192:17 197:17
  211:25 212:10
  226:1 232:13
  234:7 239:9 244:5
says 15:2 22:23
  23:4 28:24 29:20
  29:21,25 34:6,7
  37:10,12 53:19
  54:24 55:12 56:3
  56:3,8 62:14 63:9
  65:11 66:13,14,17
  66:19 67:20 69:10
  69:14 73:10 75:13
  75:17,23 76:25
  81:9 83:16 84:7
  100:23 108:25
  121:7,11 142:11
  154:23 155:3
  176:19 191:11
  204:6,21 210:24
  237:14 238:7,18
scenario 20:9
  184:22 185:13
  197:9 198:9 199:7
  202:10,20
scenarios 176:12
  180:3,19 193:1
  204:5 227:4
schedule 6:11
  234:23

schedules 96:16
scheme 108:2
  141:13
scholarship
  201:16
school 27:20
  28:20
schryver 79:5,6
  79:13 86:16 87:6
  93:19,22 98:17
  99:14 100:10
  103:3,18
scope 232:8
  234:13 238:24
scott 7:19
screen 28:18,19
  29:4,6,8 30:21
  33:23 47:24 63:8
  66:16 67:13 75:11
  75:12 83:24 120:8
  120:12,13,15,16
  120:22 153:24
  154:4,5,7,8,14
  203:15,16 205:14
scrutinized 13:16
se 223:13
search 186:8
seated 6:2 7:20
  52:13 79:4 104:25
  105:4 138:15
  172:4 209:8
  229:15
sec 169:19
second 10:1 11:16
  29:20 31:22,25
  34:10 38:24 63:9
  83:15 96:15
  136:16 202:24
  207:13 211:20,22
  211:23 212:8
  218:17 221:10,11
  228:5 238:4
  241:17

**secondly** 16:17
**section** 50:9,13,14
  50:16 67:18 68:22
  120:19 121:2
  154:11,18 174:1
  200:10 204:10
  208:7
**secured** 19:10
  55:21 200:19
**securities** 18:20
  36:19 37:8,9 38:5
**security** 36:17
**see** 11:20,24 14:16
  14:20 18:20 19:16
  19:19 20:15,21
  22:22 23:4,8,12
  34:1,8,23,24
  35:11 36:24 48:8
  54:23 55:24 59:24
  67:13,16 68:25
  69:19 80:2,11
  81:12 83:7,18
  84:12 85:25
  110:10,12 121:15
  121:16,18,19
  128:16 138:12
  143:21,23 155:7,8
  155:10,12 171:11
  173:3 174:19,19
  174:22 175:7,10
  175:23 176:12
  178:1,14 180:15
  182:17 189:16,18
  189:23 190:8
  191:10 204:25
  209:22 210:21
  211:2,24 212:1,9
  214:11 227:9
  233:14 242:11
  247:2
**seeing** 88:25
**seek** 31:24 38:24
  43:3 119:2 152:17

  241:15,25
**seeking** 31:19
  241:12
**seen** 16:12 26:25
  42:20 54:13 60:7
  66:8 75:5 109:22
  124:15 136:19
  143:8 158:7
  169:20 210:8,12
  210:14,17 211:11
  221:12 228:4,14
  233:7,11,16
  241:24
**sell** 89:1
**seller** 223:3,6
**selling** 222:9,11
  233:10
**semper** 106:24
**sempra** 16:4 22:9
  25:22 30:8,14
  80:6 81:25 98:15
  106:18,21 107:5,9
  107:20 140:3,6,9
  140:15,19 141:6
  220:6
**sempra's** 16:8
**sense** 24:19
  112:20 146:7
**sensitive** 62:9
  90:19
**sent** 127:22,24
  161:12,13 244:5
**sentence** 11:17
  29:21 31:22 32:22
  34:2 56:9 63:9,18
  80:9 81:8,14
  83:15 84:6 87:4
  89:24 90:7 202:25
  205:3,13,22 206:3
  206:11,12,19,23
  206:24,25 210:24
  238:6,16,18,20
  240:12

**sentences** 39:9
  90:11 238:1
**separate** 49:14
  81:9 101:8 124:18
  158:10
**separately** 19:17
**september** 1:15
  47:9 59:23 64:19
  65:20 66:13,19,24
  67:3,21,23 68:3
  68:19 69:7 70:2
  91:12,15 92:3
  94:12,13 95:13
  102:20 129:20
  130:5 163:8,19
  180:15,19,25
  181:11 193:21
  248:25
**sequence** 6:12
**series** 46:22 67:14
  69:21
**seriously** 14:14
**serve** 70:7 218:5
**served** 204:20
  205:7,23
**service** 186:4
**session** 136:25
  170:1
**set** 12:8 45:16,18
  46:17,19 48:6
  60:11 83:2 133:6
  166:14 177:13
  178:11 179:23
  185:17 186:18
  193:5,10,13
  197:10 198:7
  207:15 222:22,23
  234:22 236:9
  237:18
**sets** 235:13 237:25
**setting** 210:4
**settle** 57:1

