1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    In re:                        :

5                                  :    Chapter 11

6    ENERGY FUTURE HOLDINGS CORP., :    Case No. 14-10979(CSS)

7    ET AL.,                       :

8            Debtors.              :    (Jointly Administered)

9    _____:

10

11

12                                 United States Bankruptcy Court

13                                 824 North Market Street

14                                 Wilmington, Delaware

15                                 September 7, 2018

16                                 9:36 a.m. - 5:45 p.m.

17

18

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR:   UNKNOWN

1    HEARING re Evidentiary Trial on Allocation Matter

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    HOGAN MCDANIEL

4         Attorneys for the Ad Hoc EFH Claimants

5

6    BY:  GARVAN MCDANIEL

7         DANIEL HOGAN

8

9    KASOWITZ, BENSON & TORRES LLP

10        Attorneys for the Ad Hoc EFH Creditors' Committee

11

12   BY:  ANDREW H. ELKIN

13        ANDREW GLENN

14        DAVID ROSNER

15        MATTHEW STEIN

16        DAVID MARK

17        SHAI SCHMIDT

18        GAVIN SCHRYVER

19

20   NIXON PEABODY LLP

21        Attorneys for American Stock Transfer

22

23   BY:  MORGAN C. NIGHAN

24        RICHARD PEDONE

25

1   CROSS & SIMON LLC

2          Attorneys for American Stock Transfer

3

4   BY:  CHRISTOPHER P. SIMON

5

6   RICHARDS LAYTON & FINGER, P.A.

7          Attorneys for the Debtors

8

9   BY:  DANIEL J. DEFRANCESCHI

10          JASON M. MADRON

11

12   KIRKLAND & ELLIS LLP

13          Attorneys for the EFH Plan Administration Board

14

15   BY:  MARK MCKANE

16          APARNA YENAMANDRA

17          MARC KIESELSTEIN

18          ANNA TERTERYAN

19          MICHAEL ESSER

20

21   ROSNER LAW GROUP

22          Attorneys for Horton & Keglevic

23

24   BY:  SCOTT LEONHARDT

25

1   ROPES & GRAY LLP

2        Attorneys for Elliott & UMB

3

4   BY:   MATTHEW L. MCGINNIS

5         GREGG M. GALARDI

6         PETER WELSH

7

8   BAYARD, P.A.

9        Attorneys for Elliott & UMB

10

11  BY:  ERIN R. FAY

12

13  JEFFREY ROSENBAUM - Witness

14

15  ALSO PRESENT TELEPHONICALLY:

16  SAM N. ASHURAEY

17  MATTHEW C. BROWN

18  JEREMY CARTON

19  BRYAN CHEW

20  MING DANG

21  ERIC C. DAUCHER

22  KEVIN HANRAHAN

23  TAYLOR B. HARRISON

24  RAJESH JEGADEESH

25  CHRISTIAN P. JENSEN

1   JOSEPH LENZ

2   JINGWEN LIU

3   JEREMY MATICAN

4   TINA MOSS

5   DAVID NGUYEN

6   ERIK SCHNEIDER

7   MICHAEL C. SCOTT

8   DANIEL S. SHAMAH

9   JESSICA STEINHAGEN

10  NACIF TAOUSSE

11  MACLAIN THOMPSON

12  PATRICK VENTER

13  PATRICIA J. VILLAREAL

14  JARNILA WILLIS

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  Good morning,

3    everybody.  Okay, so we have two, I guess, preliminary

4    matters before we turn to the testimony.  One is my ruling

5    on the objections to Mr. Rosenbaum's direct, which I'm ready

6    to provide, and the other is -- maybe it's not ready yet --

7    you have an agreed order on the admission of the documents?

8    It might not be ready yet.

9            MR. MCKANE:  I think we're close --

10           THE COURT:  Okay.

11           MR. MCKANE:  -- and I believe we may actually have

12   a copy in the courtroom.  I believe all of the exhibits are

13   agreed to except for one.

14           MR. GALARDI:  No.

15           THE COURT:  Okay.

16           MR. MCKANE:  No?  We're done?

17       (Counsel confers)

18           THE COURT:  So, we're making progress.

19           MR. MCKANE:  So, hopefully, by the end of the

20   Rosenbaum declaration, we'll be able to walk that up.

21   Declaration?  Testimony, I apologize.

22           THE COURT:  Okay, no problem.  All right, let me

23   make my ruling, then, on the objections and we'll go through

24   it.  So, turning to Paragraph 10, there is a long sentence

25   that the PAB objected to.  I am going to strike that

1    sentence for lack of foundation.  It begins: "I understand

2    that one reason," et cetera, et cetera, and goes on.  The

3    objection to the second sentence -- or actually, third --

4    third sentence in that paragraph, has been withdrawn.

5            Paragraph 20, the objection to the last sentence

6    has been withdrawn.  Paragraph 33, which is a one-sentence

7    paragraph, there was an objection by the PAB and the Ad Hoc

8    committee.  Those objections were overruled.  This is

9    personal belief, and I don't believe it is substituting --

10   to (indiscernible) it is an opinion, I don't think it's to

11   the ultimate issue, so that objection is overruled, and that

12   testimony is allowed.

13           Paragraph 38, there's an objection by the Ad Hocs.

14   That objection is overruled.  I believe this is along the

15   lines of what Mr. Horton said, which is simply a recitation

16   of the factors that Mr. Rosenbaum considered in coming to

17   his decision and his ideas about what the ultimate amount

18   should be, but I think listing what Mr. Rosenbaum thinks is

19   important is proper testimony.  However, Paragraph 39 and

20   40, there's an objection by the Ad Hocs, and I'll sustain

21   that objection.  Paragraph 39 basically goes to the ultimate

22   issue before the Court, so that's up to me, unfortunately,

23   and then the same with Paragraph 40.

24           Paragraph 41, there's an objection on foundation,

25   the sentence sort of -- that whole paragraph, but I think

1  it's actually one, long sentence, begins: "Although I was

2  not personally involved..."  I think that sort of starts and

3  finishes the analysis, and the second sentence begins, "I

4  also understand..." again, these are not a direct personal

5  belief or a recitation of personal experience.  They are an

6  understanding of the evidence, and that's not proper.

7          With regard to Paragraphs 42, 43 and 44 -- well,

8  42 and 43, the objection, again, goes to the ultimate issue

9  before the Court, so I will strike that testimony and

10 sustain the objection.  The first sentence of Paragraph 44 -

11 - excuse me, the first two sentences of Paragraph 44 are

12 stricken.  Again, it goes to the ultimate issue before the

13 Court.  The third sentence, there's an objection by the PAB

14 on foundation and that's sustained, and that is stricken.

15 The next sentence is allowed, however, the rest of the

16 paragraph, starting with the word, term, "Moreover, I

17 understand..." is stricken.

18          Paragraph 45, again, ultimate issue, that's

19 stricken.  Paragraph 47 is withdrawn.  Paragraph 48, the

20 first two sentences are allowed, however, beginning with: "I

21 do not believe that this was appropriate..." the balance of

22 that paragraph is stricken.  The objection to Paragraph 49

23 is withdrawn, the objection to Paragraph 50 is overruled.

24 That lays the foundation for the summary and, I think, is

25 appropriate, summary chart.  Paragraph 51, the first

1    sentence goes to the ultimate issue, the second sentence

2    lacks -- excuse me, the next two sentences lack foundation,

3    and again, the final sentence goes to the ultimate issue, so

4    that Paragraph 51 is stricken.

5         The objection to the end of Paragraph 55 is

6    withdrawn, the objection to Paragraph 56 is withdrawn, the

7    objection to Paragraph 58 is withdrawn, and the objection to

8    the last sentence of Paragraph 59 is sustained.  Again --

9    well, the last two sentences, excuse me, goes to an

10   understanding, not direct knowledge, so that takes care of

11   that.  Would you like some time to digest that?  I don't

12   know who's doing the direct, Mr. Galardi or Mr. McGinnis.

13         MR. GALARDI:  Yes, Your Honor, two clarifications.

14   One is, reserve the right to move to strike the brief that

15   relied on these exact statements.  I don't know if they're

16   going to be withdrawn, but we would ask Your Honor, based on

17   your ruling, to strike the brief provisions that were...

18   Okay. Your Honor, second is --

19         THE COURT:  Okay, I'm sorry, are we striking the

20   whole brief, or just the ones that dealt with these issues?

21         MR. GLENN:  The portions of the brief that cite

22   this portion of the written direct and the deposition to the

23   testimony, as we discussed yesterday.

24         THE COURT:  Okay, it's so stricken.

25         MR. GALARDI:  May I have one minute?

1          THE COURT:  Yes, of course, Mr. Galardi.

2          MR. GALARDI:  Your Honor, just conferring on --

3    there were a number of statements and -- for example, that

4    the PAB objected to with respect to foundation, right?  So,

5    let's take Paragraph 10, which you've struck on the basis of

6    foundation.  I take it that is without prejudice that when I

7    establish -- so, for example, if I want to focus on

8    Paragraph 10 that you focused on, it said: "I understand

9    that one of the reasons the Debtors decided to terminate the

10   RSA..." now, Mister --

11          THE COURT:  That's already in evidence, so you

12   don't need Mr. Rosenbaum, but you know.

13          MR. GALARDI:  Okay, so that's one fact.  So, now,

14   at the last -- and I'm just going to give you a couple of

15   them because I want to make sure that the direct is

16   efficient and it's effective, right, it says -- excuse me,

17   Paragraph 51, for example, right?  Again, maybe you're going

18   to say the same thing, it's already in evidence and

19   unnecessary because the time records of Evercore's are in

20   there, but there is a foundation for that understanding.

21   Those are the time records.  They are evidence.  Mr.

22   Rosenbaum reviewed the -- I will show that Mr. Rosenbaum

23   reviewed those time records.

24          THE COURT:  Yeah, but the evidence isn't his

25   understanding of what the physical evidence is.  The proper

1    evidence is the physical evidence.  How you advocate what

2    that means is, of course, up to you, and how I ultimately

3    determine what it means is up to me, but his understanding

4    of the physical evidence is really -- I don't particularly

5    care.

6              MR. GALARDI:  Okay, that's fine.  Just wanted to

7    make sure we understood it.  With that, I would call Mr.

8    Rosenbaum to the stand.

9              THE COURT:  Okay.

10             MR. MCKANE:  Your Honor, I have the electronic

11   exhibits, may I approach?

12             THE COURT:  Yes.  Mr. Rosenbaum, please stand by

13   the stand, if you don't mind, for your affirmation.

14             CLERK:  Please raise your right hand.  Do you

15   affirm your word that you will tell the truth, the whole

16   truth and nothing but the truth to the best of your

17   knowledge and ability?

18             MR. ROSENBAUM:  I do.

19             CLERK:  Please state and spell your name for the

20   record.

21             MR. ROSENBAUM:  Jeffrey Rosenbaum, J-E-F-F-R-E-Y,

22   Rosenbaum, R-O-S-E-N-B-A-U-M.

23             CLERK:  Thank you.

24             THE COURT:  Thank you, sir.  Please be seated and

25   make yourself as comfortable as possible, and if you could

1    keep as close to the microphone as possible, I would

2    appreciate it.

3              MR. GALARDI:  May I approach, Your Honor?

4              THE COURT:  Yes.  And it's very nice to meet you,

5    sir, after hearing your name for years.

6         (Laughter)

7              THE COURT:  I must say, you're a lot younger than

8    I thought you'd be, but that means I'm getting old.

9              MR. ROSENBAUM:  Nice to meet you, too.

10             DIRECT EXAMINATION OF JEFFREY ROSENBAUM

11   BY MR. GALARDI:

12   Q    Mr. Rosenbaum, did you prepare a written direct with

13   respect to the allocation dispute?

14   A    Yes, I did.

15   Q    Okay, and would you turn to Tab 1 of the binder that I

16   just put in front of you?

17   A    Yes.

18   Q    And is this a copy of the written direct that you

19   prepared in connection with this allocation motion?

20   A    Yes, sir.

21   Q    And are all of the statements in the declaration true,

22   correct and accurate as you -- do you believe that all of

23   the statements, as you sit here today, in the declaration

24   are true, correct and accurate?

25   A    With two slight exceptions that I would modify.

1  Q    Okay, and would you please advise what paragraphs you

2  would say are not completely true, correct and accurate?

3  A    Yes, sir.  On Paragraph 29 on Page 10, the final

4  sentence.  We acquired additional debt at EFH and EFIH for

5  multiple purposes, including a real economic rationale,

6  which was to deal with potential allocation issues across

7  EFH and EFIH, who are focus was on.  Also, on having as much

8  of a pro rata or commensurate position about EFH and EFIH as

9  possible.

10  Q    Okay, and why don't we stop there and --

11           THE COURT:  Okay, which paragraph is this?  I'm

12  sorry.

13           MR. GALARDI:  It is Paragraph 29, Your Honor.  So,

14  for the record, why don't we bring it up?  Paragraph 29, it

15  says: "Thus, Elliott acquired additional debt and both EFH

16  and EFIH, believing that in doing so, the Debtors would not

17  be able to confirm a Berkshire plan over Elliott's vote to

18  reject such a plan."

19  Q    Why don't I ask you a few questions about that?  Now,

20  is your concern that there were other -- what I heard you

21  just say is, you want to qualify to say that there were

22  other purposes, is that correct?

23  A    Yes, sir, there were multiple purposes.

24  Q    Okay, and would you describe to the Court, what were

25  the other purposes for purchasing that debt?

1    A    Through the course of the transaction or the course of

2    the potential transaction, we were concerned about

3    allocations and cash balances of EFH and EFIH, and the only

4    way for us, as an investor, to neutralize that, if you will,

5    was to have a commensurate position in both EFH and in EFIH.

6    Q    I'm going to go back to basics.  First, let me ask you

7    a question.  Mr. Rosenbaum, have you ever testified in Court

8    before?

9    A    No, I have not.

10   Q    So, when we ask questions, you'll let me finish the

11   question, I will try to let you finish the answer.  If

12   opposing counsel or anyone asks questions, if I should rise,

13   I just want to make sure you understand that I may object

14   and then the Court will rule before you answer.  I'd ask you

15   to speak clearly and I'm sure you'll do so, but I just

16   wanted to make that clear.

17   A    Thank you.

18   Q    With respect to -- just a little bit of background.

19   What is Elliott business?

20   A    Elliott is an investment management firm.  We manage --

21   or Elliott manages roughly $35 billion dollars and has been

22   in business for approximately 42 years.

23   Q    And is it referred to as a hedge fund?

24   A    We refer to ourselves as an investment partnership.

25   Q    Okay, thanks.  All right, good, thank you.  Now, is

1   there anything else -- is there any other purpose, as you

2   sit here today, that you think, in addition to acquiring the

3   debt and also to take positions to neutralize risk, are

4   there any -- was there any other purpose for buying that

5   debt at that time?

6   A    We thought it made economic sense at the prices that we

7   were paying, otherwise we wouldn't have purchased it.

8   Q    Is there any other paragraph in your declaration, or

9   statement in your declaration, that you believe is not true,

10  correct, and accurate, as you sit here today?

11  A    I believe there was one word in Paragraph 55 that

12  didn't accurately reflect our actions.  The first sentence

13  of 55, (ii), I used the word, quote, unquote, "soliciting."

14  I don't think our actions were actually, at Elliott, in

15  soliciting any interest.  We hired professionals, lawyers

16  and bankers, to solicit interest and we were never doing any

17  quote, unquote, "soliciting."

18  Q    And so, you're really just being sensitive to the SEC

19  issues, correct, and not to use the word solicit, and that

20  is, as opposed to common parlance, SEC parlance?

21  A    Yes, sir.

22  Q    Okay.  Are there any other statements in this

23  declaration that you believe are not true, correct, and

24  accurate as you sit here today?

25  A    No, I agree with everything else.

1           MR. GALARDI:  I would now move into the records,

2    obviously subject to Your Honor's ruling, Mr. Rosenbaum's

3    written direct testimony.

4           THE COURT:  Any objection?

5           MR. MCKANE:  No objection, Your Honor.  Can we

6    just confirm your ruling as it relates to Paragraph 43?

7    There was a confusion, I think, among counsel about whether

8    that was in or out.

9           MR. GALARDI:  I have 43 out.

10          THE COURT:  43 is out.

11          MR. MCKANE:  Thank you, Your Honor.  No objection.

12          MR. GALARDI:  That's what I have.

13          MR. MCKANE:  No objection.

14          MR. PEDONE:  No objection.

15          THE COURT:  Okay, it's admitted, subject, of

16   course, to my previous rulings.

17          MR. GALARDI:  Yes, Your Honor.

18          THE COURT:  Just for the record.

19   Q    Mr. Rosenbaum, prior to joining Elliott, where were you

20   employed?

21   A    At York Capital Management.

22   Q    What was your role at York Capital Management?

23   A    I was a Managing Director.

24   Q    Did York have an investment in the TXU debt securities?

25   A    Yes.

1   Q    What was the type of investment that York had?

2   A    York owned various bonds and notes, from time to time,

3   in EFH and EFIH, and potentially even TCEH, dating back to

4   maybe 2010 or so.

5   Q    Were you the person at York that was primarily

6   responsible for York's investments in what I'll call the TXU

7   entities at that time?

8   A    Yes, sir.

9   Q    How long had York been invested in TXU?

10  A    I believe York was invested in TXU, in different

11  securities, on and off from, give or take, 2010 until after

12  I left.  I left in August of 2016.

13  Q    How long were you involved in York's investments in the

14  EFH entities or the TXU entities?

15  A    The entire time that York was involved, I was the point

16  person at York.

17  Q    Was this your only investment in the utility space?

18  A    No, it was not.  I was invested in the utility space

19  since the beginning of my career, so, for 19 years,

20  including actually in TXU prior to the LBO, in the 2005-2006

21  timeframe, we were a decent-sized equity holder in the

22  publicly-traded common stock of TXU Corp.

23  Q    Did there come a time in which York entered into a RSA

24  or restructuring support agreement?

25  A    York entered into an RSA?

1    Q    Yes.

2    A    In early, second quarter of 2014.

3    Q    If you would turn to Tab 2 in your binder.

4    A    Yes.

5    Q    Does this appear to be the RSA that York entered into?

6    A    Yes.

7    Q    Did you participate in the negotiations regarding the

8    RSA on behalf of York?

9    A    Yes, I did.

10   Q    And who was counsel to the Ad Hoc group that you

11   participated in?

12   A    Akin Gump.

13   Q    Mr. Rosenbaum, was this RSA ever approved by the Court?

14   A    No, sir.

15   Q    Did there come a time in which this RSA was terminated?

16   A    Yes, sir.

17   Q    If you would turn to Paragraph 8 of your declaration.

18   In Paragraph 8 of your declaration, you state that the RSA

19   contemplated that the Debtors would initiate certain

20   litigation regarding make-whole claims, is that correct?

21   A    Yes.

22   Q    Why did the Ad Hoc EFIH unsecured creditors want the

23   Debtors to commence that litigation?

24   A    As part of the original RSA, the EFIH unsecured holders

25   were meant to receive roughly 90 percent of the pro forma

1    equity of EFH, ex-TCEH, if you will, so 90 percent of the

2    pro forma equity of EFH, and certain EFH holders were set to

3    receive the remaining 10 percent, and as pro forma equity

4    holders of EFH, the set-up value, if you will, of where that

5    equity was being created was directly impacted by the amount

6    of claims that would have come in front of it, including

7    potential make-whole claims at the EFIH First and Second

8    Lien level.

9    Q    So, is it fair to say that the allowance or

10   disallowance of those make-whole claims would have had an

11   economic effect on the value of the securities that York

12   would have received, post-effective date of that

13   transaction?

14   A    Yes, we believed that, dollar for dollar, the set-up

15   value of pro forma or newco EFH was directly impacted by any

16   make-whole claims that were allowed or paid.

17   Q    Mr. Rosenbaum, staying with that RSA, I'm going to ask

18   you to turn -- there is a term sheet attached to that RSA,

19   and I would ask you to turn to -- and I'll try to get you an

20   exact page number, the term down in the lower corner, I

21   think, is Page 24, and if you look at the top, it's Page 79

22   of 105 of that docket entry.  Tell me when you get to that

23   page.

24   A    Page 79, yes, sir.

25   Q    And if you would look at the bottom box, there's a box

1    that says: "Allocation of Professional Fees," do you see

2    that box?

3    A    Yes, I do.

4    Q    Did you negotiate that particular provision of the term

5    sheet?

6    A    No, I did not.

7    Q    Do you know who did negotiate that on behalf of the Ad

8    Hoc group of which York was a member?

9    A    Yeah, the Ad Hoc group had financial advisors and legal

10   advisors and, as to the exact language of all of these

11   provisions, Akin Gump and Centerview negotiated the final

12   touches on all of these.

13   Q    Was your concern about professional fees in the, I'll

14   call them the TXU or EFH bankruptcy cases?

15   A    Yes, we were quite concerned about professional fees.

16   Q    What steps did York -- did York take any steps, or did

17   the Ad Hoc committee take any steps to try to, what I'll

18   call minimize, those professional fees?

19   A    Yes.  There were direct negotiations with other parties

20   to the RSA as to how professional fees under this RSA would

21   have been treated in terms of certain allocations, certain

22   amounts that would have been paid by one box versus the

23   other box, and most importantly, in my mind, in terms of

24   controlling or reining in professional fees, we basically

25   set up the RSA to have a nine-month-ish fail-stop date so

1    the transaction had to basically occur within nine months,

2    otherwise, the RSA essentially blew up.  So, in my mind, it

3    capped professional fees at, give or take, nine months.

4    Q    I'll just ask you to turn to Page 25.  You mentioned a

5    few things and I want to unpack that.  You said that there

6    were negotiations among several parties about allocations of

7    professional fees.  Did I get your testimony correct?

8    A    Yes, sir.

9    Q    And if you would turn to the next page, is there such a

10   provision with respect to professional fees of Fidelity?

11   A    Yes, there is.

12   Q    And you also mentioned, I believe, a certain cap on

13   professional fees.  Did I understand you to say that?

14   A    A cap on time.

15   Q    Okay, a cap on time.  Okay, so let's now turn to the

16   cap on time.  When you referred to the cap on time, you said

17   plus or minus nine months.  Do you have a recollection of

18   what terms were negotiated to try to have a finite

19   timeframe?

20   A    I think the plan confirmation, or the plan had to go

21   effective within nine months after filing this RSA.

22   Q    Now, I would ask you to turn, in that same document

23   now, to what is, on the top of the page, Page 21 of 105, and

24   if you would look at that.

25          THE COURT:  Which number, Mr. Galardi?  I'm sorry.

 1              MR. GALARDI:  It is Page 21 of 105, Your Honor, so

 2      you go back to what --

 3              THE COURT:  Yeah.

 4              MR. GALARDI:  You got it?

 5              THE COURT:  Yeah.  Thank you.

 6      A     Yes, I'm there.

 7      Q     It actually starts on 20.  There's a Section 8 called

 8      "Termination Events," correct?

 9      A     Yes, sir.

10      Q     When you said that there were various timetables, is

11      this what you were referring to?

12      A     Yes, sir.

13      Q     Could you just, when you refer to about nine months,

14      what was, what you said, the certain time period, what of

15      the provisions in this document did you believe set up

16      various timetables to ensure that there was a limit to

17      professional fees?

18      A     The nine months I referred to is in Section 8.01(f) as

19      in Frank: "The Bankruptcy Court shall not have entered the

20      confirmation order on or before the date that is 275 --" I

21      used 275 as nine months --

22      Q     Okay.

23      A     " -- from the petition date," and there were other

24      interim timelines or drop-dead dates, if you will; C talks

25      about the RSA assumption order at a month and a half, or 45

1    days, and E talks about a three-month -- sorry, three-and-a-

2    half-month drop-dead date on the disclosure statement order

3    of 105 days.

4    Q    Mr. Rosenbaum, before, you described that you believed

5    that the EFIH unsecured creditors would obtain about 90

6    percent of the reorganized equity, is that what I

7    understood?

8    A    Yes.

9    Q    What did York believe the value of that 90 percent

10   interest would be?  Let me ask a different question.  Did

11   you track trading prices of the EFIH securities?

12   A    Yes, we tracked trading prices of all securities.

13   Q    During this period of time, what is your understanding

14   of the trading prices of the EFIH unsecured PIK notes?

15   A    The unsecured PIK notes were trading in the 120 to 130

16   context.

17   Q    Under this plan, what was your view of the recovery, in

18   terms of value, that the PIK -- EFIH PIK notes would

19   receive?

20   A    Somewhere, give or take, in the 160 to 170 context.

21   Q    Meaning what?  I'm sorry, could you explain what you

22   mean, 160 to 170 context?

23   A    In terms of --

24   Q    They'd have received par?

25   A    Yes.

1    Q    Par plus?

2    A    Yeah, 160 cents, 160 bond price, 160 percent of face,

3    if you will, for pre-petition claim.

4    Q    Do you have an understanding of the word "bankruptcy-

5    impaired"?

6    A    Yes

7    Q    Are you aware that this term sheet, the term sheet

8    treated the general unsecured claims against EFIH Debtors as

9    impaired?

10   A    Yes.

11   Q    And do you have an understanding of why that was the

12   case?

13   A    Yes.

14   Q    What is your understanding?

15   A    Because the EFIH PIK notes or unsecured notes were to

16   be satisfied with equity and not with cash, then they were

17   deemed impaired.

18   Q    During this time, Mr. Rosenbaum, did you attend,

19   telephonically, hearings in the EFIH cases?

20   A    Yes, I attended the First Day Hearing physically and

21   the other hearings on the telephone.

22   Q    Did there come a time that, you did testify already

23   that the RSA was terminated, correct?

24   A    I'm sorry?

25   Q    You testified that the RSA was terminated?

1   A    It was terminated after, yes.

2   Q    Were there certain events, that you were aware of, that

3   caused the Debtors to terminate that RSA?

4   A    Yes.

5   Q    What is your understanding?

6   A    There was a hearing in this Court where the Debtors'

7   financial advisor, David Ying from Evercore spoke, and I

8   believe the Debtors' Co-CRO and CFO, Paul Keglevic spoke,

9   and there was concern in the Court around whether or not

10  Oncor, the EFH estates, were receiving full and fair value

11  for their 80 percent interest in Oncor.

12  Q    So the RSA was terminated.  From that date until the

13  date that you left York -- what day did you leave York?

14  A    I left York in August of 2016.

15  Q    From that date until the date -- from the date that the

16  RSA was terminated to the date you left York, did you stay

17  involved and watch, on behalf of York, the EFH bankruptcy

18  cases?

19  A    Yes, I did.

20  Q    During that period of time, did you ever review fee

21  applications of the professionals in those bankruptcy cases?

22  A    Not that I recall.

23  Q    Why not?

24  A    Basically, from the RSA period through the other plans

25  that were either contemplated or occurring through the time

1    that I left York, all of the EFIH PIK notes were meant to be

2    -- after the RSA, were meant to be paid full in cash.  So,

3    the fees, if you will, that were to be allocated to EFH or

4    EFIH would have ultimately impacted only EFH, as EFH was the

5    equity owner of EFIH.

6    Q    You joined Elliott in -- when did you join Elliott?

7    October of?

8    A    Early October of 2016.

9    Q    At the time you joined Elliott, did it own any

10   securities in EFH or EFIH?

11   A    No.

12   Q    Did there come a time when Elliott -- and did you --

13   and at Elliott, did you start tracking the EFH bankruptcy

14   cases when you joined it?

15   A    Yes, I did.

16   Q    Did Elliott start to acquire debt securities once you

17   joined Elliott?

18   A    Yes.

19   Q    Did there come a time when -- and were you aware that

20   there was a NextEra transaction that was being sought for

21   approval at the PUCT?

22   A    Yes, I was well aware.

23   Q    Did you attend any meetings with respect to the PUCT's

24   approval of the NextEra agreement?

25   A    Yes, I did.

1    Q    When did you attend those meetings?  Or, yeah, when did

2    you attend those meetings?

3    A    I attended an open meeting in Austin, Texas at the

4    Public Utility Commission of Texas on March 30th, 2017.

5    Q    And that's the meeting you refer to, and I'm going to

6    turn back to Exhibit 1 in your binder, that is the meeting

7    you refer to in Paragraph 14 of your declaration?

8    A    Yes, sir.

9    Q    After that meeting, did you have a meeting with

10   NextEra?

11   A    Yes, sir.

12   Q    Did that meeting, if you look at Paragraph 15, is the

13   meeting in April of 2017?

14   A    Yes.

15   Q    After that meeting, did you approach anyone at the

16   Debtors regarding alternative transactions, anyone at the

17   Debtors with respect to alternative transactions?

18   A    Yes, sir.

19   Q    And who did you approach?

20   A    We approached both the, I guess, CFO at the time and

21   the Co-CRO at the time, well CRO at the time, Co-CRO at the

22   time, Paul Keglevic and the CFO at the time, Tony Horton.

23   Q    And Mr. Horton is now the PAB, correct?

24   A    That's correct.

25   Q    What did you approach Mr. Horton and Mr. Keglevic

1    about, exactly?

2    A    We approached them about a variety of things, mainly

3    centered around the concern that the proposed NextEra

4    acquisition of EFH and EFIH and 80 percent interest in Oncor

5    had no potential of succeeding and that we wanted to move to

6    pursue alternative transactions, as well as part of that, to

7    pursue refinancing of certain EFIH indebtedness to lower the

8    cost and lower the cash burn.

9    Q    With respect to that approach, what was the response of

10   Mr. Keglevic?

11   A    You're not allowed to do that, you're bound by the PIK

12   PSA.

13   Q    And did Mr. Horton share that view?

14   A    Yes.

15   Q    Did you agree with that view?

16   A    No, I did not.

17   Q    Why not?

18   A    Elliott purchased PIK notes over a period of time and

19   none of those PIK notes that we purchased, we were ever

20   advised, were subject to any document, any PSA, and Elliott

21   never signed any joinders to any PSA.

22   Q    Did the Debtors offer you a waiver in the event that

23   you were party to the PSA?

24   A    Not immediately, but I believe a couple weeks after.

25   Q    Did Elliott agree to sign that waiver?

1    A    At that time, no, we did not.

2    Q    Why not?

3    A    We believed that -- we firmly believed that we were not

4    subject to the PSA and, while we were willing to sign a

5    reasonable waiver that would allow us to do the things that

6    I had discussed that we thought were important to maximize

7    value of the estates, we believed that the waiver that was

8    being offered was too constricting, if you will.  There were

9    too many oversight mechanisms and disallowances in the

10   waiver that was being offered, that it didn't really provide

11   any value to us.

12   Q    Is it correct that Elliott commenced a litigation

13   regarding that matter?

14   A    Yes, sir.

15   Q    Was that litigation ultimately withdrawn?

16   A    Yes, sir.

17   Q    Can you explain to me what changed between the time

18   that you commenced the litigation and the time in which

19   Elliott decided to withdraw that litigation?

20   A    It became more apparent that the NextEra transaction

21   wasn't going to close, or wasn't going to receive the

22   necessary approvals at the PUCT, time continued to tick with

23   the existing high-cost financings, DIP financings, and

24   second lien financings at EFIH, and we believed that it was

25   in the best interest of Elliott as well as other creditors

1    to maximize value, to figure out a way to work with the

2    Debtors, regardless of the fact that exclusivity had lapsed,

3    to find a consensual path forward.

4    Q    At this time, did Elliott also own second lien notes?

5    A    Yes, Elliott did.

6    Q    At roughly the percentage of the second lien notes that

7    Elliott owned at that time?

8    A    I believe we owned 45 percent of the class.

9    Q    So, Elliott ultimately agreed to withdraw that

10   litigation, correct?

11   A    That's accurate.

12   Q    Did Elliott also enter into an NDA with the Debtors?  A

13   non-disclosure agreement?

14   A    I believe so.

15   Q    Did Elliott begin to get information from the Debtors

16   regarding cash flows in order to be able to put together

17   what I think Mr. Keglevic said was a creditor-led plan?

18   A    Yes.  We only got information at the Debtor levels, we

19   did not get any information at the Oncor level.

20   Q    Did you need the information at the Oncor level?

21   A    No, we did not.

22   Q    As part of that information, did you receive

23   information about cash flows and projections about

24   professional fees?

25   A    Yes, we received various spreadsheets with historical -

1    - certain historical information on estate professional fees

2    and committee professional fees, as well as certain monthly

3    projections on professional fees at EFH and EFIH, as well as

4    a projected final effective date closeout payment of

5    professional fees.

6    Q    Did that have any bearing on the type of creditor-led

7    plan that Elliott wanted to propose?

8    A    I don't understand.

9    Q    Sure.  Did you contact Mr. Keglevic about those cash

10   flows and express any concerns?

11   A    Yes.

12   Q    What were the concerns you expressed?

13   A    We expressed concerns that EFIH was being overly

14   burdened by professional fees.  As part of any plan or any

15   creditor-led plan, the way that the plan would have been

16   structured, which was not dissimilar from other plans in

17   this case, the concept that the Debtors always stuck by was

18   that the cash at EFH would be initially, at least initially,

19   available for distribution to EFH creditors at the effective

20   date.  So, if you're essentially equitizing into a new

21   company and it's paying out cash in a certain box and

22   retaining cash in another box, the cash in each box is

23   directly impacted by the level of professional fees at both

24   boxes.

25   Q    Did you express any other concern about expenditures

1    with respect to any other liabilities at the EFH level?

2    A    Yeah, we had multiple meetings with the three

3    professionals remaining at the Debtors, Paul Keglevic, Tony

4    Horton, and the general counsel Andy Wright, telephonically,

5    we had multiple meetings, physically, in Dallas, and we

6    discussed a variety of things, including, but not limited

7    to, cash flow projections, the allocation of professional

8    fees, which directly impacted cash at both boxes, the

9    assumption or the leave-behind of potential asbestos

10   liabilities and how that would impact cash at both boxes,

11   whether or not a transaction could be pursued that would be

12   a taxable deconsolidation of EFIH and what the impact of

13   cash would be to both boxes.  So, we were interested in

14   value maximization and we had direct conversations with

15   those three gentlemen on all of those topics.

16   Q    Did there come a time where those lists of issues you

17   just mentioned almost broke down conversations?

18   A    Multiple times.  We had a meeting at EFH offices in

19   Dallas.  I attended with a couple of my colleagues.  Paul

20   Keglevic and Tony Horton attended, I don't believe Andy

21   Wright attended that meeting, and I believe that was in mid-

22   May of 2017, and in that meeting, Mr. Keglevic presented to

23   us what he called his top ten list of non-negotiables, kind

24   of like a David Letterman top ten list of his ten need-to-

25   haves.  And in those ten need-to-haves, he recited that any

1    transaction that they would be willing to support -- or that

2    any transaction that we had wanted to move forward on had to

3    be consensual, any transaction that they would be willing to

4    support as the Debtor had to be non-taxable, any transaction

5    that they would be willing to support as the Debtor had to

6    retain the cash at EFH at EFH, any transaction they'd be

7    willing to support at the Debtor had to include the

8    assumption of asbestos liabilities, any transaction they'd

9    be willing to support at EFH could not include any opening

10   of Pandora's box or any reallocation of professional fees.

11   And there were ten of them, so there were a couple more,

12   also.

13   Q    Did you ultimately agree to proceed on what you just

14   referred to as Mr. Keglevic's non-negotiables?

15   A    We did.

16   Q    Why did you do that?

17   A    In our business judgment, once again, given all of the

18   multi-factorial analysis of time and cash burn, et cetera,

19   and the constant paranoia, if you will, of the Debtor

20   pivoting back to Berkshire Hathaway at a lower value, as we

21   knew was likely and could be the case, we figured that the

22   path of least resistance or highest path for potential

23   value-creation was to try to work as consensually as

24   possible with the Debtors.

25   Q    In those meetings, did Mr. Keglevic or Mr. Horton ever

1    advise you of the percentage of fees that the Debtors'

2    professionals were allocating to EFH versus EFIH?

3    A    We discussed it, yes.

4    Q    What was the percentage that Mr. Keglevic described to

5    you as the percentage of fees being between EFH and EFIH?

6    A    Roughly 90/10.

7    Q    Did you ask him what the basis for that allocation was?

8    A    I don't recall if we discussed exactly what the basis

9    was, but they had provided us a spreadsheet where you could

10   see that fees were being allocated, on a go-forward basis,

11   on a monthly -- per month as well as at the end of the case,

12   give or take roughly 90/10.

13   Q    Mr. Rosenbaum, during the course of your tenure at

14   Elliott, did you come to review a copy of the interim

15   compensation order?

16   A    Yes.

17   Q    When?

18   A    As part of this litigation.

19   Q    What is your understanding of the allocation of fees

20   under that interim compensation order?

21   A    The interim compensation order provides for, solely as

22   it relates to EFH and EFIH, provides for two buckets of fee

23   types estate professionals.  One is called direct and one is

24   called collective.

25   Q    Do you have an understanding of what a direct benefit

1    fee is?

2    A    Yes.

3    Q    What is your understanding?

4    A    A direct benefit fee is performed by a professional,

5    whether legal or financial or consultant or otherwise, that

6    directly or solely benefits one box.

7    Q    Do you have an understanding of what a collective

8    benefit fee is?

9    A    Yes.

10    Q    What is your understanding of that term?

11    A    When a legal or financial or otherwise professional

12    provides a service to EFH and/or EFIH where the benefit is

13    not discernible.

14    Q    When you say the benefit is "not discernible," do you

15    mean -- what do you mean by "not discernible"?  You said EFH

16    or EFIH, so let's -- I want to focus on that.  Is a

17    collective benefit fee solely to one of those entities or is

18    it to both, in your understanding?

19    A    It's to both.

20    Q    And what is it that's not discernible?

21    A    How much of the value, how much of the time, how much

22    of that should be borne or how much of that benefitted

23    either box.

24    Q    You're not saying that the benefit itself isn't

25    discernible, it's just which Debtor benefitted, right?

1    A     That's right.

2    Q     Do you have an understanding, under the interim

3    compensation order, how the value between EFH and EFIH is

4    calculated with respect to that bucket of collective benefit

5    fees?

6    A     Yes.

7    Q     What's your understanding?

8    A     It's a mathematical extrapolation of the ratio of

9    actual, direct fees that were allocated or charged to EFH or

10   EFIH.

11   Q     And do you believe that mathematical extrapolation

12   leads to a fair result?

13   A     No, I do not.

14   Q     Do you believe --

15            MR. MCKANE:  Objection, Your Honor.  I think that

16   goes right to the core issue that's in front of you.  That

17   invades the promise to the Court.

18            MR. GALARDI:  Your Honor, I don't think the words

19   "fair" and it's a --

20            THE COURT:  I have my coffee -- all right.

21            MR. GALARDI:  So, we're going to be here for a

22   while.

23            THE COURT:  You're killing me.

24        (Laughter)

25            MR. GALARDI:  Not the first time, but you know

1    it's Munchausen by Proxy.

2              THE COURT:  No, I'm just kidding.

3              MR. GALARDI:  Your Honor, one, I think -- first of

4    all, this is not going to the issue.  Your Honor will decide

5    the issue of actual benefit and necessary benefit.  This is

6    a person who can testify, in his layman's view, his

7    perception of fairness, equitable.  It does not go.  Mr.

8    Husnick got on the stand and said, "inequitable."  This has

9    been an open issue, no one's moved to strike it.  Those are

10   not words as to actual.  Your Honor can weigh or not weigh

11   Mr. Rosenbaum's view as a consumer of bankruptcy services

12   and as paying 90 percent of the services, even for Kirkland,

13   as to whether he thinks that's fair or equitable.

14             MR. MCKANE:  The question asked was whether the

15   allocation in the interim comp order was fair, and the

16   question then becomes, what is he asking?  He is essentially

17   asking for him to opine on the ultimate issue of throwing

18   out the interim comp order.  That is up to Your Honor.

19             THE COURT:  Yeah, I agree.  I think you can ask

20   him, do you agree with it.  I mean, it's the value judgment.

21             MR. GALARDI:  Well, Your Honor, if you're

22   expecting people to come in and object to, or not object to

23   an allocation, you're going to say, well, I'm going to say

24   it's not fair.  You're striking any testimony where any

25   creditor comes in and says, I don't believe this is a fair

1    allocation.  Yes, that's your judgment, but I think you can

2    listen to the subjective judgment.

3              MR. MCKANE:  Your Honor, that's not it at all.

4              THE COURT:  Well, first of all, fairness is

5    irrelevant, okay?

6              MR. GALARDI:  That's fine, then he can answer --

7              THE COURT:  Because that's not the legal standard.

8              MR. GALARDI:  That's fine.

9              THE COURT:  And if anything bankruptcy is, it's

10   unfair.

11             MR. GALARDI:  Okay, I'll move on.

12             MR. MCKANE:  The point that we've interpreted from

13   your orders has been, from the podium, arguing the law, what

14   is right, what the standard should be, is appropriate.

15   Having witnesses in the stand testifying under oath about

16   their opinions, whether lay or expert, on this ultimate

17   issue that's in front of the Court, that's what's verboten.

18   And I think that's the --

19             MR. GALARDI:  I'll ask the question.  Do you think

20   --

21             THE COURT:  Yeah, so the objection is sustained.

22   Frankly, more on a relevance factor than anything else, but

23   --

24             MR. GALARDI:  Now that I set it up for relevance,

25   that's fine, Your Honor, I agree.

1                THE COURT:  Okay.

2    Q    Do you believe the mathematical extrapolation is

3    proper?

4    A    No, I do not.

5    Q    Why not?

6                THE COURT:  Same question.

7                MR. MCKANE:  Objection, Your Honor.  It's the same

8    issue.

9                THE COURT:  Same question.

10               MR. GALARDI:  Okay, that's fine.

11               THE COURT:  Sustained.

12               MR. GALARDI:  Come on, I want to keep you up and

13   exercising.

14        (Laughter)

15               THE COURT:  I mean, the obvious question --

16               MR. MCKANE:  Should I just stand?

17        (Laughter)

18               MR. GALARDI:  No, I'll move on.

19               THE COURT:  The obvious question is, do you agree

20   with it, which of course, is no.

21   Q    Do you agree with that allocation?

22   A    No, I do not.

23               THE COURT:  There you go.

24               MR. GALARDI:  There you go.

25   Q    Now, Mr. Rosenbaum, I'd ask you to turn to Paragraph 38

1    of your declaration.

2    A    Yes, sir.

3    Q    This paragraph refers to certain factors that you

4    considered significant in proposing an appropriate

5    allocation of the material expense claims, correct?

6    A    That's accurate.

7    Q    The first one you list there is the timeframe in which

8    the expenses were incurred.

9    A    That's right.

10   Q    Can you explain why you believe the timeframe in which

11   the expenses were incurred is a relevant consideration?

12   A    This goes to one of the answers I gave before.  For

13   most of the time during the case, the EFIH PIKs were

14   covered, being satisfied in full in cash, and when that's

15   the case, whether or not a dollar of professional fees are

16   allocated to EFH or whether or not a dollar of professional

17   fees are allocated to EFIH, the ultimate benefit or the

18   ultimate detriment solely flows up to EFH, as EFH is the

19   equity holder of EFIH.  So, an allocation of professional

20   fees, in that instance, is irrelevant to EFH PIK holders

21   when they're being paid in full in cash and I believe -- and

22   we had multiple conversations with Charles Cremens, who is

23   the disinterested director for EFIH, and he firmly shares

24   that belief.

25   Q    I'm going to caution you because both you and Judge

1    Sontchi better than I know that this was a very long case,

2    and so, you've used the word "most," and that's a four-year

3    case.  So, when you say "most of the case --"

4              THE COURT:  Four and a half.

5    Q    "-- most of the case" that they were in, can you be

6    specific about the period in which you believe the PIK note

7    -- holders of PIK notes were, quote, "in the money"?

8    A    I believe they were meant to be satisfied in full in

9    cash starting once the RSA was terminated, so July-ish of

10   2014 until the make-whole decision was reversed, or until

11   the speculation that it would have been reversed in late

12   2016.

13   Q    Turning back to Paragraph 38, the second bullet point

14   you mention is the projected recoveries for the EFH and EFIH

15   unsecured creditors under various plans.  Is that what you

16   were just referring to?

17   A    Yes, exactly.

18   Q    The third point says: "the composition of the E-side

19   committee."

20   A    That's right.

21   Q    Did you review a docket entry to find out who was on

22   the E-side committee?

23   A    Yes, and I met with the E-side committee members.

24   Q    Who were the members that you met with?

25   A    Individual noteholders, it was, for a long time, headed

1   by a woman named Mabel Brown from Ohio, who had owned some

2   EFH claims, but mainly, almost predominantly if not fully,

3   EFH claimants.

4   Q    Why do you believe the composition of the committee is

5   a relevant consideration to the allocation of the material

6   expense claims?

7   A    Most of the conversations we had with the E-side

8   committee were negotiations of various things between EFH

9   and EFIH where we were advocating the EFIH position and

10  where the committee was advocating the EFH position.

11            MR. PEDONE:  Your Honor, I --

12            THE COURT:  I'm listening.

13            MR. PEDONE:  Objection to the extent that we get

14  into hearsay as to what members of the E-side committee said

15  and the questions that are coming up.  That would be classic

16  hearsay.

17            THE COURT:  Yeah, that's --

18            MR. PEDONE:  What he said to the committee would

19  be appropriate --

20            MR. GALARDI:  I'm not going to ask for any more on

21  that question.

22            THE COURT:  Okay.

23  Q    Mr. Rosenbaum, you list in Number 4 the specific issues

24  and challenges that arose during the bankruptcy cases and

25  primary work streams undertaken by the Debtors and the E-

1   side committee's perspective.  What did you mean by that as

2   a consideration?

3   A    On the Debtors, there were -- I mean, the Debtors

4   obviously did a lot of work over a long period of time, but

5   there were kind of concrete buckets of things that they did,

6   including, but not limited to, and I'll just recite a few.

7        Exploring tax structuring and potential tax issues of

8   various transactions, including dealing with potential make-

9   whole claims at the EFIH First and Second Lien level,

10  including dealing with -- how to deal with the asbestos

11  liabilities at EFH, including the various plans that were --

12  agreements and plans that were prepared and presented for

13  EFH and EFIH, I'm obviously not talking about TCEH right

14  now, and including marketing processes for Oncor.

15       So, there were various chunks of -- or buckets of

16  discrete things that the Debtors and the professionals

17  worked on throughout the case -- cases.  And, as it relates

18  to the E-side committee's respective professionals, the vast

19  majority or the prominent amount of their work was, in my

20  mind, focused on, I think someone referred yesterday to the

21  global settlement.

22  Q    In 5, and I'm going to leave aside your counsel's

23  conversations, but did you have direct conversations with

24  the disinterested director of EFIH?

25  A    Yes, I did.

1    Q    And that was Mr. Cremens?

2    A    Yes, sir.

3    Q    Did you also have any direct conversations with either

4    counsel to or the individual EFH disinterested directors?

5    A    Yes.

6    Q    Which one was it, the counsel or was it some of the

7    directors or both?

8    A    We definitely spoke to their counsel, and I believe, to

9    -- I believe we spoke to -- I believe both were on the

10   phone.  Definitely Don Evans was on the phone.  I'm not sure

11   if --

12          THE COURT:  Billie Williamson?

13   A    -- if Ms. Williamson was on the phone.

14   Q    Those were conversations with both Mr. Cremens and then

15   Mr. Thomas and maybe Ms. Williamson, you believe she -- Mr.

16   Evans was on the phone, regarding allocation.  I don't want

17   to go into the substance, but you did have conversations

18   about appropriate allocations?

19   A    Yes.

20          THE COURT:  When was that?  Timeframe.

21          MR. ROSENBAUM:  With Mr. Cremens, I think we had a

22   set of discussions with them back when we were contemplating

23   a creditor-led equitization, which would have been the

24   summer of last year, so the summer of 2017, and then we had

25   another round of discussions with them leading up to the

1    effective date, so that would have been --

2              THE COURT:  Feb.

3              MR. ROSENBAUM:  -- late February, early March of

4    this year.

5              THE COURT:  Mm-hm.  Okay.

6    Q    You also had conversations -- did you have

7    conversations directly with Mr. Levin, Mr. Cremens' counsel?

8    A    Yes, I did.

9    Q    Did you have that in the context of meetings in your

10   office with the creditor-led plan you just discussed?

11   A    Yes.

12   Q    Did you and your -- did you also request your advisors

13   to obtain -- and did people -- did either you or people in -

14   - direct reports of yours review various transcripts of

15   hearings as well as fee applications and specific tasks

16   performed?

17   A    Yes.

18   Q    Did you personally review various fee applications?

19   A    I've looked at a view.  Some of the guys who work with

20   me -- some of the people who work with me have reviewed more

21   in detail, and I've reviewed certain of the actual

22   transcript -- or certain of the actual applications as well

23   as information gleaned from those applications.

24   Q    Did you also have discussions with Mr. Horton about the

25   allocation matters?

1   A    Yes.

2   Q    Did you also have conversations with certain members of

3   the Ad Hoc claimants' group regarding allocation issues?

4              THE COURT:  Thinking a lot of Ad Hoc committees,

5   which one are you --

6              MR. GALARDI:  The one that is a party to this

7   litigation, I apologize, Your Honor.

8              THE COURT:  Okay, thank you.  That's okay.

9   A    We've had extensive conversations with certain EFH-only

10  holders.  Whether or not they were a part of the Ad Hoc

11  group, I do not know.

12  Q    Did you have conversations with the E-side committee's

13  counsel and financial advisors?  Let me ask you -- did you

14  have conversations with Sullivan -- representatives of

15  Sullivan & Cromwell about allocation issues?

16  A    Yes, I believe so.

17  Q    Did you have conversations with anyone at Guggenheim

18  regarding allocation issues?

19  A    Yes, we had a conversation with Guggenheim.

20  Q    Do you believe that there is a precise formula for

21  allocating the material expense claims between the two

22  estates?

23             MR. MCKANE:  Objection, Your Honor, as relevance.

24  This goes straight to the lay opinion issue.  Ultimately,

25  it's your call as to how to allocate these issues.  There's

1    an order and there's facts I'm not certain that the lay

2    opinion will provide is relevant.

3              MR. GALARDI:  I think it goes to the challenges

4    that the Ad Hoc committee has said that he did not do it,

5    and I'm not sure whether in striking -- not striking

6    Paragraph 38, I just wanted to -- I'll move on, Your Honor.

7    It's in 38.

8    Q    Mr. Rosenbaum, are there certain facts that you believe

9    are relevant to whether the E-side committee provided a

10   benefit to the EFH creditors or the EFIH creditors?

11   A    The EFIH committee?

12   Q    Yes.

13   A    Yes, sir.

14   Q    The E-side committee, we'll call it.

15   A    Yes, I'm sorry.

16   Q    Yes.  And those are specific tasks, correct?

17   A    Specific tasks in the membership, yes.

18             MR. GALARDI:  Your Honor, may I take a quick

19   break?  I may be close to done.

20             THE COURT:  Sure, that's fine.  We'll take a short

21   recess.  Just let us know when you're ready to reconvene.

22   And Mr. Rosenbaum, you're new to this, so I'll say, this is

23   very important, you may not speak to any person about the

24   substance of your testimony during our break, do you

25   understand?

1          MR. ROSENBAUM:  Yes, sir.

2          THE COURT:  Very good, thank you.

3          MR. MCKANE:  Thank you, Your Honor.

4      (Recess)

5          CLERK:  All rise.

6          THE COURT:  Please be seated.  Sorry about that.

7  Every time you take a break all my other duties crash on me,

8  so it's always dangerous.  So sorry for the delay.

9          MR. GALARDI:  No, no apology necessary, Your

10  Honor.  I think I have three questions.

11          THE COURT:  Okay.

12          MR. GALARDI:  First... There's going to be four.

13  I think I just counted them.

14  Q    Mr. Rosenbaum, were you in court yesterday to hear Mr.

15  Mr. Keglevic's testimony?

16  A    Yes, I was.

17  Q    And did you hear questions of Mr. Keglevic that

18  suggested that Elliott believes it was forced to support the

19  Sempra plan?

20  A    Yes.

21  Q    Okay.  And was Elliott forced to support the Sempra

22  plan?

23  A    No, it was not.

24  Q    And did Elliott just simply make concessions to get a

25  deal done?

1    A    Yes, we made economic concessions to get the deal done.

2              MR. GALARDI:  No further questions, your honor.

3              THE COURT:  Thank you.  Who's first?  Mr. McKane?

4              MR. MCKANE:  Yeah, I got the short straw.

5              THE COURT:  Ah, okay.

6              MR. MCKANE:  Your Honor, we have exhibit binders

7    and just a little more of a preface than normal because

8    there are plans and I think some of his lawyer statement in

9    there.  We have done the excerpts of those plans to help

10   produce to both sides.  We do have one full set, Your Honor.

11   We -- that might be for you.  But we also have complete set

12   copies, but fewer number of those copies to the extent it

13   becomes necessary to refer to (indiscernible) and I believe

14   we used to docketed version so as to have no issues about

15   versions.  And Your Honor, we apologize for the paper.  May

16   I proceed?

17             THE COURT:  Not yet.  What's in here?  What's in

18   here.

19             MR. MCKANE:  Your Honor, there were four, I think,

20   additions that are docket entries, that may be used during

21   the cross-examination, that didn't actually get to the

22   binder in advance.  These are kind of backups.  We don't

23   expect that Mr. Rosenbaum's going to fight us on any of

24   these issue.  But in the event we need to refresh

25   recollection, they're available.

1          THE COURT:  Okay.  You may proceed.

2          CROSS-EXAMINATION OF JEFFREY ROSENBAUM

3    BY MR. MCKANE:

4    Q    All right.  Mr. Rosenbaum, you're a portfolio manager

5    at Elliott Management Corporation, correct?

6    A    Yes, that's correct.

7    Q    And Elliott is an investment advisory firm, correct?

8    A    We're an investment partnership.

9    Q    An investment partnership.  And as part of your duties

10   as an investment partnership, you manage portfolio

11   investments for the ultimate economic benefit of your

12   limited partners, correct?

13   A    That's accurate.

14   Q    And Elliott has holdings at EFH and EFIH, right?

15   A    That's correct.

16   Q    And the relative weighting of those holdings is such

17   that to the extent that administrative costs are shifted

18   from EFIH to EFH, even though you hold holdings at EFH, you

19   ultimately net benefit because of your relative holdings?

20   A    That's correct.

21   Q    So ultimately, to the extent in this case, the Court

22   were to shift administrative fees and expenses from the EFIH

23   estate to the EFH estate, that's a net benefit in the

24   overall coverage to Elliott and its LPs, right?

25   A    Yes.

1    Q    Approximately what percent per dollar of a shift do

2    you, does Elliott get a net benefit.

3    A    I believe we hold slightly over 70 percent of the

4    unsecured claims at EFIH, and a similar amount at EFH before

5    the intercompany claim, so maybe 36, mid- to high- 30

6    percent of the EFH claims, taking into account the TCEH

7    claim.

8    Q    Right, so with those relative holdings, do you know,

9    sitting here today, for example, if $100 or maybe more

10   appropriate, if $1 million of overall administrative costs

11   were removed from the EFH estate and placed at the EFIH

12   estate, how much of that million-dollar removal actually

13   flows through to your holding on a net basis?

14   A    Mathematically, that would be roughly, give or take 35

15   percent.

16   Q    35 percent.  You testified during your live direct of

17   regarding whether EFIH was solvent.  Do you recall that,

18   sir?

19   A    At what point in time?

20   Q    I believe your testimony was from the filing of the

21   cases up through the dates of the ruling of the Third

22   Circuit.  Is that your testimony?

23   A    I don't think I said that.

24   Q    Okay, do you have a view as to when EFIH was solvent?

25   A    Yes, I think I said from the termination of the RSA,

1    which was post- the filing date.  I think it was in July-

2    ish, maybe not exactly July 2014.  Through, I think I said,

3    when there was speculation that the Third Circuit may

4    reverse the make-whole rulings, which was late 2016.

5              THE COURT:  I guess that would have been after the

6    oral argument.

7              MR. ROSENBAUM:  Yes, sir.

8    Q    Right, the oral argument was in the last week of

9    September 2016.

10   A    That's right.

11   Q    And based on --

12   A    Adding, I'll agree.  I don't recall exactly what it

13   was, but I'll agree.

14   Q    Okay, approximately the end of September?

15   A    It was sometime around that timeframe.

16   Q    Right, and you recall sitting in the courtroom

17   yesterday, when your counsel walked through the date of the

18   oral argument with Mr. Keglevic, and that it was in advance

19   of the September 30th board meeting?

20   A    Yeah, I have no reason it disagree with you.  I just

21   don't recall exactly what it was.

22   Q    And then based on what you were looking at, I believe,

23   which were PIK trading prices, the PIK trading price merely

24   broke a buck and went below par, correct?

25   A    Yeah, that's right.

1    Q    Now, your testimony is that you thought, and expected

2    EFI to be solvent from the termination of the RSA, correct?

3    A    That's right.

4    Q    Well, sir, am I correct, I think you testified the RSA

5    was terminated in July of 2014?

6    A    I said there about. I don't know the exact date.

7    Q    And you're basing it on trading prices, but also on

8    plans that were filed, correct?

9    A    Right.  And the only reason to have terminated the RSA

10   was because the Debtor and/or the Court believed there was

11   potential higher and better value for EFH and EFIH's

12   interest in Oncor, through auction, or sale process, or

13   whatever you want to call it.  And by definition, that would

14   have paid the EFIH claimants in cash, in full.

15   Q    Okay, so based on that statement that there was

16   potentially higher and better out there and based on what

17   you believed that value was for your PIK notes at the point

18   of termination, you believed, well, if there's higher and

19   better, then it's only rainbows for me.  It's only going to

20   get better, right?

21   A    That's not true.

22   Q    Okay, so did you know that from the period of the

23   termination, from the July 2014, there was a period of over

24   seven months before there was a new plan filed, right?

25   A    Yeah, but we were engaged with, for example, I think, I

1    don't know who discussed, people discussed NextEra

2    yesterday, back in the summer of 2014, and putting in a bid.

3    And we were directly engaged with NextEra and their

4    professionals at that time, and we were aware of the bid

5    levels.

6           And I think as someone testified yesterday, it's

7    not just the gross amount of the bid levels, it's also the

8    point in time, given the claims creep and the cash flow burn

9    at EFIH.  So it's how much proceeds, versus how much claims,

10   and claims were dynamic.  But we were confident that NextEra

11   as a stalking horse was already well above the PIKs.

12   Q    So your testimony is that even though there was no plan

13   on file from July of '14 to April of 2015, based on the bids

14   and your assumption as to what the distributable value would

15   be on a not-yet-filed plan, you believed EFIH was solvent?

16   A    I believed that, and I believe everyone else that was

17   involved believed that, too.

18   Q    Okay. And you're basing that -- so there's no plan on

19   file.  You're aware of bids.  But you also mentioned that

20   you focused on trading values, right?

21   A    We focused on everything.

22   Q    Okay, and so you looked at trading value as an

23   indicator of value.

24   A    One.

25   Q    Okay.  And you actually noted the trading volume in

1    your testimony earlier today, even when the RSA was in

2    effect, correct?

3    A    That's accurate.

4    Q    And the RSA was a lockup agreement, right?  For holders

5    that were PIK holders, correct?

6    A    I'm not sure what you mean by lockup agreement.

7    Q    Were you authorized to trade your securities during the

8    period of time that you were a holder of the RSA?

9    A    I believe we were.

10    Q    Okay.  And if you traded those securities, the

11    obligation ran with the security, right?

12    A    I'm not a trader, so I'm not sure.

13    Q    You don't know whether, when you're a party to an RSA,

14    and you sell the RSA -- you sell the security that's bound

15    by the RSA, whether the obligation runs with the security?

16    A    I have a rough familiarity of how it works.  I don't

17    believe it's how you articulate it.

18    Q    Okay.  Well, let me ask you this, sir.  The RSA, isn't

19    it true that 76 of the total float of the PIK holders were

20    parties to the RSA?

21    A    I'm not sure if that's exact percentage, but I would

22    assume it was give or take two-thirds, maybe it was 76.

23    Q    So you know it was north of two-thirds, right?

24    A    I believe it sounds reasonable.  I'm sure there's a

25    document that shows it.

1    Q    Well, you attended the first-day hearing, right?

2    A    Yes, but that was four and a half years ago.

3    Q    It was.  And you recall Mr. Keglevic's first-day

4    declaration, right?

5    A    If I read it, I don't -- it was four and a half years

6    ago --

7    Q    I could show it to you.  But to the extent that they

8    are, the first-day declaration represents that the 76

9    percent of the noteholders are signed up at the PIK level to

10   the RSA, you have no reason to contradict that, right?

11   A    Hundred percent.

12   Q    And based on your experience in restructurings, it

13   would be reasonable that you would expect that the Debtors

14   would want at least two thirds of a --

15   A    That's why I said 66 percent.  That's why I said 66

16   percent.

17   Q    Right, excuse me, just to finish out the thought, just

18   so I can get my question, and then you can answer, right,

19   from a Debtor perspective, they would want to sign up at

20   least two-thirds of impaired accepting class at a Debtor,

21   correct?

22   A    Yes, that's why I said 66 percent.  Sorry if I'm wrong.

23   Q    Not a problem.  We'll get it done.  Now, after the

24   termination of the RSA, after that period of time when there

25   was no plan on file, there ultimately was a plan filed,

1    correct?

2    A    That's right.

3    Q    In approximately April of 2015, the Debtors filed a

4    plan that was referred to as the Hunt Plan, right?

5    A    Yes.

6    Q    All right.  And in your binder, you have a series of

7    exhibits.  And the Volume 1 -- do you have Volume 1?

8    A    Exhibit, yes.

9    Q    Let's go to Volume 1.  At the end of Volume 1 is PAV

10   Exhibit 319.  See that, sir?

11   A    Yes, sir.

12   Q    Okay.  Now as an EFIH PIK noteholder at the time, when

13   you were at York, you received a copy of this plan, correct.

14   A    Yes, I'm sure I did.

15   Q    And it's dated December of 2015, correct?

16   A    That's right.

17   Q    All right. And you see the pages on the top.  You see

18   where it's like 1 of 114?

19   A    Yes.

20   Q    Could you turn to 100 of 114?

21           THE COURT:  You could also look at the screen,

22   although he's on page -- that's easier for you.

23   A    Thank you.  I'm at 100, yes.

24   Q    Oh, I apologize, Your Honor.  Let's go to Page 99.  Are

25   you there?

1    A    Yes, sir.

2    Q    It's the heading Conditions Precedent to the Effective

3    date.

4    A    Yes, sir.

5    Q    All right?  Sir, you understand that before this plan

6    could become effective, there were certain conditions that

7    needed to be satisfied, right?

8    A    Yes.

9    Q    And if the parties couldn't satisfy those conditions,

10   it created a walk right.  An ability to not have to close

11   the transaction, right?

12   A    Sure.

13   Q    Okay.  And so I understand, you believe that based on

14   your projected recoveries from these plans, that you thought

15   you were unimpaired, right?  Let's hear it another way, I

16   apologize, I meant to say --

17           THE COURT:  I think you meant solvent.

18   Q    I meant solvent, that's right. Because I recognize

19   there's legal impairment.  It's your testimony based on the

20   projected recoveries of these plans that you thought EFIH

21   was solvent, right?

22   A    Not solely based on this.

23   Q    But this was one of the factors that you looked to,

24   correct?

25   A    One of many.

```
1    Q    And based on this factor, you understand that based on

2    the projected recoveries of these plans, you have to take

3    into consideration the conditions necessary to get to the

4    projected recoveries, right?

5    A    Yes, but I think you're mis-articulating what our

6    understanding is.

7    Q    Well, I just want to cover the plan-based rationale for

8    your conclusion, okay?  So let's focus on the plan right

9    now.

10   A    Sure.

11   Q    I believe right below Heading B, it says that it shall

12   be the condition of the effective date that the following

13   conditions shall have been satisfied or waived pursuant to

14   the provisions of Article 9C of the plan.  You see that,

15   sir?

16   A    Yes, sir.

17   Q    Okay.  And then moving down -- there's a section, or a

18   series of numbers there.  Let's move down to Subsection 9,

19   which is on Page 98, I believe.  100.  100 at the top, I am

20   so sorry.

21           THE COURT:  You and numbers, Mr. McKane.

22   Q    It's unbelievable, yes.  All right, you see Subheading

23   9?

24   A    Yes.

25   Q    All right.  And you see where it says that this is one
```

1    of the conditions? "All claims against the EFH and/or the

2    EFIH Debtors with respect to any make-whole claims shall be

3    disallowed make-whole claims."  You see that, sir?

4    A    Yeah, I see it.

5    Q    Did you have an understanding that that was a closing

6    condition for the Hunt plan?

7    A    Oh, yes.

8    Q    Okay.  And if you could turn back to Page 12 of 114?

9    A    12.

10   Q    Top of the page.  Definition 72.  You see there, where

11   it says disallowed make-whole claims means those make-whole

12   claims as to which the Bankruptcy Court has entered an order

13   disallowing the claim, and such order has not yet been

14   stayed, or reversed, or remanded on appeal as of the

15   effective date.  You see that, sir?

16   A    Yes, you read it correctly.

17   Q    Thank you.  And so you understood, based on that

18   definition and that closing condition, that there is a walk

19   right in this transaction, in the event that there is a

20   reversal or a remand of Judge Sontchi's make-whole ruling

21   pre-closing.

22   A    I understand that.

23   Q    All right, and you understand that if there were

24   allowed make-whole claims, relative to where you were at the

25   PIK level, that that would be a dollar-for-dollar distancing

1    of the PIK recoveries, away from the value for the allowed

2    amount of the make-wholes, correct?

3    A    The PIKs would have still been fully covered if the

4    make-wholes were allowed.  I believe the value of this plan

5    was well in excess of $10 billion.  So the impact of the

6    value --

7    Q    You're assuming that the transaction closes, correct?

8             MR. GALARDI:  Your Honor, I ask that he let him

9    finish his answer.

10            THE COURT:  Mr. McKane --

11            MR. MCKANE:  I apologize.

12            THE COURT:  Go ahead, Mr. Rosenbaum.

13   A    So the value would have been to the direct benefit or

14   detriment of the equity of EFIH which was -- and reamended

15   EFH.

16   Q    Right, right.  So, sir, you understand that the Hunt

17   Plan has a closing condition to -- because their commitment

18   was they were going to pay all allowed claims on the E-side,

19   right?

20   A    That's what I understand.

21   Q    Right.  So, and how much was the projected value of the

22   EFIH first lien and second lien make-whole claims.

23   A    In full?

24   Q    In full.

25   A    Maybe, I believe it was roughly 400 million apiece.

1   Q    400 million a piece of the first lien, and 400 million

2   apiece for the second?

3   A    I believe so.

4   Q    Ballpark numbers?

5   A    I believe.

6   Q    And you understand that in addition to the make-whole,

7   the first liens and the second liens were also asserting

8   post-petition interest claims, correct?

9   A    Right, I believe that the make-whole on the first was

10  actually crystallized, because they were taken out. Make-

11  whole and part of the seconds was crystallized, because part

12  of the seconds were taken out, and the make-whole on part of

13  the seconds was dynamic, because they would continue to

14  (indiscernible).

15  Q    And you understand that the post-petition interest

16  dispute about whether it was going to be paid at the

17  contract rate or the business judgment rate added to the

18  potential value that'd be in front of the PIKs, correct?

19  A    Post-petition interest dispute on what?

20  Q    With regards to the first liens and the second liens.

21  A    I thought that the post-petition interest dispute was

22  on the PIKs.

23  Q    No, I'm asking, sir, about are you aware of the post-

24  petition interest demand made by the first liens and the

25  second liens?

1    A    I thought that the make-whole was basically post-

2    petition interest.  It's one and the same thing.

3    Q    So to the extent -- do you understand that for those

4    claims, that there is an assertion by the first liens that

5    even though the make-whole may have been crystallized, there

6    may have been additional amounts owed as well, for the fact

7    that they weren't being paid the make-whole.  For every

8    minute that they didn't get paid the make-whole, they

9    demanded interest -- the contract period above that.

10   A    I was unaware, I always viewed the make-whole and

11   interest being one and the same thing.

12   Q    Okay.

13           THE COURT:  No, they also wanted interest on

14   interest.

15   Q    Right, and you understand that they, given their

16   appellate rights, even if the transaction closed, the wanted

17   their liens to ride through the closing.

18   A    I believe I heard that yesterday.

19   Q    You didn't know that until yesterday?

20   A    I may have known it at some point in time.

21   Q    Okay, so let's just take the $800 million that you knew

22   about at the first lien and the second lien make-whole

23   claims.  You agree with me that to the extent that those

24   claims were allowed in advance of the closing of the Hunt

25   transaction, the Hunt participants, the buyers had the

1    rights to evaluate, do I really want to pay an additional

2    $800 million for these assets?

3    A    Or the EFH holders have the ability to say, will we be

4    willing to accept $800 million less?

5    Q    Right, it's an opportunity for everybody to re-cut the

6    deal, because you cannot satisfy one of the closing

7    conditions, right?

8    A    For the Hunts or the EFH holders, yes.

9    Q    And sir, you're aware that in the disclosure statement

10   for this transaction, creditors were warned about risk with

11   regards to this plan, right?

12   A    If you show me, I can reason -- but I have no reason to

13   not believe you.

14   Q    Sure, okay.  This document, it's ELX-216.  And it's

15   actually that same first binder, right at the front.  And

16   these are excerpts of the disclosure statement.  Are you

17   there, sir?

18   A    Yes.

19   Q    And you're familiar with disclosure statements, right?

20   A    Yes.

21   Q    Okay, and using the pages on the top, if you could turn

22   to 188 of 253.

23   A    Yes, sir.

24   Q    You see Roman Numeral 8, Risk Factors?

25   A    Yes.

1    Q    All right.  And you're familiar with risk factors in a

2    disclosure statement, right?

3    A    Yes.

4    Q    And Section A(1) is risk factors relating to the

5    restructuring, right?

6    A    That's correct.

7    Q    And if you could turn to the next page, 189 of 253?

8    You see the bullets that are all listing the risk factors

9    relating to the restructuring?

10   A    I do.

11   Q    And do you see the one that is second-to-last in this

12   series of bullets?

13   A    Yes.

14   Q    Okay, and it says the outcome of current or potential

15   litigation regarding whether certain noteholders are

16   entitled to the make-whole or redemption premiums, and/or

17   post-petition interest in connection with the treatment of

18   their claims in bankruptcy.  You see that, sir?

19   A    I see it.

20   Q    And through this disclosure statement, the Debtors are

21   telling the world that there's a material risk, here in this

22   plan with regards to make-wholes, right?

23   A    That's what they're saying.

24   Q    And you knew that, right?

25   A    I'm not sure what the question --

1  Q    As a sophisticated investor in distressed securities,

2  you knew by making this risk disclosure, that's what the

3  Debtors were telling, and you and your team were aware of

4  it, and had accounted for that risk.

5  A    Yeah, once again, as part of the Hunt Plan, given the

6  value of the Hunt Plan, as an EFIH unsecured holder, we

7  didn't think it would be a risk. We also, I believe, owned

8  some EFH securities that we were concerned with EFH level

9  that was a risk.

10 Q    All right, so to be fair, you were aware of the risk,

11 but you discounted the risk, based on your insights and your

12 perspectives.

13 A    That's your articulation.  We never discount risks.

14 Q    Okay. But you acknowledge you're aware of the risk,

15 right?  Right here.

16 A    We believe that it was a risk for he securities we held

17 at EFH, but given the value of the transaction, and the

18 claims ahead of us at that time, that it was not a risk for

19 EFIH unsecured recoveries.

20 Q    But the Debtors are not limiting the risk in the manner

21 that you interpreted it.  The Debtors are saying this is a

22 risk for the plan, not just of certain securities within the

23 plan, correct?

24 A    I don't think the Debtors provided separate risk

25 sections for EFH and EFIH.  I believe it was a joint plan.

1    Q    All right, and in fact, if you go back to the first

2    page, in the risks, it refers to the Debtors as a whole.

3    Right, in that top header, it says the following risks, it's

4    the last sentence in the bold section.  It says here, the

5    following risk factors refer generally to the Debtors as a

6    matter of convenience and specific references to the

7    Debtors, you know...

8    A    (indiscernible)

9    Q    Not to be interpreted as limiting any risk factor

10   discussed below, right?

11   A    It also mentions TCEH, and I'm not aware that the make-

12   wholes or post-petition interest were a risk to TCEH.

13   Q    But the message here from the Debtors is trying to tell

14   you, is construe these risk factors broadly, right?

15   A    No, I believe that it was general, as it reads to be

16   general.  There was no separate --

17              THE COURT:  Wait a minute.  Would you disagree

18   with this question?  If the make-wholes are allowed before

19   the plan goes effective, there are two outcomes that can

20   occur:  one, the Hunts can walk.  Two, the plan gets

21   renegotiated.  Isn't it a risk, as far -- for the EFIH

22   recovery, that the Hunts would have the ability to walk,

23   even though it doesn't affect your value, if you just look

24   at it as an $800 million reduction?

25              MR. ROSENBAUM:  Well, we didn't view it in

1    isolation.  So as it specifically related to the Hunts, the

2    $800 million, if it was exactly 800, may have been give or

3    take a little bit more, a little bit less, the $800 million

4    value reduction was directly to EFH.

5             As it relates to your other question about whether

6    or not it was a risk that the Hunts couldn't reach a re-cut

7    agreement, I think, with the EFH bondholders on either an

8    increased or reduced purchase price, and what the impact

9    would have been to other EFH holders.  There were other

10   bidders that we were aware of and having conversations with

11   throughout the course of the case, whether it was NextEra,

12   Berkshire Hathaway, or other bidders, that we were aware

13   that those values cleared the chain also.

14             THE COURT:  But that's not this plan.

15             MR. ROSENBAUM:  Not this specific plan, but we

16   were aware that it's a highly -- as you know, it's a highly

17   coveted asset, and there were many bidders, at a high

18   valuation.

19             So our analysis, once again, as I mentioned to Mr.

20   McKane, included these documents, included trading prices,

21   included our view of the standalone fair value of the eight

22   percentage interest in Oncor included our constant

23   discussions with infrastructure funds, sovereign wealth

24   funds, U.S. utilities, foreign utilities, and their levels

25   of interest, and what they would be willing to pay for that.

1          THE COURT:  So any risk you reperceived with the

2     Hunts walking, based on the allowance of the make-whole

3     claims was severely reduced or eliminated because of your

4     belief that there were other bidders who would also pay

5     enough money to clear the EFIH stack.

6          MR. ROSENBAUM:  That's accurate.  There was also

7     time, once again, as I mentioned before, it's dynamic,

8     because (indiscernible) --

9          THE COURT:  I understand.

10    Q    And your point about dynamic is that you have accruing

11    claims at EFIH that are pushing the Debtor, increasing the

12    claims pool at EFIH, such that the same amount of

13    distributable value at a later point in time slowly

14    increases the risk that EFIH may not be solvent.

15    A    That's accurate.

16    Q    Okay, so we've talked about the Hunt Plan risk

17    disclosures.  As we all know, the Hunt Plan didn't close.

18    A    That's right.  s

19    Q    Right.  A risk factor was triggered, right, with

20    regards to the Public Utility Commission, right?

21    A    A risk factor, right, sure.

22    Q    But you were aware that the Public Utility Commission

23    of Texas had to approve a change of control of Oncor, right?

24    A    And they did approve it.

25    Q    Right.  And they approved it with a limitation that

1    triggered a closing condition that enabled the Hunts to

2    decide whether to close the deal, right?

3    A     That's correct.

4    Q     And they elected not to close the deal.

5    A     That's correct.

6    Q     And all the while, the EFIH PIK noteholders are dealing

7    with the fact that there's $50 million a month of accruing

8    interest in front of them, right?

9    A     That's right.

10   Q     Okay, and so then we turn to the NextEra plan.  Right,

11   and that copy of the NextEra Plan is, I believe in Binder 2.

12   I could be wrong about that.

13   A     Just to be clear, on the 50 million a month, I know it

14   was discussed yesterday, but my recollection, it was roughly

15   $22 million a month of cash interest, and another $22

16   million a month, give or take, of (indiscernible) claims.

17   So it wasn't all -- while it was all in front of the EFIH

18   unsecured holders, it wasn't all an immediate cash drain, if

19   you will.

20            THE COURT:  Understood.

21   Q     I'm sorry.  So, Volume 2, sir?  Are you there?

22   A     I am.

23   Q     The second tab of Volume 2, I believe says PAVX-430.

24   A     Yes, sir.

25   Q     All right, and this is the Fourth Amended Plan that

1    referred to as the NextEra Plan?

2    A    Correct.

3    Q    If I can direct your attention to 110 of 129.  126,

4    excuse me.  Numbers.

5    A    Yes.

6    Q    This is an easy one.  Sir, you see on Page 110 of 126,

7    there's another section, this is Letter D, it says

8    conditions precedent to the EFH effective date.  You see

9    that, sir?

10   A    That's right.

11   Q    Okay.  And you see right below it, it's very similar

12   language, it says it shall be a condition to the EFH

13   effective date, that the following conditions shall be

14   satisfied or waived, pursuant to the provisions of Article

15   IX(e) of the plan.  You see that, sir?

16   A    Yes, sir.

17   Q    This is another set of closing conditions, right?

18   A    Yes, sir.

19   Q    And if you --

20        MR. GALARDI:  Your Honor, at this point I'd ask

21   for no more questions about this plan.  This is exactly two

22   things:  one, you'll look at the date of the plan.  It's

23   9/21/16, after Mr. Rosenbaum left York, and was not employed

24   by anyone.  And Your Honor, this morning, struck that he had

25   no personal -- was not allowed to testify, there was no

1    foundation, it would be all speculation, lack of personal

2    knowledge.  So I'd ask that no questions go forward at this

3    time.

4              MR. MCKANE:  Your Honor, I'm not trying to open

5    the door with regards to what was struck, which was the

6    negotiations of the plan.  Mr. Rosenbaum left York, and then

7    joined Elliott during the time while this plan was pending

8    and was actively buying securities in the EFH capital

9    structure, during this item of evaluating whether -- before

10   this plan closes.  So the closing conditions as it relates

11   to this plan, are relevant to his assertions.

12             THE COURT:  No, this is the filing date.  The plan

13   was open for --

14             MR. GALARDI:  Well, then he should go back to the

15   date before MR. Rosenbaum left York.  Mr. Rosenbaum has

16   testified that he left York in August of that period of

17   time.  This is a September plan.

18             THE COURT:  It wasn't confirmed in September, Mr.

19   Galardi.

20             MR. GALARDI:  But he's asking --

21             THE COURT:  Well, it was, actually.  September

22   19th.

23             MR. GALARDI:  September 19th, Your Honor, at a

24   time when Mr. Rosenbaum was not there.

25             THE COURT:  Yeah, but it was in effect -- it

1    hadn't gone effective.

2            MR. MCKANE:  Your Honor, September 19th of 2016

3    was the disclosure statement.

4            THE COURT:  Oh, okay.  I apologize.

5            MR. GALARDI:  There was a plan, and it was in the

6    files.  And as long as we talk about that plan, I think the

7    condition is similar.  I just want to make sure that we're

8    talking about a plan that has the conditions when Mr.

9    Rosenbaum was still employed by York at that point.

10           MR. MCKANE:  Your Honor --

11           THE COURT:  The plan wasn't amended until after

12   the make-whole was reversed.  But he was already -- so this

13   plan was in effect while he was employed at Elliott and

14   monitoring the case.  The plan changed after the make-whole,

15   when he was -- so he's got knowledge of both plans.  So,

16   overruled.

17   Q     Thank you.  Mr. Rosenbaum?

18   A     Yes, sir.

19   Q     So we were talking about Page 110 of 126, are you

20   there, sir?  It's the same page, we were talking about that

21   page.

22   A     Yes, yeah, yeah, sorry.

23   Q     And I was flagging for you, these were closing

24   conditions, right?

25   A     Yes, sir.

1   Q    Okay, and the one I want to direct your attention to is

2   D(10).   That's on the next page, 111.

3   A    Yes, sir.

4   Q    All right.  And D(10), it's a closing condition of the

5   NextEra plan, that all EFIH first lien note claims and EFIH

6   second lien note claims that are make-whole claims shall be

7   disallowed make-whole claims.  Do you see that, sir?

8   A    Yes, sir.

9   Q    And sir, you were aware that the NextEra plan also had

10  a condition with regards to the allowance of make-whole

11  claims, right?

12  A    Yes, sir.

13  Q    All right.  And sir, if you go back to Page 91 of 126 -

14  -

15  A    I'm sorry, what page?

16  Q    91.

17  A    I'm there.

18  Q    And then you're on top, and then at the bottom of the

19  page, there's a Footnote 3.  You see that, sir.

20  A    Right.

21  Q    Are you there, sir?

22  A    Yes, sir.

23  Q    Sir, do you see where it says to the extent that make-

24  whole claims based on, or derived from the EFIH first lien

25  notes and EFIH second lien notes are allowed before the

1    effective date.  Right?

2    A    Right.

3    Q    And then it goes on.  And the plan (indiscernible) has

4    waived the condition precedent to the EFH effective date, as

5    set forth in that section, such make-whole claims will be

6    paid in full, in cash, on the effective date, or as soon as

7    reasonable practical after the EFH effective date, without

8    reducing the recoveries to holders of the allowed Class B(6)

9    claims.  Do you see that, sir?

10   A    Yes.

11   Q    Are you familiar with the provision that's referred to

12   as the PIK top-up provision?

13   A    I may have been.

14   Q    Did you have a general understanding that with regards

15   to the NextEra plan that was originally confirmed, that even

16   if the make-wholes were triggered, there's a provision that

17   the PIKs, at the election of the plan sponsor, could get

18   topped up, so that they would be paid in full?

19   A    I believe that.

20   Q    Okay, and you understand that after the triggering of

21   the -- I'm sorry, strike that.  You understand that after

22   the Third Circuit reversed Judge Sontchi in November of

23   2016, there was a renegotiation of the NextEra plan, right?

24   A    I'm not familiar with what exactly was renegotiated.

25   Q    Well, let me be more precise.  And I'll take it in

1    steps.  The Third Circuit reversed in November of 2016,

2    right?

3    A    I agree.

4    Q    And you understand that upon the Third Circuit's

5    reversal, that triggered the inability by the Debtors to

6    satisfy a closing condition, right?

7    A    I agree.

8    Q    And at anything point in time, because they triggered

9    the inability to satisfy a closing condition, there was an

10   opportunity for the plan sponsors to renegotiate the deal.

11   A    I agree.

12   Q    And as part of the renegotiating of the deal, they said

13   this footnote, right, the top-up provision comes out.  We

14   will not agree to top off the PIKs, right?

15           MR. GALARDI:  Objection, Your Honor.  I think

16   that's calling for information outside of his knowledge.

17           THE COURT:  Overruled.

18   Q    Are you aware of that, sir?

19   A    I have no reason to believe it's not the case.

20   Q    And is it consistent with your general understanding of

21   the course of these cases?

22   A    I'm not sure what that means.

23   Q    Well, let me ask you this.  Sir, you were monitoring

24   the trading prices of the PIKs, right?

25   A    That's correct.

1   Q    And sometime in the fall, either right around oral

2   argument or shortly thereafter, right, the PIK trading

3   prices started to -- the PIK trading prices started to trade

4   down.

5   A    Freudian slip.

6   Q    Not at all.  Just very sleep-deprived, sorry.  Sir, you

7   understand that the PIK training prices started to trade

8   below 100 cents, right?

9   A    That's correct.

10  Q    And sir, is it your understanding that one of the

11  primary reasons why the PIK trading prices traded below 100

12  cents was the fact that make-whole claims may need to be

13  paid to the tune of about $800 million ahead of the PIKs?

14  A    That's right.

15  Q    Okay.  So ultimately one of these closing conditions,

16  one of these risk factors came to fruition, right?

17  A    In this plan, yes.

18  Q    Yeah.  And it's that same closing condition that was in

19  the Hunt Plan.

20  A    Yeah, once again the closing condition in the Hunt

21  Plan, as I responded to you, and as I responded to Judge

22  Sontchi, we didn't view as a risk to the EFIH PIK bonds,

23  because of A, it was earlier, in the case that there was a

24  lower level of senior claims at that point in time, and B,

25  the level of consideration was billions of dollars higher.

1    Q    And with the -- and what you saw from the evolution,

2    from the Hunt Plan to the NextEra plan was the top-line

3    price for distributable value coming down, right?

4    A    But that's a massive oversimplification of --

5    Q    It's a simple question.

6    A    I disagree with that characterization.

7    Q    Okay, what was the projected enterprise value of the

8    Debtors under the Hunt Plan?

9    A    We believe the actual value of Oncor increased, if you

10   -- I invest a lot in utilities, and if you look at the

11   utility benchmark, which tends to correlate very strongly

12   with the U.S. 10 and 30-year treasury rates, which were

13   depressed, and low, and getting lower during the period of

14   time, the value of utilities in the United States increased

15   demonstrably during the time.

16           I think specifically if you looked at NextEra, for

17   example, the value of NextEra increased 50 percent over that

18   period of time.  So talking about the value of the Hunt Plan

19   versus the NextEra plan was really apples and oranges,

20   because the Hunt Plan was unique in that it was a

21   restructure that wasn't -- it was a restructure that wasn't

22   going to pay tax.  But we believed the value of Oncor

23   increased demonstrably over the course of the case.

24   Q    Sir, my question was probably a bad one, and I

25   apologize.  My question was just based on the projected --

Case 14-10979-CSS   Doc 13482   Filed 09/11/18   Page 80 of 343

1    the proposed purchase price that was embedded in the Hunt

2    Plan, do you know what that proposed purchase price was?

3    A    That was higher than the NextEra plan.

4    Q    Right.  Yeah, and I think you said yourself it was

5    projected to be approximately $10 billion?

6    A    I don't recall exactly, but someone mentioned that

7    yesterday.

8    Q    Okay, but what as the proposed purchase price embedded

9    in the NextEra plan?

10   A    I think it was high 9 billion.  Nine, eight, something

11   like that?

12   Q    And sir, you're familiar with the fact -- we talked

13   about this provision, in the renegotiated, amended NextEra

14   plan was struck, right?  You know that, right?

15   A    I'm sorry?

16   Q    The Footnote 3, the one that's on the screen, and then

17   the screen's right in front of you.

18   A    Yeah, I believe that the EFIH PIK holders, by the -- I

19   believe the EFIH PIK holders, from this time, through the

20   date that the deal fell apart, did not expect to receive the

21   part.

22   Q    Exactly.  And the PIKs were impaired, and deemed a

23   vote, right?  Or excuse me, entitled to vote.

24   A    That's correct.

25   Q    Now, sir, are you --

1      THE COURT:  I'm sorry, Mr. McKane, can we take a

2  short break?

3      MR. MCKANE:  Of course.

4      THE COURT:  Very short.  Okay.

5   (Recess)

6      THE COURT:  Sorry about that.

7      MR. MCKANE:  Not at all, Your Honor.

8      THE COURT:  You may proceed.

9      MR. MCKANE:  Thank you.

10 Q    So just a level set, Mr. Rosenbaum.  We were in a

11 period of time after the make-whole ruling by the Third

12 Circuit.  Are you with me?

13 A    Yes, sir.

14 Q    Okay.  And after the termination of the NextEra plan,

15 are you aware that earlier this year, so March of this year,

16 the Court approved a settlement of the EFIH first lien and

17 second lien make-whole claims?

18 A    I believe so.

19 Q    All right.  Ultimately, even with the reversal from the

20 Third Circuit, the Debtors were able to not have to pay out

21 100 cents of the potential exposure asserted by the EFIH

22 first liens and second liens, correct?

23 A    Yeah, I believe I negotiated that.

24 Q    Right.  You were directly involved in those

25 negotiations?

1    A    That's accurate.

2    Q    All right.  And, in fact, if we could turn to PAB510,

3    which is Binder 2, it's the third document.

4    A    Right.

5    Q    Are you there, sir?

6    A    Yes, sir.

7    Q    And if I could -- do you see the numbers up on top?

8    There's two sets of numbers.  There's 1 through 11 and then

9    there's an attachment.

10   A    Okay.

11   Q    And the attachment picks up and it goes through 93.  Do

12   you see that, sir?

13   A    Yes.

14   Q    All right.  If you could go to Page 32 of 93, this is

15   the settlement agreement.

16   A    Right.  I'm there.

17   Q    And you see there that Elliott Capital is a signatory

18   to the settlement agreement, right?

19   A    That's right.

20   Q    And you supported the negotiation of the settlement,

21   right?

22   A    That's right.

23   Q    So, and, sir, you're -- am I correct that since the

24   Third Circuit ruling, as far as you're aware, no purchaser

25   of EFH indirect interest in Oncor has ever offered enough

```
1    security -- enough consideration -- I apologize about that -
2    - to clear the EFIH stack and render the PIKs unimpaired?
3    A     On a non-taxable basis?
4    Q     Yes.
5    A     On a non-taxable basis, the answer's no.
6    Q     And, sir, are you aware of a purchaser coming forward
7    to the Debtors with some form of proposal or actionable term
8    sheet on any basis that enabled the PIKs to be paid in full
9    after the Third Circuit ruling?
10   A     On a non-taxable basis?
11   Q     On any basis.  And the key words I'm focusing on here
12   are actionable term sheet or proposal to the Debtors.
13   A     We were told that -- I think as I testified earlier --
14   that there were certain non-negotiables.  So if you wanted
15   to have a conversation with Mr. Keglevic or Mr. Horton, I
16   believe we actually had a meeting in your offices in New
17   York at one point where we brought a higher value from a
18   taxable transaction and he immediately put his binder down
19   and stormed out of the room.  So, I believe people were --
20   or potential bidders, including ourselves as potential
21   creditors equitizing, knew where that conversation was going
22   to go.
23   Q     So, my question was different.  I'm just trying to test
24   and probe your personal knowledge of what has been offered
25   to the Debtors.  Do you understand that, sir?
```

1    A    I understand what you're asking me.

2    Q    Okay.  So my question is are you aware of any proposal

3    or actual term sheet presented to the Debtors after the

4    reversal at the Third Circuit level that paid the PIKs in

5    full?

6    A    Yes.  What I'm telling you is that multiple --

7              THE COURT:  See, what I'd like you to do is answer

8    the question and allow your counsel to clarify on redirect

9    and you just stop arguing with Mr. McKane and fighting the

10   hypothetical.  Okay?

11             MR. ROSENBAUM:  Yes, sir.

12   A    No.

13   Q    Thank you, sir.  In your testimony live earlier today,

14   you made references to the fact that you viewed the RSA in

15   2014 as opposing a cap on fees.  Do you recall that

16   testimony?

17   A    Yes.

18   Q    Okay.  And --

19   A    A cap on timing.

20   Q    A cap on time and, therefore, an indirect cap on fees,

21   right?

22   A    That's right.

23   Q    All right.  So, you -- and I think you referred to

24   certain milestones in the RSA, right?

25   A    That's right.

1    Q    So, if the Debtors weren't able to satisfy the

2    milestones, that doesn't stop the cases, does it?

3    A    It stops the RSA -- it can either be extended or

4    renegotiated, or an alternative can be pursued.

5    Q    Right, we're back in the world where there's a

6    condition that has not been satisfied and it allows for a

7    continuation of negotiations, right?

8    A    Where everything's up for negotiation.

9    Q    Exactly right.  So, if the Debtors are unable to

10   satisfy the milestones for plan confirmation or any of the

11   other milestones contained therein, it gives the PIKs the

12   opportunity to withdraw their support, right?

13   A    Or renegotiate key economic terms of the agreement,

14   sure.

15   Q    But it isn't a hard cap on professional fees, right?

16   A    I don't believe that bondholders have the ability to

17   cap fees.

18   Q    Let's -- we'll move on to another subject.  Are you

19   familiar with what's sometimes referred to as the E

20   Committee settlement?

21   A    The global settlement?

22   Q    Not the global settlement; the E Committee settlement.

23   The settlement that the E Committee struck with regards to

24   certain conditions by which they would stand down?

25             THE COURT:  December 2015.

1         MR. MCKANE:  Correct.

2         MR. GALARDI:  November.

3         THE COURT:  November.  Sorry.  November 2015.

4         MR. ROSENBAUM:  What were the key terms?

5    Q    Yeah, let me help you.  I'll direct your attention to

6    it.

7    A    This is not the TCEH intercompany claim?

8    Q    I'm sorry, sir?

9    A    This is the TCEH intercompany claim?

10        THE COURT:  No.  This -- well, that was part of

11   it, right?

12        MR. GALARDI:  There was two parts.  One was

13   December, one was November.  We went through it yesterday

14   but why (indiscernible).

15   Q    Yeah.  So, one of the loose leaf documents that I

16   provided you is DI7143.  So it's right there on your

17   credenza on the right hand side.

18        THE COURT:  There've been a lot of settlements in

19   this case.  It's hard to keep them all straight.

20   A    7143, yes, sir.

21   Q    7143.  And 7143, for the record, is the order approving

22   the settlement among the Debtors, the EFH committee, and EFH

23   noteholder trustees, and certain other parties.  Do you see

24   that, sir?

25   A    Mm hmm.  Yes.

1    Q    And the actual settlement agreement is attached.  And,

2    sir, if I could ask you, consistent with the numbering --

3    the numbers of the attachment are different, and if you

4    could turn to Page 5 of 34.

5    A    Correct.

6    Q    Do you see that, sir?

7    A    Yes.

8    Q    All right.  And do you see the whereas clause?  The

9    second whereas clause on that page?

10   A    Yes.

11   Q    In your efforts in tracking the case, were you familiar

12   with the fact that the EFH committee and its -- through its

13   counsel objected to what you've referred to as the global

14   settlement?

15   A    Oh, yes, I am.

16   Q    All right.  And, sir, if you could turn to Section 3 of

17   that agreement.

18   A    Section 3.  What page?

19   Q    Which is Page 8 of 34.

20   A    Yes, I'm there.

21   Q    All right?  And you see in Section 3A the first

22   sentence?

23   A    Yes, sir.

24   Q    And specifically it says there, sir:  "Upon entry of

25   the approval order, the EFH committee and the EFH note

1    trustee shall, (i), support and shall not object to,

2    litigate against, or otherwise impair, hinder, or delay the

3    Debtor's pursuit of confirmation and consummation of the

4    amended plan or approval of any related transactions,

5    documents or settlements." Do you see that, sir?

6    A     Yes.

7    Q     All right.

8    A     Yes.

9    Q     All right.  Now, you answered that you were familiar

10   with the global settlement, right?

11   A     I don't know all of the specific terms but I'm familiar

12   with -- I think the key piece was the establishment of the

13   TCEH $700 million intercompany claim against EFH in return

14   for essentially approval or agreement or peace at the TCEH

15   unsecured level.

16   Q     Okay.  Well, sir, Binder 2, first tab, PAB Exhibit 322.

17   A     322, yes.

18   Q     Yeah.  And this is the order and the settlement -- the

19   order approving the global settlement and the global

20   settlement.  And if I could direct your attention to, again,

21   the --

22   A     What was I just looking at?

23   Q     That was the EFH committee settlement; this is the

24   actual order approving the global settlement.

25   A     I'm not familiar with the difference in the two but...

```
1    Q    Okay.  Well, I want to focus on the global settlement,

2    the one you just were discussing with regards to the claims

3    coming from one estate to another estate.

4    A    Okay.

5    Q    Are you with me, sir?

6    A    Yes.

7    Q    Okay.  And, specifically, Exhibit A of that -- when we

8    see the numbers, they'll change from "of 91" to "of 44".

9    A    Yes.

10   Q    Okay.  And in particular I'd like you to turn to Page 2

11   of 44.  This is the amended and restated settlement

12   agreement, executed version.

13   A    Okay.

14   Q    All right?  And I want to direct your attention

15   specifically to Paragraph 2.1A, which is on Page 12 of 44.

16   Are you there, sir?

17   A    Yes.

18   Q    And do you see where it says, "settlement of certain

19   inter-debtor claims"?

20   A    Yes.

21   Q    All right?  And specifically, under A, the first

22   sentence where it says, "effective upon the occurrence of

23   the settlement effective date, all non-EFH debtor

24   intercompany claims, all non..." -- excuse me -- "all non-

25   EFIH debtor intercompany claims, and all non-TCEH debtor
```

1    intercompany claims arising from the beginning of the world

2    through the settlement effective date." Do you see that,

3    sir?

4    A    Yes.

5    Q    All right?  We like broad agreements.

6            THE COURT:  So that 2000 B.C. claim that you were

7    hoping to preserve is gone.  "From the beginning of the

8    world."

9    Q    And, sir, if you could turn to page -- just a couple

10   pages forward to make certain we all are on the same pages,

11   the definitions.  Page 9 of 44.

12   A    Nine, yes, sir.

13   Q    And in particular there, you know, the definition of

14   non-EFH debtor intercompany claims.  Do you see that, sir?

15   Middle of the page?

16   A    Yes.

17   Q    Sorry.  Non-EFIH, excuse me.  The one below that.

18   A    Yes.

19   Q    And it says those claims mean, quote, "Any claim by EFH

20   or any direct or indirect subsidiary of EFH other than an

21   EFIH debtor against an EFIH debtor." Are you with me, sir?

22   So, with these terms, as sometimes stilted and awkward as

23   they are, you understood that this settlement compromised

24   all claims that debtors at the EFH level and its

25   subsidiaries, other than the FIH, or at the TCEH level had

1    that could reach into EFIH?

2    A    ...any claim by EFH or any direct or indirect

3    subsidiary of EFH...

4              THE COURT:  You know, just to be sure.  I'm not

5    asking -- he's not ask -- I don't want him to ask you to

6    interpret the document, you know, as you sit here.  The

7    question is what was your understanding when you walked in

8    the door today?  And if you don't have one, that's fine.

9              MR. ROSENBAUM:  My understanding was -- I think

10   simply, as I said before, that there was potential -- the

11   TCEH unsecured that thought they had claims up through EFH

12   and to the sponsors.  And that... in exchange for a release

13   of those claims they were -- negotiated, granted, whatever

14   you want to call it, a $700 million claim against EFH.

15   Q    Right.

16   A    And there were maybe other things about it, but those

17   were the principal things that I recall walking in the door

18   today.

19   Q    All right.  So, do you have any understanding as to

20   whether under the global settlement agreement, the EFIH

21   estate got a release of all claims that the EFH estate or

22   the TCEH estate had on an intercompany basis reaching into

23   its box?

24   A    All I recall walking into the door today was what I

25   just said.

1          THE COURT:  That's fair enough.

2    Q    Okay.  Now, Mr. Rosenbaum, you were in the courtroom

3    yesterday, right?

4    A    For part of the day, yes.

5    Q    Were you in for the part of the day in which Mr.

6    Keglevic testified?

7    A    Yes, sir.

8    Q    Okay.  And do you recall questions from your counsel to

9    Mr. Keglevic regarding the relative amounts of debt at EFH

10   and EFIH?

11   A    I believe so.

12   Q    Okay.  And you're generally familiar with Mr.

13   Keglevic's first day declaration from your attendance at the

14   hearing and your general review of these cases?

15   A    Yes.

16   Q    Okay.  If we could turn to PAB Exhibit 24, which I

17   believe is in Binder 1.  Are you there, sir?

18   A    Yes, sir.

19   Q    Okay.  And this is the first day declaration of Mr.

20   Keglevic.  And if you could look at Page 40 of 464 at the

21   top.  Are you there, sir?

22   A    Almost.  Yes, 40.  Yes, sir.  40 of 464.

23   Q    Right.  All right, and do you see the bottom of

24   Paragraph 82 where it says, "As of the petition date, EFH

25   Corp.  and EFIH had outstanding funded indebtedness of

1    approximately..." and it says, "1.929 billion at EFH and

2    approximately 7.709 billion at EFIH"?

3    A    Yes, I see that.

4    Q    And you recall your counsel asking Mr. Keglevic about

5    that, right?

6    A    Yeah.  The roughly two, and the roughly eight is

7    roughly ten, and roughly 20 percent.

8    Q    Right, exactly.  Now, if we could turn to the next

9    page.

10   A    Yes, sir.

11   Q    Right?  This is -- the references on the first page as

12   summarized on the following table, right?  Do you see that?

13   A    Yeah, I believe the sum of these numbers equals the

14   numbers on the left side.

15   Q    Exactly.  That's your understanding -- that's your

16   interpretation of the chart and you believe...  I'll just

17   leave it that way.  That's your interpretation of the chart,

18   right?

19   A    I believe so.

20   Q    All right.  And you see the EFH Corp Unsecured column

21   on the left hand side?

22   A    EFH Corp Unsecured, the top part, yes.

23   Q    Yep.  And then you see -- if you move two over from

24   there, it says, "Approximate amount outstanding as of the

25   petition date"?

1    A    Yes, sir.

2    Q    Right.  And if you sum those two numbers, that's your

3    understanding of how you get to the 1.929?

4    A    Those three numbers, yes.

5    Q    Those three numbers, you're absolutely right.  I

6    apologize.  I'm terrible with numbers.  Are you figuring

7    that out?

8              THE COURT:  The restructuring's for you, Mr.

9    McKane.  One plus one never equals two.

10   Q    Sir, do you see the Footnote 36 that's in the 1.864

11   billion?

12   A    Yeah, I see that.

13   Q    Right?  That's on the bottom of the page?

14   A    That's correct.

15   Q    Right?  And that 1.864 billion of legacy notes,

16   according to the footnote, includes a billion point 282 --

17   I'm sorry.  Blah.  I'll try that again.  It includes

18   approximately 1.282 billion of EFH notes held by EFIH.

19   A    That's what it says.  That's right.

20   Q    Right?  And you had that understanding as well, right?

21   A    That EFIH held notes in EFH?

22   Q    Correct.

23   A    Yeah, those were notes that we had exchanged in EFIH

24   that EFIH held.  They were funded that EFIH received on from

25   EFH.

1    Q    Right.  And so you understood that on the petition date

2    those notes existed, right?

3    A    Oh, yeah.

4    Q    Right?  And is it your testimony that you did not know

5    as part of the global settlement that all of the rights that

6    EFIH had against EFH relating to that billion-2 of notes was

7    extinguished?

8    A    I think I said -- I think Judge Sontchi asked me what I

9    knew about the global settlement when I walked in today.

10            THE COURT:  Right.

11    A    And I knew simply what I told you.  I knew simply what

12    I told you before.

13    Q    Right.  So you have no understanding as to whether that

14    debt was canceled as part of the -- and not -- those claims

15    were no longer valid claims after the global settlement?

16    A    If that's what the document says, that's not what I

17    recalled when I walked into the courtroom.

18            THE COURT:  I think we can move on.

19            MR. MCKANE:  I will, I will.

20            THE COURT:  You put this in your brief.

21            MR. MCKANE:  Yep.

22    Q    Mr. Rosenbaum, let's turn to some asbestos questions.

23    Sir, in Elliott's final submission, I believe it identified

24    approximately $2.75 million in asbestos related time that

25    was billed as a collective benefit that you believe

1    should've been billed as a direct benefit.  Do you recall

2    that?

3    A    That's right.

4    Q    Okay.  And there was some Ropes -- work product that

5    was done to support that calculation.  Do you recall that?

6    A    Yes, on my direction.

7    Q    Right.  And in your direction, Ropes conducted an

8    electronic search for the words asbestos, Fenicle, and

9    Kazen, correct?

10   A    I believe that's correct.

11   Q    And then any time entries that hit on those terms that

12   were then identified, compiled, and then the amounts of that

13   time were summarized, correct?

14   A    Specific to those three keywords, yes.

15   Q    Yeah, for those keywords?

16   A    Yeah, that's right.

17   Q    Right.  To your -- and that's what added up to the 2.75

18   million, right?

19   A    I don't know if it's exactly 2.75 but roughly, yeah.

20   Q    All right.  To your knowledge, based on your direction,

21   did anyone review the actual time entries to learn more

22   about the work that was actually performed in those time

23   entries?

24   A    We had a lengthy document that goes through each time

25   entry and breaks out specific tasks that were listed as work

1    product or basically a job description of what each time

2    issue was for.

3    Q    Right, right.  To your knowledge, when you had the work

4    done, when they ran the search and identified those, what

5    I'm asking is essentially, was further work done to

6    differentiate the type of work that was done?  Or was it

7    simply if you hit on those three words, we sum it up and

8    it's 2.75?

9    A    The latter.

10   Q    It's the latter?

11   A    I believe so.

12   Q    Okay.  And in the exhibits that you had -- your

13   counsel's binder, there was a document that he didn't use

14   that was on Tab 4.

15   A    Okay, I'm there.

16   Q    You're there?

17   A    Yes, sir.

18   Q    Okay.  And, sir, is this the summary work that --

19            THE COURT:  Does this have an exhibit number?

20            MR. MCKANE:  Oh, I'm sorry.  It is.  It's ELX-704.

21            THE COURT:  Thank you.

22            MR. MCKANE:  Apologize, Your Honor.

23            THE COURT:  That's okay.

24   Q    Are you there, sir?

25   A    I'm there.

1    Q    Okay.  And there's two pages -- there's a few pages of

2    summary work and then there is a -- what appears to be a

3    larger Excel Spreadsheet that is titled Time Entries from

4    DI2683 Reflected in Summary.

5    A    That's right.

6    Q    Okay.  I just want to pause there for a second.  And

7    this -- this is the results, the hits from the three-term

8    search, right?

9    A    Yes.

10   Q    Okay.  And you see the columns where you have the date,

11   time keeper, hourly rate, and matter code?

12   A    Yes, sir.

13   Q    Right?  So is it your understanding that Ropes & Gray

14   didn't go back and evaluate what matters the Kirkland team

15   identified, you know, when each biller identified what their

16   work was for in the determination of whether it was

17   appropriately collective or direct benefit?

18   A    My understanding was the description described what

19   work was being done in some portion, either zero -- or,

20   sorry, not zero, but anywhere from not zero percent to 100

21   percent was applied -- that fraction was multiplied by the

22   total hours to get the asbestos work hours.  But my

23   understanding is the description, the wide column with the

24   text talks about what was done.

25   Q    Right.

1   A    I'm not sure what the matter code is.

2   Q    Okay, so you're not familiar with the matter code and

3   how that might tie to a specific type of work that ties to a

4   specific estate?

5   A    No.  My understanding is that the three words that you

6   mentioned were searched for, the description describes what

7   work was done; if it wasn't 100 percent then it was

8   multiplied out.  But that asbestos was a liability to EFH or

9   other EFH subsidiaries other than EFIH.  And that the two

10  folks whose names were mentioned were an asbestos person and

11  their counsel.

12  Q    Right.  And so to your knowledge, there was no

13  additional work done by Ropes to evaluate, well, this is

14  clearly related to a plan confirmation issue and, therefore,

15  that would actually appropriately be collective?  It was

16  just if you hit those search terms right, we'll sum it up

17  and then proceed from there?

18  A    I agree with the second part of your statement; I don't

19  agree with the first part of your statement.

20  Q    And what you don't agree with is you just don't know

21  whether there's an additional screen or review done?

22  A    I just don't agree.  I think you mentioned something

23  about it's appropriate that it's collective.

24  Q    No, no.  My only question was trying to get to what

25  work was done by Ropes in which manner.

```
 1    A    Yeah.  That's all I know.

 2    Q    Okay.  We'll move on.  So, Mr. Rosenbaum, in your

 3    written direct testimony, in Paragraph 16 you testified that

 4    the Debtors did not permit Elliott to separately negotiate

 5    alternative financing or restructuring options with third

 6    parties?

 7    A    Sorry, that was 16?

 8    Q    16.  We're putting it up on the screen.

 9    A    That's right.

10    Q    Do you see that, sir?

11    A    That's right.

12    Q    All right.  Now, I believe in your live testimony you

13    tried to clarify this and to make clear that the Debtors

14    didn't force you to do anything, correct?  The Debtors

15    didn't force Elliott to take any particular steps, correct?

16    A    I don't understand.

17    Q    Well, so, in Paragraph 16, I'll rephrase, it says, "The

18    Debtor did not permit Elliott to separately negotiate

19    alternative financing or restructuring alternatives with

20    third parties." Do you see that?

21    A    That's right.

22    Q    And you stand by that, right?

23    A    I believe that, yeah.

24    Q    Okay.  And this is in the time period when you're at

25    Elliott, Elliott has bought in to the EFIH capital
```

1    structure, the NextEra cut plan has been confirmed, and it's

2    pending in front of the Public Utility Commission -- and

3    then thereafter?

4    A    That's right.  I think it was confirmed in February of

5    '17, is that right?  Yeah, that's right.  So, yeah, about

6    April or May of -- June, April, May, June 2017.

7    Q    And, sir, it's your testimony the Debtors stopped

8    Elliott Capital from negotiating an alternative transaction

9    presumably that Elliott believed would bring higher

10   distributable value to creditors?

11   A    I'm sorry, can you say that again?

12   Q    You believe the Debtors prevented you from going

13   forward and seeking out an alternative transaction?

14   A    The Debtors, as I think I mentioned before, maybe not

15   specific to this, told us that they believed that we were

16   bound by PSA and if we were to do that we would be in

17   violation of that PSA.

18   Q    Okay.  Let's go to Binder 2.  Apologize, Your Honor.

19   It takes a village.

20           THE COURT:  Are we getting close to the end of

21   your cross?

22           MR. MCKANE:  Your Honor, I probably have a few

23   more topics.  I apologize.

24           THE COURT:  Okay.

25   Q    11562, Docket Entry 11564, excuse me.

1           THE COURT:  Mr. Glenn, are you going to have

2   questions?  Mr. Pedone?

3           MR. MCKANE:  Your Honor, if you want --

4           THE COURT:  I'm just asking.

5           MR. PEDONE:  Probably not, Your Honor.

6           THE COURT:  Probably not.  Of course redirect.  I

7   just -- it'll take what it takes but I'm not sure how that's

8   going to affect oral argument this afternoon.

9           MR. MCKANE:  I hear you and I'm -- we're prepared

10  to close, and so -- and I'm willing to truncate.

11          THE COURT:  You take all the time you feel you

12  have and need, have to spend.  I don't know how much you

13  have left, but I'm just saying we may need to revisit what

14  we discussed yesterday in chambers about closing.

15          MR. MCKANE:  Understood, Your Honor.

16  Q    So --

17  A    11564.

18  Q    11564.  11564 is the declaration from Mr. Stephany in

19  support -- and this is with regards to the scheduling

20  dispute and just for (indiscernible) sake, Mr. Rosenbaum, do

21  you recall a dispute between the Debtors and Elliott in 2017

22  after the Debtors had filed the Berkshire plan in which

23  Elliott had asked the Debtors not to proceed forward with

24  having a hearing and getting approval of that plan for a

25  later point in time?  Do you recall that?

1    A     That's where Judge Sontchi provided the 11 --

2    Q     The 11 days.

3    A     Right, that's right.

4    Q     Right.  Exactly.  And, sir, do you recall -- with

5    regards to the testimony you just gave with regards to

6    alternative transactions, the Debtors offering Elliott a

7    series of waivers to any issues with regards to the PSA so

8    that Elliott could go seek an alternative transaction or

9    alternative financing?

10   A     I think there were multiple offers or waivers at

11   different points in time.  I think we talked a little bit

12   about that before.  And the levels of freedom that those

13   waivers provided.

14   Q     Okay.  So, sir, the Stephany declaration, if you could

15   turn to Exhibit 8.

16   A     Who is this?

17   Q     Which is three pages in.

18   A     This is the declaration -- Brain Stephany worked for us

19   or for who?

20   Q     No.  He used to work for me.  He's now in AUSA.  Very

21   good guy.  I want to show the email exchange --

22             THE COURT:  We're going to strike that.  Very good

23   guy, I don't know.  Might be, he might not be, I don't know.

24             MR. MCKANE:  He's going to be very sad to hear

25   that.

1   A    Exhibit 8?

2   Q    Exhibit 8.

3   A    Yes, sir.

4   Q    And, sir, Exhibit 8 is an email from a Kirkland

5   attorney, Ms.  Jenkin.

6   A    Yes.

7   Q    To Mr. Wilford and Mr. Galardi.  Do you see that, sir?

8   A    Yes.

9   Q    Right.  And they were representing you at this time,

10  right?

11  A    That's right.

12  Q    Right.  And the re line is EFA Unilateral Waiver

13  Language.  Do you see that?

14  A    The subject?  Yes.

15  Q    Yes, yes.  The re line, exactly, the subject line,

16  you're absolutely right.  And do you see the proposal -- the

17  language there that says, "Keith and Greg, Per your

18  discussion with Chad, below is draft language the Debtors

19  would send to memorialize the unilateral waiver we've

20  discussed"?  Do you see that?

21  A    I see it.

22  Q    And do you see the language below where it says, "The

23  EFH/EFIH parties to the attached restructuring agreement..."

24  and then it goes on to define the agreement, and the key

25  language, quote, "...agree not to enforce the restrictions

1   under the plan support agreement of the supporting

2   creditors' ability to have discussions or negotiations with

3   the EFH/EFIH creditors or other parties regarding a

4   potential backup plan proposal"?  Do you see that, sir?

5   A    Apparently it was qualified after that, but I see that.

6   Q    Yeah.  Exactly.  And the key restriction was you just

7   don't file a plan?

8   A    Do you mind if I read it?

9   Q    Sure.

10  A    I think that's one -- what you mentioned is one of the

11  restrictions.  The other restriction I recall was that the

12  Debtors had to be kept apprised or be involved in all

13  discussions related to the transactions or obviously

14  financings because the financings for the Debtor.

15  Q    Well, Mr. Rosenbaum, you know that at this point in

16  time statutory exclusivity had expired, right?

17  A    That's right.

18  Q    Okay.  And so -- and this is during dependency --

19  stayed of the dispute about whether that PSA, that earlier

20  PSA was a force fall on Elliott, right?

21  A    I'm not sure when that was -- I'm not sure exactly as

22  to when that occurred but --

23  Q    Okay, the key thing I want to highlight for you is the

24  date of this email, this original offer, right?

25  A    April 28th.

1    Q     This is April 28th, right?

2    A     Right.

3    Q     Okay.  And so even by April 28th there's an offer,

4    albeit one that Elliott rejects, of a waiver to allow

5    Elliott to go look for alternative financings or

6    transactions, right?

7    A     Yeah.  I believe we discussed this.  There was an offer

8    and we didn't find it to be free enough for us.

9    Q     Right.  Okay, could you turn to Exhibit 12?

10   A     Exhibit 12, yes.

11   Q     Yeah.  Are you there, sir?

12   A     Yes.

13   Q     And this is another email from the Kirkland -- members

14   of the Kirkland team to members of the Ropes & Gray team.

15   Are you there?

16   A     Yes.

17   Q     And so you see the one on the top from Mr. Husnick?

18   A     Yes.

19   Q     Dated May 2nd to Mr. Galardi?  Are you there?

20   A     Yeah, I'm reading -- the top one or the bottom one?

21   Q     Well, let's start with the one on the top.  The one

22   that says Greg.

23   A     Okay.

24   Q     Okay?  And it says, "The Debtors are willing to provide

25   Elliott and its affiliate that are holders of the unsecured

1    notes issued by EFI a limited waiver of restrictions under

2    the RSA as amended." And then it says, "To the extent

3    necessary to permit Elliott to make a proposal to EFIH for

4    debtor in possession financing." Do you see that?

5    A    Yes.

6    Q    And that was unacceptable?

7    A    Do you mind if I read the rest of this?

8    Q    Sure.

9    A    I think this is solely related to the finance -- the

10   potential refinancing of certain DIP loans and secured debt

11   -- secured notes, outstanding EFIH -- it doesn't discuss

12   exploring potential alternative transactions.

13   Q    Right.  This was specifically related to the DIP

14   financing because the email below came from your counsel

15   specifically asking for that, to confirm the scope of a

16   waiver.  Right?  Do you see the email below where it says,

17   "On May 1st, 6:17 for Mr. Galardi"?  And in particular the

18   language -- and this was from Mr. Galardi.  "While Elliott

19   believes it is free to enter in to negotiations with the

20   Debtors regarding such debtor in possession financing and

21   that no claims exist or could be asserted in connection with

22   its doing so, Elliott nonetheless requested the Debtors

23   confirm the same and the Debtors waive and will not assert

24   any claims against Elliott in connection with or arising out

25   of its providing the Debtors with a DIP financing term

1    sheet."

2    A    That's right.

3    Q    Right?  So, they're trying to offer you a waiver

4    specifically for the term sheet for financing because that's

5    what you asked for.

6    A    No, we asked for a waiver that would allow us to pursue

7    multiple things, including alternative transactions,

8    including financings, among other things.

9    Q    Okay.

10   A    Including the ability to talk to other third parties.

11   Q    Let's go to Exhibit 14.  And this is another email

12   exchange, and now it appears that some of the principals are

13   involved, including you and Mr. Keglevic.

14   A    Okay.

15   Q    Are you there?

16   A    Yes.

17   Q    And I believe the email that I want to focus on, it

18   starts -- the header starts on the bottom of the first page

19   and rolls over to the second.  It's from Mr. Keglevic, it's

20   dated May 4th --

21   A    Right.

22   Q    -- at 11:49 a.m., and it's to you.

23   A    That's right.

24   Q    Do you see, sir?

25   A    I see it.

1   Q    Are you there?

2   A    Yeah, I'm here.

3   Q    Okay.  It rolls over to the next page.  "Jeff..." And

4   then the first paragraph says, "As we discussed on April

5   21st, we share your objection -- objective to maximize value

6   for the EFIH and EFH estates." Do you see that?

7   A    Yes.

8   Q    And then if we go a little lower, it says in that same

9   paragraph:  "In the event that process does not yield the

10  desired result, we would like to be ready to discuss backup

11  plan proposals." Do you see that?

12  A    I see it.

13  Q    And then Mr. Keglevic says, "We are ready to meet with

14  you and any other party to push those negotiations forward."

15  Do you see that, sir?

16  A    I see it, yeah.

17  Q    Okay.  And then below it says, "To facilitate the

18  above, this letter serves as notice of the following." And

19  the first bullet thereafter, "EFH and EFIH hereby waive any

20  restrictions Elliott has under the PIK PSH to refrain from

21  discussions and negotiations, A, with third parties or

22  creditors regarding a backup plan proposal, provided such

23  parties are subject to a current NDA with the Debtors; or,

24  B, with any parties regarding potential EFIH DIP proposals,

25  again, subject to the execution of any necessary NDAs."

1    A    I see that.

2    Q    Okay.  And you received that email, right?

3    A    I received this email.

4    Q    Right.  And this waiver was -- was unacceptable to

5    Elliott?

6    A    Well, I think there -- I don't fully recall, but for

7    some reason, now that I see the word "backup plan proposal"

8    in all caps, I believe there was some issue with how that

9    was defined in some document.  I'm not sure which document.

10   Maybe the PIK PSA had that.  I'm not sure which document.

11   Maybe it was a NextEra merger agreement.  One of the

12   documents had this as a defined term and I think we had --

13   this was a year ago -- over a year ago.  But I think we had

14   an issue with exactly what backup plan proposals meant.  And

15   then I think there's, once again, carve outs on the ability

16   to do things unilaterally.

17   Q    And ultimately this was a proposal that was rejected by

18   Elliott.  But ultimately even the Debtors and Elliott were

19   able to reach an accommodation where they stood down from

20   the litigation and moved forward to evaluate alternative

21   transactions, correct?

22   A    Yes.  I don't recall exactly what date, but yes.

23   Q    Yeah, but the three proposals -- the waivers that are

24   being offered here are in late April and early May, right?

25   A    That's what the dates are, yeah.

1    Q    And the Berkshire agreement wasn't signed up until July

2    7th, right?

3    A    Early July.

4    Q    Right.  And then the scheduling hearing wasn't until

5    late August, right?

6    A    I thought it was late July.

7              THE COURT:  Yeah, it was like mid-August I think.

8              MR. MCKANE:  Mid-August.  It was moved 11 days --

9              MR. GALARDI:  Your Honor, maybe we're getting the

10   scheduling -- the scheduling hearing on the adjournment was

11   July 23rd.  The hearing on the actual approval of the

12   Berkshire agreement was scheduled for August 21st.

13             THE COURT:  Oh.

14             MR. GALARDI:  And then we had the September 6th --

15   not to be the date guru here -- September 6th was the date

16   the actual Sempra agreement got approved in the disclosure

17   statement.

18             THE COURT:  You're right, Mr. Galardi.  Thank you.

19   And you're right, Mr. Rosenbaum.

20             MR. MCKANE:  Mr. Galardi is right.

21             MR. ROSENBAUM:  Lots of dates.

22             MR. MCKANE:  A lot of dates.

23   Q    Now, sir, ultimately, Elliott's decision to move

24   forward and work with the Debtors last year --

25   A    Right.

1   Q    -- right?  Was ultimately in part based on the

2   continuing cash burn that was occurring at EFIH, right?

3   A    Well, that was one reason.

4   Q    Right.  It was a large reason, right?

5   A    It was a reason.

6   Q    And ultimately Elliott made a conclusion that in its

7   own economic interest, it was better to go forward and try

8   to reach a consensual deal earlier, to cut off the cash burn

9   rather than going down what may be a more protracted

10  confirmation process?

11  A    I don't know if we ever made an assessment on the

12  latter, but we preferred a consensual deal.  I don't know if

13  we ever made a strong assessment as to how protracted or how

14  long a unilateral or nonconsensual deal would've been.

15  Q    Okay.

16        MR. MCKANE:  Your Honor, I'm cognizant of the time

17  and I'm also cognizant of like, what's truly relevant.  If I

18  could -- if we could take a very short break, like, truly,

19  like, just a few minutes so I could confer with co-counsel,

20  otherwise known as Mr. Hezelstein, and I can try to wrap

21  this up.

22        THE COURT:  All right, we'll take a short break.

23  Just let us know when you're ready to resume.  And, again,

24  you cannot speak to anyone.  Thank you.

25        (Recess)

1                CLERK:  All rise.

2                THE COURT:  Please be seated.

3                MR. MCKANE:  Your Honor, thank you for the

4     additional time --

5                THE COURT:  Mm hmm.

6                MR. MCKANE:  -- for the time.  It's been helpful.

7     Q     Mr. Rosenbaum, just, I think, three other areas we

8     want to explore, small.  You said when you were at York that

9     you had interest in the securities starting as late back as

10    2010.  Is that right?

11    A     Roughly.  I don't recall the exact date --

12    Q     All right.

13    A     -- but it sounds like it's reasonable.

14    Q     So, in 2013 were you part of the Ad Hoc PIK Group

15    represented by Akin Gump?

16    A     In 2000 -- prebankruptcy?

17    Q     Prebankruptcy.

18    A     That's right.

19    Q     Right.  And Mr. Dizengoff is one of your lawyers?

20    A     That's right.

21    Q     Okay.  In your second binder there's a tab that says,

22    "Third Lien Letter."

23    A     Okay.

24    Q     Are you there, sir?

25    A     Yes.

1   Q    Mr. Rosenbaum, do you recall authorizing as a member of

2   that group Mr. Dizengoff to send a letter to Mr. Cieri at

3   Kirkland in July of 2013 prepetition, proposing a potential

4   exchange into an EFIH third lien note?

5   A    I don't specifically recall the letter, but I have no

6   reason to believe it didn't happen.

7   Q    Right.  And so, sir, just to -- as your understanding

8   from a restructuring perspective, to the extent that there

9   was an exchange into a third lien position from the PIKs --

10  A    Okay.

11  Q    -- right, that would put the new holders, the new third

12  lien, ahead of general unsecured claims of the EFIH estate,

13  right?

14  A    What was the date of this letter?

15  Q    This was July of 2013.

16          MR. MCKANE:  This predates the filing, Your Honor.

17          THE COURT:  Okay.

18  Q    Okay.  See --

19  A    I know.  I'm sorry.  Sorry.

20  Q    I'll tie it up in close.

21  A    Project Olympus.

22  Q    This is previous -- this unrelated to Olympus.  This is

23  just a standalone exchange from the PIKs into a third lien.

24  Do you recall?

25  A    I understand.

1    Q    And so, if that exchange had happened, then the holders

2    previously, the people like yourself, the PIKs, would have a

3    third lien position that would be ahead of a general

4    unsecured at the EFIH estate?

5    A    Let's see.  Let me just read this.  The third liens

6    would be structurally senior to the unsecureds.  So, I think

7    it also talks -- just to be complete about interest savings.

8    So, while they'd be structurally senior, there would be some

9    benefit to reduction in claims to any unsecured notes

10   binding.  But yes --

11   Q    Right.

12   A    -- the specific answer to your specific question is

13   those notes be structurally senior.

14   Q    And this exchange didn't occur, correct?

15   A    That's right.

16   Q    Right?  The Debtors didn't agree to go forward with

17   this?

18   A    That's right.

19   Q    All right.  So, let's fast-forward a year, from July of

20   2013 to July of 2014.  And at that point in time, the

21   Debtors are in bankruptcy, right, and the Debtors are

22   contemplating terminating the RSA.  Are you with me?

23   A    That's right.

24   Q    Okay.

25   A    After the hearing?

1    Q    After a part of the hearing.  And sir, do you recall --

2              THE COURT:  No, the hearing never ended.

3              MR. MCKANE:  It never ends.

4              THE COURT:  Well, no, it didn't.  It didn't end.

5    It was adjourned and then it never reconvened --

6              MR. MCKANE:  Correct, Your Honor.

7              THE COURT:  -- because you cancelled the RSA.

8              MR. MCKANE:  Exactly right.  Thank you, Your

9    Honor.

10   Q    And sir, I just want to direct your attention to the

11   other binder, the first binder, AX-12.  And 12 -- are you

12   there, sir?

13   A    We're done with this other one?

14   Q    Yeah, we're done with that one.

15   A    AHX-12, okay.

16             THE COURT:  Is this Binder 2?

17             MR. MCKANE:  This is -- we're in Binder 1.

18             THE COURT:  Binder 1?

19   A    Yes.

20   Q    Right.  And an attachment to this email from Mr.

21   Walker, where he's sending this out to the EFIH Boards is

22   another communication from Mr. Dizengoff?

23   A    Right.

24   Q    Right?  And this is dated July 7th?

25   A    2014, yeah.

1    Q    Right?  And you were a part of the PIK Group at this

2    time, right, at York?

3    A    That's right.

4    Q    And you authorized Mr. Dizengoff at some level to send

5    this communication?

6    A    The Group --

7    Q    The Group did?

8    A    Yeah.

9    Q    Right?

10   A    That's right.

11   Q    If I could direct your attention to Page 2 of the Bates

12   --

13   A    Page --

14   Q    -- on the bottom?

15   A    Yes.

16   Q    It's the first page to the left.

17   A    Oh, yeah.  Oh, the first -- Page 2 to the left?

18   Q    Yeah, so it's the first page of the letter, second

19   paragraph, the one that says, "The Ad Hoc Committee

20   requests".

21   A    Oh, yeah, I see it.

22   Q    You there, sir?

23   A    Yeah.

24   Q    And then do you see that sentence, "Abandoning the RSI

25   and the comprehensive economic compromises embodied therein

1    is not in the best interests of the EFIH unsecured creditors

2    and will lead to immediate and irreparable harm to such

3    creditor positions."  Do you see that, sir?

4    A    I see it, yes.

5    Q    Right?  And this is where your lawyers express --

6    they're expressing concerns of immediate irreparable harm,

7    right?

8    A    That's right.

9    Q    And it continues onto the next page.  You with me?

10   A    I'm just reading the rest of the end.

11   Q    Are you there?

12   A    I'm here.

13   Q    All right.  And you see, you know, it ends -- it's a

14   new thought from Mr. Dizengoff, and it says, "Further,

15   termination of the RSA would expose the EFIH's estate and

16   its creditor constituencies to significant harm, as it

17   may..." -- and the last bullet, do you see that?

18   A    That's right.

19   Q    Are you there?

20   A    I see it.

21   Q    It says, sir -- the last bullet says, "put at risk the

22   Debtors' ability to consummate the carefully crafted tax-

23   free spinoff of Texas Competitive Electric Holdings Company,

24   LLC, TCEH, which in turn would trigger" -- in bold and

25   italics -- "billions of dollars of tax liability, thereby

1    jeopardizing unsecured creditor recoveries at EFH, EFIH, and

2    TCEH."  Do you see that?

3    A    I see it, yeah.

4    Q    All right.  So, your counsel at the PIKs is expressing

5    concern that if we terminate the RSA and go down a different

6    path, there is potential exposure in the level of billions,

7    not just at the EFH level, but at the EFIH estate, at the

8    EFIH unsecured estate - level.  Excuse me.

9    A    I'm sorry, was that a question?

10   Q    Yes, it was.

11   A    Is that my understanding?

12   Q    Yes.

13   A    My understanding is that if there a taxable

14   transaction, that could trigger a billion dollars of tax

15   liability to EFH.  That EFH, under certain theories, could

16   potentially assert an intercompany claim from EFH to EFI --

17   could potentially assume -- assert an intercompany claim

18   from EFH to EFIH under a tax sharing arrangement that

19   existed between EFH and EFIH.  But at the time, I think, as

20   we discussed before, EFIH also had significant claims

21   against EFH.

22   Q    And to the extent that there's a claim being asserted

23   by EFH, right, in the billions through a tax sharing

24   agreement down to EFIH at an unsecured level, as long as you

25   were a PIK, you said pari passu with those other general

1    unsecured claims, right?

2    A    We believed it was a risk, which was articulated here.

3    I don't believe it was a -- it was definitely a risk and we

4    were cognizant in our businesses to evaluate risk.  But you

5    know, as I said, EFIH owned, I think we said before, roughly

6    $1.3 billion of EFH claims or bonds, which we believed could

7    have been set off against certain intercompany claims if

8    they were ever asserted.  So, it was a risk.  I don't know

9    if it was any bigger than any other risk.

10   Q    Okay.

11   A    But it was a risk, definitely.

12   Q    And sir, this communication from Mr. Dizengoff, right,

13   it's directed to Mr. Cremens.

14   A    That's right.

15   Q    Do you see that, sir?  And Mr. Cremens at this point

16   was the decision director -- decision manager at EFIH,

17   right?

18   A    That's right.

19   Q    Right.  And so, later in time when you -- when we were

20   in the 2017 time period, when you were discussing Mr. --

21   your difficulty with Mr. Keglevic and his 10 non-negotiables

22   --

23   A    That's right.

24   Q    -- remember that, sir?

25   A    Mm hmm.

1    Q    Right?  You mentioned you had a series of

2    communications with lots of folks, right, including Mr.

3    Cremens?  Right?

4    A    That's right.

5    Q    You had the ability to go to Mr. Cremens directly,

6    right, as the EFIH decision manager, and say to the extent

7    that you thought there was greater value in an EFIH

8    transaction, Mr. Cremens was charged with thinking solely

9    about EFIH interests and would here you out, right?

10   A    I believe he did.

11   Q    Right?  And so, you had access to Mr. Cremens and Mr.

12   Levin, so for these specific EFIH issues, irrespective of

13   what Mr. Keglevic thought, were negotiable or non-

14   negotiable?

15   A    I believe we had conversations with Mr. Cremens at that

16   time about that.

17   Q    Right.  And at any point in time did -- is it -- do you

18   think --

19            THE COURT:  I'm sorry.  Mr. Rosenbaum, can you

20   move a little closer?

21            MR. ROSENBAUM:  I'm sorry.

22            THE COURT:  That's all right.  You can -- you

23   don't need to be right on it, but I'm having a little

24   trouble.

25            MR. ROSENBAUM:  I'm sorry.

1    A    I believe we had conversations with Mr. Cremens about

2    that same stuff at that point in time.

3    Q    Right.

4          THE COURT:  Thank you.

5    Q    And so, is it your understanding that Mr. Cremens was -

6    - just ignored your concerns to the extent that you thought

7    there was a transaction out there better, that was a taxable

8    transaction?

9    A    I don't know what he thought or didn't think, but I do

10   know that we -- when we talk to him, we clearly conveyed to

11   him the same 10 non-negotiables that were conveyed to us,

12   which I articulated the ones I remember.

13   Q    And did you convey to him that you thought there was a

14   taxable transaction that was out there that was higher and

15   better?

16   A    I believe we conveyed to him that we thought that folks

17   would be -- certain parties would be interested in paying

18   more for EFH and its interest in Oncor on a taxable basis.

19   Multiple parties mentioned that to us.  Whether or not it's

20   "higher and better" I think is to be evaluated.

21   Q    Okay.  All right.  Sir, you've mentioned in your live

22   testimony you were familiar with the interim comp order --

23   the interim compensation order?

24   A    That's right.

25   Q    Okay.  And you mentioned in your live testimony as well

1   that you were aware of the professional fees that were being

2   accrued at the EFH and EFIH estates, right?

3   A    We were made keenly aware during the same time in the

4   time May of '17, when we were working with the Debtor on a

5   backup -- a critical backup plan.

6   Q    Yeah.  And you were provided, in fact, a budget at that

7   point in time and forecast for projected fees on a go-

8   forward basis?

9   A    Yeah.  Recent historicals for the past several months

10  as well as projected monthly amounts, and the amounts due at

11  the effective date, success fees, or transaction fees, or

12  whatever.

13  Q    And at any point in time in 2017, did you file an

14  objection to any of the multi-fee applications that were

15  being filed?

16  A    No, we did not.

17  Q    And at any point in time, you know, when you were at

18  York or at Elliott, did you oppose a monthly fee

19  application?

20  A    The interim --

21  Q    Just the monthlies.

22  A    No, we did not.

23  Q    Did you oppose an interim fee application?

24  A    No.  We believed that if we had an issue that we would

25  have an ability to discuss that before it became final.

1   Q    Right.  And with regards to the Kirkland application,

2   Elliott didn't oppose the final fee application, right?

3   A    I don't think we're opposing -- we don't have an issue

4   with the total amount or quantum or dollars of fees.  It's

5   the allocation of the fees across EFH and EFIH show the

6   number is what it is.  But how it's allocated is what our

7   interest is.

8   Q    And sir, isn't it true that Elliott, you know, made a

9   calculated decision to cut off the interest rate burned by

10  emerging from bankruptcy, and then raising issues with

11  regards to allocation and expense?

12  A    I don't know what you mean by calculated, but I don't

13  agree with that articulation.

14  Q    Well, okay, isn't it true that ultimately the Debtors

15  emerged, right, and it was only after the E-side Debtors

16  emerged that this motion was filed, and arguments were

17  raised to the Court about what is the appropriate allocation

18  of fees?

19  A    It's my understanding that we weren't allowed to before

20  the effective date.

21  Q    It's your understanding that you were not allowed to

22  file a motion?

23  A    That's right.

24  Q    And who gave you that understanding?

25  A    It's my understanding that the support agreement for

1    the Sempra transaction didn't allow us to do that.

2    Q    All right.  And prior -- and you enter the support

3    agreement to the Sempra transaction in late July to support

4    that transaction?

5    A    No, I believe --

6             THE COURT:  No.

7    A    -- it was on August 21st, right?

8             THE COURT:  Yeah.

9    Q    Sir --

10   A    Early in the morning of August 21st, sir.

11   Q    It's my fault.  I apologize.  You're right.  It was in

12   August.  Sir, your testimony that the Sempra PSA

13   specifically prevented Elliott Capital from raising issues

14   with regards to the allocation of fees across the Debtors'

15   estates?

16   A    It's my understanding that we were locked into support

17   all aspects of the transaction as is until the effective

18   date.

19   Q    Right.  And do you know whether the plan discusses the

20   allocation of fees at all?

21   A    I don't specifically know if the plan discusses

22   allocation of fees.

23   Q    Okay.

24             MR. MCKANE:  All right.  I'm going to pass the

25   witness.

1          THE COURT:  All right.  We're going to break for

2     lunch.  Mr. Glenn, you're next, correct?

3          MR. GLENN:  Yes, Your Honor.

4          THE COURT:  And I forget, Mr. Pedone, you said you

5     don't think you have have any questions?

6          MR. PEDONE:  I don't believe I will, Your Honor.

7          THE COURT:  Okay.  All right.  And obviously,

8     we'll have redirect.  Maybe; maybe not.  Okay.  We are going

9     to break for lunch.  We will reconvene -- let's reconvene at

10    2:00.  Sir, while you can certainly chat about the Mets or,

11    you know, anything else -- or the Phillies, not

12    (indiscernible) with it.

13          MR. GALARDI:  Grace.

14          MAN 1:  Eagles?

15          THE COURT:  Race?

16          MR. GALARDI:  Grace.

17          MAN 1:  Oh, wow.

18          THE COURT:  Oh, Mr. Galardi.  You may not prepare

19    your witness.

20          MR. GALARDI:  You spent the morning --

21          THE COURT:  All right.

22          MR. GALARDI:  I didn't prepare you for any of

23    this, but --

24          THE COURT:  You can chat away about anything

25    except the substance of your testimony during your lunch

1    period.

2              MR. GALARDI:  It's just on scheduling.  I know

3    it's 10 and 1:00, 2:00.  Is there -- I am (indiscernible)

4    obviously, and I would like to still try to get to closing

5    this afternoon.  Is there any chance we can shorten the

6    lunch break a little bit?

7              THE COURT:  All right.

8              MR. GLENN:  May I interject, Your Honor?

9              THE COURT:  Well, we could do it at 10 to 2:00.

10             MR. GLENN:  Okay.  I'm going to spend the time to

11   try to make it shorter if I can.  Does Your Honor want to

12   break by 5:00 today, or is there flexibility on our end

13   time?

14             THE COURT:  That depends on how tired I get in the

15   afternoon, quite frankly.  I would hope to break by 5:00.  I

16   don't see -- I mean, we had talked about three hours in

17   chambers.  I don't see that happening.  We can always do it

18   after or before the proposed findings are submitted, if we

19   don't get it done today, or you can figure out a way to

20   truncate down your closing.  But I certainly won't be going

21   past 6:00.  Preferably, 5:30 would be the end, but you know,

22   if we're close we might click a little past there, but after

23   6:00 I just get grumpy.  And I start grumpy, so me getting

24   grumpy is even worse, so -- and it's very --

25             MR. GALARDI:  So, we'll try to truncate --

1        THE COURT:  And it becomes very hard to

2   concentrate, frankly.

3        MR. GALARDI:  Understood.

4        THE COURT:  So, all right.  So, we'll make it an

5   hour then.  We'll return at 10 to 2:00.  And I'll see you

6   then.

7        ALL:  Thank you.

8      (Recess)

9        THE COURT:  Please be seated.  You may proceed.

10       MR. GLENN:  Thank you, Your Honor.  We have placed

11   before Your Honor and the witness witness binders for the

12   testimony today.  Mr. Rosenbaum, you should have one in

13   front of you.  Are you ready to proceed?  Thank you.  Now,

14   for the record, Andrew Glenn, Kasowitz, Spence & Torres on

15   behalf of the ad hoc committee.

16         RE-DIRECT EXAMINATION OF JEFFREY ROSENBAUM

17   BY MR. GLENN:

18   Q    Sir, I want to talk to you about the RSA.  While you

19   were at York, and the RSA was being negotiated, you would

20   agree with me that you were concerned about professional fee

21   allocation issues, correct?

22   A    That's right.

23   Q    Okay.  And I believe you testified in response to Mr.

24   McKane's questioning that you were not involved in the

25   negotiations of the professional fee allocations, correct?

1   A    Their language of the RSA?

2   Q    I thought the answer was that you weren't involved in

3   any negotiations with respect to professional fee

4   allocations.  Were you or were you not?

5   A    The RSA as a whole, and the concepts in the RSA were

6   negotiated by the proof of principals, by the ad hoc EFIH

7   PIK group.  The actual specific terms, language that was

8   used, I think I was said was specifically negotiated by

9   Centerview and Akin Gump..

10  Q    Okay, if you could move your microphone a little

11  closer, I can't hear you.

12  A    I'm sorry. Centerview and Akin Gump.

13  Q    Okay, so I'd like you to turn to Tab 1 of your binder,

14  sir.  Maybe we can flesh this out a bit.

15  A    Sure.

16  Q    This is an email exchange of April 27th of 2014.  Do

17  you see that?

18  A    Yes.

19  Q    Okay.  I'd like you turn to second page, sir.

20  A    Yes.

21  Q    And this is an email form you to Michael McDougal,

22  among other folks, copying members of the ad hoc PIK

23  committee, correct?

24  A    That's right.

25  Q    Okay.  And you state in the second page of the email,

1    gentlemen, we just concluded a three-hour call going over

2    all five relevant documents, do you see that?

3    A    Yes, sir.

4    Q    And the subject line is call request, correct?

5    A    Yes.

6    Q    And the documents you're referring to are the RSA

7    documents, correct?

8    A    I'm not sure.  It says five relevant documents.  It

9    could be.  I'm not sure.

10   Q    Okay.

11   A    I assume if it was right -- if it was April 27th, and

12   the companies filed for bankruptcy on the 29th, I'm

13   imagining that could be one of the five.

14   Q    Okay, and the top email on the first page is another

15   email from you to Mr. McDougal, Steve Zelin, and Mr. Mason

16   of the Wachtel Law Firm, correct?

17   A    That's right.

18   Q    Okay, and this is, beneath that, your agenda for this

19   call, correct?

20   A    That's right, yes.

21   Q    Okay.  Can you read Number 4 into the record, please?

22   A    Professional Fee App -- Number 4, Professional Fee

23   Allocations.

24   Q    So two days before this Chapter 11 case, you put on the

25   agenda Professional Fee Allocations as an agenda items to

1    discuss with a director of EFH, along with two advisors,

2    correct?

3    A    That's right.  For our group to discuss.  Yeah, that's

4    right.

5    Q    Okay, and  you're the one that sent that email,

6    correct?

7    A    I sent the email, that's right.

8    Q    Okay, so are you here today to challenge the

9    methodology that you agreed to in the RSA, or are you

10   agreeing with the methodology, but disagreeing how it was

11   applied?  Because I don't understand.

12   A    I'm sorry, could you ask the question?

13   Q    Today, sir, are you challenging whether that

14   methodology was appropriate?  Yes or no?

15   A    Whether the methodology in the RSA?

16   Q    Mm hmm.

17   A    Well, the RSA was a holistic document that had more

18   terms than just professional fee allocations.  And I think

19   as we had discussed before with either Mr. Galardi or Mr.

20   McKane, there were a bunch of economic items  in the RSA.

21   So the professional fee allocations were one of those.

22   Q    I'm asking you a different question.  Are you asking

23   Judge Sontchi to throw out the professional fee allocation

24   methodology that was used during this case, or are you

25   telling the judge that he should use that methodology, but

1   redo the professional fee expenses, because they were

2   wrongly used?

3   A    I don't believe we at York ever signed an agreement on

4   professional fee allocations that was approved by the Court.

5   Q    Okay.

6   A    So I believe the RSA encompassed multiple financial

7   terms, including, I think we talked about a nine-month time

8   period, a conversion into equity, a TSA amendment, which

9   would have proved Oncor tax payments to EFIH instead of EFH,

10  professional fee allocations.  So as part of that global

11  document, we agreed to it, but I don't think that this

12  document was ever approved by the Court.

13  Q    Fair enough.  Judge Sontchi did approve the interim

14  compensation order, did he not?

15  A    I believe so.

16  Q    And there's a similar, if not identical methodology in

17  that interim compensation order, correct?

18  A    I believe the language is or more or less

19  (indiscernible).

20  Q    I'll repeat my question, then.  Are you asking Judge

21  Sontchi to throw that out, or are you telling him that

22  professional time entries, professional fee charges should

23  be redone, pursuant to that methodology?  Because I don't

24  understand it.

25  A    I'm not telling him anything.  And I don't think we

1    were a party to the interim compensation agreement, or

2    that's the interim compensation order.  I think we do

3    believe that the allegation of professional fees, as per

4    that interim compensation order, isn't fair, or isn't

5    equitable, or whatever term is consistent with that, based

6    on how professional fees were allocated.

7    Q    So it's the second.  You're saying the methodology's

8    okay, but the professionals didn't follow the methodology.

9            MR. GALARDI:  Objection, that misconstrues the

10   testimony.

11           THE COURT:  Yeah, I agree.  I think he said both,

12   frankly.

13   Q    Okay, all right.  Now, another provision of the RSA

14   required EFIH to contest the allowance of the first and

15   second lien make-wholes, correct?

16   A    I believe the RSA required the -- I believe the RSA

17   required the second lien make-whole to be contested, the

18   first lien make-whole to be disallowed -- the original RSA,

19   right?  The first lien make-whole to be disallowed, and the

20   second lien make-whole to be contested, and I think

21   required, I think  the term that we used was Debtors,

22   plural, had to contest it.

23   Q    Okay, well, let's go to the RSA, then, please.  That is

24   in Tab 4 of your binder.

25   A    Tab 4?

1   Q    Okay, do they have --

2        MR. GALARDI:  Is this your binder?

3        MR. ROSENBAUM:  I have an Akin Gump.

4        MR. GALARDI:  Oh, you didn't get one?  Do you need

5   one?  Yes, that's our binder

6        MR. GLENN:  I'm sorry, I misspoke.

7   Q    Now, do you know who eventually filed the motion for

8   the adversary proceeding to disallow the make-wholes?

9   A    Kirkland, on behalf of the Debtors.

10  Q    Wasn't it on behalf of EFIH, sir?

11  A    I'm not sure, but I have no reason to believe

12  otherwise, if that's what you tell me.

13  Q    Okay, but that being the case, you agreed that those

14  make-wholes should be contested from day one of this

15  bankruptcy, correct?

16  A    Yes.

17  Q    And you testified in response to Mr. Galardi's

18  questions that you believed that your EFIH PIK bonds were

19  worth 160.  Did I hear that correctly?

20  A    I think I said under that plan, we thought we could

21  recover a nominal value of 150 to 170, something like that.

22  Q    Okay, now what was the amount outstanding on the PIK

23  bonds, as of the day of the filing of this bankruptcy case?

24  A    I think it was 1.566 billion, 1.562 billion?

25  Q    So what would the recovery have been had that plan been

1    confirmed, in gross dollars, for the PIKs?

2    A    In value, or dollars?

3    Q    Dollars.

4    A    Well, we were getting equity, so it wasn't dollars

5    (indiscernible) --

6    Q    Okay, fair enough, value.  Value, under your belief

7    that those bonds were worth 150 to 160?

8    A    Yeah, we believe they were worth -- so 1.5, 1.7 times

9    1.566 billion.

10   Q    So isn't that another $800 million to $900 million that

11   you would have received in value, had Judge Sontchi

12   confirmed that plan?

13   A    I'll assume your math is right.

14   Q    Are you familiar with the absolute priority rule in

15   bankruptcy, sir?

16   A    It was equity value, so it was obviously subject to

17   market conditions, but it wasn't cashed. So we thought the

18   equity was worth more in the market.

19   Q    Okay, but let's just use the math that you just

20   translated.  You would have recovered, under your own

21   personal valuation, an additional $800 million to $900

22   million, on top of what your bods were actually owed by the

23   EFIH Debtors, correct?

24   A    I don't think we ever established, technically, what

25   was owed by the EFH or EFIH Debtors.  I know -- I don't

1    believe at that time -- I believe at that time there were

2    potential make-whole and post-petition interest claims of

3    the PIK notes that hadn't been dealt with.  But if you just

4    view it simply as of a percent of par, sure.

5              But I don't know exactly what the claim was or

6    wasn't, including make-wholes, or post-petition interest,

7    excuse me, through the pendency of the expected case.

8    Q    And isn't it the case, sir, that under the absolute

9    priority rule, that that $800 to $900 million of value

10   should have gone to EFH and its creditors, correct?

11   A    It depends on what the allowed claim was.  The 150 to

12   170 was a percent of par.  It depends on what the allowed

13   claim was at the time of exit.

14   Q    At 1.56 billion, the number that you used, right, that

15   amount, $800 million to $900 million should have gone to EFH

16   and its creditors, correct?

17   A    I don't believe that's right.

18   Q    Well, I think  the math stands for itself, so I will

19   move along.  Now, you've asked the Court today to take into

20   account, at various points in time, people's view as to the

21   solvency of these Debtors, correct?  The E-side Debtors.

22   A    People --

23   Q    Yeah, isn't it your testimony, sir, that based on the

24   direct questioning from Mr. Galardi, that EFIH was solvent

25   for at least some portion of this case?

1          MR. GALARDI:  Objection, Your Honor.  I don't

2     think I used the word solvent.  I was using the words

3     recovered.

4          THE COURT:  I can't hear you, Mr. Galardi.

5          MR. GALARDI:  I'm sorry, Your Honor.  I do not

6     believe I asked him solvency in the technical term.  I used

7     recoveries under plans.

8          THE COURT:  Well, I personally don't -- we can't

9     read it back, but my memory was solvent.  But I don't want

10    to debate it.  Does it matter whether Mr. Galardi asked him?

11    Can you re-cast the question?

12         MR. GLENN:  I can.

13         THE COURT:  Okay.

14    Q    Was it -- I believe your testimony earlier was to the

15    effect of, putting aside solvency or not, that the value of

16    the E-side Debtors was such that EFIH and its creditors were

17    covered at various points in the case.  Isn't that what Mr.

18    Galardi asked you?

19    A    Yes, (indiscernible) paraphrase.

20    Q    And isn't it the case, sir, that you asked, or agreed

21    for the make-wholes to be objected to from the first day of

22    this case, because you didn't know where that value would

23    ultimately break?

24    A    No.

25    Q    You didn't know.

1    A    I don't agree with that.

2    Q    You don't agree with that.

3    A    No, under the RSA that we signed, it was contemplated

4    that the EFIH PIK holders would receive roughly 90 percent

5    of the equity of the company, and that EFH holders would

6    receive the remaining, I don't know if it was nine percent,

7    or something.  Management got the rest.

8              And then as equity holders of EFH, pro forma EFH,

9    NewCo EFH, whatever you want to call it, that make-whole

10   allowance of $800 million gross up by 20 percent, which was

11   not owned by EFH, a billion dollars would have changed the

12   setup value of EFH by roughly a billion dollars.

13   Q    All right.  But after the RSA was terminated, maybe

14   that's the point I should have focused on, I believe you

15   testified that EFIH was covered from there forward until the

16   NextEra plan and the make-whole decision, correct?

17   A    Yes, we believe that the EFIH unsecured bonds were

18   unimpaired, they were paid cash in full.

19   Q    Okay.  And it's your opinion, your view as a result

20   that that EFH should share in the cost of the make-whole

21   litigation, correct?

22   A    Share in the cost of the make-whole litigation?

23   Q    Yes.

24   A    That's right.

25   Q    Well, and I have a question about that.  Because I

1    think some of the record is unclear on that.  Are you asking

2    Judge Sontchi today to have the EFH creditors bear 50

3    percent of the cost of the make-whole, or call that a

4    collective benefit, or direct -- what is your position on

5    the make-whole litigation fees and expenses?

6             MR. GALARDI:  Your Honor, objection.

7             THE COURT:  Well, you just --- you objected six

8    thousand times against him saying what his position on the

9    allocation would be.  So I don't understand how you're now

10   going to ask, and we're going to spend the rest of the day

11   re-opening the door on that.

12            MR. GLENN:  I'm sorry, I'm sorry, I don't want to

13   do that.  I don't want to do that.  I'm not asking for

14   numbers, okay?

15            THE COURT:  Well, it's not just numbers.  I mean -

16   -

17            MR. GLENN:  It's the box, Your Honor.  It's what

18   fits into that box.  I don't know today whether Elliott's

19   position, not Mr. Rosenbaum's position, is that those fees

20   should be recharacterized as collective benefit, direct

21   benefit, or something else.  I'm just asking what Elliott's

22   position is on those fees in particular.  Because I don't

23   know.

24            THE COURT:  Can you say the question again?

25            MR. GLENN:  Sure.  What is Elliott Management's

1    position on the allocation of the make-whole fees?

2            THE COURT:  Yeah, no, that's unacceptable.

3            MR. GLENN:  Okay, I'll move on.  That's fine,

4    that's fine.

5    Q    Now, are you aware, sir, of the tax matters agreement

6    that the E-side Debtors signed with the T-side?

7    A    Yes.

8    Q    Okay.  And that agreement was as a result of the

9    confirmation of the T-side plan, correct?

10   A    I'm not sure what it was a result of, but I'm aware of

11   the agreement.

12   Q    Okay, putting that aside.  Are you aware that there's a

13   provision of that agreement that obligates the E-side

14   Debtors to pursue a tax-free plan?

15   A    Do you have the agreement?

16   Q    I do.

17   A    Can I see it?

18   Q    Sure.  Tab 7 of your binder.  If you turn to Page 21.

19   A    21?

20   Q    Mm hmm.

21   A    Okay.

22   Q    It's Article, Section 6.01(D)(1), for the record.

23   A    So it's Page 21, right?

24   Q    21.

25   A    Yes, I see that.

1    Q    Okay, so this agreement was in effect when Elliott

2    acquired the EFIH PIK bonds that you now own today.

3    A    Yes, this is October 3rd, 2016.

4    Q    Okay, so you knew when you bought the bonds that the

5    company was contractually obligated to pursue a tax-free

6    transaction, correct?

7    A    My recollection was it was more nuanced than that.  It

8    was that the EFIH creditors could pursue a tax-free or

9    taxable transaction, but that EFIH creditors were going to

10   pursue a taxable transaction, that the TCEH creditors could

11   move for an injunction against the EFIH creditors to stop

12   that.

13          And I think as we also discussed earlier, Elliott

14   owned roughly over a billion dollars, $1.1 billion of EFIH

15   second lien notes, and to the extent that EFIH ran out of

16   cash, I'm not sure how -- had run out of cash at that point

17   in time, I'm not sure how this provision would have stopped

18   the secured lenders from taking their collateral.

19   Q    Okay, well, we can agree on the nuances, but it's clear

20   that you knew about this agreement and this provision by the

21   time you acquired your PIK bonds, correct?

22   A    That's right.

23   Q    Okay, now you heard Mr. Galardi's opening argument, did

24   you not, where he said that there --

25          THE COURT:  Wait a minute.  So your argument is

1    that you proposed a taxable transaction, T-side seeks an

2    injunction, if the injunction is successful, you move for

3    relief from the automatic stay, and foreclose on the stock

4    of EFIH and Oncor holdings.

5            MR. ROSENBAUM:  No, no, no, no.

6            THE COURT:  All right, then I don't know what

7    you're talking about.

8            MR. ROSENBAUM:  I was just saying that we own both

9    positions, so as EFIH unsecured holder, that if they move

10   for an injunction, and they were granted an injunction, we

11   couldn't do anything.  But separate and apart from that, if

12   the company were to have run out of cash during that period

13   of time, within those two years --

14           THE COURT:  Oh, I see. So if nothing got done --

15   so no deal got done at all, EFIH seconds could seek stay

16   relief.

17           MR. ROSENBAUM:  Right, right.  That's what I

18   meant, yes.

19           THE COURT:  So this was before the EFIH first and

20   second settlement on the make-whole claims.

21           MR. ROSENBAUM:  That's right.

22           THE COURT:  Okay.

23   Q    Okay, now do you recall in Mr. Galardi's opening

24   argument, that he indicated that Elliott is not challenging

25   whether the E-side Debtors should have pursued a taxable

1    transaction, correct?

2    A    That's right.

3    Q    And you're not making that argument or espousing that

4    position today, are you?

5    A    No.

6    Q    Okay, and you testified earlier today that the Debtors

7    told you in words or in substance, that they would not

8    accept a taxable transaction, do you recall that?

9    A    Yeah, that's right.

10   Q    Okay, but you do know that exclusivity expired in this

11   case, I believe in the 2015-2016 timeframe, correct?

12   A    At some point.  I don't know exactly when.

13   Q    So putting aside whether you were obligated to any

14   restructuring support agreement, plan support agreement, you

15   could have gone to Judge Sontchi and presented your own

16   plan, correct?

17   A    Except for the fact that we had this PIK ESA litigation

18   that we discussed earlier.

19   Q    Okay.  And I believe you testified, and I want to

20   clarify this, that at some point you did receive a taxable

21   transaction for the E-side Debtors, a proposal?

22   A    We had discussed with various potential partners, and

23   various potential buyers: sovereign wealth funds, Canadian

24   pension funds, large infrastructure funds, and other

25   utilities and even the Hunts, about what the value was in

1   doing a taxable transaction, incremental value was in doing

2   a taxable transaction, and getting the step up in basis.

3   Q    Okay, but none of those proposals were ever presented

4   to the Debtors, correct?

5   A    That's right.

6   Q    Now, in your substantial contribution application, I'd

7   like to focus on the professional fees that you incurred in

8   connection with pursuit of the Sempra Plan, and objections

9   to the Berkshire Plan, okay?

10  A    Yes.

11  Q    Isn't it the case, sir, that you would have incurred

12  those fees whether or not there was a taxable plan or a non-

13  taxable plan?

14  A    Which specific fees?

15  Q    Your professional fees in relation to those plan

16  activities that you're claiming today.

17  A    I believe we would have incurred all of those fees

18  regardless of taxable versus non-taxable, with potentially

19  the exception of the distro fees.  I'm not sure how that

20  would have been treated in the taxable transaction.

21  Q    Okay, so you're claiming that EFH benefitted from those

22  fees because EFH received the benefit of a tax-free

23  transaction, correct?

24  A    We believe one of the benefits to EFH was a tax-free

25  transaction, yes.

1    Q    Okay, but you would have incurred those fees in any

2    event, even if EFH did not get the benefit you're claiming,

3    correct?

4    A    As it specifically relates to the tax, or overall?

5    Q    As it specifically relates to the plan activities, the

6    objection to the Berkshire Plan, and the movements towards

7    the Sempra Plan.

8    A    I don't agree with that.

9    Q    Why not?

10   A    We believe that the Sempra Plan -- well, we believe

11   that there was no alternative plan, unless the PSA were

12   relieved.  And we also were relieved of the PSA.  And we

13   believed that the Berkshire Transaction, or the proposed

14   Berkshire Transaction was not a confirmable plan.  So the

15   only confirmable plan was the Sempra Plan, which was a

16   result of the time and effort, and dollars that we spent.

17   Q    Okay, but in relation to whether it was a taxable or

18   non-taxable plan, that's the question I'm asking you, so the

19   record is clear.  You would have incurred those fees in

20   either event, correct?

21   A    Sure.  Regardless of the form, of whether or not it was

22   taxable or non-taxable.

23   Q    Thank you.  Now, at the time that the company pursued

24   the Berkshire Hathaway plan, you were concerned about the

25   cash burn that EFIH was incurring for the interest on the

1    secured debt, correct?

2    A    Yes, the cash burn on the DIP, on the EFIH first lien.

3    Q    And so you supported the company's decision to

4    terminate the NextEra transaction to stop that cash burn,

5    correct?

6    A    The company, I think the company unilaterally, I

7    believe, terminated the NextEra transaction, and made us

8    aware of that.

9    Q    Okay, but you supported that decision, correct?

10   A    We believe that without that, the company is kind of

11   left in purgatory, so it was the right decision.

12           MR. GLENN:  One moment, Your Honor.  Nothing

13   further, Your Honor.

14           THE COURT:  Thank you.  Mr. Galardi?

15           MR. GALARDI:  Very short redirect.

16           THE COURT:  Okay.

17           RE-DIRECT EXAMINATION OF JEFFREY ROSENBAUM

18   BY MR. GALARDI:

19   Q    Mr. Rosenbaum, I'd like you to open Volume 2 of the PAB

20   cross-binder.  And there is a document behind DI-11564,

21   which -- yes, 11564, and attached to that, I believe if I've

22   tabbed it right, is a series of emails, one called Exhibit

23   12, and one called Exhibit 14.  And I am going to start with

24   Exhibit 14, and I just want to walk through -- you remember

25   Mr. McKane asked about these emails, correct?

1            THE COURT:  What's the exhibit number, Mr.

2    Galardi?

3            MR. GALARDI:  It's the PAB's exhibit, the number

4    is 11564.

5            THE COURT:  Thank you.

6            MR. MCKANE:  It's in Volume 2.

7            THE COURT:  Okay.

8    Q    Volume 2, okay.  Now, these are a series of emails

9    between you and Mr. Keglevic, and then there's other emails,

10   correct?

11   A    That's correct.

12   Q    Okay.  And it all starts with -- you don't have that?

13           THE COURT:  Could I ask -- I don't know this

14   gentleman's name.  Could you put that up?

15           MR. GALARDI:  Could you put it on the screen?  I'm

16   sorry.

17           MAN: Which one's that?

18           MR. GALARDI:  It is DI -- that's helpful -- 11654.

19           THE COURT:  And probably the exhibit number is

20   what he wants.

21           MR. GALARDI:  (indiscernible), there's --

22           MAN: (indiscernible)

23           THE COURT:  It's a docket entry.

24           MAN: Is it on the exhibit list?

25           THE COURT:  It is not on the exhibit list.

1          MAN:  Which one is it?  743?

2          MR. GALARDI:  I'm sorry.

3          THE COURT:  It's okay.  I just prefer the screen.

4    I'm being difficult.

5          MR. GALARDI:  Maybe I should just not --

6          THE COURT:  It's okay.

7          MR. GALARDI:  I know you have it.  Mr. McKane had

8    it up before.

9          THE COURT:  (indiscernible)

10          MR. GALARDI:  Thank you.  Okay, now, so I'll speak

11    towards you.  At the very end --

12          THE COURT:  Oh, it's Mr. Stephany's okay.

13          MR. GALARDI:  This is Mr. Stephany's declaration,

14    which attached exhibits.

15          THE COURT:  I heard he's a great guy.

16          MR. GALARDI:  Yes.  He's an AUSA now, Your Honor.

17    Very great guy.  If you would go to the very last page of

18    that document, which is Exhibit 14, and Mr. Rosenbaum, you

19    were asked questions, and you mentioned that you saw the

20    capitalized term at the -- you'll see down near the bottom

21    of the email.  The capitalized term, Backup Plan Proposal.

22    What's your recollection of that backup plan proposal?

23    A    I believe it was a defined -- I think as I said

24    earlier,  think it was a defined term in either a PSA or

25    merger agreement.  I forget exactly what the definition was,

1    but the reason why I believe it was clearly capitalized in

2    Mr. Keglevic's email was because it was referring to the

3    defined term in some other document.

4    Q    Okay, now I'm going to ask you to now go to the page

5    right before that, which is the following email, where you

6    then response to Mr. Keglevic's email.  And you say,

7    unfortunately, the Debtors are still imposing restrictions

8    that go beyond the PSA, which PSA we believe does not bind

9    Elliott as a holder of the security.

10             Then you add, Elliott needs to be free to take

11   action as a holder of such securities, and without the

12   threat of litigation, that Elliott is in breach of the PSA,

13   or the cause of terminating triggering of the NextEra

14   breakup free.  Was there a discussion with Mr. Keglevic,

15   that the Debtors were saying that if Elliott acted, it would

16   be responsible for the $275 million breakup fee?

17   A    That was our concern, that if we were to act without

18   clear guidance from the Debtor and/or the Court that we were

19   in breach of the PSA, that we didn't think we were in breach

20   of, that the Debtor nor other parties would try to tag us as

21   being the causer, if you will, of triggering a potential

22   termination fee.

23   Q    Okay, and now I'm going to go back to the email -- go

24   back two more pages, which now is the email from myself, to,

25   I think it is Mr. Kieselstein and Mr. Husnick, and now I

1    want to draw your attention to the language as follows.

2           It says right in the middle, it starts, while

3    Elliott believes it is free to enter into negotiations with

4    the Debtor regarding such a Debtor in possession financing,

5    and that no claims exist, or could be asserted in connection

6    with its doing so, Elliott nonetheless requests that the

7    Debtors confirm the same, and that the Debtors waive, and

8    will not assert any claims against Elliott in connection

9    with, or arising out of its providing the Debtors with a DIP

10   financing term sheet.  Do you see that language?

11   A    Yes.

12   Q    And was Elliott concerned that the Debtors were going

13   to assert claims against Elliott if it did, in fact, pursue

14   the course of action with respect to the financing?

15   A    Very concerned.  That's why we were very deliberate in

16   how we pursued it.

17   Q    And did it seek clarification from Kirkland & Ellis

18   with respect to whether or not those claims would be

19   asserted?  That's what this email's about, correct?

20   A    That's what all the back and forth was about, between

21   Mr. Keglevic, and me, and my counsel, and Kirkland.

22   Q    And now, if you read -- let's go back to Mr. Husnick's

23   email, the very last sentence, it says, "Other than is set

24   forth in the prior sentence, the Debtors reserve all of

25   their rights under the restructuring support agreement, and

1    the provisions of the agreement remain in full force and

2    effect."  Did you ever get clarification that the Debtors

3    would not pursue Elliott for the termination fee if it acted

4    and sought separate financing?

5    A    No, it did not.

6              MR. GALARDI:  No further questions, Your Honor.

7              THE COURT: Re-cross on any of that?

8              MR. MCKANE:  Not necessary, Your Honor.

9              THE COURT:  Okay.  Thank you, Mr. Rosenbaum.  You

10   may step down.  You are free to talk about whatever you

11   want.  Except the Braves.

12             MR. ROSENBAUM:  Greg Maddux or Mike Maddux?

13             THE COURT:  You know you have the burden of proof,

14   right?

15             MR. ROSENBAUM:  That one's easy.

16             THE COURT:  All right, any further witness

17   testimony? Any rebuttal witnesses?

18             MR. MCKANE:  No witnesses from the PAB.

19             THE COURT:  All right.

20             MR. GALARDI:  No witnesses from UMB and Elliott.

21             THE COURT:  Mr. Glenn?

22             MR. GLENN:  No witnesses from us, Your Honor?

23             THE COURT:  Mr. Pedone?

24             MR. PEDONE:  No, Your Honor.

25             THE COURT:  Okay.  Any documents we need to take

1    care of?  I think we have the giant volume or order you're

2    working on?

3                MR. ESSER:  Yes, we have the order.

4                THE COURT:  Okay.  Is it ready?

5                MR. ESSER:  Yes, it is, Your Honor.

6                THE COURT:  And everyone's agreed to it, right?

7                MR. ESSER:  Yes, Your Honor.  Mike Esser, Kirkland

8    & Ellis, for the PAB.  Everyone has agreed to it, Your

9    Honor.  And it will be submitted with one agreed caveat,

10   which is the parties have agreed, and the ad hoc claimants

11   have requested the opportunity to de-designate portions of

12   the Rosenbaum deposition transcript that were previously

13   designated, but now in light of Your Honor's ruling this

14   morning, may not be appropriate into the record.

15               So I believe the proposal would be for Your Honor

16   to take the evidence into evidence -- take the exhibits into

17   evidence, the deposition designations as well, and the

18   parties will endeavor to submit an agreed revised amended

19   order that would do nothing other than strike certain

20   portions of that testimony to be consistent with Your

21   Honor's order.

22               THE COURT:  All right, and you're going to -- how

23   are you going to submit the depo designations to me?

24               MR. ESSER:  So we have actually some -- they are

25   reflected in an order.  I'm happy to hand up right now, and

1    I can walk Your Honor through the order.

2              THE COURT:  Yeah, but like the texts to read.

3              MR. ESSER:  Correct, so we also have highlighted

4    transcripts for Your Honor as well.  So I'll hand those up

5    as well.

6              THE COURT:  Oh, excellent.  All right, well you

7    don't need to hand those up.  You can give those later, when

8    we're all done.  Please approach.

9              MR. ESSER:  Wonderful.  So I may approach.

10             THE COURT:  We're going to call this the

11   Werkheiser order.  We have an unstapled copy?

12             MR. ESSER:  (indiscernible)

13             THE COURT:  No, no, I can create one.  It's just

14   easier.

15             MR. ESSER:  Your Honor, so after we're exchanging

16   preliminary exhibit lists some 15 days ago, we'd just like

17   to thank the professionals, for working through this

18   extremely voluminous record. Your Honor, you'll have 12

19   deposition transcripts designated, you'll have approximately

20   1394 total exhibits admitted that are listed on the various

21   appendices hereto, by party.

22             And while we at Kirkland love green sheets, we're

23   thankful for the suggestion to submit an agreed order in

24   lieu of reading 1394 numbers into the record here today.  So

25   thank you for whoever suggested that.  And you'll also --

1    Ms. Werkheiser, thank you for the suggestion.  And so with

2    that, I believe that it is a completely consensual record.

3             I would just note that some of the exhibits do

4    contain a judicial notice request, rather than a request

5    that they be admitted into evidence.  And so the order just

6    reflects that.  And with that, subject to the agreement that

7    we will be de-designating portions of the Rosenbaum

8    transcript, I would ask Your Honor to enter the order.

9             THE COURT:  All right, any objection?  Happy to

10   enter -- no?

11            MR. MCGINNIS:  No objection.

12            THE COURT:  Oh, you scared me.  Happy to enter the

13   order.  I'm a little worried about the size of the font on

14   some of this being scanned, and being legible.  Do you have

15   a thumb drive, or something --

16            MR. ESSER:  Sure.

17            THE COURT:  Do they still say thumb drive?  I

18   don't know, whatever.  Where we could do it electronically.

19            MR. ESSER:  Absolutely, Your Honor.  And have to

20   also submit a PDF that's also in larger font as well, if

21   that would be helpful, Your Honor.

22            THE COURT:  No, this will be fine.  If we scan it,

23   I'm afraid some of this won't come in.

24            MR. ESSER:  Got it.

25            THE COURT:  I mean, we have good scanners, but so

1    if you could just give us an electronic version, including

2    the order piece, the order plus the attachments, we'll just

3    electronic signature it, and file it.

4              MR. ESSER:  Will do, Your Honor.

5              THE COURT:  All right, but the Court will docket

6    the substance of the order.

7              MR. ESSER:  Thank you, Your Honor.

8              THE COURT:  Thank you.

9              MR. ESSER:  All right, so let's see.  Are we ready

10   to proceed to cross after a short break?

11             MR. MCKANE:  Closing?

12             THE COURT:  I mean, closing, yes, this is --

13             MR. GALARDI:  A cross, yes.  But also closing,

14   yes.  We are prepared to proceed, Your Honor.

15             THE COURT:  Okay.  So it's 2:30, 5:30, all right.

16   We'll start in about five minutes.  Take one last break.

17   I'm going to try to go straight through.  Going to shoot for

18   a 5:30 finish time.  If we finish before, that's great.  If

19   we start to go long, I might cut you off.  If we get to

20   6:00, and you're in the middle of a sentence, we're done.

21   So could we --

22             MR. GALARDI:  I go first, Your Honor, you're

23   looking at me.  I may want to go last, too.

24             THE COURT:  Do you -- right.  So do we have an

25   agreed order?  Obviously Mr. Galardi will go first.

1          MR. GALARDI:  I will go first, Your Honor, and I

2     would only ask if I could reserve just a little bit for our

3     response, but other than that --

4          THE COURT:  If we have time.  And then the ad hocs

5     --

6          MR. GLENN:  Yes.

7          THE COURT:  And then Mr. Pedone?

8          MR. PEDONE:  Yes.

9          THE COURT:  And then Mr. McKane, okay.  And then

10     if you want to reply.  Okay, so give me like five minutes,

11     and then we'll get to it.

12        (Recess)

13          THE COURT:  Please be seated.

14          MR. GALARDI:  Why don't we hand out the decks?

15     When Your Honor's ready.

16          THE COURT:  Yep.

17          MR. GALARDI:  Your Honor, I'm going to start with

18     the allocation timeline, and I'm going to start with, we had

19     a number of possible names for this.  We were going to take

20     the long and winding road for Mr. Kieselstein, Highway to

21     Hell was suggested, Living on a Prayer was suggested, but we

22     decided to stay with the timeline.  This is what we believe

23     are the most significant events in this case.  There are

24     obviously four years of events.  But this is, we actually do

25     believe this allocation issue goes through the whole case.

1              Your Honor, you've heard testimony about the PIK

2      trading prices.  We did put into the evidence the bond

3      prices, and this is illustrative of where the PIK trading

4      prices from the Bloomberg were on the various dates, as you

5      will see and as I think is consistent with Mr. Rosenbaum's

6      testimony.  At least through the Hunt Plan, it was above, it

7      then went blow par, and then it went just above, and then it

8      went, and we'll say that the end of 2017 to '18, it was

9      never, ever clear again to go near.

10             Your Honor, as we started this case, there are

11     four material expense claims.  This is to simply, to remind

12     Your Honor of what the positions of the parties were,

13     despite having not taken testimony with respect to the

14     percentages, parties are prepared to argue, and Elliott is

15     prepared to argue and go forward, and still believes that

16     the allocations that its proposed are the appropriate

17     allocations.

18             Taking those in order, we start with the NextEra

19     termination fee, and Your Honor started today's hearing, or

20     actually three days' ago's hearing with a question about

21     jurisdiction, so we thought we would take that up first.

22     Your Honor, we believe you do have jurisdiction with respect

23     to the $275 million NextEra plan reserve.  It was within

24     your jurisdiction.  It's currently being maintained by both

25     EFH and EFIH.  The Court should allocate the NextEra

1    iteration fee claims to permit the plan to make

2    distributions.  I doubt anybody in this room disagrees with

3    that.

4            And I think it's important to note that even if --

5    and I think Your Honor mentioned this, even if the Third

6    Circuit should reverse, and I think no one in this room

7    wants it to reverse, it's not -- or actually if it affirms,

8    there is still not mooted, because there is the reserve

9    issue before Your Honor.  So we believe you do have

10   jurisdiction.

11           And for the purposes of this, and I think it is

12   quite critical, because NextEra has taken an appeal from

13   Your Honor's more recent decision on the administrative

14   claim, Your Honor made rulings both in the reconsideration

15   order and in the $60 million claim that there was no actual

16   benefit.  And so we're saying that Your Honor has to assume,

17   or should assume -- you have to assume the opposite of that,

18   there is no actual benefit.

19           We are very concerned by some of the statements in

20   many of the pleadings, I don't think Your Honor needs to do

21   it, where people built on the record, built on the prior

22   work, Your Honor has already ruled on that, and we think

23   that those statements are not to be taken here.  Your Honor

24   has said no actual benefit, but assume there was a benefit

25   and then let's go forward on the NextEra termination fee.

1          We think the standard is absolutely clear with

2     respect to the extermination fee.  The applicable legal

3     standard is breakup fees must be actual and necessary to

4     preserve the value of the estate.  Critically, whether the

5     NextEra termination fee was an actual and necessary expense

6     is determined as of the date on which the expense was

7     incurred.  And a breakup fee is not a liability of the

8     Debtor until approved by the Court.

9          Now Your Honor, again taking the assumption that

10    there was an actual benefit, the critical date is September

11    19, the date that Your Honor approved going forward with the

12    merger agreement, and approved the termination fee.  What

13    were the facts as of September 19th?  The approval of the

14    termination fee was premised on the gets, and expected to

15    quadruple EFH unsecured creditors' recovery.

16          Mr. Husnick got before this Court, and net-net, he

17    said the result is an additional  450 million of

18    distributable value, and when I say significant, I mean it

19    virtually quadrupled the recoveries of the EFH unsecured

20    creditors.  And of course, it wasn't enough for Mr. Husnick

21    to say it once, later on he said it again.

22          I think it's worth mentioning once again that as a

23    result of the negotiations over the weekend, we have an

24    increase of 450 million in distributable value, quadrupling

25    the potential recoveries for the EFH creditors.  That

1    statement could only be made if it was believed that the

2    EFIH unsecured creditors were paid in full, because the

3    value was residual value.

4            Your Honor, the EFH unsecured creditors accepted

5    the termination fee on September 19th, 2006.  It says with

6    this increase in certain accounting adjustments made, with

7    respect, the Debtors have brokered support of EFH indenture

8    trustee who sits here today, fidelity in contrarium.  They

9    withdrew their objections, and their objections was to the

10   breakup fee, and the failure to provide EFH with

11   consideration.

12           Counsel to the ad hoc TCEH committee, some of whom

13   were members of the ad hoc claimants, did not file an

14   objection, stood up, and said we are pleased with this

15   morning's announcement, in terms of the revised deal terms,

16   and the economic impact that's going to have on the EFH

17   unsecured creditors.

18           Your Honor, the disclosure statement filed at that

19   time, or shortly thereafter, provided full recovery for the

20   EFIH unsecured creditors, and partial recoveries, even for

21   the EFH unsecured creditors.  And every disinterested

22   director testified that there was no allocation of the

23   termination fee in 2016.  Mr. Cremens said, didn't attempt

24   to allocate.  Mr. Evans said, I didn't agree at any point

25   upon an allocation, and Ms. Williamson said we're not going

Page 161

1    to figure out the location, because we are very hopeful and

2    obviously desirous of the transaction closing.  They

3    believed they represented to this Court that that

4    transaction was very likely to close.

5            Your Honor, the history is also uncontested.

6    We've gone through, and Mr. Keglevic goes, you've seen this

7    slide two, three, four items, so I'm not -- I'm going to

8    hold off going through it, but the negotiations and how the

9    breakup fee was, in fact, negotiated.  Importantly, Your

10   Honor, if you cleared the EFIH unsecured debt, the removal

11   of the match right was only to the benefit of the EFH

12   unsecured creditors.

13           In addition, the further discussions with the

14   creditors, and it was only EFH creditors that objected.

15   They withdrew the three objections, as I mentioned before,

16   the ad hoc committee had TCEH support, and you had an

17   additional $450 million.

18           Now, why were there other benefits, Your Honor?

19   One, tax-free transaction.  You've heard about it over and

20   over again.  There was a multi-billion dollar liability.  If

21   triggered, it would have meant administrative insolvency.

22   EFH was the benefit. EFIH we have not contested throughout

23   these proceedings, that EFIH didn't get anything out of

24   that.  EFIH unsecured creditors avoided litigation and

25   possible dilution of their unsecured claims.

1          There was the assumption of asbestos liabilities.

2     Mr. Horton testified yesterday about NextEra's view of it,

3     and his own view of it.  And eventually it came down to $100

4     million reserve.  That was straight off the purchase price.

5     I think it's important to go back to this slide, to point

6     out that at that reduction of 150 come up in July 27, you

7     would have cleared right at that time to the EFH unsecured

8     creditors.

9          In addition, we had Mr. Thomas's statements that

10    in order to avoid and allege -- and I'm going to say an

11    alleged $500 million intercompany claim of one of EFH's

12    subsidiary against another, it was important that the

13    liabilities be assumed.  We don't want to lose -- those are

14    two different things.  One's the assumption of a liability,

15    and two, it had an effect on the intercompany claim.  Your

16    Honor, I think, made a subsequent ruling.

17         In addition, Your Honor, I don't want it to be

18    lost, and it was brought out again today, there was a

19    conditioned precedent to these documents, which frankly, at

20    the time of the Hunt agreement, was more strong, because you

21    hoped the Hunt deal would close before it ever got to the

22    Third Circuit, but there was a benefit again to EFH, but it

23    also benefitted EFIH.  If NextEra was going to take on a

24    make-whole claim post-closing, that helped EFH make sure it

25    got its recoveries.

1           So Your Honor, we believe -- and then finally,

2     Your Honor, one other thing, and I don't want to get into

3     the other matter that's currently before you with me, but

4     the fact of the matter is, the creditors, two of the

5     critical creditors were expressly rewarded in part, and in

6     large part, for the work with respect to the NextEra

7     transaction.  Fidelity was subsequently granted an up to $20

8     million substantial contribution claim, not just for its

9     efforts with respect to the NextEra deal, but in part the

10    NextEra deal, the NextEra PSA joining it, getting the

11    NextEra plan confirmed, as well as the role it played in

12    TCEH.

13          And Your Honor, the EFH trustee, who now wants to

14    say they didn't get a benefit, got up in the February

15    hearing, after the make-whole, requested that they get a

16    finding for a substantial contribution claim, and Your Honor

17    ruled that now that the make-whole ruling in November of

18    2016, and specifically the Third Circuit's ruling ultimately

19    has led to a situation that the distributable value will not

20    inure to the benefit of the EFH unsecured creditors, and

21    will actually end up befitting maybe the second liens, most

22    probably the PIKs, but that doesn't mean that's just the

23    virtue of the legal rulings and the waterfall.  That doesn't

24    mean there wasn't a contribution by the indenture trustee to

25    the estate as a whole.  You granted a substantial

1   contribution claim against and solely against EFH, and there

2   was a discussion of it, was because of the $450 million.

3           Your Honor, and finally the only testimony about

4   not allocating, or allocating in a particular way, is Mr.

5   Strom's testimony.  We believe that testimony should not be

6   credited. One, he didn't consider or know the applicable

7   legal standard.  He changed, I believe, on cross, not

8   opining on benefit, only consideration.  His opinions are

9   not supported by industry data or methodology, and the

10   analysis on the debtor by debtor basis is not consistent

11   with industry practice.

12          So Your Honor, we think you look at the actual

13   benefit on the date of the transaction, September 19th, look

14   to who was the intended beneficiary of that transaction, and

15   that fee, and we think EFH has to bear, and we say 50

16   percent, we could say more, we think at least 50 percent of

17   that NextEra termination fee.

18          Your Honor, turning now to the Elliott substantial

19   contribution claim.  Your Honor, the standard is quite clear

20   again, although we've had a little bit of talk about this

21   recently, the fees have to be reasonable and necessary.  You

22   have to show a causal connection between the service and the

23   contribution.  It is not sufficient to say you would have

24   spent the money anyway, as you've heard from the ad hocs,

25   because the EFH trustee would have spent the money anyway,

1   Fidelity would have spent the money anyway.  It's not just

2   merely that you get an interest, it has to be a causal

3   connection to the body as a whole.

4           We also note that Judge Shannon said, you can look

5   at the benefit of reasonableness.  Was there actually

6   benefit?  And this is what distinguishes normal

7   professionals who can do work, hoping to benefit, and

8   sometimes lose, but that doesn't risk their fees, whereas in

9   certain situations such as this, if you do prevail, and the

10  creditor body as a whole benefits, then a creditor is

11  entitled to a substantial contribution claim.

12          And it shouldn't matter, frankly, that Elliott is

13  75 or 79 percent of the EFIH unsecured creditors.  In fact,

14  that somewhat works to its detriment, for every dollar its

15  paying itself 79 cents.  And an applicant's fees and

16  expenses, and Your Honor just recently ruled, may be

17  reimbursable where they are directly, materially, and

18  demonstrably of benefit to the creditors in general, or the

19  creditors generally.  We believe Elliott's satisfies that

20  standard.

21          Terminating the NextEra PSA to seek alternative

22  restructuring, that was the first step in advancing the

23  cases towards a restructuring transaction that was a

24  backstop to the NextEra transaction.  Your Honor, Mr.

25  Rosenbaum testified he attended the meeting, Mr. Rosenbaum

1    testified that he was told by NextEra that they would hold

2    this out, and Mr. Rosenbaum began to take efforts that

3    ultimately benefitted both estates with the transaction.

4    That was opposed by the Debtors.

5            Next, the bulk of the fees were incurred opposing

6    Berkshire, and committing to the Sempra transaction.  Your

7    Honor, unfortunately we both had to live, met last summer

8    through a series of litigation.  It was litigation about a

9    scheduling order, where there was supposed to be no evidence

10   but we had a whole day trial on evidence and extension.

11           Ultimately Elliott prevailed and got an 11-day

12   extension, and then because of the efforts commenced with

13   terminating the PSA, and because it could put in incredible

14   resources in that three-week period, could try to finance an

15   alternative transaction to the Berkshire transaction.  That

16   transaction as Your Honor will recall and the evidence says,

17   was a $9.3 billion, $300 million more than the Berkshire

18   transaction.

19           Now, the Debtor, the PAB, or the ad hoc will say,

20   but they never got the financing.  But there was -- they may

21   have ran out of time, but the fact that they had that

22   alterative, and the fact that they got that adjournment

23   allowed Sempra the time to come in with the transaction, and

24   actually allowed -- forced Sempra to go over the 9.3

25   transaction to a $9.45, 9.5 million.

1           And at that point, because of Elliott's purchase

2     of claims which had other bases, it was a able to enter into

3     an agreement, and as Your Honor knows, as we went up to the

4     weekend of August 18th, and even on the 19th of August, Your

5     Honor, at that point, we were being opposed by the Debtors

6     again.  They were seeking to designate our votes.  They were

7     doing amendments of all that sort, and they were going to go

8     to litigation.  It was only when we signed the PSA with

9     Sempra, and it was on our way down here for the August 21st

10    hearing, and we ended up doing a deal with Sempra that the

11    Debtors decided to terminate Berkshire and go forward with

12    Sempra.

13          Next, Your Honor, we spent the fees on the NextEra

14    termination fee.  Now, again, not going to compare ourselves

15    to the EFH trustee, but the fact of the matter is, if it

16    really were the case that the Third Circuit reverses.  We

17    didn't believe that there was a significant value to that.

18    We have saved the estate significant expenses, and hopefully

19    we will save the estates, both of them, whatever Your Honor

20    determines is their share of that $275 million breakup fee.

21          Your Honor, facilitating the Oncor dividend, I

22    think Your Honor will also recall that everyone was

23    concerned that Elliott might cut off its nose to spite its

24    face.  Your Honor will remember that we had numerous

25    conversations, and everyone didn't want us to file a

1    reservation of rights.  We didn't in fact -- we didn't file

2    the reservation of rights, but we then did in fact, proceed

3    with discussions that ultimately lend to a dividend being

4    distributed both to EFH and to EFIH, yes, much more to EFIH.

5            But in addition, as Mr. Horton testified, that

6    also paved the way for other tax settlements.  We negotiated

7    the plan and disclosure statement, we took on various

8    provisions with respect to that, in support of that, Your

9    Honor, and that was part of our obligations under the Sempra

10   PSA, and in fact, those fees should be compensable.

11           Your Honor, I'm not going to hand on the

12   facilitating of a resolution of this detached dispute.  We

13   believe there was a benefit, Mr. Horton testified there was

14   a benefit, but we believe that that dispute was ultimately

15   not consented -- was unsuccessful, so if Your Honor

16   determines that there wasn't an actual dollar benefit that

17   came in from that, we will understand that, but I am going

18   to caution, there are a number of transactions where

19   substantial contribution claims, or even in his case, where

20   the actual benefit didn't come home to roost.

21           So we believe that nearly all of the relief

22   obtained by Elliott was contested by the Debtors and other

23   parties.  The number Your Honor mentioned at the

24   confirmation hearing was a large number.  But that number

25   was a transaction number, condensed over four to give months

1    facing substantial litigation, substantial discovery, as

2    Your Honor is only too familiar with, to get an adjournment,

3    and we think that that should be taken account for both

4    sides.

5            We believe the E-side benefits include -- and by

6    E-side, we mean both.  We obtained a reconsideration order

7    disallowing the NextEra fee.  We facilitated and negotiated

8    a merger agreement that ultimately was 450 million in

9    distributable value greater than Berkshire.  We facilitated

10   and negotiated the Oncor dividend settlement, and we

11   preserved the tax-free transaction, everybody's interest,

12   asbestos reserve, avoiding the triggering of the

13   intercompany claim, and the EFH beneficiary settlement was

14   preserved.

15           Now, let me move on to the slogging issue, Your

16   Honor.  E-side committee fees.  Again, Your Honor is

17   familiar with professional fees.  Courts may award

18   reasonable compensation for actual and necessary.  The

19   statute itself says they have to be beneficial at the time

20   at which the service was rendered.  They have to be

21   attributable to a bankruptcy client.

22           And finally, Your Honor, Your Honor has said we

23   don't carry our burden, we don't, you know, defer to the

24   professionals.  Your Honor, deference to professionals is

25   simply not proper under the Third Circuit law.  This Court

1    has a duty to review those fee applications to determine

2    whether the proper -- whether there's an actual and

3    necessary benefit, and whether they're attributable to the

4    client.  That is an independent obligation, and as the Busy

5    Beaver report said, it doesn't matter if no one's objected.

6           Your Honor, the record will also show, and you've

7    heard testimony, "Oh, well, you didn't do this, you didn't

8    do this, you didn't do this."  Just some facts:  One, we've

9    pointed out Paragraph 4 of the interim compensation order

10   provides that until there's a final allocation; two,

11   Kirkland's fee application required objections by May 15th.

12   The allocation motion was filed on May 13th.  The allocation

13   is an objection the fee application, it's not to the

14   allowance of the fees.  As Mr. Rosenbaum said, they're not

15   objecting to those fees.

16          Your Honor, the Evercore fee application was due

17   even after that.  So, we believe there's a timely objection

18   on file if Your Honor is going to hang on any of those, and

19   there's simply no reason to say, "Oh, it was untimely," or

20   laid in wait.  The fact of the matter is, every professional

21   in bankruptcy knows, until its final order approves, and

22   Your Honor can even wait for no objection, you know has a

23   duty to review the fee applications.

24          Let's take the E-side Committee professional fees.

25   One, it's uncontested that three of the E-side committee

1    professionals did not use the allocation method in 2B of the

2    interim compensation order.  Sullivan and Cromwell:  "We

3    don't believe it's a benefit to the Debtors so, therefore,

4    the order doesn't apply."  Montgomery McCracken:  "We don't

5    believe it is to the benefit of the EFH creditor, and not

6    directly benefit any debtor, so it doesn't apply."  And

7    Alixpartners, the same thing.  The only professional on the

8    committee that attempted to say an allocation was

9    Guggenheim, who proposed a 50-50, noting that reallocation

10   may be necessary in the final fee application.

11          Let's take a summary of those E-side Committee

12   fees.  What were the primary services rendered?  During the

13   timetable that the Committee was active they investigated

14   potential insider and other claims belonging solely to the

15   EFH.  In fact, 40 percent of Montgomery McCracken's fees

16   were billed to the derivative litigation.  They contested --

17   no one disputes, we lived through it -- global settlement

18   among the Debtors including the allowance of the $700

19   million claim by TCEH against EFH; 50 percent of Sullivan's

20   fees, $12 million, were planned to the plan disclosure

21   statement.  And they said in that, immense resources devoted

22   to E-side committee litigating in opposition of the global

23   settlement.  And the E-side Committee's counsel stated that

24   EFH creditors were intended beneficiaries of their work.

25   EAF Committee takes as a premise that all EFIH creditors

1   will be paid in full priority to EFH.  Accordingly, this

2   objection is concerned only with the value of the E-side

3   Debtors collectively, measured by a return to the EFH

4   unsecured creditors as the likely fulcrum class is a

5   circumstance when the settlement would be relevant.

6          And finally, they negotiated a stand down,

7   essentially, in the documents in late November.  They

8   negotiated the EFH beneficiary settlement where TCEH agreed

9   to subordinate, essentially, to the $37.8 million claims,

10  and then to minimize their role going forward, despite

11  being, quote, "A statutory fiduciary to both EFH and EFIH

12  unsecured creditors."

13         Your Honor, looking at their fees by those time

14  periods, as I mentioned in my opening, if you look at the

15  three professionals that actually didn't allocate their

16  time, but you look at when those fees for services; if you

17  take the date of their appointment, through 11/30/2015 --

18  before Your Honor even approved what we call the global

19  settlement -- 89 percent of their fees were incurred.  They

20  stood down to minimize their expenses, Your Honor, and only

21  spent 11 percent at the end of the case.  And if you look at

22  the professionals in general, 97, 83, 89 for a total

23  percent.

24         Now, we turn to Guggenheim.  Guggenheim did, in

25  fact, allocate monthlies and allocated monthlies, the hours

Page 173

1   and fees, hours were spent 76 percent pre the settlement and

2   24 percent; fees, however, were the opposite, 34 to 66

3   percent.  That leaves out transaction fee.  Of course, the

4   transaction fee fell in the last period, Your Honor, so the

5   way we've represented that is, if you look at the left two

6   bar graphs, that's ours.  That's 76 percent of the time

7   before -- what?

8          THE COURT:  Just clearing my throat.

9          MR. GALARDI:  Oh.  Seventy-six percent of the

10  hours before 12/1 and 12/1 to the effective date, 24 percent

11  of the hours.  If you look at value, it was 24 percent, and

12  most of it in the last period, but that green box represents

13  the transaction fee which, Your Honor, they earned it as

14  long as some plan got confirmed.  That could easily shift

15  over and shift the balance well beyond the 50-50 that they

16  asked for.

17         Now, we take up Kirkland and Evercore's

18  professional case.  Your Honor, it's the same standard, I

19  can skip.  No one reviewed the allocations.  Mr. Horton

20  admitted he did not personally review any of the Debtor's

21  fee applications transcript.  Mr. Keglevic testified that he

22  never reviewed any of the bills, never had any discussions

23  with Kirkland about allocations, or fees for that matter.

24  Instead, as he testified, he believed the allocation would

25  be a matter for the disinterested directors.

1          We have deposed each and every disinterested

2     director and received a statement.  None of the

3     disinterested directors reviewed the fee applications.

4          Now, Your Honor asked us about the conflict

5     matter, whether it's technical or not, none of the

6     independent disinterested directors reviewed the fee

7     applications.  At most, they were aware of the cash flows.

8     The interim compensation order prescribes the methodology

9     that has been discussed.  It requires professionals to

10    classify fees as direct benefit fees, or collective benefit

11    fees.

12         Again, Your Honor, I'll go back to the

13    reconsideration argument.  We do not know what was in your

14    mind, Your Honor, the day you approved this.  There's been

15    testimony that it came from the RSA.  But the way the

16    methodology works it simply doesn't end up with an equitable

17    benefit.  But, more importantly, from a judicial standpoint,

18    we do not believe a finding of actual and necessary can rest

19    on the application of this order.  And that's why we don't

20    believe the professionals did anything inappropriate, we

21    just think, as a result, the final fees cannot be approved

22    as actual and necessary.

23         Specifically:  Direct benefit fees are allocated

24    100 percent to the applicable debtor.  Collective benefit

25    fees for a Debtor are allocated in the same proportion as

1    the amount of direct benefit fees for such debtor, bears to

2    the total direct benefit fees for all of the debtors.

3           The meaning of direct benefit fees under the

4    interim compensation was unclear and inconsistently defined

5    and applied.  Mr. Horton testified that he believed that the

6    direct benefit means those fees solely for the benefit of a

7    specific debtor.  Now, his testimony at trial was a little

8    bit different.

9           Kirkland testified, and actually sent out, as

10   every good law firm does that represents debtors, sent out a

11   billing memo.  It said it provided that it had to be a

12   principal or primary benefit to a single debtor.

13          And Evercore testified that at least it was

14   understanding, though it did not send out any memo or direct

15   its timekeeper, that at least the person that we deposed

16   said, "Well, we think it's done solely for the benefit of a

17   specific debtor."

18          But the problem is Kirkland's definition of direct

19   benefit fees requires debtors to allocate services that

20   principally benefitted a particular debtor.  In our brief we

21   say principally, in part, mostly -- whatever it means -- but

22   that, by definition means that one debtor was charged 100

23   percent of a fee even though another debtor likely also

24   received some benefit.  That is the free rider problem.

25          And again, Your Honor, there doesn't have to be

1   precision.  This is not, as I think Judge Carey referred to

2   it, nitpicking, but it does go to the fundamental process of

3   Your Honor being able to make a finding of whether the

4   expenses are actual and necessary.

5           We had an actual example in this case:  EFIH DIP

6   fee.  Kirkland billed time on DIP financing as a direct

7   benefit fee to EFIH.  I don't think it can be seriously

8   questioned by a bankruptcy lawyer that just because the

9   operating company is the source of the DIP, that the parent

10  who is also a debtor didn't benefit.  But that means that

11  EFIH paid 100 percent of those costs.  Nothing wrong with a

12  free ride, but that means it does have to be adjusted.

13  That's what we call the fee rider problem.

14          We were going to call it the Husnick swing effect,

15  you know, but we're going to just call it the swing effect.

16  Mr. Husnick testified that there was a swing effect, and

17  this is the problem that occurs if you substantial shift in

18  the collective benefit allocation results from simply moving

19  direct benefit fees to collective benefit fees.  As he says,

20  he calls it, this is the swing effect which is, when you

21  move a little bit from direct to indirect, or direct to

22  collective, you cause a shift in the collective benefit

23  number.  We've seen the implication, the reverse implication

24  of the swing effect with the asbestos claims.

25          Your Honor, you have that exhibit, the summary.

1    On the left-hand side, the actual final allocation of

2    Kirkland's fees, all matters, is EFIH 87 percent, EFH 13

3    percent.  That number is calculated below.  If you

4    reallocated just that $2.75 million, Your Honor, the balance

5    on the collective shifts 66 percent EFIH, 34 percent EFH.

6         Now, you know, I'm going to point out that there

7    is a problem with the entire analysis, and I am not trying

8    to open Pandora's box, or a can of worms.  If you look, you

9    notice that there is a $103- to $109 million shift.  You may

10   ask where did that come from?  Well, remember, some of this

11   time was done when TCEH was involved.  That would mean a

12   whole recalculation with TCEH.  No one wants to open that,

13   but that is the example of what I'll call the reverse swing,

14   and it's basically, if you started on the right, you move to

15   the left.  That's the consequence.

16        Your Honor, the practical impact is, of course, a

17   small amount of fees dictates the overall allocation.  And

18   Kirkland admits, Kirkland's original allocation methodology

19   -- and I don't think it was really personally Kirkland's, it

20   was the model, would have resulted in an inequitable

21   allocation.  We were concerned at the time that it could

22   produce an unfair result.

23        They changed the methodology beginning in 2006.

24   Your Honor heard testimony about the monthly fee

25   application.  And it says amounts billed to these matters --

1    69, 70, 73 -- they started allocating 90-10.  Kirkland

2    didn't explain the new methodology until 2018 when they

3    filed the final fee application.  And it says Kirkland had

4    allocated collective fees for the (indiscernible) as

5    following the TCEH effective date by the relative debt at

6    EFH and EFIH, if you go through all of that, Your Honor, but

7    what was that relative debt?

8              Kirkland suggests that the interim compensation

9    order was silent.  That is true.  There was nothing

10   specifically for the exception, but that's not to say it was

11   silent.  The order was clear:  You shall do this.

12             Kirkland never sought court approval for the

13   change.  Kirkland could not recall telling the Debtors'

14   boards.  Kirkland could not recall telling the E-Side

15   Committee or its professionals.  Kirkland could not recall

16   telling the office of the Trustee.  Kirkland could not

17   recall telling the Fee Committee.

18             The allocation (indiscernible) -- and when you

19   change to the debt, regardless of what you know it means,

20   the allocation, as Judge Carey has said, must be based on a

21   principal approach that reflects the estates and the estates

22   that benefitted from the service.  And as he explained, an

23   allocation based solely on the amount of debt, or number of

24   casino properties, would be inequitable.

25             And finally, Your Honor, the allocation method

1    based on debt, and this goes to, "Well, you didn't object,

2    you didn't object."  Well, we didn't even -- you know, if we

3    had looked at it, what was the debt?  Mr. Husnick testified,

4    I don't recall what the numbers were we used to calculate

5    the relative debt, but would imagine that Kirkland

6    calculated as of the petition date.  But as we cross Mr.

7    Keglevic, the first-day declaration, the calculation would

8    be, at most, 80-20, not 90-10.

9            And, Your Honor, this slide shows the disparity in

10   the debtors' professionals that did in fact use the

11   allocation method.  That's not to say some of this is not

12   correct, Your Honor.  Filsinger, as you know, did a large

13   report about insider compensation.  But you can look at the

14   disparity from left to right, you know, of red being the EFH

15   burden, blue being the EFIH burden, and it goes down to the

16   left as we move to the right from Evercore and Kirkland.

17           Your Honor, we believe a reallocation of the

18   professional fees is also warranted.  Thank you.

19           THE COURT:  Thank you.

20           MR. ROSNER:  May I approach, Your Honor?

21           THE COURT:  Yes.

22           MR. ROSNER:  Good afternoon, Your Honor.  David

23   Rosner from Kasowitz Benson Torres on behalf of the Ad Hoc

24   EFH claimants.

25           So, what have we been here for?  What has this

1    trial been about?  The movants here have requested that this

2    Court entertain an extraordinary relief imposing what is a

3    $200 million forced investment into an insolvent subsidiary

4    by an insolvent parent.  The movants then claim that the

5    parent benefitted so much that it should be left with

6    nothing.

7            The most extraordinary piece of this extraordinary

8    relief, Your Honor, is the idea that EFH, which got nothing

9    from the Sempra transaction should, nevertheless, pay $137.5

10   million of the NextEra breakup fee that led to the Sempra

11   transaction.

12           Now, most importantly for us, Your Honor, no court

13   has ever held that the out-of-the-money equity has ever held

14   them to be liable for the costs of a subsidiaries asset

15   sale; here, the sale of Oncor.

16           Now, Movant said at the opening, Mr. Galardi said

17   at the opening, that they were, quote, "Not contending that

18   the Debtors should have pursued a taxable transaction," end

19   quote.  But virtually their entire case rests on the

20   supposed benefit that EFH got from the Sempra transaction

21   being, in fact, tax free.

22           The evidence is absolutely crystal clear, and you

23   heard it from so many of the witnesses.  The Debtors did not

24   only -- did not try to seek only a non-taxable transaction,

25   but they also didn't pick a tax-free transaction over a

1    taxable transaction that was available to them.  They picked

2    the transactions that were available to them.  They didn't

3    pick a non-taxable one for the benefit of EFH.

4           Now, in addition to the breakup fee, Your Honor,

5    what else has a court never done?  A court has never held an

6    out-of-the-money equity builder responsible for the cost of

7    its subsidiary's challenge to claims asserted against the

8    subsidiary's estate, here the make-wholes, which they are

9    seeking, Elliott seeks to impose upon EFH because of the

10   waterfall effect that had they been eliminated, there may

11   have been incremental value that would have gone through to

12   EFH.

13          Now, in terms of the fees, Your Honor, the Movants

14   don't want to allocate.  What they're seeking to do is to

15   reallocate to EFH $42 million of already allocated Debtor's

16   professional fees.  And similarly, they want to not

17   allocate, but to reallocate to EFH 9.7 million of already

18   allocated E-side Committee professional fees.  And then they

19   want to allocate a piece of their substantial contribution

20   claim that Your Honor has granted, also up to EFH.

21          Now, we argued at the outset to Your Honor that

22   the Movants have the burden of proof here.  They are the

23   ones that want to change the existing status quo.  And we

24   believe that based upon the trial you've had, and the record

25   in this case, that they have failed to meet this burden.  No

1   witness has testified or provided any basis for the Court to

2   measure the probability that the waterfall would ever have

3   reached EFH had the NextEra deal closed.

4           That's not evidence that you have.  No witness has

5   provided any basis to measure the supposed benefit of the

6   Sempra transaction to EFH.  No witness has tied, in any way,

7   the supposed benefits that EFH received to $137.5 million,

8   as asserted by Elliott or $55 million as is asserted by the

9   PAB.  And there is no evidence that links the two.

10          No witness has provided any reliable measurement

11  of the assumption of asbestos liabilities and what that

12  actually could mean.  No witness has linked any proposed

13  reallocation with any record evidence.  No witness has

14  established a measurement of EFH benefits that translates

15  into the proposed allocations in front of Your Honor.

16          The Court needs reliable evidence, not

17  contentions, not conjectures, not generalizations, so that

18  the Court can generally, if not precisely, measure the

19  relative benefit to each estate if that is required.  There

20  has been no evidence from the Debtors that show how much EFH

21  has actually benefitted by the substantial contribution, for

22  example, that Elliott asserts other than a very small piece

23  relating to the dividend, which I'll get to in a minute.

24          The proof hasn't been offered to Your Honor.  What

25  there has been is examples, some contentions, and some

Case 14-10979-CSS   Doc 13482   Filed 09/11/18   Page 183 of 343

Page 183

1   conjectures.  But they have not established that EFH

2   received benefits over and above those for which it already

3   has paid.  They simply ask for the Court to speculate rather

4   than provide Your Honor with evidence and a reasonable

5   economic analysis that would support any of the requests

6   that they seek.

7           Now, we know, we talked about at the outset, what

8   is the legal standard here.  And it is a 503(b)(1)(A)

9   standard, and that's the legal, that's specific, and it

10  leaves no room for simple hypotheticals or speculation,

11  actual necessary costs and expenses.  O'Brien says it must

12  provide a benefit to that estate in terms of dealing with

13  the breakup fee.

14          The critical point about the legal standard that's

15  very relevant for Your Honor's consideration of the entirety

16  of the motion that's in front of you, is that this case has

17  nothing whatsoever to do with the case law that talks about

18  benefit being determined when the expense is incurred.

19          The underlying policy that I believe Mr. Galardi

20  is talking about is that providers of goods and services

21  have to be protected at the inception of doing business,

22  rather than be subject to a hindsight review of benefit,

23  otherwise entities would not bear the risk of transacting

24  with debtors, or they would do so only at a probably

25  prohibitive cost.

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

1           Those cases are about allowance.  They're not

2    about measuring of the benefit.  We're talking about the

3    measuring of a benefit.  The issue here, Your Honor, that's

4    unique to the breakup fees, is that the allowance has

5    already been made, though reconsidered properly, but it has

6    already been made in the context of a multi-debtor case.

7    What we're talking about is to determine if, after it's

8    payable, who benefitted?  That's the question. It does not,

9    in any way implicate policies that could be detrimental to

10   counterparties that would be engaging with Debtors.  NextEra

11   is not at risk here.  It's the competing estates,

12   essentially, through two sets of proxies, that are

13   contesting allocation and reallocation of allowed

14   administrative expenses.

15          So, what does the evidence show?  EFH was not the

16   primary beneficiary of these cases.  The E-side chapter 11

17   cases were necessary to monetize Oncor, EFIH's main asset,

18   to effectuate the Sempra plan.  The distribution occurred to

19   the EFIH creditors in excess of $9.8 billion from the sale

20   of its assets.  The distribution to EFH creditors, on the

21   other hand, is 202 million exclusively from their cash on

22   hand, nothing that came from the Sempra transaction.  So,

23   the actual necessary costs and expenses of the Oncor sale

24   were for the benefit of EFIH.

25          The only evidence that was adduced during the

1    course of the trial on EFH's benefit from the sale, supposed

2    benefit of the sale, was really potential or projected,

3    which is the opposite of actual.  The benefits to EFH were

4    always indirect and only through the waterfall, and only

5    after EFIH's creditors were paid in full.

6          Now, what's their contention?  Their contention is

7    EFH was the primary beneficiary of the NextEra transaction

8    because EFIH was projected to receive 100 percent recovery

9    at the time NextEra was entered into.  There's a projection.

10         Now, first, as I'll discuss in a minute and it's

11   critical to our proceedings, it's not the beneficiary of the

12   NextEra transaction that matters, it's the beneficiary of

13   the Sempra transaction that matters for allocation of the

14   breakup fee, but a projection of solvency is not the same as

15   actual solvency.  A proposal, several proposals to pay

16   creditors in full, is not solvency, at least until the

17   proposal is actually consummated and those creditors are

18   paid off.

19         Mr. Horton testified for that very reason he

20   ignored the so-called solvency; unless the transaction is

21   consummated, the projections of creditors being paid in

22   full, or there being a solvent estate, are somewhat

23   meaningless, just like trading prices are.

24         The timing of the benefit analysis, which is the

25   core of the issue that deals with the breakup fee, Your

1    Honor, at the outset of the trial this week, the Court asked

2    about the hindsight issue, I think as you articulated as the

3    hindsight issue, whether you should be reviewing this from

4    hindsight; whether it's appropriate to look at the

5    circumstances as they are today rather than at the time when

6    the fee was approved.

7            The timing of measurement of the benefit from the

8    breakup fee is dependent on when the acts give rise to the

9    liability occurred.  Here, at termination, in favor of a

10   replacement transaction.  That's when this condition

11   proceeded in triggering the breakup fee was satisfied.  So,

12   the cases that they site, for example, even the commercial

13   financial services is a case cited by Elliott, provides that

14   courts look to when the acts give rise to the liability took

15   place not when they accrued.  Collier similarly says that

16   they're deemed actual when the error, in fact, occurs.

17           There's several potential timelines, potential

18   timeframes that the Court could look at -- one was posited

19   by Mr. Galardi just a few minutes ago -- in order to

20   determine what was the benefit from the NextEra breakup fee.

21           One is when the NextEra agreement was signed.  The

22   fee accrues because there's a contractual obligation

23   contingent on Court approval.  The benefit to EFH, if looked

24   at then, rather than at the waterfall from the replacement

25   transaction which is the appropriate timeframe, at that

Page 187

1    date, if the Court were to look at it then, is at most using

2    the numbers of the breakup fee that Your Honor approved, 2.7

3    percent, would then be on the value of the asbestos

4    liability assumption, which we've discussed and was

5    discussed at length during the trial.

6         Now, there's no record evidence of what is the

7    value of the benefit of the assumption of that asbestos

8    liability.  But the disclosure statement estimates it at $58

9    million, and that would be mean to use that timeframe at the

10   time that the claim accrued; it would be only 1.6 million of

11   the breakup fee.  Plus, if you wanted to, you could then say

12   also 2.79 of the $53 million in value that was at that point

13   supposed to go through the waterfall to BFH, but that was

14   subject to the make-whole risk discount because that, of

15   course, disappeared or would have disappeared had the make-

16   wholes been allowed by, or had the decision disallowing them

17   been reversed by the Third Circuit.  That, even together,

18   totals only $3 million, and that's if you looked at it on

19   that day.

20        The next time you could look at it is the NextEra

21   transaction itself approved, because it was approved by the

22   Court and the benefit to EFH, again, if looked at on that

23   date, September 19th, rather than at when the waterfall

24   occurs upon the replacement transaction -- again, that, at

25   most, is 2.79 percent of the asbestos liability.  And then

1    the potential, as we've talked about during the course of

2    this trial, the $471 million, if you could apply it --

3    because, again, that was a projection.  But as we know, not

4    only from the Board decks, but from the testimony, that it

5    was always subject to make-whole risk.  And we all know what

6    happened with the make-whole, so that risk was a significant

7    risk.  But even then, even if you didn't discount it for the

8    make-whole, the grand total would be $14 million.

9              What's the next timeframe that you would look at

10   this?  It's when the NextEra transaction terminated because

11   of a replacement transaction aside.  That's when the fee is

12   incurred.  That's when the fee becomes actual.  Because

13   that's when the Debtors terminate the NextEra transaction in

14   order, ultimately, to close the Sempra sale, triggering the

15   condition proceeding of the breakup fee.  There, the benefit

16   to EFH measured at the appropriate time can only be at an

17   absolute maximum, a percentage, 2.79, applied to whatever

18   the Court would determine was the assumption of the asbestos

19   liabilities.  There's nothing to go through the waterfall at

20   that point.  There's nothing that goes to EFH on the date

21   that the actual fee is incurred and becomes an actual

22   expense of administration of these estates.  And again,

23   that's $1.6 million of a $275 million breakup fee, is the

24   absolute maximum.

25              That, Your Honor, is the correct timeframe on

1    which to analyze the benefit of the breakup fee, because

2    that's when the replacement transaction that led to the

3    termination fee was triggered.  And it's the replacement

4    transaction that is, is what causes the waterfall to go into

5    effect.  It's the replacement transaction that provides the

6    consideration that goes to the parties before Your Honor.

7            I think the point that is lost on the Movants in

8    this allocation motion is that this is not about allowance

9    of the NextEra breakup fee, because that has already

10   occurred.  For the allowance of the administrative claim,

11   the Court took the record as it was at the time.  It

12   determined to allow the breakup fee.  We're not revisiting

13   that here.  We are not suggesting, by the way, Your Honor,

14   that the analysis should be backward looking as to whether

15   the breakup fee created a benefit because, as Your Honor

16   stated, in its reconsideration opinion, how would serving as

17   a stalking horse in a sale that fails to garner Court

18   approval, possibly provide an actual benefit to the Debtors

19   estate.  The Court posits that it could not.

20           I'm sorry, I was on the wrong slide.

21           THE COURT:  I wasn't following you so I'm glad

22   somebody picked up --

23           MR. ROSNER:  Yes, thank you.  What I was just

24   trying to read to you, Your Honor, is your language from the

25   reconsideration order, to say that how would serving as

1   stalking horse in a sale that fails to garner court approval

2   possibly provide an actual benefit to the Debtors' estate?

3   The Court posits that it could not.  That's because it's the

4   subsequent sale that the Court approves that provides the

5   benefit.

6           Similarly -- let me see if I get it right this

7   time --

8           THE COURT:  If that's your argument, you'd better

9   hurry up and get me your proposed findings before the Third

10  Circuit rules.

11          MR. ROSNER:  The argument, Your Honor, is

12  absolutely when is the benefit -- as Judge Gross said, as he

13  upheld in the Committee's objection, he upheld a Committee's

14  objection to a breakup fee that was payable other than upon

15  a subsequent sale.  I agree with the Committee's objection

16  here, that this breakup fee, as it is proposed, is not

17  consistent with Third Circuit law, in particular, the

18  decision in the O'Brien case.  Without a successful closing

19  there would be no benefit to this estate, which would be

20  commensurate with the breakup fee.

21          So, Your Honor, as Elliott actually said in their

22  moving papers -- and now I'm going to go back to here --

23  what we're doing now is looking at the facts as of when the

24  administrative claim became payable to determine which

25  company and its creditors benefitted.  In their footnote 33

1    in their written submission relating to hindsight, the

2    Movants admit that in connection with the decision reversing

3    the make-whole disallowance, quote, "The Third Circuit

4    decision changed who would get the benefit," but did not, in

5    the Court's mind, undermine the EFH Trustee's effort to

6    secure 400 million in additional value for the EFH

7    creditors.

8              That's right.  The Third Circuit decision changed

9    who would get the benefit.  The question that we are

10   answering then is, to use Elliott's phraseology in his final

11   submission, who would get the benefit?  Here that who is

12   EFIH, because the beneficial transaction, the one that

13   produced the proceeds, was the subsequently court-approved

14   Sempra transaction.  The facts of this case are very unusual

15   as compared to a normal breakup fee because what the normal

16   breakup fee would generate would be a subsequent transaction

17   at which there would be excess proceeds.  But the --

18             THE COURT:  I would go further.  I'd say they're

19   unique.  I don't, I can't -- I haven't been able to find one

20   in the literature along these lines.

21             MR. ROSNER:  And we have not either, Your Honor.

22   The benefit is yet to be determined when it becomes payable

23   due to a different court-approved sale.  That's when the

24   determination is made, where the benefit lies.  It's the

25   Sempra transaction that makes it payable that determines

1    where does the benefit go?  And here, the benefit lies with

2    EFIH, not EFH.  And this makes sense, of course, because if

3    no one outbids the stalking horse, the fee is never payable.

4         So, Your Honor, as the Court observed -- and I

5    want to go back to some of the points that you made during

6    the course of this trial -- as the Court observed when Mr.

7    Strom, the Ad Hoc claimant's expert, was testifying, you

8    said breakup fees are paid, quote, with first dollars from

9    the replacement transaction, and Mr. Strom agreed.  Payment

10   is not dependent upon a determination of benefit.  The Court

11   has already found that there is a benefit at the allowance

12   of the breakup fee which is why the fee is paid out of purse

13   dollars.  The burden, however, always impacts the creditors

14   that are last in line.  If it's equity or if it's the

15   creditors, if they are paid in full.

16        So, here's the hypothetical that Your Honor

17   posited when Mr. Strom was on the witness stand, the Court's

18   hypothetical of who pays the breakup fee.  And you said, in

19   $100 million sale, there's $110 million of first lien debt,

20   and $100 million of second lien behind it.  And then there's

21   $140 million topping bid.  The allowed breakup fee gets paid

22   first, the remaining proceeds then used to pay off the first

23   lien, and the remaining proceeds go to the second lien.

24        The Court observed during the trial, quote, "Who

25   pays the breakup fees?  The second liens do."  In other

1    words, which level of the capital structure is impacted by

2    the payment of the breakup fee?  And that is the level at

3    which the proceeds run out: the fulcrum class.

4            So, if you use the same hypothetical you say it's

5    a three percent breakup fee, the topping bid, however,

6    instead of being 140, is 105.  The breakup fee is still paid

7    off of the top leaving 102 million to distribute.  The first

8    lien bears the impact of the breakup fee payment because

9    there is not enough value after payment of the breakup fee

10   to flow through the waterfall to the second lien.  The

11   second lien receives no proceeds from the transaction and,

12   therefore, is not directly burdened by the breakup fee, even

13   though they did, in accordance with the Movants' theory of

14   the case, they did benefit from the potential that a higher

15   bid could have been realized.

16           The first lien can't, at that point, surcharge the

17   second lien for the potential of receiving proceeds, whether

18   they're taxable or not taxable.  And that's the example

19   that's the closest to our case.  Given that the Sempra

20   consideration, after paying or being there, let's say, to

21   pay the NextEra breakup fee, did not clear the EFIH debt.

22   That debt bears the impact and the burden of the breakup fee

23   and can't be put onto its equity.

24           The last and final hypothetical, Your Honor, that

25   I think you need to -- that I would ask you to consider, is

1    what happens in the example where the NextEra breakup fee

2    worked, as a hypothetical?  It's the one where the third

3    circuit had affirmed the make-whole decision, and Sempra,

4    let's say, outbids NextEra by $300 million?  Because the

5    make-wholes remained disallowed, EFH would receive $471

6    million from that transaction.  Sempra's $300 million

7    overbid provides $275 million that goes to NextEra and the

8    additional $25 million that goes to EFH.  EFIH creditors are

9    paid in full.  So, equity, EFH, bears the burden for the

10   impact, or pays the breakup fee.  It doesn't get the $300

11   million in excess proceeds, it gets the $25 million in

12   excess proceeds.  That's the function of the waterfall.

13   That dictates who is impacted and burdened by the breakup

14   fee.

15            Could, under that scenario, Your Honor, could EFH

16   turn to EFIH, its subsidiaries who have been paid in full,

17   and then demand payment of $137.5 million, half of the

18   breakup fee, to be borne by those creditors because they

19   benefitted from the replacement transaction that triggered

20   the breakup fee.  They benefitted because having absent

21   agreeing to it, there would have been no sale and there

22   would have been no full payment.  So, they had a benefit but

23   they would get paid in full.  They wouldn't agree to pay

24   $137.5 million because they get paid by virtue of the

25   waterfall.

1           And the same is true here, Your Honor, that EFH

2    cannot, in addition to not getting paid proceeds from the

3    waterfall, at the same time then be forced to pay half of

4    the breakup fee for a transaction from which they generated

5    no proceeds.

6           Here, EFH stood to gain nothing from either the

7    NextEra or the Sempra transactions, with one caveat, the EFH

8    asbestos liabilities that I've discussed.  The maximum there

9    -- I mean according to the disclosure statement, was $58

10   million.  That actually only yielded $7.7 million in cash.

11   That was only a change, let's say, from 13.2 percent recover

12   to 13.7.  If you applied the 7.7 million -- you remember the

13   arithmetic we did at the outset of this trial -- that's only

14   $220,000 of the breakup fee.

15          The Court has to look at -- the fee is allowed as

16   an administrative expense at the time of the breakup fee

17   hearing.  But it needs to look a which estate gets

18   benefitted by that fee.  And the estate that gets benefitted

19   from that fee can only be viewed at the time of the

20   replacement transaction.

21          Even if you did, however, look at it at the time

22   of approval, which doesn't make sense under the construct of

23   the bankruptcy code, using the hypothetical of the NextEra

24   transaction, enterprise, which was, as we know, contingent

25   on make-whole allowance, which we contend, Your Honor, is

1    not the appropriate time to look at it.  EFH's maximum

2    benefit could have been $471 million, or 4.8 percent of the

3    net proceeds.  The amount of the breakup fee that applies to

4    that, even if you didn't discount it by the risk that the

5    make-wholes do not get, that that decision is not reversed,

6    is only $13 million.

7              And then, if you apply at a discount, since we

8    know with 100 percent certainty that that decision was

9    reversed, it should actually be zero.  That was a

10   speculative EFH recovery, and it's not one that you would

11   attribute a breakup free to.

12             The evidence demonstrates that the hypothetical of

13   a sale, and no make-whole, is some vague and speculative

14   benefit that we know never occurred.  It's an opportunity,

15   or a potential, but nothing more than where EFH sits in the

16   capital stack, as Your Honor pointed out during the course

17   of this trial.

18             Because of where EFH sits in the capital stack, it

19   does not substantiate a 20 percent allocation, and it

20   certainly doesn't substantiate a 50 percent allocation of

21   the breakup fee.

22             There's nothing different in the breakup fee here

23   from other breakup fees in the context of when it was

24   allowed and when it becomes payable.  What's unusual is that

25   there was no higher bid that cleared the fee.  That's the

1    key difference of this case that makes it different than all

2    other cases.  But the analysis has to be the same, because

3    there's no doubt, if there was $275 million of additional

4    consideration, that would have gone to pay the breakup fee.

5    It would not have gone to EFH.

6              So, regardless of the fact that we had a lower

7    transaction than a higher transaction, analytically, it has

8    to be looked at the same, in order to determine which estate

9    has actually been benefitted from the Court's prior grant of

10   the breakup fee.

11             Now, in terms of what the evidence has

12   demonstrated, and in response to some of Mr. Galardi's

13   arguments, there was, the witnesses have testified, there

14   was, in fact, no quid pro quo for the breakup fee.  The

15   increased termination fee to 175 million was unrelated to

16   EFH creditor recoveries.  There was no specific give and get

17   that realized benefits to EFH.  Contrary to the Movant's

18   assertion, those give and gets can't be viewed in isolation,

19   as the witness has testified.  They are part of the entire

20   proposed transaction.

21             The Movant's contention that the Court should

22   ignore the $9.8 billion in value to EFH from the transaction

23   is just not sustainable under the evidence.  Their

24   contention that $165 million increase, incremental amount of

25   the termination fee, correlated with an increase of the

1    purchase price that was for the sole benefit of EFH.

2            Well, the record demonstrates, Mr. Horton

3    testified that the Debtors never considered the negotiation

4    of the amount of the breakup fee as a quid pro quo.

5    Instead, the Court should view the transaction in the

6    aggregate as the one -- with the breakup fee being just one

7    component.

8            The record shows that the increase in the purchase

9    price that resulted in potential value, in the amount of

10   $471 million to EFH, was obtained after the agreement to

11   increase the breakup fee by $165 million.

12           The record also demonstrates that the increase in

13   consideration for NextEra's transaction that may have

14   resulted in withdrawal of objections, but because of the

15   make-whole risk, it did not guarantee any proceeds to flow

16   to EFH, and they did not, in fact, flow to EFH.

17           And there's no evidence in the record that

18   assumption of the asbestos liabilities were given in

19   exchange for the $165 million increase.

20           Elliott wants the Court to approve EFH's payment

21   of $137.5 million of the breakup fee in exchange for which

22   there's a certainty that it has received nothing.  And the

23   PAB wants to do it for $55 million in exchange for which

24   there's a certainty that EFH has received nothing.  Neither

25   O'Brien nor any other case permits this huge forced value

1    transfer from one estate to the other, and nothing in the

2    record supports that, Your Honor.

3            I'd like to turn the Debtor's professional fees.

4    The Movants have provided no actual evidence -- as you know,

5    the Movants seek to, they seek reimbursement of $42 million

6    in the Debtor's professional fees that EFIH paid.  They want

7    to get that from EFH.  The Movant's, however, haven't

8    provided any specific evidence or methodology to support any

9    reallocation.  We know, Your Honor knows from the record,

10   that the interim compensation order governs allocation.  It

11   governs direct benefit fees and collective benefit fees.

12   That order is a rational, party-negotiated, court-approved

13   methodology.

14           The Movants contend that they're not challenging

15   the interim compensation order but, in effect, that's

16   precisely what they're doing, and they're seeking -- I

17   think, as Mr. Rosenbaum testified today -- not only to

18   change the numbers but to change the methodology, but

19   there's no evidence that actually supports a basis for

20   changing the methodology.

21           The factual record is that the Debtors'

22   professionals allocated their fees pursuant to the interim

23   compensation order using the same methodology negotiated by

24   Mr. Rosenbaum and other PIK holders at that time.  Mr.

25   Husnick detailed the process that Kirkland undertook to

1    comply with the Court's orders.

2            The Debtors' professionals, as the evidence

3    showed, allocated their fees using their best judgment with

4    requisite oversight from the Debtors, the Fee Review

5    Committee and this Court.  And Mr. Horton also verified

6    this.  The legal counsel maintained intensive oversight and

7    compliance with the interim compensation order.  The

8    Debtors' accounting and treasury teams confirm the proposed

9    allocation calculations.

10           Now, Movants contend that EFIH unfairly paid

11   nearly nine times more than EFH for legal services.  But

12   this was dictated by the interim compensation order based on

13   the ratio of the direct benefit fees.  Without any evidence

14   to establish that the direct benefit fee ratio should be

15   altered, there's no basis to alter the ratio applied to the

16   collective benefit fees.

17           THE COURT:  All right.  Well, you're ignoring

18   something.  You're ignoring a couple of things.  You're

19   ignoring that Kirkland and Ellis, in 2016, departed from the

20   interim compensation order.  And you're ignoring the fact

21   that the E-side Committee counsel never complied with the

22   interim compensation order.

23           MR. ROSNER:  Your Honor, I think Mr. Husnick

24   testified exactly why there was a change, and exactly the

25   basis upon which they made that change.

1           THE COURT:  Absolutely.

2           MR. ROSNER:  And they disclosed it in the actual

3     monthly interim fee applications.

4           THE COURT:  One monthly fee app in a footnote.

5           MR. ROSNER:  But the change was dictated by, at

6     that point in the case --

7           THE COURT:  Right, but they didn't come back and

8     seek a revised interim comp board or they just changed; they

9     didn't get court approval.

10           MR. ROSNER:  And in terms of the Committee's

11    professional's, Your Honor, I think the testimony from Mr.

12    Glueckstein is that, in fact, they always viewed that they

13    were working for both estates, and he allocated the fees on

14    a 50-50 basis.  So, there's no -- but most importantly,

15    there's been nothing that's been introduced into the record

16    that gives any basis for supporting any kind of methodology

17    or different kind of allocation of the fees.  That evidence

18    isn't in front of Your Honor.  What is in front of Your

19    Honor is what the professionals did themselves, and how they

20    determined it should be done.  What we're asking the Judge,

21    Your Honor, to give deference to, is the Debtors'

22    professionals, as well as to the Debtors, who gave oversight

23    to what the actual fees, and how they were allocated.

24           THE COURT:  Well, what about the Busy Beaver

25    point, which is the Court has an independent duty to make

1    this decision itself and can't provide deference to the

2    professionals?

3              MR. ROSNER:  Well, Your Honor, you have an order

4    that was entered, and at the same time, the Court can give

5    deference to the business judgment that was exercised by the

6    professionals.  What Busy Beaver is talking about is the

7    actual fees themselves.  Nobody is challenging the actual

8    fees themselves.  What is being challenged is -- and I don't

9    believe there's an objection to Kirkland's actual fee

10   applications right now -- what's being challenged is the

11   methodology by which they allocated --

12             THE COURT:  Right.  I mean the problem is that

13   these cases always -- a lot of the appellate cases on

14   bankruptcy, as you know, are not sophisticated --

15   sophisticated is not the word -- they're not large, multi-

16   debtor chapter 11 cases.  They're small businesses, they're

17   always single-debtor cases.  You can't fault the Third

18   Circuit, or any of the circuit courts, you decide what's in

19   front of you.  But Busy Beaver, my memory of Busy Beaver is

20   it's a single-debtor case, it's not a multi-debtor case.

21   One could argue that it's not applicable, or maybe it's

22   distinguishable.  I don't know.  I don't like to distinguish

23   the Third Circuit.  (Laughter)  It makes them grumpy.

24             Sorry, I'm interrupting you.  I didn't interrupt

25   Mr. Galardi, but he had cooler slides.  (Laughter)  I know

1    you didn't do them.  You know how, when the first little

2    clip art that was in there, I'm like, oh, Mr. Galardi didn't

3    do that.  (Laughter)  That was definitely not him.

4              MR. ROSNER:  Your Honor, tax Armageddon.  The

5    Movant's contention is that the only debtor to face tax

6    Armageddon and the only one who faced that risk is EFH.  The

7    record is crystal clear on this.  First and foremost, it's a

8    pure hypothetical.  The record reflects conclusively that

9    there was no taxable transaction for the Debtors to enter

10   into.  There was none proposed, none considered.  This was

11   the beginning and the end of that analysis.

12             But Your Honor heard quite a bit about the omnibus

13   tax memo, and if a taxable sale transaction would have been

14   pursued, there was a whole -- a number of ways that EFIH

15   would have been -- Mr. Keglevic testified specifically to

16   what the considerations were that he made as a director at

17   EFIH.  There was the check-the-box issues, there's the state

18   law claims, there's the risk that the IRS would pursue under

19   a number of theories.  He testified to those risks that they

20   were considered by the EFIH board.  The Debtor's

21   fiduciaries, including the EFIH's independent director, and

22   EFIH's unsecured creditors, believe that those risks were

23   very real and very significant.  So, all Debtors were

24   concerned with the tax ramifications of a disposition of

25   Oncor, and it's the paradigmatic collective benefit.

1              In terms of the make-whole claims, we've talked

2      about the contention is, is that disallowance of EFIH's

3      make-whole claim should somehow ignore to the benefit of

4      EFH's creditors.  But there's no credible evidence that the

5      litigation concerning the potential liability arising under

6      EFIH's secured facilities provided a direct benefit to EFH.

7      EFIH was the only party to that litigation.  The Debtors'

8      professionals performed no work on behalf of EFH in

9      connection with the litigation.  The benefit to EFH, again,

10     like the breakup fee, is only indirect through the

11     waterfall.  The indirect effect on EFH is solely a function

12     of their place in the capital structure.

13             Your Honor, we discussed the Committee's

14     professional fees.  I understand the point.  I do

15     understand, however, that the Committee was representing two

16     estates, and they viewed themselves as representing two

17     different estates, and they allocated their fees

18     accordingly.  The testimony is unrebutted that the

19     professionals viewed themselves as representing all of the

20     unsecured creditors in both estates.  There's no evidence

21     that actually challenges, and there's not evidence that

22     supports, in any way, or has been posited, Your Honor, that

23     supports a methodology different than that that has already

24     been applied by the professionals themselves.

25             The Movants relied on solvency.  But, as I think

1    we talked about, there's no competent proof of solvency in

2    the record.  Projected plans that provide for full payment

3    until they're actualized, are not solvency.

4             They testify, they contend that most of the fees

5    related to the services performed prior to the EFH and EFIH

6    settlement, but they never established that the entirety of

7    the work done by the E-side Committee related to, or solely

8    related to that settlement.  There's no evidence that

9    supports any other kind of allocation.  So, Your Honor,

10   we're left with the substantial contribution claim.

11            Elliott wants to collect 30 percent of that

12   substantial contribution claim from EFH.  There is little

13   substantial evidence to establish that Elliott worked at any

14   time to benefit a Debtor other than EFIH or itself.  At

15   most, I think Elliott can only point to the 3.75 million

16   received by EFH because of its efforts.  Those were

17   incidental effects on -- the incidental effects on plan

18   confirmation are simply just insufficient.

19            The major components of the claim illustrate that

20   EFH received only a minimal benefit.  The Sempra

21   transaction, which is two-thirds of their request -- there's

22   no plausible argument or evidence that EFH benefited from

23   the transaction that resulted in the zero recovery for EFH.

24            The reconsideration, Your Honor, which is roughly

25   $3.1 million -- EFH should have no responsibility for the

1    termination fee and, therefore, none for efforts to disallow

2    it.  At most there could be an aliquot, very small

3    percentage that would relate to the assumption of the

4    asbestos claims which, as I said, there's no record evidence

5    for the amount there.  But the same ruling that applies on

6    the termination fee should apply as to this, which is

7    roughly 10 percent of what Elliott's contribution claim is.

8             The termination of the NextEra PSA, similar to

9    Sempra, EFH received no benefit from the termination of that

10   transaction.  Any (indiscernible) was EFIH, not EFH.  And

11   the Oncor dividend I talked about, and that's where there's

12   a $3.75 million benefit.

13            Your Honor, we understand that this is a unique

14   case.  And we understand that there hasn't been a multi-

15   debtor application of a termination fee in the instance in

16   which a transaction that ultimately occurred or was approved

17   by the Court, was for a lower value than the one at which

18   the breakup fee was originally approved.

19            But the analysis still remains the same: that you

20   have to view the waterfall, as I think you discussed with

21   one of the witnesses, and as we've contended in the number

22   of hypotheticals, as to where does the waterfall go?  Who

23   bears the impact and the burden of the breakup based upon

24   the waterfall?  It's the replacement transaction that yields

25   the benefit to these estates, however it is, and if that

1   transaction does not yield money down below the creditors,

2   then they bear the full burden of the breakup fee.  That's

3   how the waterfall works.

4          The evidence we think conclusively demonstrates,

5   and the applicable legal principles here conclusively

6   require that EFIH should bear the NextEra fee and the Court

7   should not disturb the existing allocations or the

8   professional fees in accordance with a substantial

9   contribution claim, roughly 12 percent of the cost

10  associated solely with the Oncor dividend should be

11  applicable to EFH.

12         And we think that's how this should come out.  And

13  we would ask Your Honor that you would deny the motion.

14         THE COURT:  Thank you.

15         MR. ROSNER:  Thank you, Your Honor.

16         THE COURT:  Mr. Pedone?

17         MR. PEDONE:  Yes.

18         THE COURT:  Actually, I'm sorry, Mr. Pedone, can

19  we take a short recess before we turn to you?

20         MR. PEDONE:  I would love a short break.

21         THE COURT:  Okay.

22      (Recess)

23         CLERK:  All rise.

24         THE COURT:  Please be seated.  It looks like an

25  '80s video game.  That's how we start.  All right.  The

Page 208

```
1    later we go, the punchier I get.

2          Go ahead.

3          MR. PEDONE:  Your Honor, the theme of the day is

4    "Back To the Future."

5          THE COURT:  Yes, it is.

6          MR. PEDONE:  Your Honor, Richard Pedone for the

7    EFH Indenture Trustee, and I'm going to try to be very

8    brief.  Your Honor, I agree with the Ad Hoc's analysis that

9    when it comes to looking for how you should pay the break-up

10   fee, we look to an allocation, not allowance.  We look to

11   the waterfall.  And the documents here, as the evidence

12   provides, show when the fee would become due.  It gets paid

13   five days after the subsequent transaction implicitly from

14   the proceeds of the subsequent transaction.  And I believe

15   the Ad Hoc's laid out the correct argument for how you would

16   follow that waterfall and what would be due.

17         What I want to address is the alternative argument

18   from primarily which is if we go back to the day, as Mr.

19   Galardi has asserted, when the fee at the hearing, 2016, was

20   determined to be allowed as part of the transaction, were

21   due as -- potentially due as part of the transaction, what I

22   keep imagining is what Ms. Williamson would have said.  And

23   you have to put yourself in that day, look forward and say

24   what I could allow, as I said in the opening, what could you

25   have allowed that day under O'Brien and case law for a fee
```

1    against EFH.

2              And under O'Brien and applicable case law, and I'd

3    suggest you imagine Ms. Williamson sitting here saying in

4    her business judgment what the maximum fee could have been

5    if we were disputing it, it would have been the 3 percent or

6    the 2.9 percent of the consideration flowing to EFH.  And we

7    would have had a discussion about what was flowing to EFH.

8              And I'd submit, Your Honor, that that is the cap

9    that you could possibly ever allow under applicable law

10   against EFH.  And I'd actually go as far as to say that I

11   think Elliott's view as to a fee where a 50 percent of the

12   break fee allocable to EFH is completely unhinged from any

13   law.  And just because this transaction is unique does not

14   mean that in hindsight we could impose a burden on EFH that

15   would not have been allowable that day.  Nobody intended

16   that.  There's no evidence that anyone intended that.  And

17   I'd submit under O'Brien and subsequent case laws, that is

18   what sets your ceiling and ask the Court to consider that if

19   it does not decide to go with the waterfall analysis where

20   nothing is due to EFH on the fee.

21             Your Honor, I want to highlight a point that Mr.

22   Keglevic made that when we go back to that date and in his

23   view on that date, "time was not an enemy of EFH because

24   they continued to get the tax cash payments from Oncor and,

25   in fact, their cash was either stable or slightly going up."

1    But cash burn at EFIH vis-à-vis the EFIH unsecured creditor

2    was substantial, and it was running $50 million.  So when we

3    get to EFH's view and what was necessary to preserve the

4    estate, on that day back in 2016, there can be no evidence

5    that EFH needed to assume that 30 percent of 50 percent of

6    the break fee outside of anything that has ever been done in

7    terms of a break fee to proceed forward.

8            EFH did not have a need for that transaction with

9    a break fee at that level, and it can't be imposed in

10   hindsight at EFH on a level that it could not have been

11   imposed on EFH on that day.  EFH could afford the

12   significant delay.  In contract with EFIH that was assuming

13   a very reasonable three percent, roughly three percent of

14   the transaction value flowing into them.  EFIH could

15   completely justifiably absorb the full fee.  And they have a

16   need for speed.

17           Your Honor, this slide is just a summary of what

18   was put up on the first day.  And, again, I want to

19   emphasize it's the maximum allocation to EFH.  You heard

20   evidence in the form of what was in the disclosure statement

21   that the asbestos liability was $58 million, 2.79 percent,

22   2.8 percent of the 58 million would bring us to 1.618.  Now,

23   again, as I indicated in the opening and as is in the

24   record, there were many gives and gets as part of that

25   asbestos liability being paid and assumed by the purchaser.

1      It was done to meet the EFIH side's need for speed.  It was

2      done as part of EFH agreeing to the transaction at that time

3      and not waiting further in time for a longer transaction.

4             We've seen evidence in this case of the value

5      going up and down of these perceived value of these estates

6      and encore going up and down.  There's no evidence in the

7      record.  We have to assume the discussion at EFH and

8      certainly in my mind at the time was if we wait longer,

9      perhaps the value will go back up and we could actually get

10     another transaction done.  And EFH was at a point, as Mr.

11     Keglevic clearly testified, that it could afford to wait.

12            So it was a bundle of gives and gets on EFH's part

13     including EFH allowing its NOLs which were clearly

14     transferred under the documents to the purchaser as their

15     testimony in this record of the valuation of those NOLs, no.

16     But to the transaction documents provided that they were

17     transferred and do you have prior testimony in these cases

18     that they had value?  Absolutely.  It was a bundle of things

19     that EFH contributed to the transaction to get it done, and

20     they all fold in.

21            But I would submit the maximum you could find is

22     that EFH would be responsible for 2.8 percent of the $58

23     million of the assumed asbestos liabilities and then turning

24     to the potential consideration that day that would flow up

25     to EFH.  This Court has acknowledged that the disclosure

1    statement hearing that we discussed in opening where it said

2    that the risk of the make-whole hitting were always there.

3    It was a great risk, a giant risk according to the Court.

4    And we heard evidence concerning what was in the disclosure

5    statement, and all parties acknowledged that risk.

6             So I would say that in all circumstances if you

7    look at the consideration flowing -- potentially flowing up

8    to EFH, which we know did not flow in hindsight, you take

9    that consideration and you must discount it by at least 50

10   percent given that giant risk.  And that would bring us to a

11   maximum share, EFH share of the break fee of $6.5 million.

12   $6.5 million plus the $1.6, I submit, would be the maximum

13   if you didn't go with the waterfall analysis the Ad Hocs

14   allowed that could be attributed to EFH.

15            Your Honor, turning to the professional fee

16   allocation, that hanging clause that preserved rights does

17   not say there shall be a hindsight de novo review of

18   allocation.  The provision was included in the context of

19   the early T-side versus E-side battles.  And that was the

20   primary event that everybody was anticipating in the case.

21   It was largely why -- we saw Mr. Shore and Mr. Weisfelner,

22   those battles were largely why transactions fell apart.

23            Perhaps if we all had perfect vision of the

24   future, we'd realize that maybe the IRSA wasn't such a bad

25   idea to get everybody onto bankruptcy more quickly.  But

1    that's not the way it rolled, and it certainly didn't roll

2    out that in fact with the view of foresight EFH was solvent

3    and the EFIH was solvent at the end of the day.  The

4    transactions couldn't get done looking at trading values and

5    saying on this day people were gambling and buying in,

6    buying out based upon perceptions of value.  Well, you know,

7    there was a regulatory risk that, well, everybody seems to

8    have gotten it wrong in multiple bets.  And so you can't say

9    the estates were solvent at that time.

10            Your Honor, the level of professional fee review

11   in this case over a period of years was extraordinary.

12   We've heard about four levels of Kirkland & Ellis review for

13   the fees before they went out.  EFIH -- EFH/EFIH had in-

14   house legal counsel.  Now the absence of Mr. Horton

15   personally reviewing fee statements or the absence of Mr.

16   Keglevic personally reviewing fee statements or frankly the

17   absence of the DBs themselves personally doing a line-by-

18   line review of fee statements is not evidence of an absence

19   of a review or dispositive of a lack of review.  There was

20   in-house legal counsel.  Ms. Doré was there overseeing the

21   process.

22            We heard that evidence from Mr. Keglevic that the

23   allocations of fees were put on the board at meetings and at

24   least once Ms. Williamson asked questions about them but the

25   allocations were put up in present and discussed in some

1    form at board meetings.  It wasn't a complete absence of

2    executive decision-making and analysis of the allocation.

3    The boards received reports.

4            Mr. Cremens as a fiduciary for EFIH represented by

5    Cravath and Jenner & Block and the financial advisors Golden

6    & Associates were in place throughout the virtual entire

7    period of this case that fee submissions from both Kirkland

8    with allocations and from the creditors committee.  And

9    there was not a complaint at all from Mr. Cremens throughout

10   the case, and he was the fiduciary charged with overseeing

11   it.

12           Your Honor, there was also the EFH disinterested

13   directors who were in place addressing the issue, and we

14   heard that Ms. Williamson raised questions.  We don't know

15   whether or not Mr. Cremens spoke up and raised questions but

16   we do know from Mr. Galardi's opening slide he is not

17   attacking that these -- that the executives in this company

18   met their fiduciary duty.  So we must assume that they met

19   that fiduciary duty and oversight of allocation of the fees

20   and oversight of the incurrences of the fees was part of

21   their obligation which he concedes they've met because

22   they're not attacking him.

23           Your Honor, we have a fee committee here, not just

24   a fee examiner looking back in hindsight.  The U.S. Trustee

25   say on that committee.  Mr. Gitlin sat on that committee.  A

1    debtor represented it, and for most of the period of these

2    cases, that was an in-house attorney from EFH/EFIH Ms. Gooch

3    who sat on the fee committee and that means that she was

4    there as part of the fee review process.  You can't say as

5    part of the fee review process she didn't take what she

6    learned as part of that process and use it in her job where

7    she had the job of being part of monitoring the incurrence

8    of each debtor's estates of these fees.  And they were

9    incurred and they were paid throughout the cases.

10           Your Honor, we have a creditors' committee that

11   was overseeing.  The creditors' committee had a fiduciary

12   duty to oversee the allocation of the fees.  As represented

13   by Sullivan & Cromwell, Ed Alvarez for a period of time, and

14   they were receiving the fees and overlooking it.  We have

15   the U.S. Trustee.

16           And most importantly, Your Honor, we have a party

17   sitting on the other side of the table now challenging the

18   fees, UNB.  Mr. Galardi represents UMB.  UMB throughout the

19   case was represented by Akin Gump and Foley & Lardner and

20   they were active participants in these cases on watch

21   throughout the cases.  And if there were a problem with the

22   allocation of the fees, in the incurrence of the fees, the

23   payment of the fees by EFIH, those parties should have

24   stepped up and spoken.  But they sat silent because the

25   parties and the professionals who are doing the best they

1    could to allocate the fees as they go along.

2            Your Honor, for four years the professionals whose

3    fee allocations are now challenged submitted 225 monthly

4    requests for payment and 80 interim fee applications.  Until

5    Elliott raises issues in 2017 and then brought the motion,

6    through multiple disclosure statements, no party raised the

7    issues.  I'd submit Elliott faces an exceedingly high burden

8    in now going back and challenging these fees and I do not

9    believe that they met their burden.  We have a high level

10   taking a shot at the fees saying it's inappropriate.

11           Here are a few slides looking at the allocations.

12   This is inappropriate but a high level in hindsight.

13   Elliott did not bring a fee examiner in who went line-by-

14   line and says this fee particular already paid, already

15   allocated is inappropriate.  They did not object to fee

16   approval requests in this case of Kirkland & Ellis, the

17   largest party, the largest applicant.  They allowed that to

18   go without objection.

19           And so, Your Honor, I do not believe they've met

20   their burden for the reallocation.  Thank you.

21           THE COURT:  Thank you, Mr. Padone.

22           Mr. McKane?

23           MR. MCKANE:  Yes, Your Honor.  We have slides.  I

24   know you're not surprised.

25           THE COURT:  And I'll bet they're green.

Page 217

1        (Laughter)

2            MR. MCKANE:  (Indiscernible).

3        (Pause)

4            MR. MCKANE:  And, Your Honor, we thank you for

5    your patience.  The PAB -- we believe the PAB's proposal

6    strikes a well-reasoned middle ground between what we view

7    as extreme positions.  The PAB is here because the economic

8    stakeholders have not resolved the dispute to date, and we

9    still have to make sure the record was accurate, thorough,

10   balanced, and complete.  And the PAB has sought to balance

11   competing considerations in order to push the process

12   forward and aid the Court.

13           Your Honor, this is the proposed allocations of

14   the two sides of the economic stakeholders.  When we saw

15   these proposals -- and, frankly, when Counsel for the PAB

16   realized that as we were -- Counsel for the Debtors

17   approaching the end of these cases and we realized the

18   disinterested directors were not going to be able to broker

19   a compromise here.  And then when we realized that it was

20   going to fall to the PAB and we were going to attempt to aid

21   the Court, members of the legal team, which shall remain

22   nameless, we called him Mercutio in Romeo and Juliet

23   thinking that there should be a plague on both their houses,

24   but not Mr. Horton.

25           Mr. Horton stepped in and he got up to speed with

1    the Debtors, got up to speed with what the disinterested

2    directors had done.  He evaluated the issues.  He tried to

3    broker a compromise and ultimately gave them the best shot

4    they could before he stepped into the breach and made his

5    proposal.  Why?  Because there's $202 million at risk

6    between the issues.

7              Your Honor, ultimately, we know no party in these

8    proceedings disputes the allowed amount of any category of

9    material administrative expenses.  And that -- no party to

10   these proceedings disputes whether the Debtors satisfied

11   their fiduciary duties.  And no parties to these proceedings

12   disputes whether the PAB satisfied its duties.  This should

13   not be an opportunity for revision of histories and

14   exploring what-ifs from the other side of two consummated

15   plans of reorganizations.  And as we all know and we saw

16   throughout these hearings, many of these issues are tied to

17   prior evidentiary hearings and court orders.

18             So what was the proposal that Mr. Horton put

19   forward as the PAB?  It was a reasoned middle ground path.

20   He did his work and ultimately what he proposed all in was a

21   shift of approximately $88 million from the EFIH estate to

22   the EFH estate -- from the EFIH -- from the EFH to -- EFIH

23   to EFH.  No, I probably said it backwards.  I'm so sorry.

24             MAN:  That's fine with us.

25             MR. MCKANE:  Sleep deprivation.  (Laughter)  A

1   basically reallocation shifting expenses, reimbursing EFIH

2   of up to $88 million.  I apologize, Your Honor.

3           So, Your Honor, we've talked about the legal

4   issues here in Section 503.  Ultimately, there are three

5   buckets of legal issues.  The first relates to the

6   termination fee.  And pursuant to 503(b)(1)(a) of the Code,

7   we have the actual and necessary cost and we focused on

8   that, but what we didn't talk about as much is the

9   preserving of the estate.  And we'll get to that over the

10  course of the closing as what costs are necessary to

11  preserve the estate and in particular the EFIH estate.

12          THE COURT:  You know, I didn't -- I just thought

13  of this, so --

14          MR. MCKANE:  Go ahead.

15          THE COURT:  -- ignore me if I'm hallucinating.

16  I'm worried about this breakup fee or termination fee issue.

17  We talked -- Mr. Galardi addressed it, you know, whether

18  it's a advisory opinion because as we sit here today, both

19  the NextEra termination fee and the administrative expense

20  fee are disallowed.

21          MR. MCKANE:  Right.

22          THE COURT:  You know, they're both on appeal.  If

23  I make a finding that 80 percent of the NextEra termination

24  fee should be payable by Elliott -- excuse me, by EFIH --

25  sorry.  Relax.  Relax.

1        (Laughter)

2            MAN:  That wasn't one of the proposals.

3        (Laughter)

4            THE COURT:  Yeah.  By EFIH, because it's an actual

5    and necessary benefit that accrued -- there was an actual

6    and necessary cost, the preserving EFIH's estate, do we have

7    a collateral estoppel or res judicata problem with NextEra

8    assuming -- well, we're on appeal, want to supplement the

9    record and then you've got a problem on appeal.  Or if I get

10   reversed and they go to the adversary proceeding that's been

11   brought and we're litigating the issue, have we somehow shot

12   ourselves in the foot on the subsequent litigation --

13           MR. MCKANE:  Your Honor?

14           THE COURT:  Does that make sense?

15           MR. MCKANE:  Yeah, it absolutely does and

16   frighteningly we thought about this.

17           THE COURT:  Oh, good.  Well, you're -- okay.

18           MR. MCKANE:  What we would propose is essentially

19   a conditional finding.  To the extent that it is ultimately

20   determined that the NextEra termination fee is allowed by

21   final order.  And then you do the allocation.  So ultimately

22   it allows everybody their appellate rights and it allows

23   everybody their litigation rights in the adversary

24   proceeding.  And it critically allows, you know, an

25   allocation of what that risk is going to be.

1              And the reason why we bring that up is it's ripe--

2      and this is the original concern you raised in the opening

3      statement.  It's ripe now because of the amounts of monies

4      that we are sitting on as the PAB for distribution from the

5      accounts, right.  And because of that --

6              THE COURT:  Right.  But that can't -- I mean

7      because they're not going to get -- unless I revisit the

8      reserve --

9              MR. MCKANE:  That's --

10             THE COURT:  -- they're not going to get paid one

11     way or the other.

12             MR. GALARDI:  But, Your Honor, I'm going to say

13     two things, Your Honor.

14             THE COURT:  I can't hear you, Mr. Galardi.  I'm

15     sorry.

16             MR. GALARDI:  I'm sorry.  I'm going to say two

17     things.  One is as I alluded to in the very opening

18     statement, there's been a lot of statements here about

19     building on the record.  And we were very concerned about

20     exactly that issue which was why we think you have to frame

21     it as Mr. McKane said, a conditional finding for the

22     purposes of distributing under each estate is not holding

23     back $275 million.

24             So this is really, as the facts have transpired,

25     really a conditional finding so that the PAB can distribute

1    as much cash as available right now.

2              MR. MCKANE:  And, ultimately, Your Honor, the

3    amount that we would distribute, you know, could be -- and

4    maybe that could be disputed.  We're always amazed at what

5    gets disputed here.  But, ultimately, that is -- the reason

6    why it's ripe is because we believe we're holding back more

7    than we would hold back otherwise until we know what the

8    allocation can be.

9              MR. GALARDI:  Right.  And remember NextEra

10   originally objected to the allocation motion and we worked

11   out a stipulation that said whatever the outcome was here,

12   they would still have their reserve at least in one form.

13   So that's why we think there is jurisdiction and the urgency

14   to it.

15             MR. MCKANE:  And the concept, Your Honor, is the

16   double reserve.

17             THE COURT:  Okay.  Mr. Glenn?

18             MR. GLENN:  Just for the record, very briefly,

19   we're not sure we agree with them and we were planning on

20   addressing this in our findings of fact and conclusions of

21   law.  I just want to make that perfectly clear for the

22   record that we're not taking a position on that as of yet.

23             THE COURT:  Okay.

24             MR. GLENN:  Thank you.

25             THE COURT:  I'm sorry I interrupted you.

1          MR. MCKANE:  Not at all, Your Honor.  So as we're

2     working through the different buckets, right, the

3     terminations fees, the classic 503(b)(1) and we cannot lose

4     sight of the fact that the board's here and disinterested

5     directors purposely deferred the allocation decision until

6     further facts developed and did not make that decision

7     earlier.  Ultimately, we think that's an important fact.

8          Regarding the substantial contribution, again,

9     this is -- you have the same actual and necessary expense

10    language from the case law.  But, again, this is a kind of

11    classic situation where you look to the substantial

12    contribution after the acts have occurred.  So it's not

13    unusual to look back in the substantial contribution scheme

14    and timing.

15         And then in that regard, we think in particular

16    with regards to these things, you look at which -- you know,

17    which estate was receiving the specific services and whether

18    that analysis changes over time as the claim occurred as

19    opposed to what we say later developed facts meaning what we

20    happened thereafter ultimately to the point where we

21    acknowledge that the termination fee is not triggered until

22    there is an alternative transaction.  And that alternative

23    transaction in this case was the Sempra transaction.

24         You may recall, Your Honor, ultimately, originally

25    when we were going to do the adversary proceeding and we set

1    out a schedule, we had actually baked in an aggressive

2    schedule for a major piece of litigation so that if it would

3    be done prior to the Sempra transaction's projected closing

4    so that we would know whether -- you know, whether there is

5    going to be potentially an allowed claim and then ultimately

6    that whole litigation was stayed based on your consideration

7    ruling.

8              So I think there's some real merit to recognizing

9    that that claim is not paid or owed by the Debtors until the

10   second transaction closes.

11             And then, finally, Your Honor, with regards to

12   professional fees, we do recognize a slightly different

13   standard with regards to timing because of the 330's

14   acknowledgement that whether the services were necessary to

15   the administration and in particular where they were

16   beneficial at the time at which the service was rendered.

17   And, therefore, in that consideration for the professionals,

18   you should consider which estate for which the specific

19   services were being provided, case law and considerations at

20   the time, and whether the professional was the primary or

21   secondary driver of the specific issues.  And, frankly, we

22   do think the thoroughness and timeliness of the fee

23   allocation process matters there.

24             Ultimately, Your Honor, these are intertwined and

25   they did an extensive case history here.  It's complex,

1    iterative, and incredibly hard to explain to anybody who

2    hasn't lived it.  Each claim here must be evaluated in the

3    context of the case, the context in which the fees were

4    occurred, and the temporal vantage point for the type of

5    claim that's being asserted.

6              Now with regards to some observations that we made

7    with regards to ours.  We think there is significant

8    selective amnesia here, right.  All it seeks to the benefit

9    of all the foundational or structuring work that was done by

10   the Debtor's professionals before the Third Circuit's make-

11   whole decision without having the obligation to pay for it,

12   right.  We obtained the order disallowing the make-whole.

13   We obtained the asbestos bar date to aid the purchasers.  We

14   preserved significant value by avoiding the cost related to

15   the interstate claims and a taxable transaction, and we

16   avoided the litigation about those interstate claims, right.

17             That was all work that ultimately inured to the

18   benefits of the E side including the EFIH estate.  We cannot

19   look past that.  And we also can't look past the fact that

20   they received in almost any scenario the lion's share of the

21   value.  And as Debtor's professionals, we say to ourselves,

22   you know, where do we commit our resources.  We commit our

23   resources and our assets to aid that estate that has the --

24   you know, that is the largest estate so we can preserve

25   value.  That is our charge as professionals.

1            Thoroughly, the Ad Hocs also suffer some amnesia

2    because the ignore the work exchange that preserve value for

3    the EFIH estates as well.  The work on the Hunt and NextEra

4    transactions did provide an optionality.  It provides an

5    opportunity.  And we'll get to the Third Circuit

6    breakthrough in a minute, but that opportunity is something

7    of value.  And we also think that they look -- they don't

8    really look carefully at the primary benefits that were

9    provided by the E committee professionals.

10            So let's turn to the termination fee, right.  The

11    facts support from the PAB's perspective that most but not

12    all of the NextEra termination fee should be allocated to

13    EFIH.  And at $275 million, this is unquestionably the

14    largest claim at issue.  Elliott and the Ad Hocs have

15    adopted diametrically opposed positions.  They're at 50/50.

16    So the spread is the largest, right.  And, ultimately, we

17    don't think for the reason we just discussed that there's a

18    need to wait for the Third Circuit if we structure this as a

19    conditional finding.

20            Now, Your Honor, the Elliott arguments in support

21    of 50/50, we just -- we do not think synch up with reality.

22    There's no support for the Elliott claim that the NextEra

23    termination increased to $275 million in July of 2016 as

24    part of a one-for-one trade of price for any statement.

25    That just doesn't square with the facts.  It also doesn't

1    square with the facts with regards to Fidelity because

2    Fidelity didn't come on board and support the transaction

3    until the subsequent price increase in September of 2016.

4    And we provided the testimony for that.  I apologize, Your

5    Honor.

6              Now the Ad Hoc's position equally doesn't hold

7    muster and they contend that no portion of the fees should

8    ever be allocated to them.  Now we recognize that --

9              THE COURT:  They've walked that back a little bit,

10   but...

11             MR. MCKANE:  I think they have because I mean you

12   hear their argument and I respect that, you know, they have

13   to position themselves relative to the Elliott position.

14   But I think where we have to pause and say to ourselves is

15   the whole analysis of the termination fee, to your point

16   about ripeness, requires us to assume in some way that Your

17   Honor's decision is reversed.

18             And in particular, if there's a reversal of the

19   termination fee, does that mean that the Third Circuit has

20   said in the extraordinary circumstance in which a

21   termination fee is owed in a scenario in which a subsequent

22   transaction is at a lower price and, therefore, somehow

23   O'Brien is satisfied nonetheless, in that scenario, what

24   could be the benefit.

25             And from our perspective as the PAB, we would say

1    the benefit was the opportunity to pursue the transaction

2    and close even if it didn't close.  And if it's that

3    opportunity that is the focus of the potential benefit, then

4    we need to look at what the EFH estate got, not just from

5    what the actual closing was at a later deal but what they

6    could have received in the NextEra deal.

7            And, Your Honor, we think at some high level --

8    nothing more than this.  We're not suggesting there's any,

9    you know, binding law of the case or anything like that --

10   we think at some level, the recognition that Fidelity made a

11   substantial contribution and the timing of that recognition

12   after the Third Circuit's make-whole ruling is some

13   acknowledgement that there is value to the estate from

14   pursuing the opportunity to gain a high recovery even if

15   that ultimately does not come to pass.

16           Now with that being said, we think there is some

17   limits to where the Ad Hoc analysis goes.  We personally

18   don't find their expert's testimony was credible.  And, in

19   fact, it's not appropriate expert testimony.  There is no,

20   as we step back, it's an extraordinary case.  It's an

21   extraordinary circumstance.  It's a multi-debtor situation

22   with a subsequent bidder not coming in over the top and yet

23   a transaction fee being owed.  That's, we think, never been

24   done before.  And so when that expert tried to look to what

25   could be an industry standard, there is no industry standard

1    in multi-debtor allocation cases, and we don't believe

2    there's evidence of Preston transactions that could support

3    that analysis.

4            Ultimately, Your Honor, we think when you have to

5    evaluate benefits, the Ad Hoc's view as it relates to

6    consideration, focusing solely on cash is just too narrow.

7    We think the definition of benefit, you know, as written in

8    the Code has to look for benefits not just beyond cash but

9    avoiding the $3.4 billion tax liability.  We think it has to

10   have some factor.  And probably more practically when you

11   think of situations, you know, more commonly, we think if

12   you look to the value of a transaction, you look not just to

13   the cash consideration but the assumption of debt with

14   regards to the transaction.

15           So, if there's -- if assumptions of debt or

16   assumptions of contract is a form of consideration, we have

17   to acknowledge here that the assumption of the asbestos

18   liabilities is a form of consideration that flowed to the

19   EFH estate.

20           And ultimately on this one, on this issue, we

21   actually agreed with Mr. Robins when he said he didn't view

22   this as appropriate expert testimony.  We actually think

23   this is not an area where experts can aid because of the

24   nature of where we are.

25           Finally, you know, with regards to --

1           THE COURT:  (indiscernible) I know that, you know

2    -- just as an aside, but I mean I know you've listened to

3    experts all the time in connection with breakup fees when

4    they're being approved in a sale transaction, but it always

5    makes me laugh that I need expert testimony to tell me that

6    the standard breakup fee is between one and three percent.

7    I think I've probably approved 50 to 100 breakup fees in the

8    last 12 and a half year.

9           MR. MCKANE:  Yeah.

10          THE COURT:  You know?  That said, sometimes

11   they're higher, so...

12          MR. MCKANE:  That's fair, Your Honor.

13          THE COURT:  Anyway, sorry to interrupt.

14          MR. MCKANE:  No, the last point on this line is

15   something that I think we need to build upon the work that

16   the Ad Hocs group advanced.  You know, they were focusing

17   very much on the waterfall analysis, right?  And the thing

18   that we do have to pause here and think about, and Your

19   Honor has -- is going to be -- consider in entering a ruling

20   is you hear -- the fact that you have a waterfall doesn't

21   take into account the fact that you have separate Debtors,

22   right, and separate Debtor Board approvals here.

23          At some very basic level, both the disinterested

24   director at EFIH and the disinterested directors at EFH

25   elected to go forward with the NextEra transaction, knowing

1    the potential benefit for both of their estates and the

2    potential risk for those estates, with separate counsel and

3    separate financial advisors, and said, I will make that

4    trade; I will take that opportunity, knowing I don't know

5    now what the transaction fee, if it goes the other way, will

6    be allocated towards me.  And I think that is the one aspect

7    of the waterfall analysis that I don't think the Ad Hocs

8    acknowledge or have taken into consideration yet.

9            Now, turning to the professional fees, I think we

10   all know now that the allocation methodology in the interim,

11   order mirrors the negotiated RSA provisions.  All right?

12   And that the RSA had significant support from prior

13   constituencies, including the EFIH PIKs.  And I think as we

14   saw, you know, from the Ad Hoc's cross-examination of Mr.

15   Rosenbaum that he actually was directly involved in the

16   professional fee allocation negotiation in the 36 hours

17   prior to the Debtors' filing.  And that was evidenced from

18   today's examination.  So, we have an acknowledgment at some

19   very basic level for this, and this structure, this

20   methodology, is something that they signed off on.

21            Now, we also know now that multiple

22   opportunities for all parties in interest to object, and

23   that there is -- and we have the publicly filed monthly

24   statements and then then the interim statements.  And

25   importantly, Your Honor, we do recognize what Mr. Pedone

1    recognized.  There is an internal legal and treasury team

2    review.

3           No, it's not Mr. Keglevic and not Mr. Horton, but

4    it is members of the legal team, including Ms. Gooch,

5    members of the treasury team as well for financial

6    forecasting.  That is in the record as well.  And then,

7    ultimately, you know, those are all approved.  And it's not

8    lost on anybody which estates are being charged and for

9    which amounts in any of the monthly fees.  That's the

10   structure that we put forward, for example, at Kirkland with

11   regard to 76 matter numbers, with EFH, EFIH and TCEH all

12   having mirrored numbers.  And then all accounts as well.

13   And each biller recording each -- up to 10th -- as low as a

14   10th of an hour to a specific matter, a specific estate, or

15   at all, right, that's how you get to 150,000 time entries.

16          And our point is on all of this, that is the

17   review that is being done before the Debtors ultimately say,

18   okay, we send the invoice.  And then at a higher level,

19   you've got the budgeting and forecasting as well.

20          Now, we recognize no party objected to the interim

21   compensation order until now.  But as we've heard, I think,

22   in the cross-examination of Mr. Rosenbaum and with Mr.

23   Galardi as well -- and this is in their final fee statement

24   as well -- they are tackling and challenging the methodology

25   of the interim comp order.  They contend there is no logical

1   or legal basis on which this Court may find that using the

2   direct fee -- direct benefit fee ratio to the fixed

3   allocation of collective benefits will result in an

4   allocation that's reflected in actual and necessary expenses

5   to EFH and EFIH.  They're taking on the comp order's entire

6   structure and saying that cannot satisfy 503.

7            And at some very basic level our view on this is

8   you have to come forward with a material showing of more

9   before you have an interim -- before you have a compensation

10  order supported by the EFIH PIK holders, you know, and

11  because it was part of the original RSA that has been carry

12  through throughout this entire case, applied by all of the

13  Debtors' professionals in some form or fashion, right, and

14  then thereafter, after closings, after emergence, take on

15  the entire structure of that order.

16           So, K&E stands by the fact that they employed a

17  reasonable, contemporaneous, and robust process for

18  allocating fees, right?  We did the billing memorandum.  We

19  did the classic memorandum.  We actually went out of our way

20  to make absolutely clear that the -- not just the allocation

21  of the time itself, but the allocation of fees associated

22  with the matter numbers was vital, and we gave guidance as

23  to how to do it to each of the billers, focusing on

24  principally -- principally was the guidance that was used;

25  not solely, not indeterminate.  Right?

1              Mr. Husnick explained how he highlighted it in the

2      billing memorandum, the certain issues.  And we emphasize

3      it's vital because your time must be properly allocated

4      among the Debtors, as discussed.

5              All right, to further bolster that process, the

6      Kirkland billing team -- we did four levels of review,

7      including two rounds focused on allocating accurately and

8      consistently, and Kirkland determined that the services

9      primarily benefitted one estate were direct benefit fees.

10     That was the guidance to all timekeepers on the front end,

11     and then you have the secondary levels of review.  All

12     right?

13             We think, Your Honor, it is highly probative.  It

14     may not be dispositive, but it is highly probative that

15     prior to the current dispute, no party had objected to the

16     allocation of our fees.  And we step back for a second --

17     and we believe that Mr. Galardi has acknowledged this at

18     least once, and maybe multiple times -- we have no incentive

19     to allocate fees to a particular estate, right?  Ours is

20     just focused on what is doing a fair allocation of fees to

21     those estate.

22             Now, yes, we -- excuse me.  The interim comp order

23     relied on the professionals to allocate their fees based on

24     the their each contemporaneous assessment of direct and

25     collective benefits.

1            And Your Honor, at this point, I have to say we

2    are reminded of some words, right, and Your Honor had some

3    words, and Teddy Roosevelt had some words.  And we can use

4    them both.

5            Your Honor, in the approval of the reimbursement

6    hearing where we were trying to figure out can we reimburse

7    third parties for this litigation, you said with regard to

8    Mr. Horton's analysis, "It wasn't perfect, but it was

9    thorough and reasonable."  We agree with that, right?  With

10   the professionals, was it perfect?  There's thorough and

11   reasonable.  We think that same analysis ultimately applies

12   here.

13           Now, Teddy Roosevelt, he said, "It's not the

14   critic who counts.  It's not the man who points out what the

15   doer of deeds could have done better.  It's the doer of

16   deeds."  This process is hard.  It takes a lot of time.  I

17   stand by what we did in terms of the review in the four

18   levels and all of the monthly efforts.  And we say at that

19   point we do think there should be some deference.  We're not

20   saying you don't look, but I think you have to acknowledge

21   that at some very basic level with all the professionals'

22   efforts, and then sent the review by the business personnel

23   as well, that this is the kind of contemporaneous review

24   that you want professionals -- especially Debtors'

25   professionals -- to do, right?

1           And so, at this -- at this level, while what we

2    have in response ultimately may be some nitpicks here or

3    there, and a challenge of one criteria or another, there's

4    no buildup, there's no comprehensive analysis to get you to

5    some material shifting of value, right?  And that's why when

6    we say there should be deference, because I think it's,

7    frankly, impossible to be perfect in this.

8           And ultimately, I question in what estates would

9    creditors pay for Debtors' professionals to do more?  How

10   many more levels of review do we need to do?  How much would

11   creditors want Debtors' professionals to making certain that

12   they're hitting the proper standard?

13          And then finally on this point, Your Honor, we do

14   think that there is a secondary concern here about like what

15   happens going forward, right?  What we had here based on

16   this review of the comp order and the no challenges along

17   the way, and then waiting for the Debtors' estates to close,

18   and then raising the fee allocation, we think the potential

19   for fee allocation litigation in large complex cases like

20   this going forward is real.  And we urge you to consider

21   that in making your decision.  So --

22          THE COURT:  Just a --

23          MR. MCKANE:  (indiscernible)

24          THE COURT:  I hear you on that, but my memory is

25   that the plan specifically reserved allocation for a later

1    time.

2              MR. MCKANE:  Right.  There is language in the

3    compensation order that made it explicitly clear that the

4    consummation of the plan did not release those issues.

5              THE COURT:  Okay.

6              MR. MCKANE:  Right.  But I think ultimately what

7    we're saying here when we talk -- again, it's very -- we're

8    not -- we're not saying they're barred from doing so.  We

9    would have briefed that legally earlier.

10             THE COURT:  All right.

11             MR. MCKANE:  What we're saying is it has to be a

12   lot more than this.

13             THE COURT:  I understand.

14             MR. MCKANE:  All right, let's -- the 90/10 issue,

15   Your Honor.  After the TCEH effective date, the debt ratio

16   between EFIH and EFH was as described above.  It's 92 to 8.

17   Elliott's 80/20 argument, it's based on the wrong numbers,

18   right?  And we -- frankly, when we walk through it today,

19   looking not just at the legal statement but at the charts,

20   it's much clearer this is 90/10, right?  You cannot take

21   into consideration an intercompany claim along those lines.

22   And so, I'll just leave it at that.

23             Now, Your Honor, normally, swing -- talk about

24   swing.  Normally, it don't mean a thing if it ain't got that

25   swing.  Mr. Kieselstein told me that it's Duke Ellington.

1    Normally, it fits.  But here, swing matters.  Swing matters

2    a lot.  And we wanted to walk through this, because shifting

3    fees from one bucket to another can cause a significant

4    swing in the total overall.

5         There are three types of swings, right?  There's

6    direct -- from one estate to direct on another estate.

7    There's collective benefit to direct.  And then there's

8    direct to collect.  So, this is an illustration of a swing

9    too, and as it specifically relates to asbestos.  Okay?  And

10   ultimately, what we're flagging for Your Honor is given the

11   amounts that are billed to collective fees relative to what

12   we have in direct fees, a relatively modest movement out of

13   collective fees into direct fees of say $1000 in any given

14   period can have a significant impact on the ratio between

15   the two estates that then gets carried back through the

16   collective and creates an oversized result.

17        So, with regards to asbestos, the challenge from

18   the movants is that the asbestos (indiscernible) work, even

19   though we contend it was a collective benefit because we

20   were responding to plan issues, disclosure statement issues,

21   and the like, and you know that issue very well.  If that

22   were to be moved directly to the EFH estate, given the

23   relatively low dollars in the direct benefits because you

24   can ultimately have an impact where a $1000 movement yields

25   a $10,000 total effect.  And that's something we want to

1   make sure Your Honor appreciates as you work through these

2   issues.

3         Now, let's talk about what Kirkland did with

4   regards to 90/10 after the T-side emerged.  The shift to the

5   90/10 methodology for allocating collective fees in '16 we

6   stand by.  We stand by it.  We think it was reasonable, it

7   was justified under the circumstances.  We acknowledge we

8   did not come back to the Court.  All right?  We thought it

9   prevented a scenario in which minimum direct fees, like we

10  just flagged, in a given month would skew the collective fee

11  allocation.  And we were focusing -- what were we doing at

12  the time?  We were doing collective work.  We were

13  confirming and consummating a joint E-side plan.  And

14  therefore, we thought the approach would mitigate the swing

15  effect.  Mr. Husnick testified about that at length.

16        What I would flag for you, Your Honor, is Mr.

17  Husnick also testified about the total impact if Your Honor

18  were to conclude that 90/10 was -- you know, it was

19  ultimately inappropriate, and we should have applied the

20  interim compensation order throughout.  I wanted to

21  highlight that.  You know, in his testimony, Mr. Husnick

22  said it would be a $3.4 million shift, you know, and

23  therefore, shifting a value from EFH to EFIH.  And that $3.4

24  million includes the swing effect.

25        So, to the extent, you know, we stand by what we

Page 240

1    did.  We thought it was the right thing to do.  But

2    ultimately, if Your Honor were to say the order is the order

3    and I'm going to hear -- if you would hear the order, that's

4    the end result of that impact.

5              THE COURT:  Okay.

6              MR. MCKANE:  Okay.  All right.  The movants in

7    Elliott focused on Judge Carey's decision in Tropicana.  And

8    Tropicana is not all that they put it out to be.  In the

9    Tropicana case,  there was no fee allocation formula ordered

10   during the bankruptcy.  And certain professionals failed to

11   allocate their fees at all.  All right?  The Court noted the

12   allocation -- and this is the quote they like to use --

13   "allocation based solely on the amount of debt would be

14   inequitable."  But that's not what the Kirkland professional

15   -- Kirkland or the other professionals did.  And

16   importantly, the Court acknowledged that the relevance of

17   debt -- same page -- the relevance of -- there is some

18   relevance of the debt in determining appropriate

19   allocations.  And Judge Carey specifically rejected an

20   allocation that failed to account for the large disparity in

21   the size of the operations or the amount of debt held by

22   respective debt groups.

23              Now, in that decision there were just a bunch of

24   proposals (indiscernible) Judge Carey ultimately did his

25   own.  So, there's some value to using debt, right, but it

1    can't be the sole arbiter because debt can't be the sole

2    measure, for example, if there are large operations or

3    there's large amounts of work being done.

4                Here, we have two holding companies, no

5    operations, we have the relative debts, and ultimately, what

6    we applied were factors beyond just debt, right?  We

7    assessed and continued the direct versus collective

8    benefits, and we allocated only 90/10 to the collective

9    benefit bucket for a limited time period because of our

10   concern about the inequitable results.

11               So, ultimately, we stand by, with little to no

12   direct benefit fees, we thought debt was our best available

13   metric, but it wasn't the only thing we did.  And

14   importantly, unlike Tropicana, you have the comprehensive

15   work on the buildup along the way so it's not just a

16   reliance on debt.

17               Now, what did we see in some of the final closing

18   strides?  And I've got to tell you, I love the colors.  It's

19   good advocacy.  You see distinctions via the movants between

20   different Debtors' professionals.  The entire evidentiary

21   presentation that was focused on Kirkland with maybe one

22   paragraph, I think, was the final statement as it related to

23   Evercore.  But then based on the fact that we got all the

24   documents into evidence, we started to see other arguments

25   regarding other professionals.  We heard an argument about

Page 242

1    RLF and was RLF's work different from Kirkland's?  And what

2    about Evercore's work?

3              Ultimately, Your Honor, what we saw on the far

4    left-hand side was the Filsinger firm, and we saw on the far

5    right-hand side Kirkland, right?  And they were very

6    different work.  And ultimately, that -- those comparisons

7    tells the story, because I think what the Elliott and UMB

8    folks want you to think about is well, they're all Debtors'

9    professionals; they all gotta be doing the same thing.  And

10   that's not true, right?

11             Evercore has different work to do than Kirkland.

12   We're working on different aspects of the case.  The

13   litigators are working on a different aspect of the case

14   than the restructuring folks, right?  And Filsinger is doing

15   something materially different than what we were doing.

16             The reason why -- and I think Mr. Galardi

17   acknowledged this -- the reason why the Filsinger feels are

18   so high at EFH, because the vast majority of what -- first

19   of all, who's Mr. Filsinger, just to remind you?  He's the

20   energy consultant, right?  He's an energy industry expert,

21   right?  And the vast majority of his time -- and since this

22   is an E-side fight didn't come up -- the vast majority of

23   his time was T-side related, right?

24             But what Mr. Filsinger did, he was also the

25   industry expert who testified in the inattentive

1   compensation hearing.  Here's the person who testified on

2   the reasonableness of the metrics.  And the reason why

3   that's an EFH issue is because the only folks that are in

4   the insider comp zone are folks who worked mainly at EFH.

5   Most of their time is allocated up at EFH relative to EFIH.

6   And that's why you see an oversized amount at EFH in that

7   circumstance.  It's the best example of different Debtor

8   professionals do different -- do things differently because

9   they're given different tasks.  And therefore, the fact that

10  you have a disparity in terms of the ratio between one

11  estate and the other without looking further and drilling

12  down further tells you very little.

13            And that's really the point here, Your Honor, is

14  just looking at the ratio without getting into the weeds and

15  figuring out what work was done is not only unsatisfying,

16  it's not really relevant.  And so, what we've really focused

17  on here is the Elliott and UMB folks have not given you the

18  evidentiary basis to do the shift that they're advocating

19  for.  All right.  And that's what this point is here.

20            The takeaway is they're asking you to shift $46.5

21  million between the estates, and there's no bottoms-up

22  analysis or causal connection between the issues they raised

23  and that quantum of money.

24            Now, with regards to who's the honest broker here,

25  this is where I think we note Mr. Galardi's observation that

Case 14-10979-CSS   Doc 13482   Filed 09/11/18   Page 244 of 343

1    we are not alleging that any of the retained professionals

2    intentionally slanted fees, right?  Here, with no -- you

3    know, I think Mr. Rosenbaum acknowledged he has a bias,

4    unequivocally, right?  He -- there is a 35 percent -- 35

5    cents of every dollar that is shifted is a net benefit gain

6    to Elliott.  And I don't think that can be lost on us.

7            We also think that the timing here is telling,

8    right?  We covered it a little bit before, but they never

9    objected to monthly fees, they never objected to the interim

10   fee application, and they were never really concerned about

11   the legality of the interim comp order or whether it

12   satisfied 503 through its methodology.  And I think what we

13   saw from Mr. Rosenbaum is this was a purposeful decision to

14   cut off the interest rate burn to get out and then litigate

15   these issues so that they could maximize the overall

16   recovery.  I don't fault them for it.  They're economic

17   animals.  That's what they do, right?  But I think we need

18   to acknowledge is that appropriate, or at this point in

19   time, based on the arguments that they're raising to start

20   this lookback.

21           Now, we're going to turn to some of the specific

22   arguments and just knock them out as we go.

23           THE COURT:  Can I ask a question?  Can I actually

24   backtrack for a second?  Because I'm a little confused about

25   the time.  And I get confused -- it goes to the NextEra

1    breakup fees, so it goes way back in what we were talking

2    about then.

3              MR. MCKANE:  Okay.

4              THE COURT:  So, I approved the NextEra merger

5    agreement on September 19, 2016.

6              MR. MCKANE:  Yep.

7              THE COURT:  Is that right?

8              MR. MCKANE:  Yes.

9              THE COURT:  Okay.  Now, was that before or after

10   the consideration increased to -- I think it was 300 and

11   then another 150?

12             MR. MCKANE:  Yeah.  So, and the number you're

13   probably also are thinking about is the 471, the ultimate --

14   the waterfall --

15             THE COURT:  Well, that's the ultimate

16   (indiscernible), yes, right.

17             MR. MCKANE:  Right.  Your approval on 9/19 was

18   immediately after those increases.  So, in other words, what

19   was presented to you in the quotes that Mr. Galardi used in

20   his argument with regard to Mr. Husnick about the weekend,

21   that increase occurred on the weekend immediately before

22   that hearing.  I think that hearing was on a Monday.

23             THE COURT:  Okay.

24             MR. MCKANE:  And so, what you had in front of you

25   at that time was if everything had gone, you know -- if you

Page 246

1    -- if the transaction could've closed on that day -- and it

2    did close on that day -- there would've been $471 million of

3    distributable value that would have flowed up to EFH.

4            THE COURT:  Plus, the --

5            MR. GALARDI:  Plus --

6            MR. MCKANE:  Plus -- exactly --

7            THE COURT:  Plus, the $58 million.  Arguably --

8            MR. MCKANE:  That's right.

9            THE COURT:  -- the $58 million asbestos

10   assumption.

11           MR. GALARDI:  No, (indiscernible) burn --

12           MR. MCKANE:  Yeah, so Mr. Galardi's point is valid

13   as well.  So, the $471 million that we're referring to is

14   always premised on a specific date for closing, and I

15   believe it was March of the following year.  So, as of March

16   31 of '17, based on where we thought --

17           THE COURT:  It's an estimate.

18           MR. MCKANE:  So, it is an estimate, yes.  So, the

19   short answer is there is hundreds of millions of dollars

20   that were forecasted to flow up based on our beliefs as to

21   when that transaction --

22           THE COURT:  Yeah, I was just confused about the

23   timeline and there's so many dates that get flown around,

24   and it's been such a long journey.

25           MR. MCKANE:  Yeah.

1             THE COURT:  Sometimes I get confused.  Thank you,

2     that's helpful.

3             MR. MCKANE:  Absolutely.  And we'll include those

4     in the findings of fact.

5             So, with regards -- and this is a busy slide for

6     us, but with regards to this issue of EFIH solvency, that

7     was -- I think we all recognized there was never a

8     guarantee, right?  It was always projected, and material

9     risk factors -- ultimately the material risk factors for

10    make-whole and regulatory risks not only were known, they

11    came to roost, you know, through -- and so ultimately, you

12    cannot focus on recoveries without looking to the entire

13    transaction.  You know, any forumla otherwise is just

14    myopic.

15            THE COURT:  Every time I think about this case

16    again, I just -- it's really hard to get around what we had

17    -- what we -- what you, what the Debtors, what the creditors

18    had in hand in December 2015 that didn't come to fruition.

19    And it's nobody's -- well, as far as I know, it's nobody's

20    fault.  I don't know.  Maybe it is somebody's fault.  But

21    you know, again, I'm sorry, I'm waxing poetic.

22            MR. MCKANE:  No, no.  It's -- Your Honor, we just

23    -- this is --

24            THE COURT:  When we talk about solvency, you know,

25    I mean, it's, you know --

1          MR. MCKANE:  It's an issue.

2          THE COURT:  But certain things have happened.

3          MR. MCKANE:  Right.  So, ultimately with regards

4     to hypothetical transactions outside this solvency issue,

5     it's never guaranteed.  And this is where it comes to, you

6     know, the language of the administrative claim talks to

7     preserving the estate, right?  And the work that was done,

8     the vast majority of the work that was done by the

9     professionals in getting these transactions together, the

10    tax work, getting the PLR together, structuring the deal,

11    you know, putting through the disclosure statement, getting

12    the plan approved, the make-whole -- not just litigating the

13    make-wholes, addressing the intercompany claims, that's all

14    preserving value, right?  Largely for the -- ultimately for

15    the EFIH estate, based on the E-side waterfall, but those

16    are all value issues that we think we need to be considered

17    in terms of evaluating the work of the professionals, and

18    what's the appropriate allocation of that work.

19          Moving on, Your Honor, ultimately -- the other

20    argument that was advanced, you know, throughout the case is

21    that somehow EFH benefited more from the tax free spend than

22    EFIH.  And we just cannot accept that assertion, Your Honor.

23    You know, a taxable separation of EFH created risk for the

24    EFIH unsecured creditors.

25          And Your Honor, the reason why I used that letter

1    from July of 2013 was just to highlight for the Court that

2    the PIK Group has been all over this tax issue since before

3    the case was filed.  They wanted to do a third lien so that

4    they could get ahead of the TSA claim that was potentially

5    in front of them.  And it carried through throughout the RSA

6    to the rejection of the RSA.  This was a known issue.

7            And so, when the Elliott team and -- they brought

8    in the Harvard professor who could only testify about the

9    federal tax income, he would -- he was never given the full

10   picture.  It wasn't his fault.  He was asked, well, you

11   know, on a -- what is the current state of federal tax law?

12   And he wasn't -- he wasn't in a position to acknowledge all

13   the risks that EFI faced, which was very -- which the

14   creditors were very aware of and its directors were very

15   aware of.

16           THE COURT:  Just an aside on that third lien.  I

17   think you spell that fraudulent conveyance, but...

18           MR. MCKANE:  There's a reason why that didn't

19   close, Your Honor.  Your Honor, and then, absolutely there

20   is no -- when we get to this issue about the stranded tax,

21   we all know there's no guarantee if it was confirmable or

22   that the IRS, you know, would take -- would do everything it

23   could to stop it, and the PUCT would take a very, very hard

24   look at those issues.  And Mr. Keglevic knows that better

25   than anyone.

1            And ultimately, you know, just a reminder, when

2    they say like there's infused in the arguments from the

3    Eliott and UMB team is this perception that they gave up

4    something, that they surrendered some upside value because

5    of the potentially step-up in basis.  But that's not what

6    the evidence is showing, right?

7            There is no guarantee a purchaser would actually

8    pay more for it.  We never saw it.  We were open for

9    business.  And I heard Mr. Rosenbaum.  I understand he feels

10   that somehow Mr. Keglevic chilled the market, or that

11   somehow Kirkland or Evercore chilled the market.  But Your

12   Honor, we cannot accept, you know, the notion that if there

13   were -- if someone else could get this asset at a price

14   where they felt that they could get it and still make a lot

15   of money, they'd pay more, right?  There is a free market

16   here.  And if Mr. Rosenbaum didn't like what he was hearing

17   from Mr. Keglevic, he could go to Mr. Cremens, because Mr.

18   Cremens, if he thought EFIH wasn't maximizing value, had not

19   only the resources but the capability and the wherewithal

20   and empowerment to do whatever he needed to do to ensure

21   that would happen.  And ultimately, their entire analysis

22   falls apart, if you just acknowledge that there is no

23   taxable transaction.

24            But if you wanted to get more into the analysis,

25   the value of the $2 billion, you know, when risk adjusted

1    for the fact that the PUCT has the undeniable capability to

2    take some or all of that away from you is very quickly eaten

3    up by the time and costs of delay of sitting out the tax

4    matters agreement, you know, moratorium period, and just

5    having that, and no interest accrue.

6    Now, quickly, Your Honor, there's no evidence that the

7    asbestos related services benefited EFH only, right?  What

8    is the critique here?  The level of the analysis that we

9    heard from Elliott and UMB was that they did a key word

10    search for asbestos -- one of these -- on the asbestos

11    claimants and the asbestos council.  They never did the line

12    level review to figure out what the work was and what was

13    related to and what the services were being provided.  Doing

14    a keyword search doesn't tell you tell you what the services

15    are.  How can you do an evaluation under 330 just based on a

16    keyword search.  What we heard from Mr. Husnick and Mr.

17    Horton, is that the work, as it relates to asbestos, is what

18    you know.  It was the bar date.  It was addressing the

19    asbestos issues relating to a joint plan.  And those

20    ultimately are collective benefits, they're shared benefits

21    by both estates and that's why they were billed as

22    collective benefits.

23              And then on the flipside of that we have the make-

24    wholes, right?  Specifically the fees relating to the

25    litigation of the make-whole claims.  Because we do want to

1     flag this, right?  Are argument -- we did not bill anything

2     related to make-whole to simply EFIH, that is not the

3     testimony from Mr. Husnick, that is not the evidence, you

4     know, in the record.  What the criticism is, specifically as

5     it relates to EFIH make-whole litigation, and I say it that

6     way because we were sued, EFIH was sued, right, by the

7     creditors to compel us, in two separate adversary

8     proceedings, to make the payments.  Right?  So that is a

9     party-based driven litigation focused solely on EFIH which

10    is the -- which was the Debtor on those indentures, not

11    EFIH.

12            Ultimately, yeah, it inured to folks' benefits.

13    Could there have been a secondary benefit?  Yes.  But the

14    work that we did, for example, when Ms. Yenamandra was able

15    to broker the compromise of those claims and present them to

16    the Court in March of 2018, that's collective benefit.  We

17    billed that as collective benefit because that was

18    compromising disputes as it related to joint plans.  So it

19    isn't as if all of the make-whole work was all driven into

20    the EFIH estate, it was related to the services provided.

21            Now, turning quickly to the Committee fees.  Your

22    Honor, we were discussing the deference issue and the

23    application of the order.  And the reason why the PAB came

24    out and said there needed to be some reallocation of the EFH

25    Committee fees is largely driven by the fact that they

1    didn't apply the order.

2         And this is -- you know, Mr. Glueckstein did good

3    work in this case and he specifically acknowledged this in

4    the deposition, and you have the dep designations.  The

5    Sullivan & Cromwell firm never specifically allocated work

6    as being for one particular party, it was their view of the

7    order that the interim comp order plainly applied only to

8    the Debtors' professionals and they -- that was their view.

9    They recognized they had a statutory charge to both estates,

10   they took the position it was 50/50 and they moved on.  And

11   so that is ultimately, you know, why the PAB came forward

12   and said there needs to be an allocation, there needs to be

13   some review, at some very basic level, of what work was done

14   under 330.  Look at the services provided.  A

15        And so when we looked at the services provided,

16   Mr. Horton specifically was involved in this, he ultimately

17   concluded that when you look at what work -- where are they

18   primary, what are the things where they conveyed the most

19   benefit and it was more for EFH than EFIH.  And that is in

20   particular the resolution, what we call the E-Committee

21   settlement where they were able to get a commitment that

22   they would stand down so long as the plans contained the

23   reinstatement of asbestos and the -- you know, and treatment

24   for OPEB, that EFH Committee settlement was in connection

25   with them standing down from their objection to the global

1      settlement, right, and which was the other large area that

2      they were prosecuting.

3              And it's there where we say, well, the global

4      settlement wasn't just EFH and TCEH, we have to acknowledge

5      that the global settlement was a tripartite agreement and

6      that EFIH got material benefits from those issues, including

7      potential claims that could have been asserted by EFH

8      against EFIH.  And so there is some value there as well.

9      And so --

10             THE COURT:  The global settlement that

11     incorporated the direct -- the DD settlement, right?

12             MR. MCKANE:  That was the -- yes, Your Honor.  The

13     DD settlement was essentially brokered and that was the

14     inter-estate settlement.

15             THE COURT:  Right.

16             MR. MCKANE:  And the reason why we call it a

17     global settlement is that it also -- it was added on to

18     because it had a T-side component --

19             THE COURT:  Right.

20             MR. MCKANE:  -- that settled between the first

21     liens and the unsecureds, and it also had a settlement by

22     the parent to reach in -- for the claims reaching up

23     potentially to the sponsors.

24             THE COURT:  Right.

25             MR. MCKANE:  And that's how it was global.  So

1    that --

2            THE COURT:  And that was the mediation that

3    Borowitz did, the thing between the Ad Hocs and the lower

4    levels, right?

5            MR. MCKANE:  That's right, Your Honor.  That's

6    right.

7            So it was essentially three parallel work streams

8    that were being negotiated at the same time that were --

9    that came together in one comprehensive settlement.  And

10   importantly, as you'll probably remember to the -- there was

11   disarmament and drag on the C-side, it was Evergreen.

12           THE COURT:  Right, I was trying to remember the

13   catch phrase.

14           MR. MCKANE:  And it helps, catch phrases help.

15           And so ultimately we did see value there that the

16   Committee provided to both estates.  And so it's -- at some

17   level we think the reallocation is appropriate.

18           And finally, Your Honor, with regards to the

19   substantial contribution claim, at some very basic level we

20   have to step back and say to ourselves, okay, remind

21   ourselves in a substantial contribution claim Elliott has to

22   be aiding creditors other than themselves, right?  And so

23   what work, you know, was done, you know, as we think about,

24   you know, what services were rendered that were not solely

25   in Elliott's self-interest and actually a benefit of the

1    parties.  And so in doing that -- and, Your Honor, you know,

2    when we heard Mr. Galardi describing the Sempra transaction

3    and what led to the Sempra transaction, you know, were

4    reminded, you know, victory has a lot of parents and Elliott

5    wants sole custody of Sempra.  So we don't concede that, we

6    think it was a collective effort, but we recognize that they

7    did bring value.

8              And when I asked, you know, what is the value that

9    Elliott brought as part of the Sempra transaction, as we

10   were at the time, dealing with the issues with regard to the

11   Berkshire versus Sempra, you know, until that they had the

12   material in their purchase price, when they had the same

13   purchase price, you know, topline price, if you will, one

14   had material -- we thought one had greater material

15   regulatory risk, in part because of the large amount of debt

16   that Sempra thought it was going to have to borrow along the

17   way, and we thought the regulators would have a problem with

18   that.  And one, you know, Berkshire Hathaway may have less

19   regulatory risk, but we thought we've got some serious

20   confirmation risk because they had a blocking position --

21   you know, Elliott had a blocking position at EFIH.

22             Now, those were ultimately issues that the boards

23   were able to resolve when there was an increase in price,

24   right, and they were able to resolve that issue.  But what

25   did Elliott deliver?  They delivered not just a consent to

1    support it, and therefore removing the risk of a blocking

2    position, but that structure did provide value to the EFH

3    parent through the -- you know, the incorporation of the

4    reinstatement of asbestos and, you know, the other

5    provisions of the E-Committee.

6            So -- and we will acknowledge that on the

7    reconsideration order it did preserve value to both estates,

8    to the extent that there is some allocation to EFH, right,

9    you know as a result of this, right?  The reconsideration

10   order alone created leverage.  It created settlement

11   leverage.  That settlement leverage hasn't ultimately borne

12   a settlement agreement yet, or we would have presented it to

13   Your Honor, but it doesn't mean that it didn't provide some

14   value because who knows what may happen in the next few

15   months.  We are always helpful.  We would like to

16   compromise, if we could, this issue with all constituents in

17   a way that ultimately the Third Circuit does not have to

18   rule, but we don't control those issues.  And ultimately the

19   PAB can only do what it can, and to be absolutely clear, Mr.

20   Horton has done everything he can to try to broker a

21   compromise.

22           Finally, Your Honor, there is this issue of the

23   Oncor dividend settlement.  And there was, it's called the

24   dividend settlement -- the release of the dividend that

25   would -- that had been held on, it did -- it was from a

1    specific allocation between EFH and EFIH but ultimately it

2    also addressed a tax litigation issue about whether -- who

3    would be responsible for an IRS reconsideration or

4    revisiting of certain tax decisions that would happen after

5    close.  And the amounts there were really unknown, because

6    we didn't have the results from the IRS work about whether

7    they were going to revisit these issues, but there was a

8    material risk and that risk was largely -- was at the EFH

9    estate, because they are the taxpayer, and ultimately that

10   was a noncash component of that settlement that provided

11   value.

12            So ultimately, Your Honor, we don't think the

13   facts support an allocation, we -- excuse me, we think the

14   facts support an allocation that lies between the parties

15   positions.  We recognize, as the PAB, that the termination

16   fee does preserve some opportunity and some optionality for

17   EFH.  We stand by the Debtors' professionals' work and we

18   think it should be respected.  We do acknowledge the E-

19   Committee's 50/50 allocation needs to be addressed in some

20   motion, based on the fact that they didn't do that similar

21   level work.  But -- and ultimately we do acknowledge that

22   EFH is -- excuse me, Elliott's efforts over the course of

23   restructuring did benefit EFIH in addition to EFH.  And for

24   those reasons we stand by the middle ground position that we

25   put forward.  Thank you.

1             THE COURT:  Thank you, Mr. McKane.

2             Mr. Galardi?

3             MR. GALARDI:  Your Honor, I gave Mr. McKane a few

4    extra minutes because he was finishing with the substantial

5    contribution claim and he used his time, so I thought that

6    was it.

7             I heard you, we won't even be close to 6, but if I

8    may take 10 to 15 minutes --

9             THE COURT:  Yeah.

10            MR. GALARDI:  -- to just respond one by one,

11   because -- and I'm -- I apologize in advance, and I hope you

12   have the paper in front of you, because I do think it's

13   important to go through a few things.

14            THE COURT:  Which paper?

15            MR. GALARDI:  I'm going to go through the order in

16   which they came up, but I want to start with what I heard

17   was a slogan a couple times. And I'm going to start with a

18   compliment to Mr. McKane.

19            You heard Mr. Rosner and you heard Mr. Pedone say,

20   this is not about allowance but about allocation.  You heard

21   that over and over again.  But Mr. McKane actually said it

22   properly, it's not about allowance of the material

23   administrative claims, but Your Honor, at a very fundamental

24   basis, this is about allowance.  And why is it about

25   allowance?  It's not about allowance of whether Kirkland's

1    fees should be X or the termination fee should be Y, or the

2    Committee fee should be Z, or Elliott's substantial

3    contribution claim, whatever comes after Z, but this is

4    about the allowance of a claim at a particular Debtor.

5              THE COURT:  Um hmm.

6              MR. GALARDI:  So the fact of the matter is, this

7    is all about allowance.  It's what can you allow at a Debtor

8    when it comes to each of those expenses.  And what we are

9    saying is Your Honor has to abide by the standard.

10             Now, somehow we forgot about (indiscernible) the

11   termination fee.  First of all, Your Honor, if you're going

12   to do a standard that says, well, we have to see if the

13   benefit is there at the time we approve the transaction,

14   that's simply not O'Brien.  As we pointed out in the

15   reconsideration motion, it's exactly the problem with

16   approving termination fees at the time of the hearing,

17   because you can't tell, necessarily, what the actual and

18   necessary benefit is.

19             And Your Honor and I had a dialogue, and I keep

20   bringing up, you know, Judge Walsh, is the bottom line is

21   you've got to have a no-outs kind of deal.  And that's

22   because you know there's a benefit, and we've slipped away

23   from that.  The time of the benefit is the time of the

24   transaction.  The time you approve a termination fee is the

25   time of the transaction.

1              But then they say, well, you've got to look at

2       when you consummate a transaction.  But then we're ignoring

3       one fact, they terminated this transaction, and they

4       terminated it for a deal that they ultimately terminated.

5       The trigger point, even if you were looking, and the Third

6       Circuit doesn't say, look at when it's payable, it doesn't

7       look -- say, look at when it's triggered, it says, when you

8       approve the transaction.  So September 19th is the date that

9       is the appropriate one.

10             And then I think again I'm going to pay a

11      compliment to Mr. McKane, the statute says preserve, it

12      doesn't say enhance.  And the termination fee was intended

13      to preserve the benefits for both the EFH and EFIH, and

14      Elliott and UMB haven't said zero, they have said allocated

15      50/50, allocate something else 70/30, allocate this 50/50.

16             Now Your Honor, we're not nitpicking when we do

17      that, we have not said there is a methodology.  And Mr.

18      Rosner keeps saying, there is a methodology, there is a

19      methodology.  Your Honor, there is no fundamental

20      methodology by which you can do the analysis in a

21      complicated case with as many fee applications.  I've been a

22      Debtors attorneys, I've screamed at my litigators for what

23      they do with the time, the corporate people, that's not a

24      task.

25             But what Your Honor did was you put a methodology

1    in here and you expressly reserved, in Paragraph 4, we're

2    going to use this methodology.  But you did say we could go

3    back and look at the allocation.  The question is, did that

4    methodology actually yield skewed results.  And I don't

5    think anybody can say 90/10 is not a skewed result.  It is a

6    skewed result.  And when we investigated we gave you the fee

7    applications, we're not nitpicking, we're saying exactly

8    that you have to go back and you've got to make the finding.

9    And there is no exceptional burden here for us to carry, the

10   fact of the matter is, it's Your Honor's duty to look at the

11   actual and necessary, we have brought the allocation issue

12   to the forefront.

13            And Your Honor, Kirkland, in 2016, October,

14   recognized there was a problem with the way in which the

15   methodology was working.  And before that time, let's make

16   the problem a little more complicated, as illustrated by our

17   asbestos exhibit, the fact of the matter is you had three

18   debtors, you had 64, 35 and this.  We did the analysis only

19   with respect to the two estates.

20            So now, Your Honor, burden of proof.  I don't

21   think we bear a burden of proof, but on one issue, whether

22   our substantial contribution claim is a benefit one, which

23   is a matter not for today, to EFIH, and then two, whether or

24   not our substantial contribution is causally connected to

25   value created for EFH.  And I think, again, the PAB has said

1    so and Mr. Rosenbaum has said so.  And I think the evidence

2    is clear the taxable transaction, we're not going to fight

3    over the parenting of the Sempra transaction, we just know

4    that Your Honor knows that as of the 19th of August they

5    were not going with that deal until we signed the Sempra

6    PSA.

7            Now, it was interesting that we had Mr. Pedone

8    come up and say, well, what would Mrs. Williamson have said

9    if she knew at the time that there'd be a three percent --

10   more than a three percent breakup fee.  Well, what would Mr.

11   Cremens have said had he known that he was paying $270

12   million of this breakup fee?  It's exactly the perverse

13   incentives that this gives parties to negotiate.

14           Your Honor, it's not the same example, but think

15   of the following, how many times have you had a secured

16   lender want to foreclose on the collateral saying, I want to

17   get my 98 cents right now, and the unsecured creditors

18   saying, no, let's take a little risk, let's throw a little

19   dice, let's get a breakup fee, let's get a deal.  And you're

20   asking that secured lender to take that risk.  But that's

21   exactly why you approve a breakup fee here in this instance.

22           And they -- there was a risk, no one doubts there

23   was a risk to the EFH creditors, and there was some upside

24   for the EFIH unsecured creditors, but that's why you

25   approved the breakup fee.  So I believe that that example

1    from the -- from Mr. Pedone about Ms. Williamson, I'm sure

2    Mr. Cremens -- and this is why they punted it, neither party

3    wanted to talk about the allocation.  We can all second

4    guess and say, it wasn't the right decision and we wouldn't

5    be here, but they didn't want to do it because they all

6    believed it would close and they all believed we wouldn't be

7    in the circumstance that we are in.

8               Now, I'd like to just point out, and to go to Mr.

9    Pedone's slash-80 slides.  I will note that I don't believe

10   there's any evidence in the record for many of the points

11   here, but I would go to slide, and it doesn't have a number,

12   but it says "Professional fees should not be revisited in

13   light of the extensive prior review."  We have no doubt that

14   Kirkland & Ellis did four levels of review.  There is not a

15   single piece of evidence in the record, other than hearsay,

16   about Ms. Dore, Mr. Wright or Ms. Gooch.  The boards

17   received reports showing allocation and Ms. Williamson

18   raised questions.  One board meeting, and we took her

19   deposition, and she never reviewed fee applications and

20   never reviewed them for allocation.

21              You have the EFIH disinterested directors that

22   they say Mr. Cremens and Cravath and Jenner & Block and

23   Golden Associates.  We have Mr. Cremens say he never

24   reviewed fee applications and never reviewed the

25   allocations.

1          We have an affidavit from Mr. Evans, so we didn't

2     take his deposition, he never reviewed fee applications, he

3     never reviewed allocations.

4          Your Honor can decide whether this was a conflict

5     matter that they should have done, but it's clearly an

6     inter-estate issue, and it's clearly something somebody

7     should have done from an independent perspective.

8          You have the EFH -- EFIH UCC, oh, they were

9     reviewing it, but they didn't think theirs would have to be

10    allocated.

11         None of these factors -- and we have the

12    statements from Mr. Keglevic about the Fee Committee and to

13    the best of his knowledge the Fee Committee didn't review

14    allocation, and Your Honor, it didn't usurp the Paragraph 4

15    that allowed parties to come back.

16         So we just don't think there's any evidence in the

17    record with respect to the review of this, and it is not to

18    be given any deference whatsoever, Your Honor has to go

19    review.

20         Your Honor, --

21         THE COURT:  I'm not reviewing $189 million of

22    fees.

23         MR. GALARDI:  I --

24         THE COURT:  It's a practical --

25         MR. GALARDI:  It's a practical issue.

1           THE COURT:  -- impossibility --

2           MR. GALARDI:  I agree.

3           THE COURT:  -- and a waste of judicial resources.

4    So that --

5           MR. GALARDI:  And Your Honor --

6           THE COURT:  -- if that's the request, that's not

7    happening.

8           MR. GALARDI:  That is -- that's not the request,

9    Your Honor.

10          And Your Honor, what we do believe, and I believe

11   this is what Judge Carey -- you know, and Your Honor didn't

12   ask me, well, what would you do differently, right?  And I

13   think that's the fundamental question.  Once you see the

14   skew, the reason question is -- and this is why I think can

15   you have a mathematic precision?  No, I don't think you can.

16   I think this is what the judge has to do at the end of the

17   day, and the help of the Fee Committee would have been

18   helpful, the help with the Independent Directors would have

19   been helpful.  But you can't say that a 90/10 review is

20   really reflective of a jointly administered, intimately

21   intertwined estates that have three or four plans, had

22   issues that went back and forth.

23          If you ask me, I don't think there's such a thing

24   as a fee in this case that was solely for the benefit of

25   every Debtor.  You could make an argument that all of them

1    are collective.  And then the question is, okay, what's the

2    proper measure.  And I think that's actually why Your Honor

3    has discretion.  Your Honor --

4            THE COURT:  It's -- yeah, no, I'm sorry, go ahead.

5            MR. GALARDI:  Go ahead, Your Honor.

6            THE COURT:  No, no, no.

7            MR. GALARDI:  No, I'll finish with that.

8            THE COURT:  I just -- I -- what's interesting is

9    that my memory of how this all played out in 2014 was this

10   was mostly a T-side concern, the T-side was worried --

11           MR. GALARDI:  Correct.

12           THE COURT:  -- that they were getting hammered

13   with everything and they wanted to make sure they weren't.

14   What I really should have done is sustained Mr. Shore's

15   objection to the joint administration order.

16           MR. GALARDI:  And I heard that almost happened,

17   Your Honor.

18           MAN:  The venue motion.  Venue.

19           MR. GALARDI:  And I complete --

20           THE COURT:  Oh, the venue motion, that's what I

21   really should have granted.  Anyway, go ahead, sir.

22           MR. GALARDI:  And there are --

23           THE COURT:  I won't hold my jokes against you, so

24   if you go a little lengthy --

25           MR. GALARDI:  That's okay.  And in calculating the

1    breakup fee, Your Honor, again, you've done a number, and

2    I'm just jumping around a little bit, you've done a number

3    of transactions, there are many times when buyers buy all

4    the cash, right?  They could have taken the cash.  To simply

5    say we left the cash on the balance sheet so you don't count

6    that, even if you did the mathematical analysis that's not

7    an acceptable answer because leaving the cash, buying it for

8    more cash and distributing the assets, that had to be

9    considered in this.

10          Your Honor, I'm going to end with just a point

11   because I can't -- you know, when somebody says my math is

12   just wrong, I'm not really great at math, but I just can't

13   accept it.

14          If you go to the Kirkland & Ellis provision about

15   this 90/10 split, now we show on their slide, on Page 28,

16   you know, after TCEH effective date, the debt ratio of EFIH

17   to EFH was 7.71 billion to .65 billion or 92/98 (sic).

18   That's now the third answer we've gotten to what the debt

19   ratio was. In their final fee application, on Page 20, it

20   says, "In particular, before accounting for that certain

21   EFIH second lien paydown in mid-2015, EFIH had approximately

22   12.63 billion in debt as compared to the approximately 1.42

23   billion in debt at EFH."  That explains the 90/10.  Now I

24   have the TCEH 90/10 and I've got no explanation of the

25   90/10.

1            THE COURT:  When was the intercompany claim

2    released?

3            MR. GALARDI:  December of 2015.

4            MR. MCKANE:  That was part of the --

5            MR. GALARDI:  That was part of the global

6    settlement.

7            MR. MCKANE:  -- a release granted with the global

8    settlement --

9            THE COURT:  All right.  So --

10           MR. MCKANE:  -- when you approved it in December

11   '15.

12           THE COURT:  Right.  So at the time -- I'm not

13   defending, I'm just making sure I have the facts right.  So

14   at the time Kirkland started to go 90/10, the -- that pre-

15   petition 80/20 number that included the intercompany debt

16   wasn't right, as of that day.

17           MR. GALARDI:  Correct.

18           THE COURT:  But what the right number is, we have

19   a couple different -- it sounds like we might have a couple

20   different stories on.  But it -- you can't count that

21   intercompany debt anymore, because it doesn't exist, it's

22   been released.

23           MR. GALARDI:  Well, and I think that's exactly the

24   point.  And again, you can't be criticized for not objecting

25   when you don't understand, you know, the notice issue.  But,

1    Your Honor, there's a few issues.  One, Mr. Husnick clearly

2    testified you did get one fee application, but I think he

3    actually testified that they had done that a couple of

4    months on a couple of the --

5                THE COURT:  Oh, then --

6                MR. GALARDI:  -- prior ones.

7                THE COURT:  -- I was unfair to him.  I'm sorry.

8                MR. GALARDI:  Okay.  So this may be an interesting

9    thing on the record, that I'm being fair to Mr. Husnick, so

10   we can take note -- you should take notice of that, Your

11   Honor.  But that, I believe, was there was two or three

12   months before that and then after that.  Then we found out

13   in the final fee application I just read the sentence of

14   what he said, we took his deposition, he thought it was

15   petition, he thought that might be appropriate, he asked it

16   here, that's why I asked Mr. Keglevic the question, which is

17   why I asked Mr. Keglevic to do the issue.

18                But the fact that cannot be overlooked is you

19   could say that York was a party to the RSA, the Debtors were

20   a party to the RSA.  The Debtors used the formula.  The

21   Debtors changed the formula.  The Debtors' counsel didn't --

22   said it didn't work, at least with respect to some

23   categories.  It made some disclosure, not all disclosure.

24   You can't be bound by that.

25                And Your Honor, again, you had a methodology, you

1    let it run, but the final period is the time in which you

2    can say, did it yield the result that Your Honor can approve

3    as actual and necessary.  And our position is you can't.

4    That doesn't mean you're disallowing professional fees, but

5    you are allowing them against specific Debtors and that's an

6    actual and necessary benefit.  And we don't think the

7    methodology permits it, and we don't think, as the

8    methodology was applied, you can do so.

9           Your Honor, I appreciate your tolerance and I --

10   that would be all that I have for this.

11          THE COURT:  Thank you, Mr. Galardi.

12          MR. GALARDI:  Thank you.

13          THE COURT:  Thank you.  Anyone else?

14          All right. Well thank you very much, everyone.  I

15   say this a lot in this case, but it's true in virtually all

16   of my cases, one of the true benefits of this position I

17   hold and being in the Delaware bankruptcy court is we are

18   blessed with having the really best lawyers in America

19   appear in front of us.  And I extend my compliments to all

20   the lawyers, and all the professionals, especially the

21   people in the back rows there who have been actually doing

22   the work and pulling together the unbelievable exhibit

23   binders and -- it just -- you know, the ability to cram what

24   we crammed into three days is the result of a tremendous

25   amount of work and organization and I truly appreciate it.

1          As I said, I'm going to -- or as I didn't say, but

2     as I said privately in chambers, but I am going to take this

3     under advisement, rather obviously.  And I think we've

4     agreed on September 27th as a deadline --

5          MAN:  I thought we said the 26th.

6          MR. GALARDI:  I think you said you were back on

7     the 27th, so we could get you a brief on the 26th and you

8     were going to (indiscernible) --

9          MAN:  27th.

10          MR. MCKANE:  Your Honor, if we can just confirm

11     that, I think that's Thursday the 27th, and that is the

12     first day you were back.  And so just to refresh Mr.

13     Galardi's recollection, the other date we were discussing

14     was Friday the 28th as well.

15          THE COURT:  Yeah, I mean I have the Gibson

16     confirmation hearing and a meeting -- that's on the 27th, so

17     however you want to proceed, just let's figure it out.  So

18     do we want the 26th by 5 or do we want the 27th by 5?

19        (Counsel confer)

20          MR. GALARDI:  Your Honor, the 27th.  And just to

21     confirm, I know Mr. Galardi said briefing, but I believe

22     your preference is proposed findings of fact and conclusions

23     of law --

24          THE COURT:  Yes.

25          MR. GALARDI:  -- with no adjectives -- or adverbs.

1           THE COURT:  Adjectives are fine, adverbs are --
2      should be limited.  Yes, okay.  If you could please file
3      them by the 27th at 5:00 and I think Ms. Werkheiser already
4      arranged with Mr. Madron the approach, but if you could
5      serve us with a hardcopy, but what we really want is an
6      email.  Please do it in -- does anyone still use
7      WordPerfect?  No?  Good.  I was going to say please put it
8      in Microsoft Word.  Judge Walrath uses WordPerfect.  And the
9      27th at 5 would be great.
10          Mr. Galardi, you are going to get a letter next
11     week on the Fee Committee open issue.  Nothing personal, I'm
12     just letting you know.
13          MR. GALARDI:  I take that issue --
14          THE COURT:  I know you care.
15          MR. GALARDI:  -- personally, too.
16          THE COURT:  Yeah.  I know there's nothing more
17     personal to a lawyer than fees.  So I wanted to let you know
18     the Court will get that out next week --
19          MR. GALARDI:  Thank you.
20          THE COURT:  -- barring a disaster.
21          Okay.  Thank you.  I don't -- are they going to
22     try to get everything out tonight?  All right, be as speedy
23     as you can, because the CSO can't leave until you're all
24     done.  Thank you very much.  We're adjourned.
25          GROUP:  Thank you, Your Honor.

1            (Whereupon these proceedings were concluded at

2    5:46 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya

6    Ledanski Hyde

7

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2018.09.11 10:25:59 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:

Page 276

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 10, 2018

**[& - 2016]**                                                                 Page 1

**&**

**&** 3:9 4:1,6,12,22
5:1,2,9 47:15
98:13 106:14
128:14 150:17
152:8 213:12
214:5,6 215:13,19
216:16 253:5
264:14,22 268:14

**1**

**1** 13:15 28:6 52:10
58:7,7,9,9,18 66:4
82:8 92:17 116:17
116:18 126:14,17
129:13 140:22
183:8 219:6 223:3
**1.1** 141:14
**1.282** 94:18
**1.3** 120:6
**1.42** 268:22
**1.5** 135:8
**1.56** 136:14
**1.562** 134:24
**1.566** 134:24
135:9
**1.6** 187:10 188:23
212:12
**1.618.** 210:22
**1.7** 135:8
**1.864** 94:10,15
**1.929** 93:1 94:3
**10** 7:24 11:5,8
14:3 20:3 62:5
75:2,4 79:12 80:5
120:21 122:11
127:3,9 128:5
206:7 259:8
277:25
**10,000** 238:25
**100** 52:9 58:20,23
60:19,19 78:8,11
81:21 98:20 99:7
162:3 174:24

175:22 176:11
185:8 192:19,20
196:8 230:7
**1000** 238:13,24
**102** 193:7
**103** 177:9
**105** 20:22 22:23
23:1 24:3 193:6
**109** 177:9
**10th** 232:13,14
**11** 1:5 82:8 103:1
103:2 111:8
130:24 166:11
172:21 184:16
202:16
**11/30/2015** 172:17
**110** 72:3,6 74:19
192:19
**111** 75:2
**114** 58:18,20 61:8
**11501** 275:23
277:23
**11562** 101:25
**11564** 101:25
102:17,18,18
146:20,21 147:4
**11654** 147:18
**11:49** 108:22
**12** 61:8,9 89:15
106:9,10 116:11
116:11,15 146:23
153:18 171:20
207:9 230:8
**12.63** 268:22
**12/1** 173:10,10
**120** 24:15
**126** 72:3,6 74:19
75:13
**129** 72:3
**13** 177:2 196:6
**13.2** 195:11
**13.7.** 195:12

**130** 24:15
**137.5** 180:9 182:7
194:17,24 198:21
**1394** 153:20,24
**13th** 170:12
**14** 28:7 55:13
108:11 146:23,24
148:18 188:8
**14-10979** 1:6
**140** 192:21 193:6
**15** 28:12 153:16
259:8 269:11
**150** 134:21 135:7
136:11 162:6
245:11
**150,000** 232:15
**15th** 170:11
**16** 100:3,7,8,17
239:5
**160** 24:20,22 25:2
25:2,2 134:19
135:7
**165** 197:24 198:11
198:19
**17** 123:4 246:16
**170** 24:20,22
134:21 136:12
**175** 197:15
**18** 157:8
**188** 65:22
**189** 66:7 265:21
**18th** 167:4
**19** 18:19 159:11
245:5
**19th** 73:22,23
74:2 159:13 160:5
164:13 167:4
187:23 261:8
263:4
**1:00** 127:3
**1st** 107:17

**2**

**2** 19:3 71:11,21,23
82:3 88:16 89:10
95:6 101:18
116:16 117:11,17
146:19 147:6,8
250:25
**2.1a** 89:15
**2.7** 187:2
**2.75** 95:24 96:17
96:19 97:8 177:4
**2.79** 187:12,25
188:17 210:21
**2.8** 210:22 211:22
**2.9** 209:6
**20** 8:5 23:7 93:7
138:10 163:7
196:19 268:19
**200** 180:3
**2000** 90:6 113:16
**2005-2006** 18:20
**2006** 160:5 177:23
**2010** 18:4,11
113:10
**2013** 113:14 114:3
114:15 115:20
249:1
**2014** 19:2 42:10
53:2 54:5,23 55:2
84:15 115:20
116:25 129:16
267:9
**2015** 55:13 58:3
58:15 85:25 86:3
247:18 268:21
269:3
**2015-2016** 143:11
**2016** 18:12 26:14
27:8 42:12 53:4,9
74:2 76:23 77:1
141:3 160:23
163:18 200:19
208:19 210:4

226:23 227:3
245:5 262:13
**2017**   28:4,13
33:22 45:24 101:6
102:21 120:20
123:13 157:8
216:5
**2018**   1:15 178:2
252:16 277:25
**202**   184:21 218:5
**21**   22:23 23:1
140:18,19,23,24
**216**   65:14
**21st**   109:5 111:12
125:7,10 167:9
**22**   71:15,15
**220,000**   195:14
**225**   216:3
**23rd**   111:11
**24**   20:21 92:16
173:2,10,11
**25**   22:4 194:8,11
**253**   65:22 66:7
**26th**   272:5,7,18
**27**   162:6
**270**   263:11
**275**   23:20,21
149:16 157:23
167:20 188:23
194:7 197:3
221:23 226:13,23
**27th**   129:16
130:11 272:4,7,9
272:11,16,18,20
273:3,9
**28**   268:15
**282**   94:16
**28th**   105:25 106:1
106:3 272:14
**29**   14:3,13,14
**29th**   130:12
**2:00**   126:10 127:3
127:9 128:5

**2:30**   155:15
**2b**   171:1
**2nd**   106:19

### 3

**3**   75:19 80:16
87:16,18 187:18
209:5
**3.1**   205:25
**3.4**   229:9 239:22
239:23
**3.75**   205:15
206:12
**30**   52:5 79:12
205:11 210:5
**300**   166:17 194:4
194:6,10 245:10
275:22 277:22
**30th**   28:4 53:19
**31**   246:16
**319**   58:10
**32**   82:14
**322**   88:16,17
**33**   8:6 190:25
**330**   251:15 253:14
275:21 277:21
**330's**   224:13
**34**   87:4,19 173:2
177:5
**35**   15:21 52:14,16
244:4,4 262:18
**36**   52:5 94:10
231:16
**37.8**   172:9
**38**   8:13 40:25
42:13 48:6,7
**39**   8:19,21
**3a**   87:21
**3rd**   141:3

### 4

**4**   43:23 97:14
130:21,22 133:24
133:25 170:9
262:1 265:14

**4.8**   196:2
**40**   8:20,23 92:20
92:22,22 171:15
**400**   62:25 63:1,1
191:6
**41**   8:24
**42**   9:7,8 15:22
181:15 199:5
**43**   9:7,8 17:6,9,10
**430**   71:23
**44**   9:7,10,11 89:8
89:11,15 90:11
**45**   9:18 23:25 31:8
**450**   159:17,24
161:17 164:2
169:8
**46.5**   243:20
**464**   92:20,22
**47**   9:19
**471**   188:2 194:5
196:2 198:10
245:13 246:2,13
**48**   9:19
**49**   9:22
**4th**   108:20

### 5

**5**   44:22 87:4
272:18,18 273:9
**50**   9:23 71:7,13
79:17 139:2
164:15,16 171:19
196:20 209:11
210:2,5 212:9
230:7
**50-50**   171:9
173:15 201:14
**50/50**   226:15,21
253:10 258:19
261:15,15
**500**   162:11
**503**   183:8 219:4,6
223:3 233:6
244:12

**51**   9:25 10:4 11:17
**53**   187:12
**55**   10:5 16:11,13
182:8 198:23
**56**   10:6
**58**   10:7 187:8
195:9 210:21,22
211:22 246:7,9
**59**   10:8
**5:00**   127:12,15
273:3
**5:30**   127:21
155:15,18
**5:45**   1:16
**5:46**   274:2

### 6

**6**   76:8 259:7
**6.01**   140:22
**6.5**   212:11,12
**60**   158:15
**64**   262:18
**65**   268:17
**66**   57:15,15,22
173:2 177:5
**69**   178:1
**6:00**   127:21,23
155:20
**6:17**   107:17
**6th**   111:14,15

### 7

**7**   1:15 140:18
**7.7**   195:10,12
**7.709**   93:2
**7.71**   268:17
**70**   52:3 178:1
**70/30**   261:15
**700**   88:13 91:14
171:18
**704**   97:20
**7143**   86:20,21,21
**72**   61:10
**73**   178:1

**743** 148:1
**75** 165:13
**76** 56:19,22 57:8
173:1,6 232:11
**79** 20:21,24
165:13,15
**7th** 111:2 116:24

**8**

**8** 19:17,18 23:7
65:24 87:19
103:15 104:1,2,4
237:16
**8.01** 23:18
**80** 26:11 29:4
216:4 219:23
264:9
**80-20** 179:8
**80/20** 237:17
269:15
**800** 64:21 65:2,4
68:24 69:2,2,3
78:13 135:10,21
136:9,15 138:10
**80s** 207:25
**82** 92:24
**824** 1:13
**83** 172:22
**87** 177:2
**88** 218:21 219:2
**89** 172:19,22

**9**

**9** 60:18,23 80:10
90:11
**9.3** 166:17,24
**9.45** 166:25
**9.5** 166:25
**9.7** 181:17
**9.8** 184:19 197:22
**9/19** 245:17
**9/21/16** 72:23
**90** 19:25 20:1 24:5
24:9 38:12 138:4

**90-10** 178:1 179:8
**90/10** 35:6,12
237:14,20 239:4,5
239:18 241:8
262:5 266:19
268:15,23,24,25
269:14
**900** 135:10,21
136:9,15
**91** 75:13,16 89:8
**92** 237:16
**92/98** 268:17
**93** 82:11,14
**97** 172:22
**98** 60:19 263:17
**99** 58:24
**9:36** 1:16
**9c** 60:14

**a**

**a.m.** 1:16 108:22
**abandoning**
117:24
**abide** 260:9
**ability** 12:17
59:10 65:3 68:22
85:16 105:2
108:10 110:15
118:22 121:5
123:25 271:23
**able** 7:20 14:17
31:16 81:20 85:1
110:19 167:2
176:3 191:19
217:18 252:14
253:21 256:23,24
**absence** 213:14,15
213:17,18 214:1
**absent** 194:20
**absolute** 135:14
136:8 188:17,24
**absolutely** 94:5
104:16 154:19
159:1 180:22

190:12 201:1
211:18 220:15
233:20 247:3
249:19 257:19
**absorb** 210:15
**accept** 65:4 143:8
248:22 250:12
268:13
**acceptable** 268:7
**accepted** 160:4
**accepting** 57:20
**access** 121:11
**accommodation**
110:19
**account** 52:6
136:20 169:3
230:21 240:20
**accounted** 67:4
**accounting** 160:6
200:8 268:20
**accounts** 221:5
232:12
**accrue** 251:5
**accrued** 123:2
186:15 187:10
220:5
**accrues** 186:22
**accruing** 70:10
71:7
**accurate** 13:22,24
14:2 16:10,24
31:11 41:6 51:13
56:3 70:6,15 82:1
217:9 275:4 277:4
**accurately** 16:12
234:7
**acknowledge**
67:14 223:21
229:17 231:8
235:20 239:7
244:18 249:12
250:22 254:4
257:6 258:18,21

**acknowledged**
211:25 212:5
234:17 240:16
242:17 244:3
253:3
**acknowledgement**
224:14 228:13
**acknowledgment**
231:18
**acquire** 27:16
**acquired** 14:4,15
141:2,21
**acquiring** 16:2
**acquisition** 29:4
**act** 149:17
**acted** 149:15
151:3
**action** 149:11
150:14
**actionable** 83:7
83:12
**actions** 16:12,14
**active** 171:13
215:20
**actively** 73:8
**activities** 144:16
145:5
**acts** 186:8,14
223:12
**actual** 37:9 38:5
38:10 46:21,22
79:9 84:3 87:1
88:24 96:21
111:11,16 129:7
158:15,18,24
159:3,5,10 164:12
168:16,20 169:18
170:2 174:18,22
176:4,5 177:1
183:11 184:23
185:3,15 186:16
188:12,21,21
189:18 190:2

199:4 201:2,23
202:7,7,9 219:7
220:4,5 223:9
228:5 233:4
260:17 262:11
271:3,6
**actualized** 205:3
**ad** 3:4,10 8:7,13
8:20 19:10,22
21:7,9,17 47:3,4
47:10 48:4 113:14
117:19 128:15
129:6,22 152:10
156:4 160:12,13
161:16 164:24
166:19 179:23
192:7 208:8,15
212:13 226:1,14
227:6 228:17
229:5 230:16
231:7,14 255:3
**add** 149:10
**added** 63:17
96:17 254:17
**adding** 53:12
**addition** 16:2 63:6
161:13 162:9,17
168:5 181:4 195:2
258:23
**additional** 14:4,15
64:6 65:1 99:13
99:21 113:4
135:21 159:17
161:17 191:6
194:8 197:3
**additions** 50:20
**address** 208:17
**addressed** 219:17
258:2,19
**addressing**
214:13 222:20
248:13 251:18

**adduced** 184:25
**adjectives** 272:25
273:1
**adjourned** 116:5
273:24
**adjournment**
111:10 166:22
169:2
**adjusted** 176:12
250:25
**adjustments**
160:6
**administered** 1:8
266:20
**administration**
4:13 188:22
224:15 267:15
**administrative**
51:17,22 52:10
158:13 161:21
184:14 189:10
190:24 195:16
218:9 219:19
248:6 259:23
**admission** 7:7
**admit** 191:2
**admits** 177:18
**admitted** 17:15
153:20 154:5
173:20
**adopted** 226:15
**advance** 50:22
53:18 64:24
259:11
**advanced** 230:16
248:20
**advancing** 165:22
**adverbs** 272:25
273:1
**adversary** 134:8
220:10,23 223:25
252:7

**advise** 14:1 35:1
**advised** 29:20
**advisement** 272:3
**advisor** 26:7
**advisors** 21:9,10
46:12 47:13 131:1
214:5 231:3
**advisory** 51:7
219:18
**advocacy** 241:19
**advocate** 12:1
**advocating** 43:9
43:10 243:18
**affect** 68:23 102:8
**affidavit** 265:1
**affiliate** 106:25
**affirm** 12:15
**affirmation** 12:13
**affirmed** 194:3
**affirms** 158:7
**afford** 210:11
211:11
**afraid** 154:23
**afternoon** 102:8
127:5,15 179:22
**agenda** 130:18,25
130:25
**aggregate** 198:6
**aggressive** 224:1
**ago** 57:2,6 110:13
110:13 153:16
186:19
**ago's** 157:20
**agree** 16:25 29:15
29:25 34:13 38:19
38:20 39:25 40:19
40:21 53:12,13
64:23 77:3,7,11
77:14 99:18,19,20
99:22 104:25
115:16 124:13
128:20 133:11
138:1,2 141:19

145:8 160:24
190:15 194:23
208:8 222:19
235:9 266:2
**agreed** 7:7,13
31:9 131:9 132:11
134:13 137:20
152:6,8,9,10,18
153:23 155:25
172:8 192:9
229:21 272:4
**agreeing** 131:10
194:21 211:2
**agreement** 18:24
27:24 31:13 56:4
56:6 69:7 82:15
82:18 85:13 87:1
87:17 88:14 89:12
91:20 104:23,24
105:1 110:11
111:1,12,16
119:24 124:25
125:3 132:3 133:1
140:5,8,11,13,15
141:1,20 143:14
143:14 148:25
150:25 151:1
154:6 159:12
162:20 167:3
169:8 186:21
198:10 245:5
251:4 254:5
257:12
**agreements** 44:12
90:5
**ah** 50:5
**ahead** 62:12 67:18
78:13 114:12
115:3 208:2
219:14 249:4
267:4,5,21
**ahx** 116:15

**aid** 217:12,20
  225:13,23 229:23
**aiding** 255:22
**ain't** 237:24
**akin** 19:12 21:11
  113:15 129:9,12
  134:3 215:19
**al** 1:7
**albeit** 106:4
**aliquot** 206:2
**alixpartners**
  171:7
**allegation** 133:3
**allege** 162:10
**alleged** 162:11
**alleging** 244:1
**allocable** 209:12
**allocate** 47:25
  157:25 160:24
  172:15,25 175:19
  181:14,17,19
  216:1 234:19,23
  240:11 261:15,15
**allocated** 27:3
  35:10 37:9 41:16
  41:17 124:6 133:6
  172:25 174:23,25
  178:4 181:15,18
  199:22 200:3
  201:13,23 202:11
  204:17 216:15
  226:12 227:8
  231:6 234:3 241:8
  243:5 253:5
  261:14 265:10
**allocating** 35:2
  47:21 164:4,4
  178:1 233:18
  234:7 239:5
**allocation** 2:1
  13:13,19 14:6
  21:1 33:7 35:7,19
  38:15,23 39:1

40:21 41:5,19
  43:5 45:16 46:25
  47:3,15,18 124:5
  124:11,17 125:14
  125:20,22 128:21
  131:23 139:9
  140:1 156:18,25
  160:22,25 170:10
  170:12,12 171:1,8
  173:24 176:18
  177:1,17,18,21
  178:18,20,23,25
  179:11 184:13
  185:13 189:8
  196:19,20 199:10
  200:9 201:17
  205:9 208:10
  210:19 212:16,18
  214:2,19 215:12
  215:22 220:21,25
  222:8,10 223:5
  224:23 229:1
  231:10,16 233:3,4
  233:20,21 234:16
  234:20 236:18,19
  236:25 239:11
  240:9,12,13,20
  248:18 253:12
  257:8 258:1,13,14
  258:19 259:20
  262:3,11 264:3,17
  264:20 265:14
**allocations** 15:3
  21:21 22:6 45:18
  128:25 129:4
  130:23,25 131:18
  131:21 132:4,10
  157:16,17 173:19
  173:23 182:15
  207:7 213:23,25
  214:8 216:3,11
  217:13 240:19
  264:25 265:3

**allow** 30:5 84:8
  106:4 108:6 125:1
  189:12 208:24
  209:9 260:7
**allowable** 209:15
**allowance** 20:9
  70:2 75:10 133:14
  138:10 170:14
  171:18 184:1,4
  189:8,10 192:11
  195:25 208:10
  259:20,22,24,25
  259:25 260:4,7
**allowed** 8:12 9:15
  9:20 20:16 29:11
  61:24 62:1,4,18
  64:24 68:18 72:25
  75:25 76:8 124:19
  124:21 136:11,12
  166:23,24 184:13
  187:16 192:21
  195:15 196:24
  208:20,25 212:14
  216:17 218:8
  220:20 224:5
  265:15
**allowing** 211:13
  271:5
**allows** 85:6
  220:22,22,24
**alluded** 221:17
**alter** 200:15
**alterative** 166:22
**altered** 200:15
**alternative** 28:16
  28:17 29:6 85:4
  100:5,19 101:8,13
  103:6,8,9 106:5
  107:12 108:7
  110:20 145:11
  165:21 166:15
  208:17 223:22,22

**alternatives**
  100:19
**alvarez** 215:13
**amazed** 222:4
**amended** 71:25
  74:11 80:13 88:4
  89:11 107:2
  152:18
**amendment** 132:8
**amendments**
  167:7
**america** 271:18
**american** 3:21 4:2
**amnesia** 225:8
  226:1
**amount** 8:17 20:5
  44:19 52:4 55:7
  62:2 70:12 93:24
  124:4 134:22
  136:15 175:1
  177:17 178:23
  196:3 197:24
  198:4,9 206:5
  218:8 222:3
  240:13,21 243:6
  256:15 271:25
**amounts** 21:22
  64:6 92:9 96:12
  123:10,10 177:25
  221:3 232:9
  238:11 241:3
  258:5
**analysis** 9:3 34:18
  69:19 164:10
  177:7 183:5
  185:24 189:14
  197:2 203:11
  206:19 208:8
  209:19 212:13
  214:2 223:18
  227:15 228:17
  229:3 230:17
  231:7 235:8,11

236:4 243:22
250:21,24 251:8
261:20 262:18
268:6
**analytically** 197:7
**analyze** 189:1
**andrew** 3:12,13
128:14
**andy** 33:4,20
**animals** 244:17
**anna** 4:18
**announcement**
160:15
**answer** 15:11,14
39:6 57:18 62:9
84:7 115:12 129:2
246:19 268:7,18
**answered** 88:9
**answering** 191:10
**answers** 41:12
**answer's** 83:5
**anticipating**
212:20
**anybody** 158:2
225:1 232:8 262:5
**anymore** 269:21
**anyway** 164:24,25
165:1 230:13
267:21
**aparna** 4:16
**apart** 80:20
142:11 212:22
250:22
**apiece** 62:25 63:2
**apologize** 7:21
47:7 50:15 58:24
59:16 62:11 74:4
79:25 83:1 94:6
97:22 101:18,23
125:11 219:2
227:4 259:11
**apology** 49:9

**app** 130:22 201:4
**apparent** 30:20
**apparently** 105:5
**appeal** 61:14
158:12 219:22
220:8,9
**appear** 19:5
271:19
**appears** 98:2
108:12
**appellate** 64:16
202:13 220:22
**appendices**
153:21
**apples** 79:19
**applicable** 159:2
164:6 174:24
202:21 207:5,11
209:2,9
**applicant** 216:17
**applicant's**
165:15
**application**
123:19,23 124:1,2
144:6 170:11,13
170:16 171:10
174:19 177:25
178:3 206:15
244:10 252:23
268:19 270:2,13
**applications**
26:21 46:15,18,22
46:23 123:14
170:1,23 173:21
174:3,7 201:3
202:10 216:4
261:21 262:7
264:19,24 265:2
**applied** 98:21
131:11 175:5
188:17 195:12
200:15 204:24
233:12 239:19

241:6 253:7 271:8
**applies** 196:3
206:5 235:11
**apply** 171:4,6
188:2 196:7 206:6
253:1
**appointment**
172:17
**appreciate** 13:2
271:9,25
**appreciates** 239:1
**apprised** 105:12
**approach** 12:11
13:3 28:15,19,25
29:9 153:8,9
178:21 179:20
239:14 273:4
**approached** 28:20
29:2
**approaching**
217:17
**appropriate** 9:21
9:25 39:14 41:4
43:19 45:18 52:10
99:23 124:17
131:14 152:14
157:16 186:4,25
188:16 196:1
228:19 229:22
240:18 244:18
248:18 255:17
261:9 270:15
**appropriately**
98:17 99:15
**approval** 27:21,24
87:25 88:4,14
102:24 111:11
159:13 178:12
186:23 189:18
190:1 195:22
201:9 216:16
235:5 245:17

**approvals** 30:22
230:22
**approve** 70:23,24
132:13 198:20
260:13,24 261:8
263:21 271:2
**approved** 19:13
70:25 81:16
111:16 132:4,12
159:8,11,12
172:18 174:14,21
186:6 187:2,21,21
191:13,23 199:12
206:16,18 230:4,7
232:7 245:4
248:12 263:25
269:10
**approves** 170:21
190:4
**approving** 86:21
88:19,24 260:16
**approximate**
93:24
**approximately**
15:22 52:1 53:14
58:3 80:5 93:1,2
94:18 95:24
153:19 218:21
268:21,22
**april** 28:13 55:13
58:3 101:6,6
105:25 106:1,3
109:4 110:24
129:16 130:11
**arbiter** 241:1
**area** 229:23 254:1
**areas** 113:7
**arguably** 246:7
**argue** 157:14,15
202:21
**argued** 181:21
**arguing** 39:13
84:9

argument 53:6,8
53:18 78:2 102:8
141:23,25 142:24
143:3 174:13
190:8,11 205:22
208:15,17 227:12
237:17 241:25
245:20 248:20
252:1 266:25
arguments 124:16
197:13 226:20
241:24 244:19,22
250:2
arising 90:1
107:24 150:9
204:5
arithmetic 195:13
armageddon
203:4,6
arose 43:24
arranged 273:4
arrangement
119:18
art 203:2
article 60:14
72:14 140:22
articulate 56:17
articulated 120:2
122:12 186:2
articulating 60:5
articulation 67:13
124:13
asbestos 33:9 34:8
44:10 95:22,24
96:8 98:22 99:8
99:10 162:1
169:12 176:24
182:11 187:3,7,25
188:18 195:8
198:18 206:4
210:21,25 211:23
225:13 229:17
238:9,17,18 246:9

251:7,10,10,11,17
251:19 253:23
257:4 262:17
ashuraey 5:16
aside 44:22
137:15 140:12
143:13 188:11
230:2 249:16
asked 38:14 95:8
102:23 108:5,6
136:19 137:6,10
137:18,20 146:25
148:19 173:16
174:4 186:1
213:24 249:10
256:8 270:15,16
270:17
asking 38:16,17
63:23 73:20 84:1
91:5 93:4 97:5
102:4 107:15
131:22,22 132:20
139:1,13,21
145:18 201:20
243:20 263:20
asks 15:12
aspect 231:6
242:13
aspects 125:17
242:12
assert 107:23
119:16,17 150:8
150:13
asserted 81:21
107:21 119:22
120:8 150:5,19
181:7 182:8,8
208:19 225:5
254:7
asserting 63:7
assertion 64:4
197:18 248:22

assertions 73:11
asserts 182:22
assessed 241:7
assessment
112:11,13 234:24
asset 69:17 180:14
184:17 250:13
assets 65:2 184:20
225:23 268:8
associated 207:10
233:21
associates 214:6
264:23
assume 56:22
119:17 130:11
135:13 158:16,17
158:17,24 210:5
211:7 214:18
227:16
assumed 162:13
210:25 211:23
assuming 62:7
210:12 220:8
assumption 23:25
33:9 34:8 55:14
159:9 162:1,14
182:11 187:4,7
188:18 198:18
206:3 229:13,17
246:10
assumptions
229:15,16
attached 20:18
87:1 104:23
146:21 148:14
attachment 82:9
82:11 87:3 116:20
attachments
155:2
attacking 214:17
214:22
attempt 160:23
217:20

attempted 171:8
attend 25:18
27:23 28:1,2
attendance 92:13
attended 25:20
28:3 33:19,20,21
57:1 165:25
attention 72:3
75:1 86:5 88:2
89:14 116:10
117:11 150:1
attorney 104:5
215:2
attorneys 3:4,10
3:21 4:2,7,13,22
5:2,9 261:22
attributable
169:21 170:3
attribute 196:11
attributed 212:14
auction 54:12
august 18:12
26:14 73:16 111:5
111:7,8,12 125:7
125:10,12 167:4,4
167:9 263:4
ausa 103:20
148:16
austin 28:3
authorized 56:7
117:4
authorizing 114:1
automatic 142:3
available 32:19
50:25 181:1,2
222:1 241:12
avoid 162:10
avoided 161:24
225:16
avoiding 169:12
225:14 229:9
award 169:17

**aware** 25:7 26:2
  27:19,22 55:4,19
  63:23 65:9 67:3
  67:10,14 68:11
  69:10,12,16 70:22
  75:9 77:18 81:15
  82:24 83:6 84:2
  123:1,3 140:5,10
  140:12 146:8
  174:7 249:14,15
**awkward** 90:22
**ax** 116:11

**b**

**b** 1:21 5:23 12:22
  60:11 76:8 78:24
  109:24 183:8
  219:6 223:3
**b.c.** 90:6
**back** 15:6 18:3
  23:2 28:6 34:20
  42:13 45:22 55:2
  61:8 68:1 73:14
  75:13 85:5 98:14
  113:9 137:9
  149:23,24 150:20
  150:22 162:5
  174:12 190:22
  192:5 201:7 208:4
  208:18 209:22
  210:4 211:9
  214:24 216:8
  221:23 222:6,7
  223:13 227:9
  228:20 234:16
  238:15 239:8
  245:1 255:20
  262:3,8 265:15
  266:22 271:21
  272:6,12
**background**
  15:18
**backstop** 165:24

**backtrack** 244:24
**backup** 105:4
  109:10,22 110:7
  110:14 123:5,5
  148:21,22
**backups** 50:22
**backward** 189:14
**backwards**
  218:23
**bad** 79:24 212:24
**baked** 224:1
**balance** 9:21
  173:15 177:4
  217:10 268:5
**balanced** 217:10
**balances** 15:3
**ballpark** 63:4
**bankers** 16:16
**bankruptcy** 1:1
  1:12,23 21:14
  23:19 25:4 26:17
  26:21 27:13 38:11
  39:9 43:24 61:12
  66:18 115:21
  124:10 130:12
  134:15,23 135:15
  169:21 170:21
  176:8 195:23
  202:14 212:25
  240:10 271:17
**bar** 173:6 225:13
  251:18
**barred** 237:8
**barring** 273:20
**based** 10:16 53:11
  53:22 54:15,16
  55:13 57:12 59:13
  59:19,22 60:1,1,7
  61:17 67:11 70:2
  75:24 79:25 96:20
  112:1 133:5
  136:23 178:20,23
  179:1 181:24

200:12 206:23
  213:6 224:6
  234:23 236:15
  237:17 240:13
  241:23 244:19
  246:16,20 248:15
  251:15 252:9
  258:20
**bases** 167:2
**basic** 230:23
  231:19 233:7
  235:21 253:13
  255:19
**basically** 8:21
  21:24 22:1 26:24
  64:1 97:1 177:14
  219:1
**basics** 15:6
**basing** 54:7 55:18
**basis** 11:5 35:7,8
  35:10 52:13 83:3
  83:5,8,10,11
  91:22 122:18
  123:8 144:2
  164:10 182:1,5
  199:19 200:15,25
  201:14,16 233:1
  243:18 250:5
  259:24
**bates** 117:11
**battles** 212:19,22
**bayard** 5:8
**bear** 139:2 164:15
  183:23 207:2,6
  262:21
**bearing** 32:6
**bears** 175:1 193:8
  193:22 194:9
  206:23
**beaver** 170:5
  201:24 202:6,19
  202:19

**befitting** 163:21
**began** 166:2
**beginning** 9:20
  18:19 90:1,7
  177:23 203:11
**begins** 8:1 9:1,3
**behalf** 19:8 21:7
  26:17 128:15
  134:9,10 179:23
  204:8
**belief** 8:9 9:5
  41:24 70:4 135:6
**beliefs** 246:20
**believe** 7:11,12
  8:9,14 9:21 13:22
  16:9,11,23 18:10
  22:12 23:15 24:9
  26:8 29:24 31:8
  31:14 33:20,21
  37:11,14 38:25
  40:2 41:10,21
  42:6,8 43:4 45:8,9
  45:9,15 47:16,20
  48:8 50:13 52:3
  52:20 53:22 55:16
  56:9,17,24 59:13
  60:11,19 62:4,25
  63:3,5,9 64:18
  65:13 67:7,16,25
  68:15 71:11,23
  76:19 77:19 79:9
  80:18,19 81:18,23
  83:16,19 85:16
  92:11,17 93:13,16
  93:19 95:23,25
  96:10 97:11
  100:12,23 101:12
  106:7 108:17
  110:8 114:6 120:3
  121:10,15 122:1
  122:16 125:5
  126:6 128:23
  132:3,6,15,18

133:3,16,16
134:11 135:8
136:1,1,17 137:6
137:14 138:14,17
143:11,19 144:17
144:24 145:10,10
146:7,10,21
148:23 149:1,8
152:15 154:2
156:22,25 157:22
158:9 163:1 164:5
164:7 165:19
167:17 168:13,14
168:21 169:5
170:17 171:3,5
174:18,20 179:17
181:24 183:19
202:9 203:22
208:14 216:9,19
217:5 222:6 229:1
234:17 246:15
263:25 264:9
266:10,10 270:11
272:21
**believed** 20:14
24:4 30:3,3,7,24
54:10,17,18 55:15
55:16,17 79:22
101:9,15 120:2,6
123:24 134:18
145:13 160:1
161:3 173:24
175:5 264:6,6
**believes** 49:18
107:19 150:3
157:15
**believing** 14:16
**belonging** 171:14
**benchmark** 79:11
**beneath** 130:18
**beneficial** 169:19
191:12 224:16

**beneficiaries**
171:24
**beneficiary**
164:14 169:13
172:8 184:16
185:7,11,12
**benefit** 35:25 36:4
36:8,12,14,17,24
37:4 38:5,5 41:17
48:10 51:11,19,23
52:2 62:13 95:25
96:1 98:17 115:9
139:4,20,21
144:22 145:2
158:16,18,24,24
159:10 161:11,22
162:22 163:14,20
164:8,13 165:5,6
165:7,18 168:13
168:14,16,20
170:3 171:3,5,6
174:10,10,17,23
174:24 175:1,2,3
175:6,6,12,16,19
175:24 176:7,10
176:18,19,19,22
180:20 181:3
182:5,19 183:12
183:18,22 184:2,3
184:24 185:1,2,24
186:7,20,23 187:7
187:22 188:15
189:1,15,18 190:2
190:5,12,19 191:4
191:9,11,22,24
192:1,1,10,11
193:14 194:22
196:2,14 198:1
199:11,11 200:13
200:14,16 203:25
204:3,6,9 205:14
205:20 206:9,12
206:25 220:5

225:8 227:24
228:1,3 229:7
231:1 233:2 234:9
238:7,19 241:9,12
244:5 252:13,16
252:17 253:19
255:25 258:23
260:13,18,22,23
262:22 266:24
271:6
**benefited** 205:22
248:21 251:7
**benefits** 36:6
144:24 161:18
165:10 169:5
182:7,14 183:2
185:3 197:17
225:18 226:8
229:5,8 233:3
234:25 238:23
241:8 251:20,20
251:22 252:12
254:6 261:13
271:16
**benefitted** 36:22
36:25 144:21
162:23 166:3
175:20 178:22
180:5 182:21
184:8 190:25
194:19,20 195:18
195:18 197:9
234:9
**benson** 3:9 179:23
**berkshire** 14:17
34:20 69:12
102:22 111:1,12
144:9 145:6,13,14
145:24 166:6,15
166:17 167:11
169:9 256:11,18
**best** 12:16 30:25
118:1 200:3

215:25 218:3
241:12 243:7
265:13 271:18
**bet** 216:25
**bets** 213:8
**better** 42:1 54:11
54:16,19,20 112:7
122:7,15,20 190:8
235:15 249:24
**beyond** 149:8
173:15 229:8
241:6
**bfh** 187:13
**bias** 244:3
**bid** 55:2,4,7
192:21 193:5,15
196:25
**bidder** 228:22
**bidders** 69:10,12
69:17 70:4 83:20
**bids** 55:13,19
**bigger** 120:9
**bill** 252:1
**billed** 95:25 96:1
171:16 176:6
177:25 238:11
251:21 252:17
**biller** 98:15
232:13
**billers** 233:23
**billie** 45:12
**billing** 175:11
233:18 234:2,6
**billion** 15:21 62:5
80:5,10 93:1,2
94:11,15,16,18
95:6 119:14 120:6
134:24,24 135:9
136:14 138:11,12
141:14,14 161:20
166:17 184:19
197:22 229:9
250:25 268:17,17

268:22,23
**billions** 78:25
  118:25 119:6,23
**bills** 173:22
**bind** 149:8
**binder** 13:15 19:3
  28:6 50:22 58:6
  65:15 71:11 82:3
  83:18 88:16 92:17
  97:13 101:18
  113:21 116:11,11
  116:16,17,18
  129:13 133:24
  134:2,5 140:18
  146:20
**binders** 50:6
  128:11 271:23
**binding** 115:10
  228:9
**bit** 15:18 69:3,3
  103:11 127:6
  129:14 156:2
  164:20 175:8
  176:21 203:12
  227:9 244:8 268:2
**blah** 94:17
**blessed** 271:18
**blew** 22:2
**block** 214:5
  264:22
**blocking** 256:20
  256:21 257:1
**bloomberg** 157:4
**blow** 157:7
**blue** 179:15
**board** 4:13 53:19
  188:4 201:8
  203:20 213:23
  214:1 227:2
  230:22 264:18
**board's** 223:4
**boards** 116:21
  178:14 214:3

**bods** 135:22
**body** 165:3,10
**bold** 68:4 118:24
**bolster** 234:5
**bond** 25:2 157:2
**bondholders** 69:7
  85:16
**bonds** 18:2 78:22
  120:6 134:18,23
  135:7 138:17
  141:2,4,21
**borne** 36:22
  194:18 257:11
**borowitz** 255:3
**borrow** 256:16
**bottom** 20:25
  75:18 92:23 94:13
  106:20 108:18
  117:14 148:20
  260:20
**bottoms** 243:21
**bought** 100:25
  141:4
**bound** 29:11
  56:14 101:16
  270:24
**box** 20:25,25 21:2
  21:22,23 32:21,22
  32:22 34:10 36:6
  36:23 91:23
  139:17,18 173:12
  177:8 203:17
**boxes** 32:24 33:8
  33:10,13
**brain** 103:18
**braves** 151:11
**breach** 149:12,19
  149:19 218:4
**break** 48:19,24
  49:7 81:2 112:18
  112:22 126:1,9
  127:6,12,15

137:23 155:10,16
  207:20 208:9
  209:12 210:6,7,9
  212:11
**breaks** 96:25
**breakthrough**
  226:6
**breakup** 149:14
  149:16 159:3,7
  160:10 161:9
  167:20 180:10
  181:4 183:13
  184:4 185:14,25
  186:8,11,20 187:2
  187:11 188:15,23
  189:1,9,12,15
  190:14,16,20
  191:15,16 192:8
  192:12,18,21,25
  193:2,5,6,8,9,12
  193:21,22 194:1
  194:10,13,18,20
  195:4,14,16 196:3
  196:11,21,22,23
  197:4,10,14 198:4
  198:6,11,21
  204:10 206:18,23
  207:2 219:16
  230:3,6,7 245:1
  263:10,12,19,21
  263:25 268:1
**brief** 10:14,17,20
  10:21 95:20
  175:20 208:8
  272:7
**briefed** 237:9
**briefing** 272:21
**briefly** 222:18
**bring** 14:14 101:9
  210:22 212:10
  216:13 221:1
  256:7

**bringing** 260:20
**broad** 90:5
**broadly** 68:14
**broke** 33:17 53:24
**broker** 217:18
  218:3 243:24
  252:15 257:20
**brokered** 160:7
  254:13
**brought** 83:17
  162:18 216:5
  220:11 249:7
  256:9 262:11
**brown** 5:17 43:1
**bryan** 5:19
**buck** 53:24
**bucket** 37:4 238:3
  241:9
**buckets** 35:22
  44:5,15 219:5
  223:2
**budget** 123:6
**budgeting** 232:19
**build** 230:15
**builder** 181:6
**building** 221:19
**buildup** 236:4
  241:15
**built** 158:21,21
**bulk** 166:5
**bullet** 42:13
  109:19 118:17,21
**bullets** 66:8,12
**bunch** 131:20
  240:23
**bundle** 211:12,18
**burden** 151:13
  169:23 179:15,15
  181:22,25 192:13
  193:22 194:9
  206:23 207:2
  209:14 216:7,9,20
  262:9,20,21

**burdened** 32:14
  193:12 194:13
**burn** 29:8 34:18
  55:8 112:2,8
  145:25 146:2,4
  210:1 244:14
  246:11
**burned** 124:9
**business** 15:19,22
  34:17 63:17
  183:21 202:5
  209:4 235:22
  250:9
**businesses** 120:4
  202:16
**busy** 170:4 201:24
  202:6,19,19 247:5
**buy** 268:3
**buyers** 64:25
  143:23 268:3
**buying** 16:4 73:8
  213:5,6 268:7

**c**

**c** 3:1,23 5:17,21
  6:7 7:1 23:24
  255:11 275:1,1
  277:1,1
**calculate** 179:4
**calculated** 37:4
  124:9,12 177:3
  179:6
**calculating**
  267:25
**calculation** 96:5
  179:7
**calculations** 200:9
**call** 12:7 18:6
  21:14,18 47:25
  48:14 54:13 91:14
  130:1,4,19 138:9
  139:3 153:10
  172:18 176:13,14
  176:15 177:13

**253**:20 254:16
**called** 23:7 33:23
  35:23,24 146:22
  146:23 185:20
  217:22 257:23
**calling** 77:16
**calls** 176:20
**canadian** 143:23
**canceled** 95:14
**cancelled** 116:7
**cap** 22:12,14,15
  22:16,16 84:15,19
  84:20,20 85:15,17
  209:8
**capability** 250:19
  251:1
**capital** 17:21,22
  73:8 82:17 100:25
  101:8 125:13
  193:1 196:16,18
  204:12
**capitalized**
  148:20,21 149:1
**capped** 22:3
**caps** 110:8
**care** 10:10 12:5
  152:1 273:14
**career** 18:19
**carefully** 118:22
  226:8
**carey** 176:1
  178:20 240:19,24
  266:11
**carey's** 240:7
**carried** 238:15
  249:5
**carry** 169:23
  233:11 262:9
**carton** 5:18
**carve** 110:15
**case** 1:6 25:12
  32:17 34:21 35:11
  41:13,15 42:1,3,3

**42**:5 44:17 51:21
  69:11 74:14 77:19
  78:23 79:23 86:19
  87:11 130:24
  131:24 134:13,23
  136:7,8,25 137:17
  137:20,22 143:11
  144:11 156:23,25
  157:10 167:16
  168:19 172:21
  173:18 176:5
  180:19 181:25
  183:16,17 184:6
  186:13 190:18
  191:14 193:14,19
  197:1 198:25
  201:6 202:20,20
  206:14 208:25
  209:2,17 211:4
  212:20 213:11
  214:7,10 215:19
  216:16 223:10,23
  224:19,25 225:3
  228:9,20 233:12
  240:9 242:12,13
  247:15 248:20
  249:3 253:3
  261:21 266:24
  271:15
**cases** 21:14 25:19
  26:18,21 27:14
  43:24 44:17 52:21
  77:21 85:2 92:14
  165:23 184:1,16
  184:17 186:12
  197:2 202:13,13
  202:16,17 211:17
  215:2,9,20,21
  217:17 229:1
  236:19 271:16
**cash** 15:3 25:16
  27:2 29:8 31:16
  31:23 32:9,18,21

**32**:22,22 33:7,8
  33:10,13 34:6,18
  41:14,21 42:9
  54:14 55:8 71:15
  71:18 76:6 112:2
  112:8 138:18
  141:16,16 142:12
  145:25 146:2,4
  174:7 184:21
  195:10 209:24,25
  210:1 222:1 229:6
  229:8,13 268:4,4
  268:5,7,8
**cashed** 135:17
**casino** 178:24
**cast** 137:11
**catch** 255:13,14
**categories** 270:23
**category** 218:8
**causal** 164:22
  165:2 243:22
**causally** 262:24
**cause** 149:13
  176:22 238:3
**caused** 26:3
**causer** 149:21
**causes** 189:4
**caution** 41:25
  168:18
**caveat** 152:9
  195:7
**ceiling** 209:18
**centered** 29:3
**centerview** 21:11
  129:9,12
**cents** 25:2 78:8,12
  81:21 165:15
  244:5 263:17
**certain** 19:19 20:2
  21:21,21 22:12
  23:14 26:2 29:7
  32:1,2,21 41:3
  46:21,22 47:2,9

48:1,8 59:6 66:15
67:22 83:14 84:24
85:24 86:23 89:18
90:10 107:10
119:15 120:7
122:17 152:19
160:6 165:9 234:2
236:11 240:10
248:2 258:4
268:20
**certainly** 126:10
127:20 196:20
211:8 213:1
**certainty** 196:8
198:22,24
**certified** 275:3
277:3
**cetera** 8:2,2 34:18
**cfo** 26:8 28:20,22
**chad** 104:18
**chain** 69:13
**challenge** 131:8
181:7 236:3
238:17
**challenged** 202:8
202:10 216:3
**challenges** 43:24
48:3 204:21
236:16
**challenging**
131:13 142:24
199:14 202:7
215:17 216:8
232:24
**chambers** 102:14
127:17 272:2
**chance** 127:5
**change** 70:23 89:8
178:13,19 181:23
195:11 199:18,18
200:24,25 201:5
**changed** 30:17
74:14 138:11

164:7 177:23
191:4,8 201:8
270:21
**changes** 223:18
**changing** 199:20
**chapter** 1:5
130:24 184:16
202:16
**characterization**
79:6
**charge** 225:25
253:9
**charged** 37:9
121:8 175:22
214:10 232:8
**charges** 132:22
**charles** 41:22
**chart** 9:25 93:16
93:17
**charts** 237:19
**chat** 126:10,24
**check** 203:17
**chew** 5:19
**chilled** 250:10,11
**christian** 5:25
**christopher** 1:22
4:4
**chunks** 44:15
**cieri** 114:2
**circuit** 52:22 53:3
76:22 77:1 81:12
81:20 82:24 83:9
84:4 158:6 162:22
167:16 169:25
187:17 190:10,17
191:3,8 194:3
202:18,18,23
226:5,18 227:19
257:17 261:6
**circuit's** 77:4
163:18 225:10
228:12

**circumstance**
172:5 227:20
228:21 243:7
264:7
**circumstances**
186:5 212:6 239:7
**cite** 10:21
**cited** 186:13
**claim** 25:3 52:5,7
61:13 86:7,9
88:13 90:6,19
91:2,14 119:16,17
119:22 136:5,11
136:13 158:14,15
162:11,15,24
163:8,16 164:1,19
165:11 169:13
171:19 180:4
181:20 187:10
189:10 190:24
204:3 205:10,12
205:19 206:7
207:9 223:18
224:5,9 225:2,5
226:14,22 237:21
248:6 249:4
255:19,21 259:5
260:3,4 262:22
269:1
**claimant's** 192:7
**claimants** 3:4
43:3 47:3 54:14
152:10 160:13
179:24 251:11
**claiming** 144:16
144:21 145:2
**claims** 19:20 20:6
20:7,10,16 25:8
41:5 43:2,6 44:9
47:21 52:4,6 55:8
55:9,10 61:1,2,3
61:11,12,24 62:18
62:22 63:8 64:4

64:23,24 66:18
67:18 70:3,11,12
71:16 75:5,6,6,7
75:11,24 76:5,9
78:12,24 81:17
89:2,19,24,25
90:1,14,19,24
91:11,13,21 95:14
95:15 107:21,24
114:12 115:9
119:20 120:1,6,7
136:2 142:20
150:5,8,13,18
157:11 158:1
161:25 167:2
168:19 171:14
172:9 176:24
181:7 203:18
204:1 206:4
225:15,16 248:13
251:25 252:15
254:7,22 259:23
**clarification**
150:17 151:2
**clarifications**
10:13
**clarify** 84:8
100:13 143:20
**class** 31:8 57:20
76:8 172:4 193:3
**classic** 43:15
223:3,11 233:19
**classify** 174:10
**clause** 87:8,9
212:16
**clear** 15:16 70:5
71:13 83:2 100:13
141:19 145:19
149:18 157:9
159:1 164:19
178:11 180:22
193:21 203:7
222:21 233:20

237:3 257:19
263:2
**cleared** 69:13
161:10 162:7
196:25
**clearer** 237:20
**clearing** 173:8
**clearly** 15:15
99:14 122:10
149:1 211:11,13
265:5,6 270:1
**clerk** 12:14,19,23
49:5 113:1 207:23
**click** 127:22
**client** 169:21
170:4
**clip** 203:2
**close** 7:9 13:1
30:21 48:19 59:10
70:17 71:2,4
101:20 102:10
114:20 127:22
161:4 162:21
188:14 228:2,2
236:17 246:2
249:19 258:5
259:7 264:6
**closed** 64:16
182:3 246:1
**closeout** 32:4
**closer** 121:20
129:11
**closes** 62:7 73:10
224:10
**closest** 193:19
**closing** 61:5,18,21
62:17 64:17,24
65:6 71:1 72:17
73:10 74:23 75:4
77:6,9 78:15,18
78:20 102:14
127:4,20 155:11
155:12,13 161:2

162:24 190:18
219:10 224:3
228:5 241:17
246:14
**closings** 233:14
**code** 98:11 99:1,2
195:23 219:6
229:8
**coffee** 37:20
**cognizant** 112:16
112:17 120:4
**collateral** 141:18
220:7 263:16
**colleagues** 33:19
**collect** 205:11
238:8
**collective** 35:24
36:7,17 37:4
95:25 98:17 99:15
99:23 139:4,20
174:10,24 176:18
176:19,22,22
177:5 178:4
199:11 200:16
203:25 233:3
234:25 238:7,11
238:13,16,19
239:5,10,12 241:7
241:8 251:20,22
252:16,17 256:6
267:1
**collectively** 172:3
**collier** 186:15
**colors** 241:18
**column** 93:20
98:23
**columns** 98:10
**come** 18:23 19:15
20:6 25:22 27:12
27:19 33:16 35:14
38:22 40:12
154:23 162:6
166:23 168:20

177:10 201:7
207:12 227:2
228:15 233:8
239:8 242:22
247:18 263:8
265:15
**comes** 38:25
77:13 208:9 248:5
260:3,8
**comfortable**
12:25
**coming** 8:16
43:15 79:3 83:6
89:3 228:22
**commence** 19:23
**commenced** 30:12
30:18 166:12
**commensurate**
14:8 15:5 190:20
**commercial**
186:12
**commission** 28:4
70:20,22 101:2
**commit** 225:22,22
**commitment**
62:17 253:21
**committee** 3:10
8:8 21:17 32:2
42:19,22,23 43:4
43:8,10,14,18
48:4,9,11,14
85:20,22,23 86:22
87:12,25 88:23
117:19 128:15
129:23 160:12
161:16 169:16
170:24,25 171:8
171:11,13,22,25
178:15,17 181:18
200:5,21 204:15
205:7 214:8,23,25
214:25 215:3,10
215:11 226:9

252:21,25 253:20
253:24 255:16
257:5 260:2
265:12,13 266:17
273:11
**committee's** 44:1
44:18 47:12
171:23 190:13,13
190:15 201:10
204:13 258:19
**committees** 47:4
**committing** 166:6
**common** 16:20
18:22
**commonly** 229:11
**communication**
116:22 117:5
120:12
**communications**
121:2
**comp** 38:15,18
122:22 201:8
232:25 233:5
234:22 236:16
243:4 244:11
253:7
**companies** 130:12
241:4
**company** 32:21
118:23 138:5
141:5 142:12
145:23 146:6,6,10
176:9 190:25
214:17
**company's** 146:3
**compare** 167:14
**compared** 191:15
268:22
**comparisons**
242:6
**compel** 252:7
**compensable**
168:10

**compensation**
35:15,20,21 37:3
122:23 132:14,17
133:1,2,4 169:18
170:9 171:2 174:8
175:4 178:8
179:13 199:10,15
199:23 200:7,12
200:20,22 232:21
233:9 237:3
239:20 243:1
**competent** 205:1
**competing** 184:11
217:11
**competitive**
118:23
**compiled** 96:12
**complaint** 214:9
**complete** 50:11
115:7 214:1
217:10 267:19
**completely** 14:2
154:2 209:12
210:15
**complex** 224:25
236:19
**compliance** 200:7
**complicated**
261:21 262:16
**complied** 200:21
**compliment**
259:18 261:11
**compliments**
271:19
**comply** 200:1
**component** 198:7
254:18 258:10
**components**
205:19
**composition**
42:18 43:4
**comprehensive**
117:25 236:4

241:14 255:9
**compromise**
217:19 218:3
252:15 257:16,21
**compromised**
90:23
**compromises**
117:25
**compromising**
252:18
**concede** 256:5
**concedes** 214:21
**concentrate** 128:2
**concept** 32:17
222:15
**concepts** 129:5
**concern** 14:20
21:13 26:9 29:3
32:25 119:5
149:17 221:2
236:14 241:10
267:10
**concerned** 15:2
21:15 67:8 128:20
145:24 150:12,15
158:19 167:23
172:2 177:21
203:24 221:19
244:10
**concerning** 204:5
212:4
**concerns** 32:10,12
32:13 118:6 122:6
**concessions** 49:24
50:1
**conclude** 239:18
**concluded** 130:1
253:17 274:1
**conclusion** 60:8
112:6
**conclusions**
222:20 272:22

**conclusively**
203:8 207:4,5
**concrete** 44:5
**condensed** 168:25
**condition** 60:12
61:6,18 62:17
71:1 72:12 74:7
75:4,10 76:4 77:6
77:9 78:18,20
85:6 186:10
188:15
**conditional**
220:19 221:21,25
226:19
**conditioned**
162:19
**conditions** 59:2,6
59:9 60:3,13 61:1
65:7 72:8,13,17
73:10 74:8,24
78:15 85:24
135:17
**conducted** 96:7
**confer** 112:19
272:19
**conferring** 11:2
**confers** 7:17
**confident** 55:10
**confirm** 14:17
17:6 107:15,23
150:7 200:8
272:10,21
**confirmable**
145:14,15 249:21
**confirmation**
22:20 23:20 85:10
88:3 99:14 112:10
140:9 168:24
205:18 256:20
272:16
**confirmed** 73:18
76:15 101:1,4
135:1,12 163:11

173:14
**confirming**
239:13
**conflict** 174:4
265:4
**confused** 244:24
244:25 246:22
247:1
**confusion** 17:7
**conjectures**
182:17 183:1
**connected** 262:24
**connection** 13:19
66:17 107:21,24
144:8 150:5,8
164:22 165:3
191:2 204:9 230:3
243:22 253:24
**consensual** 31:3
34:3 112:8,12
154:2
**consensually**
34:23
**consent** 256:25
**consented** 168:15
**consequence**
177:15
**consider** 164:6
193:25 209:18
224:18 230:19
236:20
**consideration**
41:11 43:5 44:2
60:3 78:25 83:1
160:11 164:8
183:15 189:6
193:20 197:4
198:13 209:6
211:24 212:7,9
224:6,17 229:6,13
229:16,18 231:8
237:21 245:10

considerations
203:16 217:11
224:19
considered 8:16
41:4 198:3 203:10
203:20 248:16
268:9
consistent 77:20
87:2 133:5 152:20
157:5 164:10
190:17
consistently 234:8
constant 34:19
69:22
constituencies
118:16 231:13
constituents
257:16
constricting 30:8
construct 195:22
construe 68:14
consultant 36:5
242:20
consumer 38:11
consummate
118:22 261:2
consummated
185:17,21 218:14
consummating
239:13
consummation
88:3 237:4
contact 32:9
contain 154:4
contained 85:11
253:22
contemplated
19:19 26:25 138:3
contemplating
45:22 115:22
contemporaneous
233:17 234:24
235:23

contend 195:25
199:14 200:10
205:4 227:7
232:25 238:19
contended 206:21
contending
180:17
contention 185:6
185:6 197:21,24
203:5 204:2
contentions
182:17,25
contest 133:14,22
contested 133:17
133:20 134:14
161:22 168:22
171:16
contesting 184:13
context 24:16,20
24:22 46:9 184:6
196:23 212:18
225:3,3
contingent 186:23
195:24
continuation 85:7
continue 63:13
continued 30:22
209:24 241:7
continues 118:9
continuing 112:2
contract 63:17
64:9 210:12
229:16
contractual
186:22
contractually
141:5
contradict 57:10
contrarium 160:8
contrary 197:17
contributed
211:19

contribution
144:6 163:8,16,24
164:1,19,23
165:11 168:19
181:19 182:21
205:10,12 206:7
207:9 223:8,12,13
228:11 255:19,21
259:5 260:3
262:22,24
control 70:23
257:18
controlling 21:24
convenience 68:6
conversation
47:19 83:15,21
conversations
33:14,17 41:22
43:7 44:23,23
45:3,14,17 46:6,7
47:2,9,12,14,17
69:10 121:15
122:1 167:25
conversion 132:8
convey 122:13
conveyance
249:17
conveyed 122:10
122:11,16 253:18
cooler 202:25
copies 50:12,12
copy 7:12 13:18
35:14 58:13 71:11
153:11
copying 129:22
core 37:16 185:25
corner 20:20
corp 1:6 18:22
92:25 93:20,22
corporate 261:23
corporation 51:5
correct 13:22,24
14:2,22 16:10,19

16:23 19:20 22:7
23:8 25:23 28:23
28:24 30:12 31:10
41:5 48:16 51:5,6
51:7,12,15,20
53:24 54:2,4,8
56:2,5 57:21 58:1
58:13,15 59:24
62:2,7 63:8,18
66:6 67:23 71:3,5
72:2 77:25 78:9
80:24 81:22 82:23
86:1 87:5 94:14
94:22 96:9,10,13
100:14,15 110:21
115:14 116:6
126:2 128:21,25
129:23 130:4,7,16
130:19 131:2,6
132:17 133:15
134:15 135:23
136:10,16,21
138:16,21 140:9
141:6,21 143:1,11
143:16 144:4,23
145:3,20 146:1,5
146:9,25 147:10
147:11 150:19
153:3 179:12
188:25 208:15
267:11 269:17
correctly 61:16
134:19
correlate 79:11
correlated 197:25
cost 29:8 30:23
138:20,22 139:3
181:6 183:25
207:9 219:7 220:6
225:14
costs 51:17 52:10
176:11 180:14
183:11 184:23

219:10 251:3
**could've** 246:1
**council** 251:11
**counsel** 7:17
  15:12 17:7 19:10
  33:4 45:4,6,8 46:7
  47:13 53:17 84:8
  87:13 92:8 93:4
  99:11 107:14
  112:19 119:4
  150:21 160:12
  171:23 200:6,21
  213:14,20 217:15
  217:16 231:2
  270:21 272:19
**counsel's** 44:22
**counsel's** 97:13
**count** 268:5
  269:20
**counted** 49:13
**counterparties**
  184:10
**country** 275:21
  277:21
**counts** 235:14
**couple** 11:14
  29:24 33:19 34:11
  90:9 200:18
  259:17 269:19,19
  270:3,4
**course** 11:1 12:2
  15:1,1 17:16
  35:13 40:20 69:11
  77:21 79:23 81:3
  102:6 150:14
  159:20 173:3
  177:16 185:1
  187:15 188:1
  192:2,6 196:16
  219:10 258:22
**court** 1:1,12 7:2
  7:10,15,18,22
  8:22 9:9,13 10:19

10:24 11:1,11,24
12:9,12,24 13:4,7
14:11,24 15:7,14
17:4,10,15,18
19:13 22:25 23:3
23:5,19 26:6,9
37:17,20,23 38:2
38:19 39:4,7,9,17
39:21 40:1,6,9,11
40:15,19,23 42:4
43:12,17,22 45:12
45:20 46:2,5 47:4
47:8 48:20 49:2,6
49:11,14 50:3,5
50:17 51:1,21
53:5 54:10 58:21
59:17 60:21 61:12
62:10,12 64:13
68:17 69:14 70:1
70:9 71:20 73:12
73:18,21,25 74:4
74:11 77:17 81:1
81:4,6,8,16 84:7
85:25 86:3,10,18
90:6 91:4 92:1
94:8 95:10,18,20
97:19,21,23
101:20,24 102:1,4
102:6,11 103:22
111:7,13,18
112:22 113:2,5
114:17 116:2,4,7
116:16,18 121:19
121:22 122:4
124:17 125:6,8
126:1,4,7,15,18
126:21,24 127:7,9
127:14 128:1,4,9
132:4,12 133:11
136:19 137:4,8,13
139:7,15,24 140:2
141:25 142:6,14
142:19,22 146:14

146:16 147:1,5,7
147:13,19,23,25
148:3,6,9,12,15
149:18 151:7,9,13
151:16,19,21,23
151:25 152:4,6,22
153:2,6,10,13
154:9,12,17,22,25
155:5,5,8,12,15
155:24 156:4,7,9
156:13,16 157:25
159:8,16 161:3
169:25 173:8
178:12 179:19,21
180:2,12 181:5,5
182:1,16,18 183:3
186:1,18,23 187:1
187:22 188:18
189:11,17,19,21
190:1,3,4,8
191:13,18,23
192:4,6,10,24
195:15 197:21
198:5,20 199:12
200:5,17 201:1,4
201:7,9,24,25
202:4,12 206:17
207:6,14,16,18,21
207:24 208:5
209:18 211:25
212:3 216:21,25
217:12,21 218:17
219:12,15,22
220:4,14,17 221:6
221:10,14 222:17
222:23,25 227:9
230:1,10,13 233:1
236:22,24 237:5
237:10,13 239:8
240:5,11,16
244:23 245:4,7,9
245:15,23 246:4,7
246:9,17,22 247:1

247:15,24 248:2
249:1,16 252:16
254:10,15,19,24
255:2,12 259:1,9
259:14 260:5
265:21,24 266:1,3
266:6 267:4,6,8
267:12,20,23
269:1,9,12,18
270:5,7 271:11,13
271:17 272:15,24
273:1,14,16,18,20
**court's** 191:5
  192:17 197:9
  200:1
**courtroom** 7:12
  53:16 92:2 95:17
**courts** 169:17
  186:14 202:18
**cover** 60:7
**coverage** 51:24
**covered** 41:14
  62:3 137:17
  138:15 244:8
**coveted** 69:17
**crafted** 118:22
**cram** 271:23
**crammed** 271:24
**crash** 49:7
**cravath** 214:5
  264:22
**create** 153:13
**created** 20:5
  59:10 189:15
  248:23 257:10,10
  262:25
**creates** 238:16
**creation** 34:23
**credenza** 86:17
**credible** 204:4
  228:18
**credited** 164:6

**creditor** 31:17
32:6,15 38:25
45:23 46:10 118:3
118:16 119:1
165:10,10 171:5
197:16 210:1
**creditors** 19:22
24:5 30:25 32:19
42:15 48:10,10
65:10 83:21
101:10 105:3
109:22 118:1
136:10,16 137:16
139:2 141:8,9,10
141:11 159:15,20
159:25 160:2,4,17
160:20,21 161:12
161:14,14,24
162:8 163:4,5,20
165:13,18,19
171:24,25 172:4
172:12 184:19,20
185:5,16,17,21
190:25 191:7
192:13,15 194:8
194:18 203:22
204:4,20 207:1
214:8 215:10,11
236:9,11 247:17
248:24 249:14
252:7 255:22
263:17,23,24
**creditors'** 3:10
105:2
**creep** 55:8
**cremens** 41:22
45:1,14,21 46:7
120:13,15 121:3,5
121:8,11,15 122:1
122:5 160:23
214:4,9,15 250:17
250:18 263:11
264:2,22,23

**criteria** 236:3
**critic** 235:14
**critical** 123:5
158:12 159:10
163:5 183:14
185:11
**critically** 159:4
220:24
**criticism** 252:4
**criticized** 269:24
**critique** 251:8
**cro** 26:8 28:21,21
28:21
**cromwell** 47:15
171:2 215:13
253:5
**cross** 4:1 50:21
51:2 101:21
146:20 151:7
155:10,13 164:7
179:6 231:14
232:22
**crystal** 180:22
203:7
**crystallized** 63:10
63:11 64:5
**cso** 273:23
**css** 1:6
**current** 66:14
109:23 234:15
249:11
**currently** 157:24
163:3
**custody** 256:5
**cut** 65:5 69:6
101:1 112:8 124:9
155:19 167:23
244:14

**d**

**d** 7:1 72:7 75:2,4
140:22
**dallas** 33:5,19

**dang** 5:20
**dangerous** 49:8
**daniel** 3:7 4:9 6:8
**data** 164:9
**date** 20:12 21:25
23:20,23 24:2
26:12,13,15,15,15
26:16 32:4,20
46:1 53:1,17 54:6
59:3 60:12 61:15
72:8,13,22 73:12
73:15 76:1,4,6,7
80:20 89:23 90:2
92:24 93:25 95:1
98:10 105:24
110:22 111:15,15
113:11 114:14
123:11 124:20
125:18 159:6,10
159:11 164:13
172:17 173:10
178:5 179:6 187:1
187:23 188:20
209:22,23 217:8
225:13 237:15
246:14 251:18
261:8 268:16
272:13 275:25
277:25
**dated** 58:15
106:19 108:20
116:24
**dates** 23:24 52:21
110:25 111:21,22
157:4 246:23
**dating** 18:3
**daucher** 5:21
**david** 3:14,16 6:5
26:7 33:24 179:22
**day** 25:20 26:13
57:1,3,8 92:4,5,13
92:19 134:14,23
137:21 139:10

166:10,11 174:14
179:7 187:19
208:3,18,23,25
209:15 210:4,11
210:18 211:24
213:3,5 246:1,2
266:17 269:16
272:12
**days** 24:1,3 103:2
111:8 130:24
153:16 157:20
208:13 271:24
**dbs** 213:17
**dd** 254:11,13
**de** 152:11 154:7
212:17
**dead** 23:24 24:2
**deadline** 272:4
**deal** 14:6 44:10
49:25 50:1 65:6
71:2,4 77:10,12
80:20 112:8,12,14
142:15 160:15
162:21 163:9,10
167:10 182:3
228:5,6 248:10
260:21 261:4
263:5,19
**dealing** 44:8,10
71:6 183:12
256:10
**deals** 185:25
**dealt** 10:20 136:3
**debate** 137:10
**debt** 14:4,15,25
16:3,5 17:24
27:16 92:9 95:14
107:10 146:1
161:10 178:5,7,19
178:23 179:1,3,5
192:19 193:21,22
229:13,15 237:15
240:13,17,18,21

240:22,25 241:1,6
241:12,16 256:15
268:16,18,22,23
269:15,21
**debtor** 31:18 34:4
34:5,7,19 36:25
54:10 57:19,20
70:11 89:19,23,25
89:25 90:14,21,21
100:18 105:14
107:4,20 123:4
149:18,20 150:4,4
159:8 164:10,10
166:19 171:6
174:24,25 175:1,7
175:12,17,20,22
175:23 176:10
184:6 202:16,17
202:20,20 203:5
205:14 206:15
215:1 228:21
229:1 230:22
243:7 252:10
260:4,7 266:25
**debtor's** 173:20
181:15 199:3,6
203:20 215:8
225:10,21
**debtors** 1:8 4:7
11:9 14:16 19:19
19:23 25:8 26:3,6
26:8 28:16,17
29:22 31:2,12,15
32:17 33:3 34:24
35:1 43:25 44:3,3
44:16 57:13 58:3
61:2 66:20 67:3
67:20,21,24 68:2
68:5,7,13 77:5
79:8 81:20 83:7
83:12,25 84:3
85:1,9 86:22
90:24 100:4,13,14

101:7,12,14
102:21,22,23
103:6 104:18
105:12 106:24
107:20,22,23,25
109:23 110:18
111:24 115:16,21
115:21 118:22
124:14,15 125:14
133:21 134:9
135:23,25 136:21
136:21 137:16
140:6,14 142:25
143:6,21 144:4
149:7,15 150:7,7
150:9,12,24 151:2
160:7 166:4 167:5
167:11 168:22
171:3,18 172:3
175:2,10,19
178:13 179:10
180:18,23 182:20
183:24 184:10
188:13 189:18
190:2 198:3
199:21 200:2,4,8
201:21,22 203:9
203:23 204:7
217:16 218:1,10
224:9 230:21
231:17 232:17
233:13 234:4
235:24 236:9,11
236:17 241:20
242:8 247:17
253:8 258:17
261:22 262:18
270:19,20,21,21
271:5
**debtor's** 88:3
**debts** 241:5
**december** 58:15
85:25 86:13

247:18 269:3,10
**decent** 18:21
**decide** 38:4 71:2
202:18 209:19
265:4
**decided** 11:9
30:19 156:22
167:11
**decision** 8:17
42:10 111:23
120:16,16 121:6
124:9 138:16
146:3,9,11 158:13
187:16 190:18
191:2,4,8 194:3
196:5,8 202:1
214:2 223:5,6
225:11 227:17
236:21 240:7,23
244:13 264:4
**decisions** 258:4
**decks** 156:14
188:4
**declaration** 7:20
7:21 13:21,23
16:8,9,23 19:17
19:18 28:7 41:1
57:4,8 92:13,19
102:18 103:14,18
148:13 179:7
**deconsolidation**
33:12
**deeds** 235:15,16
**deemed** 25:17
80:22 186:16
**defending** 269:13
**defer** 169:23
**deference** 169:24
201:21 202:1,5
235:19 236:6
252:22 265:18
**deferred** 223:5

**define** 104:24
**defined** 110:9,12
148:23,24 149:3
175:4
**definitely** 45:8,10
120:3,11 203:3
**definition** 54:13
61:10,18 90:13
148:25 175:18,22
229:7
**definitions** 90:11
**defranceschi** 4:9
**delaware** 1:2,14
271:17
**delay** 49:8 88:2
210:12 251:3
**deliberate** 150:15
**deliver** 256:25
**delivered** 256:25
**demand** 63:24
194:17
**demanded** 64:9
**demonstrably**
79:15,23 165:18
**demonstrated**
197:12
**demonstrates**
196:12 198:2,12
207:4
**deny** 207:13
**dep** 253:4
**departed** 200:19
**dependency**
105:18
**dependent** 186:8
192:10
**depends** 127:14
136:11,12
**depo** 152:23
**deposed** 174:1
175:15
**deposition** 10:22
152:12,17 153:19

253:4 264:19
265:2 270:14
**depressed** 79:13
**deprivation**
218:25
**deprived** 78:6
**derivative** 171:16
**derived** 75:24
**describe** 14:24
**described** 24:4
35:4 98:18 237:16
**describes** 99:6
**describing** 256:2
**description** 97:1
98:18,23 99:6
**designate** 152:11
167:6
**designated** 152:13
153:19
**designating** 154:7
**designations**
152:17,23 253:4
**desired** 109:10
**desirous** 161:2
**despite** 157:13
172:10
**detached** 168:12
**detail** 46:21
**detailed** 199:25
**determination**
98:16 191:24
192:10
**determine** 12:3
170:1 184:7
186:20 188:18
190:24 197:8
**determined** 159:6
183:18 189:12
191:22 201:20
208:20 220:20
234:8
**determines**
167:20 168:16

191:25
**determining**
240:18
**detriment** 41:18
62:14 165:14
**detrimental** 184:9
**developed** 223:6
223:19
**devoted** 171:21
**di** 146:20 147:18
**di2683** 98:4
**di7143** 86:16
**dialogue** 260:19
**diametrically**
226:15
**dice** 263:19
**dictated** 200:12
201:5
**dictates** 177:17
194:13
**didn't** 16:12
30:10 97:13 98:14
100:14,15 106:8
133:8 134:4
**difference** 88:25
197:1
**different** 18:10
24:10 83:23 87:3
103:11 119:5
131:22 162:14
175:8 191:23
196:22 197:1
201:17 204:17,23
223:2 224:12
241:20 242:1,6,11
242:12,13,15
243:7,8,9 269:19
269:20
**differentiate** 97:6
**differently** 243:8
266:12
**difficult** 148:4

**difficulty** 120:21
**digest** 10:11
**dilution** 161:25
**dip** 30:23 107:10
107:13,25 109:24
146:2 150:9 176:5
176:6,9
**direct** 7:5 9:4
10:10,12,22 11:15
13:10,12,18 17:3
21:19 33:14 35:23
35:25 36:4 37:9
44:23 45:3 46:14
52:16 62:13 72:3
75:1 86:5 88:20
89:14 90:20 91:2
96:1 98:17 100:3
116:10 117:11
128:16 136:24
139:4,20 146:17
174:10,23 175:1,2
175:3,6,14,18
176:6,19,21,21
199:11 200:13,14
204:6 233:2,2
234:9,24 238:6,6
238:7,8,12,13,23
239:9 241:7,12
254:11
**directed** 120:13
**direction** 96:6,7
96:20
**directly** 20:5,15
32:23 33:8 36:6
46:7 55:3 69:4
81:24 121:5
165:17 171:6
193:12 231:15
238:22
**director** 17:23
41:23 44:24
120:16 131:1
160:22 174:2

203:16,21 230:24
**directors** 45:4,7
173:25 174:3,6
214:13 217:18
218:2 223:5
230:24 249:14
264:21 266:18
**disagree** 53:20
68:17 79:6
**disagreeing**
131:10
**disagrees** 158:2
**disallow** 134:8
206:1
**disallowance**
20:10 191:3 204:2
**disallowances**
30:9
**disallowed** 61:3
61:11 75:7 133:18
133:19 194:5
219:20
**disallowing** 61:13
169:7 187:16
225:12 271:4
**disappeared**
187:15,15
**disarmament**
255:11
**disaster** 273:20
**discernible** 36:13
36:14,15,20,25
**disclosed** 201:2
**disclosure** 24:2
31:13 65:9,16,19
66:2,20 67:2 74:3
111:16 160:18
168:7 171:20
187:8 195:9
210:20 211:25
212:4 216:6
238:20 248:11
270:23,23

disclosures 70:17
discount 67:13
  187:14 188:7
  196:4,7 212:9
discounted 67:11
discovery 169:1
discrete 44:16
discretion 267:3
discuss 107:11
  109:10 123:25
  131:1,3 185:10
discussed 10:23
  30:6 33:6 35:3,8
  46:10 55:1,1
  68:10 71:14
  102:14 104:20
  106:7 109:4
  119:20 131:19
  141:13 143:18,22
  174:9 187:4,5
  195:8 204:13
  206:20 212:1
  213:25 226:17
  234:4
discusses 125:19
  125:21
discussing 89:2
  120:20 252:22
  272:13
discussion 104:18
  149:14 164:2
  209:7 211:7
discussions 45:22
  45:25 46:24 69:23
  105:2,13 109:21
  161:13 168:3
  173:22
disinterested
  41:23 44:24 45:4
  160:21 173:25
  174:1,3,6 214:12
  217:18 218:1
  223:4 230:23,24

264:21
disparity 179:9,14
  240:20 243:10
disposition
  203:24
dispositive 213:19
  234:14
dispute 13:13
  63:16,19,21
  102:20,21 105:19
  168:12,14 217:8
  234:15
disputed 222:4,5
disputes 171:17
  218:8,10,12
  252:18
disputing 209:5
dissimilar 32:16
distancing 61:25
distinctions
  241:19
distinguish
  202:22
distinguishable
  202:22
distinguishes
  165:6
distressed 67:1
distributable
  55:14 70:13 79:3
  101:10 159:18,24
  163:19 169:9
  246:3
distribute 193:7
  221:25 222:3
distributed 168:4
distributing
  221:22 268:8
distribution 32:19
  184:18,20 221:4
distributions
  158:2

district 1:2
distro 144:19
disturb 207:7
dividend 167:21
  168:3 169:10
  182:23 206:11
  207:10 257:23,24
  257:24
dizengoff 113:19
  114:2 116:22
  117:4 118:14
  120:12
docket 20:22
  42:21 50:20
  101:25 147:23
  155:5
docketed 50:14
document 22:22
  23:15 29:20 56:25
  65:14 82:3 91:6
  95:16 96:24 97:13
  110:9,9,10 131:17
  132:11,12 146:20
  148:18 149:3
documents 7:7
  69:20 86:15 88:5
  110:12 130:2,6,7
  130:8 151:25
  162:19 172:7
  208:11 211:14,16
  241:24
doer 235:15,15
doesn't 85:2
  107:11 163:22,23
  165:8 251:14
doing 10:12 14:16
  16:16 107:22
  144:1,1 150:6
  167:7,10 183:21
  190:23 199:16
  213:17 215:25
  234:20 237:8
  239:11,12 242:9

242:14,15 251:13
  256:1 271:21
dollar 20:14,14
  41:15,16 52:1,12
  61:25,25 161:20
  165:14 168:16
  244:5
dollars 15:21
  78:25 118:25
  119:14 124:4
  135:1,2,3,4
  138:11,12 141:14
  145:16 192:8,13
  238:23 246:19
don 45:10
don't 11:12 12:4
  12:13 14:10,14,19
  85:16 88:11 91:5
  91:8 96:19 99:18
  99:20,20,22
  100:16 102:12
  103:23,23 105:7
  110:6,22 112:11
  112:12 126:5
  127:17 131:11
  132:3,11 135:25
  136:17 137:8,9
  138:1,2 139:9,12
  139:13 145:8
  147:12 153:7
  156:14 162:13,17
door 73:5 91:8,17
  91:24 139:11
dore 264:16
doré 213:20
double 222:16
doubt 158:2 197:3
  264:13
doubts 263:22
draft 104:18
drag 255:11
drain 71:18

| | | | |
|---|---|---|---|
| **draw**  150:1 | 105:19 112:8 | **effectuate**  184:18 | 139:2 144:21,22 |
| **drilling**  243:11 | 137:14 141:13 | **efficient**  11:16 | 144:24 145:2 |
| **drive**  154:15,17 | 143:6,18 148:24 | **effort**  145:16 | 157:25 159:15,19 |
| **driven**  252:9,19 | 223:7 237:9 | 191:5 256:6 | 159:25 160:4,7,10 |
| 252:25 | **early**  19:2 27:8 | **efforts**  87:11 | 160:16,21 161:11 |
| **driver**  224:21 | 46:3 110:24 111:3 | 163:9 166:2,12 | 161:14,22 162:7 |
| **drop**  23:24 24:2 | 125:10 212:19 | 205:16 206:1 | 162:22,24 163:13 |
| **due**  123:10 170:16 | **earned**  173:13 | 235:18,22 258:22 | 163:20 164:1,15 |
| 191:23 208:12,16 | **easier**  58:22 | **efh**  3:4,10 4:13 | 164:25 167:15 |
| 208:21,21 209:20 | 153:14 | 14:4,7,8,15 15:3,5 | 168:4 169:13 |
| **duke**  237:25 | **easily**  173:14 | 18:3,14 20:1,2,2,4 | 171:5,15,19,24 |
| **duties**  49:7 51:9 | **easy**  72:6 151:15 | 20:15 21:14 26:10 | 172:1,3,8,11 |
| 218:11,12 | **eaten**  251:2 | 26:17 27:3,4,4,10 | 177:2,5 178:6 |
| **duty**  170:1,23 | **economic**  14:5 | 27:13 29:4 32:3 | 179:14,24 180:8 |
| 201:25 214:18,19 | 16:6 20:11 50:1 | 32:18,19 33:1,18 | 180:20 181:3,9,12 |
| 215:12 262:10 | 51:11 85:13 112:7 | 34:6,6,9 35:2,5,22 | 181:15,17,20 |
| **dynamic**  55:10 | 117:25 131:20 | 36:12,15 37:3,9 | 182:3,6,7,14,20 |
| 63:13 70:7,10 | 160:16 183:5 | 41:16,18,18,20 | 183:1 184:15,20 |
| **e** | 217:7,14 244:16 | 42:14 43:2,3,8,10 | 185:3,7 186:23 |
| | **ecro**  1:25 | 44:11,13 45:4 | 187:22 188:16,20 |
| **e**  1:21,21 3:1,1 7:1 | **ed**  215:13 | 47:9 48:10 51:14 | 191:5,6 192:2 |
| 7:1 12:21,21,22 | **efa**  104:12 | 51:18,18,23 52:4 | 194:5,8,9,15 |
| 24:1 42:18,22,23 | **effect**  20:11 56:2 | 52:6,11 54:11 | 195:1,6,7 196:10 |
| 43:7,14,25 44:18 | 73:25 74:13 | 61:1 62:15 65:3,8 | 196:15,18 197:5 |
| 47:12 48:9,14 | 137:15 141:1 | 67:8,8,17,25 69:4 | 197:16,17,22 |
| 62:18 72:15 85:19 | 151:2 162:15 | 69:7,9 72:8,12 | 198:1,10,16,16,24 |
| 85:22,23 124:15 | 176:14,15,16,20 | 73:8 76:4,7 82:25 | 199:7 200:11 |
| 136:21 137:16 | 176:24 181:10 | 86:22,22 87:12,25 | 203:6 204:6,8,9 |
| 140:6,13 142:25 | 189:5 199:15 | 87:25 88:13,23 | 204:11 205:5,12 |
| 143:21 169:5,6,16 | 204:11 238:25 | 89:23 90:14,19,20 | 205:16,20,22,23 |
| 170:24,25 171:11 | 239:15,24 | 90:24 91:2,3,11 | 205:25 206:9,10 |
| 171:22,23 172:2 | **effective**  11:16 | 91:14,21 92:9,24 | 207:11 208:7 |
| 178:14 181:18 | 20:12 22:21 32:4 | 93:1,20,22 94:18 | 209:1,6,7,10,12 |
| 184:16 200:21 | 32:19 46:1 59:2,6 | 94:21,25 95:6 | 209:14,20,23 |
| 205:7 212:19 | 60:12 61:15 68:19 | 99:8,9 104:23 | 210:5,8,10,11,11 |
| 225:18 226:9 | 72:8,13 74:1 76:1 | 105:3 109:6,19 | 210:19 211:2,7,10 |
| 239:13 242:22 | 76:4,6,7 89:22,23 | 119:1,7,15,15,16 | 211:13,19,22,25 |
| 248:15 253:20 | 90:2 123:11 | 119:18,19,21,23 | 212:8,11,14 213:2 |
| 257:5 258:18 | 124:20 125:17 | 120:6 122:18 | 213:13 214:12 |
| 275:1 277:1 | 173:10 178:5 | 123:2 124:5 131:1 | 215:2 218:22,22 |
| **eaf**  171:25 | 237:15 268:16 | 132:9 135:25 | 218:23 228:4 |
| **eagles**  126:14 | **effects**  205:17,17 | 136:10,15 138:5,8 | 229:19 230:24 |
| **earlier**  56:1 78:23 | | 138:8,9,11,12,20 | 232:11 233:5 |
| 81:15 83:13 84:13 | | | |

237:16 238:22
239:23 242:18
243:3,4,5,6 246:3
248:21,23 251:7
252:24 253:19,24
254:4,7 257:2,8
258:1,8,17,22,23
261:13 262:25
263:23 265:8
268:17,23
**efh's** 162:11 185:1
196:1 198:20
204:4 210:3
211:12
**efi** 54:2 107:1
119:16 249:13
**efih** 14:4,7,8,16
15:3,5 18:3 19:22
19:24 20:7 24:5
24:11,14,18 25:8
25:15,19 27:1,4,5
27:10 29:4,7
30:24 32:3,13
33:12 35:2,5,22
36:12,16 37:3,10
41:13,17,19,23
42:14 43:9,9 44:9
44:13,24 48:10,11
51:14,18,22 52:4
52:11,17,24 54:14
55:9,15 58:12
59:20 61:2 62:14
62:22 67:6,19,25
68:21 70:5,11,12
70:14 71:6,17
75:5,5,24,25
78:22 80:18,19
81:16,21 83:2
89:25 90:17,21,21
91:1,20 92:10,25
93:2 94:18,21,23
94:24,24 95:6
99:9 100:25

104:23 105:3
107:3,11 109:6,19
109:24 112:2
114:4,12 115:4
116:21 118:1
119:1,7,8,18,19
119:20,24 120:5
120:16 121:6,7,9
121:12 123:2
124:5 129:6 132:9
133:14 134:10,18
135:23,25 136:24
137:16 138:4,15
138:17 141:2,8,9
141:11,14,15
142:4,9,15,19
145:25 146:2
157:25 160:2,20
161:10,22,23,24
162:23 165:13
168:4,4 171:25
172:11 176:5,7,11
177:2,5 178:6
179:15 184:19,24
185:8 191:12
192:2 193:21
194:8,16 199:6
200:10 203:14,17
203:20 204:7
205:5,14 206:10
207:6 210:1,1,12
210:14 211:1
213:3,13,13 214:4
215:2,23 218:21
218:22,22 219:1
219:11,24 220:4
225:18 226:3,13
230:24 231:13
232:11 233:5,10
237:16 239:23
243:5 247:6
248:15,22,24
250:18 252:2,5,6

252:9,11,20
253:19 254:6,8
256:21 258:1,23
261:13 262:23
263:24 264:21
265:8 268:16,21
268:21
**efih's** 54:11
118:15 184:17
185:5 203:21,22
204:2,6 220:6
**eight** 69:21 80:10
93:6
**either** 26:25 36:23
45:3 46:13 69:7
78:1 85:3 98:19
131:19 145:20
148:24 191:21
195:6 209:25
**elected** 71:4
230:25
**election** 76:17
**electric** 118:23
**electronic** 12:10
96:8 155:1,3
**electronically**
154:18
**eliminated** 70:3
181:10
**eliott** 250:3
**elkin** 3:12
**ellington** 237:25
**elliott** 5:2,9 14:15
15:19,20,21 16:14
17:19 27:6,6,9,12
27:13,16,17 29:18
29:20,25 30:12,19
30:25 31:4,5,7,9
31:12,15 32:7
35:14 49:18,21,24
51:5,7,14,24 52:2
73:7 74:13 82:17
100:4,15,18,25,25

101:8,9 102:21,23
103:6,8 105:20
106:4,5,25 107:3
107:18,22,24
109:20 110:5,18
110:18 112:6
123:18 124:2,8
125:13 139:25
141:1,13 142:24
149:9,10,12,15
150:3,6,8,12,13
151:3,20 157:14
164:18 165:12
166:11 167:23
168:22 181:9
182:8,22 186:13
190:21 198:20
205:11,13,15
216:5,7,13 219:24
226:14,20,22
227:13 240:7
242:7 243:17
244:6 249:7 251:9
255:21 256:4,9,21
256:25 261:14
**elliott's** 14:17
139:18,21 165:19
167:1 191:10
206:7 209:11
237:17 255:25
258:22 260:2
**elliott's** 95:23
111:23
**ellis** 4:12 150:17
152:8 200:19
213:12 216:16
264:14 268:14
**elx** 65:14 97:20
**email** 103:21
104:4 105:24
106:13 107:14,16
108:11,17 110:2,3
116:20 129:16,21

129:25 130:14,15
131:5,7 148:21
149:2,5,6,23,24
150:23 273:6
**email's** 150:19
**emails** 146:22,25
147:8,9
**embedded** 80:1,8
**embodied** 117:25
**emerged** 124:15
124:16 239:4
**emergence** 233:14
**emerging** 124:10
**emphasize** 210:19
234:2
**employed** 17:20
72:23 74:9,13
233:16
**empowerment**
250:20
**enabled** 71:1 83:8
**encompassed**
132:6
**encore** 211:6
**endeavor** 152:18
**ended** 116:2
167:10
**ends** 116:3 118:13
**enemy** 209:23
**energy** 1:6 242:20
242:20
**enforce** 104:25
**engaged** 54:25
55:3
**engaging** 184:10
**enhance** 261:12
**ensure** 23:16
250:20
**enter** 31:12
107:19 125:2
150:3 154:8,10,12
167:2 203:9

**entered** 18:23,25
19:5 23:19 61:12
185:9 202:4
**entering** 230:19
**enterprise** 79:7
195:24
**entertain** 180:2
**entire** 18:15 177:7
180:19 197:19
214:6 233:5,12,15
241:20 247:12
250:21
**entirety** 183:15
205:6
**entities** 18:7,14,14
36:17 183:23
**entitled** 66:16
80:23 165:11
**entries** 50:20
96:11,21,23 98:3
132:22 232:15
**entry** 20:22 42:21
87:24 96:25
101:25 147:23
**equally** 227:6
**equals** 93:13 94:9
**equitable** 38:7,13
133:5 174:16
**equitization** 45:23
**equitizing** 32:20
83:21
**equity** 18:21 20:1
20:2,3,5 24:6
25:16 27:5 41:19
62:14 132:8 135:4
135:16,18 138:5,8
180:13 181:6
192:14 193:23
194:9
**eric** 5:21
**erik** 6:6
**erin** 5:11

**error** 186:16
**esa** 143:17
**especially** 235:24
271:20
**espousing** 143:3
**essentially** 22:2
32:20 38:16 88:14
97:5 172:7,9
184:12 220:18
254:13 255:7
**esser** 4:19 152:3,5
152:7,7,24 153:3
153:9,12,15
154:16,19,24
155:4,7,9
**establish** 11:7
200:14 205:13
**established**
135:24 182:14
183:1 205:6
**establishment**
88:12
**estate** 32:1 35:23
51:23,23 52:11,12
89:3,3 91:21,21
91:22 99:4 114:12
115:4 118:15
119:7,8 159:4
163:25 167:18
181:8 182:19
183:12 185:22
189:19 190:2,19
195:17,18 197:8
199:1 210:4
218:21,22 219:9
219:11,11 220:6
221:22 223:17
224:18 225:18,23
225:24 228:4,13
229:19 232:14
234:9,19,21 238:6
238:6,22 243:11
248:7,15 252:20

254:14 258:9
265:6
**estates** 26:10 30:7
47:22 109:6 123:2
125:15 166:3
167:19 178:21,21
184:11 188:22
201:13 204:16,17
204:20 206:25
211:5 213:9 215:8
226:3 231:1,2
232:8 236:8,17
238:15 243:21
251:21 253:9
255:16 257:7
262:19 266:21
**estimate** 246:17
246:18
**estimates** 187:8
**estoppel** 220:7
**et** 1:7 8:2,2 34:18
**evaluate** 65:1
98:14 99:1
110:20 120:4
229:5
**evaluated** 122:20
218:2 225:2
**evaluating** 73:9
248:17
**evaluation** 251:15
**evans** 45:10,16
160:24 265:1
**event** 29:22 50:24
61:19 109:9 145:2
145:20 212:20
**events** 23:8 26:2
156:23,24
**eventually** 134:7
162:3
**evercore** 26:7
170:16 175:13
179:16 241:23
242:11 250:11

evercore's 11:19
173:17 242:2
evergreen 255:11
everybody 7:3
65:5 212:20,25
213:7 220:22,23
everybody's
169:11
everyone's 152:6
everything's 85:8
evidence 9:6
11:11,18,21,24,25
12:1,1,4 152:16
152:16,17 154:5
157:2 166:9,10,16
180:22 182:4,9,13
182:16,20 183:4
184:15,25 187:6
196:12 197:11,23
198:17 199:4,8,19
200:2,13 201:17
204:4,20,21 205:8
205:13,22 206:4
207:4 208:11
209:16 210:4,20
211:4,6 212:4
213:18,22 229:2
241:24 250:6
251:6 252:3 263:1
264:10,15 265:16
evidenced 231:17
evidentiary 2:1
218:17 241:20
243:18
evolution 79:1
ex 20:1
exact 10:15 20:20
21:10 54:6 56:21
113:11
exactly 29:1 35:8
42:17 53:2,12,21
69:2 72:21 76:24
80:6,22 85:9 93:8

93:15 96:19 103:4
104:15 105:6,21
110:14,22 116:8
136:5 143:12
148:25 200:24,24
221:20 246:6
260:15 262:7
263:12,21 269:23
examination
13:10 50:21 51:2
128:16 146:17
231:14,18 232:22
examiner 214:24
216:13
example 11:3,7,17
52:9 54:25 79:17
176:5 177:13
182:22 186:12
193:18 194:1
232:10 241:2
243:7 252:14
263:14,25
examples 182:25
exceedingly 216:7
excel 98:3
excellent 153:6
exception 144:19
178:10
exceptional 262:9
exceptions 13:25
excerpts 50:9
65:16
excess 62:5
184:19 191:17
194:11,12
exchange 91:12
103:21 108:12
114:4,9,23 115:1
115:14 129:16
198:19,21,23
226:2
exchanged 94:23

exchanging
153:15
exclusively
184:21
exclusivity 31:2
105:16 143:10
excuse 9:11 10:2,9
11:16 57:17 72:4
80:23 89:24 90:17
101:25 119:8
136:7 219:24
234:22 258:13,22
executed 89:12
execution 109:25
executive 214:2
executives 214:17
exercised 202:5
exercising 40:13
exhibit 28:6 50:6
58:8,10 88:16
89:7 92:16 97:19
103:15 104:1,2,4
106:9,10 108:11
146:22,23,24
147:1,3,19,24,25
148:18 153:16
176:25 262:17
271:22
exhibits 7:12
12:11 58:7 97:12
148:14 152:16
153:20 154:3
exist 107:21 150:5
269:21
existed 95:2
119:19
existing 30:23
181:23 207:7
exit 136:13
expect 50:23
57:13 80:20
expected 54:1
136:7 159:14

expecting 38:22
expenditures
32:25
expense 41:5 43:6
47:21 124:11
157:11 159:5,6
183:18 188:22
195:16 219:19
223:9
expenses 41:8,11
51:22 132:1 139:5
165:16 167:18
172:20 176:4
183:11 184:14,23
218:9 219:1 233:4
260:8
experience 9:5
57:12
expert 39:16
192:7 228:19,24
229:22 230:5
242:20,25
expert's 228:18
experts 229:23
230:3
expired 105:16
143:10
explain 24:21
30:17 41:10 178:2
225:1
explained 178:22
234:1
explains 268:23
explanation
268:24
explicitly 237:3
explore 113:8
exploring 44:7
107:12 218:14
expose 118:15
exposure 81:21
119:6

express 32:10,25
  118:5
expressed 32:12
  32:13
expressing 118:6
  119:4
expressly 163:5
  262:1
extend 271:19
extended 85:3
extension 166:10
  166:12
extensive 47:9
  224:25 264:13
extent 43:13
  50:12 51:17,21
  57:7 64:3,23
  75:23 107:2 114:8
  119:22 121:6
  122:6 141:15
  220:19 239:25
  257:8
extermination
  159:2
extinguished 95:7
extra 259:4
extraordinary
  180:2,7,7 213:11
  227:20 228:20,21
extrapolation
  37:8,11 40:2
extreme 217:7
extremely 153:18

f

f 1:21 12:21,21
  23:18 275:1 277:1
face 25:2 167:24
  203:5
faced 203:6
  249:13
faces 216:7
facilitate 109:17

facilitated 169:7,9
facilitating
  167:21 168:12
facilities 204:6
facing 169:1
fact 11:13 31:2
  64:6 68:1 71:7
  78:12 80:12 82:2
  84:14 87:12 123:6
  143:17 150:13
  161:9 163:4
  165:13 166:21,22
  167:15 168:1,2,10
  170:20 171:15
  172:25 179:10
  180:21 186:16
  197:6,14 198:16
  200:20 201:12
  209:25 213:2
  222:20 223:4,7
  225:19 228:19
  230:20,21 233:16
  241:23 243:9
  247:4 251:1
  252:25 258:20
  260:6 261:3
  262:10,17 270:18
  272:22
factor 39:22 60:1
  68:9 70:19,21
  229:10
factorial 34:18
factors 8:16 41:3
  59:23 65:24 66:1
  66:4,8 68:5,14
  78:16 241:6 247:9
  247:9 265:11
facts 48:1,8
  159:13 170:8
  190:23 191:14
  221:24 223:6,19
  226:11,25 227:1
  258:13,14 269:13

factual 199:21
fail 21:25
failed 181:25
  240:10,20
fails 189:17 190:1
failure 160:10
fair 20:9 26:10
  37:12,19 38:13,15
  38:24,25 67:10
  69:21 92:1 132:13
  133:4 135:6
  230:12 234:20
  270:9
fairness 38:7 39:4
fall 78:1 105:20
  217:20
falls 250:22
familiar 65:19
  66:1 76:11,24
  80:12 85:19 87:11
  88:9,11,25 92:12
  99:2 122:22
  135:14 169:2,17
familiarity 56:16
far 68:21 82:24
  209:10 242:3,4
  247:19
fashion 233:13
fast 115:19
fault 125:11
  202:17 244:16
  247:20,20 249:10
favor 186:9
fay 5:11
feb 46:2
february 46:3
  101:4 163:14
federal 249:9,11
fee 26:20 35:22
  36:1,4,8,17 46:15
  46:18 123:14,18
  123:23 124:2
  128:20,25 129:3

130:22,22,25
131:18,21,23
132:1,4,10,22
149:16,22 151:3
157:19 158:1,25
159:2,5,7,12,14
160:5,10,23 161:9
164:15,17 167:14
167:20 169:7
170:1,11,13,16,23
171:10 173:3,4,13
173:21 174:3,6
175:23 176:6,7,13
177:24 178:3,17
180:10 181:4
183:13 185:14,25
186:6,8,11,20,22
187:2,11 188:11
188:12,15,21,23
189:1,3,9,12,15
190:14,16,20
191:15,16 192:3
192:12,12,18,21
193:2,5,6,8,9,12
193:21,22 194:1
194:10,14,18,20
195:4,14,15,16,18
195:19 196:3,21
196:22,25 197:4
197:10,14,15,25
198:4,6,11,21
200:4,14 201:3,4
202:9 204:10
206:1,6,15,18
207:2,6 208:10,12
208:19,25 209:4
209:11,12,20
210:6,7,9,15
212:11,15 213:10
213:15,16,18
214:7,23,24 215:3
215:4,5 216:3,4
216:13,14,15

219:6,16,16,19,20
219:24 220:20
223:21 224:22
226:10,12 227:15
227:19,21 228:23
230:6 231:5,16
232:23 233:2,2
236:18,19 239:10
240:9 244:10
258:16 260:1,2,11
260:24 261:12,21
262:6 263:10,12
263:19,21,25
264:19,24 265:2
265:12,13 266:17
266:24 268:1,19
270:2,13 273:11
**feel** 102:11
**feels** 242:17 250:9
**fees** 21:1,13,15,18
21:20,24 22:3,7
22:10,13 23:17
27:3 31:24 32:1,2
32:3,5,14,23 33:8
34:10 35:1,5,10
35:19 37:5,9
41:15,17,20 51:22
84:15,20 85:15,17
123:1,7,11,11
124:4,5,18 125:14
125:20,22 133:3,6
139:5,19,22 140:1
144:7,12,14,15,17
144:19,22 145:1
145:19 159:3
164:21 165:8,15
166:5 167:13
168:10 169:16,17
170:14,15,24
171:12,15,20
172:13,16,19
173:1,2,23 174:10
174:10,11,21,23

174:25 175:1,2,3
175:6,19 176:19
176:19 177:2,17
178:4 179:18
181:13,16,18
184:4 192:8,25
196:23 199:3,6,11
199:11,22 200:3
200:13,16 201:13
201:17,23 202:7,8
204:14,17 205:4
207:8 213:13,23
214:19,20 215:8
215:12,14,18,22
215:22,23 216:1,8
216:10 223:3
224:12 225:3
227:7 230:3,7
231:9 232:9
233:18,21 234:9
234:16,19,20,23
238:3,11,12,13,13
239:5,9 240:11
241:12 244:2,9
245:1 251:24
252:21,25 260:1
260:16 264:12
265:22 271:4
273:17
**fell** 80:20 173:4
212:22
**felt** 250:14
**fenicle** 96:8
**fewer** 50:12
**fidelity** 22:10
160:8 163:7 165:1
227:1,2 228:10
**fiduciaries** 203:21
**fiduciary** 172:11
214:4,10,18,19
215:11 218:11
**fight** 50:23 242:22
263:2

**fighting** 84:9
**figure** 31:1 127:19
161:1 235:6
251:12 272:17
**figured** 34:21
**figuring** 94:6
243:15
**fih** 90:25
**file** 55:13,19
57:25 105:7
123:13 124:22
155:3 160:13
167:25 168:1
170:18 273:2
**filed** 54:8,24
55:15 57:25 58:3
102:22 123:15
124:16 130:12
134:7 160:18
170:12 178:3
231:23 249:3
**files** 74:6
**filing** 22:21 52:20
53:1 73:12 114:16
134:23 231:17
**filsinger** 179:12
242:4,14,17,19,24
**final** 10:3 14:3
21:11 32:4 95:23
123:25 124:2
170:10,21 171:10
174:21 177:1
178:3 191:10
193:24 220:21
232:23 241:17,22
268:19 270:13
271:1
**finally** 163:1
164:3 169:22
172:6 178:25
224:11 229:25
236:13 255:18
257:22

**finance** 107:9
166:14
**financial** 21:9
26:7 36:5,11
47:13 132:6
186:13 214:5
231:3 232:5
**financing** 100:5
100:19 103:9
107:4,14,20,25
108:4 150:4,10,14
151:4 166:20
176:6
**financings** 30:23
30:23,24 105:14
105:14 106:5
108:8
**find** 31:3 42:21
106:8 191:19
211:21 228:18
233:1
**finding** 163:16
174:18 176:3
219:23 220:19
221:21,25 226:19
262:8
**findings** 127:18
190:9 222:20
247:4 272:22
**fine** 12:6 39:6,8
39:25 40:10 48:20
91:8 140:3,4
154:22 218:24
273:1
**finger** 4:6
**finish** 15:10,11
57:17 62:9 155:18
155:18 267:7
**finishes** 9:3
**finishing** 259:4
**finite** 22:18
**firm** 15:20 51:7
130:16 175:10

242:4 253:5
**firmly** 30:3 41:23
**first** 9:10,11,20,25
  15:6 16:12 20:7
  25:20 37:25 38:3
  39:4 41:7 44:9
  49:12 50:3 57:1,3
  57:8 62:22 63:1,7
  63:9,20,24 64:4
  64:22 65:15 68:1
  75:5,24 81:16,22
  87:21 88:16 89:21
  92:13,19 93:11
  99:19 108:18
  109:4,19 116:11
  117:16,17,18
  130:14 133:14,18
  133:19 137:21
  142:19 146:2
  155:22,25 156:1
  157:21 165:22
  179:7 185:10
  192:8,19,22,22
  193:7,16 203:1,7
  210:18 219:5
  242:18 254:20
  260:11 272:12
**fits** 139:18 238:1
**five** 130:2,8,13
  155:16 156:10
  208:13
**fixed** 233:2
**flag** 239:16 252:1
**flagged** 239:10
**flagging** 74:23
  238:10
**flesh** 129:14
**flexibility** 127:12
**flipside** 251:23
**float** 56:19
**flow** 33:7 55:8
  193:10 198:15,16
  211:24 212:8

**flowed** 229:18
  246:3
**flowing** 209:6,7
  210:14 212:7,7
**flown** 246:23
**flows** 31:16,23
  32:10 41:18 52:13
  174:7
**focus** 11:7 14:7
  36:16 60:8 89:1
  108:17 144:7
  228:3 247:12
**focused** 11:8
  44:20 55:20,21
  138:14 219:7
  234:7,20 240:7
  241:21 243:16
  252:9
**focusing** 83:11
  229:6 230:16
  233:23 239:11
**fold** 211:20
**foley** 215:19
**folks** 99:10 121:2
  122:16 129:22
  242:8,14 243:3,4
  243:17 252:12
**follow** 133:8
  208:16
**following** 60:12
  68:3,5 72:13
  93:12 109:18
  149:5 178:5
  189:21 246:15
  263:15
**follows** 150:1
**font** 154:13,20
**foot** 220:12
**footnote** 75:19
  77:13 80:16 94:10
  94:16 190:25
  201:4

246:20

**force** 100:14,15
  105:20 151:1
**forced** 49:18,21
  166:24 180:3
  195:3 198:25
**forecast** 123:7
**forecasted** 246:20
**forecasting** 232:6
  232:19
**foreclose** 142:3
  263:16
**forefront** 262:12
**foregoing** 275:3
  277:3
**foreign** 69:24
**foremost** 203:7
**foresight** 213:2
**forget** 126:4
  148:25
**forgot** 260:10
**form** 83:7 129:21
  145:21 210:20
  214:1 222:12
  229:16,18 233:13
**forma** 19:25 20:2
  20:3,15 138:8
**formula** 47:20
  240:9 270:20,21
**forth** 76:5 150:20
  150:24 266:22
**forumla** 247:13
**forward** 31:3 34:2
  35:10 73:2 83:6
  90:10 101:13
  102:23 109:14
  110:20 111:24
  112:7 115:16,19
  123:8 138:15
  157:15 158:25
  159:11 167:11
  172:10 208:23
  210:7 217:12
  218:19 230:25

232:10 233:8
  236:15,20 253:11
  258:25
**found** 192:11
  270:12
**foundation** 8:1,24
  9:14,24 10:2 11:4
  11:6,20 73:1
**foundational**
  225:9
**four** 42:2,4 49:12
  50:19 57:2,5
  156:24 157:11
  161:7 168:25
  213:12 216:2
  234:6 235:17
  264:14 266:21
**fourth** 71:25
**fraction** 98:21
**frame** 221:20
**frank** 23:19
**frankly** 39:22
  127:15 128:2
  133:12 162:19
  165:12 213:16
  217:15 224:21
  236:7 237:18
**fraudulent** 249:17
**free** 106:8 107:19
  118:23 140:14
  141:5,8 144:22,24
  149:10,14 150:3
  151:10 161:19
  169:11 175:24
  176:12 180:21,25
  196:11 248:21
  250:15
**freedom** 103:12
**freudian** 78:5
**friday** 272:14
**frighteningly**
  220:16

**front**   13:16 20:6
  37:16 39:17 63:18
  65:15 71:8,17
  80:17 101:2
  128:13 182:15
  183:16 201:18,18
  202:19 234:10
  245:24 249:5
  259:12 271:19
**fruition**   78:16
  247:18
**fulcrum**   172:4
  193:3
**full**   26:10 27:2
  41:14,21 42:8
  50:10 54:14 62:23
  62:24 76:6,18
  83:8 84:5 138:18
  151:1 160:2,19
  172:1 185:5,16,22
  192:15 194:9,16
  194:22,23 205:2
  207:2 210:15
  249:9
**fully**   43:2 62:3
  110:6
**function**   194:12
  204:11
**fund**   15:23
**fundamental**
  176:2 259:23
  261:19 266:13
**funded**   92:25
  94:24
**funds**   69:23,24
  143:23,24,24
**further**   50:2 97:5
  118:14 146:13
  151:6,16 161:13
  191:18 211:3
  223:6 234:5
  243:11,12

**future**   1:6 208:4
  212:24

**g**

**g**   7:1
**gain**   195:6 228:14
  244:5
**galardi**   5:5 7:14
  10:12,13,25 11:1
  11:2,13 12:6 13:3
  13:11 14:13 17:1
  17:9,12,17 22:25
  23:1,4 37:18,21
  37:25 38:3,21
  39:6,8,11,19,24
  40:10,12,18,24
  43:20 47:6 48:3
  48:18 49:9,12
  50:2 62:8 72:20
  73:14,19,20,23
  74:5 77:15 86:2
  86:12 104:7
  106:19 107:17,18
  111:9,14,18,20
  126:13,16,18,20
  126:22 127:2,25
  128:3 131:19
  133:9 134:2,4
  136:24 137:1,4,5
  137:10,18 139:6
  146:14,15,18
  147:2,3,15,18,21
  148:2,5,7,10,13
  148:16 151:6,20
  155:13,22,25
  156:1,14,17 173:9
  180:16 183:19
  186:19 202:25
  203:2 208:19
  215:18 219:17
  221:12,14,16
  222:9 232:23
  234:17 242:16
  245:19 246:5,11

  256:2 259:2,3,10
  259:15 260:6
  265:23,25 266:2,5
  266:8 267:5,7,11
  267:16,19,22,25
  269:3,5,17,23
  270:6,8 271:11,12
  272:6,20,21,25
  273:10,13,15,19
**galardi's**   134:17
  141:23 142:23
  197:12 214:16
  243:25 246:12
  272:13
**gambling**   213:5
**game**   207:25
**garner**   189:17
  190:1
**garvan**   3:6
**gavin**   3:18
**general**   25:8 33:4
  68:15,16 76:14
  77:20 92:14
  114:12 115:3
  119:25 165:18
  172:22
**generalizations**
  182:17
**generally**   68:5
  92:12 165:19
  182:18
**generate**   191:16
**generated**   195:4
**gentleman's**
  147:14
**gentlemen**   33:15
  130:1
**getting**   13:8 79:13
  101:20 102:24
  111:9 127:23
  135:4 144:2
  163:10 195:2
  243:14 248:9,10

  248:11 267:12
**giant**   152:1 212:3
  212:10
**gibson**   272:15
**gitlin**   214:25
**give**   11:14 18:11
  22:3 24:20 35:12
  52:14 56:22 69:2
  71:16 153:7 155:1
  156:10 168:25
  186:8,14 197:16
  197:18 201:21
  202:4
**given**   34:17 55:8
  64:15 67:5,17
  193:19 198:18
  212:10 238:10,13
  238:22 239:10
  243:9,17 249:9
  265:18
**gives**   85:11
  201:16 210:24
  211:12 263:13
**glad**   189:21
**gleaned**   46:23
**glenn**   3:13 10:21
  102:1 126:2,3
  127:8,10 128:10
  128:14,17 134:6
  137:12 139:12,17
  139:25 140:3
  146:12 151:21,22
  156:6 222:17,18
  222:24
**global**   44:21
  85:21,22 87:13
  88:10,19,19,24
  89:1 91:20 95:5,9
  95:15 132:10
  171:17,22 172:18
  253:25 254:3,5,10
  254:17,25 269:5,7

**glueckstein** 201:12 253:2
**go** 7:23 15:6 22:20 23:2 35:10 38:7 40:23,24 45:17 58:9,24 62:12 68:1 73:2,14 75:13 82:14 83:22 98:14 101:18 103:8 106:5 108:11 109:8 112:7 115:16 119:5 121:5 123:7 133:23 148:17 149:4,8,23,23 150:22 155:17,19 155:22,23,25 156:1 157:9,15 158:25 162:5 166:24 167:7,11 174:12 176:2 178:6 187:13 188:19 189:4 190:22 191:18 192:1,5,23 206:22 208:1,2,18 209:10 209:19,22 211:9 212:13 216:1,18 219:14 220:10 230:25 244:22 250:17 259:13,15 262:2,8 264:8,11 265:18 267:4,5,21 267:24 268:14 269:14
**goes** 8:2,21 9:8,12 10:1,3,9 37:16 41:12 47:24 48:3 68:19 76:3 82:11 96:24 104:24 156:25 161:6 179:1,15 188:20 189:6 194:7,8

228:17 231:5 244:25 245:1
**going** 7:25 10:16 11:14,17 15:6 20:17 28:5 30:21 30:21 37:21 38:4 38:23,23 41:25 43:20 44:22 49:12 50:23 54:19 62:18 63:16 79:22 83:21 101:12 102:1,8 103:22,24 112:9 125:24 126:1,8 127:10,20 130:1 139:10,10 141:9 146:23 149:4,23 150:12 152:22,23 153:10 155:17,17 156:17,18,19 159:11 160:16,25 161:7,8 162:10,23 167:7,14 168:11 168:17 170:18 172:10 176:14,15 177:6 190:22 208:7 209:25 211:5,6 216:8 217:18,20,20 220:25 221:7,10 221:12,16 223:25 224:5 230:19 236:15,20 240:3 244:21 256:16 258:7 259:15,17 260:11 261:10 262:2 263:2,5 268:10 272:1,2,8 273:7,10,21
**golden** 214:5 264:23
**gooch** 215:2 232:4 264:16

**good** 7:2 15:25 49:2 103:21,22 154:25 175:10 179:22 220:17 241:19 253:2 273:7
**goods** 183:20
**gotta** 242:9
**gotten** 213:8 268:18
**governs** 199:10,11
**grace** 126:13,16
**grand** 188:8
**grant** 197:9
**granted** 91:13 142:10 163:7,25 181:20 267:21 269:7
**graphs** 173:6
**gray** 5:1 98:13 106:14
**great** 148:15,17 155:18 212:3 268:12 273:9
**greater** 121:7 169:9 256:14
**green** 153:22 173:12 216:25
**greg** 104:17 106:22 151:12
**gregg** 5:5
**gross** 55:7 135:1 138:10 190:12
**ground** 217:6 218:19 258:24
**group** 4:21 19:10 21:8,9 47:3,11 113:14 114:2 117:1,6,7 129:7 131:3 230:16 249:2 273:25
**groups** 240:22

**grumpy** 127:23 127:23,24 202:23
**guarantee** 198:15 247:8 249:21 250:7
**guaranteed** 248:5
**guess** 7:3 28:20 53:5 264:4
**guggenheim** 47:17,19 171:9 172:24,24
**guidance** 149:18 233:22,24 234:10
**gump** 19:12 21:11 113:15 129:9,12 134:3 215:19
**guru** 111:15
**guy** 103:21,23 148:15,17
**guys** 46:19

**h**

**h** 3:12
**half** 23:25 24:2 42:4 57:2,5 194:17 195:3 230:8
**hallucinating** 219:15
**hammered** 267:12
**hand** 12:14 86:17 93:21 152:25 153:4,7 156:14 168:11 177:1 184:21,22 242:4,5 247:18
**hang** 170:18
**hanging** 212:16
**hanrahan** 5:22
**happen** 114:6 250:21 257:14 258:4
**happened** 115:1 188:6 223:20

248:2 267:16
**happening** 127:17
266:7
**happens** 194:1
236:15
**happy** 152:25
154:9,12
**hard** 85:15 86:19
128:1 225:1
235:16 247:16
249:23
**hardcopy** 273:5
**harm** 118:2,6,16
**harrison** 5:23
**harvard** 249:8
**hathaway** 34:20
69:12 145:24
256:18
**haves** 33:25,25
**headed** 42:25
**header** 68:3
108:18
**heading** 59:2
60:11
**hear** 49:14,17
59:15 102:9
103:24 129:11
134:19 137:4
221:14 227:12
230:20 236:24
240:3,3
**heard** 14:20 64:18
141:23 148:15
157:1 161:19
164:24 170:7
177:24 180:23
203:12 210:19
212:4 213:12,22
214:14 232:21
241:25 250:9
251:9,16 256:2
259:7,16,19,19,20
267:16

**hearing** 2:1 13:5
25:20 26:6 57:1
92:14 102:24
111:4,10,11
115:25 116:1,2
157:19,20 163:15
167:10 168:24
195:17 208:19
212:1 235:6 243:1
245:22,22 250:16
260:16 272:16
**hearings** 25:19,21
46:15 218:16,17
**hearsay** 43:14,16
264:15
**hedge** 15:23
**held** 67:16 94:18
94:21,24 180:13
180:13 181:5
240:21 257:25
**hell** 156:21
**help** 50:9 86:5
255:14 266:17,18
**helped** 162:24
**helpful** 113:6
147:18 154:21
247:2 257:15
266:18,19
**helps** 255:14
**hereto** 153:21
**hezelstein** 112:20
**he's** 91:5 103:20
103:24
**high** 30:23 52:5
69:17 80:10 216:7
216:9,12 228:7,14
242:18
**higher** 54:11,16
54:18 78:25 80:3
83:17 101:9
122:14,20 193:14
196:25 197:7
230:11 232:18

**highest** 34:22
**highlight** 105:23
209:21 239:21
249:1
**highlighted** 153:3
234:1
**highly** 69:16,16
234:13,14
**highway** 156:20
**hinder** 88:2
**hindsight** 183:22
186:2,3,4 191:1
209:14 210:10
212:8,17 214:24
216:12
**hired** 16:15
**historical** 31:25
32:1
**historicals** 123:9
**histories** 218:13
**history** 161:5
224:25
**hit** 96:11 97:7
99:16
**hits** 98:7
**hitting** 212:2
236:12
**hm** 46:5
**hmm** 86:25 113:5
120:25 131:16
140:20 260:5
**hoc** 3:4,10 8:7
19:10,22 21:8,9
21:17 47:3,4,10
48:4 113:14
117:19 128:15
129:6,22 152:10
160:12,13 161:16
166:19 179:23
192:7 228:17
**hoc's** 208:8,15
227:6 229:5
231:14

**hocs** 8:13,20
156:4 164:24
212:13 226:1,14
230:16 231:7
255:3
**hogan** 3:3,7
**hold** 51:18 52:3
161:8 166:1 222:7
227:6 267:23
271:17
**holder** 18:21
41:19 56:8 67:6
142:9 149:9,11
**holders** 19:24
20:2,4 41:20 42:7
47:10 56:4,5,19
65:3,8 69:9 71:18
76:8 80:18,19
106:25 114:11
115:1 138:4,5,8
199:24 233:10
**holding** 52:13
221:22 222:6
241:4
**holdings** 1:6
51:14,16,18,19
52:8 118:23 142:4
**holistic** 131:17
**home** 168:20
**hon** 1:22
**honest** 243:24
**honor** 10:13,16,18
11:2 12:10 13:3
14:13 17:5,11,17
23:1 37:15,18
38:3,4,10,18,21
39:3,25 40:7
43:11 47:7,23
48:6,18 49:3,10
50:2,6,10,15,19
58:24 62:8 72:20
72:24 73:4,23
74:2,10 77:15

81:7 97:22 101:18
101:22 102:3,5,15
111:9 112:16
113:3 114:16
116:6,9 126:3,6
127:8,11 128:10
128:11 137:1,5
139:6,17 146:12
146:13 148:16
151:6,8,22,24
152:5,7,9,15
153:1,4,15,18
154:8,19,21 155:4
155:7,14,22 156:1
156:17 157:1,10
157:12,19,22
158:5,9,14,16,20
158:22,23 159:9
159:11 160:4,18
161:5,10,18
162:16,17 163:1,2
163:13,16 164:3
164:12,18,19
165:16,24 166:7
166:16 167:3,5,13
167:19,21,22,24
168:9,11,15,23
169:2,16,16,22,22
169:24 170:6,16
170:18,22 172:13
172:18,20 173:4
173:13,18 174:4
174:12,14 175:25
176:3,25 177:4,16
177:24 178:6,25
179:9,12,17,20,22
180:8,12 181:4,13
181:20,21 182:15
182:24 183:4
184:3 186:1 187:2
188:25 189:6,13
189:15,24 190:11
190:21 191:21

192:4,16 193:24
194:15 195:1,25
196:16 199:2,9
200:23 201:11,18
201:19,21 202:3
203:4,12 204:13
204:22 205:9,24
206:13 207:13,15
208:3,6,8 209:8
209:21 210:17
212:15 213:10
214:12,23 215:10
215:16 216:2,19
216:23 217:4,13
218:7 219:2,3
220:13 221:12,13
222:2,15 223:1,24
224:11,24 226:20
227:5 228:7 229:4
230:12,19 231:25
234:13 235:1,2,5
236:13 237:15,23
238:10 239:1,16
239:17 240:2
242:3 243:13
247:22 248:19,22
248:25 249:19,19
250:12 251:6
252:22 254:12
255:5,18 256:1
257:13,22 258:12
259:3,23 260:9,11
260:19 261:16,19
261:25 262:13,20
263:4,14 265:4,14
265:18,20 266:5,9
266:10,11 267:2,3
267:5,17 268:1,10
270:1,11,25 271:2
271:9 272:10,20
273:25
**honor's** 17:2
152:13 156:15

158:13 183:15
227:17 262:10
**honor's** 152:21
**hope** 127:15
259:11
**hoped** 162:21
**hopeful** 161:1
**hopefully** 7:19
167:18
**hoping** 90:7 165:7
**horse** 55:11
189:17 190:1
192:3
**horton** 4:22 8:15
28:22,23,25 29:13
33:4,20 34:25
46:24 83:15 162:2
168:5,13 173:19
175:5 185:19
198:2 200:5
213:14 217:24,25
218:18 232:3
251:17 253:16
257:20
**horton's** 235:8
**hour** 128:5 130:1
232:14
**hourly** 98:11
**hours** 98:22,22
127:16 172:25
173:1,10,11
231:16
**house** 213:14,20
215:2
**houses** 217:23
**huge** 198:25
**hundred** 57:11
**hundreds** 246:19
**hunt** 58:4 61:6
62:16 64:24,25
67:5,6 70:16,17
78:19,20 79:2,8
79:18,20 80:1

157:6 162:20,21
226:3
**hunts** 65:8 68:20
68:22 69:1,6 70:2
71:1 143:25
**hurry** 190:9
**husnick** 38:8
106:17 149:25
159:16,20 176:14
176:16 179:3
199:25 200:23
234:1 239:15,17
239:21 245:20
251:16 252:3
270:1,9
**husnick's** 150:22
**hyde** 2:25 275:3,8
277:3,8
**hypothetical**
84:10 192:16,18
193:4,24 194:2
195:23 196:12
203:8 248:4
**hypotheticals**
183:10 206:22

**i**

**idea** 180:8 212:25
**ideas** 8:17
**identical** 132:16
**identified** 95:23
96:12 97:4 98:15
98:15
**ifs** 218:14
**ignore** 197:22
204:3 219:15
226:2
**ignored** 122:6
185:20
**ignoring** 200:17
200:18,19,20
261:2
**ii** 16:13

illustrate  205:19
illustrated  262:16
illustration  238:8
illustrative  157:3
imagine  179:5
  209:3
imagining  130:13
  208:22
immediate  71:18
  118:2,6
immediately
  29:24 83:18
  245:18,21
immense  171:21
impact  33:10,12
  62:5 69:8 160:16
  177:16 193:8,22
  194:10 206:23
  238:14,24 239:17
  240:4
impacted  20:5,15
  27:4 32:23 33:8
  193:1 194:13
impacts  192:13
impair  88:2
impaired  25:5,9
  25:17 57:20 80:22
impairment  59:19
implicate  184:9
implication
  176:23,23
implicitly  208:13
important  8:19
  30:6 48:23 158:4
  162:5,12 223:7
  259:13
importantly
  21:23 161:9
  174:17 180:12
  201:14 215:16
  231:25 240:16
  241:14 255:10

impose  181:9
  209:14
imposed  210:9,11
imposing  149:7
  180:2
impossibility
  266:1
impossible  236:7
inability  77:5,9
inappropriate
  174:20 216:10,12
  216:15 239:19
inattentive  242:25
incentive  234:18
incentives  263:13
inception  183:21
incidental  205:17
  205:17
include  34:7,9
  169:5 247:3
included  69:20,20
  69:21,22 212:18
  269:15
includes  94:16,17
  239:24
including  14:5
  18:20 20:6 33:6
  44:6,8,10,11,14
  83:20 108:7,8,10
  108:13 121:2
  132:7 136:6 155:1
  171:18 203:21
  211:13 225:18
  231:13 232:4
  234:7 254:6
income  249:9
inconsistently
  175:4
incorporated
  254:11
incorporation
  257:3

increase  159:24
  160:6 197:24,25
  198:8,11,12,19
  227:3 245:21
  256:23
increased  69:8
  79:9,14,17,23
  197:15 226:23
  245:10
increases  70:14
  245:18
increasing  70:11
incredible  166:13
incredibly  225:1
incremental  144:1
  181:11 197:24
incurred  41:8,11
  144:7,11,17 145:1
  145:19 159:7
  166:5 172:19
  183:18 188:12,21
  215:9
incurrence  215:7
  215:22
incurrences
  214:20
incurring  145:25
indebtedness  29:7
  92:25
indenture  160:7
  163:24 208:7
indentures  252:10
independent
  170:4 174:6
  201:25 203:21
  265:7 266:18
indeterminate
  233:25
indicated  142:24
  210:23
indicator  55:23
indirect  82:25
  84:20 90:20 91:2

176:21 185:4
  204:10,11
indiscernible  8:10
  50:13 63:14 68:8
  70:8 71:16 76:3
  86:14 102:20
  126:12 127:3
  132:19 135:5
  137:19 147:21,22
  148:9 153:12
  178:4,18 206:10
  217:2 230:1
  236:23 238:18
  240:24 245:16
  246:11 260:10
  272:8
individual  42:25
  45:4
industry  164:9,11
  228:25,25 242:20
  242:25
inequitable  38:8
  177:20 178:24
  240:14 241:10
information  31:15
  31:18,19,20,22,23
  32:1 46:23 77:16
infrastructure
  69:23 143:24
infused  250:2
initially  32:18,18
initiate  19:19
injunction  141:11
  142:2,2,10,10
insider  171:14
  179:13 243:4
insights  67:11
insolvency  161:21
insolvent  180:3,4
instance  41:20
  206:15 263:21
insufficient
  205:18

**intended**  164:14
  171:24 209:15,16
  261:12
**intensive**  200:6
**intentionally**
  244:2
**inter**  89:19 254:14
  265:6
**intercompany**
  52:5 86:7,9 88:13
  89:24,25 90:1,14
  91:22 119:16,17
  120:7 162:11,15
  169:13 237:21
  248:13 269:1,15
  269:21
**interest**  16:15,16
  24:10 26:11 29:4
  30:25 54:12 63:8
  63:15,19,21,24
  64:2,9,11,13,14
  66:17 68:12 69:22
  69:25 71:8,15
  82:25 112:7 113:9
  115:7 122:18
  124:7,9 136:2,6
  145:25 165:2
  169:11 231:22
  244:14 251:5
  255:25
**interested**  33:13
  122:17
**interesting**  263:7
  267:8 270:8
**interests**  118:1
  121:9
**interim**  23:24
  35:14,20,21 37:2
  38:15,18 122:22
  122:23 123:20,23
  132:13,17 133:1,2
  133:4 170:9 171:2
  174:8 175:4 178:8

  199:10,15,22
  200:7,12,20,22
  201:3,8 216:4
  231:10,24 232:20
  232:25 233:9
  234:22 239:20
  244:9,11 253:7
**interject**  127:8
**internal**  232:1
**interpret**  91:6
**interpretation**
  93:16,17
**interpreted**  39:12
  67:21 68:9
**interrupt**  202:24
  230:13
**interrupted**
  222:25
**interrupting**
  202:24
**interstate**  225:15
  225:16
**intertwined**
  224:24 266:21
**intimately**  266:20
**introduced**
  201:15
**inure**  163:20
**inured**  225:17
  252:12
**invades**  37:17
**invest**  79:10
**invested**  18:9,10
  18:18
**investigated**
  171:13 262:6
**investment**  15:20
  15:24 17:24 18:1
  18:17 51:7,8,9,10
  180:3
**investments**  18:6
  18:13 51:11

**investor**  15:4 67:1
**invoice**  232:18
**involved**  9:2
  18:13,15 26:17
  55:17 81:24
  105:12 108:13
  128:24 129:2
  177:11 231:15
  253:16
**irrelevant**  39:5
  41:20
**irreparable**  118:2
  118:6
**irrespective**
  121:12
**irs**  203:18 249:22
  258:3,6
**irsa**  212:24
**ish**  21:25 42:9
  53:2
**isn't**  85:15
**isolation**  69:1
  197:18
**issue**  8:11,22 9:8
  9:12,18 10:1,3
  37:16 38:4,5,9,17
  39:17 40:8 47:24
  50:24 97:2 99:14
  110:8,14 123:24
  124:3 156:25
  158:9 169:15
  184:3 185:25
  186:2,3 214:13
  219:16 220:11
  221:20 226:14
  229:20 237:14
  238:21 243:3
  247:6 248:1,4
  249:2,6,20 252:22
  256:24 257:16,22
  258:2 262:11,21
  265:6,25 269:25
  270:17 273:11,13

**issued**  107:1
**issues**  10:20 14:6
  16:19 33:16 43:23
  44:7 47:3,15,18
  47:25 50:14 103:7
  121:12 124:10
  125:13 128:21
  203:17 216:5,7
  218:2,6,16 219:4
  219:5 224:21
  234:2 237:4
  238:20,20 239:2
  243:22 244:15
  248:16 249:24
  251:19 254:6
  256:10,22 257:18
  258:7 266:22
  270:1
**italics**  118:25
**item**  73:9
**items**  130:25
  131:20 161:7
**iteration**  158:1
**iterative**  225:1
**it'll**  102:7
**it's**  49:8 82:3
  86:16,19 96:19
  97:8,10,20 99:23
  99:23 101:1,7
  108:19,19,22
**ix**  72:15
**i'd**  84:7 89:10
**i'll**  86:5 93:16
  94:17 100:17
  114:20
**i'm**  57:22 82:16
  83:11,23 84:6
  86:8 87:20 88:11
  88:25 91:4 94:6
  94:17 97:5,15,20
  97:25 99:1 101:11
  102:4,7,9,10,13
  105:21,21 106:20

109:2 110:9,10
112:16,17 129:12

**j**

**j** 4:9 6:13 12:21
**jarnila** 6:14
**jason** 4:10
**jeff** 109:3
**jeffrey** 5:13 12:21
  13:10 51:2 128:16
  146:17
**jegadeesh** 5:24
**jenkin** 104:5
**jenner** 214:5
  264:22
**jensen** 5:25
**jeopardizing**
  119:1
**jeremy** 5:18 6:3
**jessica** 6:9
**jingwen** 6:2
**job** 97:1 215:6,7
**join** 27:6
**joinders** 29:21
**joined** 27:6,9,14
  27:17 73:7
**joining** 17:19
  163:10
**joint** 67:25 239:13
  251:19 252:18
  267:15
**jointly** 1:8 266:20
**jokes** 267:23
**joseph** 6:1
**journey** 246:24
**judge** 1:23 41:25
  61:20 76:22 78:21
  95:8 103:1 131:23
  131:25 132:13,20
  135:11 139:2
  143:15 165:4
  176:1 178:20
  190:12 201:20
  240:7,19,24

260:20 266:11,16
273:8
**judgment** 34:17
  38:20 39:1,2
  63:17 200:3 202:5
  209:4
**judicata** 220:7
**judicial** 154:4
  174:17 266:3
**juliet** 217:22
**july** 42:9 53:1,2
  54:5,23 55:13
  111:1,3,6,11
  114:3,15 115:19
  115:20 116:24
  125:3 162:6
  226:23 249:1
**jumping** 268:2
**june** 101:6,6
**jurisdiction**
  157:21,22,24
  158:10 222:13
**justifiably** 210:15
**justified** 239:7

**k**

**k&e** 233:16
**kasowitz** 3:9
  128:14 179:23
**kazen** 96:9
**keenly** 123:3
**keep** 13:1 40:12
  86:19 208:22
  260:19
**keeper** 98:11
**keeps** 261:18
**keglevic** 4:22 26:8
  28:22,25 29:10
  31:17 32:9 33:3
  33:20,22 34:25
  35:4 49:17 53:18
  83:15 92:6,9,20
  93:4 108:13,19
  109:13 120:21

121:13 147:9
149:14 150:21
161:6 173:21
179:7 203:15
209:22 211:11
213:16,22 232:3
249:24 250:10,17
265:12 270:16,17
**keglevic's** 34:14
  57:3 149:2,6
**keglevic's** 49:15
  92:13
**keith** 104:17
**kept** 105:12
**kevin** 5:22
**key** 83:11 85:13
  86:4 88:12 104:24
  105:6,23 197:1
  251:9
**keyword** 251:14
  251:16
**keywords** 96:14
  96:15
**kidding** 38:2
**kieselstein** 4:17
  149:25 156:20
  237:25
**killing** 37:23
**kind** 33:23 44:5
  50:22 146:10
  201:16,17 205:9
  223:10 235:23
  260:21
**kirkland** 4:12
  38:12 98:14 104:4
  106:13,14 114:3
  124:1 134:9
  150:17,21 152:7
  153:22 173:17,23
  175:9 176:6
  177:18 178:1,3,8
  178:12,13,14,15
  178:16 179:5,16

199:25 200:19
213:12 214:7
216:16 232:10
234:6,8 239:3
240:14,15 241:21
242:5,11 250:11
262:13 264:14
268:14 269:14
**kirkland's** 170:11
  175:18 177:2,18
  177:19 202:9
  242:1 259:25
**knew** 34:21 64:21
  66:24 67:2 83:21
  95:9,11,11 141:4
  141:20 263:9
**knock** 244:22
**know** 10:12,15
  11:12 21:7 37:25
  42:1 47:11 48:21
  52:8 54:6,22 55:1
  56:13,23 64:19
  68:7 69:16 70:17
  71:13 80:2,14
  88:11 90:13 91:4
  91:6 95:4 96:19
  98:15 99:20 100:1
  102:12 103:23,23
  105:15 112:11,12
  112:23 114:19
  118:13 120:5,8
  122:9,10 123:17
  124:8,12 125:19
  125:21 126:11
  127:2,21 134:7
  135:25 136:5
  137:22,25 138:6
  139:18,23 142:6
  143:10,12 147:13
  148:7 151:13
  154:18 164:6
  169:23 170:22
  174:13 176:15

177:6 178:19
179:2,12,14 183:7
188:3,5 195:24
196:8,14 199:4,9
202:14,22,25
203:1 212:8 213:6
214:14,16 216:24
218:7,15 219:12
219:17,22 220:24
222:3,7 223:16
224:4,4 225:22,24
227:12 228:9
229:7,11,25 230:1
230:1,2,10,16
231:4,10,14,21
232:7 233:10
238:21 239:18,21
239:22,25 244:3
245:25 247:11,13
247:19,20,21,24
247:25 248:6,11
248:20,23 249:11
249:21,22 250:1
250:12,25 251:4
251:18 252:4
253:2,11,23
255:23,23,24
256:1,3,4,8,11,13
256:18,21 257:3,4
257:9 260:20,22
263:3 266:11
268:11,16 269:25
271:23 272:21
273:12,14,16,17
**knowing** 230:25
231:4
**knowledge** 10:10
12:17 73:2 74:15
77:16 83:24 96:20
97:3 99:12 265:13
**known** 64:20
112:20 247:10
249:6 263:11

**knows** 167:3
170:21 199:9
249:24 257:14
263:4

## l

**l** 5:4
**lack** 8:1 10:2 73:1
213:19
**lacks** 10:2
**laid** 170:20
208:15
**language** 21:10
72:12 104:13,17
104:18,22,25
107:18 129:1,7
132:18 150:1,10
189:24 223:10
237:2 248:6
**lapsed** 31:2
**lardner** 215:19
**large** 112:4
143:24 163:6
168:24 179:12
202:15 236:19
240:20 241:2,3
254:1 256:15
**largely** 212:21,22
248:14 252:25
258:8
**larger** 98:3
154:20
**largest** 216:17,17
225:24 226:14,16
**late** 42:11 46:3
53:4 110:24 111:5
111:6 113:9 125:3
172:7
**laugh** 230:5
**laughter** 13:6
37:24 40:14,17
202:23,25 203:3
217:1 218:25
220:1,3

**law** 4:21 39:13
130:16 169:25
175:10 183:17
190:17 203:18
208:25 209:2,9,13
222:21 223:10
224:19 228:9
249:11 272:23
**laws** 209:17
**lawyer** 50:8 176:8
273:17
**lawyers** 16:15
113:19 118:5
271:18,20
**lay** 39:16 47:24
48:1
**layman's** 38:6
**lays** 9:24
**layton** 4:6
**lbo** 18:20
**lead** 118:2
**leading** 45:25
**leads** 37:12
**leaf** 86:15
**learn** 96:21
**learned** 215:6
**leave** 26:13 33:9
44:22 93:17
237:22 273:23
**leaves** 173:3
183:10
**leaving** 193:7
268:7
**led** 31:17 32:6,15
45:23 46:10
163:19 180:10
189:2 256:3
**ledanski** 2:25
275:3,8 277:3,8
**left** 18:12,12
26:13,14,16 27:1
72:23 73:6,15,16
93:14,21 102:13

117:16,17 146:11
173:5 177:1,15
179:14,16 180:5
205:10 242:4
268:5
**legacy** 94:15
**legal** 21:9 36:5,11
39:7 59:19 159:2
163:23 164:7
183:8,9,14 200:6
200:11 207:5
213:14,20 217:21
219:3,5 232:1,4
233:1 237:19
275:20 277:20
**legality** 244:11
**legally** 237:9
**legible** 154:14
**lend** 168:3
**lender** 263:16,20
**lenders** 141:18
**length** 187:5
239:15
**lengthy** 96:24
267:24
**lenz** 6:1
**leonhardt** 4:24
**letter** 72:7 109:18
113:22 114:2,5,14
117:18 248:25
273:10
**letterman** 33:24
**letting** 273:12
**let's** 85:18 95:22
101:18 106:21
108:11
**level** 20:8 31:19
31:20 32:23 33:1
44:9 57:9 61:25
67:8 78:24,25
81:10 84:4 88:15
90:24,25 117:4
119:6,7,8,24

193:1,2 210:9,10
213:10 216:9,12
228:7,10 230:23
231:19 232:18
233:7 235:21
236:1 251:8,12
253:13 255:17,19
258:21
**levels** 31:18 55:5
55:7 69:24 103:12
213:12 234:6,11
235:18 236:10
255:4 264:14
**leverage** 257:10
257:11,11
**levin** 46:7 121:12
**liabilities** 33:1,10
34:8 44:11 162:1
162:13 182:11
188:19 195:8
198:18 211:23
229:18
**liability** 99:8
118:25 119:15
159:7 161:20
162:14 186:9,14
187:4,8,25 204:5
210:21,25 229:9
**liable** 180:14
**lien** 20:8 30:24
31:4,6 44:9 62:22
62:22 63:1 64:22
64:22 75:5,6,24
75:25 81:16,17
113:22 114:4,9,12
114:23 115:3
133:15,17,18,19
133:20 141:15
146:2 192:19,20
192:23,23 193:8
193:10,11,16,17
249:3,16 268:21

**liens** 63:7,7,20,20
63:24,25 64:4,17
81:22,22 115:5
163:21 192:25
254:21
**lies** 191:24 192:1
258:14
**lieu** 153:24
**light** 152:13
264:13
**limit** 23:16
**limitation** 70:25
**limited** 33:6 44:6
51:12 107:1 241:9
273:2
**limiting** 67:20
68:9
**limits** 228:17
**line** 79:2 104:12
104:15,15 130:4
192:14 213:17,18
216:13,14 230:14
251:11 260:20
**lines** 8:15 191:20
237:21
**linked** 182:12
**links** 182:9
**lion's** 225:20
**list** 33:23,24 41:7
43:23 147:24,25
**listed** 96:25
153:20
**listen** 39:2
**listened** 230:2
**listening** 43:12
**listing** 8:18 66:8
**lists** 33:16 153:16
**literature** 191:20
**litigate** 88:2
244:14
**litigating** 171:22
220:11 248:12

**litigation** 19:20,23
30:12,15,18,19
31:10 35:18 47:7
66:15 110:20
138:21,22 139:5
143:17 149:12
161:24 166:8,8
167:8 169:1
171:16 204:5,7,9
220:12,23 224:2,6
225:16 235:7
236:19 251:25
252:5,9 258:2
**litigators** 242:13
261:22
**little** 15:18 50:7
69:3,3 103:11
109:8 121:20,23
127:6,22 129:10
154:13 156:2
164:20 175:7
176:21 203:1
205:12 227:9
241:11 243:12
244:8,24 262:16
263:18,18 267:24
268:2
**liu** 6:2
**live** 52:16 84:13
100:12 122:21,25
166:7
**lived** 171:17 225:2
**living** 156:21
**llc** 4:1 118:24
**llp** 3:9,20 4:12 5:1
**loans** 107:10
**location** 161:1
**locked** 125:16
**lockup** 56:4,6
**logical** 232:25
**long** 7:24 9:1 18:9
18:13 42:1,25
44:4 74:6 112:14

119:24 155:19
156:20 173:14
246:24 253:22
**longer** 95:15
211:3,8
**look** 20:21,25
22:24 28:12 58:21
68:23 72:22 79:10
92:20 106:5
164:12,13 165:4
172:14,16,21
173:5,11 177:8
179:13 186:4,14
186:18 187:1,20
188:9 195:15,17
195:21 196:1
208:10,10,23
212:7 223:11,13
223:16 225:19,19
226:7,8 228:4,24
229:8,12,12
235:20 249:24
253:14,17 261:1,6
261:7,7 262:3,10
**lookback** 244:20
**looked** 46:19
55:22 59:23 79:16
179:3 186:23
187:18,22 197:8
253:15
**looking** 53:22
88:22 155:23
172:13 189:14
190:23 208:9
213:4 214:24
216:11 237:19
243:11,14 247:12
261:5
**looks** 207:24
**loose** 86:15
**lose** 162:13 165:8
223:3

**lost** 162:18 189:7
  232:8 244:6
**lot** 13:7 44:4 47:4
  79:10 86:18
  111:22 202:13
  221:18 235:16
  237:12 238:2
  250:14 256:4
  271:15
**lots** 111:21 121:2
**love** 153:22
  207:20 241:18
**low** 79:13 232:13
  238:23
**lower** 20:20 29:7
  29:8 34:20 78:24
  79:13 109:8 197:6
  206:17 227:22
  255:3
**lps** 51:24
**lunch** 126:2,9,25
  127:6

**m**

**m** 4:10 5:5 12:22
**mabel** 43:1
**maclain** 6:11
**maddux** 151:12
  151:12
**madron** 4:10
  273:4
**main** 184:17
**maintained**
  157:24 200:6
**major** 205:19
  224:2
**majority** 44:19
  242:18,21,22
  248:8
**making** 7:18 67:2
  143:3 214:2
  236:11,21 269:13
**man** 126:14,17
  147:17,22,24

148:1 218:24
  220:2 235:14
  267:18 272:5,9
**manage** 15:20
  51:10
**management**
  15:20 17:21,22
  51:5 138:7
**management's**
  139:25
**manager** 51:4
  120:16 121:6
**manages** 15:21
**managing** 17:23
**manner** 67:20
  99:25
**marc** 4:17
**march** 28:4 46:3
  81:15 246:15,15
  252:16
**mark** 3:16 4:15
**market** 1:13
  135:17,18 250:10
  250:11,15
**marketing** 44:14
**mason** 130:15
**massive** 79:4
**match** 161:11
**material** 41:5
  43:5 47:21 66:21
  157:11 218:9
  233:8 236:5 247:8
  247:9 254:6
  256:12,14,14
  258:8 259:22
**materially** 165:17
  242:15
**math** 135:13,19
  136:18 268:11,12
**mathematic**
  266:15
**mathematical**
  37:8,11 40:2

268:6
**mathematically**
  52:14
**matican** 6:3
**matter** 2:1 30:13
  68:6 98:11 99:1,2
  137:10 163:3,4
  165:12 167:15
  170:5,20 173:23
  173:25 174:5
  232:11,14 233:22
  260:6 262:10,17
  262:23 265:5
**matters** 7:4 46:25
  98:14 140:5 177:2
  177:25 185:12,13
  224:23 238:1,1
  251:4
**matthew** 3:15 5:4
  5:17
**maximization**
  33:14
**maximize** 30:6
  31:1 109:5 244:15
**maximizing**
  250:18
**maximum** 188:17
  188:24 195:8
  196:1 209:4
  210:19 211:21
  212:11,12
**mccracken** 171:4
**mccracken's**
  171:15
**mcdaniel** 3:3,6
**mcdougal** 129:21
  130:15
**mcginnis** 5:4
  10:12 154:11
**mckane** 4:15 7:9
  7:11,16,19 12:10
  17:5,11,13 37:15
  38:14 39:3,12

40:7,16 47:23
  49:3 50:3,4,6,19
  51:3 60:21 62:10
  62:11 69:20 73:4
  74:2,10 81:1,3,7,9
  84:9 86:1 94:9
  95:19,21 97:20,22
  101:22 102:3,9,15
  103:24 111:8,20
  111:22 112:16
  113:3,6 114:16
  116:3,6,8,17
  125:24 131:20
  146:25 147:6
  148:7 151:8,18
  155:11 156:9
  216:22,23 217:2,4
  218:25 219:14,21
  220:13,15,18
  221:9,21 222:2,15
  223:1 227:11
  230:9,12,14
  236:23 237:2,6,11
  237:14 240:6
  245:3,6,8,12,17
  245:24 246:6,8,12
  246:18,25 247:3
  247:22 248:1,3
  249:18 254:12,16
  254:20,25 255:5
  255:14 259:1,3,18
  259:21 261:11
  269:4,7,10 272:10
**mckane's** 128:24
**mean** 24:22 36:15
  36:15 38:20 40:15
  44:1,3 56:6 90:19
  124:12 127:16
  139:15 154:25
  155:12 159:18
  163:22,24 169:6
  177:11 182:12
  187:9 195:9

202:12 209:14
221:6 227:11,19
230:2 237:24
247:25 257:13
271:4 272:15
**meaning** 24:21
175:3 223:19
**meaningless**
185:23
**means** 12:2,3 13:8
61:11 77:22 175:6
175:21,22 176:10
176:12 178:19
215:3
**meant** 19:25 27:1
27:2 42:8 59:16
59:17,18 110:14
142:18 161:21
**measure** 182:2,5
182:18 241:2
267:2
**measured** 172:3
188:16
**measurement**
182:10,14 186:7
**measuring** 184:2
184:3
**mechanisms** 30:9
**mediation** 255:2
**meet** 13:4,9
109:13 181:25
211:1
**meeting** 28:3,5,6
28:9,9,12,13,15
33:18,21,22 53:19
83:16 165:25
264:18 272:16
**meetings** 27:23
28:1,2 33:2,5
34:25 46:9 213:23
214:1
**member** 21:8
114:1

**members** 42:23
42:24 43:14 47:2
106:13,14 129:22
160:13 217:21
232:4,5
**membership**
48:17
**memo** 175:11,14
203:13
**memorandum**
233:18,19 234:2
**memorialize**
104:19
**memory** 137:9
202:19 236:24
267:9
**mention** 42:14
**mentioned** 22:4
22:12 33:17 55:19
69:19 70:7 80:6
99:6,10,22 101:14
105:10 121:1
122:19,21,25
148:19 158:5
161:15 168:23
172:14
**mentioning**
159:22
**mentions** 68:11
**mercutio** 217:22
**merely** 53:23
165:2
**merger** 110:11
148:25 159:12
169:8 245:4
**merit** 224:8
**message** 68:13
**met** 42:23,24
166:7 214:18,18
214:21 216:9,19
**method** 171:1
178:25 179:11

**methodology**
131:9,10,14,15,24
131:25 132:16,23
133:8 164:9 174:8
174:16 177:18,23
178:2 199:8,13,18
199:20,23 201:16
202:11 204:23
231:10,20 232:24
239:5 244:12
261:17,18,19,20
261:25 262:2,4,15
270:25 271:7,8
**methodology's**
133:7
**metric** 241:13
**metrics** 243:2
**mets** 126:10
**michael** 4:19 6:7
129:21
**microphone** 13:1
129:10
**microsoft** 273:8
**mid** 33:21 52:5
111:7,8 268:21
**middle** 90:15
150:2 155:20
217:6 218:19
258:24
**mike** 151:12
152:7
**milestones** 84:24
85:2,10,11
**million** 52:10,12
62:25 63:1,1
64:21 65:2,4
68:24 69:2,3 71:7
71:13,15,16 78:13
88:13 91:14 95:24
96:18 135:10,10
135:21,22 136:9
136:15,15 138:10
149:16 157:23

158:15 159:17,24
161:17 162:4,11
163:8 164:2
166:17,25 167:20
169:8 171:19,20
172:9 177:4,9
180:3,10 181:15
181:17 182:7,8
184:21 187:9,10
187:12,18 188:2,8
188:23,23 191:6
192:19,19,20,21
193:7 194:4,6,6,7
194:8,11,11,17,24
195:10,10,12
196:2,6 197:3,15
197:24 198:10,11
198:19,21,23
199:5 205:15,25
206:12 210:2,21
210:22 211:23
212:11,12 218:5
218:21 219:2
221:23 226:13,23
239:22,24 243:21
246:2,7,9,13
263:12 265:21
**millions** 246:19
**mind** 12:13 21:23
22:2 44:20 105:8
107:7 174:14
191:5 211:8
**mineola** 275:23
277:23
**ming** 5:20
**minimal** 205:20
**minimize** 21:18
172:10,20
**minimum** 239:9
**minus** 22:17
**minute** 10:25 64:8
68:17 141:25
182:23 185:10

226:6
**minutes** 112:19
155:16 156:10
186:19 259:4,8
**mirrored** 232:12
**mirrors** 231:11
**mis** 60:5
**misconstrues**
133:9
**misspoke** 134:6
**mister** 11:10
**mitigate** 239:14
**mm** 46:5 86:25
113:5 120:25
131:16 140:20
**model** 177:20
**modest** 238:12
**modify** 13:25
**moment** 146:12
**monday** 245:22
**monetize** 184:17
**money** 42:7 70:5
164:24,25 165:1
180:13 181:6
207:1 243:23
250:15
**monies** 221:3
**monitoring** 74:14
77:23 215:7
**montgomery**
171:4,15
**month** 21:25
23:25 24:1,2
35:11 71:7,13,15
71:16 132:7
239:10
**monthlies** 123:21
172:25,25
**monthly** 32:2
35:11 123:10,18
177:24 201:3,4
216:3 231:23
232:9 235:18

244:9
**months** 22:1,3,17
22:21 23:13,18,21
54:24 123:9
168:25 257:15
270:4,12
**mooted** 158:8
**moratorium**
251:4
**morgan** 3:23
**morning** 7:2
72:24 125:10
126:20 152:14
**morning's** 160:15
**moss** 6:4
**motion** 13:19
124:16,22 134:7
170:12 183:16
189:8 207:13
216:5 222:10
258:20 260:15
267:18,20
**movant** 180:16
**movant's** 197:17
197:21 199:7
203:5
**movants** 180:1,4
181:13,22 189:7
191:2 193:13
199:4,5,14 200:10
204:25 238:18
240:6 241:19
**move** 10:14 17:1
29:5 34:2 39:11
40:18 48:6 60:18
85:18 93:23 95:18
100:2 111:23
121:20 129:10
136:19 140:3
141:11 142:2,9
169:15 176:21
177:14 179:16

**moved** 38:9
110:20 111:8
238:22 253:10
**movement** 238:12
238:24
**movements** 145:6
**moving** 60:17
176:18 190:22
248:19
**multi** 34:18
123:14 161:20
184:6 202:15,20
206:14 228:21
229:1
**multiple** 14:5,23
33:2,5,18 41:22
84:6 103:10 108:7
122:19 132:6
213:8 216:6
231:21 234:18
**multiplied** 98:21
99:8
**munchausen** 38:1
**muster** 227:7
**myopic** 247:14

**n**

**n** 3:1 5:16 7:1
12:22 275:1 277:1
**nacif** 6:10
**name** 12:19 13:5
147:14
**named** 43:1
**nameless** 217:22
**names** 99:10
156:19
**narrow** 229:6
**nature** 229:24
**nda** 31:12 109:23
**ndas** 109:25
**near** 148:20 157:9
**nearly** 168:21
200:11

**necessarily**
260:17
**necessary** 30:22
38:5 49:9 50:13
60:3 107:3 109:25
151:8 159:3,5
164:21 169:18
170:3 171:10
174:18,22 176:4
183:11 184:17,23
210:3 219:7,10
220:5,6 223:9
224:14 233:4
260:18 262:11
271:3,6
**need** 11:12 31:20
33:24,25 50:24
78:12 102:12,13
121:23 134:4
151:25 153:7
193:25 210:8,16
211:1 226:18
228:4 230:5,15
236:10 244:17
248:16
**needed** 59:7 210:5
250:20 252:24
**needs** 149:10
158:20 182:16
195:17 253:12,12
258:19
**negotiable** 121:13
121:14
**negotiables** 33:23
34:14 83:14
120:21 122:11
**negotiate** 21:4,7
100:4,18 263:13
**negotiated** 21:11
22:18 81:23 91:13
128:19 129:6,8
161:9 168:6 169:7
169:10 172:6,8

199:12,23 231:11
255:8
**negotiating** 101:8
**negotiation** 82:20
85:8 198:3 231:16
**negotiations** 19:7
21:19 22:6 43:8
73:6 81:25 85:7
105:2 107:19
109:14,21 128:25
129:3 150:3
159:23 161:8
**neither** 198:24
264:2
**net** 51:19,23 52:2
52:13 159:16,16
196:3 244:5
**neutralize** 15:4
16:3
**never** 16:16 29:21
67:13 94:9 116:2
116:3,5 157:9
166:20 173:22,22
178:12 181:5,5
192:3 196:14
198:3 200:21
205:6 228:23
244:8,9,10 247:7
248:5 249:9 250:8
251:11 253:5
264:19,20,23,24
265:2,3
**nevertheless**
180:9
**new** 32:20 48:22
54:24 83:16
114:11,11 118:14
178:2
**newco** 20:15
138:9
**nextera** 27:20,24
28:10 29:3 30:20
55:1,3,10 69:11

71:10,11 72:1
75:5,9 76:15,23
79:2,16,17,19
80:3,9,13 81:14
101:1 110:11
138:16 146:4,7
149:13 157:18,23
157:25 158:12,25
159:5 162:23
163:6,9,10,10,11
164:17 165:21,24
166:1 167:13
169:7 180:10
182:3 184:10
185:7,9,12 186:20
186:21 187:20
188:10,13 189:9
193:21 194:1,4,7
195:7,23 206:8
207:6 219:19,23
220:7,20 222:9
226:3,12,22 228:6
230:25 244:25
245:4
**nextera's** 162:2
198:13
**nguyen** 6:5
**nice** 13:4,9
**nighan** 3:23
**nine** 21:25 22:1,3
22:17,21 23:13,18
23:21 80:10 90:12
132:7 138:6
200:11
**nitpicking** 176:2
261:16 262:7
**nitpicks** 236:2
**nixon** 3:20
**nobody's** 247:19
247:19
**nols** 211:13,15
**nominal** 134:21

**non** 31:13 33:23
34:4,14 83:3,5,10
83:14 89:23,24,24
89:25 90:14,17
120:21 121:13
122:11 144:12,18
145:18,22 180:24
181:3
**noncash** 258:10
**nonconsensual**
112:14
**normal** 50:7
165:6 191:15,15
**normally** 237:23
237:24 238:1
**north** 1:13 56:23
**nose** 167:23
**note** 42:6 75:5,6
87:25 114:4 154:3
158:4 165:4
243:25 264:9
270:10
**noted** 55:25
240:11
**noteholder** 58:12
86:23
**noteholders** 42:25
57:9 66:15 71:6
**notes** 18:2 24:14
24:15,18 25:15,15
27:1 29:18,19
31:4,6 42:7 54:17
75:25,25 94:15,18
94:21,23 95:2,6
107:1,11 115:9,13
136:3 141:15
**notice** 109:18
154:4 177:9
269:25 270:10
**noting** 171:9
**notion** 250:12
**november** 76:22
77:1 86:2,3,3,13

163:17 172:7
**novo** 212:17
**nuanced** 141:7
**nuances** 141:19
**number** 11:3
20:20 22:25 43:23
50:12 97:19 124:6
130:21,22 136:14
147:1,3,19 156:19
168:18,23,24,24
168:25 176:23
177:3 178:23
203:14,19 206:21
245:12 264:11
268:1,2 269:15,18
**numbering** 87:2
**numbers** 60:18,21
63:4 72:4 82:7,8
87:3 89:8 93:13
93:14 94:2,4,5,6
139:14,15 153:24
179:4 187:2
199:18 232:11,12
233:22 237:17
**numeral** 65:24
**numerous** 167:24
**ny** 275:23 277:23

**o**

**o** 1:21 7:1 12:22
275:1 277:1
**o'brien** 183:11
190:18 198:25
208:25 209:2,17
227:23 260:14
**oath** 39:15
**object** 15:13
38:22,22 88:1
179:1,2 216:15
231:22
**objected** 7:25
11:4 87:13 137:21
139:7 161:14
170:5 222:10

232:20 234:15
244:9,9
**objecting**  170:15
269:24
**objection**  8:3,5,7
8:11,13,14,20,21
8:24 9:8,10,13,22
9:23 10:5,6,7,7
17:4,5,11,13,14
37:15 39:21 40:7
43:13 47:23 77:15
109:5 123:14
133:9 137:1 139:6
145:6 154:9,11
160:14 170:13,17
170:22 172:2
190:13,14,15
202:9 216:18
253:25 267:15
**objections**  7:5,23
8:8 144:8 160:9,9
161:15 170:11
198:14
**objective**  109:5
**obligated**  141:5
143:13
**obligates**  140:13
**obligation**  56:11
56:15 170:4
186:22 214:21
225:11
**obligations**  168:9
**observation**
243:25
**observations**
225:6
**observed**  192:4,6
192:24
**obtain**  24:5 46:13
**obtained**  168:22
169:6 198:10
225:12,13

**obvious**  40:15,19
**obviously**  17:2
44:4,13 105:13
126:7 127:4
135:16 155:25
156:24 161:2
272:3
**occur**  22:1 68:20
115:14
**occurred**  105:22
184:18 186:9
189:10 196:14
206:16 223:12,18
225:4 245:21
**occurrence**  89:22
**occurring**  26:25
112:2
**occurs**  176:17
186:16 187:24
**october**  27:7,8
141:3 262:13
**offer**  29:22 105:24
106:3,7 108:3
**offered**  30:8,10
82:25 83:24
110:24 182:24
**offering**  103:6
**offers**  103:10
**office**  46:10
178:16
**offices**  33:18
83:16
**oh**  58:24 61:7
74:4 87:15 95:3
97:20 111:13
117:17,17,21
126:17,18 134:4
142:14 148:12
153:6 154:12
170:7,19 173:9
203:2 220:17
265:8 267:20
270:5

**ohio**  43:1
**okay**  7:3,10,15,22
10:18,19,24 11:13
12:6,9 13:15 14:1
14:10,11,24 15:25
16:22 17:15 22:15
22:15 23:22 39:5
39:11 40:1,10
43:22 46:5 47:8,8
49:11,21 50:5
51:1 52:24 53:14
54:15,22 55:18,22
55:25 56:10,18
58:12 59:13 60:8
60:17 61:8 64:12
64:21 65:14,21
66:14 67:14 70:16
71:10 72:11 74:4
75:1 76:20 78:15
79:7 80:8 81:4,14
82:10 84:2,10,18
88:16 89:1,4,7,10
89:13 92:2,8,12
92:16,19 96:4
97:12,15,18,23
98:1,6,10 99:2
100:2,24 101:18
101:24 103:14
105:18,23 106:3,9
106:23,24 108:9
108:14 109:3,17
110:2 112:15
113:21,23 114:10
114:17,18 115:24
116:15 120:10
122:21,25 124:14
125:23 126:7,8
127:10 128:23
129:10,13,19,25
130:10,14,18,21
131:5,8 132:5
133:8,13,23 134:1
134:13,22 135:6

135:19 137:13
138:19 139:14
140:3,8,12,21
141:1,4,19,23
142:22,23 143:6
143:10,19 144:3,9
144:21 145:1,17
146:9,16 147:7,8
147:12 148:3,6,10
148:12 149:4,23
151:9,25 152:4
155:15 156:9,10
207:21 220:17
222:17,23 232:18
237:5 238:9 240:5
240:6 245:3,9,23
255:20 267:1,25
270:8 273:2,21
**old**  13:8 275:21
277:21
**olympus**  114:21
114:22
**omnibus**  203:12
**once**  27:16 34:17
42:9 67:5 69:19
70:7 78:20 110:15
159:21,22 213:24
234:18 266:13
**oncor**  26:10,11
29:4 31:19,20
44:14 54:12 69:22
70:23 79:9,22
82:25 122:18
132:9 142:4
167:21 169:10
180:15 184:17,23
203:25 206:11
207:10 209:24
257:23
**one's**  38:9 147:17
151:15 162:14
170:5

ones   10:20 122:12
  181:23 270:6
opeb   253:24
open   28:3 38:9
  73:4,13 146:19
  177:8,12 250:8
  273:11
opening   34:9
  139:11 141:23
  142:23 172:14
  180:16,17 208:24
  210:23 212:1
  214:16 221:2,17
operating   176:9
operations   240:21
  241:2,5
operator   1:25
opine   38:17
opining   164:8
opinion   8:10
  47:24 48:2 138:19
  189:16 219:18
opinions   39:16
  164:8
opportunities
  231:22
opportunity   65:5
  77:10 85:12
  152:11 196:14
  218:13 226:5,6
  228:1,3,14 231:4
  258:16
oppose   123:18,23
  124:2
opposed   16:20
  166:4 167:5
  223:19 226:15
opposing   15:12
  84:15 124:3 166:5
opposite   158:17
  173:2 185:3
opposition   171:22

optionality   226:4
  258:16
options   100:5
oral   53:6,8,18
  78:1 102:8
oranges   79:19
order   7:7 23:20
  23:25 24:2 31:16
  35:15,20,21 37:3
  38:15,18 48:1
  61:12,13 86:21
  87:25 88:18,19,24
  122:22,23 132:14
  132:17 133:2,4
  152:1,3,19,21,25
  153:1,11,23 154:5
  154:8,13 155:2,2
  155:6,25 157:18
  158:15 162:10
  166:9 169:6 170:9
  170:21 171:2,4
  174:8,19 178:9,11
  186:19 188:14
  189:25 197:8
  199:10,12,15,23
  200:7,12,20,22
  202:3 217:11
  220:21 225:12
  231:11 232:21,25
  233:10,15 234:22
  236:16 237:3
  239:20 240:2,2,3
  244:11 252:23
  253:1,7,7 257:7
  257:10 259:15
  267:15
order's   233:5
ordered   240:9
orders   39:13
  200:1 218:17
organization
  271:25

original   19:24
  105:24 133:18
  177:18 221:2
  233:11
originally   76:15
  206:18 222:10
  223:24
outbids   192:3
  194:4
outcome   66:14
  222:11
outcomes   68:19
outs   110:15
  260:21
outset   181:21
  183:7 186:1
  195:13
outside   77:16
  210:6 248:4
outstanding   92:25
  93:24 107:11
  134:22
overall   51:24
  52:10 145:4
  177:17 238:4
  244:15
overbid   194:7
overlooked
  270:18
overlooking
  215:14
overly   32:13
overruled   8:8,11
  8:14 9:23 74:16
  77:17
oversee   215:12
overseeing   213:20
  214:10 215:11
oversight   30:9
  200:4,6 201:22
  214:19,20
oversimplificati...
  79:4

oversized   238:16
  243:6
owed   64:6 135:22
  135:25 224:9
  227:21 228:23
owned   18:2 31:7,8
  43:1 67:7 120:5
  138:11 141:14
owner   27:5

**p**

p   3:1,1 4:4 5:25
  7:1
p.a.   4:6 5:8
p.m.   1:16
pab   7:25 8:7 9:13
  11:4 28:23 88:16
  92:16 146:19
  151:18 152:8
  166:19 182:9
  198:23 217:5,7,10
  217:15,20 218:12
  218:19 221:4,25
  227:25 252:23
  253:11 257:19
  258:15 262:25
pab's   147:3 217:5
  226:11
pab510   82:2
padone   216:21
page   14:3 20:20
  20:21,21,23,24
  22:4,9,23,23 23:1
  58:22,24 60:19
  61:8,10 66:7 68:2
  72:6 74:19,20,21
  75:2,13,15,19
  82:14 87:4,9,18
  87:19 89:10,15
  90:9,11,15 92:20
  93:9,11 94:1
  108:18 109:3
  117:11,13,16,17
  117:18 118:9

129:19,25 130:14
140:18,23 148:17
149:4 240:17
268:15,19
**pages** 58:17 65:21
90:10,10 98:1,1
103:17 149:24
**paid** 20:16 21:22
27:2 41:21 54:14
63:16 64:7,8 76:6
76:18 78:13 83:8
84:4 138:18 160:2
172:1 176:11
183:3 185:5,18,21
192:8,12,15,21
193:6 194:9,16,23
194:24 195:2
199:6 200:10
208:12 210:25
215:9 216:14
221:10 224:9
**pandora's** 34:10
177:8
**paper** 50:15
259:12,14
**papers** 190:22
**par** 24:24 25:1
53:24 136:4,12
157:7
**paradigmatic**
203:25
**paragraph** 7:24
8:4,5,6,7,13,19,21
8:23,24,25 9:10
9:11,16,18,19,19
9:22,22,23,25
10:4,5,6,7,8 11:5
11:8,17 14:3,11
14:13,14 16:8,11
17:6 19:17,18
28:7,12 40:25
41:3 42:13 48:6
89:15 92:24 100:3

100:17 109:4,9
117:19 170:9
241:22 262:1
265:14
**paragraphs** 9:7
14:1
**parallel** 255:7
**paranoia** 34:19
**paraphrase**
137:19
**parent** 176:9
180:4,5 254:22
257:3
**parenting** 263:3
**parents** 256:4
**pari** 119:25
**parlance** 16:20,20
**part** 19:24 29:6
31:22 32:14 35:18
47:10 51:9 63:11
63:11,12 67:5
77:12 80:21 86:10
92:4,5 93:22 95:5
95:14 99:18,19
112:1 113:14
116:1 117:1
132:10 163:5,6,9
168:9 175:21
197:19 208:20,21
210:24 211:2,12
214:20 215:4,5,6
215:7 226:24
233:11 256:9,15
269:4,5
**partial** 160:20
**participants**
64:25 215:20
**participate** 19:7
**participated**
19:11
**particular** 21:4
89:10 90:13
100:15 107:17

139:22 164:4
175:20 190:17
216:14 219:11
223:15 224:15
227:18 234:19
253:5,20 260:4
268:20
**particularly** 12:4
**parties** 21:19 22:6
56:20 59:9 86:23
100:6,20 104:23
105:3 108:10
109:21,23,24
122:17,19 149:20
152:10,18 157:12
157:14 168:23
189:6 212:5
215:23,25 218:11
231:22 235:7
256:1 258:14
263:13 265:15
**partners** 51:12
143:22
**partnership** 15:24
51:8,9,10
**parts** 86:12
**party** 29:23 47:6
56:13 109:14
133:1 153:21
199:12 204:7
215:16 216:6,17
218:7,9 232:20
234:15 252:9
253:6 264:2
270:19,20
**pass** 125:24
228:15
**passu** 119:25
**path** 31:3 34:22
34:22 119:6
218:19
**patience** 217:5

**patricia** 6:13
**patrick** 6:12
**paul** 26:8 28:22
33:3,19
**pause** 98:6 217:3
227:14 230:18
**pav** 58:9
**paved** 168:6
**pavx** 71:23
**pay** 62:18 65:1
69:25 70:4 79:22
81:20 180:9
185:15 192:22
193:21 194:23
195:3 197:4 208:9
225:11 236:9
250:8,15 261:10
**payable** 184:8
190:14,24 191:22
191:25 192:3
196:24 219:24
261:6
**paydown** 268:21
**paying** 16:7 32:21
38:12 122:17
165:15 193:20
263:11
**payment** 32:4
192:9 193:2,8,9
194:17,22 198:20
205:2 215:23
216:4
**payments** 132:9
209:24 252:8
**pays** 192:18,25
194:10
**pdf** 154:20
**peabody** 3:20
**peace** 88:14
**pedone** 3:24 17:14
43:11,13,18 102:2
102:5 126:4,6
151:23,24 156:7,8

207:16,17,18,20
208:3,6,6 231:25
259:19 263:7
264:1
**pedone's** 264:9
**pendency** 136:7
**pending** 73:7
101:2
**pension** 143:24
**people** 38:22
46:13,13,20 55:1
83:19 115:2
136:22 158:21
213:5 261:23
271:21
**people's** 136:20
**perceived** 211:5
**percent** 19:25
20:1,3 24:6,9 25:2
26:11 29:4 31:8
38:12 52:1,3,6,15
52:16 57:9,11,15
57:16,22 79:17
93:7 98:20,21
99:7 136:4,12
138:4,6,10 139:3
164:16,16 165:13
171:15,19 172:19
172:21,23 173:1,2
173:3,6,9,10,11
174:24 175:23
176:11 177:2,3,5
177:5 185:8 187:3
187:25 193:5
195:11 196:2,8,19
196:20 205:11
206:7 207:9 209:5
209:6,11 210:5,5
210:13,13,21,22
211:22 212:10
219:23 230:6
244:4 263:9,10

**percentage** 31:6
35:1,4,5 56:21
69:22 188:17
206:3
**percentages**
157:14
**perception** 38:7
250:3
**perceptions** 213:6
**perfect** 212:23
235:8,10 236:7
**perfectly** 222:21
**performed** 36:4
46:16 96:22 204:8
205:5
**period** 23:14
24:13 26:20,24
29:18 42:6 44:4
54:22,23 56:8
57:24 64:9 73:16
79:13,18 81:11
100:24 120:20
127:1 132:8
142:12 166:14
173:4,12 213:11
214:7 215:1,13
238:14 241:9
251:4 271:1
**periods** 172:14
**permit** 100:4,18
107:3 158:1
**permits** 198:25
271:7
**person** 18:5,16
38:6 48:23 99:10
175:15 243:1
**personal** 8:9 9:4,5
72:25 73:1 83:24
135:21 273:11,17
**personally** 9:2
46:18 137:8
173:20 177:19
213:15,16,17

228:17 273:15
**personnel** 235:22
**perspective** 44:1
57:19 114:8
226:11 227:25
265:7
**perspectives**
67:12
**perverse** 263:12
**peter** 5:6
**petition** 23:23
25:3 63:8,15,19
63:21,24 64:2
66:17 68:12 92:24
93:25 95:1 136:2
136:6 179:6
269:15 270:15
**phillies** 126:11
**phone** 45:10,10
45:13,16
**phrase** 255:13
**phraseology**
191:10
**phrases** 255:14
**physical** 11:25
12:1,4
**physically** 25:20
33:5
**pick** 180:25 181:3
**picked** 181:1
189:22
**picks** 82:11
**picture** 249:10
**piece** 63:1 88:12
155:2 180:7
181:19 182:22
224:2 264:15
**pik** 24:14,15,18
24:18 25:15 27:1
29:11,18,19 41:20
42:6,7 53:23,23
54:17 56:5,19
57:9 58:12 61:25

62:1 71:6 76:12
78:2,3,7,11,22
80:18,19 109:20
110:10 113:14
117:1 119:25
129:7,22 134:18
134:22 136:3
138:4 141:2,21
143:17 157:1,3
199:24 233:10
249:2
**piks** 41:13 55:11
62:3 63:18,22
76:17 77:14,24
78:13 80:22 83:2
83:8 84:4 85:11
114:9,23 115:2
119:4 135:1
163:22 231:13
**pivoting** 34:20
**place** 186:15
204:12 214:6,13
**placed** 52:11
128:10
**plague** 217:23
**plainly** 253:7
**plan** 4:13 14:17
14:18 22:20,20
24:17 31:17 32:7
32:14,15,15 46:10
49:19,22 54:24
55:12,15,18 57:25
57:25 58:4,4,13
59:5 60:7,8,14
61:6 62:4,17
65:11 66:22 67:5
67:6,22,23,25
68:19,20 69:14,15
70:16,17 71:10,11
71:25 72:1,15,21
72:22 73:6,7,10
73:11,12,17 74:5
74:6,8,11,13,14

75:5,9 76:3,15,17
76:23 77:10 78:17
78:19,21 79:2,2,8
79:18,19,20 80:2
80:3,9,14 81:14
85:10 88:4 99:14
101:1 102:22,24
105:1,4,7 109:11
109:22 110:7,14
123:5 125:19,21
134:20,25 135:12
138:16 140:9,14
143:14,16 144:8,9
144:12,13,15
145:5,6,7,10,11
145:14,15,15,18
145:24 148:21,22
157:6,23 158:1
163:11 168:7
171:20 173:14
184:18 205:17
236:25 237:4
238:20 239:13
248:12 251:19
**planned** 171:20
**planning** 222:19
**plans** 26:24 32:16
42:15 44:11,12
50:8,9 54:8 59:14
59:20 60:2 74:15
137:7 205:2
218:15 252:18
253:22 266:21
**plausible** 205:22
**played** 163:11
267:9
**pleadings** 158:20
**please** 7:2 12:12
12:14,19,24 14:1
49:6 113:2 128:9
130:21 133:23
153:8 156:13
207:24 273:2,6,7

**pleased** 160:14
**plr** 248:10
**plural** 133:22
**plus** 22:17 25:1
94:9 155:2 187:11
212:12 246:4,5,6
246:7
**pm** 274:2
**podium** 39:13
**poetic** 247:21
**point** 18:15 39:12
42:13,18 52:19
54:17 55:8 64:20
70:10,13 72:20
74:9 77:8 78:24
83:17 94:16
102:25 105:15
115:20 120:15
121:17 122:2
123:7,13,17
138:14 141:16
143:12,20 160:24
162:5 167:1,5
177:6 183:14
187:12 188:20
189:7 193:16
201:6,25 204:14
205:15 209:21
211:10 223:20
225:4 227:15
230:14 232:16
235:1,19 236:13
243:13,19 244:18
246:12 261:5
264:8 268:10
269:24
**pointed** 170:9
196:16 260:14
**points** 103:11
136:20 137:17
192:5 235:14
264:10

**policies** 184:9
**policy** 183:19
**pool** 70:12
**portfolio** 51:4,10
**portion** 10:22
98:19 136:25
227:7
**portions** 10:21
152:11,20 154:7
**posited** 186:18
192:17 204:22
**position** 14:8 15:5
43:9,10 114:9
115:3 139:4,8,19
139:19,22 140:1
143:4 222:22
227:6,13,13
249:12 253:10
256:20,21 257:2
258:24 271:3,16
**positions** 16:3
118:3 142:9
157:12 217:7
226:15 258:15
**posits** 189:19
190:3
**possession** 107:4
107:20 150:4
**possible** 12:25
13:1 14:9 34:24
156:19 161:25
**possibly** 189:18
190:2 209:9
**post** 20:12 53:1
63:8,15,19,21,23
64:1 66:17 68:12
136:2,6 162:24
**potential** 14:6
15:2 20:7 29:5
33:9 34:22 44:7,8
54:11 63:18 66:14
81:21 83:20,20
91:10 105:4

107:10,12 109:24
114:3 119:6 136:2
143:22,23 149:21
159:25 171:14
185:2 186:17,17
188:1 193:14,17
196:15 198:9
204:5 211:24
228:3 231:1,2
236:18 254:7
**potentially** 18:3
54:16 119:16,17
144:18 208:21
212:7 224:5 249:4
250:5 254:23
**practical** 76:7
177:16 265:24,25
**practically** 229:10
**practice** 164:11
**prayer** 156:21
**pre** 25:3 61:21
173:1 269:14
**prebankruptcy**
113:16,17
**precedent** 59:2
72:8 76:4 162:19
**precise** 47:20
76:25
**precisely** 182:18
199:16
**precision** 176:1
266:15
**predates** 114:16
**predominantly**
43:2
**preface** 50:7
**prefer** 148:3
**preferably** 127:21
**preference** 272:22
**preferred** 112:12
**prejudice** 11:6
**preliminary** 7:3
153:16

**premise** 171:25
**premised** 159:14
  246:14
**premiums** 66:16
**prepare** 13:12
  126:18,22
**prepared** 13:19
  44:12 102:9
  155:14 157:14,15
**prepetition** 114:3
**prescribes** 174:8
**present** 5:15
  213:25 252:15
**presentation**
  241:21
**presented** 33:22
  44:12 84:3 143:15
  144:3 245:19
  257:12
**preserve** 90:7
  159:4 210:3
  219:11 225:24
  226:2 257:7
  258:16 261:11,13
**preserved** 169:11
  169:14 212:16
  225:14
**preserving** 219:9
  220:6 248:7,14
**preston** 229:2
**presumably** 101:9
**prevail** 165:9
**prevailed** 166:11
**prevented** 101:12
  125:13 239:9
**previous** 17:16
  114:22
**previously** 115:2
  152:12
**price** 25:2 53:23
  69:8 79:3 80:1,2,8
  162:4 198:1,9
  226:24 227:3,22

250:13 256:12,13
  256:13,23
**prices** 16:6 24:11
  24:12,14 53:23
  54:7 69:20 77:24
  78:3,3,7,11 157:2
  157:3,4 185:23
**primarily** 18:5
  208:18 234:9
**primary** 43:25
  78:11 171:12
  175:12 184:16
  185:7 212:20
  224:20 226:8
  253:18
**principal** 91:17
  175:12 178:21
**principally**
  175:20,21 233:24
  233:24
**principals** 108:12
  129:6
**principles** 207:5
**prior** 17:19 18:20
  125:2 150:24
  158:21 197:9
  205:5 211:17
  218:17 224:3
  231:12,17 234:15
  264:13 270:6
**priority** 135:14
  136:9 172:1
**privately** 272:2
**pro** 14:8 19:25
  20:2,3,15 138:8
  197:14 198:4
**probability** 182:2
**probably** 79:24
  101:22 102:5,6
  147:19 163:22
  183:24 218:23
  229:10 230:7
  245:13 255:10

**probative** 234:13
  234:14
**probe** 83:24
**problem** 7:22
  57:23 175:18,24
  176:13,17 177:7
  202:12 215:21
  220:7,9 256:17
  260:15 262:14,16
**proceed** 34:13
  50:16 51:1 81:8
  99:17 102:23
  128:9,13 155:10
  155:14 168:2
  210:7 272:17
**proceeded** 186:11
**proceeding** 134:8
  188:15 220:10,24
  223:25
**proceedings**
  161:23 185:11
  218:8,10,11 252:8
  274:1 275:4 277:4
**proceeds** 55:9
  191:13,17 192:22
  192:23 193:3,11
  193:17 194:11,12
  195:2,5 196:3
  198:15 208:14
**process** 54:12
  109:9 112:10
  176:2 199:25
  213:21 215:4,5,6
  217:11 224:23
  233:17 234:5
  235:16
**processes** 44:14
**produce** 50:10
  177:22
**produced** 191:13
**product** 96:4 97:1
**professional** 21:1
  21:13,15,18,20,24

22:3,7,10,13
  23:17 31:24 32:1
  32:2,3,5,14,23
  33:7 34:10 36:4
  36:11 41:15,16,19
  85:15 123:1
  128:20,25 129:3
  130:22,22,25
  131:18,21,23
  132:1,4,10,22,22
  133:3,6 144:7,15
  169:17 170:20,24
  171:7 173:18
  179:18 181:16,18
  199:3,6 204:14
  207:8 212:15
  213:10 224:12,20
  231:9,16 240:14
  264:12 271:4
**professional's**
  201:11
**professionals**
  16:15 26:21 33:3
  35:2,23 44:16,18
  55:4 133:8 153:17
  165:7 169:24,24
  171:1 172:15,22
  174:9,20 178:15
  179:10 199:22
  200:2 201:19,22
  202:2,6 204:8,19
  204:24 215:25
  216:2 224:17
  225:10,21,25
  226:9 233:13
  234:23 235:10,21
  235:24,25 236:9
  236:11 240:10,15
  241:20,25 242:9
  243:8 244:1 248:9
  248:17 253:8
  258:17 271:20

professor  249:8
progress  7:18
prohibitive
  183:25
project  114:21
projected  32:4
  42:14 59:14,20
  60:2,4 62:21 79:7
  79:25 80:5 123:7
  123:10 185:2,8
  205:2 224:3 247:8
projection  185:9
  185:14 188:3
projections  31:23
  32:3 33:7 185:21
prominent  44:19
promise  37:17
proof  129:6
  151:13 181:22
  182:24 205:1
  262:20,21
proper  8:19 9:6
  11:25 40:3 169:25
  170:2 236:12
  267:2
properly  184:5
  234:3 259:22
properties  178:24
proportion
  174:25
proposal  83:7,12
  84:2 104:16 105:4
  107:3 109:22
  110:7,17 143:21
  148:21,22 152:15
  185:15,17 217:5
  218:5,18
proposals  109:11
  109:24 110:14,23
  144:3 185:15
  217:15 220:2
  240:24

propose  32:7
  220:18
proposed  29:3
  80:1,2,8 127:18
  142:1 145:13
  157:16 171:9
  182:12,15 190:9
  190:16 197:20
  200:8 203:10
  217:13 218:20
  272:22
proposing  41:4
  114:3
prosecuting  254:2
protected  183:21
protracted  112:9
  112:13
proved  132:9
provide  7:6 30:10
  48:2 106:24
  160:10 183:4,12
  189:18 190:2
  202:1 205:2 226:4
  257:2,13
provided  35:9
  48:9 67:24 86:16
  103:1,13 109:22
  123:6 160:19
  175:11 182:1,5,10
  199:4,8 204:6
  211:16 224:19
  226:9 227:4
  251:13 252:20
  253:14,15 255:16
  258:10
providers  183:20
provides  35:21,22
  36:12 170:10
  186:13 189:5
  190:4 194:7
  208:12 226:4
providing  107:25
  150:9

provision  21:4
  22:10 76:11,12,16
  77:13 80:13
  133:13 140:13
  141:17,20 212:18
  268:14
provisions  10:17
  21:11 23:15 60:14
  72:14 151:1 168:8
  231:11 257:5
proxies  184:12
proxy  38:1
psa  29:12,20,21
  29:23 30:4 101:16
  101:17 103:7
  105:19,20 110:10
  125:12 145:11,12
  148:24 149:8,8,12
  149:19 163:10
  165:21 166:13
  167:8 168:10
  206:8 263:6
psh  109:20
public  28:4 70:20
  70:22 101:2
publicly  18:22
  231:23
puct  27:21 30:22
  249:23 251:1
puct's  27:23
pulling  271:22
punchier  208:1
punted  264:2
purchase  69:8
  80:1,2,8 162:4
  167:1 198:1,8
  256:12,13
purchased  16:7
  29:18,19
purchaser  82:24
  83:6 210:25
  211:14 250:7

purchasers
  225:13
purchasing  14:25
pure  203:8
purgatory  146:11
purpose  16:1,4
purposeful
  244:13
purposely  223:5
purposes  14:5,22
  14:23,25 158:11
  221:22
purse  192:12
pursuant  60:13
  72:14 132:23
  199:22 219:6
pursue  29:6,7
  108:6 140:14
  141:5,8,10 150:13
  151:3 203:18
  228:1
pursued  33:11
  85:4 142:25
  145:23 150:16
  180:18 203:14
pursuing  228:14
pursuit  88:3
  144:8
push  109:14
  217:11
pushing  70:11
put  13:16 31:16
  83:18 95:20
  114:11 118:21
  130:24 147:14,15
  157:2 166:13
  193:23 208:23
  210:18 213:23,25
  218:18 232:10
  240:8 258:25
  261:25 273:7
putting  55:2
  100:8 137:15

140:12 143:13
248:11

**q**

**quadruple** 159:15
**quadrupled**
159:19
**quadrupling**
159:24
**qualified** 105:5
**qualify** 14:21
**quantum** 124:4
243:23
**quarter** 19:2
**question** 15:7,11
24:10 38:14,16
39:19 40:6,9,15
40:19 43:21 57:18
66:25 68:18 69:5
79:5,24,25 83:23
84:2,8 91:7 99:24
115:12 119:9
131:12,22 132:20
137:11 138:25
139:24 145:18
157:20 184:8
191:9 236:8
244:23 262:3
266:13,14 267:1
270:16
**questioned** 176:8
**questioning**
128:24 136:24
**questions** 14:19
15:10,12 43:15
49:10,17 50:2
72:21 73:2 92:8
95:22 102:2 126:5
134:18 148:19
151:6 213:24
214:14,15 264:18
**quick** 48:18
**quickly** 212:25
251:2,6 252:21

**quid** 197:14 198:4
**quite** 21:15
127:15 158:12
164:19 203:12
**quo** 181:23
197:14 198:4
**quote** 16:13,17
42:7 90:19 104:25
172:11 180:17,19
191:3 192:8,24
240:12
**quotes** 245:19

**r**

**r** 1:21 3:1 5:11 7:1
12:21,22 275:1
277:1
**race** 126:15
**rainbows** 54:19
**raise** 12:14
**raised** 124:17
214:14,15 216:6
221:2 243:22
264:18
**raises** 216:5
**raising** 124:10
125:13 236:18
244:19
**rajesh** 5:24
**ramifications**
203:24
**ran** 56:11 97:4
141:15 166:21
**rata** 14:8
**rate** 63:17,17
98:11 124:9
244:14
**rates** 79:12
**ratio** 37:8 200:13
200:14,15 233:2
237:15 238:14
243:10,14 268:16
268:19

**rational** 199:12
**rationale** 14:5
60:7
**reach** 69:6 91:1
110:19 112:8
254:22
**reached** 182:3
**reaching** 91:22
254:22
**read** 57:5 61:16
105:8 107:7 115:5
130:21 137:9
150:22 153:2
189:24 270:13
**reading** 106:20
118:10 153:24
**reads** 68:15
**ready** 7:5,6,8
48:21 109:10,13
112:23 128:13
152:4 155:9
156:15
**real** 14:5 203:23
224:8 236:20
**reality** 226:21
**realize** 212:24
**realized** 193:15
197:17 217:16,17
217:19
**reallocate** 181:15
181:17
**reallocated** 177:4
**reallocation** 34:10
171:9 179:17
182:13 184:13
199:9 216:20
219:1 252:24
255:17
**really** 12:4 16:18
30:10 65:1 79:19
167:16 177:19
185:2 221:24,25
226:8 243:13,16

243:16 244:10
247:16 258:5
266:20 267:14,21
268:12 271:18
273:5
**reamended** 62:14
**reason** 8:2 53:20
54:9 57:10 65:12
65:12 77:19 110:7
112:3,4,5 114:6
134:11 149:1
170:19 185:19
221:1 222:5
226:17 242:16,17
243:2 248:25
249:18 252:23
254:16 266:14
**reasonable** 30:5
56:24 57:13 76:7
113:13 164:21
169:18 183:4
210:13 233:17
235:9,11 239:6
**reasonableness**
165:5 243:2
**reasoned** 217:6
218:19
**reasons** 11:9
78:11 258:24
**rebuttal** 151:17
**recalculation**
177:12
**recall** 26:22 35:8
52:17 53:12,16,21
57:3 80:6 84:15
91:17,24 92:8
93:4 96:1,5
102:21,25 103:4
105:11 110:6,22
113:11 114:1,5,24
116:1 142:23
143:8 166:16
167:22 178:13,14

178:15,17 179:4
223:24
**recalled** 95:17
**receive** 19:25 20:3
24:19 30:21 31:22
80:20 138:4,6
143:20 185:8
194:5
**received** 20:12
24:24 31:25 58:13
94:24 110:2,3
135:11 144:22
174:2 175:24
182:7 183:2
198:22,24 205:16
205:20 206:9
214:3 225:20
228:6 264:17
**receives** 193:11
**receiving** 26:10
193:17 215:14
223:17
**recess** 48:21 49:4
81:5 112:25 128:8
156:12 207:19,22
**recharacterized**
139:20
**recitation** 8:15
9:5
**recite** 44:6
**recited** 33:25
**recognition**
228:10,11
**recognize** 59:18
224:12 227:8
231:25 232:20
256:6 258:15
**recognized** 232:1
247:7 253:9
262:14
**recognizing** 224:8
**recollection** 22:17
50:25 71:14 141:7

148:22 272:13
**reconsideration**
158:14 169:6
174:13 189:16,25
205:24 257:7,9
258:3 260:15
**reconsidered**
184:5
**reconvene** 48:21
126:9,9
**reconvened** 116:5
**record** 12:20
14:14 17:18 86:21
128:14 130:21
139:1 140:22
145:19 152:14
153:18,24 154:2
158:21 170:6
181:24 182:13
187:6 189:11
198:2,8,12,17
199:2,9,21 201:15
203:7,8 205:2
206:4 210:24
211:7,15 217:9
220:9 221:19
222:18,22 232:6
252:4 264:10,15
265:17 270:9
275:4 277:4
**recording** 232:13
**records** 11:19,21
11:23 17:1
**recover** 134:21
195:11
**recovered** 135:20
137:3
**recoveries** 42:14
59:14,20 60:2,4
62:1 67:19 76:8
119:1 137:7
159:19,25 160:20
162:25 197:16

247:12
**recovery** 24:17
68:22 134:25
159:15 160:19
185:8 196:10
205:23 228:14
244:16
**red** 179:14
**redemption** 66:16
**redirect** 84:8
102:6 126:8
146:15
**redo** 132:1
**redone** 132:23
**reduced** 69:8 70:3
**reducing** 76:8
**reduction** 68:24
69:4 115:9 162:6
**refer** 15:24 23:13
28:5,7 50:13 68:5
**references** 68:6
84:14 93:11
**referred** 15:23
22:16 23:18 34:14
44:20 58:4 72:1
76:11 84:23 85:19
87:13 176:1
**referring** 23:11
42:16 130:6 149:2
246:13
**refers** 41:3 68:2
**refinancing** 29:7
107:10
**reflect** 16:12
**reflected** 98:4
152:25 233:4
**reflective** 266:20
**reflects** 154:6
178:21 203:8
**refrain** 109:20
**refresh** 50:24
272:12

**regard** 9:7 223:15
232:11 235:7
245:20 256:10
**regarding** 19:7,20
28:16 30:13 31:16
45:16 47:3,18
52:17 66:15 92:9
105:3 107:20
109:22,24 150:4
223:8 241:25
**regardless** 31:2
144:18 145:21
178:19 197:6
**regards** 63:20
65:11 66:22 70:20
73:5 75:10 76:14
85:23 89:2 102:19
103:5,5,7 124:1
124:11 125:14
223:16 224:11,13
225:6,7 227:1
229:14,25 238:17
239:4 243:24
247:5,6 248:3
255:18
**regulators** 256:17
**regulatory** 213:7
247:10 256:15,19
**reimbursable**
165:17
**reimburse** 235:6
**reimbursement**
199:5 235:5
**reimbursing**
219:1
**reining** 21:24
**reinstatement**
253:23 257:4
**reject** 14:18
**rejected** 110:17
240:19
**rejection** 249:6

**rejects** 106:4
**relate** 206:3
**related** 69:1 88:4
95:24 99:14
105:13 107:9,13
205:5,7,8 225:14
241:22 242:23
251:7,13 252:2,18
252:20
**relates** 17:6 35:22
44:17 69:5 73:10
145:4,5 219:5
229:5 238:9
251:17 252:5
**relating** 66:4,9
95:6 182:23 191:1
251:19,24
**relation** 144:15
145:17
**relative** 51:16,19
52:8 61:24 92:9
178:5,7 179:5
182:19 227:13
238:11 241:5
243:5
**relatively** 238:12
238:23
**relax** 219:25,25
**release** 91:12,21
237:4 257:24
269:7
**released** 269:2,22
**relevance** 39:22
39:24 47:23
240:16,17,18
**relevant** 41:11
43:5 48:2,9 73:11
112:17 130:2,8
172:5 183:15
243:16
**reliable** 182:10,16
**reliance** 241:16

**relied** 10:15
204:25 234:23
**relief** 142:3,16
168:21 180:2,8
**relieved** 145:12
145:12
**remain** 151:1
217:21
**remained** 194:5
**remaining** 20:3
33:3 138:6 192:22
192:23
**remains** 206:19
**remand** 61:20
**remanded** 61:14
**remember** 120:24
122:12 146:24
167:24 177:10
195:12 222:9
255:10,12
**remind** 157:11
242:19 255:20
**reminded** 235:2
256:4
**reminder** 250:1
**removal** 52:12
161:10
**removed** 52:11
**removing** 257:1
**render** 83:2
**rendered** 169:20
171:12 224:16
255:24
**renegotiate** 77:10
85:13
**renegotiated**
68:21 76:24 80:13
85:4
**renegotiating**
77:12
**renegotiation**
76:23

**reorganizations**
218:15
**reorganized** 24:6
**repeat** 132:20
**reperceived** 70:1
**rephrase** 100:17
**replacement**
186:10,24 187:24
188:11 189:2,3,5
192:9 194:19
195:20 206:24
**reply** 156:10
**report** 170:5
179:13
**reports** 46:14
214:3 264:17
**representatives**
47:14
**represented**
113:15 161:3
173:5 214:4 215:1
215:12,19
**representing**
104:9 204:15,16
204:19
**represents** 57:8
173:12 175:10
215:18
**request** 46:12
130:4 154:4,4
205:21 266:6,8
**requested** 107:22
152:11 163:15
180:1
**requests** 117:20
150:6 183:5 216:4
216:16
**require** 207:6
**required** 133:14
133:16,17,21
170:11 182:19
**requires** 174:9
175:19 227:16

**requisite** 200:4
**res** 220:7
**reservation** 168:1
168:2
**reserve** 10:14
150:24 156:2
157:23 158:8
162:4 169:12
221:8 222:12,16
**reserved** 236:25
262:1
**residual** 160:3
**resistance** 34:22
**resolution** 168:12
253:20
**resolve** 256:23,24
**resolved** 217:8
**resources** 166:14
171:21 225:22,23
250:19 266:3
**respect** 11:4 13:13
15:18 22:10 27:23
28:17 29:9 33:1
37:4 61:2 129:3
150:14,18 157:13
157:22 159:2
160:7 163:6,9
168:8 227:12
262:19 265:17
270:22
**respected** 258:18
**respective** 44:18
240:22
**respond** 259:10
**responded** 78:21
78:21
**responding**
238:20
**response** 29:9
128:23 134:17
149:6 156:3
197:12 236:2

responsibility
  205:25
responsible  18:6
  149:16 181:6
  211:22 258:3
rest  9:15 107:7
  118:10 138:7
  139:10 174:18
restated  89:11
restriction  105:6
  105:11
restrictions
  104:25 105:11
  107:1 109:20
  149:7
restructure  79:21
  79:21
restructuring
  18:24 66:5,9
  100:5,19 104:23
  114:8 143:14
  150:25 165:22,23
  242:14 258:23
restructurings
  57:12
restructuring's
  94:8
rests  180:19
result  37:12
  109:10 138:19
  140:8,10 145:16
  159:17,23 174:21
  177:22 233:3
  238:16 240:4
  257:9 262:5,6
  271:2,24
resulted  177:20
  198:9,14 205:23
results  98:7
  176:18 241:10
  258:6 262:4
resume  112:23

retain  34:6
retained  244:1
retaining  32:22
return  88:13
  128:5 172:3
reversal  61:20
  77:5 81:19 84:4
  227:18
reverse  53:4
  158:6,7 176:23
  177:13
reversed  42:10,11
  61:14 74:12 76:22
  77:1 187:17 196:5
  196:9 220:10
  227:17
reverses  167:16
reversing  191:2
review  26:20
  35:14 42:21 46:14
  46:18 92:14 96:21
  99:21 170:1,23
  173:20 183:22
  200:4 212:17
  213:10,12,18,19
  213:19 215:4,5
  232:2,17 234:6,11
  235:17,22,23
  236:10,16 251:12
  253:13 264:13,14
  265:13,17,19
  266:19
reviewed  11:22,23
  46:20,21 173:19
  173:22 174:3,6
  264:19,20,24,24
  265:2,3
reviewing  186:3
  213:15,16 265:9
  265:21
revised  152:18
  160:15 201:8

revision  218:13
revisit  102:13
  221:7 258:7
revisited  264:12
revisiting  189:12
  258:4
rewarded  163:5
richard  3:24
  208:6
richards  4:6
ride  64:17 176:12
rider  175:24
  176:13
right  7:22 10:14
  11:4,16,17 12:14
  15:25 36:25 37:1
  37:16,20 39:14
  41:9 42:20 44:13
  51:4,14,24 52:8
  53:8,10,16,25
  54:3,9,20,24
  55:20 56:4,11,23
  57:1,4,10,17,18
  58:2,4,6,16,17
  59:5,7,10,11,15
  59:18,21 60:4,8
  60:11,22,25 61:19
  61:23 62:16,16,19
  62:21 63:9 64:15
  65:5,7,11,15,19
  66:1,2,5,22,24
  67:10,15,15 68:1
  68:3,10,14 70:18
  70:19,19,20,21,23
  70:25 71:2,8,9,10
  71:25 72:10,11,17
  74:24 75:4,11,13
  75:20 76:1,2,23
  77:2,6,13,14,24
  78:1,2,8,14,16
  79:3 80:4,14,14
  80:17,23 81:19,24
  82:2,4,14,16,18

82:19,21,22 84:21
84:22,23,24,25
85:5,7,9,12,15
86:11,16,17 87:8
87:16,21 88:7,9
88:10 89:14,21
90:5 91:15,19
92:3,23,23 93:5,8
93:11,12,18,20
94:2,5,13,15,19
94:20,20 95:1,2,4
95:10,13 96:3,7
96:16,17,18,20
97:3,3 98:5,8,13
98:25 99:12,16
100:9,11,12,21,22
101:4,5,5 103:3,3
103:4 104:9,10,11
104:12,16 105:16
105:17,20,24
106:1,2,6,9
107:13,16 108:2,3
108:21,23 110:2,4
110:24 111:2,4,5
111:18,19,20,25
112:1,2,4,4,22
113:10,12,18,19
113:20 114:7,11
114:13 115:11,15
115:16,18,19,21
115:23 116:8,20
116:23,24 117:1,2
117:3,9,10 118:5
118:7,8,13,18
119:4,23 120:1,12
120:14,17,18,19
120:23 121:1,2,3
121:4,6,9,11,17
121:22,23 122:3
122:21,24 123:2
124:1,2,15,23
125:2,7,11,19,24
126:1,7,21 127:7

128:4,22 129:24
130:11,17,20
131:3,4,7 133:13
133:19 135:13
136:14,17 138:13
138:24 140:23
141:22 142:6,17
142:17,21 143:2,9
144:5 146:11,22
149:5 150:2
151:14,16,19
152:6,22,25 153:6
154:9 155:5,9,15
155:24 161:11
162:7 177:14
179:14,16 190:6
191:8 200:17
201:7 202:10,12
207:25 219:21
221:5,6 222:1,9
223:2 225:8,12,16
226:10,16 230:17
230:22 231:11
232:15 233:13,18
233:25 234:5,12
234:19 235:2,9,25
236:5,15 237:2,6
237:10,14,18,20
238:5 239:8 240:1
240:6,11,25 241:6
242:5,5,10,14,20
242:21,23 243:19
244:2,4,8,17
245:7,16,17 246:8
247:8 248:3,7,14
250:6,15 251:7,24
252:1,6,8 254:1
254:11,15,19,24
255:4,5,6,12,22
256:24 257:8,9
263:17 264:4
266:12 268:4
269:9,12,13,16,18

271:14 273:22
**rights** 64:16 65:1
95:5 150:25 168:1
168:2 212:16
220:22,23
**ripe** 221:1,3 222:6
**ripeness** 227:16
**rise** 15:12 49:5
113:1 186:8,14
207:23
**risk** 16:3 65:10,24
66:1,4,8,21 67:2,4
67:7,9,10,11,14
67:16,18,20,22,24
68:5,9,12,14,21
69:6 70:1,14,16
70:19,21 78:16,22
118:21 120:2,3,4
120:8,9,11 165:8
183:23 184:11
187:14 188:5,6,7
196:4 198:15
203:6,18 212:2,3
212:3,5,10 213:7
218:5 220:25
231:2 247:9,9
248:23 250:25
256:15,19,20
257:1 258:8,8
263:18,20,22,23
**risks** 67:13 68:2,3
203:19,22 247:10
249:13
**rlf** 242:1
**rlf's** 242:1
**road** 156:20
275:21 277:21
**robins** 229:21
**robust** 233:17
**role** 17:22 163:11
172:10
**roll** 213:1

**rolled** 213:1
**rolls** 108:19 109:3
**roman** 65:24
**romeo** 217:22
**room** 83:19 158:2
158:6 183:10
**roosevelt** 235:3,13
**roost** 168:20
247:11
**ropes** 5:1 96:4,7
98:13 99:13,25
106:14
**rosenbaum** 5:13
7:20 8:16,18
11:12,22,22 12:8
12:12,18,21,21,22
13:9,10,12 15:7
17:19 19:13 20:17
24:4 25:18 35:13
40:25 43:23 45:21
46:3 48:8,22 49:1
49:14 51:2,4 53:7
62:12 68:25 69:15
70:6 72:23 73:6
73:15,15,24 74:9
74:17 81:10 84:11
86:4 91:9 92:2
95:22 100:2
102:20 105:15
111:19,21 113:7
114:1 121:19,21
121:25 128:12,16
134:3 142:5,8,17
142:21 146:17,19
148:18 151:9,12
151:15 152:12
154:7 165:25,25
166:2 170:14
199:17,24 231:15
232:22 244:3,13
250:9,16 263:1
**rosenbaum's** 7:5
17:2 38:11 50:23

139:19 157:5
**rosner** 3:14 4:21
179:20,22,23
189:23 190:11
191:21 200:23
201:2,5,10 202:3
203:4 207:15
259:19 261:18
**rough** 56:16
**roughly** 15:21
19:25 31:6 35:6
35:12 52:14 62:25
71:14 93:6,6,7,7
96:19 113:11
120:5 138:4,12
141:14 205:24
206:7 207:9
210:13
**round** 45:25
**rounds** 234:7
**rows** 271:21
**rsa** 11:10 18:23
18:25 19:5,8,13
19:15,18,24 20:17
20:18 21:20,20,25
22:2,21 23:25
25:23,25 26:3,12
26:16,24 27:2
42:9 52:25 54:2,4
54:9 56:1,4,8,13
56:14,15,18,20
57:10,24 84:14,24
85:3 107:2 115:22
116:7 118:15
119:5 128:18,19
129:1,5,5 130:6
131:9,15,17,20
132:6 133:13,16
133:16,18,23
138:3,13 174:15
231:11,12 233:11
249:5,6 270:19,20

rsi 117:24
rule 15:14 135:14
  136:9 257:18
ruled 158:22
  163:17 165:16
rules 190:10
ruling 7:4,23
  10:17 17:2,6
  52:21 61:20 81:11
  82:24 83:9 152:13
  162:16 163:17,18
  206:5 224:7
  228:12 230:19
rulings 17:16 53:4
  158:14 163:23
run 141:16 142:12
  193:3 271:1
running 210:2
runs 56:15

**s**

s 1:22 3:1 6:8 7:1
  12:22 70:18
sad 103:24
sake 102:20
sale 54:12 180:15
  180:15 184:19,23
  185:1,2 188:14
  189:17 190:1,4,15
  191:23 192:19
  194:21 196:13
  203:13 230:4
sam 5:16
sat 214:25 215:3
  215:24
satisfied 25:16
  41:14 42:8 59:7
  60:13 72:14 85:6
  186:11 218:10,12
  227:23 244:12
satisfies 165:19
satisfy 59:9 65:6
  77:6,9 85:1,10
  233:6

save 167:19
saved 167:18
savings 115:7
saw 79:1 148:19
  212:21 217:14
  218:15 231:14
  242:3,4 244:13
  250:8
saying 36:24
  66:23 67:21
  102:13 133:7
  139:8 142:8
  149:15 158:16
  209:3 213:5
  216:10 233:6
  235:20 237:7,8,11
  260:9 261:18
  262:7 263:16,18
says 11:16 14:15
  21:1 38:25 42:18
  60:11,25 61:11
  66:14 68:3,4
  71:23 72:7,12
  75:23 87:24 89:18
  89:22 90:19 92:24
  93:1,24 94:19
  95:16 100:17
  104:17,22 106:22
  106:24 107:2,16
  109:4,8,13,17
  113:21 117:19
  118:14,21,21
  130:8 150:2,23
  160:5 166:16
  169:19 176:19
  177:25 178:3
  183:11 186:15
  216:14 260:12
  261:7,11 264:12
  268:11,20
scan 154:22
scanned 154:14

scanners 154:25
scared 154:12
scenario 194:15
  225:20 227:21,23
  239:9
schedule 224:1,2
scheduled 111:12
scheduling 102:19
  111:4,10,10 127:2
  166:9
scheme 223:13
schmidt 3:17
schneider 6:6
schryver 3:18
scope 107:15
scott 4:24 6:7
screamed 261:22
screen 58:21
  80:16 99:21 100:8
  147:15 148:3
screen's 80:17
search 96:8 97:4
  98:8 99:16 251:10
  251:14,16
searched 99:6
seated 7:2 12:24
  49:6 113:2 128:9
  156:13 207:24
sec 16:18,20
second 8:3 9:3
  10:1,18 19:2 20:7
  30:24 31:4,6
  42:13 44:9 62:22
  63:2,7,20,25
  64:22 66:11 71:23
  75:6,25 81:17,22
  87:9 98:6 99:18
  108:19 113:21
  117:18 129:19,25
  133:7,15,17,20
  141:15 142:20
  163:21 192:20,23
  192:25 193:10,11

193:17 224:10
  234:16 244:24
  264:3 268:21
secondary 224:21
  234:11 236:14
  252:13
seconds 63:11,12
  63:13 142:15
section 23:7,18
  60:17 66:4 68:4
  72:7 76:5 87:16
  87:18,21 140:22
  219:4
sections 67:25
secure 191:6
secured 107:10,11
  141:18 146:1
  204:6 263:15,20
securities 17:24
  18:11 20:11 24:11
  24:12 27:10,16
  56:7,10 67:1,8,16
  67:22 73:8 113:9
  149:11
security 56:11,14
  56:15 83:1 149:9
see 21:1 35:10
  58:10,17,17 60:14
  60:22,25 61:3,4
  61:10,15 65:24
  66:8,11,18,19
  72:6,8,11,15 75:7
  75:19,23 76:9
  82:7,12,17 84:7
  86:23 87:6,8,21
  88:5 89:8,18 90:2
  90:14 92:23 93:3
  93:12,20,23 94:10
  94:12 98:10
  100:10,20 104:7
  104:13,16,20,21
  104:22 105:4,5
  106:17 107:4,16

108:24,25 109:6
109:11,12,15,16
110:1,7 114:18
115:5 117:21,24
118:3,4,13,17,20
119:2,3 120:15
127:16,17 128:5
129:17 130:2
140:17,25 142:14
148:20 150:10
155:9 157:5 190:6
241:17,19,24
243:6 255:15
260:12 266:13
**seek** 103:8 142:15
150:17 165:21
180:24 183:6
199:5,5 201:8
**seeking** 101:13
167:6 181:9,14
199:16
**seeks** 142:1 181:9
225:8
**seen** 161:6 176:23
211:4
**selective** 225:8
**self** 255:25
**sell** 56:14,14
**sempra** 49:19,21
111:16 125:1,3,12
144:8 145:7,10,15
166:6,23,24 167:9
167:10,12 168:9
180:9,10,20 182:6
184:18,22 185:13
188:14 191:14,25
193:19 194:3
195:7 205:20
206:9 223:23
224:3 256:2,3,5,9
256:11,16 263:3,5
**sempra's** 194:6

**send** 104:19 114:2
117:4 175:14
232:18
**sending** 116:21
**senior** 78:24
115:6,8,13
**sense** 16:6 192:2
195:22 220:14
**sensitive** 16:18
**sent** 131:5,7 175:9
175:10 235:22
**sentence** 7:24 8:1
8:3,4,5,6,25 9:1,3
9:10,13,15 10:1,1
10:3,8 14:4 16:12
68:4 87:22 89:22
117:24 150:23,24
155:20 270:13
**sentences** 9:11,20
10:2,9
**separate** 67:24
68:16 142:11
151:4 230:21,22
231:2,3 252:7
**separately** 100:4
100:18
**separation** 248:23
**september** 1:15
53:9,14,19 73:17
73:18,21,23 74:2
111:14,15 159:10
159:13 160:5
164:13 187:23
227:3 245:5 261:8
272:4 277:25
**series** 58:6 60:18
66:12 103:7 121:1
146:22 147:8
166:8
**serious** 256:19
**seriously** 176:7
**serve** 273:5

**serves** 109:18
**service** 36:12
164:22 169:20
178:22 224:16
**services** 38:11,12
171:12 172:16
175:19 183:20
186:13 200:11
205:5 223:17
224:14,19 234:8
251:7,13,14
252:20 253:14,15
255:24
**serving** 189:16,25
**set** 20:2,4,14
21:25 23:15 39:24
45:22 50:10,11
72:17 76:5 81:10
120:7 150:23
223:25
**sets** 82:8 184:12
209:18
**settled** 254:20
**settlement** 44:21
81:16 82:15,18,20
85:20,21,22,22,23
86:22 87:1,14
88:10,18,19,20,23
88:24 89:1,11,18
89:23 90:2,23
91:20 95:5,9,15
142:20 169:10,13
171:17,23 172:5,8
172:19 173:1
205:6,8 253:21,24
254:1,4,5,10,11
254:13,14,17,21
255:9 257:10,11
257:12,23,24
258:10 269:6,8
**settlements** 86:18
88:5 168:6

**setup** 138:12
**seven** 54:24
**seventy** 173:9
**severely** 70:3
**shai** 3:17
**shamah** 6:8
**shannon** 165:4
**share** 29:13 109:5
138:20,22 167:20
212:11,11 225:20
**shared** 251:20
**shares** 41:23
**sharing** 119:18,23
**sheet** 20:18 21:5
25:7,7 83:8,12
84:3 108:1,4
150:10 268:5
**sheets** 153:22
**shift** 51:22 52:1
173:14,15 176:17
176:22 177:9
218:21 239:4,22
243:18,20
**shifted** 51:17
244:5
**shifting** 219:1
236:5 238:2
239:23
**shifts** 177:5
**shoot** 155:17
**shore** 212:21
**shore's** 267:14
**short** 48:20 50:4
81:2,4 112:18,22
146:15 155:10
207:19,20 246:19
**shorten** 127:5
**shorter** 127:11
**shortly** 78:2
160:19
**shot** 216:10 218:3
220:11

should've 96:1
show 11:22 57:7
  65:12 103:21
  124:5 164:22
  170:6 182:20
  184:15 208:12
  268:15
showed 200:3
showing 233:8
  250:6 264:17
shows 56:25 179:9
  198:8
sic 268:17
side 42:18,22,23
  43:7,14 44:1,18
  47:12 48:9,14
  62:18 86:17 93:14
  93:21 124:15
  136:21 137:16
  140:6,6,9,13
  142:1,25 143:21
  169:5,6,16 170:24
  170:25 171:11,22
  171:23 172:2
  177:1 178:14
  181:18 184:16
  200:21 205:7
  212:19,19 215:17
  218:14 225:18
  239:4,13 242:4,5
  242:22,23 248:15
  254:18 255:11
  267:10,10
side's 211:1
sides 50:10 169:4
  217:14
sight 223:4
sign 29:25 30:4
  57:19
signatory 82:17
signature 155:3
signed 29:21 57:9
  111:1 132:3 138:3

140:6 167:8
  186:21 231:20
  263:5
significant 41:4
  118:16 119:20
  156:23 159:18
  167:17,18 188:6
  203:23 210:12
  225:7,14 231:12
  238:3,14
silent 178:9,11
  215:24
similar 52:4 72:11
  74:7 132:16 206:8
  258:20
similarly 181:16
  186:15 190:6
simon 4:1,4
simple 79:5
  183:10
simply 8:15 49:24
  91:10 95:11,11
  97:7 136:4 157:11
  169:25 170:19
  174:16 176:18
  183:3 205:18
  252:2 260:14
  268:4
single 175:12
  202:17,20 264:15
sir 12:24 13:5,20
  14:3,23 16:21
  18:8 19:14,16
  20:24 22:8 23:9
  23:12 28:8,11,18
  30:14,16 41:2
  45:2 48:13 49:1
  52:18 53:7 54:4
  56:18 58:10,11
  59:1,4,5 60:15,16
  61:3,15 62:16
  63:23 65:9,17,23
  66:18 71:21,24

72:6,9,15,16,18
  74:18,20,25 75:3
  75:7,8,9,12,13,19
  75:21,22,23 76:9
  77:18,23 78:6,10
  79:24 80:12,25
  81:13 82:5,6,12
  82:23 83:6,25
  84:11,13 86:8,20
  86:24 87:2,6,16
  87:23,24 88:5,16
  89:5,16 90:3,9,12
  90:14,21 92:7,17
  92:18,21,22 93:10
  94:1,10 95:23
  97:17,18,24 98:12
  100:10 101:7
  103:4,14 104:3,4
  104:7 105:4
  106:11 108:24
  109:15 111:23
  113:24 114:7
  116:1,10,12
  117:22 118:3,21
  120:12,15,24
  122:21 124:8
  125:9,10,12
  126:10 128:18
  129:14,19 130:3
  131:13 134:10
  135:15 136:8,23
  137:20 140:5
  144:11 267:21
sit 13:23 16:2,10
  16:24 91:6 219:18
site 186:12
sits 160:8 196:15
  196:18
sitting 52:9 53:16
  209:3 215:17
  221:4 251:3
situation 163:19
  223:11 228:21

situations 165:9
  229:11
six 139:7 173:9
size 154:13 240:21
sized 18:21
skew 239:10
  266:14
skewed 262:4,5,6
skip 173:19
slanted 244:2
slash 264:9
sleep 78:6 218:25
slide 161:7 162:5
  179:9 189:20
  210:17 214:16
  247:5 264:11
  268:15
slides 202:25
  216:11,23 264:9
slight 13:25
slightly 52:3
  209:25 224:12
slip 78:5
slipped 260:22
slogan 259:17
slogging 169:15
slowly 70:13
small 113:8
  177:17 182:22
  202:16 206:2
sole 198:1 241:1,1
  256:5
solely 35:21 36:6
  36:17 41:18 59:22
  107:9 121:8 164:1
  171:14 175:6,16
  178:23 204:11
  205:7 207:10
  229:6 233:25
  240:13 252:9
  255:24 266:24
solicit 16:16,19

soliciting   16:13,15
  16:17
solutions   275:20
  277:20
solvency   136:21
  137:6,15 185:14
  185:15,16,20
  204:25 205:1,3
  247:6,24 248:4
solvent   52:17,24
  54:2 55:15 59:17
  59:18,21 70:14
  136:24 137:2,9
  185:22 213:2,3,9
somebody   189:22
  265:6 268:11
somebody's
  247:20
somewhat   165:14
  185:22
sontchi   1:22 42:1
  76:22 78:22 95:8
  103:1 131:23
  132:13,21 135:11
  139:2 143:15
sontchi's   61:20
sonya   2:25 275:3
  275:8 277:3,8
soon   76:6
sophisticated   67:1
  202:14,15
sorry   10:19 14:12
  22:25 24:1,21
  25:24 48:15 49:6
  49:8 57:22 60:20
  71:21 74:22 75:15
  76:21 78:6 80:15
  81:1,6 86:3,8
  90:17 94:17 97:20
  98:20 100:7
  101:11 114:19,19
  119:9 121:19,21
  121:25 129:12

131:12 134:6
  137:5 139:12,12
  147:16 148:2
  189:20 202:24
  207:18 218:23
  219:25 221:15,16
  222:25 230:13
  247:21 267:4
  270:7
sort   8:25 9:2
  167:7
sought   27:20
  151:4 178:12
  217:10
sounds   56:24
  113:13 269:19
source   176:9
sovereign   69:23
  143:23
space   18:17,18
speak   15:15 48:23
  112:24 148:10
specific   42:6
  43:23 46:15 48:16
  48:17 68:6 69:15
  88:11 96:14,25
  99:3,4 101:15
  115:12,12 121:12
  129:7 144:14
  175:7,17 183:9
  197:16 199:8
  223:17 224:18,21
  232:14,14 244:21
  246:14 258:1
  271:5
specifically   69:1
  79:16 87:24 89:7
  89:15,21 107:13
  107:15 108:4
  114:5 125:13,21
  129:8 145:4,5
  163:18 174:23
  178:10 203:15

236:25 238:9
  240:19 251:24
  252:4 253:3,5,16
speculate   183:3
speculation   42:11
  53:3 73:1 183:10
speculative
  196:10,13
speed   210:16
  211:1 217:25
  218:1
speedy   273:22
spell   12:19 249:17
spence   128:14
spend   102:12
  127:10 139:10
  248:21
spent   126:20
  145:16 164:24,25
  165:1 167:13
  172:21 173:1
spinoff   118:23
spite   167:23
split   268:15
spoke   26:7,8 45:8
  45:9 214:15
spoken   215:24
sponsor   76:17
sponsors   77:10
  91:12 254:23
spread   226:16
spreadsheet   35:9
  98:3
spreadsheets
  31:25
square   226:25
  227:1
stable   209:25
stack   70:5 83:2
  196:16,18
stakeholders
  217:8,14

stalking   55:11
  189:17 190:1
  192:3
stand   12:8,12,13
  38:8 39:15 40:16
  85:24 100:22
  172:6 192:17
  235:17 239:6,6,25
  241:11 253:22
  258:17,24
standalone   69:21
  114:23
standard   39:7,14
  159:1,3 164:7,19
  165:20 173:18
  183:8,9,14 224:13
  228:25,25 230:6
  236:12 260:9,12
standing   253:25
standpoint   174:17
stands   136:18
  233:16
start   27:13,16
  106:21 127:23
  146:23 155:16,19
  156:17,18 157:18
  207:25 244:19
  259:16,17
started   78:3,3,7
  157:10,19 177:14
  178:1 241:24
  269:14
starting   9:16 42:9
  113:9
starts   9:2 23:7
  108:18,18 147:12
  150:2
state   12:19 19:18
  129:25 203:17
  249:11
stated   171:23
  189:16

**statement** 16:9
24:2 50:8 54:15
65:9,16 66:2,20
74:3 99:18,19
111:17 160:1,18
168:7 171:21
174:2 187:8 195:9
210:20 212:1,5
221:3,18 226:24
232:23 237:19
238:20 241:22
248:11
**statements** 10:15
11:3 13:21,23
16:22 65:19
158:19,23 162:9
213:15,16,18
216:6 221:18
231:24,24 265:12
**states** 1:1,12
79:14
**status** 181:23
**statute** 169:19
261:11
**statutory** 105:16
172:11 253:9
**stay** 26:16 142:3
142:15 156:22
**stayed** 61:14
105:19 224:6
**staying** 20:17
**stein** 3:15
**steinhagen** 6:9
**step** 144:2 151:10
165:22 228:20
234:16 250:5
255:20
**stephany** 102:18
103:14,18
**stephany's** 148:12
148:13
**stepped** 215:24
217:25 218:4

**steps** 21:16,16,17
77:1 100:15
**steve** 130:15
**stilted** 90:22
**stipulation** 222:11
**stock** 3:21 4:2
18:22 142:3
**stood** 110:19
160:14 172:20
195:6
**stop** 14:10 21:25
84:9 85:2 141:11
146:4 249:23
**stopped** 101:7
141:17
**stops** 85:3
**stories** 269:20
**stormed** 83:19
**story** 242:7
**straight** 47:24
86:19 155:17
162:4
**stranded** 249:20
**straw** 50:4
**streams** 43:25
255:7
**street** 1:13
**stricken** 9:12,14
9:17,19,22 10:4
10:24
**strides** 241:18
**strike** 7:25 9:9
10:14,17 38:9
76:21 103:22
152:19
**strikes** 217:6
**striking** 10:19
38:24 48:5,5
**strom** 192:7,9,17
**strom's** 164:5
**strong** 112:13
162:20

**strongly** 79:11
**struck** 11:5 72:24
73:5 80:14 85:23
**structurally** 115:6
115:8,13
**structure** 73:9
101:1 193:1
204:12 226:18
231:19 232:10
233:6,15 257:2
**structured** 32:16
**structuring** 44:7
225:9 248:10
**stuck** 32:17
**stuff** 122:2
**subheading** 60:22
**subject** 17:2,15
29:20 30:4 85:18
104:14,15 109:23
109:25 130:4
135:16 154:6
183:22 187:14
188:5
**subjective** 39:2
**submission** 95:23
191:1,11
**submissions** 214:7
**submit** 152:18,23
153:23 154:20
209:8,17 211:21
212:12 216:7
**submitted** 127:18
152:9 216:3
**subordinate**
172:9
**subsection** 60:18
**subsequent**
162:16 190:4,15
191:16 208:13,14
209:17 220:12
227:3,21 228:22
**subsequently**
163:7 191:13

**subsidiaries** 90:25
99:9 180:14
194:16
**subsidiary** 90:20
91:3 162:12 180:3
**subsidiary's**
181:7,8
**substance** 45:17
48:24 126:25
143:7 155:6
**substantial** 144:6
163:8,16,25
164:18 165:11
168:19 169:1,1
176:17 181:19
182:21 205:10,12
205:13 207:8
210:2 223:8,11,13
228:11 255:19,21
259:4 260:2
262:22,24
**substantiate**
196:19,20
**substituting** 8:9
**succeeding** 29:5
**success** 123:11
**successful** 142:2
190:18
**sued** 252:6,6
**suffer** 226:1
**sufficient** 164:23
**suggest** 209:3
**suggested** 49:18
153:25 156:21,21
**suggesting** 189:13
228:8
**suggestion** 153:23
154:1
**suggests** 178:8
**suite** 275:22
277:22
**sullivan** 47:14,15
171:2 215:13

253:5
sullivan's  171:19
sum  93:13 94:2
  97:7 99:16
summarized
  93:12 96:13
summary  9:24,25
  97:18 98:2,4
  171:11 176:25
  210:17
summer  45:24,24
  55:2 166:7
supplement  220:8
support  18:24
  34:1,4,5,7,9 49:18
  49:21 85:12 88:1
  96:5 102:19 105:1
  124:25 125:2,3,16
  143:14,14 150:25
  160:7 161:16
  168:8 183:5 199:8
  226:11,20,22
  227:2 229:2
  231:12 257:1
  258:13,14
supported  82:20
  146:3,9 164:9
  233:10
supporting  105:1
  201:16
supports  199:2,19
  204:22,23 205:9
supposed  166:9
  180:20 182:5,7
  185:1 187:13
surcharge  193:16
sure  11:15 12:7
  15:13,15 32:9
  45:10 48:5,20
  56:6,12,21,24
  58:14 59:12 60:10
  65:14 66:25 70:21
  74:7 77:22 85:14

91:4 99:1 102:7
  105:9,21,21 107:8
  110:9,10 129:15
  130:8,9 134:11
  136:4 139:25
  140:10,18 141:16
  141:17 144:19
  145:21 154:16
  162:24 217:9
  222:19 239:1
  264:1 267:13
  269:13
surprised  216:24
surrendered
  250:4
sustain  8:20 9:10
sustainable
  197:23
sustained  9:14
  10:8 39:21 40:11
  267:14
swing  176:14,15
  176:16,20,24
  177:13 237:23,24
  237:25 238:1,1,4
  238:8 239:14,24
swings  238:5
synch  226:21

**t**

t  140:6,9 142:1
  212:19 239:4
  242:23 254:18
  267:10,10 275:1,1
  277:1,1
tab  13:15 19:3
  71:23 88:16 97:14
  113:21 129:13
  133:24,25 140:18
tabbed  146:22
table  93:12
  215:17
tackling  232:24

tag  149:20
take  11:5,6 16:3
  18:11 21:16,17
  22:3 24:20 35:12
  48:18,20 49:7
  52:14 56:22 60:2
  64:21 69:3 71:16
  76:25 81:1 100:15
  102:7,11 112:18
  112:22 136:19
  149:10 151:25
  152:16,16 155:16
  156:19 157:21
  162:23 166:2
  170:24 171:11
  172:17 173:17
  207:19 212:8
  215:5 230:21
  231:4 233:14
  237:20 249:22,23
  251:2 259:8
  263:18,20 265:2
  270:10,10 272:2
  273:13
takeaway  243:20
taken  63:10,12
  157:13 158:12,23
  169:3 231:8 268:4
takes  10:10
  101:19 102:7
  171:25 235:16
talk  74:6 108:10
  122:10 128:18
  151:10 164:20
  219:8 237:7,23
  239:3 247:24
  264:3
talked  70:16
  80:12 103:11
  127:16 132:7
  183:7 188:1 204:1
  205:1 206:11
  219:3,17

talking  44:13 74:8
  74:19,20 79:18
  142:7 183:20
  184:2,7 202:6
  245:1
talks  23:24 24:1
  98:24 115:7
  183:17 248:6
taousse  6:10
task  261:24
tasks  46:15 48:16
  48:17 96:25 243:9
tax  44:7,7 79:22
  118:22,25 119:14
  119:18,23 132:9
  140:5,14 141:5,8
  144:22,24 145:4
  161:19 168:6
  169:11 180:21,25
  203:4,5,13,24
  209:24 229:9
  248:10,21 249:2,9
  249:11,20 251:3
  258:2,4
taxable  33:12
  34:4 83:3,5,10,18
  119:13 122:7,14
  122:18 141:9,10
  142:1,25 143:8,20
  144:1,2,12,13,18
  144:18,20 145:17
  145:18,22,22
  180:18,24 181:1,3
  193:18,18 203:9
  203:13 225:15
  248:23 250:23
  263:2
taxpayer  258:9
taylor  5:23
tceh  18:3 20:1
  44:13 52:6 68:11
  68:12 86:7,9
  88:13,14 89:25

90:25 91:11,22
118:24 119:2
141:10 160:12
161:16 163:12
171:19 172:8
177:11,12 178:5
232:11 237:15
254:4 268:16,24
**team** 67:3 98:14
106:14,14 217:21
232:1,4,5 234:6
249:7 250:3
**teams** 200:8
**technical** 137:6
174:5
**technically**
135:24
**teddy** 235:3,13
**telephone** 25:21
**telephonically**
5:15 25:19 33:4
**tell** 12:15 20:22
68:13 134:12
230:5 241:18
251:14,14 260:17
**telling** 66:21 67:3
84:6 131:25
132:21,25 178:13
178:14,16,17
244:7
**tells** 242:7 243:12
**temporal** 225:4
**ten** 33:23,24,24,25
34:11 93:7
**tends** 79:11
**tenure** 35:13
**term** 9:16 20:18
20:20 21:4 25:7,7
36:10 83:7,12
84:3 98:7 107:25
108:4 110:12
133:5,21 137:6
148:20,21,24

149:3 150:10
**terminate** 11:9
26:3 119:5 146:4
167:11 188:13
**terminated** 19:15
25:23,25 26:1,12
26:16 42:9 54:5,9
138:13 146:7
188:10 261:3,4,4
**terminating**
115:22 149:13
165:21 166:13
**termination** 23:8
52:25 54:2,18,23
57:24 81:14
118:15 149:22
151:3 157:19
158:25 159:5,12
159:14 160:5,23
164:17 167:14
186:9 189:3
197:15,25 206:1,6
206:8,9,15 219:6
219:16,19,23
220:20 223:21
226:10,12,23
227:15,19,21
258:15 260:1,11
260:16,24 261:12
**terminations**
223:3
**terms** 21:21,23
22:18 24:18,23
85:13 86:4 88:11
90:22 96:11 99:16
129:7 131:18
132:7 160:15,15
181:13 183:12
197:11 201:10
204:1 210:7
235:17 243:10
248:17

**terrible** 94:6
**terteryan** 4:18
**test** 83:23
**testified** 15:7
25:25 52:16 54:4
55:6 73:16 83:13
92:6 100:3 128:23
134:17 138:15
143:6,19 160:22
162:2 165:25
166:1 168:5,13
173:21,24 175:5,9
175:13 176:16
179:3 182:1
185:19 197:13,19
198:3 199:17
200:24 203:15,19
211:11 239:15,17
242:25 243:1
270:2,3
**testify** 25:22 38:6
72:25 205:4 249:8
**testifying** 39:15
192:7
**testimony** 7:4,21
8:12,19 9:9 10:23
17:3 22:7 38:24
48:24 49:15 52:20
52:22 54:1 55:12
56:1 59:19 84:13
84:16 95:4 100:3
100:12 101:7
103:5 122:22,25
125:12 126:25
128:12 133:10
136:23 137:14
151:17 152:20
157:1,6,13 164:3
164:5,5 170:7
174:15 175:7
177:24 188:4
201:11 204:18
211:15,17 227:4

228:18,19 229:22
230:5 239:21
252:3
**texas** 28:3,4 70:23
118:23
**text** 98:24
**texts** 153:2
**thank** 12:23,24
15:17,25 17:11
23:5 47:8 49:2,3
50:3 58:23 61:17
74:17 81:9 84:13
97:21 111:18
112:24 113:3
116:8 122:4 128:7
128:10,13 145:23
146:14 147:5
148:10 151:9
153:17,25 154:1
155:7,8 179:18,19
189:23 207:14,15
216:20,21 217:4
222:24 247:1
258:25 259:1
271:11,12,13,14
273:19,21,24,25
**thankful** 153:23
**thanks** 15:25
**that'd** 63:18
**that's** 82:1,19,22
84:22,25 91:8
92:1 93:15,15,17
94:2,10,13,14,19
94:19 95:16,16
96:3,10,16,17
97:23 98:5 100:1
100:9,11,21 101:4
101:5 102:7 103:1
103:3 104:11
105:10,17 108:2,4
108:23 110:25
128:22 129:24
142:17

theirs   265:9
theme   208:3
theories   119:15
  203:19
theory   193:13
there's   49:12 82:8
  82:8,9 85:5 98:1,1
  99:21 106:3
  110:15 251:6
there've   86:18
they'll   89:8
they're   108:3
thing   11:18 64:2
  64:11 105:23
  163:2 171:7
  230:17 237:24
  240:1 241:13
  242:9 255:3
  266:23 270:9
things   22:5 29:2
  30:5 33:6 43:8
  44:5,16 72:22
  91:16,17 108:7,8
  110:16 162:14
  200:18 211:18
  221:13,17 223:16
  243:8 248:2
  253:18 259:13
think   7:9 8:10,18
  8:25 9:2,24 16:2
  16:14 17:7 20:21
  22:20 31:17 37:15
  37:18 38:3,19
  39:1,18,19 44:20
  45:21 48:3 49:10
  49:13 50:8,19
  52:23,25 53:1,2
  54:4,25 55:6
  59:17 60:5 67:7
  67:24 69:7 74:6
  77:15 79:16 80:4
  80:10 83:13 84:23
  88:12 91:9 95:8,8

95:18 99:22 101:4
101:14 103:10,11
105:10 107:9
110:6,12,13,15
111:7 113:7 115:6
119:19 120:5
121:18 122:9,20
124:3 126:5 129:8
131:18 132:7,11
132:25 133:2,11
133:20,21 134:20
134:24 135:24
136:18 137:2
139:1 141:13
146:6 148:23,24
149:19,25 152:1
157:5 158:4,5,6
158:11,20,22
159:1,22 162:5,16
164:12,15,16
167:22 169:3
174:21 175:16
176:1,7 177:19
186:2 189:7
193:25 199:17
200:23 201:11
204:25 205:15
206:20 207:4,12
209:11 221:20
222:13 223:7,15
224:8,22 225:7
226:7,17,21
227:11,14 228:7
228:10,16,23
229:4,7,9,11,11
229:22 230:7,15
230:18 231:6,7,9
231:13 232:21
234:13 235:11,19
235:20 236:6,14
236:18 237:6
239:6 241:22
242:7,8,16 243:25

244:3,6,7,12,17
245:10,22 247:7
247:15 248:16
249:17 255:17,23
256:6 258:12,13
258:18 259:12
261:10 262:5,21
262:25 263:1,14
265:9,16 266:13
266:14,15,16,23
267:2 269:23
270:2 271:6,7
272:3,6,11 273:3
thinking   47:4
  121:8 217:23
  245:13
thinks   8:18 38:13
third   8:3,4 9:13
  42:18 52:21 53:3
  76:22 77:1,4
  81:11,20 82:3,24
  83:9 84:4 100:5
  100:20 108:10
  109:21 113:22
  114:4,9,11,23
  115:3,5 158:5
  162:22 163:18
  167:16 169:25
  187:17 190:9,17
  191:3,8 194:2
  202:17,23 225:10
  226:5,18 227:19
  228:12 235:7
  249:3,16 257:17
  261:5 268:18
thirds   56:22,23
  57:14,20 205:21
thomas   45:15
thomas's   162:9
thompson   6:11
thorough   217:9
  235:9,10

thoroughly   226:1
thoroughness
  224:22
thought   13:8 16:6
  30:6 54:1 57:17
  59:14,20 63:21
  64:1 91:11 111:6
  118:14 121:7,13
  122:6,9,13,16
  129:2 134:20
  135:17 157:21
  219:12 220:16
  239:8,14 240:1
  241:12 246:16
  250:18 256:14,16
  256:17,19 259:5
  270:14,15 272:5
thousand   139:8
threat   149:12
three   24:1,1 33:2
  33:15 49:10 94:4
  94:5 96:14 97:7
  98:7 99:5 103:17
  110:23 113:7
  127:16 130:1
  157:20 161:7,15
  166:14 170:25
  172:15 193:5
  210:13,13 219:4
  230:6 238:5 255:7
  262:17 263:9,10
  266:21 270:11
  271:24
throat   173:8
throw   131:23
  132:21 263:18
throwing   38:17
thumb   154:15,17
thursday   272:11
tick   30:22
tie   99:3 114:20
tied   182:6 218:16

**ties** 99:3
**time** 10:11 11:19
11:21,23 16:5
18:2,2,7,15,23
19:15 22:14,15,16
22:16 23:14 24:13
25:18,22 26:20,25
27:9,12,19 28:20
28:21,21,22,22
29:18 30:1,17,18
30:22 31:4,7
33:16 34:18 36:21
37:25 41:13 42:25
44:4 49:7 52:19
55:4,8 56:8 57:24
58:12 64:20 67:18
70:7,13 73:3,7,17
73:24 77:8 78:24
79:14,15,18 80:19
81:11 84:20 95:24
96:11,13,21,22,24
97:1 98:3,11
100:24 102:11,25
103:11 104:9
105:16 112:16
113:4,6 115:20
117:2 119:19
120:19,20 121:16
121:17 122:2
123:3,4,7,13,17
127:10,13 132:7
132:22 136:1,1,13
136:20 141:17,21
142:13 145:16,23
155:18 156:4
160:19 162:7,20
166:21,23 169:19
172:13,16 173:6
176:6 177:11,21
185:9 186:5
187:10,20 188:16
189:11 190:7
195:3,16,19,21

196:1 199:24
202:4 205:14
209:23 211:2,3,8
213:9 215:13
223:18 224:16,20
230:3 232:15
233:21 234:3
235:16 237:1
239:12 241:9
242:21,23 243:5
244:19,25 245:25
247:15 251:3
255:8 256:10
259:5 260:13,16
260:23,23,24,25
261:23 262:15
263:9 269:12,14
271:1
**timeframe** 18:21
22:19 41:7,10
45:20 53:15
143:11 186:25
187:9 188:9,25
**timeframes**
186:18
**timekeeper**
175:15
**timekeepers**
234:10
**timeline** 156:18
156:22 246:23
**timelines** 23:24
186:17
**timeliness** 224:22
**timely** 170:17
**times** 33:18 135:8
139:8 200:11
234:18 259:17
263:15 268:3
**timetable** 171:13
**timetables** 23:10
23:16

**timing** 84:19
185:24 186:7
223:14 224:13
228:11 244:7
**tina** 6:4
**tired** 127:14
**titled** 98:3
**today** 13:23 16:2
16:10,24 52:9
56:1 84:13 91:8
91:18,24 95:9
127:12,19 128:12
131:8,13 136:19
139:2,18 141:2
143:4,6 144:16
153:24 160:8
162:18 186:5
199:17 219:18
237:18 262:23
**today's** 157:19
231:18
**told** 83:13 95:11
95:12 101:15
143:7 166:1
237:25
**tolerance** 271:9
**tonight** 273:22
**tony** 28:22 33:3
33:20
**top** 20:21 22:23
33:23,24 58:17
60:19 61:10 65:21
68:3 75:18 76:12
77:13,14 79:2
82:7 92:21 93:22
106:17,20,21
130:14 135:22
193:7 228:22
**topics** 33:15
101:23
**topline** 256:13
**topped** 76:18

**topping** 192:21
193:5
**torres** 3:9 128:14
179:23
**total** 56:19 98:22
124:4 153:20
172:22 175:2
188:8 238:4,25
239:17
**totals** 187:18
**touches** 21:12
**track** 24:11
**tracked** 24:12
**tracking** 27:13
87:11
**trade** 56:7 78:3,7
226:24 231:4
**traded** 18:22
56:10 78:11
**trader** 56:12
**trading** 24:11,12
24:14,15 53:23,23
54:7 55:20,22,25
69:20 77:24 78:2
78:3,11 157:2,3
185:23 213:4
**training** 78:7
**transacting**
183:23
**transaction** 15:1,2
20:13 22:1 27:20
30:20 33:11 34:1
34:2,3,4,6,8 59:11
61:19 62:7 64:16
64:25 65:10 67:17
83:18 101:8,13
103:8 119:14
121:8 122:7,8,14
123:11 125:1,3,4
125:17 141:6,9,10
142:1 143:1,8,21
144:1,2,20,23,25
145:13,14 146:4,7

161:2,4,19 163:7
164:13,14 165:23
165:24 166:3,6,15
166:15,16,18,23
166:25 168:25
169:11 173:3,4,13
180:9,11,18,20,24
180:25 181:1
182:6 184:22
185:7,12,13,20
186:10,25 187:21
187:24 188:10,11
188:13 189:2,4,5
191:12,14,16,25
192:9 193:11
194:6,19 195:4,20
195:24 197:7,7,20
197:22 198:5,13
203:9,13 205:21
205:23 206:10,16
206:24 207:1
208:13,14,20,21
209:13 210:8,14
211:2,3,10,16,19
223:22,23,23
224:10 225:15
227:2,22 228:1,23
229:12,14 230:4
230:25 231:5
246:1,21 247:13
250:23 256:2,3,9
260:13,24,25
261:2,3,8 263:2,3
**transaction's**
224:3
**transactions**
28:16,17 29:6
44:8 88:4 103:6
105:13 106:6
107:12 108:7
110:21 168:18
181:2 195:7
212:22 213:4

226:4 229:2 248:4
248:9 268:3
**transcribed** 2:25
**transcript** 46:22
152:12 154:8
173:21 275:4
277:4
**transcripts** 46:14
153:4,19
**transfer** 3:21 4:2
199:1
**transferred**
211:14,17
**translated** 135:20
**translates** 182:14
**transpired** 221:24
**treasury** 79:12
200:8 232:1,5
**treated** 21:21 25:8
144:20
**treatment** 66:17
253:23
**tremendous**
271:24
**trial** 2:1 166:10
175:7 180:1
181:24 185:1
186:1 187:5 188:2
192:6,24 195:13
196:17
**tried** 100:13 218:2
228:24
**trigger** 118:24
119:14 261:5
**triggered** 70:19
71:1 76:16 77:5,8
161:21 189:3
194:19 223:21
261:7
**triggering** 76:20
149:13,21 169:12
186:11 188:14

**tripartite** 254:5
**tropicana** 240:7,8
240:9 241:14
**trouble** 121:24
**true** 13:21,24 14:2
16:9,23 54:21
56:19 124:8,14
178:9 195:1
242:10 271:15,16
275:4 277:4
**truly** 112:17,18
271:25
**truncate** 102:10
127:20,25
**trustee** 88:1 160:8
163:13,24 164:25
167:15 178:16
208:7 214:24
215:15
**trustee's** 191:5
**trustees** 86:23
**truth** 12:15,16,16
**try** 15:11 20:19
21:17 22:18 34:23
94:17 112:7,20
127:4,11,25
149:20 155:17
166:14 180:24
208:7 257:20
273:22
**trying** 68:13 73:4
83:23 99:24 108:3
177:7 189:24
235:6 255:12
**tsa** 132:8 249:4
**tune** 78:13
**turn** 7:4 13:15
19:3,17 20:18,19
22:4,9,15,22 28:6
40:25 58:20 61:8
65:21 66:7 71:10
82:2 87:4,16
89:10 90:9 92:16

93:8 95:22 103:15
106:9 118:24
129:13,19 140:18
172:24 194:16
199:3 207:19
226:10 244:21
**turning** 7:24
42:13 164:18
211:23 212:15
231:9 252:21
**two** 7:3 9:11,20
10:2,9,13 13:25
35:22 47:21 56:22
56:23 57:14,20
68:19,20 72:21
82:8 86:12 88:25
93:6,23 94:2,9
98:1 99:9 130:24
131:1 142:13
149:24 161:7
162:14,15 163:4
170:10 173:5
182:9 184:12
204:15,16 205:21
217:14 218:14
221:13,16 234:2
238:15 241:4
252:7 262:19,23
270:11
**txu** 17:24 18:6,9
18:10,14,20,22
21:14
**type** 18:1 32:6
97:6 99:3 225:4
**types** 35:23 238:5

| u |
|---|

**u** 12:22
**u.s.** 1:23 69:24
79:12 214:24
215:15
**ucc** 265:8
**ultimate** 8:11,17
8:21 9:8,12,18

10:1,3 38:17
39:16 41:17,18
51:11 245:13,15
**ultimately** 12:2
27:4 30:15 31:9
34:13 47:24 51:19
51:21 57:25 78:15
81:19 110:17,18
111:23 112:1,6
124:14 137:23
163:18 166:3,11
168:3,14 169:8
188:14 206:16
218:3,7,20 219:4
220:19,21 222:2,5
223:7,20,24 224:5
224:24 225:17
226:16 228:15
229:4,20 232:7,17
235:11 236:2,8
237:6 238:10,24
239:19 240:2,24
241:5,11 242:3,6
247:9,11 248:3,14
248:19 250:1,21
251:20 252:12
253:11,16 255:15
256:22 257:11,17
257:18 258:1,9,12
258:21 261:4
**um** 260:5
**umb** 5:2,9 151:20
215:18,18 242:7
243:17 250:3
251:9 261:14
**unable** 85:9
**unacceptable**
107:6 110:4 140:2
**unaware** 64:10
**unb** 215:18
**unbelievable**
60:22 271:22

**unclear** 139:1
175:4
**uncontested**
161:5 170:25
**undeniable** 251:1
**underlying**
183:19
**undermine** 191:5
**understand** 8:1
9:4,17 11:8 15:13
22:13 32:8 48:25
59:5,13 60:1
61:22,23 62:16,20
63:6,15 64:3,15
70:9 76:20,21
77:4 78:7 83:25
84:1 100:16
114:25 131:11
132:24 139:9
168:17 204:14,15
206:13,14 237:13
250:9 269:25
**understanding**
9:6 10:10 11:20
11:25 12:3 24:13
25:4,11,14 26:5
35:19,25 36:3,7
36:10,18 37:2,7
60:6 61:5 76:14
77:20 78:10 91:7
91:9,19 93:15
94:3,20 95:13
98:13,18,23 99:5
114:7 119:11,13
122:5 124:19,21
124:24,25 125:16
175:14
**understood** 12:7
24:7 61:17 71:20
90:23 95:1 102:15
128:3
**undertaken** 43:25

**undertook** 199:25
**unequivocally**
244:4
**unfair** 39:10
177:22 270:7
**unfairly** 200:10
**unfortunately**
8:22 149:7 166:7
**unhinged** 209:12
**unilateral** 104:12
104:19 112:14
**unilaterally**
110:16 146:6
**unimpaired** 59:15
83:2 138:18
**unique** 79:20
184:4 191:19
206:13 209:13
**united** 1:1,12
79:14
**unknown** 1:25
258:5
**unnecessary**
11:19
**unpack** 22:5
**unquestionably**
226:13
**unquote** 16:13,17
**unrebutted**
204:18
**unrelated** 114:22
197:15
**unsatisfying**
243:15
**unsecured** 19:22
19:24 24:5,14,15
25:8,15 42:15
52:4 67:6,19
71:18 88:15 91:11
93:20,22 106:25
114:12 115:4,9
118:1 119:1,8,24
120:1 138:17

142:9 159:15,19
160:2,4,17,20,21
161:10,12,24,25
162:7 163:20
165:13 172:4,12
203:22 204:20
210:1 248:24
263:17,24
**unsecureds** 115:6
254:21
**unstapled** 153:11
**unsuccessful**
168:15
**untimely** 170:19
**unusual** 191:14
196:24 223:13
**upheld** 190:13,13
**upside** 250:4
263:23
**urge** 236:20
**urgency** 222:13
**use** 16:19 97:13
131:25 135:19
171:1 179:10
187:9 191:10
193:4 215:6 235:3
240:12 262:2
273:6
**uses** 273:8
**usurp** 265:14
**utilities** 69:24,24
79:10,14 143:25
**utility** 18:17,18
28:4 70:20,22
79:11 101:2

**v**

**vague** 196:13
**valid** 95:15
246:12
**valuation** 69:18
135:21 211:15
**value** 20:4,11,15
24:9,18 26:10

30:7,11 31:1
33:14 34:20,23
36:21 37:3 38:20
54:11,17 55:14,22
55:23 62:1,4,6,13
62:21 63:18 67:6
67:17 68:23 69:4
69:21 70:13 79:3
79:7,9,14,17,18
79:22 83:17
101:10 109:5
121:7 134:21
135:2,6,6,11,16
136:9 137:15,22
138:12 143:25
144:1 159:4,18,24
160:3,3 163:19
167:17 169:9
172:2 173:11
181:11 187:3,7,12
191:6 193:9
197:22 198:9,25
206:17 210:14
211:4,5,9,18
213:6 225:14,21
225:25 226:2,7
228:13 229:12
236:5 239:23
240:25 246:3
248:14,16 250:4
250:18,25 254:8
255:15 256:7,8
257:2,7,14 258:11
262:25
**values** 55:20
69:13 213:4
**vantage** 225:4
**variety** 29:2 33:6
**various** 18:2
23:10,16 31:25
42:15 43:8 44:8
44:11,15 46:14,18
136:20 137:17

143:22,23 153:20
157:4 168:7
**vast** 44:18 242:18
242:21,22 248:8
**venter** 6:12
**venue** 267:18,18
267:20
**verboten** 39:17
**verified** 200:5
**veritext** 275:20
277:20
**version** 50:14
89:12 155:1
**versions** 50:15
**versus** 21:22 35:2
55:9 79:19 144:18
212:19 241:7
256:11
**victory** 256:4
**video** 207:25
**view** 24:17 29:13
29:15 38:6,11
46:19 52:24 68:25
69:21 78:22 136:4
136:20 138:19
162:2,3 198:5
206:20 209:11,23
210:3 213:2 217:6
229:5,21 233:7
253:6,8
**viewed** 64:10
84:14 195:19
197:18 201:12
204:16,19
**village** 101:19
**villareal** 6:13
**violation** 101:17
**virtual** 214:6
**virtually** 159:19
180:19 271:15
**virtue** 163:23
194:24

**vis** 210:1,1
**vision** 212:23
**vital** 233:22 234:3
**volume** 55:25
58:7,7,9,9 71:21
71:23 146:19
147:6,8 152:1
**voluminous**
153:18
**vote** 14:17 80:23
80:23
**votes** 167:6

**w**

**wachtel** 130:16
**wait** 68:17 141:25
170:20,22 211:8
211:11 226:18
**waiting** 211:3
236:17
**waive** 107:23
109:19 150:7
**waived** 60:13
72:14 76:4
**waiver** 29:22,25
30:5,7,10 104:12
104:19 106:4
107:1,16 108:3,6
110:4
**waivers** 103:7,10
103:13 110:23
**walk** 7:20 59:10
61:18 68:20,22
146:24 153:1
237:18 238:2
**walked** 53:17 91:7
95:9,17 227:9
**walker** 116:21
**walking** 70:2
91:17,24
**walrath** 273:8
**walsh** 260:20
**want** 11:7,15
14:21 15:13 19:22

22:5 36:16 40:12
45:16 54:13 57:14
57:19 60:7 65:1
74:7 75:1 89:1,14
91:5,14 98:6
102:3 103:21
105:23 108:17
113:8 116:10
127:11 128:18
137:9 138:9
139:12,13 143:19
146:24 150:1
151:11 155:23
156:10 162:13,17
163:2 167:25
181:14,16,19,23
192:5 199:6
208:17 209:21
210:18 220:8
222:21 235:24
236:11 238:25
242:8 251:25
259:16 263:16,16
264:5 272:17,18
272:18 273:5
**wanted** 12:6
15:16 29:5 32:7
34:2 48:6 64:13
64:16 83:14
187:11 238:2
239:20 249:3
250:24 264:3
267:13 273:17
**wants** 147:20
158:7 163:13
177:12 198:20,23
205:11 256:5
**warned** 65:10
**warranted** 179:18
**wasn't** 30:21,21
99:7 111:1,4
134:10 135:4,17
136:6 159:20

163:24 168:16
220:2
**waste** 266:3
**watch** 26:17
215:20
**waterfall** 163:23
181:10 182:2
185:4 186:24
187:13,23 188:19
189:4 193:10
194:12,25 195:3
204:11 206:20,22
206:24 207:3
208:11,16 209:19
212:13 230:17,20
231:7 245:14
248:15
**waxing** 247:21
**way** 15:4 31:1
32:15 59:15 93:17
127:19 164:4
167:9 168:6 173:5
174:15 182:6
184:9 189:13
204:22 213:1
221:11 227:16
231:5 233:19
236:17 241:15
245:1 252:6
256:17 257:17
262:14
**ways** 203:14
**we've** 39:12 47:9
70:16 161:6
164:20 170:8
173:5 176:23
187:4 188:1 204:1
206:21 211:4
213:12 219:3
232:21 243:16
256:19 260:22
268:18 272:3

**wealth** 69:23
143:23
**weeds** 243:14
**week** 53:8 166:14
186:1 273:11,18
**weekend** 159:23
167:4 245:20,21
**weeks** 29:24
**weigh** 38:10,10
**weighting** 51:16
**weisfelner** 212:21
**welsh** 5:6
**went** 53:24 86:13
157:7,7,8 167:3
213:13 216:13
233:19 266:22
**weren't** 85:1
**werkheiser**
153:11 154:1
273:3
**we'll** 85:18 99:16
100:2 112:22
**we're** 85:5 100:8
102:9 103:22
111:9
**we've** 104:19
**whatsoever**
183:17 265:18
**what's** 85:19
112:17
**wherewithal**
250:19
**wholes** 62:2,4
66:22 68:12,18
76:16 133:15
134:8,14 136:6
137:21 181:8
187:16 194:5
196:5 248:13
251:24
**who's** 50:3
**wide** 98:23

**wilford** 104:7
**williamson** 45:12
45:13,15 160:25
208:22 209:3
213:24 214:14
263:8 264:1,17
**willing** 30:4 34:1
34:3,5,7,9 65:4
69:25 102:10
106:24
**willis** 6:14
**wilmington** 1:14
**winding** 156:20
**withdraw** 30:19
31:9 85:12
**withdrawal**
198:14
**withdrawn** 8:4,6
9:19,23 10:6,6,7
10:16 30:15
**withdrew** 160:9
161:15
**witness** 5:13
125:25 126:19
128:11,11 151:16
182:1,4,6,10,12
182:13 192:17
197:19
**witnesses** 39:15
151:17,18,20,22
180:23 197:13
206:21
**woman** 43:1
**wonderful** 153:9
**won't** 127:20
**word** 9:16 12:15
16:11,13,19 25:4
42:2 110:7 137:2
202:15 251:9
273:8
**wordperfect**
273:7,8

**words** 37:18
38:10 83:11 96:8
97:7 99:5 137:2
143:7 193:1 235:2
235:3,3 245:18
**work** 31:1 34:23
43:25 44:4,19
46:19,20 96:4,22
96:25 97:3,5,6,18
98:2,16,19,22
99:3,7,13,25
103:20 111:24
158:22 163:6
165:7 171:24
204:8 205:7
218:20 225:9,17
226:2,3 230:15
238:18 239:1,12
241:3,15 242:1,2
242:6,11 243:15
248:7,8,10,17,18
251:12,17 252:14
252:19 253:3,5,13
253:17 255:7,23
258:6,17,21
270:22 271:22,25
**worked** 44:17
103:18 194:2
205:13 222:10
243:4
**working** 123:4
152:2 153:17
201:13 223:2
242:12,13 262:15
**works** 56:16
165:14 174:16
207:3
**world** 66:21 85:5
90:1,8
**worms** 177:8
**worried** 154:13
219:16 267:10

| | | |
|---|---|---|
| **worse** 127:24 | 220:15 230:9 | **you're** 82:23,24 |
| **worth** 134:19 | 245:12 246:12,22 | 84:1 92:12 94:5 |
| 135:7,8,18 159:22 | 246:25 252:12 | 97:16 99:2 100:24 |
| **would've** 246:2 | 259:9 267:4 | 104:16 111:18,19 |
| **would've** 112:14 | 272:15 273:16 | 112:23 |
| **wow** 126:17 | **year** 42:2 45:24 | **you've** 87:13 |
| **wrap** 112:20 | 46:4 79:12 81:15 | 136:19 157:1 |
| **wright** 33:4,21 | 81:15 110:13,13 | 161:6 164:24 |
| 264:16 | 111:24 115:19 | |
| **written** 10:22 | 230:8 246:15 | **z** |
| 13:12,18 17:3 | **years** 13:5 15:22 | **z** 260:2,3 |
| 100:3 191:1 229:7 | 18:19 57:2,5 | **zelin** 130:15 |
| **wrong** 57:22 | 142:13 156:24 | **zero** 98:19,20,20 |
| 71:12 176:11 | 213:11 216:2 | 196:9 205:23 |
| 189:20 213:8 | **yenamandra** 4:16 | 261:14 |
| 237:17 268:12 | 252:14 | **zone** 243:4 |
| **wrongly** 132:2 | **yep** 93:23 95:21 | **,** |
| **x** | 156:16 245:6 | **'17** 101:5 |
| **x** 260:1 | **yesterday** 10:23 | **à** |
| **y** | 44:20 49:14 53:17 | **à** 210:1 |
| **y** 12:21 260:1 | 55:2,6 64:18,19 | |
| **yeah** 11:24 21:9 | 71:14 80:7 86:13 | |
| 23:3,5 25:2 28:1 | 92:3 102:14 162:2 | |
| 33:2 38:19 39:21 | **yield** 109:9 207:1 | |
| 43:17 50:4 53:20 | 262:4 271:2 | |
| 53:25 54:25 61:4 | **yielded** 195:10 | |
| 67:5 73:25 74:22 | **yields** 206:24 | |
| 74:22 78:18,20 | 238:24 | |
| 80:4,18 81:23 | **ying** 26:7 | |
| 86:5,15 88:18 | **york** 17:21,22,24 | |
| 93:6,13 94:12,23 | 18:1,2,5,9,10,15 | |
| 95:3 96:15,16,19 | 18:16,23,25 19:5 | |
| 100:1,23 101:5,5 | 19:8 20:11 21:8 | |
| 105:6 106:7,11,20 | 21:16,16 24:9 | |
| 109:2,16 110:23 | 26:13,13,14,16,17 | |
| 110:25 111:7 | 27:1 58:13 72:23 | |
| 116:14,25 117:8 | 73:6,15,16 74:9 | |
| 117:17,18,21,23 | 83:17 113:8 117:2 | |
| 119:3 123:6,9 | 123:18 128:19 | |
| 125:8 131:3 | 132:3 270:19 | |
| 133:11 135:8 | **york's** 18:6,13 | |
| 136:23 140:2 | **younger** 13:7 | |
| 143:9 153:2 220:4 | | |