# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ) | Chapter 11 |
| ) | |
| In re ) | Case No. 14-10979 (CSS) |
| ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] ) | (Jointly Administered) |
| ) | |
| *Debtors.* ) | |
| ) | |
| ) | |

## UMB BANK, N.A.'S AND ELLIOTT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON JOINT MOTION TO FIX APPROPRIATE ALLOCATION OF CERTAIN RESERVES AND EXPENSES AS BETWEEN THE EFH AND EFIH DEBTORS

Dated:  September 27, 2018

**BAYARD, P.A.**
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
600 N. King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
scousins@bayardlaw.com
efay@bayardlaw.com

**ROPES & GRAY LLP**
Gregg M. Galardi
Daniel G. Egan
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090
Gregg.Galardi@ropesgray.com
Daniel.Egan@ropesgray.com

**ROPES & GRAY LLP**
Matthew L. McGinnis
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Matthew.McGinnis@ropesgray.com

*Counsel for UMB Bank, N.A., as Trustee, and Elliott*

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## TABLE OF CONTENTS

INTRODUCTION AND PROCEDURAL HISTORY .............................................................. 1

FINDINGS OF FACT ....................................................................................................... 6

    I.    Allocation of The Nextera Termination Fee Claims .................................................. 6

        A.    The Debtors' Pursuit of Tax-Free Restructuring Transactions. ....................... 6
        B.    The Selection of NextEra as the Stalking Horse Bidder for Oncor. ............... 8
        C.    The September 2016 Negotiations and EFH Unsecured Creditor
               Support. .............................................................................................. 14
        D.    This Court's Approval of the Termination Fee Was Based in Part on
               the Expected Benefit to the EFH Estate. .............................................. 16
        E.    The Third Circuit Makewhole Ruling, NextEra's Refusal to Pay the
               Makewhole Claims, and the Allocation of the Termination Fee. ............. 19
        F.    The Debtors' Termination of the NextEra Merger Agreement. ..................... 21
        G.    The Ad Hoc EFH Claimants' Expert Testimony on Termination Fees. ......... 22

    II.    Elliott Substantial Contribution Claim .................................................................. 24

        A.    Elliott Holds an Allowed Substantial Contribution Claim Against
               EFIH. .................................................................................................. 24
        B.    The Components of Elliott's Substantial Contribution Claim. ....................... 25
        C.    Elliott's Efforts Enhanced the Value of the EFH Estate. .............................. 28

    III.    The Allocation of Professional Fees. .................................................................... 29

        A.    The Interim Compensation Order. ............................................................... 29
        B.    The Allocation of Professional Fees and Expenses Was Not Reviewed
               By Any Disinterested Estate Representative. ....................................... 31

    IV.    E-Side Committee Professional Fees. .................................................................... 34

        A.    Appointment of the E-Side Committee and the E-Side Committee's
               Retention of Professionals. ................................................................... 34
        B.    The E-Side Committee Professionals Did Not Allocate Their Fees and
               Expenses Pursuant to the Interim Compensation Order. ......................... 36
        C.    The E-Side Committee's Services Focused on Preserving and
               Enhancing the EFH Estates for the Benefit of EFH Unsecured
               Creditors. ............................................................................................ 38
        D.    The Vast Majority of the E-Side Committee Professional Fees and
               Expenses Were Incurred Prior to December 1, 2015. ............................. 41
        E.    Guggenheim's Transaction Fee. ................................................................. 42

    V.    Kirkland and Evercore Professional Fees. ............................................................. 43

        A.    Kirkland's and Evercore's Retention and Compensation. ............................. 43
        B.    Kirkland and Evercore's Allocation of Fees Are Materially Different
               from the E-Side Debtors' Other Retained Professionals. ......................... 45
        C.    The Vast Majority of the Kirkland and Evercore Fees Were Incurred
               Prior to December 1, 2015. ................................................................... 46

D.   Kirkland's Allocation of Direct Benefit Fees and Collective Benefit Fees. ....................................................................................... 47

E.   Kirkland's Allocation of Direct Benefit Fees Does Not Reflect the Actual and Necessary Expenses of the EFH and EFIH Estates. ............... 49

F.   Kirkland's Allocation of Collective Benefit Fees Does Not Reflect the Actual and Necessary Expenses of the EFH and EFIH Estates. .............. 56

G.   Evercore's Allocations Do Not Reflect the Actual and Necessary Expenses of the EFH and EFIH Estates. ................................................... 62

**CONCLUSIONS OF LAW** ........................................................................................ 65

I.    Jurisdiction and Venue. ............................................................................... 65

II.   Nextera Termination Fee Claims. ................................................................ 65

A.   Adjudication of the NextEra Termination Fee Claims is Ripe. ..................... 65

B.   The NextEra Termination Fee Claims Shall Be Allocated 50% to EFH and 50% to EFIH. ......................................................................................... 66

C.   The NextEra Reimbursement Claim (to the Extent it Becomes Allowed) Shall Be Allocated 50% to EFH and 50% to EFIH. ................. 70

III.  Elliott Substantial Contribution Claim. ...................................................... 72

A.   Any Allowed Elliott Substantial Contribution Claim Shall Be Allocated 30% to EFH and 70% to EFIH. ................................................... 72

IV.   Movants Timely Objected to Professional Fee Allocations and the RSA Does Not Bar Movants From Objecting to Such Allocations. ............................... 74

V.    E-Side Committee Professional Fees. .......................................................... 78

A.   The E-Side Committee Professional Fees Shall Be Allocated 70% to EFH and 30% to EFIH. ............................................................................... 78

VI.   Kirkland and Evercore Fees. ....................................................................... 81

A.   The Kirkland and Evercore Fees Shall Be Allocated 50% to EFH and 50% to EFIH. ............................................................................................... 81

**CONCLUSION** ........................................................................................................ 86

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)...........................................................................................65, 71

*In re Busy Beaver Bldg. Centers, Inc.*,
   19 F.3d 833 (3d Cir. 1994)...........................................................................77, 78, 80

*In re Commercial Fin. Servs., Inc.*,
   246 F.3d 1291 (10th Cir. 2001) .................................................................................66

*In re Eagle Creek Subdivision, LLC*,
   No. 08-04292-8-JRL, 2009 WL 313383 (Bankr. E.D.N.C. Feb. 5, 2009) .............77

*In re Hechinger Inv. Co. of Del.*,
   298 F.3d 219 (3d Cir. 2002)................................................................................66, 71

*In re Kroh Bros. Dev. Co.*,
   105 B.R. 515 (Bankr. W.D. Mo. 1989).....................................................................83

*Lebron v. Mechem Financial Inc.*,
   27 F. 3d 937 (3d Cir. 1994)................................................................................28, 72

*NextEra Energy, Inc. v. Elliott Assocs., L.P. (In re Energy Future Holdings
   Corp.)*,
   --- F.3d ---, No. 18-1109, 2018 WL 4354741 (3d Cir. Sept. 13, 2018)....................2, 3, 22, 27

*In re Trans World Airlines, Inc.*,
   145 F.3d 124 (3d Cir. 1998).......................................................................................66

*In re Tropicana Entm't LLC*,
   498 Fed. App'x. 150 (3d Cir. 2012)...........................................................................72

*In re Worldwide Direct, Inc.*,
   334 B.R. 112 (Bankr. D. Del. 2005) ..........................................................................72

**Statutes**

11 U.S.C. § 330(a) ...........................................................................................77, 80, 84

11 U.S.C. § 503(b) ..................................................................................................66, 69

28 U.S.C. § 157(b) .......................................................................................................65

28 U.S.C. §§ 1408 and 1409 ........................................................................................65

**Other Authorities**

3 COLLIER ON BANKRUPTCY § 330.04 ...........................................................................................82

## INTRODUCTION AND PROCEDURAL HISTORY[1]

1.      This contested matter relates to the allocation of certain reserves and administrative expenses incurred in the above-captioned chapter 11 cases (the "<u>Bankruptcy Cases</u>") as between the estate of Energy Future Holdings Corp. ("<u>EFH</u>") and the estate of Energy Future Intermediate Holding Company, LLC ("<u>EFIH</u>" and, together with EFH and certain affiliates and subsidiaries thereof, the "<u>E-Side Debtors</u>").[2]

2.      On April 29, 2014 (the "<u>Petition Date</u>"), the E-Side Debtors and Texas Competitive Electric Holdings Company LLC ("<u>TCEH</u>") and certain of its subsidiaries (collectively, the "<u>T-Side Debtors</u>")[3] filed voluntary petitions for relief with this Court under chapter 11 of the Bankruptcy Code.  The Bankruptcy Cases were jointly administered for procedural purposes only.

3.      As of the Petition Date, EFH, through its ownership of TCEH, owned 100% of the interest in the T-Side Debtors' business of, among other things, electricity generation and lignite/coal mining.  (AHX-007, 4/29/14 Keglevic Decl. [D.I. 98] ¶¶ 19, 22, 23.)  EFH, through its ownership interest in EFIH, also indirectly owned an approximately 80% economic interest in

---

[1]     The Court hereby makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is applicable to this matter by virtue of Rule 9014 of the Federal Rules of Bankruptcy Procedure.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

[2]     For ease of reference, the Court refers herein to the allocation of reserves and administrative expenses as between "EFH" and "EFIH."  As made clear in the *First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Sempra Plan</u>"), however, the allocation is actually between the "EFH Debtors" and the "EFIH Debtors."  The EFH Debtors means, collectively, (a) EFH Corp., (b) Ebasco Services of Canada Limited, (c) EEC Holdings, Inc., (d) EECI, Inc., (e) EFH Australia (No. 2) Holdings Company, (f) EFH Finance (No. 2) Holdings Company, (g) EFH FS Holdings Company, (h) EFH Renewables Company LLC, (i) Generation Development Company LLC, (j) LSGT Gas Company LLC, (k) LSGT SACROC, Inc., (l) NCA Development Company LLC, and (m) TXU Receivables Company.  (ELX-623, Sempra Plan [D.I. 12653] Art I.A.91.)  The EFIH Debtors means, collectively, (a) EFIH and (b) EFIH Finance.  (*Id.* Art. I.A.148.)

[3]     The E-Side Debtors and the T-Side Debtors are collectively referred to herein as the "<u>Debtors</u>."

the regulated business of Oncor Electric Delivery Co. LLC ("Oncor"), the largest electricity transmission and distribution system in Texas. (*Id.* ¶¶ 19, 54.)

4.      On February 27, 2018, the Court entered its *Order Confirming the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Order"). (ELX-635, 2/27/18 Confirmation Order [D.I. 12763].) The Effective Date of the Sempra Plan occurred on March 9, 2018. (ELX-639, 3/9/18 Notice of Effective Date [D.I. 12801].)

5.      At the hearing with respect to confirmation of the Sempra Plan held on February 26 and 27, 2018 (the "Sempra Confirmation Hearing"), the Court found that the E-Side Debtors could, in their discretion, establish a segregated escrow account in the amount of $275 million (the "NextEra Plan Reserve") on account of a $275 million administrative expense claim for a termination fee (the "Termination Fee") asserted by NextEra Energy, Inc. ("NextEra") that had been disallowed by this Court but was then on appeal to the U.S. Court of Appeals for the Third Circuit (the "Third Circuit"). (ELX-634, 2/26/18 Hr'g Tr. at 233:1–3.) The Court approved the NextEra Plan Reserve as a valid exercise of the E-Side Debtors' discretion. (ELX-635, 2/27/18 Confirmation Order [D.I. 12763] ¶ 150.) The Court also stated that the NextEra Plan Reserve would "preserve the integrity of the judicial process" with respect to NextEra's appeal of the Reconsideration Order (as defined below). (ELX-735, 2/27/18 Hr'g Tr. at 15:14–17.)[4]

---

[4]     On March 13, 2018 and March 23, 2018, Elliott and UMB (as defined herein) appealed the Confirmation Order to the U.S. District Court for the District of Delaware (the "District Court") on the grounds that, among other things, (a) the NextEra Plan Reserve was contrary to the terms of the Plan and could not be approved without a separate motion and hearing and (b) NextEra should have been required to post a supersedeas bond or provide an undertaking in connection with the NextEra Plan Reserve. (3/13/18 Elliott Notice of Appeal [D.I. 12830]; 3/23/18 UMB Notice of Appeal [D.I. 12848].) These appeals have been joined pursuant to Rule 8003(b)(2) of the Federal Rules of Bankruptcy Procedure and the joined appeal remains pending in the District Court.

6.       Although the Court approved the NextEra Plan Reserve, the Court denied NextEra's request that the E-Side Debtors hold approximately $60 million in a reserve with respect to NextEra's then-pending administrative expense application (the "NextEra Reimbursement Application"), which application sought payment for various costs and expenses purportedly incurred by NextEra in connection with its pursuit of the NextEra merger transaction in the event that the Termination Fee was disallowed by a final order (the "NextEra Reimbursement Claim").  (ELX-634, 2/26/18 Hr'g Tr. at 233:10–23.)  The costs and expenses were purportedly incurred by NextEra between July 29, 2016 and July 6, 2017.  (*See* ELX-625, 2/20/18 NextEra Reimbursement Application [D.I. 12671] ¶ 43.)[5]

7.       The Confirmation Order contemplated one or more separate orders allocating the NextEra Plan Reserve and "other material Claims" as between EFH and EFIH.  (ELX-635, 2/27/18 Confirmation Order [D.I. 12763] ¶¶ 150–52.)  The Confirmation Order also provided that any Holder of a Claim may make a "request for relief in connection with the allocation of material Claims as between EFH and EFIH."  (*Id.* ¶ 153.)  The Confirmation Order set no deadline for a Holder to seek such relief.

8.       On May 13, 2018, UMB Bank, N.A., as Indenture Trustee ("UMB") for the unsecured 11.25%/12.25% Senior Toggle Notes due 2018 the ("EFIH PIK Notes"), and Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott" and, together with UMB, the "Movants") filed the *Joint Motion to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* (the "Allocation Motion").  (ELX-670, 5/13/18 Allocation Motion [D.I. 13102].)

---

[5]       NextEra did not appeal this Court's ruling denying NextEra's request that the E-Side Debtors hold approximately $60 million in a reserve with respect to the NextEra Reimbursement Claim.

9.      Pursuant to the Allocation Motion, Movants requested the Court to allocate the following four categories of administrative expenses claims (the "Material Administrative Expense Claims") as between EFH and EFIH:

a)   the NextEra Plan Reserve and any administrative expense asserted by NextEra related to the Termination Fee or the proposed merger transaction between the E-Side Debtors and NextEra, including the NextEra Reimbursement Claim or any reserve established with respect thereto (collectively, the "NextEra Termination Fee Claims");

b)   the allowed administrative expense of Elliott under sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for fees and expenses incurred by Elliott in connection with its substantial contributions in these Bankruptcy Cases (the "Elliott Substantial Contribution Claim");

c)   any allowed administrative expense for fees and expenses of any professional retained by the official committee of unsecured creditors of EFH, EFIH, EFIH Finance, Inc., and EECI, Inc. (the "E-Side Committee" and, such fees and expenses, the "E-Side Committee Professional Fees"); and

d)   any allowed administrative expense for fees and expenses of Kirkland & Ellis LLP ("Kirkland"), the Debtors' lead counsel in these Bankruptcy Cases, and Evercore Group L.L.C. ("Evercore"), the Debtors' investment banker in these Bankruptcy Cases (collectively, the "Kirkland and Evercore Fees").[6]

(ELX-670, 5/13/18 Allocation Motion [D.I. 13102] ¶ 3.)

10.      Responses, preliminary objections, or reservations of rights with respect to the Allocation Motion were filed by (a) an *ad hoc* group of EFH unsecured noteholders (the "Ad Hoc EFH Claimants"), (b) the EFH Plan Administrator Board (the "PAB"), and (c) American Stock Transfer & Trust Company, LLC, as successor trustee (the "EFH Trustee") under the indentures for certain notes issued by EFH.   (ELX-682, 6/1/18 Ad Hoc EFH Claimants' Statement and Preliminary Objection [D.I. 13168]; ELX-679, 5/29/18 PAB Response [D.I. 13150]; 5/29/18 EFH Trustee Preliminary Objection [D.I. 13148].)

---

[6]    In the Allocation Motion, Movants initially requested that the Court order a 50/50 allocation of allowed administrative expenses for fees and expenses asserted by any professional retained by the E-Side Debtors. (ELX-670, Allocation Motion [D.I. 13102].)  Movants subsequently modified this request and, as noted in Movants' Final Submission (as defined in paragraph 12 hereof), Movants no longer challenge the fee and expense allocations proposed by the Debtors' retained professionals other than Kirkland and Evercore.

11.    On June 11, 2018, the Court entered an order scheduling certain dates and deadlines and establishing certain protocols in connection with the Allocation Motion (as amended, the "Scheduling Order").  (ELX-684, 6/11/18 Scheduling Order [D.I. 13193]; PAB-X737, 8/17/18 Second Amended Scheduling Order [D.I. 13373].)

12.    In accordance with the Scheduling Order, the parties conducted discovery on the Allocation Motion, including the production of documents, eight fact witness depositions, exchanges of expert disclosures, and three expert witness depositions.  On August 30, 2018, the Movants, the PAB, the Ad Hoc EFH Claimants, and the EFH Trustee each filed and served a final written submission in connection with the Allocation Motion (collectively, the "Final Submissions").  (8/30/18 Movants' Final Submission [D.I. 13414]; 8/30/18 PAB's Final Submission [D.I. 13416]; 8/30/18 Ad Hoc EFH Claimants' Final Submission [D.I. 13415]; 8/30/18 EFH Trustee's Final Submission [D.I. 13417].)

13.    The parties' proposed allocations of the Material Administrative Expense Claims as set forth in their respective Final Submissions are as follows:

| MATERIAL ADMINISTRATIVE EXPENSE CLAIM | MOVANTS | | PAB[7] | | AD HOC EFH CLAIMANTS/EFH TRUSTEE | |
|---|---|---|---|---|---|---|
| | EFH | EFIH | EFH | EFIH | EFH | EFIH |
| NextEra Termination Fee Claims | 50% | 50% | 20% | 80% | 0% | 100% |
| Elliott Substantial Contribution Claims | 30% | 70% | 40% | 60% | 0% | 100% |
| E-Side Committee Professional Fees | 70% | 30% | 88% | 12% | 50% | 50% |
| Kirkland & Evercore Fees | 50% | 50% | 15% | 85% | 15% | 85% |

14.    On August 31, 2018, the Court entered a *Joint Stipulated Final Pre-Trial Order* in connection with the hearing on the Allocation Motion.  (8/31/18 Pre-Trial Order [D.I. 13426].)

---

[7]    For certain Material Administrative Expense Claims, the PAB proposed a range of allocations.  The figures set forth herein represent the midpoint of the PAB's proposed ranges.

15.    On September 5, 2018 through September 7, 2018, the Court held a three-day evidentiary hearing on the merits of the Allocation Motion (the "Hearing").

16.    On September 7, 2018, the Court entered an order approving a stipulation among the parties with respect to the admission into evidence or the judicial notice of various exhibits and deposition designations.  (9/7/18 Stipulation and Order [D.I. 13469].)

17.    As set out in further detail below, based on the Allocation Motion, all objections and responses thereto, the Final Submissions, and the evidence in the record and presented at the Hearing, the Court finds and determines that it is just and proper to allocate the Material Administrative Expense Claims as follows:

a)  The NextEra Termination Fee Claims shall be allocated 50% to EFH and 50% to EFIH;

b)  The Elliott Substantial Contribution Claims shall be allocated 30% to EFH and 70% to EFIH;

c)  The E-Side Committee Professional Fees shall be allocated 70% to EFH and 30% to EFIH; and

d)  The Kirkland and Evercore Fees shall be allocated 50% to EFH and 50% to EFIH.

## FINDINGS OF FACT

**I.    ALLOCATION OF THE NEXTERA TERMINATION FEE CLAIMS.**

**A.    The Debtors' Pursuit of Tax-Free Restructuring Transactions.**

18.    From the outset of the Bankruptcy Cases, and even before, the Debtors believed that a tax-free transaction for the Debtors' assets was in the best interest of both EFH and EFIH. (9/2/18 Keglevic Written Direct ¶ 39; 9/6/18 Trial Tr. at 15:12–24 (Keglevic Test.); *see also* 9/2/18 Robins Written Direct ¶¶ 23–41 (explaining that a tax-free disposition of Oncor was beneficial to both EFH and EFIH).)

19.    The Debtors' interest in a tax-free transaction was premised on the different tax status of different Debtors.  EFIH and TCEH were disregarded entities for federal income tax purposes.  (PAB-X044, 10/1/14 Tax Memorandum [D.I. 2296] at 4.)  As such, only the taxpaying corporate parent, EFH, and neither EFIH nor TCEH, would be liable to the IRS for any federal income tax liabilities attributable to the income or gain generated by a taxable transaction for EFIH (or TCEH).  (*Id.* at 8.)  A taxable disposition by EFH of EFIH or TCEH would generate a multi-billion dollar tax liability, *i.e.*, "Tax Armageddon," that the IRS would seek to collect from EFH as the taxpaying corporate parent.  (*Id.*; 9/2/18 Keglevic Written Direct ¶ 32.)

20.    In the event this occurred, EFH might seek to impose liability on EFIH for some portion (or all) of this multi-billion dollar tax liability.  It could seek to do so by electing to "check the box" to treat EFIH as a corporation for federal income tax purposes or by asserting contractual claims for indemnity or reimbursement against EFIH pursuant to tax sharing agreements.  (PAB-X044, 10/1/14 Tax Memorandum [D.I. 2296] at 20–21; 9/2/18 Keglevic Written Direct ¶ 33.)  A "check the box" election, however, (i) would not have benefitted EFH because it likely still would have been liable for taxes in an amount that far exceeded its cash, leaving it administratively insolvent, and (ii) may have been subject to challenge on the ground that authorization of such an election by EFH directors constituted a breach of their fiduciary duties.  (PAB-X044, 10/1/14 Tax Memorandum [D.I. 2296] at 8–9; 21.)  Additionally, although EFH would likely assert a contractual claim for indemnity against EFIH, that claim would have been disputed and EFH's ability to prevail was uncertain.   (PAB-X044, 10/1/14 Tax Memorandum [D.I. 2296] at 19–20; ELX-055, 10/20/14 Bidding Procedures Hr'g Tr. at 187:2–188:16 (Keglevic Test.).)  Moreover, any such contractual claim might have been subject to

setoff based on intercompany claims held by EFIH against EFH.  (*See*, *e.g.*, AHX-007, 4/29/14

Keglevic Decl. [D.I. 98] ¶ 45 (discussing intercompany claims).)

