**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>ENERGY FUTURE HOLDINGS CORP.,<br>*et al.*,<br><br>                     *Debtors.* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Chapter 11
Bankruptcy Case No. 14-10979 (CSS)
(Jointly Administered)

### THE EFH PLAN ADMINISTRATOR
### BOARD'S PROPOSED FINDINGS OF FACT AND
### CONCLUSIONS OF LAW REGARDING THE EFH/EFIH ALLOCATION DISPUTE

**KIRKLAND & ELLIS LLP**
Edward O. Sassower, P.C. (*pro hac vice*)
Stephen E. Hessler, P.C. (*pro hac vice*)
Brian E. Schartz, P.C. (*pro hac vice*)
Aparna Yenamandra (*pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

James H.M. Sprayregen, P.C. (*pro hac vice*)
Marc Kieselstein, P.C. (*pro hac vice*)
Steven N. Serajeddini (*pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Mark E. McKane, P.C. (*pro hac vice*)
Michael P. Esser (*pro hac vice*)
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

**RICHARDS, LAYTON & FINGER, P.A**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Co-Counsel to the EFH Plan Administrator Board*

## <u>INTRODUCTION AND PROCEDURAL HISTORY</u>

1.     This is a dispute regarding the allocation, but not allowance, of certain administrative expenses between the former debtor estates of Energy Future Holdings Corp. ("<u>EFH</u>") and Energy Future Intermediate Holding Company LLC ("<u>EFIH</u>") (the "<u>EFH/EFIH Allocation Dispute</u>").

### I.     The Debtors

2.     On April 29, 2014 (the "<u>Petition Date</u>"), EFH, EFIH, and dozens of affiliated entities filed petitions under chapter 11 of the Bankruptcy Code (collectively, the "<u>Debtors</u>").  These chapter 11 cases are jointly administered but not substantively consolidated (the "<u>Chapter 11 Cases</u>").  (*See Final Order Directing Joint Administration*, entered June 5, 2014 [D.I. 849].)

3.     As of the Petition Date, EFH was a holding company that owned interests in two main businesses.  Through its indirect ownership of Texas Competitive Electric Holding Company, LLC ("<u>TCEH</u>"), EFH owned 100% of the interest in the "T-Side" Debtors' electricity generation and competitive retail businesses, among other things.   The T-Side Debtors emerged from bankruptcy on October 3, 2016.  (ELX-407, *Notice of Entry of TCEH Confirmation Order and Occurrence of TCEH Effective Date*, filed Oct. 3, 2016 [D.I. 9742] (the "<u>T-Side Effective Date</u>").)

4.     Through its ownership interest in EFIH, EFH also indirectly owned an approximately 80% economic interest in Oncor Electric Delivery Company LLC ("<u>Oncor</u>"), a regulated utility and the largest transmission and distribution system in Texas.  (ELX-009, *Decl. of Paul Keglevic in Support of First Day Motions*, filed Apr. 29, 2014 [D.I. 98].)   A transaction monetizing EFIH's interest in Oncor—in a change-of-control transaction that required regulatory approval by the Public Utility Commission of Texas ("<u>PUCT</u>") to close—was a critical component of the Debtors' reorganization efforts.

1

## II.    The Sempra Plan and Creation of the PAB

5.    On September 7, 2017, the Court authorized the Debtors to enter into a merger agreement (the "Merger Agreement") with Sempra Energy ("Sempra")—a California-based utility holding company—pursuant to which Sempra would, among other things, acquire EFH's indirect economic interests in Oncor.  (ELX-557, *Order Authorizing Entry Into Merger Agreement and Approving Termination Fee, Authorizing Entry Into and Performance Under Plan Support Agreement*, filed Sept. 7, 2017 [D.I. 11873].)

6.    The Merger Agreement was a critical component of *The First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), which was confirmed by order of the Court on February 27, 2018 (the "Confirmation Order"). (ELX-635, *Order Confirming the First Amended Plan of Reorganization*, filed Feb. 27, 2018 [D.I. 12763].)  Paragraph 150 of the Confirmation Order prohibited any allocation of administrative expenses that would render the EFH estate administratively insolvent.  (*Id.* at ¶ 150.)

7.    The PUCT approved the Sempra transaction on March 8, 2018, and the Plan became effective on March 9, 2018.  (PAB-X635, *Notice of Entry of EFH Confirmation Order and Occurrence of EFH Effective Date*, filed Mar. 9, 2018 [D.I. 12801] (the "E-Side Effective Date").)

8.    The Plan created the EFH Plan Administrator Trust (the "Trust") to resolve disputed claims and administer the winding-up of the estates.  The Trust contains cash contributions from Sempra in connection with consummating the Plan, additional cash on hand, and "the Causes of Action the EFH Plan Administration Board is permitted to pursue and settle under the Plan."  (PAB-X627, *First Amended Supplement to First Amended Joint Chapter 11 Plan of Reorganization,* Ex. C (EFH Plan Administrator Trust Agreement) at Recitals ¶ E, filed Feb. 22, 2018 [D.I. 12685-8];

ELX-635 [D.I. 12763] ¶ 134.)[1]

9.      The EFH Plan Administration Trust Agreement (the "Trust Agreement"), which the Court approved pursuant to the Confirmation Order, governs the Trust.  (ELX-635, ¶ 74 [D.I. 12763]; PAB-X627 at Ex. C [D.I. 12685-8].)

10.     The EFH Plan Administrator Board (the "PAB") is the trustee of the Trust.  (PAB-X627, Ex. C at Preamble [D.I. 12685-8].)  As a fiduciary for unsecured creditors of the EFH and EFIH estates, the PAB is charged with effectuating the Plan and administering the Trust by paying claims, resolving and litigating disputed claims, and taking actions necessary to wind up the estates. (*Id.* at Art. I.1.2; ELX-635, ¶ 90 [D.I. 12763].)

III.    **The EFH/EFIH Allocation Dispute**

A.      **Settlement-Related Discussions**

11.     Prior to the E-Side Effective Date, the disinterested directors and manager of EFH and EFIH and certain creditors attempted to resolve a dispute over the allocation of certain administrative claims between EFH and EFIH.  (*See* PAB Final Submission [D.I. 13416] ¶ 2.) Those discussions concerned: (a) the $275 million NextEra Termination Fee (as defined below), (b) approximately $40 to $50 million in professional fees and expenses incurred by the E-Side Committee (as defined below), and (c) approximately $35 million in professional fees and expenses incurred by Elliott Associates, L.P., Elliott International, L.P., and the Liverpool Limited Partnership (collectively, "Elliott").  These negotiations did not yield a settlement.[2]

---

[1]    The PAB is also "authorized and empowered . . . to take any action necessary or appropriate to implement, effectuate, consummate, or further evidence the Plan in accordance with its terms . . .without further order of the Court." (ELX-635 [D.I. 12763] ¶ 90.)  In addition, the PAB "shall have the power to . . . file, withdraw, or litigate to judgment objections to Disputed Claims or Interests . . . ," including "any powers reasonably incidental thereto." (PAB-X627 [D.I. 12685-8] at Ex. C at VI.6.1(a).)

[2]    On or around February 21, 2018, the EFH Debtors executed confidentiality agreements with certain creditors of the EFH Debtors.  In those confidentiality agreements, the EFH Debtors agreed to disclose that such parties had allocation-related settlement negotiations.  The EFH Debtors filed this disclosure on the docket on February 28,

12.     After the E-Side Effective Date, the PAB and certain unsecured creditors had additional settlement discussions.  Those discussions did not yield a settlement either.

13.     Absent an allocation of these administrative claims, the PAB must hold back Plan distributions in an amount representing the lesser of (a) all available cash on hand to satisfy unsecured claims (as set forth in the Plan) and (b) the aggregate amount of the claims that have not been allocated.

14.     As of July 31, 2018, the PAB had held back approximately $570 million, excluding amounts held in the Professional Fee Escrow Accounts (as defined in the Plan) on account of, among other things, these unallocated administrative claims.    (*See PAB Post-Confirmation Quarterly Summary Report*, filed July 31, 2018 [D.I. 13330].)  This ongoing holdback is detrimental to EFIH and EFH unsecured creditors who are unable to deploy this capital for higher and better uses.  An order from the Court allocating these Administrative Claims will enable the PAB to release Plan distributions promptly, consistent with its fiduciary duties.

**B.      The Allocation Proceedings and the Parties**

15.     On May 13, 2018, Elliott and UMB Bank, N.A. ("UMB" and together with Elliott, "Elliott") filed a motion to allocate four categories of administrative claims (the "Administrative Claims"):

- **The NextEra Termination Fee Claims**: Any administrative claim asserted by NextEra Energy, Inc. ("NextEra") or any reserve established with respect thereto;

- **The E-Side Committee Professional Fee Claims**: Any allowed administrative claim asserted by any professional retained by the official committee of unsecured creditors of EFH, EFIH, and certain affiliated debtors (the "E-Side Committee");

- **The Debtors' Professional Fee Claims**: Any allowed administrative claim asserted by any professional retained by the E-Side Debtors; and

---

2018. (ELX-636, *Notice of Filing of Cash Projections and Allocation Proposals*, filed Feb. 28, 2018 [D.I. 12769].)

- **The Elliott Substantial Contribution Claim**: Any allowed administrative claim asserted by Elliott.

(*See* ELX-670, *Joint Motion of UMB Bank, N.A., as Indenture Trustee and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* (the "Allocation Motion") at ¶¶ [3-16], filed May 13, 2018 [D.I. 13102].)  These Administrative Claims encompass approximately $490,000,000 in actual and potential administrative expenses. (*Elliott Final Submission*, filed Aug. 30, 2018 [D.I. 13414].)

16.    On June 11, 2018, the Court entered the *Order Scheduling Certain Dates and Deadlines and Establishing Certain Protocols In Connection With the Joint Motion of UMB Bank NA as Indenture Trustee and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* (as amended from time to time, the "Scheduling Order").  (ELX-684 [D.I. 13193].)  Paragraph 2 of the Scheduling Order identified the "Parties" to the EFH/EFIH Allocation Dispute as:

- Certain Elliott funds, who hold approximately $1,197,251,689 in EFIH Unsecured Notes (*i.e.*, the unsecured 11.25%/12.25% Senior Toggle Notes due 2018, "EFIH PIK Notes"), $56,435,689 in EFH LBO Note Guarantees, $423,701,000 in EFH Legacy Notes, $56,435,689 in EFH LBO Note Primary claims, and $9,528,504 in EFH Swap Claims.  (*See* PAB-X643, *Statement of Ropes & Gray LLP and Bayard. P.A. Pursuant to Federal Rule of Bankruptcy Procedure 2019*, filed Apr. 3, 2018, at Ex. A [D.I. 12895].)

- UMB, the indenture trustee for the EFIH PIK Notes.  *Id.*

- An ad hoc group of claimants who hold approximately $3,453,040,000 in unsecured claims against EFH (the "Ad Hoc Group").  (*See* ELX-689, *Verified Amended Statement of Kasowitz Benson Torres LLP and Hogan McDaniel Pursuant to Bankruptcy Rule 2019*, filed July 31, 2018 [D.I. 13327] at Ex. A.)  Specifically, Alta Fundamental Advisers LLC holds $37,000,000 of the TCEH Settlement Claim and $431,000 of EFH Unexchanged Note Claims; Angelo Gordon & Co., LP holds $29,998,129 of the TCEH Settlement Claims; Apollo Management Holdings holds $3,177,302,078 of TCEH First Lien Claims; Brookfield Asset Management holds $108,680,000 of the TCEH Settlement Claim; and Farmstead Capital Management holds $99,629,698 of the TCEH Settlement Claim.  *Id.*

5

17.     On June 19, 2018, the Court entered an order authorizing the PAB's participation in the EFH/EFIH Allocation Dispute (the "PAB Participation Order").  (D.I. 13221.)[3]

18.     Following fact and expert discovery, the Parties submitted final position papers setting forth their respective proposals for allocating the Administrative Claims on August 30, 2018. (*See* D.I. 13414, 13416, 13417, and 13419.)

19.     The Court held a three-day trial on September 5-7, 2018, during which the Parties presented testimony from seven witnesses, including three experts.[4]  The Court received deposition designations from eleven witnesses, a declaration from Donald Evans (a former disinterested director of EFH who was not deposed), trial testimony designations from earlier contested matters in these Chapter 11 Cases, and nearly 1,400 exhibits.

20.     Upon consideration of that record—and the Court's experience presiding over these Chapter 11 Cases since the Petition Date—the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052, made applicable to this matter by Fed. R. Bankr. P. 9014(c).[5]

## FINDINGS OF FACT

### I.     Professional Fee Claims

#### A.     The Interim Compensation Order

21.     On September 16, 2014, the Court entered the *Order Establishing Procedures for*

---

[3]     The PAB, together with Elliott, UMB, and the Ad Hoc Group are collectively referred to herein as the "Parties."

[4]     Specifically, the Court heard testimony from Howard E. Abrams, William K. Jacobs, Jr. Visiting Professor, Harvard Law School; Anthony R. Horton, Member, EFH Plan Administrator Board and Former Director and Officer of the Debtors; Chad Husnick, Partner, Kirkland & Ellis LLP; Paul Keglevic, Former Director and Officer of the Debtors; Bradley A. Robins, Partner, Ducera Partners LLC; Jeffrey Rosenbaum, Portfolio Manager, Elliott Management Corp.; and Steven R. Strom, Principal, Odinbrook Global Advisors.

[5]     To the extent any finding of fact is determined to be a conclusion of law, it is adopted and shall be construed as—and deemed to be—a conclusion of law.  To the extent any conclusion of law is determined to be a finding of fact, it is adopted and shall be construed as—and deemed to be—a finding of fact.

*Interim Compensation and Reimbursement of Expenses for Professionals* (the "Interim Compensation Order"), which established procedures for allocating professional fees and expenses among the three primary estates: EFH, EFIH, and TCEH. (PAB-X034 [D.I. 2066].) Specifically, the Interim Compensation Order separated fees and expenses directly incurred by certain Debtors ("Direct Benefit Fees") from fees and expenses incurred for the collective benefit of one or more Debtors ("Collective Benefit Fees"). (*Id.* ¶ 2(b).) The order generally provided that, in a particular Monthly Fee Statement, each professional would allocate Collective Benefit Fees to a particular Debtor in the same proportion of Direct Benefit Fees allocated to that Debtor of the total Direct Benefit Fees charged to all Debtors in that month. (*Id.*)[6]

22.     The Interim Compensation Order left it to each professional to allocate its fees and expenses based on such professional's subjective determination—at the time charges were incurred—of how its services benefited each estate. It also reflected that individual professionals, who were not economically incentivized to charge their time to any particular estate and who had direct knowledge of their own efforts, were best positioned to make those decisions. (9/5/2018 Trial Tr. at 233:7-234:8 (Horton): "I feel like [the professionals] were trustworthy and competent with no economic incentive to allocate their fees to one particular estate or another. . . . They knew where their time was being spent, what activities were important, and how they ultimately -- what was direct, what was, you know, collective.")

