**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| Debtors. | RE: [D.I. 1833] |
| | (Jointly Administered) |

**THE AD HOC EFH CLAIMANTS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW REGARDING JOINT MOTION OF UMB BANK, N.A.,
AS INDENTURE TRUSTEE, AND ELLIOTT TO FIX APPROPRIATE
ALLOCATION OF CERTAIN RESERVES AND EXPENSES
<u>AS BETWEEN THE EFH AND EFIH DEBTORS</u>[1]**

---

[1]    Terms not defined herein shall have the meaning ascribed to them in the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code, dated February 15, 2018 [D.I. 12653] (the "Plan").

# TABLE OF CONTENTS

**Page**

FINDINGS OF FACT ................................................................................................ 1

    A.    The Debtors and Their Organizational and Capital Structure ................................ 1

    B.    The Restructuring Efforts of the E-Side Debtors .................................................. 3

        1.    Makewhole Dispute and its Effect on Creditor Recoveries ........................ 3

        2.    The Sale Process and Avoidance of "Tax Armageddon". .......................... 6

        3.    The Bidding Procedures Motion. ................................................................. 9

        4.    The Hunt Plan. ............................................................................................ 9

        5.    The NextEra Plan. ..................................................................................... 11

        6.    The Berkshire Transaction. ........................................................................ 16

        7.    The Sempra Plan. ....................................................................................... 18

    C.    The Parties Agree To A Framework For Professional Fee Allocations. .............. 19

    D.    Debtors Allocate Professional Fees Pursuant To The Interim Compensation Order Without Objection. ............................................................ 20

    E.    Appointment Of Committee Of Unsecured Creditors Of The E-Side Debtors. ............................................................................................................... 23

    F.    Elliott's Claim For Substantial Contribution, If Awarded, Is Related To Work Performed Entirely For The Direct Benefit Of EFIH. ............................... 26

        1.    Terminating the NextEra Plan Support Agreement to Seek an Alternative Restructuring Agreement. ...................................................... 27

        2.    Opposing Berkshire Transaction/Committing to the Sempra Transaction. ............................................................................................... 27

        3.    Obtaining an Order Disallowing the $275 Million NextEra Termination Fee. ........................................................................................ 28

        4.    Facilitating the Resolution of the Vistra Tax Dispute. ............................. 28

        5.    Facilitating the Oncor Dividend Settlement. ............................................. 28

6.      Negotiation of the Sempra and Related Documents and Advocating for Creditor Distributions in Connection with Plan Confirmation Proceedings. ................................................. 29

CONCLUSIONS OF LAW ................................................................................ 29

I.      Jurisdiction and Venue. ....................................................................... 29

II.     Movants Bear the Burden of Proof. ..................................................... 29

III.    There Is No Basis To Allocate Any Portion Of The NextEra Termination Fee To EFH. ................................................................... 30

IV.     There Is No Basis To Second-Guess The Debtors' And Committee's Professionals And Reallocate Their Fees Among The E-Side Debtors. ........................... 36

        A.      The Allocation of the Debtors' Retained Professional Fees Was Appropriate. ................................................................. 37

        B.      The Allocation Of The Committee's Professional Fees Was Appropriate. .......... 40

        C.      Governing Law Does Not Support Reallocation. ..**Error! Bookmark not defined.**

        D.      The Facts And Circumstances Of The Case Do Not Support Fee Reallocation. ................................................................. 41

                1.      Tax Armageddon Was a Threat to *All* E-Side Debtors. ........................... 41

                2.      EFIH Was the Direct Beneficiary of the Makewhole Claims Dispute. ................................................................. 44

                3.      The TCEH Settlement and Assumption of the Asbestos Claims Enabled Confirmation of the Plan Benefitting All E-Side Debtors. .......... 45

V.      There Is No Basis To Allocate Any Portion Of The Elliott's Substantial Contribution Claim To EFH. ................................................................. 45

        A.      None Of The Categories Of Expenditure In The Substantial Contribution Claim Benefitted EFH Except For The Dividend Settlement. .............................. 47

                1.      Terminating the NextEra Plan Support Agreement to Seek an Alternative Restructuring Agreement. ....................................................... 47

                2.      Opposing Berkshire Transaction/Committing to the Sempra Transaction. ................................................................. 47

                3.      Obtaining an Order Disallowing the $275 Million NextEra Termination Fee. ................................................................. 48

4.      Facilitating the Resolution of the Vistra Tax Dispute. ............................ 49

5.      Facilitating the Oncor Dividend Settlement. ............................................ 49

6.      Negotiation of the Sempra Plan and Related Documents and
        Advocating for Creditor Distributions in Connection with Plan
        Confirmation Proceedings. .......................**Error! Bookmark not defined.**

7.      Expenses. ................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amdura Corp.*,
  139 B.R. 963 (Bankr. D. Colo. 1992) ...........................................................39, 40

*In re Asarco, LLC*,
  Case No. 05-21207, 2011 WL 2975716 (Bankr. S.D. Tex. July 20, 2011) ......................39, 44

*In re Bidermann Indus. U.S.A.*,
  203 B.R. 547 (Bankr. S.D.N.Y. 1997) ...........................................................33

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*,
  181 F.3d 527 (3d Cir. 1999) ...........................................................30

*In re Capmark Fin. Grp. Inc.*,
  Case No. 09-13684 (CSS), 2009 WL 8519872 (Bankr. D. Del. Oct. 25, 2009) ....................30

*Computershare Tr. Co. v. Energy Future Intermediate Holding Co. (In re Energy Future Holdings Corp.*,
  2016 WL 1451045 (D. Del. Apr. 12, 2016) ...........................................................5

*Computershare Tr. Co. v. Energy Future Intermediate Holding Co. (In re Energy Future Holdings Corp.)*,
  539 B.R. 723 (Bankr. D. Del. 2015) ...........................................................3, 4

*Del. Tr. Co. v. Energy Future Intermediate Holding Co. (In re Energy Future Holdings Corp.)*,
  527 B.R. 178 (Bankr. D. Del. 2015) ...........................................................3

*Del. Tr. Co. v. Energy Future Intermediate Holding Co. (In re Energy Future Holdings Corp.)*,
  842 F.3d 247 (3d Cir. 2016) ...........................................................5

*In re Energy Future Holdings Corp.*,
  No. 18-1109, 2018 WL 4354741 (3d Cir. Sept. 13, 2018) ................................27, 47

*In re First Place Fin. Corp.*,
  Case No. 12-12961 (BLS) (Bankr. D. Del. Nov. 15, 2001) ....................................32

*Gex v. Imperial Palace of Miss., L.L.C.*,
  Case No. 07-904-D-M2, 2008 WL 11417772 (M.D. La. Jan. 9, 2008) ..................................38

*Johnston v. Suntrust Bank (In re Johnston)*,
  Case No. 12-51263, 2013 WL 1844751 (Bankr. W.D. Va. Apr. 12, 2013) ..........................29

*In re Linens Holding Co.*,
    Case No. 08-10832 (CSS) (Bankr. D. Del. Jan. 8, 2009) ........................................32

*Lebron v. Mechem Fin. Inc.*,
    27 F.3d 937 (3d Cir. 1994)........................................................................................45

*In re Metaldyne Corp.*,
    Case No. 09-13412 (MG), 2009 Bankr. LEXIS 5113 (Bankr. S.D.N.Y.
    June 25, 2009)............................................................................................................31

*N. Cal. Small Bus. Fin. Dev. Corp. (In re Bellow)*,
    544 F. App'x 732 (9th Cir. 2013) .............................................................................38

*In re Nortel Networks, Inc.*,
    Case No. 09-10138 (KG) ...........................................................................................30

*Schaffer ex rel. Schaffer v. Weast*,
    546 U.S. 49 (2005).....................................................................................................29

*Sindh v. Desai (In re Desai)*,
    Case No. 07-41713, 2009 WL 2855735 (Bankr. E.D. Tex. Sept. 2, 2009) ...............38

*In re Tropicana Entm't, LLC*,
    Case No. 09-10856 (KJC), 2014 WL 7450610 (Bankr. D. Del. Dec. 30, 2014) ..............38, 39

*Wash. Grp. Int'l, Inc. v. United States (In re Wash. Grp. Int'l, Inc.)*,
    Case No. 12-1572, 2013 WL 3963462 (B.A.P. 9th Cir. Aug. 2, 2013)....................29

*In re Worldwide Direct, Inc.*,
    334 B.R. 112 (Bankr. D. Del. 2005) .........................................................................45

**Statutes**

11 U.S.C. 503(b) .............................................................................................................30

**FINDINGS OF FACT**

A.    **The Debtors and Their Organizational and Capital Structure**

1.    On April 29, 2014 (the "Petition Date"), Energy Future Holdings Corp. ("EFH") and certain of its subsidiaries and affiliates (the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Code (the "Bankruptcy Code").  (AHX-225, *Order Confirming the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 12763] at 1.)  The Debtors' bankruptcy cases (the "Chapter 11 Cases") are jointly administered but not substantively consolidated.  (*Id.* at 9.)

2.    As of the Petition Date, the Debtors included EFH, EFH's direct, wholly-owned subsidiary Energy Future Intermediate Holdings LLC ("EFIH," and collectively with EFH (the "E-Side Debtors").  (AHX-007, *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* [D.I. 98] (the "First Day Declaration") ¶ 53.)  The Debtors also included EFH subsidiary Energy Future Competitive Holdings Company LLC ("EFCH") and EFCH's direct subsidiary Texas Competitive Electric Holding Company, LLC ("TCEH," and collectively with EFCH, the "T-Side Debtors").  (*Id.* ¶ 43.)  EFH's principal assets as of the Petition Date were an indirect 80% ownership interest in non-Debtor Oncor Electric Delivery Company LLC ("Oncor") (through its direct ownership of EFIH), and an indirect ownership of TCEH and its subsidiaries.  (*Id.* ¶ 44.)

3.    The below organization chart represents the entity structure of the Debtors as of the Petition Date:



(AHX-007, First Day Declaration ¶ 20.)

4.      On August 29, 2016, the Court confirmed the *Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the TCEH Debtors and EFH Shared Services Debtors* (the "T-Side Plan").  (AHX-141 [D.I. 9421].)

5.      On February 15, 2018, EFH, EFIH and other E-Side Debtors filed the *First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code*, dated February 15, 2018 (the "Plan"), which was confirmed by the Court on February 27, 2018 and has been consummated.  (AHX-225, *Order Confirming the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the*

*Bankruptcy Code* [D.I. 12763] (the "Sempra Confirmation Order"); PAB-X635, *Notice of Entry of EFH Confirmation Order and Occurrence of EFH Effective Date* [D.I. 12801].)

> **B.    The Restructuring Efforts of the E-Side Debtors.**

>> **1.    Makewhole Dispute and its Effect on Creditor Recoveries.**

6.    EFIH and Delaware Trust Company, as indenture trustee (the "First Lien Trustee"), were parties to an Indenture (the "First Lien Note Indenture") pursuant to which EFIH issued 10% first lien notes with an original maturity of 2020 (the "First Lien Notes").  (AHX-063, *Del. Trust Co. v. Energy Future Intermediate Holding Co. (In re Energy Future Holdings Corp.)*, 527 B.R. 178 (Bankr. D. Del. 2015) at 182-83.)  Shortly after the Petition Date, EFIH sought approval of debtor in possession financing, in part, to repay all of the outstanding First Lien Notes.  (*Id.*)  The First Lien Trustee objected to the proposed debtor in possession financing on the ground that it did not contemplate paying an amount described in the First Lien Note Indenture as the "Applicable Premium" (the "First Lien Makewhole Claim").  Consequently, on May 15, 2014, the First Lien Trustee commenced an adversary proceeding against EFIH seeking payment of the First Lien Makewhole Claim.  (*Id.*)

7.    EFIH and Computershare Trust Company N.A. and Computershare Trust Company of Canada, as indenture trustees (together, the "Second Lien Trustee"), were parties to an Indenture (the "Second Lien Note Indenture") pursuant to which EFIH issued 11% second lien notes due 2021 and 11.75% second lien notes due 2022 (together, the "Second Lien Notes"). (AHX-096, *Computershare Trust Co. v. Energy Future Intermediate Holding Co. (In re Energy Future Holdings Corp.)*, 539 B.R. 723 (Bankr. D. Del. 2015) at 724-26.)  On June 14, 2014, the Second Lien Trustee commenced an adversary proceeding seeking a declaratory judgment that the "Applicable Premium" under the indenture for the Second Lien Notes would be due and

payable upon redemption of the Second Lien Notes (the "Second Lien Makewhole Claim" and together with the First Lien Makewhole Claim, the "Makewhole Claim").  (*Id.*)

8.      On April 29, 2014, just prior to the Petition Date, EFH and EFIH, among other debtors, entered into a Restructuring Support and Lock-Up Agreement (the "RSA") with certain of their creditors, including holders of approximately 70% of the EFIH unsecured note claims. (AHX-010, *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay* [D.I. 505] at 6, Ex. 2, Ex. A at 10 (the "RSA").)

