## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., | ) Case No. 14-10979 (CSS) |
| | ) (Jointly Administered) |
| Debtors. | ) Related Docket No.: 13102 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON JOINT MOTION TO FIX APPROPRIATE ALLOCATION OF CERTAIN RESERVES AND EXPENSES AS BETWEEN THE EFH AND EFIH DEBTORS [1]

This has been a long, complicated and expensive case. The Debtors filed bankruptcy on April 29, 2014. The funded debt was split between two silos. The T-side debt was owed by a family of companies engaged in the production of energy as well as the retail sale of electricity to consumers, all in Texas. The E-side debt was owed by two holding companies – EFH Corp., the parent, and EFIH, its subsidiary. Between them EFH Corp. and EFIH held an indirect interest in Oncor, a public utility in Texas. There were potential claims between the various debtors in the billions. On the petition date, it appeared that the T-side debtors were hopelessly insolvent and the E-side debtors were probably solvent. The case was contentious from the start with numerous objections filed to every motion – even joint administration. Much happened and much was spent. The

---

[1] The Court hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions or law constitute findings of fact, they are adopted as such.

high water mark of the case occurred on December 7, 2015, on which date the Court confirmed a plan sponsored by the T-side creditors that left all of the E-side creditors unimpaired. A series of unfortunate events then occurred.[2] While the T-side debtors emerged from bankruptcy in the fall of 2016, it took until March 9, 2018 for the E-side debtors to emerge from bankruptcy after the sale of Oncor to Sempra Energy. Time was not the friend of the E-side unsecured creditors. By the time EFH Corp. and EFIH emerged from bankruptcy, the operative classes of their unsecured creditors were projected to receive approximately 16% and 23-39%, respectively.

This leads us to the matter before the Court. The principal parties, which consist of an ad hoc committee of EFH Corp. unsecured creditors and the largest holder of EFIH unsecured debt, dispute the allocation of certain administrative expenses between the non-substantively consolidated estates of EFH Corp. and EFIH. The motivation is simple. The greater the proportion of administrative expenses allocated to EFH Corp. the greater the recovery of EFIH's unsecured creditors and vice versa. Importantly, the question here is not whether the administrative claims should be allowed - it is which estate should be liable for the allowed administrative claims.[3]

There are four groups of administrative claims at issue: (i) a $275 million claim by NextEra Energy for a termination fee arising from a failed merger with Oncor: (ii) approximately $137 million in professional fees billed by the debtors' lead attorneys

---

[2]    Apologies to Lemony Snicket.

[3]    All of the administrative claims at issue are either currently disallowed or subject to entry of a final order.

and financial advisor; (iii) approximately $48 million in professional fees billed by the advisors to the Official Committee of Unsecured Creditors of EFH Corp. and EFIH; and (iv) an approximately $30 million claim for substantial contribution by a large creditor of EFH Corp. and EFIH.  After extensive briefing, a three day trial and the admission of hundreds of exhibits, the Court has determined that the appropriate allocation of the administrative expenses should be as follows:

| Administrative Claim | EFIH | EFH |
|---|---|---|
| NextEra Termination Fee | 94.6% | 5.4% |
| Debtors' Professional Fees | 85% | 15% |
| E-Side Committee Professional Fees | 12% | 88% |
| Substantial Contribution Claim | 95% | 5% |

## INTRODUCTION AND PROCEDURAL HISTORY

1.    This contested matter relates to the allocation of certain reserves and administrative expenses incurred in the above-captioned chapter 11 cases (the "Chapter 11 Cases") as between the estate of Energy Future Holdings Corp. ("EFH") and the estate of Energy Future Intermediate Holding Company, LLC ("EFIH" and, together with EFH and certain affiliates and subsidiaries thereof, the "E-Side Debtors").[4]

---

[4]    For ease of reference, the Court refers herein to the allocation of reserves and administrative expenses as between "EFH" and "EFIH."  As made clear in the *First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (the "Sempra Plan"), however, the allocation is actually between the "EFH Debtors" and the "EFIH Debtors."  The EFH Debtors means, collectively, (a) EFH Corp., (b) Ebasco Services of Canada Limited, (c) EEC Holdings, Inc., (d) EECI, Inc., (e) EFH Australia (No. 2) Holdings Company, (f) EFH Finance (No. 2) Holdings Company, (g) EFH FS Holdings Company, (h) EFH Renewables Company LLC, (i) Generation Development Company LLC, (j) LSGT Gas Company LLC, (k) LSGT SACROC, Inc., (l) NCA Development Company LLC, and (m) TXU Receivables Company. (ELX-623, Sempra Plan [D.I. 12653] Art I.A.91.)  The EFIH Debtors means, collectively, (a) EFIH and (b) EFIH Finance.  (*Id.* Art. I.A.148.)

## I.    The Debtors

2.      On April 29, 2014 (the "Petition Date"), EFH, EFIH, and dozens of affiliated entities filed petitions under chapter 11 of the Bankruptcy Code (collectively, the "Debtors").   These Chapter 11 Cases are jointly administered but not substantively consolidated.  (*See Final Order Directing Joint Administration*, entered June 5, 2014 [D.I. 849].)

3.      As of the Petition Date, EFH was a holding company that owned interests in two main businesses.   Through its indirect ownership of Texas Competitive Electric Holding Company, LLC ("TCEH"), EFH owned 100% of the interest in the "T-Side" Debtors' electricity generation and competitive retail businesses, among other things.  The T-Side Debtors emerged from bankruptcy on October 3, 2016.  (ELX-407, *Notice of Entry of TCEH Confirmation Order and Occurrence of TCEH Effective Date*, filed Oct. 3, 2016 [D.I. 9742] (the "T-Side Effective Date").)

4.      Through its ownership interest in EFIH, EFH also indirectly owned an approximately 80% economic interest in Oncor Electric Delivery Company LLC ("Oncor"), a regulated utility and the largest transmission and distribution system in Texas.  (ELX-009, *Decl. of Paul Keglevic in Support of First Day Motions*, filed Apr. 29, 2014 [D.I. 98].)   A transaction monetizing EFIH's interest in Oncor—in a change-of-control transaction that required regulatory approval by the Public Utility Commission of Texas ("PUCT") to close—was a critical component of the Debtors' reorganization efforts.

## II.    The Sempra Plan and Creation of the PAB

5.      On September 7, 2017, the Court authorized the Debtors to enter into a merger agreement (the "Merger Agreement") with Sempra Energy ("Sempra") — a California-based utility holding company — pursuant to which Sempra would, among other things, acquire EFH's indirect economic interests in Oncor.  (ELX-557, *Order Authorizing Entry Into Merger Agreement and Approving Termination Fee, Authorizing Entry Into and Performance Under Plan Support Agreement*, filed Sept. 7, 2017 [D.I. 11873].)

6.      The Merger Agreement was a critical component of *The First Amended Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), which was confirmed by order of the Court on February 27, 2018 (the "Confirmation Order").  (ELX-635, *Order Confirming the First Amended Plan of Reorganization*, filed Feb. 27, 2018 [D.I. 12763].)  Paragraph 150 of the Confirmation Order prohibited any allocation of administrative expenses that would render the EFH estate administratively insolvent.  (*Id.* at ¶ 150.)

7.      The PUCT approved the Sempra transaction on March 8, 2018, and the Plan became effective on March 9, 2018.  (PAB-X635, *Notice of Entry of EFH Confirmation Order and Occurrence of EFH Effective Date*, filed Mar. 9, 2018 [D.I. 12801] (the "E-Side Effective Date").)

8.      The Plan created the EFH Plan Administrator Trust (the "Trust") to resolve disputed claims and administer the winding-up of the estates.  The Trust contains cash contributions from Sempra in connection with consummating the Plan, additional cash on hand, and "the Causes of Action the EFH Plan Administration Board is permitted to pursue

and settle under the Plan." (PAB-X627, *First Amended Supplement to First Amended Joint Chapter 11 Plan of Reorganization,* Ex. C (EFH Plan Administrator Trust Agreement) at Recitals ¶ E, filed Feb. 22, 2018 [D.I. 12685-8]; ELX-635 [D.I. 12763] ¶ 134.)

9.      The EFH Plan Administration Trust Agreement (the "Trust Agreement"), which the Court approved pursuant to the Confirmation Order, governs the Trust. (ELX-635, ¶ 74 [D.I. 12763]; PAB-X627 at Ex. C [D.I. 12685-8].)

10.      The EFH Plan Administrator Board (the "PAB") is the trustee of the Trust. (PAB-X627, Ex. C at Preamble [D.I. 12685-8].) As a fiduciary for unsecured creditors of the EFH and EFIH estates, the PAB is charged with effectuating the Plan and administering the Trust by paying claims, resolving and litigating disputed claims, and taking actions necessary to wind up the estates. (*Id.* at Art. I.1.2; ELX-635, ¶ 90 [D.I. 12763].)

## III.   The Allocation Dispute

11.      At the hearing with respect to confirmation of the Sempra Plan held on February 26 and 27, 2018 (the "Sempra Confirmation Hearing"), the Court found that the E-Side Debtors could, in their discretion, establish a segregated escrow account in the amount of $275 million (the "NextEra Plan Reserve") on account of a $275 million administrative expense claim for a termination fee (the "Termination Fee") asserted by NextEra Energy, Inc. ("NextEra") that had been ultimately disallowed by this Court[5] but was then on direct appeal to the U.S. Court of Appeals for the Third Circuit (the "Third Circuit"). (ELX-634, 2/26/18 Hr'g Tr. at 233:1–3.) The Court approved the NextEra Plan Reserve as a valid

---

[5]      The Court initially approved the Termination Fee. However, after the NextEra transaction failed, the Court reconsidered the Termination Fee and denied it. *In re Energy Future Holding Corp.,* 575 B.R. 616 (Bankr. D. Del. 2017).

exercise of the E-Side Debtors' discretion.  (ELX-635, 2/27/18 Confirmation Order [D.I. 12763] ¶ 150.)  The Court also stated that the NextEra Plan Reserve would "preserve the integrity of the judicial process" with respect to NextEra's appeal of the Reconsideration Order (as defined below).  (ELX-735, 2/27/18 Hr'g Tr. at 15:14–17.)[6]

12.    Although the Court approved the NextEra Plan Reserve, the Court denied NextEra's request that the E-Side Debtors hold approximately $60 million in a reserve with respect to NextEra's then-pending administrative expense application (the "NextEra Reimbursement Application"), which application sought payment for various costs and expenses purportedly incurred by NextEra in connection with its pursuit of the NextEra merger transaction in the event that the Termination Fee was disallowed by a final order (the "NextEra Reimbursement Claim").  *In re Energy Future Holdings Corp.*, 588 B.R. 371 (Bankr. D. Del. 2018); (ELX-634, 2/26/18 Hr'g Tr. at 233:10–23.)  The costs and expenses were purportedly incurred by NextEra between July 29, 2016 and July 6, 2017.  (*See* ELX-625, 2/20/18 NextEra Reimbursement Application [D.I. 12671] ¶ 43.)[7]  The NextEra Reimbursement Claim is not the subject of the Court's ruling.

---

[6]    On March 13, 2018 and March 23, 2018, Elliott and UMB (as defined herein) appealed the Confirmation Order to the U.S. District Court for the District of Delaware (the "District Court") on the grounds that, among other things, (a) the NextEra Plan Reserve was contrary to the terms of the Plan and could not be approved without a separate motion and hearing and (b) NextEra should have been required to post a supersedeas bond or provide an undertaking in connection with the NextEra Plan Reserve. (3/13/18 Elliott Notice of Appeal [D.I. 12830]; 3/23/18 UMB Notice of Appeal [D.I. 12848].)  These appeals have been joined pursuant to Rule 8003(b)(2) of the Federal Rules of Bankruptcy Procedure and the joined appeal remains pending in the District Court.

[7]    NextEra did not appeal this Court's ruling denying NextEra's request that the E-Side Debtors hold approximately $60 million in a reserve with respect to the NextEra Reimbursement Claim.

13.     On September 13, 2018, the Third Circuit affirmed this Court's reconsideration of the Termination Fee.[8]  *In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018).  In response to the Third Circuit's ruling, Elliott and UMB filed a motion to release and distribute all funds in the NextEra Plan Reserve. D.I. 13497.  NextEra filed its *Petition for Rehearing or Rehearing En Banc* on September 27, 2018; thereafter, on October 24, 2018, the Third Circuit entered an order denying the petition for rehearing.  After the Third Circuit denied rehearing, this Court entered *Order Granting Joint Motion of UMB Bank, N.A., as Indenture Trustee, and Elliott to Direct the EFH Plan Administrator Board to Release ad Distribute All Funds in the NEE Plan Reserve*, which authorizes and directs the PAB to release the full amount of the NextEra Plan Reserve and distribute such funds to unsecured creditors in accordance with the Plan, such Order becoming effective on November 15, 2018. *See* D.I. 13583.

14.     The Confirmation Order contemplated one or more separate orders allocating the NextEra Plan Reserve and "other material Claims" as between EFH and EFIH.  (ELX-635, 2/27/18 Confirmation Order [D.I. 12763] ¶¶ 150–52.)  The Confirmation Order also provided that any Holder of a Claim may make a "request for relief in connection with the allocation of material Claims as between EFH and EFIH."  (*Id.* ¶ 153.)  The Confirmation Order set no deadline for a Holder to seek such relief.

---

[8]     As the case continued to develop after briefing on the Allocation Motion was completed, the Court takes judicial notice of several pleadings and orders entered after the close of briefing.  Judicial notice of public filings is appropriate under Federal Rule of Evidence 201(b)(2).  *See Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991).

15.    On May 13, 2018, UMB Bank, N.A., as Indenture Trustee ("UMB") for the unsecured 11.25%/12.25% Senior Toggle Notes due 2018 the ("EFIH PIK Notes"), and Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott" and, together with UMB, the "Movants") filed the *Joint Motion to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors* (the "Allocation Motion").  (ELX-670, 5/13/18 Allocation Motion [D.I. 13102].)

16.    Pursuant to the Allocation Motion, Movants requested the Court to allocate the following four categories of administrative expenses claims (the "Material Administrative Expense Claims") as between EFH and EFIH:

a) the NextEra Plan Reserve and any administrative expense asserted by NextEra related to the Termination Fee or the proposed merger transaction between the E-Side Debtors and NextEra, or any reserve established with respect thereto in the amount of $275 million (collectively, the "NextEra Termination Fee Claim");

b) the allowed administrative expense of Elliott under sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for fees and expenses incurred by Elliott in connection with its substantial contributions in these Bankruptcy Cases in the amount of $30,068,488.73 (the "Elliott Substantial Contribution Claim");

c) any allowed administrative expense for fees and expenses of any professional retained by the official committee of unsecured creditors of EFH, EFIH, EFIH Finance, Inc., and EECI, Inc. in the amount of $48,005,807.17 (the "E-Side Committee" and, such fees and expenses, the "E-Side Committee Professional Fees"); and

d) any allowed administrative expense for fees and expenses of Kirkland & Ellis LLP ("Kirkland"), the Debtors' lead counsel in these Bankruptcy Cases, and Evercore Group L.L.C. ("Evercore"), the Debtors' investment banker in these

Bankruptcy Cases in the aggregate amount of $136,903,558.88 (collectively, the "Kirkland and Evercore Fees").[9]

(ELX-670, 5/13/18 Allocation Motion [D.I. 13102] ¶ 3.)

17.     Responses, preliminary objections, or reservations of rights with respect to the Allocation Motion were filed by (a) an *ad hoc* group of EFH unsecured noteholders (the "Ad Hoc EFH Claimants"), (b) the PAB and (c) American Stock Transfer & Trust Company, LLC, as successor trustee (the "EFH Trustee") under the indentures for certain notes issued by EFH. (ELX-682, 6/1/18 Ad Hoc EFH Claimants' Statement and Preliminary Objection [D.I. 13168]; ELX-679, 5/29/18 PAB Response [D.I. 13150]; 5/29/18 EFH Trustee Preliminary Objection [D.I. 13148].)

18.     On June 11, 2018, the Court entered an order scheduling certain dates and deadlines and establishing certain protocols in connection with the Allocation Motion (as amended, the "Scheduling Order"). (ELX-684, 6/11/18 Scheduling Order [D.I. 13193]; PAB-X737, 8/17/18 Second Amended Scheduling Order [D.I. 13373].)

19.     In accordance with the Scheduling Order, the parties conducted discovery on the Allocation Motion, including the production of documents, eight fact witness depositions, exchanges of expert disclosures, and three expert witness depositions. On August 30, 2018, the Movants, the PAB, the Ad Hoc EFH Claimants, and the EFH Trustee each filed and served a final written submission in connection with the Allocation Motion

---

[9]     In the Allocation Motion, Movants initially requested that the Court order a 50/50 allocation of allowed administrative expenses for fees and expenses asserted by any professional retained by the E-Side Debtors. (ELX-670, Allocation Motion [D.I. 13102].) Movants subsequently modified this request and, as noted in Movants' Final Submission (as defined in paragraph 12 hereof), Movants no longer challenge the fee and expense allocations proposed by the Debtors' retained professionals other than Kirkland and Evercore.

(collectively, the "Final Submissions").  (8/30/18 Movants' Final Submission [D.I. 13414]; 8/30/18 PAB's Final Submission [D.I. 13416]; 8/30/18 Ad Hoc EFH Claimants' Final Submission [D.I. 13415]; 8/30/18 EFH Trustee's Final Submission [D.I. 13417].)

