**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1109
_____

In re:  ENERGY FUTURE HOLDINGS CORP., et al,
Debtors

NEXTERA ENERGY, INC.,
Appellant
_____

On Appeal from the United States Bankruptcy Court
for the District of Delaware
(Bankruptcy Case No. 14-10979)
Bankruptcy Judge: Honorable Christopher S. Sontchi
_____

Argued
April 19, 2018
_____

Before: GREENAWAY, JR., RENDELL, and FUENTES,
*Circuit Judges*.

(Opinion Filed:  September 13, 2018)

Thomas M. Buchanan
Winston & Strawn

1700 K Street NW
Washington, D.C. 20006

Dan K. Webb
Winston & Strawn
35 West Wacker Drive, Suite 4200
Chicago, IL 60601

Howard Seife [Argued]
Andrew Rosenblatt
Eric Daucher
Norton Rose Fulbright
1301 Avenue of the Americas
New York, NY 10019

Jonathan S. Franklin
Norton Rose Fulbright
799 9th Street NW, Suite 1000
Washington, D.C. 20001

Matthew B. McGuire
Landis Rath & Cobb
919 Market Street
Suite 1800, P.O. Box 2087
Wilmington, DE 19899
            *Counsel for Appellant NextEra Energy, Inc.*


Douglas H. Hallward-Driemeir [Argued]
Jonathan R. Ference-Burke
Ropes & Gray
2009 Pennsylvania Avenue NW, Suite 1200
Washington, D.C. 20006

Gregg M. Galardi
Keith H. Wofford
Ropes & Gray
1211 Avenue of the Americas
New York, NY 10036
> *Counsel for Appellees Elliott Associates, L.P.,*
> *Elliott International, L.P., and Liverpool*
> *Limited Partnership*

Daniel J. DeFranceschi
Jason M. Madron
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE 19801

Mark E. McKane [Argued]
Kirkland & Ellis
555 California Street, Suite 2700
San Francisco, CA 94104

James H.M. Sprayregen
Marc Kieselstein
Andrew R. McGaan
Chad J. Husnick
Steven N. Serajeddini
Kirkland & Ellis
300 North LaSalle
Chicago, Illinois 60654

Michael A. Petrino
Kirkland & Ellis
655 15th Street NW
Washington, D.C. 20005

Edward O. Sassower
Stephen E. Hessler
Brian E. Schartz
Aparna Yenamandra
Kirkland & Ellis
601 Lexington Avenue
New York, NY 10022

> *Counsel for Appellee Energy Future Holdings Corp.*

_____

OPINION

_____

GREENAWAY, JR., *Circuit Judge*.

About a year after approving a merger agreement that called for the payment of a $275 million termination fee under certain conditions, the Bankruptcy Court in this Chapter 11 case admitted that it had made a mistake, granted a motion for reconsideration, and narrowed the circumstances under which the termination fee would be triggered. Were it not for the order granting reconsideration, Appellant NextEra Energy, Inc. would now be entitled to payment of the $275 million fee out of the bankruptcy estates. In pursuit of the payment, NextEra argues in this appeal that the Bankruptcy Court had it right the

first time and should have never granted the motion for reconsideration. NextEra contends first that the motion was untimely, before arguing alternatively that the motion should have been denied on the merits because the termination fee provision, as originally drafted, was an allowable administrative expense under 11 U.S.C. § 503(b). We, however, conclude that the Bankruptcy Court did not err in either respect. The motion for reconsideration was timely, and the Bankruptcy Court did not abuse its discretion in granting it. We will therefore affirm.

## I. BACKGROUND

### A.    The Approval of the Merger Agreement and Termination Fee

Shortly after initiating Chapter 11 bankruptcy proceedings, Debtors Energy Future Holdings Corp. ("EFH") and Energy Future Intermediate Holding Company LLC ("EFIH") began marketing their approximately eighty-percent economic interest in the rate-regulated business of Oncor Electric Delivery Co. LLC, the largest electricity transmission and distribution system in Texas.[1]  On July 29, 2016, Debtors entered into an Agreement and Plan of Merger with NextEra, under which NextEra would acquire Debtors' interest in Oncor.  The Merger Agreement, which reflected an approximately $18.7 billion implied total enterprise value for

---

[1] To be precise, Debtors in the underlying consolidated Chapter 11 proceeding are EFH and fourteen of its subsidiaries, including EFIH.

Oncor, stated that NextEra would provide approximately $9.5 billion in consideration to Debtors' estates.

The Agreement also included a Termination Fee provision, which obligated Debtors to pay NextEra $275 million if the agreement was terminated under certain circumstances. As Debtors' counsel later acknowledged before the Bankruptcy Court, this provision was "incredibly detailed." App. 547. It began by providing that Debtors would be required to pay the Termination Fee—sometimes referred to as a break-up fee—

> [i]f this Agreement is terminated . . . and any alternative transaction is consummated (including any transaction or proceeding that permits the [Debtors] to emerge from the Chapter 11 Cases) pursuant to which neither [NextEra] nor any of its Affiliates will obtain direct or indirect ownership of . . . approximately 80% equity interest in Oncor.

App. 182. In other words, payment would be triggered if NextEra did not ultimately acquire Debtors' interest in Oncor and Debtors either sold Oncor to someone else or otherwise emerged from the bankruptcy proceedings. But the provision then proceeded to list a number of exceptions to this default rule. It provided, for instance, that the Fee would not be payable if the parties mutually consented to terminate the Merger Agreement prior to closing, or if Debtors terminated because NextEra was in breach of the Agreement.

Most importantly for purposes of this appeal, the Fee provision also included an exception that was to govern if the Public Utility Commission of Texas ("PUCT") did not approve

6

the merger. That part of the provision stated that payment would not be triggered if the Agreement was "terminated . . . *by [NextEra]* . . . and the receipt of PUCT Approval (without the imposition of a Burdensome Condition) [wa]s the only condition . . . not satisfied or waived in accordance with this Agreement." App. 182 (emphasis added). The Fee provision said nothing, however, about whether the $275 million would be owed if, due to the PUCT's declining to approve the Agreement, *Debtors* took the initiative to terminate rather than NextEra. Thus, under those circumstances, the default rule applied: If the PUCT rejected the merger and Debtors consequently terminated the Agreement, they would owe NextEra $275 million upon the consummation of an alternative deal, regardless of whether that alternative was better for the estates.

Before the Merger Agreement could take effect, Debtors were required to obtain approval from the Bankruptcy Court, so, within days of finalizing the Agreement with NextEra, they filed an appropriate motion with the court. In that Approval Motion, Debtors explained the Termination Fee provision as follows:

> Upon Court approval of the Merger Agreement, EFH Corp. and EFIH are liable for the Termination Fee, in the amount of $275 million, as an allowed administrative expense claim, in the event of certain termination events in accordance with the Merger Agreement. The Termination Fee is not payable in the event of, among other things, certain terminations resulting from breaches by NextEra or Merger Subsidiary or following a termination by NextEra at the Termination Date (as defined in

7

the Merger Agreement) where PUCT approval is the only closing condition not satisfied. . . .

