**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | x | |
| **In re** | : | **Chapter 11** |
| | : | |
| **ENERGY FUTURE HOLDINGS CORP.** *et al.,* | : | **Case No. 14-10979 (CSS)** |
| | : | |
| **Debtors-in-Possession.** | : | **(Jointly Administered)** |
| | : | |
| | x | Hearing Date:  November 13, 2018 at 10:00 a.m. E.T. |

**FEE COMMITTEE'S SUMMARY REPORT CONCERNING**
**UNCONTESTED INTERIM AND FINAL FEE APPLICATIONS AND SUBSTANTIAL**
**CONTRIBUTION FEE REQUESTS FOR**
**HEARING ON NOVEMBER 13, 2018 AT 10:00 A.M. E.T.**

TO:    THE HONORABLE CHRISTOPHER S. SONTCHI,
         UNITED STATES BANKRUPTCY JUDGE:

The Court, counsel, financial professionals, Debtors and creditors have lived these

Chapter 11 proceedings for four years, and few reading this report would benefit from an

historical summary—even in the context of final fee applications.  Just two days ago, the Court

itself provided a comprehensive historical summary in its decision on the allocation of reserves

and expenses [D.I. 13599].[1]  These cases are among the most, if not the most, complicated

corporate reorganizations any bankruptcy court has faced and arguably the least predictable in

the twists and turns that will culminate with a final fee hearing on November 13, 2018.

At that hearing, the Court will consider final requests of $209,574,472.44 in professional

fees and $8,606,822.22 in expenses before any final adjustments recommended by the Fee

Committee from 20 estate-compensated professional firms—that is, from all but three of the

---

[1] "This has been a long, complicated and expensive case….Much happened and much was spent."  *Id.*, *Findings of Fact and Conclusions of Law on Joint Motion to Fix Appropriate Allocation of Certain Reserves and Expenses as Between the EFH and EFIH Debtors*, at 1 (the "Allocation Decision").

Retained Professionals.  In addition, three creditor groups have submitted requests under

11 U.S.C. § 503(b), which total $71.5 million, discussed later in this Report.[2]  Now, the Court

will again exercise its statutory mandate to determine whether the professional fees and expenses

being paid by the Debtors are "reasonable and necessary" to the administration of these cases

under the Bankruptcy Code.

Neither this Report, nor the Court's hearing on November 13, 2018, will resolve all of the

pending final applications.  The Fee Committee continues to discuss several significant issues at

length, both internally and with several Retained Professionals.  Consistent with its approach

throughout, the Fee Committee's communications with all of the professionals have remained

confidential to encourage mutual good faith efforts to resolve differences.  To allow discussions

to continue—primarily with the Debtors' principal counsel and with the counsel for the

disinterested directors—the Court has accommodated the Fee Committee's request for a final

hearing on December 17, 2018, for the few applications not otherwise addressed here.  The Fee

Committee intends to submit those remaining applications with a supplemental report at least

one week prior to that December hearing.  However, in light of the consensus reached on 21 final

applications and 29 section 503(b) fee requests, the Fee Committee saw no reason to delay its

unanimous recommendation to approve them now.

## RECOMMENDATIONS

Most of the professional fees requested in the Final Applications already have been

awarded on an interim basis without objection.  The four-member Fee Committee has reviewed

each of the Final Applications, individually and in the aggregate, discussing them at every

---

[2] Eleven additional professionals already have been awarded $128.9 million in final fees and expenses with the emergence of the Debtors' generation, distribution, and retail subsidiaries (the "**T-Side**").  *See Omnibus Order Awarding Final Request for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses* [D.I. 11072].

meeting since its May 10, 2018 meeting.  In the preceding three and a half years, the interim review process addressed nearly a dozen interim applications each from each one of more than 30 professional firms with an aggregate total of $507 million in requested fees and expenses—all subject to this final review process.

Attached to this report (the "**Report**") as **Exhibits D-1** through **D-20** (and summarized on **Exhibit A**) are worksheets outlining each Retained Professional's interim fee requests, the agreed deductions embodied in each of the Court's interim compensation orders, and the total fees and expenses recommended for approval on a final basis.[3]  The Fee Committee recommends that, in a final order,[4] the Court now integrate the resolutions negotiated on an interim basis without further significant adjustment—excepting only the three identified applications deferred until the December 17, 2018 hearing. *See infra* at 4 & n.5.

