# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## OPENING BRIEF OF THE CITY OF DALLAS, TEXAS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT FOR ALLOWANCE AND PAYMENT OF ITS ADMINISTRATIVE CLAIM UNDER 11 U.S.C. § 503(b)(7)

Dated: April 26, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

John D. Demmy (Bar No. 2802)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6848
E-mail: john.demmy@saul.com

-and-

Melissa A. Martinez
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Telephone: (215) 972-8572
E-mail: melissa.martinez@saul.com

*Counsel for the City of Dallas, Texas*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................. iii

NATURE AND STAGE OF THE PROCEEDINGS ................................................1

SUMMARY OF ARGUMENT ................................................................................5

STATEMENT OF FACTS .......................................................................................7

    A.    The Water Lease and the Setting of the Wholesale Water Rate by Dallas City Council ..............................................................................7

    B.    The Sabine River Authority Unilaterally Increases the Compensation Payable by Dallas for Lake Fork Water ..............................................10

    C.    Dallas' Response to the Sabine River Authority's Unilateral Action ................12

    D.    Dallas' Wholesale Water Rate Setting Process ...................................13

    E.    Impact of the SRA Settlement on Dallas' Claims ...............................15

ARGUMENT ..........................................................................................................18

    A.    Summary Judgment Standard ..............................................................18

    B.    Dallas Properly Calculated its Administrative Claim in Accordance with § 503(b)(7) and the Terms of the Water Lease ...................................19

        1.    Section 503(b)(7) is Clear: Dallas is Entitled to an Administrative Claim Equal to the Monetary Obligations Due Under the Water Lease for a Two Year Period "Without Offset or Reduction**"** ...............19

        2.    Luminant's Rejection of the Water Lease Does Not Affect its Substantive Terms Including the Calculation of Luminant's Monetary Obligations Thereunder ........................................................21

        3.    Increases in the Wholesale Water Rate Set by Dallas City Council Ordinance for the Administrative Claim Period are Appropriately Included in Calculating Dallas' Administrative Claim ..........................22

        4.    Dallas Has No Obligation to Mitigate and Notions of Mitigation in Respect of the SRA Settlement are Misplaced .......................................25

            a.    Section 503(b)(7) Does Not Require Mitigation .......................25

    b. There is No Mitigation Duty in Connection With Take or Pay Contracts ...........................................................................25

    c. The SRA Settlement Does Not Substitute for the Rate and Payment Terms of the Water Lease in Calculating Luminant's Monetary Obligations Thereunder .........................26

  C. Dallas' Claims Need Not Be Discounted to "Present Value" as Such is Contrary to § 503(b)(7) and Serves No Legitimate Purpose .............................28

CONCLUSION ........................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allegheny Int'l, Inc.*,
    136 B.R. 396 (Bankr. W.D. Pa. 1991) .................................................................29

*Alston v. Countrywide Fin. Corp.*,
    585 F.3d. 753 (3d Cir. 2009)............................................................................20

*In re Beck*,
    272 B.R. 112 (Bankr. E.D. Pa. 2002) ...............................................................21

*In re Buffets Holdings, Inc.*,
    387 B.R. 115 (Bankr. D. Del. 2008) .................................................................23

*In re Chestnut Ridge Plaza Assocs., L.P.*,
    156 B.R. 477 (Bankr. W.D. Pa. 1993) .........................................................21, 22

*Fireman's Ins. Co. of Newark, N.J. v. DuFresne*,
    676 F.2d 965 (3d Cir. 1982)............................................................................19

*In re Flagstaff Realty Assocs.*,
    60 F.3d 1031 (3d Cir. 1995)........................................................................21, 22

*In re G-I Holdings, Inc.*,
    568 B.R. 731 (Bankr. D.N.J. 2017) ..................................................................23

*In re Gretag Imaging, Inc.*,
    485 B.R. 39 (Bankr. D. Mass. 2013) ................................................................29

*Horowitz v. Fed. Kemper Life Assurance Co.*,
    57 F.3d 300 (3d Cir. 1995)..............................................................................18

*IDEA Boardwalk, LLC v. Revel Entertainment Group, LLC (In re Revel)*,
    909 F.3d 597 (3d Cir. 2018)........................................................................27, 28

*Lamie v. United States Tr.*,
    540 U.S. 526 (2004)......................................................................................20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)......................................................................................18

*In re MDC Sys., Inc.*,
    488 B.R. 74 (Bankr. E.D. Pa. 2013) .................................................................22

*Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*,
   870 F.3d 244 (3d Cir. 2017)...........................................................................18

*In re Oakwood Homes Corp.*
   449 F.3d. 588 (3d Cir. 2006)..........................................................................29

*Olympic Junior, Inc. v. David Crystal, Inc.*,
   463 F.2d 1141 (3d Cir. 1972).........................................................................19

*In re Peters*,
   2004 WL 1291125 (Bankr. E.D. Pa. 2004).....................................................22

*Petruzzi's IGA Supermarkets v. Darling-Del. Co., Inc.*,
   998 F.2d 1224 (3d Cir. 1993).........................................................................18

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, et al.*,
   507 U.S. 380 (1993).......................................................................................20

*In re Rappaport*,
   517 B.R. 518 (Bankr. D.N.J. 2014) ...............................................................22

*In re Shane Co.*,
   464 B.R. 32 (Bankr. D. Colo. 2012) ..............................................................22

*In re Stone & Webster*,
   286 B.R. 532 (Bankr. D. Del. 2002) ..............................................................19

*Taylor-Wharton Int'l LLC v. Blasingame (In re Taylor-Wharton Int'l LLC)*,
   2010 WL 4862723 (Bankr. D. Del. Nov. 23, 2010) ......................................23

*In re The Leslie Fay Companies, Inc.*,
   166 B.R. 802 (Bankr. S.D.N.Y. 1994) ...........................................................22

*In re Transamerican National Gas Corp.*,
   79 B.R. 663 (Bankr. S.D. Tex. 1987) .............................................................22

*Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*,
   427 B.R. 301 (Bankr. D. Del. 2010) ..............................................................19

*World Fuel Servs., Inc. v. John E. Retzner Oil Co., Inc.*,
   234 F. Supp. 3d 1234 (S.D. Fla. 2017) ..........................................................26

## Statutes

11 U.S.C. § 365(d)(4) ........................................................................................19

11 U.S.C. § 365(g) ............................................................................................21

11 U.S.C. § 503(b)(7) .................................................................................. *passim*

iv

11 U.S.C. § 502(b)(6) ...................................................................................................1, 3, 28, 29

Bankruptcy Abuse Protection and Consumer Protection Act of 2005 ..........................................19

**Other Authorities**

Fed. R. Bankr. P. 7056..................................................................................................................18

MERRIAM-WEBSTER.......................................................................................................................29

## I.    NATURE AND STAGE OF THE PROCEEDING

Although it was not taking any water thereunder, on October 3, 2014, Luminant Generation Company LLC ("Luminant") noticed its intent [D.I. 2311] to assume its non-residential real property lease with Dallas (the "Water Lease").[1]  Luminant's assumption of the Water Lease was approved by the Court's order of October 27, 2014 [D.I. 2574].  By order entered on October 14, 2015 [D.I. 6447] (the "Rejection Order"), Luminant rejected the Water Lease nunc pro tunc to the September 22, 2015 date on which its motion to reject was filed.

Dallas filed a proof of claim on November 12, 2015 (the "Original POC"),[2] evidencing its claims under 11 U.S.C. §§ 503(b)(7) and 502(b)(6) resulting from rejection of the Water Lease.  On August 26, 2016, Luminant objected to the Original POC [D.I. 9409].[3]  Dallas responded to the Claim Objection on October 7, 2016 [D.I. 9779] ("Dallas' Response").

Luminant was a wholesale water customer of Dallas.  Dallas charges its wholesale water customers based on the wholesale water rate set annually by Dallas City Council following a comprehensive review process.  The wholesale water rate is a system-wide rate designed to recover Dallas' costs and expenses incurred in the previous year in delivering untreated water to its wholesale customers including, *inter alia*, Dallas' cost of such water, operations and maintenance, equipment depreciation, and infrastructure construction and repairs.  The wholesale water rate fluctuates from year to year.

