# Exhibit A

Dallas' Proof of Claim
submitted April 26, 2019

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 4420
Beaverton, OR 97076-4420

# PROOF OF CLAIM

**COURT USE ONLY**

| Name of Debtor: | Case Number: |
|---|---|
| Luminant Generation Company, LLC | 14-11032 -CSS |

**NOTE:** Do not use this form to make a claim for an administrative expense that arises *after* the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.

Name and address where notices should be sent:

City of Dallas
c/o Mark Baggett
Asst. City Attorney
1500 S. Marilla, 7BN
Dallas, TX 75201

Telephone number: (214)671-8272

Email: mark.baggett@dallascityhall.com

☒ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**
*(If known)* 1319

Filed on: Nov. 12, 2015

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):

**COURT USE ONLY**

Telephone number: Email:

**5.   Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐  Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐  Wages, salaries or commissions (up to $12,475), earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐  Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐  Up to $2,775 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐  Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐  Other – Specify applicable paragraph of 11 U.S.C. § 507(a)( 2 ).

**1.   Amount of Claim as of Date Case Filed:**   $5,598,128.87

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
If all or part of the claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete item 6.
☐   Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2.   Basis for Claim:** Claim under 11 U.S.C. 503(b)(7) for rejection of an assumed lease
(See instruction #2)   (See attached Statement of Claim)

**3.   Last four digits of any number by which creditor identifies debtor:** ___ ___ ___ ___
   **3a. Debtor may have scheduled account as:** _____
(See instruction #3a)

**4.   Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:**
☐  Real Estate      ☐  Motor Vehicle      ☐  Other

Describe: _____
Value of Property: $ _____
Annual Interest Rate _____% ☐ Fixed or ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of time case was filed, included in secured claim, if any:**
$ _____

**Basis for perfection:** _____

**Amount of Secured Claim:** $ _____

**Amount Unsecured:** $ _____

**Amount entitled to priority:**

$ $5,598,128.87

See attached Statement of Claim

**6.   Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $** _____ (See instruction #6)

**7.   Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8.   Documents:** Attach **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8 and definition of "redacted".)*
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**9.   Signature: (See instruction #9)**   Check the appropriate box.
☐ I am the creditor.   ☒ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or their   ☐ I am a guarantor, surety, indorser, or other codebtor.
(Attached a copy of power of attorney, if any.)   authorized agent. (See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)
I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: _Terry Lowery_
Title: _Director_
Company: _Dallas Water Utilities_

(Signature)   _April 13, 2019_
(Date)

Address, telephone number, and email
(if different from notice address above):
_1500 Marilla St. Room 4AS_
_Dallas, TX 75201_
Telephone number: _214-670-3188_
Email: _terry.lowery@dallascityhall.com_

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**A-002**

# ATTACHMENTS TO PROOF OF CLAIM

1.      Summary Statement in Support of Proof of Claim;

2.      Declaration of Terry Lowery (the "Lowery Declaration") and Exhibits referenced in the Lowery Declaration:

Exhibit 1:  Non-residential real property lease (the "Water Lease") between Dallas and Luminant Generation Company, LLC ("Luminant");

Exhibit 2:  October 14, 2015 Order [D. I. 6447] authorizing rejection of the Water Lease (the "Rejection Order");

Exhibit 3:  Certified Copy of Dallas City Council Ordinance No. 29879 setting the wholesale water rate for fiscal year October 1, 2015 through September 30, 2016 (*see* highlighted section on page 30);

Exhibit 4:  Certified Copy of Dallas City Council Ordinance No. 30215 setting the wholesale water rate for fiscal year October 1, 2016 through September 30, 2017 (*see* highlighted section on page 27);

Exhibit 5:  Certified Copy of Dallas City Council File No. 17-1606 which reflects approval by the Dallas City Council of the Settlement Agreement and related documents memorializing the settlement between Dallas and the Sabine River Authority (the "SRA Settlement") which are included in File No. 17-1606;

Exhibit 6:  "Projected Revenues" spreadsheet reflecting monetary obligations due under the Water Lease for the period September 23, 2015 through September 22, 2017 after giving effect to the SRA Settlement;

Exhibit 7:  Revised cost study after giving effect to the SRA Settlement resulting in reduced wholesale water rate for fiscal year October 1, 2015 through September 30, 2016 ("Revised 2015 Cost Study); and

Exhibit 8:  Revised cost study after giving effect to the SRA Settlement resulting in reduced wholesale water rate for fiscal year October 1, 2016 through September 30, 2017 ("Revised 2016 Cost Study).

# SUMMARY STATEMENT IN SUPPORT OF PROOF OF CLAIM[1]

Pursuant to the Water Lease (Exhibit 1 to the Lowery Declaration) Luminant had the right to take from Dallas, but in any event was obligated to pay for (regardless whether it took any water), 12,000 acre-feet of water annually.[2] Luminant first assumed the Water Lease, on October 27, 2014, but then rejected it pursuant to the Rejection Order (Exhibit 2 to the Lowery Declaration). Accordingly, Dallas became entitled to rejection damage claims, including an administrative claim under 11 U.S.C. § 503(b)(7) equal to all monetary obligations under the Water Lease for a two year period. Pursuant to the rate and payment terms of the Water Lease, Luminant's monetary obligations thereunder are calculated by use of a system-wide wholesale water rate set from time to time by Dallas City Council ordinance taking into account all of Dallas' costs and expenses in delivering water to its wholesale water customers in the previous year.

Dallas filed its original proof of claim on November 12, 2015 (designated as Claim No. 1319), in which it calculated its claims under 11 U.S.C. §§ 503(b)(7) and 502(b)(6) using the wholesale water rate then in effect and which had been established by Dallas City Council Ordinance for the 2015/16 fiscal year (Dallas operates on an October 1 through September 30 fiscal year) (Exhibit 3 to the Lowery Declaration). On October 7, 2016 Dallas filed an amended proof of claim due to the increase to the wholesale water rate as established by Dallas City Council Ordinance for the 2016/17 fiscal year (see Exhibit 4 to the Lowery Declaration).

Effective as of October 19, 2017, Dallas and the Sabine River Authority entered into the SRA Settlement (see Exhibit 5 to the Lowery Declaration) which, inter alia, retroactively reduced one of the many expense items incurred by Dallas in delivering untreated water to its wholesale customers for the period beginning October 2014 and continuing thereafter, and which had the effect of reducing both the wholesale water rates for the 2015/16 and 2016/17 fiscal years and the amount of Dallas' claims.

---

[1]     This Statement summarizes the basis for Dallas' administrative claim under 11 U.S.C. § 503(b)(7). Dallas also will be filing a motion for summary judgment with the Bankruptcy Court and herein incorporates by reference its Opening Brief and any reply brief it may file in support of such motion in further support of this proof of claim. Capitalized terms not defined herein have the meanings given to them in the foregoing table listing the attachments to the Lowery Declaration which is attached.

[2]     One acre-foot of water contains 325,851 gallons of water; thus, 12,000 acre-feet is 3,910,212,000 gallons.

The Projected Revenues (Exhibit 6 to the Lowery Declaration), Revised 2015 Cost Study (Exhibit 7 to the Lowery Declaration) and Revised 2016 Cost Study (Exhibit 8 to the Lowery Declaration) reflect: (i) the changes to the wholesale water rates for the 2015/16 and 2016/17 fiscal years resulting from the SRA Settlement, and (ii) the amount of Dallas' administrative claim under § 503(b)(7) after giving effect to the SRA Settlement.[3]  The monetary obligations of Luminant to Dallas for the two year period comprising Dallas' § 503(b)(7) claim are summarized below and compared with the Original POC and the Amended POC to evidence the impact (reduction) on such monetary obligations by the SRA Settlement:

**Wholesale Water Rate Per 1000 gal./Acre-foot[4]**         **Monetary Obligations**

Original POC:

|  | FY 2015/16 | $0.8335 / $271.60 | $3,259,161.72 |
|---|---|---|---|
|  | FY 2016/17 | $0.8335 / $271.60[5] | $3,259,161.72 |
|  | Original POC § 503(b)(7) Claim |  | $6,445,897.62 |

Amended POC:

|  | FY 2015/16 | $0.8335 / $271.60 | $3,259,161.72 |
|---|---|---|---|
|  | FY 2016/17 | $0.912 / $297.18[6] | $3,566,113.32 |
|  | Amended POC § 503(b)(7) Claim |  | $6,825,275.04 |

Final (Current) POC:

|  | FY 2016/17 | $0.6980 / $227.44 | $2,729,327.98 |
|---|---|---|---|
|  | FY 2016/17 | $0.7631 / $248.66 | $2,983,882.78 |
|  | **Final POC § 503(b)(7) Claim** |  | **$5,598,128.87**[7] |

---

[3]      Dallas no longer is asserting a rejection claim under § 502(b)(6).

[4]      Wholesale water rates are commonly expressed either on a per 1000 gallon or per acre-foot basis.

[5]      Because the wholesale water rate had not been set by Dallas City Council for fiscal year 2016/17 when the Original POC was filed on November 12, 2015, Dallas also used the 2015/16 rate for 2016/17.

[6]      The wholesale water rate for fiscal year 2016/17 had been set by Dallas City Council when the Amended POC was filed on or about October 7, 2016.

[7]      As reflected in the Projected Revenues spreadsheet, this amount, like the total claim amount evidenced by the Original POC and the Amended POC, deducts from the 2-year administrative claim a pro-rata amount for the period September 23, 2015 through September 30, 2015 based on the payment made by Luminant for the month of September 2015 and includes a pro-rated amount for the month of September 2017 (from September 1 through 22).

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF TERRY LOWERY IN CONNECTION WITH
AMENDED PROOF OF CLAIM SUBMITTED BY CITY OF DALLAS, TEXAS**

I, Terry Lowery, declare as follows:

1.      All of the facts set forth in this declaration are offered to the best of my knowledge, information and belief and, except as otherwise specifically may be indicated, are based upon my personal knowledge, my review of relevant documents, or information provided to me by personnel of or advisors to the City of Dallas, Texas ("Dallas").  If called to testify in court in this matter I could, and would, testify competently as to the facts set forth herein.

2.      I have both a Bachelor of Science degree and a Master of Science degree from the University of Texas.  Both degrees are in Mathematics with majors in Statistics.

3.      I currently am Dallas' Director of Water Utilities.  Prior to that I was Dallas' Assistant Director of Business Operations.

4.      In my position as Assistant Director of Business Operations, I was responsible for several Dallas governmental divisions and operations including: (i) the Financial Planning Division (including operating and capital budget development, monitoring and reporting; revenue and rate development for wholesale and retail water customers of Dallas; and development of capital funding scenarios and debt issuances); (ii) the Wholesale Services

Division (including all wholesale contracts; contract renewals; coordination of operating issues between Dallas Water Utilities and its customers; and requests for new service and any billing rate issues that may arise); (iii) the Water Conservation Division (including public outreach; educational programs; rebate and incentive programs; and all State required reporting); (iv) the Water Planning Division (including long range water supply planning for the City and its customers; management of the City's water rights, permits and reservoir operating guidelines; drought management; and development of new water supplies); and (v) Administrative Systems (including department wide training and administration and State required certification of water and wastewater operators).

5.      In my capacity as Assistant Director of Business Operations, which included the responsibility for the development of wholesale cost of service studies and rate development, and continuing in my capacity as Director of Water Utilities, I was involved in the Lake Fork Reservoir rate dispute between Dallas and the Sabine River Authority.  Also, in these capacities, I became familiar with, and have maintained my familiarity with, Dallas' relationship with Luminant Generation Company LLC ("Luminant").

6.      On or about this date Dallas has filed an amended proof of claim in the above-captioned bankruptcy case evidencing its claim against Luminant for the two year period from October 1, 2015 through September 30, 2017, based on the non-residential real property lease (the "Water Lease") between Dallas and Luminant, a true and correct copy of which is attached hereto as Exhibit 1.

7.      It is my understanding, based on information that has been provided to me, that attached hereto as Exhibit 2 is a true and correct copy of the October 14, 2015 Order entered by the Court [Docket No. 6447] authorizing rejection of the Water Lease.

33664454.2 04/10/2019

8.      Attached hereto as <u>Exhibit 3</u> is a certified copy of the Dallas City Council Ordinance No. 29879 setting the wholesale water rate for Dallas' wholesale water customers for the fiscal year October 1, 2015 through September 30, 2016.

9.      Attached hereto as <u>Exhibit 4</u> is a certified copy of the Dallas City Council Ordinance No. 30215 setting the wholesale water rate for Dallas' wholesale water customers for the fiscal year October 1, 2016 through September 30, 2017.

10.      Attached hereto as <u>Exhibit 5</u> is a certified copy of Dallas City Council File No. 17-1606, which reflects approval by the Dallas City Council of the Settlement Agreement and related documents memorializing the settlement between Dallas and the Sabine River Authority (the "SRA Settlement") which are included in File No. 17-1606.

11.      Attached hereto as <u>Exhibit 6</u> is a true and correct copy of the spreadsheet I created entitled "City of Dallas Water Utilities Department Luminant Lake Fork Untreated Water Contract Projected Revenues" which reflects the monetary obligations due under the Water Lease for fiscal years October 1, 2015 through September 30, 2016 and October 1, 2016 through September 30, 2017, after giving effect to the changed compensation under the SRA Settlement.

12.      Dallas has advised its wholesale water customers that the SRA Settlement changed the compensation payable to the Sabine River Authority for Lake Fork water for fiscal years 2015/16 and 2016/17, and that such impacted the wholesale cost studies for those years.

13.      Dallas has revised the cost studies for fiscal years 2015/16 and 2016/17, factoring in the agreed-upon compensation payable resulting from the SRA Settlement.

14.      Attached hereto as <u>Exhibit 7</u> is a true and correct copy of the revised cost study with respect to the wholesale water rate for untreated water for fiscal year October 1, 2015 through September 30, 2016, after giving effect to the SRA Settlement.

33664454.2 04/10/2019

15.     Attached hereto as <u>Exhibit 8</u> is a true and correct copy of the revised cost study with respect to the wholesale water rate for untreated water for fiscal year October 1, 2016 through September 30, 2017, after giving effect to the SRA Settlement.

16.     The Sabine River Authority compensation is the only part of the 2015/16 and 2016/17 fiscal year cost studies that changed from when they originally were done, and implemented by Dallas City Council Ordinance.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED this  17  day of April, 2019.

Terry Lowery

33664454.2 04/17/2019

# Exhibit 1 to Lowery Declaration in Support of Dallas' Proof of Claim

Non-residential real property lease (the "Water Lease") between Dallas and Luminant Generation Company, LLC



**City of Dallas**

| STATE OF TEXAS | § |
| COUNTY OF DALLAS | § |
| CITY OF DALLAS | § |

I, **BILIERAE JOHNSON,** Assistant City Secretary of the City of Dallas, Texas, do hereby certify that the attached is a true and correct copy of:

### RESOLUTION NO. 11-0579

which was passed by the Dallas City Council on **February 23, 2011.**

WITNESS MY HAND AND THE SEAL OF THE CITY OF DALLAS, TEXAS, this the **11**th day of **November, 2015.**

_____
**BILIERAE JOHNSON**
**ASSISTANT CITY SECRETARY**
**CITY OF DALLAS, TEXAS**

PREPARED BY: AG

COUNCIL CHAMBER
## 110579
February 23, 2011

**WHEREAS,** on July 8, 1981, pursuant to Resolution No. 81-1936, the Dallas City Council authorized execution of the Water Supply and Conveyance Contract between Dallas and Sabine River Authority (SRA) and Texas Utilities Generating Company (TUGCO) (Power Companies); and

**WHEREAS,** on July 30, 1986, the City of Dallas entered into the First Supplement to Water Supply Contract and Conveyance agreement between Dallas, SRA and Texas Utilities Electric Company (TUEC) which set a deadline of September 1, 2009 for TUEC to exercise the option to purchase 17,000 acre-feet per year of water from Dallas; and,

**WHEREAS,** Luminant Generation Company LLC, (formerly Texas Utilities Electric Company) exercised their option on July 24, 2006 to purchase 17,000 acre-feet of water per year and desires to enter into a forty year contract with Dallas for 12,000 acre-feet of water per year; and,

**WHEREAS,** Luminant will pay Dallas for the water and incur the cost of capital improvements necessary to transport the water to Martin Creek and any operations and maintenance and capital costs imposed by SRA; **Now, Therefore,**

**BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF DALLAS:**

**SECTION 1.** That following approval as to form by the City Attorney, the City Manager is hereby authorized to enter into an Untreated Water Contract with Luminant Generation Company LLC for 12,000 acre feet of Dallas' Lake Fork water.

**SECTION 2.** That the City Controller be and is hereby authorized and directed to deposit receipts for service provided under this contract to the Water Utilities Operation Fund as follows:

| FUND | DEPT | UNIT | FUNC | REVENUE RESOURCE CODE |
|------|------|------|------|----------------------|
| 0100 | DWU | 7005 | 7REV | 7849 |

**SECTION 3.** That this resolution shall take effect immediately from and after its passage in accordance with the provisions of the Charter of the City of Dallas and it is accordingly so resolved.

APPROVED BY
CITY COUNCIL

FEB 23 2011

*Deborah Watkins*
City Secretary

**A-012**

110579

STATE OF TEXAS            §
                                       §
COUNTY OF DALLAS      §

### UNTREATED WATER PURCHASE CONTRACT

WHEREAS, on July 30, 1986, the Sabine River Authority of Texas (hereinafter called "SRA"), Texas Utilities Electric Company, and the City of Dallas (hereinafter called "Dallas") entered into the First Supplement to Water Supply Contract and Conveyance, whereby Dallas granted to Texas Utilities Electric Company an option to purchase up to and including 17,000 acre feet of water per year from the rights of Dallas in Lake Fork (hereinafter called "the Option"); and

WHEREAS, Luminant Generation Company LLC, a Texas limited liability corporation (hereinafter called "Purchaser"), is the lawful successor to Texas Utilities Electric Company in regard to the rights granted under the Option, which option Purchaser now wishes to exercise for the purchase of 12,000 acre-feet of water per year to allow Purchaser to maintain proper water levels in Martin Lake in connection with the Martin Lake Steam Station; and

WHEREAS, Purchaser does not need the remaining 5,000 acre-feet of water per year that is a part of the Option and desires to release said 5,000 acre-feet of water per year to Dallas; and

WHEREAS, Dallas, pursuant to Certificate of Adjudication No. 05-4669, as amended, has existing contractual rights to use the water of Lake Fork and Purchaser, pursuant to Certificate of Adjudication No. 05-4649, as amended, has water rights in Martin Lake; and

WHEREAS, the diversion and use of the water by Purchaser from Lake Fork, on Lake Fork Creek, a tributary of the Sabine River, Sabine River Basin, affects the contractual water rights of Dallas in Lake Fork; and

WHEREAS, the parties desire to enter into this Untreated Water Purchase Contract ("Contract") for a term of 40 years in accordance with the terms of the Option, applicable regulations and procedures established by the Texas Commission on Environmental Quality ("TCEQ") and the Texas Water Development Board ("TWDB"), allowing Purchaser to purchase untreated water (in an amount of 6,000 acre-feet in calendar year 2011 and 12,000 acre-feet per year in calendar years 2012 through 2050) at the Dallas ordinance rate in effect on the date of this Contract, which rate may thereafter be changed from time to time in the manner set out below in this Contract.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and conditions given by each party, Dallas and Purchaser agree as follows:

**A-013**

110579

1.   CONTRACT ADMINISTRATION

This Contract shall be administered on behalf of Dallas by its Director of Water Utilities, or the Director's designated representative (hereinafter called "Director"), and on behalf of Purchaser by its authorized official or designated representative.

2.   AVAILABILITY

Dallas agrees to sell untreated water to Purchaser for industrial uses related to Purchaser's operation, as outlined below, when available. The sale of untreated water to meet the requirements of Purchaser is subject to and limited by available system supply (as determined by the Director). Sales, however, shall not be unreasonably withheld.

3.   MAXIMUM PURCHASE

Purchaser agrees to take not more than 6,000 acre-feet (1,955,106,000 gallons) of untreated water in year 2011 and 12,000 acre-feet (3,910,212,000 gallons) of untreated water per year during the remaining term of this Contract. It is an express condition of this Contract that this Contract may be terminated if Purchaser knowingly takes untreated water in excess of the maximum amount prescribed for the calendar year in question; provided, however, that if Purchaser breaches this Contract by taking more than the maximum amount, Purchaser shall remain liable for the additional amounts taken at the rates as specified in Section 4 below.

4.   RELEASE OF WATER BY PURCHASER

A.   Purchaser hereby releases and relinquishes all its interest in 5,000 acre-feet of water of the 17,000 acre-feet of water per year under the Option, as described in Article 5 of the First Supplement to Water Supply Contract and Conveyance to the City of Dallas ("Supply Contract"). The Supply Contract provides that Luminant may release back to Dallas its option and right to purchase any or all of the 17,000 acre-feet of water. This release and relinquishment dates from the effective date of this contract and is effective in perpetuity, regardless of the expiration of this Contract.

B.   In releasing and relinquishing the 5,000 acre-feet of water per year to Dallas, Purchaser is relieved of any further payment obligation to Dallas with respect to that 5,000 acre-feet of water.

C.   Dallas and Purchaser acknowledge that under this Contract, Dallas may divert, use, sell and reuse up to 6,000 acre-feet of water under the Option and this Contract in year 2011 (from January 1, 2011 to June 30, 2011). The 6,000 acre-feet of water represents one-half of that amount of water Purchaser is obligating itself to purchase from Dallas under the Option and this Contract.

5.   RATES

Purchaser shall pay Dallas for untreated water taken under this Contract at the current prevailing regular (non-interruptible) rate for untreated water sales as specified by Dallas

A-014

110579

ordinance, as same may be amended from time to time, and shall pay all other applicable charges for untreated water sales as may be adopted from time to time by ordinance of the Dallas City Council. Purchaser shall also be solely responsible for all costs, fees, or charges imposed by SRA to implement untreated water deliveries and maintain any necessary delivery facilities under this Contract. Purchaser shall maintain the Water Release Agreement executed on April 1, 2007 ("Water Release Agreement") with SRA in connection with the untreated water deliveries under this Contract, which separate agreement shall govern the terms and conditions under which SRA will release water to Purchaser from Lake Fork pursuant to this Contract. The separate Water Release Agreement between SRA and Purchaser does not modify or amend Dallas' water rights in Lake Fork under the Water Supply Contract and Conveyance, as amended.

6.   CURTAILMENT

Purchaser agrees that during periods of water shortages Dallas may, in accordance with its drought contingency plan as approved by TCEQ, reasonably restrict Purchaser's withdrawals of untreated water when such water is needed for Dallas' municipal use. No restrictions will be imposed on Purchaser unless Dallas has imposed restrictions on withdrawals as to all similarly situated users. In the event withdrawals are restricted, untreated water shall be allocated to Purchaser on a pro rata basis. The amount to be paid to Dallas pursuant to Section 7 of this Contract in the event of a curtailment shall be reduced in proportion to the reduction in the maximum number of acre-feet of untreated water to which Purchaser is annually entitled under this Contract.

7.   PAYMENTS

A.   For all calendar years during the term of this Contract except year 2011, the purchase price due, which price Purchaser hereby agrees to pay, is based on the applicable maximum amount described in Section 3 (12,000 acre-feet of untreated water) times the applicable rate as described in Section 5. Purchaser agrees that payment for untreated water made available under this Contract pursuant to the exercise of Purchaser's Option is due and shall be paid, regardless of whether or not Purchaser actually takes the maximum amount of water during such period. The purchase price due shall be paid monthly by taking the maximum amount described in Section 3 (12,000 acre-feet of untreated water or 3,910,212,000 gallons), dividing it by twelve (12), and multiplying that sum by the applicable rate as described in Section 5 in effect for that month. Dallas agrees to render a statement to Purchaser monthly and Purchaser agrees to pay promptly. Payment is due upon receipt of statement.

B.   For calendar year 2011, the purchase price due shall be paid monthly by taking the maximum amount described in Section 3 for year 2011 (6,000 acre-feet of untreated water or 1,955,106,000 gallons), dividing it by six (6), and multiplying that sum by the applicable rate as described in Section 5 in effect for that month.

C.   A payment is deemed late if received by Dallas more than 30 days from the statement date. Late payments shall accrue interest at the interest rate provided in Section 2-1.1 of the Dallas City Code, as amended.

Luminant Generation Company LLC
Untreated Water Purchase Contract
Page 3 of 10

A-015

110579

8.   <u>MEASUREMENT OF CONSUMPTION</u>

A.   Consumption shall be based upon daily releases made by SRA on behalf of Purchaser under this Contract.

B.   Dallas and Purchaser agree that Purchaser will bear all losses including transportation and evapotranspiration losses (hereinafter collectively referred to as "transmission losses") from Lake Fork downstream to Purchaser's diversion point. For the purpose of this contract, it shall be assumed that none of the water released by SRA on behalf of Purchaser under this contract will be lost in transmission from Lake Fork to Purchaser's diversion point on the Sabine River. If it is later determined that a transmission loss actually occurs, the amount of the transmission loss, expressed in percentage terms, shall be utilized in determining the quantity of water actually used. If an alternate conveyance is used to deliver contract water to Martin Lake, an amendment to this contract and a subsequent analysis shall be required to determine if · transmission losses occur due to the use of the alternate conveyance. The Parties agree that the cost of such analysis shall be borne exclusively by Purchaser.

C.   For days on which Purchaser pumps water under this Contract, Purchaser shall maintain a daily pumping log to provide a manner for determining the amount of water withdrawn at Purchaser's diversion point on the Sabine River. Monthly reports, in a format satisfactory to the Director of Dallas Water Utilities, showing daily requests (if any) by Purchaser, releases made by SRA on behalf of Purchaser, and daily amount of gallons pumped by Purchaser shall be furnished to the Director of Dallas Water Utilities. Dallas may request modification of any daily pumping report required to be maintained by Purchaser under this Subsection 8.C. if Dallas reasonably believes any such report is inaccurate.

D.   Measurement of water provided to Purchaser under this Agreement will be measured at the Point of Release at meter facilities maintained by SRA and/or Purchaser under the Water Release Agreement. Additionally, Purchaser shall furnish, install, operate, and maintain at its Point of Withdrawal on the Sabine River measuring equipment properly equipped with meters and devices of standard types for measuring within generally accepted standards of accuracy as established by the American Water Works Association the quantity of water diverted and used by Purchaser under this Contract. For purposes of this Contract, also, Purchaser shall be responsible for the continued accuracy of the meter(s) at the Point of Release in accordance with the terms and conditions of said Article IV, Measuring Equipment, of said Water Release Agreement. Should Purchaser exercise any inspection or calibration options under the Water Release Agreement or this Contract, Purchaser will notify the Director before any calibration or inspection of records or metering facilities, so that Dallas may participate, at its election.

E.   Purchaser shall maintain weekly and monthly reports of water pumped under this contract in accordance with Texas Commission on Environmental Quality Rules. Purchaser shall provide Dallas the opportunity to inspect such records during regular business hours upon reasonable notice. Purchaser shall submit to the Director of Dallas Water Utilities by March 1st of each year a copy of the annual water use reports provided to the Texas Commission on Environmental Quality and the Texas Water Development Board in accordance with 30 Texas Administrative Code, Section 295.202 and 31 T.A.C. Section 358.5.

A-016

110579

9.   DIVERSION POINT AND DISCHARGE

A.    Pumping equipment for withdrawal of the water and metering facilities may only be located as authorized by TCEQ in a water rights permit issued to Purchaser. Purchaser shall designate the diversion point at which Purchaser wishes to withdraw water, subject to the approval of the Director, SRA, and TCEQ. The designated diversion point shall be reflected in a vicinity map prepared by Purchaser prior to review and approval of the designation by the Director which shall be deemed, when completed and approved by both the Director and SRA, as attached to and made a part of this Contract as Exhibit A.

B.    Ownership and maintenance responsibility for the pumps and facilities housing pumps shall remain with Purchaser. Purchaser shall maintain pumps and motors in accordance with good engineering practice.

10.   TERM

Even though Purchaser's obligations to purchase water under this Contract do not begin until July 1, 2011, the term of this Contract shall commence on January 1, 2011 and shall remain in effect for a term of forty (40) years until December 31, 2050, subject to the terms of Purchaser's and Dallas' Water Supply Contract and Conveyance with SRA, dated October 1, 1981, as amended. This Contract may be renewed, upon the same terms and conditions (except as to rates), for an additional twenty (20) year period by mutual agreement of Dallas and Purchaser. If Dallas and Purchaser cannot mutually agree to a renewal by the end of the term of this Contract, Purchaser may continue to purchase untreated water under the terms of this Contract at the then prevailing rate for as long as the parties continue to negotiate a renewal in good faith and until negotiations either terminate or result in an approved Contract renewal.

11.   INSPECTION AND METER READING

Upon reasonable advance notice to Purchaser, authorized Dallas employees shall have the right of reasonable ingress and egress on Purchaser's property and facilities during business hours to observe pumping operations, to review pumping records and to read meters.

12.   DEFAULT - TERMINATION

A.    Dallas, acting through the Director, shall have the right to terminate this Contract upon non-payment of the charges set out in this Contract. Dallas, however, shall provide notice of intent to terminate under this Subsection 12.A. at least ten (10) days prior to the proposed effective date of termination, in order for Purchaser to tender payment and thereby cure a default as to non-payment under this Contract.

B.    Dallas, acting through the Director, shall have the right to terminate this Contract if it is found that pumping logs are not adequately maintained or that the meter is being bypassed. In addition, if the Contract is terminated under this Subsection 12.B., Dallas shall be entitled to payment for the maximum quantity of water for that calendar year in which the default under this subsection occurs.

110579

C.    In addition to the foregoing, Dallas, acting through the Director, may terminate this Contract for noncompliance with any other contractual condition upon thirty (30) days advance written notice to Purchaser of its intent to terminate; provided, however, that if Purchaser cures the condition of contractual noncompliance within the thirty (30) day period, Dallas may, at its sole option, continue this Contract.

D.    The remedies set forth in this Section 12 shall not be considered exclusive, and Dallas retains all other rights and remedies available at law and in equity in the event of any breach by Purchaser of any of the terms or provisions of this Contract.

13.   NO REPRESENTATIONS OR WARRANTIES; FORCE MAJEURE

DALLAS MAKES NO REPRESENTATIONS OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE CHARACTER, QUALITY OR AVAILABILITY OF THE WATER TO BE TAKEN AND PURCHASER AGREES TO ASSUME ALL SUCH RISKS, ACCEPTING SAID WATER, IF AVAILABLE, IN THE SAME STATE AS IT IS PUMPED OR RELEASED FROM THE DESIGNATED DIVERSION POINTS. DALLAS ALSO DOES NOT MAKE ANY REPRESENTATION THAT THE WATER WILL BE SUITABLE FOR THE PURPOSES FOR WHICH PURCHASER DESIRES TO USE IT. DALLAS SHALL NOT BE LIABLE IN ANY EVENT FOR THE INABILITY OF DALLAS TO PERFORM ANY OBLIGATION UNDER THIS CONTRACT FOR REASONS BEYOND ITS CONTROL, INCLUDING BUT NOT LIMITED TO ACTS OF GOD OR NATURAL DISASTER, WAR, DROUGHT, TERRORISM, FIRE, PUBLIC UTILITY POWER OUTAGE, OR THE RULES, REGULATIONS, OR ORDERS OF COURTS OR OF GOVERNMENTAL AGENCIES.

14.   RIGHTS AND TITLE; LIMITED RIGHT TO RESALE

A.    Purchaser agrees that it shall acquire no rights or title to the use of water other than those rights explicitly set forth in this Contract.

B.    If Purchaser projects its annual usage under this Contract to be less than 12,000 acre-feet of water in any year and desires to resell the remaining water to other persons, Dallas hereby gives its consent for such short-term water sale. In this Contract, short-term water sale means the sale of untreated water pursuant to a contract, the term of which does not exceed three years. Short-term water sale contracts may be renewed at the option of Purchaser.

C.    Purchaser shall ensure that its total maximum amount of water sold or used in any calendar year does not exceed 12,000 acre-feet.

15.   ASSIGNMENT

Other than to an affiliate or subsidiary of Purchaser, Purchaser shall not sell, assign, transfer or convey its interest in this Contract, in whole or in part, without the prior written consent of the Director. Such consent shall not be unreasonably withheld. If consent of the Director is denied, Purchaser may release back to Dallas its rights to purchase under this Contract and shall thereby be relieved of any further payment obligation to Dallas for untreated water under this Contract.

Luminant Generation Company LLC
Untreated Water Purchase Contract
Page 6 of 10

110579

16.   PERMITS AND FEES

Should the acquisition of any permits or the payment of any regulatory or other fees be required in connection with this Contract, including but not limited to permits or regulatory or other fees that may be required by TCEQ, Purchaser shall be responsible for same and shall provide written proof of the permit or regulatory or other fee payment to the Director. Purchaser shall divert water under this Contract only pursuant to such permit or amendment to any existing permit that TCEQ may issue to Purchaser relating to diversion of water from Lake Fork, to applicable regulations of TCEQ and TWDB, and the terms of this Contract.

17.   NOTICES

Except as otherwise provided in Section 18, any notice, statement, or demand required or permitted to be given under this Contract by either party to the other may be effected by personal delivery in writing or by mail, postage prepaid. Mailed notices shall be addressed to the parties at the addresses appearing below, but each party may change its address by written notice in accordance with this section. Mailed notices shall be deemed communicated as of three (3) days after mailing.

|  |  |
|---|---|
| **TO DALLAS:** | **TO PURCHASER:** |
| Director | Environmental Generation Director |
| Dallas Water Utilities | Luminant Generation Company LLC |
| Dallas City Hall | 500 North Akard Street |
| 1500 Marilla – Room 4/a/North | Suite 9-095 |
| Dallas, Texas 75201 | Dallas, Texas 75201-3411 |
|  |  |
|  | With a copy to: |
|  | General Counsel |
|  | 500 North Akard Street |
|  | 14th Floor |
|  | Dallas, Texas 75201 |

18.   NOTICE OF CONTRACT CLAIM

This Contract is subject to the provisions of Section 2-86 of the Dallas City Code, as amended, relating to requirements for filing a notice of a breach of contract claim against City. Section 2-86 of the Dallas City Code, as amended, is expressly incorporated by reference and made a part of this Contract as if written word for word in this Contract. Purchaser shall comply with the requirements of this ordinance as a precondition of any claim relating to this Contract, in addition to all other requirements in this Contract related to claims and notice of claims.

19.   CONFLICT OF INTEREST

The following section of the Charter of the City of Dallas shall be one of the conditions, and a part of, the consideration of this Contract, to wit:

Luminant Generation Company LLC
Untreated Water Purchase Contract
Page 7 of 10

110579

"CHAPTER XXII. Sec. 11. FINANCIAL INTEREST OF EMPLOYEE OR OFFICER PROHIBITED --

(a)    No officer or employee shall have any financial interest, direct or indirect, in any contract with the City or be financially interested, directly or indirectly, in the sale to the City of any land, materials, supplies or services, except on behalf of the City as an officer or employee. Any violation of this section shall constitute malfeasance in office, and any officer or employee guilty thereof shall thereby forfeit the officer's or employee's office or position with the City. Any violation of this section, with knowledge, express or implied, of the person or corporation contracting with the City shall render the contract involved voidable by the City Manager or the City Council.

(b)    The alleged violations of this section shall be matters to be determined either by the Trial Board in the case of employees who have the right to appeal to the Trial Board, and by the City Council in the case of other employees.

(c)    The prohibitions of this section shall not apply to the participation by City employees in federally-funded housing programs, to the extent permitted by applicable federal or state law."

## 20.    GIFT TO PUBLIC SERVANT

A.    Dallas may terminate this Contract immediately if Purchaser has offered, or agreed to confer any benefit upon a Dallas employee or official that the Dallas employee or official is prohibited by law from accepting.

B.    For purposes of this section, "benefit" means anything reasonably regarded as pecuniary gain or pecuniary advantage, including benefit to any other person in whose welfare the beneficiary has a direct or substantial interest, but does not include a contribution or expenditure made and reported in accordance with law.

C.    Notwithstanding any other legal remedies, Dallas may require Purchaser to remove any officer or employee of Purchaser from the administration of this Contract or any role in the performance of this Contract who has violated the restrictions of this section or any similar state or federal law, and obtain reimbursement for any expenditures made as a result of the improper offer, agreement to confer, or conferring of a benefit to a Dallas employee or official.

## 21.    VENUE

The parties agree that this Contract shall be enforceable in Dallas County, Texas, and if legal action is necessary to enforce it, exclusive venue shall lie in Dallas County, Texas.

## 22.    GOVERNING LAW

A.    This Contract shall be governed by and construed in accordance with the laws and court decisions of the State of Texas, without regard to conflict of law or choice of law principles of Texas or any other state.

Luminant Generation Company LLC
Untreated Water Purchase Contract
Page 8 of 10

110579

B.      No presumption will apply in favor of either party in the interpretation of this Contract or in the resolution of any ambiguity of any provisions hereof.

23.    LEGAL CONSTRUCTION

A.      In case any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision thereof and this Contract shall be considered as if such invalid, illegal, or unenforceable provision had never been contained in this Contract.

B.      Notwithstanding the foregoing, if any provision of this Contract shall be deemed to be invalid, illegal, or unenforceable, and such provision served as consideration for either Dallas' or Purchaser's agreement to any term or condition of this Contract still remaining in effect, Dallas and Purchaser agree to work together in good faith to provide an alternate means for providing consideration, such that their respective interests are protected and made whole.

24.    COUNTERPARTS

This Contract may be executed in any number of counterparts, each of which shall be deemed an original and constitute one and the same instrument. If this Contract is executed in counterparts, then it shall become fully executed only as of the execution of the last such counterpart called for by the terms of this Contract to be executed.

25.    CAPTIONS

The captions to the various clauses of this Contract are for informational purposes only and shall not alter the substance of the terms and conditions of this Contract.

26.    APPLICABLE LAWS

This Contract is made subject to, and Purchaser agrees to comply with, all applicable laws of the State of Texas, applicable rules, regulations and orders of TCEQ and TWDB, Federal law (including but not limited to environmental and water quality laws, rules, orders, and regulations), and the Charter and ordinances of the City of Dallas, as same may hereafter be amended. This Contract may be subject to review and approval by TCEQ or TWDB. Purchaser shall comply with all terms, conditions and provisions of the permit to be obtained from the State of Texas as amended, so long as same may remain in effect. In the event of any final judgment finding any violation or violations of the laws, rules, regulations, or orders described above, Purchaser shall be strictly liable for any damages caused to the property of Dallas, including but not limited to Dallas' interest in Lake Fork water, as a result of such violation or violations.

27.    SUCCESSORS AND ASSIGNS

This Contract shall be binding upon and inure to the benefit of the parties and their respective successors and, except as otherwise provided in this Contract, their assigns.

Luminant Generation Company LLC
Untreated Water Purchase Contract
Page 9 of 10

A-021

110579

28.    ENTIRE AGREEMENT; NO ORAL MODIFICATIONS

This Contract embodies the entire agreement of both parties, superseding all oral or written previous and contemporary agreements between the parties relating to matters set forth in this Contract. Except as otherwise provided elsewhere in this Contract, this Contract cannot be modified without written supplemental agreement executed by both parties.

EXECUTED as of the _10th_ day of _March_, 2011, on behalf of Dallas by its City Manager, duly authorized by Resolution No. 11-_0579_, adopted on _February 23_, 2011 and approved as to form by its City Attorney; and on behalf of Purchaser by its duly authorized officials.

APPROVED AS TO FORM:    CITY OF DALLAS
THOMAS P. PERKINS, JR.    MARY K. SUHM
City Attorney       City Manager


BY _____   BY _____
  Assistant City Attorney      Assistant City Manager
      Submitted to City Attorney


            PURCHASER:
            LUMINANT GENERATION COMPANY LLC,
            a Texas limited liability company


            BY _____
              Senior Vice-President

Luminant Generation Company LLC
Untreated Water Purchase Contract
Page 10 of 10

A-022

# Exhibit 2 to Lowery Declaration in Support of Dallas' Proof of Claim

October 14, 2015 Order [D. I. 6447] authorizing rejection of the Water Lease between Dallas and Luminant Generation Company, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 6141, 6142** |

## ORDER AUTHORIZING REJECTION OF A PREVIOUSLY ASSUMED NONRESIDENTIAL REAL PROPERTY LEASE BETWEEN LUMINANT GENERATION COMPANY LLC AND THE CITY OF DALLAS, TEXAS, EFFECTIVE *NUNC PRO TUNC* SEPTEMBER 22, 2015

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") authorizing the Debtors to reject that certain Agreement, dated March 10, 2011, and adopted on February 23, 2011, between Luminant Generation Company LLC ("Luminant") and the City of Dallas, Texas ("Dallas"), including any amendments or modifications thereto (the "Water Rights Lease"), effective *nunc pro tunc* to September 22, 2015, all as more fully set forth in the Motion; and upon the Frenzel Declaration; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      Pursuant to sections 365(a) and 503(b)(7) of the Bankruptcy Code and Bankruptcy Rule 6006, the Water Rights Lease, including any related agreements, amendments, or modifications thereto, is deemed rejected, effective *nunc pro tunc* to September 22, 2015.

3.      The Water Rights Lease is a nonresidential real property lease subject to section 503(b)(7) of the Bankruptcy Code.

4.      The counterparties to the Water Rights Lease must file any proofs of claim relating to the rejection of the Water Rights Lease by 30 days after the date of entry of this Order.

5.      Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

6.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

A-025

Case 14-10979-CSS   Doc 6441   Filed 10/14/15   Page 3 of 3

7.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

8.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

9.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: October ___, 2015
      Wilmington, Delaware

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

**A-026**

# Exhibit 3 to Lowery Declaration in <u>Support of Dallas' Proof of Claim</u>

Dallas City Council Ordinance No. 29879 setting the wholesale water rate for fiscal year October 1, 2015 through September 30, 2016



**City of Dallas**

| STATE OF TEXAS | § |
| COUNTY OF DALLAS | § |
| CITY OF DALLAS | § |

I, **BILIERAE JOHNSON,** City Secretary, of the City of Dallas, Texas, do hereby certify that the attached is a true and correct copy of:

## ORDINANCE NO. 29879

Which was passed by the Dallas City Council on **September 22, 2015.**

WITNESS MY HAND AND THE SEAL OF THE CITY OF DALLAS, TEXAS, this the **21st** day of **March, 2019**.

**BILIERAE JOHNSON**
**CITY SECRETARY**
**CITY OF DALLAS, TEXAS**

Prepared By: **LJ**

OFFICIAL ACTION OF THE DALLAS CITY COUNCIL

SEPTEMBER 22, 2015

15-1787

Item 56:    An ordinance amending Chapters 5A, 7, 15D, 16, 18, 27, 43A, 49, and 50 of the Dallas City Code to: (1) remove the registration fee and registration requirement for used car lots; (2) adjust registration fees for facilities that emit or have the potential to emit air contaminants; (3) adjust fees for redeeming an impounded animal from a city animal shelter; (4) adjust the intact animal permit fee; (5) adjust the fee for a temporary regulated animal permit; (6) adjust emergency ambulance transport fees; (7) adjust permit fees overseen by the Dallas Fire-Rescue Department; (8) adjust building reinspection fees; (9) adjust inspection charges for high risk buildings and occupancies; (10) adjust plan review fees for fire apparatus access roads and for limited access gates that obstruct such roads; (11) adjust installation acceptance retest fees; (12) authorize sanitation services to collect recycling from commercial establishments and establish a fee for such collection; (13) authorize more than once-a-week collection of garbage and recycling from certain commercial establishments; (14) adjust fees for sanitation collection service; (15) adjust fees for tire business licenses and mobile tire repair unit permits; (16) adjust fee for a certificate of registration for a multi-tenant property; (17) adjust fees for multi-tenant property inspections; (18) adjust fees for multi-tenant property inspections; (19) adjust the annual fee for a certificate of registration for non-owner occupied rental property; (20) adjust the reinspection fee for non-owner occupied rental property; (21) adjust the public swimming pool permit fee; (22) adjust the swimming pool manager training course fee; (23) adjust the vacant building registration fee; (24) adjust rates and charges for treated water service, wastewater service, wholesale water and wastewater service to governmental entities, untreated water service, service connections, and fire hydrant usage (fee list attached); (25) adjust the wood vendor license fee; (26) adjust the electronic repair license fee; (27) adjust the motor vehicle repair license fee; (28) adjust the home repair license fee; and (29) adjust the credit access business registration fee - Estimated Revenue: $35,044,355 (Water Utilities Revenue: $26,735,244, Sanitation Revenue: $3,628,973, General Fund Revenue: $4,680,138)

Mayor Rawlings announced agenda items 56-61 would be considered collectively; there was no objection voiced by the city council.

The city secretary read agenda items 56-61 into the record.

Councilmember Kingston requested agenda items 56-61 be considered separately; there was no objection voiced to his request.

OFFICIAL ACTION OF THE DALLAS CITY COUNCIL
15-1787
Page 2

Mayor Pro Tem Alonzo moved to adopt agenda item 56.

Motion seconded by Deputy Mayor Pro Tem Wilson.

Mayor Rawlings called a record vote on Mayor Pro Tem Alonzo's motion to adopt the item.

Voting Yes:  [15]  Rawlings, Alonzo, Wilson, Griggs, Medrano, Thomas, Arnold, Callahan, Young, McGough, Clayton, Kleinman, Greyson, Gates, Kingston

Voting No:  [0]

The city secretary declared the item unanimously adopted.

**151787**

9/2/2015

ORDINANCE NO. **29879**

An ordinance amending Sections 5A-3, 5A-8, and 5A-14 of Chapter 5A, "Air Pollution"; amending Sections 7-2.6, 7-4.11, and 7-6.2 of Chapter 7, "Animals"; amending Section 15D-5 of Chapter 15D, "Emergency Vehicles; amending Sections 105, 115, 501, and 901 of Chapter 16, "Dallas Fire Code"; amending Sections 18-2, 18-3, 18-9, and 18-57 of Chapter 18, "Municipal Solid Wastes"; amending Sections 27-32, 27-42, 27-62, and 27-72 of Chapter 27, "Minimum Urban Rehabilitation Standards"; amending Sections 43A-17 and 43A-18 of Chapter 43A, "Swimming Pools"; amending Section 48B-8 of Chapter 48B, "Vacant Buildings"; amending Sections 49-18.1, 49-18.2, 49-18.4, 49-18.5, 49-18.7 and 49-18.9 of Chapter 49, "Water and Wastewater"; and amending Sections 50-82, 50-101, 50-116, 50-137, and 50-149 of Chapter 50, "Consumer Affairs," of the Dallas City Code, as amended; repealing Section 5A-5.1 of Chapter 5A, "Air Pollution," of the Dallas City Code; removing the registration fee and registration requirement for used car lots; adjusting registration fees for facilities that emit or have the potential to emit air contaminants; adjusting fees for redeeming an impounded animal from a city animal shelter; adjusting the intact animal permit fee; adjusting the fee for a temporary regulated animal permit; adjusting emergency ambulance transport fees; adjusting permit fees overseen by the Dallas Fire-Rescue Department; adjusting building reinspection fees; adjusting inspection charges for high risk buildings and occupancies; adjusting plan review fees for fire apparatus access roads and for limited access gates that obstruct such roads; adjusting installation acceptance retest fees; authorizing sanitation services to collect recycling from commercial establishments and establishing a fee for such collection; authorizing more than once-a-week collection of garbage and recycling from certain commercial establishments; adjusting fees for

**A-031**

**29879**                                                            **151787**

sanitation collection service; adjusting fees for tire business licenses and mobile tire repair unit permits; adjusting fee for a certificate of registration for a multi-tenant property; adjusting fees for multi-tenant property inspections; adjusting fees for multi-tenant property inspections; adjusting the annual fee for a certificate of registration for a non-owner occupied rental property; adjusting the reinspection fee for non-owner occupied rental property; adjusting the public swimming pool permit fee; adjusting the swimming pool manager training course fee; adjusting the vacant building registration fee; adjusting rates and charges for treated water service, wastewater service, wholesale water, and wastewater service to governmental entities, untreated water service, service connections, and fire hydrant usage; adjusting the wood vendor license fee; adjusting the electronic repair license fee; adjusting the motor vehicle repair license fee; adjusting the home repair license fee; adjusting the credit access business registration fee; making certain conforming, semantic, grammatical, and structural changes; providing for a penalty not to exceed $2,000; providing a saving clause; providing a severability clause; and providing an effective date.

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF DALLAS:

SECTION 1.  That Section 5A-3, "Chapter Definitions," of Chapter 5A, "Air Pollution," of the Dallas City Code is amended to read as follows:

"**SEC. 5A-3.          CHAPTER DEFINITIONS.**

The definition of a term in this section applies to each grammatical variation of the term. In this chapter, unless the context requires a different definition:

(1)     AIR CONTAMINANT means dust, fumes, gas, mist, odor, particulate matter, toxic materials, smoke, or vapor, individually or in combination, that is produced by a process other than natural.

(2)     AIR POLLUTION means the presence in the atmosphere of one or more air contaminants in such concentration and of such duration:

      (A)     as to have or tend to have an injurious or adverse effect on human health or safety, animal or vegetable life, or property; or

      (B)     as to interfere with the normal use or enjoyment of animals, vegetation, or other property.

      (3)     DIRECTOR means the director of the department designated by the city manager to enforce and administer this chapter and includes representatives, agents, or city employees designated by the director to assist in the enforcement and administration of this chapter.

      (4)     FACILITY means any stationary source of air contaminants and includes the following classes.

      (A)     Class "1" facility means a stationary source of air contaminants whose actual emissions at design capacity are greater than or equal to 100 tons per year of any pollutant.

      (B)     Class "2" facility means a stationary source of air contaminants whose uncontrolled emissions at design capacity would be greater than or equal to 100 tons per year for any pollutant, but whose actual emissions are less than 100 tons per year.

      (C)     Class "3" facility means a stationary source of air contaminants whose uncontrolled emissions at design capacity are less than 100 tons per year, but greater than or equal to five tons per year.

      (D)     Class "4" facility means a facility whose uncontrolled emissions at design capacity are less than five tons per year but whose emissions are significant, or have the potential to be significant, or have a potential to be a nuisance.

      (E)     Class "5" facility means a dry cleaner that uses trichloroethylene, perchloroethylene, or naphtha when conducting cleaning operations on clothing or other fabrics.

      (5)     PERSON means an individual; corporation; government or governmental subdivision; or agency, trust, partnership, or two or more persons having a joint or common economic interest.

      [(6)     ~~USED CAR LOT means a facility or location where used automobiles, trucks, vans, or recreational vehicles are displayed for sale or lease.~~]"

      SECTION 2. That Chapter 5A, "Air Pollution," of the Dallas City Code is amended by

repealing Section 5A-5.1 as follows:

**"SEC. 5A-5.1.**     **RESERVED. [~~USED CAR LOTS: REGISTRATION REQUIRED; FEES.~~]**

[(a)    Any person who owns or operates a used car lot within the city shall register with the director on a form provided for that purpose.

(b)    Before a used car lot will be registered, an annual registration fee must be paid to the director in accordance with the following schedule:

| Number of vehicle display spaces | Fee |
|---|---|
| 1 to 9 | $200 |
| 10 to 49 | $245 |
| 50 or more | $295 |

(c)    Registration expires one year from the date of issuance and renewal must be obtained annually.

(d)    At least once a year, the director shall inspect a used car lot for compliance with state and federal laws requiring proper installation of pollution control devices on used motor vehicles.]"

SECTION 3.    That Subsection (b) of Section 5A-8, "Registration Fees," of Chapter 5A, "Air Pollution," of the Dallas City Code is amended to read as follows:

"(b)    The fee for each class of facility is as follows:

Class "1" facility    $1,465

Class "2" facility    $1,200

Class "3" facility    $940

Class "4" facility    $960

Class "5" facility    $110 [80]"

SECTION 4.    That Subsection (a) of Section 5A-14, "Offenses," of Chapter 5A, "Air Pollution," of the Dallas City Code is amended to read as follows:

"(a)    A person commits an offense if he:

(1)    refuses to submit information requested by the director under Section 5A-5(a); or

(2)    violates a rule of the Texas Natural Resource Conservation Commission identified in Section 5A-6; or

(3)    owns, controls, or manages a source that violates the emission standard prescribed by Section 5A-7(a), (b) or (c); or

(4)    interferes with the director in the exercise of his authority under Section 5A-9(b); or

(5)    violates a rule established under Section 5A-10; or

(6)    refuses to allow or interferes with an inspection authorized under Section 5A-11; or

(7)    violates a variance or order granted or issued by the Texas Natural Resource Conservation Commission under the Texas Clean Air Act[; or

(8)    fails to register a used car lot in compliance with Section 5A-5.1].”

SECTION 5.    That Subsection (a) of Section 7-2.6, “Redemption of Impounded Animals,” of Article II, “Animal Services; City Animal Shelters,” of Chapter 7, “Animals,” of the Dallas City Code is amended to read as follows:

“(a)    To redeem an impounded animal from a city animal shelter, the owner of the animal must provide proof of ownership and pay to the director the following fees:

(1)    a redemption fee of:

(A)    $50 [7] for an animal delivered for impoundment to a city animal shelter by a person other than a city employee in the performance of official duties; or

(B)    $50 [27] for an animal delivered for impoundment to a city animal shelter by a city employee in the performance of official duties;

(2)    $15 [10] for each night the animal is housed in a city animal shelter;

(3)    $19 [10] for a rabies vaccination of a dog, cat, or ferret if the owner cannot show either:

(A)    a current certificate of vaccination for the animal; or

(B)    proof that the animal was not vaccinated due to health reasons as verified by a licensed veterinarian;

29879    151787

   (4) the applicable registration fee for a dog or cat under Section 7-4.2, if the owner cannot show proof of current registration;

   (5) $15 for a microchip implant and initial national registration of a dog or cat, unless:

    (A) the animal was injected with a microchip implant prior to impoundment; or

    (B) a licensed veterinarian certifies that the animal should not be injected with a microchip implant for health reasons; and

   (6) $139 [60] for the sterilization of a dog or $139 [40] for the sterilization of a cat, unless:

    (A) the animal was spayed or neutered prior to impoundment;

    (B) the animal is under six months of age;

    (C) a licensed veterinarian certifies that the dog or cat should not be spayed or neutered for health reasons or is permanently non-fertile;

    (D) the animal is being held for sale by a retail pet store or for adoption by animal services or an animal welfare organization;

    (E) the animal is a competition cat or competition dog;

    (F) the animal is a service animal; or

    (G) the owner of the animal has, or obtains at the time of redemption, a valid intact animal permit for the animal under Section 7-4.11 of this chapter."

  SECTION 6.  That Subsection (c) of Section 7-4.11, "Intact Animal Permit," of Article IV, "Specific Requirements for Dogs and Cats," of Chapter 7, "Animals," of the Dallas City Code is amended to read as follows:

  "(c) To obtain an intact animal permit, a person must submit an application to the director (on a form provided by the director for that purpose) and pay an annual intact animal permit fee of $100 [70]. The intact animal permit application must include:

   (1) the name, address, and telephone number of the applicant;

   (2) the location where the dog or cat is harbored;

A-036

(3)    a description of the dog or cat;

(4)    proof that the animal is qualified for an intact animal permit under Subsection (b) of this section; and

(5)    any other information determined necessary by the director for the enforcement and administration of this section."

SECTION 7.   That Subsection (e) of Section 7-6.2, "Regulated Animals," of Article VI, "Prohibited and Regulated Animals," of Chapter 7, "Animals," of the Dallas City Code is amended to read as follows:

"(e)    The fees for a regulated animal permit are as follows:

| Type of Permit | | Fee |
|---|---|---|
| (1) | Annual | $500 |
| (2) | Temporary | $250 [100]." |

SECTION 8.   That Subsection (b) of Section 15D-5, "Emergency Ambulance Service Provided by Fire Department; Fee," of Division 2, "Emergency Medical Services," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

"(b)    The city shall charge the following fees for emergency ambulance services in the city provided in response to a call received by the fire department requesting the services:

(1)    $1,485 [800] for each transport of a resident of the city of Dallas to a hospital and $1,578 [900] for each transport of a nonresident of the city of Dallas to a hospital.

(2)    $125 for treatment of a person who is not transported by ambulance.

(3)    The reasonable cost of any expendable items that are medically required to be used on a person transported by ambulance or treated without being transported by ambulance, including but not limited to drugs, dressings and bandages, airways, oxygen masks, intravenous fluids and equipment, syringes, and needles.

(4)    The reasonable cost of any EKG/telemetry that is medically required to be performed on a person transported by ambulance or treated without being transported by ambulance.

     (5)    The reasonable cost of each additional paramedic over two that is medically required to respond to an emergency call.

     (6)    $15 for each loaded mile of transport by ambulance, beginning when the patient is loaded into the ambulance and ending upon arrival at the hospital."

     SECTION 9.  That Subsection 105.8 "Fees and Permits Schedule," of Section 105, "Permits and Fees," of Part 2, "Administrative Provisions," of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas Fire Code," of the Dallas City Code is amended to read as follows:

"**105.8 Fees and permits schedule.** An applicant for a permit required by Section 105.6 shall pay, upon issuance of the permit, a nonrefundable permit fee in accordance with the following schedule.

| | |
|---|---|
| 1. Acetylene generator, annual | $300.00 [~~175.00~~] |
| 2. Aerosol products, annual | $250.00 [~~175.00~~] |
| 3. Air curtain incinerator/pit burner, daily | $404.00 [~~350.00~~] |
| 4. Amusement building, annual | $150.00 [~~135.00~~] |
| 5. Asphalt (tar) kettles, annual | $199.00 [~~95.00~~] |
| 6. Aviation facilities, annual | $300.00 [~~150.00~~] |
| 7. Calcium carbide storage, annual | $300.00 [~~175.00~~] |
| 8. Candle and open flames | $125.00 [~~95.00~~] |
| 9. Carnivals and fairs, daily | $200.00 [~~160.00~~] |
| 10. Combustible storage (miscellaneous), annual | $250.00 [~~150.00~~] |
| 11. Commercial cooking fire-extinguishing system | $267.00 [~~200.00~~] |
| 12. Compressed gas filling/storage/use, annual | $250.00 [~~95.00~~] |
| 13. Cryogenic fluids, annual | $250.00 [~~150.00~~] |
| 14. Dry cleaning plant, annual | $300.00 [~~140.00~~] |
| 15. *Explosive* /blasting, daily | $450.00 [~~260.00~~] |
| 16. Fireworks/*explosive* storage, daily | $300.00 [~~160.00~~] |
| 17. Fireworks/*explosive* transportation, daily | $300.00 [~~190.00~~] |
| 18. Fireworks display (initial) | $500.00 [~~405.00~~] |
| 19. Fireworks display (subsequent) | $300.00 [~~215.00~~] |
| 20. Flammable and combustible liquids, annual | $250.00 [~~125.00~~] |
| 21. Floor/wall finishing | $150.00 [~~135.00~~] |
| 22. Fruit and crop ripening, annual | $279.00 [~~175.00~~] |
| 23. Hazardous materials, annual | $550.00 [~~175.00~~] |
| 24. Hazardous production material (HPM), annual | $550.00 [~~175.00~~] |
| 25. High-piled storage, annual | $200.00 [~~160.00~~] |
| 26. Industrial oven, annual | $250.00 [~~175.00~~] |
| 27. Limited access gates, annual (1 to 3 gates) | $250.00 [~~150.00~~] |

29879                                      151787

| | |
|---|---|
| (4 to 7 gates) | $300.00 [205.00] |
| (8 or more gates) | $400.00 [260.00] |
| 28. Liquid- or gas-fueled vehicles or equipment in assembly buildings, per event: | |
| (1 to 10 vehicles or pieces of equipment) | $200.00 [63.00] |
| (11 to 30 vehicles or pieces of equipment) | $300.00 [127.00] |
| (31 to 400 [or more] vehicles or pieces of equipment) | $400.00 [191.00] |
| (over 400 vehicles or pieces of equipment) | $500.00 |
| 29. LP-gas storage/use | $254.00 [122.00] |
| 30. LP-gas demonstration/portable cooking (cart) | $150.00 [125.00] |
| 31. LP-gas demonstration/portable cooking (vehicle) | $300.00 |
| 32. Lumber yards and woodworking plants, annual | $269.00 [160.00] |
| 33. [32.]   Magnesium, annual | $250.00 [175.00] |
| 34. [33.]   Mobile fueling | |
| (site survey), annual | $400.00 [245.00] |
| (vehicle inspection) annual | $300.00 [100.00] |
| 35. [34.]   Open burning/recreational fires | $250.00 [230.00] |
| 36. [35.]   Private fire hydrant and water supplies, annual | $350.00 [105.00] |
| 37. [36.]   Pyrotechnic special effects material, daily: | |
| Initial performance | $300.00 [185.00] |
| Subsequent performances | $300.00 [92.00] |
| 38. [37.]   Refrigeration equipment, annual | $205.00 [160.00] |
| 39. [38.]   Scrap tire storage, annual | $200.00 [160.00] |
| 40. [39.]   Spray painting/dipping, annual | $200.00 [135.00] |
| 41. [40.]   State licensed facilities | |
| (child care facility, 35 children or fewer), annual | $150.00 |
| (child care facility, more than 35 children), annual | $200.00 |
| (residential care facility), annual | $200.00 [150.00] |
| (small assisted living), annual | $200.00 [150.00] |
| (adult day care facility), annual | $200.00 [150.00] |
| 42. [41.]   Temporary membrane structures and tents, per event | $300.00 [125.00] |
| 43. [42.]   Tire-rebuilding plant, annual | $200.00 [160.00] |
| 44. [43.]   Torch and open flames | $200.00 [120.00 |
| 44. Trench burning (per day) | $350.00] |
| 45. Waste handling, annual | $250.00 [160.00] |
| 46. Welding/cutting/hotworks | $194.00 [125.00]" |

SECTION 10.   That Paragraph 105.9.1, "When Required," of Subsection 105.9

"Reinspection Fee," of Section 105, "Permits and Fees," of Part 2, "Administrative Provisions,"

of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas Fire Code," of the Dallas City

Code is amended to read as follows:

"**105.9.1 When required.** Whenever a building or premises in the city is inspected by the *fire code official* and a violation of this code is found, the building or premises shall, after the expiration of any time limit for compliance given in a notice or order issued because of the violations, be reinspected by the *fire code official* to determine that the violation has been eliminated. The owner, occupant, operator or other person responsible for the violation shall pay to the city assessor and collector of taxes a fee in accordance with the following schedule for each reinspection that is conducted until the violation is determined to be eliminated:

| NUMBER OF REINSPECTIONS | FEE |
|---|---|
| 1ST | $00 |
| 2ND | $125 [~~100~~] |
| 3RD AND EACH SUBSEQUENT | $205 [~~105~~] |

**Exception:** No fee shall be charged for a reinspection of the following:

1. A Group R-3 or R-4 occupancy, as defined in the *Dallas Building Code*.

2. An individual *dwelling unit* within an apartment house or residential condominium complex, as defined in the *Dallas Building Code*, when the violation is the responsibility of the occupant of the *dwelling unit* and not the responsibility of the owner or operator of or the person responsible for the building or premises.

3. Activities directly related to construction conducted on a building or premises, or part of the building or premises, pursuant to a valid building permit issued by the building official, including any reinspection that is required before a certificate of occupancy related to the construction activities may be issued for the building or premises."

SECTION 11.   That Subsection 115.4, "Registration Fee and Inspection Charge," of

Section 115, "Registration and Inspection of High Risk Buildings and Occupancies," of Part 2,

"Administrative Provisions," of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas

Fire Code," of the Dallas City Code is amended to read as follows:

"**115.4 Registration fee and inspection charge.** The fee for a certificate of registration for a high risk occupancy is $25, plus an inspection charge in accordance with the following schedule.

| BUILDING TYPE: | INSPECTION CHARGE [~~FEE~~]: |
|---|---|
| Public Assembly | |
| Under 5,000 square feet | $150 [~~40~~] |
| 5,000 - 9,999 square feet | $200 [~~80~~] |
| 10,000 - 59,999 square feet | $250 [~~120~~] |

29879                                    151787

| | |
|---|---|
| 60,000 - 99,999 square feet | $250 [160] |
| 100,000 square feet and over | $300 [200] |

Hazardous Materials

| | |
|---|---|
| Under 5,000 square feet | $250 [125] |
| 5,000 - 9,999 square feet | $250 [175] |
| 10,000 - 59,999 square feet | $300 [225] |
| 60,000 - 99,999 square feet | $313 [300] |
| 100,000 square feet and over | $400 [350] |

High-rise Office/Storage/Assembly

| | |
|---|---|
| Under 200,000 square feet | $250 [200] |
| 200,000 - 600,000 square feet | $260 [400] |
| Over 600,000 square feet | $291 [500] |

High-rise Residential

| | |
|---|---|
| Under 250 *dwelling units* | $300 [200] |
| 250 to 600 *dwelling units* | $439 [400] |
| Over 600 *dwelling units* | $550 [500] |

Health Care Facilities

| | |
|---|---|
| Under 100 patient rooms or individual *dwelling units* | $300 [200] |
| 100-500 patient rooms or individual *dwelling units* | $550 [400] |
| Over 500 patient rooms or individual *dwelling units* | $650 [500] |

### Exceptions:

1. The inspection charge shall not be assessed for inspecting a building or occupancy that is subject to inspection in order to obtain one of the following operational permits from the fire code official:

    a. Amusement building.

    b. Aviation facilities.

    c. Dry cleaning plant.

    d. Lumber yards and woodworking plants.

    e. State licensed facility (child care, residential care, small assisted living, adult day care).

2. The inspection charge shall not be assessed for any property that is exempt from paying City of Dallas property taxes.

**29879**                    **151787**

3.      The inspection charge shall not be assessed for any property that has a current vacant building certificate of registration from the City of Dallas."

SECTION 12.   That Subsection 115.5, "Expiration and Renewal of Registration," of Section 115, "Registration and Inspection of High Risk Buildings and Occupancies," of Part 2, "Administrative Provisions," of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas Fire Code," of the Dallas City Code is amended to read as follows:

"**115.5 Expiration and renewal of registration.** A certificate of registration for high risk buildings and occupancies expires [according to the following schedule:

1.   Assembly certificates expire] one year after the date of issuance.

[2.  Hazardous materials certificates expire two years after the date of issuance.

3.  High rise certificates expire two years after the date of issuance.

4.  Health care certificates expire one year after the date of issuance.]"

SECTION 13.   That Paragraph 501.3.1, "Plan Review Fees," of Subsection 501.3, "Construction Documents," of Section 501, "General," of Chapter 5, "Fire Service Features," of Chapter 16, "Dallas Fire Code," of the Dallas City Code is amended to read as follows:

"**501.3.1 Plan review fees.** Plans for fire apparatus access roads (in accordance with Section 503 and Appendix D) shall be accompanied by a nonrefundable $200 [75] review fee.  This shall apply to new and existing construction.

**Exception:** No plan review fee shall be charged when the plans are directly related to construction conducted on a building or premises pursuant to a valid building permit issued by the building official.

Plans for limited access gates which obstruct fire apparatus access roads (in accordance with Section L104, 'Limited Access Gates' of Appendix L) shall be accompanied by a nonrefundable $200 [75] review fee. This plan review fee shall apply to new and existing construction."

**A-042**

SECTION 14.  That Subsection 901.5, "Installation Acceptance Testing," of Section 901,

"General," of Chapter 9, "Fire Protection Systems," of Chapter 16, "Dallas Fire Code," of the

Dallas City Code is amended to read as follows:

> **901.5 Installation acceptance testing.** Fire detection and alarm systems, fire-extinguishing
> systems, fire hydrant systems, fire standpipe systems, fire pump systems, private fire service
> mains and all other *fire protection systems* and appurtenances thereto shall be subject to
> acceptance tests as contained in the installation standards and as *approved* by the *fire code
> official. The fire code official* shall witness any required acceptance testing. A retest fee shall
> be charged for retesting *fire protection system*s when the testing of the system fails after the
> contractor has submitted to the *fire code official* a pre-test certification certifying that the
> system has been pre-tested and is in an *approved* condition. The retest fee shall be $622.00
> [500.00]."

SECTION 15.    That Paragraph (41) of Section 18-2, "Definitions," of Article I,

"Collection and Disposal," of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is

amended to read as follows:

> "(41)   ROLLCART. A plastic receptacle, which is furnished by the city for the
> collection of residential refuse and recyclable materials, that:

> > (A)    has two wheels and a lid;

> > (B)    is designed to be lifted and emptied mechanically;[ and]

> > (C)    is too large for handling by manual means[.] ; and

> > (D)    is from 48 to 96 gallons."

SECTION 16.   That Subsection (a), "Containers for Residences and Duplexes," of

Section 18-3, "Regulating Containers for Municipal Solid Waste Materials," of Article I,

"Collection and Disposal" of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is

amended to read as follows:

> "(a)    Containers for residences and duplexes.  Every occupant of a residence or duplex
> shall provide the premises with a sufficient number of solid waste containers to provide for the
> peak output of municipal solid wastes from those premises without overloading the containers.
> The containers must be rollcarts [(except that bags may be used as containers for recyclable

materials or as containers for grass cuttings collected under Section 18-8(b)(3))] and must meet the requirements of this subsection.

(1)     [At a residence or duplex, a bag used as a container for recyclable materials must be blue or clear, must have at least a 1.3 mil thickness, and must not exceed 33 gallons in capacity. The combined weight of the recyclable materials and the bag must not exceed 50 pounds.

(2)]     At a residence or duplex, a person shall use only city owned and provided rollcarts as solid waste containers, except that blue rollcarts[, clear or blue bags, or any combination of each] may be used as solid waste containers for recyclable materials.

(2[3]) A person shall comply with the following requirements when using a rollcart or a blue or clear recycling bag as a solid waste container:

(A)     A container must not be overloaded to the point where spillage occurs from overflow, wind, or handling.

(B)     A container must be closed or secured at the top to prevent spillage.

(C)     Glass and other wastes that are dangerous to handle must be securely wrapped, and the container must be labeled to warn of the need for careful handling.

(D)     Ashes must be cold before being placed in a container.

(E)     Non-recyclable materials must not be placed in a container (rollcart [or blue or clear recycling bag]) designated for recyclable materials. A recycling rollcart that is used for non-recyclable materials may be removed from the premises at the direction of the director of sanitation.

(3[4]) Unless otherwise specified by the director of sanitation, and in addition to the requirements of Subsection (a)(3), a person shall comply with the following requirements when using a rollcart as a solid waste container:

(A)     A rollcart must be placed for collection so that there is a minimum clearance of three feet to each side of the rollcart and one and one-half feet to the rear of the rollcart from any fence, gas meter, telephone pole, utility box, tree, shrub, additional collection container, or other potential obstruction. A rollcart must be placed so that its handle faces the dwelling unit.

(B)     No person shall block or cause to be blocked access to or hinder collection of a rollcart that has been placed for curbside collection.

(C)    Solid waste, including recyclable materials, must be placed in a rollcart in a manner that prevents the contents from blowing out of the rollcart when being emptied.

(D)    The director of sanitation must be promptly notified of any need for repair or replacement of a rollcart. Cleanliness of a rollcart is the responsibility of the occupant or owner of the premises to which the rollcart is provided.

(E)    A 60 to 65 gallon rollcart may not weigh more than 200 pounds when loaded, and a 90 to 96 gallon rollcart may not weigh more than 250 pounds when loaded.

(F)    Additional rollcarts for garbage may be obtained from the director of sanitation for an additional fee set forth in Section 18-9(c)(1) of this article. Additional rollcarts for recyclable materials may be obtained from the director of sanitation for no additional fee.

(G)    A rollcart that is lost or damaged due to a customer's negligence may be replaced for a fee as set forth in Section 18-9(c)(8) of this article."

SECTION 17.  That Subsection (b), "Containers for Apartments, Mobile Home Parks, Institutions, and Commercial Establishments," of Section 18-3, "Regulating Containers for Municipal Solid Waste Materials," of Article I, "Collection and Disposal," of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is amended to read as follows:

"(b)    Containers for apartments, mobile home parks, institutions, and commercial establishments. Every owner of an apartment, mobile home park, institution, or commercial establishment shall provide the premises with a sufficient number of solid waste containers to provide for the peak output of municipal solid wastes from those premises without overloading the containers.

(1)    A container must be watertight and constructed of a solid and durable grade of metal or plastic material. Any container that is manually collected by city sanitation services employees must not exceed 96 [50] gallons in capacity, and the combined weight of the waste and the container must not exceed 250 [50] pounds. A container must not be overloaded to a point where spillage occurs from overflow, wind, or handling.

(2)    All containers [(except blue or clear recycling bags)] must meet the following requirements:

(A)    A container must be provided with suitable lifting handles on the outside and a close-fitting or other approved cover equipped with a handle.

(B)    A container must not contain any inside structure, such as a band or reinforcing angle, or anything within the container to prevent the free discharge of the contents. A container that has deteriorated or become damaged to the extent that the cover will not fit securely or that has a jagged or sharp edge capable of causing injury to a sanitation services employee or other person whose duty it is to handle the container will be condemned by the city. If such a container is not replaced after notice to the owner or user, the container will be removed along with its contents.

[(C)    The lid of a container must be close-fitting and must remain in place covering the container at all times when there is any material in the container. The lid may be attached by an appropriate means to the rack upon which the container is placed or to an adjacent fence or other appropriate fixed object in order to prevent the lid from getting into the pathway of a vehicle. Except on a mechanically-emptied container, the lid must not be directly attached to the container. A container that has the lid directly attached to it is a hazard to any sanitation services employee engaged in the collection of solid waste and will be condemned by the city. If such an attachment is not removed after notice to the owner or user, the container will be removed along with its contents.]"

SECTION 18.  That Section 18-9, "Specifying Charges for Sanitation Service," of Article I, "Collection and Disposal" of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is amended to read as follows:

## "SEC. 18-9.    SPECIFYING CHARGES FOR SANITATION SERVICE.

(a)    Method of charging and billing for sanitation services.

(1)    A sanitation service charge for garbage and recycling will be made for the following:

(A)    All dwelling units in the city that are served with water delivered under an active water account of the water utilities department of the city.

(B)    All dwelling units in the city that are served with wastewater service only under an active account of the water utilities department of the city.

(C)    All commercial properties in the city that can be adequately serviced with no more than 10 garbage rollcarts and 10 recycling rollcarts and that are served with water delivered under an active water account of the water utilities department of the city or that are served with wastewater service only under an active account of the water utilities department of the city.

(D)    All commercial properties that are serviced with a single garbage rollcart. These properties have the option to receive one recycling rollcart of the same size or greater than the garbage rollcart, at no additional cost.

(E)     All property that is served with sanitation services by the city and that is not specified by Subparagraphs (A), [or] (B), (C), or (D) of this paragraph. The water utilities department shall bill for sanitation services in a manner that distinguishes the sanitation charges from water or wastewater charges.

(2)     The water utilities department shall bill the person in whose name the water service or wastewater service account appears. If a sanitation services customer is not served with water or wastewater service by the city, the water utilities department shall bill the person in control of the premises or, if that person is unknown, the owner of the premises. Payment of the fee for sanitation services is due on or before the date stated on the face of the customer's bill and is delinquent after that date. A bill is delinquent if not paid within 15 days from the date it is rendered by the water utilities department.

(3)     In addition to all other legal remedies available for the collection of a debt, the following actions and remedies are authorized for delinquent payment of the charges authorized in this article:

(A)     The sanitation services may refuse to pick up and dispose of the garbage and trash (or rubbish) at the delinquent location;

(B)     The water and/or wastewater service, if any, serving the delinquent premises in question may be shut off and terminated.

(C)     A five percent late payment fee will be added to the total net bill.

(4)     All collections by the water utilities department will be applied first to the water utilities charges, and the customer will be deemed to have paid such water utilities charges first if any question arises as to how outstanding balances should be composed and applied.

(A)     All present water utilities department customers to be billed under this article will be automatically placed on the billing for sanitation services charges, regardless of whether or not a written contract exists between the city and such customers.

(B)     All present water utilities guaranty deposits upon termination of wastewater service and/or water service may be applied to any amounts due either for sanitation services charges or fees of water utilities bills.

(C)     All water utilities services contracts entered into between the water utilities department and the customer must contain an agreement that any guaranty deposit upon termination of wastewater service and/or water service may be applied to sanitation services fees and charges and to water utilities charges that have become due.

29879

151787

(b)    General regulations.

(1)    Establishment of service charges will be based upon the current use of the property rather than being based upon the zoning.

(2)    There will be no proration of service charges for a portion of a billing period. The initial billing will be made concurrent with the initial water billing. The final billing for sanitation charges will be for a full billing period.

(3)    Except as otherwise set forth in this article, collection service must be provided by the sanitation services of the city for all residences and duplexes and for all manual collection from apartments and mobile home parks, and such service may not be contracted or performed by other than the city's sanitation services.

(4)    A commercial property in the city cannot receive service for more than 10 recycling rollcarts.

(A)    A commercial property has the option to apply for an exemption to receive more than 10 recycling rollcarts upon written approval from the director of sanitation. Approval of the exemption will be at the discretion of the director of sanitation.

(B)    The director of sanitation has the discretion to limit a commercial property to fewer than 10 recycling rollcarts if the property does not have adequate space or if the property cannot reasonably be provided with recycling service.

(5)    A commercial property in the city cannot receive service for more than 10 garbage rollcarts.

(A)    A commercial property has the option to apply for an exemption to receive more than 10 garbage rollcarts upon written approval from the director of sanitation. Approval of the exemption will be at the discretion of the director of sanitation.

(B)    The director of sanitation has the discretion to limit a property to fewer than 10 garbage rollcarts if the property does not have adequate space or if the property cannot reasonably be provided with garbage service.

(6)    Commercial establishments that are located within a 1.5-mile radius of Dallas City Hall may receive more than one garbage and recycling collection per week by sanitation services. Commercial establishments that are located outside of a 1.5-mile radius of Dallas City Hall may receive more than one garbage and recycling collection per week by the sanitation services of the city only if the director of sanitation agrees in writing.

(7)    A commercial property shall comply with the following requirements when using a recycling rollcart:

A-048

    (A)    The rollcart must not be overloaded to the point where spillage occurs from overflow, wind, or handling.

    (B)    The rollcart must be closed or secured at the top to prevent spillage.

    (C)    Only recyclable materials may be placed in a recycling rollcart. A recycling rollcart that is used for non-recyclable materials or that contains a significant amount of non-recyclable materials may be removed from the premises at the direction of the director of sanitation.

    (D)    A recycling rollcart must be placed on the curb in accordance with Section 18-3(a)(4) and Section 18-4(c). A recycling rollcart that is not kept clean or that causes a nuisance may be removed from the premises at the direction of the director of sanitation.

    (8)    The director may provide for alternative solid waste collection service to a customer, if the director determines that the customer cannot be adequately serviced with the standard collection service.

    (c)    Schedule of service charges.

    (1)    The collection service charge for a residence or duplex is as follows:

    (A)    Alley or curb collection service for municipal solid waste - $22.79 [21.31] per dwelling unit per month for one rollcart, plus $10.56 per month for each additional garbage rollcart requested by the owner or occupant of the premises.

    (B)    Packout or drive-in collection service for municipal solid waste - $79.35 [71.17] per dwelling unit per month.

    (2)    The collection service charge for an apartment or a mobile home park that receives manual collection service from the sanitation services of the city is as follows:

    (A)    Alley, curb, or drive-in collection service for municipal solid waste - $22.79 [21.31] per apartment unit or mobile home space per month.

    (B)    Packout collection service for municipal solid waste - $79.35 [71.17] per apartment unit or mobile home space per month.

    (3)    A monthly collection service charge will be made for all commercial establishments for collection service provided by the sanitation services of the city as follows:

**TABLE OF MONTHLY CHARGES**
[(Rear-end Loaders)

| QUANTITY OF SOLID WASTE | NUMBER OF COLLECTIONS PER WEEK | | | | | |
|---|---|---|---|---|---|---|
| Gallons | 2 | 3 | 4 | 5 | 6 | 7 |
| 60 | $37.79 | $68.76 | $93.53 | $113.77 | $138.95 | $169.70 |
| 100 | $50.18 | $93.53 | $116.24 | $147.20 | $246.31 | $412.13 |
| 200 | $85.27 | $182.31 | $235.98 | $297.92 | $351.61 | $414.96 |
| 300 | $134.83 | $246.31 | $326.83 | $407.36 | $492.00 | $594.25] |

(Garbage & Recycling, per Section 18-9(b)(6), more than once a week)

| 96-gallon RollCarts | NUMBER OF COLLECTIONS PER WEEK* | | | | | |
|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 5 | 6 | 7 |
| 1 | $59.59 | $88.85 | $118.11 | $147.37 | $176.63 | $205.89 |
| 2 | $119.18 | $177.70 | $236.22 | $294.73 | $353.25 | $ 411.77 |
| 3 | $178.77 | $266.54 | $354.32 | $442.10 | $529.88 | $617.66 |
| 4 | $238.36 | $355.39 | $472.43 | $589.47 | $706.51 | $823.54 |
| 5 | $297.95 | $444.24 | $590.54 | $736.84 | $883.13 | $1,029.43 |
| 6 | $357.54 | $533.09 | $708.65 | $884.20 | $1,059.76 | $1,235.32 |
| 7 | $417.13 | $621.94 | $826.75 | $1,031.57 | $1,236.39 | $1,441.20 |
| 8 | $476.72 | $710.78 | $944.86 | $1,178.94 | $1,413.01 | $1,647.09 |
| 9 | $536.31 | $799.63 | $1,062.97 | $1,326.30 | $1,589.64 | $1,852.98 |
| 10 | $595.90 | $888.48 | $1,181.08 | $1,473.67 | $1,766.27 | $2,058.86 |

**TABLE OF MONTHLY CHARGES**
**(Garbage & Recycling, per Section 18-9(b)(6), once a week only)**

| | NUMBER OF COLLECTIONS PER WEEK |
|---|---|
| 96-gallon RollCarts | 1 |
| 1 | $30.33 |
| 2 | $60.66 |
| 3 | $90.99 |
| 4 | $121.32 |
| 5 | $151.65 |
| 6 | $181.98 |
| 7 | $212.31 |
| 8 | $242.64 |
| 9 | $272.97 |
| 10 | $303.30 |

(4)    A monthly recycling-only collection service charge will be made for all commercial properties for weekly collection service provided by the sanitation services of the city as follows:

**TABLE OF MONTHLY CHARGES**
**(Recycling-Only Service, Outside of the Central Business District)**

| NUMBER OF 96-GALLON RECYCLING ROLLCARTS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| $19.83 | $39.66 | $59.49 | $79.32 | $99.15 | $118.98 | $138.81 | $158.64 | $178.47 | $198.30 |

(5)    Extraordinary collection and removal service:  A cost plus rate determined by the director of sanitation for materials not included in the regular collection service as described in Section 18-8.

(6[5])    Miscellaneous collection service charges will be as follows:

(A)    Public housing may be charged as apartments.

(B)    Churches, clinics, hospitals, public buildings, and schools will be charged as commercial locations.

(7[6]) The service charge for the collection and removal of grass cuttings from any premises is:

(A)    $1.50 per bag, if the service is performed by city sanitation services; and

(B)    an amount specified by city contract, if the service is performed by a contractor selected by the city under Section 18-8(b)(3).

(8[7]) Packout or drive-in service for certain handicapped persons meeting uniform requirements specified by the director of sanitation will be provided at the rate for alley or curb collection service. Any applicant for a reduced rate under this subparagraph who intentionally makes any misrepresentation in any written statement required by such uniform requirements is guilty of an offense and, upon conviction, is punishable by a fine not to exceed $500.

(9[8]) The fee for replacement of a rollcart that is lost or damaged due to a customer's negligence is $49.59 for a garbage rollcart or $52.94 for a recycling rollcart.

(10[9]) Large dead animals, including but not limited to horses, cattle, and other animals of similar size, will be picked up by the city for a fee of $100 per animal.

(d)    A person claiming entitlement to a refund of sanitation services paid to the city must notify the director of sanitation of the claim within 180 days from the date the disputed payment was received by the city."

SECTION 19. That Section 18-57, "License and Permit Fees," of Article V, "Tires," of

Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is amended to read as follows:

## "SEC. 18-57.        LICENSE AND PERMIT FEES.

(a)    The annual fee for a tire business license is $75 [315].

(b)    The annual fee for each mobile tire repair unit permit is $75 [30].

(c)    The fee for issuing a duplicate tire business license or mobile tire repair unit permit for one that is lost, stolen, or mutilated is $32 [10].

(d)    The applicant shall pay all fees required by this section to the director before a license or permit will be issued. No refund of a fee will be made."

SECTION 20.  That Subsection (a) of Section 27-32, "Registration Fees," of Article VII, "Registration and Inspection of Multi-Tenant Properties," of Chapter 27, "Minimum Urban Rehabilitation Standards," of the Dallas City Code is amended to read as follows:

"(a)    The fee for a certificate of registration for a multi-tenant property is an amount equal to $6.00 [10.00] times the total number of units in the multi-tenant property, whether occupied or unoccupied."

SECTION 21.  That Subsection (c) of Section 27-42, "Property Inspections; Inspection and Reinspection Fees," of Article VII, "Registration and Inspection of Multi-Tenant Properties," of Chapter 27, "Minimum Urban Rehabilitation Standards," of the Dallas City Code is amended to read as follows:

"(c)    The owner or operator of a multi-tenant property shall pay to the director the following fees for a graded inspection of the property:

(1)    For a graded inspection in which the property scores 85 or higher or where Subsection (b)(3) applies to the property, no inspection fee will be charged.

(2)    For a graded inspection in which the property scores lower than 85 because of substandard conditions or other premises violations existing on the property and where Subsection (b)(4) applies to the property, the inspection fee is $46 [30] times the total number of units in the multi-tenant property.

(3)    For a graded inspection in which the property scores lower than 85 only because of failure to have or display required documentation, including but not limited to permits, notices, licenses, records, or certificates of occupancy, and where Subsection (b)(4) applies to the property, the inspection fee is $87 [20] times the total number of units in the multi-tenant property."

SECTION 22.  That Subsection (e) of Section 27-42, "Property Inspections; Inspection and Reinspection Fees," of Article VII, "Registration and Inspection of Multi-Tenant Properties," of Chapter 27, "Minimum Urban Rehabilitation Standards," of the Dallas City Code is amended to read as follows:

"(e)    The owner, occupant, operator, or other person responsible for the violation shall pay to the director the following fees for each reinspection after the first reinspection that must be conducted before the violation is determined to be eliminated:

(1)     For a reinspection conducted inside units of a multi-tenant property, the fee is $50 times the number of units actually reinspected.

(2)     For a reinspection of the exterior and common areas of a multi-tenant property, the fee is $20 [50] for each separate violation site reinspected."

SECTION 23.  That Subsection (a) of Section 27-62, "Registration Fees," of Article IX, "Registration and Inspection of Non-Owner Occupied Rental Property," of Chapter 27, "Minimum Urban Rehabilitation Standards," of the Dallas City Code is amended to read as follows:

"(a)     The annual fee for a certificate of registration for a non-owner occupied rental property is $17 [25]."

SECTION 24.  That Subsection (c) of Section 27-72, "Property Inspections; Reinspection Fees," of Article IX, "Registration and Inspection of Non-Owner Occupied Rental Property," of Chapter 27, "Minimum Urban Rehabilitation Standards," of the Dallas City Code is amended to read as follows:

"(c)     The owner, occupant, or other person responsible for the violation shall pay to the director $19 [50] for each reinspection after the first reinspection that must be conducted before the violation is determined to be eliminated."

SECTION 25.  That Section 43A-3, "Inspections," of Article I, "General Provisions," of Chapter 43A, "Swimming Pools," of the Dallas City Code is amended to read as follows:

"**SEC. 43A-3.**          **INSPECTIONS AND REINSPECTIONS.**

The director may inspect a swimming pool at any reasonable time and has authority to enter upon the premises where a pool is located to the extent necessary to make a full examination. Water samples from a pool may be taken. If a reinspection is required, the fee for the reinspection is $43."

SECTION 26.   That Subsection (c) of Section 43A-17, "Permit and Manager of Operations Required," of Article III, "Maintenance and Operation of Swimming Pools," of Chapter 43A, "Swimming Pools," of the Dallas City Code is amended to read as follows:

"(c)    The director shall issue a permit to an applicant if a qualified manager of operations has been designated and the fee has been paid. The amount of the fee is $47 [175] for [the first] each pool owned by an applicant [at one location, plus $100 for each additional pool owned by the applicant at the same location]. The fee is due on or before the first day of March of each calendar year. If a permit is initially issued after the first day of March of a calendar year, the fee for that year will be prorated according to the number of whole months remaining in the year. No refunds will be made."

SECTION 27.   That Subsection (b) of Section 43A-18, "Certification of Manager of Operations," of Article III, "Maintenance and Operation of Swimming Pools," of Chapter 43A, "Swimming Pools," of the Dallas City Code is amended to read as follows:

"(b)    The certification of a manager of operations expires two years from the date of certification and a manager must repeat the training course to maintain certification. The fee for the [attending a] training course and certificate [for the purpose of managing a pool in the city] is $47 [40; the fee for others is $60]."

SECTION 28.   That Subsection (a) of Section 48B-8, "Registration Fee and Inspection Charge," of Article II, "Registration and Inspection of Vacant Buildings," of Chapter 48B, "Vacant Buildings," of the Dallas City Code is amended to read as follows:

"(a)    The fee for a certificate of registration for a vacant building is $73 [75], plus an inspection charge in an amount equal to $185.64 + ($0.009282 x total square feet of building area, excluding stairwells, elevator shafts, and mechanical rooms)."

SECTION 29. That Subsection (c), "Rate Tables," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(c)    Rate tables.   The director shall charge customers for treated water service in accordance with the following tables:

(1)    Water Service Customer Charges.

| METER SIZE | RATE PER METER |
| --- | --- |
| 5/8-inch meter | $5.12 [4.85] |
| 3/4-inch meter | 7.07 [6.70] |
| 1-inch meter | 10.28 [9.74] |
| 1-1/2-inch meter | 19.14 [18.13] |

| | |
|---|---|
| 2-inch meter | 31.14[29.50] |
| 3-inch meter | 72.93 [69.09] |
| 4-inch meter | 121.17 [114.79] |
| 6-inch meter | 240.61 [227.94] |
| 8-inch meter | 400.50 [378.85] |
| 10-inch meter or larger | 614.98 [582.59] |

(2)    Usage Charge - Rate Per 1,000 Gallons.

   TYPE OF USAGE

   (A)    Residential:

|  | | | |
|---|---|---|---|
| | (i) | Up to 4,000 gallons | $1.87 [1.80] |
| | (ii) | 4,001 to 10,000 gallons | 4.13 [3.91] |
| | (iii) | 10,001 to 15,000 gallons | 5.81 [5.50] |
| | (iv) | Above 15,000 gallons | 8.20 [7.63] |

   (B)    General service:

|  | | | |
|---|---|---|---|
| | (i) | Up to 10,000 gallons | 3.47 [3.05] |
| | (ii) | Above 10,000 gallons | 3.71 [3.45] |
| | (iii) | Above 10,000 gallons and 1.4 times annual average monthly usage | 5.63 [5.00]" |

SECTION 30. That Paragraph (1) of Subsection (f), "Election for Certain General Water Service Customers," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

   "(1)    The customer must agree to pay each year:

      (A)    the monthly customer charge provided in Subsection (c);

      (B)    $2,135.27 [2,025.00] per month as a usage charge on the first 1,000,000 gallons used in a billing period; and

(C)    $2.95 [2.75] per 1,000 gallons used in excess of 1,000,000 gallons per month."

SECTION 31. That Subsection (g), "Adjusted Rates for Hidden Water Leaks," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(g)    Adjusted rates for hidden water leaks. When a customer experiences a substantial increase in water or wastewater usage from a hidden water leak and the customer meets the requirements of Section 49-9(e), the director will adjust the account and bill the customer:

(1)    an estimated amount of normal water usage for the period at the regular rate;

(2)    the excess water usage caused by the hidden leak at the following applicable rate:

| TYPE OF USAGE | RATE PER 1,000 GALLONS |
|---|---|
| (A)  Residential | $1.87 [1.80] |
| (B)  General service | 3.47 [3.05] |
| (C)  Optional general service | 2.95 [2.75] |
| (D)  Municipal service | 2.38 [2.35] |

and

(3)    the applicable wastewater rate prescribed in Section 49-18.2(c), based on an adjustment of wastewater volume to estimated normal volume, where adjustment is appropriate."

SECTION 32. That Subsection (i), "Rates for Municipal Purpose Water Service," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(i)    Rates for municipal purpose water service. Water service to property owned by the city of Dallas that is used solely for municipal purposes may be charged $2.38 [2.35] per 1,000 gallons of water used."

SECTION 33.  That Section 49-18.2, "Rates for Wastewater Service," of Article II,

"Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City

Code is amended to read as follows:

**"SEC. 49-18.2.    RATES FOR WASTEWATER SERVICE.**

    (a)    <u>Form of rate</u>.  The monthly rate for wastewater service to a customer consists of:

        (1)    a customer charge;

        (2)    a usage charge; and

        (3)    a surcharge for excessive concentration of wastes, if applicable.

    (b)    <u>Billing cycle</u>.  In this section, water used per month is based upon the billing cycle of the department.

    (c)    <u>Rate tables</u>.  The director shall charge a customer for wastewater service in accordance with the following tables:

        <u>Wastewater Service Charges</u>.

        (1)    Monthly customer charges

| <u>METER SIZE</u> | <u>RATE PER METER</u> |
|---|---|
| 5/8-inch meter | $4.58 [4.45] |
| 3/4-inch meter | 6.27 [6.00] |
| 1-inch meter | 9.10 [8.75] |
| 1-1/2-inch meter | 17.52 [16.60] |
| 2-inch meter | 27.60 [26.15] |
| 3-inch meter | 66.72 [63.79] |
| 4-inch meter | 106.68 [103.90] |
| 6-inch meter | 209.97 [206.50] |
| 8-inch meter | 350.51 [340.15] |
| 10-inch meter or larger | 550.72 [525.50] |

        (2)    Monthly residential usage charge    $5.20 [4.95] per 1,000 gallons of the average water consumption billed in the months of December, January, February, and March, or of the actual Month's water consumption, whichever is less, up to a maximum

<table>
<tr><td></td><td></td><td>charge of 40,000 gallons per month</td></tr>
</table>

| | | |
|---|---|---|
| (3) | Monthly general service usage charge | $3.95 [3.70] per 1,000 gallons of water used |
| (4) | Monthly usage charge for Section 49-18.1(f) customer | $3.56 [3.38] per 1,000 gallons of water used |
| (5) | Monthly general service usage charge for wastewater separately metered | $3.65 [3.50] per 1,000 gallons of wastewater discharged |
| (6) | Monthly surcharge for excessive concentrations of waste | An amount calculated in accordance with Sections 49-18.12, 49-48 and 49-49 of this chapter |
| (7) | Monthly surcharge for excessive concentrations of waste for wastewater separately metered | An amount calculated in accordance with Sections 49-18.12, 49-48 and 49-49 of this chapter |

(d)    Where residential water service is not used. If a residential customer does not receive water service solely from the city, the director shall estimate water used per month to determine the usage charge in Subsection (c).

(e)    Where general water service is not used. If a general service customer does not receive water service solely from the city, the customer must install and maintain, at the customer's expense, adequate meters that measure total water usage from other sources and that meet American Water Works Association standards. The customer must pay an additional customer charge of $10.00 per month for each meter, regardless of size, installed under this subsection. When a meter is inaccurate, the director may estimate water usage.

(f)    Rates for municipal purpose wastewater service. Wastewater service to property owned by the city of Dallas that is used solely for municipal purposes may be charged $2.58 [2.55] per 1,000 gallons of water used."

SECTION 34.    That Subsection (b), "Rate Table," of Section 49-18.4, "Rates for Wholesale Water and Wastewater Service to Governmental Entities," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(b)    Rate table. The director shall charge a governmental entity for wholesale water service in accordance with the following:

(1)     The volume charge for treated water is $0.4305 [0.3382] per 1,000 gallons of water used, and the annual water year demand charge is $243,453 [223,308] per each mgd, as established by the highest rate of flow controller setting.

(2)     If a flat rate charge for treated water is provided by contract, or in the absence of a rate of flow controller, the charge is $1.9521 [1.7339] per 1,000 gallons of treated water used.

(3)     A monthly readiness-to-serve charge will be assessed for any standby service point. The monthly fee, based on size of connection, is as follows:

| Size of Connection | Monthly Standby Fee |
| --- | --- |
| 3-inch | $72.93 [69.09] |
| 4-inch | 121.17 [114.79] |
| 6-inch | 240.61 [227.94] |
| 8-inch | 400.50 [378.85] |
| 10-inch or larger | 614.98 [582.59] |

(4)     The rate for regular untreated water service to a governmental entity is $0.8335 [0.5613] per 1,000 gallons of untreated water used. The rate for interruptible untreated water service to a governmental entity is $0.4044 [0.2451] per 1,000 gallons of untreated water used."

SECTION 35.  That Subsection (e), Wholesale Wastewater Rates," of Section 49-18.4,

"Rates for Wholesale Water and Wastewater Service to Governmental Entities," of Article II,

"Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City

Code is amended to read as follows:

"(e)     Wholesale wastewater rates.  The director may provide wholesale wastewater service to other governmental entities by contract, in accordance with the following rules:

(1)     The monthly rate for wholesale wastewater service is $2.2688 [2.3031] per 1,000 gallons of wastewater discharged.   The director is authorized to compensate those governmental entities located within the boundaries of the city for the city's use of integrated facilities owned by those governmental entities.

(2)     An infiltration and inflow adjustment factor of 11.3 [13.2] percent will be added to the average water consumption for the months of December, January, February, and March to determine billable volume for a governmental entity with unmetered wholesale wastewater service.

(3)     If the BOD or suspended solids concentration of waste discharged exceeds 250 mg/L, the governmental entity must pay a surcharge calculated in accordance with Section 49-18.12(1)(A) or (B), whichever applies."

SECTION 36.   That Subsection (f),   Treatment of Water Owned By Another Governmental Entity," of Section 49-18.4, "Rates for Wholesale Water and Wastewater Service to Governmental Entities," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(f)     Treatment of water owned by another governmental entity. The director may provide treatment services at the Elm Fork water treatment plant to water owned by another governmental entity in accordance with a written contract. The volume charge for treating water owned by another governmental entity is $0.2994 [0.2982] per 1,000 gallons of water treated, and the annual water year demand charge is $43,640 [38,177] per each mgd, as established by the maximum demand capacity set forth in the contract."

SECTION 37.   That Subsection (a), "Regular Rate," of Section 49-18.5, "Rate for Untreated Water," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(a)     Regular rate.   The charge for untreated water is $0.8335 [0.5613] per 1,000 gallons of water used."

SECTION 38.   That Subsection (b), "Interruptible Rate," of Section 49-18.5, "Rate for Untreated Water," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(b)     Interruptible rate.   The charge for interruptible service is $0.4044 [0.2451] per 1,000 gallons of water used."

SECTION 39.   That Subsection (a), "Water Service Installation and Connection Charge," of Section 49-18.7, "Service Connection Charges," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(a)    Water service installation and connection charge. The director shall charge for the installation of all water service connections at the following rates:

    (1)    Water Service Installation Charges.

| Connection Size | Fee |
| --- | --- |
| 3/4-inch | $2,972 [2,650].00 |
| 1-inch | $3,103 [2,750].00 |
| 1 1/2-inch | $4,625 [3,603].00 |
| 2-inch | $4,462 [3,605].00 |

    (2)    Connecting Existing Water Service.

| Connection Size | Fee |
| --- | --- |
| 3/4-inch | $718 [925].00 |
| 1-inch | $762 [975].00 |
| 1 1/2-inch | $1,704 [1,325].00 |
| 2-inch | $1,885 [1,575].00 |
| Up to 2-inch bullhead | $3,947 [2,575].00" |

SECTION 40. That Subsection (b), "Wastewater Service Installation and Connection Fees" of Section 49-18.7, "Service Connection Charges," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(b)    Wastewater service installation and connection fees. Except as provided in Subsection (d), the city shall charge the following rates for the installation or connection of residential wastewater service lines:

    (1)    First wastewater service line installation
        and connection charge                  $2,778 [2,674].00

    (2)    For connecting existing wastewater service lines
        constructed by other persons            $475.00"

SECTION 41. That Section 49-18.9, "Charges for Use of Fire Hydrants," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"SEC. 49-18.9.        CHARGES FOR USE OF FIRE HYDRANTS.

A person requesting use of water from a fire hydrant pursuant to Section 49-27 shall pay the following application charges:

(1)    a deposit of $1,500 to be refunded when the service is discontinued and the meter is returned to the city by the person or the person's authorized representative, less any unpaid fees for services and any costs to repair damage in excess of normal wear;

(2)    a monthly fire hydrant service charge of $72.93 [69.09]; and

(3)    a usage charge for water that will be billed at the general service rate prescribed in Section 49-18.1(c)(2)(B)."

SECTION 42.  That Section 50-82, "Fee," of Article V, "Wood Vendors," of Chapter 50,

"Consumer Affairs," of the Dallas City Code is amended to read as follows:

"SEC. 50-82.        FEE.

The applicant shall pay an annual permit fee of $64 [75] to the director at the time the license is issued.  No refund of license fees shall be made."

SECTION 43.  That Section 50-101, "Fees," of Article VIII, "Electronic Repairs," of

Chapter 50, "Consumer Affairs," of the Dallas City Code is amended to read as follows:

"SEC. 50-101.        FEES.

The annual fee for an electronic repair license is $72 [175]. The fee for issuing a duplicate license for additional establishments or for a lost, destroyed or mutilated license is $4. The fee is payable to the director upon issuance of a license. No refund of license fees shall be made."

SECTION 44.  That Section 50-116, "Fees," of Article IX, "Motor Vehicle Repairs," of

Chapter 50, "Consumer Affairs," of the Dallas City Code is amended to read as follows:

"SEC. 50-116.        FEES.

The annual fee for a motor vehicle repair license is $75 [200] for the first location and $75 [200] for a duplicate license for each additional location.  The fee for issuing a replacement license for one lost, destroyed, or mutilated is $2.  The fee is payable to the director upon issuance of a license.  No refund of license fees will be made."

29879                    151787

SECTION 45.  That Subsection (a) of Section 50-137, "License Fees," of Article X, "Home Repairs," of Chapter 50, "Consumer Affairs," of the Dallas City Code is amended to read as follows:

"(a)     The fee for a home repair license is $68 [100] a year."

SECTION 46.  That Subsection (a) of Section 50-149, "Registration Application," of Division 2, "Registration of Credit Access Businesses," of Article XI, "Credit Access Businesses," of Chapter 50, "Consumer Affairs," of the Dallas City Code is amended to read as follows:

"(a)     To obtain a certificate of registration for a credit access business, a person must submit an application on a form provided for that purpose to the director. The application must contain the following:

(1)     The name, street address, mailing address, facsimile number, and telephone number of the applicant.

(2)     The business or trade name, street address, mailing address, facsimile number, and telephone number of the credit access business.

(3)     The names, street addresses, mailing addresses, and telephone numbers of all owners of the credit access business and other persons with a financial interest in the credit access business, and the nature and extent of each person's interest in the credit access business.

(4)     A copy of a current, valid state license held by the credit access business.

(5)     A copy of a current, valid certificate of occupancy showing that the credit access business is in compliance with the Dallas Development Code.

(6)     A non-refundable application fee of $76 [50]."

SECTION 47.  That, unless specifically provided otherwise by this ordinance or by state law, a person violating a provision of this ordinance governing fire safety, zoning, or public health and sanitation, including dumping of refuse, is, upon conviction, punishable by a fine not to exceed $2,000 and that a person violating any other provision of this ordinance is, upon conviction, punishable by a fine not to exceed $500.

**A-064**

29879                                              151787

SECTION 48. That Chapters 5A, 7, 15D, 16, 18, 27, 43A, 48B, 49, and 50 of the Dallas City Code, as amended, will remain in full force and effect, save and except as amended by this ordinance. Any proceeding, civil or criminal, based upon events that occurred prior to the effective date of this ordinance are saved, and the former law is continued in effect for that purpose.

SECTION 49. That the terms and provisions of this ordinance are severable and are governed by Section 1-4 of Chapter 1 of the Dallas City Code, as amended.

SECTION 50. That a certificate of registration for high risk buildings and occupancies issued under Chapter 16 of the Dallas City Code before April 1, 2016, shall remain valid until the expiration date of that certificate.

SECTION 51. That Section 12 of this ordinance shall take effect on April 1, 2016.

SECTION 52. That the charges in the "Table of Monthly Charges (Garbage & Recycling, per Section 18-9(b)(6), once a week only)" added to Subsection (c)(3) of Section 18-9, "Specifying Charges for Sanitation Service," of Article I, "Collection and Disposal" of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code, as indicated in Section 18 of this ordinance, shall take effect on January 1, 2016.

SECTION 53. That the charges in the "Table of Monthly Charges, (Recycling-Only Service, Outside of the Central Business District)" added to Subsection (c)(4) of Section 18-9, "Specifying Charges for Sanitation Service," of Article I, "Collection and Disposal" of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code, as indicated in Section 18 of this ordinance, shall take effect on January 1, 2016.

SECTION 54. That all parts of Section 18 of this ordinance not specifically referenced in Sections 52 and 53 of this ordinance, and all other amendments not specifically referenced in

**A-065**

Sections 51 through 53 of this ordinance shall take effect on October 1, 2015, and it is accordingly so ordained.


APPROVED AS TO FORM:

WARREN M. S. ERNST, City Attorney

By _Alen Youens_

    Assistant City Attorney

Passed _____ SEP 22 2015 _____

151787



# PROOF OF PUBLICATION – LEGAL ADVERTISING

The legal advertisement required for the noted ordinance was published in the Dallas Morning News, the official newspaper of the city, as required by law, and the Dallas City Charter, Chapter XVIII, Section 7.

DATE ADOPTED BY CITY COUNCIL _____ SEP 22 2015

ORDINANCE NUMBER _____ 29879

DATE PUBLISHED _____ SEP 26 2015

ATTESTED BY:

OFFICE OF CITY SECRETARY
P:\PROOF OF PUBLICATION.docx

**A-067**

# Exhibit 4 to Lowery Declaration in
## <u>Support of Dallas' Proof of Claim</u>

Dallas City Council Ordinance No. 30215
setting the wholesale water rate for fiscal year
October 1, 2016 through September 30, 2017



**City of Dallas**

| | |
|---|---|
| **STATE OF TEXAS** | § |
| **COUNTY OF DALLAS** | § |
| **CITY OF DALLAS** | § |

I, **BILIERAE JOHNSON,** City Secretary, of the City of Dallas, Texas, do hereby certify that the attached is a true and correct copy of:

## ORDINANCE NO. 30215

Which was passed by the Dallas City Council on **September 21, 2016.**

WITNESS MY HAND AND THE SEAL OF THE CITY OF DALLAS, TEXAS, this the **21st** day of **March, 2019**.



~~BILIERAE JOHNSON~~
**CITY SECRETARY**
**CITY OF DALLAS, TEXAS**

Prepared By: **LJ**

OFFICIAL ACTION OF THE DALLAS CITY COUNCIL

SEPTEMBER 21, 2016

16-1529

Item 6:    An ordinance amending Chapters 2, 15D, 16, 18, 48A, 49 and 51A of the Dallas City Code to: **(1)** adjust stormwater fee structure; **(2)** adjust emergency ambulance transport fees; **(3)** adjust fees for operating private ambulance service; **(4)** adjust fees for vehicle tow services for vehicles parked on private property; **(5)** adjust vehicle immobilization fees; **(6)** adjust permit fees overseen by the Dallas Fire-Rescue Department; **(7)** adjust fees for the sanitation collection service and charges for disposal of solid waste materials; **(8)** adjust rates and charges for treated water service, wastewater service, wholesale water, and wastewater service to governmental entities, untreated water service, service connections, and fire hydrant usage (fee list attached); **(9)** adjust fees for certain inspections; **(10)** add fees related to development impact review decisions; **(11)** add and adjust fees for miscellaneous items; **(12)** add fees related to a sign permit in a special provision sign district; **(13)** add a fee schedule for property description reviews; **(14)** adjust fees for engineering services; and **(15)** make certain conforming, semantic, grammatical and structural changes - Estimated Revenue: $20,823,480 (Water Utilities Estimated Revenue: $13,561,718, Sanitation Estimated Revenue: $5,857,672, Sustainable Development and Construction Estimated Revenue: $281,216, General Fund Estimated Revenue: $1,122,874, Stormwater Drainage Management Estimated Revenue: No revenue impact)

Mayor Pro Tem Alonzo moved to adopt the item.

Motion seconded by Deputy Mayor Pro Tem Wilson and unanimously adopted.

Assigned ORDINANCE NO. 30215

161529

9-16-16

## ORDINANCE NO. 30215

An ordinance amending Article XXVIII, "Storm Water Drainage Utility," of Chapter 2, "Administration"; amending Sections 15D-5, 15D-9, 15D-9.2, 15D-9.10, 15D-9.16, 15D-9.31, 15D-21, 15D-23, 15D-30, 15D-36, and 15D-58 of Chapter 15D, "Emergency Vehicles"; amending Sections 105 and 115 of Chapter 16, "Dallas Fire Code"; amending Sections 18-9 and 18-11 of Chapter 18, "Municipal Solid Wastes"; amending Sections 48A-6, 48A-8, 48A-14, and 48A-20 of Chapter 48A, "Vehicle Tow Service"; amending Sections 48C-6, 48C-8, 48C-15, 48C-21, and 48C-30 of Chapter 48C, "Vehicle Immobilization Service"; amending Sections 49-18.1, 49-18.2, 49-18.4, 49-18.5, 49-18.7, and 49-18.9 of Chapter 49, "Water and Wastewater," of the Dallas City Code; amending Section 51A-1.105 of Chapter 51A, the "Dallas Development Code"; amending the stormwater fee structure, including removing exemptions and providing incentives for residential-benefitted properties; amending definitions consistent with the new stormwater fee structure; adjusting emergency ambulance transport fees; adjusting private ambulance service license fees; adjusting ambulance personnel permit fees; adjusting the inspection fee for private ambulances; adjusting fees related to emergency wrecker services; adjusting permit and reinspection fees for Dallas Fire-Rescue; adjusting fees for sanitation collection service and charges for disposal of solid waste materials; adjusting fees related to vehicle tow services; adjusting fees related to vehicle immobilization services; adjusting rates and charges for treated water service, wastewater service, wholesale water, and wastewater service to governmental entities, untreated water service, service connections, and fire hydrant usage; adjusting fees for inspections related to infrastructure improvements constructed under private development contracts; adding fees related to development impact review decisions;

30215                                    161529

adding and adjusting fees for miscellaneous items in the Dallas Development Code; adjusting fees for engineering plan submissions; adding fees for sign review in special provision sign districts; adding a fee schedule for property description reviews; making certain conforming, semantic, grammatical, and structural changes; providing for a penalty not to exceed $2,000 for a person violating a provision of this ordinance governing fire safety, zoning, or public health and sanitation and a penalty not to exceed $500 for all other provisions; providing a saving clause; providing a severability clause; and providing an effective date.

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF DALLAS:

SECTION 1.    That Article XXVIII, "Storm Water Drainage Utility," of Chapter 2, "Administration," of the Dallas City Code is retitled to read as follows:

## "ARTICLE XXVIII.

## STORMWATER [STORM WATER] DRAINAGE UTILITY."

SECTION 2.    That Article XXVIII, "Stormwater Drainage Utility," of Chapter 2, "Administration," of the Dallas City Code is amended to read as follows:

**"SEC. 2-167.**    **PURPOSE AND CREATION; ADOPTION OF STATE LAW; [CREATION] AND ADMINISTRATION OF STORMWATER [STORM WATER] DRAINAGE UTILITY.**

(a)    Purpose and creation. To protect public health and promote public safety from loss of life and property caused by stormwater overflows, stagnation, and pollution, [In the interest of public health and safety and a more efficient and economic operation of storm water drainage facilities of the city], a stormwater [storm water] drainage utility is created, which shall be a public utility.

(b)    Adoption of state law. The rules of Subchapter C, Chapter 552 [402, Subchapter C] of the Texas Local Government Code, as amended, which is adopted and incorporated into this article by reference, and any other provisions of this code relating to stormwater [storm water] drainage shall govern the operation of the utility.  Nothing in this section shall be construed to restrict the city council's ability to make other rules or policies governing the operation of the utility.

Fiscal Year 2016-2017 Fee Ordinance - Page 2

**A-072**

(c[b]) Administration. The city manager shall designate a department to manage the stormwater [storm water] drainage utility. The director of the designated department must be a person professionally competent by experience and training to manage stormwater [storm water] drainage operations. The director of the designated department shall perform such duties as required by:

[(c)    The director of the designated department shall perform such duties as required by:]

(1)    Subchapter C, Chapter 552 [402, Subchapter C] of the Texas Local Government Code, as amended;

(2)    the city manager; or [and]

(3)    city council action [ordinance of the city council].

**SEC. 2-168.**        **DEFINITIONS; STORMWATER [STORM WATER] DRAINAGE UTILITY RATES; EXEMPTIONS; INCENTIVES FOR RESIDENTIAL-BENEFITTED PROPERTIES; BILLING AND COLLECTION PROCEDURES.**

(a)    Definitions. [In this section:]

(1)    [AGRICULTURAL USE has the meaning given that term in Section 51A-2.102 of this code.

(2)]    BENEFITTED PROPERTY has the meaning assigned in Section 552.044, Chapter 552, Texas Local Government Code, as amended [CALCULATED DRAINAGE AREA means the impervious area of a lot or tract of land that is determined by multiplying the total square footage of the lot or tract by its applicable runoff coefficient].

(2[3]) CITY TAX ROLLS means the current tax records of the appraisal district in which a particular property is located.

[(4)    COMMERCIAL REAL PROPERTY means an improved lot or tract, platted or unplatted:

(A)    to which storm water drainage service is made available;

(B)    that eventually discharges into a creek, river, slough, culvert, or other channel that is part of the city's storm water drainage utility system; and

(C)    that is not residential or unimproved real property.]

30215                                        161529

(3[5])  CUSTOMER OF RECORD has the meaning assigned [given that term] in Section 49-1 of this code, as amended, and also includes the term customer, as assigned in Section 49-1 of this code, as amended.

(4[6])  DIRECTOR means the director of the department designated by the city manager to manage the stormwater [storm water] drainage utility or the director's designee.

(5)  DRAINAGE SYSTEM has the meaning assigned in Subchapter C, Chapter 552 of the Texas Local Government Code, as amended.

(6)  IMPERVIOUS AREA means any surface that prevents or substantially impedes the natural infiltration of stormwater into the ground, and includes, but is not limited to, roads, parking areas, buildings, patios, sheds, driveways, sidewalks, and surfaces made of asphalt, concrete, and roofing materials.

[(7)  IMPROVED LOT OR TRACT means a lot or tract of land that has a structure or other improvement on it that causes an impervious coverage of the soil under the structure or improvement.]

(7[8])  RESIDENTIAL-BENEFITTED [REAL] PROPERTY means an improved lot or tract:

(A)  a benefitted property [to which storm water drainage service is made available;

(B)  that eventually discharges into a creek, river, slough, culvert, or other channel that is part of the city's storm water drainage utility system; and

(C)  that contains one of the following structures: [or is platted to contain a] single [-] family (including townhouse), [or] duplex, or multifamily with four or fewer dwelling units, as those terms are defined in the Dallas Development Code, as amended [dwelling unit].

(8)  STORMWATER means rainfall runoff, snow or ice melt runoff, or surface runoff and drainage.

[(9)  RUNOFF COEFFICIENT means a percentage of a lot or tract of land determined to be impervious based on the use of the lot or tract in accordance with the following schedule:

| TYPE OF USE | RUNOFF COEFFICIENT (percentage of impervious area) |
|---|---|
| Mobile home, master-metered | 55% |
| Multifamily apartments | 70% |
| Townhomes/condominiums | 80% |

30215                    161529

| | |
|---|---|
| ~~Schools~~ | ~~70%~~ |
| ~~Churches~~ | ~~80%~~ |
| ~~Commercial~~ | ~~90%~~ |
| ~~Parking lots~~ | ~~95%~~ |
| ~~Cemetery/agricultural business~~ | ~~25%~~ |
| ~~Parks/golf courses~~ | ~~25%~~ |
| ~~Vacant lot/raw land~~ | ~~20%~~ |

~~(10)   UNIMPROVED REAL PROPERTY means a lot or tract of land:~~

~~(A)    to which storm water drainage service is made available;~~

~~(B)    that eventually discharges into a creek, river, slough, culvert, or other channel that is part of the city's storm water drainage utility system; and~~

~~(C)    that is:~~

~~(i)    owned and maintained in its natural, undeveloped state; or~~

~~(ii)    subdivided, but does not yet contain any structure or other improvement.~~

~~(11)   WHOLLY SUFFICIENT AND PRIVATELY OWNED STORM WATER DRAINAGE SYSTEM means real property owned and operated by a person other than the city, the drainage of which property does not discharge into a creek, river, slough, culvert, or other channel that is part of the city's storm water drainage utility system.]~~

(b)     <u>Stormwater drainage utility rates.</u>

(1)     The <u>stormwater</u> [~~monthly storm water~~] drainage charge for <u>residential-benefitted</u> [~~real~~] property <u>per month</u> is as follows:

| <u>IMPERVIOUS</u> [**PROPERTY**] **AREA** (in square feet) | **MONTHLY RATE** |
|---|---|
| up to <u>2,000</u> [~~6,000~~] | $<u>3.25</u> [~~3.65~~] |
| <u>2,000 – 3,500</u> [~~6,001 – 8,000~~] | $<u>5.17</u> [~~5.77~~] |
| <u>3,501 – 5,500</u> [~~8,001 – 17,000~~] | $<u>7.75</u> [~~7.77~~] |
| ~~17,001 – 215,000~~ | ~~$13.87~~ |
| more than <u>5,500</u> [~~215,000~~] | $<u>12.67</u> [~~43.87~~] |

(2[~~e~~]) The <u>stormwater</u> [~~storm water~~] drainage charge for <u>all other benefitted properties not defined as residential-benefitted</u> [~~commercial and unimproved real~~] property is an

**A-075**

30215                                                161529

amount equal to $1.75 [0.1589] per month for each 1,000 [100] square feet, or parts thereof, of impervious [the calculated drainage] area of the benefitted [commercial and unimproved real] property, with a minimum charge of $5.00 per month for non-residential-benefitted [commercial and unimproved real] property [and a maximum charge of $57.10 per month for unimproved real property].

(3[d]) If information regarding the impervious area square footage of a particular lot or tract of benefitted [residential, commercial, or unimproved real] property is unavailable or inadequate, the director may make a reasonable estimate of impervious area square footage and levy the drainage charge on that basis.

(c[e]) Exemptions. All of the real property that requires an exemption under Subchapter C, Chapter 552 of the Texas Local Government Code, as amended, as well as the real property owned by the following are [is] exempt from the charges prescribed in this section:

(1) [real property with proper construction and maintenance of a wholly sufficient and privately owned storm water drainage system;

(2)] real property owned by] the city if [and] used for municipal purposes;

[(3) real property that is appraised for agricultural use on the city tax rolls; and]

(2[4]) [real property owned by] the State of Texas; and

(3) [or by] a public or private institution of higher education.

(d) Residential-benefitted property incentives.

(1) A customer of record may be eligible for an incentive in the form of a reduction to the customer of record's monthly rate as follows:

(A) the monthly rate for the customer of record's impervious area shall be charged at the next lower monthly rate; or

(B) if the customer of record's monthly rate is the lowest monthly rate, the customer of record shall be charged 60 percent of the lowest monthly rate.

(2) To be eligible, the:

(A) customer of record must use a pond, bioswale, cistern, gravel paving, or other stormwater storage method, as approved by the director;

(B) stormwater storage method must comply with federal, state, and local laws and regulations; and

(C)    stormwater storage method must store more than 134 cubic feet or 1,000 gallons of stormwater.

(3)    To apply for an incentive under this subsection, a customer of record must make application to the director, on a form approved by the director, and include the following: stormwater storage method used, amount of stormwater stored, zoning district in which the customer of record's residential-benefitted property is located, and any other information the director deems necessary.

(4)    The director shall approve the incentive if the customer of record meets all of the eligibility criteria in Paragraph (2) of this subsection. If approved by the director, an incentive in the form of a reduction to the customer of record's monthly stormwater drainage charge will be effective on the next full billing cycle after approval.

(5)    The director may periodically inspect and review approved incentives, and may invalidate an incentive if the customer of record no longer meets the eligibility criteria in Paragraph (2) of this subsection.  If the incentive is invalidated, the director will send the customer of record a letter stating the basis of invalidation, and the monthly rate adjustment shall apply to the next full billing cycle after invalidation.

(e[f])    Billing and collection procedures.  Stormwater [storm water] drainage charges will be billed and collected in accordance with the following procedures:

(1)    The [For storm water drainage service to commercial and residential real property, the] water utilities department shall bill the customer of record in the regular water and wastewater service bill or, if no water or wastewater service account exists, the true owner of record as shown in the current city tax rolls.

[(2)    For storm water drainage service to unimproved real property, the water utilities department shall bill the true owner of record as shown in the current city tax rolls or, if a water or wastewater service account exists, the customer of record.  For the purpose of assessing and billing storm water drainage charges, adjoining tracts of unimproved real property that have the same true owner of record, as shown in the current city tax rolls, will be treated as a single property.]

(2[3])    In cases involving occupancy of a lot or tract [of commercial real property] by two or more tenants who are customers of record, the water utilities department may either prorate the charges on an equitable basis between all the customers of record or may instead bill the property owner for stormwater [storm water] drainage service under a separate account.  In addition, if a lot or tract of land receives water or wastewater service under two or more service accounts and the service accounts are all in the name of the same customer of record, the water utilities department may bill the entire drainage charge due through one service account.

(3[4])    If more than one person is named in the current city tax rolls as the true owner of record of benefitted [unimproved real] property, each person is jointly and severally

liable for stormwater [storm water] drainage charges on the property.  The water utilities department may bill any or all of the joint owners through one service account.

(f[g])  The water utilities department shall administer collection procedures and service accounts under this section. [An application for water or wastewater service is deemed to include application for storm water drainage service.]

(g[h])  Except as otherwise provided in this section, the provisions of Sections 49-3, 49-7, 49-8, 49-12, 49-15, and 49-16 of this code, as amended, will govern in all matters regarding the application for stormwater [storm water] drainage service, payment and collection of stormwater [storm water] drainage charges, the liability of persons for charges, and the remedies of the city in the event of nonpayment.

**SEC. 2-169.          SERVICE AREA.**

The service area of the stormwater [storm water] drainage utility shall be defined by the corporate boundaries of the city, as those boundaries are altered from time to time in accordance with state law and the charter and ordinances of the city."

SECTION  3.   That Paragraph (1) of Subsection (b) of Section 15D-5, "Emergency Ambulance Service Provided by Fire Department; Fee," of Division 2, "Emergency Medical Services," of Article I, "Ambulances," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

"(1)     $1,578 [485] for each transport of a resident of the city of Dallas to a hospital and $1,678 [578] for each transport of a nonresident of the city of Dallas to a hospital."

SECTION  4.   That Paragraph (13) of Subsection (a) of Section 15D-9, "Application for License," of Division 3, "Private Ambulance Service License," of Article I, "Ambulances," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

"(13)    a nonrefundable application processing fee of $120 [250]."

SECTION  5.   That Subsection (c) of Section 15D-9.2, "License Issuance; Fee; Display; Transferability," of Division 3, "Private Ambulance Service License," of Article I, "Ambulances," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

"(c)   The annual fee for a private ambulance service license is $445 [360]. The fee for issuing a duplicate license for one lost, destroyed, or mutilated is $5. The fee is payable to the director upon issuance of a license. No refund of a license fee will be made."

SECTION 6.  That Section 15D-9.10, "Application for Ambulance Personnel Permit," of Division 4, "Ambulance Personnel Permit," of Article I, "Ambulances," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

## "SEC. 15D-9.10.        APPLICATION FOR AMBULANCE PERSONNEL PERMIT.

To obtain an ambulance personnel permit or renewal of an ambulance personnel permit, a person must file with the director a completed written application on a form provided for that purpose and a nonrefundable application fee of $64 [40]. The director shall require each application to state any information the director considers necessary to determine whether an applicant is qualified."

SECTION 7.  That Section 15D-9.16, "Duplicate Permit," of Division 4, "Ambulance Personnel Permit," of Article I, "Ambulances," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

## "SEC. 15D-9.16.        DUPLICATE PERMIT.

If an ambulance personnel permit is lost, destroyed, or mutilated, the director may issue the permittee a duplicate permit upon receiving payment of a duplicate permit fee of $40[18]."

SECTION 8.  That Subsection (c) of Section 15D-9.31, "Inspection of Private Ambulances and Equipment," of Division 7, "Vehicles and Equipment," of Article I, "Ambulances," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

"(c)   The fee for each inspection of each vehicle to be operated under a private ambulance service license is $131 [52]."

SECTION 9.  That Subsection (a) of Section 15D-21, "License Application; Change of Zone," of Division 2, "Emergency Wrecker Service License," of Article II, "Emergency

30215                                        161529

Wreckers," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read

as follows:

## "SEC. 15D-21.        LICENSE APPLICATION; CHANGE OF ZONE.

(a)    A person desiring to engage in emergency wrecker service in the city shall file with the director a written application upon a form provided for that purpose, accompanied by a nonrefundable application processing fee of $250 [93]. The application must be signed by an individual who will own, control, or operate the proposed emergency wrecker service. The application must be verified and include the following information:

(1)    The trade name under which the applicant does business and the street address and telephone number of the emergency wrecker service's business location.

(2)    The number and types of wreckers to be operated, including the year, make, model, vehicle identification number, and state license plate number of, and the type of winch or lifting device to be operated on, each wrecker.

(3)    The name, address, and telephone number of the applicant.

(4)    An agreement that the applicant will participate in the wrecker rotation list.

(5)    A list, to be kept current, of the owners (including each owner's percentage of ownership) and management personnel of the emergency wrecker service, and of all employees who will participate in emergency wrecker service, including names, state driver's license numbers, wrecker driver's permit numbers, and whether the person holds an incident management towing operator's license.

(6)    A statement attesting that all property, both real and personal, used in connection with the emergency wrecker service has been rendered for ad valorem taxation in the city and that the applicant is current on payment of those taxes.

(7)    Documentary evidence from an insurance company indicating a willingness to provide liability insurance as required by this article.

(8)    Proof of an ability to provide emergency wrecker service with at least four wreckers, including a minimum of one conventional light duty wrecker and one tilt bed/roll back carrier (the other two wreckers may be either conventional light duty or tilt bed/roll back), that meet the requirements of this article and any rules and regulations promulgated by the director or the chief of police pursuant to this article.

(9)    Detailed financial reports for the previous three years that include income statements and balance sheets covering all wrecker activities or, if the applicant does not prepare

30215                          161529

an annual financial report, copies of the applicant's federal income tax statements for the previous three calendar years relating to the business.

(10)    Proof of a valid certificate of occupancy issued by the city in the name of the company and for the location of the emergency wrecker service business."

SECTION 10.  That Subsection (c) of Section 15D-23, "License Issuance; Fee; Display; Transferability; Expiration," of Division 2, "Emergency Wrecker Service License," of Article II, "Emergency Wreckers," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

"(c)    The annual fee for an emergency wrecker service license is $520 [323], prorated on the basis of whole months. The fee for issuing a duplicate license for one lost, destroyed, or mutilated is $20 [5]. The fee is payable to the director upon issuance of a license. No refund of a license fee will be made."

SECTION 11.  That Section 15D-30, "Application for Wrecker Driver's Permit; Fee," of Division 3, "Wrecker Driver's Permit," of Article II, "Emergency Wreckers," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

**"SEC. 15D-30.        APPLICATION FOR WRECKER DRIVER'S PERMIT; FEE.**

To obtain a wrecker driver's permit, or renewal of a wrecker driver's permit, a person must file with the director a completed written application on a form provided for the purpose and a nonrefundable application fee of $29 [15]. The director shall require each application to state such information as the director reasonably considers necessary to determine whether an applicant is qualified."

SECTION 12.  That Section 15D-36, "Duplicate Permit," of Division 3, "Wrecker Driver's Permit," of Article II, "Emergency Wreckers," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

**"SEC. 15D-36.        DUPLICATE PERMIT.**

If a wrecker driver's permit is lost or destroyed, the director shall issue the permittee a duplicate permit upon payment to the city of a duplicate permit fee of $24 [15]."

SECTION 13.   That Subsection (b) of Section 15D-58, "Vehicles and Equipment," of Division 7, "Vehicles and Equipment," of Article II, "Emergency Wreckers," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

"(b)   An inspection fee of $226 [30] must be paid for each wrecker that is used in the emergency wrecker service. Upon inspection and approval of each vehicle, the director shall issue a decal to the applicant or licensee. The decal must be affixed securely to the lower left corner of the front windshield of the inspected wrecker."

SECTION 14.   That Subsection 105.8 "Fees and Permits Schedule," of Section 105, "Permits and Fees," of Part 2, "Administrative Provisions," of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas Fire Code," of the Dallas City Code is amended to read as follows:

"**105.8 Fees and permits schedule.** An applicant for a permit required by Section 105.6 shall pay, upon issuance of the permit, a nonrefundable permit fee in accordance with the following schedule.

|  |  |  |
|---|---|---|
| 1. | Acetylene generator, annual | $300.00 |
| 2. | Aerosol products, annual | $250.00 |
| 3. | Air curtain incinerator/pit/trench burn, <u>daily</u> [per day] | $404.00 |
| 4. | Amusement building<u>, annual</u> | $150.00 |
| 5. | Asphalt (tar) kettles<u>, annual</u> | $199.00 |
| 6. | Aviation facilities<u>, annual</u> | $300.00 |
| 7. | Calcium carbide storage, annual | $300.00 |
| 8. | Candle and open flames | $125.00 |
| 9. | Carnivals and fairs, daily | $200.00 |
| 10. | Combustible storage (miscellaneous), annual | $250.00 |
| 11. | Commercial cooking fire-extinguishing system | $267.00 |
| 12. | Compressed gas filling/storage/use, annual | $250.00 |
| 13. | Cryogenic fluids, annual | $250.00 |
| 14. | Dry cleaning plant, annual | $300.00 |
| 15. | *Explosive* /blasting, daily | $450.00 |
| 16. | Fireworks/*explosive* storage, daily | $300.00 |
| 17. | Fireworks/*explosive* transportation, daily | $300.00 |
| 18. | Fireworks display (initial) | $500.00 |
| 19. | Fireworks display (subsequent) | $300.00 |
| 20. | Flammable and combustible liquids, annual | $250.00 |
| 21. | Floor/wall finishing | $150.00 |
| 22. | Fruit and crop ripening, annual | $279.00 |
| 23. | Hazardous materials, annual | $550.00 |

30215                                                           161529

| | |
|---|---|
| 24. Hazardous production material (HPM), annual | $550.00 |
| 25. High-piled storage, annual | $200.00 |
| 26. Industrial oven, annual | $250.00 |
| 27. Limited access gates, annual | |
| (1 to 3 gates) | $250.00 |
| (4 to 7 gates) | $300.00 |
| (8 or more gates) | $400.00 |
| 28. Liquid- or gas-fueled vehicles or equipment in assembly buildings, per event: | |
| (1 to 10 vehicles or pieces of equipment) | $200.00 |
| (11 to 30 vehicles or pieces of equipment) | $300.00 |
| (31 to 400 [or more] vehicles or pieces of equipment) | $400.00 |
| (over 400 vehicles or pieces of equipment) | $500.00 |
| 29. LP-gas storage/use | $254.00 |
| 30. LP-gas demonstration/portable cooking (CART) | $150.00 |
| 31. LP-gas demonstration/portable cooking (VEHICLE) | $300.00 |
| 32. Lumber yards and woodworking plants, annual | $269.00 |
| 33. Magnesium, annual | $250.00 |
| 34. Mobile fueling | |
| (site survey), annual | $400.00 |
| (vehicle inspection), annual | $300.00 |
| 35. Open burning/recreational fires | $250.00 |
| 36. Private fire hydrant and water supplies, annual | $350.00 |
| 37. Pyrotechnic special effects material, daily: | |
| Initial performance | $300.00 |
| Subsequent performances | $300.00 |
| 38. Refrigeration equipment, annual | $205.00 |
| 39. Scrap tire storage, annual | $200.00 |
| 40. Spray painting/dipping, annual | $200.00 |
| 41. Standby personnel, hourly | $150.00 |
| 42. State licensed facilities | |
| (child care facility, 35 children or fewer), annual [35 Children or less] | $150.00 |
| (child care facility, more than 35 children), annual [36 Children or more] | $200.00 |
| (residential care facility), annual | $200.00 |
| (small assisted living), annual | $200.00 |
| (adult day care facility), annual | $200.00 |
| 43[2]. Temporary membrane structures and tents, Including plan review (per event) | $300.00 |
| 44[3]. Tire-rebuilding plant, annual | $200.00 |
| 45[4]. Torch and open flames | $200.00 |
| 46[5]. Waste handling, annual | $250.00 |
| 47. Welding/cutting/hotworks | $194.00" |

30215                                161529

SECTION 15. That Subsection 105.9, "Reinspection Fee," of Section 105, "Permits and Fees," of Part 2, "Administrative Provisions," of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas Fire Code," of the Dallas City Code is amended to read as follows:

"**105.9 Reinspection fee.**   Reinspection fees shall be assessed in accordance with Sections 105.9.1 and 105.9.2.

**105.9.1 When required.** Whenever a building or premises in the city is inspected by the *fire code official* and a violation of this code is found, the building or premises shall, after the expiration of any time limit for compliance given in a notice or order issued because of the violations, be reinspected by the *fire code official* to determine that the violation has been eliminated.  The owner, occupant, operator or other person responsible for the violation shall pay to the city assessor and collector of taxes a fee in accordance with the following schedule for each reinspection that is conducted until the violation is determined to be eliminated.

| NUMBER OF REINSPECTIONS | FEE |
|---|---|
| 1ST | $0 |
| 2ND | $125 [$100] |
| 3RD AND EACH SUBSEQUENT | $205 [$105]" |

SECTION 16.    That Paragraph 115.3.1, "Multiple Buildings or Occupancies," of Subsection 115.3, "Application for Registration," of Section 115, "Registration and Inspection of High Risk Buildings and Occupancies," of Part 2, "Administrative Provisions," of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas Fire Code," of the Dallas City Code is amended to read as follows:

"**[A] 115.3.1 Multiple buildings or occupancies.** If the application for a certificate of Registration is being made for multiple buildings or occupancies at the same address, the information required in Section 115.3 [113.3] must be provided for each building or occupancy at that address."

SECTION 17. That Subsection 115.4, "Registration Fee and Inspection Charge," of Section 115, "Registration and Inspection of High Risk Buildings and Occupancies," of Part 2, "Administrative Provisions," of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas Fire Code," of the Dallas City Code is amended to read as follows:

30215                              161529

"[A] 115.4 Registration fee and inspection charge.** The fee for a certificate of registration for a high risk occupancy is $150 [25], plus an inspection charge in accordance with the following schedule.

| BUILDING TYPE: | INSPECTION FEE: |
|---|---|
| Public Assembly | |
| Under 5,000 square feet | $150.00 |
| 5,000 - 9,999 square feet | $200.00 |
| 10,000 - 59,999 square feet | $250.00 |
| 60,000 - 99,999 square feet | $250.00 |
| 100,000 square feet and over | $300.00 |
| | |
| Hazardous Materials | |
| Under 5,000 square feet | $250.00 |
| 5,000 - 9,999 square feet | $250.00 |
| 10,000 - 59,999 square feet | $300.00 |
| 60,000 - 99,999 square feet | $313.00 |
| 100,000 square feet and over | $400.00 |
| | |
| High-rise Office/Storage/Assembly | |
| Under 200,000 square feet | $250.00 |
| 200,000 - 600,000 square feet | $260.00 |
| Over 600,000 square feet | $291.00 |
| | |
| High-rise Residential | |
| Under 250 *dwelling units* | $300.00 |
| 250 to 600 *dwelling units* | $439.00 |
| Over 600 *dwelling units* | $550.00 |
| | |
| Health Care Facilities | |
| Under 100 patient rooms or individual *dwelling units* | $300.00 |
| 100-500 patient rooms or individual *dwelling units* | $550.00 |
| Over 500 patient rooms or individual *dwelling units* | $650.00 |

**Exceptions:**

1. The inspection charge shall not be assessed for inspecting a building or occupancy that is subject to inspection in order to obtain one of the following operational permits from the *fire code official*:

    a. Amusement building.

    b. Aviation facilities.

    c. Dry cleaning plant.

**A-085**

30215                                          161529

d. Lumber yards and woodworking plants.

e. State licensed facility (child care, residential care, small assisted living, adult day care).

2. The inspection charge shall not be assessed for any property that is exempt from paying City of Dallas property taxes.

3. The inspection charge shall not be assessed for any property that has a current vacant building certificate of registration from the City of Dallas."

SECTION 18.   That Subsection (c), "Schedule of Service Charges," of Section 18-9,

"Specifying Charges for Sanitation Service," of Article I, "Collection and Disposal," of Chapter

18, "Municipal Solid Wastes," of the Dallas City Code is amended to read as follows:

"(c)    Schedule of service charges.

(1)    The collection service charge for a residence or duplex is as follows:

(A)    Alley or curb collection service for municipal solid waste - $24.32 [22.79] per dwelling unit per month for one rollcart, plus $10.56 per month for each additional garbage rollcart requested by the owner or occupant of the premises.

(B)    Packout or drive-in collection service for municipal solid waste - $84.69 [79.35] per dwelling unit per month.

(2)    The collection service charge for an apartment or a mobile home park that receives manual collection service from the sanitation services of the city is as follows:

(A)    Alley, curb, or drive-in collection service for municipal solid waste - $24.32 [22.79] per apartment unit or mobile home space per month.

(B)    Packout collection service for municipal solid waste - $84.69 [79.35] per apartment unit or mobile home space per month.

(3)    A monthly collection service charge will be made for all commercial establishments for collection service provided by the sanitation services of the city as follows:

**TABLE OF MONTHLY CHARGES**
(Garbage & Recycling, per Section 18-9(b)(6), more than once a week)

| | **NUMBER OF COLLECTIONS PER WEEK*** | | | | | | |
|---|---|---|---|---|---|---|---|
| **96-gallon** | **1** | **2** | **3** | **4** | **5** | **6** | **7** |

30215                    161529

| RollCarts | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | $30.33 | $59.59 | $88.85 | $118.11 | $147.37 | $176.63 | $205.89 |
| 2 | $60.66 | $119.18 | $177.70 | $236.22 | $294.73 | $353.25 | $ 411.77 |
| 3 | $90.99 | $178.77 | $266.54 | $354.32 | $442.10 | $529.88 | $617.66 |
| 4 | $121.32 | $238.36 | $355.39 | $472.43 | $589.47 | $706.51 | $823.54 |
| 5 | $151.65 | $297.95 | $444.24 | $590.54 | $736.84 | $883.13 | $1,029.43 |
| 6 | $181.98 | $357.54 | $533.09 | $708.65 | $884.20 | $1,059.76 | $1,235.32 |
| 7 | $212.31 | $417.13 | $621.94 | $826.75 | $1,031.57 | $1,236.39 | $1,441.20 |
| 8 | $242.64 | $476.72 | $710.78 | $944.86 | $1,178.94 | $1,413.01 | $1,647.09 |
| 9 | $272.97 | $536.31 | $799.63 | $1,062.97 | $1,326.30 | $1,589.64 | $1,852.98 |
| 10 | $303.30 | $595.90 | $888.48 | $1,181.08 | $1,473.67 | $1,766.27 | $2,058.86 |

| | [NUMBER OF COLLECTIONS PER WEEK* | | | | | |
|---|---|---|---|---|---|---|
| 96-gallon RollCarts | 2 | 3 | 4 | 5 | 6 | 7 |
| 1 | $59.59 | $88.85 | $118.11 | $147.37 | $176.63 | $205.89 |
| 2 | $119.18 | $177.70 | $236.22 | $294.73 | $353.25 | $ 411.77 |
| 3 | $178.77 | $266.54 | $354.32 | $442.10 | $529.88 | $617.66 |
| 4 | $238.36 | $355.39 | $472.43 | $589.47 | $706.51 | $823.54 |
| 5 | $297.95 | $444.24 | $590.54 | $736.84 | $883.13 | $1,029.43 |
| 6 | $357.54 | $533.09 | $708.65 | $884.20 | $1,059.76 | $1,235.32 |
| 7 | $417.13 | $621.94 | $826.75 | $1,031.57 | $1,236.39 | $1,441.20 |
| 8 | $476.72 | $710.78 | $944.86 | $1,178.94 | $1,413.01 | $1,647.09 |
| 9 | $536.31 | $799.63 | $1,062.97 | $1,326.30 | $1,589.64 | $1,852.98 |
| 10 | $595.90 | $888.48 | $1,181.08 | $1,473.67 | $1,766.27 | $2,058.86 |

### TABLE OF MONTHLY CHARGES
(Garbage & Recycling, per Section 18-9(b)(6), once a week only [, eff. 1/1/16])

30215                161529

| - | ~~NUMBER OF COLLECTIONS PER WEEK~~ |
|---|---|
| ~~96-gallon RollCarts~~ | ~~1~~ |
| ~~1~~ | ~~$30.33~~ |
| ~~2~~ | ~~$60.66~~ |
| ~~3~~ | ~~$90.99~~ |
| 4 | ~~$121.32~~ |
| ~~5~~ | ~~$151.65~~ |
| 6 | ~~$181.98~~ |
| ~~7~~ | ~~$212.31~~ |
| 8 | ~~$242.64~~ |
| ~~9~~ | ~~$272.97~~ |
| ~~10~~ | ~~$303.30~~] |

(4)    A monthly recycling-only collection service charge will be made for all commercial properties for weekly collection service provided by the sanitation services of the city as follows:

### TABLE OF MONTHLY CHARGES
(Recycling-Only Service, Outside of the Central Business District [~~, eff. 1/1/16~~])

| NUMBER OF 96-GALLON RECYCLING ROLLCARTS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| $19.83 | $39.66 | $59.49 | $79.32 | $99.15 | $118.98 | $138.81 | $158.64 | $178.47 | $198.30 |

(5)    Extraordinary collection and removal service:  A cost plus rate determined by the director of sanitation for materials not included in the regular collection service as described in Section 18-8, as amended.

(6)    Miscellaneous collection service charges will be as follows:

(A)    Public housing may be charged as apartments.

(B)    Churches, clinics, hospitals, public buildings, and schools will be charged as commercial locations.

(7)    The service charge for the collection and removal of grass cuttings from any premises is:

(A)    $1.50 per bag, if the service is performed by city sanitation services; and

(B)    an amount specified by city contract, if the service is performed by a contractor selected by the city under Section 18-8(b)(3), as amended.

(8)    Packout or drive-in service for certain handicapped persons meeting uniform requirements specified by the director of sanitation will be provided at the rate for alley or curb collection service. Any applicant for a reduced rate under this subparagraph who intentionally makes any misrepresentation in any written statement required by such uniform requirements is guilty of an offense and, upon conviction, is punishable by a fine not to exceed $500.

(9)    The fee for replacement of a rollcart that is lost or damaged due to a customer's negligence is $49.59 for a garbage rollcart or $52.94 for a recycling rollcart.

(10)    Large dead animals, including but not limited to horses, cattle, and other animals of similar size, will be picked up by the city for a fee of $100 per animal."

SECTION 19.    That Paragraph (2) of Subsection (b) of Section 18-11, "Specifying Charges for Disposal of Solid Waste Materials," of Article I, "Collection and Disposal," of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is amended to read as follows:

"(2)    Except as provided in Subsection (b)(3), the charge for all materials accepted at a city landfill site is $25.00 [21.50] per ton based on the landfill weighing system, with a minimum charge of $25.00 [21.50] for any load that is less than one ton."

SECTION 20.    That Paragraph (5) of Subsection (c) of Section 18-11, "Specifying Charges for Disposal of Solid Waste Materials," of Article I, "Collection and Disposal," of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is amended to read as follows:

"(5)    In consideration of the agreement of a solid waste collection service to guarantee the disposal of an annual tonnage of solid waste at the landfill pursuant to a disposal service contract, the director of sanitation may provide a discount from the disposal service charge required under Subsection (c)(4) of this section in accordance with the following table:

| Disposal Service Contract Discount Rate | |
| --- | --- |
| SOLID WASTE DISPOSED OF AT THE LANDFILL DURING A CONTRACT YEAR (in tons) | DISCOUNT RECEIVED BASED ON THE CONTRACT TERM (in percentages) |

| From | To | 1 or 2 Year Contract Term | 3 or 4 Year Contract Term | 5 Year Contract Term |
|------|-----|------|------|------|
| 10,000 | 49,999 | 12.28 [0.00] % | 13.60 [1.50] % | 14.88 [3.00] % |
| 50,000 | 74,999 | 14.24 [2.25] % | 16.24 [4.50] % | 20.16 [9.00] % |
| 75,000 | 99,999 | 14.88 [3.00] % | 17.56 [6.00] % | 22.80 [12.00] % |
| 100,000 | 124,999 | 15.60 [3.75] % | 18.84 [7.50] % | 25.40 [15.00] % |
| 125,000 | 149,999 | 15.76 [3.94] % | 19.16 [7.88] % | 26.12 [15.75] % |
| 150,000 | 199,999 | 15.84 [4.06] % | 19.40 [8.13] % | 26.52 [16.25] % |
| 200,000 | No maximum | 16.00 [4.25] % | 19.76 [8.50] % | 27.16 [17.00] %" |

SECTION 21.   That Paragraph (9) of Subsection (b) of Section 48A-6, "License Required; Application," of Article II, "Vehicle Tow Service License," of Chapter 48A, "Vehicle Tow Service," of the Dallas City Code is amended to read as follows:

"(9)    a nonrefundable application processing fee of $135 [250]."

SECTION 22.   That Subsection (c) of Section 48A-8, "License Issuance; Fee; Display; Transferability; Expiration," of Article II, "Vehicle Tow Service License," of Chapter 48A, "Vehicle Tow Service," of the Dallas City Code is amended to read as follows:

"(c)    The annual fee for a vehicle tow service license is $362[1,650], prorated on the basis of whole months.   The fee for issuing a duplicate license for one lost, destroyed, or mutilated is $5.   The fee is payable to the director upon issuance of a license.   No refund of a license fee will be made."

SECTION 23.   That Section 48A-14, "Application for Wrecker Driver's Permit; Fee," of Article III, "Wrecker Driver's Permit," of Chapter 48A, "Vehicle Tow Service," of the Dallas City Code is amended to read as follows:

"SEC. 48A-14.         APPLICATION FOR WRECKER DRIVER'S PERMIT; FEE.

To obtain a wrecker driver's permit, or renewal of a wrecker driver's permit, a person must file with the director a completed written application on a form provided for the purpose and a nonrefundable application fee of $32 [15].   The director shall require each application to state such information as the director reasonably considers necessary to determine whether an applicant is qualified."

30215                    161529

SECTION 24. That Section 48A-20, "Duplicate Permit," of Article III, "Wrecker Driver's Permit," of Chapter 48A, "Vehicle Tow Service," of the Dallas City Code is amended to read as follows:

**"SEC. 48A-20.        DUPLICATE PERMIT.**

If a wrecker driver's permit is lost or destroyed, the director shall issue the permittee a duplicate permit upon payment to the city of a duplicate permit fee of $16_[5]."

SECTION 25. That Subsection (i) of Section 48A-29, "Insurance," of Article IV, "Miscellaneous Licensee and Driver Regulations," of Chapter 48A, "Vehicle Tow Service," of the Dallas City Code is amended to read as follows:

"(i)    If the insurance of a licensee lapses or is canceled and new insurance is not obtained, the director shall suspend the license until the licensee provides evidence that insurance coverage required by this section has been obtained. A person shall not operate a vehicle tow service while a license is suspended under this section whether or not the action is appealed. A $105_[0] fee must be paid before a license suspended under this section will be reinstated."

SECTION 26. That Paragraph (9) of Subsection (b) of Section 48C-6, "License Required; Application," of Article II, "Vehicle Immobilization Service License," of Chapter 48C, "Vehicle Immobilization Service," of the Dallas City Code is amended to read as follows:

"(9)    A nonrefundable application processing fee of $96_[50]."

SECTION 27. That Subsection (c) of Section 48C-8, "License Issuance; Fee; Display; Transferability; Expiration," of Article II, "Vehicle Immobilization Service License," of Chapter 48C, "Vehicle Immobilization Service," of the Dallas City Code is amended to read as follows:

"(c)    The annual fee for a vehicle immobilization service license is $557_[900], prorated on the basis of whole months. The fee for issuing a duplicate license for one lost, destroyed, or mutilated is $13_[5]. The fee is payable to the director upon issuance of a license. No refund of a license fee will be made."

**A-091**

SECTION 28. That Section 48C-15, "Application for Vehicle Immobilization Operator's Permit," of Article III, "Vehicle Immobilization Operator's Permit," of Chapter 48C, "Vehicle Immobilization Service," of the Dallas City Code is amended to read as follows:

**"SEC. 48C-15.     APPLICATION FOR VEHICLE IMMOBILIZATION OPERATOR'S PERMIT; FEE.**

To obtain a vehicle immobilization operator's permit, or renewal of a vehicle immobilization operator's permit, a person must file with the director a completed written application on a form provided for the purpose and a nonrefundable application fee of $56 [10]. The director shall require each application to state such information as the director reasonably considers necessary to determine whether an applicant is qualified."

SECTION 29.   That Section 48C-21, "Duplicate Permit," of Article III, "Vehicle Immobilization Operator's Permit," of Chapter 48C, "Vehicle Immobilization Service," of the Dallas City Code is amended to read as follows:

**"SEC. 48C-21.     DUPLICATE PERMIT.**

If a vehicle immobilization operator's permit is lost or destroyed, the director shall issue the permittee a duplicate permit upon payment to the city of a duplicate permit fee of $14 [0]."

SECTION 30.   That Subsection (h) of Section 48C-30, "Insurance," of Article IV, "Miscellaneous Licensee and Operator Regulations," of Chapter 48C, "Vehicle Immobilization Service," of the Dallas City Code is amended to read as follows:

"(h)     If the insurance of a licensee lapses or is canceled and new insurance is not obtained, the director shall suspend the license until the licensee provides evidence that insurance coverage required by this section has been obtained. A person shall not operate a vehicle immobilization service while a license is suspended under this section whether or not the action is appealed. A $52 [100] fee must be paid before a license suspended under this section will be reinstated."

SECTION 31. That Subsection (c), "Rate Tables," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

30215                                        161529

"(c)    Rate tables.    The director shall charge customers for treated water service in accordance with the following tables:

(1)    Water Service Customer Charges.

| METER SIZE | RATE PER METER |
|---|---|
| 5/8-inch meter | $5.25 [5.12] |
| 3/4-inch meter | 7.26 [7.07] |
| 1-inch meter | 10.56 [10.28] |
| 1-1/2-inch meter | 19.66 [19.14] |
| 2-inch meter | 31.98 [31.14] |
| 3-inch meter | 74.90 [72.93] |
| 4-inch meter | 124.44 [121.17] |
| 6-inch meter | 247.11 [240.61] |
| 8-inch meter | 411.31 [400.50] |
| 10-inch meter or larger | 631.58 [614.98] |

(2)    Usage Charge - Rate Per 1,000 Gallons.

TYPE OF USAGE

(A)    Residential:

(i)    Up to 4,000 gallons                    $1.90 [1.87]

(ii)    4,001 to 10,000 gallons             4.25 [4.13]

(iii)    10,001 to 15,000 gallons          6.03 [5.81]

(iv)    Above 15,000 gallons               8.55 [8.20]

(B)    General service:

(i)    Up to 10,000 gallons                  3.65 [3.47]

(ii)    Above 10,000 gallons                3.91 [3.71]

(iii)    Above 10,000 gallons and
1.4 times annual average
monthly usage                                     5.94 [5.63]"

SECTION 32. That Paragraph (1) of Subsection (f), "Election for Certain General Water Service Customers," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates,

Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(1)    The customer must agree to pay each year:

(A)    the monthly customer charge provided in Subsection (c);

(B)    $2,192.92 [2,135.27] per month as a usage charge on the first 1,000,000 gallons used in a billing period; and

(C)    $3.03 [2.95] per 1,000 gallons used in excess of 1,000,000 gallons per month."

SECTION 33. That Subsection (g), "Adjusted Rates for Hidden Water Leaks," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(g)    Adjusted rates for hidden water leaks.  When a customer experiences a substantial increase in water or wastewater usage from a hidden water leak and the customer meets the requirements of Section 49-9(e), the director will adjust the account and bill the customer:

(1)    an estimated amount of normal water usage for the period at the regular rate;

(2)    the excess water usage caused by the hidden leak at the following applicable rate:

| TYPE OF USAGE | RATE PER 1,000 GALLONS |
|---|---|
| (A)   Residential | $1.90 [1.87] |
| (B)   General service | 3.65 [3.47] |
| (C)   Optional general service | 3.03 [2.95] |
| (D)   Municipal service | 2.42 [2.38] |

and

(3)    the applicable wastewater rate prescribed in Section 49-18.2(c), based on an adjustment of wastewater volume to estimated normal volume, where adjustment is appropriate."

30215                                              161529

SECTION 34. That Subsection (i), "Rates for Municipal Purpose Water Service," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(i)    Rates for municipal purpose water service. Water service to property owned by the city of Dallas that is used solely for municipal purposes may be charged $2.42 [2.38] per 1,000 gallons of water used."

SECTION 35.  That Section 49-18.2, "Rates for Wastewater Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"**SEC. 49-18.2.        RATES FOR WASTEWATER SERVICE.**

(a)    Form of rate.  The monthly rate for wastewater service to a customer consists of:

    (1)    a customer charge;

    (2)    a usage charge; and

    (3)    a surcharge for excessive concentration of wastes, if applicable.

(b)    Billing cycle.  In this section, water used per month is based upon the billing cycle of the department.

(c)    Rate tables.  The director shall charge a customer for wastewater service in accordance with the following tables:

Wastewater Service Charges.

(1)    Monthly customer charges

| METER SIZE | RATE PER METER |
|---|---|
| 5/8-inch meter | $4.70 [4.58] |
| 3/4-inch meter | 6.44 [6.27] |
| 1-inch meter | 9.35 [9.10] |
| 1-1/2-inch meter | 17.99 [17.52] |
| 2-inch meter | 28.35 [27.60] |
| 3-inch meter | 68.52 [66.72] |

| | |
|---|---|
| 4-inch meter | 109.56 [~~106.68~~] |
| 6-inch meter | 215.64 [~~209.97~~] |
| 8-inch meter | 359.97 [~~350.51~~] |
| 10-inch meter or larger | 565.59 [~~550.72~~] |

(2)    Monthly residential usage charge: $5.31 [~~5.20~~] per 1,000 gallons of the average water consumption billed in the months of December, January, February, and March, or of the actual Month's water consumption, whichever is less, up to a maximum charge of 40,000 gallons per month.

(3)    Monthly general service usage charge: $4.08 [~~3.95~~] per 1,000 gallons of water used.

(4)    Monthly usage charge for Section 49-18.1(f) customer: $3.65 [~~3.56~~] per 1,000 gallons of water used.

(5)    Monthly general service usage charge for wastewater separately metered: $3.73 [~~3.65~~] per 1,000 gallons of wastewater discharged.

(6)    Monthly surcharge for excessive concentrations of waste: An amount calculated in accordance with Sections 49-18.12, 49-48 and 49-49 of this chapter.

(7)    Monthly surcharge for excessive concentrations of waste for wastewater separately metered: An amount calculated in accordance with Sections 49-18.12, 49-48 and 49-49 of this chapter.

(d)    <u>Where residential water service is not used</u>.  If a residential customer does not receive water service solely from the city, the director shall estimate water used per month to determine the usage charge in Subsection (c).

(e)    <u>Where general water service is not used</u>.  If a general service customer does not receive water service solely from the city, the customer must install and maintain, at the customer's expense, adequate meters that measure total water usage from other sources and that meet American Water Works Association standards.  The customer must pay an additional customer charge of $10.00 per month for each meter, regardless of size, installed under this subsection.  When a meter is inaccurate, the director may estimate water usage.

(f)    <u>Rates for municipal purpose wastewater service</u>.  Wastewater service to property owned by the city of Dallas that is used solely for municipal purposes may be charged $2.58 per 1,000 gallons of water used."

SECTION 36.    That Subsection (b), "Rate Table," of Section 49-18.4, "Rates for Wholesale Water and Wastewater Service to Governmental Entities," of Article II, "Rates,

Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(b)   Rate table. The director shall charge a governmental entity for wholesale water service in accordance with the following:

(1)   The volume charge for treated water is $0.4416 [0.4305] per 1,000 gallons of water used, and the annual water year demand charge is $262,058 [243,453] per each mgd, as established by the highest rate of flow controller setting.

(2)   If a flat rate charge for treated water is provided by contract, or in the absence of a rate of flow controller, the charge is $2.0795 [1.9521] per 1,000 gallons of treated water used.

(3)   A monthly readiness-to-serve charge will be assessed for any standby service point. The monthly fee, based on size of connection, is as follows:

| Size of Connection | Monthly Standby Fee |
|---|---|
| 3-inch | $74.90 [72.93] |
| 4-inch | 124.44 [121.17] |
| 6-inch | 247.11 [240.61] |
| 8-inch | 411.31 [400.50] |
| 10-inch or larger | 631.58 [614.98] |

(4)   The rate for regular untreated water service to a governmental entity is $0.9120 [0.8335] per 1,000 gallons of untreated water used. The rate for interruptible untreated water service to a governmental entity is $0.4265 [0.4044] per 1,000 gallons of untreated water used."

SECTION 37.  That Subsection (e), "Wholesale Wastewater Rates," of Section 49-18.4, "Rates for Wholesale Water and Wastewater Service to Governmental Entities," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(e)   Wholesale wastewater rates. The director may provide wholesale wastewater service to other governmental entities by contract, in accordance with the following rules:

(1)   The monthly rate for wholesale wastewater service is $2.4647 [2.2688] per 1,000 gallons of wastewater discharged.   The director is authorized to compensate those governmental entities located within the boundaries of the city for the city's use of integrated facilities owned by those governmental entities.

(2)      An infiltration and inflow adjustment factor of 11.4 [11.3] percent will be added to the average water consumption for the months of December, January, February, and March to determine billable volume for a governmental entity with unmetered wholesale wastewater service.

(3)      If the BOD or suspended solids concentration of waste discharged exceeds 250 mg/L, the governmental entity must pay a surcharge calculated in accordance with Section 49-18.12(1)(A) or (B), whichever applies."

SECTION 38.    That Subsection (f), "Treatment of Water Owned By Another Governmental Entity," of Section 49-18.4, "Rates for Wholesale Water and Wastewater Service to Governmental Entities," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(f)      Treatment of water owned by another governmental entity. The director may provide treatment services at the Elm Fork water treatment plant to water owned by another governmental entity in accordance with a written contract. The volume charge for treating water owned by another governmental entity is $0.3128 [0.2994] per 1,000 gallons of water treated, and the annual water year demand charge is $49,207 [43,640] per each mgd, as established by the maximum demand capacity set forth in the contract."

SECTION 39.    That Subsection (a), "Regular Rate," of Section 49-18.5, "Rate for Untreated Water," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(a)      Regular rate. The charge for untreated water is $0.9120 [0.8335] per 1,000 gallons of water used."

SECTION 40.    That Subsection (b), "Interruptible Rate," of Section 49-18.5, "Rate for Untreated Water," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(b)      Interruptible rate.  The charge for interruptible service is $0.4265 [0.4044] per 1,000 gallons of water used."

SECTION 41.    That Subsection (a), "Water Service Installation and Connection Charge," of Section 49-18.7, "Service Connection Charges," of Article II, "Rates, Charges and

Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(a)    Water service installation and connection charge.  The director shall charge for the installation of all water service connections at the following rates:

(1)    Water Service Installation Charges.

| Connection Size | Fee |
| --- | --- |
| 3/4-inch | $3,420.00 [2,972.00] |
| 1-inch | $3,520.00 [3,103.00] |
| 1 1/2-inch | $4,520.00 [4,625.00] |
| 2-inch | $4,820.00 [4,462.00] |

(2)    Connecting Existing Water Service.

| Connection Size | Fee |
| --- | --- |
| 3/4-inch | $820.00 [718.00] |
| 1-inch | $900.00 [762.00] |
| 1 1/2-inch | $2,120.00 [1,704.00] |
| 2-inch | $1,820.00 [1,885.00] |
| Up to 2-inch bullhead | $2,180.00 [3,947.00]" |

SECTION 42.  That Subsection (b), "Wastewater Service Installation and Connection Fees," of Section 49-18.7, "Service Connection Charges," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(b)    Wastewater service installation and connection fees. Except as provided in Subsection (d), the city shall charge the following rates for the installation or connection of residential wastewater service lines:

(1)    First wastewater service line installation
and connection charge                          $3,000.00 [2,778.00]

(2)    For connecting existing wastewater service lines
constructed by other persons                    $475.00"

SECTION 43.  That Section 49-18.9, "Charges for Use of Fire Hydrants," of Article II,

"Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City

Code is amended to read as follows:

"**SEC. 49-18.9.        CHARGES FOR USE OF FIRE HYDRANTS.**

A person requesting use of water from a fire hydrant pursuant to Section 49-27 shall pay
the following application charges:

(1)    a deposit of $1,500 to be refunded when the service is discontinued and
the meter is returned to the city by the person or the person's authorized representative, less any
unpaid fees for services and any costs to repair damage in excess of normal wear;

(2)    a monthly fire hydrant service charge of $74.90 [72.93]; and

(3)    a usage charge for water that will be billed at the general service rate
prescribed in Section 49-18.1(c)(2)(B)."

SECTION 44.  That Paragraph (3), "Fee Schedule," of Subsection (g), "Fees for

Inspection of Infrastructure Improvements Constructed Under Private Development Contracts,"

of Section 51A-1.105, "Fees," of Article I, "General Provisions," of Chapter 51A, "Dallas

Development Code," of the Dallas City Code is amended to read as follows:

"(3)    Fee schedule.

| Type of Inspection | Inspection Fee |
| --- | --- |
| The value of the proposed improvement is $25,000 [12,500] or less | $500.00 [600.00] |
| The value of the proposed improvement is from $25,001 to $100,000 [12,501 to $25,000] | $500.00, plus $0.02 multiplied by the value of the improvement in excess of $25,001 [1,000.00] |
| The value of the proposed improvement is 100,001 or more [from $25,001 to $100,000] | $2,000.00, plus $0.01 multiplied by the value of the improvements in excess of $100,001 [1,000.00, plus $0.035 multiplied by the value of the improvement in excess of $25,001] |
| [The value of the proposed improvement is from $100,001 to $500,000 | $3,625.00, plus $0.03 multiplied by the value of the improvements in excess of $100,001 |
| The value of the proposed improvement is $500,001 to $1,000,000 | $15,625.00, plus $0.025 multiplied by the value of the improvements in excess of $500,001 |

~~The value of the proposed improvement is $1,000,001 or more~~  ~~$28,125.00, plus $0.02 multiplied by the value of the improvements in excess of $1,000,001~~]"

SECTION 45. That Subsection (i), "Fees for Development Impact Review," of Section 51A-1.105, "Fees," of Article I, "General Provisions," of Chapter 51A, "Dallas Development Code," of the Dallas City Code is amended to read as follows:

"(i)    <u>Fees for development impact review.</u>

    (1)    An application will not be processed until the fee has been paid.

    (2)    The applicant shall pay the filing fee to the building official. The building official shall deposit fees received in the official city depository not later than the next business day following receipt of the fees.

    (3)    No refund of a fee may be made.

    (4)    The fee for a site plan review required under Section 51A-4.803 is $50.00.

    <u>(5)</u>    <u>An applicant shall pay a fee of $300.00 for an appeal to the city plan commission of a decision of the director denying a development impact review or residential adjacency review application, as described in this chapter.</u>"

SECTION 46. That Paragraph (3) of Subsection (k), "Fees for Miscellaneous Items," of Section 51A-1.105, "Fees," of Article I, "General Provisions," of Chapter 51A, "Dallas Development Code," of the Dallas City Code is amended to read as follows:

    "(3)    Fee schedule.

| Type of Application | Application Fee | Area of Notification for Hearing |
|---|---|---|
| Minor plan amendment | $825.00 | [200 feet. See also note below.] |
| <u>Appeal of the decision of the director to city plan commission or the decision of the city plan commission to the city council for a minor plan amendment</u> | <u>$300.00</u> | |
| Detailed development plan when submitted after passage of an ordinance establishing a planned development district | $600.00 for each submission | |
| Waiver of the two year waiting period under | $300.00 | |

30215    161529

Section 51A-4.701(d)(3)

| | |
|---|---|
| Extension of the development schedule under Section 51A-4.702(g)(3) | $75.00 |
| Waiver of the requirement of proof that taxes, fees, fines, and penalties are not delinquent under Section 51A-1.104.1 | $200.00 |
| Appeal to the city council of a moratorium on a zoning or nonzoning matter handled by the department | $300.00 |
| Request for a letter from the department explaining the availability of water services for a development site | $200.00 [150.00] |
| Request for a letter from the department explaining the availability of wastewater services for a development site. | $200.00 [150.00] |
| Request for performance of a wastewater capacity analysis on an existing wastewater line to determine its capacity for a proposed development or land use | $2,500.00 [800.00] |
| Appeal of an apportionment determination to the city plan commission | $600.00 |
| Appeal an apportionment determination decision of the city plan commission to the city council | $600.00 |
| Appeal a decision of the landmark $300.00 commission on a predesignation certificate of appropriateness, certificate of appropriateness, or certificate for demolition or removal to the city plan commission regarding a single family use or a handicapped group dwelling unit use | $300.00 |
| Appeal a decision of the landmark commission on a predesignation certificate of appropriateness, certificate of appropriateness, or certificate for demolition or removal to the city plan commission regarding any other use | $700.00 |
| Request for a sidewalk width waiver under Section 51A-4.124(a)(8)(C)(v) | $300.00 |
| Request for an administrative parking reduction under Section 51A-4.313 | $375.00 and $25 per space over 10 spaces |

Note: The director shall also send notification of minor plan amendments to the city plan commission members, any known neighborhood associations covering the property, and persons

30215                161529

on the early notification list at least 10 days prior to the public hearing."

SECTION 47. That Paragraph (6) of Subsection (n), "Fees for Platting, Replatting, and Other Related Fees," of Section 51A-1.105, "Fees," of Article I, "General Provisions," of Chapter 51A, "Dallas Development Code," of the Dallas City Code is amended to read as follows:

"(6)    An applicant who submits engineering plans shall pay to the director of development services:

(A)    $1,500 [1,050] for the initial submission of engineering plans;

(B)    no fee for the applicant's submission of the first modification of the initial submission of engineering plans if it includes only those modifications required in response to comments and requirements made by the department of development services after reviewing the initial submission; and

(C)    $500 [300] for each subsequent submission.

The fees required in this paragraph must be paid to the director of development services at the time of each submission. After the department of development services has approved all engineering plans and received payment of all required fees, the director of development services shall notify the commission of such approval and payment."

SECTION 48. That Paragraph (4) of Subsection (q), "Fees for Sign Review in Special Provision Sign Districts," of Section 51A-1.105, "Fees," of Article I, "General Provisions," of Chapter 51A, "Dallas Development Code," of the Dallas City Code is amended to read as follows:

"(4)    Fee schedule.

| Type of Application | Application Fee |
|---|---|
| Certificate of appropriateness for a sign in a special provision sign district when review by the city plan commission is required under Section 51A-7.505. | $345 |
| Appeal of the decision of the director to city plan commission for a sign permit in a special provision sign district | $300 |
| Appeal of the decision of the city plan commission to the city council | $300 |

161529

30215

for a sign permit in a special provision sign district

Sign location permit under Section 51A-7.930.                    $5,000

Copy change fee under Section 51A-7.930.                    10 cents per square
                                                            foot of effective area"

SECTION 49.   That Section 51A-1.105, "Fees," of Article I, "General Provisions," of Chapter 51A, "Dallas Development Code," of the Dallas City Code is amended by adding a Subsection (y), "Fees for Property Description Review," to read as follows:

"(y)   Fees for property description review.

(1)   An application will not be processed until the fee has been paid.

(2)   The applicant shall pay the fee to the director. The director shall deposit fees received in the official city depository not later than the next business day following receipt of the fees.

(3)   A fee is required for each review.

(4)   No refund of a fee may be made.

(5)   Fee schedule:

| Type of Property Description | Application Fee |
| --- | --- |
| Platted | $12.50 |
| Metes and bounds less than four pages | $25.00 |
| Metes and bounds four pages and more | $50.00" |

SECTION 50.   That the amendments to Paragraph 115.3.1 and Subsection 115.4 of Chapter 16, "Dallas Fire Code," as described in Sections 16 and 17 of this ordinance, supersede the amendments to Paragraph 115.3.1 and Subsection 115.4, of Chapter 16, "Dallas Fire Code," in Section 44, of Ordinance Number 30135, passed by the Dallas City Council on June 22, 2016.

SECTION 51.   That, unless specifically provided otherwise by this ordinance or by state law, a person violating a provision of this ordinance governing fire safety, zoning, or public health and sanitation, is, upon conviction, punishable by a fine not to exceed $2,000 and that a

30215                    161529

person violating any other provision of this ordinance is, upon conviction, punishable by a fine not to exceed $500.

SECTION 52.  That Chapters 2, 15D, 16, 18, 48A, 48C, 49, and 51A of the Dallas City Code, as amended, will remain in full force and effect, save and except as amended by this ordinance. Any proceeding, civil or criminal, based upon events that occurred prior to the effective date of this ordinance are saved, and the former law is continued in effect for that purpose.

SECTION 53.  That the terms and provisions of this ordinance are severable and are governed by Section 1-4 of Chapter 1 of the Dallas City Code, as amended.

SECTION 54.  That this ordinance shall take effect on October 1, 2016, and it is accordingly so ordained.

APPROVED AS TO FORM:

CHRISTOPHER D. BOWERS, Interim City Attorney

By _Chg Ohhe_____
     Assistant City Attorney

Passed _____ SEP 21 2016 _____



## PROOF OF PUBLICATION – LEGAL ADVERTISING

The legal advertisement required for the noted ordinance was published in the Dallas Morning News, the official newspaper of the city, as required by law, and the Dallas City Charter, Chapter XVIII, Section 7.

DATE ADOPTED BY CITY COUNCIL _____ SEP 21 2016 _____

ORDINANCE NUMBER _____ 30215 _____

DATE PUBLISHED _____ SEP 24 2016 _____

ATTESTED BY:

OFFICE OF CITY SECRETARY
P:\PROOF OF PUBLICATION.docx

**A-106**

# Exhibit 5 to Lowery Declaration in Support of Dallas' Proof of Claim

Certified Copy of Dallas City Council File No. 17-606 with SRA Settlement Agreement



**City of Dallas**

| | |
|---|---|
| **STATE OF TEXAS** | § |
| **COUNTY OF DALLAS** | § |
| **CITY OF DALLAS** | § |

I, **BILIERAE JOHNSON,** City Secretary of the City of Dallas, Texas, do hereby certify that the attached is a true and correct copy of:

### FILE NO. 17-1606

filed in my office as official records of the City of Dallas, and that I have custody and control of said records.

WITNESS MY HAND AND THE SEAL OF THE CITY OF DALLAS, TEXAS, this the **22**nd day of **March, 2019**.

**BILIERAE JOHNSON**
**CITY SECRETARY**
**CITY OF DALLAS, TEXAS**

PREPARED BY: LJ

OFFICIAL ACTION OF THE DALLAS CITY COUNCIL

OCTOBER 11, 2017

17-1606

Item 14:    Authorize an amendment to the Water Supply Contract and Conveyance between
the City and the Sabine River Authority ("SRA") for raw water from Lake Fork
Reservoir, and authorize settlement of the litigation styled: **(1)** Petition of the City
of Dallas for Review of a Decision by the Sabine River Authority to Set Water
Rates (Lake Fork Reservoir), Docket No. 43674 before the Public Utility
Commission of Texas ("PUC"); **(2)** City of Dallas v. Sabine River Authority, Cause
No. D-1-GN-15-000398 in the 53rd District Court of Travis County, Texas, and all
related appeals; and **(3)** City of Dallas v. Cary "Mac" Abney, et al. v. Sabine River
Authority, Cause No. D-150045-C in the 260th District Court of Orange County,
Texas, and all related appeals - Financing:  No cost consideration to the City

Councilmember Thomas moved to adopt the item.

Motion seconded by Councilmember Atkins and unanimously adopted. (Clayton absent when vote
taken)

COUNCIL CHAMBER
**171606**
October 11, 2017

**WHEREAS,** the City filed litigation styled: **(1)** Petition of the City of Dallas for Review of a Decision by the Sabine River Authority to Set Water Rates (Lake Fork Reservoir), Docket No. 43674 before the Public Utility Commission of Texas; **(2)** City of Dallas v. Sabine River Authority, Cause No. D-1-GN-15-000398 in the 53rd District Court of Travis County, Texas; and **(3)** City of Dallas v. Cary "Mac" Abney, et al. v. Sabine River Authority, Cause No. D150045-C in the 260th District Court of Orange County, Texas (collectively, the "Litigation"); and

**WHEREAS,** the Sabine River Authority and its Board of Directors have agreed to a settlement of the Litigation including related appeals; and

**WHEREAS,** pursuant to the settlement terms of the Litigation, the Sabine River Authority and the City have agreed to amend the Water Supply Contract and Conveyance to address: **(1)** the compensation to be paid to the Sabine River Authority for the City's use of raw water from Lake Fork Reservoir; **(2)** the assignment of certain City water contract rights to the Sabine River Authority; and **(3)** the use of City facilities for the transportation of Sabine River Authority water from Lake Fork Reservoir to Lake Tawakoni; and

**WHEREAS,** it is in the best interest of the City to settle the Litigation and amend the water supply contract.

**Now, Therefore,**

**BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF DALLAS:**

**SECTION 1.** That the proposed settlement of the Litigation is hereby approved.

**SECTION 2.** That the City Manager is hereby authorized to sign the Settlement Agreement Between the City and the Sabine River Authority and all related documents necessary to effectuate that agreement, approved as to form by the City Attorney.

**SECTION 3.** That the City Manager is hereby authorized to sign the amendment to the Water Supply Contract and Conveyance with the Sabine River Authority and all related documents necessary to effectuate that agreement, approved as to form by the City Attorney.

**SECTION 4.** That this resolution shall take effect immediately from and after its passage in accordance with the provisions of the Charter of the City of Dallas, and it is accordingly so resolved.



APPROVED BY
CITY COUNCIL

OCT 1 1 2017

Interim City Secretary

**A-110**

RECEIVED   171606

2019 MAR 22   AM II: 27

CITY SECRETARY

## SETTLEMENT AGREEMENT BETWEEN
## THE CITY OF DALLAS AND THE SABINE RIVER AUTHORITY OF TEXAS

This Settlement Agreement is entered into as of the day and year hereinafter set forth by and between the City of Dallas, Texas ("City" or "Dallas") and the Sabine River Authority of Texas ("SRA" or "Authority") in order to compromise and settle differences between the City and SRA as to water supplies owned by the Authority in Lake Fork Reservoir, to which Dallas has rights pursuant to contract, and as to other matters expressly addressed herein. The City and the Authority are individually referred to herein as a "Party" and are collectively referred to herein as the "Parties".

## RECITALS

WHEREAS, the Authority is an agency and political subdivision of the state of Texas, being a conservation and reclamation district created and governed by Article 8280-133, as amended, pursuant to Article XVI, Section 59 of the Texas Constitution; and

WHEREAS, the City is a home rule city and municipal corporation acting by and through its charter, governing ordinances and state law; and

WHEREAS, the Parties entered into a "Water Supply Contract and Conveyance" agreement ("Water Supply Contract") on or about October 1, 1981, wherein Dallas secured certain rights to water supplies, as specified therein, in Lake Fork Reservoir, an impoundment owned by the Authority on Lake Fork Creek in Rains, Hopkins and Wood Counties, Texas; and

WHEREAS, Section 6.01 of the Water Supply Contract confirmed the Parties' agreement that the initial term of such agreement would continue through November 1, 2014, and also provided that the term of the Water Supply Contract would be renewed for additional periods of forty (40) years throughout the useful life of the reservoir unless Dallas exercised its unilateral right to terminate said agreement at least one (1) year prior to the end of each such term; and

WHEREAS, Section 6.02 of the Water Supply Contract provided that the amount of compensation the Authority would be entitled to receive from Dallas during any renewal term (exclusive of the City's pro rata share of the Authority's "Service Charge", as that term is defined in such agreement) would be determined by mutual agreement of the Parties, and that the Parties would commence negotiations to determine the amount of compensation at least one (1) year prior to the expiration of the initial period and each successive forty (40) year term thereafter; and

WHEREAS, on or before November 1, 2013, the City provided written notice to SRA of its intent to renew the term of the Water Supply Contract; and

**171606**

WHEREAS, the Parties were unable to reach agreement on the amount of compensation the Authority would be entitled to receive from Dallas during the initial renewal term; and

WHEREAS, following the Parties' failure to reach agreement as to the amount of compensation the Authority would be entitled to receive from Dallas during the initial renewal term, SRA's Board of Directors set a rate for the water that Dallas had a right to divert from Lake Fork Reservoir at $0.5613 per thousand gallons, by its action on or about October 9, 2014; and

WHEREAS, following such action of the SRA Board of Directors in setting a rate for water that Dallas had a right to divert from Lake Fork Reservoir pursuant to the Water Supply Contract, the City filed an "Original Petition for Review and Request for Interim Rates" on or about October 30, 2014 with the Public Utility Commission of Texas ("PUC"), designated as PUC Docket No. 43674, requesting the PUC to set aside SRA's rate and to determine and set the amount of compensation the Authority would receive from Dallas during the initial renewal term; and

WHEREAS, said Petition was referred by the PUC to the State Office of Administrative Hearings, in Docket No. 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.WS, and by order issued on or about April 2, 2015, the Administrative Law Judge in such matter set an interim rate of $0.5613 per thousand gallons to be paid by Dallas and required that such payments be deposited into an escrow account to be opened by SRA and the City; and

WHEREAS, on or about September 9, 2015, Dallas executed an escrow agreement with SRA, as established by the Administrative Law Judge in his order of April 2, 2015; on September 10, 2015, Dallas deposited $18,087,912 into an escrow account opened pursuant to the escrow agreement (the "Escrow Account"); and, Dallas has continued to make monthly deposits into the Escrow Account of $2,009,768 each month since then; and

WHEREAS, as of September 30, 2017, the Escrow Account had a balance of $68,687,430 (the "Escrow Amount"), which is made up of the compensation to be paid by Dallas for the water supplies made available by SRA to Dallas in Lake Fork Reservoir, and also the interest income in the Escrow Account resulting from the prior balances in the Escrow Account; and

WHEREAS, on or about February 13, 2015, the City filed its "Original Petition and Declaratory Judgment and Supplemental Relief and Request for Disclosure" against SRA in Travis County, Texas, in Cause No. D-1-GN-15-000398, requesting a declaration that the rates set by SRA in its October 9, 2014 actions were not rates set pursuant to a contract; and

WHEREAS, in its "Original Answer" in Cause No. D-1-GN-15-000398, the Authority filed a Plea to the Jurisdiction, which the Travis County District Court granted on or about May 21, 2015; and

WHEREAS, following the grant of SRA's Plea to the Jurisdiction, on or about June 15, 2015 the City filed its "Notice of Appeal" of such decision with the Third Court of Appeals in

A-112

**171606**

Austin, and oral arguments before the Third Court of Appeals were held on March 23, 2016, and on June 7, 2017 the Third Court of Appeals issued a ruling; and

WHEREAS, on or about February 13, 2015, the City also filed an "Original Petition for Declaratory Judgment" against the Authority's Board of Directors, in their individual capacities as Board members, in Orange County, Texas, in Cause No. D150045-C, claiming in part that the Authority's Board members acted without legal authority when they set rates to the City for the right to use water from Lake Fork Reservoir and that such rates were therefore void; and

WHEREAS, on or about June 23, 2015, the Authority filed its "Original Petition in Intervention" in Cause No. D150045-C, requesting the Court to grant it all amounts due and owing from the City under the Water Supply Contract as renewed, at a rate of $0.5613 per thousand gallons; and

WHEREAS, the City filed a "Motion to Transfer Venue" from Orange County to Travis County, Texas related to SRA's claims in Cause No. D150045-C, on or about July 17, 2015; and

WHEREAS, the Orange County District Court in Docket No. D150045-C denied the City's "Motion to Transfer Venue" by order of January 30, 2016; and

WHEREAS, following such denial of the City's "Motion to Transfer Venue", Dallas filed a "Notice of Appeal" to the Ninth Court of Appeals on or about February 11, 2016; and

WHEREAS, the Ninth Court of Appeals dismissed the City's appeal of the Orange County District Court's denial of its "Motion to Transfer Venue" for want of jurisdiction, on or about June 9, 2016; and

WHEREAS, on or about June 14, 2016, the Orange County District Court denied the City's Plea to the Jurisdiction and overruled its Special Exceptions; and

WHEREAS, on or about July 1, 2016, the City filed a "Notice of Appeal" to the Orange County District Court's denial of its "Plea to the Jurisdiction", oral arguments before the Ninth Court of Appeals were held on December 15, 2016, and the Parties are awaiting a ruling; and

WHEREAS, the Parties agree that none of the foregoing litigation has yet resulted in any final and non-appealable determinations as to the amount of compensation as noted in Section 6.02 of the Water Supply Contract that the Authority may be entitled to receive from the City during the current initial forty (40) year renewal term of the Water Supply Contract or any subsequent forty (40) year terms; that such litigation has been expensive and time-consuming and has harmed the Parties' ability to work together; and that their mutual, long-term interest in working together to make important water supplies available to their customers is threatened by such litigation; and

WHEREAS, following good faith efforts by representatives of the Parties to address such matters, the Parties wish to compromise and settle their differences concerning such

7453959.1                                3

171606

compensation issues, for both the current initial forty (40) year renewal term and for all successive forty (40) year renewal terms, to dismiss with prejudice any and all claims, suits, and proceedings at the PUC, the District Courts and the Courts of Appeals brought by either Party, and to also enter into an agreement concerning other important matters which the Parties have agreed upon; and

WHEREAS, with respect to the current initial forty (40) year renewal term of the Water Supply Contract, and for all successive forty (40) year renewal terms, as well as for other important matters the Parties have agreed upon, the Parties also intend to execute an "Amendment to Water Supply Contract and Conveyance", attached hereto as "Exhibit A", contemporaneously with their execution of this Settlement Agreement.

NOW THEREFORE, in consideration of the foregoing recitals, which are fully incorporated into this Settlement Agreement, and for good and valuable consideration, the adequacy and sufficiency of which is acknowledged by the Parties' execution below, the Parties agree as follows:

### ARTICLE I.  USE OF ESCROW AMOUNT

1.1 Contemporaneously with their execution of this Settlement Agreement and as a condition precedent to the effectiveness of this Settlement Agreement, they will each execute the "Authorization to Release Escrow Funds" form, attached hereto as "Exhibit B", and that thereafter SRA will be entitled to retain the Escrow Amount in its own name and bank account ("SRA Account").

1.2 Following the transfer of the Escrow Amount to SRA, SRA shall be entitled to debit the Escrow Amount for the amounts to be paid to SRA by the City for the period November 2, 2014 through September 30, 2017, and thereafter SRA shall be entitled to transfer out of the SRA Account on a monthly basis the amounts to be paid to SRA from the City as compensation for such water supplies for the period following September 30, 2017, until the Escrow Amount is exhausted.

1.3 The amount of compensation to be paid to SRA from Dallas for the period November 2, 2014 to September 30, 2017, to be debited from the Escrow Amount, will be calculated in accordance with the information included in "Exhibit C -Pre-Settlement Accounting", using the rates and "take or pay" values included therein for determining such amounts. The compensation to be paid to SRA from Dallas for the Lake Fork Reservoir water supplies the City is entitled to under the Water Supply Contract and/or the Amendment to Water Supply Contract and Conveyance from October 1, 2017 through December 31, 2017 shall be calculated in accordance with the information included in "Exhibit D – Post-Settlement Accounting", using the rates and "take or pay" values included therein for determining such amounts.

1.4 SRA shall provide Dallas an accounting of the SRA Account into which the Escrow Amount is deposited, initially within thirty (30) calendar days of the deposit of the Escrow Amount into such SRA Account, and thereafter quarterly until such funds are

**A-114**

**171606**

depleted. Such accounting will reflect the withdrawals to address the Pre-Settlement compensation to be paid to SRA by Dallas for Lake Fork Reservoir water supplies prior to and including September 30, 2017 and the Post-Settlement compensation to be paid to SRA by Dallas for Lake Fork Reservoir water supplies following September 30, 2017. After the receipt by Dallas of each such accounting, Dallas shall have the right to request, and SRA shall provide within thirty (30) calendar days of such request, complete account statements of the SRA Account.

1.5   When the proceeds of the Escrow Amount are debited for payment of the Pre-Settlement compensation the City has agreed to pay SRA for water supplies in Lake Fork Reservoir for the period prior to and including September 30, 2017, Dallas shall be entitled to a prorated amount of the interest earned on the balances in the Escrow Account, from its inception through September 30, 2017, that represents that percentage of the Escrow Amount that is not to be paid to SRA for water supplies in Lake Fork Reservoir, pursuant to the accounting contemplated in Subsection 1.3 above. With respect to that interest, Dallas may affirmatively elect in writing by November 15, 2017 to have that interest disbursed to it, or, absent such affirmative election, Dallas shall be deemed to have elected to leave that interest in the SRA Account to be applied to future payment obligations of Dallas pursuant to the Amendment to Water Supply Contract and Conveyance.

1.6   When the proceeds of the Escrow Amount are debited monthly for post September 30, 2017 payments as described herein and in the Amendment to Water Supply Contract and Conveyance, Dallas shall be entitled to 100% of the interest earned on the balances of the Escrow Amount, for the period following September 30, 2017 and thereafter until such funds are exhausted. With respect to such interest, Dallas may affirmatively elect in writing by November 15, 2017 to have that interest disbursed to it, or, absent such affirmative election, the City shall be deemed to have elected to leave that interest in the SRA Account to be applied to future payment obligations of Dallas pursuant to the Amendment to Water Supply Contract and Conveyance.

ARTICLE II. DISMISSAL OF CLAIMS AND EXECUTION OF AMENDMENT

2.1   Within ten (10) business days of the Effective Date of this Settlement Agreement the Parties will file pleadings to dismiss, with prejudice to the re-filing of same, any and all claims, suits, and proceedings at the PUC, in any District Court, and at any Court of Appeals, brought by either Party with respect to the rates charged or to be charged by the Authority to Dallas for the water supplies in Lake Fork Reservoir, and each Party shall afford service to the other Party of any such pleading or filing related to such dismissals, contemporaneously with the filing of same.

2.2   Each Party shall pay and be responsible for its own attorneys' fees, witness or consultant fees, litigation expenses, and costs of court with respect to all claims, suits, and proceedings referenced in Section 2.1, and shall have no claim for payment of same against the other Party. The Parties agree that this provision does not alter the cost

7453959.1                                                    5

171606

allocation or payment obligations related to the Service Charge as provided for in the Water Supply Contract.

2.3   Contemporaneously with its execution of this Settlement Agreement, and as a condition precedent to the effectiveness of this Settlement Agreement, each Party shall execute the "Amendment to Water Supply Contract and Conveyance", attached hereto as "Exhibit A."

## ARTICLE III.  OTHER TERMS

3.1   The Recitals included above are expressly adopted and incorporated herein and reflect the understanding and intentions of the Parties, and the Parties may rely on such Recitals in interpreting and construing their intent as they agreed to enter into this Settlement Agreement.

3.2   The "Effective Date" of this Settlement Agreement is the date a Party last executes said Agreement.

3.3   In the event any one or more of the provisions contained in this Settlement Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision thereof and this Agreement shall be considered as if such invalid, illegal, or unenforceable provision had never been contained in this Agreement.

3.4   The Parties acknowledge that this Settlement Agreement is an "arm's length" agreement, entered into by Dallas and SRA freely, without duress, coercion or any undue influence, and is a mutually drafted agreement in which both parties were represented by counsel. No presumption will apply in favor of either Party in the interpretation of this Agreement or in the resolution of any ambiguity of any provision of this Agreement.

3.5   This Settlement Agreement may be executed in any number of counterparts, each of which shall be deemed an original and constitute one and the same instrument. If this Agreement is executed in counterparts, then it shall become fully executed only as of the execution of the last such counterpart.  The "Effective Date" of this Agreement shall be the date any counterpart is last executed by an authorized representative of any Party.

3.6   By their signatures below, the representatives of Dallas and SRA executing this Settlement Agreement affirm that they are authorized to enter into this Agreement on behalf of their principal. Each Party agrees to attach documentation hereto that execution of this Agreement has been authorized by its respective governing body and authorization to act has been granted to such representative.

**A-116**

171606

EXECUTED on the dates set out below on behalf of Dallas by its City Manager, duly authorized by Resolution No.17 -1606 adopted on the 11th day of October , 2017 and approved as to form by its City Attorney; and on behalf of SRA by its duly authorized official(s).

**CITY OF DALLAS, TEXAS**

T. C. BROADNAX
City Manager

By: _____
        Assistant City Manager

DATE: 10/12/2017

APPROVED AS TO FORM:
LARRY E. CASTO
City Attorney

By: _____
        Assistant City Attorney

**SABINE RIVER AUTHORITY OF TEXAS**

DAVID MONTAGNE
Executive Vice President/General Manager

By: _____

DATE: 10-19-2017

APPROVED AS TO FORM:
MARTIN C. ROCHELLE
Special Counsel

By: _____

**A-117**

171606

EXHIBIT A

AMENDMENT TO WATER SUPPLY CONTRACT AND CONVEYANCE

171606

**EXHIBIT A**

## AMENDMENT TO WATER SUPPLY CONTRACT AND CONVEYANCE

This Amendment to Water Supply Contract and Conveyance (the "Amendment") is entered into as of the day and year hereinafter set forth by and between the City of Dallas, Texas ("City" or "Dallas") and the Sabine River Authority of Texas ("SRA" or "Authority") in order to supplement and amend that certain "Water Supply Contract and Conveyance" agreement ("Water Supply Contract") they mutually entered into on or about October 1, 1981, as such agreement was subsequently supplemented and amended, related to water supplies owned by the Authority in Lake Fork Reservoir to which Dallas has rights pursuant to such agreements, and to address other important matters expressly provided for herein. The City and the Authority are individually referred to herein as a "Party" and are collectively referred to herein as "Parties".

## RECITALS

WHEREAS, the Authority is an agency and political subdivision of the state of Texas, being a conservation and reclamation district created and governed by Article 8280-133, as amended, pursuant to Article XVI, Section 59 of the Texas Constitution; and

WHEREAS, the City is a home rule city and municipal corporation acting by and through its charter, governing ordinances and state law; and

WHEREAS, the Parties entered into the Water Supply Contract on or about October 1, 1981, wherein Dallas secured certain rights to water supplies, as specified therein, in Lake Fork Reservoir, an impoundment owned by the Authority on Lake Fork Creek in Rains, Hopkins and Wood Counties, Texas; and

WHEREAS, Section 6.01 of the Water Supply Contract confirmed the Parties' agreement that the initial term of such agreement would continue through November 1, 2014, and also provided that the term of the Water Supply Contract would be renewed for additional periods of forty (40) years throughout the useful life of the reservoir unless Dallas exercised its unilateral right to terminate said agreement at least one (1) year prior to the end of each such term; and

WHEREAS, Section 6.02 of the Water Supply Contract provided that the amount of compensation the Authority would be entitled to receive from Dallas during any renewal term (exclusive of the City's pro rata share of the Authority's "Service Charge", as that term was defined in such agreement) would be determined by mutual agreement of the Parties, and that the Parties would commence negotiations to determine the amount of compensation at least one (1) year prior to the expiration of the initial period and each successive forty (40) year term thereafter; and

WHEREAS, the Parties amended the Water Supply Contract in 1986 by entering into the "First Supplement to Water Supply and Conveyance" (hereinafter, "First Supplement"), to address, among other matters, the possibility that additional firm yield from Lake Fork Reservoir could be secured by the Authority from the Texas Water Commission ("Commission") in light of

**171606**

a change to the operations of the Lake, and that if such additional yield could be secured it would belong one-half to the Authority and one-half to the City; and

WHEREAS, subsequent to the execution of the First Supplement and by virtue of the issuance of Permit No. 2948A on May 28, 1987, the Commission authorized SRA the right to supply Dallas with 131,860 acre-feet of water per annum for municipal use purposes, of which 120,000 acre-feet of water per annum could be transferred to and used in the Trinity River Basin; and

WHEREAS, pursuant to the terms of the First Supplement, Permit No. 2948A, and the subsequently issued Certificate of Adjudication No. 05-4669, Dallas has the right to 11,860 acre-feet of water per annum for municipal use purposes, but the City is not authorized to transfer such water to the Trinity River Basin; and

WHEREAS, the Authority has a need for additional water supplies to serve its customers within the Sabine River Basin; and

WHEREAS, on or before November 1, 2013, the City provided written notice to SRA of its intent to renew the term of the Water Supply Contract; and

WHEREAS, the Parties were unable to reach agreement on the amount of compensation the Authority would be entitled to receive from Dallas during the initial renewal term; and

WHEREAS, following the Parties' failure to reach agreement as to the amount of compensation the Authority would be entitled to receive from Dallas during the initial renewal term, SRA's Board of Directors set a rate for the water that Dallas had a right to divert from Lake Fork Reservoir at $0.5613 per thousand gallons, by its action on or about October 9, 2014; and

WHEREAS, following such action of the SRA Board of Directors in setting a rate for water that Dallas has a right to divert from Lake Fork Reservoir pursuant to the Water Supply Contract, the City pursued several claims against the Authority before state agencies and in state courts, and the Authority also filed claims against the City for amounts it claimed were due and owing for the Lake Fork Reservoir water supply afforded to Dallas; and

WHEREAS, the Parties have mutually determined that their mutual, current and long-term interests in working together to make important water supplies available to their customers are threatened by such litigation and disputes, and through their negotiation and execution of a Settlement Agreement, executed contemporaneously with this Amendment, the Parties agreed to settle and dismiss with prejudice all of such claims, and also to enter into this Amendment so as to address the compensation to be paid to the Authority for water supplied to Dallas from Lake Fork Reservoir, and other important matters the Parties have agreed upon.

NOW THEREFORE, in consideration of the foregoing recitals, which are fully and expressly adopted and incorporated herein and reflect the understanding and intentions of the Parties, and may be relied upon by the Parties in interpreting and construing their intent as they

7453952.1

**A-120**

171606

agreed to enter into this Amendment, and for good and valuable consideration, the adequacy and sufficiency of which is acknowledged by the Parties' execution below, the Parties hereby agree as follows:

## ARTICLE I. INTERPRETATION

1.1   This Amendment amends, modifies, and replaces certain provisions of existing and prior contracts and agreements by and among the Parties related to the Lake Fork Reservoir, including but not limited to the Water Supply Contract and First Supplement. However, except as expressly amended, modified, or replaced by the terms herein, such existing and prior contracts and agreements and all terms thereof shall remain in full force and effect, and this Amendment shall not be construed as a termination or rescission of any such existing and prior contract and agreement.

## ARTICLE II. COMPENSATION

2.1   For any period of time following the Effective Date of this Amendment for which Dallas has a contractual right under Section 6.01 of the Water Supply Contract to take water from Lake Fork Reservoir, the Parties agree that Section 6.02 of the Water Supply Contract is revised to read as follows, in its entirety:

"6.02.   In addition to the City's payment of its pro rata share of the Service Charge, which will continue to be paid as set forth herein, the amount of compensation that the Authority shall be entitled to receive from the City annually during any renewal term, including but not limited to the forty (40) year renewal term beginning November 2, 2014, shall be determined in accordance with the following and shall be payable by the City monthly in 1/12 increments:

a)   $39.75/Acre-Foot ($0.122/1000 gallons) of Water as an "In-Basin" rate for 120,000 acre-feet of water per annum, to be charged on a "take or pay" basis and without regard to whether the City actually diverts water from Lake Fork Reservoir;

b)   $59.63/Acre-Foot ($0.183/1000 gallons) of Water as an "Out-of-Basin" rate, on a "take or pay" basis, for the amount of water provided in subsections c) and e) below, and without regard to whether the City actually diverts Water from Lake Fork Reservoir or whether it transports Water out of the Sabine River Basin;

c)   The Parties agree that, beginning January 1 in Calendar Year 2018, the minimum "Out-of-Basin" take or pay volume to be used in calculating the compensation due to SRA pursuant to subsection b) will be 48,000 acre-feet per annum, and that such minimum "take or pay" volume for purposes of such calculations shall increase annually by 2,000 acre-feet for each Calendar Year thereafter, until the beginning of Calendar Year 2054, when the annual "Out-of-Basin" volume to which this "take or pay" calculation will apply will be 120,000 acre-feet of Water, and as identified in the following table:

7453952.1

3

**A-121**

171606

Minimum Out-of-Basin Take or Pay Volume  (ac-ft)

| Year | Volume | Year | Volume | Year | Volume | Year | Volume |
|------|--------|------|--------|------|--------|------|--------|
| 2017 | 46,000 | 2028 | 68,000 | 2039 | 90,000 | 2050 | 112,000 |
| 2018 | 48,000 | 2029 | 70,000 | 2040 | 92,000 | 2051 | 114,000 |
| 2019 | 50,000 | 2030 | 72,000 | 2041 | 94,000 | 2052 | 116,000 |
| 2020 | 52,000 | 2031 | 74,000 | 2042 | 96,000 | 2053 | 118,000 |
| 2021 | 54,000 | 2032 | 76,000 | 2043 | 98,000 | 2054 | 120,000 |
| 2022 | 56,000 | 2033 | 78,000 | 2044 | 100,000 | | |
| 2023 | 58,000 | 2034 | 80,000 | 2045 | 102,000 | | |
| 2024 | 60,000 | 2035 | 82,000 | 2046 | 104,000 | | |
| 2025 | 62,000 | 2036 | 84,000 | 2047 | 106,000 | | |
| 2026 | 64,000 | 2037 | 86,000 | 2048 | 108,000 | | |
| 2027 | 66,000 | 2038 | 88,000 | 2049 | 110,000 | | |

d) The Parties agree that for all renewal periods of forty (40) years beyond November 1, 2054, the annual Calendar Year "take or pay" amounts for calculation of compensation to SRA based on the then-current "In-Basin" and "Out-of-Basin" rates will be 120,000 acre-feet per annum;

e) Prior to January 1 of Calendar Year 2054, to the extent Dallas ever diverts a volume of Water in any Calendar Year greater than the minimum out-of-basin "take or pay" volume as specified in Subsection c) above, the compensation to be paid to the Authority for such year will be calculated using the actual volume of such diversion by Dallas, excluding any Water that Dallas diverts to make up for SRA's implementation of the "Joint Use" provision in Certificate of Adjudication 05-4669 as amended, but the minimum "take or pay" volumes for subsequent Calendar Years will remain as specified in Subsection c) above and such future minimum "take or pay" volumes will not be increased by such greater diversion;

f) Dallas shall report monthly to SRA its diversions of Water from Lake Fork Reservoir, and it shall also report its prior Calendar Year diversions annually to SRA by no later than January 31 of each subsequent Calendar Year during the term of the initial renewal term and all subsequent, successive renewal terms, for SRA's use in determining the actual "take or pay" volumes for the "Out-of-Basin" compensation calculation, and for SRA's annual reporting on Water use from Lake Fork Reservoir;

g) The reporting required by Subsection f) shall be used by SRA to calculate any overages to the annual "take or pay" volumes to be paid by Dallas as a result of the City's use of a greater volume of water in the prior Calendar Year than the minimum "take or pay" volume assigned for such year that was used by SRA to calculate and invoice Dallas for 1/12 of the annual compensation to be paid to the Authority and related to the prior Calendar Year's "Out-of-Basin" compensation calculation. SRA will promptly invoice Dallas for any such

171606

overage amount due, payment for which will be due within thirty (30) days after the City's receipt of that invoice;

h) Beginning January 1 in Calendar Year 2018 and thereafter for the remainder of this Agreement and for all additional, successive, forty (40) year terms of this Agreement, the "In-Basin" rate and the "Out-of-Basin" rate shall be adjusted annually, effective on January 1 for each such Calendar Year, by a percentage equal to the most recently published "Monthly Average Municipal 'A' Bond Rate for Long Maturities", as published by Moody's Investor Service;

i) To the extent the most recently published "Monthly Average Municipal 'A' Bond Rate for Long Maturities", as referenced in Subsection h) above, is greater than 5.5%, the Authority shall only be entitled to adjust the "In-Basin" and "Out-of-Basin" rates by 5.5% for such Calendar Year; and,

j) To the extent that Moody's reporting services is not available to obtain the most current monthly average "Municipal 'A' Bond Rates for Long Maturities" for use as an annual water rate escalator during the initial renewal term and all subsequent, successive renewal terms, the Parties agree that a nationally recognized alternative authoritative source shall be used and that such sources may include but not be limited to "Standards & Poor's Municipal Bond Ratings", "Fitch Municipal Bond Ratings", "Wall Street Journal Municipal Bond Ratings", or other nationally recognized sources for Municipal 'A' Bond Ratings."

## ARTICLE III.  ASSIGNMENT OF CONTRACT RIGHTS

3.1     Dallas will assign, without cost to the Authority for either the water supply and/or its possible transport to Lake Tawakoni, the City's contract rights under the First Supplement, as such rights are granted to the Authority pursuant to Permit No. 2948B and Certificate of Adjudication No. 05-4669, as amended, to 11,860 acre-feet of water per annum ("Assigned Water") for the Authority's use in serving SRA customers within the Sabine River Basin. Such assignment shall be for the current, initial renewal term of the Water Supply Contract (November 2, 2014 through November 1, 2054) and for any additional, successive forty (40) year terms. Contemporaneously with the execution of this Amendment, the City will execute the "Assignment of Contract Rights to Water" form attached hereto as "Exhibit 1" and deliver same to SRA.

3.2     The Parties acknowledge that the assignment of contract rights authorized herein will serve to reduce the City's pro rata share of the Service Charge to be paid to the Authority pursuant to the Water Supply Contract and the First Supplement, as such Service Charge is calculated pursuant to the terms of such agreements.

3.3     Dallas agrees that SRA may, in its sole discretion, divert the Assigned Water from either Lake Tawakoni or Lake Fork Reservoir, and that SRA may implement the "Joint Use" provision in Certificate of Adjudication 05-4669, as amended if it chooses to divert such water from Lake Tawakoni. Pursuant to such "Joint Use" provision, SRA agrees that, to the extent Dallas water in Lake Tawakoni is diverted to satisfy SRA's demands for Assigned Water, Dallas may divert an

171606

equal amount of water directly from Lake Fork Reservoir for its transport to and use in the Trinity River Basin. The Parties agree that any such equivalent diversion amount shall not be included in the Out-of-Basin "take or pay" volume used in the Out-of-Basin compensation calculation. To the extent the State of Texas or any agency of the State ever determines that the terms of this Article III are inconsistent with such "Joint Use" provision, the Parties agree to work collaboratively to seek enforcement of the "Joint Use" provision in a manner consistent with this Article III, or if such enforcement is unsuccessful to amend the "Joint Use" provision to address such inconsistency, all in a manner that preserves their mutual interest in i) enforcing the assignment of contract rights contemplated herein at no cost to the Authority and SRA's right to divert the Assigned Water from either Lake Fork Reservoir or Lake Tawakoni, in the Authority's sole discretion, and ii) preserving the Parties' rights as authorized in this Amendment, Certificate of Adjudication No. 05-4669, as amended, the Water Supply Contract, and the First Supplement, and as authorized in Certificate of Adjudication No. 05-4670, as amended, the July 14, 1956 Memorandum of Agreement of the Parties, and the July 30, 1986 Fifth Supplemental Memorandum of Agreement of the Parties.

## ARTICLE IV.  CAPACITY IN THE CITY'S LAKE FORK TO LAKE TAWAKONI TRANSMISSION FACILITIES

4.1     Dallas agrees to transport up to a maximum of 20,000 acre-feet per year of SRA's water supplies in Lake Fork Reservoir, as authorized to SRA in Certificate of Adjudication No. 05-4669, as amended ("SRA Water"), to Lake Tawakoni using the City's Lake Fork pump station, its Lake Fork to Lake Tawakoni pipeline, and all related facilities (collectively, the "LF-LT Pipeline") and its outfall into Lake Tawakoni (the "LF-LT Pipeline Interconnect Outfall Structure"), at a rate of not more than 36 Million Gallons per Day, when and as such facilities are operable and such capacity is available, a determination that shall be in the City's sole discretion. Such 20,000 acre-feet of transport right shall not be inclusive of any water assigned to SRA pursuant to Article III herein, except to the extent that SRA requests and Dallas transports some or all of such Assigned Water from Lake Fork Reservoir to Lake Tawakoni, in which event the actual transport of such Assigned Water shall be included within the maximum authorized transport right of 20,000 acre-feet pursuant to this Article IV. To the extent Dallas determines in its sole discretion that it has the ability to transport additional volumes of SRA Water as requested by the Authority, the City will transport same pursuant to the provisions of this Article IV. When and as capacity in the LF-LT Pipeline is used to transport SRA Water, SRA will pay Dallas the City's actual costs of electric power used for such transportation, but pursuant to the Parties' agreement as specified in Article III, SRA shall not be required to pay the City's electric power costs for the transportation of any portion of the Assigned Water that may be transported from Lake Fork Reservoir to Lake Tawakoni. During each electric power billing period in which Dallas has transported SRA Water, the costs of electric power used to transport such water will be accounted for by Dallas based upon the actual metered and electricity usage at the Lake Fork pump station, and all metered water volumes at the point of delivery in Lake Tawakoni through use of the LF-LT Pipeline Interconnect Outfall Structure. The City's total electric power costs associated with the metered power demands at the Lake Fork pump station will be shared by the Parties in proportion to each Party's share of the total actual volumes pumped, as measured by the volume of raw water metered and delivered through the LF-LT Pipeline and the volume of Water delivered through the LF-LT Pipeline Interconnect Outfall Structure during the electric

171606

power billing period. Any changes to electric power rates billed to Dallas implemented during any transfer period will be applied only to the daily volumes of SRA Water transported on or after the effective date of such changed electric rates. Charges for electric power submitted by Dallas to SRA for reimbursement shall be supported with billing information and documentation from the electric provider and all supporting calculations.

4.2    The agreement by Dallas to transport SRA Water in the LF-LT Pipeline shall be for a term of years commensurate with the term of the current, initial renewal term of the Water Supply Contract and for all additional, successive forty (40) year terms.

4.3    SRA's rights in this Article IV related to the transport of SRA Water in the LF-LT Pipeline shall be subordinate to the City's rights to use such facilities for its transfer of water to serve its current and future retail customers, and to serve wholesale customers of Dallas as of the Effective Date of this Amendment as well as any wholesale customer of such current wholesale customer who subsequently becomes a direct wholesale customer of the City.

4.4    When capacity in the LF-LT Pipeline is unavailable to SRA due to repair or maintenance of such facilities, Dallas agrees to allow SRA to divert the City's water supplies in Lake Tawakoni on a "Joint Use" basis, as authorized in Certificate of Adjudication 05-4669, as amended, to the extent Dallas has supplies available during any such time period, and the amount of such supplies shall be subsequently reimbursed to the City in the same calendar year out of SRA Water in Lake Fork Reservoir. In such event, SRA will pay for the City's electric power costs as specified in Section 4.1 for the transportation of an equivalent volume of SRA Water from Lake Fork Reservoir to the LF-LT Pipeline Interconnect Outfall Structure on Lake Tawakoni. The Parties agree that the "Joint Use" provision of Certificate of Adjudication 05-4669, as amended, authorizes the transport of such equivalent amount of SRA Water supplies for use by Dallas. To the extent the State of Texas or any agency of the State ever determines that the terms of this Article IV are inconsistent with such "Joint Use" provision, the Parties agree to work collaboratively to seek enforcement of the "Joint Use" provision in a manner consistent with this Article IV, or if such enforcement is unsuccessful to amend such "Joint Use" provision to address such inconsistency, all in a manner that preserves their mutual interest in enforcing the Parties' rights as contemplated herein and preserving their rights as authorized in Certificate of Adjudication No. 05-4669, as amended, the Water Supply Contract, and the First Supplement, and as authorized in Certificate of Adjudication No. 05-4670, as amended, the July 14, 1956 Memorandum of Agreement of the Parties, and the July 30, 1986 Fifth Supplemental Memorandum of Agreement of the Parties. The Parties also agree that such diversion by Dallas of an equivalent volume of SRA Water supplies as contemplated in this Section 4.4 shall not be included in the Out-of-Basin "take or pay" volume used in the Out-of-Basin compensation calculation.

4.5    In lieu of transporting SRA Water to Lake Tawakoni, the City may, in its sole discretion and in the same calendar year, provide SRA up to 20,000 acre-feet of the City's water supplies in Lake Tawakoni, for SRA's subsequent diversion and use, and SRA agrees to pay the City's electric power costs as if Dallas transported such water supplies to Lake Tawakoni. The Parties agree that such "in-lieu" power costs will be based on the most recent power cost calculation per average thousand gallons, as determined in accordance with the provisions of Section 4.1 above,

7453952.1

7

171606

adjusted for any known power rate increases authorized after such calculation. Power cost changes that may be authorized and implemented during the transfer period will be applied only to the daily volumes of SRA Water transferred under such changed power rates. Such "in-lieu" power cost calculations will be supported with appropriate documentation by the City. The diversion and use of such water by SRA shall be in addition to the Authority's diversion and use of the water supplies assigned by Dallas pursuant to Article III.

4.6    If Dallas provides SRA with the City's supplies of water out of Lake Tawakoni in lieu of transporting SRA Water as contemplated in Section 4.5, Dallas may, at its own cost and within the same calendar year, transport an equivalent amount of SRA Water supplies to Lake Tawakoni. No additional conditions, rates or fees shall be assessed or imposed by either Party if this provision is utilized. The Parties agree that the "Joint Use" provision of Certificate of Adjudication 05-4669, as amended, authorizes the transport of such equivalent amount of SRA Water supplies for use by Dallas. To the extent that the State of Texas or any agency of the State ever determines that the terms of this Article IV are inconsistent with such "Joint Use" provision, the Parties agree to work collaboratively to seek enforcement of the "Joint Use" provision in a manner consistent with this Article IV, or if such enforcement is unsuccessful to amend such "Joint Use" provision to address such inconsistency, all in a manner that preserves their mutual interest in enforcing the Parties' rights as contemplated herein and preserving their rights as authorized in Certificate of Adjudication No. 05-4669, as amended, the Water Supply Contract, and the First Supplement, and as authorized in Certificate of Adjudication No. 05-4670, as amended, the July 14, 1956 Memorandum of Agreement of the Parties, and the July 30, 1986 Fifth Supplemental Memorandum of Agreement of the Parties. The Parties also agree that such diversion by Dallas of an equivalent volume of SRA Water supplies as contemplated in this Section 4.6 shall not be included in the Out-of-Basin "take or pay" volume used in the Out-of-Basin compensation calculation.

4.7    The Parties recognize that the current hydraulic capacity of the LF-LT Pipeline Interconnect Outfall Structure is limited and that such capacity could be increased through the construction of certain improvements to allow for additional hydraulic capacity in such facilities and therefore additional transport services to SRA. To that end, the Parties agree that SRA may propose to the City improvements to the LF-LT Pipeline Interconnect Outfall Structure, at the Authority's sole discretion and expense, and pursuant to plans, specifications and construction to be considered and approved by Dallas, in the sole discretion of Dallas, which such consideration, approval or refusal will not be unreasonably withheld or delayed. If such improvements to the LF-LT Pipeline Interconnect Outfall Structure are constructed by SRA, the ownership of such improvements will be transferred to the City at no cost to the City and thereafter the City will own, operate and be responsible for maintaining the improvements made to such facilities. The Parties agree that following the Authority's construction of such improvements and thereafter for the remaining current, initial renewal term of the Water Supply Contract and during all additional, successive forty (40) year terms, i) SRA's rights to use such additional hydraulic capacity in the LF-LT Pipeline Interconnect Outfall Structure shall be predominant to the City's right to use such additional capacity, ii) the operations and maintenance attributable to such additional hydraulic capacity, being borne by the City, will not be included in the Authority's calculation of the Service Charge pursuant to the Water Supply Contract, and iii) the capital costs of such improvements, being borne by the Authority, will not be included in the City's

171606

calculation of the cost of service for transporting water from Lake Fork Reservoir to Lake Tawakoni or otherwise.

4.8    The Parties agree to the following planning and operational protocol for the City's transport of SRA Water pursuant to this Article IV, as well as the transport of water assigned to SRA pursuant to Article III:

a) Within thirty (30) calendar days of the Effective Date of this Amendment and annually thereafter beginning on November 1, 2018 during the current, initial renewal term of the Water Supply Contract and during all additional, successive forty (40) year terms, SRA agrees to provide Dallas a schedule for the transport and delivery of water to Lake Tawakoni (the "Transport Schedule"). The Transport Schedule shall specify the month(s) during the following calendar year that such transport will commence and cease. Within thirty (30) calendar days of its receipt of a Transport Schedule, the City will approve such schedule or identify adjustments necessary in order for it to approve such schedule. The City's approval of a Transport Schedule shall not be unreasonably withheld or delayed.

b) The Parties recognize that water demands and weather conditions vary significantly, both within and between calendar years, and that hydrologic conditions in either Lake Fork Reservoir or Lake Tawakoni may result in waste of water without timely adjustment of the Transport Schedule. To that end, and in order to conserve the water supplies of the Sabine River Basin, the Parties recognize that an approved Transport Schedule may need to be timely adjusted during any calendar year. If SRA requests revision(s) to an approved Transport Schedule, Dallas will promptly act within five (5) business days to approve and implement such revision(s). The City's approval of a revised Transport Schedule shall not be unreasonably withheld or delayed.

c) In order to most efficiently preserve and use water and to avoid waste of water, within ninety (90) days of the Effective Date of this Amendment, the Director of Dallas Water Utilities and the General Manager of the Authority will cooperate to i) identify and develop operational protocol and practices to allow for the efficient initiation and termination of the City's transport of water to Lake Tawakoni, and without regard to a Transport Schedule previously proposed by the Authority or approved by the City, and ii) develop and thereafter implement a written accounting plan consistent with the terms of this Amendment to account for Lake Fork Reservoir and Lake Tawakoni storage, diversion and use as authorized pursuant to Certificate of Adjudication 05-4669, as amended, and Certificate of Adjudication 05-4670, as amended, so as to ensure that all water authorized for each Party's use is available for diversion at the authorized points of diversion thereunder. The Parties agree to work collaboratively from time to time, as either Party requests, to review and amend the accounting plan, as necessary, to be consistent with the terms of this Amendment and to accurately reflect reservoir operations and hydrology.

## ARTICLE V. BINDING ARBITRATION

5.1    The Parties understand that during the current, initial renewal term of the Water Supply Contract, and during all additional, successive forty (40) year terms, there may be issues or disagreements that arise between them that may require resolution. To the extent that such issues

7453952.1

or disagreements do not involve i) disputed charges on an invoice, ii) the rates, take or pay amounts, and or the calculation of the escalator specified in new Section 6.02, as included in Article II herein, iii) the assignment to SRA of the City's rights to 11,860 acre-feet of water per annum as addressed in Article III herein, iv) the capacity volume in the LF-LT Pipeline as addressed in Article IV herein, or v) the calculation of the City's obligation to pay its pro rata share of the Service Charge as specified in the Water Supply Contract, the Parties agree to binding arbitration to address and resolve such issues or disagreements.

5.2    In any such binding arbitration, each Party shall pay for its own costs and attorney's fees in pursuing same, and will share equally in the cost of any arbitrator and related arbitration expenses.

## ARTICLE VI. OTHER

6.1    Section 9.06 of the Water Supply Contract is hereby amended so that hereafter it shall read as follows:

> "9.06.    The payments by the City of the Semi-Annual Facilities Charges and the Service Charges, to the extent required herein, the compensation paid by the City to the Authority pursuant to the provisions of Section 6.02, and the City's performance of other obligations expressly imposed hereunder, constitute full consideration for all rights, privileges, and benefits accruing to the City under this Agreement, as well as for the conveyance herein contained."

6.2    The Recitals included above are expressly adopted and incorporated herein and reflect the understanding and intentions of the Parties, and the Parties may rely on such Recitals in interpreting and construing their intent as they agreed to enter into this Amendment.

6.3    Dallas shall implement practices which ensure water is used in a manner that prevents waste, conserves water resources for their most beneficial and vital uses, and protects the public health. Within thirty (30) days of the Effective Date of this Amendment, Dallas shall provide a copy of its current Water Conservation Plan and Drought Contingency Plan to SRA and shall also provide SRA with copies of any plan amendments or updates as they are proposed for adoption.

6.4    Dallas agrees that a payment is deemed late if received by SRA more than thirty (30) days after the date of the City's receipt of the invoice. Late payments shall accrue interest at the rate provided in Section 2-1.1 of the Dallas City Code, as amended, or as provided by Chapter 2251 of the Texas Government Code, as amended, whichever is less.

6.5    The Parties agree that any disputed charges on any invoice shall be protested in accordance with Section 2251.042, Texas Government Code, as amended, and that in the event any Party disputes any portion of any charge on an invoice, the Party will timely pay the undisputed portion of such invoice.

7453952.1

6.6    DALLAS AGREES TO TAKE WATER TRANSPORTED BY DALLAS OR OTHERWISE AUTHORIZED TO BE DIVERTED BY DALLAS HEREUNDER "AS IS." SRA MAKES NO REPRESENTATIONS OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE CHARACTER, QUALITY OR AVAILABILITY OF THE WATER TO BE TAKEN AND DALLAS AGREES TO ASSUME ALL SUCH RISKS. SRA ALSO DOES NOT MAKE ANY REPRESENTATION THAT THE WATER WILL BE SUITABLE FOR THE PURPOSES FOR WHICH DALLAS DESIRES TO USE IT.

6.7    NEITHER PARTY SHALL BE LIABLE IN ANY EVENT FOR THEIR INABILITY TO PERFORM ANY OBLIGATION UNDER THIS AMENDMENT FOR REASONS BEYOND THE PARTY'S CONTROL, INCLUDING BUT NOT LIMITED TO ACTS OF GOD OR NATURAL DISASTER, WAR, DROUGHT, TERRORISM, FIRE, PUBLIC UTILITY POWER OUTAGE, OR THE RULES, REGULATIONS, OR ORDERS OF COURTS OR OF GOVERNMENTAL AGENCIES.

6.8    The City represents and covenants that all payments to be made by it under the Water Supply Contract and this Amendment shall constitute reasonable and necessary operating expenses of its system and that all such payments will be made from the revenues of its system. Dallas represents and has determined that the water supply obtained from the Authority pursuant to the Water Supply Contract and this Amendment is necessary and essential to the present and future operation of its water system. To that end, the City agrees throughout the term of the Water Supply Contract and this Amendment, and any extensions of such term, to continuously operate and maintain its waterworks system, and to fix and collect rates and charges for water services as will produce revenues sufficient to satisfy all of the payments required under the Water Supply Contract and this Amendment.

6.9    In the event any one or more of the provisions contained in this Amendment shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision thereof and this Amendment shall be considered as if such invalid, illegal, or unenforceable provision had never been contained in this Amendment.

6.10    The Parties acknowledge that this Amendment is an "arm's length" agreement, entered into by Dallas and SRA freely, without duress, coercion or any undue influence, and is a mutually drafted agreement in which both parties were represented by counsel. No presumption will apply in favor of either Party in the interpretation of this Amendment or in the resolution of any ambiguity of any provision of this Amendment.

6.11    This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and constitute one and the same instrument. If this Amendment is executed in counterparts, then it shall become fully executed only as of the execution of the last such counterpart. The "Effective Date" of this Amendment shall be the date any counterpart is last executed by an authorized representative of any Party.

6.12    By their signatures below, the representatives of Dallas and SRA executing this Amendment affirm that they are authorized to enter into this Amendment on behalf of their

7453952.1

11

**171606**

principal. Each Party agrees to attach documentation hereto that execution of this Amendment has been authorized by its respective governing body and authorization to act has been granted to such representative.

EXECUTED on the dates set out below on behalf of Dallas by its City Manager, duly authorized by Resolution No. __-___, adopted on the ___ day of _____, _____, and approved as to form by its City Attorney; and on behalf of SRA by its duly authorized official(s).

**CITY OF DALLAS, TEXAS**

**SABINE RIVER AUTHORITY OF TEXAS**

T. C. BROADNAX
City Manager

DAVID MONTAGNE
Executive Vice President/General Manager

By: _____
        Assistant City Manager

By: _____

DATE: _____

DATE: _____

APPROVED AS TO FORM:
LARRY E. CASTO
City Attorney

APPROVED AS TO FORM:
MARTIN C. ROCHELLE
Special Counsel

By: _____
        Assistant City Attorney

By: _____

7453952.1

**A-130**

**171606**

EXHIBIT 1

ASSIGNMENT OF CONTRACT RIGHTS TO WATER

7453952.1

171606

EXHIBIT 1

ASSIGNMENT OF CONTRACT RIGHTS TO WATER

This Assignment of Contract Rights to Water (the "Assignment") is made between the City of Dallas, Texas ("Dallas"), and the Sabine River Authority of Texas ("SRA") (each individually a "Party" and collectively the "Parties"). This Assignment is effective on the date last executed below ("Effective Date").

RECITALS

WHEREAS, Dallas is a home rule city and municipal corporation acting by and through its charter, governing ordinances and state law; and

WHEREAS, SRA is an agency and political subdivision of the state of Texas, being a conservation and reclamation district created and governed by Article 8280-133, as amended, pursuant to Article XVI, Section 59 of the Texas Constitution; and

WHEREAS, the Parties entered into that certain "Water Supply Contract and Conveyance" ("Water Supply Contract") on or about October 1, 1981, wherein Dallas secured certain rights to water supplies, as specified therein, in Lake Fork Reservoir, an impoundment owned by SRA on Lake Fork Creek in Rains, Hopkins and Wood Counties, Texas; and

WHEREAS, the Parties amended the Water Supply Contract in 1986 by entering into the "First Supplement to Water Supply and Conveyance" ("First Supplement"), to address, among other matters, the possibility that additional firm yield from Lake Fork Reservoir could be secured by SRA from the Texas Water Commission ("Commission") in light of a change to the operations of the Lake, and that if such additional yield could be secured it would belong one-half to the Authority and one-half to the City; and

WHEREAS, subsequent to the execution of the First Supplement and by virtue of the issuance of Permit No. 2948B on May 28, 1987, the Commission authorized SRA the right to supply Dallas with 131,860 acre-feet of water per annum for municipal use purposes, of which 120,000 acre-feet of water per annum could be transferred to and used in the Trinity River Basin; and

WHEREAS, pursuant to the terms of the First Supplement, Permit No. 2948B, and the subsequently issued Certificate of Adjudication No. 05-4669, Dallas has the right to 11,860 acre-feet of water per annum for municipal use purposes, but Dallas is not authorized to transfer such water to the Trinity River Basin; and

WHEREAS, SRA has a need for additional water supplies to serve its customers within the Sabine River Basin; and

**1 7 16 0 6**

WHEREAS, the Parties have entered into an Amended Water Supply Contract and Conveyance (the "Amendment") agreement contemporaneously with the execution of this Assignment, where they agreed that 11,860 acre-feet of contract rights to water held by Dallas would be assigned to SRA.

NOW, THEREFORE, in consideration of the above recitals, the mutual promises that follow and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

1. Assignment of Contract Rights to Water; No Warranties or Guarantees.

    1.1. For ten dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Dallas assigns to SRA the right to 11,860 acre-feet per annum of water to which Dallas is contractually entitled pursuant to the First Supplement, as such rights are granted to SRA pursuant to Permit 2948B and Certificate of Adjudication No. 05-4669.

    1.2. SRA's rights and obligations with respect to such water are subject to all of the terms and conditions set forth in the Amendment including, without limitation, any applicable limitations on the availability, quality and utilization of such water. Dallas does not provide, and hereby disclaims, any and all representations, warranties and guarantees with respect to such water.

2. Term.

    This Assignment shall be effective on the Effective Date, and shall continue for so long as the Water Supply Contract is effective, unless this Assignment is terminated earlier in writing signed by both Parties.

3. Miscellaneous.

    3.1. Governing Law. This Assignment and any litigation between the Parties regarding same (whether grounded in contract, tort, statute, law or equity) will be governed by, construed in accordance with, and interpreted pursuant to the laws of the State of Texas.

    3.2. Severability. If any provision of this Assignment or the application thereof to any person or circumstance is, at any time or to any extent, determined to be invalid or unenforceable by a court of competent jurisdiction, and the basis of the bargain between the Parties is not destroyed or rendered ineffective by such determination, the remainder of this Assignment, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, will not be affected thereby.

    3.3. Assignment. This Assignment to SRA may not be assigned without the prior written consent of Dallas, which consent shall not be unreasonably withheld or delayed.

3.4. Applications. SRA is solely responsible for securing any permits and licenses from any governmental authority as may be reasonably necessary or appropriate to effectuate the intent and purpose of this Assignment including, without limitation, any amendments to Certificate of Adjudication No. 05-4669. Any reductions in available water supplies mandated by a governmental authority as a result of this Assignment will be accounted for out of SRA's water supplies and not the City's water supplies.

3.5. No Third Parties Benefitted. The terms and provisions of this Assignment are for the sole benefit of the Parties, and no third party is intended to benefit therefrom.

3.6. Authority. Each of the Parties represents to the other that (i) it has full right and authority to enter into this Assignment, (ii) the person signing on behalf of the Party is authorized to do so, and (iii) the execution and delivery of this Assignment by the Party will not result in any breach of, or constitute a default under any agreement or other contract or instrument to which the Party is a party or by which either such Party may be bound.

**CITY OF DALLAS, TEXAS**

**SABINE RIVER AUTHORITY OF TEXAS**

T. C. BROADNAX
City Manager

DAVID MONTAGNE
Executive Vice President/General Manager

By: _____
    Assistant City Manager

By: _____

DATE: _____

DATE: _____

7453952.1

3

**A-134**

171606

# EXHIBIT B

## AUTHORIZATION TO RELEASE ESCROW FUNDS

**171606**

## EXHIBIT B

### AUTHORIZATION TO RELEASE ESCROW FUNDS

First Financial Trust & Asset Management Company, N.A. ("Escrow Agent") is presently holding the sum of $_____ in escrow pursuant to the terms of the Escrow Agreement between the City of Dallas ("City"), the Sabine River Authority ("Authority") and Escrow Agent, dated the 9th day of September, 2015 ("Escrow Agreement") established as the Dallas Lake Fork Escrow Agreement – Sabine River Authority ("Escrow Account").

Pursuant to Section 1.4 of the Escrow Agreement, the City and the Authority hereby instruct and authorize the Escrow Agent to disburse to the Authority the entirety of the funds held by Escrow Agent in the Escrow Account. The Escrow Agent is directed to disburse the Escrow Account as follows:

| | |
|---|---|
| Bank Name: | First Financial Trust & Asset Management Co. |
| Bank Address: | P. O. Box 701, Abilene, Texas 79604 |
| | 400 Pine Street, Suite 300, Abilene, Texas 79601 |
| ABA Number: | 111301122 |
| Account Name: | Sabine River Authority of Texas—DWU Prepaid Income Account |
| Account Number: | 3009552 |
| Telephone Number: | (409) 600-6460 |

The City and the Authority acknowledge that the Escrow Agent has fully complied with its duties under the terms and provisions of the Escrow Agreement and as a result agree to release and hold Escrow Agent harmless from all liability thereunder upon the disbursement of the Escrow Account funds authorized hereby. By their signatures below, the representatives of the City and the Authority executing this Authorization affirm that they are authorized to execute same on behalf of their principal. Attached to this Authorization as Attachments A and B are documents authorizing the execution hereof by the governing bodies of the City and the Authority.

Dated this _____ day of _____, 2017.

**CITY OF DALLAS, TEXAS**                    **SABINE RIVER AUTHORITY OF TEXAS**

T. C. BROADNAX                                DAVID MONTAGNE
City Manager                                  Executive Vice President/General Manager

By: _____                  By: _____
       Assistant City Manager

DATE: _____                  DATE: _____

**A-136**

171606

EXHIBIT C

PRE-SETTLEMENT ACCOUNTING

EXHIBIT C

8/17/2017

## PRE-SETTLEMENT ACCOUNTING
## ADDITIONAL COMPENSATION - LAKE FORK

| | In-Basin Charge [1] 120,000 ac-ft | | | Out-of-Basin Charge [2] | | | Total Charge for Additional Compensation [3] |
|---|---|---|---|---|---|---|---|
| | Volume (ac-ft) | Rate ($/ac-ft) | Amount | Minimum Out-of-Basin Volume or Overage (ac-ft) | Rate ($/ac-ft) | Amount | In-Basin + Out-of-Basin |
| November 2014 - December 2014 | 20,000 [4] | 35.84 | $ 716,800.00 | 6,667 [4] | $1.48 | $ 343,217.16 | $ 1,060,017.16 |
| 2014 Overage [5] | | | | 13,808 | $1.48 | $ 710,835.84 | $ 710,835.84 |
| January 2015 - December 2015 | 120,000 | 37.80 | $ 4,536,000.00 | 42,000 | 54.09 | $ 2,271,780.00 | $ 6,807,780.00 |
| 2015 Overage [6] | | | | 8,187 | 54.09 | $ 442,834.83 | $ 442,834.83 |
| January 2016 - December 2016 | 120,000 | 37.80 | $ 4,536,000.00 | 44,000 | 56.70 | $ 2,494,800.00 | $ 7,030,800.00 |
| 2016 Overage [7] | | | | 18,119 | 56.70 | $ 1,027,347.30 | $ 1,027,347.30 |
| January 1, 2017 - September 30, 2017 | 90,000 [8] | 39.75 | $ 3,577,500.00 | 34,500 [9] | 59.63 | $ 2,057,235.00 | $ 5,634,735.00 |
| | | | $ 13,366,300.00 | | | $ 9,348,050.13 | $ 22,714,350.13 |
| Adjustment for division of the 11,860 ac-ft [10] | | | | | | | $ 660,523.97 |
| | | | | | | | $ 23,374,874.10 |

Notes:

(1)  In-basin charge is based on 120,000 ac-ft multiplied by the annual in-basin rate for water as set by the SRA Board.

| | Rate per 1,000 Gallons | Rate per ac-ft |
|---|---|---|
| 1/1/2014 | $ 0.11 | $ 35.84 |
| 1/1/2015 | 0.116 | 37.80 |
| 1/1/2016 | 0.116 | 37.80 |
| 1/1/2017 | 0.122 | 39.75 |

(2)  Out-of-basin charge is based on the annual minimum volume for each year, plus any overages of such minimum volume, multiplied by the annual out-of-basin rate as set by the SRA Board.

| | Rate per 1,000 Gallons | Rate per ac-ft | Annual Minimum ac-ft |
|---|---|---|---|
| 1/1/2014 | $ 0.158 | $ 51.48 | 40,000 |
| 1/1/2015 | 0.166 | 54.09 | 42,000 |
| 1/1/2016 | 0.174 | 56.70 | 44,000 |
| 1/1/2017 | 0.183 | 59.63 | 46,000 |

(3)  Total charge for additional compensation is the in-basin charge plus the out-of-basin charge.

(4)  November and December 2014 total charge for additional compensation calculated using two-twelfths the annual amount of 120,000 ac-ft (20,000 ac-ft) multiplied by the in-basin rate, plus the out-of-basin rate multiplied by two-twelfths of the annual minimum for 2014 of 40,000 ac-ft. (6,667 ac-ft).

(5)  The actual amount of water diverted in November and December 2014 was 20,475 ac-ft; therefore, the out-of-basin charge is applied to two-twelfths of the annual minimum (6,667 ac-ft) plus the overage of 13,808 ac-ft.

(6)  The 2015 annual minimum volume for the out-of-basin charge is 42,000 ac-ft. The actual amount of water diverted in 2015 was 50,187 ac-ft; therefore, the out-of-basin charge is applied to the annual minimum plus the overage of 8,187 ac-ft.

(7)  The 2016 annual minimum volume for the out-of-basin charge is 44,000 ac-ft. The actual amount of water diverted in 2016 was 62,119 ac-ft; therefore, the out-of-basin charge is applied to the annual minimum plus the overage of 18,119 ac-ft.

(8)  Calculated through September 30, 2017 is nine-twelfths of 120,000 ac-ft.

(9)  Calculated through September 30, 2017 is nine-twelfths of 46,000 ac-ft.

(10)  This amount is one half of the difference between 131,860 ac-ft and 120,000 ac-ft.

171606

EXHIBIT D

POST-SETTLEMENT ACCOUNTING

171606

EXHIBIT D

8/21/2017

### POST-SETTLEMENT ACCOUNTING
### ADDITIONAL COMPENSATION - LAKE FORK

| | In-Basin Charge [1] 120,000 ac-ft | | | Out-of-Basin Charge [2] | | | Total Charge for Additional Compensation [3] |
|---|---|---|---|---|---|---|---|
| | Volume (ac-ft) | Rate ($/ac-ft) | Amount | Minimum Out-of-Basin Volume or Overage (ac-ft) | Rate ($/ac-ft) | Amount | In-Basin + Out-of-Basin |
| October 1, 2017 - December 31, 2017 | 30,000 [4] | 39.75 | $ 1,192,500.00 | 11,500 [5] | 59.63 | $ 685,745.00 | $ 1,878,245.00 |

Notes:

(1) In-basin charge is based on 120,000 ac-ft multiplied by the annual in-basin rate for water as set by the SRA Board.

| | Rate per 1,000 Gallons | Rate per ac-ft |
|---|---|---|
| 1/1/2017 | $ 0.122 | $ 39.75 |

(2) Out-of-basin charge is based on the annual minimum volume for each year, plus any overages of such minimum volume, multiplied by the annual out-of-basin rate as set by the SRA Board.

| | Rate per 1,000 Gallons | Rate per ac-ft | Annual Minimum ac-ft |
|---|---|---|---|
| 1/1/2017 | $ 0.183 | $ 59.63 | 46,000 |

(3) Total charge for additional compensation is the in-basin charge plus the out-of-basin charge.

(4) Three-twelfths of 120,000 ac-ft (30,000 ac-ft) for October 1, 2017 thru December 31, 2017.

(5) The 2017 annual minimum volume for the out-of-basin charge is three-twelfths of 46,000 ac-ft (11,500 ac-ft) for October 1 thru December 31, 2017. If actual water diverted in 2017 is more than the annual minimum, the out-of-basin charge will be applied to the annual minimum, plus the overage in excess of the annual minimum. Overage, if any, will be determined in January 2018.

171606

## ASSIGNMENT OF CONTRACT RIGHTS TO WATER

This Assignment of Contract Rights to Water (the "Assignment") is made between the City of Dallas, Texas ("Dallas"), and the Sabine River Authority of Texas ("SRA") (each individually a "Party" and collectively the "Parties"). This Assignment is effective on the date last executed below ("Effective Date").

## RECITALS

WHEREAS, Dallas is a home rule city and municipal corporation acting by and through its charter, governing ordinances and state law; and

WHEREAS, SRA is an agency and political subdivision of the state of Texas, being a conservation and reclamation district created and governed by Article 8280-133, as amended, pursuant to Article XVI, Section 59 of the Texas Constitution; and

WHEREAS, the Parties entered into that certain "Water Supply Contract and Conveyance" ("Water Supply Contract") on or about October 1, 1981, wherein Dallas secured certain rights to water supplies, as specified therein, in Lake Fork Reservoir, an impoundment owned by SRA on Lake Fork Creek in Rains, Hopkins and Wood Counties, Texas; and

WHEREAS, the Parties amended the Water Supply Contract in 1986 by entering into the "First Supplement to Water Supply and Conveyance" ("First Supplement"), to address, among other matters, the possibility that additional firm yield from Lake Fork Reservoir could be secured by SRA from the Texas Water Commission ("Commission") in light of a change to the operations of the Lake, and that if such additional yield could be secured it would belong one-half to the Authority and one-half to the City; and

WHEREAS, subsequent to the execution of the First Supplement and by virtue of the issuance of Permit No. 2948B on May 28, 1987, the Commission authorized SRA the right to supply Dallas with 131,860 acre-feet of water per annum for municipal use purposes, of which 120,000 acre-feet of water per annum could be transferred to and used in the Trinity River Basin; and

WHEREAS, pursuant to the terms of the First Supplement, Permit No. 2948B, and the subsequently issued Certificate of Adjudication No. 05-4669, Dallas has the right to 11,860 acre-feet of water per annum for municipal use purposes, but Dallas is not authorized to transfer such water to the Trinity River Basin; and

WHEREAS, SRA has a need for additional water supplies to serve its customers within the Sabine River Basin; and

171606

WHEREAS, the Parties have entered into an Amended Water Supply Contract and Conveyance (the "Amendment") agreement contemporaneously with the execution of this Assignment, where they agreed that 11,860 acre-feet of contract rights to water held by Dallas would be assigned to SRA.

NOW, THEREFORE, in consideration of the above recitals, the mutual promises that follow and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

1. Assignment of Contract Rights to Water; No Warranties or Guarantees.

    1.1. For ten dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Dallas assigns to SRA the right to 11,860 acre-feet per annum of water to which Dallas is contractually entitled pursuant to the First Supplement, as such rights are granted to SRA pursuant to Permit 2948B and Certificate of Adjudication No. 05-4669.

    1.2. SRA's rights and obligations with respect to such water are subject to all of the terms and conditions set forth in the Amendment including, without limitation, any applicable limitations on the availability, quality and utilization of such water. Dallas does not provide, and hereby disclaims, any and all representations, warranties and guarantees with respect to such water.

2. Term.

    This Assignment shall be effective on the Effective Date, and shall continue for so long as the Water Supply Contract is effective, unless this Assignment is terminated earlier in writing signed by both Parties.

3. Miscellaneous.

    3.1. Governing Law. This Assignment and any litigation between the Parties regarding same (whether grounded in contract, tort, statute, law or equity) will be governed by, construed in accordance with, and interpreted pursuant to the laws of the State of Texas.

    3.2. Severability. If any provision of this Assignment or the application thereof to any person or circumstance is, at any time or to any extent, determined to be invalid or unenforceable by a court of competent jurisdiction, and the basis of the bargain between the Parties is not destroyed or rendered ineffective by such determination, the remainder of this Assignment, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, will not be affected thereby.

    3.3. Assignment. This Assignment to SRA may not be assigned without the prior written consent of Dallas, which consent shall not be unreasonably withheld or delayed.

171606

3.4. Applications. SRA is solely responsible for securing any permits and licenses from any governmental authority as may be reasonably necessary or appropriate to effectuate the intent and purpose of this Assignment including, without limitation, any amendments to Certificate of Adjudication No. 05-4669. Any reductions in available water supplies mandated by a governmental authority as a result of this Assignment will be accounted for out of SRA's water supplies and not the City's water supplies.

3.5. No Third Parties Benefitted. The terms and provisions of this Assignment are for the sole benefit of the Parties, and no third party is intended to benefit therefrom.

3.6. Authority. Each of the Parties represents to the other that (i) it has full right and authority to enter into this Assignment, (ii) the person signing on behalf of the Party is authorized to do so, and (iii) the execution and delivery of this Assignment by the Party will not result in any breach of, or constitute a default under any agreement or other contract or instrument to which the Party is a party or by which either such Party may be bound.

**CITY OF DALLAS, TEXAS**

**SABINE RIVER AUTHORITY OF TEXAS**

T. C. BROADNAX
City Manager

DAVID MONTAGNE
Executive Vice President/General Manager

By: _____
    Assistant City Manager

By: _____

DATE: 10/12/2017

DATE: 10-19-2017

**A-143**

171606

## AMENDMENT TO WATER SUPPLY CONTRACT AND CONVEYANCE

This Amendment to Water Supply Contract and Conveyance (the "Amendment") is entered into as of the day and year hereinafter set forth by and between the City of Dallas, Texas ("City" or "Dallas") and the Sabine River Authority of Texas ("SRA" or "Authority") in order to supplement and amend that certain "Water Supply Contract and Conveyance" agreement ("Water Supply Contract") they mutually entered into on or about October 1, 1981, as such agreement was subsequently supplemented and amended, related to water supplies owned by the Authority in Lake Fork Reservoir to which Dallas has rights pursuant to such agreements, and to address other important matters expressly provided for herein. The City and the Authority are individually referred to herein as a "Party" and are collectively referred to herein as "Parties".

## RECITALS

WHEREAS, the Authority is an agency and political subdivision of the state of Texas, being a conservation and reclamation district created and governed by Article 8280-133, as amended, pursuant to Article XVI, Section 59 of the Texas Constitution; and

WHEREAS, the City is a home rule city and municipal corporation acting by and through its charter, governing ordinances and state law; and

WHEREAS, the Parties entered into the Water Supply Contract on or about October 1, 1981, wherein Dallas secured certain rights to water supplies, as specified therein, in Lake Fork Reservoir, an impoundment owned by the Authority on Lake Fork Creek in Rains, Hopkins and Wood Counties, Texas; and

WHEREAS, Section 6.01 of the Water Supply Contract confirmed the Parties' agreement that the initial term of such agreement would continue through November 1, 2014, and also provided that the term of the Water Supply Contract would be renewed for additional periods of forty (40) years throughout the useful life of the reservoir unless Dallas exercised its unilateral right to terminate said agreement at least one (1) year prior to the end of each such term; and

WHEREAS, Section 6.02 of the Water Supply Contract provided that the amount of compensation the Authority would be entitled to receive from Dallas during any renewal term (exclusive of the City's pro rata share of the Authority's "Service Charge", as that term was defined in such agreement) would be determined by mutual agreement of the Parties, and that the Parties would commence negotiations to determine the amount of compensation at least one (1) year prior to the expiration of the initial period and each successive forty (40) year term thereafter; and

WHEREAS, the Parties amended the Water Supply Contract in 1986 by entering into the "First Supplement to Water Supply and Conveyance" (hereinafter, "First Supplement"), to address, among other matters, the possibility that additional firm yield from Lake Fork Reservoir could be secured by the Authority from the Texas Water Commission ("Commission") in light of

171606

a change to the operations of the Lake, and that if such additional yield could be secured it would belong one-half to the Authority and one-half to the City; and

WHEREAS, subsequent to the execution of the First Supplement and by virtue of the issuance of Permit No. 2948A on May 28, 1987, the Commission authorized SRA the right to supply Dallas with 131,860 acre-feet of water per annum for municipal use purposes, of which 120,000 acre-feet of water per annum could be transferred to and used in the Trinity River Basin; and

WHEREAS, pursuant to the terms of the First Supplement, Permit No. 2948A, and the subsequently issued Certificate of Adjudication No. 05-4669, Dallas has the right to 11,860 acre-feet of water per annum for municipal use purposes, but the City is not authorized to transfer such water to the Trinity River Basin; and

WHEREAS, the Authority has a need for additional water supplies to serve its customers within the Sabine River Basin; and

WHEREAS, on or before November 1, 2013, the City provided written notice to SRA of its intent to renew the term of the Water Supply Contract; and

WHEREAS, the Parties were unable to reach agreement on the amount of compensation the Authority would be entitled to receive from Dallas during the initial renewal term; and

WHEREAS, following the Parties' failure to reach agreement as to the amount of compensation the Authority would be entitled to receive from Dallas during the initial renewal term, SRA's Board of Directors set a rate for the water that Dallas had a right to divert from Lake Fork Reservoir at $0.5613 per thousand gallons, by its action on or about October 9, 2014; and

WHEREAS, following such action of the SRA Board of Directors in setting a rate for water that Dallas has a right to divert from Lake Fork Reservoir pursuant to the Water Supply Contract, the City pursued several claims against the Authority before state agencies and in state courts, and the Authority also filed claims against the City for amounts it claimed were due and owing for the Lake Fork Reservoir water supply afforded to Dallas; and

WHEREAS, the Parties have mutually determined that their mutual, current and long-term interests in working together to make important water supplies available to their customers are threatened by such litigation and disputes, and through their negotiation and execution of a Settlement Agreement, executed contemporaneously with this Amendment, the Parties agreed to settle and dismiss with prejudice all of such claims, and also to enter into this Amendment so as to address the compensation to be paid to the Authority for water supplied to Dallas from Lake Fork Reservoir, and other important matters the Parties have agreed upon.

NOW THEREFORE, in consideration of the foregoing recitals, which are fully and expressly adopted and incorporated herein and reflect the understanding and intentions of the Parties, and may be relied upon by the Parties in interpreting and construing their intent as they

7459282.1

**A-145**

171606

agreed to enter into this Amendment, and for good and valuable consideration, the adequacy and sufficiency of which is acknowledged by the Parties' execution below, the Parties hereby agree as follows:

## ARTICLE I.  INTERPRETATION

1.1    This Amendment amends, modifies, and replaces certain provisions of existing and prior contracts and agreements by and among the Parties related to the Lake Fork Reservoir, including but not limited to the Water Supply Contract and First Supplement. However, except as expressly amended, modified, or replaced by the terms herein, such existing and prior contracts and agreements and all terms thereof shall remain in full force and effect, and this Amendment shall not be construed as a termination or rescission of any such existing and prior contract and agreement.

## ARTICLE II.  COMPENSATION

2.1    For any period of time following the Effective Date of this Amendment for which Dallas has a contractual right under Section 6.01 of the Water Supply Contract to take water from Lake Fork Reservoir, the Parties agree that Section 6.02 of the Water Supply Contract is revised to read as follows, in its entirety:

> "6.02.    In addition to the City's payment of its pro rata share of the Service Charge, which will continue to be paid as set forth herein, the amount of compensation that the Authority shall be entitled to receive from the City annually during any renewal term, including but not limited to the forty (40) year renewal term beginning November 2, 2014, shall be determined in accordance with the following and shall be payable by the City monthly in 1/12 increments:
>
> a) $39.75/Acre-Foot ($0.122/1000 gallons) of Water as an "In-Basin" rate for 120,000 acre-feet of water per annum, to be charged on a "take or pay" basis and without regard to whether the City actually diverts water from Lake Fork Reservoir;
>
> b) $59.63/Acre-Foot ($0.183/1000 gallons) of Water as an "Out-of-Basin" rate, on a "take or pay" basis, for the amount of water provided in subsections c) and e) below, and without regard to whether the City actually diverts Water from Lake Fork Reservoir or whether it transports Water out of the Sabine River Basin;
>
> c) The Parties agree that, beginning January 1 in Calendar Year 2018, the minimum "Out-of-Basin" take or pay volume to be used in calculating the compensation due to SRA pursuant to subsection b) will be 48,000 acre-feet per annum, and that such minimum "take or pay" volume for purposes of such calculations shall increase annually by 2,000 acre-feet for each Calendar Year thereafter, until the beginning of Calendar Year 2054, when the annual "Out-of-Basin" volume to which this "take or pay" calculation will apply will be 120,000 acre-feet of Water, and as identified in the following table:

7459282.1

3

**A-146**

171606

Minimum Out-of-Basin Take or Pay Volume  (ac-ft)

| Year | Volume | Year | Volume | Year | Volume | Year | Volume |
|------|--------|------|--------|------|--------|------|--------|
| 2017 | 46,000 | 2028 | 68,000 | 2039 | 90,000 | 2050 | 112,000 |
| 2018 | 48,000 | 2029 | 70,000 | 2040 | 92,000 | 2051 | 114,000 |
| 2019 | 50,000 | 2030 | 72,000 | 2041 | 94,000 | 2052 | 116,000 |
| 2020 | 52,000 | 2031 | 74,000 | 2042 | 96,000 | 2053 | 118,000 |
| 2021 | 54,000 | 2032 | 76,000 | 2043 | 98,000 | 2054 | 120,000 |
| 2022 | 56,000 | 2033 | 78,000 | 2044 | 100,000 |      |         |
| 2023 | 58,000 | 2034 | 80,000 | 2045 | 102,000 |      |         |
| 2024 | 60,000 | 2035 | 82,000 | 2046 | 104,000 |      |         |
| 2025 | 62,000 | 2036 | 84,000 | 2047 | 106,000 |      |         |
| 2026 | 64,000 | 2037 | 86,000 | 2048 | 108,000 |      |         |
| 2027 | 66,000 | 2038 | 88,000 | 2049 | 110,000 |      |         |

d) The Parties agree that for all renewal periods of forty (40) years beyond November 1, 2054, the annual Calendar Year "take or pay" amounts for calculation of compensation to SRA based on the then-current "In-Basin" and "Out-of-Basin" rates will be 120,000 acre-feet per annum;

e) Prior to January 1 of Calendar Year 2054, to the extent Dallas ever diverts a volume of Water in any Calendar Year greater than the minimum out-of-basin "take or pay" volume as specified in Subsection c) above, the compensation to be paid to the Authority for such year will be calculated using the actual volume of such diversion by Dallas, excluding any Water that Dallas diverts to make up for SRA's implementation of the "Joint Use" provision in Certificate of Adjudication 05-4669 as amended, but the minimum "take or pay" volumes for subsequent Calendar Years will remain as specified in Subsection c) above and such future minimum "take or pay" volumes will not be increased by such greater diversion;

f) Dallas shall report monthly to SRA its diversions of Water from Lake Fork Reservoir, and it shall also report its prior Calendar Year diversions annually to SRA by no later than January 31 of each subsequent Calendar Year during the term of the initial renewal term and all subsequent, successive renewal terms, for SRA's use in determining the actual "take or pay" volumes for the "Out-of-Basin" compensation calculation, and for SRA's annual reporting on Water use from Lake Fork Reservoir;

g) The reporting required by Subsection f) shall be used by SRA to calculate any overages to the annual "take or pay" volumes to be paid by Dallas as a result of the City's use of a greater volume of water in the prior Calendar Year than the minimum "take or pay" volume assigned for such year that was used by SRA to calculate and invoice Dallas for 1/12 of the annual compensation to be paid to the Authority and related to the prior Calendar Year's "Out-of-Basin" compensation calculation. SRA will promptly invoice Dallas for any such

171606

overage amount due, payment for which will be due within thirty (30) days after the City's receipt of that invoice;

h)  Beginning January 1 in Calendar Year 2018 and thereafter for the remainder of this Agreement and for all additional, successive, forty (40) year terms of this Agreement, the "In-Basin" rate and the "Out-of-Basin" rate shall be adjusted annually, effective on January 1 for each such Calendar Year, by a percentage equal to the most recently published "Monthly Average Municipal 'A' Bond Rate for Long Maturities", as published by Moody's Investor Service;

i)  To the extent the most recently published "Monthly Average Municipal 'A' Bond Rate for Long Maturities", as referenced in Subsection h) above, is greater than 5.5%, the Authority shall only be entitled to adjust the "In-Basin" and "Out-of-Basin" rates by 5.5% for such Calendar Year; and,

j)  To the extent that Moody's reporting services is not available to obtain the most current monthly average "Municipal 'A' Bond Rates for Long Maturities" for use as an annual water rate escalator during the initial renewal term and all subsequent, successive renewal terms, the Parties agree that a nationally recognized alternative authoritative source shall be used and that such sources may include but not be limited to "Standards & Poor's Municipal Bond Ratings", "Fitch Municipal Bond Ratings", "Wall Street Journal Municipal Bond Ratings", or other nationally recognized sources for Municipal 'A' Bond Ratings."

## ARTICLE III.  ASSIGNMENT OF CONTRACT RIGHTS

3.1     Dallas will assign, without cost to the Authority for either the water supply and/or its possible transport to Lake Tawakoni, the City's contract rights under the First Supplement, as such rights are granted to the Authority pursuant to Permit No. 2948B and Certificate of Adjudication No. 05-4669, as amended, to 11,860 acre-feet of water per annum ("Assigned Water") for the Authority's use in serving SRA customers within the Sabine River Basin. Such assignment shall be for the current, initial renewal term of the Water Supply Contract (November 2, 2014 through November 1, 2054) and for any additional, successive forty (40) year terms. Contemporaneously with the execution of this Amendment, the City will execute the "Assignment of Contract Rights to Water" form attached hereto as "Exhibit 1" and deliver same to SRA.

3.2     The Parties acknowledge that the assignment of contract rights authorized herein will serve to reduce the City's pro rata share of the Service Charge to be paid to the Authority pursuant to the Water Supply Contract and the First Supplement, as such Service Charge is calculated pursuant to the terms of such agreements.

3.3     Dallas agrees that SRA may, in its sole discretion, divert the Assigned Water from either Lake Tawakoni or Lake Fork Reservoir, and that SRA may implement the "Joint Use" provision in Certificate of Adjudication 05-4669, as amended if it chooses to divert such water from Lake Tawakoni. Pursuant to such "Joint Use" provision, SRA agrees that, to the extent Dallas water in Lake Tawakoni is diverted to satisfy SRA's demands for Assigned Water, Dallas may divert an

A-148

171606

equal amount of water directly from Lake Fork Reservoir for its transport to and use in the Trinity River Basin. The Parties agree that any such equivalent diversion amount shall not be included in the Out-of-Basin "take or pay" volume used in the Out-of-Basin compensation calculation. To the extent the State of Texas or any agency of the State ever determines that the terms of this Article III are inconsistent with such "Joint Use" provision, the Parties agree to work collaboratively to seek enforcement of the "Joint Use" provision in a manner consistent with this Article III, or if such enforcement is unsuccessful to amend the "Joint Use" provision to address such inconsistency, all in a manner that preserves their mutual interest in i) enforcing the assignment of contract rights contemplated herein at no cost to the Authority and SRA's right to divert the Assigned Water from either Lake Fork Reservoir or Lake Tawakoni, in the Authority's sole discretion, and ii) preserving the Parties' rights as authorized in this Amendment, Certificate of Adjudication No. 05-4669, as amended, the Water Supply Contract, and the First Supplement, and as authorized in Certificate of Adjudication No. 05-4670, as amended, the July 14, 1956 Memorandum of Agreement of the Parties, and the July 30, 1986 Fifth Supplemental Memorandum of Agreement of the Parties.

## ARTICLE IV.  CAPACITY IN THE CITY'S LAKE FORK TO LAKE TAWAKONI TRANSMISSION FACILITIES

4.1     Dallas agrees to transport up to a maximum of 20,000 acre-feet per year of SRA's water supplies in Lake Fork Reservoir, as authorized to SRA in Certificate of Adjudication No. 05-4669, as amended ("SRA Water"), to Lake Tawakoni using the City's Lake Fork pump station, its Lake Fork to Lake Tawakoni pipeline, and all related facilities (collectively, the "LF-LT Pipeline") and its outfall into Lake Tawakoni (the "LF-LT Pipeline Interconnect Outfall Structure"), at a rate of not more than 36 Million Gallons per Day, when and as such facilities are operable and such capacity is available, a determination that shall be in the City's sole discretion. Such 20,000 acre-feet of transport right shall not be inclusive of any water assigned to SRA pursuant to Article III herein, except to the extent that SRA requests and Dallas transports some or all of such Assigned Water from Lake Fork Reservoir to Lake Tawakoni, in which event the actual transport of such Assigned Water shall be included within the maximum authorized transport right of 20,000 acre-feet pursuant to this Article IV. To the extent Dallas determines in its sole discretion that it has the ability to transport additional volumes of SRA Water as requested by the Authority, the City will transport same pursuant to the provisions of this Article IV. When and as capacity in the LF-LT Pipeline is used to transport SRA Water, SRA will pay Dallas the City's actual costs of electric power used for such transportation, but pursuant to the Parties' agreement as specified in Article III, SRA shall not be required to pay the City's electric power costs for the transportation of any portion of the Assigned Water that may be transported from Lake Fork Reservoir to Lake Tawakoni. During each electric power billing period in which Dallas has transported SRA Water, the costs of electric power used to transport such water will be accounted for by Dallas based upon the actual metered and electricity usage at the Lake Fork pump station, and all metered water volumes at the point of delivery in Lake Tawakoni through use of the LF-LT Pipeline Interconnect Outfall Structure. The City's total electric power costs associated with the metered power demands at the Lake Fork pump station will be shared by the Parties in proportion to each Party's share of the total actual volumes pumped, as measured by the volume of raw water metered and delivered through the LF-LT Pipeline and the volume of Water delivered through the LF-LT Pipeline Interconnect Outfall Structure during the electric

171606

power billing period. Any changes to electric power rates billed to Dallas implemented during any transfer period will be applied only to the daily volumes of SRA Water transported on or after the effective date of such changed electric rates. Charges for electric power submitted by Dallas to SRA for reimbursement shall be supported with billing information and documentation from the electric provider and all supporting calculations.

4.2    The agreement by Dallas to transport SRA Water in the LF-LT Pipeline shall be for a term of years commensurate with the term of the current, initial renewal term of the Water Supply Contract and for all additional, successive forty (40) year terms.

4.3    SRA's rights in this Article IV related to the transport of SRA Water in the LF-LT Pipeline shall be subordinate to the City's rights to use such facilities for its transfer of water to serve its current and future retail customers, and to serve wholesale customers of Dallas as of the Effective Date of this Amendment as well as any wholesale customer of such current wholesale customer who subsequently becomes a direct wholesale customer of the City.

4.4    When capacity in the LF-LT Pipeline is unavailable to SRA due to repair or maintenance of such facilities, Dallas agrees to allow SRA to divert the City's water supplies in Lake Tawakoni on a "Joint Use" basis, as authorized in Certificate of Adjudication 05-4669, as amended, to the extent Dallas has supplies available during any such time period, and the amount of such supplies shall be subsequently reimbursed to the City in the same calendar year out of SRA Water in Lake Fork Reservoir. In such event, SRA will pay for the City's electric power costs as specified in Section 4.1 for the transportation of an equivalent volume of SRA Water from Lake Fork Reservoir to the LF-LT Pipeline Interconnect Outfall Structure on Lake Tawakoni. The Parties agree that the "Joint Use" provision of Certificate of Adjudication 05-4669, as amended, authorizes the transport of such equivalent amount of SRA Water supplies for use by Dallas. To the extent the State of Texas or any agency of the State ever determines that the terms of this Article IV are inconsistent with such "Joint Use" provision, the Parties agree to work collaboratively to seek enforcement of the "Joint Use" provision in a manner consistent with this Article IV, or if such enforcement is unsuccessful to amend such "Joint Use" provision to address such inconsistency, all in a manner that preserves their mutual interest in enforcing the Parties' rights as contemplated herein and preserving their rights as authorized in Certificate of Adjudication No. 05-4669, as amended, the Water Supply Contract, and the First Supplement, and as authorized in Certificate of Adjudication No. 05-4670, as amended, the July 14, 1956 Memorandum of Agreement of the Parties, and the July 30, 1986 Fifth Supplemental Memorandum of Agreement of the Parties. The Parties also agree that such diversion by Dallas of an equivalent volume of SRA Water supplies as contemplated in this Section 4.4 shall not be included in the Out-of-Basin "take or pay" volume used in the Out-of-Basin compensation calculation.

4.5    In lieu of transporting SRA Water to Lake Tawakoni, the City may, in its sole discretion and in the same calendar year, provide SRA up to 20,000 acre-feet of the City's water supplies in Lake Tawakoni, for SRA's subsequent diversion and use, and SRA agrees to pay the City's electric power costs as if Dallas transported such water supplies to Lake Tawakoni. The Parties agree that such "in-lieu" power costs will be based on the most recent power cost calculation per average thousand gallons, as determined in accordance with the provisions of Section 4.1 above,

7459282.1

7

**A-150**

171606

adjusted for any known power rate increases authorized after such calculation. Power cost changes that may be authorized and implemented during the transfer period will be applied only to the daily volumes of SRA Water transferred under such changed power rates. Such "in-lieu" power cost calculations will be supported with appropriate documentation by the City. The diversion and use of such water by SRA shall be in addition to the Authority's diversion and use of the water supplies assigned by Dallas pursuant to Article III.

4.6    If Dallas provides SRA with the City's supplies of water out of Lake Tawakoni in lieu of transporting SRA Water as contemplated in Section 4.5, Dallas may, at its own cost and within the same calendar year, transport an equivalent amount of SRA Water supplies to Lake Tawakoni. No additional conditions, rates or fees shall be assessed or imposed by either Party if this provision is utilized. The Parties agree that the "Joint Use" provision of Certificate of Adjudication 05-4669, as amended, authorizes the transport of such equivalent amount of SRA Water supplies for use by Dallas. To the extent that the State of Texas or any agency of the State ever determines that the terms of this Article IV are inconsistent with such "Joint Use" provision, the Parties agree to work collaboratively to seek enforcement of the "Joint Use" provision in a manner consistent with this Article IV, or if such enforcement is unsuccessful to amend such "Joint Use" provision to address such inconsistency, all in a manner that preserves their mutual interest in enforcing the Parties' rights as contemplated herein and preserving their rights as authorized in Certificate of Adjudication No. 05-4669, as amended, the Water Supply Contract, and the First Supplement, and as authorized in Certificate of Adjudication No. 05-4670, as amended, the July 14, 1956 Memorandum of Agreement of the Parties, and the July 30, 1986 Fifth Supplemental Memorandum of Agreement of the Parties. The Parties also agree that such diversion by Dallas of an equivalent volume of SRA Water supplies as contemplated in this Section 4.6 shall not be included in the Out-of-Basin "take or pay" volume used in the Out-of-Basin compensation calculation.

4.7    The Parties recognize that the current hydraulic capacity of the LF-LT Pipeline Interconnect Outfall Structure is limited and that such capacity could be increased through the construction of certain improvements to allow for additional hydraulic capacity in such facilities and therefore additional transport services to SRA. To that end, the Parties agree that SRA may propose to the City improvements to the LF-LT Pipeline Interconnect Outfall Structure, at the Authority's sole discretion and expense, and pursuant to plans, specifications and construction to be considered and approved by Dallas, in the sole discretion of Dallas, which such consideration, approval or refusal will not be unreasonably withheld or delayed. If such improvements to the LF-LT Pipeline Interconnect Outfall Structure are constructed by SRA, the ownership of such improvements will be transferred to the City at no cost to the City and thereafter the City will own, operate and be responsible for maintaining the improvements made to such facilities. The Parties agree that following the Authority's construction of such improvements and thereafter for the remaining current, initial renewal term of the Water Supply Contract and during all additional, successive forty (40) year terms, i) SRA's rights to use such additional hydraulic capacity in the LF-LT Pipeline Interconnect Outfall Structure shall be predominant to the City's right to use such additional capacity, ii) the operations and maintenance attributable to such additional hydraulic capacity, being borne by the City, will not be included in the Authority's calculation of the Service Charge pursuant to the Water Supply Contract, and iii) the capital costs of such improvements, being borne by the Authority, will not be included in the City's

**171606**

calculation of the cost of service for transporting water from Lake Fork Reservoir to Lake Tawakoni or otherwise.

4.8    The Parties agree to the following planning and operational protocol for the City's transport of SRA Water pursuant to this Article IV, as well as the transport of water assigned to SRA pursuant to Article III:

a)    Within thirty (30) calendar days of the Effective Date of this Amendment and annually thereafter beginning on November 1, 2018 during the current, initial renewal term of the Water Supply Contract and during all additional, successive forty (40) year terms, SRA agrees to provide Dallas a schedule for the transport and delivery of water to Lake Tawakoni (the "Transport Schedule"). The Transport Schedule shall specify the month(s) during the following calendar year that such transport will commence and cease. Within thirty (30) calendar days of its receipt of a Transport Schedule, the City will approve such schedule or identify adjustments necessary in order for it to approve such schedule. The City's approval of a Transport Schedule shall not be unreasonably withheld or delayed.

b)    The Parties recognize that water demands and weather conditions vary significantly, both within and between calendar years, and that hydrologic conditions in either Lake Fork Reservoir or Lake Tawakoni may result in waste of water without timely adjustment of the Transport Schedule. To that end, and in order to conserve the water supplies of the Sabine River Basin, the Parties recognize that an approved Transport Schedule may need to be timely adjusted during any calendar year. If SRA requests revision(s) to an approved Transport Schedule, Dallas will promptly act within five (5) business days to approve and implement such revision(s). The City's approval of a revised Transport Schedule shall not be unreasonably withheld or delayed.

c)    In order to most efficiently preserve and use water and to avoid waste of water, within ninety (90) days of the Effective Date of this Amendment, the Director of Dallas Water Utilities and the General Manager of the Authority will cooperate to i) identify and develop operational protocol and practices to allow for the efficient initiation and termination of the City's transport of water to Lake Tawakoni, and without regard to a Transport Schedule previously proposed by the Authority or approved by the City, and ii) develop and thereafter implement a written accounting plan consistent with the terms of this Amendment to account for Lake Fork Reservoir and Lake Tawakoni storage, diversion and use as authorized pursuant to Certificate of Adjudication 05-4669, as amended, and Certificate of Adjudication 05-4670, as amended, so as to ensure that all water authorized for each Party's use is available for diversion at the authorized points of diversion thereunder. The Parties agree to work collaboratively from time to time, as either Party requests, to review and amend the accounting plan, as necessary, to be consistent with the terms of this Amendment and to accurately reflect reservoir operations and hydrology.

## ARTICLE V.  BINDING ARBITRATION

5.1    The Parties understand that during the current, initial renewal term of the Water Supply Contract, and during all additional, successive forty (40) year terms, there may be issues or disagreements that arise between them that may require resolution. To the extent that such issues

7459282.1

**171606**

or disagreements do not involve i) disputed charges on an invoice, ii) the rates, take or pay amounts, and or the calculation of the escalator specified in new Section 6.02, as included in Article II herein, iii) the assignment to SRA of the City's rights to 11,860 acre-feet of water per annum as addressed in Article III herein, iv) the capacity volume in the LF-LT Pipeline as addressed in Article IV herein, or v) the calculation of the City's obligation to pay its pro rata share of the Service Charge as specified in the Water Supply Contract, the Parties agree to binding arbitration to address and resolve such issues or disagreements.

5.2    In any such binding arbitration, each Party shall pay for its own costs and attorney's fees in pursuing same, and will share equally in the cost of any arbitrator and related arbitration expenses.

## ARTICLE VI.  OTHER

6.1    Section 9.06 of the Water Supply Contract is hereby amended so that hereafter it shall read as follows:

> "9.06.    The payments by the City of the Semi-Annual Facilities Charges and the Service Charges, to the extent required herein, the compensation paid by the City to the Authority pursuant to the provisions of Section 6.02, and the City's performance of other obligations expressly imposed hereunder, constitute full consideration for all rights, privileges, and benefits accruing to the City under this Agreement, as well as for the conveyance herein contained."

6.2    The Recitals included above are expressly adopted and incorporated herein and reflect the understanding and intentions of the Parties, and the Parties may rely on such Recitals in interpreting and construing their intent as they agreed to enter into this Amendment.

6.3    Dallas shall implement practices which ensure water is used in a manner that prevents waste, conserves water resources for their most beneficial and vital uses, and protects the public health.  Within thirty (30) days of the Effective Date of this Amendment, Dallas shall provide a copy of its current Water Conservation Plan and Drought Contingency Plan to SRA and shall also provide SRA with copies of any plan amendments or updates as they are proposed for adoption.

6.4    Dallas agrees that a payment is deemed late if received by SRA more than thirty (30) days after the date of the City's receipt of the invoice. Late payments shall accrue interest at the rate provided in Section 2-1.1 of the Dallas City Code, as amended, or as provided by Chapter 2251 of the Texas Government Code, as amended, whichever is less.

6.5    The Parties agree that any disputed charges on any invoice shall be protested in accordance with Section 2251.042, Texas Government Code, as amended, and that in the event any Party disputes any portion of any charge on an invoice, the Party will timely pay the undisputed portion of such invoice.

7459282.1

**171606**

6.6    DALLAS AGREES TO TAKE WATER TRANSPORTED BY DALLAS OR OTHERWISE AUTHORIZED TO BE DIVERTED BY DALLAS HEREUNDER "AS IS." SRA MAKES NO REPRESENTATIONS OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE CHARACTER, QUALITY OR AVAILABILITY OF THE WATER TO BE TAKEN AND DALLAS AGREES TO ASSUME ALL SUCH RISKS. SRA ALSO DOES NOT MAKE ANY REPRESENTATION THAT THE WATER WILL BE SUITABLE FOR THE PURPOSES FOR WHICH DALLAS DESIRES TO USE IT.

6.7    NEITHER PARTY SHALL BE LIABLE IN ANY EVENT FOR THEIR INABILITY TO PERFORM ANY OBLIGATION UNDER THIS AMENDMENT FOR REASONS BEYOND THE PARTY'S CONTROL, INCLUDING BUT NOT LIMITED TO ACTS OF GOD OR NATURAL DISASTER, WAR, DROUGHT, TERRORISM, FIRE, PUBLIC UTILITY POWER OUTAGE, OR THE RULES, REGULATIONS, OR ORDERS OF COURTS OR OF GOVERNMENTAL AGENCIES.

6.8    The City represents and covenants that all payments to be made by it under the Water Supply Contract and this Amendment shall constitute reasonable and necessary operating expenses of its system and that all such payments will be made from the revenues of its system. Dallas represents and has determined that the water supply obtained from the Authority pursuant to the Water Supply Contract and this Amendment is necessary and essential to the present and future operation of its water system. To that end, the City agrees throughout the term of the Water Supply Contract and this Amendment, and any extensions of such term, to continuously operate and maintain its waterworks system, and to fix and collect rates and charges for water services as will produce revenues sufficient to satisfy all of the payments required under the Water Supply Contract and this Amendment.

6.9    In the event any one or more of the provisions contained in this Amendment shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision thereof and this Amendment shall be considered as if such invalid, illegal, or unenforceable provision had never been contained in this Amendment.

6.10    The Parties acknowledge that this Amendment is an "arm's length" agreement, entered into by Dallas and SRA freely, without duress, coercion or any undue influence, and is a mutually drafted agreement in which both parties were represented by counsel. No presumption will apply in favor of either Party in the interpretation of this Amendment or in the resolution of any ambiguity of any provision of this Amendment.

6.11    This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and constitute one and the same instrument. If this Amendment is executed in counterparts, then it shall become fully executed only as of the execution of the last such counterpart. The "Effective Date" of this Amendment shall be the date any counterpart is last executed by an authorized representative of any Party.

6.12    By their signatures below, the representatives of Dallas and SRA executing this Amendment affirm that they are authorized to enter into this Amendment on behalf of their

7459282.1

11

**A-154**

171606

principal. Each Party agrees to attach documentation hereto that execution of this Amendment has been authorized by its respective governing body and authorization to act has been granted to such representative.

EXECUTED on the dates set out below on behalf of Dallas by its City Manager, duly authorized by Resolution No. 17-1606 adopted on the 11th day of October , 2017 , and approved as to form by its City Attorney; and on behalf of SRA by its duly authorized official(s).

**CITY OF DALLAS, TEXAS**

T. C. BROADNAX
City Manager

By: _____
        Assistant City Manager

DATE: ___10/12/2017___

APPROVED AS TO FORM:
LARRY E. CASTO
City Attorney

By: _____
        Assistant City Attorney

**SABINE RIVER AUTHORITY OF TEXAS**

DAVID MONTAGNE
Executive Vice President/General Manager

By: _____

DATE: ___10-19-2017___

APPROVED AS TO FORM:
MARTIN C. ROCHELLE
Special Counsel

By: _____

A-155

171606

# EXHIBIT 1

## ASSIGNMENT OF CONTRACT RIGHTS TO WATER

7459282.1

171606

EXHIBIT 1

ASSIGNMENT OF CONTRACT RIGHTS TO WATER

This Assignment of Contract Rights to Water (the "Assignment") is made between the City of Dallas, Texas ("Dallas"), and the Sabine River Authority of Texas ("SRA") (each individually a "Party" and collectively the "Parties"). This Assignment is effective on the date last executed below ("Effective Date").

RECITALS

WHEREAS, Dallas is a home rule city and municipal corporation acting by and through its charter, governing ordinances and state law; and

WHEREAS, SRA is an agency and political subdivision of the state of Texas, being a conservation and reclamation district created and governed by Article 8280-133, as amended, pursuant to Article XVI, Section 59 of the Texas Constitution; and

WHEREAS, the Parties entered into that certain "Water Supply Contract and Conveyance" ("Water Supply Contract") on or about October 1, 1981, wherein Dallas secured certain rights to water supplies, as specified therein, in Lake Fork Reservoir, an impoundment owned by SRA on Lake Fork Creek in Rains, Hopkins and Wood Counties, Texas; and

WHEREAS, the Parties amended the Water Supply Contract in 1986 by entering into the "First Supplement to Water Supply and Conveyance" ("First Supplement"), to address, among other matters, the possibility that additional firm yield from Lake Fork Reservoir could be secured by SRA from the Texas Water Commission ("Commission") in light of a change to the operations of the Lake, and that if such additional yield could be secured it would belong one-half to the Authority and one-half to the City; and

WHEREAS, subsequent to the execution of the First Supplement and by virtue of the issuance of Permit No. 2948B on May 28, 1987, the Commission authorized SRA the right to supply Dallas with 131,860 acre-feet of water per annum for municipal use purposes, of which 120,000 acre-feet of water per annum could be transferred to and used in the Trinity River Basin; and

WHEREAS, pursuant to the terms of the First Supplement, Permit No. 2948B, and the subsequently issued Certificate of Adjudication No. 05-4669, Dallas has the right to 11,860 acre-feet of water per annum for municipal use purposes, but Dallas is not authorized to transfer such water to the Trinity River Basin; and

WHEREAS, SRA has a need for additional water supplies to serve its customers within the Sabine River Basin; and

**171606**

WHEREAS, the Parties have entered into an Amended Water Supply Contract and Conveyance (the "Amendment") agreement contemporaneously with the execution of this Assignment, where they agreed that 11,860 acre-feet of contract rights to water held by Dallas would be assigned to SRA.

NOW, THEREFORE, in consideration of the above recitals, the mutual promises that follow and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

1. Assignment of Contract Rights to Water; No Warranties or Guarantees.

   1.1. For ten dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Dallas assigns to SRA the right to 11,860 acre-feet per annum of water to which Dallas is contractually entitled pursuant to the First Supplement, as such rights are granted to SRA pursuant to Permit 2948B and Certificate of Adjudication No. 05-4669.

   1.2. SRA's rights and obligations with respect to such water are subject to all of the terms and conditions set forth in the Amendment including, without limitation, any applicable limitations on the availability, quality and utilization of such water. Dallas does not provide, and hereby disclaims, any and all representations, warranties and guarantees with respect to such water.

2. Term.

   This Assignment shall be effective on the Effective Date, and shall continue for so long as the Water Supply Contract is effective, unless this Assignment is terminated earlier in writing signed by both Parties.

3. Miscellaneous.

   3.1. Governing Law. This Assignment and any litigation between the Parties regarding same (whether grounded in contract, tort, statute, law or equity) will be governed by, construed in accordance with, and interpreted pursuant to the laws of the State of Texas.

   3.2. Severability. If any provision of this Assignment or the application thereof to any person or circumstance is, at any time or to any extent, determined to be invalid or unenforceable by a court of competent jurisdiction, and the basis of the bargain between the Parties is not destroyed or rendered ineffective by such determination, the remainder of this Assignment, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, will not be affected thereby.

   3.3. Assignment. This Assignment to SRA may not be assigned without the prior written consent of Dallas, which consent shall not be unreasonably withheld or delayed.

7459282.1

**A-158**

171606

3.4. <u>Applications</u>. SRA is solely responsible for securing any permits and licenses from any governmental authority as may be reasonably necessary or appropriate to effectuate the intent and purpose of this Assignment including, without limitation, any amendments to Certificate of Adjudication No. 05-4669. Any reductions in available water supplies mandated by a governmental authority as a result of this Assignment will be accounted for out of SRA's water supplies and not the City's water supplies.

3.5. <u>No Third Parties Benefitted</u>. The terms and provisions of this Assignment are for the sole benefit of the Parties, and no third party is intended to benefit therefrom.

3.6. <u>Authority</u>. Each of the Parties represents to the other that (i) it has full right and authority to enter into this Assignment, (ii) the person signing on behalf of the Party is authorized to do so, and (iii) the execution and delivery of this Assignment by the Party will not result in any breach of, or constitute a default under any agreement or other contract or instrument to which the Party is a party or by which either such Party may be bound.

**CITY OF DALLAS, TEXAS**

**SABINE RIVER AUTHORITY OF TEXAS**

T. C. BROADNAX
City Manager

DAVID MONTAGNE
Executive Vice President/General Manager

By: _____
        Assistant City Manager

By: _____

DATE: _____

DATE: _____

7459282.1

3

171606

## AUTHORIZATION TO RELEASE ESCROW FUNDS

First Financial Trust & Asset Management Company, N.A. ("Escrow Agent") is presently holding the sum of $ 68,769,069 _____ in escrow pursuant to the terms of the Escrow Agreement between the City of Dallas ("City"), the Sabine River Authority of Texas ( "Authority") and Escrow Agent, dated the 9th day of September, 2015 ("Escrow Agreement") established as the Dallas Lake Fork Escrow Account – Sabine River Authority ("Escrow Account").

Pursuant to Section 1.4 of the Escrow Agreement, the City and the Authority hereby instruct and authorize the Escrow Agent to disburse the sum of $ 68,769,069 to the Authority, being the entirety of the funds held by Escrow Agent in the Escrow Account. The Escrow Agent is directed to disburse the Escrow Account as follows:

| | |
|---|---|
| Bank Name: | First Financial Trust & Asset Management Company, N.A. |
| Bank Address: | P. O. Box 701, Abilene, Texas 79604 |
| | 400 Pine Street, Suite 300, Abilene, Texas 79601 |
| ABA Number: | 111301122 |
| Account Name: | Sabine River Authority of Texas—DWU Prepaid Income Account |
| Account Number: | 3009552 |
| Telephone Number: | (409) 600-6460 |

The City and the Authority acknowledge that the Escrow Agent has fully complied with its duties under the terms and provisions of the Escrow Agreement and as a result agree to release and hold Escrow Agent harmless from all liability thereunder upon the disbursement of the Escrow Account funds authorized hereby. By their signatures below, the representatives of the City and the Authority executing this Authorization affirm that they are authorized to execute same on behalf of their principal. Attached to this Authorization as Attachments A and B are documents authorizing the execution hereof by the governing bodies of the City and the Authority.

Dated this _19_ day of _October,_ 2017.

**CITY OF DALLAS, TEXAS**                **SABINE RIVER AUTHORITY OF TEXAS**

T. C. BROADNAX                          DAVID MONTAGNE
City Manager                            Executive Vice President/General Manager

By: _____                       By: _____
    Assistant City Manager
    majed al ghafry

DATE: 10/18/2017                        DATE: _10-19-2017_

171606

**AGENDA ITEM # 14**

| | |
|---|---|
| **STRATEGIC PRIORITY:** | Government Performance and Financial Management |
| **AGENDA DATE:** | October 11, 2017 |
| **COUNCIL DISTRICT(S):** | N/A |
| **DEPARTMENT:** | City Attorney's Office<br>Water Utilities |
| **CMO:** | Larry Casto, 670-3491<br>Majed Al-Ghafry, 670-3302 |
| **MAPSCO:** | N/A |

## SUBJECT

Authorize an amendment to the Water Supply Contract and Conveyance between the City and the Sabine River Authority ("SRA") for raw water from Lake Fork Reservoir, and authorize settlement of the litigation styled: **(1)** Petition of the City of Dallas for Review of a Decision by the Sabine River Authority to Set Water Rates (Lake Fork Reservoir), Docket No. 43674 before the Public Utility Commission of Texas ("PUC"); **(2)** City of Dallas v. Sabine River Authority, Cause No. D-1-GN-15-000398 in the 53rd District Court of Travis County, Texas, and all related appeals; and **(3)** City of Dallas v. Cary "Mac" Abney, et al. v. Sabine River Authority, Cause No. D-150045-C in the 260th District Court of Orange County, Texas, and all related appeals - Financing:  No cost consideration to the City

## BACKGROUND

The City and SRA are parties to a Water Supply Contract and Conveyance under which the City pays SRA for raw water, to which it has rights, from the Lake Fork Reservoir. The initial term of the contract expired November 1, 2014.  The City and SRA were unable to agree on compensation for the Lake Fork water for the initial renewal term of the contract.  SRA's Board of Directors set a rate for the water on October 9, 2014.

The City filed a petition for review at the PUC, a lawsuit against SRA in Travis County, and a lawsuit against SRA's Board of Directors in Orange County.  In these proceedings, the City contested the rate set by SRA for Lake Fork water.  The City and SRA have reached a proposed settlement of all litigation subject to City Council approval.  In order to facilitate the proposed settlement, the City and SRA have agreed to amend the Water Supply Contract and Conveyance to address water rates, assignment of certain City water contract rights, and use of City facilities for the transportation of SRA water.

171606

## PRIOR ACTION/REVIEW (COUNCIL, BOARDS, COMMISSIONS)

City Council was briefed in Closed Session on October 8, 2014 and December 3, 2014.

City Council was briefed in Closed Session on November 3, 2015.

City Council was briefed in Closed Session on April 6, 2016, May 18, 2016, and October 19, 2016.

City Council was briefed in Closed Session on April 5, 2017 and May 17, 2017.

City Council will be briefed by memorandum on October 6, 2017.

## FISCAL INFORMATION

No cost consideration to the City.

# SEE ALSO

## File: 17-1606

The following files contain information relating to this file and may be of interest.   The information contained in these files may amend, repeal or otherwise affect the status of this file.

14-1726

14-2079

15-2030

16-0508

16-0789

16-1709

17-0558

A-163

# Exhibit 6 to Lowery Declaration in <u>Support of Dallas' Proof of Claim</u>

"Projected Revenues" spreadsheet reflecting monetary obligations due under the Water Lease for fiscal years October 1, 2015 through September 30, 2016 and October 1, 2016 through September 30, 2017 after giving effect to the SRA Settlement

**CITY OF DALLAS WATER UTILITIES DEPARTMENT**
**LUMINANT LAKE FORK UNTREATED WATER CONTRACT**
**PROJECTED REVENUES**

| FY 2014-15 | | | FY 2015-16 | | | FY 2016-17 | | |
|---|---|---|---|---|---|---|---|---|
| Service Period | Invoice Amount | Usage (1,000 Gallons) | Service Period | Invoice Amount | Usage (1,000 Gallons) | Service Period | Invoice Amount | Usage (1,000 Gallons) |
| September 23-30 | -$48,773.38 | 86,894 | October 2015 | $227,444.00 | 325,851 | October 2016 | $248,656.90 | 325,851 |
| | | | November 2015 | $227,444.00 | 325,851 | November 2016 | $248,656.90 | 325,851 |
| | | | December 2015 | $227,444.00 | 325,851 | December 2016 | $248,656.90 | 325,851 |
| | | | January 2016 | $227,444.00 | 325,851 | January 2017 | $248,656.90 | 325,851 |
| | | | February 2016 | $227,444.00 | 325,851 | February 2017 | $248,656.90 | 325,851 |
| | | | March 2016 | $227,444.00 | 325,851 | March 2017 | $248,656.90 | 325,851 |
| | | | April 2016 | $227,444.00 | 325,851 | April 2017 | $248,656.90 | 325,851 |
| | | | May 2016 | $227,444.00 | 325,851 | May 2017 | $248,656.90 | 325,851 |
| | | | June 2016 | $227,444.00 | 325,851 | June 2017 | $248,656.90 | 325,851 |
| | | | July 2016 | $227,444.00 | 325,851 | July 2017 | $248,656.90 | 325,851 |
| | | | August 2016 | $227,444.00 | 325,851 | August 2017 | $248,656.90 | 325,851 |
| | | | September 2016 | $227,444.00 | 325,851 | September 1-22 2017 | $182,348.39 | 325,851 |
| Total | -$48,773.38 | 86,894 | Total | $2,729,327.98 | 3,910,212 | Total | $2,917,574.27 | 3,910,212 |

GRAND TOTAL        $5,598,128.87

**Notes:**
**(1) Effective October 1, 2014 untreated water rate was $0.5613/1,000 gallons.**
**(2) Revised settlement rate for the period beginning October 1, 2015 untreated water rate would be $.6980/1,000 gallons.**
**(3) Revised settlement rate for the period beginning October 1, 2016 untreated water rate would be $.7631/1,000 gallons.**
**(4) The previous account number for this contract was 100728155**

**A-165**

# Exhibit 7 to Lowery Declaration in <u>Support of Dallas' Proof of Claim</u>

Revised cost study after giving effect to the SRA Settlement resulting in reduced wholesale water rate for fiscal year October 1, 2015 through September 30, 2016

**Schedule B -UTW**
**Dallas Water Utilities**
**Operations and Maintenance Expense – Water**
**Base Year 2014**
**($000)**

| Line No. | Function | (1) Power & Light (a) | (2) Chemicals (b) | (3) Purchased Treated Water | (4) Street Rental (c) | (5) Bachman & White Rock | (6) Other O&M | (7) Total |
|---|---|---|---|---|---|---|---|---|
| 1 | Supply Reservoir | 0 | | 0 | 1,358 | 0 | 13,779 | 15,137 |
| 2 | Raw Water Transmission | 3,043 | | 1 | 1,648 | 0 | 13,687 | 18,379 |
| | Purification | | | | | | | |
| 3 | Elm Fork | 2,383 | 5,125 | 0 | 1,113 | 0 | 7,800 | 16,421 |
| 4 | All Other | 588 | 5,878 | 0 | 2,175 | 0 | 11,596 | 20,236 |
| 5 | Treated Water Transmission | - | 0 | 0 | 733 | 0 | 7,442 | 8,175 |
| | Treated Water Distribution | | | | | | | |
| 6 | Lines | - | 0 | 1 | 2,850 | 0 | 28,926 | 31,777 |
| 7 | Pumps | 12,516 | 0 | 0 | 2,198 | 0 | 9,793 | 24,507 |
| 8 | Storage | 0 | 0 | 0 | 103 | 0 | 1,043 | 1,146 |
| 9 | Subtotal | 12,516 | 0 | 1 | 5,151 | 0 | 39,762 | 57,429 |
| 10 | Fire Protection | 0 | 0 | 0 | 127 | 0 | 1,293 | 1,420 |
| 11 | Meters | 0 | 0 | 0 | 660 | 0 | 6,704 | 7,364 |
| | Customer Service | | | | | | | |
| 12 | Wholesale | 0 | 0 | 0 | 49 | 0 | 493 | 542 |
| 13 | Retail | 0 | 0 | 0 | 826 | 0 | 8,382 | 9,208 |
| 14 | Subtotal | 0 | 0 | 0 | 875 | 0 | 8,876 | 9,750 |
| 15 | Other Administration | 0 | 0 | 0 | 0 | 0 | 0 | - |
| 16 | Total | 18,530 | 11,002 | 2 | 13,840 | - | 110,937 | 154,312 |

(a) Power and Light expense has been assigned wholly to Raw Water Transmission, Purification, and Pumps functions.
(b) Chemicals costs has been assigned wholly to Purification function.
(c) Initial allocation of Street Rental to Wholesale Customer Service has been eliminated.

**A-167**

**Schedule C -UTW**
**Dallas Water Utilities**
**Operations and Maintenance Expense – Water**
**Test Period Adjustments**
**FY 2015**
**($000)**

| Line No. | Function | (1) Power & Light (a) | (2) Chemicals (b) | (3) Purchased Treated Water | (4) Street Rental (c) | (5) Bachman & White Rock | (6) Other O&M | (7) Total |
|---|---|---|---|---|---|---|---|---|
| 1 | Supply Reservoir | 0 | 0 | 0 | 1,810 | 0 | 23,443 | 25,253 |
| 2 | Raw Water Transmission | 223 | 0 | 1 | 689 | 0 | 10,516 | 11,430 |
|  | Purification |  |  |  |  |  |  |  |
| 3 | Elm Fork | 175 | 127 | 0 | -113 | 0 | -443 | (254) |
| 4 | All Other | 43 | 210 | 0 | -220 | 0 | 1,240 | 1,273 |
| 5 | Treated Water Transmission | 0 | 0 | 0 | -72 | 0 | 330 | 258 |
|  | Treated Water Distribution |  |  |  |  |  |  |  |
| 6 | Lines | - | 0 | 1 | -304 | 0 | 995 | 692 |
| 7 | Pumps | 919 | 0 | 0 | -167 | 0 | 645 | 1,397 |
| 8 | Storage | - | 0 | 0 | -3 | 0 | 124 | 120 |
| 9 | Subtotal | 919 | 0 | 1 | -474 | 0 | 1,763 | 2,209 |
| 10 | Fire Protection | 0 | 0 | 0 | -9 | 0 | 103 | 94 |
| 11 | Meters | 0 | 0 | 0 | -77 | 0 | 155 | 78 |
|  | Customer Service |  |  |  |  |  |  |  |
| 12 | Wholesale | 0 | 0 | 0 | -2 | 0 | 56 | 54 |
| 13 | Retail | 0 | 0 | 0 | 102 | 0 | 2,523 | 2,625 |
| 14 | Subtotal | 0 | 0 | 0 | 100 | 0 | 2,578 | 2,679 |
| 15 | Other Administration | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 16 | Total | 1,360 | 337 | 2 | 1,635 | 0 | 39,685 | 43,018.78 |

(a) Power and Light expense has been assigned wholly to Raw Water Transmission, Purification, and Pumps functions.

(b) Chemicals costs has been assigned wholly to Purification function.

(c) Initial allocation of Street Rental to Wholesale Customer Service has been eliminated.

**Schedule D - UTW**
**Dallas Water Utilities**
**Operations and Maintenance Expense - Water**
**Test Period 2015**
**($000)**

| Line No. | Function | (1) Power & Light (a) | (2) Chemicals (b) | (3) Purchased Treated Water | (4) Street Rental (c) | (5) Bachman & White Rock | (6) Other O&M | (7) Total |
|---|---|---|---|---|---|---|---|---|
| 1 | Supply Reservoir | 0 | 0 | 0 | 3,167 | 0 | 22,269 | 25,436 |
| 2 | Raw Water Transmission | 3,266 | | 0 | 2,338 | 0 | 24,203 | 29,809 |
| 3 | Purification | | | | | | | |
| | Elm Fork | 2,558 | 5,251 | 0 | 1,000 | 0 | 7,357 | 16,166 |
| | All Other | 632 | 6,088 | 0 | 1,954 | 0 | 12,836 | 21,509 |
| 4 | Treated Water Transmission | 0 | 0 | 0 | 661 | 0 | 7,772 | 8,433 |
| | Treated Water Distribution | | | | | | | |
| 5 | Lines | 0 | 0 | 2 | 2,546 | 0 | 29,921 | 32,469 |
| 6 | Pumps | 13,434 | 0 | 0 | 2,031 | 0 | 10,438 | 25,904 |
| 7 | Storage | 0 | 0 | 0 | 99 | 0 | 1,167 | 1,266 |
| 8 | Subtotal | 13,434 | 0 | 2 | 4,677 | 0 | 41,525 | 59,638 |
| 9 | Fire Protection | 0 | 0 | 0 | 119 | 0 | 1,396 | 1,514 |
| 10 | Meters | 0 | 0 | 0 | 584 | 0 | 6,858 | 7,442 |
| | Customer Service | | | | | | | |
| 11 | Wholesale | 0 | 0 | 0 | 47 | 0 | 549 | 596 |
| 12 | Retail | 0 | 0 | 0 | 928 | 0 | 10,905 | 11,833 |
| 13 | Subtotal | 0 | 0 | 0 | 975 | 0 | 11,454 | 12,429 |
| 14 | Other Administration | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 | Total | 19,890 | 11,339 | 3 | 15,475 | 0 | 135,669 | 182,376 |

(a) Power and Light expense has been assigned wholly to Raw Water Transmission, Purification, and Pumps functions.
(b) Chemicals costs has been assigned wholly to Purification function.
(c) Initial allocation of Street Rental to Wholesale Customer Service has been eliminated.

Supply Reservoir Other O&M reduced by $22,107,448 for SRA Escrow payment for 11 months and increased by $7,153,817.88 for settlement costs

**A-169**

Schedule E-UTW
Dallas Water Utilities
Allocation of System O&M to Raw and Treated Water Service
Test Period 2015
($000)

| Line No. | Description | Total System (1) Power & Light (x) | (2) Chemicals | (3) Purchased Treated Water | (4) Street Rental | (5) Buchanan & White Rock | (6) Other O&M | (7) Total | Raw Water (8) Power & Light (x) | (9) Chemicals | (10) Purchased Treated Water | (11) Street Rental | (12) Buchanan & White Rock | (13) Other O&M | (14) Total | Total Treated Water (15) Power & Light (x) | (16) Chemicals | (17) Purchased Treated Water | (18) Street Rental | (19) Buchanan & White Rock | (20) Other O&M | (21) Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Supply Reservoir | 0 | 0 | 0 | 3,167 | 0 | 22,209 | 23,436 | 0 | 0 | 0 | 0 | 0 | 2,000 | 2,000 | 0 | 0 | 0 | 3,167 | 0 | 20,209 | 23,436 |
| 2 | Raw Water Transmission | | 0 | 2 | 2,338 | 0 | 24,207 | 26,542 | 0 | 0 | 0 | 0 | 0 | 1,665 | 1,665 | 2,040 | 0 | 2 | 2,338 | 0 | 22,538 | 24,877 |
| 3 | Energy | 2,197 | | | | | | 2,197 | | | | | | | 151 | 2,040 | | | | | | 2,040 |
| 4 | Demand | 1,069 | | | | | | 1,069 | | | | | | | 0 | 1,069 | | | | | | 1,069 |
| 5 | Elm Fork Purification | | 5,251 | 0 | 1,000 | 0 | 7,357 | 33,608 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 5,251 | 0 | 1,000 | 0 | 7,357 | 13,608 |
| 6 | Energy | 1,720 | | | | | | 1,720 | | | | | | | 0 | 1,720 | | | | | | 1,720 |
| 7 | Demand | 838 | | | | | | 838 | | | | | | | 0 | 838 | | | | | | 838 |
| 8 | All Other Purification | | 6,088 | 0 | 1,954 | 0 | 12,836 | 20,878 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 6,088 | 0 | 1,954 | 0 | 12,836 | 20,878 |
| 9 | Energy | 425 | | | | | | 425 | | | | | | | 0 | 425 | | | | | | 425 |
| 10 | Demand | 207 | | | | | | 207 | | | | | | | 0 | 207 | | | | | | 207 |
| 11 | Treated Water Transmission | 0 | 0 | 0 | 661 | 0 | 7,772 | 8,433 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 661 | 0 | 7,772 | 8,433 |
| 12 | Treated Water Distribution | 0 | 0 | 0 | 2,546 | 0 | 29,921 | 32,469 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,546 | 0 | 29,921 | 32,469 |
| 13 | Pumps | 9,034 | 0 | 0 | 2,031 | 0 | 10,438 | 12,470 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,034 | 0 | 0 | 2,031 | 0 | 10,438 | 12,470 |
| 14 | Energy | 9,034 | | | | | | 9,034 | | | | | | | 0 | 9,034 | | | | | | 9,034 |
| 15 | Demand | 4,400 | | | | | | 4,400 | | | | | | | 0 | 4,400 | | | | | | 4,400 |
| 16 | Storage | 0 | 0 | 0 | 99 | 0 | 1,167 | 1,206 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 99 | 0 | 1,167 | 1,206 |
| 17 | Subtotal | 17,434 | 0 | 2 | 4,677 | 0 | 41,525 | 59,638 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,434 | 0 | 2 | 4,677 | 0 | 41,525 | 59,638 |
| 18 | Fire Protection | 0 | 0 | 0 | 119 | 0 | 1,396 | 1,514 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 119 | 0 | 1,396 | 1,514 |
| 19 | Meters | 0 | 0 | 0 | 584 | 0 | 6,858 | 7,442 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 584 | 0 | 6,858 | 7,442 |
| 20 | Customer Service Wholesale | 0 | 0 | 0 | 47 | 0 | 549 | 596 | 0 | 0 | 0 | 0 | 0 | 55 | 55 | 0 | 0 | 0 | 47 | 0 | 494 | 541 |
| 21 | Retail | 0 | 0 | 0 | 928 | 0 | 10,905 | 11,833 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 928 | 0 | 10,905 | 11,833 |
| 22 | Subtotal | 0 | 0 | 0 | 975 | 0 | 11,454 | 12,429 | 0 | 0 | 0 | 0 | 0 | 55 | 55 | 0 | 0 | 0 | 975 | 0 | 11,399 | 12,374 |
| 23 | Other Administration | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 24 | Total | 19,296 | 11,339 | 3 | 15,475 | 0 | 135,669 | 162,177 | 0 | 0 | 0 | 0 | 0 | 3,720 | 3,872 | 19,739 | 11,339 | 3 | 15,475 | 0 | 131,949 | 178,526 |

(a) Power & Light costs are allocated to Energy (Volume) and Demand based on analysis of how power expense is incurred.

**A-170**

**Schedule E-1-UTW**
**Dallas Water Utilities**
**Allocation of Treated Water O&M to Wholesale and Retail Service**
**Test Period 2015**
**($000)**

| Line No. | Description | | (1) Power & Light (a) | (2) Chemicals | (3) Purchased Treated Water | (4) Street Rental | (5) Dsckmm & White Rock | (6) Other O&M | (7) Total | (8) Power & Light (a) | (9) Chemicals | (10) Purchased Treated Water | (11) Street Rental | (12) Dsckmm & White Rock | (13) Other O&M | (14) Total | (15) Power & Light (a) | (16) Chemicals | (17) Purchased Treated Water | (18) Street Rental | (19) Dsckmm & White Rock | (20) Other O&M | (21) Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Irring Water Treatment Only | | | | | | Wholesale Treated Water | | | | | | | Retail Treated Water | | | | | | |
| 1 | Supply Reservoir | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,307 | 15,474 |
| 2 | Raw Water Transmission | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,099 | 7,099 | 0 | 0 | 0 | 2,338 | 0 | 15,499 | 17,778 |
| 3 | Energy | | 0 | | | | | | | 717 | | | | | 717 | 717 | 1,329 | | | | | | 1,329 |
| 4 | Demand | | 0 | | | | | | | 337 | | | | | 337 | 337 | 732 | | | | | | 732 |
| 5 | Elm Fork Purification | | | 1,599 | 0 | 0 | 0 | 1,203 | 2,802 | 1,280 | | | | 1,938 | 1,938 | | 2,372 | 0 | 1,000 | 0 | 4,216 | 7,588 |
| 6 | Energy | | 524 | | | | | | 524 | 419 | | | | 419 | 419 | 777 | 777 | | | | | | 777 |
| 7 | Demand | | 137 | | | | | | 137 | 221 | | | | 221 | 221 | 480 | 480 | | | | | | 480 |
| 8 | All Other Purification | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,334 | | | | 4,043 | 4,043 | | 3,954 | 0 | 1,954 | 0 | 8,793 | 14,701 |
| 9 | Energy | | 0 | | | | | | | 149 | | | | 149 | 149 | 276 | 276 | | | | | | 276 |
| 10 | Demand | | 0 | | | | | | | 65 | | | | 85 | 85 | 142 | 142 | | | | | | 142 |
| 11 | Treated Water Transmission | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,448 | 2,448 | 0 | 0 | 0 | 661 | 0 | 5,324 | 5,985 |
| 12 | Treated Water Distribution | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2,546 | 0 | 29,921 | 32,469 |
| 13 | Pumps | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,167 | | | | 3,057 | 3,057 | 5,867 | | | 2,031 | 0 | 7,381 | 9,421 |
| 14 | Energy | | 0 | | | | | | | 3,167 | | | | 3,167 | 3,167 | 5,867 | | | | | | 5,867 |
| 15 | Demand | | 0 | | | | | | | 1,386 | | | | 1,386 | 1,386 | 3,014 | | | | | | 3,014 |
| 16 | Storage | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 99 | 0 | 1,167 | 1,266 |
| 17 | Subtotal | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,553 | 1,280 | 0 | 0 | 3,957 | 7,610 | 8,883 | 2,372 | 2 | 4,677 | 0 | 38,468 | 52,028 |
| 18 | Fire Protection | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 119 | 0 | 1,396 | 1,514 |
| 19 | Meters | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 384 | 0 | 6,858 | 7,242 |
| 20 | Customer Service Wholesale | | 0 | 0 | 0 | 20 | 0 | 20 | 20 | 0 | 0 | 0 | 0 | 474 | 474 | 0 | 0 | 0 | 47 | 0 | 0 | 47 |
| 21 | Retail | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 928 | 0 | 10,905 | 11,833 |
| 22 | Subtotal | | 0 | 0 | 0 | 20 | 0 | 20 | 20 | 0 | 0 | 0 | 0 | 474 | 474 | 0 | 0 | 0 | 975 | 0 | 10,905 | 11,880 |
| 23 | Other Administration | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 474 | 474 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 24 | Total | | 661 | 1,599 | 0 | 20 | 0 | 1,223 | 3,483 | 6,461 | 3,614 | 0 | 0 | 22,021 | 36,896 | 12,617 | 6,326 | 3 | 15,475 | 0 | 103,706 | 138,227 |

(a) Power & Light costs are allocated to Energy (Volume) and Demand based on analysis (a) or how power expense is incurred

**A-171**

**Schedule F-UTW**
**Dallas Water Utilities**
**Depreciation Expense – Water**
**($000)**

| Line No. | Description | (1) Base Year FY 2014 | (2) Adjustments | (3) Test Period FY 2015 |
|---|---|---|---|---|
| 1 | Raw Water Supply | 4094 | 1671 | 5,765 |
| 2 | Inside Only | 803 | 171 | 974 |
| 3 | Subtotal | 4,897 | 1,842 | 6,739 |
| 4 | Raw Water Transmission | 3187 | -24 | 3,163 |
| 5 | S.E. Balancing Reservoir | 0 | 0 | 0 |
| 6 | Subtotal | 3,187 | (24) | 3,163 |
|  | Purification |  |  |  |
| 7 | Elm Fork | 4417 | 357 | 4,774 |
| 8 | All Other | 13432 | -5633 | 7,799 |
|  | Subtotal | 17,849 | (5,276) | 12,573 |
| 9 | Treated Water Transmission | 6479 | -1 | 6,478 |
| 10 | Inside Only | 5 | 142 | 147 |
| 11 | Subtotal | 6,484 | 141 | 6,625 |
|  | Treated Water Distribution |  |  |  |
| 12 | Lines | 21233 | 1991 | 23,224 |
| 13 | Pumps | 5193 | -4400 | 793 |
| 14 | Storage | 338 | -5 | 333 |
| 15 | Subtotal | 26,764 | (2,414) | 24,350 |
| 16 | Fire Protection | 5347 | -8634 | (3,287) |
| 17 | Meters | 336 | -12 | 324 |
|  | Customer Service |  |  |  |
| 18 | Wholesale | 0 | -1 | (1) |
| 19 | Retail | 1 | 0 | 1 |
| 20 | Subtotal | 1 | (1) | 0 |
| 21 | Other Administration | 310 | 11 | 321 |
| 22 | Subtotal | 65,175 | (14,367) | 50,808 |
| 23 | Equipment Pool | 197 | 1022 | 1,219 |
| 24 | Total | 65,372 | (13,345) | 52,027 |

**Schedule G – UTW**
**Dallas Water Utilities**
**Allocation of System Depreciation to Raw and Treated Water Service**
**Test Period 2015**
**($000)**

| Line No | Description | (1) Total w/o Bachman & White Rock | (2) Total System Bachman & White Rock | (3) Total | (4) Total w/o Bachman & White Rock | (5) Raw Water Bachman & White Rock | (6) Total | (7) Total w/o Bachman & White Rock | (8) Treated Water Bachman & White Rock | (9) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply | 5,765 | 974 | 6,739 | 518 | 87 | 605 | 5,247 | 887 | 6,134 |
| 2 | Raw Water Transmission | 3,163 | 0 | 3,163 | 218 | 0 | 218 | 2,945 | 0 | 2,945 |
| 3 | S.E. Balancing Reservoir | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Purification | | | | | | | | | |
| 4 | Elm Fork | 4,774 | 0 | 4,774 | 0 | 0 | 0 | 4,774 | 0 | 4,774 |
| 5 | All Other | 7,799 | 0 | 7,799 | 0 | 0 | 0 | 7,799 | 0 | 7,799 |
| 6 | Treated Water Transmission | 6,478 | 0 | 6,478 | 0 | 0 | 0 | 6,478 | 0 | 6,478 |
| 7 | Inside Only | 147 | 0 | 147 | 0 | 0 | 0 | 147 | 0 | 147 |
| | Treated Water Distribution | | | | | | | | | |
| 8 | Lines | 23,224 | 0 | 23,224 | 0 | 0 | 0 | 23,224 | 0 | 23,224 |
| 9 | Pumps | 793 | 0 | 793 | 0 | 0 | 0 | 793 | 0 | 793 |
| 10 | Storage | 333 | 0 | 333 | 0 | 0 | 0 | 333 | 0 | 333 |
| 11 | Subtotal | 24,350 | | 24,350 | 0 | | 0 | 24,350 | | 24,350 |
| 12 | Fire Protection | (3,287) | | (3,287) | 0 | | 0 | (3,287) | | (3,287) |
| 13 | Meters | 324 | | 324 | 0 | | 0 | 324 | | 324 |
| | Customer Service | | | | | | | | | |
| 14 | Wholesale | (1) | 0 | (1) | 0 | 0 | 0 | (1) | 0 | (1) |
| 15 | Retail | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 |
| 16 | Subtotal | 0 | | 0 | 0 | | 0 | 0 | | 0 |
| 17 | Other Administration | 321 | 0 | 321 | 2 | 0 | 2 | 319 | 0 | 319 |
| 18 | Equipment Pool | 1,219 | 0 | 1,219 | 6 | 0 | 6 | 1,213 | 0 | 1,213 |
| | Total | 51,053 | 974 | 52,027 | 744 | 87 | 831 | 50,309 | 887 | 51,196 |

**A-173**

**Schedule G-1-UTW**
**Dallas Water Utilities**
**Allocation of Treated Water Depreciation to Wholesale and Retail Service**
**Test Period 2015**
**($000)**

| Line No | Description | (1) Irving Water Treatment Only — Total w/o Bachman & White Rock | (2) Bachman & White Rock | (3) Total | (4) Wholesale Treated Water — Total w/o Bachman & White Rock | (5) Bachman & White Rock | (6) Total | (7) Retail Treated Water — Total w/o Bachman & White Rock | (8) Bachman & White Rock | (9) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply | 0 | 0 | 0 | 2,061 | 0 | 2,061 | 3,186 | 887 | 4,073 |
| 2 | Raw Water Transmission | 0 | 0 | 0 | 928 | 0 | 928 | 2,017 | 0 | 2,017 |
| 3 | S.E. Balancing Reservoir | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | Purification |  |  |  |  |  |  |  |  |  |
| 4 | Elm Fork | 780 | 0 | 780 | 1,258 | 0 | 1,258 | 2,736 | 0 | 2,736 |
| 5 | All Other | 0 | 0 | 0 | 2,456 | 0 | 2,456 | 5,343 | 0 | 5,343 |
| 6 | Treated Water Transmission | 0 | 0 | 0 | 2,040 | 0 | 2,040 | 4,438 | 0 | 4,438 |
| 7 | Inside Only | 0 | 0 | 0 | 0 | 0 | 0 | 147 | 0 | 147 |
|  | Treated Water Distribution |  |  |  |  |  |  |  |  |  |
| 8 | Lines | 0 | 0 | 0 | 0 | 0 | 0 | 23,224 | 0 | 23,224 |
| 9 | Pumps | 0 | 0 | 0 | 232 | 0 | 232 | 561 | 0 | 561 |
| 10 | Storage | 0 | 0 | 0 | 0 | 0 | 0 | 333 | 0 | 333 |
| 11 | Subtotal | 0 | 0 | 0 | 232 | 0 | 232 | 24,118 | 0 | 24,118 |
| 12 | Fire Protection | 0 | 0 | 0 | 0 | 0 | 0 | (3,287) | 0 | (3,287) |
| 13 | Meters | 0 | 0 | 0 | 0 | 0 | 0 | 324 | 0 | 324 |
|  | Customer Service |  |  |  |  |  |  |  |  |  |
| 14 | Wholesale | (0) | 0 | (0) | (1) | 0 | (1) | 0 | 0 | 0 |
| 15 | Retail | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 16 | Subtotal | (0) | 0 | (0) | (1) | 0 | (1) | 1 | 0 | 1 |
| 17 | Other Administration | 12 | 0 | 12 | 66 | 0 | 66 | 241 | 0 | 241 |
| 18 | Equipment Pool | 45 | 0 | 45 | 252 | 0 | 252 | 916 | 0 | 916 |
| 19 | Total | 837 | 0 | 837 | 9,292 | 0 | 9,292 | 40,180 | 887 | 41,067 |

**A-174**

## Schedule H - UTW
## Dallas Water Utilities
## Rate Base – Water
## Base Year 2014
### ($000)

| Line No. | Description | (1) Gross Original Cost Plant Investment | (2) Less Contributed Plant | (3) DWU-Financed Original Cost Plant Investment | (4) Less Accumulated Depreciation | (5) DWU-Financed Original Cost Net Plant Investment | (6) CWIP | (7) Working Capital | (8) Materials & Supplies (a) | (9) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply | 407,174 | 0 | 407,174 | 119016 | 288,158 | 0 | 1722 | 407 | 290,287 |
| 2 | Inside Only | 34752 | 0 | 34,752 | 4372 | 30,380 | 0 | 0 | 35 | 30,415 |
| 3 | Subtotal | 441,926 | 0 | 441,926 | 123,388 | 318,538 | 0 | 1,722 | 442 | 310,702 |
| 4 | Raw Water Transmission | 221,141 | 0 | 221,141 | 49861 | 171,280 | 0 | 2091 | 221 | 173,592 |
| 5 | S.E. Balancing Reservoir | 3567 | 0 | 3,567 | 3567 | | 0 | 0 | 4 | 4 |
| 6 | Subtotal | 224,708 | 0 | 224,708 | 53,428 | 171,280 | 0 | 2,091 | 225 | 173,596 |
| | Purification | | | | | | | | | |
| 7 | Elm Fork | 197,618 | 7 | 197,611 | 7744 | 119,867 | 0 | 0 | 0 | 119,867 |
| 8 | All Other | 658,602 | 515 | 658,087 | 141,290 | 516,797 | 22,561 | 4,171 | 856 | 544,385 |
| 9 | Subtotal | 856,220 | 522 | 855,698 | 219,034 | 636,664 | 22,561 | 4,171 | 856 | 664,252 |
| 10 | Treated Water Transmission | 461,989 | 18,970 | 443,019 | 149295 | 293,724 | 120 | 930 | 462 | 295,236 |
| 11 | Inside Only | 261 | 243 | 18 | 116 | (98) | 0 | 0 | 0 | (98) |
| 12 | Subtotal | 462,250 | 19,213 | 443,037 | 149,411 | 293,626 | 120 | 930 | 462 | 295,138 |
| | Treated Water Distribution | | | | | | | | | |
| 13 | Lines | 1,174,409 | 188,966 | 985,443 | 326694 | 658,749 | 162439 | 3616 | 1,174 | 823,978 |
| 14 | Pumps | 49,622 | 2,523 | 47,099 | 29234 | 17,865 | 2384 | 2789 | 50 | 23,088 |
| 15 | Storage | 26,246 | - | 26,246 | 11170 | 15,076 | 130 | 130 | 26 | 15,232 |
| 16 | Subtotal | 1,250,277 | 191,489 | 1,058,788 | 367,098 | 691,690 | 164,823 | 6,535 | 1,250 | 864,298 |
| 17 | Fire Protection | 41569 | 13704 | 27,865 | 29234 | (1,369) | 0 | 162 | 42 | (1,165) |
| 18 | Meters | 19670 | 141 | 19,529 | 9576 | 9,953 | 2535 | 838 | 20 | 13,346 |
| | Customer Service | | | | | | | | | |
| 19 | Retail | 1438 | 0 | 1,438 | 1429 | 9 | 0 | 1048 | 1 | 1,058 |
| 20 | Wholesale | 0 | 0 | 0 | 0 | 0 | 0 | 62 | 1 | 62 |
| 21 | Subtotal | 1,438 | 0 | 1,438 | 1,429 | 9 | 0 | 1,110 | 1 | 1,120 |
| 22 | Other Administration | 12372 | 0 | 12,372 | 5126 | 7,246 | 0 | 17,559 | 12 | 7,258 |
| 23 | Subtotal | 3,310,430 | 225,069 | 3,085,361 | 957,724 | 2,127,637 | 190,039 | 17,559 | 3,310 | 2,338,545 |
| 24 | Equipment Pool | 38117 | 15 | 38,102 | 26005 | 12,097 | 0 | 0 | 38 | 12,135 |
| 25 | Total | 3,348,547 | 225,084 | 3,123,463 | 983,729 | 2,139,734 | 190,039 | 17,559 | 3,348 | 2,350,680 |

CWIP - Construction Work in Progress

(a) Materials and Supplies has been added and is allocated on gross original plant investment.

**Schedule 1 - UTW**
**Dallas Water Utilities**
**Rate Base – Water**
**Adjustments**
**($000)**

| Line No. | Description | (1) Gross Original Cost Plant Investment | (2) Less Contributed Plant | (3) DWU-Financed Original Cost Plant Investment | (4) Less Accumulated Depreciation | (5) DWU-Financed Original Cost Net Plant Investment | (6) CWIP | (7) Working Capital | (8) Materials & Supplies (a) | (9) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply | 0 | 0 | 0 | 5765 | (5,765) | 0 | 2931 | 0 | (2,834) |
| 2 | Inside Only | 0 | 0 | 0 | 974 | (974) | 0 | 0 | 0 | (974) |
| 3 | Subtotal | 0 | 0 | 0 | 6739 | (6,739) | 0 | 2931 | 0 | (3,808) |
| 4 | Raw Water Transmission | 0 | 0 | 0 | 3163 | (3,163) | 1688 | 1343 | 0 | (132) |
| 5 | S.E. Balancing Reservoir | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | Subtotal | 0 | 0 | 0 | 3163 | (3,163) | 1688 | 1343 | 0 | (132) |
|  | Purification |  |  |  |  |  |  |  |  |  |
| 7 | Elm Fork | 0 | 0 | 0 | 4,774 | (4,774) | 0 | 0 | 0 | (4,774) |
| 8 | All Other | 0 | 0 | 0 | 7,799 | (7,799) | 12,678 | 169 | 0 | 5,048 |
|  | Subtotal | 0 | 0 | 0 | 12,573 | (12,573) | 12,678 | 169 | 0 | 274 |
| 9 | Treated Water Transmission | 30000 | 0 | 30,000 | 6478 | 23,522 | -120 | 41 | 30 | 23,473 |
| 10 | Inside Only | 0 | 0 | 0 | 147 | (147) | 120 | 0 | 0 | (27) |
| 11 | Subtotal | 30,000 | 0 | 30,000 | 6,625 | 23,375 | 0 | 41 | 30 | 23,446 |
|  | Treated Water Distribution |  |  |  |  |  |  |  |  |  |
| 12 | Lines | 3,539 | 0 | 3,539 | 23224 | (19,685) | 38095 | 124 | 4 | 18,538 |
| 13 | Pumps | 20 | 0 | 20 | 793 | (773) | 72 | 195 | 0 | (506) |
| 14 | Storage | 0 | 0 | 0 | 333 | (333) | 0 | 16 | 0 | (317) |
| 15 | Subtotal | 3,559 | 0 | 3,559 | 24,350 | (20,791) | 38,167 | 335 | 4 | 17,715 |
| 16 | Fire Protection | 0 | 0 | 0 | -3287 | 3,287 | 0 | 13 | 0 | 3,300 |
| 17 | Meters | -2 | 0 | (2) | 324 | (326) | 1630 | 19 | 0 | 1,323 |
|  | Customer Service |  |  |  |  |  |  |  |  |  |
| 18 | Retail | 0 | 0 | 0 | 0 | 0 | 0 | 315 | 0 | 315 |
| 19 | Wholesale | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 7 |
| 20 | Subtotal | 0 | 0 | 0 | 0 | 0 | 0 | 322 | 0 | 322 |
| 21 | Other Administration | 0 | 0 | 0 | 321 | (321) | 0 | 0 | 0 | (321) |
| 22 | Subtotal | 33,557 | 0 | 33,557 | 50,808 | (17,251) | 54,163 | 5,173 | 34 | 42,119 |
| 23 | Equipment Pool | 750 | 0 | 750 | 1219 | (469) | 0 | 0 | 1 | (468) |
| 24 | Total | 34,307 | 0 | 34,307 | 52,027 | (17,720) | 54,163 | 5,173 | 35 | 41,651 |

CWIP - Construction Work in Progress
(a) Materials and Supplies has been added and is allocated on gross original plant investment

**Schedule J - UTW**
**Dallas Water Utilities**
**Rate Base – Water**
**Test Period 2015**
**($000)**

| Line No. | Description | (1) Gross Original Cost Plant Investment | (2) Less Contributed Plant | (3) DWU-Financed Original Cost Plant Investment | (4) Less Accumulated Depreciation | (5) DWU-Financed Original Cost Net Plant Investment | (6) CWIP | (7) Working Capital | (8) Materials & Supplies (a) | (9) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply Inside Only | 407,174 | 0 | 407,174 | 124,781 | 282,393 | 0 | 4,653 | 407 | 287,453 |
| 2 |  | 34,752 | 0 | 34,752 | 5,346 | 29,406 | 0 | 0 | 35 | 29,441 |
| 3 | Subtotal | 441,926 |  | 441,926 | 130,127 | 311,799 | 0 | 4,653 | 442 | 316,894 |
| 4 | Raw Water Transmission | 221,141 | 0 | 221,141 | 53,024 | 168,117 | 1,688 | 3,434 | 221 | 173,460 |
| 5 | S.E. Balancing Reservoir | 3,567 | 0 | 3,567 | 3,567 | 0 | 0 | 0 | 4 | 4 |
| 6 | Subtotal | 224,708 |  | 224,708 | 56,591 | 168,117 | 1,688 | 3,434 | 225 | 173,464 |
|  | Purification |  |  |  |  |  |  |  |  |  |
| 7 | Elm Fork | 197,618 | 7 | 197,611 | 82,518 | 115,093 | 0 | 0 | 0 | 115,093 |
| 8 | All Other | 658,602 | 515 | 658,087 | 149,089 | 508,998 | 35,239 | 4,340 | 856 | 549,433 |
| 9 | Subtotal | 856,220 | 522 | 855,698 | 231,607 | 624,091 | 35,239 | 4,340 | 856 | 664,526 |
| 10 | Treated Water Transmission | 491,989 | 18,970 | 473,019 | 155,773 | 317,246 | 0 | 971 | 492 | 318,709 |
| 11 | Inside Only | 261 | 243 | 18 | 263 | (245) | 120 | 0 | 0 | (125) |
| 12 | Subtotal | 492,250 | 19,213 | 473,037 | 156,036 | 317,001 | 120 | 971 | 492 | 318,584 |
|  | Treated Water Distribution |  |  |  |  |  |  |  |  |  |
| 13 | Lines | 1,177,948 | 188,966 | 988,982 | 349,918 | 639,064 | 200,534 | 3,740 | 1,178 | 844,516 |
| 14 | Pumps | 49,642 | 2,523 | 47,119 | 30,027 | 17,092 | 2,456 | 2,984 | 50 | 22,582 |
| 15 | Storage | 26,246 | 0 | 26,246 | 11,503 | 14,743 | 0 | 146 | 26 | 14,915 |
| 16 | Subtotal | 1,253,836 | 191,489 | 1,062,347 | 391,448 | 670,899 | 202,990 | 6,870 | 1,254 | 882,013 |
| 17 | Fire Protection | 41,569 | 13,704 | 27,865 | 25,947 | 1,918 | 0 | 175 | 42 | 2,135 |
| 18 | Meters | 19,668 | 141 | 19,527 | 9,900 | 9,627 | 4,165 | 857 | 20 | 14,669 |
|  | Customer Service |  |  |  |  |  |  |  |  |  |
| 19 | Retail | 1,438 | 0 | 1,438 | 1,429 | 9 | 0 | 1,363 | 1 | 1,373 |
| 20 | Wholesale | 0 | 0 | 0 | 0 | 0 | 0 | 69 | 0 | 69 |
| 21 | Subtotal | 1,438 | 0 | 1,438 | 1,429 | 9 | 0 | 1,432 | 1 | 1,442 |
| 22 | Other Administration | 12,372 | 0 | 12,372 | 5,447 | 6,925 | 0 | 0 | 12 | 6,937 |
| 23 | Subtotal | 3,343,987 | 225,069 | 3,118,918 | 1,008,532 | 2,110,386 | 244,202 | 22,732 | 3,344 | 2,380,664 |
| 24 | Equipment Pool | 38,867 | 15 | 38,852 | 27,224 | 11,628 | 0 | 0 | 39 | 11,667 |
| 25 | Total | 3,382,854 | 225,084 | 3,157,770 | 1,035,756 | 2,122,014 | 244,202 | 22,732 | 3,383 | 2,392,331 |

CWIP - Construction Work in Progress
(a) Materials and Supplies has been added and is allocated on gross original plant investment.

**Schedule K - UTW**
**Dallas Water Utilities**
**Allocation of System Rate Base to Raw and Treated Water Service**
**Test Period 2015**
**($000)**

| Line No. | Description | Total System (1) Total w/o Bachman & White Rock | (2) Bachman & White Rock | (3) Total | Raw Water (4) Total w/o Bachman & White Rock | (5) Bachman & White Rock | (6) Total | Treated Water (7) Total w/o Bachman & White Rock | (8) Bachman & White Rock | (9) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply | 287,453 | 29,441 | 316,894 | 25,813 | 2,644 | 28,457 | 261,640 | 26,797 | 288,437 |
| 2 | Raw Water Transmission | 173,460 | 0 | 173,460 | 11,934 | 0 | 11,934 | 161,526 | 0 | 161,526 |
| 3 | S.E. Balancing Reservoir | 4 | 0 | 4 | 0 | 0 | 0 | 4 | 0 | 4 |
|  | Purification |  |  |  |  |  |  |  |  |  |
| 4 | Elm Fork | 115,093 | 0 | 115,093 | 0 | 0 | 0 | 115,093 | 0 | 115,093 |
| 5 | All Other | 549,433 | 0 | 549,433 | 0 | 0 | 0 | 549,433 | 0 | 549,433 |
| 6 | Treated Water Transmission | 318,709 | 0 | 318,709 | 0 | 0 | 0 | 318,709 | 0 | 318,709 |
| 7 | Inside Only | (125) | 0 | (125) | 0 | 0 | 0 | (125) | 0 | (125) |
|  | Treated Water Distribution |  |  |  |  |  |  |  |  |  |
| 8 | Lines | 844,516 | 0 | 844,516 | 0 | 0 | 0 | 844,516 | 0 | 844,516 |
| 9 | Pumps | 22,582 | 0 | 22,582 | 0 | 0 | 0 | 22,582 | 0 | 22,582 |
| 10 | Storage | 14,915 | 0 | 14,915 | 0 | 0 | 0 | 14,915 | 0 | 14,915 |
| 11 | Subtotal | 882,013 | 0 | 882,013 | 0 | 0 | 0 | 882,013 | 0 | 882,013 |
| 12 | Fire Protection | 2,135 | 0 | 2,135 | 0 | 0 | 0 | 2,135 | 0 | 2,135 |
| 13 | Meters | 14,669 | 0 | 14,669 | 0 | 0 | 0 | 14,669 | 0 | 14,669 |
|  | Customer Service |  |  |  |  |  |  |  |  |  |
| 14 | Wholesale | 69 | 0 | 69 | 7 | 0 | 7 | 62 | 0 | 62 |
| 15 | Retail | 1,373 | 0 | 1,373 | 0 | 0 | 0 | 1,373 | 0 | 1,373 |
| 16 | Subtotal | 1,442 | 0 | 1,442 | 7 | 0 | 7 | 1,435 | 0 | 1,435 |
| 17 | Other Administration | 6,937 | 0 | 6,937 | 40 | 0 | 40 | 6,897 | 0 | 6,897 |
| 18 | Equipment Pool | 11,667 | 0 | 11,667 | 68 | 0 | 68 | 11,599 | 0 | 11,599 |
|  | Total | 2,362,890 | 29,441 | 2,392,331 | 37,862 | 2,644 | 40,506 | 2,325,027 | 26,797 | 2,351,824 |

Note: Total excludes working capital requirements associated with street rental

**A-178**

**Schedule K-1-UTW**
**Dallas Water Utilities**
**Allocation of Treated Water Rate Base to Wholesale and Retail Service**
**Test Period 2015**
**($000)**

| Line No. | Description | (1) Irving Water Treatment Only — Total w/o Bachman & White Rock | (2) Bachman & White Rock | (3) Total | (4) Wholesale Treated Water — Total w/o Bachman & White Rock | (5) Bachman & White Rock | (6) Total | (7) Retail Treated Water — Total w/o Bachman & White Rock | (8) Bachman & White Rock | (9) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply | 0 | 0 | 0 | 102,772 | 0 | 102,772 | 158,868 | 26,797 | 185,665 |
| 2 | Raw Water Transmission | 0 | 0 | 0 | 50,875 | 0 | 50,875 | 110,651 | 0 | 110,651 |
| 3 | S.E. Balancing Reservoir | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 |
|  | Purification |  |  |  |  |  |  |  |  |  |
| 4 | Elm Fork | 18,816 | 0 | 18,816 | 30,324 | 0 | 30,324 | 65,953 | 0 | 65,953 |
| 5 | All Other | 0 | 0 | - | 173,053 | 0 | 173,053 | 376,380 | 0 | 376,380 |
| 6 | Treated Water Transmission | 0 | 0 | 0 | 100,383 | 0 | 100,383 | 218,326 | 0 | 218,326 |
| 7 | Inside Only | 0 | 0 | 0 | 0 | 0 | 0 | (125) | 0 | (125) |
|  | Treated Water Distribution |  |  |  |  |  |  |  |  |  |
| 8 | Lines | 0 | 0 | 0 | 0 | 0 | 0 | 844,516 | 0 | 844,516 |
| 9 | Pumps | 0 | 0 | 0 | 6,614 | 0 | 6,614 | 15,968 | 0 | 15,968 |
| 10 | Storage | 0 | 0 | 0 | 0 | 0 | 0 | 14,915 | 0 | 14,915 |
| 11 | Subtotal | 0 | 0 | 0 | 6,614 | 0 | 6,614 | 875,399 | 0 | 875,399 |
| 12 | Fire Protection | 0 | 0 | 0 | 0 | 0 | 0 | 2,135 | 0 | 2,135 |
| 13 | Meters | 0 | 0 | 0 | 0 | 0 | 0 | 14,669 | 0 | 14,669 |
|  | Customer Service |  |  |  |  |  |  |  |  |  |
| 14 | Wholesale | 2 | 0 | 2 | 60 | 0 | 60 | 0 | 0 | 0 |
| 15 | Retail | 0 | 0 | 0 | 0 | 0 | 0 | 1,373 | 0 | 1,373 |
| 16 | Subtotal | 2 | 0 | 2 | 60 | 0 | 60 | 1,373 | 0 | 1,373 |
| 17 | Other Administration | 284 | 0 | 284 | 1,639 | 0 | 1,639 | 4,974 | 0 | 4,974 |
| 18 | Equipment Pool | 478 | 0 | 478 | 2,756 | 0 | 2,756 | 8,365 | 0 | 8,365 |
| 19 | Total | 19,580 | 0 | 19,580 | 468,476 | 0 | 468,476 | 1,836,971 | 26,797 | 1,863,768 |

Note: Total excludes working capital requirements associated with street rental

**Schedule L - UTW**
**Dallas Water Utilities**
**Allocation Factors for Volume Costs**

| Line No. | Volume | (1) Actual FY 2005 | (2) Actual FY 2006 | (3) Actual FY 2007 | (4) Actual FY 2008 | (5) Actual FY 2009 | (6) Actual FY 2010 | (7) Actual FY 2011 | (8) Actual FY 2012 | (9) Actual FY 2013 | (10) Test Period FY 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Untreated | | | | | | | | | | |
| 1 | Average Day (MGD) | 15.9 | 15.2 | 18.2 | 15.3 | 16.5 | 16.6 | 18.3 | 19.4 | 21.6 | 28.7 |
| 2 | Percent Total | 3.3 | 3.3 | 4.1 | 3.8 | 3.9 | 3.9 | 4.2 | 4.4 | 4.9 | 6.9 |
| | Treated Water | | | | | | | | | | |
| 3 | Average Day (MGD) | 468.6 | 452.0 | 428.6 | 384.9 | 411.0 | 413.5 | 415.5 | 424.9 | 419.0 | 388.8 |
| 4 | Percent Total | 96.7 | 96.7 | 95.9 | 96.2 | 96.1 | 96.1 | 95.8 | 95.6 | 95.1 | 93.1 |
| | Total System | | | | | | | | | | |
| 5 | Average Day (MGD) | 484.5 | 467.2 | 446.8 | 400.2 | 427.5 | 430.1 | 433.8 | 444.3 | 440.6 | 417.5 |

MGD - Million Gallons per Day

**A-180**

**Schedule M - UTW**
**Dallas Water Utilities**
**Reservoir Allocation**
**Untreated Water**
**FY 2015**

| Line No. | | (1)<br>Avg.<br>FY 77/78<br>MGD | (2)<br>Test Period<br>MGD | (3)<br>1979<br>10 Yr. Projection<br>MGD |
|---|---|---|---|---|
| 1 | Untreated Water Customers | 12.6 | 28.73 | 22.4 |
| 2 | Treated Water Customers | 37.1 | 136.3 | 72.0 |
| 3 | Inside City of Dallas | 182.8 | 252.5 | 205.0 |
| 4 | Total | 232.5 | 417.5 | 299.4 |

Note:    Reservoir Allocation = 10 Year Projection + (Test Period Usage - Average Usage
for FY 77 and FY 78)

10 Year Projection = (22.4 / 299.4) = 7.5%

Average FY 77 & FY 78 Usage = (12.6 / 232.5) = 5.4%

Test Period Usage = (28.73/417.5) =                6.88% (See Schedule N - UTW)

Reservoir Allocation = 7.5% + (6.88% - 5.4%) =     8.98% (See Schedule N - UTW)

MGD - Million Gallon Day

**Schedule N - UTW**
**Dallas Water Utilities**
**Summary of Allocation Factors – Untreated Water**
**FY 2015**

| Line No. | Function | (1) Volume | (2) Untreated Water % Demand | (3) Reservoir | (4) Treated Water % |
|---|---|---|---|---|---|
| 1 | Raw Water Supply | | | 8.98 | 91.02 |
| | Raw Water Transmission | | | | |
| | Light & Power | | | | |
| 2 | Energy | 6.88 | | | 93.12 |
| 3 | Demand-MD | | 0.00 | | 100.00 |
| 4 | Other Costs | 6.88 | | | 93.12 |
| 5 | Purification | | | | 100.00 |
| | Chemicals | | | | |
| | Light & Power | | | | 100.00 |
| 6 | Energy | 0.00 | | | 100.00 |
| 7 | Demand-MD | | 0.00 | | 100.00 |
| 6 | Purchased Water | | | | 100.00 |
| 8 | Other Costs | | | | 100.00 |
| 9 | Treated Water Transmission | | | | 100.00 |
| | Light & Power | | | | |
| 10 | Other Costs | | | | 100.00 |
| 11 | Treated Water Distribution | | | | 100.00 |
| | Chemicals | | | | |
| | Light & Power | | | | |
| 12 | Energy | 0.00 | 0.00 | | 100.00 |
| 13 | Demand-MD | | 0.00 | | 100.00 |
| 12 | Lines | | 0.00 | | 100.00 |
| 14 | Pumps-MH | | | | 100.00 |
| 15 | Storage-PH | | | | 100.00 |
| 16 | Fire Protection | | | | 100.00 |
| 17 | Meters | 10.00 | | | |
| 18 | Customer Service | | | | 90.00 |
| | Wholesale | | | | 100.00 |
| 19 | Retail | | | | |
| 20 | Other Administration | 1.10 | 0.00 | 1.03 | 97.88 |
| 21 | O&M Expenses / Depreciation | 1.20 | 0.00 | 0.43 | 98.37 |
| 22 | Rate Base | 1.20 | 0.00 | 0.50 | 98.30 |
| 23 | Equipment Pool | 1.10 | 0.00 | 1.03 | 97.88 |
| 24 | O&M Expenses / Depreciation | 1.20 | 0.00 | 0.43 | 98.37 |
| 25 | Rate Base | 1.20 | 0.00 | 0.50 | 98.30 |

MD - Max Day
MH - Max Hour
PH - Peak Hour

**A-182**

**Schedule O - UTW**
**Dallas Water Utilities**
**Summary Cost of Service - Untreated Water**
**Test Period 2015**
**($000)**

| Line No. | Description | (1) Operation and Maintenance Expense | (2) Depreciation Expense | (3) Return on Investment | (4) Total |
|---|---|---|---|---|---|
| 1 | Supply Reservoir | 2,000 | 605 | 1,261 | 3,866 |
| 2 | Raw Water Transmission | 1,816 | 218 | 529 | 2,563 |
| 3 | Wholesale Customer Service | 55 | 0 | 0 | 55 |
| 4 | Other Administration | 0 | 2 | 2 | 4 |
| 5 | Equipment Pool | 0 | 6 | 3 | 9 |
| 6 | Total | 3,871 | 831 | 1,795 | 6,497 |
| 7 | Less Irving Payment Credit | 0 | 0 | 0 | 0 |
| 8 | Total | 3,871 | 831 | 1,795 | 6,497 |

Test Period Volume (MG)           10,485.8
Interruptible Volume (MG)         -2,097.2
                                   8,388.6

Cost of Service                    6,497.1
Interruptible Revenues             -642.0
                                   5,855.1

Non-Interruptible Unit Rate Per 1,000 Gallons    $  0.6980  per 1,000 gallons
Interruptible Unit Rate Per 1,000 Gallons        $  0.3061  per 1,000 gallons

MG - Million Gallons

**A-183**

# Exhibit 8 to Lowery Declaration in Support of Dallas' Proof of Claim

Revised cost study after giving effect to the SRA Settlement resulting in reduced wholesale water rate for fiscal year October 1, 2016 through September 30, 2017

**Schedule B-UTW**
**Dallas Water Utilities**
**Operations and Maintenance Expense - Water**
**Base Year 2015**
**($000)**

| Line No. | Function | (1) Power & Light (a) | (2) Chemicals (b) | (3) Purchased Treated Water | (4) Street Rental (c) | (5) Bachman & White Rock | (6) Other O&M | (7) Total |
|---|---|---|---|---|---|---|---|---|
| 1 | Supply Reservoir | 0 | 0 | 0 | 3,060 | 0 | 35,882 | 38,942 |
| 2 | Raw Water Transmission | 4,515 | 0 | 0 | 2,458 | 0 | 24,303 | 31,276 |
|  | Purification | | | | | | | |
| 3 | Elm Fork | 2,288 | 6,560 | 0 | 933 | 0 | 7,800 | 17,581 |
| 4 | All Other | 564 | 4,931 | 0 | 1,823 | 0 | 10,178 | 17,497 |
| 5 | Treated Water Transmission | - | 0 | 0 | 618 | 0 | 7,242 | 7,860 |
|  | Treated Water Distribution | | | | | | | |
| 6 | Lines | - | 0 | 1 | 2,348 | 0 | 27,538 | 29,888 |
| 7 | Pumps | 12,770 | 0 | 0 | 1,850 | 0 | 8,925 | 23,546 |
| 8 | Storage | 0 | 0 | 0 | 88 | 0 | 1,034 | 1,122 |
| 9 | Subtotal | 12,770 | 0 | 1 | 4,287 | 0 | 37,497 | 54,555 |
| 10 | Fire Protection | 0 | 0 | 0 | 109 | 0 | 1,279 | 1,388 |
| 11 | Meters | 0 | 0 | 0 | 560 | 0 | 6,567 | 7,127 |
|  | Customer Service | | | | | | | |
| 12 | Wholesale | 0 | 0 | 0 | 41 | 0 | 485 | 526 |
| 13 | Retail | 0 | 0 | 0 | 943 | 0 | 11,059 | 12,002 |
| 14 | Subtotal | 0 | 0 | 0 | 984 | 0 | 11,543 | 12,528 |
| 15 | Other Administration | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 16 | Total | 20,138 | 11,491 | 2 | 14,832 | - | 142,291 | 188,754 |

(a) Power and Light expense has been assigned wholly to Raw Water Transmission, Purification, and Pumps functions.
(b) Chemicals costs has been assigned wholly to Purification function.
(c) Initial allocation of Street Rental to Wholesale Customer Service has been eliminated.

**Schedule C-UTW**
**Dallas Water Utilities**
**Operations and Maintenance Expense - Water**
**Test Period Adjustments**
**FY 2016**
**($000)**

| Line No. | Function | (1) Power & Light (a) | (2) Chemicals (b) | (3) Purchased Treated Water | (4) Street Rental (c) | (5) Bachman & White Rock | (6) Other O&M | (7) Total |
|---|---|---|---|---|---|---|---|---|
| 1 | Supply Reservoir | 0 | 0 | 0 | 1,204 | 0 | 4,218 | 5,422 |
| 2 | Raw Water Transmission | 229 | 0 | 1 | 1,041 | 0 | 3,858 | 5,129 |
|  | Purification |  |  |  |  |  |  |  |
| 3 | Elm Fork | 116 | 127 | 0 | 251 | 0 | -443 | 51 |
| 4 | All Other | 29 | (1,303) | 0 | 491 | 0 | 2,062 | 1,279 |
| 5 | Treated Water Transmission | 0 | 0 | 0 | 219 | 0 | 622 | 841 |
|  | Treated Water Distribution |  |  |  |  |  |  |  |
| 6 | Lines | - | 0 | 1 | 853 | 0 | 2,576 | 3,430 |
| 7 | Pumps | 646 | 0 | 0 | 621 | 0 | 896 | 2,163 |
| 8 | Storage | - | 0 | 0 | 49 | 0 | 254 | 303 |
| 9 | Subtotal | 646 | 0 | 1 | 1,523 | 0 | 3,726 | 5,896 |
| 10 | Fire Protection | 0 | 0 | 0 | 49 | 0 | 203 | 252 |
| 11 | Meters | 0 | 0 | 0 | 188 | 0 | 473 | 661 |
|  | Customer Service |  |  |  |  |  |  |  |
| 12 | Wholesale | 0 | 0 | 0 | 22 | 0 | 108 | 130 |
| 13 | Retail | 0 | 0 | 0 | 265 | 0 | 299 | 564 |
| 14 | Subtotal | 0 | 0 | 0 | 286 | 0 | 407 | 694 |
| 15 | Other Administration | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 16 | Total | 1,019 | (1,176) | 2 | 5,252 | 0 | 15,128 | 20,224.51 |

(a) Power and Light expense has been assigned wholly to Raw Water Transmission, Purification, and Pumps functions.
(b) Chemicals costs has been assigned wholly to Purification function.
(c) Initial allocation of Street Rental to Wholesale Customer Service has been eliminated

**Schedule D - UTW**
**Dallas Water Utilities**
**Operations and Maintenance Expense - Water**
**Test Period 2016**
**($000)**

| Line No. | Function | (1) Power & Light (a) | (2) Chemicals (b) | (3) Purchased Treated Water | (4) Street Rental (c) | (5) Bachman & White Rock | (6) Other O&M | (7) Total |
|---|---|---|---|---|---|---|---|---|
| 1 | Supply Reservoir | 0 | 0 | 0 | 4,264 | 0 | 23,951 | 28,214 |
| 2 | Raw Water Transmission | 4,744 | 0 | 2 | 3,499 | 0 | 28,161 | 36,405 |
| 3 | Purification | | | | | | | |
|  | Elm Fork | 2,404 | 6,687 | 0 | 1,185 | 0 | 7,357 | 17,632 |
|  | All Other | 593 | 3,628 | 0 | 2,314 | 0 | 12,240 | 18,776 |
| 4 | Treated Water Transmission | 0 | 0 | 0 | 836 | 0 | 7,864 | 8,700 |
|  | Treated Water Distribution | | | | | | | |
| 5 | Lines | 0 | 0 | 2 | 3,202 | 0 | 30,114 | 33,318 |
| 6 | Pumps | 13,417 | 0 | 0 | 2,471 | 0 | 9,821 | 25,709 |
| 7 | Storage | 0 | 0 | 0 | 137 | 0 | 1,288 | 1,425 |
| 8 | Subtotal | 13,417 | 0 | 2 | 5,810 | 0 | 41,224 | 60,452 |
| 9 | Fire Protection | 0 | 0 | 0 | 158 | 0 | 1,482 | 1,640 |
| 10 | Meters | 0 | 0 | 0 | 749 | 0 | 7,040 | 7,789 |
|  | Customer Service | | | | | | | |
| 11 | Wholesale | 0 | 0 | 0 | 63 | 0 | 593 | 656 |
| 12 | Retail | 0 | 0 | 0 | 1,208 | 0 | 11,358 | 12,566 |
| 13 | Subtotal | 0 | 0 | 0 | 1,271 | 0 | 11,951 | 13,221 |
| 14 | Other Administration | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 | Total | 21,157 | 10,315 | 3 | 20,084 | 0 | 141,269 | 192,828 |

(a) Power and Light expense has been assigned wholly to Raw Water Transmission, Purification, and Pumps functions.
(b) Chemicals costs has been assigned wholly to Purification function.
(c) Initial allocation of Street Rental to Wholesale Customer Service has been eliminated.

Supply Reservoir Other O&M reduced $24,117,216 for SRA Escrow expense and increased $7,967,300.28 for for actual settlement costs

**Schedule E-UTW**
**Dallas Water Utilities**
**Allocation of System O&M to Raw and Treated Water Service**
**Test Period 2016**
**($000)**

| Line No. | Description | (1) Total System — Power & Light (x) | (2) Chemicals | (3) Purchased Treated Water | (4) Street Rental | (5) Backhous & White Rock | (6) Other O&M | (7) Total | (8) Raw Water — Power & Light (x) | (9) Chemicals | (10) Purchased Treated Water | (11) Street Rental | (12) Backhous & White Rock | (13) Other O&M | (14) Total | (15) Total Treated Water — Power & Light (x) | (16) Chemicals | (17) Purchased Treated Water | (18) Street Rental | (19) Backhous & White Rock | (20) Other O&M | (21) Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Supply Reservoirs | 0 | 0 | | 0 | 0 | 23,931 | 26,011 | 0 | 0 | | 0 | 0 | 2,203 | 2,203 | 0 | 0 | | 0 | 0 | 23,748 | 26,011 |
| 2 | Raw Water Transmission | | | | | | | | | | | | | | | | | | | | | |
| 3 | Energy | 3,390 | 0 | | 3,499 | 0 | 28,161 | 31,661 | 226 | 0 | | 0 | 0 | 1,999 | 1,999 | 2,964 | 0 | | 3,499 | 0 | 26,162 | 29,662 |
| 4 | Demand | 1,354 | | | | | | 1,354 | 226 | | | | | 226 | 226 | 1,354 | | | | | | 1,354 |
| 5 | Elm Fork Purification | | | | | | | | | | | | | | | | | | | | | |
| 6 | Energy | 1,617 | 6,687 | | 1,185 | 0 | 7,357 | 15,228 | 0 | 0 | | 0 | 0 | 0 | 0 | 1,617 | 6,687 | | 1,185 | 0 | 7,357 | 15,228 |
| 7 | Demand | 787 | | | | | | 787 | 0 | | | | | | 0 | 787 | | | | | | 787 |
| 8 | All Other Purification | | | | | | | | | | | | | | | | | | | | | |
| 9 | Energy | 399 | 3,628 | | 2,314 | 0 | 12,240 | 18,181 | 0 | 0 | | 0 | 0 | 0 | 0 | 399 | 3,628 | | 2,314 | 0 | 12,240 | 18,181 |
| 10 | Demand | 194 | | | | | | 194 | 0 | | | | | | 0 | 194 | | | | | | 194 |
| 11 | Treated Water Transmission | 0 | 0 | | 836 | 0 | 7,864 | 8,700 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | | 836 | 0 | 7,864 | 8,700 |
| 12 | Lines | 0 | 0 | | 3,202 | 0 | 30,114 | 33,318 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | | 3,202 | 0 | 30,114 | 33,318 |
| 13 | Pumps Energy | 9,023 | 0 | 2 | 2,471 | 0 | 9,821 | 12,292 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,023 | 0 | 2 | 2,471 | 0 | 9,821 | 12,292 |
| 14 | Energy | 4,394 | | | | | | 9,023 | 0 | | | | | | 0 | 9,023 | | | | | | 9,023 |
| 15 | Demand | | | | | | | 4,394 | 0 | | | | | | 0 | 4,394 | | | | | | 4,394 |
| 16 | Storage | 0 | 0 | | 137 | 0 | 1,288 | 1,425 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | | 137 | 0 | 1,288 | 1,425 |
| 17 | Subtotal | 13,412 | 0 | 2 | 5,810 | 0 | 41,224 | 60,455 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,412 | 0 | 2 | 5,810 | 0 | 41,224 | 60,455 |
| 18 | Fire Protection | 0 | 0 | | 158 | 0 | 1,482 | 1,640 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | | 158 | 0 | 1,482 | 1,640 |
| 19 | Meters | 0 | 0 | | 7,240 | 0 | 7,240 | 7,390 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | | 7,240 | 0 | 7,240 | 7,390 |
| 20 | Customer Service Wholesale | 0 | 0 | | 63 | 0 | 509 | 656 | 0 | 0 | | 0 | 0 | 56 | 56 | 0 | 0 | | 63 | 0 | 534 | 707 |
| 21 | Retail | 0 | 0 | | 1,208 | 0 | 11,358 | 12,566 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | | 1,208 | 0 | 11,358 | 12,566 |
| 22 | Subtotal | 0 | 0 | | 1,271 | 0 | 13,121 | 13,121 | 0 | 0 | | 0 | 0 | 56 | 56 | 0 | 0 | | 1,271 | 0 | 11,892 | 13,162 |
| 23 | Other Administration | | | | | | | | | | | | | | | | | | | | | |
| 24 | Total | 21,158 | 20,315 | 3 | 20,084 | 0 | 141,269 | 102,826 | 226 | 0 | 0 | 0 | 0 | 4,261 | 4,483 | 20,932 | 20,315 | 3 | 20,084 | 0 | 137,008 | 108,342 |

**A-188**

Schedule E-1-UTW
Dallas Water Utilities
Allocation of Treated Water O&M to Wholesale and Retail Service
Test Period 2016
($000)

| Line No. | Description | (1) Power & Light (¢) | (2) Chemicals | (3) Purchased Treated Water | (4) Sewer Rental | (5) Reclaim & White Rock | (6) Other O&M | (7) Total | (8) Power & Light (¢) | (9) Chemicals | (10) Purchased Treated Water | (11) Sewer Rental | (12) Reclaim & White Rock | (13) Other O&M | (14) Total | (15) Power & Light (¢) | (16) Chemicals | (17) Purchased Treated Water | (18) Sewer Rental | (19) Reclaim & White Rock | (20) Other O&M | (21) Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Living Water Treatment Only | | | | | | | Wholesale Treated Water | | | | | | | Retail Treated Water | | | | |
| 1 | Supply Reservoir | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 8,488 | 8,488 | 0 | 0 | | 4,264 | 0 | 13,260 | 17,523 |
| 2 | Raw Water Transmission | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,035 | 0 | | 0 | 0 | 8,607 | 8,607 | 0 | 0 | 0 | 3,449 | 0 | 17,555 | 21,055 |
| 3 | Energy | 0 | | | | | | | 1,035 | | | | | 1,035 | | | | | | | | 1,792 |
| 4 | Demand | 0 | | | | | | | 511 | | | | | 511 | 1,043 | | | | | | | 1,043 |
| 5 | Elm Fork Purification | 436 | 1,778 | 0 | 0 | 1,188 | 0 | 2,566 | 3,712 | 1,713 | 0 | 0 | 0 | 2,929 | 3,712 | 773 | 1,196 | 0 | 1,185 | 0 | 4,140 | 8,526 |
| 6 | Energy | 436 | | | | | 436 | | 414 | | | | | 414 | | 773 | | | | | | 773 |
| 7 | Demand | 127 | | | | | 127 | | 217 | | | | | 217 | | 443 | | | | | | 443 |
| 8 | All Other Purification | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 139 | 1,266 | 0 | 0 | 0 | 4,027 | 5,230 | 260 | 2,862 | 0 | 2,314 | 0 | 8,213 | 12,896 |
| 9 | Energy | 0 | | | | | | | 139 | | | | | 139 | | 260 | | | | | | 260 |
| 10 | Demand | 0 | | | | | | | 64 | | | | | 64 | | 136 | | | | | | 136 |
| 11 | Treated Water Transmission | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,583 | 2,583 | 0 | 0 | 0 | 836 | 0 | 5,277 | 6,113 |
| 12 | Treated Water Distribution | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30,114 | 33,328 |
| 13 | Lines | 0 | | | | | | | 0 | | | | | 0 | | 3,202 | | | | | | |
| 14 | Pumps | 0 | | | | | | | 3,100 | 0 | | | | 2,861 | 2,861 | 5,874 | | | 2,472 | 0 | 6,960 | 9,431 |
| 15 | Energy | 0 | | | | | | | 3,100 | | | | | 3,100 | | 3,426 | | | | | | 5,823 |
| 16 | Demand | 0 | | | | | | | 1,446 | | | | | 1,446 | | 2,448 | | | | | | 2,948 |
| 17 | Storage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 337 | 0 | 1,288 | 1,425 |
| 18 | Subtotal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,595 | 0 | 0 | 0 | 0 | 2,861 | 7,456 | 8,322 | 0 | 2 | 5,810 | 0 | 39,364 | 52,966 |
| 19 | Fire Protection | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 158 | 0 | 1,462 | 1,666 |
| 20 | Meters | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 740 | 0 | 7,060 | 7,789 |
| 21 | Customer Service | 0 | 0 | 0 | 0 | 0 | 21 | 21 | 0 | 0 | 0 | 0 | 0 | 513 | 513 | 0 | 0 | 0 | 63 | 0 | 11,358 | 12,556 |
| 22 | Wholesale | 0 | 0 | 0 | 0 | 0 | 21 | 21 | 0 | 0 | 0 | 0 | 0 | 513 | 513 | 0 | 0 | 0 | 4,208 | 0 | 11,158 | |
| 23 | Retail | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 63 | 0 | 63 | |
| 24 | Subtotal | 9 | 0 | 0 | 0 | 0 | 21 | 21 | 0 | 0 | 0 | 0 | 0 | 514 | 514 | 0 | 0 | 0 | 1,271 | 0 | 11,358 | 12,623 |
| 25 | Other Administrative | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total | 553 | 1,778 | 0 | 0 | 1,209 | 0 | 3,544 | 6,975 | 2,979 | 0 | 0 | 0 | 29,112 | 39,066 | 11,400 | 5,558 | 3 | 20,653 | 0 | 106,487 | 143,732 |

A-189

**Schedule F-UTW**
**Dallas Water Utilities**
**Depreciation Expense – Water**
**($000)**

| Line No. | Description | (1) Base Year FY 2015 | (2) Adjustments | (3) Test Period FY 2016 |
|---|---|---|---|---|
| 1 | Raw Water Supply | 2035 | 2148 | 4,183 |
| 2 | Inside Only | 1022 | -61 | 961 |
| 3 | Subtotal | 3,057 | 2,087 | 5,144 |
| 4 | Raw Water Transmission | 2338 | 983 | 3,321 |
| 5 | S.E. Balancing Reservoir | 0 | 0 | 0 |
| 6 | Subtotal | 2,338 | 983 | 3,321 |
| 7 | Purification — Elm Fork | 3000 | 3267 | 6,267 |
| 8 | All Other | 12623 | -6713 | 5,910 |
| 9 | Subtotal | 15,623 | (3,446) | 12,177 |
| 10 | Treated Water Transmission — Inside Only | 5120 | 2041 | 7,161 |
|  |  | 3 | 8 | 11 |
| 11 | Subtotal | 5,123 | 2,049 | 7,172 |
| 12 | Treated Water Distribution — Lines | 16828 | 5890 | 22,718 |
| 13 | Pumps | -877 | 2902 | 2,025 |
| 14 | Storage | -1727 | 2979 | 1,252 |
| 15 | Subtotal | 14,224 | 11,771 | 25,995 |
| 16 | Fire Protection | -3660 | 6454 | 2,794 |
| 17 | Meters | 402 | 142 | 544 |
| 18 | Customer Service — Wholesale | 0 | 0 | 0 |
| 19 | Retail | 0 | 1 | 1 |
| 20 | Subtotal | 0 | 1 | 1 |
| 21 | Other Administration | 290 | 201 | 491 |
| 22 | Subtotal | 37,397 | 20,242 | 57,639 |
| 23 | Equipment Pool | 389 | 1159 | 1,548 |
| 24 | Total | 37,786 | 21,401 | 59,187 |

**Schedule G -UTW**
**Dallas Water Utilities**
**Allocation of System Depreciation to Raw and Treated Water Service**
**Test Period 2016**
**($000)**

| Line No. | Description | (1) Total System — Total w/o Bachman & White Rock | (2) Total System — Bachman & White Rock | (3) Total System — Total | (4) Raw Water — Total w/o Bachman & White Rock | (5) Raw Water — Bachman & White Rock | (6) Raw Water — Total | (7) Treated Water — Total w/o Bachman & White Rock | (8) Treated Water — Bachman & White Rock | (9) Treated Water — Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply | 4,183 | 961 | 5,144 | 385 | 88 | 473 | 3,798 | 873 | 4,671 |
| 2 | Raw Water Transmission | 3,321 | 0 | 3,321 | 236 | 0 | 236 | 3,085 | 0 | 3,085 |
| 3 | S.E. Balancing Reservoir | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Purification | | | | | | | | | |
| 4 | Elm Fork | 6,267 | 0 | 6,267 | 0 | 0 | 0 | 6,267 | 0 | 6,267 |
| 5 | All Other | 5,910 | 0 | 5,910 | 0 | 0 | 0 | 5,910 | 0 | 5,910 |
| 6 | Treated Water Transmission | 7,161 | 0 | 7,161 | 0 | 0 | 0 | 7,161 | 0 | 7,161 |
| 7 | Inside Only | 11 | 0 | 11 | 0 | 0 | 0 | 11 | 0 | 11 |
| | Treated Water Distribution | | | | | | | | | |
| 8 | Lines | 22,718 | 0 | 22,718 | 0 | 0 | 0 | 22,718 | 0 | 22,718 |
| 9 | Pumps | 2,025 | 0 | 2,025 | 0 | 0 | 0 | 2,025 | 0 | 2,025 |
| 10 | Storage | 1,252 | 0 | 1,252 | 0 | 0 | 0 | 1,252 | 0 | 1,252 |
| 11 | Subtotal | 25,995 | 0 | 25,995 | 0 | 0 | 0 | 25,995 | 0 | 25,995 |
| 12 | Fire Protection | 2,794 | 0 | 2,794 | 0 | 0 | 0 | 2,794 | 0 | 2,794 |
| 13 | Meters | 544 | 0 | 544 | 0 | 0 | 0 | 544 | 0 | 544 |
| | Customer Service | | | | | | | | | |
| 14 | Wholesale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 | Retail | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 |
| 16 | Subtotal | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 |
| 17 | Other Administration | 491 | 0 | 491 | 2 | 0 | 2 | 489 | 0 | 489 |
| 18 | Equipment Pool | 1,548 | 0 | 1,548 | 7 | 0 | 7 | 1,541 | 0 | 1,541 |
| 19 | Total | 58,226 | 961 | 59,187 | 630 | 88 | 718 | 57,596 | 873 | 58,469 |

**A-191**

**Schedule G-1-UTW**
**Dallas Water Utilities**
**Allocation of Treated Water Depreciation to Wholesale and Retail Service**
**Test Period 2016**
**($000)**

| Line No | Description | Irving Water Treatment Only | | | Wholesale Treated Water | | | Retail Treated Water | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | (1) Total w/o Bachman & White Rock | (2) Bachman & White Rock | (3) Total | (4) Total w/o Bachman & White Rock | (5) Bachman & White Rock | (6) Total | (7) Total w/o Bachman & White Rock | (8) Bachman & White Rock | (9) Total |
| 1 | Raw Water Supply | 0 | 0 | 0 | 1,482 | 0 | 1,482 | 2,316 | 873 | 3,189 |
| 2 | Raw Water Transmission | 0 | 0 | 0 | 1,015 | 0 | 1,015 | 2,070 | 0 | 2,070 |
| 3 | S.E. Balancing Reservoir | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Purification | | | | | | | | | |
| 4 | Elm Fork | 1,012 | 0 | 1,012 | 1,729 | 0 | 1,729 | 3,526 | 0 | 3,526 |
| 5 | All Other | 0 | 0 | 0 | 1,944 | 0 | 1,944 | 3,966 | 0 | 3,966 |
| 6 | Treated Water Transmission | 0 | 0 | 0 | 2,356 | 0 | 2,356 | 4,805 | 0 | 4,805 |
| 7 | Inside Only | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 11 |
| | Treated Water Distribution | | | | | | | | | |
| 8 | Lines | 0 | 0 | 0 | 0 | 0 | 0 | 22,718 | 0 | 22,718 |
| 9 | Pumps | 0 | 0 | 0 | 590 | 0 | 590 | 1,435 | 0 | 1,435 |
| 10 | Storage | 0 | 0 | 0 | 0 | 0 | 0 | 1,252 | 0 | 1,252 |
| 11 | Subtotal | 0 | 0 | 0 | 590 | 0 | 590 | 25,405 | 0 | 25,405 |
| 12 | Fire Protection | 0 | 0 | 0 | 0 | 0 | 0 | 2,794 | 0 | 2,794 |
| 13 | Meters | 0 | 0 | 0 | 0 | 0 | 0 | 544 | 0 | 544 |
| | Customer Service | | | | | | | | | |
| 14 | Wholesale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 | Retail | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 16 | Subtotal | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 17 | Other Administration | 22 | 0 | 22 | 102 | 0 | 102 | 365 | 0 | 365 |
| 18 | Equipment Pool | 71 | 0 | 71 | 321 | 0 | 321 | 1,149 | 0 | 1,149 |
| 19 | Total | 1,105 | 0 | 1,105 | 9,539 | 0 | 9,539 | 46,952 | 873 | 47,825 |

**Schedule II - UTW**
**Dallas Water Utilities**
**Rate Base - Water**
**Base Year 2015**
**($000)**

| Line No. | Description | (1) Gross Original Cost Plant Investment | (2) Less Contributed Plant | (3) DWU-Financed Original Cost Plant Investment | (4) Less Accumulated Plant Depreciation | (5) DWU-Financed Original Cost Net Plant Investment | (6) CWIP | (7) Working Capital | (8) Materials & Supplies (a) | (9) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply Inside Only | 407,174 | 0 | 407,174 | 121051 | 286,123 | | 4485 | 407 | 290,015 |
| 2 | | 36322 | 0 | 36,322 | 5394 | 30,928 | 0 | | 36 | 30,964 |
| 3 | Subtotal | 443,496 | 0 | 443,496 | 126,445 | 317,051 | 0 | 4,485 | 443 | 321,979 |
| 4 | Raw Water Transmission | 225,382 | 0 | 225,382 | 52199 | 173,183 | | 3602 | 225 | 177,010 |
| 5 | S.E. Balancing Reservoir | 3567 | 0 | 3,567 | 3567 | 0 | | | 4 | 4 |
| 6 | Subtotal | 228,949 | 0 | 228,949 | 55,766 | 173,183 | 0 | 3,602 | 229 | 177,014 |
| | Purification | | | | | | | | | |
| 7 | Elm Fork | 197,520 | 7 | 197,513 | 80744 | 116,769 | 0 | | 0 | 116,769 |
| 8 | All Other | 687,118 | 515 | 686,603 | 153,913 | 532,690 | 34,249 | | 885 | 571,864 |
| 9 | Subtotal | 884,638 | 522 | 884,116 | 234,657 | 649,459 | 34,249 | 4,040 | 885 | 688,633 |
| 10 | Treated Water Transmission Inside Only | 467,304 | 19,031 | 448,273 | 154415 | 293,858 | 0 | 905 | 467 | 295,230 |
| 11 | | 243 | 243 | 0 | 119 | (119) | 0 | 905 | | (119) |
| 12 | Subtotal | 467,547 | 19,274 | 448,273 | 154,534 | 293,739 | 0 | 905 | 467 | 295,111 |
| | Treated Water Distribution | | | | | | | | | |
| 13 | Lines | 1,218,587 | 192,190 | 1,026,397 | 343522 | 682,875 | 187679 | 3442 | 1,219 | 875,215 |
| 14 | Pumps | 48,764 | 2,523 | 46,241 | 28357 | 17,884 | 0 | 2712 | 48 | 20,644 |
| 15 | Storage | 22,607 | - | 22,607 | 9443 | 13,164 | 0 | 129 | 23 | 13,316 |
| 16 | Subtotal | 1,289,958 | 194,713 | 1,095,245 | 381,322 | 713,923 | 187,679 | 6,283 | 1,290 | 909,175 |
| 17 | Fire Protection | 41095 | 13829 | 27,266 | 25574 | 1,692 | 0 | 160 | 41 | 1,893 |
| 18 | Meters | 22893 | 141 | 22,752 | 9978 | 12,774 | 0 | 821 | 23 | 13,618 |
| | Customer Service | | | | | | | | | |
| 19 | Retail | 1438 | 0 | 1,438 | 1429 | 9 | 0 | 1382 | 1 | 1,392 |
| 20 | Wholesale | 0 | 0 | 0 | 0 | 0 | 0 | 61 | 0 | 61 |
| 21 | Subtotal | 1,438 | 0 | 1,438 | 1,429 | 9 | 0 | 1,443 | 1 | 1,453 |
| 22 | Other Administration | 12389 | 0 | 12,389 | 5416 | 6,973 | 0 | | 12 | 6,985 |
| 23 | Subtotal | 3,392,403 | 228,479 | 3,163,924 | 995,121 | 2,168,803 | 221,928 | 21,739 | 3,391 | 2,415,861 |
| 24 | Equipment Pool | 37893 | 15 | 37,878 | 26894 | 11,484 | 0 | 0 | 38 | 11,522 |
| 25 | Total | 3,430,296, | 228,494 | 3,201,802 | 1,021,515 | 2,180,287 | 221,928 | 21,739 | 3,429 | 2,427,383 |

CWIP - Construction Work in Progress
(a) Materials and Supplies has been added and is allocated on gross original plant investment.

## Schedule 1 - UTW
## Dallas Water Utilities
## Rate Base - Water
## Adjustments
## ($000)

| Line No. | Description | (1) Gross Original Cost Plant Investment | (2) Less Contributed Plant | (3) DWU-Financed Original Cost Plant Investment | (4) Less Accumulated Depreciation | (5) DWU-Financed Original Cost Net Plant Investment | (6) CWIP | (7) Working Capital | (8) Materials & Supplies (a) | (9) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply | | | | | | | | | |
| 2 | Inside Only | 0 | 0 | 0 | 4183 | (4,183) | 0 | 528 | 0 | (3,655) |
| 3 | Subtotal | 0 | 0 | 0 | 961 | (961) | 0 | | 0 | (961) |
| 4 | Raw Water Transmission | 2725 | 0 | 2725 | 3321 | (596) | 179 | 511 | 3 | 97 |
| 5 | S.E. Balancing Reservoir | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 |
| 6 | Subtotal | 2725 | 0 | 2725 | 3321 | (596) | 179 | 511 | 3 | 97 |
| 7 | Purification / Elm Fork | 0 | 0 | 0 | 6,267 | (6,267) | 0 | 0 | | (6,267) |
| 8 | All Other | 0 | 0 | 0 | 5,910 | (5,910) | 10,108 | 74 | 0 | 4,272 |
| | Subtotal | 0 | 0 | 0 | 12,177 | (12,177) | 10,108 | 74 | 0 | (1,995) |
| 9 | Treated Water Transmission | 39 | 0 | 39 | 7161 | (7,122) | 0 | 78 | -1 | (7,045) |
| 10 | Inside Only | 0 | | 0 | 11 | (11) | 0 | | 6 | (5) |
| 11 | Subtotal | 39 | 0 | 39 | 7,172 | (7,133) | 0 | 78 | 5 | (7,050) |
| | Treated Water Distribution | | | | | | | | | |
| 12 | Lines | -367 | 1251 | (1,618) | 22718 | (24,336) | 43285 | 322 | 0 | 19,271 |
| 13 | Pumps | 5699 | 0 | 5,699 | 2025 | 3,674 | 0 | 193 | 0 | 3,867 |
| 14 | Storage | 0 | 0 | 0 | 1252 | (1,252) | 0 | 32 | 0 | (1,220) |
| 15 | Subtotal | 5,332 | 1,251 | 4,081 | 25,995 | (21,914) | 43,285 | 547 | 0 | 21,918 |
| 16 | Fire Protection | 0 | 0 | 0 | 2794 | (2,794) | 0 | 25 | 0 | (2,769) |
| 17 | Meters | 0 | 0 | 0 | 544 | (544) | 1301 | 59 | 0 | 816 |
| 18 | Customer Service / Retail | 0 | 0 | 0 | 0 | (1) | 0 | 38 | 0 | 37 |
| 19 | Wholesale | 0 | 0 | 0 | 1 | 0 | 0 | 13 | 0 | 13 |
| 20 | Subtotal | 0 | 0 | 0 | 1 | (1) | 0 | 51 | 0 | 50 |
| 21 | Other Administration | 0 | | 0 | 491 | (491) | 0 | 0 | 0 | (491) |
| 22 | Subtotal | 8,096 | 1,251 | 6,845 | 57,639 | (50,794) | 54,873 | 1,873 | 8 | 5,960 |
| 23 | Equipment Pool | 1293 | 0 | 1,293 | 1548 | (255) | 0 | 0 | 1 | (254) |
| 24 | Total | 9,389 | 1,251 | 8,138 | 59,187 | (51,049) | 54,873 | 1,873 | 9 | 5,706 |

CWIP - Construction Work in Progress
(a) Materials and Supplies has been added and is allocated on gross original plant investment

**Schedule J - UTW**
**Dallas Water Utilities**
**Rate Base - Water**
**Test Period 2016**
**($000)**

| Line No. | Description | (1) Gross Original Cost Plant Investment | (2) Less Contributed Plant | (3) DWU-Financed Original Cost Plant Investment | (4) Less Accumulated Plant Depreciation | (5) DWU-Financed Net Plant Original Cost Investment | (6) CWIP | (7) Working Capital | (8) Materials & Supplies (a) | (9) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply | 407,174 | 0 | 407,174 | 125,234 | 281,940 | 0 | 5,013 | 407 | 287,360 |
| 2 | Inside Only | 36,322 | 0 | 36,322 | 6,355 | 29,967 | 0 | | 36 | 30,003 |
| 3 | Subtotal | 443,496 | 0 | 443,496 | 131,589 | 311,907 | 0 | 5,013 | 443 | 317,363 |
| 4 | Raw Water Transmission | 228,107 | 0 | 228,107 | 55,520 | 172,587 | 179 | 4,113 | 228 | 177,107 |
| 5 | S.E. Balancing Reservoir | 3,567 | 0 | 3,567 | 3,567 | 0 | 0 | | 4 | 4 |
| 6 | Subtotal | 231,674 | 0 | 231,674 | 59,087 | 172,587 | 179 | 4,113 | 232 | 177,111 |
| 7 | Purification | | | | | | | | | |
| 8 | Elm Fork | 197,520 | 7 | 197,513 | 87,011 | 110,502 | 0 | | 0 | 110,502 |
| 9 | All Other | 687,118 | 515 | 686,603 | 159,823 | 526,780 | 44,357 | 4,114 | 885 | 576,136 |
| | Subtotal | 884,638 | 522 | 884,116 | 246,834 | 637,282 | 44,357 | 4,114 | 885 | 686,638 |
| 10 | Treated Water Transmission | 467,343 | 19,031 | 448,312 | 161,576 | 286,736 | 0 | 983 | 466 | 288,185 |
| 11 | Inside Only | 243 | 243 | 0 | 130 | (130) | 0 | | 6 | (124) |
| 12 | Subtotal | 467,586 | 19,274 | 448,312 | 161,706 | 286,606 | 0 | 983 | 472 | 288,061 |
| 13 | Treated Water Distribution | | | | | | | | | |
| 14 | Lines | 1,218,220 | 193,441 | 1,024,779 | 366,240 | 658,539 | 230,964 | 3,764 | 1,219 | 894,486 |
| 15 | Pumps | 54,463 | 2,523 | 51,940 | 30,382 | 21,558 | 0 | 2,905 | 48 | 24,511 |
| 15 | Storage | 22,607 | 0 | 22,607 | 10,695 | 11,912 | 0 | 161 | 23 | 12,096 |
| 16 | Subtotal | 1,295,290 | 195,964 | 1,099,326 | 407,317 | 692,009 | 230,964 | 6,830 | 1,290 | 931,093 |
| 17 | Fire Protection | 41,095 | 13,829 | 27,266 | 28,368 | (1,102) | 0 | 185 | 41 | (876) |
| 18 | Meters | 22,893 | 141 | 22,752 | 10,522 | 12,230 | 1,301 | 880 | 23 | 14,434 |
| | Customer Service | | | | | | | | | |
| 19 | Retail | 1,438 | 0 | 1,438 | 1,430 | 8 | 0 | 1,420 | 1 | 1,429 |
| 20 | Wholesale | 0 | 0 | 0 | 0 | 0 | 0 | 74 | 0 | 74 |
| 21 | Subtotal | 1,438 | 0 | 1,438 | 1,430 | 8 | 0 | 1,494 | 1 | 1,503 |
| 22 | Other Administration | 12,389 | 0 | 12,389 | 5,907 | 6,482 | 0 | 0 | 12 | 6,494 |
| 23 | Subtotal | 3,400,499 | 229,730 | 3,170,769 | 1,052,760 | 2,118,009 | 276,801 | 23,612 | 3,399 | 2,421,821 |
| 24 | Equipment Pool | 39,186 | 15 | 39,171 | 27,942 | 11,229 | 0 | 0 | 39 | 11,268 |
| 25 | Total | 3,439,685 | 229,745 | 3,209,940 | 1,080,702 | 2,129,238 | 276,801 | 23,612 | 3,438 | 2,433,089 |

CWIP - Construction Work in Progress
(a) Materials and Supplies has been added and is allocated on gross original plant investment.

**Schedule K - UTW**
**Dallas Water Utilities**
**Allocation of System Rate Base to Raw and Treated Water Service**
**Test Period 2016**
**($000)**

| Line No. | Description | (1) Total w/o Bachman & White Rock | (2) Total System Bachman & White Rock | (3) Total | (4) Total w/o Bachman & White Rock | (5) Raw Water Bachman & White Rock | (6) Total | (7) Total w/o Bachman & White Rock | (8) Treated Water Bachman & White Rock | (9) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Raw Water Supply | 287,360 | 30,003 | 317,363 | 26,437 | 2,760 | 29,197 | 260,923 | 27,243 | 288,166 |
| 2 | Raw Water Transmission | 177,107 | 0 | 177,107 | 12,575 | 0 | 12,575 | 164,532 | 0 | 164,532 |
| 3 | S.E. Balancing Reservoir | 4 | 0 | 4 | 0 | 0 | 0 | 4 | 0 | 4 |
| | Purification | | | | | | | | | |
| 4 | Elm Fork | 110,502 | 0 | 110,502 | 0 | 0 | 0 | 110,502 | 0 | 110,502 |
| 5 | All Other | 576,136 | 0 | 576,136 | 0 | 0 | 0 | 576,136 | 0 | 576,136 |
| 6 | Treated Water Transmission | | | | | | | | | |
| 7 | Inside Only | 288,185 | 0 | 288,185 | 0 | 0 | 0 | 288,185 | 0 | 288,185 |
| | | (124) | 0 | (124) | 0 | 0 | 0 | (124) | 0 | (124) |
| | Treated Water Distribution | | | | | | | | | |
| 8 | Lines | 894,486 | 0 | 894,486 | 0 | 0 | 0 | 894,486 | 0 | 894,486 |
| 9 | Pumps | 24,511 | 0 | 24,511 | 0 | 0 | 0 | 24,511 | 0 | 24,511 |
| 10 | Storage | 12,096 | 0 | 12,096 | 0 | 0 | 0 | 12,096 | 0 | 12,096 |
| 11 | Subtotal | 931,093 | 0 | 931,093 | 0 | 0 | 0 | 931,093 | 0 | 931,093 |
| 12 | Fire Protection | (876) | 0 | (876) | 0 | 0 | 0 | (876) | 0 | (876) |
| 13 | Meters | 14,434 | 0 | 14,434 | 0 | 0 | 0 | 14,434 | 0 | 14,434 |
| | Customer Service | | | | | | | | | |
| 14 | Wholesale | 74 | 0 | 74 | 7 | 0 | 7 | 67 | 0 | 67 |
| 15 | Retail | 1,429 | 0 | 1,429 | 0 | 0 | 0 | 1,429 | 0 | 1,429 |
| 16 | Subtotal | 1,503 | 0 | 1,503 | 7 | 0 | 7 | 1,496 | 0 | 1,496 |
| 17 | Other Administration | 6,494 | 0 | 6,494 | 39 | 0 | 39 | 6,455 | 0 | 6,455 |
| 18 | Equipment Pool | 11,268 | 0 | 11,268 | 68 | 0 | 68 | 11,200 | 0 | 11,200 |
| 19 | Total | 2,433,086 | 30,003 | 2,433,089 | 39,126 | 2,760 | 41,886 | 2,363,960 | 27,243 | 2,391,203 |

**A-196**

Schedule K-1-UTW
Dallas Water Utilities
Allocation of Treated Water Rate Base to Wholesale and Retail Service
Test Period 2016
($000)

| Line No | Description | Irving Water Treatment Only | | | Wholesale Treated Water | | | Retail Treated Water | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| | | Total w/o Bachman & White Rock | Bachman & White Rock | Total | Total w/o Bachman & White Rock | Bachman & White Rock | Total | Total w/o Bachman & White Rock | Bachman & White Rock | Total |
| 1 | Raw Water Supply | 0 | 0 | 0 | 101,838 | 0 | 101,838 | 159,085 | 27,243 | 186,328 |
| 2 | Raw Water Transmission | 0 | 0 | 0 | 54,129 | 0 | 54,129 | 110,403 | 0 | 110,403 |
| 3 | S E. Balancing Reservoir | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 |
| | Purification | | | | | | | | | |
| 4 | Elm Fork | 17,848 | 0 | 17,848 | 30,482 | 0 | 30,482 | 62,172 | 0 | 62,172 |
| 5 | All Other | 0 | 0 | - | 189,543 | 0 | 189,543 | 386,593 | 0 | 386,593 |
| | Treated Water Transmission | | | | | | | | | |
| 6 | Inside Only | 0 | 0 | 0 | 94,810 | 0 | 94,810 | 193,375 | 0 | 193,375 |
| 7 | | 0 | 0 | 0 | 0 | 0 | 0 | (124) | 0 | (124) |
| | Treated Water Distribution | | | | | | | | | |
| 8 | Lines | 0 | 0 | 0 | 0 | 0 | 0 | 894,486 | 0 | 894,486 |
| 9 | Pumps | 0 | 0 | 0 | 7,140 | 0 | 7,140 | 17,371 | 0 | 17,371 |
| 10 | Storage | 0 | 0 | 0 | 0 | 0 | 0 | 12,096 | 0 | 12,096 |
| 11 | Subtotal | 0 | 0 | 0 | 7,140 | 0 | 7,140 | 923,953 | 0 | 923,953 |
| 12 | Fire Protection | 0 | 0 | 0 | 0 | 0 | 0 | (876) | 0 | (876) |
| 13 | Meters | 0 | 0 | 0 | 0 | 0 | 0 | 14,434 | 0 | 14,434 |
| | Customer Service | | | | | | | | | |
| 14 | Wholesale | 3 | 0 | 3 | 64 | 0 | 64 | 0 | 0 | 0 |
| 15 | Retail | 0 | 0 | 0 | 0 | 0 | 0 | 1,429 | 0 | 1,429 |
| 16 | Subtotal | 3 | 0 | 3 | 64 | 0 | 64 | 1,429 | 0 | 1,429 |
| 17 | Other Administration | 331 | 0 | 331 | 1,534 | 0 | 1,534 | 4,590 | 0 | 4,590 |
| 18 | Equipment Pool | 575 | 0 | 575 | 2,661 | 0 | 2,661 | 7,964 | 0 | 7,964 |
| 19 | Total | 18,757 | 0 | 18,757 | 482,201 | 0 | 482,201 | 1,863,002 | 27,243 | 1,890,245 |

Note: Total excludes working capital requirements associated with street rental.

**A-197**

**Schedule L - UTW**
**Dallas Water Utilities**
**Allocation Factors for Volume Costs**

| Line No. | Volume | (1) Actual FY 2005 | (2) Actual FY 2006 | (3) Actual FY 2007 | (4) Actual FY 2008 | (5) Actual FY 2009 | (6) Actual FY 2010 | (7) Actual FY 2011 | (8) Actual FY 2012 | (9) Actual FY 2013 | (10) Test Period FY 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Untreated | | | | | | | | | | |
| 1 | Average Day (MGD) | 15.9 | 15.2 | 18.2 | 15.3 | 16.5 | 16.6 | 18.3 | 19.4 | 21.6 | 28.9 |
| 2 | Percent Total | 3.3 | 3.3 | 4.1 | 3.8 | 3.9 | 3.9 | 4.2 | 4.4 | 4.9 | 7.1 |
| | Treated Water | | | | | | | | | | |
| 3 | Average Day (MGD) | 468.6 | 452.0 | 428.6 | 384.9 | 411.0 | 413.5 | 415.5 | 424.9 | 419.0 | 378.5 |
| 4 | Percent Total | 96.7 | 96.7 | 95.9 | 96.2 | 96.1 | 96.1 | 95.8 | 95.6 | 95.1 | 92.9 |
| | Total System | | | | | | | | | | |
| 5 | Average Day (MGD) | 484.5 | 467.2 | 446.8 | 400.2 | 427.5 | 430.1 | 433.8 | 444.3 | 440.6 | 407.4 |

MGD - Million Gallons per Day

**Schedule M - UTW**
**Dallas Water Utilities**
**Reservoir Allocation**
**Untreated Water**
**FY 2016**

| Line No. | | (1) Avg. FY 77/78 MGD | (2) Test Period MGD | (3) 1979 10 Yr. Projection MGD |
|---|---|---|---|---|
| 1 | Untreated Water Customers | 12.6 | 28.91 | 22.4 |
| 2 | Treated Water Customers | 37.1 | 132.1 | 72.0 |
| 3 | Inside City of Dallas | 182.8 | 246.4 | 205.0 |
| 4 | Total | 232.5 | 407.4 | 299.4 |

Note:  Reservoir Allocation = 10 Year Projection + (Test Period Usage - Average Usage for FY 77 and FY 78)

10 Year Projection = (22.4 / 299.4) = 7.5%

Average FY 77 & FY 78 Usage = (12.6 / 232.5) = 5.4%

Test Period Usage = (28.91/407.4) =                          7.10% (See Schedule N - UTW)

Reservoir Allocation = 7.5% + (7.10% - 5.4%) =              9.20% (See Schedule N - UTW)

MGD - Million Gallon Day

Schedule N - UTW
Dallas Water Utilities
Summary of Allocation Factors - Untreated Water
FY 2016

| Line No. | Function | (1) Volume | (2) Untreated Water % Demand | (3) Reservoir | (4) Treated Water % |
|---|---|---|---|---|---|
| 1 | Raw Water Supply) | | | 9.20 | 98.80 |
| | Raw Water Transmission | | | | |
| | Light & Power | | | | |
| 2 | Energy | 7.10 | 0.00 | | 92.90 |
| 3 | Demand-MD | | | | 100.00 |
| 4 | Other Costs | 7.10 | | | 92.90 |
| 5 | Purification | | | | |
| | Chemicals | | | | |
| | Light & Power | | | | 100.00 |
| 6 | Energy | 0.00 | | | 100.00 |
| 7 | Demand-MD | | 0.00 | | 100.00 |
| 6 | Purchased Water | | | | 100.00 |
| 8 | Other Costs | | | | 100.00 |
| | Treated Water Transmission | | | | |
| 9 | Light & Power | | 0.00 | | 100.00 |
| 10 | Other Costs | | | | 100.00 |
| 11 | Treated Water Distribution | | | | 100.00 |
| | Chemicals | | | | |
| | Light & Power | | | | |
| 12 | Energy | 0.00 | 0.00 | | 100.00 |
| 13 | Demand-MD | | | | 100.00 |
| 12 | Lines | | | | 100.00 |
| 14 | Pumps-MH | | 0.00 | | 100.00 |
| 15 | Storage-PH | | 0.00 | | 100.00 |
| 16 | Fire Protection | | 0.00 | | 100.00 |
| 17 | Meters | | | | 100.00 |
| | Customer Service | | | | |
| 18 | Wholesale | | | | 90.00 |
| 19 | Retail | 10.00 | | | 100.00 |
| | Other Administration | | | | |
| 20 | O&M Expenses | 1.14 | 0.00 | 1.18 | 97.67 |
| 21 | Depreciation | 0.83 | 0.00 | 0.41 | 98.76 |
| 22 | Rate Base | 1.21 | 0.00 | 0.52 | 98.27 |
| | Equipment Pool | | | | |
| 23 | O&M Expenses | 1.14 | 0.00 | 1.18 | 97.67 |
| 24 | Depreciation | 0.83 | 0.00 | 0.41 | 98.76 |
| 25 | Rate Base | 1.21 | 0.00 | 0.52 | 98.27 |

MD - Max Day
MH - Max Hour
PH - Peak Hour

### Schedule O - UTW
### Dallas Water Utilities
### Summary Cost of Service - Untreated Water w/ settleup included
### Test Period 2016
### ($000)

| Line No. | Description | (1) Operation and Maintenance Expense | (2) Depreciation Expense | (3) Return on Investment | (4) Total |
|---|---|---|---|---|---|
| 1 | Supply Reservoir | 2,203 | 473 | 1,330 | 4,006 |
| 2 | Raw Water Transmission | 2,225 | 236 | 573 | 3,034 |
| 3 | Wholesale Customer Service | 59 | 0 | 0 | 59 |
| 4 | Other Administration | 0 | 2 | 2 | 4 |
| 5 | Equipment Pool | 0 | 7 | 3 | 10 |
| 6 | Total | 4,487 | 718 | 1,908 | 7,113 |
| 7 | Less Irving Payment Credit | 0 | 0 | 0 | 0 |
| 8 | Total | 4,487 | 718 | 1,908 | 7,113 |

Test Period Volume (MG) 10,552.0
Interruptible Volume (MG) -2,110.4
8,441.6

Cost of Service 7,113.0
Interruptible Revenues -671.0
6,442.0

Non-Interruptible Unit Rate Per 1,000 Gallons $ 0.7631 per 1,000 gallons
Interruptible Unit Rate Per 1,000 Gallons $ 0.3179 per 1,000 gallons

MG - Million Gallons