# Exhibit H

Terry Lowery Deposition Excerpts

1            TERRY LOWERY - 4/7/2017

2        IN THE UNITED STATES BANKRUPTCY COURT

              FOR THE DISTRICT OF DELAWARE

3

     In re:                        )     Chapter 11

4                                  )

     ENERGY FUTURE HOLDINGS        )     Case No.

5    CORPORATION., et al.          )     14-10979(CSS)

                                   )

6          Debtors,               )

                                   )

7

8

9

10

11         ORAL DEPOSITION OF TERRY LOWERY

12              DALLAS, TEXAS

13          Friday, April 7, 2017

14

15

16

17

18

19

20

21

22   Reported by:

23   KIM A. McCANN, RMR, CRR, CSR

24   JOB NO. 122268

25

1              TERRY LOWERY - 4/7/2017

2

3

4                    April 7, 2017

5                     9:56 a.m.

6

7          Oral deposition of TERRY LOWERY, held

8    at the offices Luminant Generation Corporation,

9    LLC, Energy Plaza, 1601 Bryan Street, Dallas,

10   Texas, pursuant to the Federal Rules of

11   Bankruptcy Procedure, before Kim A. McCann,

12   Registered Merit Reporter, Certified Realtime

13   Reporter and Certified Shorthand Reporter in and

14   for the State of Texas.

15

16

17

18

19

20

21

22

23

24

25

1          TERRY LOWERY - 4/7/2017

2   A P P E A R A N C E S:

3       KIRKLAND & ELLIS

          BY:  JUSTIN SOWA, ESQUIRE

4       555 California Street

          San Francisco, California 94104

5       Counsel for Debtors

6

7

8       CITY OF DALLAS, ASSISTANT CITY ATTORNEY

          BY:  MARK BAGGETT, ESQUIRE

9       1500 Marilla Avenue

          Dallas, Texas 75201

10      Counsel for Witness and City of Dallas

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    TERRY LOWERY - 4/7/2017
2                         I N D E X
3                                                    PAGE
4     Examination By Mr. Sowa                           6
5
6                       E X H I B I T S
7
8       NUMBER          DESCRIPTION            PAGE
9     Exhibit 1      Amended Notice of Deposition of    10
                     the City of Dallas, Texas,
10                   30(b)(6) witness
11    Exhibit 2      Declaration of Terry Lowery        13
12    Exhibit 3      City of Dallas' Responses to       14
                     Reorganized TCEH's First Set of
13                   Interrogatories
14    Exhibit 4      Water Supply Contract and          28
                     Conveyance between Sabine River
15                   Authority and City of Dallas and
                     Dallas Power & Light
16
      Exhibit 5      First Supplement to Water Supply   30
17                   Contract and Conveyance between
                     Sabine River Authority and City
18                   of Dallas
19    Exhibit 6      Untreated Water Purchase Contract  30
                     between the City of Dallas and
20                   Luminant
21    Exhibit 7      Original Proof of Claim            32
22    Exhibit 8      Amendment Proof of Claim           32
23    Exhibit 9      Short-term Untreated Water         40
                     Purchase Contract
24
25
```

1

2   TERRY LOWERY - 4/7/2017

| | | |
|---|---|---|
| Exhibit 10. | E-mail dated 5/15/10 from Lakesha Tucker-Baylor to Kim Mireles and Jacqueline Taylor | 47 |
| Exhibit 11 | Sabine River Authority Budget Proposal for 2015 | 57 |
| Exhibit 12 | O&M charge history for Sabine River Authority for Lake Fork water | 75 |
| Exhibit 13 | Chart of the wholesale treated and then untreated water rates going back to 1985 and 1981 | 79 |
| Exhibit 14 | E-mail dated 4/13/10 from Kim Mireles and Jacqueline Culton | 97 |
| Exhibit 15 | Amendment to Certifcate of Adjudication | 106 |
| Exhibit 16 | Short-term contract with North Texas Municipal Water District for the sale of untreated water | 113 |
| Exhibit 17 | E-mail dated 9/22/16 from Jacqueline Culton to Terry Lowery re City of Crandall | 119 |
| Exhibit 18 | Meeting Minutes Town of Sunnyvale | 126 |
| Exhibit 19 | Response of the City of Dallas, Texas in Opposition to the Objection of Energy Future Holdings Corp., et al. To Proof of Claim No. 13319 | 144 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          TERRY LOWERY - 4/7/2017

2          THE WITNESS:  Right.

3          Q.  Yes.  Yes, right.  I'm not asking you

4     to divulge any conversations with counsel that's

5     privileged.  But just a "yes" or "no" as to

6     whether you've been consulted with regard to any

7     decision making related to the litigation?

8          A.  Yes.

9          Q.  Okay.  I would like to give you some

10    of the agreements that we're going to be talking

11    about, just to make sure that we're on the same

12    page and we are looking at the same things.

13    Okay.  And we'll come back to these.  So you'll

14    want to maybe label it, keep it organized, if you

15    can.

16          MR. SOWA:  I think we're up to LUM 4.

17          (Exhibit 4 was marked.)

18          Q.  Do you recognize this document,

19    Ms. Lowery?

20          A.  Yes.

21          Q.  What is it?

22          A.  It is a contract.  Is this the '81

23    contract?

24          Q.  And if you'll look at -- towards the

25    end, there's a date on it.

1      TERRY LOWERY - 4/7/2017

2          A.   Yes, it's the 1981 contract, the SRA.

3          Q.   And who's this agreement between, if

4      you'll look at the first page?

5          A.   City of Dallas and the Sabine River

6      Authority and so also the power company and

7      whichever name thereof.

8          Q.   And you understand that at least one

9      of these entities is at least a predecessor to

10     Luminant?

11         A.   Yes, I do.

12         Q.   So is this the original agreement

13     that generally governs the Lake Fork Reservoir?

14         A.   It appears to be.

15         Q.   Now, I believe you were not working

16     at the City at the time that this was negotiated,

17     right?

18         A.   No, I was not.

19         Q.   But you're generally familiar with

20     this agreement?

21         A.   Very generally, yes.

22         Q.   Have you reviewed it?  I know you

23     said you reviewed it in preparation for this

24     deposition?

25         A.   I didn't read the whole thing.

1           TERRY LOWERY - 4/7/2017

2           Q.  Have you seen it before?

3           A.  I've seen it.  Have I read it in

4       detail, no, I have not.

5           MR. SOWA:  This one's going to be LUM

6       5.

7           (Exhibit 5 was marked.)

8           Q.  Do you recognize this?

9           A.  Yes.

10          Q.  What is this?

11          A.  This is the first supplement to the

12      aforementioned contract.

13          Q.  Do you know what changed between the

14      original contract and the supplement?

15          A.  My understanding is the amount of

16      water that was available changed.

17          Q.  Any idea why that changed?

18          A.  No, sir, I don't know.

19          Q.  And I'm going to hand you what we'll

20      mark LUM 6.

21          (Exhibit 6 was marked.)

22          Q.  Can you take a moment to review that?

23          (Witness reviewing document.)

24          Q.  Do you recognize the document?

25          A.  Yes, I do.

