1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                    :

                               :     Chapter 11

6    ENERGY FUTURE HOLDINGS    :

     CORP.,  et al.,           :     Case No. 14-10979(CSS)

7                              :

               Debtors.        :     (Jointly Administered)

8    _____:

9

10

11

12                            United States Bankruptcy Court

13                            824 North Market Street

14                            Wilmington, Delaware

15                            March 26, 2021

16                            10:00 AM

17

18

19

20

21

22    B E F O R E :

23    HON CHRISTOPHER S. SONTCHI

24    U.S. BANKRUPTCY JUDGE

25    ECRO OPERATOR:   LESLIE MURIN

1    HEARING re Status Conference

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   KIRKLAND & ELLIS LLP

4       Attorneys for Debtors

5

6   BY:  MARK MCCANE

7       APARNA YENAMANDRA

8

9   RICHARDS LAYTON & FINGER, P.A.

10       Attorneys for Debtors

11

12   BY:  JASON MADRON

13       DANIEL DEFRANCESCHI

14

15   ASHBY & GEDDES, P.A.

16       Attorneys for Interested Party

17

18   BY:  KATHARINA EARLE

19

20   ROPES & GRAY LLP

21       Attorneys for UMB BANK, N.A.

22

23   BY:  GREGG GALARDI

24

25

1    FLEISCHMAN BONNER & ROCCO LLP

2          Attorneys for NextEra Energy

3

4    BY:   KEITH FLEISCHMAN

5          JIM BONNER

6

7    U.S.   TRUSTEE

8

9    BY:   RICHARD SCHEPACARTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Good morning, everybody.  This is

3      Judge Sontchi, we are here on EFH as we approach the 7th

4      anniversary of the petition date.  I have the band back

5      together with some new people, it looks like, as well.

6      Thank you all for being available on relatively short

7      notice.

8              I called this status conference, of course, in --

9      as a reaction or in response to the Third Circuit's decision

10     on the administrative claim of NextEra.  The remand has not

11     actually happened yet, I don't have that on the docket yet,

12     that usually takes -- that can take a little while.

13             The machinery of the government, as you might

14     imagine, doesn't always work so quickly.  But I wanted to

15     get everybody together to talk about how we proceed going

16     forward, what the ideas might be, what the position to the

17     party might be.

18             It looks like, from just perusing the docket this

19     morning, that NextEra may have new counsel or additional

20     counsel who I haven't met yet, so let me just turn it over

21     to the debtors first -- debtors always get to go first in

22     Bankruptcy Court, and then we'll go from there.

23             MR. MCKANE:  Thank you, Your Honor.  Good morning,

24     it's Mark McKane of Kirkland and Ellis.  Can you hear me?

25             THE COURT:  Yes, Sir.

1          MR. MCKANE:  Wonderful.  So, I'm going to appear

2     on behalf of the Planning Administrator Board, I'm joined

3     today by Ms. Yenamandra, Mr. Madron, and Mr. DeFrancesca.  I

4     note Mr. Husnick is unable to join us today and Mr.

5     (indiscernible), but they both send their regards.

6          Your Honor, we've spent the last two weeks talking

7     to various constituencies as debtors are wont to do,

8     including counsel, new counsel for NextEra, counsel

9     (indiscernible), the counsel for the EFIH trustee and EFH

10    trustee, and we even checked in with Mr. (indiscernible) on

11    behalf of the dissolved (indiscernible).  I think it's safe

12    to say that everyone is still digesting the Third Circuit

13    decision and thinking through next steps.

14          And to your point with regard to the mandate, Your

15    Honor, and the remand, the timing for our petition to -- for

16    re-hearing on the opinion has not yet lapsed, I understand

17    that's scheduled to lapse on Monday, and I do expect once

18    that occurs or once that time period passes, that may be the

19    triggering event with regards to the remand.

20          Your Honor, as we discuss potential next steps, I

21    do think it's appropriate to just update you I think -- or

22    really, update the constituents to make sure everyone has a

23    plain page account where we stand as plan administrator,

24    with regard to assets remaining, and then potentially

25    discuss how that may impact next steps.  And specifically,

1    Your Honor, let's just -- we want to start with what --

2    where the plan administrator stands.