**settled** 48:3
**settlement** 38:11
  38:17 48:1,2,8
  49:1,2,4,10,12,14
  49:17,19,20,22
  50:1,2,4,8,11,19
  51:3 58:7 108:17
  109:1,8,18 110:19
  111:7,19 113:19
  128:6 131:10,11
  131:13,24 132:13
  142:3,12,19 143:4
  144:18 145:5
  147:6 161:20
  164:20,21,23
  165:10,23
**settlements** 47:15
  47:19 49:5,23
  88:14
**settling** 112:19
  146:5
**severally** 222:19
  223:13
**share** 28:2
**shared** 237:20
**sharing** 17:17
**sheet** 13:19 16:6
  35:7 137:2 170:3
**sheets** 26:21
**shemah** 4:20
**shielded** 17:4,7
**short** 51:13 52:6
  62:6 66:4 78:24
  104:19 209:1
  217:7
**shot** 118:24
  152:12
**shouldn't** 232:22
**show** 96:19
  117:25 151:14
  204:4
**showed** 102:21

**showing** 69:8 72:3
94:25
**shown** 180:11
**shows** 124:4
157:21 204:9
**side** 10:13 49:9,12
49:20,22 50:24
55:20 56:3 80:21
120:25 128:9,10
128:15,21,23
129:5,6,10,13,17
129:18,19 131:10
132:1 154:17
161:24,25 162:5
162:11,13,21,25
163:2,4,6,7
164:20 165:11
185:20 201:3
240:15
**sides** 81:12
**sieving** 133:14
166:22
**sign** 26:9 43:19
100:14 197:7
**signatories** 34:17
35:4
**signature** 76:17
76:17,20
**signed** 18:7 32:12
32:21,23,25 33:3
33:8,9 34:22,25
35:4,5 39:3 42:10
79:24 80:16,17
91:4 196:23,24
206:21
**significance**
218:11 227:16
**significant** 12:24
16:5,15 33:25
65:1,8 67:22 97:1
97:17 196:18
201:3

**significantly**
196:21 234:14
**similar** 82:9 186:7
**similarly** 92:17
**simple** 21:1 102:7
102:8 191:25
192:20
**simply** 76:2 102:5
192:17 232:18
242:19
**single** 214:15,21
214:22 222:9,9,11
223:1,3 233:10,19
**sir** 7:23 51:19
59:19 70:7 79:5
99:6 105:18 106:9
106:9,14,16,19
107:18 108:23
109:7 110:1
111:20 112:13
113:2,9,22 114:15
116:25 117:4
126:25 137:7
139:6,19,19,24
140:1,4 141:4
142:9,18 143:12
145:6,25 146:14
146:21 147:9
148:2 150:14,18
160:14 164:16
170:7 172:4
198:22 203:15,18
205:7,14,22 207:9
207:23 208:3,11
209:2 216:8 234:2
**sit** 59:13 122:6
131:17 155:25
**sitting** 125:3
158:20
**situated** 104:20
**situation** 16:2,14
189:4 214:19
228:14,16 233:6

**situations** 172:22
223:9 233:8
**six** 121:7,11
134:20 154:23
155:3 168:3
**size** 72:10 218:11
**sized** 89:3
**skeptical** 12:22
24:23
**skewed** 71:21
**skillsets** 104:1
**skinny** 63:4
**skip** 48:17
**slide** 203:21
**slight** 222:17
**slightly** 24:5
117:16 151:5
**slowly** 177:10
**small** 27:22,23
28:16 63:4 92:13
190:1 218:21
**smaller** 16:14
133:8 166:16
173:19
**solely** 7:1 111:12
144:23 178:13,16
179:1 188:25
**solicit** 207:16
**solicited** 47:8
**solutions** 248:20
**solve** 71:11
**somebody** 13:2
17:9,22 104:25
138:15
**somewhat** 107:17
141:2 182:5
**sontchi** 1:22 93:17
96:17
**sontchi's** 111:25
145:11
**sonya** 2:25 248:3
248:8

**sorry** 9:14 18:6
22:25 31:8,11
34:19 40:17 41:6
43:2 47:22 49:11
50:12 51:13,25
57:12 58:2 63:3
83:19,21 93:4
99:16 110:20
120:23 121:1,8
126:10 127:19
129:3 130:19,25
131:4 136:16
138:6 144:6
154:15,18,24
159:25 161:9
162:19,20 164:8
164:13 171:5,14
177:12 182:7,7,9
189:16 194:8
195:14 203:25
210:13 212:21
223:15,16 224:16
224:22 225:25
227:10,11 230:12
236:21 239:1,4
**sort** 45:16 112:14
146:1 212:2
228:16
**sought** 122:12
156:6 167:11
**sounded** 131:2,2
164:14,14
**sounds** 57:6
**speak** 99:17
124:12 158:4
201:22 202:2
**speaking** 32:16
70:13 241:11
**speaks** 187:24
238:22 243:3
**speciation** 57:13
**specific** 24:12
32:23 59:24 98:1

122:10 123:24
124:2 127:6
128:25 129:16
156:4 157:16,19
160:21 162:15
163:4 182:13,15
189:3,10,15,22,25
190:14 209:21
215:24 219:19
235:13,19 237:10
237:15
**specifically** 29:21
73:9 102:12,15
124:6 128:24
157:23 162:14
180:7 187:23
200:16 203:12
205:12 209:16
210:21 222:20
**specifics** 111:3
117:19 144:14
151:8
**speculate** 110:17
144:3
**speculation** 37:25
100:10 111:16
145:2 239:14,18
239:24 240:7,8,13
240:21 244:21
**speed** 10:9
**spell** 7:14 171:25
**spend** 88:13 218:7
**spent** 92:15
240:23
**spiked** 88:16,18
**spinout** 13:5
**spoke** 132:7
165:17
**sponsors** 48:3
49:5
**square** 24:8
**stable** 24:5