21.    Accordingly, to avoid these and other significant issues, every restructuring

transaction proposed by the Debtors during these Bankruptcy Cases contemplated a tax-free

disposition of the Debtors' assets.  (9/6/18 Trial Tr. at 80:4–15 (Keglevic Test.).)  In fact, on the

Petition Date, the Debtors commenced the Bankruptcy Cases with a restructuring support

agreement (the "RSA") that contemplated a tax-free transaction.  The RSA was executed by a

number of parties, including an *ad hoc* committee of holders of the EFIH PIK Notes.  (PAB-

X022, 4/28/14 Restructuring Support Agreement [D.I. 505-2].)  The RSA provided, among many

other things, a mechanism for allocating the anticipated professional fees for the Bankruptcy

Cases.

22.    In July 2014, however, the Debtors determined that it was in the best interest of

their estates to terminate the RSA and pursue alternative restructuring proposals, including a

potential sale of EFH's and EFIH's economic interests in Oncor.  (9/2/18 Keglevic Written

Direct ¶¶ 8–10; ELX-024, 7/25/14 Debtors' Notice of RSA Termination [D.I. 1697]; PAB-X108,

1/14/15 Bidding Procedures Order [D.I. 3295].)  As a result, the RSA was never approved by the

Court, and the Debtors pursued an informal marketing process for Oncor, sought and obtained

approval of bidding procedures from this Court, and ran a formal stalking horse process

commencing in early 2015.  (ELX-055, ELX-059, ELX-061, and ELX-070, 2014 Bidding

Procedures Hr'g Trs.; PAB-X108, 1/14/15 Order Approving Revised Bidding Procedures [D.I.

3295]; 9/2/18 Keglevic Written Direct ¶ 10.)

    **B.    The Selection of NextEra as the Stalking Horse Bidder for Oncor.**

23.    By the end of July 2016, the E-Side Debtors were engaged in negotiations with

NextEra and at least one other bidder in connection with a merger transaction involving the E-

Side Debtors' interests in Oncor. (9/2/18 Keglevic Written Direct ¶ 17; ELX-457, 2/10/17 Keglevic Decl. at 9–10.)[8] As of July 21, 2016, four key deal terms remained open in connection with the E-Side Debtors' negotiations with NextEra and the other bidder: (i) the cash purchase price; (ii) the amount of the termination fee; (iii) NextEra's request for a "match right" with respect to any competing bids; and (iv) the treatment of potential asbestos liabilities arising out of certain EFH Debtors' operations and the impact of those liabilities on a potential multi-million dollar intercompany claim asserted against EFH. (ELX-457, 2/10/17 Keglevic Decl. at 10; PAB-X379, Jul. 21, 2016 Joint Board Meeting Minutes.)

24.     Between July 21 and July 29, 2016, NextEra improved its bid by (i) increasing the cash purchase price by $310 million (initially by $200 million and then a few days later by another $110 million), (ii) dropping its request for a match right, and (iii) agreeing to assume and reinstate all asbestos liabilities of EFH, setting aside $250 million of the cash purchase price in escrow to satisfy the potential asbestos liabilities (the "Asbestos Escrow"). (ELX-457, 2/10/17 Keglevic Decl. at 10; 9/2/18 Horton Written Direct ¶¶ 30–31; 9/5/18 Trial Tr. at 229:19–230:19 (Horton Test.).) In response to these "gets" from NextEra, the E-Side Debtors agreed to increase the termination fee in the merger agreement from $110 million to $275 million. (ELX-457, 2/10/17 Keglevic Decl. at 10; 9/5/18 Trial Tr. at 229:19–230:19 (Horton Test.).)

25.     The "gets" from NextEra made it the preferred bidder and would have provided actual benefit to both EFH and EFIH had that transaction closed. First, the increase in cash purchase price resulted in the EFIH unsecured creditors being projected to receive a full recovery

---

[8]     While the E-Side Debtors were engaged in negotiations with NextEra and the other bidder, the T-Side Debtors were pursuing their own plan of reorganization which contemplated a spin-off transaction for TCEH in which there would be a step-up in basis (the "T-Side Plan"). (PAB-X371, 6/16/16 Second Amended T-Side Plan [D.I. 8746].) On August 29, 2016, the T-Side Debtors confirmed the T-Side Plan. (PAB-X420, 8/29/16 Confirmation Order for T-Side Plan [D.I. 9421].) The Effective Date of the T-Side Plan occurred on October 3, 2016. (PAB-X437, 10/3/16 Notice of Effective Date of T-Side Plan [D.I. 9742].)

on their claims and the EFH unsecured creditors projected to receive some of the additional cash purchase price as a cash recovery.[9]  (*See* 9/6/18 Trial Tr. at 90:14–91:2 (Keglevic Test.) (affirming that the $110 million purchase price increase on top of the $200 million prior purchase price increase permitted the NextEra transaction to "fully clear the EFIH capital structure and provide excess value to EFH"); PAB-X401, 8/5/16 Third Amended Chapter 11 Plan [D.I. 9199]; 8/5/16 Disclosure Statement for Third Amended Chapter 11 Plan [D.I. 9200].)

26.    Second, the elimination of the match right increased the likelihood that the E-Side Debtors would receive a higher competing bid, and thus provided EFH unsecured creditors with an opportunity for an even greater cash recovery.  (*See* ELX-400, 9/19/16 Hr'g Tr. at 25:5–13 (Debtors' counsel: dropping the match right "was important to the Debtors because they viewed the match right as a value inhibiting term, particularly in a bankruptcy context").)

27.    Third, because asbestos claims would be allowed only against EFH Debtors other than EFH, NextEra's agreement to reinstate and assume such liabilities would have (i) eliminated certain unsecured claims against EFH Debtors other than EFH, (ii) increased the pro rata recoveries of the EFH unsecured creditors holding claims only against EFH, (iii) left the asbestos creditors with unsecured claims that were unimpaired, and (iv) avoided litigation related to an alleged $500 million intercompany claim asserted by Debtor LSGT Gas Co. LLC against EFH that could have resulted in lower recoveries for unsecured creditors of EFH.  (12/19/16 Opinion [D.I. 10414] at 6–7 (noting that the Debtors believe that most asbestos claims are against EECI, Inc. with certain asbestos claims also against EEC Holdings, Inc., LSGT Gas Co., LLC, and LSGT SACROC, Inc.); ELX-400, 9/19/16 Hr'g Tr. at 90:5–8; ELX-353, Jul. 22, 2016 Joint Board Book at 3 (Disinterested Directors of EFH's Counsel: "noted the importance to EFH Corp.

---

[9]    Certain classes of EFH creditors were projected to receive a full recovery due to the reinstatement of asbestos claims and the TCEH Turnover Distribution and EFH Beneficiary Settlement (each as defined herein).

of a buyer assuming asbestos liabilities to protect against an alleged $500 million intercompany claim being asserted against EFH Corp. by one of the EFH Corp. subsidiaries").)

28.     NextEra's agreement to fund the $250 million Asbestos Escrow was a dollar-for-dollar reduction in cash to be paid under the NextEra Merger Agreement (as defined below), which cash would not be received by the E-Side Debtors, and in particular EFIH, unless NextEra obtained an insurance policy that fully covered all asbestos liabilities.  (*See* ELX-364, NextEra Merger Motion [D.I. 9190-2] § 1.7(c) (providing that the $250 million would be held in the Asbestos Escrow for a term of 50 years, with any remaining balance at the end of such term to be paid over to charity).)  As a result, the Asbestos Escrow provided an actual benefit to the asbestos creditors who were left unimpaired and the unsecured creditors holding claims only against EFH.  It provided no financial benefit and was actually detrimental to the economic interests of the unsecured creditors of EFIH because it resulted in a dollar-for-dollar reduction of the cash that could have been available to pay the claims of EFIH unsecured creditors, if they were not paid in full.

29.     Following the July negotiations, the E-Side Debtors selected NextEra as the stalking horse bidder and, on July 29, 2016, executed a merger agreement with NextEra (the "NextEra Merger Agreement").  (*See* ELX-364, 8/3/16 NextEra Merger Motion [D.I. 9190] at Exhibit 1 (Merger Agreement).)  The EFH board of directors and the EFIH board of managers (the "E-Side Boards") approved the NextEra Merger Agreement, and on August 3, 2016, the E-Side Debtors moved this Court for an order (the "NextEra Merger Motion") approving the NextEra Merger Agreement and the Termination Fee, and authorizing the E-Side Debtors to enter into a plan support agreement that incorporated the NextEra Merger Agreement.  (9/2/18 Keglevic Written Direct ¶ 17; ELX-364, NextEra Merger Motion [D.I. 9190].)

30.     The E-Side Debtors also filed a plan of reorganization (the "NextEra Plan") that rested on consummation of the NextEra Merger Agreement.   (PAB-X401, 8/5/16 Third Amended Chapter 11 Plan [D.I. 9199].)   The liquidation analysis attached to the disclosure statement for the NextEra Plan filed on August 5, 2016 projected full (100%) recoveries to EFIH unsecured creditors, and projected that EFH unsecured creditors would receive distributions of approximately 21% of their allowed claims.   (8/5/16 Liquidation Analysis for Third Amended Chapter 11 Plan [D.I. 9200-5] at 10–17.)[10]

31.     In these filings, the E-Side Debtors did not propose to allocate the Termination Fee between the EFH and EFIH estates.   (See ELX-364, NextEra Merger Motion [D.I. 9190].) Instead, with input from the Disinterested Directors,[11] the Debtors requested that any allocation of the Termination Fee be left for a later date.   In that regard, every Disinterested Director testified that he or she did not attempt to reach an agreement to allocate the Termination Fee in or around the time the NextEra Merger Agreement was signed or before the NextEra Sale Hearing (as defined below).   (See Cremens Dep. Tr. at 56:8–12 (agreeing EFH and EFIH "did not attempt to allocate" the Termination Fee); ELX-737, 8/29/18 Evans Decl. ¶ 5 ("I did not agree at any point upon an allocation of this Termination Fee"); Williamson Dep. Tr. at 27:12–23 ("We were not going to figure out the allocation at that point in time.").)   This was because the Disinterested Directors believed that the NextEra transaction would close and, thus, the

---

[10]   The version of the disclosure statement for the NextEra Plan filed on August 5, 2016 left the projected recoveries for various classes of EFIH and EFH unsecured creditors blank, but the liquidation analysis attached thereto included projected recoveries of 100% for EFIH unsecured creditors (compared to an approximately 98% recovery in a hypothetical liquidation) and 21% for EFH unsecured creditors (compared to a 0% recovery in a hypothetical liquidation).   (8/5/16 Liquidation Analysis for Third Amended Chapter 11 Plan [D.I. 9200-5] at 10-17.)   As discussed below, the amended version of the disclosure statement filed on September 21, 2016 listed projected plan recoveries for EFIH unsecured creditors and EFH unsecured creditors of 100% and 50%, respectively.   (ELX-398, 9/21/16 Disclosure Statement for Fourth Amended Chapter 11 Plan [D.I. 9616] at 22, 27.)

[11]   The "Disinterested Directors" are the E-Side Debtors' representatives Charles Cremens, the disinterested manager of EFIH, and Donald Evans and Billie Williamson, the disinterested directors of EFH.

Termination Fee would not be payable.  (*See* Williamson Dep. Tr. at 27:19–23 ("[W]e were very hopeful and obviously very desirous of that transaction closing."); ELX-400, 9/19/16 Hr'g Tr. [D.I. 9606] at 28:9–11 (Debtors' counsel: "Mr. Horton is confident that the proposed transaction with NextEra will close and believes there's a low possibility that the termination fee will be triggered.").)

32.     Additionally, the E-Side Debtors and their Disinterested Directors approved the NextEra Merger Agreement and the Termination Fee on July 29, 2016 knowing that the appeal of this Court's rulings (the "Makewhole Rulings") disallowing claims for makewhole premiums sought by certain EFIH creditors (the "Makewhole Claims") was pending in the Third Circuit. (9/6/18 Trial Tr. 94:12–16 (Keglevic Test.); Horton Dep. Tr. 64:25–65:8; *see also* 9/6/18 Trial Tr. at 95:24–96:8 (Keglevic Test.) ("Certainly our directors were aware that it was substantial litigation . . . ."); Cremens Dep. Tr. 58:10–59:3 (affirming that he was "comfortable approving the NextEra merger agreement even though there was no definitive determination as to how those make whole claims would be treated.").)  Reversal of the Makewhole Rulings could have had a significant impact on creditor recoveries.  The E-Side Debtors and the Disinterested Directors believed, however, that it was unlikely that this Court's Makewhole Rulings would be overturned, and were thus comfortable approving the NextEra Merger Agreement and the Termination Fee while the appeal of the Makewhole Rulings was pending.  (*See* Cremens Dep. Tr. at 58:5–9 (affirming that it is "fair to say [he] thought that the allowance of those [makewhole] claims at the time of the NextEra merger agreement was unlikely"); Williamson Dep. Tr. at 80:13–18 (affirming that she "was comfortable approving the NextEra merger agreement, even though that [makewhole] litigation was still pending"); Horton Dep. Tr. at 95:7–14 ("5 to 10 percent" probability that the Third Circuit would reverse).)

33.     Moreover, a condition precedent to the closing of the NextEra transaction was that there was no order reversing, remanding, or staying the Makewhole Rulings at the time the NextEra transaction closed.  (ELX-397, 9/21/16 Fourth Amended Chapter 11 Plan [D.I. 9612] Art. I.A.67 and IX.D.10.)   Thus, at the time the E-Side Boards approved proceeding with NextEra as the stalking horse bidder, both EFH and the EFIH unsecured creditors had reason to expect that they would receive the benefits negotiated in July because the EFIH unsecured creditors would receive a full recovery, so long as no order reversing, remanding, or staying this Court's Makewhole Rulings was entered before the NextEra transaction was consummated. (9/2/18 Keglevic Written Direct ¶ 18; 9/6/18 Trial Tr. at 62:19–64:17 (Keglevic Test.); ELX-397, 9/21/16 Fourth Amended Chapter 11 Plan [D.I. 9612] Art. I.A.67 and IX.D.10.)

34.     Finally, despite learning in late August 2016 that oral argument in the Third Circuit appeal was scheduled for September 27, 2016 (*see* 8/24/16 Oral Argument Notification, *Delaware Trust Co. v. Energy Future Intermediate Holding Company LLC (In re Energy Future Holdings Corp.)*, No. 16-1351 (3d Cir. 2016)), the E-Side Debtors and their Disinterested Directors proceeded with the request that the Court not allocate the Termination Fee at the September 19, 2016 hearing (*see* ELX-400, 9/19/16 Hr'g Tr. [D.I. 9606].)

### C.     The September 2016 Negotiations and EFH Unsecured Creditor Support.

35.     Notwithstanding the additional value resulting from the negotiations with NextEra in late July 2016, the E-Side Debtors faced opposition to the NextEra Merger Agreement and, specifically, the Termination Fee.  This opposition came only from EFH unsecured creditors: (i) the EFH Trustee; (ii) Contrarian Capital Management, LLC ("Contrarian"); (iii) Fidelity Management & Research Company ("Fidelity"); and (iv) certain asbestos claimants (the "Asbestos Claimants").  (ELX-381, EFH Trustee Objection [D.I. 9399]; ELX-378, Contrarian Objection [D.I. 9402]; ELX-379, Fidelity Objection [D.I. 9397]; ELX-380, Asbestos Claimants'

14

Objection [D.I. 9398].)  Three of these unsecured creditors held claims only against EFH.  (ELX-381, EFH Trustee Objection [D.I. 9399]; ELX-378, Contrarian Objection [D.I. 9402]; ELX-380, Asbestos Claimants' Objection [D.I. 9398].)

36.    None of these objections challenged the E-Side Debtors' request to leave the Termination Fee unallocated.   Nor did any party raise any concern or express some understanding that the allocation of the Termination Fee would be addressed after the pending appeal of this Court's Makewhole Rulings was decided, even though the oral argument on that appeal was scheduled for September 27, 2016, only eight days after the September 19, 2016 NextEra sale hearing (the "NextEra Sale Hearing").   Instead, negotiations to resolve these objections focused exclusively on obtaining additional consideration for EFH unsecured creditors that would result in their dropping their objections to the NextEra Merger Agreement and the Termination Fee.  (*See* 9/6/18 Trial Tr. at 92:12–93:7 (Keglevic Test.) ("[W]hen we had no EFH support, we kept pushing . . . You got to, you know, buy their support and, you know, the asset's worth more.").)

37.    The interested parties' negotiations were successful, and on September 18, 2016, the E-Side Debtors and NextEra executed an amendment to the NextEra Merger Agreement pursuant to which NextEra agreed to (i) further increase the cash purchase price by $300 million and (ii) reduce the Asbestos Escrow from $250 million to $100 million.  (9/2/18 Horton Written Direct ¶ 32; 9/5/18 Trial Tr. at 230:20–231:9 (Horton Test.); 9/6/18 Trial Tr. at 64:18–65:18 (Keglevic Test.); ELX-393, 9/19/18 Order Authorizing Entry into Merger Agreement [D.I. 9584] at Amendment No. 1 to Merger Agreement.)

38.    These further "gets" from NextEra were expected to result in "an additional $450 million in distributable value" that would inure entirely to the benefit of EFH unsecured creditors.

(*See* 9/2/18 Horton Written Direct ¶¶ 32–33 ("Because EFIH creditors were already projected to receive a 100% recovery, these increases in distributable value were projected to inure to the benefit of EFH creditors . . . ."); Cremens Dep. Tr. 57:15–58:4 ("Yes, they [EFH] benefited to the extent we believed that EFIH was going to be covered in terms of their claims.").)

      **D.**    **This Court's Approval of the Termination Fee Was Based in Part on the Expected Benefit to the EFH Estate.**

      39.    As of the commencement of the NextEra Sale Hearing, all objections, other than the Asbestos Claimants' objection, were resolved as a result of the final additional "gets" from NextEra.  (9/2/18 Horton Written Direct ¶ 33; ELX-400, 9/19/16 Hr'g Tr. at 14:22–15:3; 29:2–9.) After hearing evidence, the Court approved the NextEra Merger Agreement, as amended, including the Termination Fee, and reserved decision on any allocation of the Termination Fee as requested.  (ELX-393, 9/19/16 Order Approving NextEra Merger Agreement [D.I. 9584] ¶ 4.)

      40.    As Debtors' counsel emphasized, the additional "gets" from NextEra were expected to quadruple EFH unsecured creditor recoveries.  (*See* ELX-400, 9/19/16 Hr'g Tr. at 14:18–15:2 (Debtors' counsel: "Net/net the result is an additional $450 million of distributable value. . . [a]nd when I say significant I mean it virtually quadrupled the recoveries of EFH unsecured creditors.  As a result FIDO, or Fidelity, Contrarian, and the EFH indenture trustee for the Legacy notes have agreed to withdraw their objections today, to the merger agreement and the plan support agreement."); ELX-400, 9/19/16 Hr'g Tr. at 87:14–21 (Debtors' counsel: "I think it is worth mentioning once again that as a result of the negotiations over the weekend, we have an increase of $450 million in distributable value, quadrupling the potential recoveries for the EFH creditors.").)

      41.    Debtors' counsel further advised the Court that the EFH unsecured creditors withdrew their objections to the Termination Fee in exchange for the value expected to be

received from the additional "gets" from NextEra.  (*See* ELX-400, 9/19/16 Hr'g Tr. at 29:6–9 (Debtors' counsel: "With this increase, and certain accounting adjustments made with respect to the cash purchase price, Debtors have brokered the support of the EFH indenture trustee, Fidelity[,] and Contrarian.").)

42.    Additionally, although not an objector, counsel to the *ad hoc* committee of TCEH first lien creditors (the "Ad Hoc TCEH Committee") spoke in support of the NextEra transaction, stating that as the economic beneficiaries of a $700 million TCEH settlement claim against EFH, "[w]e were very pleased with this morning's announcement in terms of the revised deal terms and the economic impact that's going to have for EFH unsecured creditors. . . ."  (ELX-400, 9/19/16 Hr'g Tr. at 107:6–18.)  Three of the five Ad Hoc EFH Claimants were members of the Ad Hoc TCEH Committee that supported approval of the NextEra Merger Agreement, and these members continue to hold claims against EFH solely through their share of the TCEH settlement claim.  (*Compare* ELX-402, 9/26/16 Ad Hoc TCEH Committee's 2019 Statement (listing Angelo Gordon & Co., L.P., Apollo Management Holdings L.P., and Brookfield Asset Management as members), *with* ELX-689, 7/31/18 Ad Hoc EFH Claimants' 2019 Statement (listing Angelo Gordon & Co., L.P., Apollo Management Holdings L.P., and Brookfield Asset Management as members holding TCEH Settlement Claims).)

43.    On September 21, 2016, the Debtors filed the final approved disclosure statement and an amended NextEra Plan.  (ELX-398, 9/21/16 Disclosure Statement for Fourth Amended Chapter 11 Plan [D.I. 9616]; ELX-397, 9/21/16 Fourth Amended Chapter 11 Plan [D.I. 9612].)  The amended NextEra Plan reflected the additional value received under the September 18th amendment, still projecting a full (100%) recovery for EFIH unsecured creditors but now projecting that EFH unsecured creditors would receive distributions of approximately 50% of

their allowed claims.  (ELX-398, 9/21/16 Disclosure Statement for Fourth Amended Chapter 11 Plan [D.I. 9616] at 22, 27; *see also* ELX-397 9/21/16 Fourth Amended Chapter 11 Plan [D.I. 9612].)   Other key terms, including the tax-free nature of the NextEra transaction and reinstatement of the asbestos liabilities, remained largely unchanged.  (*See* ELX-469, 2/16/17 Hr'g Tr. at 136:20–24 (Debtors' counsel: "we have a tax-free transaction on the E-Side" and "the [NextEra] plan structure avoids" Tax Armageddon).)

44.     After the NextEra Sale Hearing, this Court approved two creditors' requests for substantial contribution claims solely against EFH based, in large part, on those creditors' efforts in September 2016 with respect to increasing the consideration provided by NextEra and supporting the NextEra Plan.