23.     The allocation methodology that the Court approved in the Interim Compensation Order was a carry-over from an agreed-upon provision in the original restructuring support agreement. (*See* PAB-X029, *Motion of Energy Future Holdings Corp., et al., for Entry of Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the*

---

[6]    Amounts allocated between the three estates changed monthly. This was a function of whether professionals performed comparatively more services that benefited a single estate relative to the others. (*See* 9/2/2018 Horton Written Direct ¶ 16.)

*Automatic Stay*, filed May 16, 2014 (the "Restructuring Support Agreement") at Ex. A at 24-25 [D.I. 505-2].)[7]  In addition to the EFH and EFIH Debtors, an ad hoc group of holders of EFIH PIK Notes were parties to that Restructuring Support Agreement.

24.    Jeffrey Rosenbaum, who is now a portfolio manager at Elliott but who held a similar position at York Capital in 2014, directly participated in the negotiations of the allocation methodology.  (9/7/2018 Trial Tr. at 21:19-22:3 (Rosenbaum):  "There were direct negotiations with other parties to the RSA as to how professional fees under this RSA would have been treated in terms of certain allocations, certain amounts that would have been paid by one box versus the other box, and most importantly, in my mind, in terms of controlling or reining in professional fees."; *id.* at 130:24-131:7 (Rosenbaum).)

25.    No party objected to this allocation methodology—either as it existed in the Restructuring Support Agreement or the Interim Compensation Order—until Elliott filed the Allocation Motion four years later.  (*See* 9/2/2018 Horton Written Direct ¶ 11.)

   **B.    Processing and Payment of Professional Fees**

26.    The Interim Compensation Order also established procedures for professionals to seek compensation and expense reimbursement from the Debtors.  Specifically, each professional was required to file a monthly fee statement reflecting fees and expenses incurred in a particular month (each, a "Monthly Fee Statement").  (PAB-X034, Sept. 16, 2014 *Interim Compensation Order* [D.I. 2066] ¶ 2(c).)

27.    Interested parties then had 21 days to object to any Monthly Fee Statement.  (*Id.* at ¶ 2(d).)  No party filed an objection to a Monthly Fee Statement during the Chapter 11 Cases.

---

[7]    In the weeks leading up to the filing of the Debtors' chapter 11 petitions, and after extensive negotiations, several of the Debtors' largest stakeholders agreed to a global restructuring of the Debtors premised on a tax-free deconsolidation of TCEH from EFH, a simultaneous deleveraging of EFIH through a $2 billion investment, and a framework for settling the makewhole claims against EFIH.  (*See* 9/2/2018 Keglevic Written Direct ¶ 8.)

28.     When the objection period lapsed, a professional filed a certificate of no objection ("CNO") regarding its Monthly Fee Statement.  (*Id.*)

29.     After a CNO was filed, each professional submitted to the Debtors a request for payment, including the CNO and an invoice allocating 80% of its fees and 100% of its expenses, as detailed in Monthly Fee Statement.  (9/2/2018 Horton Written Direct ¶ 13.)

30.     Before the expiration of the objection period and submission of a CNO, the Debtors' legal team reviewed the invoices accompanying the Monthly Fee Statements and, from time to time, negotiated directly with professionals about the amounts sought. (*Id.* at ¶ 14.)  Members of the Debtors' accounting and treasury teams separately confirmed the professional's proposed allocation calculation, adjusted budget forecasts accordingly, and issued the wires authorized under the CNO. (*Id.*)  From time to time, members of the Debtors' treasury team would directly engage with professionals regarding the professionals' proposed allocation and its impact on budget forecasts, including revising those budget forecasts accordingly.  (*Id.*)

31.     In addition to Monthly Fee Statements, beginning with the period ending August 31, 2014, and at three-month intervals thereafter, each professional could file an interim fee application for amounts sought in the Monthly Fee Statements not yet approved (each, an "Interim Fee Application").  (PAB-X034 [D.I. 2066] ¶ 2(f).)  No party objected to any Interim Fee Application in the Chapter 11 Cases.

32.     Professionals then negotiated the proposed allowance of their fees and expenses with the Fee Review Committee, who filed a report detailing agreed-upon reductions and a proposed form of order.  (9/2/2018 Horton Written Direct ¶ 15; *see also, e.g.*, PAB-X244, *Fee Committee's Fourth Status Report Concerning Interim Fee Applications*, filed June 16, 2015 [D.I. 4774].)  Upon the Court's consideration and approval of such an order, each professional submitted another

payment request to the Debtors.  (9/2/2018 Horton Written Direct ¶ 15.)  This packet included a copy of the order awarding interim compensation and an invoice that allocated the 20% holdback requested in such Interim Fee Application (after taking into account any agreed-upon adjustments with the Fee Review Committee and any unpaid Monthly Fee Statements).  (*Id.*)  The Debtors then processed and made payments accordingly.  (*Id.*)

### C.    Debtor-Side Professional Allocations

33.    Elliott chose to focus its Debtor-side analysis on Kirkland & Ellis LLP ("Kirkland"), the Debtors' primary legal counsel, and Evercore Group L.L.C. ("Evercore"), the Debtors' financial advisor.  Based on the overall record, Kirkland and Evercore generally followed a detailed and reasonable allocation process that was consistent with the discretion afforded under the Interim Compensation Order.  Although there may be imperfections in a subset of the thousands of allocation decisions made over four years, good-faith compliance with the Interim Compensation Order does not require a false precision.  And even if it did, no Party presented any comprehensive or statistical analysis that shows whether any such imperfections benefited one estate versus another in the aggregate.

### i.    The Effect of Reallocating Professional Fees and Expenses

34.    Because the Interim Compensation Order requires professionals to allocate Collective Benefit Fees in proportion to the professional's Direct Benefit Fees, re-allocating fees from one bucket to another creates a "swing effect."  (*See* 9/5/2018 Trial Tr. at 84:8-85:20 (Husnick).)  In other words, relatively small movements in fees—for example, by moving Direct Benefit Fees between different estates or by shifting Collective Benefit Fees to Direct Benefit Fees or vice versa—can have significant outcomes.  (*Id.*)  Under the allocation methodology in the Interim Compensation Order, there is a cascading effect on allocation because changing the proportional amount of Direct Benefit Fees causes a downstream re-allocation of Collective Benefit

10

Fees to each of the estates.  (*Id.*)

35.    For example, assuming a professional billed $80,000 as Collective Benefit Fees to the estates in a month, re-allocating $1,000 from Collective Benefit Fees to EFH Direct Benefit Fees would cause EFH to pay $9,238 ***more*** in Collective Benefit Fees in that month.

| Illustration of Scenario 2 (Asbestos) | | | | |
|---|---|---|---|---|
| | Original Allocation | Direct Impact | Modified Allocation | Total Impact |
| **Collective Fees** | | | | |
| EFH | $13,333 | | $22,571 | + $9,238 |
| EFIH | $66,667 | | $56,429 | - $10,238 |
| **Total** | **$80,000** | - $1,000 | **$79,000** | - $1,000 |
| **Direct Fees** | | | | |
| EFH | $1,000 | + $1,000 | $2,000 | + $1,000 |
| EFIH | $5,000 | | $5,000 | |

- **Direct Impact:** $1,000 from Collective Benefit Fees to EFH Direct Benefit Fees

- **Total Impact:** EFH pays $9,238 more Collective Benefit Fees

### ii.    Kirkland's Allocation Process

36.    Prior to the Court's entry of the Interim Compensation Order—and consistent with the Restructuring Support Agreement—Kirkland opened over 75 internal billing matter codes to facilitate the allocation of fees and expenses associated with its services.  (9/2/2018 Husnick Written Direct ¶¶ 3, 4.)  These included matter numbers labeled "ALL"—to indicate services collectively benefitting all estates (*i.e.*, Collective Benefit Fees)—as well as matter numbers with a prefix of "[EFH]," "[EFIH]," and "[TCEH]"—to indicate services benefitting certain estates directly (*i.e.,* Direct Benefit Fees).  (*Id.* at ¶ 3.)[8]

37.    In addition, Kirkland created a billing protocol for Kirkland attorneys and paraprofessionals working on the Chapter 11 Cases.  (*Id.* ¶ 6.)  Kirkland distilled that billing protocol in a May 4, 2014 memorandum (the "Billing Memorandum").  (*See* ELX-011.)  The protocol and Billing Memorandum reflected the need to "keep track of time across three silos with a

---

[8]    By the end of the Chapter 11 Cases, Kirkland had used over 130 matter numbers.  (9/2/2018 Husnick Written Direct ¶ 5.)

11

fourth that would be collective benefit." (9/5/2018 Trial Tr. at 62:24-63:10 (Husnick).) Kirkland explained to its billers "that if the principal beneficiary of principal involvement was a particular Debtor, you should bill that as a direct benefit fee to that silo. If there were multiple principal beneficiaries or it wasn't clear that it principally involved multiple subsidiaries, then you would bill it into a collective benefit matter number." (*Id.*)

38.    In addition to the protocol and Billing Memorandum, Kirkland expended substantial time and resources reviewing time entries prior to submitting Monthly Fee Statements on the docket. (9/2/2018 Husnick Written Direct ¶ 10.) Kirkland restructuring attorneys ranging from junior associates to partners generally conducted four rounds of review of time entries, focusing on moving time to the appropriate matter number, aligning different professionals' entries for the same tasks, and removing privileged and confidential information. (*Id.*; *see also* 9/5/2018 Trial Tr. at 63:24-64:17 (Husnick).)[9]

39.    At the completion of each monthly review process, Kirkland filed its Monthly Fee Applications on the docket. (9/2/2018 Husnick Written Direct ¶¶ 10, 12.) The Monthly Fee Applications showed how Kirkland allocated its time among the different estates. (*See, e.g.,* AHX-138, *Notice of Fee Statement*, filed Aug. 5, 2016 [D.I. 9198-1].)

40.    At the same time that Kirkland filed its Monthly Fee Statements, Kirkland submitted them to the Debtors' in-house legal team for review. (9/2/2018 Husnick Written Direct ¶ 13.) From time to time, the Debtors' in-house legal team and Kirkland would discuss specific time entries and/or specific work streams—for example, the need for certain work streams, the staffing of certain work streams, and the expected timeline of certain work streams. (*Id.*) In addition, the Debtors' internal and external forecasting and budgeting teams would occasionally discuss with

---

[9]    In total, Kirkland partners reviewed approximately 15,000 pages of time entries, containing approximately 150,000 individual time entries. (9/2/2018 Husnick Written Direct ¶ 11.)

Kirkland the status of current and projected work streams and the expected effect on existing estate budgets of different Debtors.  (*Id.*)

41.     Kirkland also filed Interim Fee Applications, which consolidated the prior four to five Monthly Fee Statements.  (*Id.* at ¶ 15.)  Each Interim Fee Application contained detailed summaries of services performed in the applicable billing period, a breakdown of the tasks performed within a particular matter number, and an aggregate allocation of the fees and expenses between the estates.  (*See, e.g.*, AHX-233, *Summary Cover Sheet and Twelfth Interim Fee Application of Kirkland & Ellis LLP*, filed Apr. 17, 2018 [D.I. 12961] ¶ 27.)  Kirkland also submitted a final fee application.  (*See* ELX-659, *Summary Cover Sheet to the Final Fee Application of Kirkland & Ellis LLP and Kirkland & Ellis International LLP, Attorneys for the Debtors and Debtors in Possession, for the Period from April 29, 2014 Through and Including March 9, 2018*, filed Apr. 23, 2018 [D.I. 13019].)

42.     No party filed an objection to any Kirkland Monthly Fee Statement, (9/2/2018 Husnick Written Direct ¶ 14), any Kirkland Interim Fee Application (*id.* at ¶ 17), or Kirkland's Final Fee Application (*id.* at ¶ 20).[10]  (*See also* 9/5/2018 Trial Tr. at 66:8-9 (Husnick): "To my knowledge, no party ever filed a formal objection to our fee applications.")

43.     Kirkland modified its allocation methodology in connection with the T-Side Effective Date.  Before that time, in situations where Kirkland found that its services inured to the collective benefit of more than one estate, Kirkland allocated such fees and expenses as "Collective Benefit Fees," proportionally to the amount of Direct Benefit Fees incurred by such estate during that month.  (9/2/2018 Husnick Written Direct ¶ 26.)  Kirkland timekeepers billed that time to client matter numbers that had the prefix "[ALL]."  (*Id.* at ¶ 25.)

---

[10]     The Fee Review Committee has a separate deadline to object to Kirkland's Final Fee Application.  (9/2/2018 Husnick Written Direct ¶ 20.)

RLF1 20051958v.1

44.     After the T-Side Effective Date, Kirkland separately tracked work performed for the benefit of Reorganized TCEH, so "Collective Benefit Fees" generally represented services performed for the collective benefit of the EFH Debtors and the EFIH Debtors.  (*Id.* at ¶ 27.)  By that time, the primary remaining issue for the EFH/EFIH Debtors was the sale of EFH's indirect economic interest in Oncor that would enable EFH and EFIH to emerge from the Chapter 11 Cases. (*Id.*)  Therefore, nearly all of Kirkland's services performed for the EFH and EFIH Debtors after the T-Side Effective Date were for the collective benefit of both the EFH and EFIH Debtors.  (*Id.*)  As a result, there were little to no Direct Benefit Fees billed to either estate, and Kirkland's original allocation methodology would have resulted in an inequitable allocation, had it been applied, which was not contemplated by or intended in the Interim Compensation Order.  (*Id.* at ¶ 28.)

45.     For example, in Kirkland's November 2016 Monthly Fee Statement, Kirkland sought payment of (a) $512.70 in EFH Direct Benefit Fees; (b) $79,496.90 in EFIH Direct Benefit Fees; and (c) a total of $1,277,411.84 in Collective Benefit Fees.  (*See* AHX-171, *Notice of Fee Statement*, filed Jan. 6. 2017 [D.I. 10605-1].)  Using the original allocation methodology, EFIH would have paid a disproportionate share of the Collective Benefit Fees (more than 99%) even though the most significant work stream in November 2016 was determining how to modify the joint plan and joint disclosure statement to address the Third Circuit Makewhole Opinion (as defined below); such work was done for the collective benefit of all of the E-Side estates.  (9/2/2018 Husnick Written Direct ¶ 28.)  In other words, EFIH would have paid a disproportionate share of Collective Benefit Fees incurred for the benefit of both EFH and EFIH in a given month merely because EFH had only a marginal amount of Direct Benefit Fees in that month.  (*Id.*)

46.     To account for the changing circumstances—and avoid allocation of a disproportionate share to any particular estate under the prior allocation methodology—Kirkland

allocated post-T-Side Effective Date Collective Benefit Fees by the relative debt at EFH and EFIH

to reflect the creditor constituencies that were benefitting from such estate's efforts to maximize

value for its respective estate.  (*Id.* at ¶ 30.)  This resulted in a post-T-Side Effective Date allocation

of Kirkland's Collective Benefit Fees of approximately 10% to the EFH Debtors and approximately

90% to the EFIH Debtors.  (*Id.* at ¶ 31; 9/5/2018 Trial Tr. at 83:17-84:7 (Husnick).)[11]  Had Kirkland

adhered to its original allocation methodology, it would have caused approximately $3 to $4 million

in fees to be re-allocated from EFIH to EFH.  (*See* 9/5/2018 Trial Tr. at 57:14-19 (Husnick).)