9.      The EFIH unsecured creditors executed the RSA even though the transaction contemplated in the RSA would not provide them with 100% recoveries. (9/2/2018 Keglevic Written Direct ¶¶ 8-9; AHX-010, RSA [D.I. 505] Ex. 2, Ex. A at 10.)

10.     Among the signatories of the RSA was York Capital Management Global Advisors, LLC (on behalf of certain funds and/or accounts managed and/or advised by it and/or its advisors) ("York Capital").  (AHX-006, 4/29/2014 email from Aparna Yenamandra of Kirkland & Ellis, attaching, *inter alia*, "Absolute Final RSA [K&E].pdf" [EFH2D10034694 at 765].)  At the time, Jeffrey Rosenbaum – now employed by Elliott Management Corporation as portfolio manager[2] – was York Capital's principal representative in connection with its holdings of EFIH unsecured notes, and negotiated the RSA on behalf of York.  (9/2/2018 Rosenbaum Written Direct, ¶¶ 1, 5, 6; 9/7/2018 Trial Tr. at 19:7-9, 51:4-6 (Rosenbaum).)

11.     The RSA specifically required EFIH to commence litigation to challenge the Makewhole Claim.  (AHX-010, *Motion of Energy Future Holdings Corp., et al., for Entry of an*

---

[2]    Elliott Management Corporation provides investment advisory services for Elliott Associates, L.P. ("Elliott Associates"), Elliott International, L.P. ("Elliott International"), the Liverpool Limited Partnership ("Liverpool," and together with Elliott Associates and Elliott International, "Elliott").  (9/2/2018 Rosenbaum Written Direct ¶ 1.)

*Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay* [D.I. 505], Ex. 2, Ex. A at 58-59; 9/2/2018 Keglevic Written Direct ¶ 9.)

12.     Because EFIH was the party to the operative loan agreements that gave rise to the Makewhole Claims, EFIH – and not EFH – was a party to the proceedings that resulted in the adjudication of the Makewhole Claims. (AHX-063; AHX-096.)

13.     Under EFIH's capital structure, the primary and direct beneficiary of the disallowance of the Makewhole Claims was EFIH as a result of the potential reduction of its liabilities and, because of such reduction, its unsecured creditors.  (9/2/2018 Keglevic Written Direct ¶ 18; AHX-170, *Amended Disclosure Statement for the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10564] at 38-39.)

14.     Following extensive litigation, the Court disallowed the Makewhole Claims in a decision that was affirmed by the District Court.  (AHX-063; AHX-096; AHX-116, *In re: Energy Future Holdings Corp.*, 2016 WL 1451045 (D. Del. Apr. 12, 2016); AHX-117 *Computershare Trust Co. v. Energy Future Intermediate Holding Co. (In re Energy Future Holdings Corp.)*, 2016 WL 1451045 (D. Del. Apr. 12, 2016).)

15.     On November 17, 2016, the United States Court of Appeals for the Third Circuit (the "Third Circuit") reversed the decisions of the Bankruptcy Court and the District Court disallowing the Makewhole Claims ("Makewhole Opinion").  (AHX-158, *Del. Trust Co. v. Energy Future Intermediate Holding Co. (In re Energy Future Holdings Corp.)*, 842 F.3d 247 (3d Cir. 2016).)  This decision vastly increased EFIH's liabilities.  (Keglevic Dep. Tr. at 65:3-22.).

2.      **The Sale Process and Avoidance of "Tax Armageddon."**

16.     Throughout the course of these Chapter 11 Cases, the Debtors engaged in robust restructuring efforts, extensively marketed Oncor, and vigorously negotiated with all stakeholders and prospective buyers. (9/2/2018 Keglevic Written Direct ¶ 5.)

17.     In furtherance of their duty to maximize the value of the Debtors' estates, the Debtors' managers, advisors, and Boards carefully considered all the restructuring alternatives that were proposed or otherwise available to the Debtors throughout the chapter 11 process. (Keglevic Dep. Tr. at 38:19-39:11.)  The Debtors' fiduciaries, including EFIH's independent directors, believed that there were serious risks for EFIH and its creditors associated with a taxable transaction.  (9/2/2018 Keglevic Written Direct ¶ 5;  Cremens Dep. at 29:22-31:13, 46:11-20, 72:17-73:18.)

18.     The Debtors never foreclosed the possibility of a taxable transaction and stood ready to consider any proposal—taxable or otherwise—that would have been in the best interests of their respective estates.  (Keglevic Dep. Tr. at 25:2-6, 38:15-17, 38:19-39:14; 9/6/2018 Trial Tr. at 13:12-17 (Keglevic).)  Nevertheless, the Debtors, including EFIH, were cognizant of the substantial risks and harms that could result from a restructuring transaction that triggered a multi-billion dollar tax liability. (9/2/2018 Keglevic Written Direct ¶ 6; 9/6/18 Trial Tr. at 11:20-13:17 (Keglevic); Keglevic Dep. Tr. at 19:25-20:8, 29:17-19, 29:22-24, 30:4-32:16; Cremens Dep. Tr. at 29:22-31:13; Williamson Dep. Tr. at 24:22-25:1, 42:25-43:3.)

19.     Accordingly, the Debtors prepared and filed their *Omnibus Tax Memorandum*, dated October 1, 2014 (the "Tax Memo").  (PAB-X044, Omnibus Tax Memorandum [D.I. 2296].)  The Tax Memo presented a balanced description of the risks of a taxable disposition of Oncor.  (PAB-X044, Omnibus Tax Memorandum [D.I. 2296] at 12-20; Keglevic Dep. Tr. at 29:6-8, 29:11-15.).  Among other things, the Debtors and their fiduciaries – including EFIH and

6

its directors – recognized the possibility that a tax liability at EFH would lead to extensive litigation and could lead to liability or, at minimum, additional cost, delay and value degradation at EFIH.  The underlying basis for this assessed risk of tax liability included a check-the-box election by EFH; changes in IRS regulations; successful IRS opposition to a transaction stranding an unpayable tax at EFH and putting the tax to EFIH; the IRS's successful prevention of EFIH's new owners from enjoying a stepped-up basis from the transaction; and various state-law theories of liability regarding responsibility for a "stranded" tax.  (PAB-X044, Omnibus Tax Memorandum [D.I. 2296] at 12-20; 10/20/2014 Bidding Procedures Hr'g Tr. [Docket No. 2579] at 129:3-18 (Keglevic); 9/2/2018 Keglevic Written Direct ¶ 32-35; Keglevic Dep. Tr. at 29:25-30:2, 30:4-32:16; 33:13-16, 33:18-34:18; Cremens Dep. Tr. at 30:13-31:13; Williamson Dep. Tr. at 24:12-21, 33:10-34:7.)

20.     As described below, the Debtors pursued a tax-free restructuring from the beginning of the Chapter 11 Cases to avoid these potential catastrophic ramifications to the E-Side Debtors.  This path was consistently supported by EFIH unsecured creditors.

21.     Indeed, the RSA contemplated a global restructuring of the Debtors premised on a tax-free deconsolidation of TCEH from EFH and a simultaneous deleveraging of EFIH.  (AHX-007, First Day Declaration ¶ 17; 9/2/2018 Keglevic Written Direct ¶ 8; AHX-010, RSA at 6.) On July 7, 2014, when creditors objected to the viability of the RSA, counsel for the ad hoc committee of certain EFIH unsecured noteholders wrote to Charles Cremens, the EFIH Disinterested Director, "to make sure the viewpoint of the Ad Hoc Committee is directly communicated to you," and urged adherence to the RSA "and the comprehensive economic compromises embodied therein . . . ."  (9/2/2018 Keglevic Written Direct ¶ 41; AHX-012, Email from Jeff Walker to Arcilia C. Acosta, et al., copying Scott Lebovitz, et al., attaching Letter from

Ira S. Dizengoff to Charles H. Cremens, copying Richard M. Cieri, Edward O. Sassower, Stephen E. Hessler, Scott L. Albarino, Samuel M. Greene, Jeffrey E. Finger, and Members of the Ad Hoc Committee) [CCREMENS000001 at 002].).  Among other harms, the EFIH unsecured creditors' letter warned that termination of the RSA could "put at risk the Debtors' ability to consummate the carefully crafted tax-free spin-off of [TCEH], which in turn would trigger *billions* of dollars of tax liability, thus jeopardizing unsecured creditor recoveries at the EFH, EFIH and TCEH estates." (9/2/2018 Keglevic Written Direct ¶ 41; AHX-012 [CCREMENS000001 at 002].)

22.    No credible proposal was ever made to the Debtors that contemplated a taxable disposition of Oncor.  (9/2/2018 Keglevic Written Direct ¶ 6; Keglevic Dep. Tr. at 25:11-14, 25:16-24, 38:15-17, 38:19-39:14; Cremens Dep. Tr. at 31:14-18; Williamson Dep. Tr. at 25:21-26:2; Rosenbaum Dep. Tr. at 131:17-22, 131:24-25.)

23.    During the periods in these Chapter 11 Cases when there was no specific proposal under consideration, the Debtors reached out to key creditor constituencies, including the EFIH unsecured creditors, to obtain their input on a path forward.  (9/2/2018 Keglevic Written Direct ¶ 7.)  The Debtors signed up five different restructuring transactions over the course of their restructuring.  (*Id.*)  None of those transactions contemplated triggering a massive tax liability. (*Id.*)

24.    Ultimately, there were insurmountable obstacles to each of the signed transactions, with the exception of the now-consummated transaction with Sempra. That tax-free transaction, which Elliott supported, was the best available restructuring alternative for the EFH and EFIH estates.  (*Id.*)

### 3.    **The Bidding Procedures Motion.**

25.    In July 2014, the Debtors determined that it was in the best interests of their

estates to terminate the RSA and to pursue alternative restructuring proposals, including a

potential sale of EFH and EFIH's economic interests in Oncor.  (9/2/2018 Keglevic Written

Direct ¶ 10; 9/6/2018 Trial Tr. at 41:17-22 (Keglevic).)  To that end, the Debtors pursued an

informal marketing process for Oncor in the following months, and sought and obtained court

approval of bidding procedures (the "Bidding Procedures Motion").  (9/2/2018 Keglevic Written

Direct ¶ 10; AHX-015, *Debtors' Notice of (A) Termination of Restructuring Support Agreement,*

*(B) Withdrawal of Second Lien Opt-In, and (C) Withdrawal of EFIH Settlement Motion, EFIH*

*Second Lien DIP Motion, and Restructuring Support Agreement Assumption Motion* [D.I. 1697];

AXH-018, *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving*

*Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C)*

*Approving the Form and Manner of Notice Thereof* [D.I. 2087]; AHX-049, *Order (A) Approving*

*Revised Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings,*

*and (C) Approving the Form and Manner of Notice Thereof* [D.I. 3295] (the "Bidding

Procedures Order").)

### 4.    **The Hunt Plan.**

26.    The Debtors' restructuring efforts following the entry of the Bidding Procedures

Order led to the execution of a merger agreement with a consortium of investors affiliated with

Hunt Consolidated, Inc. ("Hunt"), joined by certain TCEH unsecured creditors ("Hunt Merger

Agreement").  (ELX-290, Hunt Merger Agreement [D.I. 121-15].)  The Debtors' Boards and the

Disinterested Directors/Managers of EFH, EFIH, and TCEH ("Disinterested Directors") all

approved the Hunt transaction as in the best interests of their respective estates.  (9/2/2018

Keglevic Written Direct ¶ 11; AHX-082, *Disclosure Statement for the Fifth Amended Joint Plan*

*of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 6124].)

27.     The Hunt transaction had a total equity value of $12 billion.  (9/2/2018 Keglevic Written Direct ¶ 12).  It involved a complex REIT structure, would not trigger any stranded tax liability, and was projected to pay all creditors 100 cents on the dollar, assuming the parties satisfied all of the closing conditions and the transaction was consummated.  (*Id.*).