20.    The parties' proposed allocations of the Material Administrative Expense Claims as set forth in their respective Final Submissions are as follows:

| MATERIAL ADMINISTRATIVE EXPENSE CLAIM | MOVANTS | | PAB[10] | | AD HOC EFH CLAIMANTS/EFH TRUSTEE | |
|---|---|---|---|---|---|---|
| | EFH | EFIH | EFH | EFIH | EFH | EFIH |
| **NextEra Termination Fee Claim** | 50% | 50% | 20% | 80% | 0% | 100% |
| **Elliott Substantial Contribution Claims** | 30% | 70% | 40% | 60% | 0% | 100% |
| **E-Side Committee Professional Fees** | 70% | 30% | 88% | 12% | 50% | 50% |
| **Kirkland & Evercore Fees** | 50% | 50% | 15% | 85% | 15% | 85% |

21.    On August 31, 2018, the Court entered a *Joint Stipulated Final Pre-Trial Order* in connection with the hearing on the Allocation Motion.  (8/31/18 Pre-Trial Order [D.I. 13426].)

---

10    For certain Material Administrative Expense Claims, the PAB proposed a range of allocations.  The figures set forth herein represent the midpoint of the PAB's proposed ranges.

22.     On September 5, 2018 through September 7, 2018, the Court held a three-day evidentiary hearing on the merits of the Allocation Motion (the "Hearing").

23.     On September 7, 2018, the Court entered an order approving a stipulation among the parties with respect to the admission into evidence or the judicial notice of various exhibits and deposition designations.  (9/7/18 Stipulation and Order [D.I. 13469].)

24.     This is the Court's findings of fact and conclusions of law with regard to the Allocation Motion.

## FINDINGS OF FACT

### I.     Allocation of The Nextera Termination Fee Claims.

#### A.     The Selection of NextEra as the Stalking Horse Bidder for Oncor.

25.     By the end of July 2016, the E-Side Debtors were engaged in negotiations with NextEra and at least one other bidder in connection with a merger transaction involving the E-Side Debtors' interests in Oncor.  (9/2/18 Keglevic Written Direct ¶ 17; ELX-457, 2/10/17 Keglevic Decl. at 9–10.)[11]   As of July 21, 2016, four key deal terms remained open in connection with the E-Side Debtors' negotiations with NextEra and the other bidder:  (i) the cash purchase price; (ii) the amount of the termination fee; (iii) NextEra's request for a "match right" with respect to any competing bids; and (iv) the treatment of potential asbestos liabilities arising out of certain EFH Debtors' operations and the impact of those

---

[11]   While the E-Side Debtors were engaged in negotiations with NextEra and the other bidder, the T-Side Debtors were pursuing their own plan of reorganization which contemplated a spin-off transaction for TCEH in which there would be a step-up in basis (the "T-Side Plan").  (PAB-X371, 6/16/16 Second Amended T-Side Plan [D.I. 8746].)  On August 29, 2016, the T-Side Debtors confirmed the T-Side Plan. (PAB-X420, 8/29/16 Confirmation Order for T-Side Plan [D.I. 9421].)  The Effective Date of the T-Side Plan occurred on October 3, 2016.  (PAB-X437, 10/3/16 Notice of Effective Date of T-Side Plan [D.I. 9742].)

liabilities on a potential multi-million dollar intercompany claim asserted against EFH. (ELX-457, 2/10/17 Keglevic Decl. at 10; PAB-X379, Jul. 21, 2016 Joint Board Meeting Minutes.)

26.     Between July 21 and July 29, 2016, NextEra improved its bid by (i) increasing the cash purchase price by $310 million (initially by $200 million and then a few days later by another $110 million), (ii) dropping its request for a match right, and (iii) agreeing to assume and reinstate all asbestos liabilities of EFH, setting aside $250 million of the cash purchase price in escrow to satisfy the potential asbestos liabilities (the "Asbestos Escrow"). (ELX-457, 2/10/17 Keglevic Decl. at 10; 9/2/18 Horton Written Direct ¶¶ 30–31; 9/5/18 Trial Tr. at 229:19–230:19 (Horton Test.).)  In response to these "gets" from NextEra, the E-Side Debtors agreed to increase the termination fee in the merger agreement from $110 million to $275 million.  (ELX-457, 2/10/17 Keglevic Decl. at 10; 9/5/18 Trial Tr. at 229:19–230:19 (Horton Test.).)

27.     The "gets" from NextEra made it the preferred bidder and would have provided actual benefit to both EFH and EFIH had that transaction closed.  First, the increase in cash purchase price resulted in the EFIH unsecured creditors being projected to receive a full recovery on their claims and the EFH unsecured creditors projected to receive some of the additional cash purchase price as a cash recovery.[12]  (*See* 9/6/18 Trial Tr. at 90:14–91:2 (Keglevic Test.) (affirming that the $110 million purchase price increase on top of

---

[12]   Certain classes of EFH creditors were projected to receive a full recovery due to the reinstatement of asbestos claims and the TCEH Turnover Distribution and E-Side Committee Settlement (each as defined herein).

the $200 million prior purchase price increase permitted the NextEra transaction to "fully

clear the EFIH capital structure and provide excess value to EFH"); PAB-X401, 8/5/16 Third

Amended Chapter 11 Plan [D.I. 9199]; 8/5/16 Disclosure Statement for Third Amended

Chapter 11 Plan [D.I. 9200].)

28.    Second, the elimination of the match right increased the likelihood that the E-

Side Debtors would receive a higher competing bid, and thus provided EFH unsecured

creditors with an opportunity for an even greater cash recovery.  (*See* ELX-400, 9/19/16

Hr'g Tr. at 25:5–13 (Debtors' counsel: dropping the match right "was important to the

Debtors because they viewed the match right as a value inhibiting term, particularly in a

bankruptcy context").)

29.    Third, because asbestos claims would be allowed only against EFH Debtors

other than EFH, NextEra's agreement to reinstate and assume such liabilities would have

(i) eliminated certain unsecured claims against EFH Debtors other than EFH, (ii) increased

the pro rata recoveries of the EFH unsecured creditors holding claims only against EFH,

(iii) left the asbestos creditors with unsecured claims that were unimpaired, and

(iv) avoided litigation related to an alleged $500 million intercompany claim asserted by

Debtor LSGT Gas Co. LLC against EFH that could have resulted in lower recoveries for

unsecured creditors of EFH.  (12/19/16 Opinion [D.I. 10414] at 6–7 (noting that the Debtors

believe that most asbestos claims are against EECI, Inc. with certain asbestos claims also

against EEC Holdings, Inc., LSGT Gas Co., LLC, and LSGT SACROC, Inc.); ELX-400,

9/19/16 Hr'g Tr. at 90:5–8; ELX-353, Jul. 22, 2016 Joint Board Book at 3 (Disinterested

Directors of EFH's Counsel: "noted the importance to EFH Corp. of a buyer assuming

asbestos liabilities to protect against an alleged $500 million intercompany claim being asserted against EFH Corp. by one of the EFH Corp. subsidiaries").)

30.    NextEra's agreement to fund the $250 million Asbestos Escrow was a dollar-for-dollar reduction in cash to be paid under the NextEra Merger Agreement (as defined below), which cash would not be received by the E-Side Debtors, and in particular EFIH, unless NextEra obtained an insurance policy that fully covered all asbestos liabilities.  (*See* ELX-364, NextEra Merger Motion [D.I. 9190-2] § 1.7(c) (providing that the $250 million would be held in the Asbestos Escrow for a term of 50 years, with any remaining balance at the end of such term to be paid over to charity).)  As a result, the Asbestos Escrow provided an actual benefit to the asbestos creditors who were left unimpaired and the unsecured creditors holding claims only against EFH.

31.    Following the July negotiations, the E-Side Debtors selected NextEra as the stalking horse bidder and, on July 29, 2016, executed a merger agreement with NextEra (the "NextEra Merger Agreement").  (*See* ELX-364, 8/3/16 NextEra Merger Motion [D.I. 9190] at Exhibit 1 (Merger Agreement).)  The EFH board of directors and the EFIH board of managers (the "E-Side Boards") approved the NextEra Merger Agreement, and on August 3, 2016, the E-Side Debtors moved this Court for an order (the "NextEra Merger Motion") approving the NextEra Merger Agreement and the Termination Fee, and authorizing the E-Side Debtors to enter into a plan support agreement that incorporated the NextEra Merger Agreement.  (9/2/18 Keglevic Written Direct ¶ 17; ELX-364, NextEra Merger Motion [D.I. 9190].)  The E-Side Debtors also filed a plan of reorganization (the "NextEra Plan") that

rested on consummation of the NextEra Merger Agreement.  (PAB-X401, 8/5/16 Third Amended Chapter 11 Plan [D.I. 9199].)

32.    In these filings, the E-Side Debtors did not propose to allocate the Termination Fee between the EFH and EFIH estates.  (*See* ELX-364, NextEra Merger Motion [D.I. 9190].) Instead, with input from the Disinterested Directors,[13] the Debtors requested that any allocation of the Termination Fee be left for a later date.  In that regard, every Disinterested Director testified that he or she did not attempt to reach an agreement to allocate the Termination Fee in or around the time the NextEra Merger Agreement was signed or before the NextEra Sale Hearing (as defined below).  (*See* Cremens Dep. Tr. at 56:8–12 (agreeing EFH and EFIH "did not attempt to allocate" the Termination Fee); ELX-737, 8/29/18 Evans Decl. ¶ 5 ("I did not agree at any point upon an allocation of this Termination Fee"); Williamson Dep. Tr. at 27:12–23 ("We were not going to figure out the allocation at that point in time.").)  This was because the Disinterested Directors believed that the NextEra transaction would close and, thus, the Termination Fee would not be payable.  (*See* Williamson Dep. Tr. at 27:19–23 ("[W]e were very hopeful and obviously very desirous of that transaction closing."); ELX-400, 9/19/16 Hr'g Tr. [D.I. 9606] at 28:9–11 (Debtors' counsel: "Mr. Horton is confident that the proposed transaction with NextEra will close and believes there's a low possibility that the termination fee will be triggered.").)

---

[13] The "Disinterested Directors" are the E-Side Debtors' representatives Charles Cremens, the disinterested manager of EFIH, and Donald Evans and Billie Williamson, the disinterested directors of EFH.

33.     Additionally, the E-Side Debtors and their Disinterested Directors approved the NextEra Merger Agreement and the Termination Fee on July 29, 2016 knowing that the appeal of this Court's rulings (the "Makewhole Rulings") disallowing claims for makewhole premiums sought by certain EFIH creditors (the "Makewhole Claims") was pending in the Third Circuit.  (9/6/18 Trial Tr. 94:12–16 (Keglevic Test.); Horton Dep. Tr. 64:25–65:8; *see also* 9/6/18 Trial Tr. at 95:24–96:8 (Keglevic Test.) ("Certainly our directors were aware that it was substantial litigation . . . ."); Cremens Dep. Tr. 58:10–59:3 (affirming that he was "comfortable approving the NextEra merger agreement even though there was no definitive determination as to how those make whole claims would be treated.").) Reversal of the Makewhole Rulings could have had a significant impact on creditor recoveries.  The E-Side Debtors and the Disinterested Directors believed, however, that it was unlikely that this Court's Makewhole Rulings would be overturned, and were thus comfortable approving the NextEra Merger Agreement and the Termination Fee while the appeal of the Makewhole Rulings was pending.  (*See* Cremens Dep. Tr. at 58:5–9 (affirming that it is "fair to say [he] thought that the allowance of those [makewhole] claims at the time of the NextEra merger agreement was unlikely"); Williamson Dep. Tr. at 80:13–18 (affirming that she "was comfortable approving the NextEra merger agreement, even though that [makewhole] litigation was still pending"); Horton Dep. Tr. at 95:7–14 ("5 to 10 percent" probability that the Third Circuit would reverse).)

34.     Moreover, a condition precedent to the closing of the NextEra transaction was that there was no order reversing, remanding, or staying the Makewhole Rulings at the time the NextEra transaction closed.  (ELX-397, 9/21/16 Fourth Amended Chapter 11 Plan [D.I.

9612] Art. I.A.67 and IX.D.10.)   Thus, at the time the E-Side Boards approved proceeding with NextEra as the stalking horse bidder, both EFH and the EFIH unsecured creditors had reason to expect that they would receive the benefits negotiated in July because the EFIH unsecured creditors would receive a full recovery, so long as no order reversing, remanding, or staying this Court's Makewhole Rulings was entered before the NextEra transaction was consummated.   (9/2/18 Keglevic Written Direct ¶ 18; 9/6/18 Trial Tr. at 62:19–64:17 (Keglevic Test.); ELX-397, 9/21/16 Fourth Amended Chapter 11 Plan [D.I. 9612] Art. I.A.67 and IX.D.10.)

35.     Finally, despite learning in late August 2016 that oral argument in the Third Circuit appeal was scheduled for September 27, 2016 (*see* 8/24/16 Oral Argument Notification, *Delaware Trust Co. v. Energy Future Intermediate Holding Company LLC (In re Energy Future Holdings Corp.)*, No. 16-1351 (3d Cir. 2016)), the E-Side Debtors and their Disinterested Directors proceeded with the request that the Court not allocate the Termination Fee at the September 19, 2016 hearing (*see* ELX-400, 9/19/16 Hr'g Tr. [D.I. 9606].)

## B.     The September 2016 Negotiations and EFH Unsecured Creditor Support.

36.     Notwithstanding the additional value resulting from the negotiations with NextEra in late July 2016, the E-Side Debtors faced opposition to the NextEra Merger Agreement and, specifically, the Termination Fee.   This opposition came only from EFH unsecured creditors: (i) the EFH Trustee; (ii) Contrarian Capital Management, LLC ("Contrarian"); (iii) Fidelity Management & Research Company ("Fidelity"); and (iv) certain asbestos claimants (the "Asbestos Claimants").   (ELX-381, EFH Trustee Objection [D.I.

9399]; ELX-378, Contrarian Objection [D.I. 9402]; ELX-379, Fidelity Objection [D.I. 9397]; ELX-380, Asbestos Claimants' Objection [D.I. 9398].)

37.     None of these objections challenged the E-Side Debtors' request to leave the Termination Fee unallocated.  Nor did any party raise any concern or express some understanding that the allocation of the Termination Fee would be addressed after the pending appeal of this Court's Makewhole Rulings was decided, even though the oral argument on that appeal was scheduled for September 27, 2016, only eight days after the September 19, 2016 NextEra sale hearing (the "NextEra Sale Hearing").   Instead, negotiations to resolve these objections focused exclusively on obtaining additional consideration for EFH unsecured creditors that would result in their dropping their objections to the NextEra Merger Agreement and the Termination Fee.  (*See* 9/6/18 Trial Tr. at 92:12–93:7 (Keglevic Test.) ("[W]hen we had no EFH support, we kept pushing . . . You got to, you know, buy their support and, you know, the asset's worth more.").)

38.     The interested parties' negotiations were successful, and on September 18, 2016, the E-Side Debtors and NextEra executed an amendment to the NextEra Merger Agreement pursuant to which NextEra agreed to (i) further increase the cash purchase price by $300 million and (ii) reduce the Asbestos Escrow from $250 million to $100 million. (9/2/18 Horton Written Direct ¶ 32; 9/5/18 Trial Tr. at 230:20–231:9 (Horton Test.); 9/6/18 Trial Tr. at 64:18–65:18 (Keglevic Test.); ELX-393, 9/19/18 Order Authorizing Entry into Merger Agreement [D.I. 9584] at Amendment No. 1 to Merger Agreement.)  Significantly, notwithstanding the $100 million Asbestos Escrow, the Debtors estimated the value of the assumed asbestos liability and "legacy claims" was $58 million. (AHX-226, Disclosure

Statement for First Amended Joint Plan [DI 18899] p. 18; Horton Dep. Tr. at 79:17-81:6; Strom Dep. Tr. at 149:13-17; 9/2/2018 Strom Written Direct ¶ 34.5.)  All in, the total consideration being provided by NextEra was $9.827 billion.

39.     These further "gets" from NextEra were expected to result in "an additional $450 million in distributable value" that would inure entirely to the benefit of EFH unsecured creditors for a total of $471 million in cash consideration to EFH.  (*See* 9/2/18 Horton Written Direct ¶¶ 32–33 ("Because EFIH creditors were already projected to receive a 100% recovery, these increases in distributable value were projected to inure to the benefit of EFH creditors . . . ."); Cremens Dep. Tr. 57:15–58:4 ("Yes, they [EFH] benefited to the extent we believed that EFIH was going to be covered in terms of their claims.").)

### C.    This Court's Approval of the Termination Fee

40.     As of the commencement of the NextEra Sale Hearing, all objections, other than the Asbestos Claimants' objection, were resolved as a result of the final additional "gets" from NextEra.  (9/2/18 Horton Written Direct ¶ 33; ELX-400, 9/19/16 Hr'g Tr. at 14:22–15:3; 29:2–9.)   After hearing evidence, the Court approved the NextEra Merger Agreement, as amended, including the Termination Fee, and reserved decision on any allocation of the Termination Fee as requested.   (ELX-393, 9/19/16 Order Approving NextEra Merger Agreement [D.I. 9584] ¶ 4.)