The Merger Agreement includes provisions that allow for any higher or otherwise better bids to emerge. From the execution of the Merger Agreement until entry of the Approval Order, the Debtors may solicit, initiate, and facilitate higher or otherwise better offers without paying the Termination Fee. . . . If the Debtors terminate the Merger Agreement following entry of the Approval Order to accept another proposal, and the transaction contemplated by such other proposal is consummated, the Debtors would owe the $275 million Termination Fee.

App. 397–98 (citation omitted).

On September 19, 2016, after several creditors objected to the proposed merger, the Bankruptcy Court held a hearing regarding the Approval Motion. During that hearing, William Hiltz, a member of Debtors' financial advisory team testified about whether the Termination Fee would be triggered upon failure to achieve approval from the PUCT:

THE COURT: [I]f the Court confirms the . . . NextEra deal, and that plan does not consummate because of a failure to achieve regulatory approval, is the break-up fee payable?

MR. HILTZ: If the Debtor enters into another transaction, the answer is yes.

8

THE COURT: But if this transaction simply falls apart because you don't get regulatory approval from the Public Utility Commission?

MR. HILTZ: Well, again, I think if the Debtor enters into another transaction including a reorganization involving its own creditors . . . it would be payable.

THE COURT: . . . [B]ecause if this plan gets confirmed for Debtors—not anything the Debtors do wrong, they don't get the regulatory approval they need—this falls apart and a year and a half from now they confirm a different plan that's not even a sale plan, say it's a standalone plan, that break-up fee would be payable?

MR. HILTZ: I believe so.

App. 535. Although Hiltz's testimony did not address the critical distinction between whether it was Debtors or NextEra that initiated the termination upon PUCT disapproval, it was otherwise accurate: payment of the Fee did not necessarily hinge on whether either party was at fault for the PUCT's failure to approve, and the "alternative transaction" that would trigger payment did not need to be a sale plan. Rather, as Hiltz acknowledged to the Bankruptcy Court, the alternative could be a standalone plan—meaning a resolution without the involvement of a third party, under which at least some creditors would have to agree to accept less than one hundred percent payment and instead take debt and/or equity issued by a reorganized company.

Later on at the hearing, however, Debtors' counsel contradicted Hiltz's testimony. Initially, counsel informed the court that the Fee would not be payable if the PUCT rejected the plan and "NextEra walk[ed]." App. 541. But minutes later, counsel added:

> Suffice to say there's no break-up fee if the PUC[T] just denies—outright denies approval. But if the PUC[T] imposes the burdensome condition which is a significant hurdle, . . . a break-up fee is triggered.

App. 547. This statement was inaccurate in that the triggering of the Fee did not turn on whether the PUCT outright rejected the merger or instead imposed a "burdensome condition," which a different provision of the Merger Agreement defined with specificity. Rather, as we have said, whether the Fee became payable upon PUCT disapproval hinged on whom it was that took the initiative to terminate the agreement—Debtors or NextEra. Thus, it was incorrect to state "there's no break-up fee if the PUCT . . . outright denies approval." In reality, if the PUCT flat-out rejected the merger, the Fee would be payable, so long as it was the Debtors who terminated.

Debtors' counsel's misstatement was never corrected during the September 19 hearing, though, and at the conclusion of the hearing, the Bankruptcy Court entered an order approving the Merger Plan and Agreement. The Approval Order authorized Debtors to enter into the merger, approved the Termination Fee on the terms provided for in the Agreement, and authorized Debtors to pay the Termination Fee to NextEra as an allowable administrative expense to the extent it became due and payable under the Agreement. The Order further provided that, in the event the Fee became payable,

10

EFH and EFIH would agree on the allocation of the payment between their respective estates, and then seek the Bankruptcy Court's approval of such allocation. If EFH and EFIH were ultimately unable to agree on how to divide the payment, the Order stated that the Bankruptcy Court "would determine the appropriate allocation of the Termination Fee" between the estates. App. 455. Indeed, the Bankruptcy Court, was to "retain jurisdiction over any matter or disputes arising from or relating to the interpretation, implementation or enforcement of th[e] Order." App. 456.

Later reflecting on Debtors' Approval motion, the objections raised by the various creditors, and the September 19 hearing, the Bankruptcy Court would state that no one "focused the Court on a critical fact: the Merger Agreement did not set a date by which approval by the [PUCT] had to be obtained." App. 19. "Consequently," the court wrote, no party made it aware "that if the PUCT did not approve the NextEra Transaction, the Debtors could eventually be required to terminate the Merger Agreement and trigger the Termination Fee unless NextEra terminated first of its own volition." App. 19–20 (emphasis omitted). And, according to the court, "under no foreseeable circumstances would NextEra terminate the Merger Agreement . . . [b]ecause NextEra had the ability to hold out . . . until the Debtors were forced by economic circumstances to terminate." App. 26 (emphasis omitted). Put differently, because there was no date by which PUCT approval had to be obtained before the merger dissolved automatically, in the face of regulatory rejection, NextEra could simply be patient, pursue all possible appeals, and wait for Debtors to terminate first, which would allow NextEra to collect the $275 million Termination Fee.

**B.    The Bankruptcy Court's Reconsideration of the Approval Order**

On September 22, 2016, three days after the Bankruptcy Court entered the Approval Order, the PUCT held a hearing at which one of its Commissioners expressed concerns over the Fee. Perhaps due to Debtors' counsel's misstatement at the September 19 hearing before the Bankruptcy Court, the Commissioner appeared to be under the false impression that the Fee would be payable if the PUCT imposed burdensome conditions, but not if it outright rejected the merger. And perhaps partly based on that impression, he stated that the Termination Fee "appear[ed] to be an effort to really tie the [PUCT's] hands" and force it to approve the merger without any burdensome conditions. App. 690. In the Commissioner's eyes, if the PUCT imposed certain conditions on its approval, then NextEra would just hold out for payment of the Termination Fee, which the Commissioner feared might come from Debtors' "only asset," Oncor—to the detriment of Oncor's customers. App. 694. NextEra's purported hope, then, according to the Commissioner, was that the PUCT would be reluctant to trigger payment of the Fee, and would therefore approve the merger as proposed in order to prevent such payment.

In the aftermath of the Commissioner's statement, Debtors and NextEra submitted a letter to the Bankruptcy Court on September 25, seeking to clarify the terms of the Termination Fee provision. The letter began by stating the parties' joint view was that "NextEra Energy is not entitled to a termination fee under the merger agreement if NextEra Energy terminates the merger agreement because the [PUCT] either approves the merger agreement transaction with 'burdensome conditions' (as defined in the merger agreement)

12

Case: 18-1109 Document: 003113075005 Page: 18 Date Filed: 11/01/2018

or does not approve the merger agreement transaction." App. 702. This statement corrected part of Debtors' counsel's misstatement from the September 19 hearing, but it did not address the critical related issue: what would happen if the PUCT rejected the merger or approved it with burdensome conditions *and NextEra did not terminate*.