After reviewing fee applications for twelve interim periods, discussing them with the applicants at length, negotiating adjustments, and reviewing and reconciling each of the Final Applications, the Fee Committee has concluded that the fees and expenses requested for approval and discussed in this Report meet the statutory and administrative standards for reasonableness and necessity.  *See generally* 11 U.S.C. § 330; 3 *Collier on Bankruptcy* ¶ 330.03 (Richard Levin & Henry J. Sommer eds., 16th ed. 2018).  Accordingly, the Fee Committee recommends the Court's approval of:

1.    Twenty-one applications for the final fee period, summarized on **Exhibit A**, requesting final fees and expenses, adjusted by consent (each a "**Final Application**" and,

---

[3] In most instances, each of the Final Applications accurately incorporated the interim adjustments.  A few professionals requested the sum of each of their initial interim requests, however, necessitating a final re-adjustment to capture the interim fee deductions previously negotiated, reported, and ordered.

[4] A form of final fee order is attached to this report as **Exhibit E**.

collectively, the "**Final Applications**").[5]  The Final Applications incorporate five remaining

interim fee applications, summarized on **Exhibit B**, requesting $5,832,123.66 in interim fees and

$123,960.55 in deferred interim expenses, adjusted by consent (the "**Interim Applications**").[6]

2.      Twenty-nine fee requests of professional firms, representing three creditor groups,

summarized on **Exhibit C** (the "**Substantial Contribution Fee Requests**"), seeking estate

reimbursement of $69,282,894.90 in professional fees and $2,273,715.25 in expenses pursuant to

the *Order Confirming the First Amended Joint Plan of Reorganization of Energy Future*

*Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH*

*Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 12763] (the "**Confirmation**

**Order**") and the *Order Allowing Administrative Expense Claim for Fidelity Management &*

*Research Company's Substantial Contribution Pursuant to Sections 503(b)(3)(D) and 503(b)(4)*

*of the Bankruptcy Code* [D.I. 11050] (the "**Fidelity Substantial Contribution Order**"), adjusted

by consent.[7]

The Fee Committee recommends that the Court approve the applications addressed in this

Report at or before the hearing scheduled for November 13, 2018.  Only one objection has been

---

[5] Three final fee applications remain pending and under discussion: the *Final Fee Application of Kirkland & Ellis LLP and Kirkland & Ellis International LLP, Attorneys for the Debtors and Debtors in Possession, for the Period From April 29, 2014 Through and Including March 9, 2018* [D.I. 13019] requesting $172,805,511.20 in fees and $10,433,832.69 in expenses; the *Final Application of Proskauer Rose LLP, Counsel for Debtor Energy Future Holdings Corp., for Compensation for Services Rendered and Reimbursement of Expenses Incurred from November 19, 2014 Through March 9, 2018* [D.I. 13021] requesting $22,998,289.61 in fees and $459,756.06 in expenses; and the *Final Fee Application of Shaw Fishman Glantz & Towbin LLC as Special Delaware Counsel for the Debtors and Debtors in Possession for the Period August 14, 2017 Through and Including March 9, 2018* [D.I. 13014] requesting $31,877.00 in fees and $282.89 in expenses.  The Fee Committee expects to report on them at the December 17, 2018 hearing, concluding its substantive work on these cases.  Assuming all pending fee applications and requests are resolved at or before the December hearing without objection, the Fee Committee chair and counsel will prepare and submit their own final fee applications on or around February 15, 2019.

[6] Two additional interim fee applications—the eleventh and twelfth interim fee period applications of Proskauer Rose LLP—remain pending and under discussion [D.I. 12683, 13001].

[7] The Court's latest decision discusses throughout the question of substantial contribution, addressing the role of clients and professionals alike, and this Report is consistent with that discussion with the relatively minor exceptions noted.  *E.g.*, Allocation Decision ¶¶ 132-143, 147-151; *see infra* at 16 & n.17.

filed—the majority creditors filed a preliminary and generic objection to 19 of the Final

Applications, *Majority Creditors' Omnibus Preliminary Objection Regarding Final Fee*

*Applications* [D.I. 13107] (the "**Majority Creditors' Objection**"), stating an intent to

supplement the objection and "reserv[ing] all rights, claims, and objections regarding the scope,

quality, necessity and reasonableness of fees and expenses sought in connection with…" the

Final Applications.  To the Fee Committee's knowledge, no supplement has been filed.

## BACKGROUND

The long interim review process, and the Court's approval of the interim applications as

adjusted and without objection, contribute both to the form and the substance of this Report.

Unlike the previous Fee Committee reports, it does not identify and discuss each Retained

Professional in the narrative, nor does it make individual qualitative assessments of the

professionals' services—in part because the Court has done that on occasion [D.I. 7255,

at 81-82, l. 2-25; D.I. 10865, at 54-57, l. 23-11].  Instead, the Report offers quantitative

recommendations and conclusions in the exhibits and, in the narrative, observations to help

enhance public understanding of a very difficult and expensive undertaking.