---

[1]  The Water Lease is attached to the *Declaration of Terry Lowery in Connection With Amended Proof of Claim Submitted by City of Dallas, Texas* (the "Second Lowery Declaration") as its **Exhibit 1**.  The Second Lowery Declaration is attached to the Final POC (as defined herein) and the Final POC is included in the *Appendix in Support of Motion of City of Dallas, Texas for Summary Judgment* (the "Appendix") as its **Exhibit A**, pages A-001 to A-201.

[2]  Excerpts of the Original POC (including some of its attachments but excluding others that would be duplicative of those also included in Dallas' Final POC, as defined herein) is included in the Appendix as its **Exhibit B**, pages A-202 to A-206.

[3]  The *Objection of Energy Future Holdings Corp., et al., to Proof of Claim 13319 Filed by the City of Dallas* (the "Claim Objection," inclusive of its Exhibit B) is included in the Appendix as its **Exhibit C**, pages A-207 to A-240.

Dallas filed an amended proof of claim on or about October 7, 2016 (the "Amended POC") to reflect the change to its claim caused by the increase in the wholesale water rate adopted by Dallas City Council for the fiscal year October 1, 2016 through September 30, 2017 (substantially year 2 of the 2-year administrative claim period under 11 U.S.C. § 503(b)(7)).[4]

The compensation Dallas pays to the Sabine River Authority for water that Dallas has the right to draw from the Lake Fork Reservoir is a factor, among several, in Dallas City Council's setting of the wholesale water rate. At all relevant times when (i) Luminant assumed the Water Lease, (ii) Luminant rejected the Water Lease, (iii) Dallas filed its Original POC and its Amended POC, and (iv) Luminant filed the Claim Objection, a dispute existed between Dallas and the Sabine River Authority with respect to the proper amount of such compensation. Until resolution of that dispute, the precise amounts of Dallas' claims against Luminant were not definitively calculable.

An evidentiary hearing in this matter was scheduled for May 27, 2017 but, in early May 2017, Dallas and the Sabine River Authority reached a tentative settlement in principle (the "SRA Settlement"), subject to definitive documentation, resolving their dispute. The SRA Settlement (as more fully described herein), sets the compensation payable by Dallas to the Sabine River Authority for the disputed period – November 2014 through September 2017 – and going forward. Because of the tentative settlement and its potential effect on the claim litigation, Dallas and Luminant agreed to a "stand-still" to allow documentation of the SRA Settlement to

---

[4] Excerpts of the Amended POC (including some of its attachments but excluding others that would be duplicative of those also included in Dallas' Final POC, as defined herein) is included in the Appendix as its **Exhibit D**, pages A-241 to A-246.

proceed and the parties to evaluate the effect of the SRA Settlement on Dallas' claims. The SRA

Settlement has been documented and has become effective.[5]

On April 26, 2019, Dallas filed a further amended proof of claim (the "Final POC")

evidencing its administrative claim under § 503(b)(7) after giving effect to the SRA Settlement.

Dallas no longer is asserting a rejection claim under § 502(b)(6).

The objections Luminant raised in the Claim Objection which appear to remain for

determination include:

(1)     Whether Dallas is entitled to include the increases to the wholesale water
        rate adopted by Dallas City Council ordinance after rejection of the Water
        Lease in calculating Luminant's monetary obligations under the Water
        Lease ("Objection 1");

(2)     Whether Dallas had a duty to but did not take reasonable steps to mitigate
        ("Objection 2"); and

(3)     Whether Dallas' claim must be discounted to present value
        ("Objection 3").[6]

Based on the record before the Court no genuine issue of material fact exists either in

respect of the calculation of Dallas' claim under the Water Lease or Dallas' entitlement to an

allowed administrative claim under § 503(b)(7).

Dallas thus is entitled to judgment as a matter of law allowing its administrative claim in

the amount of $5,598,128.90 as set forth in the Final POC and compelling payment of such claim

---

[5]   The SRA Settlement is set forth in the written agreement and related documents (collectively, the "SRA Settlement Agreement") attached to the Second Lowery Declaration in Exhibit 4.  A-107 to A-163.

[6]   See A-208 to A-209.  Although the Claim Objection did not explicitly request that Dallas' administrative claim be discounted to present value, which instead made such objection only to Dallas' claim under § 502(b)(6), Luminant's post-SRA Settlement statements indicate it may now be pressing a discount objection to the § 503(b)(7) claim as well.

in full in accordance with the confirmed chapter 11 plan applicable to Luminant [D.I. 9374] (the

"Confirmed Plan").

## II.    SUMMARY OF ARGUMENT

*Response to Objections 1 and 2*:

The Final POC correctly calculates Dallas' administrative claim under § 503(b)(7), equal to the monetary obligations due under the Water Lease for 2 years in accordance with the rate and payment terms of the Water Lease, with credit to Luminant for payments it made to Dallas attributable to such 2-year period, and correctly taking into account the wholesale water rate set by Dallas City Council for such 2-year period as impacted by the SRA Settlement.

(a)    Despite its rejection of the Water Lease, Luminant remains bound by the rate and payment terms of the Water Lease, which contemplate annual setting of wholesale water rates by Dallas City Council.

(b)    Dallas' administrative claim under § 503(b)(7) must be calculated solely in accordance with the rate and payment terms of the Water Lease, and not on the basis of any other agreement including, without limitation, the SRA Settlement Agreement.

(c)    In accordance with the rate and payment terms of the Water Lease and applicable law allowing increases in contract rates in connection with rejection damage claims, calculation of Dallas' 2-year administrative claim for the period September 23, 2015 through September 22, 2017, properly includes the increased wholesale water rates set by Dallas City Council applicable to such time period.[7]

(d)    The impact of the SRA Settlement on Dallas' § 503(b)(7) administrative claim, which is reflected in the Final POC, is limited to how the change in the compensation payable by Dallas to the Sabine River Authority impacts the wholesale water rate applicable to the 2-year administrative claim period.

---

[7]  Luminant paid its Water Lease obligation for the month of September 2015; and, Dallas has credited against its § 503(b)(7) claim the amount of Luminant's payment attributable to the period September 23 through 30, 2015.

24906974.6 04/26/2019

(e)    The SRA Settlement Agreement term setting the compensation due to the Sabine River Authority for the 11,860 acre-feet of water "earmarked" to Luminant under the Water Lease for the time period prior to the effectiveness of the SRA Settlement Agreement (October 2017) does not displace the rate and payment terms of the Water Lease in calculating Luminant's monetary obligations to Dallas under the Water Lease.

(f)    Dallas has no duty to mitigate as § 503(b)(7) provides for allowance of a claim thereunder "without reduction or setoff for any reason whatsoever except for sums actually received or to be received from an entity other than the debtor," and, under common law, mitigation does not apply to "take or pay" contracts like the Water Lease.

*Response to Objection 3*:

Discounting Dallas' 2-year administrative claim for the period October 1, 2015 through September 22, 2017 to "present value" as of the September 22, 2015 effective date of rejection of the Water Lease is:

(i)    not authorized by § 503(b)(7), which provides that Dallas' administrative claim is not subject to reduction for such reason,

(ii)    not otherwise proper under the Bankruptcy Code and Third Circuit precedent as § 503(b)(7) does not require determination of the "value" of Dallas' claim "as of" a certain time period, and

(iii)    neither necessary nor reasonable as the reason for present valuation – to set a fair value, at a set time, of a stream of payments extending into the future – is not applicable here because the time period for the "stream" of the payments due under the Water Lease in respect of Dallas' § 503(b)(7) claim already has ended.

24906974.6 04/26/2019

## III.    STATEMENT OF FACTS

A.    **The Water Lease and the Setting of the**
**Wholesale Water Rate by Dallas City Council**

The Water Lease was adopted by resolution of the Dallas City Council on February 23, 2011; was executed by Luminant and Dallas as of March 10, 2011; and was made effective as of January 1, 2011.[8] Under the Water Lease, Luminant had the right annually from January 1, 2011 through December 31, 2050 to take up to, and in any event was obligated to pay for, 12,000 acre-feet of water.[9] Luminant did not take any water in 2014 or 2015.[10]

The water subject to the Water Lease is included in the 131,860 acre-feet of water that Dallas is authorized annually to draw from the Lake Fork Reservoir pursuant to the "Water Supply Contract and Conveyance" entered into on or about October 1, 1981 with the Sabine River Authority (the "Sabine Water Agreement").[11]  Dallas obtained such water for its own use and to sell to its wholesale customers, which included Luminant.[12]  Under the Sabine Water Agreement, Dallas cannot remove more than 120,000 acre feet of water from the Sabine River basin.[13]

---

[8]  A-212 (Claim Objection at ¶ 9).