```
 1              TERRY LOWERY - 4/7/2017
 2         Q.  What do you recognize it to be?
 3         A.  I recognize it to be the Untreated
 4    Water Purchase Contract between the City of
 5    Dallas and Luminant.
 6         Q.  And this was entered into in early
 7    2011, I believe.
 8              Does that sound right?
 9         A.  Yes.
10         Q.  And were you involved in the
11    negotiation of this agreement?
12         A.  I may have sat in meetings, but no.
13         Q.  I think you may have testified
14    earlier that you had -- you were new on the job
15    at this point and may have been around but not an
16    active participant in the negotiations.  Is that
17    accurate?
18         A.  That would be accurate.
19         Q.  Since then, have you become familiar
20    with this agreement?
21         A.  More familiar, yes.
22         Q.  And you've reviewed this in
23    preparation for your deposition today?
24         A.  I read through it.
25         Q.  But you've seen it before then, too?
```

Page 32

1              TERRY LOWERY - 4/7/2017

2          A.  Yes, I have.

3          Q.  Okay.  I'm going to hand you two more

4      documents.  The larger one will be LUM 7.

5              (Exhibit 7 was marked.)

6          Q.  And then the smaller one will be LUM

7      8.

8              (Exhibit 8 was marked.)

9          Q.  Do you know what these are?

10         A.  No.

11         Q.  So you haven't seen these documents

12     before?

13         A.  I don't --

14         Q.  You don't have to look through all

15     the attachments.

16         A.  Don't -- if I have, I don't remember.

17         Q.  So you understand that the City

18     brought a claim in Luminant's bankruptcy,

19     correct?

20         A.  Yes.

21         Q.  And do you understand that you need

22     to file a document in the bankruptcy court to

23     mark that claim?  Do you understand that?

24         A.  Yes.

25         Q.  Okay.  Do you know that's called a

TERRY LOWERY - 4/7/2017

1

2      "Proof of Claim"?

3             A.  If you say so.

4             Q.  If I represent to you that these are

5      the original and then the amendment proof of

6      claim filed by the City in Luminant's bankruptcy,

7      would you agree that that's a accurate

8      description of these documents?

9             A.  To my knowledge, yes.

10            Q.  That's all right.  You haven't seen

11     them before.  That's -- we can note that and move

12     on.

13            A.  Okay.

14            Q.  Okay.  So I would like to ask some

15     questions about the agreements between the City

16     and SRA and the City and Luminant that we just

17     looked at a moment ago.

18            A.  Okay.

19            Q.  Can you give an understanding between

20     the relationship between the City of Dallas and

21     the Sabine River Authority?

22            A.  Two contracts:  One for Lake Fork and

23     one for Lake Tawakoni.  Dallas entered into the

24     contract in 1981.  My understanding is that

25     originally the power company, TUGCO, whomever,