3            The plan administrators filed 12 post-confirmation

4    quarterly reports in this case.  Each of which sets out the

5    cash of the PAB withholding as of the end date covered by

6    that report.  The last of the quarter reports was filed on

7    February 1st of this year, that is docket entry 14160,

8    covering the period of time ending the end of last year,

9    12/31/2020.  That report showed that EFH currently held at

10   that time, as of 12/31, 1.142 million dollars.  And that

11   EFIH held at that time, $991,000.

12           Now, Your Honor, as of March 15th, the date that

13   the Third Circuit decision came down, those numbers had been

14   reduced slightly, with EFIH now holding 1.012 million

15   dollars -- excuse me, that's EFH, I apologize.  EFH at 1.012

16   and EFIH at approximately $900,000.  Now, some may ask where

17   did the cash go?  So, we should start by kind of just doing

18   -- reminding the Court, reminding the constituencies, plan

19   administrators do what they do.  They distribute, and the

20   vast majority of the cash that had been held by the PAB have

21   been used for planned distributions.  And when I say vast, I

22   mean the (indiscernible) amount.

23           Since emerging from bankruptcy on March 28th, the

24   plan administrator to -- since the debtors emerged on March

25   2018, the PAB has distributed over 200,000 -- excuse me, 200

1    million dollars to EFH unsecured creditors and approximately

2    800 million to EFIH unsecured creditors.

3            To be a little more granular about that, of that

4    amount, approximately 95 million went to the funded debt

5    classes at EFH, specifically classes A4, A6, A7.  Elliott is

6    the largest holder in those three classes.  And

7    additionally, approximately 780 million dollars went to the

8    unsecured funded debt classes at EFIH, that's classes B5 and

9    B6.  And Elliott is the largest holder in those classes as

10   well.

11           We -- in our -- when we met with NextEra counsel

12   earlier this week, they specifically asked how much money

13   does Elliott get?  That was a question that they posed,

14   because we reported that -- maybe not this level of

15   granularity, but we gave them the rough numbers of this is

16   what's left in the estate.

17           Based on our understanding using an Elliott 2019

18   statement that was filed in April of 2018, so in other

19   words, based on their represented holdings in various

20   classes at that time, the plan administrator's rough math is

21   that Elliott received approximately 58 million dollars out

22   of EFH, and 574 million dollars out of EFIH.  I provide that

23   for context and in direct response to a question that had

24   been asked by NextEra counsel.  But that's based on, Your

25   Honor, information that we had available to us during our

1   distributions and the position that Elliott had back at that

2   time.

3          So, we provide that background and that kind of

4   state of affairs because we think that informs next steps.

5   And specifically, Your Honor, if the administrator, if Mr.

6   Horton tries to figure out what to do with the remaining

7   assets it has, and how to address the outstanding issues

8   that may be presented in front of Your Honor before we go

9   into what is undeniably the most expensive thing poss --

10  aspect of a dispute resolution, which would be fact

11  discovery and fact gathering with regards to whether there

12  is an allowed administrative claim for NextEra, we think

13  it's appropriate for the parties to consider two topics and

14  that -- and address two issues that kind of a threshold

15  phase.  The first is whether there's an ability to just

16  gorge distributions from unsecured creditors.  This -- three

17  years after emergence.

18          And if so, what -- to whom does debt reg belong,

19  and what limits, if any, are -- should be opposed on that?

20  We don't generally, what the law is with regard to

21  disgorgement, we know that there are factors that the Court

22  would take into consideration and that there's some

23  discretion involved, but as Your Honor probably recalls and

24  you know you have a lot on your plate, the ability to

25  exercise these remedies is a serious question here, because

1    as Your Honor recalls, the plan is predicated on a number of

2    key zones.  Some of those affect unsecured creditor

3    distribution, including the recovery on the amount of the

4    TCEH settlement claim, as that term is used in the plan, and

5    recovery to non-qualified beneficiaries.

6             And yeah, I would -- I, just to be candid, Your

7    Honor, with regards to disgorgement and addressing how that

8    may or may not work, there could be some real significant

9    implementation issues and execution issues on that.  So,

10   that is a key question, is disgorgement available, and if

11   so, and the -- how?

12            And then, I think also, and the question may be

13   whether are -- any remedies are available to NextEra at this

14   time in its collection efforts, is there an equitable

15   movements question as well?  And I put that to the party as

16   recognizing there is law in this area and equitable

17   (indiscernible) in this Circuit and in others, but there are

18   -- recognizing these are settlements that have occurred,

19   there may be some issues there as well that need to be

20   addressed by the Court.

21            But Your Honor, given the minutest levels of cash

22   that remain, that -- in the accounts of the Plan

23   Administrator Board three years after the effective date, as

24   we try to fashion what would be potentially a path forward,

25   to us, addressing the questions of a disgorgement remedy and

1    how that may work, I think provides the best insight before

2    a party starts marking down some broad-brush litigation

3    paths.

4            THE COURT:  Well the plan is a final -- the

5    confirmation order is the final order, correct?