**stack** 120:10
154:2
**stakeholders** 56:6
96:3 172:22
**stalking** 43:5
130:1 163:14
211:19
**stand** 6:22 7:8
51:3 131:17 165:3
237:4 245:3,24
**standalone** 38:18
**standard** 82:8
**standing** 10:25
92:19 171:19
**stands** 236:21
**start** 15:14 20:3,6
23:25 47:21
105:19 121:8
139:7 154:24
229:16 239:16
246:11
**started** 18:20
22:14 28:8 53:17
53:17 86:25
112:23 146:10
**starter** 16:13
**starters** 23:10
**starting** 10:3
18:24 236:16
237:14 239:15
**starts** 237:9
244:22
**state** 7:14 17:18
38:23 39:2 57:14
107:15 119:14
153:5 171:25
177:10 189:14
201:9 209:19
245:1
**stated** 21:24 141:1
**statement** 14:24
59:14 85:3,6
86:13 110:5

112:11 135:8,18
135:24 143:16
145:22 168:14,23
169:4 244:3
245:18
**statements** 56:17
208:4 242:15
**states** 1:1,12
**stayed** 21:3
110:25 144:11
**staying** 63:20
**stein** 4:14
**steinhagen** 5:17
**step** 16:16 69:24
137:5 170:5 216:9
**steps** 69:21,25
100:16
**steven** 5:12
171:17 172:2,9
173:22 199:24
209:13 220:14
**stick** 136:15
169:18 182:21,22
**stock** 3:13 35:13
37:18
**stop** 87:5,5
**stopped** 20:9
**storm** 193:4 206:2
**straight** 55:10
101:3
**stranded** 15:20
17:21 231:16
232:6
**strategic** 215:12
215:22
**strategy** 92:12
**streamline** 132:25
166:9
**street** 1:13 46:11
**stressed** 217:17
**stretch** 38:19
**strike** 30:22 37:21
69:2 72:14 86:13

87:4 132:16
165:25 193:3
246:20,22
**striking** 86:16
**strom** 5:12 6:18
6:25 138:4 171:3
171:17,18,24
172:2,2,5,6,6,9,11
172:24 173:2,22
173:24,24 175:3
177:4,13 178:25
180:5 181:23
183:11 184:11
185:17 186:24
189:9,13 193:19
193:22,25 196:13
197:16 198:6
199:24 200:1,3,5
201:13 204:21
209:4,13,15 212:1
212:12,20 216:10
220:14 222:4,18
222:22 223:19,24
224:1,3,20 225:13
226:5,11,23
227:11 230:14
232:15
**strom's** 219:11
220:18,24 221:1
221:15,19 224:6
224:12 225:3,4
227:17,21 228:1,5
**strom's** 230:21
232:9,20,21
**strong** 50:22
111:7 144:18
**structural** 55:18
**structure** 53:8
90:3,16,25 100:21
130:12 164:1
173:25 207:18
210:17 211:13

**structured** 80:14
211:12
**struggling** 197:14
**study** 89:15
**stuff** 57:2
**sub** 209:19
**suberect** 96:11
**subject** 77:25
135:9 168:15
241:16
**subjected** 200:12
**subjects** 125:13
159:5
**submission**
242:17
**submissions**
220:25,25
**submit** 59:6
**submitted** 53:18
79:18 82:24 83:16
83:21 183:13,16
205:11 227:11,12
242:9 244:10
**subordination**
50:10,15
**subparagraph**
48:24
**subparagraphs**
225:11
**subsequent** 59:21
96:19 131:21
165:6
**subsequently** 9:24
215:11
**subsidiaries** 56:14
56:22 207:20,25
**substance** 15:3
51:17 209:3
**substantial** 24:7
24:11 37:7 40:22
94:22 95:2 96:5
97:24 105:20
106:2,12 107:23

108:15 109:5
110:3 113:21
126:1 139:8,12,22
141:9 142:1,16
143:14 147:8
159:16
**substantially** 86:5
88:24 89:12,13,19
96:12
**substantive**
214:17,19
**substantively**
188:1,4,12,22
189:1,5 214:22
**subtle** 197:22
**subvert** 245:22
**succeeded** 238:8
**successful** 213:24
**suggest** 38:13
**suggestion** 26:3
**suite** 248:22
**sullivan** 5:1
**summarized** 77:3
**summary** 215:3
238:15 243:14,15
243:15 244:1
245:2
**summer** 130:1
163:15
**supplemental**
243:9
**support** 10:12
22:10 26:3 34:8
42:5,6 44:9,10
59:7,9 82:24
92:17,22 97:13
108:4 127:16
141:15 187:8
221:8,16 222:4
223:25 228:20
**supported** 20:18
**supporting** 19:3
65:10 106:17

140:2 161:6
**supportive** 42:9
**supports** 221:13
227:22 228:2
**suppose** 180:2
184:4 194:4
196:23 197:5,6
**sure** 12:22 13:16
18:19 31:16 32:8
35:2 36:2 44:12
55:5 61:25 64:6
66:12,15 69:13
79:1 82:7 91:13
101:12 116:21,21
118:1 120:10,11
123:8 126:17,17
127:6 135:3
150:10,10 151:16
154:2,3 157:2
160:6,20 172:8
174:16 177:8,12
177:19 187:19
197:13 199:23
202:14,16 209:11
213:5,7 217:16
219:9 229:17
236:16 246:3
**sustain** 87:3 95:12
245:19
**sustained** 135:5
168:12
**swap** 27:22
**swings** 109:22
143:8
**sworn** 216:17