45.     First, at the confirmation hearing on the NextEra Plan (the "NextEra Confirmation Hearing"), this Court approved a substantial contribution claim solely against EFH in favor of the EFH Trustee (the "EFH Trustee Substantial Contribution Claim").  The Court's approval was based largely on the EFH Trustee's role in improving the terms of the NextEra Merger Agreement and providing an actual benefit to EFH and its unsecured creditors, even though it had become clear that the actual cash benefits would not ultimately inure to the benefit of the EFH unsecured creditors as a result of the Third Circuit Makewhole Ruling (as defined below). (ELX-471, 2/17/17 Hr'g Tr. at 20:13–22:13.)

46.     Second, in March 2017, this Court approved a substantial contribution claim solely against EFH in an amount not to exceed $20 million in favor of Fidelity (the "Fidelity Substantial Contribution Claim").  The Fidelity Substantial Contribution Claim was also approved in large part because of its objection to the NextEra Merger Agreement, its efforts to increase NextEra's purchase price, and its willingness to enter into a plan support agreement in

favor of the NextEra Plan that enabled the E-Side Debtors to obtain confirmation of the NextEra

Plan.  (ELX-487, 3/24/17 Order Allowing Fidelity Substantial Contribution Claim [D.I. 11050].)

> **E.    The Third Circuit Makewhole Ruling, NextEra's Refusal to Pay the Makewhole Claims, and the Allocation of the Termination Fee.**

47.    On November 17, 2017, nearly two months after the NextEra Sale Hearing, the

Third Circuit issued its ruling in the makewhole appeal (the "Third Circuit Makewhole Ruling").

(ELX-430, 11/17/16 Third Circuit Makewhole Ruling.)

48.    The Third Circuit Makewhole Ruling reversed this Court's Makewhole Rulings

and, thus, the E-Side Debtors could not close the NextEra transaction absent NextEra waiving

the condition precedent.  (*Id.*; ELX-397 9/21/16 Fourth Amended Chapter 11 Plan [D.I. 9612]

Art. IX.D.)  NextEra refused to do so and, consequently, the projected recoveries of both the

EFH and EFIH unsecured creditors were negatively impacted.  (*See* 9/5/18 Trial Tr. at 231:17–

22 (Horton Test.) ("$471 million was drained from EFH in that instance, and about—the PIKs

were impaired about 165 million.").)  These reduced recoveries were also reflected in the trading

prices of the EFIH PIK Notes, which had traded below par after the September 27, 2016 Third

Circuit oral argument and went far lower after the Third Circuit Makewhole Ruling.  (ELX-671,

EFIH PIK Prices Chart [D.I. 13102-2].)

49.    The Third Circuit Makewhole Ruling did not impact any other aspects of the

NextEra Plan that benefitted EFH unsecured creditors.  The NextEra Plan still reinstated the

asbestos claims, provided for the payment in full of the EFH Beneficiary Claims (as defined

below), and contemplated a tax-free transaction.  (PAB-X503, 2/17/17 Eighth Amended Chapter

11 Plan [D.I. 10853]; PAB-X504, 2/17/17 Order Confirming Eighth Amended Chapter 11 Plan

[D.I. 10859].)  The NextEra Plan was confirmed on February 17, 2017.  (PAB-X504, 2/17/17

Order Confirming Eighth Amended Chapter 11 Plan [D.I. 10859].)

50.     During the Hearing, the Ad Hoc EFH Claimants introduced a board slide calculating the potential impact of the Third Circuit reversing this Court's Makewhole Rulings. (AHX-151, 9/30/16 Joint Board Book.)  As part of his testimony, Mr. Keglevic, EFH's and EFIH's CRO and CEO and a member of EFIH's board of managers, stated that during the Bankruptcy Cases he "tracked" the Third Circuit litigation and was "aware" of its impact on creditor recoveries.  (*See* 9/6/18 Trial Tr. at 94:17–95:4 (Keglevic Test.).)  There was, however, no evidence that the E-Side Boards were ever presented with these calculations regarding the financial effect that allowance of the Makewhole Claims would have on EFH or EFIH creditor recoveries from July 21, 2016, when the Debtors were negotiating with the two potential stalking horse bidders, to September 19, 2016, when the Court approved the NextEra Merger Agreement and Termination Fee.  Moreover, neither the August 3, 2016 version of the NextEra Plan nor the September 21, 2016 version of the NextEra Plan included any such calculation.  Indeed, the only evidence of that calculation is that it was part of an EFH/EFIH/TCEH board book dated September 30, 2016 (*i.e.*, after the NextEra Sale Hearing) that provided an update on the Third Circuit's September 27, 2016 oral argument in the makewhole appeal and illustrated the potential consequences of the Third Circuit allowing the Makewhole Claims.  (*See* ELX-405, Sept. 30, 2016 Joint Board Book; 9/6/18 Trial Tr. at 66:3–67:3 (Keglevic Test.).)

51.     More importantly, there is no evidence that the analysis identified by the Ad Hoc EFH Claimants was considered by the E-Side Debtors or their Disinterested Directors when they decided to proceed with the NextEra transaction and defer any allocation of the Termination Fee, or to request the Court's approval of the NextEra Merger Agreement, the Termination Fee, and their decision not to allocate the Termination Fee.  In fact, the evidence is to the contrary.  First, as found above, the E-Side Debtors and the Disinterested Directors believed the risks of reversal

were minimal.  Second, no one raised any concerns about a potential reversal of this Court's

Makewhole Rulings at the NextEra Sale Hearing, when the Court was asked to approve the

Termination Fee and defer any decision on the allocation of the Termination Fee for subsequent

proceedings.  (*See generally* ELX-400, 9/21/18 Hr'g Tr.)  Third, no party in interest, not the E-

Side Debtors, the Disinterested Directors, nor any creditor or other interested party, requested the

Court to allocate the Termination Fee at the NextEra Confirmation Hearing in February 2017, at

which point the consequences of the Third Circuit Makewhole Ruling were fully known and

reflected in the projected distributions to EFH and EFIH unsecured creditors.

      **F.**      **The Debtors' Termination of the NextEra Merger Agreement.**

      52.      The Debtors terminated the NextEra Merger Agreement on July 7, 2017 after the

Public Utility Commission of Texas ("PUCT") denied NextEra's and Oncor's joint change of

control application.  (ELX-519, 7/7/17 NextEra Merger Agreement Termination Notice [D.I.

11424]; 9/6/18 Trial Tr. 115:24–116:6 (Keglevic Test.).)

      53.      Because the NextEra transaction was not consummated, neither EFH nor EFIH

ultimately received any actual benefit from the NextEra transaction.[12]  (*See* ELX-569, 10/3/17

Opinion [D.I. 11998] at 31 (Court: "In this case, the Debtors were forced to terminate the Merger

Agreement to pursue a lower offer because NextEra had the Debtors in a corner.  Payment of a

termination fee under those circumstances, which would have been predictable had the Court

properly understood the facts, could not provide an actual benefit to the debtor's estate sufficient

to satisfy the *O'Brien* standard."); *see also* ELX-583, 10/18/17 Order Granting Elliott's Motion

to Reconsider [D.I. 12075]; *NextEra Energy, Inc. v. Elliott Assocs., L.P. (In re Energy Future*

---

[12]    In this Court's prior rulings disallowing the Termination Fee and the NextEra Reimbursement Claim, the Court
found that the NextEra transaction provided no benefit to the E-Side Debtors' estates.  The findings of fact and
conclusions of law set forth herein in no way alter or affect this Court's prior rulings on the Termination Fee
and NextEra Reimbursement Claim.  However, solely for purposes of the Allocation Motion and this ruling, I
must assume that one or both of the Court's prior rulings on the Termination Fee and the NextEra
Reimbursement Claim is reversed on appeal.

*Holdings Corp.*), --- F.3d ---, No. 18-1109, 2018 WL 4354741 at *12 (3d Cir. Sept. 13, 2018) (affirming 10/18/17 Order Granting Elliott's Motion to Reconsider).)

54.     After the E-Side Debtors terminated the NextEra transaction, they initially sought approval of a proposed merger transaction with Berkshire Hathaway Energy Company ("Berkshire").  (9/2/18 Keglevic Written Direct ¶ 22.)  Prior to obtaining Court approval of the Berkshire transaction, the E-Side Debtors entered into and ultimately consummated a merger agreement with Sempra Energy ("Sempra").  (9/2/18 Keglevic Written Direct ¶ 26.)  Both the Berkshire transaction and Sempra transaction provided for less consideration than the E-Side Debtors expected to receive under the NextEra transaction.  (9/2/18 Keglevic Written Direct ¶¶ 18, 23, 27.)

### G.     The Ad Hoc EFH Claimants' Expert Testimony on Termination Fees.

55.     At the hearing on the Allocation Motion, the Ad Hoc EFH Claimants offered Mr. Steven Strom as an expert witness on termination fees.  (*See generally* 9/2/18 Strom Written Direct.)

56.     Mr. Strom's methodology consisted of a review and analysis of historical termination fee data, with a focus on the total bid consideration that courts have authorized debtors to collectively pay (in some cases, by a single seller/debtor, and in other cases, by multiple sellers/debtors) as a result of a single transaction.  (*Id.* ¶¶ 25–33 & Appendix A.)  After "considering th[e] facts and upon reviewing the data," Mr. Strom divided the Termination Fee by the total consideration that would have been paid by NextEra under the NextEra Merger Agreement, as amended ($275 million divided by $9.827 billion), yielding 2.798% of the total consideration to be paid by NextEra.  (*Id.* ¶ 34(f)(2).)  Then, without any analysis, support, or justification for doing so, Mr. Strom made the outcome-determinative assumption that the Termination Fee should be allocated to EFH and EFIH at a rate of 2.798% across each dollar of

transaction consideration ultimately received by each estate.[13]  (*Id.* ¶ 34(f)(3); *see also* 9/6/18 Trial Tr. at 191:7–12 (Robins Test.) (Mr. Strom's allocation opinion is "[e]ssentially that the Court should look at the cash proceeds from the purchase price that would have gone to each debtor had the sale closed and apply the break-up fee ratable on that basis").)  Mr. Strom's ultimate conclusion was that only a small fraction (or none) of the Termination Fee should be allocated to EFH because EFH would have only received a small fraction (or no) cash consideration under the NextEra Merger Agreement or the NextEra Merger Agreement, as amended, had the NextEra transaction been consummated.  (*Id.* ¶¶ 34(f)(3), (4).)

57.     The Court does not credit Mr. Strom's expert opinion for at least three reasons.

58.     First, Mr. Strom only focused on the cash consideration that would have been received in the transaction and did not consider other benefits that the NextEra transaction would have conferred on the E-Side Debtors.  (*See* 9/6/18 Trial Tr. at 157:6–158:8 (Strom Test.); *id.* at 174:5–174:9 (Strom Test.) (affirming he was not "looking at the benefits of the transaction in your [expert] report; [he was] focused on the term 'consideration' as [he] defined it").)  Second, Mr. Strom's opinions are not supported by the industry data he reviewed or his relevant experience.  (*Id.* at 151:11–156:9 (Strom Test.).)  Third, Mr. Strom's core opinion is based only on arithmetic and an unsupported outcome-determinative assumption that the Termination Fee should be allocated pro rata across each dollar of transaction consideration.  (*Id.* at 158:18–160:3 (Strom Test.); *see* 9/6/18 Trial Tr. at 193:8–195:5 (Robins Test.) ("[Mr. Strom] assumes you allocate it ratably and his opinion is that's what the Court should do.").)

---

[13]     Mr. Strom also opined, generally, that the average termination fee is approximately 3% of total consideration, and that the Termination Fee falls within the range of precedent termination fees, viewed relative to mean and median precedent termination fees.  (9/2/18 Strom Written Direct ¶ 34(c); 34(f)(2).)  This conclusion is irrelevant to the current dispute: no party is contending that the Termination Fee is too large or otherwise falls outside the range of reasonableness.

## II.   ELLIOTT SUBSTANTIAL CONTRIBUTION CLAIM.

### A.   Elliott Holds an Allowed Substantial Contribution Claim Against EFIH.

59.   On February 17, 2018, the E-Side Debtors filed a memorandum of law in support of confirmation of the Sempra Plan in which they requested a finding that Elliott made a substantial contribution to EFIH and thus should be entitled to an allowed administrative expense claim against EFIH under sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for fees and expenses incurred by Elliott in making such substantial contribution.  (PAB-X624, 2/17/18 Debtors' Confirmation Brief [D.I. 12666] ¶ 64.)   On February 22, 2018, Elliott filed with the Court a declaration of Jeffrey Rosenbaum in support of the E-Side Debtors' request for allowance of a substantial contribution claim in favor of Elliott.  (AHX-225, 2/22/18 Rosenbaum Decl. [D.I. 12695].)

60.   At the February 26, 2018 hearing on confirmation of the Sempra Plan, the Court stated that it would "absolutely find" that Elliott made a substantial contribution to the estates which "clearly meet[s] . . . the applicable law.  In particular, the work that resulted in having Sempra here, was very much a result of many people working hard, but absolutely a result of Elliott's participation . . . ."  (ELX-634, 2/26/18 Hr'g Tr. [D.I. 12770] at 237:21–238:6.)

61.   In the Confirmation Order entered the next day, the Court found that Elliott "made, in accordance with sections 503(b)(3)(D), 503(b)(4), and 503(b)(5) of the Bankruptcy Code, a substantial contribution in these cases" and is "hereby granted an Allowed Administrative Claim against EFIH, pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, in an aggregate amount of up to $35 million for fees and expenses (including fees and expenses for legal counsel, financial advisors, consultants and other professionals)" incurred in connection with Elliott's substantial contributions.  (ELX-635, 2/27/18 Confirmation Order [D.I. 12763] ¶ 109.)   The Confirmation Order further provided that the grant of such

substantial contribution claim in favor of Elliott was without prejudice to the reallocation of such claim as between EFH and EFIH.  (*Id.*)

**B.    The Components of Elliott's Substantial Contribution Claim.**

62.    On May 11, 2017, in accordance with the Confirmation Order, Elliott submitted to the PAB, the Fee Committee, and the U.S. Trustee (a) a statement in support of Elliott's substantial contribution claim, (b) a summary of the professionals that have provided services to Elliott in connection with Elliott's substantial contributions, (c) invoices for each such professional, and (d) a breakdown of out-of-pocket expenses incurred in connection with Elliott's substantial contributions (as amended, the "Elliott Substantial Contribution Statement"). (ELX-669, 5/11/18 Elliott Substantial Contribution Statement.)

63.    The Elliott Substantial Contribution Claim is broken down into six categories. First, Elliott asserts that it incurred approximately $3.7 million, or just over 12% of the Elliott Substantial Contribution Claim, in connection with efforts to move the estates toward an alternative restructuring transaction once it became clear that the PUCT was likely to deny the NextEra transaction.   (9/2/18 Rosenbaum Written Direct ¶ 54; ELX-669, 5/11/18 Elliott Substantial Contribution Statement ¶¶ 6–10.)  This category includes fees and expenses incurred in connection with litigation over whether Elliott was bound by a January 2, 2017 Plan Support Agreement (as amended).  (9/2/18 Rosenbaum Written Direct ¶ 54.)

64.    Second, Elliott asserts that it incurred approximately $19.8 million, or approximately 66% of the Elliott Substantial Contribution Claim, in connection with Elliott's efforts to (i) oppose the E-Side Debtors' proposed transaction with Berkshire, (ii) develop an alternative creditor-led plan of reorganization to provide greater consideration to the E-Side Debtors' estates, and (iii) negotiate and work with the E-Side Debtors and Sempra to proceed with the financially superior Sempra transaction.  (9/2/18 Rosenbaum Written Direct ¶ 55; ELX-

669, 5/11/18 Elliott Substantial Contribution Statement ¶¶ 11–18; *see also* AHX-224, 2/22/18 Rosenbaum Decl. ¶¶ 12–20.)

65.    In August 2017, Elliott secured an eleven-day adjournment of the hearing on approval of the Berkshire merger agreement, which ultimately allowed Sempra to propose a competing transaction providing $9.3 billion in consideration for the estates.  (9/2/18 Rosenbaum Written Direct ¶ 55.)   During that adjournment, Elliott (i) litigated its objections to the E-Side Debtors' scheduling request and the Berkshire merger agreement, (ii) assembled a consortium of parties interested in a nontaxable transaction valued at $300 million more than the Berkshire transaction, and (iii) negotiated the final terms of the Sempra transaction, including a purchase price increase by Sempra of $150 million above its initial offer.  (*Id.*)   Prior to and during the adjournment, the E-Side Debtors took the position that no offer better than the Berkshire deal existed.  (*See* ELX-544, 8/16/17 Debtors' Reply to Objections to Motion for Order Authorizing Entry into Merger Agreement [D.I. 11761] ¶ 43 ("[A]ll potentially interested parties have had a significant period of time in which to develop an alternative proposal. None have emerged. Allowing such parties additional time in the hopes that a heretofore-unforeseen white knight purchaser will enter the regulatory and litigation morass that are the Debtors' chapter 11 cases is a reckless proposition.").)   In the end, the Sempra transaction resulted in $450 million more in cash consideration than the E-Side Debtors would have received under the Berkshire transaction.

66.    Third, Elliott asserts that it incurred approximately $3.4 million, or just over 11% of the Elliott Substantial Contribution Claim, in connection with obtaining an order granting reconsideration of a prior order of the Court approving the $275 million Termination Fee (the "Reconsideration Order").  (9/2/18 Rosenbaum Written Direct ¶ 56; ELX-669, 5/11/18 Elliott Substantial Contribution Statement ¶¶ 19–26; *see also* AHX-224, 2/22/18 Rosenbaum Decl.

¶¶ 21–25.)  As a result of the Reconsideration Order, the Termination Fee was disallowed and NextEra's application for payment thereof was denied.  (ELX-583, 10/18/17 Reconsideration Order [D.I. 12075].)  NextEra appealed that order to the Third Circuit, and on September 13, 2018, the Third Circuit issued an opinion affirming the Reconsideration Order.  *See NextEra Energy, Inc. v. Elliott Assocs., L.P. (In re Energy Future Holdings Corp.)*, No. 18-1109, 2018 WL 4354741 at *12 (3d Cir. Sept. 13, 2018).[14]

67.     Fourth, Elliott asserts that it incurred approximately $1.5 million, or less than 5% of the Elliott Substantial Contribution Claim, in connection with negotiating the Sempra Plan and related ancillary documents, as well as advocating for both EFH and EFIH unsecured creditor matters relating to the Sempra Plan and confirmation proceedings.  (9/2/18 Rosenbaum Written Direct ¶ 57; ELX-669, 5/11/18 Elliott Substantial Contribution Statement ¶¶ 38–40.)

68.     Fifth, Elliott asserts that it incurred approximately $680,000, or just over 2% of the Elliott Substantial Contribution Claim, in connection with helping to negotiate a $31 million payment by Sempra to the E-Side Debtors' estates to resolve a dispute over payment of certain of Oncor's 2017 quarterly dividends (the "Oncor Dividend Settlement").  (9/2/18 Rosenbaum Written Direct ¶ 58; ELX-669, 5/11/18 Elliott Substantial Contribution Statement ¶¶ 32–37; *see also* AHX-224, 2/22/18 Rosenbaum Decl. ¶¶ 26–30.)  Of the $31 million settlement payment, $27.25 million was paid to EFIH for distribution to EFIH unsecured creditors, and $3.75 million was paid to EFH for distribution to EFH unsecured creditors. (ELX-616, Order Approving Settlement Between the Debtors and Sempra [D.I. 12631].)  The Oncor Dividend Settlement also

---

[14]  The Third Circuit's opinion affirmed this Court's prior ruling that the Termination Fee is disallowed.  But as the Movants state in the Allocation Motion, under no circumstances will the allocations set forth herein render the EFH estate administratively insolvent.  In the event a request for panel rehearing or rehearing *en banc* of the Third Circuit's ruling is granted, the Reconsideration Order is ultimately reversed, and the full amount of the Termination Fee is allowed following resolution of an adversary proceeding pending before this Court, the allocations set forth herein will be adjusted if necessary to ensure that the EFH estate remains administratively solvent.

resolved various open tax issues and disputes between Oncor and EFH.  (*Id.*; 9/7/18 Trial Tr. 257:22–258:11 (PAB Closing).)

69.     Sixth, Elliott asserts that it incurred approximately $1.1 million, or approximately 3.5% of the Elliott Substantial Contribution Claim, in connection with its efforts to obtain a resolution of a tax allocation dispute between EFH and Vistra in connection with a tax matters agreement between the parties.  (9/2/18 Rosenbaum Written Direct ¶ 59; ELX-669, 5/11/18 Elliott Substantial Contribution Statement ¶¶ 27–31.)

70.     On September 10, 2018, this Court issued a letter to the Fee Committee clarifying that the question of whether Elliott has "made a 'substantial contribution' to the Debtors' estate[s] as interpreted by the Third Circuit in *Lebron v. Mechem Financial Inc.*, 27 F. 3d 937 (3d Cir. 1994) to have been previously resolved in the affirmative and not subject to further review." (9/10/18 Letter to Fee Committee [D.I. 13475].)  The Elliott Substantial Contribution Claim remains subject to review for reasonableness.  (*Id.*)

71.     The PAB agrees that Elliott made a substantial contribution in these Bankruptcy Cases and, in its Final Submission, asks this Court to allocate 36% to 44% of the Elliott Substantial Contribution Claim to EFH with the remaining amount allocated to EFIH.  (9/2/18 Horton Written Direct ¶¶ 49–52; 8/30/18 PAB's Final Submission [D.I. 13416] ¶ 11.)

## C.     Elliott's Efforts Enhanced the Value of the EFH Estate.

72.     The Court finds that there is a causal connection between Elliott's services and the benefits realized by not only EFIH but also EFH.  Elliott's efforts with respect to supporting the Sempra transaction, prosecuting and obtaining the Reconsideration Order, and facilitating the Oncor Dividend Settlement alone contributed to at least $725 million of additional value to the E-Side Debtors' estates.  These efforts preserved approximately $205 million in cash at the EFH level for the benefit of EFH unsecured creditors as well as the funds held by EFH that are

necessary to pay administrative expenses.  (AHX-224, 2/22/18 Rosenbaum Decl. ¶ 8; ELX-636, 2/28/18 Notice of Filing of Cash Projections [D.I. 12769].)

73.    In addition, Elliott's opposition to the Berkshire transaction, its sponsorship of the Sempra transaction, and support of the Sempra Plan not only provided EFIH unsecured creditors with additional cash distributions, but also preserved and enhanced recoveries for EFH unsecured creditors by, among other things, preserving the tax-free nature of the restructuring transaction, the reinstatement of all asbestos liabilities, and the benefits of the TCEH Turnover Distribution (as defined below).  (*See* ELX-635, 2/27/18 Confirmation Order [D.I. 12763]; 11/25/15 EFH Beneficiary Settlement Order [D.I. 7143].)