47.     Kirkland disclosed the change in a footnote in its June 2016, July 2016, August

2016, and September 2016 Monthly Fee Statements.  (*See* AHX-138, *Notice of Fee Statement*, filed

Aug. 5, 2016 [D.I. 9198-1] at 13 n.1; AHX-142, *Notice of Fee Statement*, filed Sept. 8, 2016 [D.I.

9498-1] at 13 n.1; AHX-153, *Notice of Fee Statement*, filed Oct. 10, 2016 [D.I. 9792-1] at 13 n.1;

and AHX-157, *Notice of Fee Statement*, filed Nov. 11, 2016 [D.I. 10181-1] at 13 n.1.)  The change

was also discernible from summaries of fees that were included in Kirkland's Monthly Fee

Statements and Interim Fee Applications.  (9/2/2018 Husnick Written Direct ¶ 32.)

48.     Elliott cites to Kirkland's Matter No. 76 as evidence that Kirkland's allocated fees

incorrectly to EFIH as Direct Benefit Fees instead of Collective Benefit Fees, but their citation is

misplaced.  (*See* Elliott Final Submission [D.I. 13414] ¶ 31.)  Although Matter No. 76 was

nominally labeled "[EFIH] Plan and Disclosure Statement" (which would otherwise suggest it was

an EFIH Direct Benefit matter number), the Monthly Fee Statements that Elliott claims reflect

---

[11]    After the TCEH Effective Date, the debt ratio at EFIH/EFH was approximately $7.71 billion to approximately
$0.65 billion, or 92 percent to 8 percent.  At the trial, Elliott referenced debt numbers as of the Petition Date.
(ELX-009, *Decl. of Paul Keglevic in Support of First Day Motions*, filed Apr. 29, 2014 [D.I. 98] ¶ 82.)  As of
the Petition Date, the Debtors reported approximately $1.3 billion of EFH debt held by EFIH.  The
Restructuring Support Agreement contemplated that these debt claims would be cancelled.  (PAB-X029,
*Motion of Energy Future Holdings Corp., et al., for Entry of Order Authorizing the RSA Debtors to Assume the
Restructuring Support Agreement and Modifying the Automatic Stay*, filed May 16, 2014, at Ex. A at 13-15
[D.I. 505-2].)  These debt claims were ultimately released as part of the global settlement in December 2015, at
least nine months before the T-Side Effective Date.  (PAB-X322, *Order Approving Amended & Restated
Settlement Agreement*, filed Dec. 7, 2015 [D.I. 7243].)

improper allocations contain a footnote indicating that—although nominally labeled as an EFIH Direct Benefit matter number—the fees related to the services performed pursuant to Matter No. 76 were actually being allocated to EFH and EFIH at a ratio of approximately 10% to 90%, consistent with the relative debt at both estates.  (*See* AHX-138 [D.I. 9198-1] at 13 n.1; AHX-142 [D.I. 9498-1] at 13 n.1; AHX-153 [D.I. 9792-1] at 13 n.1; and AHX-157 [D.I. 10181-1] at 13 n.1.)  It was during this time period (June 2016 to September 2016) that the Debtors had determined to bifurcate the confirmation and consummation processes for the T-Side Debtors and E-Side Debtors.  (*See* 9/5/2018 Trial Tr. at 77:9-12 (Husnick).)  As a result, for certain matter numbers (all of which are disclosed in the Monthly Fee Statements filed from June 2016 to September 2016), Kirkland utilized existing Direct Benefit matter numbers to record its services, but allocated the fees reflected in such matter numbers as if they were Collective Benefit matter numbers, until such time as Kirkland was able to open a new Collective Benefit matter number.  (9/5/2018 Trial Tr. 77:14-78:6 (Husnick).)  This approach was designed to approximate the updated Collective Benefit matter numbers that took effect in October 2016 (following the T-Side Effective Date).

### iii.   Evercore's Allocation Process

49.     Throughout its engagement, Evercore followed a diligent process and used reasonable efforts to allocate their fees.  Generally, Evercore allocated Direct Benefit Fees to EFH, EFIH, or TCEH, and apportioned each estate's Collective Benefit Fees based on the proportion of Direct Benefit Fees billed to each estate.  (Matican Dep. Tr. at 41:5-18.)  Evercore's fee allocations were "tied to the discussions [with] the creditor constituents" and the result of "an internal process . . . [involving] discussions and sharing of the underlying hours and applications, monthly fee statements, et cetera, with [their] counsel and with the debtors."  (*Id.* at 18:4-12; 20:4-7; 34:5-12.)  Specifically, Evercore timekeepers relied on those communications and an internal summary of fee categories to determine whether time was attributable to EFH or EFIH.  (*Id.* at 51:22-25, 52:2-3.)

16

Although there was no documentation of formalized guidance, no evidence demonstrated that Evercore professionals allocated their fees and expenses in a manner consistent with the Interim Compensation Order. Further, no party objected to any Evercore Monthly Fee Statement, any Evercore Interim Fee Application, or Evercore's Final Fee Application.[12]

### iv.     The Debtors' Other Professionals

50.     In its Motion, Elliott presented argument regarding several other Debtor-side professionals, including arguments that alleged inconsistencies in the allocation of expenses across the estates between different Debtor professionals was evidence that the professionals misallocated their fees and expenses. (*See* PAB-X670 [D.I. 13102] ¶ 61.) But non-identical allocations between professionals are not evidence of a flawed allocation methodology or that any professional's allocations were erroneous. To the contrary, those differences can just as easily result from the fact that different professionals were responsible for different work streams at different times, which benefitted different estates, and from the Interim Compensation Order's deference to each professional's discretion. (*See, e.g.*, 9/5/2018 Trial Tr. at 266:8-20 (Horton): "[RLF] knew what services that they were providing and for whom, and they allocated it accordingly. . . . [Kirkland and RLF are] two different firms doing two different activities."); ELX-074, *First Interim Fee Application of Filsinger Energy Partners*, filed Nov. 10, 2014 [D.I. 2733] and ELX-124, *Second Interim Fee Application of Filsinger Energy Partners*, filed Feb. 16, 2015 [D.I. 3555] (noting that a significant aspect of Filsinger's work during these periods involved the development of comprehensive forecasts of projected operations and cash flows for each Debtors' individual assets and business units, in connection with Filsinger's evaluation and assessment of the Debtors' compensation metrics)).

---

[12]     As with Kirkland's Final Fee Application, the Fee Review Committee has a separate deadline to object to Evercore's Final Fee Application.

17

D.    **Committee-Side Professional Allocations**

51.    The U.S. Trustee appointed the E-Side Committee to act as a fiduciary for both EFH and EFIH unsecured creditors.  (PAB-X048, *Notice of Appointment of Unsecured Creditors*, filed Oct. 27, 2014 [D.I. 2570].)

52.    The E-Side Committee professionals allocated their fees and expenses 50/50 between EFH and EFIH.   (Glueckstein Dep. Tr. at 41:24-42:12.)   The E-Side Committee professionals believed that allocation was appropriate because the E-Side Committee's work generally provided a benefit to all unsecured creditors of the E-Side Debtors.  (Glueckstein Dep. Tr. at 61:5-14.)  As counsel for the E-Side Committee testified in his deposition, "[W]e ultimately, along with the other professionals for the committee, agreed . . . that a 50/50 [allocation] made sense under the circumstances given that the spirit of the order with respect to collective benefit talked about EFIH, EFH, TCEH as the major debtor entities and that a 50/50 allocation made sense, again because we had creditors, the substantial creditor body of both unsecured creditors of both of those estates within our purview and it, in our view, was appropriate to split it that way."  (Glueckstein Dep. Tr. at 40:13-41:2.)[13]

53.    Despite the E-Side Committee professionals' apparent intent to comply with the "spirit" of the Interim Compensation Order, counsel for the E-Side Committee acknowledged that the 50/50 allocation was not "undertaken pursuant to Section 2(b) of the Interim Compensation

---

[13]    Although this testimony could be read as suggesting that the Debtors "agreed" to the E-Side Committee's 50/50 allocation, counsel for the E-Side Committee clarified, "You continue to characterize it as an agreement, and I don't want you to kind of overstate if that was a term I used in my answer.  There was a discussion around how to pay our invoices and what the percentage would be, or at least some correspondence in that regard, . . . and that was really the extent of the discussion."  (Glueckstein Dep. Tr. at 41:13-23.)  Consistent with this clarification, the full record does not permit a finding that the Debtors agreed to a 50/50 allocation of the E-Side Committee professionals' fees.  (*See* 9/2/2018 Husnick Written Direct ¶ 33:  "I am not aware that the Debtors expressly consented to the E-Committee's allocation of professional fees or expenses.  Nor am I aware that Kirkland ever directed or consented to another Debtor professional's allocation of professional fees or expenses.  In the event Kirkland received an inquiry from another professional about how to allocate certain fees, Kirkland directed such professionals to the Interim Compensation Order and the Debtors for further guidance.")

Order per se because our view was, and continues to be, that the plain language of that really only applied to the debtor professionals."  (Glueckstein Dep. Tr. at 47:21-48:3; *see also id.* at 47:3-17: "[A]gain, the reasoning at the time for the 50/50 was that the expenses of the estate professionals had to be paid by one or both of the estates in some amount, and our view was that all of these benefits were for the creditors and the creditors committee and none of the estates, and so it was really for, you know, the E-Side as a whole and consistent with the spirit of the—of the order that had been entered by the Court allocating those as between EFH and EFIH was appropriate, and we saw no reason for one estate versus the other to pay more than a disproportionate share of those amounts.")

54.    Although the E-Side Committee professionals had a good-faith rationale for its 50/50 allocation, it did not comport with the Interim Compensation Order.  The Interim Compensation Order required a more nuanced, adaptive, and contemporaneous allocation.  (*See* PAB-X034 [D.I. 2066] ¶ 2(b).)  Because the E-Side Committee professionals' approach did not comport with the Interim Compensation Order, there is no pre-existing allocation to which the Court can defer.

55.    The question, then, is what portion of the E-Side Committee professional fee claims, if any, should be allocated to EFH and EFIH, respectively.  This requires an evaluation of whether and to what extent the E-Side Committee's efforts were for the benefit of each estate.

56.    The E-Side Committee's most significant activity in the chapter 11 cases was laying the groundwork for and negotiating the settlement between the Debtors and the E-Side Committee (the "E-Side Committee Settlement").  (*See* 9/2/2018 Horton Written Direct ¶ 22; 9/5/18 Trial Tr. at 238:4-13 (Horton).)  That settlement resolved the E-Side Committee's objections to the global settlement agreement among EFH, EFIH, and TCEH (the "Global Settlement") and to the Hunt

Plan.  The settlement's key provisions included:

- reinstatement of Class A3 Claims (and, if the Debtors did not reinstate those claims, the E-Side Committee could terminate its support of the agreement);

- the TCEH Turnover Distribution; and

- a "gag" provision limiting the E-Side Committee's further participation, provided there was no breach of the E-Side Committee Settlement.

(9/2/2018 Horton Written Direct ¶ 22.)  The E-Side Committee Settlement primarily addressed EFH Claims (*i.e.*, Reinstated Class A3 Claims and the TCEH Turnover Distribution).  (*Id.* at ¶ 24.) Nonetheless, in addition to paving the path to a more consensual hearing on the Global Settlement and Hunt Plan confirmation, the "gag" provision in the E-Side Committee Settlement reduced the fee and expense accrual of the E-Side Committee's professionals, thereby benefiting both EFH and EFIH unsecured creditors.  (9/2/2018 Horton Written Direct ¶ 23; *see* 9/5/2018 Trial Tr. at 238:9-12 (Horton): "Ultimately, as part of that settlement, so long as, you know, every plan continued to meet those general requirements of the E-committee settlement, they were going to be less involved in the case.")

57.     As a general matter, the E-Side Committee arguably played a more significant advocacy role for EFH unsecured creditors than for EFIH unsecured creditors.  This is because EFIH unsecured claims only arose out of EFIH funded debt, and those claimholders had separate counsel throughout the chapter 11 cases.  Although the EFH creditors who held claims based on EFH funded debt also retained professionals—most notably, Fidelity and the EFH Indenture Trustee each retained counsel and financial advisors—EFH had some non-funded debt creditors who were unrepresented or only represented at various points in the case.  (9/2/2018 Horton Written Direct ¶ 24.)  Thus, those most likely to benefit from the E-Side Committee's guidance were holders of EFH unsecured trade debt, which amounted to less than $5 million in total claims, a relatively small amount.  (*Id.* at ¶ 25.)

58.     At the same time, some of the E-Side Committee's actions inured primarily to the benefit of EFIH unsecured creditors.  For example, one of the E-Side Committee's objections to the Hunt Plan focused on potential delays to emergence.  Specifically, the E-Side Committee noted that if the T-Side Junior Creditor Consortium (who were contemplated to own Reorganized EFH under the Hunt Plan) failed to fund its commitment, a 50-day period to secure replacement financing would be triggered and the effective date delayed.  (PAB-X307, *Trial Brief and Omnibus Objection of the EFH Official Committee to (I) Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform under the Settlement Agreement and (II) Confirmation of the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, filed Oct. 23, 2015 [D.I. 6627] at 109, 114.)  In making that particular objection, the E-Side Committee acted primarily for the benefit of EFIH unsecured creditors, since emergence delays would cause additional interest rate accruals and professional fee burn primarily to the detriment of EFIH unsecured creditors.

59.     Finally, some of the E-Side Committee's work, such as its considerable efforts in connection with setting the asbestos bar date and its services related to tax issues, inured to the collective benefit of both the EFH and EFIH estates.  (*See* 9/5/2018 Trial Tr. at 238:17-22 (Horton): "Although they may not have been driving those two activities, they were certainly involved in doing work for both estates in that regard.  They were part of the global settlement agreement.  And, you know, that provided tremendous value, I believe, to both estates, given the various claims.")

### E.     Specific Work Streams:  Tax-Related Services

60.     One of Elliott's premises to re-allocate Debtor-side professional fees is that EFH benefited from tax-related services because "EFIH unsecured creditors . . . were indifferent as to whether a restructuring transaction was taxable or non-taxable."  (*See* PAB-X670 [D.I. 13102] ¶

21

33.)  That premise does not square with the record:  pursuing a tax-free transaction maximized value for and benefitted all estates collectively.