28.     The Court confirmed the plan of reorganization implementing the Hunt transaction in December 2015 ("Hunt Plan").  (AHX-101, *Amended Order Confirming the Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 7285])  Consummation of the Hunt Plan was conditioned on disallowance of the Makewhole Claims.  (*Id.*, Ex. A, Art. IX.B.9; 9/2/2018 Keglevic Written Direct ¶ 13 ("Hunt Confirmation Order").)

29.     In parallel with confirmation of the Hunt Plan, the Debtors secured approval of an inter-creditor settlement agreement that resolved billions of dollars in potential litigation related to various prepetition claims and contained continuing obligations even in the event the Hunt Plan was not confirmed. ("Intercreditor Settlement").  (9/2/2018 Keglevic Written Direct ¶ 13; PAB-X322, *Order Approving Amended and Restated Settlement Agreement* [D.I. 7243].)  Such Intercreditor Settlement was in the best interests of, and provided a substantial benefit to EFIH. (11/15/2015 Direct Testimony of Charles H. Cremens ¶ 63.)   One of the components of the Intercreditor Settlement was the EFH/EFIH Committee Settlement which included a requirement to reinstate any "Legacy General Unsecured Claims," meaning asbestos claims, under any "Alternative Restructuring."   (AHX-225, Sempra Confirmation Order at 2; AHX-226, *Disclosure Statement for the First Amended Joint Plan of Reorganization of Energy Future*

*Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH*

*Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11889] (the "Sempra Disclosure

Statement") at 93, 112.)

30.     As a condition to consummating any disposition of EFH and EFIH's indirect

interests in Oncor, the buyers and Oncor were required to obtain regulatory approval from the

Public Utility Commission of Texas ("PUCT").  (9/2/2018 Keglevic Written Direct ¶ 14; AHX-

101, Hunt Confirmation Order [D.I. 7285], Ex. A, Art. IX.B.3.)

31.     After a lengthy deliberative process, the PUCT entered an order that did not

contain all the approvals necessary to consummate the Hunt transaction.  (9/2/2018 Keglevic

Written Direct ¶ 14.)  Importantly, the PUCT did not allow the new buyers to retain tax savings

from the REIT structure and instead would have required sharing those savings with ratepayers.

(9/2/2018 Keglevic Written Direct ¶ 15.)  As a result, the Hunt Merger Agreement was

terminated.  (*Id.*; PAB-X329, March 24, 2016 PUCT Order re Hunt Transaction at 9.)

**5.     The NextEra Plan.**

32.     Following termination of the Hunt transaction, the Debtors continued to seek an

alternative restructuring proposal that would maximize value, reaching out to both creditors and

potential investors who had previously expressed an interest in Oncor.  (9/2/2018 Keglevic

Written Direct ¶ 16.)  The Debtors expressed a willingness to consider any and all proposals

during this time that would have maximized value and did not foreclose a taxable transaction.

No taxable proposals were made.  (*Id.*)

33.     After vigorous negotiations with bidders, and with the approval of the Debtors'

Boards and Disinterested Directors, the Debtors entered into a merger agreement with NextEra

on July 29, 2016 (as amended in September 2016, the "NextEra Merger Agreement").  (9/2/2018

Keglevic Written Direct ¶ 17; AHX-137, *Motion of the EFH/EFIH Debtors for Order (A)*

*Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing*

*Entry into and Performance Under Plan Support Agreement* [D.I. 9190]; AHX-144, *Order(A)*

*Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing*

*Entry into and Performance under Plan Support Agreement* [D.I. 9584].)

34.    The NextEra Merger Agreement and corresponding plan of reorganization(the

"NextEra Plan") contemplated a tax-free spin-off of TCEH and a tax-free sale of EFH and

EFIH's interests in Oncor.  (9/2/2018 Keglevic Written Direct ¶ 18.)  The transaction had a total

equity value of $10 billion—$2.6 billion lower than the Hunt transaction.  (*Id.*)  As with the Hunt

Plan, disallowance of the Makewhole Claims was a condition precedent to consummation of the

NextEra Plan (the "Makewhole Condition").  (*Id.*; PAB-X430, *Fourth Amended Joint Plan of*

*Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the*

*Bankruptcy Code* [D.I. 9612], Art. IX.D.10.)

35.    Consistent with the 2015 Intercreditor Settlement, the NextEra Merger Agreement

provided for the assumption by NextEra of the asbestos claims.  (AHX-145, *Disclosure*

*Statement for the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings*

*Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors*

*and EFIH Debtors*, [D.I. 9616] at 122-23.)  Following additional negotiations just prior to the

hearing to approved the NextEra Merger Agreement on September 19, 2016,  NextEra increased

its bid by $450 million of distributable value but did not receive an increase in the break-up fee

as a result.  (9/6/18 Trial Tr. at 91:11- 91:24 (Keglevic).)  $150 million of this value included a

release of asbestos escrow funds that NextEra had created for internal accounting purposes.

(9/6/2018 Trial Tr. at 87:7-88:10 (Keglevic); ELX-400, 9/21/2016 Hr'g Tr. at 13:23-14:21.)  The

agreement to release the escrow funds was part of the Debtors' negotiations to put forward a

successful plan which inured to the benefit of both EFH and EFIH. (Horton Dep. Tr. at 20:9-21:22; Keglevic Dep. Tr. at 111:4-111:23.)

36.     The NextEra transaction contemplated the disposition of EFIH's interest in Oncor to NextEra. (9/6/2018 Trial Tr. at 46:25-47:3 (Keglevic).)  In exchange, EFIH was to receive all of the cash consideration from NextEra – approximately $ 9.8 billion. (AHX-137, *Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9190] at 18; AHX-147, *Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Energy Future* [D.I. 9616] at 18.)  Although EFH did not sell anything in the transaction, it received the nominal benefit of the assumption of $58 million in assumed asbestos liabilities. (AHX-226, Sempra Disclosure Statement at 93, 112; Horton Dep. Tr. at 20:9-21-22; Keglevic Dep. Tr. at 111:4-111:23.)  The Debtors believed that at most, the liabilities were $100 million. (9/6/2018 Trial Tr. at 89:7-21 (Keglevic).)  Moreover, under the NextEra merger agreement, the reserve for asbestos claims was ultimately reduced to only $100 million. (9/21/2016 Hr'g Tr. at 13:23-14:21; 9/2/2018 Horton Written Direct ¶ 32.)

37.     At the time of the Third Circuit's decision, the NextEra Plan, which provided for the sale of the Debtors' economic interest in Oncor to NextEra Energy, Inc. ("NextEra"), had been filed, but not confirmed by this Court. (AHX-145, *Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors*, [D.I. 9616].)

38.     As a result of the allowance of the Makewhole Claims, all cash consideration

from the NextEra Plan, had it been consummated, would have gone to EFIH creditors, and none

would have gone to EFH creditors:

| | Makewhole Claims Allowed | Makewhole Claims Disallowed |
|---|---|---|
| **Merger Agreement** | | |
| Value to EFIH | $9,299 million | $9,246 million |
| Excess Value to EFH | $0 | $53 million |
| | | |
| **Amended Merger Agreement** | | |
| Value to EFIH | $9,769 million | $9,298 million |
| Excess Value to EFH | $0 | $471 million |

(AHX-151, Board Agenda attaching Restructuring Update Dated September 30, 2016 at 22;

Keglevic Dep. Tr. at 65:6-17.)  The Court finds that based on the Third Circuit's decision on the

Makewhole Claims, the only benefit EFH obtained from the NextEra transaction was the

assumption of $58 Million in asbestos liabilities.  (AHX-226, Sempra Disclosure Statement [D.I.

11889] at 93, 112.).

39.     Following the Third Circuit's reversal of the Bankruptcy Court's disallowance of

the Makewhole Claims, which caused the Makewhole Condition to fail, NextEra took the

opportunity to renegotiate the deal.  (9/2/2018 Keglevic Written Direct ¶ 19.)  This resulted in

execution of a plan support agreement between EFIH unsecured creditors, NextEra, and the

Debtors in January 2017 (the "NextEra-PIK PSA"), under which the Makewhole Condition was

removed and certain EFIH unsecured creditors agreed to support the revised NextEra Plan.

(9/2/2018 Keglevic Written Direct ¶ 19; PAB-X478, NextEra-PIK PSA, [D.I. 10530], Ex. A.)

The obvious inference is that the EFIH unsecured creditors believed that the NextEra transaction

was so value-maximizing that they were willing to make concessions to ensure that it would

close.

40.     The NextEra Merger Agreement provided for a termination fee of $275 million payable in the event of certain termination circumstances specified therein (the "NextEra Termination Fee").  (AHX-144, NextEra Order, Ex. 1 § 8.5(b).)  The NextEra Termination Fee was approved to ensure that the Debtors had a party that ensured they would receive definite consideration for the sale of Oncor.  As such, § 8.5(b) of the NextEra Merger Agreement specifically provided that the NextEra Termination Fee would be only payable if, as and when an "alternative transaction is consummated."  (AHX-137, NextEra Merger Agreement [D.I. 9584] § 8.5(b).)  The NextEra Termination Fee must therefore be paid out of the proceeds of the "alternative transaction," *i.e.*, the Sempra transaction consistent with customary practice.

41.     During the course of the negotiation of the NextEra Merger Agreement, NextEra first proposed a $110 million termination and then sought to increase the fee to $275 million. (AHX-143, *EFH/EFIH Debtors Omnibus Reply to Objections to Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* ¶¶ 31-32; 9/6/18 Trial Tr. at 61:15-61:19 (Keglevic).)  Specifically, on July 27, 2016, NextEra agreed to increase its purchase price by $200 million and eliminate the match right it had previously insisted on.  (AHX-143 ¶¶ 17, 32-33; 9/2/2018 Horton Written Direct ¶ 30; 9/6/2018 Trial Tr. at 84:6-84:13 (Keglevic).)  At the same time, NextEra requested and the Debtors agreed to an increase in the termination fee to $275 million.  (AHX-143, ¶¶ 16-20, 33.) The next day, on July 28, 2016, NextEra agreed to an additional purchase price increase of $110 million without any additional concessions by EFH or EFIH.  (9/6/2018 Trial Tr. at 61:15-61:19 (Keglevic); 9/2/2018 Horton Written Direct ¶ 31.)  It was only with this additional increase in distributable value that all EFIH unsecured creditors were projected to receive a 100% recovery

based on the assumption that the Makewhole Claims would not be allowed, and only if the

Debtors satisfied all other closing conditions and the transaction closed.  (9/2/2018 Horton

Written Direct ¶ 31.)

42.    Although the Bankruptcy Court confirmed the NextEra Plan in February 2017, the

PUCT denied NextEra and Oncor's change of control application as against the public interest.

(9/2/2018 Keglevic Written Direct ¶ 20; AHX-176, *Order Confirming the Eighth Amended Joint*

*Plan of Reorganization of Energy Future Holdings Corp., Pursuant to Chapter 11 of the*

*Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors* [D.I. 10859].)

### 6.    The Berkshire Transaction.

43.    Following the PUCT's denial of NextEra's application, the Debtors terminated

the NextEra transaction and again explored restructuring alternatives.  (9/2/2018 Keglevic

Written Direct ¶ 21.)  The Debtors were open to any viable option that would be in the best

interests of their estates.  (*Id.*)  However, a tax matters agreement that the EFH/EFIH Debtors

had entered into with the TCEH/Shared Services Debtors in October 2016, in consultation with

NextEra and with the approval of the Debtors' Boards and the Disinterested Directors (the "Tax

Matters Agreement"), limited the EFH/EFIH Debtors' ability to pursue a taxable deal after the

TCEH/Shared Services Debtors emerged from bankruptcy.  (9/2/2018 Keglevic Written Direct ¶

21; AHX-152, *Tax Matters Agreement by and among Energy Future Holdings Corp., Energy*

*Future Intermediate Holding Company LLC, EFIH Finance Inc., EFH Merger Co., LLC and Tex*

*Energy LLC*, dated as of October 3, 2016 § 2.05.)  Elliott knew about the tax matters agreement

and the restrictions therein before it acquired EFIH debt.