41.     As Debtors' counsel emphasized, the additional "gets" from NextEra were expected to quadruple EFH unsecured creditor recoveries.  (*See* ELX-400, 9/19/16 Hr'g Tr. at 14:18–15:2 (Debtors' counsel: "Net/net the result is an additional $450 million of distributable value. . . [a]nd when I say significant I mean it virtually quadrupled the

recoveries of EFH unsecured creditors.  As a result FIDO, or Fidelity, Contrarian, and the EFH indenture trustee for the Legacy notes have agreed to withdraw their objections today, to the merger agreement and the plan support agreement."); ELX-400, 9/19/16 Hr'g Tr. at 87:14–21 (Debtors' counsel: "I think it is worth mentioning once again that as a result of the negotiations over the weekend, we have an increase of $450 million in distributable value, quadrupling the potential recoveries for the EFH creditors.").)

42.     Debtors' counsel further advised the Court that the EFH unsecured creditors withdrew their objections to the Termination Fee in exchange for the value expected to be received from the additional "gets" from NextEra.  (*See* ELX-400, 9/19/16 Hr'g Tr. at 29:6–9 (Debtors' counsel: "With this increase, and certain accounting adjustments made with respect to the cash purchase price, Debtors have brokered the support of the EFH indenture trustee, Fidelity[,] and Contrarian.").)

43.     Additionally, although not an objector, counsel to the *ad hoc* committee of TCEH first lien creditors (the "Ad Hoc TCEH Committee") spoke in support of the NextEra transaction, stating that as the economic beneficiaries of a $700 million TCEH settlement claim against EFH, "[w]e were very pleased with this morning's announcement in terms of the revised deal terms and the economic impact that's going to have for EFH unsecured creditors. . . ."  (ELX-400, 9/19/16 Hr'g Tr. at 107:6–18.)  Three of the five Ad Hoc EFH Claimants were members of the Ad Hoc TCEH Committee that supported approval of the NextEra Merger Agreement, and these members continue to hold claims against EFH solely through their share of the TCEH settlement claim.  (*Compare* ELX-402, 9/26/16 Ad Hoc TCEH Committee's 2019 Statement (listing Angelo Gordon & Co., L.P., Apollo

Management Holdings L.P., and Brookfield Asset Management as members), *with* ELX-689, 7/31/18 Ad Hoc EFH Claimants' 2019 Statement (listing Angelo Gordon & Co., L.P., Apollo Management Holdings L.P., and Brookfield Asset Management as members holding TCEH Settlement Claims).)

44.     On September 21, 2016, the Debtors filed the final approved disclosure statement and an amended NextEra Plan.  (ELX-398, 9/21/16 Disclosure Statement for Fourth Amended Chapter 11 Plan [D.I. 9616]; ELX-397, 9/21/16 Fourth Amended Chapter 11 Plan [D.I. 9612].)  The amended NextEra Plan reflected the additional value received under the September 18th amendment, projecting a full (100%) recovery for EFIH unsecured creditors and projecting that EFH unsecured creditors would receive distributions of approximately 50% of their allowed claims.  (ELX-398, 9/21/16 Disclosure Statement for Fourth Amended Chapter 11 Plan [D.I. 9616] at 22, 27; *see also* ELX-397 9/21/16 Fourth Amended Chapter 11 Plan [D.I. 9612].)  Other key terms, including the tax-free nature of the NextEra transaction and reinstatement of the asbestos liabilities, remained largely unchanged.  (*See* ELX-469, 2/16/17 Hr'g Tr. at 136:20–24 (Debtors' counsel: "we have a tax-free transaction on the E-Side" and "the [NextEra] plan structure avoids" Tax Armageddon).)

45.     After the NextEra Sale Hearing, this Court approved two creditors' requests for substantial contribution claims solely against EFH based, in large part, on those creditors' efforts in September 2016 with respect to increasing the consideration provided by NextEra and supporting the NextEra Plan.

46.    First, at the confirmation hearing on the NextEra Plan (the "<u>NextEra</u> <u>Confirmation Hearing</u>"), this Court approved a substantial contribution claim solely against EFH in favor of the EFH Trustee (the "<u>EFH Trustee Substantial Contribution Claim</u>").  The Court's approval was based largely on the EFH Trustee's role in improving the terms of the NextEra Merger Agreement and providing an actual benefit to EFH and its unsecured creditors.  (ELX-471, 2/17/17 Hr'g Tr. at 20:13–22:13.)

47.    Second, in March 2017, this Court approved a substantial contribution claim solely against EFH in an amount not to exceed $20 million in favor of Fidelity (the "<u>Fidelity</u> <u>Substantial Contribution Claim</u>").  The Fidelity Substantial Contribution Claim was also approved in large part because of its objection to the NextEra Merger Agreement, its efforts to increase NextEra's purchase price, and its willingness to enter into a plan support agreement in favor of the NextEra Plan that enabled the E-Side Debtors to obtain confirmation of the NextEra Plan.  (ELX-487, 3/24/17 Order Allowing Fidelity Substantial Contribution Claim [D.I. 11050].)

**D.    The Third Circuit Makewhole Ruling, NextEra's Refusal to Pay the Makewhole Claims, and the Allocation of the Termination Fee.**

48.    On November 17, 2017, nearly two months after the NextEra Sale Hearing, the Third Circuit issued its ruling in the makewhole appeal (the "<u>Third Circuit Makewhole</u> <u>Ruling</u>").  (ELX-430, 11/17/16 Third Circuit Makewhole Ruling.)

49.    The Third Circuit Makewhole Ruling reversed this Court's Makewhole Rulings and, thus, the E-Side Debtors could not close the NextEra transaction absent NextEra waiving the condition precedent.  (*Id.*; ELX-397 9/21/16 Fourth Amended Chapter

11 Plan [D.I. 9612] Art. IX.D.)   NextEra refused to do so and, consequently, the projected recoveries of both the EFH and EFIH unsecured creditors were negatively impacted.  (*See* 9/5/18 Trial Tr. at 231:17–22 (Horton Test.) ("$471 million was drained from EFH in that instance, and about—the PIKs were impaired about 165 million.").)   These reduced recoveries were also reflected in the trading prices of the EFIH PIK Notes, which had traded below par after the September 27, 2016 Third Circuit oral argument and went far lower after the Third Circuit Makewhole Ruling.  (ELX-671, EFIH PIK Prices Chart [D.I. 13102-2].)

50.    The Third Circuit Makewhole Ruling did not impact any other aspects of the NextEra Plan that benefited EFH unsecured creditors.  The NextEra Plan still reinstated the asbestos claims, provided for the payment in full of the EFH Beneficiary Claims (as defined below), and contemplated a tax-free transaction.  (PAB-X503, 2/17/17 Eighth Amended Chapter 11 Plan [D.I. 10853]; PAB-X504, 2/17/17 Order Confirming Eighth Amended Chapter 11 Plan [D.I. 10859].)  The NextEra Plan was confirmed on February 17, 2017.  (PAB-X504, 2/17/17 Order Confirming Eighth Amended Chapter 11 Plan [D.I. 10859].)

51.    During the Hearing, the Ad Hoc EFH Claimants introduced a board slide calculating the potential impact of the Third Circuit reversing this Court's Makewhole Rulings.  (AHX-151, 9/30/16 Joint Board Book.)   As part of his testimony, Mr. Keglevic, EFH's and EFIH's CRO and CEO and a member of EFIH's board of managers, stated that during the Bankruptcy Cases he "tracked" the Third Circuit litigation and was "aware" of its impact on creditor recoveries.  (*See* 9/6/18 Trial Tr. at 94:17–95:4 (Keglevic Test.).)   There was, however, no evidence that the E-Side Boards were ever presented with these calculations regarding the financial effect that allowance of the Makewhole Claims would

have on EFH or EFIH creditor recoveries from July 21, 2016, when the Debtors were negotiating with the two potential stalking horse bidders, to September 19, 2016, when the Court approved the NextEra Merger Agreement and Termination Fee.  Moreover, neither the August 3, 2016 version of the NextEra Plan nor the September 21, 2016 version of the NextEra Plan included any such calculation.  Indeed, the only evidence of that calculation is that it was part of an EFH/EFIH/TCEH board book dated September 30, 2016 (*i.e.*, after the NextEra Sale Hearing) that provided an update on the Third Circuit's September 27, 2016 oral argument in the makewhole appeal and illustrated the potential consequences of the Third Circuit allowing the Makewhole Claims.  (*See* ELX-405, Sept. 30, 2016 Joint Board Book; 9/6/18 Trial Tr. at 66:3–67:3 (Keglevic Test.).)

52.    More importantly, there is no evidence that the analysis identified by the Ad Hoc EFH Claimants was considered by the E-Side Debtors or their Disinterested Directors when they decided to proceed with the NextEra transaction and defer any allocation of the Termination Fee, or to request the Court's approval of the NextEra Merger Agreement, the Termination Fee, and their decision not to allocate the Termination Fee.  In fact, the evidence is to the contrary.  First, as found above, the E-Side Debtors and the Disinterested Directors believed the risks of reversal were minimal.  Second, no one raised any concerns about a potential reversal of this Court's Makewhole Rulings at the NextEra Sale Hearing, when the Court was asked to approve the Termination Fee and defer any decision on the allocation of the Termination Fee for subsequent proceedings.  (*See generally* ELX-400, 9/21/18 Hr'g Tr.)  Third, no party in interest, not the E-Side Debtors, the Disinterested Directors, nor any creditor or other interested party, requested the Court to allocate the Termination Fee at the

25

NextEra Confirmation Hearing in February 2017, at which point the consequences of the Third Circuit Makewhole Ruling were fully known and reflected in the projected distributions to EFH and EFIH unsecured creditors.

### E.    The Debtors' Termination of the NextEra Merger Agreement.

53.    The Debtors terminated the NextEra Merger Agreement on July 7, 2017 after the Public Utility Commission of Texas ("PUCT") denied NextEra's and Oncor's joint change of control application.  (ELX-519, 7/7/17 NextEra Merger Agreement Termination Notice [D.I. 11424]; 9/6/18 Trial Tr. 115:24–116:6 (Keglevic Test.).)

54.    Because the NextEra transaction was not consummated, neither EFH nor EFIH ultimately received any actual benefit from the NextEra transaction.[14]  (*See* ELX-569, 10/3/17 Opinion [D.I. 11998] at 31 (Court: "In this case, the Debtors were forced to terminate the Merger Agreement to pursue a lower offer because NextEra had the Debtors in a corner. Payment of a termination fee under those circumstances, which would have been predictable had the Court properly understood the facts, could not provide an actual benefit to the debtor's estate sufficient to satisfy the *O'Brien* standard."); *see also* ELX-583, 10/18/17 Order Granting Elliott's Motion to Reconsider [D.I. 12075]; *NextEra Energy, Inc. v. Elliott Assocs., L.P. (In re Energy Future Holdings Corp.)*, 904 F.3d 298, 315-16 (3d Cir. 2018) (affirming 10/18/17 *Order Granting Elliott's Motion to Reconsider*).)

---

[14]    In this Court's prior rulings disallowing the Termination Fee and the NextEra Reimbursement Claim, the Court found that the NextEra transaction provided no benefit to the E-Side Debtors' estates.  The findings of fact and conclusions of law set forth herein in no way alter or affect this Court's prior rulings on the Termination Fee and NextEra Reimbursement Claim.  However, solely for purposes of the Allocation Motion and this ruling, I must assume that one or both of the Court's prior rulings on the Termination Fee and the NextEra Reimbursement Claim is reversed on appeal.

55.     After the E-Side Debtors terminated the NextEra transaction, they initially sought approval of a proposed merger transaction with Berkshire Hathaway Energy Company ("Berkshire").  (9/2/18 Keglevic Written Direct ¶ 22.)  Prior to obtaining Court approval of the Berkshire transaction, the E-Side Debtors entered into and ultimately consummated a merger agreement with Sempra Energy ("Sempra").  (9/2/18 Keglevic Written Direct ¶ 26.)  Both the Berkshire transaction and Sempra transaction provided for less consideration than the E-Side Debtors expected to receive under the NextEra transaction.  (9/2/18 Keglevic Written Direct ¶¶ 18, 23, 27.)

## II.     Professional Fee Claims

### A.     The Interim Compensation Order

56.     On September 16, 2014, the Court entered the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (the "Interim Compensation Order"), which established procedures for allocating professional fees and expenses among the three primary estates:  EFH, EFIH, and TCEH.  (PAB-X034 [D.I. 2066].)  Specifically, the Interim Compensation Order separated fees and expenses directly incurred by certain Debtors ("Direct Benefit Fees") from fees and expenses incurred for the collective benefit of one or more Debtors ("Collective Benefit Fees").  (*Id.* ¶ 2(b).)  The order generally provided that, in a particular Monthly Fee Statement (defined below), each professional would allocate Collective Benefit Fees to a particular Debtor in the same proportion of Direct

Benefit Fees allocated to that Debtor of the total Direct Benefit Fees charged to all Debtors in that month.  (*Id.*)[15]

57.    The Interim Compensation Order left it to each professional to allocate its fees and expenses based on such professional's subjective determination—at the time charges were incurred—of how its services benefited each estate.  It also reflected that individual professionals, who were not economically incentivized to charge their time to any particular estate and who had direct knowledge of their own efforts, were best positioned to make those decisions.  (9/5/2018 Trial Tr. at 233:7-234:8 (Horton):  "I feel like [the professionals] were trustworthy and competent with no economic incentive to allocate their fees to one particular estate or another. . . . They knew where their time was being spent, what activities were important, and how they ultimately -- what was direct, what was, you know, collective.")

58.    The allocation methodology that the Court approved in the Interim Compensation Order was a carry-over from an agreed-upon provision in the original restructuring support agreement.  (*See* PAB-X029, *Motion of Energy Future Holdings Corp., et al., for Entry of Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay*, filed May 16, 2014 (the "Restructuring Support Agreement") at Ex. A at 24-25 [D.I. 505-2].)[16]  In addition to the EFH and EFIH Debtors, an

---

[15]  Amounts allocated between the three estates changed monthly.  This was a function of whether professionals performed comparatively more services that benefited a single estate relative to the others. (*See* 9/2/2018 Horton Written Direct ¶ 16.)

[16]  In the weeks leading up to the filing of the Debtors' chapter 11 petitions, and after extensive negotiations, several of the Debtors' largest stakeholders agreed to a global restructuring of the Debtors premised on a tax-free deconsolidation of TCEH from EFH, a simultaneous deleveraging of EFIH through

ad hoc group of holders of EFIH PIK Notes were parties to that Restructuring Support Agreement.

59.     Jeffrey Rosenbaum, who is now a portfolio manager at Elliott but who held a similar position at York Capital in 2014, directly participated in the negotiations of the allocation methodology.  (9/7/2018 Trial Tr. at 21:19-22:3 (Rosenbaum): "There were direct negotiations with other parties to the RSA as to how professional fees under this RSA would have been treated in terms of certain allocations, certain amounts that would have been paid by one box versus the other box, and most importantly, in my mind, in terms of controlling or reining in professional fees." *Id.* at 130:24-131:7 (Rosenbaum).)

60.     No party objected to this allocation methodology—either as it existed in the Restructuring Support Agreement or the Interim Compensation Order—until Elliott filed the Allocation Motion four years later.  (*See* 9/2/2018 Horton Written Direct ¶ 11.)

## B.    Processing and Payment of Professional Fees

61.     The Interim Compensation Order also established procedures for professionals to seek compensation and expense reimbursement from the Debtors. Specifically, each professional was required to file a monthly fee statement reflecting fees and expenses incurred in a particular month (each, a "Monthly Fee Statement").  (PAB-X034, Sept. 16, 2014 *Interim Compensation Order* [D.I. 2066] ¶ 2(c).)

---

a $2 billion investment, and a framework for settling the makewhole claims against EFIH.  (*See* 9/2/2018 Keglevic Written Direct ¶ 8.)

62.    Interested parties then had 21 days to object to any Monthly Fee Statement. (*Id.* at ¶ 2(d).)  No party filed an objection to a Monthly Fee Statement during the Chapter 11 Cases.

63.    When the objection period lapsed, a professional filed a certificate of no objection ("CNO") regarding its Monthly Fee Statement.  (*Id.*)

64.    After a CNO was filed, each professional submitted to the Debtors a request for payment, including the CNO and an invoice allocating 80% of its fees and 100% of its expenses, as detailed in Monthly Fee Statement.  (9/2/2018 Horton Written Direct ¶ 13.)

65.    Before the expiration of the objection period and submission of a CNO, the Debtors' legal team reviewed the invoices accompanying the Monthly Fee Statements and, from time to time, negotiated directly with professionals about the amounts sought. (*Id.* at ¶ 14.)  Members of the Debtors' accounting and treasury teams separately confirmed the professional's proposed allocation calculation, adjusted budget forecasts accordingly, and issued the wires authorized under the CNO.  (*Id.*)  From time to time, members of the Debtors' treasury team would directly engage with professionals regarding the professionals' proposed allocation and its impact on budget forecasts, including revising those budget forecasts accordingly.  (*Id.*)

66.    In addition to Monthly Fee Statements, beginning with the period ending August 31, 2014, and at three-month intervals thereafter, each professional could file an interim fee application for amounts sought in the Monthly Fee Statements not yet approved (each, an "Interim Fee Application").  (PAB-X034 [D.I. 2066] ¶ 2(f).)  No party objected to any Interim Fee Application in the Chapter 11 Cases.