That issue the letter waited until the penultimate paragraph to discuss:

> In other words, the $275 million termination fee is triggered if EFH and/or EFIH terminate the merger agreement as a consequence of the Commission either not approving the merger agreement transaction or approving the merger transaction with the imposition of imposing of a burdensome condition. In order for EFH and/or EFH to pursue an alternative transaction, EFH and EFIH believe that they would only terminate in such a situation if they had an alternative proposal to pursue. The termination fee is not triggered if, under the same circumstances NextEra Energy terminates the merger agreement instead of EFH and/or EFIH.

App. 702. Importantly, like the Approval Motion and the testimony at the September 19 hearing, the letter neglected to explain that the Merger Agreement did not set a date by which approval by the PUCT had to be obtained before the merger dissolved on its own.

The next day, at a previously scheduled hearing, the Bankruptcy Court detoured from the agenda to address the comments of the PUCT Commissioner and the parties'

subsequent letter. The court acknowledged that it was "sympathetic" to the Commissioner's concerns, but it appeared to be put at ease by the parties' letters. App. 715. According to the court, in the letter, "the parties clarified that . . . NextEra will not seek to collect any portion of the termination fee contemplated by the merger agreement in the event NextEra terminates" because of PUCT rejection or PUCT approval with burdensome conditions. App. 716. Again, though, it never came up that that the Merger Agreement did not provide a date by which PUCT approval had to be achieved. Instead, the court proceeded to briefly address the Commissioner's concern that Oncor would be on the hook for the Termination Fee if it became payable. It spelled out that the fee was "an issue for the Bankruptcy Court and the creditors of EFH and EFIH, and not for the PUCT, Oncor, and the rate payers," because if the fee was triggered it would "constitute an administrative expense claim payable by EFH and EFIH." App. 717. Consequently, the court "encourage[d] the [PUCT] to review the proposed merger . . . with an unblinking eye and in no way to be influenced by the possible triggering of the termination fee." App. 718. The court then moved on to the previously scheduled agenda. It made no changes to the September 19 Approval Order.

The next month, NextEra and Oncor submitted their Joint Application for change of control of Oncor to the PUCT. The Application asked for the PUCT to drop two central features of a "ring-fence" the PUCT had previously imposed on Oncor when it was owned by Debtors: (1) the requirement that Oncor maintain an independent board of directors, and (2) the ability of certain minority shareholders to veto dividends. NextEra would not negotiate with regard to either feature, leading members of the PUCT to refer to them as "deal killers."

*E.g.*, App. 765, 772.  In April 2017, the PUCT formally denied the Joint Application, concluding that the merger was not in the public interest under the Texas Public Utility Regulatory Act.   The parties subsequently filed two requests for reconsideration, but NextEra continued to hold firm on the deal-killer terms.  The PUCT denied both requests for the same reasons provided in its original decision.

According to the Bankruptcy Court, at this point, the merger was "clearly dead."   But NextEra showed no indications of terminating the agreement.  Instead, it filed an appeal in Texas state court.  In the words of the Bankruptcy Court, NextEra made it "clear that [it] would appeal the PUCT's decision to all levels of review, leaving the Debtors no choice but to terminate the Merger Agreement and risk triggering the Termination Fee or else incur months or years of continued interest and fee obligations."  App. 28.

On July 7, 2017, Debtors formally terminated the Merger Agreement based on the failure to obtain regulatory approval and NextEra's alleged breach of the Agreement.  The same day, Debtors entered into a different merger agreement with another party.

A few weeks later, on July 29, 2017, Appellees Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott"), who are creditors of Debtors, filed the motion to reconsider at issue in this appeal.  In its motion, Elliott sought reconsideration of the Approval Order to the extent that the Approval Order authorized Debtors to pay the Termination Fee under circumstances where the parties failed to obtain PUCT approval and Debtors were resultantly forced to terminate the Agreement in order to pursue an alternative transaction.

Within days, NextEra filed a competing application with the Bankruptcy Court seeking allowance and payment of the Termination Fee upon Debtors' consummation of the alternative transaction, to which Elliott objected based on the same grounds as in its motion to reconsider.

The Bankruptcy Court ultimately granted Elliott's motion, explaining that it had "fundamentally misapprehended the facts as to whether the Termination Fee would be payable if the PUCT failed to approve the NextEra Transaction." App. 45. The court rejected NextEra's argument that the motion was untimely, concluding instead that the Approval Order was interlocutory because it "d[id] not resolve all issues relating to the Termination Fee," such as the allocation of the Fee between the Debtors' estates. App. 36. In the alternative, the court ruled that it was appropriate to grant the motion even if the Approval Order was a final order, because "the interest of justice outweigh[ed] the interest of finality." App. 45.

On the merits, the court concluded that, had it possessed complete knowledge of the facts at the time the Approval Motion was filed, it could not have approved the Termination Fee. Specifically, the court held that the Fee was not an "actual, necessary cost[] and expense[] of preserving the estate" under 11 U.S.C. § 503(b)(1)(A), because "[p]ayment of a termination or break-up fee when a court (or regulatory body) declines to approve the related transaction cannot provide an actual benefit to a debtor's estate sufficient to satisfy" the statutory requirement. App. 43.

Accordingly, the Bankruptcy Court amended the Approval Order to provide that:

> The Termination Fee, upon the terms and
> conditions of the Merger Agreement, is approved
> in part and disallowed in part. The Termination
> Fee is disallowed in the event that the PUCT
> declines to approve the transaction contemplated
> in the Merger Agreement and, as a result, the
> Merger Agreement is terminated, regardless of
> whether the Debtors or NextEra subsequently
> terminates the Merger Agreement. In those
> circumstances, the EFH/EFIH Debtors are not
> authorized to pay the Termination Fee as a
> qualified administrative expense or otherwise.
> The Termination Fee is otherwise approved.

App. 12. NextEra then filed a timely appeal of the Bankruptcy
Court's decision, and this Court agreed to hear the appeal
directly and on an expedited basis pursuant to 28 U.S.C.
§ 158(d)(2).

## II. JURISDICTION

The Bankruptcy Court had jurisdiction under 28 U.S.C.
§§ 157 and 1334(b). We have jurisdiction under 28 U.S.C.
§ 158(d)(2).

## III. DISCUSSION

On appeal, NextEra argues that the Bankruptcy Court
erred in granting Elliot's motion to reconsider for two
independent reasons. First, NextEra contends that the motion
should have been denied because it was untimely. Second,
NextEra argues that, even if the motion was timely, it should
have been denied on the merits because, regardless of any
misapprehension of the facts, the Bankruptcy Court was right

in its initial determination that the Termination Fee, as originally drafted, was an allowable administrative expense under 11 U.S.C. § 503(b); thus, in NextEra's view, there was no error of law requiring correction.