Restructuring an energy conglomerate with more than $31 billion in secured debt and

66,000 claims is, at the risk of understatement, no small task.  Add to that four groups of Debtor

professionals, zealously competing *ad hoc* creditor groups, and dozens of contentious contested

matters, an initially arduous task becomes more even more daunting.  With four separate plan

processes over 48-months and unusual legal issues yielding several published appellate

decisions, the final amount of requested professional fees nevertheless remains startling,

notwithstanding the length and complexity of the proceedings.

These costs did not go unchecked.  While the Court has observed that the value of any fee

review process cannot be measured by the amounts "saved" [D.I. 7896, at 18-19, l. 11-6;

D.I. 6675, at 15, l. 2-23], the Fee Committee process yielded millions in direct deductions from the fees and expenses initially requested.  *See* **Exhibits D1-D20**.  In addition to the time and effort spared the Court and its staff, these "savings" do not include incalculable amounts that professionals elected not to bill because of the Fee Committee's sometimes intrusive review.

As expected in a case spanning nearly four years and twelve interim compensation periods, professionals' timekeeping and billing practices improved significantly over time.  In successive fee periods, the Fee Committee recommended an increasing number of applications for interim Court approval without major adjustments.  However, there were—and are— exceptions.  Throughout, professionals have been generally responsive to the Fee Committee's requests for information and cooperative in discussing and resolving areas of concern.

### Fee Committee Composition and Process

Empaneled on August 21, 2014 pursuant to the *Stipulation and Order Appointing a Fee Committee* [D.I. 1896] (the "**Fee Committee Order**"),[8] the Fee Committee's composition has changed twice.  Richard Gitlin, the Independent Member and Chair,[9] and Richard Schepacarter on behalf of the U.S. Trustee have served since the Fee Committee's inception.  After confirmation of the T-Side Plan of Reorganization, *see Amended Order Confirming the Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 7285], Tony Horton and Paul Keglevic replaced Cecily Gooch as the Debtors' co-representatives.  Mr. Keglevic left EFH shortly after the E-side's emergence on March 9, 2018.  Mr. Horton remains the director of the Plan Administrator Board

---

[8] Superseded by *Order Amending Stipulation and Order Appointing Fee Committee and Granting Related Relief* [D.I. 12552] and *Further Amended Stipulation and Order Appointing a Fee Committee* [D.I. 13574] (together, the "**Amended Fee Committee Order**").

[9] Capitalized terms in this Report not otherwise defined have the meanings ascribed in the Amended Fee Committee Order.

for EFH and EFIH (the "**PAB**").  After contested proceedings beginning late last year, Howard J.

Kaplan replaced Peter Kravitz as the Official Committee of Unsecured Creditors' representative.

*See Notice of Appointment of EFH/EFIH Official Committee Representative to the Fee*

*Committee* [D.I. 12506].  Since January 22, 2018, Mr. Kaplan has participated in all of the Fee

Committee's meetings and deliberations and has concurred with the Fee Committee's decisions

and recommendations after the date of his appointment, except as noted separately.[10]

The Fee Committee has worked under the leadership of its Chairman, primarily through

monthly meetings that included extensive discussions of issues—large and small—identified in

the review of the voluminous professional fee requests.  To date, the Fee Committee has met on

more than 65 separate occasions, most often in New York, deliberating for hundreds of hours, to

arrive at the recommendations summarized in its interim reports [D.I. 3147, 3356, 3522, 4774,

4807, 6548, 7850, 7873, 8800, 9257, 9908, 11038, 11413, 12148, 12611, 13141, 13519] and,

ultimately, in this Report.

Before each meeting, counsel to the Fee Committee developed with the Chairman an

agenda and detailed materials, including an extensive data analysis of the time spent and the

activities described in each of the fee applications, to help inform the Fee Committee's

discussions.  Counsel reported at each meeting on, among other things, the detailed results of the

review process, the feedback from Retained Professionals, and the progress made with respect to

the consensual resolution of interim fee applications.

---

[10] If a Fee Committee Letter Report "is not unanimously approved by the Fee Committee, any Fee Committee Member may prepare a written dissent, which shall be transmitted along with the Fee Committee Letter Report to that Retained Professional, with a copy to the Debtors, the Committee and the U.S. Trustee."  Amended Fee Committee Order at 10, ¶ F(1).  As noted above, the Fee Committee has not yet resolved all of the issues relating to several professionals.  *See supra* at 4 & n.5.

The Fee Committee articulated a comprehensive set of written, case-specific principles that it applied to each interim and, now, these Final Applications.  Those principles led to a quantitative and qualitative review of the applications and the data and documentation submitted in support of them.  For every professional for nearly every period, the Fee Committee approved a confidential letter report with detailed exhibits itemizing and quantifying identified deficiencies and concerns.  Finally, the Fee Committee requested, received and evaluated supplemental information from professionals and negotiated with each professional on consensual deductions leading to interim Court approval on an uncontested basis.