   A-251 to A-252 (¶ 9 of the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing Rejection of a Previously Assumed Nonresidential Real Property Lease Between Luminant Generation Company LLC and the City of Dallas, Texas, Effective Nunc Pro Tunc to September 22, 2015* [D.I. 6141] (the "Rejection Motion"), which is included in the Appendix as its **Exhibit E**, pages A-247 to A-262); and

   A-268 (¶ 14 of the *Declaration of Terry Lowery in Support of Response of City of Dallas, Texas in Opposition to the Objection of Energy Future Holdings Corp., et al., to Proof of Claim No. 13319* [D.I. 9780] (the "First Lowery Declaration"), which is included in the Appendix as its **Exhibit F**, at pages A-263 to A-328).

[9]  A-212 (Claim Objection at ¶ 9); A-252 (Rejection Motion at ¶ 10); A-268 (First Lowery Declaration at ¶ 14); A-333 to A-334 and A-348 (pages 31-32 and 36 of the Deposition of Terry Lowery, excerpts of which ("Lowery Dep. Tr.") are included in the Appendix as its **Exhibit H**, pages A-334 to A-380).

[10]  A-252 (Rejection Motion at ¶ 10).

[11]  A -211 to A-212 (Claim Objection at ¶¶ 7-9); A-251 to A-252 (Rejection Motion at ¶¶ 7-9); A-265 to A-266 and A-268 (First Lowery Declaration at ¶¶ 5, 6 and 15); A-341 to A-342 and A-347 (Lowery Dep. Tr. at pages 29-30 and 35).

[12]  A-268 (First Lowery Declaration at ¶ 4).

[13]  A-268 (First Lowery Declaration at ¶ 15); A-347 (Lowery Dep. Tr. at page 35).

The Luminant facility at which the water subject to the Water Lease was to be used is located in the Sabine River basin.[14]  In effect, Dallas agreed to sell to Luminant 11,860 acre-feet of water (representative of the water that could not be removed from the Sabine River basin) plus an additional 140 acre-feet that it had the right to remove, which together comprised the 12,000 acre-feet of water subject to the Water Lease.[15]

As Luminant has conceded, its monetary obligations under the Water Lease are calculated "based on the current prevailing rate for untreated water, as specified by [Dallas] ordinance, . . . as may be amended from time to time."[16]

The Water Lease provides:

> 5.    RATES
>
> Purchaser shall pay Dallas for untreated water under this Contract at the current prevailing regular (non-interruptible) rate for untreated water sales as specified by Dallas ordinance, as same may be amended from time to time, and shall pay all other applicable charges for untreated water sales as may be adopted from time to time by ordinance of the Dallas City Council.  Purchaser shall also be solely responsible for all costs, fees, or charges imposed by [Sabine River Authority] to implement untreated water deliveries and maintain any necessary delivery facilities under this Contract.
>
> *        *        *
>
> 7.    PAYMENTS
>
> A.    . . . the purchase price due … is based on the applicable maximum amount … (12,000 acre-feet of untreated water) times the applicable rate as described in Section 5.[17]

The wholesale water rate that Dallas City Council sets annually is a system-wide rate based on all costs and expenses incurred by Dallas over its entire water system in the previous

---

[14]  *Id.*

[15]  A-268 (First Lowery Declaration at ¶ 15).  Luminant did not actually take any water from Dallas in either 2014 or 2015.  A-252 (Rejection Motion at ¶ 10).

[16]  A-212 to A-213 (Claim Objection at ¶ 10); A-252 (Rejection Motion at ¶ 10).  *See also*, A-268 (First Lowery Declaration at ¶ 14).

[17]  A-014 to A-015 (Water Lease at ¶¶ 5, 7).

year.[18]  It includes the cost of water obtained from all sources including, without limitation, the

Lake Fork Reservoir, the costs of operations and maintenance of water delivery systems,

equipment depreciation, and infrastructure construction and repairs, and so on.[19]  The wholesale

water rate is used to calculate both Luminant's monetary obligations under the Water Lease and,

as provided in the Memorandum of Agreement (the "MOA"), the obligations of Dallas' other

wholesale water customers.[20]  All of Dallas' wholesale customers, including Luminant, agreed to

pay for water provided by Dallas based on this system-wide wholesale water rate.[21]  Dallas

conducts a yearly cost of service study for untreated water sold to wholesale customers.[22]  From

the cost study, a wholesale water rate is determined which is then used to determine amounts due

to Dallas for untreated water.[23]

The wholesale water rate is the only variable in determining the monetary obligations due

from Luminant under the Water Lease.[24]  It provides that the "purchase price due" from

Luminant for the water it is entitled to take is based on the "maximum amount" (12,000 acre-

---

[18]  A-207-208 (First Lowery Declaration at ¶¶ 13, 16); A153 (Claim Objection at ¶ 11); A298-299 and A309-314 (Lowery Dep. Tr. at pages 58-59 and 69-74).

[19]  A-267 to A-268 (First Lowery Declaration at ¶¶ 13, 16); A-357 (Lowery Dep. Tr. at page 57).

[20]  A-014 to A-015 (Water Lease at ¶¶ 5 and 7); A-295 to A-296 (Memorandum of Agreement between Dallas and its wholesale water customers, effective as of December 17, 2009, at ¶¶ 6-7, referenced in the First Lowery Declaration and attached to Dallas' Response as Exhibit 7); A-353 to A-355, A-358 to A-359 and A-362 to A-363 (Lowery Dep. Tr. at pages 53-55, 58-59 and 62-63).

[21]  *Id.*

[22]  A-268 to A-270 (First Lowery Declaration at ¶¶ 16-18 and 22-23); A-359 to A-360 (Lowery Dep. Tr. at pages 59-60)

[23]  *Id.*

[24]  A-014 to A-015 (Water Lease at ¶¶ 5 and 7).

9

feet, or 3,910,219,000 gallons of water annually)[25] "times the applicable rate as described in Section 5."[26]

The wholesale water rate has been increasing for several years due to many factors.[27]  It was $155.37 per acre-foot for the period October 1, 2011 through September 30, 2012;[28] increased to $174.49 per acre-foot as of the April 29, 2014 commencement of these bankruptcy cases;[29] increased to $182.90 per acre-foot for the fiscal year starting October 1, 2014 through September 30, 2015;[30] and, due in large part to the Sabine River Authority's unilateral and unlawful price increase (described in detail below), increased to $271.60 per acre-foot for the fiscal year October 1, 2015 through September 30, 2016[31] and then to $297.18 per acre-foot for the fiscal year October 1, 2016 through September 30, 2017.[32]

**B.      The Sabine River Authority Unilaterally Increases the Compensation Payable by Dallas for Lake Fork Water**

In accordance with its terms, the 1981 Sabine Water Agreement would automatically renew for another 40-year term unless Dallas gave written notice of termination at least one year

---

[25]  One acre-foot contains approximately 325,851 gallons of water; and 12,000 acre-feet includes approximately 3,910,219,000 gallons. *See Acres feet to Gallons (US-Liquid)*, ConvertLIVE, https://convertlive.com/u/convert/acre-feet/to/gallons-us-liquid#12000 (last visited Apr. 24, 2019), and **Exhibit I** to the Appendix, pages A-381 to A-383.

[26]  A-015 (Water Lease, at ¶ 7 entitled "Payments").

[27]  A-270 (First Lowery Declaration at ¶ 24); A-370 to A-371 and A-375 (Lowery Dep. Tr. at pages 70-71 and 81).

[28]  A-252 (Rejection Motion at ¶ 10).

[29]  A-270 to A-271 (First Lowery Declaration at ¶ 25).

[30]  A-212 to A-213 (Claim Objection at ¶ 10); A-252 (Rejection Motion at ¶ 10); A-270 to A-271 (First Lowery Declaration at ¶ 25).

[31]  A-213 (Claim Objection at ¶ 11); A-270: (First Lowery Declaration at ¶ 22).