```
1              TERRY LOWERY - 4/7/2017
2     and the Sabine River Authority were going to do
3     the joint venture.  The power company didn't want
4     it or didn't want to continue, and Dallas was
5     asked if they wanted to participate and we chose
6     to.
7              My understanding is that Dallas paid
8     100 percent of the debt service, including paying
9     back TUGCO for what they already paid for the
10    construction of the reservoir.  So we paid
11    100 percent of the costs associated with
12    construction of the reservoir, and per the 1981
13    contract, we're entitled to 74 percent of the
14    water in the reservoir, and in exchange would pay
15    74 percent of the operating and maintenance of
16    the reservoir.
17         Q.  Who pays the other 26?
18         A.  I don't know for a fact.  There are
19    other contracts that the Sabine River Authority
20    has.  So it would be for revenue that they
21    receive.
22         Q.  Can you take a look at the
23    interrogatory responses, which was Exhibit 3?
24         A.  Okay.
25         Q.  Can we look at Interrogatory No. 7?
```

Page 35

TERRY LOWERY - 4/7/2017

2    A.   All right.

3    Q.   If you'll look at the response, the

4  second sentence reads, "By dedicating its Sabine

5  River basin allotment to the Debtor, and

6  utilizing the rest of the water out of the basin,

7  the City fulfilled its purpose of investing in

8  Lake Fork."

9         Do you see that?

10   A.   Yes.

11   Q.   What's the meaning of saying the

12  water is dedicated to the Debtor, which I take to

13  be Luminant here?

14   A.   Dallas has rights to 131,860 acre

15  feet.   Per those contracts, only 120,000 acre

16  feet can leave the Sabine River basin and move to

17  the Trinity basin.   There was 11,860 that had to

18  remain in the basin.

19   Q.   I understand that.   But what -- what

20  does it mean that the water is dedicated to

21  Luminant?

22   A.   We have 11,860 acre feet that remain

23  in the basin.   Our contract with Luminant was for

24  12,000 acre feet, which in the contract it states

25  it will move -- it's Sabine water that will move

1          TERRY LOWERY - 4/7/2017

2     to Lake Fork through a diversion with Sabine

3     River Authority.

4          Q.  So by "dedicated," does that just

5     mean you have a contractual agreement with

6     Luminant or by Luminant's entitled to 12,000 acre

7     feet of water?

8          A.  Yes.

9          Q.  And what does it mean where you say

10    that "the City fulfilled its purpose of investing

11    in Lake Fork"?

12         A.  We -- the purpose is for water supply

13    for Dallas' water system.  That allowed us to

14    bring 120,000 acre feet to our water supply

15    system to provide water to our customers.

16         Q.  And that was --

17         A.  That was the purpose of the contract

18    and the purpose of the water rights agreements.

19         Q.  Now, what's the origin of the 11,860

20    acre feet -- let me strike that.  Let me ask that

21    question again.

22              You said that the City is -- has

23    rights to 74 percent of the water in the Lake

24    Fork reservoir; is that right?

25         A.  From the original 1981 contract, yes.

1                TERRY LOWERY - 4/7/2017

2   time.  So "dispute" I guess it -- for me it would

3   be when they set a rate.

4         Q.  And when did that happen?

5         A.  That was in October of 2014.

6         Q.  Okay.  And that's when they

7   unilaterally set a rate?

8         A.  Yes.

9         Q.  And what was that rate for?

10         A.  It was for -- for -- do you mean --

11   would you clarify, do you mean the amount?

12         Q.  What -- the rate for what?

13         A.  It was for the entire 131,860 acre

14   feet.

15         Q.  So the water --

16         A.  All of the water in the contract.

17         Q.  And now can you explain, the City

18   pays the SRA a certain rate for the water in Lake

19   Fork?

20         A.  We pay a percentage for their O&M

21   water for Lake Fork.  We pay a percentage of the

22   charges for all O&M charges for the reservoir at

23   Lake Fork.  Those are included in the O&M budget.

24   So we don't pay a per-thousand-gallon, we pay a

25   percent.

Page 44

1              TERRY LOWERY - 4/7/2017
2         Q.   And is that what you meant by "rate"?
3         A.   No.
4         Q.   The rate, that was set at something
5    different?
6         A.   They set a rate but they set a
7    percent per-thousand-gallon rate.
8         Q.   And that per-thousand-gallon rate,
9    the City passes on to its customers.
10        A.   (No verbal response.)
11        Q.   Why don't you, in your own words,
12   explain to me the relationship between the SRA
13   rate and the City of Dallas' water rate?
14        A.   How do you mean -- I'm sorry.  I'm
15   not trying to be dense.  How do you mean that?
16        Q.   No, I understand.  So you said that
17   you understood the dispute with the SRA to begin
18   when they set a rate unilaterally, right?
19        A.   Right.
20        Q.   I'm asking how that rate ties to the
21   rate that Luminant pays, for example?
22        A.   They set the same rate
23   per-thousand-gallons.  They use Dallas' rate that
24   we charge to our wholesale customers.
25        Q.   Okay.  Can you explain that?  The --

1          TERRY LOWERY - 4/7/2017

2     just explain to me, I think I'm just missing the

3     connection.

4          A.   Yeah, I think I'm being dense.  Try

5     again, please.

6          Q.   All right.  So let's take it one

7     piece at a time.

8          A.   Deal.

9          Q.   What's the agreement between the City

10    of Dallas and the Sabine River Authority?  What

11    is that agreement called?

12         A.   I call it the SRA contract.

13         Q.   And what does the SRA contract govern

14    then?

15         A.   It governs the management and what

16    the City of Dallas pays for the water that --

17    rights that we have in the Sabine river.

18         Q.   Okay.

19         A.   And that right at Lake Fork.

20         Q.   Now, what does the City of Dallas pay

21    for the water rights to the water in Lake Fork?

22         A.   Per the contract, we pay 100 percent

23    of the costs for the construction and then we pay

24    74 percent service charge annually that covers

25    their -- their operating and capital expenses to

1              TERRY LOWERY - 4/7/2017

2     maintain and operate the reservoir.

3              Q.   Okay.   What does the contract say

4     about a rate?

5              A.   There is language in Section 6.02

6     about additional compensation to be agreed upon

7     -- mutually agreed upon.   The Sabine River

8     Authority established a rate in October of 2014

9     of 56.13 cents per thousand gallons on a

10    take-or-pay basis for the entire 131,860 acre

11    feet in Lake Fork.

12             Q.   And what was the City of Dallas'

13    position with regard to the SRA setting that

14    rate?

15             A.   The -- it became a legal issue.

16             Q.   Okay.   Is it your understanding,

17    though, that the SRA contract does not actually

18    allow the SRA to set a rate unilaterally,