6            MR. MCKANE:  Absolutely, Your Honor.

7            THE COURT:  Okay.

8            MR. MCKANE:  And Your Honor, I would be remiss if

9    I didn't say -- in noting that when we -- you may recall

10   post-effective date in response to motions practiced which

11   regards to distribution, there are actually additional

12   orders that have been entered addressing whether there

13   should be distributions, and there -- and there -- orders

14   direct the PAB, to make certain distributions.

15           THE COURT:  Okay.  All right, this is very

16   helpful.  Thank you for the update.  I was not aware -- I

17   don't read the quarterly reports unless I have to, so I was

18   not aware of the exact situation, so that's very helpful.

19           MR. MCKANE:  Your Honor, you're not alone, and if

20   we could count page views on that download, I don't think

21   the quarterly reports are heavily downloaded or reviewed in

22   these cases.  But they're pithy, they're only two to three

23   pages.

24           THE COURT:  Okay.  Let's see, let me hear from Mr.

25   Galardi.

1           MR. GALARDI:  Your Honor, the only two things I

2      would add is what I think you touched on at the end.  As

3      Your Honor may recall, there was a reserve for the 275

4      million dollars that was subject to a post-confirmation

5      motion and Your Honor directed the -- that money be

6      distributed, and it was, as we all know, it's not an

7      authorized and directed, because the trustees who are

8      represented on this call, and I do represent UMB, wanted an

9      order that would authorize and direct them to make

10     distributions to unsecured creditors.

11          Your Honor struck the 14-day appeal period to make

12     it go effective 21 days on the distribution of 275 million

13     dollars, and I'm just doing this for emphasis as to what has

14     happened.  That order was subject to contested matters, that

15     order was appealed, and NextEra did drop the appeal of that

16     order, having not requested a further reserve.

17          So, that's another final order I just wanted to

18     bring to Your Honor's attention, because we do agree and

19     we've talked with Mr. McKane that we think those are the

20     threshold issues here before you even get to further

21     discovery on 503B1 which we believe would be expensive in

22     itself.  And take a lot of time.

23          THE COURT:  Okay, thank you.  Anyone else -- I'm

24     going to turn to NextEra last, but anyone else wish to be

25     heard before I ask to hear from NextEra?  Okay.  I'll hear

1    form NextEra.

2          MR. BONNER:  Good morning, Your Honor, my name is

3    Jim Bonner, I represent NextEra along with my co-counsel,

4    Keith Fleischman.  Thank you for giving us the opportunity

5    to address the Court this morning about these important

6    issues.

7          The Third Circuit, of course, has said that we may

8    indeed have a right to the payment of our administrative

9    claim, and the Court's right to focus on what the next steps

10   are.  In our estimation, the next steps are discovery that

11   both Mr. McKane and Mr. Galardi have referenced this

12   morning.  Rather than it being exhaustive, it's our

13   intention to try to make that as targeted as possible to

14   serve everybody's desire to resolve this case in as

15   expeditious a manner as possible.

16         We've already started drafting that discovery, we

17   intend to serve it -- the written request early next week,

18   and to work with counsel to try to work out a schedule that

19   does bring this case to a resolution as quickly as possible.

20   It -- of course we did know that money had been distributed

21   and that there was a relatively small amount of money left

22   in the plan at this point in time.

23         Importantly, however, Your Honor, there are two

24   million dollars that are left in the plan, no one's offered

25   that to us, but we have every intention to show our

1   entitlement to the payment of that, and while it's a

2   relatively small percentage of NextEra's overall claim, the

3   Court certainly has to adjudicate who has the right to that

4   two million dollars.

5         On top of that, I think my colleagues have matters

6   exactly backwards when they say that we should run -- to

7   figure out what are the various sources of recovery that we

8   could have after NextEra establishes its entitlement to the

9   payment of its administrative expenses.

10         Of course, the normal course of events is for a

11   party to prove its entitlement to a recovery before anyone

12   addresses whether they're a liquid party from which to --

13         THE COURT:  I mean, (indiscernible), but I mean if

14   there's no money to be had, there's no point to spending

15   money to get a -- I guess prove a point if you're NextEra by

16   getting the allowed claim that would never get paid.

17         MR. BONNER:  Fair point, Your Honor, but again, I

18   think it's important to note that there are over two million

19   dollars in --

20         THE COURT:  But they're going to spend that

21   defending against you.  So, there won't be two million

22   dollars left.  If it costs two million dollars to litigate,

23   there'll be zero.

24         MR. BONNER:  Well, I'm a small firm, Your Honor,

25   and we don't have the resources to spend two million dollars

1    on this claim, so it's not our intention to have two million

2    dollars' worth of discovery conducted here, certainly.