---

**t**

**t** 80:21 129:5,7,13
162:21 163:2
172:2,2 248:1,1
**tab** 8:21 11:5
28:16,20 29:5
30:21 33:16,17
38:20 47:20,20,21

47:22,24 48:12,15
49:15 50:9,13
53:18 54:10 60:1
60:2,2 63:3,4 65:3
66:3,25,25 67:7
67:11 75:4 76:11
76:19 79:14 82:22
83:20 99:3 108:23
142:9 174:13,14
200:4,5 204:19,21
206:2
**table** 20:8 77:3
90:1
**tabs** 67:4
**tack** 176:21
**tactics** 133:22
167:5
**take** 6:15 11:16
12:6 14:15 16:8
19:9,14 20:14
24:1 25:15 33:18
51:13 52:6 55:2
73:22 78:22,24
87:17,23 99:3
103:14 104:19
123:20,22,23,25
124:5 157:12,14
157:15,17,22
178:7 179:9
199:18 203:25
209:1,15 212:4
215:1 225:3 229:9
246:2
**taken** 15:24
101:18
**talk** 18:14 20:6
46:10 86:25
108:14 110:2
114:19 115:18
122:15 125:18
132:23 141:25
143:13 148:6
149:6 156:9 166:7

191:13 229:11
241:13
**talked**  14:2 97:15
97:16 98:3 124:22
132:5 158:14
165:15 215:16
**talking**  24:17
32:25 33:2 35:17
58:8 69:20,22
87:5 189:14
**talks**  225:22
238:17
**tangible**  210:1
**tape**  31:10
**targeted**  7:1
**task**  212:4
**tax**  14:19 15:1,6,6
15:9,9,13,16,20
16:11,16,19 17:3
17:4,6,15,17,22
17:22 18:7 22:20
24:4 26:4 52:23
53:5 80:10,14
109:20,21,21,22
112:25 124:13,14
124:16 132:13
143:6,7,7,8
146:12 158:5,7,8
165:23 207:18,24
208:13,17 210:17
231:4,5,8,11,20
**taxable**  11:22
12:5,18,21 13:4,5
13:13,15,15,17,18
13:23 14:10,17
15:15,19 16:1
17:10 18:12 20:19
21:17,21 22:10
108:4,7,12,12
141:15,18,23
207:18,24 208:12
231:6,18

**taxes**  53:6,10
109:12,13 112:6
142:23,24 145:17
**tceh**  18:8 24:9,10
43:14 48:1,3,4,8
54:19 70:21 72:3
112:25 130:16
**tch**  146:12 164:5
**team**  70:15
**technically**  67:5
**telephonically**
5:15
**tell**  7:10 22:21
23:18 33:21
118:25 128:13
133:5,12 152:13
162:3 166:13,20
171:21 212:6
214:14 216:19
234:5 244:23
**telling**  73:18
**tells**  77:17
**template**  24:1
**ten**  43:24 88:20
**tension**  117:23
151:12
**term**  13:19 35:7
51:24 113:5
146:17 207:6
**terminate**  41:19
43:3 115:21,24
117:14,19 119:1,8
122:7 149:9,12
151:3,8 152:15,23
156:1
**terminated**  21:5,5
21:24,25,25 53:16
116:4,7,15,15,18
117:5,10,25
119:11 121:5,9
122:1,18 149:17
149:19 150:2,5,7
150:19,24 151:14

153:1 154:21
155:1,20 156:12
**terminating**
118:20 152:8
**termination**  22:5
60:18 65:19 68:5
68:7 84:24 91:16
100:2,3,7 102:6
110:4,7,15 115:18
118:21 120:4
121:6,14 122:2,19
123:6,9,16 143:15
143:18 144:1
149:6 152:9
153:20 154:22
155:6 156:13,25
157:3,8 195:3
196:20 198:16
199:8 223:21
224:4 225:5,9
227:23 228:2
233:3 240:5
**terms**  15:25 21:11
31:15 67:21 71:8
84:11 118:14
152:2 211:12
215:20 230:17
235:9 242:23
**terteryan**  3:9 7:5
7:6,18 8:6 9:5
23:1,3 26:13,16
26:20 27:6,17
37:24 48:16 58:16
78:4 98:22,22,25
103:6 104:4
**test**  44:22 80:5
**testified**  52:15
58:17 62:3 97:18
105:21 108:10
114:25 122:12
125:22 127:3
132:18,25 139:8
141:21 148:12

156:6 159:12
160:17 166:2,9
174:7 184:19
185:18 214:10
221:14
**testify**  57:15,16
78:18 113:23
114:7 124:23
135:7,15 147:10
147:19 158:15
168:13,19 173:25
174:4,24 176:25
237:13 243:25
**testifying**  22:14
200:17 234:11
236:20 242:1,21
**testimonies**
179:22
**testimony**  6:25
8:16,19 11:9 18:4
18:7 51:17 85:6
86:7,12,17,23
101:14 108:9
114:21 118:1
135:3 137:14
141:20 148:8
151:15 168:11
170:14 175:3
178:25 179:24
184:3 187:3 188:3
188:22,25 193:17
203:19 205:10
206:21 207:1
209:3 219:17,19
220:11,18,21,23
220:24 223:25
227:12 230:8
232:9 234:13
235:11 241:5,6,23
242:14,25 243:20
245:11 246:20
**testing**  196:8