74.    Moreover, with respect to Elliott's other efforts, the PAB proffered evidence that Elliott's efforts facilitating the Oncor Dividend Settlement increased distributable value for not only EFIH and but also EFH unsecured creditors, and its prosecution of the Reconsideration Motion and appeal of the Reconsideration Order will preserve distributable value for EFH unsecured creditors.  (9/2/18 Horton Written Direct ¶ 51.)  And as Mr. Horton also testified, Elliott's participation in the tax allocation dispute between EFH and Vistra preserved and likely increased distributable value for EFH unsecured creditors by helping the E-Side Debtors avoid potentially costly tax litigation for EFH, the taxpaying entity, regarding its obligations to Oncor or Oncor Electric Delivery Holdings Company LLC and achieve resolution of a dispute with Vistra that had implications for EFH's tax attributes.  (9/2/18 Horton Written Direct ¶ 51.)

## III.    THE ALLOCATION OF PROFESSIONAL FEES.

### A.    The Interim Compensation Order.

75.    On September 16, 2014, the Court entered its *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (the "Interim Compensation Order").  (PAB-X034, Interim Compensation Order [D.I. 2066].)  The Interim

Compensation Order established procedures for professionals retained by the Debtors and the E-Side Committee (collectively, the "Professionals") to seek approval of fees and expenses on an interim basis by filing monthly fee statements and interim fee applications.  (*Id.* ¶¶ 2(a) and 2(f).)

76.    The Interim Compensation Order also required Professionals to allocate fees and expenses as between EFH and EFIH in accordance with certain procedures.    Specifically, paragraph 2(b) of the Interim Compensation Order provided:

> Each Professional shall allocate (the "Fee and Expense Allocation") any fees and expenses sought in connection with each Monthly Fee Statement to the applicable Debtors for whose benefit such fees and expenses were incurred (the "Direct Benefit Fees").  To the extent a Professional incurs fees or expenses for the collective benefit of [EFH], [EFIH], and [TCEH] (the "Collective Benefit Fees"), such fees and expenses shall be allocated to each Debtor in the same proportion that the amount of Direct Benefit Fees incurred by such Professional for such Debtor bears to the total amount of Direct Benefit Fees incurred by such Professional for all of the Debtors (the "Collective Fee Allocation").

(*Id.* ¶ 2(b).)

77.    The Interim Compensation Order expressly provided that each Professional's proposed allocation of fees and expenses were "subject to later challenge and disgorgement until final allowance by the Court."  (*See id.* ¶ 4 ("All fees and expenses paid to Professionals under the Compensation Procedures (including, for the avoidance of doubt, the allocation of such fees and expenses among the Debtors) are subject to challenge and disgorgement until final allowance by the Court.").)  Kirkland's representative testified that this language was included to allow parties in interest to revisit allocations later on in the cases.  (*See* Husnick Dep. Tr. at 21:8–19 ("[F]olks requested that there be a reservation of rights in the interim compensation order that allowed people to revisit how allocations shook out at any particular time").)

78.     Prior to filing the Allocation Motion, neither Movants nor any other party objected to the allocation of any Professional's fees.  None of the Professionals' fees that are a subject of the Allocation Motion have been finally allowed by the Court.

**B.      The Allocation of Professional Fees and Expenses Was Not Reviewed By Any Disinterested Estate Representative.**

79.     The E-Side Debtors' principals, the PAB, the E-Side Boards, and their Disinterested Directors did not personally review any invoices or fee applications to ensure the Professionals' allocations were appropriate.  In addition, although the Debtors' internal legal departments might have reviewed some or all of the monthly, interim, or final Professional invoices and fee applications, there is no evidence that their review was intended to ensure that the allocations contained therein were appropriate with respect to the E-Side Debtors' estates.

80.     Mr. Horton admitted that he "did not . . . personally review any of the Debtors' professional fee applications" before they were filed with the Court.  (Horton Dep. Tr. at 33:19–21; 9/5/18 Trial Tr. at 248:23–250:15 (Horton Test.).)  In fact, even in his capacity as the PAB, Mr. Horton could not say whether the Debtors reviewed the fee applications before they were filed with the Court.  (Horton Dep. Tr. at 33:22–25.)  Instead, Mr. Horton simply deferred to any allocations proposed by the various professionals.  (9/5/18 Trial Tr. at 242:13–243:6 (Horton Test.).)  Moreover, although Mr. Horton allocated the E-Side Committee's professional fees equally in cash flows and made distributions on account of interim fee applications, as the PAB, Mr. Horton has asserted that the E-Side Committee's professional fees should be re-allocated approximately 88% to EFH and 12% to EFH.  (8/30/18 PAB's Final Submission [D.I. 13416].)

81.     Mr. Keglevic similarly admitted that he "never reviewed any of the bills, never had any discussions with [Kirkland] about allocations, or fees for that matter."  (Keglevic Dep. Tr. 167:25–168:8.)  In fact, Mr. Keglevic "believed" that allocation of professional fees between

E-Side Debtors was a "conflict matter" and would be a matter for the Disinterested Directors. (Keglevic Dep. Tr. 78:2–12; *see* ELX-526 at PAB00000254 (Richard Levin of Jenner & Block writes to Jon Rafpor of Alvarez & Marsal that "I've been directed to you by Paul Keglevic of EFH and Aparna Yenamandra of Kirkland & Ellis . . . I would like to receive a copy of the [Retained Professional Fee] Tracker . . . There is some urgency to this request.").)

82.    The Disinterested Directors did not, however, review the Professionals' monthly, interim, or final fee applications.  (*See* Cremens Dep. Tr. at 59:6–22 (affirming that he was "not reviewing the fee applications as they were submitted throughout the case"); Williamson Dep. Tr. 75:12–15 (affirming that she "did not typically review the fee applications submitted by debtor professionals"); ELX-737, 8/22/18 Evans Decl. ¶ 3 ("I did not review any of [the Debtors' professionals] fee applications before or after they were submitted to the Court.").)  At most, at E-Side Board meetings, the E-Side Board and the Disinterested Directors reviewed budgets and cash flows for the EFH and EFIH estates that reflected how Professional fees were being paid from each respective estate.  (ELX-737, 8/22/18 Evans Decl. ¶ 3 ("[A]lthough I was occasionally made aware of the total amount of professional fees incurred by the E-Side Debtors, I do not recall reviewing or being aware of how professionals retained by Debtors or the E-Side Committee determined how to allocate their fees and expenses between the Debtors' estates, including the estates of EFH and EFIH.").)  There is no evidence, however, that these cash flows reflected allocations by Professionals or that any particular Professional's invoices or applications were ever reviewed at those board meetings.

83.    There is also no evidence that the Fee Committee was charged with reviewing the allocation of Professionals' fees among estates or that it actually did review the allocation of Professionals' fees.  The order directing the Fee Committee's review of fee statements and

applications does not explicitly task it with reviewing allocations.  (ELX-706, 8/21/14 Order Appointing a Fee Committee [D.I. 1896].)  Moreover, if the allocation of Professional fees were indeed a "conflict matter" as Mr. Keglevic believed, the Disinterested Directors, and not the Fee Committee, should have been reviewing these allocations.  (*See* 9/6/18 Trial Tr. at 70:24–71:1 (Keglevic Test.) ("I definitely believe [the allocation of Professional fees] was a conflict matter"); ELX-030, 9/16/14 Order Regarding Conflict Matter Protocol [D.I. 2051]; ELX-072, 11/7/14 EFIH Board Resolutions; ELX-073, 11/7/14 EFH Board Resolutions.)

84.    Nor is there any evidence that the Fee Committee actually reviewed Professional fee allocations, and the only evidence submitted suggests that they did not.  (*See* Keglevic Dep. Tr. 166:24–167:8 ("Q: And do you recall at any time having any discussions with Kirkland & Ellis regarding any change in the way that they were allocating their fees among the estates?  A: No, and I also, well, don't remember -- the fee committee did not look at allocation."); 9/6/18 Trial Tr. 70:19–23 (Keglevic Test.) ("Q: And did the Fee Committee review allocation of professional fees between the EFH estate, the EFIH estates, and the TCEH estate?  A: Not to the best of my knowledge, while I was on the Fee Committee."); 9/5/18 Trial Tr. 70:19–23 (Horton Test.) ("Q: Do you know if the Fee Committee reviewed the allocations of fees by the Debtors' professionals at the time that you participated in Fee Committee meetings?  A: I don't recall that topic ever being addressed or brought up.").)  Indeed, had the Fee Committee been charged with, or undertaken, the task of reviewing Professional fee allocations, it would undoubtedly have brought the E-Side Committee's failure to comply with paragraph 2(b) of the Interim Compensation Order (discussed further below) to the Professionals' and this Court's attention.

## IV.     E-SIDE COMMITTEE PROFESSIONAL FEES.

### A.     Appointment of the E-Side Committee and the E-Side Committee's Retention of Professionals.

85.     On October 27, 2014, the Office of the U.S. Trustee formed the E-Side Committee.  (ELX-060, 10/27/14 Notice of Appointment of Committee of Unsecured Creditors [D.I. 2570].)   The E-Side Committee was appointed after a request was made by the EFH Trustee for an EFH-only committee.  (7/23/14 EFH Trustee Motion to Appoint Committee for EFH [D.I. 1676]; *see* 9/16/14 Hr'g Tr. [D.I. 2081] at 78:19–23 (denying motion without prejudice as moot but noting that "it can be renewed in the event that circumstances might support a motion compelling a formation of a committee").)

86.     Although the E-Side Committee was a statutory representative of both EFH and EFIH, (ELX-060, 10/27/14 Notice of Appointment of Committee of Unsecured Creditors [D.I. 2570]; ELX-104, 1/15/15 Amended Notice of Appointment of Committee of Unsecured Creditors [D.I. 3313]), the members of the E-Side Committee were all EFH creditors: (i) Shirley Fenicle, who held an unsecured claim against EFH, (ii) David William Fahey, who held an unsecured claim against EFH, (iii) Peter Tinkham, who held an unsecured claim against EFH, (iv) the EFH Trustee, which served as indenture trustee for unsecured notes issued by EFH, and (v) Brown & Zhou, LLC, which, upon information and belief, held a small amount of unsecured notes issued by both EFH and EFIH.  (ELX-104, 1/15/15 Amended Notice of Appointment of Committee of Unsecured Creditors [D.I. 3313]; Glueckstein Dep. Tr. at 17:10–18:2.)  Although one member may have held notes on which both EFH and EFIH were liable, no member of the E-Side Committee held an unsecured claim only against EFIH.

87.     By separate orders dated January 12, 2015, the E-Side Committee was authorized to retain and employ (a) Montgomery, McCracken, Walker & Rhoads, LLP ("Montgomery") as

Delaware and conflicts counsel, and (b) AlixPartners, LLP ("AlixPartners") as restructuring advisor.  (ELX-100, 1/12/15 Montgomery Retention Order [D.I. 3241]; ELX-099, 1/12/15 AlixPartners Retention Order [D.I. 3242].)

88.    By separate orders dated January 13, 2015, the E-Side Committee was authorized to retain and employ (a) Sullivan & Cromwell LLP ("Sullivan") as lead counsel, and (b) Guggenheim Securities ("Guggenheim") as investment banker.  (ELX-103, 1/13/15 Sullivan Retention Order [D.I. 3282]; ELX-102, 1/13/15 Guggenheim Retention Order [D.I. 3276].)

89.    The terms of Sullivan's, Montgomery's, and AlixPartners' engagements by the E-Side Committee provided for such firms to be compensated based on hourly rates.  (ELX-103, 1/13/15 Sullivan Retention Order [D.I. 3282]; ELX-100, 1/12/15 Montgomery Retention Order [D.I. 3241]; ELX-099, 1/12/15 AlixPartners Retention Order D.I. 3242].)   The terms of Guggenheim's engagement provided for Guggenheim to receive (a) a fixed monthly fee of $250,000 (the "Guggenheim Monthly Fee") and (b) a cash fee of $9 million (the "Guggenheim Transaction Fee") payable if a restructuring transaction was consummated with respect to the E-Side Debtors during the term of Guggenheim's engagement or within twelve months following the expiration or termination of such engagement.  (ELX-102, 1/13/15 Guggenheim Retention Order [D.I. 3276].)[15]  Notwithstanding this compensation arrangement, Guggenheim agreed to maintain and submit time records in half-hour increments in its monthly fee statements and interim fee applications of the services rendered in these Bankruptcy Cases by Guggenheim's Professionals.  (ELX-102, Guggenheim Retention Order [D.I. 3276].)

---

[15]    Under the terms of Guggenheim's engagement, 50% of the aggregate of Guggenheim Monthly Fees in excess of $1.5 million were to be credited against the Guggenheim Transaction Fee.  (ELX-102, 1/13/15 Guggenheim Retention Order [D.I. 3276].)  Pursuant to an agreement reached between Guggenheim and the Fee Committee, Guggenheim agreed to reduce the Guggenheim Monthly Fee beginning on January 1, 2017 to $125,000 and agreed to reduce the Guggenheim Transaction Fee by $1 million.  (ELX-660, 4/23/18 Guggenheim Final Fee Application [D.I. 12998] at 5 n.10.)

**B.**    **The E-Side Committee Professionals Did Not Allocate Their Fees and Expenses Pursuant to the Interim Compensation Order.**

90.    Three of the four E-Side Committee Professionals did not propose any allocation in their monthly, interim, or final fee statements.  (*See*, *e.g.*, ELX-564, Sullivan 34th Monthly Fee Statement [D.I. 11926] (Sullivan stating that "the fees and expenses of S&C have been incurred for the benefit of the EFH Committee and not for the direct benefit of any Debtor. Accordingly, no allocation of such fees and expenses is proposed at this time by S&C."); ELX-604, 2/22/18 Montgomery 38th Monthly Fee Statement [D.I. 12502] (Montgomery stating that "the fees and expenses of MMWR are for the benefit of the EFH Committee and not for the direct benefit of any Debtor and, accordingly, no allocation is proposed at this time by MMWR"); ELX-484, 2/21/17 AlixPartners 25th Monthly Fee Statement [D.I. 11034] (AlixPartners stating that "[t]he fees of AlixPartners are for the benefit of the EFH Committee and not the direct benefit of any Debtor and, accordingly, no allocation is proposed at this time by AlixPartners").)

91.    The representative of the E-Side Committee explained that it did not follow the allocation methodology set forth in paragraph 2(b) of the Interim Compensation Order because the E-Side Committee did not believe it provided a direct benefit to any Debtor in these Bankruptcy Cases and did not believe that the allocation methodology in paragraph 2(b) applied to them.  (*See* Glueckstein Dep. Tr. at 61:5–14 ("[A]ll of the committee professionals were working for the committee.  The committee represented the creditors' collective interests of all four of the estates, and we never – and any of us never specifically allocated work we were done or viewed work we were done as being for one particular individual party."); *id.* at 47:21–48:3 ("[I]t was not an allocation that was undertaken pursuant to Section 2(b) of the Interim Compensation Order per se because our view was, and continues to be, that the plain language of that really only applied to the debtor professionals.").)

36

92.     The fourth E-Side Committee Professional, Guggenheim, proposed in each of its monthly fee statements that the Guggenheim Monthly Fee for such month be allocated 50% to EFH and 50% to EFIH, but noted that "[t]o the extent necessary, reallocation of the fees and expenses set forth above will occur in interim and/or final fee applications." (*See*, *e.g.*, ELX-613, 38th Monthly Fee Statement of Guggenheim [D.I. 12644] ¶ 4.)  Guggenheim's monthly fee statements contain a blanket statement that "[t]he EFH Committee represents creditors of Energy Future Holdings Corporation, Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and EECI, Inc.  Guggenheim Securities' [Monthly Fee] is proposed as a joint and several expense of each of these estates pursuant to section 328 of the Bankruptcy Code." (*See*, *e.g.*, ELX-613, 2/5/18 Guggenheim 38th Monthly Fee Statement [D.I. 12644] ¶ 3.)  Beyond this, Guggenheim's fee statements provide no explanation as to why it proposed to allocate the Guggenheim Monthly Fee equally between EFH and EFIH, and its proposed allocation was not based on an allocation of the time entries that Guggenheim was required to keep.  Indeed, unlike Evercore, Guggenheim did not attempt to allocate its timekeepers' time entries between EFH and EFIH.  (*See*, *e.g.*, ELX-288, 2/12/16 Guggenheim 4th Interim Fee Statement [D.I. 7829] at Ex. C; ELX-409, 10/10/16 Guggenheim 6th Interim Fee Statement [D.I. 9791] at Ex. C).)

93.     Guggenheim did not propose any allocation of the Guggenheim Transaction Fee as between EFH and EFIH.  (ELX-660, 4/23/18 Guggenheim Final Fee Application [D.I. 12998].)

94.     At no time did any of the E-Side Committee Professionals seek clarification from the Court regarding whether they were required to allocate their fees and expenses pursuant to paragraph 2(b) of the Interim Compensation Order or how their fees and expenses should be allocated if that paragraph applied.

### C.    The E-Side Committee's Services Focused on Preserving and Enhancing the EFH Estates for the Benefit of EFH Unsecured Creditors.

95.    The E-Side Committee was a statutory representative of both EFH and EFIH. Nonetheless, under the circumstances that existed when the E-Side Committee and its Professionals were most active, the E-Side Committee's Professionals' efforts in these cases were predominantly focused on preserving and enhancing the EFH estate for the benefit of EFH's unsecured creditors.  (*See* 9/2/18 Horton Written Direct ¶ 24 (noting that the EFH/EFIH Committee Settlement "primarily addressed EFH claims" and that the E-Side Committee "arguably played a more significant advocacy role for EFH unsecured creditors than EFIH unsecured creditors").)

96.    For example, according to Sullivan's final fee application, Sullivan devoted "[i]mmense resources" to opposing a proposed settlement agreement (the "Global Settlement") between, among others, TCEH, EFH, and EFIH in late 2015.  (ELX-662, 4/23/18 Sullivan Final Fee Application [D.I. 13002] ¶ 38.)   The E-Side Committee opposed the Global Settlement mainly because it believed that (a) the EFH estate was unjustifiably releasing valuable claims against third parties, including against TCEH, EFH's directors and officers, and EFH's equity holders, and (b) TCEH should not be given an allowed intercompany claim in the amount of $700 million against the EFH estate.  (ELX-235, 10/23/15 Trial Brief and Omnibus Objection of the E-Side Committee [D.I. 6627] at 53–58, 88.)

97.    In addition, in a 132-page trial brief filed by the E-Side Committee in opposition to the Global Settlement (the "Trial Brief"), the E-Side Committee explained that its opposition was focused primarily on preserving recoveries for EFH unsecured creditors.  Specifically, the E-Side Committee stated that:

> [T]he EFH Committee takes as a premise that all EFIH creditors will be paid in full in priority to EFH creditors.  Accordingly, this Objection is

38

concerned only with value to the E-side Debtors collectively, measured by return to EFH unsecured creditors as the likely fulcrum class in the circumstances when the settlement would be relevant.

(ELX-235, 10/23/15 Trial Brief and Omnibus Objection of the E-Side Committee [D.I. 6627] at 34 n.4.)

98.     Ultimately, after extensive discovery and a multi-week trial, the E-Side Committee agreed to withdraw its opposition to the Global Settlement after negotiating a separate settlement agreement, which was approved by the Court on November 25, 2015 (the "EFH Beneficiary Settlement").  (11/25/15 EFH Beneficiary Settlement Order [D.I. 7143].)

99.     Pursuant to the EFH Beneficiary Settlement, (a) TCEH agreed to segregate, hold in trust, assign, and turn over to holders of Beneficiary Claims (as defined in the EFH Beneficiary Settlement) against EFH any recovery received by TCEH on account of the TCEH Settlement Claim up to an amount not to exceed $37.8 million in the aggregate (the "TCEH Turnover Distribution"), (b) the Debtors agreed to amend their proposed restructuring plan to provide for a reinstatement of all asbestos claims against EFH, and (c) the E-Side Committee agreed to "use reasonable efforts to minimize its participation in the Chapter 11 Cases" going forward.  (11/25/15 EFH Beneficiary Settlement Order [D.I. 7143].)  Most members of the E-Side Committee hold Beneficiary Claims or asbestos claims against EFH Debtors and are projected to receive a full recovery in these cases as a result of the EFH Beneficiary Settlement. (ELX-104, 1/15/15 Amended Notice of Appointment of Committee of Unsecured Creditors [D.I. 3313]; ELX-558, Disclosure Statement for Sempra Plan [D.I. 11889] Art. I.G.)

100.     Sullivan recorded time on these matters primarily to its "Plan and Disclosure Statement" matter code, which accounts for approximately 50% of Sullivan's total fee request in these cases.  Sullivan also recorded time spent on these matters to its "Intercompany Claims" matter code and "Claims Investigation" matter code, which together account for more than 7% of

Sullivan's total fee request.  Sullivan's other main matter codes (and the total fees billed to each) include: (i) "Tax" matters ($1,828,798 in fees); (ii) "Asset Disposition" matters ($1,618,626 in fees); and (iii) "Claims Administration and Objections" matters ($821,800), for which Sullivan notes "[a] substantial portion of time spent in this category includes asbestos matters."  (ELX-662, 4/23/18 Sullivan Final Fee Application [D.I. 13002] at 6.)

101.     The E-Side Committee's objection to the Global Settlement was supported by significant investigatory work undertaken by Montgomery.  (*See* ELX-235, 10/23/15 Trial Brief and Omnibus Objection of the E-Side Committee [D.I. 6627] ¶ 143 (Montgomery "has filed a supplemental statement (the 'Conflicts Counsel Supplement') setting forth the view of the EFH Committee that the EFH estate has valuable claims against the Controlling Owners that are compromised by the Intersilo Settlement").)  Montgomery devoted more than 40% of its incurred fees ($2,341,235.50) to tasks relating to "Derivative Litigation Investigation," which involved an "intensive" investigation of potential claims against Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., and Goldman, Sachs & Co., in their capacities as equity owners of EFH.  (ELX-658, 4/20/18 Montgomery Final Fee Application [D.I. 12986] at 9; ELX-292, 2/17/16 Montgomery 4th Interim Fee Application [D.I. 7868] ¶ 34.)  Additionally, Montgomery incurred an additional $521,786.50 (or 9.1% of its total fees) under "Asbestos-Related Matters."  (ELX-658, 4/20/18 Montgomery Final Fee Application [D.I. 12986] at 9.)  This work was entirely for the benefit of EFH unsecured creditors because it involved an investigation of potential claims by EFH against its equity sponsors.