61.     It is true that the Debtors had significant concerns about the viability of any transaction that would trigger a deconsolidation tax that EFH could not satisfy.  (*See, e.g.*, PAB-X044, *Omnibus Tax Memorandum*, filed Oct. 1, 2014 [D.I. 2296] at 16-17; PAB-X033, Presentation re Due Diligence Meetings, dated July 21, 2014 [EFH9001508 at EFH90001510-11]; 9/2/2018 Keglevic Written Direct ¶ 31.)  The magnitude of the tax was believed to exceed $7 billion dollars.  (9/2/2018 Husnick Written Direct ¶ 47.)  EFH lacked sufficient assets, on its own, to pay even a small fraction of this tax liability.  (*Id.*)

62.     While under current federal income tax law, EFH, not EFIH, would have been directly liable to the Internal Revenue Service ("IRS") for federal income taxes, stranding a multi-billion dollar tax posed significant litigation and regulatory risks to all Debtors, and, potentially, an acquirer of the assets of EFIH.  Indeed, there were a number of means by which EFIH could have been liable for significant portions of such taxes, whether directly to the government or indirectly to EFH.  (*See* 9/2/2018 Keglevic Written Direct ¶ 33:  "[A]lthough EFH would be directly liable to the IRS for federal income taxes resulting from a taxable sale of its indirect economic interests in Oncor, the Debtors understood that there were several means by which EFH might seek to hold its subsidiaries liable for portions of such taxes, whether to the IRS directly or by reimbursing EFH.")

63.     First, an EFH fiduciary may have considered a "check-the-box" election for EFIH.  (9/2/2018 Husnick Written Direct ¶ 48.)  A successful check-the-box election would have caused EFIH to become taxable as a corporation for federal income tax purposes, rendering it liable for taxes resulting from a taxable transaction.  (9/2/2018 Keglevic Written Direct ¶ 33; 9/2/2018 Husnick Written Direct ¶ 49; PAB-X033, Presentation re Due Diligence Meetings, dated July 21,

22

2014 [EFH9001508 at EFH90001511].)   The Debtors expected that any check-the-box election would be heavily litigated.  (9/2/2018 Keglevic Written Direct ¶ 33.)

64.    Second, even had EFH not elected to check the box, there was risk that the federal government could pursue payment for such taxes from EFIH's assets, including EFIH's economic interests in Oncor, or would seek to change the law or notice proposed regulations that would enable the government to collect taxes directly from EFIH, or create the possibility that it could.  (9/2/2018 Keglevic Written Direct ¶ 35; 9/2/2018 Husnick Written Direct ¶ 50.)

65.    The government could have attempted to deviate from the IRS's historic position with respect to its inability to assert taxes against a "disregarded entity," or the government could have attempted to utilize state law theories to collect taxes from such entities.  (*See* 9/2/2018 Keglevic Written Direct ¶ 35.)   In addition, in the face of a massive stranded tax, the Debtors believed that the government could have attempted to change or enact, or simply announced its intent to change or enact, applicable regulations concerning disregarded LLCs that would have enabled collection of those taxes from, potentially, EFIH.  (*Id.*)   Indeed, the government objected to the Bidding Procedures Motion to the extent a transaction could trigger a stranded tax and made a statement at the bidding procedures hearing that it would likely oppose any such transaction.  (PAB-X047, *United States' Limited Objection to the Debtors' Motion to Approve Bidding Procedures*, filed Oct. 15, 2014 [D.I. 2454]; 9/5/18 Trial Tr. at 186:3-15 (Robins) (confirming that if the government asserted a claim for a stranded tax, it would be an administrative claim and if the Debtors could not satisfy that claim, the "Debtors couldn't emerge from chapter 11").)

66.    Additionally, the Debtors were also concerned that there was a risk that the government would have attempted to pursue a third party purchaser for any stranded tax or that, at a minimum, a third party purchaser would be concerned about such a risk.  (9/2/2018 Keglevic

Written Direct ¶ 35.)   Again, the Debtors believed that such measures by the government likely would result in time-consuming and expensive litigation, which could have reduced the consideration offered by potential purchasers, which in turn would reduce recoveries to all estates, including EFIH.  (*Id.*; 9/2/2018 Husnick Written Direct ¶ 50.)

   67. Third, there was risk that EFH would seek reimbursement from EFIH for taxes owed pursuant to the Federal and State Income Tax Allocation Agreement Among the Members of the Energy Future Holdings Corp. Consolidated Group.  (*See* PAB-X004, § 1.2 [EFH00945689 at EFH00945690-91]; 9/2/2018 Keglevic Written Direct ¶ 34; 9/2/2018 Husnick Written Direct ¶ 51.) EFH may also have sought reimbursement from Oncor for taxes resulting from a taxable separation pursuant to the Amended and Restated Tax Sharing Agreement.  (*See* PAB-X003, § 9 [EFH02028985 at EFH02029001]; 9/2/2018 Keglevic Written Direct ¶ 34; 9/2/2018 Husnick Written Direct ¶ 52.)   The potential that taxes would be owed to EFH from Oncor could have materially decreased the amount a purchaser would be willing to pay for EFIH's interests in Oncor, which, in turn, would have decreased distributable value for the EFH and EFIH Debtors' estates. (9/2/2018 Keglevic Written Direct ¶ 34; 9/2/2018 Husnick Written Direct ¶ 52.)   Given the amount of taxes potentially at issue, it was likely that EFH's ability to collect taxes pursuant to the various tax sharing agreements would have been heavily litigated, further draining estate resources.  (PAB-X033, Presentation re Due Diligence Meetings, dated July, 21 2014 [EFH9001508 at EFH90001511]; 9/2/2018 Keglevic Written Direct  ¶ 34; 9/2/2018 Husnick Written Direct ¶ 52.)

   68. Fourth, the PUCT might not approve such a transaction in the event it left a stranded tax liability at EFH, or, if it did approve it, approval could be conditioned on requiring a purchaser to share tax benefits associated with such a transaction with Oncor's ratepayers. (9/2/2018 Keglevic Written Direct ¶ 36; 9/2/2018 Husnick Written Direct ¶ 53.)   The Debtors considered this a very real

risk, as the PUCT conditioned its approval of a proposed transaction for EFIH's indirect interests in Oncor that would have allowed the Hunts to obtain tax benefits associated with converting Oncor into a "REIT" structure if they shared such benefits with ratepayers.  (*See* 9/2/2018 Keglevic Written Direct ¶ 36; PAB-X329, *PUCT Order re Hunt Transaction*, dated Mar. 24, 2016 [PUC Dkt. No. 45188] at 9.)

69.     Fifth, even if the PUCT would have permitted a buyer to retain any tax benefit resulting from a "step-up" in the tax basis of Oncor's assets in a taxable transaction, the government could have taken steps to prevent a buyer from obtaining such a step-up in tax basis, such as enacting new regulations (or announcing an intent to enact new regulations) that would prevent a tax basis step-up in a "stranded tax" situation.  (9/2/2018 Keglevic Written Direct ¶ 37; PAB-X033, Presentation re Due Diligence Meetings, dated July 21, 2014 [EFH90001508 at EFH90001511].)

70.     Sixth, there was a risk that, following the T-Side Effective Date, any efforts by EFH or EFIH to pursue a taxable transaction would have violated the Tax Matters Agreement, which the Disinterested Directors heavily negotiated and authorized on behalf of their respective estates (and the Court approved as part of the T-Side Confirmation Order).  (9/2/2018 Keglevic Written Direct ¶ 38; PAB-X439, Tax Matters Agreement, dated Oct. 3, 2016, at § 2.05; PAB-X410, Unanimous Written Consent of the Joint Boards, dated Aug. 16, 2016 [EFH657325]; PAB-X390, Presentation to the Joint Boards re Restructuring, Tax, and M&A Update, dated July 27, 2016 [EFH06365761 at EFH06365766].)  Specifically, the Tax Matters Agreement limited the EFH/EFIH Debtors' ability to pursue a taxable deal after the TCEH/Shared Services Debtors emerged from bankruptcy. (9/2/2018 Keglevic Written Direct ¶ 21; PAB-X439, Tax Matters Agreement, dated Oct. 3, 2016, at § 2.05; PAB-X410, Unanimous Written Consent of the Joint Boards, dated Aug. 16, 2016 [EFH06577325].)  It contained provisions that placed significant limitations and imposed significant

requirements if EFH and EFIH pursued a taxable transaction within two years of the T-Side Effective Date. (*See, e.g.*, PAB-X439, Tax Matters Agreement, dated Aug. 16, 2016, at § 6.01(b); 9/2/2018 Husnick Written Direct ¶ 54.) As a result, any efforts after the T-Side Effective Date to pursue a taxable transaction at EFH or EFIH may have created litigation risk with Vistra Energy. (9/2/2018 Husnick Written Direct ¶ 54.)

71.     Finally, there were confirmation risks associated with pursuit of a taxable transaction. The Debtors' chief executive officer believed it was implausible that the EFH Board and EFH Disinterested Directors would authorize entry into a transaction that would have triggered a multi-billion dollar tax at EFH. (9/2/2018 Keglevic Written Direct ¶ 32.) Without EFH's support, confirmation and consummation of any EFIH-only taxable transaction would have been extremely difficult, if not impossible. (*Id.*)[14]

72.     In light of these risks, the Debtors believed that a tax-free transaction was in the best interests of both the EFH and EFIH estates and maximized enterprise value for those estates. (9/2/2018 Keglevic Written Direct ¶ 39.) Nonetheless, the record reflects that the Debtors remained open to the possibility of a value-maximizing taxable transaction. (*See id.* at ¶ 5.)

---

[14]     In light of these numerous risks, Elliott's tax expert, Mr. Abrams, proffered an opinion that was far too narrow to inform the Court's findings. Mr. Abrams' analysis was limited to federal income tax liability. (9/5/18 Trial Tr. at 134:8-10, 145:23-146:1 (Abrams).) He did not "offer[] any opinions regarding, the availability, advisability, or state law or contractual implications (if any) of a taxable disposition or other disposition of EFIH." (*Id.* at 134:17-135:5; 9/2/2018 Abrams Written Direct ¶ 9.) Mr. Abrams also ignored—or did not consider—EFH's potential check-the-box election following a sale and potential IRS action under state law theories. (9/5/18 Trial Tr. at 140:14-141:1, 142:21-143:9 (Abrams).)

The opinion proffered by Elliott's other expert also did not aid the Court in its decision-making. Mr. Robins' opinion was confined to the Debtors' exploration of a tax-free disposition of Oncor and the net benefits to EFH and EFIH respectively. (9/2/2018 Robins Written Direct ¶ 6.) Mr. Robins' opinion was based on a comparison to a hypothetical transaction, as the Debtors never received a proposal for a taxable deposition of Oncor. (9/2/2018 Keglevic Written Direct ¶ 6.) In evaluating the putative benefits from the tax-free disposition of Oncor, Mr. Robins did not consider the financial consequences of a taxable disposition, how much the tax-sharing litigation would cost, or how long it take. (9/5/18 Trial Tr. at 170:11-21, 172:10-15 (Robins).) Moreover, Mr. Robins relied on untested assumptions from illustrative financial projections, all based on a hypothetical transaction for which he conceded there was no buyer. (*Id.* at 171:4-172:12, 178:14-179:18, 177:17-178:21) Even then, his cost-benefit analysis failed to account for approximately $1 billion in costs from increasing cash-pay interest accruals and professional fees. (*Id.* at 202:9-203:5.)

73.     Consistent with their robust marketing efforts and duty to maximize the value of the Debtors' estates, the Debtors' managers, advisors, and boards stood ready to consider any proposal—taxable or otherwise—that would have been in the best interests of their respective estates.  (9/2/2018 Keglevic Written Direct ¶ 6; *see also id.* at ¶ 31: "[T]he Debtors' objective at all times was to maximize value for their estates, consistent with their fiduciary duties, and we were always open to considering any deal that would achieve our objective.")  The Bidding Procedures Order made clear that the Debtors would accept any and all proposals, whether taxable or tax-free, including for a transaction at the EFIH level.  (*See* PAB-X108, *Order (A) Approving Revised Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof*, filed Jan. 14, 2015 [D.I. 3295] ("Bidding Procedures Order") at Ex. 1 at 1:  "These Bidding Procedures set forth the process by which the Debtors are authorized to solicit proposals . . . **to acquire, in any form and employing any structure, whether taxable (in whole or in part) or tax-free, any or all of the assets** or the reorganized equity . . . of EFH Corp. or one or more of its direct or indirect subsidiaries, including EFIH") (emphasis added).)

74.     Ultimately, no credible or actionable proposal for a taxable transaction was presented to the Debtors by a single party.  (9/2/2018 Keglevic Written Direct ¶ 6; 9/6/18 Trial Tr. at 13:18-21 (Keglevic) ("Q: Did the Debtors ever receive an actionable taxable transaction term sheet?  A: No. We didn't -- we did not, and not even anything remotely approaching actionable.");  9/5/18 Trial Tr. at 177:4-5, 178:10-13 (Robins) (confirming he is "not aware of any tax proposal for the E-side that the debtors received" and "not aware of any purchaser willing to pay the proposed $2 to $3 billion for the step up in basis").)  That fact demonstrates these risks described above were real and significant.  (9/5/18 Trial Tr. at 194:19-23 (Robins):  "And there's very good and clear reasons

why [EFH and EFIH] both wanted to pursue a tax-free transaction.")

75.    In fact, there is evidence that EFIH unsecured creditors analyzed and understood those risks and believed a tax-free disposition was in the best interests of the Debtors' estates.  (*See* 9/2/2018 Keglevic Written Direct ¶ 41; 9/5/18 Trial Tr. at 176:19-21 (Robins):  "Q: And you think a tax-free transaction on the E-side was value maximizing; right?  A: Yes.").)

76.    Indeed, EFIH unsecured creditors implored the Debtors not to trigger a massive tax liability because it would be a significant detriment to their projected recoveries.  During pre-petition restructuring negotiations in 2013, counsel for the EFIH unsecured creditors approached EFIH and its subsidiary EFIH Finance, Inc. with the idea of an exchange of their notes into a "third lien" security at EFIH.  (9/2/2018 Keglevic Written Direct ¶ 40.)  The proposal was made in part as an effort to obtain a higher priority than a potential claim at EFIH under a tax sharing agreement.  (*Id.*)  EFIH and EFIH Finance, Inc. did not pursue that exchange.  (*Id.*)

77.    Additionally, on July 7, 2014, counsel for the ad hoc committee of certain EFIH unsecured noteholders wrote to the EFIH Disinterested Manager, "to make sure the viewpoint of the Ad Hoc Committee is directly communicated to you," and urged adherence to the Restructuring Support Agreement "and the comprehensive economic compromises embodied therein . . . ." (PAB-X032, July 8, 2014 Email from J. Walker to A. Acosta *et al*, att. I. Dizengoff letter to C. Cremens [CCREMENS000001 at CCREMENS000002-03].)  Among other harms, the EFIH unsecured creditors' letter warned that termination of the Restructuring Support Agreement could "put at risk the Debtors' ability to consummate the carefully crafted tax-free spin-off of [TCEH], which in turn would trigger ***billions*** of dollars of tax liability, thus jeopardizing unsecured creditor recoveries at the EFH, EFIH and TCEH estates."  (*Id.* at CCREMENS000003.)