44.    Also driving the Debtors to confirm a viable plan and emerge from bankruptcy

was EFIH's ongoing cash burn of approximately $50 to $60 million a month for interest expense,

which directly impacted the recoveries of EFIH unsecured creditors.  (9/6/2018 Trial Tr. at 24:3-24:8 (Keglevic).)  There was no comparable cash burn at EFH. (*Id.*)

45.    The Debtors signed a merger agreement with Berkshire Hathaway Energy Company ("BHE") in July 2017 ("BHE Merger Agreement") and proposed a related plan of reorganization ("BHE Plan").  (AHX-196, *Motion of the EFH/EFIH Debtors for Order Authorizing Merger Agreement and Approving Termination Fee* [D.I 11430].)  The Debtors' boards and the Disinterested Directors approved entry into the BHE Merger Agreement. (9/2/2018 Keglevic Written Direct ¶ 22; PAB-X543, Minutes of the Meeting of the Joint Boards, dated Jul. 6, 2017.)  The Debtors terminated the NEE Merger Agreement immediately prior to signing the BHE Merger Agreement. (PAB-X545, *Notice of Filing of Letters Terminating (A) the NEE Plan Support Agreement and (B) the NEE Merger Agreement Filed by Energy Future Holdings Corp.* [D.I. 11424].)

46.    The BHE transaction had a total equity value of $9.3 billion.  (9/2/2018 Keglevic Written Direct ¶ 23.)  It too contemplated a tax-free disposition of EFH and EFIH's interests in Oncor.  (*Id.*)  The projected EFIH unsecured creditors' recoveries were substantially impaired under the BHE Plan and would not provide any distribution to EFH from the sale proceeds based on the outcome of the Makewhole Opinion.  (9/2/2018 Keglevic Written Direct ¶ 23; AHX-195, *Disclosure Statement for the Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11427] at 31.)

47.    Elliott fiercely opposed that transaction, arguing in favor of its own hypothetically higher value deal, which never materialized.  (9/2/2018 Keglevic Written Direct ¶ 25; Rosenbaum Dep. Tr. at 135:14-23; PAB-X554, *Elliott Funds' Objection to the Motion of the*

*EFH/EFIH Debtors for Entry of an Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols in Connection with Confirmation of the Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11505].)  Even after signing with BHE, the Debtors continued discussions with Elliott about its potential deal.  (9/2/2018 Keglevic Written Direct ¶ 25.)

7.    **The Sempra Plan.**

48.    In August 2017, the Debtors received an alternative transaction proposal from Sempra, which built upon and largely preserved the structure of the BHE transaction, but contemplated an additional $150 million in consideration.  (9/2/2018 Keglevic Written Direct ¶ 26.)  Following additional negotiations, Elliott agreed to support the Sempra transaction.  (*Id.*)  On August 21, 2017, on the eve of the hearing to approve the Debtors' entry into the BHE Merger Agreement, the debtors' boards and the Disinterested Directors authorized the Debtors to terminate the BHE Merger Agreement and enter into a merger agreement with Sempra on August 21, 2017.  (*Id.*)  Elliott's agreement to support the Sempra transaction was memorialized in a plan support agreement ("Sempra-Elliott PSA").  (9/2/2018 Keglevic Written Direct ¶ 26; PAB-X584, *Order (CORRECTED) (A) Authorizing Entry into Merger Agreement and Approving Termination Fee, and (B) Authorizing Entry into and Performance Under Plan Support Agreement*, [D.I. 11873], Ex. 2.)

49.    The Sempra transaction had a total equity value of $9.45 billion and contemplated a tax-free disposition of EFH and EFIH's interests in Oncor.  (9/2/2018 Keglevic Written Direct ¶ 27; PAB-X586, *Disclosure Statement for the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Solicitation Version], [D.I.

18

11888] at 21.)  Once again, under the Sempra Plan, the EFIH unsecured creditors' recoveries

were impaired, and it would not provide any distribution to EFH from the sale proceeds.

(9/2/2018 Keglevic Written Direct ¶ 27; PAB-X586 [D.I. 11888] at 39.)

50.     The Sempra Plan was confirmed on March 9, 2018.  (9/2/2018 Keglevic Written

Direct ¶ 28; AHX-225, Sempra Confirmation Order [D.I. 12763]; PAB-X635, *Notice of Entry of

EFH Confirmation Order and Occurrence of EFH Effective Date* [D.I. 12801].)

### C.    The Parties Agree To A Framework For Professional Fee Allocations.

51.     The RSA also included a framework agreed to by the parties to allocate

professional fees incurred during the Chapter 11 Cases among the Debtors.  (AHX-010, RSA

[D.I. 505], at Ex. 2, Ex. A at 79-80].)  Creditors of EFIH, including Jeffrey Rosenbaum, then of

York Capital, a major holder of EFIH unsecured claims, and now of Elliott, were involved in

these negotiations.  (*See* 9/7/18 Hearing Tr. 130:24-131:4 (Rosenbaum) (admitting that he

participated in the negotiation of the RSA's fee allocation provision); Horton Dep. at 13:2-10

(admitting that the RSA negotiations "predominantly" involved the EFIH PIK holders); Husnick

Dep. Tr. at 27:21-28:1, 28:20-29:5 (noting that Kirkland attorneys had conversations with

counsel to the EFIH PIK holders regarding the allocation provisions); *id.* at 121:3-121:11, 122:8-

22, 122:25-125:20 (Rosenbaum took an active role in the RSA negotiations, including those

regarding allocation).)

52.     With respect to such allocation, the RSA provided, in pertinent part, that:

Any professional fees (the "Professional Fees") incurred by professionals retained
by the Debtors (the "Debtors' Professionals") shall be allocated to, and paid by, the
applicable Debtors for whose direct benefit such Professional Fees were incurred
(the "Direct Benefit Fees").  To the extent a Professional Fee is incurred for the
collective benefit of the EFH Debtors, EFIH Debtors, and TCEH Debtors (the
"Collective Benefit Fees"), such Professional Fees shall be allocated to each Debtor
in the same proportion that the amount of Direct Benefit Fees incurred by such
Debtor's Professional for such Debtor bears to the total amount of Direct Benefit
incurred by such Debtor's Professional for all of the Debtors, on a monthly basis in

connection with the Debtor's Professional's fee application (the "Collective Fee Allocation").

(AHX-010, RSA [D.I. No. 505], Ex. 2, Ex. A at 79.)

53.    The parties agreed that the determination of which Debtor is responsible for the fees incurred during the Chapter 11 Cases is a function of whether one or more Debtors received a "*direct benefit*."  As Keglevic testified at his deposition, "we ask the professionals to use their professional judgment and make a determination whether it was direct or indirect."  (Keglevic Dep. Tr. at 149:18-150:4.)  This differentiation between direct and indirect benefit and the reliance on the Debtors' professionals' business judgment are essential to a proper allocation. Other factors, including the solvency of EFIH, were not considered in the allocation determination.  (9/5/2018 Trial Tr. at 272:17-273:21 (Horton).)

54.    This allocation formulation in the RSA was incorporated into the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals*, entered by the Court on September 16, 2014 [D.I. 2066] (the "Interim Compensation Order").  (PAB-X034; *see* 9/2/2018 Husnick Written Direct, ¶ 4; Husnick Dep. Tr. at 20:24-21:7; Horton Dep. Tr. at 10:21-11:18.)

55.    The Interim Compensation Order remains effective and no party has requested this Court to reconsider the specific allocation provisions therein.

**D.    Debtors Allocate Professional Fees Pursuant To The Interim Compensation Order Without Objection.**

56.    The Debtors' professionals – and in particular, Kirkland & Ellis LLP ("Kirkland") – established a comprehensive system to ensure that its efforts to allocate professional fees among the Debtors complied with the Interim Compensation Order.

57.    Kirkland created a billing protocol to provide specific and comprehensive guidance to its timekeepers to help allocate fees in real time.  (9/2/2018 Husnick Written Direct

¶ 6; Husnick Dep. Tr. at 54:5-55:20.)  This included the circulation of a billing memorandum (ELX-011, Memorandum from E. Sassower to Energy Future Holdings Corp. Billers re: Billing Protocol Memorandum for all Kirkland & Ellis Attorneys and Paraprofessionals Working on Project Olympus [PAB00000665-674]) and a list of matters and their allocations (ELX-699, K&E Memo – Split Allocation Among Entities [PAB00000655-664]) to guide Kirkland's timekeepers.

58.     Pursuant to its internal guidance, Kirkland allocated direct benefit fees based on the entity the firm was representing when it took a particular action.  (9/2/2018 Husnick Written Direct ¶¶ 22-24; Husnick Dep. Tr. at 44:6-11.)  For example, Kirkland allocated the fees it incurred relating to the dispute regarding the Makewhole Claims to EFIH because the EFIH indenture trustee filed the adversary proceeding against EFIH, triggered by EFIH's motion to repay the EFIH first lien debt.  (Husnick Dep. Tr. at 45:11-24.)  Correspondingly, time Kirkland billed EFH for time it specifically devoted to EFH's asbestos claims.  (*Id*. at 114:17-15.)

59.     In contrast, Kirkland categorized collective benefit fees as those for which there was no single "principal" beneficiary, an understanding both Kirkland and the Debtors shared. (9/2/2018 Husnick Written Direct ¶ 25; Husnick Dep. Tr. at 50:19-51:3; *see also* Williamson Dep. Tr. at 19:2-18; Keglevic Dep. Tr. at 144:10-21.)  Thus, Kirkland billed matters relating to plan promulgation and confirmation as a collective benefit.  As a result, Kirkland allocated time it devoted to confirmation objections, including objections by asbestos claimants, as collective benefits because such matters included numerous tasks that impacted plan confirmation. Confirmation, the paradigmatic shared benefit, if subject to a sustainable objection, impacted all Debtors regardless of the entity-specific party-in-interest making the objection.  (Husnick Dep. Tr. at 113:17-114:17, 118:15-119:1.)

60.     Following the TCEH Effective Date, Kirkland believed that strict adherence to the procedures set forth in the Interim Compensation Order would have resulted in an inequitable allocation.  (9/2/2018 Husnick Written Direct ¶ 28.)  To avoid this result, Kirkland allocated Collective Benefit Fees "by the relative debt at EFH and EFIH to reflect the creditor constituencies that were benefitting from such estate's efforts."  (*Id.* ¶ 30.)  This resulted in an allocation of Collective Benefit Fees of approximately 90% to EFIH and approximately 10% to EFH.  (*Id.* ¶ 31.)  Kirkland's change to the allocation methodology was discernable from summaries of fees that were included in monthly fee statements and interim fee applications. (*Id.* ¶ 32.)  No party ever challenged this change.

61.     The Debtors' professionals filed numerous monthly fee statements and interim fee applications pursuant to the Interim Compensation Order throughout the course of the Chapter 11 Cases.  All of the evidence indicates that the allocation of fees made by the Debtors' professionals in these fee statements and applications was reasonable in accordance with the Interim Compensation Order.

62.     Kirkland's preparation of its monthly fee statements and interim fee applications was detailed and robust.  The process involved no less than four separate rounds of review. (9/2/2018 Husnick Written Direct ¶ 10.) Such review also often included discussions with members of the Debtors' in-house legal team.  (9/2/2018 Husnick Written Direct ¶ 13.)  This process provided an additional layer of business judgment scrutiny, to ensure that professionals properly allocated their fees and expenses.  Keglevic Dep. Tr. at 149:18-150:4 ("[W]e ask the professionals to use their professional judgment and make a determination whether it was direct or indirect."); Husnick Dep. Tr. at 142:23-143:20 (allocation methodology "was approved at that time as being consistent with the debtors' business judgment"); Horton Dep. Tr. at 24:2-13

("[T]here was a legal team that was reviewing the legal bills and invoices."); Cremens Dep. Tr. at 34:17-35:1 ("[T]he professionals had an allocation methodology and the management of the company was very much responsible for being quality assurance around how that was being done.")

63.    The allocation of Evercore Group LLC's ("Evercore") fees similarly tracked the procedure in the Interim Compensation Order.  For example, Evercore allocated work related to the asbestos claims to EFH, (Matican Dep. Tr. at 25:1-10, 25:12-25), work related to the Makewhole Claims to EFIH, (*id.* at 26:1-25), and work related to plan confirmation as a collective benefit.  (*Id.* at 26:18-27:9, 30:1-25.)  The actual allocation percentages fluctuated on a monthly basis, reflecting the work performed and the active exercise by Evercore (which submitted the allocations) and the Debtors (which approved them) of its business judgment to allocate fees appropriately.