67.    Professionals then negotiated the proposed allowance of their fees and expenses with the Fee Review Committee, who filed a report detailing agreed-upon reductions and a proposed form of order.  (9/2/2018 Horton Written Direct ¶ 15; *see also, e.g.*, PAB-X244, *Fee Committee's Fourth Status Report Concerning Interim Fee Applications*, filed June 16, 2015 [D.I. 4774].)  Upon the Court's consideration and approval of such an order, each professional submitted another payment request to the Debtors.  (9/2/2018 Horton Written Direct ¶ 15.)  This packet included a copy of the order awarding interim compensation and an invoice that allocated the 20% holdback requested in such Interim Fee Application (after taking into account any agreed-upon adjustments with the Fee Review Committee and any unpaid Monthly Fee Statements).  (*Id.*)  The Debtors then processed and made payments accordingly.  (*Id.*)

### C.    Debtor-Side Professional Allocations

68.    Elliott chose to focus its Debtor-side analysis on Kirkland, the Debtors' primary legal counsel, and Evercore, the Debtors' financial advisor.  Based on the overall record, Kirkland and Evercore generally followed a detailed and reasonable allocation process that was consistent with the discretion afforded under the Interim Compensation Order.  Although there may be imperfections in a subset of the thousands of allocation decisions made over four years, good-faith compliance with the Interim Compensation Order does not require a false precision.  And even if it did, no Party presented any comprehensive or statistical analysis that shows whether any such imperfections benefited one estate versus another in the aggregate.

i.    **Kirkland's Allocation Process**

69.    Prior to the Court's entry of the Interim Compensation Order—and consistent with the Restructuring Support Agreement—Kirkland opened over 75 internal billing matter codes to facilitate the allocation of fees and expenses associated with its services. (9/2/2018 Husnick Written Direct ¶¶ 3, 4.)  These included matter numbers labeled "ALL"—to indicate services collectively benefitting all estates (*i.e.*, Collective Benefit Fees)—as well as matter numbers with a prefix of "[EFH]," "[EFIH]," and "[TCEH]"—to indicate services benefitting certain estates directly (*i.e.*, Direct Benefit Fees).  (*Id.* at ¶ 3.)[17]

70.    In addition, Kirkland created a billing protocol for Kirkland attorneys and paraprofessionals working on the Chapter 11 Cases.  (*Id.* ¶ 6.)  Kirkland distilled that billing protocol in a May 4, 2014 memorandum (the "Billing Memorandum").  (*See* ELX-011.)  The protocol and Billing Memorandum reflected the need to "keep track of time across three silos with a fourth that would be collective benefit."  (9/5/2018 Trial Tr. at 62:24-63:10 (Husnick).)  Kirkland explained to its billers "that if the principal beneficiary of principal involvement was a particular Debtor, you should bill that as a direct benefit fee to that silo. If there were multiple principal beneficiaries or it wasn't clear that it principally involved multiple subsidiaries, then you would bill it into a collective benefit matter number."  (*Id.*)

71.    In addition to the protocol and Billing Memorandum, Kirkland expended substantial time and resources reviewing time entries prior to submitting Monthly Fee Statements on the docket.  (9/2/2018 Husnick Written Direct ¶ 10.)  Kirkland restructuring

---

[17]    By the end of the Chapter 11 Cases, Kirkland had used over 130 matter numbers.  (9/2/2018 Husnick Written Direct ¶ 5.)

attorneys ranging from junior associates to partners generally conducted four rounds of review of time entries, focusing on moving time to the appropriate matter number, aligning different professionals' entries for the same tasks, and removing privileged and confidential information.  (*Id.*; *see also* 9/5/2018 Trial Tr. at 63:24-64:17 (Husnick).)[18]

72.     At the completion of each monthly review process, Kirkland filed its Monthly Fee Applications on the docket.  (9/2/2018 Husnick Written Direct ¶¶ 10, 12.)  The Monthly Fee Applications showed how Kirkland allocated its time among the different estates.  (*See, e.g.,* AHX-138, *Notice of Fee Statement*, filed Aug. 5, 2016 [D.I. 9198-1].)

73.     At the same time that Kirkland filed its Monthly Fee Statements, Kirkland submitted them to the Debtors' in-house legal team for review.  (9/2/2018 Husnick Written Direct ¶ 13.)  From time to time, the Debtors' in-house legal team and Kirkland would discuss specific time entries and/or specific work streams—for example, the need for certain work streams, the staffing of certain work streams, and the expected timeline of certain work streams.  (*Id.*)  In addition, the Debtors' internal and external forecasting and budgeting teams would occasionally discuss with Kirkland the status of current and projected work streams and the expected effect on existing estate budgets of different Debtors.  (*Id.*)

74.     Kirkland also filed Interim Fee Applications, which consolidated the prior four to five Monthly Fee Statements.  (*Id.* at ¶ 15.)  Each Interim Fee Application contained detailed summaries of services performed in the applicable billing period, a breakdown of

---

[18]   In total, Kirkland partners reviewed approximately 15,000 pages of time entries, containing approximately 150,000 individual time entries.  (9/2/2018 Husnick Written Direct ¶ 11.)

the tasks performed within a particular matter number, and an aggregate allocation of the fees and expenses between the estates.  (*See, e.g.*, AHX-233, *Summary Cover Sheet and Twelfth Interim Fee Application of Kirkland & Ellis LLP*, filed Apr. 17, 2018 [D.I. 12961] ¶ 27.)  Kirkland also submitted a final fee application.  (*See* ELX-659, *Summary Cover Sheet to the Final Fee Application of Kirkland & Ellis LLP and Kirkland & Ellis International LLP, Attorneys for the Debtors and Debtors in Possession, for the Period from April 29, 2014 Through and Including March 9, 2018*, filed Apr. 23, 2018 [D.I. 13019].)

75.    No party filed an objection to any Kirkland Monthly Fee Statement, (9/2/2018 Husnick Written Direct ¶ 14), any Kirkland Interim Fee Application (*id.* at ¶ 17), or Kirkland's Final Fee Application (*id.* at ¶ 20).[19]  (*See also* 9/5/2018 Trial Tr. at 66:8-9 (Husnick): "To my knowledge, no party ever filed a formal objection to our fee applications.")

76.    Kirkland modified its allocation methodology in connection with the T-Side Effective Date.  Before that time, in situations where Kirkland found that its services inured to the collective benefit of more than one estate, Kirkland allocated such fees and expenses as "Collective Benefit Fees," proportionally to the amount of Direct Benefit Fees incurred by such estate during that month.  (9/2/2018 Husnick Written Direct ¶ 26.)  Kirkland timekeepers billed that time to client matter numbers that had the prefix "[ALL]."  (*Id.* at ¶ 25.)

---

[19]    The Fee Review Committee has a separate deadline to object to Kirkland's Final Fee Application. (9/2/2018 Husnick Written Direct ¶ 20.)

77.     After the T-Side Effective Date, Kirkland separately tracked work performed for the benefit of Reorganized TCEH, so "Collective Benefit Fees" generally represented services performed for the collective benefit of the EFH Debtors and the EFIH Debtors.  (*Id.* at ¶ 27.)  By that time, the primary remaining issue for the EFH/EFIH Debtors was the sale of EFH's indirect economic interest in Oncor that would enable EFH and EFIH to emerge from the Chapter 11 Cases.  (*Id.*)  Therefore, nearly all of Kirkland's services performed for the EFH and EFIH Debtors after the T-Side Effective Date were for the collective benefit of both the EFH and EFIH Debtors.  (*Id.*)  As a result, there were little to no Direct Benefit Fees billed to either estate, and Kirkland's original allocation methodology would have resulted in an inequitable allocation, had it been applied, which was not contemplated by or intended in the Interim Compensation Order.  (*Id.* at ¶ 28.)

78.     For example, in Kirkland's November 2016 Monthly Fee Statement, Kirkland sought payment of (a) $512.70 in EFH Direct Benefit Fees; (b) $79,496.90 in EFIH Direct Benefit Fees; and (c) a total of $1,277,411.84 in Collective Benefit Fees.  (*See* AHX-171, *Notice of Fee Statement*, filed Jan. 6. 2017 [D.I. 10605-1].)  Using the original allocation methodology, EFIH would have paid a disproportionate share of the Collective Benefit Fees (more than 99%) even though the most significant work stream in November 2016 was determining how to modify the joint plan and joint disclosure statement to address the Third Circuit Makewhole Opinion (as defined below); such work was done for the collective benefit of all of the E-Side estates. (9/2/2018 Husnick Written Direct ¶ 28.)  In other words, EFIH would have paid a disproportionate share of Collective Benefit Fees incurred for the benefit of both

EFH and EFIH in a given month merely because EFH had only a marginal amount of Direct Benefit Fees in that month. (*Id.*)

79.     To account for the changing circumstances—and avoid allocation of a disproportionate share to any particular estate under the prior allocation methodology—Kirkland allocated post-T-Side Effective Date Collective Benefit Fees by the relative debt at EFH and EFIH to reflect the creditor constituencies that were benefitting from such estate's efforts to maximize value for its respective estate. (*Id.* at ¶ 30.) This resulted in a post-T-Side Effective Date allocation of Kirkland's Collective Benefit Fees of approximately 10% to the EFH Debtors and approximately 90% to the EFIH Debtors. (*Id.* at ¶ 31; 9/5/2018 Trial Tr. at 83:17-84:7 (Husnick).)[20] Had Kirkland adhered to its original allocation methodology, it would have caused approximately $3 to $4 million in fees to be re-allocated from EFIH to EFH. (*See* 9/5/2018 Trial Tr. at 57:14-19 (Husnick).)

80.     Kirkland disclosed the change in a footnote in its June 2016, July 2016, August 2016, and September 2016 Monthly Fee Statements. (*See* AHX-138, *Notice of Fee Statement*, filed Aug. 5, 2016 [D.I. 9198-1] at 13 n.1; AHX-142, *Notice of Fee Statement*, filed Sept. 8, 2016 [D.I. 9498-1] at 13 n.1; AHX-153, *Notice of Fee Statement*, filed Oct. 10, 2016 [D.I. 9792-1] at 13

---

[20]   After the TCEH Effective Date, the debt ratio at EFIH/EFH was approximately $7.71 billion to approximately $0.65 billion, or 92 percent to 8 percent. At the trial, Elliott referenced debt numbers as of the Petition Date. (ELX-009, *Decl. of Paul Keglevic in Support of First Day Motions*, filed Apr. 29, 2014 [D.I. 98] ¶ 82.) As of the Petition Date, the Debtors reported approximately $1.3 billion of EFH debt held by EFIH. The Restructuring Support Agreement contemplated that these debt claims would be cancelled. (PAB-X029, *Motion of Energy Future Holdings Corp., et al., for Entry of Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay*, filed May 16, 2014, at Ex. A at 13-15 [D.I. 505-2].) These debt claims were ultimately released as part of the global settlement in December 2015, at least nine months before the T-Side Effective Date. (PAB-X322, *Order Approving Amended & Restated Settlement Agreement*, filed Dec. 7, 2015 [D.I. 7243].)

n.1; and AHX-157, *Notice of Fee Statement*, filed Nov. 11, 2016 [D.I. 10181-1] at 13 n.1.)  The change was also discernible from summaries of fees that were included in Kirkland's Monthly Fee Statements and Interim Fee Applications.  (9/2/2018 Husnick Written Direct ¶ 32).

81.    Elliott cites to Kirkland's Matter No. 76 as evidence that Kirkland's allocated fees incorrectly to EFIH as Direct Benefit Fees instead of Collective Benefit Fees, but their citation is misplaced.  (*See* Elliott Final Submission [D.I. 13414] ¶ 31.)  Although Matter No. 76 was nominally labeled "[EFIH] Plan and Disclosure Statement" (which would otherwise suggest it was an EFIH Direct Benefit matter number), the Monthly Fee Statements that Elliott claims reflect improper allocations contain a footnote indicating that—although nominally labeled as an EFIH Direct Benefit matter number—the fees related to the services performed pursuant to Matter No. 76 were actually being allocated to EFH and EFIH at a ratio of approximately 10% to 90%, consistent with the relative debt at both estates.  (*See* AHX-138 [D.I. 9198-1] at 13 n.1; AHX-142 [D.I. 9498-1] at 13 n.1; AHX-153 [D.I. 9792-1] at 13 n.1; and AHX-157 [D.I. 10181-1] at 13 n.1.)  It was during this time period (June 2016 to September 2016) that the Debtors had determined to bifurcate the confirmation and consummation processes for the T-Side Debtors and E-Side Debtors.  (*See* 9/5/2018 Trial Tr. at 77:9-12 (Husnick).)  As a result, for certain matter numbers (all of which are disclosed in the Monthly Fee Statements filed from June 2016 to September 2016), Kirkland utilized existing Direct Benefit matter numbers to record its services, but allocated the fees reflected in such matter numbers as if they were Collective Benefit matter numbers, until such time as Kirkland was able to open a new Collective Benefit matter number.  (9/5/2018 Trial Tr.

77:14-78:6 (Husnick).)  This approach was designed to approximate the updated Collective Benefit matter numbers that took effect in October 2016 (following the T-Side Effective Date).

### ii.    Evercore's Allocation Process

82.    Throughout its engagement, Evercore followed a diligent process and used reasonable efforts to allocate their fees.  Generally, Evercore allocated Direct Benefit Fees to EFH, EFIH, or TCEH, and apportioned each estate's Collective Benefit Fees based on the proportion of Direct Benefit Fees billed to each estate.  (Matican Dep. Tr. at 41:5-18.) Evercore's fee allocations were "tied to the discussions [with] the creditor constituents" and the result of " an internal process [involving] discussions and sharing of the underlying hours and applications, monthly fee statements, et cetera, with [their] counsel and with the debtors."  (*Id.* at 18:4-12; 20:4-7; 34:5-12.)  Specifically, Evercore timekeepers relied on those communications and an internal summary of fee categories to determine whether time was attributable to EFH or EFIH.  (*Id.* at 51:22-25, 52:2-3.)  Although there was no documentation of formalized guidance, no evidence demonstrated that Evercore professionals allocated their fees and expenses in a manner consistent with the Interim Compensation Order.  Further, no party objected to any Evercore Monthly Fee Statement, any Evercore Interim Fee Application, or Evercore's Final Fee Application.[21]

---

[21]    As with Kirkland's Final Fee Application, the Fee Review Committee has a separate deadline to object to Evercore's Final Fee Application.

### iii.    The Debtors' Other Professionals

83.    In its Motion, Elliott presented argument regarding several other Debtor-side professionals, including arguments that alleged inconsistencies in the allocation of expenses across the estates between different Debtor professionals was evidence that the professionals misallocated their fees and expenses.  (*See* PAB-X670 [D.I. 13102] ¶ 61.)  But non-identical allocations between professionals are not evidence of a flawed allocation methodology or that any professional's allocations were erroneous.  To the contrary, those differences can just as easily result from the fact that different professionals were responsible for different work streams at different times, which benefitted different estates, and from the Interim Compensation Order's deference to each professional's discretion. (*See, e.g.*, 9/5/2018 Trial Tr. at 266:8-20 (Horton):  "[RLF] knew what services that they were providing and for whom, and they allocated it accordingly. . . . [Kirkland and RLF are] two different firms doing two different activities."); ELX-074, *First Interim Fee Application of Filsinger Energy Partners*, filed Nov. 10, 2014 [D.I. 2733] and ELX-124, *Second Interim Fee Application of Filsinger Energy Partners*, filed Feb. 16, 2015 [D.I. 3555] (noting that a significant aspect of Filsinger's work during these periods involved the development of comprehensive forecasts of projected operations and cash flows for each Debtors' individual assets and business units, in connection with Filsinger's evaluation and assessment of the Debtors' compensation metrics)).

### D.    Committee-Side Professional Allocations

84.    The U.S. Trustee appointed the E-Side Committee to act as a fiduciary for both EFH and EFIH unsecured creditors.  (PAB-X048, *Notice of Appointment of Unsecured Creditors*, filed Oct. 27, 2014 [D.I. 2570].)

85.    The E-Side Committee professionals allocated their fees and expenses 50/50 between EFH and EFIH.  (Glueckstein Dep. Tr. at 41:24-42:12.)  The E-Side Committee professionals believed that allocation was appropriate because the E-Side Committee's work generally provided a benefit to all unsecured creditors of the E-Side Debtors.  (Glueckstein Dep. Tr. at 61:5-14.)  As counsel for the E-Side Committee testified in his deposition, "[W]e ultimately, along with the other professionals for the committee, agreed that a 50/50 [allocation] made sense under the circumstances given that the spirit of the order with respect to collective benefit talked about EFIH, EFH, TCEH as the major debtor entities and that a 50/50 allocation made sense, again because we had creditors, the substantial creditor body of both unsecured creditors of both of those estates within our purview and it, in our view, was appropriate to split it that way."  (Glueckstein Dep. Tr. at 40:13-41:2.)[22]

---

[22]    Although this testimony could be read as suggesting that the Debtors "agreed" to the E-Side Committee's 50/50 allocation, counsel for the E-Side Committee clarified, "You continue to characterize it as an agreement, and I don't want you to kind of overstate if that was a term I used in my answer.  There was a discussion around how to pay our invoices and what the percentage would be, or at least some correspondence in that regard, . . . and that was really the extent of the discussion."  (Glueckstein Dep. Tr. at 41:13-23.)  Consistent with this clarification, the full record does not permit a finding that the Debtors agreed to a 50/50 allocation of the E-Side Committee professionals' fees.  (*See* 9/2/2018 Husnick Written Direct ¶ 33:  "I am not aware that the Debtors expressly consented to the E-Committee's allocation of professional fees or expenses.  Nor am I aware that Kirkland ever directed or consented to another Debtor professional's allocation of professional fees or expenses.  In the event Kirkland received an inquiry from another professional about how to allocate certain fees, Kirkland directed such professionals to the Interim Compensation Order and the Debtors for further guidance.")