## A.     The Timeliness of Elliott's Motion for Reconsideration

As the Bankruptcy Court correctly recognized, the timeliness of Elliott's motion depends in part on whether the September 19, 2016 Approval Order was an interlocutory or a final order. The Federal Rules of Bankruptcy Procedure do not expressly authorize motions for reconsideration. But bankruptcy courts, like any other federal court, possess inherent authority, *see Law v. Siegel*, 571 U.S. 415, 420–21 (2014), and such authority permits courts to reconsider prior interlocutory orders "at any point during which the litigation continue[s]," as long as the court retains jurisdiction over the case, *State Nat'l Ins. Co. v. Cty. of Camden*, 824 F.3d 399, 406 (3d Cir. 2016). Thus, if the Approval Order was interlocutory, no strict time limit applied to Elliott's motion for reconsideration.

If, on the other hand, the Approval Order was final, Elliot's motion would be subject to the time restrictions of Federal Rule of Civil Procedure 60. *See* Fed. R. Bankr. P. 9024 (providing that, with limited exceptions, Rule 60 applies in cases under the Bankruptcy Code); Fed. R. Civ. P. 60(b) ("On motion and just terms, the court may relieve a party . . . from a final judgment, order or proceeding."). When based on mistake, newly discovered evidence, or fraud, a motion brought under Rule 60(b) must be brought within one year of the entry of the underlying order, and under all circumstances, such a motion "must be made within a reasonable time." Fed.

R. Civ. P. 60(c). Here, Elliott's motion was filed less than a year after the Approval Order was filed, but NextEra argues that the motion was not made within a reasonable time because, according to NextEra, Elliott could have raised its arguments at the time the merger was initially approved.

We generally review timeliness determinations for an abuse of discretion. *See Bailey v. United Airlines*, 279 F.3d 194, 202–03 (3d Cir. 2002) (reviewing for abuse of discretion determination that motion for summary judgment was timely); *see also In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817 (3d Cir. 1982) ("[M]atters of docket control . . . are committed to the sound discretion of the District Court."). But the threshold question of whether the Approval Order is interlocutory or final is a legal issue that turns on the interpretation of Rule 60—that is, whether the Approval Order constitutes a "final . . . order" under the Rule. We exercise plenary review over such questions involving the interpretation of the Federal Rules of Civil Procedure. *Garza v. Citigroup, Inc.*, 881 F.3d 277, 280 (3d Cir. 2018). Accordingly, here, we first exercise plenary review over the Bankruptcy Court's conclusion that the Approval Order was interlocutory. Once we have answered that initial question, we review any remaining aspects of the Bankruptcy Court's timeliness determination for an abuse of discretion. *See Bailey*, 279 F.3d at 202–03.

Turning to the initial question, we begin by noting that the rules of finality and appealability are different in the bankruptcy context than in ordinary civil litigation. Because "[a] bankruptcy case involves 'an aggregation of individual controversies,'" *Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1692 (2015) (quoting 1 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 5.08[1][b] (16th ed. 2014)), "Congress

has long provided that orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger case," *id.* (quoting *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 657 n.3 (2006)). Indeed, the bankruptcy appeals statute "authorizes appeals of right not only from final judgments in cases but from 'final judgments, orders, and decrees . . . in cases and proceedings.'" *Id.* (omission in original) (quoting 28 U.S.C. § 158(a)).

In light of these general principles, we have adopted a flexible, pragmatic approach to finality in the bankruptcy context. *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 97 (3d Cir. 1988). Among the factors relevant to this approach are "(1) 'the impact of the matter on the assets of the bankruptcy estate,' (2) 'the preclusive effect of a decision on the merits,' and (3) 'whether the interests of judicial economy will be furthered'" by an immediate appeal. *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 314 (3d Cir. 2011) (quoting *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 104 (3d Cir. 1988)). The ultimate question, however, is whether the order "fully and finally resolved a discrete set of issues, leaving no related issues for later determination." *In re Taylor*, 913 F.2d 102, 104 (3d Cir. 1990); *see also Bullard*, 135 S. Ct. at 1692.

Applying a flexible, pragmatic approach here, we agree with the Bankruptcy Court that the Approval Order was interlocutory. Assuming the "discrete set of issues" for purposes of finality was those related to the Termination Fee provision, the Order still reserved questions for later determination. For one, the Order did not resolve how the Fee would be allocated between EFH's and EFIH's respective estates in the event it became payable. Rather, at a minimum, the Order required the Bankruptcy Court to approve an

allocation proposed by EFH and EFIH at a later date. Thus, the Fee could not be paid without further court action. If EFH and EFIH were unable to agree on such an allocation, the Order provided that the Bankruptcy Court would have to determine an appropriate allotment. That the Approval Order left this allocation question unanswered is critical to the finality analysis, because it means that the impact of the Order itself on the assets of the respective estates was both uncertain and far-off. The later allocation determination very well might have had significant effects on the rights of other interested parties, too, as we can assume that EFH and EFIH do not share all of the same creditors. Even in the flexible, pragmatic world of bankruptcy, "[f]inal does not describe th[e] state of affairs" when "parties' rights and obligations remain unsettled." *Bullard*, 135 S. Ct. at 1692.

It was not only the allocation issue that remained up in the air either. Although the Approval Order authorized Debtors to enter into the Merger Agreement and pay the Termination Fee "to the extent it bec[a]me[] due and payable pursuant to the terms and conditions of the Merger Agreement," the Order also expressly provided that the Bankruptcy Court was "retain[ing] jurisdiction over any matter or disputes arising from or relating to the interpretation, implementation or enforcement of th[e] Order." App. 455–56. As it turns out, such a dispute has arisen: in a separate adversary complaint that is not at issue in this appeal, Debtors have alleged that, even if the Termination Fee provision were enforced as originally drafted and approved, NextEra still would not be entitled to the Fee, because, according to Debtors,

21

NextEra breached the Merger Agreement.[2]  It is exactly this kind of dispute over which the Bankruptcy Court retained jurisdiction in the Approval Order.  Because the Approval Order left open the possibility that the Bankruptcy Court would need to decide when the Fee was payable, it was uncertain that the Order itself would have any impact on the estates without further court action.

Nonetheless, according to NextEra, the discrete question for purposes of finality here was whether the Termination Fee provision satisfied the legal standard applicable to administrative expenses under 11 U.S.C. § 503(b).  In NextEra's view, the Approval Order was final because, by its own terms, it provided that the Termination Fee was approved "without any further proceedings before, or order of, the Court."  App. 455.  But this argument overlooks the fact that the Order's very next sentence provided the significant caveat that the Bankruptcy Court would have to approve the allocation of the Fee between the estates.  Thus, as we have said, in reality, the Fee could not have been paid until further court action took place.