In some instances, counsel developed new reporting formats and protocols in direct response to requests of Fee Committee members for more detailed or nuanced analysis.  By way of example, after several rounds of reporting, Fee Committee members noted a significant variance in the amount of time—both absolute and relative—that professional firms spent on retention and fee application-related matters.  The Fee Committee requested more detailed reporting on eight categories of retention and application-related fees.  *See infra* at 13.

At least since the U.S. Court of Appeals decision in *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833 (3d Cir. 1994), there has been little controversy about the standard for applying section 330 of the Bankruptcy Code.  *See* Allocation Decision ¶ 170 at 76-77.  This Court has supplemented that appellate precedent with its own decisions.  *E.g.*, *In re Molycorp, Inc.*, 562 B.R. 67, 81-83 (Bankr. D. Del. 2017) (approving $8.6 million in compensation on recommendation of a fee examiner); *In re Cal Dive Int'l, Inc.*, No. 15-10458, 2015 WL 9487852 (Bankr. D. Del. Dec. 28, 2015).

The final word on Final Applications, like interim applications, always is the Court's.  Any compensation or reimbursement approved during the proceedings remains subject to

adjustment (and disgorgement) if the applicant has not met its burden of proof in the final review process. *See*, *e.g.*, *In re Taxman Clothing Co.*, 49 F.3d 310, 312, 314 (7th Cir. 1995); *In re Evangeline Ref. Co.*, 890 F.2d 1312, 1321 (5th Cir. 1989) (*cited with approval In re Culp*, 550 B.R. 683, 694 (D. Del.)). Here, the unusual amount sought in the applications, individually or in the aggregate, does not change the basic legal and administrative standards, which the Fee Committee has applied in reaching its recommendations.

While the Fee Committee's review evaluated compliance with all of the requirements and guidelines established by the Bankruptcy Code, the Executive Office of the U.S. Trustee, and the Fee Committee, the unique history of these cases resulted in a particular focus—and extensive discussion and deliberation—on several central issues.

### Flat Fee Retained Professionals

This case has been unique in any number of ways, including successive plan confirmation proceedings, interspersed with periods of relatively little activity for some professionals. The initial RSA, ultimately terminated, led to the confirmation of the "Hunt/REIT" plan late in 2015. The first of several "quiet periods" ensued, as the parties awaited the Texas Public Utilities Commission's ("**PUCT**") separate and independent regulatory decisions. By spring 2016, it was clear that the PUCT would not approve the proposed and confirmed transaction, and the professionals began work on "Plan B," a freestanding plan for the T-Side Debtors. After a second series of confirmation hearings, the T-Side emerged in October 2016, terminating the engagements of 11 retained professionals, *see supra* at 2 & n.2, and shifting the focus to the marketing and sale of the Debtors' controlling interest in Texas' largest transmission utility, Oncor.

A third plan process yielded the confirmed NextEra plan in February 2017 with another quiet period while the state regulatory process continued. By late spring 2017, it had become

regrettably clear that the PUCT would not approve the NextEra transactions either, and the professionals shifted their work once more to a fourth plan—built, first, upon the proposed sale of Oncor to a Berkshire Hathaway entity and, finally, to Sempra.

As a result of this procedural history, flat fee financial professionals retained pursuant to section 328(a) of the Bankruptcy Code could continue collecting monthly flat fees—as much as $525,000 per month—even during long periods of little activity.  (Of the total amounts of fees and expenses requested in the Final Applications, about 40 percent is attributable to financial firms.)  Cognizant of the "improvident" standard under section 328(a),[11] the Fee Committee carefully monitored the activities of flat fee professionals, including monthly hours reported, concluding that the serial quiet periods constituted a circumstance not capable of being anticipated at retention.  Thus, the Fee Committee concluded, some of the flat fee arrangements required adjustment, though the judicial precedent applying section 328 limited the Fee Committee's reach. *See, e.g.*, *In re Relativity Fashion, LLC*, No. 15-11989, 2016 WL 8607005 (Bankr. S.D.N.Y. Dec. 16, 2016).

After months of data analysis and discussion, the Fee Committee met individually with each flat fee financial professional to hear their perspectives and enhance the committee's appreciation for each professional's role.  Ultimately, most of the flat fee professionals accepted significant adjustments to their agreed compensation with one professional shifting from flat fee to hourly billing at the request of one of the Debtors.  In all, the Fee Committee negotiated more

---

[11] "[T]he court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  11 U.S.C. § 328(a).

than $9.6 million in reduced monthly flat fees and an additional $2.5 million in transactional fee adjustments.[12]

During the interim fee review process, some professionals continued to request full monthly fees but agreed to their recommended disallowance or to a reduction in the originally-negotiated transaction fees.  Other professionals voluntarily suspended even billing their flat fees, incorporating negotiated reductions in their final requests.  As a result, only some of the flat fee savings are included as deductions summarized on **Exhibit A** and detailed in **Exhibit D**.