[32]  A-270 (First Lowery Declaration at ¶ 23).

prior to November 1, 2014.[33]  Prior to the deadline, Dallas notified the Sabine River Authority of its intent for the agreement to renew for the additional 40-year term.[34]

The Sabine Water Agreement provided that the compensation payable by Dallas during the renewal term was to be determined by "mutual agreement."[35]  It further provided that if agreement was not reached prior to expiration of the original term, the Public Utility Commission of Texas, formerly the Texas Water Commission (the "Texas PUC"), may establish interim compensation until agreement is reached.[36]

For more than 6 years prior to the November 1, 2014 renewal deadline, Dallas attempted to negotiate compensation for the renewal term with the Sabine River Authority but agreement was not reached.[37]  On October 9, 2014, the Sabine River Authority unilaterally and unlawfully, and without requesting the Texas PUC to establish interim compensation, increased the price payable by Dallas for Lake Fork water.[38]

The Sabine River Authority's unilateral and unlawfully imposed price to Dallas was equal to the $182.90 per acre-foot of water (equivalent to $0.5613 per 1000 gallons) Dallas then was charging its wholesale customers, and increased Dallas' cost for Lake Fork water by 800%.[39]  Because Dallas incurs costs and expenses in supplying water to its wholesale customers in addition to the compensation it pays to the Sabine River Authority for Lake Fork water, setting the compensation due for Lake Fork water equal to the rate Dallas charged its wholesale

---

[33]  A-266 (First Lowery Declaration at ¶ 7).

[34]  *Id.*

[35]  A-213 (Claim Objection at ¶ 11); A-266 (First Lowery Declaration at ¶ 8).

[36]  A-266 (First Lowery Declaration at ¶ 9).

[37]  A-213 (Claim Objection at ¶ 11); A-267 (First Lowery Declaration at ¶ 10).

[38]  A-213 (Claim Objection at ¶ 11); A-267 (First Lowery Declaration at ¶¶ 10-11); A-349 and A-352 (Lowery Dep. Tr. at pages 43, 46).

[39]  A-213 (Claim Objection at ¶ 11); A-267 and A-270 to A-271 (First Lowery Declaration at ¶ 11 and 25).

customers meant that the amounts to be paid by Dallas' wholesale customers no longer would cover the City's full costs of providing water to them.[40]

## C.    Dallas' Response to the Sabine River Authority's Unilateral Action

Dallas brought three separate proceedings challenging the Sabine River Authority's unilateral action (the "SRA-Dallas Litigation"):

(a)    First, Dallas appealed to the Texas PUC, arguing the Sabine River Authority's action was "contrary to public interest," and "unreasonably preferential, prejudicial, and discriminatory";

(b)    Second, Dallas sought a declaratory judgment in state district court that the increased compensation the Sabine River Authority' was imposing on Dallas was not set in accordance with the Sabine Water Agreement (Dallas also appealed from the trial court's dismissal of the declaratory judgment action on governmental immunity grounds); and

(c)    Third, Dallas sued the Sabine River Authority's directors for the *ultra vires* action of unilaterally setting the water rate charged to Dallas.[41]

Pursuant to its rules, the Texas PUC abated the matter pending before it until a court could resolve the contractual dispute, but set the compensation to be paid by Dallas at the amount imposed by the Sabine River Authority and required Dallas to deposit payments into an escrow account (the "SRA Escrow").[42]    Dallas informed its wholesale customers, including Luminant, of the ongoing dispute with the Sabine River Authority, including the pending

---

[40]  A-213 (Claim Objection at ¶ 11); A-376 to A-377 (Lowery Dep. Tr. at pages 141-42).

[41]  A-213 to A-214 (Claim Objection at ¶ 12); *see generally, Declaration of Stacy Rodriguez in Support of Response of City of Dallas, Texas in Opposition to the Objection of Energy Future Holdings Corp., et al., to Proof of Claim No. 13319* [D.I. 9781] (the "Rodriguez Declaration"), which is attached to the Appendix as **Exhibit G**, pages A-329 to A-333.

[42]  A-213 to A-214 (Claim Objection at ¶ 12).

litigation, the payment of increased compensation into the SRA Escrow, and the effect of such on the wholesale water rate.[43]

### D.    Dallas' Wholesale Water Rate Setting Process

Dallas' wholesale water rate is set on an annual basis following a comprehensive review process, and is designed to recover the costs and expenses incurred by Dallas during the prior year in delivering untreated water to its wholesale customers.[44]  Dallas annually conducts a wholesale cost of service study which is the basis for the wholesale rate.[45]  For Luminant, the rate set by City Council is then plugged into the simple math equation set forth in the Water Lease to determine Luminant's monetary obligations thereunder for that fiscal year.

Dallas' rate setting process begins in January of each fiscal year (which run from October 1 through September 30) and continues for several months.[46]  Wholesale water rates approved by Dallas City Council become effective on the first day of October, consistent with Dallas' fiscal year of October 1 through September 30.[47]

The process is monitored by a committee of wholesale customers who are kept informed through every stage, including through in-person meetings.[48]  Customers may pose questions and comment, both in writing and orally at such meetings.[49]  The questions and comments are not

---

[43]   A-253 (Rejection Motion at ¶12); A-214 and A-235 to A-240 (Claim Objection at ¶ 13 and correspondence attached to the Claim Objection in Exhibit B thereto).

[44]   A-252 (Rejection Motion at ¶ 10); A-268 (First Lowery Declaration at ¶ 16); A-294 to A-296 (MOA at ¶¶ 5-7).

[45]   A-268 to A-270 (First Lowery Declaration at ¶ 16-23).

[46]   A-269 and A-272 to A-274 (First Lowery Declaration at ¶ 17 and Exhibit 2 referenced in the First Lowery Declaration and attached to Dallas' Response – 2015 and 2016 Schedules for Wholesale Water and Wastewater Cost of Service Study); A-354 to A-355 (Lowery Dep. Tr. at pages 54-55).

[47]   A-269 (First Lowery Declaration at ¶ 21).

[48]   A-269 and A-278 to A-290 (First Lowery Declaration at ¶ 20 and Exhibits 4 and 5 referenced in the Lowery Declaration and attached to Dallas' Response – 2015 Cost of Service Study Participants and Questions and Follow-up Questions from 2015 Wholesale Cost of Service Studies); A-365 to A-366 (Lowery Dep. Tr. at pages 65-66)

[49]   *Id.*

confidential and are available to all wholesale customers.[50]  Dallas typically circulates a proposed wholesale water rate to its wholesale customers in July and Dallas City Council votes on the proposed rates in September.[51]

The rate setting process for fiscal year October 1, 2015 through September 30, 2016 followed this process.  It began in January 2015, after the Sabine River Authority's unilateral compensation increase, and led to the Dallas City Council ordinance enacted on September 22, 2015.[52]  As is customary, Dallas' wholesale customers were kept informed of the process including the anticipated increase to the wholesale water rate due to the unilateral action taken by the Sabine River Authority and the payments into the SRA Escrow.[53]

On September 22, 2015, the same day Luminant filed the Rejection Motion, Dallas City Council considered the proposed wholesale water rate for the 2015/16 fiscal year.[54]  By Ordinance adopted on September 22, 2015,[55] following a rate setting process as described above, Dallas City Council raised the rate for untreated wholesale water to $271.60 per acre foot effective October 1, 2015.[56]  The 2015/16 wholesale water rate captured the increased

---

[50]  *Id.*

[51]  A-269 (First Lowery Declaration at ¶ 21); A-360 (Lowery Dep. Tr. at page 60).

[52]  A-269 (First Lowery Declaration at ¶ 18).

[53]  A-214 (Claim Objection at ¶ 13); A-253 (Rejection Motion at ¶12).

[54]  A-269 and A-275-277 (First Lowery Declaration at ¶ 19).  The September 22, 2015 Dallas City Council meeting agenda is referenced in the Lowery Declaration as Exhibit 3 and was attached to Dallas' Response.  It provides, in relevant part:

> **BACKGROUND**
>
> In compliance with the City's Financial Performance Management Criteria (FMPC) #15, an annual review of selected fees and charges is conducted to determine the extent to which the full cost of associated services is being recovered by revenues. The charges which are incorporated into the proposed ordinance relate to adjusting … (24) rates and charges for treated water service, wastewater service, wholesale water and wastewater service to governmental entities, untreated water service. Service connections, and fire hydrant usage; ….