19    correct?

20             A.   To my understanding, and I'm not an

21    attorney, the language is mutually agreeable.

22             Q.   Right.

23             A.   And that was not.

24             Q.   So what did the City do when the SRA

25    took those steps?

1          TERRY LOWERY - 4/7/2017

2          Q.   Sort of.  And do you remember when

3     the new higher rate went into effect, the City's

4     rate for untreated wholesale water?

5          A.   Our rates --

6               MR. BAGGETT:  Can you be more

7     specific, please?

8               MR. SOWA:  With regard to which part?

9               MR. BAGGETT:  When you said -- what

10    time frame are we talking about?

11          Q.   Fair.  So in fall of 2015, is it true

12    that the City set a new rate and it was higher

13    than the prior year's rate?

14          A.   That is correct.  And it was

15    established in the summer of 2015.

16          Q.   What do you mean by "established"?

17          A.   Through our cost-of-service process.

18          Q.   Okay.  I want to go -- get into that

19    in just a second.

20               But first, I want to establish when

21    those rates became effective?

22          A.   October 1st, which is the first day

23    of our fiscal year.

24          Q.   So that was after the effective date

25    of the rejection of the contract?

1               TERRY LOWERY - 4/7/2017

2      A.  Yes.

3      Q.  Okay.

4          MR. SOWA:  Going for an hour, do you

5 want to take a break or keep going?

6          MR. BAGGETT:  It's totally up to you.

7          THE WITNESS:  I'm fine.

8          MR. SOWA:  Let's take a minute.  This

9 is a decent breaking spot.  So...

10         THE WITNESS:  Okay.

11        (Break from 10:57 a.m. to 11:04 a.m.)

12      Q.  (BY MR. SOWA) Okay.  You started

13 getting into the -- the rate-making process,

14 which I would like to sort of walk through to

15 make sure I understand all of that.

16        So to start, can you just give me --

17 in your words, describe the process the City uses

18 to set its rate for wholesale of water?

19      A.  Sure.  Annually we perform wholesale

20 cost-of-service studies for water, treated and

21 untreated, and for wastewater.  The process

22 usually begins January where we start gathering

23 data from the year before and the cost-of-service

24 studies has -- there's an MOA attached to the

25 treated water contract, a similar exhibit to the

1    TERRY LOWERY - 4/7/2017

2    untreated and the wastewater contract that use

3    the same principles to establish the process for

4    the cost-of-service studies.  So it's agreed-upon

5    methodology between Dallas and all its customers.

6         Our -- our cost-of-service study

7    recovers rates retroactively.  So, for instance,

8    the rates that went into effect October 1, 2016,

9    recovered costs for fiscal year 2016.  They are

10   not intended to cover -- recover costs for 2017.

11   So we retroactively recover our costs.

12         So when we perform the

13   cost-of-service study that will be -- we -- we do

14   our base year is the prior fiscal year, and then

15   the test period is the current year that we're

16   in.  And it will project -- it will have actual

17   data for the first six months of the year, and

18   then the last six months of the year are adjusted

19   for any adjustments during that year that you

20   know are going to occur.  It can't be what's

21   going to happen next year.  It's got to be this

22   year.

23         And then there are allocation factors

24   for average day cost, the maximum day cost, and

25   that determines how much the customers pay.

1    TERRY LOWERY - 4/7/2017

2              The information is provided in a

3    binder -- the financial information in the flow

4    chart of the cost comparing the current year with

5    the prior years and sent out to the wholesale

6    customers for review.  They provide questions and

7    comments back, we respond to those.  We have a

8    meeting with -- we have a wholesale water rate

9    subcommittee and a wastewater rate subcommittee

10   that reviews this in detail.  They send in

11   questions.  Anyone can send in questions.  We

12   compile the questions and respond.

13             Then we have a meeting and we go over

14   changes that occurred, what the rates are going

15   to be, any issues that the customer may have or

16   concerns.  We'll go away and answer those

17   questions, and then we'll send out the

18   preliminary rates in July with the

19   cost-of-service study, and then so that gives the

20   customers time to review those proposed rates

21   that would go into effect October 1st and then

22   they're adopted as part of the City's budget

23   process.

24             Q.  So I want to look at another document

25   here.

Page 57

1          TERRY LOWERY - 4/7/2017

2          MR. SOWA:  This will be LUM 11.

3          (Exhibit 11 was marked.)

4     Q.   What is this document?

5     A.   This is Sabine River Authority budget

6  proposal for -- I guess this is for '15?

7     Q.   '15, yeah.

8     A.   Part of the process with the Sabine

9  River Authority, as I mentioned earlier, is we

10 pay 74 percent of their water in Lake Fork and

11 80 percent of the water in Tawakoni.  So they

12 meet with us annually, usually in July, to go

13 over their budget and any changes that have

14 occurred in that budget and what -- what caused

15 them.  And then typically we say "thank you very

16 much," and we both go our separate ways.  And

17 then that's what we get billed on.

18     Q.   So is that -- do those costs get

19 passed on to the City's customers?

20     A.   Those costs are included in our

21 costs.  This would be -- are you referring to our

22 wholesale customers?  Let me --

23     Q.   Yes.

24     A.   -- if they are a shared cost.

25 They're functionalized costs.  All of the

Page 58

1       TERRY LOWERY - 4/7/2017

2    Utility's costs are functionalized.  And if it is

3    a cost that is benefited to our customers, then

4    they are shared on an allocated basis.  If it is

5    a cost that the customer receives no benefit

6    from, the wholesale customers, then it is

7    excluded and considered an inside-only cost.

8         Q.  So what types of things would be

9    inside-only costs?

10        A.  For treated water distribution lines,

11   they typically go out into neighborhoods, the

12   wholesale customers receive no benefit from those

13   lines.  So all costs associated with building,

14   operating, maintaining those lines are excluded.

15   They're considered an inside-only cost.  Our

16   retail billing cost, they receive no benefit from

17   that, so they don't pay those costs.

18        Q.  And -- keep going.  Sorry.

19        A.  So that the costs are allocated based

20   on whether or not there is a benefit received

21   from the customers.

22        Q.  And which sort of costs do benefit

23   the customers and are thus recoverable from them?

24        A.  Raw water supply, raw water

25   transmission, for treated water, it would be

A-358

1          TERRY LOWERY - 4/7/2017