3              THE COURT:  Well, but they're going to ask

4    discovery of you.  I mean, it's your burden.

5              MR. BONNER:  I understand that, Your Honor, and

6    so, we're certainly willing to shoulder that burden in order

7    to show that our entitlement to this money -- and not as an

8    empty exercise, Your Honor, I think as Mr. McKane suggested

9    in his remarks, the Third Circuit has spoken to this issue

10   in the Tribune Media case.

11             It said that when we have a situation where a

12   group of creditors has been overpaid as a result of a

13   mistake that was made that was reversed on appeal, we can

14   have disgorgement from those creditors, and this is clearly

15   a situation in which Elliott was the moving force behind --

16             THE COURT:  But that was an appeal of the

17   confirmation order.

18             MR. BONNER:  Right, Your Honor.

19             THE COURT:  Totally different.  Completely

20   different.

21             MR. BONNER:  I respectfully disagree, Your Honor.

22             THE COURT:  Fair enough.  Fair enough.

23             MR. BONNER:  In addition to that, at the point in

24   time in which Elliott opposed the stay that was requested of

25   the reconsideration order, it acknowledged in its own papers

1    that there was a right to disgorgement, and that as a

2    result, according to Elliott, there was no need for the stay

3    that NextEra had requested because there were remedies

4    available to it, even if the money was distributed.

5           So, at this point we've got a flip flop by

6    Elliott, we have a situation where there's two million

7    dollars left in the estate, they're clearly, even according

8    to Mr. McKane are situations in which there's disgorgement

9    allowed in these circumstances, and as a result, Your Honor,

10   I think the proper way to approach this case is to allow us

11   to conduct the targeted discovery that we need, have a

12   hearing, determine what the amount of NextEra's allowed

13   claim is, and then we can address the remedies, which

14   naturally in the Court of litigation follow the

15   establishment of the claim.

16          THE COURT:  All right, I understand, Mr. Bonner.

17   Thank you.  Let's make sure you don't submit discovery or

18   sort of start this ball rolling until we actually get the

19   remand, because I don't have -- I mean, we're all having

20   this conversation, actually right this second I don't have

21   jurisdiction over this issue.  So, we have to wait for

22   remand.

23          MR. BONNER:  And just one more point, Your Honor.

24   To the extent that the --

25          THE COURT:  And actually -- well, let me

1    interrupt.  I don't want discovery propounded until there's

2    a scheduling order in place.

3              MR. BONNER:  Absolutely, Your Honor.  Of course.

4    There's no reason why the parties can't walk and chew gum,

5    Your Honor, to the extent that the plan or Elliott which is

6    to submit a motion say that there's no practicality in

7    moving forward here, there's no reason why we can't go

8    through the preliminary steps of serving the discovery,

9    starting that process, collecting the targeted documents

10   that we're going to request, while at the same time they

11   file whatever motion they want to, akin to a motion to

12   dismiss early in the litigations so that they can have this

13   issue that they're raising here considered by the Court

14   while we're simultaneously pursuing discovery.

15             As Your Honor has suggested, this case is rather

16   old, vintage at this point in time, and there's no reason to

17   slow down the process of accepting the value of NextEra's

18   claim in order to run to the end of this case and say where

19   is the money going to come from?

20             THE COURT:  Well, I think the Third Circuit made

21   it pretty clear that motion to dismiss would not be the path

22   for this Court to take, so I'd be very reluctant to do that.

23             MR. MCKANE:  Your Honor, for --

24             THE COURT:  Has anyone -- yeah, Mr. McKane --

25   well, yeah, go ahead, Mr. McKane.

1            MR. MCKANE:  Yeah, just a couple points, and I'd

2     be remiss in noting two things.  One, it's less than two

3     million dollars at this point, and that two million dollars,

4     there are other claims, even if we're talking about the cost

5     of litigation that we need to satisfy with that two million

6     dollars, there are vendor -- we have disputes with vendors

7     that we're trying to resolve as well, so I'd just flag that.

8            I also -- I recognize counsel is relatively new to

9     the case.  Based on -- I'll just say this.  Based on our

10    discussions with them to date, we would strongly urge them

11    to speak with their client and NextEra's former counsel at

12    the (indiscernible) to make sure that they have the

13    underlying factual understanding of all the things that

14    preceded so that the PAB and others, if we find ourselves in

15    discovery aren't re-educating unnecessarily new counsel to a

16    situation where NextEra has been involved for many, many

17    years.