**tests** 82:8
**texas** 119:14
153:5
**thank** 7:17,23 8:3
22:20 23:2 26:15
27:17 28:1 40:19
46:14 48:19,20,21
52:13 62:17 63:7
98:18,19,21 103:1
104:4,7,22 105:5
105:6,7,18 108:14
109:4 119:24
120:19 122:15
136:1,4 137:7
138:2,18,19 139:6
141:25 142:15
153:15 154:11
156:9 169:6,7
170:7 171:1 172:3
172:4,8 182:19
195:18,20 199:13
199:17,23 204:2,3
209:5 216:8,10
219:15 229:5,8
230:5 234:2,3
235:7 239:11
240:24 241:1
244:2,14,16 247:5
247:6
**thanks** 6:7
**that's** 45:21
173:18 174:13
179:4,14 181:14
182:17 185:11
191:25 197:21,25
198:11 200:4
207:4,12 230:14
230:17 233:19
235:20 236:24
237:5 238:22,24
240:7 241:15
243:22 244:14
245:16

**thee** 68:7
**theoretical** 195:10
**theory** 58:21
**thereof** 205:3
207:13
**there's** 180:22
193:3 195:9 203:9
204:21 234:12,18
238:2,13,14,16,21
241:5 242:6,25
243:7,23 244:13
245:16 246:2
**they're** 144:23
188:1,5,5,7,12
203:13 204:24
237:12 238:13
242:4 244:10
**they've** 236:14
**thick** 29:4 54:11
**thin** 173:18
**thing** 17:6 24:24
34:1 91:20 214:14
238:1 245:22
246:4
**things** 17:19 23:6
60:25 66:21 195:7
210:1 241:5,11
**think** 6:19,25 10:1
10:22 12:19 13:1
13:9 14:4,24,25
15:2,3 16:2,12
17:16 18:23 19:25
21:9 25:4,11,13
26:8,25 28:16
29:4 30:4,23
32:19 33:2,17
36:15,20 38:2,14
38:15,18,19 39:19
42:4,18 44:2,17
44:20 45:13 46:19
50:21 52:8 53:16
57:19 60:1 61:18
62:11 67:20,25

71:17 72:11,15
73:3,4,6 77:18,22
82:7 85:2,15,16
86:6,17,24 87:4
87:11,11,19 88:20
89:1,10,17,20
90:18 91:2 92:4
93:4 94:2,9,15
96:9 97:2,3
101:22 104:14
107:16,16 108:2,5
111:18 112:24
113:14 115:15
116:1,13 118:16
119:3,11 120:7,24
123:22 124:8
125:15 127:3
128:13,18,20
129:25 130:2,5,15
130:24 131:17
132:7,18,20,21
133:23 134:15
141:1,2,13,16
145:4 146:11
147:1 149:3,14,25
152:4,18 153:1,23
157:14,19,25
159:7 160:17
162:2,8,10 163:13
163:15,18 164:4
164:12 165:2,17
166:2,4,5 167:6
167:23 172:25
174:13 177:17
196:8,14 198:3
212:2 214:10
215:14,16 216:11
222:1,2 223:17
226:13,21 227:6
229:18 230:15
232:25 233:1,20
234:14,18 236:23
238:13,23,24

240:7 241:5,17,24
242:5 243:8,11
244:10,13 246:1
**thinking** 32:22,23
33:10,11
**thinks** 72:14
**third** 6:5 19:19
63:22,25 64:1,10
65:23 66:6 75:25
86:8 93:23 94:8
94:17 97:4 99:11
99:11,23 110:15
110:21 111:24
144:1,7 145:10
181:1,21 189:22
189:25 190:5,19
193:18 200:24
206:3,12 233:13
235:15 242:5
**thirds** 107:23
141:9
**thirty** 237:17
**thomas** 55:24,24
56:4,16 57:8,16
**thomas's** 57:14,18
**thompson** 114:1
126:13 136:6,17
136:22,25 137:1,9
137:17 138:2
160:3 169:9,23
170:1,2,9,17
171:1
**thought** 7:24 12:5
14:5 20:1 24:8,11
24:16,22 26:1
42:4 53:1 88:2
92:24,25 96:18
99:24 100:21,22
134:1,9,10 167:8
167:17 201:23
202:3,8,18
**three** 29:22 68:14
81:23 114:16

130:10 148:3
163:23 210:11
225:18,21,21
226:4 236:3,8
**thrown** 15:16
101:9
**tier** 29:22
**time** 8:9 12:6
15:24 17:11 20:13
21:6 22:7 24:2,3
24:16,24 25:16
26:14,23 31:20
32:8 36:11 37:8
38:13 42:11,22
43:12 45:17 50:24
51:21 52:2 53:9
54:8 58:5 61:14
61:21 63:14,22
64:18 70:8 71:16
71:16 76:16 80:1
81:16,21 85:18
86:2 89:25 90:1,2
90:6,15,18,21
92:20 94:6 96:20
99:9,21 101:10,12
102:19 105:15
106:1 107:1
115:13 116:8,17
122:11 125:7
126:2,4,14,18
127:1 128:9
129:25 130:9
133:9 134:8,14,14
134:15 135:21
139:3,11 140:11
149:1,20 150:7
156:5 158:24
159:17,19 160:4,7
160:15 161:23
163:8,13,22
166:16 167:16,22
167:22,23 169:1
173:9 177:6,16,18

177:22 178:8,19
178:23 179:3,11
179:13,21 180:1,7
181:6,20 183:16
196:24 200:11,17
201:9,24 202:4
205:23,23 206:3
206:10,10,20,20
218:7 234:9
240:16 243:16,16
246:13
**timeframe** 30:3
47:13 61:24
123:24 128:13
129:23 157:16
162:2 163:11
**timeframes** 45:18
**timeline** 45:18,20
46:7
**timeliness** 12:23
**times** 133:21
167:4
**timing** 46:20
234:22
**tired** 234:5
**titled** 207:14
**today** 6:12 8:16
8:19 28:8 53:19
59:13 63:2 79:17
84:17 105:19
122:6 124:23
125:3 129:14
139:7 155:25
158:15,20 163:3
173:25 174:4
184:3,6 219:16
221:14 227:12
241:21,25 246:16
**today's** 219:20
**told** 89:11 132:19
133:21 166:3
167:3