102.     Approximately 27.5% of AlixPartners' total fees and expenses were categorized under the "Potential Litigation: Solvency/Valuation" matter code and approximately 17.7% of AlixPartners' total fees and expenses were categorized under the "Potential Litigation: Other"

matter code.  (ELX-666, 4/23/18 AlixPartners Final Fee Application [D.I. 13012].)  This work was predominantly, if not entirely, for the benefit of EFH unsecured creditors because the E-Side Committee's objections to the Global Settlement were focused on EFH claims and rights and culminated in the EFH Beneficiary Settlement which improved the treatment of EFH unsecured creditors.

### D.    The Vast Majority of the E-Side Committee Professional Fees and Expenses Were Incurred Prior to December 1, 2015.

103.    The time period when the vast majority of the E-Side Committee's Professionals' services were performed also supports a finding that those services were predominately for the benefit of EFH unsecured creditors.  From the date of the E-Side Committee's appointment through November 30, 2015: (i) Sullivan incurred approximately 88% of its fees (or $22,065,956.99);[16] (ii) Montgomery incurred approximately 83% of its fees (or $4,932,855.17);[17] (iii) AlixPartners incurred approximately 97% of its fees (or $3,514,404.71); [18] and (iv) Guggenheim expended 76% of its hours.[19]

---

[16]    Sullivan's monthly fee applications through November 2015 totaled $22,065,956.99, which represents approximately 88% of the total fees and expenses Sullivan requested throughout the cases ($25,053,734.28), prior to any adjustments. (ELX-662, 4/23/18 Sullivan Final Fee Application [D.I. 13002] at 2–4.)

[17]    Montgomery's monthly fee applications through November 2015 totaled $4,932,855.17 (ELX-108, 1/23/15 Montgomery 1st Monthly Fee Statement [D.I. 3359] at 1; ELX-112, 2/5/15 Montgomery 2nd Monthly Fee Statement [D.I. 3455] at 1; ELX-135, 2/26/15 Montgomery 3rd Monthly Fee Statement [D.I. 3690] at 1; ELX-147, 3/24/15 Montgomery 4th Monthly Fee Statement [D.I. 3955] at 1; ELX-156, 4/21/15 Montgomery 5th Monthly Fee Statement [D.I. 4240] at 1; ELX-163, 5/21/15 Montgomery 6th Monthly Fee Statement [D.I. 4559] at 1; ELX-186, 6/24/15 Montgomery 7th Monthly Fee Statement [D.I. 4849]; ELX-197 at 1, 7/21/15 Montgomery 8th Monthly Fee Statement [D.I. 5063] at 1; ELX-208, 8/24/15 Montgomery 9th Monthly Fee Statement [D.I. 5693] at 1; ELX-244, 10/30/15 Montgomery 10th Monthly Fee Statement [D.I. 6793] at 1; ELX-257, 11/17/15 Montgomery 11th Monthly Fee Statement [D.I. 7022] at 1; ELX-268, 12/16/15 Montgomery 12th Monthly Fee Statement [D.I. 7386] at 1; ELX-270, 12/22/15 Montgomery 13th Monthly Fee Statement [D.I. 7432] at 1.)  This represents approximately 83% of the total fees and expenses Montgomery requested throughout the cases ($5,975,959.16), prior to any adjustments.  (ELX-658, 4/20/18 Montgomery Final Fee Application [D.I. 12986] at 3.)

[18]    AlixPartners' monthly fee applications through November 2015 totaled $3,514,404.71 (*See* ELX-110, 1/23/15 AlixPartners 1st Monthly Fee Statement [D.I. 3370] at 1; ELX-115, 2/5/15 AlixPartners 2nd Monthly Fee Statement [D.I. 3458] at 1; ELX-133, 2/26/15 AlixPartners 3rd Monthly Fee Statement [D.I. 3686] at 1; ELX146, 3/24/15 AlixPartners 4th Monthly Fee Statement [D.I. 3954] at 1; ELX-159, 4/21/15 AlixPartners 5th

104.    During this time period, EFIH unsecured creditors were projected to receive a 100%

recovery on their claims.  (*See*, *e.g.*, PAB-X283, 8/10/15 Third Amended Chapter 11 Plan [D.I.

5244]; PAB-X286, 9/21/15 Fifth Amended Chapter 11 Plan [D.I. 61233]).)  Furthermore, during

that time period, the EFIH PIK Note prices traded above par, further evidencing that the market

expected EFIH unsecured creditors to receive a full recovery on their claims.  (ELX-671, EFIH

PIK Prices Chart [D.I. 13102-2].)  Accordingly, any additional funds generated in these cases for

the EFIH estate were projected to flow to EFH, as the sole member of EFIH, which funds would

in turn benefit EFH unsecured creditors.

### E.    Guggenheim's Transaction Fee.

105.    Guggenheim has also sought payment of the Guggenheim Transaction Fee in the

amount of $8 million (ELX-660, 6/23/18 Guggenheim Final Fee Application [D.I. 12998].)  In

that regard, Guggenheim's engagement letter (dated January 13, 2015) provided that it would

receive the Guggenheim Transaction Fee payable upon consummation of *any* E-Side Debtor

---

Monthly Fee Statement [D.I. 4246] at 1; ELX-166, 5/21/15 AlixPartners  6th Monthly Fee Statement [D.I. 4573] at 1; ELX-183, 6/24/15 AlixPartners 7th Monthly Fee Statement [D.I. 4814] at 1; ELX-195, 7/21/15 AlixPartners 8th Monthly Fee Statement [D.I. 5058] at 1; ELX-207, 8/24/15 AlixPartners 9th Monthly Fee Statement [D.I. 5692] at 1; ELX-220, 9/25/15 AlixPartners 10th Monthly Fee Statement [D.I. 6185] at 1; ELX232, 10/21/15 AlixPartners 11th Monthly Fee Statement [D.I. 6546] at 1; ELX-265, 11/30/15 AlixPartners 12th Monthly Fee Statement [D.I. 7171] at 1; ELX-275, 1/19/16 AlixPartners 13th Monthly Fee Statement [D.I. 7689] at 1.)  This represents approximately 97% of the total fees and expenses AlixPartners requested throughout the cases ($3,640,000.62), prior to any adjustments (ELX-666, 4/23/18 AlixPartners Final Fee Application [D.I. 13012] at 2.)

[19]    Guggenheim spent 9,663.5 hours representing the E-Side Committee through November 2015 (ELX-109, 1/23/15 Guggenheim 1st Monthly Fee Statement [D.I. 3360] at 3; ELX-114, 2/5/15 Guggenheim 2nd Monthly Fee Statement [D.I. 3457-1] at 10; ELX-134, 2/26/15 Guggenheim 3rd Monthly Fee Statement [D.I. 3688] at 3; ELX-148, 3/24/15  Guggenheim 4th Monthly Fee Statement [D.I. 3958] at 3; ELX-157, 4/21/15 5th Guggenheim Monthly Fee Statement of Guggenheim [D.I. 4236] at 3; ELX-162 at 3, 5/21/15 Guggenheim 6th Monthly Fee Statement [D.I. 4547] at 3; ELX-184, 6/22/215 Guggenheim 7th Monthly Fee Statement [D.I. 4816] at 3; ELX-198, 7/21/15 Guggenheim 8th Monthly Fee Statement [D.I. 5064] at 3; ELX-205, 8/21/15 Guggenheim 9th Monthly Fee Statement of Guggenheim [D.I. 5614] at 7; ELX-219, 9/25/15 Guggenheim 10th Monthly Fee Statement [D.I. 6136] at 3; ELX-250, 11/12/15 Guggenheim 11th Monthly Fee Statement [D.I. 6989] at 7; ELX226 at 3, 12/07/15 Guggenheim 12th Monthly Fee Statement [D.I. 7248] at 3; ELX-271, 12/22/15 Guggenheim 13th Monthly Fee Statement [D.I. 7439] at 3.)  This represents approximately 76% of the total hours Guggenheim reported throughout the cases (12,746.5).  (ELX-660, 4/23/18 Guggenheim Final Fee Application [D.I. 12997] at 37.)

restructuring transaction.  (ELX-660, 6/23/18 Guggenheim Final Fee Application [D.I. 12998] ¶ 8.)  The Guggenheim Transaction Fee was thus a potential liability of both EFH and EFIH as of the date the Court approved Guggenheim's retention on January 13, 2015.  Guggenheim's services to the E-Side Committee were substantially completed by December 2015.  In fact, nearly 76% of all the hours billed by Guggenheim's timekeepers were for work performed prior to that date.  (*See generally* Guggenheim Monthly Fee Applications.)  There is no evidence that Guggenheim provided any services with respect to the solicitation and ultimate consummation of the Sempra transaction and in fact, Guggenheim and the other E-Side Committee Professionals were required to minimize their efforts after November 2015 pursuant to the EFH Beneficiary Settlement.  (11/25/15 EFH Beneficiary Settlement Order [D.I. 7143].)

106.    In its Final Submission, the PAB asks this Court to allocate 86% to 90% of the E-Side Committee Professional Fees to EFH with the remaining amount allocated to EFIH.  (8/30/18 PAB's Final Submission [D.I. 13416] ¶ 11.)

## V.    KIRKLAND AND EVERCORE PROFESSIONAL FEES.

### A.    Kirkland's and Evercore's Retention and Compensation.

107.    By separate orders dated September 16, 2014, the Debtors were authorized to retain and employ (a) Kirkland as lead counsel and (b) Evercore as investment banker and financial advisor.  (ELX-31, 9/16/14 Kirkland Retention Order [D.I. 2052]; ELX-33, 9/16/14 Evercore Retention Order [D.I. 2056].)

108.    The terms of Kirkland's engagement provided that Kirkland would be compensated based on hourly rates.  (ELX-31, 9/16/14 Kirkland Retention Order [D.I. 2052].)

109.    The terms of Evercore's engagement provided for Evercore to receive (a) a fixed monthly fee of $525,000 (the "Evercore Monthly Fee"), (b) a one-time $35 million Restructuring Fee (prior to any crediting) payable on consummation of a Restructuring (as defined in

43

Evercore's engagement letter), (c) a one-time Sale Fee of $9 million payable upon consummation of any Sale (as defined in Evercore's engagement letter), and (d) a one-time DIP Financing Fee of $11 million payable in the event a first lien DIP Financing was raised by EFCH/TCEH or EFIH (together with the Restructuring Fee and the Sale Fee, the "Evercore Transaction Fees").[20]  (ELX-33, 9/16/14 Order Authorizing Employment and Retention of Evercore [D.I. 2056].)  Evercore timekeepers recorded their time to "facilitate allocation" between EFH, EFIH, or both estates.  (AHX-242, 5/24/18 Evercore Final Fee Application [D.I. 13140] ¶ 12(f).)  Evercore proposed an allocation of the Evercore Transaction Fees "amongst as many of TCEH/EFCH, EFIH, and EFH . . . in proportion to all allocated time spent by Evercore on each."  (AHX-242, 5/24/18 Evercore Final Fee Application [D.I. 13140] ¶ 12(f).)

110.    Kirkland and Evercore were subject to the Interim Compensation Order, and both acknowledge that their proposed fee and expense allocations may be reviewed and reallocated by the Court.  (*See*, *e.g.*, ELX-240, 10/28/15 Evercore 18th Monthly Fee Application [D.I. 6734] ¶¶ 3–4 (stating that Evercore's proposed allocations are "tentative" and that "reallocation may be required"); ELX-652, 4/18/18 Kirkland 12th Interim Fee Application [D.I. 12961] ¶ 27 (stating that Kirkland's allocation is "proposed"); Husnick Dep. Tr. at 21:8–19 ("[F]olks requested that there be a reservation of rights in the interim compensation order that allowed people to revisit how allocations shook out at any particular time").)

111.    The Court next turns to certain facts that are relevant to both Kirkland's and Evercore's allocations before addressing each Professional's allocations in detail.

---

[20]    Evercore's engagement letter provides for a $600,000 Evercore Monthly Fee, which the Court revised to $525,000 in Evercore's retention order.  (ELX-033, 9/16/14 Order Authorizing the Employment and Retention of Evercore [D.I. 2056] ¶ 6; AHX-242, 5/24/18 Evercore Final Fee Application [D.I. 13140] ¶ 12.)

**B.**  **Kirkland and Evercore's Allocation of Fees Are Materially Different from the E-Side Debtors' Other Retained Professionals.**

112.    Of Kirkland's total E-Side Debtor fees and expenses incurred in these cases, $13,060,373.81, or approximately 12.5%, are allocated to EFH, and $90,698,124.71, or approximately 87.5%, are allocated to EFIH.  (*See generally* Kirkland monthly fee applications; *see also* ELX-659, 4/23/18 Kirkland Final Fee Application [D.I. 13019] ¶ 28.)

113.    Similarly, of Evercore's E-Side fees and expenses incurred in these cases, $9,994,743.15, or approximately 27%, are allocated to EFH and $26,678,785.86, or approximately 73%, are allocated to EFIH.  (*See generally* Evercore monthly fee applications; AHX-242, 5/24/18 Evercore Final Fee Application [D.I. 13140] ¶ 14.)

114.    Both Kirkland's and Evercore's allocations are materially different from all of the other E-Side Debtors' retained professionals.  In addition to Kirkland and Evercore, the E-Side Debtors retained a multitude of other professionals in connection with these Bankruptcy Cases. Unlike Kirkland and Evercore, most of these professionals, including the E-Side Debtors' local counsel, allocated far more in fees and expenses to EFH than EFIH.  For example: (i) Filsinger Energy Partners ("Filsinger"), the Debtors' energy consultant, allocated its fees approximately 80% to EFH and 20% to EFIH; (ii) Alvarez & Marsal North America, LLC ("A&M"), the Debtors' restructuring advisor, allocated its fees approximately 75% to EFH and 25% to EFIH; (iii) Richards, Layton, & Finger ("RLF"), the Debtors' Delaware counsel, allocated its fees approximately 65% to EFH and 35% to EFIH; and (iv) Deloitte & Touche LLP ("Deloitte"), the Debtors' independent auditor, allocated its fees approximately 50% to EFH and 50% to EFIH. (*See* PAB-X662, RLF Final Fee Application [D.I. 13106-3] at Exhibit B; *see generally* Filsinger monthly fee applications; A&M monthly fee applications; RLF monthly fee applications; Deloitte monthly fee applications; *see also* Movants' Closing Slides at 43.)

C.     **The Vast Majority of the Kirkland and Evercore Fees Were Incurred Prior to December 1, 2015.**

115.    The vast majority of Kirkland and Evercore's services were performed during periods of time when EFH unsecured creditor recoveries, and not EFIH unsecured creditor recoveries, were at risk.  Prior to September 1, 2016, Kirkland had billed approximately $152 million, or 83% of its total fees and expenses disclosed in its final fee application.  (ELX-659, 4/23/18 Kirkland Final Fee Application [D.I. 13019] at 3–4.)  By this same date, Evercore had already billed approximately $15.7 million, or 75% of its total monthly fees and expenses disclosed in its final fee application.[21]  (ELX-659, 5/24/18 Evercore Final Fee Application [D.I. 13140] at 6.)  As the Debtors' investment banker, the majority of Evercore's time during this period was spent on general restructuring transactions, valuations and analyses, plans of reorganization, and general litigation assistance.  For example, (a) 13.4% of Evercore's time was spent on Asset Sales and Other M&A Activity, (b) 17.5% of its time was spent on Valuation and Recoveries Analysis, (c) 11.4% of its time was spent on General Financial Analysis and Research, (d) 8.3% of its time was spent on Plans of Reorganization, and (e) 14.6% of its time was spent on Court Testimony and Litigation Support.  (AHX-242, 5/24/18 Evercore Final Fee Application [D.I. 13140].)  Most of Evercore's remaining time was spent on general case activities, such as General Case Administration, Due Diligence, Travel, Retention Application, and Fee Application matters.  (AHX-242, 5/24/18 Evercore Final Fee Application [D.I. 13140].)

116.    During this time period, EFIH unsecured creditors were projected to receive a 100% recovery on their claims.  (*See, e.g.*, PAB-X283, 8/10/15 Third Amended Chapter 11 Plan [D.I. 5244]; PAB-X286, 9/21/15 Fifth Amended Chapter 11 Plan [D.I. 6123].)  Accordingly, any additional funds generated in these cases for the EFIH estate would have flowed to EFH, as the

---

[21]    This number and percentage exclude any transaction fees awarded to Evercore, which were triggered at the consummation of certain events rather than monthly hours incurred.

sole member of EFIH, and benefitted EFH unsecured creditors.  During this time period, the EFIH PIK Note prices also generally traded above par, further evidencing that the market expected EFIH unsecured creditors to receive full payment.  (ELX-671, EFIH PIK Prices Chart [D.I. 13102-2].)

**D.      Kirkland's Allocation of Direct Benefit Fees and Collective Benefit Fees.**

117.     Prior to the Court approving the Interim Compensation Order, Kirkland provided a directive to timekeepers for entering time with respect to the Debtors' Bankruptcy Cases (the "Timekeeping Directive").  This Timekeeping Directive defined a "Direct Benefit Fee" as one that "principally" benefitted one particular Debtor.  (ELX-011, 5/5/14 Kirkland Timekeeper Directive at 7; *see* 9/5/18 Trial Tr. 93:6–10 (Husnick Test.) (characterizing fees as Direct Benefit Fees if they "could be principally or primarily for the benefit of a single Debtor.").)

118.     Pursuant to the Timekeeping Directive, a Kirkland timekeeper was to allocate his or her services to a "Collective Benefit Fee" matter code when the timekeeper provided services that were not "primarily" for the benefit of any particular Debtor.  In that regard, Kirkland defined "Collective Benefit Fees" to be fees for services that were provided to the Debtors when the primary Debtor beneficiary was "not discernible or clear."  (Husnick Dep. Tr. at 50:19-51:3; *accord* ELX-011, 5/5/14 Kirkland Timekeeper Directive at 7.)

119.     After entry of the Interim Compensation Order and before October 2016, Kirkland timekeepers generally followed the Timekeeping Directive and allocated Collective Benefit Fees in accordance with paragraph 2(b) of the Interim Compensation Order.  (9/2/18 Husnick Written Direct ¶¶ 22–26.)  The allocation of Collective Benefit Fees was a formulaic approach based on the ratio of EFH Direct Benefit Fees to EFIH Direct Benefit Fees.  (PAB-X034, 9/16/14 Interim Compensation Order ¶ 2(b); *see* PAB-X703, 6/29/18 Kirkland Position Statement [D.I. 13255] ¶ 9 ("[A]s a result of the methodology, ***the allocation of Collective***

***Benefit Fees in a particular month is formulaic***." (emphasis in original)); 8/10/18 Husnick Dep.

Tr. at 47:5-17; 102:16-24 (referring to the "formula" set forth in paragraph 2(b) of the Interim

Compensation Order for calculating Collective Benefit Fees); 9/5/18 Trial Tr. at 83:21-84:7

(Husnick Test.) (same).)

120.    From June 2016 to September 2016, Kirkland departed from the allocation

methodology set forth in paragraph 2(b) of the Interim Compensation Order with respect to

certain EFIH Direct Benefit Fee matter codes, and used the "corresponding debt amounts" of

EFIH and EFH to allocate fees in those matter codes 90% to EFIH and 10% to EFH.  (ELX-368,

8/5/16 Kirkland 26th Monthly Fee Statement, [D.I. 9198] Ex. A n.1; ELX-387, 9/8/16 Kirkland

27th Monthly Fee Statement, [D.I. 9498] Ex. A n.1; ELX-410, 10/10/16 Kirkland 28th Monthly

Fee Statement, [D.I. 9792] Ex. A n.1; ELX-429, 11/16/16 Kirkland 29th Monthly Fee Statement,

[D.I. 10181] Ex. A n.1.)

121.    Then in October 2016 and thereafter, Kirkland abandoned the methodology set

forth in paragraph 2(b) of the Interim Compensation Order for allocating Collective Benefit Fees

and used "the relative debt of EFH and EFIH" to allocate E-Side Collective Benefit Fees 90% to

EFIH and 10% to EFH.  (9/2/18 Husnick Written Direct ¶ 27; ELX-659, 4/23/18 Kirkland Final

Fee Application [D.I. 13019] ¶ 33.)

122.    As a result of applying the Timekeeping Directive with respect to Direct Benefit

Fees over the course of the cases, Kirkland's final fee application requests that the Court approve

approximately $19.5 million of its fees and expenses as Direct Benefit Fees for EFH and EFIH.

(ELX-659, 4/23/18 Kirkland Final Fee Application [D.I. 13019] ¶ 28.)  Of this amount, Kirkland

requests the Court approve its allocation approximately $17.6 million, or approximately 90% of

all Direct Benefit Fees, to EFIH, and the remaining $1.9 million, or approximately 10% of Direct Benefit Fees, to EFH.  (*Id.* ¶ 24.)

123.    As a result of using the Timekeeping Directive, the allocation methodology in the Interim Compensation Order, and its own modifications thereto, Kirkland requests that this Court approve approximately $84.2 million in fees and expenses as E-Side Collective Benefit Fees.  Of this amount, Kirkland requests the Court approve allocating approximately $73.1 million, or approximately 87% of all Collective Benefit Fees, to EFIH and the remaining $11.1 million, or approximately 13% of all the Collective Benefit Fees, to EFH.  (*Id.* ¶ 28.)

124.    For the reasons set forth below, the Court cannot find that Kirkland's application of the Interim Compensation Order, the Timekeeping Directive, or its deviations from the terms of the Interim Compensation Order resulted in an allocation of Kirkland's Professional fees and expenses upon which the Court may find that the allocations of Direct Benefit Fees and Collective Benefit Fees between EFH and EFIH reflect the actual and necessary fees and expenses of preserving the EFH and EFIH estates.

   **E.    Kirkland's Allocation of Direct Benefit Fees Does Not Reflect the Actual and Necessary Expenses of the EFH and EFIH Estates.**

125.    The Timekeeping Directive required Kirkland timekeepers to input time for services to an EFH or EFIH Direct Benefit Fee matter code when those services "principally" or "primarily" benefitted a single Debtor.  (ELX-011, 5/5/14 Kirkland Timekeeper Directive at 7.)  This Timekeeping Directive resulted in a number of problems notwithstanding Kirkland timekeepers' good-faith efforts to comply with it and paragraph 2(b) of the Interim Compensation Order.