78.    EFIH unsecured creditors (including Elliott in 2017 and York in 2014, when Mr.

Rosenbaum was at that firm) signed various restructuring support agreements to support tax-free transactions. (*See, e.g.*, PAB-X025, Apr. 29, 2014 Email from A. Yenamandra to S. Serajeddini re EFH Term Sheet RSA [EFH2D10034694 at EFH2D10034765]; PAB-X478, Plan Support Agreement Dated Jan. 2, 2017 by and Between the EFH/EFIH Debtors, the PIK Notes Trustee, and Certain Creditor Parties Thereto, dated Jan. 3, 2017 [D.I. 10530]; PAB-X584, *Order (CORRECTED) (A) Authorizing Entry into Merger Agreement and Approving Termination Fee, and (B) Authorizing Entry Into and Performance Under Plan Support Agreement*, dated Sept. 7, 2017 [D.I. 11873].)  As sophisticated, experienced parties with separate counsel, Elliott and its predecessors negotiated consensual deals that, in their view, best maximized their recovery. They were under no obligation to commit themselves to supporting a restructuring path forward— particularly after statutory exclusivity had expired.  Their decision to nevertheless support the Debtors' proposed path forward as opposed to forging their own alternative path reflects their belief that the Debtors' path best maximized their recovery.

### F.    Specific Work Streams:  Makewhole-Related Services

79.    In support of its contention that more of the Debtors' professional fees should be allocated to the EFH estate, Elliott has argued that "disallowance of the EFIH noteholders' make-whole premiums—and the Debtors' efforts in contesting noteholders' entitlement to these premiums—would inure to the benefit of EFH creditors."  (PAB-X670 [D.I. 13102] ¶ 34.)  The record instead reflects that the litigation efforts to disallow the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims (the "Makewhole Claims") inured to the benefit of EFIH unsecured creditors.

80.    The Parties' dispute primarily relates to the allocation of fees and expenses incurred in litigating the Makewhole Claims.  Kirkland billed its fees and expenses incurred in litigating the allowance of Makewhole Claims to the EFIH Debtors as Direct Benefit Fees.  (9/2/2018 Husnick

Written Direct ¶ 40.)  Kirkland billed fees and expenses relating to other matters involving the Makewhole Claims, such as negotiating Disclosure Statement and Plan objections, as Collective Benefit Fees.  (*Id.* at ¶ 43.)

81.    In the Debtors' waterfall, EFIH unsecured creditors were directly below the EFIH first and second lien creditors.  As a result, at nearly all valuations, disallowing the Makewhole Claims would inure to the benefit of the EFIH unsecured creditors.  (9/2/2018 Horton Written Direct ¶ 39.)  At some valuations where EFIH unsecured creditors would receive a full recovery, disallowing the Makewhole Claims would inure to the benefit of the EFH unsecured creditors.  (*Id.* ¶ 39.)

82.    The EFIH unsecured creditors were economically incentivized to support the Debtors' attempts to have those claims disallowed.  Because EFIH unsecured creditor recoveries were not guaranteed in the Chapter 11 Cases, and because the interest accrual on the EFIH First Lien Notes and EFIH Second Lien Notes was substantial—tens of millions of dollars per month— EFIH unsecured creditors had every incentive to vigorously pursue disallowance of the Makewhole Claims.  (*See* 9/2/2018 Husnick Written Direct ¶ 42.)  Successfully doing so would have increased the likelihood of significant, if not full, recoveries to the EFIH unsecured creditors as opposed to substantially lower recoveries, and it would have enabled EFIH unsecured creditors to avoid the interest rate burn saved by repaying the EFIH First Lien Notes from reappearing through the allowance of those claims.  (*Id.*)

83.    Indeed, it was EFIH's motion to repay the principal amount of EFIH First Lien Notes at the start of the Chapter 11 Cases that triggered the makewhole litigation.  (*Id.* at ¶ 41.)  The original Restructuring Support Agreement included a provision obligating EFIH to challenge the allowance of the EFIH Makewhole Claims.  (*See* PAB-X029 [D.I. 505-2] at Ex. 2 at Ex. A at 3-4,

7.)  EFIH unsecured creditors signed onto the Restructuring Support Agreement.  (*Id.* at Ex. 2 at Ex. A at 14; 9/2/2018 Rosenbaum Written Direct ¶ 6.)

84.    Further, EFH was not a party or involved in the makewhole litigation.  (9/2/2018 Horton Written Direct ¶ 41.)  EFIH and EFIH Finance, Inc. were the Debtor entities party to the EFIH First Lien Indenture and EFIH Second Lien Indenture, and defendants in the suits filed by the EFIH First Lien Indenture Trustee and EFIH Second Lien Trustee.  (*See* PAB-X028, Compl., *CSC Trust Co. of Del. v. Energy Future Intermediate Holding Co. LLC, et al.*, Adv. Proceeding 14-50363-CSS (Bankr. D. Del. May 15, 2014); PAB-X031, Compl., *Computershare Trust Co., N.A. et al. v. Energy Future Intermediate Holding Co. LLC, et al.*, Adv. Proceeding 14-50405-CSS (Bankr. D. Del. June 16, 2014).)

85.    As a result, Kirkland appropriately allocated (a) as Direct Benefit Fees to EFIH the fees and expenses incurred in connection with litigating the allowance of Makewhole Claims and (b) as Collective Benefit Fees the fees and expenses incurred in addressing other matters involving the Makewhole Claims, such as negotiating Disclosure Statement and Plan objections, negotiating and documenting the EFIH Secured Settlement, and negotiating a potential path forward following the Third Circuit Makewhole Opinion in November 2016.

### G.    Elliott's Solvency-Related Basis for Re-Allocation

86.    Elliott further argues that "the overwhelming majority of Kirkland's Direct Benefit Fees were incurred when EFIH was solvent, and accordingly when any plan could have benefited only EFH unsecured creditors."  (PAB-X670 [D.I. 13102] ¶ 67.)  Specifically, Elliott argues that until the Third Circuit's opinion in November 2016, EFIH was "solvent" because EFIH unsecured creditors were expected to receive a 100% recovery.  The record contradicts any suggestion that EFIH could not have benefited from the work performed by the Debtors' professionals from the Petition Date to November 2016.

31

87.     First, over time, there were declines in the amount of consideration potential purchasers were willing to infuse into the Reorganized Debtors. (9/2/2018 Horton Written Direct ¶ 43.) While all potential purchasers were prepared to satisfy secured claims at EFIH (to avoid a difficult "cram" fight at plan confirmation), there was increasingly less certainty over time as to the recovery for EFIH unsecured creditors. (*Id.*)

88.     Second, Elliott's argument does not account for the reality that EFIH could only be solvent upon the consummation of a deal, which would be subject to substantial contingencies. (*See id.* ¶ 44; PAB-X426, *Disclosure Statement for the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors*, filed Sept. 15, 2016 [D.I. 9557] at 163 (identifying risks regarding the Debtors' ability to consummate the Plan); PAB-X319, *Sixth Amended Joint Plan of Reorganization*, filed Dec. 1, 2015 [D.I. 7187] at 100-01; 9/5/18 Trial Tr. at 273:16-21 (Horton).) Until a transaction closed, there was no guarantee that EFIH was solvent. Accordingly, the Debtors and their professionals had to undertake significant efforts to preserve the estate. (*See* 9/2/2018 Horton Written Direct ¶ 44.)[15]

89.     One of those contingencies was obtaining an order disallowing the Makewhole Claims. Every Plan filed between the Court's disallowance of the Makewhole Claims and the Third Circuit's opinion had a closing condition permitting the proposed purchaser to terminate the transaction if the Court order disallowing the Makewhole Claims was stayed, reversed, or remanded on appeal prior to the E-Side Effective Date. (PAB-X319 [D.I. 7187] at § IX.B.9; PAB-X339, *Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, filed May 1, 2016 [D.I. 8355] at § IX.D.8; PAB-X352, *Amended Joint Plan of*

---

[15]     Mr. Robins, Elliott's expert, acknowledged that, in formulating his solvency assumption, he did not do a "classic investment banker enterprise valuation"; instead, he relied on "a secondary indicator of enterprise value" (*i.e.*, trading prices of debt). (9/5/18 Trial Tr. at 174:7-17 (Robins).)

*Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, filed May 10, 2016 [D.I. 8421] at § IX.D.8; PAB-X430, *Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, filed Sept. 21, 2016 [D.I. 9612] at § IX.D.10.)  Given the threat of an adverse ruling on the Makewhole Claims and the uncertainty of the ultimate purchase price, the EFIH unsecured creditors were never guaranteed a 100% recovery and, thus, had every incentive to advocate for EFIH to litigate the disallowance of the Makewhole Claims.

90.     To maximize value, the Debtors needed to address a number of other risks, as well. One was the threat of a massive tax liability being triggered at EFH, with EFIH bearing contingent risk under a number of different legal theories described above.  (*See* 9/2/2018 Horton Written Direct ¶ 46; 9/2/2018 Keglevic Written Direct ¶¶ 31-39; PAB-X044, Omnibus Tax Memorandum [D.I. 2296] at 7-8, 10, 12-21; 9/6/18 Trial Tr. at 15:6-18:13 (Keglevic).)  A quantification of this risk is reflected in the Debtors' various liquidation analyses, which show that EFIH unsecured creditors were not projected to receive full recoveries in a "check-the-box" scenario.  (*See, e.g.*, PAB-X431, *Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors*, filed Sept. 21, 2016 [D.I. 9616], Ex. E at 17 (showing 1.4% recovery to holders of Class B6 claims where "'check-the-box' effective for all currently disregarded entities").)  There was also the potential for an extensive litigation overhang from the inter-estate claims, regulatory hurdles to consummating the transaction, and the Debtors needed to address their asbestos liabilities. (9/2/2018 Horton Written Direct ¶ 46.)

91.     For a purchaser to close a transaction and infuse capital into the EFIH estate, the Debtors and their professionals had to address these risks.  (*See id.* at ¶ 47.)  In some cases, it took

33

years to do so.  (*Id.*)  In the absence of a comprehensive solution for these risks, EFIH unsecured creditors would have received materially less value.  (*Id.*)  Accordingly, it would be inappropriate for unsecured creditors of EFIH to avoid shouldering the bulk of the costs of the work from which they ultimately benefited.

92.    At the same time, EFH likewise benefited from the Debtors' efforts to mitigate these risks, which gave EFH the option of receiving some of the distributable value from the sale of Oncor and avoided massive liabilities.  At certain points in the case, that potential value to EFH was material.  (*Id.*)

93.    Elliott also ignores that the Debtors and Sempra were able to quickly consummate the Sempra transaction because all of the participants learned from—and built upon—prior experiences.  (9/2/2018 Keglevic Written Direct ¶ 28:  "The Sempra transaction built on over three years of work done by the Debtors, their professionals, the various buyers, and the creditors in the chapter 11 cases . . . .  This enabled Sempra to promptly clear the necessary execution hurdles, where preceding transactions had failed.")  The Sempra transaction benefited from the prior work done on the regulatory front (with the PUCT and IRS); the parties were able to expedite the diligence process and deal documentation from the groundwork laid with the NextEra and Berkshire transactions; and as with NextEra, Sempra benefited from the presence of the evergreen Global Settlement.  (*See* 9/2/2018 Horton Written Direct ¶ 48; 9/2/2018 Keglevic Written Direct ¶ 28.)

## H.    Specific Work Streams:  Asbestos-Related Services[16]

---

[16]    The Debtors believed the aggregate asbestos-related liabilities were "substantially less than $250 million."  (9/6/2018 Trial Tr. at 86:5-6 (Horton).)  The Debtors advised their boards that Dr. Thomas Vasquez of Ankura Consulting Group concluded that the total nominal cost to resolve pending and future asbestos-related claims against the E-Side Debtors in the most likely scenario was approximately $49.7 million, with a net present value of $36.4 million.  (PAB-X484, Presentation to the Boards (Restructuring Update), dated Jan. 20, 2017 [EFH06598368 at EFH06598410].)  The Debtors also advised their boards that from 1992 to 2014, the Debtors' aggregate asbestos expenses were approximately $26.4 million, and that from 2009 to 2013, asbestos-related expenses averaged approximately $2 million per year.  (PAB-X156, Presentation to the Boards (Restructuring Update), dated Mar. 30, 2015 [EFH05547944 at EFH055479450]).

34

94.     Elliott argues that "pursuit of a transaction in which asbestos claims against the EFH Debtors are assumed . . . has been driven by, and resulted, in direct benefits to the EFH estate and its creditors."  (PAB-X670, *Allocation Motion* [D.I. 13102] ¶ 31.)    The record contradicts that argument.

95.     As part of these Chapter 11 Cases, the E-Side Debtors focused their asbestos-related time on two primary work streams:  (a) obtaining the Asbestos Bar Date Order and (b) reinstating claims filed by claimants who timely filed asbestos-related proofs of claim before the Asbestos Bar Date as part of a joint plan of reorganization.  (9/2/2018 Horton Written Direct ¶¶ 55-58.)  Both were components of the Debtors' holistic restructuring efforts and inured to the collective benefit of both the EFH and EFIH estates (and before the T-Side Effective Date, all of the Debtors).  (9/5/2018 Trial Tr. at 81:21-83:2 (Husnick).)[17]

96.     Convincing a potential acquirer of the Reorganized Debtors to assume uncapped asbestos liabilities was a challenge, and the Debtors sought the Asbestos Bar Date in an effort to provide some certainty regarding the scope of Reorganized EFH's and the Reorganized LSGT Debtors' potential liability.  (9/2/2018 Horton Written Direct ¶ 56; 9/5/18 Trial Tr. at 82:13-83:2 (Husnick).)  The Debtors then had extensive negotiations with proposed purchasers about the importance of reinstating preserved asbestos claims, and the Debtors made concessions to secure that commitment.  (9/2/2018 Horton Written Direct ¶ 56.)  Thus, without the certainty that the Asbestos Bar Date provided regarding the extent of the Debtors' asbestos liabilities, potential purchasers likely would have discounted their purchase price or otherwise reduced the available distributable value, which in turn would have resulted in a dollar-for-dollar reduction in distributions to EFIH unsecured creditors.  (*See id.*)

---

[17]    Had the Debtors defended or litigated the merits of any particular asbestos-related claim—and they did not (9/2/2018 Husnick Written Direct ¶ 35)—fees related to that litigation should have been allocated to the Debtor against whom the claim was asserted.

97.     Reinstating timely-preserved claims was also critical to gaining support from the E-Side Committee in the Chapter 11 Cases.  (*Id.* ¶ 58.)  As discussed above, reaching a compromise with the E-Side Committee—and maintaining that compromise after the Hunt transaction failed—benefited EFIH unsecured creditors.  This compromise also avoided the costs of protracted litigation under section 524(g) of the Bankruptcy Code regarding a channeling injunction and the costs of concomitant delays (including significant interest burn—approximately $50 million per month—at EFIH).  (9/2/2018 Husnick Written Direct ¶ 38; 9/5/18 Trial Tr. at 81:21-82:12 (Husnick).)