64.    No party *ever* objected to any of the allocations contained in any of the Monthly Fee Statements or Interim Fee Applications.  (*See, e.g.*, 9/2/2018 Husnick Written Direct ¶¶ 14, 17; Husnick Dep. Tr. at 142:23-143:20 ("[U]ltimately, no party, the debtors or otherwise, objected to the monthly fee statements or the interim fee statements that were submitted by Kirkland & Ellis.").

65.    Indeed, until the Allocation Motion was filed on May 13, 2018, no party had formally challenged the Debtors' allocation of fees as an issue with the Court.

**E.    <u>Appointment Of Committee Of Unsecured Creditors Of The E-Side Debtors</u>.**

66.    On October 27, 2014, the United States Trustee for the District of Delaware appointed the official committee of unsecured creditors of EFH and EFIH (the "Committee"). (AHX-032, *Notice of Appointment of Committee of Unsecured Creditors* [D.I. 2570].)

67.     From the outset of its appointment, the Committee believed that the specific

allocation provisions of the Interim Compensation Order did not apply to the fees and expenses it

incurred.  (ELX 109, First Monthly Fee Statement of Guggenheim [D.I. 3360], ¶ 3; AHX051,

First Monthly Fee Statement of S&C [D.I. 3358] at 3.)  Specifically, the Committee's counsel

stated that "[w]ith respect to the allocation of fees and expenses contemplated by section 2(b) of

the Interim Compensation Order, the fees and expenses of S&C are for the benefit of the EFH

Committee and not for the direct benefit of any Debtor and, accordingly, no allocation is

proposed at this time by S&C."  (AHX051, First Monthly Fee Statement of S&C [D.I. 3358]

at 3.)

68.     Instead, the Committee and the Debtors agreed to allocate the Committee's

professional fees 50%/50% between EFH and EFIH.  (Husnick Dep. Tr. at 40:12-18; Glueckstein

Dep. Tr. at 39:25-41:1.)  The Committee believed that this was appropriate because the

Committee was providing a collective benefit to all unsecured creditors of the E-Side Debtors.

(Glueckstein Dep. Tr. at 39:25-41:1, 47:3-17.)

69.     A review of the Sullivan & Cromwell LLP's ("S&C") first four interim fee

applications covering the period from November 5, 2014 through December 31, 2015 – the

period when most of the services performed by S&C on behalf of the Committee were rendered

– shows that approximately $10.82 million in fees out of a total of $18.5 million in fees was

incurred for work related to the Debtors' plan and disclosure statements.  (AHX-054, First

Interim Fee Application of S&C [D.I. 3567] at 2; AHX-071, Second Interim Fee Application of

S&C [D.I. 4732] at 3; AHX-089, Third Interim Fee Application of S&C [D.I. 6507] at 4; AHX-

110, Fourth Interim Fee Application of S&C [D.I. 7822] at 5.)  This alone accounts for 58.5% of

the S&C's fees during this period.  An additional $3.75 million was incurred by the Committee

in connection with hearings, case administration, employment and fee applications, and meeting

with creditors, accounting for an additional 20.3% of S&C's fees.  (AHX-054, First Interim Fee

Application of S&C [D.I. 3567] at 2; AHX-071, Second Interim Fee Application of S&C [D.I.

4732] at 3; AHX-089, Third Interim Fee Application of S&C [D.I. 6507] at 4; AHX-110, Fourth

Interim Fee Application of S&C [D.I. 7822] at 5.)  A further $1.47 million was incurred by the

Committee related to tax issues, accounting for yet another 8%.  (AHX-054, First Interim Fee

Application of S&C [D.I. 3567] at 2; AHX-071, Second Interim Fee Application of S&C [D.I.

4732] at 3; AHX-089, Third Interim Fee Application of S&C [D.I. 6507] at 4; AHX-110, Fourth

Interim Fee Application of S&C [D.I. 7822] at 5.)  In the aggregate, these matters accounted for

86.8% of the fees incurred by the Committee for work performed by S&C during this period.

During this same period, Kirkland allocated substantially all of its work related to the same

professional services as a Collective Benefit.  (AHX-055, Second Interim Fee Application of

Kirkland [D.I. 3567] ¶ 34; AHX-073, Third Interim Fee Application of Kirkland [D.I. 4773]

¶ 35; AHX-095, Fourth Interim Fee Application of Kirkland [D.I. 6484] ¶ 27; AHX-106, Fifth

Interim Fee Application of Kirkland [D.I. 7719] ¶ 32.)

70.    Similarly, Guggenheim's fees were never geared toward any specific transaction

or event that benefitted EFH alone.  Apart from its fixed monthly charge, Guggenheim was paid

based on consummation of a plan, sale or financing transaction.  All of these items were for the

collective benefit of EFH and EFIH.

71.    Although the Committee's allocation determination was not disclosed by S&C in

any of its monthly fee statements or interim fee applications, the allocation was disclosed by

Guggenheim Securities, LLC ("Guggenheim"), the Committee's investment banker, beginning

with its third monthly fee statement.  (ELX-134, Third Monthly Fee Statement of Guggenheim

[D.I. 3688] ¶ 3.)

72.     No party *ever* objected to *any* of the allocations contained in *any* of the dozens of monthly fee statements or the interim fee applications filed by Guggenheim.  Nor did any party object to S&C's statement that the Committee believed that the Interim Compensation Order did not govern the allocation of fees incurred by the Committee.

**F.     Elliott's Claim For Substantial Contribution, If Awarded, Is Related To Work Performed Entirely For The Direct Benefit Of EFIH.**

73.     On May 11, 2018, Elliott submitted a *Statement in Support of Substantial Contribution Claim Pursuant to 11 U.S.C. §§ 503(b)(3) and 503(b)(4) to* Fee Committee (ELX-669) (the "Substantial Contribution Statement"), seeking payment and reimbursement of $30,236,354.38 in professional fees and $1,438,294.91 in expenses (the "Substantial Contribution Claim).  (*Id.*; ELX-670, *Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* (the "Allocation Motion"), [D.I. 13102] at 4 n.3.)  The reimbursement request is broken down into 6 separate categories as indicated:

| | |
|---|---|
| Terminating the NextEra Plan Support Agreement to Seek an Alternative Restructuring Agreement | $3,392,781.60 |
| Opposing Berkshire Transaction/Committing to the Sempra Transaction | $20,371,874.53 |
| Obtaining an Order Disallowing the $275 Million NextEra Termination Fee | $3,320,572.75 |
| Facilitating the Resolution of the Vistra Tax Dispute | $1,096,434.50 |
| Facilitating the Oncor Dividend Settlement | $584,366.00 |
| Negotiation of the Sempra Plan and Related Documents and Advocating for Creditor Distributions in Connection with Plan | $1,470,325.00 |

| Confirmation Proceedings | |
|---|---|

(AHX-239, Substantial Contribution Statement at 5, 7, 9, 11-12, 14.)

### 1. Terminating the NextEra Plan Support Agreement to Seek an Alternative Restructuring Agreement.

74.    After the PUCT denied NextEra and Oncor's joint application for approval of a proposed merger transaction on April 13, 2017, Elliott sought declaratory and injunctive relief with respect to the NextEra PSA in order to enable Elliott to formulate, negotiate and prosecute alternative transactions and plans of reorganizations. (ELX-497, Elliott's Verified Complaint for Declaratory and Injunctive Relief [D.I. 11223].) Elliott incurred fees and expenses in connection with the litigation over the NextEra PSA, including preparing and filing a complaint and other pleadings for declaratory and injunctive relief. (AHX-240, Substantial Contribution Statement at 6-7.)

### 2. Opposing Berkshire Transaction/Committing to the Sempra Transaction.

75.    Elliott opposed the Berkshire transaction, arguing that it undervalued the E-Side Debtors' interests in Oncor. (*Id.* at 11.) Elliott moved to adjourn a hearing to approve the Berkshire merger agreement, which was granted in part by the Court. (EXL-542, *Order Granting, in Part, Denying in Part, "The Elliott Funds' Motion to Adjourn Hearing on the Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* [D.I. 11506].) Elliott claims that it subsequently actively participated in negotiations with Sempra and helped facilitate its regulatory approval. (AHX-240, Substantial Contribution Statement at 8.)

### 3. Obtaining an Order Disallowing the $275 Million NextEra Termination Fee.

76.     On July 29, 2017, Elliott filed a motion seeking reconsideration of the Court's order authorizing the E-Side Debtors to pay the NextEra Termination Fee when NextEra failed to obtain PUCT approval and the E-Side Debtors were forced to terminate the merger agreement and pursue an alternative transaction.  (ELX-532, *The Elliott Funds' Motion to Reconsider in Part the September 19, 2016 Order Approving the NextEra Termination Fee* [D.I. 11636].)  On October 18, 2017, the Court granted the reconsideration motion.  (ELX-583, *Order Granting the Motion to Reconsider of Elliott Associates and Denying Application of NextEra Energy Inc. for Payment of Administrative Claim* [D.I. 12075].)  The Third Circuit has affirmed the Court's order.  *In re Energy Future Holdings Corp.*, No. 18-1109, 2018 WL 4354741 (3d Cir. Sept. 13, 2018).  The record is undisputed that Elliott's efforts resulted in approximately $150 million of incremental consideration, all of which went to EFIH.

### 4. Facilitating the Resolution of the Vistra Tax Dispute.

77.     Elliott initiated efforts to obtain resolution of a tax allocation dispute between the E-Side Debtors and Vistra Energy Corp. ("Vistra").  (AHX-240, Substantial Contribution Statement at 11.)  The litigation, however, was ultimately resolved in favor of Vistra.  (9/6/2018 Trial Tr. at 112:21-113:6 (Horton).)

### 5. Facilitating the Oncor Dividend Settlement.

78.     Elliott participated in the negotiation of a $31 million payment by Sempra to the E-Side Debtors' estates in connection with a dispute concerning the payment of certain of Oncor's 2017 quarterly dividends.  (AHX-240, Substantial Contribution Statement at 12.)  The negotiations resulted in a Court-approved settlement requiring Sempra to pay the E-Side

Debtors' estates $31 million as consideration of the dividends and in resolution of certain tax issues.  (*Id.* at 14.)

### 6.    Negotiation of the Sempra and Related Documents and Advocating for Creditor Distributions in Connection with Plan Confirmation Proceedings.

79.    Elliott participated in the negotiation of the Sempra Plan, confirmation order and related documents.  (AHX-240, Substantial Contribution Statement at 14.)  Elliott also opposed a request by NextEra for a $275 million reserve.  (ELX-624 *Elliott Funds' Reply to Objection of NextEra Energy, Inc. to First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holdings Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 12665].)  Elliott claims that it incurred fees and expenses in connection with the foregoing.  (AHX-240, Substantial Contribution Statement at 14.)

## CONCLUSIONS OF LAW

### I.    Jurisdiction and Venue.

80.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and paragraph 72 of the *Order Confirming the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 12763].  The matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

81.    Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409.

### II.    Movants Bear the Burden of Proof.

82.    As the party seeking affirmative relief from the court, the Movants carry the burden to prove that the foregoing fees should be reallocated.  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) ("[W]e have usually assumed without comment that plaintiffs bear the

burden of persuasion regarding the essential aspects of their claims."); *Wash. Grp. Int'l, Inc. v. United States (In re Wash. Grp. Int'l, Inc.)*, Case No. 12-1572, 2013 WL 3963462, at *9 (B.A.P. 9th Cir. Aug. 2, 2013) ("Generally speaking, the party seeking relief bears the burden of proof."); *Johnston v. Suntrust Bank (In re Johnston)*, Case No. 12-51263, 2013 WL 1844751, at *5 (Bankr. W.D. Va. Apr. 12, 2013) ("an aphorism of the legal system" is that "the party seeking relief or seeking to change the status quo bears the burden of proving that he is entitled to relief.").  Movants have failed to carry their burden of proving that they are entitled to the relief sought in the Allocation Motion.

**III.    There Is No Basis To Allocate Any Portion Of The NextEra Termination Fee To EFH.**

83.    In the Third Circuit, a break-up fee may be allowed only where the fee is "actually necessary" in providing an "actual benefit" to the debtor's estate by inducing a sale transaction.  *See* 11 U.S.C. 503(b); *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533-35 (3d Cir. 1999).  Indeed, a court may not approve a break-up fee that would be payable in the absence of an alternative transaction because in such a circumstance, by definition, there is no "actual benefit" to the estate.  *See, e.g.*, *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG) [D.I. 1735], 10/15/2009 Hr'g Tr. at 75 (Bankr. D. Del. Oct. 27, 2009) ("Without a successful closing, there would be no benefit to this estate, which would be commensurate with the breakup fee . . . .").