86.     Despite the E-Side Committee professionals' apparent intent to comply with the "spirit" of the Interim Compensation Order, counsel for the E-Side Committee acknowledged that the 50/50 allocation was not "undertaken pursuant to Section 2(b) of the Interim Compensation Order per se because our view was, and continues to be, that the plain language of that really only applied to the debtor professionals." (Glueckstein Dep. Tr. at 47:21-48:3; *see also id.* at 47:3-17: "[A]gain, the reasoning at the time for the 50/50 was that the expenses of the estate professionals had to be paid by one or both of the estates in some amount, and our view was that all of these benefits were for the creditors and the creditors committee and none of the estates, and so it was really for, you know, the E-Side as a whole and consistent with the spirit of the—of the order that had been entered by the Court allocating those as between EFH and EFIH was appropriate, and we saw no reason for one estate versus the other to pay more than a disproportionate share of those amounts.")

87.     The E-Side Committee professionals did not comport with the Interim Compensation Order.  The Interim Compensation Order required a more nuanced, adaptive, and contemporaneous allocation.  (*See* PAB-X034 [D.I. 2066] ¶ 2(b).)  Because the E-Side Committee professionals' approach did not comport with the Interim Compensation Order, there is no pre-existing allocation to which the Court can defer.

88.     The question, then, is what portion of the E-Side Committee professional fee claims, if any, should be allocated to EFH and EFIH, respectively.  This requires an evaluation of whether and to what extent the E-Side Committee's efforts were for the benefit of each estate.

89.    The E-Side Committee's most significant activity in the chapter 11 cases was laying the groundwork for and negotiating the settlement between the Debtors and the E-Side Committee (the "E-Side Committee Settlement").  (*See* 9/2/2018 Horton Written Direct ¶ 22; 9/5/18 Trial Tr. at 238:4-13 (Horton).)    That settlement resolved the E-Side Committee's objections to the global settlement agreement among EFH, EFIH, and TCEH (the "Global Settlement") and to the Hunt Plan.  The settlement's key provisions included:

- reinstatement of Class A3 Claims (and, if the Debtors did not reinstate those claims, the E-Side Committee could terminate its support of the agreement);

- the TCEH Turnover Distribution; and

- a "gag" provision limiting the E-Side Committee's further participation, provided there was no breach of the E-Side Committee Settlement.

(9/2/2018 Horton Written Direct ¶ 22.)    The E-Side Committee Settlement primarily addressed EFH Claims (*i.e.*, Reinstated Class A3 Claims and the TCEH Turnover Distribution).  (*Id*. at ¶ 24.)  Nonetheless, in addition to paving the path to a more consensual hearing on the Global Settlement and Hunt Plan confirmation, the "gag" provision in the E-Side Committee Settlement reduced the fee and expense accrual of the E-Side Committee's professionals, thereby benefiting both EFH and EFIH unsecured creditors.   (9/2/2018 Horton Written Direct ¶ 23; *see* 9/5/2018 Trial Tr. at 238:9-12 (Horton): "Ultimately, as part of that settlement, so long as, you know, every plan continued to meet those general requirements of the E-committee settlement, they were going to be less involved in the case.")

90.    As a general matter, the E-Side Committee played a more significant advocacy role for EFH unsecured creditors than for EFIH unsecured creditors.  This is

because EFIH unsecured claims only arose out of EFIH funded debt, and those claimholders had separate counsel throughout the chapter 11 cases.  Although the EFH creditors who held claims based on EFH funded debt also retained professionals—most notably, Fidelity and the EFH Indenture Trustee each retained counsel and financial advisors—EFH had some non-funded debt creditors who were unrepresented or only represented at various points in the case.  (9/2/2018 Horton Written Direct ¶ 24.)  Thus, those most likely to benefit from the E-Side Committee's guidance were holders of EFH unsecured trade debt, which amounted to less than $5 million in total claims, a relatively small amount.  (*Id.* at ¶ 25.)

91.    At the same time, some of the E-Side Committee's actions inured primarily to the benefit of EFIH unsecured creditors.  For example, one of the E-Side Committee's objections to the Hunt Plan focused on potential delays to emergence.  Specifically, the E-Side Committee noted that if the T-Side Junior Creditor Consortium (who were contemplated to own Reorganized EFH under the Hunt Plan) failed to fund its commitment, a 50-day period to secure replacement financing would be triggered and the effective date delayed.  (PAB-X307, *Trial Brief and Omnibus Objection of the EFH Official Committee to (I) Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform under the Settlement Agreement and (II) Confirmation of the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, filed Oct. 23, 2015 [D.I. 6627] at 109, 114.)  In making that particular objection, the E-Side Committee acted primarily for the benefit of EFIH unsecured creditors, since emergence delays would cause

additional interest rate accruals and professional fee burn primarily to the detriment of EFIH unsecured creditors.

92.     Finally, some of the E-Side Committee's work, such as its considerable efforts in connection with setting the asbestos bar date and its services related to tax issues, inured to the collective benefit of both the EFH and EFIH estates.  (*See* 9/5/2018 Trial Tr. at 238:17-22 (Horton): "Although they may not have been driving those two activities, they were certainly involved in doing work for both estates in that regard.  They were part of the global settlement agreement.  And, you know, that provided tremendous value, I believe, to both estates, given the various claims.")

### E.     Specific Work Streams:  Tax-Related Services

93.     One of Elliott's premises to re-allocate Debtor-side professional fees is that EFH benefited from tax-related services because "EFIH unsecured creditors . . . were indifferent as to whether a restructuring transaction was taxable or non-taxable."  (*See* PAB-X670 [D.I. 13102] ¶ 33.)  That premise does not square with the record:  pursuing a tax-free transaction maximized value for and benefitted all estates collectively.

94.     It is true that the Debtors had significant concerns about the viability of any transaction that would trigger a deconsolidation tax that EFH could not satisfy.  (*See, e.g.*, PAB-X044, *Omnibus Tax Memorandum*, filed Oct. 1, 2014 [D.I. 2296] at 16-17; PAB-X033, Presentation re Due Diligence Meetings, dated July 21, 2014 [EFH9001508 at EFH90001510-11]; 9/2/2018 Keglevic Written Direct ¶ 31.)  The magnitude of the tax was believed to exceed $7 billion dollars.  (9/2/2018 Husnick Written Direct ¶ 47.)  EFH lacked sufficient assets, on its own, to pay even a small fraction of this tax liability.  (*Id.*)

95.    While under current federal income tax law, EFH, not EFIH, would have been directly liable to the Internal Revenue Service ("IRS") for federal income taxes, stranding a multi-billion dollar tax posed significant litigation and regulatory risks to all Debtors, and, potentially, an acquirer of the assets of EFIH.  Indeed, there were a number of means by which EFIH could have been liable for significant portions of such taxes, whether directly to the government or indirectly to EFH.  (*See* 9/2/2018 Keglevic Written Direct ¶ 33: "[A]lthough EFH would be directly liable to the IRS for federal income taxes resulting from a taxable sale of its indirect economic interests in Oncor, the Debtors understood that there were several means by which EFH might seek to hold its subsidiaries liable for portions of such taxes, whether to the IRS directly or by reimbursing EFH.")

96.    First, an EFH fiduciary may have considered a "check-the-box" election for EFIH.  (9/2/2018 Husnick Written Direct ¶ 48.)  A successful check-the-box election would have caused EFIH to become taxable as a corporation for federal income tax purposes, rendering it liable for taxes resulting from a taxable transaction.  (9/2/2018 Keglevic Written Direct ¶ 33; 9/2/2018 Husnick Written Direct ¶ 49; PAB-X033, Presentation re Due Diligence Meetings, dated July 21, 2014 [EFH9001508 at EFH90001511].)  The Debtors expected that any check-the-box election would be heavily litigated.  (9/2/2018 Keglevic Written Direct ¶ 33.)

97.    Second, even had EFH not elected to check the box, there was risk that the federal government could pursue payment for such taxes from EFIH's assets, including EFIH's economic interests in Oncor, or would seek to change the law or notice proposed regulations that would enable the government to collect taxes directly from EFIH, or create

the possibility that it could.  (9/2/2018 Keglevic Written Direct ¶ 35; 9/2/2018 Husnick Written Direct ¶ 50.)

98.    The government could have attempted to deviate from the IRS's historic position with respect to its inability to assert taxes against a "disregarded entity," or the government could have attempted to utilize state law theories to collect taxes from such entities.  (*See* 9/2/2018 Keglevic Written Direct ¶ 35.)  In addition, in the face of a massive stranded tax, the Debtors believed that the government could have attempted to change or enact, or simply announced its intent to change or enact, applicable regulations concerning disregarded LLCs that would have enabled collection of those taxes from, potentially, EFIH. (*Id.*)  Indeed, the government objected to the Bidding Procedures Motion to the extent a transaction could trigger a stranded tax and made a statement at the bidding procedures hearing that it would likely oppose any such transaction.  (PAB-X047, *United States' Limited Objection to the Debtors' Motion to Approve Bidding Procedures*, filed Oct. 15, 2014 [D.I. 2454]; 9/5/18 Trial Tr. at 186:3-15 (Robins) (confirming that if the government asserted a claim for a stranded tax, it would be an administrative claim and if the Debtors could not satisfy that claim, the "Debtors couldn't emerge from chapter 11").)

99.    Additionally, the Debtors were also concerned that there was a risk that the government would have attempted to pursue a third party purchaser for any stranded tax or that, at a minimum, a third party purchaser would be concerned about such a risk. (9/2/2018 Keglevic Written Direct ¶ 35.)  Again, the Debtors believed that such measures by the government likely would result in time-consuming and expensive litigation, which

could have reduced the consideration offered by potential purchasers, which in turn would reduce recoveries to all estates, including EFIH. (*Id.*; 9/2/2018 Husnick Written Direct ¶ 50.)

100.    Third, there was risk that EFH would seek reimbursement from EFIH for taxes owed pursuant to the Federal and State Income Tax Allocation Agreement Among the Members of the Energy Future Holdings Corp. Consolidated Group. (*See* PAB-X004, § 1.2 [EFH00945689 at EFH00945690-91]; 9/2/2018 Keglevic Written Direct ¶ 34; 9/2/2018 Husnick Written Direct ¶ 51.) EFH may also have sought reimbursement from Oncor for taxes resulting from a taxable separation pursuant to the Amended and Restated Tax Sharing Agreement. (*See* PAB-X003, § 9 [EFH02028985 at EFH02029001]; 9/2/2018 Keglevic Written Direct ¶ 34; 9/2/2018 Husnick Written Direct ¶ 52.) The potential that taxes would be owed to EFH from Oncor could have materially decreased the amount a purchaser would be willing to pay for EFIH's interests in Oncor, which, in turn, would have decreased distributable value for the EFH and EFIH Debtors' estates. (9/2/2018 Keglevic Written Direct ¶ 34; 9/2/2018 Husnick Written Direct ¶ 52.) Given the amount of taxes potentially at issue, it was likely that EFH's ability to collect taxes pursuant to the various tax sharing agreements would have been heavily litigated, further draining estate resources. (PAB-X033, Presentation re Due Diligence Meetings, dated July, 21 2014 [EFH9001508 at EFH90001511]; 9/2/2018 Keglevic Written Direct ¶ 34; 9/2/2018 Husnick Written Direct ¶ 52.)

101.    Fourth, the PUCT might not approve such a transaction in the event it left a stranded tax liability at EFH, or, if it did approve it, approval could be conditioned on requiring a purchaser to share tax benefits associated with such a transaction with Oncor's

ratepayers. (9/2/2018 Keglevic Written Direct ¶ 36; 9/2/2018 Husnick Written Direct ¶ 53.) The Debtors considered this a very real risk, as the PUCT conditioned its approval of a proposed transaction for EFIH's indirect interests in Oncor that would have allowed the Hunts to obtain tax benefits associated with converting Oncor into a "REIT" structure if they shared such benefits with ratepayers. (*See* 9/2/2018 Keglevic Written Direct ¶ 36; PAB-X329, *PUCT Order re Hunt Transaction*, dated Mar. 24, 2016 [PUC Dkt. No. 45188] at 9.)

102.    Fifth, even if the PUCT would have permitted a buyer to retain any tax benefit resulting from a "step-up" in the tax basis of Oncor's assets in a taxable transaction, the government could have taken steps to prevent a buyer from obtaining such a step-up in tax basis, such as enacting new regulations (or announcing an intent to enact new regulations) that would prevent a tax basis step-up in a "stranded tax" situation. (9/2/2018 Keglevic Written Direct ¶ 37; PAB-X033, Presentation re Due Diligence Meetings, dated July 21, 2014 [EFH90001508 at EFH90001511].)

103.    Sixth, there was a risk that, following the T-Side Effective Date, any efforts by EFH or EFIH to pursue a taxable transaction would have violated the Tax Matters Agreement, which the Disinterested Directors heavily negotiated and authorized on behalf of their respective estates (and the Court approved as part of the T-Side Confirmation Order). (9/2/2018 Keglevic Written Direct ¶ 38; PAB-X439, Tax Matters Agreement, dated Oct. 3, 2016, at § 2.05; PAB-X410, Unanimous Written Consent of the Joint Boards, dated Aug. 16, 2016 [EFH657325]; PAB-X390, Presentation to the Joint Boards re Restructuring, Tax, and M&A Update, dated July 27, 2016 [EFH06365761 at EFH06365766].) Specifically, the Tax Matters Agreement limited the EFH/EFIH Debtors' ability to pursue a taxable deal

after the TCEH/Shared Services Debtors emerged from bankruptcy. (9/2/2018 Keglevic Written Direct ¶ 21; PAB-X439, Tax Matters Agreement, dated Oct. 3, 2016, at § 2.05; PAB-X410, Unanimous Written Consent of the Joint Boards, dated Aug. 16, 2016 [EFH06577325].) It contained provisions that placed significant limitations and imposed significant requirements if EFH and EFIH pursued a taxable transaction within two years of the T-Side Effective Date. (*See, e.g.*, PAB-X439, Tax Matters Agreement, dated Aug. 16, 2016, at § 6.01(b); 9/2/2018 Husnick Written Direct ¶ 54.) As a result, any efforts after the T-Side Effective Date to pursue a taxable transaction at EFH or EFIH may have created litigation risk with Vistra Energy. (9/2/2018 Husnick Written Direct ¶ 54.)

104.    Finally, there were confirmation risks associated with pursuit of a taxable transaction. The Debtors' chief executive officer believed it was implausible that the EFH Board and EFH Disinterested Directors would authorize entry into a transaction that would have triggered a multi-billion dollar tax at EFH. (9/2/2018 Keglevic Written Direct ¶ 32.) Without EFH's support, confirmation and consummation of any EFIH-only taxable transaction would have been extremely difficult, if not impossible. (*Id.*)[23]

---

[23]    In light of these numerous risks, Elliott's tax expert, Mr. Abrams, proffered an opinion that was far too narrow to inform the Court's findings. Mr. Abrams' analysis was limited to federal income tax liability. (9/5/18 Trial Tr. at 134:8-10, 145:23-146:1 (Abrams).) He did not "offer[] any opinions regarding, the availability, advisability, or state law or contractual implications (if any) of a taxable disposition or other disposition of EFIH." (*Id.* at 134:17-135:5; 9/2/2018 Abrams Written Direct ¶ 9.) Mr. Abrams also ignored—or did not consider—EFH's potential check-the-box election following a sale and potential IRS action under state law theories. (9/5/18 Trial Tr. at 140:14-141:1, 142:21-143:9 (Abrams).)

The opinion proffered by Elliott's other expert also did not aid the Court in its decision-making. Mr. Robins' opinion was confined to the Debtors' exploration of a tax-free disposition of Oncor and the net benefits to EFH and EFIH respectively. (9/2/2018 Robins Written Direct ¶ 6.) Mr. Robins' opinion was based on a comparison to a hypothetical transaction, as the Debtors never received a proposal for a taxable deposition of Oncor. (9/2/2018 Keglevic Written Direct ¶ 6.) In evaluating the putative benefits from the tax-free disposition of Oncor, Mr. Robins did not consider the financial consequences of a taxable disposition, how much the tax-sharing litigation would cost, or how long it take. (9/5/18 Trial Tr. at 170:11-

105.    In light of these risks, the Debtors believed that a tax-free transaction was in the best interests of both the EFH and EFIH estates and maximized enterprise value for those estates. (9/2/2018 Keglevic Written Direct ¶ 39.) Nonetheless, the record reflects that the Debtors remained open to the possibility of a value-maximizing taxable transaction. (*See id.* at ¶ 5.)

106.    Consistent with their robust marketing efforts and duty to maximize the value of the Debtors' estates, the Debtors' managers, advisors, and boards stood ready to consider any proposal—taxable or otherwise—that would have been in the best interests of their respective estates. (9/2/2018 Keglevic Written Direct ¶ 6; *see also id.* at ¶ 31: "[T]he Debtors' objective at all times was to maximize value for their estates, consistent with their fiduciary duties, and we were always open to considering any deal that would achieve our objective.")  The Bidding Procedures Order made clear that the Debtors would accept any and all proposals, whether taxable or tax-free, including for a transaction at the EFIH level. (*See* PAB-X108, *Order (A) Approving Revised Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof*, filed Jan. 14, 2015 [D.I. 3295] ("Bidding Procedures Order") at Ex. 1 at 1:  "These Bidding Procedures set forth the process by which the Debtors are authorized to solicit proposals . . . *to acquire, in any form and employing any structure, whether taxable (in whole or in part)*

---

21, 172:10-15 (Robins).)  Moreover, Mr. Robins relied on untested assumptions from illustrative financial projections, all based on a hypothetical transaction for which he conceded there was no buyer.  (*Id*. at 171:4-172:12, 178:14-179:18, 177:17-178:21)  Even then, his cost-benefit analysis failed to account for approximately $1 billion in costs from increasing cash-pay interest accruals and professional fees.  (*Id*. at 202:9-203:5.)