---

[2]  Debtors' adversary complaint, which seeks a declaratory judgment, was filed in the Bankruptcy Court before Elliott's motion for reconsideration was granted.  *See* Adversary Complaint, *Energy Future Holdings Corp. v. NextEra Energy, Inc.*, (*In re Energy Future Holdings Corp.*), Ch. 11 Case No. 1:14-bk-10979, Adv. No. 17-50942 (Bankr. D. Del. Aug. 3, 2017).  At oral argument before this Court, counsel for NextEra represented that the adversary proceeding has been put on "hiatus" pending our resolution of this appeal. Tr. of Oral Arg. at 11.

Also, the Supreme Court recently rejected a conception of finality that "slic[ed] the case too thin." *Bullard*, 135 S. Ct. at 1692 (dismissing Debtor's argument that "each time the bankruptcy court reviews a proposed plan . . . it conducts a separate proceeding" for purposes of the bankruptcy appeals statute). NextEra's proposed conception here, in our view, would do just that: single out a particular question about a particular provision of a merger agreement, chop it off the broader case, and deem it its own separate issue. This conception takes our flexible, pragmatic approach to finality too far.

Because we conclude that the Approval Order was interlocutory, Elliott's motion to reconsider was subject to no explicit time restriction. Instead, the only timeliness argument that NextEra might have is the doctrine of laches. To assert a laches defense, NextEra would have to show that Elliott inexcusably delayed its motion and that NextEra was prejudiced as a result of such a delay. *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 226 (3d Cir. 2007). Laches is an equitable doctrine, however, and the decision of whether to recognize it as a defense in a particular case is left to the discretion of the lower courts. *Id.* Here, we cannot say that the Bankruptcy Court abused its discretion in refusing to bar Elliott's motion because of laches. The motion was filed less than a year after the Approval Order was issued, within weeks of Debtors terminating the Merger Agreement, and actually before NextEra had even filed its application seeking payment of the Termination Fee. The Fee provision in the Merger Agreement was also complicated, and the record was muddled at the time the Bankruptcy Court was making its approval decision. Under these circumstances, we are unable to conclude that Elliott *inexcusably* delayed the filing of its

motion.[3]   The Bankruptcy Court therefore did not abuse its discretion in determining that the motion was timely.

## B.   The Merits of Elliott's Motion for Reconsideration

### 1.   The Applicable Legal Standard

Turning to the merits of Elliott's motion, we must first identify the applicable legal standard.  We have, on occasion, stated that lower courts "possess[] inherent power over interlocutory orders, and can reconsider them when it is consonant with justice do so."  *State Nat'l Ins. Co.*, 824 F.3d at 417 (quoting *United States v. Jerry*, 487 F.2d 600, 605 (3d Cir. 1973)); *see also Roberts v. Ferman*, 826 F.3d 117, 126 (3d Cir. 2016) ("'[T]he law of the case doctrine does not limit the power of trial judges to reconsider their prior decisions,' but . . . when a court does so, it must explain on the record why it is doing so and 'take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling.'" (quoting *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997))).  The Bankruptcy Court here, however, thought that its task required

---

[3] NextEra argues that we should bar Elliott's motion as untimely because "the alleged infirmities forming the basis" of the motion "all occurred (or failed to occur) before the Bankruptcy Court entered the Approval Order."  Appellant's Br. at 28–29.  And yet, according to NextEra, "Elliott sat on its hands for nearly a year, waiting to see if it would reap the benefits of a successful transaction induced by approval of the Termination Fee." *Id.* at 33.  The Bankruptcy Court was better equipped than we are to evaluate this contention, however, and there simply is no evidence in the record before us that Elliott acted with the motive NextEra alleges.

a little more. In part because bankruptcy proceedings "involve[] the routine entry of interlocutory orders," the Bankruptcy Court concluded that parties in bankruptcy cases should not be permitted to relitigate previously decided issues "without good cause." App. 30. The court therefore subjected Elliott's motion to the same standard that governs motions to alter or amend a judgment under Federal Rule of Civil Procedure 59(e). *See* Fed. R. Bankr. P. 9023 (incorporating Rule 59). According to that standard, such a motion should be granted only where the moving party shows that at least one of the following grounds is present: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [made its initial decision]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *United States ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 848–89 (3d Cir. 2014) (quoting *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)).

In our view, the Bankruptcy Court's approach makes sense, at least in the context of an order approving a merger agreement and accompanying termination fee provision. If courts could freely amend any interlocutory bankruptcy order, the larger proceedings would be fraught with uncertainty, and parties could never rely on prior decisions. Accordingly, we will assess the merits of Elliott's motion using the same standard employed by the Bankruptcy Court.

In seeking reconsideration, Elliott has not alleged an intervening change in the law or the availability of new evidence. Its motion is instead based entirely on the third basis for reconsideration provided above: the need to correct a clear error of law or fact or prevent manifest injustice. In granting the motion, the Bankruptcy Court concluded that it "had a

25

fundamental misunderstanding of the critical facts when it [initially] approved the Termination Fee" because it was unaware that the Merger Agreement did not set a date by which PUCT approval had to be obtained. App. 38. This factual error, the court said, led it to incorrectly apply the law governing the permissibility of termination fees in bankruptcy cases. According to the court, had it "properly apprehended the facts at the time" it was considering Debtors' Approval Motion, "it could not have approved" the Termination Fee provision as it was originally drafted. App. 44. In other words, the Bankruptcy Court had committed "manifest errors" of both fact and law, which required the court to amend the September 19 Approval Order so that payment would not be triggered when the Merger Agreement was terminated—by either party—as a result of the PUCT's failure to approve the transaction. App. 47.

To affirm, we need only conclude that the Bankruptcy Court committed a clear error of fact *or* law, as the relevant standard is disjunctive. *See, e.g.*, *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010) (citing *Max's Seafood*, 176 F.3d at 677). We have never adopted strict or precise definitions for "clear error of law or fact" and "manifest injustice" in the context of a motion for reconsideration, and we do not endeavor to do so here. We have, however, suggested that there is substantial, if not complete, overlap between the two concepts. *See, e.g.*, *id.* ("The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact . . . ." (first alteration in original) (quoting *Max's Seafood*, 176 F.3d at 677)). To state what may be obvious, the focus is on the gravity and overtness of the error. *See, e.g.*, *Burritt v. Ditlefsen*, 807 F.3d 239, 253 (7th Cir. 2015) ("A 'manifest error' occurs when the district court

commits a 'wholesale disregard, misapplication or failure to recognize controlling precedent." (quoting *Oto v. Metro Life. Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000))); *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 195 (1st Cir. 2004) ("[A] manifest error is '[a]n error that is plain and indisputable, and that amounts to a complete disregard of the controlling law.'" (second alteration in original) (quoting Black's Law Dictionary 563 (7th ed. 1999))). Thus, Elliott must show more than mere disagreement with the earlier ruling; it must show that the Bankruptcy Court committed a "direct, obvious, [or] observable error," *Manifest Injustice*, Black's Law Dictionary (10th ed. 2014), and one that is of at least some importance to the larger proceedings.