Despite voluntary reductions, some issues involving flat fees are inherent.  The customary practices of the market for financial services (including the payment of significant transaction fees in addition to flat fees and hourly fees), the language of section 328, and the complexities of major Chapter 11 proceedings—all leave structural and statutory questions not limited to this case.  At least eight financial professionals (including 503(b) applicants) requested a significant amount in transactional fees reflected in their applications.  *See* **Exhibits D-5**, **D-8**, and **D-17**; *see also* **Exhibit C**.  The Fee Committee negotiated significant reductions in transaction fees as well as in monthly fees payable to financial professionals.

### *Inefficient Staffing*

Another primary focus of the Fee Committee's attention has been staffing—not only the appropriateness of a senior lawyer performing junior associate or paraprofessional tasks but the sheer number of counsel involved.  The problem of staffing efficiency was pervasive across

---

[12] These savings are in addition to the $4.3 million reduced in connection with flat fee professionals whose work concluded upon T-Side emergence.  *See Fee Committee's Report Concerning Uncontested Interim and Final Fee Applications for Hearing on March 28, 2017 at 10:00 a.m.* [D.I. 11038] at 25, ¶ 33 (noting approximately $1.5 million in monthly flat fee reductions for Greenhill & Co., LLC as financial advisor to the T-side debtors' disinterested directors) and *id.* at 29, ¶ 41 (noting $2.8 million in waived monthly flat fees for Lazard Freres & Co., as financial advisor to the T-Side official committee of unsecured creditors).

clients and their professionals, compounded by the necessary but inherently inefficient separate representation of each of the Debtors' disinterested directors. The problem was also visible to the public and the Court—with overflow hearing space occasionally required. Putting aside landmark events like first day and confirmation hearings, the Fee Committee concluded that staffing was excessive in many instances—hearings, depositions, and inter- and intra-office calls and meetings.

In response, the Fee Committee developed additional guidelines. It presumptively accepted the presence of one counsel with a speaking role and one timekeeper as a back up to the speaker for each hearing and—in most cases—allowed compensation for no more than two lawyers to take a deposition and one to defend. The attendance of one Delaware-based counsel was always presumptively appropriate. The issue was never how many lawyers or other professionals a client could send to a hearing, deposition or board meeting but how many the Bankruptcy Code permitted the estates to compensate for that attendance.

The Fee Committee and counsel spent more time negotiating with professionals on staffing than perhaps any other issue. Again, there is no confusion in the case law. *See*, *e.g.*, *In re Fleming Cos.*, 304 B.R. 85 (Bankr. D. Del. 2003) (Walrath, J.). Its application here was difficult for the varied reasons that made this case difficult. Hearings quite often involved multiple discrete issues, requiring more than one lawyer to have a focus and speaking role. In the negotiation process, most professionals provided credible explanations for most of the lawyers they marshalled, but that alone did not always satisfy the reasonableness standard. Though some professionals improved their staffing practices dramatically over the course of the case, the Fee Committee continuously negotiated adjustments to reduce the fees and related expenses attributable to excessive attendance in most all of the interim fee periods.

***Time Spent on Fee Applications and Billing for Nonworking Travel***

Time spent on routine invoicing, billing, and collection activities—as well as remedying deficiencies in applications and negotiating adjustments with the Fee Committee—were almost routinely recommended for disallowance.  Many professionals then eliminated such charges entirely.[13]  The final recommendations here incorporate verified fees for fee application preparation that in most cases fall within the generally accepted standard of three to five percent of total fees billed.

With the number of timekeepers involved in these proceedings, more than 2,180 in all, relatively "minor" fee and expense issues had significant and potentially even more significant effects on the estates.  The Fee Committee rigorously applied the rule on half-time charges for travel, questioned the number of professionals charging the estates for reviewing daily docket entries, addressed the efficiency of broadly-defined team meetings at individual firms, and focused on the duplication of services both within firms and between firms with clients with common interests.

***Expenses***

The expense reimbursement requests here total more than $8.6 million, itself a remarkable amount.  The professionals generally, though not invariably, honored the U.S. Trustee Guidelines and the rules of this Court.  *See* Local Rule 2016-2.  The Fee Committee imposed caps on meal expenses, hotel charges, copying, and messenger and car services— resulting in significant savings.  The instances of excessive expenses were rare.  A major portion of the expense category is attributable to travel.  The Debtors are based in Texas, their counsel in Chicago and New York, and the larger firms with multiple offices sometimes brought lawyers

---

[13] All professionals were asked to eliminate non-compensable tasks from their timekeeping, but not all did.  This explains, though only in part, the apparent discrepancy among professionals in relative total fee deductions.

from those offices in other cities into the proceedings.  The costs were questioned and eliminated
if not adequately justified, and airfare was reimbursed only for coach class fares.