[55]  The September 22, 2015 Ordinance is attached to the Second Lowery Declaration, which is attached to the Final POC, and appears in the Appendix at A-027 to A-067.

[56]  A-270 (First Lowery Declaration at ¶ 22).

compensation to the Sabine River Authority that Dallas was compelled to begin paying into the SRA Escrow in late 2014.[57]

Before the increased wholesale water rate went into effect, all wholesale customers, including Luminant, were provided with notice thereof and none objected to the rate or the process by which the rate was set.[58]

Consistent with the process described above for the 2015/16 fiscal year (and prior years), on September 21, 2016, Dallas City Council set the wholesale water rate for fiscal year 2016/17, effective October 1, 2016 and continuing through September 30, 2017, at $0.9120 per 1,000 gallons (equivalent to $297.18 per acre foot).[59]

**E.      Impact of the SRA Settlement on Dallas' Claims**

The SRA Settlement does four things.  It:

* amends the Sabine Water Agreement to fix the compensation payable by Dallas to the Sabine River Authority for the renewal term (commencing November 2, 2014 and continuing for 40 years thereafter, which includes the period applicable to Dallas' administrative claim – October 1, 2015 through September 22, 2017);[60]

* allows the Sabine River Authority to withdraw funds from the SRA Escrow as pre-settlement compensation for Lake Fork water for the period November 2014 through October 2017 (in effect, the time period from the Sabine River Authority's unilateral action through the SRA Settlement), and provides that the remaining funds in the SRA Escrow could be

---

[57] A-252 (Rejection Motion at ¶10, fn. 6); A-269 (First Lowery Declaration at ¶ 18).

[58] A-253 (Rejection Motion at ¶ 12); A-270 and A-291-292 (First Lowery Declaration at ¶ 22 and Exhibit 6 referenced in the First Lowery Declaration and attached to Dallas' Response – July 17, 2015, letter from Dallas to Luminant); A-364 to A-366 (Lowery Dep. Tr. at pages 64-66).

[59] A-270 (First Lowery Declaration at ¶ 23).

[60] *See* SRA Settlement Agreement, A-111 to A-160.

withdrawn by the Sabine River Authority to pay Dallas' compensation
obligations going forward;[61]

\*      provides for dismissal of the SRA-Dallas Litigation;[62] and

\*      effective as of the October 19, 2017 effective date of the SRA Settlement,
        provides for the relinquishment by Dallas of its right to draw the 11,860
        acre-feet of water that could not be removed from the Sabine River
        basin.[63]

As Dallas has advised its wholesale customers, the SRA Settlement changed the
compensation payable to the Sabine River Authority for Lake Fork water, which impacted the
cost studies conducted for fiscal years 2015/16 and 2016/17.[64]  Accordingly, Dallas has revisited
those cost studies, factoring in the agreed-upon compensation payable to the Sabine River
Authority resulting from the SRA Settlement.[65]  The revised cost studies are attached to Dallas'
Final POC.[66]  The Sabine River Authority compensation is the only change to the cost studies
from when they originally were done, and used by Dallas City Council in adopting wholesale
water rates for fiscal years 2015/16 and 2016/17.[67]

The impact of the agreed-upon compensation payable to the Sabine River Authority
pursuant to the SRA Settlement on Dallas' previously established wholesale water rates for fiscal
years 2015/16 and 2016/17 and its § 503(b)(7) claim, is set forth below:

---

[61]   *Id.*  The SRA Settlement also allows the Sabine River Authority to immediately withdraw approximately half
($660,000) of the approximate $1,330,000 total compensation payable for the 11,860 acre-feet of water that Dallas
could not remove from the Sabine River basin and with respect to which it was relinquishing its rights after the
effective date of the SRA Settlement.

[62]   *Id.*

[63]   *Id.*

[64]   A-008 (Second Lowery Declaration at ¶12).

[65]   A-008 (Second Lowery Declaration at ¶13).

[66]   As it promised, Dallas has credited its decreased obligations to the Sabine River Authority to its customers,
including to Luminant as reflected in the Final POC.  *See* A-0044 to A-006 and A-164 to A-201 (Exhibits 6 to 8 to
the Second Lowery Declaration attached to the Final POC); and A-379 (Lowery Dep. Tr. at page 147).

[67]   A-009 (Second Lowery Declaration at ¶16).

| **Wholesale Water Rate Per 1000 gal./Acre-foot**[68] | **Monetary Obligations** |
|---|---|
| Original POC: | |
| FY 2015/16   $0.8335 / $271.60 | $3,259,161.72 |
| FY 2016/17   $0.8335 / $271.60[69] | $3,259,161.72 |
| Original POC § 503(b)(7) Claim | $6,445,897.62 |
| Amended POC: | |
| FY 2015/16   $0.8335 / $271.60 | $3,259,161.72 |
| FY 2016/17   $0.912 / $297.18[70] | $3,566,113.32 |
| Amended POC § 503(b)(7) Claim | $6,825,275.04 |
| Final (Current) POC: | |
| FY 2016/17   $0.6980 / $227.44 | $2,729,327.98 |
| FY 2016/17   $0.7631 / $248.66 | $2,983,882.78 |
| **Final POC § 503(b)(7) Claim** | **$5,598,128.87**[71] |

---

[68]  Wholesale water rates are commonly expressed either on a per 1000 gallon or per acre-foot basis.

[69]  Because the wholesale water rate had not been set by Dallas City Council for fiscal year 2016/17 when the Original POC was filed on November 12, 2015, Dallas also used the 2015/16 rate for 2016/17.

[70]  The wholesale water rate for fiscal year 2016/17 had been set by Dallas City Council when the Amended POC was filed on or about October 7, 2016.

[71]  The two year administrative claim period runs from the rejection of the Water Lease, which, pursuant to the Rejection Order, was made nunc pro tunc to September 22, 2015 . Thus, as a technical matter, a portion, effectively one week, of the two year administrative claim period falls within the 2014/15 fiscal year.  As reflected in the Projected Revenues spreadsheet (A-164 to A-165), the amount of Luminant's 2-year monetary obligation to Dallas as calculated in the Final POC, like the total claim amount evidenced by the Original POC, deducts from the 2-year administrative claim a pro-rata amount for the period September 23, 2015 through September 30, 2015 based on the payment made by Luminant for the month of September 2015 and includes a pro-rated amount for the month of September 2017 (from September 1 through 22).  That credit for a portion of September 2015 and the pro-ration for September 2017, was not included in the Amended POC, which Dallas assert reflects an innocent administrative mistake at the time the Amended POC was prepared and filed which has been corrected by the Final POC.

# IV.    ARGUMENT

## A.    Summary Judgment Standard

Summary judgment must be granted when:

> The pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[72]

Not every "dispute" over a fact is genuine and not every "disputed fact" is material. Disputes are genuine only "if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct";[73] and a "disputed" fact is material only if, based on the substantive applicable law, it "might affect the outcome."[74]  Upon demonstration of the absence of material issues of fact, a party "must come forward with specific facts showing that there is a genuine issue for trial."[75]  The existence of "some" evidence in support of the non-moving party is not sufficient for denial of summary judgment as "enough" evidence must exist to enable a fact finder reasonably to find for the

---

[72] Fed. R. Bankr. P. 7056.  *See Petruzzi's IGA Supermarkets v. Darling-Del. Co., Inc.,* 998 F.2d 1224, 1230 (3d Cir. 1993) (stating that "in all cases summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law.").

[73] *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir. 1995) (internal citations omitted).

[74] *Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*, 870 F.3d 244, 253 (3d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[75] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986) (internal citations, quotation, and emphasis omitted).

nonmoving party.[76]    A party resisting summary judgment cannot rely on bare assertions, conclusory allegations or suspicions.[77]

There are no genuine issues of material fact with respect to the basis for Dallas' administrative claim or the calculation of that claim as evidenced by the Final POC.[78]   And, as set forth below, there are no statutory or other defenses to the allowance of such claim.   Thus, Dallas is entitled to judgment based on the undisputed facts and the law applicable to its claim.