2     purification, transmission -- wholesale services,

3     they do pay for wholesale services, but it's a

4     small group that exclusively deals with wholesale

5     customers.

6          Q.  Now, as part of this rate-setting

7     process, customers are able to submit comments to

8     the City, right?

9          A.  Yes.

10          Q.  So how does that process work, the

11     customer feedback process?

12          A.  Well, there's the -- occasionally we

13     get off-the-cuff comments.  A few weeks ago, "I

14     haven't heard about the SRA case.  Where is that

15     now?"

16          We're like, "It's pending.  We're

17     still where we are."

18          Q.  Right.

19          A.  But typically the way it works is we

20     send out the binder that has the financial data

21     from the prior year.  It has our test data, it

22     has where things have varied and why in the

23     different cost centers, and then we ask the

24     customers to provide us comments and concerns.

25          Q.  And when does that binder get sent

1          TERRY LOWERY - 4/7/2017

2     out?

3          A.   I noticed in your request for

4     admissions you did not like "typically," but

5     typically it goes out in the first part of June.

6     We use data through March, and sometimes,

7     depending on the City's financial system when

8     closing, what's close, typically goes out the

9     first week in June.  The binder will go out with

10    the information and they have 10 days to two

11    weeks to provide us questions and that -- and

12    areas of concern.  And then we will send out

13    responses and then we schedule a meeting with the

14    rate subcommittees.  And they can bring

15    additional questions, and sometimes in discussing

16    that study in a meeting, additional questions

17    will come up and then we'll respond to those.

18               And those are all -- the goal is to

19    have those all resolved before 30 days before the

20    council adopts the ordinance with the rates in

21    them.  They've already been proposed.  The

22    original is proposed in June, finalized in July,

23    out for comment.  At that point any issues are

24    typically resolved.

25          Q.   So what kinds of questions do

1          TERRY LOWERY - 4/7/2017

2    customers ask?

3          A.   Their favorite is why did it go up.

4    They don't typically ask when it goes down.

5    There's some of them that we've had some

6    increases in raw water supply because of the SRA

7    rate case.  So there's been quite a few questions

8    about those.

9          Occasionally there's questions we're

10   also building a pipeline, raw water pipeline.  So

11   our raw water transmission costs have gone up.

12   There's been questions about that -- how much is

13   it going to be?  What's the timing on it?  It

14   just varies.  And because ours is based on the

15   prior year base year, maybe one year we have a

16   lot of expense in the major tools category

17   because we did work somewhere that maybe the

18   prior year we didn't.  So it went up that year,

19   and will probably go down in another expense

20   area.  It's basically why did it change.

21         Q.   Can you recall any circumstances

22   where the rate that the City ultimately set was

23   different from the rate that the City initially

24   proposed?

25         A.   In the preliminary proposals, there

1          TERRY LOWERY - 4/7/2017

2     have been times in the past where somebody found

3     a typo or a numerical error.  And as I tell the

4     committee, that's their job.  You know, there's a

5     lot of numbers in there.  We look for you to find

6     this stuff.  You know, we look at it and try not

7     to make a mistake, but we want your help.

8               So if somebody finds a numerical

9     issue, then that may be corrected.  But beyond

10    that -- and that would be prior to the July

11    sending out.  But beyond that, no.

12          Q.   Okay.  So there's never been a case

13    where a customer has, say, disagreed with the

14    methodology used with the rate and you changed

15    the rate as a result of that?

16          A.   No.  Our methodology is laid out.  We

17    -- this 2010 memorandum of agreement, it was at

18    least two, possibly a three-year collaborative

19    effort with all of our wholesale customers.  We

20    included our untreated customers, our wastewater

21    customers, we went through the prior methodology,

22    we went through the prior memorandum of

23    agreement.  All the City signed off on it.  So we

24    have -- it's a very transparent process that

25    we're kind of in it together.

1          TERRY LOWERY - 4/7/2017

2          Q.   But at the time that the proposed

3    rates are sent to the customers in -- when is

4    that in the spring or the summer?

5          A.   The proposed rates typically go with

6    the June binder.

7          Q.   Okay.  But by the time those rates

8    are distributed to customers in -- did you say

9    June or July?

10          A.   June.

11          Q.   June, yeah.

12          A.   It's the 1st.

13          Q.   The rate is unlikely to change?

14          A.   Yes, it is unlikely to change, unless

15    somebody made just a mistake.

16          Q.   Absent a typo or a miscalculation --

17          A.   Right.

18          Q.   -- the rates are essentially locked?

19          A.   And I have walked into the office and

20    heard from my employees, "We found a mistake."

21              And I'm, like, "Okay.  Guys, we need

22    to correct this," and we correct it before our

23    June meeting.

24          Q.   So what gets discussed in the

25    subcommittee meetings?

Page 64

1      TERRY LOWERY - 4/7/2017
2          A.  What changed, what's going on with
3      the utility, where are we on the integrated
4      pipeline project, are there any major changes
5      coming up.  We -- you know, a few years ago, we
6      made a change -- it's probably been more than a
7      few years ago now.  We provide a flow chart where
8      you can see the cost and how they get allocated
9      out.  And so somebody said, "Gee, it would be
10     nice if we could see -- compare it."
11         So now we put the prior year's number
12     above the flow chart so it improves the process.
13         Q.  Is it fair to say that the goal of
14     this process with the customers and the
15     subcommittees is to help them understand why the
16     rate ended up where it is?
17         A.  Yes.  It's understanding and it's
18     also an impact to them, we want them to be
19     comfortable with what we're doing, and as I said,
20     I appreciate more eyes because I want it to be
21     right.
22         Q.  But if a customer is uncomfortable
23     with the number but there's no error in
24     calculation or typos, is there anything they can
25     do about it?

A-364

1          TERRY LOWERY - 4/7/2017

2          A.   The -- there are -- there's -- there

3     is an option in the memorandum of agreement if

4     everybody agrees to change the methodology, which

5     has happened in the past if -- years back, there

6     hasn't been a change in a long time since we did