18            And then, with regard to whether there's a

19    disgorgement right or not, we are not saying whether there

20    is or is not under these circumstances.  We think these

21    facts need to be fleshed out and presented so there can be a

22    discussion on those issues, 'cause as we said, we're just

23    trying to be practical with the resources we have.  Are we

24    trying to resolve?  Are we -- is there -- this a litigation

25    issue, is this a settlement issue, the administrator is

1    trying to figure out what to do with its limited resources.

2    And that's the driver here.  And so, we're happy to address

3    the issues, but it is not lost on us that there is some

4    (indiscernible) that we need to develop and present it to

5    Your Honor in a reasonable way and consistent with what

6    we've done in so much of this case, we have learned of the

7    importance of having a scheduling order, and so, Your Honor,

8    we'd ask that once a remand come to place you allow the

9    parties to meet and confer further, and then present our --

10   if necessary, if we can't get to a consensual resolution

11   (indiscernible) scheduling orders and allow Your Honor to

12   direct us on a path forward.

13             THE COURT:  Yeah, we're definitely going to go

14   with a scheduling order, keep a lid on the cost of belated

15   discovery, but if the discovery right is the right and it'll

16   happen if necessary, I hesitate to broach the M word, but

17   has anyone considered mediation to try to resolve this

18   issue?  People may not be -- mediation can be too soon and

19   it can be too late, and it just might be too soon in this

20   particular instance, but maybe not, so I just sort of throw

21   that out there.  Unfortunately, Richards is involved, so the

22   best mediator in Delaware is unavailable, but -- and that's

23   former Judge (indiscernible), but there are wonderful

24   mediators out there, but they're not free, either.

25   Nothing's free except talking to me.

1          MR. MCKANE:  And we appreciate your service, Your

2     Honor.  The administrator has discussed the issue of

3     mediation.  It may be -- we don't want to say it's too soon,

4     'cause it's very hard to say anything in (indiscernible) at

5     this point is too soon.  But there -- we do want to make

6     certain that both -- we see the world the same way before we

7     reach out and potentially expend those resources.

8          MR. GALARDI:  Yeah, and Your Honor, I'll just add,

9     and obviously this is a status conference, not a place to

10    have an argument with respect to this Court's

11    (indiscernible) going to be thrown out, the timing, there

12    are a lot of facts, that again, I would have the record and

13    the chronology will be put before Your Honor at appropriate

14    times with respect to those statements, as you said, the

15    plan confirmation, the actual order, allowing and directing

16    the distributions of 275, so hopefully we believe there are

17    threshold issues, I won't say on a motion to dismiss, but I

18    will say there are threshold legal issues that we think

19    we'll bring to the Court very soon after the mandate is

20    issued.

21          THE COURT:  All right.  Well again, let's proceed

22    in an orderly way, if at all possible.

23          MR. GALARDI:  We agree.

24          THE COURT:  Yeah.  Well, look, there's a limited

25    amount of money in the estate, or what's left post-

1   administration -- whatever, the trust.  Obviously, if you're

2   talking about money ahead of that or beyond that, we know

3   who the target is, obviously, the big fish is

4   (indiscernible) Elliott, and I don't expect, frankly, that

5   they would be in the mood to start handing money back on

6   their return in this matter, especially since it's been so

7   long, but it'll be what it'll be.  This is very helpful for

8   me, thank you.

9            So, let's wait for the remand, I guess -- well, I

10  won't ask.  Never mind.  Let's wait for the remand and then

11  the parties can discuss a scheduling order, if you want

12  another status conference anytime, not a problem, happy to

13  put it -- it's actually so much easier now with the Zoom, it

14  doesn't mat -- it doesn't cost what it used to cost to fly

15  people in from all over the creation, so, we'll thread

16  something together real quick and I can -- we can have --

17  discuss this further and if you can't reach an agreement on

18  scheduling orders, you just want to submit dueling

19  scheduling orders, I do that a lot.  That's fine, just do

20  that under certification of counsel, your local counsel, Mr.

21  Bonner we'll be able to let you know how that goes.

22           I think it's Mr. (Maguire), I saw him here.  Yup,

23  there he is, so he knows what he's doing, he'll help you out

24  on that.  Any questions before we adjourn?  Good to see all

25  of you.  Everybody looks older except for Ms. Yenamandra.

1    And Ms. Earle, excuse me.  And Ms. Earle.  All right.  And

2    Ms. (indiscernible), I've got to be careful here, I don't

3    want to get in trouble.  I'm already in trouble.  All right,

4    thank you very much, we're adjourned.

5              MR. MCKANE:  Thanks, Your Honor.

6

7    (Whereupon these proceedings were concluded at 10:25 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 23

1                   C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature: Sonya U. Ledanski Hyde]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date: March 29, 2021