**tomorrow** 242:10
246:4,11 247:1
**toolkit** 17:19
**top** 34:5 48:10
50:14 51:5 54:23
62:12 69:14
120:21,24 154:13
154:16 189:17
192:11 207:11,14
212:15
**topic** 41:14
**topping** 219:6
**torres** 4:8 79:7
171:16 235:8
**total** 28:23 61:2
77:8 91:23 96:25
133:19 167:1
191:18,21 192:5
194:10,22
**totaling** 206:6,16
**totally** 234:6
**touched** 189:20
**tower** 92:14
**tpuc** 17:1,21,25
18:2,21
**track** 36:4,7,8
**tracked** 95:3
186:11
**trade** 40:14
**trading** 36:8,12
36:14,16,17,19,21
38:16
**traditional** 130:12
163:25
**transaction** 11:22
11:23 12:5,11,18
12:19,21 13:4,15
13:17,19,23 14:18
15:15,20 16:1,19
17:10 18:1,12
19:11 20:19 21:17
21:21 26:4 28:22
28:25 30:2,8,9,11

32:13 40:7,8
43:14,17 44:11,14
44:23 47:8,9
52:16,22 53:13,16
59:11,17,18,22
61:22 64:11 67:18
80:5,6,6,7 81:9,24
81:25,25 82:17
84:3 90:8 97:19
102:4,6 106:18,21
106:24 107:5,5,9
107:20,21 108:3,4
108:6 115:21,25
116:6,9,15,18,20
117:6,10,15,20,21
117:22 119:8,9,12
119:15,16 121:10
121:13,18,21
122:1,2,8,8,13,24
123:1 124:25
128:14,22 133:1
134:14 135:22
140:3,6,9,15,15
140:19 141:6,7,14
141:15,17 149:9
149:13,18,21
150:2,7,9,20,25
151:4,9,10,11
152:23,24 153:2,5
153:6 155:2,5,10
155:14,20,21,21
156:2,2,7,18,20
158:17 162:4,12
166:10 167:22
169:2 179:13
181:16 191:19,22
194:1,4,15,18
195:2,5,6,12,22
195:23 196:1,15
196:17,21,22
198:12,13,17
199:2,3,4 200:13
201:4 202:8,17

204:15 205:5,19
205:20 207:5,14
207:25 210:3,18
211:1,2,7,8,21
218:1,5,12,14,17
220:6 222:14
227:3 230:4,10
231:1,3,4,8,11,11
231:18,20,23
233:19 239:20
**transactions**   18:9
20:17 79:25 80:4
80:10,13,17 81:1
81:4,5,17,19,24
82:4,5,16 108:11
117:2,9 119:2
141:22 150:16,23
152:17 186:15,24
187:12,16 188:9
210:6,6 217:5,9
217:10,18,19,23
222:23,24 223:1
**transcribed**   2:25
**transcript**   42:20
248:4
**transfer**   3:13
121:14 155:6
**treasury**   127:12
127:22 161:2,12
**treated**   20:10
214:20
**tremendous**   15:24
**trial**   2:1 110:24
111:5,6 144:10,16
144:17 234:23
**tried**   130:1 163:14
188:23
**trigger**   20:19
102:10 121:22
155:15
**triggered**   100:3,3
100:8,15 122:23
156:17

**triggering**   15:5,9
80:10
**triggers**   120:3
121:17 153:19
155:9
**true**   9:2 28:10,20
39:24 59:15
101:16,24 173:5
230:17 248:4
**truly**   133:23
167:6
**trust**   29:11 109:6
142:17
**trustee**   241:9
246:6
**truth**   7:10,11,11
171:21,22,22
216:19
**try**   28:21 29:9
43:12 92:6 114:21
117:21 131:23
132:25 148:8
151:10 165:8
166:9 197:24
212:24 218:9,17
**trying**   10:8 40:17
43:23 64:6 91:22
105:8 121:4
128:13,25 138:20
154:20 162:2,15
197:22 209:25
211:4 213:3,8
231:3 234:7,22
**tsa**   82:1
**tune**   15:17
**turn**   8:21 11:5,13
19:15 22:11 28:15
29:3,19 31:23
33:16 35:9 36:22
41:15 44:19 48:6
48:7 49:15 50:9
51:4 54:10,22
60:1 66:3,24,25

70:6 75:4,9 76:11
76:21 79:14,20
82:16 83:2 84:7
89:24 108:23
110:9 120:9
142:10 143:20
153:25 174:21
184:10 186:21
189:10 200:3,6,15
201:6 202:23
203:8,12 205:10
205:11 207:9,12
**turned**   98:6
101:25
**turning**   36:22
43:7 203:10
**turnover**   131:15
132:12 164:25
165:21
**two**   16:3 18:9
23:21 25:19 39:8
47:19 51:4 62:6
67:22 68:20,22
87:24 88:16 90:10
93:5 107:23 109:4
116:1 141:9
142:15 149:14
191:15 194:5
204:5 206:23
215:17 217:7
218:13 221:3,4
222:18 223:8,18
237:20 238:1
241:9
**type**   18:9 24:24
217:8
**typed**   243:24
**typical**   202:25
225:22
**typically**   127:11
161:1 205:3,17
210:25 212:15
213:3,7 230:18