126.    The Timekeeping Directive was not consistent with the understanding of "Direct Benefit Fees" held by at least one of the Debtors' other Professionals or Mr. Horton.  (*See*

Matican Dep. Tr. at 23:7–11 (noting that Direct Benefit Fees would be those fees for services that were "solely" for the benefit of a particular Debtor); 9/5/18 Trial Tr. at 245:22–25 (Horton Test.) ("Q: And your view, sir, is that a direct benefit fee is a fee that's incurred solely for the benefit of a specific debtor, correct? A: Yes, sir.").)

127.    More importantly, given that the Interim Compensation Order contemplated that a Debtor would be 100% responsible for its Direct Benefit Fees, the Court finds that a Direct Benefit Fee must be for a service that was performed solely for the benefit of a single Debtor. Otherwise one Debtor would be paying the actual and necessary expenses of another debtor (*i.e.,* the "Free Rider Effect"), as illustrated below.  The Timekeeping Directive did not, however, specify that a Direct Benefit Fee must be for a service that was performed solely for the benefit of a single Debtor.

128.    Even assuming all of the Kirkland timekeepers had the same understanding of when a service "principally" or "primarily" benefitted a single Debtor and they properly classified activities using the Timekeeping Directive, then the applicable "Direct Benefit Fee" E-Side Debtor would be charged 100% of the fees for services even though another E-Side Debtor might receive some, perhaps a material amount, of the actual benefit from the services provided by that timekeeper.  In such circumstances, the E-Side Debtor that was not the "primary" beneficiary was a "free rider," receiving services that preserved or enhanced that free rider E-Side Debtor's estate but for which services it was not charged the actual, necessary expense.  The evidence establishes that there are at least two significant examples of this "free rider" problem.

129.    As one example, Kirkland timekeepers classified approximately $4 million, or nearly 25% of the total EFIH Direct Benefit Fees, under the EFIH Plan/Disclosure Statement matter code (Matter No. 76) and $0 in EFH Direct Benefit Fees under the same matter code for

EFH (Matter No. 98).  All of the E-Side reorganization plans were pursued on behalf of both EFH and EFIH, and EFIH never filed or prosecuted a separate plan of reorganization.  (ELX-659, 4/23/18 Kirkland Final Fee Application [D.I. 13019] ¶ 99.)  Moreover, although Kirkland also billed substantial time to Collective Benefit Fee matter codes for such work, there is no simple way to determine why timekeepers used the Direct Benefit Fee matter code or the Collective Benefit Fee matter code based on the time entry descriptions.  Thus, the Court cannot find that only EFIH benefitted from the services billed to the EFIH Plan/Disclosure Statement matter code, and finds that EFH received an actual benefit from EFIH incurring this $4 million in EFIH Direct Benefit Fees for which it should reimburse EFIH.

130.    As another example, Kirkland also classified certain fees billed by its timekeepers on matters related to the disputes regarding the Makewhole Claims as EFIH Direct Benefit Fees. (*See* ELX-659, 4/23/18 Kirkland Final Fee Application [D.I. 13019] ¶¶ 91, 93, 95, 101.)  A precise amount of these fees cannot be determined from a review of the final application, but given the importance of the matter and the Court's familiarity with the issue, such fees are undoubtedly material.  In its preliminary position statement with respect to the Allocation Motion served on June 29, 2018 (the "PAB Position Statement"), the PAB admits that "if the Makewhole Claims were disallowed by Final Order, the incremental value from an increased purchase price would flow to EFH creditors."  (AHX-247, PAB Position Statement ¶ 12; *see also id.* ¶ 20 ("[U]nder the consummated Sempra Plan—all else being equal—the disallowance of the Makewhole Claims would have inured benefit to EFH.")  Also, as the evidence established, during the time in which the Makewhole Claim litigation was being pursued, each plan of reorganization provided that the unsecured creditors of EFIH would receive payment in full and the trading prices of the EFIH PIK Notes reflected that the market believed that the holders of

such notes would receive par.  Thus, the Court cannot find that only EFIH received an actual benefit from these EFIH Direct Benefit Fees, and instead finds that EFH received some actual benefit from the EFIH Direct Benefit Fees for which it should reimburse EFIH.

131.    Nor can the Court accept the PAB's and Ad Hoc EFH Claimants' contention that EFIH should bear 100% of these fees because the Makewhole Claims that were being litigated were solely based on debt documents to which only EFIH was a party.  (8/30/18 PAB's Final Submission [D.I. 13416] at 29-30; 8/30/18 Ad Hoc EFH Claimants' Final Submission [D.I. 13415] at 3, 17, 38.)  First, that position ignores the fact that EFH was an intended beneficiary of the services because of its equity interest and the fact that the outcome of the litigation was relevant to confirmation of the joint plans proposed by EFH and EFIH.  Second, that position is directly at odds with the PAB's and the Ad Hoc EFH Claimants' position regarding the treatment of fees related to asbestos and tax matters.  (8/30/18 PAB's Final Submission [D.I. 13416] at 27–29, 33–35; 8/30/18 Ad Hoc EFH Claimants' Final Submission [D.I. 13415] at 36–39.)

132.    In particular, only EFH Debtors were liable on allowed asbestos claims and EFH was the only recognized federal-income-tax-paying entity.  (ELX-623, Sempra Plan [D.I. 12653] Art I.A.233; *see* 9/5/18 Trial Tr. at 108:22–109:5 (Husnick Test.) (noting that the E-Side Debtors classified all asbestos claims as "EFH legacy claims").)  Both the PAB and the Ad Hoc EFH Claimants, however, request that this Court defer to Kirkland's treatment of fees for these matters as "Collective Benefit Fees," thereby leaving EFIH to pay 90% of such fees, even though the EFH Debtors are the entities that are undeniably liable.

133.    It also does not matter that Kirkland billed significant Collective Benefit Fees to both EFH and EFIH for Plan/Disclosure Statement work and issues relating to the Makewhole Claims.  EFIH paid nearly 90% of those Collective Benefit Fees for these services, and the Court

finds that even if the 90% of the Collective Benefit Fees for those matters was appropriate, which it is not, EFIH should still not shoulder 100% of these EFIH Direct Benefit Fees. Moreover, as the evidence demonstrated, even if the Direct Benefit Fees charged for these matters were relatively modest, if these fees for services are reclassified from EFIH Direct Benefit Fees to Collective Benefit Fees, the ratio of EFH Direct Benefit Fees to EFIH Direct Benefit Fees changes and consequently the percentage allocation of Collective Benefit Fees between EFH and EFIH changes, entitling EFIH to further reimbursement.  (*See* 9/5/18 Trial Tr. at 85:22–109:5 (Husnick Test.) ("[I]f you move $1 million of time from EFIH into collective benefit . . . it creates a huge swing effect, because what you're doing is you're changing the ratio of direct benefit fees by a million, but then you multiply that times the entire collective benefit fee.  So, just moving a million dollars can have a massive swing.").)

134.    In addition, although all Kirkland timekeepers received the same guidance, a cursory review of individual Kirkland timekeepers' entries shows that despite their good-faith efforts, the Timekeeper Directive was not consistently applied with respect to allocating services between Direct Benefit Fees and Collective Benefit Fees.  For example, on September 19, 2016, one Kirkland timekeeper billed 4.6 hours addressing plan confirmation discovery issues to the EFIH Direct Benefit Fee matter code "[EFIH] Plan/Disclosure Statement" (*see* ELX-466, 2/15/17 Kirkland 8th Interim Fee Application [D.I. 10840-10] at 223), but only a couple of weeks later on October 3, 2016, that same timekeeper billed 6.7 hours spent addressing plan confirmation discovery issues with respect to the exact same plan to the Collective Benefit Fee project code "[All E-Side] Plan/Disclosure Statement" project code (*id.* at 362).

135.    Additionally, the evidence also shows that timekeepers made different subjective judgments regarding whether specific services were (a) primarily for a single Debtor and, thus,

billed as Direct Benefit Fees or (b) services for which the primary beneficiary was indiscernible or not clear and consequently billed as Collective Benefit Fees. For example, on September 16, 2016, one Kirkland timekeeper billed 2.6 hours for preparing an exhibit list for the NextEra Merger Agreement hearing to the Collective Benefit Fee matter code "[All] Contested Matters & Adv. Proceeding" (*id.* at 133), whereas on September 1, 2016, a second Kirkland timekeeper billed 2.1 hours spent reviewing and analyzing objections to the motion to approve the NextEra Merger Agreement and drafting a reply to the same to the EFIH Direct Benefit Fee matter code "[EFIH] Plan/Disclosure Statement" (*id.* at 167), notwithstanding that all of the objections to the NextEra Merger Agreement were filed by EFH unsecured creditors.

136.    While some subjective judgment in timekeeping is expected, implementation of the Timekeeper Directive resulted in EFIH bearing more than its fair share of the costs and expenses related to, among other things, asbestos matters and tax issues. It is undisputed that any asbestos claim would only be an allowed claim against EFH Debtors. (ELX-635, 2/27/18 Confirmation Order [D.I. 12763] Ex. A Art. III.A.1.) Thus, because those liabilities are solely the responsibility of EFH Debtors, the fees for such services would be expected to be EFH Direct Benefit Fees under the Timekeeping Directive because those services "principally" or "primarily" relate to liabilities of EFH, even if those services also benefitted EFIH with respect to claims administration, prosecuting a plan and disclosure statement, or some other matter. Nonetheless, Kirkland timekeepers billed their services related to clearly identifiable EFH asbestos matters as Collective Benefit Fees. (ELX-704, Rule 1006 Summary of Kirkland Time Entries Billed to "ALL" Matter Codes and Referring to "Asbestos," "Fenicle," and "Kazan"; 9/2/18 Rosenbaum Written Direct ¶ 50.) As a result, approximately $2.75 million in asbestos-related fees were allocated 90% to EFIH. (ELX-704, Rule 1006 Summary of Kirkland Time Entries Billed to

"ALL" Matter Codes and Referring to "Asbestos," "Fenicle," and "Kazan"; 9/2/18 Rosenbaum

Written Direct ¶ 50.)  While that amount is small relative to Kirkland's total fee request, if that

time were billed to an EFH Direct Benefit Fee matter code, the total allocation of the Collective

Benefit Fees would change dramatically:  EFIH's allocation of Collective Benefit Fees would be

reduced from approximately $74 million to approximately to $54 million, and EFH's allocation

of the Collective Benefit Fees would increase from approximately $9.8 million to approximately

$33 million (*i.e.*,  the "Reverse Swing Effect") (Movants' Closing Slides at 35–36.).  The EFH

estate would thus owe the EFIH estate approximately $20 million for excess fees paid on this

issue alone.

137.    Similarly, Kirkland timekeepers billed approximately $12.7 million in fees to the

Collective Benefit Fee matter code "Tax Issues" (Matter No. 29).  As set forth in Kirkland's final

fee application, EFIH, a disregarded entity for tax purposes, has been allocated nearly 90% of

those Collective Benefit Fee for "Tax Issues."  Had more than $2.7 million of this work been

billed as a Direct Benefit Fee to EFH, the only taxpayer liable to the IRS, EFIH would be entitled

to more than the $20 million it would be owed with respect to asbestos matters because of the

Reverse Swing Effect.

138.    Based on the above and the other evidence submitted, the Court cannot find that

the Direct Benefit Fees allocated to EFH and EFIH, respectively, are a proper allocation of the

actual and necessary expenses of the EFH and EFIH estates.  Instead, the Court finds that EFIH

has paid or is being requested to pay a substantial amount of the actual, necessary fees and

expenses for services rendered by Kirkland that preserved and enhanced the EFH estate,

warranting a reallocation of the EFIH Direct Benefit Fees to EFH billed by Kirkland.

     **F.**     **Kirkland's Allocation of Collective Benefit Fees Does Not Reflect the Actual and Necessary Expenses of the EFH and EFIH Estates.**

139.    The Court also cannot find that Kirkland's allocation of Collective Benefit Fees reflects the actual and necessary expenses of EFIH and EFH for the services provided in those matter codes for a number of reasons.

140.    First, as set forth above, certain of the EFIH Direct Benefit Fees billed by Kirkland should have been billed to Collective Benefit Fee matter codes. Had that occurred, the resulting ratio used for determining the allocation of the Collective Benefit Fees between EFH and EFIH would have been different.

141.    Second, as also found above, certain of the Collective Benefit Fees billed by Kirkland, such as fees related to asbestos matters and tax issues, should have been properly categorized as EFH Direct Benefit Fees under the Timekeeping Directive because they "principally" or "primarily" benefitted EFH, and thus should have been billed by Kirkland timekeepers as such, if Kirkland timekeepers were consistently applying their stated rule that the entity that had the liability should bear the costs, as the PAB asserts with respect to makewhole matters. (8/30/18 PAB's Final Submission [D.I. 13416] at 29–31.)

142.    The Court also finds that the asbestos and tax matters are not the only examples where the formulaic allocation methodology in the Interim Compensation Order and the timekeepers' subjective judgments resulted in an overstatement of Collective Benefit Fees and understatement of EFH Direct Benefit Fees. For example, approximately 88% of $4.9 million in fees was charged to EFIH for the Collective Benefit Fee matter code Retiree & Empl. Issues/OPEB (Matter No. 26) even though EFIH had few, if any, employees. And similarly, EFIH was charged approximately 88% of the fees and expenses with respect to the following Collective Benefit matter categories: (i) Plan and Disclosure Statements (Matter No. 21) in the

approximate amount of $35.2 million; (ii) Contested Matters & Adversary Proceedings (Matter No. 9) in the approximate amount of $45 million (including time spent addressing asbestos and Termination Fee issues); and (iii) Claims Administration & Objections (Matter No. 8) in the approximate amount of $3.9 million (including time spent addressing asbestos claims against EFH).  (ELX-659, 4/23/18 Kirkland Final Fee Application [D.I. 13019] at Ex. G.)  There is no basis in the record for the Court to find that the actual and necessary cost and expense to EFH for services performed in these matter categories was only approximately 12%, as application of the Direct Benefit Fee ratio in paragraph 2(b) of the Interim Compensation Order would require. Indeed, if only the fees for one of the above matters was moved to an EFH Direct Benefit Fee matter code, then EFH would not only be liable to EFIH for the amount of those Direct Benefit Fees, but would also have to bear a significantly higher percentage of the Collective Benefit Fees as a result of the Reverse Swing Effect.

143.    Third, using the methodology in the Interim Compensation Order for allocating Collective Benefit Fees for services rendered to the E-Side Debtors during the time period prior to October 2016, Kirkland allocated approximately 88% of its Collective Benefit Fees to EFIH and approximately 12% to EFIH.[22]  This disparity is significant, especially given that under the Timekeeper Directive the Kirkland timekeepers determined that EFIH was not the "principal" or "primary" beneficiary of Kirkland's services and, as between EFH and EFIH, the debtor beneficiary of the services was "not discernible or clear" to the Kirkland timekeeper.  (ELX-011, 5/5/14 Kirkland Timekeeper Directive at 7.)   On this basis alone, the Court may find that

---

[22]    Prior to October 2016, Kirkland allocated approximately $7.2 million of Collective Benefit Fees to EFH and $50.1 million to EFIH.  ELX-067, 10/31/14 Kirkland 1st Interim Fee Statement [D.I. 2683] at 19; ELX-127, 2/17/15 Kirkland 2nd Interim Fee Statement [D.I. 3569] at 19; ELX-178, 6/15/15 Kirkland 3rd Interim Fee Statement [D.I. 4773] at 20; ELX-227, 10/15/15 Kirkland 4th Interim Fee Statement [D.I. 6484] at 17; ELX-277, 1/21/16 Kirkland 5th Interim Fee Statement [D.I. 7708] at 19; ELX-333, 6/15/16 Kirkland 6th Interim Fee Statement [D.I. 8736] at 18; ELX-419, 10/17/16 Kirkland 7th Interim Fee Statement [D.I. 9844] at 19; ELX-429, 11/16/16 Kirkland 28th Monthly Fee Statement [D.I. 10181] at 4.

Collective Benefit Fees should be allocated equally between EFH and EFIH because neither EFH nor EFIH could be identified by a Kirkland timekeeper as the principal or primary beneficiary of the services.

144.    Similarly, after October 2016, Kirkland allocated 90% of its Collective Benefit Fees to EFIH and 10% of the Collective Benefit Fees to EFH, based solely on either the "corresponding debt amounts" or "the relative debt of EFH and EFIH."  (9/2/18 Husnick Written Direct ¶ 27; ELX-659, 4/23/18 Kirkland Final Fee Application [D.I. 13019] ¶ 33.)  During that time, however, Kirkland timekeepers nonetheless allocated their time to Collective Benefit Fee matter codes because the principal or primary beneficiary of such services was not discernible or clear.  Again, on this basis alone, the Court may find that Collective Benefit Fees should be allocated equally between EFH and EFIH because neither EFH nor EFIH was the primary beneficiary of the services and the relative debt of each entity does not reflect the actual benefit a debtor received from the services.

145.    Fourth, as Kirkland conceded, the methodology set forth in paragraph 2(b) of the Interim Compensation Order did not work, at least in certain circumstances.  In Kirkland's preliminary statement filed on June 29, 2018 in connection with the Allocation Motion (the "Kirkland Position Statement"), Kirkland states that "[w]ith limited Direct Benefit Fees, the methodology [in the Interim Compensation Order] did not work as applied."  (PAB-X703, 6/29/18 Kirkland Position Statement [D.I. 13255] ¶ 7.)  To illustrate, Kirkland provided an example involving a hypothetical month where Kirkland timekeepers billed $0 in EFH Direct Benefit Fees, $100 in EFIH Direct Benefit Fees, and $12,000 in Collective Benefit Fees.  (*Id.*) Using the Interim Compensation Order allocation methodology in the example, Kirkland notes, would result in EFIH paying 100% of the Collective Benefit Fees.  Kirkland states that "[i]n this

58

illustrative example, EFIH is paying a disproportionate share of Collective Benefit Fees incurred for the benefit of both EFH and EFIH." (*Id.*; *see* 9/2/18 Husnick Written Direct ¶ 28 ("Kirkland's original allocation methodology would have resulted in an inequitable allocation. . . . .").)

146.    In February 2016, before Kirkland changed its methodology for calculating Collective Benefit Fees, this exact inequitable situation occurred. In that month, Kirkland timekeepers billed $0 in EFH Direct Benefit Fees, $44,996.20 in EFIH Direct Benefit Fees, and $376,808.07 in E-Side Debtor Collective Benefit Fees. (ELX-312, 4/6/16 Kirkland 22nd Monthly Fee Statement [D.I. 8149] ¶ 2.) Applying the Interim Compensation Order's allocation methodology, Kirkland allocated 100% of those Collective Benefit Fees to EFIH in February 2016. (*Id.*)

147.    Finally, while the Court understands and appreciates why Kirkland changed its methodology for allocating Collective Benefit Fees in October 2016, it cannot find that allocating Collective Benefit Fees solely on the basis of the "corresponding debt amounts" or the "relative debt of EFH and EFIH" results in a proper allocation of the actual and necessary expenses of the EFH and EFIH. In fact, no evidence was submitted to demonstrate that using debt amounts would result in Collective Benefit Fees being allocated to reflect the actual and necessary expenses of the EFH and EFIH estates, and the Court finds no basis to make such a finding.

148.    Moreover, to the extent that the formulaic methodology set forth in paragraph 2(b) of the Interim Compensation Order resulted in allocations that Kirkland believed were inequitable and unfair, (ELX-659, 4/23/18 Kirkland Final Fee Application [D.I. 13019] ¶¶ 32–33), the matter should have been addressed with the Court. It was not, and the notice provided to

interested parties was not adequate.  In its monthly fee statements for June, July, August, and September 2016, Kirkland stated in a footnote to an exhibit that the amounts billed to three or four EFIH matter codes (the number varied based on the month) "are allocated 90% to EFIH and 10% to EFH Corp. reflecting the corresponding debt amounts."  (ELX-386, 8/5/16 Kirkland 26th Monthly Fee Statement [D.I. 9198] Ex. A n.1; ELX-387, 9/8/16 Kirkland 27th Monthly Fee Statement [D.I. 9498] Ex. A n.1; ELX-410, 10/10/16 Kirkland 28th Monthly Fee Statement [D.I. 9792] Ex. A n.1; ELX-429, 11/16/16 Kirkland 29th Monthly Fee Statement [D.I. 10181] Ex. A n.1.)  This footnote did not explain why this change was made given the terms of the Interim Compensation Order, why it was necessary with respect to any particular matter code, what debt amounts were used to calculate the 90/10 allocation, or why it was proper to use "corresponding debt amounts" to allocate the fees falling in those matter codes 90% to EFIH and 10% to EFH. (9/5/18 Trial Tr. at 77:9–78:6 (Husnick Test.).)

149.    Nor did the statement in Kirkland's final fee application filed on April 23, 2018 provide timely and adequate notice that following the Effective Date of the chapter 11 plan for the TCEH Debtors a year-and-a-half earlier (in October 2016), Kirkland deviated from the Interim Compensation Order and began allocating *all* Collective Benefit Fees 90% to EFIH and 10% to EFH based on "the relative debt at EFH and EFIH."  Kirkland used this 90/10 methodology to allocate all of its Collective Benefit Fees in each and every fee submission filed for October 2016 and thereafter.  (ELX-659, 4/23/18 Kirkland Final Fee Application [D.I. 13019].)  Yet, none of Kirkland's monthly or interim fee submissions filed for October 2016 or any subsequent period contained a statement that Kirkland made this change.  Nor did any monthly or interim fee applications explain the basis for Kirkland using this methodology for allocating Collective Benefit Fees as opposed to the methodology in the Interim Compensation

Order.  (*See* 9/5/18 Trial Tr. 105:12–24 (Husnick Test.) (the new methodology was never explained, but "by looking at the fees that were actually billed, if you divided them out . . .  you can determine that we were doing it on [a 90/10] basis").)  Moreover, Kirkland did not provide notice of this change to its allocation of Collective Benefit Fees to the Debtors' board or managers, the Fee Committee, the U.S. Trustee, or any other parties in interest.  (Husnick Dep. Tr. 86:11–22.)  Nor did Kirkland seek Court approval to modify or deviate from the Interim Compensation Order methodology for calculating Collective Benefit Fees, which required that "each Professional ***shall*** allocate" its fees and expenses in accordance therewith.  (Husnick Dep. Tr. 90:6–11; 9/5/18 Trial Tr. at 100:11–15 (Husnick Test.); PAB-X034, Interim Compensation Order [D.I. 2066] ¶ 2(b) (emphasis added).)