98.     Moreover, EFIH restructured its debts by consummating a joint plan of reorganization with EFH that addressed the Debtors' asbestos liabilities.  In other words, a value-maximizing result for EFIH was tied directly to the Debtors' resolution of their asbestos-related liabilities.  To achieve this result, the Debtors' professionals had to resolve due process-related objections to disclosure statements and related joint plans of reorganization (and defend confirmed plans on appeal).  (9/2/2018 Husnick Written Direct ¶ 39.)  It may be true that resolving asbestos claims might have mattered to only EFH *if* EFIH consummated a transaction separate from EFH.  But as discussed above, no creditor or third-party put its capital behind such a transaction and ultimately, EFIH unsecured creditors unanimously supported the Debtors' pursuit and consummation of the joint plan.

## II.     NextEra Termination Fee

99.     Following the termination of the Hunt transaction, the Debtors held multi-bidder negotiations in the summer 2016 to market their economic interest in Oncor.  On July 29, 2016, the Debtors entered into a merger agreement with NextEra Energy, Inc. (the "NextEra Merger Agreement").  (*See* PAB-X399, Unanimous Written Consent of Joint Boards, dated Aug. 2, 2016 [EFH06577296]; PAB-X400, *Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and*

36

*Performance Under Plan Support Agreement*, filed Aug. 3, 2016 [D.I. 9190].)  Following a hearing on September 19, 2016, this Court entered an order (the "Termination Fee Order"): (a) authorizing the Debtors to enter into the NextEra Merger Agreement, (b) approving a $275 million termination fee (the "NextEra Termination Fee") on the terms set forth in the NextEra Merger Agreement (but deferring the determination of how to allocate the NextEra Termination Fee), and (c) authorizing the Debtors to pay the NextEra Termination Fee as an administrative expense to the extent it became due and payable under the terms of the NextEra Merger Agreement, subject to a further Court order allocating the NextEra Termination Fee.  (PAB-X429, *Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement*, filed Sept. 19, 2016 [D. I. 9584].)

100.    In the EFH/EFIH Allocation Dispute, the Parties have presented evidence about the E-Side Debtors' negotiations of the NextEra Termination Fee and NextEra's final purchase price. Specifically, Elliott has argued that an increase in the NextEra Termination Fee from $110 million to $275 million during negotiations directly increased recoveries for EFH creditors, who should therefore bear half of the NextEra Termination Fee.  (PAB-X670 [D.I. 13102] ¶ 48.)  Elliott has also argued that "NextEra assumed the [asbestos] liabilities . . . in exchange for a $165 million increase to the termination fee" and that such agreement to assume asbestos liabilities benefited EFH only. (*Id.* at ¶ 39.)  Neither statement comports with the record.

101.    As an initial matter, the record does not support Elliott's binary—or quid-pro-quo— summary of the negotiations.  Like any multi-bidder negotiation for the assets of a debtor with multiple, active creditor constituencies and regulatory issues, no single deal term was discussed in a vacuum.  (9/2/2018 Horton Written Direct ¶ 29.)

102.    On July 27, 2016, NextEra simultaneously agreed to increase its purchase price by

$200 million, eliminate a match right, and reinstate timely-preserved asbestos-related claims. (PAB-X393, Presentation to Joint Boards (M&A Update), dated July 28, 2016 [EFH06375541 at EFH06375546]; PAB-X395, Minutes of Meeting of Joint Boards, dated July 28, 2016 [EFH06523189 at EFH06523189-90].)   Those concessions from NextEra were factors in the decision by both EFH and EFIH to consider an increase in the NextEra Termination Fee.  (9/2/2018 Horton Written Direct ¶ 30.)  Dropping the match right, in particular, preserved the flexibility for EFH and EFIH to benefit from an alternative proposal on either economic or non-economic terms, without the chilling effect of an overhanging match right.  (*Id.*)  In addition, the increase in the NextEra Termination Fee made that fee consistent with the termination fee sought by the other bidder negotiating with the Debtors at the time.  (9/6/2018 Trial Tr. at 61:6-14 (Keglevic).)

103.   The next day, on July 28, 2016, NextEra agreed to an additional purchase price increase of $110 million.  (PAB-X398, Minutes of Meeting of Joint Boards, dated July 29, 2016 [EFH06440533]; 9/5/2018 Trial Tr. at 230:15-18 (Horton):  "[W]e went back to NextEra with an ask for $150 million increase in price and a reverse breakup fee.  We got $110 million increase in the price.")  NextEra increased its purchase price without any additional concessions by EFH or EFIH, perhaps as a reaction to a NextEra concern that the Debtors were simultaneously negotiating with another bidder.  (9/2/2018 Horton Written Direct ¶ 31.)  It was only with this additional increase in distributable value that all EFIH unsecured creditors were projected to receive a 100% recovery.  (*Id.*; 9/5/2018 Trial Tr. at 230:18-19 (Horton):  "And at that point in time, we cleared the PIKS, they were getting 100 percent recovery."; 9/6/2018 Trial Tr. at 61:15-19 (Keglevic):  "I think the importance of that last 110 was to get EFIH paid in full, assuming no make-whole liability.")  Of course, EFIH unsecured creditors would receive a 100% recovery only if the Debtors satisfied all of the closing conditions—including a series of state and federal regulatory approvals and the

absence of an order reversing, remanding, or staying the Court order disallowing the Makewhole Claims— and the transaction closed. (9/2/2018 Horton Written Direct ¶ 31; PAB-X431, *Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors*, filed Sept. 21, 2016 [D.I. 9616], Art. VI.D.)

104.    The Debtors then executed the NextEra Merger Agreement and filed a motion seeking authority to enter into the transaction. (9/2/2018 Horton Written Direct ¶ 32; 2/10/2017 Keglevic Written Direct ¶ 18.) Leading up to the September 19, 2018 hearing, EFH and EFIH continued to engage in negotiations regarding the NextEra Merger Agreement. (9/2/2018 Horton Written Direct ¶ 32; 2/10/2017 Keglevic Written Direct ¶ 19.) On September 18, 2016, NextEra agreed to increase its purchase price by $300 million. Additionally, NextEra agreed to release an approximately $150 million held in reserve for purposes of satisfying reinstated asbestos claims (although such reserve did not operate as a cap on the Reorganized Debtors' obligations to satisfy any valid, reinstated claim). (9/2/2018 Horton Written Direct ¶ 32; 2/10/2017 Keglevic Written Direct ¶ 19.) As a result of the increased purchased price and release of $150 million of cash consideration, there was an additional $450 million of distributable value. (PAB-X435, Presentation to Joint Boards (Restructuring Update), dated Sept. 30, 2016 [EFH06577922 at EFH06577934].)

105.    Because EFIH creditors were already projected to receive a 100% recovery, these increases in distributable value were projected to inure to the benefit of EFH creditors—again, absent an order reversing, remanding, or staying the Court order disallowing the Makewhole Claims and pending satisfaction of the other closing conditions. (9/2/2018 Horton Written Direct ¶ 33; 9/5/2018 Trial Tr. at 231:7-8 (Horton): "It was roughly $471 million coming up from EFIH to

EFH.")   In other words, as of September 19, 2016, EFH unsecured creditors were projected to benefit from all of the 11th hour, $450 million increase in distributable value, but only if EFIH unsecured creditors were paid in full at closing.  (9/2/2018 Horton Written Direct ¶ 34.)  On the other hand—and also as of September 19, 2016—the $450 million increase would benefit the EFIH unsecured creditors if the Makewhole Claims ever became Allowed by Final Order and, to the extent such allowance was prior to the E-Side Effective Date, the NextEra transaction closed without modification to the then-existing conditions precedent to consummation.  (*Id.*)

106.    Contemporaneous with the increased purchase price, Fidelity—the then-largest single holder of EFH unsecured claims—withdrew its objections to the NextEra Transaction and became a party to the NextEra Plan Support Agreement.  (PAB-X431, *Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors*, filed Sept. 21, 2016 [D.I. 9616] at 9.)  This helped pave the way to a more consensual confirmation process for both EFH and EFIH.  The Court approved the Debtors' entry into the transaction the next day.  (9/2/2018 Horton Written Direct ¶ 33; PAB-X429, *Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement*, filed Sept. 19, 2016 [D.I. 9584].)[18]

107.    On November 17, 2016, as the parties were preparing for confirmation, the Third Circuit issued an opinion that reversed this Court's disallowance of the Makewhole Claims.  *Delaware Trust Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 842 F.3d 247 (3d Cir. 2016) (the "Makewhole Opinion").  The "$471 million was drained

---

[18]    The Court later approved a substantial contribution claim for Fidelity of up to $20 million (subject to various conditions precedent), allocated 100% to EFH.  (ELX-487, *Order Allowing Administrative Expense Claim for Fidelity Management & Research Company's Substantial Contribution Pursuant to Sections 503(B)(3)(D) and 503(B)(4) of the Bankruptcy Code*, filed Mar. 24, 2017 [D.I. 11050].)

from EFH in that instance, and . . . the PIKs were impaired about [$]165 million." (9/5/2018 Trial Tr. at 231:18-22 (Horton).)  EFIH unsecured creditors now faced an impending order allowing significant senior secured claims that would reduce their recoveries dollar-for-dollar.  EFIH unsecured creditors had two choices:  (a) negotiate for participation and consent rights in any future litigation or settlement of the Makewhole Claims or (b) withdraw support of the NextEra Plan and develop an alternative proposal that provides a greater recovery to EFIH unsecured creditors.  (*See* 9/2/2018 Horton Written Direct ¶ 36; 9/2/2018 Keglevic Written Direct ¶ 19.) A super-majority group of the EFIH PIK Notes opted for the former, electing to increase their distributable value through litigation and settlement of the Makewhole Claims.  (PAB-X481, *Amended Disclosure Statement for the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors*, filed Jan. 4, 2017 [D.I. 10565], § I.C.I.)  As a result, EFH unsecured creditors would receive cash on hand at EFH only (in the absence of an alternative, superior proposal).  (9/2/2018 Horton Written Direct ¶ 36.)  Thus, had the NextEra transaction closed, the entirety of the September 18, 2016 increase in NextEra's purchase price would have gone to the EFIH unsecured creditors.  (*Id.*)

108.    EFIH unsecured creditors may have continued to support the NextEra transaction—rather than developing or advocating for an alternative transaction or plan—because of concerns about further delays to emergence.  While EFH could not remain in chapter 11 indefinitely, the adequacy of cash at EFH was relatively more stable than at EFIH.  (9/6/2018 Trial Tr. at 24:3-8, 24:17-19 (Keglevic).)  This was largely due to the absence of secured debt at EFH.  (9/2/2018 Horton Written Direct ¶ 37.)  On the other side, EFIH depended on Oncor dividend distributions, which were never guaranteed.  (9/2/2018 Horton Written Direct ¶ 37.)  Indeed, the payment of such

amounts was, from time to time, the subject of dispute and controversy.  (*See, e.g.*, PAB-X613, *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Approving the Settlement Between the Debtors and Sempra and Approving the Agreed Amendment to the Merger Agreement*, filed Feb. 2, 2018 [D.I. 12571] at 7.)  Moreover, the EFIH First Lien DIP Facility offered a finite level of credit, and there was an interest cost of more than $20 million a month with that facility.  (9/2/2018 Horton Written Direct ¶ 37.)   There was also $25 million per month of cash-pay obligations on the EFIH second lien debt, in addition to ongoing interest obligations on the Makewhole Claims.  (*Id.*)   Growing interest on the Debtors' secured credit facilities (and the ongoing professional fee costs) depressed the recoveries of EFIH unsecured creditors.  (*Id.*; 9/6/2018 Trial Tr. at 24:6-8 (Keglevic): "the cash burn at EFIH, vis-à-vis an unsecured EFIH creditor was substantial because it was $50 to $60 million dollars a month.")

109.    Although EFH unsecured creditors ultimately were not projected to receive any cash consideration from the NextEra Merger Agreement (had it closed), they also benefited from NextEra Transaction.  In effect, the NextEra deal bought them an opportunity for a greater recovery, and, not surprisingly, the NextEra Termination Fee was an up-front demand required by the counterparty for the right to pursue that opportunity.[19]

## III.    Elliott Substantial Contribution Claim

110.    The Confirmation Order included a finding that Elliott made a substantial contribution and granted Elliott an administrative claim pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code of up to $35 million for fees and expenses (subject to review by

---

[19]    The Court did not find useful the opinion of Steven R. Strom, the Ad Hoc Group's expert regarding the amount and structure of breakup fees in section 363 sales.  Mr. Strom relied on precedent transactions that did not involve or implicate multi-debtor silos.  (9/6/2018 Trial Tr. at 186:14-187:23 (Strom).)  Further, Mr. Strom conceded he has no experience allocating a break-up fee among a jointly administered estate and no experience allocating professional expenses among a jointly administered estate. (*Id.* at 184:10-23, 185:4-16, 187:3-25 (Strom).)  Finally, Mr. Strom was inconsistent in his determination of whether avoidance of a contingent liability constituted a benefit. (*Id.* at 202:17-204:16, 205:22-206:22 (Strom).)

the Fee Review Committee) incurred in connection with its substantial contributions (the "Elliott Substantial Contribution Claim").  (PAB-X631, *Order Confirming the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company, LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code*, filed Feb. 27, 2018 [D.I. 12763] at ¶ 109.)  The Confirmation Order allocated the ultimate allowed amount of the Elliott Substantial Contribution Claim to EFIH (consistent with the terms of the Sempra Plan Support Agreement), but left open the possibility of a reallocation pursuant to separate Court order. (*Id.*)[20]

111.    These findings of fact do not summarize all of the contributions that Elliott made to the Chapter 11 Cases, but instead focus on the contributions that inform an allocation of the Elliott Substantial Contribution Claim.  However, these findings of fact do not inform the appropriate allowed amount of the Elliott Substantial Contribution Claim.

112.    One of Elliott's most prominent contributions was its efforts regarding the NextEra Termination Fee, which would significantly reduce the administrative claims pool for the E-Side Debtors.  On July 29, 2017, Elliott filed a motion to reconsider the Termination Fee Order to the limited extent it authorized the Debtors to pay the NextEra Termination Fee when NextEra failed to obtain regulatory approval and, due to the absence of an outside date by which regulatory approval had to be obtained, the Debtors were forced to terminate the NextEra merger transaction in order to

---

[20]    Elliott's Substantial Contribution Claim is subject to review by the Fee Review Committee.  On May 11, 2018, Elliott submitted a statement to the Fee Review Committee, seeking payment and reimbursement of $30,236,354.38 in professional fees and $1,438,294.91 in expenses.  (ELX-669, *Statement in Support of Substantial Contribution Claim Pursuant to 11 U.S.C. §§ 503(b)(3) and 503(b)(4)*, dated May 11, 2018 [Elliott_00010628].)