84.    Because break-up fees are approved solely to induce a sale transaction, they are typically calculated as a percentage of the sale consideration and are payable out of from the first dollars of consideration received from a subsequent sale.

85.    Break-up fees are generally expressed as fixed dollar amounts or as a specific percentage (*i.e.* not sliding scale) of consideration.  (9/2/2018 Strom Written Direct ¶ 34.d.)

When expressed as a fixed dollar amount, the ratio of the break-up fee to consideration is typically 3.0%. (*Id.*) Break-up fees are not applied, or at least not fully applied, to contingent consideration. (*Id.* ¶ 34.e.) That is, break-up fees are lower as a percentage of the total consideration received where some portion of that consideration is conditional or contingent on external events. (*Id.*)

86. Break-up fees are typically payable by the entity receiving the direct benefit of the transaction out of the proceeds of the replacement transaction. (*Id.* ¶ 34.f.5.) Accordingly, it would not be typical to assess a break-up fee directly against the owner of an equity interest in the debtor whose assets are being sold merely because a portion of the proceeds may be upstreamed to the equity holder. (*Id.*)

87. Indeed, in multi-debtor cases, debtors are liable for a break-up fee only to the extent that they received value for the assets sold. *See In re Capmark Fin. Grp. Inc.*, Case No. 09-13684 (CSS), 2009 WL 8519872 (Bankr. D. Del. Oct. 25, 2009) (bidding procedures order in a multi-debtor case providing that each debtor is responsible only for the pro rata portion of the break-up fee based on the amounts allocable to the purchase price consideration such debtor would receive); *In re Metaldyne Corp.*, Case No. 09-13412 (MG), 2009 Bankr. LEXIS 5113, at *16 n.3 (Bankr. S.D.N.Y. June 25, 2009) ("[E]ach of the Metaldyne Companies shall be liable for its pro rata share of the Break-up Fee based upon the value to be received by such Metaldyne Company under the Successful Bid for the Powertrain Assets.").

88. The NextEra Termination Fee was approved to ensure that the Debtors had a party that would provide certainty for the sale of Oncor. As such, § 8.5(b) of the NextEra Merger Agreement specifically provided that the NextEra Termination Fee would be only payable if, as and when an "alternative transaction is consummated." (AHX-137, NextEra

Merger Agreement [D.I. 9584] § 8.5(b).)  The NextEra Termination Fee must therefore be paid out of the proceeds of the "alternative transaction," *i.e.*, the Sempra transaction consistent with customary practice.

89.    Movants propose a 50%/50% allocation of the NextEra Termination Fee between EFIH and EFH.  Movants point out that "the NextEra transaction and the Termination Fee benefitted ***neither*** EFH nor EFIH."  (*Final Written Submission of UMB Bank, N.A., as Indenture Trustee, and Elliott in Support of Joint Motion to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13414] ("Movants' Final Written Submission") at 17.)  They argue that because the Debtors eventually consummated the Sempra transaction – which provided EFIH with less value than the NextEra transaction – EFIH should not bear 100% of the NextEra Termination Fee.  (Movants' Final Written Submission at 19.)  Similarly, the PAB proposes an allocation of between 18%-22% to EFH and between 78%-82% to EFIH.  (*Final Written Submission of EFH Plan Administrator Board Objecting to the Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott in Support of Joint Motion to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* [D.I. 13416] at 15.)

90.    Movants further argue that their allocation proposal is warranted because the Court "must review the expected benefit from the [NextEra] Termination Fee at the time it was approved."  (Movants' Final Written Submission at 11.)  At that time, Movants argue, EFH stood to benefit from the consummation of the Oncor sale because the Makewhole Claims had not yet been allowed by the Third Circuit, and EFH was projected to receive over $400 million from the sale proceeds as the equity holder of EFIH after EFIH creditors were paid in full.  (Movants' Final Written Submission at 12, 19.)  Movants are mistaken.

91.     As a threshold matter, there is no evidence in the record to support either the Movants' or the PAB's proposed allocations.   Instead, the proposals they have proffered are arbitrary numbers that have no supporting methodology or evidentiary support in the record.  I cannot credit allocations proposed on this basis.  Any allocation of the NextEra Termination Fee to EFH must be denied for the additional reasons below.

92.     First, any contingent, speculative benefit arising out of a transaction other than the certain consideration received by the owner of the sold asset cannot be taken into account in calculating break-up fees because it is not an "actual benefit" to the estate.  *See, e.g.*, *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. Jan. 8, 2009) [D.I. 3182], Hr'g Tr. at 32:9-20 (holding that the break-up fee should be calculated based only on the cash component of the sale; the equity component offered by the stalking horse was excluded from the analysis as "too speculative"); *In re First Place Fin. Corp.*, Case No. 12-12961 (BLS) (Bankr. D. Del. Nov. 15, 2001) [D.I. 125], Hr'g Tr. at 31 (for purposes of determining whether a break-up fee was reasonable, the only relevant metric is whether it is within a reasonable proportion to the sale consideration; post-closing capital committed by the would-be buyer is irrelevant); *In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1997) (declining to measure break-up fee against "value of transaction" and instead analyzing "size of the fees relative to the consideration to be realized by the debtors").  As such, the speculative recoveries to EFH under the NextEra Plan, contingent on the Makewhole Claims being disallowed, do not justify the Movants' proposed allocation.

93.     Second, any break-up fee, including the NextEra Termination Fee, reduces the consideration that otherwise would flow through a debtor's capital structure yielding residual value, if any, less the break-up fee to equity.  Thus, if EFIH had been solvent at the time of the

Sempra transaction, EFH would have received the proceeds remaining after paying the EFIH creditors in full, *less $275 million*.  Requiring EFH to bear a portion of that fee where EFIH is insolvent is akin to a mandatory capital contribution by an equity holder.  Movants have offered no justification for such an extreme remedy.  It would be similarly inappropriate and unequitable to have EFH bear any portion of a break-up fee where, unlike here, EFIH was solvent and EFH received sale proceeds above and beyond payment of the NextEra Termination Fee.  The point is that the fee, like any other cost of the sale, should be taken off the top as a charge reducing the waterfall.

94.    Accordingly, EFIH must bear 100% of the NextEra Termination Fee not based on the *ex post facto* benefit inuring thereto, but because EFIH was the party that recovered substantially all of the consideration in exchange for the disposition of its interest in Oncor's parent company, Oncor Electric Delivery Holdings Company LLC.

95.    Movants further argue that EFH should bear a portion of the NextEra Termination Fee because the NextEra transaction was pursued by the E-Side Debtors to avoid potential tax consequences for both Debtors.  (Movants' Final Submission at 10-11.)  Yet, the record shows that no credible proposal was ever made to the Debtors that contemplated the taxable disposition of Oncor.  (9/2/2018 Keglevic Written Direct ¶ 6; Keglevic Dep. Tr. at 25:11-14, 25:16-24, 38:15-17, 38:19-39:14; Cremens Dep. Tr. at 31:14-18; Williamson Dep. Tr. at 25:21-26:2; Rosenbaum Dep. Tr. at 131:17-22, 131:24-25.)  EFH should not foot the bill for a result for which there was never a viable alternative.

96.    Finally, Movants' argument that the NextEra Termination Fee was increased by $165 million "in exchange for additional 'gets' intended to benefit EFH creditors" is factually incorrect.  (Movants' Final Submission at 5-11.)  As the record shows, on July 27, 2016 NextEra

requested and the Debtors agreed to an increase in the termination fee to $275 million.  (AHX-143, ¶¶ 17-20).  The next day, on July 28, 2016, NextEra agreed to an additional purchase price increase of $110 million.  (9/6/2018 Trial Tr. at 61:15-61:19 (Keglevic); 9/2/2018 Horton Written Direct ¶ 31.)  NextEra increased its purchase price without any additional concessions by EFH or EFIH.  (9/2/2018 Horton Written Direct ¶ 31).  It was only with this additional increase in distributable value that all EFIH unsecured creditors were projected to receive a 100% recovery based on the assumption that the Makewhole Claims would not be allowed, but only if the Debtors satisfied all of the closing conditions and the transaction closed.  (*Id.*).  As such, the increase in the amount of the NextEra Termination Fee provided no benefit to EFH.  Movants claim that the waiver of objections to the NextEra Termination Fee by certain EFH creditors proves a *quid pro quo* that rendered EFH liable.  I find no facts or law to support this argument.  The Court cannot allow a break-up fee based on an alleged agreement between one or even a group of creditors and a buyer that was never provided to the Court or approved.  And even if there were such an agreement, that is not the operative legal standard for approval of a break-up fee, which must be approved by the Court based on the requirements of the Bankruptcy Code, not a private agreement.  A party seeking allowance of any administrative expense must prove an *actual benefit* to a bankruptcy estate, not a perceived benefit by a creditor group based solely on the possibility of consideration flowing to that estate from a waterfall.

97.    The NextEra transaction did offer one benefit to the EFH estate:  NextEra agreed to assume liability for asbestos claims against EFH.  The value of the asbestos claims that would have diluted the unsecured creditors of EFH had such claims remained in the claim pool.  Such claims had a present value of approximately $58 million.  (AHX-226, *Disclosure Statement for the First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy*

*Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11889] (the "Sempra Disclosure Statement") at 93, 112.) However, had those claims been asserted against the EFH estate, they would have received only approximately 11.1-11.9% recoveries, or $6.40 million to $6.90 million versus the $9.8 billion benefit to EFH.  Accordingly, EFH must reserve $180,000 to $194,000, or its pro rata share of the Break-Up Fee based on the $6.90 million benefit to EFH.  (AHX-226, Sempra Disclosure Statement [D.I. 11889] (the "Sempra Disclosure Statement").

## IV.    There Is No Basis To Second-Guess The Debtors' And Committee's Professionals And Reallocate Their Fees Among The E-Side Debtors.

98.    The Movants request to reallocate the professional fees incurred in this case by the Debtors' and Committee's professionals among the E-Side Debtors.  Movants argue that the Debtors' professional fees should be reallocated 50% to EFH and 50% to EFIH, and the Committee's professional fees should be reallocated 70% to EFH and 30% to EFIH.  The PAB seeks to reallocate the Committee's professional fees 90% to EFH and 10% to EFIH.  I cannot accept either of these reallocations because neither the Movants nor the PAB offer any methodology or record evidence tied to the proposed reallocations, especially given the continued effectiveness of the Interim Compensation Order.  (Rosenbaum Dep. Tr. at 50:4-8 (admitting that Elliot does not have a methodology building up into the proposed 50%/50% split); *id.* at 71:12-18 (admitting that he is unaware of any document with "calculations supporting any specific split allocating these disputed professional fees").)  Nor have the Movants proposed an alternative methodology to govern (or any reasoned bases to change) allocation of the Committee's Fees.  (*See id.* at 71:12-18 (admitting that he was unaware of any document with "calculations supporting any specific split allocating these disputed professional fees").)

A.      **Governing Law Does Not Support Reallocation.**

99.     The Movants have therefore clearly failed to carry their burden of proving that reallocation is warranted.  *See N. Cal. Small Bus. Fin. Dev. Corp. (In re Bellow)*, 544 F. App'x 732, 734 (9th Cir. 2013) (a party "failed to carry its burden of proof . . . [w]here was little, if any, relevant documentary evidence provided at trial, and only speculative witness testimony."); *Sindh v. Desai (In re Desai)*, Case No. 07-41713, 2009 WL 2855735, at *5 (Bankr. E.D. Tex. Sept. 2, 2009) ("[N]ebulous testimony uncorroborated by documentation is insufficient to carry [party's] burden of proof."); *Gex v. Imperial Palace of Miss., L.L.C.*, Case No. 07-904-D-M2, 2008 WL 11417772, at *2 (M.D. La. Jan. 9, 2008) ("In attempting to carry its burden of proof, the defendant . . . must submit evidence that establishes . . . the actual amount in controversy.").