*or tax-free, any or all of the assets* or the reorganized equity . . . of EFH Corp. or one or more of its direct or indirect subsidiaries, including EFIH") (emphasis added).)

107.    Ultimately, no credible or actionable proposal for a taxable transaction was presented to the Debtors by a single party.  (9/2/2018 Keglevic Written Direct ¶ 6; 9/6/18 Trial Tr. at 13:18-21 (Keglevic) ("Q: Did the Debtors ever receive an actionable taxable transaction term sheet?  A: No. We didn't -- we did not, and not even anything remotely approaching actionable."); 9/5/18 Trial Tr. at 177:4-5, 178:10-13 (Robins) (confirming he is "not aware of any tax proposal for the E-side that the debtors received" and "not aware of any purchaser willing to pay the proposed $2 to $3 billion for the step up in basis").)  That fact demonstrates these risks described above were real and significant.  (9/5/18 Trial Tr. at 194:19-23 (Robins):  "And there's very good and clear reasons why [EFH and EFIH] both wanted to pursue a tax-free transaction.")

108.    In fact, there is evidence that EFIH unsecured creditors analyzed and understood those risks and believed a tax-free disposition was in the best interests of the Debtors' estates.  (*See* 9/2/2018 Keglevic Written Direct ¶ 41; 9/5/18 Trial Tr. at 176:19-21 (Robins):  "Q: And you think a tax-free transaction on the E-side was value maximizing; right?  A: Yes.").)

109.    Indeed, EFIH unsecured creditors implored the Debtors not to trigger a massive tax liability because it would be a significant detriment to their projected recoveries. During pre-petition restructuring negotiations in 2013, counsel for the EFIH unsecured creditors approached EFIH and its subsidiary EFIH Finance, Inc. with the idea of an exchange of their notes into a "third lien" security at EFIH.  (9/2/2018 Keglevic Written

Direct ¶ 40.)  The proposal was made in part as an effort to obtain a higher priority than a potential claim at EFIH under a tax sharing agreement.  (*Id.*)  EFIH and EFIH Finance, Inc. did not pursue that exchange.  (*Id.*)

110.    Additionally, on July 7, 2014, counsel for the ad hoc committee of certain EFIH unsecured noteholders wrote to the EFIH Disinterested Manager, "to make sure the viewpoint of the Ad Hoc Committee is directly communicated to you," and urged adherence to the Restructuring Support Agreement "and the comprehensive economic compromises embodied therein . . . ."  (PAB-X032, July 8, 2014 Email from J. Walker to A. Acosta *et al*, att. I. Dizengoff letter to C. Cremens [CCREMENS000001 at CCREMENS000002-03].)  Among other harms, the EFIH unsecured creditors' letter warned that termination of the Restructuring Support Agreement could "put at risk the Debtors' ability to consummate the carefully crafted tax-free spin-off of [TCEH], which in turn would trigger **billions** of dollars of tax liability, thus jeopardizing unsecured creditor recoveries at the EFH, EFIH and TCEH estates."  (*Id.* at CCREMENS000003.)

111.    EFIH unsecured creditors (including Elliott in 2017 and York in 2014, when Mr. Rosenbaum was at that firm) signed various restructuring support agreements to support tax-free transactions.  (*See, e.g.*, PAB-X025, Apr. 29, 2014 Email from A. Yenamandra to S. Serajeddini re EFH Term Sheet RSA [EFH2D10034694 at EFH2D10034765]; PAB-X478, Plan Support Agreement Dated Jan. 2, 2017 by and Between the EFH/EFIH Debtors, the PIK Notes Trustee, and Certain Creditor Parties Thereto, dated Jan. 3, 2017 [D.I. 10530]; PAB-X584, *Order (CORRECTED) (A) Authorizing Entry into Merger Agreement and Approving Termination Fee, and (B) Authorizing Entry Into and Performance Under Plan Support Agreement*,

dated Sept. 7, 2017 [D.I. 11873].)   As sophisticated, experienced parties with separate counsel, Elliott and its predecessors negotiated consensual deals that, in their view, best maximized their recovery. They were under no obligation to commit themselves to supporting a restructuring path forward—particularly after statutory exclusivity had expired. Their decision to nevertheless support the Debtors' proposed path forward as opposed to forging their own alternative path reflects their belief that the Debtors' path best maximized their recovery.

### F.    Specific Work Streams:  Makewhole-Related Services

112.    In support of its contention that more of the Debtors' professional fees should be allocated to the EFH estate, Elliott has argued that "disallowance of the EFIH noteholders' make-whole premiums—and the Debtors' efforts in contesting noteholders' entitlement to these premiums—would inure to the benefit of EFH creditors."  (PAB-X670 [D.I. 13102] ¶ 34.)  The record instead reflects that the litigation efforts to disallow the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims (the "Makewhole Claims") inured to the benefit of EFIH unsecured creditors.

113.    The Parties' dispute primarily relates to the allocation of fees and expenses incurred in litigating the Makewhole Claims.  Kirkland billed its fees and expenses incurred in litigating the allowance of Makewhole Claims to the EFIH Debtors as Direct Benefit Fees. (9/2/2018 Husnick Written Direct ¶ 40.)  Kirkland billed fees and expenses relating to other matters involving the Makewhole Claims, such as negotiating Disclosure Statement and Plan objections, as Collective Benefit Fees.  (*Id*. at ¶ 43.)

114.     In the Debtors' waterfall, EFIH unsecured creditors were directly below the EFIH first and second lien creditors.  As a result, at nearly all valuations, disallowing the Makewhole Claims would inure to the benefit of the EFIH unsecured creditors.  (9/2/2018 Horton Written Direct ¶ 39.)  At some valuations where EFIH unsecured creditors would receive a full recovery, disallowing the Makewhole Claims would inure to the benefit of the EFH unsecured creditors.  (*Id.* ¶ 39.)

115.     The EFIH unsecured creditors were economically incentivized to support the Debtors' attempts to have those claims disallowed.  Because EFIH unsecured creditor recoveries were not guaranteed in the Chapter 11 Cases, and because the interest accrual on the EFIH First Lien Notes and EFIH Second Lien Notes was substantial—tens of millions of dollars per month—EFIH unsecured creditors had every incentive to vigorously pursue disallowance of the Makewhole Claims.  (*See* 9/2/2018 Husnick Written Direct ¶ 42.)  Successfully doing so would have increased the likelihood of significant, if not full, recoveries to the EFIH unsecured creditors as opposed to substantially lower recoveries, and it would have enabled EFIH unsecured creditors to avoid the interest rate burn saved by repaying the EFIH First Lien Notes from reappearing through the allowance of those claims.  (*Id.*)

116.     Indeed, it was EFIH's motion to repay the principal amount of EFIH First Lien Notes at the start of the Chapter 11 Cases that triggered the makewhole litigation.  (*Id.* at ¶ 41.)  The original Restructuring Support Agreement included a provision obligating EFIH to challenge the allowance of the EFIH Makewhole Claims.  (*See* PAB-X029 [D.I. 505-2] at

Ex. 2 at Ex. A at 3-4, 7.)  EFIH unsecured creditors signed onto the Restructuring Support

Agreement.  (*Id.* at Ex. 2 at Ex. A at 14; 9/2/2018 Rosenbaum Written Direct ¶ 6.)

117.    Further, EFH was not a party or involved in the makewhole litigation.

(9/2/2018 Horton Written Direct ¶ 41.)  EFIH and EFIH Finance, Inc. were the Debtor

entities party to the EFIH First Lien Indenture and EFIH Second Lien Indenture, and

defendants in the suits filed by the EFIH First Lien Indenture Trustee and EFIH Second Lien

Trustee.  (*See* PAB-X028, Compl., *CSC Trust Co. of Del. v. Energy Future Intermediate Holding

Co. LLC, et al.*, Adv. Proceeding 14-50363-CSS (Bankr. D. Del. May 15, 2014); PAB-X031,

Compl., *Computershare Trust Co., N.A. et al. v. Energy Future Intermediate Holding Co. LLC, et

al.*, Adv. Proceeding 14-50405-CSS (Bankr. D. Del. June 16, 2014).)

118.    As a result, Kirkland appropriately allocated (a) as Direct Benefit Fees to EFIH

the fees and expenses incurred in connection with litigating the allowance of Makewhole

Claims and (b) as Collective Benefit Fees the fees and expenses incurred in addressing other

matters involving the Makewhole Claims, such as negotiating Disclosure Statement and

Plan objections, negotiating and documenting the EFIH Secured Settlement, and

negotiating a potential path forward following the Third Circuit Makewhole Opinion in

November 2016.

### G.    Elliott's Solvency-Related Basis for Re-Allocation

119.    Elliott further argues that "the overwhelming majority of Kirkland's Direct

Benefit Fees were incurred when EFIH was solvent, and accordingly when any plan could

have benefited only EFH unsecured creditors."  (PAB-X670 [D.I. 13102] ¶ 67.)  Specifically,

Elliott argues that until the Third Circuit's opinion in November 2016, EFIH was "solvent"

because EFIH unsecured creditors were expected to receive a 100% recovery. The record contradicts any suggestion that EFIH could not have benefited from the work performed by the Debtors' professionals from the Petition Date to November 2016.

120.    First, over time, there were declines in the amount of consideration potential purchasers were willing to infuse into the Reorganized Debtors. (9/2/2018 Horton Written Direct ¶ 43.) While all potential purchasers were prepared to satisfy secured claims at EFIH (to avoid a difficult "cram" fight at plan confirmation), there was increasingly less certainty over time as to the recovery for EFIH unsecured creditors. (*Id.*)

121.    Second, Elliott's argument does not account for the reality *that EFIH could only be solvent upon the consummation of a deal, which would be subject to substantial contingencies.* (*See id.* ¶ 44; PAB-X426, *Disclosure Statement for the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors*, filed Sept. 15, 2016 [D.I. 9557] at 163 (identifying risks regarding the Debtors' ability to consummate the Plan); PAB-X319, *Sixth Amended Joint Plan of Reorganization*, filed Dec. 1, 2015 [D.I. 7187] at 100-01; 9/5/18 Trial Tr. at 273:16-21 (Horton).) Until a transaction closed, there was no guarantee that EFIH was solvent. Indeed, the only transaction that closed was the Merger Agreement with Sempra and under that deal EFIH is clearly insolvent. Accordingly, the Debtors and their professionals had to

undertake significant efforts to preserve the estate.  (*See* 9/2/2018 Horton Written Direct ¶ 44.)[24]

122.    One of those contingencies was obtaining an order disallowing the Makewhole Claims.  Every Plan filed between the Court's disallowance of the Makewhole Claims and the Third Circuit's opinion had a closing condition permitting the proposed purchaser to terminate the transaction if the Court order disallowing the Makewhole Claims was stayed, reversed, or remanded on appeal prior to the E-Side Effective Date.  (PAB-X319 [D.I. 7187] at § IX.B.9; PAB-X339, *Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, filed May 1, 2016 [D.I. 8355] at § IX.D.8; PAB-X352, *Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, filed May 10, 2016 [D.I. 8421] at § IX.D.8; PAB-X430, *Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, filed Sept. 21, 2016 [D.I. 9612] at § IX.D.10.) Given the threat of an adverse ruling on the Makewhole Claims and the uncertainty of the ultimate purchase price, the EFIH unsecured creditors were never guaranteed a 100% recovery and, thus, had every incentive to advocate for EFIH to litigate the disallowance of the Makewhole Claims.

123.    To maximize value, the Debtors needed to address a number of other risks, as well.  One was the threat of a massive tax liability being triggered at EFH, with EFIH bearing

---

[24]    Mr. Robins, Elliott's expert, acknowledged that, in formulating his solvency assumption, he did not do a "classic investment banker enterprise valuation"; instead, he relied on "a secondary indicator of enterprise value" (*i.e.*, trading prices of debt).  (9/5/18 Trial Tr. at 174:7-17 (Robins).)

contingent risk under a number of different legal theories described above. (*See* 9/2/2018 Horton Written Direct ¶ 46; 9/2/2018 Keglevic Written Direct ¶¶ 31-39; PAB-X044, Omnibus Tax Memorandum [D.I. 2296] at 7-8, 10, 12-21; 9/6/18 Trial Tr. at 15:6-18:13 (Keglevic).) A quantification of this risk is reflected in the Debtors' various liquidation analyses, which show that EFIH unsecured creditors were not projected to receive full recoveries in a "check-the-box" scenario. (*See, e.g.,* PAB-X431, *Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors*, filed Sept. 21, 2016 [D.I. 9616], Ex. E at 17 (showing 1.4% recovery to holders of Class B6 claims where "'check-the-box' effective for all currently disregarded entities").) There was also the potential for an extensive litigation overhang from the inter-estate claims, regulatory hurdles to consummating the transaction, and the Debtors needed to address their asbestos liabilities. (9/2/2018 Horton Written Direct ¶ 46.)

124.    For a purchaser to close a transaction and infuse capital into the EFIH estate, the Debtors and their professionals had to address these risks. (*See id.* at ¶ 47.) In some cases, it took years to do so. (*Id.*) In the absence of a comprehensive solution for these risks, EFIH unsecured creditors would have received materially less value. (*Id.*)

125.    At the same time, EFH likewise benefited from the Debtors' efforts to mitigate these risks, which gave EFH the option of receiving some of the distributable value from the sale of Oncor and avoided massive liabilities. At certain points in the case, that potential value to EFH was material. (*Id.*)

126.    Elliott also ignores that the Debtors and Sempra were able to quickly consummate the Sempra transaction because all of the participants learned from—and built upon—prior experiences. (9/2/2018 Keglevic Written Direct ¶ 28: "The Sempra transaction built on over three years of work done by the Debtors, their professionals, the various buyers, and the creditors in the chapter 11 cases . . . . This enabled Sempra to promptly clear the necessary execution hurdles, where preceding transactions had failed.")  The Sempra transaction benefited from the prior work done on the regulatory front (with the PUCT and IRS); the parties were able to expedite the diligence process and deal documentation from the groundwork laid with the NextEra and Berkshire transactions; and as with NextEra, Sempra benefited from the presence of the evergreen Global Settlement.  (*See* 9/2/2018 Horton Written Direct ¶ 48; 9/2/2018 Keglevic Written Direct ¶ 28.)

### H.    Specific Work Streams:  Asbestos-Related Services

127.    Elliott argues that "pursuit of a transaction in which asbestos claims against the EFH Debtors are assumed . . . has been driven by, and resulted, in direct benefits to the EFH estate and its creditors."  (PAB-X670, *Allocation Motion* [D.I. 13102] ¶ 31.)  The record contradicts that argument.

128.    As part of these Chapter 11 Cases, the E-Side Debtors focused their asbestos-related time on two primary work streams:  (a) obtaining the Asbestos Bar Date Order and (b) reinstating claims filed by claimants who timely filed asbestos-related proofs of claim before the Asbestos Bar Date as part of a joint plan of reorganization.  (9/2/2018 Horton Written Direct ¶¶ 55-58.)   Both were components of the Debtors' holistic restructuring

efforts and inured to the collective benefit of both the EFH and EFIH estates (and before the T-Side Effective Date, all of the Debtors).  (9/5/2018 Trial Tr. at 81:21-83:2 (Husnick).)

129.    Convincing a potential acquirer of the Reorganized Debtors to assume uncapped asbestos liabilities was a challenge, and the Debtors sought the Asbestos Bar Date in an effort to provide some certainty regarding the scope of Reorganized EFH's and the Reorganized LSGT Debtors' potential liability.  (9/2/2018 Horton Written Direct ¶ 56; 9/5/18 Trial Tr. at 82:13-83:2 (Husnick).)  The Debtors then had extensive negotiations with proposed purchasers about the importance of reinstating preserved asbestos claims, and the Debtors made concessions to secure that commitment.  (9/2/2018 Horton Written Direct ¶ 56.)  Thus, without the certainty that the Asbestos Bar Date provided regarding the extent of the Debtors' asbestos liabilities, potential purchasers likely would have discounted their purchase price or otherwise reduced the available distributable value, which in turn would have resulted in a dollar-for-dollar reduction in distributions to EFIH unsecured creditors. (*See id.*)

130.    Reinstating timely-preserved claims was also critical to gaining support from the E-Side Committee in the Chapter 11 Cases.  (*Id.* ¶ 58.)  As discussed above, reaching a compromise with the E-Side Committee—and maintaining that compromise after the Hunt transaction failed—benefited EFIH unsecured creditors.  This compromise also avoided the costs of protracted litigation under section 524(g) of the Bankruptcy Code regarding a channeling injunction and the costs of concomitant delays (including significant interest burn—approximately $50 million per month—at EFIH).  (9/2/2018 Husnick Written Direct ¶ 38; 9/5/18 Trial Tr. at 81:21-82:12 (Husnick).)