Despite this heightened standard, we review a lower court's determination regarding a motion to reconsider for an abuse of discretion. *See, e.g.*, *Howard Hess*, 602 F.3d at 246. To the extent the Bankruptcy Court's determination was based on factual findings, we review such findings for clear error. *Id.* To the extent its determination was "predicated on an issue of law, such an issue is reviewed de novo." *Max's Seafood*, 176 F.3d at 673 (italics omitted). Here, however, we are presented with no such legal issue, because the decision to allow or deny a termination fee is itself reviewed for only an abuse of discretion. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 205 (3d Cir. 2010).

## 2.     The Bankruptcy Court's Claimed Error of Fact

Review of the Bankruptcy Court's purported factual error is relatively straightforward. The parties agree that the Merger Agreement did not set a date by which PUCT approval had to be achieved. Although the Bankruptcy Court made no

27

express finding on the subject before it issued the Approval Order, it later said that it was unaware that the Agreement failed to provide such a date. As a starting point, we think the best source for information about the Bankruptcy Court's subjective understanding is the court itself. Indeed, we must accept the Bankruptcy Court's factual conclusions regarding its own subjective understanding unless they are clearly erroneous. *See Max's Seafood*, 176 F.3d at 673; c*f. Monsanto Co. v. E.I. Du Pont de Nemours & Co.*, 748 F.3d 1189, 1198 (Fed. Cir. 2014) (reviewing for clear error district court's findings that a party "had made factual misrepresentations of its subjective understanding"). We see no reason to second-guess the Bankruptcy Court's admission that it initially failed to recognize the absence of a deadline for PUCT approval, because there was no mention of any such deadline in Debtors' Approval Motion, the September 19 hearing testimony, or the September 25 letter submitted by Debtors and NextEra.

NextEra contends that it would have been unusual for the Agreement to include a deadline for regulatory approval and that "[a]ccordingly, there was no need for the parties to call attention to the fact that the transaction followed standard market practice." Appellant's Br. at 18. But even assuming NextEra is correct in its description of standard market practices, its argument addresses a different issue than the one before us. NextEra's contention is essentially that the Bankruptcy Court *should have* developed an accurate understanding of the facts in the first instance based on the record that was developed. Our inquiry is more limited, though. The relevant question for our purposes is whether the Bankruptcy Court—justified or not—misapprehended the facts at the time it issued the Approval Order. Absent any indication in the record that the Bankruptcy Court knew that

the Merger Agreement did not include a deadline for PUCT approval, we cannot say that the court's findings with regard to its own subjective understanding were clearly erroneous.

### 3.     The Bankruptcy Court's Claimed Error of Law and Decision to Reconsider the Approval Order

Of course, the significance of the Bankruptcy Court's error of fact depends on how the error impacts the underlying legal determination—that is, the permissibility of the Termination Fee under the original terms of the Fee provision. If the factual error was central to the relevant legal calculus, we think it appropriate to deem it a *clear* or *manifest* error warranting reconsideration.  If, on the other hand, the factual error had only a tangential impact on the legal determination, the Bankruptcy Court would have abused its discretion in concluding that it was a manifest error.  The question then would be whether, setting aside the factual error, the Bankruptcy Court had committed a legal error so indisputable and fundamental that it rose to the level of a manifest error of law.

The legal calculus begins with our decision in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.) (O'Brien)*, 181 F.3d 527, 532 (3d Cir. 1999), where we held that courts do not have the authority to "create a right to recover from [a] bankruptcy estate where no such right exists under the Bankruptcy Code."  As a result, termination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503, which, in relevant part, permits the payment of post-petition administrative expenses only to the extent that they constitute "the actual, necessary costs and expenses of preserving the

29

estate," 11 U.S.C. § 503(b)(1)(A) (2012). *See O'Brien*, 181 F.3d at 535. In light of this statutory requirement, we rejected application of a business judgment rule, under which a requested termination fee would be approved if the debtor had a good faith belief that the fee would benefit the estate. *O'Brien*, 181 F.3d at 535. "[T]he allowability of break-up fees," we said, instead "depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate."[4] *Id.*

How can a termination fee provide such a benefit to a debtor's estate? In *O'Brien*, we recognized two possible ways. First, we said that "such a benefit could be found if assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, "if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can

---

[4] We explained that this standard applies to all requests for terminations fees, as long as the claimed right to recover "arose after [the debtor] filed for bankruptcy protection and began marketing its assets for sale." *O'Brien*, 181 F.3d at 532; *see also id.* at 535 (reasoning that there existed no "compelling justification for treating an application for break-up fees and expenses under § 503(b) differently from other applications for administrative expenses"). Thus, it is immaterial that *O'Brien* differed from this case in that the bankruptcy court there "had specifically denied breakup fees as part of the sale process." Dissenting Op. at 4. Here, like in *O'Brien*, NextEra's right to recover the Termination Fee arose after Debtors had initiated the bankruptcy proceedings. *O'Brien* therefore applies.

rely, the bidder may . . . provide[] a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.* A decade after *O'Brien*, we identified a third way a termination fee could preserve the value of an estate: by assuring that a bidder "adhered to its bid rather than abandoning its attempt to purchase . . . in the event that the Bankruptcy Court required an auction for [the] sale" of the relevant asset. *In re Reliant Energy*, 594 F.3d at 207.

It bears emphasis, however, that we have always said these are ways a termination fee *might* confer a benefit on an estate. *See, e.g.*, *O'Brien*, 181 F.3d at 537 (explaining that these were instances "where a benefit could be found" or "may" be found). We have never held that bankruptcy courts must allow fees whenever they find that one of the above features is present. Rather, it is ultimately within a bankruptcy court's discretion to approve or deny a termination fee based on the totality of the circumstances of the particular case. *See In re Reliant Energy*, 594 F.3d at 205. Exercising that discretion and taking into account all of the relevant circumstances, the bankruptcy court must make what is ultimately a judgment call about whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is "actually necessary to preserve the value of the estate," *O'Brien*, 181 F.3d at 535. *See In re Reliant Energy*, 594 F.3d at 208 (holding that the bankruptcy court did not abuse its discretion in denying a proposed fee when the "potential harm to the estate the break-up fee would cause by deterring other bidders from entering the bid process outweighed" the benefit the fee might have conferred by securing a bidder's adherence to its bid).

Here, the Bankruptcy Court's error of fact means that the Bankruptcy Court had overlooked a significant potential

harm when it initially approved the Termination Fee as drafted by the parties. The Bankruptcy Court failed to initially recognize that Debtors had essentially gambled on PUCT approval. If the PUCT declined to approve the merger, Debtors would owe the $275 million Termination Fee unless NextEra took the initiative to terminate the Agreement first. But the Bankruptcy Court did not appreciate that, since the Merger Agreement included no deadline by which PUCT approval had to be obtained before the deal would dissolve on its own, NextEra had little incentive to terminate the agreement first on its own volition. Instead, NextEra could simply wait for Debtors to terminate, which would trigger payment of the $275 million Fee. Under those circumstances, the Termination Fee would provide no benefit to estates. It would in fact be detrimental: not only would the estates be out $275 million, but Debtors would be back to square one and, with the passage of time, in a worse off position—desperate to accept an alternative transaction.