* * * * *

### Interim Fee Application Recommended for Approval

Five interim fee applications, *see* **Exhibit B**, require the Court's approval.  The Fee
Committee's recommendation applies the guidelines and standards applied in the interim fee
periods and resolves the Fee Committee's concerns with respect to these interim applications.
The adjusted total fees and expenses recommended are also reflected on **Exhibits D-5** and **D-11**.
Perhaps purely as a housekeeping matter in light of the Final Application recommendations in
this Report, the Fee Committee recommends that the Court approve the remaining Interim
Applications, as adjusted and summarized on **Exhibit B**.[14]

### Substantial Contribution Fee Requests Recommended for Approval

The Court's extensive discussion of the involvement of creditor groups in these
proceedings eliminates the need for an extensive discussion of section 503(b) applications here.
*See generally* Allocation Decision.  The amounts involved are significant, however, and their
resolution by consensus noteworthy, perhaps in keeping with the Court's observation earlier this
week about the need to avoid "false precision" in complying with the Interim Compensation
Order.  Allocation Decision at 31, ¶ 132 *et seq*.

On April 24, 2018, the Fee Committee sent a memorandum to all professionals expected
to seek estate reimbursement for fees and expenses pursuant to the Confirmation Order or the
Fidelity Substantial Contribution Order.[15]  That memorandum asked professionals to submit to

---

[14] A proposed form of interim fee order is attached as **Exhibit F**.

[15] The memorandum supplemented a previous one, dated March 14, 2018, sent before receiving communications
from the Court on the requested scope of the Fee Committee's review.  *See* D.I. 12896, 13088.

the Fee Committee a summary identifying their clients, disclosing the terms of their

representation, describing in general terms their role in these cases, and relating the work they

performed to the Court's substantial contribution findings.  The Fee Committee also requested

electronic billing data, to the extent section 503(b) professionals maintained hourly data, in the

same format required of all Retained Professionals.

Three creditors submitted memorandum fee requests (the "**Requesting Parties**").  *See*

**Exhibit C**.  After counsel's initial review of these materials, the Fee Committee engaged in

extensive discussions at its meetings regarding the appropriate treatment of those requests.  The

Court held a status conference on August 27, 2018, at the Fee Committee's request, issuing a

September 10, 2018 letter [D.I. 13475] resolving a disagreement about the appropriate standard

for the Fee Committee's review.  *See* D.I. 13112, D.I. 13295, D.I. 13385.

The fee review process for the Requesting Parties was comprehensive and practical.  For

many professionals, it began with the same type of data analysis that has been the cornerstone of

the review process for Retained Professionals over the four years of these proceedings.

However, the section 503(b) process was not, nor could it be, as exacting as the Retained

Professional review process—given the focus of the Court's orders, the statutory and

precedential mandates, and the inherently "after the fact" nature of the fee requests themselves.

Most of the requesting professionals did not routinely follow bankruptcy billing

conventions, and many of the analytical tools available for Retained Professional fee requests

could not be used to review the section 503(b) applications.  As a result, the Fee Committee

concluded that it would not seek wholesale deductions for some billing deficiencies such as

vague and block timekeeping, failure to keep time in tenths of an hour increments, and failure to

maintain segregated matter numbers.  Rather, the Fee Committee reviewed and verified the

general categories of services identified in the professionals' submissions for their "substantial contribution," noting any questioned expenditure of time and resources in a particular task category and their proposed treatment as a section 503(b) claim.  *See also* Allocation Decision, ¶¶ 83, 93, 119-121, and 126.

As it did for the T-Side substantial contribution claimants, *see* August 11, 2016 Fee Committee Report [D.I. 9257], the Fee Committee attempted to apply the same expense guidelines and limits it applied to Retained Professionals.  In many instances, however, the Fee Committee was unable to do so with the information provided and requested additional detail or documentation to verify compliance.  Many professionals supplied additional information; some did not or could not.  The Fee Committee conducted sometimes extensive discussions with this group of professionals, reviewing significant additional information and documentation and benefitting from the generally cooperative response of the Requesting Parties.

The Fee Committee now recommends that the Court enter an order allowing the 29 Substantial Contribution Fee Requests itemized on **Exhibit C**—on the terms outlined below and in the Proposed Order attached as **Exhibit G**. [16]

1.    *Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership ("Elliott") by Ropes & Gray*

On July 11, 2018, Ropes and Gray submitted a memorandum to the Fee Committee requesting a review of $30,668,488.73 in fees[17] and $1,358,399.62 in expense reimbursements

---

[16] The resolution of the section 503(b) applications here mirrors—both in process and in result—the resolution of analogous applications in the T-Side proceeding. *See Fee Committee's Report Concerning Uncontested Fee Applications and Section 503(b) Fee Requests for Hearing on October 26, 2016 at 10:00 a.m.* [D.I. 9908]; *Fee Committee's Report Concerning Uncontested Fee Applications and Section 503(b) Final Fee Requests for Hearing on July 11, 201[7] at 10:00 a.m.* [D.I. 11413].