**B.    Dallas Properly Calculated its Administrative Claim in Accordance with § 503(b)(7) and the Terms of the Water Lease**

**1.    Section 503(b)(7) is Clear: Dallas is Entitled to an Administrative Claim Equal to the Monetary Obligations Due Under the Water Lease for a Two Year Period "Without Offset or Reduction"**

Section 503(b)(7) provides, in relevant part:

> [T]here shall be allowed, administrative expenses ... including-
>
> (7) with respect to a nonresidential real property lease previously assumed under section 365, and subsequently rejected, a sum equal to all monetary obligations due, . . . for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, without reduction or setoff for any reason whatsoever except for sums actually received or to be received from an entity other than the debtor, . . . .[79]

---

[76] *In re Stone & Webster*, 286 B.R. 532, 536 (Bankr. D. Del. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *see also Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*, 427 B.R. 301, 305 (Bankr. D. Del. 2010) ("The party opposing the motion 'must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[77] *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  *See also Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972) ("[C]onclusory statements, general denials, and factual allegations not based on personal knowledge would be insufficient to avoid summary judgment.").

[78] Luminant took the deposition of Terry Lowery and had the opportunity to take the deposition of Stacy Rodriguez, the declarants in connection with the Declarations included in the Appendix and from which undisputed facts are included in the Statement of Facts section of this Opening Brief.

[79] Section 503(b)(7) is the product of a legislative "give and take."  The Bankruptcy Abuse Protection and Consumer Protection Act of 2005 ("BAPCPA") amended 11 U.S.C. § 365(d)(4) to limit the period in which a debtor could decide to assume or reject executory contracts and leases to a maximum of 210 days.  BAPCPA also included the provision, codified at § 503(b)(7), limiting the administrative claim resulting from rejection of a previously assumed contract to 2-years rather than, potentially, the balance of the contract term as might have prevailed prior to BAPCPA (the Water Lease had 35 years remaining as of rejection, with potential monetary obligations thereunder in

These words are clear and unambiguous, and susceptible of plain meanings which are neither ambiguous nor absurd in application to the facts of this matter, and, thus are enforceable in accordance with their plain meanings.[80]  Given the "give and take" in respect of the competing interests of debtors and lessors over assumed contracts that later are rejected, the notion that the § 503(b)(7) claim resulting from such a rejection is a function solely of the lease contract and not subject to reduction for any reason other than actual dollars received is appropriate.

The calculation of Luminant's monetary obligations under the Water Lease and, thus, Dallas' § 503(b)(7) claim, is a straightforward math equation dictated by the terms of the Water Lease.  There are only two components to the primary equation: (i) the amount of water Luminant was obligated to buy from Dallas, which is fixed at 12,000 acre-feet per year, multiplied by the only variable (ii) the wholesale water rate established by Dallas City Council.  Then, of course, each year's calculation is added to get to the 2-year claim period under § 503(b)(7).  The variable – the wholesale water rate – was subject to a contingency prior to the SRA Settlement but no longer is; and, as reflected in the Final POC, Dallas has re-calculated its claim based on the revised wholesale water rates adopted by Dallas City Council.

Luminant has not taken issue previously with Dallas' math as reflected in its Original POC (although Dallas acknowledges Luminant's challenge to Dallas' use of post-September 22,

---

the many tens of millions of dollar for the remainder of the term).  However, that limited 2-year claim is not subject to reduction – either due to notions of "mitigation" or discounting to present value – as Luminant has argued.

[80]  *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004).  *See also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, et al.*, 507 U.S. 380, 388 (1993) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979) (Courts should "properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'"); *Alston v. Countrywide Fin. Corp.*, 585 F.3d. 753, 758-60 (3d Cir. 2009) ("Because it is presumed that Congress expresses its intent through ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute.") (citations and internal quotation marks omitted).

2015 increases to the wholesale water rate in its calculation). The only input that has changed since the Original POC is the wholesale water rate. The new rate resulting from the agreed-upon compensation payable to the Sabine River Authority pursuant to the SRA Settlement has been incorporated in Dallas' Final POC. The calculation otherwise has remained the same.

### 2. Luminant's Rejection of the Water Lease Does Not Affect its Substantive Terms Including the Calculation of Luminant's Monetary Obligations Thereunder

Whether prior to or after assumption, rejection of a contract is a breach of the contract, not a termination.[81] A debtor, although stating its intent not to continue performing its contractual obligations by deciding to reject, nevertheless remains bound by the contract provisions with respect to the calculation of the damages resulting from the breach.[82]

The Third Circuit's decisions in *Flagstaff Realty* is instructive in this regard. In *Flagstaff Realty*, the lease provided for reduction in the rent payable to the debtor-landlord by the non-debtor tenant if the tenant cured a default by the debtor, which the tenant did. In ruling for the tenant that the debtor-landlord was bound by this term of the lease, notwithstanding rejection, the Third Circuit stated:

> "Rejection does not alter the substantive rights of the parties to the lease," and thus does not alter the continuing vitality of terms affecting the amount of rent such as paragraph 29. *In re Chestnut Ridge Plaza Associates, L.P.*, 156 B.R. 477, 483 (Bankr. W.D. Pa. 1993). The primary function of rejection is to "allow[ ] a debtor lessor to escape the burden of providing continuing services to a tenant." *In re Lee Road Partners*, 155 B.R. 55, 60 (Bankr. E.D.N.Y. 1993) (citing cases), aff'd, 169 B.R. 507 (E.D.N.Y. 1994). Rejection affects the lessor's duties to the tenant. *See also In re Stable Mews Associates, Inc.*, 41 B.R. 594, 597 (Bankr.

---

[81] 11 U.S.C. § 365(g) ("the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease— . . . if such contract or lease has been assumed under this section . . . if before such rejection the case has not been converted . . . at the time of such rejection). *See In re Chestnut Ridge Plaza Assocs., L.P.*, 156 B.R. 477, 483 (Bankr. W.D. Pa. 1993) (holding that "the rejection of an executory contract or unexpired lease under § 365 does not mean that the contract or lease is terminated."); *In re Beck*, 272 B.R. 112, 121 (Bankr. E.D. Pa. 2002) (holding to the same effect as *Chestnut Ridge Plaza Assocs.)*

[82] *In re Flagstaff Realty Assocs.*, 60 F.3d 1031, 1034 (3d Cir. 1995) ("*Flagstaff Realty*").

S.D.N.Y. 1984) (rejection "reliev[es] the estate from covenants requiring future performance, such as the provision of utilities, repairs, maintenance and janitorial services by the debtor") (citation omitted); 2 *Collier on Bankruptcy* § 365.09, at 356-58 (15th ed. 1995) (rejection "results merely in the cancellation of covenants requiring performance in the future by the landlord"). The *Chestnut Ridge* court emphasized that

> [t]he obligations under the lease and rights associated with the tenant's leasehold interest do not just vanish because a debtor has rejected the lease. The leasehold interest remains intact and the lease remains operative between the parties. 156 B.R. at 485 (citations omitted).

Thus, although the rejection of the lease by the debtor-landlord relieves it of prospective obligations to perform under the lease, it does not relieve it of its obligation to accept the agreed upon reduced rent provided for under the terms of the lease.[83]

Like the debtors in *Flagstaff Realty*, Luminant's rejection of the Water Lease does not relieve it from its obligation to pay the amounts due, and as calculated, thereunder.

### 3.    Increases in the Wholesale Water Rate Set by Dallas City Council Ordinance for the Administrative Claim Period are Appropriately Included in Calculating Dallas' Administrative Claim

Rejection damages claims should compensate a lessor for its loss of revenue over the course of the rejected lease, subject to the applicable statutory caps.[84] Thus, increases in rents or contract rates must be included in calculating rejection damage claims.[85]

Section 503(b)(7) provides that Dallas is entitled to a claim for rejection of the Water Lease measured in accordance with the terms of the Water Lease. Luminant agreed in the Water

---

[83]  60 F.3d at 1034.  *See also, In re Chestnut Ridge Plaza Assocs., L.P.*, 156 B.R. at 483.

[84]  *See In re The Leslie Fay Companies, Inc.*, 166 B.R. 802, 809 (Bankr. S.D.N.Y. 1994).