7     the 2010 -- then everybody can say, okay, we've

8     always calculated average day this way.  That

9     doesn't make sense anymore, let's do it this way.

10          And so there's a place in the back of

11    the study that says -- for documents any changes

12    that have been made in the process.  But when

13    that memorandum of agreement is adopted, the

14    first study that is performed based off of that

15    memorandum, that's considered the methodology

16    going forward.  We don't change it.

17          Q.   Okay.

18          A.   We don't have the right to change it

19    without agreement, which probably keeps --

20          Q.   Sure.

21          A.   -- discord down because it's

22    something we've all agreed to.

23          Q.   Right.  So just to summarize.  You

24    apply the methodology that everyone's agreed to?

25          A.   Yes.

Page 66

1            TERRY LOWERY - 4/7/2017
2          Q.  You use that to generate the proposed
3   rate, which goes out in June?
4          A.  Yes.
5          Q.  There are opportunities for customers
6   to talk to the City, to meet with the City to
7   understand how that rate came to be, correct?
8          A.  Yes.
9          Q.  But it is, absent a typo or a
10  miscalculation, the rate is not going to change
11  between June and September?
12         A.  Correct.
13         Q.  Do you recall whether Luminant ever
14  participated in those meetings or discussions?
15         A.  Luminant was not on the subcommittee.
16  I know Luminant has received correspondence from
17  them.
18         Q.  What is the -- the subcommittee of
19  wholesale customers?
20         A.  We have a water subcommittee and we
21  have a wastewater subcommittee, and their task is
22  to review the costs, to review the methodology,
23  to look for errors, to look for things that stand
24  out as "That doesn't look right to me.  Why is it
25  like that?"  So that's their job.

1          TERRY LOWERY - 4/7/2017

2          Q.  Okay.

3          A.  So each subcommittee has a chair that

4    is responsible for those duties, and they meet

5    with us and they go over these.  There are

6    treated water and untreated water customers on

7    the water subcommittee and there's wastewater

8    customers.  And we meet with them as a group.  So

9    they represent all the customers.  They're their

10   voice.

11         Q.  And Luminant's not a member?

12         A.  No.

13         Q.  Focusing on the 2015 rate-setting

14   process --

15         A.  Okay.

16         Q.  -- which I'm sure was a particularly

17   fun one for you.  But did -- did you get --

18              MR. BAGGETT:  Just, if I can.  The

19   City has a fiscal year from October 1st.  So

20   could we be specific when we say 2015, are we

21   talking about the 2015-2016 fiscal year or 2014.

22         Q.  So when I say 2015, I mean the -- the

23   packet that was mailed in June of 2015.

24         A.  Okay.

25         Q.  So I guess that would be --

Page 68

TERRY LOWERY - 4/7/2017

1
2          A.   That would be the 2015 study for the
3    2016 rates.
4          Q.   And is that the one that first
5    incorporated that increased SRA rate?
6          A.   Yes, it is.
7          Q.   Did you get any negative feedback
8    from customers during that rate-setting process?
9          A.   Towards the City of Dallas?
10         Q.   Uh-huh.
11         A.   No.
12         Q.   Towards the SRA?
13         A.   Considerable.
14         Q.   Did any customer propose a way that
15   the rate could be lower?
16         A.   No.
17         Q.   Is there any way that the rate could
18   have been lower than what you set?
19         A.   Based on the costs, no.
20         Q.   Right.  So what did you tell the
21   customers who were upset with the SRA?
22         A.   We sent out a letter in May.  It
23   seems like we sent out another letter in July --
24   June or July, I believe, to communicate with them
25   because the SRA had sent our customers a letter.

A-368

Page 69

TERRY LOWERY - 4/7/2017

1

2    I don't know if they sent Luminant a letter or

3    not, but they sent our customers a letter

4    describing that if only Dallas were reasonable,

5    they wouldn't have to pay all these costs.  And

6    it kind of backfired because -- because our

7    customers are so aware of our process, they knew

8    that they'd been paying those costs, that Sabine

9    River Authority had not paid the cost of

10   construction, they had paid for it in their

11   rates.  So it really did not work well.  They

12   were pretty furious actually and wanted to help.

13        Q.  What do you mean they "wanted to

14   help"?

15        A.  If there was any way they could

16   support -- support us in this issue.

17        Q.  So in the litigation?

18        A.  Yes.

19        Q.  The dispute?

20        A.  Yes.

21        Q.  But there was nothing that could be

22   done about the rate that was set?

23        A.  No.  Our methodology is -- is

24   established.

25        Q.  And it incorporates the SRA costs?

1          TERRY LOWERY - 4/7/2017

2          A.   That is a cost of raw water supply.

3     So it's an included cost.

4          Q.   Okay.   Does the City make predictions

5     as to future rates?

6          A.   Sometimes we'll generalize, but we

7     try not to.   It's a very variable situation, and

8     until recently when there have been some cost

9     drivers that have increased, our water supply was

10    pretty established.   So it's fairly flat.   And we

11    did not -- I think we did a general trend, it

12    goes up about 2 percent a year.   And I track

13    that, take a look at the IPL and the impacts of

14    that.   But typically, no, we don't.

15         Q.   And are you continuing to project 2

16    percent per year, generally speaking, in looking

17    forward?

18         A.   I do in my rate matrix, but it's just

19    as a placeholder.   It can vary.   Sometimes it

20    goes down, wastewater goes up and down.   So they

21    do vary.

22         Q.   So I think you noted in your

23    declaration that water rates have been trending

24    upward for the last several years?

25         A.   Yes, they have.

1              TERRY LOWERY - 4/7/2017

2         Q.  And -- and I think you note that

3    that's because, setting aside the SRA, it's

4    because of certain infrastructure costs that the

5    City has been incurring?

6         A.  Yes.

7         Q.  Now, those costs aren't specifically

8    related to Lake Fork, right?

9         A.  No.

10        Q.  Because you've spread the costs

11   across all the customers?

12        A.  We do a system rate.

13        Q.  Do you have your declaration in front

14   of you?

15        A.  Somewhere.  Here it is.

16        Q.  So that's Exhibit 2.  So if you'll

17   look at paragraph 13, if you want to just read

18   that to yourself.

19            (Witness complies.)

20        Q.  So in this paragraph you say that

21   "Although the water from Lake Fork comprises only

22   just over 21 percent of Dallas' connected water

23   supply, the compensation increase imposed by the

24   Sabine River Authority with respect to Lake Fork

25   water is included in the wholesale rate charged