**typo**   67:20

**u**

**u.s.**   1:23 172:23
**uaf**   169:14
**ucc**   129:3,4
162:19,19
**ultimate**   16:4 88:8
**ultimately**   10:1,12
15:10 21:4 38:11
47:8 51:11 55:15
61:25 70:2 77:20
81:23 93:23 98:9
98:12 110:15
111:21 130:6
134:25 144:1
145:7 163:19
168:8 201:24
202:4,8,18
**um**   225:1
**umb**   4:2,23 6:24
28:7 136:11
169:15
**umb's**   9:12,16
**uncertain**   115:5,7
115:8,9 148:17,19
148:20,21
**uncertainty**
111:17 115:11
134:16 145:3
148:23 167:24
**underlying**
222:15,21
**understand**   7:3
13:5 15:15 21:19
26:11 35:25 42:13
58:6 59:25 75:5
75:25 87:6 89:22
93:12 122:17
126:10 131:22
156:11 159:25
165:7 177:19
179:22 181:23
182:1,16,24 185:4

187:19 197:16
213:6 214:18
220:13 226:7,18
231:3,14 239:16
239:17 240:6,11
240:14,22,23
244:22 246:3
**understanding**
6:12,24 21:1
49:16 50:2,4,19
51:6,7 58:11,19
63:18 71:13 73:10
74:13 75:18
106:14 108:8
113:15 117:16
123:15,17 128:12
133:2 139:24
141:19 147:2
151:5 157:7,9
162:1 166:11
182:6 220:24
224:7 225:9,13
226:11,23 241:13
242:2 245:10
**understatement**
118:17 152:5
**understood** 39:12
71:7 90:24 93:3,8
94:17,19,20
101:24 122:17
134:13 156:11
167:21 209:4
223:5 229:12,12
241:21
**undertaking** 47:1
**unfair** 71:21
242:20
**unfortunately**
27:20
**unimpaired** 37:10
**unique** 53:8
**uniqueness**
102:16

**united** 1:1,12
**universe** 188:24
188:25
**unknown** 1:25
**unquote** 133:25
**unsecured** 5:2
19:10 24:6 32:12
32:16,17,20,23
33:3 34:15,21,25
35:10 37:13 39:3
39:10,11,12 40:9
44:25 45:2,5
55:21 130:16
164:5 194:11,14
194:23 195:8
196:16,19 198:11
201:3 237:23
240:16
**unsecureds** 43:14
**unsolicited** 42:23
**update** 54:24
67:12,18 68:15
69:4
**updates** 20:11
67:14
**upstreamed** 203:3
**urged** 115:20
122:7 149:8 156:1
**use** 17:18 27:21
28:17 30:16 45:20
63:6 80:16 236:11
**uses** 15:2
**usually** 210:10
211:6,11,15

**v**

**v** 7:16 172:2
**vague** 126:13
160:3
**vaguely** 51:2
107:22 141:8
**valuable** 24:23
**value** 10:9 12:7,11
12:23 13:10 14:6

14:13 16:25 28:23
35:23 39:22,24
40:4 42:2 44:18
69:22 70:1 81:10
81:19 83:17 84:11
86:3 87:8 90:8,16
91:24 106:21,23
108:2,5 112:18
113:15 115:10
123:3 129:18
140:6,8 141:12,16
146:5 147:2
148:22 156:22
163:6 181:16
194:25 196:19
201:10 202:9,19
204:10 218:9
230:11,13,22
240:1
**valued** 30:8
**values** 69:16,17
**various** 19:23
44:10 72:1 119:14
126:2 128:10
153:4 159:18
161:24 177:18
179:19 180:9
181:5 215:21
235:12
**vast** 27:12
**veil** 17:19
**veritext** 248:20
**version** 236:9,14
**versus** 24:18
107:6 114:12
134:2,2 140:16
147:24 167:9,10
180:23
**viable** 20:10,10
101:22
**vice** 8:10
**view** 14:22 89:7
115:4 123:19,25

131:20 148:16
157:11,17 165:5
178:17 229:1
**vigorous** 53:19,24
**virtually** 92:21
**vis** 24:6,6
**vistra** 112:6,15
113:6,18 145:17
146:2,18 147:5
**volume** 36:19
172:24,25
**vote** 35:19,21
80:25 97:20
**voted** 81:3,16
97:18
**voting** 82:10

**w**

**waited** 22:4
**waiting** 116:19
120:22 124:4,24
150:9 154:14
157:22 158:16
**waiver** 20:5
**waivers** 19:23
21:2,11,16
**walk** 64:16 102:11
102:14
**walked** 102:21
241:20 242:7
**want** 20:3 46:10
46:16 57:20 58:23
82:16 83:4 89:20
89:22 92:18,19
95:18 100:6 103:4
104:12 110:2,21
111:1 113:23
115:18 118:1
125:12,13 131:23
133:16 137:5
143:13 144:11
147:10 149:6
151:15 159:4,5
165:8 166:24