150.    Additionally, the evidence presented does not provide the Court with a basis on which to determine the debt amounts that Kirkland used to allocate all of its Collective Benefit Fee matter codes in and after October 2016.  The Kirkland final fee application states that after October 2016, it allocated 90% of the Collective Benefit Fees to EFIH and 10% to EFH because, "before accounting for that certain EFIH second lien paydown in mid-2015, EFIH had approximately $12.36 billion in debt as compared to approximately $1.42 billion in debt at EFH—in other words, EFIH carried approximately 90% of the debt load across the EFH/EFIH Debtors."  (ELX-659, 4/23/18 Kirkland Final Fee Application [D.I. 13019] ¶ 33.)  Kirkland's final fee application does not, however, provide any source for those debt figures or the date used for calculating the debt figures.

151.    Nor was Kirkland's representative adequately able to explain the basis for the debt burden ratio, testifying that "I don't recall what numbers we used" to calculate the relative debt, but that he "would imagine" that Kirkland used debt amounts "as of the petition date."

Kirkland's representative further testified that if he were asked to calculate the relative debt burden, he believed the Petition Date debt would be the proper benchmark.  (9/5/18 Trial Tr. at 102:13–103:7 (Husnick Test.).)  However, the evidence demonstrates that Petition Date debt was not in fact used.  As set forth in Mr. Keglevic's First Day Declaration, as of the Petition Date, "EFH Corp. and EFIH had outstanding funded indebtedness of approximately $1.929 billion at EFH Corp. and approximately $7.709 billion at EFIH," which calculates to a debt ratio as between EFIH and EFH of approximately 80% to 20%.  (AHX-007, 4/29/14 Keglevic Decl. ¶ 82.)  Moreover, although Kirkland's counsel stated at the trial that the 90/10 debt ratio used for allocating Collective Benefit Fees was based on indebtedness as of October 3, 2016 of $7.71 billion at EFIH and $0.65 billion at EFH (9/7/18 Trial Tr. 237:14–16 (PAB Closing); PAB Closing Slides at 28), these amounts were not previously disclosed and are inconsistent with the amounts set forth in Kirkland's final fee application.  And if October 3, 2016, were the proper date, there has been no explanation as to the 90/10 allocation of specific matter codes in the prior months of June, July, August, and September when the 90/10 allocation was based on the "corresponding debt amounts."

### G.    Evercore's Allocations Do Not Reflect the Actual and Necessary Expenses of the EFH and EFIH Estates.

152.    Unlike Kirkland, Evercore did not send any communication to its timekeepers explaining how to distinguish between Direct Benefit Fees and Collective Benefits Fees, thereby leaving it entirely to the subjective judgment of each Evercore timekeeper.  (*See* Matican Dep. Tr. at 53:10–17 ("Q. Are you aware of any specific document that Evercore created that provided direction or instruction to its professionals on how to allocate their time? A. No.").)

153.    That judgment led to individual timekeepers using inconsistent classifications and inconsistencies between different timekeepers.  A review of Evercore's time entries shows that

the same timekeepers entered different classifications (Direct or Collective) for the same or similar tasks.  (*See, e.g.*, ELX-437, 12/6/16 Evercore 7th Interim Fee Application [D.I. 10323-2] (one Evercore timekeeper who inconsistently listed "valuation" time entries under both "EFIH" and "All" Debtors).)  A review of Evercore's time entries also shows that different timekeepers entered different classifications (Direct or Collective) for the same or similar tasks.  (*Compare* ELX-437, 12/6/16 Evercore 7th Interim Fee Application [D.I. 10323-2] (two Evercore timekeepers who listed all "valuation" time entries under "EFIH") *with id.* (two other Evercore timekeepers who listed all "valuation" time entries under "All" Debtors).)

154.    Additionally, although Evercore's representative stated that the proper interpretation of "Direct Benefit Fees" would be those fees for services that were "solely" for the benefit of a particular Debtor (Matican Dep. Tr. at 23:7–11), Evercore did not communicate that standard.  Nor did its timekeepers actually apply it.  For example, in Evercore's Seventh Interim Fee Application for the period of May 1, 2016 through August 31, 2016, two individual timekeepers recorded more than 97% of their total hours (133.5 hours out of 137.5 hours) as Direct Benefit Fees to EFIH.  (ELX-437, 12/6/16 Evercore 7th Interim Fee Application [D.I. 10323-2] at 9–10, 15.)  The EFIH Direct Benefit Fees included numerous entries such as "EFH Asbestos Call," (*id*. at 9) "EFH Tax Call," (*id.*) "EFH Valuation Discussion," (*id.*) "Tax Discussion," (*id*. at 15) and "Valuation Discussion," (*id*. at 15) which cannot reasonably be found to be solely, or even primarily, to preserve the EFIH estate.

155.    Additional examples of time improperly allocated solely to EFIH as Direct Benefit Fees include entries for (i) "EFIH/EFH analysis," (ELX-071, 11/4/14 Evercore 1st Interim Fee Application [D.I. 2700] at 42) (ii) "Analysis for EFH/EFIH contingencies," (*id*. at 58) (iii) "Call with K&E/A&M/EVR re: requests from EFIH and EFH unsecured indenture trustees,"

(*id*. at 43) (iv) "Listened to UMB and AST calls," (*id*. at 59.) (v) "Call with advisors to EFH and EFIH Unsecured trustee," (*id.* at 27) and (vi) "Call with Company and K&E tax re. alternate EFH/EFIH structures." (*id*.) Each of these examples is contained in a single Evercore interim fee application. (*Id.*)

156.    Evercore's proposed allocation of the Evercore Transaction Fees also does not reflect the actual and necessary expenses of EFH and EFIH. With respect to the $11 million DIP Financing Fee, Evercore acknowledged that the post-petition financing approved in these cases benefitted both EFH's and EFIH's respective estates, yet Evercore did not allocate any of the DIP Financing Fee to EFH, instead allocating it entirely between TCEH and EFIH. (*See* Matican Dep. Tr. at 68:14–69:7 (acknowledging that the DIP facilities benefitted EFH by providing it time to pursue an M&A transaction, and that "[t]he DIP facilities assisted in financing the case, and the case encompassed all three estates"); AHX-242, 5/24/18 Evercore Final Fee Application [D.I. 13140].) In light of this admission, the Court cannot find that EFH should not bear any of Evercore's DIP Financing Fee.

157.    As for the $35 million Restructuring Fee and the $9 million Sale Fee, both of which were triggered upon consummation of the Sempra Plan, Evercore allocated those fees 76% and 70%, respectively, to EFIH based on Evercore's total hours billed to each estate. (AHX-242, 5/24/18 Evercore Final Fee Application [D.I. 13140].) The Court cannot find, however, that EFIH should be responsible for 70% or more of the Restructuring Fee and the Sale Fee, given the facts and circumstances regarding the Sempra transaction and the role played by Evercore with respect to that transaction, and the fact that Evercore's efforts much earlier, when EFIH was thought to be solvent, had a significant bearing on Evercore earning both the Restructuring Fee and the Sale Fee.

## CONCLUSIONS OF LAW

### I.  JURISDICTION AND VENUE.

158.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, paragraph 72 of the Confirmation Order, and Article XI of the Sempra Plan.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### II.  NEXTERA TERMINATION FEE CLAIMS.

#### A.  Adjudication of the NextEra Termination Fee Claims is Ripe.

159.  As a preliminary matter, adjudication of the proper allocation of the NextEra Termination Fee Claims is not moot in light of the Third Circuit's September 13, 2018 ruling affirming this Court's Reconsideration Order.  Rather, the proper allocation of the NextEra Termination Fee Claims is an actual controversy that is ripe for judicial adjudication.  *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (explaining that the rationale of the ripeness requirement is "to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements").  Though the Third Circuit has affirmed this Court's Reconsideration Order, NextEra has stated on the record that it intends to move for a rehearing of the Third Circuit's decision, "both before the panel and en banc."  (*See* 9/18/18 Hr'g Tr. at 7:14–15.)  NextEra has also appealed the Court's dismissal of the NextEra Reimbursement Claim.  Accordingly, allocation of the NextEra Termination Fee Claims is not an "abstract disagreement" but remains an actual controversy ripe for judicial adjudication.

65

160.    Additionally, even if NextEra's motion for rehearing is unsuccessful and NextEra does not file a petition for a writ of certiorari with the U.S. Supreme Court, the PAB established the NextEra Plan Reserve on account of the disallowed Termination Fee, which reserve can only be released following entry of a Court order that has not been stayed or otherwise pursuant to paragraph 154 of the Confirmation Order.  The NextEra Plan Reserve precludes the PAB from distributing cash in excess of $275 million to the unsecured creditors of EFH and EFIH because of the unresolved allocation of the NextEra Termination Fee Claims and the PAB's uncertainty as to which estate (EFH, EFIH, or both) will ultimately need to pay for the Termination Fee if it becomes allowed.  Thus, a determination as to the proper allocation of the NextEra Termination Fee Claims is necessary so that the PAB can at least release amounts in excess of the $275 million required to pay NextEra in the event that any appeal of the Reconsideration Order is successful.

**B.     The NextEra Termination Fee Claims Shall Be Allocated 50% to EFH and 50% to EFIH.**

161.    To qualify as administrative expenses of a particular debtor, the expenses must be the "actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A); *In re Trans World Airlines, Inc.*, 145 F.3d 124, 136 (3d Cir. 1998) ("[A]dministrative expenses are allowable only for the actual, necessary costs and expenses of preserving the estate." (internal quotations omitted).)

162.    In assessing whether an expense "preserved" an estate, courts look to the date on which the expense was incurred.  *See In re Hechinger Inv. Co. of Del.*, 298 F.3d 219, 225 (3d Cir. 2002) ("Section 503(b)(1)(A) does not give administrative priority to wages, salaries, or commissions due to be paid after the commencement of the case.  It looks to the time when the services were rendered not when they were scheduled for payment" (internal quotation marks

66

and emphasis omitted)); *see also In re Commercial Fin. Servs., Inc.*, 246 F.3d 1291, 1295 (10th

Cir. 2001) (to determine administrative priority, courts look to "when the acts giving rise to a

liability took place, not when they accrued")

163.    Here, the Ad Hoc EFH Claimants argue that the proper date on which to analyze

the benefit of the Termination Fee is "when the replacement transaction that led to the

[T]ermination [F]ee was triggered."  (9/7/18 Trial Tr. at 188:25–189:6.)  The Court disagrees.

The Termination Fee was approved as an administrative expense on September 19, 2016 and,

thus, became a potential liability of EFH and EFIH as of that date.  The NextEra Merger

Agreement was also approved on that same date; as a result, any liability with respect to the

NextEra Reimbursement Claim or expenses NextEra purportedly incurred in furtherance of the

NextEra Merger Agreement also accrued as of that same date.  Therefore, the allocation of the

NextEra Termination Fee Claims must be determined based on the facts and circumstances as

they existed on September 19, 2018.

164.    Viewed as of September 19, 2016, and assuming that the Termination Fee

provided an actual benefit despite the Court's finding otherwise (*see* ELX-569, Reconsideration

Opinion [D.I. 11998] at 31; 8/1/18 Opinion [D.I. 13332] at 23, 28), the NextEra transaction was

intended to preserve and would have provided substantial benefits to ***both*** EFH and EFIH.  The

uncontested facts establish that the Termination Fee was increased from $110 million to $275

million during the course of negotiations that included NextEra: (i) increasing the cash purchase

price to provide for the expected payment in full of all EFIH creditors with additional

consideration flowing to the benefit of EFH unsecured creditors; (ii) agreeing to drop its match

right which the E-Side Debtors believed would enhance the likelihood of competitive bidding

and, thus, potentially provide additional recoveries for EFH unsecured creditors; and (iii)

agreeing to assume and reinstate all asbestos liabilities against EFH in exchange for $250 million of the purchase price that otherwise would have been paid in cash to the EFH and EFIH Debtors being held in reserve for such liabilities.

165.    The Ad Hoc EFH Claimants contend that the resolution of the Makewhole Claims was an important consideration for the E-Side Debtors at the time they requested the Court to approve the Termination Fee and defer any allocation of the Termination Fee until a later date. (*See* 9/5/18 Trial Tr. at 22:7–12 (Ad Hoc EFH Claimants' counsel: "[T]he boards of directors, the Disinterested Boards of Directors specifically took the point about determining whether this was an approvable transaction on the basis of the make wholes being disallowed as they sat at that time, or on the make wholes being ultimately allowed.").)  There is no evidence to support this conclusion.  To the contrary, the uncontested facts establish that the E-Side Debtors and their Disinterested Directors supported Court approval of the Termination Fee and deferring its allocation, knowing that an appeal to the Court's Makewhole Rulings was pending but believing that the risk of reversal was minimal.  Indeed, if the outcome of the Makewhole Claim litigation was the basis for deferring the allocation of the Termination Fee, the E-Side Debtors' counsel would have made this clear on the record at the NextEra Sale Hearing and the allocation issue would have been addressed at the NextEra Confirmation Hearing.  Neither occurred.  To the contrary, Debtors' counsel emphasized that the "gets" from NextEra were expected to quadruple EFH unsecured creditor recoveries and did not even mention the oral argument scheduled eight days later.

166.    The Ad Hoc EFH Claimants also contend that, because EFH ultimately received no cash consideration under the NextEra transaction or Sempra transaction, EFH should only pay a small fraction (or none) of the Termination Fee.  (8/30/18 Ad Hoc EFH Claimants' Final

Submission [D.I. 13415] at 30.)    The Court disagrees.    Again, the Court must assess the allocation of the Termination Fee based on the facts and circumstances as they existed on September 19, 2019, and as of that date, the EFH unsecured creditors were the intended beneficiaries of projected cash consideration.    Indeed, if reviewed in hindsight as the Ad Hoc EFH Claimants request (*id.* at 25–26), no party received any actual consideration or benefit from the NextEra transaction because it was not approved by the PUCT and could not close.

167.    Moreover, the Ad Hoc EFH Claimants' only support for their assertion that the Termination Fee should be allocated pro rata across each dollar of transaction consideration is the testimony from their proffered expert, Mr. Steven Strom.    The Court accords Mr. Strom's testimony no weight.    (*Cf.* PAB Closing Slides at 17 ("Mr. Strom's testimony is not credible and not appropriate expert testimony."); *see also supra* Findings of Fact II.G.)    As this Court has determined, as of September 19, 2016, EFH was the intended beneficiary of significant cash, which fact Mr. Strom did not consider.    In addition, there is simply no requirement that a termination fee be allocated among debtors only in proportion to the cash consideration that each particular debtor's creditors would receive under the transaction.    Instead, the Court must review all of the benefits each Debtor was expected to receive as of September 19, 2016 had the NextEra transaction been consummated.

168.    In sum, viewed as of September 19, 2016, the NextEra Merger Agreement was expected to provide significant financial and other benefits for both the EFH and EFIH estates. Based on the foregoing and having considered the positions of the parties and the evidence in the record, it is just and proper for the Termination Fee to be allocated 50% to EFH and 50% to EFIH.

C.    **The NextEra Reimbursement Claim (to the Extent it Becomes Allowed) Shall Be Allocated 50% to EFH and 50% to EFIH.**

169.    The Court's allocation of the NextEra Termination Fee Claims is based on the evidence adduced and arguments proffered by the Parties at the Hearing.  Both the $275 million Termination Fee and the approximately $60 million NextEra Reimbursement Claim were asserted by NextEra as administrative expenses arising out of this Court's approval of the NextEra Merger Agreement.  (*See* ELX-625, NextEra Reimbursement Application [D.I. 12671] ¶ 36 ("NextEra is entitled under Section 503(b)(1)(A) of the Code to an administrative claim for its expenses incurred in attempting to close on the Merger Agreement."); *id.* ¶ 4 ("The Merger Agreement would become enforceable against the Debtors only upon an Approval Order by the Bankruptcy Court.").)

170.    Movants' Allocation Motion expressly requested the Court allocate all administrative expense claims filed by NextEra, including the $60 million NextEra Reimbursement Claim.  (*See* ELX-670, 5/13/18 Allocation Motion [D.I. 13102] at 4 (defining "NextEra Termination Fee Claims" as "[a]ny administrative claim asserted by NextEra related to the NextEra Termination Fee, the NextEra Reimbursement Claim (as defined below), or any reserve established with respect thereto, including the NextEra Plan Reserve").)

171.    The Ad Hoc EFH Claimants were on notice of Movants' position and had the opportunity to distinguish between allocation of the Termination Fee and the NextEra Reimbursement Claim.  The Ad Hoc EFH Claimants did not present any evidence or proffer any arguments distinguishing between allocation of the Termination Fee and the NextEra Reimbursement Claim.  Accordingly, this Court finds that there is no basis to reopen the record or consider additional evidence *ex post facto* that may be submitted by the Ad Hoc EFH Claimants.

172.    The Ad Hoc EFH Claimants also contend that the allocation of the NextEra Reimbursement Claim is not ripe or justiciable.  The Court disagrees.  First, the PAB has the obligation to establish appropriate reserves under the Sempra Plan, and addressing the amount, if any, that should be reserved on account of the disallowed NextEra Reimbursement Claim permits the PAB to do so and still make distributions to the EFH and EFIH unsecured creditors. These distributions have already been delayed for approximately six months.  Second, NextEra requested the Court to approve a reserve for this claim at the Sempra Confirmation Hearing, which the Court denied.  There is a motion pending before the Court seeking to release the NextEra Plan Reserve, and if the Court approves that motion, NextEra will undoubtedly again request that the Court reserve an amount for the disallowed NextEra Reimbursement Claim. Third, NextEra has appealed this Court's order disallowing the NextEra Reimbursement Claim, and that order is not final and remains subject to reversal. Thus, the Court concludes that for these and other reasons an allocation of the NextEra Reimbursement Claim is ripe and necessary to effectuate the terms of the Sempra Plan. *Abbott Labs*, 387 U.S. at 148.

173.    As to the NextEra Reimbursement Claim itself, NextEra alleges that the expenses comprising the NextEra Reimbursement Claim were incurred between execution of the NextEra Merger Agreement and the date the NextEra Merger Agreement was terminated, and were incurred in furtherance of NextEra's efforts to close on the NextEra Merger Agreement.  (*See* ELX-625, NextEra Reimbursement Application [D.I. 12671] ¶¶ 36, 43.)  Accordingly, to the extent the NextEra Reimbursement Claim is allowed, any expenses incurred by NextEra must be allocated based upon the perceived benefits from the NextEra transaction viewed as of the date this Court approved the NextEra Merger Agreement. *See Hechinger*, 298 F.3d at 225.  Thus, the

71

NextEra Reimbursement Claim, to the extent it becomes allowed, should be allocated in the same proportion as the Termination Fee—50% to EFH and 50% to EFIH.[23]

## III.    ELLIOTT SUBSTANTIAL CONTRIBUTION CLAIM.

### A.    Any Allowed Elliott Substantial Contribution Claim Shall Be Allocated 30% to EFH and 70% to EFIH.

174.    Section 503(b)(3)(D) of the Bankruptcy Code grants administrative expense status for the "actual, necessary expenses" incurred by a creditor "in making a substantial contribution in a case under chapter 9 or 11 of this title."  11 U.S.C. § 503(b)(3)(D).  In addition, section 503(b)(4) of the Bankruptcy Code allows administrative expenses for "reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable" under section 503(b)(3)(D) of the Bankruptcy Code and reimbursement for "actual, necessary expenses incurred by such attorney or accountant."  11 U.S.C. § 503(b)(4).

175.    In *Lebron v. Mechem Financial Inc.*, the Third Circuit adopted the substantial contribution test articulated by the Tenth Circuit:  "In determining whether there has been a 'substantial contribution' pursuant to section 503(b)(3)(D), the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors."  27 F.3d 937, 944 (3d Cir. 1994) (quoting *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988)); *see also In re Tropicana Entm't LLC*, 498 Fed. App'x. 150, 152 (3d Cir. 2012).

176.    An applicant for a substantial contribution claim must "show a 'causal connection' between the service and the contribution."  *In re Worldwide Direct, Inc.*, 334 B.R. 112, 121–22

---

[23]    As found by this Court in its August 1, 2018 opinion, NextEra is not a creditor of the Debtors and, therefore, is precluded from obtaining a substantial contribution claim under section 503(b)(3)(D) of the Bankruptcy Code.  (*See* ELX-690, 8/1/18 Opinion [D.I. 13332] at 25–26.)  Accordingly, the Court is not evaluating the NextEra Reimbursement Claim with the benefit of hindsight.  NextEra appealed this Court's order granting Movants' motion to dismiss and for summary judgment on the NextEra Reimbursement Application, but NextEra's statement of issues filed on August 29, 2018 does not indicate that NextEra is appealing this Court's finding that NextEra was not a creditor.  (8/29/18 NextEra Statement of Issues and Designation of the Record [D.I. 13406].)

(Bankr. D. Del. 2005); *see also Lebron*, 27 F.3d at 944 (an applicant should be reimbursed for fees and expenses where its efforts have "foster[ed] and enhance[d] . . . the progress of reorganization").  It is appropriate for the Court to assess the reasonableness of substantial contribution claims with the benefit of hindsight. *See Worldwide Direct*, 334 B.R. at 121.

177.    Elliott's most significant contributions in these cases are its efforts in connection with (a) helping move the estates towards an alternative restructuring after the PUCT denied the application for regulatory approval of the NextEra merger transaction, (b) opposing the Berkshire merger transaction and helping facilitate and negotiate the Sempra transaction, which provided the E-Side Debtors' estates with $450 million more in consideration than the Berkshire proposal, and (c) obtaining reconsideration of the $275 million Termination Fee.  These are also the categories in which Elliott expended the most resources, with approximately 90% of the fees and expenses comprising the Elliott Substantial Contribution Claim falling within these three categories.

178.    Elliott's efforts are causally connected to benefits received not only by EFIH but also by EFH.  Although EFH may not have received significant additional identifiable cash consideration as a result of Elliott's efforts, Elliott's pursuit of alternative transactions, its support of the Sempra Plan, and its  prosecution of the Reconsideration Motion preserved the EFH estate by, among other things, preserving the cash EFH has available to distribute to EFH unsecured creditors in the approximate amount of $205 million, avoiding "Tax Armageddon" by supporting a tax-free restructuring transaction, providing for the reinstatement of all asbestos liabilities, and preserving the TCEH Turnover Distribution and the EFH Beneficiary Settlement. These same efforts also enabled EFH to retain sufficient cash to pay its administrative claims in full.