Section 503(b) of the Bankruptcy Code requires an evaluation of the benefit the applicant made to the *estate*, not to the applicant itself.  As a result, it is noteworthy—but not dispositive—that Elliott is advocating for an EFIH-favorable outcome in this allocation dispute.  Elliott itself conceded that a "shift [of] administrative fees and expenses from the EFIH estate to the EFH estate, [is] a net benefit in the overall coverage to Elliott . . . ." (9/7/2018 Trial Tr. at 51:21-25 (Rosenbaum).)

pursue an alternative transaction. (ELX-532, *The Elliott Funds' Motion to Reconsider in Part the September 19, 2016 Order Approving the NextEra Termination Fee*, filed Jul. 29, 2017 [D.I. 11636] (the "Reconsideration Motion").)  On October 18, 2017, the Court entered an order granting the Reconsideration Motion.  (ELX-583, *Order Granting the Motion to Reconsider of Elliott Associates and Denying Application of NextEra Energy Inc. for Payment of Administrative Claim*, filed Oct. 18, 2017 [D.I. 12075] (the "Reconsideration Order").)  On September 13, 2018, the Third Circuit affirmed the Reconsideration Order.  *NextEra Energy, Inc. v. Elliott Assocs., L.P. (In re Energy Future Holdings Corp.)*, No. 18-1109, 2018 WL 4354741 (3d Cir., Sept. 13, 2018).

113.    Although the NextEra Termination Fee is presently a disallowed claim, it is the subject of additional appellate proceedings, and the Parties have asked the Court to allocate a reserve the Debtors established for the NextEra Termination Fee pending the appeal of the Reconsideration Order.

114.    Specifically, at the February 26 through 27, 2018 confirmation hearing, this Court ruled that the Debtors could, in their discretion, establish a $275 million reserve for the disallowed NextEra Termination Fee.  (ELX-634, 2/26/2018 Hr'g Tr. at 233:1–3.)  The Court also concluded that the reserve would "preserve the integrity of the judicial process" with respect to NextEra's appeal of the Reconsideration Order. (*See id.* at 15:1–17.)  Accordingly, the Court approved the NextEra Plan Reserve as a valid exercise of the Debtors' discretion and reasonable business judgment.  (PAB-X631, *Order Confirming the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code*, filed Feb. 27, 2018 [D.I. 12763] at ¶ 150.)[21]

---

[21]    On March 13, 2018 and March 23, 2018, Elliott and UMB, respectively, appealed the Confirmation Order with respect to the reserve.  That appeal is fully briefed.

115. Another component of Elliott's substantial contribution was its support of the Sempra transaction, which "increased distributable value for EFIH creditors, but not EFH creditors." (9/2/2018 Horton Written Direct ¶ 50.)  Elliott also "facilitated a settlement of certain dividend issues between the Debtors and Oncor . . . [resulting] in (a) Sempra making a guaranteed $31 million payment to the Debtors (the vast majority of which was paid to EFIH) and (b) the resolution of a dispute that could have complicated confirmation and potentially delayed emergence (which would have been to the detriment of EFIH unsecured creditors)."  (9/2/2018 Horton Written Direct ¶ 50; *see also* 9/2/2018 Rosenbaum Written Direct ¶ 58.)[22]  Absent the settlement, there was a significant risk that Oncor—and after closing, Sempra—would retain the value related to any actual or potential dividends.  It also avoided the need for discovery that could have delayed or disrupted consummation.  (9/2/2018 Horton Written Direct ¶ 50.)

116. In addition, the Oncor Dividend Settlement avoided potentially costly tax litigation for EFH regarding its obligations to Oncor or Oncor Electric Delivery Holdings Company LLC for tax years 2017 and 2018 under the Oncor Tax Sharing Agreement.  (*See* 9/2/2018 Horton Written Direct ¶ 51; 9/2/2018 Rosenbaum Written Direct ¶ 58.)  That litigation could have conceivably

---

On February 20, 2018, NextEra filed an application seeking allowance and payment of approximately $60 million in various expenses purportedly incurred by it in connection with the transaction as administrative expenses under section 503(b) of the Bankruptcy Code. (ELX-625, *Application of NextEra Energy, Inc. for Allowance and Payment of Administrative Claim*, filed Feb. 20, 2018 [D.I. 12671] (the "NextEra Expense Application").)

In connection with confirmation, NextEra requested that the Court order the Debtors to also set a reserve for the NextEra Expense Application.  (*See Notice of Filing NextEra Energy, Inc.'s Proposed Confirmation Order Modifications*, filed Feb. 25, 2018 [D.I. 12749]; *see also* ELX-634, 2/26/18 Hr'g Tr. at 214:15–24).  The Court denied NextEra's request for a back-up reserve.  (ELX-634, 2/26/18 Hr'g Tr. at 233:17–23).  NextEra did not appeal that denial.

On March 23, 2018, Elliott filed a motion to dismiss the NextEra Expense Application or, in the alternative, for summary judgment denying and disallowing NextEra's $60 million administrative expense claim.  On August 1, 2018, this Court issued an opinion granting Elliott's motion.  (ELX-690, *Memorandum Opinion*, filed Aug. 1, 2018 [D.I. 13332].)  NextEra appealed the subsequent order to the District Court. (*Notice of Appeal*, filed Aug. 15, 2018 [D.I. 13363].)

[22]  A smaller portion of the Oncor Dividend Settlement flowed directly to EFH.  (9/2/2018 Horton Written Direct ¶ 51.)

extended past the E-Side Effective Date, and the fees associated with that litigation would reduce distributable value available to creditors.  (9/2/2018 Horton Written Direct ¶ 51; 9/5/2018 Trial Tr. at 236:9-13 (Horton):  "Had . . . the Sempra transaction not closed, to have the opportunity to have that E&P, so that if we ended up doing an equitization plan, we'd have that E&P available to do some type of dividend to the new equity holders.")

## CONCLUSIONS OF LAW

117.    Based on the findings of fact set forth above, the Court makes the following conclusions of law:

## I.    Jurisdiction and Venue

118.    The Debtors commenced these Chapter 11 Cases on April 29, 2014.  Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409 and remains proper.  The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and paragraph 72 of the Confirmation Order.  This is a core proceeding pursuant to 11 U.S.C. § 157(b).

119.    The Parties further consent, pursuant to Local Rule 9013-1(f), to entry of a final order to the extent that it is later determined that the Court, absent consent of the Parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

### A.    Standards of Law

#### i.    General Considerations Informing Allocation of Material Administrative Expense Claims

120.    As an initial matter, in evaluating the various proposals filed in connection with the Allocation Motion and the evidence and arguments presented in connection with each such proposal, the Court considered the following factors, among others, with respect to each of the

46

Material Administrative Expense Claims: (a) the intertwined and extensive history of the Chapter 11 Cases; (b) the state of the Chapter 11 Cases and primary drivers, complications, and legal and financial considerations driving the Chapter 11 Cases at the time the Material Administrative Expense Claims were incurred; and (c) the extent to which each of the Material Administrative Expense Claims relates to, benefits from, or is informed by earlier events.

ii.    **Section 503(b)(1) of the Bankruptcy Code Governs the Allocation of the NextEra Termination Fee Claim**

121.    As it relates to the allocation of the NextEra Termination Fee Claim, the Court finds that the relief requested by the PAB (as described herein) is appropriate under the Bankruptcy Code and relevant law.  Section 503(b) of the Bankruptcy Code controls the "Allowance of administrative expenses," and is therefore applicable to the allocation of the NextEra Termination Fee Claim.

122.    In particular, the allowance and the allocation of the NextEra Termination Fee Claim is governed by section 503(b)(1)(A)(i) of the Bankruptcy Code, which provides for the allowance of "the actual, necessary costs and expenses of preserving the estate including—wages, salaries, and commissions for services rendered after the commencement of the case."  *See In re Trans World Airlines, Inc.*, 145 F.3d 124, 136 (3d Cir. 1998) ("administrative expenses are allowable only for the actual, necessary costs and expenses of preserving the estate") (internal quotations omitted).  This Court's previous decisions related to the allowance of the NextEra Termination Fee reserved the Parties' rights to seek an appropriate allocation of the NextEra Termination Fee Claim.[23]

123.    In evaluating the evidence and arguments presented regarding the appropriate allocation of the NextEra Termination Fee Claim, this Court considered the following factors, among others: (a) the estate(s) for which specific services were being provided, (b) how the analysis

---

[23]    PAB-X429, *Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement*, filed Sept. 19, 2016 [D. I. 9584] ¶ 4.); ELX 583, *Order Granting the Motion to Reconsider of Elliott Associates and Denying Application of NextEra Energy Inc. for Payment of Administrative Claim*, filed Oct. 18, 2017 [D.I. 12075] at 23.

47

changes when measured at the time the NextEra Termination Fee Claim was incurred as compared to under later-developed facts, and (c) whether the benefits associated with the NextEra Termination Fee Claim ran to both the EFH Debtors and the EFIH Debtors or were unique to one estate over another.

124.    Pursuant to paragraph 150 of the Confirmation Order, the EFH/EFIH Debtors funded the NextEra Plan Reserve in the amount of $275,000,000.00.  If the NextEra Plan Reserve Amount is reduced by order of the Court (and such order has not been stayed)[24] pursuant to the terms described in paragraph 154 of the Confirmation Order, any remaining funds in the NextEra Plan Reserve shall be allocated between EFH and EFIH in the same proportion the NextEra Termination Fee is allocated between EFH and EFIH under this Order; ***provided*, *however***, that, for the avoidance of doubt, no funds shall be released from the NextEra Plan Reserve on account of the NextEra Termination Fee Claim or any other Claim pursuant to this Order and any such release shall be governed by separate order of the Court.

### iii.    Section 503(b)(3)(d) of the Bankruptcy Code Governs Allocation of the Elliott Substantial Contribution Claim

125.    Additionally, the allocation of the Elliott Substantial Contribution Claim is governed by section 503(b)(3)(d) of the Bankruptcy Code, which provides for the allowance of "the actual, necessary expenses . . . incurred by . . . a creditor, an indenture trustee, an equity security holder, or a committee . . . in making a substantial contribution in a case under chapter 9 or 11 of this title."

126.    In evaluating the appropriate allocation of the Elliott Substantial Contribution Claim, this Court applies the test set forth by the Third Circuit in *Lebron v. Mecham Financial Inc.*, 27 F.3d 937 (3d Cir. 1994)—the extent to which Elliott's efforts "resulted in an actual and

---

[24]    To the extent such order of the Court order is stayed, such stay would be subject to the issuance of a bond by the party seeking the stay.

demonstrable benefit" to the EFH Debtors' estates and the EFIH Debtors' estates, as well as their respective creditors. *Id.* at 944.

### iv.    Section 330(a)(3)(C) of the Bankruptcy Code Governs the Allocation of Professional Fee Claims

127.    Finally, the allocation of the Debtor Professional Fee Claims and the EFH Committee Fee Claims is governed by section 330(a)(3)(C) of the Bankruptcy Code, which states that, in determining reasonable compensation to be awarded to a professional, the court shall consider "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title."  In evaluating evidence and arguments presented regarding the appropriate allocation of the Debtor Professional Fee Claims and the EFH Committee Fee Claims, this Court considered the following factors, among others: (a) the estate for which specific services were provided; (b) case-wide considerations at the time such services were provided; (c) whether a professional was the primary or secondary driver of a specific issue; and (d) the thoroughness and timeliness of a Professional's fee allocation process.

128.    In addition to the Bankruptcy Code, Professionals in these Chapter 11 Cases were required to comply with the Interim Compensation Order.  Notably, pursuant to paragraph 2(b) of the Interim Compensation Order, Professionals were required to allocate Collective Benefit Fees "to each Debtor in the same proportion that the amount of Direct Benefit Fees incurred by such Professional for such Debtor bears to the total amount of Direct Benefit Fees incurred by such Professional for all of the Debtors."  This Court finds as a matter of law that the Professionals allocated Fees and Expenses appropriately under the Interim Compensation Order and that no reallocation of Professionals' Fees and Expenses is warranted.

129.    This Court's conclusion of law regarding professionals' allocations—and, in particular, Kirkland & Ellis's post-TCEH Effective Date allocations of Collective Benefit Fees—is

also supported by the "Memorandum Regarding Fee Allocation Dispute" in *In re Tropicana Entertainment, LLC*.  *See In re Tropicana Entm't*, Case No. 08-10856 (KJC), 2014 WL 7450610, at *6 (Bankr. D. Del., Dec. 30, 2014) ("[T]he Steering Committee's proposed 50/50 allocation fails to account for the large disparity in the size of the operations or amount of debt held by the two groups of Debtors.").  Kirkland & Ellis applied *Tropicana* appropriately by assessing Direct Benefit Fees versus Collective Benefit Fees and allocating to prevent inequitable results from occurring.

130.    The burden of proof is on the movant to prove that it is entitled to an allocation of an administrative expense award, and it must do so by a preponderance of evidence.  *In re Worldwide Direct*, 334 B.R. 112, 120 (Bankr. D. Del. Nov. 30, 2005) (citations omitted); *In re Transamerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992) (holding that "the burden of persuasion, by a preponderance of the evidence, remains with the movant").

131.    Movants have not satisfied their burden for reallocation of Professionals' Fees and Expenses.  Movants did not present legal arguments that, even if presumed to be factually true, would justify a substantial disruption to allocation of Fees and Expenses between EFH and EFIH.  Specifically, non-identical allocations between Kirkland & Ellis and other Professionals, including Filsinger Energy Partners, do not warrant a reallocation of Professionals' Fees and Expenses.  The Court determines that as a matter of law the Interim Compensation Order provided Professionals substantial discretion to determine proper allocation procedures.  Given the unique services each Professional conferred, variance between Professionals' allocation methodologies is consistent with the independent process determinations authorized under the Interim Compensation Order.

**B.      Allocation of the NextEra Termination Fee Claim or any other Allowed Claim Asserted by NextEra and Payable from the NextEra Plan Reserve is a Proper Exercise of the Court's Power**

132.    As a matter of law, this Court's determination of the proper allocation of the NextEra Termination Fee Claim or any other Claim asserted by NextEra that becomes Allowed by

50

Final Order and is payable from the NextEra Plan Reserve is a justiciable issue, as supported by the Court's findings of fact and conclusions of law reflected herein. *See In re Cubic Energy, Inc.*, 587 B.R. 849, 855 (Bankr. D. Del. July 6, 2018) ("In a bankruptcy context, the Third Circuit has determined that an opinion is not advisory where it actually invalidates a clause, orders a party to do something, or otherwise resolves the parties' litigation." (citations omitted)). In addition, this Court has held that "an opinion that has some valid 'legal effect'; will not be advisory." *Id.* at 855. Here, entry of the Order will not only resolve the Parties' litigation of the Material Administrative Expense Claims, but will also require the PAB to effectuate the allocations set forth herein with respect to the Cash held in the EFH/EFIH Cash Distribution Account (as defined in the Plan). Following the EFH Effective Date, the PAB effectively held a "double reserve" at both EFH and EFIH on account of the total amount of the Material Administrative Expense Claims pending a resolution of the EFH/EFIH Allocation Dispute. As a result of this "double reserve," the PAB has not been able to make any Plan distributions to Holders of Allowed Claims at EFH and has only made a single distribution to Holders of Allowed Unsecured Claims at EFIH. Following entry of a non-stayed Order resolving the EFH/EFIH Allocation Dispute, the PAB will be positioned to reasonably promptly make material Plan distributions for the benefit of EFH and EFIH unsecured creditors.