100.    The fact that the Debtors, the Committee and their respective professionals engaged in the exercise of contemporaneously allocating fees distinguishes this case from *In re Tropicana Entm't, LLC*, Case No. 09-10856 (KJC), 2014 WL 7450610 (Bankr. D. Del. Dec. 30, 2014), cited by the Movants.  (Movants' Final Written Submission at 4-5, 23-24.)  In *Tropicana*, the Court rejected the debtors' proposed after-the-fact allocation of fees and enforced its own allocation "based on [the court's] own experience" because the professionals had failed to allocate many of their fees in real time, pursuant to the Court's order.  *Id.* at *6.  In contrast, here, both Kirkland and Evercore adhered to the methodology agreed by creditors – including EFIH creditors – in the RSA and later approved by the Court.  The Committee's professionals, for their part, did not fail to follow the Court's orders.  Rather, they properly allocated their fees 50%/50% between EFH and EFIH because their services did not provide a direct benefit to either Debtor.

101.    More factually analogous to this case is *In re Asarco, LLC*, Case No. 05-21207, 2011 WL 2975716 (Bankr. S.D. Tex. July 20, 2011), where the court upheld counsel's fee

allocation between the debtors according to who was the beneficiary of such services, noting that "[i]n large, long, complex cases, the Court should look at the totality of circumstances and not nitpick fee entries." *Id.* at *17. Similarly, in *In re Amdura Corp.*, 139 B.R. 963 (Bankr. D. Colo. 1992), the court entered a "fee order" that contained a procedure to deal with the allocation of billings among multiple debtors similar to the procedure in the Chapter 11 Cases here.

102.    In upholding the allocation of fees, the *Amdura* court relied on the fact that:

> [t]he fee application submitted by [counsel] evidences that **efforts were made by the firm to establish a billing system which would enable the attorneys to identify with some degree of particularity the Debtor for whom services were being provided** . . . . **In certain circumstances services were provided by [counsel] which, the firm believed, benefited more than one, but not all, of the Debtors. In those instances, the firm attempted to allocate, on a pro rata basis, the time and charges involved to those Debtors which were so benefited**. That time allocation is explicitly disclosed with respect to the particular time entry in the revised fee application filed with the Court.

*Id*. at 971 (emphasis added).

103.    The same logic used by the court in *Amdura* applies here. Rather than apply the analytically flawed (actually nonexistent) methodology offered by Movants, the Court should accept the contemporaneous allocations made by the Debtors' and Committee's professionals.

104.    Moreover, given the importance of the allocation of professional fees to the parties, and the incorporation into the RSA and the Interim Compensation Order of a specific framework, it was reasonable to expect that any objection to allocation (as was the case for an objection to any aspect of a professional's request for payment) would be made timely prior to any set objection deadline.

### B.    The Allocation of the Debtors' Retained Professional Fees Was Appropriate.

105.    As described above, the RSA included a framework agreed to by the parties – including the EFIH PIK holders – to allocate the Debtors' professional fees incurred during the Chapter 11 Cases among the various estates. (AHX-010, RSA [D.I. 505], at Ex. 2, Ex. A at 79-

80].)  The RSA formulation was incorporated into the Interim Compensation Order.  (PAB-X034, Interim Compensation Order [D.I. 2066]; *see* 9/2/2018 Husnick Written Direct, ¶ 4; Husnick Dep. Tr. at 20:24-21:7; Horton Dep. Tr. at 10:21-11:18.)  The Interim Compensation Order required professionals to allocate "Direct Benefit Fees" among the EFH, EFIH and TCEH Debtors, and to allocate "Collective Benefit Fees" to each Debtor in the same proportion as the Direct Benefit Fees.  (PAB-X034, Interim Compensation Order [Dkt. No. 2066].)

106.    Pursuant to the Interim Compensation Order, if certain professional services directly benefitted one Debtor, *only* that Debtor was liable to pay fees for those services as "Direct Benefit Fees," regardless of whether other Debtors may have indirectly benefitted therefrom.  (PAB-X034, Interim Compensation Order [D.I. 2066].)  Conversely, if more than one Debtor directly benefitted from certain professional services, the fees for those services were deemed "Collective Benefit Fees."  (*Id.*)

107.    The Debtors' professionals made their allocation decisions in real time as the Chapter 11 Cases progressed in accordance with the procedure set forth in the Interim Compensation Order.  (9/2/2018 Husnick Written Direct ¶ 6; Husnick Dep. Tr. at 54:5-55:20.)  No party *ever* objected to *any* of the allocations contained in *any* of the Monthly Fee Statements or Interim Fee Applications.  *See, e.g.*, Husnick Dep. at 142:23-143:20 ("[U]ltimately, no party, the debtors or otherwise, objected to the monthly fee statements or the interim fee statements that were submitted by Kirkland & Ellis.").

108.    The record establishes that the Debtors' professionals in this case complied with the Interim Compensation Order, maintained appropriate and adequate procedures for allocating their fees among the Debtors' estates, and followed those procedures throughout these Chapter 11 Cases.  (9/5/2018 Trial Tr. at 58:16-65:25 (Husnick).)  This is evidenced by the

multiple layers of review that every professional fee allocation underwent before the professionals were paid. For example, in the case of Kirkland, (i) timekeepers were provided guidance as to how to allocate their time among the estates; (ii) senior members of the Kirkland team reviewed all invoices before they were submitted; (iii) Kirkland publicly filed each one of its monthly fee applications so that every creditor had a chance to object; (iv) Kirkland publicly filed each one of its interim fee applications, given every creditor yet another chance to lodge an objection; (v) the fee examiner in these Chapter 11 Cases reviewed Kirkland's fee applications, including Kirkland's allocations; (vi) the Debtors reviewed Kirkland's fee applications; and (vii) at the end of this process, the Court approved the fee applications submitted by Kirkland. (*Id.*; 9/2/2018 Husnick Written Direct, ¶¶ 6-13.) As described above, after the TCEH Effective Date, Kirkland started to allocate the collective benefit fees approximately 90% to EFIH and approximately 10% to EFH. Husnick Direct ¶ 31. No party, however, ever challenged this allocation method, which was meant to benefit EFIH. (9/5/2018 Trial Tr. at 57:4-24; 9/2/2018 Husnick Written Direct ¶ 13.)

109.    In complex Chapter 11 cases such as these, there will always be opportunities to nitpick and second-guess professionals with the benefit of hindsight. Given the substantial passage of time, the failure of any party to object and the exercise of professional judgment by professionals based on contemporaneous facts and circumstances, Movants bear a very high burden to reallocate millions of dollars of fees. Movants have failed to show any material issues that would cause me to perform a reallocation of the fees, and I decline to do so.

## C.    The Allocation Of The Committee's Professional Fees Was Appropriate.

110.    Similarly, the Committee's professionals determined that a 50%/50% allocation of their fees was appropriate. The evidence suggests that they did this following discussions with the Debtors and their tacit, if not explicit, approval.

111.    An analysis of the services of the Committee performed establishes that an overwhelming majority of the work related to the plan and disclosure statement and other activities that the Debtors similarly classified as a collective benefit.

112.    There is no evidence in the record that conclusively establishes that the Committee's professionals performed work for any one particular Debtor.

113.    Accordingly, there is no basis to override the judgment of the Committee's professionals and reallocate the fees in any manner.

114.    Moreover, there is no discernable methodology employed by the Movants or the PAB in calculating their respective proposed affirmative allocations.  The numbers are entirely arbitrary and bear no relationship to the factual record.

**D.    The Facts And Circumstances Of The Case Do Not Support Fee Reallocation.**

115.    Even if the Court were to undertake a review of the facts that transpired during these Chapter 11 Cases and examine whether the allocation decisions were appropriate, the outcome of this dispute would not change.

**1.    Tax Armageddon Was a Threat to *All* E-Side Debtors.**

116.    In arguing for their proposed reallocations, Movants rely on revisionist history contending that the cases were administered primarily to avoid a "Tax Armageddon," in which EFH – purportedly alone – would face $7 billion in tax liability if the Debtors closed a taxable sale of Oncor assets.  I cannot credit this argument because no party proffered any evidence for any bona fide taxable transaction that the Debtors refused.  The uncontested evidence shows that the Debtors pursued transactions that would maximize value for EFIH, as well as EFH.  I cannot punish EFH through a fee reallocation because the Debtors chose transactions that would maximize value for EFIH.

117.    The issues concerning a potential taxable sale of Oncor were thoroughly litigated in connection with the Bidding Procedures Motion by several parties in interest, including EFIH creditors.  Numerous creditor groups filed objections to the Bidding Procedures Motion.  For example, Delaware Trust, the indenture trustee for EFIH's senior notes, objected on the ground that the Debtors made a critical error in pursuing a non-taxable transaction, to the detriment of EFIH and its creditors.  (AHX-038, Bidding Proecdures Order [D.I. 2699] at 7:14-16, 4-8.).

118.    As discussed above, in the Tax Memo, the Debtors concluded that because EFH is a holding company without assets to satisfy a $7 billion tax liability, the IRS would likely oppose any sale that would result in such a large "stranded liability" from its disregarded subsidiaries.  (PAB-X044, Tax Memo [D.I. 2296] at 4, 15-17.)  The Debtors also outlined a number of potential contingencies that could result in tax liability at EFIH if the IRS did not successfully prevent a taxable transaction from occurring, as well as ways to mitigate that liability.  (*Id.* at 18-19.)  Thus, because the recoveries of EFIH's creditors also were at significant risk from a taxable transaction, a tax-free deconsolidation was in the best interests of all constituencies.

119.    The Court, after a four-day evidentiary hearing on the merits, found that the Debtors' bidding procedures would be considered a valid exercise of business judgment, after obtaining approval from each Debtor's board.  (AHX-038, Bidding Procedures Order [D.I. 2699] at 18:11-19:2, 25:4-25.)  The Court rejected Delaware Trust's contention that the Debtors were singularly focused on tax-free transactions, and found that time would be needed to allow for such alternative transactions to be formulated, even though such alternative transactions were unlikely to occur.  (*Id.* at 12:20-22, 15:9-14, 22:6-12.)  The Court also credited the testimony of Evercore, the Debtors' financial advisors, that a taxable transaction was "unlikely" because

potential buyers would be concerned about the risks of such a transaction.  (*Id.* at 22.)  The Court

subsequently entered the Bidding Procedures Order.

120.    Thus, the Court has already recognized the clear risk that neither the IRS (which

would litigate the matter), nor EFH (which would do the same), nor potential bidders (who might

not even bid), would simply accept a taxable transaction that left a stranded tax at EFH.  The

issue of whether avoiding a "Tax Armageddon" was solely a benefit to EFH or was a benefit to

both the EFH and EFIH estates was thus settled nearly four years ago when the Court entered the

Bidding Procedures Order.  (AHX-038, Bidding Procedures Order [D.I. 2699].)

121.    Indeed, as set forth in detail above, Mr. Cremens, EFIH's independent director,

acknowledged the reality of the tax risk to EFIH and that it was in EFIH's best interest to avoid a

taxable transaction.  (Cremens Dep. Tr. at 29:22-31:13.)  The uncontroverted evidence

establishes that EFIH's unsecured creditors agreed, including a letter sent by counsel to the ad

hoc group of EFIH PIK holders (of which Rosenbaum's prior firm York was a member) raising

concerns about a taxable transaction, and Rosenbaum's own acknowledgement of risks

associated with a taxable transaction.  (AHX-012 [CCREMENS000001 at 002]; Rosenbaum

Dep. Tr. at 120:7-121:2.)  Moreover, because a viable taxable transaction was never presented to

the Debtors, Movants' claim that the Debtors incurred additional costs from attempting to

consummate non-taxable transactions is simply meritless.  (9/6/2018 Trial Tr. at 108:9-13

(Horton); 9/2/2018 Keglevic Written Direct ¶ 6; Keglevic Dep. Tr. at 25:11-14, 25:16-24, 38:15-

17, 38:19-39:14; Cremens Dep. Tr. at 31:14-18; Williamson Dep. Tr. at 25:21-26:2; Rosenbaum

Dep. Tr. at 131:17-22, 131:24-25.)

122.    As avoidance of a taxable transaction was in all parties' interest – and Movants

have made no effort to specifically identify any additional time spent because such a transaction

was pursued (and cannot in any event) – there is no basis to reallocate the fees incurred by the Debtors and the Committee.

### 2.    EFIH Was the Direct Beneficiary of the Makewhole Claims Dispute.

123.    Next, Movants argue that litigation of the Makewhole Claims did not directly benefit EFIH – even though the claims arose out of EFIH's secured loans and EFIH was the objecting party.