131.    Moreover, EFIH restructured its debts by consummating a joint plan of reorganization with EFH that addressed the Debtors' asbestos liabilities.  In other words, a value-maximizing result for EFIH was tied directly to the Debtors' resolution of their asbestos-related liabilities.  To achieve this result, the Debtors' professionals had to resolve due process-related objections to disclosure statements and related joint plans of reorganization (and defend confirmed plans on appeal).  (9/2/2018 Husnick Written Direct ¶ 39.)  It may be true that resolving asbestos claims might have mattered to only EFH *if* EFIH consummated a transaction separate from EFH.  But as discussed above, no creditor or third-party put its capital behind such a transaction and ultimately, EFIH unsecured creditors unanimously supported the Debtors' pursuit and consummation of the joint plan.

## III.    ELLIOTT SUBSTANTIAL CONTRIBUTION CLAIM.

### A.    Elliott Holds an Allowed Substantial Contribution Claim Against EFIH.

132.    On February 17, 2018, the E-Side Debtors filed a memorandum of law in support of confirmation of the Sempra Plan in which they requested a finding that Elliott made a substantial contribution to EFIH and thus should be entitled to an allowed administrative expense claim against EFIH under sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for fees and expenses incurred by Elliott in making such substantial contribution.  (PAB-X624, 2/17/18 Debtors' Confirmation Brief [D.I. 12666] ¶ 64.)  On February 22, 2018, Elliott filed with the Court a declaration of Jeffrey Rosenbaum in support of the E-Side Debtors' request for allowance of a substantial contribution claim in favor of Elliott.  (AHX-225, 2/22/18 Rosenbaum Decl. [D.I. 12695].)

133.    At the February 26, 2018 hearing on confirmation of the Sempra Plan, the Court stated that it would "absolutely find" that Elliott made a substantial contribution to the estates which "clearly meet[s] . . . the applicable law.  In particular, the work that resulted in having Sempra here, was very much a result of many people working hard, but absolutely a result of Elliott's participation . . . ."  (ELX-634, 2/26/18 Hr'g Tr. [D.I. 12770] at 237:21–238:6.)

134.    In the Confirmation Order entered the next day, the Court found that Elliott "made, in accordance with sections 503(b)(3)(D), 503(b)(4), and 503(b)(5) of the Bankruptcy Code, a substantial contribution in these cases" and is "hereby granted an Allowed Administrative Claim against EFIH, pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, in an aggregate amount of up to $35 million for fees and expenses (including fees and expenses for legal counsel, financial advisors, consultants and other professionals)" incurred in connection with Elliott's substantial contributions.  (ELX-635, 2/27/18 Confirmation Order [D.I. 12763] ¶ 109.)  The Confirmation Order further provided that the grant of such substantial contribution claim in favor of Elliott was without prejudice to the reallocation of such claim as between EFH and EFIH.  (*Id.*)

**B.    The Components of Elliott's Substantial Contribution Claim.**

135.    On May 11, 2017, in accordance with the Confirmation Order, Elliott submitted to the PAB, the Fee Committee, and the U.S. Trustee (a) a statement in support of Elliott's substantial contribution claim, (b) a summary of the professionals that have provided services to Elliott in connection with Elliott's substantial contributions, (c) invoices for each such professional, and (d) a breakdown of out-of-pocket expenses incurred in

62

connection with Elliott's substantial contributions (as amended, the "Elliott Substantial Contribution Statement"). (ELX-669, 5/11/18 Elliott Substantial Contribution Statement.)

136. The Elliott Substantial Contribution Claim is broken down into six categories. First, Elliott asserts that it incurred approximately $3.7 million, or just over 12% of the Elliott Substantial Contribution Claim, in connection with efforts to move the estates toward an alternative restructuring transaction once it became clear that the PUCT was likely to deny the NextEra transaction. (9/2/18 Rosenbaum Written Direct ¶ 54; ELX-669, 5/11/18 Elliott Substantial Contribution Statement ¶¶ 6–10.) This category includes fees and expenses incurred in connection with litigation over whether Elliott was bound by a January 2, 2017 Plan Support Agreement (as amended). (9/2/18 Rosenbaum Written Direct ¶ 54.)

137. Second, Elliott asserts that it incurred approximately $19.8 million, or approximately 66% of the Elliott Substantial Contribution Claim, in connection with Elliott's efforts to (i) oppose the E-Side Debtors' proposed transaction with Berkshire, (ii) develop an alternative creditor-led plan of reorganization to provide greater consideration to the E-Side Debtors' estates, and (iii) negotiate and work with the E-Side Debtors and Sempra to proceed with the financially superior Sempra transaction. (9/2/18 Rosenbaum Written Direct ¶ 55; ELX-669, 5/11/18 Elliott Substantial Contribution Statement ¶¶ 11–18; see also AHX-224, 2/22/18 Rosenbaum Decl. ¶¶ 12–20.)

138. In August 2017, Elliott secured an eleven-day adjournment of the hearing on approval of the Berkshire merger agreement, which ultimately allowed Sempra to propose a competing transaction providing $9.3 billion in consideration for the estates. (9/2/18 Rosenbaum Written Direct ¶ 55.) During that adjournment, Elliott (i) litigated its objections

to the E-Side Debtors' scheduling request and the Berkshire merger agreement, (ii) assembled a consortium of parties interested in a nontaxable transaction valued at $300 million more than the Berkshire transaction, and (iii) negotiated the final terms of the Sempra transaction, including a purchase price increase by Sempra of $150 million above its initial offer. (*Id.*) Prior to and during the adjournment, the E-Side Debtors took the position that no offer better than the Berkshire deal existed. (*See* ELX-544, 8/16/17 *Debtors' Reply to Objections to Motion for Order Authorizing Entry into Merger Agreement* [D.I. 11761] ¶ 43 ("[A]ll potentially interested parties have had a significant period of time in which to develop an alternative proposal. None have emerged. Allowing such parties additional time in the hopes that a heretofore-unforeseen white knight purchaser will enter the regulatory and litigation morass that are the Debtors' chapter 11 cases is a reckless proposition.").) In the end, the Sempra transaction resulted in $450 million more in cash consideration than the E-Side Debtors would have received under the Berkshire transaction.

139.    Third, Elliott asserts that it incurred approximately $3.4 million, or just over 11% of the Elliott Substantial Contribution Claim, in connection with obtaining an order granting reconsideration of a prior order of the Court approving the $275 million Termination Fee (the "Reconsideration Order"). (9/2/18 Rosenbaum Written Direct ¶ 56; ELX-669, 5/11/18 Elliott Substantial Contribution Statement ¶¶ 19–26; *see also* AHX-224, 2/22/18 Rosenbaum Decl. ¶¶ 21–25.) As a result of the Reconsideration Order, the Termination Fee was disallowed and NextEra's application for payment thereof was denied. (ELX-583, 10/18/17 Reconsideration Order [D.I. 12075].) NextEra appealed that order to the Third Circuit, and on September 13, 2018, the Third Circuit issued an opinion

affirming the Reconsideration Order.  *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d

Cir. 2018).  On October 24, 2018, the Third Circuit denied a request for rehearing.[25]

140.    Fourth, Elliott asserts that it incurred approximately $1.5 million, or less than

5% of the Elliott Substantial Contribution Claim, in connection with negotiating the Sempra

Plan and related ancillary documents, as well as advocating for both EFH and EFIH

unsecured creditor matters relating to the Sempra Plan and confirmation proceedings.

(9/2/18 Rosenbaum Written Direct ¶ 57; ELX-669, 5/11/18 Elliott Substantial Contribution

Statement ¶¶ 38–40.)

141.    Fifth, Elliott asserts that it incurred approximately $680,000, or just over 2% of

the Elliott Substantial Contribution Claim, in connection with helping to negotiate a $31

million payment by Sempra to the E-Side Debtors' estates to resolve a dispute over payment

of certain of Oncor's 2017 quarterly dividends (the "Oncor Dividend Settlement").  (9/2/18

Rosenbaum Written Direct ¶ 58; ELX-669, 5/11/18 Elliott Substantial Contribution

Statement ¶¶ 32–37; *see also* AHX-224, 2/22/18 Rosenbaum Decl. ¶¶ 26–30.)  Of the $31

million settlement payment, $27.25 million was paid to EFIH for distribution to EFIH

unsecured creditors, and $3.75 million was paid to EFH for distribution to EFH unsecured

creditors. (ELX-616, Order Approving Settlement Between the Debtors and Sempra [D.I.

---

[25]    The Third Circuit's opinion affirmed this Court's prior ruling that the Termination Fee is disallowed. But as the Movants state in the Allocation Motion, under no circumstances will the allocations set forth herein render the EFH estate administratively insolvent.  In the event the Reconsideration Order is ultimately reversed, and the full amount of the Termination Fee is allowed following resolution of an adversary proceeding pending before this Court, the allocations set forth herein will be adjusted if necessary to ensure that the EFH estate remains administratively solvent.

12631].)  The Oncor Dividend Settlement also resolved various open tax issues and disputes between Oncor and EFH.  (*Id.*; 9/7/18 Trial Tr. 257:22–258:11 (PAB Closing).)

142.    Sixth, Elliott asserts that it incurred approximately $1.1 million, or approximately 3.5% of the Elliott Substantial Contribution Claim, in connection with its efforts to obtain a resolution of a tax allocation dispute between EFH and Vistra in connection with a tax matters agreement between the parties.  (9/2/18 Rosenbaum Written Direct ¶ 59; ELX-669, 5/11/18 Elliott Substantial Contribution Statement ¶¶ 27–31.)

143.    On September 10, 2018, this Court issued a letter to the Fee Committee clarifying that the question of whether Elliott has "made a 'substantial contribution' to the Debtors' estate[s] as interpreted by the Third Circuit in *Lebron v. Mechem Financial Inc.*, 27 F. 3d 937 (3d Cir. 1994) to have been previously resolved in the affirmative and not subject to further review."  (9/10/18 Letter to Fee Committee [D.I. 13475].)  The Elliott Substantial Contribution Claim remains subject to review for reasonableness.  (*Id.*)

## CONCLUSIONS OF LAW

144.    Based on the findings of fact set forth above, the Court makes the following conclusions of law:

## I.    Jurisdiction and Venue

145.    The Debtors commenced these Chapter 11 Cases on April 29, 2014.  Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409 and remains proper.  The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334

and paragraph 72 of the Confirmation Order.  This is a core proceeding pursuant to 11 U.S.C. § 157(b).

146.     The Parties have further consented, pursuant to Local Rule 9013-1(f), to entry of a final order to the extent that it is later determined that the Court, absent consent of the Parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## II.    Standards of Law

### A.    Section 503(b)(1) of the Bankruptcy Code Governs the Allocation of the NextEra Termination Fee Claim

147.     As it relates to the allocation of the NextEra Termination Fee Claim, section 503(b) of the Bankruptcy Code controls the "allowance of administrative expenses," and is therefore applicable to the allocation of the NextEra Termination Fee Claim.

148.     In particular, the allowance and the allocation of the NextEra Termination Fee Claim is governed by section 503(b)(1)(A)(i) of the Bankruptcy Code, which provides for the allowance of "the actual, necessary costs and expenses of preserving the estate including—wages, salaries, and commissions for services rendered after the commencement of the case."  *See In re Trans World Airlines, Inc.*, 145 F.3d 124, 136 (3d Cir. 1998) ("administrative expenses are allowable only for the actual, necessary costs and expenses of preserving the estate") (internal quotations omitted).  This Court's previous decisions related to the

allowance of the NextEra Termination Fee reserved the Parties' rights to seek an appropriate allocation of the NextEra Termination Fee Claim.[26]

149.    Pursuant to paragraph 150 of the Confirmation Order, the EFH/EFIH Debtors funded the NextEra Plan Reserve in the amount of $275,000,000.00. If the NextEra Plan Reserve Amount is reduced by order of the Court (and such order has not been stayed)[27] pursuant to the terms described in paragraph 154 of the Confirmation Order, any remaining funds in the NextEra Plan Reserve shall be allocated between EFH and EFIH in the same proportion the NextEra Termination Fee is allocated between EFH and EFIH under this Order; ***provided, however,*** that, for the avoidance of doubt, no funds shall be released from the NextEra Plan Reserve on account of the NextEra Termination Fee Claim or any other Claim pursuant to this Order and any such release shall be governed by separate order of the Court.

### B.    Section 503(b)(3)(d) of the Bankruptcy Code Governs Allocation of the Elliott Substantial Contribution Claim

150.    Additionally, the allocation of the Elliott Substantial Contribution Claim is governed by section 503(b)(3)(d) of the Bankruptcy Code, which provides for the allowance of "the actual, necessary expenses . . . incurred by . . . a creditor, an indenture trustee, an

---

[26]    PAB-X429, *Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement,* filed Sept. 19, 2016 [D. I. 9584] ¶ 4.); ELX 583, *Order Granting the Motion to Reconsider of Elliott Associates and Denying Application of NextEra Energy Inc. for Payment of Administrative Claim,* filed Oct. 18, 2017 [D.I. 12075] at 23.

[27]    On October 25, 2018, the Court entered an Order, which authorizes and directs the PAB to release the full amount of the NextEra Plan Reserve and distribute funds to unsecured creditors effective November 15, 2018. To the extent the order of the Court is stayed, such stay would presumably be subject to the issuance of a bond by the party seeking the stay.

equity security holder, or a committee . . . in making a substantial contribution in a case under chapter 9 or 11 of this title."

151.    In evaluating the appropriate allocation of the Elliott Substantial Contribution Claim, this Court applies the test set forth by the Third Circuit in *Lebron v. Mecham Financial Inc.*, 27 F.3d 937 (3d Cir. 1994)—the extent to which Elliott's efforts "resulted in an actual and demonstrable benefit" to the EFH Debtors' estates and the EFIH Debtors' estates, as well as their respective creditors. *Id.* at 944.

**C.    Section 330(a)(3)(C) of the Bankruptcy Code Governs the Allocation of Professional Fee Claims**

152.    Finally, the allocation of the Debtor Professional Fee Claims and the EFH Committee Fee Claims is governed by section 330(a)(3)(C) of the Bankruptcy Code, which states that, in determining reasonable compensation to be awarded to a professional, the court shall consider "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title."

153.    The burden of proof is on the movant to prove that it is entitled to an allocation of an administrative expense award, and it must do so by a preponderance of evidence. *In re Worldwide Direct*, 334 B. R. 112, 120 (Bankr. D. Del. Nov. 30, 2005) (citations omitted); *In re Transamerican Nat. Gas Corp.*, 978 F. 2d 1409, 1416 (5th Cir. 1992) (holding that "the burden of persuasion, by a preponderance of the evidence, remains with the movant").

**D.    Allocation of the NextEra Termination Fee Claim or any other Allowed Claim Asserted by NextEra and Payable from the NextEra Plan Reserve is a Proper Exercise of the Court's Power**

154.    As a matter of law, this Court's determination of the proper allocation of the NextEra Termination Fee Claim or any other Claim asserted by NextEra that becomes Allowed by Final Order and is payable from the NextEra Plan Reserve is a justiciable issue, as supported by the Court's findings of fact and conclusions of law reflected herein. *See In re Cubic Energy, Inc.*, 587 B.R. 849, 855 (Bankr. D. Del. 2018) ("In a bankruptcy context, the Third Circuit has determined that an opinion is not advisory where it actually invalidates a clause, orders a party to do something, or otherwise resolves the parties' litigation." (citations omitted)).  In addition, this Court has held that "an opinion that has some valid 'legal effect'; will not be advisory." *Id.* at 855.  Here, entry of the Order will not only resolve the Parties' litigation of the Material Administrative Expense Claims, but will also require the PAB to effectuate the allocations set forth herein with respect to the Cash held in the EFH/EFIH Cash Distribution Account (as defined in the Plan).  Following the EFH Effective Date, the PAB effectively held a "double reserve" at both EFH and EFIH on account of the total amount of the Material Administrative Expense Claims pending a resolution of the EFH/EFIH Allocation Dispute.  As a result of this "double reserve," the PAB has not been able to make any Plan distributions to Holders of Allowed Claims at EFH and has only made a single distribution to Holders of Allowed Unsecured Claims at EFIH.  Following entry of a non-stayed Order resolving the EFH/EFIH Allocation Dispute, the PAB will be positioned to reasonably promptly make material Plan distributions for the benefit of EFH and EFIH unsecured creditors.

### III.    The Court's Conclusions Are Supported by the Evidentiary Record

155.    The Court makes the following conclusions as to the proper allocation of the Material Administrative Expenses:

| Material Administrative Expense Claim | Allocation to EFH | Allocation to EFIH |
|---|---|---|
| NEE Termination Fee Claim (*$275,000,000* if Allowed in full) | 5.4% (*$14,850,000.00*) | 96.6% (*$260,150,000.00*) |
| EFH/EFIH Debtors' Professional Fee Claims (Kirkland and Evercore) (*$136,903,558.88*) | 16% (*$21,904,569.42*) | 84% (*$114,998,989.46*) |
| E-Side Committee Professional Fees (*$48,005,807.17*) | 88% (*$42,245,110.31*) | 12% (*$5,760,696.86*) |
| Elliott's Substantial Contribution Claim (*$30,068,488.73*) | 5% (*$1,551,600*) | 95% (*$28,628,400*) |
| Total (*$489,977,854.78*) | 16.4% (*$80,551,279.73*) | 83.6% (*$409,538,086.32*) |

156.    The Court's conclusions are fully supported by the evidentiary record and result from a correct application of controlling law.

### IV.    Allocation of the Termination Fee

157.    The largest of the Material Administrative Claims is the claim for the Termination Fee in the amount of $275 million arising from the failed NextEra merger. A threshold question is at what point in time should the Court determine allocation of the claim as the value flowing to EFH creditors under the NextEra plan was different at various times.