Due to its factual error, the Bankruptcy Court failed to weigh this potential harm to the estates against the potential benefits. There is no question that the Termination Fee conferred some benefit by inducing NextEra to make the highest bid that Debtors received. *See O'Brien*, 181 F.3d at 537. But we cannot look at that benefit in a vacuum. Unlike the circumstances contemplated in *O'Brien*, NextEra's bid was not designed to provide a competitive benefit. And although the Termination Fee was intended to induce NextEra to adhere to its bid, *see In re Reliant Energy*, 594 F.3d at 207, this benefit was potentially negated by the perverse incentive that could result. Indeed, the Fee provision would potentially induce NextEra to adhere to its bid in a particular way. It would allow NextEra to hold firm against any burdensome conditions.

Rather than negotiate on its "deal killer" conditions, NextEra could remain uncompromising and pursue appeals until Debtors were forced to terminate the Agreement out of financial necessity.

Looking at the totality of the circumstances, we do not think the Bankruptcy Court abused its discretion in concluding that a scenario where "Debtors were forced to terminate the Merger Agreement . . . because NextEra had the Debtors in a corner . . . would have been predictable" had the court possessed a complete understanding when it initially approved the Termination Fee.[5]  With an accurate view of the facts, one would have seen that, by inducing NextEra's bid, the Termination Fee *might eventually* maximize the value of the estates—assuming the deal closed.  This the Bankruptcy Court recognized at the outset.  But the Fee also created substantial financial risk if the PUCT did not approve the transaction and, as a result, closing did not take place.  When it initially approved the Fee, the Bankruptcy Court did not fully appreciate this risk.  A court also could have, in exercising its discretion, determined that the Fee provision would itself make closing less likely to occur, because if the PUCT imposed conditions that NextEra did not like, NextEra would have less

---

[5] Contrary to the Dissent's suggestions, *see* Dissenting Op. at 2, the Bankruptcy Court, in its opinion, stated explicitly that it was not using hindsight when reconsidering the issue of whether the Termination Fee was allowable, and we see nothing in the record or the Bankruptcy Court's reasoning that contradicts this disclaimer.  We therefore need not reach the question of whether it is permissible for a court to act based on hindsight when considering a proposed termination fee's compliance with *O'Brien*.

reason to compromise and could instead simply wait for the Debtors to terminate and trigger payment of the $275 million Fee. This problem the Bankruptcy Court, by its own admission, completely missed when it approved the Fee.

In sum, the Termination Fee provision had the potential of providing a large benefit to the estates, but it also had the possibility to be disastrous. Once it had a complete understanding, the Bankruptcy Court properly weighed the various considerations and determined that the potential benefit was outweighed by the harm that would result under predictable circumstances. In other words, the risk was so great that the Fee was not necessary to preserve the value of Debtors' estates. Having made such a determination, the Bankruptcy Court did not abuse its discretion in denying the Fee in part.[6]

The Bankruptcy Court also did not abuse its discretion in concluding that its previous factual error was a *clear* or *manifest* one that justified the partial denial of the Fee on a motion for reconsideration.[7] As we have already explained,

---

[6] According to the Dissent, it was error for the Bankruptcy Court to "engage[] in an after-the-fact assessment of benefit to the estates as if no initial approval had been granted." Dissenting Op. at 4. But an "after-the-fact assessment" is inevitable in the context of a motion for reconsideration, and the court did not act "as if no initial approval had been granted." Rather, as we have said, it subjected itself to the heightened Rule 59(e) standard.

[7] We therefore need not reach the question of whether the court also committed a manifest error of law and do not hold, as the Bankruptcy Court did, that "[p]ayment of a

the error of fact was obvious and indisputable.  Indeed, NextEra concedes that the Merger Agreement did not include a date by which PUCT approval had to be obtained.  The factual error also had a substantial impact on the Bankruptcy Court's *O'Brien* analysis, as the above discussion illustrates.  The error led the court to fundamentally misjudge the likelihood that the Termination Fee would be harmful to the estates.

To be sure, we have said that when a court reconsiders a prior decision, it must "take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling." *Roberts*, 826 F.3d at 126 (quoting *Williams*, 130 F.3d at 573). Here, NextEra purportedly spent a significant amount of money in its attempt to obtain PUCT approval.  As NextEra acknowledges, however, it has an alternative way to seek reimbursement for those expenses: its Application for Allowance and Payment of Administrative Expenses in the amount of nearly $60 million is currently pending before the Bankruptcy Court.  We are also mindful of the fact that NextEra believed for roughly a year that it would be entitled to payment of the Termination Fee if Debtors terminated the Agreement due to the PUCT's declining to approve the merger, and that NextEra formed expectations accordingly.  But we

---

termination or break-up fee when a court (or regulatory body) declines to approve the related transaction can[] [never] provide an actual benefit to a debtor's estate sufficient to satisfy the *O'Brien* standard," App. 43.  We hold only that the Bankruptcy Court did not abuse its discretion in concluding that, in this particular case, the risk of harm was so great that the Termination Fee was not necessary to preserve the value of Debtors' estates.

think general principles of reliance were adequately protected in this case by the heightened Rule 59(e) standard that the Bankruptcy Court employed.

That the heightened standard was satisfied here is in and of itself proof that this case is anomalous. Reconsideration was warranted only because the Bankruptcy Court failed to discern a critical fact that profoundly altered the underlying legal determination. If we were presented with anything less, our conclusion may very well have been different. Reconsideration remains a form of relief generally reserved for "extraordinary circumstances." *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). And yet, it is also a form of relief generally left to the discretion of lower courts. That, of course, is no accident. It is a product of our recognition that some "fact-bound issues . . . are ill-suited for appellate rule-making," *United States v. Tomko*, 562 F.3d 558, 565 (3d Cir. 2009) (en banc), and that the matters under our review have often been "decided by someone who is thought to have a better vantage point than we on the Court of Appeals," *id.* (quoting *United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004)). *See generally id.* at 564–66 (discussing principles underlying the abuse of discretion standard in both civil and criminal cases). In this case, we have little doubt that the Bankruptcy Court was "better positioned . . . to decide the issue[s] in question." *McLane Co., Inc. v. EEOC*, 137 S. Ct. 1159, 1166–67 (2017) (quoting *Pierce v. Underwood*, 487 U.S. 552, 560 (1988)). Having examined the record and the Bankruptcy Court's reasoning closely, we cannot say that it abused its discretion in taking the unusual step of reconsidering its prior decision.

## IV. CONCLUSION

For the foregoing reasons, we will affirm the Bankruptcy Court's Order granting Elliott's motion for reconsideration.