[17] The Ropes & Gray fee request, as amended during the Fee Committee negotiations, is $600,000.00 greater than stated in the original Elliott substantial contribution claim.

incurred by 19 professionals that provided services on behalf of Elliott.[18]  *See* **Exhibit C**.  The

Fee Committee, through its chair and counsel, engaged in extensive informal discussions with

Ropes & Gray and Elliott, seeking additional detail and documentation to support the requests.

The Elliott professionals provided services primarily in the following categories:

- The NextEra plan (about 14 percent of fees requested);

- The NextEra termination fee dispute (about 20 percent of fees requested); and

- The Berkshire transaction (about 46 percent of fees requested).

The Fee Committee requested additional detail on the Elliott professionals' work and

expenses in some of these task categories and noted significant concerns.  In particular, some of

the financial advisory service fees requested were supported by only cursory documentation.

The Fee Committee also identified significant expense concerns, including expenses that were

not documented.

The Elliott professionals and the Fee Committee agreed that, in lieu of attempting to

gather and submit significant additional documentation for analysis, the professionals would

accept a flat percentage adjustment of 10 percent, or $3,202,688.84, to address the Fee

Committee's concerns.  That proposed resolution was sufficient to address all of the categories

of questioned billing and expenses, and the Fee Committee agreed to recommend the flat

percentage deduction to the Court for approval.  The Fee Committee now recommends that the

Elliott Fee Request be approved, as adjusted on **Exhibit C**, on an uncontested basis.

---

[18] The July 11 submission superseded a May 11, 2018 submission that had included the fees of 23 professionals.

2.    *American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under the EFH Note Indentures (the "EFH Indenture Trustee") by Nixon Peabody LLP*

On May 18, 2018, Nixon Peabody submitted a memorandum to the Fee Committee requesting its review of $18,898,312.67 in fees and $510,083.28 in expense reimbursements incurred by six professional firms that provided services to the EFH Indenture Trustee.  The Fee Committee, through its chair and counsel, engaged in extensive informal discussions with Nixon Peabody, seeking additional detail and documentation to support the request.  The EFH Indenture Trustee Professionals provided services primarily in the following categories:

- •    The Hunt/REIT plan (about 43 percent of fees requested);

- •    The TCEH spin-off plan (about 27 percent of fees requested); and

- •    The NextEra plan (about 24 percent of fees requested).

The Fee Committee requested additional detail on the EFH Indenture Trustee professionals' work in some of these task categories and noted some concerns.  In particular, some of the financial advisory service fees requested were supported by only cursory documentation.  Moreover, the relationship between some of the services provided and the Court's substantial contribution finding was not immediately evident, particularly with respect to services apparently provided for the benefit of the client itself.

The Fee Committee accordingly concluded that at least 85 percent of the amounts sought benefitted the estates subject to the substantial contribution findings while the remainder sought more appropriately was attributable to the client's benefit.  In the context of the negotiated compromise, the review identified only a minor amount of time or expense that could be characterized as *per se* unreasonable.  Like the compromises reached with the other section 503(b) groups, the Fee Committee concluded that a percentage reduction for this group reflected a fair and practical approach.

The EFH Indenture Trustee professionals and the Fee Committee agreed that, in lieu of gathering and submitting significant additional documentation, the professionals would accept a flat percentage adjustment of 15 percent, or $2,911,259.39, to address the Fee Committee's concerns. That proposed resolution was sufficient to address the questioned substantial contribution concerns, and the Fee Committee agreed to recommend the flat percentage deduction to the Court for approval. The Fee Committee now recommends that the EFH Indenture Trustee Fee Request be approved, as adjusted on **Exhibit C**, on an uncontested basis.

3.    *Fidelity Management & Research Company*

A.    *Fried, Frank, Harris, Shriver & Jacobson LLP*

On April 27, 2018, Fried Frank submitted a memorandum to the Fee Committee requesting its review of $9,859,050.50 in fees and $306,830.61 in expense reimbursements for its work on behalf of Fidelity Management. The Fee Committee, through its chair and counsel, engaged in informal discussions with Fried Frank, seeking additional detail and documentation to support the request. Fried Frank professionals provided services to Fidelity primarily in the following categories:

• The Hunt/REIT plan (about 77 percent of fees requested); and

• The NextEra plan (about 18 percent of fees requested).