[85]  *See In re Rappaport*, 517 B.R. 518, 542 (Bankr. D.N.J. 2014)(awarding escalating future damages under rejected contract); *In re MDC Sys., Inc.*, 488 B.R. 74, 88-89 (Bankr. E.D. Pa. 2013)(rent increase for the last month of the one year cap period included in calculating the rejection claim); *In re Shane Co.*, 464 B.R. 32, 45 (Bankr. D. Colo. 2012)(rent increases every three months under the lease included in the calculation of the rejection claim using the 15% claim measurement); *In re Peters*, 2004 WL 1291125, at *6 (Bankr. E.D. Pa. 2004)(rent increase in the last month of the applicable one year cap period included in the calculation of the rejection claim); *In re Transamerican National Gas Corp.*, 79 B.R. 663, 668 (Bankr. S.D. Tex. 1987)(factoring rate schedule increases in utility contract into estimation analysis);

Lease to pay based on the wholesale water rate established from time to time by Dallas City Council ordinance.  The bargain Dallas struck with all its wholesale customers, including Luminant, was that all costs and expenses incurred by Dallas in providing water in the prior year on a system-wide basis would be covered in the setting of the wholesale water rate for the following year applicable to every customer.  The rate adopted by Dallas City Council for fiscal year 2015/16 was designed to recover costs incurred by Dallas in the 2014/15 fiscal year (and 2016/17 captures costs incurred in 2015/16).

Luminant knew when it executed the Water Lease that the wholesale water rate could (and likely would) change annually.  After commencement of this bankruptcy case Luminant again, as a debtor in possession, by assuming the Water Lease, affirmatively agreed to be bound by all the terms of the Water Lease including, inter alia, that the wholesale water rate would be set annually by Dallas City Council.[86]

As noted above, the wholesale water rate increased from commencement of the bankruptcy cases to $182.90 per acre-foot effective October 1, 2014, and, despite taking no water in 2014, Luminant nevertheless decided to assume the Water Lease by its notice dated October 3, 2014.  Even when it later sought permission to reject the Water Lease (in the Rejection Motion), and in pleadings filed after that (*i.e.*, the Claim Objection), Luminant acknowledged that its monetary obligations under the Water Lease would be subject to Dallas City Council ordinance based on Dallas' wholesale water cost studies and that the rate could change from time to time.

---

[86]  *See Taylor-Wharton Int'l LLC v. Blasingame (In re Taylor-Wharton Int'l LLC)*, 2010 WL 4862723 (Bankr. D. Del. Nov. 23, 2010) (holding that rejection relieves a debtor from future performance under the contract but does not undo pre-rejection acts).  *See also In re G-I Holdings, Inc.*, 568 B.R. 731, 767 (Bankr. D.N.J. 2017) (internal citations omitted) (holding that a debtor assumes all terms of the contract including those that are beneficial and those that are burdensome and cannot "'cherry-pick' the provisions of an assumed contract with which it will comply."); *In re Buffets Holdings, Inc.*, 387 B.R. 115, 119 (Bankr. D. Del. 2008) (citing *In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951)) ("If the debtor decides to assume a lease, however, it must generally assume all the terms of the lease and may not pick and choose only favorable terms to be assumed.").

The $182.90 per acre-foot rate in effect as of the September 22, 2015 effective date of rejection and for only 8 days of the ensuing 2-year administrative claim period (approximately $44 and $61 per acre-foot, respectively, below the re-calculated wholesale water rates for fiscal years 2015/16 and 2016/17 after giving effect to the SRA Settlement), does not adequately compensate Dallas as required by § 503(b)(7) and bankruptcy policy.

First, its use over the entire administrative claim period is not in accord with the rate and payment terms of the Water Lease, which is the benchmark for calculation of Dallas' administrative claim under § 503(b)(7).  The Water Lease sets Luminant's monetary obligations thereunder based on the wholesale water rates set by Dallas City Council from time to time.  As contemplated by the Water Lease, the $182.90 rate changed, in effect on the same day that Luminant moved to reject.  It was not in effect at all for fiscal years 2015/16 and 2016/17, which, except for the first 8 days (September 23-30, 2015) and the last 8 days (September 23-30, 2017) comprises the applicable 2-year administrative claim period under the statute.  As Luminant has recognized, a $182.90 rate would not cover all costs and expenses incurred by Dallas in delivering untreated water to its wholesale customers.

Second, use of a $182.90 rate does not comply with the mandate of § 503(b)(7) that Dallas' claim is "equal to all monetary obligations" "with respect to" the "lease previously assumed under section 365, and subsequently rejected."  The Water Lease contemplates increases to the wholesale water rate; thus, actual increases must be included in the calculation of Luminant's monetary obligations under the Water Lease.  Use of the $182.90 rate as the multiplier in connection with the rate and payment terms of the Water Lease artificially and unjustifiably limits Dallas' claim contrary to the mandate of § 503(b)(7) and would not provide proper compensation to Dallas on account of its rejection claim.

24906974.6 04/26/2019

4.      **Dallas Has No Obligation to Mitigate and Notions of Mitigation in Respect of the SRA Settlement are Misplaced**

To the extent that Luminant persists in its objection based on mitigation, such is not well-founded either under § 503(b)(7) or common law.

a.      **Section 503(b)(7) Does Not Require Mitigation**

Section 503(b)(7) provides for allowance of a claim "without reduction or setoff for any reason whatsoever except for sums *actually received or to be received* from an entity other than the debtor, . . . ." Dallas has not received any such sums and nothing in the SRA Settlement represents sums actually received by Dallas from a non-debtor party.

The SRA Settlement actually reduces the compensation payable by Dallas to the Sabine River Authority for Lake Fork water from the amounts that Dallas had been compelled to pay into the SRA Escrow and which were used to calculate the prior wholesale water rates, which Dallas has baked into its revised cost studies and wholesale water rates for fiscal years 2015/16 and 2016/17.  Luminant has received the benefit of the SRA Settlement by virtue of the reduced wholesale water rates adopted by Dallas City Council for fiscal years 2015/16 and 2016/17.

Thus, in accordance with the plain meaning of § 503(b)(7), Dallas had no duty to mitigate and did not receive any actual sums triggering the reduction language of the statute.

b.      **There is No Mitigation Duty in Connection With Take or Pay Contracts**

Apart from the clear and unambiguous "no reduction" language of § 503(b)(7), Dallas has no common law duty to mitigate.  The Water Lease is a "take or pay" contract.  Luminant is entitled to take a certain volume of water but must pay for it regardless of whether any water is taken.  Given the nature of such obligation (*i.e.*, that Dallas must make the subject of the contract available for the entire term of the take or pay obligation, and all 12,000 acre-feet theoretically

could be taken on the last day of the period), no common law duty of mitigation exists.[87]  Thus, Luminant's mitigation argument would be a non-starter even before application of § 503(b)(7).

   c. **The SRA Settlement Does Not Substitute for the Rate and Payment Terms of the Water Lease in Calculating Luminant's Monetary Obligations Thereunder**

   Dallas anticipates Luminant will argue that the settlement term in the SRA Settlement Agreement by which Dallas and the Sabine River Authority agreed to set the compensation payable for the 11,860 acre-feet of water that could not be removed from the Sabine River basin at approximately $1,330,000 and to allow the Sabine River Authority to immediately withdraw 50% of such amount from the SRA Escrow must be considered in the calculation of Luminant's monetary obligations under § 503(b)(7).  Luminant's position in this regard, based presumably either on notions of "mitigation" or that the SRA Settlement supplants the rate and payment terms of the Water Lease, is incorrect for at least four separate but equally dispositive reasons.

   First, Luminant does not get to re-write or ignore terms of the Water Lease either by rejection or by virtue of the SRA Settlement.  None of Dallas' wholesale customers, including Luminant, are charged for water based only on the cost to Dallas of the specific water supplied to them by Dallas.  The fungible nature of water in a city-wide system highlights the absurdity of such a position while also ignoring the many other costs incurred by Dallas in delivering water to its customers, costs which are recovered in the next year through the wholesale water rate and spread by agreement among all of Dallas' wholesale customers.