1                TERRY LOWERY - 4/7/2017
2     to all wholesale customers regardless of whether
3     the water is drawn entirely, partially, or not at
4     all from Lake Fork."  Right?
5          A.  Right.
6          Q.  So you're saying that -- you go on to
7     say that this provides a benefit to Luminant
8     because they don't have to solely saddle their
9     share of the SRA costs?
10         A.  Yes.
11         Q.  Is that fair?
12         A.  That's fair.
13         Q.  You said these other infrastructure
14    expenses that have causes rates to trend upward
15    do not relate to Lake Fork, right?
16         A.  Correct, they do not.
17         Q.  But those costs were also baked into
18    the rate that Luminant paid, correct?
19         A.  They are in the rate.
20         Q.  So all expenses get spread across?
21         A.  Across the system, yes.
22         Q.  So some of them are going to be a
23    benefit to certain customers and some of them are
24    going to be a detriment to certain customers.  Is
25    that fair to say?

1            TERRY LOWERY - 4/7/2017

2       A.   I would not agree that -- that

3   they're detrimental.  It benefits the system, it

4   benefits all of us.

5       Q.   So, sure.  The costs are the things

6   that are necessary for the whole system to

7   function; is that right?

8       A.   Correct.

9       Q.   So those costs get distributed across

10  everyone?

11      A.   Yes.

12      Q.   But that's still -- Luminant only

13  procures water from the City from Lake Fork,

14  right?  That may not be true.  Is that true?

15      A.   That's not totally true.  There is a

16  contract from Ray Hubbard as well.

17      Q.   Okay.

18      A.   And there used to be one at

19  Northlake.

20      Q.   And what's the nature of the Lake Ray

21  Hubbard contract with Luminant?

22      A.   It was just signed in February.  It's

23  a short-term contract for untreated water for the

24  steam plant.

25      Q.   Do you know how much water is subject

1           TERRY LOWERY - 4/7/2017
2     to that, roughly?
3           A.   No, I don't.   It's whatever the
4     limitation -- it may be -- no, I don't.
5           Q.   Is it around the same as the Lake
6     Fork contract?
7           A.   No, sir.   It's a smaller amount.   So
8     I'm looking at Kim -- I'm looking at Kim to
9     remind me.   It's a small amount.
10          Q.   So generally Luminant is getting
11    water in Dallas through these sort of specific
12    contracts, right?
13          A.   Correct.
14          Q.   There's a couple of contracts?
15          A.   Correct.
16          Q.   So Luminant doesn't really use most
17    of Dallas' water infrastructure, right?
18          A.   Correct.
19          Q.   So work that the City does on
20    infrastructure improvements, you know, in the
21    City or in the Trinity River basin area, that
22    doesn't really benefit Luminant, does it?
23          A.   If it is untreated water that comes
24    into the system, there's infrastructure that --
25    you would have to specify what kind of

1          TERRY LOWERY - 4/7/2017

2    down, right?

3          A.  Yes, I would -- haven't performed a

4    cost-of-service study, but that is $24 million

5    out of cost immediately.  Although, there are

6    whatever the settlement is or however it goes

7    forward, but at least that, yes.

8          Q.  So looking at the rates, while, you

9    know, since 2000, it seems they've ranged from,

10   what, 41 cents through -- you know, through 2015

11   to 56 cents, and then there's a jump to 83 cents

12   in 2015, right?

13         A.  Yes.

14         Q.  And that was as a result of the SRA

15   setting its new rates?

16         A.  The largest portion of it, yes.

17         Q.  And were the City to -- again, to

18   prevail in the SRA litigation, it's possible the

19   rate would return back down to more like the 2014

20   level?

21         A.  It would be higher.

22         Q.  Higher than 2014, but lower than

23   2015?

24         A.  Yes.

25         Q.  All right.  Why don't we change gears

1          TERRY LOWERY - 4/7/2017

2     the time the contract was rejected?

3          A.   Okay.   I get that that's your

4     position.

5          Q.   Yes.   And the City's position is the

6     rate you should use is the current rate, right?

7          A.   Yes.

8          Q.   And obviously the City feels strongly

9     enough about that difference to engage in this

10    litigation, right?

11         A.   Yes.

12         Q.   Yes.   And if the City does not

13    prevail, if Luminant prevails, then the City will

14    be paid for the next two years at the old rate,

15    not the new rate.   Do you understand that?

16         A.   What I do understand is that the rate

17    that was set for October 1, 2015, recovered costs

18    that occurred during the year prior.   So those

19    rates are retroactive.   Those costs have already

20    been incurred and they were incurred prior to the

21    contract being.

22         Q.   So if Luminant ends up paying the

23    City at the old rate and not the new rate, then

24    those costs will not end up being covered in

25    full, right?

Page 142

TERRY LOWERY - 4/7/2017

2  A.  Right.  Because they're paying a year

3  behind.

4  Q.  Right.  And the City is not making

5  efforts to sell $3.5 million worth of water,

6  right?

7  A.  The City is not making efforts to

8  sell water that it cannot move out of the Sabine

9  River basin, that is correct.

10  Q.  Now that water was subject to a

11  40-year term with Luminant.  So the City was

12  expecting, in fact, to sell that water to

13  Luminant for another, I don't know, 30 years or

14  so?

15  A.  Yes.

16  Q.  Does the City plan on not selling

17  that water for the next 30 years?

18  A.  I have no idea.  That -- that's

19  speculative on what's going to happen in the

20  future.  I do not know the answer to that.

21  Q.  All right.  But you haven't discussed

22  with anyone what you might do with the water in

23  the future?

24  A.  With -- that's a very broad sentence.

25  Q.  With the 12,000 acre feet in Lake

1              TERRY LOWERY - 4/7/2017

2    in escrow?

3          A.   54.4, I believe it is, as of the end

4    of February.

5          Q.   Can you explain what those escrowed

6    funds are -- what are they?

7          A.   They are based on -- we were ordered

8    by the administrative law judge to place in

9    escrow from November 2014 forward, $2,009,768 a

10   month, which is equivalent to the 56.13 cents per

11   thousand gallons for the water in Lake Fork.  It

12   works out to $24.1 million a year.

13         Q.   So you're essentially paying the --

14   is that the difference being the old rate and the

15   new rate with the SRA in escrow?

16         A.   It continues to -- yeah, it is the

17   additional compensation.

18         Q.   Okay.  But you're charging your

19   customers at the higher rate?

20         A.   We are charging our customers the

21   costs we're incurring and that includes funding

22   that escrow.

23         Q.   Right.  So the customers are paying

24   you that amount and you pay that amount then into

25   escrow?