173:10 189:9,21
194:3 198:5
203:16 218:15,20
223:18 229:17
231:17 232:25
234:20 245:5,9
246:1,2
**wanted** 21:12
22:8 23:16 25:6
28:9 57:8 62:17
64:12 117:14
151:3 179:18
232:24
**wants** 114:2
147:14
**ware** 96:21
**wasn't** 22:8 25:5
45:14 53:5 56:25
69:3 71:14,22
133:9 174:16
178:22 179:20
235:16
**waterfall** 55:16
95:6 96:2 97:6
118:12 122:25
151:24 156:19
198:19,21 211:6,8
211:10,18 212:14
213:8,9,18,21,25
214:5
**waterfalls** 213:16
**way** 15:4 18:24
21:1 22:1,10,13
34:10 41:2,4
53:17 71:8 78:17
84:1 86:24 89:11
99:24 103:25
114:14,16 148:1,3
183:9 184:2,4
188:8 191:5 212:3
212:4,7 213:2
227:5 245:22

**ways** 67:22
**we've** 33:22,23
43:18 46:16 120:7
124:15 153:23
158:7
**website** 186:4,7
**week** 94:16
242:18
**weekend** 67:23
**weekly** 20:11
**weeks** 134:20
168:3
**welcome** 7:22,22
104:5,8 137:8
170:8 239:12
**welsh** 173:16,17
173:19,23 182:9
182:11,14,19,22
195:14,18 196:6
197:22,25 199:10
199:13,17 216:5
216:12,13,21
219:8,15 224:18
224:22,25 229:6
232:7,12 233:15
234:1
**went** 11:12 61:11
67:25 74:6,6,7,9
88:7 91:21,22
92:13 109:8 130:2
130:4,7,8 134:20
142:19 163:15,17
163:20,21 168:3
177:12 199:6
242:2
**weren't** 207:4
**we'll** 173:1 191:13
194:9 206:3 209:1
238:4,12,19,20,22
245:24 246:3,11
246:12
**we're** 244:6,7

**we've** 200:5
**wholes** 97:15,24
98:5 201:9,23
202:3
**williamson** 5:18
72:19
**willing** 194:10,21
**willingness** 13:13
55:2
**wilmington** 1:14
**win** 212:24 213:8
214:3
**windsor** 215:21
**wins** 213:17
**wire** 121:14
127:22 155:6
161:12
**wires** 127:24
161:13
**wishes** 216:4
**withdraw** 76:5
114:13 129:8
147:25 236:22
238:4,12,19,21,22
241:20 244:7
246:21
**withdrawing**
244:6 245:20
246:6
**withdrawn**
236:24 237:5,8
241:25 246:10
**withdrew** 245:10
245:13
**witness** 5:11,12
5:13 6:24 99:15
138:5,9 171:4,8
199:22 200:4
243:23
**woodmont** 215:22
**word** 7:10 78:1,9
89:4 112:17 146:4
171:21 203:6

**worded** 14:24
**words** 13:16 15:2
80:16 106:7 121:3
139:18 154:19
178:24 179:16
192:9 213:17
**work** 6:11 12:4
22:20 108:19
111:15 112:25
128:21 142:5
145:1 146:12
162:11 197:19
201:20 217:1,2,8
220:1,2
**worked** 10:2
184:22 215:9
217:6
**working** 10:10
19:3 126:22
129:17 160:11
163:5 228:11
230:21
**works** 198:19
**world** 201:9
**worlds** 119:5
152:20
**worth** 92:23
**would've** 101:6,25
**wouldn't** 188:2
203:10
**would've** 198:12
198:17 230:10,12
231:12,15,25
232:4,5 238:9
**wright** 74:1 132:7
165:18
**write** 183:7
202:25
**writing** 21:7
108:25 142:11
**written** 11:5,9,11
11:13 19:15 22:12
25:2 27:7 38:21

**[written - à]**

41:15,17 59:6
68:11 79:17
105:21 106:16,20
107:12 109:25
112:5 116:23
124:3 125:22
127:3 137:12
139:9 140:1,5,22
143:11 145:16
150:12 157:20
159:12 160:17
170:12 173:1,2,3
174:12,18 186:22
189:11 200:3,4,5
200:16 202:24
203:19 204:21
205:10,12,24
206:9,11,21 207:1
235:12 241:23
**wrong**  41:3 59:5
94:19 95:20 121:2
132:8 154:18
165:18
**wrote**   208:11

**x**

**xiv**   34:21

**y**

**yeah**   6:14 18:19
26:23 28:1 32:4
33:25 34:23 35:19
44:1,12 51:25
52:8 53:3,10
57:15 59:12 62:9
62:17,22 77:18
85:7,15 86:5
89:10 91:5 93:19
99:19 102:15
104:3 112:24
113:8 118:4 120:2
121:2 125:21
126:16 127:21
130:23 131:8
135:5,17 146:11

146:20 151:18
153:18 154:19
159:11 160:5
164:11 168:12,22
170:1 174:14
192:16 196:9
209:1 212:19
217:24 223:12
231:9 233:18
234:6 237:2
**year**   18:9 87:12
87:13 88:16
109:23 124:1,20
143:9 157:18
158:12 186:5
220:5,11 243:6
**years**   36:13 40:21
88:19 172:20
217:7 228:12
**yenamandra**   3:7
**yep**   91:16 104:23
104:23
**yesterday**   109:11
117:22 128:4
142:22 151:11
161:18 216:25
217:11,12 241:4
241:19,22 244:5
245:12
**yield**   239:20
**york**   9:23 31:17
34:16 243:1
**you'd**   171:18
201:8 235:20
**you'll**   171:21
239:15 245:20
**you're**   172:8
174:4 179:9,10,17
184:4 190:6 191:5
193:3 200:17
201:13 207:23
234:7 235:3 236:5
239:12

**you've**   60:7
184:11,15,18,21
185:8,12 205:11
233:7,16 241:24

**z**

**zero**   25:10 111:11
114:4 144:22
147:16

**à**

**à**   24:6