179.    Additionally, Elliott's efforts in connection with the Oncor Dividend Settlement and resolution of the Vistra tax dispute preserved the EFH estate for the benefit of EFH unsecured creditors by not only securing a dividend payment for EFH, but also helping EFH to avoid potentially costly tax litigation regarding its obligations to Oncor or Oncor Electric Delivery Holdings Company LLC and achieve resolution of a dispute with Vistra that had implications for EFH's tax attributes.  (8/30/18 PAB's Final Submission [D.I. 13416] ¶¶ 19–20.)

180.    Based on the foregoing and having considered the positions of the parties and the evidence in the record, it is just and proper for the Elliott Substantial Contribution Claim to be allocated 30% to EFH and 70% to EFIH.

## IV.  MOVANTS TIMELY OBJECTED TO PROFESSIONAL FEE ALLOCATIONS AND THE RSA DOES NOT BAR MOVANTS FROM OBJECTING TO SUCH ALLOCATIONS.

181.    The Court now turns to Movants' requested allocations of professional fees.  It first addresses the PAB's threshold contention that Movants have waived their right to request an allocation of the E-Side Committee Professional Fees and the Kirkland and Evercore Fees because they did not object to the monthly or interim fee submissions filed by the E-Side Committee's Professionals and Kirkland and Evercore.  (8/30/18 PAB Final Written Submission [D.I. 13416] ¶ 31; 9/5/18 Trial Tr. at 66:1–21 (Husnick Test.).)  The Court disagrees with the PAB's argument for several reasons.

182.    First, the Interim Compensation Order expressly provided that "[a]ll fees and expenses paid to Professionals under the Compensation Procedures (including, for the avoidance of doubt, the allocation of such fees and expenses among the Debtors) are subject to challenge and disgorgement until final allowance by the Court."  (PAB-X034, 9/16/14 Interim Compensation Order [D.I. 2066] ¶ 4.)  And the evidence shows that this provision was intended to permit parties to review allocations after some time passed.  (*See* Husnick Dep. Tr. at 21:8–19

("[F]olks requested that there be a reservation of rights in the interim compensation order that allowed people to revisit how allocations shook out at any particular time.").)

183.     Second, the Confirmation Order specifically reserved for this Court all allocation issues and did not establish a deadline for filing objections to those allocation issues.  In fact, it contemplated the PAB presenting the allocation issues to the Court.  (ELX-635, 2/27/18 Confirmation Order [D.I. 12763] ¶ 152.)  In any event, to the extent there was any deadline for objecting to professionals' proposed allocations, the Movants' Allocation Motion, which was filed on May 13, 2018, met such deadline.  The Allocation Motion was filed before the final fee application objection deadlines set by Kirkland (May 15, 2018), Evercore (June 15, 2018), and Guggenheim (May 14, 2018), and all E-Side Committee professional fee applications except for Montgomery, which set a May 11, 2018 objection deadline.  (ELX-658, 4/20/18 Montgomery Final Fee Application [D.I. 12986].)  Montgomery is, moreover, not prejudiced in any way by the Court reallocating Montgomery's fees and expenses, since a reallocation does not affect the ultimate amount of fees and expenses to be paid to Montgomery.

184.     Third, as the evidence demonstrates, Kirkland made certain changes to the allocation methodology that were not disclosed until it filed its final fee application, which notice was not adequate or proper and, consequently, could not preclude Movants from seeking their proposed allocation.

185.     Fourth, the Court finds that no party in interest, including the PAB, Kirkland, Evercore, or the E-Side Committee professionals, has been prejudiced by Movants' filing.  Those Professionals that actually proposed an allocation have recognized throughout these cases that their allocations were not binding and were subject to review and reallocation.  (*See*, *e.g.*, ELX-240, 10/28/15 Evercore 16th Monthly Fee Application [D.I. 6734] ¶¶ 3–4 (stating that

Evercore's proposed allocations are "tentative" and that "reallocation may be required"); ELX-652, 4/18/18 Kirkland 12th Interim Fee Application [D.I. 12961] ¶ 27 (stating that Kirkland's allocation is "proposed"); ELX-613, 2/15/18 Guggenheim 38th Monthly Fee Statement [D.I. 12644] ¶ 4 (stating that "[t]o the extent necessary, reallocation of the fees and expenses set forth above will occur in interim and/or final fee applications").)  Moreover, prior to the Sempra Confirmation Hearing it appeared that the Disinterested Directors were addressing these matters, but in any event, Movants have made known their intention to seek an allocation of Professionals' fees since before the Sempra Confirmation Hearing. (*See, e.g.*, PAB-X629, 2/22/18 Horton Decl. ¶ 14 ("Because allocation inherently involves a negotiation and settlement between the two estates, it is a Conflicts Matter and the Disinterested Directors and Manager of EFH and EFIH and their advisors are engaged in negotiations and are consulting with key constituencies.").)

186.    The Ad Hoc EFH Claimants also ask this Court to conclude that Elliott and perhaps UMB are precluded from seeking reallocation of Kirkland's and Evercore's fees under paragraph 2(b) of the Interim Compensation Order because York Capital Management, where Mr. Rosenbaum was previously employed, was a member of an *ad hoc* committee that entered into the RSA, and the RSA provided for an allocation methodology substantially similar to that set forth in the Interim Compensation Order.  (*See* 8/30/18 Ad Hoc EFH Claimants' Final Submission [D.I. 13415] ¶ 85.)  The Court disagrees.  While the RSA was apparently the source of some of the language in paragraph 2(b) of the Interim Compensation Order, the Court concludes that the Movants are not precluded from seeking a reallocation of professional fees and expenses that resulted from the implementation of paragraph 2(b) of the Interim Compensation Order for at least four reasons.

187.    First, the RSA was never approved by the Court and was terminated by the Debtors.  (*See* ELX-024, 7/25/14 Debtors' Notice of Termination of the RSA [D.I. 1697].) Second, neither Elliott nor UMB was a party to the RSA, and there is no basis to find that they were or are somehow bound thereby. Third, the section of the RSA containing the allocation language at issue expressly provided that it was subject to any orders entered by the Court regarding professional fees and compensation, and the Interim Compensation Order contains such an exception.  (*See* PAB-X022, 4/28/14 Restructuring Support Agreement [D.I. 505-2] Ex. A at 25 ("After the Petition Date, all payment of Professional Fees, including any allocation formula, shall be subject to any applicable orders of the Bankruptcy Court."); PAB-X034, 9/16/14 Interim Compensation Order [D.I. 2066] ¶ 4.) (providing that each professional's proposed allocation of fees and expenses is "subject to later challenge and disgorgement until final allowance by the Court").)   Fourth, the RSA had a number of other limitations and agreements regarding professional fees, reflecting that the above language was part of the gives and gets of the contemplated transaction and cannot be viewed in isolation.   The RSA contemplated an entirely different restructuring transaction and timetable than that which transpired in these Bankruptcy Cases.   (*See* PAB-X022, 4/28/14 Restructuring Support Agreement [D.I. 505-2] § 8.01(f) (requiring entry of a confirmation order within 275 days after the Petition Date) and Ex. A (describing the proposed restructuring transactions); 9/7/18 Trial Tr. at 18:23–23:21 (Rosenbaum Test.) (describing the restructuring transactions contemplated by the RSA and the timetable with respect thereto).)

## V.    E-SIDE COMMITTEE PROFESSIONAL FEES.

### A.    The E-Side Committee Professional Fees Shall Be Allocated 70% to EFH and 30% to EFIH.

188.    Courts may award "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses."  11 U.S.C. § 330(a)(1).  Fees of retained professionals must be reasonable and necessary to the administration of the particular debtor's case at the time the services were rendered.  *See* 11 U.S.C. § 330(a)(3)(C) (an award for fees is made for services "beneficial at the time at which the service was rendered.")

189.    The fee and expense approval process must be done on a debtor-by-debtor basis, and professional fees and expenses that are not incurred for the benefit of a particular debtor should not be paid out of the estate of such debtor.  *See In re Eagle Creek Subdivision, LLC*, No. 08-04292-8-JRL, 2009 WL 313383, at *3 (Bankr. E.D.N.C. Feb. 5, 2009) ("Section 330(a) of the Bankruptcy Code allows for the payment of professionals' fees that are necessary or beneficial to the case in which they are incurred.  11 U.S.C. § 330(a).  It follows that each case must stand on its own when determining the allocation of professionals' fees among parallel debtors."); 3 COLLIER ON BANKRUPTCY § 330.04[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ("Expenses are deemed 'actual' when they are in fact incurred rather than based upon guesswork, formula or pro rata allocation, and when they are obviously attributable to a bankruptcy client.")

190.    A bankruptcy court has an independent "*duty* to review fee applications, notwithstanding the absence of objections."  *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 841 (3d Cir. 1994) (emphasis in original).  To conserve judicial resources, however, "the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled."  *Id.* at 845.

78

191.    The Ad Hoc EFH Claimants (but not the PAB) contend that this Court should "afford the appropriate business judgment deference" to the E-Side Committee's professionals' allocations.  (8/30/18 Ad Hoc EFH Claimants' Final Submission [D.I. 13415] at 3.)  The Ad Hoc EFH Claimants cite no authority in support of this contention, and no such deference is warranted.  First, the Court has an independent duty to review fee applications and, thus, while it may certainly consider how the professionals allocated their fees, it is not proper for the Court to simply defer to the judgment of professionals, including with respect to the allocation of fees and expenses as between or among multiple estates.  That is especially true with respect to the Professional fees of the E-Side Committee.  None of the E-Side Committee Professionals complied with the terms of the Interim Compensation Order.  Three of the four E-Side Committee Professionals (Sullivan, Montgomery, and AlixPartners) did not allocate their fees and expenses, and the fourth (Guggenheim) suggested an allocation of 50% to EFH and 50% to EFIH with respect to its Monthly Fees, without any justification, and did not propose any allocation of its Transaction Fee.   No independent third party—not the E-Side Debtors, their Disinterested Directors, nor the Fee Committee—reviewed the E-Side Committee Professionals' proposed allocations during the course of these cases.  And the PAB, which is charged with paying any allowed professional fees, has also requested that the E-Side Committee Professional Fees be reallocated.

192.    In allocating the E-Side Committee Professional Fees, the Court recognizes that the E-Side Committee served as a fiduciary for all unsecured creditors of EFH and EFIH; however, when determining the actual and necessary expenses of the EFH and EFIH estates, this Court cannot ignore that the E-Side Committee's work streams during the Bankruptcy Cases were targeted at preserving and possibly enhancing value for the EFH estate.

193.     Perhaps the E-Side Committee's most significant contribution to these cases was its negotiation of the EFH Beneficiary Settlement, which was made possible by the E-Side Committee's ardent opposition to the Global Settlement.  The EFH Beneficiary Settlement resolved the E-Side Committee's objections to the Global Settlement and Hunt Plan, but its provisions were for the primary benefit of EFH creditors.

194.     The EFH Beneficiary Settlement provided for reinstatement of EFH Class A3 claims (all of which are asbestos claims against EFH) and preserved 100% recoveries for holders of EFH Class A5, A8, and A9 claims through the TCEH Turnover Distribution.  The EFH Beneficiary Settlement did not provide any similar reinstatement or enhanced recoveries for any class of EFIH unsecured creditors.

195.     In addition, the E-Side Committee acknowledged that its opposition to the Global Settlement was concerned primarily with what it viewed as the "fulcrum" class of EFH unsecured creditors because the E-Side Committee took "as a premise that all EFIH creditors will be paid in full in priority to EFH creditors."  (ELX-235, 10/23/15 E-Side Committee Trial Brief and Omnibus Objection [D.I. 6627] at 34 n.4.)  The fact that the E-Side Committee was operating under this presumption in its efforts leading up to the EFH Beneficiary Settlement is significant because the vast majority of each E-Side Committee professional's services were rendered prior to this Court's approval of the EFH Beneficiary Settlement.[24]

196.     Further, although the Guggenheim Transaction Fee did not become payable until consummation of the Sempra merger transaction, Guggenheim's role was significantly reduced in these cases after the Court approved the EFH Beneficiary Settlement.  Accordingly, in determining an appropriate allocation of the Guggenheim Transaction Fee, it is appropriate for

---

[24]     As discussed above, approximately 89% of Sullivan's fees, 83% of Montgomery's fees, 97% of AlixPartners' fees, and 76% of Guggenheim's hours were incurred or expended, as applicable, prior to December 1, 2015 when EFIH unsecured creditors were projected to receive a full recovery on their claims.

this Court to consider the efforts of Guggenheim in connection with a restructuring transaction in these cases and the time period when such efforts were expended.  As noted above, Guggenheim's efforts were expended during a time period when EFIH creditors were expected to be paid in full under the various proposed restructuring transactions.

197.    Accordingly, based on the foregoing and having considered the positions of the parties and the record in this matter, it is just and proper for the allowed professionals fees and expenses of the E-Side Committee, including the Guggenheim Transaction Fee (to the extent allowed), to be allocated 70% to EFH and 30% to EFIH.

## VI.    KIRKLAND AND EVERCORE FEES.

### A.    The Kirkland and Evercore Fees Shall Be Allocated 50% to EFH and 50% to EFIH.

198.    The applicable law discussed above governing the E-Side Committee Professional Fees applies with equal force to the Kirkland and Evercore Fees.  Notably, the Kirkland and Evercore Fees must benefit a particular debtor "at the time at which the service was rendered." 11 U.S.C. § 330(a)(3)(C).  In addition, fees and expenses cannot be charged 100% to a particular Debtor under section 330 of the Bankruptcy Code where the services underlying such fees and expenses benefitted more than one Debtor.  While the Court need not undertake an exhaustive line-by-line review of Kirkland's and Evercore's fee applications, it does have a duty to review fee applications to ensure compliance with applicable law and to correct "reasonably discernible abuses." *Busy Beaver*, 19 F.3d at 845.  Although the Court finds that there were no intentional abuses, and none have been alleged, the Court concludes that reallocation of the Kirkland and Evercore Fees is required to ensure that EFH and EFH each pay only their share of the actual and necessary expenses of the E-Side Bankruptcy Cases.

199.    The Ad Hoc EFH Claimants and the PAB both contend that this Court should defer to Kirkland's and Evercore's proposed allocations.  (8/30/18 Ad Hoc EFH Claimants' Final Submission [D.I. 13415] ¶ 82; 8/30/18 PAB's Final Submission [D.I. 13416] ¶ 11.)  Again, in light of its independent duty to review fee applications, it is not appropriate for the Court simply to defer to the allocations of professionals.   Deference is not proper here because, as the evidentiary record shows, (i) the allocation methodology set forth in the Interim Compensation Order produced inequitable results in the context of these cases (which Kirkland admits); (ii) that allocation methodology, even if it were fair, was inconsistently applied by different professionals and even by some individual timekeepers; (iii) the allocation methodology with respect to Collective Benefit Fees was eventually abandoned by Kirkland in 2016 and, in any event; (iv) the resulting 90/10 allocation of Kirkland's fees and expenses in 2016 through the conclusion of these Bankruptcy Cases does not reflect the actual and necessary expenses of the EFIH and EFH estates for the services they were provided and is at odds with a number of other professionals in the cases, including Delaware counsel to the E-Side Debtors.  In addition, there is no evidence that any fiduciary or third party, including E-Side Boards, the Disinterested Directors, or the Fee Committee, reviewed Kirkland's and Evercore's proposed allocations during the course of these cases.  There is also an issue as to whether the allocation of professional fees raised a "conflict matter" that required the Disinterested Directors to address allocation.

200.    Unlike the E-Side Committee Professionals, Kirkland and Evercore attempted to use the allocation methodology set forth in the Interim Compensation Order, at least until mid-2016 in Kirkland's case.  That methodology, however, was at all relevant times during these cases subject to challenge, and the fees and expenses sought in any particular fee statement or

application were subject to reallocation as between the EFH and EFIH estates.  (PAB-X034, Interim Compensation Order [D.I. 2066] ¶ 4.)

201.    Application of the Interim Compensation Order allocation methodology cannot supplant the need for a professional's fees and expenses to satisfy the standards of sections 330 and 503(b) of the Bankruptcy Code with respect to the Debtor for which payment or reimbursement is sought.  *See* 3 COLLIER ON BANKRUPTCY § 330.04[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ("Expenses are deemed 'actual' when they are in fact incurred rather than based upon guesswork, formula or pro rata allocation, and when they are obviously attributable to a bankruptcy client.")

202.    As Kirkland acknowledged in the Kirkland Position Statement and in its final fee application, the Interim Compensation Order methodology could lead to inequitable results and, in fact, did lead to inequitable results in these cases, leading Kirkland to change its allocation methodology.  This is because allocating Collective Benefit Fees—which, by their nature, are incurred for the benefit of multiple Debtors when no primary beneficiary was discernible or clear—based on a formulaic application of the ratio of a particular Debtor's Direct Benefit Fees to the total Direct Benefit Fees of all Debtors does not properly reflect the extent to which such Collective Benefit Fees constituted the actual and necessary expenses of preserving that Debtor's estate, as required by Bankruptcy Code sections 330 and 503(b).

203.    The evidence presented at the Hearing reveals multiple instances of inconsistent and inequitable, if not improper, allocation of fees by both Kirkland and Evercore.  For example, the Court cannot conclude that it was proper for Kirkland to bill all fees incurred for work relating to asbestos matters as Collective Benefit Fees given that all asbestos claims in these cases would be allowed against EFH.    At the very least, Kirkland's defense of its

83

Case 14-10979-CSS    Doc 13521    Filed 09/27/18    Page 89 of 92

characterization of fees relating to asbestos matters as Collective Benefit Fees is inconsistent

with Kirkland's defense of its characterization of fees relating to litigation of the Makewhole

Claims as EFIH Direct Benefit Fees.  In addition, the Court does not believe it was proper for

Kirkland or Evercore to bill all fees relating to post-petition financing as EFIH Direct Benefit

Fees, and to thus charge EFIH with 100% of such fees, when services relating to postpetition

financing benefitted all estates.

204.    Kirkland's alternative methodology employed from mid-2016 and thereafter

pursuant to which Kirkland allocated 90% of all Collective Benefit Fees to EFIH and 10% to

EFH based solely on "debt amounts" is also inequitable and does not properly reflect the actual

and necessary expenses of EFIH and EFH.[25]  In *In re Tropicana Entertainment, LLC*, Judge

Carey found that "[a]n allocation based solely on the amount of debt or number of casino

properties would be inequitable" because, among other things, "Chapter 11 debtors and their

professionals must undertake many time-consuming and expensive tasks, regardless of the size

of the estate or the number of creditors."  2014 WL 7450610 at *6.  The Court agrees with Judge

Carey's reasoning.  *See also In re Kroh Bros. Dev. Co.*, 105 B.R. 515, 524 (Bankr. W.D. Mo.

1989) (rejecting allocation based upon total indebtedness of different obligors, noting that "[t]he

court does not condone this type of allocation of fees and expenses because it makes the court's

determination of reasonableness and necessity impossible").

205.    In addition, as noted above, both Kirkland's and Evercore's allocations are

materially different from all of the other E-Side Debtors' professionals' allocations.  While

differences among the E-Side Debtors' professionals are to be expected, the Court finds that such

---

[25]    In addition, between Kirkland's final fee application, Kirkland's testimony, and the PAB's closing arguments at
the Hearing, Kirkland has identified at least three different debt figures it claims to have used in calculating the
90/10 debt ratio.  Accordingly, there is insufficient evidence in the record to substantiate the accuracy of the
90/10 ratio.

significant differences are not adequately explained and Kirkland's and Evercore's fee and expense allocations do not reflect the actual and necessary expenses incurred by EFH and EFIH.

206.    Because the allocation methodologies used by Kirkland and Evercore did not properly account for the extent to which each estate benefitted from Kirkland's and Evercore's services, and because these methodologies resulted in an excessive amount of fees and expenses being allocated to EFIH, the Court concludes that reallocation is necessary.

207.    A proper allocation of the Kirkland and Evercore Fees must take into account the nature, extent, and value of the services provided by Kirkland and Evercore and "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of," EFH's and EFIH's case. *See* 11 U.S.C. § 330(a)(3).

208.    Kirkland's primary matter codes that encompassed the vast majority of Kirkland's fees and expenses included (i) Plan and Disclosure Statements, (ii) Contested Matters and Adversary Proceedings, (iii) Corporate Governance Issues, (iv) Claims Administration and Objections, (v) Tax Issues, (vi) Retiree and Employee Benefit Issues, (vii) Retention and Fee Applications, (viii) Hearings, (ix) and Valuation Issues.

209.    Evercore's primary matter codes that encompassed the vast majority of Evercore's fees and expenses included (i) Valuation and Recoveries Analysis, (ii) Court Testimony and Litigation Support, (iii) Asset Sales and Other M&A Activity, (iv) General Financial Analysis and Research, and (v) Plans of Reorganization.

210.    These services collectively benefitted both EFH and EFIH and were provided in furtherance of the E-Side Debtors' ultimate goal of confirming a chapter 11 plan of reorganization for both EFH and EFIH.  The Court cannot conclude based on the evidence in the record that one particular Debtor benefitted from these services more than another Debtor.

Accordingly, it is just and proper for the Kirkland and Evercore Fees to be allocated 50% to EFH and 50% to EFIH.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court finds that the Material Administrative Expense Claims should be allocated as follows: (i) NextEra Termination Fee Claims: 50% EFH and 50% EFIH; (ii) Elliott Substantial Contribution Claim: 30% EFH and 70% EFIH; (iii) E-Side Committee Professional Fees: 70% EFH and 30% EFIH; and (iv) Kirkland and Evercore Fees: 50% EFH and 50% EFIH.

Dated: _____, 2018
       Wilmington, Delaware

_____
HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

**PROPOSED AND SUBMITTED BY:**

Wilmington, Delaware
Date:  September 27, 2018

**BAYARD, P.A.**

*/s/ Erin R. Fay*
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
600 N. King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
scousins@bayardlaw.com
efay@bayardlaw.com

–and–

**ROPES & GRAY LLP**
Gregg M. Galardi
Daniel G. Egan
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090
Gregg.Galardi@ropesgray.com
Daniel.Egan@ropesgray.com

**ROPES & GRAY LLP**
Matthew L. McGinnis
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Matthew.McGinnis@ropesgray.com

*Counsel for Elliott and UMB Bank, N.A., as Trustee*