### C.    The Approved Proposal Is Supported by the Evidentiary Record

133.    The following proposal put forth by the PAB at the hearing on the Allocation Motion is hereby approved (the "Approved Proposal") as follows:[25]

| Material Administrative Expense Claim | Allocation to EFH | Allocation to EFIH |
| --- | --- | --- |

---

[25]    The proposed figures set forth in the allocation chart below are consistent with the *Final Submission of EFH Plan Administrator Board Objecting to the Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13416].

| Material Administrative Expense Claim | Allocation to EFH | Allocation to EFIH |
|---|---|---|
| NEE Termination Fee Claim (*$275,000,000* if Allowed in full) | 20% (*$55,000,000.00*) | 80% (*$220,000,000.00*) |
| Elliott's Substantial Contribution Claim (*$30,068,488.73*) | 40% (*$12,027,395.49*) | 60% (*$18,041,093.24*) |
| E-Side Committee Professional Fees (*$48,005,807.17*) | 88% (*$42,245,110.31*) | 12% (*$5,760,696.86*) |
| EFH/EFIH Debtors' Professional Fee Claims (Kirkland and Evercore) (*$136,903,558.88*) | 16% (*$21,904,569.42*) | 84% (*$114,998,989.46*) |

134.    The Approved Proposal is supported by the evidentiary record presented at the hearing on the Allocation Motion and is hereby approved.  The evidence supports this Court's determination that the Approved Proposal is a fair, well-reasoned, and accounts for the context of these Chapter 11 Cases.

### i.    NextEra Termination Fee Claim

135.    The Court's ruling with respect to the NextEra Termination Fee assumes that the NextEra Termination Fee is ultimately allowed by final order, and therefore a court has made a finding in a final non-appealable order that (a) the Debtors benefited from the NextEra Merger Agreement even though the transaction did not close and (b) the NextEra Termination Fee is owned.

136.    The evidence showed that the amount of the NextEra Termination Fee was one part of a holistic transaction.  Among other things, the evidence shows that both EFH and EFIH benefited from the NextEra Merger Agreement.  In particular, NextEra's agreement to increase its purchase price by $200 million on July 27, 2016, reinstate Class A3 Claims, and eliminate a match right were all key factors in the decision of EFH and EFIH to agree to an increase in the NextEra Termination Fee.

137.    That said, the evidence shows that the benefits of the NextEra Merger Agreement inured primarily to the benefit of EFIH creditors.  To the extent an increase in distributable value led to Fidelity's withdrawal of its objection and decision to support the NextEra PSA, such action ultimately inured to the benefit of EFIH unsecured creditors.  Furthermore, at the time the NextEra Merger Agreement was approved, this increase in distributable value would have inured to the benefit of EFIH unsecured creditors if the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims—which were pending before the Third Circuit—ever became Allowed by Final Order.  Additionally, the evidence is clear that an expedited exit from chapter 11 was critical to EFIH creditors, given the interest and professional fee obligations at EFIH, uncertain dividend distributions, and limited funding from the EFIH First Lien DIP Facility.

138.    Although the EFIH creditors were the primary beneficiaries of the NextEra Merger Agreement (and therefore should bear a larger portion of the NextEra Termination Fee), the evidence demonstrates that the $450 million increase in distributable value in the final days leading up to the approval of the NextEra Merger Agreement was, at the time it was approved, slated to inure entirely to the benefit of EFH creditors.  This increase in distributable value shifted Fidelity from an objector to the NextEra Merger Agreement and NextEra Plan to a supporter of the NextEra PSA.  Indeed, in acknowledging the benefits to the EFH estate of obtaining the support of its largest creditor and avoiding severely contested merger agreement and plan confirmation proceedings, the Court approved a substantial contribution claim for Fidelity of up to $20 million (subject to various conditions precedent), allocated 100% to EFH.  (ELX-487, *Order Allowing Administrative Expense Claim for Fidelity Management & Research Company's Substantial Contribution Pursuant to Sections 503(B)(3)(D) and 503(B)(4) of the Bankruptcy Code*, filed Mar. 24, 2017 [D.I. 11050].)

139.    There is insufficient evidence to support Elliott's assertion that the NextEra

Termination Fee increased in July 2016 as a one-for-one exchange for an increased purchase price and NextEra's agreement to reinstate Class A3 Claims.  Such a finding would be necessary to support Elliott's proposed allocation of the NextEra Termination Fee.

140.    Additionally, there is no evidence to support the Ad Hoc Group's proposed findings, each of which would be necessary to support the Ad Hoc Group's proposal.  First, the Third Circuit's Makewhole Opinion did not mean that EFIH was the sole beneficiary of the NextEra transaction.  Second, the record shows that EFH benefited from the optionality created by the NextEra transaction (in other words, a path to emergence that avoided triggering a multi-billion dollar tax liability), and thus at least some portion of the NextEra Termination Fee Claim must be allocated to EFH.  Third, there is insufficient evidence to support the Ad Hoc Group's argument that any payment by EFH of the NextEra Termination Fee upon the closing of an Alternative Transaction (as defined in the NextEra Merger Agreement) constituted a "double counting" against EFH because EFH would be paying a portion of such fee despite its creditors only receiving Cash on hand.  Indeed, not only would a path to emergence and optionality constitute consideration for assuming the NextEra Termination Fee (to the extent such portion of such NextEra Termination Fee is found to have benefitted the estates), but the logical extension of the Ad Hoc Group's argument demonstrates its inapplicability.  In any "waterfall" plan where unsecured creditor recoveries are not guaranteed, the existence of a triggered termination fee has the potential to reduce unsecured creditor recoveries substantially.  In other words, any allocation of a termination fee across unsecured creditors of multiple estates has the potential to constitute a "double counting" using the Ad Hoc Group's term.  Fourth, the record shows that the Ad Hoc Group's witness was not credible and did not provide helpful expert testimony.  In particular, the testimony of Mr. Strom did not provide any evidence of the industry standard on multi-debtor allocations of termination fees, or any

empirical evidence to support his analysis on termination fees. Mr. Strom's testimony further did not consider the benefits to both EFH and EFIH of avoiding a multi-billion dollar tax liability and the import of both the EFH Board of Directors and the EFIH Board of Managers approving entry by EFH and EFIH, as applicable, into the NextEra Merger Agreement.

### ii.   Elliott's Substantial Contribution Claim

141.    The evidence requires the Court to find that Elliott's participation in these Chapter 11 Cases inured to the benefit of both EFH and EFIH creditors. Thus, both estates should pay for a portion of the Elliott Substantial Contribution Claim. In particular, Elliott's efforts in filing and prosecuting the Reconsideration Motion benefited both the EFH and EFIH estates. *See Worldwide Direct,* 334 B.R. at 122 (noting that one factor to determine whether a substantial contribution exists is whether services were provided "solely in self-interest or to benefit all parties in the case"). If the Reconsideration Motion ultimately results in the NextEra Termination Fee becoming disallowed by Final Order, Claims at EFH will be reduced and distributable value to EFH creditors will increase. Such increase will inure to the benefit of creditors other than Elliott.

142.    The record is also uncontroverted that Elliott is the largest holder of EFIH unsecured debt and thus was economically incentivized to act in the best interests of EFIH creditors. Still, no evidence was presented to support the Ad Hoc Group's request for allocation of the entire Elliott Substantial Contribution Claim to EFIH: the record is clear that Elliott's efforts provided a substantial benefit to EFH.

### iii.   E-Side Committee Fees

143.    The evidence shows that the E-Side Committee did not properly allocate its fees and expenses under the Interim Compensation Order and thus a reallocation of the E-Side Committee's Fees and Expenses is warranted.

144.    The majority of E-Side Committee Fees inured to the benefit of EFH creditors. The

record demonstrates that the resolution of the E-Side Committee's objections to the Hunt Plan and Global Settlement primarily addressed EFH Claims, specifically through the Reinstated Class A3 Claims and the TCEH Turnover Distribution. Additionally, EFH has various Classes of non-funded unsecured debt that did not have independent retained counsel to advocate on their behalf. Thus, the E-Side Committee played a more significant advocacy role for EFH unsecured creditors, while EFIH unsecured creditors had separate advocates for nearly the entire duration of the Chapter 11 Cases.

145.    However, the evidence also shows that the EFIH creditors benefited from the work of the E-Side Committee and thus should be liable for a portion of the E-Side Committee Fees. The E-Side Committee fulfilled its role as an appointed statutory committee to protect unsecured creditors of both EFH and EFIH. Additionally, the E-Side Committee's objection to the Hunt Plan and the related plan support agreement conveyed concerns that the failure of the T-Side Junior Creditor Consortium to fund its commitment under the Hunt Plan would delay the effective date of the Hunt Plan. Given that delays in these Chapter 11 Cases were harmful primarily to EFIH unsecured creditors, these efforts preserved value for EFIH.

146.    The evidence does not support the Ad Hoc Group's proposal. The Ad Hoc Group's proposal does not accurately account for the benefit EFH creditors received from: (a) the Hunt and NextEra transactions (and the optionality created from related services); and (b) professional services provided by the E-Side Committee.

### iv.    Debtor Professionals' Fees

147.    The Movants have not satisfied their burden with respect to their proposed reallocation of Debtor Professional Fees. The Movants did not perform any quantifiable or statistical analysis regarding allegedly "misallocated" time or the economic effect of such alleged "misallocations." Moreover, the Movants' review of Debtor Professional Fees and Expenses was

not methodological and consisted primarily of searching time entries for specific terms, without evaluating those time entries for context within the Chapter 11 Cases when such time entries were recorded.  In addition, and as an alternative to utilizing a more methodological approach capable of being evaluated for accuracy, Movants elected to highlight certain issues (i.e., EFIH's alleged solvency or workstreams related to the asbestos claims) as indicative of a flawed process, without conducting a simultaneous "bottom up" approach of their proposed reallocation. Finally, alleged singular inconsistencies within a professional's time entries or alleged inconsistencies between professionals are not sufficient, without more, to persuade the Court that a comprehensive reallocation of the Debtors' professionals' contemporaneous, good-faith, and reasonable allocation efforts is necessary or appropriate.

148.    The evidence shows that the Debtor professionals' process for the allocation of Debtor Professional Fees was reasonable and in good faith.  The evidence shows that the Debtors conducted a reasonable process to insure the Debtor professionals' compliance with the Interim Compensation Order.  Specifically, the evidence shows that Kirkland and Evercore executed a detailed and reasonable process for allocating fees and expenses.  In Kirkland's case, this included: an intensive and iterative process for preparing and reviewing invoices; clear separation of matter numbers to indicate Direct Benefit and Collective Benefit Fees; direct engagement with the Debtors' legal team; and a memorialized billing process.  Although the record indicates that Evercore engaged in a different process than Kirkland, Evercore was reasonably thorough and conscientious.

149.    In addition, the evidence shows that Kirkland's allocation of asbestos-, tax-, and makewhole-related services properly tracked the benefits conferred to each estate.  The record does not support Elliott's assertions that EFH benefited more from a "tax-free spin" or that EFIH was

solvent into late 2016. The record does not support Elliott's claim that makewhole and asbestos-related services benefited EFH only. Moreover, the record shows that Kirkland's post-TCEH Effective Date allocation of Collective Benefit Fees properly accounted for the disparity in debt between the EFH and EFIH estates. This change in methodology was reasonable after the TCEH Effective Date in light of the emergence of all operating entities and the "joint" or "global" nature of the primary remaining workstreams (e.g., a joint EFH/EFIH plan, a joint EFH/EFIH disclosure statement, a joint EFH/EFH merger agreement).[26] Moreover, no evidence was presented as to a reallocation of Evercore's fees and expenses or any other professional's fees and expenses, and thus there is no basis for reallocating Fees and Expenses incurred by Evercore or any other Professional.

150. In short, there is insufficient evidence to warrant deviating from the inherent deference provided to professionals under the Interim Compensation Order for those professionals who contemporaneously allocated Fees and Expenses, and there is no evidence to support a viable, alternative, quantifiable methodology for re-allocation of professional fees and expenses. Contrary to Elliott's assertion, the Court concludes that the allocation methodology in the Interim Compensation Order as applied by the Debtors' professionals satisfied Sections 503 and 330 of the Bankruptcy Code.

### D.    Additional Findings

151. Professionals in these Chapter 11 Cases have acted prudently, in good faith, and with no motive (financial or otherwise) to skew the allocation of Fees and Expenses to one estate over another.

152. Moreover, no party has asserted that the Debtors or the PAB failed to satisfy their

---

[26] The evidence also shows that Kirkland's Matter No. 76, though nominally billed as an EFIH Direct Benefit matter number, was actually allocated between EFH and EFIH in accordance with their respective funded debt figures, consistent with Kirkland's allocation methodology post-TCEH Effective Date and as disclosed in the Monthly Fee Statements.

fiduciary duties in incurring the Material Administrative Expense Claims or otherwise in connection with the litigation and prosecution of the Allocation Motion.  This Court concludes as a matter of law that the Debtors and the PAB acted in accordance with their fiduciary duties with respect to all of the foregoing.

153.    Nothing herein shall constitute a finding or approval of this Court that any amounts on account of any of the Material Administrative Expense Claims shall be Allowed or otherwise payable by the PAB, ***provided further***, that such amounts shall be Allowed or otherwise authorized and paid by the PAB only in connection with separate order of the Court.  In addition, nothing in this Order shall impose any liability or obligations on any of (a) the TCEH Debtors; (b) the EFH Shared Services Debtors; (c) the Reorganized TCEH Debtors; (d) the Reorganized EFH Shared Services Debtors; (e) the Reorganized EFH/EFIH Debtors; (f) the Plan Sponsor and EFH Merger Sub, (g) the EFH Plan Administrator Board (except with respect to its obligation to allocate the Material Administrative Expense Claims in accordance with the terms of this Order); and, (h) with respect to each of the foregoing Entities in clauses (a) through (g), such Entity and its current and former Affiliates.

Dated: _____2018
       Wilmington, Delaware

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
CHIEF UNITED STATES BANKRUPTCY JUDGE


*[Remainder of page intentionally left blank.]*

RLF1 20051958v.1

## RESPECTFULLY PROPOSED AND SUBMITTED

Dated: September 27, 2018
Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

**KIRKLAND & ELLIS LLP**
Edward O. Sassower, P.C. (*pro hac vice*)
Stephen E. Hessler, P.C. (*pro hac vice*)
Brian E. Schartz, P.C. (*pro hac vice*)
Aparna Yenamandra (*pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com
                aparna.yenamandra@kirkland.com

James H.M. Sprayregen, P.C. (*pro hac vice*)
Marc Kieselstein, P.C. (*pro hac vice*)
Steven N. Serajeddini (*pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Email:          james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                steven.serajeddini@kirkland.com

Mark E. McKane, P.C. (*pro hac vice*)
Michael P. Esser (*pro hac vice*)
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Email:          mark.mckane@kirkland.com
                michael.esser@kirkland.com

*Co-Counsel to the EFH Plan Administrator Board*