124.    EFIH was the direct beneficiary of the litigation concerning the Makewhole Claims because it was the party that had the right to object, and its creditors stood to benefit directly from any such disallowance.  This is at least one reason why the Ad Hoc Committee of PIK Holders agreed with the Debtors that EFIH should file objections to the Makewhole Claims in the RSA.

125.    Movants' rationale for why EFIH was not a direct beneficiary – its purported solvency – is entirely circular.  EFIH's solvency was dependent upon disallowance of the Makewhole Claims, except for the Hunt Plan.  The fact that the Makewhole Claims were allowed rendered EFIH insolvent.  Determining relative benefit of professional fees based on a debtor's valuation (the predicate of solvency here) at any given time would set a dangerous and complicated precedent.  Here, the Debtors' valuation varied by transaction, and EFIH's solvency varied based on the valuation and, ultimately, the allowance of the Makewhole Claims.  Reconciling and allocating fees in this situation would be a practical impossibility, the Debtors did not do so, (9/5/2018 Trial Tr. at 272:17-273:21 (Horton)), and the Court declines to undertake that exercise.

126.    Accordingly, Movants' argument that EFIH was not the beneficiary of the Makewhole Claims litigation is unfounded.

### 3.    The TCEH Settlement and Assumption of the Asbestos Claims Enabled Confirmation of the Plan Benefitting All E-Side Debtors.

127.    Movants also assert that EFH was the direct beneficiary of the TCEH Settlement and the Debtors' assumption of asbestos claims, and therefore, that the fees incurred in connection with these activities should be deemed a direct benefit to EFH rather than a collective benefit to the E-Side.  However, Movants' assertion fails to address the fact that these two issues were critical components of the larger plan negotiation and confirmation process, and that resolution of these two issues paved the way for plan confirmation that benefited *all* E-Side Debtors – including EFIH.  (11/15/2015 Direct Testimony of Charles H. Cremens ¶ 63.)

128.    More fundamentally, Movants are attempting to cherry-pick a handful of events (and related fee entries) that transpired during the over nearly four-year history of the Chapter 11 Cases – the precise type of nitpicking that the *Asarco* court counseled against in favor of the business judgment of debtors and their professionals.  The testimony of these professionals and the E-Side Debtors' directors, as set forth above, warrants the Court's deference to the real-time allocation of the Debtors' and the Committee's professional fees, both of which have never been the subject of a single objection by any party until now.  Indeed, a contrary holding would open up a Pandora's box of fee litigation in all future multi-debtor, large-format cases in this District. The Allocation Motion must be denied for this additional reason.

### V.    There Is No Basis To Allocate Any Portion Of The Elliott's Substantial Contribution Claim To EFH.

129.    Elliott submitted the Substantial Contribution Statement, seeking payment and reimbursement of $30,236,354.38 in professional fees and $1,438,294.91 for the Substantial Contribution Claim.  (*Id.*; ELX-670, *Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* (the "Allocation Motion"), [D.I. 13102] at 4 n.3.)  Professional fees are broken

down into six separate categories as indicated, *supra*.  Movants contend that these fees should be split 30% EFH and 70% EFIH based upon purported direct benefits that EFH received.  (ELX-670, Allocation Motion [D.I. 13102] at 32-33.)  The PAB seeks to allocate these fees between from 36-44% to EFH and between from 56-64% to EFIH.  As with the other disputed expenses, neither the Movants nor the PAB have proffered any methodology or substantiation of their proposed allocation to record evidence.

130.    Sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code allow creditors that have made a "substantial contribution" in a case under chapter 11 to receive their "actual, necessary expenses" incurred, as well as reasonable compensation for professional services rendered.  In demonstrating this, a claimant must demonstrate an "actual and demonstrable benefit to the debtor's estate and the creditors."  *In re Worldwide Direct, Inc.*, 334 B.R. 112, 121 (Bankr. D. Del. 2005).  In the Third Circuit, for a contribution to be "substantial," the "benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests."  *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994).  In arriving at this determination "courts consider the following factors:  1) whether services were rendered solely to *benefit* the client or to *benefit* all parties in the case; 2) whether the services provided direct, significant demonstrable benefit to the estate; and 3) whether the services were duplicative of services rendered by attorneys for the committee, the committee themselves, or the debtor and its attorneys."  *Worldwide Direct*, 334 B.R. at 122 (citation omitted).

131.    As outlined below, Elliott cannot satisfy the factors outlined in *Worldwide Direct*, in that EFH received no benefit from Elliott's professional fees and expenses incurred in connection with the categories outlined in its Substantial Contribution Statement other than with

respect to the Oncor dividend settlement. Therefore, Elliott has failed to meet its burden and EFIH is allocated all of the professional fees and expenses requested in the Substantial Contribution Statement other than with respect the Oncor dividend settlement.

### A. None Of The Categories Of Expenditure In The Substantial Contribution Claim Benefitted EFH Except For The Dividend Settlement.

#### 1. Terminating the NextEra Plan Support Agreement to Seek an Alternative Restructuring Agreement.

132.    EFH did not obtain any benefit from Elliott's termination of the NextEra plan support agreement (the "NextEra PSA") in favor of an alternative restructuring transaction. Elliott did not terminate the NextEra PSA; the Debtors did so in the exercise of their fiduciary duties. (9/6/2018 Trial Tr. at 115:18-116:6 (Horton).) The Debtors did not terminate the NextEra transaction at the insistence of Elliott. (*Id.* at 115:18-23.) Additionally, although Elliott was interested in pursuing an alternative transaction, it was interested in doing so to minimize EFIH's incurrence of additional interest expense, which EFH did not have. (*Id.* at 117:13-118:8, 119:19-23.) Moreover, any fees or expenses that Elliott incurred in attempting to terminate the NextEra Plan Support Agreement (the Court finds that it did not terminate the agreement) were duplicative of the Debtors' role in doing so. (*Id.* at 115:18-116:6.) Therefore, the third factor is also not satisfied with respect to that category of professional fees and expenses.

133.    Consequently, EFH did not benefit from any expenses Elliott incurred in connection with seeking an alternative restructuring transaction. (*Id.* at 118:9-17.)

#### 2. Opposing Berkshire Transaction/Committing to the Sempra Transaction.

134.    EFH did not obtain a benefit from Elliott's expenditure of professional fees in connection with the Sempra transaction. First, Elliott would have expended those fees irrespective of the type of transaction that the Debtors pursued, and no credible taxable proposal

was ever made to the Debtors.  (9/6/2018 Trial Tr. at 108:9-13 (Horton); 9/2/2018 Keglevic

Written Direct ¶ 6; Keglevic Dep. Tr. at 25:11-14, 25:16-24, 38:15-17, 38:19-39:14; Cremens

Dep. Tr. at 31:14-18; Williamson Dep. Tr. at 25:21-26:2; Rosenbaum Dep. Tr. at 131:17-22,

131:24-25.)  Second, EFH did not receive any distributable value from the Sempra transaction.

(9/6/2018 Trial Tr. at 107:9-11, 108:6-8, 107:23-108:2 (Horton).)  Second, EFH did not receive

any distributable value from the Sempra transaction.  (9/7/2018 Trial Tr. at 145:23-146:11;

9/6/2018 Trial Tr. at 107:9-11 (Horton), 107:22-108:2 (Horton).)  There was no incremental

benefit to EFH that resulted from Elliott's conduct.  All of the benefit went to EFIH, and, thus,

all of the associated expense should be borne by EFIH.  Accordingly, EFH received no benefit

from Elliott's professional fees incurred in connection with their pursuit of the Sempra

transaction.

> **3.      Negotiation of the Sempra Plan and Related Documents and Advocating for Creditor Distributions in Connection with Plan Confirmation Proceedings.**

135.    EFH obtained no benefit from Elliott's pursuit of the Sempra Plan.  All of the

Sempra Plan distributable value inured to EFIH and none to EFH.  Also, EFIH obtained a benefit

through the reduction of interest rate expense that only existed at the EFIH level.  (9/6/2018 Trial

Tr. at 107:9-11, 107:18-108:2, 117:8-118:8 (Horton); 9/2/2018 Keglevic Written Direct ¶ 6;

Keglevic Dep. Tr. at 25:11-14, 25:16-24, 38:15-17, 38:19-39:14; Cremens Dep. Tr. at 31:14-18;

Williamson Dep. Tr. at 25:21-26:2; Rosenbaum Dep. Tr. at 131:17-22, 131:24-25.)

Accordingly, EFH received no benefit from Elliott's professional fees incurred in connection

with their pursuit of the Sempra transaction.

4.    **Obtaining an Order Disallowing the $275 Million NextEra Termination Fee.**

136.    The Court also finds that EFH obtained no significant benefit from Elliott's professional fee expenditures associated with litigation to disallow the NextEra Termination Fee. Although the Third Circuit recently affirmed this Court's disallowance of the NextEra Termination Fee, *In re Energy Future Holdings Corp.*, No. 18-1109, 2018 WL 4354741 (3d Cir. Sept. 13, 2018), the decision still remains subject to *en banc* rehearing, or appeal to the United States Supreme Court.  (Rosenbaum Dep. Tr. at 152:21-153:1.)  As described above, over 99% of the NextEra Termination fee should be paid by EFIH, if allowed.  Elliott's substantial contribution to save this expenses should be allocated in the same way as the fee itself.

137.    To the extent that the affirmance by the Third Circuit becomes final, EFH's benefit from the order is the expense saved equal to its share of the $275 million NextEra Termination Fee.  Thus, EFH's share of Elliott's substantial contribution claim is the same percentage as its share of the NextEra Termination Fee, if the NextEra Termination Fee is ultimately allowed on a final basis.

5.    **Facilitating the Resolution of the Vistra Tax Dispute.**

138.    The Court also finds that EFH did not obtain a benefit from Elliott's professional fees incurred in connection with the Vistra tax dispute.  Elliott, in the first instance, demanded that EFH commence litigation against Vistra.  (9/6/2018 Trial Tr. at 112:5-20 (Horton).)  EFH ultimately brought the litigation, which was resolved in favor of Vistra.  (*Id.* at 112:21-113:6.) Accordingly, EFH did not obtain any benefit from the litigation against Vistra.

6.    **Facilitating the Oncor Dividend Settlement.**

139.     The record reflects that EFH received only $3.75 million in settlement proceeds from the Oncor dividend settlement (or 12%), whereas EFIH obtained $27.25 million.  (9/6/2018

Trial Tr. at 109:4-16 (Horton).)  Accordingly, approximately 12% of the total for the fees related

to the Oncor dividend settlement ($70,123.92 of $584,366.00) should be borne by EFH.

### 7.    **Expenses.**

140.    Because Elliott's expenses incurred were in connection with the professional fees,

Elliott's expenses likewise failed to benefit EFH, (Rosenbaum Dep. Tr. at 216:19-217:15),

except those incurred in connection with the Oncor dividend settlement.

### **CONCLUSION**

For the reasons set forth above, the Allocation Motion shall be denied, except as
specifically set forth below:

- EFH shall reserve $194,000, and EFIH shall reserve $274,806,000, in connection
  with the NextEra Termination Fee.  To the extent the NextEra Termination Fee is
  denied by Final Order, these reserves shall be released in accordance with the
  Sempra Confirmation Order.

- EFH shall pay 0.07% of the $3,320,527.75 ($2,324.37) correlating to Movants'
  Substantial Contribution Claim, relating to the Order disallowing the NextEra
  Termination Fee, to the extent such Order becomes a Final Order.

- EFH shall pay 12% of the $584,366 ($70,123.92) correlating to Movants'
  Substantial Contribution Claim, relating to the Oncor Dividend Settlement.

Dated:  September 27, 2018
        Wilmington, Delaware

HOGAN ♦ MCDANIEL

By:  /s/ Garvan F. McDaniel
Garvan F. McDaniel, Esq. (DE #4167)
1311 Delaware Avenue
Wilmington, Delaware 19806

Telephone:  (302) 656-7540
Facsimile:  (302) 656-7599
Email:  gfmcdaniel@dkhogan.com

– and –

KASOWITZ BENSON TORRES LLP
David S. Rosner, Esq.
Andrew K. Glenn, Esq.
Matthew B. Stein, Esq.
Gavin D. Schryver, Esq.
David J. Mark, Esq.
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800
Email:  drosner@kasowitz.com
        aglenn@kasowitz.com
        mstein@kasowitz.com
        gschryver@kasowitz.com
        dmark@kasowitz.com

*Co-Counsel to the Ad Hoc EFH Claimants*