158.    As of July 21, 2016, no value was flowing to EFH under the NextEra transaction – not even the assumption of asbestos liabilities as required under the E-Side Committee Settlement.

159.    By July 29, 2016 (the date of the NextEra Merger Agreement), NextEra had improved its bid by, among other things, increasing the cash purchase price by $310 million, and agreeing to assume and reinstate all asbestos liabilities of EFH, setting aside $250 million of the cash purchase price in the Asbestos Escrow.  These changes "cleared the EFIH stack" and provided some cash consideration to EFH and provided for the assumption of EFH asbestos liabilities.

160.    As the September 19, 2016 sale hearing approached, various parties, including key EFH creditors, continued to negotiate and, on the eve of the hearing, the E-Side Debtors and NextEra executed an amendment to the NextEra Merger Agreement pursuant to which NextEra agreed to (i) further increase the cash purchase price by $300 million and (ii) reduce the Asbestos Escrow from $250 million to $100 million.  The result of this amendment was to increase the cash consideration flowing to EFH to $471 million with the assumption of asbestos liabilities valued at $58 million remaining in place.  On September 19, 2016, the Court approved the NextEra Merger Agreement, which included the $275 million Termination Fee.

161.    On November 17, 2017, the Third Circuit issued the Third Circuit Makewhole Ruling, which reversed this Court's Makewhole Rulings and, thus, the E-Side Debtors could not close the NextEra transaction absent NextEra waiving the condition precedent.  NextEra refused to do so.  In the words of Mr. Horton, "$471 million was drained from EFH in that

instance, and about—the PIKs were impaired about 165 million."  Nonetheless, the Third Circuit Makewhole Ruling did not impact any other aspects of the NextEra Plan that benefitted EFH unsecured creditors.  The NextEra Plan still reinstated the asbestos claims and contemplated a tax-free transaction.  The NextEra Plan was confirmed on February 17, 2017.

162.    The appropriate time to determine the allocation of the Termination Fee is on the date the Court approved the NextEra Merger Agreement, i.e., September 19, 2016. Payment of the Termination Fee became a binding obligation upon Court approval. Moreover, the Court approved the merger agreement based upon the facts presented at the hearing, including the anticipated recovery to EFH creditors.

163.    As of September 19, 2016, the total cash and identifiable non-cash consideration flowing to the E-side Debtors under the NextEra Merger was $9.827 billion. The measurable consideration flowing to EFH was $471 million in cash and $58 million in assumed asbestos liabilities for a total of $529 million.  $529 million is 5.4% of $9.827 billion. Thus, EFH's allocation of the Termination Fee is 5.4% and EFIH's share is 94.6%.

## V.    Allocation of the Debtors' Professional Fee Claims

164.    The Movant's request to reallocate the Debtors' Professional Fee Claims fails on the facts and the law.  The Movants have not satisfied their burden with respect to their proposed reallocation of Debtor Professional Fees.  The facts clearly refute the Movant's position.  The Movants did not perform any quantifiable or statistical analysis regarding allegedly "misallocated" time or the economic effect of such alleged "misallocations." Moreover, the Movants' review of Debtor Professional Fees and Expenses was not

methodological and consisted primarily of searching time entries for specific terms, without evaluating those time entries for context within the Chapter 11 Cases when such time entries were recorded. In addition, and as an alternative to utilizing a more methodological approach capable of being evaluated for accuracy, Movants elected to highlight certain issues (i.e., EFIH's alleged solvency or workstreams related to the asbestos claims) as indicative of a flawed process, without conducting a simultaneous "bottom up" approach of their proposed reallocation. Finally, alleged singular inconsistencies within a professional's time entries or alleged inconsistencies between professionals are not sufficient, without more, to persuade the Court that a comprehensive reallocation of the Debtors' professionals' contemporaneous, good-faith, and reasonable allocation efforts is necessary or appropriate.

165.    The evidence shows that the Debtor professionals' process for the allocation of Debtor Professional Fees was reasonable and in good faith. The evidence shows that the Debtors conducted a reasonable process to insure the Debtor professionals' compliance with the Interim Compensation Order. Specifically, the evidence shows that Kirkland and Evercore executed a detailed and reasonable process for allocating fees and expenses. In Kirkland's case, this included: an intensive and iterative process for preparing and reviewing invoices; clear separation of matter numbers to indicate Direct Benefit and Collective Benefit Fees; direct engagement with the Debtors' legal team; and a memorialized billing process. Although the record indicates that Evercore engaged in a different process than Kirkland, Evercore was reasonably thorough and conscientious.

166.    In addition, the evidence shows that Kirkland's allocation of asbestos-, tax-, and makewhole-related services properly tracked the benefits conferred to each estate.  The record does not support Movants' assertions that EFH benefited more from a "tax-free spin" or that EFIH was solvent into late 2016.  The record does not support Elliott's claim that makewhole and asbestos-related services benefited EFH only.  Moreover, the record shows that Kirkland's post-TCEH Effective Date allocation of Collective Benefit Fees properly accounted for the disparity in debt between the EFH and EFIH estates.  This change in methodology was reasonable after the TCEH Effective Date in light of the emergence of all operating entities and the "joint" or "global" nature of the primary remaining workstreams (e.g., a joint EFH/EFIH plan, a joint EFH/EFIH disclosure statement, a joint EFH/EFH merger agreement).[28]  Moreover, no evidence was presented as to a reallocation of Evercore's fees and expenses or any other professional's fees and expenses, and thus there is no basis for reallocating Fees and Expenses incurred by Evercore or any other Professional.

167.    In short, there is insufficient evidence to warrant deviating from the inherent deference provided to professionals under the Interim Compensation Order for those professionals who contemporaneously allocated Fees and Expenses, and there is no evidence to support a viable, alternative, quantifiable methodology for re-allocation of professional fees and expenses.

---

[28]    The evidence also shows that Kirkland's Matter No. 76, though nominally billed as an EFIH Direct Benefit matter number, was actually allocated between EFH and EFIH in accordance with their respective funded debt figures, consistent with Kirkland's allocation methodology post-TCEH Effective Date and as disclosed in the Monthly Fee Statements.

168.    In addition, the law does not support Movant's position. Courts may award "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1). Fees of retained professionals must be reasonable and necessary to the administration of the particular debtor's case at the time the services were rendered. *See* 11 U.S.C. § 330(a)(3)(C) (an award for fees is made for services "beneficial at the time at which the service was rendered.")

169.    The fee and expense approval process must be done on a debtor-by-debtor basis, and professional fees and expenses that are not incurred for the benefit of a particular debtor should not be paid out of the estate of such debtor. *See In re Eagle Creek Subdivision, LLC*, No. 08-04292-8-JRL, 2009 WL 313383, at *3 (Bankr. E.D.N.C. Feb. 5, 2009) ("Section 330(a) of the Bankruptcy Code allows for the payment of professionals' fees that are necessary or beneficial to the case in which they are incurred. 11 U.S.C. § 330(a). It follows that each case must stand on its own when determining the allocation of professionals' fees among parallel debtors."); 3 COLLIER ON BANKRUPTCY § 330.04[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ("Expenses are deemed 'actual' when they are in fact incurred rather than based upon guesswork, formula or pro rata allocation, and when they are obviously attributable to a bankruptcy client.")

170.    A bankruptcy court has an independent "duty to review fee applications, notwithstanding the absence of objections." *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 841 (3d Cir. 1994). To conserve judicial resources, however, "*the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled.*" *Id.* at 845 (emphasis added).

171.    This Court must apply the cases governing the allowance of professionals faithfully.  But the perfect cannot be the enemy of the good.  A detailed item-by-item review of the professional fees by the Court in a case of this size and complexity is simply impossible and any attempt to do so would be a colossal waste of judicial resources.  In order to address this problem, the Court entered the Interim Compensation Order, which provided a mechanism for the professionals to allocate their fees and expenses among the respective estates.[29]  This was a wholly appropriate mechanism in a case of this complexity. When the allocation method in the Interim Compensation Order outlived its usefulness, Kirkland & Ellis modified its approach upon notice to the parties.  While the Court would have preferred counsel seeking a modification of the order, the modification was an appropriate mechanism to address the changing circumstances of the Chapter 11 Cases. Moreover, the allocations were subject to review and objection for over 4 years without any objection being asserted until this time.  While Movants have the right under the Interim Compensation Order to challenge the allocation at this time, the long passage of time without objection in this hotly contested case is significant.[30]

172.    Certainly, the Court has a duty to review fees, but establishing the mechanism in the Interim Compensation Order that relied on the professionals' allocations subject to notice and an opportunity for objection was sufficient and complied

---

[29]    The Court also appointed the Fee Committee to review and negotiate professional fees in these Chapter 11 Cases.  The service of the Fee Committee has been exemplary and of tremendous assistance to the Court.

[30]    The absence of any objection to any fee application in this highly contentious case is truly extraordinary.  The Court credits this result to the structure of the Fee Committee and the work of its members, which resulted in parties in interest "buying into" the fee review process.

with the holding in *Busy Beaver* that "the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled." *Id.* at 845. Moreover, as set forth above, the facts clearly refute the Movant's position.

173.    Thus, the Court concludes that the allocation methodology in the Interim Compensation Order as applied by the Debtors' professionals satisfied Sections 503 and 330 of the Bankruptcy Code. There is no reason to disturb the allocation of Kirkland's and Evercore's professional fees, which the Court understands to be 16% to EFH and 84% to EFIH.

## VI.    Allocation of the E-Side Committee Fees

174.    As discussed above, the Court may rely on the proper application of the procedure in the Interim Compensation Order to determine the allowance of fees and expenses in a case of this size and complexity. However, the evidence shows that the E-Side Committee did not properly allocate its fees and expenses under the Interim Compensation Order. Thus, the Court must undergo an independent analysis of the E-Side Committee's fees and expenses.

175.    In allocating the E-Side Committee Professional Fees, the Court recognizes that the E-Side Committee served as a fiduciary for all unsecured creditors of EFH and EFIH; however, when determining the actual and necessary expenses of the EFH and EFIH estates, this Court cannot ignore that the E-Side Committee's work streams during the Bankruptcy Cases were primarily targeted at preserving and possibly enhancing value for the EFH estate.

176.    The E-Side Committee's most significant contribution to these cases was its negotiation of the E-Side Committee Settlement, which was made possible by the E-Side Committee's ardent opposition to the Global Settlement.  The E-Side Committee Settlement resolved the E-Side Committee's objections to the Global Settlement and Hunt plan, but its provisions were for the primary benefit of EFH creditors.

177.    The E-Side Committee Settlement provided for reinstatement of EFH Class A3 claims (all of which are asbestos claims against EFH) and preserved 100% recoveries for holders of EFH Class A5, A8, and A9 claims.  It did not provide any similar reinstatement or enhanced recoveries for any class of EFIH unsecured creditors.

178.    In addition, the E-Side Committee acknowledged that its opposition to the Global Settlement was concerned primarily with what it viewed as the "fulcrum" class of EFH unsecured creditors because the E-Side Committee took "as a premise that all EFIH creditors will be paid in full in priority to EFH creditors."   The fact that the E-Side Committee was operating under this presumption in its efforts leading up to the E-Side Committee Settlement is significant because the vast majority of each E-Side Committee professional's services were rendered prior to this Court's approval of the E-Side Committee Settlement.

179.    Accordingly, the professional fees and expenses of the E-Side Committee is allocated 88% to EFH and 12% to EFIH.

## VII.    Allocation of Elliott's Substantial Contribution Claim.

180.    The Court has previously held that Elliott has "made a 'substantial contribution' to the Debtors' estate[s] as interpreted by the Third Circuit in *Lebron v. Mechem*

*Financial Inc.*, 27 F. 3d 937 (3d Cir. 1994). The Elliott Substantial Contribution Claim, however, remains subject to review for reasonableness. The Elliott Substantial Contribution Claim, which is in the amount of approximately $30 million, can be divided into 6 categories. The Court will address the categories separately.

181.    First, Elliott asserts that it incurred approximately $3.7 million, or just over 12% of the Elliott Substantial Contribution Claim, in connection with efforts to move the estates toward an alternative restructuring transaction once it became clear that the PUCT was likely to deny the NextEra transaction. At the time these fees were incurred and a contribution was made (Spring-Summer, 2017), the only value to EFH from the NextEra plan was the assumption of asbestos liabilities. Importantly, EFH was not sensitive to the passage of time so an early termination of the NextEra plan was of *de minimis* value to EFH. Thus, 100% of this portion of the claim is allocated to EFIH.

182.    Second, Elliott asserts that it incurred approximately $19.8 million, or approximately 66% of the Elliott Substantial Contribution Claim, in connection with Elliott's efforts to (i) oppose the E-Side Debtors' proposed transaction with Berkshire, (ii) develop an alternative creditor-led plan of reorganization to provide greater consideration to the E-Side Debtors' estates, and (iii) negotiate and work with the E-Side Debtors and Sempra to proceed with the financially superior Sempra transaction. Importantly, the treatment of EFH creditors under the Sempra plan was identical to that under the Berkshire plan. EFH creditors received no benefit from switching bidders. The only impediment to overcome was Elliott's ability to block confirmation because of its debt holdings, i.e., the Debtors could not cramdown a plan on Elliott without designating Elliott's votes. But, EFH can't be liable

for helping Elliott to solve a problem Elliott created in the first place.  Indeed, EFH may have been worse off at the time because execution risk was greater with Sempra than with Berkshire.  Of course, the Sempra transaction was superior to the extent it provided $450 million more value to the Debtors and Elliott's role in providing that value was critical but 100% of that increased value flowed to EFIH creditors and, thus, 100% of the related substantial contribution claim must be allocated to EFIH.

183.    Third, Elliott asserts that it incurred approximately $3.4 million, or just over 11% of the Elliott Substantial Contribution Claim, in connection with obtaining an order granting reconsideration of a prior order of the Court approving the $275 million Termination Fee.  Both EFH and EFIH benefitted from the disallowance of the Termination Fee.  This isn't related to the value received by the two estates from the imposition of the fee in the first place.  The Court has held above that the value EFH received from the approval of the Termination Fee was $471 million in cash and $58 million in assumed liabilities.  However, once approved by the Court, the Termination Fee became a joint and several liability of EFH and EFIH.  Obtaining reconsideration of the approval of the Termination Fee and avoiding joint and several liability benefitted both estates.  Thus the Court will allocate 30% of this portion of the claim to EFH and 70% to EFIH as requested by Movants.

184.    Fourth, Elliott asserts that it incurred approximately $1.5 million, or less than 5% of the Elliott Substantial Contribution Claim, in connection with negotiating the Sempra Plan and related ancillary documents, as well as advocating for both EFH and EFIH unsecured creditor matters relating to the Sempra Plan and confirmation proceedings.  Once it became clear that the Debtors were going to pursue the Sempra Plan, it became

important to the creditors of both EFH and EFIH that the plan be confirmed and, more importantly, go effective.  While EFH creditors did not face the time pressures confronted by EFIH creditors, EFH could not stay in bankruptcy forever.  The only way to unlock what little value was left at EFH for the benefit of its creditors was to confirm a plan.  Moreover, confirmation of the Sempra Plan would provide for the assumption of $58 million in EFH liabilities.  Finally, the Sempra Plan was a tax-free transaction, which benefitted EFH.  Thus the Court will allocate 30% of this portion of the claim to EFH and 70% to EFIH as requested by Movants.

185.    Fifth, Elliott asserts that it incurred approximately $680,000, or just over 2% of the Elliott Substantial Contribution Claim, in connection with helping to negotiate the Oncor Dividend Settlement, which provided a $31 million payment by Sempra to the E-Side Debtors' estates.  $3.75 million of $31 million payment went to EFH.  That is 12%.  Thus, 12% of this portion of the substantial claim is attributable to EFH with 88% allocable to EFIH.

186.    Sixth, Elliott asserts that it incurred approximately $1.1 million, or approximately 3.5% of the Elliott Substantial Contribution Claim, in connection with its efforts to obtain a resolution of a tax allocation dispute between EFH and Vistra in connection with a tax matters agreement between the parties.  Elliott's pursuit of this matter was unsuccessful and no funds flowed to the EFH estate.  Thus, 100% of this portion of the claim is allocated to EFIH.

187.    In sum, 5% of Elliott's substantial contribution claim is allocated to EFH and 95% to EFIH.

## CONCLUSION

For the reasons set forth herein, the Court finds that the allocation of the Material

Administrative Expenses is as follows:

| Material Administrative Expense Claim | Allocation to EFH | Allocation to EFIH |
|---|---|---|
| NEE Termination Fee Claim (*$275,000,000* if Allowed in full) | 5.4% (*$14,850,000.00*) | 96.6% (*$260,150,000.00*) |
| EFH/EFIH Debtors' Professional Fee Claims (Kirkland and Evercore) (*$136,903,558.88*) | 16% (*$21,904,569.42*) | 84% (*$114,998,989.46*) |
| E-Side Committee Professional Fees (*$48,005,807.17*) | 88% (*$42,245,110.31*) | 12% (*$5,760,696.86*) |
| Elliott's Substantial Contribution Claim (*$30,068,488.73*) | 5% (*$1,551,600*) | 95% (*$28,628,400*) |
| Total (*$489,977,854.78*) | 16.4% (*$80,551,279.73*) | 83.6% (*$409,538,086.32*) |

The parties are directed to submit an order under certification of counsel.

By the Court:

_____
Christopher S. Sontchi
Chief United States Bankruptcy Judge

Date: October 31, 2018