*In re:  ENERGY FUTURE HOLDINGS CORP.*

*No. 18-1109*

---

**RENDELL**, <u>Circuit Judge</u>, dissenting:

While I am reluctant to dissent because I have no doubt that the Bankruptcy Court carefully considered its decision to reverse course and disallow the previously approved Termination Fee, two significant aspects of this case concern me: first, the grant of a delayed reconsideration motion when there had been no clear error of fact or law, and, second, the flawed analysis of the benefit to the estates as though there had been no pre-approval of the Fee as part of the Merger Agreement.  I conclude that the Bankruptcy Court abused its discretion in granting reconsideration, and, therefore, I disagree with the Majority's affirmance of the Bankruptcy Court's order.

Admittedly, the facts of the case presented a difficult situation for the Bankruptcy Court.  The Next Era deal would have brought $9.5 billion to the estates.  When that deal failed to obtain regulatory approval, the Debtors were forced to terminate and seek a new deal, which would bring "materially less" to the estates.[1]  The Bankruptcy Court was thus faced

---

[1] Elliott Br. at 19.

with the prospect of further depleting the estates by payment of the $275 million Termination Fee.[2]

Nonetheless, the reconsideration of the previously approved Fee was uncalled for. The Bankruptcy Court may have "misapprehended" that the Fee would be payable in the situation that developed, but this was no legal or factual error. It was simply a failure to appreciate a particular set of potential consequences which became apparent in the light of day. But hindsight cannot justify nullifying a material term of the deal that was struck with all of the facts on the table. Here, the parties fully appreciated the potential scenarios at the time the Fee was initially approved. Indeed, when Elliott filed the reconsideration motion, the Debtors—who had every incentive to cry foul as to the initial deal and avoid paying the Fee—opposed Elliott's motion, calling the motion "Machiavellian."[3]

The Bankruptcy Court seems to say that had it appreciated this eventuality, it would not have approved the Fee, but this defies logic and common sense. The Court had considered the Fee and its importance to the deal extensively in its initial approval of it as part of the Merger Agreement.

---

[2] I submit that the fact that the Debtors were left to accept a less favorable deal is the real culprit. Had the Debtors terminated to pursue a higher and better offer after regulatory approval of the Next Era deal was denied, there would have been no reconsideration of the initial approval of the fee. Indeed, that would have been a common scenario that the Fee guarded against. Thus, the issue of the denial of regulatory approval or an end date for approval is a red herring.

[3] A. 1206.

2

The many benefits to the estates were apparent to the Bankruptcy Court. In particular, the Court stated, "I think the evidence overwhelmingly indicates that a breakup fee was necessary to induce NextEra to make a bid, and to move forward with a merger agreement,"[4] and "[i]t's clear that the termination fee went up at the end of the process but it went up primarily, I believe, because they walked away from the match right, and the combination of match right, lower breakup fee was replaced with no match right and a higher breakup fee."[5] With regard to the size of the Fee, the Court concluded, "[1.47%] is an appropriate number for a case of this size"—that is, $18.7 billion—and "[t]he evidence is clear that this is on the low end of utility-type transactions [and] on the low end of this Court's experience with regard to breakup fees that I have approved numerous times."[6] Clearly, the Fee was a necessary and integral aspect of the deal. Indeed, NextEra would have "walked" without it.[7] The Debtors urged the Court to approve the Fee as part of the deal, lest they have to go "back to the drawing board."[8] The Bankruptcy Court engaged in a thoughtful assessment of the Fee's value to the deal.[9] Thus, there was no legal flaw in the

---

[4] A. 578.

[5] A. 579.

[6] A. 578.

[7] A. 483-85.

[8] A. 549.

[9] Although, as explained below, the controlling precedent, *O'Brien* and *Reliant*, involved consideration of the fee when presented later as a cost of administration, rather than when pre-approved as part of a sale agreement, the "benefit" or "value" of the fee is the standard for both. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, No. 09-11204, 2009 WL

original approval, let alone a clear error.    Therefore, reconsideration was unwarranted.

But the Bankruptcy Court's reasoning suffers from another infirmity.  It engaged in an after-the-fact assessment of benefit to the estates as if no initial approval had been granted, citing to *O'Brien* and *Reliant*.  The Court reasoned that the Fee was not an allowable administrative expense under 11 U.S.C. § 503(b)(1)(A) because "[p]ayment of a termination or break-up fee when a court (or regulatory body) declines to approve the related transaction cannot provide an actual benefit to a debtor's estate sufficient to satisfy the *O'Brien* standard."[10]  The Court considered what *did* happen and conducted an *O'Brien* analysis anew.  But this after-the-fact assessment of benefit was improper because the Fee had initially been approved as part of the Merger Agreement.

*O'Brien* and *Reliant* are distinguishable because, in those cases, the court had specifically denied breakup fees as part of the sale process.  The issue before us involved the denial of the later, post-sale requests for the fee by the unsuccessful bidders as an administrative expense under § 503.[11]  As the Majority notes here, in the Approval Order the

---

3242292 (Bankr. E.D. Pa. Oct. 8, 2009), *rev'd in part on other grounds*, 418 B.R. 548 (E.D. Pa. 2009) (using *O'Brien* to analyze whether to authorize a breakup fee pre-auction).

[10] A. 43.

[11] It is interesting to note that in both *O'Brien* and *Reliant*, the bankruptcy courts did not dismiss the unsuccessful bidders' later requests out-of-hand but seriously considered the role their bids had played in moving the sale process forward when assessing the value to the estates.  The Bankruptcy

Bankruptcy Court had already authorized the Debtors to pay the Fee as an allowable administrative expense that preserved value for the estates to the extent it became due and payable under the Merger Agreement.[12]

The United States Court of Appeals for the Fifth Circuit has noted this tension in *In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011). There, the Court observed that "[t]he unsuccessful bidders in *O'Brien* and *Reliant Energy* sought payment for expenses incurred without the court's pre-approval for reimbursement, and thus section 503 was the proper channel for requesting payment." *Id.* at 602. Here, due to the previous approval, the Bankruptcy Court's analysis of the after-the-fact benefit to the estates—or lack thereof—was misplaced. The Fee had been properly approved as part of the Merger Agreement, and there was no issue of allowance after the fact of an administrative expense. All that remained was to allocate and pay the previously approved Fee. There is no place in our precedent for a "double" § 503 analysis, where a party could seek approval of a fee as a term of a deal and then get another bite at the *O'Brien* apple, urging there was no value, if the deal sours. And yet that is what the Bankruptcy Court did here.

The reconsideration of a previously approved term of a deal, based on a bankruptcy court's failure to appreciate all of

---

Court's reasoning here, however, focused on later events, namely the denial of regulatory approval, as depriving the bid of value. I suggest this was off target, even if it had not been an abuse of discretion to entertain a motion for reconsideration.

[12] Majority Op. at 10.

the potential ramifications of the term, sets a troubling—if not dangerous—precedent.   Parties to commercial transactions present the terms of the deal to the court for approval and, once approved, are entitled to rely on the court's order, which is based on a thoughtful, well-reasoned analysis.   Here, that should have been the guiding principle, and the grant of reconsideration so as to nullify the previously approved Fee when there was no clear error of fact or law was an abuse of discretion.