The Fee Committee requested additional detail on Fried Frank's work in some of these task categories and noted some concerns. Fried Frank and the Fee Committee agreed that, in lieu of attempting to gather and submit significant additional documentation, the professionals would accept a flat percentage adjustment of about 10 percent, or $1,016,588.11, to address the Fee Committee's concerns. That proposed resolution was sufficient to address all of the categories of questioned billing and expenses, and the Fee Committee agreed to recommend the flat

percentage deduction to the Court for approval.  The Fee Committee now recommends that the Fried Frank Fee Request be approved, as adjusted on **Exhibit C**, on an uncontested basis.

### B.    *O'Kelly Ernst & Joyce, LLC*

On April 28, 2018, O'Kelly Ernst & Joyce, LLC submitted a letter to the Fee Committee requesting its review of $48,113.00 in fees and $686.14 in expense reimbursements.  As Delaware counsel for 2017 and 2018, O'Kelly Ernst's activities generally mirrored Fried Frank's and, for similar reasons, O'Kelly Ernst agreed to a flat percentage adjustment of 10 percent, or $4,879.91 to address the Fee Committee's concerns.  The Fee Committee now recommends that the O'Kelly Ernst Fee Request be approved, as adjusted on **Exhibit C**, on an uncontested basis.

### C.    *Cross & Simon LLC*

On April 27, 2018, Cross & Simon, LLC submitted a letter to the Fee Committee requesting its review of $208,930.00 in fees and $4,788.71 in expense reimbursements.  As Delaware counsel from April 2014 through November 2016, Cross & Simon's activities generally mirrored Fried Frank's and, for similar reasons, Cross & Simon agreed to a flat percentage adjustment of 10 percent, or $21,371.87, to address the Fee Committee's concerns. The Fee Committee now recommends that the Cross & Simon Fee Request be approved, as adjusted on **Exhibit C**, on an uncontested basis.

### D.    *Perella Weinberg Partners by Davis Polk & Wardwell LLP*

On April 19, 2018, Davis Polk submitted a letter to the Fee Committee on behalf of Perella Weinberg Partners ("PWP") requesting a review of $9,600,000.00 in fees and $56,926.89 in expense reimbursements incurred by PWP as investment banker to Fidelity.  PWP provided services to Fidelity primarily in the following areas:

- •    EFIH first and second lien DIP lender;

- •    The Hunt/REIT plan; and

• The NextEra transaction.

The Fee Committee requested additional detail on the nature of PWP's work in some of these task categories and noted its concern about the absence of detailed work records. PWP and the Fee Committee agreed that, in lieu of attempting to gather and submit significant additional documentation, to propose a flat percentage adjustment of 10 percent, or $965,692.69, to address the Fee Committee's concerns.[19] That proposed resolution was sufficient to address all of the categories of questioned billing and expenses, and the Fee Committee agreed to recommend the flat percentage deduction to the Court for approval. The Fee Committee now recommends that the PWP Fee Request be approved, as adjusted on **Exhibit C**, on an uncontested basis.

## CONCLUSION

Based on all of the above, the Fee Committee respectfully requests:

1. That the Court enter the order attached as **Exhibit E**, approving on a final basis and without objection the Final Applications outlined in this Report and on the attached **Exhibit A**, subject to the agreed reductions summarized in the exhibit; and

2. That the Court enter the order attached as **Exhibit F**, approving on an interim basis and without objection the Interim Applications outlined in this Report and on the attached **Exhibit B**, subject to the agreed reductions summarized in the exhibit; and

3. That the Court enter the order attached as **Exhibit G**, approving on a final basis and without objection the Substantial Contribution Fee Requests outlined in this Report and on the attached **Exhibit C**, subject to the agreed reductions summarized in the exhibit.

---

[19] PWP also elected, in recognition of the inactive periods in these cases, *see supra* at 9-10, to forego $5.2 million in monthly flat fees to which it could have been entitled under the terms of its engagement agreement with Fidelity, although the $20 million cap on Fidelity's substantial contribution award would have prevented Fidelity from recouping all of those fees from the Debtors had they not been waived.

Dated:  November 2, 2018.

**BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP**


_____/s/ William M. Alleman, Jr._____
Jennifer R. Hoover, Esquire (5111)
William M. Alleman, Jr., Esquire (5449)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: 302-442-7010
Facsimile: 302-442-7012
E-mail: jhoover@beneschlaw.com
            walleman@beneschlaw.com

- and -

GODFREY & KAHN, S.C.


_____/s/ Katherine Stadler_____
Katherine Stadler, *Admitted Pro Hac Vice*

GODFREY & KAHN, S.C.
One East Main Street, Suite 500
P.O. Box 2719
Madison, WI 53701-2719
Telephone: 608-257-3911
Facsimile: 608-257-0609
E-mail: kstadler@gklaw.com

*Attorneys for the Fee Committee*

19610068.5