   Second, in the context of § 503(b)(7), neither the approximate $660,000 that Dallas agreed to allow the Sabine River Authority to withdraw from the SRA Escrow in respect of the

---

[87] *See World Fuel Servs., Inc. v. John E. Retzner Oil Co., Inc.*, 234 F. Supp. 3d 1234, 1241 (S.D. Fla. 2017) ("Breach of a take or pay agreement entitles the non-breaching party to payments it would have received under the contract with no duty to mitigate damages.").  Moreover, for the reasons set forth in Dallas' Response to the Claim Objection, *see* D.I. 9779 at ¶¶ 92-98, mitigation would not defeat Dallas' claim under the circumstances here including that the Lake Fork water subject to the Water Lease could not be removed from the Sabine River basis and Dallas had no other customers in the Sabine River basin.

11,860 acre-feet nor the entire $1,330,000 reflecting the agreed-upon compensation for the 11,860 acre-feet are "sums actually received … from an entity other than the debtor."  The funds in the SRA Escrow were paid by Dallas as required by the Texas PUC during the pendency of the SRA-Dallas Litigation and dispute over the Sabine River Authority's unilaterally imposed compensation.  Thus, neither the $660,000 that remained in the SRA Escrow or the $660,000 taken out of the SRA Escrow constitute actual dollars received by a non-debtor and do not serve to reduce Dallas' claim under § 503(b)(7).

Third, Luminant's anticipated argument is based on a single provision of the SRA Settlement Agreement, which agreement itself does not amend or impact the Water Lease or the rate and payment terms of the Water Lease.  This provision deals with one narrow issue – how much could the Sabine River Authority withdraw from the SRA Escrow upon closing of the settlement – which has nothing to do with the rate and payment terms of the Water Lease or the setting of the wholesale water rate by Dallas City Council as contemplated by the Water Lease.

Fourth, the agreed-upon compensation payable to the Sabine River Authority pursuant to the SRA Settlement for the 11,860 acre-feet already has been factored into the re-calculated wholesale water rates for the 2015/16 and 2016/17 fiscal years and in Dallas' administrative claim under § 503(b)(7) as set forth in the Final POC.  Thus, to the extent, if any, that such might be considered as an arguable basis for mitigation or reduction, Luminant already has received this benefit.

The Third Circuit's decision in *Revel*[88] must be considered here.  In *Revel*, the debtors sold their assets pursuant to a sale agreement under which the buyer would acquire certain legal claims the debtors may have had against the tenant under a rejected lease which included the rent due thereunder.  The lease also provided for recoupment by the tenant of certain obligations the

---

[88]   *IDEA Boardwalk, LLC v. Revel Entertainment Group, LLC (In re Revel)*, 909 F.3d 597 (3d Cir. 2018) ("*Revel*").

24906974.6 04/26/2019

debtors owed thereunder.  In holding the buyer had not acquired the debtors' assets free from such recoupment claims, the Third Circuit stated that:

> In their net effect, the rent and recoupment provisions ensured that IDEA would pay rent in the first four years of the Lease term only when an IDEA venue turned a profit (as measured by the year-to-date distributable cash flow from the venue and accounting for the depreciation of capital that IDEA contributed to that venue). To render the ''recoupment'' component of this framework inoperative, while still calculating the ''rent'' component using the same formulas, would upend the rent framework established in the Lease and deny IDEA's statutory right to remain in possession of the premises under the same ''rental terms.'' *Flagstaff*, 60 F.3d at 1035.[89]

Similarly, a myopic focus on the SRA Settlement to the exclusion of the rate and payment terms of the Water Lease would be improper given the clear mandate of § 503(b)(7) that it is the terms of the Water Lease that control the determination of Luminant's monetary obligations and Dallas' claim under § 503(b)(7).

## C.    Dallas' Claims Need Not Be Discounted to "Present Value" as Such is Contrary to § 503(b)(7) and Serves No Legitimate Purpose

In the Claim Objection Luminant argued that Dallas' § 502(b)(6) claim must be discounted to present value.  Luminant did not then also argue that the § 503(b)(7) claim had to be discounted as well.  However, based on Luminant's post-SRA Settlement statements, Dallas anticipates Luminant may take this position in respect of the § 503(b)(7) claim as well.  But § 503(b)(7) does not authorize discounting the claim; and, moreover, there is no legal, factual or practical rationale for a present value discount to be applied to Dallas' administrative claim.

First, discounting Dallas' § 503(b)(7) claim would be an improper reduction of the claim contrary to the plain text of the statute.  Again, § 503(b)(7) provides that a lessor's post-rejection

---

[89]  909 F.3d at 602.

24906974.6 04/26/2019

administrative claim is "without reduction . . . for any reason whatsoever…."  Dallas submits that language ends the inquiry.

Second, Third Circuit precedent compels the conclusion that other words used in the statute (apart from the "without reduction . . . for any reason whatsoever…." language) do not support present valuation.  In *Oakwood Homes Corp*. ("*Oakwood*"), the Third Circuit held that the text of § 502(b) does not require present valuation of all claims representative of a stream of future payments, contrasting this section to the Bankruptcy Code sections that require present valuation (including § 1129), which use the words "value, as of" rather than "amount." [90]  Like § 502(b)(6), § 503(b)(7) expresses the claim available thereunder as a "sum."[91]  Consistent with § 502(b)(6), § 503(b)(7) does not use the words "value, as of."  Thus, the *Oakwood* rationale also applies to § 503(b)(7) claims and, consistent with the "no reduction" mandate of the statute, § 503(b)(7) claims should not be discounted to present value.  This result is in accord with case law that has declined to discount rejection damage claims to present value.[92]

Moreover, there is no financial or practical reason why Dallas' § 503(b)(7) claim should be discounted to present value.  Dallas' claim has not yet been allowed and relates to a time period – October 1, 2015 through September 22, 2017 – that already has long elapsed.  There is no stream of future payments requiring present valuation.

Dallas' claim also had not "crystalized" as of the September 22, 2015 *nunc pro tunc* rejection of the Water Lease.  Rather, as Debtors argued in the Claim Objection, Dallas' § 503(b)(7) claim was contingent and required estimation at such time (and remained so until

---

[90]  *In re Oakwood Homes Corp*. 449 F.3d. 588, 595 (3d Cir. 2006).

[91]  The word "sum" is akin to "amount" and is not ordinarily defined with a timing component, like "value, as of." *See* "*Sum*", MERRIAM-WEBSTER, www.Merriam-Webster.com/dictionary/sum (last visited Apr. 24, 2019) ("1: an indefinite or specified *amount* of money; 2: the whole *amount*").

[92]  *See In re Gretag Imaging, Inc.*, 485 B.R. 39, 45-46 (Bankr. D. Mass. 2013) (refusing to reduce rejection damage claim to present value); *In re Allegheny Int'l, Inc.*, 136 B.R. 396 (Bankr. W.D. Pa. 1991)(same).

finalization of the SRA Settlement, and the setting of final wholesale water rates for the 2015/16 and 2016/17 fiscal years).[93]

Thus, due to the clear and unambiguous "no reduction" language of § 503(b)(7), and the absence of any appropriate rationale for present valuation applicable to the facts and circumstances here, Dallas' administrative claim under § 503(b)(7) should not be discounted to present value.

## V.    CONCLUSION

For all the foregoing reasons, Dallas submits that there are no genuine issues of material fact in connection with Dallas' administrative claim under § 503(b)7) and that Dallas is entitled to summary judgment and entry of an order allowing its claim in the amount of $5,598,128.87.

Dated: April 26, 2019                    **SAUL EWING ARNSTEIN & LEHR LLP**

                                            *John D. Demmy*
                                            John D. Demmy (Bar No. 2802)
                                            1201 N. Market Street, Suite 2300
                                            P.O. Box 1266
                                            Wilmington, DE 19899
                                            Telephone:  (302) 421-6848
                                            E-mail:  john.demmy@saul.com

                                            -and-

                                            Melissa A. Martinez
                                            Centre Square West
                                            1500 Market Street, 38th Floor
                                            Philadelphia,  PA 19102-2186
                                            Telephone: (215) 972-8572
                                            E-mail: melissa.martinez@saul.com

                                            *Counsel for the City of Dallas, Texas*

---

[93]   In addition, the earliest time that Dallas would have been entitled to payment of its administrative claim was October 3, 2016 – a year after rejection of the Water Lease – when the Confirmed Plan became effective.  Of course, at that time the Debtors already had objected to Dallas' claims and the definitive calculation of such claims remained subject to resolution of the SRA dispute.

24906974.6 04/26/2019