```
1              TERRY LOWERY - 4/7/2017
2         A.   That's --
3         Q.   If I'm oversimplifying --
4         A.   You are oversimplifying.  Our
5    customers pay their rates based on the
6    cost-of-service study.  Part of the moneys that
7    we take in pay our expenses.  One of our expenses
8    is to fund the escrow.  So our wholesale and
9    retail customers are paying through their rates
10   to fund the escrow, yes.
11        Q.   And if the City prevails in its
12   litigation with the SRA --
13        A.   Yes.
14        Q.   -- some or all of those escrowed
15   funds will be returned to the City, correct?
16        A.   Correct.
17        Q.   And presumably that will then be
18   passed on back to your customers?
19        A.   Correct.
20        Q.   Now Luminant is not a customer
21   anymore?
22        A.   Correct.
23        Q.   So Luminant will not get any sort of
24   refund should you win on the SRA litigation in
25   the future?
```

Page 148

1          TERRY LOWERY - 4/7/2017

2          A.   Since they're not a customer, that

3     makes sense, yes.

4          Q.   Right.   But in this litigation, the

5     City is seeking damages based on the rate that

6     includes the funding the escrow, correct?

7          A.   Which is a current expense, yes.

8     That's what it's based on, current expenses.

9          Q.   So if Luminant pays damages at the

10    current rate, the 2016 rate, and then sometime in

11    the future, the City wins its litigation with the

12    SRA, would you agree that the City will get paid

13    twice for those amounts?

14         A.   First of all, that's a lot of ifs.

15    Would you mind giving me the ifs again.

16         Q.   So presume the City prevails in the

17    litigation that we're a part of, the City will be

18    paid two years of damages at the current rate.

19              Do you understand that?

20         A.   We are accruing that money in escrow.

21    We're not spending it.   It's in an escrow fund.

22         Q.   I understand that.   But you're asking

23    Luminant to pay in damages for the two years of

24    the contract; the City is asking Luminant to pay

25    damages based on the current rate?

A-380